IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

                             Plaintiff,

     v.                                         OPINION and ORDER

REED C. WIDEN, MICHAEL
KIESLER, WIDEN ENTERPRISES, LLC,              22-cv-400-jdp
AND WINDY WATERS, INC.,

                        Defendants.

Faced with financial difficulties, plaintiff Stacy Randall sold her 20% ownership interest in her family's company for $1.3 million in May 2020. Less than 15 months later, her brother, Reed Widen, and a corporate officer, Michael Kiesler, sold the company for $162 million. Randall estimates that she would have received $32 million had she not been deceived into selling off all of her shares. She contends that Reed and Kiesler had been keeping her in the dark about the company's operations for years, funneled millions of dollars in dividend payments to Reed disguised as salary and bonuses, and then concealed material information and lied to convince her to sign the stock redemption agreement under artificially tight deadlines. Defendants say her case is nothing more than seller's remorse.

Randall asserts 15 claims alleging violations of federal and state securities laws and state common law. Defendants move to dismiss all of Randall's claims under Federal Rule of Civil Procedure Rule 12(b)(6). For the reasons explained below, the court will deny defendants' motion.

ALLEGATIONS OF FACT

In considering a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The court draws the following facts from Randall's complaint and the documents attached to it.

**A.  Corporate history**

Randall's grandparents founded Widen Enterprises, LLC in 1948 to manufacture films and plates for printing. Over time, Randall's grandparents gifted small amounts of stock in the company to Randall and her four brothers—Tyler, Stewart, Price, and Reed. Randall's father, Mark, eventually inherited ownership of the company.

In 1997, Mark created Windy Waters, Inc. as a holding company to own Widen Enterprises. Randall and the other shareholders traded their shares of Widen Enterprises for shares of Windy Waters. The shareholder agreement governing Widen Enterprises was amended in 2001 to apply to Windy Waters, which had no operations of its own. When Mark died in 2002, Randall and her brothers became the sole shareholders in Windy Waters in equal amounts.

**B.  Reed Widen asserts control over the companies**

Over time, Reed consolidated his brothers' ownership interests in Windy Waters in transactions that he kept private from Randall. Reed also secretly transferred shares to various corporate executives, including Kiesler, the longtime chief financial officer of Widen Enterprises and treasurer of Windy Waters. Eventually, Reed came to own nearly 80% of Windy Waters, with Randall owning approximately the remaining 20%.

Reed served as the president and chairman of the board of Widen Enterprises for many years. He also acted as the de facto executive officer of Windy Waters, unilaterally directing the company's policies and actions by signing corporate documents as "shareholder." Around 2006, Reed hired a chief executive officer (CEO) who transformed Widen Enterprises into a software-based marketing technology company, specializing in digital asset management and product information management. By 2020, Widen Enterprises had revenues of approximately $30 million.

Windy Waters received distributions from Widen Enterprises as its sole shareholder. It held these funds in investment accounts in the form of cash and marketable securities. Other than a single dividend in April 2016 and small dividends to cover each shareholder's tax liability, Reed did not pay any official dividends to the shareholders of Windy Waters. But he paid himself a $1 million annually plus additional bonuses through Widen Enterprises, even though he worked less than full time and Widen Enterprises employed a full-time CEO.

## C. Randall excluded from corporate governance and affairs

Randall, who has only a high-school education, was nominally a director of Windy Waters. She was never an officer or regular employee of either Widen Enterprises or Windy Waters.

Randall never received any information about the companies' financial, operational, or strategic matters from Reed, Kiesler, or anyone else. When Randall asked Reed about the companies, he brushed her off. Randall was afraid of Reed's temper and had learned not to ask him questions.

When Reed needed the board of directors to take action, he occasionally told Randall that he needed her signature. But more often, Reed and Kiesler simply forged Randall's

signature on corporate documents using a rubber signature stamp without Randall's knowledge or consent. Kiesler had previously convinced Randall to permit him to create this stamp to be used only with her express permission when Randall lived in Florida between 2001 and 2013. But Kiesler (and presumably Reed) continued to use the stamp without Randall's knowledge or consent after she returned to Wisconsin in 2015.

**D. Randall sells her entire interest in Windy Waters**

In May 2020, Randall was going through a divorce and needed about $100,000 for living expenses and to pay her divorce attorney. She had previously sold small portions of her stock in Windy Waters when she needed cash. So she approached Reed for help. On May 5, Reed told Randall that her timing was unfortunate because the companies "had a Covid problem." But he suggested that an option might be available through Millmont, a family-owned real estate holding company.

