IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

          Plaintiff,

   v.

                                        Civil Action No. 22-cv-400

REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

          Defendants.

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S PRAYER FOR RELIEF SEEKING RESCISSION

Since Plaintiff Stacy Randall and Defendant Windy Waters, Inc. entered into the Stock Redemption Agreement and Promissory Note on May 13, 2020, Randall has received and accepted, without objection, 37 monthly payments of $16,430.09, totaling $607,913.33, under those documents. Randall, having thus ratified the agreements and waived her right to seek rescission, cannot now claim those same agreements are null and void. Randall's response to the motion to strike is premised on the incorrect position that Section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc, renders the release in the Stock Redemption Agreement (and therefore the entire agreement) void *ab initio*. It does not, and federal law does not preclude application of ratification and waiver doctrines to bar Randall's rescission claim. Besides arguing federal law nullifies the doctrines, Randall does not address the common law principles of waiver and ratification head on. She focuses instead on the separate tender-back prerequisite to filing a suit for rescission, which is not the premise of the motion to strike. The reason the Court should strike Randall's rescission request is simple: A party cannot continuously receive and accept

payments under a contract with knowledge of alleged fraud and then later seek rescission of that very contract. Even Randall acknowledges that these arguments are "superficially appealing." ECF No. 36 at 2. The defendants' motion to strike (ECF No. 31) should be granted.

## I.      THE MOTION TO STRIKE IS RIPE.

As a preliminary matter, this motion is ripe and should be addressed on the merits. Randall agrees that addressing the issue of whether Randall may seek rescission at this stage serves the interests of judicial economy. ECF No. 36 at 7. Randall does not dispute any of the facts supporting the motion to strike, all of which are either explicitly stated in or implied by the allegations in the complaint. It is undisputed that Randall received, accepted, and did not deny or return the payments contemplated by the Stock Redemption Agreement and the related Promissory Note attached to the complaint. The issue is therefore ripe for consideration and ruling.[1]

## II.      THE EXCHANGE ACT DOES NOT NULLIFY THE AGREEMENTS OR CREATE AN EXCEPTION TO BASIC COMMON LAW DOCTRINES.

For three key reasons, the Exchange Act does not give Randall license to have her cake and eat it too. First, the Act prohibits prospective waivers of rights, not standard releases like the one in the Stock Redemption Agreement, so it does not render the release void or voidable. Second, the release is severable from the rest of the Stock Redemption Agreement, so Randall's focus on the release is misplaced. Third, cases applying the Act explain that fraud in the inducement does not render a transaction subject to the Act void. As a result, common law rescission principles and the related doctrines of ratification and waiver apply.

First, the Stock Redemption Agreement does not violate 15 U.S.C. § 78cc as a matter of law. Randall's argument is premised squarely on the mutual release found in section 5 of the Stock Redemption Agreement, which she contends is a waiver of compliance with the

---

[1] If the Court prefers the issue be addressed on summary judgment instead, Defendants will be prepared to do so.

Exchange Act and therefore violates the Act. ECF No. 36 at 7–9. That is not correct.

A release of existing claims is perfectly allowable under the Exchange Act—it is only waivers of future compliance with the Act that are prohibited. The statute disallows provisions that bind "any person to waive compliance with" the Exchange Act. 15 U.S.C. § 78cc(a). For example, this provision rendered unenforceable a corporate bylaw that required cases to be filed in state court because the provision waived compliance with the mandatory jurisdictional provision in the Exchange Act. *Seafarers Pension Plan ex rel. Boeing Co. v. Bradway*, 23 F.4th 714, 720 (7th Cir. 2022). In contrast, releases of claims arising from past conduct are permissible. *See, e.g.*, *Goodman v. Epstein*, 582 F.2d 388, 399 (7th Cir. 1978).

In *Goodman*, the Seventh Circuit addressed the validity of a release found in an amendment to a limited partnership agreement that was executed to formalize the withdrawal of one of the partners. *Id.* at 394. One issue on appeal was whether the release was valid under 15 U.S.C. § 78cc(a). *Id.* at 395–96. The parties agreed that the statute does not invalidate releases of mature, ripened claims, but differed on whether that included only claims actually known to the parties or also included claims the releasing party should have known after reasonable inquiry. *Id.* at 402–03. In deciding which of the "two apparently competing philosophies" was correct, the Seventh Circuit explained that "the defendants' theory which admittedly places some duty of inquiry on the party signing the release, is the more readily acceptable as fulfilling the policy requirements of the federal securities laws and needs of judicial economy." *Id.* at 403. The court further explained:

> The mere fact that an individual has been asked to sign a release should be sufficient to put that individual on notice that a reasonable inquiry should be undertaken. . . .
>
> . . . .

