# In the Matter Of:

*Stacy L. Randall vs Reed C. Widen, et al.*

*Deposition of Reed C. Widen  Video Deposition*

*August 23, 2023*



**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 3

```
 1              I N D E X
 2    Examination:                                 Page
 3    By Mr. Palay                                    6
 4
 5
 6
 7    Exhibits Identified:                         Page
 8    Exhibit 1    Widen Confidential Information     18
                   Memorandum
 9
      Exhibit 2    Defendants' Objections and        58
10                 Responses to Plaintiff
                   Stacy L. Randall's First Set of
11                 Interrogatories
12    Exhibit 3    Messages dated 5/5/2020           66
13    Exhibit 4    Messages dated 5/6/2020           71
14    Exhibit 5    Message dated 10/16/2019          75
15    Exhibit 6    Second Amended to Shareholder     82
                   Agreement
16
      Exhibit 7    Messages dated 10/22/2019        103
17
      Exhibit 8    Two emails dated 12/1/2014       104
18                 between Matthew Gonnering and
                   Gary Norris
19
      Exhibit 9    2/23/2018 email to Reed Widen    111
20                 from Matthew Gonnering
21    Exhibit 10   8/10/2018 email to Reed Widen    113
                   from Matthew Gonnering
22
      Exhibit 11   4/10/2020 email to Reed Widen    116
23                 from Matthew Gonnering
24    Exhibit 12   Two emails dated 5/27/2015       121
25                 between Reed Widen and
                   Corey Goldstein
```

Page 4

```
 1    Exhibits Identified:                         Page
 2    Exhibit 13   String of emails ending with a  122
                   4/13/2020 email to Reed Widen
 3                 from Dylan Goldsmith
 4    Exhibit 14   5/8/2020 email to Reed Widen    125
                   from Matthew Gonnering
 5
      Exhibit 15   Two emails dated 2/14/2020      136
 6                 between Reed Widen and
                   Matthew Gonnering
 7
      Exhibit 16   String of emails ending with a  145
 8                 6/1/2020 email to Reed Widen
                   from Russell Wolff
 9
      Exhibit 17   String of emails ending with a  151
10                 8/25/2020 email to
                   Matthew Gonnering from Reed Widen
11                 and 8/26/2020 email to Russ Wolff
                   from Reed Widen
12
      Exhibit 18   8/29/2020 email to              155
13                 Matthew Gonnering from Reed Widen
14    Exhibit 19   Widen Revisit Valuation Range   159
15    Exhibit 20   9/10/2021 email to Stacy Randall 170
                   from Reed Widen
16
      Exhibit 21   Messages dated 9/11/2021        172
17
      Exhibit 22   Defendants' First Amended       181
18                 Objections and Responses to
                   Plaintiff Stacy L. Randall's
19                 First Set of Requests for
                   Admission
20
      Exhibit 23   9/20/2021 email to Stacy Randall 184
21                 from Reed Widen
22    Exhibit 24   Messages dated 9/10/2021        186
23    Exhibit 25   Messages dated 9/10/2021        186
24    Exhibit 26   12/12/2021 email to Stacy Randall 191
                   from Reed Widen
25
```

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,
              Plaintiff,
        -vs-                  Case No. 3:22-cv-00400-jdp
REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,
              Defendants.

        Video Deposition of REED C. WIDEN, taken
at the instance of the Plaintiff, under and pursuant to
Rules 26 and 30 of the Federal Rules of Civil Procedure,
before Carmen Harder, RPR, a Notary Public in and for
the State of Wisconsin, at O'Neil, Cannon, Hollman,
DeJong & Laing S.C., 111 East Wisconsin Avenue,
Suite 1400, Milwaukee, Wisconsin, on August 23, 2023,
commencing at 9:09 a.m. and concluding at 3:51 p.m.
```

Page 2

```
 1           A P P E A R A N C E S
 2
 3    REINHART BOERNER VAN DEUREN S.C., by
      MR. DAVID G. PALAY,
 4    MS. MONICA A. MARK,
      MS. JESSICA HUTSON POLAKOWSKI,
 5    22 East Mifflin Street, Suite 700,
      Madison, Wisconsin 53703,
 6         appeared on behalf of the Plaintiff.
 7
      REINHART BOERNER VAN DEUREN S.C., by
 8    MR. MARK A. CAMELI,
      1000 North Water Street, Suite 1700
 9    Milwaukee, Wisconsin 53202
           appeared on behalf of the Plaintiff.
10
11    HOLLAND & KNIGHT LLP, by
      MR. MARK H. CHURCHILL,
12    1650 Tysons Boulevard, Suite 1700,
      Tysons, Virginia 22102,
13         appeared on behalf of the Defendants.
14
      O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
15    MR. DEAN P. LAING,
      MR. CHRISTA D. WITTENBERG,
16    111 East Wisconsin Avenue, Suite 1400,
      Milwaukee, Wisconsin 53202,
17         appeared on behalf of the Defendants.
18
      Also present:  Michael Kiesler
19                    Mark Lyle, Videographer
20
21
22
23
24
25
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 5

```
1   Exhibits Identified:                          Page
2   Exhibit 27   Project Wildcat, Financial due    196
                 diligence, June 2021
3
    Exhibit 28   Spreadsheet of Instant Messages    214
4
5   (The original exhibits were attached to the original
        transcript, and copies were provided to counsel)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24              (The original transcript was filed with
25                  Attorney David G. Palay)
```

Page 6

```
1                  REED C. WIDEN, called as a witness,
2          being first duly sworn, testified on oath as
3          follows:
4
5                        EXAMINATION
6   By Mr. Palay:
7   Q   Good morning, Mr. Widen.
8   A   Good morning.
9   Q   I just introduced myself, and so you understand
10      that I'm representing Stacy Randall in this case.
11      I just want to get a couple ground rules just
12      covered so we're clear about how the deposition
13      will proceed.  For one thing, I will sometimes
14      refer to a group consisting of you, Mr. Kiesler,
15      the company Windy Waters, and the company
16      Widen Enterprises as the defendants.
17  A   Okay.
18  Q   So if I say defendants, you'll understand who I'm
19      talking about?
20  A   Yes.
21  Q   Okay.  And that brings us to another point, which
22      is that the way we'll proceed is I'll ask
23      questions, and you'll answer them.  Is that okay?
24  A   Yes.
25  Q   Okay.  And as you see, we're being -- we're being
```

Page 7

```
1   videotaped, but we're also having a court reporter
2   take down what we're saying, so we'll need to give
3   verbal responses.  Understood?
4   A   I understand.
5   Q   Okay.  We'll have to wait for each other to finish
6       speaking before the other person starts speaking.
7       I'll try to do that for you and ask that you do
8       the same.
9   A   Okay.
10  Q   If you don't understand a question I ask, just
11      please ask me to clarify, and I will do my best to
12      do so.  Understood?
13  A   Understood.
14  Q   If you do answer a question, though, fair to say
15      that you understood it?
16  A   I understand.
17  Q   If you need to take a break at any point, just let
18      us know.  The only exception for that would be if
19      there's a question pending, I would just ask that
20      you answer the question.
21  A   Okay.
22  Q   Mr. Widen, is there any reason you could not give
23      complete, honest, and truthful testimony this
24      morning?
25  A   No.
```

Page 8

```
1   Q   Okay.  You're not currently under the influence of
2       any alcohol or drugs or medications that would
3       impair your ability to --
4   A   No.
5   Q   -- give accurate, honest questions?  It's a
6       standard question.
7   A   I understand.
8   Q   I mean nothing personal.
9   A   I understand.
10  Q   Have you ever been deposed before?
11  A   No, I haven't.
12  Q   Okay.  What did you do to prepare for this
13      deposition other than speaking with your lawyers?
14  A   That's it.
15  Q   Did you speak to anyone other than your lawyers
16      about this deposition?
17  A   Not really, no.
18  Q   Not -- did -- I mean --
19  A   My wife.
20  Q   Okay.  Did you communicate in writing about this
21      deposition with anyone other than your --
22  A   No.
23  Q   -- lawyers?
24          Did you review any documents in preparation
25      for this deposition?
```

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 9

1   A   They showed me a few.
2   Q   Okay.
3   A   A couple.
4   Q   Which documents?
5   A   A lot of text messages, emails.
6   Q   Okay.  What is your understanding of the dispute
7       that this case is about?
8   A   I'm not sure.
9   Q   Okay.  Have you spoken --
10  A   I didn't do anything wrong.  I don't know what
11      this is about.  Well, I know what it's about, but
12      I don't understand why we're here.
13  Q   Okay.  Have you seen the plaintiff's complaint in
14      the case?
15  A   Of course.
16  Q   Okay.  Have you read it?
17  A   Some of it.
18  Q   And so do you understand what her positions are in
19      the case?
20  A   I guess, yeah.
21  Q   Okay.  And you disagree with those positions?
22  A   Of course.
23  Q   Okay.  One other thing that's going to I think
24      come up a lot today is the concept of value.
25  A   Okay.

Page 10

1   Q   So when I say value, what does that mean to you?
2   A   The value of the what, the company?
3   Q   Sure.  That would be a good example.
4   A   Okay.
5   Q   So what does the value of the company mean to you?
6           MR. CHURCHILL:  Objection to the
7       extent it calls for a legal conclusion.  You
8       can answer.
9   A   What the value of the company is?
10  Q   No, not what it is, but just what does it mean?
11      What does the value mean for -- what is the value
12      of a company?
13          MR. CHURCHILL:  Same objection,
14      calls for a legal conclusion, expert
15      testimony.  You can answer.
16  A   I'm not sure I really understand the question.
17  Q   Okay.  So when we talk about value, I want you to
18      think about a specific definition of that today.
19      And the definition I'd like you to think about is
20      the amount of money that 100 percent ownership of
21      something like a company would change hands in the
22      marketplace between a buyer and a seller where
23      neither the buyer or the seller has any compulsion
24      to enter into the transaction and both of them
25      have all the relevant information.  Does that make

Page 11

1       sense?
2   A   I guess, yeah.
3   Q   Okay.  Any part of that not make sense?
4   A   I'm good.
5   Q   Okay.
6           MR. CHURCHILL:  I'm going to just
7       object to the extent there's not a pending
8       question.  And we'll -- I think we'll deal
9       with value on the questions as it comes as
10      opposed to having the witness assume a
11      definition for the rest of the day.
12  Q   Okay.  That's going to be the concept of value I'm
13      going to be using at every turn.  So I can refer
14      to that concept, but that is -- I guess maybe a
15      way to deal with that is if we're talking about
16      value and you mean something other than that
17      definition, just maybe let me know.
18  A   Okay.
19  Q   Okay.  I'd like to just hear a little bit about
20      your background before we begin.  What positions
21      have you held at Windy Waters and
22      Widen Enterprises over your career?
23  A   Well, I started in high school painting floors and
24      walls.  I then went to work at -- I had a lot of
25      different jobs.  I did a little bit of everything

Page 12

1       to understand the business.  I got into a sales
2       role after that.
3   Q   And what were you selling at that time?
4   A   Prepress.
5   Q   Okay.  And can you tell us what that is.
6   A   There's a process between creative and printing,
7       which is the prepress part of it.  And it's called
8       four color separations.  You scan an image, break
9       it down into four colors, yellow, magenta, cyan,
10      and black.
11          THE COURT REPORTER:  Can you slow
12      down, please.  Thank you.
13          THE WITNESS:  Of course.  Sorry.
14  A   Which is the printing process.  And we made the
15      films for printers to make plates, print ads,
16      catalogs, inserts, what have you.
17  Q   You made the films to make the plates to print --
18  A   Yes.
19  Q   -- the creative --
20  A   So we did --
21  Q   -- content?  Okay.
22  A   -- the film part, not the plate part.  That was --
23          THE COURT REPORTER:  Can you repeat
24      that, please.
25  A   Yes.  We made film, not the plates, okay?  We

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 13

1   provided those to the printer.  We then --
2 Q And you did the color separation?
3 A Yes.
4 Q Okay.  Have you ever been employed by another
5   company besides Windy Waters or Widen Enterprises?
6 A Yes.
7 Q Which company was that?
8 A Well, one was Dairy Equipment Company right after
9   high school.  I worked in a Tempe cash vault when
10   I went down to Arizona after high school.
11 Q Okay.  And how long were you employed with them
12   about?
13 A Arizona is probably six months because I came home
14   for Christmas and didn't go back.  And
15   Dairy Equipment, a year I'm guessing.  I don't
16   know.
17 Q Did you get any specific training for your roles
18   at Widen Enterprises or Windy Waters?
19 A Yeah.  I went through every department in the
20   company.  I learned every step of the process.
21 Q I should also just add it might be easier at some
22   points to refer to Windy Waters and
23   Widen Enterprises as the companies.  Does that
24   make sense?
25 A Sure.

Page 14

1 Q Okay.  Do you have any experience writing
2   software?
3 A No.
4 Q Okay.  Or software code or anything?
5 A No.
6 Q Okay.  Never taken any courses about that?
7 A No.
8 Q Okay.  And today what are you doing?  Are you
9   retired?
10 A Yes.
11 Q Okay.  So going back to May 2020.  How would you
12   describe the industry and business that the
13   companies were in?
14 A May of 2020?
15 Q May of 2020.
16 A We were doing the transition from the prepress,
17   premedia.  I also started creating the graphics
18   communication, which evolved into a marketing
19   software company, with Matthew's help.
20 Q Okay.  You began creating the marketing software
21   part of the business in May 2020?
22 A I guess so.  I don't remember.  Yeah.
23 Q Okay.
24 A Our industry was going away.  We needed to figure
25   out what we were going to be when we grew up

Page 15

1   there, and that was going to be a graphics
2   communications company, which evolved into a
3   marketing software company.
4 Q Okay.  And do you know about when
5   Widen Enterprises began transitioning from a
6   prepress company into a graphics software company
7   and a --
8 A No.  I mean -- I don't know.  I mean,
9   specifically, no.
10 Q Okay.  When did you begin running the companies
11   first?
12 A '17, maybe 2016.
13 Q In 2016 you began running the companies?
14 A I'm guessing.
15 Q Okay.  What did you -- what was your role before
16   that?
17 A Vice president.
18 Q Okay.  And who was the -- who was running the
19   companies at that time?
20 A I would answer to my father.
21 Q Okay.  When did your father retire?
22 A When he died.
23 Q Okay.
24 A 2003.
25 Q So your father died in 2003?

Page 16

1 A Yes.
2 Q So who ran the companies between 2003 and 2016?
3 A Me.
4 Q Oh, okay.  So you took over in 2003?
5         MR. CHURCHILL:  Objection, vague.
6     You can answer.  Ambiguous.  Go ahead.  You
7     can answer.
8 A Okay.  Yeah, I don't remember the specific date,
9   but I grew up in a family business.  I had a lot
10   of different roles.
11 Q Okay.  Anyone besides you or your father run
12   Widen Enterprises or Windy Waters since 2003?
13         MR. CHURCHILL:  Objection,
14     compound.
15 A I'm trying to think when my brother Tyler was
16   around.  I don't know if he was around then or
17   not.  If there was anybody, it was Tyler, myself.
18 Q Okay.  And you mentioned -- I think you mentioned
19   Matthew Gonnering helping with the transition into
20   a software company?
21 A Uh-huh.
22 Q When did Matthew Gonnering join the company?
23 A I don't remember what date.
24 Q Okay.  Do you remember if it was before or after
25   2010?

For the Record, Inc. | 888-892-0392 | office@FTRMadison.com
www.FTRMadison.com
Pages13..16

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

| | | Page 17 |
|---|---|---|
| 1 | A | I don't remember the date. |
| 2 | Q | Okay.  Was it after your father died? |
| 3 | A | No, I don't think so. |
| 4 | Q | Okay.  It was before your father died.  And whose |
| 5 | | idea was it to transition from the prepress |
| 6 | | company into the, into the software company? |
| 7 | A | It was mine. |
| 8 | Q | Okay.  When did you have that idea about? |
| 9 | A | It all started when I hired Gary Norris back |
| 10 | | 30 years ago, whatever. He's a very smart man. |
| 11 | | He was the one that helped me create a digital |
| 12 | | company I guess. |
| 13 | Q | Okay.  What gave you that idea originally? |
| 14 | A | The industry was changing, needed to evolve. |
| 15 | Q | Okay.  So fair to say that Widen Enterprises did |
| 16 | | end up evolving into a software company -- |
| 17 | A | Absolutely. |
| 18 | Q | -- completely? |
| 19 | A | Yes. |
| 20 | Q | Okay.  And by May 2021 was Widen Enterprises |
| 21 | | primarily a software as a service company? |
| 22 | A | May of '21? |
| 23 | Q | Yeah. |
| 24 | A | Yeah, it's fair to say. |
| 25 | Q | Okay.  And more specifically, was it what's known |

| | | Page 18 |
|---|---|---|
| 1 | | as a digital asset management -- |
| 2 | A | Uh-huh. |
| 3 | Q | -- company?  Okay. |
| 4 | A | That was part of it, yes. |
| 5 | Q | So between 2003 when your father passed away and |
| 6 | | May 2021, you built a pretty successful company? |
| 7 | A | Yes. |
| 8 | Q | Okay.  I'd like to show you our first exhibit. |
| 9 | | THE COURT REPORTER:  No. 1. |
| 10 | | (Exhibit No. 1 marked for |
| 11 | | identification) |
| 12 | Q | Do you recognize this document? |
| 13 | A | I haven't looked at it. |
| 14 | Q | Okay.  Well, take a -- you know, look it over, you |
| 15 | | know.  Take your time. |
| 16 | A | Excuse me. |
| 17 | | (Witness reviews document) |
| 18 | | MR. PALAY:  I'm sorry, ma'am.  You |
| 19 | | said this was marked as Exhibit 1? |
| 20 | | THE COURT REPORTER:  1. |
| 21 | | MR. PALAY:  Okay. |
| 22 | A | I don't remember all this, no.  I remember him |
| 23 | | (indicating).  That's my grandfather. |
| 24 | Q | If I could, I'd like to direct your attention to |
| 25 | | the first page after the cover sheet when you're |

| | | Page 19 |
|---|---|---|
| 1 | | ready. |
| 2 | A | Okay. |
| 3 | Q | At the top of that page it says |
| 4 | | "Widen Enterprises, Inc. ('Widen' or the |
| 5 | | 'Company') has engaged SEG Capital Advisors, LLC |
| 6 | | ('SEG') as its exclusive financial advisor in |
| 7 | | exploring a possible sale, merger, or |
| 8 | | recapitalization of the Company." |
| 9 | | Do you see that? |
| 10 | A | I do. |
| 11 | Q | Okay.  Is this a document that SEG helped |
| 12 | | Widen Enterprises prepare for the purposes of |
| 13 | | potentially selling Widen Enterprises? |
| 14 | A | I don't know that. |
| 15 | Q | Okay.  Is this a document you participated in |
| 16 | | creating? |
| 17 | A | No. |
| 18 | Q | Okay.  Do you know who created this? |
| 19 | A | No.  Well, SEG is all over it. |
| 20 | Q | Okay.  But you didn't have any part in creating |
| 21 | | this? |
| 22 | A | Not the document. |
| 23 | Q | Okay.  Did you review any of the information that |
| 24 | | went into the document? |
| 25 | A | Of course. |

| | | Page 20 |
|---|---|---|
| 1 | Q | Okay.  And was that information accurate? |
| 2 | | MR. CHURCHILL:  Objection, lack of |
| 3 | | foundation. |
| 4 | | THE WITNESS:  Am I to answer? |
| 5 | | MR. CHURCHILL:  If you can. |
| 6 | A | The question was? |
| 7 | Q | Was the information you reviewed that went into |
| 8 | | this document accurate? |
| 9 | | MR. CHURCHILL:  Same objection. |
| 10 | A | Yeah, as far as I know. |
| 11 | Q | Okay.  On that same page on the next paragraph, it |
| 12 | | says "This memorandum has been prepared from |
| 13 | | information obtained from the management of the |
| 14 | | Company and from other sources believed to be |
| 15 | | reliable." |
| 16 | | Who was the management of Widen Enterprises |
| 17 | | in May 2021? |
| 18 | A | Me, Matthew, Michael. |
| 19 | Q | Okay.  So fair to say you, Matthew, and Michael |
| 20 | | helped provide the information for this, for this |
| 21 | | document? |
| 22 | A | I'm not sure about that.  I can't speak on |
| 23 | | Michael's or Matthew's behalf. |
| 24 | Q | Okay.  But you did? |
| 25 | A | Probably to an extent. |

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

---

Page 21

1  Q  Okay.  Let's flip a few pages.  At the bottom do
2     you see where it says "WINDY," and then there's
3     some numbers?  Let's go to the one that says 7906.
4     Okay.  This page begins with the title
5     "Widen Overview."  Do you see that?
6  A  I do.
7  Q  It says "A highly respected, premium brand trusted
8     by hundreds of the world's most iconic enterprise
9     brands."
10        Did I read that correctly?
11 A  That's what I have.
12 Q  Okay.  And at the top there's some numbers.  The
13    first one says "63M+ Active Assets."  Do you know
14    what that means?
15 A  I'm not sure.  I would think it would be
16    63 million digital images.
17 Q  Okay.  And then next to that it says "102K+ YTD
18    Active Users."  Do you see that?
19 A  Uh-huh.
20 Q  Does that mean 102,000 plus year-to-date active
21    users?
22 A  I would assume so.
23 Q  Okay.  And then next to that it says "$34M 2021P
24    ARR"?
25 A  Uh-huh.

Page 22

1  Q  Do you understand that to mean $34 million in
2     annual recurring revenue for -- projected for
3     2021?
4  A  Yes.
5  Q  Okay.  And then next to that it says "21% 2018A –
6     2021P ARR CAGR."  Do you see that?
7  A  I do.
8  Q  Okay.  Does that mean 21 percent annual recurring
9     revenue compound annual growth rate between 2018
10    actual and 2021 projected?
11 A  Okay.
12 Q  Is that a yes?
13 A  Yes.
14 Q  Okay.  And then it says about "~680 1Q21A
15    Customers," right?  Does that mean about
16    680 customers in the first quarter of 2021?
17 A  I don't know.
18 Q  Okay.  Next to that it says "95% 2020A ARR
19    Retention"?
20 A  Uh-huh.
21 Q  That means 95 percent annual revenue -- annual
22    recurring revenue retention for 2020?
23 A  I guess so.  I'm assuming yes.
24 Q  Okay.  And then at the end it says "$3.1M 2020A
25    Adj. EBITDA."  Do you know what EBITDA means?

Page 23

1  A  Of course.
2  Q  Okay.  What is EBITDA?
3  A  Earnings before taxes, depreciation.
4  Q  And amortization, right?
5  A  Yes.
6  Q  Okay.  So it's fair to say a measure of profits or
7     free cash at a company?
8  A  Okay.  Yes.
9  Q  Okay.  So that means that Widen Enterprises had
10    $3.1 million in adjusted EBITDA for 2020?
11 A  Okay.
12 Q  Agreed?  Okay.  I'm meaning to ask these as a
13    question, so if --
14 A  I didn't create this document, so I'm just telling
15    you what I know.
16 Q  Okay.  Is that information that we just read, as
17    far as you're aware, correct as --
18 A  It is.
19 Q  -- of May 2021?
20        Okay.  Let's flip to 7912.  Okay.  At the top
21    of this page it says "Strong Executive Team with
22    Long Tenure."  Do you see that?
23 A  I do.
24 Q  Okay.  And it lists Matthew Gonnering,
25    Deanna Ballew, Michael Kiesler, Debby Leisner,

Page 24

1     Jake Athey, and Ben Dotte?
2  A  Okay.
3  Q  You're not listed; is that correct?
4  A  That's correct.
5  Q  How come?
6             MR. CHURCHILL:  Objection.
7  A  I don't know.
8             MR. CHURCHILL:  Objection, lack of
9        foundation.  You can answer.
10 Q  Okay.
11 A  I don't know.
12 Q  Let's flip a few more to 7917.  Okay.  So this
13    says "Key Investment Highlights.  The last proven
14    enterprise-grade DAM provider that is still
15    self-funded."  Correct?
16 A  Yes.
17 Q  Okay.  And the first bullet point says "G2 Crowd,
18    Forrester, and Gartner continually rank Widen as
19    one of the best enterprise-grade Digital Asset
20    Management offerings in the market today."
21        Do you see that?
22 A  I do.
23 Q  Okay.  Is that true?
24 A  Yes.
25 Q  Okay.  And the next bullet point, it says "Decades

---

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 25

1     of experience and innovation and a strong,
2     customer centric culture has established the
3     Company as one of the most widely respected and
4     trusted brands in its market," correct?
5  A  Agree.
6  Q  Okay. Is that a true statement, too, as of --
7  A  I think so.
8  Q  -- 2021? Okay.
9  A  I believe so.
10  Q  So fair to say Widen had been a digital asset
11    management company for some number of years by the
12    time this document was created?
13  A  Yes.
14  Q  Okay. And we won't read them all, but towards the
15    bottom, the third bullet point from the bottom, it
16    says "Strong overall financial profile, and
17    balance of solid revenue growth and EBITDA
18    margins. Highly attractive recurring revenue
19    business model driving strong revenue visibility."
20       Do you see that?
21  A  I do.
22  Q  Okay. What is -- what does recurring revenue
23    business model mean to you?
24  A  Recurring revenue? Annual recurring revenue?
25  Q  Yes.

Page 26

1  A  Customers over the years.
2  Q  So it's customers that keep spending money with
3    the company year after year?
4  A  That's the way I would read it.
5  Q  Okay. Let's skip way down to 7933. Okay. And at
6    the top of this page it says "Award Winning
7    Enterprise-Grade Product $40M+ of R&D investment
8    establishing the Company as the leader in
9    Enterprise DAM." Is that right?
10  A  That's what I read.
11  Q  Okay. And it lists a number of awards next to
12    that, correct?
13  A  Yes.
14  Q  Okay. One of those is the MarTech Breakthrough
15    Award for 2020. Do you see that?
16  A  I do.
17  Q  The MarTech Breakthrough Award for 2019?
18  A  I do.
19  Q  Do you know what that award is?
20  A  I don't.
21  Q  Okay. It lists the "CODiE 2019 SIIA CODIE
22    WINNER." Do you see that?
23  A  I do.
24  Q  Do you know what that award is?
25  A  No, but I know it's prominent.

Page 27

1  Q  Okay. Let's keep going down to 7954. Okay. Here
2    it says "Global Infrastructure. Widen's global
3    infrastructure provides for enterprise grade
4    scalability and service quality."
5       Do you see that?
6  A  I do.
7  Q  Do you know what the dots on this map/picture
8    represent?
9  A  No.
10  Q  Okay. Did Widen have any offices outside of the
11    United States?
12  A  One in London.
13  Q  Okay. Did it have any infrastructure in Brazil?
14  A  No.
15  Q  Okay. In Australia?
16  A  No.
17  Q  Singapore?
18  A  No.
19  Q  Beijing?
20  A  No.
21  Q  Tokyo?
22  A  No.
23  Q  Germany?
24  A  No.
25  Q  Ireland?

Page 28

1  A  No.
2  Q  Okay. Let's go to 7957. Okay. It says
3    "Customer Overview"?
4  A  Yes.
5  Q  "Trusted by a large, hard to replicate and
6    valuable global customer consisting of the most
7    iconic brands in the world." Is that right?
8  A  That's what I see.
9  Q  Okay. And it has some of the same metrics we
10    talked about on the first page, and then it lists
11    a lot of brand trademarks. Are those Widen
12    customers?
13  A  Appears to be.
14  Q  Okay. Do you know if Dyson was a Widen customer
15    in May 2021?
16  A  I don't.
17  Q  Okay. Do you know if General Electric Aviation
18    was a customer of Widen Enterprises?
19        MR. CHURCHILL: Objection as to --
20  A  In 2021?
21        MR. CHURCHILL: -- time.
22  Q  Yeah.
23  A  I don't know the dates.
24  Q  Okay. Fair to say this page is representing that
25    those two companies were customers at the time --

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

**Page 29**

1        MR. CHURCHILL: Objection.
2  Q  -- this was created?
3        MR. CHURCHILL: Sorry. Objection,
4    lack of foundation. You may answer.
5  A  They were customers.
6  Q  Okay. At the time this document was created?
7  A  I don't know that.
8  Q  Okay. Would you have -- would you have told
9    potential buyers of Widen Enterprises that they
10   were customers if they weren't customers?
11 A  Of course not.
12 Q  Okay.
13 A  If they weren't customers, no. I wouldn't have
14   said that.
15 Q  Okay. Let's go to 7958. Okay. This page says
16   "Strong and Consistent Growth. Product
17   leadership, trusted brand, and strong market
18   tailwinds driving continued growth."
19       Do you see that?
20 A  Yes. Excuse me.
21 Q  And it says that Widen Enterprises -- there's an
22   ARR graph next to an Average ARR graph. Do you
23   see that?
24 A  I do.
25 Q  And in the first one, just the ARR graph, it says

**Page 30**

1    Widen Enterprises was projecting to reach
2    $60 million in annual recurring revenue by 2023.
3    Do you see that?
4  A  I do.
5  Q  $44 million -- $44 and a half million, excuse me,
6    in annual recurring revenue by 2022?
7  A  Uh-huh.
8  Q  And it said there was $26.1 million in annual
9    recurring revenue for 2021 [2020]? That was an
10   actual number?
11 A  Okay.
12 Q  And $22.8 million in annual recurring revenue for
13   2019?
14 A  Okay.
15 Q  And $19.1 million for -- in annual recurring
16   revenue for 2018?
17 A  Okay.
18 Q  Okay.
19 A  That's what I see.
20 Q  Was annual recurring revenue an important metric
21   for Widen Enterprises?
22 A  For selling it, probably.
23 Q  Okay.
24 A  I never viewed it that way.
25 Q  How come?

**Page 31**

1  A  It never occurred to me to view it that way.
2  Q  Okay. But for selling the company, it became
3    important?
4  A  Well, that's when the term came up more often than
5    not.
6  Q  Okay. Let's go to 7982. So this page says
7    "Financial Overview. Attractive overall financial
8    profile balancing steady, consistent revenue
9    growth with EBITDA margins." Is that right?
10 A  Yes.
11 Q  It says "Highly attractive recurring revenue
12   business model driving strong revenue visibility,"
13   right?
14 A  Okay.
15 Q  "Solid and consistent revenue and ARR growth,"
16   correct?
17 A  Yes.
18 Q  "Strong gross margins to drive continued
19   profitability at scale," correct?
20 A  Correct.
21 Q  Okay. And let's go to 7985. Okay. So this is
22   the -- a financial sheet for the company; is that
23   correct?
24       MR. CHURCHILL: Objection, lack of
25    foundation.

**Page 32**

1  A  Sure. Yes.
2  Q  Okay. Go ahead. Sorry.
3  A  No. I'm just clearing my throat.
4  Q  Oh. In the column labeled 2019A --
5  A  Okay.
6  Q  -- do you see where it says "Revenue," and then
7    under it it says "Recurring"?
8  A  Yes.
9  Q  Okay. And it says $22,542,781; is that right?
10 A  Where are you looking?
11 Q  In the column that says 2019A.
12 A  A, yes.
13 Q  Across from "Recurring" under "Revenue."
14 A  Okay. 22,542, yes.
15 Q  Okay. And that means that's how much recurring
16   revenue the company had in 2019?
17 A  That's the way I'd read it.
18 Q  Okay. And then down two lines below that for
19   "Total Revenue" it says $28,689,687; is that
20   correct?
21 A  That's what it got.
22 Q  Total revenue?
23 A  Uh-huh.
24 Q  And going across to 2020, the recurring revenue
25   number is $25,528,245?

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

**Page 33**

1 A  Okay.
2 Q  And the total revenue number for 2020 is
3    $29,142,311; is that right?
4 A  That's what it says.
5 Q  Okay.  And then back to the 2019 column.  All the
6    way at the bottom next to "EBITDA," it says
7    $698,843; is that right?
8 A  Yes.
9 Q  Okay.  And below that it says "Adjusted EBITDA,"
10   $1,840,000 -- $1,840,580; is that right?
11 A  Yes.
12 Q  Do you know what, what the adjusted EBITDA on that
13   is?
14 A  No.
15 Q  And then 2020 it says the EBITDA is negative
16   $139,040; is that right?
17 A  I see that.
18 Q  Okay.  And the adjusted EBITDA for 2020 is
19   $3,125,973?
20 A  Uh-huh.
21 Q  Okay.  So that means if we're looking at the
22   adjusted EBITDA for 2019 and 2020,
23   Widen Enterprises was making about $1.8 million
24   for 2019 and about $3.1 million for 2020 in
25   profits?

**Page 34**

1             MR. CHURCHILL:  Objection, lack of
2      foundation.  You may answer.
3 A  I guess so, yeah.
4 Q  Okay.  And for 2021, that column has a P.  It's a
5    projected number.  The total EBITDA projected is
6    minus $2,700,000; is that right?
7 A  That's what I see.
8 Q  And the adjusted EBITDA projected is minus
9    $571,000?
10 A  That's what I see.
11 Q  Okay.  Let's continue on to 7988.  Okay.  So this
12   page says "EBITDA Adjustments Detail," correct?
13 A  Yes.
14 Q  And the first line says "Owner / Executive Comp:
15   Total base compensation, bonus and fringe for the
16   one Owner/President/Founder."  Is that right?
17 A  That's what I see.
18 Q  Okay.  Are you -- were you the one
19   owner/president/founder in May 2021?
20 A  I was never a founder.
21 Q  Okay.  Is that person they're referring to there
22   you?
23 A  I don't know.
24 Q  Okay.  Any other president of the company in
25   May 2021?

**Page 35**

1 A  No.
2 Q  Okay.  And you were an owner of the company at
3    that time?
4 A  Yes.
5 Q  And you were the president of the company at that
6    time?
7 A  Yes.
8 Q  Okay.  And -- so going below to the
9    "EBITDA Adjustments" chunk of the numbered
10   portion.  It says for 2019 actual, the "Owner /
11   Executive Compensation" is $1,803,897; is that
12   correct?
13 A  Where are you looking?
14 Q  So under -- in the column 2019 --
15 A  Yes.
16 Q  -- A down to "EBITDA Adjustments," across from
17   "Owner / Executive Compensation."
18 A  Okay.
19 Q  Okay.  Did I read that number right, $1,803,897?
20 A  That's what it says.
21 Q  Was that the total amount of compensation that you
22   received from Widen Enterprises in 2019?
23 A  I don't know.  It seems high.
24 Q  Okay.  What would you have thought it was?
25 A  Less than that.

**Page 36**

1 Q  Okay.  You would be surprised if it was -- if you
2    received that much compensation?
3 A  Yes.
4 Q  Okay.  Did you receive compensation in 2019 from
5    Widen Enterprises?
6 A  Yes.
7 Q  Okay.  Do you have a recollection of how much --
8 A  I don't.
9 Q  -- compensation you received?
10 A  No.
11 Q  Okay.  Going across to the same number -- or the
12   same adjustment for 2020, it says $3,227,053; is
13   that correct?
14 A  Where are you looking?  I'm sorry.
15 Q  Next to the --
16 A  Yes.  I got it.
17 Q  Okay.  Was that the correct number I just read?
18 A  $3,227,053, yeah.
19 Q  Okay.  Is that how much compensation you received
20   from Widen Enterprises in 2020?
21 A  No.
22 Q  Okay.  How much -- did you receive compensation in
23   2020?
24 A  Yes.
25 Q  Okay.  How much do you remember receiving?

**Page 37**

1  A  Less than that.
2  Q  Okay.  Because this seems too high?
3  A  Yes.
4  Q  Do you think it would have been warranted if you
5     had earned the two numbers we're looking at, the
6     $1.8 million and $3.2 million in 2019 and 2020?
7                    MR. CHURCHILL:  Objection,
8            ambiguous.
9  A  No idea.
10 Q  Okay.  So those numbers are added in this
11    "EBITDA Adjustments" column.  Do you see that?
12 A  Yes.
13 Q  And then at the bottom it has the adjusted EBITDA.
14    So of the total adjusted EBITDA for 2019, which as
15    we read earlier is $1,840,580, it says $1,803,897
16    of that is for your compensation.  Is that fair to
17    say?
18 A  I don't know.
19 Q  Okay.
20 A  Where are you reading that number?
21 Q  So at the bottom --
22 A  Got the 1.8 adjusted EBITDA.
23 Q  Yeah.  And then of that adjustment, if we go back
24    up to the "Owner / Executive Compensation" --
25 A  Okay.

**Page 38**

1  Q  -- line, $1.8 million is that portion of the
2     adjustment; is that correct?
3  A  I wasn't the sole owner.
4                    MR. CHURCHILL:  Objection, lack of
5            foundation.  Make sure to let me have an
6            opportunity to listen --
7                    THE WITNESS:  Sorry.
8                    MR. CHURCHILL:  -- to the question.
9  Q  Okay.  But are you -- when it says "the one
10    Owner/President/Founder," you think that's talking
11    about you?
12 A  Yes.
13 Q  Okay.  And then for 2020, of the total adjustment
14    of $3,125,973, there's an adjustment for the
15    "Owner / Executive Compensation" of $3,227,053; is
16    that fair?
17 A  Yes.
18 Q  Okay.  And who were the other owners at the time
19    this document was created?
20 A  Mike Kiesler, Matthew.  I don't remember if
21    Brian Becker and Terry Vile (phonetic) were owners
22    there or not.
23                   THE COURT REPORTER:  Can you repeat
24            those names.
25 A  Terry Vile I don't remember.  He was an owner at

**Page 39**

1     one time.  I don't know about conception of this
2     document.  Same goes for Brian Becker and Gary
3     Norris.
4  Q  Do you remember how much each of those people
5     owned at this time?
6  A  I do not.
7  Q  Okay.  On the next page, 7989, it says
8     "Cap Table," and then it lists shareholders.
9  A  Okay.
10 Q  The first shareholder listed is The Widen Family
11    at 69 percent.  Do you see that?
12 A  I do.
13 Q  Who was part of The Widen Family who owned
14    69 percent?
15 A  I don't know.
16 Q  Okay.
17 A  In 2019 you're talking?
18 Q  2021.
19 A  '21.  I don't know.  I'm assuming it's me.
20 Q  Did any other Widens own part of the company in
21    2021?
22 A  I don't believe so.
23 Q  Okay.  And then it says Matthew Gonnering, the
24    CEO, and Michael Kiesler, the CFO, owned
25    collectively 18 percent?

**Page 40**

1  A  That's what it says.
2  Q  And then it says Executive Advisor owned
3     13 percent; is that right?
4  A  That's what it says.
5  Q  Who is the Executive Advisor?
6  A  Don't know.
7  Q  Okay.  You can -- we don't have to look at this
8     anymore.
9         Ultimately you sold Widen Enterprises to a
10    company called Acquia, Inc., right?
11 A  Yes.
12 Q  Okay.  And you sold it for a purchase price of
13    $162 million?
14 A  Yes.
15 Q  Okay.  Fair to say that that price reflected the
16    value of Widen Enterprises as we defined it here
17    today?
18 A  Apparently.
19 Q  Okay.  You sold 100 percent of its stock --
20 A  Right.
21 Q  -- to Acquia, right?
22       Do you know of any reason that Acquia had any
23    compulsion to buy Widen Enterprises?
24                   MR. CHURCHILL:  Objection,
25            ambiguous.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 41

1   A   No.  I don't know their position.
2   Q   Were you under any compulsion to sell
3       Widen Enterprises?
4   A   When?
5   Q   In 2021 when you sold it to Acquia?
6   A   Well, sure.
7   Q   What compulsion were you under?
8                MR. CHURCHILL:  Objection,
9           ambiguous.
10  A   What's compulsion?  What do you want?
11  Q   Like, was there anything that forced you to --
12  A   No.
13  Q   Okay.  And did you provide Acquia with all the
14      relevant information about the company --
15  A   Yes.
16  Q   -- when they bought it?
17      Okay.  Do you think that was a fair price for
18      Acquia to pay for Widen Enterprises?
19               MR. CHURCHILL:  Objection,
20          ambiguous.
21  A   Don't know.
22  Q   Do you think the company was worth less than that?
23  A   Yeah.
24  Q   Okay.  How much do you think the company was
25      worth?

Page 42

1   A   I don't know.  I heard that it could go for three
2       to four times EBITDA.
3   Q   Okay.
4   A   We didn't have EBITDA, kept pouring money into the
5       company.  When it came out that it was four times
6       revenue, I was shocked.
7   Q   Who told you that it would be three to four times
8       EBITDA?
9   A   Jeff Horein.
10  Q   Okay.  And who is Jeff Horein?
11  A   He's an M&A person at Baker Tilly.
12  Q   Okay.  When did he tell you that?
13  A   I don't know.
14  Q   Was it in 2021?
15  A   I don't know.
16  Q   Okay.
17  A   Could have been.
18  Q   Okay.  So going back to 2019 and 2020.  Was the --
19      the company was a digital asset management company
20      at that time?
21  A   Yes.
22  Q   And that's a type of software service?
23  A   Yes.
24  Q   Any big differences in the company in 2019 and '20
25      and 2021?

Page 43

1   A   It evolved into a marketing software company
2       versus digital asset management.
3   Q   Okay.  So what's the difference between the
4       marketing software and the digital asset
5       management?
6   A   Digital asset management was as it is, taking
7       their images and distributing them to whoever
8       needed them.  Software company evolved into the
9       tools that we created listening to customers.
10  Q   Okay.  When did that -- when did that transition
11      happen?
12  A   It was continuous.
13  Q   Okay.  Starting in -- before 2019?
14  A   Yeah.
15  Q   Okay.  So in 2019 and '20 was it a marketing
16      software company at that point?
17  A   2020?
18  Q   Yeah, and 2019.
19  A   It was evolving into that if it wasn't.
20  Q   Okay.  Do you have a date when you would say it
21      definitely was --
22  A   No.
23  Q   -- a marketing software company?
24  A   No.
25  Q   Just by 2021?

Page 44

1   A   Okay.
2   Q   Okay.  And it was at least a partially marketing
3       software company in 2019 to '20?
4   A   Probably fair to say.
5   Q   Okay.  And those are the years that the document
6       we were just looking at listed you receiving
7       $1.8 million for 2019 and $3.2 million for 2020 in
8       total compensation?
9                MR. CHURCHILL:  Objection,
10          misstates testimony, mischaracterizes
11          testimony.
12  Q   Okay.  Did you read the document in a different
13      way?
14  A   No.
15  Q   Okay.  In, like, between January and May 2020,
16      what was your -- what was your position at
17      Windy Waters?
18  A   I don't recall.
19  Q   How about at Widen Enterprises?
20  A   From what dates?
21  Q   January to May 2020.
22  A   Windy Waters I don't know.  Widen was president
23      and chairman of the board.
24  Q   Okay.  Fair to say you ran those companies in that
25      period of time?

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023

Page 45

| | |
|---|---|
| 1 | A   Yes. |
| 2 | Q   You were in control of what happened at those |
| 3 | companies? |
| 4 | MR. CHURCHILL:  Objection, |
| 5 | ambiguous.  You may answer. |
| 6 | A   Matthew ran the companies -- |
| 7 | Q   Okay. |
| 8 | A   -- with my -- with me I should say. |
| 9 | Q   Did Matthew report to you, or did you report to |
| 10 | Matthew? |
| 11 | A   Matthew reported to me. |
| 12 | Q   Okay.  So you ultimately called the shots? |
| 13 | A   Yes. |
| 14 | Q   Okay.  And who appointed you as president of the |
| 15 | companies? |
| 16 | MR. CHURCHILL:  Objection, vague. |
| 17 | When? |
| 18 | Q   When you became president of Widen Enterprises. |
| 19 | A   My father I think did. |
| 20 | Q   Okay.  Do you know if Widen Enterprises had a |
| 21 | board of directors? |
| 22 | A   Sometimes we did. |
| 23 | Q   Okay.  Do you know if the board of directors |
| 24 | appointed you as the president of the company? |
| 25 | A   Did not. |

Page 46

| | |
|---|---|
| 1 | Q   Okay.  Do you know who elected the board of |
| 2 | directors of Widen Enterprises? |
| 3 | A   It depends on what board you're talking about. |
| 4 | There was a couple of them. |
| 5 | Q   Oh, okay.  So -- |
| 6 | A   My father formed one, and I formed one after I |
| 7 | hired Matthew to take the CEO role. |
| 8 | Q   At Widen Enterprises? |
| 9 | A   Yes. |
| 10 | Q   Okay.  So who elected the directors of the board |
| 11 | you formed? |
| 12 | A   I did. |
| 13 | Q   Okay. |
| 14 | A   I selected them. |
| 15 | Q   You selected them.  Did anyone else get to vote |
| 16 | about who the directors were? |
| 17 | A   No. |
| 18 | Q   Did anybody supervise you in your role as |
| 19 | president of Widen Enterprises? |
| 20 | A   I was consulted a lot by Baker Tilly. |
| 21 | Q   But not internal to the company? |
| 22 | A   No. |
| 23 | Q   Okay.  And you determined your own compensation |
| 24 | from Widen Enterprises, correct? |
| 25 | A   Yes. |

Page 47

| | |
|---|---|
| 1 | Q   And you did that by considering your individual |
| 2 | performance, the company's performance, and the |
| 3 | market conditions; is that correct? |
| 4 | A   Correct. |
| 5 | Q   Okay.  So taking those each in turn, for your |
| 6 | performance, for that aspect of your compensation, |
| 7 | did that refer to just how well you were doing |
| 8 | your job as president? |
| 9 | A   It depended how well the company was doing. |
| 10 | Q   The individual performance depended on how well |
| 11 | the company was doing? |
| 12 | A   Well, how else would you measure it? |
| 13 | Q   So what's the difference between individual |
| 14 | performance and the company's performance? |
| 15 | A   You tell me. |
| 16 | Q   Well, these are your words. |
| 17 | A   I don't know. |
| 18 | Q   Okay. |
| 19 | A   The company's performance is easy, right?  It's |
| 20 | measured. |
| 21 | Q   Measured by its financial -- |
| 22 | A   Yes. |
| 23 | Q   -- performance? |
| 24 | A   Yes. |
| 25 | Q   Okay.  And how well the company was doing |

Page 48

| | |
|---|---|
| 1 | financially impacted how much compensation you |
| 2 | determined to pay yourself? |
| 3 | A   I guess. |
| 4 | Q   Okay.  And you said your individual performance |
| 5 | also impacted how much compensation you received; |
| 6 | is that right? |
| 7 | A   Okay. |
| 8 | Q   Is that correct? |
| 9 | A   Correct I guess. |
| 10 | Q   Okay. |
| 11 | A   I'm trying to be fair and honest here. |
| 12 | Q   Sure.  I appreciate that.  Can you tell me how you |
| 13 | evaluated your individual performance. |
| 14 | A   Measured by the success of the company. |
| 15 | Q   Okay.  So they're sort of the same thing, |
| 16 | individual performance and company performance? |
| 17 | A   I would think so. |
| 18 | Q   Okay.  And part of your role as president was you |
| 19 | said you oversaw the CEO, Matt Gonnering, correct? |
| 20 | A   Uh-huh. |
| 21 | Q   Sorry.  I just -- you need to give a verbal -- |
| 22 | A   Yes. |
| 23 | Q   Okay.  Thank you.  So part of your individual |
| 24 | performance was how well you were kind of |
| 25 | overseeing Matt Gonnering as CEO? |

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 49

1  A  Yes.
2  Q  Okay.  And part of that job overseeing
3     Matt Gonnering was overseeing how well the company
4     was performing financially?
5  A  Yes.
6  Q  Okay.  How did you keep track of how well the
7     company was performing financially?
8  A  Statements, income statements.
9  Q  So you would review the income statements of the
10    company?
11  A  Of course.
12  Q  Okay.  How often would you review them?
13  A  Every month.
14  Q  Okay.  And who would send you those?
15  A  Mike.
16  Q  So -- okay.  Mike Kiesler would send you the
17    income statements every month, and --
18  A  Yes.
19  Q  -- you'd review those?
20  A  Yes.
21  Q  Those were important to you?
22  A  Yes.
23  Q  Okay.  Did Matt Gonnering send you financial
24    information to review?
25  A  I got most of it from Michael.

Page 50

1  Q  Okay.  Any other information you reviewed to keep
2    track of the company's performance as it related
3    to your compensation?
4  A  Just projection versus actual.
5  Q  Okay.  You wanted to see how, how those related to
6    each other?
7  A  Whether we were on target or not.
8  Q  Okay.  So you wanted to know what the projection
9    was?
10  A  And what actual was.
11  Q  Okay.  Was one of the metrics of the company's
12    financial performance that you kept track of its
13    revenues?
14  A  Yes.
15  Q  Okay.  And its recurring revenues?
16  A  Revenue.
17  Q  You didn't distinguish between revenue --
18  A  No.
19  Q  -- and recurring?
20       Okay.  Do you know if the company kept track
21    of those separately?
22  A  We did.
23  Q  Okay.  But you didn't think it was a big
24    difference?
25  A  To me, no.

Page 51

1  Q  Okay.  So fair to say that the revenue was an
2    important metric in determining how well the
3    company was doing?
4  A  Yes.
5  Q  Okay.  Did Mike Kiesler or Matt Gonnering update
6    you about the company's strategic initiatives?
7  A  Of course.
8  Q  Okay.  Its customers?
9  A  Yeah.
10  Q  Adding a new customer or losing a customer?
11  A  I wasn't notified of every customer.
12  Q  Important customers?
13  A  Well, I guess I was because it all came through
14    email.  There was a review of a new customer and
15    what they were, so yeah, I guess I was notified of
16    it.
17  Q  Okay.
18  A  Not necessarily through Matthew or Mike.
19  Q  Got it.  So you would just get like an automated
20    update about new customers?
21  A  Okay.
22  Q  I'm asking you.
23  A  Yeah.  Sure.  Yes.
24  Q  Okay.  And Windy Waters had some marketable
25    securities accounts, correct?

Page 52

1  A  Such as?
2  Q  Did Windy Waters have investment accounts that it
3    kept?
4  A  Did Windy Waters?  I don't know.
5  Q  Okay.  Do you know if Widen Enterprises did?
6  A  We had some accounts, yeah.
7  Q  Okay.  Do you know who managed those accounts?
8  A  No.
9  Q  Okay.  Do you know Isthmus Partners managed any
10    marketable --
11  A  They weren't --
12  Q  -- securities --
13  A  -- part of it then.
14  Q  Okay.  Do you know if Schwab managed any
15    marketable securities --
16  A  I don't remember.
17  Q  -- accounts?  Don't know?  Okay.
18  A  I don't remember, no.  Sorry.
19  Q  Do you know who made, like, the decisions about
20    how much money to put into those accounts or take
21    out of them?
22  A  Well, I did.
23  Q  Okay.  What was that money used for?
24  A  For the growth?
25  Q  That was --

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

---

**Page 53**

1  A  Investments?

2  Q  Yeah.

3  A  I don't know.  It was just a secure spot to put
4     money.

5  Q  Okay.

6         MR. CHURCHILL:  And, David, is now
7     a good time to take a break?

8         MR. PALAY:  Yeah.  That's fine.

9         (Recess)

10 Q  Okay.  Mr. Widen, before we took a break we were
11    talking about the factors that you looked at when
12    setting your compensation from Widen Enterprises
13    and Windy Waters.  Do you remember that?

14 A  Yes.

15 Q  Okay.  And we were saying that two of the factors
16    were your individual performance and the company's
17    performance.  Do you remember that?

18 A  Yes.

19 Q  And those kind of overlapped because they were
20    both based on the company's performance, correct?

21 A  Yes.

22 Q  So was one of the things that you considered when
23    evaluating the company's performance and your
24    individual performance the company's EBITDA?

25 A  I'm not sure I put a lot of weight into that.

**Page 54**

1  Q  Okay.  What were the things you put the most
2     weight into when determining your compensation?

3  A  Well, I lived and breathed this company 24/7.
4     It's been four decades of my life, so my effort
5     was always there.

6  Q  So what were the factors that determined your
7     compensation year to year?

8  A  Well, how much I put into it probably.

9  Q  Okay.  And you said you always put a lot into it?

10 A  It was on my mind all the time.

11 Q  So if you made $1.8 million one year and
12    $3.1 or 2 million the next year, what accounts for
13    that difference?

14 A  I'm not sure that's accurate numbers.

15 Q  Okay.  Just hypothetically speaking, what would
16    account for the difference between two years of
17    compensation?

18 A  Performance of the company and the effort I put
19    in.

20 Q  Okay.  Did you put in less effort some years than
21    others?

22 A  I doubt it.

23 Q  Okay.  So fair to say the performance of the
24    company was what was driving your compensation?

25 A  Somewhat fair.

**Page 55**

1  Q  Okay.  Anything not fair about that?

2  A  The effort that I put in every day.

3  Q  Okay.  So what I'm understanding you to say is
4     that you always put in that effort, so that was
5     kind of a constant year to year?

6  A  It was my life.

7  Q  Okay.  So the changes in your comp from year to
8     year were explained most by the performance of the
9     company?

10 A  Yes.

11 Q  Okay.

12 A  Somewhat, yeah.

13 Q  Did you consider how your compensation compared
14    with the company's value?

15        MR. CHURCHILL:  Objection,
16    ambiguous.

17 A  Lots of times I was consulted by Baker Tilly on
18    comp.

19 Q  Oh, okay.  Who at Baker Tilly consulted with you
20    on comp?

21 A  Russ Wolff and Brad DeNoyer earlier in the
22    process.

23 Q  Okay.  And what information did they provide?

24 A  Just suggested income for companies my size.

25 Q  Okay.  And how did they gauge the size of the

**Page 56**

1     company?

2  A  I don't know.

3  Q  Okay.  What income did they suggest?  Was it the
4     amount that you took, or did you take a different
5     amount?

6         MR. CHURCHILL:  Objection, vague.

7  A  What they suggested.

8  Q  Okay.  So Baker Tilly suggested year to year the
9     amount of compensation you took?

10 A  I didn't say year to year.

11 Q  Okay.  So for 2019 and '20 did Baker Tilly suggest
12    the amount of compensation that you actually got?

13 A  I don't believe so.

14 Q  Okay.  So for 2019, 2020, did you consider the
15    company's value in determining how much
16    compensation you received?

17        MR. CHURCHILL:  Objection,
18    compound.

19 A  No.

20 Q  Okay.  Did you consider the company's revenues
21    when determining how much compensation you
22    received in 2019?

23 A  No.

24 Q  How did you measure the performance of the company
25    when determining how much compensation you

---

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 57

1   received in 2019?
2   A   I don't remember.
3   Q   Okay.  When Baker Tilly provided its suggestions
4       for how much compensation you would receive, were
5       those -- how did they provide that information?
6   A   Verbal.
7   Q   Okay.  So you'd have a meeting with Russ Wolff?
8   A   Yes.
9   Q   Okay.  And is he the one who primarily provided
10      the suggestions on compensation?
11  A   Not -- I mean, not every year, no.
12  Q   Okay.  And not for 2019?
13  A   I don't think so.
14  Q   Okay.  So I guess I'm just -- I can't understand
15      how you measured the company's performance for
16      determining your compensation in 2019 if it wasn't
17      by the company's EBITDA and it wasn't by the
18      company's revenues and it wasn't by the company's
19      value.  Does that -- can you tell me how you, how
20      you determined that?
21  A   By the company's performance.  I answered that
22      already.
23  Q   Okay.  But not by its revenue, EBITDA, or value?
24  A   Not EBITDA.
25  Q   So revenue?

Page 58

1   A   Revenue, growth.
2   Q   Okay.  So you did consider revenue when
3       determining --
4   A   Yes.
5   Q   -- compensation?
6           Okay.  Did you consider value when
7       determining --
8   A   No.
9   Q   -- compensation?  Okay.  So just revenue?
10  A   Sorry.  I'll slow down.  Pardon me?
11  Q   So just revenue?
12  A   Not just.
13  Q   Okay.  What else?
14  A   My effort.
15  Q   Okay.  Revenue and your effort?
16  A   Yeah.
17  Q   And then you also said you considered the
18      market conditions when setting your compensation;
19      is that correct?
20  A   No.
21  Q   Okay.
22              (Exhibit No. 2 marked for
23              identification)
24              THE COURT REPORTER:  No. 2.
25  Q   Okay.  Mr. Widen, do you recognize this document?

Page 59

1   A   I'm not sure.  I've seen a lot of them.
2   Q   Okay.  I'll represent to you that this is
3       "DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF
4       STACY L. RANDALL'S FIRST SET OF
5       INTERROGATORIES" --
6   A   Okay.
7   Q   -- in this case.
8           Did -- did you consult with your attorneys
9       about creating this document?
10  A   No.
11  Q   Okay.  You did not participate in answering these
12      interrogatories?
13  A   Well, I don't know.  I haven't read it.  If I
14      answered, it'd be documented, correct?
15  Q   Well, I'm asking you.
16  A   I'll take a minute and familiar myself.
17              (Witness reviews document)
18  Q   I would direct your attention to page 11,
19      Interrogatory No. 7.
20  A   I'm not that far yet, but okay.  Page 11?
21  Q   Yeah.  Interrogatory No. 7.
22  A   Got it.
23  Q   Okay.  It says "Describe in detail how the
24      compensation paid to Reed and Kiesler by each of
25      the Companies for each of 2019 and 2020 was

Page 60

1       determined, including identifying the person" or
2       persons "who made such determination(s)."
3           Do you see that?
4   A   I do.
5   Q   Okay.  And there are two paragraphs of answers.
6       And in the second paragraph beginning with the
7       first sentence, it says "Subject to and without
8       waiving the foregoing objections, or the General
9       Objections above, Defendants respond as follows:
10      The amount of compensation for years 2019 and 2020
11      paid to Reed Widen and Mr. Kiesler was determined
12      by considering each person's individual
13      performance, the company's performance, and the
14      market conditions.  The person who made the
15      determination for each was that person's manager.
16      Mr. Kiesler's wages were determined by
17      Matthew Gonnering.  Reed Widen determined his
18      wages and bonus amounts for himself and
19      Mr. Kiesler."
20          Did I read that correctly?
21  A   You did.
22  Q   Okay.  Is that information true and accurate?
23  A   I don't think it all is, no.
24  Q   Okay.  What about that is not true or accurate?
25  A   I wouldn't give Michael a bonus without Matthew's

Page 61

1    okay.
2  Q  Okay.  So Matthew participated in setting the
3     bonus amounts for Mr. Kiesler?
4  A  Yes.
5  Q  Anything else about that answer not true or
6     accurate?
7  A  I don't think so.
8  Q  Okay.  So when it says that each person's
9     compensation was determined by considering that
10    person's individual performance, the company's
11    performance, and the market conditions, what are
12    the market conditions referring to?
13 A  I'm not sure.
14 Q  Okay.  So you don't know if that's, that's an
15    accurate statement or not?
16            MR. CHURCHILL:  Objection,
17       mischaracterizes testimony.  You can answer.
18 A  I don't know.
19 Q  Okay.  I guess, you know, just so we can move on,
20    if you can just describe to me -- in 2019 you're
21    determining how much compensation you're going to
22    receive, okay?  Correct?  You determined your own
23    compensation --
24 A  Yes.
25 Q  -- in 2019?

Page 62

1        Okay.  How did you do that?  Describe that
2     process.
3  A  I don't know.
4  Q  Okay.  There's no process to describe?
5  A  Just my effort and how well the company was doing.
6  Q  Okay.  You just thought of those two things and
7     picked a number?
8  A  I guess.
9  Q  Okay.  And then you -- going back.  We were
10    talking about the company being -- transitioning
11    from a digital asset management company to a
12    software sales company?
13 A  Yes.
14 Q  What software did it sell?
15 A  It was software as a service.
16 Q  Okay.  What was the software?
17 A  I don't understand the question.
18 Q  What was the software product or service that the
19    company offered?
20 A  It was a marketing software company.
21 Q  Okay.  Can you describe what the marketing
22    software was?
23 A  It's hard.  I mean, we would listen to customers,
24    and we built products, code.  There were templates
25    for automation, those types of things.

Page 63

1  Q  Okay.  And it had been a marketing software
2     company since when?
3            MR. CHURCHILL:  Objection, asked
4       and answered.
5  A  I thought so too.
6            MR. PALAY:  I believe, Counsel, the
7       answer was that it was a continuous period.
8  Q  And I'm just wondering when did that -- when did
9     it first begin being a marketing software company?
10 A  Matthew started transitioning it from a graphics
11    communications company to a marketing software
12    company when he took over.
13 Q  Okay.  And when did Matthew take over?
14 A  I don't remember the date.
15 Q  Okay.  Do you remember if it was before 2010?
16 A  I don't.
17 Q  Okay.  Do you remember if it was before 2018?
18 A  It was before 2018.
19 Q  Okay.  So I'd like to talk a little bit about your
20    sister Stacy's roles at the company.  So during
21    the period we were just talking about, 2019 to
22    2020, was Stacy helping you run the companies?
23 A  No.
24 Q  Okay.  Was she an employee?
25 A  I don't think so.

Page 64

1  Q  At one point was she an employee of the companies?
2  A  Twice.
3  Q  Okay.  And was she fired?
4  A  Yes.
5  Q  By you?
6  A  One time.
7  Q  Okay.  And she was fired for cause; is that right?
8  A  Yeah.
9  Q  Okay.  What was the cause?
10 A  She was drinking.
11 Q  On the job?
12 A  At lunch she took an hour and a half lunch when
13    she was allowed a half hour, came back smelling of
14    booze, as our receptionist.
15 Q  And so you dismissed her from the company?
16 A  Yes.
17 Q  Okay.  In 2019, 2020 did Stacy go to the companies
18    on a regular basis?
19 A  On a regular basis, no.
20 Q  Did she have any responsibilities for any part of
21    the companies?
22 A  No.
23 Q  She didn't help you supervise the CEO?
24 A  No.
25 Q  She didn't keep track of the company's financial

Page 65

1     health like you did?
2  A  No.
3  Q  Fair to say that she really didn't contribute to
4     the value of the companies at all?
5  A  Fair to say.
6  Q  Did she do anything at all to help the companies?
7  A  No.
8  Q  She really had no active role in the companies?
9  A  No, not since her termination.
10 Q  Okay.  When was that termination?
11 A  I don't remember.
12 Q  Was it more than ten years ago?
13 A  Yes.
14 Q  Okay.  And did she attend any meetings?
15 A  No.
16 Q  Okay.  Just going back to the software marketing
17    company that we were talking about.  Can you just
18    describe what the software did that you sold.
19 A  No.
20 Q  No.  Okay.  Do you know who would be able to
21    describe that?
22 A  Matthew.
23 Q  Okay.  So in the beginning of this deposition I
24    asked you if you'd read the complaint in this
25    case, right, and you said you read parts of it?

Page 66

1  A  Uh-huh.
2  Q  So you know that part of this case is about
3     Stacy's redemption -- the redemption of Stacy's
4     stock from Windy Waters in 2020, correct?
5  A  Correct.
6  Q  Okay.  So I'd like to talk about that, that
7     transaction now.
8                (Exhibit No. 3 marked for
9                identification)
10               THE COURT REPORTER:  No. 3.
11 Q  Okay.  What has been marked as Exhibit No. 3, do
12    you recognize this?  It's a two-page document.
13 A  Yes.
14 Q  Okay.  What is it?
15 A  It's a text message between me and my sister.
16 Q  Okay.  And if you flip to the second page, the
17    first text message says it was sent on May 5, 2020
18    at 4:14 p.m.?
19 A  Yes.
20 Q  Okay.  And it says -- this was sent by
21    Stacy Randall?  That message was sent by --
22 A  Yes.
23 Q  -- Stacy Randall?
24       Okay.  And it says -- the message says "Steve
25    is taking me to court.  He wants me to pay him

Page 67

1     maintenance, his reasons are . . . bullshit.  I'm
2     going to need to get some money."
3        Did I read that correctly?
4  A  You did.
5  Q  Okay.  And then --
6             MR. CHURCHILL:  Just an objection.
7        You left out the word "all," but I don't
8        think it's important.
9             MR. PALAY:  Thank you, Mark.
10 Q  For completeness it says -- the message says "He
11    wants me to pay him maintenance, his reasons are
12    all bullshit.  I'm going to need to get some
13    money."
14       And then on the same day, May 5, 2020 at
15    5:25 p.m., it says the owner, whose number is
16    608-217-5910, responds.  Is that your phone
17    number?
18 A  It is.
19 Q  Okay.  And it was your phone number at this time?
20 A  Yes.
21 Q  Okay.  And you said "We have a Covod [sic]
22    problem, your timing couldn't be worse.  We might
23    have to take care of it in Milmont [sic]."  Is
24    that correct?
25 A  That's what it says.

Page 68

1  Q  Okay.  What did you mean by that?
2  A  A COVID problem?
3  Q  Yeah, the whole message.  What did you mean when
4     you said that?
5  A  I think it's self-explanatory, but COVID was a new
6     thing.  Nobody -- everybody was very uncertain,
7     right?  She needed money.  Maybe we could find
8     some in a different company called Millmont.
9  Q  Okay.  And Millmont, what kind of company is that?
10 A  It's just a holding company for real estate.  The
11    cottage and the office building were part of it.
12 Q  Okay.  So was that a company that you and Stacy
13    were owners of as well?
14 A  She owned 20 percent.
15 Q  Okay.  And you thought Millmont might have some
16    money that you could make available to Stacy for
17    this?
18 A  I tried to take care of Stacy a lot when she
19    needed money when I had no obligation to do so,
20    and I always worked for her.
21 Q  Okay.  And so you wanted to help take care of her
22    in this instance and help get her the money she
23    needed for this, her court appearances that she
24    was talking about?
25 A  This and every other stock redemption that she

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 69

1    did, yes.
2  Q  Okay.  Did you talk to anyone else about this
3     before responding to Stacy?
4  A  I don't remember.
5  Q  Okay.  Did you look at, you know, at the company's
6     financial situation before responding?
7  A  Well, I knew of the financial situation.
8  Q  You knew it because you were on top of it?
9  A  Yeah.
10 Q  Okay.  And so you understood that Stacy wanted --
11    what she said is some money; is that right?
12 A  That's what it says.
13 Q  Okay.  And so did that mean that to you that she
14    wanted to liquidate some amount of stock to get
15    the money she needed for this divorce proceeding?
16 A  Fair to say.
17 Q  Okay.  What were the possible ways you thought of
18    that Stacy could get this money?
19 A  Listed right there, Millmont.
20 Q  And what happened with the Millmont idea?
21 A  I don't remember.
22 Q  Did you look into it?
23 A  I'm sure I did.
24 Q  Okay.  Did you speak to anyone about whether
25    Millmont could provide the money?

Page 70

1  A  I would have had to call Russell Wolff or
2     something, yeah.
3  Q  Do you remember doing that?
4  A  I don't remember doing it, but I'm sure I did.
5  Q  Okay.  What makes you think you did?
6  A  He often told me if there was extra money for
7     distributions.
8  Q  In Millmont?
9  A  Yeah.
10 Q  Did Millmont make distributions?
11 A  Only if -- only when necessary.
12 Q  Okay.  So your testimony is that you believe you
13    spoke to Russ Wolff about whether Millmont could
14    make a distribution --
15 A  Yes.
16 Q  -- that would give Stacy this money?
17 A  Yes.
18 Q  Okay.  Do you remember what Russ told you?
19 A  I don't.
20 Q  Okay.  Stacy didn't tell you that she wanted to
21    liquidate all of her stock in Windy Waters, right?
22 A  No.
23 Q  Okay.  After Russ -- so was Russ Wolff the first
24    person you talked to about this?
25 A  I don't know.

Page 71

1  Q  Okay.  Who else can you remember talking to about
2     this?
3  A  I'm sure I talked to Michael.
4  Q  Okay.  Do you remember when you talked to Michael?
5  A  No.
6  Q  Did you discuss with Michael Stacy being redeemed
7     for all of her stock in Windy Waters?
8  A  When?
9  Q  At any point.
10 A  He told me that she wanted to.
11 Q  Michael told you that Stacy wanted to redeem all
12    of her stock?
13 A  Well, she did redeem it all, is what they told me,
14    if I remember right.
15 Q  Do you remember when he told you that?
16 A  No.
17 Q  Okay.  Did you talk to Matt Gonnering about this?
18 A  No.
19 Q  Okay.
20              (Exhibit No. 4 marked for
21              identification)
22              THE COURT REPORTER:  No. 4.
23 A  Excuse me.
24 Q  Okay.  I've just handed you what's been marked as
25    Exhibit No. 4.  And --

Page 72

1  A  Okay.
2  Q  -- it's a stapled document.  Do you want to take a
3     look at that, and let me know if you recognize
4     this.
5  A  Do I recognize the answer "Yes"?  I don't know.
6  Q  Are these -- is this a printout of text messages
7     between you and Michael Kiesler?
8  A  It appears to be.
9  Q  Okay.  If you go to the last page, is there a
10    message dated May 6, 2020 at 2:15 p.m.?
11 A  I have to go to the page.  I'm sorry.  "You okay
12    with Windy Waters purchasing ALL Stacy shares with
13    7 year" -- yes.
14 Q  Okay.  So Michael Kiesler texted you "You okay
15    with Windy Waters purchasing ALL Stacy shares with
16    7 year monthly payout"; is that correct?
17 A  That's what it says.
18 Q  Okay.  Was this the first time you and Mr. Kiesler
19    discussed Windy Waters purchasing all of Stacy's
20    shares?
21 A  I believe so.
22 Q  Okay.  And Mr. Kiesler capitalized the word "ALL."
23    Do you know why?
24 A  No.
25 Q  Okay.  And had you ever discussed with anyone else

**Page 73**

1    at the companies or otherwise the companies
2    purchasing all of Stacy's stock before May 6,
3    2020?
4 A   No.
5 Q   Okay. Are you sure about that?
6 A   Yes.
7 Q   Okay. The second page of the document --
8 A   Okay.
9 Q   -- is also dated May 6, 2020 at 2:21 p.m.
10 A   Okay.
11 Q   And that same number that we talked about, that's
12    your number. You said "Yes;" is that correct?
13 A   That's what it says.
14 Q   Okay. Did you send this message?
15 A   Obviously.
16 Q   Okay.
17 A   I don't know what it refers to.
18 Q   Did you -- do you remember telling Michael Kiesler
19    that you were okay with Windy Waters purchasing
20    all of Stacy's stock?
21 A   Yes.
22 Q   Do you know why the plan changed from Stacy
23    selling some of her stock to selling all of her
24    stock?
25 A   No.

**Page 74**

1 Q   Okay. You never discussed a reason for that with
2    Stacy?
3 A   No.
4 Q   Did you ever discuss a reason for that with
5    Mr. Kiesler?
6 A   No.
7 Q   Okay. Anyone else?
8 A   I don't believe so.
9 Q   Okay. Can you think of a reason why that -- why
10    the plan would have changed from purchasing some
11    of Stacy's stock on May 5 to all of it on May 6?
12          MR. CHURCHILL: Objection, assumes
13       facts not in evidence. You can respond.
14 A   The earlier text I don't believe says anything
15    about giving all or part of it.
16 Q   Oh.
17 A   She said she needs money.
18 Q   Right. And I asked you if you understood that to
19    mean that she needed enough money for -- to pay
20    for the divorce proceeding that she was talking
21    about.
22 A   I don't remember you saying that.
23 Q   Okay. Well, let's look at that message again.
24 A   Okay.
25 Q   So on that message, which is Exhibit 3, Stacy said

**Page 75**

1    to you "Steve is taking me to court. He wants me
2    to pay him maintenance, his reasons are all
3    bullshit. I'm going to need to get some money."
4 A   Uh-huh.
5 Q   Okay. So Stacy said she needed to get some money,
6    right?
7 A   Okay.
8 Q   Did she say that she wanted to redeem all of her
9    stock?
10 A   I don't see that here.
11 Q   Okay. Did you understand that message to mean
12    that she wanted to redeem enough stock to pay for
13    their divorce proceeding?
14 A   I don't remember that.
15 Q   Okay. Did you understand that message to mean she
16    wanted to redeem all of her stock?
17 A   Not necessarily.
18 Q   Okay.
19          (Exhibit No. 5 marked for
20          identification)
21          THE COURT REPORTER: No. 5.
22 Q   Okay. What's been marked as Exhibit No. 5 appears
23    to be a text message -- or an email message.
24    Excuse me. Do you see that?
25 A   It's a what message?

**Page 76**

1 Q   An email message.
2 A   Yes.
3 Q   Okay. On the second page it -- it appears to be
4    from Matthew Gonnering. Is that an email
5    message -- or an email address you recognize for
6    him?
7 A   Yes.
8 Q   Okay. And the message says "A few things we
9    should explore after a conversation I had with
10    Reed yesterday: 1) buy back the shares of the
11    children's trust (Reed wants to dissolve the
12    trust) and Stacy after the year-end valuation
13    (with spacing payments), 2) after those
14    transactions, explore the benefits of paying Reed
15    (and Gary) in dividends instead of wages."
16       Did I read that correctly?
17 A   You did.
18 Q   Okay. Did you have a conversation with
19    Matt Gonnering in October of 2019 about buying
20    back shares of the children's trust?
21 A   No. If I remember right, I dissolved that trust
22    because it was irrevocable. So I paid it out and
23    then created a revocable trust.
24 Q   Okay. What was the children's trust?
25 A   That was it.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 77

1  Q  It was a trust for your children?
2  A  Yeah.
3  Q  Okay.  And you dissolved that trust?
4  A  I paid it out because it was revocable -- or
5     unrevocable.
6  Q  Do you know when you dissolved that trust?
7  A  I don't remember.
8  Q  Okay.  When you say you paid it out, do you mean
9     you purchased the property that was in the trust
10    from the trust?
11 A  Whatever the trust was worth I had to pay them for
12    it.  I was paying the taxes for it as well, which
13    made me do this.
14 Q  Okay.  So you talked about buying the shares that
15    were owned by the trust back from the trust with
16    Matt Gonnering?
17 A  I had to pay it out.  No, I didn't.
18 Q  When you say pay it out, what does that mean?
19 A  It was an irrevocable trust, okay, so I had to pay
20    it out to dissolve it.
21 Q  Okay.  So you had to pay the trust for the
22    property that the trust owned?
23 A  I had to pay the kids for it, yes.
24 Q  Okay.  So if the -- did the trust own shares of
25    Windy Waters?

Page 78

1  A  I don't remember.
2  Q  Okay.  If the trust had owned shares of
3     Windy Waters, would that have meant that was what
4     you had to buy back from the trust?
5  A  I don't know.  Yes.
6  Q  Okay.  Did you discuss doing that with
7     Matt Gonnering in --
8  A  I don't know.
9  Q  -- 2019?  You don't know.  Okay.
10       Any reason Matt Gonnering would lie about
11    that?
12 A  I don't think so.
13 Q  Okay.  Did you discuss buying out Stacy from
14    Windy Waters with Matt Gonnering in 2019?
15 A  I don't remember.
16 Q  Okay.  Any reason you can think of that
17    Matt Gonnering would lie about having a
18    conversation with you about that?
19       MR. CHURCHILL:  Objection,
20       mischaracterizes the document.
21 A  There's no reason I would think Matthew would lie
22    about anything.
23 Q  Okay.  Did you discuss with Matt Gonnering in 2019
24    that after the trust and Stacy were bought out
25    exploring the benefits of paying yourself and

Page 79

1     someone named Gary in dividends instead of wages?
2        MR. CHURCHILL:  Objection,
3        compound.
4  A  I don't recall that.
5  Q  Okay.
6  A  I do remember about, yes, Gary Norris --
7  Q  Was he --
8  A  -- as a consultant --
9  Q  Was he --
10 A  -- versus an employee.
11 Q  I'm sorry.  I didn't mean to cut you off.  What
12    did you say?
13 A  We wanted -- there was enough talk about paying
14    him as a consultant instead of an employee.
15 Q  Okay.  Was Gary Norris an owner of Windy Waters?
16 A  Yes.
17 Q  Okay.  And did he receive wages?
18 A  He was an employee.
19 Q  Okay.  And did you ever speak with Matt Gonnering
20    about the possibility of paying him in dividend
21    payments instead of wages?
22 A  No.
23 Q  Okay.  So going back to the message we were
24    looking at before between you and Michael Kiesler
25    on May 6, as far as you're aware, was it

Page 80

1     Michael Kiesler's idea that Windy Waters would buy
2     all of Stacy's stock?
3  A  Was it his idea?  I'm not sure.
4  Q  Was that the first time you ever heard the idea of
5     buying all of Stacy's stock --
6  A  I believe so.
7  Q  -- in Windy Waters?
8        Okay.  And did you communicate with
9     Mr. Kiesler about buying all of Stacy's stock in
10    Windy Waters over the following weeks?
11 A  I don't recall.
12 Q  Okay.  Now, when Mr. -- when Mr. Kiesler asked you
13    about buying all of Stacy's stock, he said it
14    would be on a seven-year payment structure; is
15    that --
16 A  Okay.
17 Q  -- accurate?
18       Did you understand that the price paid to
19    Stacy would be calculated using the EBITDA formula
20    from the Windy Waters shareholder agreement?
21 A  I knew it would be executed per the formula, yeah.
22 Q  Okay.
23 A  Very --
24 Q  How did you --
25 A  -- similar to our other redemptions.

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 81

1  Q  Okay. You knew that because that's how the price
2     had been calculated for previous redemptions?
3  A  Uh-huh.
4  Q  Okay.
5  A  Yes. Excuse me.
6  Q  And as well as redemptions of other members of
7     your family?
8  A  Other shareholders.
9  A  Yeah.
10 A  Including family.
11 Q  Okay. Any redemptions you're aware of that --
12    where the price was not calculated using that
13    formula?
14 A  Not that I'm aware of.
15 Q  Okay. Did you -- did you believe that the price
16    for Stacy's redemption in May 2020 had to be
17    calculated using that formula?
18 A  Well, that's the way we always did it.
19 Q  Did you believe that there was a requirement in
20    the shareholder agreement that you do it that way?
21 A  I believe so. I don't know.
22 Q  You don't know if you believe that?
23 A  I know we executed that formula for every stock
24    redemption that was done.
25 Q  Okay. Did you consider whether the shareholder

Page 82

1     agreement required you to use that formula?
2  A  I'm not sure.
3  Q  Okay. So --
4        (Exhibit No. 6 marked for
5         identification)
6        THE COURT REPORTER: No. 6.
7  Q  So the document that's been marked as No. 6 says
8     at the top "SECOND AMENDMENT TO SHAREHOLDER
9     AGREEMENT." Do you see that?
10 A  I do.
11 Q  Do you recognize this as the second amendment to
12    the Windy Waters shareholder agreement?
13 A  I don't recall it. I see my signature.
14 Q  Okay. If you flip to the page titled Exhibit C.
15    And take a minute to look at that. Do you
16    recognize this as the EBITDA formula used to
17    redeem all the shareholders from Windy Waters?
18        (Witness reviews document)
19 A  Okay. I'm sorry. Your question was?
20        MR. PALAY: Could you read back my
21    question.
22        THE COURT REPORTER: "Do you
23    recognize this as the EBITDA formula used to
24    redeem all the shareholders from
25    Windy Waters?"

Page 83

1  A  Yes.
2  Q  Okay. And the top of it, it says this is the
3     "Fair Market Value per share Calculation;" is that
4     right?
5  A  That's what it says.
6        MR. PALAY: Okay. This has been
7     previously marked.
8        THE COURT REPORTER: Okay. Do you
9     want a new sticker or just refer to it as
10    such?
11       MR. PALAY: What do you want to do?
12    I would say continuous probably and just
13    use --
14       MR. CHURCHILL: Your call, totally
15    your call.
16       MR. PALAY: I think we can just
17    leave it that way.
18 Q  And what's been marked as -- can you see what
19    exhibit that is to Mr. Seid's deposition?
20 A  It says 22.
21 Q  Okay. What's been marked as an exhibit to
22    Mr. Seid's deposition is a spreadsheet, and it's
23    in -- the print is kind of small, so I apologize
24    for that. Is this an actual calculation using the
25    EBITDA formula from the Windy Waters shareholder

Page 84

1     agreement?
2  A  I'm not sure.
3  Q  Okay.
4        MR. CHURCHILL: So, David, just for
5     the record, counsel's got a one-pager, and I
6     have a one-pager. The witness has a
7     multiple-page document with font different
8     size than what I have. So I just want to
9     make sure that you and he are looking at the
10    same document.
11       MR. PALAY: He might have the full
12    set because his is the only one marked.
13    Indeed.
14       MR. CHURCHILL: Thank you.
15       MR. PALAY: Thank you.
16 Q  This one is a little easier to read. Can you see
17    now whether this is a spreadsheet of calculations
18    done using the EBITDA formula?
19 A  It's a spreadsheet of calculations. I don't know
20    about the EBITDA.
21 Q  Okay. In the first column under 12/2019, a few
22    lines down it says "EBITDA Calculation." Do you
23    see that?
24 A  I do.
25 Q  And it provides a number for the EBITDA, $50,000?

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 85

1  A  Uh-huh.
2  Q  And then below that it says "Weighted Average
3     EBITDA (3,2,1)." Do you see that?
4  A  Not yet.
5  Q  It's -- yeah.
6  A  Weighted?
7  Q  Yeah.
8  A  I'm not seeing the word weighted. There it is.
9     All right.
10 Q  Okay. And then if you compare it to the Exhibit C
11    in the shareholder agreement, is that what
12    Exhibit C says? There's three years of EBITDA and
13    then "Weighted Average EBITDA (3,2,1)"?
14 A  Okay.
15 Q  Okay. And then in both the shareholder agreement
16    and this spreadsheet, the next line says "Fixed
17    Multiple," 3.6. Do you see that?
18 A  I do.
19 Q  Okay. And then it says "Plus" in both of them,
20    "Cash and Cash Equivalents," "Securities Available
21    for Sale and Other Investments," and "Stock
22    Subscription Notes Receivable." Do you see that?
23 A  I do.
24 Q  Okay. And then it says "Less" in both the
25    spreadsheet and the formula, "Deferred

Page 86

1     Compensation." And then "Interest Bearing Debt"
2     is the second line in the shareholder formula,
3     third line in the spreadsheet. And the
4     spreadsheet also has a line that says "N/P - Stock
5     Redemption (SW/PW)."
6        Do you see that?
7  A  I'm sorry. Where?
8  Q  In the spreadsheet understand "Less." It's the
9     second line.
10 A  Okay.
11 Q  Yeah. And then under both -- and the next line in
12    both of them says "Estimated Value of
13    Windy Waters." Do you see that?
14 A  On the spreadsheet? "Estimated Value of
15    Windy Waters," yes.
16 Q  Okay. So fair to say the formula in the
17    shareholder agreement calculates what it calls the
18    "Estimated Value of Windy Waters"?
19 A  That's what it says.
20 Q  Okay. And in this column for 2019 in the
21    spreadsheet, the "Estimated Value of Windy Waters"
22    is $6,896,973; is that correct?
23 A  Well, I'm seeing $7,441,000 here.
24 Q  In the spreadsheet.
25 A  In the spreadsheet. "Estimated Value of

Page 87

1     Windy Waters," $6,896,000, yes.
2  Q  Okay. And that's for December 2019, right?
3  A  That's what it says.
4  Q  Okay. And then the next line says "Value of
5     Stockholder's Equity"?
6  A  Okay.
7  Q  And that's $1,937,105; is that right?
8  A  All right.
9  Q  And it says "Concluded Value of Windy Waters
10    (higher of A or B)," higher of the stockholder's
11    equity or the estimated value number; is that
12    right?
13 A  That's what it says.
14 Q  Okay. So it says the concluded value is
15    $6,896,973; is that right?
16 A  That's what it says.
17 Q  Okay. And then it looks like what the formula
18    does is it says the number of shares of Class A
19    and Class B. And there's a 5 percent price
20    adjustment to the Class A shares?
21 A  Yes.
22 Q  Are those the voting shares in Windy Waters?
23 A  Yes.
24 Q  Okay. And then it divides the concluded or
25    estimated value by the number of shares after that

Page 88

1     price adjustment; is that right?
2  A  Say that again.
3  Q  The -- you get a -- the formula determines the
4     price per Class A and B shares --
5  A  Yes.
6  Q  -- by dividing the estimated value of the company
7     by the number of shares taking into
8     consideration --
9  A  Yes.
10 Q  -- the 5 percent adjustment?
11       And for the -- at the bottom of the
12    spreadsheet, for the Class A price per share with
13    5 percent adjustment, the price is $646.19?
14 A  That's what it says, yes.
15 Q  Okay. And the price per Class B per share is
16    $615.42?
17 A  That's what it says, yes.
18 Q  Okay. Do you know if that was the price per share
19    paid to Stacy in her May 2020 redemption?
20 A  I do not.
21 Q  Okay. We'll look at that in a second. So can you
22    show me on this formula how, how the formula
23    accounts for the value of Widen Enterprises?
24          MR. CHURCHILL:  Objection, lack of
25    foundation, vague, and ambiguous.

Page 89

1   A   No, I can't.  I'm not a CPA.
2   Q   Okay.  Do you know if this formula does in any way
3       account for the value of Widen Enterprises?
4                MR. CHURCHILL:  Same objection.
5   A   Again, no.
6   Q   Did you believe in December of -- or in May --
7       excuse me.
8           Did you believe in May of 2020 that the
9       estimated value of Windy Waters produced by the
10      EBITDA formula in the shareholder agreement was
11      the value of Windy Waters as we defined it here
12      today?
13  A   I would think so, yes.
14  Q   Okay.  So you thought Windy Waters was worth about
15      $6.8 million in May 2020?
16               MR. CHURCHILL:  Objection to --
17  A   I don't know.  Sorry.
18               MR. CHURCHILL:  Objection to the
19           use of the word value.
20  A   And I don't know.
21  Q   Okay.  How much did you think Windy Waters was
22      worth in May 2020?
23               MR. CHURCHILL:  Objection,
24           ambiguous.
25  A   Don't know, never thought about it.

Page 90

1   Q   How much did you think Widen Enterprises was worth
2       in May of 2020?
3                MR. CHURCHILL:  Objection,
4            ambiguous.
5   A   I never thought about it.
6   Q   Fair to say Widen Enterprises was owned
7       100 percent by Windy Waters in May 2020?
8   A   Windy Waters was the holding company.
9   Q   And it owned all of the Widen Enterprises stock?
10  A   Yeah.
11  Q   Okay.  So fair to say Windy Waters could not have
12      been worth less than Widen Enterprises was worth
13      in May 2020?
14  A   I guess so.
15  Q   Does the EBITDA formula take account of
16      Widen Enterprises' revenues in any way?
17  A   I don't know.
18  Q   Okay.  Can you see anywhere on the formula where
19      it does?
20  A   No.
21  Q   Okay.
22  A   Are you talking about this (indicating) or this
23      (indicating)?
24  Q   Either one.
25  A   No.

Page 91

1   Q   Was that a no?
2   A   What was the question?
3   Q   Does the formula take account of the revenues of
4       Widen Enterprises in any way?
5   A   I don't know.
6   Q   How would you determine if it did?
7   A   I don't know.  I mean, revenue is revenue.  A
8       formula is a formula.
9   Q   Right.  So does this formula ever use
10      Widen Enterprises' revenue as an input?
11  A   I'm sure it does somewhere.  It says Windy Waters.
12      I don't see Widen in here.
13  Q   You would think that the formula would take
14      account of Widen Enterprises' revenue?
15               MR. CHURCHILL:  Objection, lack of
16           foundation, calls for speculation.
17  A   I would think so.
18  Q   And you would think so because to accurately gauge
19      the value of Widen Enterprises you would need to
20      know its revenue?
21               MR. CHURCHILL:  Same objection.
22  A   Yes.
23  Q   Okay.  Okay.  I will represent to you that
24      Stacy Randall was redeemed for her remaining stock
25      in Windy Waters in May 2020 for a price of

Page 92

1       $1,352,166.31, okay?
2   A   I believe you.
3   Q   Do you know about how much of Windy Waters Stacy
4       owned at that time?
5   A   Somewhere less than 20 percent.
6   Q   Okay.
7   A   I believe.  I don't know the number.
8   Q   Do you think that $1.3 million I just told you was
9       an accurate gauge of the value of Stacy's stock in
10      Windy Waters at that time?
11  A   Yes, using the formula.
12  Q   Okay.  So it was accurate because that's what the
13      formula calculated?
14  A   That's the only way we determined it.
15  Q   Okay.  But you just told me that the formula to
16      accurately gauge the value of Windy Waters would
17      need to take account of the value of
18      Widen Enterprises; is that fair?
19  A   I guess.
20  Q   And that to accurately gauge the value of
21      Widen Enterprises you would need to know its
22      revenues; is that fair?
23               MR. CHURCHILL:  Objection to the
24           extent it mischaracterizes testimony,
25           objection to the use of the word value.  You

Page 93

1    may answer.
2  A  Yeah.
3  Q  Okay.  So if that purchase price, the
4    $1.3 million, didn't take account of the value of
5    Widen Enterprises or the revenues of
6    Widen Enterprises, would your testimony still be
7    the same, that it was an accurate gauge of the
8    value of Stacy's stock at that time?
9  A  Yes.  It's the only way we determined it.
10 Q  Okay.  Is that how you determined the value of
11   Widen Enterprises when you sold the company to
12   Acquia?
13 A  No.
14 Q  How did you determine it then?
15 A  SEG.
16 Q  SEG, your investment bank determined --
17 A  Yes.
18 Q  -- it?
19        Do you know how they did it?
20 A  No.
21 Q  Did you ask them?
22 A  No.
23 Q  They just told you a number, and you just accepted
24   it?
25 A  Apparently.

Page 94

1  Q  Okay.
2  A  Their actual number was 180 to 230, I believe.
3  Q  And did you think that was an accurate gauge of
4    the value of --
5  A  I didn't know the value.
6        MR. CHURCHILL:  Hang on.  Please
7     let counsel finish his question --
8        THE WITNESS:  I'm sorry.
9        MR. CHURCHILL:  -- so we know what
10    he's actually asking --
11       THE WITNESS:  Got you.
12       MR. CHURCHILL:  -- before you start
13    --
14       THE WITNESS:  I'm sorry.
15       MR. CHURCHILL:  -- to answer.
16 Q  Did you think the range you just told me was an
17   accurate gauge of the value of Widen Enterprises
18   when SEG told that to you?
19 A  I would have no idea.
20 Q  Okay.  So you were selling this company knowing
21   nothing about what it was worth?
22       MR. CHURCHILL:  Objection,
23    mischaracterizes testimony.
24 A  I didn't know it was worth that.
25 Q  Okay.  Why didn't you use the EBITDA formula from

Page 95

1    the shareholder agreement when selling
2    Widen Enterprises?
3  A  I don't know.  I don't know.
4  Q  Did you talk about doing that with anyone at the
5    company?
6  A  Selling to Acquia?
7  Q  Yeah, when you sold it to Acquia.
8  A  The EBITDA formula?
9  Q  Yes.
10 A  No.
11 Q  Okay.
12 A  They were offering more.
13 Q  Okay.  So because they were offering more, you
14   sold it for more?
15 A  Correct.
16 Q  Okay.  When you sold the company to Acquia, you
17   personally received around $102 million for your
18   ownership stake in Windy Waters and -- through
19   Windy Waters/Widen Enterprises; is that correct?
20 A  I guess so.  I don't remember the exact number.
21 Q  Okay.  Any reason to think it was not $102 million
22   or --
23 A  No.
24 Q  -- thereabouts?
25        Okay.  And at the time you owned about

Page 96

1    68.97 percent of Windy Waters?
2  A  Okay.
3  Q  And do you know if Acquia paid you that money
4    directly or if they paid it to Windy Waters?
5  A  No.  I don't remember.
6  Q  Is it fair to say that if Stacy had owned
7    20 percent of Windy Waters at the time
8    Widen Enterprises was sold to Acquia she would
9    have received 20 percent of the money Acquia paid
10   for Widen Enterprises?
11       MR. CHURCHILL:  Objection, lack of
12    foundation, calls for speculation.  You can
13    answer.
14 A  She wasn't a shareholder.
15 Q  But if she had been a shareholder, would she have
16   received --
17 A  Of course.
18 Q  -- her pro rata amount?
19        And that would have been much more
20   than the $1.3 million she received in May 2020,
21   right?
22 A  Yes.
23 Q  Okay.  Do you think that was fair?
24       MR. CHURCHILL:  Objection,
25    ambiguous.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 97

1   A   I don't know what fair means. We did the
2       calculation per the formula when we bought her out
3       as we did every other time.
4   Q   So when I'm thinking of fair, I'm just thinking of
5       whether every person is getting what they deserve.
6       Is that an appropriate -- I don't want to say a
7       fair use of fair, but is it an appropriate use of
8       fair?
9   A   Okay.
10  Q   Okay. So using that definition, do you think it
11      was fair that Stacy got $1.3 million for
12      20 percent of Windy Waters in May 2020 and you got
13      $102 million for 68.97 percent of Windy Waters in
14      September 2021?
15              MR. CHURCHILL: Objection to the
16          extent it mischaracterizes testimony. You
17          may answer.
18  A   I don't know. Again, fair. We did the
19      calculation by the book. There was no thought of
20      selling the company at that time that we purchased
21      her out.
22  Q   Okay. And you believed that the company was worth
23      $6.8 million at the time Stacy was bought out?
24  A   That's what you're saying. I'm sorry.
25  Q   How much -- well, tell me. How much did you

Page 98

1       believe the company was worth at that time in
2       May 2020?
3   A   I told you earlier I don't know.
4   Q   Okay. So you just did the calculation, and
5       whatever the calculation produced, that's how much
6       you paid without any thought of how much the
7       company was worth?
8               MR. CHURCHILL: Objection,
9           mischaracterizes testimony. You may answer.
10  A   I didn't do the calculation.
11  Q   Okay. When you were keeping track of the revenues
12      for Widen Enterprises in your role as president,
13      were you considering the value of that company at
14      the time?
15  A   No.
16  Q   Okay. Why did you care about the revenues then?
17  A   It's how I monitor the growth of the company.
18  Q   Why did you care about the growth of the company?
19  A   My dad used to have a saying: When you're green,
20      you're growing; when you're ripe, you're dead. So
21      growth is good.
22  Q   Okay. So you wanted to grow, but you didn't care
23      how much the company was worth?
24  A   I never thought about it that way.
25  Q   Okay.

Page 99

1   A   There was no interest in selling it.
2   Q   Did you ever talk to the other executives at
3       Widen Enterprises about how much the company was
4       worth?
5   A   No.
6   Q   Did any of them ever advise you how much they
7       believed Widen Enterprises was worth?
8   A   I would have never had those conversations.
9   Q   Okay. Matthew Gonnering never told you how much
10      he thought the company was worth?
11              MR. CHURCHILL: Objection, vague as
12          to time frame.
13  A   No.
14  Q   Would you have believed Matthew Gonnering's
15      estimates of how much the company was worth if he
16      had given them to you?
17  A   Probably.
18  Q   Okay. Fair to say Matthew Gonnering knew the most
19      of anyone at the company about how much the
20      company was worth?
21  A   I don't know that.
22  Q   Okay. Can you think of anyone who would have
23      known better?
24  A   No.
25  Q   Okay.

Page 100

1               THE VIDEOGRAPHER: I'm going to
2           need to switch in about five minutes, switch
3           media.
4               MR. PALAY: Why don't we take a
5           break.
6               MR. CHURCHILL: Yeah, why don't we
7           take a break. Sure.
8               (Recess)
9   Q   Mr. Widen, welcome back.
10  A   Thank you.
11  Q   Before the break we were talking about -- I was
12      asking you whether you had ever considered the
13      value of Windy Waters or Widen Enterprises while
14      you were running those. Do you remember that?
15  A   I do.
16  Q   Okay. And what is your testimony? Did you ever
17      consider the values of those companies while you
18      were running them?
19  A   Absolutely not.
20  Q   Okay. And did anyone at those companies ever
21      advise you about what the value of those companies
22      might be?
23              MR. CHURCHILL: Objection, asked
24          and answered. You can answer.
25  A   Okay. On a dollar amount, no. Like I said,

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 101

```
1       Jeff Horein one time said three to four times
2       EBITDA.
3    Q  Okay.  And you don't recall when that was?
4    A  No.
5    Q  Okay.
6    A  I think we were golfing.
7    Q  Okay.  Do you know if it was in 2019 or before?
8    A  I have no idea.
9    Q  And correct me if I'm wrong, but I believe you
10      said Matt Gonnering never advised you about what
11      he believed the companies might be worth?
12   A  Matthew, no.
13   Q  Okay.  And did Matt Gonnering ever advise you that
14      the companies might be worth a multiple of their
15      revenues?
16   A  Yes -- well, kind of.  At one point in time there
17      was a company that sold for three times revenue.
18      I'm not even sure if it was our industry,
19      something he caught wind of.  I said I'm not
20      interested.
21   Q  Okay.  So Matt Gonnering brought the sale of
22      another company to your attention?
23   A  He did.
24   Q  Okay.  Do you remember about when that was?
25   A  No.  I don't know, no, not specifically.
```

Page 102

```
1    Q  Okay.  Was it before 2018?
2    A  I don't know for sure.
3    Q  Okay.  And Matt Gonnering said that that company
4       had sold for a multiple of about three times its
5       revenue?
6    A  Yeah.
7    Q  Did he say that he thought Widen Enterprises might
8       be worth around three times its revenue?
9    A  Never mentioned it.
10   Q  Okay.  Did Matt Gonnering ever tell you that he
11      thought Widen Enterprises might be worth
12      $60 million?
13   A  No.
14   Q  Did Matt Gonnering ever tell you that he thought
15      Widen Enterprises might be worth $80 million?
16   A  No.
17   Q  Okay.  Did Matt Gonnering ever tell you that he
18      thought Widen Enterprises might be worth
19      four times its recurring revenue?
20   A  No.
21   Q  Did Matt Gonnering ever tell you that he thought
22      Widen Enterprises might be worth between three and
23      five times its recurring revenue?
24   A  No.
25   Q  Okay.  Did Matt Gonnering ever tell you that he
```

Page 103

```
1       thought Widen Enterprises might be worth as much
2       as six times its revenue?
3    A  No.
4    Q  In 2019 did you ask Matt Gonnering to look into
5       how much cash you would receive if the company was
6       sold for $50 million and you invested your portion
7       of those proceeds?
8    A  No.
9    Q  Okay.
10            (Exhibit No. 7 marked for
11            identification)
12           THE COURT REPORTER:  No. 7.
13   Q  Okay.  What's been marked as Exhibit 7 is a
14      two-page printout of what looks to be emails
15      between Matt Gonnering and Michael Kiesler.  Do
16      you see that?
17   A  I do.
18   Q  Okay.  And in the top email, which was sent on
19      October 22, 2019, Matt Gonnering says to
20      Mr. Kiesler, "Hey CFO guy.....pretend company
21      valuation is $50M and Reed decided to sell.  Based
22      on his ownership % he now had" blank "M in
23      post-sale cash and he reinvested that amount into
24      the market at an average S&P return rate, what
25      would his annual return be?"
```

Page 104

```
1       Do you see that?
2    A  I do.
3    Q  Okay.  So do you understand that Matt Gonnering is
4       asking Michael Kiesler what your annual return
5       would be on your portion of a $50 million sale of
6       Widen Enterprises?
7    A  I do.
8    Q  Okay.  And Mr. Kiesler tells Mr. Gonnering "I just
9       sent you an email" and that he's "Not certain what
10      his tax effect on the sale transaction would be."
11      Is that correct?
12   A  That's what it says.
13   Q  And then Mr. Kiesler doesn't know what your
14      current basis is in your stock; is that correct?
15   A  That's what it says.
16   Q  And your testimony is that you did not ask
17      Mr. Gonnering to look into this?
18   A  Absolutely not.
19   Q  Okay.  Did he ever share the results with you of
20      what Mr. Kiesler sent him?
21   A  No.
22   Q  Okay.
23   A  Not that I remember.
24            (Exhibit No. 8 marked for
25            identification)
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 105

1                THE COURT REPORTER:  No. 8.
2  Q  Okay.  The document I just handed to you appears
3     to be an email chain amongst a few people, and the
4     second email down was sent on December 1, 2014 at
5     5:06 p.m.  Do you see that?
6  A  I do.
7  Q  And it's from Matthew Gonnering, correct?
8  A  Uh-huh.
9  Q  Did you receive this email?
10 A  It says I did.  I don't recognize it.
11 Q  Okay.  The first thing Mr. Gonnering says is "For
12    valuation reference, an article from Milwaukee
13    Business Journal.  Snippets from the article."
14    And then there are a few bullet points.
15       Do you see that?
16 A  I guess, yes.  Excuse me.
17 Q  Sorry.  The first bullet point says "Research firm
18    Gartner estimated that global spending on SaaS
19    will reach $22.1 billion by 2015."
20       Do you see that?
21 A  I do.
22 Q  And SaaS you understand to mean software as a
23    service?
24 A  Yes.
25 Q  That was the business that Widen Enterprises was

Page 106

1     in when this was sent?
2  A  Not at this point.
3  Q  Oh, okay.  What --
4  A  This is 2014.
5  Q  What kind of business was Widen Enterprises?
6  A  I think we were still in the graphics
7     communications stage.
8  Q  Okay.  You were not a software as a service
9     company?
10 A  I don't know.  I guess you could coin it as such,
11    but no, I didn't.
12 Q  Okay.  I'm not sure I understand.  You did not
13    believe that Widen Enterprises was a software as a
14    service company in 2014?
15 A  I don't think so.  I thought we were a data
16    communications company.  I guess that would be
17    software as a service.  I don't know.  It's a long
18    time ago.
19 Q  Okay.  I'm just asking you was Widen Enterprises a
20    software as a service company in 2014?  Yes or no?
21 A  I don't know.  I don't know.
22 Q  How would you determine that?
23 A  I don't know that either.
24 Q  Okay.
25 A  Yeah, I don't know.  I'm not trying to be vague,

Page 107

1     but I honestly don't know.
2  Q  You were running Widen Enterprises in 2014?
3  A  Yes.
4  Q  And you don't know what industry that company was
5     in?
6  A  I didn't say that.
7  Q  Okay.  So tell me what industry that company was
8     in.
9  A  We were a graphics communications company.
10 Q  Okay.  Not a software as a service?
11 A  I didn't say that either.  I guess -- let's go
12    with yes.  It was a software as a service.
13 Q  Okay.  And the second bullet point says software
14    as a service "mergers and acquisitions
15    transactions grew 25 percent last year, and the
16    median" software as a service "exit multiple was
17    more than double that paid for traditional,
18    on-premise software targets."
19       Do you see that?
20 A  I do.
21 Q  Okay.  So Mr. Gonnering is advising you that the
22    market for mergers and acquisitions of the
23    company -- of the -- of companies in
24    Widen Enterprises' industry is increasing that
25    year, fair to say?

Page 108

1  A  Okay.
2  Q  Okay.  And that the median multiple -- the median,
3     excuse me, exit multiple for software as a service
4     company is more than double for what traditional
5     software companies received; is that fair?
6  A  Where are you seeing that?
7  Q  In that second bullet point I just read.
8  A  Okay.  Okay.
9  Q  Yes?
10 A  Yes.
11 Q  Okay.  And he says that "the valuations of"
12    software as a service "companies are about twice
13    those a traditional licensed software companies
14    generating the same revenues."
15       Do you see that?
16 A  I do.
17 Q  Okay.  And he says the "Traditional software
18    companies have an average enterprise value of
19    three times revenue, while" software as a service
20    "companies trade at a much higher multiple of
21    6.5 times revenue."
22       Do you see that?
23 A  I do.
24 Q  So fair to say Mr. Gonnering is saying that
25    Widen Enterprises' enterprise value would be about

**Stacy L. Randall v.**
Reed C. Widen, et al.

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 109

1  twice that of a traditional licensed software
2  company?
3            MR. CHURCHILL:  Objection, calls
4       for speculation, lack of foundation,
5       mischaracterizes the document.
6  A  I don't know.
7  Q  Okay.  Well, you just told me that
8     Widen Enterprises was a software as a service
9     company?
10 A  Yes.
11 Q  Okay.  And that Mr. Gonnering said that the
12    valuation of software as a service companies are
13    about twice those of traditional licensed software
14    companies --
15 A  Okay.
16 Q  -- with the same revenues, correct?
17 A  Correct.
18            MR. CHURCHILL:  Objection to the
19       extent it mischaracterizes the document.
20 Q  Okay.  And so fair to say that Mr. Gonnering is
21    telling you that the valuation of
22    Widen Enterprises as a software as a service
23    company would be about twice that of a traditional
24    license software company generating the same
25    revenues?

Page 110

1            MR. CHURCHILL:  Objection, calls
2       for speculation.
3            THE WITNESS:  Do I answer?
4            MR. CHURCHILL:  You can answer if
5       you can, yeah.
6  A  I guess it's fair to say.
7  Q  Okay.  And then at the bottom he says "If you're
8     keeping score at home, that's $8MM*6.5=52MM."
9  A  Okay.
10 Q  Do you know what the 8MM was in this email?
11 A  No.
12 Q  In 2014 was Widen Enterprises' revenues around
13    $8 million?
14 A  I don't remember.
15 Q  Okay.  And he says "If you throttled the EBITDA
16    for purposes of market valuation perhaps we run at
17    2MM*12=24MM."  Do you see that?
18 A  I do.
19 Q  And he says "Market value somewhere between
20    24-52MM.  And going up...."  Is that correct?
21 A  That's what it says.
22 Q  Fair to say Mr. Gonnering is telling you in this
23    email that the market value of Widen Enterprises
24    is somewhere between $24 and $52 million and going
25    up?

Page 111

1  A  Fair to say.
2  Q  All right.
3            (Exhibit No. 9 marked for
4            identification)
5            THE COURT REPORTER:  No. 9.
6            (Discussion off the record)
7  Q  Okay.  Do you recognize this document, Mr. Widen?
8  A  No.
9  Q  It appears to be an email sent from Mr. Gonnering
10    to you and Michael Kiesler on February 23, 2018.
11    Do you see that?
12 A  Yes.
13 Q  The subject is "Operational Update, Feb 22."
14 A  Okay.
15 Q  The email --
16 A  It says "activities."  Oh, "Operation Update,
17    Feb 22."  Gotcha.
18 Q  And the email is addressed to you, correct?
19 A  Correct.
20 Q  Take a look -- take a minute and look this over,
21    and let me know if this refreshes your
22    recollection on whether Mr. Gonnering ever advised
23    you that the estimated value of Widen Enterprises
24    was around $60 million.
25            (Witness reviews document)

Page 112

1  Q  I'm only going to ask you about a portion of this,
2     and it's towards the top.
3  A  Okay.
4  Q  Under the heading "Valuation" -- do you see that
5     paragraph?
6  A  Yes.
7  Q  Mr. Gonnering says to you "Shutterstock acquired
8     WebDAM a handful of years ago for approximately
9     $12M."  And you understand capital M to mean
10    million, correct?
11 A  Yes.
12 Q  He says "Bynder acquired WebDAM from Shutterstock
13    for approximately $49M.  WebDAM was likely close
14    to our software revenue totals, possibly less.  I
15    am unsure of any other sizzle in the deal but if
16    it's straight-up DAM, then my guess is the
17    valuation was 3-4x revenue.  If they were
18    equivalent to our software revenue last year
19    ($14M) then it works out to 3.5x revenue.  Using
20    our projected 2018 software revenue of $18M, our
21    market valuation on 3.5x revenue is $63M."
22            Did I read that correctly?
23 A  Yes.
24 Q  Okay.  Fair to say Mr. Gonnering is advising you
25    that based on the projected software revenue for

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 113

```
1        2018 at this time he estimates that
2        Widen Enterprises' market valuation is somewhere
3        around $63 million?
4                    MR. CHURCHILL:  Objection to the
5               extent it mischaracterizes the document.
6   A    Yes, it's fair to say.
7                    (Exhibit No. 10 marked for
8               identification)
9                    THE COURT REPORTER:  No. 10.
10  Q    Okay.  What's been handed to you marked as
11       Exhibit No. 10 appears to be an email from
12       Matt Gonnering to you and Michael Kiesler dated
13       August 10, 2018, correct?
14  A    That's what it says.
15  Q    Okay.  And the subject again is "Operational
16       Update, August 10."  Do you see that?
17  A    I do.
18  Q    Take a minute and look over this document, and let
19       me know if this refreshes your recollection on
20       whether Mr. Gonnering ever advised you that he
21       estimated that the value of Widen Enterprises was
22       around $80 million.
23                   (Witness reviews document)
24  Q    The portion of this email I'd like to direct your
25       attention to is towards the bottom under the
```

Page 114

```
1        heading "Minority Stake Interest."
2   A    Okay.  I'll get there.  I don't want to take it
3        out of content.
4   Q    Take your time.
5                    (Witness reviews document)
6   A    All right.  Your question is?
7   Q    So my first question is under the heading
8        "Minority Stake Interest," Mr. Gonnering tells you
9        that as he has done infrequently over the last
10       handful of years, he responded to a private equity
11       firm called Five Elms Capital to listen, correct?
12  A    That's what it says.
13  Q    And when he says he responded to a private equity
14       firm, what did you understand that to mean?
15  A    I don't know.
16  Q    You had no idea?
17  A    I thought we were in acquisition mode.
18  Q    You did think you were in acquisition mode?
19  A    Uh-huh.
20  Q    Okay.  And what do you mean by acquisition mode?
21  A    Acquiring other companies.
22  Q    Okay.
23  A    Growth.
24  Q    So you understood his response to a private equity
25       firm to be about Widen Enterprises acquiring other
```

Page 115

```
1        companies?
2   A    Uh-huh.
3   Q    Okay.  Mr. Gonnering says that this private equity
4        firm, Five Elms Capital, focuses on B2B software
5        as a service companies, and they have about
6        $300 million in investments and are investing out
7        of a $150 million now; is that correct?
8   A    That's what it says.
9   Q    Okay.  And a sentence -- two sentences later he
10       said "They expressed interest in a minority stake.
11       When asked what they do with a minority stake,
12       they communicated several options; 1) sell to a
13       larger private equity firm, 2) take a majority
14       stake, or 3) sell back to Widen.  In my own
15       reflection 'new product velocity' and 'risk
16       reduction' came to mind as benefits.  If we are
17       valued at $80M (4x software revenue of 20M), then
18       a 10% stake provides us $8M in capital to deploy
19       into labor and marketing our new ventures."
20           Do you see that?
21  A    I do.
22  Q    Fair to say Mr. Gonnering is estimating in this
23       section of the email that Widen Enterprises is
24       worth around four times its software revenue?
25  A    I guess so.
```

Page 116

```
1   Q    And fair to say that he's approximating that value
2        at around $80 million?
3   A    That's what it says.
4   Q    Okay.  And you testified earlier that you paid
5        attention to Mr. Gonnering's updates about how the
6        company was doing, correct?
7   A    Yeah.
8   Q    That included these operational updates like this?
9   A    Uh-huh.
10  Q    Okay.
11  A    Yes.
12                   (Exhibit No. 11 marked for
13              identification)
14                   THE COURT REPORTER:  No. 11.
15  Q    Okay.  What's been handed to you and marked as
16       Exhibit 11, Mr. Widen, appears to be an
17       operational update from Mr. Gonnering to you and
18       Mr. Kiesler dated April 10, 2020; is that correct?
19  A    Yes.
20  Q    Okay.  Take a minute and look this document over,
21       and then look up when you're ready to discuss it.
22       And I should just say I'm going to focus for now
23       on the first page of the document.
24                   (Witness reviews document)
25  Q    Can I ask you about a portion of this document,
```

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 117

```
1        Mr. Widen?
2   A    Of course.
3   Q    Okay.  At the bottom of the first page under the
4        heading "Software & Total Revenue" --
5   A    Okay.
6   Q    -- Mr. Gonnering tells you "Revenue adjustments
7        have been made to software as we anticipate slower
8        growth as a result of current conditions.
9        Previously, our 2020 projections hovered around
10       29.46M and after some recent changes, the software
11       projection is $28.29M.  This represents a 14.7%
12       software revenue growth over last year's software
13       revenue of 24.66M.  Our total" -- going on to the
14       next page -- projected revenue -- "revenue is
15       projected at 30.92M, or 7.8% better than last
16       year's total revenue of 28.69M."
17            Did I read that correctly?
18  A    It seems like it.
19  Q    Okay.  So Mr. Gonnering is telling you that as of
20       April 10, 2020, Widen Enterprises is projecting
21       software revenue of $28.29 million?
22  A    That's what it says.
23  Q    Okay.  Is that accurate?
24                MR. CHURCHILL:  Objection, lack of
25       foundation.
```

Page 118

```
1   A    The projection.
2   Q    Okay.  And that was a 14.7 percent growth over the
3        software revenue from a year before?
4                MR. CHURCHILL:  Objection, lack of
5        foundation.
6   A    That's what it says.
7   Q    And April 10, 2020 was after the beginning of the
8        COVID-19 pandemic, correct?
9                MR. CHURCHILL:  Objection, lack of
10       foundation.
11  A    What was your date?
12  Q    April 10, 2020.
13  A    Right before COVID or early COVID, wasn't it?
14  Q    It was early COVID, as I recall it.
15  A    Yeah, yeah.
16  Q    Is that how you recall it?
17  A    I do.
18  Q    Okay.  So fair to say Widen Enterprises was still
19       growing in the early part of the COVID-19
20       pandemic?
21  A    The software part was.  The premedia was not.
22  Q    Okay.  And actually -- so in the paragraph before
23       the one we just read under "Sunsetting Content
24       Production Services" -- do you see that?
25  A    The first page?
```

Page 119

```
1   Q    Yeah.
2   A    Okay.  I didn't read that one yet.  "Content
3        Production Services."  Yeah.
4             (Witness reviews document)
5   A    All right.
6   Q    Okay.  So towards the end of that paragraph, the
7        last few sentences, Mr. Gonnering says "As of now,
8        it appears we'll be notifying in June/July for
9        July/August departure.  This is approximately
10       16-people and will provide proper severance
11       packages, to include: 1-week of pay for every year
12       of service with a maximum of 26-weeks,
13       reimbursement for COBRA expenses, and outplacement
14       services.  In total, the severance will cost
15       ~$500K.  The longest-standing service we have
16       provided the market will no longer be part of the
17       Widen product offering; the end of an era."
18            Do you see that?
19  A    I do.
20  Q    Mr. Gonnering is talking about discontinuing the
21       content production aspect of Widen Enterprises.
22       Fair to say that this -- at this time Widen was
23       transitioning into a primarily or solely software
24       company?
25  A    Yes.
```

Page 120

```
1   Q    Okay.  Do you know how much of Widen Enterprises'
2        business in April 2020 was software as compared to
3        content production?
4   A    No, not exactly, no.
5   Q    Okay.  Do you know how much -- or about how much?
6   A    I would think maybe 70/30, maybe 80/20.
7   Q    With 70 or 80 being software --
8   A    Software.
9   Q    -- and 20 to 30 being content production?
10  A    Yes.
11  Q    Is content production different than premedia?
12  A    No.
13  Q    Those are -- those are -- they mean the same
14       thing?
15  A    Yes.
16  Q    Okay.  Around this time, Mr. Widen, did you
17       receive -- I should rephrase that.
18            Did you receive solicitations from people
19       looking to buy Widen Enterprises?
20  A    Constantly.
21  Q    Constantly.  Did they ever talk about a price?
22  A    No.  I never acknowledged them.
23  Q    Okay.  But you knew that if you wanted to sell
24       Widen Enterprises you could do that?
25                MR. CHURCHILL:  Objection, calls
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 121

```
 1        for speculation.
 2   A    I don't speculate, yeah.
 3   Q    Okay.
 4   A    Excuse me.
 5            (Exhibit No. 12 marked for
 6             identification)
 7              THE COURT REPORTER:  No. 12.
 8   A    That is fine print.
 9   Q    Yeah.  Sorry.  So this is a printout of what
10        appears to be a letter addressed to you on the
11        bottom with an email response from you at the top.
12        Do you see that?
13   A    An email response at the top.  I'm seeing "I have
14        attempted to contact you."  "Mr. Widen."
15   Q    At the very top of the page it looks like there's
16        an email from you to --
17   A    Oh, I got it.
18   Q    -- Corey Goldstein.
19   A    I see it up here now.  Yes.
20   Q    Okay.  Looking at this letter, it looks like a
21        solicitation from someone about buying
22        Widen Enterprises --
23   A    Yes.
24   Q    -- is that fair?
25            And towards the middle it says that "DFW" --
```

Page 122

```
 1        the company this person represents -- "seeks
 2        businesses which: Benefit from a recurring revenue
 3        stream; Have high margin, scalable business
 4        models;" and "Can be expanded through selective
 5        add-on acquisitions to expand service lines,
 6        diversify geography or deepen customer
 7        penetration."  Is that correct?
 8   A    Okay.
 9   Q    Fair to say that the solicitation specifically
10        calls out recurring revenue as a benefit of
11        companies like Widen Enterprises?
12   A    That's what it says.
13   Q    Okay.
14   A    Yes.
15            (Exhibit No. 13 marked for
16             identification)
17              THE COURT REPORTER:  No. 13.
18   Q    Okay.  And what's been handed to you and marked as
19        Exhibit 13 appears to be an email string between
20        you and a person named Dylan Goldsmith; is that
21        correct -- or I should rephrase.  I don't know
22        that you ever actually wrote to Mr. Goldsmith.
23   A    I did not.
24   Q    But Mr. Goldsmith wrote to you a few times --
25   A    Yes.
```

Page 123

```
 1   Q    -- is that fair?
 2            At the bottom, the very last email on the
 3        second page, on February 9, 2020 --
 4   A    Okay.
 5   Q    -- do you see that email?
 6   A    I do.
 7   Q    Okay.  Mr. Goldsmith said to you "Hi Reed, Hope
 8        2020 is treating you well so far.  We had a brief"
 9        conversation "via email regarding your company and
10        my client Alpine Software Group . . . a private
11        equity firm highly active in your market space.
12        ASG has a 'martech' division that exclusively
13        targets businesses in the DAM, reputation and
14        brand management sectors."
15            "At the time you mentioned it was a bit
16        premature.  I know we still may be a little early,
17        but it would be great to catch up and give you a
18        sense of our recent activity in the space and
19        interest.  We can also discuss what has driven
20        valuation in recent deals and what you can do now
21        to drive value in a transaction that may be
22        several years down the road."
23              MR. CHURCHILL:  Objection to the
24            extent counsel's recitation misstated the
25            first line of the document.  You said
```

Page 124

```
 1        "conversation."  It says "We had a brief
 2        connection via email."
 3              MR. PALAY:  Apologies.
 4   Q    And then Mr. Goldsmith ends by saying "Needless to
 5        say enhancing value and salability makes a
 6        business stronger and more profitable whether or
 7        not a sale ultimately occurs."
 8            "Do you have some time to catch up next week?
 9        I look forward to it."
10            "Enjoy the weekend!!"
11            Do you see that?
12   A    I do.
13   Q    Okay.  Now, Mr. Goldsmith says that you and him
14        connected briefly over email.  Do you recall doing
15        that?
16   A    We never connected.
17   Q    Okay.  He's just saying that to engage --
18   A    It's a ploy.
19   Q    -- in conversation?
20            Okay.  He said that you said that it was a
21        bit premature.  You never said that?
22   A    Never said that.
23   Q    Okay.  This is just --
24   A    My response was I'm not interested at this point
25        in time.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 125

1  Q  Yes.  Well, where --
2              MR. CHURCHILL:  That's a different
3          document.
4  A  That was a different document, but --
5  A  Yeah.
6  A  -- I think it's the same thing, isn't it?
7              MR. CHURCHILL:  No.
8  Q  But these are the types of solicitations --
9  A  Anyways.
10 Q  -- you received all the time?
11 A  Yes.
12 Q  And you never responded to them?
13 A  No.
14 Q  Okay.
15          (Exhibit No. 14 marked for
16          identification)
17              THE COURT REPORTER:  No. 14.
18 Q  Okay.  What's been handed to you and marked as
19     Exhibit 14 appears to be another operational
20     update from Mr. Gonnering to you and Mr. Kiesler,
21     this one dated May 8, 2020?
22 A  Uh-huh.
23 Q  Okay.
24 A  Yes.
25 Q  Do you see about a quarter of the way down the

Page 126

1      page under the heading "Software Revenue"?
2  A  Okay.
3  Q  Mr. Gonnering says "Currently projected at 27.44M
4      and we'll likely reduce it by a few hundred
5      thousand due to increased churn from existing
6      customers.  We will adjust more frequently, given
7      the circumstances, pulling in current data to
8      estimate departures.  Software revenue growth in
9      2020 is about 10% better when compared to 2019."
10         Did I read that correctly?
11 A  Yes.
12 Q  Okay.  So Mr. Gonnering was advising you on May 8,
13     2020 that the projected software revenue for
14     Widen Enterprises as of that date was
15     $27.44 million?
16 A  Excuse me.  Yes.
17 Q  Okay.  And that was a 10 percent increase from
18     2019?
19 A  That's what it says.
20 Q  Okay.  And this is during COVID again, correct?
21 A  Correct.
22 Q  Okay.  So using the metric that Mr. Gonnering used
23     in August 2018 of four times recurring revenues,
24     would it be fair to say that the estimated value
25     of Widen Enterprises as of this date using that

Page 127

1      metric was around $110 million?
2  A  Fair to say.
3  Q  Okay.  Is that how you interpreted these
4      numbers --
5  A  No.
6  Q  -- on May 8?
7  A  Not at all.
8  Q  How did you interpret them then?
9  A  As face value.
10 Q  What does that mean?
11 A  Well, it means projection was $27.44 million.
12 Q  And you didn't read anything into that?
13 A  Absolutely not.
14 Q  Okay.
15 A  Again, I was not interested in selling the
16     company.
17 Q  Okay.  Why did you have Mr. Gonnering report these
18     numbers to you in -- so regularly?
19 A  Well, it's my vested interest.  It's my company.
20 Q  Your vested interest includes the value of the
21     company, right?
22 A  Okay.
23 Q  Is that a yes?
24 A  I didn't value the company, so the answer is no I
25     guess.

Page 128

1  Q  Okay.  Your vested interest in the company does
2      not include its value?
3  A  No -- I mean -- no.  I never thought of it that
4      way.
5  Q  How did you think of it?
6  A  That my vested interest is the company.  I never
7      considered the value of it.
8  Q  Okay.  So what about the company was your vested
9      interest if not its value?
10 A  Well, it would be the value, but I never
11     considered it that way.  Again, there was no
12     interest in selling the company.
13 Q  Do you think that the value of a company only
14     matters if you're selling it?
15 A  To me?  Yes.
16 Q  Okay.  What about if you're selling a piece of it?
17 A  I wouldn't sell a piece of it.
18 Q  Okay.  But if someone was selling a piece of the
19     company, would the value of the company matter?
20 A  I don't know.
21              MR. CHURCHILL:  Objection to the
22          use of the word value.  You may answer.
23 A  I don't know.
24 Q  Okay.  Well, you sold a piece of Windy -- of
25     Widen Enterprises to Acquia, right?  You only

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023

Page 129

1    owned about 70 percent.
2  A  It was a 100 percent sale.
3  Q  But you only owned a piece of it, right?
4  A  Correct.
5  Q  So did the value of the company matter to you when
6     you sold that piece of it?
7  A  With that number, yes.
8  Q  Okay.  Okay.  So going back to Stacy's redemption
9     of all of her Windy Waters stock in May 2020,
10    around, around this time of the emails we were
11    just looking at.  Did you think that you had any
12    obligations to share information with Stacy in
13    connection with that redemption?
14 A  No.
15 Q  Did you think you had any obligations to share
16    information about the company's value in
17    connection with that redemption?
18 A  No.
19 Q  Did you think you had any obligations to share any
20    information about the company's financials with
21    respect to that transaction?
22 A  To Stacy?
23 Q  Yeah.
24 A  No.
25 Q  Okay.  Did you share any information with Stacy

Page 130

1     about the companies in connection with that
2     transaction?
3  A  No, unless she asked for it.
4  Q  Okay.  Do you know if anyone else shared any
5     information with Stacy about that transaction?
6  A  I don't.
7  Q  Okay.  So just to be clear, you did not tell Stacy
8     what the companies' revenues were prior to her
9     selling her interest in Windy Waters in May 2020?
10          MR. CHURCHILL:  Objection to the
11       use of the word companies.  You may answer.
12 A  No.
13 Q  And that includes the companies' software revenue;
14    you didn't share that information with Stacy in
15    connection with the May 2020 redemption?
16          MR. CHURCHILL:  Same objection to
17       the use of the word companies.  You may
18       answer.
19 A  No.
20 Q  And that includes the companies' -- the cash
21    amount that the companies held at the time of that
22    redemption; you didn't share that with Stacy
23    either?
24          MR. CHURCHILL:  Same objection.
25 A  No.

Page 131

1  Q  And I'll just clarify.  I'm talking about
2     Widen Enterprises and Windy Waters.  And if you
3     shared any of this information about either of the
4     companies with Stacy, please let me know.
5     Understood?
6  A  Yeah.
7  Q  Okay.  Did you share the amount of compensation
8     you were getting from either of the companies with
9     Stacy in connection with this transaction?
10 A  No.
11 Q  Did you share any information about, you know, the
12    number of customers the companies had, whether
13    they were growing or anything about their
14    operations with Stacy in connection with this
15    transaction?
16 A  No.
17 Q  Do you think Stacy would have understood any of
18    the information I just listed off if you had
19    shared it with her?
20 A  I don't know.
21          MR. CHURCHILL:  Objection, calls
22       for speculation.
23 A  I don't know.
24 Q  You don't know.  Okay.  Can you think of anything
25    about the companies that you disclosed to Stacy in

Page 132

1     connection with the May 2020 redemption?
2  A  No.
3  Q  Can you think of any information about the
4     companies that you know other people disclosed to
5     Stacy in connection with the May 2020 redemption?
6  A  No.
7  Q  Okay.  So when did you first consider selling
8     Widen Enterprises?
9  A  I don't remember the date.
10 Q  Do you remember the year?
11 A  It would be the year we engaged with SEG.
12 Q  And by that you mean the year you signed an
13    engagement letter with them?
14 A  Okay.
15 Q  Is that -- is that what you mean?
16 A  I guess so.
17 Q  Okay.  Was that before or after Stacy's
18    redemption?
19 A  After.
20 Q  Okay.  So assuming that you signed an engagement
21    letter with SEG in January of 2021, your testimony
22    is that you did not consider selling the
23    companies -- or selling Widen Enterprises in the
24    prior year at all, that is, 2020?
25 A  I don't believe so.

**Stacy L. Randall v.**
Reed C. Widen, et al.

**Deposition of  Reed C. Widen  Video Deposition**
August 23, 2023

Page 133

1  Q  Okay.  How much money did you think a buyer would
2     pay for Widen Enterprises when you started to
3     consider selling it?
4  A  I didn't have a number.
5  Q  Okay.  In February of 2020, is it your testimony
6     that you had not considered selling the companies
7     at that point?
8  A  February of 2020, yes.
9  Q  That is your testimony?
10  A  That we weren't considering.
11  Q  Did you spend some time in Arizona in February of
12     2020?
13  A  Probably.
14  Q  Okay.  Did your nephew Justin Randall come visit
15     you there in February of 2020?
16  A  I don't remember.
17  Q  Okay.  Do you remember being by your pool with
18     Justin in the winter of 2020?
19  A  I don't remember 2020, but yeah, Justin's been
20     over.
21  Q  Okay.  Did you talk to Justin at all about the
22     possibility of selling the companies ever?
23  A  I don't remember that.
24  Q  Did you tell Justin that you thought you could
25     sell the companies for enough money so that you

Page 134

1     could personally receive around $80 million?
2  A  I don't ever recall that.
3  Q  Okay.  Do you -- do you know if you didn't tell
4     Justin that or you just -- you just can't recall
5     that?
6  A  I don't recall.
7  Q  Okay.  Is there anything that would refresh your
8     recollection about whether you said that?
9  A  I don't think I would have done that.  It would
10     have sounded like I was conceded or bragging, and
11     I wouldn't have done that.
12  Q  Okay.  Why did you first consider selling the
13     companies?  What caused you to do that?
14  A  Matthew.
15  Q  Okay.  In what way?
16  A  Brandfolder sold for X amount of revenue.  I said
17     Now it would be stupid not to look into it.
18  Q  Okay.  So --
19  A  And that was look into it, not go ahead and sell.
20  Q  Matthew told you about a different sale of a
21     company that was based on recurring revenue?
22  A  Yes.
23  Q  And you realized that you might be able to get a
24     lot of money for Widen Enterprises?
25  A  Yes.

Page 135

1  Q  And you would be stupid not to look into selling
2     it at that point?
3  A  Yes.
4  Q  Okay.  Do you remember when, when Matthew first
5     told you about the Brandfolder acquisition?
6  A  No.
7  Q  Okay.
8         THE WITNESS:  I'm getting hungry.
9         MR. CHURCHILL:  Do you think we
10     could maybe do lunch in a little bit?  If you
11     need to do the --
12         MR. PALAY:  We can do -- we can do
13     lunch now.
14         MR. CHURCHILL:  Do you want to
15     break for lunch now?  It might be a good
16     time.  It's 12:30.
17         (Lunch Recess)
18  Q  Mr. Widen --
19  A  Yes.
20  Q  -- we just took our lunch break.  And I can't
21     represent that I recall exactly what we were
22     discussing, but I think we were talking about if
23     and when you ever considered selling the company
24     for the first time.  Does that accord with your
25     recollection?

Page 136

1  A  Yeah.
2  Q  Did you ever discuss with Mr. Gonnering the
3     possibility of being acquired by Salesforce?
4  A  No.
5  Q  Okay.
6  A  No, not that I know.  I don't think so.
7  Q  You don't think so?
8  A  I don't think so.
9  Q  Okay.
10  A  It seems to me like there might have been an early
11     bidder but bowed out soon.
12  Q  Do you remember if you discussed it with
13     Mr. Gonnering as early as February 2020?
14  A  No, I don't remember.
15  Q  Okay.
16         (Exhibit No. 15 marked for
17         identification)
18         THE COURT REPORTER:  No. 15.
19         MR. PALAY:  I think I just handed
20     you two.
21         THE COURT REPORTER:  Oh, yep.
22         (Discussion off the record)
23  Q  Okay.  The document I just handed to you marked
24     as -- you said 15, ma'am?
25         THE COURT REPORTER:  15.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 137

1  Q  -- looks to me to be another operational update
2     from Mr. Gonnering to you and Mr. Kiesler, this
3     one dated February 14, 2020?
4  A  Okay.
5  Q  Okay. And just starting from the top under the
6     heading "Revenue," it says "Our 2020" year-end --
7     excuse me. "Our 2020 YE revenue projection is
8     32.7M, representing a 14.1% growth over last year.
9     This run rate is slightly better than our targeted
10    revenue of 32.4M. The software portion of this
11    revenue is 29.78M and content production is
12    2.94M."
13       Excuse me. Did I read that correctly?
14 A  I believe so.
15 Q  Okay. And down at the bottom of this page under
16    the heading "Salesforce Partnership."
17 A  Okay.
18 Q  I'm not going to read the entire paragraph because
19    it's kind of long, but if you want to take a
20    moment to look it over and refresh your
21    recollection there.
22       (Witness reviews document)
23 Q  Okay. A few sentences up from the bottom
24    Mr. Gonnering said "However if Salesforce enters
25    the DAM space, we need to anticipate the impact on

Page 138

1     our customer and buyer activity. The market power
2     of this gorilla may make it more risky to stay the
3     course. Active discussion. Typical market
4     activity indicates this type of partnership leads
5     to acquisition. Staying abreast of your future
6     plans is important because if you were operating
7     on a shorter term horizon, we may want to pursue
8     this opportunity more aggressively."
9        Did I read that right?
10 A  Yes.
11 Q  So -- and Mr. Gonnering in this paragraph is
12    talking about a potential partnership between
13    Widen Enterprises and Salesforce?
14 A  Yeah.
15 Q  And that's a partnership that did come to
16    fruition, correct?
17 A  I think we had them as a client.
18 Q  Okay. You didn't -- you didn't do -- you didn't
19    have a partnership where Salesforce paid you to be
20    their sort of back office digital asset
21    management?
22 A  I don't believe so.
23 Q  Okay. We can return to that. Do you know if
24    Salesforce paid you like a onetime payment in 2020
25    of about a -- like in a -- you don't -- you don't

Page 139

1     know anything about that?
2  A  I don't. I'm sorry.
3  Q  Okay. So when Mr. Gonnering says that it may be
4     "risky to stay the course," what do you think he's
5     referring to there?
6        MR. CHURCHILL: Objection, calls --
7  Q  What do you understand at the time that he was
8     referring to there?
9        MR. CHURCHILL: You can answer that
10       question.
11 A  I guess I don't know what it means. I don't know
12    what stay the course means.
13 Q  Okay. And he says -- when he says that "Typical
14    market activity indicates this type of partnership
15    leads to acquisition," did you understand that to
16    be referring to an acquisition of
17    Widen Enterprises by Salesforce?
18 A  Well, we're certainly not going to buy them, so I
19    guess that's the way I would read it.
20 Q  Okay. And then he says "Staying abreast of your
21    future plans is important because if you were
22    operating on a shorter term horizon, we may want
23    to pursue this opportunity more aggressively."
24       When he's talking about your horizon, fair to
25    say he's referring to your horizon for selling the

Page 140

1     company?
2        MR. CHURCHILL: Objection to the
3        extent it calls for speculation.
4  A  What's the date of this again? 2014/20 -- or
5     2/14. I don't know. I had a conversation once
6     with Matthew. He had asked me about my future
7     plans. Then I was 60, and I said I'll review it
8     at 62, and if we don't do anything, I'll review it
9     at 65.
10 Q  Okay. So when you were 60, Mr. Gonnering asked
11    you about your plans encompassing, you know,
12    whether you were planning to sell the company?
13 A  He wanted a succession plan, not necessarily
14    selling.
15 Q  But, like, about that topic?
16 A  About what topic?
17 Q  Whether you would be selling the company at any
18    time.
19 A  Again, it was more about a succession plan.
20 Q  Okay.
21 A  Whatever that was deemed to be.
22 Q  And you didn't have an answer for him when you
23    were 60 but said you'd revisit it at 62?
24 A  And if I didn't sell or do something by then, I
25    would look at it at 65.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 141

1  Q  Okay.  So selling was a possibility when you were
2     60?
3  A  No.
4  Q  Okay.  But you told him that if you didn't sell by
5     then you would plan at 62?
6  A  We had the conversation when I was 60.  I wasn't
7     interested in selling.
8  Q  Okay.
9  A  So we were going to revisit it at 62, and if we
10    didn't do anything, I would revisit it at 65.
11 Q  Okay.  And how old are you now?
12 A  I'm 62 currently, 63 --
13 Q  Okay.
14 A  -- June 15.
15 Q  So when you were 60, that would have been June
16    15 -- help me out -- 2021 or --
17 A  No.
18 Q  -- 2020?
19 A  '20.
20 Q  Okay.
21 A  I was born in '60.
22 Q  So that was after this conversation you had this
23    succession planning conversation with
24    Mr. Gonnering?
25 A  I don't know that.

Page 142

1  Q  Well, if it was when you were 60 and you turned 60
2     June 15, 2020, that would be after February --
3  A  Okay.
4  Q  -- 14, 2020, right?
5  A  Fair.
6  Q  Okay.  So as of this -- as of the date of this
7     document, you had not talked to Mr. Gonnering
8     about succession planning yet?
9  A  No.
10 Q  Okay.  What was your succession plan when you were
11    60?
12 A  Didn't really have one yet.
13 Q  Okay.  Did you -- had you contemplated at all who
14    would take over the company if you weren't able to
15    run it anymore?
16 A  Well, that would have been Matthew, but I never
17    contemplated it.  It would have been him.
18 Q  Okay.  Because there was no one else to do it?
19 A  Not in my mind.
20 Q  Okay.  In the -- so you don't know why
21    Mr. Gonnering was referring to a shorter term
22    horizon, like, shorter than what?  You can't say
23    what he meant?
24 A  No.  I'm sorry.
25 Q  Okay.  In the next page you responded to

Page 143

1     Mr. Gonnering.  You said "You mentioned walking me
2     through the last yrs next week, I'm in AZ your
3     welcome to come down and get out of the cold.  I
4     agree on sales force.  Our branding is vert [sic]
5     important.  Sorry for including written comments
6     on the 360, I don't see enough interaction on a
7     daily basis for feel comfortable replying.  Keep
8     me" postponed -- "posposposted on your progress."
9                 MR. CHURCHILL:  We'll stipulate
10          that that means posted.
11 Q  Okay.  Yeah, keep me posted on your progress.
12                 MR. CHURCHILL:  Yes.
13 Q  Okay.  Did I read that roughly correctly except
14    for the "posposposted"?
15 A  Yeah.
16 Q  Okay.  So, first of all, does this refresh your
17    recollection on whether you spent time in Arizona
18    in February of 2020?
19 A  Well, I guess so, yes.
20 Q  And when you asked about walking me through last
21    year's next week, were you referring to last
22    year's financial statements?
23 A  I don't know.  I don't remember.  "You mentioned
24    walking me through" -- I don't remember.
25 Q  Okay.  When you said "I agree on sales force,"

Page 144

1     what did you agree with?
2  A  I don't know.  I would speculate if I answered
3     that.
4  Q  Okay.  You don't know if you agreed that that type
5     of partnership leads to an acquisition?
6  A  I don't remember.  I'm sorry.
7  Q  Okay.  Do you remember if you were agreeing that
8     staying the course with respect to
9     Widen Enterprises would be more risky if
10    Salesforce entered the digital asset management
11    space?
12 A  I don't remember.  I don't know.
13 Q  Okay.
14 A  They're a big gorilla.
15 Q  Were you concerned that Salesforce would enter the
16    digital asset management space?
17 A  No.
18 Q  Even though they were a big gorilla?
19 A  No.
20 Q  Why not?
21 A  I'm not afraid of competition.
22 Q  Even with a company as large as Salesforce?
23 A  I'm not afraid of competition.
24 Q  Okay.
25

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 145

1      (Exhibit No. 16 marked for
2      identification)
3          THE COURT REPORTER:  No. 16.
4    A  More really small print.
5    Q  Yeah.  So Exhibit 16 appears to be a series of
6       emails between you and Russ Wolff of
7       Baker Tilly --
8    A  Okay.
9    Q  -- is that correct?
10   A  Seems like it.
11   Q  Okay.  And if you go down the page, there's an
12      email on May 27 at 3 -- let's go to the one below
13      it.  There's an email on May 27, 2020 at 2:11 p.m.
14      from Russ Wolff to you, and it's from the email
15      address notifications@assuresign.com.  Do you see
16      that?
17   A  I do.
18   Q  And it says "Dear" Mr. "Widen, Your 2019 income
19      tax return is complete and ready for electronic
20      filing."  That's the first sentence.  It says --
21   A  Yes.
22   Q  -- more.
23          Fair to say this is -- this was likely an
24      automated message?
25   A  I guess.

Page 146

1    Q  Okay.  Did you under -- did you think it was an
2       automated message when you received it?
3    A  I don't remember.
4    Q  Okay.  Do you know if Russ Wolff would have
5       emailed you and said Dear, Mr. Widen and then --
6       is that how he addressed you?
7    A  No.
8    Q  Okay.  And then the same day, May 27, right above
9       that you wrote back to this message, and said
10      "I'm in Madison all of next week, can we meet?the
11      only thing I have is a lunch meeting Tuesday.
12      Pick date and time that works for you."
13          Do you see that?
14   A  I do.
15   Q  Why did you want to meet with, with Russ Wolff in
16      May of 2020?
17   A  I'm assuming just to go over the taxes.
18   Q  Okay.  Was that typical?  Did you go --
19   A  Of course.
20   Q  -- over your tax return every year?
21   A  Yeah.
22   Q  Okay.  Did you talk to Russ Wolff about how the
23      company was doing when you'd meet with him?
24   A  Yeah.
25   Q  Was he somebody that you would talk about your

Page 147

1       future plans for the company with?
2    A  Depending.  It's not something we talked about a
3       lot, no.
4    Q  Did you ever talk about your future plans for the
5       company with Russ?
6    A  I don't know.
7    Q  Sorry.  I didn't --
8    A  Yeah, I'm thinking.  I don't believe so.
9    Q  Did you end up meeting with Russ Wolff in May of
10      2020?
11   A  I don't know.
12   Q  Okay.  The top email says "Reed, I can be at your
13      house around 2:45 if that works."  Does that
14      refresh your recollection of whether you met with
15      Russ?
16   A  I don't know.
17   Q  Okay.  So you have no recollection of whether you
18      met with Russ Wolff in May of 2020?
19   A  Well, not that date, no.
20   Q  Anytime --
21   A  By the way, this says 6/1/2020, not May.
22   Q  That's -- that's true.  Do you have any
23      recollection of whether you met with Russ Wolff in
24      June of 2020?
25   A  I don't remember.

Page 148

1    Q  Okay.
2    A  I'm sure I did.
3    Q  Do you have any recollection of what you discussed
4       with Russ Wolff --
5    A  No.
6    Q  -- in June of 2020?  No recollection?
7    A  None.
8    Q  Okay.  Now, by June or July 2020 you had talked to
9       Mr. Gonnering and expressed an interest in selling
10      Widen Enterprises at some point, correct?
11   A  Say the date again.
12   Q  June to July 2020.
13   A  Possibly.  That might have been when he brought
14      the Brandfolder deal to me.
15   Q  Okay.  If we go back to the interrogatory
16      responses that Defendants filed in this case,
17      might that refresh your recollection?
18   A  I don't know.  I can try.
19   Q  Okay.  Okay.  If you go to page 9,
20      Interrogatory No. 6 asks you as a group of
21      defendants to "Describe in detail the 'M&A
22      Process' undertaken by Defendants as described in"
23      document labeled SEG 94, "including but not
24      limited to the date on which any of Defendants
25      first initiated the first three milestones," which

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 149

1  are ('#1 Ownership desire,' '#2 Find trusted
2  advisors,' and '#3 Organize information') and the
3  dates on which each of those milestones was
4  completed."
5      Did I read that approximately correctly?
6  A  I think so.
7  Q  Okay.  And do you know what this "M+A Process" is
8  referring to?
9  A  I know what M&A is.
10  Q  Okay.  Was the M&A process something that
11  Mr. Gonnering updated you on during the sale
12  process of Widen Enterprises?
13  A  No.
14  Q  Okay.  You never received updates on the M&A
15  process from Mr. Gonnering?
16  A  Well, of course.
17      MR. CHURCHILL:  Just one point of
18      clarification to remind counsel that the
19      document referenced in the actual
20      Interrogatory No. 6 proved to be incorrect,
21      and so the document ultimately that was
22      discussed was SEG_299.
23      MR. PALAY:  That is -- thank you,
24      Counsel.
25  Q  On the next page, on page 10 --

Page 150

1  A  Okay.
2  Q  -- the defendants responded that -- and this is
3  the beginning of the first full paragraph, "The
4  first step, '#1 Ownership desire,' started in
5  late" June 2020.  In late June or early July,
6  Reed Widen first expressed an interest in
7  Mr. Gonnering in selling Widen Enterprises, Inc.
8  somewhere between two to five years' time," that
9  is, "between mid-2022 to 2025"; is that right?
10  A  Yes.  We just talked about that.
11  Q  Is that accurate?
12  A  Yes.
13  Q  Okay.  So in late June or early July you first
14  told Mr. Gonnering that you had an interest in
15  selling Widen Enterprises at some point?
16  A  No.  That was, again, about the succession plan,
17  which wasn't defined yet by selling or ease op or
18  anything other thing.
19  Q  So this statement in Defendants'
20  Interrogatory No. 6 is not accurate?
21  A  I can't say that for sure, but again, there was no
22  desire on my part at that point in time to sell
23  the company.
24  Q  Okay.  And you didn't express an interest to
25  Mr. Gonnering in selling Widen Enterprises at that

Page 151

1  time?
2  A  No.  I told him we'd review it in 2022 and 2025.
3  Q  Did you review these interrogatories before they
4  were provided to the plaintiff in --
5  A  I didn't read for or --
6  Q  -- this case?
7  A  No.  Review, yeah, skim.
8  Q  But you didn't review them closely to tell --
9  A  No.
10  Q  -- if they were accurate?
11  A  Sorry.  No.
12      (Exhibit No. 17 marked for
13      identification)
14      THE COURT REPORTER:  No. 17.
15  Q  Okay.  What's been marked as Exhibit 17 and handed
16  to you is a printout of an email from you to
17  Matt Gonnering in August of 2020; is that right?
18  A  Okay.
19  Q  Okay.  And scrolling down, it looks like the first
20  email in the chain is on Tuesday, August 25 from
21  Mr. Gonnering to you and says "Morning Reed.  A
22  transaction in our industry was announced
23  yesterday.  A publicly traded company called
24  Smartsheet . . . shared the following in this
25  article," which is apparently linked.

Page 152

1  "'Smartsheet will pay approximately $155 million
2  for the acquisition, subject to certain customary
3  adjustments and indemnification obligations, with
4  a combination of cash and stock.'"
5      "Brandfolder does not have the same market
6  presence or size.  I would guess they were between
7  15-20M in annual revenue," and then he says an
8  "(article here shares 12M in 2017/2018 plus
9  growth).  At 20M, that is 7.75x revenue."
10      "A noteworthy transaction."
11      Did I read that correctly?
12  A  Yes.
13  Q  Okay.  What did you understand this, this message
14  to mean?
15  A  That a company sold for seven and a half times
16  revenue -- or seven and three-quarter times I
17  guess.
18  Q  Any particular reason that Mr. Gonnering would
19  bring this sale of this company to your attention?
20  A  You would have to ask him.  I don't know.
21  Q  Okay.  You said "Hmmm, that makes it very
22  interesting," right?
23  A  Well, where did I say that?
24  Q  In the email above on the same day.
25  A  Let's see.  Yeah.

Page 153

1  Q   What is the "it" that was very interesting?
2  A   The number.
3  Q   I'm not sure if I understand.  You said that "that
4      makes it very interesting."  What was very -- what
5      is the "it" referring to?
6  A   The 7.75 times revenue.
7  Q   Okay.  So you were saying that that's interesting
8      because if you applied it to Widen Enterprises,
9      that would be a large amount of money that you
10     could get for the company?
11 A   Yes.
12 Q   Okay.  Had you been talking to Mr. Gonnering about
13     potential revenue multipliers that might be
14     applied to Widen Enterprises at this time?
15 A   No.
16 Q   This was the first time you'd ever heard about it?
17 A   Yeah, and he brought them to me.
18 Q   What about the emails we reviewed earlier where
19     Mr. Gonnering was talking about a revenue
20     multiplier between three and five times and a
21     revenue multiplier of four times in 2014 and 2018?
22 A   Again, those are numbers he brought to me.
23 Q   Okay.
24 A   It's unsolicited.  I didn't ask.
25 Q   Okay.  And you never talked about it with him?

Page 154

1  A   Well, apparently we did, right?  It's documented.
2  Q   Do you remember talking about it?
3  A   No.  I mean, I wasn't interested in selling, so
4      no.
5  Q   Okay.  And you said in the next e-mail a minute
6      later after your first email, "If our number is
7      over 200 million it's time to look at selling."
8      Is that correct?
9  A   It looks like it.
10 Q   Okay.  So it looks like as of this date you did
11     think about selling Widen Enterprises; is that
12     fair?
13 A   For $200 million, yeah, I would have sold it.
14 Q   Okay.  And what was -- was there a number you had
15     in your mind at that time that was sort of a
16     number you would agree to sell Widen Enterprises
17     for?
18 A   No, no.
19 Q   Until this day when $200 million was brought up?
20 A   Well, nobody offered that.
21 Q   Right.
22 A   I said "If our number is over 200 million," I'd
23     look at selling it.
24 Q   Okay.
25 A   I didn't say I would sell it.

Page 155

1  Q   Right.  It's just time to look at selling, right?
2  A   That's what it says.
3  Q   Okay.  Had you looked at selling it before?
4  A   No.
5  Q   Okay.  Is this the first time that you ever spoke
6      to Mr. Gonnering about selling the company?
7  A   I don't think we even talked about selling --
8      well, I guess we did there.  Yes.
9  Q   Okay.
10 A   For $200 million I'd have sold it.
11 Q   But you did sell it for less than $200 million,
12     right?
13 A   I understand.
14 Q   Is that correct?
15 A   Yes.
16 Q   Okay.  Did you and Mr. Gonnering meet with
17     Jeff Horein at Baker Tilly in -- around this time?
18 A   I did not.
19 Q   Okay.  Do you know if Mr. Gonnering was meeting
20     with Jeff Horein --
21 A   I do not.
22 Q   -- at Baker Tilly about that?  Okay.
23             (Exhibit No. 18 marked for
24             identification)
25             THE COURT REPORTER:  No. 18.

Page 156

1  Q   So Exhibit 18 that's been handed to you is a
2      series of emails between you and Mr. Gonnering
3      from August of 2020; is that accurate?
4  A   It says August 29, 2020, yes.
5  Q   Okay.  And on Friday, August 28, 2020 you wrote
6      "I'm meeting with Russ Wolff in a couple of weeks
7      incase I pull the trigger on a sale.  Glass door,
8      are those reviews from pre media?  I have a lot of
9      respect for Jeff, but keep me informed of what he
10     wants."
11         Do you see that?
12 A   Okay.
13 Q   So fair to say by this time you were at least
14     planning to have a conversation with Russ Wolff
15     around the sale of Widen Enterprises?
16 A   I can't say that.
17 Q   You said you're meeting with Russ Wolff in a
18     couple weeks in case you pull the trigger on a
19     sale.  What did you mean by that?
20 A   I don't know.  "I pull the trigger on a sale.
21     Glass door."  I remember that.  Okay.
22 Q   So what did you mean by that first sentence, that
23     you were meeting with Russ Wolff in a couple weeks
24     in case you pulled the trigger on a sale?
25 A   I guess that's what it says.  I guess I was

**Stacy L. Randall v.**
Reed C. Widen, et al.

**Deposition of  Reed C. Widen  Video Deposition**
August 23, 2023

Page 157

1    starting to explore the possibility.
2  Q  Okay.  And then Mr. Gonnering said in the next
3     message, "I will keep you informed on all
4     activities related to this preliminary work from
5     Baker Tilly.  Estimated project time is
6     2-3 months."
7  A  I don't know where you're at.
8  Q  It's in the email above the one we were just
9     looking at.
10 A  Oh, I got you.  All right.
11 Q  So fair to say Mr. Gonnering did keep you informed
12    of all activities related to the preliminary work
13    from Baker Tilly?
14 A  Fair to say.
15 Q  What did that preliminary work relate to?
16 A  I'm not sure.
17 Q  Okay.  Did it have to do with selling
18    Widen Enterprises?
19 A  I'm guessing.
20 Q  Okay.  But you don't recall?
21 A  Not -- no.  But that would be my guess.
22 Q  Okay.  And at some point Widen Enterprises engaged
23    SEG, correct?
24 A  Yes.
25 Q  And you discussed with SEG the appropriate value

Page 158

1     of Widen Enterprises in a sale; is that fair?
2  A  I don't think so.  I wouldn't know what the
3     appropriate number in a sale would be.
4  Q  Okay.  SEG didn't advise you about what the
5     appropriate number in a sale would be?
6  A  Well, they said it would be arranged between 2 and
7     2 -- or 180 and 200 or something like that.  I
8     don't remember.
9  Q  Okay.
10 A  180 was the low end; 200 was the top end.
11 Q  I guess maybe my question was confusing because of
12    the word appropriate.  SEG and you discussed how
13    much Widen Enterprises was worth in a market
14    transaction?
15 A  Yes.
16 Q  Okay.  And did SEG advise you that that amount was
17    based on a multiple of Widen Enterprises'
18    recurring revenue?
19 A  I don't remember that conversation.  It was just a
20    broad range of numbers.
21 Q  Okay.
22 A  Between 180 and 200.
23 Q  And they didn't tell you any reason why?
24 A  I don't remember.
25 Q  Okay.

Page 159

1           (Exhibit No. 19 marked for
2           identification)
3           THE COURT REPORTER:  No. 19.
4  Q  Okay.  Exhibit 19 that has been handed to you
5     appears to be a presentation, and the front page
6     says "Revisit Valuation Range," and then it says
7     "WIDEN" and "Private + Confidentiality," correct?
8  A  I see that.
9  Q  Is this something you've seen before?
10          MR. CHURCHILL:  Counsel, just for
11     the record, while the witness is reviewing
12     the document, do you happen to have a Bates
13     number for this one?
14          MR. PALAY:  I don't, and I couldn't
15     even tell you why not.  I have no idea how I
16     would have this without a Bates number.
17          MR. CHURCHILL:  Maybe it was mated.
18          MR. PALAY:  Oh, yeah, it could be.
19     We can make it -- I believe it is SEG_3893.
20          MR. CHURCHILL:  Okay.  Thank you.
21 A  I don't recall this specific document, though.
22 Q  Did you see documents like this from SEG?
23 A  Like this?
24 Q  Documents that dealt with the value of
25     Widen Enterprises.

Page 160

1  A  Well, at the beginning when we interviewed them,
2     they came up with a value.
3  Q  On the third page after the cover sheet -- sorry,
4     the third page including the cover sheet.  It says
5     "Initial Guidance."
6  A  Got it.
7  Q  "Range: 128M-204M."
8           MR. CHURCHILL:  One moment.  The
9     witness is --
10 A  No.
11          MR. CHURCHILL:  -- on a different
12     page.
13 A  Got it.
14 Q  Okay.  That first bullet point, "Range:
15     128M-204M."
16 A  Okay.
17 Q  Was that the initial guidance that SEG gave you
18    about the value of Widen Enterprises?
19 A  I recall it being 180 to 200.
20 Q  Okay.  And the next bullet point says 2020 annual
21    recurring revenue $25.6 million.
22 A  Okay.
23 Q  And the next bullet point says "5-10x."
24 A  Okay.
25 Q  Okay.  Fair to say in this document SEG is saying

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 161

1  their initial guidance was that Widen Enterprises
2  was worth somewhere between 5 to 10 times its
3  annual recurring revenue for 2020?
4              MR. CHURCHILL:  Objection, lack of
5      foundation.
6  A  If that adds up to 128 to 204, it's fair.
7  Q  Okay.  At the bottom of the graph on this page, it
8      says "Bridgepoint estimates an Enterprise Value of
9      $128-$204mm on projected 2020 ARR of $25.6mm."
10             Do you see that?
11 A  I do.
12 Q  Okay.  Is this basically the same thing Gonnering
13     had been saying in those operational updates that
14     Widen Enterprises' value was a function of
15     multiplying its annual recurring revenue?
16 A  I don't think Matthew ever valued the company.
17             THE COURT REPORTER:  I'm sorry.
18      What?
19 A  I don't think Matthew ever valued the company.
20 Q  Do you recall a couple of documents we looked at
21     earlier today where Mr. Gonnering applies
22     different multiple ranges to Widen Enterprises'
23     then projected revenue or recurring revenue and
24     comes up with estimated values?
25 A  I remember them.

Page 162

1  Q  I'm sorry?
2  A  I remember them, yes.
3  Q  Okay.  So fair to say Matt Gonnering was doing
4      essentially the same thing as SEG in this document
5      albeit at lower multiples of annual recurring
6      revenue than SEG was using?
7              MR. CHURCHILL:  Objection, lack of
8      foundation, calls for speculation.  You can
9      answer.
10 A  All right.  I guess so.
11 Q  Okay.  So let's go back to September 2021 when --
12 A  Okay.
13 Q  -- you sold Widen Enterprises to Acquia.
14 A  Okay.
15 Q  Do you recall that, that time period?
16 A  Sure.
17 Q  Did there come a time when Stacy contacted you and
18     raised some concerns about the transaction where
19     she was redeemed of her Windy Waters stock?
20 A  Rephrase that question.  I'm sorry.
21 Q  Did Stacy contact you in September of 2021?
22 A  No.
23 Q  Okay.  Did you contact Stacy in 2000 --
24 A  Yes.
25 Q  Okay.  And what did you contact her to say?

Page 163

1  A  My wife encouraged me to tell her that I sold the
2      company.
3              THE COURT REPORTER:  I'm sorry.
4      What?
5  A  My wife encouraged me to tell her that we sold the
6      company.
7  Q  Did you not want to tell Stacy that you sold the
8      company?
9  A  It wasn't her business anymore, right?  She wasn't
10     a shareholder.
11 Q  Okay.  Was there anything you were worried about
12     coming from you telling Stacy that you sold the
13     company?
14 A  No.
15 Q  Okay.  So your wife encouraged you to tell her?
16 A  Yeah.
17 Q  And you did tell her?
18 A  Of course.
19 Q  And then what happened after that?
20 A  I offered her a million dollars, and she called an
21     attorney.
22 Q  Okay.  Why did you offer her a million dollars?
23 A  Because I offered my whole siblings and my wife's
24     siblings money.
25 Q  Okay.

Page 164

1  A  It was all grateful except for hers.
2  Q  So she was not grateful?
3  A  Well, no.  She turned it down and sued me.
4  Q  Okay.
5  A  That doesn't sound grateful to me.
6  Q  Did you think she should be grateful?
7  A  Yes.
8  Q  Okay.
9  A  I didn't owe her anything.
10 Q  Okay.  So you felt Stacy was ungrateful for not
11     accepting the million dollar gift that you offered
12     her in September of 2021?
13 A  Yes.
14 Q  Okay.  After you sold the company and realized it
15     was worth $162 million as of September 2021 --
16 A  Okay.
17 Q  -- did you still think the company was worth
18     $6.8 million in May of 2020?
19 A  I don't know.
20 Q  What do you mean you don't know?
21 A  I mean I don't know.  I mean, the 162 is a number
22     I never perceived would ever come true.
23 Q  But now that you know it was true --
24 A  Yeah.
25 Q  -- looking back at May 2020 --

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 165

```
1   A   Okay.
2   Q   -- do you think today that the company was worth
3       $6.8 million then?
4                   MR. CHURCHILL:  Objection to the
5           extent it mischaracterizes testimony.  You
6           may answer.
7   A   I don't know how to answer it.
8   Q   Why not?
9                   MR. CHURCHILL:  Same objection,
10          mischaracterizes testimony.
11  A   Because I never thought about selling the company
12      at that point in time.
13  Q   Right.  But now -- but looking back at that time
14      now that you have sold the company --
15  A   Okay.
16  Q   -- do you think the company was worth $6.8 million
17      in May of 2020?
18                  MR. CHURCHILL:  Same objection.
19  A   Same answer.  I don't know because I never really
20      valued the company.
21  Q   Okay.  So sitting here today, you cannot say how
22      much you think Windy Waters was worth in May of
23      2020?
24  A   No, I cannot.
25  Q   Okay.  Do you think it was worth less than
```

Page 166

```
1       $162 million?
2   A   Yes.
3   Q   Do you think it was worth less than $100 million?
4   A   Yes.
5   Q   Okay.  What changed between May of 2020 and
6       September of 2021 that would change the value of
7       Windy Waters by $50 to $60 million?
8                   MR. CHURCHILL:  Objection to the
9           extent it mischaracterizes prior testimony.
10          You may answer.
11  A   I guess an offer.
12  Q   So the offer changed the value?
13                  MR. CHURCHILL:  Same objection.
14  A   Yes.
15  Q   So was Windy Waters worth anything in 2000 -- in
16      May of 2020 before there was an offer?
17  A   Yes.
18  Q   Okay.  How could it be worth anything if there was
19      no offer?
20  A   Still had a value, right?
21  Q   Okay.  So it had a value, and the value wasn't
22      connected to the offer in May of 2020?
23  A   Is that a question?
24  Q   Yes.
25  A   I don't know how to answer it.
```

Page 167

```
1   Q   I'm just trying to paraphrase what you said.  In
2       May of 2020 Windy Waters, which owned
3       Widen Enterprises --
4   A   Yes.
5   Q   -- at the time, had some value?
6   A   Yes.
7   Q   Okay.  Even though there was no offer to buy it at
8       that point?
9   A   Right.
10  Q   How would that value have been determined?
11                  MR. CHURCHILL:  Objection to the
12          extent it calls for expert testimony.  You
13          may answer.
14  A   I'm not a CPA, so I don't know.
15  Q   Okay.  So --
16  A   I didn't value companies.
17  Q   -- if a CPA told you in May of 2020 that
18      Windy Waters, which owned Widen Enterprises,
19      was worth $150 million, would that change how you
20      think Stacy should have been treated in the
21      May 2020 redemption?
22  A   That's a hypothetical.  I don't know how to answer
23      that.  I wasn't advised that it was worth
24      $150 million back then.
25  Q   Okay.  Fair to say that if you had been advised
```

Page 168

```
1       that it was worth $150 million you would have not
2       bought Stacy's stock as if the company was worth
3       $6.8 million?
4                   MR. CHURCHILL:  Objection,
5           mischaracterizes prior testimony.  You may
6           answer.
7   A   If I knew it was going to be that much, I would
8       have probably told her not to sell.
9   Q   Okay.  Do you think it was smart of her to sell in
10      2020?
11  A   I don't know.
12  Q   Looking back knowing what you know now?
13  A   I don't know.  I don't know what smart means in
14      this case.  We used a formula and bought her out.
15      We weren't considering selling the company.  It
16      kind of is what it is.
17  Q   Okay.  And did you make more money on the sale
18      personally because Stacy sold all her stock in
19      May 2020?
20                  MR. CHURCHILL:  Objection.
21          Objection to the hypothetical.  You can
22          answer the question.
23  A   I guess my stock shares went up in value, my
24      ownership.
25  Q   So you made more money because Stacy sold her
```

Page 169

1    interest in May of 2020?
2                MR. CHURCHILL:  Same objection and
3        object to the extent it calls for expert
4        testimony.  You can answer.
5  A  Yes.
6  Q  Okay.  Do you think that was fair?
7  A  I don't know what fair means.
8  Q  So earlier we talked about fair meaning everyone
9     getting what they deserve.  And you understood
10    that, right?
11        Okay.  So under that --
12                THE COURT REPORTER:  Is that a yes
13        or no?
14  A  That's a yes.
15                THE COURT REPORTER:  Thank you.
16  Q  Under that definition, do you think that's fair?
17  A  I believe she was treated fair.
18  Q  Okay.  Did Stacy ask you in September 2021 when
19     you talked to her about selling the company if you
20     had contemplated selling the company before her
21     buyout?
22  A  No, not that I recall.
23  Q  Did you advise Stacy in September of 2021 when you
24     had started thinking about selling the company?
25  A  No.

Page 170

1  Q  Okay.
2                (Exhibit No. 20 marked for
3                identification)
4                THE COURT REPORTER:  No. 20.
5  Q  Okay.  Exhibit 20 that's been handed to you
6     appears to be a text from you to Stacy; is that
7     correct?
8  A  I guess so, yes.
9  Q  And it says "I haven't talked to Kiesler yet but I
10     did find out that we . . . didn't start talking
11     about selling it until February this year;" is
12     that correct?
13  A  That's what it says.
14  Q  Okay.  And this text is dated September 10, 2021?
15  A  Okay.
16  Q  Is that a yes?
17  A  I see it.
18  Q  And so February of this year would be February of
19     2021?
20  A  I don't know.  I would assume that.
21  Q  Okay.  So you told Stacy that you had found out
22     that you -- or we didn't start talking about
23     selling the company until February of 2021?
24  A  Apparently.
25  Q  Okay.  Who is the "we"?

Page 171

1  A  Well, I guess it would be me, Michael, and
2     Matthew.
3  Q  Okay.  And how did you find that out?
4  A  What do you mean how did I find it out?
5  Q  You said you found out that you hadn't started
6     talking about selling the company until February
7     of that year.  How did you -- how did you find
8     that out?
9  A  I don't remember.
10  Q  Okay.  Did you eventually talk to Michael Kiesler
11     about when you considered -- first considered
12     selling the company?
13  A  I don't recall.
14  Q  Okay.  Did you ever find out that it had been
15     prior to February 2021?
16  A  I don't recall.
17  Q  Is there anything that could refresh your
18     recollection on whether you talked to
19     Michael Kiesler about when you started
20     contemplating selling the company or whether you
21     talked to Stacy about whether that was -- whether
22     you first began thinking about selling it in
23     February of 2021?
24  A  Is there anything that would make me recall that?
25     I don't know.  That was your question, correct?

Page 172

1  Q  Yeah.  Nothing you can think of?
2  A  Not right now offhand, no, sir.
3  Q  Okay.
4                (Exhibit No. 21 marked for
5                identification)
6                THE COURT REPORTER:  No. 21.
7  Q  So Exhibit 21 that's been handed to you is a
8     printout of what looks like a chat or probably a
9     text message chain between you and Mr. Kiesler; is
10     that correct?
11  A  It says "Mike."
12  Q  Do you know if that's Mike's number?
13  A  I do not.
14  Q  Okay.  And it looks like on September 11, 2021 --
15  A  Okay.
16  Q  -- you texted Mike and said "I don't think Stacy
17     will call you but don't tell her how much stock
18     she had."  And Mike said -- used an emoji to
19     indicate that he understood and would do as you
20     said?
21  A  Well, she was privy to that information.  He
22     didn't have to tell her.
23  Q  Why did you not want Mike to tell her how much
24     stock she had?
25  A  Because she had that information.

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 173

1  Q  So why would you go out of your way to tell Mike
2     not to tell her that?
3  A  I don't know that, but she has that information,
4     so she would have known it.
5  Q  You don't know why you texted Mike this?
6  A  I don't understand, no.
7  Q  What don't you understand?
8  A  Why I would have sent that.
9  Q  Okay.
10 A  But she has -- she obviously knows what she owned.
11 Q  Yeah.  Did you not want Stacy to realize how much
12    money she would have gotten if she had continued
13    owning --
14 A  I don't know that.
15 Q  What do you mean you don't know that?
16 A  Rephrase the question again.
17 Q  Did you not want Stacy to understand how much
18    money she would have gotten if she had continued
19    owning the shares of Windy Waters that she sold in
20    May 2020?
21 A  I think she would have figured that out herself
22    anyways.
23 Q  So that's not my question.  My question is did you
24    not want her to figure that out?
25 A  I didn't say that either.  I don't think --

Page 174

1  Q  Right.  I'm asking you that.
2  A  Yeah.  She could have figured it out.
3  Q  Did you not want her to, though?
4  A  I don't think I have an answer for that.
5  Q  Okay.
6  A  I mean, she has the information.  She could have
7     figured it out herself.
8  Q  Right.  But I'm asking about why you would tell
9     Mike Kiesler not to tell her how much stock she
10    had.
11 A  Because she has that information herself.
12 Q  Why does that mean that Mike shouldn't tell her
13    that?
14 A  I don't know.
15 Q  Well, you're the one who told Mike --
16 A  I understand.
17 Q  -- not to tell her that.  So why did you --
18 A  I don't know.
19 Q  -- write that?
20 A  I don't recall why I wrote that.  I just know she
21    had the information herself.
22        MR. CHURCHILL:  Hey, Dave.  Are we
23    pretty close to a break?  We've been going
24    for not quite an hour but close.
25        MR. PALAY:  We can take a break.

Page 175

1        MR. CHURCHILL:  Okay.
2        (Recess)
3  Q  Mr. Widen, we were almost done talking about
4     Exhibit 21 before the break.  And that's --
5  A  Okay.
6  Q  -- a text message where you told Mr. Kiesler not
7     to tell Stacy how much stock she had in
8     Windy Waters --
9  A  Okay.
10 Q  -- in September 2021?
11 A  Yep.
12 Q  And it's your testimony here today that you don't
13    know why you told Mr. Kiesler to withhold that
14    information?
15 A  I don't know why I told him.  I just know that she
16    had that information.
17 Q  Okay.  But you don't know why you specifically
18    reached out to --
19 A  I do not.
20 Q  You don't know why you specifically reached out to
21    Mr. Kiesler to advise him that you wanted him to
22    withhold that information?
23 A  I don't recall, no.
24 Q  Okay.  Were you concerned that Stacy would feel
25    cheated if she found out how much stock she'd had

Page 176

1     or how much you sold the company for?
2  A  No.
3  Q  Were you concerned that Stacy might Sue you if she
4     found out how much stock she had or how much you
5     sold the company for?
6  A  Well, when she turned down the million dollar
7     offer, I could smell trouble in the horizon.  I
8     thought it was a very gracious gift.  I gave it to
9     my two siblings, my brothers.  She turned it down.
10    I gave a half a million dollars to all of my
11    wife's siblings and started a charitable
12    foundation, put $10 million of my own money in
13    that.  So when she turned it down, it smelled like
14    trouble to me.
15 Q  Now, your wife's siblings didn't own any stock in
16    Windy Waters, right?
17 A  No, nor did my brothers.
18 Q  So -- well, they did at one point, didn't they?
19 A  True.
20 Q  But Stacy did, right?
21 A  When?
22 Q  Up until May 2020.
23 A  Yes.
24 Q  So could you see why Stacy would feel that she was
25    entitled to more than your wife's brothers with

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 177

1  respect to the sale proceeds of the company?
2  A  She got more than my wife's brothers. Her
3  siblings, our brothers, she got the same amount.
4  Q  She got -- she got -- I'm sorry. I don't
5  understand.
6  A  I offered Stacy, Stewart, and Price, my siblings,
7  all a million dollars. My wife's family got a
8  half a million.
9  Q  Your brother Stewart passed away?
10  A  Excuse me. Price and Tyler.
11  Q  Oh, okay. You offered everyone a million dollars?
12  A  Not everybody. In my family, yes. Her family, a
13  half a million.
14  Q  Oh, okay. Your wife's family?
15  A  Yes.
16  Q  Okay. And when she turned that down, you thought
17  you could smell trouble and that she might raise a
18  legal claim?
19  A  Yeah.
20  Q  Okay. Do you think Stacy is smart?
21  A  I don't know. I mean, that's my perception. I
22  don't know. She's not dumb.
23  Q  Have you ever told anyone she's stupid?
24  A  Probably.
25  Q  Okay.

Page 178

1  A  When I get mad at her.
2  Q  Is that what you think?
3  A  I don't know. Sometimes. I thought it was stupid
4  of her to turn down a million dollar gift.
5  Q  Okay. Did you think it was stupid of her to sell
6  all her Windy Waters stock?
7  A  I don't think so, no.
8  Q  Did that turn out to be a good decision she made?
9  A  I thought it was fair. I mean, we used the
10  formula.
11  Q  When you say fair, what do you mean now?
12  A  We used the formula, the same formula we used
13  every time she or anybody else had stock
14  redemption.
15  Q  Right. So it was fair because it was the same
16  formula as used for her prior redemptions and your
17  brothers' prior redemptions, right?
18  A  And anybody else.
19  Q  Except you, right?
20  A  Well, mine is different.
21  Q  Why is yours different?
22  A  Because I sold the company as a shareholder.
23  Q  Okay. So that entitles you to a different
24  calculation of the company's value?
25  A  I guess so.

Page 179

1  Q  Okay. How come?
2      MR. CHURCHILL: Object to the
3      extent it calls for expert testimony. You
4      can answer.
5  A  How come? Because I put 43 years of my life in
6  it.
7  Q  Did that make your stock more valuable than her
8  stock?
9  A  I would think so. In my mind, absolutely. I
10  worked hard.
11  Q  Okay.
12  A  And, by the way, we didn't buy out, okay? When we
13  bought out, it was a formula. When Acquia bought
14  out, it was their formula.
15  Q  Why did you use the formula to buy out Stacy if it
16  didn't apply to a redemption that was voluntarily
17  done?
18      MR. CHURCHILL: Objection, assumes
19      facts not in evidence, mischaracterizes
20      testimony, lack of foundation.
21  A  I don't understand the question.
22  Q  You testified earlier that at the time of Stacy's
23  redemption you believed that the Windy Waters
24  shareholder agreement required the use of the
25  formula for that redemption; is that an

Page 180

1  accurate --
2  A  When the company does that, yes.
3  Q  Okay. Is that still your understanding?
4  A  I would think so, yes.
5  Q  Would it change your view of whether Stacy got
6  what she was fairly entitled to if you found out
7  that the Windy Waters shareholder agreement does
8  not require the use of that formula for a
9  redemption like Stacy's?
10      MR. CHURCHILL: Objection, vague
11      and ambiguous. You may answer.
12  A  She didn't object to the formula.
13  Q  Sorry. What was that?
14  A  She didn't object to the formula. That's what we
15  used.
16  Q  So my question is would it change your view of
17  whether Stacy was treated fairly if you found out
18  that that formula was not required to be used at
19  that redemption?
20  A  I guess I didn't know that, so I think she was
21  treated fairly.
22  Q  Okay. So I'll represent to you today that that
23  formula is not required to be used for a
24  redemption like the one that Stacy did in
25  May 2020. Understood?

Page 181

```
 1   A   Okay.
 2                   MR. CHURCHILL:  And I'm going to
 3           object to that as assuming facts not in
 4           evidence.  You can pose that as a
 5           hypothetical, but you cannot represent for
 6           the record that that's what the document
 7           says.  It's a legal conclusion.
 8                   MR. PALAY:  Okay.
 9                   (Exhibit No. 22 marked for
10                   identification)
11                   THE COURT REPORTER:  No. 22.
12   Q   Okay, Mr. Widen.  What's just been handed to you
13       and marked as Exhibit 22 is a copy of "DEFENDANTS'
14       FIRST AMENDED OBJECTIONS AND RESPONSES TO
15       PLAINTIFF STACY L. RANDALL'S FIRST SET OF REQUESTS
16       FOR ADMISSION."  Do you see that on this document?
17   A   On page 7.
18   Q   It's on page 1.
19   A   Well, you opened it -- gave it to me at page 7.
20   Q   Okay.  I will represent to you that that is what
21       this document is, okay?
22   A   Okay.
23   Q   Is this a document that you helped prepare with
24       your attorneys?
25   A   Yes.
```

Page 182

```
 1   Q   Okay.  And if you go to page 7.
 2   A   Okay.
 3   Q   Request for Admission No. 16 says "Admit that no
 4       provision of the Shareholder Agreement of
 5       Windy Waters in effect as of May 13, 2020 limited
 6       the purchase price paid to Plaintiff for
 7       Plaintiff's stock in Windy Waters on May 13,
 8       2020."
 9               Do you see that?
10   A   I do.
11   Q   And do you see below it says "Subject to and
12       without waiving the General Objections above,
13       Defendants respond as follows: Admitted."
14               Do you see that?
15   A   I do.
16   Q   Okay.  So you can set that aside now.  And I think
17       that will clear up the evidentiary record.  And I
18       will represent to you that Defendants have
19       admitted that the shareholder agreement of
20       Windy Waters did not require the use of the EBITDA
21       formula for Stacy's redemption in May 2020, okay?
22       Do you understand that?
23   A   Okay.
24                   MR. CHURCHILL:  I'm still going to
25           object on the --
```

Page 183

```
 1                   MR. PALAY:  That's fine.
 2                   MR. CHURCHILL:  -- same basis.
 3   Q   Does that change your opinion of whether Stacy was
 4       treated fairly in the May 2020 redemption?
 5   A   No, because she was present and also signed that
 6       shareholder agreement.
 7   Q   I'm sorry.  So because she signed the shareholder
 8       agreement, it doesn't change anything?
 9   A   Not in my mind, no.
10   Q   Okay.  Why does whether she signed the shareholder
11       agreement have anything to do with my question,
12       which is whether knowing that the shareholder
13       agreement didn't require the use of the formula
14       that was used, it changes your opinion about
15       whether that was fair or not?
16   A   Well --
17                   MR. CHURCHILL:  I object -- I
18           object to the extent it mischaracterizes
19           testimony in a prior question.  You may
20           answer.
21   A   Rephrase your question again.  I'm sorry.
22   Q   Can you explain to me why the fact that Stacy
23       signed the shareholder agreement has anything to
24       do with whether or not it was fair to use a
25       formula for her redemption that was not required
```

Page 184

```
 1       by that shareholder agreement?
 2                   MR. CHURCHILL:  Same objection.
 3   A   Well, it's the formula that we always use, so I
 4       didn't know that there was a provision in there
 5       that could be negotiated.
 6   Q   Would you have done things differently had you
 7       known that at the time?
 8   A   I don't know.  I don't know.
 9   Q   If one of these shareholders of Windy Waters today
10       wanted to redeem their shares, would you use the
11       formula?
12   A   Yes.
13   Q   Okay.  Okay.
14                   (Exhibit No. 23 marked for
15                   identification)
16                   THE COURT REPORTER:  No. 23.
17                   MR. PALAY:  Dean, you're out.  I'm
18           sorry.
19                   MR. LAING:  I'm out.  All right.
20   Q   So what's been handed to you and marked as
21       Exhibit 23 appears to be a text message from you
22       to Stacy dated September 20, 2021 --
23   A   Okay.
24   Q   -- is that right?
25   A   Yes.
```

**Stacy L. Randall v.**
Reed C. Widen, et al.

**Deposition of Reed C. Widen Video Deposition**
August 23, 2023

Page 185

1 Q   It just says "There goes your million dollar
2       gift."
3 A   Yes.
4 Q   Did you text Stacy that on that day?
5 A   Well, apparently.
6 Q   How come?
7 A   Because she called an attorney and turned down my
8       million dollars.
9 Q   She turned down your million dollars?
10 A   Yes.
11 Q   Okay.  When did she do that?
12 A   Date?
13 Q   Or about-ish.  I mean --
14 A   When we had the conversation.  Her first comment
15       was You're going to give me the same amount that
16       you've given your brothers? like she deserved
17       more.  At that point in time I could smell
18       trouble.  Her tone of voice was bad.
19 Q   And then what did you say?
20 A   I said Yes.  I'm giving you the same amount as
21       them.
22 Q   And what was her response?
23 A   I don't remember, but when she told me that she
24       contacted an attorney that's going to contact
25       ours, I said "There goes your million dollar

Page 186

1       gift."
2 Q   Okay.  So it wasn't a gift she could have if she
3       contacted an attorney?
4 A   Not if she's going to sue me.  I'm not going to
5       fund her lawsuit against me.
6 Q   Okay.  Okay.  This --
7       (Exhibit No. 24 marked for
8       identification)
9       THE COURT REPORTER:  No. 24.
10 Q   Okay.  I've handed you -- or the reporter has
11       handed you what's been marked as Exhibit 24.  And
12       I'm also going to hand you a second exhibit to
13       read along with it.
14       (Exhibit No. 25 marked for
15       identification)
16       THE COURT REPORTER:  No. 25.
17       (Witness reviews documents)
18 Q   Let's look at Exhibit 25 -- actually, let's just
19       look at Exhibit 24.  This looks like a text chain
20       between you and Michael Kiesler; is that fair?
21 A   It says "Mike."
22 Q   Okay.  Do you recognize that as his number or --
23 A   I don't know his number.
24 Q   Okay.
25 A   He's in my contacts.

Page 187

1 Q   And is he in your contacts as Mike?
2 A   He's in my contacts as Mike Kiesler.
3 Q   Okay.  On September 10, 2021 Mike says to you
4       "19.585%."  Do you see that?
5 A   Yes.
6 Q   Is that the amount of -- the percentage of
7       Windy Waters that Stacy redeemed in May 2020?
8 A   I believe so.
9 Q   And you said "Dam.  How much was her buy out?"
10       "Roughly."  And Mike said "$1,352,166.31," right?
11 A   Yes.
12 Q   Why did you -- why did you want to know how much
13       stock Stacy owned in the company?
14 A   More than curiosity.
15 Q   What do you mean?
16 A   She was being bought out.  I needed to know what
17       it was going to be.
18 Q   Well, this was September 2021, right?  So this was
19       over a year after she was --
20 A   Okay.
21 Q   -- bought out.
22 A   All right.
23 Q   So why were you talking to Mike about how much
24       stock she had?
25 A   I don't remember.

Page 188

1 Q   Okay.  Why did you say "Dam" when he told you how
2       much?
3 A   I don't know.
4 Q   Okay.  You have -- you don't know why you said
5       that?
6 A   I do not know.
7 Q   Was it because you recognized how much money she
8       would have received had she kept that stock?
9 A   Again, I don't know.
10 Q   Okay.  And Mike says to you after he tells you the
11       $1,300,000 number, "For reference, you received
12       13.5% of her 20%."  Do you see that?
13 A   I do.
14 Q   Okay.  And by that he meant that you personally
15       got the -- your holdings went up 13.5 percent in
16       the company?
17 A   Agreed.
18 Q   Okay.  And you said to Mike "We don't ever mention
19       that again.  But thanks.  So as a part of the deal
20       did we pay her out in full?"  Do you see that?
21 A   I do.
22 Q   Why did you never want to mention that again?
23 A   Because I could smell trouble.
24 Q   And by that you mean a lawsuit?
25 A   Yes.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 189

1  Q  Okay. So you didn't want to discuss how you
2     benefited from Stacy's buyout?
3  A  Okay.
4  Q  Is that a yes?
5  A  I don't know. You're the one who phrased it.
6  Q  I'm asking you.
7  A  And I'm telling you I don't know.
8  Q  Okay. You're the one who said it, so --
9  A  All right. I understand.
10 Q  Okay. So you don't know why you said any of the
11    things in this text chain?
12 A  I --
13            MR. CHURCHILL: Objection,
14       mischaracterizes testimony, misstates
15       testimony.
16 A  I answered it.
17 Q  Sorry. I missed it.
18 A  I said I don't know.
19 Q  Okay. And you said -- and then Mike said "The
20    balance on the note to her at" August 31, 2021
21    "was 1,130,599.46."
22 A  Yes.
23 Q  "It is up to you how you'd like to handle paying
24    her out once the transaction's funds are wired to
25    Windy Waters." Okay?

Page 190

1  A  Uh-huh.
2  Q  And he's referring to the money Acquia is paying
3     for Widen Enterprises, correct?
4  A  I'm assuming.
5  Q  Okay. And you wrote back "Pay her in full 2.3m
6     should keep her happy."
7  A  Uh-huh.
8  Q  Okay. So that's the 1.3 she's owed under the --
9     for the 19.5 percent above plus the $1 million
10    gift?
11 A  Yes.
12 Q  Okay. Why did you want to keep her happy?
13 A  She's my sister. I want her to be happy.
14 Q  Okay. So you just -- you just wanted to keep her
15    happy because she's your sister?
16 A  Yeah. I like her happy.
17 Q  Did you want her to keep from raising any legal
18    issues about her buyout?
19 A  I don't know. When she turned down the million
20    dollars, it was certainly a concern.
21 Q  But was --
22 A  And I was going out of my way to pay her all one
23    lump sum so she would have all this all at one
24    time versus over seven years. I thought I was
25    doing her a big favor.

Page 191

1  Q  Okay.
2  A  Again, watching after her again.
3  Q  And so again you felt she was ungrateful?
4  A  Oh, yeah, absolutely.
5  Q  Okay. She should have been grateful for the
6     $2.3 million?
7  A  The buyout plus a million, yes.
8  Q  Okay. And Mike says thumbs up "But let's chat
9     about this. You in town next week?" Did you chat
10    with Mike about that?
11 A  I don't remember.
12 Q  Okay. Anything that would jog your memory on
13    whether you chatted with Mike about that?
14 A  Not really. I don't think so.
15 Q  Okay.
16            (Exhibit No. 26 marked for
17             identification)
18            THE COURT REPORTER: No. 26.
19 Q  Okay. So Exhibit 26 that's been handed to you
20    looks to be a text message from you to Stacy on
21    December 12, 2021; is that correct?
22 A  That's what it says.
23 Q  And in that message to Stacy you said "I have
24    decided that Milmont [sic] will no longer pay the
25    bills for the cottage. You can expect

Page 192

1     notification from my attorney that you will be
2     responsible for 20% of the mortgage utilities
3     insurance and any other costs." Is that --
4  A  Okay.
5  Q  -- correct?
6  A  That's what it says.
7  Q  Why did you send Stacy this message?
8  A  Was that after the sale of the building?
9  Q  I don't know.
10 A  I think that would be why. Then there was no more
11    income.
12 Q  Okay. It says "I have decided that Milmont [sic]
13    will no longer pay the bills for the cottage."
14 A  Okay.
15 Q  So why did you decide that?
16 A  Well, if there wasn't any revenue coming into
17    Millmont, pretty self-explanatory I think.
18 Q  Okay. And Millmont owned the building that
19    Widen Enterprises operated out of?
20 A  Yes.
21 Q  And at some point you decided to sell that
22    building?
23 A  Yes.
24 Q  Why did you decide to do that?
25 A  A number of reasons. One, I didn't want to be a

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 193

| | |
|---|---|
| 1 | landlord to somebody that wasn't me, okay?  We |
| 2 | occupied it before Acquia.  And, two, she's not a |
| 3 | very good business partner because she's never |
| 4 | worked.  If things went south, she wouldn't be |
| 5 | able to pay her end of the bills. |
| 6 Q | Okay.  What end of the bills would Stacy have to |
| 7 | pay of Millmont? |
| 8 A | It's right here, 20 percent. |
| 9 Q | Okay. |
| 10 A | And that would be for the cottage and the |
| 11 | building. |
| 12 Q | Okay.  So you think that Stacy is responsible for |
| 13 | 20 percent of the expenses of the buildings that |
| 14 | Millmont owns? |
| 15 A | Yes.  Her ownership is 20 percent. |
| 16 Q | Okay. |
| 17 A | It's reasonable, right? |
| 18 Q | I don't know.  I mean, you would have to know |
| 19 | about that. |
| 20 | Did you provide Stacy information about the |
| 21 | building you decided to sell from Millmont? |
| 22 A | What do you mean?  What kind of information? |
| 23 Q | I don't know.  Anything.  I mean, you said she's |
| 24 | an owner. |
| 25 A | She got paid out, so she got information. |

Page 194

| | |
|---|---|
| 1 Q | Okay.  Did you think Stacy could afford to pay |
| 2 | her -- the 20 percent of the mortgage, utilities, |
| 3 | insurance, and other costs that you were telling |
| 4 | her she had to pay for Millmont? |
| 5 A | No.  That's why I didn't want her as a partner. |
| 6 | That's why I sold. |
| 7 Q | So -- okay.  So you were telling her she had to |
| 8 | pay costs that you didn't think she could pay? |
| 9 A | I was telling her that's going to be her -- she |
| 10 | owns 20 percent of the building, so she's |
| 11 | responsible for 20 percent of the cost. |
| 12 Q | Okay.  That you didn't think she could afford to |
| 13 | pay? |
| 14 A | I didn't -- she's not a very good business |
| 15 | partner. |
| 16 Q | Okay. |
| 17 A | Not financial strength anyways. |
| 18 Q | Did you want her to sell her portion of Millmont |
| 19 | to you? |
| 20 A | I would buy it now. |
| 21 Q | Did you ever text her and say Sell me the cottage |
| 22 | and get out of my life? |
| 23 A | I don't know. |
| 24 Q | Okay.  So as part of the process of selling |
| 25 | Widen Enterprises, did Widen Enterprises retain an |

Page 195

| | |
|---|---|
| 1 | accounting firm called Grant Thornton? |
| 2 A | They were part of the process for some reason.  I |
| 3 | don't remember why. |
| 4 Q | Okay. |
| 5 A | Baker Tilly was our accounting firm. |
| 6 Q | Okay.  You don't remember what Grant Thornton did? |
| 7 A | No, I don't. |
| 8 Q | Okay.  Does the term quality of earnings study |
| 9 | mean anything to you? |
| 10 A | It could. |
| 11 Q | Okay.  What does that mean? |
| 12 A | I think that's what Grant Thornton did. |
| 13 Q | Okay.  And what -- what is your understanding of |
| 14 | what that is? |
| 15 A | The quality of earnings? |
| 16 Q | Yes. |
| 17 A | It's just verifying the earnings of the customers. |
| 18 Q | Of Widen Enterprises? |
| 19 A | Yeah. |
| 20 Q | Okay.  And did you provide Grant Thornton with |
| 21 | information about Widen Enterprises as part of |
| 22 | that report? |
| 23 A | Me personally, no. |
| 24 Q | Okay.  Did other people at the company? |
| 25 A | I'm assuming Michael did. |

Page 196

| | |
|---|---|
| 1 Q | Okay.  And do you believe that the information |
| 2 | provided to Grant Thornton was accurate? |
| 3 A | Of course. |
| 4 Q | Okay. |
| 5 | (Exhibit No. 27 marked for |
| 6 | identification) |
| 7 | THE COURT REPORTER:  No. 27. |
| 8 Q | Okay.  I've just handed you a document marked -- |
| 9 | you said 20 -- |
| 10 | THE COURT REPORTER:  27. |
| 11 Q | -- 27 that says on the front "Grant Thornton |
| 12 | Project Wildcat Financial due diligence June |
| 13 | 2021."  Do you see that? |
| 14 A | I do. |
| 15 Q | Do you recognize this? |
| 16 A | The document? |
| 17 Q | Yeah. |
| 18 A | Not really, no. |
| 19 Q | Okay.  Never saw this before? |
| 20 A | I don't think so. |
| 21 Q | Okay.  Do you recognize the term Project Wildcat? |
| 22 A | Yes. |
| 23 Q | What is that? |
| 24 A | It's the name we called it. |
| 25 Q | The name who called what? |

Page 197

```
 1  A  Matthew came up with Wildcat because he thought I
 2     went to Arizona State.
 3  Q  For college?
 4  A  No.  Yes.
 5            MR. CHURCHILL:  Arizona.
 6  A  Arizona.
 7  Q  Okay.  And --
 8  A  Arizona State is Sun Devils.
 9  Q  So was this sort of the code name for the sale of
10     Widen Enterprises?
11  A  I guess so.
12  Q  Okay.  If you flip to that first page, there's a
13     letter addressed to Matt.  And the fourth
14     paragraph down, it says "The sufficiency of the
15     work plan and the contents of our findings are
16     solely the responsibility of your management and
17     you agree that you will perform additional due
18     diligence procedures prior to concluding on the
19     merits of the proposed transaction."
20        Do you see that?
21  A  I do.
22  Q  Okay.  If you flip to the page 4142 at the bottom.
23  A  4142.
24  Q  The top of the page says "EBITDA adjustments,"
25     right?
```

Page 198

```
 1  A  Yes.
 2  Q  And we were talking about EBITDA adjustments at
 3     the beginning of the deposition, right?
 4  A  Yes.
 5  Q  And there were some EBITDA -- or there was an
 6     adjusted EBITDA number for 2020 -- or '19 and 2020
 7     in the confidential information memorandum that we
 8     were looking at, if you recall, correct?
 9  A  Correct.
10  Q  Okay.  Did you communicate with anyone about
11     EBITDA adjustments as a part of Project --
12  A  No.
13  Q  -- Wildcat?  No.
14        Is it your understanding that anyone at the
15     companies communicated about EBITDA adjustments
16     with Grant Thornton as part of Project Wildcat?
17  A  I wouldn't know.
18  Q  Okay.
19  A  I did not.
20  Q  So if you go down, it says Adjustment 1, "Owner/
21     executive compensation."  And it says
22     "Owner/President - compensation."
23  A  All right.  Excuse me.
24            MR. CHURCHILL:  That was a yawn.
25  Q  Oh, sorry.  That was a yawn.
```

Page 199

```
 1  A  Yes.  I'm sorry.  Excuse me.
 2            MR. CHURCHILL:  No reflection on
 3        your questions.
 4  Q  "Owner/President - compensation" for 2019 -- and I
 5     should say it says "in thousands" -- 1,514 and for
 6     2020 2,053; is that right?
 7  A  Yes.
 8  Q  Okay.  So those are -- those numbers are in
 9     millions, right, because it says dollars are in
10     thousands to the left?
11  A  Okay.
12  Q  So that's $1,514,000 and $2,053,000?
13  A  Okay.
14  Q  Is that a yes?
15  A  Yeah.
16  Q  Okay.  Was that the compensation that you received
17     in 2019 and 2020 respectively?
18            MR. CHURCHILL:  Objection, lack of
19        foundation.
20  A  It appears so.
21  Q  Do you remember receiving a different amount of
22     compensation?
23  A  No.
24  Q  Okay.  Do you remember receiving that amount of
25     compensation?
```

Page 200

```
 1  A  No.
 2  Q  Okay.  Do you remember receiving any compensation?
 3  A  Of course.
 4  Q  Okay.  What do you remember about your
 5     compensation in --
 6  A  That I got --
 7  Q  -- 2019?
 8  A  -- paid biweekly.
 9  Q  Okay.  You got paid biweekly.  Going below to A.
10     It says "Owner/President."  Is that you?
11  A  Could be.
12  Q  But is it?
13  A  Yes.
14  Q  Okay.  And it says "This adjustment removes the
15     Company's Owner compensation (base salary, bonus
16     and fringe) during the Historical Period as these
17     costs are not expected to continue
18     post-transaction."
19  A  Okay.
20  Q  "We understand the owner is not actively involved
21     in the operations of the Company and any role in
22     the business will be absorbed by current
23     Management.  We obtained payroll registers and
24     estimated the fringe at a rate $15 annually based
25     on the average employee insurance and payroll tax
```

Stacy L. Randall v.                                    Deposition of Reed C. Widen Video Deposition
Reed C. Widen, et al.                                                              August 23, 2023

Page 201

1  benefits.  The adjustment also removes the Owner's
2  auto lease expense and personal credit card
3  expenses that were charged through the business
4  (primarily related to personal auto fuel expense).
5  Total Owner's compensation and other personal
6  expenses are outlined as follows."  And then it
7  provides a table.
8       Did I read that correctly?
9  A  Yes, you did.
10 Q  Okay.  Do you understand what Grant Thornton meant
11     by they are adjusting the company's EBITDA to
12     remove your compensation?
13 A  Yes.
14 Q  Okay.  What did they mean?
15          MR. CHURCHILL:  Objection.  The
16          document speaks for itself.  You may answer.
17 A  That I'm not going to be included in the future so
18     won't be part of the number anymore.
19     But this is looking backwards to the historical
20     period it says, right?
21 A  I don't know that.  What do you mean by that?
22 Q  So the first sentence says "This adjustment
23     removes the Company's Owner compensation (base
24     salary, bonus and fringe) during the Historical
25     Period," right?

Page 202

1  A  I don't know what that is.
2  Q  Okay.  Do you think it's talking about 2019 and
3     2020?
4  A  I don't know.  If you read on, it says
5     "post-transaction," so I'm assuming it's going to
6     be the sale of the company.
7  Q  Well, is this EBITDA adjustment giving the EBITDA
8     for 2019 and 2020?
9          MR. CHURCHILL:  Objection, lack of
10         foundation.
11 A  And I don't know.
12 Q  Were those the EBITDA adjustments that we talked
13     about in the beginning of the deposition?
14 A  I don't remember.
15 Q  Okay.
16 A  I'm assuming.
17 Q  It says the basis for the adjustment is that you
18     are not actively involved in the operations of the
19     company and that any role that you have will be
20     absorbed by current management.  What do you
21     understand that to mean?
22 A  They clearly didn't know what my role was.
23 Q  So --
24 A  Matthew was running day-to-day operations under my
25     guidance.

Page 203

1  Q  Okay.  And I guess what do you -- what do you mean
2     by that?  Are you saying that you were involved in
3     the day-to-day operations?
4  A  I just said Matthew was.
5  Q  Okay.  But not you?
6  A  I oversaw those.
7  Q  Okay.  But not, not, not on a day-to-day basis;
8     you oversaw them at a higher level --
9  A  True.
10 Q  -- is that fair?
11 A  Yes.
12 Q  Okay.  And if you look below -- well, strike that.
13     So did Grant Thornton add back your
14     compensation for 2019 and 2020 to the EBITDA of
15     the company to get the adjusted EBITDA?
16 A  I don't know that.
17 Q  Okay.  Would it surprise you if they did?
18 A  I don't know that either.  Why would it surprise
19     me?
20 Q  I don't know.  I'm asking you.
21 A  Neither do I.
22 Q  Okay.  Looking at the chart below for 2019.
23     It says that the owner/president -- and that's we
24     decided is you -- the compensation is $938,000,
25     and a bonus was $521,000.  Do you see that?

Page 204

1  A  I do.
2  Q  Okay.  What was that bonus for?
3  A  I'm going to assume it was for taxes.
4  Q  Okay.  What do you mean by that?
5  A  We're an S Corp.  Shareholders pay the taxes.
6  Q  Okay.  So you would pay yourself a bonus in the
7     amount that you needed to pay your S Corp taxes?
8  A  I guess so.
9  Q  Okay.  Is that a yes?
10 A  Yes.
11 Q  Did you ever discuss buying out specific
12     shareholders of Windy Waters with Mr. Gonnering?
13 A  Mr. Gonnering discussed it with me.
14 Q  Okay.  What did he say?
15 A  He just wanted to clean up the ownership.
16 Q  Okay.  Why did Mr. Gonnering want to clean up the
17     ownership?
18 A  I don't know.
19 Q  Okay.  When did you guys have this conversation?
20 A  I don't remember.
21 Q  Was it in 2020?
22 A  I don't know what part of I don't remember you
23     don't get.  I don't remember.  I'm sorry.
24 Q  Okay.  You don't remember anything about that
25     conversation?

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 205

1   A   I do remember the conversation.  I just don't
2       remember when.
3   Q   Okay.  Do you remember what season it was?
4   A   Like spring, summer, or fall?
5   Q   Yeah.
6   A   No.  I'm sorry.
7   Q   Do you remember what you told him about cleaning
8       up the ownership?
9   A   I said If you want to go ahead and pursue that,
10      go ahead.
11  Q   Okay.  So you gave Mr. Gonnering the authorization
12      to clean up the ownership of Windy Waters?
13  A   Yes.
14  Q   Okay.  Was that before Stacy's buyout?
15  A   I don't think so.  I don't know.
16  Q   Were there any other shareholders who were
17      redeemed after Stacy's May 2020 buyout?
18  A   I don't believe so.
19  Q   Okay.  So it must have been before; is that fair?
20  A   That's fair.
21  Q   Okay.
22  A   But I don't recall it.
23  Q   Did Mr. Gonnering ever tell you that the EBITDA
24      valuation from the company's shareholder agreement
25      was low?

Page 206

1   A   Was low?  I don't recall that.
2               MR. PALAY:  Okay.  Counsel, I could
3           probably end in about an hour if we took a
4           break.
5   A
6               MR. CHURCHILL:  Sure.  We can take
7           a break.
8               (Recess)
9   Q   Okay, Mr. Widen.  Before the break we were
10      discussing a conversation you had at some point
11      with Mr. Gonnering where you authorized
12      Mr. Gonnering to clean up the ownership of
13      Windy Waters.  Do you recall that?
14  A   I do.
15  Q   Did cleaning up the ownership of Windy Waters
16      refer to Stacy?
17  A   I don't believe so.
18  Q   Who did it refer to?
19  A   I think he was talking about Gary Norris,
20      Terry Vile, and Brian Becker.
21  Q   Okay.  And who were those people?
22  A   Key employees.
23  Q   Okay.  And Gonnering wanted to buy them out of the
24      company?
25  A   You'd have to ask him.

Page 207

1   Q   Okay.
2   A   But, yeah, he wanted to clean up the ownership for
3       whatever reason.
4   Q   Okay.  And he didn't tell you why he wanted to
5       clean up the ownership?
6   A   I said That's fine.  Go ahead.
7   Q   Okay.  Did you retire from the companies at some
8       point?
9   A   Not until after the sale.
10  Q   Okay.  You never told Widen Enterprise employees
11      that you were retiring before the sale?
12  A   I don't believe so, no.
13  Q   Like in 2009?
14  A   No.
15  Q   Okay.  How often did you go to the
16      Widen Enterprises office?
17  A   When?
18  Q   Let's say 2019 to 2020.
19  A   Sometimes weekly, sometimes monthly.  Sometimes it
20      would be a couple months.
21  Q   Okay.
22  A   Not a real clear answer on that one.
23              THE COURT REPORTER:  What was that?
24  A   No real clear answer to that question.
25  Q   And about how many hours a week did you work on

Page 208

1       behalf of Widen Enterprises?
2               MR. CHURCHILL:  Objection, vague as
3           to time.
4   Q   In the same time period, 2019 to '20.
5   A   I think I was always working.  It was always on my
6       mind.
7   Q   Okay.  It was always on your mind.  Were you
8       always actually doing work for Widen Enterprises?
9   A   In my mind it's work, yeah.
10  Q   Okay.  And what was that work?
11  A   Well, there's strategic planning, where we're at,
12      where we're going to go, how we're going to get
13      there.  Am I drinking Matthew's Kool-Aid today?
14      Am I not drinking Matthew's Kool-Aid today?
15  Q   Okay.  What do you mean by drinking Matthew's
16      Kool-Aid?
17  A   Am I buying everything he's selling?
18  Q   Okay.  In terms -- what was he telling you or --
19  A   It could be the projections.  It could be, you
20      know, projected cash flow, you know, whatever.
21  Q   Was Matthew more or less optimistic than you were?
22              MR. CHURCHILL:  Objection, vague as
23          to time.
24  A   He's pretty optimistic.
25  Q   Okay.  So you were doing sort of strategic

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023

Page 209

1    thinking about the companies?
2  A  All the time.
3  Q  All the time?
4  A  Yeah.
5  Q  And that was -- that was the work that you were
6     doing on a daily basis?
7  A  On a daily basis, yes. Meeting with Matthew was
8     another part.
9  Q  Okay. And did you spend time every year in
10    Arizona?
11 A  Every year?
12 Q  During 2019 to '20, end of '20.
13 A  Yes.
14 Q  Okay. About how often -- about how much time did
15    you spend in Arizona those two years?
16 A  Three months maybe.
17 Q  Each year?
18 A  I'm thinking.
19 Q  Okay. And when you were in Wisconsin, did you
20    spend a fair amount of time at the family cottage?
21 A  Yes.
22 Q  Okay. About how much time?
23 A  Again, about three months.
24 Q  Okay.
25 A  But not all at once there. I was back and forth.

Page 210

1  Q  From Madison to the cottage?
2  A  Yes.
3  Q  Okay. Did you tell the other shareholders of
4     Windy Waters how much you were being paid by those
5     companies?
6  A  No.
7                    MR. CHURCHILL: Objection, vague as
8        to time.
9  Q  How come?
10 A  Nobody asked.
11 Q  Okay. Did it -- did it seem like a lot to you?
12 A  I don't think so.
13 Q  It seemed like the appropriate amount for --
14 A  Yeah.
15 Q  -- the work you were doing?
16 A  Uh-huh.
17 Q  Okay. Did you tell the directors of Windy Waters
18    how much you were being paid by the companies?
19 A  No. I'm a private person.
20 Q  Okay. And too private to share with the directors
21    of Windy Waters?
22 A  I'm a pretty private person.
23 Q  Okay. So you did not share that information?
24 A  No.
25 Q  Okay. Why did -- why did your compensation

Page 211

1     increase between 2019 and 2020 by over $500,000?
2  A  I think that was bonuses for taxes.
3  Q  Okay. So you just had more tax obligations in
4     2020?
5  A  I don't remember, but yes, I'm sure.
6  Q  Okay. And you would -- you would take that money
7     out as a bonus as compensation to pay your taxes?
8  A  Yeah.
9  Q  Okay. Did the other shareholders -- like, Stacy
10    in 2019, did she get a bonus?
11 A  I don't think so.
12 Q  Okay. But she had taxes, right?
13 A  I'm not sure what her tax liability was.
14 Q  But everyone had taxes pro rata to the amount of
15    stock they owned?
16 A  Sounds right.
17 Q  Okay. But you got a bonus for your taxes, and
18    other shareholders didn't?
19                 MR. CHURCHILL: Objection, lack of
20       foundation.
21 A  Yes.
22 Q  Okay. After Stacy's redemption in May 2020, did
23    you consider taking more or all of your
24    compensation through dividends instead of through
25    wages or bonuses?

Page 212

1  A  I didn't.
2  Q  Did anyone?
3  A  I think it was suggested.
4  Q  By who?
5  A  Probably Baker Tilly. Maybe Mike got guidance
6     from Baker Tilly. I don't know.
7  Q  So was that an option because Stacy was no longer
8     a shareholder?
9  A  I don't know.
10 Q  Okay.
11 A  I don't know.
12 Q  I'd also like to talk about COVID, COVID-19.
13 A  Yeah.
14 Q  Now, if you recall when Stacy first contacted you
15    about needing to get some money, you responded
16    that it was a bad time because of COVID, right?
17       How did COVID --
18                 THE COURT REPORTER: Is that a yes
19       or no?
20 A  That's a yes.
21                 THE COURT REPORTER: Thank you.
22                 MR. PALAY: Sorry. Thank you.
23 Q  How did COVID impact Widen Enterprises?
24 A  Well, I think that was early in COVID, and we were
25    uncertain what it was going to be.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023**

Page 213

1 Q  Okay. How did -- how did COVID ultimately impact
2     Widen Enterprises?
3 A  Well, we lost some volume. I don't know if we
4     lost customers, but certainly it was less. Cash
5     was scarcer, had some. PPP went in the bank for a
6     rainy day.
7 Q  Did Widen Enterprises remain profitable during
8     COVID?
9                MR. CHURCHILL: Objection,
10         ambiguous.
11 A  I don't remember. I think we made small money.
12 Q  I'm sorry. What?
13 A  I think we made small money.
14 Q  In profits?
15 A  Uh-huh.
16 Q  Okay. And you referenced a PPP loan. How much
17     money did Widen Enterprises receive in the PPP
18     loan?
19 A  I don't remember.
20 Q  Does $2.7 million sound about right?
21                MR. CHURCHILL: Objection, calls
22         for speculation, lack of foundation. You can
23         answer.
24 A  I don't want to be speculating. I don't have a
25     solid answer for you there, sir.

Page 214

1 Q  Okay.
2                (Exhibit No. 28 marked for
3         identification.)
4                THE COURT REPORTER: No. 28.
5 A  Oh, boy. Cheese and rice.
6                MR. PALAY: I'm sorry. What was
7         that exhibit again?
8                THE COURT REPORTER: 28.
9 Q  Okay. I've just handed you what's been marked as
10     Exhibit 28, and it is written in small writing.
11     It is a print-off of text messages that the
12     defendants in this case have produced to the
13     plaintiff.
14                MR. PALAY: I believe, Counsel,
15         that this is Bates stamped WINDY_1101.
16                MR. CHURCHILL: Thank you.
17 Q  Mr. Widen, on the left you see there is a column
18     of numbers 1 through 18?
19 A  Yes.
20 Q  Okay. If you go to 13 --
21 A  Okay.
22 Q  -- it says on the top "Instant Messages From," and
23     this one says it's from Mike Kiesler, okay?
24 A  Okay.
25 Q  And the message body says "2.7M forgivable

Page 215

1     dollars," and then there's some emoji signs. And
2     it looks like it was sent on April 9, 2020. Do
3     you see that?
4 A  I do. Is it sent to me?
5 Q  Well, does that refresh your recollection on
6     whether Widen Enterprises received about
7     $2.7 million in PPP funding?
8 A  Possibly.
9 Q  What do you mean by possibly?
10 A  I don't want to speculate, so I'm going to say
11     possibly. I'm guessing that it is.
12 Q  Okay. Do you recall receiving a different amount
13     of PPP --
14 A  No.
15 Q  -- dollars?
16                Okay. Going up to line 11.
17 A  Okay.
18 Q  It looks like this message is from Mr. Gonnering,
19     and it was sent on April 17, 2020. And the
20     message says "Yes, we're good. The remote working
21     setup is fine for us. We report business
22     continuity 3x per week in key areas...all our
23     'green' meaning expectations are being met. We
24     have new revenue projections in the works to
25     reduce new customer volume again. We have a good

Page 216

1     cash position. Onward."
2                Is that an accurate reading of that text?
3 A  I think so.
4 Q  Okay. Is this Mr. Gonnering advising you on
5     April 17, 2020?
6 A  I don't know who it's to.
7 Q  Okay. So you don't know if these messages were
8     received by you or not?
9 A  I do not.
10 Q  Okay. Do you recall receiving that message?
11 A  I don't.
12                MR. PALAY: Counsel, do you -- I
13         know you weren't around when this was
14         provisionally produced. My understanding
15         when it was produced was that when there
16         wasn't a name that was -- it was from Reed's
17         phone.
18                THE WITNESS: I didn't send these.
19                MR. LAING: There's no question to
20         you.
21                MR. PALAY: Yeah. Sorry,
22         Mr. Widen.
23                MR. CHURCHILL: So I can probably
24         clarify that for you if you need me to on a
25         break.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen  Video Deposition**
**August 23, 2023**

---

Page 217

```
1              MR. PALAY:  Okay.  That's fine.
2              MR. CHURCHILL:  And I think we've
3        separately produced all of these also.
4              MR. PALAY:  I think you're right.
5        I just didn't bring them all.
6              MR. CHURCHILL:  Yeah.  I can ask.
7    Q   Okay.  Can you go up to No. 9.  It says it was
8        sent from Stacy Randall to blank, and the message
9        is "Steve is taking me to court.  He wants me to
10       pay him maintenance, his reasons are all bullshit.
11       I'm going to need to get some money."
12   A   Uh-huh.
13   Q   Do you recall receiving that messages?
14   A   Well, sure.  We talked about this earlier.
15   Q   Okay.  Does that refresh your recollection of
16       whether you received some of these other messages
17       where the to -- the recipient is a blank?
18   A   I can't say that.
19   Q   Okay.
20   A   I'm trying to read some other ones to see if they
21       make any sense to me, but --
22   Q   I'm looking at 10 --
23   A   Okay.
24   Q   -- where the recipient is Matt Gonnering, and the
25       sender is blank.  And it says "If the worst
```

Page 218

```
1        happens take 1/2 my salary and add it to yours.
2        Other than that the trust is what it is."
3              Do you see that?
4    A   I do.
5    Q   Okay.  Can you think of anyone else who would have
6        told Matt Gonnering in April of 2020 to take half
7        of their salary and add it to his other than you?
8    A   No.
9    Q   Okay.  So do you think you sent that message?
10   A   I do.
11   Q   Okay.  Do you know what you meant when you were
12       telling him to take half of your salary and add it
13       to his?
14   A   2024 -- or 2020.  I don't.  I don't know what
15       "the worst happens" means either.
16   Q   Okay.
17   A   I don't remember.
18   Q   And do you know what trust you were talking about
19       or why that is what it was?
20   A   I think he was asking me about the kids' trust,
21       and it is what it is because it is irrevocable.
22   Q   Okay.  So one thing that's come up in this case is
23       the fact that there was a stamp of Stacy's
24       signature at the company, right?
25   A   Yes.
```

---

Page 219

```
1    Q   You were aware of that, right?
2    A   Absolutely.
3    Q   Did you ever ask Stacy if you or anyone at the
4        companies could use the stamp on any particular
5        documents?
6    A   Every time we used it we asked her.
7    Q   Okay.  Every time you used it you would -- how
8        would you ask her?
9    A   I think Michael did it most of the time.  He had
10       it.  But it was a phone call or a text message.
11   Q   Okay.  So he would call or text her and say Can I
12       use this stamp?
13   A   Yes.
14   Q   Were you there when he did that?
15   A   No.
16   Q   Okay.
17   A   Not all the time.
18   Q   How do you know he did that?
19   A   Because I know he asked her every time.  That was
20       part of our protocol.
21   Q   Okay.  But how do you know, like, if you didn't --
22       if you weren't there?
23   A   I guess I wouldn't, but it was part of our
24       protocol, so I'm assuming he followed it.
25   Q   Okay.  So the protocol was not that you understood
```

Page 220

```
1        that once Stacy gave you the stamp she was giving
2        you permission to use it whenever you or anyone at
3        the companies wanted?
4    A   Not without her noticing -- notification.
5    Q   Okay.  So the understanding was that she would be
6        asked every single time?
7    A   Yes.
8    Q   Okay.  And you had a stamp of your signature as
9        well, right?
10   A   I did.
11   Q   And were you asked every time anyone wanted to --
12   A   Of course.
13   Q   -- use it?
14   A   Yes.
15   Q   Okay.  Do you know if, if Mr. Kiesler showed Stacy
16       the documents he wanted to stamp --
17   A   I do not.
18   Q   -- when he'd call her?
19   A   I do not.
20   Q   Okay.
21   A   I'm confident that he would have talked her
22       through it, but I don't know that, but I'm
23       confident.
24   Q   Okay.
25   A   She would have asked.
```

---

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 221

1  Q  So you mentioned earlier that Stacy was president
2     of Windy Waters; is that right?
3  A  I guess so, yes.
4  Q  When you -- why do you say you guess so?
5  A  She was.
6  Q  Okay.  And who appointed Stacy the president of
7     Windy Waters?
8  A  Probably my father if he -- what time?  Which time
9     frame?
10 Q  Well, I guess ever.
11 A  Excuse me.
12 Q  So you think your father would have first
13    appointed Stacy president?
14 A  I don't know.
15 Q  Did you ever vote for Stacy to be president?
16 A  Not if he assigned her, no.
17 Q  Did you ever assign -- appoint Stacy to be
18    president?
19 A  No.
20 Q  Okay.  Why would Stacy have been the president if
21    Stacy had no involvement with the companies?
22 A  Good question.  I wish I had a good answer for
23    you.  I think when Windy Waters was being formed
24    as a holding company, there was a barrier between
25    us for protection of the company and myself.

Page 222

1  Q  Okay.  So it was to protect Windy Waters as a
2     company and to protect you in some capacity?
3  A  It would have been protect Widen Investments -- or
4     Widen Enterprises.
5  Q  Okay.  How did that protect Widen Enterprises?
6  A  Well, that's a corporate shield over it, right?
7  Q  Okay.  So having a holding company over
8     Widen Enterprises protected Widen Enterprises or
9     protected Windy Waters?
10 A  I think that was -- I think that's the purpose of
11    it.  Whether it did or not, I don't know.
12 Q  Okay.  And when you say Widen Investments, what's
13    that?
14 A  Nothing.  It was short-lived.  It owned something.
15    It owned some piece -- oh, it owned our original
16    building.  We had two buildings at one point in
17    time, and Widen Investments owned the old one.
18 Q  To your knowledge did Stacy know that she was the
19    president of Windy Waters?
20 A  Well, she signed that buy-sell agreement as
21    president.
22 Q  The shareholder agreement?
23 A  Yeah.
24 Q  Okay.  So --
25 A  So she signed it as president, so I'm assuming she

Page 223

1     knew she was president.
2  Q  Okay.  But we were talking earlier about that
3     agreement, and you were saying you didn't
4     necessarily know everything that was in that
5     agreement; is that fair?
6  A  True.
7  Q  Okay.  So is it possible that Stacy didn't know
8     everything that was in that agreement either?
9  A  Ask her --
10        MR. CHURCHILL:  Object.
11 A  -- that.
12        MR. CHURCHILL:  Objection, calls
13    for speculation.
14 Q  Okay.
15        THE WITNESS:  Sorry, Mark.
16        MR. CHURCHILL:  Thank you.
17 Q  Did you ever tell Stacy she was the president of
18    Windy Waters?
19 A  I don't remember.
20 Q  Do you know if anyone else at the company has ever
21    told her she was the president of Windy Waters?
22 A  Well, I'm assuming she was informed when she was
23    named president.
24 Q  Okay.  But you --
25 A  I'm assuming.

Page 224

1  Q  Okay.  But that's an assumption, not something you
2     know?
3  A  I don't have fact.
4  Q  Okay.  What did Stacy do as the president of
5     Windy Waters?
6        MR. CHURCHILL:  Objection, lack of
7     foundation.  You can answer to the extent you
8     know.
9  A  Not much.  She didn't come to the office.
10 Q  Did she do anything as president of --
11 A  I don't believe so.
12 Q  -- Windy Waters?
13        Okay.  Did Stacy receive any compensation as
14    president of Windy Waters?
15 A  I don't know.  I don't think so, but I don't know.
16 Q  So you got between $1 and $2 million a year as
17    president of Widen Enterprises, correct?
18        MR. CHURCHILL:  Objection,
19    mischaracterizes testimony.
20 A  Yes.
21 Q  But Stacy didn't get any compensation as president
22    of Windy Waters?
23        MR. CHURCHILL:  Objection,
24    misstates testimony.
25 A  I don't know that.  She wasn't active.  I was

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023**

Page 225

```
 1    active every day.
 2 Q  Okay.  But she -- she was not active?
 3 A  She was not active.
 4 Q  Okay.  And you -- can you tell me anything she did
 5    as president of Windy Waters?
 6 A  No.
 7 Q  Okay.  Mr. Widen, did you use an email address
 8    reeder53527@gmail.com?
 9 A  That is my new email address.
10 Q  Oh, okay.  When -- when was that created?
11 A  After the sale of the company.
12 Q  Okay.  Prior to that did you have any other email
13    addresses other than your Widen Enterprises email
14    address?
15 A  There was one Proton.
16 Q  Okay.  What's that?
17 A  A secured email site.
18 Q  Okay.
19 A  You know, if there's email communication.
20 Q  And it's for secure emails?
21 A  It was for, well, the sale of the company.
22 Q  Okay.  But --
23 A  It wasn't on our server.
24 Q  Okay.  And it wasn't -- it came about during the
25    sale of the company?
```

Page 226

```
 1 A  That's why I was -- yes.
 2 Q  Okay.  Prior to that did you only use your
 3    Widen Enterprise email?
 4 A  Yes.
 5 Q  Okay.  At the very beginning of the deposition I
 6    asked you if you had reviewed any documents in
 7    preparation.  Do you recall that?
 8 A  Yes.
 9 Q  Okay.  And you said you had reviewed some text
10    messages and emails I think?
11 A  With them, yes.
12 Q  Did you take any notes when you were reviewing
13    documents?
14 A  No.
15 Q  To your knowledge have all the documents that you
16    reviewed been provided in discovery to Stacy?
17 A  One more time.
18 Q  To your knowledge --
19 A  Yeah.
20 Q  -- were all the -- have all the documents that you
21    reviewed been provided in this case to Stacy or
22    her lawyers?
23 A  I'm assuming.
24 Q  Okay.  I guess I wouldn't know that.
25                    MR. PALAY:  I would just state on
```

Page 227

```
 1    the record that if any of those documents
 2    have not been provided we would like to have
 3    them produced.
 4           MR. CHURCHILL:  And I'll state on
 5    the record to my understanding everything has
 6    been produced that we have.
 7           MR. PALAY:  Okay.
 8           MR. CHURCHILL:  And I can also now
 9    state that the blank Tos in Exhibit 28 are
10    Reed --
11           MR. PALAY:  Okay.
12           MR. CHURCHILL:  -- in each case.
13           MR. PALAY:  Thank you.
14           MR. CHURCHILL:  Mr. Widen.  Sorry.
15 Q  And I just want to go rehash a few things that
16    we've talked about --
17 A  Okay.
18 Q  -- just to make sure it's clear.  Prior to May of
19    2020, did you ever tell anyone what you believed
20    the value of Widen Enterprises or Windy Waters
21    was?
22 A  No.
23 Q  Okay.  No one at Baker Tilly?
24 A  No.
25 Q  Okay.  Not Matt Gonnering?
```

Page 228

```
 1 A  I never valued the company.  We had this
 2    conversation earlier.
 3 Q  Okay.  And so you had no correspondence with
 4    anybody about the value of Widen Enterprises or
 5    Windy Waters prior to May of 2020?
 6 A  That I generated?  No.
 7           MR. PALAY:  Okay.  If you'll just
 8    give us one second.
 9           (Recess)
10 Q  Mr. Widen, I just have one more question.  You
11    said when I asked you had you corresponded with
12    anyone about the value of Widen Enterprises or
13    Windy Waters prior to May 2020, you said not in
14    messages that you had generated --
15 A  Right.
16 Q  -- is that correct?
17           Did you correspond with anyone about the
18    value of either of those companies prior to
19    May 2020 in messages that other people generated?
20 A  Matthew.  We talked about those.
21 Q  Okay.  The ones we talked about today?
22 A  Yeah.
23 Q  Okay.  Anyone else that you can think of?
24 A  No, sir.
25           MR. PALAY:  Okay.  Thank you.  I
```

Page 229

1  don't have any further questions.
2          THE WITNESS:  Thank you.
3          MR. PALAY:  Nice to meet you.
4          THE VIDEOGRAPHER:  No
5  clarification?
6          MR. CHURCHILL:  I have nothing.
7  Thank you.
8      (Adjourning at 3:51 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 230

1  STATE OF WISCONSIN )
                      ) ss.
2  COUNTY OF DANE    )
3
4      I, Carmen Harder, RPR, a Notary Public in and
5  for the State of Wisconsin, do hereby certify that
6  the foregoing deposition of REED C. WIDEN was taken
7  before me on August 23, 2023, and reduced to writing
8  by me, a professional court reporter and
9  disinterested person, approved by all parties in
10  interest and thereafter converted to typewriting
11  using computer-aided transcription.
12      I further certify that I am not related to nor
13  an employee of counsel or any of the parties to the
14  action, nor am I in any way financially interested in
15  the outcome of this case.
16      IN WITNESS WHEREOF, I have hereunto set my hand
17  and affixed my notarial seal of office at Madison,
18  Wisconsin, this 28th day of August 2023.
19
20
21
       Notary Public, State of Wisconsin
22     My Commission Expires 9/25/2025
23
24
25

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023 Index: #1..$22,542,781

### Exhibits

**Widen 8-23-23 Exhibit 1**
3:8 18:10,19

**Widen 8-23-23 Exhibit 2**
3:9 58:22

**Widen 8-23-23 Exhibit 3**
3:12 66:8,11 74:25

**Widen 8-23-23 Exhibit 4**
3:13 71:20,25

**Widen 8-23-23 Exhibit 5**
3:14 75:19,22

**Widen 8-23-23 Exhibit 6**
3:15 82:4

**Widen 8-23-23 Exhibit 7**
3:16 103:10,13

**Widen 8-23-23 Exhibit 8**
3:17 104:24

**Widen 8-23-23 Exhibit 9**
3:19 111:3

**Widen 8-23-23 Exhibit 10**
3:21 113:7,11

**Widen 8-23-23 Exhibit 11**
3:22 116:12,16

**Widen 8-23-23 Exhibit 12**
3:24 121:5

**Widen 8-23-23 Exhibit 13**
4:2 122:15,19

**Widen 8-23-23 Exhibit 14**
4:4 125:15,19

**Widen 8-23-23 Exhibit 15**
4:5 136:16

**Widen 8-23-23 Exhibit 16**
4:7 145:1,5

**Widen 8-23-23 Exhibit 17**
4:9 151:12,15

**Widen 8-23-23 Exhibit 18**
4:12 155:23 156:1

**Widen 8-23-23 Exhibit 19**
4:14 159:1,4

**Widen 8-23-23 Exhibit 20**
4:15 170:2,5

**Widen 8-23-23 Exhibit 21**
4:16 172:4,7 175:4

**Widen 8-23-23 Exhibit 22**
4:17 181:9,13

**Widen 8-23-23 Exhibit 23**
4:20 184:14,21

**Widen 8-23-23 Exhibit 24**
4:22 186:7,11,19

**Widen 8-23-23 Exhibit 25**
4:23 186:14,18

**Widen 8-23-23 Exhibit 26**
4:24 191:16,19

**Widen 8-23-23 Exhibit 27**
5:2 196:5

**Widen 8-23-23 Exhibit 28**
5:3 214:2,10 227:9

### #

**#1**
150:4

**#2**
149:1

**#3**
149:2

### $

**$1**
190:9 224:16

**$1,300,000**
188:11

**$1,352,166.31**
92:1 187:10

**$1,514,000**
199:12

**$1,803,897**
35:11,19 37:15

**$1,840,000**
33:10

**$1,840,580**
33:10 37:15

**$1,937,105**
87:7

**$1.3**
92:8 93:4 96:20 97:11

**$1.8**
33:23 37:6 38:1 44:7 54:11

**$10**
176:12

**$100**
166:3

**$102**
95:17,21 97:13

**$110**
127:1

**$128-$204mm**
161:9

**$12M**
112:9

**$139,040**
33:16

**$14M**
112:19

**$15**
200:24

**$150**
115:7 167:19,24 168:1

**$155**
152:1

**$162**
40:13 164:15 166:1

**$18M**
112:20

**$19.1**
30:15

**$2**
224:16

**$2,053,000**
199:12

**$2,700,000**
34:6

**$2.3**
191:6

**$2.7**
213:20 215:7

**$200**
154:13,19 155:10,11

**$22,542,781**
32:9

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023** Index: $22.1..11

**$22.1**
  105:19

**$22.8**
  30:12

**$24**
  110:24

**$25,528,245**
  32:25

**$25.6**
  160:21

**$25.6mm**
  161:9

**$26.1**
  30:8

**$27.44**
  126:15 127:11

**$28,689,687**
  32:19

**$28.29**
  117:21

**$28.29M**
  117:11

**$29,142,311**
  33:3

**$3,125,973**
  33:19 38:14

**$3,227,053**
  36:12,18 38:15

**$3.1**
  23:10 33:24 54:12

**$3.1M**
  22:24

**$3.2**
  37:6 44:7

**$300**
  115:6

**$34**
  22:1

**$34M**
  21:23

**$40M+**
  26:7

**$44**
  30:5

**$49M**
  112:13

**$50**
  103:6 104:5 166:7

**$50,000**
  84:25

**$500,000**
  211:1

**$500K**
  119:15

**$50M**
  103:21

**$52**
  110:24

**$521,000**
  203:25

**$571,000**
  34:9

**$6,896,000**
  87:1

**$6,896,973**
  86:22 87:15

**$6.8**
  89:15 97:23 164:18 165:3,16 168:3

**$60**
  30:2 102:12 111:24 166:7

**$615.42**
  88:16

**$63**
  113:3

**$63M**
  112:21

**$646.19**
  88:13

**$698,843**
  33:7

**$7,441,000**
  86:23

**$8**
  110:13

**$80**
  102:15 113:22 116:2 134:1

**$80M**
  115:17

**$8M**
  115:18

**$8MM*6.5=52MM**
  110:8

**$938,000**
  203:24

---

**'**

**'#1**
  149:1

**'widen'**
  19:4

---

**1**

**1**
  18:9,10,19,20 76:10 105:4 115:12
  181:18 198:20 214:18

**1,130,599.46**
  189:21

**1,514**
  199:5

**1-week**
  119:11

**1.3**
  190:8

**1.8**
  37:22

**1/2**
  218:1

**10**
  113:7,9,11,13,16 116:18 117:20
  118:7,12 126:17 149:25 161:2 170:14
  187:3 217:22

**10%**
  115:18 126:9

**100**
  10:20 40:19 90:7 129:2

**102,000**
  21:20

**102K+**
  21:17

**11**
  59:18,20 116:12,14,16 172:14 215:16

Stacy L. Randall v.
Reed C. Widen, et al.

**Deposition of Reed C. Widen Video Deposition**
August 23, 2023Index: 12..2021

**12**
121:5,7 191:21

**12/2019**
84:21

**128**
161:6

**128M-204M**
160:7,15

**12:30**
135:16

**12M**
152:8

**13**
40:3 122:15,17,19 182:5,7 214:20

**13.5**
188:15

**13.5%**
188:12

**14**
125:15,17,19 137:3 142:4

**14.1%**
137:8

**14.7**
118:2

**14.7%**
117:11

**15**
136:16,18,24,25 141:14,16 142:2

**15-20M**
152:7

**16**
145:1,3,5 182:3

**16-people**
119:10

**162**
164:21

**17**
15:12 151:12,14,15 215:19 216:5

**18**
39:25 155:23,25 156:1 214:18

**180**
94:2 158:7,10,22 160:19

**19**
159:1,3,4 198:6

**19.5**
190:9

**19.585%**
187:4

**1Q21A**
22:14

---

**2**

**2**
54:12 58:22,24 76:13 115:13 158:6,7

**2,053**
199:6

**2-3**
157:6

**2.3m**
190:5

**2.7M**
214:25

**2.94M**
137:12

**2/14**
140:5

**20**
42:24 43:15 44:3 56:11 68:14 92:5 96:7,9 97:12 120:9 141:19 170:2,4,5 184:22 193:8,13,15 194:2,10,11 196:9 208:4 209:12

**20%**
188:12 192:2

**200**
154:7,22 158:7,10,22 160:19

**2000**
162:23 166:15

**2003**
15:24,25 16:2,4,12 18:5

**2009**
207:13

**2010**
16:25 63:15

**2014**
105:4 106:4,14,20 107:2 110:12 153:21

**2014/20**
140:4

**2015**
105:19

**2016**
15:12,13 16:2

**2017/2018**
152:8

**2018**
22:9 30:16 63:17,18 102:1 111:10 112:20 113:1,13 126:23 153:21

**2018A**
22:5

**2019**
26:17,21 30:13 32:16 33:5,22,24 35:10,14,22 36:4 37:6,14 39:17 42:18, 24 43:13,15,18 44:3,7 56:11,14,22 57:1,12,16 59:25 60:10 61:20,25 63:21 64:17 76:19 78:9,14,23 86:20 87:2 101:7 103:4,19 126:9,18 145:18 199:4,17 200:7 202:2,8 203:14,22 207:18 208:4 209:12 211:1,10

**2019A**
32:4,11

**2020**
14:11,14,15,21 22:22 23:10 26:15 30:9 32:24 33:2,15,18,22,24 36:12,20, 23 37:6 38:13 42:18 43:17 44:7,15,21 56:14 59:25 60:10 63:22 64:17 66:4, 17 67:14 72:10 73:3,9 81:16 88:19 89:8,15,22 90:2,7,13 91:25 96:20 97:12 98:2 116:18 117:9,20 118:7,12 120:2 123:3,8 125:21 126:9,13 129:9 130:9,15 132:1,5,24 133:5,8,12,15,18, 19 136:13 137:3,6,7 138:24 141:18 142:2,4 143:18 145:13 146:16 147:10, 18,24 148:6,8,12 150:5 151:17 156:3, 4,5 160:20 161:3,9 164:18,25 165:17, 23 166:5,16,22 167:2,17,21 168:10,19 169:1 173:20 176:22 180:25 182:5,8, 21 183:4 187:7 198:6 199:6,17 202:3, 8 203:14 204:21 205:17 207:18 211:1, 4,22 215:2,19 216:5 218:6,14 227:19 228:5,13,19

**2020A**
22:18,24

**2021**
17:20 18:6 20:17 22:3,10,16 23:19 25:8 28:15,20 30:9 34:4,19,25 39:18, 21 41:5 42:14,25 43:25 97:14 132:21 141:16 162:11,21 164:12,15 166:6 169:18,23 170:14,19,23 171:15,23 172:14 175:10 184:22 187:3,18

189:20 191:21 196:13

**2021P**
21:23 22:6

**2022**
30:6 151:2

**2023**
30:2

**2024**
218:14

**2025**
150:9 151:2

**204**
161:6

**20M**
115:17 152:9

**21**
17:22 22:8 39:19 172:4,6,7 175:4

**21%**
22:5

**22**
83:20 103:19 111:13,17 181:9,11,13

**22,542**
32:14

**23**
111:10 184:14,16,21

**230**
94:2

**24**
186:7,9,11,19

**24-52MM**
110:20

**24.66M**
117:13

**24/7**
54:3

**25**
107:15 151:20 186:14,16,18

**26**
191:16,18,19

**26-weeks**
119:12

**27**
145:12,13 146:8 196:5,7,10,11

**27.44M**
126:3

**28**
156:5 214:2,4,8,10 227:9

**28.69M**
117:16

**29**
156:4

**29.46M**
117:10

**29.78M**
137:11

**2:11**
145:13

**2:15**
72:10

**2:21**
73:9

**2:45**
147:13

**2MM*12=24MM**
110:17

---
**3**

**3**
66:8,10,11 74:25 115:14 145:12

**3,2,1**
85:3,13

**3-4x**
112:17

**3.5x**
112:19,21

**3.6**
85:17

**30**
17:10 120:9

**30.92M**
117:15

**31**
189:20

**32.4M**
137:10

**32.7M**
137:8

**360**
143:6

**3:51**
229:8

**3x**
215:22

---
**4**

**4**
71:20,22,25

**4142**
197:22,23

**43**
179:5

**4:14**
66:18

**4x**
115:17

---
**5**

**5**
66:17 67:14 74:11 75:19,21,22 87:19
88:10,13 161:2

**5-10x**
160:23

**5:06**
105:5

**5:25**
67:15

---
**6**

**6**
72:10 73:2,9 74:11 79:25 82:4,6,7
148:20 149:20 150:20

**6.5**
108:21

**6/1/2020**
147:21

**60**
140:7,10,23 141:2,6,15,21 142:1,11

**608-217-5910**
67:16

**62**
140:8,23 141:5,9,12

**63**
21:16 141:12

**63M+**
21:13

**65**
140:9,25 141:10

**68.97**
96:1 97:13

**680**
22:14,16

**69**
39:11,14

**7**

**7**
59:19,21 72:13,16 103:10,12,13
181:17,19 182:1

**7.75**
153:6

**7.75x**
152:9

**7.8%**
117:15

**70**
120:7 129:1

**70/30**
120:6

**7906**
21:3

**7912**
23:20

**7917**
24:12

**7933**
26:5

**7954**
27:1

**7957**
28:2

**7958**
29:15

**7982**
31:6

**7985**
31:21

**7988**
34:11

**7989**
39:7

**8**

**8**
104:24 105:1 125:21 126:12 127:6

**80**
120:7

**80/20**
120:6

**8MM**
110:10

**9**

**9**
111:3,5 123:3 148:19 215:2 217:7

**94**
148:23

**95**
22:21

**95%**
22:18

**A**

**ability**
8:3

**about-ish**
185:13

**abreast**
138:5 139:20

**absolutely**
17:17 100:19 104:18 127:13 179:9
191:4 219:2

**absorbed**
200:22 202:20

**accepted**
93:23

**accepting**
164:11

**accord**
135:24

**account**
54:16 89:3 90:15 91:3,14 92:17 93:4

**accounting**
195:1,5

**accounts**
51:25 52:2,6,7,17,20 54:12 88:23

**accurate**
8:5 20:1,8 54:14 60:22,24 61:6,15
80:17 92:9,12 93:7 94:3,17 117:23
150:11,20 151:10 156:3 180:1 196:2
216:2

**accurately**
91:18 92:16,20

**acknowledged**
120:22

**Acquia**
40:10,21,22 41:5,13,18 93:12 95:6,7,
16 96:3,8,9 128:25 162:13 179:13
190:2 193:2

**acquired**
112:7,12 136:3

**acquiring**
114:21,25

**acquisition**
114:17,18,20 135:5 138:5 139:15,16
144:5 152:2

**acquisitions**
107:14,22 122:5

**active**
21:13,18,20 65:8 123:11 138:3 224:25
225:1,2,3

**actively**
200:20 202:18

**activities**
111:16 157:4,12

**activity**
123:18 138:1,4 139:14

**actual**
22:10 30:10 35:10 50:4,10 83:24 94:2
149:19

**add**
13:21 203:13 218:1,7,12

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023 Index: add-on..applies

**add-on**
122:5

**added**
37:10

**Adding**
51:10

**additional**
197:17

**address**
76:5 145:15 225:7,9,14

**addressed**
111:18 121:10 146:6 197:13

**addresses**
225:13

**adds**
161:6

**Adj**
22:25

**adjourning**
229:8

**adjust**
126:6

**adjusted**
23:10 33:9,12,18,22 34:8 37:13,14,22
198:6 203:15

**adjusting**
201:11

**adjustment**
36:12 37:23 38:2,13,14 87:20 88:1,10,
13 198:20 200:14 201:1,22 202:7,17

**adjustments**
34:12 35:9,16 37:11 117:6 152:3
197:24 198:2,11,15 202:12

**Admission**
181:16 182:3

**Admit**
182:3

**admitted**
182:13,19

**ads**
12:15

**advise**
99:6 100:21 101:13 158:4,16 169:23
175:21

**advised**
101:10 111:22 113:20 167:23,25

**advising**
107:21 112:24 126:12 216:4

**advisor**
19:6 40:2,5

**Advisors**
19:5

**advisors,'**
149:2

**afford**
194:1,12

**afraid**
144:21,23

**aggressively**
138:8 139:23

**agree**
25:5 143:4,25 144:1 154:16 197:17

**agreed**
23:12 144:4 188:17

**agreeing**
144:7

**agreement**
80:20 81:20 82:1,9,12 84:1 85:11,15
86:17 89:10 95:1 179:24 180:7 182:4,
19 183:6,8,11,13,23 184:1 205:24
222:20,22 223:3,5,8

**ahead**
16:6 32:2 134:19 205:9,10 207:6

**albeit**
162:5

**alcohol**
8:2

**allowed**
64:13

**Alpine**
123:10

**ambiguous**
16:6 37:8 40:25 41:9,20 45:5 55:16
88:25 89:24 90:4 96:25 180:11 213:10

**AMENDED**
181:14

**amendment**
82:8,11

**amortization**
23:4

**amount**
10:20 35:21 56:4,5,9,12 60:10 69:14
96:18 100:25 103:23 130:21 131:7
134:16 153:9 158:16 177:3 185:15,20
187:6 199:21,24 204:7 209:20 210:13
211:14 215:12

**amounts**
60:18 61:3

**announced**
151:22

**annual**
22:2,8,9,21 25:24 30:2,6,8,12,15,20
103:25 104:4 152:7 160:20 161:3,15
162:5

**annually**
200:24

**answering**
59:11

**answers**
60:5

**anticipate**
117:7 137:25

**anymore**
40:8 142:15 163:9 201:18

**Anytime**
147:20

**Apologies**
124:3

**apologize**
83:23

**apparently**
40:18 93:25 151:25 154:1 170:24
185:5

**appearances**
68:23

**appears**
28:13 72:8 75:22 76:3 105:2 111:9
113:11 116:16 119:8 121:10 122:19
125:19 145:5 159:5 170:6 184:21
199:20

**applied**
153:8,14

**applies**
161:21

**apply**
179:16

**appoint**
221:17

**appointed**
45:14,24 221:6,13

**approximately**
112:8,13 119:9 149:5 152:1

**approximating**
116:1

**April**
116:18 117:20 118:7,12 120:2 215:2,
19 216:5 218:6

**areas...all**
215:22

**Arizona**
13:10,13 133:11 143:17 197:2,5,6,8
209:10,15

**ARR**
21:24 22:6,18 29:22,25 31:15 161:9

**arranged**
158:6

**article**
105:12,13 151:25 152:8

**ASG**
123:12

**asks**
148:20

**aspect**
47:6 119:21

**asset**
18:1 24:19 25:10 42:19 43:2,4,6 62:11
138:20 144:10,16

**Assets**
21:13

**assign**
221:17

**assigned**
221:16

**assume**
11:10 21:22 170:20 204:3

**assumes**
74:12 179:18

**assuming**
22:23 39:19 132:20 146:17 181:3

**assumption**
190:4 195:25 202:5,16 219:24 222:25
223:22,25 226:23

**assumption**
224:1

**Athey**
24:1

**attempted**
121:14

**attend**
65:14

**attention**
18:24 59:18 101:22 113:25 116:5
152:19

**attorney**
163:21 185:7,24 186:3 192:1

**attorneys**
59:8 181:24

**attractive**
25:18 31:7,11

**August**
113:13,16 126:23 151:17,20 156:3,4,5
189:20

**Australia**
27:15

**authorization**
205:11

**authorized**
206:11

**auto**
201:2,4

**automated**
51:19 145:24 146:2

**automation**
62:25

**average**
29:22 85:2,13 103:24 108:18 200:25

**Aviation**
28:17

**award**
26:6,15,17,19,24

**awards**
26:11

**aware**
23:17 79:25 81:11,14 219:1

**AZ**
143:2

---

**B**

**B**
87:10

**B2b**
115:4

**back**
13:14 14:11 17:9 33:5 37:23 42:18
62:9 64:13 65:16 76:10,20 77:15 78:4
79:23 82:20 100:9 115:14 129:8
138:20 146:9 148:15 162:11 164:25
165:13 167:24 168:12 190:5 203:13
209:25

**background**
11:20

**backwards**
201:19

**bad**
185:18 212:16

**Baker**
42:11 46:20 55:17,19 56:8,11 57:3
145:7 155:17,22 157:5,13 195:5
212:5,6 227:23

**balance**
25:17 189:20

**balancing**
31:8

**Ballew**
23:25

**bank**
93:16 213:5

**barrier**
221:24

**base**
34:15 200:15 201:23

**based**
53:20 103:21 112:25 134:21 158:17
200:24

**basically**
161:12

**basis**
64:18,19 104:14 143:7 183:2 202:17
203:7 209:6,7

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023Index: Bates..buy

**Bates**
159:12,16 214:15

**Bearing**
86:1

**Becker**
38:21 39:2 206:20

**began**
14:20 15:5,13 171:22

**begin**
11:20 15:10 63:9

**beginning**
60:6 65:23 118:7 150:3 160:1 198:3
202:13 226:5

**begins**
21:4

**behalf**
20:23 208:1

**Beijing**
27:19

**believed**
20:14 97:22 99:7,14 101:11 179:23
227:19

**Ben**
24:1

**benefit**
122:2,10

**benefited**
189:2

**benefits**
76:14 78:25 115:16 201:1

**bidder**
136:11

**big**
42:24 50:23 144:14,18 190:25

**billion**
105:19

**bills**
191:25 192:13 193:5,6

**bit**
11:19,25 63:19 123:15 124:21 135:10

**biweekly**
200:8,9

**black**
12:10

**blank**
103:22 217:8,17,25 227:9

**board**
44:23 45:21,23 46:1,3,10

**body**
214:25

**bonus**
34:15 60:18,25 61:3 200:15 201:24
203:25 204:2,6 211:7,10,17

**bonuses**
211:2,25

**book**
97:19

**booze**
64:14

**born**
141:21

**bottom**
21:1 25:15 33:6 37:13,21 88:11 110:7
113:25 117:3 121:11 123:2 137:15,23
161:7 197:22

**bought**
41:16 78:24 97:2,23 168:2,14 179:13
187:16,21

**bowed**
136:11

**boy**
214:5

**Brad**
55:21

**bragging**
134:10

**brand**
21:7 28:11 29:17 123:14

**Brandfolder**
134:16 135:5 148:14 152:5

**branding**
143:4

**brands**
21:9 25:4 28:7

**Brazil**
27:13

**break**
7:17 12:8 53:7,10 100:5,7,11 135:15,
20 174:23,25 175:4 206:4,7,9 216:25

**Breakthrough**
26:14,17

**breathed**
54:3

**Brian**
38:21 39:2 206:20

**Bridgepoint**
161:8

**briefly**
124:14

**bring**
152:19 217:5

**brings**
6:21

**broad**
158:20

**brother**
16:15 177:9

**brothers**
176:9,17,25 177:2,3 185:16

**brothers'**
178:17

**brought**
101:21 148:13 153:17,22 154:19

**building**
68:11 192:8,18,22 193:11,21 194:10
222:16

**buildings**
193:13 222:16

**built**
18:6 62:24

**bullet**
24:17,25 25:15 105:14,17 107:13
108:7 160:14,20,23

**bullshit**
67:1,12 75:3 217:10

**business**
12:1 14:12,21 16:9 25:19,23 31:12
105:13,25 106:5 120:2 122:3 124:6
163:9 193:3 194:14 200:22 201:3
215:21

**businesses**
122:2 123:13

**buy**
40:23 76:10 78:4 80:1 120:19 139:18

167:7 179:12,15 187:9 194:20 206:23

**buy-sell**
222:20

**buyer**
10:22,23 133:1 138:1

**buyers**
29:9

**buying**
76:19 77:14 78:13 80:5,9,13 121:21
204:11 208:17

**buyout**
169:21 189:2 190:18 191:7 205:14,17

**Bynder**
112:12

---

**C**

**CAGR**
22:6

**calculated**
80:19 81:2,12,17 92:13

**calculates**
86:17

**calculation**
83:3,24 84:22 97:2,19 98:4,5,10
178:24

**calculations**
84:17,19

**call**
70:1 83:14,15 172:17 219:10,11
220:18

**called**
6:1 12:7 40:10 45:12 68:8 114:11
151:23 163:20 185:7 195:1 196:24,25

**calls**
10:7,14 86:17 91:16 96:12 109:3
110:1 120:25 122:10 131:21 139:6
140:3 162:8 167:12 169:3 179:3
213:21 223:12

**Cap**
39:8

**capacity**
222:2

**capital**
19:5 112:9 114:11 115:4,18

**capitalized**
72:22

**card**
201:2

**care**
67:23 68:18,21 98:16,18,22

**career**
11:22

**case**
6:10 9:7,14,19 59:7 65:25 66:2 148:16
151:6 156:18,24 168:14 214:12
218:22 226:21 227:12

**cash**
13:9 23:7 85:20 103:5,23 130:20
152:4 208:20 213:4 216:1

**catalogs**
12:16

**catch**
123:17 124:8

**caught**
101:19

**caused**
134:13

**centric**
25:2

**CEO**
39:24 46:7 48:19,25 64:23

**CFO**
39:24 103:20

**chain**
105:3 151:20 172:9 186:19 189:11

**chairman**
44:23

**change**
10:21 166:6 167:19 180:5,16 183:3,8

**changed**
73:22 74:10 166:5,12

**changing**
17:14

**charged**
201:3

**charitable**
176:11

**chart**
203:22

**chat**
172:8 191:8,9

**chatted**
191:13

**cheated**
175:25

**Cheese**
214:5

**children**
77:1

**children's**
76:11,20,24

**Christmas**
13:14

**chunk**
35:9

**CHURCHILL**
10:6,13 11:6 16:5,13 20:2,5,9 24:6,8
28:19,21 29:1,3 31:24 34:1 37:7 38:4,
8 40:24 41:8,19 44:9 45:4,16 53:6
55:15 56:6,17 61:16 63:3 67:6 74:12
78:19 79:2 83:14 84:4,14 88:24 89:4,
16,18,23 90:3 91:15,21 92:23 94:6,9,
12,15,22 96:11,24 97:15 98:8 99:11
100:6,23 109:3,18 110:1,4 113:4
117:24 118:4,9 120:25 123:23 125:2,7
128:21 130:10,16,24 131:21 135:9,14
139:6,9 140:2 143:9,12 149:17
159:10,17,20 160:8,11 161:4 162:7
165:4,9,18 166:8,13 167:11 168:4,20
169:2 174:22 175:1 179:2,18 180:10
181:2 182:24 183:2,17 184:2 189:13
197:5 198:24 199:2,18 201:15 202:9
206:6 208:2,22 210:7 211:19 213:9,21
214:16 216:23 217:2,6 223:10,12,16
224:6,18,23 227:4,8,12,14 229:6

**churn**
126:5

**circumstances**
126:7

**claim**
177:18

**clarification**
149:18 229:5

**clarify**
7:11 131:1 216:24

**Class**
87:18,19,20 88:4,12,15

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023Index: clean..concluded**

clean
204:15,16 205:12 206:12 207:2,5

cleaning
205:7 206:15

clear
6:12 130:7 182:17 207:22,24 227:18

clearing
32:3

client
123:10 138:17

close
112:13 174:23,24

closely
151:8

COBRA
119:13

code
14:4 62:24 197:9

CODIE
26:21

coin
106:10

cold
143:3

collectively
39:25

college
197:3

color
12:8 13:2

colors
12:9

column
32:4,11 33:5 34:4 35:14 37:11 84:21
86:20 214:17

combination
152:4

comfortable
143:7

comment
185:14

comments
143:5

communicate

8:20 80:8 198:10

communicated
115:12 198:15

communication
14:18 225:19

communications
15:2 63:11 106:7,16 107:9

comp
34:14 55:7,18,20

companies
13:23 14:13 15:10,13,19 16:2 28:25
44:24 45:3,6,15 55:24 59:25 63:22
64:1,17,21 65:4,6,8 73:1 100:17,20,21
101:11,14 107:23 108:5,12,13,18,20
109:12,14 114:21 115:1,5 122:11
130:1,11,17,21 131:4,8,12,25 132:4,
23 133:6,22,25 134:13 167:16 198:15
207:7 209:1 210:5,18 219:4 220:3
221:21 228:18

companies'
130:8,13,20

company
6:15 10:2,5,9,12,21 13:5,7,8,20 14:19
15:2,3,6 16:20,22 17:6,12,16,21 18:3,
6 19:8 20:14 23:7 25:3,11 26:3,8 31:2,
22 32:16 34:24 35:2,5 39:20 40:10
41:14,22,24 42:5,19,24 43:1,8,16,23
44:3 45:24 46:21 47:9,11,25 48:14,16
49:3,7,10 50:20 51:3 54:3,18,24 55:9
56:1,24 62:5,10,11,12,19,20 63:2,9,
11,12,20 64:15 65:17 68:8,9,10,12
88:6 90:8 93:11 94:20 95:5,16 97:20,
22 98:1,7,13,17,18,23 99:3,10,15,19,
20 101:17,22 102:3 103:5,20 106:9,
14,16,20 107:4,7,9,23 108:4 109:2,9,
23,24 116:6 119:24 122:1 123:9
127:16,19,21,24 128:1,6,8,12,13,19
129:5 134:21 135:23 140:1,12,17
142:14 144:22 146:23 147:1,5 150:23
151:23 152:15,19 153:10 155:6
161:16,19 163:2,6,8,13 164:14,17
165:2,11,14,16,20 168:2,15 169:19,
20,24 170:23 171:6,12,20 176:1,5
177:1 178:22 180:2 187:13 188:16
195:24 200:21 202:6,19 203:15
206:24 218:24 221:24,25 222:2,7
223:20 225:11,21,25 228:1

Company'
19:5

company's
47:2,14,19 50:2,11 51:6 53:16,20,23,

24 55:14 56:15,20 57:15,17,18,21
60:13 61:10 64:25 69:5 129:16,20
178:24 200:15 201:11,23 205:24

compare
85:10

compared
55:13 120:2 126:9

compensation
34:15 35:11,17,21 36:2,4,9,19,22
37:16,24 38:15 44:8 46:23 47:6 48:1,5
50:3 53:12 54:2,7,17,24 55:13 56:9,
12,16,21,25 57:4,10,16 58:5,9,18
59:24 60:10 61:9,21,23 86:1 131:7
198:21,22 199:4,16,22,25 200:2,5,15
201:5,12,23 203:14,24 210:25 211:7,
24 224:13,21

competition
144:21,23

complaint
9:13 65:24

complete
7:23 145:19

completed
149:4

completely
17:18

completeness
67:10

compound
16:14 22:9 56:18 79:3

compulsion
10:23 40:23 41:2,7,10

conceded
134:10

concept
9:24 11:12,14

conception
39:1

concern
190:20

concerned
144:15 175:24 176:3

concerns
162:18

concluded
87:9,14,24

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023Index: concluding..COVID

**concluding**
197:18

**conclusion**
10:7,14 181:7

**conditions**
47:3 58:18 60:14 61:11,12 117:8

**confident**
220:21,23

**confidential**
198:7

**Confidentiality**
159:7

**confusing**
158:11

**connected**
124:14,16 166:22

**connection**
124:2 129:13,17 130:1,15 131:9,14
132:1,5

**consideration**
88:8

**considered**
53:22 58:17 100:12 128:7,11 133:6
135:23 171:11

**consistent**
29:16 31:8,15

**consisting**
6:14 28:6

**constant**
55:5

**Constantly**
120:20,21

**consult**
59:8

**consultant**
79:8,14

**consulted**
46:20 55:17,19

**contact**
121:14 162:21,23,25 185:24

**contacted**
162:17 185:24 186:3 212:14

**contacts**
186:25 187:1,2

**contemplated**
142:13,17 169:20

**contemplating**
171:20

**content**
12:21 114:3 118:23 119:2,21 120:3,9,
11 137:11

**contents**
197:15

**continually**
24:18

**continue**
34:11 200:17

**continued**
29:18 31:18 173:12,18

**continuity**
215:22

**continuous**
43:12 63:7 83:12

**contribute**
65:3

**control**
45:2

**conversation**
76:9,18 78:18 123:9 124:1,19 140:5
141:6,22,23 156:14 158:19 185:14
204:19,25 205:1 206:10 228:2

**conversations**
99:8

**copy**
181:13

**Corey**
121:18

**Corp**
204:5,7

**corporate**
222:6

**correct**
23:17 24:3,4,15 25:4 26:12 31:16,19,
20,23 32:20 34:12 35:12 36:13,17
38:2 46:24 47:3,4 48:8,9,19 51:25
53:20 58:19 59:14 61:22 66:4,5 67:24
72:16 73:12 86:22 95:15,19 101:9
104:11,14 105:7 109:16,17 110:20
111:18,19 112:10 113:13 114:11
115:7 116:6,18 118:8 122:7,21

126:20,21 129:4 138:16 145:9 148:10
154:8 155:14 157:23 159:7 170:7,12
171:25 172:10 190:3 191:21 192:5
198:8,9 224:17 228:16

**correctly**
21:10 60:20 67:3 76:16 112:22 117:17
126:10 137:13 143:13 149:5 152:11
201:8

**correspond**
228:17

**corresponded**
228:11

**correspondence**
228:3

**cost**
119:14 194:11

**costs**
192:3 194:3,8 200:17

**cottage**
68:11 191:25 192:13 193:10 194:21
209:20 210:1

**counsel**
63:6 94:7 149:18,24 159:10 206:2
214:14 216:12

**counsel's**
84:5 123:24

**couple**
6:11 9:3 46:4 156:6,18,23 161:20
207:20

**courses**
14:6

**court**
7:1 12:11,23 18:9,20 38:23 58:24
66:10,25 68:23 71:22 75:1,21 82:6,22
83:8 103:12 105:1 111:5 113:9 116:14
121:7 122:17 125:17 136:18,21,25
145:3 151:14 155:25 159:3 161:17
163:3 169:12,15 170:4 172:6 181:11
184:16 186:9,16 191:18 196:7,10
207:23 212:18,21 214:4,8 217:9

**cover**
18:25 160:3,4

**covered**
6:12

**COVID**
68:2,5 118:13,14 126:20 212:12,16,
17,23,24 213:1,8

**COVID-19**
118:8,19 212:12

**Covod**
67:21

**CPA**
89:1 167:14,17

**create**
17:11 23:14

**created**
19:18 25:12 29:2,6 38:19 43:9 76:23
225:10

**creating**
14:17,20 19:16,20 59:9

**creative**
12:6,19

**credit**
201:2

**Crowd**
24:17

**culture**
25:2

**curiosity**
187:14

**current**
104:14 117:8 126:7 200:22 202:20

**customary**
152:2

**customer**
25:2 28:3,6,14,18 51:10,11,14 122:6
138:1 215:25

**customers**
22:15,16 26:1,2 28:12,25 29:5,10,13
43:9 51:8,12,20 62:23 126:6 131:12
195:17 213:4

**cut**
79:11

**cyan**
12:9

**D**

**dad**
98:19

**daily**
143:7 209:6,7

**Dairy**
13:8,15

**Dam**
24:14 26:9 112:16 123:13 137:25
187:9 188:1

**data**
106:15 126:7

**date**
16:8,23 17:1 43:20 63:14 118:11
126:14,25 132:9 140:4 142:6 146:12
147:19 148:11,24 154:10 185:12

**dated**
72:10 73:9 113:12 116:18 125:21
137:3 170:14 184:22

**dates**
28:23 44:20 149:3

**Dave**
174:22

**David**
53:6 84:4

**day**
11:11 55:2 67:14 146:8 152:24 154:19
185:4 213:6 225:1

**day-to-day**
202:24 203:3,7

**dead**
98:20

**deal**
11:8,15 112:15 148:14 188:19

**deals**
123:20

**dealt**
159:24

**Dean**
184:17

**Deanna**
23:25

**Dear**
145:18 146:5

**Debby**
23:25

**Debt**
86:1

**decades**
24:25 54:4

**December**
87:2 89:6 105:4 191:21

**decide**
192:15,24

**decided**
103:21 191:24 192:12,21 193:21
203:24

**decision**
178:8

**decisions**
52:19

**deemed**
140:21

**deepen**
122:6

**defendants**
6:16,18 60:9 148:16,21,22,24 150:2
182:13,18 214:12

**Defendants'**
59:3 150:19 181:13

**Deferred**
85:25

**defined**
40:16 89:11 150:17

**definition**
10:18,19 11:11,17 97:10 169:16

**Denoyer**
55:21

**department**
13:19

**departure**
119:9

**departures**
126:8

**depended**
47:9,10

**Depending**
147:2

**depends**
46:3

**deploy**
115:18

**deposed**
8:10

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023Index: deposition..drinking

**deposition**
6:12 8:13,16,21,25 65:23 83:19,22
198:3 202:13 226:5

**depreciation**
23:3

**describe**
14:12 59:23 61:20 62:1,4,21 65:18,21
148:21

**deserve**
97:5 169:9

**deserved**
185:16

**desire**
150:4,22

**desire,'**
149:1

**detail**
34:12 59:23 148:21

**determination**
60:15

**determination(s)**
60:2

**determine**
91:6 93:14 106:22

**determined**
46:23 48:2 54:6 57:20 60:1,11,16,17
61:9,22 92:14 93:9,10,16 167:10

**determines**
88:3

**determining**
51:2 54:2 56:15,21,25 57:16 58:3,7
61:21

**Devils**
197:8

**DFW**
121:25

**died**
15:22,25 17:2,4

**difference**
43:3 47:13 50:24 54:13,16

**differences**
42:24

**differently**
184:6

**digital**
17:11 18:1 21:16 24:19 25:10 42:19
43:2,4,6 62:11 138:20 144:10,16

**diligence**
196:12 197:18

**direct**
18:24 59:18 113:24

**directly**
96:4

**directors**
45:21,23 46:2,10,16 210:17,20

**disagree**
9:21

**disclosed**
131:25 132:4

**discontinuing**
119:20

**discovery**
226:16

**discuss**
71:6 74:4 78:6,13,23 116:21 123:19
136:2 189:1 204:11

**discussed**
72:19,25 74:1 136:12 148:3 149:22
157:25 158:12 204:13

**discussing**
135:22 206:10

**discussion**
111:6 136:22 138:3

**dismissed**
64:15

**dispute**
9:6

**dissolve**
76:11 77:20

**dissolved**
76:21 77:3,6

**distinguish**
50:17

**distributing**
43:7

**distribution**
70:14

**distributions**
70:7,10

**diversify**
122:6

**dividend**
79:20

**dividends**
76:15 79:1 211:24

**divides**
87:24

**dividing**
88:6

**division**
123:12

**divorce**
69:15 74:20 75:13

**document**
18:12,17 19:11,15,22,24 20:8,21
23:14 25:12 29:6 38:19 39:2 44:5,12
58:25 58:9,17 66:12 72:2 73:7 78:20
82:7,18 84:7,10 105:2 109:5,19 111:7,
25 113:5,18,23 114:5 116:20,23,24,25
119:4 123:25 125:3,4 136:23 137:22
142:7 148:23 149:19,21 159:12,21
160:25 162:4 181:6,16,21,23 196:8,16
201:16

**documented**
59:14 154:1

**documents**
8:24 9:4 159:22,24 161:20 186:17
219:5 220:16 226:6,13,15,20 227:1

**dollar**
100:25 164:11 176:6 178:4 185:1,25

**dollars**
163:20,22 176:10 177:7,11 185:8,9
190:20 199:9 215:1,15

**door**
156:7,21

**dots**
27:7

**Dotte**
24:1

**double**
107:17 108:4

**doubt**
54:22

**drinking**
64:10 208:13,14,15

**drive**
31:18 123:21

**driven**
123:19

**driving**
25:19 29:18 31:12 54:24

**drugs**
8:2

**due**
126:5 196:12 197:17

**duly**
6:2

**dumb**
177:22

**Dylan**
122:20

**Dyson**
28:14

---

**E**

**e-mail**
154:5

**earlier**
37:15 55:21 74:14 98:3 116:4 153:18
161:21 169:8 179:22 217:14 221:1
223:2 228:2

**early**
118:13,14,19 123:16 136:10,13 150:5,
13 212:24

**earned**
37:5

**earnings**
23:3 195:8,15,17

**ease**
150:17

**easier**
13:21 84:16

**easy**
47:19

**EBITDA**
22:25 23:2,10 25:17 31:9 33:6,9,12,
15,18,22 34:5,8,12 35:9,16 37:11,13,
14,22 42:2,4,8 53:24 57:17,23,24
80:19 82:16,23 83:25 84:18,20,22,25
85:3,12,13 89:10 90:15 94:25 95:8

**effect**
104:10 182:5

**effort**
54:4,18,20 55:2,4 58:14,15 62:5

**elected**
46:1,10

**Electric**
28:17

**electronic**
145:19

**Elms**
114:11 115:4

**email**
51:14 75:23 76:1,4,5 103:18 104:9
105:3,4,9 110:10,23 111:9,15,18
113:11,24 115:23 121:11,13,16
122:19 123:2,5,9 124:2,14 145:12,13,
14 147:12 151:16,20 152:24 154:6
157:8 225:7,9,12,13,17,19 226:3

**emailed**
146:5

**emails**
9:5 103:14 129:10 145:6 153:18 156:2
225:20 226:10

**emoji**
172:18 215:1

**employed**
13:4,11

**employee**
63:24 64:1 79:10,14,18 200:25

**employees**
206:22 207:10

**encompassing**
140:11

**encouraged**
163:1,5,15

**end**
17:16 22:24 119:6,17 147:9 158:10
193:5,6 206:3 209:12

**ends**
124:4

**engage**
124:17

**engaged**
19:5 132:11 157:22

**engagement**
132:13,20

**enhancing**
124:5

**Enjoy**
124:10

**enter**
10:24 144:15

**entered**
144:10

**enterprise**
21:8 26:9 27:3 108:18,25 161:8
207:10 226:3

**enterprise-grade**
24:14,19 26:7

**Enterprises**
6:16 11:22 13:5,18,23 15:5 16:12
17:15,20 19:4,12,13 20:16 23:9 28:18
29:9,21 30:1,21 33:23 35:22 36:5,20
40:9,16,23 41:3,18 44:19 45:18,20
46:2,8,19,24 52:5 53:12 88:23 89:3
90:1,6,9,12 91:4,19 92:18,21 93:5,6,
11 94:17 95:2,19 96:8,10 98:12 99:3,7
100:13 102:7,11,15,18,22 103:1 104:6
105:25 106:5,13,19 107:2 109:8,22
110:23 111:23 113:21 114:25 115:23
117:20 118:18 119:21 120:19,24
121:22 122:11 126:14,25 128:25
131:2 132:8,23 133:2 134:24 138:13
139:17 144:9 148:10 149:12 150:7,15,
25 153:8,14 154:11,16 156:15 157:18,
22 158:1,13 159:25 160:18 161:1
162:13 167:3,18 190:3 192:19 194:25
195:18,21 197:10 207:16 208:1,8
212:23 213:2,7,17 215:6 222:4,5,8
224:17 225:13 227:20 228:4,12

**Enterprises'**
90:16 91:10,14 107:24 108:25 110:12
113:2 120:1 158:17 161:14,22

**enters**
137:24

**entire**
137:18

**entitled**
176:25 180:6

**entitles**
178:23

**Equipment**
13:8,15

**equity**
87:5,11 114:10,13,24 115:3,13 123:11

**equivalent**
112:18

**Equivalents**
85:20

**era**
119:17

**essentially**
162:4

**established**
25:2

**establishing**
26:8

**estate**
68:10

**estimate**
126:8

**estimated**
86:12,14,18,21,25 87:11,25 88:6 89:9
105:18 111:23 113:21 126:24 157:5
161:24 200:24

**estimates**
99:15 113:1 161:8

**estimating**
115:22

**evaluated**
48:13

**evaluating**
53:23

**eventually**
171:10

**evidence**
74:13 179:19 181:4

**evidentiary**
182:17

**evolve**
17:14

**evolved**
14:18 15:2 43:1,8

**evolving**
17:16 43:19

**exact**
95:20

**EXAMINATION**
6:5

**exception**
7:18

**exclusive**
19:6

**exclusively**
123:12

**excuse**
18:16 29:20 30:5 71:23 75:24 81:5
89:7 105:16 108:3 121:4 126:16
137:7,13 177:10 198:23 199:1 221:11

**executed**
80:21 81:23

**executive**
23:21 34:14 35:11,17 37:24 38:15
40:2,5 198:21

**executives**
99:2

**exhibit**
18:8,10,19 58:22 66:8,11 71:20,25
74:25 75:19,22 82:4,14 83:19,21
85:10,12 103:10,13 104:24 111:3
113:7,11 116:12,16 121:5 122:15,19
125:15,19 136:16 145:1,5 151:12,15
155:23 156:1 159:1,4 170:2,5 172:4,7
175:4 181:9,13 184:14,21 186:7,11,
12,14,18,19 191:16,19 196:5 214:2,7,
10 227:9

**existing**
126:5

**exit**
107:16 108:3

**expand**
122:5

**expanded**
122:4

**expect**
191:25

**expectations**
215:23

**expected**
200:17

**expense**

201:2,4

**expenses**
119:13 193:13 201:3,6

**experience**
14:1 25:1

**expert**
10:14 167:12 169:3 179:3

**explain**
183:22

**explained**
55:8

**explore**
76:9,14 157:1

**exploring**
19:7 78:25

**express**
150:24

**expressed**
115:10 148:9 150:6

**extent**
10:7 11:7 20:25 92:24 97:16 109:19
113:5 123:24 140:3 165:5 166:9
167:12 169:3 179:3 183:18 224:7

**extra**
70:6

---

**F**

**face**
127:9

**fact**
183:22 218:23 224:3

**factors**
53:11,15 54:6

**facts**
74:13 179:19 181:3

**fair**
7:14 17:15,24 20:19 23:6 25:10 28:24
37:16 38:16 40:15 41:17 44:4,24
48:11 51:1 54:23,25 55:1 65:3,5 69:16
83:3 86:16 90:6,11 92:18,22 96:6,23
97:1,4,7,8,11,18 99:18 107:25 108:5,
24 109:20 110:6,22 111:1 112:24
113:6 115:22 116:1 118:18 119:22
121:24 122:9 123:1 126:24 127:2
139:24 142:5 145:23 154:12 156:13
157:11,14 158:1 160:25 161:6 162:3

167:25 169:6,7,8,16,17 178:9,11,15
183:15,24 186:20 203:10 205:19,20
209:20 223:5

**fairly**
180:6,17,21 183:4

**fall**
205:4

**familiar**
59:16

**family**
16:9 39:10,13 81:7,10 177:7,12,14
209:20

**father**
15:20,21,25 16:11 17:2,4 18:5 45:19
46:6 221:8,12

**favor**
190:25

**Feb**
111:13,17

**February**
111:10 123:3 133:5,8,11,15 136:13
137:3 142:2 143:18 170:11,18,23
171:6,15,23

**feel**
143:7 175:24 176:24

**felt**
164:10 191:3

**figure**
14:24 173:24

**figured**
173:21 174:2,7

**filed**
148:16

**filing**
145:20

**film**
12:22,25

**films**
12:15,17

**financial**
19:6 25:16 31:7,22 47:21 49:23 50:12
64:25 69:6,7 143:22 194:17 196:12

**financially**
48:1 49:4,7

**financials**

**find**
68:7 149:1 170:10 171:3,4,7,14

**findings**
197:15

**fine**
53:8 121:8 183:1 207:6 215:21 217:1

**finish**
7:5 94:7

**fired**
64:3,7

**firm**
105:17 114:11,14,25 115:4,13 123:11
195:1,5

**Fixed**
85:16

**flip**
21:1 23:20 24:12 66:16 82:14 197:12,
22

**floors**
11:23

**flow**
208:20

**focus**
116:22

**focuses**
115:4

**font**
84:7

**force**
143:4,25

**forced**
41:11

**foregoing**
60:8

**forgivable**
214:25

**formed**
46:6,11 221:23

**formula**
80:19,21 81:13,17,23 82:1,16,23
83:25 84:18 85:25 86:2,16 87:17 88:3,
22 89:2,10 90:15,18 91:3,8,9,13
92:11,13,15 94:25 95:8 97:2 168:14
178:10,12,16 179:13,14,15,25 180:8,

12,14,18,23 182:21 183:13,25 184:3,
11

**Forrester**
24:18

**forward**
124:9

**found**
170:21 171:5 175:25 176:4 180:6,17

**foundation**
20:3 24:9 29:4 31:25 34:2 38:5 88:25
91:16 96:12 109:4 117:25 118:5,10
161:5 162:8 176:12 179:20 199:19
202:10 211:20 213:22 224:7

**founder**
34:20

**fourth**
197:13

**frame**
99:12 221:9

**free**
23:7

**frequently**
126:6

**Friday**
156:5

**fringe**
34:15 200:16,24 201:24

**front**
159:5 196:11

**fruition**
138:16

**fuel**
201:4

**full**
84:11 150:3 188:20 190:5

**function**
161:14

**fund**
186:5

**funding**
215:7

**funds**
189:24

**future**
138:5 139:21 140:6 147:1,4 201:17

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023Index: G2..hands

**G**

**G2**
24:17

**Gartner**
24:18 105:18

**Gary**
17:9 39:2 76:15 79:1,6,15 206:19

**gauge**
55:25 91:18 92:9,16,20 93:7 94:3,17

**gave**
17:13 160:17 176:8,10 181:19 205:11
220:1

**General**
28:17 60:8 182:12

**generated**
228:6,14,19

**generating**
108:14 109:24

**geography**
122:6

**Germany**
27:23

**gift**
164:11 176:8 178:4 185:2 186:1,2
190:10

**give**
7:2,22 8:5 48:21 60:25 70:16 123:17
185:15 228:8

**giving**
74:15 185:20 202:7 220:1

**Glass**
156:7,21

**global**
27:2 28:6 105:18

**Goldsmith**
122:20,22,24 123:7 124:4,13

**Goldstein**
121:18

**golfing**
101:6

**Gonnering**
16:19,22 23:24 39:23 48:19,25 49:3,
23 51:5 60:17 71:17 76:4,19 77:16
78:7,10,14,17,23 79:19 99:9,18

101:10,13,21 102:3,10,14,17,21,25
103:4,15,19 104:3,8,17 105:7,11
107:21 108:24 109:11,20 110:22
111:9,22 112:7,24 113:12,20 114:8
115:3,22 116:17 117:6,19 119:7,20
125:20 126:3,12,22 127:17 136:2,13
137:2,24 138:11 139:3 140:10 141:24
142:7,21 143:1 148:9 149:11,15
150:7,14,25 151:17,21 152:18 153:12,
19 155:6,16,19 156:2 157:2,11
161:12,21 162:3 204:12,13,16 205:11,
23 206:11,12,23 215:18 216:4 217:24
218:6 227:25

**Gonnering's**
99:14 116:5

**good**
6:7,8 10:3 11:4 53:7 98:21 135:15
178:8 193:3 194:14 215:20,25 221:22

**gorilla**
138:2 144:14,18

**Gotcha**
111:17

**gracious**
176:8

**grade**
27:3

**grandfather**
18:23

**Grant**
195:1,6,12,20 196:2,11 198:16 201:10
203:13

**graph**
29:22,25 161:7

**graphics**
14:17 15:1,6 63:10 106:6 107:9

**grateful**
164:1,2,5,6 191:5

**great**
123:17

**green**
98:19 215:23

**grew**
14:25 16:9 107:15

**gross**
31:18

**ground**
6:11

**group**
6:14 123:10 148:20

**grow**
98:22

**growing**
98:20 118:19 131:13

**growth**
22:9 25:17 29:16,18 31:9,15 52:24
58:1 98:17,18,21 114:23 117:8,12
118:2 126:8 137:8 152:9

**guess**
9:20 11:2,14 14:22 17:12 22:23 34:3
48:3,9 51:13,15 57:14 61:19 62:8
90:14 92:19 95:20 105:16 106:10,16
107:11 110:6 112:16 115:25 127:25
132:16 139:11,19 143:19 145:25
152:6,17 155:8 156:25 157:21 158:11
162:10 166:11 168:23 170:8 171:1
178:25 180:20 197:11 203:1 204:8
219:23 221:3,4,10 226:24

**guessing**
13:15 15:14 157:19 215:11

**guidance**
160:5,17 161:1 202:25 212:5

**guy.....pretend**
103:20

**guys**
204:19

**H**

**half**
30:5 64:12,13 152:15 176:10 177:8,13
218:6,12

**hand**
186:12

**handed**
71:24 105:2 113:10 116:15 122:18
125:18 136:19,23 151:15 156:1 159:4
170:5 172:7 181:12 184:20 186:10,11
191:19 196:8 214:9

**handful**
112:8 114:10

**handle**
189:23

**hands**
10:21

Hang
94:6

happen
43:11 159:12

happened
45:2 69:20 163:19

happy
190:6,12,13,15,16

hard
28:5 62:23 179:10

heading
112:4 114:1,7 117:4 126:1 137:6,16

health
65:1

hear
11:19

heard
42:1 80:4 153:16

held
11:21 130:21

helped
17:11 19:11 20:20 181:23

helping
16:19 63:22

Hey
103:20 174:22

high
11:23 13:9,10 35:23 37:2 122:3

higher
87:10 108:20 203:8

Highlights
24:13

highly
21:7 25:18 31:11 123:11

hired
17:9 46:7

historical
200:16 201:19,24

Hmmm
152:21

holding
68:10 90:8 221:24 222:7

holdings
188:15

home
13:13 110:8

honest
7:23 8:5 48:11

honestly
107:1

Hope
123:7

Horein
42:9,10 101:1 155:17,20

horizon
138:7 139:22,24,25 142:22 176:7

hour
64:12,13 174:24 206:3

hours
207:25

house
147:13

hovered
117:9

hundred
126:4

hundreds
21:8

hungry
135:8

hypothetical
167:22 168:21 181:5

hypothetically
54:15

I

iconic
21:8 28:7

idea
17:5,8,13 37:9 69:20 80:1,3,4 94:19
101:8 114:16 159:15

identification
18:11 58:23 66:9 71:21 75:20 82:5
103:11 104:25 111:4 113:8 116:13
121:6 122:16 125:16 136:17 145:2
151:13 155:24 159:2 170:3 172:5
181:10 184:15 186:8,15 191:17 196:6
214:3

identifying
60:1

image
12:8

images
21:16 43:7

impact
137:25 212:23 213:1

impacted
48:1,5

impair
8:3

important
30:20 31:3 49:21 51:2,12 67:8 138:6
139:21 143:5

incase
156:7

include
119:11 128:2

included
116:8 201:17

includes
127:20 130:13,20

including
60:1 81:10 143:5 148:23 160:4

income
49:8,9,17 55:24 56:3 145:18 192:11

incorrect
149:20

increase
126:17 211:1

increased
126:5

increasing
107:24

indemnification
152:3

indicating
18:23 90:22,23

individual
47:1,10,13 48:4,13,16,23 53:16,24
60:12 61:10

industry
14:12,24 17:14 101:18 107:4,7,24
151:22

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023Index: influence..knew

**influence**
8:1

**information**
10:25 19:23 20:1,7,13,20 23:16 41:14
49:24 50:1 55:23 57:5 60:22 129:12,
16,20,25 130:5,14 131:3,11,18 132:3
172:21,25 173:3 174:6,11,21 175:14,
16,22 193:20,22,25 195:21 196:1
198:7 210:23

**information'**
149:2

**informed**
156:9 157:3,11 223:22

**infrastructure**
27:2,3,13

**infrequently**
114:9

**initial**
160:5,17 161:1

**initiated**
148:25

**initiatives**
51:6

**innovation**
25:1

**input**
91:10

**inserts**
12:16

**instance**
68:22

**Instant**
214:22

**insurance**
192:3 194:3 200:25

**interaction**
143:6

**interest**
86:1 99:1 114:1,8 115:10 123:19
127:19,20 128:1,6,9,12 130:9 148:9
150:6,14,24 169:1

**interested**
101:20 124:24 127:15 141:7 154:3

**interesting**
152:22 153:1,4,7

**internal**
46:21

**interpret**
127:8

**interpreted**
127:3

**interrogatories**
59:5,12 151:3

**interrogatory**
59:19,21 148:15,20 149:20 150:20

**interviewed**
160:1

**introduced**
6:9

**invested**
103:6

**investing**
115:6

**investment**
24:13 26:7 52:2 93:16

**investments**
53:1 85:21 115:6 222:3,12,17

**involved**
200:20 202:18 203:2

**involvement**
221:21

**Ireland**
27:25

**irrevocable**
76:22 77:19 218:21

**issues**
190:18

**Isthmus**
52:9

**J**

**Jake**
24:1

**January**
44:15,21 132:21

**Jeff**
42:9,10 101:1 155:17,20 156:9

**job**
47:8 49:2 64:11

**jobs**
11:25

**jog**
191:12

**join**
16:22

**Journal**
105:13

**July**
148:8,12 150:5,13

**July/august**
119:9

**June**
141:14,15 142:2 147:24 148:6,8,12
150:5,13 196:12

**June/july**
119:8

**Justin**
133:14,18,21,24 134:4

**Justin's**
133:19

**K**

**keeping**
98:11 110:8

**key**
24:13 206:22 215:22

**kids**
77:23

**kids'**
218:20

**Kiesler**
6:14 23:25 38:20 39:24 49:16 51:5
59:24 60:11,19 61:3 72:7,14,18,22
73:18 74:5 79:24 80:9,12 103:15,20
104:4,8,13,20 111:10 113:12 116:18
125:20 137:2 170:9 171:10,19 172:9
174:9 175:6,13,21 186:20 187:2
214:23 220:15

**Kiesler's**
60:16 80:1

**kind**
48:24 53:19 55:5 68:9 83:23 101:16
106:5 137:19 168:16 193:22

**knew**

69:7,8 80:21 81:1 99:18 120:23 168:7
223:1

**knowing**
94:20 168:12 183:12

**knowledge**
222:18 226:15,18

**Kool-aid**
208:13,14,16

---

**L**

**labeled**
32:4 148:23

**labor**
115:19

**lack**
20:2 24:8 29:4 31:24 34:1 38:4 88:24
91:15 96:11 109:4 117:24 118:4,9
161:4 162:7 179:20 199:18 202:9
211:19 213:22 224:6

**LAING**
184:19 216:19

**landlord**
193:1

**large**
28:5 144:22 153:9

**larger**
115:13

**late**
150:5,13

**lawsuit**
186:5 188:24

**lawyers**
8:13,15,23 226:22

**leader**
26:8

**leadership**
29:17

**leads**
138:4 139:15 144:5

**learned**
13:20

**lease**
201:2

**leave**

83:17

**left**
67:7 199:10 214:17

**legal**
10:7,14 177:18 181:7 190:17

**Leisner**
23:25

**letter**
121:10,20 132:13,21 197:13

**level**
203:8

**liability**
211:13

**license**
109:24

**licensed**
108:13 109:1,13

**lie**
78:10,17,21

**life**
54:4 55:6 179:5 194:22

**limited**
148:24 182:5

**lines**
32:18 84:22 122:5

**linked**
151:25

**liquidate**
69:14 70:21

**listed**
24:3 39:10 44:6 69:19 131:18

**listen**
38:6 62:23 114:11

**listening**
43:9

**lists**
23:24 26:11,21 28:10 39:8

**lived**
54:3

**LLC**
19:5

**loan**
213:16,18

**London**
27:12

**long**
13:11 23:22 106:17 137:19

**longer**
119:16 191:24 192:13 212:7

**longest-standing**
119:15

**looked**
18:13 53:11 155:3 161:20

**losing**
51:10

**lost**
213:3,4

**lot**
9:5,24 11:24 16:9 28:11 46:20 53:25
54:9 59:1 68:18 134:24 147:3 156:8
210:11

**Lots**
55:17

**low**
158:10 205:25 206:1

**lower**
162:5

**lump**
190:23

**lunch**
64:12 135:10,13,15,17,20 146:11

---

**M**

**M&a**
42:11 149:9,10,14

**M+a**
148:21 149:7

**mad**
178:1

**made**
12:14,17,25 52:19 54:11 60:2,14
77:13 117:7 168:25 178:8 213:11,13

**Madison**
146:10 210:1

**magenta**
12:9

**maintenance**

67:1,11 75:2 217:10

**majority**
115:13

**make**
10:25 11:3 12:15,17 13:24 38:5 68:16
70:10,14 84:9 138:2 159:19 168:17
171:24 179:7 217:21 227:18

**makes**
70:5 124:5 152:21 153:4

**making**
33:23

**man**
17:10

**managed**
52:7,9,14

**management**
18:1 20:13,16 24:20 25:11 42:19 43:2,
5,6 62:11 123:14 138:21 144:10,16
197:16 200:23 202:20

**manager**
60:15

**map/picture**
27:7

**margin**
122:3

**margins**
25:18 31:9,18

**Mark**
67:9 223:15

**marked**
18:10,19 58:22 66:8,11 71:20,24
75:19,22 82:4,7 83:7,18,21 84:12
103:10,13 104:24 111:3 113:7,10
116:12,15 121:5 122:15,18 125:15,18
136:16,23 145:1 151:12,15 155:23
159:1 170:2 172:4 181:9,13 184:14,20
186:7,11,14 191:16 196:5,8 214:2,9

**market**
24:20 25:4 29:17 47:3 58:18 60:14
61:11,12 83:3 103:24 107:22 110:16,
19,23 112:21 113:2 119:16 123:11
138:1,3 139:14 152:5 158:13

**marketable**
51:24 52:10,15

**marketing**
14:18,20 15:3 43:1,4,15,23 44:2
62:20,21 63:1,9,11 65:16 115:19

**marketplace**
10:22

**martech**
26:14,17 123:12

**mated**
159:17

**Matt**
48:19,25 49:3,23 51:5 71:17 76:19
77:16 78:7,10,14,17,23 79:19 101:10,
13,21 102:3,10,14,17,21,25 103:4,15,
19 104:3 113:12 151:17 162:3 197:13
217:24 218:6 227:25

**matter**
128:19 129:5

**matters**
128:14

**Matthew**
16:19,22 20:18,19 23:24 38:20 39:23
45:6,9,10,11 46:7 51:18 60:17 61:2
63:10,13 65:22 76:4 78:21 99:9,14,18
101:12 105:7 134:14,20 135:4 140:6
142:16 161:16,19 171:2 197:1 202:24
203:4 208:21 209:7 228:20

**Matthew's**
14:19 20:23 60:25 208:13,14,15

**maximum**
119:12

**meaning**
23:12 169:8 215:23

**means**
21:14 22:21,25 23:9 32:15 33:21 97:1
127:11 139:11,12 143:10 168:13
169:7 218:15

**meant**
78:3 142:23 188:14 201:10 218:11

**measure**
23:6 47:12 56:24

**measured**
47:20,21 48:14 57:15

**media**
100:3 156:8

**median**
107:16 108:2

**medications**
8:2

**meet**

146:15,23 155:16 229:3

**meet?the**
146:10

**meeting**
57:7 146:11 147:9 155:19 156:6,17,23
209:7

**meetings**
65:14

**members**
81:6

**memorandum**
20:12 198:7

**memory**
191:12

**mention**
188:18,22

**mentioned**
16:18 102:9 123:15 143:1,23 221:1

**merger**
19:7

**mergers**
107:14,22

**merits**
197:19

**message**
66:15,17,21,24 67:10 68:3 72:10
73:14 74:23,25 75:11,15,23,25 76:1,5,
8 79:23 145:24 146:2,9 152:13 157:3
172:9 175:6 184:21 191:20,23 192:7
214:25 215:18,20 216:10 217:8 218:9
219:10

**messages**
9:5 72:6 214:11,22 216:7 217:13,16
226:10 228:14,19

**met**
147:14,18,23 215:23

**metric**
30:20 51:2 126:22 127:1

**metrics**
28:9 50:11

**Michael**
20:18,19 23:25 39:24 49:25 60:25
71:3,4,6,11 72:7,14 73:18 79:24 80:1
103:15 104:4 111:10 113:12 171:1,10,
19 186:20 195:25 219:9

**Michael's**
20:23

**mid-2022**
150:9

**middle**
121:25

**Mike**
38:20 49:15,16 51:5,18 172:11,16,18,
23 173:1,5 174:9,12,15 186:21 187:1,
2,3,10,23 188:10,18 189:19 191:8,10,
13 212:5 214:23

**Mike's**
172:12

**milestones**
148:25 149:3

**million**
21:16 22:1 23:10 30:2,5,8,12,15
33:23,24 37:6 38:1 40:13 44:7 54:11,
12 89:15 92:8 93:4 95:17,21 96:20
97:11,13,23 102:12,15 103:6 104:5
110:13,24 111:24 112:10 113:3,22
115:6,7 116:2 117:21 126:15 127:1,11
134:1 152:1 154:7,13,19,22 155:10,11
160:21 163:20,22 164:11,15,18 165:3,
16 166:1,3,7 167:19,24 168:1,3 176:6,
10,12 177:7,8,11,13 178:4 185:1,8,9,
25 190:9,19 191:6,7 213:20 215:7
224:16

**millions**
199:9

**Millmont**
68:8,9,15 69:19,20,25 70:8,10,13
192:17,18 193:7,14,21 194:4,18

**Milmont**
67:23 191:24 192:12

**Milwaukee**
105:12

**mind**
54:10 115:16 142:19 154:15 179:9
183:9 208:6,7,9

**mine**
17:7 178:20

**minority**
114:1,8 115:10,11

**minus**
34:6,8

**minute**

**million**
59:16 82:15 111:20 113:18 116:20
154:5

**minutes**
100:2

**mischaracterizes**
44:11 61:17 78:20 92:24 94:23 97:16
98:9 109:5,19 113:5 165:5,10 166:9
168:5 179:19 183:18 189:14 224:19

**missed**
189:17

**misstated**
123:24

**misstates**
44:10 189:14 224:24

**mode**
114:17,18,20

**model**
25:19,23 31:12

**models**
122:4

**moment**
137:20 160:8

**money**
10:20 26:2 42:4 52:20,23 53:4 67:2,13
68:7,16,19,22 69:11,15,18,25 70:6,16
74:17,19 75:3,5 96:3,9 133:1,25
134:24 153:9 163:24 168:17,25
173:12,18 176:12 188:7 190:2 211:6
212:15 213:11,13,17 217:11

**monitor**
98:17

**month**
49:13,17

**monthly**
72:16 207:19

**months**
13:13 157:6 207:20 209:16,23

**morning**
6:7,8 7:24 151:21

**mortgage**
192:2 194:2

**move**
61:19

**multiple**
85:17 101:14 102:4 107:16 108:2,3,20
158:17 161:22

**multiple-page**
84:7

**multiples**
162:5

**multiplier**
153:20,21

**multipliers**
153:13

**multiplying**
161:15

---

**N**

**N/p**
86:4

**named**
79:1 122:20 223:23

**names**
38:24

**necessarily**
51:18 75:17 140:13 223:4

**needed**
14:24 17:14 43:8 68:7,19,23 69:15
74:19 75:5 187:16 204:7

**needing**
212:15

**Needless**
124:4

**negative**
33:15

**negotiated**
184:5

**nephew**
133:14

**Nice**
229:3

**Norris**
17:9 39:3 79:6,15 206:19

**note**
189:20

**notes**
85:22 226:12

**noteworthy**
152:10

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023Index: noticing..owned

**noticing**
  220:4

**notification**
  192:1 220:4

**notifications@assuresign.com.**
  145:15

**notified**
  51:11,15

**notifying**
  119:8

**number**
  25:11 26:11 30:10 32:25 33:2 34:5
  35:19 36:11,17 37:20 62:7 67:15,17,
  19 73:11,12 84:25 87:11,18,25 88:7
  92:7 93:23 94:2 95:20 129:7 131:12
  133:4 153:2 154:6,14,16,22 158:3,5
  159:13,16 164:21 172:12 186:22,23
  188:11 192:25 198:6 201:18

**numbered**
  35:9

**numbers**
  21:3,12 37:5,10 54:14 127:4,18
  153:22 158:20 199:8 214:18

---

**O**

**oath**
  6:2

**object**
  11:7 169:3 179:2 180:12,14 181:3
  182:25 183:17,18 223:10

**objection**
  10:6,13 16:5,13 20:2,9 24:6,8 28:19
  29:1,3 31:24 34:1 37:7 38:4 40:24
  41:8,19 44:9 45:4,16 55:15 56:6,17
  61:16 63:3 67:6 74:12 78:19 79:2
  88:24 89:4,16,18,23 90:3 91:15,21
  92:23,25 94:22 96:11,24 97:15 98:8
  99:11 100:23 109:3,18 110:1 113:4
  117:24 118:4,9 120:25 123:23 128:21
  130:10,16,24 131:21 139:6 140:2
  161:4 162:7 165:4,9,18 166:8,13
  167:11 168:4,20,21 169:2 179:18
  180:10 184:2 189:13 199:18 201:15
  202:9 208:2,22 210:7 211:19 213:9,21
  223:12 224:6,18,23

**objections**
  59:3 60:8,9 181:14 182:12

**obligation**
  68:19

**obligations**
  129:12,15,19 152:3 211:3

**obtained**
  20:13 200:23

**occupied**
  193:2

**occurred**
  31:1

**occurs**
  124:7

**October**
  76:19 103:19

**offer**
  163:22 166:11,12,16,19,22 167:7
  176:7

**offered**
  62:19 154:20 163:20,23 164:11 177:6,
  11

**offering**
  95:12,13 119:17

**offerings**
  24:20

**offhand**
  172:2

**office**
  68:11 138:20 207:16 224:9

**offices**
  27:10

**on-premise**
  107:18

**one-pager**
  84:5,6

**onetime**
  138:24

**Onward**
  216:1

**op**
  150:17

**opened**
  181:19

**operated**
  192:19

**operating**
  138:6 139:22

**Operation**
  111:16

**operational**
  111:13 113:15 116:8,17 125:19 137:1
  161:13

**operations**
  131:14 200:21 202:18,24 203:3

**opinion**
  183:3,14

**opportunity**
  38:6 138:8 139:23

**opposed**
  11:10

**optimistic**
  208:21,24

**option**
  212:7

**options**
  115:12

**Organize**
  149:2

**original**
  222:15

**originally**
  17:13

**outlined**
  201:6

**outplacement**
  119:13

**overlapped**
  53:19

**oversaw**
  48:19 203:6,8

**overseeing**
  48:25 49:2,3

**Overview**
  21:5 28:3 31:7

**owe**
  164:9

**owed**
  190:8

**owned**

39:5,13,24 40:2 68:14 77:15,22 78:2
90:6,9 92:4 95:25 96:6 129:1,3 167:2,
18 173:10 187:13 192:18 211:15
222:14,15,17

**owner**
34:14 35:2,10,17 37:24 38:3,15,25
67:15 79:15 193:24 198:20 200:15,20
201:23

**Owner's**
201:1,5

**owner/president**
198:22 199:4 200:10 203:23

**owner/president/founder**
34:16,19 38:10

**owners**
38:18,21 68:13

**ownership**
10:20 95:18 103:22 149:1 150:4
168:24 193:15 204:15,17 205:8,12
206:12,15 207:2,5

**owning**
173:13,19

**owns**
193:14 194:10

---

**P**

---

**p.m.**
66:18 67:15 72:10 73:9 105:5 145:13
229:8

**packages**
119:11

**pages**
21:1

**paid**
59:24 60:11 76:22 77:4,8 80:18 88:19
96:3,4,9 98:6 107:17 116:4 138:19,24
182:6 193:25 200:8,9 210:4,18

**painting**
11:23

**Palay**
6:6 18:18,21 53:8 63:6 67:9 82:20
83:6,11,16 84:11,15 100:4 124:3
135:12 136:19 149:23 159:14,18
174:25 181:8 183:1 184:17 206:2
212:22 214:6,14 216:12,21 217:1,4
226:25 227:7,11,13 228:7,25 229:3

**pandemic**
118:8,20

**paragraph**
20:11 60:6 112:5 118:22 119:6 137:18
138:11 150:3 197:14

**paragraphs**
60:5

**paraphrase**
167:1

**Pardon**
58:10

**part**
11:3 12:7,22 14:21 18:4 19:20 39:13,
20 48:18,23 49:2 52:13 64:20 66:2
68:11 74:15 118:19,21 119:16 150:22
188:19 194:24 195:2,21 198:11,16
201:18 204:22 209:8 219:20,23

**partially**
44:2

**participate**
59:11

**participated**
19:15 61:2

**partner**
193:3 194:5,15

**Partners**
52:9

**partnership**
137:16 138:4,12,15,19 139:14 144:5

**parts**
65:25

**passed**
18:5 177:9

**pay**
41:18 48:2 66:25 67:11 74:19 75:2,12
77:11,17,18,19,21,23 119:11 133:2
152:1 188:20 190:5,22 191:24 192:13
193:5,7 194:1,4,8,13 204:5,6,7 211:7
217:10

**paying**
76:14 77:12 78:25 79:13,20 189:23
190:2

**payment**
80:14 138:24

**payments**
76:13 79:21

**payout**
72:16

**payroll**
200:23,25

**pending**
7:19 11:7

**penetration**
122:7

**people**
39:4 105:3 120:18 132:4 195:24
206:21 228:19

**perceived**
164:22

**percent**
10:20 22:8,21 39:11,14,25 40:3,19
68:14 87:19 88:10,13 90:7 92:5 96:1,
7,9 97:12,13 107:15 118:2 126:17
129:1,2 188:15 190:9 193:8,13,15
194:2,10,11

**percentage**
187:6

**perception**
177:21

**perform**
197:17

**performance**
47:2,6,10,14,19,23 48:4,13,16,24
50:2,12 53:16,17,20,23,24 54:18,23
55:8 56:24 57:15,21 60:13 61:10,11

**performing**
49:4,7

**period**
44:25 63:7,21 162:15 200:16 201:20,
25 208:4

**permission**
220:2

**person**
7:6 34:21 42:11 60:1,14 70:24 97:5
122:1,20 210:19,22

**person's**
60:12,15 61:8,10

**personal**
8:8 201:2,4,5

**personally**
95:17 134:1 168:18 188:14 195:23

**persons**
60:2

**phone**
67:16,19 216:17 219:10

**phonetic**
38:21

**phrased**
189:5

**Pick**
146:12

**picked**
62:7

**piece**
128:16,17,18,24 129:3,6 222:15

**plaintiff**
59:3 151:4 181:15 182:6 214:13

**plaintiff's**
9:13 182:7

**plan**
73:22 74:10 140:13,19 141:5 142:10
150:16 197:15

**planning**
140:12 141:23 142:8 156:14 208:11

**plans**
138:6 139:21 140:7,11 147:1,4

**plate**
12:22

**plates**
12:15,17,25

**ploy**
124:18

**point**
6:21 7:17 24:17,25 25:15 43:16 64:1
71:9 101:16 105:17 106:2 107:13
108:7 124:24 133:7 135:2 148:10
149:17 150:15,22 157:22 160:14,20,
23 165:12 167:8 176:18 185:17
192:21 206:10 207:8 222:16

**points**
13:22 105:14

**pool**
133:17

**portion**
35:10 38:1 103:6 104:5 112:1 113:24
116:25 137:10 194:18

**pose**
181:4

**position**
41:1 44:16 216:1

**positions**
9:18,21 11:20

**pospossposted**
143:8,14

**possibility**
79:20 133:22 136:3 141:1 157:1

**possibly**
112:14 148:13 215:8,9,11

**post-sale**
103:23

**post-transaction**
200:18 202:5

**posted**
143:10,11

**postponed**
143:8

**potential**
29:9 138:12 153:13

**potentially**
19:13

**pouring**
42:4

**power**
138:1

**PPP**
213:5,16,17 215:7,13

**pre**
156:8

**preliminary**
157:4,12,15

**premature**
123:16 124:21

**premedia**
14:17 118:21 120:11

**premium**
21:7

**preparation**
8:24 226:7

**prepare**
8:12 19:12 181:23

**prepared**
20:12

**prepress**
12:4,7 14:16 15:6 17:5

**presence**
152:6

**present**
183:5

**presentation**
159:5

**president**
15:17 34:24 35:5 44:22 45:14,18,24
46:19 47:8 48:18 98:12 221:1,6,13,15,
18,20 222:19,21,25 223:1,17,21,23
224:4,10,14,17,21 225:5

**pretty**
18:6 174:23 192:17 208:24 210:22

**previous**
81:2

**previously**
83:7 117:9

**price**
40:12,15 41:17 80:18 81:1,12,15
87:19 88:1,4,12,13,15,18 91:25 93:3
120:21 177:6,10 182:6

**primarily**
17:21 57:9 119:23 201:4

**print**
12:15,17 83:23 121:8 145:4

**print-off**
214:11

**printer**
13:1

**printers**
12:15

**printing**
12:6,14

**printout**
72:6 103:14 121:9 151:16 172:8

**prior**
130:8 132:24 166:9 168:5 171:15
178:16,17 183:19 197:18 225:12
226:2 227:18 228:5,13,18

**private**
114:10,13,24 115:3,13 123:10 159:7
210:19,20,22

**Stacy L. Randall v.**
Reed C. Widen, et al.

**Deposition of  Reed C. Widen  Video Deposition**
August 23, 2023Index: privy..raising

**privy**
172:21

**pro**
96:18 211:14

**problem**
67:22 68:2

**procedures**
197:18

**proceed**
6:13,22

**proceeding**
69:15 74:20 75:13

**proceeds**
103:7 177:1

**process**
12:6,14 13:20 55:22 62:2,4 149:7,10,
12,15 194:24 195:2

**Process'**
148:22

**produced**
89:9 98:5 214:12 216:14,15 217:3
227:3,6

**product**
26:7 29:16 62:18 115:15 119:17

**production**
118:24 119:3,21 120:3,9,11 137:11

**products**
62:24

**profile**
25:16 31:8

**profitability**
31:19

**profitable**
124:6 213:7

**profits**
23:6 33:25 213:14

**progress**
143:8,11

**project**
157:5 196:12,21 198:11,16

**projected**
22:2,10 34:5,8 112:20,25 117:14,15
126:3,13 161:9,23 208:20

**projecting**
30:1 117:20

**projection**
50:4,8 117:11 118:1 127:11 137:7

**projections**
117:9 208:19 215:24

**prominent**
26:25

**proper**
119:10

**property**
77:9,22

**proposed**
197:19

**protect**
222:1,2,3,5

**protected**
222:8,9

**protection**
221:25

**protocol**
219:20,24,25

**Proton**
225:15

**proved**
149:20

**proven**
24:13

**provide**
20:20 41:13 55:23 57:5 69:25 119:10
193:20 195:20

**provided**
13:1 57:3,9 119:16 151:4 196:2
226:16,21 227:2

**provider**
24:14

**provision**
182:4 184:4

**provisionally**
216:14

**publicly**
151:23

**pull**
156:7,18,20

**pulled**
156:24

**pulling**
126:7

**purchase**
40:12 93:3 182:6

**purchased**
77:9 97:20

**purchasing**
72:12,15,19 73:2,19 74:10

**purpose**
222:10

**purposes**
19:12 110:16

**pursue**
138:7 139:23 205:9

**put**
52:20 53:3,25 54:1,8,9,18,20 55:2,4
176:12 179:5

**Q**

**quality**
27:4 195:8,15

**quarter**
22:16 125:25

**question**
7:10,14,19,20 8:6 10:16 11:8 20:6
23:13 38:8 62:17 82:19,21 91:2 94:7
114:6,7 139:10 158:11 162:20 166:23
168:22 171:25 173:16,23 179:21
180:16 183:11,19,21 207:24 216:19
221:22 228:10

**questions**
6:23 8:5 11:9 199:3 229:1

**R**

**R&d**
26:7

**rainy**
213:6

**raise**
177:17

**raised**
162:18

**raising**
190:17

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Reed C. Widen Video Deposition
August 23, 2023 Index: ran..refreshes

**ran**
  16:2 44:24 45:6

**Randall**
  6:10 66:21,23 91:24 133:14 217:8

**RANDALL'S**
  59:4 181:15

**range**
  94:16 158:20 159:6 160:7,14

**ranges**
  161:22

**rank**
  24:18

**rata**
  96:18 211:14

**rate**
  22:9 103:24 137:9 200:24

**reach**
  30:1 105:19

**reached**
  175:18,20

**read**
  9:16 21:10 23:16 25:14 26:4,10 32:17
  35:19 36:17 37:15 44:12 59:13 60:20
  65:24,25 67:3 76:16 82:20 84:16
  108:7 112:22 117:17 118:23 119:2
  126:10 127:12 137:13,18 138:9
  139:19 143:13 149:5 151:5 152:11
  186:13 201:8 202:4 217:20

**reading**
  37:20 216:2

**ready**
  19:1 116:21 145:19

**real**
  68:10 207:22,24

**realize**
  173:11

**realized**
  134:23 164:14

**reason**
  7:22 40:22 74:1,4,9 78:10,16,21 95:21
  152:18 158:23 195:2 207:3

**reasonable**
  193:17

**reasons**
  67:1,11 75:2 192:25 217:10

**recall**
  44:18 79:4 80:11 82:13 101:3 118:14,
  16 124:14 134:2,4,6 135:21 157:20
  159:21 160:19 161:20 162:15 169:22
  171:13,16,24 174:20 175:23 198:8
  205:22 206:1,13 212:14 215:12
  216:10 217:13 226:7

**recapitalization**
  19:8

**Receivable**
  85:22

**receive**
  36:4,22 57:4 61:22 79:17 103:5 105:9
  120:17,18 134:1 213:17 224:13

**received**
  35:22 36:2,9,19 48:5 56:16,22 57:1
  95:17 96:9,16,20 108:5 125:10 146:2
  149:14 188:8,11 199:16 215:6 216:8
  217:16

**receiving**
  36:25 44:6 199:21,24 200:2 215:12
  216:10 217:13

**recent**
  117:10 123:18,20

**receptionist**
  64:14

**Recess**
  53:9 100:8 135:17 175:2 206:8 228:9

**recipient**
  217:17,24

**recitation**
  123:24

**recognize**
  18:12 58:25 66:12 72:3,5 76:5 82:11,
  16,23 105:10 111:7 186:22 196:15,21

**recognized**
  188:7

**recollection**
  36:7 111:22 113:19 134:8 135:25
  137:21 143:17 147:14,17,23 148:3,6,
  17 171:18 215:5 217:15

**record**
  84:5 111:6 136:22 159:11 181:6
  182:17 227:1,5

**recurring**
  22:2,8,22 25:18,22,24 30:2,6,9,12,15,
  20 31:11 32:7,13,15,24 50:15,19

**recess** 
  102:19,23 122:2,10 126:23 134:21
  158:18 160:21 161:3,15,23 162:5

**redeem**
  71:11,13 75:8,12,16 82:17,24 184:10

**redeemed**
  71:6 91:24 162:19 187:7 205:17

**redemption**
  66:3 68:25 81:16,24 86:5 88:19 129:8,
  13,17 130:15,22 132:1,5,18 167:21
  178:14 179:16,23,25 180:9,19,24
  182:21 183:4,25 211:22

**redemptions**
  80:25 81:2,6,11 178:16,17

**reduce**
  126:4 215:25

**reduction'**
  115:16

**reed**
  6:1 59:24 60:11,17 76:10,11,14
  103:21 123:7 147:12 150:6 151:21
  227:10

**Reed's**
  216:16

**reeder53527@gmail.com**
  225:8

**refer**
  6:14 11:13 13:22 47:7 83:9 206:16,18

**reference**
  105:12 188:11

**referenced**
  149:19 213:16

**referring**
  34:21 61:12 139:5,8,16,25 142:21
  143:21 149:8 153:5 190:2

**refers**
  73:17

**reflected**
  40:15

**reflection**
  115:15 199:2

**refresh**
  134:7 137:20 143:16 147:14 148:17
  171:17 215:5 217:15

**refreshes**
  111:21 113:19

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023 Index: registers..revenue**

**registers**
200:23

**regular**
64:18,19

**regularly**
127:18

**rehash**
227:15

**reimbursement**
119:13

**reinvested**
103:23

**relate**
157:15

**related**
50:2,5 157:4,12 201:4

**relevant**
10:25 41:14

**reliable**
20:15

**remain**
213:7

**remaining**
91:24

**remember**
14:22 16:8,23,24 17:1 18:22 36:25
38:20,25 39:4 52:16,18 53:13,17 57:2
63:14,15,17 65:11 69:4,21 70:3,4,18
71:1,4,14,15 73:18 74:22 75:14 76:21
77:7 78:1,15 79:6 95:20 96:5 100:14
101:24 104:23 110:14 132:9,10
133:16,17,19,23 135:4 136:12,14
143:23,24 144:6,7,12 146:3 147:25
154:2 156:21 158:8,19,24 161:25
162:2 171:9 185:23 187:25 191:11
195:3,6 199:21,24 200:2,4 202:14
204:20,22,23,24 205:1,2,3,7 211:5
213:11,19 218:17 223:19

**remind**
149:18

**remote**
215:20

**remove**
201:12

**removes**
200:14 201:1,23

**repeat**
12:23 38:23

**rephrase**
120:17 122:21 162:20 173:16 183:21

**replicate**
28:5

**replying**
143:7

**report**
45:9 127:17 195:22 215:21

**reported**
45:11

**reporter**
7:1 12:11,23 18:9,20 38:23 58:24
66:10 71:22 75:21 82:6,22 83:8
103:12 105:1 111:5 113:9 116:14
121:7 122:17 125:17 136:18,21,25
145:3 151:14 155:25 159:3 161:17
163:3 169:12,15 170:4 172:6 181:11
184:16 186:9,10,16 191:18 196:7,10
207:23 212:18,21 214:4,8

**represent**
27:8 59:2 91:23 135:21 180:22 181:5,
20 182:18

**representing**
6:10 28:24 137:8

**represents**
117:11 122:1

**reputation**
123:13

**Request**
182:3

**REQUESTS**
181:15

**require**
180:8 182:20 183:13

**required**
82:1 179:24 180:18,23 183:25

**requirement**
81:19

**Research**
105:17

**respect**
129:21 144:8 156:9 177:1

**respected**
21:7 25:3

**respond**
60:9 74:13 182:13

**responded**
114:10,13 125:12 142:25 150:2
212:15

**responding**
69:3,6

**responds**
67:16

**response**
114:24 121:11,13 124:24 185:22

**responses**
7:3 59:3 148:16 181:14

**responsibilities**
64:20

**responsibility**
197:16

**responsible**
192:2 193:12 194:11

**rest**
11:11

**result**
117:8

**results**
104:19

**retain**
194:25

**retention**
22:19,22

**retire**
15:21 207:7

**retired**
14:9

**retiring**
207:11

**return**
103:24,25 104:4 138:23 145:19
146:20

**revenue**
22:2,9,21,22 25:17,18,19,22,24 30:2,
6,9,12,16,20 31:8,11,12,15 32:6,13,
16,19,22,24 33:2 42:6 50:16,17 51:1
57:23,25 58:1,2,9,11,15 91:7,10,14,20
101:17 102:5,8,19,23 103:2 108:19,21
112:14,17,18,19,20,21,25 115:17,24
117:4,6,12,13,14,16,21 118:3 122:2,

Stacy L. Randall v.
Reed C. Widen, et al.

**Deposition of Reed C. Widen Video Deposition**
**August 23, 2023Index: revenues..selling**

10 126:1,8,13 130:13 134:16,21
137:6,7,10,11 152:7,9,16 153:6,13,19,
21 158:18 160:21 161:3,15,23 162:6
192:16 215:24

**revenues**
50:13,15 56:20 57:18 90:16 91:3
92:22 93:5 98:11,16 101:15 108:14
109:16,25 110:12 126:23 130:8

**review**
8:24 19:23 49:9,12,19,24 51:14 140:7,
8 151:2,3,7,8

**reviewed**
20:7 50:1 153:18 226:6,9,16,21

**reviewing**
159:11 226:12

**reviews**
18:17 59:17 82:18 111:25 113:23
114:5 116:24 119:4 137:22 156:8
186:17

**revisit**
140:23 141:9,10 159:6

**revocable**
76:23 77:4

**rice**
214:5

**ripe**
98:20

**risk**
115:15

**risky**
138:2 139:4 144:9

**road**
123:22

**role**
12:2 15:15 46:7,18 48:18 65:8 98:12
200:21 202:19,22

**roles**
13:17 16:10 63:20

**roughly**
143:13 187:10

**rules**
6:11

**run**
16:11 63:22 110:16 137:9 142:15

**running**
15:10,13,18 100:14,18 107:2 202:24

**Russ**
55:21 57:7 70:13,18,23 145:6,14
146:4,15,22 147:5,9,15,18,23 148:4
156:6,14,17,23

**Russell**
70:1

---

**S**

---

**S&amp;p**
103:24

**Saas**
105:18,22

**salability**
124:5

**salary**
200:15 201:24 218:1,7,12

**sale**
19:7 85:21 101:21 104:5,10 124:7
129:2 134:20 149:11 152:19 156:7,15,
19,20,24 158:1,3,5 168:17 177:1
192:8 197:9 202:6 207:9,11 225:11,
21,25

**sales**
12:1 62:12 143:4,25

**Salesforce**
136:3 137:16,24 138:13,19,24 139:17
144:10,15,22

**scalability**
27:4

**scalable**
122:3

**scale**
31:19

**scan**
12:8

**scarcer**
213:5

**school**
11:23 13:9,10

**Schwab**
52:14

**score**
110:8

**scrolling**
151:19

**season**
205:3

**section**
115:23

**sectors**
123:14

**secure**
53:3 225:20

**secured**
225:17

**securities**
51:25 52:12,15 85:20

**seeks**
122:1

**SEG**
19:5,11,19 93:15,16 94:18 132:11,21
148:23 157:23,25 158:4,12,16 159:22
160:17,25 162:4,6

**SEG'**
19:6

**SEG_299**
149:22

**SEG_3893**
159:19

**Seid's**
83:19,22

**selected**
46:14,15

**selective**
122:4

**self-explanatory**
68:5 192:17

**self-funded**
24:15

**sell**
41:2 62:14 103:21 115:12,14 120:23
128:17 133:25 134:19 140:12,24
141:4 150:22 154:16,25 155:11 168:8,
9 178:5 192:21 193:21 194:18,21

**seller**
10:22,23

**selling**
12:3 19:13 30:22 31:2 73:23 94:20
95:1,6 97:20 99:1 127:15 128:12,14,
16,18 130:9 132:7,22,23 133:3,6,22
134:12 135:1,23 139:25 140:14,17

141:1,7 148:9 150:7,15,17,25 154:3,7,
11,23 155:1,3,6,7 157:17 165:11
168:15 169:19,20,24 170:11,23 171:6,
12,20,22 194:24 208:17

**send**
49:14,16,23 73:14 192:7 216:18

**sender**
217:25

**sense**
11:1,3 13:24 123:18 217:21

**sentence**
60:7 115:9 145:20 156:22 201:22

**sentences**
115:9 119:7 137:23

**separately**
50:21 217:3

**separation**
13:2

**separations**
12:8

**September**
97:14 162:11,21 164:12,15 166:6
169:18,23 170:14 172:14 175:10
184:22 187:3,18

**series**
145:5 156:2

**server**
225:23

**service**
17:21 27:4 42:22 62:15,18 105:23
106:8,14,17,20 107:10,12,14,16
108:3,12,19 109:8,12,22 115:5
119:12,15 122:5

**services**
118:24 119:3,14

**set**
59:4 84:12 181:15 182:16

**setting**
53:12 58:18 61:2

**setup**
215:21

**seven-year**
80:14

**severance**
119:10,14

**share**
83:3 88:12,15,18 104:19 129:12,15,
19,25 130:14,22 131:7,11 210:20,23

**shared**
130:4 131:3,19 151:24

**shareholder**
39:10 80:20 81:20,25 82:8,12 83:25
85:11,15 86:2,17 89:10 95:1 96:14,15
163:10 178:22 179:24 180:7 182:4,19
183:6,7,10,12,23 184:1 205:24 212:8
222:22

**shareholders**
39:8 81:8 82:17,24 184:9 204:5,12
205:16 210:3 211:9,18

**shares**
72:12,15,20 76:10,20 77:14,24 78:2
87:18,20,22,25 88:4,7 152:8 168:23
173:19 184:10

**she'd**
175:25

**sheet**
18:25 31:22 160:3,4

**shield**
222:6

**shocked**
42:6

**short-lived**
222:14

**shorter**
138:7 139:22 142:21,22

**shots**
45:12

**show**
18:8 88:22

**showed**
9:1 220:15

**Shutterstock**
112:7,12

**siblings**
163:23,24 176:9,11,15 177:3,6

**sic**
67:21 143:4 191:24 192:12

**sic]**
67:23

**signature**
82:13 218:24 220:8

**signed**
132:12,20 183:5,7,10,23 222:20,25

**signs**
215:1

**SIIA**
26:21

**similar**
80:25

**Singapore**
27:17

**single**
220:6

**sir**
172:2 213:25 228:24

**sister**
63:20 66:15 190:13,15

**site**
225:17

**sitting**
165:21

**situation**
69:6,7

**size**
55:24,25 84:8 152:6

**sizzle**
112:15

**skim**
151:7

**skip**
26:5

**slightly**
137:9

**slow**
12:11 58:10

**slower**
117:7

**small**
83:23 145:4 213:11,13 214:10

**smart**
17:10 168:9,13 177:20

**Smartsheet**
151:24 152:1

**smell**
176:7 177:17 185:17 188:23

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of  Reed C. Widen  Video Deposition
August 23, 2023Index: smelled..staying

smelled
176:13

smelling
64:13

Snippets
105:13

software
14:2,4,19,20 15:3,6 16:20 17:6,16,21
42:22 43:1,4,8,16,23 44:3 62:12,14,
15,16,18,20,22 63:1,9,11 65:16,18
105:22 106:8,13,17,20 107:10,12,13,
16,18 108:3,5,12,13,17,19 109:1,8,12,
13,22,24 112:14,18,20,25 115:4,17,24
117:4,7,10,12,21 118:3,21 119:23
120:2,7,8 123:10 126:1,8,13 130:13
137:10

sold
40:9,12,19 41:5 65:18 93:11 95:7,14,
16 96:8 101:17 102:4 103:6 128:24
129:6 134:16 152:15 154:13 155:10
162:13 163:1,5,7,12 164:14 165:14
168:18,25 173:19 176:1,5 178:22
194:6

sole
38:3

solely
119:23 197:16

solicitation
121:21 122:9

solicitations
120:18 125:8

solid
25:17 31:15 213:25

sort
48:15 138:20 154:15 197:9 208:25

sound
164:5 213:20

sounded
134:10

Sounds
211:16

sources
20:14

south
193:4

space
123:11,18 137:25 144:11,16

spacing
76:13

speak
8:15 20:22 69:24 79:19

speaking
7:6 8:13 54:15

speaks
201:16

specific
10:18 13:17 16:8 159:21 204:11

specifically
15:9 17:25 101:25 122:9 175:17,20

speculate
121:2 144:2 215:10

speculating
213:24

speculation
91:16 96:12 109:4 110:2 121:1 131:22
140:3 162:8 213:22 223:13

spend
133:11 209:9,15,20

spending
26:2 105:18

spent
143:17

spoke
70:13 155:5

spoken
9:9

spot
53:3

spreadsheet
83:22 84:17,19 85:16,25 86:3,8,14,21,
24,25 88:12

spreadsheet also
86:4

spring
205:4

Stacy
6:10 59:4 63:22 64:17 66:21,23 68:12,
16,18 69:3,10,18 70:16,20 71:6,11
72:12,15 73:22 74:2,25 75:5 76:12
78:13,24 80:19 88:19 91:24 92:3 96:6
97:11,23 129:12,22,25 130:5,7,14,22
131:4,9,14,17,25 132:5 162:17,21,23
163:7,12 164:10 167:20 168:18,25

169:18,23 170:6,21 171:21 172:16
173:11,17 175:7,24 176:3,20,24
177:6,20 179:15 180:5,17,24 181:15
183:3,22 184:22 185:4 187:7,13
191:20,23 192:7 193:6,12,20 194:1
206:16 211:9 212:7,14 217:8 219:3
220:1,15 221:1,6,13,15,17,20,21
222:18 223:7,17 224:4,13,21 226:16,
21

Stacy's
63:20 66:3 72:19 73:2,20 74:11 80:2,
5,9,13 81:16 92:9 93:8 129:8 132:17
168:2 179:22 180:9 182:21 189:2
205:14,17 211:22 218:23

stage
106:7

stake
95:18 114:1,8 115:10,11,14,18

stamp
218:23 219:4,12 220:1,8,16

stamped
214:15

standard
8:6

stapled
72:2

start
94:12 170:10,22

started
11:23 14:17 17:9 63:10 133:2 150:4
169:24 171:5,19 176:11

starting
43:13 137:5 157:1

starts
7:6

state
197:2,8 226:25 227:4,9

statement
25:6 61:15 150:19

statements
49:8,9,17 143:22

States
27:11

stay
138:2 139:4,12

staying

138:5 139:20 144:8

**steady**
31:8

**step**
13:20 150:4

**Steve**
66:24 75:1 217:9

**Stewart**
177:6,9

**sticker**
83:9

**stipulate**
143:9

**stock**
40:19 66:4 68:25 69:14 70:21 71:7,12
73:2,20,23,24 74:11 75:9,12,16 80:2,
5,9,13 81:23 85:21 86:4 90:9 91:24
92:9 93:8 104:14 129:9 162:19 168:2,
18,23 172:17,24 174:9 175:7,25
176:4,15 178:6,13 179:7,8 182:7
187:13,24 188:8 211:15

**stock.'**
152:4

**stockholder's**
87:5,10

**straight-up**
112:16

**strategic**
51:6 208:11,25

**stream**
122:3

**strength**
194:17

**strike**
203:12

**string**
122:19

**strong**
23:21 25:1,16,19 29:16,17 31:12,18

**stronger**
124:6

**structure**
80:14

**study**
195:8

**stupid**
134:17 135:1 177:23 178:3,5

**subject**
60:7 111:13 113:15 152:2 182:11

**Subscription**
85:22

**success**
48:14

**successful**
18:6

**succession**
140:13,19 141:23 142:8,10 150:16

**sue**
176:3 186:4

**sued**
164:3

**sufficiency**
197:14

**suggest**
56:3,11

**suggested**
55:24 56:7,8 212:3

**suggestions**
57:3,10

**sum**
190:23

**summer**
205:4

**Sun**
197:8

**Sunsetting**
118:23

**supervise**
46:18 64:23

**surprise**
203:17,18

**surprised**
36:1

**SW/PW**
86:5

**switch**
100:2

**sworn**
6:2

**T**

**table**
39:8 201:7

**tailwinds**
29:18

**taking**
43:6 47:5 66:25 75:1 88:7 211:23
217:9

**talk**
10:17 63:19 66:6 69:2 71:17 79:13
95:4 99:2 120:21 133:21 146:22,25
147:4 171:10 212:12

**talked**
28:10 70:24 71:3,4 73:11 77:14 142:7
147:2 148:8 150:10 153:25 155:7
169:8,19 170:9 171:18,21 202:12
217:14 220:21 227:16 228:20,21

**talking**
6:19 11:15 38:10 39:17 46:3 53:11
62:10 63:21 65:17 68:24 71:1 74:20
90:22 100:11 119:20 131:1 135:22
138:12 139:24 153:12,19 154:2
170:10,22 171:6 175:3 187:23 198:2
202:2 206:19 218:18 223:2

**target**
50:7

**targeted**
137:9

**targets**
107:18 123:13

**tax**
104:10 145:19 146:20 200:25 211:3,
13

**taxes**
23:3 77:12 146:17 204:3,5,7 211:2,7,
12,14,17

**Team**
23:21

**telling**
23:14 73:18 109:21 110:22 117:19
163:12 189:7 194:3,7,9 208:18 218:12

**tells**
104:8 114:8 117:6 188:10

**Tempe**
13:9

**templates**
62:24

**ten**
65:12

**Tenure**
23:22

**term**
31:4 138:7 139:22 142:21 195:8
196:21

**termination**
65:9,10

**terms**
208:18

**Terry**
38:21,25 206:20

**testified**
6:2 116:4 179:22

**testimony**
7:23 10:15 44:10,11 61:17 70:12
92:24 93:6 94:23 97:16 98:9 100:16
104:16 132:21 133:5,9 165:5,10 166:9
167:12 168:5 169:4 175:12 179:3,20
183:19 189:14,15 224:19,24

**text**
9:5 66:15,17 72:6 74:14 75:23 170:6,
14 172:9 175:6 184:21 185:4 186:19
189:11 191:20 194:21 214:11 216:2
219:10,11 226:9

**texted**
72:14 172:16 173:5

**thereabouts**
95:24

**thing**
6:13 9:23 48:15 68:6 105:11 120:14
125:6 146:11 150:18 161:12 162:4
218:22

**things**
53:22 54:1 62:6,25 76:8 184:6 189:11
193:4 227:15

**thinking**
97:4 147:8 169:24 171:22 209:1,18

**Thornton**
195:1,6,12,20 196:2,11 198:16 201:10
203:13

**thought**
35:24 62:6 63:5 68:15 69:17 89:14,25
90:5 97:19 98:6,24 99:10 102:7,11,14,
18,21 103:1 106:15 114:17 128:3
133:24 165:11 176:8 177:16 178:3,9
190:24 197:1

**thousand**
126:5

**thousands**
199:5,10

**three-quarter**
152:16

**throat**
32:3

**throttled**
110:15

**thumbs**
191:8

**Tilly**
42:11 46:20 55:17,19 56:8,11 57:3
145:7 155:17,22 157:5,13 195:5
212:5,6 227:23

**time**
12:3 15:19 18:15 25:12 28:21,25 29:6
35:3,6 38:18 39:1,5 42:20 44:25 53:7
54:10 64:6 67:19 72:18 80:4 92:4,10
93:8 95:25 96:7 97:3,20,23 98:1,14
99:12 101:1,16 106:18 113:1 114:4
119:22 120:16 123:15 124:8,25
125:10 129:10 130:21 133:11 135:16,
24 139:7 140:18 143:17 146:12 150:8,
22 151:1 153:14,16 154:7,15 155:1,5,
17 156:13 157:5 162:15,17 165:12,13
167:5 178:13 179:22 184:7 185:17
190:24 208:3,4,23 209:2,3,9,14,20,22
210:8 212:16 219:6,7,9,17,19 220:6,
11 221:8 222:17 226:17

**times**
42:2,5,7 55:17 101:1,17 102:4,8,19,23
103:2 108:19,21 115:24 122:24
126:23 152:15,16 153:6,20,21 161:2

**timing**
67:22

**title**
21:4

**titled**
82:14

**today**
9:24 10:18 14:8 24:20 40:17 89:12
161:21 165:2,21 175:12 180:22 184:9
208:13,14 228:21

**Tokyo**
27:21

**told**
29:8 42:7 70:6,18 71:10,11,13,15
92:8,15 93:23 94:16,18 98:3 99:9
109:7 134:20 135:5 141:4 150:14
151:2 167:17 168:8 170:21 174:15
175:6,13,15 177:23 185:23 188:1
205:7 207:10 218:6 223:21

**tone**
185:18

**tools**
43:9

**top**
19:3 21:12 23:20 26:6 69:8 82:8 83:2
103:18 112:2 121:11,13,15 137:5
147:12 158:10 197:24 214:22

**topic**
140:15,16

**Tos**
227:9

**total**
32:19,22 33:2 34:5,15 35:21 37:14
38:13 44:8 117:4,13,16 119:14 201:5

**totally**
83:14

**totals**
112:14

**town**
191:9

**track**
49:6 50:2,12,20 64:25 98:11

**trade**
108:20

**traded**
151:23

**trademarks**
28:11

**traditional**
107:17 108:4,13,17 109:1,13,23

**training**
13:17

**transaction**
10:24 66:7 104:10 123:21 129:21
130:2,5 131:9,15 151:22 152:10
158:14 162:18 197:19

**transaction's**
189:24

**transactions**
76:14 107:15

**transition**
14:16 16:19 17:5 43:10

**transitioning**
15:5 62:10 63:10 119:23

**treated**
167:20 169:17 180:17,21 183:4

**treating**
123:8

**trigger**
156:7,18,20,24

**trouble**
176:7,14 177:17 185:18 188:23

**true**
24:23 25:6 60:22,24 61:5 147:22
164:22,23 176:19 203:9 223:6

**trust**
76:11,12,20,21,23,24 77:1,3,6,9,10,
11,15,19,21,22,24 78:2,4,24 218:2,18,
20

**trusted**
21:7 25:4 28:5 29:17 149:1

**truthful**
7:23

**Tuesday**
146:11 151:20

**turn**
11:13 47:5 178:4,8

**turned**
142:1 164:3 176:6,9,13 177:16 185:7,
9 190:19

**two-page**
66:12 103:14

**Tyler**
16:15,17 177:10

**type**
42:22 138:4 139:14 144:4

**types**
62:25 125:8

**typical**
138:3 139:13 146:18

---

**U**

---

**Uh-huh**
16:21 18:2 21:19,25 22:20 30:7 32:23
33:20 48:20 66:1 75:4 81:3 85:1 105:8
114:19 115:2 116:9 125:22 190:1,7
210:16 213:15 217:12

**ultimately**
40:9 45:12 124:7 149:21 213:1

**uncertain**
68:6 212:25

**understand**
6:9,18 7:4,10,16 8:7,9 9:12,18 10:16
12:1 22:1 57:14 62:17 75:11,15 80:18
86:8 104:3 105:22 106:12 112:9
114:14 139:7,15 152:13 153:3 155:13
173:6,7,17 174:16 177:5 179:21
182:22 189:9 200:20 201:10 202:21

**understanding**
9:6 55:3 180:3 195:13 198:14 216:14
220:5 227:5

**understood**
7:3,12,13,15 69:10 74:18 114:24
131:5,17 169:9 172:19 180:25 219:25

**undertaken**
148:22

**ungrateful**
164:10 191:3

**United**
27:11

**unrevocable**
77:5

**unsolicited**
153:24

**unsure**
112:15

**update**
51:5,20 111:13,16 113:16 116:17
125:20 137:1

**updated**
149:11

**updates**
116:5,8 149:14 161:13

**users**
21:18,21

---

**utilities**
192:2 194:2

---

**V**

---

**vague**
16:5 45:16 56:6 88:25 99:11 106:25
180:10 208:2,22 210:7

**valuable**
28:6 179:7

**valuation**
76:12 103:21 105:12 109:12,21
110:16 112:4,17,21 113:2 123:20
159:6 205:24

**valuations**
108:11

**valued**
115:17 161:16,19 165:20 228:1

**values**
100:17 161:24

**vault**
13:9

**velocity**
115:15

**ventures**
115:19

**verbal**
7:3 48:21 57:6

**verifying**
195:17

**versus**
43:2 50:4 79:10 190:24

**vert**
143:4

**vested**
127:19,20 128:1,6,8

**Vice**
15:17

**view**
31:1 180:5,16

**viewed**
30:24

**Vile**
38:21,25 206:20

**visibility**

---

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of  Reed C. Widen  Video Deposition**
**August 23, 2023** Index: visit..Wolff

25:19 31:12

**visit**
133:14

**voice**
185:18

**volume**
213:3 215:25

**voluntarily**
179:16

**vote**
46:15 221:15

**voting**
87:22

---

**W**

**wages**
60:16,18 76:15 79:1,17,21 211:25

**wait**
7:5

**waiving**
60:8 182:12

**walking**
143:1,20,24

**walls**
11:24

**wanted**
50:5,8 68:21 69:10,14 70:20 71:10,11
75:8,12,16 79:13 98:22 120:23 140:13
175:21 184:10 190:14 204:15 206:23
207:2,4 220:3,11,16

**warranted**
37:4

**watching**
191:2

**Waters**
6:15 11:21 13:5,18,22 16:12 44:17,22
51:24 52:2,4 53:13 66:4 70:21 71:7
72:12,15,19 73:19 77:25 78:3,14
79:15 80:1,7,10,20 82:12,17,25 83:25
86:13,15,18,21 87:1,9,22 89:9,11,14,
21 90:7,8,11 91:11,25 92:3,10,16
95:18 96:1,4,7 97:12,13 100:13 129:9
130:9 131:2 162:19 165:22 166:7,15
167:2,18 173:19 175:8 176:16 178:6
179:23 180:7 182:5,7,20 184:9 187:7
189:25 204:12 205:12 206:13,15

210:4,17,21 221:2,7,23 222:1,9,19
223:18,21 224:5,12,14,22 225:5
227:20 228:5,13

**Waters/widen**
95:19

**ways**
69:17

**Webdam**
112:8,12,13

**week**
124:8 143:2,21 146:10 191:9 207:25
215:22

**weekend**
124:10

**weekly**
207:19

**weeks**
80:10 156:6,18,23

**weight**
53:25 54:2

**weighted**
85:2,6,8,13

**widely**
25:3

**Widen**
6:1,7,16 7:22 11:22 13:5,18,23 15:5
16:12 17:15,20 19:4,12,13 20:16 21:5
23:9 24:18 25:10 27:10 28:11,14,18
29:9,21 30:1,21 33:23 35:22 36:5,20
39:10,13 40:9,16,23 41:3,18 44:19,22
45:18,20 46:2,8,19,24 52:5 53:10,12
58:25 60:11,17 88:23 89:3 90:1,6,9,
12,16 91:4,10,12,14,19 92:18,21 93:5,
6,11 94:17 95:2 96:8,10 98:12 99:3,7
100:9,13 102:7,11,15,18,22 103:1
104:6 105:25 106:5,13,19 107:2,24
108:25 109:8,22 110:12,23 111:7,23
113:2,21 114:25 115:14,23 116:16
117:1,20 118:18 119:17,21,22 120:1,
16,19,24 121:14,22 122:11 126:14,25
128:25 131:2 132:8,23 133:2 134:24
135:18 138:13 139:17 144:9 145:18
146:5 148:10 149:12 150:6,7,15,25
153:8,14 154:11,16 156:15 157:18,22
158:1,13,17 159:7,25 160:18 161:1,
14,22 162:13 167:3,18 175:3 181:12
190:3 192:19 194:25 195:18,21
197:10 206:9 207:10,16 208:1,8
212:23 213:2,7,17 214:17 215:6
216:22 222:3,4,5,8,12,17 224:17

225:7,13 226:3 227:14,20 228:4,10,12

**Widen's**
27:2

**Widens**
39:20

**wife**
8:19 163:1,5,15

**wife's**
163:23 176:11,15,25 177:2,7,14

**Wildcat**
196:12,21 197:1 198:13,16

**wind**
101:19

**Windy**
6:15 11:21 13:5,18,22 16:12 21:2
44:17,22 51:24 52:2,4 53:13 66:4
70:21 71:7 72:12,15,19 73:19 77:25
78:3,14 79:15 80:1,7,10,20 82:12,17,
25 83:25 86:13,15,18,21 87:1,9,22
89:9,11,14,21 90:7,8,11 91:11,25
92:3,10,16 95:18,19 96:1,4,7 97:12,13
100:13 128:24 129:9 130:9 131:2
162:19 165:22 166:7,15 167:2,18
173:19 175:8 176:16 178:6 179:23
180:7 182:5,7,20 184:9 187:7 189:25
204:12 205:12 206:13,15 210:4,17,21
221:2,7,23 222:1,9,19 223:18,21
224:5,12,14,22 225:5 227:20 228:5,13

**WINDY_1101**
214:15

**WINNER**
26:22

**Winning**
26:6

**winter**
133:18

**wired**
189:24

**Wisconsin**
209:19

**withhold**
175:13,22

**Wolff**
55:21 57:7 70:1,13,23 145:6,14 146:4,
15,22 147:9,18,23 148:4 156:6,14,17,
23

**wondering**
  63:8

**word**
  67:7 72:22 85:8 89:19 92:25 128:22
  130:11,17 158:12

**words**
  47:16

**work**
  11:24 157:4,12,15 197:15 207:25
  208:8,9,10 209:5 210:15

**worked**
  13:9 68:20 179:10 193:4

**working**
  208:5 215:20

**works**
  112:19 146:12 147:13 215:24

**world**
  28:7

**world's**
  21:8

**worried**
  163:11

**worse**
  67:22

**worst**
  217:25 218:15

**worth**
  41:22,25 77:11 89:14,22 90:1,12
  94:21,24 97:22 98:1,7,23 99:4,7,10,
  15,20 101:11,14 102:8,11,15,18,22
  103:1 115:24 158:13 161:2 164:15,17
  165:2,16,22,25 166:3,15,18 167:19,23
  168:1,2

**write**
  174:19

**writing**
  8:20 14:1 214:10

**written**
  143:5 214:10

**wrong**
  9:10 101:9

**wrote**
  122:22,24 146:9 156:5 174:20 190:5

———————— Y ————————

**yawn**
  198:24,25

**YE**
  137:7

**year**
  13:15 26:3 54:7,11,12 55:5,7,8 56:8,
  10 57:11 72:13,16 107:15,25 112:18
  118:3 119:11 132:10,11,12,24 137:8
  146:20 170:11,18 171:7 187:19 209:9,
  11,17 224:16

**year's**
  117:12,16 143:21,22

**year-end**
  76:12 137:6

**year-to-date**
  21:20

**years**
  17:10 25:11 26:1 44:5 54:16,20 60:10
  65:12 85:12 112:8 114:10 123:22
  179:5 190:24 209:15

**years'**
  150:8

**yellow**
  12:9

**yesterday**
  76:10 151:23

**yrs**
  143:2

**YTD**
  21:17