# In the Matter Of:

*Stacy L. Randall v. Reed C. Widen, et al.*

---

*Video Deposition of Michael J. Kiesler*

*September 19, 2023*

---



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

_____

STACY L. RANDALL,

        Plaintiff,

   -vs-            Case No. 3:22-cv-00400-jdp

REED C. WIDEN, MICHAEL KIESLER,

WIDEN ENTERPRISES, LLC, and

WINDY WATERS, INC.,

        Defendants.

_____

      Video Deposition of MICHAEL J. KIESLER,

taken at the instance of the Plaintiff, under and

pursuant to Rules 26 and 30 of the Federal Rules of Civil

Procedure, before Sheila K. Finnegan-Martinez, RPR, a

Notary Public in and for the State of Wisconsin, at

O'Neil, Cannon, Hollman, DeJong & Laing S.C.,

111 East Wisconsin Avenue, Suite 1400, Milwaukee,

Wisconsin, on September 19, 2023, commencing at

9:02 a.m. and concluding at 6:22 p.m.

---

**Page 2**

1            A P P E A R A N C E S

2

3

   REINHART BOERNER VAN DEUREN S.C., by

4   Ms. Jessica Hutson Polakowski and
   Mr. David G. Palay,

5   22 East Mifflin Street, Suite 700,
   Madison, Wisconsin 53703,

6      appeared on behalf of the Plaintiff.

7

8   HOLLAND & KNIGHT LLP, by
   Mr. Mark H. Churchill,

9   1650 Tysons Boulevard, Suite 1700,
   Tysons, Virginia 22102,

10     appeared on behalf of the Defendants.

11

12  O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
   Mr. Dean P. Laing and

13  Ms. Christa D. Wittenberg,
   111 East Wisconsin Avenue, Suite 1400,

14  Milwaukee, Wisconsin 53202,
      appeared on behalf of the Defendants.

15

16  Also present:  Jon Hansen, Videographer

17

18

19            I N D E X

20

Examination:                   Page

21

   By Ms. Polakowski.................................  8

22

23

24

25            (Continuing)

---

**Page 3**

1          I N D E X (Continued)

2

Exhibit Identified:               Page

3

4  Exhibit 1    Letter dated September 12, 2023, to
             David Palay from Holland & Knight....  13

5

6  Exhibit 2    Tax returns of Widen Enterprises and
             Windy Waters with cover page.........  46

7  Exhibit 3    Tax returns for Windy Waters.........  47

8  Exhibit 4    Stock Transfer Agreement dated
             January 1, 2008...................  66

9

   Exhibit 5    Spreadsheet with cover page..........  71

10

11  Exhibit 6    Project Wildcat, Financial due
             diligence, June 2021.................  80

12  Exhibit 7    String of emails ending with a
             5/22/2020 email to Michael Kiesler

13             from Matthew Gonnering..............  90

14  Exhibit 8    Defendants' Objections and Responses
             to Plaintiff Stacy L. Randall's

15             First Set of Interrogatories......... 101

16  Exhibit 9    Windy Waters, Inc. Corporate Record
             Book #2............................. 105

17

18  Exhibit 10   Unanimous Consent of the Board of
             Directors and Shareholders of Windy

19             Waters, Inc., dated June 1, 2015..... 106

20  Exhibit 11   12/26/2019 email to Stacy Widen
             Randall from Michael Kiesler......... 108

21  Exhibit 12   12/26/2019 email to Michael Kiesler
             from Stacy Widen Randall............. 108

22

23  Exhibit 13   Unanimous Consent Resolution of the
             Board of Directors of Windy Waters,

24             Inc., dated January 1, 2007......... 109

25            (Continuing)

---

**Page 4**

1          I N D E X (Continued)

2

Exhibit Identified:               Page

3

4  Exhibit 14   Unanimous Consent Resolution of the
             Board of Directors of Windy Waters

5             dated March 22, 2010................ 112

6  Exhibit 15   Two emails dated 12/26/2019 between
             Stacy Randall Widen and Michael

7             Kiesler............................. 123

8  Exhibit 16   Minutes of the 2018 Annual Meeting
             of the Shareholders of Windy Waters,

9             Inc................................. 125

10  Exhibit 17   Minutes of the 2019 Annual Meeting
             of the Shareholders of Windy Waters,

11             Inc................................. 127

12  Exhibit 18   2017 Consent Resolutions of the Sole
             Director of Windy Waters, Inc........ 128

13  Exhibit 19   2017 Consent Resolution of the Sole
             Shareholder of Windy Waters, Inc..... 130

14

15  Exhibit 20   2016 Consent Resolutions of the Sole
             Director of Windy Waters, Inc........ 132

16  Exhibit 21   2016 Consent Resolutions of the Sole
             Shareholder of Windy Waters, Inc..... 133

17

18  Exhibit 22   Minutes of the Annual Meeting and
             Shareholders of Windy Waters, Inc.,

19             dated 12/7/2015..................... 134

20  Exhibit 23   Minutes of the Annual Meeting of the
             Shareholders of Windy Waters, Inc.,

21             dated 12/8/2014..................... 135

22  Exhibit 24   Minutes of the Annual Meeting of the
             Shareholders of Windy Waters, Inc.,

23             dated 12/7/2013..................... 138

24  Exhibit 25   Letter dated 7/22/2004 to Reed Widen
             with valuation report............... 142

25            (Continuing)

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

**Page 5**

I N D E X (Continued)

Exhibit Identified:                                    Page

Exhibit 26   EVP Flex December 2020.............. 146

Exhibit 27   12/1/2014 email to Matthew Gonnering
             from Gary Norris..................... 150

Exhibit 28   2/23/2018 email to Reed Widen from
             Matthew Gonnering.................... 156

Exhibit 29   8/10/2018 email to Reed Widen from
             Matthew Gonnering with subject line:
             Operational Update, August 10........ 161

Exhibit 30   5/8/2020 email to Reed Widen from
             Matthew Gonnering with subject line:
             Operational Update, May 8............ 164

Exhibit 31   Messages dated 4/12/2019............. 169

Exhibit 32   Messages dated 10/16/2019............ 180

Exhibit 33   Messages dated 10/22/2019............ 183

Exhibit 34   11/22/2019 email to Matthew
             Gonnering from Reed Widen with
             subject line: Re: Operational
             Update, 11/22...................... 185

Exhibit 35   4/21/2016 email to Scott Seid from
             Michael Kiesler...................... 189

Exhibit 36   String of emails ending with a
             4/26/2016 email to Scott Seid from
             Michael Kiesler...................... 192

Exhibit 37   Second amendment to
             Shareholder Agreement................ 199

Exhibit 38   Shareholder Agreement of
             Widen Colourgraphics, Ltd............ 201

Exhibit 39   12/20/2018 email to Reed Widen and
             Michael Kiesler from Loren Paulson... 205
                                       (Continuing)

**Page 6**

I N D E X (Continued)

Exhibit Identified:                                    Page

Exhibit 40   Messages dated 5/6/2020.............. 212

Exhibit 41   5/12/2020 email to Scott Seid from
             Michael Kiesler...................... 215

Exhibit 42   1/3/2019 Promissory Note............. 222

Exhibit 43   String of emails ending with a
             5/13/2020 email to Scott Seid from
             Michael Kiesler...................... 234

Exhibit 44   Defendants' Objections and Responses
             to Plaintiff Stacy L. Randall's
             First Set of Requests for Admission.. 238

Exhibit 45   Messages dated 5/14/2020............. 246

Exhibit 46   Defendants' Objections and Responses
             to Plaintiff Stacy L. Randall's
             First Set of Interrogatories......... 248

Exhibit 47   Widen marketing document,
             Confidential Information Memorandum.. 251

Exhibit 48   Message dated 5/14/2020.............. 253

Exhibit 49   Stock Redemption Agreement........... 254

Exhibit 50   Messages dated 9/10/2021............. 271

Exhibit 51   Messages dated 9/11/2021............. 273

Exhibit 52   Messages dated 9/12/2021............. 275

Exhibit 53   Complaint............................ 278

Exhibit 54   Defendants' First Amended Answer
             to Complaint......................... 278

(The exhibits were attached to the original transcript,
          and copies were provided to counsel)

(The original transcript was filed with
    Attorney Jessica Hutson Polakowski)

**Page 7**

TRANSCRIPT OF PROCEEDINGS

          THE VIDEOGRAPHER:  Good morning.
We are now on the record.  Today's date is
September 19, 2023.  The time is 9:02.
          This video-recorded deposition of
Michael Kiesler, In the Matter of Stacy L.
Randall versus Reed Widen, et al., Case No.
22-cv-00400jdp.  This deposition is being
held at the Law Offices of O'Neil Cannon,
Milwaukee, Wisconsin.
          My name is Jon Hansen, CLVS, from
For the Record, Madison, Wisconsin.  At this
time, if counsel could state their
appearances for the record, after which our
reporter will swear in the witness and we can
proceed.
          MS. POLAKOWSKI:  Good morning.
Jess Polakowski and David Palay,
Reinhart Boerner Van Deuren, appearing on
behalf of Stacy Randall.
          MR. CHURCHILL:  Mark Churchill on
behalf of Mike Kiesler, with
Holland & Knight, and with me is Dean Laing
and Christa Wittenberg of O'Neil Cannon.

**Page 8**

          MICHAEL J. KIESLER, called as a
witness herein, having been first duly sworn
on oath, was examined and testified as
follows:

                    EXAMINATION
BY MS. POLAKOWSKI:
Q   Good morning, Mr. Kiesler.
A   Good morning, Jess.
Q   Nice to talk to you again.
         As you know, I'm representing Stacy Randall.
    Along with David, I'll be asking you some
    questions today.  I'll go through a couple of the
    ground rules, just to make things easier.  I'm
    sure you've heard this all before, but we'll
    just -- for the record.
         So I'm going to ask you questions, and if you
    don't understand something that I say, I want you
    to ask me to clarify.  I don't want you to answer
    anything that you don't understand.  Is that fair?
A   It is.
Q   And if I do ask you a question and you answer, I
    will assume that you understood.  Is that also
    fair?
A   Yes.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

1  Q  Because everything is transcribed here today, it's
2     very important that we don't talk over each other.
3     I'll ask a question, and I'll ask you to allow me
4     to finish the question before you begin to answer.
5     Is that also fair?
6  A  It is.
7  Q  Is there any reason that you can't answer the
8     questions here today truthfully and honestly?
9  A  No.
10 Q  If you need to take a break at any point in time,
11    I want you to just let me know.  That's totally
12    fine.  I'm sure that your attorney will also call
13    for breaks as needed.  The one exception to that
14    is if there is a question pending, I will ask you
15    to answer the question before you take a break.
16    Is that agreeable?
17 A  It is.
18 Q  Mr. Kiesler, have you ever been deposed before?
19 A  I have not.
20 Q  What did you do to prepare for this deposition
21    today?
22 A  Met with my counsel twice.
23 Q  And when you say "your counsel," who are you
24    referring to?
25 A  Zoom meeting with Mark Churchill and Christa.

1  Q  And you said that was on two occasions?
2  A  Yeah.  Well, the Zoom meeting was on the 8th,
3     which was a Friday.  And then met in person on the
4     13th, which was last Wednesday.
5  Q  And approximately how long were those two meetings
6     for?
7  A  The Zoom meeting was probably four hours, four and
8     a half.  And the in-person meeting was maybe five
9     or six.
10 Q  Did you review any documents in the course of
11    those meetings?
12 A  I did.
13 Q  Do you recall what you reviewed?
14 A  Not specifically.
15 Q  If you know, did you review anything that
16    wasn't -- that hasn't already been produced in
17    this litigation?
18 A  No.
19 Q  Have you spoken with anyone other than your
20    attorneys about this deposition?
21 A  Just my wife.  And the only other people that
22    would have been aware, obviously, counsel, and
23    Reed Widen and Matthew Gonnering.
24 Q  What did you and -- let's start with Reed.  What
25    did you and Reed talk about with regard to this

1     deposition?
2  A  We didn't talk about -- I'm just referring to an
3     email that Christa sent that said when the
4     deposition dates were.  That's all.
5  Q  Other than that email, you haven't spoken with
6     anyone?
7  A  Not specifically regarding the deposition, no.
8  Q  And you mentioned Mr. Gonnering?
9  A  Same.
10 Q  And what about your wife?  What did you say to her
11    about this deposition?
12 A  That I was going to be in Milwaukee.
13 Q  Have you communicated with anyone in writing about
14    this deposition?
15 A  No.  Well, no.
16 Q  Other than your attorneys?
17 A  Right.  No.
18 Q  What is your understanding of the dispute between
19    Stacy Randall and the defendants?
20 A  My understanding is that we sold Stacy shares of
21    stock, that she requested, and now she is stating
22    that she was treated unfairly.
23 Q  We're going to talk a lot about value today, and I
24    just want to set a definition of that before we
25    get into that.

1     If we're talking about value, let me start by
2     asking you, what does that mean to you?
3  A  It means a lot of things.  Value could be defined
4     in many different ways.
5  Q  How do you define it?
6             MR. CHURCHILL:  Object to the
7        extent it calls for a -- object to the extent
8        it calls for a legal conclusion.  But you can
9        answer.
10 A  The price that somebody might pay for something
11    and the -- I guess, on the other side, the price
12    somebody would sell something for, without, you
13    know, any outside interference-type thing.
14 Q  Excellent definition.  I would -- I would almost
15    say the exact same thing.
16    So when I'm defining "value," I will -- I
17    will intend for it to mean the 100 percent value
18    of what something would sell for between a willing
19    buyer and a willing seller, neither acting under
20    some compulsion to buy or sell.
21 A  Sure.
22 Q  Is that fair?
23             MR. CHURCHILL:  Object to the
24        extent it calls for a legal conclusion.
25 A  That's what we can call it today.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 13

1  Q  Mr. Kiesler, are you aware that your attorney has
2     recently produced documents to us, on
3     September 12th?
4  A  Yes.
5  Q  And that was two days before your deposition was
6     scheduled to occur; correct?
7  A  Yes.
8            (Exhibit No. 1 was marked for
9             identification)
10           THE STENOGRAPHER:  Exhibit 1.
11           MS. POLAKOWSKI:  Thank you.
12  Q  Mr. Kiesler, I'm handing you what has been marked
13     as Exhibit 1.  Have you ever seen it before?
14  A  Yes.
15  Q  And the letter says --
16  A  Wait, wait.  When was this dated?  September 23.
17        No, I'm sorry.  I don't believe I've seen --
18     I thought this was the initial document hold.
19  Q  Oh, no?
20  A  It's not.  Okay.  No, I haven't seen this.
21  Q  It's -- you see that it is a letter dated
22     September 12, 2023, directed to David Palay from
23     Holland & Knight, who's representing you in this
24     matter?
25  A  Yes.

Page 14

1  Q  And in this letter, it says, "Mr. Kiesler
2     identified," and I'm looking at the third
3     sentence.  "Mr. Kiesler identified for the first
4     time a backup drive he had created to preserve
5     Windy Waters documents from his laptop, which was
6     then turned into Widen Enterprises and wiped."
7        Did I read that correctly?
8  A  That's what it says here, yeah.
9  Q  Tell me about this backup drive.
10  A  Sure.
11  Q  First of all, why did you create it?
12  A  The backup drive was created because I knew that I
13     was, well, treasurer of Windy Waters even
14     subsequent to the sale, and there files on my
15     laptop that needed to be backed up for those
16     purposes.
17  Q  When did you create that backup drive?
18  A  On the 23rd.  The day before closing.  The 23rd of
19     September 2021.
20  Q  You say the day before closing.  That's the day
21     before closing on the sale of Widen --
22  A  Widen Enterprises; correct.
23           THE STENOGRAPHER:  If you could,
24        just wait for her to finish her question.
25           THE WITNESS:  Oh, I'm sorry.

Page 15

1  Q  What was the nature of that backup drive?  Was it
2     like an external hard drive?
3  A  The -- yeah, it was an external hard drive.
4  Q  Which -- how did you go about creating this
5     backup?  Were there a certain subset of documents
6     on your computer that you preserved, or what?
7     Just tell me about what you -- how you created it.
8  A  Sure.  The backup was created from my laptop, and
9     I backed up whatever was on my desktop, plus
10     documents, didn't back up any system files or
11     anything like that.  So I was trying to back up my
12     entire -- all the files.
13  Q  And were these files isolated on the computer in
14     some sort of file?
15  A  File structure.
16  Q  Okay.
17  A  Yeah.
18  Q  Titled "Windy Waters," something along those
19     lines, or . . .
20  A  That was -- on my laptop was a collection of files
21     from a very long time.  I worked at Widen for
22     31 years.  So there were times when I got a new
23     laptop, many years ago, but it was basically a
24     backup of all the files that were on my machine.
25  Q  All the files on your machine?

Page 16

1  A  Yep.
2  Q  I see.
3  A  Other than system files, like Microsoft Excel --
4  Q  I see.
5  A  -- or Windows.
6  Q  And in the letter, it says it was -- the laptop
7     itself was turned in to Widen Enterprises and then
8     wiped.  Was that part of the transaction?
9  A  It was -- when -- what does that mean, part of the
10     transaction?
11  Q  Was that something that you did as part of the
12     closing of the sale of Widen Enterprises?
13  A  I don't know if it was a part of the close of the
14     sale of Widen Enterprises, what they -- "they"
15     meaning Matthew, Acquia -- so that I could keep my
16     laptop.
17  Q  Oh.
18  A  So they wiped it before they gave it back to me.
19  Q  I see.  So you wiped it not to turn it in to the
20     company but because you were keeping it for your
21     personal use; is that right?
22  A  I wiped it because I needed the files for -- as
23     treasurer of Windy Waters going forward; so I
24     wanted to maintain those files in that behalf.
25  Q  Why didn't you just keep your laptop, though?

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Michael J. Kiesler

Page 17

1   A   They wanted to wipe all the program files off of
2       it.
3   Q   Okay.  Got it.  When you -- when you backed
4       everything up onto the external hard drive, did
5       you do any sort of review or did you just back
6       everything up?
7   A   Just backed everything up.
8   Q   And when did you, in the course of this
9       litigation, discover this backup?
10  A   I did a -- it was when Christa gave me -- or,
11      presented the interrogatory that indicated have
12      you supplied everything.  And I did a complete
13      mind -- you know, memory of what I had and what I
14      was -- as I recalled it at that point, "Oh,
15      there's a backup.  There's files on that.  I
16      better mention that."
17  Q   And, as best as you can recall, approximately when
18      was that?
19  A   When was what?
20  Q   That you -- Christa presented you with the
21      interrogatory and you did the internal inventory
22      and thought of this backup.
23  A   Oh, sure.  It was like same day, next day.
24  Q   And when was that?
25  A   I don't recall the date.

Page 18

1   Q   Okay.  Was it in September?
2              MR. CHURCHILL:  Objection.  Calls
3          for speculation.
4   A   It was right after the interrogatory.
5   Q   Okay.  And with regard to the contents of that
6       backup drive, is that -- tell me historically what
7       the time frame was.  You -- I think you said it
8       was everything for Windy Waters, but --
9   A   It was everything that was on my laptop.
10  Q   Okay.  Let's switch gears a bit.  I'm going to
11      talk a little bit now about your educational
12      background.  Where did you go to school?
13  A   College?
14  Q   Yeah.
15  A   University of Wisconsin-Madison.
16  Q   And what is your degree in?
17  A   Bachelor of business administration, with a degree
18      in accounting.
19  Q   What year did you graduate?
20  A   1987.
21  Q   And when you graduated, what was your intended --
22      what did you want to do with your life?
23  A   Professionally?
24  Q   Yes, thank you.
25  A   Become an accountant.  At that point, CPA.

Page 19

1   Q   Are you, in fact, a CPA?
2   A   Yes, currently.
3   Q   When did you take the CPA exam, if you recall?
4   A   Over a period of time.  I believe I took -- I took
5       parts, and there were -- had four parts at that
6       point.  Didn't pass all four parts the first time.
7       Passed two parts, then passed one part and passed
8       the last part.  So it was over a period of time.
9       I think the last time I took it was when I was at
10      Widen.
11  Q   Forgive my ignorance, but is -- in order to
12      maintain your CPA designation, do you have to take
13      continuing education?
14  A   Not until more recently, meaning within the last
15      probably five, ten years.  Initially, no.  But,
16      yes, now there is a requirement for that.
17  Q   And have you always maintained those --
18  A   My required -- I've maintained it.  I'm sorry.
19             MR. CHURCHILL:  Try to let her
20          finish her question before you answer.
21             THE WITNESS:  Yeah, sorry.
22  Q   And in your training as a CPA, are you required to
23      be conversant in, for instance, financial
24      statements?
25             MR. CHURCHILL:  Objection.

Page 20

1              Ambiguous.  You can answer.
2   A   That's just a general thing.
3   Q   So, yes?  You know how to read a financial
4       statement?
5   A   Yeah.
6   Q   And you know how to read a balance sheet?
7   A   Yes.
8   Q   Income statements you're familiar with?
9   A   Yep.  Yes.
10  Q   Cash flow statements?
11  A   We did not have a cash flow statement for a very
12      long time at Widen.
13  Q   Okay.
14  A   So not as much with the cash flow statement.
15  Q   And you're certainly familiar with valuations?
16  A   Not really.
17  Q   No?  What about EBITDA?  That's a term that
18      means --
19  A   Sure.
20  Q   -- something to you?
21  A   Mm-hmm.
22  Q   Generally you're familiar with -- well, let me --
23      let me back up.  You were the CFO of
24      Widen Enterprises; correct?
25  A   I started as controller.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 21

1  Q  And, as a CFO, you're familiar with -- with
2     concepts of corporate governance?
3  A  Can you specify what that means?
4  Q  Sure.  Operating agreements, the operating
5     agreement, for instance, for the companies.
6  A  Not specifically.
7  Q  Okay.  You were engaged in strategic planning for
8     the company?
9              MR. CHURCHILL:  Objection.
10             Ambiguous.  Vague.  You can answer.
11 A  No, not really.  I mean, I consulted.
12 Q  Well, tell me about that.  What was your role --
13    when you say you were involved as a consultant in
14    strategic planning to the company, what do you
15    mean by that?
16 A  Again, we're talking over 31 years of time here.
17    So Reed and Matthew were the folks that did the
18    strategic planning.
19 Q  Were you involved in that process, or was it
20    really Reed and Matthew on their own?
21 A  It was more of a market -- marketing company; so
22    it -- it was a lot of marketing strategy, which I
23    had no role at all in.
24 Q  Were you involved in those conversations?
25             MR. CHURCHILL:  Objection.  Vague.

Page 22

1              You can answer.
2  A  Not to -- I mean, I don't even know how to answer
3     that.  I mean, yeah -- no.
4  Q  So any strategic planning that happened at the
5     company was between Reed and Matthew, and you were
6     not involved in those conversations?
7  A  Well --
8              MR. CHURCHILL:  Objection.
9              Ambiguous.  You can answer.
10 A  We, at -- I don't know when it was implemented,
11    but there was an executive committee, which I was
12    on.  Matthew ran that.
13 Q  Who else was on that committee?
14 A  There was the -- positionwise or people, namewise?
15 Q  Well, let's start by just identify for me the
16    individuals.
17 A  Ben Dotte was as -- he was head of development.
18    Jake Athey was head of marketing.  Deanna Ballew,
19    she was in charge of product.  Matthew, CEO.
20    Myself, CFO.  I'm thinking I might be missing
21    someone.  Debby Leisner, she was -- I'm not sure
22    what her title was.  I believe that was it.
23 Q  Was Reed on the executive committee?
24 A  No.
25 Q  No.  When was it formed?

Page 23

1  A  Don't know.
2  Q  Recently, or you mentioned you've been with the
3     company for 31 years?
4  A  Yeah, no.  Matthew implemented it.
5  Q  Okay.  So sometime after Matthew --
6  A  Yes.
7  Q  -- came to work for the companies.
8              When -- when did you begin working for Widen?
9  A  1990.
10 Q  When you first started, what was your role?
11 A  Controller.
12 Q  And as a controller, what -- tell me -- tell me
13    what that means, what you did.
14 A  Basically managed the books, created accurate
15    financial statements.  It was just me and one
16    other person at that time.  So we did accounts
17    payable, accounts receive -- payroll, all the
18    accounting functions.
19 Q  Who did you report to at that time?
20 A  Mark Widen.
21 Q  Were you -- where did -- where did you work before
22    Widen?
23 A  Grant Thornton.
24 Q  And what did you do at Grant Thornton?
25 A  I was an auditor.

Page 24

1  Q  How long were you there?
2  A  Two years.
3  Q  And was that your first job out of college?
4  A  It was.
5  Q  How did you come to work for Widen?  Who hired
6     you?
7  A  Mark Widen.
8  Q  Did you know Mark before you went to work for
9     Widen?
10 A  No.
11 Q  When you started working at Widen, how many people
12    were -- how many employees did it have,
13    approximately?
14             MR. CHURCHILL:  Objection to the
15             extent it calls for speculation.  You can
16             answer.
17 A  75-ish.
18 Q  What was the business of Widen Enterprises when
19    you started working there?
20 A  Pre-media (indiscernible) prepress.
21             THE STENOGRAPHER:  I'm sorry?
22 Q  I'm sorry?
23 A  Prepress operations, pre-media.
24 Q  What does that mean?
25 A  We produced film that printers would take and

**Stacy L. Randall v.**                                    **Video Deposition of Michael J. Kiesler**
**Reed C. Widen, et al.**

Page 25

1    makes plates to produce the print product.
2  Q  How would you describe the business of
3     Widen Enterprises when it sold to Acquia?  What
4     was it -- what was its business?
5  A  It was a software company.
6  Q  What did it do?
7  A  It was -- now we're talking about -- give me a
8     date.
9  Q  Immediately prior to the sale to Acquia.
10 A  So in 2021?
11 Q  Correct.
12 A  Okay.  We had a product called "Widen Collective,"
13    and it was a data -- a data asset -- asset
14    management system, software as a service.  It
15    wasn't prepackaged software, software as a
16    service.
17 Q  So it sounds like there was quite an evolution in
18    the business of Widen Enterprises from the time
19    you went to work for Widen to the time that Widen
20    sold to Acquia.  Would you agree with that?
21 A  We changed our product.
22 Q  How did that change come about?
23 A  Gradually, over time.
24 Q  Was there someone whose idea it was to change the
25    business of Widen?

Page 26

1  A  From what to what?
2  Q  Well, what -- at any point in time.  So you said
3     it was prepress.  It ended -- it -- when you
4     started, it was prepress --
5  A  Yeah.
6  Q  -- and when you ended your tenure --
7  A  Yeah.
8  Q  -- it was software as a service?
9  A  Yep.
10 Q  How did that evolution happen?
11 A  The company, Widen Enterprises, used to use mag
12    tapes to store images.  Technology changed, and
13    so the Macintosh became a thing.  And when that
14    happened, we were able to store images on file
15    servers.
16       And so at that point Reed -- don't know
17    how -- got -- or, knew about Gary Norris.  And so
18    they develop -- started internally developing a
19    way to house images, manage images, internally and
20    to use for our customers.  And then, as time went
21    on, the development of that -- that code became
22    more, I guess, advanced.
23 Q  Okay.
24 A  And through Gary and Reed's direction, it kind of
25    morphed into software as a service.  We -- I guess

Page 27

1     that that's how that happened.
2  Q  You mentioned Gary Norris.  Who is Gary Norris?
3  A  He was the director of -- he oversaw -- he oversaw
4     the -- this -- development people, the coders.
5  Q  Thank you.  What was his background?  Do you know?
6  A  I don't.
7  Q  When did he last work for Widen?
8  A  He worked through the sale.
9  Q  You started at Widen as the controller; is that
10    right?
11 A  Mm-hmm.
12 Q  And what was your next role?
13 A  I think I was promoted to vice president of
14    finance.
15 Q  At that point who did you report to?
16 A  Mark Widen.
17 Q  Do you recall what time frame that was generally?
18 A  I don't.
19 Q  How long were you the VP of finance?
20 A  I don't recall.
21 Q  What was -- did you have a different role after
22    that?
23 A  CFO.
24 Q  When did you become the CFO?
25 A  I don't recall.

Page 28

1  Q  I'm terrible at dates, so I don't -- I don't fault
2     you for that.
3  A  Sorry.
4  Q  As the CFO, what were your duties?
5  A  Same, pretty much.
6  Q  And just tell me what those are.
7  A  Make sure that -- basically, run the accounting
8     department, produce accurate financial statements
9     on a monthly basis.
10 Q  Did you manage a staff of employees?
11 A  I did.
12 Q  How many people reported to you?
13 A  At different times there was different numbers.
14    These are educated guesses, but maybe two to five,
15    three to five.
16 Q  And who did you report to as the CFO?
17 A  Oh --
18            MR. CHURCHILL:  Objection.  Vague
19       as to time.
20 A  When was that?
21 Q  When you first became CFO, who did you report to?
22 A  I don't recall whether or not Matthew became CEO
23    yet.  So it could have been -- could have been
24    Reed because, at some point, I did report to Reed.
25 Q  I interpret what you just told me to mean that, at

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

1   some point when Matthew came to work for the
2   company, you then reported to him; is that right?
3   Did I interpret that correctly?
4   A   I don't believe so.  It would have been after he
5   was promoted to CEO.
6   Q   So at some point you were reporting to Reed; is
7   that right?
8   A   Correct.
9   Q   And at some point that changed, and you began
10   reporting to Matthew?
11   A   Correct.
12   Q   You don't -- do you recall when that was?
13   A   I don't.
14   Q   In 2019, who did you report to?
15   A   2019, Matthew.
16   Q   And would that be true until the company sold?
17   A   Correct.
18   Q   I've seen a number of emails that have been
19   produced in this case called operational updates.
20   A   Mm-hmm.
21   Q   Is that a document you're familiar with, generally
22   speaking?
23   A   I know the document you're talking about.
24   Q   Tell me, generally speaking, what these
25   operational updates were.

1   A   Sure.  They were Matthew's way of communicating to
2   Reed about what was going on in the business.
3   That's about it.
4   Q   And you were copied on these emails?
5   A   I was.
6   Q   Did you have a role in preparing the financial
7   information that went into these emails?
8   A   When you say "prepare" -- or, "a role in
9   preparing," only to the extent that my department
10   was responsible for the numbers that were
11   generated.  Matthew had access to that.
12   Q   I see.  So the numbers that were in those emails,
13   those came from your department, generally
14   speaking?
15               MR. CHURCHILL:  Objection. Assumes
16         facts not in evidence.  Lack of foundation.
17         You can answer, if you know.
18   A   Matthew got that information from our accounting
19   system.
20   Q   And you were responsible, as the CFO, for
21   maintaining the accounting system?
22   A   Correct.
23   Q   In your view, was it important to have accurate
24   numbers in the system?
25   A   Yes.

1   Q   Do you have any training specific to software
2   companies?
3   A   No.
4   Q   We talked a little about your role as the CFO and
5   who you reported to.  What about as the treasurer
6   of Windy Waters?  Who did you report to?
7   A   There was no reporting really involved there.  I
8   mean, Stacy was president.
9   Q   Did you report to Stacy?
10   A   I would communicate with her, at times, about
11   documents.
12   Q   Did Stacy ever give you any direction as the
13   treasurer of Windy Waters?
14   A   She gave me her approval to use her stamp.
15   Q   Other than giving you approval to use her stamp,
16   did she give you -- did she ever tell you to do
17   anything as the treasurer of Windy Waters?
18   A   She would tell me to use her stamp.
19   Q   And other than telling you to use the stamp, was
20   there any direction that Stacy ever gave you with
21   regard to Windy Waters?
22               MR. CHURCHILL:  Objection.
23         Ambiguous.
24   A   I don't recall.
25   Q   Was Stacy involved in the business of

1   Windy Waters?
2               MR. CHURCHILL:  Objection.
3         Ambiguous. Vague.
4   A   I don't know because I just don't know.
5   Q   You were the treasurer of the -- of the company;
6   correct?
7   A   Mm-hmm.
8   Q   Did you deal with Stacy on a day-to-day basis?
9   A   No, not day-to-day.
10   Q   In your view, was Stacy a sophisticated business
11   person?
12   A   She was competent.
13   Q   What was your -- for -- well, and let me ask you
14   this:  Was Stacy involved in the business of
15   Widen Enterprises?
16               MR. CHURCHILL:  Objection. Vague.
17         Ambiguous.
18   A   I don't know.  I don't know.
19   Q   You're the CFO of the company?
20   A   Right.  The reason I say I don't know is because
21   they have -- not all the meetings were in front of
22   me.  I mean, they would have family -- it's a
23   family-run business; so I don't know what they're
24   talking about doing when I'm not around.
25   Q   Sure.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 33

1  A   That's the only thing I'm kind of being a little
2      bit -- answering the way I am.
3  Q   Fair.  So let me just put it this way:  You were
4      at the company every day?
5  A   Yes.
6  Q   For 31 years?
7  A   Yes.
8  Q   Was Stacy there every day?
9  A   No.
10                 MR. CHURCHILL:  Objection.  Calls
11         for speculation.
12  Q   Was Stacy regularly at the company?
13  A   She came in once in a while.
14  Q   Okay.  When there were -- well, let me ask you:
15      Were there board meetings for Windy Waters?
16                 MR. CHURCHILL:  Objection.  Vague.
17  A   Not that I'm aware.
18  Q   You were never present at a board meeting for --
19  A   No.
20  Q   -- Windy Waters?
21  A   No.
22  Q   When Widen sold to Acquia in 2021, you were
23      employed by the company?
24  A   Yes.
25  Q   What was your compensation when you -- when the

Page 34

1      company sold to Acquia, what were you making on an
2      annual basis for Widen?
3  A   I don't know.
4  Q   Do you know what your compensation was in 2020?
5  A   No.
6  Q   You are the CFO?
7  A   Yes.
8  Q   And an accountant?
9  A   Correct.
10  Q   Do you know what your compensation was in 2019?
11  A   I didn't track my compensation.
12  Q   Was any part of your compensation for
13      Widen Enterprises tied to the performance of the
14      company?
15                 MR. CHURCHILL:  Vague as to time
16         frame.  You can answer.
17  A   Tied to the compensation of the company . . .
18  Q   The performance of the company.
19  A   The performance of the company.
20  Q   So, for instance, did you get a bonus if the
21      company did well?
22  A   No.
23  Q   And would that be true for the duration of your
24      employment?  You were not compensated differently
25      if the company did well?

