**In The Matter Of:**

*Stacy L. Randall v.*
*Reed C. Widen, et al.*

---

*Video Deposition of Matthew R. Gonnering*
*September 21, 2023*

---



*Original File Gonnering Matthew 9-21-23.txt*
*Min-U-Script® with Word Index*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

_____

STACY L. RANDALL,

        Plaintiff,

   -vs-            Case No. 3:22-cv-00400-jdp

REED C. WIDEN, MICHAEL KIESLER,

WIDEN ENTERPRISES, LLC, and

WINDY WATERS, INC.,

        Defendants.

_____

       Video Deposition of MATTHEW R. GONNERING,
taken at the instance of the Plaintiff, under and
pursuant to Rules 26 and 30 of the Federal Rules of Civil
Procedure, before Kaila M. Macek, RMR, CRR, a
Notary Public in and for the State of Wisconsin, at
O'Neil, Cannon, Hollman, DeJong & Laing S.C.,
111 East Wisconsin Avenue, Suite 1400, Milwaukee,
Wisconsin, on September 21, 2023, commencing at 9:05 a.m.
and concluding at 6:06 p.m.

---

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3    REINHART BOERNER VAN DEUREN s.c., by
      MR. DAVID G. PALAY,
 4    MS. MONICA A. MARK,
      MR. MARK A. CAMELI,
 5    1000 North Water Street, Suite 1700
      Milwaukee, Wisconsin 53202
 6         appeared on behalf of the Plaintiff.
 7
      HOLLAND & KNIGHT LLP, by
 8    MR. MARK H. CHURCHILL,
      1650 Tysons Boulevard, Suite 1700,
 9    Tysons, Virginia 22102,
           appeared on behalf of the Defendants.
10
11    O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
      MR. DEAN P. LAING,
12    111 East Wisconsin Avenue, Suite 1400,
      Milwaukee, Wisconsin 53202,
13         appeared on behalf of the Defendants.
14    Also present:  Jay Church, Videographer
15
16
              I N D E X
17
      Examination:                             Page
18
      By Mr. Palay                                5
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1    Exhibits Identified:                               Page
 2    Exhibit 1    Widen Enterprises Business Plan        28
 3    Exhibit 2    Confidential Information Memorandum     52
 4    Exhibit 3    Slack message 4/12/19                  128
 5    Exhibit 4    Slack message 10/16/19                 139
 6    Exhibit 5    Slack message 10/22/19                 150
 7    Exhibit 6    Email dated 11/22/19                   157
 8    Exhibit 7    Email dated 7/3/20                     171
 9    Exhibit 8    Email dated 12/1/14                    180
10    Exhibit 9    Email dated 2/23/18                    191
11    Exhibit 10   Email dated 8/10/18                   198
12    Exhibit 11   Email dated 4/10/20                   209
13    Exhibit 12   Email dated 5/8/20                    219
14    Exhibit 13   Slack message dated 5/14/20           243
15    Exhibit 14   Grant Thornton Quality of             256
                   Earnings Study
16
      Exhibit 15   Email dated 8/26/20                   277
17
      Exhibit 16   Email dated 5/22/20                   284
18
      Exhibit 17   Grant Thornton Engagement Letter      289
19                 for Advisory Services
20
      (The original exhibits were attached to the original
21     transcript, and copies were provided to counsel)
22
23
24        (The original transcript was filed with
                Attorney David G. Palay)
25
```

---

**Page 4**

