**In The Matter Of:**

*Stacy L. Randall v*

*Reed C. Widen, et al.*

DUPLICATE ORIGINAL

---

*Stacy L. Randall*

*August 28, 2023*

*Confidential*

---

*Colleen Reed Reporting LLC*

*P.O. Box 293*

*Milwaukee, Wisconsin 53201*

*www.colleenreed.com*

Original File 082823StacyRandallF.txt

**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

-----------------------------------------------------

STACY L. RANDALL,

Plaintiff,

-vs- CIVIL ACTION NO. 22-CV-400

REED C. WIDEN, MICHAEL KIESLER, WIDEN ENTERPRISES, LLC, and WINDY WATERS, INC.,

Defendants.

-----------------------------------------------------

CONFIDENTIAL - VIDEO DEPOSITION OF: STACY L. RANDALL

DATE: August 28, 2023

TIME: 9:21 a.m. to 7:02 p.m.

LOCATION: Reinhart Boerner Van Deuren, S.C.
22 East Mifflin Street, Suite 700
Suite 700
Madison, Wisconsin 53703

REPORTED BY: Ali J. Kornburger

A P P E A R A N C E S

REINHART BOERNER VAN DEUREN, S.C., by
JESSICA HUTSON POLAKOWSKI, ATTORNEY AT LAW
MARK A. CAMELI, ATTORNEY AT LAW
DAVID G. PALAY, ATTORNEY AT LAW
22 East Mifflin Street, Suite 700
Madison, Wisconsin 53703
jpolakowski@reinhartlaw.com
mcameli@reinhartlaw.com
dpalay@reinhartlaw.com
appeared on behalf of the Plaintiff.

HOLLAND & KNIGHT, LLP, by
MARK H. CHURCHILL, ATTORNEY AT LAW
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
mark.churchill@hklaw.com
appeared on behalf of the Defendants.

HOLLAND & KNIGHT, LLP, by
SARAH MORAIN, ATTORNEY AT LAW
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
sarah.morain@hklaw.com
appeared via telephone on behalf of the Defendants.

O'NEIL, CANNON, HOLLMAN, DEJONG & LAING, S.C., by
CHRISTA D. WITTENBERG, ATTORNEY AT LAW
Bank One Plaza, Suite 1400
111 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-4870
christa.wittenberg@wilaw.com
appeared on behalf of the Defendants.

ALSO PRESENT:

Mark Lyle, Videographer

# I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Churchill | 6 |

| EXHIBITS: | | MARKED |
|---|---|---|
| Exhibit 1 - | Notice of Deposition of Plaintiff Stacy L. Randall | 7 |
| Exhibit 2 - | Complaint | 8 |
| Exhibit 3 - | Plaintiff Stacy L. Randall's Objections and Responses to Defendant's First Requests for Production of Documents | 30 |
| Exhibit 4 - | Shareholder Agreement of Widen Colourgraphics, LTD | 40 |
| Exhibit 5 - | Amendment of Shareholder Agreement of Widen Colourgraphics, LTD, Effective 9/12/2001 | 55 |
| Exhibit 6 - | Second Amendment to Shareholder Agreement | 77 |
| Exhibit 7 - | Restated Stock Transfer Agreement | 105 |
| Exhibit 8 - | Plaintiff Stacy L. Randall's Objections and Responses to Defendant's First Set of Interrogatories | 110 |
| Exhibit 9 - | December 2019 string of text messages | 131 |
| Exhibit 10 - | Screenshot of text messages with Reed Widen | 135 |
| Exhibit 11 - | 2005 Stock Redemption Agreement | 162 |
| Exhibit 12 - | 2007 Stock Redemption Agreement | 175 |
| Exhibit 13 - | 2011 Stock Redemption Agreement | 187 |
| Exhibit 14 - | 2017 Stock Redemption Agreement | 203 |
| Exhibit 15 - | 2019 Stock Redemption Agreement | 212 |
| Exhibit 16 - | Joint Petition for Divorce | 218 |
| Exhibit 17 - | 4/3/19 letter Amy T. Collins to Stacy L. Randall | 220 |
| Exhibit 18 - | Notice of Motion and Motion to Modify Temporary Order | 227 |
| Exhibit 19 - | Notice of Hearing | 239 |
| Exhibit 20 - | Amended Temporary Order | 242 |
| Exhibit 21 - | Text exchange Windy47391 to 47392 | 245 |
| Exhibit 22 - | Text message From Stacy Randall to Mark Goff | 279 |
| Exhibit 23 - | Text message from Stacy Randall to | 280 |

Exhibit 24 - Text message from Stacy Randall to Mark Goff 284
Exhibit 25 - Text message from Stacy Randall to Mark Goff 285
Exhibit 26 - Email chain Scott Spangler 298
Exhibit 27 - Widen Financial Statements Consolidated December 31, 2019 301
Exhibit 28 - Text message from Stacy Randall to Justin Randall 313
Exhibit 29 - May 13, 2020, Stock Redemption Agreement 316
Exhibit 30 - Text message from Stacy Randall to Mike Kiesler 323
Exhibit 31 - Text message from Stacy Randall to Mike Kiesler 325

(Original transcript supplied to Attorney Christa D. Wittenberg)
(Originals of Exhibits 1 through 31 are attached to the original transcript. Scanned copies were provided to all counsel)

TRANSCRIPT OF PROCEEDINGS

(Exhibit No. 1 was marked.)

THE VIDEOGRAPHER: Good morning. We're going on the record. The time is 9:21 a.m. The date is August 28th, 2023. This is media unit number 1 of the video recorded deposition of Stacy Randall taken by counsel for the defendants in the matter of Stacy Randall versus Reed Widen, et al.

The case is filed in the U.S. District Court for the Western District of Wisconsin, case number 322CV00400JDP. Today we are at the offices of Reinhart Boerner Van Deuren, 22 East Mifflin in Madison, Wisconsin.

My name is Mark Lyle. I'm today's videographer with Ryker and Lyle Legal Video Service, and our court reporter is Ali Kornburger who is here on behalf of Colleen Reed Reporting.

First we will have counsel introduce themselves and state whom they represent after which the court reporter will swear in the witness. We will begin with the noticing attorney.

MR. CHURCHILL: This is Mark Churchill with Holland & Knight, and I represent the defendants Reed Widen, Michael Kiesler, Widen Enterprises, LLC, and Windy Waters, Inc., and on the phone with me from

my firm Holland & Knight as well as Sarah Morain.

MS. WITTENBERG: And Christa Wittenberg from O'Neil Cannon on behalf of the defendants as well.

MS. POLAKOWSKI: Good morning. Jess Polakowski appearing on behalf of Stacy Randall. Also with me is Mark Cameli and David Palay.

STACY L. RANDALL, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. CHURCHILL:

Q Would you please state and spell your name for the record?

A Stacy, S-T-A-C-Y, Randall, R-A-N-D-A-L-L.

Q And you are the same Stacy Randall that has filed the lawsuit for which we're having your deposition today, correct?

A Correct.

Q And your maiden name was Widen; is that correct?

A That's right.

Q And you are the sister of one of the defendants, Reed Widen?

A Yes.

Q Ms. Randall, what is your date of birth?

A 9/13/57.
Q And this is a standard question when we take depositions, is there anything medically or medication-wise that might cause you to not be able to give your full and honest testimony today?
A No, there's not.
Q Are you aware that other depositions have been taken in this case?
A I am.
Q And have you read any of those deposition transcripts?
A I have not.
Q Ms. Randall, I have handed you what's been marked for identification as defendant's Exhibit 1 to your deposition. It states that it's a Notice of Deposition of Plaintiff Stacy L. Randall. Have you seen this document before?
A I don't believe so.
Q Have you seen the Complaint in this case before?
A Yes, I have.
Q You can put that to the side. So on occasion today there may be documents that I show you for purposes of asking you questions that will have this caption that was on the top there. And so

when we do go over questions like that, that should be an indication it's a filing or document in this case. Have you been deposed before?

A Never.

Q Okay.

(Exhibit No. 2 was marked.)

BY MR. CHURCHILL:

Q We just mentioned the Complaint. I have just handed you now what's been marked for identification as Exhibit 2 to your deposition. It does state that it's the Complaint at the top. You can flip through that if you would like. I just want to know whether or not you recognize the document.

And I will say, Ms. Randall, that there are exhibits that were attached to that document that I have taken off for brevity sake, so the exhibits are missing, but that should be a complete copy, otherwise, of the Complaint you filed in this case.

A Yes. I have seen this. I recognize it.

Q When was the last time you think you reviewed it?

A Last night.

Q You said that you had not been deposed before, correct?
A Correct.
Q Have you ever been a witness in a case, in a legal case?
A No, I have not.
Q Have you ever testified in any way?
A No, I have not.
Q It probably makes sense, although I'm sure that you have been prepared by your counsel for me to explain a little bit the rules of the road because this is -- although it's kind of informal, it's also a formal process. So let's go over a little bit of how I hope today can proceed.
A Okay.
Q As you can tell we have a court reporter here. She's taking down everything that I say and everything that everybody else says including you.
A Okay.
Q And it's also being videotaped, and so that will ultimately help the court reporter if you and I have issues, but I can already tell you're doing a great job of waiting until I'm finished

talking to speak. That's going to be important because what we do need to be able to do is understand what we did today. And so if I'm speaking if you could wait until I finish my question, and then when you're speaking I will wait until you finish your answer. Does that makes sense?
A That sounds good.
Q And it also is important, that you're already doing, is to make sure you give a verbal response.
A Right.
Q So there may be occasions that you do a "mm-hmm" or something like that, and so I might ask you what that meant, and I don't mean to be rude.
A I understand.
Q You understand also that you're testifying under oath, correct?
A Yes, I do.
Q There may be times frankly that you don't understand one of my questions, and if that's the case, feel free to just tell me you don't understand, and I will try to rephrase it or restate it; is that fair?
A That sounds good.

Q And if you do answer one of my questions, I'm going to understand that you understood my question. Is that also fair?
A Yes.
Q During the course of the day I do think we will be here for a while, so we will want to take some breaks. If you need a break for any reason, please just ask and that will be totally fine. If I have a question that's pending and I'm expecting an answer, unless you have a medical emergency, I would ask that you try to finish the question and then we can break and different people need different amounts of time. So I certainly am sympathetic to when you will need a break.
A Okay.
Q Your attorney may also have explained the process of objections to questions, and the way that works is if I ask a question that your counsel finds objectionable based on an evidentiary rule, she's going to state her objection. And, again, that's a process where you have to let her do that, and I will respect her right to do that. Her objection may or may not make me rephrase my question, but unless

your counsel instructs you not to answer at all, I'm entitled to an answer to my question. Does that make sense?
A Yes.
Q Do you have any questions?
A No, I don't.
Q Let's talk a little bit about your preparation for today. Specifically with respect to the deposition, what did you do to prepare for today's deposition?
A Well, like I said, I reviewed the Complaint last night. I got together with my attorneys three times here at the office.
Q Let's start with you reviewing the Complaint. Did you just do that on your own?
A It was kind of a mutual thing.
Q Why did you review the Complaint? Were there certain parts that you were interested in reviewing?
A There were certain parts that I just didn't remember.
Q And when you say you don't remember, do you mean you don't remember the Complaint, or you don't remember what's stated in the Complaint?
A Well, it's been so long. Yes, I definitely

remember the Complaint. I just didn't remember some of the exact dates and hopefully that will help me today. Maybe it won't. Maybe I still won't remember.
Q Understood. You said that you met on three different occasions?
A Yes.
Q When you met with counsel, did you meet with anybody other than counsel, meaning persons other than attorneys?
A No.
Q With respect to your deposition today, have you discussed that topic with anyone other than counsel?
A My son.
Q And is that your son Justin?
A Yes.
Q Do you have any other children?
A Yes.
Q Did you discuss the deposition with anyone other than Justin?
A No.
Q And what did you talk with Justin about?
A Well, actually he came to several of the meetings when we were -- when we were bringing

the Complaint -- writing the Complaint up. He helped me remember things and -- so he pretty much has been in the know all along.
Q And with respect to today's deposition, what did you talk with Justin about?
A I just asked him to think of me on Tuesday.
Q Did you talk with him this morning?
A No.
Q How old is Justin?
A He's 42.
Q My dad forgot my birthday almost every year. No judgment.
A It's the mom's job.
Q Are there particular parts of your Complaint that Justin is helping you remember? You indicated that he helped you a little bit with respect to remembering some facts. Are there particular portions of the Complaint that he's helping you remember?
MS. POLAKOWSKI: I'm going to lodge an objection here and just caution you not to reveal the contents of things we have talked about with you -- we attorneys.
THE WITNESS: Can you repeat the question, please?

MR. CHURCHILL: Sure. Could you read it back?

(Last question read back.)

THE WITNESS: No.

BY MR. CHURCHILL:

Q And I think we will talk about Justin later today. So we can come back to that as well.

Who is Steven Randall, that's your ex-husband?

A My ex-husband.

Q Have you spoken with Steven Randall about your deposition today?

A No.

Q Does he know you're being deposed?

A No.

Q When is the last time you spoke with your ex-husband about this case?

A Never.

Q You have never spoken with your ex-husband about this case?

A Never.

Q Does he know that you filed the lawsuit?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I'm not sure.

BY MR. CHURCHILL:

Q You had a divorce proceeding with Mr. Randall, correct?
A Yes.
Q This lawsuit never came up in your divorce proceeding?
A No.
Q Didn't you have to disclose in your divorce proceeding that you had payments with respect to the May 2020 redemption agreement?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: Can you repeat the question? I'm sorry.
MR. CHURCHILL: Sure. Could you read that back?
(Last question read back.)
THE WITNESS: Yes, I did.
BY MR. CHURCHILL:
Q But the topic of the fact that there is a lawsuit regarding those payments has never come up with Mr. Randall?
A I'm sorry. Yes, it has.
Q Okay. And in what way has it come up?
A Well, with the payments. My -- because then I had to pay him $4,000 a month once I started

getting them.
Q But if I understand your testimony correctly, you're saying that you have not discussed the lawsuit -- this lawsuit itself with your ex-husband?
A He vaguely knows what it's about. He does not know details. I have not told him details.
Q Has he discussed at all with you the amount of money that you are seeking potentially under the damages portion of your lawsuit?
A No.
Q Have you discussed that part of your Complaint with Justin?
A Yes.
Q And what have you discussed with Justin about the damages alleged in your Complaint?

MS. POLAKOWSKI: Again, I will caution you not to reveal the contents of discussions that we have had.

MR. CHURCHILL: I just want to know what you've talked with Justin about only, not anything about what counsel has told you.

THE WITNESS: Justin pretty much knows everything, and he's the one that suggested I get some lawyers.

BY MR. CHURCHILL:
Q And when you say that specifically, you're talking about back in 2021?
MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony.
BY MR. CHURCHILL:
Q When you say that he suggested that you get lawyers, you're talking about back in September of 2021?
A Yeah. I'm talking about May of 2020.
Q Okay. You're talking about when you were going to enter the -- or when you were considering entering the redemption agreement back in May of 2020?
MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony.
THE WITNESS: Yes.
BY MR. CHURCHILL:
Q Do you understand my question?
A Will you repeat?
Q So you mentioned that Justin was the one that recommended you get an attorney?
A Mm-hmm.
Q That's a "yes"?
A Yes.

Q And the time period that you're talking about where he made that suggestion was May of 2020?
A Before my redemption he wanted me to -- he suggested that I get somebody to look at the financial records of Widens.
Q And did Justin make any recommendations with respect to getting a lawyer for purposes of this lawsuit?
A Yes.
Q And when did he make that recommendation if you remember?
A Sometime after -- or before the sale of the company.
Q Was it after you had a conversation with your brother Reed about the fact that Widen Enterprises was going to be acquired?
A Yes.
Q We will get back to some of those details too. I'm going to try, if I can, during the course of the deposition to somewhat go chronologically because I think that will help you -- potentially help you remember things.
A Thank you.
Q Ms. Randall, are you currently employed?
A No, I am not.

Q And when was the last time that you were employed?
A I was briefly employed in 2000 and part of 2001.
Q And who was your employer then?
A Widen Enterprises.
Q And what were you doing in 2000 and 2001 for Widen Enterprises?
A I was a receptionist.
Q And was it that one job during that whole time 2000 to 2001?
A Yes. I believe my mother passed away in January of '01. So I didn't work for very long in '01.
Q And were you a receptionist at the main company location?
A Yes, I was.
Q Which is located where?
A Mangrove Lane.
Q Other than that job that ended in 2001 as a receptionist, have you had any other sources of income since that time?
A No.
Q Do you have any bank accounts?
A Yes.
Q With who?
A Associated Bank, Summit Credit Union, and Lake

Ridge Bank.
Q And is Associated Bank your checking account?
A I have a checking account there, yes.
Q Any other accounts there?
A Savings.
Q Any others?
A No.
Q And what is the account that you have at Summit Credit Union?
A I also have a savings and a checking.
Q And what was the third institution?
A Lake Ridge.
Q And what accounts do you have there?
A Checking and savings.
Q I have multiple banks too, but I'm interested in knowing why you have multiple banks with multiple accounts?
A Because my father always told me, don't put all your eggs in one basket.
Q Any other institutions that you have accounts?
A Yes.
Q Okay. What are those?
A I have an account at Raymond James.
Q Is that a financial advisor?
A Yes.

Q And what type of account is that?
A I have a savings account. I don't think it's called a savings account, but it's pretty much a savings account with higher interest, and I have a few stocks.
Q Do you have any certificates of deposit, CDs?
A No, I do not.
Q What about a retirement account, do you have one of those?
A I do.
Q And who is that with?
A Fidelity.
Q How many retirement accounts do you have?
A Just that one.
Q And do you know what form of a retirement account that is, for example is it a Roth IRA?
A No. I know it's not that.
Q Do you have a 401K?
A No.
Q What, if any, direct deposits do you have to any of your accounts, and what I mean by that is money that is automatically deposited from some source?
A Just the payment for my stocks.
Q And the payment from your stocks goes where, to

which account?
A Associated checking.
Q Are you collecting any social security benefits?
A I'm sorry. Yes, I am.
Q And where do they go, which account?
A They go to Lake Ridge checking.
Q Are you collecting any disability?
A No.
Q What about any other sources of money that are directly deposited like that?
A Nothing else. I also do have a Roth.
Q Okay.
A That I'm a beneficiary for my son. So my husband and I split that.
Q Explain to me what you mean when you say that you're a beneficiary.
A My husband took his own life. My son took his own life, and that was life insurance that he had for work and they rolled it.
Q I see. So it was your son's policy, and you are a beneficiary?
A Correct.
Q And which account does that one go into?
A That actually is held at Lake Ridge.
Q Okay. Any other deposits that you know of or

can think of?
A No.
Q What about from your dad's estate, is there money that is still being distributed from your father's estate to you?
A No.
Q I wanted to ask you a little bit more about the stocks that you mentioned having at Raymond James. Do you know what companies you are invested in?
A I cannot recall.
Q Do you know the size of the portfolio?
A 63,000.
Q And that's as of your last check?
A Correct.
Q Have you sold stock -- I'm sorry, go ahead.
A No check. There's no -- I didn't get a check for that.
Q Understood.
A Okay.
Q That's money that's currently invested, correct?
A Correct.
Q Have you sold stocks recently?
A Not since May of 2020.
Q And none from your portfolio with Raymond James?

A No.
Q Ms. Randall, do you currently serve on any boards of directors?
A No.
Q Do you currently hold any positions with any associations?
A No, I do not.
Q Are there any groups that you belong to?
A No.
Q For example, are you on a church group or anything like that?
A No, I am not.
Q Is there any other source of income that you currently have that we have not discussed?
A No, there is not.
Q I want to talk a little bit about the document collection process. We will be going over some documents today and some of them are yours and some are mine. I want to get a sense for where your documents are in terms of your -- what you have provided your counsel and what we may have missed or not.
When you first were going to file this lawsuit, did you collect any documents for your counsel?

A No.
Q In the course of this lawsuit, and by that I'm going to mean -- when I say "this lawsuit," I'm going to basically mean from filing in September of 2021 until now; is that okay?
A Yes.
Q Have you handed documents to your counsel?
A Not that I can remember.
Q Have you ever been asked to search for documents?
A Not that I can recall.
Q Have you ever searched your phone for documents or, for example, messages?
A No, I have not.
Q So did you at any point turn your phone over to have it searched?
A Yes, I did.
Q And with respect to what would have been on your phone or what is on your phone, do you use your message feature?
A Yes.
Q And is it an iPhone?
A Yes.
Q Do you have any other message platforms that you use like WhatsApp?

A I don't even know what that is, so, no.
Q Is the only message platform that you use your iMessage platform?
A Yes.
Q What email accounts do you have, Ms. Randall?
A I have one account.
Q And which one is that?
A StacyleeRandall6@gmail.com.
Q Have you had prior email accounts in the past?
A Yes.
Q Which ones?
A Oh, Lord. It's been so long. I have had this email for a long time. So I believe my first email was SLR -- SLR13@yahoo.
Q And when is the last time you used that account?
A That was my very first account. So that was a long, long time ago.
Q Can you estimate how long ago?
A I didn't jump on the email train right away. I can't. I'm sorry.
Q That's okay. Do you think you have used that Yahoo account within the last ten years?
A No.
Q Within the last 20 years, so that would be 2003?
A No.

Q Do you think you ever used that account, the SLR13yahoo account while you were working at Widen?
A No.
Q When you were working at Widen, the last time being 2000 to 2001, did you use your personal email?
MS. POLAKOWSKI: Objection. Form.
BY MR. CHURCHILL:
Q For work purposes?
A No.
Q I assumed you used your personal email for personal purposes?
A Yes.
Q And you had a Widen email account while working at Widen?
A No, I did not.
Q You never had a Widen email account?
A No.
Q So did you ever send emails while working at Widen related to Widen business?
A No, I did not.
Q When you were working as a receptionist no one emailed you?
MS. POLAKOWSKI: Objection. Form.

Mischaracterizes her testimony.

THE WITNESS: What do you mean by "no one"?

BY MR. CHURCHILL:

Q Back when you were working as a receptionist in 2000 to 2001 no one emailed you at work for work purposes?

A No.

Q How did people communicate with you, just by phone and in person?

A Correct.

Q When you were working at Widen in 2000 and 2001, did anybody text you for work purposes?

A No.

Q In this case there have been some -- and when I say "this case," I mean this litigation which started in 2022 and, again, you have the Complaint?

A Correct.

Q So the -- for your orientation purposes, the filing date is actually listed at the top, so July 21, 2022, is when you filed your Complaint. There have been document requests that have been served upon you. Are you familiar with that process at all?

A That have been served upon me? Can you explain what you mean?

MS. POLAKOWSKI: And, Stacy, again to the extent that you would need to disclose contents of conversations you have had with us to answer these questions, I will caution you not to do so.

(Exhibit No. 3 was marked.)

BY MR. CHURCHILL:

Q So the court reporter has handed you what's been marked for identification as Exhibit 3 to your deposition.

A Okay.

Q And I will just identify it for record. It's a document titled, Plaintiff Stacy L. Randall's Objections and Responses to Defendant's First Requests for Production of Documents. Do you see that?

A Yes.

Q I just mentioned document requests when I was asking you a question. I will represent to you that this document is actually the responses that your counsel provided to our request. Have you seen this document before?

A No. I don't -- I can't recall. I remember answering questions.

Q So you -- I may have already asked you this question, but now that you have the benefit of this document if you will permit me to ask you again, do you remember looking for documents in response to requests for documents?
A Yes, I do.
Q And did you provide documents to counsel?
A Yes, I did.
Q Did you search your -- your files at home, if you have files, for any hard copy documents that you might have?
A No, I did not.
Q Do you keep hard copy files?
A No, I do not.
Q What about audio or audiovisual files, do you have anything like that that could relate to this lawsuit?
A No.
Q For example, do you have any recordings of voice messages that have been left for you by, for example, your brother?
A No.
Q Have you ever in interacting with the defendants in this case used an audio recorder to record what somebody was saying?

A No.
Q When you were meeting with -- I'm jumping ahead a little bit, so you let me know if I need to establish a background. When you were meeting with Mr. Kiesler related to the May redemption, did you record any of that meeting?
A No.
Q When you were talking with your brother on the phone in May of 2020, did you record that?
A No.
Q Did you search for any recordings in response to the document request in this case?
A No.
Q But you're confident that you don't have any?
A Yes.
Q You can set that exhibit to the side. It does make sense during the course of the day to keep the Complaint handy because I think that will be helpful, and I'm going to be referring to it off and on. For the most part the other exhibits you can push off to the side.
A Okay.
Q Are you aware of any documents that you have related to this case that you have not provided to your attorneys?

A No.
Q Are you aware of any electronic files that relate to this case that you have not provided to your attorneys?
A No.
Q The reason why I mentioned September 20 of 2021 earlier was that that was a day that your attorneys, Reinhart firm, sent something called a Litigation Hold Notice to what now are the defendants in this case. Do you remember that process?
A No. Not specifically.
Q So I will have some documents that I can show you that will help remind you a little bit.
Generally stating your attorneys sent some letters telling your brother, for example, as one of them to preserve documents because you had some concerns about the redemption -- about the redemption. Do you remember that?
A I remember them telling me that, yes.
Q And, in fact, you reached out to your brother to let him know that, you were giving him a heads up to let him know that this was coming?
A I did.
Q Since that time period, that September time

period, have you deleted any documents that are relevant for this case?

MS. POLAKOWSKI: Object to form. Calls for a legal conclusion as to relevance.

THE WITNESS: Can you rephrase?

MR. CHURCHILL: Sure. Can you read back the question?

(Last question read back.)

THE WITNESS: No.

BY MR. CHURCHILL:

Q Are there any files that you have destroyed or gotten rid of that are relevant to this case?

MS. POLAKOWSKI: Same objection.

THE WITNESS: No.

BY MR. CHURCHILL:

Q I want to go back a little bit to your history of working with the company and how you kind of proceeded along the way. So we're going to start way back in time.

You are obviously part of the Widen family, correct?

A Yes.

Q And do you have a recollection of when you first got involved in any way with the company?

A It was in 19 -- wait. I believe it was in 1977.

Q Okay. You're going to have to do the math for me. How old were you in 1977?
A 1977, I was born in '57, so 20 years.
Q Okay. So you were 20. And what were you doing in 1977 for the company?
A I was working in the dark room as a contact person.
Q What does that mean?
A At the time we were prepress and every page has four colors, and the strippers were the ones that made up the pages, like for a catalog, and they made yellow, red, blue, and black. And I would have to combine different things that they had and put it on film.
Q So you were actually touching and working in the process?
A Yes.
Q And how long did you do that particular job?
A I did that until '86.
Q And from 1977 to '86 were you pretty much doing that same job the whole time?
A Yes.
Q Were you paid?
A Yes.
Q Do you remember how much?

A No.
Q Did you have shares in Widen at the time?
A Yes.
Q Do you remember how much?
A 20 percent.
Q And you grew up with four brothers, correct?
A Yes, I did.
Q And can you give me the birth order?
A Stewart, Reed, Tyler, and Price.
Q And where are you?
A I'm at the top.
Q You're first?
A I am first.
Q Okay. What other jobs did you hold with the Widen company?
A Other than the receptionist, nothing.
Q And so that first job ended in 1986?
A Correct.
Q And were you terminated from that position?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

BY MR. CHURCHILL:

Q Do you understand my question?
A Yes, I do. I was terminated sometime, but I don't believe it was in '86.

Q What do you recall about the termination?
A That I and my husband were both called to the front office and three of my brothers and my dad were there.
Q Which brothers?
A Tyler -- Stewart, Reed, and Tyler.
Q Okay. And what happened?
A They told me I was a distraction and that it would be best if I left.
Q Do you remember anything else that was said?
A I don't remember.
Q You weren't certain that this was in 1986. Why?
A Well, because after my youngest went to kindergarten I went back like part time, and I think it was during that time after I went back when she started going to kindergarten, so that would be '90, '91. That is when it was.
Q Why was Steven called, if you know, to be a part of that meeting?
A I'm not sure.
Q Was he working for the company as well?
A Yes.
Q What was he doing?
A I believe at that time he was -- he was a stripper.

Q Who -- if there was a single person, who made the determination to terminate you in that period '90 to '91?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I don't know.
BY MR. CHURCHILL:
Q Do you remember who said, Stacy, you're being a distraction or something to that effect?
A There was -- it was either Reed or Tyler.
Q Do you remember who was in charge or running the company at that time?
A My father.
Q Did you say anything to your father about the decision?
A I did not.
Q Did you fight it?
A No.
Q Did you ever have any discussions with your brothers or your father about that decision to terminate?
A No.
Q Why not?
A They are pretty scary people especially when they are all in one room. So I just decided

that they want me gone, then I'm going to leave.
Q I take it you disagreed with their characterization of you?
A I did.
Q Do you have any idea what they were referring to?
A No, I do not.
Q Have you ever talked about it with anyone since this time?
A No.
Q Did you talk about it with your then husband Steven?
A Well, he was there so he knew. So I don't remember.
Q Did that determination to terminate you have any impact on your shares with either company at the time?

MS. POLAKOWSKI: Object to the extent it calls for a legal conclusion. Calls for speculation.

THE WITNESS: I'm not sure.

MR. CHURCHILL: So let's try to get some -- ahold around the time period.

(Exhibit No. 4 was marked.)

BY MR. CHURCHILL:

Q Okay. Ms. Randall, the court reporter has handed you what's been marked for identification as Exhibit 4 to your deposition.

A Mm-hmm.

Q And the document is not Bates labeled, but this is a document that has been -- or is your version Bates labeled? Good. Okay. My version is not Bates labeled.

This is a document that's been produced in the case. Do you recognize this document, Shareholder Agreement of Widen Colourgraphics, LTD?

A No.

Q Are you aware that there is a shareholder agreement?

A Yes.

Q If you would -- and I don't have the benefit of the Bates number. The Bates number, when I say that, that's going to be numbers in the bottom right corner. For the most part today I'm going to use that as a guide to track with you where we are talking. For purposes of this document I'm going to use the actual page number on the document. Would you flip to page 18?

