IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

      Plaintiff,

  v.

REED C. WIDEN, MICHAEL
KIESLER, WIDEN ENTERPRISES,
LLC, and WINDY WATERS, INC.,

      Defendants.

Case No. 22-cv-400-jdp

---

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

SUMMARY OF RELEVANT UNDISPUTED FACTS.................................................. 2

I.   History and Evolution of the Companies. .......................................................... 2

II.  Reed and Kiesler Learn of the Companies' Value. ............................................ 7

III. Reed, Kiesler, and Gonnering Plan to Buy Stacy Out........................................ 10

IV. Reed, Kiesler, and Gonnering Spot an Opportunity to Execute the Plan............. 12

V.  The Redemption Documents. ........................................................................... 15

VI. Defendants Celebrate a ███████████████ ................................................ 16

VII.    Stacy Is Shocked to Learn of the Sale to Acquia. ......................................... 17

VIII.   The Parties Attempt to Resolve their Disputes. ........................................... 19

ARGUMENT .............................................................................................................. 22

I.   Legal Standard. ................................................................................................ 22

II.  Reed and Kiesler Breached Their Fiduciary Duty to Stacy Regarding the Redemption
     of Her Stock and Reed's Constructive Dividends. ........................................... 22

     A.  Kiesler and Reed owed Stacy a fiduciary duty. ........................................ 23

         1.   Reed and Kiesler owed Stacy a fiduciary duty as officers of Windy Waters........ 23

         2.   Reed owed Stacy a fiduciary duty as the majority shareholder of Windy Waters........ 25

     B.  Reed and Kiesler breached their fiduciary duty to Stacy. ........................ 26

         1.   Reed and Kiesler failed to disclose relevant information to Stacy about the
              May 2020 buyout. ........................................................................... 29

         2.   Reed and Kiesler breached their fiduciary duty by making affirmative
              misrepresentations to Stacy about the May 2020 redemption........................ 35

         3.   Reed and Kiesler breached their fiduciary duty to Stacy by paying Reed
              dividends disguised as wages and bonuses.............................................. 38

     C.  Reed's and Kiesler's breaches of fiduciary duty caused Stacy damages. ............ 42

III. Stacy Is Entitled to Summary Judgment on Defendants' Liability for Federal
     Securities Fraud Under Rule 10b-5(b). ............................................................ 45

IV. The Release Provision of the May 2020 Redemption Agreement Cannot Absolve
Reed's and Kiesler's Tortious Conduct. ..................................................................52

    A.  Defendants fraudulently induced Stacy's assent to the redemption agreement. ................52

    B.  Reed and Kiesler are equitably estopped from relying upon the release in
the redemption agreement. ..................................................................................56

V.  Defendants' Defenses of Ratification and Waiver Fail. .............................................57

    A.  Defendants are equitably estopped from arguing ratification during
settlement negotiations. ......................................................................................58

    B.  Wisconsin law precludes a post-litigation waiver or release of claims other
than by written instrument or court-approved stipulation..................................61

    C.  Federal law precludes ratification of the release. ................................................63

CONCLUSION...........................................................................................................65

## INTRODUCTION

Stacy Randall was strapped for cash and in immediate need of $50,000 to pay for ongoing divorce proceedings when, in May of 2020, she went to her brother, Reed Widen, for help. Reed ran the family business, of which Stacy was a 19.585% owner. Unbeknownst to Stacy, her brother, along with CFO Michael Kiesler and CEO Matthew Gonnering, had long been discussing buying Stacy out of the company, because they thought that they could do so at a "low" price, and because it would be easier for Reed to take the millions of dollars that he paid himself annually as a dividend, rather than "compensation." So when Reed and the executives learned of Stacy's need for cash, they recognized the opportunity before them.

Reed and Kiesler had repeatedly been advised by Gonnering that the company's market value was based on a multiple of its annual recurring software revenue, which value Gonnering had recently estimated at over $80 million. But in May 2020, after hearing of Stacy's financial jam, Kiesler approached Stacy with an offer that employed an inapplicable formula from the company's shareholder agreement instead. That formula calculated the company's "estimated value" at just $6.8 million—*less* than the appraised value sixteen years earlier, prior to a decade of explosive revenue growth.

Kiesler had been advised by multiple lawyers that the formula did not apply to a voluntary sale.  But he did not tell Stacy that. Rather, he insisted to Stacy that the price was "fair" because the company had used it in prior redemptions. And he further leveraged Stacy's predicament by insisting, at Reed's direction, that she could only get the $50,000 she needed if she surrendered her *entire* ownership interest in the company, which, for reasons that remain unexplained, he said was all the company could "afford."

When Stacy was not persuaded, Kiesler went further. Though the company was profitable and projecting over $27.4 million in annual software revenue at the time, a substantial increase from

1

the prior year, and had just received $2.7 million in forgivable PPP funds, he advised her that selling out would be "smart" because the company might not be financially viable in the near future. Reluctantly, Stacy went along with the redemption for $1.35 million, because she trusted that her brother and the CFO—both her fiduciaries—had her best interests at heart.

Reed, Gonnering, and Kiesler celebrated Stacy's buyout as a "[m]ission accomplished." And *within six weeks* of acquiring Stacy's stake, Reed began actively pursuing a sale of the company, which was completed around a year later at a price of *$162 million.* In doing so, Reed and the other owners, including Kiesler and Gonnering, realized an additional $30 million of profit at Stacy's expense. These core facts are undisputed. In separating Stacy from her stock at pennies on the dollar through deliberate, calculated misrepresentations and omissions, Reed and the executives violated their fiduciary duty owed to Stacy, and Stacy is therefore entitled to summary judgment on Count Six of her Complaint.

Stacy further moves for summary judgment on Count Two of the Complaint because the undisputed facts establish that Defendants are liable for federal securities fraud under SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b). Finally, anticipating that Defendants will seek to excuse their misconduct based on the affirmative defenses of release and ratification, Stacy also establishes here that, based on the undisputed facts, those provide no defense as a matter of law.

## SUMMARY OF RELEVANT UNDISPUTED FACTS

### I.     History and Evolution of the Companies.

Widen Enterprises, Inc. began as an engraving company in 1948, but by 2019 had grown into a highly successful Software as a Service (SaaS) business. Plaintiff's Statement of Undisputed Fact ("SOF") ¶¶ 16-24. Since 1997, Widen Enterprises has been wholly owned by Windy Waters, Inc. (together with Widen Enterprises hereafter "the Companies," unless context requires separate treatment). (SOF ¶¶ 7, 15.) In 2003, Stacy and Reed's father, Mark Widen, died. (SOF ¶ 306.) Stacy

became a one-fifth owner of the Companies along with at least three of her four brothers, including Reed. (SOF ¶ 306.)

After Mark's death, Reed succeeded as President and Chairman of Widen Enterprises, unilaterally selecting the board of directors (which he eventually disbanded), directing the actions of the Companies' executives, and "ultimately call[ing] the shots" at the Companies. (SOF ¶¶ 34-42.) Over time, Reed also became the majority and controlling shareholder of Windy Waters. (SOF ¶¶ 34-37.) However, by 2019, Reed was not involved in the day-to-day operations of the Companies. (SOF ¶¶ 105-110, 132-134.) Instead, the day-to-day operations were overseen by CEO Matthew Gonnering. (SOF ¶ 107.) Reed was Gonnering's manager, and Gonnering was Kiesler's manager. (SOF ¶ 42.)

Despite stepping back, and spending around six months of the year at his home in Arizona or at the family cottage, Reed still received substantial wages and bonuses from Widen Enterprises— $1,459,328 in 2019 and $2,001,517 in 2020. (SOF ¶¶ 108, 117-118.)[1] Reed unilaterally determined his own compensation based on the Companies' "performance," which he evaluated based on how the Companies were doing financially, mainly measured by their revenues. (SOF ¶¶ 111-118.)

By contrast, Stacy received minimal economic benefit from being a shareholder. As far as Stacy was aware, she and her other siblings were ostensibly directors of Windy Waters so that they could receive "directors' fees" of a few thousand dollars around Thanksgiving or Christmas, which her father had distributed before his death. (SOF ¶ 301.)[2]  However, Stacy was a "director" only

---

[1] In 2018, Reed received $900,752 in wages and bonus. (SOF ¶ 117.) In 2019, Gonnering received total compensation of $495,244 and Kiesler received total compensation of $249,160. (SOF ¶¶ 119, 121.)

[2] Article 3, Section 3.03 of the Windy Waters Bylaws provides, in relevant part, that a director ███████████████████████████████████████████████████████████████████████████████████ " (SOF ¶ 12.) Thus, without notice of the actions taken at subsequent shareholders' meetings, a director would have no way to know if they had been nominated or reelected, nor could a person decide whether to consent to serve.

nominally and never attended meetings or otherwise participated in the company's governance at all. (SOF ¶¶ 302, 304-305.)

After Mark's death, Reed and Kiesler continued to name Stacy as a director, and at times President, of Windy Waters. (SOF ¶¶ 295-296.) However, with a single exception,[3] Reed and Kiesler did this by affixing a stamp of Stacy's signature to annual corporate resolutions, or else unilaterally appointing her in the minutes of purported meetings that Stacy did not attend and that Kiesler testified did not occur. (SOF ¶¶ 288-296.) For much of this period, Stacy lived in Florida. (SOF ¶ 303.)

While protocol required Kiesler to contact Stacy and obtain her consent for each specific document that Defendants wanted to stamp with her signature, Kiesler now says that he relied on *Reed's* representations that Reed had discussed the use of Stacy's stamp with her, or else on his belief that he had Stacy's "implied consent" to affix her signature without discussing the specific document with her. (SOF ¶¶ 290-293.) However, Defendants collectively recall contacting Stacy on only one specific occasion in 2019 to request her consent (SOF ¶ 300), though there are at least 15 corporate documents that appoint or elect Stacy to various roles at Windy Waters with a stamp of Stacy's signature affixed thereto. (SOF ¶ 295.) It is undisputed that Stacy did not actually attend the meetings (which did not occur) or review the documents on which her signature stamp was used. (SOF ¶¶ 293-294, 304-305.) Stacy was notified of no meetings and had "no active role in the companies." (SOF ¶¶ 304-305.)

In 2007, the shareholder agreement for Windy Waters was amended to include a formula for calculating the "Fair Market Value per share" of Windy Waters stock for redemptions at a

---

[3] In that single exception, Stacy executed a 2012 consent resolution as a director of Windy Waters via DocuSign. (SOF ¶ 297.)

shareholder's death or permanent disability: the "EBITDA formula."[4] (SOF ¶ 141.) Undisputedly, the EBITDA formula did not apply to any transactions where a shareholder voluntarily redeemed their stock, and Reed and Kiesler were told of the formula's inapplicability to voluntary redemptions, including Stacy's May 2020 redemption, prior to the redemption. (SOF ¶¶ 148-150.)[5] The EBITDA formula is based on a weighted average of the company's EBITDA over the previous three years, multiplied by 3.6. (SOF ¶¶ 143-144.) Windy Waters' cash and securities are then added, and deferred compensation and interest-bearing debt subtracted, to arrive at values designated the "Estimated Value of Windy Waters, Inc." and the "Concluded Value of Windy Waters," as set forth below. (SOF ¶¶ 145-146.)

---

[4] "EBITDA" stands for "Earnings Before Interest Taxes Depreciation and Amortization." EBITDA is a measure of a company's profitability that attempts to represent cash profit generated by the company's operations. Adam Hayes, EBITDA: Meaning, Formula, and History, *Investopedia.com*, https://www.investopedia.com/terms/e/ebitda.asp (last updated Mar. 21, 2023).

[5] Stacy does not recognize the signature on this amendment as her actual signature. (SOF ¶ 142.) However, this issue is not material to the present motion.



(SOF ¶¶ 143-146 (highlighting as produced).) The EBITDA formula does not take into account the revenues or fair market value of Widen Enterprises, Windy Waters' wholly-owned subsidiary. (SOF ¶¶ 9, 151-156.)

When the EBITDA formula was adopted, Widen Enterprises primarily provided premedia services and had annual software revenues of less than $2 million. (SOF ¶¶ 23, 147.) But over the years, Widen Enterprises evolved from a pre-press company specializing in engraving, to a color-separation, specialty printing, and other "premedia" service used by physical and then online catalogs, and finally into a digital asset management (DAM) company that exclusively provided

software as a service (SaaS). (SOF ¶¶ 23-24.) By 2019, $22.5 million of Widen Enterprises' total revenues of $28.7 million were recurring revenues from its DAM SaaS business. (SOF ¶¶ 80-81.) By April 10, 2020, Widen Enterprises' transformation from pre-press to software company was complete, and the company made plans to dismiss its remaining premedia creation workforce. (SOF ¶ 24.)

## II.     Reed and Kiesler Learn of the Companies' Value.

The Companies experienced explosive growth in revenue and profitability from 2004 to 2020. In 2004, an appraisal provided to Reed reflected Windy Waters' fair market value—defined in the report as the price at which the company would change hands in an arms-length transaction between a willing buyer and willing seller—at $7.4 million. (SOF ¶¶ 46-48.) However, beginning around 2008, the Companies shifted the focus of the business from premedia services to software services. (SOF ¶ 307.) As Gonnering explained it, a digital asset management company that provided software as a service would generate more revenue with less marginal cost and thus be more profitable. However, Gonnering explained that ███████████████████████████████████ ████████████████████████████████████████████████████████ (SOF ¶ 307.) Thus, Gonnering's plan forecast that the company's *software revenues* would increase sharply into the following decade, while its *net income* (the basis for EBITDA) would increase only modestly. Gonnering summarized these projections with the below chart:



(SOF ¶ 307.) As shown by an analysis the company commissioned when preparing to market Widen Enterprises for sale in December 2020, Gonnering's plan worked, and Widen Enterprises' software revenue began to increase sharply, as seen below:



(SOF ¶ 308.)

With its sharp increase in software revenue, Widen Enterprises' (and Windy Waters') market value soared, as Gonnering repeatedly informed Reed and Kiesler beginning as early as 2014. In December 2014, Gonnering advised Reed and Kiesler that the "[m]arket value" of a SaaS company like Widen Enterprises was based primarily on a multiple of the company's revenue, and that ██████████████████████████████████████████████████ ██████████████████████████████████████ (SOF ¶¶ 50, 52-54.) Thus, ████████████ ██████████████████████████████████████████████████████ ████████████████████████ (SOF ¶ 55.) Gonnering was correct. In fact, it is widely understood in the SaaS industry that, because "earnings are generally understated" and "not as good an indicator of future cash flows as current revenues," "SaaS businesses trade on a price to revenue basis, or a 'Revenue Multiple.'" (SOF ¶ 73.)

Thus, in 2014, Gonnering wrote that based on Widen Enterprises' revenues, its ████████ ██████████████████████████████████████████" (SOF ¶ 58.)



(SOF ¶¶ 52-59.)