Kiesler called Randall on May 6, 2020, to tell her that Windy Waters and Widen Enterprises could not afford to pay her even $50,000. No one told Randall that Windy Waters had over $5 million in cash and liquid securities and that Widen Enterprises's projected revenue was $30 million. Kiesler said the only way Randall could get any cash from the companies was to sell her entire interest in Windy Waters for $1.1 million. Kiesler assured Randall that the price was fair because he had used the same method to value the stock as when the companies had bought out her brothers' stock many years earlier. He gave Randall three hours to decide. Kiesler kept Reed apprised of these negotiations and confirmed that Reed wanted to purchase all of Randall's shares.

Randall did not call Kielser back. But a few minutes before the three-hour deadline ran, Kiesler called Randall to tell her that he had been given another three days for Randall to accept

the all-or-nothing offer. Randall stated that she would need to talk with her financial advisor and attorney. But she did not want to accept the offer, so she also let the three-day deadline lapse.

Kiesler called Randall again on May 13 to tell her that he and Widen Enterprises's CEO had come up with another $250,000, but Randall had to accept by the end of the day. Despite Randall's efforts, no one could provide her with legal advice before Kiesler's deadline lapsed. So Randall went to see Kiesler and asked him whether he and the corporate executives were planning to sell Widen Enterprises. Kiesler responded that there had been no talk of that. Without providing any further financial information or disclosure about the companies, Kielser handed Randall a stock redemption agreement and a promissory note in the lobby of Widen Enterprises. Randall signed both documents on the spot.

### E. Widen Enterprises sells for $162 million

In the beginning of September 2021, Reed called Randall to tell her that he had sold Widen Enterprises and was going to give her a gift of $1 million. Randall later learned that a third-party company had purchased Widen Enterprises on August 17, 2021, for $162 million—approximately 25 times the value implied by the purchase price under her redemption agreement.

Randall estimates that had she still owned the shares that defendants purchased from her, she would have received approximately $32 million in sale proceeds. Reed, who owned just under 70% of the companies at the time of the purchase, received over $100 million for his shares. Kiesler received over $12.3 million for his 8% interest in the companies.

The court will discuss additional facts in the analysis section of the opinion.

ANALYSIS

Randall brings three claims for securities fraud under federal law and seven state-law claims alleging securities and common law fraud, breach of fiduciary duty, unjust enrichment, civil theft, and minority shareholder suppression. In addition, she seeks a declaratory judgment that the redemption documents are unenforceable due to fraud, unconscionability, duress, or against public policy, and to pierce the corporate veil of Windy Waters and Widen Enterprises. Defendants move to dismiss Randall's claims on the following grounds: (1) the release provision in the redemption agreement bars all of Randall's claims; (2) Randall has failed to support her claims with sufficient factual allegations; (3) Reed and Widen Enterprises cannot be held liable for the acts of Kiesler; and (4) Randall lacks standing to assert a claim for minority shareholder oppression.

On a motion to dismiss, the question is whether Randall provided defendants with fair notice of her claims and alleged facts plausibly suggesting that she is entitled to relief. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020). The court concludes that Randall has met this standard with respect to all of her claims. The motion to dismiss will be denied.

**A.  Release of claims**

Defendants contend that all of Randall's claims are barred by the redemption agreement's provision releasing Windy Waters, Widen Enterprises, and all of their employees and directors from "any and all claims of any kind or nature, known or unknown, . . . including, but not limited to any claim arising from the sale and purchase of the Shares." Dkt. 1-1, at § 5. As defendants acknowledge in their reply brief, the release of a claim is an affirmative defense that should be raised in a motion for judgment on the pleadings under Rule 12(c). *See United States v. Rogers Cartage Co.*, 794 F.3d 854, 860 (7th Cir. 2015); *Oliver v. Jess*, No. 20-cv-1069,

6

2021 WL 2533508, at *1 (E.D. Wis. June 21, 2021). But defendants argue that their failure to use the correct procedure is harmless because all the facts necessary to rule on the affirmative defense are properly before the court. *See Rogers Cartage*, 794 F.3d at 860 (discussing harmless error standard). The court disagrees.

Randall correctly points out that a contract, including one containing an integrated release, is void if it was induced by defendants' fraudulent or material misrepresentations and omissions, on which she justifiably relied. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014); *First Nat. Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 222-23, 293 N.W.2d 530, 538 (1980). In addition to her fraud claims, Randall is seeking declaratory judgments that the redemption agreement is unenforceable due to fraud, unconscionability, duress, and public policy.

Defendants argue that Randall has not pleaded fraud with sufficient particularity, the misrepresentations and alleged omissions that Randall identifies are not false, and Randall has not shown justifiable reliance. But these arguments are unpersuasive for the reasons discussed below.