> The requirement that a person exercise reasonable inquiry to discover possible matured claims existing at the time of execution of a waiver does nothing to defeat the general policy against the In futuro waiver of securities claims. Quite to the contrary, it insures that the signing of a waiver is something that will not be undertaken lightly.

*Id.* at 404 (citation omitted). In short, only waivers of future violations of law can be avoided under the Exchange Act. *See id.*; *Korn v. Franchard Corp.*, 388 F. Supp. 1326, 1330 (S.D.N.Y. 1975). ("I conclude that Section 29(a) does not nullify, as a matter of law, all settlements of claims arising from acts violating the Securities Exchange Act of 1934, but only those which condone continuing violations of federal law or anticipatorily waive the right to commence litigation arising out of future violations.").

Even the cases Randall relies upon follow this same rule. For example, one case Randall cites states as follows: "Not all releases, however, are void. . . . Only those releases attempting anticipatory waivers of compliance with the securities laws are void." *Jadoff v. Gleason*, 140 F.R.D. 330, 333–34 (M.D.N.C. 1991) (finding implicit waiver through acknowledgement of receipt of information void). In another, a court interpreting a parallel provision in the 1933 Securities Act held that a "general release, purporting to settle an already ripened controversy, is not by its terms void as a matter of law." *Cohen v. Tenney Corp.*, 318 F. Supp. 280, 284 (S.D.N.Y. 1970).

Under Wisconsin law, unless a release explicitly states otherwise, it only serves to extinguish matured, ripe claims. The Wisconsin Supreme Court has held as follows:

> A release ordinarily operates on the matters expressed therein which are already in existence at the time of giving the release. Accordingly, demands originating at the time a release is given or subsequently, and demands subsequently maturing or accruing, are not as a rule discharged by the release unless expressly embraced therein or falling within the fair import of the terms employed.

*Rensink v. Wallenfang*, 8 Wis. 2d 206, 214, 99 N.W.2d 196 (1959) (quoting 76 C.J.S. *Release* § 53). That is, under Wisconsin law, a release does not waive anything related to future conduct unless it explicitly says so.

Here, the release in the Stock Redemption Agreement does not purport to waive any future conduct or future compliance with securities laws. It does not discuss future claims or future conduct at all. It is an ordinary release that serves only to extinguish mature claims that were in existence as of the time of signing the Stock Redemption Agreement on May 13, 2020. The release is therefore perfectly valid under the Exchange Act and is not void or voidable.

Second, Randall's reliance on an argument that the release is void under the Exchange Act misses the point. Even if the Court were to entertain the notion that the release in the Stock Redemption Agreement is void under the Exchange Act, the release is severable from the rest of the agreement. Section 7.d. of the Stock Redemption Agreement makes any illegal, invalid, or unenforceable provision severable, while retaining the balance of the agreement "in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from [the] Agreement." Stock Redemption Agreement ¶ 7.d., ECF No. 1-6; Widen Decl. Ex. A, ECF No. 33-1. Whether or not the mutual release in the Stock Redemption Agreement is valid is beside the point. Randall is seeking to rescind the entire contract and undo the entire transaction to undo the sale of her stock. There is no basis to allege that the key provisions to effectuate that transfer are void *ab initio* under the Exchange Act.

Third, alleged fraud does not make a contract void *ab initio*, not even if the contract is subject to the Exchange Act. A contract induced by fraud is voidable (not void). *E.g.*, *First Nat'l Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 209, 293 N.W.2d 530 (1980). One court applying 15 U.S.C. § 78cc explained that this rule applies even to contracts about securities:

> [A]n agreement induced by fraud in violation of the securities acts is not ipso facto void, neither under s 29(b) nor by virtue of the "illegalities" in the formation of the contract. Since such a contract may be either affirmed or avoided by the innocent party, that party faces the same choice under the securities acts when he learns of the fraud as he faces under the common law. If he wishes to avoid the contract, the steps he must take to preserve his rescission remedy are the same as at common law. Similarly, conduct that affirms a fraudulently induced contract under general contract law principles, such as acceptance of benefits under the contract or exercise of acts of ownership over the property, will terminate the injured party's power to avoid the contract on illegality grounds, where the only illegality is violation of the antifraud provisions of the securities laws.