Page 35

1  A   It -- bonuses were not tied necessarily to --
2      directly to performance.
3  Q   What were they tied to?
4                 MR. CHURCHILL:  Objection.  Vague
5         and ambiguous.  You can answer.
6  A   It was up to -- specifically, for me, it was up to
7      my -- my manager; so that -- whether it be Reed,
8      Matthew, Mark.
9  Q   So if I understand you correctly, you did get
10      bonuses while you were working for
11      Widen Enterprises?
12  A   Mm-hmm.
13  Q   Is that a yes?
14  A   Yes.
15  Q   Sorry.  And the bonuses were at the discretion of
16      your manager?
17  A   Correct.
18  Q   Whether that was related to the performance of the
19      company or not, you couldn't say?
20  A   I can't say.
21  Q   Do you know -- I think you mentioned three
22      different individuals.  You said Mark, Matthew,
23      and Reed?
24  A   Mm-hmm.  Yes.
25  Q   Do you know whether one of those three was

Page 36

1      responsible for making the decision as to your
2      compensation or all three of them together?
3  A   When?
4  Q   Well, let's start with -- let me back up.
5         When did Mark pass away?
6  A   I don't recall.
7  Q   And at some point Matthew became the CEO of the
8      company; is that right?
9  A   Correct.
10  Q   So before Mark passed, was he responsible for
11      making decisions about your bonus?
12  A   He was.
13  Q   Okay.  And then after -- when Mark passed away,
14      did Matthew immediately take the CEO position, or
15      who ran the company when Mark passed?
16  A   I believe that was Reed.
17  Q   How long did Reed run the company for?
18  A   Until he appointed Matthew as CEO.
19  Q   And was that around 2008?
20  A   I don't recall.
21  Q   Okay.  When Reed was running the company, was he
22      responsible for making decisions about your bonus?
23  A   Can I ask you what you mean by running the
24      company, just so I'm clear?
25  Q   Sure.  Well, I guess there are two different ways

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 37

```
1      to look at it, one is nominally in charge of the
2      company.  So if he is the CEO or president of the
3      company, the other is actually running the
4      day-to-day operations of the company.
5   A  So we're talking day-to-day operations of the
6      company --
7   Q  I'm talking day-to-day.
8   A  -- as opposed to, like, strategic direction.
9   Q  Correct.
10  A  And so the question was -- can you repeat the
11     question?
12            MS. POLAKOWSKI:  Could you read it
13        back for me.
14            THE STENOGRAPHER:  One moment
15        please.
16            Question:  "When Reed was running the
17        company, was he responsible for making
18        decisions about your bonus?"
19  A  Yes.
20  Q  And you -- you differentiated, in your response,
21     between strategic planning of the company and
22     day-to-day operations.  I interpret that to mean
23     that, at some point, there was a differentiation
24     of those roles for Reed.
25            Did he stop running the day-to-day operations
```

Page 38

```
1      at some point in time?
2            MR. CHURCHILL:  Objection.  Calls
3         for speculation.
4   A  Well, he appointed Matthew as CEO to run the
5      company.
6   Q  And then after that point, when he appointed
7      Matthew as the CEO, was Matthew responsible for
8      the day-to-day operations of the company?
9   A  I don't know what Reed's involvement was because
10     it was directly with Matthew.
11  Q  Okay.  Were you -- after Matthew became the CEO,
12     were you involved with Reed on a day-to-day basis?
13  A  Absolutely not.
14  Q  Was Reed present at the company on a day-to-day
15     basis?
16            MR. CHURCHILL:  Objection.  Calls
17        for speculation.  Lack of foundation.
18  A  I saw him in the buildings.
19  Q  Every day?
20  A  Not every day.
21  Q  Was he -- scratch that.
22            What we've talked about Windy Waters.
23     What is Windy Waters?
24  A  Windy Waters is the parent company of Widen
25     Enterprises, Inc.
```

Page 39

```
1   Q  Your role of Windy Waters was as the treasurer;
2      is that right?
3   A  That's the title I had.
4   Q  What -- what did you do as the treasurer of
5      Windy Waters?
6   A  Well, Windy Waters was consolidated with
7      Widen Enterprises, Inc., from a financial
8      standpoint.  Windy Waters was nothing more than an
9      investment.  It had investments and a nominal bank
10     account.
11  Q  Who managed the investment of Windy Waters?
12  A  Different folks, outsiders, I mean third parties.
13     So Baker Tilly Wealth Management, SEI,
14     Wealthspire, Raymond James, to name a few.
15  Q  So fair to say third-party financial
16     consultants --
17  A  Yep.
18  Q  -- managed the investments --
19  A  Yes.
20  Q  -- of --
21  A  Yes.
22  Q  Were you paid for your role as the treasurer of
23     Windy Waters?
24  A  No.
25  Q  When did you become the treasurer of Windy Waters?
```

Page 40

```
1   A  More -- more than likely, when it was created,
2      1997.
3   Q  And you mentioned the third-party consultants that
4      would manage the investments of Windy Waters.
5            Do you know who decided to hire those
6      consultants or to switch consultants?
7   A  Mark.  And when Mark passed away, it would have
8      been Reed.
9   Q  Fair to say Stacy was not involved in managing
10     those investments?
11            MR. CHURCHILL:  Objection to the
12        extent it calls for speculation.
13            THE WITNESS:  Can I answer it?
14            MR. CHURCHILL:  Mm-hmm.
15            THE WITNESS:  Okay.
16  A  She expected me to.
17  Q  What was Reed's role at Windy Waters?
18  A  Reed's role at Windy Waters.  From an officer
19     standpoint?
20  Q  Well, let's -- let me start with just
21     operationally rather than title.
22            After Mark passed away, was Reed in charge at
23     Windy Waters?
24  A  It's hard for me to -- to say in charge, because
25     in charge was it -- I mean, it was, again, just a
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 41

```
1    holding -- a holding company, a parent company,
2    and it was just to put excess cash into when we
3    had it, if we had it, in Widen Enterprises.
4        So there was really no running of that
5    company.  It was just a means to maintain funds.
6  Q  And --
7  A  So there was no running.
8  Q  Understood.  So Windy Waters' purpose was to hold
9    funds and Widen Enterprises'; is that right?
10 A  Excess cash.
11 Q  And Widen?
12 A  Oh, I'm sorry.  I maybe misunderstood you.  What
13    was the question before that?
14 Q  Sure.  My question was:  Windy Waters' role was to
15    hold excess cash --
16 A  Oh.
17 Q  -- and Widen Enterprises'; is that correct?
18 A  Excess cash from Widen Enterprises, is that what
19    you're saying?
20 Q  And it owned Widen Enterprises; correct?
21 A  Correct.
22 Q  And this might be a tough one, too, but in your
23    capacity as the treasurer of Windy Waters, who did
24    you report to?
25            MR. CHURCHILL:  Objection.  Vague
```

Page 42

```
1        as to time.
2  A  Again, I didn't have a -- report to anybody.
3  Q  Who did you take direction from?
4            MR. CHURCHILL:  Same objection.
5  A  Windy Waters was just a holding company.
6  Q  Okay.  Would it be fair to say that the value of
7    Windy Waters was always at least the value of
8    Widen Enterprises?
9            MR. CHURCHILL:  Objection.  Calls
10            for a legal conclusion.  Calls for expert
11            testimony.
12 A  I don't know what the value would be of
13    Windy Waters at any time.
14 Q  Well, you would agree with me that, since its
15    existence, Windy Waters owned the entirety of
16    Widen Enterprises?
17 A  It was -- yeah, it was sole shareholder.
18 Q  There is no point in time from the creation of
19    Windy Waters to the sale of Widen Enterprises that
20    Windy Waters was not the sole shareholder?
21 A  Correct.
22 Q  Are you -- so, company sold in 2021; correct?
23 A  Correct.
24 Q  What do you do now?
25 A  I am retired.
```

Page 43

```
1  Q  Where do you live?
2  A  In Fort Atkinson, Wisconsin.
3  Q  How did it come to be that you became a
4    shareholder of Windy Waters?
5  A  Mark Widen wanted to give equity interest to some
6    of the key employees.
7  Q  And you were, obviously, one of those key
8    employees that he wanted to give equity to?
9  A  Right.
10 Q  Who else received equity in the company?
11            MR. CHURCHILL:  Objection.  Vague
12            as to time.  You can answer.
13 A  Gary Norris, and I don't recall anyone else, but
14    it seems to me that there were others.
15 Q  Do you recall when you became a shareholder of
16    Windy Waters?
17 A  I -- I don't.
18 Q  What percentage of Windy Waters did you own when
19    you became a shareholder, when you first became a
20    shareholder?
21 A  I don't recall.
22 Q  What about, do you recall what percentage of the
23    company you owned when the -- when
24    Widen Enterprises was sold?
25 A  If I had to guess -- can I guess?
```

Page 44

```
1            MR. CHURCHILL:  No.
2  A  No, I don't recall.
3  Q  Well, we have some -- we have some documents we
4    can take a look at to refresh your memory on that.
5            MR. CHURCHILL:  I'm confident the
6            information's out there.
7  Q  Whose idea -- so you said Mark -- it was Mark's
8    idea to give you equity in the company to start
9    with; correct?
10 A  Correct.
11 Q  And did your ownership in the company ever change?
12    Did you ever receive more ownership?
13 A  It did.
14 Q  Do you know when that was?
15 A  I don't.
16 Q  Whose idea was that, to give you more ownership?
17 A  I don't recall.
18 Q  Would it have been Reed or Mark?
19 A  I don't know.  I don't know.
20 Q  Do you know if Reed ever gave you ownership --
21    additional ownership in the company?
22 A  If -- I don't know.  If it was after Mark passed
23    away, then it would have had to have been Reed.
24 Q  Okay.
25 A  That's why I'm hee-hawing.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 45

```
1   Q   Did you ever talk with anyone about obtaining
2       ownership in the company?
3   A   No.
4   Q   Was there a meeting of Windy Waters where you
5       obtained ownership in the company?
6   A   No.
7   Q   Do you know whether the other shareholders of
8       Windy Waters would have been notified when you
9       received ownership in the company?
10              MR. CHURCHILL:  Object to the
11          extent it calls for speculation.  You can
12          answer.
13  A   I believe so.
14  Q   How do you know that the other shareholders would
15      have been notified?
16  A   Other shareholders.  I believe there's consent
17      resolutions, if I'm not mistaken.
18  Q   Who drafted those consent resolutions?
19  A   Our attorney.
20  Q   And when you say "our attorney," is that Mr. Seid?
21  A   Depends on the timing.  Could have been
22      Lee Kilkelly.
23  Q   I see.  So it was either Lee Kilkelly or
24      Scott Seid?
25  A   If it wasn't Scott Seid, it could have been
```

Page 46

```
1       somebody prior to him.  Because Scott Seid is
2       at -- was at Lee Kilkelly and Stafford Rosenbaum.
3   Q   When in -- in May of 2020, when Stacy's shares
4       were redeemed, did you receive any additional
5       ownership in Windy Waters?
6               MR. CHURCHILL:  Objection.  I think
7           you said May 2021.
8               MS. POLAKOWSKI:  I said 2020.
9               MR. CHURCHILL:  Did you?  Okay.
10              MS. POLAKOWSKI:  Yeah.
11  A   No.
12  Q   Okay.
13          (Exhibit No. 2 was marked for
14          identification)
15              MS. POLAKOWSKI:  This is a heavy
16          one.
17              THE STENOGRAPHER:  Exhibit 2.
18  Q   Mr. Kiesler, you've just been handed what has been
19      marked as Exhibit 2.  Do you recognize this as the
20      2020 tax returns of Widen Enterprises and
21      Windy Waters?
22  A   It appears that way.  Yes, it states that.
23  Q   Turn, please, to -- you see at the bottom of the
24      page there's Windy 00 numbers?
25  A   Yes.
```

Page 47

```
1   Q   Could you turn, please, to Windy 004429.
2   A   Okay.
3   Q   Are you there?
4   A   Yep.
5   Q   Do you see this is the Schedule K-1 of the 2020
6       tax return for Windy Waters?
7   A   Okay.
8   Q   Do you see your name on that page?
9   A   I do.
10  Q   Do you see it says "current year allocation
11      percentage"?
12  A   Yes.
13  Q   And that's listed as 7.666708 percent; is that
14      right?
15  A   That's what it says.
16  Q   Is that your -- is that representative of your
17      ownership of Windy Waters in 2020?
18  A   As it states here, yes.
19          (Exhibit No. 3 was marked for
20          identification)
21              THE STENOGRAPHER:  Exhibit 3.
22  Q   Mr. Kiesler, you've just been handed what has been
23      marked as Exhibit 3.  Do you recognize Exhibit 3
24      as the 2019 tax returns for Windy Waters?
25  A   I do.
```

Page 48

```
1   Q   Turn, please, to page Stafford 227 -- I'm sorry.
2       Give me one second.  2231.  2331, excuse me.
3   A   Oh, trick question.  2278, 2276 --
4   Q   2331.
5   A   2331.  Okay.
6   Q   Do you recognize that page as the Schedule K-1 for
7       2019 for Windy Waters?
8   A   Yes.
9   Q   And do you see your ownership of the company
10      listed on that page?
11  A   Yes.
12  Q   And your ownership of the company as of 2019 was
13      6.077985 percent; correct?
14  A   That's what it states.
15  Q   So between 2019 and 2020, you gained an ownership
16      percentage of about 1 1/2; correct?
17  A   If that's the math.
18  Q   How did that happen?
19  A   Was there a redemption or a -- a redemption within
20      that time period?
21  Q   I'm asking you.  Do you recall how you came to own
22      an additional percentage and a half?
23  A   It would have been because of a redemption.
24  Q   And would that be because of Stacy's redemption?
25  A   That appears to be the time frame.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**
**Video Deposition of  Michael J. Kiesler**

1   Q   Do you know, was Stacy ever notified that you
2       received an additional 1 1/2 percent of the
3       company between 2019 and 2020?
4                MR. CHURCHILL:  Objection.  Calls
5           for speculation.
6   A   I'm (indiscernible).
7                THE STENOGRAPHER:  I'm sorry?
8   A   I'm unaware.
9                THE STENOGRAPHER:  Thank you.
10  Q   Do you know why you received the additional
11      percent and a half of Windy Waters between 2019
12      and 2020?
13  A   The company purchased back the shares; so that
14      automatically changes percentages for everybody.
15  Q   I see.  To the best of your knowledge, was that
16      done automatically, or was there a resolution to
17      grant you an additional percent and a half?
18  A   It's -- it's just math.  I was not granted
19      additional shares of anything.  When you take a
20      smaller amount and divide it up, it's just math.
21  Q   When you first became a shareholder of
22      Windy Waters, what were the assets of the company?
23  A   Don't recall.
24  Q   When you first became a shareholder of
25      Windy Waters, did you have an idea of what your

1       ownership in the company was worth?
2   A   No.
3   Q   Did you ever have an idea of what the value of
4       your stock in Windy Waters was worth?
5   A   Not on the open market.  If I were to retire,
6       though, we would have used the formula.
7   Q   And we'll get there, but not quite yet.
8           When Stacy's shares were redeemed in May of
9       2020, did your shares in Windy Waters become more
10      valuable?
11               MR. CHURCHILL:  Objection to the
12          extent it calls for a legal conclusion.
13          Calls for speculation.  Lack of foundation.
14  A   I'm not even sure what that means, more valuable.
15  Q   More valuable to me means worth more money.  So I
16      will ask you to apply that --
17  A   Sure.
18  Q   -- definition.
19               MR. CHURCHILL:  Same objections.
20  A   If I were to have retired prior to or after her
21      redemption, the amount would have been different
22      based on -- based on -- wait a minute.  Let me
23      think about that.
24          Percentage has nothing to do with it.  It's
25      total shares; so, no.  I'm sorry.  I

1       misunderstood.
2   Q   Let me just ask the question.  I'm not sure if I
3       understood your answer, so I just --
4   A   Sure.
5   Q   -- want to make sure I -- we're clear here.
6           When Stacy's shares were redeemed in May of
7       2020, my question was:  Did your shares become
8       more valuable?
9   A   No.
10  Q   Okay.  How do you know that?
11  A   Based on -- on the formula we were using, I had
12      the same number of shares; so it didn't matter
13      before or after.  It would have been the same
14      amount based on the formula.
15  Q   But that's not -- we just established your
16      percentage of ownership was different in 2020 than
17      it was in 2019; right?
18  A   Yes.
19  Q   So you had a different number of shares in 2020?
20      Same number of shares, different percentage.
21  Q   We've talked a little bit already about
22      Matthew Gonnering.  Do you recall when he first
23      began working at Widen Enterprises?
24  A   No.  All I know, he was a print salesman.
25  Q   I'm sorry.  What was that?

1   A   He was a print salesman.
2   Q   When he first came to work for Widen, he was a
3       print salesman?
4   A   Mm-hmm.
5   Q   What is that?  What did he sell?
6   A   Print.
7   Q   Okay.  How long did he work as a print salesman,
8       if you know?
9   A   Don't know.
10  Q   At some point did his role change?
11  A   It did.
12  Q   How?
13               MR. CHURCHILL:  Object to the
14          extent it calls for speculation.  Lack of
15          foundation.  You can answer if you know.
16  A   Reed promoted him.
17  Q   Reed promoted him?
18  A   Yeah.  Yes.  I'm sorry.  Yes.
19  Q   From -- so when Reed first promoted him from a
20      print salesman, what was his next role?
21               MR. CHURCHILL:  Objection to the
22          extent it calls for speculation.  Lack of
23          foundation.
24  Q   If you know.
25  A   I believe he went straight from print salesman to

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 53

1    CEO.
2    Q    What were -- if you know, as -- I would say, as
3         best as you observed it, what were Mr. Gonnering's
4         day-to-day responsibilities?
5                   MR. CHURCHILL:  Objection to the
6              extent it calls for speculation.  Lack of
7              foundation.
8    A    He was in charge of day-to-day operations of the
9         company.
10   Q    And you reported to Mr. Gonnering at this point in
11        time, when he became the CEO?
12   A    Yes.
13   Q    When Mr. Gonnering became the CEO, did Reed step
14        back from the day-to-day operations of the
15        company?
16                  MR. CHURCHILL:  Object to the
17             extent it calls for speculation.  Lack of
18             foundation.
19   A    I don't know.
20   Q    Do you recall after Mr. Gonnering became the CEO
21        what were Reed's day-to-day operations at the
22        company?
23                  MR. CHURCHILL:  Calls for
24             speculation.  Lack of foundation.
25   A    I don't know.

Page 54

1    Q    You were there every day?
2    A    Again, it was Reed and Matthew.  They -- they
3         were -- Matthew reported to Reed.  So I was just
4         taking -- you know, doing my job as an accountant,
5         creating financial -- accurate financial
6         statements.  Reed -- and Matthew reported to Reed.
7    Q    You all worked in the same office, correct?
8    A    Building.
9    Q    Where was your office in relation to Matthew's
10        office?
11                  MR. CHURCHILL:  Objection.  Vague.
12   A    These are really hard questions because it covers
13        a time frame, and our offices got moved around and
14        changed, and so it depends on when we're talking
15        about.  And I would not be able to put dates on
16        when our offices were in --
17   Q    Well, let me ask you this:  You were the CFO of
18        the company?
19   A    Correct.
20   Q    Matthew was the CEO?
21   A    Correct.
22   Q    There were no other executives of the company that
23        had the title chief; correct?
24   A    I think Gary was chief in -- chief of something,
25        possibly.  Chief innovation officer?  I don't

Page 55

1    know.  I hate to speculate.
2    Q    You're -- you've heard some -- you've heard the
3         phrase C-suite before; correct?
4    A    Yes.
5    Q    Typically, C-suite employees are located in the
6         same portion of a building.
7              Would you -- were you typically located in
8         the same realm of the building as Mr. Gonnering?
9    A    No.
10   Q    What about board meetings?  Did you have board
11        meetings for Widen Enterprises or Windy Waters?
12   A    No.
13   Q    Never?
14   A    Reed had created an external board for a short
15        period of time.  So I don't know if -- when you
16        say "board meeting," I want to make sure I'm
17        accurate in telling you the truth.
18             So at a certain point of time, Reed had
19        outsiders come in for board meetings, very short
20        period of time, don't recall much about that time
21        period.  But as far as other board meetings, for
22        the officers and directors of Windy Waters and
23        Widen Enterprises, no.
24   Q    You said there were board meetings where external
25        folks came in.  When was that?  You said it was a

Page 56

1    short period of time?
2    A    Don't recall.
3    Q    Was Stacy involved in those meetings?
4                   MR. CHURCHILL:  Objection as to the
5              extent it calls for speculation.  Lack of
6              foundation.  You can answer.
7    A    I don't believe so.
8    Q    How did decisions get made at Widen Enterprises?
9                   MR. CHURCHILL:  Objection.  Vague.
10             Ambiguous.
11   A    What decisions?
12   Q    Day-to-day operational decisions, who was in
13        charge?
14                  MR. CHURCHILL:  Objection.  Vague
15             and ambiguous.
16   A    There were people in charge of areas that made
17        decisions on those areas: accounting, operations,
18        development.
19   Q    Let's cover each.  Accounting?
20   A    Myself.
21   Q    Operations?
22   A    There's product, which was Deanna Ballew.
23   Q    I'm sorry?
24   A    Deanna Ballew was in charge of product.
25        Jake Athey was in charge of marketing.  And

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 57

```
1          Matthew oversaw everybody.
2    Q   Do you know that Matthew was paid in his capacity
3          as CEO of the company?
4    A   I don't recall.
5    Q   Is that true -- well, let me ask you:  Do you know
6          what he made in 2020 as the CEO of the company,
7          what his salary was?
8    A   No.
9    Q   What about 2021?  Do you know what his salary was
10         in 2021?
11   A   I don't recall.
12   Q   You don't recall what his salary was in 2019?
13   A   No.
14   Q   Do you know if any portion of Matthew's salary was
15         based on the performance of the company?
16   A   No, not that I'm aware of.
17   Q   I just want to make sure the record is clear.  I'm
18         not sure if you were saying, no, it wasn't, or no,
19         you don't recall.
20              MR. CHURCHILL:  Can you read the
21         question back to the witness.
22              THE STENOGRAPHER:  One moment,
23         please.
24              Question:  "Do you know if any portion
25         of Matthew's salary was based on the
```

Page 58

```
1          performance of the company?
2    A   There were no specific bonus plans.
3          I guess I'm having a hard time with this,
4          too, because the performance of the company,
5          that's kind of -- either you're talking about hard
6          numbers or you're talking about, well, the general
7          performance is good, so we're going to, you know,
8          give you a bonus discretionarily.
9          So I would say no.
10   Q   You just identified two subsets of opportunities
11         to give someone a bonus.
12   A   Right.
13   Q   One was based on hard numbers.  So my first
14         question is going to be:  Did Matthew ever receive
15         a bonus based on the hard numbers of the company?
16   A   No.
17              MR. CHURCHILL:  Objection.
18   Q   And then the --
19              MR. CHURCHILL:  Make sure to let
20         me listen to the question and respond.
21   Q   And the second set of opportunities for bonus,
22         we'll call it, that you identified was just a
23         discretionary, if the company is doing well.
24              Did Matthew ever receive that type of a
25         bonus?
```

Page 59

```
1              MR. CHURCHILL:  Objection to the
2          extent it calls for speculation.  Lack of
3          foundation.
4    A   I don't know.
5    Q   Okay.
6              MR. CHURCHILL:  Jess, when you're
7          ready, we could take a break.
8              MS. POLAKOWSKI:  Anytime.
9              MR. CHURCHILL:  Okay.  Why don't we
10         do it now.  We've been on over an hour.
11         Sounds good.  Thank you.
12              THE VIDEOGRAPHER:  We're going off
13         the record at 10:11.
14         (A recess is taken)
15              THE VIDEOGRAPHER:  We're back on
16         the record at 10:30.
17   (By Ms. Polakowski)
18   Q   Mr. Kiesler, before the break, we were talking a
19         bit about Windy Waters and the management of
20         Windy Waters, and I understand that it's a
21         holding company.
22         Tell me, who signed documents on behalf of
23         Windy Waters?
24              MR. CHURCHILL:  Objection.  Vague.
25   A   Corporate documents were signed by shareholders
```

Page 60

```
1          and directors.
2    Q   Who were those shareholders and directors?
3              MR. CHURCHILL:  Objection.  Vague.
4    A   I don't recall at this moment.
5    Q   Did -- we talked about Reed's involvement in
6          Widen.  In 2019 -- well, let's start at 2021 and
7          work backwards.
8          What -- and I understand you weren't privy
9          to everything happening at the company, but just
10         in your role as a chief financial officer of the
11         company, what was Reed's involvement in the
12         company on a day-to-day basis in 2021?
13              MR. CHURCHILL:  Object to the
14         extent it calls for speculation.
15   A   I don't know.
16   Q   Is it also -- is your answer the same if I asked
17         for 2020?
18   A   It is.
19   Q   Same for 2019?
20   A   It would be the same for any point in time where
21         Reed was Matthew's boss.
22   Q   And would that be right after Matthew became the
23         CEO of the company?
24   A   Yes.
25   Q   So after Matthew became the CEO of the company,
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 61

1  you don't know what Reed's involvement with the
2  company was?
3  A  Personally, no.
4  Q  You testified that Stacy was the president of
5     Windy Waters.  Did Stacy ever direct the decisions
6     of Windy Waters?
7  A  She relied on me to handle the accounting for it,
8     for Windy Waters.
9  Q  And let me ask you the question one more time:
10    Did Stacy ever direct the decisions of
11    Windy Waters?
12 A  Define "direct."  What do you mean by that?
13 Q  What do you mean by that?
14 A  She allowed me to use the stamp when she was made
15    aware of it.
16 Q  You just said "she allowed me to use the stamp
17    when she was made aware of it."
18       Were there circumstances where you used the
19    stamp that Stacy was not aware of it?
20 A  Nope.
21 Q  And we'll talk in detail about this later, but
22    when you used Stacy's signature stamp, did you get
23    approval from her each and every time you used it?
24 A  Either me or Reed.
25 Q  Were you the one to affix her stamp to a document?

Page 62

1  A  I was.
2  Q  Did you ever see Reed affix Stacy's signature
3     stamp to a document?
4  A  No.
5  Q  Did you ever send Stacy documents for her
6     approval?
7  A  She signed them in person at times, and she saw
8     the documents at that point.
9  Q  You're talking about when she would see things in
10    person?
11 A  Mm-hmm.
12 Q  There was a period of time where she was living in
13    Florida; correct?
14 A  Correct.
15 Q  Did you send her documents for her review and
16    approval at that point in time?
17 A  No.
18 Q  So how did you know that she approved a document
19    for you to put her signature stamp on?
20 A  Either myself or Reed would contact her.
21 Q  So there were times -- I just want to make sure I
22    understand.
23       You said that there were times that Reed
24    would obtain her approval to use the signature
25    stamp; is that right?

Page 63

1  A  That was the agreement.
2  Q  And during those circumstances, during those times
3     when it was your understanding that Reed received
4     her approval, it was still you that affixed her
5     signature on the documents?
6  A  Yes.
7  Q  Did Reed tell you that he obtained Stacy's
8     permission to use the signature each and every
9     time that you affixed her signature?
10 A  Yes.
11 Q  So there were times where you affixed Stacy's
12    signature stamp to a document that you didn't
13    obtain Stacy's permission directly, if I
14    understand you correctly?
15 A  Correct.
16 Q  How did you -- well, let me ask you this:  Did you
17    update Stacy on the financial performance of
18    Windy Waters?
19          MR. CHURCHILL:  Objection.  Vague
20       and ambiguous.
21 A  If she were to sign in person, if it would have
22    been --
23 Q  I'm not asking about her signing documents.
24 A  Okay.
25 Q  My question was just solely with regard to the

Page 64

1  financial operation of Windy Waters.
2     Did you provide Stacy with financial updates
3     as to how Windy Waters was doing?
4          MR. CHURCHILL:  Same objections.
5  A  I was just stating that the annual minutes have
6     some financial information in them, and so if she
7     were to sign those in person, she would have seen
8     that then; otherwise, no.
9  Q  So other than the annual minutes of Windy Waters,
10    you did not provide Stacy with financial updates
11    of the company; correct?
12 A  I provided her with financial information during
13    the redemption process.
14 Q  And we'll certainly talk about that.  But other
15    than the information you provided her in advance
16    of her redemption and the annual minutes, there's
17    no other financial information that you provided
18    to Stacy with regard to Windy Waters?
19 A  I don't recall.
20 Q  With regard to Windy Waters, you talked about its
21    existence being for the purpose of being the sole
22    shareholder of Widen Enterprises and maintaining
23    excess cash.  You also testified about some
24    consultants that were engaged to manage those
25    investments.

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Michael J. Kiesler

Page 65

1          Who directed those consultants?
2                MR. CHURCHILL:  Objection.  Lack of
3          foundation.
4    A    I believe I testified that they were set up by
5          Mark or Reed.  There's no direction after that.
6    Q    Well, if -- if a consultant were fired, who would
7          fire them?
8                MR. CHURCHILL:  Objection.  Lack of
9          foundation.
10   A    I can't imagine firing somebody other than lack of
11         performance, and that did not happen; so I don't
12         know.
13   Q    Okay.  Was there anyone -- I think you said you
14         made some decisions for Windy Waters.
15              Who spoke for Windy Waters?
16                MR. CHURCHILL:  Objection.  Vague
17         and ambiguous.
18   A    I accounted for Windy Waters.
19   Q    Who had the capacity or the authority to sign on
20         behalf of -- sign documents on behalf of
21         Windy Waters?
22   A    I did.  I had a signatory on a bank account.
23   Q    Anyone else?
24   A    I don't believe so.
25   Q    Mr. Gonnering became a shareholder of Windy Waters

Page 66

1          at some point in time; correct?
2    A    Correct.
3    Q    Do you recall when that was?
4    A    I don't.
5    Q    Did he ever sign documents on behalf of
6          Windy Waters?
7    A    He did not.
8    Q    And you said you signed documents on behalf of
9          Windy Waters.  Who authorized you to sign
10         documents on behalf of Windy Waters?
11   A    I don't know.
12              (Exhibit No. 4 was marked for
13         identification)
14              THE STENOGRAPHER:  Exhibit 4.
15   Q    Mr. Kiesler, I've just handed you what has been
16         marked as Exhibit 4.  Have you ever seen Exhibit 4
17         before?
18   A    This appears to be a document that was created by
19         our attorney at the time.  And my role would be to
20         provide information with respect to specifics on
21         maybe share -- share amounts.
22   Q    And this is a stock transfer agreement dated
23         January 1st of 2008 by which Matthew Gonnering
24         obtained ownership in Windy Waters; correct?
25   A    Correct.

Page 67

1    Q    And if you turn to page 12 of the document, do you
2          recognize your signature on that page?
3    A    Yes.
4    Q    And you signed this document as the treasurer of
5          Windy Waters; correct?
6    A    Correct.
7    Q    Do you see right above your signature there
8          appears to be a signature of Stacy Randall?
9    A    Correct.
10   Q    Do you recognize that as her signature stamp?
11   A    It appears to be her signature stamp.
12   Q    Did you affix her signature stamp to this
13         document?
14   A    I -- I don't recall that, but I would have.
15   Q    Did anyone else ever, to the best of your
16         knowledge, affix Stacy's signature stamp on
17         documents other than yourself?
18   A    It was locked in my drawer.
19   Q    So, no, no one else --
20   A    No.
21   Q    -- other than yourself ever affixed Stacy's
22         signature stamp?
23   A    No.
24   Q    Do you have a recollection of executing this
25         document or not?

Page 68

1    A    I would have executed it.
2    Q    My question was:  Do you have a recollection of
3          executing this document?
4    A    Specifically, no.
5    Q    Do you have a recollection of whether you obtained
6          Stacy's approval to affix her signature on this
7          document prior to doing so?
8    A    Either Reed or myself would have.
9    Q    And I don't want you to guess about what might
10         have happened.  I'm asking specifically what
11         happened here.
12              Do you recall whether you obtained Stacy's
13         approval to use her signature stamp on this
14         document prior to affixing her signature?
15   A    I believe Reed was involved with notifying Stacy
16         regarding the -- the stock transfer agreement.
17   Q    So did you ever talk to Stacy about this document?
18   A    I don't recall.
19   Q    Do you know if Stacy has any knowledge at all of
20         this document?
21   A    I don't -- wouldn't know that.
22   Q    Looking at Exhibit A of the document -- it's the
23         last page -- the title is "Stock Transfer
24         Agreement Base Price-per-Share Calculation."
25         Correct?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 69

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Did you draft this document? |
| 3 | A | I did not. |
| 4 | Q | Was this drafted by the attorneys? |
| 5 | A | It was. |
| 6 | Q | At some point the company stopped using base |
| 7 | | price-per-share calculation and started using fair |
| 8 | | value.  Do you recall when that was? |
| 9 | A | No, I don't. |
| 10 | Q | Were you involved in the decision to make that |
| 11 | | change -- |
| 12 | A | No. |
| 13 | Q | -- from base price per share to fair value? |
| 14 | A | No. |
| 15 | Q | And I'll represent to you that I've reviewed this |
| 16 | | document in detail, and I didn't see any |
| 17 | | discussion at all of fair value or fair market |
| 18 | | value in this document. |
| 19 | | Do you know whether fair value was discussed |
| 20 | | in providing Mr. Gonnering his shares of the |
| 21 | | company? |
| 22 | A | No. |
| 23 | Q | And let me just make sure I understand.  No, you |
| 24 | | don't know, or no, it was not discussed? |
| 25 | A | I don't know. |

Page 70

| | | |
|---|---|---|
| 1 | Q | And when you explained to Stacy in May of 2020 how |
| 2 | | the value of her shares was calculated, you used |
| 3 | | the words "fair value"; correct? |
| 4 | | MR. CHURCHILL:  Objection.  Lack of |
| 5 | | foundation.  Assumes facts not in evidence. |
| 6 | A | No. |
| 7 | Q | You didn't give her a document that said fair |
| 8 | | value? |
| 9 | | MR. CHURCHILL:  Same objections. |
| 10 | A | So you're talking about the redemption -- |
| 11 | Q | May -- |
| 12 | A | -- she actually signed May 13th -- |
| 13 | Q | May of 2020. |
| 14 | A | -- not on the phone -- okay.  Well, you said May |
| 15 | | of 2020.  I had another -- I had a conversation |
| 16 | | with her on the phone on May 6th, where I did go |
| 17 | | through the same calculation. |
| 18 | Q | And is it your testimony that you did not call it |
| 19 | | the fair value of the company? |
| 20 | A | I didn't call it the fair value. |
| 21 | | (Exhibit No. 5 was marked for |
| 22 | | identification) |
| 23 | | THE STENOGRAPHER:  Exhibit 5. |
| 24 | Q | You said, when you were talking to Stacy and |
| 25 | | explaining the value of her shares, that you did |

Page 71

| | | |
|---|---|---|
| 1 | | not call it the fair value of the company? |
| 2 | A | Correct. |
| 3 | Q | Why didn't you? |
| 4 | A | We were just going over the document. |
| 5 | Q | Did you know at the time that the value you were |
| 6 | | (inaudible) for her shares did not represent the |
| 7 | | fair value of the company? |
| 8 | A | I didn't know what the fair value of the company |
| 9 | | was on open market. |
| 10 | Q | Mr. Kiesler, I'm handing you what I've just marked |
| 11 | | as Exhibit 5. |
| 12 | A | Thank you. |
| 13 | Q | Do you -- do you recognize Exhibit 5? |
| 14 | A | I do. |
| 15 | Q | What is it? |
| 16 | A | It's a spreadsheet I used to track the per -- |
| 17 | | price per share of A and B shares throughout time. |
| 18 | Q | And is this the spreadsheet that you used to |
| 19 | | calculate what would be paid to Stacy for her |
| 20 | | redemption in May of 2020? |
| 21 | A | It appears to be. |
| 22 | Q | And do you see the highlighted lines in the middle |
| 23 | | of the page?  It says "Estimated Value of |
| 24 | | Windy Waters"? |
| 25 | A | Yes. |

Page 72

| | | |
|---|---|---|
| 1 | Q | And then it says "Concluded value of Windy Waters" |
| 2 | | at the bottom of that highlighted section? |
| 3 | A | Okay.  Yes. |
| 4 | Q | When you were explaining to Stacy in May of 2020 |
| 5 | | on the phone call that you just referenced -- I |
| 6 | | think you said it was May 6, 2020 -- did you walk |
| 7 | | her through this document? |
| 8 | A | I did. |
| 9 | Q | And tell me each and every thing that you |
| 10 | | explained to her based on this document. |
| 11 | A | Sure.  I started at the top and worked my way |
| 12 | | down.  So we started at net income, explained net |
| 13 | | income, meaning it's revenue less expenses.  And |
| 14 | | then -- |
| 15 | Q | And let me -- sorry, let me just stop you there. |
| 16 | | That's net income of Windy Waters; correct? |
| 17 | A | Consolidated. |
| 18 | Q | It doesn't represent the income of |
| 19 | | Widen Enterprises, though, does it? |
| 20 | A | Oh, yeah. |
| 21 | Q | So you represented to Stacy that the consolidated |
| 22 | | income of both Widen Enterprises and Windy Waters |
| 23 | | as of December of 2019 was $270,000? |
| 24 | A | Correct. |
| 25 | Q | Go on.  I apologize.  I interrupted you. |

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

Page 73

1  A   Sure.
2  Q   **You said you explained starting from the top to**
3     **the bottom.**
4  A   And then I would just -- I went through each line
5     item here.  So you've got income tax expense;
6     that's an add.  You've got book depreciation,
7     which is an addition.  You've got other income,
8     which you're subtracting out.  Other expenses,
9     you're adding back.  Any gains or losses, you
10    would be either subtracting a gain or adding a
11    loss.  And then that come -- came down to your
12    earnings before income tax, depreciation, and
13    amortization.
14        And then I explained to her that there was a
15    weighted average that was used, and then also that
16    there was a multiple that had been used throughout
17    time.  And then that cash in -- cash equivalence
18    were added back, and securities were added back.
19        And then if there was any amount payable on
20    stock redemptions, those would be subtracted to
21    come up with the value of Windy Waters.  And then
22    we compare that to stockholders' equity and take
23    the higher amount.  And then it's the calculation
24    of the per -- or, the share price is calculated
25    below.