```
 1         THE VIDEOGRAPHER:  Good morning.
 2    We're going on the record.  The time is
 3    9:05 a.m.  Today is September 21st, 2023.
 4    This is media unit number one of the video
 5    recorded deposition of Matthew Gonnering.
 6         This is in the matter of Stacy Randall
 7    versus Reed Widen, et al.  The case is filed
 8    in the U.S. District Court, Western Direct of
 9    Wisconsin.  Case number 3:22-cv-00400-jdp.
10         The deposition is taking place at
11    111 East Wisconsin Avenue.  That's in
12    Milwaukee, Wisconsin.  My name is Jay Church.
13    I'm the videographer today.
14         If we could have counsel please state
15    your appearances and affiliation for the
16    record, and then our court reporter will
17    swear in the witness.
18         MR. PALAY:  David Palay from
19    Reinhart Boerner Van Deuren on behalf of
20    Stacy Randall, and with me today are my
21    colleagues Monica Mark and Mark Cameli.
22         MR. CHURCHILL:  Mark Churchill on
23    behalf of Widen Enterprises and the
24    defendants from Holland & Knight, and with me
25    is Dean Laing of O'Neil Cannon.
```

Page 5

1             MATTHEW R. GONNERING, called as a
2     witness, being first duly sworn, testified on
3     oath as follows:
4                    EXAMINATION
5  BY MR. PALAY:
6  Q   Good morning, Mr. Gonnering.  I just introduced
7      myself, but my name is David, and we've actually
8      met in some other contexts before, so you know
9      that.  And as I said, I represent Stacy Randall in
10     this case.  And the defendants in the case are
11     Reed Widen, Michael Kiesler, who you know;
12     correct?
13 A   Correct.
14 Q   And two companies, Windy Waters, Inc., and Widen
15     Enterprises, LLC.  You understand that?
16 A   I do.
17 Q   I'll refer to that group as the defendants
18     sometimes.  So you'll understand if I refer to the
19     defendants, I'm referring to Reed, Michael
20     Kiesler, Windy Waters, and Widen Enterprises?
21 A   Okay.
22 Q   Now, you're not a party to this case in your
23     individual capacity; right?
24 A   Correct.
25 Q   But as we'll talk about later, you are and have

Page 6

1      been employed by Widen Enterprises in the past;
2      right?
3  A   Correct.
4  Q   And presently; correct?
5  A   Correct.  Employed by Acquia presently.
6  Q   Oh, thank you.  And we'll talk about it, but
7      Acquia now owns Widen Enterprises?
8  A   Correct.
9  Q   Okay.  And so Widen Enterprises and the
10     defendant's attorneys are representing you in that
11     capacity as a witness of Acquia; is that your
12     understanding?
13 A   My understanding is they're, yeah, representing
14     Matthew Gonnering and my presence here today.
15     Yeah.
16 Q   Okay.  Have you ever been deposed before?
17 A   I have not.
18 Q   Okay.  I'm sure you've seen it on TV.  It's not
19     too complicated.  But I'll just go over some
20     ground rules to make it smooth.  Basically I'll
21     ask you questions and you'll answer them to the
22     best of your ability.  If you don't understand a
23     question, just let me know.  I don't want you to
24     tell me anything you don't understand.  But if you
25     do answer a question, I'll assume that you

Page 7

1      understood it.  Is that fair?
2  A   Yep.
3  Q   And we're on video, but there's also a court
4      reporter taking down what we say.  So it's
5      important that we give audible answers to things.
6      So, you know, normally you might uh-huh or uh-uh
7      or nod, but here we have to kind of say yes, no.
8      Understood?
9  A   Understood.
10 Q   Is there any reason that you couldn't give
11     truthful and complete answers to questions this
12     morning?
13 A   No.
14 Q   Okay.  How did you originally learn about this
15     deposition?
16 A   I was asked to participate in the deposition I
17     believe from Holland & Knight, from our attorneys.
18 Q   Okay.  And did you do anything to prepare for this
19     deposition?
20 A   I did.
21 Q   What did you do?
22 A   I met with my attorneys.
23 Q   Okay.  And did you communicate with anyone else
24     about the deposition other than your attorneys?
25 A   I communicated with my wife.

Page 8

1  Q   Okay.
2  A   And my employer.
3  Q   Okay.  Who at your employer did you communicate
4      with?
5  A   General counsel Jason Wagstaff.
6  Q   Did you review any documents in preparation for
7      the deposition?
8  A   I did.
9  Q   Okay.  Which documents?
10 A   A variety of documents.
11 Q   Okay.  Like which ones?
12 A   There was a lot.  Operational updates, things that
13     I've written historically.
14 Q   Anything else?
15 A   The shareholder agreement that I signed.  And
16     that's -- that's what I recall.
17 Q   Did you make any notes in preparing for the
18     deposition?
19 A   I did not.
20 Q   And you understand that Reed and Michael Kiesler
21     have given depositions in this case already?
22 A   I do.
23 Q   Have you discussed their depositions with them at
24     all?
25 A   No.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

1  Q  Okay.  Did you discuss this deposition with either
2     of those two?
3  A  No.
4  Q  And you didn't -- did you review any of the
5     transcripts of their depositions?
6  A  I reviewed Reed's transcript.  Yes.
7  Q  Okay.  So -- okay.  So you have a good
8     understanding of what this case is about if you've
9     reviewed Reed's transcript; fair?
10 A  I do.
11 Q  Okay.  Can you tell me your understanding of what
12    the dispute in this case is?
13 A  I understand the dispute is that Stacy claims she
14    was mistreated with respect to her redemption.
15 Q  Okay.  And have you talked to Reed or Mr. Kiesler
16    about that dispute at all?
17 A  No.
18 Q  Never once talked to them about this whole case?
19 A  Did I ever talk to them about this case once at
20    all.  When we were together with our -- with our
21    counsel, we would talk about it.
22 Q  Okay.
23 A  We would be in the same conversation with counsel.
24 Q  Okay.  Have you communicated with anyone other
25    than your counsel here or the general counsel at

1     Acquia about the dispute generally?
2  A  My wife is aware of the general dispute and that
3     I'm here.
4  Q  Okay.  One thing that I think you won't be
5     surprised is going to come up a good amount today
6     is the concept of value.  Do you have an
7     understanding of what value means?
8  A  Yes.
9  Q  Okay.  Can you tell me what that is?
10 A  I think of value as the worth of something.
11 Q  Okay.  I like that.  I'm going to be even a little
12    more specific today and I'm going to -- I'm going
13    to define value for our conversation as the amount
14    of money that something would change hands over in
15    exchange for where the buyer doesn't have any
16    compulsion to buy it and the seller doesn't have
17    any compulsion to sell it and it's in an arm's
18    length transaction where both buyer and seller
19    have all the relevant information.  Does that make
20    sense?
21 A  It does.  When you say that, I think of market
22    valuation.  That's what I understand to be what
23    you just described.
24 Q  Yeah.  I agree.  Is there other concepts of value
25    that -- other than market valuation that you use?

1  A  In general, the term value as indicating something
2     of worth, I might value a relationship, there
3     might be other indications of --
4  Q  Okay.  We're just talking about cold hard cash
5     today.
6  A  Yes.  I'm aware of a book value.  That's a term in
7     finance.
8  Q  Yeah.  And we might talk about book value.  If
9     we're talking about anything other than that fair
10    market value, I'll be specific that we're talking
11    about book value or, you know, any other type of
12    value or, you know, things that you just value
13    generally.
14 A  Okay.
15        MR. CHURCHILL:  And I'll just state
16    for the record as an objection that we don't
17    agree to the use of value globally in the
18    same way for reasons that the witness just
19    stated, so we'll take the questions as they
20    come.
21 BY MR. PALAY:
22 Q  So can you just give me a brief history of your
23    employment, kind of, you know, you don't have to
24    start in, like, high school, but maybe, you know,
25    where did you go to college, what did you do,

1     then, you know, how did you get here?
2  A  Okay.  I -- after college, well, I went to
3     St. Norbert College in De Pere, Wisconsin, and
4     then after that, I worked for a company called GEF
5     Graphics down in Skokie, Illinois, did estimating
6     and planning for them.
7        And then from there, I went to work for a
8     company in Appleton called Master Litho, which is
9     a book manufacturing company, in a sales capacity.
10       From Master Litho, I went to Krause
11    Publications, which was a publisher of a variety
12    of magazines titles, and I would sell display
13    advertising for one of those magazines in
14    particular.
15       And I worked for -- well, I should -- I
16    worked for GBF graphics for six to 12 months; I
17    worked for Master Litho for one, two years; I
18    worked for Krause Publications for six to
19    12 months, and then I moved to Madison and got the
20    job at Widen in a sales capacity to sell printing
21    services, and that would be in 2000.
22 Q  Oh, okay.  So you started at Widen in 2000.  And
23    your background is in sales generally?
24 A  Yep.  Sales and marketing.  Yes.
25 Q  What did you -- I assume you got a degree from

**Stacy L. Randall v.**                                          **Video Deposition of Matthew R. Gonnering**
**Reed C. Widen, et al.**

Page 13

1    St. Norbert?
2  A  I did.  Yep.  Bachelor's of business
3    administration.
4  Q  Okay.  Great.  And so your first job at Widen was
5    selling you said print services?
6  A  Printing services.  Yep.
7  Q  Okay.  What kind of printing services?
8  A  Printing services would be called sheet-fed
9    printing services, so that would translate into
10    brochures, low, small-count brochures for
11    marketing people.  So they would make -- sell
12    sheets of like an 8 and a half by 11 sell sheet,
13    full color, or tri-float brochures.  Those were
14    the printing services that we provided from the
15    equipment that we manage, which was sheet-fed
16    presses.
17  Q  Okay.  And what does sheet-fed mean?
18  A  The presses are fed with sheets of paper versus a
19    roll of paper, for example.
20  Q  Oh, okay.
21  A  So sheet-fed would just indicate that it's a lower
22    volume.
23  Q  More specialized?
24  A  Not necessarily specialized, by just a lower
25    volume of production.

Page 14

1  Q  Okay.  And that was in 2008?  Or 2000, sorry.
2  A  That was 2000.  Yep.
3  Q  Okay.  How did you progress through Widen
4    Enterprises?
5  A  After selling printing -- printing is a difficult
6    thing to sell.  It was a very commoditized
7    service.  There was a tremendous amount of pricing
8    pressure to sell those things.  And Widen already
9    had what they referred to as an image database at
10    the time, and this was something that I viewed as
11    differentiation, and so I pursued a role in
12    marketing to help guide the company to use this as
13    a place to differentiate us in not just printing,
14    but the other services that we provide, because we
15    also provided prepress services, and this image
16    database is a service.  And so I moved from sales
17    to marketing, and then from marketing to then
18    managed sales and marketing both and those teams,
19    and then build up the marketing efforts.
20  Q  Okay.  So I got to unpack that because -- so first
21    in your sales capacity, you recognized the image
22    database as a point of differentiation with some
23    of your competitors?
24  A  Yeah.
25  Q  Okay.  And then because of that, you were, what

Page 15

1    did you say, promoted into the marketing or
2    transferred to marketing?
3  A  I would probably consider it more of a side step.
4    Was I was in a sales role and I moved to
5    marketing.
6  Q  Okay.  And you affected sort of the direction of
7    the company's marketing towards incorporating the
8    image database more centrally; is that fair?
9  A  To be included as a place to differentiate the
10    other services like printing and prepress.
11  Q  Okay.  So there's printing we talked about a
12    little bit.  What's -- what is prepress?
13  A  You can think of prepress as the color retouching
14    of an image.  That was the -- one of the services.
15    There was also the preparation of catalogs before
16    they go to press.  So we would operate in between
17    the design firm and the printer, and we would help
18    to make the files that the designers were creating
19    ready for the print production process.
20  Q  Are those, like -- what kind of files are those?
21    Are those like physical files?  Are they digital
22    files?
23  A  There was a transformation over time.  So based on
24    my recollection, the digitization of prepress was
25    a late '80s thing.  The company that helped usher

Page 16

1    that in was a company called Scitex, and then it
2    transitioned into digital more fully, and so the
3    files that we would prepare would be things like
4    Photoshop files, you can think on a per-image
5    level.  There was like an EPS file, which is an
6    encapsulated postscript file.
7  Q  Okay.  So by the time you got there, it was -- the
8    file touch-up was all digital?
9  A  Yeah.
10  Q  Okay.  Got it.  And then so tell me more.  How did
11    you -- how did you encompass the image database
12    into the prepress and printing aspect of the
13    company?
14  A  How did I encompass it into the aspects of the
15    company.
16  Q  If I didn't phrase that right, feel free to just
17    tell me how it does make sense.
18  A  Yeah.  I think of it as a source of
19    differentiation.  So how could we more effectively
20    sell this suite of things that we were delivering
21    to market.  And I viewed the image database as a
22    place to create more value for the customer in
23    this case and say we could sell printing, we could
24    sell prepress, we could sell the image database.
25  Q  These are images that the company owned or had the

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 17

1     rights to?

2 A   The company did not own these images.  The

3     customer owned the images.

4 Q   Oh, okay.  So you used a specific customer's

5     images with that customer?

6 A   The customer would contract us to do work on an

7     image.

8 Q   Okay.

9 A   Customer would upload files into the image

10    database that were their files.

11 Q   Got it.  And so you were housing files for the

12    customer?

13 A   Correct.

14 Q   And housing iterations of, you know, touch-ups and

15    changes that happened to the image?

16 A   Correct.

17 Q   Okay.  And then you'd make those accessible to the

18    customer in a way that added value to them?

19 A   And the -- yes.  The accessibility was through

20    the -- well, the customer would make them

21    accessible, so the customer would organize those,

22    those what we call digital assets.  The customer

23    would organize those in a way that they wanted,

24    and then they would extend permissions to the

25    rights to people that they wanted to have access

Page 18

1     to those things.

2 Q   Oh, okay.  So the customer's the one who is

3    housing all of this data, like it's on their --

4    the customer's servers?

5 A   No.

6 Q   Oh, okay.  You have -- they're on your servers?

7 A   They were on our servers early, yes.  So we had a

8    server room, we had a data center at our location,

9    and in that data center resided those images.

10    They were stored there.  The customers would

11    access it through the web browser.

12 Q   Okay.  Got it.  So did there come a point when the

13    company started building, designing out, and

14    creating software that allowed the customers to

15    interact with their own images that were on your

16    servers or servers that you, you know, license

17    elsewhere?

18 A   The image database was the interface --

19 Q   That is the interface?

20 A   -- to the storage, so to speak.

21 Q   Okay.  So was that software?

22 A   Yes.

23 Q   Okay.  And that was Widen software?

24 A   Correct.

25 Q   And that existed before you got there?

Page 19

1 A   Correct.

2 Q   And you recognized that as something that could

3    add more value than the company was emphasizing at

4    the time?

5 A   Correct.

6 Q   Okay.  So, yeah, so what ended up happening with

7    that?  Did that pan out?

8 A   It did.

9 Q   Okay.

10 A   We pivoted to grow in software and then the

11    printing and the prepress services.  Printing was

12    a -- we divested from printing at some point in

13    our history.  I don't recall the year we divested

14    from it.  But we no longer provided printing

15    services.  We still provided these prepress

16    services or image retouching services, but that

17    market was in decline, so we pivoted to doing just

18    the software, focusing on just the software and

19    then growing that business.

20 Q   And when did that pivot take place?

21 A   I would say that was over time.

22 Q   Okay.

23 A   Because it was -- the software was created, based

24    on my understanding, the software was created in

25    about the mid '90s, and so that's when we started

Page 20

1     doing image database things.  And so over time, it

2    progressed into being the business.  We were in

3    the software business only.

4 Q   Okay.  Like, is there a year you can say you were

5    in the software business only by for sure?

6 A   When we sunsetted the content production business,

7    which was a new label to the prepress business,

8    when we sunsetted that business, we could say at

9    that time we were only software.

10 Q   Okay.  Do you remember about when that sunsetting

11    occurred?

12 A   That was in -- that was in -- that was actually in

13    COVID time where we -- in that -- in that moment

14    in time, the work just stopped showing up, so

15    customers would no longer send work, and we saw

16    this firsthand.  So there was -- there was just

17    nothing to do.  Customers would not give us work

18    anymore because they -- because of their

19    uncertainty.

20 Q   When you say work, do you mean prepress work?

21 A   I mean prepress work.

22 Q   Okay.  But the --

23 A   Not --

24 Q   Sorry.  I didn't mean to cut you off.

25 A   It wasn't exclusive to the prepress work at that

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 21

1  time.  There was other challenges in that time
2  period.  But because of the work that stopped
3  showing up, we had made a decision to say we need
4  to consider what exiting this business looks like.
5  Q  Okay.  Was the software work still going on at
6     that point?
7  A  The software work was going on at that time, but
8     that also had significant challenges, so we had --
9     we had gone into -- we had gone into March of 2020
10    and had to navigate the uncertainty not just of
11    the content production business, but also of the
12    software business.
13       So we had made a lot of adjustments and
14    planning for what we were anticipating or
15    projecting for revenue that was not going to show
16    anymore.  So we had gone through a variety of
17    planning.  We had -- in fact we had planned for up
18    to 6 million in reductions for expenses.  We ended
19    up actioning at about three of that in
20    anticipation of just the uncertainty.
21 Q  Sure.
22 A  So we had to -- so we had to -- that was all part
23    of that time period.
24 Q  Okay.  So, yeah.  So there's like a general
25    uncertainty about everything at that time period,

Page 22

1     but the company still decided, sorry, to sort of
2     conclude the pivot from, you know, prepress to
3     solely software during that COVID period?
4  A  I would say based on the demand for those services
5     that stopped showing up, then we -- yeah, we had
6     to make a business decision there and say we just
7     can't keep doing this anymore.  It's not going to
8     generate the profits that we need.
9  Q  Got it.
10 A  So we're going to exit.
11 Q  And so this was a transition that -- was this a
12    transition that had begun before you arrived at
13    the company or was this something that you were
14    kind of the catalyst for?
15 A  I think since it was started in the mid '90s, the
16    company was aware of it, and I would say Reed in
17    particular, because at that time there was a
18    general understanding of this digitization process
19    and that prepress was not going to be the same
20    thing like it used to be.
21       And so that was a -- in fact, that's the --
22    based on my understanding, that's when Reed
23    decided to diversity into several different
24    things.  We established a photo studio at the
25    time.  We added the printing services.  We added

Page 23

1  the image database services in that time period.
2  So it was based on Reed's direction at the time,
3  that was the portfolio of things we were putting
4  out there to diversify away from what was prepress
5  and what might happen to prepress.
6  Q  What was that time?  Was that mid '90s or was that
7     when you joined?
8  A  I think that -- all those things were created
9     before I got there.
10 Q  Got it.  Okay.
11 A  And the way I think about the history is I place
12    those in the mid '90s.
13 Q  Okay.
14 A  But I started in 2000, so I know that they were
15    already there when I started.
16 Q  And so we kind of left off, you side-stepped from
17    sales to marketing, and then you oversaw both
18    sales and marketing?
19 A  Correct.
20 Q  Okay.  And then how did you come to run this
21    company?
22 A  After -- well, after managing -- we changed the
23    sales and marketing motion.  We used to have
24    outside salespeople who would make cold calls on
25    potential customers.  That was an ineffective way

Page 24

1  of selling, and we moved to a marketing-driven
2  approach whereby we would display our thought
3  leadership in the market and then we would draw
4  people to us who had that need.  And so that was
5  part of the sales and marketing activities at the
6  time, and Reed looked favorably on that, and I --
7  Q  Did it -- like did you make the company more money
8     by kind of changing that motion of marketing?
9  A  Make the company more -- we made the company more
10    effective.  Absolutely more effective.  It was
11    better use of dollars.
12 Q  Got it.
13 A  Versus the -- what I would refer to as the
14    outbound sales process versus the inbound
15    marketing approach.
16 Q  How do you measure, like, effectiveness?
17 A  There is, if you -- well new customers is a good
18    way to measure.
19 Q  Okay.
20 A  So how many new customers are we earning as a
21    result of what we're doing.
22 Q  Okay.
23 A  So that's a measure.
24 Q  Does that mean more revenues?
25 A  New customers would equate to more revenues.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 25

1  Q  Okay.
2  A  Yes.
3  Q  So is that kind of a measurement of growth or a
4     better use or a better effectiveness, sorry?
5  A  Say more there.
6  Q  If I was looking for like a hard number kind of
7     way to measure increased effectiveness and, you
8     know, it's through new customers, would that --
9     and that equates to new revenues, would more
10    revenues, you know, equate to a more effective
11    company?
12              MR. CHURCHILL:  Objection.
13          Confusing.  You can answer.
14 A  I guess I would generally say a sales and
15    marketing effectiveness measure is how much it
16    costs to acquire a customer.  So it's referred to
17    as CAC, Customer Acquisition Cost.  So that's
18    generally, when you think about sales and
19    marketing effectiveness, people would refer to
20    CAC, so how much money are we spending to acquire
21    a customer.
22 Q  Okay.  And you care about a customer because the
23    customer brings in revenue?
24 A  You care about the customer because -- well,
25    because we can help the customer ultimately.  Like

Page 26

1     they have a -- they came to us with a problem,
2     we've got a product that is able to solve that
3     problem, and so we want to solve that problem.  We
4     want to -- we want to help that customer realize
5     whatever their desired outcome is.  And so that's
6     the path that we go.  And the customer pays us for
7     that.
8  Q  Right.  Okay.  So it's like more customers for
9     less spend, kind of?
10 A  Not necessarily more customers for less spend.
11 Q  The cost of acquiring a customer goes down, so the
12    per-customer spend is lower?  No?
13 A  Cost of acquiring a customer might go up because
14    you're investing in that growth.  And you might
15    bring it down over time, but your acquisition of a
16    customer might cost you more in the earlier years
17    than the later years.
18 Q  But the goal is to get that -- the CAC low?
19 A  The goal would be, yeah, to have a CAC -- to have
20    a lower CAC is one mix that you would say, yeah,
21    we would want a lower CAC eventually.
22 Q  Got it.
23 A  And eventually the -- I would say that the
24    outbound move to inbound was more effective
25    because it drew more customers to us.  We were

Page 27

1     able to help more customers.  But it didn't
2     necessarily cost us less at that moment in time.
3     It would have over time.
4  Q  Okay.  And was that -- was this what you
5     instituted as the head of sales and marketing,
6     this emphasis on what we're talking about,
7     lowering CAC and acquiring more customers and more
8     efficient means?
9              MR. CHURCHILL:  Objection.  Vague.
10         You can answer.
11 A  I didn't institute a lower CAC.  That wasn't a
12    directive.  What I was leading was we can help
13    more people, we can bring in more customers, and
14    so that's what I wanted.  And then I staffed the
15    team to do that.
16 Q  Okay.  And when did you take over as the CEO?  Was
17    that the next step from head of sales and
18    marketing to CEO?
19 A  Correct.
20 Q  Okay.  When did that happen?
21 A  That was February 2009.
22 Q  Okay.  And what as far as you understand led to
23    that decision?
24              MR. CHURCHILL:  Objection to the
25         extent it calls for speculation.

Page 28

1  A  I told Reed I wanted that job.
2  Q  When?
3  A  Whenever he thought I was ready.
4  Q  Okay.  But when did you tell him?  Sorry.
5  A  Oh, I don't recall that date.
6  Q  Okay.  And who made the decision to -- that you
7     would be CEO?
8  A  Reed.
9  Q  Okay.  Was there like a meeting that happened
10    before that where that decision was made, or was
11    that just a decision Reed made alone?
12              MR. CHURCHILL:  Objection.  Calls
13         for speculation.
14 A  I don't know.
15 Q  Okay.  So let's look at a document.
16         (Exhibit No. 1 was marked for
17         identification.)
18 Q  Okay.  So I'm handing you what's been marked as
19    Exhibit 1.  And I guess I'll just ask you, do you
20    recognize this as a Widen Enterprises business
21    plan that you prepared?
22         Are you looking for something in particular?
23 A  No.  So far, yes is the answer, but I want to make
24    sure that all the pages are --
25 Q  Oh, okay.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 29

1  A  Are recognizable.

2  Q  I didn't slip any in.  It might make more sense if
3      we talk about a few specific pages, and then you
4      let me know if anything doesn't seem right about
5      this document.  The cover for instance says
6      Business Plan 2008 Prepared by Matthew Gonnering;
7      right?

8  A  Yes.

9  Q  Okay.  And did you prepare a business plan for
10     Widen Enterprises in 2008?

11  A  I did.

12  Q  Okay.  And at that time you were head of sales and
13     marketing?

14  A  Yes.

15  Q  Okay.  What prompted you to prepare this?

16  A  I don't remember.

17  Q  Do you recall if anyone asked you to prepare this?

18  A  I don't recall.

19  Q  Okay.  If you open the cover sheet on the first
20     page, there's an executive summary, and the second
21     paragraph starting at the second sentence, it
22     says, "Widen is about to embark on another
23     monumental shift that requires the transformation
24     of process and the alignment of resources to focus
25     on the strategic objectives of the organization."

Page 30

1     And then it lists some objectives.  Did I read
2     that right?

3  A  You did.

4  Q  Okay.  So what was the monumental shift that the
5     company was about to embark on?

6  A  This is -- well, the objectives strengthen
7     customer relationships, advance the software
8     architecture, efficiencies in premedia, which is
9     also referred to as prepress historically and also
10     the reference to content and production, and then
11     dominate the market.

12     The monumental shift would be the software,
13     building what we planned as a -- what I would
14     refer to as a house of brands.  We were going to
15     want to build up a variety of different products
16     that were consisting of different brands
17     underneath the Widen business.  But our go-to
18     market would be -- eventually that was brands like
19     Smartimage, Invidity, things that we created over
20     time.  So to embark on a monumental shift was to
21     say we're going to build up the software part of
22     the business even more.

23  Q  Okay.  And what did -- under the dominate the
24     marketplace, it says, "The goal is nothing short
25     of global domination, and marketing resources is

Page 31

1     the enabling vehicle to get there."  What did you
2     mean by global domination?

3  A  That's Matthew trying to inspire.

4  Q  Okay.  Like to be the best, you know, digital
5     asset management company in the world or in the
6     globe?

7  A  Yeah.  To be the leader, the market leader.

8  Q  Okay.  And did you -- were you the market leader
9     at the time that this was created?

10  A  We were not.

11  Q  Did you think you could get there?

12  A  Yes.

13  Q  Where -- did you have a sense of where in the
14     digital asset management market Widen Enterprises
15     was at this time?

16  A  I would say our position here was a -- we were a
17     small player.

18  Q  And you wanted to be a -- biggest player?

19  A  I wanted to be the leader.

20  Q  The leader.  Okay.  So what does it mean to you to
21     be the leader?

22  A  I think it -- to be a leader means you're setting
23     an example.  So not just the biggest.  To be the
24     biggest, the biggest what?  We were not going to
25     be able to be bigger in revenue than Adobe or

Page 32

1     OpenText.  Some of those, that's not -- that's not
2     a reasonable ask.  So to be a leader would be to
3     represent ourselves and to have the -- a market
4     leading reputation for being customer-centric, for
5     solving customer problems, the go-to place.

6  Q  Got it.

7  A  You need to -- you need to consider Widen if
8     you're thinking about digital asset management.

9  Q  And -- okay.  And you said the monumental shift
10     was a shift to focus on software; right?

11         MR. CHURCHILL:  Objection.

12         Misstates testimony.

13  BY MR. PALAY:

14  Q  Is that -- did I understand that correctly?

15  A  The monumental shift was to focus on building what
16     would ultimately be called a house of brands.
17     That was what was intended to be built with what
18     we were pursuing here.  Which wouldn't have been
19     exclusively digital asset management.

20  Q  Okay.  Was it -- did part of the shift mean
21     increasing the focus on digital asset management?

22  A  Digital asset management was part of it.

23  Q  Okay.

24  A  In addition to other brands that we would -- that
25     were not known at this time, but other brands that

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 33

1   we would create and then ultimately did create.
2  Q  Were those other brands software brands?
3  A  They were.
4  Q  Okay.  So like how much of the business was
5     software at the time you created this document,
6     approximately?
7  A  I don't recall.  I would also say that software is
8     one component of this, as well, because as we
9     think about what it looks like to strengthen a
10     customer relationship, the software doesn't
11     necessarily strengthen the software relationship.
12     The responsiveness to the requests, the customer
13     success plans that we embark on, the professional
14     services that we wrap around, the software itself
15     was really important, so.
16  Q  That makes a lot of sense.  But the end product,
17     you know, those are infrastructure aspects of the
18     company; right?
19  A  I wouldn't refer to those as infrastructure.  I
20     would refer to those as services that we wrapped
21     around the software.
22  Q  Oh, okay.  Like you would pay separately for those
23     things, or were those things the company did to
24     sell its software services more effectively?
25  A  We would bundle the services such as

Page 34

1     implementation.  We would say there's software,
2     but there's the implementation help that we're
3     going to provide you to get you up and running,
4     and then there's the ongoing support, so when you
5     have questions, you call us.  Those were bundled
6     with the software.
7  Q  Got it.  Is that what it means to be like software
8     as a service, like the -- does that encompass the
9     ongoing support aspect of, you know, you pay for
10     software, you maybe pay a subscription fee, but
11     you also pay for sort of support as you go and
12     need it?
13  A  That's how I thought of software as a service.
14  Q  Okay.
15  A  And how I would advocate for software as a
16     service, which is it's not just about the
17     software, it's about the service that we're going
18     to provide to the customer.
19  Q  That makes sense.
20  A  That's not necessarily how a software as a service
21     would be defined industry-wide.  The SaaS or
22     software as a service delivery might also be
23     considered a -- something hosted.  So it would be
24     I'm accessing that software through a internet
25     connection in a web browser.  So that's how others

Page 35

1     might interpret what does it mean to deliver it
2     via SaaS.
3  Q  Okay.
4  A  We amplify it intentionally for differentiation
5     reasons, that we're providing services around the
6     software.
7  Q  Got it.  Well, maybe not got it, but getting it.
8     And -- okay.  So software as a service kind of
9     describes this sort of general type of a company,
10     you know, and you said people sort of view it
11     differently, like Widen focused on the service
12     aspect of software as a service, some companies
13     might focus more just on the software subscription
14     aspect of the service, and digital asset
15     management is a subset type of software as a
16     service?
17  A  Let me try that differently.
18  Q  Just take it from the top.
19  A  Yeah.
20  Q  Yeah don't even start with what I --
21  A  We could think about SaaS as a delivery model.
22     How are we going to deliver the software.  SaaS is
23     a way to deliver it.  And you would say that SaaS
24     is a way to deliver it versus installed software.
25     So are we going to sell this software or deliver

Page 36

1     this software via a hosted environment or
2     installing it into a server room somewhere else.
3     So that's the -- SaaS is the delivery model.  The
4     software of digital asset management before SaaS
5     was a thing was delivered and still is to this day
6     as an installed thing.
7  Q  Got it.
8  A  So you could put digital asset management software
9     in a server room for some customer, and they could
10     run it there, and customers still do that and
11     providers still do that.
12        We were focused on the SaaS delivery model
13     and we amplified the service component because we
14     knew or thought we knew what the customer wanted,
15     and they wanted not just the software of digital
16     asset management, they wanted the experience
17     around that software and the services around it,
18     like implementation and support.
19  Q  Okay.  That -- it's starting to -- it's starting
20     to click.  Let's flip way ahead.  You see these --
21     the numbers on the bottom, it says Acquia and then
22     it has numbers?
23  A  I do.
24  Q  Let's go to 11067.  This says it's a pro forma
25     income statement, and it looks like it has some

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 37

1  years from before 2008 and some years, you know,
2  starting in 2008 going forward, and they have a P
3  next to them at the top, and I assume that means
4  projected.  Is that correct?
5  A  That's correct.
6  Q  Okay.  Can I actually ask you to read the
7  paragraph below all the numbers, and then I'm just
8  going to ask you what it means, because I don't --
9  I'm not, as you can tell, super up on this stuff.
10 A  Okay.  So read the paragraph that starts with
11    Interpretations?
12 Q  Yeah.
13 A  Okay.  "Interpretations from historical activity
14    led to correlations between the increase in the
15    percentage of revenue from software services and
16    the decrease in cost of goods sold.  This
17    correlation may be drawn because the variable cost
18    associated with providing software services to
19    additional customers is minimal, thus the
20    contribution margin to fixed cost has greater than
21    influence causing increases in net income.
22        Increases in sales and marketing spend have
23    also risen during this time period, which proves
24    to be directly correlated with increasing the
25    percentage of revenue attributed to software

Page 38

1    services.  Continuing to focus on increasing the
2    percentage of software services revenue will
3    require increases in sales and marketing
4    expenses."
5  Q  Thank you.  Okay.  How would you explain that to
6    like -- like an 8th grader?  We could go as low as
7    6th if we need to.
8            MR. CHURCHILL:  Do you have either
9        one of those?
10           MR. PALAY:  I don't.  But I am one
11       at heart, so --
12 A  This is -- well, if we -- if we invest on -- if we
13    invest in increasing the sales and marketing
14    activities for software, we'll increase the
15    revenue.  And that revenue is more profitable than
16    the content production or prepress or premedia
17    service revenue.
18 Q  Got it.  Okay.  So --
19 A  Which I -- sorry.
20 Q  No.  I didn't mean to cut you off.
21 A  That's not necessarily sixth grade or eighth grade
22    talk, though.
23 Q  That is low enough.  Like, I think -- okay.  So
24    the way I sort of tried to decipher it was you're
25    saying like a -- a higher percentage of the

Page 39

1    company's revenue coming from its software
2    services correlates with lower costs of goods
3    sold, and that correlates with a higher net
4    income?
5  A  Potentially.  If we -- it contributes to -- so
6    yes, the software services would have a better
7    gross margin than the prepress premedia content
8    production services.  How we spend the rest of the
9    money matters related to income.  Because there's
10    research and development, sales and marketing,
11    general administrative expenses.
12 Q  And this goes to something you were kind of trying
13    to explain to me before I think, which is you also
14    need to spend more on your marketing, at least
15    in -- at the early stage in order to get that, you
16    know, higher percentage of the company's revenue
17    to come from software, so you might not get a
18    higher net income on your way, you know, on this
19    path; is that fair?  Or it might be a slower build
20    to a higher net income because you're using more
21    money to do marketing?
22 A  Yeah.  We would invest more money in marketing,
23    and therefore -- yeah, it wouldn't just be
24    marketing.  There's R&D, marketing, yes, for
25    positioning and other general administrative

Page 40

1    expenses.  So those things are all part of what
2    would take from the gross margin and before you
3    get to the net income.
4  Q  Okay.  So you get -- so higher percentage of
5    revenues from software create a bigger gross
6    margin; fair?
7  A  Higher revenue percentage from software creates a
8    better gross margin.  That is -- if you're
9    managing your business effectively.
10 Q  Because that was the plan here?
11 A  Yep.
12 Q  Okay.  But it might not have created any
13    difference or even a better net margin because you
14    might use some or all of that new margin that
15    you've created to do -- for the things you're
16    saying, marketing, R&D service, build out, things
17    like that?
18 A  Correct.
19 Q  Got it so this is a plan for building -- for
20    growing the company?
21 A  Correct.
22 Q  Okay.  And growing it as a software-centric
23    company?
24 A  The content production and premedia and prepress
25    services were still a part of this, so that is in

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 41

1    the total revenue.
2  Q  But this one -- but this paragraph's talking about
3     an increase in the software revenue specifically;
4     right?
5  A  Let's double check it.
6  Q  I should say an increase in revenue from providing
7     software services, I think is more accurately what
8     this is referring to.
9  A  Increasing the percentage of revenue attributed to
10    software services.  So that was the -- that was
11    the -- that was the direction.
12 Q  Okay.  So fair to say your plan here is to
13    increase the company's percentage of revenues
14    coming from its software services from before the
15    plan, and that that would be the best way to grow
16    the company going forward?
17 A  The best way to grow the company going forward was
18    to focus on markets that were growing and
19    attractive, and software was attractive, and we
20    had a steady decline on the other side of the
21    business.  So the direction of the company was to
22    grow software.
23 Q  Got it.  Okay.  And is that ultimately what the
24    company did?
25 A  Ultimately we grew the software business.

Page 42

1  Q  Okay.
2  A  Yes.
3  Q  Did the company follow this plan more or less?
4  A  I would need to go back through this plan and look
5     at it.
6  Q  How about just what we're talking about right
7     there, you know, increasing the share of the
8     company's revenue that comes from providing
9     software services?
10 A  We did increase the percentage of revenue.
11 Q  Okay.
12 A  For providing software services, yes.
13 Q  Did you think that that would make the company
14    more valuable?
15           MR. CHURCHILL:  Objection.
16           Ambiguous.  Vague.
17 A  I think it would make the company more --
18 Q  At the time did you think that?
19 A  I think it would make the company more
20    sustainable.
21 Q  Okay.  What does that mean?  Yeah.
22 A  The direction was growth, so we're going to grow
23    as a company.  And so to grow as a company is to
24    continue providing services.  So sustainable means
25    we're going to be able to continue to provide

Page 43

1    services for an extended period of time.
2        The challenge we were navigating was the
3    content production prepress premedia business was
4    not a sustainable business.  There was not growth
5    opportunity there.  So when the directive is grow
6    this company, we had to find a different way to
7    grow.  So growth was the objective.
8  Q  Okay.  And is a growing company more valuable than
9     a declining company?
10 A  Is a growing company more valuable than a
11    declining company.  Is the worth of a growing
12    company -- it depends.
13 Q  Two companies otherwise identical, one's growing,
14    one's declining, fair to say the one growing is
15    going to be more valuable?
16           MR. CHURCHILL:  Object to the
17           extent it calls for expert testimony.
18 A  I think the value of the company and the -- the
19    value of the company would include more than just
20    growth.  So growth is --
21 Q  But they're identical other than the growth and
22    the decline.
23 A  Repeat that for me.
24 Q  So the two companies, identical.  One's growing,
25    one's declining.  Is the growing one more valuable

Page 44

1    than the declining one?
2           MR. CHURCHILL:  Same objections.
3  A  Not necessarily.
4  Q  Okay.  What could make the declining identical
5     company more valuable than the growing identical
6     company?
7           MR. CHURCHILL:  Same objection.
8  A  You'd have to look deeper at those companies.
9     You'd have to understand what the --
10 Q  Why would you have to look deeper if they're
11    identical?
12           MR. CHURCHILL:  Same objection.
13 A  I think about what else a company would be doing.
14    Are they innovating?  What is their reputation?
15 Q  You're fighting the hypo.  You're fighting the
16    hypo, Mr. Gonnering.  We can move on.  I guess
17    what I'm just looking to understand is when you
18    wrote this plan, did you think that following this
19    plan would make the company more valuable than it
20    otherwise would have been?
21 A  I wrote this plan to help the company grow.
22 Q  Okay.  And did you think that helping the company
23    grow would have any affect on how valuable the
24    company was?
25 A  I helped the company grow not to increase the

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 45

1    value, but to continue to provide a sustainable
2    organization so that we could continue to
3    innovate, we could continue to help customers, we
4    could continue to hire, we can continue to
5    participate in the community, we can -- to grow is
6    to -- is to -- is to thrive, is to keep growing,
7    to keep helping others.
8  Q  No, I understand that that was your focus.  I'm
9    just asking did you think that being a growing and
10   thriving company would have any affect on the
11   value of the company?
12               MR. CHURCHILL:  Objection
13      ambiguous.
14 A  I didn't think that way.
15 Q  Okay.  You just didn't think about that at all?
16 A  Growth -- yeah.  The objective was growth, and
17   this was the plan to grow.
18 Q  Got it.  Okay.  Flip back two pages for me to
19   11065.
20 A  11065.  Yep.
21 Q  Okay.  So this has revenue forecasts, and it
22   breaks them out between software as a service and
23   the premedia business.  Were those how you divided
24   the total revenue of the company at the time,
25   those two segments?

Page 46

1  A  Yes.
2  Q  Okay.  And it looks like, going to the 2008
3    projected software revenue at the top, looks like
4    the company was projecting just under $2.5 million
5    in revenue from the software as a service
6    business; is that correct?
7  A  That's -- yes.  Correct.  We were projecting less
8    than 2.5 million in 2008.  Yes.
9  Q  Okay.  And then flip forward to 11070.  And this
10   is a graph that plots total revenue, sales and
11   marketing, I think spend, and net income from 2003
12   through a projected 2011.
13 A  Yep.
14 Q  Fair?  And is it -- how would you describe the
15   trends in this graph?
16 A  I would describe this as a growth trend.
17 Q  Okay.  And how would you describe the relationship
18   between the net income component, the sales and
19   marketing spending, and the total revenue parts of
20   the graph?
21 A  The relationship between the three?
22 Q  Yeah.
23 A  So if we increase sales and marketing spend, we
24   will continue to increase the total revenue, which
25   will allow us to increase net income.

Page 47

1  Q  Okay.  I see that.  Fair to say the growth in
2    total revenue is projected to occur at a much
3    higher rate than the growth in either -- in net
4    income?
5  A  The growth in total revenue is appearing to grow
6    faster than the growth in sales and marketing and
7    the growth in net income.
8  Q  Okay.  And that's because of the dynamic we
9    discussed before, you know, it's -- you were
10   projecting to use a lot of the increased margin
11   you create from the increased revenue on, you
12   know, on various spending for R&D, marketing,
13   services, et cetera; is that right?
14 A  We were increasing the spending in those, yes.
15 Q  Okay.
16 A  But the revenue growth is -- I can't remember the
17   page you referenced before, but the revenue growth
18   is a combination of the software and the premedia
19   business.
20      What was the chart that we just looked at?
21 Q  I think it was 11065.  So that's a good point.  If
22   you look at the change row under software as a
23   service and premedia.
24 A  Yes.
25 Q  Both historically in projected, it looks like at

Page 48

1    this time you're projecting much smaller growth in
2    the premedia business year to year, like 4.7
3    basically going forward after 2008, compared to
4    the software as a service business; right?  Those
5    are projected to grow 26 and a half percent year
6    over year; is that right?
7  A  Software growth is projected at 26.45, and the
8    premedia growth is projected at 4.7.  Correct.
9  Q  So fair to say in that graph of total revenue, the
10   majority of that growth is projected to take place
11   from the software component of the business?
12 A  I'd have to understand the numbers.  If you're
13   talking about a percentage, then the percentage of
14   growth.
15 Q  Yeah.  A percentage of growth?
16 A  Yeah.
17 Q  Okay.  And fair to say you said this graph
18   represents growth?  Or I don't know how you
19   described it.
20 A  Yeah, I look at the lines and I think they're all
21   going up and to the right, and that's a growth.
22 Q  And growth -- so growth doesn't necessarily mean
23   that the net income is increasing by very much;
24   fair?
25 A  Based on the projections, that's what this says.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

1    Yes.

2  Q  Could the company grow even if the net income

3      declined?

4  A  The company could grow in something.  The company

5      could grow in revenue.

6  Q  Okay.  And when you're thinking of growth, are

7      you -- which is more important between those two

8      things, the gross revenue or the net income?  Or

9      what was it I guess for this specific situation?

10     What did you think was more important to grow?

11  A  We had to keep all things in mind.  So as a

12     bootstrap company, we're not getting anything from

13     anybody else.  We're going to grow it, we're going

14     to grow it by our own work ethic, and so we need

15     to have a good mix of revenue growth and we have

16     to be responsible with the dollars that we're

17     earning and spending.  Well, first spending, and

18     then therefore earning such that we can make sure

19     we plow it back to grow.

20  Q  Was your goal in creating this plan to grow the

21      company's net income as much as you could?

22  A  My goal in creating this plan was to grow the

23     company, and by growing the company in revenue, we

24     would have the possibility of growing the company

25     in income, as well.

1  Q  Okay.

2           MR. PALAY:  So this might be a good

3     time to take a break.  It's been an hour.

4          THE VIDEOGRAPHER:  Stand by one

5     second.  We're going off the record.  The

6     time is 10:07 a.m.  We'll make this the end

7     of media unit number one.

8    (A recess is taken from 10:07 a.m. to 10:25 a.m.)

9         THE VIDEOGRAPHER:  We're going back

10     on the record.  The time is 10:25 a.m.  This

11     is the beginning of media unit number two.

12  BY MR. PALAY:

13  Q  Mr. Gonnering, welcome back.  We left off talking

14      about this 2008 business plan a little bit.  And I

15      think it's -- we should probably fast-forward a

16      little bit.  All the planning we discussed that

17      went into this business plan, did that occur, and

18      if it occurred, did it work?

19  A  All the planning was --

20  Q  I'll just stop you.  I didn't mean planning.  All

21      the -- the plan that you articulated in this

22      business plan, did that get implemented at Widen

23      Enterprises?

24  A  I need to go back and look at this business plan

25     to see what of it got implemented.

1  Q  Okay.

2  A  I could say --

3  Q  Why don't you just tell me how Widen Enterprises

4      evolved and changed after this business plan in

5      fact as opposed to worrying about the plan.

6  A  We created additional brands that were different

7     than digital asset management.  For example, we

8     created Smartimage.  We created Vidime.  These

9     were -- we acquired the copyright of an open

10    source upload tool called Fine Uploader.  So we

11    were starting to build out a house of brands, and

12    it was -- these were applications that were not

13    Widen-branded, and that was part of this plan.  So

14    we invested in creating those.

15  Q  And we -- those charts we looked at, did Widen

16     Enterprises' total revenue climb after this 2008

17     business plan?

18  A  I don't recall.  Eventually it was that way.  But

19    there was a mix over time where the projections

20    that we anticipated were not realized until I

21    don't recall when, but there was a time when

22    the -- you look at the company in its total and it

23    looked flat.

24  Q  Was there ever a down year in revenue?

25  A  I don't recall.

1  Q  Okay.  Let's fast-forward all the way.

2         (Exhibit No. 2 was marked for

3     identification.)

4  Q  Keep it handy, we might go back.  Maybe just keep

5      of stack of docs.

6  A  Okay.

7  Q  So what's been marked and marked as Exhibit 2, it

8      says Widen Confidential Information Memorandum.

9      Is this a document you recognize?

10  A  I recognize the cover page.

11  Q  Okay.

12  A  Because that's all I'm looking at.

13  Q  Did you ever help prepare a confidential

14      information memorandum for Widen Enterprises?

15  A  Yes.

16  Q  Okay.  And in what context did you do that?

17  A  In collaboration with a group called the Software

18    Equity Group or SEG.

19  Q  And what was the purpose in creating the

20      confidential information memorandum?

21  A  To highlight the company.

22  Q  To whom?

23  A  To potential buyers.

24  Q  Okay.  So this is a document in marketing the

25      company to potentially acquirers?

Page 53

1  A  Correct.

2  Q  Okay.  And when did you -- about when did you

3     create this document or help create this document?

4  A  The creation of this document would have been

5     after we engaged SEG.  So I would put the start of

6     this in the early part of 2021 and into perhaps

7     summer of 2021.

8  Q  Okay.  And SEG you said is the Software Equity

9     Group?

10  A  Correct.

11  Q  And what is that group?

12  A  That is an investment bank.

13  Q  Okay.  So they were helping to market and sell

14     Widen Enterprises?

15  A  They were helping us explore what that would look

16     like.

17  Q  Okay.  Did they eventually help sell Widen

18     Enterprises?

19  A  Yes.

20  Q  Okay.  Based on this confidential information

21     memorandum?

22  A  It was part of the equation.

23  Q  Okay.  If we go to the first page.  That first

24     larger paragraph, well, I guess I'll just read the

25     first line, it says, "Widen Enterprises, Inc., has

Page 54

1     engaged SEG Capital Advisors, LLC, as its

2     exclusive financial advisor in exploring a

3     possible sale merger for recapitalization of the

4     company."  Did I read that correct?

5  A  Yes.

6  Q  And that's just as you described it a moment ago.

7     And the first sentence of the next paragraph says,

8     "This memorandum has been prepared from

9     information obtained from the management of the

10     company and from other sources believed to be

11     reliable."  Did I read that correctly?

12  A  You did.

13  Q  And who was the management of the company that

14     provided information for this to SEG?

15  A  The management of the company would have been the

16     chairman and the executive team.

17  Q  And who was the chairman and who was on the

18     executive team?

19  A  Reed Widen was the chairman, and then me and then

20     my team, which would have been Jake, Deanna,

21     Debby, Mike, and Ben.

22  Q  Okay.  Can you just tell me what each of those

23     people's or person's roles were at the company?

24  A  Yep.  Reed --

25                 MR. CHURCHILL:  Objection.  Vague

Page 55

1     as to time.

2  Q  What timeline?

3  Q  When this was created, when they were the

4     management of the company providing information

5     for this confidential information memorandum.

6  A  So as we created this in the first half of 2021,

7     Reed's role was chairman, my role was CEO, Mike's

8     role was CFO, Deanna's role was chief innovation

9     officer, Jake's role was VP of sales and

10     marketing, Debbie's role was VP of operations, and

11     Ben was head of technology.

12  Q  Okay.  And fair to say you oversaw that team as

13     chief executive officer?

14  A  Yes.

15  Q  Okay.  Did you make sure all the information that

16     went into this confidential information memorandum

17     was true and accurate?

18  A  To the best of my ability.

19  Q  Yes.  Okay.  What was Reed's role in verifying the

20     truth and accuracy of the information that went

21     into this confidential information memorandum?

22                 MR. CHURCHILL:  Object to the

23             extent it calls for speculation.

24  A  I interpreted Reed's role the same as I had

25     before, which was his -- he provided me guidance

Page 56

1     and direction and mentorship.

2  Q  Okay.  So in the context of creating this

3     document, what does that mean?

4  A  That means his role as chairman was to continue to

5     provide me guidance, mentorship, and direction for

6     how I conduct my team and how I organize the

7     information for this document.

8  Q  Was he, like, checking your numbers for accuracy?

9  A  He would not have gone to that level.  No.

10  Q  Do you think he would have been able to do that?

11  A  If Reed would engage at that level, he would be

12     able to do that, yeah.

13  Q  What do you mean engage at that level?

14  A  If he would look at numbers, he would dig into

15     numbers and he would identify what those things

16     would mean or potentially not mean and he would

17     ask questions.

18  Q  Okay.  Did he look into numbers in the creation of

19     this document?

20  A  I don't know.

21  Q  Okay.  He never told you that he looked into

22     numbers?

23  A  He didn't tell me that he looked into numbers

24     related to this document.

25  Q  Sorry.  I should say have said in relation to this

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 57

1    document. Okay. Flip with me to 7906 at the
2    bottom. So this is a page that says, "Widen
3    Overview: A highly respected premium brand
4    trusted by hundreds of the worlds most iconic
5    enterprise brands." Is that right?
6  A  Yes.
7  Q  And then there's a series of numbers under that.
8     Can you just take me through what each of those
9     mean?
10 A  Yep. Active assets is the volume of digital
11    assets that customers were managing in our
12    systems.
13 Q  Okay. Is that an important metric for a digital
14    asset company?
15 A  Not necessarily.
16 Q  Okay.
17 A  It indicates volume, scale.
18 Q  And 63 million is your -- was your number?
19 A  This reads 63 million-plus, so this would be
20    something more than 63 million.
21 Q  Okay. Yeah. You can --
22 A  102,000-plus year to date active users with a
23    couple footnotes there as of certain dates. So
24    the year to date footnote two as of April 21, in
25    the footnote three, active users, active users are

Page 58

1     a customer user who signed in 2021. Active users
2     were the people that were interacting with the
3     software.
4   Q  Okay. Like each individual account, so it could
5      be more than one at a particular customer?
6   A  Correct.
7   Q  Got it. We can -- yeah.
8   A  34 million 2021 projected ARR, annual recurring
9      revenue.
10  Q  What's that one mean?
11  A  This is a projection, what we thought the
12     potential for our 2021 annual recurring revenue,
13     which is the subscription revenue that customers
14     would pay us for software services.
15  Q  And that's a subset of the total revenue?
16  A  That would be part of the total revenue. Yes.
17     Projected part.
18  Q  Why is that one carved out specifically here?
19  A  Like the others, they're relevant for the type of
20     business we're running. How scaleable are we with
21     users and assets and what we project for our
22     annual recurring revenue.
23  Q  So is that a particularly important type of
24     revenue in this industry?
25  A  Annual recurring revenue is one of the indicators

Page 59

1     of how a company is or might grow in the future.
2     Yes.
3   Q  Okay. And why the recurring revenue over just
4      general revenue?
5   A  Recurring revenue is the subscription to the
6      software services, and so it reoccurs, so that's
7      good for retention and --
8   Q  Like you've already done a lot of the work to get
9      to customer and they're keeping coming back?
10  A  Yeah. It's a good -- it's a good measure of
11     growth.
12  Q  Okay. Would that be the most important type of
13     revenue at this type of company?
14            MR. CHURCHILL: Objection. Vague
15            and ambiguous.
16  A  Depends.
17  Q  Well, it's the first type of revenue that the
18     company and its investment bankers highlighted on
19     this page, so I took that to mean that the company
20     and the investment bankers thought it was
21     particularly important. Is that fair?
22  A  I don't know that the order of that matters.
23  Q  Did you think this was particularly important
24     aspect of the company?
25  A  I think it was one of the important aspects of the

Page 60

1     company because it was a growth indicator.
2   Q  Okay. We can go to the next one.
3   A  21 percent, 2018 A, actual, to 2021 P, projected,
4      ARR annual occurring growth compounded annual
5      growth rate.
6   Q  Okay. That's -- that's a lot, so you have to
7      explain that one to me.
8   A  That's the anticipated or projected growth of the
9      annual recurring revenue.
10  Q  Got it. So it's talking about how that 34 million
11     number would be projected to change in the future?
12  A  No. That is -- that 34 million --
13  Q  It's talking about how it changed --
14  A  -- represents --
15  Q  -- to get there?
16  A  Yeah.
17  Q  Oh, okay.
18  A  21 P and 21 P represent to me that this 34 million
19     includes the 21 percent assumption that was made
20     for growth.
21  Q  Okay. So -- and that -- I'm guessing the
22     21 percent is kind of an average over that period
23     of 2018 to 2021?
24  A  Compounded annual growth rate would be, yes,
25     growth rate average.

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 61

1   Q   Okay.  So for 2020, the annual recurring revenue
2       would be about 21 percent less than the 34 million
3       for the year 2020?
4   A   I don't know that.  It would be an average of what
5       would be '18, '19, '20, '21.  So that's a
6       four-year average, so I don't know what 2020 would
7       be.
8   Q   Okay.  Okay.  We can go to that 680 number.
9   A   Approximately 680, that would represent that is
10      probably first quarter of 2021 actual customers.
11      So approximately 680 customers.
12  Q   Okay.  Total customers?
13  A   Correct.
14  Q   And that one, that one even I get.  Okay.  What's
15      the 95 percent?
16  A   95 percent 2020 A, which is actual, ARR retention.
17  Q   How much of the recurring revenue the company
18      keeps from year to year?
19  A   For 2020 it represents the amount of revenue that
20      we kept for the annual recurring revenue.
21  Q   Got it.
22  A   95 percent.
23  Q   And what's that net number score?
24  A   Is a standard measure of loyalty, and the common
25      question there is how likely would you be to

Page 62

1       recommend X, and then you would rate that on a
2       scale of 1 to 10.
3   Q   Is this to a hundred or --
4   A   It could go -- what was the -- it could go to a
5       hundred, yes.  Net -- I think it could go to a
6       hundred.  So you would answer 1 to 10.  9s and 10s
7       are promoters, 6 and 7s are neutrals, and less
8       than that are detractors.  So 52 percent promoter
9       score is an indicator of customer loyalty.
10  Q   Is that a good score?
11  A   It's a score that is worth sharing to indicate how
12      loyal the customers are.
13  Q   Okay.  So these are -- I meant is 52 a good score?
14  A   Depends what you compare it to.
15  Q   Okay.  Fair enough.  Okay.  And what's the last
16      one?
17  A   3.1 million 2020 A, actual, ADJ, which is
18      adjusted, EBITDA.
19  Q   Okay.  And what does it mean for it to be
20      adjusted?
21  A   That means there's certain things that the next
22      company would not have to incur.  So he would
23      adjust for those things out.
24  Q   Okay.
25  A   And so that adjusted EBITDA does not have certain

Page 63

1       things in it.
2   Q   Got it.  And EBITDA, can you just tell me what
3       that is?
4   A   Earnings before interest, taxes, depreciation, and
5       amortization.
6   Q   And earnings are like net profits, basically?
7   A   It's basically revenue minus expenses equals
8       earnings.
9   Q   Okay.  How does the E in EBITDA equate to net
10      profits, or how does it compare to net profits?
11  A   Similar, but what do you mean by net profits?
12  Q   Well, I don't know.  Or net sales, let's say.
13      What is that number?  Does that figure into an
14      EBITDA at all?
15  A   Revenue, which could also be referred to as sales,
16      minus expenses, which is the amount of money we
17      pay to service that revenue and then ultimately
18      invest in R&D and sales and marketing and general
19      administrative, so minus those expenses equals
20      earnings.
21  Q   Okay.  Got it.  And so that net sales equals
22      earnings?
23  A   Net sales does not equal earnings.
24  Q   Oh, okay.  So how does net sales and -- where does
25      net sales figure into earnings?

Page 64

1   A   What do you mean by net sales?
2   Q   Well, did the company track its net sales or its
3       net income?
4   A   We had net income.
5   Q   Okay.  Maybe --
6   A   I don't know what net sales means, though.
7   Q   Got it.  Maybe I was just referring to something
8       that doesn't exist.  Is the net income the EBITDA?
9   A   The net income and EBITDA are different.
10  Q   Okay.  How did they relate, if at all?
11  A   Net income -- well, I don't know.  This is where I
12      would defer to the CFO and ask questions about how
13      net income differs from EBITDA.
14  Q   I don't mean EBITDA, I just meant the earnings
15      part of EBITDA.  What is earnings?
16  A   Earnings is how much is left after you take out
17      the expenses from the revenue.
18  Q   Okay.  So I thought that was what net sales was
19      too, but maybe I'm wrong and maybe we just need
20      to --
21  A   I don't use net sales as a term.
22  Q   Oh, okay.  How come?
23  A   I don't know.  I just don't.
24  Q   Okay.
25  A   I haven't.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 65

1  Q  Or net income, I should say.  Do you use that as a
2     term?
3  A  Net income is a term.
4  Q  Okay.
5  A  It is on -- it was on our financial statements,
6     yes.
7  Q  Okay.  First bullet point says, "Widen is
8     continually ranked by G2 Crowd, Forrester, and
9     Gartner as one of the best enterprise-grade
10    digital asset management offerings in the market
11    today."  What are G2 Crowd, Forrester, and
12    Gartner?
13 A  G2 Crowd is a place where customers go to rate the
14    software.  Forrester and Gartner are analysts.
15 Q  Okay.  And they all thought that Widen Enterprises
16    was one of the best enterprise-grade digital asset
17    management offerings in the market?
18 A  Forrester and Gartner thought that.  G2 Crowd is
19    represented by customers.
20 Q  Okay.  But they ranked -- it says that they also
21    ranked you as one of the best enterprise-grade
22    digital asset management offerings?
23 A  Correct.
24 Q  Okay.  Going back to these numbers, how if at all
25    did they change from -- and it looks like this

Page 66

1     was, like, at least footnote two says the 102,000
2     number is as of April 2021.  So this document I
3     would say must have been created at least as of
4     April 2021; is that fair?
5  A  This stat was created.  That doesn't necessarily
6     indicate the document was created.  So that stat
7     would have been taken from that time period.
8  Q  Right.  But that stack couldn't get in here before
9     April 2021; right?
10 A  Correct.
11 Q  Okay.  So we know the document was created at
12    least as of April of 2021?
13 A  Yeah.  That's -- trying to think of could the
14    document have been created --
15 Q  Oh, yeah.  Like it was finalized, like this page
16    couldn't have been produced as it is now before
17    that number?
18 A  Right.  It would have been incomplete if it would
19    have been.
20 Q  Okay.
21 A  Yeah.
22 Q  And I'm sure there were probably iterations over
23    time.
24    Let's go through those numbers at the top,
25    and can you just tell me how if at all they had

Page 67

1     changed from the year before, and we'll say
2     May 2020?
3              MR. CHURCHILL:  Objection.  Lack of
4     foundation.
5  BY MR. PALAY:
6  Q  You were the CEO in May of 2020?
7  A  Correct.
8  Q  Okay.
9              MR. CHURCHILL:  Same objection.
10 A  I'm not going to be able to remember what that
11    looked like.
12 Q  Okay.
13 A  Across these.
14 Q  Do you -- I mean, do you know roughly, like, you
15    know, in an estimate?
16 A  No.
17 Q  Fair enough.  Let's flip to 7917.  Well, let's
18    just stop at 7911 because it's kind of fun.  Are
19    these -- these are all, like, brands for the most
20    part I recognize.  Are these customers of Widen
21    Enterprises?
22 A  They are.
23 Q  Were they, you know, brand new customers or were
24    these customers that have been with Widen for a
25    period of time?

Page 68

1  A  I don't know that.
2  Q  Okay.  How did you select the customers to put on
3     this page?
4  A  They are recognizable.
5  Q  Yeah.  Okay.  And then let's stop at 7192.  Is
6     this the executive team that you were referring to
7     before?
8  A  It is.
9  Q  Okay.
10 A  Without Reed.
11 Q  Oh, was Reed on the executive team?
12 A  Reed was my boss and I referenced him as a part of
13    this, but this is the executive team from me down.
14 Q  Okay.  So it's like you, then these five, and then
15    above you, Reed?
16 A  Correct.
17 Q  Okay.  Did any of these people report to Reed?
18 A  No.
19 Q  Okay.  Did they interact directly with Reed or did
20    that all go through you?
21              MR. CHURCHILL:  Objection.  Vague
22    as to time frame.
23 A  When?
24 Q  Let's say at the time of this document, so like
25    April 2021 going back, you know, two years to

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 69

1      April of 2019.
2    A  Can you restate that for me?
3    Q  I think it would be a tricky question to read back
4       so I'll just start -- so April 2019 to April 2021,
5       did these five people under you, Deanna, Michael,
6       Debby, Jake, and, Ben, did they of them report
7       directly to Reed during that period?
8    A  No.
9    Q  Okay.  Did any of them have direct interactions
10      with Reed during that period in their capacity as
11      members of the executive team?
12          MR. CHURCHILL:  Objection.  Calls
13          for speculation.
14   A  I don't know.
15   Q  Okay.  So we can continue on to 7917.  So this
16      page says key investment highlights, and it says
17      the last proven entergrade -- enterprise grade
18      digital asset management provider that is still
19      self-funded.  Can you explain what that means?
20   A  That means we are supporting ourselves without
21      external investment.
22   Q  Okay.  And that's -- is that -- why is that
23      something that someone who might buy the company
24      would want to know?
25   A  Why is that something --

Page 70

1    Q  I should rephrase it.  Why is that something you
2       wanted to tell potential acquirers of the company?
3    A  Pride.
4    Q  Like you guys did this based on your own
5       bootstrapping?
6    A  Correct.
7    Q  Okay.  And that just shows that the company was
8       sort of effective?
9    A  Responsible.
10   Q  Okay.  What do you mean by responsible?
11   A  That we took great care in how we managed the
12      organization and invested in areas that we wanted
13      to.
14   Q  Okay.  And there's a couple other bullet points I
15      wanted to ask about.  Going third from the bottom,
16      it says, "Strong overall financial profile and
17      balance of solid revenue growth and EBITDA
18      margins.  Highly attractive recurring revenue
19      business model driving strong revenue visibility."
20      Why was the recurring revenue business model
21      highly attractive in your view?
22   A  The recurring revenue business model was highly
23      attractive because it indicates growth.
24   Q  Okay.  And growth is just -- why is growth
25      important?

Page 71

1    A  Growth is important such that we can -- we have a
2       good product market fit, we're able to solve the
3       market's problems or the customer's problems.
4    Q  Okay.
5    A  And then the customers are responding favorably.
6    Q  And this was the document that you were showing to
7       companies that might buy your company; is that
8       right?
9    A  Correct.  Eventually.
10   Q  And they would pay the company money, you know,
11      for its stock; right?
12   A  We didn't go to that level, pay the company money
13      for its stock.  We --
14   Q  Well, what does it mean to buy a company?
15   A  To buy a company, you have to define what is --
16      what is being purchased.
17   Q  As far as I know, you can either buy stock or
18      assets.  I mean, is there another way?
19   A  You could buy intellectual property as an asset.
20      Yeah.  You could -- yeah.  So that's what I think.
21      It's a stock or an asset.  Yeah.
22   Q  Okay.  So whether buying its stock or buys its
23      assets, this was the document you were sending to
24      companies that might buy Widen Enterprises?
25   A  This is the document that we were using to explore

Page 72

1       what that would look like.  Yes.
2    Q  Well, you were exploring it not, like, amongst
3       yourselves, you were exploring it with those
4       companies; right?
5    A  We were exploring it with potential companies.
6    Q  Okay.  So the people who might buy the company
7       received this document?
8    A  Correct.
9    Q  Okay.
10   A  The people who were interested in the company
11      would have received this document.
12   Q  And the people who you work for now who did buy
13      the company did receive this document; right?
14   A  Correct.
15   Q  Okay.  And fair to say when you're selling the
16      company, you wanted to sell it for as much money
17      as you could sell it for?
18   A  When we were selling the company, when we were in
19      market exploring what that looked like, the desire
20      was to have it for maximum possible sale.  Yes.
21      Maximum possible money.
22   Q  Okay.  And these are the things that you
23      highlighted about the company to achieve that
24      goal, the things that are in this document?
25   A  To maximize that.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 73

1  Q  Yes.

2  A  Yes.

3  Q  Okay.  Let's go to 79 -- and I guess I should just

4     say, so the highly attractive recurring revenue

5     business model was something you thought was

6     important for potential acquirers to know in order

7     for the company to sell for as high a price as it

8     could?

9  A  One of the things.

10  Q  Yeah.  Fair.  Let's go to 7933.  So this says --

11     this slide is titled Award Winning

12     Enterprise-Grade Product, and then it's got a

13     bunch of what look like awards.  Can you just tell

14     me what these awards are?

15  A  The top to bottom, left to right, first two rows

16     are awards from G2 Crowd, which is the site that

17     captures customers as they rank us.  The third row

18     is the MarTech breakthrough award, which is an

19     award for marketing technology.  The GetApp

20     category leaders award from 2020, I am not sure.

21     The CODiE award from 2019 says Widen named

22     software company of the year in SIIA CODiE awards.

23     There's another MarTech breakthrough award from

24     2019 in the last row.

25  Q  Are these important in your industry, these types

Page 74

1     of awards?

2              MR. CHURCHILL:  Objection.

3        Ambiguous.

4  A  Important to whom?

5  Q  Yeah.  Good question.  I mean, other -- I mean, I

6     guess potential acquirers of the company?

7  A  These indicate that other organizations view us

8     favorably.

9  Q  Okay.  It's a recognized leader in the digital

10     asset management space; fair?

11  A  It's another organization saying that and not us

12     saying it.

13  Q  Got it.  And did you -- and was that true, were

14     you a leader in the digital asset management space

15     at this time?

16  A  The chart that you're looking at is the G2 chart,

17     so according to G2, yes, we were a leader.

18  Q  Did you just as CEO believe the company was a

19     leader?

20  A  I believed that we were on a trajectory to be a

21     leader.

22  Q  Okay.  Had a ways to go?

23  A  Always progressing.

24  Q  Okay.  Let's flip ahead to 7954.  Okay.  This

25     is -- this says Global Infrastructure, and then

Page 75

1     there's a bunch of points around the globe.  What

2     do those points indicate?

3  A  This is an Amazon Web Services map that has points

4     of data centers.

5  Q  Oh, so these are just like data centers that the

6     company used?

7  A  Not all data centers were used, but we would have

8     used data centers.

9  Q  Why is this something that the company was

10     highlighting?

11  A  This was -- we were reliant on Amazon Web Services

12     for their infrastructure to be able to provide our

13     software.

14  Q  Okay.  So you're just -- you're kind of telling

15     people, like, we use Amazon's infrastructure and

16     that's globally situated?

17  A  We have a dependency on Amazon, and this is a

18     graph of where those data centers are.

19  Q  Gotcha.  Let's keep going.  Let's go to 7957.

20     Okay.  It says, "Customer Overview.  Trusted by a

21     large, hard to replicate and valuable global

22     customer consisting of the most iconic brands in

23     the world."  What made your customer base hard to

24     replicate?

25  A  That they were prominent, recognizable brands.

Page 76

1  Q  Okay.  These are hard to get as customers?

2  A  Yes.

3  Q  And what made that valuable?

4  A  That it speaks to our ability to serve a

5     recognizable brand.

6  Q  Okay.  And that's something you thought that

7     potential acquirers would find valuable?

8  A  It's something that we thought was valuable.

9  Q  Okay.  Let's go to the next page.  Okay.  So this

10     is -- well, you know, I don't want to keep getting

11     it wrong, so you tell me, what are these graphs

12     showing?  And we're on 7958.

13  A  7958.  The graph on the left-most graph, it says

14     annual recurring revenue with a footnote one,

15     which defines annual recurring revenue as MRR or

16     monthly recurring revenue times 12.  Then it goes

17     on to say in the analysis, "A customer is

18     recognized as one when invoiced for its first

19     recurring subscription payment."

20        And this represents a comparison between 2018

21     actuals in a vertical bar of 19.1 million and then

22     represents each year thereafter with projected ARR

23     for '21, '22, and '23, and then actuals for '18,

24     '19, and '20.  The line at the top compares what

25     appears to be 2018 with actuals with the

**Page 77**

1      projections of 2023 and represents a 26 percent

2      compounded annual growth rate.

3   Q   And is that actually like about the compounded

4      annual growth rate that you were projecting in

5      that 2008 plan?

6   A   I would need to go back to that plan and --

7   Q   Let's -- I think it was on 11065.

8   A   Okay.  I'm on it.

9   Q   So in that column for software as a service

10      business --

11   A   Yep.

12   Q   Going forward from 2008, it was projecting about

13      an annual change of 26 and a half percent?

14   A   Did you just say -- did you just say 2008?

15   Q   Forward from 2008.  So -- or I guess 2008's 27.32,

16      but then the next three years are all

17      26.45 percent.  Is the change, is that similar to

18      the compounded annual growth rate?

19   A   That would be -- this is a growth rate in software

20      as a service revenue for 2009 to 2010.  Yes.  In

21      that growth rate, this represents a very different

22      timeline, but.

23   Q   Sure.  But it looks like you were pretty accurate

24      in projecting this?

25   A   Well, I wouldn't have projected out this far.

**Page 78**

1   Q   Okay.  Fair.  But at the time you made this

2      document, the one we're looking at, the

3      confidential information memorandum, you were

4      projecting by 2023, that's this year, to reach

5      $60 million in annual recurring revenue?

6   A   That was the projection that we stated in the SIM.

7   Q   Did you make it?

8   A   2023 --

9   Q   I guess we're not done.

10   A   -- is not over.

11   Q   Okay.  Are you on track?

12   A   This is my current employer, so I want to make

13      sure that I'm not revealing --

14              MR. CHURCHILL:  And we can mark

15      this --

16              MR. PALAY:  Yeah, we can mark the

17      transcript attorneys' eyes only.

18              MR. CHURCHILL:  Yeah.  We can mark

19      this portion of the transcript attorneys'

20      eyes only.

21              MR. PALAY:  I won't trade on it.

22      (THE FOLLOWING PORTION IS CONFIDENTIAL -

23         ATTORNEYS' EYES ONLY)

24

25

**Page 79**



19   (END OF CONFIDENTIAL PORTION OF TRANSCRIPT)

**Page 80**

1   BY MR. PALAY:

2   Q   We can put the business plan away.  Let's go to

3      7982.  Okay.  So this says Financial Overview, and

4      then it says, "Attractive overall financial

5      profile balancing steady, consistent revenue

6      growth with EBITDA margins."  And then it says

7      that it's -- I think it's talking about Widen and

8      it says it's a highly attractive recurring revenue

9      business model driven -- driving strong revenue

10      visibility.  What does that -- what does that

11      mean?

12   A   Revenue visibility is connected to growth

13      potential, which is, if it's recurring, you have

14      visibility into what might be occurring next year.

15   Q   Okay.  It's visibility about what's going to

16      happen?

17   A   Stronger visibility, not -- you don't know.

18   Q   That's what visibility's referring to, though?

19   A   Correct.

20   Q   Okay.  Let's go to 7985.  So this is -- I guess

21      what is this?

22   A   This is Summary P&L, which is profit and loss.

23   Q   Okay.  Is that like an income statement, or what

24      is that?

25   A   It's a -- yeah.  It shows the revenue and the

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 81

1      expenses and --
2 Q   Okay. So it looks like we got 2019 and 2020
3      actual numbers and then projected numbers for 2021
4      through 2023?
5 A   Correct.
6 Q   And I think these are the numbers from that graph
7      we were looking at earlier with the projected 2023
8      revenue of or annual recurring revenue of 60
9      million. Does that look about right?
10 A   That looks right.
11 Q   Okay. So for 2019, looks like the annual
12      recurring revenue of the company was $22,783,238?
13 A   Correct.
14 Q   And there's a -- and the growth rate below it's
15      19 percent. That's compared to the year before?
16 A   Correct.
17 Q   Is that a good growth rate, 19 percent?
18          MR. CHURCHILL: Objection.
19          Ambiguous.
20 A   Good based on what standard?
21 Q   Did you consider it strong?
22 A   I considered it to be consistent with what we were
23      trying to accomplish, which was growth.
24 Q   Okay.
25 A   There's -- yeah. There's better growth.

Page 82

1 Q   Sure. And then the next year, 2020, it's
2      $26,052,223 and a 14 percent rate. What did you
3      think of that year, was that year -- was that a
4      strong year?
5 A   Actuals in 2020, 2020 was a highly uncertain year,
6      so I don't necessarily know what was good or not
7      good. I think it was -- it was not as good as the
8      year prior.
9 Q   Sure. Well, I mean, you had more annual recurring
10      revenue, but it grew by a lower rate; is that
11      right?
12 A   We had more recurring revenue from 22-7 to 26,
13      yes, and that didn't grow as strong as the year
14      prior. Yes.
15 Q   Okay. And again, you break out the annual
16      recurring revenue from the rest of the revenue;
17      correct?
18 A   We break that out in addition to breaking out
19      other things on the P&L, which is standard.
20 Q   Yeah. Is that because the annual recurring
21      revenue is particularly important or you felt it
22      was particularly important to potential acquirers
23      of the company?
24          MR. CHURCHILL: Objection.
25          Compound.

Page 83

1 A   Can you separate the questions?
2 Q   Sure. Did you feel the annual recurring revenue
3      was a particularly important metric to highlight
4      about the company to potential acquirers?
5 A   It was one of the important metrics to highlight.
6 Q   It's the first line on this; right?
7 A   It is the first line.
8 Q   Is there a more important metric that you can
9      think of?
10 A   I would say it's the -- also it's the first line
11      because that's what is often referred to as top
12      line. So it is the revenue. That's how things
13      start. Is there a more important metric? It
14      depends.
15 Q   Okay. It's one of the important metrics?
16 A   It's one of the important metrics.
17 Q   Okay. And then down at the bottom or near the
18      bottom, we have that net income number. And for
19      2019, it looks like it was $270,058. That's a lot
20      smaller than $22,783,238; right?
21 A   Go back to that one. Can you repeat that.
22 Q   The net income for 2019 is much smaller than the
23      annual recurring revenue; right?
24 A   The net income is much smaller than the recurring
25      revenue. Are you comparing 22.7 million to

Page 84

1      270,000?
2 Q   Correct.
3 A   Yes, those are different numbers and that is --
4      that income is much smaller than ARR.
5 Q   And for the next year, the net income was negative
6      $500,000, a little bit more?
7 A   Uh-huh.
8 Q   And it was projected to be very negative for 2021;
9      right?
10 A   Correct.
11 Q   Was that a concern to you?
12 A   This --
13          MR. CHURCHILL: Objection. Vague.
14 A   Can you say more about what concern?
15 Q   Did you think that was a problem?
16          MR. CHURCHILL: Objection. Vague
17          as to time frame.
18 BY MR. PALAY:
19 Q   I guess in 2020 when that number went from
20      positive 270,000 to negative 500,000, did you view
21      that as a problem?
22 A   I viewed it as part of our path for growth.
23 Q   Okay. Say more about that. How come?
24 A   To grow, we would need to invest in certain things
25      like R&D and sales and marketing and other

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 85

1    activities that sometimes would cost us more than
2    what we were earning in revenue.  And that would
3    be at some point something that we would grow out
4    of.
5  Q  And for 2021, the net income's projected to be
6    negative $3 million; right?  A little over,
7    $3,100,000?
8  A  Correct.
9  Q  Fair to say if you were valuing this company based
10   on its net income, this declining trend from 2019
11   to 2021 would not make the company look like its
12   value is increasing?
13              MR. CHURCHILL:  Objection to the
14        extent it calls for expert testimony.
15  A  It would not make it look like the company is --
16    can you repeat it?  I'm sorry.  Can you repeat
17    that question?
18  Q  So, you know, we were talking about how this
19    document was used by the company to market itself
20    to potential acquirers; right?
21  A  Uh-huh.
22  Q  And the goal there was to achieve the highest
23    selling price for the company possible; right?
24  A  Uh-huh.
25  Q  And this downward trend from 2019 to 2021

Page 86

1    projected in net income, you know, would that --
2    would that be something that the company was
3    concerned would affect its selling price?
4  A  It was just a number in the flow of all the other
5    numbers.  So it was what it was.
6  Q  Okay.  We can come back to that.  So let's go to
7    7988.
8              MR. CHURCHILL:  Did you say 88.
9              MR. PALAY:  Yeah.
10 BY MR. PALAY:
11  Q  So this is an EBITDA Adjustment Detail, and the
12    top line says, "Owner executive comp total base
13    compensation bonus and fringe with a one-owner
14    president founder."  Is that referring to Reed?
15  A  Reed was the owner president.  Yes.
16  Q  Okay.  So what does it mean had it says total base
17    comp, compensation, bonus and fringe?  What does
18    that mean in the context of this EBITDA adjustment
19    detail?
20  A  That means Reed's compensation, bonus, and other
21    expenses are adjusted out.
22  Q  What does it mean to adjust those out?
23  A  It means to show the detail of them and then allow
24    your earnings to show what it would look like
25    without that.

Page 87

1  Q  Okay.  Without paying Reed any compensation,
2    bonus, or fringe?
3  A  In the next environment.  This is adjusting out
4    because in this case Reed would not have stayed
5    with the organization.
6  Q  So -- well, I don't know if that's quite accurate.
7    So it does it for 2019, which was in the past at
8    this point, right, in 2020?
9  A  Which is to show historically what the company
10   would have looked like.
11  Q  If Reed had not been paid anything?
12  A  Correct.
13  Q  Okay.  What was the -- what was the purpose of
14    showing potential buyers what the company would
15    look like if Reed had not been paid anything in
16    2019 and 2020?
17  A  I would add that it's not just that.  There's
18    several other adjustments that are helpful to line
19    item out so that the potential buyer knows the
20    things that are not going to be in their future.
21    So they could look at the past through a financial
22    lens that looks like how it would look going
23    forward.
24  Q  Okay.  So let's just focus on this one, though,
25    because it looks like by far, the biggest portion

Page 88

1    of this adjustment, right, if you go into the
2    detail, it says owner executive compensation for
3    2019, 1.8 million; for 2020, 3.2 million.  Right?
4  A  2000 -- yeah, owner executive compensation, 2019
5    actual 1.8, 2020 actual 3.2.
6  Q  Yeah.  So you're showing the potential
7    acquirers -- so first of all, that 1.8 million and
8    3.2 million, that was Reed's total comp,
9    compensation, bonus, and fringe for those
10    two years 2019 and 2020?
11  A  I don't -- I can't confirm that right now.  I
12    don't know.
13  Q  Okay.  I mean, any reason to believe that's not
14    accurate?
15  A  There's -- in addition to Reed, there is another
16    executive that would also not continue on, and his
17    name was Gary Norris.
18  Q  Oh, so you think these might be two people
19    combined?
20  A  That's -- that's possible, which is why I am
21    saying -- I paused.
22  Q  Gotcha.  Okay.  So -- and these numbers are
23    positive in this EBITDA adjustment; correct?
24  A  Which ones?
25  Q  The 1.8 and the 3.2 million.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 89

1  A   The 1.8 and 3.2 are positive as in add back.
2  Q   Yeah, they're adding back, so they're -- the
3      adjusted EBITDA is that much higher than the
4      actual EBITDA?
5  A   Correct.
6  Q   Okay.  So this increased -- you know, removing
7      Reed's compensation and Gary's essentially
8      increased the EBITDA of the company?
9  A   By removing Reed's and Gary's compensation and
10     adding those back, EBITDA would go up.
11 Q   By that amount, yeah, okay.  And ultimately
12     through this document and your other efforts,
13     Widen Enterprises was purchased by your current
14     employer, Acquia; correct?
15 A   Correct.
16              MR. CHURCHILL:  Objection.
17 BY MR. PALAY:
18 Q   And how much money did Acquia pay for Widen
19     Enterprises?
20 A   Acquia along where their private equity partner,
21     which is Vista, paid $162 million on
22     September 24th, 2021.
23 Q   And it bought 100 percent of Widen Enterprises
24     stock?
25 A   Correct.

Page 90

1  Q   From Widen Enterprises' owner, which was Windy
2      Waters?
3  A   Correct.
4  Q   Fair to say that $162 million reflected the value
5      of Widen Enterprises at the date of that purchase?
6              MR. CHURCHILL:  Objection.
7              Ambiguous.
8  A   $162 million represented what Acquia was willing
9      to pay for Widen.
10 Q   Okay.  Was Acquia a willing buyer?
11 A   Acquia was a willing buyer.
12 Q   Okay.  Was Windy Waters a willing seller?
13 A   Windy Waters was a willing seller.
14 Q   Did Acquia have to your knowledge all of the
15     relevant information about the value of Widen
16     Enterprises?
17 A   Acquia had the relevant information about the
18     organization, financials and the like.
19 Q   So, I mean, the relevant information for
20     determining the value of the company?
21 A   They had what they needed to decide what they were
22     going to pay.
23 Q   Okay.  Did you view Acquia as having been
24     presented with the relevant information reflecting
25     Widen Enterprises' value?

Page 91

1  A   We provided Acquia everything that they asked for.
2  Q   So is that a yes or a no?  Did you -- was there
3      any information relevant to Widen Enterprises'
4      value that you believe Acquia did not possess?
5  A   Say more about the value.
6  Q   Well, remember, we're -- I'm defining value as a
7      willing buyer and a willing seller, how much money
8      would change hands over a change of ownership of
9      this item, in this case Widen Enterprises, when
10     neither side is acting under compulsion and both
11     sides have all the relevant information.
12         So, yeah, so that's -- with that definition
13     of value, do you think Acquia had all of the
14     relevant information to that definition of value
15     when it decided to purchase Widen Enterprises for
16     $162 million?
17 A   We provided Acquia all the information about the
18     organization for them to make a determination that
19     they would pay $162 million.
20 Q   What's the distinction you're making between that
21     answer and my question?
22 A   I don't know.
23 Q   Okay.  So --
24              MR. CHURCHILL:  I can help.  Calls
25         for speculation.

Page 92

1  BY MR. PALAY:
2  Q   Do you know of information that you believed was
3      relevant to the value of Widen Enterprises that
4      was not given to Acquia before Acquia made its
5      determination to purchase Widen Enterprises?
6  A   We provided Acquia everything that they needed.
7  Q   Okay.  Would you say everything that they needed
8      is the relevant information?
9              MR. CHURCHILL:  Object to the
10         extent it calls for speculation as to what
11         Acquia thinks it needed.
12 A   Everything that Acquia asked for, they were given.
13 Q   Okay.  Do you know of any important financial
14     information that was not given to Acquia in
15     connection with its purchase of Widen Enterprises?
16 A   Do I know of any financial information that was
17     not given to Acquia.
18 Q   Important financial information.
19 A   No.
20 Q   Okay.  So it seems like if Acquia was a willing
21     buyer, Windy Waters was a willing seller, Acquia
22     had as far as you know all of the important
23     financial information about the company and
24     everything it asked for, it seems like we meet all
25     the criteria for my definition of value for Widen

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 93

1  Enterprises on the date of that sale; right?
2  A  We meet the value that Acquia was assigning to
3     Widen.
4  Q  Okay.
5  A  Yes.
6  Q  What's different about the value of the company if
7     the value is defined by what a buyer is assigning
8     to it, you know, what a buyer and a seller's
9     determination of value mean?  What's different
10    about the value of the company and Acquia's value
11    of the company?
12 A  Different buyers would assign different value.
13 Q  Okay.  So I'm -- so you're saying the value might
14    have been higher?
15 A  I'm saying the value might have been different.
16 Q  Could the value have been lower than what Acquia
17    was willing to pay?
18 A  The value that Acquia paid was the value that
19    Acquia saw.
20 Q  Right.  But we're broadening the definition of
21    value because, you know, I think one of the
22    important things about a concept like value is
23    that it's transportable, right?  You know, it's
24    not just talking about what one party thinks, it's
25    defining this concept, I don't want to say this

Page 94

1     value, by what two parties, you know, with equal
2     information or relevant information meet at;
3     right?
4            MR. CHURCHILL:  Object to the
5        extent it calls for expert testimony.
6  A  I understand.
7  Q  Do you agree with that I said?
8  A  You're going to have to repeat it.  It was a
9     rather lengthy statement.
10 Q  So I don't understand how the value of -- the fair
11    market value of Widen Enterprises could be lower
12    than what Acquia was willing to pay if -- and did
13    pay if Acquia was a willing buyer, Windy Waters
14    was a willing seller, both had all the relevant
15    information, and neither one was compulsed to the
16    deal.  Can you explain to me how that could be
17    possible?
18           MR. CHURCHILL:  Same objection.
19       Calls for expert testimony.  You can respond.
20 A  I think Acquia saw that value in us, and another
21    buyer could have even seen other value in us that
22    was different than what Acquia saw.  So the value
23    is dependent on what the buyer's situation is.
24 Q  Sure.  But doesn't the fact that Acquia saw that
25    value by definition make it the value as of that

Page 95

1  date, or at least the value as of that date?
2            MR. CHURCHILL:  Same objection.
3     Calls for expert testimony.
4        I think this witness has provided his
5     answer on what counsel is asking is an
6     opinion of an economist as to the definition
7     of fair market value, and I don't know that
8     this witness can testify to that.
9            MR. PALAY:  Well, the witness seems
10    to be makes a distinction; I'm just asking
11    what the distinction is.
12           MR. CHURCHILL:  I think the witness
13    has said that a different buyer could pay a
14    different amount of money.  So if a different
15    buyer was there, it may assign a lower or a
16    higher value.  I think that's clear on his
17    testimony.  $162 million was what this buyer
18    paid.  If it was a different company, it
19    would have assigned a different value through
20    negotiation.
21       You can keep asking the questions of the
22    witness, but I think that's what's been
23    stated multiple times now.
24           MR. PALAY:  Okay.  Thank you for
25    that.  I will keep asking the questions,

Page 96

1     though.
2            MR. CHURCHILL:  Okay.
3            MR. PALAY:  So could you read back
4     the question.
5     (Record was read back as requested.)
6            Q:  But doesn't the fact that
7        Acquia saw that value by definition make it
8        the value as of that date, or at least the
9        value as of that date?
10 A  It makes it the value that Acquia saw.
11 Q  Okay.  Did you believe that was an accurate
12    reflection of the value as of that date?
13 A  I believed that was because Acquia told us what
14    the value they saw in us through that number, that
15    that was what Acquia was willing to pay.
16 Q  And that was what you were willing to accept?
17 A  That was what Reed was willing to accept.  Yes.
18 Q  So it was just up to Reed, you didn't get a say in
19    that?
20 A  Ultimately it's his decision.
21 Q  Did you agree with that decision?
22 A  Did I agree with that decision.  That's what Reed
23    wanted.  Reed agreed to that because that was his
24    call.  So whether or not I agreed or disagreed --
25 Q  But I'm just asking did you agree?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 97

1   A   Did I agree that Reed should sell at that price?

2   Q   Yes.

3   A   I agreed that for Acquia to say they're willing
4       pay $162 million for Widen, that that was
5       something Reed should consider.

6   Q   Okay.  Did you think it was something Reed should
7       execute on?

8   A   Did I think it was something Reed should execute
9       on.  Reed executed on it, and whether or not I
10      agreed with it, I don't know, did I agree with it
11      at the time.  Trying to put myself back in that
12      spot.  Did I agree or disagree with it?  I agreed
13      with it because Acquia was also a good home for
14      Widen.

15   Q   Did you think that Widen could sell for more than
16      162 million?

17   A   I didn't know.

18   Q   But did you think that it could?

19   A   I didn't know.

20   Q   Did you believe that it might be able to sell for
21      a higher price?

22   A   I don't know.

23   Q   You don't know what you believed?

24   A   I don't know what Widen could have sold for at any
25      point in the future.  I don't know that.

Page 98

1   Q   Sure.  I'm just asking at the time did you think
2       that was a possibility?

3   A   I think if we were to entertain different buyers
4      at different points in time, we would see
5      different values.

6   Q   Okay.  Would any of them have been higher than 162
7       million?

8   A   It's -- well, they would be different.  Could some
9      of them have been higher, could some of them have
10      been lower, yeah.

11   Q   Sure.

12   A   It would be different.

13   Q   What points in time do you think that the sale
14      price would have been higher than 162 million?

15   A   What points in time would the sale price have been
16      higher than 162 million?

17   Q   I should say points in time and different buyers
18      were the two factors you identified?

19   A   Yeah.  I think a different buyer -- let's see.  I
20      think about -- it depends on the growth.  It
21      depends on how we were growing.  It depends on our
22      financial performance.  It depends how we were
23      continuing our reputation.  I would say at some
24      point in the future, if we were to continue
25      growing, increasing reputation, that the

Page 99

1      possibility exists that we would have a different
2      buyer for a different amount.

3   Q   Okay.  Did you counsel Reed on whether to sell the
4      company at any particular point in time?

5   A   I shared with Reed that there was a transaction
6      that was very relevant in 2020, August 24th, to be
7      exact, and that was a -- an awareness for Reed to
8      understand what this market -- how this market was
9      performing.

10   Q   Okay.  You were just giving Reed the information
11      for Reed to make an informed decision?

12   A   I was giving information to Reed about what other
13      organizations -- what was happening at other
14      organizations so that he was aware.

15   Q   Okay.  Did you think Reed might not have been
16      aware of how much money he could sell Widen
17      Enterprises for?

18   A   I don't know what Reed was aware of.

19   Q   Okay.  So why did you share the information with
20      him?

21   A   I would share information with Reed to make sure
22      that he knew we were headed in the right
23      direction.

24   Q   Okay.  So tell me, going back a year before this
25      document to May 2020, how do you think the value

Page 100

1      of the company changed between May 2020 and the
2      creation -- and the sale of, you know, Widen
3      Enterprises in September 2021?

4   A   How do I think the value of the company changed
5      from May of 2020 until September of 2021?

6          MR. CHURCHILL:  Objection.

7          Ambiguous.  You can answer.

8   A   I didn't -- I didn't know the value of the company
9      in May of 2020.  That wasn't something we were
10      monitoring or looking at.  We were looking at
11      growth.  And in May of 2020 in particular, which
12      was two months after COVID, managing uncertainty.
13      That's what -- that was May of 2020.

14   Q   I'm just asking you now sitting here today,
15      though, you know, how you think those -- the value
16      at those two points in time changed?

17   A   I don't know.

18   Q   Do you think the value of Widen Enterprises
19      increased between May 2020 and September 2021?

20   A   I think it depends on the buyer.

21   Q   Okay.  Do you think it decreased?

22   A   I think it depends on the buyer.

23   Q   So to some buyers, it might have decreased?

24   A   Compared to what?

25   Q   To May 2021 value, September 2000 -- or, sorry,

Stacy L. Randall v.                              Video Deposition of Matthew R. Gonnering
Reed C. Widen, et al.

Page 101

1    May 2020 value, September 2021 value, in some
2    context, it might have decreased from May 2020 to
3    September 2021?
4                    MR. CHURCHILL:  Objection.  Lack of
5            foundation.
6    A  Possibly.
7    Q  Okay.  Do you think it increased by more than
8       $100 million?
9                    MR. CHURCHILL:  Same objection.
10   A  Do I think the value of Widen increased by
11      $100 million between May of 2020 and September of
12      2021?
13                   MR. CHURCHILL:  Also calls for
14           expert testimony.  He can answer.
15   A  I don't know.
16   Q  Do you think that's likely?
17                   MR. CHURCHILL:  Same objection.
18   A  I don't know.
19   Q  It might have?
20   A  I don't know.
21   Q  Do you think it increased by $150 million?
22   A  I don't know.
23                   MR. CHURCHILL:  Same objections.
24   BY MR. PALAY:
25   Q  You don't know if the value of the company that

Page 102

1       you ran increased by more than $150 million in a
2       year?
3    A  Correct.
4    Q  So it might have?
5    A  I don't know.
6    Q  So it's possible?
7                    MR. CHURCHILL:  Objection.
8            Mischaracterizes testimony.
9    A  I don't know.
10   Q  What would you need to know to know that?
11                   MR. CHURCHILL:  Objection.  Vague.
12   A  What would I need to know to know that the value
13      changed over that time?
14   Q  To know if it changed by $150 million.
15   A  There would have had to have been a potential
16      buyer.
17   Q  So without a potential buyer, there is no value?
18   A  Without a potential buyer, there is no way to
19      determine what the change would be.  And there
20      were no potential buyers in 2020 because there was
21      no -- there was no -- there was no go to market
22      motion for anything related to selling the
23      business, so we did not know.
24   Q  So does the fact -- okay.  So did you ever
25      estimate the value of Widen Enterprises before the

Page 103

1       sale to Acquia?
2    A  I would not estimate the value of Widen.  I would
3       know the value that other organizations -- I would
4       guesstimate the value of other organizations in
5       our market.
6    Q  Okay.  But never of Widen?
7    A  Not of Widen.
8    Q  Okay.  You never told Reed the fair market -- the
9       market value of Widen Enterprises is around X
10      number on a given date?
11   A  I would tell Reed based on my estimates of other
12      organizations who were in our market, and I would
13      take what those organizations were doing, I would
14      estimate their revenues, back of the napkin, and
15      then I would apply it to ours as a guess.
16   Q  Okay.  So you'd apply it to Widen Enterprises and
17      give a guess of Widen Enterprises' value?
18                   MR. CHURCHILL:  Objection.
19           Mischaracterizes testimony.
20   A  I would take what I guessed to be what was going
21      on with someone else in our industry and then I
22      would apply that to Widen numbers.
23   Q  And the result would be a guess about Widen's
24      value?
25                   MR. CHURCHILL:  Objection.

Page 104

1            Ambiguous.
2    A  It would be a indication that we're headed in the
3       right direction, not the value of Widen.
4    Q  Never used that word, value?
5    A  I don't know about that.
6    Q  Okay.  So you might have used that word, value,
7       about referring to Widen?
8                    MR. CHURCHILL:  Objection.  Lack of
9            foundation.
10   A  I don't know.
11   Q  Okay.  Well, you said you reviewed documents in
12      anticipation and preparation of this deposition;
13      right?
14   A  Some documents, yeah.
15   Q  Did any of them assign a value or an estimated
16      value to Widen Enterprises by you?
17                   MR. CHURCHILL:  Objection.
18           Ambiguous.
19   A  I don't know that I'd used the term value.
20   Q  Okay.  You can't think of any that did?
21   A  I don't recall.
22   Q  Okay.
23                   MR. PALAY:  I think we can take a
24           break.
25                   THE VIDEOGRAPHER:  We're going off

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 105