A Okay.

Q And do you see your signature there, Ms. Randall?
A Yes.
Q And you -- as I read it, it says, "Stacy Widen Randall," and you wrote above it "Stacy Widen Randall." Do you see that?
A Yes, I do.
Q And is that to the best of your knowledge your signature?
A Yes, it is.
Q You don't have a recollection of signing this document specifically?
A When my dad wanted us to sign something, we signed. And I probably just saw this paper.
Q Why do you say that?
A Because that's just the way he operated.
Q So do you believe that you didn't actually review the 1992 shareholder agreement before you signed it?
A I did not review it.
Q You know that for certain?
A Yes.
Q Were you concerned that you weren't reviewing a document before signing it?
A Like I said, if my dad told me to do something,

like sign here, I did.
Q And do you have a specific memory of your dad telling you that in this instance?
A No.
Q So you are assuming that's what happened or you're not sure?
A There were many things that I had to sign. So I don't specifically remember this time.
Q So is there a chance that you actually did review the 1992 shareholder agreement before signing it?
A No.
Q Why do you say that?
A Because I probably wasn't given it. I was not given it.
Q Was it important for you at the time to review a document before signing it?
MS. POLAKOWSKI: Object to form.
THE WITNESS: Can you rephrase that, please?
BY MR. CHURCHILL:
Q Sure. Let me back up a little bit. Did it concern you if you were given a document by your father that you weren't reviewing it before signing it?

A No.
Q Why?
A I just never thought about it.
Q Do you know in what capacity you were signing this particular document? As you look at it do you know what capacity you were signing?
MS. POLAKOWSKI: Objection to the extent that it calls for a legal conclusion.
THE WITNESS: Capacity, what do you mean by "capacity"?
BY MR. CHURCHILL:
Q Sure. So for example, on page 18 your dad is Mark Widen -- was Mark Widen, correct?
A Mm-hmm.
Q So he was signing as president, do you see that?
A Yes.
Q Do you know why your signature line is there?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: Somebody put it there.
BY MR. CHURCHILL:
Q Well, you were a shareholder, right?
A Yes.
Q So do you think that was why you were signing?
A I can't say.

Q Would you flip the page -- actually, you don't need to flip. You got it right there. I have to flip. So the page titled Exhibit A, schedule of shareholders. Do you see that?
A Yes.
Q And your name is listed first under name, right, "Stacy Widen Randall." Do you see that?
A Yes.
Q And then in the second column it's titled "Class A Common Stock." Do you see that?
A Yes.
Q And then there's a number underneath, 4,655. Do you see that?
A Yes.
Q And then there's a third column, "Class B Common Stock." Do you see that?
A Yes.
Q And then there's a number underneath listed 56,790. Do you also see that?
A Yes.
Q In addition to your name here, there are four additional people listed. Do you see that?
A Yes.
Q Your brothers Reed, right?
A Yes.

Q Stewart, right?
A Yes.
Q Tyler, correct?
A Yes.
Q And Price, correct?
A Yes.
Q Is it your understanding that this Exhibit A schedule of shareholders was the listing of stock provided to you and all of your brothers under the 1992 shareholder agreement?
MS. POLAKOWSKI: Object to the extent that it calls for a legal conclusion.
THE WITNESS: I don't know that.
BY MR. CHURCHILL:
Q Do you recall whether or not as of 1992 this division of shares was the actual amount of shares that you held in the company then known as Widen Colourgraphics?
A I had no way of knowing.
Q You didn't know how many shares you possessed at the time?
A That's right.
Q Did you think it was important for you to know how many shares you held?
MS. POLAKOWSKI: Object to form.

THE WITNESS: I probably never thought about it or I never thought about it.

BY MR. CHURCHILL:

Q You never thought about what exactly?

A What you just asked me.

Q You never thought about how many shares you held?

A Yes.

Q Why not?

A And whether it was important. I knew I had 20 percent.

Q Okay.

A That's all I knew.

Q And if you go back to that page 18 that we were looking at before, you see that the other persons that signed in addition to your dad were your brothers, correct?

A Yes.

Q Do you now have a better recollection as to why you signed the 1992 shareholder agreement?

A Now I do, yes.

Q Okay. And is it your understanding that you were signing as a shareholder of the company?

A As of right now I do.

Q If you had an issue or a concern about signing

something, would you have said something to your father?
A No.
Q Would you have said something to one of your brothers?
A No.
Q Did you ever have a concern -- let's go back to this time frame, the 1992 time frame. Did you have a concern that you were signing something that somehow you shouldn't be signing or didn't want to sign?
MS. POLAKOWSKI: Object to form.
THE WITNESS: Well, like I said before, I never questioned my dad.
BY MR. CHURCHILL:
Q But as to my question specifically, did you have a concern that you were signing something?
A No.
Q You weren't concerned that your dad was somehow treating you unfairly?
A No.
Q Were you concerned in 1992 that one of your brothers was treating you unfairly?
A No.
Q Did you have an attorney help you at all with

respect to this 1992 shareholder agreement at the time?
A No.
Q If you recall, when was the first time you ever engaged an attorney for anything?
A Right now. This. I'm sorry, my divorce.
Q You never engaged an attorney prior to that?
A Never.
MS. POLAKOWSKI: Mark, we have been going about an hour. Whenever you're at a good spot, can we just take a short break?
MR. CHURCHILL: We can take one now. That's fine. We're going to come back to this document. So you can leave that there, but now is a good time for a break.
THE VIDEOGRAPHER: Off the record 10:18 a.m.
(Brief recess taken.)
THE VIDEOGRAPHER: We are back on the record at 10:36 a.m.
BY MR. CHURCHILL:
Q So, Ms. Randall, we were still working with that Exhibit 4, the 1992 shareholder agreement. Do you recall whether or not any of your brothers had an attorney representing them for purposes

of signing the 1992 shareholder agreement?
MS. POLAKOWSKI: Objection.
Foundation.
THE WITNESS: I don't know.
BY MR. CHURCHILL:
Q Do you recall at all the actual signing?
A Of this particular document?
Q Yes.
A No.
Q Do you recall if at the time Widen Colourgraphics had an attorney that it used for documents like this?
MS. POLAKOWSKI: Objection.
Foundation.
THE WITNESS: I would have no idea.
BY MR. CHURCHILL:
Q Do you have a memory of any attorney that the Widen company used at any point in time?
A The only one I knew of was Scott Seid.
Q With the Stafford Rosenbaum firm?
A Yes.
Q You don't remember any attorney prior to Scott Seid?
A My dad, when my dad was around he used a guy by the name -- last name was Kilkelly.

Q Did you ever meet Mr. Kilkelly?
A I'm not sure.
Q Do you remember whether or not you ever communicated with Mr. Kilkelly yourself?
A No.
Q You don't remember?
A No, I did not communicate.
Q So did you ever ask Mr. Kilkelly for any legal help?
A No.
Q Did you ever reach out to an attorney to the best of your knowledge with respect to the 1992 shareholder agreement?
A No.
Q Do you recall whether you considered speaking with an attorney about the 1992 shareholder agreement?
A I did not consider it.
Q Can you tell me why you didn't consider it, if you remember?
A Like I said, my dad was a very intimidating, mean person and if he told me to sign something I signed it. No questions asked.
Q But, again, you weren't concerned to the best of your recollection that something was wrong with

the 1992 shareholder agreement when you signed it?

A I didn't know what I was signing.

Q Tell me a little bit more about your dad and how he was mean and intimidating. Can you give me a little more explanation on that?

A You met my brother Reed, very similar, had no patience, no tolerance, didn't want to talk about the weather, business, and he was a jerk. He was physically and mentally abusive.

Q Was he physically abusive to you?

A No.

Q Was he mentally abusive to you?

A Yes.

Q In what way?

A He was just mean and putting me down all the time. The one thing that sticks in my mind the most was I was walking through the living room into their sun room, and it was a big room. So he watched me walk for quite a while, and he looked at me and said, "I thought you said you were trying to lose weight, not gain it." Constant things like that.

Q And this is your dad saying that about when, do you remember? Like what year or how old were

you?
A I don't know how old I was. I was married. I can tell you that.
Q Any other ways that he was mentally abusive to you?
A Every day.
Q Did you interact with him every day?
A Well, every day that I spoke with him, and I honestly tried not to interact with him.
Q Your dad died in 2003; is that correct?
A I thought '02, but I don't know.
Q How was your relationship with your father at the time that he passed, in and around that time?
A It was civil.
Q You're not sure in 1992 whether you were still working for the company at the time, right? If I remember your testimony from earlier you may have been terminated in '91?
A I may have been.
Q What do you recall, Ms. Randall, about the evolution of the business? You were talking before about the prepress business. Did the company change the business that it was in?
A Yes.

Q What do you recall about that?
A I recall Reed appointing Matthew Gonnering as CEO and then all of a sudden things changed.
Q How so?
A I was not working there. I never talked about it with anybody. So I know that they did software of some kind.
Q Do you remember what the business line was like when you were working as a receptionist in 2000 to 2001, was it still prepress then?
A Yes.
Q Do you have any recollection of the creation of Windy Waters as an entity?
A I do not.
Q Did you at some point come to understand that Windy Waters was what's known as a holding company?
MS. POLAKOWSKI: Object to the extent it calls for a legal conclusion.
THE WITNESS: I don't know what a holding company is. So I would have to say no.
BY MR. CHURCHILL:
Q You did know that you essentially traded in your stock in the Widen company for stock in Windy Waters, correct?

MS. POLAKOWSKI: Objection. Form to the extent it calls for a legal conclusion.
THE WITNESS: I did not -- I'm not aware of that.
BY MR. CHURCHILL:
Q You know that the stock that you ultimately redeemed in May 2020 was Windy Waters stock, though, correct?
MS. POLAKOWSKI: Same objection.
THE WITNESS: No.
BY MR. CHURCHILL:
Q Did you believe you had Widen Enterprises stock?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.
THE WITNESS: Yes.
(Exhibit No. 5 was marked.)
THE WITNESS: Are we done with Exhibit 4?
BY MR. CHURCHILL:
Q Who knows if we come back to it, but you can put it to the side for now. I can't promise you, Ms. Randall.
You have been handed what's been marked for identification as Exhibit 5 to your deposition. Take a moment to look at it.

Exhibit 5, Ms. Randall, is a document titled "Amendment of Shareholder Agreement of Widen Colourgraphics, Limited." Do you see that at the top?

A Yes, I do.

Q And the date indicated there in that first sentence is an effective date of September 12th, 2001. Do you see that as well?

A I do.

Q And if you flip to the second page of Exhibit 5, Ms. Randall, do you see your signature?

A Yes, I do.

Q And it states, "Stacy Widen Randall," correct?

A Yes.

Q And similar to the 1992 shareholder agreement that we were just looking at, your dad is listed there as the president, correct?

A Yes.

Q And then your four brothers also each signed, correct?

A Yes.

Q If you flip back to the first page, Ms. Randall, there is a portion of the document titled "Recitals." Do you see that up at the top?

A Yes.

Q And I'm going to orient you a little bit to the document by reading through a couple things, and then I will get to a question here.

Under the first recital it says, "The undersigned (collectively shareholders, individually shareholder) entered into that certain shareholder agreement of Widen Colourgraphics, Limited, as of March 1, 1992," and then it defines it as Widen shareholder agreement. Do you see that?

A Yes.

Q And then in paragraph 2, "The shareholders, except for Tyler Widen, exchanged all the shares of stock they held in Widen Colourgraphics, Limited, NKA" -- which means now known as -- "Widen Enterprises, Inc., for sales of Windy Waters, Inc." Do you see that?

A Yes.

Q Paragraph 3, "Tyler Widen sold his shares in Widen Colourgraphics, Limited, to the shareholders pursuant to a shareholder agreement dated January 1, 1995." Do you see that?

A Yes.

Q And then paragraph 4, "Subsequently Tyler Widen and the shareholders received additional shares

of Windy Waters, Inc., by virtue of a distribution from grantor retained annuity trusts of Mark Widen and Betty Widen." Do you see that?
A Yes.
Q Is Betty Widen your mother?
A Yes.
Q And then paragraph 5, "The shareholders desire to amend the Widen shareholder agreement to have it apply to their shares of Windy Waters, Inc." Do you see that?
A I do.
Q Do you have a recollection of signing this amendment September 12th, 2001?
A I can't recall.
Q Does this document at all help you recall that your shares were now in Windy Waters, Inc.?
MS. POLAKOWSKI: Object to the extent it calls for a legal conclusion.
THE WITNESS: I didn't know.
BY MR. CHURCHILL:
Q Do you remember anything about your brother Tyler selling his shares back to Widen Colourgraphics?
A No.

Q So you don't remember maybe why he did that?
A You said sold them back to Widen?
Q Right. If you look at paragraph 3 on that first page, do you have any recollection of Tyler being less involved in the business?
A Yes.
Q Do you remember why?
A Yes.
Q What was the reason?
A Because my dad told him that he was going to be taking over the business as president and then changed his mind said he was going to appoint Reed.
Q So Tyler wanted to be more involved, and he wasn't allowed to be. Is that what you are saying?
A Tyler wanted to be president.
Q And is that your understanding as to why Tyler sold his shares or you don't remember Tyler choosing to sell his shares?
A I did not know that Tyler sold his shares.
Q Do you remember that you got more shares because Tyler sold his shares?
MS. POLAKOWSKI: Objection. Form.
THE WITNESS: I did not know.

BY MR. CHURCHILL:
Q Did you review this first amendment -- it's actually just called amendment. Did you review the September 12, 2001, amendment of shareholder agreement of Widen Colourgraphics that I handed you as Exhibit 5 prior to signing it?
A No.
Q Do you think you reviewed it after signing it?
A I can't say. I don't remember.
Q Why do you think you didn't review it?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.
THE WITNESS: Can you --
BY MR. CHURCHILL:
Q Sure.
A Yeah. Why do I think I didn't --
Q Let me go back to address counsel's objection. Do you remember whether or not you reviewed it, Exhibit 5?
A I don't believe I did.
Q And why do you believe that?
A Again, because my dad probably just gave us all the signature page and told us to sign it.
Q Do you actually remember that that's the way it happened or you are speculating?

A I remember that that's the way he did it, sign here.
Q Was it important for you at the time to review a document like this before signing it?
A No.
Q Why not?
A I trusted my dad.
Q And you didn't believe your dad was being unfair to you?
A Correct.
Q Do you recall whether you had an attorney representing you with respect to the execution of this document?
A I did not have an attorney.
Q Do you recall whether any of your brothers had an attorney that they were using?
A I wouldn't know that.
Q When you signed -- if you recall, when you signed a document like this, would you all get together and sign at the same time or would you sign separately?
A Most of the time we all signed at the same time.
Q Can you remember a specific example that you could walk me through where that happened?
A My mom and dad always had Sunday dinner, and

this is the type of stuff that he would bring when we were all there and told us to sign it.
Q And when you say "he," you mean your father?
A My dad.
Q And how were those dinners? Were those good events, bad events?
A Horrible.
Q Why do you say that?
A Because he sat at the head of the table, and it was a glass dining room table, and he'd pound his fists and just told us what losers we were and just verbal abuse pretty much every Sunday.
Q Did you know when you were going to the dinners that there might be business that was going to be discussed?
A Never.
Q Was it common that your dad would discuss business at the Sunday dinners?
A Only when Widens wasn't doing well.
Q But he wouldn't tell you necessarily ahead of time that I need you to review a document?
A Never.
Q How did your father communicate with you, let's say at this time frame in September of 2001? Would he call you on the phone to say come to

Sunday dinner?
A No. We all just always went to Sunday dinner. It was expected of us.
Q What about communications with your mom at the time, would she communicate with you about dinner ahead of time and say, hey, are you coming to Sunday dinner?
A No.
Q How was your relationship with your mom?
A Very good.
Q Where did she sit at the table?
A The other end.
Q Did you always sit in the same place?
A Yes.
Q Next to your father?
A Yes.
Q If the dinners were so horrible, why did you go?
A It was expected of us.
Q Did you ever say, I'm not going?
A Never.
Q Did Steven go with you?
A Yes.
Q Did you have children at the time, and to be specific let's say 2001?
A Yes.

Q Did your children attend also?
A Yes.
Q Did you ever discuss with Steven your thoughts about the Sunday dinners?
A Well, the first time he witnessed it as most of the in-laws they were horrified and shocked. They'd never seen a family operate like that.
Q How big was the table that you're talking about, like how many people did it seat?
A I can't remember offhand. It was a big, long table.
Q Is it your memory that everybody sat at the table including children and spouses?
A The kids sat at the table when they got older.
Q It's my understanding that you don't have a specific recollection of the day that you signed this document?
A I do not.
Q Is it possible that you did not sign it at Sunday dinner, in other words, might you have signed it at the office?
A No.
Q Why is that not possible?
A Because we always signed them on Sunday dinner.
Q Did your dad have an office at the Widen

business building?

A Yes.

Q Do you recall where it was located at the time?

MS. POLAKOWSKI: Objection. Form. Are we still talking about 2001?

BY MR. CHURCHILL:

Q Yeah. So in 2001 where was Widens building?

A We had two.

Q Okay. And did your father have an office in one of the buildings?

A He had an office in the old building and in the new building.

Q And did you ever meet with him at the old building in his office?

A Yes.

Q And did he ever call you into his office at the old building to sign documents?

A I don't think so. I don't know.

Q He had an office in the new building as well?

A Yes.

Q In this time frame, 2001?

A I can't remember when they built the new one.

Q Did your father ever call you into his office in the new building to sign documents?

A No.

Q In Exhibit 5, the same document, Ms. Randall, if you would turn to the page -- you're on it -- directly after the signature page. This is titled Exhibit A. Do you see that?
A Yes.
Q And similar to the 1992 agreement that we went over, this is a listing of shares of stock. Do you agree with that?
A Yes.
Q And the numbers -- and you can compare it to Exhibit 4, the numbers have changed. Would you agree with me?
A Yes.
Q Do you recall -- let me first just remark what this document Exhibit 5 indicates. Under your name with an address of 5106 Rustic Way, McFarland. Do you see that?
A Yes.
Q And that's where you were living at the time?
A Yes.
Q You have under Class A common stock 232.75 shares. Do you see that?
A I do.
Q If you go back to the 1992 agreement, see, we're already going back to the document. You asked.

I know. If you go back to the 1992 agreement and if you turn to what effectively is page 19 of the document --

MS. POLAKOWSKI: Of Exhibit 4?

MR. CHURCHILL: Yes. Exhibit 4.

MS. POLAKOWSKI: Here you go.

THE WITNESS: 19.

BY MR. CHURCHILL:

Q Yeah, it will be right after 18. Do you agree that your shares have changed between the 1992 agreement and the 2001 agreement? Do you see that?

A I see that.

Q And also with respect to Class B common stock whereas in 1992 you had 56,790 and in the 2000 agreement you have 5,063.9025. Do you see that?

A Is that a point or a comma?

Q I think it's a decimal.

A Yes, I see that.

Q And your Class A common stock has gone up from 4,655 shares to 232.75 shares, correct?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: It looks like it to me, but this definitely isn't a decimal sign or a period. It's a comma.

BY MR. CHURCHILL:
Q Which document are you looking at?
A The --
Q Right. So --
A These are commas.
Q Yes. And then look at Exhibit 5.
A Yes, those are dots.
Q I agree. So some are commas and some are dots. I agree. Do you recall specifically with respect to Exhibit 5, the later document, why your shares were different from, for example, Reed's under Class A common stock?
MS. POLAKOWSKI: Objection. Calls for speculation. Legal conclusion.
THE WITNESS: I don't know why.
BY MR. CHURCHILL:
Q Do you agree that Reed has more Class A common stock shares listed than you do?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: That Reed has more than I?
BY MR. CHURCHILL:
Q Yeah. You can -- to reduce potential confusion, you can put Exhibit 4 away now, the older one,

and just focus on the newer one. Put that one away. Okay. So let's focus on the 2001 document.

You agree that Reed has more Class A common stock shares listed than you, correct?
A It appears that way, yes.
Q Do you recall why that was the case?
A I wouldn't know.
Q And in turn, you agree that you have more Class B common stock shares listed than Reed does? He's directly below you. You agree with that as well?
A Yes.
Q And do you have a recollection of why that was the case?
A No, I don't.
Q Do you recall whether or not you questioned why Reed had more Class A common stock shares than you at that time in 2001?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: I didn't see this document.

BY MR. CHURCHILL:
Q When you say that, you mean you don't believe you saw this document at the time that you

signed it?
A That's correct.
Q Do you believe that you ever saw Exhibit A?
A I can say I never saw this.
Q Are you guessing that you never saw it, or you're confident that you never saw it?
A I'm confident that I never saw it.
Q And why is that, Ms. Randall?
A Because we signed these at the Sunday dinner table and this was all we saw.
Q And you were just pointing at a document. When you say this was all you saw, you mean the signature page?
A The signature.
Q I know this goes back some time, but do you have a recollection in your mind of when you first realized that your shares in the company might be different than your brothers?
A I did not -- after -- after my dad passed away, I know something went on about A and B and different types of stock because we got a letter from -- I don't know if it was Kilkelly or if it was from Dan Harding who is the estate attorney saying that Reed was going to do this, whatever it was. I didn't understand it, and I remember

calling my youngest brother Price because he and I were executors. And I said, "What is this thing we're supposed to sign about Reed?" And he said, "Stac, just sign it. Reed's going to -- Reed's going to do what Reed wants to do." So that's the only time I knew there was any type of exchange of stocks.

Q So you understood with respect to that communication that that concerned a difference in stock ownership or share ownership?

A An A and a B is all I know.

Q Before coming here to today's deposition have you ever reviewed a document such as Exhibit 5 that lists ownership of Class A and Class B stock involving you?

A I can't say for sure.

Q Was it important to you in 2001 to know how many shares you had in the company?

A I assumed I knew.

Q What do you think you knew?

A That I had 20 percent of the company.

Q And so when you signed the 2001 amendment to the shareholder agreement, you did not believe that your shares might be adjusted under that document?

MS. POLAKOWSKI: Objection. Legal conclusion.

THE WITNESS: No. I don't think -- I don't remember. I don't think so, but I can't remember. I didn't really understand it.

BY MR. CHURCHILL:

Q Did you feel like you needed to have an attorney help you with respect to understanding the first amendment to the 1992 shareholder agreement?

A No.

Q Are you making a claim or are you contesting in this lawsuit the adjustment of your brothers shares as represented in the first amendment to the 1992 shareholder agreement?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Foundation.

THE WITNESS: I would probably have to talk with my lawyers about that.

BY MR. CHURCHILL:

Q Are you questioning whether or not the change in the share ownership in the first amendment -- as represented in the first amendment was proper?

MS. POLAKOWSKI: Same objections.

THE WITNESS: I wouldn't know.

BY MR. CHURCHILL:

Q You would need to talk to your attorneys?
A Yes.
Q You agree that your Class A common stock share amount represented in Exhibit 5 is the same as Stewart and Price, correct?
A Yes.
Q And you agree that your Class B common stock amount is the same as your brothers Stewart and Price, correct?
A Yes.
Q You were never employed by Windy Waters, correct?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I don't recall where I was employed. I thought it was Widen Colourgraphics or Widen Enterprises.
BY MR. CHURCHILL:
Q Do you remember receiving a paycheck at any time?
A Yes.
Q Do you remember who wrote the paychecks -- sorry, what company's name was on the paychecks?
A That's a long time ago. I can't recall.
Q We were talking a little bit before about the

fact that Tyler wanted to be president and that didn't happen. Do you remember that testimony?
A Yes.
Q Was there some reason why Tyler wasn't the person that became president, do you remember?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I wasn't involved in any of that. I don't know.
BY MR. CHURCHILL:
Q Do you know whether Tyler's vision of the company was different than Reed's, for example?
MS. POLAKOWSKI: Same objection.
THE WITNESS: I don't know what Tyler was thinking.
BY MR. CHURCHILL:
Q The time that you were working as a receptionist in 2000, 2001, do you remember that?
A Yes.
Q I wanted to go back to that. You were terminated from that position as well; isn't that correct?
A Yes, I was.
Q And do you recall the circumstances under which you were terminated?

A I was told or maybe Reed -- I was told by Reed that Brian Becker said -- maybe I went to Reed's office. Brian Becker told Reed that his clients were complaining because his phone calls weren't answered.
Q And who was Brian Becker?
A He was a sales rep or something. I'm not sure what he did. He had numerous jobs.
Q And if I understand your testimony correctly, you're saying that Brian said his phones weren't being answered?
A His phone calls, answered all the calls that came in. And you don't really like that job anyway, do you? I said, "No, I can't stand it."
Q Who said that to you?
A Reed. I would pace back and forth. I couldn't -- my dad kind of made me take that job, and I said, no, I really don't, and he said, "Well, why don't you just go," and, again, I said okay.
Q Anything else?
A No.
Q Do you recall Reed raising a question about whether or not you had been drinking at lunch, drinking meaning alcohol at lunch?

A Not Reed, no.
Q Do you recall anyone raising a question about whether or not you had been drinking at lunch on the job?
A Yes.
Q Did Reed tell you that you were being terminated because you had been drinking on the job?
A No.
Q Did anyone ever say that that was a reason why you were terminated for that receptionist position?
A No.
Q To this day have you ever heard anybody say that was the reason you were terminated?

MS. POLAKOWSKI: I will object and caution you not to disclose conversations you have had with counsel.

THE WITNESS: Can you repeat the question, please?

MR. CHURCHILL: Can you read it back?

(Last question read back.)

THE WITNESS: No.

BY MR. CHURCHILL:
Q Ms. Randall, at a certain point you took on the office of president of Windy Waters; isn't that

correct?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I don't know.

BY MR. CHURCHILL:

Q You don't know whether or not you ever served as president of Windy Waters?

A No.

Q Is it a surprise to you that I'm asking you whether or not you served as president of Windy Waters?

A I was told by my attorneys.

MS. POLAKOWSKI: Objection. Stop talking.

(Exhibit No. 6 was marked.)

BY MR. CHURCHILL:

Q You have been handed by the court reporter what's been marked as Exhibit 6 to your deposition, and this is one of those documents that the order is a little funky. So I'm going to have you turn to page 2. That really is kind of the beginning of the document. It's double-sided. It's the page you're looking at now, Ms. Randall. The front page is actually related to the document, and it's a consent to

shareholder agreement. We're probably not going to look at that. The real beginning of this document is Bates labeled in the bottom right corner. You will see Windy0033092. Do you see that?
A Yes.
Q And then there are several more pages in the document, and there's some more of those consents in the back. So Exhibit 6 to your deposition is titled Second Amendment to Shareholder Agreement. Do you see that at the top?
A Yes.
Q And on the third page of the exhibit, second page of the agreement, Bates number Windy0033093 is a page that has some signature lines on it. Do you see that as well?
A Yes.
Q And do you see under Windy Waters, Inc., your name Stacy Widen Randall, president?
A I do.
Q And do you see your signature there?
A Yes.
Q And then do you also see under shareholders on the right side Reed C. Widen, Stacy Widen

Randall and Price Widen?

A I do.

Q And do you see your signature there?

A Yes.

Q And those signatures from you, they aren't the same signature, correct?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: What do you mean by that?

BY MR. CHURCHILL:

Q Well, I'm not a handwriting expert, but would you say in looking at the two different signatures that they are not identical?

A Yes.

Q Do you have a recollection of signing Exhibit 6, the portion that has your signature on it?

A I don't remember.

Q But you don't have any reason to doubt that that is your signature, correct, in both places?

A I'm pretty sure the one under Reed Widen is not mine.

Q Why do you say that?

A Because that's not how I signed my name.

Q So are you -- are you saying that you think

somebody signed for you?
A I can't say.
Q What about the version of your signature under Windy Waters, Inc., is that your signature where it says, "Stacy Widen Randall, president"?
A That one is also questionable. I can't say for sure.
Q And can you tell me -- let's go through each one. What's questionable about it? Why are you saying that?
A It does not look like my signature.
Q Do you have any recollection of speaking to anyone about the second amendment to shareholder agreement and your need to sign it?
A I don't remember.
Q If you -- does this help at all with your recollection of serving as president of Windy Waters?
A Recollection?
Q Yeah. Does seeing this document remind you at all that you did have a role as president of Windy Waters?
A It does not.
Q Other than I'm assuming your meetings with counsel, which I don't want you to talk about,

do you have a recollection of seeing this document?
A I do not.
Q So I take it you don't know how long you may have served as president of Windy Waters, assuming that you held that title?
MS. POLAKOWSKI: Objection. Form.
THE WITNESS: Assuming -- I wouldn't -- I don't -- I don't remember any of it.
BY MR. CHURCHILL:
Q Do you remember ever holding any meetings as president of Windy Waters?
A No meetings were held.
Q In this time frame, which is you will see back on the first page of the agreement, second page of the exhibit, May 7, 2007, do you see that?
A Mm-hmm. I do.
Q So in the 2007 time frame, do you remember what your involvement was with respect to Widen Enterprises?
A I was a director.
Q You were a director of Widen Enterprises or of Windy Waters?
A That I'm not sure.
Q You were not employed at that time by Widen

Enterprises, correct?
A Correct.
Q Do you remember whether or not you were reviewing any financial documents of Widen Enterprises --
MS. POLAKOWSKI: Objection.
BY MR. CHURCHILL:
Q -- in 2007?
A I can't say for sure. I don't remember.
Q Do you remember in this time frame, 2007, whether or not any financial documents were provided to you?
A No, they were not.
Q When I say "financial documents," what do you think that means, like what does it mean to you?
A Checkbook, bank accounts, anything that has to do with money.
Q Profit and loss statements?
A Mm-hmm.
Q That's a "yes"?
A Yes.
Q Revenues, revenue statements?
A Yes. I don't -- yes.
Q Do you know who would have made the decision -- I'm asking you to speculate -- do you know who

would have made a decision to appoint you as president of Windy Waters?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion and speculation.

THE WITNESS: I wouldn't -- I have no idea.

BY MR. CHURCHILL:

Q Do you know who was the president of Windy Waters prior to 2007?

A No.

Q Do you know who was the president of Windy Waters at any point in time?