And up it went. As Widen Enterprises' software-generated revenues grew from year to year, Gonnering's value estimates to Reed and Kiesler climbed in lockstep. (SOF ¶¶ 58, 65, 67, 72.) In a February 23, 2018 Operational Update to Reed and Kiesler, under the heading, "████████," Gonnering explained that ███████████████████████████████████ ██████████████████ (SOF ¶¶ 60-65.)[6] By August, that number rose by $17 million: in an August 10, 2018 Operational Update, Gonnering told Reed and Kiesler that Gonnering had responded to an inquiry from a private equity firm called Five Elms Capital ████████ and Gonnering floated the idea of Widen Enterprises accepting a minority investor. (SOF ¶¶ 67-71.) Gonnering explained to Reed and Kiesler that ████████████████████████████████ ████████████████████████████████████████████████ ██████████ (SOF ¶ 72.)

Reed understood the Companies' value. In February 2020, Justin Randall, Stacy's son, visited Reed in Arizona. (SOF ¶ 76.) During Justin's visit, Reed confided that the Companies regularly received solicitations to sell Widen Enterprises, and that Reed was considering a sale because Reed could sell the company for around $80 million. (SOF ¶¶ 77-78.) Around that time, Reed owned approximately 55% of the Companies. (SOF ¶ 37.)

## III.   Reed, Kiesler, and Gonnering Plan to Buy Stacy Out.

Gonnering had long advised Reed to buy Stacy and any other passive shareholders out of the company because he believed having passive shareholders was suboptimal and because he wanted "all hands on deck." (SOF ¶ 104.) By 2019, as the Companies' value soared, the first seeds of the buyout scheme were planted when Reed sought to use the Companies to cover his tax liability. Specifically, in April 2019, Reed asked Widen Enterprises to cover a "████████████" by paying

---

[6] Gonnering's estimate, which used a multiplier approximately half as large as what he said generally applied in the industry, was conservative.

him a ██████ (SOF ¶ 123.) Gonnering and Kiesler discussed whether the Companies should make

payment to Reed as a dividend, but decided against that because a dividend ███████████████

███████████████████ including Stacy, which would require a ████████████████ (SOF

¶¶ 123-129.)

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

(SOF ¶¶ 123-128.)

Six months later, in October 2019, Gonnering reported to Kiesler regarding a conversation

he had with Reed the previous day, explaining that they ████████████████████████████

████████████████████████████████ and then ██████████

████████████████████████████████ (SOF ¶ 94.)

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

11

(SOF ¶¶ 94-95.)[7]

A month later, in November 2019, Gonnering wrote to Reed and explained that Gary had asked to purchase additional shares of Windy Waters. (SOF ¶¶ 95-96.) Gonnering advised Reed not to sell more shares to Gary because █████████████████████████████████ ███████████████████████████ (SOF ¶¶ 96-99.) Therefore, Gonnering recommended that the company ████████████████████████████████████████████ ███████████████████ (SOF ¶ 99.)

███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

(SOF ¶ 99.) Stacy was one of the ███████████████ to whom Gonnering was referring. (SOF ¶ 102.) Reed heeded Gonnering's advice and did not permit Gary to buy more shares. (SOF ¶ 101.)

## IV.     Reed, Kiesler, and Gonnering Spot an Opportunity to Execute the Plan.

On May 5, 2020, Stacy contacted Reed for help. (SOF ¶ 164.) Stacy told Reed that her then-husband was initiating legal proceedings and demanding maintenance payments and that she needed to get some cash. (SOF ¶ 165.) Reed responded that Stacy's timing was unfortunate because the Companies had a █████████████ and that ███████████████████████████████ a separate family-owned real estate holding company that had been left to Stacy, Reed, and their siblings. (SOF ¶ 166.) Later on May 5, 2020, Kiesler and Reed spoke by phone and Reed told Kielser that Stacy was "asking for money again" and that "he (i.e., Reed) was kind of annoyed with the fact that she kept coming back to the company for money, and him personally," and that Reed

---

[7] Gary Norris was a longtime executive at Widen Enterprises and shareholder of Windy Waters. (SOF ¶¶ 95-96.)

"wanted to [buy] all of her shares . . . using the formula that we used for Price [Widen]." (SOF ¶ 167.)

Early the next morning, May 6, 2020, Kiesler, who also helped the family administer Millmont, spoke with Stacy on the phone. (SOF ¶ 168.) Stacy told Kiesler that she would need approximately $100,000 for her divorce and living expenses, but Kiesler said that the Companies did not have $100,000 they could make available to her. (SOF ¶¶ 169-170.) Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that either. (SOF ¶ 171.) At the time, the Companies had around $5 million in cash on hand and had recently paid Reed an approximately $500,000 ▇▇▇▇ based on his need to meet tax obligations. (SOF ¶¶ 117, 123-129, 269-270.) Kiesler told Stacy that the only way she could get any cash from the Companies was to sell her entire interest in Windy Waters—approximately 20% of the outstanding shares. (SOF ¶¶ 172, 174.)

Stacy told Kiesler that she did not want to sell her entire interest. (SOF ¶ 173.) In five prior partial redemptions, Stacy had sold only the minimum amount of stock necessary to obtain a particular amount of cash she needed, at most $250,000. (*See* SOF ¶ 299 (Palay Decl., ¶ 20, Ex. 18).) Kiesler reiterated that the Companies wanted to purchase her entire interest using the price-per-share calculation model in the EBITDA formula. (SOF ¶ 175.) Kiesler offered Stacy $1.1 million for her approximately 20% interest in Windy Waters. (SOF ¶¶ 175-176.) Stacy told Kiesler that that price seemed too low, but Kiesler assured her that the price was "fair," purportedly because it used "the same formula that had been used for [Stacy's] prior partial share redemptions and for the complete share redemptions of [her] brothers." (SOF ¶¶ 177-178.) Defendants claim that Kiesler then walked Stacy through the model price-per-share formula calculation he had used to calculate the $1.1 million offer price. (SOF ¶ 179.) In a second conversation with Stacy, Kiesler again insisted the price was fair. (SOF ¶ 188.)

13

When Stacy remained unconvinced, Kiesler told Stacy that "it could be smart given the current financial state of affairs, including the uncertainty presented by the onset of the COVID-19 pandemic, for [her] to sell her shares because there was no guarantee that Widen Enterprises would remain a viable company." (SOF ¶¶ 181-182.) However, Kiesler could point to no financial difficulties faced by the Companies, which were profitable, still projected 18% growth, had millions of dollars speculatively invested in securities portfolios, and had just received a $2.7 million loan from the Paycheck Protection Program that they were considering returning. (SOF ¶¶ 79-83, 85, 183, 221, 269-270.)

Stacy explained to Kiesler that her investment in the Companies was all she had to live on for the rest of her life, but Kiesler told her the deal was "take it or leave it," and that if she turned it down, the Companies could not help her finance her divorce proceedings. (SOF ¶¶ 185-186.) Kiesler conducted no investigation or analysis on the fair market value of the Companies. (SOF ¶ 92.) Kiesler could not even say whether he believed that the formula applied to Stacy's redemption. (SOF ¶ 157.) Rather, Kiesler offered Stacy only a total redemption at the formula price because that was Reed's direction, the formula had been used in prior redemptions, and he was "always told to be consistent." (SOF ¶¶ 92, 157, 167.) Kiesler told Stacy that he needed her answer by the end of the day. (SOF ¶ 186.) After speaking with Stacy, Kiesler contacted Reed to confirm that Kiesler should arrange for Windy Waters to purchase ███ of Stacy's shares in the company, to which Reed responded six minutes later, ███ (SOF ¶ 187.)

Two days later, on May 8, 2020, Gonnering wrote to Reed and Kiesler regarding the approximately $2.7 million Paycheck Protection Program loan to Widen Enterprises that the company was considering returning. (SOF ¶ 189.) Although Gonnering viewed the loan as "necessary" for the Companies, he stated that ████████████████████████████

14

███████████████████████████████████████████

██████████████████████████ (SOF ¶ 189.)

███████████████████████████████████████████████████

On May 13, 2020, after not hearing from her, Kiesler called Stacy again and told her that he had updated the price-per-share calculation model using the December 2019 financials, and that the redemption price Windy Waters would offer in the proposed redemption had increased to approximately $1.3 million. (SOF ¶ 191.) This time, too, Kiesler told Stacy that she had until the end of the day to accept the offer. (SOF ¶ 192.) Kiesler messaged Gonnering that "████████," the Companies' attorney, "has everything he needs from me. Waiting for ████ to turn around agreements and then will share with Stacy and hopefully meet for signatures." (SOF ¶ 193.)

Stacy attempted, to no avail, to contact an attorney for legal advice within Kiesler's end-of-day deadline. SOF ¶ 195. Unable to find an attorney who could help her by the end-of-day deadline, she went to the Companies' office to meet with Kiesler. (SOF ¶¶ 194, 196.) When Stacy entered the Companies' office, Kiesler was waiting for her in the lobby, talking on the phone with ████ (SOF ¶ 196.) Stacy asked Kiesler whether he and the Companies' executives were preparing to sell Widen Enterprises. (SOF ¶ 199.) Kiesler responded, "No, there's been no talk of that." (SOF ¶ 200.)

Kiesler then showed Stacy the draft May 13, 2020 redemption agreement and promissory note for the first time. (SOF ¶ 203.) Stacy signed the Redemption Agreement on May 13, 2020 while she was at the Companies' offices with Kiesler. (SOF ¶ 204.)

## V.   The Redemption Documents.

The documents Stacy signed at the Companies' office on May 13, 2020, consisted of a stock redemption agreement, dated May 13, 2020, and a promissory note, also dated May 13, 2020. (SOF

¶ 222.) The redemption agreement states that Windy Waters would purchase 232.75 shares of Class A common stock of Windy Waters for $646.19 per share, and 1,952.7568 shares of Class B common stock of Windy Waters for $615.42 per share, for a total purchase price of $1,352,166.31. (SOF ¶ 223.)

The promissory note provided for 84 monthly payments at an annual interest rate on Windy Waters' outstanding obligations to Stacy of only 0.580%, the Applicable Federal Rate—the lowest rate that may be charged without the U.S. Internal Revenue Service ("IRS") requiring that interest income be imputed—as published by the IRS for May 2020. (SOF ¶ 225.) The promissory note was not secured by collateral or guaranteed by a guarantor or surety. (SOF ¶ 226.) Defendants calculated the price paid to Stacy for her shares using the EBITDA Formula for the (so-called) "Fair Market Value per share" from Windy Waters' shareholder agreement. (SOF ¶ 227.) It is undisputed, however, that that formula did not apply to Stacy's redemption. (SOF ¶¶ 148-150.) Based on that calculation, Defendants had calculated the "Estimated Value of Windy Waters" to be $6,896,973, less than 5% of what the Defendants sold Widen for 16 months later. (SOF ¶ 228.) Kiesler signed the redemption agreement and promissory note on behalf of Windy Waters. (SOF ¶ 204.)

## VI.   Defendants Celebrate a █████████████████

The next day, May 14, 2020, Kiesler and Gonnering exchanged celebratory Slack messages regarding their ████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

(SOF ¶¶ 207-208 (emphasis added).)  The same day, May 14, 2020, Kiesler texted Reed:

16

[REDACTED]

(SOF ¶ 209.)  Widen Enterprises remained profitable through the pandemic, and the $2.7 million went "in the bank for a rainy day." (SOF ¶¶ 82-83, 221, 310.)

Just over one week later, on May 22, 2020, Gonnering wrote to Kiesler and Reed about Widen Enterprises' decision to keep the $2.7 million in PPP funds it had received and [REDACTED] Stacy's shares of Windy Waters, with a [REDACTED] [REDACTED] (SOF ¶¶ 211-214.)

[REDACTED]

(SOF ¶ 214.)

## VII.   Stacy Is Shocked to Learn of the Sale to Acquia.

Just over one month later, having acquired all of Stacy's shares, Reed asked Gonnering to look into selling Widen Enterprises. (SOF ¶ 215.) And just sixteen months after Stacy's redemption, in September 2021, Reed, Kiesler, and Gonnering sold Widen Enterprises for $162 million to a company called Acquia, Inc. (SOF ¶¶ 16-17.) At closing, Kiesler received over $12 million based on his 8.32% indirect ownership of Widen Enterprises, Gonnering received nearly $14 million based on his 9.43% indirect ownership of Widen Enterprises, and Reed received over $102 million based on his approximately 68.97% indirect ownership of Widen Enterprises. (SOF ¶¶ 241-243.) If Stacy had still owned the approximately 20% of Windy Waters stock Defendants had caused the company to redeem on May 13, 2020, she would have been entitled to approximately $29,403,545.30 at the time of closing, after closing costs, plus her share of the cash held in or previously distributed by Windy Waters. (SOF ¶ 245.)

On September 10, 2021, after Stacy found out about the sale of Widen Enterprises to Acquia, she contacted Reed and told him that she had concerns about how her May 2020 redemption had been handled. (SOF ¶ 229.) Later that day, Reed texted Stacy that "we didn't start talking about selling it until February this year [2021.]" (SOF ¶ 230.) This was false; Reed had asked Gonnering to look into selling in "late June or early July" 2020—i.e., mere weeks after Stacy's redemption. (SOF ¶ 215.)

Following Stacy's inquiry, later that day, Reed asked Kiesler how much stock Stacy had owned. (SOF ¶ 231.) Kiesler told Reed ███████ to which Reed responded, ██████████ █████████████ (SOF ¶¶ 232-233.) Kiesler told him, ███████████ ███████████████ (SOF ¶ 234.) Reed responded, ████████████ █████████████████████ (SOF ¶ 235.) After Kiesler informed Reed of the balance remaining on the promissory note, Reed told Kiesler, ██████████ ████████ [8] (SOF ¶¶ 236-237.)

---

[8] The ██████ referred to the balance of the May 13, 2020 Promissory Note combined with a $1 million "gift" Reed had offered Stacy post-sale. (SOF ¶ 237.)



(SOF ¶¶ 231-237.) The next day, September 11, 2021, Reed texted Kiesler, ███████████

███████████████████████████████ (SOF ¶ 238.) Kiesler responded with an

emoji indicating he understood. (SOF ¶ 238.)



(SOF ¶ 238.)

## VIII.   The Parties Attempt to Resolve their Disputes.

Upon learning of the sale, but prior to its close, Stacy grew concerned that she had not been

treated fairly. (SOF ¶ 229.) Her son, Justin, introduced her to an attorney, who counseled Stacy

about her rights. (SOF ¶ 246.) On September 20, 2021, prior to the close of the Widen Enterprises

sale to Acquia, Stacy's attorney sent notices to Defendants alerting them to a potential dispute. (SOF

¶ 247.) A week later, Stacy's counsel spoke with Defendants' counsel.[9] (SOF ¶ 248.) Defendants' counsel stated that, based on his understanding at the time, the process for redeeming Stacy's shares in 2020 was straightforward and fair. (SOF ¶¶ 249-250.)