**B. Sufficiency of Randall's allegations**

**1. Securities fraud (claims 1-3 and 5)**

**a. Relevant statutes**

United States Securities Exchange Commission (SEC) Rule 10b-5 prohibits the following in connection with the purchase or sale of any security: (a) using any device, scheme or artifice to defraud; (b) making an untrue statement of material fact or omitting a material fact necessary in order to make a statement not misleading; and (c) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit. 17 C.F.R.

§ 240.10b-5(a)-(c) (promulgated under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)). The Exchange Act also provides for secondary (or controller) liability by making "[e]very person who . . . controls someone liable for fraud is jointly and severally liable "with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Randall asserts claims against all defendants under each subsection of Rule 10b-5 (claims 1 and 2) and a claim for controller liability against Reed (claim 3).

Randall also asserts a claim under the Wisconsin Uniform Securities Act, Wis. Stat. § 551.501 (claim 5). Defendants acknowledge that this statute parallels the language of Rule 10b-5 and federal case law addressing Rule 10b-5 is persuasive authority. *See State v. Evans*, 617 N.W.2d 220, n.2 (Wis. Ct. App. 2000) ("[W]here a state rule mirrors the federal rule, we consider federal cases interpreting the rule to be persuasive authority."). So I will not separately address the state statute.

### b. Pleading requirements

In a typical private action for securities fraud, a plaintiff must establish: (1) a deceptive or manipulative act, material misrepresentation, or omission by defendants; (2) a connection between defendants' action, misrepresentation, or omission and the purchase or sale of a security; (3) scienter; (4) plaintiff's reliance on the act, misrepresentation, or omission; (5) economic loss; and (6) loss causation.[1] *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

---

[1] To succeed on her claims, Randall will have to show both "loss causation," which means that she would not have suffered a loss if the facts were what she believed them to be, and "transaction causation," which means that she would not have signed the redemption agreement had defendants not acted deceitfully. *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir. 1988) (holding appropriate inquiry is whether information disclosed or withheld affected the investment decision).

Because Randall is alleging fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires that she "state with particularity the circumstances constituting fraud," which includes describing the "who, what, when, where, and how" of the fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). In addition, Randall's federal claims are subject to the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b), which requires a complaint to:

1) Specify each misleading statement and omission, the reason why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, all facts on which that belief is formed. *Id.*, § 78u-4(b)(1).

2) Allege "facts giving rise to a strong inference that [defendants] acted with the required state of mind," for each alleged act, misstatement, or omission. *Id.*, § 78u-4(b)(2)(A).

3) Plausibly allege that defendants' acts, misstatements, and omissions caused plaintiff's loss. *Id.*, § 78u-4(b)(4).

Defendants' arguments with respect to Randall's statutory securities fraud claims focus on whether Randall adequately alleged deceitful acts and misleading statements and omissions with the requisite scienter and reliance.[2] But as discussed with respect to each element below, Randall's complaint contains a cohesive story that explains clearly, logically, and in detail the circumstances constituting the alleged fraud.

### c. Alleged misrepresentations and omissions

Defendants argue that Randall has not identified any actual misrepresentations or omissions and instead bases her Rule 10b-5(b) claim on "changes in future circumstances— most particularly, the sale of Widen Enterprises." Dkt. 13, at 16. But Randall has identified

---

[2] Defendants' additional argument that Randall has not stated such claims against Widen Enterprises will be addressed in a separate section below.

19 categories of misrepresentations and omissions that were material to the sale of her remaining shares of Windy Waters. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (Material facts are those "viewed by the reasonable investor as having significantly altered the total mix of information made available."). Specifically, Randall alleges that Kiesler made the following misleading statements in May 2020:

(1)   The only way for Randall to obtain cash through the companies was a complete redemption of her interest, even though other means were available through Millmont, a loan, or her share of the dividends Reed had been receiving.

(2)   The companies could not financially afford to make even $50,000 available to Randall other than through a complete redemption, even though the companies were flush with cash.

(3)   Randall's interest in the companies was worth only $1.3 million (and by inference, Windy Waters was worth only $6.5 million), even though defendants knew that Windy Waters had that amount of cash on hand and held an even more valuable asset, Widen Enterprises.

(4)   Randall had to make her decision in three hours, then three days, then one day, because of Covid, even though it would have been possible for defendants to give her time to retain independent counsel and advice.

(5)   There had been no talk of selling the companies as of the redemption, even though Reed had made statements to third parties to the contrary.

(6)   Randall would be smart to sell her shares to avoid the risk that the companies would fail or become insolvent, even though Kiesler knew that Widen Enterprises was financially sound and profitable and did not actually believe it was at risk of insolvency or failure.