*Gannett Co. v. Reg. Pub. Co.*, 428 F. Supp. 818, 831 (D. Conn. 1977) (footnote omitted).

As another court explained, "Courts have construed Section 29(b) to render any contract made in violation of the Exchange Act 'voidable' at the option of the wronged party. An agreement to purchase securities that is induced by fraud is, under § 29(b), voidable at the will of the defrauded party." *Kidder Peabody & Co. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479, 498 (S.D.N.Y. 1995) (citations omitted).

One reason for this rule is that voiding agreements where the allegedly wronged party does not seek such relief or is not entitled to rescission could have the effect of invalidating agreements in circumstances that cause more harm than good. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387 (1970). "The interests of the victim are sufficiently protected by giving him the right to rescind." *Id.* at 388. An entirely void agreement, in contrast, is a legal nullity and void as to everybody, not just an injured party, as Randall herself notes. ECF No. 36 at 9 (citing 17A Am. Jur. 2d *Contracts* § 9; *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 432 (1998) (Breyer, J., concurring)). For all these reasons, agreements concerning securities are only voidable, not void, if they are induced by fraud, and the party seeking to avoid the contract must follow the same common law principles as any other party seeking rescission of any other kind of contract.

6

Whether under Wisconsin common law, as the choice of law in the Stock Redemption Agreement, or federal common law, the result should be the same. As the volume and variety of cases cited in Defendants' opening brief shows, the principles of ratification and waiver of the right to rescission after a party continues to accept the benefits of a contract are recognized in state and federal courts across the country. There is no reason federal common law would differ, and Randall cites no cases applying federal common law that apply different rules.

## III.      OTHER FEDERAL LAWS GOVERNING RELEASES ARE INAPPOSITE.

Citing a handful of cases applying different federal statutes in different contexts, Randall makes the bold argument in section III of her response brief that the mere fact that she has claims under the Exchange Act means the doctrines of ratification and waiver do not apply. This novel argument is unsupported by case law and without merit for several reasons.

First and foremost, Randall does not cite any authority on point. Apparently, no court anywhere has ever held that contracts relating to exchanges of securities are exempt from common law principles. The only case known to Defendants addressing the issue squarely held the exact opposite. In *Gannett*, the court applied the doctrine of ratification to bar a party's request for the remedy of rescission for its claims under the Exchange Act. 428 F. Supp. at 831. The court concluded common law principles applied just like to any other contract: "If he wishes to avoid the contract, the steps he must take to preserve his rescission remedy are the same as at common law." *Id.* The only case law on point, therefore, holds that common law principles, including ratification and waiver of the right to seek rescission, apply even to contracts subject to the Exchange Act. This Court should hold the same.

Second, other than the Supreme Court cases, the cases Randall cites are not binding, further limiting their persuasive authority. One case explicitly disagrees with Seventh Circuit precedent holding common law principles related to rescission apply to claims under federal law.

7

*McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 308 (6th Cir. 2018). Another notes conflicting authority on applying ratification to releases of claims under federal statutes. *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 784 (3d Cir. 2007) ("We recognize that other courts have applied the common law doctrine of ratification to ERISA claims."). Others are simply non-binding and unpersuasive out-of-circuit cases that do not involve the Exchange Act. *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993); *GunBroker.com, LLC v. Tenor Cap. Partners, LLC*, No. 1:20-CV-613-TWT, 2021 WL 5113200, at *9 (N.D. Ga. Nov. 3, 2021). In fact, the only Seventh Circuit case cited by Randall that analyzes whether to apply common law principles to federal statutory claims holds that common law applies. *Fleming v. U.S. Postal Service AMF O'Hare*, 27 F.3d 259, 260 (7th Cir. 1994) (holding the common law concept of tender-back was "not a peculiarity of Illinois law; it is a general principle of contract law, and would surely be a component of any federal common law of releases").

Third, several of the cases Randall cites discuss only the tender-back requirement for rescission claims, not ratification and waiver. *E.g.*, *McClellan*, 900 F.3d at 308; *Botefur*, 7 F.3d at 156. As discussed in the next section of this brief, these are distinct concepts, and only the latter forms the basis of the motion to strike.