Page 74

1  Q   **And I want to focus on that "Estimated Value of**
2     **Windy Waters" line.  It's listed at $6,896,973 as**
3     **of December of 2019; correct?**
4  A   Correct.  Well, correct.
5  Q   **At the time that you represented to Stacy that the**
6     **estimated value of Windy Waters was $6,896,000,**
7     **did you have an opinion as to whether it**
8     **represented the value that Windy Waters would sell**
9     **for on the open market?**
10 A   I didn't know what it would sell for on the open
11    market.
12 Q   **Did you do anything to investigate what it would**
13    **sell for on the open market when you made this**
14    **representation to Stacy?**
15 A   I did not.
16 Q   **As you sit here today, do you know whether**
17    **$6,896,973 represented the fair market value of**
18    **Windy Waters as of December 2019?**
19            MR. CHURCHILL:  Objection.  Calls
20        for expert conclusion.  Calls for legal
21        conclusion.  You may respond.
22 A   I think you're comparing apples to oranges.
23 Q   **Let me just have the question read back.**
24 A   Sure.
25            THE STENOGRAPHER:  One moment,

Page 75

1     please.
2            Question:  "As you sit here today, do
3        you know whether $6,896,973 represented the
4        fair market value of Windy Waters as of
5        December 2019?"
6            MR. CHURCHILL:  Same objections.
7  A   It represented the fair -- it represented an
8     amount based on the calculation of the formula
9     that we used to price out shares at that time.
10 Q   **And I'm going to try one more time because this is**
11    **an important issue.**
12 A   Mm-hmm.
13 Q   **Did you believe -- and, well, let me start with:**
14    **As you sit here today, do you believe that**
15    **$6,896,973 represented the fair market value of**
16    **the company as of December of 2019?**
17            MR. CHURCHILL:  Objection.  Calls
18        for expert testimony and a legal conclusion.
19 A   And, again, I would have to answer the same way.
20    It represents an amount based on a formula that we
21    had used over time to calculate price per share.
22 Q   **It represents a number that was calculated using a**
23    **formula is your answer to my question, which**
24    **was -- my question was:  Is it the fair market**
25    **value of the company?  You are a CFO.  You**

Page 76

1     understand what that means?
2            MR. CHURCHILL:  Objection.
3        Objection.  Argumentative.  Asked and
4        answered.
5  Q   **As you sit here today, are you able to tell me**
6     **whether $6,896,973 represents the fair market**
7     **value of the company in December of 2019?**
8  A   I am able to tell you that that amount equals the
9     value of that formula at that point in time.
10 Q   **The intention of the formula that you're talking**
11    **about was not to calculate the fair market value**
12    **of the company; correct?**
13            MR. CHURCHILL:  Objection.  Assumes
14        facts not in evidence.
15 A   I don't know.
16 Q   **And there's no reference in this document,**
17    **Exhibit 5, to a base price per share; correct?**
18 A   The reference is to a price per share of Class A
19    and Class B stock.
20 Q   **And to estimated value of Windy Waters; correct?**
21 A   That's what it says here.  And also the
22    stockholder equity.
23 Q   **When you -- did you draft this spreadsheet?**
24 A   I created this spreadsheet.
25 Q   **And you would have been the person to input the**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 77

1   words "estimated value of Windy Waters"?
2  A  I created this spreadsheet at the direction and
3     approval of our accountant at the time.
4  Q  Who was your accountant at the time?
5  A  What year are we at here?  I don't -- I don't -- I
6     couldn't recall when this was developed.
7  Q  This was -- this is the document you used for
8     Stacy's redemption; correct?
9  A  Correct.  But I -- I used this format all the way
10    back to 2007, so it appears.
11 Q  I see.  Did someone tell you to use the words
12    "fair value" on the spreadsheet?
13 A  I don't recall.
14 Q  When I asked you whether the $6,896,000 number
15    represented the fair market value of the companies
16    as of December 2012, your response was it
17    represents a value that was obtained applying a
18    formula?
19            MR. CHURCHILL:  Objection.
20        Misstates testimony.  You said 2012.
21            MS. POLAKOWSKI:  I'm -- thank you.
22 Q  Correction.  2019.
23        My question to you is:  You're unable to say
24    whether that number represents the fair market
25    value of the company as of December 2019; correct?

Page 78

1  A  I don't know what the fair market value of the
2     company was then.
3  Q  And you didn't do anything to investigate whether
4     that $6 million number was the fair market value
5     of the company as of December of 2019; correct?
6  A  No.
7  Q  Did you have an idea -- when you were having this
8     conversation in May of 2020 with Stacy about
9     redeeming her shares, did you have any idea what
10    the company was worth?
11 A  No.
12 Q  Did you do anything to investigate what the
13    company was worth in making these representations
14    to Stacy?
15            MR. CHURCHILL:  Objection.  Asked
16        and answered.  You can answer.
17 A  No.
18 Q  Are there any agreements between yourself and
19    Reed Widen and Matthew Gonnering with regard to
20    this lawsuit?
21 A  Any agreements?
22 Q  Agreements.
23 A  Not that I'm aware of.
24 Q  What about Terry Vial or Gary Norris?  Have they
25    had any involvement in this lawsuit?

Page 79

1  A  Gary Norris has passed away.  And Terry Vial, no.
2  Q  Have you had any conversations with Terry about
3     this lawsuit?
4  A  No.
5  Q  We talked about Reed's role at Widen Enterprises.
6        At some point did Reed tell you he was
7     retiring from Widen Enterprises?
8  A  No.
9  Q  He never told you that?
10 A  No.
11 Q  How many hours was Reed working at
12    Widen Enterprises in 2019?
13            MR. CHURCHILL:  Objection.  Lack of
14        foundation.  Calls for speculation.
15 A  I don't know.
16 Q  Same answer for 2020?
17 A  I don't know.
18 Q  Did Reed produce any work product that you
19    reviewed while you were at Widen; for instance,
20    memos?  Did you ever see a memo written by Reed?
21 A  I don't recall.
22 Q  And is that also -- excuse me.  Is that also true
23    for 2019?
24 A  It is.  I don't recall.
25 Q  The same answer for 2020?

Page 80

1  A  It is.  I don't recall.
2  Q  How many hours a week did you work at
3     Widen Enterprises?
4            MR. CHURCHILL:  Objection.  Vague.
5  A  More than 40.
6  Q  We talked about the value of the company in 2020
7     and what you represented to Stacy.
8        If you had wanted to investigate the value of
9     the company in twenty -- in May of 2020, in having
10    these conversations with Stacy, what would you
11    have done?
12 A  I don't know.
13        (Exhibit No. 6 was marked for
14        identification)
15            THE STENOGRAPHER:  Exhibit 6.
16 A  Thank you.
17 Q  Mr. Kiesler, I've just handed you what has been
18    marked as Exhibit 6.  Have you ever seen this
19    before?
20 A  Yes.
21 Q  What is it?
22 A  It appears to be the output as a result of a
23    quality of earnings engagement.
24 Q  Were you involved in providing information for the
25    preparation of this report?

Stacy L. Randall v.                                    Video Deposition of  Michael J. Kiesler
Reed C. Widen, et al.

Page 81

1   A   Myself and my international controller were.
2   Q   And looking at the page that's numbered 4132,
3       Grant Thornton has addressed this report to
4       Matthew Gonnering; correct?
5   A   Correct.
6   Q   And it says that it -- in the second paragraph, it
7       says that it's dependent on the accuracy of
8       management responses to our inquiries.  Do you see
9       that?
10  A   Which paragraph?  I'm sorry.
11  Q   Second paragraph that begins, "Our work does not
12      constitute an audit or a review of the financial
13      statements or any part thereof.  The objective of
14      which is the expression of an opinion or limited
15      assurance on the financial statements or a part
16      thereof or verification of the accuracy of
17      management responses to our inquiries."
18          Did I read that correctly?
19  A   That is the third paragraph.
20  Q   I read that correctly?
21  A   Yeah, third paragraph, though.
22  Q   And you were -- you were -- you were involved in
23      providing information that they're relying on;
24      correct?
25  A   Myself and Theresa, the international controller.

Page 82

1   Q   And was the information that you provided to
2       Grant Thornton accurate?
3   A   As I knew it.
4   Q   Do you have any reason to believe --
5   A   No.
6   Q   -- as you sit here today, that it wasn't accurate?
7   A   No.
8   Q   Turn to page 4142 of this document, please.
9       Are you there?
10  A   Yep.
11  Q   There's a paragraph in the middle of the page that
12      says "Owner/President."
13  A   Okay.
14  Q   And the text of the document states that the
15      "adjustment removes the company's owner
16      compensation during historical period as these
17      costs are not expected to continue
18      post-transition [sic].  We understand the owner is
19      not actively involved in the operations of the
20      company, and any role in the business will be
21      absorbed by current management."
22          Do you see that?
23  A   I do.
24  Q   Was that accurate?
25  A   It was.

Page 83

1   Q   As of the date of this document, was Reed actively
2       involved in the management of the company?
3              MR. CHURCHILL:  Objection.  Calls
4          for speculation.  Lack of foundation.
5   A   I don't --
6              MR. CHURCHILL:  You can answer.
7   A   I don't know.
8   Q   And, again, you are the CFO, or you were the CFO
9       at this time?
10  A   Yes.
11  Q   At this time was Reed actively involved in the
12      operations of the company?
13             MR. CHURCHILL:  Same objections.
14         Asked and answered.
15  A   I was unaware.
16  Q   Did you ever -- did you read this report when it
17      came out?
18  A   I would have review -- I reviewed it.
19  Q   Did you ever contact Grant Thornton and tell them
20      that that was inaccurate?
21  A   It is accurate.
22  Q   And it looks to me like Grant Thornton decided to
23      add -- to remove his compensation from their
24      determination of the revenue of the company;
25      correct?

Page 84

1   A   Correct.
2   Q   You didn't remove it in the spreadsheet that you
3       provided to Stacy, though, did you?
4              MR. CHURCHILL:  Objection.
5          Misleading.  You can answer.
6   A   There was no intention of -- that I knew of that
7       Reed was going to retire or leave the company when
8       Stacy redeemed her shares.  The only time that
9       that ever came up was after there was a interest
10      by Acquia to purchase the company.  Then he
11      said -- well, there would be no reason to -- well,
12      I don't -- I don't know that.
13          At that point Reed made the decision to have
14      his wages removed from this calculation.
15  Q   Oh, so Reed directed that his wages would be
16      removed?
17  A   I guess I don't know.
18  Q   Okay.  How frequently at this time did you
19      communicate with Reed?
20  A   Not very often at all.
21  Q   Do you recall in 2019 what Reed's compensation
22      was?
23  A   No.
24  Q   Took a look at that same page, 4142.
25          Do you see it listed there, owner/president

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 85

1  compensation, 2019, $1,514,000?
2  A  Yes.
3  Q  In 2020, it was $2,053,000?
4  A  Yes.
5  Q  And then to date in '21, it was $2,088,000?
6              MR. CHURCHILL:  Objection.
7        Document speaks for itself.  Lack of
8        foundation.
9  Q  Is that right?
10 A  The document says that.
11 Q  Yep.  And your compensation is also listed there,
12    as is Mr. Gonnering's; correct?
13             MR. CHURCHILL:  Objection. Lack of
14        foundation.
15 A  With respect to CFO/CEO compensation, yes.
16 Q  The CEO is listed as of -- well, 2019 is 145,000?
17 A  That's what it says.
18 Q  2020 at 736,000?
19 A  That's what it says.
20 Q  In '21 is 750; correct?
21 A  That's what it says.
22 Q  So Reed was making over twice what the CEO was
23    making; correct?
24             MR. CHURCHILL:  Objection.
25        Assumes -- assumes facts not in evidence.

Page 86

1        Calls for speculation.  Lack of foundation.
2  A  It appears that way.
3  Q  Why did the CEO's compensation change so
4     drastically from year to year; in particular,
5     between 2019 and 2020, if you know?
6  A  Can I read this real quick?
7  Q  Of course.
8  A  Okay.  Thank you.
9        I guess I'm not sure I understand what the
10       normalization process they're using to adjust the
11       CFO and CEO's base salary.
12 Q  In your estimation -- so this is a time in which
13    Reed was not actively involved in the company;
14    true?
15             MR. CHURCHILL:  Objection. Vague.
16 A  I don't know that.
17 Q  Well, we just looked at a statement that said he
18    is not actively involved in the company, and you
19    said that's accurate.
20             MR. CHURCHILL:  Objection.
21        Mischaracterizes testimony.  Misstates
22        document.  Also, vague as to time frame.
23 Q  The statement in the document is:  "We understand
24    the owner is not actively involved in the
25    operations of the company, and any role in the

Page 87

1  business will be absorbed by current management."
2        Did I read that correctly?
3  A  Yes.
4  Q  And you said that that's accurate, that Reed was
5     not actively involved in the operations of the
6     company.  Are you changing your testimony now?
7  A  I don't know what Reed was involved in outside the
8     operations of the company, as far as strategic
9     direction or that sort of thing.
10 Q  Okay.  So it's -- you continue to maintain the
11    testimony that Reed was not actively involved in
12    the operations of the company as of 2021; correct?
13 A  I don't know if he was actively involved because
14    him and Matthew were the two that discussed things
15    outside of my knowledge.  Reed --
16 Q  What services was Reed providing to the company
17    such that he was paid $2 million in 2020?
18             MR. CHURCHILL:  Objection.  Lack of
19        foundation.  Calls for speculation.  Also,
20        assumes facts not in evidence.
21 A  Strategic direction and executive guidance.
22 Q  What executive guidance did Reed provide to the
23    company in 2020?
24 A  I would not know that, but that would be a Matthew
25    question.

Page 88

1  Q  Likewise, what strategic guidance did Reed provide
2     to the company in 2019?
3  A  Again, a Matthew question.
4  Q  I may have asked you this, and I apologize if I
5     did:  Windy Waters did not hold board meetings; is
6     that right?
7  A  No.
8  Q  That --
9  A  It did not.
10 Q  Okay.  Windy Waters did not hold board meetings?
11 A  Correct.
12 Q  Did you ever -- in your capacity as the treasurer
13    of Windy Waters, did you ever report to Stacy?
14             MR. CHURCHILL:  Objection.
15        Ambiguous.
16 A  No, not personally.
17 Q  Do you know whether anyone did?
18 A  I don't --
19             MR. CHURCHILL:  Objection.  Calls
20        for speculation.
21 A  I don't know.
22 Q  Did Windy Waters elect the board of
23    Widen Enterprises?
24 A  I don't know.
25 Q  Do you know who voted Windy Waters' stock as the

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

---

Page 89

1  sole shareholder as Widen -- of Widen Enterprises?
2  A  Sole shareholder.  So that would be Windy Waters.
3  It depends on what year.
4  Q  Well, let's start at 2021 and work backwards.
5  In 2021, who voted Windy Waters stock as
6  Widen Enterprises' sole shareholder?
7  A  I would -- I don't know.
8  Q  Okay.  And as of May 2020, what was Reed's role at
9  Windy Waters?
10 A  I'm not aware of a role he had at Windy Waters.
11 Q  I'm sorry?
12 A  I'm not aware of a role he had at Windy Waters.
13 Q  My question was as of May 2020.  And I'll just ask
14 the same question for 2019:  Did Reed have a role
15 at Windy Waters in 2019?
16 A  I don't believe Reed -- well, I'm sorry.
17 What year are we talking about?
18 Q  '19.
19 A  What was the last question, though?
20 Q  May of 2020.
21 A  Okay.  Again, I do not believe Reed had a role at
22 Windy Waters.
23 Q  Let's fast-forwarded to post-May of 2020.
24 What was Reed's role as of, we'll call it,
25 mid 2020 after Stacy's redemption at Windy Waters?

Page 90

1  A  After Stacy's redemption, I believe Matthew was
2  then director and president of Widen Enterprises.
3  I was treasurer/secretary.  And Windy Waters, Reed
4  was president/director, and I was
5  treasurer/secretary, I think.
6  Q  Did Reed's role change after the -- let me
7  clarify.  Did Reed's role at Windy Waters change
8  after Stacy's redemption in May of 2020?
9  A  No.
10 Q  Did you have any concerns regarding Reed's
11 appointment as the director and president of
12 Windy Waters in 2020?
13 A  Nothing comes to mind.
14 (Exhibit No. 7 was marked for
15 identification)
16 THE STENOGRAPHER:  Exhibit 7.
17 Q  Mr. Kiesler, I'm handing you what has been marked
18 as Exhibit 7.
19 A  Thank you.
20 Q  I'll represent to you that this is an email
21 exchange between yourself and Matthew Gonnering.
22 The first email that appears on the page is
23 actually the first chronological email as well.
24 It's May 22nd of 2020.  Do you see that?
25 A  Yes.

Page 91

1  Q  Do you recognize this as a true and correct copy
2  of an email exchange between yourself and
3  Mr. Gonnering in May of 2020?
4  A  It appears to be.
5  Q  The title of -- well, first of all, I just wanted
6  to point out, in the middle of the document,
7  there's an email from you to Mr. Gonnering that
8  says, "Please see responses inset in red below."
9  Did I read that correctly?
10 A  I see that.
11 Q  And I'll represent to you that I did go back to
12 make sure that I don't have a color copy of this
13 document, and I don't.
14 A  No worries.
15 Q  So you see the email below.  It appears that there
16 are responses in line to the questions that
17 Mr. Gonnering was -- was posing?
18 A  Yes.
19 Q  And the title of the email from Mr. Gonnering to
20 you was "Governance documentation director
21 removal."  Correct?
22 A  Yes.
23 Q  And Mr. Gonnering's asking you a couple of
24 questions on governance of the companies.
25 First, he asks for copies of the bylaws of

Page 92

1  the Widen Enterprises or Windy Waters; correct?
2  MR. CHURCHILL:  Objection.  It's a
3  minor point.  He just says "do we have
4  bylaws."  He doesn't ask for copies.
5  Sorry.  I couldn't resist, Jess.
6  Q  As your attorney points out, it says "do we have
7  copies of bylaws?"  Correct?
8  A  It doesn't say copies.
9  Q  We're really being accurate here.
10 A  But I understand what you mean; so, yes.
11 Q  And in response to Mr. Gonnering's question, you
12 did, in fact, provide the bylaws of Windy Waters;
13 correct?
14 A  Yes, it appears to be.
15 Q  Why was Mr. Gonnering asking you for copies of the
16 bylaws in May of 2020?
17 MR. CHURCHILL:  Objection to the
18 extent it calls for speculation.
19 A  I don't recall.
20 Q  Did you ever talk to Mr. Gonnering about that?
21 A  I don't -- I don't recall.
22 Q  You don't -- do you recall whether --
23 A  I recall doing this, but I don't recall --
24 Q  Sure.
25 A  -- going over it.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 93

```
1   Q   Do you recall ever asking him --
2   A   No.
3   Q   -- why he wanted the bylaws?
4   A   I'm sorry.  No.
5   Q   And then in this email, Mr. Gonnering asks you --
6       in point number 2, he says, "The buyback of
7       Stacy's shares trigger this for me since she has a
8       'director' role."  Do you see that?
9   A   Mm-hmm.  Yes.
10  Q   Thank you.  And then he says, "However, I only
11      know she has this role through dialogue with you.
12      Is there documentation that supports her role as a
13      director?"
14          Fair to say Stacy was not actively involved
15      as a director of Windy Waters?
16                  MR. CHURCHILL:  Objection.
17              Mischaracterizes the document.  You can
18              answer.
19  A   The question was:  Is she actively involved in --
20  Q   Correct?
21  A   -- in Windy Waters?  No.
22  Q   Would it also be accurate to say she was not
23      actively involved in Widen Enterprises?
24  A   Yes.
25  Q   And then in point 3, Mr. Gonnering asks you, he
```

Page 94

```
1       says, "In the event such documentation exists for
2       her role and bylaws exist for Widen Enterprises,
3       Inc., and/or Windy Waters, I would like to
4       understand how these bylaws should be used to
5       remove a director."  Do you see that?
6   A   I do.
7   Q   And in your response, in the bold text, you state
8       that you "asked Scott to advise as to best
9       approach to protect the piercing of the corporate
10      shield with respect to her placement."
11          Do you see that?
12  A   Yes.
13  Q   "Scott," does that refer to Scott Seid?
14  A   Yes.
15  Q   What did you mean by that?
16  A   By what?
17  Q   "I've been communicating with Scott regarding this
18      as part of Stacy's share buyout.  The redemption
19      agreement incorporated language to remove her, all
20      of her duties.  I asked Scott to advise as to the
21      best approach to protect the piercing of the
22      corporate shield with respect to her replacement."
23  A   Due to the fact that Stacy no longer was in place
24      as a president or a director of Windy Waters, we
25      needed to figure out who -- who would be.
```

Page 95

```
1       It's my -- my assumption and knowledge, going
2       way back to Bob Kilkelly, that Windy Waters was
3       created, like I say here, as a corporation.  And
4       you don't want to protect -- or, you don't want to
5       pierce the corporate shield.  I'm not an attorney;
6       so I can't speak to that much other than I know
7       there has to be as much a separation as possible.
8   Q   Do you recall what the concern you had was with
9       regard to piercing the corporate veil in May of
10      2020 when Stacy was no longer a director?
11  A   What the concern was?
12  Q   Yes.
13  A   It was -- it was Matthew's concern.  And I,
14      therefore, talked to Scott about how to resolve
15      that.
16  Q   So you did, in fact, have discussions with
17      Attorney Seid about this?
18  A   Yes.
19  Q   What do you recall about that conversation?
20                  MR. CHURCHILL:  And just stating
21              for the record, I believe that you are
22              allowed to disclose this because we have
23              waived privilege as to communications
24              regarding Stacy.
25                  So we are not asserting privilege as to
```

Page 96

```
1       that communication, and you may respond to
2       the question from Counsel.
3   A   Okay.
4   Q   Do you need it read back?
5   A   Yes, please.
6                  THE STENOGRAPHER:  One moment,
7              please.
8                  Question:  "What do you recall about
9              that conversation?"
10  A   I recall that I -- I talked to him about who would
11      be best to fill those roles.
12  Q   And what was his response?
13  A   I believe he was going to have -- he was going to
14      have to look into it and get back to me.
15  Q   Did he get back to you?
16  A   He did.
17  Q   What did he tell you?
18  A   I don't recall.  But it would have been what we
19      had done.
20  Q   And that was putting Reed as the director and
21      president of Windy Waters; correct?
22  A   Yes.
23  Q   Do you recall having a meeting with Mr. Gonnering
24      to clean up the corporate governance documents?
25  A   When you say "clean up," do you mean shift people
```

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

Page 97

1     around?
2  Q  Well, let me just direct your attention to
3     paragraph 5 of this email.
4  A  Okay.
5  Q  It says -- Mr. Gonnering says to you, "If we don't
6     have clean documentation for Inc. or Windy, I move
7     to begin the process of getting us more organized
8     objections."
9        And your response is, "Windy Waters is
10    relatively clean.  Second, your" -- I think you
11    meant "your motion to discuss cleaning up Inc."
12       Do you see that?
13 A  Oh.  Yes, I do.
14 Q  Did you have a conversation with Mr. Gonnering to
15    discuss cleaning up the corporate document?
16 A  I don't recall it, but we probably discussed it.
17 Q  I just want to make sure I understand.
18       So you don't recall a discussion with --
19 A  I -- I don't recall a specific discussion.
20 Q  And this -- it struck me, the language that was
21    used.  Mr. Gonnering says "I move to begin," and
22    then you seconded the motion.
23 A  We just have a playful-type relationship.
24 Q  That was my question.  So this was not a formal
25    meeting of the Windy Waters board?

Page 98

1  A  No.
2  Q  What was your relationship with Stacy like prior
3     to May of 2020?
4  A  Very good.  I like Stacy.
5  Q  You thought of her as a friend?
6  A  I wouldn't go that far.  She was obviously a
7     Widen; so throughout the many years, we met.
8  Q  I believe you testified that she would ask you to
9     provide certain financial information or
10    accounting materials periodically.
11       She asked you to do things on behalf of the
12    company.  Is that accurate?
13 A  That's what I said?  Through her stamp, the use of
14    her stamp.
15 Q  Fair to say she trusted you?
16 A  There would be no reason why I would think she
17    didn't.
18 Q  Do you remember -- we've talked a lot about the
19    stamp already, and we're going to talk a little
20    bit more about it, but do you remember when you
21    first started using Stacy's signature stamp?
22 A  It would have been after she moved to Florida.
23 Q  Do you recall approximately when that was?
24 A  I think it was in the beginning of 2000s.  So I
25    think it was 2001.

Page 99

1  Q  Okay.  How -- what do you remember about how that
2     process came to be?  How did Stacy's signature
3     stamp come to be a thing?
4  A  Sure.  She was in my office one day, signing
5     another document, and her brother Stewart was
6     there.  And Stewart indicated to Stacy that,
7     "Hey.  Hey, Stace, why don't you just get a
8     signature stamp?  I use one for convenience.
9     It's really nice to have."
10       And since she's down in Florida, it would be
11    a convenience for her.
12 Q  When -- well, let me ask you:  You said Stewart
13    had a signature stamp as well?
14 A  He -- he did.
15 Q  Did you -- were you authorized to use Stewart's
16    signature stamp?
17 A  Stewart originally had it, and then he had me
18    sign -- he was in charge of Millmont.
19 Q  I'm sorry?
20 A  He was in charge of Millmont.  So he had me
21    sign -- because he didn't want to do it anymore --
22    sign the checks, the Friday check run checks,
23    with it.
24 Q  For -- when you say "the Friday check run checks,"
25    that was for Millmont?

Page 100

1  A  Correct.
2  Q  What checks would be run on Fridays for Millmont?
3  A  Well, Millmont had operating expenses.
4  Q  Okay.  So Stacy got the signature stamp around
5     2001.  Was she a shareholder of Windy Waters at
6     the time?
7  A  Actually, I didn't say she got the stamp in 2001.
8     That's when she moved to Florida.
9  Q  Okay.
10 A  I don't recall exactly when she got the stamp.
11 Q  Okay.  Do you recall using her signature stamp at
12    any point before 2001?
13 A  There was no signature stamp.
14 Q  Okay.  Was Stacy a shareholder of Windy Waters
15    when she moved to Florida in 2001?
16 A  I believe so.
17 Q  At that time was she an officer of Windy Waters?
18 A  I don't think so.  There's records that, you know,
19    obviously, you can -- you look into.  I -- I don't
20    know.  I hate saying I think so, because I want to
21    be truthful.  So I don't know.
22 Q  When Stacy moved to Florida and you began to use
23    her signature stamp, would you call her each time
24    that you wanted to use her signature stamp?
25 A  Either I would talk to her or, like I said

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 101

1   previously, Reed would give -- would have talked
2   to her and gave -- told me that he had gotten her
3   approval.
4   Q   When Stacy was -- well, when was Stacy elected
5       president of Windy Waters?
6   A   I don't know.
7   Q   Who elected her president of Windy Waters?
8   A   I don't know.
9                (Exhibit No. 8 was marked for
10               identification)
11               THE STENOGRAPHER:  Exhibit 8.
12  Q   Mr. Kiesler, I'm handing you what has been marked
13      as Exhibit 8.
14  A   Thank you.
15  Q   I will represent to you that those are Defendants'
16      responses to our discovery requests.  Take a look,
17      please, at page 14.
18           Do you see your signature on page 14?
19  A   Yes.
20  Q   You're aware that you verified these responses to
21      interrogatories under oath?
22  A   Yes.
23  Q   Turn to response to Interrogatory No. 4, please.
24      I wanted to -- so Interrogatory 4 asks that you
25      "Identify each instance in which any person

Page 102

1   obtained Plaintiff's consent to use the stamp of
2   her signature, the person obtaining such consent,
3   the medium of obtaining such consent, and the date
4   such consent was obtained and the document on
5   the -- on which the stamp was used."  Correct?
6   A   That's what it says.
7   Q   And I wanted to ask you about your response,
8       specifically in the -- at the end of the second
9       paragraph on page 7, you state, "Plaintiff was
10      aware that the stamp was being used, did not
11      condition or withdraw her consent to the stamp's
12      use, and never suffered the stamp's use over her
13      or anyone else's objection."
14           Did I read that correctly?
15  A   I'm trying to find it.  I'm sorry.  Where are we
16      at?
17  Q   Oh, second paragraph.  At the end of it, it says,
18      "Thereafter, Plaintiff was aware that the stamp
19      was being used."
20  A   Okay.  Okay.
21  Q   How did you know that Stacy was aware her stamp
22      was being used?
23  A   Either Reed told me that she was aware or I became
24      aware myself.
25  Q   The next -- the first sentence of the third

Page 103

1   paragraph of the response says, "Defendants cannot
2   recall every occasion on which a person discussed
3   with Plaintiff usage of her signature stamp."
4        Do you see that?
5   A   I do.
6   Q   I believe what you've testified today is that each
7       and every time Stacy used -- Stacy's stamp was
8       used, either you or Reed discussed the use of the
9       stamp with her; is that correct?
10  A   If I recalled the occasion.
11  Q   Oh, are you now saying you don't know whether you
12      asked Stacy every time you used her signature
13      stamp?
14  A   Well, if there was a reason for her to -- to sign
15      a document, I would either -- I would either get
16      firsthand knowledge that that was okay to use it
17      or discuss with Reed, who would have gotten her
18      approval to use it.  But I wouldn't be able to
19      recall every occasion that I have ever done that.
20  Q   At the end of the response, the very last sentence
21      says, "Given the forgoing, Plaintiff's initial
22      provision of express consent for usage of the
23      stamp and her subsequent course of conduct
24      resulted in implied consent, if not express
25      consent, for use of the signature stamp on each

Page 104

1   occasion thereafter."
2        Did I read that correctly?
3   A   It appears you did, yes.
4   Q   Is it your position that you had implied consent
5       to use Stacy's signature stamp?
6            MR. CHURCHILL:  Objection to the
7        extent it calls for a legal conclusion.
8        You can answer.
9   A   Yeah.
10  Q   So you didn't think you needed her permission each
11      and every time you used the stamp; is that right?
12  A   I either did get it or got it through Reed; so if
13      implied means through Reed, so be it.
14  Q   Okay.  Was Stacy aware of the contents of the
15      documents that her signature was being affixed to?
16            MR. CHURCHILL:  Objection.  Calls
17        for speculation.  Lack of foundation.
18  A   When I presented them to her to sign, yes.
19  Q   When Stacy was in Florida and you would affix a
20      document to her signature -- her signature to a
21      document, did you email her copies of the
22      documents you were signing on her behalf?
23  A   Like I had previously said, many times, I'd ask
24      Reed if he had discussed the documents with her.
25      I don't know what he would have done.

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

---

Page 105

1  Q  My question isn't with regard to what Reed did.
2     It's with regard to what you did.
3        Did you send to -- to Stacy, by email or any
4     other means, copies of the documents that you were
5     affixing her signature to?
6  A  No.
7  Q  Why not?
8  A  We would have discussed them.  She didn't ask for
9     them.
10 Q  There were times between May of 2004 and May of
11    2020 that Stacy's stamp was not used to execute
12    documents, that she actually executed documents
13    herself; correct?
14 A  Correct.
15            (Exhibit No. 9 was marked for
16             identification)
17            THE STENOGRAPHER:  Exhibit 9.
18 Q  Mr. Kiesler, I'm handing you what has been marked
19    as Exhibit 9, and I'll ask you to turn to the
20    signature -- let me see.  It's signature page on
21    1287.  Do you see that?
22 A  I do.
23 Q  And this particular document was executed by
24    Stacy Randall by DocuSign; is that right?
25 A  It appears that way.

---

Page 106

1  Q  Why was DocuSign used in certain instances but not
2     others?
3  A  I don't know who the originator of this document
4     was.
5  Q  And this is the third amendment to shareholder
6     agreement?
7  A  Right.  I don't know if it wasn't initiated from
8     our attorney or from me.  Can't tell.
9  Q  So you did have the capacity to send Stacy
10    documents to DocuSign?
11 A  I don't recall in -- I don't recall at this time
12    period.
13 Q  Well, you said at that time period.  I just want
14    to close that out.  Did you ever -- did you ever
15    send Stacy documents to sign via DocuSign?
16 A  I don't recall.
17            (Exhibit No. 10 was marked for
18             identification)
19            THE STENOGRAPHER:  Exhibit 10.
20 Q  Mr. Kiesler, I'm handing you what has been marked
21    as Exhibit 10.  Do you recognize this as the
22    August 1st of the -- well, actually, let me have
23    you flip to Windy 1188.
24 A  I'm there.
25 Q  And this is a unanimous consent of the board of

---

Page 107

1     directors and shareholders of Windy Widen to
2     redeem a portion of Stacy's shares.  It says
3     275.5210?
4  A  When you say "Windy Widen," you mean Windy Waters?
5  Q  Yes.
6  A  Okay.  Yes.
7  Q  And that -- on the next page, you see Stacy's wet
8     signature; correct?
9  A  It appears that it is her wet signature; correct.
10 Q  Do you know why she would have signed certain
11    documents in some circumstances but DocuSigned in
12    other circumstances?
13 A  She was in town.
14 Q  And after you obtained Stacy's signature stamp in
15    two thousand -- around 2001, did you ever seek her
16    permission specifically to use that stamp?
17 A  She gave me permission to use the stamp when she
18    gave it to me.
19 Q  Do you ever recall Stacy telling you you couldn't
20    use her signature stamp?
21 A  Just -- just once.
22 Q  Was that -- was there only one instance where you
23    asked her specifically to use her signature stamp
24    and she said no?
25 A  No.  I don't recall the other times, though.

---

Page 108

1  Q  There were other times?
2  A  No.  I think -- I don't recall other times.
3  Q  So there could have been.  You just don't recall?
4  A  I don't recall.
5            MS. POLAKOWSKI:  We'll mark these
6            at the same time.
7            (Exhibit Nos. 11 and 12 were marked
8             for identification)
9            THE STENOGRAPHER:  Exhibit 11 and
10           12.
11 Q  Mr. Kiesler, I'm handing you what has been marked
12    as Exhibit 11 and 12.  Do you recognize these
13    documents as an exchange of text between yourself
14    and Stacy Randall?
15 A  Yes.
16 Q  And in Randall 74, you asked Stacy, "Is it okay
17    that I use your signature stamp on the consent
18    resolution for the buyback of the children's trust
19    shares?"  Correct?
20 A  That's what it states.
21 Q  And Stacy responded with a simple "No."  Correct?
22 A  That's what it states.
23 Q  Why did you seek her permission by text in
24    December of 2019?
25 A  Reed asked me to get her approval for this because

---

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 109

1    I think he was having trouble getting ahold of
2    her.  So I texted her, and she responded.
3  Q  And I understood your testimony to be that you --
4    every time you used Stacy's signature stamp,
5    either you would obtain her approval to do so or
6    Reed would; correct?
7  A  Correct.
8  Q  Do you ever recall a time -- other than this
9    particular exchange, did you ever ask her in
10   writing whether you could affix her signature
11   stamp?
12 A  I don't recall.
13           (Exhibit No. 13 was marked for
14           identification)
15           THE STENOGRAPHER:  Exhibit 13.
16           MS. POLAKOWSKI:  Thank you.
17 A  Thank you.
18 Q  Mr. Kiesler, you've just been handed what has been
19   marked as Exhibit 13.  This is a unanimous consent
20   resolution of the board of directors of
21   Windy Waters dated January 1, 2007; correct?
22 A  Yes.  That's what it states.
23 Q  And does it appear to you that Stacy's signature
24   stamp was affixed to this document?
25 A  Yes.

Page 110

1  Q  This particular document approves a redemption
2    that -- and authorizes you to enter into the
3    agreement on behalf of Windy Waters; correct?  And
4    I'll direct your attention to paragraph 3.
5  A  Yes, that's what it states.
6  Q  And paragraph 4 says that "the board and the
7    corporation waives any and all notices of meeting
8    to consider the matters incorporated in the
9    resolution and consents without a meeting as
10   provided under Wisconsin statutes."  Correct?
11 A  Yes.
12 Q  Do you recall whether you were present for the
13   execution of this document?
14 A  I don't recall.
15 Q  And it's signed by Price Widen and Stewart Widen?
16 A  Yes.
17 Q  And the signature stamp of Stacy Widen Randall is
18   affixed.  I believe you testified that no one
19   other than you affixed Stacy's --
20 A  Correct.
21 Q  -- signature to documents; correct?
22 A  Yes.
23 Q  So would it have been you who affixed Stacy's
24   signature to this document?
25 A  I assume so, yes.

Page 111

1  Q  Did you seek Stacy's permission to execute this
2    document on her behalf before you did so?
3  A  I would have either gone to her directly or gotten
4    approval through Reed.
5  Q  Do you have any direct recollection of that --
6  A  No --
7  Q  -- as you sit here today?
8  A  -- I don't.
9  Q  Do you know whether Stacy has ever seen this
10   document before?
11        MR. CHURCHILL:  Objection.  Calls
12        for speculation.
13 A  I don't.
14 Q  Did you ever provide this document to Stacy for
15   her review?
16 A  I don't recall.
17        (Exhibit No. 14 was marked for
18        identification)
19        THE STENOGRAPHER:  Exhibit 14.
20        MS. POLAKOWSKI:  Where did it go?
21        Did I give you a copy yet?
22        MR. CHURCHILL:  Not yet.
23 A  Thank you.
24        MR. CHURCHILL:  Thank you.
25 Q  Mr. Kiesler, I just handed you what has been

Page 112

1    marked as Exhibit 14.  It is a Unanimous Consent
2    Resolution of the Board of Directors of
3    Windy Waters dated December 31, 2009; correct?
4    I'm sorry, effective as of December 31, 2009.
5  A  Correct.
6  Q  The date of the document is actually 22nd of
7    March 2010; correct?
8  A  Correct.
9  Q  And do you see Stacy's signature stamp affixed on
10   this document?
11 A  I do.
12 Q  This document, again, approves a stock redemption
13   agreement and authorizes you, once again, to enter
14   into an agreement on behalf of Windy Waters;
15   correct?
16 A  Correct.
17 Q  And it, again, waives any and all notices of the
18   meeting to consider the matters incorporated in
19   the resolution?
20 A  Yes.
21 Q  And consents to a meeting -- consents without a
22   meeting; correct?
23 A  Correct.
24 Q  And, again, it would have been you that affixed
25   Stacy's signature stamp to this document?