```
1            the record.  The time is 11:45 a.m.  This is
2       the end of media unit number two.
3    (A recess is taken from 11:45 a.m. to 12:33 p.m.)
4                THE VIDEOGRAPHER:  We're going back
5       on the record.  The time is 12:33 p.m.  This
6       is the beginning of media unit number three.
7    BY MR. PALAY:
8    Q   Welcome back.  Before the break, we were having a
9        discussion about the concept of value and Widen
10       Enterprises' value at different points in time.
11       Do you recall that?
12   A   Uh-huh.
13   Q   And you were saying -- or correct me if I'm wrong,
14       the way I understood your testimony was that you
15       don't know if $162 million was the fair market
16       value of Widen Enterprises on the date it sold to
17       Acquia because other buyers might have paid more
18       or less?
19   A   My testimony was that 162 million was what Acquia
20       was willing to pay Widen and that other buyers may
21       have been willing to pay something different.
22   Q   Okay.  Do you have any reason to believe that the
23       fair market value of Widen Enterprises on the date
24       that Acquia purchased it was less than
25       $162 million?
```

Page 106

```
1                MR. CHURCHILL:  Objection to the
2       extent it calls for expert testimony.
3    A   I don't know.
4    Q   So do you have any reason to believe that?
5    A   I know that Acquia paid 162 million for Widen on
6        September 24th, 2021.
7    Q   Okay.  And are you aware of --
8    A   So --
9    Q   Oh, sorry.  Go ahead.
10   A   No, go ahead.
11   Q   Are you aware of any information that would
12       suggest to you that that amount did not represent
13       the fair market value?
14                MR. CHURCHILL:  Same objection.
15   A   I don't know.  I'm not -- that's not my expertise,
16       so I don't know.
17   Q   Okay.  And I was asking you about the value back
18       in May 2020, if you recall.
19   A   I recall.
20   Q   And you were saying you don't know what that value
21       is?
22   A   Correct.
23   Q   And you were saying you don't know whether the
24       value of Widen Enterprises, and I'm talking about
25       the fair market value of Widen Enterprises,
```

Page 107

```
1    changed by $150 million between May 2020 and
2    September 2021?
3    A   Right.  I don't know.  Correct.
4    Q   Is there anything -- is there any information that
5        you could review that would tell you whether the
6        fair market value of Widen Enterprises changed by
7        $150 million between May 2020 and September 2021?
8    A   Is there any information that I could review that
9        would tell me that?  Is that --
10   Q   Yeah.
11   A   Okay.  No.  Because -- well, in May of 2020, there
12       was no willingness to sell and there was no buyer,
13       and the combination of that is why I don't know.
14       So we would have to make up that.
15   Q   I guess, yeah.  So I suppose you could assume the
16       same company, but a willing seller of the company
17       and then, you know, would that change your answer?
18   A   I would have to -- roll that back to me slower.
19   Q   Assume the company is the same but the seller --
20       but there is an intention to sell in May 2020.
21       Would that change your answer?
22   A   Well, there is no intention to sell in May of
23       2020.
24   Q   Right.  That's the part I'm asking you to assume.
25   A   So if we were to assume that there was a seller?
```

Page 108

```
1    Q   Uh-huh.
2    A   We were in the active selling mode in May of 2020?
3    Q   Yeah.
4    A   And there was an active buyer --
5    Q   Yeah.
6    A   -- as well?  We could make those things up.
7    Q   Sure.  So let's assume these two things.  Do you
8        have any reason to believe that the value changed
9        by $150 million between May 2020 and
10       September 2021, assuming a willing seller and a
11       willing buyer in May of 2021 -- May of 2020?
12                MR. CHURCHILL:  Objection.
13       Improper hypothetical.  Calls for expert
14       testimony.
15   A   I have -- yeah, I can't answer.  I have a hard
16       time making up.
17   Q   You can't -- it wouldn't change your --
18   A   It just wouldn't happen.  Right.  It wasn't a
19       thing, so.  In May of 2020 it was also -- yeah, if
20       I put myself in May of 2020, that was a way
21       different time.  That was -- that was the height
22       of -- that was the height of the COVID time.  To
23       even fathom thinking about or making up that we
24       were selling, in May of 2020, that wasn't --
25       that's not even a possibility.
```

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 109

1  Q  So do you have any idea of the fair market value
2     of Widen Enterprises in May of 2020?
3  A  Do I have any idea of the fair market value of
4     Widen Enterprises in May of 2020?  We were not
5     willing to sell.  There was no desire to sell.
6     There was not a willing buyer, and therefore
7     there's no market valuation at that time.
8  Q  Okay.  So your testimony is that in May of 2020,
9     Widen Enterprises had no fair market value?
10 A  That wasn't the focus.  We were focused on the
11    business at that time, especially -- I would
12    emphasize again, especially May of 2020.  We're --
13    all we were thinking about was how are we
14    navigating this particular uncertainty, which was
15    remote employees, which was uncertainty from what
16    we have as the objective, which is growth, and
17    what happens to the organization given the risk
18    that we had at that time, which was significant
19    based on the customer agreements that we had.
20        So, like, I'm -- I'm trying to put myself
21    back in May of 2020.  The furthest thing from our
22    mind was valuation, because I was worried about
23    survival.  I was worried about what are we going
24    to do if all the customers cancel their contracts.
25    That was my concern at that time.  So I can't --

Page 110

1  Q  So you have no conception of --
2  A  Wasn't even a thought.
3  Q  Okay.  Do you believe that the value was less than
4     $10 million in May of 2020?
5             MR. CHURCHILL:  Objection.  Calls
6         for expert testimony.  You can answer.
7  A  I don't know what the value was in May of 2020.
8     It wasn't on my mind.  I was not thinking value.
9  Q  Okay.  So sitting here today, knowing what you
10    know today, do you -- could you say you have a
11    sincere belief that the value was less than
12    $10 million in May of 2020?
13            MR. CHURCHILL:  Same objection.
14 A  That's a -- that's a hypothetical to go back and
15    apply current knowledge to that time, which it
16    wasn't even a --
17 Q  I don't think that's a hypothetical.  I'm just
18    asking you to apply current knowledge to that
19    time.  I'm not asking you to assume anything.
20 A  Well, I wasn't -- yeah, I wasn't thinking about
21    that at the time.
22 Q  No, I'm asking you today, though.
23 A  Repeat the question.
24 Q  Sitting here today, can you say that you sincerely
25    believed -- believe that the value of Widen

Page 111

1     Enterprises was less than $10 million in May of
2     2020?
3             MR. CHURCHILL:  Objection.  Calls
4         for speculation.
5  A  I can say I don't know.
6  Q  Okay.  Did you have any position at Windy Waters?
7  A  I did not.
8  Q  Okay.  And you were -- but you were a shareholder
9     of Windy Waters?
10 A  Correct.
11 Q  When did you become a shareholder of Windy Waters?
12 A  I don't remember.
13 Q  Do you remember how many times you purchased or
14    were granted shares in Windy Waters?
15 A  I don't remember.
16 Q  Do you remember if that was -- if you were --
17    became a shareholder before you became CEO or
18    after?
19 A  I don't remember.
20 Q  Okay.  Did you have any -- did you play any role
21    with respect to the operations of Windy Waters?
22 A  No.
23 Q  Did you oversee anybody who did play a role in the
24    operations of Windy Waters?
25 A  There was -- well, the CFO of Widen Enterprises

Page 112

1     had a role at Windy Waters.  I oversaw Mike in his
2     role as the CFO of Widen Enterprises.  So not in
3     his capacity at Windy Waters.
4  Q  Okay.  Did Mike ever report to you, you know, what
5     he was doing in his capacity at Windy Waters?
6  A  I was aware of some things, but not a reporting to
7     me.
8  Q  Okay.  How did you become aware?
9  A  He would tell me certain things.
10 Q  Okay.  Did you ask certain things too?
11 A  Yeah, I would ask for follow-ups on certain
12    things.
13 Q  Okay.  What kind of things?
14 A  Well, for example, when we were responding to
15    Stacy's request to redeem her shares, I had a
16    follow-up with him asking about the status of
17    that.  So that's an example of a follow-up that I
18    made.
19 Q  Okay.  And you refer to Stacy's request to redeem
20    her shares.  Tell me what you know about that.
21 A  I know that she reached out to us, and I know that
22    Reed wanted to help his sister, and I know that we
23    then offered to purchase her shares, and I know
24    that she accepted.  That's what I know.
25 Q  Do you know if she reached out and requested that

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 113

```
1     the company buy all of her shares?
2   A I don't know.
3   Q You don't know?
4   A No.
5   Q Did you ever ask?
6   A No.
7   Q Okay.  Are you assuming that she requested to have
8     the company purchase all of her shares?
9   A I don't know.
10  Q Okay.  Did you ever attend any meetings as a
11    shareholder of Windy Waters?
12  A No.
13  Q To your knowledge were any shareholder meetings of
14    Windy Waters shareholders ever held?
15  A I don't know.
16  Q Okay.  You're not aware of any?
17  A No.  I'm not sure.
18  Q Did you ever become aware of any meetings of
19    executives of Windy Waters?
20  A I don't know.  No.  I wasn't made aware of.
21  Q How about any meetings of the board of directors
22    of Windy Waters?
23  A No.  Wasn't involved.
24  Q Okay.  But even though Windy Waters owned the
25    company that you were the CEO of; right?
```

Page 114

```
1   A Correct.
2   Q So how would Windy Waters as the shareholder of
3     Widen Enterprises communicate its intentions,
4     requests, you know, any of that to you as CEO of
5     Widen Enterprises?
6   A I reported to Reed as the chairman, and so it
7     would have been through Reed and his direction.
8   Q Okay.  So everything you knew about Windy Waters'
9     exercise of its rights as a shareholder at Widen
10    Enterprises came through Reed?
11  A Can you repeat that question.
12       (Record was read back as requested)
13  A I didn't know of any rights of shareholders.  So
14    if there was anything Windy Waters related that I
15    needed to know about, it would have come from
16    Reed, but those things were not part of that
17    dialogue.
18  Q Okay.  I mean, are you aware that shareholders
19    have rights in companies?
20  A I'm aware that shareholders have rights.
21  Q Okay.
22  A And I was a shareholder, as well, and had rights.
23  Q Sure.  And how did Windy Waters decide how to vote
24    its shares in Widen Enterprises?
25  A I don't know.
```

Page 115

```
1   Q Even though you were a shareholder?
2   A Yep.  I wasn't involved with those.  I didn't have
3     a role with Windy Waters.
4   Q Okay.  Even -- you didn't get to vote your shares
5     in Windy Waters?
6   A Not that I recall.
7   Q Okay.  To your knowledge were those decisions made
8     by Reed?
9        MR. CHURCHILL:  Objection.  Calls
10       for speculation.
11  A I don't know.  I wasn't involved.
12  Q How about Widen Enterprises, did that have a board
13    of directors?
14  A Early on, Reed put the board together, yeah.
15  Q Okay.  And how long did that board exist for?
16  A I don't know.
17  Q Were you on the board?
18  A I was not on the board.
19  Q Did you attend board meetings?
20  A Yes.
21  Q Okay.  Who were at -- who was at those meetings?
22  A A local business entrepreneur, his name is Ben
23    Scharff; the bank, Jim Hegenbarth, Park Bank; and
24    Baker Tilly, representative from Baker Tilly.
25  Q Okay.  And do you know in what capacity those
```

Page 116

```
1     individuals attended those meetings?
2   A Can I have a couple more because Reed, Mike, and
3     Gary Norris were also a part of that.  Those were
4     three additional people who were part of that
5     board.  So, I'm sorry, can you repeat that
6     question.
7   Q So all the people you mentioned, were those
8     directors of that company?
9   A I don't know what capacity they served in.
10  Q Okay.
11  A I knew that I was responsible for reporting out to
12    them.
13  Q You reported to this board?
14  A I reported to Reed as the chairman of the board,
15    and Reed assembled this group, and then I would
16    report up what the organization was doing in terms
17    of activities.
18  Q You reported to the group?
19  A I reported to Reed directly as an org structure.
20    Yes.  He was my boss, so I reported to Reed.  I
21    would present to that board.
22  Q Okay.
23  A When it was in existence.
24  Q When did it stop being in existence?
25  A I don't know.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 117

1   Q   You have no idea?
2   A   No, I don't.
3   Q   Was it last year?
4   A   No, it was not last year.
5   Q   Was it before 2020?
6   A   Did it stop existing before 2020?  Yes.
7   Q   Did it stop existing before 2018?
8   A   Yes.
9   Q   Before 2015?
10  A   I don't know.
11  Q   Okay.  So before 2017?
12  A   I don't know.
13  Q   And do you know what caused that board to stop
14      existing?
15  A   No.
16  Q   Who appointed you as the CEO of Widen Enterprises?
17  A   Reed.
18  Q   Okay.  And in his capacity as what?
19  A   Chairman.
20  Q   Chairman of what?
21  A   Of the board.
22  Q   Okay.  So as chairman of the board, he appointed
23      you the CEO?
24  A   Correct.
25  Q   Okay.  Do you know if the board specifically

Page 118

1       authorized him to do that?
2   A   I do not.
3   Q   Who elected the board members of Widen
4       Enterprises?
5   A   Reed appointed the board members.
6   Q   Okay.  So they weren't elected?
7   A   Yeah.  They were -- yeah, they were -- they were
8       not elected, they were appointed, and Reed
9       appointed them.
10  Q   Okay.  Did Stacy Randall ever attend any of the
11      board meetings of the board of Widen Enterprises?
12  A   No.
13  Q   Do you know if she ever attended any meetings at
14      Widen Enterprises ever?
15  A   I don't know.
16  Q   You never saw her at a meeting?
17  A   No.
18  Q   How often did you see Stacy at Widen Enterprises?
19  A   A few times.
20  Q   Like under ten?
21  A   I don't know.
22  Q   Like how long in between each time would you say
23      like you -- it would be between when you saw
24      Stacy?
25  A   I don't know.