A No.

Q Are you aware whether at the time that you redeemed your shares in May 2020, so the final redemption, whether you were then resigning as president of Windy Waters as well?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Calls for speculation.

THE WITNESS: I would not know. I don't know. I don't remember.

BY MR. CHURCHILL:

Q Do you recall a time that you ever asked to see the financial records of Widen Enterprises?

A I never did.

Q Until this lawsuit. You agree that you asked with respect to this lawsuit, correct?
A I would not agree with that.
Q You would agree that your attorneys have asked for the financial records with respect to this lawsuit?
A I'm not aware of that. I don't know.
Q Did anyone ever tell you that you could not have financial records for Widen Enterprises?
A No.
Q Did anyone ever tell you that you could not have financial records for Windy Waters?
A No.
Q You said that you had served as a director, correct?
A Yes.
Q And you didn't associate or differentiate between being a director of Windy Waters versus being a director of Widen Enterprises, correct?
A Correct.
Q Do you remember what period of time you served as a director?
A I do not remember when it started.
Q Were you a director back in 2000 and 2001 when you were working as a receptionist at Widen?

A Yes.
Q Were you a director back in 1992 when the 1992 shareholder agreement was signed?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I don't remember.
BY MR. CHURCHILL:
Q In your capacity as a director, did you ever talk to other directors about the performance of Widen Enterprises?
A I did.
Q Okay. And what type of conversations are you thinking of?
A It was just how -- with Reed, how is the company doing.
Q And when would you have conversations like that?
A Normally they were up north at our cottage.
Q And where is the cottage located?
A Boulder Junction, Wisconsin.
Q And when you say "up north," you mean north of here?
A Yes. Boulder Junction is north of here.
Q How far is it?
A 257 miles from my door step to that door step.
Q And how long have you made that trip to the

cottage?
A Since I was a baby.
Q In your role as a director did you ever establish any company policies?
A No.
Q In your role as a director did you ever revise any company policies?
MS. POLAKOWSKI: Objection. Form. Calls for a legal conclusion.
THE WITNESS: Not that I remember.
BY MR. CHURCHILL:
Q In your role as a director did you ever review any company policies?
A No.
Q In your role as a director did you ever hire anyone?
A No.
Q In your role as a director did you ever fire anyone?
A No.
Q In your role as a director did you ever inquire about an employee's compensation?
A No.
Q In your role as a director did you ever set anyone's compensation, like the amount?

A No.
Q In your role as a director did you ever declare any dividends for shareholders?
A No.
Q In your role as a director did you ever consult with any advisors to Widen Enterprises?
A No.
Q Did you ever consult with any advisors to Windy Waters?
A No.
Q In your role as a director did you ever meet with attorneys to the companies?
A No.
Q In your role as a director did you ever consult with accountants to either company?
A No.
Q Let's say in this time frame, 2007, did you know who were accountants to the company?
A No, I don't.
Q Did you ever use Baker Tilly, the firm Baker Tilly?
A Yes.
Q Do you remember whether Baker Tilly were the accountants to the company in 2007 to either company?

A They changed their name. It was -- gosh. Virtual -- what was it? Was it Virtual Krause. Baker Tilly is now something -- it's a different name than the original name.

Q They were called something before and then they became Baker Tilly?

A Yes.

Q Did you ever consult with the predecessor entity?

A No.

MS. POLAKOWSKI: Object to form.

BY MR. CHURCHILL:

Q Ms. Randall, have you heard of the term before fiduciary duty?

A I have heard it, yes.

Q What is your understanding of what a fiduciary duty is?

MS. POLAKOWSKI: I will object to the extent that the question would require you disclose information that was discussed between yourself and counsel. I will instruct you not to answer. If you have an understanding independent of what we have told you, you can provide that.

BY MR. CHURCHILL:

Q Do you have an independent understanding outside

of your conversations with counsel about what a fiduciary duty is?
A I always just thought it was -- yeah, that it had to do with a person that was looking out for my best interest.
Q Did you have an understanding that fiduciary duties can be owed to shareholders?
MS. POLAKOWSKI: Same objection and same instruction.
THE WITNESS: No.
BY MR. CHURCHILL:
Q Did you understand in your role as a director that you might owe fiduciary duties to anyone?
MS. POLAKOWSKI: Same objection. Calls for a legal conclusion.
BY MR. CHURCHILL:
Q Do you understand my question?
A Repeat it, please.
Q Sure. Let me break it down a little bit. So you testified that you were a director, right?
A Yes.
Q And you knew that you were a director?
A Yes.
Q Although you're not sure as to which company you were a director?

A Correct.
Q At the time that you were serving as a director, did you believe that you owed fiduciary duties to anyone?
A I was not sure what fiduciary duties was. So I didn't know.
Q In your role as a director did you believe that you had any type of duty to anyone other than yourself?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: Can you rephrase that, please?
BY MR. CHURCHILL:
Q Let me try it this way. So backing away from fiduciary duty because my understanding of your testimony just now is that you didn't consider fiduciary duty like as a legal concept at the time. In your role when you were serving as a director, did you consider that you had any type of duty or obligation to anyone other than yourself with respect to your role with the companies?
MS. POLAKOWSKI: Object to the extent that it calls for a legal conclusion.

THE WITNESS: I wouldn't know that.

BY MR. CHURCHILL:

Q It wasn't something that was in your mindset at the time?

A No.

Q Let's look at the second amendment again and back to your signature.

MS. POLAKOWSKI: Is that Exhibit 5?

MR. CHURCHILL: That is Exhibit 6.

THE WITNESS: I have got it.

BY MR. CHURCHILL:

Q Exhibit 6. So I wanted to look at your signature again, and with that in your mind, you're aware that the question of the use of a signature stamp has come up in this litigation, right?

A Yes.

Q And the signature stamp that we're talking about or at least one of them would be your signature stamp, correct?

A Yes.

Q As you sit here, can you tell whether or not one of the signatures on Exhibit 6 is the signature stamp?

A It is not.

Q And why do you know that?
A The signature stamp was more bold and darker.
Q Okay. The signature stamp was first an issue that came up after you moved to Florida, right?
A Yes.
Q And do you remember when you moved to Florida in 2001, roughly when?
A December.
Q What precipitated or caused that decision to move to Florida?
A Can you ask me that in a different way?
Q Yeah. Why did you move?
A To get away from my dad.
Q Any other reasons?
A No.
Q Did you move with the rest of your family?
A I moved with my husband and my youngest child because she was still in high school.
Q Justin did not go with you?
A No.
Q And what's your daughter's name?
A Lindsey.
Q A-Y?
A L-I-N-D-S-E-Y.
Q E-Y. And so in December of 2001 you were not

working for Widen Enterprises anymore?
A No.
Q But you were a director of Widen Enterprises at the time, correct?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I don't know for sure.
BY MR. CHURCHILL:
Q Do you know whether you were president of Windy Waters at the time?
MS. POLAKOWSKI: Same objection. Calls for a legal conclusion.
THE WITNESS: I didn't know that I was ever president.
BY MR. CHURCHILL:
Q How did you notify, if at all, your family that you were moving to Florida?
A I told my dad face to face. I don't recall how I told my brothers.
Q And what part of Florida did you move to?
A Tampa area.
Q Were you concerned at all about being able to fulfill any responsibilities that you had to the companies by moving to Florida?
MS. POLAKOWSKI: Objection. Calls for

a legal conclusion. Also assumes facts not in evidence.

THE WITNESS: I don't believe I was in my right frame of mind when that was all going on.

BY MR. CHURCHILL:

Q Did you have -- in your mind did you have responsibilities to the companies in 2001 when you moved to Florida?

MS. POLAKOWSKI: Same objections.

THE WITNESS: I know that I had to sign things.

BY MR. CHURCHILL:

Q And in what capacity were you signing things?

A What do you mean "capacity"?

Q You said that you had to sign things. Why did you have to sign things?

MS. POLAKOWSKI: Object to the extent it calls for a legal conclusion.

THE WITNESS: I don't know.

BY MR. CHURCHILL:

Q Well, you knew you had to sign things. Did you believe you had to sign things because you were a director?

MS. POLAKOWSKI: Same objection.

THE WITNESS: I wasn't sure why I had

to sign actually.
BY MR. CHURCHILL:
Q Did you believe that you had to sign things because you were a shareholder?
MS. POLAKOWSKI: Same objection.
THE WITNESS: I didn't know why I had to sign things.
BY MR. CHURCHILL:
Q But you knew that you had to sign things as you're calling them?
A Documents.
Q So that was -- you have anticipated my next question. What kind of things do you think you would need to sign?
A Whatever Mike Kiesler asked me to sign.
Q That's the first time Mike's name has come up. When did he first start getting involved in the company as far as you can remember?
A I know my dad hired him. I don't recall when.
Q So in 2001 when you moved to Florida, do you remember what position or role Mike Kiesler had?
A He was CFO.
Q And anybody else other than Mike Kiesler that might need you to sign something?
A No.

Q What about your dad?
A In '01 he wasn't doing much at the office.
Q Okay. So who was doing much at the office in '01, Reed?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I don't know what Reed was doing.
BY MR. CHURCHILL:
Q I know this is back in time, but in 2001 when you moved, who was running the companies?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I am not sure --
BY MR. CHURCHILL:
Q So --
A -- about that.
Q So you mentioned that you did tell your dad that you were moving, right?
A Yes.
Q Did you tell your dad because you felt like he was the person that needed to know from a company perspective, or did you tell your dad because he's your dad?
MS. POLAKOWSKI: Objection. Calls for

speculation.

THE WITNESS: I told him because he's my dad.

BY MR. CHURCHILL:

Q Were you concerned about your ability to sign documents remotely?

A I was not.

Q Why were you not concerned?

A I don't think I even thought about it.

MS. POLAKOWSKI: We have been going about another hour. At a convenient time can we take a break whether for lunch or otherwise?

MR. CHURCHILL: Sure.

BY MR. CHURCHILL:

Q Let me just ask a couple more questions so we can finish with that issue.

So you said you're not sure if you ever thought about it. When did you first realize I'm going to need to sign some things?

A When Kiesler sent me something to sign.

Q And do you remember what that was?

A I have no idea.

Q How often did Kiesler send you things to sign in this time frame, let's say 2001, 2002?

A I don't remember.

Q Do you remember the types of things that you had to sign?
A Pretty much stuff like sign this.
Q And Mike Kiesler is not your dad, so did he give you the whole document or just the signature page?
A I can't remember.
Q Would Mike Kiesler explain to you what it was that he wanted you to sign or that they needed signed?
A I don't remember for sure.
MR. CHURCHILL: We can take a break.
THE VIDEOGRAPHER: We will go off the record. The time is 11:43 a.m.
(Lunch recess taken.)
THE VIDEOGRAPHER: We are back on the record. This will mark the beginning of media unit number 2 of the video recorded deposition of Stacy Randall. Today's date is August 28th, 2023, and the time is 12:39 p.m.
BY MR. CHURCHILL:
Q Good afternoon, Ms. Randall.
A Good afternoon.
Q Before we broke for lunch we had started talking about your move to Florida. Do you recall that?

A Yes.
Q And we were also talking about your signature as well. Do you remember that?
A Mm-hmm.
Q I wanted to talk more about the stamp, your signature stamp.
A Okay.
Q If I understand correctly, you purchased the stamp from a Staples in Florida; is that correct?
A No.
Q Where did you purchase the stamp from?
A Staples in Monona.
Q And is that in Wisconsin?
A Yes. It's about two miles from the office.
Q Do you have a recollection of when you purchased the stamp?
A I don't. It was after '01.
Q Do you think it was in 2002?
A I can't even guess.
Q I have got a document that I'm pretty confident is the stamp, and we will go over that so we can try to figure out when it was used.
Is there a date in your mind when you could say I know as of this date no question the

stamp was being used?
A No, there's not.
Q Can you tell me how you had the stamp made, like the process?
A Well, I just signed a piece of paper at Staples, and then they took it, and when I came back in I went back and got it.
Q Are you left-handed?
A I am.
Q And so do you remember what type of pen you used to sign it?
A No.
Q You were mentioning that the ink is a little thicker on the stamp, correct?
A Yes.
Q Do you remember if it was a felt tip point pen as opposed to a ball point pen?
A I paid no attention to that. I can't tell you.
Q Do you know if the stamp was supposed to be used with a certain color ink or did that matter?
A It was self-inking.
Q How does that work?
A When you just press down on it and it turns black. So I think when it turns upside down it gets the ink, and then when you press it down,

that was my signature.
Q I see. So there's ink in the stamp, you don't use a blotter?
A Right.
Q I'm showing my age now. Do you remember how it was that the decision to use a stamp came about?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I don't know what Mike Kiesler was thinking, no.
BY MR. CHURCHILL:
Q Isn't it true that one of your brothers was using a stamp also?
A I'm not aware of that.
Q Do you remember having a conversation in Mike Kiesler's office with your brother Stewart and Mike where the fact that Stewart was using a stamp came up?
A No. I don't recall that.
Q Do you ever remember any of your brothers telling you that they sometimes use a signature stamp instead of their ink signature?
A No, I don't remember that.
Q Is it your understanding that any of your family sometimes used an ink stamp besides yourself?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I don't know.

BY MR. CHURCHILL:

Q Tell me what you remember about whose decision it was to use the stamp, initially I mean?

A I don't know who it was; either Reed or Kiesler.

Q Was it your suggestion or Reed or Kiesler?

A It was one of those two.

Q Did you agree that the stamp was something that could be used on occasion?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: Well, it depended. I needed to know when they used it.

BY MR. CHURCHILL:

Q Tell me what you recall about the conversation where it was decided that the stamp could be used on occasion.

A I don't remember a conversation.

Q Did you communicate with anyone, with the companies about the conditions under which your stamp could be used?

A They were supposed to let me know.

Q And who did you tell that to?

A Mike Kiesler.

Q And did that happen on the telephone or over email?
MS. POLAKOWSKI: Object to form.
BY MR. CHURCHILL:
Q Do you understand my question?
A You want to know --
Q Don't guess. Let me tell you or let me reask it. I'm interested in you telling me about the conversation or communication you had with Mike Kiesler or Reed where it was decided when the stamp could be used. Do you remember discussing it with anyone?
A I remember -- I remember a little bit of the conversation, yes.
Q And who was the conversation with?
A Mike Kiesler.
Q What was said?
A I told him that -- when he asked me about getting a stamp, I said I don't have a problem with that as long as you let me know when you're using it.
Q And was that a conversation that was had in person or over the telephone?
A That I don't remember.
Q You said that he asked. What do you mean, it

was Mike's idea to use the stamp?
A I don't know if it was Reed or Mike who made the decision. I don't know.
Q Did you agree to use the stamp when it was to be used? In other words, under the conditions did you say, yes, I agree that the stamp can be used under certain conditions?
A I don't recall them ever asking except for in late -- I don't remember. Was it December or something he texted me or emailed me and asked me if I could use my stamp.
Q You agree that you knew the stamp was going to be used at certain times because you got the stamp and gave it to Mike, right?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I didn't agree with that. No.
BY MR. CHURCHILL:
Q You purchased the stamp, right?
A Yes.
Q And you brought it to Mike Kiesler?
A Yes.
Q And you gave it to him?
A Yes.

Q Did you hand it to him yourself?
A I don't remember that.
Q Do you remember what you said to Mike when you gave him the stamp?
A Here it is.
Q Okay. And you understood that when the stamp was used, the stamp would be a substitute for your actual handwritten signature, correct?
A That's what I was told.
Q And you understood that, correct, you understood that it was going to be a substitute for your handwritten signature?
A Yes. But they needed to ask me first or let me know first.
Q I understand that part of your testimony as well. So tell me what you remember as well as you can remember about how you directed the stamp to be used?
A When they needed my signature they could use the stamp as long as I was aware of it.
Q And did it matter how they communicated with you to get your approval, for example, was text okay?
A I don't recall if we talked about that.
Q Did you ever text your approval to use the

signature?
A Never.
Q Was phone conversation okay to get your approval?
A I don't recall ever a phone conversation.
Q Were there any documents that you're aware of that you agreed to have the stamp used where you didn't have to approve it in advance? In other words, you knew it would be used and you said, that's okay, I don't need to approve those?
A No.
(Exhibit No. 7 was marked.)
BY MR. CHURCHILL:
Q Ms. Randall, you have been handed what's been marked for identification as Exhibit 7 to your deposition.
A Yes.
Q And this is a document that's titled, "Restated Stock Transfer Agreement." Do you see that at the top of page 1?
A Yes, I do.
Q And the date for this document it says that it's made effective December 31, 2012. Do you see that?
A Yes, I do.

Q And this document appears to concern a transaction between Terry Vial. Do you see that?
A Yes, I do.
Q Windy Waters and Widen Enterprises. Do you see that?
A Yes.
Q Do you remember Terry Vial?
A Yes.
Q Who is Terry Vial?
A A very good friend of Reed's.
Q And was he a shareholder in the company -- or Windy Waters at a certain point in time?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I'm not aware of that.
BY MR. CHURCHILL:
Q You don't remember whether Terry Vial ever held shares in the company?
A I don't know if he did.
Q If -- I will note for the record that this document is not Bates labeled, Exhibit 7, but I do believe it's been produced in the case. And we can provide the Bates number if you guys need it on the break.

If you would flip, Ms. Randall, in Exhibit 7 to page 13 of the document?
A That's my stamp.
Q That is your stamp?
A Yup.
Q And I think I know what you're going to say, but tell me why you say that's your stamp.
A Because it's bold and very dark black.
Q And to the best of your recollection that's what the piece of paper looked like that you submitted to have the stamp created?
A Yes.
Q Can you go back, if you would, to an exhibit that we discussed prior to lunch, Exhibit 6, it's the second amendment to the shareholder agreement, the first page is a consent to shareholder agreement page, and then we were discussing your signature. So this would be on page 3 of the exhibit that I wanted you to turn to.
A Mm-hmm.
Q So you said before that you were -- that you did not believe that -- or at least you weren't certain that the signature on page 3 of Exhibit 6 was actually your signature; am I remembering

your testimony correctly?
A Yes.
Q Can you compare the signatures between these two documents and tell me whether or not you still wonder if it's your signature?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: If I still think this is my signature or not my signature?
BY MR. CHURCHILL:
Q Yes. Or if you can tell.
A I can't really tell.
Q Let's go to Exhibit 4, the one that I told you you wouldn't need to see again. I didn't really say that. You asked me. I'm bringing back Exhibit 4, and that's the 1992 shareholder agreement. Do you have that?
A Yes.
Q And do you remember we were looking at page 18?
A Yes.
Q Can you go to page 18?
A Sure.
Q And you see your signature on that page?
A I do.
Q And now comparing the three, it looks like your

signatures are a little different on each document. Do you agree with that?
A Yes.
Q Is it possible that you sign documents differently at times?
A Yes.
Q Have you always written out your middle name when you sign documents or do you sometimes not write it out?
A Sometimes I don't write it out.
Q In your signature that's in the signature stamp for Exhibit 7, I'm going to ask you to look at it with me. It looks like you did write out Widen, maybe, but it's super quick or quick?
A Yes.
Q I don't want to say sloppy because I'm not trying to offend you, but it's quickly written. Do you agree with that?
A I don't think it was quick. I don't recall it being quick. I don't know what I was thinking at the time.
Q Fair to say that you -- when you signed things sometimes your signature is more legible than other times?
A When I changed my signature to this.

Q On Exhibit 7?
A Yeah, the initials.
Q Yes.
A Was when we started doing real estate in Florida, and there was so many documents that I had to sign that I got tired of doing that. So I just went (noise) and that's been my signature ever since.
Q And just for the record when you said "doing that," you got tired of writing it --
A Stacy Widen Randall, writing it all out.
Q Okay. And if I can find other examples of the stamp, I will. But you agree the stamp is the version of the signature in Exhibit 7?
A Yes, I do.
MR. CHURCHILL: Okay. Thank you, Ms. Randall.
(Exhibit No. 8 was marked.)
BY MR. CHURCHILL:
Q Ms. Randall, the court reporter has handed you now what's been marked for identification as Exhibit 8 --
A Yes.
Q -- to your deposition, and this is a document titled, "Plaintiff Stacy L. Randall's Objections

and Responses to Defendant's First Set of Interrogatories." Do you see that?
A Yes.
Q And on the last -- we're missing from this version actually your verification, but do you recall reviewing interrogatory responses for purposes of this case to then respond to questions from defendants?
A Can you tell me what an interrogatory is?
Q Sure. So an interrogatory, I will state for the record, is a written question that you can serve on another party in a case. So you have served interrogatories on defendants and defendants have served interrogatories on you.
In this particular example this is a set of questions, the interrogatories, that you have answered.
A Yes.
Q And your attorneys worked with you, and there's one about the stamp that I just wanted you to look at.
A Okay.
Q And I believe it is -- it starts on page 7 of Exhibit 8, interrogatory number 3. Tell me when you're there.

A Yes.

Q I will just read it out loud. Interrogatory number 3 reads, "Identify and describe your decision to obtain and provide for use by the companies a 'rubber signature stamp' as referenced in paragraphs," and then it lists a number of paragraphs in the Complaint. Do you see that?

A Yes.

Q And then there's some lawyer speak on bottom of page 7, and then we're going to flip over and look at your answer. It's at the top of page 8. That reads, "Plaintiff purchased a stamp with her signature at the request of Mr. Kiesler." Do you see that?

A Yes.

Q Is that still correct?

A I guess I was assuming -- yes, he's the one that asked me.

Q And next line, "Plaintiff moved to Florida from Madison, Wisconsin, in or around 2001. Because plaintiff lived in Florida, Mr. Kiesler or other members of company management would fax or scan documents to plaintiff to sign." Do you see that?

A Yes.
Q And do you recall that prior to using the stamp Mr. Kiesler or other members of company management would fax or scan documents for you to sign?
A Yes.
Q Are you aware of any instance where Mr. Kiesler or members of management did not send you a document to sign?

MS. POLAKOWSKI: Object to the form of the question.

THE WITNESS: Can you rephrase that, please?

MR. CHURCHILL: Can you read it back?

(Last question read back.)

MR. CHURCHILL: And I'm speaking specifically in this time frame after you moved to Florida and your interrogatory response says that -- Mr. Kiesler or other members of company management would fax or scan documents for you to sign. So what I'm asking is whether you're aware of a situation where something that needed to be signed by you was not faxed or scanned to you?

MS. POLAKOWSKI: Objection to the form of the question.

THE WITNESS: I wouldn't know because I didn't -- all I know is the ones that they did send me, and by the looks of the stamps I was not aware of those.

BY MR. CHURCHILL:

Q Okay. But before the stamp was being used, you're not aware of an occasion where something wasn't sent to you that needed to be signed?

A I don't know what I don't know, I guess.

Q The interrogatory then continues, "Following plaintiff's move, Mr. Kiesler asked plaintiff to get a stamp with her signature in the event a document needed to be signed quickly and plaintiff was unavailable to sign and scan and/or fax the document to Windy Waters." Do you see that?

A Yes.

Q And does that still reflect your testimony regarding the stamp?

A Yes, it does.

Q Reading on, "Plaintiff agreed, provided the stamp was used for the limited purposes of signing documents that required a quick turnaround and on the express condition that Mr. Kiesler or another member of Windy Waters'

leadership notified plaintiff each time they wished to use the signature stamp. Mr. Kiesler agreed to plaintiff's terms." Do you see that as well?

A Yes.

Q Do you remember the discussion about distinguishing between documents that required a quick turnaround versus documents that did not require a quick turnaround?

A It seemed everything that he sent me was quick turnaround.

Q But do you remember saying to Mr. Kiesler or anyone else in management that if a document doesn't require a quick turnaround, the stamp is not to be used?

A No.

Q Do you remember the quick turnaround requirement at all?

MS. POLAKOWSKI: Object to the form of the question.

THE WITNESS: Like I said, everything that Kiesler sent me seemed to be needed quickly.

BY MR. CHURCHILL:

Q My understanding of your interrogatory responses is that the stamp was not to be used unless the

signature required a quick turnaround, was that the case?
A I'm not sure.
Q Did you go back to Wisconsin at any point for the express purpose of signing documents?
A Not that I can remember.
Q Did you ever say that if a document that required signing didn't require a quick turnaround that you expected to be able to come back to sign the documents in person?
A No.
Q Do you remember anything about the quick turnaround requirement other than the fact that documents normally needed to be signed on a quick turnaround basis?
A I don't.
Q The next statement is, "Following the conversation with Mr. Kiesler, plaintiff went to a Staples in Monona, Wisconsin, and purchased the stamp. Plaintiff then provided the stamp to Mr. Kiesler." Do you see that?
A Yes.
Q And that's your testimony here today as well?
A Yes.
Q After the stamp was acquired and we're not sure

exactly when, but sometime after 2001, do you remember occasions when Mike would reach out to you to ask you if the stamp could be used?
A Just one time and that was in December of '19, maybe.
Q Is it possible that Mike did reach out to you to ask your permission to use the stamp on other occasions and you had forgotten?
A That's possible.
Q You may have already answered this, Ms. Randall, but remember we just looked at Exhibit 7 --
A Yes.
Q -- which had the example of the stamp?
A Yes.
Q Do you remember signing this document involving Terry Vial and the companies that has your signature stamp that's dated December 31, 2012?
A I did not sign that.
Q My mistake. Do you remember agreeing to have the stamp used?
A No.
Q Is it possible that you agreed to have the stamp used and you don't remember?
MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: Anything is possible. So, yes, maybe I don't remember, but --

BY MR. CHURCHILL:

Q Do you remember every occasion that your stamp was used in 2012?

MS. POLAKOWSKI: Objection. Calls for speculation. Foundation.

THE WITNESS: No.

BY MR. CHURCHILL:

Q Is it your testimony in this case that other than the time that you remember your stamp being used, which you said was sometime in late 2019, that that use of your stamp was without your approval?

A Can you repeat that, please?

MR. CHURCHILL: Can you read it back, please?

(Last question read back.)

THE WITNESS: The use of my stamp was -- I don't recall any phone call or text or email other than that one in December of '21.

BY MR. CHURCHILL:

Q So this takes me back to the same question. I want to make sure you can answer it if you can.

So is it your position then that for all

the other occasions where the stamp may have been used but you don't remember that that use was without your approval?

MS. POLAKOWSKI: Objection. Speculation.

THE WITNESS: Yeah. It was a long time ago. Possible. I can't answer that for sure.

BY MR. CHURCHILL:

Q If you did give your approval to use the stamp, you agree that it could be used?

A The one time, yes.

Q Let's say on any time that you gave your approval, if it's shown that you gave your approval and you just have forgotten, you agree the stamp could be used, correct?

MS. POLAKOWSKI: Objection calls for speculation.

THE WITNESS: I don't recall ever giving permission to use my stamp.

BY MR. CHURCHILL:

Q And I understand that. What I'm asking is slightly different. Let's assume that you did give your approval on another occasion, pick a date, 2015. Do you agree that if on that occasion you gave your approval to Mike Kiesler

Case: 3:22-cv-00400-jdp Document #: 58 Filed: 09/29/23 Page 121 of 328


or to Reed or to whomever, if you gave approval to use it, do you agree that that was a proper use of the stamp?

MS. POLAKOWSKI: Objection calls for speculation. Foundation.

THE WITNESS: I didn't assume anything. So I would have to say no.

BY MR. CHURCHILL:

Q Tell me again the conditions on which you were going to allow the use of your stamp. From the moment that it was created the conditions were what?

MS. POLAKOWSKI: Objection. Asked and answered.

THE WITNESS: The conditions were that I needed to know when they were using my stamp.

BY MR. CHURCHILL:

Q And were there further conditions in terms of how you needed to know?

A No.

Q So let's assume that there was an occasion other than late 2019 where you were told in advance that they wanted to use your stamp, and you said, yes, would that be an approved use of your stamp?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I don't ever recall anything -- them ever calling and asking except for that one time.

BY MR. CHURCHILL:

Q I understand that. And at the risk of incurring another objection from your counsel, I'm asking you to assume -- it's a hypothetical. So by assuming and as a hypothetical it doesn't mean it actually happened. It's a hypothetical. Just like I can assume that I'm Donald Trump, and I'm sitting in the room.

Assume that you actually did agree to the use of your stamp in a conversation with Mike Kiesler. If it was then used, would that have been okay?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I don't know what I would have done at the time.

BY MR. CHURCHILL:

Q So if you approved use of the stamp, you would then have been upset or disagreed if the stamp was used?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony. Calls for speculation.

THE WITNESS: The only reason they were allowed to use my stamp was if I knew about it. There's not much more to say.

BY MR. CHURCHILL:

Q Not only if you knew about it, right, but if you had agreed?

A Yes.

Q Not just if you knew?

A Knew and I agreed.

Q So if you knew and agreed, would it have been okay to use the stamp?

MS. POLAKOWSKI: Same objections.

THE WITNESS: I don't know what I would have done in that situation.

BY MR. CHURCHILL:

Q So is it your testimony that if you had known about use of the stamp and agreed to its use that you may have protested if it was used?

MS. POLAKOWSKI: Objection. Calls for speculation. Mischaracterizes her testimony.

THE WITNESS: I can't say that for sure.

BY MR. CHURCHILL:
Q It's important to you, right, to know whether or not your signature was being validity used, do you agree with that?
A Yes.
Q And you agree that the stamp when approved by you substituted for your signature, correct?
A Yes.
Q You understand that your signature is a significant thing, in other words, that the signing of a document has legal consequences. Do you agree with that?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: Can you give me a for instance?
BY MR. CHURCHILL:
Q Well, if you sign a document, does that have significance to you?
MS. POLAKOWSKI: Same objections. Calls for speculation.
THE WITNESS: Yes.
BY MR. CHURCHILL:
Q Okay. And what do you understand it to mean if you decide to sign a document?