On October 6, 2021, Stacy's counsel again spoke with Defendants' counsel. (SOF ¶ 249.) Stacy's counsel followed up with an email explaining, in a reference to potential settlement negotiations, that "a helpful first step in these discussions would be if your client could share the process and calculations used to determine the purchase prices for Ms. Randall's shares in 2020." (SOF ¶ 250.) Approximately one week later, on October 14, 2021, Defendants' counsel provided those items, which included the Companies' 2019 financial statements and the calculation of Stacy's purchase price. (SOF ¶ 251.)

Over the next several months, the parties engaged in settlement discussions and negotiations. (SOF ¶ 252.) Stacy's counsel continually requested further information about the sale of Widen Enterprises, and originally demanded that any settlement take place before the end of 2021. (SOF ¶ 253.) Defendants' counsel requested an extension to allow him to engage with the new owner of Widen Enterprises about the terms of disclosing documents about the purchase, some of which were produced in January of 2022. (SOF ¶ 254-255.) By January 2022, Defendants' counsel had made an initial settlement offer and raised the possibility of mediation. (*See* SOF ¶ 255.) Stacy's counsel explained in responsive correspondence that:

> In general, our client is reluctant to undertake mediation based on your client's offer because of the potential for that process to delay her asserting her claims. That's particularly true if the process is used to stall her from advancing her claims through

---

[9] Plaintiff is mindful of the limitations under Federal Rule of Evidence 408 and does not disclose here information concerning inadmissible evidence as enumerated under the rule. Its use is limited for the purpose of addressing Defendants' ratification defense, and even if it concerned inadmissible evidence as defined by Federal Rule of Evidence 408(a), it would nevertheless be excepted under Federal Rule of Evidence 408(b). Notably, Defendants first brought this series of communications to the Court's attention in their Motion to Strike, albeit without revealing that they occurred in the context of settlement negotiations. (*See* Mot. to Strike at 5-6 (citing Widen Decl. ¶ 7, Ex. C), ECF No. 32).

> the discovery process or if she risks running over any statutes of limitations. We would therefore need any mediation to include both reasonable discovery and a tolling agreement.

(SOF ¶ 256.) Stacy's counsel also demanded additional discovery, including text message and email correspondence among the defendant parties, and the shareholder agreement Defendants' counsel had mentioned in prior correspondence. (SOF ¶ 257.) Defendants provided some of those documents shortly before the mediation, in May 2022. (SOF ¶ 258.) However, Defendants provided none of the Slack messages, nor various other documents, cited herein until formal discovery in this case. (*See, e.g.*, SOF ¶¶ 60, 67, 99, 237-238, 123, 207.)

To address Stacy's concerns that settlement negotiations could delay or prejudice her assertion of claims, on March 1, 2022, Stacy and the Defendants entered into a written Standstill and Tolling Agreement. (SOF ¶ 259.) The Standstill and Tolling Agreement provides that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any legal or equitable actions or defenses that the Parties may have." (SOF ¶ 260.)

The parties' discussions culminated in a formal mediation held on or around May 11, 2022. (SOF ¶ 261.) Negotiations continued for multiple weeks but were ultimately unsuccessful. (SOF ¶ 262.) On July 21, 2022, after nearly a year of settlement discussions seeking to avoid litigation, Stacy commenced this lawsuit, seeking rescission of the redemption agreement, among other relief. (SOF ¶ 263.)

## ARGUMENT

### I.      Legal Standard

"Summary judgment is appropriate when the movant shows 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" and a court must "consider all of the evidence in the record in the light most favorable to the non-moving party," and "draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); and then quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996)); *see also Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020). "Mere 'metaphysical doubt as to the material facts' is not enough," *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and the defendants "cannot rest on mere unsupported denials" to stave off summary judgment. *Koclanakis v. Merrimack Mut. Fire Ins.*, 899 F.2d 673, 675 (7th Cir. 1990).

### II.     Reed and Kiesler Breached Their Fiduciary Duty to Stacy Regarding the Redemption of Her Stock and Reed's Constructive Dividends.

"The elements of a claim for breach of fiduciary duty are straightforward: 1) the defendant owed the plaintiff a fiduciary duty; 2) the defendant breached that duty; and 3) the breach of duty caused the plaintiff's damage." *Schneider v. Schneider*, No. 19-CV-980-JDP, 2021 WL 1574709, at *4 (W.D. Wis. Apr. 22, 2021) (citing *Yates v. Holt-Smith*, 2009 WI App 79, ¶¶ 19–20, 319 Wis. 2d 756, 768 N.W.2d 213). Construing the undisputed facts of this case in the light most favorable to Defendants, each of those elements is met here, and no reasonable jury could determine otherwise.

22

### A.   Kiesler and Reed owed Stacy a fiduciary duty.

The first element of Stacy's fiduciary duty claim, the existence of the fiduciary duty, is unquestionably met here. Reed and Kiesler both owed Stacy a duty as officers of Windy Waters; Reed, as the majority shareholder, further owed Stacy, the minority shareholder, a duty on that basis as well. In Wisconsin, "[t]he existence of a [fiduciary] duty is a question of law." *Est. of Sheppard ex rel. McMorrow v. Specht*, 2012 WI App 124, ¶ 5, 344 Wis. 2d 696, 824 N.W.2d 907.

Wisconsin law recognizes two general types of fiduciary relationships: 1) those specifically created by contract or a formal legal relationship; and 2) "those implied in law due to the factual situation surrounding the transactions and relationships of the parties to each other and to the questioned transactions." *Production Credit Ass'n of Lancaster v. Croft*, 143 Wis. 2d 746, 752, 423 N.W.2d 544 (Ct. App. 1988); *Balistrieri v. Alioto*, No. 2004AP929, 2005 WL 3210804, ¶ 26 (Wis. Ct. App. Dec. 1, 2005) (unpublished) (citation omitted). While Stacy contends that both types of fiduciary relationship existed here, only the existence of a fiduciary duty based on the parties' formal legal relationship is necessary for Stacy to be entitled to summary judgment.

### 1.   Reed and Kiesler owed Stacy a fiduciary duty as officers of Windy Waters.

It is black letter law that a corporate officer owes a fiduciary duty to the corporation's shareholders. *See Reget v. Paige*, 2001 WI App 73, ¶ 12, 242 Wis. 2d 278, 626 N.W.2d 302. ("A corporate officer or director is under a fiduciary duty to act in good faith and to deal fairly in the conduct of all corporate business. This duty extends to the corporation, itself, and to its shareholders." (citation omitted)); *Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 442, 557 N.W.2d 835 (Ct. App. 1996) (same); *see Smith v. Kleynerman*, No. 2015AP207, 2016 WL 3308940, ¶ 24 (Wis. Ct. App. June 16, 2016) (unpublished) (shareholder owning 50% of corporation's stock owed fiduciary duty to shareholder owning the other 50% "by virtue of his being a corporate officer of" the corporation).

Defendants do not dispute that Kiesler was the Treasurer of Windy Waters and the CFO of Widen Enterprises and that through May 13, 2020, Stacy was a shareholder of Windy Waters, through which she was an indirect shareholder of Widen Enterprises. (SOF ¶¶ 9, 28, 37 (Palay Decl. Ex. 98), 44, 231-232.) Nor is it disputed that Kiesler executed numerous corporate documents for Windy Waters, including the May 13, 2020 redemption agreement at issue in this case, as its Treasurer. (*See, e.g.*, SOF ¶ 204, 299 (Palay Decl. Exs. 18 & 95).) That agreement represented Kiesler's corporate authority to act on behalf of and bind Windy Waters. (SOF ¶ 204.) Thus, Kiesler was a corporate officer of Windy Waters and, "by virtue of his being a corporate officer," Kiesler was "under a fiduciary duty to act in good faith and to deal fairly in the conduct of all corporate business," including with respect to its shareholders, such as Stacy. *Kleynerman*, 2016 WL 3308940, ¶¶ 24, 41 (second quote quoting *Reget*, 2001 WI App 73, ¶ 12).

While Reed did not have a specific title with respect to Windy Waters, it is undisputed that he controlled both Windy Waters and Widen Enterprises. (SOF ¶ 15, 36, 35-42.) It is also undisputed that Reed "ultimately called the shots" at both of the Companies. (SOF ¶ 41.) Reed testified that Windy Waters was created as a way to "protect" Widen Enterprises and himself. (SOF ¶ 7.) Reed exercised the rights of Windy Waters by personally appointing the board of directors of Widen Enterprises (SOF ¶ 38), although statutorily, that right belonged to the company's shareholder, Windy Waters. *See* Wis. Stat. § 180.0803(3) ("Directors shall be elected at the first annual shareholders' meeting and at each annual meeting thereafter unless their terms are staggered under s. 180.0806.").[10] Reed's control of Windy Waters included directing Kiesler, an officer of that company, with respect to the redemption at issue in this case. (SOF ¶¶ 167, 187, 209.) In other

---

[10] Article 3, Section 3.02 of the Windy Waters Bylaws provides that ███████████████████████████████████████████ (SOF ¶ 11.)

words, whatever his formal title, Reed was an officer of Windy Waters and owed Stacy fiduciary duties as an officer of the company.

> 2. **Reed owed Stacy a fiduciary duty as the majority shareholder of Windy Waters.**

It also settled law that the "fact of control of the common property held and exercised . . . creates the fiduciary obligation" on the part of a majority shareholder of a corporation to a minority shareholder. *S. Pac. Co. v. Bogert*, 250 U.S. 483, 492 (1919) (applying the doctrine even where such ownership and control is not direct but through a subsidiary company because "the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions.") Wisconsin law is in accord. "Under Wisconsin law, majority shareholders in closely held corporations owe a fiduciary duty to the corporation and minority shareholders." *Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1077 (E.D. Wis. 2014) (citing *Grognet v. Fox Valley Trucking Serv.*, 45 Wis.2d 235, 241, 172 N.W.2d 812 (1969)); *see Specht*, 2012 WI App 124, ¶ 7 ("Wisconsin law does impose a fiduciary duty from a majority shareholder to a minority shareholder."); *Croft*, 143 Wis. 2d at 754 (discussing the "well-settled and often applied rule of corporation law and equity that a majority stockholder occupies a fiduciary relationship toward minority stockholders"); *see also Notz v. Everett Smith Grp., Ltd.*, 2009 WI 30, ¶¶ 4, 28, 38, 316 Wis. 2d 640, 764 N.W.2d 904.

Defendants do not dispute that Reed, individually, was the majority shareholder of Windy Waters at the time of the May 2020 redemption, at which point he owned approximately ███ of Windy Waters' stock. (SOF ¶¶ 34-37.) Nor do Defendants dispute that Reed, with Kiesler's assistance, "ran the Companies" and that he exercised "control of the Companies" at the time of the redemption. (SOF ¶¶ 38-42.) It follows that by virtue of his ownership and "control of the common

property," Reed owed Stacy, a minority shareholder (SOF ¶¶ 28, 37 (Palay Decl. Ex. 98)), a fiduciary duty of loyalty (among others) with respect to the redemption.

### B. Reed and Kiesler breached their fiduciary duty to Stacy.

Where the facts are not in dispute, "whether the facts as found constitute a breach . . . is a question of law." *Jorgensen v. Water Works, Inc.*, 2001 WI App 135, ¶ 8, 246 Wis. 2d 614, 630 N.W.2d 230 (*Jorgensen II*). The undisputed facts also establish the next element of Stacy's fiduciary duty claim: the breach. Reed and Kiesler failed to disclose relevant information to Stacy about the value of her stock and the circumstances of the sale; they made affirmative *mis*representations on those topics as well. Both these acts are quintessential breaches of fiduciary duty. And Reed and Kiesler also undisputedly breached their duty in a third way as well: by paying Reed constructive dividends disguised as ▮▮▮▮ and ▮▮▮▮ without paying Stacy her share of those dividends. Accordingly, this element, too, is established for purposes of summary judgment.

"The central tenet of the fiduciary relationship is that the beneficiary's interest must be placed before the fiduciary's." *N. Air Servs., Inc. v. Link*, No. 2008AP2897, 2012 WL 130531, ¶ 17 (Wis. Ct. App. Jan. 18, 2012) (unpublished) (citing *Zastrow v. J. Commc'ns, Inc.*, 2006 WI 72, ¶ 28, 291 Wis. 2d 426, 718 N.W.2d 51). "A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest because by accepting the obligation of a fiduciary he consciously sets another's interests before his own." *Zastrow*, 2006 WI 72, ¶ 28. In other words, "a fiduciary relationship results in the legal assumption of the 'obligation to act for another's benefit.'" *Zastrow*, 2006 WI 72, ¶ 31 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis. 2d 127, 136, 377 N.W.2d 605 (1985)). The duty of loyalty requires a fiduciary "to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests." *Zastrow*, 2006 WI 72, ¶ 31 (quoting *Losee v. Marine Bank*, 2005 WI App 184, ¶ 16, 286 Wis. 2d 438, 703 N.W.2d 751).

"Wisconsin courts have long recognized that fiduciaries have a duty to disclose relevant facts." *Schneider*, 2021 WL 1574709, at *8 (citing *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶ 50, 284 Wis. 2d 307, 700 N.W.2d 180; *Boeck*, 127 Wis. 2d at 135; *Killeen v. Parent*, 23 Wis. 2d 244, 251, 127 N.W.2d 38 (1964)); *Zastrow*, 2006 WI 72, ¶ 34 ("[T]he duty of loyalty also encompasses a trustee's affirmative duty to make full disclosure of all facts relevant to the transaction the beneficiary is about to undertake" (citation omitted)); *Groshek v. Trewin*, 2010 WI 51, ¶ 16, 325 Wis. 2d 250, 784 N.W.2d 163 (affirming breach of fiduciary duty claim where "there was not full disclosure" regarding an agreement signed between fiduciary and beneficiary); *Groshek v. Trewin*, No. 2008AP787, 2009 WL 778351, ¶ 16 (Wis. Ct. App. Mar. 26, 2009) (unpublished), *aff'd*, 2010 WI 51, 325 Wis. 2d 250, 784 N.W.2d 163 (explaining that the duty of loyalty "is broader than simply requiring the fiduciary to refrain from acting in his own self-interest. For example, it also may require . . . fully disclosing to the beneficiary all information relevant to the beneficiary's interest." (alteration in original) (quoting *Zastrow*, 2006 WI 72, ¶¶ 29, 31)). Where "a fiduciary relationship exists . . . the failure to disclose may be actionable as both an intentional misrepresentation (fraud) and a breach of fiduciary duty." *Archdiocese of Milwaukee*, 2005 WI 123, ¶ 50. Practically speaking, Reed's and Kiesler's fiduciary duty—which included the duty of loyalty, *Modern Materials*, 206 Wis. 2d at 442—required that when they desired for the company to purchase all of Stacy's stock, they had a duty to disclose to Stacy all relevant information about that stock's value. *Zastrow*, 2006 WI 72, ¶ 29.