Dkt. 1, at ¶ 214. Randall also alleges that defendants did not disclose the following material information:

(1)   As of the end of April 2020, the companies had over $5 million in free cash either sitting in bank accounts or speculatively invested in liquid securities.

(2)   During 2019, the companies had revenue of nearly $30 million and were profitable.

10

(3)   At the time of the redemption, the companies were projecting annual revenue of $30 million, which represented an 11% growth in the core software-based revenue.

(4)   The valuation formula defendants were using was not based on an actual appraisal of the companies' fair market value, was not required by any shareholder agreement, and completely ignored the actual value of Windy Waters' most valuable asset, Widen Enterprises.

(5)   The fair market value of software companies like Widen Enterprises is commonly determined by a multiple of the company's revenues and not its earnings before interest, taxes, depreciation, and amortization (EBITDA).

(6)   Defendants regularly received solicitations and offers relating to the potential purchase of the companies.

(7)   The companies recently signed a non-disclosure agreement with an international investment bank specializing in selling technology companies.

(8)   Reed had been considering selling the companies prior to the redemption.

(9)   Reed knew as recently as three months before the redemption that the companies were worth over $100 million.

(10)  Reed had just taken annual compensation of nearly $1.5 million from Widen Enterprises.

(11)  Randall was entitled to her share of millions of dollars in profits that the companies had been distributing to Reed as salary and bonuses, which would have negated her need for the money in the first place.

(12)  It would have been possible for Millmont to partially redeem Randall, or to distribute or loan cash to Randall, as Reed originally suggested.

(13)  Reed and Kiesler forged Randall's signature on corporate documents using the rubber stamp, kept her uninformed about corporate actions, and purported to waive rights on her behalf.

*Id*., at ¶ 215.

Defendants argue that they had no duty to offer Randall cash or a loan and did not affirmatively demand that Randall sell her shares. But that is beside the point. Randall is alleging that she never would have agreed to the redemption agreement had defendants not

lied to her and withheld key information about the real value of the companies and her ownership benefits.

Defendants list a number of reasons why the statements that Kiesler made to Randall were true or should not have mattered to Randall. *See* Dkt. 12, at 18-21. For example, they contend that it is not plausible to infer that the companies were flush with cash because the $5 million that Windy Waters had in operating capital represented only two months of revenue for Widen Enterprises and the Covid pandemic already was negatively affecting the economy. They argue that they fairly calculated the redemption value of Randall's shares using the same method they had used for all of her and her brothers' prior stock redemptions. Defendants also point out that Kiesler's statement that Widen Enterprises might not be around in a few years is true of any business. But these arguments either rely on information outside the pleadings or involve factual disputes that are not appropriately resolved on a motion to dismiss.

Defendants attempt to refute Randall's allegations that Reed and Kiesler had been contemplating selling the companies prior to the 2020 redemption by pointing to the Widen Enterprise sale documents attached to Randall's complaint. *See* Dkt. 1-8 and 1-10. They say that Widen Enterprises's January 2021 contract for merger and acquisition advisory services makes clear that no sale was imminent at the time Randall sold her shares. But even if this is true, it does not mean that Reed had not contemplated selling the company before May 2020. In fact, Randall alleges that Reed stated as early as February 2020 that he was considering selling Widen Enterprises because he could personally receive $80 million.[3] Dkt. 1, at ¶ 50.

---

[3] Defendants contend that this particular allegation lacks the specificity required under Rule 9(b) and the PSLRA because Randall fails to identify when, where, and to whom Reed made the statements. But as Randall argues, she is not alleging that Reed made false statements to third parties. Instead, Randall bases her Rule 10b-5 claims on Kiesler's assurances that there

Defendants also argue that Randall could have discovered all of the alleged misleading statements and omissions prior to the sale had she sought legal advice or simply asked to review the companies' financial information. *See Arber v. Essex Wire Corp.*, 490 F.2d 414, 420 (6th Cir. 1974) ("[A]n insider has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation, at least where that information is readily available."); *Scarabello v. Reichle*, 856 F. Supp. 404, 408 (N.D. Ill. 1994) ("Defendants failure to provide information regarding the value of AWVC's stock, at the time the Plaintiff expressed his desire to sell, does not constitute a material omission giving rise to fraud in the sale of securities."). But the cases on which defendants rely involve summary judgment or post-trial rulings citing evidence showing that the undisclosed information was readily available in financial statements that were provided to the plaintiffs. In this case, Randall has alleged that she was not provided with any financial statements and that defendants actively concealed material information from her. Moreover, Randall cites decisions from this circuit holding that a securities fraud plaintiff's inadequate inquiry or investigation did not relieve the defendant of its duty to disclose material information. *See Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990) ("The securities laws are designed to induce the person who possesses information to reveal it accurately. The obligation rests with the speaker, not with the listener."); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528 (7th Cir. 1985) ("[W]e will not establish a legal rule under which

---

had been no talk of selling the companies and defendants' failure to tell her otherwise. The court is satisfied that Randall's allegations regarding that misrepresentation and omission meet the heightened pleading standard.

investors must resort to the costly self-help approach of investigation on pain of losing the protection of the principal legal safeguard.").