Finally, most of the cases involve federal statutes that explicitly create requirements for valid releases, unlike the Exchange Act, and the courts find ratification would undermine the statutory release requirements themselves. In particular, in *Oubre*, the Court focused on the "strict, unqualified statutory stricture on waivers" in the OWBPA, including a mandatory time period for a party to review the release and consider options, a mandatory time period during which the employee could change her mind, and a requirement that the release reference ADEA claims specifically. 522 U.S. at 424–25, 427. The Court explained that allowing ratification conflicted

with the statute's text. *Id.* at 427 ("The statute creates a series of prerequisites for knowing and voluntary waivers and imposes affirmative duties of disclosure and waiting periods. . . . The text of the OWBPA forecloses the employer's defense, notwithstanding how general contract principles would apply to non-ADEA claims."). It was this inability to overrule explicit Congressional directives that formed the basis of the ruling—not generic policy arguments about remedial statutes, as Randall contends.

The short per curiam decision in *Hogue* seems heavily influenced by the fact that the employer filed a "Memorandum Confessing Error" in the Supreme Court that conceded applicable law did not require a plaintiff to tender back payments before filing a claim for rescission. *Hogue v. S. R. Co.*, 390 U.S. 516, 516 (1968). The case also did not address ratification or waiver, ruling only that Federal Employers' Liability Act jurisprudence does not require tender back before an injured employee may sue an employer despite a release. *See id.* at 517–18.

In sum, there is no authority holding that the mere fact that a claim is brought under the Exchange Act means common law contract principles do not apply. The cases Randall cites all revolve around challenges to releases, discuss different statutes, are inapplicable, and in most cases, are not binding authority. The Exchange Act does not include any specific requirements for releases and does not regulate them like the OWBPA and other statutory regimes do. The apples-to-oranges comparison is unpersuasive. The Exchange Act does not offer an exception to ratification and waiver of the right to rescind.

## IV. COMMON LAW WAIVER AND RATIFICATION PRINCIPLES PRECLUDE RANDALL'S REQUEST FOR RESCISSION.

The well-established common law principles of waiver and ratification form the heart of Defendants' motion to strike. Rather than addressing those principles head on, Randall's response instead focuses on the common law concept of tendering back—a requirement that a

party seeking rescission of a contract (typically a release) tender back consideration received for that contract. Arguably, the requirement that a party seeking rescission tender back the consideration *also* supports a dismissal of Randall's request for rescission, and as Randall acknowledges, some courts have treated the tender-back requirement as a precondition to filing suit. Other courts prefer to address the issue when considering damages.

Certainly, if Randall's rescission claims are not dismissed and if she were to be awarded damages, she would be required to credit any amounts that were already paid to her under the contract, as she acknowledges, ECF No. 36 at 20. That can be resolved if and when damages are determined. Randall's speculation that rescinding the agreements would necessarily result in payment to her is premature and unsupported. But that is beside the point, because the tender-back doctrine is not the basis of the motion to strike. Rather, Randall's request for rescission should be stricken because, ***after acquiring knowledge of the facts she contends support her fraud claims, and even after filing suit for fraud***, Randall has continued to accept payments, each month, that she would only be entitled to receive under the very agreements she seeks to rescind. A party cannot accept payments under a contract for years, thus acknowledging the contract's validity, and at the same time seek a ruling that the contract is void and subject to rescission, thereby asserting its invalidity. "A party's right to rescind for fraud or mistake is waived if he . . . affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission." *Thompson v. Village of Hales Corners*, 115 Wis. 2d 289, 319, 340 N.W.2d 704 (1983); *see also Grube v. Daun*, 213 Wis. 2d 533, 551, 570 N.W.2d 851 (1997). A tender back at this stage is, quite simply, too late. Ratification and waiver have already occurred.

Nowhere in Randall's response does she dispute the proposition that a party who accepts the benefits from a contract ratifies it and cannot seek rescission, nor does she challenge

its application to this case to bar her rescission claims outside of the discussion involving the

Exchange Act. Randall argues against application of the tender-back precondition to rescission

discussed by Randall, but that is a distinct concept. Indeed, one court applying the ratification

doctrine explicitly confirmed it was not basing its decision on a pre-suit tender-back requirement,

but ratification alone:

> The court does not hold that Seward, prior to initiating this
> suit, was obligated to tender back to GMC the supplemental
> retirement benefits which he received. Rather, the court holds that
> Seward, to avoid ratification of the Release, was obligated to tender
> back or refuse the benefits he received after he became aware of the
> alleged fraud and duress he now raises as a defense to the Release.