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Michael J. Kiesler

Page 113

1  A  Assuming so.
2  Q  Did you speak to Stacy about this -- about this
3     unanimous consent resolution?
4  A  Either I would have firsthand or Reed would have
5     talked to her and gotten her approval to sign it.
6  Q  Do you have a specific recollection of discussing
7     this document with Stacy?
8  A  I do not.
9  Q  Do you have any recollection about speak -- of
10    speaking with Stacy about the redemption
11    agreement?
12  A  I do not.
13  Q  Do you have any reason to believe that Stacy has
14    ever seen this document before?
15  A  I don't know.
16  Q  Did you provide it to her?
17  A  I don't recall.
18  Q  I'll have you go back to, I think it was
19    Exhibit 10, unanimous consent resolution of the
20    board, and it's Windy 1177 on the bottom.  Do you
21    have that?
22  A  Yep.
23  Q  This document is actually a number of different
24    documents, so I'm just going to ask you a couple
25    of questions about it.

Page 114

1  A  Okay.
2  Q  Go to 1179, please.
3  A  I'm there.
4  Q  This is the minutes of the annual meeting of the
5     shareholders of Windy Waters, Inc.; is that right?
6  A  It is.
7  Q  And it's dated the 7th of December 2015; correct?
8  A  Correct.
9  Q  The first paragraph states that "The annual
10    meeting of the shareholders of Windy Waters, Inc.,
11    was held" -- it says "of," but I think it means
12    "on the 7th day of December 2015 pursuant to the
13    waiver of notice and consent signed by the
14    shareholders and annexed to the minutes of this
15    meeting."  Correct?
16  A  Correct.
17  Q  Was Stacy Randall present at this meeting?
18  A  To my knowledge, there is no meeting.  Mark Widen,
19    back when Mark was -- when I first started and
20    started doing this, told me to just put a date on
21    here.  And everybody knew, all the family members
22    knew, that these documents were around and being
23    done annually as a corporate -- a corporate
24    requirement.
25        So to answer your question was she aware of

Page 115

1     it, she was probably aware that annual meetings
2     were necessary as a corporate requirement.  But am
3     I specifically aware that she was aware, no.
4  Q  And this particular annual meeting was one where
5     Stacy Randall was elected to serve as a director
6     of Windy Waters; correct?
7  A  Correct.
8  Q  And you signed this document as the secretary of
9     Windy Waters?
10  A  Yes.
11  Q  Did you ever discuss Stacy's role as a director of
12    Windy Waters with her?
13  A  I do not recall.
14  Q  You said she probably would have been aware that
15    annual meetings was a -- were required for
16    corporations.  How -- how would she have been
17    aware of that?
18  A  Well, she allowed me to use her stamp on all
19    annual meeting-type documents, and that was during
20    a meeting in my office when she was there.
21        And I just said, "Hey, Stacy, these are just
22    annual documents for corporate governance.  Is it
23    okay if I just use your stamp every year for
24    those, for that purpose?"
25        And she said, "Yeah, go ahead."

Page 116

1  Q  So Stacy trusted you to affix her stamp without
2     seeing the documents?  She didn't need to see the
3     documents?
4  A  If it had to do with annual meetings.
5  Q  Turning to page 1180, the next page of the
6     document, it's titled "Waiver."  And it says, "We,
7     the undersigned being all of the shareholders of
8     Windy Waters, Inc., entitled to vote, do hereby
9     waive any and all notice of the time and place of
10    this annual meeting."
11        And it appears to be signed by both
12    Reed Widen and Stacy Randall; correct?
13  A  Correct.
14  Q  And that appears to be her signature stamp;
15    correct?
16  A  It appears that way.
17  Q  Did you affix her signature stamp to this
18    document?
19  A  I'm assuming I did.
20  Q  And is this the same waiver that was just
21    referenced in the annual meeting minutes that we
22    looked at, on 1179?
23  A  It appears to be.
24  Q  Were there any other shareholders of Windy Waters
25    in December of 2015 other than Reed Widen and

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 117

```
1         Stacy Randall?
2    A    Shareholders?
3    Q    Yes.
4    A    Of Windy Waters?
5    Q    Correct.
6    A    Yes.
7    Q    Were they voting shareholders?
8    A    No.
9    Q    Looking at the next page, 1180 -- I'm sorry, 1181,
10        the document is entitled "Minutes of Annual
11        Meeting of the Board of Directors of
12        Windy Waters."
13   A    I'm sorry.  1181?
14   Q    Yes, you got it.
15   A    Okay.
16   Q    And this is, again, an annual meeting minutes.
17            It says that "The meeting was called to order
18        and the following directors were present," and it
19        says "Stacy Randall."  Do you see that?
20   A    I do.
21   Q    Did this annual meeting actually happen?
22   A    As I just testified a little earlier, they were
23        all aware that these documents were needing to be
24        submitted for corporate governance, or
25        requirements, rather.  I guess I'll stop there.
```

Page 118

```
1    Q    So, and let me just reask the question:  Was there
2         a meeting --
3    A    No.
4    Q    -- an annual meeting in December of 2015?
5            So Stacy was not present at a meeting in
6         December of 2015; correct?
7    A    No.
8    Q    Bad question; bad answer.
9            Was Stacy present at an annual meeting in
10        December of 2015?
11   A    Not as this document states.
12   Q    Who would have drafted this?
13   A    The attorney.
14   Q    Do you know whether -- well, let me ask it this
15        way:  Did you specifically notify Stacy of an
16        annual meeting of the board of directors of
17        Windy Waters in December of 2015?
18   A    Going back to my previous statement, she was in my
19        office.  I asked her if I could just use her stamp
20        on all annual meeting minutes, documents, and she
21        said yes.
22   Q    So she would not have had specific notice of the
23        December 2015 annual meeting of the board of
24        directors of Windy Waters; correct?
25   A    She would not.
```

Page 119

```
1    Q    And the third -- fourth paragraph down says that
2         "The following individuals were duly nominated and
3         elected to serve as officers of the corporation,"
4         and Stacy Randall is listed as the president;
5         correct?
6    A    Yes.
7    Q    Did you ever notify Stacy that she was elected in
8         December of 2015 to serve as the president of
9         Windy Waters?
10   A    I don't recall, but Reed may have.
11   Q    Reed may have?  Is that your testimony?
12   A    I don't know.
13   Q    This was a meeting, or presumes to be a meeting,
14        where a redemption was voted on and approved;
15        correct?
16   A    Are we looking at 1181 and 1182?
17   Q    Correct.
18   A    It was activity that happened during that year.
19   Q    So the minutes of the annual meeting actually just
20        recorded activity that happened in the year 2015;
21        is that right?
22   A    This -- that is correct for this document.
23   Q    Did you ever discuss the redemptions that were
24        recorded in 11 -- Windy 1181 and Windy 1182 with
25        Stacy?
```

Page 120

```
1    A    Either I did or Reed Widen would have discussed
2         them with her.
3    Q    And I'm not interested in what may have or would
4         have happened.  I'm interested in your personal
5         recollection.
6            And my question is:  Do you have a personal
7         recollection of discussing the redemptions
8         referenced in 1181 and 1182 with Stacy?
9    A    Not currently, no.
10   Q    Do you have any basis to believe that Stacy was
11        aware of the redemptions referenced in Windy 1181
12        and 1182?
13   A    I don't have a basis for that.
14   Q    And is that your signature on the minutes?
15   A    Yes.
16   Q    Did you prepare these annual minutes?
17   A    The attorney provides a template, and I just
18        filled out the template.
19   Q    Turn, please, to Windy 1203.  This is a unanimous
20        consent of the board of directors and Class A
21        shareholders of Windy Waters.  Do you see that?
22   A    Yes.
23   Q    Have you ever seen this before?
24   A    I don't recall.
25   Q    Under the paragraph that's labeled "Recitals," it
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 121

1    indicates that it's effective December 24, 2019;
2    correct?
3  A  Yes.
4  Q  And that is -- this is the document by which --
5    or, which you had asked for in Exhibits 11 and 12
6    Stacy's signature on?  And if you need to look
7    back at those exhibits, feel free to do so.
8  A  That was 11 and 12?
9  Q  Correct.
10 A  We're on -- oh.
11 Q  Keep that document that you have in front of you
12    handy.
13 A  Okay.  Okay.  So this is -- yes, it appears to be
14    the same.
15 Q  And you had texted Stacy on December 26, 2019, and
16    asked if you could affix her signature; correct?
17 A  Right.
18 Q  But this document is actually effective
19    December 24th --
20 A  Correct.
21 Q  -- 2019?
22 A  Correct.
23 Q  And this is -- this was a document whereby the
24    shares of Reed's children's trust were redeemed,
25    essentially?

Page 122

1  A  Correct.
2  Q  And turning to Windy 1204, do you see Stacy's
3    signature stamp there?
4  A  I do.
5  Q  And you would have been the person to affix that
6    signature stamp on this document?
7  A  I'm assuming so.
8  Q  After Stacy told you, no, you could not use her
9    signature stamp on this document, did you
10    subsequently obtain her consent?
11 A  I did.
12 Q  When was that?
13 A  Same day.
14 Q  How?
15 A  Telephone.
16 Q  You called her?
17 A  I did.
18 Q  And she said, "Yes" --
19 A  Yes.
20 Q  -- "you may use my signature stamp"?
21 A  Yes.
22 Q  What else do you recall of that conversation?
23 A  Short.  I don't recall anything else.
24        (Exhibit No. 15 was marked for
25          identification)

Page 123

1        THE STENOGRAPHER:  Exhibit 15.
2  Q  Mr. Kiesler, I'm handing you what has been marked
3    as Exhibit 15 -- thank you -- and I apologize.
4        The first two are exhibits we've already --
5    the first two text messages are exhibits we've
6    already looked at, the text between you and Stacy
7    asking for her consent on -- to use her stamp on
8    the -- on the resolution.
9        I'd like you to turn to the third physical
10    page of the document, which is dated Thursday,
11    December 26, 2019, from yourself to Stacy.
12        After you told you, no, you could not use her
13    signature, you said, "Are you just kidding?"
14        Do you recall texting Stacy "Are you just
15    kidding?"
16 A  I do.
17 Q  Why did -- why did you text her that?
18 A  Because normally Stacy's not so one-worded.
19 Q  And then she responded, "No, I am not kidding.  I
20    cannot talk right now.  I'm under some extreme
21    pressure right now.  This will have to wait."
22        Is that right?
23 A  I see that.
24 Q  And that was at 4:18 on December 16 [sic]?
25 A  That's what it states, yep.

Page 124

1  Q  And it's your testimony that after 4:18 on
2    December 26th you called her and obtained her
3    consent to use her signature?
4  A  Yes.
5  Q  Do you recall why the document that we were
6    looking at Windy 1204 was backdated to
7    December 24th?
8  A  I don't.
9  Q  Did you tell Stacy that it would be backdated?
10 A  I don't recall.
11 Q  Did you describe the contents of this document to
12    Stacy when you talked to her and obtained her
13    consent to use her signature?
14 A  I did not.
15 Q  Do you have any reason to believe that Stacy was
16    aware of the contents of the documents at -- at
17    Windy 1203 and 1204?
18        MR. CHURCHILL:  Objection.  Calls
19          for speculation.
20 A  I don't know.
21        (Exhibit No. 16 was marked for
22          identification)
23        THE STENOGRAPHER:  Exhibit 16.
24        MS. POLAKOWSKI:  Thank you.
25 Q  Mr. Kiesler, I'm handing you what has been marked

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

Page 125

1    as Exhibit 16 --
2  A  Thank you.
3  Q  -- the minutes of the 2018 annual meeting of the
4     shareholders of Windy Waters.  Do you see that?
5  A  Yes.
6  Q  And do you see your signature on that document?
7  A  I do.
8  Q  And turning to the second page of the document, do
9     you see Stacy's signature stamp affixed there?
10 A  Yes.
11 Q  And you would have been the person to affix her
12    signature on -- on Exhibit 16?
13 A  I'm assuming so.
14 Q  The first paragraph of this document states that
15    "The annual meeting of the shareholders of
16    Windy Waters, Inc., was held on the 7th day of
17    December 2018."
18       Is it accurate to say that this meeting did
19    not occur?
20 A  Yes.
21 Q  And the second paragraph said, "The meeting was
22    called to order.  Stacy Widen and Reed Widen,
23    trustee of -- Stacy Widen and Reed Widen, trustee
24    of the Reed C. Widen and Leanne M. Widen revocable
25    trust of 2013, being all of the voting

Page 126

1     shareholders, were present."
2        They were not, in fact, present; correct?
3  A  I don't believe so.
4  Q  In other words, they were not present?
5  A  No.
6  Q  And this motion -- or, this document, again,
7     moves, seconds, and -- and carries the election of
8     Stacy as the sole director of the corporation;
9     correct?
10 A  That's what it states.
11 Q  Did you ever discuss this document with
12    Stacy Randall?
13 A  This is another annual meeting document; so it
14    would have been one of the documents that she gave
15    me explicit rights to sign.
16 Q  Do you have any basis to believe that Stacy ever
17    saw this document?
18 A  I don't know that.
19 Q  Do you have any basis to believe that Stacy knew
20    the contents of the document that is Exhibit 16?
21 A  I'm unaware of that.
22 Q  And then looking at the second page of the
23    document, there's a waiver there, stating that the
24    shareholders waive any and all notice of the time
25    and place of the annual meeting; correct?

Page 127

1  A  Correct.
2  Q  Were there any other voting shareholders of
3     Windy Waters in 2018?
4  A  No.
5              (Exhibit No. 17 was marked for
6              identification)
7           THE STENOGRAPHER:  Exhibit 17.
8  Q  Mr. Kiesler, I'm handing you what has been marked
9     as Exhibit 17.
10 A  Thank you.
11 Q  It is the 2019 Minutes of the Annual Meeting of
12    the Shareholders of Windy Waters, Inc.; correct?
13 A  Correct.
14 Q  And do you see your signature on that document?
15 A  Yes.
16 Q  Again, there's a reference to the annual meeting
17    in December of 2019 being held.
18       Is it your recollection that there was no
19    annual meeting of Windy Waters in 2019?
20 A  It's my recollection.
21 Q  And this is a meeting, again, at which Stacy was
22    apparently elected as a director of Windy Waters;
23    correct?
24 A  That's what it states.
25 Q  And it does state that she is elected as the sole

Page 128

1     director of the corporation for one year; is that
2     right?
3  A  Yes.
4  Q  Turning to the second page, there's a waiver, same
5     as 2018, where the sole voting shareholders were
6     Reed Widen and Stacy Randall; is that right?
7  A  Yes.
8  Q  And you see Stacy's signature stamp affixed there?
9  A  Yes.
10 Q  Would it have been you that affixed Stacy's
11    signature stamp to this document?
12 A  I'm assuming so.
13 Q  Do you have any reason to believe that Stacy ever
14    saw the -- saw this document?
15 A  I'd have no reason.
16 Q  Do you have any reason to believe that Stacy
17    understood the contents of these documents?
18 A  I don't know.
19             (Exhibit No. 18 was marked for
20             identification)
21          THE STENOGRAPHER:  Exhibit 18.
22 A  Thank you.
23 Q  Mr. Kiesler, you've just been handed what has been
24    marked as Exhibit 18.  It is a 2017 consent
25    resolution of the sole director of Windy Waters,

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 129

1      Inc.; correct?
2    A   Yes.
3    Q   And the sole director of Windy Waters, Inc., is
4        Stacy Randall?
5    A   Correct.
6    Q   Turning to the second page, do you see Stacy's
7        signature stamp affixed there?
8    A   Yes.
9    Q   And would you have been the person to affix
10       Stacy's signature stamp to Exhibit 18?
11   A   I'm assuming so.
12   Q   Was Stacy present at the time this document was
13       executed?
14   A   I don't know.
15   Q   Do you have any recollection of a meeting where
16       this was approved?
17   A   I do not.
18   Q   And this is a consent resolution whereby Stacy is
19       named the president of Windy Waters, Inc.;
20       correct?
21   A   Correct.
22   Q   Do you have any reason to believe that Stacy ever
23       saw this document?
24   A   I -- I don't know.
25   Q   Did you ever discuss the contents of this document

Page 130

1        with Stacy?
2    A   Not that I can recollect.
3    Q   This is going to feel a bit repetitive, but we'll
4        go through as quickly as we can.
5            (Exhibit No. 19 was marked for
6              identification)
7            THE STENOGRAPHER:  Exhibit 19.
8            MS. POLAKOWSKI:  Thank you.
9    Q   Mr. Kiesler, I'm handing you what has been marked
10       as Exhibit 19.  It is a 2017 consent resolutions
11       of the sole shareholder of Windy Waters, Inc.;
12       correct?
13   A   Yes.
14   Q   Do you recognize that as Stacy's signature stamp
15       on Exhibit 19?
16   A   I do.
17   Q   Did you affix Stacy's signature stamp to this
18       document?
19   A   I'm assuming so.
20   Q   Did you ever discuss the contents of this document
21       with Stacy?
22   A   I don't know.
23   Q   And this particular consent resolution elects
24       Stacy to serve as the sole director of the
25       corporation; is that right?

Page 131

1    A   Yes.
2    Q   Do you have any reason to believe that Stacy was
3        aware that she was elected as the sole shareholder
4        on December 9, 2017?
5    A   I don't.
6    Q   Do you know who drafted this document?
7    A   The attorney.
8    Q   There is -- under Stacy's signature, it says
9        "Sole Shareholder."  Do you see that?
10   A   Yes.
11           MR. CHURCHILL:  Objection.
12       Mischaracterizes document.  Above Stacy's
13       signature.
14   Q   Yes.  Immediately above the signature.
15           And then also the -- the title of the
16       document says "Consent Resolutions of the Sole
17       Shareholder of Windy Waters."  Do you see that?
18   A   I do.
19   Q   Stacy was not the sole shareholder in December of
20       2017, was she, of Windy Waters?
21   A   No.
22           (Exhibit No. 20 was marked for
23             identification)
24           THE STENOGRAPHER:  Exhibit 20.
25   Q   Mr. Kiesler, I'm handing you --

Page 132

1    A   Thank you.
2    Q   -- what has been marked as Exhibit 20.  Do you
3        recognize this as the 2016 Consent Resolutions of
4        the Sole Director of Windy Waters, Inc.?
5    A   I do.
6    Q   And on the second page, do you see Stacy's
7        signature stamp affixed on that document?
8    A   I do.
9    Q   And would it have been you to affix Stacy's
10       signature stamp on Exhibit 20?
11   A   Yes.  Again, with all these, with implied consent.
12   Q   So you did not obtain Stacy's permission
13       specifically for this document to affix her
14       signature?
15           MR. CHURCHILL:  Objection.
16       Mischaracterizes testimony.
17   A   I'm saying anything that related to the annual
18       meetings and those documents related to those
19       annual meetings, which also these are, she gave me
20       implied consent to -- to sign those with her
21       signature stamp.
22   Q   And Stacy is again appointed in Exhibit 20 as the
23       president of Windy Waters; correct?
24   A   Yes.
25   Q   Did you ever discuss the contents of this document

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 133

1   with Stacy?
2  A   I don't know.
3  Q   For any of these exhibits, 19 -- Exhibits 18, 19,
4      20, did you ever provide copies to Stacy before
5      you affixed her signature?
6  A   I don't recall.
7            (Exhibit No. 21 was marked for
8            identification)
9            THE STENOGRAPHER:  Exhibit 21.
10 Q   Mr. Kiesler, I'm handing you what has been marked
11     as Exhibit 21.
12 A   Thank you.
13 Q   Do you recognize this as a 2016 consent
14     resolutions of the sole shareholder of
15     Windy Waters, Inc.?
16 A   Yes.
17 Q   And do you see Stacy's signature stamp affixed
18     there?
19 A   I do.
20 Q   Would it have been you to affix Stacy's signature
21     stamp on this document?
22 A   I'm assuming so.  And, again, with implied
23     consent.
24 Q   And this -- by this document, Stacy is elected to
25     serve as the sole director of the corporation;

Page 134

1      correct?
2  A   Correct.
3  Q   Did you ever discuss the contents of this document
4      with Stacy Randall?
5  A   I don't recall.
6  Q   Do you have any reason to believe that Stacy was
7      aware of this document?
8  A   I don't know.  Other than the fact that she was
9      aware that I was signing annual meetings
10     documents.
11           (Exhibit No. 22 was marked for
12           identification)
13           MS. POLAKOWSKI:  I'm going through
14        all your stickers.
15           THE STENOGRAPHER:  Exhibit 22.
16 Q   Mr. Kiesler, I'm handing you what has been marked
17     as Exhibit 22.
18 A   Thank you.
19 Q   Do you recognize this as the 2015 Minutes of the
20     Annual Meeting of Shareholders of Windy Waters,
21     Inc.?
22 A   I do.
23 Q   And do you see your signature on that document?
24 A   Yes.
25 Q   And then, turning to the second page, do you see

Page 135

1      Stacy's signature stamp?
2  A   Yes.
3  Q   And it would have been you to affix Stacy's
4      signature stamp to page 2 of Exhibit 22?
5  A   Assuming so, with her implied consent.
6  Q   And by these annual minutes of the shareholders of
7      Windy Waters, Inc., Stacy was again elected to
8      serve as director of Windy Waters; correct?
9  A   Correct.
10 Q   Do you have any reason to believe Stacy ever saw
11     this document?
12 A   I don't know.
13 Q   Did you ever provide her with a copy of this
14     document?
15 A   I don't recall.
16 Q   Did you ever discuss Exhibit 22 with Stacy?
17 A   I don't recall, other than the fact that she was
18     aware that I was signing these documents.
19           (Exhibit No. 23 was marked for
20           identification)
21           THE STENOGRAPHER:  Exhibit 23.
22 Q   Mr. Kiesler, I'm handing you what has been marked
23     Exhibit 23.  Do you recognize this as a -- as the
24     Minutes of the Annual Meeting of the Shareholders
25     of Windy Waters dated December 8, 2014?

Page 136

1  A   Yes.
2  Q   And is this -- is that your signature on the first
3      page of Exhibit 23?
4  A   Yes.
5  Q   And by this document, was Stacy -- Stacy was
6      elected to serve as a director of the corporation?
7  A   Yes.
8  Q   And you see your signature on -- I may have asked
9      that already.
10 A   I do.
11 Q   Do you see your signature on the first page of 23?
12 A   I do.
13 Q   There's a line on the top of the document that
14     says "DocuSign Envelope ID."  Do you see that?
15 A   I do.
16 Q   Do you recall sending this document via DocuSign
17     for Price Widen to sign?
18 A   I don't recall if I did that or not.
19 Q   Looking at the second page of Exhibit 23, it looks
20     like Price Widen did, in fact, DocuSign this
21     document; correct?
22 A   Correct.
23 Q   And do you see Stacy Widen's signature stamp
24     there?
25 A   Yes.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 137

1   Q   Did you affix Stacy's signature stamp to this
2       document?
3   A   I'm assuming so, with her implied consent.
4   Q   Why would you have sent this by DocuSign to
5       Price Widen but not to Stacy Randall?
6   A   Because I had her implied consent.
7   Q   And this -- by this document, Stacy is again
8       appointed, elected as a director of the
9       corporation; correct?
10  A   Correct.
11  Q   Did you ever discuss the contents of Exhibit 23
12      with Stacy?
13  A   I don't recall.
14  Q   Do you have any reason to believe that Stacy was
15      aware of the document that is Exhibit 23?
16  A   I don't know.  Other than the fact that she gave
17      me implied consent to sign these.
18          (Exhibit No. 24 was marked for
19               identification)
20          THE STENOGRAPHER:  Exhibit 24.
21          MR. CHURCHILL:  How many more of
22      these do you think you have, Jess?  Are we
23      close to --
24          MS. POLAKOWSKI:  Well --
25          MR. CHURCHILL:  Should we break for

Page 138

1   lunch?
2           MS. POLAKOWSKI:  I was just going
3   to say, I see it's 12:20, and I know you've
4   got your thing, so . . .
5           MR. CHURCHILL:  So if you have
6   lots, maybe -- I hate to break your flow.
7           MS. POLAKOWSKI:  Yeah, I'm trying
8   to think here.  I've got five more.  It's up
9   to you.
10          MR. LAING:  Why don't we break.
11          MR. CHURCHILL:  Yeah.
12          MS. WITTENBERG:  If that's okay.
13          MR. CHURCHILL:  If you don't mind.
14          MS. POLAKOWSKI:  Totally fine, yep.
15          MR. CHURCHILL:  Okay.
16          MS. POLAKOWSKI:  So I'm just going
17  to make a note that we're leaving off on
18  Exhibit 24.
19          MR. CHURCHILL:  Yes, just marked
20  24.  Okay.  Thanks, Jess.
21          MS. POLAKOWSKI:  Yep.  Did I give
22  you your copy . . .
23          THE VIDEOGRAPHER:  Going off the
24  record at 12:22.
25          (A lunch recess is taken, 12:22 to

Page 139

1              1:30 p.m.)
2           THE VIDEOGRAPHER:  We're back on
3       the record at 1:30.
4   (By Ms. Polakowski)
5   Q   Good afternoon, Mr. Kiesler.
6   A   Thank you.
7   Q   Before the break, we were talking a little bit
8       about value and what the value of the companies
9       Widen Enterprises and Windy Waters was in May of
10      2020.
11          I believe you said you did not have an
12      understanding of the fair market value of the
13      company at that time; is that correct?
14  A   Correct.
15  Q   Who would have been in the best position to know
16      what the fair market value of the company was in
17      May of 2020?
18          MR. CHURCHILL:  Objection.  Calls
19      for speculation.  Assumes facts not in
20      evidence.  You can answer.
21  A   I don't know.
22  Q   And I believe you testified before the break that
23      you don't know what you would have done to
24      investigate the value of the company; is that --
25      did I understand your testimony correctly?

Page 140

1   A   The -- I was answering -- what was the question I
2       was answering?
3   Q   Well, I believe my question to you was:  What
4       would you have done to investigate or to find out
5       what the fair market value of the company was in
6       May of 2020?  Do you recall that question?
7   A   Not specifically, but what would I have -- what
8       I -- what was the reason for me to have -- to do
9       that?
10  Q   Well, as the CFO of the company, if you wanted to
11      determine what the fair market value of the
12      company was, how would you have gone about
13      determining that?
14  A   It --
15          MR. CHURCHILL:  Objection.
16      Objection.  Calls for expert testimony.
17      You can answer.
18  A   If it relates to the redemption of Stacy's shares,
19      there was no reason for me to go outside.
20  Q   And my question is just with regard to the fair
21      market value of the company generally.
22          If you wanted to know or to determine what
23      the fair market value of the company is, what --
24      what would you do to investigate that?
25          MR. CHURCHILL:  Same objection,

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 141

1        plus lack of foundation.
2  A   Since the fair market value on the open market is
3        to actually know what companies would pay and
4        buyers would sell for, I don't even know what I
5        would do.
6  Q   You would not determine the fair market value of
7        the company using the formula that's set forth in
8        the shareholder agreement; correct?
9                  MR. CHURCHILL:  Objection.
10              Mischaracterizes testimony.
11  A   That wasn't the purpose of that formula.  It was
12       to calculate the redemption price or subscription
13       price per share.
14  Q   Did you ever discuss the fair market value of
15       Widen Enterprises or Windy Waters with anyone?
16  A   No.  I didn't know what it was.
17  Q   Did anyone at Windy Waters or Widen Enterprises
18       ever disclose to you their opinions of the fair
19       market value of the company?
20  A   Not that I'm aware of.
21  Q   And, just to be very specific, did anyone ever --
22       did you ever discuss with anyone what
23       Widen Enterprises would sell for if
24       Widen Enterprises were to sell?
25  A   I did not.

Page 142

1  Q   As the CFO of the company, did you ever obtain an
2        appraisal of Widen Enterprises?
3  A   A formal appraisal, no.
4  Q   What about Windy Waters?  Did you ever have an
5        appraisal done of Windy Waters?
6  A   Not that I'm aware of.
7  Q   Have you ever seen an appraisal of
8        Widen Enterprises or Windy Waters?
9  A   I don't recall.
10              (Exhibit No. 25 was marked for
11              identification)
12              THE STENOGRAPHER:  Exhibit 25.
13  Q   Mr. Kiesler, I'm handing you what has been marked
14       as Exhibit 25.  Have you ever seen Exhibit 25
15       before?
16  A   No.  This doesn't look familiar to me at all.
17  Q   I'll direct your attention to the second paragraph
18       on the first page of Exhibit 25.
19              It says, "This letter serves as an update to
20       our complete valuation report presenting our
21       opinion as to the fair market value of the common
22       stock of Windy Waters, Inc., as of July 6, 2003,
23       the date of Mr. Mark A. Widen's death."  Correct?
24  A   That's what it says, yes.
25  Q   And it's dated -- the date of this document is

Page 143

1        July 22, 2004; correct?
2  A   Correct.
3  Q   And then this third paragraph down says, "The
4        purpose of our valuation calculations is to
5        determine an estimate of the fair market value of
6        a marketable, majority interest in 100 percent of
7        the equity in Windy Waters, Inc., as of
8        April 30, 2004."
9              Did I read that correctly?
10  A   Yes, you did.
11  Q   And would you interpret that to mean they are
12       determining what the company would likely sell
13       for?
14              MR. CHURCHILL:  Objection.
15              Document speaks for itself.  Lack of
16              foundation.  You can answer.
17  A   It says the fair market value of -- of the
18       marketable majority interest.
19  Q   There is a definition that appears towards the end
20       of the page of fair market value, and it's defined
21       as "The price, expressed in cash equivalents, at
22       which property would change hands between a
23       hypothetical willing and able buyer and a
24       hypothetical willing and able seller, acting at
25       arm's length in an open and unrestricted market,

Page 144

1        when neither is under compulsion to buy or sell
2        and when both have reasonable knowledge of
3        relevant facts."
4              Did I read that correctly?
5  A   Yep.
6              MR. CHURCHILL:  You omitted "in
7              terms of" in the first line.
8              MS. POLAKOWSKI:  Very good at
9              catching.
10              MR. CHURCHILL:  Otherwise, I'll
11              stipulate that it's correct.
12              MR. PALAY:  Such a stickler.
13  Q   Do you agree with that definition?
14              MR. CHURCHILL:  Objection.  Calls
15              for expert testimony.
16  A   I can't say if I do or don't.
17  Q   Turn, please, to page Windy 47997.
18  A   Okay.  I'm there.
19  Q   I'll direct your attention to the third full
20       paragraph of text that begins "Based on."  Do you
21       see that?
22  A   I do.
23  Q   Beginning of the page -- or, the middle of that
24       paragraph says, "It is our opinion that the fair
25       market value of a marketable, majority interest in

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 145

```
1       100 percent of the outstanding common stock of
2       Windy Waters, Inc., was 7,441,000 as of April 30,
3       2004."
4            Did I read that correctly?
5   A   Yes, you did.
6   Q   Do you know who had access to this document?
7   A   I don't.
8   Q   Was it in your files?
9   A   Not that I -- no.
10  Q   And you would agree with me that the revenue that
11      the company was generating in 2020 was
12      significantly greater than the revenue that the
13      company was generating in 2004?
14  A   What were the two dates?
15          MS. POLAKOWSKI:  Could you read
16      back the question for me, please.
17              THE STENOGRAPHER:  One moment,
18      please.
19              Question:  "And you would agree with me
20      that the revenue that the company was
21      generating in 2020" -- excuse me, "in 2020
22      was significantly greater than the revenue
23      that the company was generating in 2004?"
24  A   Significantly, don't know.  More, don't know.  But
25      I'm sure there's numbers to -- to back that up.
```

Page 146

```
1   Q   Did the company's revenue ever decrease year to
2       year in that period, from 2004 to 2020?
3   A   I don't recall.
4   Q   Did the company's software revenue ever decrease
5       from year to year during that period, 2004 to
6       2020?
7   A   Again, I don't recall.
8           (Exhibit No. 26 was marked for
9       identification)
10              THE STENOGRAPHER:  Exhibit 26.
11  Q   Mr. Kiesler, I'm handing you what has been marked
12      as Exhibit 26.  Let me first ask:  Have you ever
13      seen this document before?
14  A   It looks familiar.
15  Q   Were you involved in the creation of this
16      document?
17  A   I was not.
18  Q   It's dated December of 2020; is that right?
19  A   Yes.
20  Q   What is your -- you said it looks familiar.
21          What is your understanding of this document?
22  A   Matthew engaged ITR Economics and was working with
23      them.  And from what I recall, we had a few
24      meetings, Zoom meetings, where they presented
25      this, these graphs.  I don't recall why Matthew
```

Page 147

```
1       engaged him initially, though.
2   Q   Do you recall whether you were involved in
3       compiling financial information for the purpose of
4       these reports?
5   A   It would have come from our financial accounting
6       system.
7   Q   Took a look, please, at page Windy 0048041.
8           Do you see on that page of Exhibit 26 a graph
9       depicting the revenue growth at Widen Enterprises
10      from 2005 to the end of 2020?
11  A   Meaning this top line?
12  Q   Correct.
13  A   Yes.
14  Q   So back to my previous question, which was:  Do
15      you agree with me that there was substantial
16      revenue growth between 2004 and 2020 at
17      Widen Enterprises?
18              MR. CHURCHILL:  Objection.
19          Ambiguous.
20  A   It appears that there was growth.  I don't know
21      about substantial.
22  Q   Would you call it substantial growth?
23  A   Between '05 and '21?
24  Q   Correct.
25  A   Do we know what the numbers were between '05 and
```

Page 148

```
1       '21?
2   Q   I believe they're listed at the bottom of the
3       page.
4   A   '05 is not down there.
5   Q   Do you see December '20 --
6   A   December --
7   Q   -- that revenue was 27.5 million; correct?
8   A   Right, but what's in '05?
9   Q   Well, if we're estimating based on this graph, it
10      looks like it's a couple of million.
11  A   Okay.
12  Q   Correct?
13  A   Actually, yeah, it has increased.
14  Q   Would you agree with me that Widen Enterprises was
15      worth significantly more in 2020 than it was in
16      2004?
17              MR. CHURCHILL:  Objection.  Lack of
18          foundation.  Calls for expert conclusion.
19  A   I don't know if it was worth more on the open
20      market or not.
21  Q   What information would you need to determine that?
22  A   A willing buyer, willing seller.
23  Q   Who at the companies would you say has the most
24      knowledge of the companies' value?
25              MR. CHURCHILL:  Objection.  Vague.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 149

| | | |
|---|---|---|
| 1 | A | Based on the willing seller and willing buyer, |
| 2 | | my -- my opinion would be that nobody would. |
| 3 | | Nobody -- we didn't track that.  I mean, we |
| 4 | | didn't -- |
| 5 | Q | And so when you purchased 20 percent of the shares |
| 6 | | of the company in May 2020, you had no idea what |
| 7 | | the fair market value of the company was? |
| 8 | A | Nope. |
| 9 | Q | And you didn't think it was prudent to do anything |
| 10 | | to ascertain the fair market value of the company |
| 11 | | in May of 2020? |
| 12 | A | Nope. |
| 13 | Q | Would you agree with me that as of December 1, |
| 14 | | 2014, you knew that typically the value of a |
| 15 | | software -- of a software as a service company |
| 16 | | like Widen was based primarily on a multiple of |
| 17 | | the company's revenue? |
| 18 | A | No. |
| 19 | Q | You don't agree that you knew that? |
| 20 | A | I did not know that at that time. |
| 21 | | MS. POLAKOWSKI:  I'm missing a |
| 22 | | document.  Just give me a second. |
| 23 | | (Exhibit No. 27 was marked for |
| 24 | | identification) |
| 25 | | THE STENOGRAPHER:  Exhibit 27. |