Page 119

1   Q   Do you know what she was doing at the companies?
2   A   When I would see her, she would be visiting with
3       her daughter-in-law, Julie Randall, who was
4       employed and still is employed as a sales rep for
5       the organization.  So she would be visiting and
6       then I would see her, and we had an open format as
7       a floor layout and I would see her, and that was
8       the capacity that I saw her in.
9   Q   Did you ever meet with Stacy regarding Windy
10      Waters at all?
11  A   No.
12  Q   When Stacy would come, did you meet with her?
13  A   I would socialize with her.  I didn't have a
14      formal meeting with her.  No.
15  Q   Did you report any information about Widen
16      Enterprises or Windy Waters to her?
17  A   I did not.
18  Q   Do you know if anyone else did?
19  A   I don't know.
20  Q   So Reed was your direct supervisor at Widen
21      Enterprises?
22  A   Correct.
23  Q   Okay.  And he set your compensation?
24  A   Correct.
25  Q   And in 2019 and 2020, what was that compensation?

Page 120

1   A   My compensation?
2   Q   Yeah.
3   A   If I recall, my compensation, my wages being about
4       500,000.
5   Q   Total?
6   A   There was a bonus provided in 2020 that would have
7       made that higher than that.
8   Q   Oh, okay.  So just in wages, about 500,000?
9   A   About that.
10  Q   Okay.  Do you know if Reed took any compensation
11      in his capacity as chairman at Widen Enterprises?
12  A   Yeah, we paid Reed compensation for his role as
13      chairman.  Yes.
14  Q   Were you aware of how much compensation that was?
15  A   Approximately.  We would pay him comp of about --
16      well, wages about a million or a little bit more.
17  Q   Okay.  In 2019 and 2020?
18  A   I don't know how -- I don't know if that was true
19      for both years, but I know it was over a million.
20  Q   Okay.  What were Reed's day-to-day
21      responsibilities as chairman?
22          MR. CHURCHILL:  Objection.  Vague.
23  A   His responsibility was me.  I mean, he was
24      overseeing me as chairman.  I was his
25      responsibility.  So his activities were related to

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 121

```
1      my performance and connections with me.
2   Q  Okay.  When you say his activities were related to
3      your performance and his connection with you, what
4      were those activities?
5   A  What time period are we talking about?
6   Q  Let's stick with 2019 and 2020.
7   A  Okay.  So his activities with me, he would be
8      involved strategically with the organization in
9      terms of what direction are we going.  So, for
10     example, in that time period, we were expanding
11     another product and he was participating in that
12     and advising on that.
13         There was also his involvement, I don't
14     recall when this was, but he would get involved
15     with banking and tax firms when we were -- he
16     would have a relationship with those, and then
17     when we would want to change those or consider
18     changing those, he would get involved there.
19  Q  Did he negotiate those agreements?
20  A  I don't know that he was the negotiator of the
21     agreements, but there was -- I mean, his role was
22     significant in those relationships.
23  Q  Okay.  So like which relationships was Reed's role
24     significant in?
25  A  In terms of banking and --
```

Page 122

```
1   Q  Anyone.
2   A  Yeah, well, the -- well, banking and tax, if we
3      think about just those two, those were something
4      he wanted to be part of.  And he held
5      relationships historically with the banks, so Park
6      Bank and a relationship with Jim Hegenbarth, who I
7      believe was the president of Park Bank at the
8      time.  So held those relationships.
9          And then when we want to change the bank and
10     we did to Associated Bank, he got involved there.
11     And then his involvement with Baker Tilly has been
12     something that's been ongoing for quite a while.
13  Q  Okay.  So, like, on like a typical day, like a
14     work day, what was your interaction with Reed?
15  A  A typical work day, I would meet with him and we
16     would -- he would ask questions about budget, he
17     would ask questions about certain expenses, he
18     would ask questions about employees, like checking
19     in on people, like how is so and so or how is this
20     person and how's the progress with this product.
21     He would challenge certain spending, why is -- why
22     are we spending money on X or Y or Z.  So those
23     would be interactions that Reed and I would have.
24  Q  And when you were at the company, Reed was at the
25     company every day?
```

Page 123

```
1   A  Yeah.  I don't know about every day, if he was
2      there every day.  I didn't track that.
3   Q  Well, if you met with him daily, you would know if
4      he was there; right?
5   A  I didn't meet with him daily.
6   Q  Oh, how often did you meet with him?
7   A  It varied.  I would say it varied based on --
8      well, based on what -- it varied based on what I
9      needed.  So I suppose on occasion I could have met
10     with him once a week, on occasion I could go a
11     month without meeting him.
12  Q  And did you talk on the phone in between?
13  A  We would have spoken on the phone when I was --
14     yeah.  He -- yeah.  He would -- he would call me
15     on occasion at whatever time at whatever hour, and
16     that would be a -- that would be a call.  It would
17     be Reed Widen, I'm having family dinner, Reed
18     Widen shows up on call, and he would be available
19     to me at any hour of the day if I needed it.  So
20     that was a thing.
21  Q  Okay.  So Reed's involvement was overseeing you as
22     the CEO and then checking in with you on various
23     aspects of the company's operations, and he would
24     also take a leading role in managing the banking
25     and accounting relationships; is that -- and this
```

Page 124

```
1      is 2019 and '20?
2   A  I wouldn't say a leading role.  I would say he was
3      participating in that activity.  Ultimately he was
4      the accountable party to them, so.
5   Q  How did his compensation get determined?
6   A  He would determine his compensation.
7   Q  Okay.  Any input from anyone else?
8   A  I would look at that compensation.
9   Q  Did you provide input?
10  A  I would have told him -- I didn't provide input,
11     but I would have told him I objected to if I did.
12  Q  You would have told him?
13  A  I would have told him that.  Yeah.
14  Q  But you didn't object to it?
15  A  I didn't object to it.
16  Q  Okay.  Did you -- I mean, because you thought that
17     the value he was providing the company was worth a
18     million dollars a year?
19  A  I looked at that as a here's a chairman of this
20     kind of organization and is this a -- is this a
21     wage that we would pay a chairman.  And so based
22     on my casual understanding of that role, I looked
23     at that and said yeah.
24  Q  Is that -- so if Reed had retired as being
25     chairman, would you have looked to replace his
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 125

1  role with someone else earning a million dollars a
2  year?
3  A  I would look to, as it goes for anybody with any
4     departure or retirement, I would reexamine what do
5     we really need and how are we going to staff this
6     back.  In Reed's case, I would have staffed back
7     probably with a team of advisors, a team of people
8     who would represent various advisory capacities
9     that Reed provided to me.
10 Q  Because it would take a team of people to replace
11    Reed's role at the company?
12 A  Yeah.  I mean, Reed was not a -- you couldn't
13    replace Reed.  Reed was the -- Reed was there 30,
14    40 years he's been.  It's his name on the
15    building, his name in the marketplace.  He's
16    got -- yes, he's got the rich legacy knowledge,
17    but also how he takes that knowledge and
18    repurposes it with his monitorship with me was
19    very important to me.  So to replace him is -- you
20    couldn't replace.  You don't replace Reed.  But I
21    would replace his advisory capacity with a team of
22    advisors.
23 Q  And you assess that that would probably cost about
24    a million dollars a year?
25 A  I haven't looked at it.  I don't know.

Page 126

1  Q  Okay.  But --
2  A  That would be my budget that I would say, all
3     right, now how am I going to staff this back with
4     a team of advisors who whatever that was.
5  Q  So Reed doesn't work at the company anymore;
6     right?
7  A  Reed does not work for Acquia.
8  Q  How did you replace his role?
9  A  Well, I report to the CEO of Acquia now, so I get
10    coaching and mentoring and guidance through the
11    CEO of Acquia, and I also have other people at
12    Acquia that I actively network with and consult
13    with.
14 Q  Is the CEO of Acquia's role in Acquia similar to
15    Reed's role at Widen Enterprises?
16 A  The CEO of Acquia is the role of the CEO, and it
17    would not be the role of the chairman.  So he is
18    not the chairman like Reed was the chairman of
19    Widen.
20 Q  Fair to say he is more involved on a day-to-day
21    basis than Reed was as a chairman?
22 A  The CEO is involved in more day-to-day activities.
23 Q  What's his compensation?
24 A  Whose?
25 Q  The CEO of Acquia.

Page 127

1  A  I don't know.
2  Q  So to oversee you, how did you make sure Reed was
3     informed about what you were doing in your role as
4     CEO?
5  A  I made sure he was informed in conversations that
6     we had, and I also provided updates to him over
7     email.  And we'd talk on occasion.
8  Q  Okay.  And that was --
9  A  Over the phone.
10 Q  Sorry.  So some in-person meetings, and then you
11    said every, you know, couple weeks to every couple
12    months, a phone call and then written
13    communications?
14 A  Correct.
15 Q  How often were the in-person meetings?
16 A  Varies.
17 Q  This is 2019 to 2020 still.
18 A  2019 -- well, in 2020, they were more frequent
19    just based on the dynamics of the business at that
20    time.  Reed needed to be aware of the uncertainty
21    that we were navigating, so that was a much more
22    regular connection there.
23 Q  Okay.  Reed stayed more closely apprized of what
24    was going on at the company in 2020 than in 2019?
25 A  I would say our communication -- my communication

Page 128

1  to him was more frequent given the state of the
2  business.
3  Q  Okay.
4  A  And that state was the COVID state of uncertainty
5     and, yeah.  Yeah.  Just uncertainty amplified.
6  Q  So you said Reed's comp was about a million
7     dollars a year in wage; right?
8  A  I don't know the exact amount, but --
9  Q  Around that.  Did Reed ever get a bonus?
10 A  Reed would get bonuses, yeah.  He would earn
11    bonuses.
12 Q  And those were based on his performance?
13 A  His performance, yeah.
14 Q  Okay.
15 A  Yep.
16          (Exhibit No. 3 was marked for
17       identification.)
18 Q  Okay.  So what's been handed to you and marked as
19    Exhibit 3, I'd like you to take a look at this.
20    Do you recognize this as a text communication
21    between you and Michael Kiesler?
22 A  Did you say a text communication?
23 Q  Yeah.  Well, what kind of communication is this?
24 A  I'm looking at the icon in the upper left, and it
25    looks like a Slack icon, so I would say this would

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 129

1   be more likely a Slack exchange.
2   Q  Okay.  And that's an instant messaging program
3      that you guys used?
4   A  It's an internal communications tool.
5   Q  Okay.  And this is a conversation you had with
6      Michael Kiesler over Slack?
7   A  Uh-huh.
8   Q  And if you look a couple lines down, Mr. Kiesler
9      says to you, "FYI, Reed has a substantial tax bill
10     that he has asked the company to pay via bonus."
11     And you say, "Of which will be grossed up for tax
12     reasons," and Mr. Kiesler says, "Correct."  Right?
13  A  Yep.  I see it.
14  Q  Okay.  So that to me looks like Reed is asking the
15     company to pay him a bonus based on his tax
16     liabilities; is that fair?
17  A  No.  We owed Reed a bonus here, and Reed appears
18     to be saying he was going to use it for a tax
19     bill.
20  Q  Oh, okay.
21  A  Ultimately what we -- we owed Reed a bonus here,
22     and so that he's stating he's using it for a tax
23     bill is not -- not my concern.
24  Q  Got it.  And then so you go on and you say, "Does
25     a shareholder distribution have less

Page 130

1      consequences?"  And Mr. Kiesler says, "Not certain
2      since I don't know what the basis of the stock is
3      of the stock redeemed."  And you say, "I was
4      thinking dividend, not buyback."  Do you see that?
5   A  I do.
6   Q  So why were you asking if this payment should be
7      made as a dividend if it was owed to Reed as a
8      bonus?
9   A  Yeah, I was thinking this is going to -- this is
10     going to be grossed up for tax reasons.  There's a
11     sizable bonus here.
12  Q  What is -- first of all, what did you mean by
13     grossed up for tax reasons?
14  A  That means to pay for the taxes related to the
15     bonus amount and so that the bonus amount would be
16     at a level that would be paying for the taxes
17     related to that bonus.
18  Q  Okay.  So the bonus isn't just a set amount, the
19     bonus is a gross amount that after taxes comes to
20     a net amount?
21  A  Correct.
22  Q  Okay.  And why was it -- why did you determine
23     that Reed's bonus was going to be determined by
24     the net amount as opposed to the gross amount?
25  A  Reed would determine that.

Page 131

1   Q  Okay.  And was it based on the fact that he needed
2      this bonus for tax reasons?
3   A  How he used the bonus again was not my -- not my
4      concern.  It was that we owed him a bonus.
5   Q  Okay.  Because you got to pay taxes on the
6      gross-up too; right?
7   A  Right.
8   Q  It's like a circular calculation?
9   A  Yeah.  There was a gross -- yeah.  There was a
10     gross-up.  And this was common.  This was a me
11     verifying with Mike this is going to be a larger
12     amount.
13  Q  Is this how your bonuses were determined?
14  A  I don't remember.
15  Q  You don't remember if this was how your bonuses
16     were determined?
17  A  I don't.  No.
18  Q  Do you know if this is how Mr. Kiesler's bonuses
19     were determined?
20  A  I don't.
21  Q  Did you have responsible for setting Mr. Kiesler's
22     compensation?
23  A  I did.
24  Q  Okay.  But you don't know if this is -- did you --
25     did you ever decide to pay Mr. Kiesler a bonus?

Page 132

1   A  Yes.
2   Q  Okay.  How did you determine how much to pay him?
3              MR. CHURCHILL:  Objection.  Assumes
4         facts not in evidence.
5   A  How did I determine what to pay Mr. Kiesler?
6   Q  Yeah.
7   A  Sometimes Reed would recommend a bonus and I would
8      confirm that that's an appropriate amount.
9   Q  And then you would gross up that amount to get
10     that as the after tax amount?
11  A  I don't remember that.
12  Q  Oh, okay.  So you said Reed determined that he
13     would get this bonus?
14  A  Correct.
15  Q  Okay.  And Reed determined how much the bonus
16     would be?
17  A  Correct.
18  Q  Okay.  So let's get back.  Why did you ask if this
19     should be done as a dividend?
20  A  I -- what I was thinking here was maybe I can talk
21     to Reed about what it would look like to pay a
22     dividend and then he might forego his bonus and
23     then we'd have the shareholders to win in this.
24     So that was what I was thinking.
25  Q  Like you and Mr. Kiesler and Stacy at this time

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 133

1    would all have gotten a share of that amount as
2    opposed to just Reed getting the bonus?
3  A  Reed would still be owed a bonus, which ends up
4    being my concern here, which is, okay, we could go
5    through the process of a dividend, but then Reed
6    would still be owed a bonus.
7       And so my conclusion as I'm thinking with
8    Mike on this is, well, we should just pay Reed the
9    bonus that he's owed because otherwise we'll make
10   a distribution, which is a large amount, and we'd
11   then have to still owe Reed the bonus, which is
12   then putting the company in a less desirable
13   financial position.
14 Q  Your interest was decreasing the total amount that
15   went out of the company?
16 A  My interest was honoring the commitments, and the
17   commitment we made was Reed's bonus.  So Reed --
18 Q  And Reed determined that commitment?
19 A  Reed determined the amount.
20 Q  Who determined that there was a commitment?
21 A  We commit to paying bonuses to Reed, to the
22   chairman, for his role.
23 Q  And who decided to do that?
24 A  Reed decides to do that.
25 Q  Okay.  So Reed determined that there was a

Page 134

1    commitment and how much the commitment was?
2  A  And the organization recognizes that there's a
3    commitment and that we have to honor that
4    commitment.  Yes.
5  Q  Okay.  So you ask Mr. Kiesler if this should be
6    done as a dividend, but then it looks like he says
7    to you it would have to be prorated to all
8    shareholders, much larger number?
9  A  Uh-huh.
10 Q  And you said plan A --
11 A  Yep.
12 Q  -- meaning go with the bonus?
13 A  Which is let's -- I'm not going to approach Reed
14   with the dividend idea because dividends are
15   ultimately his decision.  But, yeah, this was --
16   then it was going to be a -- it's better to just
17   pay Reed what he's owed as a bonus.
18 Q  And why do you say dividends are ultimately Reed's
19   decision?
20 A  Because he's the chairman and I report to him and
21   that's his -- that's his call.
22 Q  Okay.  And then Mike says, "Another FYI.
23   Redemption transaction has been completed with
24   Stacy Randall.  Total of $120,000 in stock value
25   is redeemed.  She paid back her $20,000 note

Page 135

1    receivable plus interest."
2       So why is Mike Kiesler telling you about
3    Stacy's redemption at Windy Waters if you don't
4    have a role as Windy Waters?
5  A  Sometimes he would just provide an update.
6  Q  Okay.  Did you ever ask him for updates about
7    Windy Waters transactions with Stacy?
8  A  I -- yeah, I do remember asking for an update
9    after Stacy came to us and asked to redeem her
10   shares that I said is Reed going to help Stacy or
11   not.
12 Q  Let's go back to that.  So you say you don't know
13   if Stacy asked to do -- to redeem all of her
14   shares or part of her shares; right?
15 A  Correct.
16 Q  Who told you that she approached the company about
17   redeeming shares at all?
18 A  That would have been Reed or Mike.  I don't recall
19   which one.
20 Q  Okay.  Do you recall when you heard about that?
21 A  I don't.
22 Q  Okay.  You don't recall anything about that
23   conversation?
24 A  No, I don't.
25 Q  Okay.  You can put that aside.  So did you see the

Page 136

1    dividend as a way to -- as a replacement for the
2    bonus?
3  A  The idea thread there was maybe I could convince
4    Reed to forego the bonus that he was owed and then
5    we could have more people share in a dividend.
6    But --
7  Q  Like you?
8  A  Like me.  I would have benefitted from that too.
9    Yep.
10 Q  I'm guessing that wasn't your primary concern was
11   not your personal benefit, I'm guessing?
12 A  No.  It was my -- my primary concern was we owe
13   Reed a bonus and that I don't want to put the
14   company in a financial state that is not as
15   favorable.
16      So by my thought process of that was if I
17   propose a dividend to Reed and Reed likes that
18   dividend, then he's still owed the bonus and
19   therefore now we're not only having a much larger
20   distribution, but now we're also still owing Reed
21   the bonus, as in he would want potentially both.
22 Q  Why would it have been a much larger distribution
23   from the dividend than the bonus?
24 A  Why would it have been a much larger distribution
25   as a dividend rather than a bonus?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 137

1  Q  Yeah.
2              MR. CHURCHILL:  Objection.
3          Mischaracterizes testimony.
4  BY MR. PALAY:
5  Q  Well, Mike Kiesler said to you much larger number,
6     right?
7  A  Yeah.
8  Q  Why would that have been the case?
9  A  Because the bonus that we owed Reed was a smaller
10    amount than what the dividend would have been.
11 Q  The dividend to get Reed the same amount --
12 A  Correct.
13 Q  -- as the bonus?
14 A  Correct.
15 Q  Okay.  So you were thinking of a dividend that
16    would get Reed the same exact amount as this
17    bonus?
18 A  That was the thinking of how might I be able to do
19    this, and if I put this in front of Reed, would he
20    go for it, instead of just taking his bonus that
21    he earned.  But if I could get him the dividend,
22    then more people could win from that.  But that
23    would be a larger amount, and Reed was still owed
24    his bonus, which was my ultimate concern there,
25    and then thinking I'm not going to put the company

Page 138

1     in that state.
2  Q  Okay.  So how much was Reed owed in a bonus?
3  A  It varied.
4  Q  Based on what?
5  A  Based on his determination of performance, which
6     is reflected on how I was performing as the CEO,
7     which was his primary responsibility.
8  Q  Okay.  So did your -- your bonuses, did they go up
9     and down with Reed's bonuses?
10 A  Reed would set my bonuses and they would go up and
11    down.  Yeah.
12 Q  Okay.  Did they go up and down by the same amount?
13 A  I don't know.
14 Q  So based on how you did as CEO, Reed would set a
15    bonus, and that would change from, what, how often
16    did he get a bonus?
17 A  Reed's bonuses?
18 Q  Yeah.
19 A  He would -- they would be annual.  He would set
20    the bonus and he would determine what that bonus
21    amount was by how I was performing, which was his
22    primary responsibility, and also the organization.
23 Q  So it was annual.  When in the fiscal year did
24    Reed's bonus get paid?
25 A  I don't remember.

Page 139

1  Q  Was it the same time every year?
2  A  I don't remember.
3  Q  Was it different times in different years?
4  A  I don't know.
5  Q  Okay.  Did is it happen just in April of 2019
6     because that when Reed's taxes were due?
7  A  I don't know.
8              (Exhibit No. 4 was marked for
9          identification.)
10             MR. PALAY:  So what is this,
11         Exhibit 4?
12             THE REPORTER:  Yes.
13 BY MR. PALAY:
14 Q  Do you recognize this document?
15 A  I do.
16 Q  Is it a Slack message from you?
17 A  It is the same icon on the left, and that would
18    indicate it's a Slack message, yes.
19 Q  Okay.  Do you know who you wrote this Slack
20    message to?  If you go to the front page, it says
21    you and Mike Kiesler, it looks like?
22 A  Yep.
23 Q  Okay.
24 A  That would indicate that I sent it to Mike.  Yep.
25 Q  Okay.  And can you just read this Slack message.

Page 140

1  A  "A few things we should explore after a
2     conversation I had with Reed yesterday.  One,
3     buy back the shares of the children's trust.
4     Parens, Reed wants to dissolve that trust, end
5     parens, and Stacy, after the year end valuation,
6     parens, with spacing of payments, end parens.
7     Two, after those transactions, explore the
8     benefits of paying Reed, parens, and Gary, end
9     parens, in dividends instead of wages."
10 Q  Thank you.  So does this indicate that you spoke
11    with Reed about buying back the shares of the
12    children's trust and Stacy in 2019?
13 A  This indicates I had a conversation with Reed.
14 Q  About those two things?
15 A  Not necessarily about those two things.  It does
16    indicate I had a conversation with Reed.
17 Q  Okay.  And that conversation sparked to you the
18    idea of buying back the shares of the children's
19    trust and Stacy?
20 A  That's the way this reads.  Yes.
21 Q  And so why would you have come up with an idea
22    about buying back shareholders of Windy Waters if
23    you didn't have a role in Windy Waters'
24    management?
25 A  Yep.  I had a lot -- yeah, I had ideas about how

| | Page 141 |
|---|---|
| 1 | things could work.  And the buying back of shares |
| 2 | was something I had proposed, in particular buying |
| 3 | back the shares of passive shareholders, people |
| 4 | that were not engaged in the business and had a |
| 5 | willingness to be engaged, and that Stacy was one |
| 6 | of those and price was the one before that. |
| 7 | Q  Why did you want -- why did you think buying |
| 8 | passive shareholders out was a good idea? |
| 9 | A  I think offering to buy them out was a good idea |
| 10 | because having engaged shareholders was better. |
| 11 | Q  Okay.  Well, this doesn't say offer.  This says |
| 12 | buy back; right? |
| 13 | A  Yeah.  There's two willing parties here.  The |
| 14 | offer to buy back is a price -- could have |
| 15 | refused, Stacy could have refused, other people |
| 16 | could have refused. |
| 17 | Q  Sure.  And then after those transactions, explore |
| 18 | the benefits of paying Reed and Gary in dividends |
| 19 | instead of wages? |
| 20 | A  Yep. |
| 21 | Q  Why after those transactions? |
| 22 | A  This isn't the first time that I would have |
| 23 | addressed this.  This was a -- this was a business |
| 24 | school topic that stuck with me as in, oh, there's |
| 25 | benefits to paying people in dividends versus |

| | Page 142 |
|---|---|
| 1 | wages, and so, yeah, this wouldn't have been the |
| 2 | first time I raised this, and it shows up here |
| 3 | again as a should we explore this. |
| 4 | Q  Okay.  And so what's the benefit of paying people |
| 5 | in dividends as opposed to wages? |
| 6 | A  Less tax. |
| 7 | Q  Okay.  Because you pay a lower tax late on |
| 8 | dividend than you do on compensation? |
| 9 | A  That was my general understanding.  Yeah. |
| 10 | Q  Okay.  Did you go to business school? |
| 11 | A  I did. |
| 12 | Q  Oh, at St. Norbert? |
| 13 | A  Yes. |
| 14 | Q  Okay.  Was that part of your undergrad degree |
| 15 | or -- |
| 16 | A  Correct. |
| 17 | Q  And so you thought that if there were fewer |
| 18 | passive shareholders in the business, yeah, I |
| 19 | guess, so what's the point of waiting until after |
| 20 | the buyouts of Stacy and the children's trust to |
| 21 | explore the dividends? |
| 22 | A  I think, I mean, this was something I proposed |
| 23 | before too, so this was another time to propose |
| 24 | it. |
| 25 | Q  Okay.  So you had proposed buying Stacy out before |

| | Page 143 |
|---|---|
| 1 | this? |
| 2 | A  I don't know that there was any proposal to offer |
| 3 | Stacy in particular.  There was a general |
| 4 | statement of let's offer to buy back the shares of |
| 5 | passive shareholders. |
| 6 | Q  Okay.  All passive shareholders? |
| 7 | A  Correct. |
| 8 | Q  Not singling anyone out? |
| 9 | A  Correct. |
| 10 | Q  When did you first raise that with Reed? |
| 11 | A  I don't recall. |
| 12 | Q  It was before 2019? |
| 13 | A  I don't recall. |
| 14 | Q  Okay.  You said this wasn't the first time you |
| 15 | raised this, so when was the other time before |
| 16 | this that you raised this? |
| 17 | A  I don't know. |
| 18 | Q  Okay.  So you don't know if this was or wasn't the |
| 19 | first time you raised this? |
| 20 | A  This wouldn't have been the first time I raised |
| 21 | it.  And this is 10/16/19.  You had expanded on |
| 22 | '19 in general, which, before 10/16/19, there was |
| 23 | ten months prior.  It's possible that it happened |
| 24 | in '19, but I don't know. |
| 25 | Q  Okay.  I'm just trying to -- okay.  Expanding to |

| | Page 144 |
|---|---|
| 1 | all time horizons, what makes you think this |
| 2 | wasn't the first time you raised this? |
| 3 | A  Because it's a -- it was a topic that stuck with |
| 4 | me.  It was a topic that I had asked and thought |
| 5 | about before. |
| 6 | Q  Okay.  Like over years? |
| 7 | A  The dividends? |
| 8 | Q  Well, the buyout and the dividends. |
| 9 | A  Yeah.  Both.  I don't know when I first proposed |
| 10 | that to Reed. |
| 11 | Q  Okay.  But it was before this? |
| 12 | A  Before this. |
| 13 | Q  Okay.  And what did Reed say, you know, when you |
| 14 | proposed that to him? |
| 15 | A  I don't recall what Reed said. |
| 16 | Q  Ever? |
| 17 | A  No. |
| 18 | Q  Okay.  You don't recall any response from Reed |
| 19 | anytime you ever raised that? |
| 20 | A  No. |
| 21 | Q  Okay.  And you don't -- so you don't recall what |
| 22 | he said to you in this conversation? |
| 23 | A  I do not. |
| 24 | Q  Do you think you would have raised doing it to |
| 25 | Michael Kiesler if Reed had told you not to do |

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 145

```
1        this, to pursue this?
2   A    Do I think I would have proposed it or would I
3        have said it to Michael Kiesler if Reed had said
4        no.  I don't know.
5   Q    You might have done it anyway?
6   A    I don't know.
7   Q    Okay.  And you said with spacing payments.  What
8        did that mean?
9   A    I was aware that we had paid previous shareholders
10       that were owed a large amount, that we would space
11       their payments.  Steward Widen was an example of
12       that.  We had spaced his payments over a time
13       period given the amount was so large.  Price's
14       agreement also had a spacing of payments since the
15       amount was so large.  So the spacing of payments
16       for the shareholders that were owed the largest
17       amount was beneficial to the business.
18  Q    Because the shareholder's basically financing the
19       purchase?
20  A    Because the shareholder's financing the purchase.
21       I don't know that.  If it's just --
22  Q    Would you call that a seller financed deal where
23       someone's getting payments over time as opposed to
24       all the money they're owed up front?
25  A    Provided that both parties are agreeing to what
```

Page 146

```
1        those payments are.
2   Q    Sure.  Yeah.  So would you agree with that
3        characterization as a seller financed?
4   A    Seller -- I wouldn't use those words.  I haven't
5        used those words before, so I'm not sure.
6   Q    Okay.  That's fine.  And so you said Stewart's
7        buyout and Price's buyout.  When was Stewart
8        bought out?
9   A    I don't know.
10  Q    Do you know why Stewart was bought out?
11  A    I don't.
12  Q    Do you know if it was because he died?
13  A    I don't.
14  Q    Okay.  Did you meet Stewart?
15  A    Yep.
16  Q    Did you ever met him after his buyout?
17  A    I don't recall.
18  Q    Okay.  Do you know why Price was bought out?
19  A    I don't.
20  Q    Those were transactions that you proposed, you
21       said?
22  A    I didn't propose those specific transactions.  It
23       would have been in the -- in the summary of what's
24       offered to buy back.
25  Q    Do you know who proposed the specific
```

Page 147

```
1        transactions?
2   A    I don't.
3   Q    Okay.  Did you participate in either of those
4        transactions at all?
5   A    No.
6   Q    Okay.  And when you said buy out the children's
7        trust and Stacy with the spacing payments, were
8        you thinking that buyout was going to happen
9        using the formula in the shareholder agreement
10       that was used for Stewart's buyout?
11  A    I was -- since I was a shareholder, I also knew of
12       that formula, and yes, I know Price used that
13       formula, I know Stewart.  I know all shareholders
14       bought and sold on that formula.
15  Q    Okay.
16  A    And were agreed to do to use that formula.  Yes.
17  Q    When did the shareholders agree to use that
18       formula?
19  A    I don't know.
20  Q    Well, you were a shareholder?
21  A    I agreed to use the formula when I agreed to the
22       stock agreement that I had signed.
23  Q    Okay.  Was that agreement cabined to certain types
24       of transactions, or just anytime you ever bought
25       or sold stock from the company?
```

Page 148

```
1   A    I understood the formula to be when I want to buy
2        shares, I buy them through that equation, and then
3        also when I sell shares, I would sell them through
4        that equation if there was a certain event where I
5        would want to sell.
6   Q    What do you mean a certain event?
7   A    Like I would have the need to sell the shares.  So
8        if I wanted to sell the shares, I would be
9        accountable to that formula.
10  Q    Okay.  So if you wanted to sell, you know, 10
11       percent of your stock in 2019 when you were the
12       CEO and you were going to continue being the CEO,
13       you believed that the shareholder agreement
14       required you to sell using that formula?
15  A    Yeah.
16  Q    Okay.  Do you still believe that today?
17  A    Yeah.
18  Q    Okay.
19  A    If I were to have sold my shares, I would have
20       been following that agreement.
21  Q    Because that's what the agreement required?
22            MR. CHURCHILL:  Objection to the
23       extent it calls for a legal conclusion.
24  A    I would have to consult counsel to be able to
25       figure out if that was --
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

1  Q  But that was your belief at the time, at least?
2  A  The belief at that time was that I would have to
3     follow that formula.
4  Q  Got it.  And the belief at that time was that the
5     children's trust and Stacy would have to follow
6     that formula too?
7  A  And that it was a consistent formula for all
8     shareholders.  Yes.
9  Q  Okay.  But I'm not asking you if it was
10    consistent, I'm just asking if it was required.
11              MR. CHURCHILL:  Same objection.
12         Calls for a legal conclusion.
13 A  I would have to consult counsel before determining
14    whether or not that was the case.
15 Q  Okay.  Did you ever do that?
16 A  No.
17 Q  Okay.  Did you ever ask Michael Kiesler to look
18    into how much money Reed would expect to receive
19    in a sale of Widen Enterprises at a sale price of
20    $50 million?
21 A  I asked Mike to look into what I deemed my
22    competition, which was what Reed could generate in
23    the market.  So I asked Mike Kiesler to look at
24    that.
25 Q  I'm sorry.  I'm not sure if I'm following.  What

1     do you mean your competition?
2  A  I viewed -- I viewed the growth of the
3     organization and what I had to provide as the CEO
4     as something that was better than what Reed could
5     get in the market.
6  Q  I see.  Okay.  So you measured your performance as
7     a CEO against what Reed would essentially make if
8     he sold the company and just invested his money in
9     the stock market?
10 A  I didn't measure my performance against it.  I
11    knew that it was a factor.  It was a way that I
12    would determine was I doing my job.
13 Q  Your job was to stay ahead of that?
14 A  My job -- amongst several things, yes.
15 Q  Okay.  And so when you asked Michael Kiesler to
16    look into how much Reed would get and then make in
17    a sale of Widen Enterprises at $50 million, why
18    did you pick $50 million?
19 A  I picked 50 million -- what's the date on that?
20 Q  It was in October 2019.  Here, we can just look at
21    the document.  It doesn't need to be a
22    hypothetical.  We love hypotheticals in the law.
23    We grew up on them.
24            (Exhibit No. 5 was marked for
25       identification.)

1  Q  Okay.  So this is another Slack message between
2     you and Michael Kiesler.  It's dated October 22nd,
3     2019.  I kind of summarized the gist of it.  I
4     know your counsel will catch me if I mess up the
5     reading at all, which is why I've been asking you
6     to do it.
7              MR. CHURCHILL:  Is that why.
8  BY MR. PALAY:
9  Q  He's a stickler and, you know, sometimes it's hard
10    to read.  I'll try.  You said to Mike -- and do
11    you call him Mike?  I don't mean to --
12 A  Mike or Michael.
13 Q  Okay.  You said, "Hey, CFO guy.  Pretend company
14    valuation is $50 million and Reed decided to sell.
15    Based on his ownership percentage, he now had
16    blank million in post-sale cash and he reinvested
17    that amount into the market at an average S and
18    amp colon -- or semicolon P return rate.  What
19    would his annual return be."  Did I read that
20    correctly?
21 A  Yeah.
22 Q  That was not an easy one either.  So what was
23    this -- what was the point of this message?  This
24    was what you were saying you wanted to stay ahead
25    of --

1  A  Yep.
2  Q  -- basically what Reed could get in the market?
3  A  Yep.
4  Q  And this is what you believed Reed could get in
5     the market all of that day?
6  A  No.  This was a pretend.  So pretend company
7     valuation is 50 million.
8  Q  So you do -- you do do hypotheticals about the
9     company valuation?
10 A  Well, I did a pretend here for the result of being
11    able to say how are we performing relative to the
12    alternatives.
13 Q  Okay.  And you would only know how you're
14    performing relative to the alternatives if you
15    picked a realistic alternative scenario; right?
16 A  I would have picked the scenario that was based on
17    other companies.  So I know by way of date that
18    this is after a transaction that was made by a
19    company called WebDAM, and that I estimated a
20    multiple in that transaction and would have
21    applied my guess on that equation to get to this.
22    So it's a guess and a pretend and a what if.
23 Q  Okay.  When you say a multiple, what do you mean?
24 A  I mean a multiplier to some other number.
25 Q  Okay.  What was that other number in this case?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

---

Page 153

1   A   In this case, that other number would have been
2       the annual recurring revenue.
3   Q   Okay.  So you guesstimated -- you pretended and
4       guessed at what -- well, let me just start over.
5       Did you know WebDAM's annual recurring revenue?
6   A   I did not.
7   Q   Okay.  So you guessed what that number was?
8   A   Correct.
9   Q   Based on the sale price?
10  A   No.  I don't recall exactly how I would have
11      guessed it.
12  Q   You came to some guess about WebDAM's
13      annual recurring revenue?
14  A   Correct.
15  Q   And then you applied a multiplier to that number?
16  A   Correct.
17  Q   And you said if I applied the same multiplier to
18      Widen Enterprises' annual recurring revenue, the
19      number would be 50 million?
20  A   Correct.
21  Q   Okay.  Did that seem like a reasonable guess to
22      you?
23  A   It was a guess.  It was a number to then run the
24      rest of this, which is to say pretend these
25      things, and if that's the -- if those are the

Page 154

1       assumptions, this is the result.
2   Q   Okay.  And what -- do you recall what the result
3       was?
4   A   I don't.
5   Q   Okay.  Do you think that was, like, an
6       unreasonable assumption to make, using the same
7       multiplier for WebDAM and Widen Enterprises?
8   A   Was it an unreasonable assumption?  It was an
9       assumption.  It was an assumption based on another
10      company in our market.  So I don't know if it was
11      reasonable or unreasonable.  It was just -- it
12      just was.
13  Q   Was it informed?
14  A   It was a company that we would compete with, so
15      I --
16  Q   I mean, you wanted to accurately understand if you
17      were beating what Reed could do to get in the
18      market; right?
19  A   I did.  Yep.
20  Q   Okay.  So you -- this was as accurate as you could
21      be?
22  A   This was as accurate as I could be.  With a lot of
23      guessing about what it could be from the WebDAM
24      transaction.  Again, I didn't know that one.
25      Guessing that one then and applying it here was a

Page 155

1       way to say pretend if it's this.
2   Q   Okay.  So what did you know about the WebDAM
3       transaction?  What was like the information you
4       gleaned from that?
5   A   Based on the press release that was provided by
6       the company that acquired them.
7   Q   Okay.  So you knew the sale price?
8   A   Yep.
9   Q   Okay.  And then how did you figure out what
10      multiplier to use?
11  A   I would have guessed their revenue.
12  Q   Okay.  So you guessed their revenue, and then you
13      figured out from that the multiplier?
14  A   Right.  I would have just taken their transaction
15      price divided by what my guess on revenue was and
16      then got the multiple.
17  Q   Got it.  How did you guess their revenue?
18  A   Market -- general market activities.  Like I think
19      they might have been at this and there might have
20      been a growth rate or --
21  Q   Okay.  Like did you have, like, information that
22      you used, or was this just like -- like a wild
23      guess at their revenue?
24  A   I don't recall.  Yeah, I would have hacked
25      together a formula.