MS. POLAKOWSKI: Same objections.
THE WITNESS: It depends on what kind of a document it is.
BY MR. CHURCHILL:
Q Let's say that it's the shareholder agreement and you signed it. Isn't signing an agreement in your mind what you're thinking when you sign something, doesn't that mean that you are agreeing to the contents of the document?
MS. POLAKOWSKI: Object to form. Mischaracterizes her testimony. Also calls for a legal conclusion.
THE WITNESS: I would have to talk to my lawyers.
BY MR. CHURCHILL:
Q I'm not asking what your lawyer thinks. I'm asking what you think.
A I don't know what I think, and I probably would need an explanation from my lawyers.
MR. CHURCHILL: Okay. So can you read my question back, please?
(Last question read back.)
MS. POLAKOWSKI: And I will restate my objections.
THE WITNESS: Regarding the

stockholders agreement, I believe that was one that my dad had us sign. I didn't know what I was signing.

BY MR. CHURCHILL:

Q Okay. So I'm trying --

A I didn't understand what I was signing.

Q I heard your testimony. So I'm trying to be more basic. I will be as basic as I can because I'm not trying to trick you. I'm trying to understand what you are thinking when you sign something.

If you sign a document that's like an agreement, what does your signature mean to you -- not to your attorney -- what does your signature mean to you when you sign it?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Also calls for speculation. Incomplete hypothetical.

THE WITNESS: Like a check or something like that is a document.

BY MR. CHURCHILL:

Q Okay. What does it mean to you when you sign a check to you?

A That I just paid a bill, and it's my proof.

Q So you're agreeing -- in the case of a check do

you agree that if you write a check, you're agreeing that this is money that can be taken from your account to pay for something?
A Yes.
Q Okay. So if you agreed to have the stamp used in a certain circumstance, right, let's say that you agreed, you approved of its use and you agreed that the stamp could be used, are you then agreeing that your stamp has the same power as your handwritten signature?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Calls for speculation.
THE WITNESS: If I knew about it and I understood it, my stamp could be used.
BY MR. CHURCHILL:
Q Okay. And if you had approved the use of your stamp, then you agree that that use could be relied on, like your stamp was something that could be used and could be relied on if you agreed to have it used?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I was under -- that's what I was told.
BY MR. CHURCHILL:

Q That's what you were told by who?
A Mike Kiesler.
Q What do you mean?
A Well, he could -- I guess I told him if I knew about it and I understood it, he could use my signature. I can't assume that I would or not because I don't remember them ever asking me.
Q Okay. So then back to my earlier question. If there was an occasion when you approved the use of the stamp and you remember one, right, late 2019, if there was an occasion where you approved the use of the stamp, you agree that the stamp could be used for your signature?

MS. POLAKOWSKI: Objection. Calls for speculation. Legal conclusion.

THE WITNESS: That day was not a good day for me, and I do recall them, Reed and Mike Kiesler trying to call me numerous times, and I was just getting irritated with them. And when Mike Kiesler first asked me, I told him, no, you could not use it.

BY MR. CHURCHILL:
Q I know exactly -- I'm going to try one more time and -- I'm going to try one more time. I'm not talking about that situation yet. I'm going to

get to it and show you documents so that you're comfortable with that situation. Because I think I know the time you're talking about in late 2019.

Just more generally, Ms. Randall, if you -- hypothetically, I'm not saying you remember an occasion, but hypothetically if you gave approval to use the stamp, right, you knew about it ahead of time and you gave approval, then you agree that the stamp could be used, correct?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Speculation.

THE WITNESS: I don't know whether I agree or not.

BY MR. CHURCHILL:

Q Was there something else required besides your approval?

A Me understanding what the document said.

Q So was a condition of using the stamp you also saying to someone I know what the document is, and I understand the document?

A That was not said. That was just in my mind. I did not say it, per se.

Q Do you remember an occasion where you were

prevented from looking at a document that required your signature?
A Yes.
Q What occasion is that?
A These ones from my dad.
Q Well, if I understood your testimony earlier, you said you only remembered seeing the signature page. You didn't say somebody prevented you from seeing the document.
A Well, he prevented me from seeing the document.
Q Did you ask to see the document?
A No. It was my dad, no.
Q So how did your dad prevent you from looking at the document before you signed it?
A He did not give it to me.
Q Did you ask?
A I did not ask, and I would not ask.
Q But you could have asked?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I don't feel I could have asked.
BY MR. CHURCHILL:
Q Why don't you feel you could have asked?
A Because he was mean and scary.

Q So on occasions when you had to sign a document -- strike that.

Your father being mean and scary prevented you from asking to review a document, or you think that that's what happened?

MS. POLAKOWSKI: Objection to the extent it mischaracterizes her testimony.

THE WITNESS: I know that I wouldn't have asked my dad to see the document.

BY MR. CHURCHILL:

Q Do you know that your father would have said no if you had asked?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I don't know what my dad thought.

BY MR. CHURCHILL:

Q So your dad might have shown you the document if you asked to see the document --

MS. POLAKOWSKI: Same objection.

MR. CHURCHILL: -- isn't that true?

THE WITNESS: I don't know what my dad would have thought.

BY MR. CHURCHILL:

Q It's possible that your dad would have said --

yeah, let me finish my question before you object and before you answer.

It's possible, right, if you had asked your father to review the document that he would have said yes?

MS. POLAKOWSKI: I will object. Calls for speculation. Also asked and answered.

THE WITNESS: I don't know what my dad would have said.

(Exhibit No. 9 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, you have been handed what's been marked as Exhibit 9 for identification, and this is a -- it's a four-page printout of a string of emails. You can take a moment to review that. I think this is the late 2019 exchange that you were talking about.

A There's no print or anything.

Q So let's go to the first page. At the very top do you see where the date is Thursday, December 26th, 2019, at 3:05 p.m.?

A Yes.

Q And this is from Mike Kiesler to you, correct?

A Yes.

Q And I believe the chat means that this is a text

exchange?
A Possible.
Q It looks like Mike's cell phone is listed there under the from, 608-212-7825. Do you see that?
A Yes.
Q And Mike says, "Hi, Stacy, hope you had a wonderful Christmas" -- and I assume that square used to be some type of emoji -- "and are enjoying the warm temps. Is it okay that I use your signature stamp on the consent resolution for the buy back of the children's trust shares." Do you see that?
A Yes.
Q And is this the exchange you were talking about before in late 2019 where someone asked for your approval to use the stamp?
A Yes.
Q Do you remember that particular request from Mike or just now remember it because you see the document?
A I remember that Reed and Mike were trying to get ahold of me all day, and I wasn't answering their calls.
Q If you flip -- go ahead.
A And I believe I said, no, when I finally did

answer it.
Q So if you flip to page 2, there's a response from you. It looks like at 4:15 p.m. Do you see that?
A Mm-hmm.
Q And you said, "No," correct?
A Mm-hmm.
Q It looks like the next response, if you go to the next page, Mike two minutes later texts back and says, "Are you just kidding?" Do you see that?
A Yup.
Q And then shortly after you responded at 4:18 p.m. you texted back and said, "No, I am not kidding. I cannot talk right now. I'm under some extreme pressure right now. This will have to wait." Do you see that?
A Mm-hmm.
MS. POLAKOWSKI: That's a "yes," Stacy?
THE WITNESS: Yes.
BY MR. CHURCHILL:
Q Do you remember what your extreme pressure was at the time?
A Yes.

Q What was it?
A I can't -- I really would rather not talk about it.
Q Okay.
MS. POLAKOWSKI: Stacy, do you need to take a break?
MR. CHURCHILL: Do you need a break?
THE WITNESS: Yes. Can I for a few minutes?
MR. CHURCHILL: Yes.
THE VIDEOGRAPHER: We will go off the record. The time is 1:24 p.m.
(Brief recess taken.)
(Exhibit No. 10 was marked.)
THE VIDEOGRAPHER: We are back on the record. The time is 1:39 p.m.
BY MR. CHURCHILL:
Q Okay. Ms. Randall, I wanted to go back and talk about Exhibit 9 again. That was the email or the text exchange between you and Mike. Do you have that?
A Yes, I do.
Q At the time that you were texting with Mr. Kiesler in late December 2019, did you know what his reference was to the consent resolution

for the buy back of the children's trust shares?
A No, I did not.
Q Do you recall whether your brother Reed had reached out to you earlier that day on this issue?
A I believe he did.
Q You have been handed what's been marked for identification as Exhibit 10 to your deposition. And this looks like it's a colored picture of a screenshot from your phone. Do you agree with that?
A Yes.
Q That is your phone, right?
A I'm not sure because it says "Reed Widen" at the top. Maybe it's his phone.
Q This was produced by you. Do you see the Bates number on the bottom is Randall390? And if I understand it correctly, your brother Reed's communication in this text string are on the left-hand side of the phone and your responses are on the right-hand side. Do you agree with that?
A Well, his are black and mine is green.
Q So his black ones are leaning to the left and your green ones are leaning to the right?

A Correct.
Q So it looks like on December 26th, 2019, at 9:21 a.m., which would have been the same morning that Mike texted you, Reed wrote and said, "Can you talk to Mike Kiesler? We need your signature." Do you see that?
A Yes.
Q Is that the communication that you were remembering that he made on this issue earlier in the day?
A Yes.
Q Did he talk to you by telephone as well?
A I cannot remember.
Q Is this the type of communication that you would get from Reed from time to time regarding a need to get your signature?
MS. POLAKOWSKI: Objection. Form. Vague.
THE WITNESS: I normally didn't get things from Reed for signature.
BY MR. CHURCHILL:
Q Do you recall another time that Reed texted you asking you for your signature on something other than Exhibit 10?
A I do not recall that.

Q And then I'm going to combine the two documents for purposes of giving a time chronology here. So it looks like after you responded to Mike at 4:15 p.m., that was part of Exhibit 9, when you said, no, you then responded to your brother Reed and said, "Sorry, I can't talk right now." Do you see that?
A Yes.
Q And I don't think we know the exact time frame of his responses, but he responds after you and says, "Call me soon." Do you see that?
A Yes.
Q "Can you talk," and then he says, "Call me, please. I have only tomorrow left to get your signature." Do you see that?
A Yes.
Q You agree that your brother was trying to get your signature for purposes of signing some documents, correct?
A Yes.
Q And you agree that Mike Kiesler was trying to get your signature and asking for your signature?
A Yes.
Q And then at 6:01 p.m. still December 26th your

brother Reed says, "Are you okay? Can I help you somehow?" Do you see that?
A I do.
Q And then it doesn't look like you texted back in this thread because the next communication is from March the 3rd, 2020. Do you agree with that?
A Yes.
Q Do you recall if you called your brother on the phone in response to his question about whether you were okay and can I help you somehow?
A I don't know for sure who called who, if I called him or he called me.
Q But you did speak to him about what was troubling you?
A No. I did not.
Q Did you ultimately give your consent that was being requested on December 26th that you originally said no to?
A Yes, I did.
Q And was there a business related reason to you initially saying no to the request to use your signature stamp?
MS. POLAKOWSKI: Objection. Form. Vague.

BY MR. CHURCHILL:
Q Do you understand my question?
A No.
Q You originally said no, correct?
A Right.
Q And was that a personal reason as opposed to a business reason related to Widen Enterprises or Windy Waters?
A I think it may have been a little bit of both.
Q Were you -- I didn't want to ask you why you were upset, but now I'm going to have to ask you. What was the reason that you were upset?
A I don't want to talk about it.
Q If it's a business related reason to the request for signature, I'm going to have to ask you to respond. If it's not related to the request for signature at all, then I don't need to pry and we don't need to know. But understand that if it's related at all to your saying no to the request for the signature, like if you had a reason that should have prevented them from using your signature, I need to ask you to provide that reason, please.
A I didn't know what they needed my signature for.
Q Okay.

A They were just asking for my signature.
Q Okay.
A And I wasn't -- I don't feel I was in my right state of mind to be signing documents or giving a signature.
Q And why do you say that?
A Because I was extremely -- it was an extremely bad day for me.
Q Okay. Did the badness of the day have to do at all with the business of the company?
A No.
Q Okay. And that's what I meant when I was asking before about a business related reason. So was the badness of the day a personal reason?
A Yes.
MS. POLAKOWSKI: Can we just take a --
MR. CHURCHILL: Sure.
BY MR. CHURCHILL:
Q Do you need a moment, Ms. Randall?
A No, I'm okay.
Q You understand why I have to ask you the question, right? You understand why I have to ask you the question?
A About why I was so upset that day?
Q Just about whether or not it was a business

reason because I just need to know whether or not there was a reason related to the actual request that caused you to say no. And I think you're saying that that's not the case. It was a personal issue.

A I didn't know why they needed my signature. They were pressuring me for my signature, and I didn't know why, and I wanted to know why.

Q But Mike Kiesler was offering to tell you why, correct?

A I never talked to Mike.

Q When you ultimately gave your consent to use the signature stamp, did you do that by telephone or by text?

A I don't remember. I don't remember.

Q Do you remember asking any questions about what the use of the signature stamp was for other than the issue that Mike raised in Exhibit 9 concerning the consent resolution for the buy back of the children's trust shares?

A I asked no questions.

Q Did you look at the entire document that your stamp was going to be affixed to or attached to?

A No.

Q Did you ask for it?

A I did not.
Q Did you understand what was happening through that document that your stamp was being applied to, in other words, the purpose of the document?
MS. POLAKOWSKI: Objection. Form. Calls for a legal conclusion.
THE WITNESS: I didn't see or read it.
BY MR. CHURCHILL:
Q Did you understand, however, what the actual document was intending to do in terms of the consent resolution for the buy back of the children's trust shares?
MS. POLAKOWSKI: Same objections.
THE WITNESS: I did not know that.
BY MR. CHURCHILL:
Q Did you think it was important to review that document at the time?
A At the time, no.
Q And you knew that providing your consent to use the stamp meant that your stamp was a substitution for your ink signature, correct?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I don't know what I was thinking that day.

BY MR. CHURCHILL:
Q Did you know that you were giving your approval?
A I felt I was being pressured to give my approval.
Q Did you tell anybody that you felt like you were being pressured to give your approval?
A No.
Q Did -- was there any other communication with respect to -- strike that.
You said you didn't remember how you ultimately gave your approval?
A No.
Q No, meaning you don't remember?
A No, I don't remember.
Q So you don't remember there being any additional pressure provided either, correct?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.
THE WITNESS: I don't remember that.
BY MR. CHURCHILL:
Q Would it be fair to say that you and Reed, your brother Reed, have had an up and down relationship?
MS. POLAKOWSKI: Object to form. Vague.

BY MR. CHURCHILL:
Q Do you know what I mean by "up and down"?
A Will you please explain to me what you mean by up and down?
Q Sure. So if I'm asking you about your relationship with Reed, would you say that sometimes you guys get along well and sometimes you don't get along well?
MS. POLAKOWSKI: Objection. Form. Is there a time frame you're asking about?
BY MR. CHURCHILL:
Q How about let's do your entire relationship with Reed to start and then we can narrow it down. Would you say that sometimes you guys have gotten along well and sometimes you haven't?
A Yes.
Q Would you agree that on occasion Reed has looked out for you?
A No.
Q How did you take his comment in Exhibit 10 at 6:01 p.m. where he says, "Are you okay? Can I help you somehow?" How did you take that or how did you interpret that?
A I don't remember.
Q Are you saying that Reed was not showing some

concern about the way you were feeling?

MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony.

THE WITNESS: I don't know what Reed was thinking or feeling that day. He's a manipulator.

BY MR. CHURCHILL:

Q And you don't remember that particular comment anyhow, correct?

MS. POLAKOWSKI: Object to form.

THE WITNESS: I don't -- I don't remember it.

BY MR. CHURCHILL:

Q Has Reed not looked out for you over the years by helping you financially?

A No, he has not.

Q Reed has never helped you out financially?

MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony.

THE WITNESS: How do mean financially?

BY MR. CHURCHILL:

Q When you needed help, has Reed found a way to help you out financially?

MS. POLAKOWSKI: Objection. Form. Assumes facts not in evidence.

THE WITNESS: Personally or through business he -- after I asked for some money from my stock, first he would blow up at me because this is ridiculous and we're not a bank and blah, blah, blah, and then he would eventually tell me to talk to Kiesler.

BY MR. CHURCHILL:

Q And what did you understand him to mean when he said we're not a bank?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I'm not sure what Reed was thinking when he said that.

BY MR. CHURCHILL:

Q That's not really what I asked. I'm asking what did you understand him to mean, not what he actually meant. What did you understand his comment to mean? I'm asking for your understanding.

A I was thinking that they don't have money to be giving me.

Q Did you ever say to him, well, the companies are a bank or something to that effect?

A No, I did not say that.

Q Did you understand his response -- did that mean

to you that you felt that he was annoyed with you?

A When he was asking, are you okay, can I help you?

Q No, the comment about the bank.

A Yes.

Q Do you feel like you treated the companies like a bank?

A No, I did not.

Q After the creation of the stamp, were you aware that it was being used from time to time?

A No.

MS. POLAKOWSKI: Objection. Form. Vague.

BY MR. CHURCHILL:

Q So after its creation, which we don't have pinpointed exactly, but let's just say after its creation until when you ultimately redeemed the rest of your shares in May of 2020, you were not aware that the stamp was being used from time to time?

A I was never called, text, or emailed to find out if they could use my stamp. So I did not know that they were using my stamp.

Q Regardless of whether you were called or texted,

did you know it was being used?

MS. POLAKOWSKI: Objection. Asked and answered.

THE WITNESS: No. I did not know it was being used.

BY MR. CHURCHILL:

Q Did you ever tell anyone after the stamp was created to stop using your stamp?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I don't believe so.

BY MR. CHURCHILL:

Q Did you ever suspect that the stamp was being used without your approval after its creation?

A I don't think I ever really thought about it.

Q Did you ever receive copies of documents that may have had your stamp on it, but you just didn't look at the documents?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I did not receive documents.

BY MR. CHURCHILL:

Q You never received any documents?

A Not with my stamp on it, no.

Q What kind of documents did you receive?
MS. POLAKOWSKI: Objection. Vague.
THE WITNESS: I can't think of any. Probably nothing else.
BY MR. CHURCHILL:
Q I took from your last answer that maybe you did receive documents. So, again, let's pinpoint it after the creation of the stamp. Did you ever receive documents from the companies either Windy Waters or Widen Enterprises?
A No, not that I can recall.
Q What about related to your taxes that you had to file, did you receive documents related -- from the companies related to your taxes that you had to file?
MS. POLAKOWSKI: Object to form.
THE WITNESS: I think I did.
BY MR. CHURCHILL:
Q And what do you think those were, what documents would they have been?
MS. POLAKOWSKI: Objection. Form. Calls for speculation.
BY MR. CHURCHILL:
Q Are you thinking of official tax documents like your K-1 or something like that, or are you

thinking of something different?
A I got -- I got stuff for the cottage.
Q What kind of stuff did you get for the cottage?
A I don't know. I look at it and -- I'm not an accountant. I don't know.
Q And when you say stuff for the cottage, you mean the cottage that was part of Milmont, LLC?
A Yes.
Q And you understand that Milmont, LLC, is a different corporate entity than Windy Waters and Widen Enterprises, correct?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
BY MR. CHURCHILL:
Q Do you understand that?
A I realize it's a different LLC, yes.
Q Any other documents that you received specifically -- sorry, not any other. I don't think we have heard any documents yet. You think you may have received some documents from Windy Waters or Widen Enterprises. I'm trying to figure out if you remember what they may have been.
A I believe I got things from the company for -- I don't know, for tax reasons. I just knew I had

to send it off to my accountant.
Q But those documents came to you first as far as you remember?
A Yes.
Q Did you ever review the documents that you got before sending them to your accountant?
A No, I did not.
Q Do you remember at all what type of documents they would be or when you received them?
A When I received them was random. It was never at the same time. I'm not sure what -- I don't know what.
Q Do you remember if you filed taxes at a particular time each year?
A I did not file taxes at a particular time each year.
Q Did you have your own accountant to help you with taxes?
A Yes.
Q And who would that have been?
A Scott Spangler. I still haven't filed my taxes this year.
Q When you got documents from the company for purposes of taxes, did you then forward them to Scott Spangler?

A I -- I had a folder that I put everything in, so, no.
Q When you say you had a folder, do you mean like an electronic folder?
A No. I do nothing electronically like that. I don't know how.
Q So how did you get the documents to Mr. Spangler?
A I had a folder that I put anything that I thought had to do with taxes in this folder, and I would take it to him when I got everything.
Q And is Mr. Spangler still your accountant today?
A Yes.
Q Is he located in -- I'm going to mispronounce it, Stoughton?
A Stoughton. It's very Norwegian.
Q Stoughton.
A Stoughton.
Q And is he with H&R Block still?
A Yes, he is.
Q And how long has he been your accountant, if you remember?
A Since I came back from Florida. Let me see. Probably since '15.
Q And 2015 is roughly when you moved back from the

Tampa area?
A No. We moved back in '11 or '12. We had an accountant in Florida that we used.
Q And who was that?
A I don't know his name. My husband took care of all that stuff.
Q Do you remember the name of the firm if it was a firm?
A He worked out of his house.
Q And so you started using Scott Spangler roughly in 2015?
A Yes.
Q Who did you use in Wisconsin between the time when you moved back and 2015, if anyone?
A We used the guy in Florida.
Q You still used the person in Florida?
A For like three or four years, but it became pretty obvious that he didn't know Wisconsin law and taxes.
Q And so did you use the same procedure with the accountant in Florida that you did with Mr. Spangler, you would send hard copies to him in Florida?
A My husband took care of all that. I'm not sure what he did.

Q When you say all of that, that would have included any documents that you had from Windy Waters or Widen Enterprises that you needed to submit for tax purposes, correct?

MS. POLAKOWSKI: Object to the extent it calls for speculation.

THE WITNESS: Can you repeat that question, please?

MR. CHURCHILL: Can you read it back?

(Last question read back.)

MS. POLAKOWSKI: Also object to the extent it calls for a legal conclusion.

THE WITNESS: My husband got the mail. That was like his job. So I don't know what all he sent to the tax accountant. Anything that came in the mail, I guess.

BY MR. CHURCHILL:

Q Did you understand him to be submitting your documents related to Windy Waters and Widen Enterprises for tax purposes to your accountant?

A Yes.

Q It was his responsibility to do it?

A Yeah. He took care of the taxes, took care of all the money.

Q Is there something that would jog your memory on

the name of that Florida accountant?
A I never talked to him. I don't know.
Q You never talked to him?
A No.
Q When you and your husband did your taxes back when you were living in Florida, did you go meet personally with the accountant to review the taxes before signing?
A I did not go, but Steve went.
Q Didn't you have to sign your return?
A I did, but he probably brought it home to me. I don't remember.
Q You can put that one to the side. Ms. Randall, can you go back to Exhibit 6 again. That's the second amendment to the shareholder agreement with the consent on the first page. This is the one we were looking at when we were looking at your signature.
A Okay.
Q So I think I didn't quite finish a couple questions that I had about this one. In part because you didn't remember whether or not you signed this document, correct?
A Correct.
Q So I take it you don't have a memory of

reviewing the document?
A No, I do not.
Q If you signed this document yourself in 2007, would you have reviewed it before signing it?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I was living in Florida at the time. I don't remember reviewing it.
BY MR. CHURCHILL:
Q Do you think you would have reviewed it before signing?
MS. POLAKOWSKI: Same objection. Asked and answered.
THE WITNESS: I probably would have reviewed it, but I -- I wouldn't understand it.
BY MR. CHURCHILL:
Q Do you recall whether or not you had an attorney look at this document?
A I did not have an attorney.
Q Would it have been important for you to review it before signing it?
MS. POLAKOWSKI: Object to form. Vague.
THE WITNESS: What do you mean by "important"?

BY MR. CHURCHILL:
Q Well, if you were going to sign a document, would it be important for you to review it before signing it?
MS. POLAKOWSKI: Same objection.
THE WITNESS: I would have to say that -- I would have to say, no, because I don't -- so much legal words, and I wouldn't understand it anyways. I would need a lawyer.
BY MR. CHURCHILL:
Q Say that last part. I didn't understand.
A I would need a lawyer.
Q But you don't remember getting a lawyer for purposes of reviewing this document, correct?
A I did not get a lawyer.
Q Let me have you look at page 2, again, which is the first page of the agreement.
A Yes.
Q Again, this document is dated May 7, 2007, right?
A Yes.
Q And this is the document that has a signature for you under president. Do you remember going over that before?
A Yes.

Q So on the first page of the agreement, which is Windy33092, do you see under the recitals there are three paragraphs and two number twos for some reason?
A Yes, I do see that.
Q I think we call that a typo. So that probably should have been a 3. Let me go through those recitals with you.
So the first paragraph reads, "The shareholders entered into a shareholder agreement under the name of Widen Colourgraphics, LTD, as of March 1, 1992, which agreement was made applicable to the corporation with an amendment of shareholders agreement dated effective September 12, 2001." And then it says, "together, the shareholder agreement." Do you see that?
A Yes.
Q And then under paragraph 2 it states, "The corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions." Do you see that?
A Yes.
Q And do you know what that's a reference to?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I do not.

BY MR. CHURCHILL:

Q The second paragraph 2, but should have been paragraph 3, reads, "The shareholders desire to amend the shareholder agreement to adopt such formula as the basis for determining the fair market value of the stock." Do you see that?

A Yes.

Q And there's another document that's included in this or attached as a part of this agreement. It's an Exhibit C. So if you flip to the page after your signature titled Exhibit C, do you see that?

A Yes.

Q Okay. And that Exhibit C, this is Windy33095 titled, "Exhibit C Fair Market Value Per Share Calculation." Do you see that?

A Yes.

Q And then there's a bunch of words and some numbers and something referred to the weighted average EBITDA. Do you see that as well?

A Yes.

Q Have you seen Exhibit C before?

A I don't believe so. I don't recall.
Q If you signed this agreement in 2007, would you have reviewed the exhibits that were attached to the agreement?
MS. POLAKOWSKI: Objection. Calls for speculation. Assumes facts not in evidence.
THE WITNESS: I don't think that I saw this.
BY MR. CHURCHILL:
Q Do you remember generally at this time in 2007 a discussion about amending the shareholder agreement?
A I don't remember anything about that.
Q Do you remember anything about amending the shareholder agreement to formalize a formula?
MS. POLAKOWSKI: Objection. Vague as to timing.
THE WITNESS: I don't remember. I wasn't told about most of this stuff.
BY MR. CHURCHILL:
Q You agree that if you did sign the 2007 agreement, that you would have been agreeing to the statements in the agreement, correct?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Calls for speculation.

THE WITNESS: I wouldn't understand all this. I don't know whatever it is EBITDA.

BY MR. CHURCHILL:

Q But would you have understood if you signed that you were agreeing to the contents of the agreement even if you didn't understand it yourself?

MS. POLAKOWSKI: Same objections. Legal conclusion. Calls for speculation.

THE WITNESS: I don't know.

BY MR. CHURCHILL:

Q The reference in the recitals to this first paragraph 2, the fact that, "The corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions." That's a reference to one of your prior stock redemptions; isn't it?

MS. POLAKOWSKI: Objection. Calls for speculation. Calls for a legal conclusion.

THE WITNESS: I have no idea what it's in reference to.

MR. CHURCHILL: Hold that off to the side, not too far because we might need to look at it again, and I'm going to give you a new document.

(Exhibit No. 11 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, you have been handed what's been marked as Exhibit 11 for identification. Take a look, and then I want to ask you a few questions about it.

A Okay.

Q And for the record, this is a document labeled Windy688 through 692. Ms. Randall, this document is titled, "Stock Redemption Agreement." Do you see that on the first page?

A Yes, I do.

Q And the date listed is September 2, 2005, with an effective date of January 30, 2005. Do you see that?

A Yes, I do.

Q And this is a written agreement between Windy Waters, Inc., and Stacy Randall, correct?

A It looks like that, yes.

Q And do you have a recollection of signing this document?

A No, I do not.

Q If you look at page 3 of the exhibit, which is Windy690 --

A Yes.

Q -- do you see your signature?
A Yes.
Q It looks like another version of your signature?
A That's my signature.
Q This is the one you were using at the time?
A I don't know.
Q You don't have any reason to believe that somebody else signed this for you?
A That looks like my signature.
Q And do you remember getting $200,000 by redeeming some shares in Windy Waters in September time frame of 2005?
A I don't remember when I got it. I remember that I got it.
Q You do remember getting $200,000?
A I don't specifically remember the amount.
Q Do you remember -- I'm sorry. Go ahead.
A There were several amounts of money that I got different amounts. I don't recall when or how much.
Q So let me -- I'm going to try to get you to remember what was happening in your life back in '05. So do you remember needing money?
MS. POLAKOWSKI: Object to form. Vague.

THE WITNESS: Only time I ever asked for money was because I needed it.
BY MR. CHURCHILL:
Q So do you remember asking for some amount of money from anyone related to the companies in 2005?
A I can't say when it was.
Q Do you remember who you asked?
A I probably asked Reed.
Q And do you remember anything about the conversation?
A "Talk to Kiesler" is what he would always say.
Q So he said, "Talk to Kiesler." And did you say, I want to redeem shares in Windy Waters, or did you leave it more open than that?
A I said I would like to get some money from my stock.
Q For your stock in Windy Waters?
A I'm not sure where my stock was from.
Q Did Milmont exist at this time?
A Yes.
Q Did you ask for money from Milmont, or did you ask for money from Windy Waters?
A I asked -- I just asked for stock.
Q And you knew then that would mean that you would

sell some of your stock and get money in return?
A Correct.
Q And if you look in the recitals in Exhibit No. 11, you will see in recital A that there is a statement of the stock that you then owned. If you go on -- go on the first page, Ms. Randall, of the exhibit -- I'm looking at recitals paragraph A, very first page --
A Okay.
Q -- do you see where it says, "Randall is the owner of two hundred thirty-two and 75/100 shares of Class A voting common stock."
A I see that.
Q And five thousand six thirty-three and 90.25/100 shares of Class B nonvoting common stock, do you see that as well?
A Yes, I do.
MS. POLAKOWSKI: Just so the record is clear, I think you said 5,033.
MR. CHURCHILL: I should have said 63.
BY MR. CHURCHILL:
Q So 5,063.9025. Do you see that?
A Yes.
Q Do you remember when we were looking at the chart before of your stock ownership, and it had

the columns?
A Yes.
Q And do you understand that by entering into this agreement you decided to redeem some of your Class B nonvoting shares of stock?
MS. POLAKOWSKI: Objection. Form. Calls for a legal conclusion.
THE WITNESS: I did not know that.
BY MR. CHURCHILL:
Q Did you specify what shares you wanted to redeem?
MS. POLAKOWSKI: Objection. Form.
THE WITNESS: I didn't know that I had different shares. I didn't have the information to specify which share I wanted.
BY MR. CHURCHILL:
Q Did you review this 2005 Stock Redemption Agreement before signing it?
MS. POLAKOWSKI: Objection. Form.
THE WITNESS: I can't specifically remember. This --
BY MR. CHURCHILL:
Q You were redeeming --
A -- long time ago.
Q You were redeeming shares for $200,000. Do you

think you reviewed it?