The undisputed facts establish that Reed and Kiesler breached their fiduciary duty to Stacy by (1) failing to disclose virtually *any* of the information in their possession relevant to the value of the Companies and Stacy's shares; (2) affirmatively misrepresenting the Companies' financial ability to conduct a partial redemption, the fairness of the buyout price, and their assessment of the financial risks the Companies faced and the wisdom of Stacy selling out; and (3) funneling millions of dollars

in dividends to Reed disguised as ▮▮▮ and ▮▮▮, while withholding the same from Stacy—ultimately contributing to the financial distress that forced her to seek Reed's help in the first place. Each of these breaches independently entitles Stacy to summary judgment on this claim.

At the outset, it is important to understand that Defendants' rationalization of their conduct is deeply misguided. For example, Reed has defended his self-dealing by testifying that he deserved a higher price for his stock than Stacy did because he had put so much time and effort into running the business. (SOF ¶ 309.) That is fundamentally wrong; in fact, it was Reed's "control of the common property held and exercised . . . that create[d] the fiduciary obligation" to Stacy. *Bogert*, 250 U.S. at 492.

Reed further rationalized his conduct the same way Defendants now defend their misrepresentations that the redemption price was "fair": because Stacy's redemption price was calculated in the same way as her *other siblings'*, she has nothing to complain about. But the relevant measure of Reed's and Kiesler's adherence to their fiduciary duty is not whether they treated Stacy the same as Reed's other siblings, but whether they placed her interests before their own. (SOF ¶¶ 167, 240. *See also* SOF ¶¶ 149-150.)[11] Unquestionably, under the undisputed facts, they did not place Stacy's interests before their own. Likewise, Kiesler has defended using the undisputedly *inapplicable* EBITDA formula to value Stacy's stock while ignoring *all* of the on-point information about the Companies' market value at his fingertips, arguing that he "was always told to be consistent" with the use of the formula in past redemptions. (SOF ¶¶ 52-58, 60-75, 92, 148-150, 156-157.) However, Kiesler's fiduciary duty mandated honesty and accuracy far above "consistency."

---

[11] Moreover, it is far from clear that the Companies were as valuable when Stacy's siblings were redeemed, the last of which occurred in 2015, compared to Stacy in 2020.

1.    **Reed and Kiesler failed to disclose relevant information to Stacy about the May 2020 buyout.**

Reed's and Kiesler's failure to disclose the relevant facts known to them about the value of Stacy's interest in the Companies establishes a breach of their fiduciary duty. Reed and Kiesler openly admit that they shared *no information* with Stacy about the Companies or their value, other than that contained in the spreadsheet used to calculate the inapplicable EBITDA formula price per share. (SOF ¶¶ 180, 269-287.) Kiesler testified that whether to disclose information relevant to the value of Stacy's shares "never crossed my mind" because the purchase price was calculated based on the EBITDA formula. (SOF ¶¶ 92, 157, 167.)

Thus, it is undisputed that Defendants did not disclose the Companies' revenues or recurring revenues—the measure by which Gonnering had estimated their value for years—or any of those estimations. (SOF ¶¶ 180, 277-284.) Reed testified that a person would need to know this in order to understand the Companies' value. (SOF ¶ 312.) On this point, Reed was correct: it is widely understood in the SaaS industry that "SaaS businesses trade on a price to revenue basis, or 'Revenue Multiple.'" (SOF ¶ 73.) Indeed, recurring revenue was the metric Gonnering had used to estimate the company's value to Reed and Kiesler throughout the preceding five years—at figures that were many multiples of what Defendants represented as the Companies' value to Stacy. (SOF ¶¶ 52-58, 60-74.) It was the metric that the company's investment bankers used to estimate its fair market value. (SOF ¶ 86.) It was the metric Acquia used to assess its potential purchase of the company. (SOF ¶ 311.) And it was a metric the company highlighted again and again in its promotional materials to potential acquirers, including Acquia. (SOF ¶¶ 86-87 (Ex. 2 at WINDY0007906; WINDY0007917; WINDY0007958; WINDY0007982; WINDY0007985).)

But the "Estimated Value of Windy Waters" on the EBITDA spreadsheet Defendants claim they disclosed to Stacy has *nothing* to do with revenue or its fair market value.[12] (SOF ¶¶ 151, 154-156.) In fact, examining the formula calculation spreadsheet at Exhibit 41 of the Palay Declaration reveals that, of the $6,896,973 that Reed and Kiesler represented to Stacy as the "Estimated Value of Windy Waters," $5,963,440 was directly attributable to the cash and securities held by the company in investment accounts. In other words, the EBITDA formula valued Windy Waters as if Widen Enterprises—its wholly owned subsidiary with nearly $30 million in continually increasing, recurring software revenues that sold for $162 million 16 months later—was worth less than $1 million.[13]

The EBITDA Formula used to calculate the "Estimated Value of Windy Waters" presented to Stacy lacks the very information that the company executives *themselves* used to approximate the company's value, which—using the metrics Reed and Kiesler were using at the time—would have been around $100 million on the date of Stacy's redemption. (SOF ¶¶ 72-74.)[14] Reed and Gonnering testified that they believed, or were unsure, at the time of Stacy's 2020 redemption that the shareholder agreement required the use of the EBITDA formula for Stacy's redemption. (SOF ¶ 158.) Kiesler testified that he could not say whether or not he believed the formula was

---

[12] Defendants' position is that they read the EBITDA formula calculation, which contains Widen Enterprises' net income, to Stacy "line by line." (SOF ¶ 180.) Thus, only for purposes of the present motion, Stacy accepts that as true. *See Menard, Inc.*, 880 F.3d at 905.

[13] The sole financial figure they *did* disclose, Widen Enterprises' net income, was a misrepresentation of that figure, failing to disclose millions of dollars in fluctuating ███████████ that Reed paid himself from the Companies. Thus, when Defendants eventually went to sell Widen Enterprises, they added all of Reed's compensation for 2019 and 2020 back as "Adjusted EBITDA," discussed further below at section II(B)(3). (SOF ¶¶ 132-134.)

[14] Applying Gonnering's metric of four times recurring revenue from August 2018 to the trailing-twelve-month subscription revenue of $24,001,394 for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen Enterprise on an enterprise basis would be $96,005,576. (SOF ¶ 74.) Applying Gonnering's metric to the forecasted annual software revenue as of May 8, 2020, the estimated fair market value of Widen Enterprises on an enterprise basis would be $109,760,000. (*See* SOF ¶¶ 72, 85.)

required. (SOF ¶ 157.) However, when discussing a prior partial redemption of Stacy's stock, Reed's attorney stated to him and Kiesler that the redemption would not ███████████ and that Reed therefore had ███████████ ████████ (SOF ¶ 149 (emphasis added).) Consistent with that advice, the Companies' attorney stated to Kiesler, the day before Stacy's May 2020 redemption, that he believed ██████ ████████████████████████ (SOF ¶ 150.)



(SOF ¶ 150.)[15] By contrast, payments subject to the EBITDA formula under the shareholder agreement are not ██████ or subject to ████████████ (*See* SOF ¶¶ 143-146.) And, again, it is undisputed that the EBITDA formula does not apply to a voluntary redemption like Stacy's.[16] (SOF ¶¶ 148-150.) Yet Kiesler withheld this information, too, misleadingly representing to Stacy that this was "fair," because it was the way it had always been done. (SOF ¶¶ 157, 178, 272.)

Reed and Kiesler also withheld the CEO's explicit estimates of Widen Enterprises' value that they had been privy to for years. (SOF ¶¶ 180, 277-279.) Based on Gonnering's 2018 estimate

---

[15] Byline intentionally omitted.

[16] The Second Amendment to the Windy Waters shareholder agreement provides that the EBITDA formula shall be used to determine ████████████████████████████ of the agreement. (SOF ¶ 141 (Ex. 39).) Section 2.2 of the agreement, titled ██████ ██████████████████ . (SOF ¶ 141 (Ex. 38 at STAFFORD001315).) Section 2.3 of the agreement, titled ████████████████████ (SOF ¶ 141 (Ex. 38 at STAFFORD001316).)

that Widen Enterprises would be valued at around four times its recurring revenue, Reed and Kiesler must have understood that, by Gonnering's metric, the company's value was at least approximately $96 million at the end of April 2020 (trailing-twelve-month recurring revenue of $24,001,394 multiplied by four), and $110 million based on Gonnering's May 8, 2020 update about the company's projected recurring revenue for 2020 just days before Stacy's May 13, 2020 redemption. (SOF ¶¶ 72, 74, 85.)[17] And Reed and Kiesler withheld that information despite Reed personally telling his nephew, Justin, Stacy's son, that he believed Widen Enterprises to be worth approximately $80 million only three months before the May 2020 redemption. (SOF ¶ 78.)[18]

Any one of these omissions alone would support summary judgment on a breach of Reed's and Kiesler's fiduciary duties. For example, in *Zastrow*, the Wisconsin Supreme Court held that "giving plaintiffs incomplete information relative to plaintiffs' holdings" was a breach of the trustees' fiduciary duty of loyalty. *Zastrow*, 2006 WI 72, ¶ 43. There, a trust agreement governing an employee stock trust provided a longer timeframe for employees selling their stock to the remaining employees (including the trustees) upon retirement than upon leaving employment for other reasons. *Id.* ¶ 3. Upon the sale of the company, none of the employees sought to retire. *Id.* ¶ 9. The trustees, who were also employees of the company, thus advised them that they "had to sell-back their Trust units"

---

[17] The CEO's estimates turned out to be conservative, as Defendants actually received a multiple closer to six times the Companies' recurring revenue.

[18] At his deposition, Reed testified that he had no recollection as to whether he made those statements to Justin in February 2020. (08/23/2023 R. Widen Dep. Tr. 133:14-134:6.) Reed cannot now create a genuine dispute of fact on this point. *James v. Hale*, 959 F.3d 307, 315–16 (7th Cir. 2020) ("[E]very federal court of appeals permits a judge to disregard a 'sham' affidavit—typically an affidavit that contradicts prior deposition testimony. In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. . . . The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule to weed out unfounded claims, specious denials, and sham defenses." (quotation marks omitted) (emphasis in original)); *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 577–78 (2d Cir. 1969) (contradictory affidavit failed to raise a genuine issue of material fact). Regardless, Reed's statements to Justin are unnecessary for Stacy to be entitled to judgment on the claims at issue in Plaintiff's motion given the documentary evidence demonstrating Reed's knowledge of the Companies' value.

using the shorter, non-retirement timeframe. *Id.* ¶¶ 9, 23, 42.  The circuit court held that the trustees had breached their fiduciary duty by failing to provide information about the availability of the longer timeframe, which would have been available to certain employees who could have elected to retire had they known. *Id.* at ¶ 42. The Wisconsin Supreme Court agreed, holding that the "found facts prove that the Trustees created circumstances that adversely affected the plaintiffs' ability to make an informed decision about whether to retire," which "constitutes a breach of the Trustees' duty of loyalty[.]" *Id.*

The information Reed and Kiesler disclosed to Stacy was far more "incomplete" than that in *Zastrow*—and it was not merely "incomplete," it was actively misleading. Reed and Kiesler presented Stacy with the "Estimated Value of Windy Waters" from the EBITDA formula in the Windy Waters shareholder agreement, which was to be applied only to mandatory redemptions at a shareholder's death or permanent disability. (SOF ¶¶ 141, 180.) They did not disclose that the EBITDA formula was inapplicable or that it did not reflect the company's actual value; to the contrary, they represented the EBITDA spreadsheet as a mathematical *calculation* of the Companies "Estimated Value." Simultaneously, Reed and Kiesler withheld *all* of the information about Widen Enterprises' *actual* value—e.g., its actual and projected revenue and recurring revenues and its CEO's estimates of its value—that Stacy, or any advisor she managed to retain, needed to determine for themselves the company's value.

Indeed, Wisconsin courts have specifically found breaches of fiduciary duty where a fiduciary forces a transaction on an unsuspecting party and fails to provide the very information needed for the party to understand and assess it. In *Groshek v. Trewin,* the Wisconsin Court of Appeals and the Wisconsin Supreme Court upheld a judgment that an attorney, Trewin, breached his fiduciary duty to former clients when he purchased their property for about half of its fair value, even though

33

the clients were represented by a different attorney for at least part of the transaction. *See Groshek*,

2009 WL 778351, ¶ 19. Notably, the facts parallel those of Stacy's case in several respects:

> The idea for the whole transaction was Trewin's, not the Grosheks'. The Grosheks did not want to sell their property, but Trewin portrayed the sale to them as the only option they had. The Grosheks did not understand the transaction and did not understand Trewin would have the ability to sell their property "out from underneath them." Trewin told the Grosheks the deal had to be done right away, and both of the Grosheks felt it was a rush deal because he was losing his license on August 31. Although the signed August 30 agreement stated that the Grosheks "ha[ve] had the opportunity to review this agreement prior to the execution of this agreement, and ha[ve] been advised to review the agreement with another attorney of their choosing, which they have done," the Grosheks had not done this when they signed it because Trewin had not given them a reasonable opportunity to do so. Trewin did not make a full disclosure in that there was no purchase price specified, the profit he was going to make was not disclosed, and the buy-back process was not specified.

*Id.* Similarly, in this case it is undisputed that the 2020 redemption, at least insofar as it required the

redemption of ███████ of Stacy's stock, (SOF ¶ 187), was Kiesler's and Reed's idea. (SOF ¶¶ 173,

185.) It is undisputed that Stacy did not want to sell all of her stock. (SOF ¶ 173.) It is undisputed

that Kiesler repeatedly insisted that the deal had to be done within hours or days. (SOF ¶¶ 186, 192.)

It is undisputed that Stacy felt "uncomfortable" signing the agreement, (SOF ¶ 198), which she had

never seen before Kiesler presented it for her signature in-person the same day she signed. (SOF

¶203.) It is undisputed that Stacy was not sophisticated regarding finance or business. (SOF ¶ 30);

*Croft*, 143 Wis. 2d at 755-56 ("Manifest in the existence of a fiduciary relationship is that there exists

an inequality, dependence, weakness of . . . business intelligence, knowledge of facts involved, or

other conditions giving to one an advantage over the other."). And it is undisputed that Reed and

Kiesler did not disclose the profit they stood to make. (*See* SOF ¶ 180.) Add to these undisputed

facts the fact that Reed and Kiesler arranged for their company to purchase Stacy's interest at a

company valuation of only around *5%* of what they sold it for sixteen months later, (SOF ¶ 228),

and, as in *Groshek*, it is clear that "the evidence supports a finding that [Kiesler, on behalf of himself,

Reed and Gonnering] led [Stacy] to believe he was acting in [her] best interests in order to advance

his own interests." *Groshek*, 2009 WL 778351, ¶ 25. Given the undisputed facts listed above, no reasonable jury could conclude otherwise.

> ## 2. Reed and Kiesler breached their fiduciary duty by making affirmative misrepresentations to Stacy about the May 2020 redemption.