In any event, whether Randall had a duty to investigate the financial health of the companies under the particular circumstances in this case is not a question to be resolved at the pleading stage. Randall has plausibly alleged that she relied on defendants' misleading statements and omissions.

### d.  Alleged scheme and deceptive acts

Randall also bases her Rule 10b-5(a) and (c) claims on allegations that Reed and Kiesler forged her signature on corporate documents, excluded her from shareholder and director meetings, and funneled millions of dollars in dividends to Reed disguised as compensation. Defendants argue that these actions had no connection to the May 2020 redemption because they all occurred before Randall sold her shares. But Randall plausibly alleges that these acts furthered and concealed defendants' fraudulent scheme because: (1) depriving Randall of dividends depressed the value of the stock to her, making it more likely that she would be willing to part with it for a low offer; (2) forging Randall's signature and excluding her from meetings kept Randall in the dark about the true value of the companies; and (3) Reed's willingness and ability to take $1 million in annual compensation for part-time work demonstrates that defendants did not believe their representations about the companies' financial instability and low value.

As they did with the misrepresentations and omissions, defendants fault Randall for not taking measures to protect her interests as a shareholder. Defendants say that Randall approved the rubber stamp and did not restrict its use, that she did not request access to any financial information, and that she did not question whether compensation or dividends were paid to

14

Reed. But Randall alleges that Reed avoided her questions about the company and that the signature stamp was to be used only with her express permission when she was living in Florida between 2001 and 2013. Moreover, if Randall's allegations about Reed's and Kiesler's deceit are true, it is unlikely that more in-depth questioning would have stopped them. So Randall's allegations regarding defendants' misdeeds in furtherance of the fraud are sufficient to state a claim. Defendants will have the opportunity to challenge Randall's allegations and present contrary evidence in support of their defense at summary judgment or trial.

### e. Scienter

Randall must do more than tell a plausible story about defendants' intent; she must "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007)).

Randall alleges that scienter for defendants' deceitful acts can be inferred from the following:

(1) Reed, Kiesler, and Windy Waters stood to reap a windfall from the redemption in direct proportion to the amount they underpaid Randall.

(2) Defendants knew the price they paid Randall in the redemption was grossly unfair and possessed nonpublic information demonstrating the same, which they kept from Randall.

(3) Defendants made material misrepresentations and omissions to Randall regarding the redemption.

(4) Defendants imposed artificial deadlines upon Randall and did not provide her the redemption documents in advance to pressure her into accepting the redemption without legal advice.

(5) Defendants included self-serving release language in the redemption documents when such language was not included in prior partial redemptions from Randall.

(6)  Defendants selectively employed unambiguously nonapplicable language from the Windy Waters shareholder agreement regarding the formula for valuing a shareholder's interest during a mandatory redemption, while failing to offer Randall the corresponding protections of the clawback provisions applicable to such redemptions.

(7)  Reed offered to pay Randall a $1 million gift after reaping a windfall through the redemption, evidencing his guilt.

(8)  Defendants forged Randall's signature to hide corporate actions and prevent Randall from obtaining information about the companies and her rights as a shareholder.

Dkt. 1, at ¶ 208.

Defendants present their own version of these events to defeat an inference of scienter, including: (1) defendants used the same valuation formula for all prior redemptions without objection—including all five of Randall's previous redemptions that predated May 2020; (2) the release language was mutual and had value to Randall because she was resigning as a director of the company; (3) Reed gave Randall the $1 million out of generosity to allow her to share in the sale proceeds; (4) Randall ignored the artificial deadlines, which defendants did not enforce; (5) Randall admittedly knew she had to seek legal and financial counsel but did not do so; and (6) defendants' decisions reflected sound business judgment in an effort to preserve operating capital in the midst of economic uncertainty during a global pandemic. But Randall's alleged inferences of scienter are at least as likely as any of defendants' opposing inferences, particularly when considered in conjunction with the alleged misrepresentations and omissions made at the time of the negotiations. Moreover, many of defendants' arguments impermissibly rely on evidence outside the pleadings and will need to be resolved on summary judgment or at trial.

### f. Controller liability

Defendants' only argument with respect to this claim is that it is derivative of Randall's Rule 10b-5 claims. The court has concluded that Randall stated plausible claims for relief under Rule 10b-5(a)-(c). So defendants' argument fails.