*Seward v. B.O.C. Div. of Gen. Motors Corp.*, 805 F. Supp. 623, 34 (N.D. Ill. 1992).

Randall relies on cases and Restatement illustrations involving fact patterns missing

an essential element—they involve discovery of fraud after the benefits were accepted, not the

other way around. These sources are not on point because they do not address the impact of

accepting contractual benefits after discovery of fraud. For example, in the only Wisconsin case

Randall cites to support her common law arguments, the plaintiff accepted a payment at the time

a contract was made, discovered fraud thereafter, and then later sued. *Bowe v. Gage*, 127 Wis. 245,

245, 106 N.W. 1074 (1906). The issue decided by the court was whether the suit could be

maintained even though the plaintiff did not first tender back the payment received at the time the

contract was made. *Id.* at 250. It did not involve the acceptance of contract benefits after discovery

of fraud or after suing for rescission. Similarly, the Restatement illustrations Randall cites in

support of her position also involve only benefits accepted before discovery of alleged fraud, so

are inapposite to the issue of ratification and waiver—and they certainly are not "precisely" the

situation in this case, as Randall contends, ECF No. 36 at 17.[2] Here, in contrast, Randall accepted payments for years after discovering the facts that she contends support her fraud claims.

        The same is true of the *Fleming* case cited by Randall—it involves only the question of whether a party can rescind a contract without returning consideration. 27 F.3d at 260. It did *not* involve the receipt of contractual benefits after the discovery of fraud, so it has no bearing on whether Randall ratified the Stock Redemption Agreement or waived her right to rescind.

        Where the right to seek rescission has been waived and the contract has been ratified, subsequent tender back is too little and too late. "When a party to a contract discovers an alleged fraud, however, it has two choices: 'affirm the contract and sue for damages, or . . . disaffirm and seek restitution.' If a party elects to affirm the contract, he may not later on disaffirm it and ask for rescission." *AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 772 (W.D. Wis. 2016) (citations omitted). As one early case explained, a party wishing to avoid a contract must "at once announce his purpose" and if he continues accepting the benefit of the contract, waiver has occurred and he "will be as conclusively bound by the contract as if no fraud or mistake had occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." *Hunt v. Hardwick & Co.*, 68 Ga. 100, 104 (1881). Another case held that an offer to return consideration after a motion to dismiss a rescission request was filed was too late, explaining as follows:

        This offer is simply too little, too late. . . .

        . . . .

        Even if Grillet's tender-back offer had been sufficient, it came too late. . . . To avoid ratifying the release through her conduct,

---

[2] Illustration 17 to Restatement (First) of Restitution § 65, relied upon by Randall, is also not "precisely" the same situation for another reason: Windy Waters did not sell Randall's shares after purchasing them from her. Rather, about a year and a half after Randall sold her shares back to Windy Waters, Windy Waters sold its subsidiary, Widen Enterprises. *See* Compl. ¶¶ 143, 149.

> Grillet should have returned the consideration soon after she learned that some younger employees in her department had not been terminated. Instead, she kept the benefits of the release for two years after she discovered the alleged misrepresentation. It is simply too late for Grillet to avoid ratification.

*Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 220–21 (5th Cir. 1991), *overruled on other grounds by Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994).

Last, Randall attempts to downplay the authority on ratification and waiver by arguing they are limited to cases involving "bargained-for releases of claims." ECF No. 36 at 19. Though cases involving releases and settlement agreements are relevant, even excluding the cases addressing settlement agreements, the doctrines of ratification and waiver are supported by many cases in many other contexts. Defendants' opening brief cited to numerous cases discussing ratification or waiver outside of the settlement agreement context, including the following cases:

- o *Grube*, 213 Wis. 2d at 551 (holding that plaintiffs could not rescind the sale of a parcel of land because plaintiffs affirmed the contract by living on and making improvements to the land despite the contamination they alleged supported rescission claim)
- o *AVL Powertrain Eng'g*, 178 F. Supp. 3d at 772 (holding that plaintiff could not rescind a master agreement governing large engine testing because plaintiff, by operating pursuant to the terms of the agreement until the defendant stopped performing, affirmed the contract and waived its right to rescission)
- o *ESPN, Inc. v. Off. of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999) (holding that rescission of a telecasting agreement was unavailable after MLB continued to perform and accept performance under the agreement for more than a year after grounds for rescission arose)
- o *Tankstar USA, Inc. v. Navistar, Inc.*, No. 2017AP1907, 2018 WL 6199278, at *6 (Wis. Ct. App.  Nov. 27, 2018) (unpublished decision) (holding that rescission of vehicle purchase contracts was unavailable because the plaintiff, by selling the vehicles and filing the action seeking contract-based damages, affirmed the contracts)

In the following additional cases, ratification or waiver was found outside of the settlement agreement context:

- o *Ajamian v. Schlanger*, 89 A.2d 702, 703–04 (N.J. Super. Ct. App. Div. 1952) (holding that a buyer could not rescind a contract for the sale of an embroidery factory because after discovering the fraud, the buyer affirmed the contract by making monthly payments on the purchase price and continuing to pay rent and make improvements to the factory, noting that "once made, this election [to affirm the contract] is irrevocable")
- o *Dennis v. Jones*, 14 A. 913, 914–15 (N.J. 1888) (holding that a buyer could not rescind a contract for the sale of a skating rink where the buyer, upon discovering the fraud, continued to make mortgage payments and run the skating rink business, which constituted "plenary evidence of an election to abide by their contract" that was "irrevocable")
- o *Markowicz v. SWEPI LP*, 940 F. Supp. 2d 222, 228–31 (M.D. Pa. 2013) (holding that a non-signing cotenant of a mineral lease waived his right to rescind the lease because he failed to take affirmative steps to disavow the lease and effectively accepted the benefits of the lease when he transferred rental checks to the other cotenant that were dispensed pursuant to the lease terms)
- o *Gannett*, 428 F. Supp. at 824–26 (holding that a buyer of a newspaper company waived its right to rescind a purchase agreement because after discovery of the fraud, buyer's conduct evidenced an intent to affirm the contract)

This is not an exhaustive list. The well-accepted waiver and ratification doctrines apply to contracts of every type, not just settlement agreements. Randall's attempts to cabin this doctrine into the narrower context of cases involving settlement agreements fails.

The point of the ratification and waiver doctrines is not damages, offsets, or how much money which party owes to which party. Rather, the point is that a party who has enjoyed and accepted the benefits of a contract for many months after learning of facts that would allow for rescission cannot later seek to rescind that agreement. Randall does not dispute (because she cannot) that she accepted $607,913.33 in monthly payments since she and Windy Waters entered into the Stock Redemption Agreement and Promissory Note on May 13, 2020. Of those 37 payments, 21 were accepted after Randall learned of the alleged fraud, 19 after threatening to sue, and 11 after filing suit. This constituted ratification of the contract and a waiver of any right to rescind the documents contract. Anything less would unfairly allow Randall to have her cake and eat it too.

**CONCLUSION**

It is undisputed that Randall accepted monthly payments of $16,430.09 under the Stock Redemption Agreement and the related Promissory Note, including for nearly two years after first asserting the transaction was the product of fraud. To attempt to avoid this ratification of the documents and waiver of the ability to rescind them, Randall deflects with legal arguments that are without merit. The common law doctrines of waiver and ratification that underpin the motion to strike apply and bar Randall's rescission claims, even those based on the Exchange Act. For all the reasons stated in this brief and defendants' opening brief, the defendants' Motion to Strike Plaintiff's Prayer for Relief Seeking Rescission should be granted and the Court should strike paragraphs B and O in the prayer for relief section of the complaint.

Dated this 4th day of August 2023.

Respectfully submitted,

s/ Christa D. Wittenberg
Dean P. Laing
Christa D. Wittenberg
O'Neil, Cannon, Hollman, DeJong & Laing S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
Phone: 414.276.5000
dean.laing@wilaw.com
christa.wittenberg@wilaw.com

Mark H. Churchill
Martin Durkin
HOLLAND & KNIGHT LLP
1650 Tysons Boulevards, Suite 1700
Tysons, Virginia 22102
Phone: 703.720.8600
mark.churchill@hklaw.com
martin.durkin@hklaw.com

*Attorneys for Defendants*