Page 150

| | | |
|---|---|---|
| 1 | Q | Mr. Kiesler, I'm handing you what has been marked |
| 2 | | as Exhibit 27, and I apologize that it's a little |
| 3 | | hard to read. |
| 4 | A | No worries. |
| 5 | | MR. CHURCHILL:  Thank you.  You |
| 6 | | gave me two. |
| 7 | Q | Do you recognize Exhibit 27 as a true and correct |
| 8 | | copy of an email exchange between Gary Norris, |
| 9 | | Matthew Gonnering, with yourself and Mr. Reed |
| 10 | | Widen copied? |
| 11 | A | Yes. |
| 12 | Q | And do you see the date of the email as |
| 13 | | December 1, 2014? |
| 14 | A | Yes. |
| 15 | Q | And the title of the email is "Valuation"? |
| 16 | A | Yep. |
| 17 | Q | Do you see in this email where |
| 18 | | Matthew Gonnering -- towards the bottom of the |
| 19 | | page, Matthew Gonnering wrote "For valuation |
| 20 | | reference," and then he links to an article in the |
| 21 | | Milwaukee Journal? |
| 22 | A | I do. |
| 23 | Q | Who is Gary Norris? |
| 24 | A | He was our chief operating officer, I believe. |
| 25 | Q | And if you look at the third bullet point down in |

Page 151

| | | |
|---|---|---|
| 1 | | Matthew's email, he says, "The valuation of |
| 2 | | SaaS" -- and that stands for software as a |
| 3 | | service? -- |
| 4 | A | Yes. |
| 5 | Q | -- "companies are about twice those of traditional |
| 6 | | licensed software companies generating the same |
| 7 | | revenue." |
| 8 | | Did I read that correctly? |
| 9 | A | You did. |
| 10 | Q | And then the next bullet point down, he says, |
| 11 | | "Traditional software companies have an average |
| 12 | | enterprise value of three times revenue, while |
| 13 | | SaaS companies trade at a much higher multiple of |
| 14 | | 6.5 times revenue." |
| 15 | | Did I read that correctly? |
| 16 | A | You did. |
| 17 | Q | And then he concludes the email saying, "If |
| 18 | | you're keeping score at home, that's 8 million |
| 19 | | times 6.5 equals 52 million.  If you throttle the |
| 20 | | EBITDA for purposes of market valuation, perhaps |
| 21 | | we run at 2 million times 12 equals 24 million. |
| 22 | | And going up." |
| 23 | | Did I read that correctly? |
| 24 | A | You did. |
| 25 | Q | At this time Widen Enterprises was a software as a |

Page 152

| | | |
|---|---|---|
| 1 | | service company; correct? |
| 2 | A | '14, I believe so, yes. |
| 3 | Q | When did Widen transition to a SaaS company? |
| 4 | A | I don't recall. |
| 5 | Q | What impact, if any, did the transition of |
| 6 | | Widen Enterprises to a SaaS company have on |
| 7 | | Widen's revenue? |
| 8 | A | Very little at first.  And as it progressed, it |
| 9 | | became more and more, as opposed to the prepress |
| 10 | | revenue, right. |
| 11 | Q | What -- if you know, what was Widen's annual |
| 12 | | revenue before it transitioned to a SaaS company? |
| 13 | A | I don't know what "transition" really means |
| 14 | | because it was over many, many years, and I |
| 15 | | don't -- I wouldn't even be the one to define |
| 16 | | that. |
| 17 | Q | Okay.  So in his email where he's using EBITDA as |
| 18 | | a metric of value, he uses a multiple of 12 times |
| 19 | | EBITDA; correct? |
| 20 | A | Yes. |
| 21 | Q | Did you agree with Gonnering as to his estimates |
| 22 | | of value at this time? |
| 23 | A | I didn't read this. |
| 24 | Q | Never saw this before? |
| 25 | A | I do not recall this. |

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 153

```
 1   Q   As you sit here today, do you know whether these
 2       numbers represent the fair market value of the
 3       company as of 12/1/2014?
 4   A   No.
 5   Q   Did you ever tell Matthew that you didn't think
 6       these estimates represented the fair market value
 7       of the company?
 8   A   No.  I never read this.
 9   Q   If you had read this email --
10   A   Mm-hmm.
11   Q   -- would that have impacted your opinion of the
12       fair market value of the company?
13   A   I'd have to read it.  It appears that they're
14       trying to put numbers on -- on value.  But, again,
15       if you sell to a willing -- a willing buyer and a
16       willing seller without compulsion, I don't know if
17       this represents it or not.
18   Q   And in Matthew's email, he says, "Market value
19       somewhere between 24 and $52 million."  Correct?
20   A   Yes.
21   Q   Would you have disclosed that information to Stacy
22       in May of 2020 if you were aware of it?
23               MR. CHURCHILL:  Objection.
24           Ambiguous.
25   A   I don't know.
```

Page 154

```
 1   Q   And Matthew concludes his email, "And going
 2       up . . ."
 3           Did you agree with Matthew that the value of
 4       the company was going up as of December 1, 2014?
 5               MR. CHURCHILL:  Objection.  Assumes
 6           facts not in evidence.  Lack of foundation.
 7   A   I had never read this.
 8   Q   And the revenue did, in fact, increase year over
 9       year since 2014; correct?
10   A   It appears that way, yes.
11   Q   And, in fact, the revenue grew from 8 million to
12       more than three times that at the time Widen sold;
13       correct?
14               MR. CHURCHILL:  Objection.  Lack of
15           foundation.
16   A   I don't know.
17   Q   Do you know whether between 2014 and 2020 Widen's
18       annual revenue ever declined year over year?
19               MR. CHURCHILL:  Objection.  Asked
20           and answered.  But you can answer.
21               MS. POLAKOWSKI:  And this is where
22           I get to be specific, Mark, and say I asked
23           about 2004 to 2020.
24               MR. CHURCHILL:  Okay.  You got me.
25   A   What was this question, 2004 to 2020?
```

Page 155

```
 1   Q   Yes.  No.  2014 to 2020.
 2   A   Oh.  Can I go back to the graph?
 3   Q   Sure.  I'll represent to you that there's no
 4       downward trend on the graph.
 5   A   I think I remember seeing that.
 6   Q   So you agree with me that Widen's revenue
 7       increased every year, year over year, from 2014
 8       to two thousand --
 9   A   Total revenue; right?
10   Q   Correct.
11   A   Correct.
12   Q   And would you agree with me that Widen's software
13       revenue specifically also grew every year, year
14       over year, from 2014 to 2020?
15               MR. CHURCHILL:  Objection.  Lack of
16           foundation.
17   A   Yes.
18   Q   Did Matthew ever email you and Reed to say that he
19       believes SaaS companies do not sell at a multiple
20       of 6.5 times revenue?
21   A   Not that I'm aware of.
22   Q   And in this same email, Gary Norris responds to
23       Matthew and copies each of you and says, "I love
24       it.  Traditional software companies don't have the
25       tight client touchpoints we do and particularly
```

Page 156

```
 1       don't have an ongoing software subscription
 2       revenue."
 3           Did I read that correctly?
 4   A   Mm-hmm.  Yes.
 5   Q   It says, "Traditional software also doesn't offer
 6       the integrated professional support."
 7           You agree with these distinctions between
 8       SaaS and traditional software companies?
 9               MR. CHURCHILL:  Objection.  Lack of
10           foundation.
11   A   I don't have the knowledge of that.
12               (Exhibit No. 28 was marked for
13           identification.)
14               THE STENOGRAPHER:  Exhibit 28.
15               MS. POLAKOWSKI:  Thank you.
16   Q   Mr. Kiesler, I'm handing you what has been marked
17       as Exhibit 28.  Do you recognize this email as an
18       operational update sent from Matthew Gonnering to
19       Reed Widen with a copy to yourself on
20       February 23rd of 2018?
21   A   It says that, yes.
22   Q   And the subject line of the email says
23       "Operational Update, February 22nd"?
24   A   Yep.  Yes.
25   Q   And I asked you earlier about operational updates.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 157

1    Is this the type of email that you would be
2    referring to if you said operational update?
3  A  It would.
4  Q  Were these sent regularly?
5  A  It would be a great question for Matthew.  I don't
6    recall.
7  Q  Fair to say you expected these operational updates
8    to be accurate?
9  A  As accurate as Matthew had information.
10  Q  Did Matthew ever share these operational updates
11    with you before he sent them around to the group?
12  A  No.
13  Q  Turning to the first full substantive paragraph,
14    the -- the heading on the paragraph is "Bynder" --
15    that's B-y-n-d-e-r -- "acquires WebDAM."
16    Do you see that?
17  A  Acquired WebDAM?
18  Q  Yep, "Bynder acquires WebDAM"?
19  A  Are we in the second paragraph?
20  Q  The heading of the first paragraph.
21  A  Oh, I'm sorry.  Yes.
22  Q  What does that mean?  What do you understand
23    "Bynder acquires WebDAM" to be referring to?
24  A  In 2018, nothing.
25  Q  The second line of that first paragraph, at the

Page 158

1    end of the second line, it says, "This appears to
2    be stronger US front for Bynder (based in
3    Amsterdam) and a pickup of approximately
4    600 customers to give them a clear third place in
5    the DAM market.  Number 1, Adobe; number 2,
6    OpenText; number 4, Widen."
7    Did I read that correctly?
8  A  Yes.
9  Q  Did you agree with Matthew's analysis that Widen
10    was number four in the digital asset management
11    market?
12  A  I did not read this.  Again, I'll say these were
13    Reed's -- or, Matthew's way to update Reed, and he
14    just cc'd me on them.  I very rarely read them, if
15    ever, because I was living in the moment.  I
16    was --
17  Q  You were living it realtime?
18  A  Yeah.
19  Q  Were there other emails that Matthew, the CEO of
20    the company, sent that you regularly did not read?
21  A  I don't recall.
22  Q  What is the size of the digital asset management
23    market?
24    MR. CHURCHILL:  Objection.  Vague.
25  A  I don't have expertise on that.

Page 159

1  Q  Second paragraph down is titled "Valuation."  Do
2    you see that?
3  A  Yes.
4  Q  In the second line, at the end of the second line
5    says, "My guess is the valuation was a three to
6    four times revenue -- was three to four times
7    revenue.  If they were equivalent to our software
8    revenue last year, 14 million, then it works out
9    to 3.5 times revenue.  Using our projected 2018
10    software revenue of 18 million, our market
11    valuation on the 3.5 times revenue is 63 million."
12    Did I read that correctly?
13  A  You did.
14  Q  Did you agree with Matthew that as of February of
15    2018 the fair market value of the company was
16    $63 million?
17    MR. CHURCHILL:  Objection.  Lack of
18    foundation.
19  A  I wouldn't -- I wouldn't know.
20  Q  Did you ever disclose that to Stacy, that the fair
21    market value of the company was $63 million?
22    MR. CHURCHILL:  Objection.  Assumes
23    facts not in evidence.
24  A  There would be no reason for me to do that.  I was
25    unaware of it.

Page 160

1  Q  And then there's a paragraph with a heading
2    "GDPR."  Do you see that?
3  A  Yes.
4  Q  And that stands for General Data Projection
5    Relation?
6  A  I think it should say "Protection Regulation."
7  Q  Oh, fair enough.
8  A  Yeah.
9  Q  Mr. Gonnering in that paragraph says that "We have
10    activity in almost every country in the world."
11    Do you agree with Matthew that Widen had a
12    global presence?
13    MR. CHURCHILL:  Objection.  Lack of
14    foundation.
15  A  "Global" meaning just what?
16  Q  Worldwide, a presence around the world.  I guess,
17    what do you understand "global" to mean?
18  A  A worldwide presence, I -- what year was this,
19    '18?  So was this -- this was after we opened the
20    UK office, I think.  We had customers around the
21    world.
22  Q  And this -- fair to say as of February 23rd, 2018,
23    this is the only estimate of the fair market value
24    of the company that you would be aware of?
25  A  I wasn't aware of this.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 161

1  Q  Well, let me ask you this way:  As you sit here
2     today, are you aware of any other valuation, fair
3     market valuation of the company, as of
4     February 23rd of 2018?
5          MR. CHURCHILL:  Objection.  Assumes
6             facts not in evidence.  Misleading.  You can
7             answer.
8  A  We just looked at a valuation.  I don't recall
9     what the date on that was.
10 Q  2004.
11         MR. CHURCHILL:  Same objection.
12 A  I don't -- I'm unaware of any others.
13            (Exhibit No. 29 was marked for
14             identification)
15         THE STENOGRAPHER:  Exhibit 29.
16 Q  Mr. Kiesler, I'm handing you what's been marked as
17    Exhibit 29.
18 A  Thank you.
19 Q  And I will ask if you recognize this as an
20    operational update sent from Matthew Gonnering to
21    Reed Widen with a copy to yourself on August 10th
22    of 2018?
23 A  It is.
24 Q  And it's titled "Operational Update, August 10th."
25    Correct?

Page 162

1  A  It is.
2  Q  I'd like to direct your attention to the bottom of
3     the page where there's a paragraph heading
4     "Minority Stake Interest."  Do you see that?
5  A  I do.
6  Q  Mr. Gonnering reports in that paragraph that he
7     responded to a private equity firm, Five Elms
8     Capital, to listen.  Do you see that?
9  A  I do.
10 Q  Did you ever talk to Mr. Gonnering about his
11    conversation with Five Elms Capital?
12 A  Never.
13 Q  Were you aware that Mr. Gonnering had a
14    conversation with Five Elms Capital?
15 A  No.
16 Q  Matthew says in this paragraph that Five Elms
17    Capital expressed an interest in a minority stake.
18    Do you see that?
19 A  Where is that?
20 Q  Third line down.
21 A  Okay.  I see it.
22 Q  It says, "They expressed interest in a minority
23    stake."  Correct?
24 A  Correct.
25 Q  And at the end of the paragraph, Matthew says, "If

Page 163

1     we are valued at 80 million (4x software revenue
2     of 20 million), then a 10 percent stake provides
3     us $8 million in capital to deploy into labor and
4     marketing our new ventures."
5          Did I read that correctly?
6  A  You did.
7  Q  Did you ever respond to Matthew and tell him you
8     didn't believe the company was worth $80 million?
9  A  I never read this.
10 Q  And if you're using Mr. Gonnering's math here,
11    Stacy's 20 percent share would be worth
12    16 million; correct?
13         MR. CHURCHILL:  Objection.  Calls
14            for expert testimony.  Lack of foundation.
15 A  We used the formula we used for everyone to
16    calculate what her purchase price would be.
17         MS. POLAKOWSKI:  Are you able to
18            read back the question for me.
19         THE STENOGRAPHER:  One moment,
20            please.
21            Question:  "And if you're using
22         Mr. Gonnering's math here, Stacy's 20 percent
23         share would be worth 16 million; correct?"
24         MR. CHURCHILL:  What were my
25            objections?

Page 164

1          THE STENOGRAPHER:  "Objection.
2          Calls for expert testimony.  Lack of
3          foundation."
4          MR. CHURCHILL:  Also, assumes facts
5             not in evidence.  You can answer.
6  A  I wouldn't know.
7  Q  Well, let me just ask you to do some math, since
8     you are a CPA.
9          If a 10 percent interest is $8 million, what
10    would a 20 percent interest be worth?
11 A  16.
12            (Exhibit No. 30 was marked for
13             identification)
14         THE STENOGRAPHER:  Exhibit 30.
15 Q  Mr. Kiesler, I'm handing you what has been marked
16    as Exhibit 30.  Do you recognize this as another
17    operational update sent from Matthew Gonnering to
18    Reed Widen, with a copy to yourself, dated May 8,
19    2020?
20 A  Yes.
21 Q  May 8, 2020, would have been immediately prior to
22    Stacy's buyout; correct?
23 A  Correct.
24 Q  I'd like to direct your attention to the paragraph
25    that's titled "Software Revenue" in the middle of

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 165

1    the page. Do you see that?
2  A  I do.
3  Q  On May 8th of 2020, Mr. Gonnering wrote to you and
4     Reed and projected that Widen Enterprises'
5     software revenue for 2020 would be approximately
6     $27,440,000; correct?
7  A  Yes.
8  Q  And he represents that "Software revenue growth in
9     2020 is about 10 percent better when compared to
10    2019"; correct?
11 A  Yes.
12 Q  And May 8th of 2020, that would have been several
13    months into the pandemic also; correct?
14 A  Correct.
15 Q  And these numbers would have been based on your
16    accounting system?
17 A  They would.
18 Q  Did you ever write to Reed or Matthew and dispute
19    these numbers?
20          MR. CHURCHILL: Objection. Lack of
21       foundation.
22 A  I did -- I didn't read this document.
23 Q  Did you ever tell Reed or Matthew prior to
24    May 13th of 2020 that you did not believe software
25    revenue was likely to grow 10 percent in 2020?

Page 166

1  A  No, never had that conversation.
2  Q  Did you ever tell Stacy prior to May 13, 2020,
3     that the software revenue of Widen Enterprises for
4     2020 was projected to be $27,440,000?
5  A  I had no reason to.
6  Q  Did you tell Stacy in May of 2020 that revenues in
7     2020 were projected to grow 10 percent over 2019?
8  A  I wasn't aware of that.
9  Q  There's a paragraph heading that says
10    "2021 Planning" towards the bottom of the page.
11 A  Okay.
12 Q  There's -- and there's a list of four areas of
13    investment that Matthew talks about, and I just
14    wanted to ask: Number 4 is "pursue another
15    opportunity that we -- that we currently
16    researching." Do you see that?
17 A  I do.
18 Q  Do you know what he's talking about there?
19 A  I don't.
20 Q  And then he says, "An early projection shows
21    2020 [sic] around 31.5 million, an 18 percent
22    increase over 2020."
23          Did I read that correctly?
24 A  You did.
25 Q  Was that referring to Widen's software revenue?

Page 167

1  A  I -- I don't know. I can't tell.
2  Q  So in May -- on May 8th of 2020, five days before
3     Stacy's redemption, the CEO of the company was
4     projecting revenue growth in the following year of
5     18 percent; correct?
6          MR. CHURCHILL: Objection. Lack of
7       foundation. Lack of personal knowledge.
8  A  I'm -- I didn't know. I wouldn't have known if he
9     did that.
10 Q  Did you have any role in projecting revenues?
11 A  That was Matthew's.
12 Q  So even as of May 8, 2020, at the height of the
13    COVID pandemic, Widen was still projecting growth
14    of 18 percent?
15          MR. CHURCHILL: Objection. Lack of
16       foundation. Lack of personal knowledge.
17       Calls for speculation.
18 A  I -- I wouldn't know that.
19 Q  Would you expect Matthew's updates to Michael to
20    be accurate? I'm sorry, to Reed.
21 A  I have no reason to believe they wouldn't be.
22 Q  I'd like to pivot now to talk about the
23    redemption, Stacy's redemption, in May of 2020.
24          In your own words, tell me how the
25    transaction came about.

Page 168

1  A  Reed, on May 5th, emailed me and said that it
2     is -- or, not emailed me. He left me a voicemail.
3     He said that Stacy needs money again.
4          And then I called him back. And he said that
5     she's asking for money again and that we should --
6     because he was kind of annoyed with the fact that
7     she kept coming back to the company for money, and
8     him personally, I guess, that he wanted to sell
9     all of her shares to her using the formula that we
10    used for Price.
11 Q  Did -- sorry. Go ahead.
12 A  No, I'm done.
13 Q  Did he specifically -- in that first conversation
14    you had about the redemption, did he specifically
15    say he wanted to purchase all of her shares?
16 A  Yes.
17 Q  Did he specifically say he would not give Stacy
18    money other than to purchase all of her shares?
19 A  I don't recall that.
20          (Exhibit No. 31 was marked for
21       identification)
22          THE STENOGRAPHER: Exhibit 31.
23          MS. POLAKOWSKI: Thank you.
24 Q  In that first conversation on May 5th of 2020 with
25    Reed, did he specifically tell you that he wanted

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 169

1    to use the formula to buy Stacy's shares out?
2  A  We talked about how the price would be calculated
3    based on the formula.
4  Q  What do you recall about that discussion about the
5    price?
6  A  It was pretty short, just do it the same way we
7    did Stewart -- or, Price, rather.
8  Q  I am showing you what has been marked as
9    Exhibit 31.  I'll represent to you that this is a
10    text message exchange between yourself and
11    Matthew Gonnering dated April 12th of 2019.
12        Do you see that?
13  A  Yes.
14  Q  And the topic of this exchange is Reed's bonus for
15    a tax bill at -- specifically, at April 12th, at
16    5:10 p.m., you text Matthew and say, "Reed has a
17    substantial tax bill that he has asked the company
18    to pay via bonus."
19        Did I read that correctly?
20  A  Yes.
21  Q  And he says, "Of which will -- of which will be
22    grossed up for tax reasons."  True?
23  A  True.
24  Q  Were you concerned that this bonus was not based
25    on Reed's services to the company but, rather, on

Page 170

1    Reed's cash needs?
2  A  Basically, Reed -- I said, "Reed has a substantial
3    tax bill."  So I guess I wouldn't know other than
4    that.
5  Q  And then Matthew asks you, "Does a shareholder
6    distribution have less tax consequences?"
7    Correct?
8  A  Correct.
9  Q  And you later, at 5:17, say, "Would have to be
10    pro rata to all shareholders."  Correct?
11  A  Correct.
12  Q  So you were aware if the company issued a
13    distribution, it needed to be pro rata to all
14    shareholders?
15  A  Correct.
16  Q  So if you're looking to get money just to Reed,
17    one owner, you couldn't do that through a
18    distribution?
19  A  Correct.
20  Q  Did you have any concern in April of 2019 that the
21    other shareholders, of which you were one, were
22    essentially being deprived of their share of a
23    distribution?
24  A  No.
25  Q  And then in the same text thread, after you said

Page 171

1    it would have to be pro rata to all shareholders,
2    you said a "much larger number"; correct?
3  A  Correct.
4  Q  And then Matthew says "Plan A"?
5  A  Correct.
6  Q  So because a distribution would have had to be
7    pro rata to all shareholders, you and
8    Matthew Gonnering decided to pay Reed through a
9    bonus rather than a distribution?
10        MR. CHURCHILL:  Objection.
11       Mischaracterizes document and testimony.
12       You can answer.
13  A  It says Matthew said "Plan A."
14  Q  Did you understand Plan A to refer to --
15  A  But he's telling me Plan A.
16  Q  Just so I'm clear, Matthew is telling you, "Let's
17    pay Reed as a bonus rather than a distribution
18    because a distribution would have to be pro rata
19    to all shareholders"?
20        MR. CHURCHILL:  Objection.  Calls
21       for speculation.
22  A  I can't say what Matthew is thinking, but he's the
23    one that said Plan -- go with Plan A.
24  Q  Okay.  The very last text in this thread, back in
25    April of 2019, refers to a redemption with Stacy.

Page 172

1        You say, "Another fyi... Redemption
2    transaction has been completed with
3    Stacy Randall."  Do you see that?
4  A  Yes.
5  Q  What was Mr. Gonnering's role with respect to
6    ownership of the company in 2019?
7  A  I just updated him with all information.  I kept
8    him privy to everything I did.
9  Q  I'm sorry?
10  A  I kept him privy to everything I did.
11  Q  Why?
12  A  Because he's my boss.
13  Q  And so with regard to reporting to Mr. Gonnering
14    on the ownership of the companies, would it be
15    fair to say you didn't distinguish between Widen
16    and Windy Waters in reporting the ownership
17    updates to Mr. Gonnering?
18  A  Meaning there's a distinction between the
19    companies?
20  Q  Correct.
21  A  No.  We -- we considered them one when it came to
22    things like that.
23  Q  Okay.  When you were dealing with Stacy -- so Reed
24    calls you on May 5th and says he wants to redeem
25    all of Stacy's shares, and then you called Stacy;

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 173

1    is that right?
2  A  The next day.
3  Q  Tell me about that conversation.
4  A  Sure.  I called her up.  She said, "I need money
5     for legal fees."  And she said, "I need 100,000."
6        And I said I don't know if we could provide
7     that much or make that available to her.  And then
8     she said, "How about 50?"
9        And I said, "I still don't know if we can
10    make that available to you."  And I said, "Reed
11    would like to purchase all of your shares."
12       And she didn't know, obviously, at that point
13    what that meant to her from a monetary value.  So
14    I told her that I would go through it with her on
15    my -- you know, I was on my computer.  And so I
16    pulled up the stock summary and register and along
17    with the spreadsheet that I had created that we've
18    looked at.
19       And I told her -- well, I calculated the
20    amount based on her A's and B shares and the price
21    per share of the November 2019 price per share
22    calculations because I hadn't done an update for
23    12 -- 2019.  And I told her I would have to update
24    it.  But I told her the amount, and she said,
25    "That seems awfully low."

Page 174

1        And I said, "Well, let me explain to you how
2     we went through it."  So I went through each line
3     item with her and explained what the number was.
4        And then she -- what did she do?  She --
5     well, I explained to her that it needed to be
6     updated, and she -- I don't know if she said -- I
7     can't remember what else she said, but basically,
8     it was, "Reed makes the decision," because she was
9     kind of, like, trying to bargain with me.
10       And I said, "Reed -- Reed has the ultimate
11    decision.  I have to verify.  You know, I have to
12    make sure with him."
13       And so I said, "Let me know -- but let me
14    know what you think before the end of the day."
15  Q  When you were negotiating this with Stacy, was it
16    your belief that you were doing so on behalf of
17    Reed?
18  A  Well, I wasn't negotiating.
19  Q  Well, you said she tried to bargain with you.
20  A  Well, she was telling me that it wasn't enough,
21    and I told her, "Well, it's the same formula we've
22    always used, 32" -- I didn't know how many times,
23    but it was 32 times prior and that it was the same
24    formula that we used for her and for her brothers.
25       And so she was like -- she -- I don't know

Page 175

1     what she was like, but then I basically came to
2     the point where I said Reed makes the final
3     decision on this, whether or not he wants to sell
4     all of her shares or not, not the formula.
5  Q  Were you -- did you believe you were acting on
6     Reed's behalf when you were talking to Stacy?
7              MR. CHURCHILL:  Objection to the
8         extent it calls for a legal conclusion.
9  A  No.
10  Q  Whose interests did you have in mind?
11  A  Well, I was just, you know, stating that if she
12    wanted to sell her shares, it would have to be
13    based on this formula.
14  Q  Why did you tell her it would have to be based on
15    the formula?
16  A  Because that's what we've done in the past, and
17    I've been consistent with that for all of the many
18    times we've done it in the past.
19  Q  You did not disclose to her the revenue of
20    Widen Enterprises at that time, did you?
21  A  Net income, which incorporated --
22  Q  $200,000?
23  A  Which incorporates revenue.
24  Q  You didn't tell her that the company made
25    $27 million that year?

Page 176

1  A  Net?  Net income or just the sales revenue?
2  Q  Revenue.
3  A  Just -- it was based on net income.
4  Q  Did you think you ought to disclose anything to
5     Stacy along those lines?
6  A  Any kind of redemptions were based on that
7     formula, and subscriptions.
8  Q  You said you told her in the call that she -- that
9     you could not make $100,000 available to her;
10    correct?
11  A  Correct.
12  Q  You were certainly aware that Widen Enterprises
13    and/or Windy Waters had sufficient cash to make
14    $100,000 available to her; correct?
15             MR. CHURCHILL:  Objection.  Assumes
16        facts not in evidence.
17  A  This -- this goes to the PPP loan that we received
18    in -- on April 13th, I think, it was.  There was a
19    safe harbor on the 17th -- or, on the 7th, rather.
20    And so we wanted -- Stacy was really in need of
21    this money, from what I could tell in the
22    conversation.
23       So we wanted to get her the money, but I knew
24    that there was a safe harbor deadline of the
25    following day; so that's why I wanted to go and

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

Page 177

1    get -- and get an answer by the end of the day so
2    that we could, as a company, make a decision
3    whether or not we needed to -- to actually return
4    the money to the government.
5             MS. POLAKOWSKI:  Can you read back
6        my question, please.
7             THE STENOGRAPHER:  One moment,
8        please.
9             Question:  "You were certainly aware
10       that Widen Enterprises and/or Windy Waters
11       had sufficient cash to make $100,000
12       available to her; correct?"
13  A  No.
14  Q  **You weren't aware that at that time Windy Waters**
15     **had $5.5 million invested in the money market?**
16  A  Which included PPP.  Well --
17  Q  **2.7?**
18  A  -- cash equivalents, yes.
19  Q  **So if we deduct the 2.7 million PPP loan from the**
20     **5.5 million that you had on hand, there's still**
21     **ample money --**
22             MR. CHURCHILL:  Objection.
23  Q  **-- to provide Stacy with $100,000; correct?**
24             MR. CHURCHILL:  And objection.
25       Assumes facts not in evidence.

Page 178

1   A  No.  We had approximately, was it, 2 million a
2      month in expenses.  I mean, it would -- $550,000
3      payrolls.  It -- it was right during -- I mean, it
4      was in the middle of COVID, and we didn't know
5      what our customers would do if we didn't -- you
6      know, if we didn't have money coming in,
7      obviously, we would not have been able to afford
8      it.
9   Q  **Well, the 5.5 million that I'm talking about sat**
10     **in Windy Waters.**
11     **Is it your testimony today that Windy Waters**
12     **money was used to pay the expenses at**
13     **Widen Enterprises?**
14  A  If need be.
15  Q  **And is it also your money -- or, your testimony**
16     **today that that 5.5 million sitting at**
17     **Windy Waters in May of 2020 included the**
18     **$2.7 million of Widen Enterprises' PPP?**
19  A  I don't -- I think -- I don't think so.
20  Q  **And if Widen Enterprises was having financial**
21     **difficulty, as you suggest, why did**
22     **Widen Enterprises think it was a good idea to pay**
23     **Stacy $1.3 million for all of her shares at that**
24     **time?**
25  A  We didn't -- financial difficulties is what you

Page 179

1      say.  I don't think -- I didn't say that.
2   Q  **The company wasn't having financial difficulties**
3      **in May of 2020; correct?**
4             MR. CHURCHILL:  Objection.
5        Ambiguous.
6   A  We were in the middle of COVID.  Nobody knew
7      anything.  There was so much uncertainty, so much
8      fear, so much economic volatility.  Nobody knew
9      anything.  We -- we would go home.  We would see a
10     test curve on TV, nobody knew anything.
11            As far as -- I'm sorry, what was the
12     question again?
13  Q  **Let me just back up.  As of May of 2020, the CEO**
14     **of the company was projecting 18 percent growth**
15     **for 2021; correct?**
16  A  It was down from what the original growth numbers
17     were.
18  Q  **Can you answer my question?**
19  A  Yes.
20  Q  **You would agree with me that there were internal**
21     **discussions at Widen Enterprises about purchasing**
22     **the entirety of Stacy's shares before she came to**
23     **you or Reed in May of 2020?**
24            MR. CHURCHILL:  Objection.  Lack of
25       foundation.

Page 180

1   A  She came to Widen doing what?  What was the
2      question?
3             THE STENOGRAPHER:  One moment,
4        please.
5             Question:  "You would agree with me that
6        there were internal discussions at
7        Widen Enterprises about purchasing the
8        entirety of Stacy's shares before she came to
9        you or Reed in May of 2020?"
10            MR. CHURCHILL:  My objection was
11       lack of foundation.
12  A  Not that I'm aware of.
13            (Exhibit No. 32 was marked for
14            identification)
15            THE STENOGRAPHER:  Exhibit 32.
16            MS. POLAKOWSKI:  31?
17            THE STENOGRAPHER:  32.
18            MS. POLAKOWSKI:  32, okay.
19  Q  **Mr. Kiesler, I've just handed you what has been**
20     **marked as Exhibit 32.  It is a series of text**
21     **messages between Matthew Gonnering and yourself**
22     **dated October 16, 2019; correct?**
23  A  Correct.
24  Q  **I'm turning to the second page of the exhibit.**
25     **Matthew Gonnering sent you a text on**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 181

1    October 16th of 2019, indicating, "A few things we
2    should explore about a conversation I had with
3    Reed yesterday: 1), buy back the shares of the
4    children's trust (Reed wants to dissolve the
5    trust) and Stacy after the year-end valuation
6    (with spacing of payments);
7         "2), After those transactions, explore the
8    benefits of paying Reed (and Gary) in dividends
9    instead of wages."
10        Correct? Did I read that correctly?
11  A  Correct.
12            MR. CHURCHILL: Objection. The
13        first sentence reads "a few things we should
14        explore after a conversation I had with Reed
15        yesterday."
16            You stated that the sentence said "a few
17        things we should explore about a conversation
18        I had with Reed yesterday."
19            MS. POLAKOWSKI: Thank you.
20  Q  Do you recall having a discussion with
21     Mr. Gonnering about that conversation that he had
22     with Reed?
23  A  I don't.
24  Q  Did you ever talk to Reed about the conversation
25     he had with Matthew?

Page 182

1   A  I didn't.
2   Q  Did you have an understanding as to why Matthew --
3      strike that.
4         Did you have an understanding as to why Reed
5      wanted to buy back Stacy's shares in October of
6      2019?
7             MR. CHURCHILL: Objection. Assumes
8         facts not in evidence. Misleading.
9   A  I don't.
10  Q  And the last part of that text message says,
11     "Explore the benefits of paying Reed (and Gary) in
12     dividends instead of wages."
13        Did I read that correctly?
14  A  Yes.
15  Q  And do you understand if payments are made in
16     dividends rather than wages, they must be paid
17     pro rata to all shareholders?
18  A  Yes.
19  Q  So if Stacy was bought out, Matthew wanted to
20     explore the benefits of paying Reed and Gary in
21     dividends instead of wages; correct?
22            MR. CHURCHILL: Objection.
23        Mischaracterizes the document. Misleading.
24        You may answer.
25  A  It states here that he wants to explore those

Page 183

1      types of things.
2   Q  Back to that May 6th conversation you had with
3      Stacy, did you do any analysis to determine
4      whether the company could afford to buy $100,000
5      worth of Stacy's stock at that time?
6   A  No. But going back to that previous question that
7      you asked, we felt that it would be easier to pay
8      her in payments, small payments, over time rather
9      than a lump sum, and it would look maybe different
10     to the government if they audited us.
11  Q  Okay.
12            (Exhibit No. 33 was marked for
13            identification)
14            MS. POLAKOWSKI: 33?
15  Q  Mr. Kiesler, I'm handing you --
16  A  Thank you.
17  Q  -- what has been marked as Exhibit 33.
18        Do you recognize Exhibit 33 as another text
19     exchange between Matthew Gonnering and yourself?
20  A  Yes.
21  Q  And the date on this exchange is October 22nd of
22     2019; correct?
23  A  Correct.
24  Q  And Mr. Gonnering texts you and says, "Hey, CFO
25     guy... pretend company valuation is 50 million

Page 184

1      and Reed decided to sell. Based on his ownership
2      percent, he now had blank-million in post-sale
3      cash and he reinvested that amount in the market
4      at an average S&P return rate, what would his
5      annual return be?"
6         Did I read that correctly?
7   A  Yes.
8   Q  And then in response, you said, "I just sent you
9      an email"?
10  A  I responded to him; correct.
11  Q  In your email to him, did you say, "Matthew, the
12     company's not worth $50 million"?
13  A  No. I sent him a -- what time was this, 9:03? I
14     sent him a spreadsheet of what he was looking for.
15  Q  Did you ask Mr. Gonnering what the basis was for
16     his valuation of $50 million?
17  A  I did not.
18  Q  When you were, just a moment ago, talking about
19     structuring Stacy's -- Stacy's payments over the
20     course of years, that was to avoid the appearance
21     of paying her -- of redeeming her shares
22     immediately; correct?
23  A  No.
24  Q  When was that discussion?
25  A  Of paying her over 84 months?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

Video Deposition of Michael J. Kiesler

Page 185

1  Q  Correct.
2  A  On the 5th.
3               THE STENOGRAPHER:  Did you say
4      "84"?
5               THE WITNESS:  84.
6               THE STENOGRAPHER:  Thank you.
7  Q  Did you discuss that with Reed?
8  A  Yeah.
9  Q  And that was to do with the PPP loan?
10  A  Mm-hmm.
11  Q  That's a yes?
12  A  Yes.
13           (Exhibit No. 34 was marked for
14           identification)
15               THE STENOGRAPHER:  Exhibit 34.
16  Q  Mr. Kiesler, I'm handing you what has been
17    marked as Exhibit 34.
18        Do you recognize this as another operational
19    update from -- from -- well, this appears to be an
20    email from Reed Widen to Matthew Gonnering,
21    copying you, which -- thanking Matthew for the
22    operational update which was sent on November 22nd
23    of 2019; correct?
24  A  Correct.
25  Q  And this would have been -- so November of 2019.

Page 186

1    I think the last exhibit, the text message we
2    looked at, were October of 2019, for context.
3  A  Yes.
4  Q  Took a look, please, at the paragraph titled
5    "Stock Purchase Request."  Do you see that?
6  A  Yes.
7  Q  In that paragraph, Matthew says, "In a
8    conversation with Gary this week, he requested the
9    purchase of additional Windy Waters shares.  I
10    communicated that he should have that conversation
11    with you.  I also told him I would advise you on
12    this request to manage his expectation, and that
13    his advice is as follows:  We've been working" --
14    excuse me, "and that advice is as follows:  We
15    have been working on buying back shares, as the
16    weighted EBITDA valuation is low.  I recommend we
17    do not sell more shares and continue the share
18    buybacks of specific shareholders as previously
19    outlined."
20        Did I read that correctly?
21  A  Yes.
22  Q  Did you ever do an analysis of whether the
23    weighted EBITDA valuation is low?
24  A  Not with respect to this, no.
25  Q  Did you ever tell Stacy that the weighted EBITDA

Page 187

1    valuation is low?
2  A  I did not.  Can you hold on a minute?  Let me just
3    read this one more time here.  Okay.
4  Q  Did you -- do you have a recollection of reviewing
5    this operational update when it was received?
6  A  I did not.
7  Q  And at this point in time -- so he says, "And
8    continue the share buybacks of specific
9    shareholders, as previously outlined."
10        Do you see that?
11  A  I do.
12  Q  Do you know, is that in reference to the previous
13    text message that we just looked at where you
14    discussed buying Stacy's shares and the children's
15    trust?
16  A  I don't -- I don't know for sure.
17  Q  Had any other shareholders executed buybacks
18    recently?
19  A  I wish I knew.  We were buying back -- we bought
20    back Terry Vial and Brian Becker's shares, but I
21    don't know -- I can't recall when that was.
22  Q  Took a look at the paragraph at the top of the
23    page that's titled "2019 EBITDA + Revenue."
24        Do you see that?
25  A  Yep.

Page 188

1  Q  In this email Mr. Gonnering is representing that
2    "software revenue is 23.97 million.  Our
3    2009 [sic] total revenue is projected at
4    27.96 million, 20 percent growth over last year."
5        Did I read that correctly?
6  A  You did.
7  Q  And, again, would those numbers have come from the
8    accounting system you were responsible --
9  A  (Indiscernible).
10  Q  -- for maintaining?
11               THE STENOGRAPHER:  Your answer
12      again?
13  A  Presumably so.
14               THE STENOGRAPHER:  Thank you.
15  Q  Fair to say that as of November of 2019, Widen was
16    doing quite well at 20 percent growth?
17           MR. CHURCHILL:  Objection.
18      Ambiguous.
19  A  It appears we were doing 20 percent growth.
20  Q  And as the CFO of the company, did you believe
21    that 20 percent growth year over year was a good
22    metric?
23  A  I didn't.  Not "I didn't," but I didn't think that
24    way.
25  Q  Sure.  So you didn't think about it?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 189

1   A   No.
2   Q   Took a look, please, at the paragraph that's
3       titled "2020 Current Snapshot."  Do you see that?
4   A   I do.
5   Q   And that paragraph says, "Revenue for next year is
6       projected at 32.43 million, of which 29.45 million
7       is software and 2.98 million is content
8       production.  EBITDA is 1.18 million or
9       3.6 percent."
10          Did I read that correctly?
11  A   You did.
12  Q   Fair to say that as of November of 2019,
13      Mr. Gonnering was projecting that 2020 would be
14      another strong year?
15                  MR. CHURCHILL:  Objection.  Calls
16          for speculation.  Lack of foundation.
17  A   It looks like Matthew was stating what he stated
18      here.
19                  (Exhibit No. 35 was marked for
20                  identification)
21                  THE STENOGRAPHER:  Exhibit 35.
22  Q   Mr. Kiesler, I'm handing you what has been marked
23      as Exhibit 35.
24  A   Thank you.
25  Q   Do you recognize this as an email from yourself to

Page 190

1       Scott Seid titled "Stock Redemption Question" on
2       Thursday, April 21st, of 2016?
3   A   Yes.
4   Q   You had asked Mr. Seid, "Terry -- Terry has a
5       stock transfer agreement that discusses value and
6       redemption upon termination."  Do you see that?
7   A   I was trying to read the whole thing.  Hold on.
8       Where are you at?
9   Q   Third -- let's see.  Third paragraph down begins
10      "There is no issue with that, is there?"
11          And then it says, "Terry has a stock transfer
12      agreement that discusses value and redemption upon
13      termination.  So that wouldn't come into play
14      here, correct?"
15          Did I read that correctly?
16  A   I -- yeah, I see that.
17  Q   So was it your understanding at this time that the
18      stock transfer agreement between the company and
19      Terry Vial required redemption to be based on a
20      certain number?
21  A   I'm not -- I'm not sure what this is -- I'm not
22      sure what the genesis of this was.
23  Q   Well, the second paragraph says, "Windy Waters
24      would like to purchase Terry -- would like to
25      purchase and Terry Vial would like to redeem all

Page 191

1       of his Windy Waters shares."
2   A   Mm-hmm.
3   Q   "Terry is not terminating employment.
4       Windy Waters would like to just consolidate
5       ownership as much as possible."
6   A   Sure.
7   Q   Do you see that?
8   A   Mm-hmm.
9   Q   So as of April 21, 2016, you were certainly aware
10      that the -- that the company was attempting to
11      consolidate ownership as much as possible;
12      correct?
13  A   It appears that way.
14  Q   And you were asking about -- asking Mr. Seid, the
15      company's attorney, about the valuation that would
16      have to be purchased -- or, utilized to purchase
17      Mr. Vial's stock back; correct?
18  A   It appears that way, yeah.
19  Q   And it looks like you -- it was your understanding
20      that the stock transfer agreement had a set value;
21      correct?
22                  MR. CHURCHILL:  Objection.
23          Document speaks for itself.
24  A   I was just stating that there was a stock transfer
25      agreement that discusses a value.

Page 192

1   Q   Where did you get that directive, to consolidate
2       ownership as much as possible, from?
3                   MR. CHURCHILL:  Objection.
4           Mischaracterizes testimony.
5   A   I don't recall.
6   Q   Do you recall whether Reed told you to consolidate
7       ownership as much as possible?
8                   MR. CHURCHILL:  Same objection.
9   A   I don't recall that.
10  Q   Did Stacy tell you to consolidate ownership as
11      much as possible?
12  A   I don't believe so.
13                  (Exhibit No. 36 was marked for
14                  identification)
15                  THE STENOGRAPHER:  Exhibit 36.
16  Q   Mr. Kiesler, I'm handing you what's been marked as
17      Exhibit 36.
18  A   Thank you.
19  Q   This is another email exchange between yourself
20      and Mr. Seid, excuse me, dated April 26, 2016;
21      correct?
22  A   Correct.
23  Q   I'm going to start at page 5 of this document, so
24      the page that begins at Stafford 002820.  Do you
25      see the email there that we just discussed?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 193

1   A   Yes.
2   Q   Okay.  And then the following pages are Scott's
3       response; correct?  So at Stafford 2819, do you
4       see an email from Scott to yourself dated
5       April 22, 2016?
6   A   I do.
7   Q   And your answers to Scott's questions are in red
8       in this email; correct?
9   A   It appears that way.
10  Q   And Scott had responded to your email saying,
11      "There is no issue with this, is there?  Terry has
12      a stock transfer agreement that discusses value."
13          Scott responded saying, "There is no issue
14      with the corporation redeeming Terry's shares, and
15      you are correct that the stock transfer agreement
16      is silent with respect to a calculation of price."
17          Did you know that the stock transfer
18      agreement was silent as to the price of
19      redemption?
20  A   It goes back to my original email to him and my
21      question to him.
22          So my question to him looks like the question
23      of -- on termination, as opposed to something
24      else, is that -- I don't -- I don't know.  Does it
25      have to do with strictly reading the -- the stock

Page 194

1       transfer agreement with respect to what that
2       pertains to.
3   Q   In your email, in red, you say, "I think the STA
4       dated May 15, 2004 (Section 2.2.1) refers to the
5       valuation model, however, it appears to only apply
6       to termination of employment (alive or dead)."
7           Did I read that correctly?
8   A   Mm-hmm.  Yes.
9   Q   And so you agree that you were aware as of
10      April 22, 2016, that the valuation model provided
11      by the shareholder agreement did not require
12      redemption at the formula price other than in
13      instances of termination of employment?
14                  MR. CHURCHILL:  Objection.
15          Misstates and mischaracterizes document.
16  A   I'm not sure at that time.  I'm not sure.
17  Q   You're aware, as you sit here today, that the
18      valuation model contemplated by the shareholder
19      agreement applies to stock repurchases only in the
20      instance of termination of employment?
21                  MR. CHURCHILL:  Objection.  Assumes
22          facts not in evidence.  Calls for a legal
23          conclusion.
24  A   I guess I'm uncertain, unless I had the document
25      to read.

Page 195

1   Q   Were you aware in May of 2020, on May -- we'll say
2       specifically on May 6 of 2020, when you were
3       talking to Stacy about the redemption of her
4       shares, were you aware that the formula you were
5       using to calculate the value that she would be
6       paid was not mandatory?
7   A   Was not mandatory.  I don't recall.  I just know
8       that we -- I was always told to be consistent.
9   Q   And were you aware when you talked to Stacy on
10      May 6 of 2020 that the formula contemplated by the
11      shareholder agreement applies only in
12      circumstances of death or permanent disability?
13                  MR. CHURCHILL:  Objection.  Calls
14          for a legal conclusion.  Assumes facts not in
15          evidence.
16  A   At that time I'm -- don't know what -- I don't
17      think I considered that.
18  Q   And then on the first page of Exhibit 36, Mr. Seid
19      emails you on April 25, 2016, and asks, "Do you
20      think" -- well, let's just go through the whole
21      email, I suppose.
22          The title is "Stock Redemption Question"?
23  A   Okay.
24  Q   And in the email, Scott is asking you, with regard
25      to the redemption of Terry Vial's shares, he says,

Page 196

1       "Do you think there are any shareholders that
2       would have a beef with it?"  Do you see that?
3   A   I do.
4   Q   Do you know whether any shareholders had a beef
5       with the redemption of Terry Vial's shares?
6   A   I don't recall any -- any issues.
7   Q   Did you ever discuss the redemption of
8       Terry Vial's shares with Stacy?
9   A   I don't recall.
10  Q   Do you have any basis for the -- well, do you have
11      any basis to believe that Stacy was aware of the
12      redemption of Terry Vial's shares?
13  A   I don't know that.
14  Q   And in your email to Scott, at the top of the
15      page, on April 26 of 2016, you say, "Terry is now
16      satisfied with our original offer based on the
17      actual stock price at 12/31/15," and then you say,
18      "No duress necessary!"
19          What did you mean, "no duress necessary"?
20  A   That would have been just playing off of a
21      conversation we would have had verbally.  He's
22      always telling me, "You can't force these guys to
23      sell."
24          And so I would have come back and just
25      playfully said, "Hey, no duress necessary."

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 197

1    But going back -- can I go back?
2 Q  Mm-hmm.
3 A  As far as the sale itself, Stacy would have signed
4    agreements on that; right?  So she would have --
5    she would have been aware.  Because you asked me
6    if Stacy was aware of the stock transaction.  She
7    would have been aware.
8 Q  Oh, of Terry Vial's transaction?
9 A  When it occurred.
10 Q  She would not have been aware if you affixed her
11    signature stamp, though, would she?
12 A  Like we've said before, Reed would always either
13    talk to her about it or I would.
14 Q  But you never talked to her about the
15    Terry Vial --
16 A  I don't recall that.
17 Q  And in the same email to Scott, you say,
18    "Brian Becker is also very interested in
19    redeeming his shares at that price as well.
20    The stars must be aligning!!!"
21    Do you see that?
22 A  I do.
23 Q  Fair to say you were excited about the notion of
24    redeeming both Terry Vial and Brian Becker's
25    shares?

Page 198

1    MR. CHURCHILL:  Objection.
2    Ambiguous.
3 A  Not necessarily.  I was probably just playfully
4    communicating with him.
5 Q  What did you mean by "the stars must be aligning"?
6 A  Probably that both of them wanted to sell their
7    shares.
8    MR. CHURCHILL:  Jess, are you close
9    to a break?  We've been going --
10    MS. POLAKOWSKI:  We can take a
11    break any time.
12    MR. CHURCHILL:  Okay.  Why don't we
13    take one for a little while, move around a
14    little bit.
15    MS. POLAKOWSKI:  How long would you
16    like to take?
17    MR. CHURCHILL:  Ten minutes.
18    MS. POLAKOWSKI:  That's fine.
19    THE VIDEOGRAPHER:  Going off the
20    record at 2:54.
21    (A recess is taken)
22    THE VIDEOGRAPHER:  We're back on
23    the record at 3:19.
24    (Exhibit No. 37 was marked for
25    identification)

Page 199

1 (By Ms. Polakowski)
2 Q  Mr. Kiesler, I'm handing you what has been marked
3    as Exhibit 37.
4 A  Thank you.
5 Q  We've talked today, at some length, about a
6    formula that was used to calculate the value that
7    was paid to Stacy for her shares in May of 2020,
8    and I just handed you Exhibit 37.
9    Do you recognize Exhibit 37?
10 A  I have seen it in the past.
11 Q  Exhibit 37 is titled "Second Amendment to
12    Shareholder Agreement."  Is that right?
13 A  It is.
14 Q  And it's pertaining to Windy Waters, Inc.; also
15    true?
16 A  Correct.
17 Q  Did you keep a copy of this document at the
18    company?
19 A  It was probably in my file.
20 Q  Do you know if you had the original copy of this
21    document in your file?
22 A  I don't think I ever kept originals.
23 Q  Would you have had a paper copy or electronic?
24 A  Maybe both.
25 Q  Okay.  Did you ever provide a copy of this, of

Page 200

1    Exhibit 37, to Stacy?
2 A  I did not.
3 Q  Do you know if anyone else ever provided a copy of
4    Exhibit 37 to Stacy?
5 A  Well, since she signed it, I don't know if she
6    kept a copy; otherwise, no, I don't know.
7 Q  Were you -- as a shareholder of Windy Waters, were
8    you ever provided a copy of the Second Amendment
9    to Shareholder Agreement?
10 A  I don't think so.
11 Q  Turn, please, to page 4.  Do you see on page 4
12    there is a fair market value per share calculation
13    that's listed there?
14 A  I do.
15 Q  Do you recognize what is described on page 4 of
16    Exhibit 37 as the written description of the
17    formula that was used to redeem Stacy's shares in
18    May of 2020?
19 A  Let me read it, please.
20 Q  Sure.
21 A  Yes, those appear to be the words.
22 Q  And the title on page 4 of Exhibit 37 is "Fair
23    Market Value per share Calculation."  Correct?
24 A  Correct.  One -- one caveat, though.  Well, I
25    think I did see this in something that I was

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

---

Page 201

1  given, a stock transfer agreement or something.
2  Q  Okay.
3  A  So I think as a shareholder you did see this.
4  Q  Okay.  In looking at page 1 of Exhibit 37, at the
5     bottom of the page, the paragraph reads, "Except
6     as otherwise provided, the price for each share of
7     Stock or interest therein redeemed or purchased
8     pursuant to Sections 2.2 and 2.3 shall be equal to
9     the fair market value per share of stock as
10    determined pursuant to this Section 3.2."
11       Did I read that correctly?
12 A  Mm-hmm.  Yes.
13 Q  Do you know what Section 2.2 and 2.3 of the
14    shareholder agreement relate to?
15 A  Just thinking that -- no, not off the top of my
16    head.
17       (Exhibit No. 38 was marked for
18       identification)
19       THE STENOGRAPHER:  Exhibit 38.
20 Q  Mr. Kiesler, I'm handing you what has been marked
21    as Exhibit 38.
22 A  Thank you.
23 Q  Do you recognize Exhibit 38 as the original
24    shareholder agreement pertaining to
25    Widen Enterprises?

Page 202

1  A  It appears to be, yes.
2  Q  Have you seen this before?
3  A  Probably.
4  Q  Turn, please, to Section 2.2 and 2.3, which is at
5     page 8 of the document.  Well, I apologize.
6     Page 8 is the section that begins "Redemption of
7     Stock."  Do you see that?
8  A  I do.
9  Q  And if you look at 2.2, 2.2 relates to redemption
10    in the event of death; correct?
11 A  Correct.
12 Q  And 2.3 relates to redemption in the event of
13    permanent and total disability.  Also correct?
14 A  Correct.
15 Q  So, Mr. Kiesler, would you agree with me, based on
16    your review of these two documents, that the
17    formula we just looked at in Exhibit 37 applies in
18    the event of death or disability?
19       MR. CHURCHILL:  Objection to the
20       extent it calls for a legal conclusion.
21 A  So your statement was that 2.2, 2.3 relates to the
22    second amendment.
23       MS. POLAKOWSKI:  Could you read
24       back my question, please.
25       THE STENOGRAPHER:  One moment,

Page 203

1  please.
2       Question:  "So, Mr. Kiesler, would you
3       agree with me, based on your review of these
4       two documents, that the formula we just
5       looked at in Exhibit 37 applies in the event
6       of death or disability?"
7       MR. CHURCHILL:  Same objection.
8       Calls for a legal conclusion.
9  A  Yes.
10 Q  Stacy was not in either of those scenarios --
11 A  No.
12 Q  -- in May of 2020; correct?
13 A  No.
14 Q  She was not permanently -- permanently disabled in
15    May of 2020?
16 A  She was not, that I was aware of.
17 Q  Nor was she decease -- deceased in May of 2020;
18    correct?
19 A  No.
20 Q  Did you know in May of 2020 that the formula does
21    not apply to redemptions like Stacy's?
22       MR. CHURCHILL:  Objection.  Assumes
23       facts not in evidence.  Calls for a legal
24       conclusion.  Calls for --
25 A  We had used --

Page 204

1       THE WITNESS:  Can I answer?
2       MR. CHURCHILL:  Yeah, I'm finished.
3  A  We used the formula that we used for Stacy --
4     Stacy's redemption and all previous redemptions
5     even prior to the second amendment, which
6     memorialized the formula; so that's why it was
7     used.
8       MS. POLAKOWSKI:  Can you read back
9       my question, please.
10      THE STENOGRAPHER:  One moment,
11      please.
12      Question:  "Did you know in May of 2020
13      that the formula does not apply to
14      redemptions like Stacy's?"
15      MR. CHURCHILL:  And my objections
16      are assumes facts not in evidence, calls for
17      a legal conclusion.
18 A  I don't recall.
19 Q  Did you ever tell Stacy in May of 2020 that the
20    formula does not apply to redemptions like hers?
21 A  Since I can't recall, I don't recall that either.
22 Q  You said, when you talked to Stacy on May 5th of
23    twenty -- May 6th of 2020? --
24 A  May 6th.
25 Q  -- that she was trying to bargain with you;

Stacy L. Randall v.                                              Video Deposition of  Michael J. Kiesler
Reed C. Widen, et al.

Page 205

1    correct?
2  A  She indicated that the price was too low.
3  Q  Do you think Stacy would have found it to be
4     relevant that the formula does not apply to her
5     redemption?
6                      MR. CHURCHILL:  Objection.  Calls
7          for speculation.  Assumes facts not in
8          evidence.
9  A  I don't -- I don't know.
10  Q  Did Attorney Seid ever tell you that the EBITDA
11     formula does not apply to redemptions like
12     Stacy's?
13  A  From what I remember, Scott told me that the
14     formula we were using was okay to use in
15     redemptions like Stacy's.
16  Q  Do you recall -- well, let's look at some
17     documents.
18                      MS. POLAKOWSKI:  This one's hard to
19          read.
20                      (Exhibit No. 39 was marked for
21          identification)
22                      MS. POLAKOWSKI:  39?
23                      THE STENOGRAPHER:  Exhibit 39.
24  Q  Mr. Kiesler, I am handing you what has been marked
25     as Exhibit 39, and it is an email exchange between

Page 206

1     someone by the name of Loren Paulson, addressed to
2     Reed Widen and yourself, dated December 20th of
3     2018; correct?
4  A  Correct.
5  Q  Who is Loren Paulson?
6  A  He is a -- well, he was a partner at Lee Kilkelly,
7     Paulson & Younger, and he went over to
8     Stafford Law and was our benefits attorney.
9  Q  And in -- do you recall why you were discussing a
10     stock redemption with Loren Paulson in December of
11     2018?
12  A  Let me read this.  One moment, please.  Okay.
13  Q  Let me just ask you:  So the email from
14     Loren Paulson says, "Following up on our
15     conversation last evening regarding the potential
16     redemption of Stacy's shares."
17          Do you recall a conversation you had with
18     Loren Paulson in December of 2018 regarding this
19     redemption of Stacy's shares?
20  A  I don't.  I don't.
21  Q  Do you recall why you were talking about the
22     redemption of Stacy's shares in December of 2018?
23  A  I guess I would have to remind myself whether or
24     not we redeemed shares in that time period for
25     Stacy.

Page 207

1  Q  And Mr. Paulson in his email says to you, "it does
2     not appear that the proposed redemption of Stacy's
3     shares will be made pursuant to the terms of the
4     Shareholder Agreement, so it appears you have a
5     great deal of latitude in negotiating its payment
6     terms."  Correct?
7  A  That's what it says, yes.
8  Q  Did you ever follow up with Mr. Paulson and ask
9     him why the redemption of Stacy's shares would not
10     be made pursuant to the terms of the shareholder
11     agreement?
12  A  I don't recall.
13  Q  Did you understand that the purchase of Stacy's
14     shares would have to be negotiated?
15  A  Have to be negotiated.  No.
16  Q  Back to 2020.  I'd like to talk about May 13th of
17     2020, the date that the redemption agreement was
18     signed.
19          You were on a phone call with Attorney Seid
20     at the time that Stacy arrived at your office; is
21     that right?
22  A  I was.
23  Q  Did you call him?
24  A  Yes, I believe I did.
25  Q  Why did you call him?

Page 208

1  A  That day, the SBA issued a new FAQ regarding the
2     PPP, and I was trying to get his understanding of
3     what that meant.
4  Q  Where -- do you recall where you were when Stacy
5     arrived at the office?
6  A  Yes.  There was nobody in the building.  My office
7     was in the basement.  There's a bell that we
8     installed on the first floor.
9          And so at around the time I thought we had
10     agreed to come, I walked upstairs.  I was just
11     going to wait upstairs.  No one else was in the
12     building.  It was near the end of the day.
13          And when I came up the stairs and looked out
14     the windows, I noticed that Stacy was driving up.
15  Q  And you were walking up the stairs while you were
16     on the phone with Attorney Seid?
17  A  Yep.
18  Q  What -- so were you talking about the SBA guidance
19     on the PPP at the time Stacy arrived at the
20     office?
21  A  Yes.
22  Q  Did he tell you that Stacy had also called him?
23  A  No.
24  Q  Did he tell you that Stacy was uncomfortable with
25     the redemption agreement?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 209

1   A   Not that I can recall.
2   Q   Did he tell you that he gave Stacy names of
3       attorneys that he could consult with -- that she
4       could consult with?
5   A   No.
6   Q   Did you ask Mr. Seid at that time for names of
7       attorneys that Stacy could consult with?
8   A   No.
9   Q   Did you, during this phone call, ask Mr. Seid
10      whether the formula applies to redeem Stacy's
11      shares?
12  A   That wasn't the topic of the conversation at all.
13  Q   So you did not?
14  A   Did not.
15  Q   Had you talked with Mr. Seid about the potential
16      redemption of Stacy's shares prior to your phone
17      call with him on May 13th of 2020?
18  A   I believe it was the 12th.
19  Q   Was that the only other time that you had talked
20      to Mr. Seid about the potential redemption of
21      Stacy's shares?
22  A   Yep.  Yes.
23  Q   When you -- well, did you have a conversation with
24      him on May 12th?
25  A   I called him to tell him that we may need

Page 210

1       documents created the following day.  I told him
2       that Stacy was -- I didn't tell him -- I was going
3       to call Stacy.  I told him I was going to call
4       Stacy and that, if she wanted to redeem her
5       shares, I would need to get them created, the
6       documents created, as quickly as possible.
7           Because I wanted -- then, again, the -- the
8       SBA had extended the -- the safe harbor to
9       May 14th.
10  Q   When you talked to him on May 12th, did you
11      instruct him to begin drafting those documents?
12  A   No.
13  Q   When did you ask him to draft those documents?
14  A   After I talked to Stacy and she agreed to redeem
15      her shares.
16  Q   Was that on May 12th or May 13th?
17  A   May 13th.
18  Q   And did you talk to Mr. Seid after that as well?
19  A   Talked to him.  I would have just sent him what I
20      needed to send him.  I don't know if I -- I don't
21      think I talked to him.
22  Q   Did you -- in instructing Mr. Seid to draft the
23      redemption agreement, did you tell him what form
24      to use?
25  A   I don't think I directed him, no.  I'm sorry.  You

Page 211

1       said that -- I want to get this right.
2           You said that he didn't talk to him again on
3       the, I guess, 13th.  The 13th.  Oh, I'm thinking
4       back to the 6th.  I'm sorry.  I'm confused.  I did
5       not talk to him again.
6   Q   Okay.  Let me back up because you may have raised
7       a point that I missed.
8           Did you talk to Mr. Seid before May 12th
9       about Stacy's redemption?
10  A   May 12th.  No.
11  Q   Okay.  When you asked him to draft an agreement to
12      redeem all of Stacy's shares, did he ever suggest
13      to you that there -- that it would be possible to
14      sell her less than her full shares?
15  A   No.
16  Q   Did you understand -- well, certainly, you had
17      redeemed a number of shares from Stacy in the
18      past; correct?
19  A   Correct.
20  Q   So you certainly understood that it -- that the
21      company could redeem more than the entirety of --
22      or, less than the entirety of Stacy's interest;
23      correct?
24  A   Correct.
25  Q   On the last (indiscernible) --

Page 212

1           MR. CHURCHILL:  Famous last words.
2           MS. POLAKOWSKI:  I don't have any
3       hidden boxes.
4           MR. CHURCHILL:  Yeah, but David's
5       sitting over there with a smile.
6           (Exhibit No. 40 was marked for
7           identification)
8           THE STENOGRAPHER:  Exhibit 40.
9           MS. POLAKOWSKI:  Thank you.
10          MR. PLAYA:  (Indiscernible) make an
11      early flight, you'd think you learned your
12      lesson; right?
13          MS. POLAKOWSKI:  I'm sure you
14      anticipated this would be a long day.
15  Q   Mr. Kiesler, I just handed you what has been
16      marked as Exhibit 40, and it appears to be a text
17      message exchange between yourself and someone
18      that's just identified on the document as "Owner?"
19          Would that be Reed Kiesler?
20  A   Pardon?
21  Q   Reed Widen.  I'm sorry.
22  A   One moment, please.  You're looking at "Owner."
23      Oh, "217."  Yes, that appears to be Reed's phone
24      number.
25  Q   Okay.  And this is a text message that you sent

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 213