Page 156

1   Q   Okay.  I mean, did you use like market research
2       companies at all to figure out what your
3       competitors' revenues were?
4   A   No.
5   Q   Never used Capital IQ or anything like that?
6   A   No.
7   Q   Okay.  And is revenue or annual recurring revenue
8       numbers something that DAM companies keep very
9       private?
10  A   It's not -- yeah, it wouldn't be a known number.
11      We wouldn't publish ours and other companies
12      wouldn't publish theirs.
13  Q   You wouldn't talk to other people outside your
14      company about your --
15  A   No.
16  Q   Okay.  Would you say, though, guesses were like
17      your -- were your best guesses based on what you
18      knew?
19  A   They were my guesses at the time with what I knew.
20  Q   Best guesses at the time based on what you knew?
21  A   Based on the time that I would have applied to
22      doing it, yeah.
23  Q   So at that time?
24  A   And with the time constraints.  So these would
25      have been, all right, I see this, I could have

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 157

1    done that calculation in two minutes.
2  Q  You didn't do, like, a ton of research to find out
3     that, you could have looked into it further is
4     what you're saying?
5  A  Correct.
6  Q  But like -- I understand.  If I could paraphrase
7     how I understand it, given how much time you spent
8     looking into it and the information you had, that
9     was your best guess?
10 A  Given the amount of time I spent and the
11    information that was available to me, yeah.
12 Q  Okay.
13              (Exhibit No. 6 was marked for
14        identification.)
15 Q  Okay.  Do you recognize this document?
16 A  This is an operational update to Reed.
17 Q  Okay.  And is this the type of up date you would
18    prepare in your normal course of duties as CEO?
19 A  Yes.
20 Q  And this one's dated November 22nd, 2019?
21 A  Yep.
22 Q  Okay.  And it looks like in the beginning, you
23    update Reed on the cash and the accounts
24    receivable?
25 A  Uh-huh.

Page 158

1  Q  And then the 29 EBITDA and revenue?
2  A  Yep.
3  Q  So you kind of kept Reed apprized of -- well, I
4     should ask, are these -- these are projected
5     numbers as of this date in the 29 EBITDA and
6     revenue?
7  A  Operating at estimated -- yes.  That's estimated.
8     This is projected and projected.  Yes.
9  Q  Okay.  And why did you keep Reed apprized of the
10    projected software revenue and total revenue?
11 A  Because that was part of growing the company, to
12    keep him apprized of how we were performing.
13 Q  And those are important measurements of
14    performance?
15 A  One of the important measurements.
16 Q  Okay.  Midway down, it says -- there's a line that
17    says Stock Purchase Request.  It says -- well, I
18    guess, can you read this one so I don't mess it
19    up.
20 A  "In a conversation with Gary this week, he
21    requested the purchase of additional Windy Waters
22    shares.  I communicated that he should have the
23    conversation with you.  I also told him how I
24    would advise you on this request to manage his
25    expectations, and that advice is as follows.  We

Page 159

1     have been working on buying back shares, as the
2     weighted EBITDA valuation is low.  I recommend we
3     do not sell more shares and continue the share
4     buybacks of specific shareholders as previously
5     outlined."
6  Q  Okay.  So Gary Norris -- is this Gary Norris as
7     Gary?
8  A  Yep.
9  Q  Okay.  He came to you and asked if he could buy
10    more shares of Windy Waters?
11 A  Yep.
12 Q  Okay.  And what did you say to Gary?
13 A  Talk to Reed.
14 Q  Okay.  And that's because Reed decided if people
15    could buy shares of Windy Waters?
16 A  That was my understanding.
17 Q  Okay.  You didn't say talk to Stacy; right?
18 A  No.
19 Q  Did you understand Stacy to have any role in
20    deciding if people bought shares of Windy Waters?
21 A  I didn't.
22 Q  Okay.  And you told Gary what you were going to
23    tell Reed in order to manage Gary's expectations?
24    Okay.  Why did you want to do that?
25 A  To make sure that Gary knew what I thought.

Page 160

1  Q  And so you were just being open with Gary
2     basically?
3  A  Yeah.  Gary was a -- yeah, a person I respected
4     tremendously.  Yes.
5  Q  And you didn't want him to be blindsided because
6     the advice you were giving Reed wasn't necessarily
7     what Gary might have wanted to hear?
8  A  Potentially.  I don't know what Gary wanted to
9     hear.  It was just that I thought it was
10    appropriate to tell him.
11 Q  But you knew Gary wanted to buy shares?
12 A  I knew that he wanted to buy shares.  Yes.
13 Q  And you were advising Reed not to agree do that;
14    right?
15 A  I was advising Reed that we're offering to buy
16    back shares.  So -- and that I would not recommend
17    to sell more shares.  Yes.  That's what I wrote.
18 Q  So not what Gary really wanted probably, based on
19    what you knew?
20 A  Based on his request to buy.  Correct.
21 Q  Based on his request.  Right.  Yeah.  I know you
22    can't be in Gary's head.  So when you said we've
23    been working on buying back shares, that's
24    referring to the idea we talked about the -- you
25    wanting to buy out the passive shareholders?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 161

1  A   To offer the buy the passive shareholders, yes.
2  Q   Right. Well, yeah. I mean you wanted to buy them
3      out; of course you couldn't buy them out unless
4      they agreed?
5  A   Correct.
6  Q   And that -- just take me back to the business
7      school reasons because, you know, I -- I have a
8      little bit of experience in that area and, you
9      know, I understand that companies often prefer to
10     have active shareholder bases as opposed to
11     passive shareholder bases. Why did you think that
12     was a good idea for Widen Enterprises?
13 A   I thought active shareholders were important to
14     running a small business with growth desires, that
15     we needed all hands on deck.
16 Q   Okay. And passive shareholders can be a drain on
17     growth if they get dividends; right?
18 A   Passive shareholders can -- I wouldn't think of it
19     like that.
20 Q   Okay. So what was the problem with passive
21     shareholders?
22 A   Just that they weren't engaged.
23 Q   Okay. Why is that bad?
24 A   Because I want all hands on deck. I want
25     everybody contributing.

Page 162

1  Q   But if they're -- if it's the same people
2      contributing at the end because there's just fewer
3      shareholders, why does it matter if there's other
4      people out there that aren't contributing?
5  A   I don't know.
6  Q   Okay. So you said that you've been -- we've been
7      working on buying back shares as the weighted
8      EBITDA valuation is low. What did you mean there?
9  A   I mean I know the formula since I'm a shareholder,
10     it was based on the weighted EBITDA, and I know
11     that relative to where we were wanting to perform
12     with EBITDA, the target of EBITDA, we were low.
13     We were lower than our target.
14 Q   Okay. So you thought the target was going to
15     rise?
16 A   The EBITDA target was expressed usually as 3 to
17     5 percent, a range. So we would target EBITDA at
18     3 to 5 percent.
19 Q   You were predicting the EBITDA would grow and that
20     the valuation based on the EBITDA formula would be
21     higher later, so this was low compared to what it
22     was going to be?
23 A   This is low relative to the target. So in 2019,
24     if I go back to the projected EBITDA at negative
25     3.6 percent, that was off pace, and our pace

Page 163

1      desire was 3 to 5 percent. So that was me saying
2      EBITDA is low, and we're not hitting that target.
3  Q   I'm not sure if I understand that. The -- you're
4      currently operating at negative 3.6 or negative
5      $1 million EBITDA estimated for the year end?
6  A   Correct.
7      So the current EBITDA valuation would be high
8      compared to that because when that comes in, if
9      that's below your target, that's going to lower
10     it; right?
11 A   I knew the formula to be a weighted EBITDA and
12     that this EBITDA number would be part of it, and
13     that EBITDA number was not desirable. We didn't
14     want to be at that level. We wanted to be at a
15     better level. But it was what it was.
16     But you -- so you saw that as a good time to buy
17     back passive shareholders because the valuation
18     was low?
19 A   Yes.
20 Q   Okay. And you recommended to Reed that he not
21     sell shares at that valuation because that
22     valuation was low?
23     I recommended we don't sell shares, not
24     necessarily because the valuation was low.
25 Q   Okay. Why did you recommend not to sell more

Page 164

1      shares?
2  A   Because the second half of that, which was focused
3      on the offer to buy back passive shareholders.
4  Q   Okay. And those passive shareholders included
5      Stacy?
6  A   Stacy was a part of that passive shareholder
7      group, yeah, and priced before that.
8  Q   Okay. So she was one of the specific shareholders
9      that you had been working on buying out?
10 A   We didn't -- it was generally thought the passive
11     shareholders, yes, organizing let's offer to buy
12     passive shareholders back like we did with price.
13     And this was, yeah, us organizing, all right, what
14     might this look like. And then she ended up
15     coming to us and saying --
16 Q   Sure. We'll get to that. But Stacy's one of the
17     specifics -- so you said we have been working on
18     buying back shares, and then you said you
19     recommend that Reed continue to share buybacks of
20     specific shareholders. Stacy's one of the
21     shareholders that you recommended continuing the
22     buybacks of?
23     To offer to buy the shares back. Yes.
24 Q   Okay. Offer in order to complete the buyback;
25     right?

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 165

1  A   Correct.
2  Q   Okay. And when you say as previously outlined,
3      when did you previously outline that?
4  A   I don't know the date of that.
5  Q   Okay. What were you referring to when you said
6      that?
7  A   Previous conversations around the let's offer to
8      buy back passive shareholders.
9  Q   Those conversations were with -- between you and
10     who?
11 A   Reed.
12 Q   Okay. Was Michael Kiesler part of those
13     conversations?
14 A   I don't think so.
15 Q   Did he know of your -- I don't want to put words
16     in your mouth, but desire or plan or outline or
17     whatever to buy back the passive shareholders?
18 A   I don't know what he knew.
19 Q   Okay. You didn't tell Mike?
20 A   No.
21 Q   Of that plan?
22 A   No.
23 Q   Was this related to the issue we talked about
24     earlier about dividends and how that might be a
25     more effective way to get compensation to Reed

Page 166

1      because it would be at a lower tax rate?
2  A   I'm not relating those two things.
3  Q   Okay. So the passive shareholder buyback is not
4      related to the dividend issue?
5  A   No.
6  Q   Okay. That was just -- the passive share back --
7      the passive shareholder buyback was just a
8      general, I don't know, desire on your part to have
9      actively engaged shareholders and not have passive
10     shareholders?
11 A   Correct.
12 Q   Okay. And is there any specific reasons that you
13     saw that as a good thing?
14 A   All hands on deck.
15 Q   What does that mean?
16 A   That means we're all in. I want engaged people in
17     the organization.
18 Q   Okay. How come?
19 A   Because we could grow faster, in theory. We could
20     do more.
21 Q   Why would the -- why would the shareholders impact
22     that?
23 A   Contributions from the shareholders would advise
24     us on how to grow.
25 Q   I'm -- so was -- did you view Stacy's passive

Page 167

1      shareholdership as like a drag on growth?
2  A   I didn't view it as a drag on growth.
3  Q   So why did you want to buy her out?
4          MR. CHURCHILL: Objection to the
5      extent it mischaracterizes testimony.
6  A   I recommended we offer.
7  Q   I understand. You aren't going to force her to
8      buyout. Why did you recommend accomplishing the
9      buy out of Stacy?
10 A   I recommended this because I wanted active
11     shareholders. So that was --
12 Q   We're just right back to the beginning, though.
13     I'm saying what was the benefit of the active
14     shareholders or the detriment of the passive
15     shareholders?
16 A   Well, I guess evidenced by the Stacy redemptions,
17     and I know this wasn't the first time she
18     redeemed, which was May in this request, that she
19     had previous redemptions. And when she would come
20     back to the organization asking for us to help,
21     the business would incur expense related to that.
22 Q   Like attorney's fees?
23 A   Correct. Yeah, we would have to incur those. And
24     my CFO, who I desperately needed in our business,
25     was taken away from the operating activities, and

Page 168

1      I needed him, especially needed him in COVID time,
2      so.
3  Q   Well, this was preCOVID; right?
4  A   Yeah. Right. But, yeah. But I know that, yeah,
5      she came to us several times. And I know every
6      time that happened, Reed wanted to help, Mike had
7      to spend time, we had to spend money. And I
8      don't -- as a business, I would --
9  Q   Because Mike would view servicing or dealing with
10     the family members as, you know, as important if
11     not more important than his normal CFO jobs?
12 A   Mike would honor those requests. I didn't want
13     Mike to be consumed with anything other than the
14     operations of the business. So I viewed it as a
15     distraction for the person that I need most.
16 Q   Got it. And you said this didn't relate to the
17     dividend issue; right?
18 A   I don't know -- if we could go back to the context
19     of that, it would be helpful.
20 Q   So I don't want to ask you a question I've asked,
21     but I guess now there's a little confusion, on my
22     part, at least. Was one of the benefits of not
23     having passive shareholders that the active
24     shareholders could be paid in a more tax efficient
25     manner through dividends as opposed to bonuses or

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 169

1      wages?
2    A  If they were still owed wages and bonuses, they
3       would have been paid that.
4    Q  So it wouldn't have been instead of?
5    A  I haven't thought through that all the way.  I
6       don't -- I think they would have been wage and
7       bonus earners, and they also would have been
8       owed -- they could have been paid dividends.
9    Q  Okay.  But did you ever think about replacing just
10      normal compensation with dividends?
11   A  That was the business school concept in theory
12      that I had carried with me, as in what might that
13      look like.
14   Q  Okay.  So fair to say one of the benefits to not
15      having passive shareholders is that you could pay
16      active shareholders what they would have received
17      in wages as a dividend instead without having to
18      pay the passive shareholders their pro rata chunk
19      of that dividend?
20   A  I would have needed to determine if that was
21      acceptable.
22   Q  Sure.  But that was a potential benefit?
23   A  That was a potential use of -- yeah.  Yeah.  That
24      was a potential benefit based on the theory that I
25      carried with me that was --

Page 170

1    Q  Okay.  And is that something you did end up
2       exploring after Stacy's final buyout?
3    A  No.
4    Q  Okay.  When you say no, you sound pretty sure like
5       you never looked into replacing compensation with
6       dividend after Stacy's final buyout?
7    A  No.  And that was the lowest priority thing for us
8       in that moment in time, which was we were all
9       about -- that was May 2020.  That was all about
10      business survivability.  There was no room to
11      think about anything else.
12   Q  Okay.  But how about at any time after Stacy's
13      buyout?
14   A  No.
15   Q  Okay.
16                  MR. CHURCHILL:  David, we've been
17          going for a while.  Is now a good time for a
18          break?
19                  MR. PALAY:  Well, it's not the
20          best, but that's fine.
21                  THE VIDEOGRAPHER:  We're going off
22          the record.  The time is 1:56 p.m.  This is
23          the end of media unit number three.
24      (A recess is taken from 1:56 p.m. to 2:17 p.m.)
25                  THE VIDEOGRAPHER:  We are going

Page 171

1       back on the record.  The time is 2:17 p.m.
2       This is the beginning of media unit number
3       four.
4    BY MR. PALAY:
5    Q  Welcome back.  Okay.  So before this break, I was
6       asking you if you had ever looked into replacing
7       active owner compensation with dividends after
8       Stacy's buyout.  And I believe you had said you
9       did not look into that, but correct me if I'm
10      misstating it.
11   A  That's correct.
12   Q  Okay.
13                  (Exhibit No. 7 was marked for
14          identification.)
15   Q  Okay.  Do you recognize what's been handed to you
16      as Exhibit 7 as another operational update from
17      you to Reed copying Mike Kiesler?
18   A  Yes.
19   Q  And this one is dated July 3rd, 2020?
20   A  Yes.
21   Q  Okay.  Fair to say that was after Stacy's final
22      buyout in May 2020?
23   A  Yes.
24   Q  Okay.  I'd like to direct your attention to the
25      bottom of the page.  Can you read me the paragraph

Page 172

1       under the words Dividend Exploration?
2    A  Yes.
3    Q  Thank you.
4    A  "Mike and I chatted about the possibility of
5       setting forth a dividend structure which may be
6       more tax advantageous than compensation through
7       salary and bonus.  We need to understand this more
8       fully, and Mike is exploring this as a possible
9       future financial reward system."
10   Q  Okay.  So does this refresh your recollection at
11      all about whether you explored replacing
12      compensation with dividends after Stacy's buyout?
13   A  I don't recall this, but I'm reading it now.
14   Q  Reading it, does it refresh your recollection on
15      any of that or no?
16   A  It doesn't.  No.
17   Q  Okay.  Did you -- you did write this; right?
18   A  Yes.  Yep.
19   Q  But you just don't recall writing it?
20   A  Correct.
21   Q  Okay.  Fair to say this is discussing exploring
22      replacing compensation with dividends?
23   A  The possibility of setting forth a dividend
24      structure which may be more tax advantageous than
25      compensation.  And we don't understand it yet.  We

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 173

1    need to figure that -- what that might look like
2    with exploring it.  So I don't know that I would
3    infer that it is replacing it.  It's setting --
4    it's the possibility of exploring what it might
5    look like.
6  Q  Right.  But it's exploring it because it may be
7     more tax advantageous than compensation through
8     salary and bonus; right?
9  A  That's written.  Yep.
10 Q  Okay.  So to me that suggests replacing it because
11    otherwise it doesn't matter if it's more tax
12    advantageous if you're still paying the same base
13    and a compensation?
14 A  Yeah, I don't recall.  I don't recall the
15    reference here.  But it does -- yeah, it was --
16 Q  Is that a fair inference by me?
17 A  I think I would have -- I mean, I would have wrote
18    it replacement of.  That's not clear here.  And
19    that we don't understand it and that we need to
20    explore it.  That's what I read.
21 Q  Okay.  So let's go back -- I know it's not your
22    favorite topic, but it's mine -- to talking about
23    value and how you thought about value when you
24    were the CEO of Widen Enterprises, which I guess
25    you still are.  Or there is no Widen Enterprises

Page 174

1     now is my understanding?
2  A  Well, I work for Acquia.
3  Q  Okay.  And Acquia owns Widen Enterprises?
4  A  Acquia acquired Widen Enterprises.
5  Q  And does Widen Enterprises have its own CEO now?
6  A  No.
7  Q  Okay.  So help me understand.  You run Widen
8     Enterprises?
9  A  No.
10 Q  Okay.  Who runs Widen Enterprises?
11 A  Acquia.  Acquia acquired Widen Enterprises.  Widen
12    Enterprises is -- there's not an entity referred
13    to as Widen Enterprises in an operating way.
14 Q  It's integrated into Acquia?
15 A  Correct.
16 Q  Okay.  Got it.  And what's your role in Acquia?
17 A  I'm a general manager of a business unit called
18    the content cloud business unit.
19 Q  Okay.  Who do you report to?
20 A  I report to the CEO.
21 Q  Okay.  How many general managers are there?
22 A  There are three in total; that includes me.
23 Q  Okay.
24 A  Well, clarification there.  There are three
25    general managers of business units.  There are

Page 175

1     other general managers of other activities in
2     different regions of the world that have a general
3     manager title.
4  Q  Got it.  Okay.  So when we were talking about
5     the -- when you asked Mike to pretend that Reed
6     sold the company for $50 million, you said you
7     thought about the company -- or you estimated the
8     company's value in that circumstance by basically
9     estimating a -- or by figuring out a multiple to
10    apply to its annual recurring revenues?
11 A  The formula I used was taking a competitor's
12    published acquisition price and then guessing the
13    revenue amount and then getting a multiplier to
14    then apply to what our projected rates would be to
15    be able to say pretend this.
16 Q  Okay.  And then -- and that was an important thing
17    to you because it would allow you to measure how
18    you were performing relative to Reed just selling
19    the company?  You were performing to Reed's
20    benefit as a -- in comparison to him selling the
21    company?
22 A  In comparison to the -- yeah, what the
23    alternatives would be.
24 Q  Okay.
25 A  In addition, I also used it internally because we

Page 176

1     were open with financial information with all
2     employees, and there would be a communication that
3     is we need to understand that what we need to
4     generate as a business is something that is more
5     advantageous then that can be garnered in the
6     market.
7  Q  Okay.  And that's because, you know, as a
8     privately held company, the owners have the option
9     to sell the company?
10 A  In a privately held company, the owners have the
11    option to sell the company.  Generally.
12 Q  I mean, is that why you saw that as the
13    alternative to you running the company was Reed
14    selling the company?
15 A  It was an alternative to a return as in are we
16    growing fast enough, are we agreeing to the degree
17    that we need to grow.
18 Q  Okay.  And was that a metric, the application of a
19    multiple to annual recurring revenues that you
20    used to estimate the company's value at any other
21    times other than that one we discussed?
22          MR. CHURCHILL:  Objection.
23          Ambiguous.
24 A  I would take other activity in market and guess
25    what that was, and then I would apply that to

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 177

1      Widen numbers.

2  Q  And by apply that, I'm just asking is it -- were

3      you applying a multiple to Widen's annual

4      recurring revenue?

5  A  I applied that multiple that I would estimate to

6      Widen's annual recurring revenue.

7  Q  Okay.

8  A  On occasion.  Yes.

9  Q  That was how you estimated the value of Widen

10     Enterprises?

11             MR. CHURCHILL:  Objection.

12            Ambiguous.

13  A  That wasn't an estimate of the value of Widen

14      Enterprises.

15  Q  Okay.  In the prior communication, I think you

16      said to assume a value of $50 million; right?

17  A  Assume.  Correct.

18  Q  Okay.  And the way --

19             MR. CHURCHILL:  Objection.

20            Misstates the document.

21             MR. PALAY:  How so?

22  A  Pretend.

23             MR. CHURCHILL:  Pretend company

24        valuation is $50 million.

25  BY MR. PALAY:

Page 178

1  Q  Okay.  So that is how you would -- applying a

2      multiple to Widen's annual recurring revenue is

3      how you would estimate its valuation?

4  A  No.

5  Q  What's incorrect about that?

6  A  Applying a multiple of revenue from another

7      transaction to our numbers was a way to look at

8      what the company opportunity was for future

9      growth.

10  Q  Well, but you asked Mike to pretend company

11     valuation is $50 million.

12  A  In that context, it was for generating a return in

13     growth compared to what that alternative was, so.

14  Q  But you way you arrived at the valuation of

15     $50 million was applying a multiple that you

16     figured out to Widen's annual recurring revenue?

17  A  I took an estimate from the WebDAM transaction and

18     then applied that to the Widen annual recurring

19     revenue.

20  Q  And that gave you a valuation?

21  A  That gave me a number to pretend that we could run

22     through this exercise.

23  Q  And you called that number a valuation?

24  A  I said let's pretend this is a $50 million

25     valuation.

Page 179

1  Q  Okay.  So did you ever at any other time use the

2      method of applying a multiple to Widen's annual

3      recurring revenue to arrive at an estimation of

4      Widen's valuation or value?

5  A  I would do that for purposes of are we headed in

6      the right direction.

7  Q  Is that a yes?

8  A  I didn't do it for purposes of valuation.  I did

9      it for purposes of here's what's going on in the

10     market, and that's a good signal or a good

11     indicator as to our ability to grow and continue

12     to grow in this market.

13  Q  Okay.  I guess the confusion is I'm not asking you

14     why you did the exercise, I'm asking if the

15     exercise of applying a multiple to Widen's annual

16     recurring revenue was something you had done or

17     you did at other times to arrive at a valuation of

18     Widen for whatever reason you wanted to arrive at

19     that number?

20  A  I used it for the reasons as stated.  I used it

21     for the reason of assigning that multiple to Widen

22     numbers to ensure that the direction we were going

23     was right for the growth expectations that we had.

24     But it was not -- I did not assign a value to the

25     company through that means.  It was a

Page 180

1      understanding that we're headed in the right

2      direction because these are the market activities.

3  Q  Did you ever call it a value or valuation?

4  A  I don't know.

5  Q  Okay.  Did you ever share an opinion about what

6      Widen's value was at any point in time with anyone

7      else at the company ever?

8  A  I don't think so.

9  Q  Okay.  Never once shared an estimation in your

10     view of what the company was worth?

11  A  I don't recall.

12  Q  Okay.  Never told Reed what you thought the

13     company was worth?

14  A  I would provide Reed the updates of market

15     activity.

16  Q  Did that ever include telling him that, you know,

17     my best estimate of Widen's value is X or Y?

18  A  I don't know.

19  Q  Okay.

20            (Exhibit No. 8 was marked for

21        identification.)

22  Q  Okay.  Mr. Gonnering, Exhibit 8 that's been handed

23     to you appears to me to be a December 1st, 2014,

24     email.  Well, two emails, I should say.  There's

25     one from you to a group of people, and then it

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 181

1       looks like Gary Norris responds to your email
2       later that same day; is that accurate?
3   A   That is accurate.
4   Q   Okay.  And in the first email from you, which it
5       looks like went to the group of Mike Kiesler, Reed
6       Widen, and Gary Norris, you said, "For valuation
7       reference, an article from Milwaukee Business
8       Journal, snippets from the article.  Research firm
9       Gartner estimated that global spending on SaaS
10      will reach $22.1 billion by 2015.  SaaS mergers
11      and acquisitions transactions grew 25 percent last
12      year, and the median SaaS exit multiple was more
13      than double that paid for traditional on premise
14      software targets.
15         The valuations of SaaS companies are about
16      twice those of traditional licensed software
17      companies gathering the same revenues.
18      Traditional software companies have an average
19      enterprise value of three times revenue, while
20      SaaS companies traded a much higher multiple of
21      6.5 times revenue.  If you're keeping score at
22      home, that's 8 million times 6.5 equals 52
23      million.  If you throttled the EBITDA for purposes
24      of market valuation, perhaps we return at 2
25      million times 12 equals 24 million.  Market value

Page 182

1       somewhere between 24 to 52 million and going up."
2       Did I read that right?
3   A   You did.
4   Q   Okay.  Fair to say --
5   A   Well, yeah.  Okay.  Sorry.
6   Q   No, please.
7             MR. CHURCHILL:  Everything but one
8      word.
9             MR. PALAY:  Okay.  Well, okay.
10      Well, I noticed you didn't correct
11      Mr. Gonnering, but what did I miss, Mark.
12           MR. CHURCHILL:  You said gathering
13      instead of generating in the third bullet.
14      That's a minor point.  We'll let it slide.
15          MR. PALAY:  Okay.  Appreciate it.
16  BY MR. PALAY:
17   Q   Fair to say this email is telling Reed, Mike
18      Kiesler, and Gary Norris an estimate of the
19      company's market value?
20   A   This is providing a reference to an article from
21      the Milwaukee business journal from Gartner
22      talking about the delivery models of SaaS versus
23      installed.  And then what I'm doing is I'm
24      estimating based on these analyst numbers what
25      that might look like for us for the purpose of

Page 183

1       validating that we're making the right decisions
2       to grow the business.
3   Q   Okay.  You say market value somewhere between 24
4      and 52 million and going up; right?
5   A   I do say that.  Yes.
6   Q   Okay.  I mean, is there any way to understand that
7      other than an estimate of the company's market
8      value?
9   A   The way to understand it is to say we're in the
10      right market, there's growth to be had, and this
11      is good indication of that.
12   Q   Okay.  Mr. Gonnering, so there's going to be a
13      trial in this case, I'm going to call you as a
14      witness, and I'm going to ask you, when you say
15      market value somewhere between 24 and 52 million
16      and going up, is that an estimation of the market
17      value of Widen Enterprises.  What's your response
18      going to be?
19   A   My response is going to be I took estimates.
20   Q   I mean, I'm going to -- in the trial, I'm going to
21      be a little meaner.  I'm going to say yes or no.
22      Is that an estimation of the company's market
23      value?
24   A   I wrote market value between 24 and 52 million.
25      That doesn't mean that the company's market

Page 184

1       valuation was that.  I show the assumptions that I
2       make, and the reason for these is to indicate that
3       we're in the right -- we're playing in the right
4       market.
5   Q   But I'm not asking you if that was the true and
6      final number.  It's a large range.  I'm just
7      asking you was that an estimation by you of the
8      company's market value?
9   A   That was an estimate based on the assumptions that
10      I expressed here of what an EBITDA or a revenue
11      formula would look like.
12   Q   Okay.  And let's talk about that.  You said
13      that -- or one thing you took from this article
14      apparently is that SaaS companies trade at a much
15      higher multiple of 6.5 times revenue; is that
16      right?
17   A   That's a bullet point which appears to be a lift
18      directly from that article.  Yes.
19   Q   Okay.  And did you believe that was correct at the
20      time?
21   A   I believed that SaaS or software as a service was
22      a better delivery model than installed software.
23   Q   Did you believe it traded at a multiples of 6.5
24      times revenue?
25   A   I don't know.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 185

1   Q   You told your boss that.

2   A   I told my boss this with the expression of we're
3       in the right business.  We're delivering software
4       the right way.

5   Q   But you did tell your boss that?

6   A   I wrote below a summary of that, which is
7       revealing to us that we're in the right place.

8   Q   Okay.  And this was in 2014.  This was a long time
9       ago.  Did you ever learn that that was not true,
10      that SaaS companies trade at multiples of 6.5
11      times revenue?

12  A   Did I ever learn that was not true.  I don't
13      recall.

14  Q   Okay.  You don't recall ever learning that that
15      was not true?

16  A   No.

17  Q   Okay.  Do you recall ever telling Reed,
18      Mr. Kiesler, and Mr. Norris that that was not true
19      after sending this email?

20  A   I did not say that that was not true.

21  Q   After sending this email?

22  A   I didn't say that that's not true.  It's not true
23      that -- let me pause.  I didn't say that it wasn't
24      true that SaaS companies were trading at a higher
25      multiple of six and a half times.  I cited the

Page 186

1       article where that reference was made.

2   Q   Oh, okay.  Did you ever learn that that reference
3       from the article was not correct?

4   A   I didn't pursue it after that.  I didn't know.

5   Q   Okay.  Have you since then until today come upon
6       knowledge that SaaS companies do not in fact trade
7       at multiples of 6.5 times revenue?

8   A   The examples with other companies in our market
9       based on rough estimates would have revealed that
10      SaaS companies are not at that rate.

11  Q   What rate would it have revealed?

12  A   The WebDAM transaction for example, when I
13      estimated that, I believe I estimated that given
14      the sale price and then the here's what I think,
15      and I think I stated that one was three to five
16      times revenue.

17  Q   Okay.

18  A   And that would be not six and a half times.

19  Q   What did Widen Enterprises sell to Acquia for how
20      many -- how many times its annual recurring
21      revenue?

22  A   I don't recall that --

23  Q   You don't know?

24  A   -- ratio.  No.

25  Q   Okay.  Have you ever discussed that ratio?

Page 187

1   A   No.

2   Q   Never?

3   A   I don't recall.

4   Q   Okay.  Do you have any reason to believe you never
5       have discussed it, though?

6   A   Do I have any reason to believe I've never
7       discussed it.  It was discussed by people at
8       Acquia as a -- as a result of it, but I wasn't
9       discussing it.

10  Q   So what was the result of that?

11  A   I don't remember the reference.

12  Q   Okay.  Who at Acquia discussed it?

13  A   It would have been the former CEO.

14  Q   The person who was the CEO at the time of the
15      purchase of Widen Enterprises?

16  A   It would have been the former CEO of Acquia.

17  Q   Who was the CEO at the time of the purchase of
18      Widen Enterprises?

19  A   Correct.

20  Q   Okay.  You talked to him about this after the
21      sale?

22  A   I wouldn't have talked to him about it after the
23      sale.  He would have made a casual reference to
24      it.

25  Q   Okay.  And do you -- you don't recall what the

Page 188

1       ratio that he referenced was?

2   A   No.  It would have been the sale price divided by
3       the annual recurring revenue.

4   Q   Okay.  And that would be -- so we know the annual
5       recurring revenue for Widen Enterprises in the
6       last complete year before the sale; right?

7   A   We know the annual recurring revenue of Widen in.

8   Q   2020?

9   A   -- 2020.

10  Q   Okay.  We know the sale price?

11  A   Yep.

12  Q   So let's do it.  So the annual recurring revenue
13      for 2020 --

14              MR. CHURCHILL:  Can you just point
15          me where you're reading from.

16              MR. PALAY:  Sorry.  I'm getting
17          this from Windy 7985 in I believe Exhibit 2.
18          And if anyone else would rather do this
19          calculation, I would be --

20              MR. CHURCHILL:  Could have Matthew
21          do it.

22  BY MR. PALAY:

23  Q   Matthew, do you have a calculator?

24  A   I do not.

25  Q   Okay.  Lucky you.

Page 189

1   A   I would say also that you could pull it off of the
2       SIM.
3   Q   Yeah.
4   A   And, yeah, and that's a place to go, but we should
5       reference that this is -- I don't know that this
6       is an audited statement or is it the Grant
7       Thornton --
8   Q   Hey, you guys sold securities based on it, not me.
9       I don't know if this is accurate or not.  But
10      let's use the numbers that Acquia was told.  Fair?
11  A   Yeah.  The numbers that -- this is a summary of
12      those numbers.  The numbers would have been
13      through due diligence.  There would have been
14      financial diligence done not only by Grant
15      Thornton, but also Vista Equity Partners, their
16      financial teams, as well as Acquia's financial
17      teams.
18  Q   Okay.  Well --
19  A   There's a lot of people going through those
20      numbers.
21  Q   We can see if that changes, but this number was
22      represented to Acquia in this confidential
23      information memorandum; correct?
24  A   Correct.
25  Q   And it was as accurate as you could be at that

Page 190

1       time; correct?
2   A   Correct.
3   Q   Okay.  And so the number is 26,52,223?
4   A   Yep.
5   Q   So I'm going to divide 162 million by that number;
6       is that fair?
7   A   Yep.
8   Q   Okay.  Okay.  I get 6.218, so I'm going to go with
9       6.22 or 6.2.  Okay?
10  A   Okay.
11  Q   Fair?  Does that sound reasonable to you?
12  A   I agree with the math and how you explained it.
13  Q   Okay.  So fair to say whether or not this is how
14      Acquia determined it, Widen Enterprises sold for a
15      multiple of 6.2 times its annual recurring
16      revenue?
17  A   Acquia paid Widen 6.2 as a multiple of revenue if
18      we were to isolate that number.
19  Q   Got it.  Okay.  Did you believe the information
20      that you provided to Reed in this 2014 email,
21      Exhibit 8, was accurate at the time that you
22      provided it?
23  A   I believe that the analysts, in this case Gartner,
24      has a good reputation and that they're providing
25      information that is helpful.

Page 191

1   Q   I mean, you didn't want to give Reed inaccurate
2       information, did you?
3   A   No.
4   Q   Did you want to give him accurate information?
5   A   I wanted to give him information that was in this
6       case published in the public and so that he was
7       aware of what Gartner was saying about the
8       delivery model of SaaS versus installed.
9   Q   But I'm just asking generally, like you would not
10      have wanted to give Reed information that you
11      thought was inaccurate, would you?
12  A   I would not give Reed inaccurate information.
13  Q   Okay.  It wasn't a trick question.  Did you ever
14      estimate Widen Enterprises' market valuation at
15      $63 million?
16  A   I don't recall.
17  Q   Okay.
18              (Exhibit No. 9 was marked for
19          identification.)
20  Q   Okay.  What's been handed to you and marked as
21      Exhibit 9 looks to be another operational update
22      from you to Reed and Mr. Kiesler dated
23      February 23, 2018; is that accurate?
24  A   To Reed with a copy to Mike.
25  Q   Yes.

Page 192

1   A   To Reed.
2   Q   Yes.  But Mike received it; right?
3   A   Mike was copied.
4   Q   What's the distinction?
5   A   This is to Reed.
6   Q   But Mike received it?
7   A   He was a carbon copy.
8   Q   Okay.  Just tell me if there's any reason for you
9       to believe that Mike didn't receive it because he
10      was CC'd as opposed to added in the to line?
11  A   I think it was a reference to this is to Reed and
12      Mike was copied on it.
13  Q   I understand.  Yeah.  You're writing to Reed.
14  A   Correct.
15  Q   I just meant that he -- isn't that what it means
16      to get a carbon copy of it, you receive a copy of
17      it?
18  A   He got a copy of it.
19  Q   Yeah, he got a copy of it.  Cool.  So the second
20      paragraph here, can I ask you to read that one,
21      the one under valuation.
22  A   "Shutterstock acquired WebDAM a handle of years
23      ago for approximately 12 million.  Bynder acquired
24      WebDAM from Shutterstock for approximately 49
25      million.  WebDAM was likely close to our software

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 193

1    revenue totals, possibly less. I am unsure of any
2    other sizzle in the deal, but if it's straight up
3    DAM, then my guess is the valuation was three to
4    four X revenue. If they were equivalent to our
5    software revenue last year, parens, 14 million,
6    end parens, then it works out to 3.5 X revenue.
7    Using our projected 2018 software revenue of 18
8    million, our market valuation on 3.5 X revenue is
9    63 million."
10  Q  Thank you. Okay. So this is now at least the
11    third time I have seen a writing from you
12    referencing the value or valuation of Widen
13    Enterprises. Fair?
14  A  This is, yeah, another occasion where I am using
15    other activity in the market as a reference to the
16    growth potential that we have and that we're
17    moving in the right direction.
18  Q  Right. But it says using our projected 2018
19    software revenue of $18 million, our market
20    valuation on 3.5 X revenue is $63 million; right?
21  A  That's what it says.
22  Q  Okay. Fair to say that's an estimation of Widen
23    Enterprises market valuation as of this date based
24    on the -- based on the 3.5 X as an assumption?
25  A  I use these assumptions and apply those

Page 194

1    assumptions to our revenue to determine if we were
2    headed in the right direction. So directionally
3    we were going in the right --
4  Q  What do you mean directionally? You mean because
5    63 million is bigger than the last estimate in
6    2014 at 52 million?
7  A  That we're in a market that is responding to
8    growth, that is capable of growing. So these are
9    good indicators that we are in a market that is
10    active and that has potential, that has growth
11    opportunities. And our directive is to grow and
12    so that's what these reveal.
13  Q  Okay. So the point of sending this to Reed was to
14    let him know that you believed the company was on
15    the right track in the right market?
16  A  We were headed in the right direction and that the
17    growth potential was there for us to keep growing.
18  Q  But this is an estimate of the estimate of the
19    value -- of the market valuation of Widen
20    Enterprises on this day right? This isn't a
21    projected future valuation?
22  A  It's projected because it says projected software
23    revenue, so.
24  Q  Okay. So at the end of 2018?
25  A  Right. There's a projection in here.