MS. POLAKOWSKI: Same objection. Asked and answered.

THE WITNESS: I was probably just given the signature page.

BY MR. CHURCHILL:

Q Well, you said that was something that your dad did. Was that something that other people did to you as well?

A Yes.

Q Do you know for sure that you were only given the signature page or you're speculating?

A I do not know for sure.

Q Was it important for you to review a document like this?

MS. POLAKOWSKI: Objection. Form. Calls for a legal conclusion.

THE WITNESS: I didn't know the importance of -- the importance or unimportance of any document.

BY MR. CHURCHILL:

Q Well, in 2007 -- or excuse me, in 2005 you were going to get $200,000 from redeeming shares. What I'm asking you is at the time was it important to you to review the document before

signing it?

MS. POLAKOWSKI: Same objection. Calls for a legal conclusion. Vague.

THE WITNESS: No.

BY MR. CHURCHILL:

Q Why not?

A I trusted my brother and Mike Kiesler.

Q So do you have a recollection of reviewing how many shares you were redeeming in order to be paid $200,000?

A No. I don't remember.

Q Did you understand that there was some type of computation involved in order to decide how many shares you would redeem in order to be paid $200,000?

MS. POLAKOWSKI: Objection. Calls for speculation. Assumes facts not in evidence.

THE WITNESS: I don't understand the question.

MR. CHURCHILL: Can you read it back?

(Last question read back.)

MS. POLAKOWSKI: I will restate my objections.

THE WITNESS: No.

BY MR. CHURCHILL:

Q You knew that there was a value that was being assigned to those shares, correct?
A I wasn't aware that there was a value.
Q Didn't you understand that you were going to sell back some shares? In other words, you were losing some shares that you had owned in order to get the money?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I believe that's probably what I thought.
BY MR. CHURCHILL:
Q And so, therefore, you knew that there was a value that those shares had, that in order to get a certain price each share had a value. You knew that, didn't you?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony. Assumes facts not in evidence.
THE WITNESS: I don't believe I knew that.
BY MR. CHURCHILL:
Q Did you think at the time that if you sold more of your shares you would get more money?
MS. POLAKOWSKI: Objection. Calls for

speculation.

THE WITNESS: I don't know what I thought at that time.

BY MR. CHURCHILL:

Q Did you think if you sold less of your shares you would get less money?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I don't know what I was thinking at that time.

BY MR. CHURCHILL:

Q So it's your testimony that you didn't care what you were being paid for the shares that you were redeeming?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.

THE WITNESS: I did not say that.

BY MR. CHURCHILL:

Q Did you care?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: I never thought about it.

BY MR. CHURCHILL:

Q Did you wonder if your shares had value?

MS. POLAKOWSKI: Objection. Calls for

speculation.

THE WITNESS: I guess I figured that they did because I was getting money by cashing in my stock.

BY MR. CHURCHILL:

Q Did you wonder what the value that you were being paid was based on?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: No, I did not.

BY MR. CHURCHILL:

Q Did you ask anyone?

A No, I did not.

Q Were you happy with the $200,000 that you received?

A I believe I asked for it. So, yes, I was happy.

Q And when you say you believe asked for it, do you mean that you asked for a specific sum?

A Yes.

Q So is it your understanding that you specified the amount and someone else determined how many shares that meant you would redeem?

A Yes.

Q Do you remember why the amount $2,000 was chosen by you -- $200,000 was chosen by you?

A I needed money.
Q Why 200,000?
A That I'm not sure of.
Q Do you recall anything about a negotiation with anyone in order to reach this agreement?
A No, I don't remember.
Q Did you have an attorney representing you?
A No. I did not.
Q Did the companies have an attorney representing them?
MS. POLAKOWSKI: Objection. Foundation.
BY MR. CHURCHILL:
Q Let me strike that. Did Windy Waters have an attorney representing it?
MS. POLAKOWSKI: Same objection.
THE WITNESS: I don't know.
BY MR. CHURCHILL:
Q Did you meet with any attorneys?
MS. POLAKOWSKI: Objection. Vague.
THE WITNESS: No, I did not.
BY MR. CHURCHILL:
Q Do you remember that you received the $200,000 as a lump sum payment? Do you know what I mean by lump sum?

A Yes, I do.
Q Did you receive the $200,000 as a lump sum payment?
A I think I did.
Q And how did you receive that money?
A In a check.
Q Handed to you?
A I was living in Florida at the time. So I'm not sure if I was back home or if I was in Florida.
Q And did you talk with Reed about this transaction, if you remember?
A I just told him that I needed $200,000, and he told me to talk to Kiesler.
Q Do you remember any other communications with Reed about it?
A No.
Q Did you say "thank you"?
A No.
Q Now that you have had an opportunity to look at Exhibit 11, Ms. Randall, and you have Exhibit 6, which is that second amendment to the shareholder agreement, right on your right hand, do you agree that this is one of the previous stock transactions that's referenced in paragraph 2 of the recitals of the second

amendment?

MS. POLAKOWSKI: Objection. Calls for legal conclusion. Assumes facts not in evidence.

THE WITNESS: I don't agree to that because I didn't know.

BY MR. CHURCHILL:

Q Because you didn't know what?

A How they were figuring anything out.

Q You agree that the 2005 redemption is a stock transaction, correct?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

THE WITNESS: Well, I asked them if I could get $200,000 from my stock. Yes.

BY MR. CHURCHILL:

Q And it's your stock transaction, right, from 2005?

A Yes.

(Exhibit No. 12 was marked.)

MR. CHURCHILL: Ms. Randall, you have been handed now by the court reporter what's been marked as Exhibit 12 for identification. My copy doesn't have a Bates number on it. What do you have, Jess?

MS. POLAKOWSKI: Windy0002954.

BY MR. CHURCHILL:
Q So the first page is labeled Windy2954. Take a moment to look at that document, please.
A Okay.
Q Do you recognize this document, Ms. Randall?
A I do not.
Q If you flip to -- well, first of all, just to identify the document further it's titled -- Exhibit 12 is titled "Stock Redemption Agreement," which is just like what Exhibit 11 was titled, right, Stock Redemption Agreement. But this one is dated August 2, 2007, with an effective date of June 30, 2007. Do you see that?
A Yes, I do.
Q And I'm just going to refer to it as 2007 Stock Redemption Agreement to distinguish it from 2005; is that okay?
A Yes.
Q In this 2007 Stock Redemption Agreement you have a signature here. Do you see that on page 3?
A Yes, I do.
Q And is that your signature?
A Yes.
Q It's another slightly different form, I think.

You have no reason to believe that's not your signature?
A No.
Q You this time were paid for redeeming some stock $250,000; is that correct? If you look at the first page under the second paragraph price and terms.
A It seems like an awful lot that I would have asked for.
Q So you anticipated my next question. Is the process similar to what happened the last time, the first time in 2005, did you say I need X amount of dollars, and then the determination of the amount of shares was computed?
A I can't remember the amount of money that I asked for.
Q Do you have any reason to believe that you did not ask for $250,000?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I just say that it seems like a lot of money for me to have asked for.
BY MR. CHURCHILL:
Q Do you have a memory of this being given to you without you asking?

A No.
Q Is it fair to assume that you asked for $250,000 or you're just not sure you needed that much?
A I'm just not sure that I needed that much.
Q What was happening in your life at this point in time? So this is kind of three quarters of the way through '07.
A My husband was in charge of the money.
Q Does that mean that he was the one that needed the 250,000?
A Well, he asked me if I could get whatever amount of money, and I always said yes.
Q You have no reason to believe that you didn't ask for $250,000. You just don't remember; is that correct?
A I just don't remember.
Q Just like that 2005 agreement, if you look under recitals, there's a statement again of the amount of shares that you owned at the time. Do you see that?
MS. POLAKOWSKI: I'm sorry, are we looking at 12?
MR. CHURCHILL: We're looking at 12. You have got 12.
BY MR. CHURCHILL:

Q I'm having trouble -- my eyes have gotten bad, so I can't see.
A Yeah. I took my contacts out. So I can't really see. What did you want to know?
Q You see under recitals section A there's a statement of the amount of shares that you have, right? Do you see that?
A Yes.
Q And it looks like your Class A shares are remaining the same still, do you see that? You still have 232.75 shares?
A Yes.
MS. POLAKOWSKI: Objection. Form.
THE WITNESS: I see it.
BY MR. CHURCHILL:
Q Do you understand that the Class A shares were voting shares as distinguished from nonvoting shares?
MS. POLAKOWSKI: Objection. Calls for legal conclusion.
THE WITNESS: No. I had no idea.
BY MR. CHURCHILL:
Q You agree that your voting shares have stayed the same, though, from document to document, they are still at 232.75 shares?

MS. POLAKOWSKI: Same objection.
THE WITNESS: That's what they say.
BY MR. CHURCHILL:
Q Do you know what the difference is between a voting and a nonvoting stock share?
MS. POLAKOWSKI: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: No. I don't know the difference.
BY MR. CHURCHILL:
Q At this time you were still a member of the board of directors, correct?
MS. POLAKOWSKI: Objection. Assumes facts not in evidence.
THE WITNESS: I don't know if I was or not.
BY MR. CHURCHILL:
Q 2007?
MS. POLAKOWSKI: Same objection.
BY MR. CHURCHILL:
Q Didn't you state earlier that you were a member of the board of directors in 2007?
MS. POLAKOWSKI: Same objection.
THE WITNESS: I thought I was.
BY MR. CHURCHILL:

Q Do you think that had anything to do with your voting shares?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

THE WITNESS: I would have no idea of that.

BY MR. CHURCHILL:

Q Did you have an understanding when you obtained the price and terms under this 2007 Stock Redemption Agreement that your shares were being given a certain value?

MS. POLAKOWSKI: Objection. Legal conclusion. Assumes facts not in evidence.

THE WITNESS: I really never thought about it. I didn't assume because I really never thought about it.

BY MR. CHURCHILL:

Q You knew that some of your shares were being redeemed in order to get the money, though, correct?

MS. POLAKOWSKI: Same objections.

THE WITNESS: Yes, I did.

BY MR. CHURCHILL:

Q When you say you never thought about it, does that mean you didn't know that there was a

value, or you just didn't care what the value was?
A I didn't know what the value was.
Q That was option C. You knew there was a value. You just didn't know what it was, correct?
A Yes.
MS. POLAKOWSKI: Mark, we have been going about another hour. At your convenience, can we take a short break?
MR. CHURCHILL: If you could just let me finish on this one.
BY MR. CHURCHILL:
Q Ms. Randall, do you remember anything now that you had a chance to look at it needing the $250,000?
A I do not remember.
Q Again, you were paid in a lump sum. You got the money all at once, right?
A Yes.
Q And you were still in Florida?
A Yes.
Q Did you get a check again?
A Yes.
Q Do you remember what you used the money for once you got it?

A Well, it was usually for taxes or to pay the accountant. Those are the two big ones I can remember.
Q Do you remember at all comparing the two agreements at the time in 2007, meaning the 2005 agreement and the 2007 agreement?
A Do I remember what?
Q Do you remember at the time comparing the two agreements that you had signed, the 2005 and the 2007 agreement?
A I did not compare them because I didn't have these papers.
Q So when you signed the 2007 agreement, did you review it?
MS. POLAKOWSKI: Object to form.
THE WITNESS: I didn't review it. I say I probably skimmed over it.
BY MR. CHURCHILL:
Q So you believe you had the whole agreement before you signed it, right?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.
THE WITNESS: I don't remember.
BY MR. CHURCHILL:
Q Would it have been important for you to review

it?

MS. POLAKOWSKI: Objection. Form. Calls for a legal conclusion.

THE WITNESS: Probably not because I trusted my brother and Kiesler.

BY MR. CHURCHILL:

Q But you don't know whether in fact you reviewed the 2007 agreement before you signed it, correct?

A I don't believe I had it. So I don't remember reviewing it.

Q And when you say you don't believe you have it, that's because you believe you only saw the signature page?

A Well, I didn't have it to take home and look at.

Q Did you sign it at home?

A No.

Q Where did you sign it?

A This I probably signed at the office.

Q Which office?

A Widens.

Q So you went to Wisconsin to sign this one?

A What was the month? June.

Q August of '07. It was effective June 30, it says, but it was entered into in August of '07.

A I was in Wisconsin.

Q So you believe you went into Widen's office to execute this one?

A Yes, I do.

Q And just one more question before we break. Why do you believe that you didn't review the whole document if you were in the office and there to sign it?

MS. POLAKOWSKI: Object to the extent it misstates her testimony. Calls for speculation.

THE WITNESS: I don't know.

BY MR. CHURCHILL:

Q Do you actually -- so I have another follow-up question. Do you actually remember not reviewing the document or you're speculating?

A I don't remember reviewing this or skimming it.

Q But do you remember not reviewing it? In other words, do you know that you didn't review it, or you just don't remember one way or the other?

A I know I did not review it. Mike Kiesler may have told me what it says.

Q So when you said skimming it, was that you skimming it or him holding it and --

A It was me skimming it.

Q So you held the document in your hand?

A Well, I can't remember if I had it.
Q So how did you skim it?
A You are assuming that I had it.
Q You tell me how -- you didn't like my term reviewed, I take it.
A Right.
Q So how did you look at it? Let's just use look. How did you look at it? If you didn't review it, what did you do?
A I don't know that I had this to review or look at.
Q But you also don't know you didn't have it, correct?
A Correct.
Q And this was a transaction that you wanted to enter into, right, you wanted the money?
MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony. Assumes facts not in evidence.
THE WITNESS: I asked for the money, yes.
BY MR. CHURCHILL:
Q So you wanted to enter into a transaction to redeem your shares to get $250,000?
MS. POLAKOWSKI: Same objections.

THE WITNESS: Well, I needed the money, so, yes.

MR. CHURCHILL: We can break.

THE VIDEOGRAPHER: Off the record at 2:45 p.m.

(Brief recess taken.)

THE VIDEOGRAPHER: We are back on the record. This will mark the beginning of media unit number 3 of the video recorded deposition of Stacy Randall. Today's date is August 28th, 2023, and the time is 3:05 p.m.

MR. CHURCHILL: So just to state for the record, and I should have read Christa's note to me at the time, Exhibit 7 which was that agreement between Terry Vial and the companies, that was produced as Windy0002150 through 2164. I'm not going to ask any more questions about it, but I just wanted to provide the Bates numbers.

MS. POLAKOWSKI: You're not asking her to confirm because there's --

MR. CHURCHILL: Correct. Because the version I marked for purposes of your deposition is unmarked. I just wanted to track that for everyone. Something you truly don't care about, Ms. Randall.

THE WITNESS: No. I really don't. I

don't know what the heck you're talking about.

(Exhibit No. 13 was marked.)

BY MR. CHURCHILL:

Q So, Ms. Randall, the court reporter has handed you what's been marked for identification as Exhibit 13 to your deposition. Would you take a moment to review it? Do you recognize this document?

A I do not.

Q So Exhibit 13 is another document titled, "Stock Redemption Agreement." Do you see that at the top?

A Yes, I do.

Q And it looks to be in fairly similar form as the other Stock Redemption Agreements. Do you agree with that kind of general statement?

A Yes, I do.

Q And on page 3 you have signed the document or maybe it's your signature stamp. I'm interested in your conclusion on that one.

A For sure it's my signature stamp.

Q Okay. Do you remember asking in early -- well, sometime in late 2010 or early 2011 to redeem some more shares in Windy Waters?

A I don't remember asking. If that's what this

says.

Q Well, let's look at the first page.

A I am.

Q Do you see in the middle under price in terms that the total redemption price shall be $200,000?

A Yes, I do.

Q Do you remember asking to obtain $200,000 in early 2011?

A I don't remember.

Q Is it fair to assume that you did ask?

A Yes.

Q And so if your stamp was used, is it also fair to assume that you approved the use of the stamp in order to get the document executed?

MS. POLAKOWSKI: Object to form. Misstates her testimony. Calls for a legal conclusion.

THE WITNESS: I did not okay the use of my stamp.

BY MR. CHURCHILL:

Q You did not okay the use of your stamp for purposes of getting the $200,000?

A I was never asked.

Q Did you know that a redemption agreement was

being entered into for purposes of obtaining the $200,000?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: Can you repeat that question?

BY MR. CHURCHILL:

Q Sure. Let me state it differently. Do you now recall that you got $200,000 in 2011?

MS. POLAKOWSKI: Object to form.

THE WITNESS: If that's what this says. I trust my brother and Mike Kiesler, so, yes.

BY MR. CHURCHILL:

Q You don't remember asking for it, though?

A No. I do -- I don't know when I asked for all these. I honestly don't.

Q Well, let's -- let's go through them quickly. There was one in 2005 for $200,000, right?

A Yes.

Q And then in 2007 there was another one for 250,000, correct?

A Yes.

Q So now in 2011 another $200,000, right?

A Correct.

Q Do you remember why you needed the money?

MS. POLAKOWSKI: Object to form.

Vague as to time.
BY MR. CHURCHILL:
Q Let me orient you specifically. Let me specify. Do you remember why you needed the money for the third redemption, the one in 2011?
A I think it was probably because he owed taxes, property taxes.
Q Who is "he"?
A My husband. We. Did I say he? Because he took care of all the money, and we had bills to pay.
Q For the 2007 redemption agreement you said that you signed that one in Wisconsin, correct?
A Yes.
Q And this 2011 agreement you're saying that that is your stamp that's being used, correct?
A Yes.
Q Do you remember where you were in 2011 in January when this would have been happening? Were you in Florida?
A Yes. Yes. Because we always went back right after the first of the year.
Q Tell me again when you moved back to Wisconsin, what year.
A '11 or '12, I said.
Q But January of '11 you think you were still in

Florida?
A In January I believe I was living in Florida, and I believe I was back in Florida on January 11th.
Q Do you know whether or not you ever reviewed this 2011 Stock Redemption Agreement?
MS. POLAKOWSKI: Object to form.
THE WITNESS: Review, no. I did not review it.
BY MR. CHURCHILL:
Q Do you know whether you ever looked at it?
A I probably never looked at it.
Q Do you know whether it was sent to you in advance to review or look at?
MS. POLAKOWSKI: Object to form. Vague as to -- hold on. Vague as to -- I lost my train of thought.
THE WITNESS: Sorry.
MS. POLAKOWSKI: What was the last question?
(Last question read back.)
MS. POLAKOWSKI: Vague as to in advance of what.
BY MR. CHURCHILL:
Q Do you know whether or not you asked to look at

the 2011 Stock Redemption Agreement prior to having it executed?

MS. POLAKOWSKI: Objection that it assumes facts not in evidence.

THE WITNESS: I did not look at this prior.

BY MR. CHURCHILL:

Q And why do you say that? Why do you know that?

A Because I normally didn't see these papers.

Q Well, you saw the 2007 one, right?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.

THE WITNESS: Well, I -- I thought I have seen it, but I did not review it nor did I review this one.

BY MR. CHURCHILL:

Q With respect to 2007 agreement?

A Yes.

Q You said you thought you skimmed it. Is that no longer your testimony?

A I probably skimmed it if they gave it to me.

Q Do you think you skimmed the 2011 Stock Redemption Agreement?

A I do not.

Q Tell me what -- because I feel like you're

having a problem with my word review. Tell me what skim means to you.
A You're just like looking at it quickly. I'm not one of those speed readers.
Q Okay.
A So I'm just looking at it quickly looking for keywords.
Q And how are you using the word review? Like you agree with me that you're differentiating between review and skim?
A Reviewing and skimming are two different things.
Q So what is reviewing to you?
A That I would read it word for word.
Q Okay. And remind me, your testimony with respect to the 2011 agreement was you don't believe you skimmed it?
A Was that this one?
Q The third one.
A The one with the stamp.
Q What about going back to the 2005 agreement that was the one Exhibit 11, the first one for $200,000. Did you skim that one?
A I don't remember.
Q Do you know whether your ex-husband Steven ever spoke with anyone about your stock redemptions?

Let's start with the first one. Do you know whether Steven spoken with anyone about your 2005 stock redemption?
A No. He wouldn't have.
Q He wouldn't have or he didn't?
A He didn't.
Q And how do you know that?
A Because he knew that they were my stocks, and the money I got was for me to give to him.
Q What about the 2007 agreement, did Steven to your knowledge speak with anyone about that agreement?
A No, he did not.
Q Was he with you when you were at the office skimming the 2007 agreement?
A No, he was not.
Q What about the 2011 agreement, was Steven involved at all with that one?
A No. He didn't come to any of this.
Q So to the extent -- if I understand correctly, to the extent Steven had involvement it was that you and he discussed the money that you would need, but otherwise he was not involved?
MS. POLAKOWSKI: Object to form.
THE WITNESS: He wasn't involved in --

he was not included in any of this.

BY MR. CHURCHILL:

Q Did he ever ask Reed for money?

A No.

Q Did he ever ask Kiesler for money?

A No.

Q Did Steven ever ask your dad for money?

A No.

Q Did Steven ask any of your brothers for money?

A No.

Q Did Steven have any role with respect to the use of your signature stamp?

A Role?

MS. POLAKOWSKI: Objection. Form. Calls for a legal conclusion.

THE WITNESS: What do you mean by "role"?

BY MR. CHURCHILL:

Q Did Steven talk to you at all initially about getting the stamp?

A He did not.

Q Did Steven ever talk to you about the use of the stamp for a particular document?

A He did not.

Q Do you ever remember discussing the use of your

signature stamp with Steven?

A I'm sure that I told him that Mike Kiesler asked me to have one made, but other than that there was no discussion.

Q You may have already answered this, Ms. Randall. Did you say you did skim the 2011 agreement or not?

MS. POLAKOWSKI: Objection. Asked and answered.

THE WITNESS: I don't believe I did.

BY MR. CHURCHILL:

Q So you didn't know at the time how your shares of stock in Windy Waters were changing as a result of this agreement?

A No. I did not know that.

Q Is it your testimony that you didn't know that agreement -- that an agreement was being signed at all?

A I did not know that they were signing an agreement -- that I was signing an agreement.

Q But you knew that you had signed one in 2007, correct?

A I knew that I signed one, yes.

Q Didn't you assume that you would have to sign an agreement again in 2011?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Assumes facts not in evidence.

THE WITNESS: I didn't know what the formula was or how you -- I guess I never really thought about it.

BY MR. CHURCHILL:

Q Okay. And I didn't ask about the formula just yet. I was asking about the signing of an agreement at all. So let me be really clear because I don't want you to guess. Did you think you didn't have to sign a document for purposes of getting the $200,000 in 2011?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony. Calls for a legal conclusion, and assumes facts not in evidence.

THE WITNESS: I did not know that I needed to sign every time.

BY MR. CHURCHILL:

Q That's what you thought in 2011?

A That's what I thought in all of them. I didn't know.

Q Now you have lost me a little bit. You were present in 2007 when you signed the 2007 agreement, correct?

A Yes.

Q Okay. And you knew you were signing an agreement, correct?
A Yes.
Q And you knew that you were receiving money as a result of redeeming some shares in Windy Waters, correct?
A I did not know where the stocks were coming from. Windy Waters, Widen Enterprises I didn't know, but I knew I was getting money.
Q And you knew that you were signing?
A Yes.
Q And so 2011 you're saying that you did not expect that you would have to sign a new agreement?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony. Assumes facts not in evidence. Calls for a legal conclusion.

THE WITNESS: At that time I don't know what I expected.

BY MR. CHURCHILL:
Q Is it possible that you have just forgotten, Ms. Randall?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: Yeah, it is.

BY MR. CHURCHILL:
Q You trusted Mike Kiesler at this time in 2011?
A I trusted Reed and Mike Kiesler through the whole thing.
Q And this was the third time that you had gotten some money from -- you didn't discern between Windy Waters and Widen, but let's say the companies. This is the third time you had gone to them for money, correct?
A Yes.
Q And this was the third time that you had gotten it, correct?
A Yes.
Q Do you remember what you spent this money on?
A Probably taxes, and I don't -- in '11. Steve bought a lot of real estate, and I'm thinking that -- well, I know the crash really affected us.
Q The stock market crash?
A Yes. And he probably was behind on some of those loans.
Q Steve you mean?
A Or us. We. My name was always attached.
Q And you mean the loans for the homes?
A Mortgages, yes.

Q Mortgages. Okay. Did it occur to you in 2011 what the value of your shares might be compared to what they had been, say, in 2007 when you had done the last redemption?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I never thought about it.

BY MR. CHURCHILL:

Q Did it occur to you how the value of your shares might be computed for purposes of knowing how many shares were redeemed for the $200,000?

MS. POLAKOWSKI: Same objection.

THE WITNESS: I was aware that there was a formula to figure them out, but I didn't know what, where, or how.

BY MR. CHURCHILL:

Q And when you say you were aware that there was a formula, when were you first aware that there was a formula?

A I honestly can't remember that.

Q Was it prior to the third redemption in 2011?

A I honestly don't remember.

Q Did you know when you signed the 2007 redemption agreement that that was pursuant to a formula?

MS. POLAKOWSKI: Objection. Assumes facts not in evidence. Calls for a legal conclusion.

THE WITNESS: I don't think so.

BY MR. CHURCHILL:

Q Why do you say you don't think so?

A I can't remember.

Q What does a formula mean to you?

A It's a way to make things.

Q Do you remember when we were looking at the second shareholder amendment, Exhibit 6, and there is this Exhibit C page?

A Yes.

MS. POLAKOWSKI: Which exhibit was that?

MR. CHURCHILL: It's 6.

THE WITNESS: Okay.

BY MR. CHURCHILL:

Q And if you go to Exhibit C, it should be Windy33095 if you're looking at the bottom right corner.

A Okay. That helps me a lot. Yes.

Q Do you remember us talking about this before, fair market value per share calculation?

A Yes.

Q Is this a formula to you?

MS. POLAKOWSKI: Objection. Vague. Foundation.

THE WITNESS: No. I never thought of it that way.

BY MR. CHURCHILL:

Q Do you see up at the top it says, "The value of the corporation shall be determined by," and then there's a colon?

A Mm-hmm.

Q And then there's an explanation of how the value should be determined?

A Yes.

Q Is this the formula that you thought was being used to value your shares at any point in time?

A I didn't see these documents, and if I did, I did not read them or skim them.

Q Did you possibly skim Exhibit C, not review but skim?

A I honestly don't remember seeing this.

Q Do you recall with respect to that 2011 stock redemption that you were not redeeming your voting shares?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion and assumes facts not in evidence.

THE WITNESS: I was never told what

kind of shares I was redeeming. I didn't even know there's different kinds.

(Exhibit No. 14 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, you have now been handed what's been marked for identification as Exhibit 14 to your deposition. It's a document Bates labeled Windy705 through Windy710.

A Yes.

Q And this document is also titled, "Stock Redemption Agreement." Do you see that on the first page?

A Yes, I do.

Q And do you recognize this document?

A I do not.

Q If you're on the first page, do you see that, "This agreement is entered into effective the 1st day of August 2017 by and between Windy Waters Inc., (the corporation) a Wisconsin corporation having offices at 6911 Mangrove Lane, Madison, Wisconsin 53713, and Stacy L. Randall of 1972 Barber Drive, No. 3, Stoughton" --

A Stoughton.

Q "Stoughton, Wisconsin 53589." Do you see that?

A Yes, I do.
Q Does that refresh your recollection at all?
MS. POLAKOWSKI: Objection. Vague.
THE WITNESS: Of what?
BY MR. CHURCHILL:
Q Of entering into the agreement.
A How much did I get this time?
Q It looks like $78,000, so less.
A 275? No, that's the number of shares.
Q If you look down under price -- I think it's always going to be the same. So if you look under price and terms, do you see in the middle paragraph 2? It looks like you got $78,000 this time, right?
A Looks like it, yes.
Q Do you remember why $78,000?
A I don't specific -- no. I don't specifically remember.
Q Let's look at page 3 and your signature. Do you agree that that's not your stamp?
A I agree that's not my stamp.
Q Do you remember signing Exhibit 14?
A No.
Q In 2017 now you're back in Wisconsin obviously, right?

A Yes.
Q You're in Stoughton?
A Stoughton.
Q And do you remember what was going on in your life then that you might need $78,000 as a particular sum?
A 2017 I was contemplating filing for divorce.
Q And did Steven have anything to do with this request, if you recall?
A I'm not sure.
Q Do you think that the fact that you were contemplating filing for divorce had something to do with you needing the money?
A I don't believe I had talked to an attorney. I don't know.
Q You did get paid the $78,000?
A Yes.
Q And, again, that was in a lump sum?
A Yes.
Q And you had to redeem some shares in order to get the $78,000, right?
MS. POLAKOWSKI: Objection. Assumes facts not in evidence. Calls for a legal conclusion. Calls for speculation.
THE WITNESS: I didn't specifically

say that I needed shares. I just asked for -- I would like to get -- I would like to get $78,000 from my stock. That's what I would say.

BY MR. CHURCHILL:

Q And do you remember specifically saying that?

A No.

Q Who would you have said that to, Reed?

A Reed.

Q And he referred you to Mike Kiesler?

A Yup. Talk to Kiesler.

Q And do you remember whether you reviewed this 2017 Stock Redemption Agreement prior to signing it?

MS. POLAKOWSKI: Object to form.

THE WITNESS: I did not review it.

BY MR. CHURCHILL:

Q And how do you know that?

A Because I didn't review any of them.