Not only did Reed and Kiesler keep from Stacy all the information they had about Windy Waters' actual value, they also affirmatively presented the EBITDA formula as a "fair" measure of her stock's value. (SOF ¶ 272.) Even aside from Kiesler's representations about the fairness of the transaction, the men represented to Stacy that the EBITDA formula calculated the "Estimated Value of Windy Waters" at $6,896,973. (SOF ¶ 272.) Presenting Stacy with what appeared to be (but was not) a detailed, fulsome financial disclosure—a *calculation* of the "Estimated Value of Windy Waters," no less—represented to Stacy, who was unsophisticated, not highly educated, and knew nothing about running or valuing a company, (SOF ¶¶ 29, 30), that she had all the relevant information she needed to make an informed decision. In other words, Reed's and Kiesler's use of the EBITDA formula made their withholding of relevant information *worse*, not better.

Based on the information they received from Gonnering, Reed and Kiesler knew that the price was not "fair" and that the "Estimated Value of Windy Waters" was orders of magnitude greater than $6.8 million. Again, over $5.9 million of that was attributed to the cash and marketable securities Windy Waters owned, meaning that *less than $1 million* was attributed to the value of Widen Enterprises—a company from which Reed drew ███████████ of approximately $1.5 million the year before and which Defendants sold for $162 million just over a year later. (SOF ¶¶ 16, 117.)

At the very least, Reed and Kiesler made these representations with reckless disregard for their truth or falsity. Kiesler and Reed had been advised by Widen Enterprises' CEO that the estimated value of the company was approximately *$80 million*—based on its *lower* revenues from

2018. Applying the metric the CEO had been consistently using for five years—four times recurring revenue—Reed and Kiesler knew, or should have known, that the company was worth approximately $100 million at the time of the May 2020 redemption. (*See supra* n.14.) Just months before Stacy's redemption, Reed personally expressed a belief that the company was worth approximately $80 million. (SOF ¶ 78.) And Reed admitted that he "constantly" received solicitations from prospective buyers looking to acquire Widen Enterprises (SOF ¶ 84), which, when considered alongside the information he was receiving from the CEO about the company's value at different points in time (*supra* Summary of Relevant Undisputed Facts § II), would have put any reasonable executive on notice of a substantial likelihood that the company was worth significantly more than $6.8 million.

Reed and Kiesler leveraged other affirmative misrepresentations as well to convince Stacy that their deal was not only fair but was actually "smart" for her despite possessing information showing that it was anything but. First, Kiesler told Stacy that it would, or "could," be smart for her to sell Defendants her entire interest in the Companies "given the current financial state of affairs, including the uncertainty presented by the onset of the COVID-19 pandemic . . . because there was no guarantee that Widen Enterprises would remain a viable company." (SOF ¶ 182.) Kiesler underscored this misrepresentation of the Companies' financial health by telling Stacy that the Companies could "not afford" to make even $50,000 available to her other than through a complete redemption. (SOF ¶ 171.) This theoretical risk was wholly inconsistent with the facts as Kiesler knew them, including that Widen Enterprises projected *increased* recurring software revenues of over $27 million in 2020 (SOF ¶ 85), that Widen Enterprises was profitable (SOF ¶ 310), that Windy Waters held millions of dollars in investment portfolios that was not being used to operate the Companies (SOF ¶¶ 269-270), and that it had just received a $2.7 million forgivable loan from the Paycheck Protection Program. (SOF ¶ 189.) Reed testified that Widen Enterprises remained profitable

through the pandemic and that the $2.7 million went "in the bank for a rainy day." (SOF ¶¶ 221, 310.) Reed and Kiesler disclosed *none* of this to Stacy. (SOF ¶ 180.)

Nor can Kiesler shrug off his representations that the deal was fair and smart as a mere "opinion." *See, e.g., Kraft v. Wodill*, 17 Wis. 2d 425, 431, 117 N.W.2d 261 (1962) (representation that assets sold to plaintiff "were worth $5,500" was "a statement of fact, not one of opinion" due to defendant's "superior" "familiarity with the tavern business and the worth of such businesses"); *see also* Wis. JI-Civil 2401 (2023) ("However, a statement of opinion, which carries with it an implied assertion that the speaker knows that the facts exist which support the speaker's opinion, may, in your discretion, be determined by you to be a representation of fact."). As the Chief Financial Officer of Widen Enterprises and Treasurer of Windy Waters, Kiesler's statements carried the weight of his financial expertise and implied access to corroborating information.

Nor would that defense save Kiesler even if he *were* merely expressing opinion. In both Wisconsin and the Seventh Circuit, even "statements of opinion, including predictions of future events, are actionable when the speaker 'knows of facts incompatible with [the] opinion.'" *Christense v. TDS Metrocom LLC*, No. 2008AP554, 2008 WL 5172804, ¶ 13 (Wis. Ct. App. Dec. 11, 2008) (alteration in original) (unpublished) (quoting *Lundin v. Shimanski*, 124 Wis. 2d 175, 192, 368 N.W.2d 676 (1985)); *Bay State Milling Co. v. Martin*, 916 F.2d 1221, 1227 (7th Cir. 1990) (same). Moreover, "liability for making a false statement of opinion may lie if . . . 'the speaker did not hold the belief she professed' . . . ." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 186 (2015)). Kiesler was an insider who owed Stacy a fiduciary duty, and his admonition that it would be "smart" for Stacy to sell represented that he genuinely believed that doing so was in Stacy's objective interest, based on his knowledge. However, Kiesler testified that he "[d]o[es]n't know the definition of 'smart,'" and therefore could not have actually held the belief he professed. (SOF ¶ 313.) Regardless, Kiesler

37

unquestionably *did* know of facts showing the opposite to be the case and did not genuinely hold the belief he professed; hence, he celebrated Stacy's decision to take his advice as ███████ for Reed and himself. (SOF ¶ 209.)

Even beyond the fact that these representations were objectively untrue, the deal Kiesler was offering did *nothing* to decrease the risk to Stacy of a downturn at Widen Enterprises or to help the Companies "afford" a redemption. Her $1.3 million in payments were to be made in monthly installments for seven years at the minimum legal interest rate—that is, the purchase was financed *by Stacy*. (SOF ¶ 225; *see* Palay Decl. Ex. 54 at WINDY0003176.) Windy Waters provided *no collateral*, or even a guaranty of payment, meaning that in any future insolvency (if the Companies really were in financial straits), Stacy would be a mere unsecured creditor. (SOF ¶ 226.) And Kiesler did not even attempt to explain why the Companies could "afford" a complete redemption at $1.3 million but not a partial one at $50,000. (SOF ¶¶ 171, 174.) Even in the light most favorable to Defendants, this is nonsensical. Under the Redemption Documents, Stacy was to receive $16,430.09 per month for eighty-four months, meaning the company would have been required to pay out $49,290.27 of the $50,000 it supposedly could not afford within the first three months. Thus, Stacy's sale of her interest at around 5% of its fair market value while at the same time failing to mitigate the hypothetical risk of insolvency was not "smart" under any rationale.

> ### 3. Reed and Kiesler breached their fiduciary duty to Stacy by paying Reed dividends disguised as wages and bonuses.

In Wisconsin, "[a] dividend is defined as '[a] portion of a company's earnings or profits distributed pro rata to its shareholders, usu[ally] in the form of cash or additional shares.'" *Yates*, 2009 WI App 79, ¶ 16 (second and third alterations in original) (quoting *Black's Law Dictionary* 512 (8th ed. 2004)). Thus, "[c]ourts generally classify a recurrent payment to the stockholders of a corporation on their stock investment as a dividend." *Yates*, 2009 WI App 79, ¶ 16 (citing *Hellmich*

*v. Hellman,* 276 U.S. 233, 236–37 (1928)). "The fact that a distribution is not called a 'dividend' by a corporation's board of directors is not dispositive as to whether the distribution is a dividend within the meaning of the law." *Yates,* 2009 WI App 79, ¶ 16 (citing *Jorgensen v. Water Works, Inc.,* 218 Wis. 2d 761, 776–77, 582 N.W.2d 98 (Ct. App. 1998) (*Jorgensen I*); *Notz,* 2009 WI 30, ¶ 24). Accordingly, payments of "compensation" to insiders that are "not based on work performed for the corporation" are considered a sharing of corporate profits instead. *Jorgensen II*, 2001 WI App 135, ¶¶ 12, 15, 19.

Wisconsin law recognizes that a majority shareholder's payment of such constructive dividends constitutes a breach of fiduciary duty. *Notz,* 2009 WI 30, ¶ 4 (concluding that majority shareholders' payment of certain expenses  that accrued to their benefit as shareholders of separate company was a "constructive dividend to the majority shareholder[s]" that supported a breach of majority shareholders' fiduciary duty); *Jorgensen II*, 2001 WI App 135, ¶¶ 12, 19 (payment of "officers' compensation" to certain shareholders that "were not based on work performed for the corporation but instead were distributions related to profits" constituted breach of fiduciary duty to unpaid shareholders); *Theis v. Durr*, 125 Wis. 651, 661–62, 104 N.W. 985 (1905) (corporate resolution that reduced the amount of capital stock in the corporation benefitted the majority shareholders, who owed subscription debt, at the expense of the minority shareholders, who had fully paid for their shares).

The payments Reed arranged for himself in 2019 and 2020 were not based on the work he performed for the Companies, but rather on the Companies' financial performance and Reed's own personal cash needs, making them dividends.[19] (SOF ¶¶ 111-113, 122-130).  Reed's self-assessed

---

[19]  Defendants claim that, in 2019 and 2020, Reed set his own compensation based on his "individual performance, the company's performance, and the market conditions." (SOF ¶ 111.) However, Reed testified that both the "individual performance" and "company performance" aspects of his compensation boiled down to the company's financial performance, specifically with respect to its revenues. (SOF ¶¶ 1112-113.)

compensation totaled $3.5 million for 2019 and 2020, and approximately $1.5 million of that amount was paid to Reed in 2019. (SOF ¶¶ 117-118.) Of that $1.5 million, Reed received approximately $500,000 as a ████████ (SOF ¶ 117.) Reed testified that he was paid bi-weekly.[20] (SOF ¶ 116.)

However, the undisputed facts show that the millions of dollars Reed paid himself were *not* based on the actual work he performed. Reed testified that, during 2019, he would visit the company's office every few weeks to every few months and that he spent around six months either in Arizona or at the family cottage. (SOF ¶ 108.) The work Reed allegedly performed consisted of meeting with Gonnering and thinking about the companies. (SOF ¶ 109.) However, Reed was unable to describe the companies' software products in any detail. (SOF ¶ 110.)[21]

Were his own admissions not enough, the analysis of his role at the Companies during the sale to Acquia confirms that Reed's compensation did not reflect his actual contributions. When selling Widen Enterprises, Defendants took the position that Reed's compensation was ████ ██████ and that Reed was ████████████████████████ of Widen Enterprises during the years that he took a $3.5 million salary. (*See* SOF ¶¶ 131-134.) Based on those facts, the national accounting firm that Widen Enterprises hired to study its financial statements in anticipation of the sale concluded that the salary and bonus payments should be considered *EBITDA*—i.e., profits—by a future buyer. (SOF ¶¶ 131-134.)[22] How the ████████████ services of a person ████████ ████████████████████ of a company could fairly be worth millions of dollars—approximately

---

[20] This compensation was not disclosed to Stacy prior to the redemption. (SOF ¶¶ 180, 285-186.)

[21] When pressed about the fair value of the services that Reed allegedly provided, i.e., the "performance" aspect of Reed's self-assessment, Defendants professed an inability to understand the terms "services," "fair," and "value." (*See* Palay Decl., Ex. 20 at 14.)

[22] In other words, adding insult to injury, Reed's $3.5 million in disguised dividends directly reduced the amount paid to Stacy under the EBITDA formula.

three times the compensation paid to the company's CEO, who *was* actively involved in managing the Companies—Defendants cannot explain.

Reed also admits that he paid himself the $500,000 bonus aspect of his 2019 compensation based on his need to pay a tax obligation. (SOF ¶ 129.) Thus, although labeled a "bonus," it was "not based on work performed for the corporation" but rather on Reed's need or desire for a particular amount of money to pay his tax obligations. *Jorgensen II*, 2001 WI App 135, ¶ 12. But Reed did not distribute a commensurate "bonus" to Stacy, who he recognized owed similar taxes. (SOF ¶ 130.) In fact, Kiesler and Gonnering specifically considered getting Reed the cash he wanted as a dividend but rejected the idea *because* it ████████████████████████████ and require a ██████████████████ (SOF ¶¶ 123-128.) Because withholding the pro-rata portion of distribution from certain shareholders treats the unpaid shareholder "differently" and "inequitably," it constitutes a breach of the fiduciary duty Reed and Kiesler owed to Stacy. *Jorgensen II*, 2001 WI App 135, ¶¶ 18-19.

Finally, as to the other $1 million in compensation Reed took in 2019, Reed testified that it was based on the company's financial performance. (SOF ¶¶ 111-113.) But payments based on *the company's* performance or revenues are just "[a] portion of a company's earnings or profits"—that is, payments based on Reed's ownership of the company. *Yates*, 2009 WI App 79, ¶ 16 (alteration in original) (quoting Black's Law Dictionary 512 (8th ed. 2004)). In other words, regardless of what they called these payments, they were, as a legal matter, dividends. *Yates*, 2009 WI App 79, ¶ 16.

Just like the "officers' compensation" in *Jorgensen* that "were not based on work performed for the corporation but instead were distributions related to profits," Reed's payments to himself from 2019 through May 2020, based on his personal cash needs or the company's financial performance, were, as a matter of law, constructive dividends, the payment of which constituted a breach of Reed's and Kiesler's fiduciary duty. *See Jorgensen*, 2001 WI App 135, ¶¶ 12, 19; *see also*

41

*Notz*, 2009 WI 30, ¶ 38 (corporate expenses that accrued to their benefit as shareholders of separate company was a "constructive dividend to the majority shareholder[s]" that supported a breach of majority shareholders' fiduciary duty).