### 2. Common law fraud (claim 4) and civil theft (claim 8)

Randall relies on the same misrepresentations and omissions in asserting state-law claims for intentional misrepresentation and civil theft. The elements of these claims are similar to those of securities fraud. *See Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶¶ 12-13, 283 Wis. 2d 555, 569-70, 699 N.W.2d 205, 211-12 (plaintiff must allege defendants knowingly or recklessly made untrue factual representation or failed to disclose a fact with the intent to defraud, and plaintiff relied on it to her detriment); Wis. Stat. § 943.20(1)(d) (crime to obtain "title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made").

Defendants argue that Randall's intentional misrepresentation and civil theft claims fail for many of the same reasons as her Rule 10b-5(b) claims: Randall failed to plead fraud with particularity, defendants did not make any false statements or omit material information, Randall did not adequately investigate the companies' financial health, and defendants did not have a duty to disclose any additional information under the circumstances.[4] But the court has

---

[4] In Wisconsin, a defendant has a duty to disclose a fact in a business transaction when: (1) the fact is material to the transaction; (2) the defendant knows the plaintiff is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of defendant, and plaintiff could not reasonably be expected to discover it; and (4) on account of the objective circumstances, plaintiff would reasonably expect disclosure of the fact. *Kaloti*, 2005 WI 111, at ¶¶ 16-17.

rejected these grounds for dismissal for the reasons stated above. Defendants' additional arguments that Reed and Widen Enterprises cannot be held liable for misrepresentation or civil theft will be addressed below.

### 3. Unjust enrichment (claim 7)

Randall asserts a claim for unjust enrichment against Reed, Kiesler, and Windy Waters. This claim has three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had an appreciation or knowledge of the benefit; and (3) the defendant accepted or retained the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. *Buckett v. Jante*, 2009 WI App 55, ¶ 9, 316 Wis. 2d 804, 812, 767 N.W.2d 376, 380.

Defendants seek dismissal of the claim under the general principle that the doctrine of unjust enrichment does not apply when the parties have entered into a contract. *See Meyer v. The Laser Vision Inst.*, 2006 WI App 70, ¶ 22, 290 Wis. 2d 764, 779, 714 N.W.2d 223, 230. But as discussed below, Randall alleges facts suggesting that the redemption agreement is void and unenforceable. Until the validity of the redemption agreement is decided, it is premature to decide whether the contract bars the unjust enrichment claim.

Defendants also argue that Randall cannot resort to an equitable remedy when she has a legal remedy. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 520 (7th Cir. 2021). But Randall says that defendants could be liable for unjust enrichment even in the absence of fraud. She argues that she has pleaded unjust enrichment in the alternative, as she is entitled to do under Federal Rules of Civil Procedure 8(d)(2) and (3). In reply, defendants point out that Randall also has asserted other related claims that may provide her with legal remedies. *See id.* ("Allowing a double recovery for [] intertwined claims may itself be inequitable.").

Defendants may be correct that the unjust enrichment claim will be unnecessary or be precluded by Randall's other available legal remedies. But summary judgment is the appropriate stage to resolve that issue. For now, the court will deny defendants' motion to dismiss on this ground.

### 4.  Civil conspiracy (claim 10)

In Wisconsin, a civil conspiracy is "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, ¶ 168, 285 Wis. 2d 236, 324, 701 N.W.2d 523, 566 (citation omitted). Randall cannot bring a cause of action for conspiracy alone, but she can seek "damages caused by acts pursuant to a conspiracy." *Onderdonk v. Lamb*, 79 Wis. 2d 241, 246, 255 N.W.2d 507, 509 (1977) (citations omitted). To do so, she must show "some agreement between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1078 (E.D. Wis. 2014).

Defendants argue that they cannot be held liable for conspiracy because they are protected by the intra-corporate conspiracy doctrine, which provides that corporate officers acting within the scope of their employment cannot conspire with one another or with the corporation. *Id.* (explaining that officers' acts are acts of the corporation, and corporation cannot conspire with itself). As discussed further below, Randall has alleged that Kiesler and Reed acted as agents of Windy Waters and Widen Enterprises and that Reed had actual or apparent authority over Kielser. If this is true, the intra-corporate conspiracy doctrine may preclude Randall from seeking damages against defendants under a conspiracy theory. But to the extent that defendants argue that Kiesler's conduct cannot be attributed to Reed or the

corporations, the intra-corporate conspiracy doctrine would not apply. So resolution of this issue is more appropriate at summary judgment or trial.