```
 1        to --
 2   A    Hold up.
 3   Q    Sure.
 4   A    Do I have two copies here?
 5   Q    Well --
 6               MR. CHURCHILL:  I'll just put
 7          that --
 8   A    Okay.  I'm sorry.
 9   Q    This appears to be a text message that you sent to
10        Reed Widen on May 6th of 2020?
11   A    Correct.
12   Q    And on May 6th, you said, "Stacy is having
13        seller's remorse!  She just called and said she'd
14        have to talk with her attorney before she could
15        agree to buyout.  I told her to do that right away
16        and get back to me."
17               Did I read that correctly?
18   A    Yep.  Yes.
19   Q    Do you know whether Stacy ever did consult with an
20        attorney?
21   A    I am unaware of that.
22   Q    Did you ever tell Stacy she should talk to an
23        attorney?
24   A    When she was at the office, signing -- before she
25        signed the agreements, I asked her if she would
```

Page 214

```
 1        want to take them to her attorney, and she said it
 2        wouldn't matter anyway.
 3   Q    What did you mean by "seller's remorse"?
 4   A    I don't know.  That she just changed her mind.
 5   Q    And you knew at this point that Stacy did not want
 6        to sell all of her shares of the company; correct?
 7               MR. CHURCHILL:  Objection.  Calls
 8          for speculation.  Assumes facts not in
 9          evidence.
10   A    At this point we -- I did not know.
11   Q    You told me that you had done partial redemptions
12        of Stacy's shares a number of times over the
13        years; correct?
14   A    Correct.
15   Q    Why didn't you do that this time?
16   A    Reed instructed me.
17   Q    In other words, Reed instructed you to purchase
18        all of Stacy's shares?
19   A    Correct.
20   Q    Did Reed ever respond to that text message?
21   A    Which one?  This one?
22   Q    Yeah, the May 6, 2020, text message.
23   A    I don't believe so.
24               (Exhibit No. 41 was marked for
25                 identification)
```

Page 215

```
 1               THE STENOGRAPHER:  Exhibit 41.
 2               MS. POLAKOWSKI:  Thank you.
 3   Q    Mr. Kiesler, I just handed you what has been
 4        marked as Exhibit 41.  Do you recognize Exhibit 41
 5        as an email exchange between yourself and
 6        Scott Seid on May 12th of 2020?
 7   A    Yes.
 8   Q    Is this the email you were just talking about
 9        where you instructed Mr. Seid to draft the
10        redemption agreement for Stacy's shares?
11   A    Yes.  I thought it was a telephone conversation,
12        but it looks like it was an email.
13   Q    Well, you do say in the email at the bottom that
14        "I can give you a call after that to see if you
15        are available."
16               Do you know -- do you have a recollection of
17        calling him?
18   A    I thought I spoke with him, but I -- this -- I
19        don't know for sure now.
20   Q    And there's a note at the bottom that says, "I
21        told Stacy you may be able to help her with the
22        legal issues she was having with Steve.  Hope that
23        was okay."
24   A    That had to do with her divorce.
25   Q    And when you indicated to Mr. Seid that
```

Page 216