Page 195

1  Q  But it's as of that day that's the projected
2    software revenue; right?
3  A  As of that day, that was the projected year-end
4    software revenue, 18 million.
5  Q  Okay. So, you know, to keep Reed informed that
6    you believe the company was in the right market
7    and going in the right direction, you let him know
8    that you believed the company had an estimated
9    market valuation of $63 million?
10  A  Yeah. I took the multiplier to our revenue and
11    said we're going in the right direction. That's
12    what that says.
13  Q  Did you ever get to any estimates of market
14    valuation of widen higher than 63 million?
15  A  I don't recall.
16  Q  If the annual recurring revenue had gone higher
17    than it was projected in this projection at 18
18    million, would that have meant a higher estimated
19    market valuation?
20          MR. CHURCHILL: Objection to the
21        extent it calls for expert testimony. You
22        can answer.
23  A  If we had a higher projected 2018 software
24    revenue, then you're saying that some would be
25    higher.

Page 196

1  Q  I'm asking you to -- yeah, I mean, that's what it
2    says to me, but is that true?
3  A  Well the formula would, yeah, determine that.
4    Yeah. If you insert a bigger number, then, yeah,
5    and you multiply it by the same, then you would
6    have a bigger number.
7  Q  Did the annual recurring revenue ever decrease
8    from 2018 through the sale in 2021?
9  A  I don't recall.
10  Q  It's only three years.
11  A  Right.
12  Q  You don't know if it decreased year over year
13    during that period?
14  A  I can't confirm that it did. I think we were in
15    the growth mode. I don't think it did, but I
16    would want to confirm.
17  Q  Okay. So why did you think it was important for
18    Reed to have this information?
19  A  To indicate that we're making the right decisions,
20    that we're in the right direction.
21  Q  So to keep doing what you're doing?
22  A  To keep growing and that the growth potential is
23    there.
24  Q  Okay.
25  A  And that by way of these, it's -- people are

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 197

1   participating in this market, there's customers to
2   be earned here, and this is a -- this is good.
3   We're in a good, healthy, attractive market.
4   Q   It's good for your valuation to go up; right?
5   A   Good for the growth of the company so that we can
6   continue growing, which is the objective.
7   Q   Okay.  So the objective is not to be more
8   valuable, it's to -- just to grow?
9   A   It's to grow.
10  Q   Okay.  Why is that the objective?  Just wondering.
11  A   Well, the alternative is less favorable, so if
12  you're growing you're stagnant or your not
13  growing.  But growing is good because growing is
14  we've got a good product market fit, we have the
15  ability to help solve more customer problems, so
16  more customers will come to us because we've got
17  the right product.  Growth is good because we can
18  also increase the employment.  Growth is good
19  because we can also contribute back to the
20  community.  So -- growth is good because we could
21  also increase profitability.  So growth is good
22  for those reasons, and I don't represent that to
23  be comprehensive, but those are a few things.
24  Q   That makes sense.  Okay.  So valuation is sort of
25  a metric in gauging growth?

Page 198

1   A   This is a way to say are we in the right market,
2   are we making the right directional moves.
3   Q   Okay.
4   A   And this says, yeah, this is directionally right.
5          (Exhibit No. 10 was marked for
6          identification.)
7   Q   Okay.  Exhibit 10 that you now have appears to be
8   an August 10th, 2018, operational update from you
9   to Reed with a carbon copy to Mr. Kiesler.  Is
10  that accurate?
11  A   August 10th, 2018, to Reed, copy to Mike.  Yes.
12  Q   Okay.  I'm going to ask you to read again.  Can
13  you read the second to last paragraph under
14  Minority Stake Interest.
15  A   Yes.
16  Q   Thank you.
17  A   "As I have infrequently done in the last handful
18  of years, I responded to a private equity firm,
19  Five Elms Capital, to listen.  They focus on B2B
20  SaaS companies, have 300 million in investments,
21  and are investing out of a 150 million now.  They
22  complete with Insight Ventures, parens, the
23  company funding Bynder, end parens, and have been
24  looking into the DAM space for several years.
25  They expressed interest in a minority stake.  When

Page 199

1   asked what they do with a minority stake, they
2   communicated several options: One, sell to a
3   larger private equity firm; two, take a majority
4   stake; or three, sell back to Widen.
5          In my own reflection, new product velocity
6   and risk reduction come to mind as benefits.  If
7   we are valued at 80 million, parens, four X
8   software revenue of 20 million, end parens, then a
9   10 percent stake provides us 8 million in capital
10  to deploy into labor and marketing our new
11  ventures.
12         On the risk reduction front, the risk of
13  funding our growth is then shared as we scale up.
14  Of course, there are other consequences to a
15  minority stake, but sharing to keep your options
16  open."
17  Q   Thank you.  Okay.  So you said you responded to a
18  private equity firm to listen.  Is that correct?
19  A   That's correct.
20  Q   What do you mean you responded?  Responded to
21  what?
22  A   I would have responded to some kind of outreach.
23  Q   Okay.  And that's something you had done
24  infrequently, you said?
25  A   Correct.

Page 200

1   Q   Was -- did you frequently receive outreach from
2   private equity firms?
3   A   Yes.
4   Q   Okay.  How often?
5   A   I would --
6          MR. CHURCHILL:  Objection.  Vague
7          as to time frame.
8   A   During what time period?
9   Q   So this is 2018, let's say 2017 through 2019.
10  A   2017 to 2019.  I don't know the volume, but I do
11  know that they are a -- there's a lot of sales
12  emails that you would receive, and I still receive
13  them to this day.  Even though Widen doesn't
14  exist, I receive them for Widen.
15  Q   Okay.
16  A   So that's -- that would be typical marketing
17  outreach.
18  Q   What do you mean by marketing outreach?
19  A   An email, and I don't recall calls in the time
20  period that you're referring to, but -- so I would
21  say frequently it would be email.
22  Q   Okay.  And I'll just say we -- do you think this
23  was an email that you received?
24  A   I don't know.
25  Q   Okay.  But you did receive emails from private

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 201

1    equity firms in this period?
2  A  I received emails from private equity firms in
3    this period that were, yeah, marketing, marketing
4    emails.
5  Q  So what did these private equity firms want from
6    you?
7  A  They want to invest.
8  Q  Okay.  They want to buy out minority stake or a
9    majority stake or the whole thing of Widen
10    Enterprises?
11  A  In this -- private equity firms generally have
12    funds that they invest, and they want to either
13    buy a company, all or part of it.  In some cases
14    they're also simply gaining intelligence.
15  Q  Okay.  Did you discuss, like -- you know, what you
16    know did you discuss with Five Elms?
17  A  I don't recall.
18  Q  Did you discuss, you know, how much money they
19    would want to invest?
20  A  No.  I don't recall.
21  Q  Okay.  Did they bring up, you know, this 10
22    percent stake that you raised?
23  A  I don't recall.
24  Q  Okay.  Any idea why you would just -- why you
25    would use the 10 percent stake number?

Page 202

1  A  No, I don't.
2  Q  Okay.  And fair to say you estimate Widen
3    Enterprises' market value at $80 million here?
4  A  No.  That's an if.  If we are.
5  Q  Yeah.
6  A  So it's not me valuing the company.
7  Q  What is it?
8  A  It's me giving a hypothetical of pretend this for
9    a second and now let's go with the rest of the
10    story.
11  Q  Okay.  So you hypothetically valued the company at
12    $8 million?
13  A  I put that number in there as a place holder to
14    get to the real part of the conversation, which is
15    following in that sentence.
16  Q  Sure.  But $80 million came from somewhere; right?
17  A  In parentheses, we can see where that came from.
18  Q  Four times software revenue of $20 million?
19  A  Correct.
20  Q  Okay.  Pretty consistent with the last couple
21    estimations we've looked at?
22  A  Use of the WebDAM formula being applied several
23    times.
24  Q  Okay.
25  A  Yes.

Page 203

1  Q  And why did you tell Reed this?
2  A  This was again the -- we were in the right
3    direction.  There's growth opportunity here.  The
4    other activity here is good to think about, where
5    would we invest.  And so when we think about how
6    might we invest in our growth, we might invest in
7    new product philosophy, we might invest in risk
8    reduction.  So I tell Reed this because it's,
9    again, good directional information for if we're
10    going to keep growing.
11  Q  It wasn't to actually consider taking a 10 percent
12    minority investor on?
13  A  No.
14  Q  Okay.  But -- so why do you go through the trouble
15    of talking about how you would use those funds and
16    what the risks or consequences of a minority
17    investor are?
18  A  I go through the process of that to say we need to
19    be paying attention to new product velocity and
20    risk reduction as we continue to grow, and that
21    the consequence of minority stake is -- I'm not
22    sure.
23  Q  Where do you say that?  I don't see where you say
24    that.
25  A  The product velocity and rick reduction?

Page 204

1  Q  Yeah.
2  A  That would be in my own reflection, new product
3    velocity and risk reduction come to mind as
4    benefits.
5  Q  Benefits of a minority investment?
6  A  Benefits of our growth, benefits of what we need
7    to be paying attention to as we continue to grow.
8  Q  I'm just not seeing it.  I mean, you're talking
9    about getting $8 million in capital to deploy into
10    labor and marketing or new ventures; right?
11  A  Yep.
12  Q  I mean, that doesn't -- that sounds like you're
13    talking about taking $8 million from Five Elms
14    Capital for 10 percent of the company and what you
15    would use that money for?
16  A  No.
17  Q  No?
18  A  No.
19  Q  Okay.  Where -- why -- what does that mean?
20  A  That says we should consider investment in new
21    product velocity and risk reduction, and if we
22    were able to generate more, we could continue to
23    grow, but we need to pay attention to new product
24    velocity and risk reduction.
25  Q  See, I just don't -- I just don't see that in the

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 205

1   paragraph.  What I see it says if we're valued
2   at $80 million, I'll skip the paren, then a 10
3   percent stake provides us $8 million in capital to
4   deploy into labor and marketing or new ventures on
5   the risk reduction front, the risk of funding our
6   growth is then shared as we scale up.  And that
7   means shared with the outside investor; right?
8   A  Yep.
9   Q  Okay.  And of course there are consequences to a
10     minority stake, but sharing to keep your options
11     open; right?
12  A  Uh-huh.
13  Q  I mean, explain how this is not, you know, sharing
14     the potential for minority investor to keep Reed's
15     options open for potentially taking a minority
16     investor on?
17  A  Yeah.  Again, I would say directionally this is
18     just revealing that we're in the right place.
19     There is interest from other companies, and
20     they're investing in these markets, and that's
21     good.  And if --
22  Q  Where does it say that, though?
23  A  Well, it says it by way of here's a B2B SaaS
24     company, they've got 300 million in investments,
25     and they're investing out of 100 million --

Page 206

1   $150 million fund now.  They compete with a
2   private equity fund that owns a competitor of
3   ours, and they've been looking into DAM for
4   several years.  So that says, great, there's
5   people looking at this market, and that means
6   there's growth potential here.
7   Q  Okay.  So you're, like, reading between the lines?
8   You're not -- you didn't come out and say that,
9   that's just the implication of what you're saying?
10  A  That's the -- yeah, that's the -- that's what I'm
11     reading through this.
12  Q  Okay.
13  A  Yes.
14  Q  So, I'm sorry, but like I see it says if we're
15     valued at $80 million, four times software revenue
16     of 20 million, and you're telling me it doesn't
17     say that, it says something that isn't said in
18     this paragraph, and I just don't understand.
19  A  Yeah.  That says pretend we're this, and then
20     let's pretend also that we've got $8 million,
21     wherever that 8 million comes from.  But how would
22     we --
23  Q  Well, you say where it comes from?
24  A  In this example, yeah.  And it is an example to
25     say, you know, in one way, let's look at an

Page 207

1   exercise of what if we had $8 million and we're
2   going to invest in new product velocity and risk
3   reduction.  And it's also to say we're going in
4   the right direction.  There's a -- there's
5   interest in this market, continued interest in
6   this market.
7   Q  Okay.  Did you say pretend anywhere in here?
8   A  I say -- do I use the word pretend.  I use the
9   word if.
10  Q  Okay.  And if means pretend?
11  A  If means pretend with me for a second here.
12  Q  Okay.  What's the point of mentioning Five Elms at
13     all if the only thing you wanted to communicate
14     was to pay attention to new product velocity and
15     risk reduction?
16  A  It's me reporting up to Reed as part of the
17     operational updates that these are some of my
18     activities, this is what I'm doing.  And it's
19     further validating that there's another company, a
20     company in this market that's validating that this
21     is -- there's growth potential here.
22  Q  Okay.  What were the options that you were
23     referring to Reed keeping open?
24  A  I don't recall.
25  Q  Anything that would refresh your recollection on

Page 208

1   what those options were?
2   A  No.  I just don't recall.
3   Q  Okay.  Had you ever discussed taking on a minority
4   investor with Reed at this point?
5   A  No.
6   Q  Okay.  You know that for sure?
7   A  Right.
8   Q  Okay.  Had you ever discussed Reed selling the
9   company with Reed at this point?
10  A  No.
11  Q  You know that for sure?
12  A  Yep.
13  Q  Okay.  How do you know that for sure?
14  A  Because I didn't.
15  Q  So you know the options that you're talking about
16     keeping open are not selling the company?
17  A  Correct.
18  Q  Okay.  But you don't know what those options are?
19  A  I don't recall what I'm referring to here.
20  Q  Okay.
21  A  Yeah, I had not discussed with Reed anything
22     related to minority investment that was indicating
23     his or responding to his desire to sell.  That
24     was -- this is --
25  Q  I'm not asking about his desire to sell, I'm just

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 209

1  asking about what these options are. And I'm just
2  trying to confirm that you have no idea what the
3  options you're referring to are?
4  A  I don't recall. Yeah.
5  Q  Okay you have no way to know that?
6  A  No. Yeah, I don't recall.
7  Q  Okay.
8          (Exhibit No. 11 was marked for
9       identification.)
10 Q  Okay. Do you recognize what's been marked as
11    Exhibit 11 as another operational update from you
12    to Reed dated April 10th, 2020, with a carbon copy
13    to Mr. Kiesler?
14 A  I do.
15 Q  Okay. So let's -- maybe let's work our way up
16    from the bottom. At the bottom it says Software
17    and Total Revenue. It says, "Revenue adjustments
18    have been made to software as we anticipate slower
19    growth as a result of current conditions." I'm
20    going to stop reading there. Or I'll just keep
21    going. Sorry. "Previously, our 2020 projections
22    hovered around 29.46 million, and after some
23    recent changes, the software projection is
24    28.29 million. This represents a 14.7 percent
25    software revenue growth over last year's software

Page 210

1  revenue of 24.66 million. Our total projected
2  revenue -- our total revenue is projected at
3  30.92 million or 7.8 percent better than last
4  year's total revenue of 28.69 million." Did I
5  read that correctly?
6  A  You did.
7  Q  Okay. So as of April 10, 2020, and this is during
8    COVID, right? Is that the current conditions
9    you're referring to?
10 A  Absolutely.
11 Q  Okay. So you're projecting a 14.7 percent revenue
12    software revenue growth over the year before?
13 A  That's -- yeah. That's what this says, yeah.
14 Q  And that software revenue you're projecting there
15    is 28.29 million?
16 A  Software projected is 28.29. Yes.
17 Q  Is the software revenue, what component of that is
18    annual recurring revenue?
19 A  I don't recall the percentage.
20 Q  So annual recurring revenue would be a subset of
21    total software revenue?
22 A  Correct.
23 Q  Okay. And -- okay. So fair to say the company
24    was growing at this point during COVID?
25 A  Fair to say the company was -- the software

Page 211

1  revenue was growing.
2  Q  Okay.
3  A  Not at the desired growth rate.
4  Q  Okay. Growing less fast than you would have
5    liked?
6  A  Less desirable.
7  Q  Okay. Okay. Paragraph above that one, it says
8    Sunsetting Content Production Services. And I'm
9    not going to read the whole thing, but if you want
10    to just take a look and read it to yourself, it --
11    the last sentence says, "In total the severance
12    will cost about $500,000." Sorry, it's two
13    sentences. "The longest standing service we had
14    provided the market will no longer be part of the
15    Widen product offering, the end of an era." Do
16    you see that?
17 A  Yep.
18 Q  Okay. What is this paragraph referring to? Is
19    this referring to what we talked about in the --
20    sort of near the beginning of the deposition when
21    you said that at some point we sunsetted the -- I
22    think we were talking about premedia or
23    nonsoftware parts of the company?
24 A  This is saying, yeah, and I also made a reference
25    to the work just stopped showing up. So customers

Page 212

1  shopped sending work, and all of a sudden we are
2  in serious danger. And then we go through the
3  process of the PPP funding and then come to the
4  conclusion ultimately that this business is not
5  going to rebound and we're going to need to exit
6  because there's so much uncertainty in this
7  market, especially because customers just stopped
8  showing up, so.
9  Q  So you decided to exit that market completely and
10    just be 100 percent a software company at this
11    point?
12 A  We decided to exit this market, yes, because of
13    the circumstances that were in front of us here.
14    Yes.
15 Q  Sure. And so then you would just be in software?
16 A  And as a result of that, we would be in software
17    and services, and the services around the software
18    would include --
19 Q  Right.
20 A  -- the things that we discussed before,
21    implementation and other related services.
22 Q  Got it. Let's -- what were the PPP -- take me
23    through this PPP situation that the company dealt
24    with during this COVID period. What was that?
25 A  Yeah. So if we step back, in March, early March,

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 213

1 we formed a team to monitor COVID-related
2 activities, and it was to address what all of a
3 sudden was upon us, which is the whole thing needs
4 to change, the employment needs to change with
5 respect to where people are working, we need to
6 think about what customers are doing in this time,
7 we need to figure out how our revenue and expenses
8 need to change.
9      And so we formed that team in early March,
10 and then we ended up sending employees home to
11 work from home.  And then we looked at primarily
12 the risk to the business was something that we
13 used to differentiate in the market, which was to
14 play against the larger players who would demand
15 longer-term contracts, we said, you know what,
16 we're going to give every customer a 30-day out to
17 the agreement.
18      And so we started to look at that in this
19 climate as we're adjusting expenses and planning
20 to adjust up to 6 million in expenses out of the
21 organization.  We looked at anywhere from 100 to
22 200 different customers in a variety of impacted
23 markets like airline -- like airlines and
24 hospitality and food service.  So we looked at all
25 that and we said there's a lot of revenue here

Page 214

1      that we're earning from these customers, and we've
2      got this 30-day out clause that we've used as
3      differentiation for a long time that now looked
4      like it might be the death of us because we
5      thought, oh, my goodness, what is going to happen
6      if every customer gives a 30-day written notice
7      out of the agreement.  Because we gave them that
8      ability.
9 Q    They could just terminate on 30 days notice at any
10      point?
11 A    Correct.  Yep.  And that was a real scary thing
12      for us.  And we -- yeah, it was a -- yeah.  And we
13      thought, well, what are we going to do.  How are
14      we going to do this.  The PPP stuff started to
15      come into play here, which is to say, okay, well,
16      we don't really have -- there is no certainty.
17           And so the PPP was a place where we could go
18      to say look, we -- there is clear uncertainty for
19      us, especially given the circumstances that we're
20      under.  And we went through the PPP process.  We
21      worked with Associated Bank to do that.  Mike led
22      the way there, and we were able to secure a PPP
23      loan as part of that and to have the ability then
24      to say, all right, well, if this happens, if
25      something really bad happens, then hey, we would

Page 215

1      stage this in as in we're ready for the, all
2      right, up to 6 million in expense reductions,
3      which we acted on about three of that.  We know of
4      customers who are in high-risk markets like
5      airlines and hospitality and food services and
6      travel and tourism.  So we knew of the amount of
7      customer risk there.
8           And the worst case, customers would act on
9      this, and we were going to have to position how
10      are we going to survive this if this starts to
11      roll through.  And so we were -- we were ready for
12      that and to the degree what we could be to counter
13      that and to do the best that we could to survive.
14 Q    So the PPP was kind of like you were -- you
15      applied for the loan because you were preparing
16      for sort of a worst case scenario that was a
17      potential under your agreements with your
18      customers?
19 A    PPP was in preparation -- it was for uncertainty.
20 Q    Yeah.
21 A    And we applied for that because we saw nothing but
22      uncertainty.
23 Q    Right.
24 A    That's all we were living and breathing at that
25      time, which was --

Page 216

1 Q    You were still growing at the time?
2 A    Projected.
3 Q    Right.
4 A    We started to slice it, which is why we sliced it
5      by those markets.  We said where are the high-risk
6      customers, where -- how are the new customers
7      going to show up or not show up, and what if they
8      exercise their 30-day out.  So all those things
9      were swirling.
10 Q    So you wanted to be ready, so you applied for PPP?
11 A    We had to be ready.  Yeah.  It was uncertain.
12 Q    Right.  Okay.  We'll come back to this.
13           MR. PALAY:  Do you guys want to
14      take a break?
15           MR. CHURCHILL:  Sure.
16           THE VIDEOGRAPHER:  Stand by one
17      second.  We're going off the record at 3:20
18      p.m.  This is the end of media unit number
19      four.
20 (A recess is taken from 3:20 p.m. to 3:43 p.m.)
21           THE VIDEOGRAPHER:  We're going back
22      on the record.  The time is 3:43 p.m.  This
23      is the beginning of media unit number five.
24 BY MR. PALAY:
25 Q    Welcome back, Mr. Gonnering.  Okay.  Before this

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Matthew R. Gonnering

Page 217

1    break, we were talking about Widen Enterprises'
2    receipt of a PPP loan, and you were saying how --
3    or I'm paraphrasing you, and correct me if I'm
4    wrong, but the loan was necessary so that the
5    company could be prepared for various negative
6    potentialities that might occur, one of which
7    we -- you highlighted was that your customers had
8    an ability to cancel their subscription on 30 days
9    notice?
10   A    It was part of it.  The potentiality, yes, and the
11        actual.  There was the events that were going on
12        at that time, like the shutting off of work, and
13        so the PPP loan was for what was happening and for
14        the potentiality of all the other things.
15   Q    Okay.  Did your -- did the company's revenue
16        decrease because of COVID?
17   A    I'd have to look.  I don't know.
18   Q    Okay.  And how much PPP money did the company end
19        up getting?
20   A    I recall that to be about 2.7 million.
21   Q    Okay.  And that was an important cash source for
22        the company at that time?
23   A    It was important.
24   Q    Okay.
25   A    Due to the uncertainty.

Page 218

1    Q    Right.  And something the company very much
2         needed?
3    A    Yes.
4    Q    Okay.  Something you would not have wanted to
5         forego if at all avoidable?
6    A    The PPP loan was important for us to continue
7         operations and to, yeah, to protect against the
8         potentialities that we talked about already.
9    Q    Would you say the PPP loan was necessary for the
10        company?
11   A    Yeah.  Necessary for the uncertainty of the
12        company.
13   Q    Okay.
14   A    Yes.  That's what the PPP loan was for,
15        uncertainty, and that is exactly what we lived.
16   Q    Right.  I was there.  Not there, but I was around.
17   A    Yep.
18   Q    Okay.  Did you ever consider returning the money
19        once the company had gotten it?
20   A    I had posed a reference to what it would look like
21        to return that money.
22   Q    Okay.  Why did you go through that exercise?
23   A    Well, there was a lot of -- not only was there
24        uncertainty in the market, there was also
25        uncertainty related to those PPP loans.

Page 219

1    Q    Right.
2    A    That was a shroud of uncertainty.  There was --
3         the messaging was very different.
4    Q    Day-to-day.
5    A    During the application process, then all the
6         sudden it shifted.  Like --
7    Q    I was a lawyer during that time.  I was as
8         uncertain as you.
9    A    So it was -- yeah.  That -- yeah.
10   Q    So you didn't want to be -- like you didn't want
11        to trip a fault line and be in violation of some
12        later determined standard and get in trouble,
13        basically?
14   A    Right.  We wanted to follow the rules.
15   Q    Right.  You wanted to follow the rules?
16   A    Yep.
17   Q    Okay.
18                 (Exhibit No. 12 was marked for
19           identification.)
20   Q    Okay.  So Exhibit 12 looks like a May 8th, 2020,
21        operational update from you to Reed carbon copying
22        Mr. Kiesler; is that accurate?
23   A    That is.
24   Q    Okay.  And I guess the first thing I would direct
25        your attention to is a couple of paragraphs down,

Page 220

1    it says Software Revenue?
2    A    Uh-huh.
3    Q    And it says, "As of this date, currently projected
4         at 27.44 million, and we'll likely reduce it by a
5         few hundred thousand due to increased churn from
6         existing customers.  Did I read that first
7         sentence correctly?
8    A    Due to increased -- yep.
9    Q    Okay.  Increased churn means people cancelling
10        their subscriptions?
11   A    Increased churn due to, yeah, customers leaving.
12   Q    Okay.  And you said, "We will adjust more
13        frequently given the circumstances pulling in
14        current data to estimate departures.  Software
15        revenue growth in 2020 is about 10 percent better
16        when compared to 2019."  Is that right?
17   A    That is right.
18   Q    Okay.  So still growing compared to 2019, but not
19        as fast as you would like?
20   A    In software.  Yep.
21   Q    In software.  Okay.  And then, you know, we talked
22        about before you had already made the decision to
23        shutter the content production aspect of the
24        business; right?
25   A    I don't know if that decision was made at this

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 221

```
 1        time, so --
 2   Q    Okay.  It said end of an era in April of 2020,
 3        but --
 4   A    Okay.
 5   Q    I don't know.  So if you go above that one, on the
 6        PPP return, it says, "In the event we return the
 7        funds, we'll move up the content production
 8        departure to a date sooner than the September 1
 9        date.  If we go this route, we would likely wait
10        until the last day to see if anything else changes
11        in our favor.
12             One opportunity would trip our decision to
13        give the money back without waiting, and that
14        would be fulfilling the liquidity request of Stacy
15        Randall.  If we buy her shares, we would not keep
16        the funds.  Share buybacks and receiving federal
17        funds don't mix well."  Did I read that right?
18   A    You did.
19   Q    So why would buying Stacy's shares trip the
20        decision to give the PPP money back without
21        waiting to see if there was more favorable
22        guidance?
23   A    This was a recommendation, and it was the optics
24        of it.  It was we're helping Stacy with her
25        request, and just before this, we accepted
```

Page 222

```
 1        2.7 million and were going to use that
 2        $2.7 million in PPP money for the intended
 3        purpose.  And then in May, we talk about, all
 4        right, are we going to help Stacy?  Okay, well,
 5        then we commit to 1.-whatever million, and I
 6        didn't like the optics of that, that we were going
 7        to use the PPP for its intended purpose, and then
 8        we were also going to commit to 1.-whatever and
 9        helping Stacy.  So it was an optics thing, which
10        is why I would -- which is why I was making that
11        recommendation.
12   Q    Okay.  So let's take it all one step at a time.
13        So you talk about helping Stacy, but buying
14        Stacy's shares was something you had been wanting
15        to do for a while at this point; right?
16   A    Offering to buy back shares was something that I
17        had recommended.  Yes.
18   Q    Okay.  And is that why you called this an
19        opportunity, referring to buying back Stacy's
20        shares?
21   A    Wanted an opportunity to -- opportunity to trip
22        our decision to give the money back.  Yeah, I
23        didn't think of it as a -- yeah.  I see the
24        reading of the word opportunity.
25   Q    You didn't think of it as an opportunity?
```

Page 223

```
 1   A    Opportunity would trip our decision to give the
 2        money back.  Yeah, I didn't.  I saw it -- yeah, I
 3        saw it as a she's asking for help and that's
 4        coming through -- well, came through Reed and Reed
 5        wanted to help, so that's what I -- that's what I
 6        understood.
 7   Q    Okay.  But you called it an opportunity.
 8   A    Here, I referred to one opportunity would trip our
 9        decision to give the money back without waiting,
10        and that would be fulfilling the liquidity request
11        of Stacy Reynolds.  So she requested that
12        liquidity.
13   Q    Okay.  And how do you know she requested --
14   A    And there would be an opportunity to help her.
15        And I know that through -- it would have been
16        through dialogue with Reed.
17   Q    So the opportunity was helping Stacy?
18   A    One opportunity --
19   Q    It wasn't an opportunity for the company or your
20        benefit, it was for Stacy's benefit?
21   A    Let me make sure that -- one opportunity to -- one
22        opportunity would trip our decision to give the
23        money back without waiting, and that would be
24        fulfilling the liquidity request of Stacy Randall.
25        Yeah.  An opportunity to help.
```

Page 224

```
 1   Q    Okay.  Where does it say help?
 2   A    It doesn't.
 3   Q    Okay.  But that's what you meant?  You didn't see
 4        this as an opportunity to do the thing that you
 5        say you had wanted to do, it was an opportunity to
 6        help Stacy?
 7   A    Right.
 8   Q    And that was something you looked for,
 9        opportunities to help Stacy?
10   A    The opportunity to help Stacy was something that
11        came through from Reed and Mike when I was -- when
12        I learned of this.  That's what I understood Reed
13        wanting to do here.
14   Q    Okay.  And you talked to Reed about his desire to
15        help Stacy?
16   A    Something like that.  Yes.
17   Q    Well, what do you mean?  What's something like
18        that?
19   A    I don't recall the conversation, but I do remember
20        that that was what was expressed.
21   Q    Okay.  Did Reed tell you that he would only agree
22        to buy all of Stacy's shares instead of a portion
23        of them?
24   A    I don't recall that.
25   Q    Okay.  Did Mike Kiesler ever tell you that Reed
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 225

```
 1     told him that?
 2  A  I don't recall that.
 3  Q  Okay.  Did Reed ever -- did you and Reed look into
 4     other opportunities to help Stacy?
 5  A  I -- I didn't.
 6  Q  Okay.  You never looked into another opportunity
 7     to help Stacy?
 8  A  No.  That would have -- no, I didn't.
 9  Q  Did you think about other opportunities to help
10     Stacy in this situation, like other ways to get
11     her money besides buying her shares?
12  A  I didn't.  This would have been -- yeah, Reed
13     would be the decision maker here.  So I didn't
14     look for other opportunities.
15  Q  Okay.
16  A  My focus at this time was business sustainability.
17     My focus was this is -- this is height of COVID.
18     This is I've got all customers that could submit
19     30-day written notice out of all agreements, and
20     I've got expense reductions, and all these -- so
21     my entire focus and time is spent working through
22     that, and the opportunity to help came up through
23     Reed.
24  Q  Well, that's what part -- so that's what I don't
25     understand.  You said your whole focus was on
```

Page 226

```
 1     helping the company?
 2  A  Uh-huh.
 3  Q  And the PPP money was important to the company?
 4  A  Yeah.
 5  Q  You needed it, it was necessary, you said?
 6  A  Correct.
 7  Q  But you would give it all back for the opportunity
 8     to help Stacy by buying her shares for
 9     1.-something million dollars.  So you'd lose the
10     2.7, the 1.-whatever would be out the door, and it
11     would all be worth it because why?
12  A  I recommended giving it back in the event we
13     fulfill Stacy's --
14  Q  Well, you said it would trip the opportunity?
15  A  Yeah.
16  Q  Or, excuse me, would trip the decision to give the
17     shares back.
18  A  That's what I -- that would my representation.
19     Ultimate decision maker is Reed.  So my
20     recommendation was that because I didn't like the
21     optics of it.
22  Q  Got it.  But why would the opportunity to help
23     Stacy by buying all of her shares be worth
24     returning the $2.7 million from the company's
25     perspective?
```

Page 227

```
 1         MR. CHURCHILL:  Objection.
 2         Mischaracterizes testimony.
 3  A  Can you repeat the question?
 4         (Record was read back as requested.)
 5  A  Optics.  The perception of that, which is we
 6     expressed the uncertainty with PPP, we used it in
 7     accordance with that agreement, rightfully so, and
 8     then we committed to this liquidity request.  And
 9     I didn't like the --
10  Q  Yeah.
11  A  From a business perspective, it was the -- it was
12     the possible negative optics to that, which were
13     also very dominant in this time period.
14     Organizations were being shamed for --
15  Q  Oh, I hear you.
16  A  -- these activities.
17  Q  I was advising people the same way.  I understand
18     why you wouldn't want to take $2.7 million and
19     then buy an owner's stock with it.  That's not my
20     question, though.  My question is what did the
21     company get from helping Stacy that made it worth
22     foregoing the $2.7 million that you said was
23     necessary?
24  A  What the company got was avoidance of negative PR.
25  Q  Right.  But why not just not buy Stacy's stock and
```

Page 228

```
 1     keep the 2.7 that you said was necessary?
 2  A  That would have been fine if Stacy didn't want
 3     that.
 4  Q  But Stacy couldn't force you to buy her stock,
 5     right?
 6  A  I understood this to be Reed wanted to help Stacy,
 7     and that was -- we -- Reed wants to do that, then
 8     that's what we're going to do.
 9  Q  Okay.  So this was all about helping Stacy?
10  A  From my perspective, the opportunity to help and
11     the way Reed expressed it.
12  Q  Okay.  So you wanted to help Stacy as much as you
13     possibly could?
14  A  I was focused on the business, and the business,
15     at the direction of Reed, and directs accordingly,
16     do you want to help Stacy, so be it, then we'll do
17     what needs to be done or what you want to do.
18  Q  Well, so I'm not understanding.  Whose opportunity
19     was helping Stacy?  You said you're focused on the
20     business, but you're also focused on helping
21     Stacy, and those two things seem to go against
22     each other because helping the business means
23     keeping the necessary $2.7 million and, you know,
24     helping Stacy means not keeping that money.  So
25     which were you more focused on, helping the
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 229

1  business or helping Stacy?
2  A   I was focused on helping the business and
3      fulfilling Reed's request to help Stacy and doing
4      whatever we could to do that.
5  Q   Okay.  Did you ever advise Reed to go ahead and
6      fulfill Stacy's request?
7  A   I did not.
8  Q   Okay.  Did you ever advise him not to?
9  A   I wasn't involved with it.
10 Q   Okay.  You've never made a recommendation one way
11     or the other --
12 A   No.
13 Q   -- about pursuing this?
14 A   No.
15 Q   Okay.  And all the information you learned about
16     Stacy's request, is that fair to say it was from
17     Reed?
18 A   I would say it was from Reed and possibly from
19     Mike.
20 Q   Okay.  So this is May 8th.  You had talked to Reed
21     and maybe Mike about Stacy's request.
22 A   Reed or Mike would have made a reference to it.
23     Yes.
24 Q   Okay.  What did they tell you about?
25 A   Well, what I recall is Reed's reference to helping

Page 230

1      his sister.  So that would have been a Reed -- a
2      Reed statement.  But I don't know if I had talked
3      to Mike about it.  It's possible that Mike would
4      have made also a reference to it, but I don't
5      recall what that reference would have been.
6  Q   You didn't see this as an opportunity from
7      the company's perspective to buy out one of the
8      passive shareholders that you had wanted to buy
9      out?
10 A   Correct.
11 Q   Okay.  Do you remember the first time you learned
12     about Stacy's request as you've described it?
13 A   I don't recall the time.
14 Q   Okay.  But it was by May 8th?
15 A   Yes.
16 Q   Okay.  And did you understand that this request,
17     you referenced 1.-something million dollars, did
18     you understand that that price would be arrived at
19     using the EBITDA formula from the company's
20     shareholder agreement?
21 A   I understood that formula to be used for all the
22     shareholder transactions.  Yes.
23 Q   Okay.  So you did not believe that Stacy's request
24     would be fulfilled at a negotiated price, it would
25     be fulfilled using a preordained price?