Q Did you skim it?

A At this point probably not.

Q What do you mean by that, "at this point probably not?"

A I have gone through this a number of times.

Q And when you say that you're referring to the 2005, 2007, and 2011 redemptions?

A Correct.
Q And do you have any specific recollection of being given this document in advance?
A No, I do not.
Q It's fair to say that you knew that in order to be paid the $78,000 that you were redeeming Windy Waters shares, right?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion and assumes facts not in evidence.
THE WITNESS: I didn't know what kind of stocks I was redeeming.
BY MR. CHURCHILL:
Q You just knew they were stocks, but you didn't know whether it was Windy Waters or another company?
A Correct.
Q Who else could it have been?
A Widen Enterprises.
Q Did you have shares in Widen Enterprises?
A I don't know what I had shares in.
Q So you thought you were either redeeming shares in Widen Enterprises or Windy Waters?
A Yes.
Q Did you ask to do anything through Milmont or that didn't come up?

A No, I did not.
Q Why didn't you?
A Because I never thought of it.
Q When we talk about Milmont, is that -- for you is that the same as talking about the cottage?
A Yes.
Q And so would redeeming shares in Milmont mean you were losing your right to the cottage?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I'm not really sure what it would have done because it's never happened.
BY MR. CHURCHILL:
Q I guess I'm wondering whether or not there's something to Milmont other than the cottage.
A There's a cottage and then there's another piece of land. There's two cottages on the same property. Well, no, they are not on the same property, but they cannot be divided, and then we have a piece of land on a fishing lake.
Q But Milmont was not something that you were interested in when you said I want to sell some stock for some money?
MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony.

THE WITNESS: I never even thought about Milmont.

BY MR. CHURCHILL:

Q Why?

MS. POLAKOWSKI: Calls for speculation.

THE WITNESS: Why didn't I think of it? I don't know why I didn't think of it. I just had always gotten it from whatever company I got -- where my stocks were.

BY MR. CHURCHILL:

Q Okay. Did you have an attorney representing you?

A No.

Q With respect to the 2017 Stock Redemption Agreement?

A No, I did not.

Q Why not?

A Because I trusted Reed and Mike Kiesler to be doing the best thing for me.

Q Did you interact with an attorney for Windy Waters or Widen Enterprises with respect to the 2017 Stock Redemption Agreement?

A No, I did not.

Q Do you have a memory of signing the 2017 Stock

Redemption Agreement?

A I don't have a memory of that.

Q You don't have any reason to believe that you didn't sign the agreement, correct?

A Correct.

Q Did you ask any questions about how your shares were being valued for purposes of the redemption that is represented by the 2017 Stock Redemption Agreement?

A No, I did not.

Q Did you -- do you remember thinking at all that this Stock Redemption Agreement looked a lot like the prior ones you had signed?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: I don't really remember thinking that, but it kind of all looked the same to me. I didn't really look at them that closely. I didn't think I needed to.

BY MR. CHURCHILL:

Q Was there any reason in your mind that any of those prior Stock Redemption Agreements were not authorized by you? In other words, would you say today that you did not authorize the 2005 Stock Redemption Agreement?

MS. POLAKOWSKI: Objection. Calls for

a legal conclusion.

THE WITNESS: Authorize? What are you meaning when you say "authorize"?

BY MR. CHURCHILL:

Q What does authorize mean to you?

A I asked you what you meant by authorized.

Q Do you like approved better? How about approved? Would you say that you didn't ultimately approve the 2005 Stock Redemption Agreement?

MS. POLAKOWSKI: Object again. Calls for a legal conclusion.

THE WITNESS: I asked for the money so, yes, I would say I authorized.

BY MR. CHURCHILL:

Q And you agree that you authorized the sale of stock in order to get the money, correct?

A Yes. As far as I knew that's the only way I could get money.

Q And using that same definition, asking for money and authorizing the sale of stock to get the money, you also authorized the 2007 Stock Redemption Agreement, correct?

MS. POLAKOWSKI: Object to the extent it calls for a legal conclusion.

THE WITNESS: I would say yes.

BY MR. CHURCHILL:

Q And same for 2011, you authorized that Stock Redemption Agreement, right, you knew that you were getting money and authorizing the sale of stock in order to get that money, correct?

MS. POLAKOWSKI: Same objection. Calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. CHURCHILL:

Q And then with respect to Exhibit 14, the 2017 Stock Redemption Agreement, again, you authorized the sale of your stock in exchange for $78,000, correct?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

THE WITNESS: Well, each time I asked for money from my stock, so, yes.

(Exhibit No. 15 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, the court reporter has now handed you what's been marked for identification as Exhibit 15 to your deposition as a document Bates labeled Windy711 through 716 titled, "Stock Redemption Agreement." Again, this one

dated January 1, 2019. Do you recognize Exhibit 15?
A No. I do not.
Q Your signature is on page 3. Do you see that?
A Yes, I do.
Q And do you agree that's your signature?
A Yes, I do.
Q And going to price and terms, Ms. Randall, on page 1, it looks like you sold your Windy Waters stock for $120,000. Do you see that?
A I do see that.
Q Do you have a recollection of doing this in early January of '19?
MS. POLAKOWSKI: Object to form. Vague as to doing this.
THE WITNESS: Yes, I do.
BY MR. CHURCHILL:
Q And what do you remember about that particular stock redemption?
A That I needed money.
Q Do you remember why?
A I needed money to pay my divorce lawyer, and I didn't have any money.
Q And so you entered into this agreement. Did you get a copy in advance of signing it?

A No.
Q Did you skim it before signing it?
A I don't remember doing that.
Q Do you think you didn't skim it before signing it?
A Probably not.
Q Was it important for you to skim it before signing it?
MS. POLAKOWSKI: Object to form. Calls for a legal conclusion.
THE WITNESS: I did not feel that it was.
BY MR. CHURCHILL:
Q Why?
A Because I trusted Mike Kiesler and Reed Widen.
Q Would it be fair to say that this is a very similar agreement to four others that you had entered for purposes of selling your Windy Waters stock?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Objection. Foundation.
THE WITNESS: No.
BY MR. CHURCHILL:
Q It doesn't look a lot like the other agreements that you had signed?

MS. POLAKOWSKI: Misstates her testimony.

THE WITNESS: Well, now that I see this I remember there's something about a note. He added the 20,000 on for -- I don't recall.

BY MR. CHURCHILL:

Q Isn't one of the reasons why you were comfortable signing this Stock Redemption Agreement because it was the fifth time that you had done it?

MS. POLAKOWSKI: Objection. Form. Assumes facts not in evidence. It calls for a legal conclusion.

THE WITNESS: Well, this wasn't the same because there was a note -- I can't remember what was involved in this one, and again, I trusted my brother and Mike Kiesler with everything they wrote and had me sign.

BY MR. CHURCHILL:

Q Did you have an attorney represent you for purposes of the 2019 Stock Redemption Agreement?

A No, I did not.

Q Do you remember whether Windy Waters had attorneys represent it for the purposes of the 2019 Stock Redemption Agreement?

A I never had information about that.
Q Do you have any memory of receiving the document prior to signing it?
A No. I did not get it before I signed.
Q Did you have to negotiate any of the terms in the 2019 Stock Redemption Agreement?
MS. POLAKOWSKI: Object to form.
THE WITNESS: There was something about the added 20,000, but I don't remember what that was.
BY MR. CHURCHILL:
Q Can you -- Ms. Randall, can you point to me where the added 20,000 is?
A Well, I asked for 100,000.
Q Okay.
A And for some reason he gave me 120, and I don't remember what that was for.
Q Who is "he"?
A Mike Kiesler.
Q So your memory is that you only asked for 100,000 and he gave you 120 instead?
A Yes.
Q Were you okay with that or you didn't want to do that?
MS. POLAKOWSKI: Objection. Calls for

a legal conclusion.

THE WITNESS: I didn't feel like I had much of a choice.

BY MR. CHURCHILL:

Q But you did sign this document, correct?

A Yes, I did.

Q And you did redeem some of your shares in Windy Waters, Inc., in order to obtain the $120,000, correct?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

THE WITNESS: I don't remember the specifics about this.

BY MR. CHURCHILL:

Q Like the other redemption agreements, you authorized the sale of some of your stock in order to get some money back, correct?

MS. POLAKOWSKI: Same objections. Calls for a legal conclusion.

THE WITNESS: Yes. I did because that's the only way I knew to get money.

(Exhibit No. 16 was marked.)

BY MR. CHURCHILL:

Q Do you remember when you filed for divorce?

A November of '18 or '19.

Q So this is -- the court reporter has handed you what's been marked for identification as Exhibit 16 to your deposition. And when I think of filing dates, I think of when you filed your joint petition for divorce. This is a document that's not Bates labeled, but this is taken from the docket in your divorce proceeding. Do you agree that this is your Joint Petition for Divorce filed on April 1 of 2019?
A I did not file on April 1st.
Q Look at page 4 of Exhibit 16. Do you see your signature there?
A Yes, I do.
Q And that is your signature on the left side above Stacy Lee Randall?
A Yes, it is.
Q Do you remember when you started using the L for Lee instead of the W for Widen?
A No, I don't.
Q So you mentioned earlier that you knew that you needed some money for your divorce expenses. Was part of that need to pay counsel?
A Yes.
Q And your divorce attorney was Maureen Collins, correct?

A Amy.
Q Amy, sorry. I don't know why I said Maureen. Amy Collins, sorry, and she later became Amy Collins O'Hara, correct?
A Yes.
Q And you retained her in roughly November of 2018. Does that sound right?
A Yes.
Q And Amy Collins, later Amy Collins O'Hara was an attorney with the firm Stafford Rosenbaum; is that right?
A Yes.
Q And Stafford Rosenbaum was also the firm that employed Scott Seid who you spoke about before, right?
A Yes.
Q When you engaged Ms. Collins, you knew that Scott Seid was also an attorney for Windy Waters, correct?
A I knew there was an attorney in the building because they had to do a conflict of interest. I didn't know who it was.
Q You didn't know that Scott Seid was the attorney for Windy Waters at the time?
A I wasn't aware of the name, no.

Q When is the first time that you interacted with Scott Seid at all?
A The only time was when I was signing the redemption.
Q Had you met him before?
A Never.
Q And when you say "redemption," you mean May 2020, right?
A Yes.
Q So had you not met Scott Seid prior to that?
A No, I had not.
Q You had only spoken with him on the telephone prior to May 20 -- May 13, 2020?
A Just that day.
(Exhibit No. 17 was marked.)
MR. CHURCHILL: You have been handed, Ms. Randall, what's been marked as Exhibit 17 to your deposition. What's your Bates number on that, Jess?
MS. POLAKOWSKI: Stafford000868.
BY MR. CHURCHILL:
Q You mentioned earlier something about a conflict waiver, correct?
A Yes.
Q And do you recognize Exhibit 17 as the conflict waiver that you signed with Stafford Rosenbaum?

A I don't exactly remember what it looked like.
Q Sure. So this is a letter dated April 3, 2019. Do you see that at the top?
A Yes.
Q And it's signed by Amy T. Collins. Do you see that at the bottom?
A Yes, I do.
Q And it's addressed to you?
A Yes, it is.
Q And the letter says, "Dear, Stacy, in November 2018 you engaged Stafford Rosenbaum, LLP, to represent you with respect to a divorce matter. As you know, we also represent Windy Waters, Inc., (the company) in unrelated corporate matters including your redemption of shares of the company." Do you see that?
A Yes.
Q And then in the next paragraph it states, "We believe that our firm's continued representation of the company would not adversely affect our representation of you; however, in situations like this, which happen from time to time, we're allowed to represent both clients in the matters only if both clients consent. We, therefore, have asked whether you will consent to our

representation of the company in unrelated corporate matters while we represent you with respect to your divorce. Please confirm by signing one copy of this letter and returning it to me by email, fax, or mail. Please call or email me if you have any questions." And then she signs that. Do you see all of that?
A Yes, I do.
Q Does this refresh your recollection as to whether or not this was the waiver conflict that you signed?
A Well, this is the one that I signed, yes.
Q And I assume 2018 down at the bottom is just a typo, you meant to probably write 2019 and you accidently wrote 2018?
A When you said that I retained her in 2019 --
Q I said 2018, actually. Do you remember November 2018?
A Okay.
Q You agree that in order to use Ms. Collins as your attorney that you were waiving any claim of conflict with respect to her firm's representation of Windy Waters, correct?
MS. POLAKOWSKI: I will object to the extent it calls for a legal conclusion. And, Mark, I

just note on this document, Exhibit 17, there are a couple of different dates on here that make it a little bit ambiguous including April 3rd, 2019. It looks like it was signed it says April 2018, and then there's a fax on the top that appears to be April 9, 2019. All of which are after the date of divorce proceeding was filed on the 1st of April.

MR. CHURCHILL: Right. So I asked Ms. Randall if she believes that 2018 was a typo or just a mistake on her part, and she doesn't remember, but she testified that she engaged Ms. Collins in November of '18. So we know -- or we don't know. We can suspect that maybe you just wrote the wrong date that you weren't backdating your conflict waiver. Let's set aside the document for a second then and ask you generally.

BY MR. CHURCHILL:

Q Do you agree that you waived any conflict with Stafford Rosenbaum as to its representation of Windy Waters including with respect to the redemption of shares of the company by you?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

THE WITNESS: I agreed to it, but I'm not sure what I was agreeing to.

BY MR. CHURCHILL:
Q Did you ask Ms. Collins to explain it?
A No. No. Because it seemed like it was no big deal.
Q Did you skim this letter before you signed it?
A I read it.
Q So you reviewed this one?
A Yes, I did.
Q Word for word?
A Yes, I did.
Q And did you have an opportunity to ask her any questions?
A I probably could have.
Q Did you?
A No.
Q And are you aware whether Windy Waters had to sign its own conflict waiver with Stafford Rosenbaum in order for Stafford Rosenbaum to represent you?
A I was not aware of that.
Q Have you ever seen the form of waiver that Windy Waters signed with Stafford Rosenbaum in order for Stafford Rosenbaum to represent it and also you?
MS. POLAKOWSKI: Objection. Assumes

facts not in evidence.

THE WITNESS: I did not see that.

BY MR. CHURCHILL:

Q Have you ever been told that there was a waiver signed by Windy Waters just like the waiver or similar to the waiver that you signed?

A No.

Q Do you believe that Stafford Rosenbaum had a conflict that you had not waived?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

THE WITNESS: What do you mean by that? Can you rephrase it?

BY MR. CHURCHILL:

Q Sure. Do you believe that Stafford Rosenbaum had a conflict of interest in that it was representing Windy Waters for purposes of your share redemptions and also representing you for purposes of your divorce?

MS. POLAKOWSKI: Same objection. Also vague as to timing.

THE WITNESS: For my divorce I don't think that -- it was just Amy that was dealing with my divorce. Nobody else.

BY MR. CHURCHILL:

Q And nobody else includes also not Scott Seid, correct?
A As far as I knew.
Q You knew he was not your attorney, didn't you?
A I didn't even know his name.
Q But your understanding was that Amy Collins was your attorney and no one else?
A For my divorce?
Q Yes.
A Yes.
Q Did you believe that Stafford Rosenbaum was your attorney for any other purpose?
A Yes.
Q What purpose was that?
A When it came to all that, why we're here. I thought that Scott Seid would be an attorney for me also.
Q And he did ultimately tell you that he was not your attorney, correct?
A I don't believe he told me that.

MS. POLAKOWSKI: Mark, we have been going about another hour. Is now a good spot?

MR. CHURCHILL: Now is probably a good time.

THE VIDEOGRAPHER: Off the record.

3:59 p.m.

(Brief recess taken.)

(Exhibit No. 18 was marked.)

THE VIDEOGRAPHER: We are back on the record at 4:17 p.m.

BY MR. CHURCHILL:

Q Ms. Randall, the court reporter has handed you what's been marked for identification as Exhibit 18 to your deposition. It's a document titled, "Notice of Motion and Motion to Modify Temporary Order." Do you see that?

A Yes.

Q And in the top right corner it indicates a filing date, if you see that, of April 22, 2020. Do you see that?

A Yes.

Q Am I correct that this was a filing in the divorce proceeding with your ex-husband?

A Yes.

Q And did this particular filing to modify temporary order by your ex-husband have anything to do with the reason why you came to Reed in May asking for additional money?

A Yes.

Q I don't want to pretend to summarize the whole

document, but to state it generally your husband was basically asking for you to pay him for money, correct?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: When is this dated?

BY MR. CHURCHILL:

Q April of 2020, April 22 of 2020.

A No. I didn't have any money.

Q Flip to the last page of the filing, if you would. If you need to review other portions of it, obviously please do so, but I'm looking at paragraph 13 of Exhibit 18. Are you there?

A Mm-hmm.

Q And "I" -- that's your husband is the I -- ex-husband, sorry. "I am asking that the court modify the existing temporary order," then subpart A, "Requiring Stacy to either take over some additional expenses or pay temporary maintenance to me. B, requiring Stacy to contribute to my future attorney fees which are necessary to proceed with this case, and C, for any additional relief the court deems appropriate." Do you see that?

A Yes.

Q So does this refresh your recollection that your husband was essentially asking for you to pay him more money?

MS. POLAKOWSKI: Objection. Form. Mischaracterizes the document. Foundation.

THE WITNESS: Yes, it does.

BY MR. CHURCHILL:

Q Were you concerned at the time that if your husband was successful with this filing that you were going to have to pay something called maintenance to him?

A No.

Q Why were you not concerned about that? You just said you didn't have any money.

A I wasn't concerned because I didn't have any money. So I had no money to give him.

Q If -- strike that.

Did developments in your divorce proceeding cause you to reach out to Reed on May the 5th and say that you needed some money?

A It probably had something to do with it, yes.

Q I'm going to ask you a couple questions or a few questions about Exhibit 18.

A Okay.

Q Would you look at paragraph 10, please?

A Yes.
Q That paragraph reads, "My attorney contacted Stacy's attorney to see if Stacy would agree to contribute to some of the costs. Stacy inherited significant assets and upon information and belief has been able to meet her budget by relying on those assets. The response that we received was that Stacy was not willing to provide any financial help and that I should sell my condominium instead." Do you see that?
A Yes.
Q Do you know what condominium?
A 1972 Barber Drive.
Q And was that a condominium that he owned?
A We owned.
Q And so if he sold the Barber Drive condominium, the assets would have been split between the two of you?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: Yes, they would have.
BY MR. CHURCHILL:
Q And was he living there alone at the time?
A Yes, he was.
Q You saw his reference to the fact -- or what he

alleges was a fact that Stacy inherited significant assets in line 2. Do you see that?
A Yes.
Q Do you know what he was referring to?
A I really don't.
Q Did you inherit gold coins from your parents?
A Yes, I did.
Q Did you inherit silver bars from your parents?
A Yes, I did.
Q Did you inherit any gold bars from your parents?
A I haven't looked in there in a while. I believe there's one or two small bars.
Q And when you say "there," what are you referring to, a safe?
A My safe.
Q And where is your safe, at your house?
A Yes.
Q Do you still own the gold coins?
A Yes, I do.
Q Do you still own the silver bars?
A Yes, I do.
Q Do you still own the gold bars?
A Yes, I do.
Q Do you know the value of the gold coins?
A I do not.

Q Do you know the value of the silver bars?
A No.
Q Do you know the value of the gold bars?
A No.
Q Have you ever had anyone estimate the value of the gold coins?
A No.
Q Have you ever had anyone estimate the value of the silver bars?
A No.
Q Have you ever had anyone value an estimate of the gold bars?
A No.
Q Why have you not redeemed any of those -- any of that gold or silver for cash?
A Because I had no reason to.
Q Did you ever consider redeeming any of those assets, specifically I mean the gold coins, the silver bars and the gold bars, instead of going to Reed for more cash?
A No, I did not.
Q Why did you not?
A I just didn't think of it.
Q Was it an option for you?
MS. POLAKOWSKI: Objection. Calls for

speculation.

THE WITNESS: No.

BY MR. CHURCHILL:

Q Why not?

A Well, I just because I never thought about it. So I don't think it was an option. Those are put away. You don't see them; you don't think about them.

Q If you had -- so are you stating that you didn't remember that you had them in the safe?

A No.

Q So if you had wanted to you could have redeemed the gold coins for cash, couldn't you?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I didn't think about redeeming those for cash then or ever.

BY MR. CHURCHILL:

Q I understand that's your testimony, but my question is could you have redeemed the gold coins for cash?

MS. POLAKOWSKI: And I will object again. Calls for speculation.

THE WITNESS: Could I have? No.

BY MR. CHURCHILL:

Q Why not?
A Because I don't want to.
Q So is that the only reason why you couldn't have?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I have never ever, ever thought about it until just now.
BY MR. CHURCHILL:
Q If you had wanted to redeem the gold coins for cash, could you have, or is there something that's preventing you from doing so other than your desire not to?
MS. POLAKOWSKI: Objection calls for speculation. Calls for legal conclusion.
THE WITNESS: I just don't want to.
BY MR. CHURCHILL:
Q So that's the only reason, correct?
A Yes.
MS. POLAKOWSKI: Same objections.
BY MR. CHURCHILL:
Q No one else has a claim to the gold coins other than you, correct?
MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: Nobody has -- can you read that back for me, please?

(Last question read back.)

MS. POLAKOWSKI: And same objections.

THE WITNESS: Until I die.

BY MR. CHURCHILL:

Q Same question with respect to the silver bars, the only thing that prevented you from redeeming them for cash is that you didn't want to, right?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I didn't think of it.

BY MR. CHURCHILL:

Q There's that, and then otherwise it's just because you didn't want to redeem them for cash, correct?

MS. POLAKOWSKI: Same objection.

THE WITNESS: I didn't think of it. I never thought about selling, and I never have.

BY MR. CHURCHILL:

Q So if you had thought about selling the silver bars as a way to get cash, was there anything preventing you from doing so?

MS. POLAKOWSKI: Objection. Calls for speculation and for a legal conclusion.

THE WITNESS: I don't know what I would have done.

BY MR. CHURCHILL:

Q That wasn't my question. This is just like the gold coins. Isn't the only thing that stopped you from redeeming the silver bars for cash was your desire not to?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion and speculation.

THE WITNESS: And that I never thought about it.

BY MR. CHURCHILL:

Q So those two things?

A Correct.

Q Same question for the gold bars, the only thing that stopped you from redeeming them for cash was that you never thought about them and that you don't want to, correct?

MS. POLAKOWSKI: Same objections.

THE WITNESS: The biggest reason is because I never even thought about it.

BY MR. CHURCHILL:

Q And the other reason is that you don't want to?

A Right.

Q Do you have any other heirlooms from your

parents through your inheritance?

MS. POLAKOWSKI: Object to form.

BY MR. CHURCHILL:

Q Do you know what I mean by "heirloom," like a family heirloom?

A Like a watch?

MS. POLAKOWSKI: Vague as to time.

THE WITNESS: I have my mother's watch.

BY MR. CHURCHILL:

Q You got that as part of your inheritance through the estate?

A Yes.

Q Any other -- strike that.

Do you know what the value is of your mother's watch?

A I do not.

Q Have you ever had it appraised?

A No.

Q Do you believe it's valuable?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: That I don't know.

BY MR. CHURCHILL:

Q Is there anything else that you inherited that

would be considered a valuable asset to you?

MS. POLAKOWSKI: Objection. Calls for speculation. Also vague as to value.

THE WITNESS: I got her pearls.

BY MR. CHURCHILL:

Q Do you know their value?

A No.

Q Have you ever had them appraised?

A No.

Q Anything else?

A I cannot think of anything else. It's been so long.

Q Any vehicles of any type?

A No.

Q Any boats of any type?

A Other than the ones at Milmont.

Q You didn't obtain a boat through inheritance, right, it wasn't something you were inherited?

A Well, it was -- the cottage was given to us. So I don't know if that's inheritance or not.

Q Is there anything else that you can think of that might qualify as a significant asset that Steven was talking about in his filing on April 22?

MS. POLAKOWSKI: Objection.

Foundation. Form.

BY MR. CHURCHILL:

Q When Steven wrote -- or his attorney wrote that you inherited significant assets, that's what I'm speaking of specifically, something that you inherited that's considered a significant asset. Those are his words, but anything else that occurs to you?

MS. POLAKOWSKI: Same objections.

THE WITNESS: Not that I can think of.

BY MR. CHURCHILL:

Q Do you recall that there was going to be a hearing set on your ex-husband's motion to modify temporary order for May 18 of 2020?

A Do I have recollection of that? Yes.

(Exhibit No. 19 was marked.)

BY MR. CHURCHILL:

Q The court reporter has now handed you what's been marked as Exhibit 19 for identification, and this is another document from your divorce proceeding. Do you agree?

A Yes.

Q And it's a notice of hearing, if you look at the top, from the circuit court of Dane County filed April 23, 2020. Do you see that, Ms. Randall,

up at the top right?

A Yes.

Q And it states that there is a motion hearing set for May 18, 2020. Do you see that?

A Yes.

Q And in the middle there's a single line paragraph that states, "Attorney Hazen's motion to modify the temporary order." Do you see that?

A Yes.

Q And that's a reference to your ex-husband's attorney, right?

A Yes.

Q And do you remember that this hearing was going to be scheduled in May?

A I don't remember the date, no.

Q Was the fact that this hearing was upcoming on your ex-husband's motion to modify temporary order one of the reasons why you called Reed on May the 5th?

A Yes.

Q Were there other reasons that you called Reed on May the 5th?

A I needed to pay my attorney, and I was running out of money.

Q Were you concerned that the temporary order was going to be modified as your husband had requested in the motion filed with the divorce court?
A I honestly don't remember what the original agreement was, so. I don't know what you mean by modified.
Q Were you originally paying your husband maintenance on a monthly basis prior to the order being modified?
A No. I was not.
Q Do you remember the court issuing an order that you were to pay your ex-husband monthly amounts in maintenance?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I'm not certain.
(Exhibit No. 20 was marked.)
BY MR. CHURCHILL:
Q I got a document for you.
A I'm sure you do.
Q The court reporter has handed you now what's been marked for identification as Exhibit 20 to your deposition. And you will see in the top right corner that this was filed on May the

21st. So this would be after that April -- May 18 hearing, correct?
A Yes.
Q Did you attend the May 18 hearing?
A No.
Q Why didn't you attend?
A There was no place to go because it was COVID.
Q Was it a remote hearing?
A Video.
Q Okay. That makes sense. And do you recognize this document titled, "Amended Temporary Order"?
A Yes. I do remember this.
Q Okay. Under the order part of the temporary order, do you see down kind of towards the bottom in capitals, it says, "It is hereby ordered," do you see that?
A Yes.
Q The document says, "Effective June 15, 2020, Stacy Randall shall pay directly to Steven Randall $4,000 per month. Characterization of these payments as either contribution to expenses or an advance on property division shall be determined by agreement of the parties or by the court at the final hearing." And then paragraph 2, "Steven Randall shall place the

condominium at 1972 Barber Drive, Unit 3, Stoughton, Wisconsin, on the market for sale."
Do you see that?
A Yes, I do.
Q And, in fact, you did have to start paying your ex-husband $4,000 per month, correct?
A Yes.
Q Do you remember when the $4,000 figure specifically first came out?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: After I sold my stock.
BY MR. CHURCHILL:
Q Did that number get set at the hearing itself, or was that a proposed figure prior to the May 18 hearing?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I believe they came in asking for 6,000.
BY MR. CHURCHILL:
Q "They" meaning Steven and his attorney?
A Steve and his attorney.
Q And how did you settle on $4,000?
A My attorney --

MS. POLAKOWSKI: I'm going to caution you at this point to not disclose things that you discussed with your attorney.

THE WITNESS: My attorney came up with it. That's not true. The person that was listening to all of this because I had to give expenses and Steve had to give his expenses, she or he said that he won't agree to the 6,000, but he would agree to 4,000.

BY MR. CHURCHILL:

Q To your best recollection did you know about the $4,000 as something that you would owe prior to the hearing on May 18th, or did it get decided on May 18th?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I had no idea why he wanted this.

BY MR. CHURCHILL:

Q Did you remember when you first learned that you would have to pay the 4,000, like what date?

A No. I don't remember what date that was.

Q Do you think you knew or learned about it prior to receiving the order that is Exhibit 20?

MS. POLAKOWSKI: Objection. Calls for

speculation.

THE WITNESS: I did not know about it prior.

(Exhibit No. 21 was marked.)

BY MR. CHURCHILL:

Q The court reporter has now handed you what's been marked for identification as Exhibit 21 to your deposition, Ms. Randall.

A Yes.

Q It is a two-page document labeled Windy47391 to 47392, and it is a series of texts on the second page. First page I believe is just a cover page. There's a series of texts on page 2. Do you see those?

A Yes.

Q Do you recognize these as texts between you and your brother Reed?

A Yes.

Q That's his -- he's indicated as owner, that's his phone number, right, 608-217-5910?

A Last I knew that was his phone number.

Q Okay. And you did, in fact, text your brother on the 5th of May 2020 at 4:14 p.m. and write, "Steve is taking me to court. He wants me to pay him maintenance. His reasons are all

bullshit. I'm going to need to get some money."
A Yes.
Q And your brother Reed wrote back at 5:25 p.m., "We have a Covod problem." He accidently misspelled COVID, right? "Your timing couldn't be worse. We might have to take care of it in Milmont." Do you see that?
A Yes.
Q Why did you reach out to your brother?
A I always reached out to my brother when I wanted to cash in some of my stock.
Q And your brother had always agreed, right?
A No. He told me to talk to Kiesler.
Q Ultimately, you had redeemed the stock when you had requested it, though, correct?
A Yes.
Q What did you understand at the time him to mean by his reference to might have to take care of it in Milmont?
A I didn't ask. I don't know. It never came up again.
Q But what did it mean to you at the time, anything?
A No.
Q You said it never came up again. Did you ever

ask after this May 5, 2020, text exchange with your brother about whether or not there was money that could be provided to you through Milmont?

A Did not.

Q Why not?

A I didn't know what he meant by take care of through Milmont. So I didn't have questions to ask because I didn't know.

Q You knew at the time that Milmont included the cottages, correct?