### C.   Reed's and Kiesler's breaches of fiduciary duty caused Stacy damages.

The undisputed facts establish the third and final element of Stacy's breach of fiduciary duty claim, as well: Defendants' breaches caused Stacy damages. By withholding information and making misrepresentations relevant to the Companies' value, Reed and Kiesler were able to induce Stacy to sell her *entire* interest when she would not have sold *any* of it had she been told the truth. In doing so, Reed and Kiesler enriched themselves and the other Windy Waters shareholders to the tune of approximately $30 million. And by failing to pay Stacy her share of the dividends that Reed received, Stacy was not only denied those dividends in and of themselves, she was denied the financial resources that would have enabled her to pay the legal bills that caused her to reach out to Reed for help in the first place. Accordingly, summary judgment is warranted.[23]

"Rescission is an appropriate remedy when property is acquired in connection with a breach of fiduciary duty." *Groshek*, 2010 WI 51, ¶ 21. A breach of fiduciary duty is an intentional tort, and Wisconsin courts recognize that "[t]ort law is designed to provide full compensation for persons who are injured by another's unreasonable conduct." *Link*, 2012 WL 130531, ¶ 16 (citing *Merten v. Nathan*, 108 Wis.2d 205, 211–12, 321 N.W.2d 173 (1982); *Heath v. Zellmer*, 35 Wis.2d 578, 600, 151 N.W.2d 664 (1967)). Wisconsin courts further recognize that a minority shareholder who sells her interest at less than its fair value because of a breach of fiduciary duty has suffered damages. "When a minority stockholder agrees to sell out at less than fair value, the majority has won." *Link*, 2012 WL 130531, ¶ 14 (citing *Sugarman v. Sugarman*, 797 F.2d 3, 7 (1st Cir. 1986). Thus, when a

---

[23] The existence of damages in an ascertainable quantum is readily proven, though Stacy will prove the precise quantity of damages at trial.

minority shareholder "would have maintained an ownership interest" in a company "but for" breaches of fiduciary duties, the injured shareholder is normally "entitled to recover damages sufficient to restore [her] to that position, to the extent possible, as a remedy." *Link*, 2012 WL 130531, ¶ 15; *see Pro-Pac, Inc. v. WOW Logistics Co.*, 721 F.3d 781, 786, 788 (7th Cir. 2013) (unpublished per curiam) (noting that "Wisconsin courts have also recognized restitution as an appropriate remedy for a tortious breach of fiduciary duty" and that the "compensatory measure of liability and restitution often overlap, such that 'the benefit to the one and the loss to the other are co-extensive'" (citation omitted)). Similarly, "the duty of loyalty demands that a fiduciary be compelled to disgorge any profits received as a result of the breach." *Link*, 2012 WL 130531, ¶ 17 (citing *Cmty. Nat'l Bank v. Med. Benefit Adm'rs, LLC*, 2001 WI App 98, ¶ 8, 242 Wis.2d 626, 626 N.W.2d 340).[24]

Defendants admit that Stacy told Kiesler that she did not want to sell her entire interest in the companies. (SOF ¶ 173.) Rather, Stacy wanted to sell the minimum amount she needed to finance her divorce proceedings, $50,000, and at most $100,000. (SOF ¶¶ 169, 171.) Reed's and Kiesler's breaches of fiduciary duty caused Stacy damages because they caused her to sell her entire interest in the company when she would not have agreed, or needed, to sell *any* if not for those breaches. The relevant measure of Stacy's damages is therefore the difference between what Stacy would have been entitled to receive had she remained a shareholder of Windy Waters and the amount paid to her under the May 2020 redemption agreement—approximately $28,051,379, plus her share of the dividends Reed received, and her share both of the cash removed from the

---

[24] Punitive damages are also available when compensatory damages (defined by Section 903 of the Restatement (Second) of Torts as "damages awarded to a person as compensation, indemnity or restitution for harm sustained by him") are imposed. *Link*, 2012 WL 130531, ¶ 13 n.4. While Stacy seeks summary judgment only with respect to her entitlement to compensatory/restitution damages, she expects to seek punitive damages at trial.

Companies prior to the sale, and that remaining within Windy Waters afterwards. This quantum, which is certain and easily quantified, represents the harm Reed and Kiesler directly caused her and closely approximates the ill-gotten gains Reed and Kiesler realized at Stacy's expense.

Further, had Stacy received her share of the $2.25 million of constructive dividends Reed had paid himself in 2019 and through May 13, 2020 ($1,459,328 of total compensation in 2019 plus bi-weekly compensation of $41,358.35 for the first 19 weeks of 2020)—approximately $800,000— she would not have needed to consider selling *any* of her interest in Windy Waters, let alone all of it.[25] Instead, she would have retained the shares as she planned to do because, as she explained to Kiesler, her investment in the Companies was all she had to live on for the rest of her life. (SOF ¶185.) Yet Kiesler, at Reed's direction, insisted that she sell ███ such interest, and claimed that the total redemption was the *only* way she could get *any* money out of the Companies. (SOF ¶¶ 186- 187.)

* * *

The undisputed facts thus establish that Reed and Kiesler owed Stacy fiduciary duties that required them to place her interests ahead of their own; that they breached those duties by misrepresenting and omitting relevant facts to induce her to redeem her stock and by paying Reed disguised dividends that Stacy did not receive; and that Stacy suffered damages as a result. Accordingly, Stacy respectfully requests that the Court enter summary judgment on her breach of fiduciary duty claim.

---

[25] This approximation is based on the assumption that Reed's $2,245,136.58 in dividends represented between January 1, 2019 and May 13, 2020 represents approximately 55% of the company's total dividends in that period, commensurate with Reed's approximately 55% ownership at that time. (*See* SOF ¶ 37.)

### III.    Stacy Is Entitled to Summary Judgment on Defendants' Liability for Federal Securities Fraud Under Rule 10b-5(b).

Stacy also moves for summary judgment on Defendants' liability for federal securities fraud under Rule 10b-5(b)[26]. As discussed below, the same undisputed facts, surrounding the same misrepresentations and omissions that establish Defendants' breaches of fiduciary duty, entitle her to judgment as a matter of law on these claims, as well.

"Close corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts." *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir. 1987); *Michaels v. Michaels*, 767 F.2d 1185, 1194–97 (7th Cir.1985). That duty means that corporate insiders buying a company's stock are not "entitled to be silent" about information "that substantially affect[s] the value of the stock." *Jordan*, 815 F.2d at 435. Correspondingly, investors dealing with close corporations are under no duty to investigate the truth or completeness of representations made to them, or to discover omissions. *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540 (7th Cir. 1990); T*eamsters Loc. 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 526, 528 (7th Cir. 1985) ("Once the duty to disclose exists, and lying or nondisclosure is condemned as an intentional tort, it no longer matters whether the [investor] conducts an investigation well or at all.").

To prove her claim under Rule 10b-5(b), Stacy must demonstrate that Defendants "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996).

**(1) Misstatements and Omissions.** The same misstatements and omissions discussed *supra*, at section II(B)(1)-(2), establish the first element of Stacy's claim. Reed and Kiesler misstated to Stacy

---

[26] Stacy reserves her claim under SEC Rule 10b-5(a) and (c) for trial.

that the $1.3 million dollar purchase price was "fair" (SOF ¶ 178), that the "Estimated Value of Windy Waters" was $6.8 million (SOF ¶ 228), that Windy Waters could not "afford" a $50,000 or $100,000 partial redemption (SOF ¶¶ 170, 171), and that selling her interest for $1.3 million in a seller-financed transaction at the legal minimum interest rate with no guaranty or collateral from Windy Waters was "smart" given the purported financial risks of continued ownership. (*See* SOF ¶ 181.) Reed and Kiesler withheld from Stacy that:

> (1) they had been continually advised by Widen Enterprises' CEO for years that Widen Enterprises' (and therefore Windy Waters') value was a function of its recurring revenues;

> (2) the CEO estimated that value to exceed $80 million based on recurring revenues significantly lower than those at the time of Stacy's sale;

> (3) the Companies' recurring revenues had been continually increasing year-to-year since at least 2014 and were projected to be approximately $27,440,000 for 2020 at the time of Stacy's redemption;

> (4) the EBITDA formula from the shareholder agreement did not apply to the redemption and that the price was instead to be ████████

> (5) Reed "constantly" received solicitations to purchase Widen Enterprises;

> (6) the Companies had over $5.5 million in cash and liquid securities that was invested in the market and not being used to operate the Companies;

> (7) the Companies had just received $2.7 million in PPP loans that they were considering returning;

> (8) Reed had arranged to pay himself approximately $1.5 million in 2019—about three times the CEO's salary—despite ████████████████ in the company's operations; and

> (9) Reed's compensation directly reduced the EBITDA calculation number Stacy was offered. (*See supra* section II(B)(1); SOF ¶ 180.)

**(2) Materiality.** In the context of securities fraud, facts are "material" where they would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted). This objective test takes account of the circumstances: "the fact that the corporation is small and closely-held may affect the materiality of an omitted fact" both because "an event of a given magnitude probably has a larger

46

potential impact on the fortunes of a small company than on the fortunes of a large one" and because "what the reasonable shareholder considers important is necessarily a function of his options." *Michaels*, 767 F.2d at 1196. "The definition of 'materiality'. . . covers whatever is important enough to reasonable participants in an investment decision to alter their behavior. Usually price (or facts that influence price) is all that matters to securities transactions, but Rule 10b–5 does not foreclose the possibility that the participants will deem other facts vital." *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

While often a question of fact, where "the established omissions [or misstatements] are 'so obviously important to an investor that reasonable minds cannot differ on the question of materiality'" then the "issue of materiality [is] appropriately resolved as a matter of law by summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (citation omitted); *see Elipas v. Jedynak*, No. 07 C 3026, 2010 WL 1611024, at *2 (N.D. Ill. Apr. 20, 2010).

In this case, materiality can be established as a matter of law, because Defendants withheld *all relevant* information about the Companies' value and the price paid for Stacy's securities. Even the net income number forming the basis of her purchase price, the lone piece of financial information purportedly disclosed to Stacy, was misstated because it falsely excluded Reed's disguised dividends. (Hence, when marketing the Companies to potential third-party buyers, Defendants disclosed an ███████████ number that added back Reed's compensation—a number that they did *not* disclose to Stacy.) In other words, this case does not require determination of whether any single, specific piece of information is material; it requires only determination of whether *any* material information existed at all.  That question can be resolved as a matter of law.

Reasonable minds cannot differ that a reasonable investor in a closely-held DAM SaaS company would view the information withheld from Stacy as significantly altering the total mix of information made available, namely:

- The existence of years of increasing revenues and recurring revenues, particularly where those revenues were many times greater than the entire purported "value" of the company disclosed to the investor;

- Multiple estimates of a company's value from its CEO, which estimated that its value was many times greater than that produced by the formula *purporting* to estimate its value;

- The fact that the formula was not applicable to Stacy's redemption;

- The taking of millions of dollars in compensation by an owner ███████████████ ██████████████████ of the company—approximately three times that of the CEO, particularly when that compensation directly reduced the estimated value and purchase price held out to the investor;

- The company's holding of $5.5 million in cash and securities not used for operations and its receipt of $2.7 million in forgivable loans, particularly given its claimed inability to "afford" a $50,000 partial redemption. (*See supra* section II(B)(1).)

(3) **Scienter.** To prove scienter, Stacy must establish that Defendants "either knew that the representations they made to [Stacy] were false or were reckless in disregarding a substantial risk that they were false." *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (citing *Makor Issues & Rts, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977); *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *Meadows v. SEC*, 119 F.3d 1219, 1226–27 (5th Cir. 1997)). Recklessness in this context means "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Lyttle*, 538 F.3d at 603 (citation omitted). Thus, "[e]ven when a party's subjective beliefs are critical to liability, it is not always true that the case cannot be decided on summary judgment." *Id.* at 604; *Jakubowski*, 150 F.3d at 681–82 (affirming summary judgment on securities fraud claim where "[d]eliberate ignorance" was the most favorable interpretation of defendant's mental state).

The undisputed facts establish Defendants' scienter because Reed and Kiesler undisputedly were in possession of information that demonstrated the falsity of their representations and omissions. At the absolute minimum, they were reckless in disregarding the substantial risk that their

representations and omissions were false. Although Reed and Kiesler represented that the $1.3 million purchase price was "fair" and that the "Estimated Value of Windy Waters" was $6.8 million, they knew of facts showing that this was not true, or disregarded a substantial risk it was not true. For over five years, Reed and Kiesler had been receiving regular updates about the Companies' value from its CEO, who estimated that the Companies were worth well over $80 million by the time of Stacy's redemption. (SOF ¶ 72; *see supra* n.14.) If the CEO of a company stating his belief that the company is worth $80 million does not create a substantial risk that a representation that the company is worth $6.8 million is not true, nothing does. And in the face of the mountain of information about the Companies' value, Kiesler testified that he did not do *anything* to investigate their value in connection with Stacy's redemption. (SOF ¶ 92.) Each of these facts alone renders Kiesler's assertion of fairness and omission of Gonnering's assessments intentionally misleading, or at the very least reckless.[27]

The concept of fair market value was explained to Reed in a 2004 appraisal of the Companies. (SOF ¶ 47.) That appraisal, done before Gonnering took over and before the Companies developed tens of millions of dollars in annual recurring revenue, estimated that they were worth *more* than the $6.8 million represented to Stacy as fair *sixteen years later*. (SOF ¶ 48.)

---

[27] Kiesler testified that he did not read the 2018 Operational Updates containing Gonnering's $63 million and $80 million market value estimations, on which Kiesler was copied, because he "was living in the moment." (SOF ¶ 75.) For a CFO to claim that he never read regular updates from the CEO covering crucial topics about the finances of the company, to which the CFO owed a fiduciary duty, is astounding. For that CFO to plow ahead with valuing a shareholder's 20% stake in that company on the basis of only the most circumscribed and tangentially relevant information (i.e. the EBITDA calculation spreadsheet) because he "was living in the moment" instead of reviewing crucial, regular, and on-topic updates from his boss is, at best, deliberate ignorance. *See Jakubowski*, 150 F.3d at 681–82. And that recklessness *also* demonstrates a further fiduciary breach. *See Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 442, 557 N.W.2d 835 (Ct. App. 1996) ("It is well established that a corporate officer or director is under a fiduciary duty of loyalty, good faith and fair dealing in the conduct of corporate business."); *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (noting that "the responsibilities of corporate officers and directors toward shareholders" includes "a duty of care as well as a duty of loyalty").

Reed and Kiesler also knew that the EBITDA formula did not apply to the transaction by the terms of the Windy Waters shareholder agreement and that the price was therefore ███████ (SOF ¶ 150.)[28] "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Lyttle*, 538 F.3d at 603 (citation omitted).

Nor can Reed and Kiesler allege a genuine dispute over their subjective beliefs. Both Reed and Kiesler have stated they lack the ability or facts to state what they subjectively believed the value of the Companies was in May 2020. (Palay Decl., Ex. 23 at 2, Ex. 24 at 2.) Indeed, Reed has testified that he *never* considered the value of the Companies. (SOF ¶ 191.) Similarly, Kiesler testified that it "never crossed my mind" whether any other information was relevant to the value of Stacy's shares because he was applying the EBITDA formula." (SOF ¶ 92.)   Having disavowed any subjective belief, they cannot rely on speculation about what a jury *might* believe about their subjective states of mind on this question. And given that they had been advised of the CEO's estimation that the Companies were worth over $80 million, that Reed "constantly" received solicitations to purchase them, and that Reed drew millions of dollars a year in ████████ from them, no reasonable jury could believe them if they *did* testify that they actually believed in May 2020 that the Companies were worth a mere $6.8 million—less than before the preceding decade and a half of transformation and consistent growth. "Mere 'metaphysical doubt as to the material facts' is not enough" to create a genuine fact dispute. *Lynch*, 698 F.3d at 564.

**(4) Securities.** There is no dispute that the Windy Waters stock redeemed from Stacy by Defendants were securities within the meaning of the federal securities laws. (SOF ¶ 25.) And there

---

[28] Reed's and Kiesler's understanding that the EBITDA formula did not apply is also demonstrated by the fact that they failed to offer Stacy the "catch-up" payments to which she would have been entitled upon the sale of Widen Enterprises if that section of the Windy Waters shareholder agreement had applied. (SOF ¶¶159-161.)

can be no genuine dispute that Defendants made the misstatements and omissions described above in the context of the purchase and sale of those securities.