### 5. Requests for declaratory judgment (claims 11-14) and veil piercing (claim 15)

Randall asserts separate claims for a declaratory judgment that the redemption documents are void and unenforceable for a variety of reasons and for piercing the corporate veil to hold Reed personally liable. Defendants oppose these requests, citing many of the same arguments that they raise in conjunction with Randall's other claims. But a declaratory judgment and veil piercing are remedies for an underlying cause of action; they are not separate, substantive claims for relief. *See Medical Assur. Co., Inc. v. Hellman*, 610 F.3d 371, 377 (7th Cir. 2010) ("[A] federal court applying the Declaratory Judgment Act must evaluate the parties' rights based on the same body of substantive law that would apply in a conventional action"); *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) ("Piercing the corporate veil, after all, is not itself an action; it is merely a procedural means of allowing liability on a substantive claim."). It is premature at this stage for the court to determine the appropriate remedy.

To the extent that defendants argue that Randall failed to adequately plead unconscionability, duress, and public policy as affirmative defenses to enforcement of the release clause in the redemption agreement, that argument is unpersuasive. The elements of these defenses are similar. Unconscionability generally refers to "an absence of meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other party." *Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶ 27, 259 Wis. 2d 587, 609, 657 N.W.2d 411, 422. To establish duress, Randall must show that she was the victim of a wrongful or unlawful act or threat that deprived her of her unfettered will and compelled

her to make a "disproportionate exchange." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 109 (1980). Finally, a party's lack of sophistication in business matters or unequal bargaining power may provide a basis for voiding exculpatory or disclaimer clauses. *See Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI App 110, ¶ 22, 274 Wis. 2d 719, 739, 685 N.W.2d 154, 164. For the reasons already discussed, the court concludes that Randall's allegations plausibly suggest that defendants deprived Randall, an unsophisticated party, of any meaningful choice or volition in entering into a contract that substantially favored defendants.

The court will not dismiss Randall's requests for declaratory judgment and veil piercing.

## C. Liability of Widen Enterprises and Reed

Defendants contend that Randall has failed to state a claim against Widen Enterprises because that company was not a signatory to Randall's redemption agreement and did not sell any shares. They also contend that Randall cannot state claims for misrepresentation or civil theft against Reed because there are no allegations that Reed spoke to or communicated with Randall about the sale of her stock. But Randall seeks to hold Reed and Widen Enterprises liable (1) for Kiesler's actions under the doctrines of vicarious liability and agency; or alternatively, (2) as aiders and abettors in Kiesler's commission of fraud.

### 1. Vicarious liability and agency

Under Wisconsin's doctrine of respondeat superior, an employer is responsible for the conduct of any "servant" acting within the scope of his or her employment. *See Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 198-99, 423 N.W.2d 848, 852 (1988) (citations omitted); *Est. of Hegarty ex rel. Hegarty v. Beauchaine*, 2001 WI App 300, ¶ 59, 249 Wis. 2d 142, 176, 638 N.W.2d 355, 372. A "servant" is someone "employed to perform service for another" and subject to "the other's control or right to control." *Kashishian v. Port*, 167 Wis.2d 24, 33,

481 N.W.2d 277, 280 (1992). "Agency is a consensual, fiduciary relation between two persons, created by law by which one, the principal, has a right to control the conduct of the agent." *Skrupky v. Elbert*, 189 Wis. 2d 31, 43, 526 N.W.2d 264, 269 (Ct. App. 1994). Actual authority may be expressed by or implied from the statements or actions of the principal. *Id.* Under the related doctrine of apparent agency, "a principal may be held liable for the acts of one who reasonably appears to a third person, through acts by the principal or acts by the agent if the principal had knowledge of those acts and acquiesced in them, to be authorized to act as an agent for the principal." *Pamperin*, 144 Wis.2d at 203, 423 N.W.2d at 853-54. This is true even when no agency relationship actually exists or when the agent is acting outside the scope of any actual agency authority. *Kolbe & Kolbe Millwork, Co. v. Manson Ins. Agency, Inc.*, 983 F. Supp. 2d 1035, 1041 (W.D. Wis. 2013).

Randall alleges that: (1) Kiesler was a corporate officer and acting as an agent for both Windy Waters and Widen Enterprises; (2) Reed ran the companies along with Kiesler, as Chairman of the Board of Widen Enterprises and a de facto executive officer of Windy Waters; (3) Reed directly and indirectly controlled Kiesler, who was Reed's employee and subordinate; (4) Reed gave Kiesler a written directive about Randall's stock redemption on May 6, 2020; and (5) Kiesler reported back to Reed at least twice on his conversations with Randall. Dkt. 1, at ¶¶ 4, 29-32, 68-74, 92, 123, 158, and 223. These allegations plausibly suggest that Reed and Widen Enterprises may have controlled or had the right to control Kiesler's actions and that Kiesler was acting on behalf of both Reed and Widen Enterprises with an intent to carry out his employment. They also plausibly suggest that Widen Enterprises may be liable for any actions that Reed took as an agent or employee of the company. If the facts show later that the required master-servant or agency relationships did not exist, or that Kiesler was not acting on

22

behalf of Widen Enterprises or Reed in negotiating the redemption agreement, defendants may file a motion for summary judgment at the appropriate time. *See Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015) ("Plaintiffs' pleading burden should be commensurate with the amount of information available to them.").