```
 1        "Windy Waters is interested in purchasing all of
 2        Stacy Randall's interest in Windy Waters, Inc.,"
 3        was your knowledge of Windy Waters' interest in
 4        purchasing all of Stacy Randall's shares based on
 5        your conversation with Reed?
 6   A    Yes.
 7   Q    And you were aware at the time that you sent this
 8        email that Mr. Seid represented the company,
 9        Widen Enterprises and Windy Waters; correct?
10   A    Correct.
11   Q    And were you aware that he did not represent Stacy
12        personally?
13   A    Didn't know one way or the other.
14   Q    What, if any, duties did you think that you owed
15        to Stacy in May of 2020?
16               MR. CHURCHILL:  Objection.  Calls
17          for a legal conclusion.  Ambiguous.
18   A    I don't -- I don't know.
19   Q    Do you recall whether you ever asked Mr. Seid if
20        you owed Stacy any duties?
21   A    I don't recall that.
22   Q    Did you think that you had an obligation to
23        provide Stacy with information relevant to the
24        value of her stock in May of 2020?
25               MR. CHURCHILL:  Objection to the
```

Page 217

1    extent it calls for a legal conclusion.
2  A  I don't -- I don't know.  I don't think it crossed
3    my mind.
4  Q  **Did you think you had an obligation to provide**
5    **Stacy with information relevant to the value of**
6    **the company in May of 2020?**
7         MR. CHURCHILL:  Same objection.
8  A  Didn't cross my mind.
9  Q  **As the CFO of the company, what information do you**
10   **think would be relevant to the determination of**
11   **value of Stacy's stock?**
12        MR. CHURCHILL:  Objection.  Calls
13        for expert testimony.  Improper hypothetical.
14        You can answer if you can.
15 Q  **Do you need it read back?**
16 A  Please.
17        THE STENOGRAPHER:  One moment,
18        please.
19        Question:  "As the CFO of the company,
20        what information do you think would be
21        relevant to the determination of value of
22        Stacy's stock?"
23        MR. CHURCHILL:  And my objections:
24        calls for expert testimony, improper
25        hypothetical.

Page 218

1  A  Probably a formal valuation.
2  Q  **You did not instruct Stacy to get a formal**
3    **valuation at that time, did you?**
4  A  No.  Nope.
5  Q  **Did you tell her that a formal valuation is**
6    **relevant to the value of her shares?**
7  A  Didn't cross my mind.
8  Q  **Other than a formal valuation, as the CFO of the**
9    **company, do you think there's any other**
10   **information that would be relevant to the value of**
11   **Stacy's shares?**
12        MR. CHURCHILL:  Same objections.
13        Calls for expert testimony.
14 A  Again, it didn't cross my mind because we were
15   using the formula.
16 Q  **And I believe you've testified that in May of --**
17   **in May of 2020, you told Stacy that the only way**
18   **for her to get money out of the companies was to**
19   **sell all of her shares of the companies; correct?**
20 A  That's what Reed had directed me to tell her, yes.
21        MR. CHURCHILL:  Could you read back
22        that question, please, even though I'm late.
23        MS. POLAKOWSKI:  It's been a long
24        day.
25        THE STENOGRAPHER:  One moment,

Page 219

1    please.
2        Question:  "And I believe you've
3        testified that in May of -- in May of 2020,
4        you told Stacy that the only way for her to
5        get money out of the companies was to sell
6        all of her shares of the company; correct?"
7        MR. CHURCHILL:  Okay.
8  A  Same answer.  Didn't I answer that?  I did answer
9    that.  I answered that.
10 Q  **I don't think you did.**
11        THE STENOGRAPHER:  If you want
12        to wait, I can -- the answer:
13        "That's what Reed had directed me to
14        tell her, yes."
15        MS. POLAKOWSKI:  Oh, and you just
16        asked that the question be read back.
17        Are we good moving on?
18        MR. CHURCHILL:  Yeah, we're good.
19        MS. POLAKOWSKI:  Okay.
20 Q  **So you did not think that the -- that there was**
21   **any other information that was relevant to the**
22   **value of Stacy's shares because you were applying**
23   **the formula; correct?**
24        MR. CHURCHILL:  Objection to the
25        extent it mischaracterizes testimony.

Page 220

1  A  Never crossed my mind.
2  Q  **If you knew that her stock was worth $100 million**
3    **but the formula said 1.3 million, would you have**
4    **disclosed that $100 million value to her?**
5  A  How would I know that value?
6  Q  **This is a hypothetical.  Hypothetically speaking,**
7    **if the company -- if her shares were worth**
8    **100 million.**
9  A  So you're asking me to speculate?
10 Q  **I'm asking you to assume what I'm telling you is**
11   **true for the purpose of my question.**
12 A  Okay.  And so the question was again?  I'm sorry.
13 Q  **Sure.  So if you knew Stacy's -- the value of**
14   **Stacy's shares was worth $100 million, the fair**
15   **market value of the company, of 20 percent of the**
16   **company was $100 million -- if that were true -- I**
17   **know it's not -- do you think that would be**
18   **relevant to tell her?**
19 A  If I knew indeed that was the selling price of the
20   company, that a willing buyer and a willing seller
21   would --
22        MR. CHURCHILL:  That's not --
23        that's not the question.
24        THE WITNESS:  That's not the
25        question?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 221

1    A    Can we go at it one more time?
2         MS. POLAKOWSKI:  Would you mind
3              reading it back, Sheila.
4    A    I'm sorry.
5         THE STENOGRAPHER:  One moment,
6              please.
7              Question:  "Sure.  So if you knew
8              Stacy's -- the value of Stacy's shares was
9              worth $100 million, the fair market value of
10             the company, of 20 percent of the company was
11             $100 million, if that were true -- I know
12             it's not -- do you think that would be
13             relevant to tell her?"
14   A    I wouldn't necessarily hide it from her.
15   Q    If you were selling your shares of the company to
16        the company, would you find it relevant, the value
17        of the company?
18   A    I guess if I came to the company selling my shares
19        and the company said "This is what we're going to
20        do.  This is how we're calculating the selling
21        price," I would say yes or no.  She came to us.
22   Q    When I just asked you about whether you would
23        disclose the value to Stacy, your answer was you
24        wouldn't hide it from her.
25             Would you tell her, though?

Page 222

1    A    There would be no reason not to.
2    Q    One way for Stacy to get money out of the company
3         would have been for the company to loan her money;
4         correct?
5              MR. CHURCHILL:  Objection. Assumes
6              facts not in evidence.
7    A    Hypothetically, okay, yeah, sure.
8    Q    You're aware that the company has, in fact, loaned
9         Stacy money in the past?
10   A    I believe there was a loan.
11             (Exhibit No. 42 was marked for
12             identification)
13             THE STENOGRAPHER:  Exhibit 42.
14   Q    Mr. Kiesler, I'm showing you what has been marked
15        as Exhibit 42.
16   A    Thank you.
17   Q    Do you recognize Exhibit 42 as a promissory note
18        dated January 3rd, 2019, executed by
19        Stacy Randall?
20   A    I do.
21   Q    And per the terms of this note, Stacy received a
22        loan of $20,000 from Widen Enterprises; is that
23        right?
24   A    Correct.
25   Q    This was approximately a year before the

Page 223

1         redemption, a year and a half-ish before the
2         redemption; correct?
3    A    Correct.
4    Q    Have you seen this document before?
5    A    I have.
6    Q    When?
7    A    When it was drafted by our attorney.
8    Q    That would be back in 2019?
9    A    Most likely.
10   Q    And this was actually a loan from
11        Widen Enterprises, Inc., rather than Windy Waters;
12        correct?
13   A    Yes.
14   Q    Despite the fact that the company had loaned Stacy
15        money in the past and it was aware that Stacy
16        needed money, the company was not willing to
17        consider loaning her money in May of 2020;
18        correct?
19   A    This had to do with a redemption, though, didn't
20        it?  $120,000 redemption, same date?
21   Q    Are you able to answer my question, Mr. Kiesler?
22   A    Depends on what the answer to my question is, I
23        guess.  What was --
24   Q    Yeah, let's read the question back.
25             THE STENOGRAPHER:  One moment,

Page 224

1              please.
2              Question:  "Despite the fact that the
3              company had loaned Stacy money in the past
4              and it was aware that Stacy needed money, the
5              company was not willing to consider loaning
6              her money in May of 2020; correct?"
7    A    If this has to do with the redemption as well,
8         Stacy wanted 120 at the time, and she only -- and
9         whatever reason, I can't recall, she was going to
10        get $20,000 back somehow and pay this off
11        immediately then.  So it was a part of a kind of a
12        redemption deal.  Like it wasn't a stand-alone
13        promissory note, as I remember it.
14   Q    In any event, the company in two thousand -- in
15        May of 2020, was not willing to consider loaning
16        Stacy the money rather than --
17   A    That was Reed's decision.
18             MS. POLAKOWSKI:  I may be missing a
19             document.
20   Q    Was Stacy the president of Windy Waters at the
21        time Reed directed you to buy all of her shares?
22   A    I believe she was.
23   Q    Did you ask her whether she would have preferred a
24        different arrangement?
25   A    What do you mean "arrangement"?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 225

1  Q  Well, as the president of the company, was she --
2     did you offer her any other options than
3     purchasing all of her shares?
4  A  Again, it was Reed's decision.
5  Q  Stacy was the sole director of Windy Waters at the
6     time?
7  A  Windy Waters' president, director, I don't recall.
8  Q  So if Stacy was -- and I'll ask you -- I
9     understand your testimony is you don't recall, but
10    I'm going to ask you to assume for the purpose of
11    my question that Stacy was the sole director and
12    president of Windy Waters at the time that her
13    shares were redeemed.
14        Assuming that is true, why was Reed the only
15    person to weigh in on the decision of whether to
16    redeem Stacy's shares?
17 A  Reed typically made decisions.  I mean, he's
18    majority shareholder; so kind of that was given
19    weight of Widen -- or, Windy Waters.
20            MS. POLAKOWSKI:  I think I'm
21        missing a document, but we can get it at a
22        break.  Yeah, it's missing.
23 Q  On May 13th when Stacy came to your office, did
24    you read the redemption agreement to her?
25 A  I did.

Page 226

1  Q  You read it to her line by line?
2  A  Paragraph by paragraph, we went through it
3     together.
4  Q  Did you ask her if she understood it?
5  A  I did after each paragraph.
6  Q  Did she indicate she did?
7  A  She did.
8  Q  Why did you read it line by line to Stacy?
9  A  Because I wanted to make sure she understood what
10    she was signing.
11 Q  Did you provide the redemption agreement to her in
12    advance of the meeting?
13 A  No.  She received it at the meeting.
14 Q  And at that May 13th meeting, Stacy asked you if
15    the company's executives were preparing to sell
16    Widen; correct?
17 A  Correct.
18 Q  And you said there's been no talk of that; also
19    correct?
20 A  Correct.
21 Q  Did you ever tell her -- well, let me start with:
22    At the May 13, 2020, meeting, did you tell her
23    that 1.3 million was not representative of the
24    fair market value of her shares?
25 A  I did not know that.

Page 227

1  Q  Did you believe that she was aware at the time she
2     signed the agreement that $1.3 million was not the
3     fair market value of the -- of her shares?
4            MR. CHURCHILL:  Just objection.
5        Assumes facts not in evidence.  Calls for a
6        legal conclusion.  You can answer.
7  A  The only thing I can say is that she was aware of
8     what the share price value was based on a -- the
9     formula.
10 Q  And you previously told Stacy that the share price
11    value based on the formula as you calculated it
12    was fair?
13 A  I don't recall that.
14 Q  Did you tell her it would be smart for her to sign
15    the redemption agreement?
16 A  I may have said something like due to COVID, I
17    don't know where the company will be years from
18    now.  But any business, you know, you don't know.
19 Q  Do you recall telling her that it would be smart
20    for her to sign the agreement?
21 A  I don't recall that.
22 Q  Do you recall telling her that it was a
23    take-it-or-leave-it deal?
24 A  I believe I did say that.
25 Q  And you told her that the company may not be

Page 228

1     around in a few years?
2  A  I don't know if it was a few years.  It might not
3     be around at some point due to COVID.
4  Q  What was your basis for telling her that?
5  A  The fear, uncertainty, economic volatility.
6  Q  Were you aware at the time you told her that
7     that the company was projecting revenue growth of
8     20 percent for the following year?
9  A  I didn't tell her that.  I don't know if I even --
10    that didn't cross my mind.
11 Q  Was the company facing any risk of insolvency at
12    that time?
13 A  At that time, no.  There was a -- another issue as
14    far as deferred revenue where our customers made
15    payments ahead of time, subscription payments, so
16    they paid for the entire year.  And the way the
17    contracts were written is, if they would leave
18    during the year, that we'd have to pay them back.
19        So if -- what that means, that if at any
20    point in time we would -- I don't remember whether
21    it would have been a $9 million -- could have been
22    up towards $9 million in deferred revenue at that
23    time; so if the company would become insolvent, we
24    would technically have had to owe our customers
25    $9 million.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 229

1   Q   That risk, though, that didn't happen?
2   A   No.
3   Q   Did you discuss that risk with anyone at that
4       time?
5   A   No.
6   Q   Reed was taking his salary biweekly at this point,
7       in May of 2020?
8   A   With all other employees, yes.
9   Q   Do you -- strike that.
10          Did you provide Stacy with the names of any
11      attorneys to speak with on May 13, 2020?
12  A   I did not.
13  Q   As you sit here today, do you think it was smart
14      for Stacy to sell her shares for $1.3 million?
15              MR. CHURCHILL:  Objection.
16          Ambiguous.
17  A   I think she sold her shares based on the formula,
18      knowing that that's what was going to be used.
19              MS. POLAKOWSKI:  Would you mind
20          reading back the question, please.
21              THE STENOGRAPHER:  One moment,
22          please.
23              Question:  "As you sit here today, do
24          you think it was smart for Stacy to sell her
25          shares for $1.3 million?"

Page 230

1               MR. CHURCHILL:  And objection.
2           Ambiguous.  Also, calls for speculation.
3   A   Don't know the definition of "smart."  But I know
4       it was, again, comparing apples to oranges, just
5       because we didn't know what the -- I did not know
6       what the company was going to sell for on the
7       open market.
8           So to say it was smart, just based on the
9       formula, now that -- I mean, hindsight's 20/20.
10      We sell the company for a different amount.  It's
11      a different time.  It's a different -- you know,
12      so it's not comparing the same logic, the same
13      numbers, the same --
14  Q   And it's not comparing the same numbers because
15      the formula has nothing to do with the fair market
16      value of the company; correct?
17  A   I can't say that.  I don't know that.
18  Q   Well, in this instance, did the formula represent
19      the -- did the value that you calculated of the
20      company based on the formula represent what a
21      willing buyer and a willing seller would pay for
22      the company?
23  A   On May 13th, I don't know.
24  Q   On May 13th, you represented that the value of the
25      company was $6.8 million; correct?

Page 231

1   A   If that's what it calculates to.
2   Q   And ultimately the company sold in September of
3       2021?
4   A   Ultimately.
5   Q   What was the value of the sale in 2021?
6   A   It was 162.
7   Q   $162 million?
8   A   Yep.
9   Q   As you sit here today, are you able to say whether
10      the company -- the fair market value in May of
11      2020 of the company was $6.8 million?
12              MR. CHURCHILL:  Objection.  Asked
13          and answered.
14              THE WITNESS:  Answer again?
15              MR. CHURCHILL:  Yeah, I think
16          you've answered it --
17              THE WITNESS:  Oh.
18              MR. CHURCHILL:  -- but you can
19          answer, sure.
20  A   At that point in time, I had no idea.
21  Q   And you did nothing to investigate whether
22      $6.8 million represented the fair market value of
23      the company --
24  A   No.
25  Q   -- in May of 2020?

Page 232

1   A   Sorry.  No.
2   Q   And when Stacy came to the office in May, on
3       May 13th of 2020, you didn't disclose to her the
4       company's revenue at that time, did you?
5   A   I, on the telephone call, told her that we -- that
6       I reran the numbers based on 12/31.  So
7       specifically going -- no, I don't think -- I don't
8       believe I did.
9   Q   And you didn't disclose to Stacy the company's
10      financial projections for the year, did you?
11  A   I did not.
12  Q   You didn't disclose to Stacy in May of 2020 the
13      company's cash holdings?
14  A   No.  Nor did she ask any of those questions or
15      request any financial information at that meeting.
16  Q   Did you -- did you disclose to Stacy how much Reed
17      was receiving in compensation?
18  A   I did not.
19  Q   Did you disclose to Stacy the large customer
20      contracts that Widen Enterprises had, any of them?
21  A   No.  Nor did she ask for any financial
22      information.
23  Q   Did you disclose to Stacy the number of customers
24      Widen Enterprises had?
25  A   No.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 233

1 Q   Do you think that any of that information I just
2     asked you about is relevant to the value of the
3     company?
4                 MR. CHURCHILL: Objection. Calls
5            for a legal conclusion.
6 A   I may have asked those questions, but I don't know
7     if -- you know, why wouldn't Stacy ask those
8     questions.
9 Q   You would have asked those questions because
10    they're relevant to the value of the company?
11                MR. CHURCHILL: Objection.
12           Mischaracterizes testimony.
13 A   I said I don't know if I would.
14 Q   Tell me each and every piece of information about
15    Widen Enterprises and Windy Waters that you
16    provided to Stacy in May of 2020 prior to asking
17    her to sign the redemption agreement.
18 A   Again, we went over the formula on the phone call
19    on May 6th line by line so she understood the
20    numbers that made up that calculation. And then,
21    again, I told her those numbers were updated --
22 Q   That's the entirety --
23 A   -- on the 13th.
24 Q   That's the entirety of the information you
25    provided to Stacy in May of --

Page 234

1 A   Because she understood that it was based on the
2     formula, and the formula was the formula.
3            (Exhibit No. 43 was marked for
4            identification)
5                 THE STENOGRAPHER: Exhibit 43.
6            MS. POLAKOWSKI: Thank you.
7 Q   Mr. Kiesler, I'm handing you what has been marked
8     as Exhibit 43. It is a series of email exchanges
9     between yourself and Scott Seid on May 13th of
10    2020. Do you see that?
11 A   Yes.
12 Q   And I'd like to start at the last page of the
13    document. Well, the second-to-last page is the --
14 A   Sure.
15 Q   -- email, begins -- there's an email from you
16    dated March 17th of 2015. Do you see that there?
17 A   I do.
18 Q   And it's an email exchange between yourself and
19    Scott Seid from 2015?
20 A   Yes.
21 Q   And in your email to Scott, you're discussing the
22    Price -- excuse me, the Price Widen buyout?
23 A   Yes.
24 Q   And you say, "I've attached our longstanding value
25    calculation formula recalculated with our

Page 235

1     December 31, 2014, results."
2            Do you see that there?
3 A   Yes.
4 Q   And then back to Stafford 63, the previous page,
5     Mr. Seid responds to your email and says, "Turbo,
6     email from 2015 regarding the per share payment
7     for the stock price [sic] owned by Price. One or
8     two more to follow. I'm now thinking that with a
9     voluntary sale to the corporation, the price is
10    negotiated."
11           Did I read that correctly?
12 A   Yes.
13 Q   Did you understand based on Mr. Seid's email that
14    formula does not apply?
15                MR. CHURCHILL: Objection. Calls
16           for speculation.
17 A   No. I was unaware of that. Is that what he's
18    saying here, though? "One or two more to follow.
19    I'm now thinking voluntary sale to the corp, the
20    price is negotiated."
21           That all sounds like he's reversing his --
22    his stance on that. It's not due to death and
23    what the other thing -- the other was.
24 Q   Did you review this email when Mr. Seid sent it to
25    you?

Page 236

1 A   Back in 2015 -- or, '20?
2 Q   Yes, in 2020.
3 A   I would have received it; so I would have read it.
4 Q   And in response to Mr. Seid's email that says the
5     price is negotiated, you sent him a spreadsheet, a
6     calculation using the formula, and asked if you
7     would be safe using the 12/31/19 values; correct?
8 A   Yes.
9 Q   Knowing what you know today, do you think that the
10    $1.3 million paid to Stacy for her 20 percent of
11    the company was representative of the fair market
12    value of the company?
13                MR. CHURCHILL: Objection. Calls
14           for legal conclusion, expert testimony.
15           Ambiguous. You may answer.
16 A   I would tell you that if I retired early, I would
17    have used the same formula for me.
18 Q   That wasn't my question.
19                MS. POLAKOWSKI: Could you read it
20           back for me, please.
21                THE STENOGRAPHER: One moment,
22           please.
23           Question: "Knowing what you know today,
24    do you think that the $1.3 million paid to
25    Stacy for her 20 percent of the company was

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 237

1  representative of the fair market value of
2  the company?"
3           MR. CHURCHILL:  Objection legal
4  conclusion.  Calls for expert testimony.
5  Ambiguous.  Also calls for speculation.  Lack
6  of foundation.
7  A  It seems like we've asked and answered this
8  before, haven't we?
9           At the time in -- knowing what I know today,
10  at the time, May 13th, I still suggest that it was
11  what the price-per-share calculation was going to
12  be based on that formula that we were using for
13  her, for Price, for everybody back in history; so
14  it is what it was.  Hindsight is 20/20.
15  Q  I'm going to try one more time.
16           Do you think that $1.3 million represents the
17  fair market value of 20 percent, of a 20 percent
18  interest in Windy Waters?
19           MR. CHURCHILL:  Objection.  Vague
20  as to time frame.
21  A  I --
22  Q  And I'll address your counsel's objection.
23           As of May 2020.
24  A  I don't know how to answer any differently.
25  Q  You haven't answered it.  We can have it read back

Page 238

1  one more time.
2           THE STENOGRAPHER:  One moment,
3  please.
4           Question:  "I'm going to try one more
5  time.  Do you think that $1.3 million
6  represents the fair market value of
7  20 percent, of a 20 percent interest in
8  Windy Waters?"
9           MR. CHURCHILL:  And then she
10  clarified it was as of May 2020.
11           And just for the record, my objections
12  are that it calls for a legal conclusion,
13  calls for expert testimony, lack of
14  foundation, and it calls for speculation.
15  A  I believe it's fair based on the formula.
16           (Exhibit No. 44 was marked for
17  identification)
18           THE STENOGRAPHER:  Exhibit 44.
19  Q  Mr. Kiesler, I'm showing you what has been marked
20  as Exhibit 44.  Do you recognize Exhibit 44 as
21  Defendants' objections and responses to Plaintiff
22  Stacy L. Randall's first set of requests for
23  admission?
24  A  Yes.
25  Q  Have you reviewed this before?

Page 239

1  A  I've seen it.
2  Q  Did you assist in the preparation of this
3  document?
4  A  (No verbal response).
5  Q  Let me ask a better question.
6  A  Go ahead.
7  Q  Did you provide information pertinent to these
8  responses?
9  A  I don't believe so.
10  Q  Okay.  Do you know who would have?
11  A  These appear to be requests that are -- can be
12  determined by either documents or other means.
13           MR. CHURCHILL:  Try not to answer
14  by whatever's going through your head, and
15  answer the question that Counsel's asked you.
16  A  Sorry.
17  Q  Do you know from Windy Waters or Widen Enterprises
18  who would have been involved in providing
19  information responsive to these requests?
20  A  It would have been myself or Reed.
21  Q  Would Mr. Gonnering have been involved at all?
22  A  I don't know that.
23  Q  Turn, please, to request number 20 at page 9 of
24  the document.  And the request asks the defendants
25  to "Admit that you did not disclose to Plaintiff

Page 240

1  the current financial statements of
2  Widen Enterprises prior to the redemption."
3           There's a portion of this response I wanted
4  to ask you about.  It says -- the -- it's the
5  fourth line down.  It says, "Shortly prior to the
6  redemption, Defendant Kiesler went through the
7  model price-per-share calculation model with
8  Plaintiff, line by line, using November 2019
9  financial information of the companies."
10           Did I read that correctly?
11  A  Help me out here.  Where are we?
12           MR. CHURCHILL:  I'll stipulate to
13  that, but do you need to take a break?  Are
14  you okay?
15           THE WITNESS:  No, I'm okay.
16           MR. CHURCHILL:  Okay.  Let's try
17  again.
18  Q  Okay.  I was directing your attention to the
19  sentence that begins "shortly" in objections and
20  response.  Do you see that?
21  A  Yes.
22  Q  And it's referring to the model price --
23  A  Yes.
24  Q  -- per share calculation formula that you went
25  through with Stacy; correct?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 241

1 A  Yes.

2 Q  I just want to confirm.  Is what you're referring
3    to there the same document, the same spreadsheet,
4    that we looked at earlier today?

5 A  Yes.  And I did -- now that I'm looking at this
6    more closely, I did obviously work with counsel
7    for the responses and also read them once they put
8    this together.

9 Q  Turn, please, to page 31 of this document.  I'd
10   like to ask about RFA 74.  It says, "Admit that
11   Plaintiff was not notified in writing of meetings
12   of the shareholders of the companies between 2015
13   and May 13, 2020."

14       And that request is denied.  Do you see that?

15 A  Yes.

16 Q  How was Stacy provided written notice of the
17   meetings of the shareholders of the companies
18   between 2015 and 2020?

19 A  This would go back to her approval of me using the
20   stamp for those meetings.

21 Q  What you're denying here is that Stacy was not
22   notified in writing of meetings.

23       Is it your belief today that Stacy was
24   provided written notification of shareholder
25   meetings?

Page 242

1 A  She was aware of the documents -- at least I am
2    assuming she was aware of the documents that I was
3    using her stamp on, because she gave me permission
4    to use it for that purpose.

5 Q  Let me back up.  We talked earlier about the
6    annual meetings --

7 A  Yeah.

8 Q  -- and I believe we established that the annual
9    meetings didn't actually occur?

10 A  Oh, as far as actual meetings, that's what this is
11   getting at, not the actual document?

12 Q  So --

13 A  I'm sorry.

14 Q  Just take a minute, and my question is,
15   essentially:  Was Stacy provided written notice of
16   meetings of the shareholders of the companies?

17 A  No.

18 Q  So this response is incorrect?

19       MR. CHURCHILL:  Objection.  The
20       document speaks for itself.

21 A  It appears to be (indiscernible).

22       THE STENOGRAHER:  I'm sorry.  One
23       more time.

24 A  It appears to be inaccurate.

25       THE STENOGRAPHER:  Inaccurate.

Page 243

1 Q  And same questions on the next request, 75.  It
2    says, "Admit that the Plaintiff was not notified
3    orally of meetings of the shareholders of the
4    companies between 2015 and May 13, 2020," and that
5    response is also denied.  Do you see that?

6 A  I do.

7 Q  You would agree with me, though, that there were
8    not meetings of shareholders of the companies
9    between 2015 and 2020?

10 A  I would.

11 Q  And you would agree with me that Stacy was not
12   notified orally of these meetings that didn't
13   occur?

14 A  Correct.

15 Q  RFA 79 asks -- turning to page 32, RFA 79 requests
16   that Defendants:  "Admit that Plaintiff had no
17   role in management or decision-making at the
18   companies during all times that Plaintiff was
19   nominally a director and/or officer of the
20   companies," and the response is, again, denied.

21       Do you believe that Stacy did have a role in
22   the management or decision-making of the
23   companies?

24 A  Only in that she would be informed of the use of
25   her stamp, and she approved it and it was used on

Page 244

1    documents that were, obviously, Windy Waters
2    documents.

3 Q  Other than approving the use of her stamp, did she
4    have anything to do with the management of the
5    companies?

6       MR. CHURCHILL:  Objection to the
7       extent it calls for speculation.

8 Q  To the best of your knowledge.

9 A  Again, I don't know.

10 Q  Did you -- well, tell me each and every management
11   decision you're aware of Stacy making.

12 A  I don't know of any, but they could have occurred.

13 Q  Tell me each and every decision at the companies
14   that Stacy made.

15       MR. CHURCHILL:  Objection.  Calls
16       for speculation.

17 A  I don't recall any right now.  But, again, I don't
18   know what she was doing.

19       MR. CHURCHILL:  Are you doing fine?
20       Do you need a break?

21       THE WITNESS:  I'm --

22       MR. CHURCHILL:  I don't need a
23       break.  I'm just noticing you're wavering.

24       THE WITNESS:  We can take a break.

25       MR. CHURCHILL:  Jess, do you have a

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 245

```
1        sufficient amount that we could take a break
2        and get reorganized --
3                 MS. POLAKOWSKI:  Absolutely.  Yeah,
4        I think --
5                 MR. CHURCHILL:  I just notice him
6        wavering a little bit.
7                 MS. POLAKOWSKI:  Yeah, no, that's
8        fine.  We're getting to the home stretch.
9                 MR. CHURCHILL:  If you don't mind,
10       maybe we'll take a break --
11                MS. POLAKOWSKI:  That's fine.
12                MR. CHURCHILL:  -- and stretch our
13       legs.
14                THE VIDEOGRAPHER:  Going off the
15       record at 4:28.
16            (A recess is taken)
17                THE VIDEOGRAPHER:  We're back on
18       the record at 4:55.
19            (Exhibit No. 45 was marked for
20            identification)
21                THE STENOGRAPHER:  Exhibit 45.
22                MS. POLAKOWSKI:  Thank you.
23  (By Ms. Polakowski)
24  Q   Mr. Kiesler, I'm showing you what has been marked
25       Exhibit 45.
```

Page 246

```
1   A   Okay.  Thank you.
2   Q   And if you look at the second page of the
3        document, there is a text exchange between
4        yourself and Matthew Gonnering.  Do you see that?
5   A   Yes.
6   Q   And this is dated May 14th of 2020?
7   A   Yep.
8   Q   And do you know if that time is accurate?  Would
9        you be texting Matthew Gonnering at 3:00 in the
10       morning?
11  A   Oh, that doesn't appear right.
12  Q   Okay.
13  A   Is that the GMT issue?
14  Q   That could be.  In any event, did you text
15       Matthew Gonnering on May 14th of 2020, updating
16       him that "Windy Waters, Inc., has purchased all
17       Randall shares"?
18  A   Yes.
19  Q   And did you also say "Mission accomplished"?
20  A   That's what I put there; right.
21  Q   What did you mean by "mission accomplished"?
22  A   Sure.  On the -- this was the 14th, 13th.
23       On the 12th -- I believe it was the 12th --
24       Matthew chatted me, Slacked me, a message.  And
25       just -- it said "Stacy?"  And it -- I called him
```

Page 247

```
1        back and asked him what he meant.
2        It jogged my memory because I hadn't heard
3        from Stacy the whole week, and he wanted an update
4        on where we were with Stacy.  And so he suggested
5        that I go ahead and update the numbers and call
6        her the following day.  So then I did -- so it was
7        like a task that he was -- he had had me do.
8        You got -- got to understand me, that I'm a
9        Post-It note kind of guy, so my desk was just
10       full of Post-It notes.  So when I had something
11       to do, I would put it on a Post-It note, hoping it
12       made it on my desk.
13       So then the -- on the 14th, when I texted him
14       back -- or, this is a Slack message, it looks
15       like.  I just said "Mission accomplished."  That
16       task is completed and it's done.
17  Q   And Matthew responded, "Excellent.  Thank you for
18       making it happen"?
19  A   Mm-hmm.
20  Q   Do you know -- well, first of all, why were you --
21       why did Mr. Gonnering care about the redemption of
22       Stacy's shares?
23                MR. CHURCHILL:  Objection.  Calls
24       for speculation.
25  A   I don't know.
```

Page 248

```
1   Q   And Mr. Gonnering says, "Thank you for making it
2        happen."
3        Are you the one that made the redemption
4        happen?
5   A   Just getting the process done.
6   Q   Okay.  And it was good news to Mr. Gonnering that
7        the redemption was accomplished; correct?
8                 MR. CHURCHILL:  Objection.  Calls
9        for speculation.
10  A   I don't know.
11  Q   He says "excellent," and he thanked you for making
12       it happen?
13  A   It sounds like he was happy about it.
14            (Exhibit No. 46 was marked for
15            identification)
16                THE STENOGRAPHER:  Exhibit 46.
17  Q   Mr. Kiesler, I'm handing you what has been marked
18       as Exhibit 46.  This is Defendants' objections and
19       responses to Plaintiff's first set of
20       interrogatories; correct?
21  A   It is.
22  Q   And turn to the last page of the document.  Well,
23       I guess it's the second-to-last page.  Well --
24  A   Page 14?
25  Q   Yes, page 14.  Do you recognize your signature?
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 249

1   A   I do.
2   Q   Turn to page 10, please.  I'll directing your
3       attention to the very bottom of the page where it
4       says "Step 3."  Do you see that?
5   A   Yes.
6               MR. CHURCHILL:  Hey, Jess, just a
7           point of order.  I do think you've already
8           marked this as Exhibit 8.
9               MS. POLAKOWSKI:  Is that why I
10          couldn't find it?
11              MR. CHURCHILL:  So just for the
12          record.
13              MS. POLAKOWSKI:  Well, that answers
14          that.
15              MR. CHURCHILL:  It was a mountain
16          of exhibits ago, but just for the record,
17          this, I believe --
18              MS. POLAKOWSKI:  I was really
19          scratching my head about that.  All right.
20  Q   Well, I'll direct your attention to the bottom of
21      the page where it says "Step 3."
22  A   Okay.
23  Q   And it says "Organize information."  Do you see
24      that?
25  A   I do.

Page 250

1   Q   And then it says, "SEG sent information requests
2       after discussion with Mr. Gonnering on October 5,
3       2020, which started the process of collecting and
4       organizing certain information relevant to the
5       investigation of the sale."
6               Did I read that correctly?
7   A   Yes.
8   Q   Were you involved in the collection and
9       organization of that information?
10  A   This is for SEG.  I'm thinking Matthew was in
11      charge of this.  Yes, it was Matthew's
12      responsibility.
13  Q   So you were not involved in --
14  A   I don't recall it.
15  Q   Okay.  Do you know what information was collected
16      and provided to SEG?
17  A   Probably all the marketing background information.
18      Matthew probably would be able to tell you exactly
19      what was provided.
20              Now, SEG -- let me read this.  One moment,
21      please.  "Stated the process of collecting
22      information . . ."
23              Yeah, well, we didn't complete organizing
24      information until the final closing, which is
25      true.  Those were requests that came through

Page 251

1       Acquia as diligence requests to us.  So I don't
2       know if, I mean, that would be all a part of this.
3               (Exhibit No. 47 was marked for
4               identification)
5               THE STENOGRAPHER:  Exhibit 47.
6   Q   Mr. Kiesler, I'm handing you what's been marked as
7       Exhibit 47.
8   A   Thank you.
9   Q   Do you recognize Exhibit 47?
10  A   It looks like a marketing document provided by
11      SEG.
12  Q   Who is SEG?
13  A   Software Equity Group.
14  Q   Have you ever seen this before?
15  A   Yes.
16  Q   Took a look at the page that has the Bates
17      label 7902 at the bottom, so it's page 2 of the
18      document.  Second paragraph indicates that "This
19      memorandum has been prepared from information
20      obtained from the management of the company and
21      from other sources believed to be reliable."
22              Do you see that?
23  A   Where are you reading that?
24  Q   Second paragraph, "This memorandum has been
25      prepared from information."

Page 252

1   A   Got it, yep.
2   Q   Do you -- do you recall providing information
3       per -- for SEG to it prepare this?
4   A   Matthew provided literally 100 percent of this
5       information based -- again, the financial stuff
6       was based on what was in our accounting systems.
7   Q   And the information in the accounting systems is
8       information you would have been involved in
9       preparing?
10  A   Of course.
11  Q   To the best of your knowledge, is the information
12      contained in this document accurate?
13  A   To the best of my knowledge, yes.
14  Q   Did you know that this document was being used to
15      solicit purchasers for Widen?
16  A   Yes.
17  Q   Do you recall when Widen engaged SEG for -- for
18      this -- for the purpose of seeking out purchasers
19      for Widen?
20  A   I think it was January of '01 -- or, '21.  Sorry.
21  Q   Do you agree with me that at the time Widen was
22      acquired by Acquia in 2021 for $162 million, Widen
23      had projected negative EBITDA for 2021 of
24      2.7 million?
25              MR. CHURCHILL:  Objection.  Assumes

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

Page 253

1    facts not in evidence.  Lack of foundation.
2  A  Unaware as we sit here.
3  Q  And do you know whether in 2020, the year prior to
4    the purchase of Widen for $162 million, Widen had
5    EBITDA of negative 139,000?
6        MR. CHURCHILL:  Same objections:
7      lack of foundation, assumes facts not in
8      evidence.
9  A  Unaware at this time.
10       (Exhibit No. 48 was marked for
11       identification)
12       THE STENOGRAPHER:  Exhibit 48.
13 Q  Mr. Kiesler, I'm handing you what has been marked
14    as Exhibit 48.
15 A  Thank you.
16 Q  Do you recognize Exhibit 48 as a text from
17    yourself to Reed Widen?
18 A  Yes.
19 Q  And you texted Reed Widen on May 14th of 2020
20    with -- with "Good news on two fronts."  Correct?
21 A  Correct.
22 Q  And you said, "Windy Waters now owns all of
23    Stacy's shares and we will be keeping the PPP
24    money."
25       Did I read that correctly?

Page 254

1  A  Correct.
2  Q  So it was good news that Windy Waters now owns all
3    of Stacy's shares?
4  A  Yes.
5  Q  Why was this good news?
6  A  Because I was just responding to his directive to
7    sell her shares.
8  Q  Did Reed agree that it was good news?
9        MR. CHURCHILL:  Objection to the
10       extent it calls for speculation.
11 A  Don't recall.
12 Q  Back to this.
13       (Exhibit No. 49 was marked for
14       identification)
15       THE STENOGRAPHER:  Exhibit 49.
16 Q  Mr. Kiesler, I'm handing you what has been marked
17    as Exhibit 49.  Do you recognize Exhibit 49?
18 A  Yes.  This looks like the redemption that goes
19    with that note that we discussed earlier.
20 Q  This was a agreement to redeem a portion of
21    Stacy's stock; is that right?
22 A  Correct.
23 Q  And this is dated December -- excuse me,
24    January 1, 2019?
25 A  Correct.

Page 255

1  Q  I would like to focus your attention on Recital B.
2    And it says in Recital B that "The parties have
3    agreed that the redemption of the shares held by
4    Randall shall be at fair market value, and that
5    the price and terms of redemption have been
6    negotiated at arm's length by unrelated parties
7    with opposing financial interests."
8        Did I read that correctly?
9  A  You did.
10 Q  Were you involved -- well, first of all, who
11    drafted that language?
12 A  Our attorney.
13 Q  Were you involved in negotiating the price of the
14    redemption?
15 A  No, not me specifically.
16 Q  Was there any negotiation of the price of those
17    shares?
18       MR. CHURCHILL:  Objection.
19      Ambiguous.
20 A  Not -- I don't know.
21 Q  Would it be fair to say you were not involved in
22    any negotiations regarding the price of the shares
23    that were redeemed on January 1, 2019?
24       MR. CHURCHILL:  Objection.  Calls
25      for a legal conclusion.  Ambiguous.

Page 256

1  A  When I was involved with the price of the shares,
2    again, we used the formula for this.
3  Q  And my question was:  Were there negotiations?
4        MR. CHURCHILL:  Same objections,
5      calls for legal conclusion.  Ambiguous.
6  A  I don't know.
7  Q  You were not personally involved in any
8    negotiations --
9  A  I was not.
10 Q  -- with Stacy regarding the price at which her
11    shares would be redeemed at as of January 1, 2019;
12    correct?
13       MR. CHURCHILL:  Same objections.
14 A  Not that I'm aware of.
15 Q  Who, if you know, were the unrelated parties with
16    opposing financial interests that were involved in
17    the negotiations?
18       MR. CHURCHILL.  Objection.  No
19      personal knowledge.
20 Q  And, just to be clear, you did sign this document;
21    correct?
22 A  I did.  I did not draft it.  I don't know what
23    that's referring to.
24 Q  Was Stacy provided a copy of this agreement in
25    advance of being asked to sign it?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 257

1    A    It appears that her wet signature is on this,
2         which would lead me to believe that she was
3         present when she did sign it.  And if -- I would
4         have been the one to present it to her to sign,
5         and when I did that, I always gave her the entire
6         document and allowed her to look at it.
7    Q    But prior to actually meeting to sign the
8         document --
9    A    Oh.
10   Q    -- would she have received a copy of this
11        agreement?
12   A    Don't recall.
13   Q    You didn't send her a copy, to the best of your
14        recollection?
15   A    I don't recall.
16   Q    Was Stacy represented by an attorney with regard
17        to this stock redemption agreement?
18   A    I don't know.
19   Q    Was the company represented by an attorney with
20        regard to this stock redemption agreement?
21   A    Our attorney drafted it.
22   Q    And you may have said this already -- and I
23        apologize if you did -- but the price was
24        calculated using the same formula we've been
25        talking about so much today; correct?

Page 258

1    A    Correct.
2    Q    There was not an analysis of the fair market value
3         of the company done in order to come up with a
4         price per share --
5              MR. CHURCHILL:  Objection.
6    Q    -- for the purpose of this stock redemption
7         agreement?
8              MR. CHURCHILL:  Objection.  Calls
9              for a legal conclusion.
10   A    No formal valuation was done.
11   Q    What, if anything, was the basis for the statement
12        that "the redemption of the shares held by Randall
13        shall be at fair market value"?
14   A    This was drafted by our attorney.  They would --
15        I don't know.
16   Q    When you signed the stock redemption agreement in
17        May of 2020, did you know that the company could
18        sell for substantially more than $6.8 million?
19   A    I did not know what the company was worth on the
20        open market, what it could sell for.
21   Q    And at that time, the only valuations of the
22        company that had been sent to you were the two
23        emails that we talked about, the operational
24        updates from Mr. Gonnering that you didn't read?
25              MR. CHURCHILL:  Objection.

Page 259

1              Mischaracterizes documents and testimony.
2    A    I can't recall.
3    Q    Can you think of any other document that was
4         provided to you that purported to set forth the
5         value of the company?
6    A    No.
7    Q    And the 2004 appraisal that we talked about today,
8         is that the only formal appraisal that you've ever
9         seen of the company?
10   A    I hadn't seen it, but you showing it to me seems
11        like it would be a correct statement because I
12        don't recall any other valuations.
13   Q    That's the only -- the 2004 appraisal that we
14        talked about today is the only appraisal of the
15        companies that you've ever seen; correct?
16   A    The -- for Mark Widen's death?
17   Q    Correct.
18   A    Yeah, I haven't seen any other appraisals.
19   Q    When you found out that the company could sell for
20        $162 million, were you surprised?
21   A    I was shocked.
22   Q    Was Reed Widen surprised?
23   A    Don't know.
24   Q    Did you ever talk about the company selling for
25        $162 million with Mr. Widen?

Page 260

1    A    I -- like I said, our communication -- I didn't
2         communicate through Reed, to Reed.  My boss was
3         Matthew.
4    Q    Was Matthew surprised that the company could sell
5         for $162 million?
6              MR. CHURCHILL:  Objection to the
7              extent it calls for speculation.
8    A    I don't know.
9    Q    Did you ever express your surprise with regard to
10        the value of the company in writing?
11   A    Not that I'm aware of.
12   Q    Did you ever interact with someone by the name of
13        Russ Wolff over at Baker Tilly?
14   A    He's our partner.  He's our partner at -- at
15        Baker Tilly.
16   Q    So you worked --
17   A    He works mainly through Reed.
18   Q    Do you -- did you know that Mr. Wolff met with
19        Reed on May 27th of 2020?
20   A    No.
21   Q    You weren't a part of that meeting?
22   A    Nope.
23   Q    Do you know the purpose of that meeting?
24   A    No.
25   Q    Do you recall when Widen Enterprises began to go

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

| | | |
|---|---|---|
| Page 261 | | |

1      to market?
2                        MR. CHURCHILL:  Just object on
3            ambiguous grounds.  Lack of foundation.
4    A  Go to market.
5    Q  Let me ask it a better way.
6            When did Widen Enterprises make the
7        decision to sell?
8    A  Well, the ultimate decision to sell was at
9        closing.  Prior to that, there was indication of
10       intents, indication of intents I think they're
11       called, IOIs.  Prior to that, it would have just
12       been the proposal and engagement with SEG.
13   Q  What is the earliest that you recall learning that
14       Reed was interested in exploring a potential sale
15       of Widen Enterprises?
16   A  The first date that I became aware would have been
17       the meeting with Matthew and Jeff Horein, from
18       Baker Tilly, at the end of August, I believe it
19       was, 2020.
20   Q  That was in August of 2020?
21   A  Yeah.
22   Q  Was there -- what was the catalyst for these
23       discussions regarding the sale of
24       Widen Enterprises?
25   A  The big catalyst that I'm aware of was the

| | | |
|---|---|---|
| Page 262 | | |

1        acquisition of Brandfolder by Smartsheet, which I
2        think also happened at the end of August 2020.
3    Q  Why was that a catalyst for the sale?
4    A  I believe it was because Brandfolder was also a
5        SaaS company in our space.
6    Q  In the digital asset --
7    A  Digital assets management space, yep.
8    Q  And tell me more about that.  Did Reed learn about
9        the Brandfolder -- was it Brandfolder?
10   A  Yeah, Brandfolder.  I had learned --
11                       MR. CHURCHILL:  Objection to the
12           extent it calls for speculation.
13   A  I learned about it from Matthew.  I don't know how
14       Reed learned about it.
15   Q  When did you learn about the Brandfolder sale?
16   A  When we met with Jeff Horein.
17   Q  In August of 2020?
18   A  (No verbal response).
19   Q  That's a yes?
20   A  Yes.  I'm sorry.  Getting late in the day.
21   Q  Yeah, I completely understand.
22           What was your role in negotiating, if any,
23       in negotiating the sale of Widen Enterprises to
24       Acquia?
25   A  I didn't have a role.

| | | |
|---|---|---|
| Page 263 | | |

1    Q  Okay.  You -- were you involved in the
2        negotiations at all?
3    A  I was involved in just a Zoom meeting, and then
4        they -- and then they submitted a proposal.
5    Q  Who was involved in that Zoom meeting?
6    A  Myself, Reed, and Matthew.
7    Q  What was the purpose of the meeting?
8    A  To get to know us.
9    Q  Who was responsible for handling the negotiations
10       of the deal?
11   A  Matthew was pretty much in charge of that.  I
12       don't know what Reed's involvement was.
13   Q  Do you know who Matthew's primary contact at
14       Acquia was?
15   A  So that was after they gave an interest to
16       purchase.  We worked through SEG.
17   Q  Okay.
18   A  So we didn't work directly through Acquia.
19   Q  And is it your understanding that Matthew also
20       worked directly through SEG and not with -- was
21       not involved directly with negotiations with
22       Acquia?
23                       MR. CHURCHILL:  Objection.  Lack of
24           foundation.  Calls for speculation.
25   A  I -- I don't know.  I don't know.

| | | |
|---|---|---|
| Page 264 | | |

1    Q  Was Reed involved in the negotiations at all?
2                        MR. CHURCHILL:  Same objections.
3    A  I don't know.
4    Q  When -- well, in that initial Zoom call that you
5        were a part of, what, if any, information did
6        Acquia ask for?
7    A  I don't recall.  A lot of it was just get to know
8        each other, share stories.
9    Q  Did you talk about the financials of the company
10       at all?
11   A  I don't recall.
12   Q  Prior to the negotiations with Acquia starting,
13       had any other entity expressed an interest in
14       acquiring Widen?
15   A  When you say "Acquia starting," you mean before --
16       before Acquia starting, you said?
17   Q  Before you began negotiations and you -- and by
18       "you," I mean Widen Enterprises.  Before
19       Widen Enterprises --
20   A  Okay.
21   Q  -- began negotiating with Acquia for the sale of
22       Widen Enterprises, are you aware of any other
23       entity that expressed an interest in acquiring
24       Widen Enterprises?
25   A  There were other indications of interest.  I want

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Michael J. Kiesler**

Page 265

1    to say there was -- I want to say there was two
2    others.
3  Q  Were you involved in dealing with those other
4    companies, or would that primarily have been
5    Matthew as well?
6  A  Matthew.
7  Q  I'm sorry?
8  A  Matthew.  Sorry.
9  Q  Did anything happen between May 13th of 2020 and
10    August 17, 2021, that had a significant impact on
11    Widen's value?
12              MR. CHURCHILL:  Objection.  Lack of
13        foundation.
14  A  What's August 17th of 2021?
15  Q  A date.
16  A  Okay.
17              MR. CHURCHILL:  Same objection.
18  A  I'm sorry.  I was hung up on the date.  What was
19    the question?
20              MS. POLAKOWSKI:  If you could read
21        it back, Sheila.
22  A  Sorry.
23  Q  No, that's okay.
24              THE STENOGRAHER:  One moment,
25        please.

Page 266

1              Question:  "Did anything happen between
2        May 13th of 2020 and August 17th of 2021 that
3        had a significant impact on Widen's value?"
4              MR. CHURCHILL:  Same objection.
5        Lack of foundation.
6  A  I don't know.
7  Q  You're not aware of anything that would have had a
8    significant impact on Widen's value?
9  A  Nothing stands out to me.
10              MR. CHURCHILL:  Objection.
11        Misleading.
12  Q  Would you agree with me that Widen did not
13    change -- did not substantially change its
14    business between May 13th of 2020 and August of
15    2021?
16              MR. CHURCHILL:  Objection.
17        Ambiguous.
18  A  By changing its business, we did not -- I mean,
19    we're still software as a service company.
20  Q  Do you have any reason to believe that Widen was
21    worth $150 million more in August of 2021 than it
22    was in May of 2020?
23              MR. CHURCHILL:  Objection.  Calls
24        for a legal conclusion.  Calls for expert
25        testimony.

Page 267

1  A  I wouldn't know.
2  Q  When Widen sold -- when Widen Enterprises was sold
3    to Acquia, Acquia issued payment to the
4    shareholders of Windy Waters directly; correct?
5  A  It came through a funds flow through to the
6    shareholders.
7  Q  So that's a yes?
8  A  Yes.
9  Q  Why were the funds paid directly to the
10    shareholders rather than to Windy Waters?
11              MR. CHURCHILL:  Objection.  Lack of
12        foundation.
13  A  I don't -- I don't know.
14  Q  You are aware that Windy Waters at the time was
15    the sole shareholder of Widen Enterprises?
16  A  If I can clarify, did -- they didn't go -- did
17    they go directly to -- I don't recall.  They
18    may -- the funds may have went to Windy Waters and
19    then -- or, then the shareholders.  It's very easy
20    to find that out.
21  Q  And you personally received $12 million based on
22    your sale of 8.3 percent of the company?
23  A  There was an amount held back, so not -- no.
24  Q  What was the amount that you received?
25  A  Something less than that.

Page 268

1  Q  You don't recall what it was?
2  A  Not exactly.
3  Q  Was it $10 million?
4  A  I think it was 11-something.
5  Q  Have you received the additional true-up to get to
6    the $12 million point?
7  A  No.
8  Q  Do you expect to?
9  A  Yes.
10  Q  Do you think it is fair that you received or
11    expect to receive $12 million for your 8 percent
12    in the company but Stacy received 1.3 million for
13    her 20 percent stake in the company?
14  A  Comparing apples to oranges.
15  Q  I'm going to call you to testify at trial,
16    Mr. Kiesler, and when I ask you this question in
17    front of a jury, you will have to provide a
18    response, and so I'm going to press you on this
19    one more time.
20        Do you think that it's fair that you received
21    $12 million for your 8 point -- or, your 8 percent
22    stake in the company, but Stacy received
23    1.3 million for her 20 percent?
24  A  At the time -- I'll tell you again.  At the time
25    when we sold Stacy's shares, I had no idea what

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Michael J. Kiesler

Page 269

1 the value of the company was on the open market.
2 Q I'm asking, as you sit here today, do you think
3 it's fair that Stacy received $1.3 million for her
4 20 percent interest in the company and you
5 received $12 million for your 8 percent interest
6 in the company?
7 A It's fair that I received the amount of money that
8 I did based on the sale of the company.
9         MS. POLAKOWSKI: Could you read
10        back the question, please.
11        THE STENOGRAPHER: One moment,
12        please.
13        Question: "I'm asking, as you sit here
14        today, do you think it's fair that Stacy
15        received $1.3 million for her 20 percent
16        interest in the company and you received
17        $12 million for your 8 percent interest in
18        the company?"
19        MR. CHURCHILL: Can you read his
20        answer back?
21        THE STENOGRAPHER: One moment,
22        please.
23        Answer: "It's fair that I received the
24        amount of money that I did based on the sale
25        of the company."

Page 270

1 Q Do you think it's fair that Stacy received the
2 amount of money she received for her 20 percent
3 interest in the company?
4 A It's fair that Stacy received the money that she
5 received at the time she received the money based
6 on the formula that we used for redemptions at
7 that time.
8 Q How much money is in Windy Waters today?
9 A Approximately 8 million.
10 Q Are you still a shareholder of Windy Waters?
11 A Yes.
12 Q Who are the other shareholders of Windy Waters
13 today?
14 A Reed Widen, Matthew Gonnering, and Loretta Norris.
15 Q That's Mr. Norris's widow?
16 A Mm-hmm.
17 Q Sorry. That's a yes?
18 A Yes.
19 Q Is Windy Waters involved in business today?
20 A No. Just paying legal fees.
21 Q Sorry. I was distracted by the noise.
22        Stacy started asking questions about the
23 buyout by Acquia in September of 2021; correct?
24        MR. CHURCHILL: Objection. Lack of
25        foundation.

Page 271

1 A I'm unaware of that.
2 Q And do you know -- so I'm sorry. It was -- what
3 was Mrs. Norris's first name?
4 A Loretta.
5 Q I take it, Mr. Norris's shares were not redeemed
6 upon his death?
7 A No.
8 Q Why not?
9 A Why? I -- I don't know.
10        (Exhibit No. 50 was marked for
11        identification)
12        THE STENOGRAPHER: Exhibit 50.
13 Q And just one more question. When did Mr. Norris
14 pass away?
15 A I don't know the date.
16 Q Was it -- do you know if it was before or after
17 the --
18 A After closing. I'm sorry. After closing.
19 Q Mr. Kiesler, I'm handing you what has been marked
20 as Exhibit 50. Do you recognize Exhibit 50 as a
21 text exchange between yourself and Reed Widen?
22 A I do.
23 Q And it's dated September 10th of 2021; correct?
24 A Correct.
25 Q And in this particular text exchange, you -- it

Page 272

1 looks like you must be responding to something
2 that Reed had asked you because the text exchange
3 starts with a 19.585 percent; is that right?
4 A That's what it says.
5 Q And Reed responses, "Damn. How much was her
6 buyout?" Do you see that?
7 A I do.
8 Q Does that nine -- 19.585 percent represent the
9 percentage of the company that Stacy owned before
10 the redemption in May of 2020?
11 A I don't know.
12 Q Do you know why Reed reacted this way in this
13 text -- text exchange?
14        MR. CHURCHILL: Object to the
15        extent it calls for speculation.
16 A I don't.
17 Q Did you ever talk to him about this?
18 A No.
19 Q And then Reed asked how much Stacy's buyout was;
20 correct?
21 A Correct.
22 Q Have you ever talked to Reed after -- since
23 May 13th of 2020, have you ever talked to Reed
24 about Stacy's buyout?
25 A No.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 273

1  Q   Have you ever talked -- and I'm going to caution
2      you not to disclose any conversations that you've
3      had with your attorneys about this, but have you
4      talked to anyone at all other than your attorneys
5      about Stacy's buyout?
6  A   Generalities with my wife.
7  Q   Tell me about the generalities with your wife that
8      you've talked about with her.
9  A   Oh, just that we bought the share -- bought her
10     shares.
11 Q   Okay.
12 A   Nothing beyond that.
13              (Exhibit No. 51 was marked for
14              identification)
15              THE STENOGRAPHER:  Exhibit 51.
16 Q   Mr. Kiesler, you've just been handed what has been
17     marked as Exhibit 51.  Do you recognize Exhibit 51
18     as another text exchange between yourself and
19     Reed Widen?
20 A   Yes.
21 Q   And this is dated September 11, 2021; is that
22     right?
23 A   September 11th, yes.
24 Q   And in this email exchange, Reed asks you -- well,
25     he says, "I don't think Stacy will call you, but

Page 274

1      don't tell her how much stock she had."
2              Did I read that correctly?
3  A   Yes.
4  Q   And you responded with a perfect emoji?
5  A   Just an okay.
6  Q   If you know, why did Reed direct you not to tell
7      Stacy how much stock she had?
8  A   I -- I don't know.
9  Q   And you did agree to withhold that information if
10     Stacy asked for it?
11 A   I indicated that, okay.
12 Q   Did Stacy ever call you and ask you how much stock
13     she had?
14 A   No.
15 Q   Did you think it was strange that Reed was
16     directing you not to tell Stacy how much stock she
17     had?
18 A   The only thing I could think of is that he didn't
19     want her to blow up.  This was on 9/11.  This
20     is -- this was before the sale.  Probably didn't
21     want her to do anything that would harm the -- the
22     sale of the company.
23              (Exhibit No. 52 was marked for
24              identification)
25              THE STENOGRAPHER:  Exhibit 52.

Page 275

1  Q   Mr. Kiesler, I'm showing you what has been marked
2      as Exhibit 52.
3  A   Thank you.
4  Q   Do you recognize Exhibit 52 as a text exchange --
5      exchange between yourself and Matthew Gonnering?
6  A   I don't -- I don't know his phone number, but I --
7      so I don't know for sure.
8  Q   Well, on November -- excuse me, September 12th of
9      2021, you sent a text to someone asking, "Has Reed
10     talked to you about this?"  And then you quote,
11     "We're going to have to come up with a way to pay
12     out Stacy in full.  She is such a shit show,
13     (a/k/a, not brilliant stupid)."
14              Did I read that correctly?
15 A   Yes.
16 Q   Were you forwarding a message that Reed had sent
17     to you?
18 A   It appears that way.
19 Q   Do you know, if, in fact, this is
20     Matthew Gonnering's number, why were you texting
21     him about this particular issue?
22 A   I wanted to know if Reed had talked to -- assuming
23     it's Matthew, about this text string he had with
24     me.
25 Q   And did -- did you ever talk to Matthew about this

Page 276

1      particular text string?
2  A   I seem to think I -- there was a follow-up, and
3      Matthew indicated that he had heard from Reed
4      something -- I don't know for sure.  But it seems
5      like I did follow up with Matthew on this.  Beyond
6      that, I'm not -- I don't recall.
7  Q   So I want to make sure I understand.  You believe
8      you did follow up with Matthew on this?
9  A   Yes.
10 Q   What did you learn when you followed up with
11     Matthew?
12 A   Nothing.  He -- he didn't know why Reed would have
13     said that.
14 Q   And did you -- well, first of all, do you know why
15     Reed wanted to come up with a way to pay out Stacy
16     in full?
17 A   I think he was just referring to paying her full
18     amount of the redemption.
19 Q   Do you know why he wanted to do that?
20 A   No.
21 Q   And did you, in fact, or anyone at
22     Widen Enterprises or Windy Waters, come up with a
23     way to pay Stacy in full?
24 A   It never occurred in the full.  Yeah, it was
25     just -- no, that never happened.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 277

1   Q   And, in fact, Stacy is receiving payments;
2       correct?
3   A   She is.
4   Q   Where is that money coming out of?
5   A   Windy Waters.
6   Q   We're on to the last two exhibits.
7   A   Big one.
8   Q   I'm going to hand you both of these at the same
9       time, because it's the complaint and the answer,
10      and I want to ask you some questions about what
11      you've alleged in your answer.
12              THE STENOGRAPHER:  I'm sorry.  I
13          didn't see which --
14              MS. POLAKOWSKI:  It doesn't matter.
15          (Exhibit Nos. 53 and 54 were marked
16              for identification)
17              THE STENOGRAPHER:  Exhibits 53 and
18          54.
19  Q   And, as I said, Mr. Kiesler, I'm going to ask you
20      to keep both of the documents in front of you so
21      that I can ask you about the answer with regard to
22      the allegations in the complaint.
23          Starting with paragraph 5 of the complaint,
24      which is marked as Exhibit 54 . . .
25              MR. CHURCHILL:  Actually, the

Page 278

1           complaint is 53, Jess.
2               MS. POLAKOWSKI:  Oh, I'm sorry.
3               MR. CHURCHILL:  Answers --
4               MS. POLAKOWSKI:  I wrote them
5           down --
6               MR. CHURCHILL:  First amended
7           answer is 54.
8               MS. POLAKOWSKI:  I wrote them down
9           wrong.
10  Q   All right.  So I'd like you to look at paragraph 5
11      of the complaint, and likewise, paragraph 5 of
12      your amended answer.
13          And the allegation in paragraph 5 says, "For
14      years, Reed and Kiesler kept Stacy in the dark
15      about the Companies' operations, performance, and
16      financial health, never holding (or, at least,
17      never notifying Stacy of) shareholder or director
18      meetings for the company.
19          "Unbeknownst to Stacy, Reed and Kiesler were
20      actually using a rubber stamp to forge her
21      signature on corporate documents during this time,
22      which purported to memorialize the actions of the
23      Companies' shareholders and directors."
24          And turning to your answer, Exhibit 54 --
25              MR. CHURCHILL:  Hang on one sec,

Page 279

1           Jess.  Let me just --
2               MS. POLAKOWSKI:  Oh, sure.
3               MR. CHURCHILL:  I think Mike might
4       be on page 5 instead of paragraph 5.
5               MS. POLAKOWSKI:  Oh.
6               MR. CHURCHILL:  So you need to --
7       Counsel's reading from paragraph 5.  So
8       your -- yeah.
9               THE WITNESS:  Oh, okay.  Thank you.
10  Q   And do you see in Exhibit 54, the amended answer,
11      that Defendants deny the allegations in
12      paragraph 5?
13  A   I do.
14  Q   And it's denied in its entirety; correct?
15  A   Correct.
16  Q   And I just want to make sure I understand, looking
17      at each component of paragraph 5 --
18  A   Sure.
19  Q   -- what your position is.
20          So do you deny that you and Reed kept Stacy
21      in the dark about the company's operations,
22      performance, and financial health?
23  A   I was always forthright with Stacy.  Whenever she
24      asked for information, I'd give it to her.
25  Q   Did you ever proactively provide her with

Page 280

1       information regarding the operations, performance,
2       and financial health of the companies?
3   A   She would have seen a annual meeting minutes if
4       she signed them.  We haven't -- I think she signed
5       one or two; I don't know how many.  If she had
6       signed annual meeting minutes, she would have seen
7       those.  I guess that's what I'm kind of thinking
8       about.
9   Q   Sure.  And other than the -- if there are annual
10      meeting minutes that she signed, other than those
11      documents, did you ever provide Stacy with any
12      information pertaining to the operations,
13      performance, and financial health of the
14      companies?
15  A   She never asked for any, no.
16  Q   And looking at the next sentence, it says -- and
17      this is denied -- "Unbeknownst to Stacy, Reed and
18      Kiesler were actually" -- oh, I'm sorry.  I
19      skipped a part.  "Never" -- the next part of the
20      sentence is "never holding shareholder or director
21      meetings for the companies."
22          Do you deny that shareholder or director
23      meetings for the companies did not occur?
24  A   They were all aware that they didn't occur.
25  Q   And it says, "Unbeknownst to Stacy, Reed and

**Stacy L. Randall v.**
Reed C. Widen, et al.

**Video Deposition of  Michael J. Kiesler**

---

Page 281

1    Kiesler were actually using a rubber stamp to
2    forge her signature."
3        You don't deny that you did use the rubber
4    stamp of Stacy's signature on a number of
5    occasions; correct?
6  A  With her approval, correct.
7  Q  Turn, please, to paragraph 25 of Exhibit 53 and
8    Exhibit 54.  And I'll direct your attention to
9    paragraph 25.
10 A  Okay.
11 Q  Paragraph 25 of the complaint, and looking at the
12   answer, is also denied; correct?
13 A  Yes.  Yes.
14 Q  And 25 states, "Over time, Reed consolidated his
15   brothers' ownership interest in the companies in
16   transaction kept private from Stacy."
17       Let me start with that sentence.  Do you deny
18   that sentence?
19 A  Reed --
20          MR. CHURCHILL:  Objection.  The
21       document speaks for itself.  You can answer.
22 A  "Reed consolidated his brothers' ownership
23   interest in the companies in transactions."
24       When it says "consolidates his brothers'
25   ownership," not -- not to Reed.  The company just

Page 282

1    purchased those shares.
2  Q  And those transactions were not disclosed to
3    Stacy; correct?
4          MR. CHURCHILL:  Objection.
5       Mischaracterizes testimony.
6  A  She approved the use of her stamp.  So if there
7    were consent resolutions and she didn't sign wet,
8    with wet signatures, she would have been made
9    aware of them --
10 Q  Did you talk --
11 A  -- and approved.
12 Q  -- to Stacy about applying her signature stamp to
13   consent resolutions regarding the sale of her
14   brothers' shares?
15 A  I don't recall.
16 Q  And Footnote 1, which is also denied, states that
17   "Reed also transferred shares to Kiesler and other
18   executives of the companies in transactions kept
19   private from Stacy."
20       Did you ever disclose to Stacy transfers of
21   shares to yourself and other executives of the
22   companies?
23          MR. CHURCHILL:  Objection.  Asked
24       and answered.
25 A  I'm assuming "transferred" means subscription of

Page 283

1    shares, or if this is just -- I don't -- I don't
2    understand the term "transferred."  Because they
3    were a company.  They were treasury shares, and
4    we -- I purchased them.  And she was -- she would
5    have been, just like my other answer, aware of
6    them through her approval of the use of her stamp
7    if she didn't sign the documents wet.
8  Q  You don't have any recollection of personally
9    discussing the transfer of shares to yourself or
10   other executives of the companies with Stacy,
11   though, do you?
12 A  I don't recall that.
13 Q  Turning to paragraph 29, please, on the next page,
14   the allegations in paragraph 9 -- 29 state that
15   "The Companies' board of directors were inactive
16   and did not hold formal meetings or observe
17   corporate formalities."  That para -- that
18   sentence is also denied.
19       It is true that the companies' board of
20   directors were inactive and did not hold formal
21   meetings or observe corporate formalities;
22   correct?
23          MR. CHURCHILL:  Objection to the
24       extent it calls for a legal conclusion.
25 A  There were meetings at the Widen household.

Page 284

1    You're saying formal, though.  Don't know if I'd
2    call those formal or not.
3  Q  Do you believe that the boards of the companies
4    were active?
5          MR. CHURCHILL:  Same objection.
6       Calls for a legal conclusion.  Ambiguous.
7  A  I'm -- I'm unaware.
8  Q  Turn, please, to paragraph 34 of Exhibits 53 and
9    54.  34 states, "in fact, until the redemption,
10   Widen Enterprises' CEO Gonnering was not even
11   aware that Stacy was nominally a director of
12   Windy Waters."
13       Did I read that correctly?
14 A  You did.
15 Q  Was Mr. Gonnering aware that Stacy was nominally a
16   director of Windy Waters prior to her redemption?
17          MR. CHURCHILL:  Objection.
18       Ambiguous.
19 A  I don't know.
20 Q  Paragraph 35 states that "the Companies, Reed, or
21   Kiesler did not provide Stacy with any information
22   about the Companies' financial, operational, or
23   strategic matters," and that also is denied.
24       What specific information did you personally
25   provide to Stacy regarding the financial,

Page 285

1    operational, or strategic matters of the company?
2                MR. CHURCHILL:  Objection.  Asked
3         and answered.
4    A  Over time, if she would have signed annual
5       meetings in person, she would have seen financial
6       information.  And, also, I don't know what they
7       shared at their Thanksgiving get-togethers.
8    Q  So, to the best of your recollection, the only
9       thing that you can think of that was provided to
10      Stacy regarding the operations, strategic matters,
11      or health of the companies were the annual meeting
12      minutes if she, in fact, signed them?
13   A  Or any discussions she would have had with Reed.
14   Q  Sure.  But you're not aware of any discussions
15      that she had with Reed?
16   A  I'm unaware.
17   Q  Paragraph 45 relates to Reed's compensation.  It
18      says that "he paid himself approximately
19      $1 million in annual compensation, plus hundreds
20      of thousands of dollars in fluctuating annual
21      bonuses," and that paragraph also is denied.
22         The information contained in that paragraph
23      is accurate, isn't it?
24                MR. CHURCHILL:  Objection.  Lack of
25         foundation.

Page 286

1    A  I -- I don't know.  Reed's nominal service, he --
2       I wouldn't know what his service was specifically.
3       That's a Matthew question.
4    Q  With regard to the $1 million in annual
5       compensation, plus hundreds of thousands of
6       dollars in fluctuating annual bonuses, that
7       information is accurate; correct?
8                MR. CHURCHILL:  Objection.  Lack of
9         foundation.
10   A  I would need to -- I don't know, sitting here
11      today.
12   Q  And the next paragraph states that "This was over
13      twice what Reed paid the company's CEO, who
14      actually ran Widen Enterprises."
15         Do you dispute that Reed's comp was over
16      twice what Mr. Gonnering made in compensation?
17                MR. CHURCHILL:  Objection.  Lack of
18         foundation.
19   A  I don't know.
20   Q  Do you dispute that Mr. Gonnering ran
21      Widen Enterprises?
22                MR. CHURCHILL:  Objection.  Vague.
23         Ambiguous.
24   A  I'm sorry.  Which -- where are we on?
25   Q  46.

Page 287

1    A  Oh, okay.  And what was -- I'm sorry.  What was
2       the question?
3                MS. POLAKOWSKI:  Could you read it
4         back, please, Sheila.
5                THE STENOGRAPHER:  One moment,
6         please.
7            Question:  "Do you dispute that
8         Mr. Gonnering ran Widen Enterprises?"
9                MR. CHURCHILL:  And I objected on
10        vague and ambiguous grounds.
11   A  Does that relate to 46?
12   Q  Yes.
13   A  Matthew Gonnering was in charge of day-to-day
14      operations.
15   Q  Turn, please, to paragraph 59 on the same page.
16      59 states that "Nobody at the Companies provided
17      any financial disclosure about what Stacy's shares
18      were worth."
19         And then it goes on to say, "or explained to
20      her that selling them outright, as opposed to
21      seeking a loan against them -- or her share of
22      millions of dollars in profits Reed had been
23      taking as purported compensation and bonuses --
24      was likely not in her long-term financial
25      interest."

Page 288

1         Did you ever tell Stacy that selling her
2       shares outright was likely not in her long-term
3       financial interest?
4    A  We didn't have that discussion.
5    Q  Turn, please, to paragraph 69.  Paragraph 69 says
6       that Reed had responded to Stacy's message that
7       she needed money, saying that "the Companies had a
8       COVID problem, and we might have to take care of
9       it in Millmont."
10         And your answer actually does admit this
11      particular allegation; correct?
12   A  That's what it states.
13   Q  Do you agree that the company had a COVID problem
14      in May of 2020?
15   A  I don't know what Reed meant by that.
16   Q  Do you know what COVID problem he was referring
17      to?
18   A  I think he was re -- I believe he was referring to
19      the PPP issue.
20   Q  Okay.  What ultimately did the company use those
21      $2.7 million in PPP funds for?
22   A  Operations, continuing operations.
23   Q  And ultimately that $2.7 million loan was
24      forgiven?
25   A  It was.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Michael J. Kiesler**

Page 289

1  Q  Do you know what Millmont is?
2  A  Yes.
3  Q  Do you know whether -- well, did you ever explore
4     getting Stacy money out of Millmont in May of
5     2020?
6  A  I did not.
7  Q  And was that because Reed directed you to sell --
8     to purchase Stacy's shares?
9  A  Millmont wasn't my area.  I paid the bills, but
10    that was about it.  It was Reed.
11 Q  Paragraph 70 refers to a conversation, the May 6th
12    conversation, that you had with Stacy.
13       Is there anything else, other than what
14    you've already disclosed to me today, that you
15    recall about that conversation?
16 A  I don't believe so.  I don't recall necessarily
17    everything I've talked about today regarding that,
18    though.
19 Q  Fair enough.  There's nothing that comes to mind?
20 A  I expressed her -- her urgency, right, I hope,
21    because that was a big deal.  Other than that, I
22    don't think anything.
23 Q  Paragraph 74 indicates that "Kiesler told Stacy
24    that the only way she could get any cash from the
25    companies was to sell her entire interest in the

Page 290

1     companies," and that paragraph is admitted.
2        Why did you tell Stacy that the only way to
3     get any cash out of the companies was to sell her
4     entire interest?
5  A  Reed expressed his desire to purchase all of her
6     shares.
7  Q  Paragraph 75 reads that "Kiesler did not explain
8     why this was the only way Stacy could realize any
9     cash on her substantial investment," and that
10    portion of the paragraph is denied.
11       Did you explain to Stacy on May 6th of 2020
12    why the only way for her to get any cash out of
13    the company was to sell her entire interest?
14 A  I explained to her that Reed wanted to purchase
15    all of her shares.
16 Q  Did you explain to her why that was the only way
17    she could get any money out of the company?
18 A  It was Reed -- Reed's desire.
19 Q  Did you tell her that Reed insisted that the only
20    way she could get any money out of the company was
21    to sell her entire interest?
22 A  I -- yes.
23                MS. POLAKOWSKI:  Mark, we have just
24       a couple of minutes left.  Can we just take a
25       five-minute break --

Page 291

1                MR. CHURCHILL:  Of course.
2                MS. POLAKOWSKI:  -- and I can
3        consolidate things.
4                THE VIDEOGRAPHER:  Going off the
5        record at 6:04.
6           (A recess is taken)
7                THE VIDEOGRAPHER:  We're back on
8        the record at 6:14.
9  (By Ms. Polakowski)
10 Q  There's just a few more paragraphs of the
11    complaint that I'd like to ask you about,
12    Mr. Kiesler.
13       First of all, paragraph 81 on page 15.
14    It's -- this paragraph was admitted in the answer
15    and indicates that "Kiesler also told Stacy, in
16    sum and -- in sum and substance, that she would be
17    smart to sell her interest in the Companies while
18    she had the chance because Widen, the operating
19    company, might not even be around in a few years,
20    and she risked ending up with nothing if she
21    didn't take his offer."  Do you see that?
22 A  Yes.
23 Q  And do you see in the answer that that was
24    admitted?
25 A  This is 81?  Wait.  81?

Page 292

1  Q  82.
2  A  82?
3  Q  I'm sorry, no.  81.
4  A  Admit that -- okay.
5  Q  You do see that that allegation was admitted?
6  A  I do.
7  Q  Do you recall saying to Stacy, in sum and
8     substance, that she would be smart to sell her
9     interest in the companies?
10 A  In sum and substance, I believe I would have -- I
11    believe I told her that if she -- or, the
12    company -- we were uncertain because of the COVID,
13    if the company does fail, her -- her money -- she
14    wouldn't -- she would get more now than if the
15    company failed, obviously.
16 Q  So it is accurate that you admit that that -- the
17    allegations in that paragraph, as you sit here
18    today?
19                MR. CHURCHILL:  Object.  Objection.
20       The answer speaks for itself.
21 Q  Yes?
22 A  Yes.
23                MR. CHURCHILL:  Same objection.
24 Q  Okay.  Paragraph 124, please.  This is a
25    conversation we have not yet talked about today.

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Michael J. Kiesler

Page 293

1    So paragraph 124 was admitted in the answer,
2    and that provides that "During a stop by the
3    Companies' office, Stacy asked Kiesler what had
4    happened to the shares of the companies -- to the
5    shares the companies had purchased from her in May
6    of 2020.  Kiesler told her, in sum and substance,
7    that the shares were 'just floating around out
8    there' and that 'nobody has them because they're
9    not worth anything.'"
10    Do you recall telling Stacy that the shares
11    were just floating around out there and that
12    nobody has them because they're not worth
13    anything?
14 A  This was a situation where I was in my office,
15    working on probably the -- the what do you call
16    it -- the information for the Acquia sale.  And I
17    looked up, and she's standing in my doorway.  And
18    she was really in a combative mood, and so I just
19    flippantly made this statement.  And then after I
20    made this statement, I said, "No, the company
21    purchased your shares."
22 Q  The statement that the shares aren't worth
23    anything, that is not accurate, is it?
24 A  To her, they're not worth anything.
25 Q  Well, she didn't own them; correct?

Page 294

1 A  Correct.  But she was like "Where are my shares?"
2    or "Who got my shares?," or something like that.
3 Q  What did you mean by "the shares were just
4    floating around out there"?  Do you recall?
5 A  Again, it was just a -- a flippant remark.
6 Q  Earlier today, we talked about the funds in
7    Windy Waters as of May of 2020, and specifically,
8    we talked about Windy Waters having about
9    $5.5 million of cash or cash equivalence on hand.
10    Do you recall, generally speaking, our
11    conversation about that?
12 A  Generally.
13 Q  When, if ever, were Windy Waters funds used to pay
14    the expenses of Widen Enterprises?
15 A  Again, it was a consolidated parent, so we
16    consolidated it with the operating company.  It
17    was used to set aside -- set aside excess cash
18    from Widen Enterprises.
19    So if Widen Enterprises had extra cash, we'd
20    make transfers into the Windy Waters investment
21    accounts or -- yep, that's where it landed.  And
22    vice versa:  If Widen Enterprises needed cash, we
23    would move it from Windy Waters to
24    Widen Enterprises.  It was just a way to keep it
25    separated for legal liability purposes.

Page 295

1 Q  Did that frequently happen, where Windy Waters
2    funds were used to pay Widen Enterprises expenses?
3    MR. CHURCHILL:  Objection.
4    Ambiguous.
5 A  They were never used to pay -- I guess I thought
6    you were talking about the movement of money.  The
7    actual expenses, like shareholder distributions,
8    were always paid out of -- technically, out of
9    Windy Waters.
10    What happened was, Widen Enterprises would
11    pay it, and then there was a due to/due from
12    account, so there -- intercompany account that was
13    used to track those amounts.
14    So, technically, Windy Waters was paying for
15    Windy Waters expenses.  Widen Enterprises was
16    paying for Widen Enterprises expenses.  All of it
17    was coming out of the Widen Enterprises checking
18    account.  When it did, we made that intercompany
19    entry as a liability from Widen to Windy.
20 Q  And I thought I understood your previous testimony
21    to be that the reason that $5.5 million could not
22    be used to loan Stacy money was because it needed
23    to be available to pay Widen Enterprises expenses.
24    Did I understand your testimony correctly?
25 A  Due to the uncertainty, we needed to make sure

Page 296

1    we -- we were accumulating cash at that time.
2 Q  And how frequently, if ever, did Windy Waters go
3    into that $5.5 million to make -- to transfer
4    money to Widen Enterprises?
5 A  I don't recall.
6 Q  Did you ever discuss with anyone having
7    Windy Waters pay the expenses of
8    Widen Enterprises?
9 A  No.
10 Q  I just have a couple more questions, and then
11    we'll be done.
12    Looking at how the sale of the companies has
13    ultimately played out, i.e., that $162 million was
14    received for the company, do you have any regrets
15    about the way Stacy's buyout occurred?
16 A  No.  No.
17 Q  If you had it to do over again, is there anything
18    that you would do differently about Stacy's
19    buyout?
20 A  Again, 20/20's -- hindsight's 20/20.
21    At the time of her buyout, I wouldn't have
22    done it any differently.  Again, Reed was the one
23    that directed me to do the buyout.
24    MS. POLAKOWSKI:  I think that's
25    all.  Just one -- David, anything else you --

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of  Michael J. Kiesler*

Page 297

```
1              MR. PALAY:  No.  I'm good.
2         MS. POLAKOWSKI:  That's all I have.
3         THE WITNESS:  Thank you.
4         MS. POLAKOWSKI:  Thank you for your
5    time.
6         THE WITNESS:  Thank you.
7         MR. CHURCHILL:  Nothing from us.
8    Thank you.
9         THE VIDEOGRAPHER:  Going off the
10   record at 6:22.  End of deposition.
11
12      (Proceedings concluded at 6:22 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 298

```
1    STATE OF WISCONSIN    )
                           ) SS:
2    COUNTY OF DANE        )
3
4         I, Sheila K. Finnegan-Martinez, a Registered
5    Professional Reporter and Notary Public in and for
6    the State of Wisconsin, do hereby certify that the
7    foregoing video deposition of MICHAEL J. KIESLER was
8    taken by me on September 19, 2023, and reduced to
9    writing by me, a professional court reporter and
10   disinterested person, approved by all parties in
11   interest and thereafter converted to typewriting
12   using computer-aided transcription.
13        I further certify that I am not related to nor
14   an employee of counsel or any of the parties to the
15   action, nor am I in any way financially interested in
16   the outcome of this case.
17        IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my notarial seal of office at Madison,
19   Wisconsin, this 24th day of September, 2023.
20
21
22
     Notary Public, State of Wisconsin
23   My Commission Expires May 3, 2027
24
25
```