Page 231

1  A   I understood it as a shareholder myself that there
2      was a preset agreed upon weighted EBITDA formula
3      that would determine that price.
4  Q   Okay.
5  A   And it was my understanding that that was
6      universal across all shareholders.
7  Q   Okay.  And you said you had reviewed the
8      shareholder agreement yourself at this point?
9  A   My signed agreement, yes.
10 Q   Okay.  So you had a copy?
11 A   I had a -- I have a copy.  Yes.
12 Q   Okay.  And did you review it in connection with
13     the events we're talking about here at all in May
14     of 2020?
15 A   I did not go back and review my shareholder
16     agreement during this time.
17 Q   Okay.  Did you talk to Mike Kiesler, Reed, or the
18     company's lawyers about what that shareholder
19     agreement said?
20 A   No.
21 Q   During this time?
22 A   No.
23 Q   Before?
24 A   No.
25 Q   Okay.  And you -- I'm a little unclear.  Your

Page 232

1      understanding at this time was that the EBITDA
2      formula was required or mandated by the
3      shareholder agreement for a transaction like the
4      buyback of Stacy's shares?
5  A   My understanding was that if I wanted to sell --
6  Q   Well, let's talk about Stacy's.
7  A   Well, I don't know about Stacy's.  I know about
8      mine.  So I -- and I know that to be then I would
9      apply that to others, as in my interpretation of
10     that agreement that I had was that I have a
11     weighted EBITDA formula that is used to buy and
12     also then used to sell if I were to express my
13     desire to sell.  That was my understanding.
14 Q   Okay.  Fair to say then that your view is that the
15     formula was required to be used?
16 A   I didn't do this, but I would have -- I would have
17     sought other advice to ensure that.  But my
18     general understanding was that formula was the
19     formula.
20 Q   I know it was the formula, but was it required?
21 A   I don't know that.
22 Q   Okay.  And you didn't know that at the time or
23     not?
24 A   No.
25 Q   Okay.  Did you think about that?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 233

1   A   No.
2   Q   Okay. What part of the agreement gave you the
3       impression that it had to be used, the formula?
4   A   I just remembered the formula being present as
5       part of my agreement, and that therefore that
6       would be used.
7   Q   Would your decision to want to help Stacy by
8       buying her shares have been impacted if the
9       formula didn't apply and you had to buy the shares
10      at the fair market value of those shares?
11  A   Well, this was -- so this is -- one, this is
12      Reed's decision, so -- and also, Stacy agreeing to
13      it. And so I'd like to ask the question be
14      repeated because I got distracted by those.
15          (Record was read back as requested.)
16  A   That have been impacted. Reed's call on this one.
17      But we -- as the business, we didn't go out and
18      get -- we didn't go out and value those shares for
19      those transactions. So I don't know what that
20      would have been. And would that decision have
21      changed? I suppose that depends.
22  Q   Depends on what?
23  A   On what that amount would have been.
24  Q   So if the amount that the fair market value of the
25      shares had been higher than the EBITDA formula,

Page 234

1       would you maybe not have wanted to take the
2       opportunity to help Stacy by buying out her shares
3       if the company had to spend more money?
4   A   Yeah, I don't know.
5   Q   Okay. And this was the same EBITDA formula that
6       you told me was low a couple months before; right?
7   A   Relative to projections, yes.
8   Q   Okay. You still thought it was low when you
9       wanted to help Stacy by using it?
10  A   I wasn't thinking about low or high in this case.
11      I was thinking about we got trouble, so.
12  Q   Okay. Just wanted to help Stacy?
13  A   Reed wants to help Stacy. Yes.
14  Q   Okay. So you didn't want to help Stacy, Reed
15      wanted to help Stacy?
16  A   I wanted to help Stacy because Reed wants to help
17      Stacy. So what Reed wants, then we'll figure that
18      out.
19  Q   Okay. So you're saying -- you're calling it an
20      opportunity to help from Reed's perspective, and
21      because from it's from Reed's perspective, it's
22      from your perspective because whatever Reed wants,
23      you want to help him get?
24          MR. CHURCHILL: Objection.
25      Mischaracterizes testimony.

Page 235

1   A   I guess it's an opportunity to help and Reed wants
2       to help, and therefore we're going to help.
3   Q   Okay. Did you believe that the EBITDA formula at
4       this time was an accurate gauge of the company's
5       fair market value? You referenced that the
6       company didn't get an appraisal or anything to
7       determine that. Did you think that the EBITDA
8       formula was, like, more or less equal to the fair
9       market value?
10  A   I didn't think about the EBITDA formula relative
11      to fair market value. I thought about the EBITDA
12      formula as the formula that the shareholders
13      agreed to, and that was it.
14  Q   Okay. And so the only way that can make sense to
15      me is if the formula was required to be used. Do
16      you see why that would be?
17  A   Say it again.
18  Q   The only way it can make sense to me that it
19      doesn't matter if the EBITDA formula and the fair
20      market value are or are not the same is if the
21      EBITDA formula has to be used, you know, then
22      we're stuck with it; right? Does that -- do you
23      see why I'm saying that?
24  A   No. I don't understand. So --
25  Q   So if there's a formula in the agreement that

Page 236

1       comes out to $1.3 million, and I think that's
2       about what Stacy got for her shares, but you don't
3       have to use it, and that amount is less than the
4       fair market value of those shares, that to me
5       would matter unless the formula was required to be
6       used. Do you see why I'm saying that?
7           MR. CHURCHILL: Objection. Calls
8       for a legal conclusion.
9   A   Yeah, I -- I would have to review my own
10      shareholder agreement to see, like, what does that
11      say. I don't know --
12  Q   I'm just talking about hypothetical or pretend or
13      whatever. Like, can you see why if the formula
14      didn't equate to fair market value and didn't need
15      to be used, that that might matter that they're
16      not the same?
17  A   That it might matter that they're not the same.
18  Q   The EBITDA formula value and the fair market
19      value.
20          MR. CHURCHILL: Same objection.
21      Also object on the grounds of confusing.
22  A   I'm not sure how to answer.
23  Q   Okay. So why did it not matter to you that the
24      EBITDA formula value of Stacy's shares,
25      1.3 million, and the fair market value may or may

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 237

1        not have been the same?

2  A  Why would it matter that they may or may not have

3        been the same?

4  Q  Why did it not matter to you?

5  A  Why did it not matter that they were the same.

6        The shareholder -- well, it only mattered that the

7        shareholder agreement that I was aware of because

8        I agreed to the same thing is -- was a -- was

9        expressing the EBITDA formula, and that was the

10       formula that we were to follow.  It wasn't --

11       there wasn't a -- there wasn't another formula.

12       That was it.  So we didn't know any other formula.

13  Q  Right.  So what would happen if there was no

14       formula?  What would you have done?

15            MR. CHURCHILL:  Objection.  Calls

16          for speculation.

17  A  I don't know.

18  Q  I mean, you would pay someone what the shares are

19       worth; right?

20  A  If there was no formula, I don't -- there was a

21       formula.

22  Q  Agreed.  But let's pretend.  You did do some

23       pretending earlier today, and you did some

24       pretending in your emails, so pretend with me.

25       Pretend there's no formula.

Page 238

1  A  Okay.

2  Q  How would you figure out how much to pay Stacy for

3       her shares?

4            MR. CHURCHILL:  Objection.  Calls

5          for expert testimony.

6  A  I would seek advice from counsel.

7  Q  From a lawyer?

8  A  Yeah.

9  Q  Okay.  Would it seem reasonable to just pay what

10       the shares are worth, whatever that amount is?

11           MR. CHURCHILL:  Objection.

12          Ambiguous.

13  A  The shares are worth what the formula says they're

14       worth.

15  Q  No, no, no.  We're pretending no formula.

16  A  So restate your question.

17  Q  If there's no formula.

18  A  Yeah.

19  Q  Would it seem reasonable to just pay a shareholder

20       being redeemed like Stacy the fair market value of

21       the shares?

22  A  I don't know.

23  Q  Anything about that seem not reasonable?

24  A  If I put myself in those shoes and if I'm in that

25       case, I would again go to seek legal advice.

Page 239

1  Q  Okay.  My question, anything about that seem not

2       reasonable to you?

3  A  Anything about that seem not reasonable to me.

4  Q  Paying someone fair market value for their shares.

5           MR. CHURCHILL:  Objection.  Vague.

6  A  What is -- who defines fair market value?

7  Q  We can all fight about that later.  Whatever that

8       amount is, seem reasonable that that's the amount

9       someone should get paid if there's not a formula

10       saying they have to get paid a different amount?

11           MR. CHURCHILL:  Objection.  Vague

12          as to time frame.

13  A  Yeah, if there's no -- again, if there's no

14       formula, I would seek advice.  I don't know.

15  Q  Is there an amount you'd pay someone other than

16       the fair market value for their property, you

17       know, in the absence of an agreement to the

18       contrary?

19           MR. CHURCHILL:  Same objections.

20  A  I don't know.

21  Q  Okay.  Did you affirmatively believe that the

22       EBITDA formula approximated or equalled the share

23       fair market value, or did you just think it didn't

24       matter?

25  A  I think it -- the EBITDA formula that I agreed to

Page 240

1        was how we all agreed to buy and sell shares, so.

2  Q  So is that the second one, it didn't matter

3       whether it equalled the fair market value?

4  A  It didn't -- did it matter if it equalled -- it

5       was -- what mattered in those case was it was the

6       agreement.  I agreed to that, and therefore that's

7       what I'm -- that's what I'm going to follow.

8  Q  Okay.  So it didn't matter whether it was the fair

9       market value or not because in your view, that's

10       what the agreement said?

11  A  That was the agreement.

12  Q  Okay.

13  A  The agreement I made with the company would have

14       been this, and I would -- as I previously spoke

15       to, if I'm wanting to do that, I would get my

16       agreement and I would seek advice, and then I

17       would -- then I would act on that advice or not

18       act on it.

19  Q  Okay.  So -- and you said you'd seek advice from a

20       lawyer, you said?

21  A  That's -- I imagine that's what it would look

22       like.  I didn't do that.  I didn't go through that

23       process.

24  Q  Sure.  You as the CEO of the company would not

25       know how to value this stock in the absence of a

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 241

1    formula without advice from a lawyer?
2  A  There was a formula, so that was the agreed
3      upon --
4  Q  Well, we've already established that you know how
5      to pretend, so let's say there's not a formula
6      because I'll just tell you, I don't agree that
7      there's a formula.  So we just have a disagreement
8      there, so we're going to -- pretend no formula
9      with me.  Okay?  You with me?  Okay.  We're
10     pretending no formula.  You as the CEO would not
11     know how to value your shares if you were in
12     Stacy's position without getting advice from a
13     lawyer?
14  A  That's what I would do.  I would go get advice.
15  Q  Okay.  You think because that's important?
16  A  To get advice?
17  Q  Yeah.
18  A  Yes.
19  Q  To figure out how much you should sell your stock
20     for?
21  A  To get advice on, yeah, that matter and anything
22     else that might be relevant.
23  Q  Did you feel like the company had any obligation
24     or I should say anyone, the company, Reed, Mike
25     Kiesler, did you feel that any of them had any

Page 242

1      obligation to give Stacy information about the
2      value of her shares, or that was relevant to the
3      value her shares?
4              MR. CHURCHILL:  Objection.
5          Compound.
6  A  Parse it for me.
7  Q  Did you think that Reed, Mike Kiesler, or Windy
8      Waters had any obligation to provide Stacy
9      information that would be relevant to the value
10     and the fair market value of her shares when
11     buying those shares?
12  A  I think if Stacy would have requested information,
13     that it would have been delivered to her.
14  Q  Okay.  But you didn't think there was any
15     obligation to provide that information without her
16     requesting it?
17  A  I don't know what those obligations would be.
18  Q  Okay.  You didn't believe -- fair to say if you
19     believed there had been an obligation to provide
20     Stacy information, even though she didn't request
21     it, you would have done that?
22  A  If Stacy would have asked me for something, yeah,
23     I would have provided that to her.
24  Q  Wasn't -- wasn't quite the question.  So my
25     question is fair to say that if you believed that

Page 243

1      the company, Reed or Mike Kiesler, did have an
2      obligation to provide Stacy with information
3      relevant to the value of her shares, even though
4      Stacy didn't ask for that information, that you
5      would have advised the company, Mike Kiesler, or
6      Reed to provide that information?
7  A  If there was some obligation that was expressed
8      that information needed to be provided, there --
9      it would have been provided, so.
10  Q  Okay.  Did Reed ever tell you that Stacy only
11     wanted to sell $100,000 worth of her shares?
12  A  No.
13  Q  Would that have impacted any of your advice to
14     Reed about whether to pursue the opportunity of
15     buying all of Stacy's shares?
16  A  I don't know.
17  Q  Okay.
18              (Exhibit No. 13 was marked for
19          identification.)
20  Q  So before we get into this, did you talk to Mike
21     Kiesler or Reed after May 8th and before the
22     buyback of Stacy's shares were completed about the
23     status of the transaction at all?
24  A  I would have inquired with Mike at one point in
25     time about the status of that, because I was aware

Page 244

1      of it.
2  Q  Okay.  And why do you care?
3  A  To see how he was spending his time.
4  Q  Okay.  It was just a matter of time management?
5  A  What is he -- yeah, what is he working on.  Is he
6      working on this.
7  Q  Did you want the company to buy Stacy's shares?
8  A  That didn't matter to me.
9  Q  You didn't care either way?
10  A  No.
11  Q  Okay.  So this is a May 14th, 2020, looks like
12     Slack message between you and Mike Kiesler again?
13  A  Yep.
14  Q  And Mike says to you, "On a different front, Windy
15     Waters, Inc., has purchased all Randall shares.
16     Mission accomplished.  16K a month, 84 months, at
17     .58 percent."  You said, "Excellent.  Thank you
18     for making it happen."  Do you see that?  I read
19     that right?
20  A  Yes, you did.
21  Q  Okay.  So, well, let's start with if you didn't
22     care about the company buying her -- Stacy's
23     shares, why did you say it was excellent that they
24     did?
25  A  Excellent, thanks for helping Stacy.  It's good.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 245

1  Q  Okay.
2  A  Fulfilling what Reed wanted to do.
3  Q  Okay.  So this -- you just thought it was
4     excellent because it helped Stacy?
5  A  Because it fulfilled what Reed wanted to do here,
6     which was helping Stacy.  Yes.
7  Q  And you're aware that this whole case is about
8     Stacy saying it didn't help her; right?
9  A  I'm not.
10 Q  Well, you said in the beginning that your
11    understanding of the case is that Stacy felt she
12    wasn't treated fairly?
13 A  Yep.
14 Q  Okay.  So, you know, if the whole point was
15    helping Stacy, does it matter if Stacy felt like
16    this was helping her?
17 A  Well, Stacy asked for this, which is --
18 Q  Well, let's leave that aside because I don't know
19    that we agree about that.  I mean, you said you
20    never talked to Kiesler or Reed about whether
21    Stacy -- what exactly Stacy asked for; right?
22 A  Correct.
23 Q  Okay.  So you don't know what Stacy asked for?
24 A  But I do know she asked.
25 Q  You knew she asked something, but you don't know

Page 246

1     what she asked for; right?
2  A  Correct.
3  Q  Okay.  So where does Mike Kiesler reference
4     helping Stacy in this text?
5  A  He doesn't say the word help.
6  Q  No, he just talks about Windy Waters buying all
7     Randall shares and he calls that mission
8     accomplished.  Doesn't talk about helping Stacy.
9     But you're saying that this is all -- your
10    statement that this is excellent, and your
11    thanking Mike is all because it helped Stacy?
12 A  Because it delivered on what Reed wanted to do,
13    which was help his sister.
14 Q  Okay.  How do you know that's what Reed wanted to
15    do?
16 A  Because he had expressed it at some point.
17 Q  And you don't know when?
18 A  I don't know when.
19 Q  What else did he say when he expressed that
20    he wanted to help his sister?
21 A  I don't recall.
22 Q  Okay.  Are you aware that Mike Kiesler was deposed
23    in this case too?
24 A  I am.
25 Q  Okay.  Do you know if he testified that Reed told

Page 247

1     him that buying Stacy's shares was about helping
2     Stacy or not?
3  A  I don't.
4  Q  Okay.  Do you think Stacy had the information that
5     she would have needed to evaluate or ask someone
6     to evaluate the fair market value of her shares or
7     of the company when she sold her shares in
8     May 2020?
9             MR. CHURCHILL:  Objection.  Lack of
10       foundation.  Calls for speculation.
11 A  I don't know what information she had.
12 Q  Okay.  What information would you have wanted if
13    you were going to figure out the fair market value
14    of the company in May 2020?
15 A  What information would I want if I was selling my
16    shares?
17 Q  Well, just if you were -- if you wanted to know
18    the fair market value of Widen Enterprises in
19    May 2020.
20 A  As a shareholder, as a -- if I put myself in that
21    position and I want to sell my shares, what I
22    would ask for is the financial statements.
23 Q  What in them would you think is important?
24 A  All of it.
25 Q  Hard to know the value of the company without

Page 248

1     seeing its financial statements?
2             MR. CHURCHILL:  Objection.
3        Misleading.
4  A  What do you mean?
5  Q  I mean could you -- would it have been difficult
6     to figure out the value of the company without
7     seeing its financial statements?
8             MR. CHURCHILL:  Objection.
9        Ambiguous.
10 A  I would have -- I would have referenced the
11    formula that I agreed to as the -- that's what I
12    agreed to.  That was the -- that's what would have
13    determined the --
14 Q  Wait.  So my question is how you would have
15    determined the fair market value.  Do you
16    understand that?
17 A  Now I'm putting that piece together.  Yes.
18 Q  Okay.  And you're saying you would have looked at
19    the formula to figure out the fair market value?
20 A  Well, no.  If I were to sell my shares, I would --
21 Q  No, no.  Forget selling your shares.  Just if you
22    as Matt Gonnering, CEO of the company, wanted to
23    know the fair market value of this company in
24    May 2020, what information would you have needed
25    to see?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

| Page 249 |
|---|

1  A   So as the CEO of the company, if I was trying to
2      determine fair market value, we didn't know fair
3      market value at that time, but I would -- I
4      would -- you would have to take the company to
5      some kind of valuation expert.  I would seek
6      expert advice.
7  Q   Okay.  Would looking at the EBITDA formula in the
8      shareholder agreement have told you anything about
9      the fair market value of the company?
10                   MR. CHURCHILL:  Objection.  Calls
11              for expert testimony.
12  A   Yeah, again, as the -- so two different roles
13      here.  The first role was if I'm a shareholder and
14      wanting to know, I would ask for financial
15      statements.  The second, as the CEO, I would seek
16      expert advice.  I would --
17  Q   Okay.  In neither of those situations would you
18      just like at the EBITDA formula and say that's all
19      I need to know?
20                   MR. CHURCHILL:  Objection.  Calls
21              for expert testimony.
22  A   I don't know.
23  Q   Well, that isn't what you told me you would do in
24      either of those situations; correct?
25  A   For selling the shares, there was an agreed upon

| Page 250 |
|---|

1      shareholder agreement that I also agreed to, that
2      all the shareholders agreed to, so that's that.
3          Now, the fair market value determination
4      would require expertise.  So as the CEO, if I'm
5      going to provide a market valuation of the
6      company, then I would have to use and pay for
7      services from another company who would have
8      expert advice on that front.
9  Q   Okay.  Did you ever ask -- did you ever tell Reed
10      or anyone else that you thought the company was
11      worth a certain amount because the EBITDA formula
12      said so?
13  A   I don't recall.
14  Q   Would you have done that?
15  A   Would I have said to Reed or anyone else that the
16      EBITDA formula was what?
17  Q   Okay.  So just take from me the EBITDA formula
18      that was used for Stacy's buyout had an estimated
19      value of the company at around $6.8 million.
20      Okay?  So her around 20 percent stake was valued
21      at about $1.3 million.  With me so far?
22  A   I understand that to be the formula.
23  Q   Okay.  Would you have told Reed in May 2020 that
24      you thought $6.8 million was an accurate estimate
25      of the fair market value of Widen Enterprises?

| Page 251 |
|---|

1  A   I would have told Reed I don't know what the fair
2      market value of Widen Enterprises is.
3  Q   Okay.  So you would not have told him $6.8 million
4      was an accurate estimate if you didn't know what
5      the fair market value was; right?
6  A   Correct.  I would have told him I don't know.
7  Q   Okay.  In the context of Stacy's buyout, did you
8      do anything to figure out the fair market value of
9      either the company or her shares?
10  A   I wasn't a part of that, so I don't know.
11  Q   Do you know if anyone did anything to try to
12      figure out the fair market value of the company or
13      her shares?
14  A   I don't know.
15  Q   Okay.  Would you have thought -- would you have
16      known that as the CEO of the company, do you
17      think?
18  A   I don't -- I don't know.  That would be -- that
19      would be something Reed would have directed or
20      done.
21  Q   Okay.  And you never heard about it?
22  A   Nope.
23  Q   Okay.  Do you know anything about what Stacy's
24      financial situation was at -- during this time?
25  A   No.

| Page 252 |
|---|

1  Q   Did Reed ever mention that Stacy was in need of
2      cash?
3  A   No.
4  Q   Okay.  He just -- did he tell you why she wanted
5      to sell any shares at all?
6  A   No.
7  Q   Okay.  He just said I want to help Stacy by buying
8      all of her shares?
9                   MR. CHURCHILL:  Objection.
10              Misstates testimony.
11  BY MR. PALAY:
12  Q   Well, what did he say?
13  A   He said he wanted to help.
14  Q   That was it, he just said I want to help?
15  A   Yep.
16  Q   Okay.  He didn't mention shares or Stacy?
17  A   No.
18  Q   He just called you and said I want to help, and
19      you understood that meant buy Stacy's shares?
20  A   I don't know that he called and I don't know
21      exactly the phrasing of it, but it was help his
22      sister was what I knew he was intending to do.
23  Q   Okay.  So how did you ever connect helping Stacy
24      to buying her shares?
25  A   Because that's what I understood Stacy came to the

Page 253

1    organization, to ask for help, to --
2  Q  Okay.  So someone told you that that's what was
3     being discussed?
4  A  Someone told me that, yes, and that would have
5     been Reed or Mike.
6  Q  Okay.  So -- gotcha.  So they -- okay.  When did
7     Reed first express to you in any interest in
8     exploring selling the company?
9  A  When did Reed first express to you interest in
10    selling -- Reed -- Reed came to me in the July,
11    June 2020 time frame and said that in two to
12    five years from that time, which would put it at
13    2022 to 2025, he was looking to move on.  Yes.
14 Q  Did he say what had brought him to that decision?
15 A  No.
16    Did you ask?
17 A  No.  But I had connected with that being his age,
18    that he was -- I knew him to be 60 years old that
19    year, and that that was a reference point for him.
20 Q  And had you ever talked about, you know, what
21    would happen if Reed left the company with Reed
22    before?  Like succession?
23 A  I would ask Reed if you die in a plane crash, what
24    do you want me to do?  And that would have
25    historically, talk to Leanne, which is his wife.

Page 254

1     And then I would pose the what about both of you,
2     and it would be talk to the kids, Jenna and
3     Jessie.  So I had gone through that casual
4     conversation with him.
5  Q  You had talked to Leanne Widen about what she
6     would want if Reed died in a plane crash?
7  A  I did not talk to Leanne.
8  Q  Oh.
9  A  I asked Reed what I should do if something were to
10    happen to him.  He said you would need to at that
11    point in time talk to Leanne.
12 Q  Got it.  Okay.  So as part of selling Widen
13    Enterprises, did the company retain Grant
14    Thornton?
15 A  We used Grant Thornton for a quality of earnings
16    assessment.
17 Q  What is that?
18 A  It's a go through your financial statements line
19    by line.
20 Q  Okay.  And make sure they're all correct?
21 A  And validate.  Yep.  It's a third-party
22    assessment.
23 Q  Yeah.  What does that have to do with selling the
24    Widen Enterprises?
25 A  You would want to make sure that you were

Page 255

1     presenting financials that were verified by a
2     reputable company that's not you.
3  Q  So it's important that Grant Thornton stand behind
4     the accuracy of these financials?
5  A  It's important that Grant Thornton review the
6     financials and, yeah, parse through them and leave
7     their comments and things and that is made
8     available.
9  Q  Important then to give Grant Thornton accurate
10    information when they're doing that assessment?
11 A  Yes.
12 Q  Okay.  Did you participate in giving Grant
13    Thornton that information?
14 A  To a -- to a degree.  Yeah.  Whatever they would
15    have asked for, I would have provided.
16 Q  Okay.  Were you sort of in charge of providing
17    them the information?
18 A  Information was probably coming at them from
19    several sources.
20 Q  Okay.  And did you do anything to make sure the
21    information they got was accurate?
22 A  I didn't verify information.  I was trusting that
23    the information that was going to them was
24    accurate.
25 Q  Do you know of any information that went to them

Page 256

1     that was not accurate?
2  A  I do not.
3  Q  Did you read the quality of earnings report?
4  A  I would have read parts of it.
5  Q  Did you see anything in it that was not accurate?
6  A  I did not.  Or don't recall seeing anything as
7     inaccurate.
8            (Exhibit No. 14 was marked for
9            identification.)
10 Q  Okay.  Do you recognize what's been handed to you
11    as Exhibit 14 as that quality of earnings study we
12    were talking about from Grant Thornton?
13 A  I recognize it's 14 and the cover page that, yeah,
14    represents financial due diligence.
15 Q  Okay.  Is that what the quality of earnings report
16    was called?
17 A  It was -- yeah, it would be referred to as the
18    Q of E, quality of earnings, and what is labeled
19    here financial due diligence.  Yeah.
20 Q  Okay.  Let's go to 4142.  Okay.  So this page is
21    talking about EBITDA adjustments.  And at the top,
22    it says, "This adjustment adds back the total base
23    compensation, bonus, and fringe for the one-owner
24    president founder and executive advisor.  These
25    two current roles are nonessential to business

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 257

1 operations and we understand any duties will be
2 absorbed within the current management structure
3 at no additional cost burden." Is that accurate?
4 I didn't read the parentheticals like you did,
5 but --
6 A  What you read is what is written here.
7 Q  Okay. As far as you understand, is that an
8 accurate statement?
9 A  It's an accurate statement as to the nonessential
10 nature of those roles in the next environment.
11 Q  Well, it says, "Will be absorbed within the
12 current management structure at no additional
13 cost," right?
14 A  Yes.
15 Q  It doesn't reference anything in the future, does
16 it?
17 A  Not in that statement.
18 Q  Okay.
19 A  Well, will be absorbed. It's a future reference.
20 Q  Sure. But by the current management structure?
21 A  By the current management structure.
22 Q  Okay. And this report on the front is dated
23 June 2021; correct?
24 A  Yes.
25 Q  And that was before the sale to Acquia; right?

Page 258

1 A  Correct.
2 Q  So -- and I think we talked about this earlier,
3 but the one-owner president founder is referring
4 to Reed; right?
5 A  Correct. But I do notice that he's -- he wasn't
6 the owner, so that's --
7 Q  Understood. But that person is Reed?
8 A  Correct.
9 Q  Okay. And then the executive advisor, is that
10 Gary Norris?
11 A  Correct.
12 Q  Okay. So accurate to say that as of June 2021,
13 Reed's role was nonessential to business
14 operations?
15 A  Nonessential to business operations in the next
16 life, which may be then absorbed by current
17 management, so.
18 Q  It doesn't say next life, though, does it?
19 A  It does not say next life. No.
20 Q  So is what's written here accurate or not
21 accurate?
22 A  I interpret the statement to be the roles are
23 nonessential to the future business that may
24 acquire us.
25 Q  Where do you derive that interpretation from?

Page 259

1 A  It's from working through the exercise of
2 assembling this.
3 Q  Any reason that Grant Thornton wouldn't put that
4 in there here if that's what it meant?
5         MR. CHURCHILL: Objection. Calls
6    for speculation. Lack of foundation.
7 A  I don't know why. I don't know.
8 Q  Okay. You would agree with me that are, A-R-E, is
9 the present tense of the verb To Be?
10 A  Agree.
11 Q  And it says that these two current roles are
12 nonessential to business operations; correct?
13 A  Yep.
14 Q  Okay. Fair to say that in the present tense, when
15 this was written, Reed's roles were nonessential
16 to business operations?
17         MR. CHURCHILL: Objection.
18    Document speaks for itself. You can answer
19    the question.
20 BY MR. PALAY:
21 Q  I'd take that.
22         MR. CHURCHILL: You can answer the
23    question.
24 A  It says these two current roles are nonessential
25    to business operations. That is what it says.

Page 260

1 Q  Okay. And that is an accurate statement as of
2 this time?
3 A  When I think about this, I think Reed and Gary
4 were -- they were not nonessential.
5 Q  So this is not accurate?
6 A  Well, the way -- I think there's an interpretation
7 here, which is -- which I have interpreted this as
8 which is why the EBITDA adjustment, the adjusted
9 EBITDA line is to represent what is needed in the
10 future, so.
11 Q  Yeah, but it's -- so we've established that it
12 says are and it's -- that's a present tense verb
13 when it says they are nonessential, and then when
14 you go down under the owner president
15 compensation, it goes 2019 and 2020, and those are
16 both in the past?
17 A  Uh-huh.
18 Q  I don't see anything about the future here. Do
19 you?
20 A  There's no future -- well, there's trailing
21 12 months '21, but that would have likely included
22 a current. As I had stated when we talked about
23 EBITDA adjustments before, to look back was to get
24 a look at what that -- what the future owner would
25 have been realizing with the structure that they

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 261

1    would put forth.
2  Q  So you would tell -- you -- Grant Thornton would
3     tell prospective acquirers of the company that
4     they should consider the company's EBITDA in 2019
5     and 2020 not to include Reed's compensation even
6     though Reed's compensation was essential in 2019
7     and 2020?
8  A  They would say you wouldn't include it because the
9     future -- because Reed wouldn't stay around.  So
10    they were saying add back to earnings Reed and
11    Gary because the next business, they're not going
12    to be here.  That's what EBITDA adjustment means
13    and that's what Grant Thornton was representing.
14 Q  Okay.  So Reed's compensation was essential in
15    2019?
16 A  Reed's compensation was essential.
17 Q  Okay.
18 A  Reed was essential.
19 Q  Reed was essential in 2019.  So this $1.5 million
20    that he was paid was an essential cost of the
21    company?
22 A  Yeah.
23 Q  Okay.  And did you ever represent to anyone that
24    that $1.5 million was not an essential cost of the
25    company in 2019?

Page 262

1  A  I don't recall representing that.
2  Q  Okay.  How would it be added back to EBITDA in
3     2019 if it was essential?
4  A  How would it be added back to 2019 if it was
5     essential.
6           MR. CHURCHILL:  Objection.
7        Misleading.
8  A  The -- I think I'm going to repeat what I've said
9     before.  The potential buyers would want to
10    understand the organization the way it would have
11    looked with these add-backs, with some history.
12    So '19 and '20 are sharing with the potential
13    buyers.  This is what the organization would have
14    liked like if you would have owned it back in '19
15    and '20, given these -- these roles that are not
16    going to be a part of the transaction.
17 Q  So -- okay.  Well, let's -- so first of all, it
18    says CEO compensation for 2019 and 2020,
19    145,736,000.  Those are the add-backs for your
20    compensation; right?
21 A  Correct.
22 Q  Okay.  Why is it -- and you said your compensation
23    was about $500,000 in 2019; right?
24 A  Correct.
25 Q  Why isn't it adding back $500,000?

Page 263

1  A  Because my role would have continued in a
2     different capacity in a new buyer, potentially.
3  Q  Okay.  So this is like an alternate universe in
4     the past with different facts that -- but
5     projecting into the future?  I don't understand.
6  A  This is saying that a potential buyer would not
7     incur the same expenses that the current company
8     is incurring because of the -- because of what the
9     buyer would eventually do, and therefore we're
10    going to be able to look at what historical
11    financials would be with those things removed or
12    added back.
13 Q  Okay.  So if Reed's role was essential in 2019,
14    that means that the company would not have done as
15    well if he wasn't there; right?
16 A  If Reed's role was essential in 2019, the company
17    would not have done as well, with the exception of
18    if we would have replaced Reed with advisors or
19    whatever else, like I had --
20 Q  So how can you represent the rest of the 2019
21    financials to a company in which you're saying
22    assume Reed wasn't there, but Reed was needed to
23    create all the rest of the financials?
24 A  Yeah.  Well, if that's what -- that's what a
25    future -- again, a potential buyer would want to

Page 264

1     replay what they're not going to incur backwards
2     so they could get a look at, well, what would
3     have -- what would 2019 have been.
4  Q  Okay.  If you go down to A, it says owner
5     president.  It says, "This adjustment removes the
6     company's owner compensation, base salary, bonus,
7     and fringe during the historical period, but these
8     costs are not expected to continue
9     post-transaction.  We understand the owner is not
10    actively involved in the operations of the
11    company, and any role in the business will be
12    absorbed by current management."  Did I read that
13    right?
14 A  You did.
15 Q  Okay.  So help me understand.  That is saying
16    presently Reed is not actively involved in the
17    operations of the company; right?
18 A  It was saying Grant Thornton understands that.
19 Q  Okay.  And did you tell Grant Thornton that that
20    was not accurate?
21 A  I did not.
22 Q  Okay.  Why not?
23 A  I don't know.
24 Q  Should you have?
25 A  Reading it now, yes.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 265

1  Q   Okay.  If you had to go back, you would tell Grant
2      Thornton can't make that EBITDA adjustment, that's
3      not accurate?
4                MR. CHURCHILL:  Objection.
5            Mischaracterizes testimony.
6  A   The EBITDA adjustment is made because the
7      potential buyer is trying to replicate what would
8      have happened historically without the cost that
9      they would have been able to add back.  So that's
10     what the EBITDA add-back is.
11  Q  Okay.  So Grant Thornton was just misinformed
12     about whether Reed was actively involved in the
13     company?
14  A   Yes.
15  Q  Okay.  Do you know who told them that?
16  A   I don't.
17  Q  Okay.  It wasn't you, though?
18  A   I don't recall.
19  Q  Okay.  So we should just -- we'll have to ask
20     Grant Thornton that?
21  A   I don't know.
22  Q  Who at Grant Thornton was responsible for
23     gathering the information from the company for
24     this?
25  A   I don't recall.

Page 266

1  Q   You don't know who you dealt with at Grant
2      Thornton?
3  A   I don't remember that person's name.
4  Q   Okay.  Why did Reed's compensation between 2019
5      and 2020 change by $500,000?
6  A   That would have likely been a bonus.
7  Q   Because the company was doing better?
8  A   That would have been a combination of company
9      performance and his performance and --
10  Q  So fair to say 2020 was a better year than 2019?
11  A   You have to look across the parameters, the
12     company performance, the individual performance,
13     and the market rate of a chairman.
14  Q  Okay.  So -- but fair to say looking across those
15     parameters, 2020 must have been a better year than
16     2019 because Reed made 25 percent more money?
17  A   2020 was better in one of those parameters or all
18     of them or some combination thereof.
19  Q  The combination; right?
20  A   Yeah.
21  Q  Okay.  So were you -- well, let's scrap that.  Do
22     you have any emails or records that would refresh
23     your recollection on who at Grant Thornton was
24     collecting the information that said that Reed was
25     not actively involved in the operations of the

Page 267

1      company?
2  A   I don't know.
3  Q   And when you say actively involved, what do you
4      mean?
5  A   When I say -- I didn't say actively involved just
6      now.
7  Q   Well, I asked you about actively involved because
8      that's I think the language that the report says.
9      "We understand the owner is not actively involved
10     in the operations of the company."  What do you --
11     and you say he was actively involved?
12  A   Yep.
13  Q   Okay.  So what does that mean?  What did he do?
14  A   What did Reed do?
15  Q   Yeah.
16  A   Well, Reed and I would meet at varying times.
17     Reed would provide guidance for me, mentorship for
18     me on his experience and how that can be helpful
19     for me to run the business.  He'd weigh in on
20     strategic matters.  He would advise on
21     directionally new ventures that we were embarking
22     on.  He would challenge expenses for certain
23     things.  He would manage relationships with the
24     previously mentioned banking, tax.  He would --
25     yeah, historically he would have the most

Page 268

1      significant customer relationships that continued
2      into the current environment, so.
3  Q   What were those significant customer relationships
4      that Reed had?
5  A   One was called Edge Advertising.  That was a
6      customer relationship that he had, and the contact
7      name there was Cheryl Crugland.  And Edge was a --
8      Edge was a significant contributor to the health
9      of the organization, and Reed kept that
10     relationship.
11  Q   One of your biggest customers?
12  A   Absolutely.  Yep.  Reed also kept relations with
13     the -- as an executive with another executive at
14     Reebok for our work with them.  Also another very
15     sizable customer that contributed to our financial
16     success.
17  Q   On the size of customers, where do Edge and Reebok
18     fall?
19  A   I would guess each of those customers was about
20     $2 million each at their peaks.
21  Q   Okay.  And what's, like, Widen's top customer in
22     2019 and 2020 paying?
23  A   The Edge relationship was -- that changed over, so
24     in 2020, that wasn't the same volume that we used
25     to have with them.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 269

1   Q   What was it in 2020?
2   A   I don't recall Edge's revenue in 2020.
3   Q   Not 2 million?
4   A   It was -- no, it was not 2 million.
5   Q   1 million?
6   A   I don't know.
7   Q   Okay.  Why -- so but Reed was -- but sounds like
8       the customer relationship that Reed managed
9       declined?
10  A   The -- well, the main contact for Edge, Cheryl,
11      she had retired in that duration, and Reed was
12      executive sponsor of that particular account.
13  Q   Okay.  Yeah.  So, okay.  So you said you looked at
14      the kind of the rate that a chairman at a similar
15      company would get?
16  A   I would look at --
17  Q   You did that or you would?
18  A   I didn't do that formally.  I would casually
19      understand it just by my general readings of
20      business literature.
21  Q   And did you understand that at a company of
22      similar size to Widen, a chairman would make
23      between 1.5 and $2 million?
24  A   I would say from my understanding, from the
25      general readings that I had when I see these, I

Page 270

1       think, okay.  That's -- that's --
2   Q   Seems normal?
3   A   That's good.  Yeah.
4   Q   About what percentage of a company's market value
5       is it reasonable to pay a chairman?
6               MR. CHURCHILL:  Objection.  Calls
7           for expert testimony.  Lack of foundation.
8   A   I don't know.
9   Q   Okay.  Do you think it's -- do you think
10      30 percent is too high?
11              MR. CHURCHILL:  Same objections.
12  A   I don't know.
13  Q   You don't know?
14  A   I don't know.
15  Q   So you think it might be reasonable for a company
16      to pay its chairman annually 30 percent of its
17      fair market value?
18              MR. CHURCHILL:  Objection.
19          Mischaracterizes testimony.
20  A   Yeah, I don't know.
21  Q   Okay.  How would you figure that out?
22  A   How do I figure out percentage?
23  Q   Yeah.  Like if it's reasonable for a chairman to
24      receive, yeah, 20 or 30 percent of a company's
25      market value annually.

Page 271

1   A   I'd have to find an expert.
2   Q   Okay.  Did you ever do that?
3   A   I did not.
4   Q   Okay.  So what led you to believe that these
5       numbers were reasonable?
6   A   I would read business literature casually and
7       understand when certain wages were posted and
8       shared in various popular business articles, that
9       you would read those and you would think, okay.
10  Q   Like which ones did you compare it to?
11  A   I don't have a specific one, but I would just say
12      generally I could -- I read the popular business
13      literature that's --
14  Q   Okay.  Can you point me to any specific piece of
15      information that led you to believe that the --
16      Reed's 1.5 million in 2019 and 2 million in 2020
17      was a reasonable amount of compensation for what
18      Reed did at the company?
19  A   No.
20  Q   Okay.
21              MR. PALAY:  Do you guys want to
22          take a break?  Probably come back and do the
23          last round.
24              MR. CHURCHILL:  Sure.
25              THE VIDEOGRAPHER:  We're going off

Page 272

1       the record.  The time is 4:55 p.m.  This is
2       the end of media unit number five.
3   (A recess is taken from 4:55 p.m. to 5:16 p.m.)
4               THE VIDEOGRAPHER:  We're going back
5           on the record.  The time is 5:16 p.m.  This
6           is the beginning of media unit number six.
7   BY MR. PALAY:
8   Q   Welcome back, Mr. Gonnering.  I am just getting
9       situated here, if you'll just bear with me for a
10      second.  Okay.  I don't recall what we are talking
11      about before.  If you do, let me know.
12  A   I don't.
13  Q   Yeah, it's been a long day at this point, right.
14  A   It has.
15  Q   Okay.  You said the earlier -- earlier in the
16      deposition that on I think August 24th, 2020, you
17      alerted Reed to a significant transaction in the
18      space.  Can you tell me a little bit about that?
19  A   Yes.  There was a press release issued by -- I
20      don't recall the source, but it would have --
21      represented that a company called Brandfolder was
22      acquired by a company called Smartsheet and that
23      the transaction amount for that was 155 million,
24      which I had to read a lot of times because that
25      was a shocker.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 273

1    So that transaction was significant because
2    Brandfolder was someone who would be in the finals
3    when we would compete for business.  And so to see
4    a company that was in the finals like us for
5    winning digital asset management business share a
6    transaction amount of 155 million was -- was
7    unfathomable.  It was --
8  Q  Good news?
9  A  It was just this is difficult to process that
10   this -- this kind of transaction just took place.
11   So that was the -- yeah.  As I said, the reaction
12   was I'm going to have to read this thing a lot of
13   times because I'm not sure that I am reading it
14   right.
15 Q  Because you didn't think that your company was
16   worth 155 million?
17 A  Not -- no.  That company valuation that they were
18   communicating 155 million was crazy.  It was --
19 Q  What multiple of annual recurring revenue did that
20   transaction price imply for the Brandfolder
21   acquisition?
22 A  What I did in that was I estimated, took guesses
23   on what that revenue might have been, and then
24   applied it against that 155 and then made the
25   assumption of somewhere between seven and eight

Page 274

1    times revenue.
2  Q  Which was much higher than the assumption you'd
3    been using for years of three to five times
4    revenue?
5  A  That was higher than the assumption that I had
6    seen previously from WebDAM as the other most
7    prominent example.
8  Q  That was the 6.5 times one or --
9  A  No.  The WebDAM example was the --
10 Q  Three to five?
11 A  Three to five.
12 Q  Okay.
13 A  Yeah.  They sold to Bynder for three to five.
14 Q  Okay.
15 A  So to see this one and then estimate their revenue
16   and to calculate that at seven to eight was a
17   shock.
18 Q  So at that point you thought Widen Enterprises is
19   a company worth, you know, somewhere around what
20   Brandfolder's worth because they're up here?
21 A  I didn't know what we were worth at that time, but
22   it was something that I had --
23 Q  But you might be, I guess, is --
24 A  Well, I had to communicate it to Reed, that it was
25   so significant that, like, Reed needs to know this

Page 275

1    just happened.
2  Q  Okay.  Why would Reed care about that?
3  A  Again, for market -- what's going on in the
4    market.
5  Q  Okay.  Just like out of curiosity, what impact
6    would that have to Reed?
7  A  What impact would knowledge of that transaction
8    have on Reed?
9  Q  Yeah.  Why --
10           MR. CHURCHILL:  Objection.  Calls
11      for --
12 BY MR. PALAY:
13 Q  Why did he need to know that?
14           MR. CHURCHILL:  Object to the
15      extent it calls for speculation.
16 A  I thought Reed should know about it.
17 Q  Yeah.  How come?
18 A  Because he needs to be informed on what's
19   happening in the market, and this was a
20   significant activity in the market.
21 Q  Did Reed stay apprized of what was happening in
22   the market on his own, or did he just rely on you
23   for that?
24           MR. CHURCHILL:  Objection.  Calls
25      for speculation.

Page 276

1  A  I don't know what Reed relied on outside of what I
2    would provide.
3  Q  Okay.  And when you provided Reed information on
4    the market, was it in the form of these
5    operational updates we've been looking or in other
6    forms?
7  A  That was the dominant form.
8  Q  Okay.  Like how often did you give him an
9    operational update?
10 A  I would guess that to be every other week or every
11   month.
12 Q  Okay.  And then when you put those together, they
13   look -- I mean they're long, thoughtful documents.
14   Did you -- were you, like, reviewing company
15   financial information to make sure it was accurate
16   when you put it in those updates?
17 A  Those updates included financial information from
18   our budgeting and our financial systems.
19 Q  Okay.  So you just look it up on the system or --
20 A  I would like it up as to what is current and then
21   put that into that format.
22 Q  How long do you think it took you to put those
23   operational updates together every other week or
24   every month, whenever you did it?
25 A  I don't know.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 277

1  Q  Was that, like, an important task to you?  It
2     looks to me when I read those like you sat down
3     and, you know, spend a good chunk of time, you
4     know, typing it out, making sure it was made
5     sense, et cetera?
6  A  Yeah.
7  Q  Is that accurate?
8  A  It is accurate.
9  Q  Okay.  Let's look at this.
10                (Exhibit No. 15 was marked for
11        identification.)
12  Q  Okay.  So this is I think the email we were just
13     talking about.  Okay.  Apparent -- you lied, it's
14     August 25th, not August 24th, but we can forgive
15     that.
16  A  Can I make a comment regarding that.
17  Q  Yeah, sure.
18  A  The first line in my email to Reed on August
19     the 25th, a transaction in our industry was
20     announced yesterday.
21  Q  Nice.
22  A  So --
23  Q  Fair.
24  A  So it would have been announced --
25  Q  I misunderstood it as when you -- yeah.  You had

Page 278

1     the date of the transaction in your mind?
2  A  Correct.
3  Q  Got it.  And I was kidding about the lying, by the
4     way.  That was just a -- for the record, that was
5     a joke.
6                MR. CHURCHILL:  Move to strike.
7                MR. PALAY:  Stricken.
8  BY MR. PALAY:
9  Q  So you said --
10               MR. CHURCHILL:  Lawyer jokes, it's
11        late in the day, you just got to let it
12        happen, Matthew.  It's not funny to anybody
13        else but us.  Don't worry.
14               MR. PALAY:  It's not even funny.
15  BY MR. PALAY:
16  Q  You said, "Morning, Reed.  A transaction in our
17     industry was announced yesterday."  August 24th,
18     that was my editorial.  "A publicly-traded company
19     called Smartsheet shared the following in this
20     article," that appears to be linked, smart -- this
21     is quoted, "Smartsheet will pay approximately
22     $155 million for the acquisition subject to
23     certain customary adjustments and indemnification
24     obligations with a combination of cash and stock."
25               And you go on to say to Reed, "Brandfolder

Page 279

1     does not have the same market presence or size.  I
2     would guess they were between 15 to 20 million in
3     annual revenue."  And you said, "Article here
4     shares 12 million in 2017 to 2018 plus growth.  At
5     20 million, that is a 7.75 time -- that is 7.7
6     times -- 7.75 times revenue.  A noteworthy
7     transaction."  Did I read that-ish correctly?  It
8     wasn't perfect.
9  A  Ish.
10  Q  Okay.  Anything worth correcting?
11  A  Not at this time.  No.
12  Q  Okay.  So when you said Brandfolder does not have
13     the same market presence or size, did you mean in
14     comparison to Widen Enterprises?
15  A  I meant in comparison to our market presence, and
16     what I would mean by market presence is
17     reputation.  And my inference on size was size
18     related to my assumption of their revenue.
19  Q  Okay.  And those are compared to -- okay.  And
20     those are comparing Brandfolder as you ascertain
21     them to what you knew to be those things for Widen
22     Enterprises?
23  A  Would I --
24  Q  When you say same, what's -- same as what?
25  A  Yeah, same as -- same as our presence or same as

Page 280

1     our size.
2  Q  Okay.
3  A  That's what I meant.
4  Q  So -- and it says -- Reed says back, "If our
5     number is over 200 million, it's time to look at
6     selling."  And by that, you took Reed to
7     mean selling Widen Enterprises, I'm assuming?
8  A  That's what I would -- yeah, that's what I took
9     that to mean.
10  Q  Okay.  Is that $200 million number something you
11     guys had discussed ever?
12  A  No.
13  Q  Is the 200 million what would be implied for a
14     selling price of Widen Enterprises if it sold at
15     the 7.75 times revenue that you are guesstimating
16     Brandfolder sold at?
17  A  I don't know where Reed got that 200 million.
18  Q  Okay.  But you had already discussed the
19     possibility of a sale at some point in the two to
20     five-year horizon at this point, right, with Reed?
21  A  Reed expressed in July, June that in two to
22     five years, we would look at whatever is next.
23  Q  And you took that to mean selling?
24  A  The possibility of him moving on.
25  Q  Okay.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 281

1  A   Which would be now we've got to figure out what
2      that means.
3  Q   Where did you have this conversation with Reed?
4  A   I recall that conversation with Reed at the Widen
5      building.
6  Q   Okay.
7  A   In Madison.  Or Monona, technically.
8  Q   And did Reed spend part of the year in Arizona?
9  A   I don't know.
10 Q   Okay.  Was there -- were there a period of months
11     during the year where Reed would not come to the
12     Widen Enterprises office?
13 A   I don't know how long he would not come to the
14     office.  I knew that he would go to Arizona.  I
15     don't know how long he would go there.
16 Q   Okay.  Sometimes he'd invite you down there;
17     right?
18 A   I believe he invited me.
19 Q   And was Brandfolder smaller than Widen
20     Enterprises?
21 A   Based on some of the assumptions that I was
22     tracking and understanding, I guessed that
23     Brandfolder was smaller than us.
24 Q   Okay.  And you guessed that Widen -- or I guess I
25     shouldn't say you guess.  You knew that Widen

Page 282

1      Enterprises' market presence was more significant
2      than Brandfolder's?
3  A   I don't know that.  I would have said I feel the
4      Widen brand reputation is stronger than
5      Brandfolder's.
6  Q   Okay.  So by August 25th, you knew Widen was worth
7      more than $7 million?
8  A   By August 20th, I didn't --
9  Q   Of 2020.
10 A   I didn't know what Widen was worth.
11 Q   Okay.  You thought it might have still been worth
12     zero or $7 million at -- on this date when a
13     company of less prominence and what you thought to
14     be lower revenues sold for $155 million?
15 A   Yeah, I didn't know what the value of Widen was at
16     this time because we weren't doing that.
17 Q   What do you mean you weren't doing that?
18 A   We weren't assessing value.  We weren't
19     determining what the value of Widen was at that
20     time.
21 Q   So what did Reed mean when he said if our number
22     is over 200 million, it's time to look at selling?
23 A   That's the first time I would have seen him
24     express, all right, there's a number that Reed
25     has, and he just told me what that number is.

Page 283

1  Q   And he's saying if we can sell the company for
2      over $200 million, it's time to look at doing
3      that?
4  A   That's what I take that to mean.  If our number is
5      over 200 million, it's time to look at selling.
6  Q   Okay.
7  A   And I didn't know what our number was.
8  Q   Sure.  Did -- let's change gears and talk about
9      Stacy for a little bit.  What did you know about
10     Stacy's role at Widen Enterprises and Windy Waters
11     up through her buyout?
12 A   I knew that she was a director of the company.
13 Q   How did you know that?
14 A   I don't know.
15 Q   Okay.  And when you say the company, you mean
16     Windy Waters; correct?
17 A   Correct.
18 Q   Because you knew that she was not a director of
19     Widen Enterprises?
20 A   Correct.
21 Q   Okay.  Did you ever hear of anything Stacy did as
22     a director of Windy Waters?
23 A   I did not.
24 Q   Okay.  Did that strike you as strange for a
25     director never to do anything?

Page 284

1          MR. CHURCHILL:  Objection.
2      Mischaracterizes testimony.
3  A   I wasn't part of the Windy Waters organization, so
4      I didn't have visibility into what her role would
5      or would not have been.
6  Q   Well, you were a shareholder; right?
7  A   I was a shareholder.
8  Q   How many other shareholders were there?
9  A   I don't know the number off hand.  I could try to
10     count them.
11 Q   Okay.  When you say you didn't have visibility
12     into the Windy Waters organization, who had
13     visibility into that organization?
14 A   Well, that would have been Reed.
15 Q   Just Reed?
16          MR. CHURCHILL:  Object.  Calls for
17      speculation.
18 A   Yeah, I don't know who had visibility into the
19     organization.
20 Q   Other than Reed?
21 A   Correct.
22 Q   Okay.
23          (Exhibit No. 16 was marked for
24      identification.)
25 Q   Okay.  So Exhibit 16 looks to be a couple of

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 285

1  emails between you and Michael Kiesler; is that
2  correct?
3 A  Yes.
4 Q  Okay.  The top one's dated May 22nd, 2020; right?
5 A  Uh-huh.
6 Q  And that's I think about a little over a week
7  after Stacy's buyout on May 13th, 2020; does that
8  sound right?
9 A  I rely on the dates that you've just provided.
10 Q  Okay.  And you said to Mike Kiesler, "I looked
11  through what I have for corporate governance
12  documentation, paren, what you previously sent
13  here linked, and have a few questions."  So let's
14  stop there.  What corporate governance
15  documentation did you look at?
16 A  I don't recall what I looked at.
17 Q  Okay.  What corporate governance documentation
18  were you aware of at that time?
19 A  I wasn't aware of anything prior to asking about
20  it.
21 Q  Okay.  And you -- this is corporate governance
22  documentation for Windy Waters and Widen
23  Enterprises?
24 A  Whatever corporate governance documentation that
25  was out there.

Page 286

1 Q  For either of those two companies?
2 A  Correct.
3 Q  Okay.  And you asked, "Do we have bylaws for Widen
4  Enterprises, Inc, or Windy Waters?  The documents
5  I have are historical for engraving and color
6  graphics, and we referenced these when evaluating
7  whether a special board meeting was necessary."
8  So you were not aware of bylaws for Widen
9  Enterprises and/or Windy Waters as of this date?
10 A  I don't believe so.
11 Q  Okay.  And then you said, "Two.  The buyback of
12  Stacy's shares triggers this for me since she has
13  a, quote, director role.  However, I only know she
14  has this role through dialogue with you.  Is there
15  documentation that supports her role as a
16  director?"  Do you see that?
17 A  Yep.
18 Q  Okay.  So you say that you only know that Stacy
19  has a director role through conversations with
20  Michael Kiesler?
21 A  That's what this says.  Yeah.
22 Q  Was that accurate?
23 A  That is what I said at this point in time, so I
24  would take that to be, yeah, that's how I would
25  know she was a director.

Page 287

1 Q  Okay.  So you didn't have any knowledge of her
2  being a director by seeing any actions she'd ever
3  taken or talking to her or anything like that?
4 A  Correct.
5 Q  Okay.  And then I don't think we need to move
6  through this whole thing.  In the next email down,
7  Mike Kiesler responds to you in red, though ours
8  is not red, but looks like he also put it in caps,
9  so.  In point three, you asked him, "In the event
10  such documentation exists for her role and bylaws
11  exist for Widen Enterprises, Inc., and/or Windy
12  Waters, I would like to understand how those
13  bylaws should be used to remove a director."
14  Why did you want to know how to remove a
15  director?
16 A  I knew that she was a director and I knew that she
17  was no longer part of the organization, and that
18  was the reason for my inquiry.
19 Q  Okay.  And Scott says, "I've been communicating
20  with" -- or, excuse me, Mike says, "I've been
21  communicating with Scott regarding this as part of
22  Stacy's share buyout.  The redemption agreement
23  incorporated language to remove her of all duties.
24  I asked Scott to advise as to best approach to
25  protect the piercing of the corporate shield with

Page 288

1  respect to a replacement."  I'll stop there.
2  What did you understand Scott or Mike to mean
3  about protecting against the piercing of the
4  corporate shield?
5 A  I don't understand what Mike meant there.
6 Q  Okay.  Did you ask him?
7 A  I don't recall.
8 Q  Okay.  Did you write him an email asking him?
9 A  I don't recall.
10 Q  Okay.  Going back to that Grant Thornton quality
11  of earnings report we were looking at, and you
12  were saying you didn't think some of the
13  statements in there were accurate.  Do you know
14  who besides you and Reed could have provided Grant
15  Thornton that information?
16 A  Do I know who could have provided Grant Thornton
17  that information.  I do not.
18 Q  Can you think of anyone other than you or Reed who
19  could have told Grant Thornton about Reed's
20  involvement or lack of involvement in the company?
21 A  No.
22 Q  Okay.  Do you think it was you or Reed who told
23  Grant Thornton that?
24 A  I -- I don't think that Grant Thornton was told
25  that, so.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 289

1  Q   You think Grant Thornton just made it up?
2  A   I don't think they made it up, but I -- yeah, I
3      don't -- I don't know where it came from.
4              (Exhibit No. 17 was marked for
5          identification.)
6  Q   So Exhibit 17 is a letter to you from Grant
7      Thornton; is that accurate, dated February 16th of
8      2021?
9  A   A letter and an attachment to the letter.
10 Q   Yeah.  And the letter, it's an engagement letter
11     for advisory services; right?
12 A   Engagement letter for advisory services.  Yes.
13 Q   And on page 2 you signed this; right?
14 A   That is correct.
15 Q   Okay.  And on page 3 at point two, it says
16     Management Responsibilities.  It says, "Grant
17     Thornton assumes no management responsibilities
18     for client."  And client is Widen Enterprises; is
19     that correct?
20 A   Correct.
21 Q   "Accordingly, client agrees to perform all
22     management responsibilities and oversee the
23     services by designating an individual preferably
24     within senior management who possesses suitable
25     skill, knowledge, and experience to evaluate the

Page 290

1      adequacy and results of the services performed and
2      accept responsibility for the results of the
3      services."  Do you see that?
4  A   I do.
5  Q   Okay.  Did Widen Enterprises do that?  Did they
6      assign an individual within senior management to
7      accept responsibility for the results of their
8      services?
9  A   That would have been me.
10 Q   Okay.  So you accept responsibility for the
11     results of the Grant Thornton services?
12 A   I do.
13 Q   Okay.  And the results of those services were that
14     quality of earnings due diligence report we looked
15     at right?
16 A   Correct.
17 Q   So do you accept responsibility for the
18     information that is contained in that report that
19     purports to be information that was provided to
20     Grant Thornton by the company?
21 A   I accept that Grant Thornton assembled their
22     financial due diligence with information that was
23     provided to the best of their ability and that to
24     the best of my ability I reviewed that document
25     and --

Page 291

1  Q   So do you accept responsibility for the results of
2      that providing them of information to Grant
3      Thornton?
4  A   I accept responsibility for providing information
5      to Grant Thornton.
6  Q   Okay.
7  A   Yes.
8  Q   But you disclaim the accuracy of what's in the
9      report now?
10 A   I interpret that differently.  I see that when we
11     talked about that last differently.
12 Q   Okay.  You see it as instead of saying Reed is not
13     actively involved as saying Reed will not be
14     actively involved?
15 A   Correct.  With the potential buyer.
16 Q   Okay.  And do you have any basis in the document
17     for that reading, or is that just something you're
18     bringing to the document?
19 A   That's something that I know was communicated, and
20     that's back to the use of it, which is as part of
21     the add-back to earnings calculation, which is
22     indicating, as add-backs do, what a potential
23     buyer would not incur in expenses.  And we knew
24     certain activities would not continue.
25 Q   So what does the nonessential mean when it says

Page 292

1      Reed's services are not essential?
2              MR. CHURCHILL:  Objection to the
3          extent it calls for speculation.
4  A   I don't know what that means.
5  Q   Yeah, I mean, it says these services are
6      nonessential; right?  It's 4142.  And the top
7      paragraph, it says, "These two current roles,"
8      referring to Reed and Gary, "are nonessential to
9      business operations, and we understand any duties
10     will be absorbed within the current management
11     structure at no additional cost or burden."
12     What -- how can you read that to be referring to a
13     postacquisition period?
14 A   I read it as it relates to the nature of its use
15     as an adjustment, which is what an EBITDA
16     adjustment is.
17 Q   I don't understand.  So when it says these two
18     current roles are nonessential, you read that to
19     mean these two current roles are essential?
20 A   These two current roles are nonessential to the
21     business operations with the potential buyer.
22     Because those roles would not continue into the
23     next state.
24 Q   But there is no buyer today, right, at the time of
25     this document?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 293

1  A   That's correct.
2  Q   So how can they not be essential to a buyer that
3      doesn't exist?
4  A   That's the intent of the EBITDA adjustment, which
5      is to say that the nature of an EBITDA adjustment
6      is that a potential buyer is able to say I will
7      not incur these particular expenses, and therefore
8      I can add them back to earnings and I can look at
9      the historical financials through that same lens.
10 Q   Okay.  So the basis for them not incurring those
11     expenses is that Reed and Gary's roles are
12     nonessential; is that accurate?
13 A   The basis of those are that those roles would not
14     continue into the next phase of the business,
15     whatever the acquirer would be.
16 Q   That's not what this says, though, is it?
17             MR. CHURCHILL:  Objection.  Lack of
18         foundation.  Calls for speculation.
19 BY MR. PALAY:
20 Q   This doesn't say add these back because these two
21     roles won't continue.  It says these two current
22     roles are nonessential.
23             MR. CHURCHILL:  Same objections.
24 A   I don't know what they mean in that statement.
25 Q   But you read that to mean these two current roles

Page 294

1      won't continue?
2  A   These two roles won't continue is what I use as an
3      explanation based on the EBITDA adjustment
4      categorization of this.
5  Q   Okay.  So if you had this to do over again, you
6      would correct this document that Grant Thornton
7      used to do financial due diligence on the company
8      as it was preparing to sell?
9              MR. CHURCHILL:  Objection.  Calls
10         for speculation.  Lack of foundation.
11 A   I don't know what I'd do.
12 Q   Well, would you leave it like this?
13             MR. CHURCHILL:  Same objections.
14 A   I don't know what I'd do.
15 Q   Okay.  Why would you not correct it if it's wrong?
16             MR. CHURCHILL:  Objection.
17         Mischaracterizes testimony.
18 A   I didn't say that I wouldn't correct it.  I said I
19     didn't know what I would correct or how I would
20     correct.
21 Q   Okay.  But you would correct it in some way?
22             MR. CHURCHILL:  Objection.
23         Mischaracterizes testimony.
24 A   I don't know what I would do.
25 Q   Okay.  Would you do nothing?

Page 295

1  A   I don't know what I'd do.
2  Q   Okay.  But you feel that this is accurate or not
3      accurate?
4  A   Reed and Gary were essential to business
5      operations.
6  Q   When did they stop being essential?
7  A   They --
8              MR. CHURCHILL:  Objection.
9          Ambiguous.  You can answer.
10 A   When did they stop being essential.
11 Q   Because they're not there right now; right?
12 A   Right.  Which is where I'm thinking if they're not
13     essential because they opted out of the business.
14     They weren't a part of the next phase of the
15     business.  They weren't included in the next --
16 Q   They're not essential because they're not there?
17             MR. CHURCHILL:  Same objections.
18 A   Repeat for me, please, or restate?
19 Q   I don't understand -- can you -- I don't
20     understand your testimony.  When did Reed and --
21     Reed and Gary are not involved in the business
22     now; right?
23 A   Correct.
24 Q   And the business is functioning?
25 A   Correct.

Page 296

1  Q   Okay.  It's functioning without Reed and Gary?
2  A   It's functioning without Reed and Gary, and they
3      became nonessential when the new organization, the
4      new owners took over because those roles and
5      duties were provided through other roles that
6      already existed within Acquia.
7  Q   Okay.  But they were essential at the time this
8      document was written?
9  A   They were essential to the business at the time of
10     this document.
11 Q   Okay.  So you -- and they were essential because
12     Reed provided you with a lot of guidance and had
13     some customer relationships and was a mentor, and
14     what else did he do?
15 A   Yeah.  Reed -- yeah, Reed provided me with
16     mentorship and guidance and direction.
17     Strategically he would weigh in on directional
18     matters such as additional products or he would
19     weigh in on the --
20 Q   What's, like, an additional product that Reed
21     thought of?
22 A   He would participate in what additional products
23     that were being ideated.  So one example of that
24     was a product information management system that
25     we were exploring in 2018/2019, in that time

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 297

```
 1      period.
 2  Q   Okay.  He weighed in on that?
 3  A   He would weigh in on that.
 4  Q   Okay.  And his weigh-in was really important?
 5  A   Yeah.
 6  Q   What did he say?
 7  A   I don't recall exactly what he said.
 8  Q   It was essential, but you don't recall what he
 9      said?
10  A   It was part of the guidance that he provided.
11  Q   Okay.  What was the guidance?
12  A   I don't recall the guidance.
13  Q   But you know it was really important?
14  A   Yeah.
15  Q   Worth like 1.5 to $2 million a year?
16                MR. CHURCHILL:  Objection.
17            Argumentative.
18  A   It wasn't just that.  The strategy was one part of
19      it.  The other parts of it were, again, the
20      mentorship, the guidance that he provided, so he
21      would apply his years of experience to help mentor
22      me, to guide me.
23  Q   Like, can you give me an example of that?
24  A   Yeah.  And he would ask questions about employees,
25      so he would say -- he would check in, how are
```

Page 298

```
 1      so-and-so doing or how is this person doing.
 2  Q   How is that essential?
 3  A   Taking care of the health of the organization
 4      through the people.
 5  Q   By asking questions about them?
 6  A   Yeah.
 7  Q   Okay.  Did -- and what did he do when you told him
 8      the information?
 9  A   He'd ask more questions.
10  Q   Okay.  And that was -- okay.
11  A   And I would say in addition, there was -- I had
12      shared the relationships that he had with banking
13      and with tax.  Had already shared the customer
14      relationships.
15  Q   What benefits did you get from the relationships
16      he had with banks and tax that were essential?
17  A   Generally speaking, a bank is essential to a
18      business for banking reasons.
19  Q   Would you not have been able to use a bank without
20      Reed?
21  A   We would have had a relationship with a bank
22      without Reed, but that was a relationship that
23      Reed had made sure that we had.
24  Q   Okay.  But if Reed wasn't there, would you have
25      not been -- had a bank to use or --
```

Page 299

```
 1  A   We would have -- we would have used a bank.
 2  Q   Okay.  So that can't be essential; right?
 3                MR. CHURCHILL:  Objection.
 4            Ambiguous.  Misleading.
 5  A   It wasn't just that Reed was providing the
 6      relationship to the bank, it was the -- it was the
 7      dynamics in that relationship, the --
 8  Q   Like what did that benefit the company?
 9  A   The right questions to ask, the right
10      negotiations, the right positioning, the right
11      opportunities to network, the right introductions.
12  Q   Fair to say these are pretty intangible benefits?
13                MR. CHURCHILL:  Objection.
14            Ambiguous.
15  BY MR. PALAY:
16  Q   Or can you quantify them in any way?
17  A   Can I quantify those?
18  Q   Or are they sort of intangible?
19  A   I'm trying to think of how to quantify a
20      relationship.
21  Q   Can you quantify anything about Reed's value added
22      to the company, let's go with 2019 and 2020, the
23      years the report are about?
24  A   Can I quantify anything about that.  I think about
25      the -- well, the customer.  Customer -- the
```

Page 300

```
 1      customers that he -- we could even start before
 2      that.  The software doesn't exist without Reed.
 3      So back in the mid '90s when Reed said we are
 4      going to -- or declared however he did that that
 5      we're going to diversify from prepress, there was
 6      the photography services, there was the printing
 7      services, and then there was this image database,
 8      and so that was the reason why we went down this
 9      path.
10  Q   Sure.  But that happened in the '90s.  You know,
11      that wasn't in 2019; right?
12  A   2019 doesn't exist without that decision and
13      that --
14  Q   So why don't you keep paying Reed today?
15  A   The eventual buyer, Acquia, I don't know what
16      decision they would have made about Reed.  But
17      Reed is --
18  Q   Well, if Reed's 2019 annual compensation is based
19      on something he did in the '90s, shouldn't he get
20      that compensation today?
21                MR. CHURCHILL:  Objection.
22            Mischaracterizes testimony.
23  A   Yeah, I didn't say that that was the reason for
24      his compensation.
25  Q   Oh, okay.  I misunderstood.  Why are we talking
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 301

1      about the '90s?
2 A  I was going back to you were asking for a
3      quantifiable thing.
4 Q  That he did like in 2019?
5 A  That he did.  Well, the history is also relevant
6      because, again, we wouldn't have existed in this
7      capacity without his leadership then.
8           And the customer relationships that were
9      established and continued for several decades were
10      also quantifiable through revenue.  And there are
11      quantifiable things that would exist in employee
12      surveys as it relates to satisfaction and
13      engagement that are part of his -- part of how he
14      wanted the business to be run.
15 Q  And the employees, they -- in the surveys, they
16      reflected that the employees really valued Reed?
17 A  This would have been the output of his mentorship
18      of me, which is if we want to try to quantify
19      would that might be, Reed was a very
20      people-centered person, and that was mentorship
21      that I valued.
22           And I learned what I learned from Reed, and
23      when I led the organization, I led it through his
24      mentorship and guidance, and that would be
25      reflected in employee satisfaction and engagement

Page 302

1      surveys.  If we want to quantify that, we did
2      quantify those things.
3 Q  Were Reed's services to the company in 2019 more
4      important than yours?
5 A  Were Reed's services in 2019 more important than
6      mine?  I don't know that.
7 Q  Well, why did Reed make so much more than you?
8 A  Reed was the chairman, and the chairman has a
9      market rate that chairmans make and --
10 Q  But you said you never looked into what the market
11      rate would be because you didn't even know what
12      the size -- you know how valuable the company was
13      or how to compare it or anything?
14 A  I said I casually look at business literature in
15      reading of popular business publications, which is
16      where I would have gleaned this is.
17 Q  Can you tell me anything you read that suggested
18      that Reed's compensation as chairman was
19      reasonable?
20 A  No.
21 Q  So we talked a lot about, you know, how we got
22      here.  We talked about Stacy's redemption, and
23      your intention was to help Stacy; is that correct?
24 A  Reed's intention was to help Stacy.
25 Q  Okay.  What was your intention?  Was to do

Page 303

1      whatever Reed wanted?
2 A  To fulfill what Reed wanted.
3 Q  Okay.  And you understood what Reed wanted was to
4      buy all of Stacy's shares?
5           MR. CHURCHILL:  Objection.
6      Misstates testimony.
7 BY MR. PALAY:
8 Q  Well, that's what happened; right?
9 A  Can you restate it?
10 Q  Okay.  Your intention was to do whatever Reed
11      wanted; is that accurate?
12 A  I -- yeah.  I reported to Reed, so yes, Reed
13      directs and I act.
14 Q  Okay.  And the company did buy all of Stacy's
15      shares; correct?
16 A  The company, yeah, the company bought Reed's --
17      Stacy's shares.  Yes.
18 Q  So is it fair to say that what Reed wanted was to
19      buy all of Stacy's shares?
20 A  That was the -- that was the end result, so I
21      don't know what Reed wanted.
22 Q  Did anyone try to -- did anyone want to buy
23      Stacy's shares other than Reed that you know of?
24 A  I don't know.
25 Q  Okay.  And you said you didn't believe that the

Page 304

1      company had any obligation to give Stacy any
2      information she didn't ask for; is that accurate?
3 A  I said that any information that she would have
4      requested would have been provided.
5 Q  Okay.  So do you think the company had any
6      obligation to provide Stacy information that she
7      didn't ask for?
8 A  I don't know what those obligations would have
9      been.
10 Q  Okay.  Sitting here today, you know, the end of
11      this long deposition and this lawsuit, is there
12      anything that going back to May of 2020 you would
13      do differently?
14 A  Anything going back to May of 2020 that I would do
15      differently.  No.
16 Q  Knowing what you know today, you would still help
17      buy Stacy's stock at the price that it was
18      purchased for?
19 A  Stacy asked and Reed wanted to help.  And that
20      agreement was the agreement that all shareholders
21      had agreed to with the weighted EBITDA formula,
22      and so it was consistent and what was used.
23 Q  Okay.  And that that makes it -- that makes it
24      right?
25 A  That makes it the agreement.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 305

1 Q   Okay.  So it's because Stacy agreed that she had
2     to be bought at this particular amount?
3 A   Like me, I agreed to that.
4 Q   Okay.  Would it change anything if Stacy had not
5     agreed to be bought out at that amount in the
6     shareholder agreement?
7 A   If she didn't sell, that would have been --
8 Q   No, no.  I'm just saying under the shareholder
9     agreement, if Stacy had not agreed to the use of
10    the EBITDA formula for her redemption, would that
11    change whether you would do anything differently
12    about using that formula to buy her out?
13 A   I don't know what I would have done.
14 Q   Well, I'm asking you today, you know, knowing what
15    you know today.
16 A   I don't know what I'd have done.
17 Q   You can't answer that question?
18 A   Just don't know what I would have done.
19 Q   Okay.  Is there any information that you could
20    review or learn that would allow you to answer
21    that question?
22 A   Can we revisit the question again, reframe that.
23 Q   Yeah.  Knowing what you know today, if the -- if
24    Stacy had not agreed to the use of the EBITDA
25    formula for the purchase of her shares in the

Page 306

1     shareholder agreement, is there anything that you
2     would have done differently?
3 A   So in this case, Stacy -- Stacy would have said
4     no, I don't want follow at that?
5 Q   Or just she never agreed to it in the first place
6     is more what I was thinking.
7 A   Then it would have been fine.
8 Q   Okay.  So would you have done anything differently
9     then?
10 A   Well, she wouldn't have sold her shares then.
11 Q   Oh, okay.  I was talking about under the
12    agreement.  I guess let's just say it this way.
13    Do you think it's fair that Stacy got $1.3 million
14    for 20 percent of the company in May 2020?
15 A   I think that what she sold for was consistent with
16    the agreements that all shareholders agreed to.
17 Q   Yeah.  That's not what I asked, though.  Do you
18    think it's fair?
19 A   Can you tell me what fair is?
20 Q   Well, why don't you tell me.  Do you have any clue
21    what fair means?
22 A   I think of fair as something provided that is --
23    that is owed to you.
24 Q   Yeah.  So do you think $1.3 million is all that
25    was owed to Stacy?

Page 307

1 A   I think what was owed to Stacy was agreed upon by
2     Stacy and by other shareholders and it was
3     consistent.
4 Q   When you say agreed upon, when do you -- what are
5     you talked about?
6 A   I'm saying that like my agreement, I had to agree
7     to the formula, and I did.  And that -- that
8     formula was something that Stacy agreed to.
9 Q   So doesn't the formula say if the company gets
10    sold within three years of a buyback using the
11    formula, that the shareholder gets 66 percent of
12    what they would have gotten had they been a
13    shareholder during the buyback -- during the sale
14    of the company?
15 A   I don't know that.
16 Q   You're relying on -- you keep telling me about
17    this formula, but have you ever -- have you read
18    it?
19 A   I read mine.
20 Q   Well, isn't it one agreement?  Isn't that the
21    point of a shareholder agreement?  You don't have,
22    like, your own individual version; right?
23 A   I didn't think so, but I don't know.
24 Q   Okay.  So does yours say that?
25 A   I don't know.

Page 308

1 Q   Okay.  If that's what the EBITDA formula says in
2     the shareholder agreement, is that something that
3     Stacy should have gotten?
4 A   If that's something that the EBITDA formula says
5     in the shareholder agreement, then --
6 Q   If that's something that the shareholder agreement
7     in the part where it lists the -- where it
8     provides the EBITDA formula, if it says that a
9     shareholder redeemed using this formula is
10    entitled to 66 percent of what they would have
11    received had they been a shareholder at the time
12    of a sale of this company within three years of
13    their redemption using this formula, is that
14    something that Stacy should get?
15 A   I don't know.  I don't -- I don't know the
16    language that you're talking about there.
17 Q   Okay.  We can be done.
18        THE VIDEOGRAPHER:  Anything from
19    you guys?
20        MR. CHURCHILL:  No.
21        THE VIDEOGRAPHER:  We're going off
22    the record.  The time is 6:06 p.m.  This is
23    the end of today's video-recorded testimony.
24    Our number of media units used today is six.
25        (Adjourning at 6:06 p.m.)

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Matthew R. Gonnering**

Page 309

```
 1   STATE OF WISCONSIN )
                        ) ss.
 2   COUNTY OF DANE     )

 3

 4        I, Kaila M. Macek, RMR, CRR, a Notary Public in
 5   and for the State of Wisconsin, do hereby certify
 6   that the foregoing deposition of MATTHEW R. GONNERING
 7   was taken before me on September 21, 2023, and
 8   reduced to writing by me, a professional court
 9   reporter and disinterested person, approved by all
10   parties in interest and thereafter converted to
11   typewriting using computer-aided transcription.
12        I further certify that I am not related to nor
13   an employee of counsel or any of the parties to the
14   action, nor am I in any way financially interested in
15   the outcome of this case.
16        IN WITNESS WHEREOF, I have hereunto set my hand
17   and affixed my notarial seal of office at Madison,
18   Wisconsin, this 24th day of September 2023.
19
20        _____
                    Notary Public, State of Wisconsin
21                  My Commission Expires 1/14/2027
22
23
24
25
```