A Yes.

Q So is it your testimony that you didn't understand that taking care of it in Milmont referred to something to do with the cottages?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.

THE WITNESS: I figured that it probably had something to do with the cottages.

BY MR. CHURCHILL:

Q Do you have a sentimental attachment to the cottages?

MS. POLAKOWSKI: Objection. Form. Vague.

THE WITNESS: I used to have a huge

sentimental value, but I don't have that anymore.

BY MR. CHURCHILL:

Q At the time of this redemption, which would have been -- well, actually we're not at the redemption yet. So May of 2020. So more than three years ago did you have that sentimental attachment to Milmont?

A Yes.

Q Would you have been interested in that time frame, May of 2020, in selling off part of your interest in the cottages?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I never thought about it.

BY MR. CHURCHILL:

Q But you would have been interested?

MS. POLAKOWSKI: Same objection.

THE WITNESS: I don't know what I would have thought at that time.

BY MR. CHURCHILL:

Q Isn't it true that when the topic of Milmont came up later after the redemption and closer to the time of you filing suit that you made it clear that you didn't want to part with your

interest in Milmont?

MS. POLAKOWSKI: Objection. Foundation. Assumes facts not in evidence.

THE WITNESS: Milmont had nothing to do with this suit.

BY MR. CHURCHILL:

Q Did you try to explore other ways to obtain money other than a sale of your stock from Windy Waters?

A No.

Q Did you apply for any loans?

MS. POLAKOWSKI: Objection. Vague as to timing.

BY MR. CHURCHILL:

Q We're still talking in this May 2020 time frame prior to your May 18 hearing in your divorce case.

A No.

Q In that same time frame prior to your May 18 hearing while your divorce proceeding was going on, did you ask other family members for money?

A No.

Q In that same time frame did you take money out of retirement accounts?

A No.

Q Did you consider moving?
A In May of 2020?
Q Yes.
A I had already moved, so, no.
Q Where were you living at the time?
A I was living in an apartment that I'm still in in McFarland.
Q Did you have an obligation in May of 2020 for condo payments?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I didn't think so.
BY MR. CHURCHILL:
Q But did you? You said you didn't think so. Did you have an obligation for condo payments in May of 2020?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I don't know.
BY MR. CHURCHILL:
Q Did you have any rental properties at the time in May of 2020 prior to May 18?
A Yes.
Q What were those rental properties?
A They were condominiums in Cottage Grove.

Q How many?
A I believe there was eight.
Q And do you know their approximate value at the time?
A I did not.
Q Did you consider selling any of the eight condos that you owned?
A No.
Q Why not?
A That was part of our income at the time.
Q When you say "our income," you mean --
A Steve and I.
Q -- you and Steven? And how did you get that income, you rented them out?
A Yes.
Q And did you obtain lease -- excuse me, did you obtain rental income on all eight?
A Yes.
Q Where is Cottage Grove?
A It's between --
Q Sorry. I don't know.
A I think it's south of Madison, but I don't know.
Q How long had you had those condos?
A I really don't know.
Q Do you still own those condos today?

A I do not.
Q Were those -- any of those eight condo properties that you and Steven purchased with some of the money you got from the prior stock redemptions?
A No.
Q You mentioned earlier in your testimony that there were properties that Steven had purchased. Do you remember that?
A Yes.
Q What properties were you discussing then?
A The properties in Florida.
Q And did you still have those properties in May of 2020?
A No.
MS. POLAKOWSKI: Objection to form. Mischaracterizes her testimony.
BY MR. CHURCHILL:
Q What were those properties exactly?
A I didn't have much interest in that. I believe most of them were homes.
Q When you say you didn't have much interest, do you mean like personal intellectual interest or financial interest?
A Intellectual.

Q Do you know when those homes were sold?
A Most of them were not sold.
Q What happened to them?
A They were -- unbeknownst to me I thought my husband was paying the whatever and he was not.
Q The whatever you mean a mortgage?
A Yes. And so most of them went to short sales.
Q The bank foreclosed on the mortgages?
A I don't believe there was any foreclosures, but I'm not positive.
Q And how many Florida properties are you talking about?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I can't even guess. I was not happy about it.
BY MR. CHURCHILL:
Q As of let's say May 18, again, 2020 all of those Florida properties were gone, in other words, you didn't have an interest in them anymore?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I didn't have -- I didn't have an interest in them?
BY MR. CHURCHILL:

Q Financial interest. They were no longer part of the property -- or they were no longer a financial asset of you and Steven?
A That's right.
Q Did you consider refinancing any mortgages prior to the hearing on May 18, 2020?
MS. POLAKOWSKI: Objection. Assumes facts not in evidence.
THE WITNESS: I did not.
BY MR. CHURCHILL:
Q What cars did you have at that time leading up to May 18, 2020? Did you still have your Cadillac?
A I had my Cadillac, yes.
Q And you owned that car at that time, right? You no longer had to pay any finance payments?
A Correct.
Q What about the Infinity, did you have the Infinity?
A No. I did not. Steve did.
Q That was his car?
A Supposed to be my car, but, yes, it turned out to be his.
Q When you say it was his, do you mean that he actually had paid you to drive it or he was just

possessing it?
A He was possessing it.
Q So was it really your car?
A That's --
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: That's what the agreement was when we walked into the dealership.
BY MR. CHURCHILL:
Q Whose name was the title in?
A It was in one of our LLCs.
Q Which LLC?
A I don't recall.
Q How many LLCs did you and Steven have?
A I'm not really sure.
Q Do you know the names of any of your LLCs?
A One of them was a number Willows. I can't remember if it was Two Willows or Three Willows something Willows.
Q And what was the purpose of that LLC?
A I don't know.
Q Did you have anything to do with its creation?
A No, I did not.
Q Was any of your money used for purposes of its operation?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I would have to say that everything that we had was from my money.

BY MR. CHURCHILL:

Q Do you know whether or not your personal finances were co-mingled with Two Willows, LLC?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I don't know that.

BY MR. CHURCHILL:

Q Do you remember the name of any other LLCs set up by you and Steve?

A Set up by Steve.

Q Set up by Steve.

A I don't. It's been quite a while.

Q Do you remember roughly how many?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: (Shakes head.)

BY MR. CHURCHILL:

Q So you said "set up by Steve." He was using your name also?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I don't know how LLCs work. I don't know how many names you have to put on them, but I'm assuming, yes, my name was on them.

BY MR. CHURCHILL:

Q Do you ever remember signing any documents related to those LLCs?

A I remember signing documents, but I'm not certain what they were for.

Q Did you review the documents before signing them?

A I did not.

Q Ms. Randall, would you say that it was your practice to skim documents before signing rather than reviewing them?

MS. POLAKOWSKI: Objection. Form. Mischaracterizes her testimony.

BY MR. CHURCHILL:

Q Do you understand what I mean by my question as to whether it was your practice?

A Did I normally do it?

Q Yeah.

A Yes. Any of the documents that I signed were all written or however you want to explain it by people that I trusted. So I did not normally read things.

Q So far the only document that you indicated that you -- that we have talked about today that you indicated that you reviewed word for word was the conflict waiver. Would you agree with that?
A Yes.
Q In May of 2020, again, leading up to May 18, did you have hired help for you?
MS. POLAKOWSKI: Objection. Form. Vague.
THE WITNESS: Like what kind of hired help?
BY MR. CHURCHILL:
Q So, for example, did you have somebody helping keep up your house or apartment?
A Prior to that? Steve did hire somebody. He had a reason. I can't remember what it was.
Q And what was that person doing?
A Cleaning.
Q Okay. Sorry, I didn't mean to cut you off.
A They cleaned.
Q And how often did they come?
A Every other week.
Q What about a lawn service, did you have one of those?
A We lived in a condo, and it was included in the

condo association.
Q Did you in this time frame, again prior to May 18, 2020, try to sell any of the personal items that you had? We have already gone over the gold and silver, and we know that's a no, but did you try to sell anything else?
A I don't think so.
Q Like any furniture?
A No.
Q Any jewelry?
A Definitely not jewelry.
Q Any heirlooms or parts of your inheritance?
A No.
Q Did you consider holding a garage sale or yard sale, rummage sale?
A Before we moved back to Wisconsin we had a big garage sale.
Q Was that down in Florida?
A Yes.
Q Did you do that at any time leading up to the May 18 time frame of 2020?
A No.
Q After you moved to Wisconsin?
A No.
Q Did you apply for any jobs once you got back to

Wisconsin leading up to the May 18, 2020, date?
A I did not.
Q Did you ever apply for public benefits?
A No. I did not.
Q Do you know if you qualified?
A No. I do not.
Q Did you ever apply for food stamps?
A No. I did not.
Q Do you know if you qualified?
A I don't know.
Q Tell me what happened after your text exchange that we just went over with your brother. So that's kind of the early evening of May the 5th. Do you remember what happened next?
MS. POLAKOWSKI: Objection. Form. Vague.
BY MR. CHURCHILL:
Q Did you have any more conversations that day with anybody at Windy Waters or Widen?
A I don't remember specifically the dates.
Q Do you remember -- I told you to keep your Complaint close because I think that might be helpful for you as we move through some of the remaining facts.
Ms. Randall, if you would, and this is

Exhibit 2 for your deposition, I think if you turn to page 14 that will get us on track in terms of where we are. You certainly can refer to 13 if you need to see. I was going to start asking you about some of your allegations in paragraph 70 and after. Do you need a moment to look at it?
A Yes, I do. I remember this.
Q Okay. So I think you said again that Reed told you to speak with Kiesler?
A Yes.
Q And to the best of your recollection once you got done with that text exchange with your brother Reed on May 5, did you speak with him again or text or communicate with him again in any way until your actual signing of the redemption on May 13, do you remember?
A I'm not -- not before my redemption.
Q Is it correct that Mike Kiesler called you on May 6th?
A Yes.
Q And you told him that you needed $100,000; is that correct?
A Yes.
Q Why $100,000?

A Because I had no money.
Q But why the amount $100,000?
A I figured that -- I thought that would get me through a year.
Q And what did he say?
A He told me that they didn't have $100,000 to give me.
Q And when you say he said, "They didn't," who did you think he meant?
A The company.
Q And so did you then change the amount to 50,000?
A Yes.
Q And what did he say in response to that?
A Same thing.
Q Did Mike Kiesler mention COVID at all?
A Oh, yes.
Q In that conversation on the phone?
A I don't know if it was that particular conversation.
Q Tell me -- you said, "Oh, yes." Tell me what he said to you about COVID in the context of this redemption negotiation or discussion.
A He told me they could not give me 100,000 or 50,000 because COVID had been very hard on the company and that they -- he did not know whether

the company was going to be around or not, and also he said something about accepting or not accepting COVID money. I have no idea what that meant, but they had to let somebody know whether they were going to take it or leave it.

Q Did you understand him to be referencing the government or you don't know?

A I assumed that.

Q What else do you remember him saying?

A The only way we can give you any money would be to redeem all your stocks.

Q And what did you say in response?

A I don't want to redeem all my stocks. That's my life savings.

Q And at some point he discussed with you a dollar figure, right, in that conversation 1.1 million dollars?

A I can't remember what conversation, but somewhere in there he mentioned that.

Q So we're still in this May 6 phone call that I believe was in the morning. Do you remember that he mentioned the 1.1 million dollar value in that phone conversation?

A I do.

Q Do you remember Mr. Kiesler discussing how that

value was computed?

A No.

Q You don't remember or he didn't do it?

A He didn't tell me.

Q Sorry, I have a tickle in my nose.

Do you remember him stating that the figure that he computed was based only on November 2019 financials and that he would need to update that number?

MS. POLAKOWSKI: Objection. Form. Are we still talking about the May 6 conversation?

MR. CHURCHILL: Yeah.

BY MR. CHURCHILL:

Q Do you remember him talking about November 2019 financials?

A I do not remember that.

Q Do you remember him telling you that the 1.1 million dollar figure would need to be updated?

A No.

Q Do you remember him walking through any part of the financials that were the basis for the 1.1 million dollars?

MS. POLAKOWSKI: Objection. Form. Vague.

THE WITNESS: Walk me through the

financials?

BY MR. CHURCHILL:

Q Did he walk through any calculations for you? Did he explain anything to you?

A Not at that time.

Q Did there come a time that he did explain part of the calculation to you or any of the calculation to you?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: There was a time when I was arguing with him about redeeming all my stocks and how I did not want to do that, that he told me that the same formula that we used for your other brothers is the same -- is the one we're using for you.

BY MR. CHURCHILL:

Q Did that reassure you at all?

A No.

Q Did you discuss with him, with Mr. Kiesler, that the same formula that was used for your prior redemptions was also being used for this redemption?

A No.

Q Did you believe that the formula that was being used in May 2020, that was being offered to you,

was different than any of your prior redemptions?

MS. POLAKOWSKI: Objection. Foundation. Assumes facts not in evidence.

THE WITNESS: I don't remember thinking that.

BY MR. CHURCHILL:

Q You did remember that you had redeemed shares before, correct?

A Yes.

Q Were you concerned that the formula was different?

MS. POLAKOWSKI: Same objections.

THE WITNESS: I can't remember thinking that.

BY MR. CHURCHILL:

Q Did you think it might be the same, the formula?

MS. POLAKOWSKI: Objection. Assumes facts not in evidence.

THE WITNESS: I don't remember what I was thinking. I was so angry.

BY MR. CHURCHILL:

Q When you were in that conversation with Mr. Kiesler, did you make any request to see financial information of the company?

A No. I did not.
Q Did you understand that there was going to need to be an agreement written up for your stock redemption if you were to pursue it?
MS. POLAKOWSKI: Objection. Calls for speculation.
THE WITNESS: I don't know what I thought.
BY MR. CHURCHILL:
Q Is there any reason why you wouldn't have expected a Stock Redemption Agreement to be drawn up like you had drawn up for the prior five times?
MS. POLAKOWSKI: Same objection. Also calls for a legal conclusion.
THE WITNESS: I did not think about it.
BY MR. CHURCHILL:
Q You said you were so mad. Why were you so mad?
A Because he was telling me I had to do this, take it or leave it. And he gave me three hours to make my decision.
Q And you ultimately decided to leave it, right, you didn't do it?
MS. POLAKOWSKI: Objection. Vague.

THE WITNESS: I didn't decide anything.

BY MR. CHURCHILL:

Q Did you accept the 1.1 million dollar redemption price for all of your shares?

A No, I did not.

Q And you intentionally did not accept it, correct?

A Yes.

MS. POLAKOWSKI: Objection. Calls for a legal conclusion.

BY MR. CHURCHILL:

Q In your Complaint you used the word fair with respect to your conversation with Mr. Kiesler, for example, if you look at paragraph 79. Do you see that?

A Yes.

Q Paragraph 79 reads, "Kiesler insured Stacy that the price was fair." Do you see that?

A Yes.

Q Is that the word Mr. Kiesler used, or is that you summarizing the conversation?

A I believe that's his words.

Q You believe he used the word "fair"?

A Yes.

Q You testified that Mr. Kiesler told you that the formula that was used was the same formula that had been used for your brothers, correct?
A Yes.
Q Was that part of his explanation for why it was fair?
A I'm not sure why he said that was fair. I told him I am not my brothers. I don't care what they did. I don't know what they did, but I don't feel that this is a fair price.
Q And what was the reason -- again, we're talking May 6, right? What was the reason in that conversation why you thought it was not a fair price?
A 1 million dollars. Well, I had a feeling that the company was worth more than that, and he continued to tell me they had no money. We don't know if we're going to be around. COVID was really hard on us. I don't know if we will ever be able to give you money if you don't take this. So that's the extent of it.
Q Did you know at the time that your brother Price Widen had redeemed his remaining shares of his stock in Windy Waters in 2015, in other words, had been completely bought out?

A I did not know when any of them sold out.

Q Other than knowing the exact date, were you aware in May of 2020 that Price no longer held any shares in the company?

A I did not know that.

Q Did you know that -- at the time in May 2020 did you know that Price had signed a redemption agreement?

MS. POLAKOWSKI: Objection. Assumes facts not in evidence.

THE WITNESS: I didn't know anything about what Price was doing.

MS. POLAKOWSKI: Mark, we have been at it for just about another hour. If there's time to take a break, that would be great.

MR. CHURCHILL: I just have a couple more and then I'll take a break.

BY MR. CHURCHILL:

Q You mentioned the three-hour time frame, and then you mentioned that a few -- I'm looking at paragraph 86 of your Complaint. "A few minutes before the three-hour deadline ran Kiesler called Stacy again." Do you see that?

A Yes.

Q And what did Mr. Kiesler say to you?

A He told me that he had really good news, that Matthew and he came up with another $250,000. And he also told me that he was given another three days to decide whether they wanted the COVID money or not.

MR. CHURCHILL: We can take a break now, not quite this second. I think that the additional money came up in a later conversation, but I will have you figure out whether or not that's the case.

Your Complaint states that in his call back on May 6th he gave you more time, but it doesn't look like there was additional money discussed until May 13th. But I will get some documents together that will help you as well. Why don't we take a break?

THE VIDEOGRAPHER: Off the record at 5:17 p.m.

(Brief recess taken.)

THE VIDEOGRAPHER: We are back on the record. This will mark the beginning of media unit number 4 of the video recorded deposition of Stacy Randall. Today's date is August 28th, 2023, and the time is 5:34 p.m.

BY MR. CHURCHILL:

Q Ms. Randall, I actually put a document on top of your pile there. It was Exhibit 13. Do you see that?
A Yes.
Q I realize that I forgot to ask you one question about that stock redemption. So this is the January 2011 stock redemption, and you remember we discussed this one earlier. In the order of things it would be number 3. Do you remember that, or do you remember that testimony from earlier today?
A Yes.
Q And you got the $200,000 as a result of redeeming your stock, correct?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. CHURCHILL:
Q And my question, which I forgot to ask you was, was that a lump sum payment like the other ones?
A Yes.
Q Thank you. You can put that to the side now. We were talking a little bit about COVID in that conversation -- in some conversation that you had with Mike Kiesler. You testified you

weren't sure which conversation it was, but that it came up; is that correct?
A That is correct.
Q Was it your understanding that COVID was presenting challenges for the companies or did you not know one way or the other?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I had no way of knowing.
BY MR. CHURCHILL:
Q Did Mr. Kiesler say anything about the possibility that COVID might impact the actual payments to you if you were to reach an agreement for the stock redemption?
MS. POLAKOWSKI: Same objection.
THE WITNESS: Can you say that again, please?
MR. CHURCHILL: Can you read that back for me?
(Last question read back.)
THE WITNESS: Not in so many words.
BY MR. CHURCHILL:
Q Did you understand that there was a potential that you might have to repay any money that you got back as a part of a Stock Redemption

Agreement if COVID had certain impacts on the company?

MS. POLAKOWSKI: Objection. Foundation. Also assumes facts not in evidence.

THE WITNESS: It never occurred to me. I never heard anything about that.

BY MR. CHURCHILL:

Q If COVID had had that type of impact on the company, would you have repaid the money that you had gotten from any of your Stock Redemption Agreements?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I have no idea what it would have done.

BY MR. CHURCHILL:

Q Going back to your Complaint if you still have that handy.

A I sure do.

Q I'm on page 16 and paragraph 91. Are you there, Ms. Randall?

A Yes.

Q Paragraph 91 reads, "Stacy told Kiesler that she would need to talk with her financial advisor and attorney." Do you see that?

A Yes.
Q And, again, to orient you on where we are, this is end of the day May 6th, right, are you with me?
A Yes.
Q Do you remember saying that to Mr. Kiesler?
A Yes, I do.
Q The financial advisor that you were referencing, was that Mark Goff?
A Yes, it was.
Q And the attorney that you were referencing, who would that have been?
A Probably Scott Seid.
Q Not Ms. Collins O'Hara?
A No.
Q Why not her?
A I don't think -- I probably thought that she doesn't know anything about -- she's a divorce attorney.
Q Did you reach out to Scott Seid after the conversation with Mr. Kiesler on May the 6th?
A I did not.
Q Did you reach out to any other attorney, other than Scott Seid, after the conversation with Mike Kiesler on May the 6th?

A Well, the only other one that I would have reached out to because I don't know lawyers would be Amy, but I don't recall.
Q You mentioned earlier that you had discussed things with your son Justin; isn't that correct?
A Yes.
Q Didn't he recommend that you get an attorney?
A This is on May 6th?
Q Any time after the conversation with Mike Kiesler.
MS. POLAKOWSKI: The May 6th conversation?
MR. CHURCHILL: Yes.
THE WITNESS: Yes.
BY MR. CHURCHILL:
Q And why didn't you do what your son suggested?
A Because I didn't have the time.
Q Did you reach out to any attorneys on May the 7th or May the 8th, May the 9th, May the 10th, May the 11th, or May the 12th?
A May 12th I did.
Q Who did you reach out to on May 12th?
A Was that the day I signed?
Q May 13 is the day you signed.
A Then I didn't reach out to anybody.

Q Why didn't you have the time in the week between May 6 and May 13 to reach out to an attorney?
A Because I was given three hours to make my decision, and then Kiesler called me back and told me that they -- and I don't know who "they" was or is -- gave him another three days.
Q Okay. And then -- but you didn't sign anything or redeem your stock in those three days, correct?
A Correct.
Q So no three-day deadline was enforced; isn't that right?
A That's right.
Q So, again, why didn't you ever call an attorney until you called Scott Seid?
A I didn't know any attorneys to call.
Q Did your son Justin know any attorneys to call?
A He was going to try to get ahold of somebody.
Q And what happened, do you know?
A This person said that they didn't have time to do what Justin was asking, I believe.
Q What about conversations with Mr. Goff, you did reach out to him, didn't you?
A Yes.
Q How long had he been your financial advisor, if

you recall?
A I don't know.
Q Well, let's say starting in May 2020, was it more than ten years?
A No.
Q Can you give me an estimate of roughly when you started using Mark Goff?
A It was after I moved back to Wisconsin.
Q Which I think you said was 2012.
A Yes. So it was between probably -- I didn't do it then. Maybe '16 to '18. I'm questioning myself.
Q That's fair. Did Mr. Goff help you at all with any of the LLCs that Steven had set up?
A No, he did not.
Q Did he only help you with your personal portfolio, or did he help you with more than that?
A Just me.
(Exhibit No. 22 was marked.)
BY MR. CHURCHILL:
Q The court reporter is handing you what's been marked for identification as Exhibit 22 to your deposition. I will just note for the record that we discovered something funky about the

timing on the email. The metadata actually indicates that this email is not from 4:59 p.m., but is from 11:59 a.m. I'm not sure why that is or why that happens. Sometimes it's something where things convert to something known as GMT time. I don't really know, but I will represent to you that the time stamp on what's printed out is wrong and the actual time stamp is on something that your counsel is holding right now.

The reason why I raise it is because there's a couple communications that you have and the time is jumping around a little bit, but I think that when we get through with it, you will agree with me on the order of things.

So regardless, let's look at the content of Exhibit 22. This is a text between you and Mark Goff. Do you see that?

A Yes.

Q And it's on May 6th?

A Yes.

Q And it's actually right before lunch time, believe it or not, and not 4:59 p.m. You say, "Mark, Steve is taking me to court. I'm going to need -- I'm going to need to pull money from

my stock to cover all this divorce bullshit. The accountant at Widens just called me with an offer. He told me I have to either take it or leave it. If I leave it, they cannot give me any money at this time or in the foreseeable future. He told me I need to decide by 3:00 p.m. today. Please call me. I need your advice." Did I read that correctly?

A Yes.

Q And the accountant that you're talking about is Mike Kiesler, right?

A Yes.

Q And you state in there the bit about the take it or leave it, which is what you testified to earlier today, correct?

A Yes.

MS. POLAKOWSKI: Mark, just for the record, I accept your representation as to the timing of this text message, obviously subject to confirmation.

MR. CHURCHILL: Yeah.

(Exhibit No. 23 was marked.)

BY MR. CHURCHILL:

Q You now have in front of you what's been marked for identification as Exhibit 23. Do you have

it, Ms. Randall?
A Yes.
Q And you can see why I was focused on the time because this says 12:16, and I think that is correct. So I will represent to you that I believe this was a subsequent text from you to Mark Goff -- excuse me, to Justin Randall.
And this is a document produced as Randall116. You said to Justin in your text, "Kiesler was extremely cocky with me. He told me that Widens might even be around in seven years. I could end up with nothing if I don't take this offer. I tried to explain to him that this is a really big deal. It's what I have to live on for the rest of my life. I need time to talk to my people. He told me I need to take it or leave it. If I turn it down, sorry we can't help you." Do you see that?
A Yes.
Q Do you remember if Justin responded to your text?
A I'm sure he did. That's probably maybe when he told me that I need to get an attorney to look at Widens' financials.
Q You think as a result of that text from you?

A Mm-hmm.
Q Did you speak with Justin on the phone?
A We talked back and forth in all different ways during this time.

MR. CHURCHILL: I'm going to hand this document to the court reporter, and it has what I think is the correct time written on it if that's okay, Jess, just because I think it will be helpful for the record. It's written in a time and circled. It's reflected in the metadata report that I just gave you.

(Exhibit No. 24 was marked.)

BY MR. CHURCHILL:
Q Okay. So, Ms. Randall, the court reporter has handed you what's been marked for identification as Exhibit 24, and I just indicated that there's a different time stamp written on it because I believe the actual time of this communication is 2:58 p.m. and not 7:58 p.m.

MS. POLAKOWSKI: I will just note for the record, I'm confused now because we weren't talking about that email previously, I don't believe.

MR. CHURCHILL: Right. So the first one -- this is another text from her to Mr. Goff, and it's just a couple hours after Exhibit 22.

MS. POLAKOWSKI: Okay. So your suggestion is that the timing on both of these texts is off?

MR. CHURCHILL: Correct. So the two to Goff are both off. So the first Goff text was at 11:59 a.m., not 4:59 a.m., and this Goff text is at 2:58 p.m., not 7:58 p.m. The timing on the one with Justin I think is correct.

MS. POLAKOWSKI: Just so the record is clear as well, note that the email found on Exhibit 24 is also on the backside of Exhibit 22.

MR. CHURCHILL: Double-sided?

MS. POLAKOWSKI: Yeah. That was part of my confusion.

MR. CHURCHILL: Is that on the witness's copy?

MS. POLAKOWSKI: I believe so, but we can check. Do you have Exhibit 22, Stacy? It is on the witness's copy.

MR. CHURCHILL: Okay. I don't think that was intentional. Okay. That just means we could have used one document instead of two.

BY MR. CHURCHILL:

Q So Exhibit 24 is also on the back of Exhibit 22 apparently, but let's use 24 now because it's

got the time written on it in a circle as 2:58 p.m. Are you there?

A Yes.

Q Exhibit 24 is a follow up text from you to Mark Goff. Do you see that?

A I do.

Q And you state in your text, "Are you alive? Have COVID-19? Maybe you are on some tropical island some place soaking in the sun. I am in need of money. I asked Reed if I could please pull some cash from stocks. This is what I was told, Widens is telling me that the only way they can help me is for them to buy me out. It would be 1.1 million dollars over seven years paying me monthly $14,000. Supposedly it has something to do with COVID bail-out money. I would obviously have to invest this money. My accountant is out until Monday so I don't have an opinion from a tax point."

Do you remember who the accountant was? Was that Scott Spangler that you're talking about?

A Yes.

Q So you asked Mr. Goff continuing, "Do you think this is something I should consider? I found

out about this offer at around 10:00 a.m. this morning. They are giving me until 3:00 p.m. to decide. If I don't take this offer, there's nothing they can do to help me. Sorry is what the accountant at Widens told me. Mind you this is the only money I have to live on for the rest of my life. Yours truly, Stacy Randall." Do you remember sending that text?

A I remember the first sentence for sure. Yeah, I do remember it.

Q And do you remember communicating with Mr. Goff after sending this text?

A I can't remember where he was or if he was just ignoring me or what. That's why I asked all those questions.

Q Do you remember whether or not you had a phone call after texting him?

MS. POLAKOWSKI: Objection. Vague as to timing.

THE WITNESS: I do not remember.

(Exhibit No. 25 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, now you have been handed what's been marked as Exhibit 25 for identification. It's a document produced as Randall328, and this

is another text from you to Mr. Goff, correct?
A It appears that way.
Q And, again, May 6th, 2020, and the time is 4:30 p.m. Do you agree with that?
A Yes.
Q And I have no change to make to the time. This seems to be correct. And you state in your text, "Thanks for helping me know what I should say." Do you see that first sentence?
A I do.
Q Does that help remind you whether you had a phone call or not?
A I don't remember if it was a phone -- just the way it's worded I think that I was just thanking him for his help.
Q You had communicated somehow with Mr. Goff, correct?
A Yes.
Q And you wrote -- you texted here, "Mike's attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought they had an interest in my well-being. He told me that the company puts

all of the incoming profit right back into the business. So they never make any money. He gave me the way they have evaluated the company shares since 1991. It has nothing to do with how good or how bad the company is doing. He was trying to tell me in seven years my stock would still be worth 1.1 million. I don't understand how that could be. Just when I was going to call him back, he was calling me. It was at 3:58." Do you see that?

A Yes, I do.

Q And it references a discussion that Mike had with you where he gave you -- he gave -- you wrote, "He gave me the way they have evaluated the company shares since 1991." Do you see that?

A Yes.

Q So was that a discussion that Mr. Kiesler had with you about the redemption agreements or you just don't remember?

A I don't remember.

Q Do you remember me asking you earlier whether or not Mr. Kiesler had gone over financial information with you?

A Yes.

Q And this appears to indicate that he did go over some financial information with you on May the 6th; isn't that right?

MS. POLAKOWSKI: Objection. Mischaracterizes the document.

THE WITNESS: I wasn't thinking of this as financial information.

BY MR. CHURCHILL:

Q You told Mr. Goff that Mr. Kiesler gave you the way they had evaluated the company shares since 1991; isn't that right?

A Yes.

Q And you have no reason to believe that what you texted to Mr. Goff wasn't true when you wrote it?

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I'm sure that it was the truth.

BY MR. CHURCHILL:

Q And then you said to Mr. Goff, you said -- and I'm going right back to the middle here. We just were reading up where it says, "Just when I was going to call him back, he was calling me. It was at 3:58. I had to chuckle thinking he

was going to pressure me for a decision." Why did you say that?
A Because I hadn't contacted him and the three hours was nearing.
Q It says that you were going to chuckle. It sounds like you had one over on him. He was calling you --
A Well, I had my answer.
Q So why did you say you were going to chuckle? You weren't feeling very pressed, it doesn't seems like.
MS. POLAKOWSKI: Objection. Form. Mischaracterizes the document.
THE WITNESS: I had to chuckle because he was calling. He wasn't waiting for me to call him.
BY MR. CHURCHILL:
Q You wrote, "I had to chuckle thinking he was going to pressure me for a decision." Isn't that an indication that you weren't feeling pressure?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.
THE WITNESS: That I wasn't feeling pressure?

BY MR. CHURCHILL:
Q Yeah.
A Absolutely not.
Q You wrote, "What he told me was that he had just received an email saying the government has pushed back the deadline for another week so he doesn't need my answer today after all." Do you see that?
A Yes.
Q Didn't you say on your Complaint that Mr. Kiesler didn't provide any reason for why you got additional time to consider the offer?
MS. POLAKOWSKI: Objection. And, Stacy, if you need to look at the Complaint to see what was said, you can take the time you need to do that.
THE WITNESS: Can you repeat that question or comment?
BY MR. CHURCHILL:
Q Sure. Why don't you go first to page 15 of your Complaint. Paragraph 86 to start.
A Okay.
Q Paragraph 86 reads, "Stacy decided not to call Kiesler back; however, a few minutes before the three-hour deadline ran Kiesler called Stacy

again." Do you see that?
A Yes.
Q Paragraph 87 the reads, "Kiesler told Stacy that he had good news, that he had been given another three days for Stacy to accept the all or nothing offer." Do you see that?
A Yes.
Q And then paragraph 88, "Kiesler offered no explanation for this new time constraint." Do you see that as well?
A I do.
Q Didn't you just tell Mark Goff that Kiesler did give a explanation for the new time constraint?
MS. POLAKOWSKI: Objection. Mischaracterizes the documents.
THE WITNESS: Yes, I did.
BY MR. CHURCHILL:
Q You then said to Mr. Goff, "Now I have time to talk to Scott Spangler on Monday to see what he thinks I should do. Kiesler now knows I don't trust he or Reed, and I don't believe they have my best interest in mind at all. I could tell he was in disbelief, and I could hear some sadness in his voice. So that's where we are sitting at this moment. Things will be changing

daily I am sure. I will keep you posted. I'm going to need your knowledge on how to make my money grow. Thank you for your time, Mark."

Did I read that accurately?

A Yes, you did.

Q It seems like you weren't feeling much pressure as a result of this situation based on your statements to Mr. Goff, wouldn't you agree with that, Ms. Randall?

MS. POLAKOWSKI: Objection. Form.

THE WITNESS: What are you talking about pressure?

BY MR. CHURCHILL:

Q Why did you say, "Kiesler now knows I don't trust he or Reed"?

A I had a lot of pressure on me. I really -- these days were so stressful because I knew nothing.

Q So why did you tell Mr. Goff that Kiesler knows you don't trust he or Reed?

A Maybe I just thought that because of the way -- the tone of his voice.

Q And was that true that you didn't trust Mike or Reed as a result of that situation?

A I was beginning to question it.

Q Certainly no reason to believe that you would tell Goff that if it wasn't true, correct?
A Yes.
Q Did you, in fact, get in touch with Scott Spangler on Monday like you said you were going to?
A That I can't remember, and if I did, he would have said -- I don't know what he would have said.
Q You agree that between the time that you wrote this text to Mark Goff on May the 6th and the time that you eventually signed the redemption agreement that a week passed, right?
A Yes.
Q Did you change how you felt about trusting Reed and Mike in that weeks' time frame?
A Yes.
Q Why?
A Just the way that Mike Kiesler was talking to me.
Q That made you trust him more or trust him less?
A I had the utmost trust and respect in Mike Kiesler until this, and I can't identify why. I have been told that I'm a good people reader, and so far pretty much what I think is what --

when people ask me it's been true.
Q Just for the record, you said you trusted Mike Kiesler until this and you pointed at the table. What do you mean until which --
A I meant until this whole thing started.
Q The lawsuit, you mean?
A Yes.
Q And when you say that you trusted Mike Kiesler until the lawsuit, you trusted Mike Kiesler until you found out that the company sold for 162 million dollars; is that what you mean?
A Yeah.
Q You said that your son Justin was suggesting that you hire an attorney, correct?
A He did suggest that.
Q And Justin also suggested that you obtain counsel to find out what the companies were worth. Is that what you testified to?
A No.
Q You said something about Justin suggesting that you have the books checked out or the financials checked out?
A Yes. Find an attorney to look at the financial books.
Q And it's true that you never had that done prior

to signing the redemption agreements, correct?
A Justin thought he knew somebody, but this person did not have the time to do what he was asking.
Q So the answer is, yes, you did not do that between your conversation --
A I did not do that.
Q -- with Justin and when you signed the redemption agreements?
A Correct.
Q Isn't it true that none of the deadlines that you have complained about in your Complaint related to the redemption in May were actually enforced by any of the defendants?
A Like the three days and the three hours?
Q Yeah.
A There's a reason why Mike Kiesler called me at 3:58. So like I said, I thought that he was calling me to pressure me for an answer.
Q And then he didn't, correct?
A Correct. So those to me were, hmm, I wonder why he did that. Those three hours were hell. We're talking about my stock and my life.
Q And is it your understanding that you didn't have an ability not to sign any agreement?
MS. POLAKOWSKI: Object to the form of

the question.

BY MR. CHURCHILL:

Q Do you understand what I'm asking?

A Not really.

Q Couldn't you have just not signed?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: If I was financially stable, I probably wouldn't have signed.

BY MR. CHURCHILL:

Q No one was holding the pen and forcing you to sign, correct?

A Nobody was holding the pen and forcing me to sign.

Q And in fact, you had other assets that you could have redeemed instead of the stocks, correct?

MS. POLAKOWSKI: Objection. Calls for speculation. Calls for a legal conclusion.

THE WITNESS: Are you talking about my silver and my gold?

BY MR. CHURCHILL:

Q Silver and your gold is some, right? You could have redeemed those?

A Like I said, I never even thought about it.

Q But you could have which you also said, correct?

MS. POLAKOWSKI: Objection. Calls for speculation. Calls for legal conclusion.

THE WITNESS: If I thought about it, but I wouldn't have.

BY MR. CHURCHILL:

Q And you could have sold your condos in the Cottage Grove area, correct?

MS. POLAKOWSKI: Objection. Calls for speculation. Calls for a legal conclusion.

THE WITNESS: This is May of 20 --

BY MR. CHURCHILL:

Q May of 2020.

A I didn't want to have anything to do with those condos.

Q But you could have sold them?

A I don't --

MS. POLAKOWSKI: Hold on. Objection. Calls for speculation and calls for a legal conclusion.

BY MR. CHURCHILL:

Q What's your answer, Ms. Randall?

A I don't know if I could have or not.

(Exhibit No. 26 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, you have been handed what's been

marked for identification as Exhibit 26 to your deposition, and it's a document produced by you Randall403 through 405. Do you have that in front of you?

A Yes, I do.

Q And this was a document that I found out was an example of a communication that you had with Scott Spangler. Do you see him listed at the top of the first page of the exhibit?

MS. POLAKOWSKI: I will object to form and foundation. Also it mischaracterizes the document. I'm not seeing Stacy's name anywhere on these documents.

BY MR. CHURCHILL:

Q So this is a communication between -- at the top it's between Steve and Scott Spangler. Do you see that? I'm sorry, on the very first page. I said your name, but it's actually Steven's name. Do you see that?

A Yes.

Q And then there's a PDF that's got your name and the title of the PDF. Do you see that at the top?

A Yes.

Q Did you ever have any involvement in the

exchanges with Scott Spangler regarding tax information?

MS. POLAKOWSKI: Object. Vague as to time.

THE WITNESS: With Scott Spangler talking about tax information?

BY MR. CHURCHILL:

Q Yes.

A Yes. He was my accountant.

Q And I said ever meaning ever. Did you ever have an exchange with Scott Spangler on tax information?

A He explained my taxes to me every year.

Q Did you know in November of 2018 that Steven Randall was communicating regarding your K-1 with Scott Spangler?

MS. POLAKOWSKI: Objection. It assumes facts not in evidence.

THE WITNESS: No. I did not know that.

BY MR. CHURCHILL:

Q When Steven was dealing with tax issues, he was acting on your behalf; isn't that correct?

MS. POLAKOWSKI: Objection. Calls for a legal conclusion and also foundation.

THE WITNESS: We were still married, so, yes.

BY MR. CHURCHILL:

Q Let me go back quickly to Exhibit 25. This was your last text that I showed you to Mark Goff. Do you have that one?

A Yes, I do.

Q Near the second to bottom line you texted, "Things will be changing daily I am sure." Do you see that?

A Yes, I do.

Q Do you remember why you said that?

A Because I was being told different things.

Q Did you anticipate there would be more negotiations with Mike Kiesler?

MS. POLAKOWSKI: Objection. Form. Vague as to negotiations.

THE WITNESS: I don't know if that's what I meant or what I --

BY MR. CHURCHILL:

Q Did you remember at the time that Mike Kiesler had told you that he needed to update the figure for the redemption with December 2019 financials?

A I do not remember him telling me that.

(Exhibit No. 27 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, you have been handed what's been marked for identification as Exhibit 27 to your deposition. It's a document produced by you in this case, Randall178 through Randall187.

A It's a -- what did you say?

Q I was reading the Bates numbers.

A Okay.

Q So I gave you -- the front page should be Randall178 and that back page should be Randall187.

A Okay. Yes.

Q Do you recognize this document?

A No.

Q For the record, it's a document titled, "Widen Financial Statements Consolidated December 31, 2019," and I'm interested in knowing when you obtained this document, if you know, since it was produced by you in this case.

MS. POLAKOWSKI: Object. Foundation.

THE WITNESS: Produced by me?

BY MR. CHURCHILL:

Q Yeah. Remember that process we were talking about before where I said there were document

requests served on you, and then I asked you if you had searched for documents.

A Yes.

Q I'm wondering if you have this document or if this document was provided to you actually from the defendants.

MS. POLAKOWSKI: Objection. Foundation.

THE WITNESS: I don't remember anything about this.

BY MR. CHURCHILL:

Q Have you ever seen it before today?

A No.

Q Okay. You can put that to the side. Let's go back to your Complaint so we can walk through the rest of the timeline here. On -- in paragraph 93 on page 16. Are you there?

A Yes.

Q Paragraph 93 reads, "Stacy did not want to accept Kiesler's offer," and by that you mean the offer from May the 6th, the 1.1 million; is that what you meant by that?

A "Stacy did not want" --

MS. POLAKOWSKI: I will object to form and foundation.

BY MR. CHURCHILL:

Q I will keep reading. Let's see if I can jog your memory. "Stacy did not want to accept Keisler's offer so despite her financial situation she allowed the three-day time limit to lapse without responding." Do you see that?

A Yes.

Q And then you allege that, "On or around May 13 Kiesler called Stacy again." Do you see that?

A Yes.

Q What do you remember about that conversation?

MS. POLAKOWSKI: Mark, I apologize can you orient me?

MR. CHURCHILL: Sure. Paragraph 94.

MS. POLAKOWSKI: Thank you.

BY MR. CHURCHILL:

Q What do you remember about Mike calling you on May 13? This is when you wrote that he had come up with another $250,000.

A He told me, guess what, I have more good news. He told me that they found another 250,000.

Q Isn't it true that Mr. Kiesler told you that he was just updating the formula for the December 2019 financials?

MS. POLAKOWSKI: Objection.

Mischaracterizes her testimony.

THE WITNESS: I don't remember that at all.

BY MR. CHURCHILL:

Q Do you remember saying something to him along the lines of, "That's more like it," when you found out about the 250,000?

A No. I said, "That's all?"

Q And so the offer that was made then was in excess of 1.3 million dollars for the rest of your stock, correct?

A Yes.

Q Ms. Randall, if you were so upset about the amount of money being offered, why didn't you turn it down?

A I was told I had to take it or leave it, and they didn't know when they could give me money if they could give me money.

Q So why didn't you leave it?

A I didn't have any money.

Q That's not been your testimony today. You testified that you had other assets and other money.

MS. POLAKOWSKI: I will object to the form of the question. It mischaracterizes her

testimony.

BY MR. CHURCHILL:

Q Isn't it true that you had other assets that you could have redeemed and not had to sell your stock?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: No.

BY MR. CHURCHILL:

Q That's not true?

A No.

Q Isn't it true that you knew that this did not involve Milmont, which was a different asset that you could have redeemed instead?

MS. POLAKOWSKI: Object to the form of the question. Also calls for speculation.

THE WITNESS: I didn't think about it.

BY MR. CHURCHILL:

Q But you knew Milmont wasn't one of -- wasn't being discussed with respect to the stock redemption, correct?

MS. POLAKOWSKI: Objection. Speculation. Calls for -- excuse me, just one second. Foundation.

THE WITNESS: What do you mean by --

who discussed?

BY MR. CHURCHILL:

Q When you were having the discussion with Mike Kiesler --

A Yes.

Q -- on May the 6th and then again on May the 13th you knew this was not a discussion about Milmont, correct?

MS. POLAKOWSKI: Object to the form of the question. Vague.

THE WITNESS: Right.

BY MR. CHURCHILL:

Q Okay. In paragraph 97, again, of the Complaint page 16 it states, "Frantic for advice, Stacy contacted friends in the wealth management industry and her personal accountant, but nobody could provide advice before Kiesler's deadline lapsed." Do you see that?

A Yes.

Q So is it true then that you did reach out to additional people after getting off the telephone with Mike Kiesler?

A I reached out to Mark Goff.

Q Again? On May 13?

MS. POLAKOWSKI: Object to the form of

the question. Mischaracterizes the document.
BY MR. CHURCHILL:
Q Are you following me, Ms. Randall?
A Yes, I am.
Q Who are the people that you reached out to that are referenced in paragraph 97 of your Complaint?
A Wealth management would be Mark Goff.
Q And then personal accountant would be Scott Spangler?
A Yes.
Q Anybody else?
A I do not believe so.
Q And then you reached out to your attorney, right, your divorce Attorney Ms. Collins O'Hara?
A Yes, I did.
Q In paragraph 105 -- strike that.
Let's back up a little bit to orient you. Paragraph 103, let's start with -- of the Complaint on page 17 -- "Stacy then emailed Attorney B with a frantic subject line, 'I need help.'" Do you see that?
A Yes.
Q And do you remember who Attorney B was?
A It would be Amy.

Q And you -- then it says, "Stacy told Attorney B that Kiesler had just called her and apparently revised his valuation of Windy Waters, but that because of the COVID thing I have to sign these papers today, like now." Do you see that?
A Yes.
Q So you knew that you were going to see some papers?
MS. POLAKOWSKI: Object to the form of the question.
THE WITNESS: I knew that I was going to be seeing -- I had to sign some papers today.
BY MR. CHURCHILL:
Q You expected to see -- if you were going to do the deal, you expected to see a redemption agreement again, correct?
MS. POLAKOWSKI: Objection mischaracterizes her testimony.
THE WITNESS: No. I did not expect to see that.
BY MR. CHURCHILL:
Q What papers did you think you were going to need to see?
MS. POLAKOWSKI: Objection. Mischaracterizes the document.

THE WITNESS: I didn't know.

BY MR. CHURCHILL:

Q Did you think to ask to see the papers that you might have to sign prior to signing them?

MS. POLAKOWSKI: Object to the form of the question. It's vague.

THE WITNESS: Can you repeat that?

MR. CHURCHILL: Would you read it back, please?

(Last question read back.)

THE WITNESS: No. I did not think of that.

BY MR. CHURCHILL:

Q Isn't it true that you agreed with Mike Kiesler that Scott Seid would draft up papers for you to sign for the May 2020 redemption agreement?

A That's not true.

Q You didn't agree for Scott Seid to draft those papers?

A I knew nothing about Scott Seid.

Q Well, that's not true because in paragraph 102 you admit you called and left Scott Seid a message.

A Right. But I did not know that he was going to be drafting papers.

Q That never came up?
A Are you asking me if Mike Kiesler ever told me that Scott Seid was going to draft papers?
Q Isn't it true that you and Mike Kiesler agreed that Scott Seid would draft up the papers for you to review and sign?
MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.
THE WITNESS: No, that's not true.
BY MR. CHURCHILL:
Q Ultimately you left Scott Seid a voicemail, right?
A Yes, I did.
Q And was it your understanding at the time that Mr. Seid could advise you with respect to the potential redemption of your shares?
A Yes, it was.
Q And that's true even though you had signed a conflict waiver earlier saying that you knew that the Stafford Rosenbaum firm was handling the redemptions of your shares for the company?
A I did not know that Rosenbaum was doing -- writing redemption things.
Q You remember that you signed that conflict waiver that says expressly that the Stafford

Rosenbaum firm would be handling redemptions of your stock?

MS. POLAKOWSKI: Objection to the extent it mischaracterizes the document and calls for a legal conclusion. Also vague as to timing.

THE WITNESS: I know that I signed the paper.

MS. POLAKOWSKI: And, Stacy, if you need to look at the waiver letter to determine what it says, go ahead and take the time that you need to do that.

THE WITNESS: Yeah. Where is that?

MR. CHURCHILL: It should be Exhibit 17.

MR. PALAY: Mark, I just want to ask you a question about this document when it's a good time, so just let me know.

MR. CHURCHILL: Sure.

BY MR. CHURCHILL:

Q All right. So second sentence, first paragraph of Exhibit 17 letter to you from Amy T. Collins, "As you know, we also represent Windy Waters, Inc., (the company) in unrelated corporate matters including your redemption of shares of the company." Do you see that?

A Yes.
Q Okay. Do you now recall that you waived that conflict and therefore knew that Stafford Rosenbaum was representing Windy Waters in the redemption of your shares?
MS. POLAKOWSKI: Objection. Mischaracterizes the document. Also calls for a legal conclusion.
THE WITNESS: I don't think that I had enough information to say that.
MR. CHURCHILL: Why don't we take a break?
THE VIDEOGRAPHER: Going off the record. The time is 6:29 p.m.
(Brief recess taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 6:44 p.m.
BY MR. CHURCHILL:
Q Ms. Randall, you got off the phone with Ms. O'Hara and then ultimately made the decision to go to Widens offices, correct?
A That is right.
Q Did Mike Kiesler know you were coming?
A Yes.
(Exhibit No. 28 was marked.)

BY MR. CHURCHILL:
Q Ms. Randall, you have been handed what's been marked for identification as Exhibit 28 to your deposition. And this is a text from you to Justin sent at 3:56 p.m. on May 13. Do you see that?
A Yes.
Q And you wrote, "Well lo and behold, Kiesler did another evaluation of the company and came up with another 250,000." Do you see that?
A Yes.
Q "Nothing I can do about it. I will be going over to the office to sign the papers at 4:30." Do you see that?
A Yes.
Q Why did you say, "Nothing I can do about it"?
A He made it perfectly clear to me there is nothing I can do about it.
Q So you already knew before you went to the offices that you were going to sign?
A I felt like I had to sign.
Q And you hadn't reviewed what you were calling the papers yet, correct?
A Correct.
Q When you arrived at the office, you saw Mike

Kiesler on his phone, correct?
A Yes.
Q And he was talking to Scott Seid?
A Yes.
Q And you asked Mike if you could speak to Scott Seid, correct?
A That's right.
Q And Mike handed you his phone; isn't that right?
A Yes.
Q And in the course of talking with Scott Seid on the telephone you indicated that you were uncomfortable redeeming your shares?
A Yes, I did.
Q And isn't it true that Scott Seid said to you that nobody could force you to sign any documents?
A Yes.
Q And isn't it also true that Scott Seid offered to provide you names of attorneys that could advise you if you wanted them?
A That is not true.
Q Are you aware that Scott Seid gave a deposition in this case?
A Yes, I am.
Q And are you aware that he testified to the fact

that he gave you -- that he offered to give you names of attorneys in that phone conversation?

MS. POLAKOWSKI: Object to the extent it assumes facts not in evidence.

THE WITNESS: Am I aware of the fact that he says he did?

BY MR. CHURCHILL:

Q Yes.

A No.

Q Is it possible that you don't remember that Scott Seid offered to give you attorneys names?

MS. POLAKOWSKI: Objection. Calls for speculation.

THE WITNESS: I honestly don't believe that he did.

BY MR. CHURCHILL:

Q So do you believe that Scott Seid is lying?

MS. POLAKOWSKI: Object to the form of the question. Foundation. Calls for speculation.

THE WITNESS: I wouldn't call it lying. I just think he doesn't remember.

(Exhibit No. 29 was marked.)

BY MR. CHURCHILL:

Q Ms. Randall, the court reporter has now handed you what's been marked for identification as

Exhibit 29 to your deposition.
A Okay.
Q It's Bates labeled Windy2919 through 2924. Do you recognize this as your May 13, 2020, redemption agreement?
A No.
Q Do you see on the first page the date, May 13, 2020, up at the top?
A On the first page?
Q Yes. At the top of the first page, "13th day of May 2020." Do you see that up top?
A Yes, I do.
Q And do you see your signature on page 3?
A Yes, I do.
Q And do you also see a Promissory Note attached to the agreement?
A I see that.
Q And do you see that amount listed as $1,352,166.31?
A Yes, I see that.
Q And you agree that this is the agreement that you entered into for the redemption of the remaining shares that you had in Windy Waters corporation?
MS. POLAKOWSKI: Objection. Form.

Calls for a legal conclusion.

THE WITNESS: I can't be exactly sure. I didn't really look at it.

BY MR. CHURCHILL:

Q Did you review this document at all before signing it?

A No, I did not.

Q Do you remember Mike Kiesler reading through the Stock Redemption Agreement for you line by line?

A No.

Q Do you remember Mike Kiesler reading the Promissory Note for you line by line?

A No, I do not.

Q Do you remember Mike Kiesler asking whether you understood the contents as he read through both documents to you?

A He did not read.

Q Did you pay any attention to paragraph 5 or section 5 on page 2 of Exhibit 29 titled "Release"?

MS. POLAKOWSKI: Object to the form of the question. Also assumes facts not in evidence.

BY MR. CHURCHILL:

Q Do you remember noticing that at all when you were with Mr. Kiesler before signing the

document?

MS. POLAKOWSKI: Also object to the extent it mischaracterizes her testimony.

THE WITNESS: I -- no.

BY MR. CHURCHILL:

Q You don't remember?

A Huh-uh.

Q Would it have been important for you to review this document prior to signing it?

MS. POLAKOWSKI: Object to the form of the question. Calls for a legal conclusion.

THE WITNESS: Would it be important to me?

BY MR. CHURCHILL:

Q Yeah.

A Well, he explained -- now that I'm rereading this, he explained to me what he wanted me to know.

Q So you felt like you didn't need to review it because he explained it for you?

MS. POLAKOWSKI: Objection. Mischaracterizes her testimony.

THE WITNESS: Again, I trusted Mike Kiesler. I thought he was being honest with me.

BY MR. CHURCHILL:

Q Would you say that you treated this document the same way that you treated the other redemption agreements, that you skimmed it?
A No. I did not skim it.
Q You didn't even skim this document?
A No, I did not.
Q Even though you knew that you were redeeming the rest of your shares in the company?
MS. POLAKOWSKI: Object to the form of the question. It assumes facts not in evidence. It also calls for a legal conclusion.
THE WITNESS: I was just -- I felt totally pressured to sign this. So I don't know what I thought.
BY MR. CHURCHILL:
Q Mr. Kiesler didn't say that you couldn't leave, correct?
A No. He didn't say that.
Q Mr. Kiesler didn't give you a specific time frame for when you had to sign on that day, did he?
A He told me I had to be there at 4:30 to sign.
Q Did he give you an end time when you had to leave?
A I don't recall.

Q Did you ask him for any financial documents in that meeting?
A No.
Q In paragraph 117 of your Complaint, Ms. Randall, it says, "Stacy" --
MS. POLAKOWSKI: Hold on. Let me get it in front of her.
MR. CHURCHILL: Sure.
MS. POLAKOWSKI: It's right here, Stacy.
THE WITNESS: Okay.
BY MR. CHURCHILL:
Q So on page 18 paragraph 117 that reads, "Stacy asked Kiesler whether he and the companies' executives were preparing to sell Widen Enterprises." Do you see that?
A Yes.
Q And what, to the best of your recollection, were the words that you actually used?
A That I used?
Q Yes.
A I asked him if there was any thought about selling the company.
Q Did you say, "Are the companies' executives preparing to sell Widen Enterprises"?

A No.
Q So tell me what it is you think you remember asking exactly.
A Are you -- is there any thought about selling the company.
Q And in paragraph 118 in the Complaint there's quotes around the statement, "No, there's been no talk of that." Do you see that?
A Yes.
Q And is that quoted because you recall that that's exactly what Mike Kiesler said?
A Yes.
Q Would you turn to paragraph 50 of the Complaint which is on page 11? Are you there?
A Yes.
Q Paragraph 50 reads, "During this period" -- and the period is in the prior paragraph. Do you see the date February 2020?
A Yes, I do.
Q "During this period Reed made statements to third parties to the effect that Widen Enterprises regularly receives solicitations and offers from potential acquirers and that he was considering selling Widen Enterprises because he could personally receive 80 million dollars for

his ownership interest in Widen Enterprises, implying a fair market value of Widen Enterprises of at least 100 million dollars."
Do you see that?
A Yes.
Q Is it my understanding that the basis for that allegation in paragraph 50 is statements that your son says that he heard?
A My son was told that.
Q And what is it -- I know your son is not here, but what is your understanding of what your son heard exactly?
A I'm not exactly sure what he heard.
Q Okay. This is your Complaint, and you're making the allegation. So what is it you believe -- what is it that you're saying that your brother was saying in February of 2020?
A He told Justin that -- I'm not sure. I wasn't there. I don't know what Reed said.
Q Okay. So you're relying on your son Justin for that allegation in the Complaint?
A Yes.
Q Do you have any basis to believe that your brother was stating to anyone in the February 2020 time frame that he was considering selling

Widen Enterprises within the next year?

MS. POLAKOWSKI: And, Stacy, I will caution you, as has been true throughout the day, if you have to rely on conversations that you have had with us as counsel in order to answer that question, I will instruct you not to answer.

THE WITNESS: I need an explanation on what you -- what you're asking me. Can you rephrase?

BY MR. CHURCHILL:

Q Sure. I will try to rephrase it. Do you have any basis for asserting that your brother, Reed Widen, was telling people that he was considering selling the company within a year of February 2020?

A No, I don't.

(Exhibit Nos. 30 and 31 were marked.)

BY MR. CHURCHILL:

Q So, Ms. Randall, I have handed you what's been marked for identification as Exhibit 30 and 31 to your deposition, and we will end with these today. Exhibit 30 is a text between you and Mike Kiesler. Do you see that?

A Yes, I do.

Q And it's September of 2020. Do you see that?

A Yes, I do.

Q And you say, "Hey, dude. I hope you are doing well. Fucking asshole and I have a mediation tomorrow morning at 9:00. " You mean Steven Randall by that reference?
A Yes, I do.
Q And you ask Mike, "Could you temporarily lower the monthly payment I am receiving right now or adjust it to say 10 or 11K per month. My thought being I would not be able to afford to continue giving him $4,000 a month. I shouldn't have to anyway." Do you see that?
A Yes, I do.
Q Did Mike Kiesler adjust the promissory note to reduce the amount of money you were receiving?
MS. POLAKOWSKI: Objection. Foundation.
THE WITNESS: I don't recall him even responding to this.
BY MR. CHURCHILL:
Q Okay. And did you adjust how much that you had to pay your ex-husband, or did you keep on having to pay him the same amount of 4,000?
MS. POLAKOWSKI: Objection. Calls for a legal conclusion.
THE WITNESS: I was told at that

meeting that he -- they were denying his $6,000 a month and they are going to do 4,000.

BY MR. CHURCHILL:

Q Last document then, Exhibit 31, June 15, 2020. It's a little earlier. Again, to Mike you wrote, "Hi, Mike. Are you trying to get me killed? Let me know if I'm mistaken please. I was under the impression that I would get my checks on the 13th of every month. I realize that was Saturday. I thought it would show up today. Problem is I am supposed to be giving a fucking $4,000 check to fucking asshole on the 15th of each month. The check has not hit my bank yet. I love that I can't pay him today. Ha ha ha. I guess he isn't very happy."

This is in reference to the check that's being discussed here in reference to the payment that was supposed to be made under the May 13, 2020, redemption agreement, correct?

MS. POLAKOWSKI: Objection. Foundation.

BY MR. CHURCHILL:

Q So this is June 2020. And you were expecting a check, right, from the May redemption agreement?

MS. POLAKOWSKI: Objection. Misstates

her testimony.

THE WITNESS: I can't say that I was expecting it.

BY MR. CHURCHILL:

Q Is it fair to say that you and your brother Reed engaged in colorful language at times?

A Oh, yes.

MS. POLAKOWSKI: I think we're all done.

MR. CHURCHILL: I think I'm out of time.

THE VIDEOGRAPHER: There being nothing further, this will conclude the deposition. We will go off the record at 7:02 p.m., and four media units were used.

(Proceedings concluded at 7:02 p.m.)

STATE OF WISCONSIN )
) SS:
COUNTY OF MILWAUKEE )

I, ALI KORNBURGER, Notary Public in and for the State of Wisconsin, do hereby certify that the above deposition of STACY RANDALL was recorded by me on August 28, 2023, and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof I have hereunder set my hand and affixed my seal of office at Milwaukee, Wisconsin, this 7th day of September, 2023.

ALI KORNBURGER NOTARY PUBLIC STATE OF WISCONSIN

Ali Kornburger
Notary Public
In and for the State of Wisconsin

My Commission Expires: February 22, 2024.