**(5-6) Reliance Causing Damages.** Stacy's reliance has been established as both a matter of law and undisputed fact. First, to the extent Stacy's claims arise from Defendants' withholding of information, Stacy's reliance is presumed. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-54 (1972). Given Defendants' omissions of *all* relevant information about the Companies' value and financial status, no more is needed in this case.

However, the undisputed facts also establish that Stacy did, in fact, rely on Defendants' misstatements and omissions. (SOF ¶¶ 205-206.) For one thing, that was the *only* information to which Stacy had access. While wary of their aggressive tactics and assertions, Stacy was resigned to the fact that she would have to trust that Reed (her brother) and Kiesler, who owed her a fiduciary duty as a matter of law, would place her interests above their own. (SOF ¶¶ 198, 206.) Even Gonnering credited Kiesler with ███████████—an acknowledgement that, but for Kiesler's actions, the redemption would not have taken place. (SOF ¶ 208.)

\* \* \*

Reed and Kiesler made numerous misrepresentations and omissions in connection with the purchase and sale of Stacy's Windy Waters stock. They made those misrepresentations and omissions, at a minimum, with a reckless disregard of the risk that they were false. And Stacy relied on them—and suffered damages as a result. No more is needed to establish Reed's and Kiesler's liability for federal securities fraud as a matter of law, and thus, Stacy respectfully requests that the Court grant summary judgment on this claim, as well.

## IV.   The Release Provision of the May 2020 Redemption Agreement Cannot Absolve Reed's and Kiesler's Tortious Conduct.

For multiple independent reasons, Reed and Kiesler cannot rely on the release to survive summary judgment with respect to their breaches of fiduciary duty and violation of federal securities laws. (*See* Am. Answer 33, Fifth Affirmative Defense, ECF No. 45.) First, because Reed and Kiesler fraudulently induced Stacy to sign the May 2020 redemption, they cannot point to the release provision in that document to absolve them from liability for that tortious conduct. Second, because Reed and Kiesler obtained Stacy's signature by violating their fiduciary duty, they are equitably estopped from using the fruits of that breach against Stacy now. Further, because their fiduciary breaches also violated Rule 10b-5, they cannot point to the release to absolve that liability, either.

### A.   Defendants fraudulently induced Stacy's assent to the redemption agreement.

Wisconsin has adopted section 164 of the Restatement (Second) of Contracts to determine when a contract is voidable and subject to rescission by one of the parties. *First Nat'l. Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 222-23, 293 N.W.2d 530 (1980).[29] Under that approach, "[i]f one party to a contract induces the other party to enter into the contract by means of fraudulent or material misrepresentation and the second party justifiably relies on the misrepresentation, the contract is voidable." *Johnson Bank v. Tiziani*, No. 2010AP3121, 2011 WL 4835728, ¶ 11 (Wis. Ct. App. Oct. 13, 2011) (unpublished). The requirements for establishing fraud sufficient to avoid a contract are "less stringent" than those for imposing tort liability, so "if there is fraud, there is no requirement that the misrepresentation be material." *Notte*, 97 Wis. 2d at 213, 223 n.7. And because Wisconsin law treats the failure to disclose a fact where there is a duty to do so "as equivalent

---

[29] At the time of *Notte*, the Second Restatement of Contracts was in draft form, and the Wisconsin Supreme Court cited Section 306 of Tentative Draft No. 11, 1976. In 1981, the Second Restatement was published. "[T]he final version of the RESTATEMENT (SECOND) OF CONTRACTS, which is the most recent version, maintained the same approach as the tentative draft cited in *Notte*." *Johnson Bank v. Tiziani*, No. 2010AP3121, 2011 WL 4835728, ¶ 11 n.3 (Wis. Ct. App. Oct. 13, 2011). (unpublished).

to a representation of the nonexistence of the fact," *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 13, 283 Wis.2d 555, 699 N.W.2d 205 (citation omitted), both a misstatement and "[n]on-disclosure can form the basis for a misrepresentation sufficient to allow the avoidance of a contract obligation under general principles of contract law." *Notte*, 97 Wis. 2d at 219.

"A misrepresentation is an assertion that does not accord with facts as they exist." *Notte*, 97 Wis. 2d at 222. Whether undisputed facts show a misrepresentation is a question of law. *Alioto*, 2005 WL 3210804, ¶ 30. A misrepresentation is fraudulent:

if the maker intends his assertion to induce a party to manifest his assent and the maker

(a) knows or believes that the assertion is not in accord with the facts, or

(b) does not have the confidence that he states or implies in the truth of the assertion, or

(c) knows that he does not have the basis that he states or implies for the assertion.

Restatement (Second) of Contracts § 162 Westlaw (database updated May 2023); *Notte*, 97 Wis. 2d at 223 n.7 (quoting Restatement (Second) of Contracts § 304(1) (Tent. Draft No. 11, 1976) that was finalized at Restatement (Second) of Contracts § 162, which is nearly identical to the tentative draft's language).

There is no genuine dispute of fact that Defendants intended their representations and omissions to induce Stacy into signing the May 2020 redemption agreement. There is no dispute that Kiesler insisted upon a total redemption over Stacy's objection. (SOF ¶¶ 172, 173.) Defendants also repeatedly stated that intent, at least once in writing. Kiesler stated, to both Stacy and the Companies' attorney, that ███████████████████████████████████████████████ ███████████████████████████████ (SOF ¶¶ 175, 190.) Beyond that, Gonnering specifically referenced the plan to █████████████████████████████████████ to facilitate declaring Reed's dividends as such. (SOF ¶ 94) (emphasis added). The next month, he reminded Reed that

53

the two ███████████████████████████████████████████████████
(SOF ¶ 99.) He therefore recommended that they ██████████████████████
█████████████████████████ (SOF ¶ 99.) Stacy was one of those shareholders. (SOF ¶ 102.)
Gonnering then advised Reed and Kiesler of the ███████████ that Stacy's need for cash presented,
an opportunity so valuable that it was worth returning $2.7 million in PPP funds. (SOF ¶ 189.) Upon
completion, Kiesler called the redemption ███████████ and referred to it as a ███████████
█████████████████ (SOF ¶¶ 207, 209.) Gonnering then thanked Kiesler for ███████████████ (SOF
¶ 208.)

Nor is there a genuine dispute that Defendants' misstatements and omissions were
misrepresentations within the meaning of Section 162 of the Restatement (Second) of Contracts. As
far back as *2004* – before decades of transformation and growth – Reed was advised that the
Companies' value was *higher* than the value represented to Stacy as fair in 2020. (SOF ¶ 48.) And
for over five years leading up to the May 2020 redemption, Gonnering consistently advised Reed
and Kiesler that the value of Widen Enterprises (and by extension Windy Waters) was a function of
multiplying its revenue by a factor between three and four. (SOF ¶¶ 58-74.) Gonnering had,
accordingly, written that Widen Enterprises' value was between *$24-$52 million in December 2014,*
*$63 million in February 2018, and $80 million in August 2018.* (SOF ¶¶ 58, 65, 67.) If the 3.5x
revenue multiple used by Gonnering was applied to the trailing-twelve-month subscription revenue
of $24,001,394 for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen
on an enterprise basis would be $84,004,879. (SOF ¶ 66.) Applying Gonnering's metric of "4x"
recurring revenue from August 2018 to the trailing-twelve-month subscription revenue of
$24,001,394 for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen
Enterprise on an enterprise basis would be $96,005,576. (SOF ¶ 74.) And applying that metric to
the $27,440,000 in annual recurring revenue the Companies were projecting on May 8, 2020, five

days before Stacy's redemption, the estimated fair market value of Widen Enterprises on an enterprise basis would be $109,760,000. (*See supra* n.14.)

Yet Kiesler, in the face of these staggering sums, represented to Stacy that the "Estimated Value" of Windy Waters was $6,896,973, or that Defendants at least believed it was. (SOF ¶ 228.) That was "not in accord with the facts" that they knew. At absolute minimum, there can be no dispute that the men lacked "confidence in the truth of [that] assertion," and knew they did "not have the basis for" it. Yet Kiesler's representation that the purchase price was "fair" unavoidably implied that it represented the actual value of Stacy's stock, or that Kiesler believed that it did. At best, Reed's and the Companies' lawyers' advice that the formula was inapplicable, and Gonnering's advice that the formula was "low" and that the Companies were worth at least $80 million, means that Kiesler knew that he did "not have the basis that he states or implies for the assertion" that the estimated value of Windy Waters was $6.8 million or that the offered price was fair. More accurately, the evidence demonstrates that he knew those assertions were not in accord with the facts. In any event, Defendants' attempts to link this representation to how Stacy's price compared to her brothers' redemptions, instead of the actual value of the Companies, is unavailing; there is nothing "fair" about paying Stacy less than the value of her stock, whomever else Kiesler and Reed induced into similar transactions.

Kiesler's assertions that Windy Waters could not "afford" a $50,000 partial redemption, and that Stacy selling her entire interest for $1.3 million was "smart," were also not in accord with the facts as Kiesler knew them, nor made with "the confidence that he state[d] or implie[d] in the truth of the assertion." Rather, Kiesler made these representations despite knowing "that he [did] not have the basis that he state[d] or implie[d] for the assertion." In fact, Windy Waters had over $5.5 million in cash and securities not being used to operate the Companies, Widen Enterprises was profitable and projecting growth, and the Companies had just received $2.7 million in forgivable loan proceeds

that the Companies were considering returning and which ended up in the "bank for a rainy day." (SOF ¶¶ 85, 189, 221, 310; *see* Palay Decl., Es. 20 at 18 & Ex. 41.) Kiesler lacked any basis to represent to Stacy that Widen Enterprises' condition was financially precarious; the facts available to him, which he withheld, showed exactly the opposite.

Because Reed and Kiesler owed her a fiduciary duty, Stacy was justified in relying upon their misstatements and omissions. *Alioto*, 2005 WL 3210804, ¶ 17 (de facto fiduciary relationship established justified reliance where one party did not read a contract before signing). Stacy's reliance was also justified based on the undisputed facts, as explained above at section III. "Where the facts are undisputed, whether the party claiming fraud was justified in relying on a misrepresentation is a question of law." *In re 2015 Voting Tr. Agreement for Certain S'holders of Mason Cos., Inc.*, No. 2020AP1937, 2023 WL 1992077, ¶ 20 (Wis. Ct. App. Feb. 14, 2023) (unpublished). It is not disputed that Stacy lacked sophistication and experience in business and financial matters and that she had trusted Reed and Kiesler to run the Companies for decades. (SOF ¶ 30, 38, 41.) Reed and Kiesler cannot now claim that Stacy should never have trusted them in the first place.

### B.    Reed and Kiesler are equitably estopped from relying upon the release in the redemption agreement.

To the extent that the Court finds that Reed and Kiesler breached their fiduciary duty to Stacy in the context of the May 2020 redemption agreement, Reed and Kiesler should be estopped from raising the release as a defense to their tortious conduct. Under Wisconsin law, "[e]stoppel may be applied where action or nonaction on the part of the one against whom the estoppel is asserted induced reliance by another, either in the form of action or nonaction, to his detriment." *Gonzalez v. Teskey*, 160 Wis. 2d 1, 12–13, 465 N.W.2d 525 (Ct. App. 1990) (citation omitted). Equitable estoppel may preclude the assertion of rights under a contract. *Gabriel v. Gabriel*, 57 Wis. 2d 424, 428, 204 N.W.2d 494 (1973). Whether estoppel applies is within the trial court's discretion

and requires proof by satisfactory and convincing evidence. *Teskey*, 160 Wis. 2d at 12–13. Three factors are necessary to apply equitable estoppel: "(1) [a]ction or nonaction which induces (2) reliance by another (3) to his detriment." *Gabriel*, 57 Wis. 2d at 429. Based on the same facts that establish Reed's and Kiesler's breach of fiduciary duty, all three elements are met here.

Reed's and Kiesler's actions and nonactions are well documented, as discussed above at sections II(B)(1)-(2). That Stacy, who lacked legal representation and who naively hoped the Companies' attorney could advise her, relied on those actions and nonactions is beyond question. And nobody can dispute that this reliance was to her detriment—to the tune of nearly $30 million. (*See* SOF ¶ 245.) Thus, Reed and Kiesler may not rely upon self-protective provisions they obtained to absolve them of liability for the breach they committed in obtaining it.

## V.     Defendants' Defenses of Ratification and Waiver Fail.

Defendants argue that Stacy's receipt of note payments beginning on October 13, 2021 "ratified" the May 2020 redemption agreement as a whole. (*See* Am. Answer 33, Second and Sixth Affirmative Defenses; *see also* Defs.' Reply in Supp. Mot. to Strike 1-2, ECF No. 37.)[30] However, the timeline does not allow for that argument. Even Defendants appear to agree that Stacy could not possibly have known the material facts necessary to demonstrate ratification until after she learned of the sale to Acquia, on September 20, 2021.[31] And she did not accept another note payment until

---

[30] Defendants originally argued that Stacy's failure to tender note payments until July of this year amounts to a waiver of her right to seek rescission. (*See* Defs.' Mot. to Strike 2, ECF No. 32.) That argument fails under black letter contract law, which provides that a party need not tender money she is entitled to retain in order to pursue rescission. However, Defendants later shifted, contending that Defendants do *not* rely on the tender-back prerequisite for filing a rescission claim. (*See* Defs.' Reply in Supp. Mot. to Strike 1.)

[31] Stacy knew almost nothing about Defendant's actual conduct until it came out in formal discovery—much of it quite recently—and could not have waived or ratified that conduct before she had full knowledge of the material facts. For example, Stacy was unaware of Defendants' planning to ███████ the buyouts of ███████ ████████ or any of Defendants' internal estimations of the Companies' value until this year. She had no documents from third parties, such as Acquia, Software Equity Group, Grant Thornton, or Baker Tilly. Stacy therefore could not have ratified the redemption agreement nearly two years ago simply because she was

October 13, 2021 – by which time the parties were well into settlement negotiations that dragged on for nearly a year. Defendants are estopped from claiming that Stacy manifested an intent to be bound by their redemption agreement during those negotiations, particularly where Defendants signed a written agreement that recognized that Stacy's claims were preserved and never mentioned ratification. Nor can Defendants mount the counterintuitive argument that Stacy manifested an intent to be bound by the redemption agreement *after* commencing this litigation, where she has pleaded the very opposite. And under no circumstances could Stacy have ratified a release of her securities fraud claim, which is governed by federal law.

### A. Defendants are equitably estopped from arguing ratification during settlement negotiations.

Ratification, or waiver,[32] requires full knowledge of all material facts. *See, e.g., Hall v. Chi., M. & St. P. Ry. Co.*, 48 Wis. 317, 4 N.W. 325, 327 (1880) (ratification requires "full knowledge" of the material circumstances); *In re Spengler*, 228 Wis. 2d 250, 263, 596 N.W.2d 818 (Ct. App. 1999); *Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 372 (7th Cir. 2018) ("A person is not bound by a ratification made without knowledge of material facts" (quoting Restatement (Third) of Agency § 4.06 (2006))). The earliest point that Defendants have argued Stacy obtained the requisite knowledge was September 20, 2021, when Stacy's lawyers first reached out to counsel for Defendants. (Defs.' Mot. to Strike 5.)

---

aware of the sale to Acquia. *See Salstone v. Gen. Felt Indus., Inc.*, No. 84 C 9976, 1989 WL 68832, at *7 (N.D. Ill. June 16, 1989) ("In order for a waiver to be knowing, the plaintiff must be sufficiently apprised of the relevant facts which make up her claim . . . [I]t is not clear even now [at summary judgment] what [the defendant] knew and when, much less what [the plaintiff] knew." (emphasis added)).

[32] Defendants originally argued that Stacy's "acceptance of the benefits" of the redemption agreement (i.e., accepting monthly payments from Windy Waters) amounted to a "waiver," which "[o]ther jurisdictions refer to . . . as a ratification" of her right to seek rescission, which "generally requires each party to return, or at least offer to return, the property that he or she has received." (Defs.' Mot. to Strike 12, ECF No. 32 (quoting *TankStar USA v. Navistar, Inc.*, No. 2017AP1907, 2018 WL 6199278, ¶ 6 (Wis. Ct. App. Nov. 27, 2018)).).

The first note payment Defendants allege Stacy received after acquiring that knowledge was on October 13, 2021. (*Id.*) However, Defendants do not acknowledge that in the interim the parties initiated negotiations that stretched on for nearly a year—which triggers estoppel here. As discussed above at section IV(B), "[e]stoppel may be applied," in a trial court's discretion, "where action or nonaction on the part of the one against whom the estoppel is asserted induced reliance by another, either in the form of action or nonaction, to his detriment." *Teskey*, 160 Wis. 2d at 12-13 (citing *Southern Wis. Cattle Credit Co. v. Lemkau*, 140 Wis. 2d 830, 840, 412 N.W.2d 159 (Ct. App. 1987)). While "actual fraud, in a technical sense, is not required," courts consider "whether the party against whom estoppel is asserted has engaged in fraudulent or inequitable conduct." *Teskey*, 160 Wis. 2d at 13 & n.8.

Specifically, one week after the September 20, 2021 correspondence, Stacy's counsel spoke with Defendant's counsel by phone. (SOF ¶ 248.) On October 6, 2021, Stacy's counsel followed up a second conversation with an email explaining that "a helpful first step in these discussions would be if your client could share the process and calculations used to determine the purchase prices for Ms. Randall's shares in 2020." (SOF ¶ 250.) Approximately one week later, on October 14 and 15, 2021, Defendants' counsel provided those items, which included the Companies' 2019 financial statements and the calculation of Stacy's purchase price. (SOF ¶ 251.)

Over the next several months, the parties engaged in settlement discussions. (SOF ¶ 252.) By January 2022, Defendants' counsel had made an initial settlement offer and raised the possibility of mediation. (SOF ¶ 255.) Stacy's counsel explained in responsive correspondence that:

> In general, our client is reluctant to undertake mediation based on your client's offer because of the potential for that process to delay her asserting her claims. That's particularly true if the process is used to stall her from advancing her claims through the discovery process or if she risks running over any statutes of limitations. We would therefore need any mediation to include both reasonable discovery and a tolling agreement.

59

(SOF ¶ 256.) Stacy's counsel also demanded additional discovery, including text message and email correspondence among the defendant parties, and the shareholder agreement Defendants' counsel had mentioned in prior correspondence. (SOF ¶ 257.) Defendants provided some of those documents shortly before the mediation, in May 2022. (SOF ¶ 258.) However, Defendants did not produce various other documents cited in this brief until formal discovery in this case. Defendants provided *none* of the Slack messages cited herein until formal discovery in this case. As the foregoing history shows, Defendants are estopped from arguing that Stacy manifested an intent to be bound by the redemption agreement during settlement discussions that Defendants had suggested, encouraged, and elongated.

And not only are Defendants estopped from arguing otherwise, but Defendants explicitly *agreed* that Stacy's claims were preserved. On March 1, 2022, Stacy and Defendants entered into a written Standstill and Tolling Agreement. (SOF ¶ 259.) The Standstill and Tolling Agreement provides that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations *or similar defenses* and to provide for *the retention of any legal or equitable actions or defenses that the Parties may have.*" (SOF ¶ 260 (emphasis added).) At no point during *any* of the parties' settlement discussions, did Defendants object to Stacy receiving or retaining monthly payments, much less claim that those payments amounted to a ratification of the redemption agreement.

In sum, Defendants coaxed Stacy into eight months of settlement negotiations, during which Stacy lacked significant information about their conduct, and during which they agreed that Stacy would preserve her claims. They cannot now argue that Stacy "ratified" the very transaction with

respect to which the parties were discussing settlement by receiving payments Defendants made *after* those negotiations began, and during which Defendants agreed that Stacy's claims were preserved.

### B. Wisconsin law precludes a post-litigation waiver or release of claims other than by written instrument or court-approved stipulation.

Nor can Defendants argue that post-litigation payments amount to a manifestation of intent to be bound by the redemption agreement. In fact, Wisconsin law specifically precludes any argument that Stacy's post-litigation *conduct*[33] ratified the redemption agreement and thereby effectuated a settlement of her claims. "Under Wisconsin law, settlement agreements are enforceable only if they are (1) made in writing; or (2) made in court and entered in the minutes or recorded." *Mayek v. Gundersen Boscobel Area Hosp.*, No. 19-CV-811-JDP, 2023 WL 2328070, at *3 (W.D. Wis. Mar. 2, 2023) (citing Wis. Stat. § 807.05). The law applies equally to purported settlements made in the course of federal litigation. *See Mayek*, 2023 WL 2328070, at *3. Wisconsin Statutes section 807.05 provides:

> **Stipulations.** No agreement, stipulation, or consent between the parties or their attorneys, in respect to the proceedings in an action or special proceeding shall be binding unless made in court or during a proceeding conducted under s. 807.13 or 967.08 and entered in the minutes or recorded by the reporter, or made in writing and subscribed by the party to be bound thereby or the party's attorney.

Wis. Stat. § 807.05. Yet Defendants claim that Stacy's post-litigation *conduct* "ratified the agreements and waived [Stacy's] right to seek rescission." (Def's' Reply in Supp. Mot. to Strike 1, ECF No. 37.) That is, Defendants argue that Stacy's post-litigation conduct manifested her "consent" to be bound by the May 2020 redemption agreement that Stacy has consistently argued is void. As set forth above, Wisconsin law sensibly precludes such counterintuitive arguments.

---

[33] Stacy assumes, for the sake of argument, that the passive acceptance of payments that Defendants have continued to make after Stacy filed this suit to void the redemption agreement could be considered "conduct" on Stacy's part.

Here, Defendants argue that by manifesting a purported "consent" to the redemption agreement, Stacy has waived or released her rescission claim—and potentially other claims through the release provision.[34] But only a *written instrument* or on-the-record stipulation could have that effect once Stacy initiated legal proceedings. *See* Wis. Stat. § 807.05. Such a default makes sense; by filing a lawsuit explicitly seeking rescission of the redemption agreement, Stacy manifested a clear intent ***not*** to be bound by or ratify it. Thus, only a written agreement to the contrary could overcome that legal presumption.

Other jurisdictions are in accord. For example, in a closely analogous case based on one bank's allegedly fraudulent inducement of another bank to participate in a real estate loan, the U.S. District Court for the Southern District of New York held that pleading a rescission claim unambiguously manifests an intent *not* to be bound by an agreement, such that post-litigation acceptance of payments due under that agreement cannot amount to ratification. *Banque Arabe Et Internationale D'Investissement v. Md. Nat'l. Bank*, 850 F. Supp. 1199, 1215 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 146 (2d Cir. 1995). That is because "the formal pleading of a rescission claim eliminates any implication of a subsequent ratification . . . . [W]here plaintiff would be entitled to at least as much relief at the close of trial, 'acceptance of payments *after* commencement of a suit for rescission cannot be deemed a ratification.'" *Id.* (quoting *Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1302 (S.D.N.Y. 1986)). Similarly, *Prudential* rejected the idea of post-litigation ratification through the acceptance of note payments after the commencement of litigation. "By filing this suit demanding rescission, the Plaintiffs have made an unambiguous request to have the contract voided

---

[34] Defendants have only alleged that their ratification theory eliminates Stacy's right to seek recession. However, this is disingenuous, as Defendants will almost certainly claim that any ratification of the "redemption agreement" also ratified the *release provision*, as well.

and therefore it is not possible to construe the acceptance of payments as an inference of Plaintiffs' intent to ratify the contract." *Prudential Ins.*, 630 F. Supp. at 1302.

C.    Federal law precludes ratification of the release.

Federal, not state, law controls the validity of rights under federal remedial statutes, including whether a release thereof has been ratified. *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) illustrates the point. In *Oubre*, the petitioner employee, "as part of a termination agreement, signed a release of all claims against her employer," receiving as consideration severance pay in installments. *Id.* at 423-24. The release did not comply with federal statutory requirements under the Age Discrimination in Employment Act of 1967 (ADEA). *Id.* at 424. Accordingly, after Oubre received the final payment, she sued; the employer argued that her suit was barred by the release because she ratified and validated it "by retaining the moneys paid to secure it." *Id.*[35]

The Court began by rejecting the employer's rigid view of state contract jurisprudence, noting that "in equity, a person suing to rescind a contract, as a rule, is not required to restore the consideration at the very outset of the litigation." *Id.* at 426. But more to the point, the Court held, state contract jurisprudence was not the governing law:

> Even if the employer's statement of the general rule requiring tender back before one files suit were correct, it would be unavailing. The rule cited is based simply on the course of negotiation of the parties and the alleged later ratification. The authorities cited do not consider the question raised by statutory standards for releases and a statutory declaration making nonconforming releases ineffective. It is the latter question we confront here.

*Id.* Accordingly, the Court then turned to the text of the Older Workers Benefit Protection Act (OWBPA), which had amended the ADEA. It reasoned that "[t]he statutory command is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's

---

[35] It is also significant that Stacy received *no* consideration for the release in the redemption agreement, the purchase price of which was calculated *exclusively* based on the formula value for Stacy's stock. (*See* Pl.'s Opp'n to Mot. to Strike 20, ECF No. 20.)

requirements." *Id.* at 426-27.  The policy, it held, was "likewise clear . . . : it is designed to protect the rights and benefits of older workers." *Id.* at 427. Thus, the Court concluded, "[t]he OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word. . . . Courts cannot with ease presume ratification of that which Congress forbids." *Id.*; *see also Hogue v. S. R. Co.*, 390 U.S. 516 (1968) (per curiam).

Following *Oubre*, the circuit courts have consistently applied the rule set forth in *Oubre* and *Hogue*, looking to the statutory text of the federal remedial statute at issue as well as the policy behind the statute in determining whether retention of benefits may serve to ratify a release and determining that it does not. *See, e.g., McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 308 (6th Cir. 2018) (holding that "the tender-back doctrine does not apply to claims brought under Title VII and the [Equal Pay Act]"); *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 784 (3d Cir. 2007) (rejecting tender back/ratification defense in the context of ERISA claims); *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993) ("We hold that a civil rights plaintiff is not required to return or offer to return consideration received pursuant to a valid release agreement as a prerequisite to initiating a § 1983 action premised on the violations purportedly released by the agreement."). The rationale of *Oubre* is no less applicable to the Securities Exchange Act—which is to say that both the text and the purpose of the Exchange Act preclude Defendants' ratification argument.

As explained in Stacy's Opposition to Defendants' Motion to Strike, ECF No. 36, 15 U.S.C. sections 78cc(a) and (b) clearly preclude contractual provisions purporting to waive compliance with the Exchange Act or its rules and regulations, as well as contracts made in violation of the Exchange Act as to the rights of parties entering into them in violation of the Act.[36] Likewise, the policy considerations underpinning the Exchange Act, like the policy behind the OWBPA and the FELA

---

[36] Stacy incorporates by reference the arguments raised in her Opposition to Defendants' Motion to Strike.

(and section 1983, and ERISA, and Title VII, and the EPA), militate against applying state law contractual ratification principles in order to cut off rights under federal remedial statutes. The Exchange Act was "part of an overall broad scheme of federal regulation enacted in the early 1930s, through which Congress wanted investors to have access to comprehensive, accurate information about the companies in which they were investing." *AUSA Life Ins. v. Ernst & Young*, 206 F.3d 202, 218 (2d Cir. 2000) (footnote & citation omitted). It was intended to "promote investor confidence in the United States securities markets and thereby to encourage the investment necessary for capital formation, economic growth, and job creation." *Id.* (quoting Private Securities Litigation Reform Act of 1995, P.L. 104-67, S. Rep. No. 104-98 (June 19, 1995), reprinted in 1995 U.S.C.C.A.N. 679, 683). To apply Defendants' ratification/waiver argument would undercut those principles: far from encouraging access to comprehensive, accurate information for investors, it would promote violation of the Exchange Act by encouraging bad actors to induce financially vulnerable investors into violative contracts with consideration that the investor cannot easily tender, and to procure releases to such contracts so as to insulate violations of the Exchange Act, including fraudulent representations and omissions.

## CONCLUSION

As fiduciaries, Reed and Kiesler owed Stacy "[n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.). Instead, they cheated her out of what was supposed to be her life's savings. This Court should adhere to the judicial tradition of "[u]ncompromising rigidity" upholding the standard of fiduciary conduct. *Id.* Under the undisputed facts of this case, as shown by the extensive evidence submitted in support of Stacy's motion, that adherence requires finding Reed and Kiesler liable for breaching their fiduciary duty. Because Reed's and Kiesler's undisputed conduct also violated federal securities laws, namely Rule 10b-5(b), this Court should grant Stacy judgment on their liability for that claim, as well.

Defendants' central defense in this case—that Stacy signed an agreement purporting to waive all her claims against them—misses the point. Because Defendants achieved that result only through fraud and deceit, neither the law nor equity will permit them to seek refuge in it now. Understanding that there is no defense to their actions as a matter of fact, Reed and Kiesler have resorted to the formalistic arguments that Stacy "ratified" their fraudulently induced agreement—either while she was engaged with settlement negotiations with them, during which they entered into a contract that provided for the preservation of all of Stacy's claims, or after she sued them claiming that agreement was void. Unsurprisingly, the law and equity preclude such arguments under these facts, and Defendants' ratification and waiver defenses therefore fail.

Respectfully submitted this 29th day of September, 2023.

*s/ David G. Palay*
Mark A. Cameli
mcameli@reinhartlaw.com
David G. Palay
dpalay@reinhartlaw.com
Monica A. Mark
mmark@reinhartlaw.com
Elizabeth Elving
eelving@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965
Telephone:  414-298-1000
Facsimile:  414-298-8097

*Attorneys for Stacy L. Randall*