### 2. Aiding and Abetting

An aider and abettor is someone "who knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself." *See Winslow v. Brown*, 125 Wis. 2d 327, 336, 371 N.W.2d 417, 422 (Ct. App. 1985) (citing Restatement (Second) Law of Torts § 876). Randall alleges that Reed forged her signature on corporate documents, excluded her from shareholder and director meetings, funneled millions of dollars in dividends to Reed disguised as compensation, and either directed or substantially encouraged Kiesler's negotiation of Randall's stock redemption. As for Widen Enterprises, Randall alleges that the company selectively paid dividends only to Reed, which artificially depressed the value of Randall's stock to her. Although Randall's allegations against Widen Enterprises are attenuated, she alleges that the fraudulent scheme took place over many years and only came to a head when the parties executed the redemption in May 2020. So for now, the court concludes Randall's allegations plausibly suggest that the actions taken by Reed and Widen Enterprises aided and abetted Kiesler in carrying out the fraud. As discussed above, whether the companies or Reed can be held accountable for Kiesler's conduct is a matter to be resolved at summary judgment or trial.

### D. Minority shareholder oppression (claim 9)

Randall asserts a claim against Reed under Wis. Stat. § 180.1430(2)(b), which allows the court to dissolve a corporation if "the directors or those in control of the corporation have

23

acted, are acting or will act in a manner that is illegal, oppressive or fraudulent." Defendants seek to dismiss this claim for lack of standing because § 180.1430(2)(b) expressly requires that a party be a shareholder to bring a claim and Randall no longer holds any shares in Windy Waters. *See N. Air Servs., Inc. v. Link*, 336 Wis. 2d 1, 40, 804 N.W.2d 458, 477 (2011) ("Interpreting Wis. Stat. § 180.1430 to require a plaintiff to be a shareholder in order to bring a judicial dissolution claim is not only a straightforward reading of the statute's plain language; it is also the most logical interpretation given the statute's purpose."); *Fabick v. Evers*, 2021 WI 28, ¶ 103, 396 Wis. 2d 231, 283, 956 N.W.2d 856, 882 ("*Northern Air* . . . makes clear that if you no longer own shares of stock, you no longer have standing to maintain a shareholder action."). Much like Randall, Jay Link, the plaintiff in *Northern Air*, alleged that he was "squeezed out" of his former company and not paid a fair price for his shares. *Northern Air*, 336 Wis. 2d at 41, 804 N.W.2d at 478. The state circuit court concluded that Link was not oppressed and ordered specific performance of the stock sale agreement for the appraised market value of the shares. On appeal, Link argued that he never intended to lose his right to appeal his oppression claim. But the Wisconsin Supreme Court held that the "intention to maintain standing does not trump the clear statutory language of § 180.1430"; once Link transferred his shares per the court order, he lost standing. *Id*. So, as a former shareholder, Randall would not have standing to bring a claim under § 180.1430(2)(b).

But Randall says that she should allowed to plead her minority shareholder oppression claim in the alternative. She argues that if she succeeds in obtaining a declaratory judgment that the redemption agreement is void and unenforceable, she would be entitled to pursue reinstatement of her minority ownership in Windy Waters as an equitable remedy. Defendants did not respond to this argument on reply, arguing only that Randall has failed to state a claim

to rescind the redemption agreement or otherwise have it declared void. The court has concluded otherwise. Moreover, Randall's alternative pleading argument does not appear to be at odds with *Northern Air* because the state supreme court found it significant that Link "never argued that the Buy–Sell Agreement was not a valid, enforceable agreement." *Northern Air*, 336 Wis. 2d at 41, 804 N.W.2d at 478. If Randall proves the redemption documents are void or unenforceable, she may be entitled to relief as a minority shareholder. So at least for now, the court will allow Randall to plead her minority shareholder claim in the alternative.

ORDER

IT IS ORDERED that the motion to dismiss filed by defendants Reed Widen, Michael Kiesler, Widen Enterprises, LLC, and Windy Waters, Inc., Dkt. 12, is DENIED.

Entered July 24, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge