IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

STACY L. RANDALL,

        Plaintiff,

v.

                                    Civil Action No. 22-cv-400

REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

        Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY OF FACTS .................................................................................................2

LEGAL STANDARD...............................................................................................20

ARGUMENT ............................................................................................................21

I.     Randall Released All Possible Claims Connected to the Redemption. .......................21

II.    Randall's Claims for Securities Fraud Under Section 10(b) of the Securities
       Exchange Act and Rule 10b-5 Fail as a Matter of Law (First and Second Claims
       for Relief)...............................................................................................................22

    A.    Randall Fails to Show Material Misrepresentations and Omissions. ......................25

        1.    Defendants' Representations Were Truthful Statements of Fact..............................25

        2.    Defendants' Representations Were Earnest Opinion.................................................26

    B.    Because These Were Truthful Statements, Randall Cannot Show That
          Defendants Acted With the Requisite Scienter...................................................32

    C.    Randall Is Barred From Relying on Omissions Regarding Reed's Salary and
          Bonuses for a Direct Securities Fraud Claim.............................................................35

    D.    Randall's Claims for Scheme Liability Fail................................................................36

III.   Reed is not Liable for Controller Liability (Third Claim for Relief)............................39

IV.    Randall's claim against Reed for control person liability over Kiesler, Windy
       Waters, and Widen Enterprises fails because Randall has failed to show a primary
       violation under Rule 10b-5. Randall's State Securities Fraud Claim Fails for the
       Same Reasons her Federal Claims Fail (Fifth Claim For Relief). ................................40

V.     Randall Has Failed to Prove Common Law Fraud (Fourth Claim for Relief). ............41

    A.    Randall Must Establish All Five Elements of Common Law Fraud by Clear and
          Convincing Evidence. .................................................................................................41

    B.    Randall Has Failed to Establish Clear and Convincing Evidence of the
          Existence of Material Fraudulent Statements or Omissions Concerning the
          Redemption. .................................................................................................................42

        1.    Randall Cannot Prove Affirmative Misrepresentations Were Made "in
              Connection With the Redemption" That Induced Randall to Enter Into the
              Redemption Agreement. .......................................................................................43

            a.    No affirmative misrepresentations were made as to "the value of the
                  Companies.".................................................................................................43

            b.    No affirmative misrepresentations were made as to "the prospects for sale" of
                  Widen Enterprises.........................................................................................44

   c. No affirmative misrepresentations were made as to "alternative means by which Randall could obtain cash." .................................................45

  2. Randall Cannot Prove Omissions of Disclosure of Material Facts That Induced Randall to Enter Into the Redemption Agreement. ................................46

   a. No omissions of material disclosures were made as to "the value of the Companies." ............................................................47

   b. No omissions of material disclosures were made as to "the prospects for sale" of Widen Enterprises. ..........................................49

   c. No omissions of material disclosures were made as to "alternative means by which Stacy could obtain cash." .................................49

 C. Randall Has Failed to Establish Clear and Convincing Evidence of Reliance. .........50

VI. Randall Has Failed to Establish a Genuine Issue in Dispute Regarding Reed Widen and Kiesler's Alleged Breaches of Fiduciary Duty (Sixth Claim for Relief). ...53

 A. Randall Repeats the Same Unproven Allegations to Assert Fiduciary Breach Claims Against Reed Widen and/or Kiesler. ..........................................53

 B. Judgment Is Proper for Defendants on Randall's Derivative Claims for Breach of Fiduciary Duty. ............................................................55

 C. Randall's Claims for Fiduciary Breach Also Are Barred by the Statute of Limitation. ....................................................................55

VII. Randall's Claim of Unjust Enrichment Is Precluded by the Valid Redemption Agreement (Seventh Claim for Relief). ................................................58

VIII. Randall Has Failed to Create a Triable Claim for Civil Theft (Eighth Claim for Relief). ......................................................................60

IX. Randall Cannot Bring a Claim Under Wisconsin Statute § 180.1430(2)(b) (Ninth Claim for Relief). ....................................................................61

X. Randall Has Failed to Show Entitlement to Damages for Civil Conspiracy to Commit Fraud (Tenth Claim for Relief). ..............................................62

XI. Randall's Declaratory Relief Remedies Cannot be Granted ........................................63

 A. No Fraud Can Justify Voiding the Redemption Documents and Avoiding the Release. ........................................................................64

 B. Neither Procedural nor Substantive Unconscionability Exist to Justify Voiding the Redemption Documents. ............................................64

 C. Duress Was Absent and Thus Cannot Justify Voiding the Redemption Documents. ....................................................................67

 D. The Redemption Documents Are Not Violative of Wisconsin Public Policy. .........68

XII. Randall's Veil Piercing Remedy Is Improper and Should be Dismissed (Count XV) ...........................................................................69

XIII. Randall's Request for Rescission Remains Improper. .................................................69

CONCLUSION................................................................................................................................70

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Agostino v. Hicks*,
    845 A.2d 1110 (Del. Ch. 2004) ................................................................... 36

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................... 20

*Antelis v. Freeman*,
    799 F. Supp. 2d 854 (N.D. Ill. 2011) ...................................................... 37, 38

*Appleton Papers Inc. v. Mason & Dixon Lines, Inc.*,
    No. 03-C-415, 2005 WL 8162776 (E.D. Wis. Mar. 15, 2005) ................................. 53

*Arber v. Essex Wire Corp.*,
    490 F.2d 414 (6th Cir. 1974) ...................................................................... 23

*Arneson v. Arneson*,
    120 Wis. 2d 236, 355 N.W.2d 16 (Ct. App. 1984) ................................................ 48

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................... 23

*Brame v. Gen. Motors LLC*,
    535 F. Supp. 3d 832 (E.D. Wis. 2021) ........................................................ 60

*Caisse Nationale de Credit Agricole v. CBI Indus.*,
    90 F.3d 1264 (7th Cir. 1996) ...................................................................... 21

*Carlson v. Pepin County*,
    167 Wis. 2d 345, 481 N.W.2d 498 (Ct. App. 1992) ......................................... 56, 57

*Carney–Rutter Agency, Inc. v. Cent. Off. Bldgs., Inc.*,
    263 Wis. 244, 57 N.W.2d 348 (1953) ............................................................ 52

*Chambers Dev. Co. v. Passaic Cnty. Utilities Auth.*,
    62 F.3d 582 (3d Cir. 1995) ......................................................................... 32

*Cont'l Cas. Co. v. Wis. Patients Comp. Fund*,
    164 Wis. 2d 110, 473 N.W.2d 584 (Ct. App. 1991) ............................................. 60

*Cousins Submarines, Inc. v. Fed. Ins. Co.*,
    No. 12-CV-387, 2013 WL 494163 (E.D. Wis. Feb. 8, 2013) .................................. 61

*Dakin v. Marciniak*,
  2005 WI App 67, 280 Wis. 2d 491, 695 N.W.2d 867 ............................................57

*Danis v. USN Commc'ns., Inc.*,
  121 F. Supp. 2d 1183 (N.D. Ill. 2000) ..................................................................33

*Deminsky v. Arlington Plastics Mach.*,
  2003 WI 15, 259 Wis. 2d 587, 657 N.W.2d 411 ....................................................65

*Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Co.*
  117 Wis. 2d 587, 602, 345 N.W.2d 417, 425 (1984)..............................................65

*Donohoe v. Consol. Operating & Prod. Corp.*,
  30 F.3d 907 (7th Cir. 1994) ...................................................................................40

*Donovan v. ABC-NACO Inc.*,
  No. 02 C 1951, 2002 WL 1553259 (N.D. Ill. July 15, 2002) ...................................40

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................................23

*In re Est. of Katze-Miller*,
  158 Wis. 2d 559, 463 N.W.2d 853 (Ct. App. 1990) ...............................................67

*Finch v. Southside Lincoln-Mercury, Inc.*,
  2004 WI App 110, 274 Wis. 2d 719, 685 N.W.2d 154 ...........................................68

*Fujisawa Pharm. Co. v. Kapoor*,
  115 F.3d 1332 (7th Cir. 1997) ...............................................................................38

*Gandhi v. Sitara Mgmt., LLC*,
  721 F.3d 865 (7th Cir. 2013) .................................................................................24

*Goodman v. Epstein*,
  582 F.2d 388 (7th Cir. 1978) .................................................................................21

*Goodman v. Nat'l Sec. Agency, Inc.*,
  621 F.3d 651 (7th Cir. 2010) .................................................................................21

*Thomas ex rel. Gramling v. Mallett*,
  2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523  .................................................63

*Hale v. Chu*,
  614 F.3d 741 (7th Cir. 2010) .................................................................................36

*Hammack v. DeLonghi*,
  S.p.A., 914 F. Supp. 303 (E.D. Wis. 1996)............................................................56

*Haney v. Bridge to Life, Ltd.*,
  No. 18 CV 5417, 2019 WL 1098921 (N.D. Ill. Mar. 8, 2019) ...............................................41

*Hankee v. Menard, Inc.*,
  No. 01-C-661-C, 2002 WL 23257167 (W.D. Wis. Apr. 15, 2002) ........................................67

*Hansen v. A.H. Robins, Inc.*,
  113 Wis. 2d 550, 335 N.W.2d 578 (1983)..............................................................................56

*Hennig v. Ahearn*,
  230 Wis.2d 149, 601 N.W.2d 14 (Ct. App. 1999) ..................................................................51

*Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*,
  356 F.3d 731 (7th Cir. 2004) ..................................................................................................70

*Israeli v. Dott. Gallina S.R.L.*,
  632 F. Supp. 2d 866 (W.D. Wis. 2009) ..................................................................................51

*John Doe 1 v. Archdiocese of Milwaukee*,
  2007 WI 95, 303 Wis. 2d 34, 734 N.W.2d 827 .....................................................................57

*Kaloti Enterprises, Inc. v. Kellogg Sales Co.*,
  2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205 ................................................42, 46, 47, 49

*Koehler v. Haechler*,
  27 Wis. 2d 275, 133 N.W.2d 730 (1965).........................................................................56, 57

*Korhumel Steel Corp. v. Wandler*,
  229 Wis. 2d 395, 600 N.W.2d 592 (Ct. App. 1999) ..............................................................42

*Krier v. Vilione*,
  2009 WI 45, 317 Wis. 288, 766 N.W.2d 517 ...................................................................36, 55

*Kruse v. Horlamus Indus., Inc.*,
  130 Wis. 2d 357, 387 N.W.2d 64 (1986)...............................................................................42

*Lanza v. Drexel & Co.*,
  479 F.2d 1277 (2d Cir. 1973)..................................................................................................32

*Lewis v. Anderson*,
  477 A.2d 1040 (Del. 1984) .....................................................................................................37

*Lewis v. Paul Revere Life Insurance Co.*,
  80 F. Supp. 2d 978 (E.D. Wis. 2000)......................................................................................56

*Link v. Link*,
  2020 WI App 1, 389 Wis. 2d 624, 937 N.W.2d 296 (unpublished) ...................................36, 55

*Love v. Med. Coll. of Wis.*,
   371 F. Supp. 3d 489 (E.D. Wis. 2016) ..................................................................69

*Mann v. Hanil Bank*,
   920 F. Supp. 944 (E.D. Wis. 1996) ......................................................................42

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ..............................................................................................23

*Moseman v. Van Leer*
   263 F.3d 129, 133–34 (4th Cir. 2001) .............................................................21, 22

*N. Air Servs., Inc. v. Link*,
   2011 WI 75, 336 Wis. 2d 1, 804 N.W.2d 458 .................................................61, 62

*N. Crossarm Co. v. Chem. Specialties, Inc.*,
   318 F. Supp. 2d 752 (W.D. Wis. 2004) ...............................................................60

*Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   509 F. Supp. 2d 752 (W.D. Wis. 2007) ...............................................................65

*Notz v. Everett Smith Grp., Ltd.*,
   2009 WI 30, 316 Wis. 2d 640, 764 N.W.2d 904 .......................................36, 37, 55

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) .........................................................................................26, 37

*Palucki v. Sears, Roebuck & Co.*,
   879 F.2d 1568 (7th Cir. 1989) .............................................................................20

*Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*,
   972 F.2d 753 (7th Cir. 1992) ...........................................................................51, 52

*Parsons v. Associated Banc-Corp*,
   2017 WI 37, 374 Wis. 2d 513, 893 N.W.2d 212 ..................................................69

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009) ..................................................................40

*Pope v. Ziegler*,
   127 Wis. 2d 56, 377 N.W.2d 201 (Ct. App. 1985) ................................................68

*Portnoy v. Kawecki Berylco Indus., Inc.*,
   607 F.2d 765 (7th Cir. 1979) ...............................................................................36

*Pritzlaff v. Archdiocese of Milwaukee*,
   194 Wis. 2d 302, 533 N.W.2d 780 (1995) ............................................................56

*Raasch v. City of Milwaukee*,
  2008 WI App 54, 310 Wis. 2d 230, 750 N.W.2d 492 ............................................51

*Reget v. Paige*,
  2001 WI App 73, 242 Wis. 2d 278, 626 N.W.2d 302 .................................36, 50, 55

*S.E.C. v. Familiant*,
  910 F. Supp. 2d 83 (D.D.C. 2012) ......................................................................24

*S.E.C. v. ITT Educ. Servs., Inc.*,
  303 F. Supp. 3d 746 (S.D. Ind. 2018) .................................................................24

*S.E.C. v. Rio Tinto plc*,
   41 F.4th 47, 53 (2d Cir. 2022). ..........................................................................24

*S.E.C. v. Ustain*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) .............................................................24, 38

*S.E.C. v. Winemaster*,
  529 F. Supp. 3d 880 (N.D. Ill. 2021) ..................................................................24

*Sands v. Menard*,
  2016 WI App 76, 372 Wis. 2d 126, 887 N.W.2d 94 ............................................57

*Scarabello v. Reichle*,
  856 F. Supp. 404 (N.D. Ill. 1994) ......................................................................28

*Schanke v. Manawa Cmty. Nursing Ctr., Inc.*,
  150 Wis. 2d 317. 442 N.W.2d 605, 1989 WL 65303 (Ct. App. 1989)...................48

*Schflike v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) .........................................................................33, 35

*Schneider v. Schneider*,
  Case No. 19-cv-980-jdp, 2021 WL 1574709 (W.D. Wis. Apr. 22, 2021)...............53

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) ..............................................................................33

*SEC v. Tex. Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968).................................................................................25

*Selmer Co. v. Blakeslee-Midwest Co.*,
  704 F.2d 924 (7th Cir. 1983) ..............................................................................68

*Siegfried v. Torgerson*,
  2022 WI App 42, 978 N.W.2d 397, 2022 WL 2046261 (unpublished) ...................42

*Smith v. RecordQuest, LLC*,
  989 F.3d 513 (7th Cir. 2014) ................................................................60

*Sonday v. Dave Kohel Agency, Inc.*,
  2006 WI 92, 293 Wis. 2d 458, 718 N.W.2d 631 ....................................69

*Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................40

*Spitler v. Dean*,
  148 Wis. 2d 630, 436 N.W.2d 308 (1989).........................................56, 57

*Starsurgical Inc. v. Aperta, LLC*,
  40 F. Supp. 3d 1069 (E.D. Wis. 2014)...................................................63

*Stevens v. Equidyne Extractive Indus. 1980, Petro/Coal Program 1*,
  694 F. Supp. 1057 (S.D.N.Y. 1988).......................................................35

*Stillwell v. Linda*,
  110 Wis. 2d 388, 329 N.W.2d 257 (Ct. App. 1984) ..............................68

*Takata v. Riot Blockchain, Inc.*,
  No. 18-02293, 2020 WL 2079375 (D.N.J. Apr. 30, 2020)....................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................32

*Watts v. Watts*,
  137 Wis. 2d 506, 405 N.W.2d 303 (1987)............................................59

*Welch v. St. Helens Petroleum Co.*,
  78 F.2d 631 (9th Cir. 1935) ..................................................................54

*Wis. Auto Title Loans, Inc. v. Jones*,
  2006 WI 53, 290 Wis. 2d 514, 714 N.W.2d 155 ..................................65

*Wurtz v. Fleischman*,
  97 Wis. 2d 100, 293 N.W.2d 155 (1980)..............................................67

*Zastrow v. J. Commc'ns., Inc.*,
  2006 WI 72, 291 Wis. 2d 426, 718 N.W.2d 51 ....................................56

## Statutes

15 U.S.C. § 78j...........................................................................................22

15 U.S.C. § 78t...........................................................................................40

28 U.S.C. § 1658(b) ....................................................................................37

Securities Exchange Act § 10(b)...................................................................................22, 23

Wis. Stat. § 180.1430(2)(b).......................................................................................61, 62

Wis. Stat. § 551.501(2) ...................................................................................................41

Wis. Stat. § 893.57.........................................................................................................56

Wis. Stat. § 895.446.......................................................................................................61

Wis. Stat. § 943.20.........................................................................................................61

**Other Authorities**

17 C.F.R. § 240.10b-5 ............................................................................... *passim*

Fed. R. Civ. P. 9(b) ........................................................................................................41

Fed. R. Civ. P. 56(a) ......................................................................................................20

Restatement (Second) of Contracts § 175(1) ................................................................68

S.B. 483, 98th Reg. Sess. (Wis. Apr. 9, 2008) .............................................................41

Plaintiff Stacy Randall was a shareholder of Windy Waters, Inc. until May 13, 2020, when she sold all of her remaining shares back to the company pursuant to a seven-year payout stream (the "Redemption"). The company agreed to buy back her shares using the exact price calculation formula that was used each time the corporation sold or purchased its shares dating back to 2004, when the formula was put into effect. This stock value formula was used each and every time (1) that Randall sold shares back to the company (five times previously and six in all) (2) that Randall purchased shares from the company, (3) that her brothers sold shares back to the company, and (4) that the trust established for the benefit of defendant Reed Widen's children sold its shares back to the company. The purchase price paid to Randall was the highest per-share price ever paid by the company in a redemption. Following the May 13, 2020 redemption, Randall received and accepted 40 monthly payments for her shares, the most recent one on September 11, 2023, pursuant to the redemption agreement she now claims is invalid.

In September 2021, taking advantage of an unexpected boom in the market for mergers and acquisitions, Windy Waters sold its operating subsidiary, Widen Enterprises. Had Randall remained a shareholder of Windy Waters, rather than selling her shares sixteen months earlier, she would have shared in the sale proceeds. No doubt-in hindsight-she regrets her choice to sell her shares. Randall took that seller's remorse to the next level by engaging counsel and filing this lawsuit alleging fraud, breach of fiduciary duty, and various other claims in an effort to rescind the sale of her stock or obtain damages.

With the principal fact discovery now at an end, including depositions of Randall and the Defendants, the baseless nature of Randall's claims has been confirmed. As argued herein, Randall has failed to show a disputed issue of material fact as to any of her claims for relief. Nor can Randall support her request for declaratory relief that would find the Redemption documents (the

"Redemption Documents") unenforceable. This Court should grant Defendants' motion for summary judgment in its entirety, and rule for Defendants as a matter of law.

<u>SUMMARY OF FACTS</u>

*Roles and History of the Parties*

Windy Waters, Inc. is a holding company that previously owned Widen Enterprises, LLC.[1] Defendants' Proposed Findings of Fact (PFOF), filed herewith, ¶¶ 1, 11, 14. Widen Enterprises was founded and run by members of the Widen family. PFOF ¶¶ 2, 6. It was originally in the printing industry, but as that market shrank over time, Widen Enterprises developed and grew a software division. PFOF ¶¶ 7, 9-10.

Plaintiff Stacy Randall, Defendant Reed Widen,[2] and their three brothers were the grandchildren of the founders of Widen Enterprises and were all given shares in Widen Enterprises, which were later exchanged for shares of Windy Waters when it was established as a holding company. PFOF ¶¶ 6, 8, 11-12. The owners of Windy Waters have always consisted solely of members of the Widen family or long-term employees of Widen Enterprises. PFOF ¶ 13.

Reed worked at Widen Enterprises for nearly his entire working career. PFOF ¶¶ 16-21. He worked in every department so that he could learn all aspects of the business. PFOF ¶ 17. Despite having only a high school education, Reed worked his way up to a sales role and then into management. PFOF ¶¶ 18-20. After his father died, Reed took over as the president and CEO of Widen Enterprises and oversaw the company's operations until it was sold in late 2021. PFOF ¶¶

---

[1] Widen Enterprises, LLC, was originally called Widen Engraving, and later Widen Colourgraphics, Ltd. and Widen Enterprises, Inc. This entity will be referred to as Widen Enterprises throughout for consistency, even if referring to a time the company had a different name.

[2] Because several relevant individuals have the last name Widen, Reed Widen is referred to by his first name in this brief.

15, 21. Reed was the majority shareholder of Windy Waters, but was not a director or officer of that company between 2005 and May 13, 2020. PFOF ¶¶ 3, 39.

Another important executive at Widen Enterprises is Matthew Gonnering, who was promoted to CEO in 2009 to run the day-to-day operations of the company and allow Reed to focus on higher-level matters. PFOF ¶¶ 22-23. Reed and Gonnering were frequently in consultation and made all important decisions about Widen Enterprises. PFOF ¶ 30. Reed worked around the clock to help the company thrive, explaining, "I lived and breathed this company 24/7." PFOF ¶ 24. Reed's role as president included making strategic planning and tactical decisions, overseeing and coaching Gonnering, and developing and maintaining key relationships with bankers, tax advisors, and customers. PFOF ¶ 23. Reed was irreplaceable. PFOF ¶¶ 16-21, 23-25, 81. As Gonnering explained, "you couldn't replace Reed," and it would have taken a "team of advisors" to fill his role if he had left the company. PFOF ¶ 81.

Randall had two bouts of employment with Widen Enterprises. PFOF ¶¶ 32-37. Between 1977 and approximately 1990 or 1991, Randall worked in the darkroom for Widen Enterprises working on the prepress process and was eventually terminated by her father while he still ran the company. PFOF ¶¶ 33-34. The second time she was employed by Widen Enterprises, roughly in 2000 and 2001, Randall worked as a receptionist. PFOF ¶ 35. She was terminated from this position, too, because she was not adequately performing her job duties—not showing up on time, not answering calls, taking long lunches, and returning from lunch smelling of alcohol. PFOF ¶ 36. Randall was also a director of Windy Waters from 1998 until May 13, 2020, and was the President of Windy Waters from approximately 2007 until May 13, 2020. PFOF ¶¶ 39-42. Randall was a minority shareholder in Windy Waters, but was a passive shareholder and president who was not actively engaged with the company. PFOF ¶¶ 4, 46.

3

Michael Kiesler served as the Chief Financial Officer of Widen Enterprises from approximately 2000 until approximately November 2021. PFOF ¶ 27.

***Stock transaction history***

Between 2004 and 2020, several shareholders sold their shares back to Windy Waters. PFOF ¶ 82. On other occasions, shareholders purchased shares from Windy Waters. PFOF ¶ 83. Randall did both: She sold some shares in 2005, 2007, 2011, 2017, and 2019, purchased shares in 2012, and sold all of her remaining shares in May 2020. PFOF ¶¶ 82, 111-113, 192, 366. A chart showing each stock transaction for Windy Waters from 2004 to 2020 is below:

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Gary Norris | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Terry Vial | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Thomas Schmidt | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Michael Kiesler | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Stacy Randall | 06/30/2005 | Redemption | 611.88 | $326.86 |
| Stewart Widen | 01/01/2007 | Redemption | 232.75      (Class A) 5063.903 (Class B) | $294.70 (Class A) $280.66 (Class B) |
| Gary Norris | 01/01/2007 | Subscription | 712.606 | $280.66 |
| Michael Kiesler | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Terry Vial | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Stacy Randall | 06/30/2007 | Redemption | 801.05 | $312.09 |
| Reed Widen | 01/01/2008 | Subscription | 594.16 | $336.61 |
| Thomas Schmidt | 12/31/2009 | Redemption | 285.68 | $155.34 |
| Matthew Gonnering | 01/01/2011 | Subscription | 592.77 | $168.70 |
| Stacy Randall | 01/18/2011 | Redemption | 1185.5364 | $168.70 |
| Terry Vial | 02/07/2011 | Redemption | 264.7308 | $168.70 |
| Brian Becker | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Gary Norris | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Matthew Gonnering | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Michael Kiesler | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Reed Widen | 12/31/2012 | Subscription | 446.7078 | 223.86 |
| Stacy Randall | 12/31/2012 | Subscription | 44.6708 | 223.86 |
| Price Widen | 06/01/2015 | Redemption | 232.75      (Class A) 5063.9025 (Class B) | $178.44 (Class A) $169.94 (Class B) |
| Brian Becker | 04/30/2016 | Redemption | 104.4923 | $334.14 |

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Terry Vial | 04/30/2016 | Redemption | 377.2522 | $334.14 |
| Stacy Randall | 08/01/2017 | Redemption | 275.5210 | $283.10 |
| Stacy Randall | 01/01/2019 | Redemption | 281.8291 | $425.79 |
| Reed C. Widen Children's Trust | 12/24/2019 | Redemption | 861 | $512.54 |
| Stacy Randall | 05/13/2020 | Redemption | 232.75    (Class A) 1952.7568 (Class B) | $646.19 (Class A) $615.42 (Class B) |

PFOF ¶ 82.

For each of these transactions, Windy Waters used the same methodology to determine the price per share that would be used. PFOF ¶ 84. Kiesler, the treasurer for Windy Waters, made these calculations using a formula (the "Stock Price Formula") that resulted in a per-share price. PFOF ¶¶ 84, 108-109. This formula was created based on a 2004 report from Bruce Hutler, an advisor at the accounting firm used by Windy Waters at the time—then called Virchow Krause, which later became part of Baker Tilly. PFOF ¶¶ 88-103. This report was provided for "management planning and a possible transaction of the Company's shares of stock" and offered an estimated value of the stock of Windy Waters. PFOF ¶¶ 92-93. Using generally accepted valuation methods, Hutler calculated that a 100% interest in Windy Waters Inc. as of April 30, 2004, was worth $7,441,000. PFOF ¶¶ 89-90, 93.

In his report, Hutler explained that the value of any shares that were less than a majority interest would need to be discounted by 25% because those shares have no control of the company, but would instead have to "collaborate with other minority shareholders to be more than 50% to exercise prerogatives of ownership." PFOF ¶ 94. Hutler further explained that the shares would need to be further discounted by 35% because the company is a closely held corporation and the shares are therefore not marketable on the open market. PFOF ¶ 95. For a company like Windy Waters, there is virtually no market for its shares because very few persons are willing to purchase a minority block of shares in a family-run, privately owned company and, if they are willing to do

so, they expect a large discount from the pro rata value. PFOF ¶ 96. Unless the company agrees to buy the shares back or other shareholders agree to purchase the shares, or the company is obligated to do so based on an existing agreement, a minority shareholder often has no way to sell their shares and exit from ownership. PFOF ¶ 97.

The Stock Price Formula adopted the valuation from the Hutler report and turned it into a formula using an implied multiple of EBITDA to arrive at an estimated value of all shares of Windy Waters, and then divided that dollar amount by the amount of shares to arrive at a price per share. PFOF ¶ 100. Just like the Hutler report, the Stock Price Formula also includes a 5% adjustment for the difference between the price for class A voting shares and class B non-voting shares. PFOF ¶ 101. Unlike the Hutler 2004 report, the formula in the Second Amendment to Shareholder Agreement does not include any discount for lack of control or minority status or any discount for lack of marketability. PFOF ¶ 102. This Stock Price Formula was agreed to by the voting shareholders as the best way to calculate a price for Windy Waters shares—shares that have virtually no value on the open market, especially those that are minority shares. PFOF ¶¶ 96-97, 103. To address the concerns of minority shareholders from the lack of an ability to exit from ownership, it is common for corporations and their shareholders to agree on the use of a formula by which shares will be redeemed if the shareholder is interested in severing their relationship with the company. PFOF ¶ 98. Usually, such a formula does not reflect fair market value. PFOF ¶ 99. Instead, it is simply a formula agreed upon by the shareholders by which their stock will be redeemed if they wish to do so. PFOF ¶ 99. This is done as a courtesy to the shareholder, who would otherwise not have a market to provide liquidity for their shares. PFOF ¶ 99.

The use of the Stock Price Formula was memorialized in the Second Amendment to Shareholder Agreement of Windy Waters in 2007. PFOF ¶¶ 85-86. The Second Amendment states,

"The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions." PFOF ¶ 86. This Amendment was signed by Stacy Randall not only as a shareholder, but also as then-President of Windy Waters. PFOF ¶ 87. There was only one exception to the use of the per-share price calculated using the Stock Price Formula: On occasions where Kiesler compared the formula per-share price to a per-share price using the company's assets minus liabilities—that is, the net assets, referred to as the stockholder's equity amount in Windy Waters' financial statements—if he found the price calculated from net assets was higher than the result using the Stock Price Formula (and therefore more favorable to the shareholder), the price based on net assets was used. PFOF ¶ 104. Hutler, the author of the report that the Stock Price Formula was based on, advised Kiesler that this would be appropriate to do. PFOF ¶¶ 88, 105. Randall was aware this methodology using the Stock Price Formula was used to determine the price of shares. PFOF ¶ 110. It was the same price methodology used when Randall exercised her preemptive rights to purchase shares from Windy Waters in 2013. PFOF ¶¶ 191-194. In other words, Randall both sold and purchased shares using that formula, so if the formula resulted in a low price per share, she benefitted when she purchased shares and if the formula resulted in a high price per share, she benefitted when she sold shares. A calculation using the Stock Price Formula is the process the shareholders of Windy Waters always used. PFOF ¶¶ 108, 194. Kiesler did it this way every time because he "was always told to be consistent." PFOF ¶ 109.

A chart showing each of Randall's stock redemptions is below:

| Effective Date | # of Shares: | Price Per Share: | Total Price: |
|---|---|---|---|
| 06/30/2005 | 611.88 | $326.86 | 200,000.00 |
| 06/30/2007 | 801.05 | $312.09 | $250,000.00 |
| 01/18/2011 | 1185.5364 | $168.70 | $200,000.00 |
| 08/01/2017 | 275.5210 | $283.10 | $78,000.00 |
| 01/01/2019 | 281.8291 | $425.79 | $120,000.00 |
| 05/13/2020 | 232.75 (Class A)<br>1952.7568 (Class B) | $646.19 (Class A)<br>$615.42 (Class B) | $1,352,166.31 |

PFOF ¶ 113. Each of these transactions was willing and voluntary on both sides. PFOF ¶ 114. Both Randall and Windy Waters had the right to say no. PFOF ¶ 114. The shareholder agreement did not contain any provisions obligating the company to buy back shares at any price, or at all, nor did it give Randall the right to sell her shares back. PFOF ¶ 115.

Each time Randall sold shares back to the company, it was because she asked to do so. PFOF ¶¶ 117-118, 124-125, 131-132, 138-139, 146-147. Each time, she approached Reed asking for money in exchange for shares, and each time, Reed willingly helped her out and asked Kiesler to handle the stock transaction. PFOF ¶¶ 117-118, 124-125, 131-132, 138-139, 146-147. Each time, the amount paid was based on the same process involving a calculation of the Stock Price Formula. PFOF ¶¶ 119, 126, 133, 140, 150. Each time, the price calculated from the Stock Price Formula was more favorable than the price would have been if calculated from net assets, and she was paid the Stock Price Formula price for her shares. PFOF ¶ 116. Each time, Randall neither asked for nor received any financial information about Windy Waters. PFOF ¶¶ 122, 129, 136, 143, 153, 155-156. Each time, she signed a stock redemption agreement with similar terms, but now says she does not believe she reviewed any of the agreements before signing. PFOF ¶¶ 120, 127, 134, 141, 144, 151. Randall asserts she never thought about the number of shares she was selling or the value of her shares. PFOF ¶¶ 157-158.

This exact routine was followed in 2005, when Randall requested and received $200,000; in 2007, when Randall requested and received $250,000; in 2011, when Randall requested and received $200,000; in 2017, when Randall requested and received $78,000; in 2019, when Randall requested and received $100,000 plus an additional $20,000 to repay money she borrowed from Widen Enterprises; and in 2020 when Randall requested money again. PFOF ¶¶ 117-154. The process for Randall's final stock redemption in May 2020 was different only in that Windy Waters offered to repurchase Randall's shares only if she sold all of her shares, and only if the company could pay the purchase price over seven years rather than all at once like prior transactions. PFOF ¶¶ 252, 256, 436. The reasons for telling Randall that Windy Waters was only willing to purchase all of her shares, instead of some of them, were that (1) Windy Waters was no longer willing to be Randall's bank; (2) each time Randall sold shares it cost Windy Waters attorneys' fees and required time by Kiesler to calculate the formula and confer with counsel; and (3) Windy Waters preferred active, as opposed to passive, shareholders going forward. PFOF ¶ 241.

Randall's final stock redemption in 2020 was not only handled like all her prior transactions, but it was also handled nearly identically to the final redemption of all shares by her brother, Price Widen, in 2015. PFOF ¶¶ 173-174, 318, 320-325. In fact, counsel for Windy Waters used Price's stock redemption documents as a template when creating the stock redemption agreement and promissory note Randall signed to sell all of her shares. PFOF ¶¶ 320-325. The only material difference between Randall's transaction and Price's transaction is that the Stock Price Formula calculation resulted in a price below the price calculated from net assets in 2015, so Windy Waters paid the price calculated from net assets to Price instead. PFOF ¶¶ 173-174. Price was represented by counsel for purposes of his transaction, and accepted the price offered. PFOF ¶ 176.

9

The price per share that Randall received in 2020 was the highest share price anyone had paid or received for Windy Waters stock in the history of the company. PFOF ¶ 370. Randall received more per share than (1) her brother Price when he sold all of his shares in 2015, (2) her brother Stewart when he sold all of his shares in 2007, (3) the Reed C. Widen Children's Trust of 2007, established by Reed for the benefit of his children, when selling all of its shares in 2019, and (4) all the other shareholders who had sold shares in the history of the company. PFOF ¶¶ 369-370.

### Status of Windy Waters in Spring 2020

In May 2020, Widen Enterprises and Windy Waters (like most businesses) were grappling with the uncertainty and economic risk associated with the COVID-19 pandemic. PFOF ¶¶ 199, 224, 226. As the Court will surely recall, the public health emergency related to the COVID-19 pandemic resulted in widespread fear, uncertainty, and business challenges in 2020. PFOF ¶¶ 196-198. Widen Enterprises formed a COVID-19 Response Team on March 3, 2020, adopting an early cautionary approach to the evolving situation. PFOF ¶¶ 200-201. The team created a plan to reduce expenses by up to approximately $6 million "to offset potential revenue declines" and included reductions to employee development, merit-based wage increases, new hires, promotional spending, and executive wage reductions, and the company even considered layoffs. PFOF ¶ 201. Gonnering promptly took a 10% pay cut. PFOF ¶ 202. Expenses were ultimately reduced by $3 million. PFOF ¶ 203. Modeling and forecasts done by Widen Enterprises predicted no new customers in April or May 2020 and only half the usual number of new customers for the rest of 2020. PFOF ¶ 206. In addition, Widen Enterprises was concerned its existing customers, looking for cost-cutting or struggling financially themselves, would fail to renew or cancel their contracts. PFOF ¶¶ 228-233. This was especially concerning to Widen Enterprises because its standard

contracts allowed customers to terminate on 30 days' notice and obtain a refund pro rata for the portion of unused time left on the contract. PFOF ¶¶ 229-230. As a result, a large portion of the money Widen Enterprises had been paid had not been earned and the company could be required to repay customers out of its own cash reserves. PFOF ¶ 231.

One of the critical components of Widen Enterprises' reaction to the pandemic was to retain strong cash reserves to protect against the many risks to the company. PFOF ¶¶ 207-210. As explained by Gonnering in an operational update to Reed in April 2020:

> While cash is good at the moment, this is critical to our operational success. As you'll read in the scenarios below, maintaining a strong cash position will help us weather the storm. Given the persistent market uncertainty, an even stronger cash position is desired.

PFOF ¶ 207. The cash reserves held by Widen Enterprises in May 2020 were equal to only about three months of expenses. PFOF ¶ 208.

In early April 2020, Widen Enterprises also applied for a government-funded Paycheck Protection Program ("PPP") loan in excess of $2.6 million to ensure payroll for 149 employees could be consistently maintained despite the economic uncertainty. PFOF ¶ 211. As explained in a memorandum from Gonnering to Reed dated May 1, 2020, Widen Enterprises determined it needed the PPP loan because:

> There is massive uncertainty and our business is subject to that uncertainty in the form of less revenue from existing customers as a result of bankruptcies, cutbacks, and reduced upselling opportunities. There is also uncertainty in our new customer volume as buying behavior for our services has slowed significantly. We built an organization around this expected growth and that growth is in jeopardy. Our spending levels, including labor spending, is structured based on revenue projections that are no longer accurate. We are funded by our own working capital and our ability to sustain operations continues to be threatened by economic uncertainty.

PFOF ¶ 226.

A company could face potential criminal sanctions if it took a PPP loan without sufficient showing of need or made false certifications. PFOF ¶¶ 217-220. During a safe harbor period, any company could return PPP funds without any penalty. PFOF ¶ 219. Widen Enterprises analyzed the certifications required for the PPP loan and in early May 2020, was contemplating whether it needed to return the PPP funds. PFOF ¶ 218. The deadline to return the PPP funds to take advantage of the safe harbor was May 7, 2020, but was eventually pushed back to May 14, 2020. PFOF ¶ 219. Widen Enterprises originally planned to return the PPP funds if it purchased Randall's shares to avoid even the risk of criminal sanctions and the appearance of impropriety of accepting government funding and at the same time redeeming shareholders. PFOF ¶ 220. However, on May 13, 2020, the day Randall sold her shares, the government announced criminal penalties would not be suffered by companies who took PPP funds even if the government later concluded the companies should not have qualified for the program. PFOF ¶ 221. As a result, Widen Enterprises kept the PPP funds. PFOF ¶ 222.

Gonnering summed up the Widen Enterprises focus in May 2020 as follows:

> [A]ll we were thinking about was how are we navigating this particular uncertainty, which was remote employees, which was uncertainty from what we have as the objective, which is growth, and what happens to the organization given the risk that we had at that time, which was significant based on the customer agreements that we had. So, like, I'm I'm trying to put myself back in May of 2020. The furthest thing from our mind was valuation, because I was worried about survival.

PFOF ¶ 390.

### Randall's Request for Money Preceding the May 13, 2020 Redemption

On May 5, 2020, just as she had done five times before, Randall contacted Reed and told him she needed money. PFOF ¶¶ 111, 117, 124, 131, 138, 146, 236-237. Reed responded, explaining COVID was a concern for the companies, but was willing to help find options for her.

PFOF ¶ 238. Reed then contacted Kiesler and asked him to talk with Randall about Windy Waters purchasing her shares as a way to get her money. PFOF ¶ 239. Kiesler was concerned about the idea of paying money in light of the uncertainty with the PPP loan, but Reed wanted Kiesler to help his sister. PFOF ¶ 240. Randall had been showing no interest in the company and distracted leaders from their daily work each time she wanted to sell shares, so Reed believed it was in the company's best interest to buy her out in full, once and for all, rather than in part if it was going to do anything. PFOF ¶¶ 241-242. Reed assumed any purchase of her shares would be done consistent with the Stock Price Formula calculation that had been used with all prior stock redemptions between 2005 and 2020, consistent with past practices, and never even considered any other options (nor did Randall request any). PFOF ¶ 243.

On May 6, 2020, Kiesler called Randall, and Randall explained she needed money quickly for her divorce proceeding. PFOF ¶¶ 246-247. Kiesler explained to Randall that COVID was a concern for the company and that it was struggling with a decision about whether to keep or return PPP money. PFOF ¶ 248. Kiesler told Randall that Windy Waters was only interested in purchasing her stock if it could purchase all of it (consistent with what Reed had told him), rather than any further partial sales as had occurred previously. PFOF ¶¶ 244, 249-251. Kiesler further explained the company was not willing to pay the full redemption cost in one lump sum, but would pay the amount over a period of seven years. PFOF ¶ 252. Kiesler further explained Windy Waters was willing to buy Randall's remaining shares using the price-per-share calculation model that was used in prior stock transactions both for Randall and others, and explained that model valued Randall's remaining shares at approximately $1.1 million using financial data through November 2019. PFOF ¶¶ 253-254. Kiesler explained to Randall in that conversation that he would have to update the calculation with end-of-year numbers if she was interested in going forward. PFOF ¶

255. Randall said she thought that the price was too low because she "had a feeling that the company was worth more than" an amount that would make her shares worth $1.1 million, but did not explain a basis for that belief. PFOF ¶ 257. Whether the price was low (or high) made no difference—it was an offer the company had no obligation to make. PFOF ¶¶ 97, 106, 115. Randall did not ask for any financial information or documents about the company during her discussion with Kiesler. PFOF ¶¶ 258-259.

Kiesler told Randall that Windy Waters was not willing to leave the offer open for an extended period due to the extreme uncertainty about the PPP loan. PFOF ¶¶ 260-262. The safe harbor deadline for returning PPP funds was the next day and Widen Enterprises needed to know if it had to return the funds. PFOF ¶¶ 261-262. Kiesler asked Randall to give a response before he left for the day, assuring her she was not obligated to sell her shares. PFOF ¶¶ 263-264. Randall told Kiesler the decision was a "really big deal" and she wanted "time to talk to [her] people." PFOF ¶ 265.

After Randall and Kiesler spoke, Kiesler confirmed with Reed that Reed approved Windy Waters purchasing all of Randall's shares. PFOF ¶ 266. Randall contacted her son, Justin Randall, and told him about the offer. PFOF ¶ 304. In response, Justin Randall told Randall that she needed to get an attorney to look at the financials of Widen Enterprises before deciding what to do. PFOF ¶ 305. Randall also communicated with her financial advisor, who gave her advice about what to say when talking with Kiesler. PFOF ¶¶ 307-309.

Late in the day on May 6, around 4 pm, Randall and Kiesler spoke again. PFOF ¶ 267. Randall asked for more time so she could talk to a lawyer or financial advisor, and Kiesler told her she could have more time and should confer with them. PFOF ¶¶ 267-268. Kiesler also explained that the government safe harbor deadline for the PPP loan money had been extended another week,

14

and so he did not need Randall's answer that day and could leave the offer open longer. PFOF ¶ 269. Randall told Kiesler that she had never thought he and Reed had an interest in Randall's well-being and made it clear that she did not trust them. PFOF ¶ 271. Ultimately, Randall decided not to accept Windy Waters' offer to buy her shares at the price offered on May 6, 2020. PFOF ¶ 272

Randall did not contact any attorneys between May 6 and May 12. PFOF ¶ 306. She did not ask any questions to Kiesler or Reed about the value of Windy Waters or Widen Enterprises, or ask to see any financial statements or business records. PFOF ¶¶ 299-300. The only advice she sought in that timeframe was when she asked her financial advisor how to make the money she was offered for her stock grow. PFOF ¶¶ 307-310. She considered talking with her accountant but does not recall whether or not she did so. PFOF ¶¶ 312-313.

### Randall's Final Stock Redemption

On approximately May 12, 2020, Kisler updated the price-per-share calculation model using the December 2019 financials, as promised previously, and as a result, the redemption price Windy Waters would offer Randall for all of her shares had increased to approximately $1.3 million. PFOF ¶¶ 314-315. On May 12, 2020, Kiesler contacted Scott Seid, the lawyer for Windy Waters, for two reasons: (1) to ask if his calculation of $1.3 million for Randall's shares using the Stock Price Formula was appropriate, and Seid responded "it would be consistent to do it that way," and (2) to ask him to prepare a documentation to use for the potential transaction. PFOF ¶¶ 316-317, 319. Kiesler told Seid to treat Randall's transaction precisely the same as Windy Waters had treated her brother, Price Widen, when he had sold all of his shares in 2015. PFOF ¶ 318. Seid prepared the redemption agreement and promissory note for Randall using the documents from when Price Widen sold the remainder of his shares. PFOF ¶ 320. Kiesler called Randall on May 13 to communicate that updated offer of over $1.3 million. PFOF ¶ 326. Randall agreed with those terms on the spot, and said she would be coming in later that day to sign the documents. PFOF ¶

328. Randall emailed her divorce attorney after talking with Kiesler and asked for advice. PFOF ¶ 329. She also called Seid and left a voicemail. PFOF ¶ 331.

Randall came to see Kiesler later that afternoon at his office to review and consider the documents prepared to effectuate the redemption of her shares—a stock redemption agreement and a promissory note. PFOF ¶ 333. When she arrived, Kiesler was talking with Scott Seid about an issue related to the PPP loan. PFOF ¶ 334. Seid said he owed Randall a call and asked to speak with her. PFOF ¶ 334. Randall and Seid then spoke, and Seid told her that no one could force her to sign the documents and that she should not sign them if she was uncomfortable. PFOF ¶¶ 335-336. A few minutes after that conversation, Seid sent an email to Randall's divorce lawyer stating:

> Just talked to her. . . . She is uncomfortable about signing documents for the sale of her stock, which are consistent with the way in which everyone else has sold their stock. I told her that she absolutely had the right to seek outside counsel before signing anything and that I would be happy to give her names of attorneys to do that. She said she would let me know.

PFOF ¶ 340. After Seid and Randall hung up, Kiesler asked whether Randall wanted her son or anyone else to review the documents before she signed, and Randall declined. PFOF ¶ 342. Kiesler then read aloud both the stock redemption agreement and the promissory note word for word, while Randall followed along, stopping after each paragraph to ask if she understood and whether she had any questions. PFOF ¶ 343. Kiesler and Randall then executed the documents. PFOF ¶¶ 348-349. Randall did not disagree with anything in the documents or ask for anything to be changed. PFOF ¶ 344. Nor did Kiesler tell her she had to leave the office by a certain time. PFOF ¶ 345. Kiesler even asked Randall if she wanted to take the documents with her to review alone or with an attorney and not sign them that day. PFOF ¶¶ 346-347.

Prior to executing the May 13, 2020 Redemption Agreement, Randall did not ask Kiesler, Reed, or anyone affiliated with either company how the value of the shares redeemed under that

agreement was calculated, nor to see the calculation. PFOF ¶ 352. Randall also never asked for any financial documents related to this transaction. PFOF ¶¶ 350-351. Randall was satisfied with the documents and the dollar amount, and decided on her own free will to sign that day. PFOF ¶¶ 348-349.

Pursuant to the stock redemption agreement she signed on May 13, 2020, Randall sold all of her remaining shares in Windy Waters, consisting of 232.75 shares of Class A common stock of Windy Waters at $646.19 per share, and 1,952.7568 shares of Class B common stock of Windy Waters at $615.42 per share, for a total purchase price of $1,352,166.31. PFOF ¶¶ 365-366. Accompanying the stock redemption agreement was a promissory note by which Widen Enterprises became obligated to pay Randall for her shares on the stated terms. PFOF ¶ 367. Pursuant to the transaction documents, Randall also resigned as the sole director and president of Windy Waters. PFOF ¶ 353.

### Randall's Financial Status

The reason Randall said she needed money in May 2020 was because of her divorce proceeding. PFOF ¶¶ 236-237. On April 22, 2020, Randall's husband filed a motion in their divorce proceeding seeking maintenance. PFOF ¶ 287 The motion was set for a hearing on May 18, 2020, and Randall needed to pay her attorneys. PFOF ¶¶ 288-289. Other than asking Reed about getting money by selling her stock, Randall did nothing to explore any other way to obtain money when she needed it in May 2020, despite having numerous other options available to her. PFOF ¶¶ 290-298.

As of May 13, 2020, Randall was a 20% owner of a different family-owned company, Millmont, that owned two cottages, some land, and an office building. PFOF ¶ 273. Randall "never thought of" the possibility of selling her interest in Millmont when she needed money, including

in May 2020, and did not discuss the option with Reed. PFOF ¶¶ 274-275. As of May 2020, Randall and her husband together owned eight condominiums that they rented out. PFOF ¶¶ 276. Five of the rental properties were worth $230,000 each in November 2020; another three were worth a combined $510,000. PFOF ¶ 277. Randall did not consider selling any of the condos or refinancing any of the mortgages in May 2020. PFOF ¶¶ 278-279. Randall also did not sell her unencumbered Cadillac worth $28,000, her heirloom watch and pearls, any furniture or other jewelry, or the gold coins and gold and silver bars she owned. PFOF ¶¶ 280, 283, 284, 286, 291. Indeed, though nothing prevented her from selling her gold and silver bullion, Randall "never ever, ever thought about" selling them and did not want to. PFOF ¶¶ 284. Nor did Randall consider getting a job. PFOF ¶ 292.

Randall did not apply for any loans, take money out of any retirement accounts, or ask any other family members for money in May 2020. PFOF ¶¶ 295-298. Instead, once she was offered the ability to sell her remaining shares in Windy Waters, she pursued only that option and chose to sell her shares for a price she willingly accepted. PFOF ¶¶ 273-298.

*Unexpected Sale of Widen Enterprises*

Reed was not interested in selling Widen Enterprises at any time on or before May 13, 2020. PFOF ¶¶ 384-385. Reed and Kiesler did not know its fair market value as of May 13, 2020. PFOF ¶¶ 387-389. After Reed turned 60 in June 2020, Gonnering and Reed talked about what Reed's long-term plans were so they could begin succession planning for Widen Enterprises. PFOF ¶ 391. On July 21, 2020, July 24, 2020, and August 14, 2020, Gonnering and Reed had exploratory conversations about succession planning, focusing on the timeframe of two to five years down the road. PFOF ¶ 395. At this stage of the succession planning process, Reed started considering many possible forms of succession plans, including letting Gonnering run the

company, creating an employee stock ownership plan, or making plans to sell, all during the timeframe of two to five years. PFOF ¶ 394.

On August 25, 2020, Gonnering informed Reed that a company called Brandfolder, a comparable competitor of Widen Enterprises, just sold for $155 million. PFOF ¶ 398. Reed and Gonnering were shocked to hear this number, and Reed told Gonnering it would be foolish not to at least consider selling Widen Enterprises if it could sell for $200 million. PFOF ¶¶ 399, 402. Because of this market development, Reed told Gonnering to begin the process of exploring selling the company within two to five years. PFOF ¶¶ 403-405. In October 2020, when Seid, Windy Waters' lawyer, learned that it might sell Widen Enterprises in two to five years, it "completely took [Seid] by surprise that Reed was considering selling the company" because "Widen was such a great company and a family-owned company that [he thought] they would just continue on doing what they were doing." PFOF ¶¶ 413-414. Seid was also surprised to learn the price paid for Brandfolder, calling it "crazy money," and realized this had caused Windy Waters to consider the possibility of selling. PFOF ¶ 415. Indeed, the market for buying and selling companies in late 2020 and early 2021 was at a peak, especially for software-related companies. PFOF ¶¶ 398-402.

Windy Waters sold Widen Enterprises effective September 24, 2021, for a net sale price of $148.5 million. PFOF ¶¶ 428-430. The then-current shareholders divided a portion of the sale proceeds. PFOF ¶¶ 429-430. Reed recognized his good fortune and generously offered to give each of his three living siblings a gift of $1 million each. PFOF ¶ 431. Reed's two living brothers happily accepted the gifts. PFOF ¶ 432. When Reed called Stacy and offered her the gift of $1 million, she got angry, turned it down, and then hired an attorney, eventually filing this suit. PFOF ¶ 433.

### *Randall's Acceptance of Payments From the Stock Redemption Agreement*

When Randall sold her remaining shares to Windy Waters on May 13, 2020, she and Windy Waters agreed the purchase price of $1,352,166.31 would be payable in monthly payments of $16,430.09 over seven years, beginning on June 13, 2020 and ending on May 13, 2027. PFOF ¶ 436. Since June 16, 2020, Windy Waters has caused a total of 40 monthly payments of $16,430.09, totaling $657,203.60, to be paid to Randall under the Stock Redemption Agreement and Promissory Note. PFOF ¶ 437. Each of these payments was accepted by Randall without objection. PFOF ¶ 438.

### *Randall's Complaint*

On July 21, 2022, Randall filed this lawsuit. In her complaint, she alleges that she was not paid fair market value for her shares in May 2020 and "the defendants . . . conspired to cheat Stacy, the plaintiff, out of tens of millions of dollars' worth of stock in the family business," and Seid and his law firm, Stafford Rosenbaum, "assisted Reed and Kiesler in carrying out this scheme." Compl., ECF No. 1, ¶¶ 1, 8. Randall alleges that she was "defrauded" by "Reed, Kiesler, and Windy Waters, with the assistance of the Law Firm," in connection with the May 2020 stock redemption. *Id.* ¶ 9.

### **LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one which, under the applicable substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is genuinely disputed when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As Judge Posner has explained: "A district judge faced with such a motion must decide . . . whether the state of the evidence is such that, if the case were tried

tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir. 1989). Summary judgment is frequently referred to as the "put up or shut up" moment in a lawsuit for the non-moving party:

> We often call summary judgment, the "put up or shut up" moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely.

*Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010) (internal citations omitted). Ultimately, a non-movant is "required to wheel out all its artillery to defeat" summary judgment. *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (internal quotations omitted).

## **ARGUMENT**

### I.    **Randall Released All Possible Claims Connected to the Redemption.**

All of Randall's claims fail because she agreed to a broad, general release of all claims, including unknown claims, in connection with the Redemption Agreement ("Release"). Courts routinely enforce general releases when "dealing with a plaintiff who has affirmatively acted to release another party from any possible liability in connection with a transaction in securities." *Goodman v. Epstein*, 582 F.2d 388, 404 (7th Cir. 1978). In *Moseman v. Van Leer*, the court granted summary judgment in favor of defendants for plaintiffs' action for fraud and securities violations because the plaintiffs had released their claims. 263 F.3d 129, 133–34 (4th Cir. 2001). In support of its holding, the *Moseman* court quoted the Seventh Circuit:

> The mere fact that an individual has been asked to sign a release should be sufficient to put that individual on notice that a reasonable inquiry should be undertaken. No longer do we have the innocent investor sitting back and merely holding his security; we are not requiring an innocent investor continually to question management concerning his investment, but only to undertake a "reasonable inquiry" prior to taking the affirmative act of signing a release.

. . .

> The requirement that a person exercise reasonable inquiry to discover possible matured claims existing at the time of execution of a [release] does nothing to defeat the general policy against the *in futuro* waiver of securities claims. Quite to the contrary, it insures that the signing of a [release] is something that will not be undertaken lightly, with the expectation that the [release] will be unenforceable . . . because the party executing [it] kept his eyes closed, and therefore did not "know."

*Id.* (quoting *Goodman*, 582 F.2d at 404).

The Release includes the following easy-to-understand language:

> For and in consideration of the payments and agreements herein, Seller, for herself, her heirs and assigns, hereby releases [Windy Waters] and its subsidiary, Widen Enterprises, Inc., and all their employees and directors, from any and all claims of any kind or nature, known or unknown, she may have against them, including but not limited to any claim arising from the sale and purchase of the Shares, excluding the obligations in the Company's Promissory Note.

PFOF ¶ 366. Thus, the Release encompasses every claim that existed as of the execution of the Redemption Agreement, including every claim based on the facts leading up to the execution of the agreement—necessarily including *all claims* Randall asserts in this case. By signing, Randall was on notice that a reasonable inquiry should have been undertaken. *See id.* It is undisputed that Randall failed to conduct *any* inquiry prior to signing the Release. PFOF ¶¶ 258, 304-313, 338, 350, 352. And because Randall's claims arise from the sale and purchase of her Windy Waters shares in May 2020 or the facts leading up to it, all of Randall's claims were in existence when she signed the Redemption Agreement. Meaning, each of her claims had matured when she signed the Release. Randall released her ability to bring this lawsuit in the first instance and, thus, the Release disposes of this entire lawsuit. Summary judgment on all claims is proper on this basis alone.

## II.    Randall's Claims for Securities Fraud Under Section 10(b) of the Securities Exchange Act and Rule 10b-5 Fail as a Matter of Law (First and Second Claims for Relief).

Randall's claims for federal securities fraud fail as a matter of law. The undisputed facts show that Windy Waters simply redeemed Randall's shares the same way that it had done for

Randall and all other shareholders in the past. Thus, Randall has failed to establish the necessary evidence to support her claims for federal securities fraud.

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b). To effectuate Congress's intent, the Securities and Exchange Commission ("SEC") implemented rule 10b-5, which makes it unlawful: "(a) [t]o employ any device, scheme," "or artifice to defraud"; "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading"; or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

There are two theories of liability for securities fraud under § 10(b) and Rule 10b-5: liability for acts or omissions and liability for schemes. For the first theory, under Rule 10b-5(b), a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). "[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). More specifically, there is no affirmative duty to direct "attention to all routine data commonly found in the statements and books of the corporation, at least where that information is readily available; the outsider has knowledge

23

that is available and makes no inquiry; and the information thus available is not of an unusual or extraordinary nature." *Arber v. Essex Wire Corp.*, 490 F.2d 414, 420 (6th Cir. 1974). And "with respect to contingent or speculative information or events," materiality depends "at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (internal quotations omitted).

The second theory of liability under Rule 10b-5(a) and (c) is often called scheme liability. *S.E.C. v. Familiant*, 910 F. Supp. 2d 83, 93 (D.D.C. 2012). "The elements of a Rule 10b-5(a) and (c) claim are similar to a Rule 10b-5(b) claim." *S.E.C. v. Winemaster*, 529 F. Supp. 3d 880, 917 (N.D. Ill. 2021) (citing *S.E.C. v. Kameli*, Case No. 17 C 4686, 2020 WL 2542154, at *12 (N.D. Ill. May 19, 2020)). Instead of relying solely on a misstatement or omission, the plaintiff is required to show "deceptive conduct that is distinct from the alleged misrepresentations and omissions." *S.E.C. v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 764 (S.D. Ind. 2018); *see also S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022). "A scheme is a plan or program of something to be done; an enterprise, a project; as, a business scheme, or a crafty, unethical project. The scheme, in other words, is the plan or design, not the ultimate result." *S.E.C. v. Ustain*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) (internal quotation marks omitted). In short, liability under Rule 10b-5(a) and (c) is "premised on a course of deceptive or manipulative conduct." *Takata v. Riot Blockchain, Inc.*, No. 18-02293, 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020).

In an attempt to establish a primary claim of securities fraud, Randall points to unconnected and immaterial events to concoct an unfounded saga of multi-decade deceit. The undisputed facts, however, reveal the truth. In the midst of the unprecedented COVID-19 pandemic, Randall sought

to sell her shares rather than consider any of the other options available to her to pay for her divorce. Accordingly, this Court should grant summary judgment in favor of the Defendants.

### A. Randall Fails to Show Material Misrepresentations and Omissions.

Randall's securities claims all must fail because she has failed to show a triable issue that Defendants' representations and alleged omissions were, in fact, false. *Gandhi v. Sitara Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013) (acknowledging that securities fraud claims cannot survive summary judgment without proof that the statement was false). In determining whether a misrepresentation or omission has occurred, a court must inquire "into the meaning of the statement to the reasonable investor and its relation to the truth." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968). Ascertaining the truth of a fact is simple.

### 1. Defendants' Representations Were Truthful Statements of Fact.

As an initial point, it must be understood that Windy Waters had no legal obligation to redeem Randall's shares at any price. Nor did it have an obligation to pay her fair market value for her shares. Windy Waters has every right to offer her any amount it wants—fair or not—for her shares. Of course Randall has every right to reject Windy Waters' offer or to negotiate a different price. Ignoring the reality of the situation, Randall alleges she was somehow suckered into selling her shares, despite her failure to investigate their value, negotiate their price, or retain an attorney to counsel her through the process. The tipping point for Randall's alleged misrepresentations is Kiesler's statement on May 13, 2020, in response to her question whether the "the Companies' executives were preparing to sell Widen Enterprises," that "No, there's been no talk of that." Compl. ¶¶ 117–18. Indeed, Randall seems to allege that if she knew the executives *were* preparing to sell Widen Enterprises, she would have held onto her stock, and thus found other ways to meet her expected maintenance obligations to her husband. At the time of the Redemption, there were no plans, preparation, or discussion of sell the company. PFOF ¶¶ 355, 373, 376, 385, 387, 407-

410. Thus, Kiesler responded truthfully. The first discussion of Windy Waters selling Widen Enterprises at all was in approximately late August 2020, when he learned Reed and Gonnering were considering the possibility of selling. PFOF ¶ 403, 407, 409.  Randall has no evidence to the contrary.

Randall also wrongly claims that the "all-or-nothing" redemption offer was a misrepresentation because it was not the "only way" she could have gotten cash from the Companies. Compl. ¶¶ 74, 214. Again, Kiesler was being truthful. A redemption of all of Randall's shares was, in fact, the only basis on which Windy Waters was willing to provide cash to Plaintiff from the company. PFOF ¶ 249. If a minority shareholder of a closely-held corporation wishes to sell her shares to the company, the shareholder is reliant on the company's agreement to buy the shares back, unless the company is obligated to do so based on an existing agreement. PFOF ¶¶ 97, 106. No such obligation existed. PFOF ¶ 115. Instead, Randall was told that the only way she could obtain cash from the Companies was via a complete redemption, which was well within its rights. PFOF ¶ 264. It was her choice to accept or reject that offer, and Randall accepted.

### 2. Defendants' Representations Were Earnest Opinion.

The other statements Plaintiff characterizes as material fact are non-actionable opinion. Under the Supreme Court's holding in *Omnicare, Inc. v. Laborers District Council Construction Industries Pension Fund*, courts must apply the "reasonable investor inquiry" to determine whether an opinion statement was misleading, and therefore actionable. 575 U.S. 175, 189–92 (2015). As the Court explained, a reasonable investor considers opinion statements in context because a reasonable investor "does not expect that *every* fact known to an issuer supports its opinion statement." *Id.* at 190 (emphasis in original). Opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence

of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90. A reasonable investor would be *discerning*—attending to the specificity of the opinion, the method by which the statement is conveyed, "customs and practices of the relevant industries," the "surrounding text, including hedges, disclaimers, and apparently conflicting information," among other factors. *Id.* at 190.

Relevant here, Randall alleges that she was misled by the following statements:

- "The Companies could not financially afford to make $100,000 or ($50,000) available to Stacy other than through a complete redemption of her approximately one-fifth interest therein[.]" Compl. ¶ 214.

- "For some reason having to do with 'Covid,' Stacy needed to make her decision in three hours (then three days, then one day)[.]" *Id.*

- "Stacy would be smart to sell her shares in the Companies because Widen Enterprises [sic] to avoid the risk that the Companies failed or become insolvent." *Id.*

- "Stacy's interest in the Companies was fairly worth only $1.3 million (and, impliedly, that the Companies were fairly worth only $6.5 million)[.]" *Id.*

All of these statements are opinion because Kiesler did not believe the company had a large lump sum payment it could afford to give to Randall, especially in light of uncertainty regarding the PPP loan guidance. PFOF ¶¶ 216, 218-219, 252. That financial uncertainty from COVID generally placed the company at risk of losing its customers, including by having customers take advantage of the 30-day out on contracts. PFOF ¶¶ 196-210, 229-235. Although Kiesler did not recall using the word "smart," he did believe that Widen Enterprises was not guaranteed to be a viable company, and thus expressed to Randall that the complete redemption offer at the share price dictated by the Stock Price Formula locked Randall in at a set share price over seven years. PFOF ¶ 199, 217, 224, 252, 256, 311. Finally, Kiesler objectively believed the price dictated by the Stock Price Formula was "fair," as it was the price all redemptions (and subscriptions) had followed, including Randall previously. PFOF ¶¶ 82, 84-109, 195, 387. In fact, Kiesler would have

assumed the same formula would dictate the price of his stock had he chosen to sell it prior to acquisition of Widen Enterprises by Acquia in September 2021. PFOF ¶ 195.

Moreover, Randall's own words in a May 6 text message sent to her financial advisor, Mark Goff, evidence Randall's understanding of Kiesler's opinions:

> Thanks for helping me know what I should say. Mikes [sic] attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought that they have had an interest in my well being. He told me that the company puts all of the in coming [sic] "profit" right back into the business. So they never make any money…. He gave me the way they have evaluating shares since 1991. It has nothing to do with how good or bad the company is doing. He was trying to tell me in 7 years my stock would still be worth 1.1 mill. I don't understand how that could be. Just when I was going to call him back he was calling me, it was at 3:58. I had to chuckle thinking he was going to pressure me for a decision. What he told me was that he had just received an email saying the government has pushed back the deadline for another week so he doesn't need my answer today after all. Now I have time to talk to Scott Spangler on Monday to see what he thinks I should do. Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all. I could tell he was in disbelief and I could hear some sadness in his voice. . . .

PFOF ¶ 311.

Aware of this, Randall ascribes liability for so-called "omissions to disclose material information" across all Defendants. Randall conveniently skirts the facts that (1) it was recommended that she seek external counsel to represent her in the 2020 Redemption, (2) she habitually does not read the legal documents she signs, and (3) she does not bother to ask questions when she does not understand the contents of a document. PFOF ¶¶ 67, 144, 153, 258, 311, 338, 340, 350, 352. But the law does not allow a plaintiff to weaponize his or her own willful blindness against a defendant by claiming everything he or she did not know was an omission.

Moreover, the label "omissions" is legally and factually inaccurate. For example, Randall's claim that Defendants concealed the fair market value from Randall (omissions 4 and 5 above), presumes a legal obligation that did not exist. Defendants "do not have an affirmative duty to

determine and offer fair value when purchasing stock from minority shareholders." *See Scarabello v. Reichle*, 856 F. Supp. 404, 407 (N.D. Ill. 1994). In short, nothing of legal significance was omitted. Other alleged omissions, like "[i]t would have been possible for Millmont to partially redeem [Randall], or distribute or loan cash to [Randall], as Reed originally suggested," are equally irrelevant grousings. *Id.* at ¶ 215. It was not Defendants' obligation to remind Randall of the financial resources and options available to her. With that logic, Defendants should have reminded Randall she had gold and silver bars sitting in her safe at home, or that she should consider listing any of her eight condominiums in Cottage Grove for sale. PFOF ¶¶ 276-279, 282-286.

The table below compares Plaintiff's self-serving alleged omissions with the undisputed facts:

| Alleged Omission (Compl. ¶ 215) | Undisputed Facts |
|---|---|
| 1. As of the end of April 2020, the Companies had over $5 million in free cash either sitting in bank accounts or speculatively invested in liquid securities; | • Widen did not have "free cash" but was facing COVID, had a payroll to meet, and no obligation to be Randall's bank. PFOF ¶¶ 196-199, 211, 225. |
| 2. During 2019 the Companies had revenue of nearly $30 million and were profitable; | • 2019 revenues are irrelevant to Redemption. PFOF ¶¶ 84-88, 98-99, 103-105, 108-110, 116. |
| 3. At the time of the Redemption, the Companies were projecting annual revenue of $30 million, which represented an 11% growth in the core software-based revenue; | • 2020 projection of revenues irrelevant to Redemption, particularly in light of COVID. PFOF ¶¶ 84-88, 98-99, 103-105, 108-110, 116, 226. |
| 4. The valuation formula the Defendants were using was not based on an actual appraisal of the Companies' fair market value, was not required by any shareholder agreement, and completely ignored the actual value of Windy Waters' most valuable asset, Widen Enterprises; | • Randall had approved use of Stock Price Formula as part of Second Amendment to Shareholder Agreement, which she signed as President. PFOF ¶¶ 43, 85.<br>• On its face, the Stock Price Formula is based on weighted EBITDA and not based on actual appraisal of fair market value. PFOF ¶ 100.<br>• No obligation to pay fair market value to minority shareholder in close corporation. PFOF ¶¶ 97, 106, 115. |

| Alleged Omission (Compl. ¶ 215) | Undisputed Facts |
|---|---|
| 5. The fair market value of software companies, such as Widen Enterprises, is commonly determined by a multiple of the company's revenues, not its EBITDA; | • Market value was irrelevant to Redemption. PFOF ¶¶ 84-88, 98-99, 103-105, 108-110. |
| 6. The Defendants regularly received solicitations and offers relating to the potential purchase of the Companies | • Reed never responded to any solicitations and was not preparing to sell Widen Enterprises in any event on or before the Redemption. PFOF ¶¶ 374-377. |
| 7. The Companies had recently signed a non-disclosure agreement with an international, sell-side investment bank specializing in selling technology companies; | • The non-disclosure was related to a possible acquisition by Widen Enterprises, not a sale of Widen Enterprises. PFOF ¶¶ 380-382. |
| 8. Reed had been considering selling the Companies prior to the Redemption; | • Reed had not been considering selling prior to the Redemption. PFOF ¶¶ 355, 373, 376, 385, 387, 407-410. |
| 9. Reed knew, as recently as three months before the Redemption, that the Companies were fairly worth over $100 million; | • No valuation of Widen Enterprises had been undertaken and no one knew the fair market value. PFOF ¶ 387. |
| 10. Reed had just taken annual "compensation" of nearly $1.5 million from Widen Enterprises; | • Reed's compensation was appropriate but also irrelevant to the Redemption. PFOF ¶¶ 77-81, 84-88, 98-99, 103-105, 108-110, 116. |
| 11. Stacy was entitled to her share of the millions of dollars in profits that the Companies had been distributing to Reed as "salary," and "bonuses" (which would have negated her need for the money in the first place); | • Randall got the same dividends as other minority shareholders in Windy Waters. PFOF ¶ 73.<br>• Reed's compensation was appropriate. PFOF ¶ 77-81.<br>• Profits were reinvested in Widen Enterprises to grow the company. PFOF ¶ 26.<br>• Randall did not work. PFOF ¶ 37.<br>• Randall had other means of cash that she did not explore and spent money on real estate investments that resulted in foreclosures and short sales. PFOF ¶¶ 273-303. |
| 12. It would have been possible for Millmont to partially redeem Stacy, or distribute or loan cash to Stacy, as Reed originally suggested; and | • Randall did not explore Millmont as an option because she did not want to part with her use of the cottage, which had great sentimental value. PFOF ¶¶ 273-275, 294, 301.<br>• A loan was not explored by mutual agreement, nor did Randall indicate she was |

| Alleged Omission (Compl. ¶ 215) | Undisputed Facts |
|---|---|
| | willing to pay money back to Windy Waters. PFOF ¶¶ 295-296. |
| 13. Reed and Kiesler had been forging Stacy's signature on corporate documents using the rubber stamp, keeping Stacy uninformed about corporate actions, and purporting to waive rights on Stacy's behalf. | • No evidence exists of forging of Randall's signature. PFOF ¶¶ 51-67. |

Collectively, these undisputed facts vitiate all of Randall's claims that Defendant made material misrepresentations or omissions. At bottom, Randall's claims are premised on the position that Defendants had a duty to offer corporate documents to her absent her request; had a duty to pay her fair market value for her stock; had a duty to make sure she consulted with her attorney or advisor as to whether the price offered was a good deal for her; and had a duty to conduct a market analysis to see what was happening in the mergers and acquisitions market at the time she wanted to sell her shares. Defendants had no such duty. The evidence shows that Randall was aware of the weight of the decision she was making, sought advice from others, and in fact received advice prior to making her decision. Cutting what turned out to be a bad deal for her was within her control and power. As the old saying goes, a deal is a deal, even if it turns out to be a bad deal for some of the parties. *See Chambers Dev. Co. V. Passaic Cnty. Utilities Auth.*, 62 F.3d 582, 589 (3d Cir. 1995) ("The sanctity of a contract is a fundamental concept of our entire legal structure. Freedom of contract includes the freedom to make a bad bargain."). The fact that she chose to sell her shares, and therefore missed out on a big payday with the other shareholders when the company sold 16 months later, does not support a claim of securities fraud.

**B.       Because These Were Truthful Statements, Randall Cannot Show That Defendants Acted With the Requisite Scienter.**

Randall's federal securities claims also fail as a matter of law because Randall has failed to show that Defendants had the requisite scienter. This independent requirement of the statute dooms her claims.

The Supreme Court has defined scienter as "embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 (1976)). To survive summary judgment on the element of scienter, a plaintiff must offer evidence that shows that the challenged statement or omission was made with knowledge or with "willful, deliberate, or reckless disregard of the truth that is the equivalent of knowledge." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1305 (2d Cir. 1973). In fact, a plaintiff "must do more than show that the defendant had knowledge of the undisclosed facts." *Danis v. USN Commc'ns., Inc.*, 121 F. Supp. 2d 1183, 1193 (N.D. Ill. 2000) (citing *Schflike v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)). Instead, a plaintiff must show that the danger of misleading the plaintiff was "actually known or so obvious that any reasonable man would be legally bound as knowing." *Schflike*, 866 F.2d at 946 (citation omitted). Thus, the required level of recklessness must be so extreme that intent can be inferred. *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).

Randall *cannot* show that Defendants either knew that their statements were false or that they were acting so recklessly that intent can be imputed to Defendants. First and foremost, there can be no scienter as to a misrepresentation of Widen's fair market value. No fair market valuation had been commissioned. PFOF ¶ 387. Moreover, fair market value was not the basis for and premise behind the Stock Price Formula. PFOF ¶¶ 100-104. The contractual formula was established to provide a reasonable price for the shares, recognizing the lack of marketability of a

32

minority block of stock and the fact that absent the company's willingness to purchase the stock based upon an agreed-upon formula, the owner had no right to compel a purchase. PFOF ¶¶ 95, 102, 115.  In closely held corporations, there is no market for the company to base its valuation of a shareholder's stock and minority shares have extremely low value. PFOF ¶ 96. Fair market value has no relevance. PFOF ¶ 99-100. Thus, the contracted Stock Price Formula was a reasonable way to calculate a price and allow Randall to sell stock she otherwise could not have turned into cash. PFOF ¶¶ 100-110. Defendants properly relied on the agreed Stock Price Formula to determine a price for her shares, and Randall never objected to its use.

The absence of scienter seems even more plain considering the events in Wisconsin and around the world in the spring of 2020. Not long before Randall asked Reed for more money, the world was forever changed by COVID-19. On March 12, 2020, Governor Tony Evers declared a public health emergency due to COVID-19 in Wisconsin. PFOF ¶ 196. The next day President Trump followed suit and declared a national emergency. PFOF ¶ 197. COVID-19 caused global disruption and both Windy Waters and Widen Enterprises were not immune from this extreme disruption. PFOF ¶¶ 198-199. Defendants had more than a reasonable concern that Widen Enterprises might not survive the pandemic. PFOF ¶¶ 200-210, 227-228. While this was not an uncommon concern during the COVID-19 pandemic, the Widen Enterprises business model made them even more at risk because the vast majority of its customers had contracts that allowed them to terminate on 30 days' notice. PFOF ¶ 229. Though customers paid up-front for a year of services, if they terminated before the year was over, the Widen Enterprises standard contract required that the customer be refunded pro rata for the portion of time not used. PFOF ¶ 230. Thus, Widen Enterprises was faced with the uncertainty of a deadly pandemic. That uncertainty was

compounded by the fact that its customers were able to cancel their contracts with limited notice, which would have required Widen Enterprises to pay substantial refunds.

Defendants' sole focus during May 2020 was to ensure Widen Enterprises' survival. PFOF ¶ 390. To combat these uncertainties, Widen Enterprises retained cash reserves to cover about three months of expenses. PFOF ¶ 208. Widen Enterprises also applied for a PPP loan in April 2020 to ensure payroll for 149 employees could be consistently maintained. PFOF ¶ 211. The loan was necessary because, "given the economic uncertainty, [Widen Enterprises] did not know if [its] line of credit was going to be sufficient to fund a recovery without a clear timeline, let alone a survival." PFOF ¶ 213. In fact, Kiesler was greatly concerned about the certifications required to keep the PPP loan and Widen Enterprises was contemplating whether it needed to return the PPP funds if Widen Enterprises purchased Randall's shares. PFOF ¶¶ 217-218. Debating the company's survival in the midst of Randall's Redemption, there was nothing to indicate that her shares were allegedly being undervalued that was "so obvious that any reasonable man would be legally bound as knowing." *See Schflike*, 866 F.2d at 946.

Determining Widen Enterprises' market value was the furthest thing from anyone's mind. PFOF ¶ 390. Unsurprisingly then, there is no evidence to suggest that Defendants were preparing, planning, or considering selling Widen Enterprises on or before May 13, 2020. PFOF ¶ 384. In June and July 2020, there were discussions surrounding succession planning, but the timeframe was for two to five years down the road and included non-sale options. PFOF ¶¶ 391-395. It was not until August 25, 2020, when Gonnering informed Reed that Brandfolder, a comparable competitor of Widen Enterprises, had sold for $155 million, that Reed seriously began to consider selling the company. PFOF ¶ 398-403. There is absolutely no evidence that Defendants even considered selling Widen Enterprises until *__after Randall sold her shares__*. PFOF ¶¶ 355, 373, 376,

385, 387, 407-410. Therefore, Randall has not and cannot show that Defendants knew or seriously considered selling Widen Enterprises *at the time she sold her shares*. *See Stevens v. Equidyne Extractive Indus. 1980, Petro/Coal Program 1*, 694 F. Supp. 1057, 1064 (S.D.N.Y. 1988) (stating that allegations regarding events after the sale of the securities cannot be used to support a securities fraud claim).

Accordingly, Randall's failure to prove scienter alone is sufficient to defeat all her claims for securities fraud.

### C.     Randall Is Barred From Relying on Omissions Regarding Reed's Salary and Bonuses for a Direct Securities Fraud Claim.

Randall is precluded from relying on alleged omissions regarding Reed's salary and bonuses because such allegations support a derivative claim not a direct claim. Even assuming she had properly framed her claims as derivative, Randall no longer has standing to bring these claims.

When a shareholder alleges that a director has misappropriated or stolen money from the corporation, the cause of action is derivative. Wisconsin law is clear that "[w]hen money is being misappropriated or stolen from a corporation, the damage is to the corporation, and as a result, the appropriate action is a derivative action and not a direct action." *Krier v. Vilione*, 2009 WI 45, ¶ 31, 317 Wis. 288, 766 N.W.2d 517. Any claim asserting a director received unreasonable compensation is derivative because the claim is based on the theory of corporate waste. *Reget v. Paige*, 2001 WI App 73, ¶ 16, 242 Wis. 2d 278, 626 N.W.2d 302. Thus, any of Randall's alleged omissions regarding Reed's salary or bonuses are not actionable omissions in a direct securities fraud case because the primary injury is to the corporation—not Randall.

Further, the fact that Reed may have personally benefitted from the compensation does not change the analysis that these alleged omissions could have only been brought in a derivative action. Any "[a]lleged self-dealing by a corporate director does not transform an action that

35

primarily injures the corporation into one that primarily injuries the corporation into one that primarily injures a shareholder." *Link v. Link*, 2020 WI App 1, ¶ 62, 389 Wis. 2d 624, 937 N.W.2d 296 (unpublished); *see also Notz v. Everett Smith Grp., Ltd.*, 2009 WI 30, ¶ 22, 316 Wis. 2d 640, 764 N.W.2d 904 Accordingly, none of Randall's alleged omissions regarding Reed's salary and bonuses can be relied on in a direct securities fraud claim under 10b-5.

Even if she were able to bring a derivative claim in a direct securities action, Randall no longer has standing to do so. "A derivative suit permits a shareholder to bring an action on behalf of a corporation." *Hale v. Chu*, 614 F.3d 741, 742 n.1 (7th Cir. 2010) (citing *Ross v. Bernhard*, 396 U.S. 531, 538 (1970)). For the shareholder to do so, they must maintain stock ownership throughout the litigation to prevent litigious plaintiffs from further harming the corporation. *See Portnoy v. Kawecki Berylco Indus., Inc.*, 607 F.2d 765, 767 (7th Cir. 1979); *see also Agostino v. Hicks*, 845 A.2d 1110, 1117 n.16 (Del. Ch. 2004). Thus, "[a] plaintiff who ceases to be a shareholder, whether by reason of merger or for any other reason, loses standing to continue a derivative suit." *See Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984); *see also Notz*, 2009 WI 30, ¶ 35 (recognizing the "general rule that a loss of standing as a shareholder for any reason, including a merger, is fatal to a derivative claim"). Randall sold her shares in Windy Waters and no longer has standing to maintain a derivative suit on behalf of Widen Enterprises. Therefore, summary judgment should be granted in favor of Defendants on any alleged omission regarding Reed's compensation.

### D.    Randall's Claims for Scheme Liability Fail.

Randall advances two unsupported theories for scheme liability. She first points to the use of a signature stamp over the course of nearly two decades as a way to keep Randall from participating in shareholder and director meetings that never occurred. She then argues that Defendants were attempting to "squeeze out" Randall through her own repeated requests to sell

her own shares, culminating in the final redemption. The two interrelated theories are based on Randall's own actions, or more appropriately inactions, to create the illusion of deception when no deception existed. Randall failed to sufficiently support any of her claims for scheme liability as Rule 10b-5 does not exist for plaintiffs who "second-guess inherently subjective and uncertain assessments" nor is it "an invitation to Monday morning quarterback." *Omnicare*, 575 U.S. at 186.

Randall's reliance on the use of the stamp to create a scheme is misplaced and, more importantly, time barred. For securities fraud violations, there is a strict timeframe for when a plaintiff may bring a claim. A plaintiff may only bring a claim within two years if an investor discovers facts constituting the violation. 28 U.S.C. § 1658(b). "The Seventh Circuit test for determining the time at which such a discovery of the violation took place has long been held to be the point at which a plaintiff was put on 'inquiry notice' of the fraud." *Antelis v. Freeman*, 799 F. Supp. 2d 854, 861 (N.D. Ill. 2011) (citing *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332 (7th Cir. 1997)). "Inquiry notice" is triggered if the plaintiff "should have learned through the exercise of ordinary diligence, facts sufficiently probative of fraud that would induce a reasonable person to investigate whether he might have a claim." *Id.* Here, Randall has known about the use of her stamp for almost two decades. PFOF ¶¶ 51-67. If she had any concern about Defendants' use of the stamp, she could have requested Defendants to stop using it. PFOF ¶ 62. Finally, Randall is doing exactly what the Seventh Circuit warned against—she sat back and waited until Widen Enterprises was sold to then go back and try to drum up absurd claims of fraud to recover more from the shares that she already sold. *See Fujisawa*, 115 F.3d at 1337 ("It would be highly undesirable if, suspecting securities fraud, an investor could sit back and wait out the entire . . . response period before suing[.]").

Further, Randall's scheme involving the "squeeze out" does not make sense as she was the one that initiated the redemption each time. A scheme is "a plan or program of something to be done," meaning that Defendants need to be the ones purporting to take actions for the scheme. *Ustain*, 229 F. Supp. 3d at 774. In the instant case, Randall came to Reed asking for more money in May 2020, just as she had six times before. PFOF ¶¶ 82, 113, 117, 124, 131, 138, 146, 236-237. She is, thus, the one who initiated the Redemption. PFOF ¶¶ 236-237. Defendants were not pressuring her to sell her shares in Windy Waters before she asked to do so. PFOF ¶¶ 236-237.

The so-called "artificial deadlines" that Randall references did not impact her decision to sell her shares because she did not abide by them. PFOF ¶¶ 268, 272, 311. Even more telling, these deadlines were not artificial at all. Randall had come to Defendants requesting to sell more of her shares in the midst of the confusion surrounding PPP loans. The federal government had set the deadline of May 7, 2020, to return the PPP funds to take advantage of the safe harbor. PFOF ¶ 219. Widen Enterprises originally planned to return the PPP funds if it purchased Randall's shares to avoid even the risk of criminal sanctions and the appearance of impropriety. PFOF ¶ 220. When Kiesler discovered that the federal government was extending the time to take advantage of the safe harbor until May 14, 2020, he called Randall to inform her that she had more time to make her decision. PFOF ¶¶ 260-270. Thus, the deadline imposed by Kiesler was not part of any grand scheme, but rather to ensure Widen Enterprises was abiding by federal law.

The undisputed facts also show that they were not used to pressure Randall into accepting the Redemption without seeking advice of counsel. In fact, Randall originally stated that she would need to consult with an attorney after her call with Kiesler on May 6. PFOF ¶ 268. Randall stated that the additional time Kiesler had provided to consider the redemption would permit her to speak with her attorney (among other advisors). PFOF ¶¶ 265-267. On May 13, despite agreeing to meet

38

for the purpose of possibly signing the Redemption Documents, Kiesler offered Randall an opportunity to leave with the Redemption Documents on May 13 and consult an attorney. PFOF ¶¶ 345-347.

Finally, all previous share redemptions (including Randall's five previous redemptions) followed the Stock Price Formula that was memorialized in the Second Amendment to the Shareholder Agreement. PFOF ¶¶ 117-119, 124-128, 131-135, 138-142, 146-150. The undisputed evidence shows that for complete redemptions of officers and directors—*e.g.,* Price Widen and Randall—Windy Waters' attorney included the same form of general release. PFOF ¶¶ 366, 368. Following this course of conduct was not part of some grand scheme to "squeeze out" Randall from Windy Waters.

For these reasons, Randall cannot support a claim for scheme liability under either of her theories. Accordingly, Randall's claims for securities fraud under Rule 10b-5 fail as a matter of law based on the undisputed facts.

### III.  Reed is not Liable for Controller Liability (Third Claim for Relief).

Randall has failed to prove control person liability against Reed. A person who, directly or indirectly, controls a person or entity that has violated securities law may themselves be liable. 15 U.S.C. § 78t(a). Known as "control person liability," it "is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Therefore, Randall must first show a primary violation under § 10b and Rule 10b-5. However, a defendant cannot be held liable for both a primary violation and control person liability. *See, e.g.*, *Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009).

"First, the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—

39

even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911–12 (7th Cir. 1994) (emphasis in original). "The mere fact that Plaintiff alleges these Defendants are directors is not enough for control person liability." *Donovan v. ABC-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002). Randall's claim against Reed for control person liability over Kiesler, Windy Waters, and Widen Enterprises fails because Randall has failed to show a primary violation under Rule 10b-5.

## IV. Randall's State Securities Fraud Claim Fails for the Same Reasons her Federal Claims Fail (Fifth Claim For Relief).

Randall's state securities fraud claim must fail for the same reasons as her federal securities fraud claim under 10b-5(b). Wisconsin Statute § 551.501(2) and Rule 10b-5(b) are essentially identical causes of action. *Compare* Wis. Stat. § 551.501(2), *with* 17 C.F.R. § 240.10b-5(b); *see also Haney v. Bridge to Life, Ltd.*, No. 18 CV 5417, 2019 WL 1098921, at *5 (N.D. Ill. Mar. 8, 2019) (acknowledging that the similarly-worded Wisconsin securities fraud statutes contains analogous elements to federal securities fraud); S.B. 483, 98th Reg. Sess. (Wis. Apr. 9, 2008) (acknowledging the January 1, 2009 update to the statute was to achieve uniformity and cooperation with relevant federal laws).[3] Indeed, Randall explicitly relies on her federal 10b-5(b) claim—specifically, the second claim for relief—to substantiate her state securities fraud claim. *See* Compl. ¶ 239. And as this Court recognized in its order on Defendants' Motion to Dismiss, federal securities fraud precedent is instructive. ECF No. 35 at 8.  Thus, the above arguments against Randall's federal

---

[3] Defendants acknowledge that there are two pertinent differences. First, the Wisconsin statute covers fraud in connection with an "offer" of securities, whereas federal securities fraud covers the "purchase" or "sale" of securities. *See Haney*, 2019 WL 1098921, at * 5. This is not contested in this matter. Second, the Private Securities Litigation Reform Act does not cover Wisconsin law. *Id.* at *6 n.5. But a plaintiff must nevertheless plead fraud, including state-law fraud, with particularity under Federal Rule of Civil Procedure 9(b). *Id.* (citing *Perelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)). Because this case has progressed beyond the pleading stage, the parties need not dwell on this difference.

securities fraud claims equally apply to the Randall's state securities fraud claim. Consequently, Randall's state securities fraud claim fails.

## V.     **Randall Has Failed to Prove Common Law Fraud (Fourth Claim for Relief).**

Judgment also is proper on Randall's Fourth Claim for Common Law Fraud. According to Randall, certain acts of "fraud" were committed, with the intent of "induc[ing] her to enter into the Redemption Agreement." Compl. ¶ 233. Specifically, Randall alleges that "Kiesler made numerous affirmative misrepresentations of material fact to Stacy in connection with the Redemption." Compl. ¶ 229. Randall further alleges that "Defendants also omitted to disclose to Stacy material information with respect to the Redemption, notwithstanding that the defendants had a duty to disclose such information." Compl. ¶ 230. Because Randall has failed to establish fraud, she cannot prove fraudulent inducement to contract. Accordingly, summary judgment for Defendants is proper.

### A.     **Randall Must Establish All Five Elements of Common Law Fraud by Clear and Convincing Evidence.**

To state a claim for common law fraud, Randall must prove:

(1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false[4]; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205 (citations omitted). Randall has the burden of establishing each element of common law fraud not merely by the preponderance of the evidence but by "clear and convincing evidence." *See Korhumel Steel Corp. v. Wandler*, 229 Wis. 2d 395, 403, 600 N.W.2d 592, 596 (Ct. App. 1999).

---

[4] "Reckless" representations in the third element are those "made by a person who knows that he or she has no sufficient basis of information to justify them." *Siegfried v. Torgerson*, 2022 WI App 42, ¶ 28, 978 N.W.2d 397, 2022 WL 2046261 (unpublished)  (quoting Wis Ji—Civil 2401 (2018)).

That higher standard in Wisconsin for fraud claims is also referred to as the "clear, satisfactory, and convincing evidence," which means evidence that produces a greater level of certainty than the preponderance standard that required to prove many civil claims. *Kruse v. Horlamus Indus., Inc.*, 130 Wis. 2d 357, 363, 387 N.W.2d 64, 67 (1986) (internal citations omitted). The clear and convincing standard "places an extraordinary high bar before the plaintiffs; to clear it, they must introduce *compelling* evidence to support their version of events." *Mann v. Hanil Bank*, 920 F. Supp. 944, 950-951 (E.D. Wis. 1996) (emphasis added).

**B.   Randall Has Failed to Establish Clear and Convincing Evidence of the Existence of Material Fraudulent Statements or Omissions Concerning the Redemption.**

Randall has *no evidence*—much less compelling evidence—to support her claim that the Redemption Agreement was fraudulently induced. As argued above, Randall's speculative "facts" and conclusory accusations as to the Redemption remain entirely untrue and flatly contradicted by the undisputed facts.

Randall's common law fraud claim is summarized in Paragraph 231 of her Complaint: "material information, including with respect to the value of the Companies, the prospects for selling them, and the alternative means by which Stacy could obtain cash, was known to the Defendants but not to Stacy, and Stacy could not have reasonably been expected to discover this information because the Defendants intentionally withheld that information from her." Compl. ¶ 231. None of those alleged misrepresentations or omissions have been established. As a result, Randall cannot establish the requisite element for common law fraud of a false statement or omission (much less one knowingly or recklessly made to induce Randall to act).

1.      **Randall Cannot Prove Affirmative Misrepresentations Were Made "in Connection With the Redemption" That Induced Randall to Enter Into the Redemption Agreement.**

Because her common law fraud claim is specifically designed to avoid the Redemption, Randall focuses on alleged affirmative misrepresentations by Kiesler "prior to, and in conjunction with, her signing the Redemption Agreement." Compl. ¶¶ 228-29. Randall directly communicated with Kiesler regarding her request for money. In response to this request, Kiesler presented an offer of a redemption of all Randall's shares on May 6 and an updated offer on May 13, using the formula from the Second Amendment to the Shareholder Agreement. Similarly, Kiesler met with Randall and witnessed her signature on the Redemption Agreement. However, Randall has failed to prove that any of the alleged affirmative statements made by Kiesler actually constituted a material misrepresentation.

a.      **No affirmative misrepresentations were made as to "the value of the Companies."**

First, as to "the value of the Companies," Kiesler truthfully explained on May 6 to Randall that the formula that had been used consistently over time was being used again to value her shares. PFOF ¶ 327; *see also* PFOF ¶¶ 84, 108-109, 117-119, 124-128, 131-135, 138-142, 146-150. He walked Randall through the formula on the telephone, using the spreadsheet he actually used to calculate Randall's share value. PFOF ¶¶ 253-254. Kiesler also explained that the formula was consistently used for the prior shareholder redemptions and subscriptions; including Price Widen's complete redemption in 2015. PFOF ¶¶ 175-176, 318. Kiesler provided an initial share value of approximately $1.1 million, which was an accurate application of the Stock Price Formula as of November 2019 financials. PFOF ¶ 253. Kiesler also truthfully stated in that May 6 call that he would need to update Randall's share value calculated under the Stock Price Formula, based on the end-of-year financials for 2019. PFOF ¶ 255.

Kiesler did not say that the Stock Price Formula used for the share value offered to Randall was based on a "market valuation" of Widen Enterprises. PFOF ¶ 259. No such valuation had been done. PFOF ¶ 388. Randall expressed her actual understanding of the share price calculation after her phone call with Kiesler on May 6, explaining to her financial advisor Mark Goff as follows: "[Kiesler] gave me the way they have evaluated the company shares since 1991. It has nothing to do with how good or bad the company is doing." PFOF ¶ 311.

With reference to the consistent use of the formula over time, including five prior times by Randall herself, Kiesler accurately stated his belief to Randall that the share price based on the formula was "fair." PFOF ¶¶ 82, 84-109, 195, 387. Kiesler also truthfully represented to Randall that selling her shares now at the offered share price would lock in a share price and provide certainty in an otherwise uncertain time due to COVID. PFOF ¶ 256.

A week later, on May 13, Kiesler provided Randall with the updated share value, as promised and as calculated accurately with December 2019 financials. PFOF ¶¶ 314, 325. Kiesler followed the Stock Price Formula again. Randall recognized on May 13 that the formula was being used again and was producing the share price expected—*i.e.*, this was a mathematical exercise by Kiesler, as it had been five times previously. PFOF ¶¶ 84, 327. As Randall texted to her son Justin prior to heading over to meet Kiesler at 4:30 p.m., "Kiesler did another evaluation of the company and came up with another $250 thousand. Nothing I can do about it." PFOF ¶ 332.

### b. No affirmative misrepresentations were made as to "the prospects for sale" of Widen Enterprises.

Likewise, Kiesler did not misrepresent the prospects of a sale of Widen Enterprises. Randall alleges that on May 13, 2020, "Stacy asked Kiesler whether he and the Companies' executives were preparing to sell Widen Enterprises." Compl. ¶ 117. Randall then alleges that "Kiesler responded, in sum and substance, 'No, there's been no talk of that.'" Compl. ¶ 118. The

undisputed evidence is that Defendants were not "preparing to sell Widen Enterprises." Indeed, there was no present intent to prepare to possibly sell Widen Enterprises until January 2021, when Defendants engaged an investment bank, SEG. PFOF ¶ 418. The first discussion of any sort by executives regarding an interest in possibly selling was in late June or July 2020, when Reed Widen expressed a need to firm up his "succession plan," including a possible sale of the company *in two to five years'* time (*i.e.*, possibly selling at some point between 2022 and 2025). PFOF ¶¶ 394-395, 405. There is no earlier first discussion of a possible interest in selling Widen Enterprises. Even so, that late summer discussion did not constitute talk of "preparing to sell" Widen Enterprises. Indeed, no preparation with respect to selling occurred as a result. Instead, Reed's standing direction to his CEO was to continue to grow the company. PFOF ¶ 25.  Only when Smartsheet announced its purchase of Widen Enterprises' competitor Brandfolder, on August 24, 2020, did Reed Widen give voice to an interest in possibly selling, depending on whether Widen Enterprises' value could reach $200 million. PFOF ¶¶ 398-402.

### c. No affirmative misrepresentations were made as to "alternative means by which Randall could obtain cash."

Kiesler accurately represented that a redemption of all of Randall's shares was the only way that Defendants wished to provide Randall cash from the Companies. PFOF ¶¶ 244, 249-251. That "all or nothing" offer was, in fact, at Reed Widen's instruction. PFOF ¶¶ 244, 249-251. Kiesler did not offer, nor did Randall request, a partial redemption, a loan, or some other financial arrangement. PFOF ¶ 251. Kiesler did not have authority to make such an offer in any event. PFOF ¶ 251. Likewise, neither Widen Enterprises nor Windy Waters could spare $50,000 from its cash reserves for anything other than operating expenses. PFOF ¶ 210. Kiesler would have been content not buying back any of Randall's shares, particularly given the uncertainties of COVID and the PPP loan repayment guidance. PFOF ¶ 240. What Kiesler ultimately negotiated for Defendants,

as was previously done with Price Widen in 2015, was spaced payments of $16,430.09 over seven years. PFOF ¶¶ 318, 321, 436.

> **2.    Randall Cannot Prove Omissions of Disclosure of Material Facts That Induced Randall to Enter Into the Redemption Agreement.**

Randall also cannot meet her burden of establishing by clear and convincing evidence any material omissions by the Defendants.

As the Wisconsin Supreme Court explained in *Kaloti Enters.*, "[t]he type of interest protected by the law of misrepresentation in business transactions is the interest in formulating business judgments without being misled by others—that is, an interest in not being cheated." *Id.*, 2005 WI 111, ¶ 16 (quoting *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 29–30, 288 N.W.2d 95, 101 (1980)). The *Kaloti* court also relied on the "Concealment and Nondisclosure" section of the Restatement of Torts, which requires not only that "the non-disclosing party knew that the other party was not aware of the fact," but also that "the mistaken party could not discover the fact by ordinary investigation or inspection, or he or she could not otherwise reasonably be expected to discover the fact." *Id.* ¶ 17 (quoting Restatement (Second) of Torts § 551 cmt. L (1977)). As the court further explained, "[t]he second element, that the mistaken party could not reasonably be expected to discover the fact, is particularly important to the present analysis. As we remarked in *Ollerman*, parties to a business transaction must 'use their faculties and exercise ordinary business sense, and not [] call on the law to stand *in loco parentis* to protect them in their ordinary dealings with other business people.'" *Id.* ¶ 18 (quoting *Ollerman*, 94 Wis. 2d at 30). Conversely, "where the [material] facts are peculiarly and exclusively within the knowledge of one party to the transaction and the other party is not in a position to discover the facts for himself [or herself]," disclosure is required. *Id.* ¶ 19 (quoting *Ollerman*, 94 Wis. 2d at 31).

### a. No omissions of material disclosures were made as to "the value of the Companies."

Just as there were no affirmative misrepresentations as to the value of the Companies, there were no omissions either. There cannot be fraudulent concealment of a valuation that never occurred. The Defendants did not solicit (and thus, did not possess) a market valuation of Widen Enterprises at any point in May 2020. PFOF ¶ 388. Tellingly, Widen Enterprises was not looking to sell at any point until late 2020, after the Brandfolder acquisition by Smartsheet sent shockwaves through company executives. PFOF ¶¶ 398-403. Indeed, obtaining a market valuation or positioning Widen Enterprises to be sold was "the furthest thing" from everyone's mind in May 2020. PFOF ¶389-390. As previously mentioned, the company was in a marked period of uncertainty. PFOF ¶¶ 199, 224, 226, 390.

Equally important, no evidence exists that anyone at the Companies believed that a market valuation was the relevant value proposition for a share redemption. The prior subscriptions and redemptions had consistently used the formula provided by the Second Amendment to Shareholder Agreement. PFOF ¶¶ 85-86. Stacy signed that Second Amendment to Shareholder Agreement as President of Windy Waters and a shareholder, and agreed to sell shares under Stock Price Formula five times between 2005 and 2019. PFOF ¶¶ 43, 112. An agreement valuing shares for close corporations is acknowledged under the law. *See Arneson v. Arneson*, 120 Wis. 2d 236, 250–51, 355 N.W.2d 16, 23 (Ct. App. 1984) (holding that where the buy-sell agreement prescribes a process for determining and adjusting share price, the valuation of stock and discount factor applied thereto for considerations of minority interest and nonmarketability are not clearly erroneous). Otherwise, the reality facing shareholders like Randall is the absence of a market for their shares. *See Schanke v. Manawa Cmty. Nursing Ctr., Inc.*, 150 Wis. 2d 317. 442 N.W.2d 605, 1989 WL 65303, at *4 (Ct. App. 1989) ("Lack of marketability refers to the fact that interests in closely-held corporations

cannot be readily sold and therefore are less marketable and in turn less valuable than publicly traded shares."). Consequently, a minority shareholder's stock value is heavily discounted and does not approximate market value, much less investment value. *See id.* (explaining that the value of minority shares in privately or closely-held corporations is discounted for several reasons). Ultimately, Randall faced the same take-it-or-leave-it redemption offer that all minority shareholder face when seeking cash for their stock.

Again, there also is no basis to conclude that Defendants somehow hid the Companies' "value" by not proactively disclosing financial information. The relevant financial information from Kiesler's and Randall's perspective—given the five prior redemptions under the same formula—was the 2019 end-of-year financials as run through the Stock Price Formula, which Kiesler walked Randall through on the telephone on May 6. Notwithstanding that fact, Randall would have been given financial information she required for the Redemption if she had asked. PFOF ¶ 338. But Randall did not ask. PFOF ¶¶ 68, 258, 352.

Randall's failure to inquire as to the financial statements of the Companies was typical. PFOF ¶ 68. Randall admits that she *never* asked about the financial performance of the Companies, or to see financial records related to its performance. PFOF ¶¶ 299-300. In fact, the only evidence of Randall showing an interest in reviewing financials was during the May 6 telephone call with Kiesler. According to Randall's report of the conversation (shared with her financial advisor Mark Goff, directly after speaking with Kiesler), "I told [Kiesler] that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company." PFOF ¶ 311. There is no allegation that Defendants sought to block such access. Randall simply did not follow through, even though Randall also stated her belief to Goff that "Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all." PFOF ¶ 311.

Thus, there is no question that Randall had the ability and wherewithal to inquire as to questions of "value." She could have hired someone to analyze company financials and acknowledged that perhaps she should. She plainly understood that the share value quoted by Kiesler was *not* based on a market value of Widen Enterprises. Randall was in a position to discover any facts for herself but chose not to do so. *See Kaloti Enters.*, 2005 WI 111, ¶ 19.

### b. No omissions of material disclosures were made as to "the prospects for sale" of Widen Enterprises.

Just as Kiesler's statement that "there's been no talk" of any executives "preparing to sell" Widen Enterprises, there were no related omissions by Defendants. Moreover, the concealment that Randall suggests is wholly unsupported by the evidence. There is no support, through witness testimony or document evidence, for the speculation that when Randall was selling her shares, the Companies were preparing, planning, contemplating, or even ruminating over a sale. PFOF ¶ 355, 373, 376, 385, 387, 407-410. Most recently, the Companies had been in acquisition mode, not sell mode. PFOF ¶ 380-381. Widen also was a family company. To the extent Reed Widen may have recognized his majority shareholder status had value, he was not planning to sell Widen Enterprises. PFOF ¶ 384. Offers of interest from marketers came routinely but were never taken seriously. PFOF ¶¶ 373-379. The Companies' long-time attorney never thought that Widen Enterprises would ever sell and was shocked when he learned that they were considering it—and equally shocked by the prices being discussed following the Brandfolder announcement in August 2020. PFOF ¶¶ 414-415.

### c. No omissions of material disclosures were made as to "alternative means by which Stacy could obtain cash."

Randall's allegation that Defendants concealed "alternative means by which Randall could obtain cash" is legally and factually bankrupt. First, as previously argued (*see* Sec. II, *supra*), Randall has no basis under the law to impose an obligation on the Companies to extend to Randall,

a shareholder, any loan or to make any special distribution. *Reget*, 2001 WI App. 73, ¶ 26 (corporation had no duty to make a market in its stock or to repurchase shares at a price acceptable to minority shareholder). That is, Windy Waters had zero obligation to give Randall any cash or buy her shares at any price. Because of that case law, Defendants' "all or nothing"/"take-it-or-leave-it" proposal—*i.e.*, that Randall could sell all her Windy Waters shares or seek money elsewhere—was appropriate, fair, and lawful. Were that not the case, shareholders like Randall could bankrupt a close corporation with repeated demands for cash, regardless of the company's financial ability to satisfy such demands. The law in Wisconsin is definitive and should end the discussion here.

### C.  Randall Has Failed to Establish Clear and Convincing Evidence of Reliance.

Randall's common law fraud claim also fails because she cannot establish reliance on any of the alleged statements or omissions of material fact concerning the Redemption. The Redemption was Randall's *sixth* redemption following the Stock Price Formula from the Second Amendment to Shareholder Agreement. PFOF ¶ 112. Randall signed a written agreement each and every time. PFOF ¶¶ 120, 127, 134, 141, 151.  Even if Randall could plausibly allege that she never reviewed any of the prior five agreements, the law imputes knowledge of the agreements' contents to Randall. Randall cannot create a jury question by ignoring her obligation to review the agreements she signed. Randall also cannot say she was not given a fair opportunity to read the Redemption Agreement and Promissory Note.

In Wisconsin, "[i]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Appleton Papers Inc. v. Mason & Dixon Lines, Inc.*, No. 03-C-415, 2005 WL 8162776, at *4 (E.D. Wis. Mar. 15, 2005) (quoting *Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992)). This is so even where the signatory claims *not* to have read the contract. *See id.* at *4 ("Obviously, a

party who signs a contract cannot avoid its terms by failing to read them."); *Hennig v. Ahearn*, 230 Wis. 2d 149, 156, 601 N.W.2d 14, 18 (Ct. App. 1999) ("[A] party who signs a contract after a fair opportunity to read the contract is bound by its terms."). Indeed, parties who sign contracts are under a duty to find out the contract terms before agreeing to be bound by them. *Raasch v. City of Milwaukee*, 2008 WI App 54, ¶ 10, 310 Wis. 2d 230, 750 N.W.2d 492.

Further, Wisconsin law is clear that "[f]ailure to read a contract…is not an excuse that relieves a person from the obligations of a contract." *Israeli v. Dott. Gallina S.R.L.*, 632 F. Supp. 2d 866, 870 (W.D. Wis. 2009) (internal citations omitted). "[I]n their dealings with each other, [parties] cannot close their eyes to the means of knowledge equally accessible to themselves and those with whom they deal, and then ask courts to relieve them from the consequences of their lack of vigilance." *Carney–Rutter Agency, Inc. v. Cent. Off. Bldgs., Inc.*, 263 Wis. 244, 253, 57 N.W.2d 348, 352 (1953) (internal citations omitted); *see also Paper Express, Ltd.*, 972 F.2d at 757 ("[A] blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound. Mere ignorance will not relieve a party of her obligations and she will be bound by the terms of the agreement ... [A] party who agrees to terms in writing without understanding or investigating those terms does so at his own peril." (internal citations omitted)).

For the Redemption at issue—Randall's sixth and final redemption—Kiesler first reviewed the formula with Randall, as used to calculate her share price, on their initial telephone conversation on May 6, 2020. PFOF ¶¶ 253-254. Randall was advised the formula had been used consistently before, including the complete redemption of her brother Price. Compl. ¶ 80. Randall admits that Kiesler walked her through the formula. PFOF ¶ 311.

Randall plainly knew that the same valuation method was being used as had always been used. PFOF ¶ 82-87, 103, 108, 110-14. 116-54. Indeed, prior to heading over to the company offices to meet with Kiesler, she texted her son the following: "Kiesler did another evaluation of the company and came up with another $250 thousand.. (sic) Nothing I can do about it (sic) I will be going over to the office to sign the papers at 4:30." PFOF ¶ 332. Once Randall arrived at the office, prior to her signing, Kiesler read through the Redemption Agreement and Promissory Note with Randall, stopping after each paragraph to ask Randall whether she understood or had any questions. PFOF ¶ 343. Thus, even if Randall followed her *modus operandi* as a shareholder of not reviewing the documents she signed PFOF ¶ 67, that attempt at ignorance was remedied by Kiesler in this final redemption. Moreover, Randall also sought to verify that the executives were not "preparing to sell Widen Enterprises" (Compl. ¶ 117)—proof that Randall understood that holding her shares and not selling her remaining stock might offer greater value than a complete redemption in May 2020.

When she finally signed the Redemption Agreement, Randall knew what she was doing and that she was choosing her familiar route to cash over other options. She *chose* not to pursue other options for cash that she had at her disposal. PFOF ¶¶ 282-286, 291-298. Randall elected not to pursue cash through a sale of her interest in Millmont. PFOF ¶ 294. Randall did not want to sell her gold and silver bars, or gold coins. PFOF ¶ 285. Randall did not want to part with family heirlooms. PFOF ¶ 284. She chose not to explore sales of any of the eight condominiums she owned in Wisconsin. PFOF ¶¶ 276-278.

Thus, as previously argued with respect to securities fraud and Randall's flawed theory of causation (*see* Sec.II, *supra*), the only alleged "fraud" that Randall truly claims to have relied on is the whether the executives were "preparing to sell Widen Enterprises." Compl. ¶ 117.  The

indisputable facts remain that Widen Enterprises was not being prepared for sale. Randall's decision to enter into the Redemption, therefore, cannot be the product of fraud. Randall fails to present a jury issue as to common law fraud, and summary judgment is proper for Defendants.

### VI.   Randall Has Failed to Establish a Genuine Issue in Dispute Regarding Reed Widen and Kiesler's Alleged Breaches of Fiduciary Duty (Sixth Claim for Relief).

Judgment for Defendants is proper on Randall's Sixth Claim for Breach of Fiduciary Duties, as asserted against Reed and Kiesler.

### A.   Randall Repeats the Same Unproven Allegations to Assert Fiduciary Breach Claims Against Reed Widen and/or Kiesler.

The elements of a claim for breach of fiduciary duty are: "1) the defendant owed the plaintiff a fiduciary duty; 2) the defendant breached that duty; and 3) the breach of duty caused the plaintiff's damage." *Schneider v. Schneider*, Case No. 19-cv-980-jdp, 2021 WL 1574709, at *4 (W.D. Wis. Apr. 22, 2021). Once more, Randall fails to meet her evidentiary burden for each supposed breach:

- The evidence does not show a breach by Reed or Kiesler of their fiduciary duties to Randall "by issuing constructive dividends to Reed, in the form of outsized and unearned 'salary' and 'bonuses,' while withholding nearly all dividends to Stacy." Compl. ¶ 252. Reed's salary and bonuses were in line with standard compensation for what a Chairman of the Board would be paid in the market. PFOF ¶ 79. Other than tax dividends, Windy Waters only issued one shareholder dividend, in April 2016. PFOF ¶¶ 49, 72. Randall was treated like every other Windy Waters shareholder with respect to dividends and was paid her pro rata share each time dividends were paid. PFOF ¶ 73. Randall did not own shares in Widen Enterprises, so no dividends could be claimed as owed, but Widen Enterprises would never have paid Randall dividends anyway because it reinvested in growth. PFOF ¶ 26. A company has no obligation to pay dividends to its shareholders. *Welch v. St. Helens Petroleum Co.*, 78 F.2d 631, 634 (9th Cir. 1935).

- The undisputed facts show Randall's allegation that Kiesler and Reed breached their fiduciary duties to Randall "by forging her signature on corporate documents using a rubber stamp," Compl. ¶ 253, is false. Defendants followed the agreed protocol reached with Randall once she obtained her signature stamp to accommodate her move to Florida. PFOF ¶¶ 52-60. Windy Waters never used the signature stamp outside of the scope of authority given by Randall to do so. PFOF ¶ 61. Either Reed or Kiesler got her approval for any documents on which the signature stamp was used. PFOF ¶ 57.

After Kiesler explained the standard corporate documents Windy Waters completed each year, Randall provided her advance blanket approval for Kiesler to use the stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. PFOF ¶ 60. The changes in "voting" power Randall complains of, Compl. ¶ 255, were thus also approved by Randall, who chose not to inquire further and, in any event, did not benefit Reed. Regardless, there is not a single instance of Randall's stamp being used without her express or implied consent. PFOF ¶¶ 57-62. For her part, Randall largely could not recall approving the use of her stamp but did not testify that she had denied its use either. PFOF ¶¶ 58-59. She admitted it is possible that someone reached out on occasions beyond the one she recalled during her deposition. PFOF ¶ 59. Randall routinely did not review documents before she signed them, typically only "skimming" the contents, if that, and even accepting only the signature page without demanding to see the entire document. PFOF ¶ 67. Stacy trusted Reed and Kiesler "with everything they wrote and had [her] sign." PFOF ¶ 63. Randall's lack of memory, failure to point to a single instance of misuse of the rubber stamp, and failure to demand further or more complete review of documents she signed, PFOF ¶ 64, make her incapable of putting forth any facts sufficient for her allegations of forgery to survive summary judgment. In any event, use of Randall's signature stamp is not causal of her stock redemption.

- The evidence does not establish willful misconduct or mistreatment of Randall, as falsely alleged by Randall. Compl. ¶ 254. Rather, Randall was always a passive shareholder—neither invested nor interested in Widen Enterprises beyond it being a source of money. PFOF ¶ 46. Randall treated Windy Waters like a bank, coming back time after time for more money.[5] PFOF ¶ 47. Reed and his family indulged her requests for money in order to help her, and in spite of the inconvenience and cost to the company to do so — given the need to engage counsel to draw up documents, and the distraction to Kiesler as CFO. PFOF ¶¶ 154, 242. No evidence exists that anyone _other than Randall_ reduced her stock ownership in Windy Waters; indeed, Reed and Kiesler did not care whether Randall kept her shares or sold them as she was a member of the family and Reed's sister. PFOF ¶¶ 240, 264. Regardless, Randall was always treated fairly and where there were pre-emptive purchase rights for shares, Randall exercised those rights. PFOF ¶¶ 190-192. For his part, Reed was running Widen Enterprises and growing the business as an all-encompassing pursuit—working tirelessly to lead the evolution of Widen Enterprises from a pre-press company to a company focused on software services. PFOF ¶¶ 23-26.

---

[5] During much of that time, Plaintiff and her husband appeared to use the money for expensive real estate investments in Florida and Wisconsin rather than essential expenses. PFOF ¶ 302. Plaintiff was not happy with her husband's real estate investments in Florida, specifically, which resulted in foreclosures or short sales. PFOF ¶ 303.

## B.     Judgment Is Proper for Defendants on Randall's Derivative Claims for Breach of Fiduciary Duty.

Notwithstanding Randall's failure to provide evidence of fiduciary breach by either Reed or Kiesler, Randall also fails to present a triable issue because many of her alleged breaches are derivative claims rather than individual claims. Thus, even if Randall *could* show a genuine issue as to the propriety of Reed's salary and bonus amounts (*see* Compl. ¶ 252), that claim had to be brought as a derivative claim on behalf of the corporation. *See Krier*, 2009 WI 45, ¶ 31; *Reget*, 2001 WI App 73, ¶ 16 & n.10. The fact that Randall alleges Reed and Kiesler realized "an improper personal benefit" (Compl. ¶ 254) does not change the analysis. "Alleged self-dealing by a corporate director does not transform an action that primarily injures the corporation into one that primarily injures a shareholder." *Link v. Link*, 2020 WI App 1, ¶ 62  (unpublished) (citation omitted); *see also Notz*, 316 Wis. 2d 640, ¶ 22 ("Notz alleges self-dealing on the part of the majority shareholder, but the cases on which he relies do not stand for the proposition that a shareholder-director's self-dealing transforms an action that primarily injures the corporation into one that primarily injures a shareholder.").

## C.     Randall's Claims for Fiduciary Breach Also Are Barred by the Statute of Limitation.

Breach of fiduciary duty claims are subject to either a two-year limitations period or three-year limitations period because the tort is considered intentional. *Zastrow v. J.  Commc'ns., Inc.*, 2006 WI 72, ¶¶ 42-43, 291 Wis. 2d 426, 718 N.W.2d 51. The longer period applies if the injury occurred after February 26, 2010—the effective date of the Wisconsin statute extending the limitations period to three years. Wis. Stat. § 893.57 (2010).

A plaintiff's claim does not accrue until she has "discovered" the facts supporting a claim, but accrual does not wait until plaintiff knows she has a legal claim. *Koehler v. Haechler*, 27 Wis. 2d 275, 278, 133 N.W.2d 730, 731 (1965). "[T]ort claims shall accrue on the date the injury is

discovered or with reasonable diligence should be discovered, whichever occurs first." *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 560, 335 N.W.2d 578, 583 (1983). Full knowledge of defendants' bad acts or of plaintiff's harm is not required for the claim to accrue; the plaintiff need only know that she has been injured and who is potentially responsible. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 315-17, 533 N.W.2d 780, 785-86 (1995).

"[O]nce injury and cause are known, plaintiffs must act diligently to determine whether their injury was due to the breach of a duty." *Lewis v. Paul Revere Life Insurance Co.,* 80 F. Supp. 2d 978, 1005 (E.D. Wis. 2000) (interpreting Wisconsin law). A plaintiff acts with reasonable diligence if she pursues the investigation of her potential claim in the manner a reasonable person would. *Hammack v. DeLonghi*, S.p.A., 914 F. Supp. 303, 306 (E.D. Wis. 1996) (citing *Carlson v. Pepin County*, 167 Wis. 2d 345, 353, 481 N.W.2d 498, 501 (Ct. App. 1992)); *see also Spitler v. Dean*, 148 Wis. 2d 630, 638, 436 N.W.2d 308, 311 (1989) (defining reasonable diligence as "such diligence as the great majority of persons would use in the same or similar circumstances"). "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." *Id*. Thus, a plaintiff is expected to investigate her claim. All a plaintiff needs are the "essential facts as will, if diligently investigated, disclose the [claim]." *Koehler*, 27 Wis. 2d at 278, 133 N.W.2d at 732 (quoting *Milwaukee W. Bank v. Lienemann 15*, 15 Wis. 2d 61, 65, 112 N.W.2d 190, 192 (1961)).

The questions of (a) what information a plaintiff needs for her claim to accrue and (b) whether she exhibited reasonable diligence are objective ones. *Carlson*, 167 Wis. 2d at 353, 481 N.W.2d at 501. Moreover, both are questions of fact that are properly decided on summary judgment so long as the facts are undisputed and when only one reasonable inference can be drawn

56

from the facts. *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 53, 303 Wis. 2d 34, 734 N.W.2d 827; *see also Dakin v. Marciniak*, 2005 WI App 67, ¶ 14, 280 Wis. 2d 491, 695 N.W.2d 867 ("When the material facts are undisputed and only one inference can reasonably be drawn, whether a plaintiff exercises reasonable diligence in the discovery of an injury is a question of law."). Ultimately, the date a fiduciary duty claim accrues is the date a plaintiff gains reasonable access to the relevant information, not when she bothers to look. *Sands v. Menard*, 2016 WI App 76, ¶¶ 67-69, 372 Wis. 2d 126, 887 N.W.2d 94.

In this case, Randall has known of the relevant facts underlying most of her breach of fiduciary duty claims since well before her first stock redemption in 2005. To the extent those claims are not defeated on summary judgment as improper derivative claims, they are time barred under Wisconsin law.

Randall has been well aware of the lack of dividends to shareholders for decades. Randall has been a shareholder since at least 1997. PFOF ¶ 4.  Stacy was paid directors' fees every year she was a director, around Thanksgiving each year. PFOF ¶ 40. Yet Randall also knows that she can only remember a single non-tax-related shareholder dividend—issued by Reed in April 2016. Compl. ¶ 48; PFOF ¶ 27. Randall did not need to know the precise amount of Reed's salary and bonus each year to know that she was not receiving distributions or dividends. Moreover, she received tax forms each year to help her file her taxes that provided information about Windy Waters' financials and her accountant explained her taxes to her every year. PFOF ¶¶ 454-455. Although a passive shareholder in most respects, Randall did sign documents as President of Windy Waters. PFOF ¶¶ 43-46. She also entered into five different share redemptions, document by redemption agreements, between 2005 and 2019, so was aware of how and why her ownership interest declined. PFOF ¶¶ 111-114. She had every ability to review the information she was

provided or ask for more. Under the circumstances, and the reasonable person standard, Randall's claim as it relates to alleged constructive dividends accrued well before February 26, 2010, and are time-barred.

The same limitations analysis applies to the alleged improper use of Randall's signature stamp and any claims of forged signatures. She created the rubber stamp herself and provided it to Kiesler sometime between 2001 and 2004. PFOF ¶ 52. Well before 2010, Randall was aware that her stamp was being used and expressly consented to the stamp's use on annual documents for corporate governance purposes, specifically. PFOF ¶¶ 54-56, 60. The stamp was used thereafter, each year, based on Randall's blanket consent. PFOF ¶ 60. Randall was aware she had to sign documents related to Windy Waters or Widen Enterprises but claims she did not know why. PFOF ¶ 51. Reed or Kiesler contacted Randall each time the stamp was used on something she had not already approved. PFOF ¶ 57. The only evidence of Randall ever denying permission to use her stamp was in late December 2019, and Randall admits she ultimately consented to the stamp's use on that occasion. PFOF ¶ 58. Randall never asked to see copies of documents on which the signature stamp was used. PFOF ¶ 64. Thus, Randall either elected not to complain, in line with her passive shareholder status, or simply chose not to look over the years. Accordingly, the statute of limitations has run on her breach of fiduciary claims as to the stamp and alleged "forgery" of her signature.

## VII.   Randall's Claim of Unjust Enrichment Is Precluded by the Valid Redemption Agreement (Seventh Claim for Relief).

Judgment for Defendants is proper on Randall's Seventh Claim for Unjust Enrichment, as asserted against Reed, Kiesler, and Windy Waters. The Redemption Agreement is a valid and binding contract, which precludes any claim for unjust enrichment under the law.

The elements of a cause of action for unjust enrichment are "(1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." *Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303, 313 (1987).

In this case, Randall alleges that in selling her stock, Reed, Kiesler, and Windy Waters "captured the true value of [Randall's] interest in the Companies, while paying [Randall] only a small fraction of that value." Compl. ¶ 260. Randall further alleges that "[i]t would be inequitable for Reed, Kiesler or Windy Waters to retain the benefits conferred upon them by [Randall] in the Redemption without paying [Randall] the value thereof under the circumstances." *Id.* ¶ 263.

Randall, however, negotiated and signed the Redemption Agreement, along with the Promissory Note. PFOF ¶¶ 366-367. That contract is valid and binding. Moreover, the Redemption Agreement includes a mutual release, which precludes any claim for unjust enrichment. PFOF ¶ 366. As Randall has failed to create triable issues on any of her fraud-based claims and cannot otherwise justify a request to void or rescind the Redemption Agreement, her Seventh Claim for Relief cannot lie. A cause of action for unjust enrichment is not available where the parties have entered into a valid contract. *See Cont'l Cas. Co. v. Wis. Patients Comp. Fund*, 164 Wis. 2d 110, 118, 473 N.W.2d 584, 587 (Ct. App. 1991) ("The doctrine of unjust enrichment does not apply where the parties have entered into a contract."). "Unjust enrichment is not a mechanism for correcting soured contractual arrangements." *N. Crossarm Co. v. Chem. Specialties, Inc.*, 318 F. Supp. 2d 752, 767 (W.D. Wis. 2004). Notwithstanding the above arguments, Randall's request for unjust enrichment is an equitable claim and is precluded given Randall's demand for legal remedies. *See Smith v. RecordQuest, LLC*, 989 F.3d 513, 520 (7th Cir. 2014) ("Smith cannot resort

to a remedy in equity (unjust enrichment) when she has a remedy at law…."). This Court did not force Randall to elect remedies upon ruling on Defendants' motion to dismiss. Now at summary judgment, an election is proper to prevent double recovery. *See Brame v. Gen. Motors LLC*, 535 F. Supp. 3d 832, 843 (E.D. Wis. 2021).

**VIII.** **Randall Has Failed to Create a Triable Claim for Civil Theft (Eighth Claim for Relief)**.

For Randall's Eighth Claim for Relief against all Defendants, Randall relies on the claims of affirmative misrepresentation and material omissions included in her Second Claim for Relief alleging federal securities fraud under the Securities and Exchange Act and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), promulgated thereunder. Compl. ¶ 266. Randall's efforts to repackage her failed fraud claims as a statutory violation in Wisconsin are fruitless and judgment for Defendants is proper.

To find liability for civil theft under Wis. Stat. §895.446(1), "a court must first find the existence of a theft under Wis. Stat. § 943.20(1)(d)." *Cousins Submarines, Inc. v. Fed. Ins. Co.*, No. 12-CV-387, 2013 WL 494163, at *9 (E.D. Wis. Feb. 8, 2013). Under Wisconsin law, it is a crime to "[o]btain[ ] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Wis. Stat. § 943.20(1)(d).

Just as Randall has failed to show that the allegations in Complaint Paragraphs 214 and 215 constitute actual "untrue statements or omissions of material fact," (*see* Sec. II.A, *supra*), she has failed to show such statements constitute evidence of intentional deception with a false representation (or material omission). Randall has not shown evidence of deception by Defendants through untrue statements or concealment of the truth. In short, Randall entered into the Redemption Agreement with her eyes wide open, knowing that she was receiving a share value

60

based on the Stock Price Formula, and not because there was an impending sale or hidden company valuation that Defendants refused to share. No theft occurred here, and Randall cannot prove such a claim.

Accordingly, Randall has not shown sufficient evidence of the predicate acts for liability under Wisconsin Statutes §§ 943.20 and 895.446. Judgment for Defendants is therefore required on Randall's Eighth Claim for Relief.

## IX. Randall Cannot Bring a Claim Under Wisconsin Statute § 180.1430(2)(b) (Ninth Claim for Relief).

"A shareholder oppression claim is, by definition, a claim brought by an individual shareholder *in his or her capacity as shareholder* for injury done to his individual interests that arise out of his or her share ownership." *N. Air Servs., Inc. v. Link*, 2011 WI 75, ¶ 89, 336 Wis. 2d 1, 804 N.W.2d 458 (emphasis added); Wis. Stat. § 180.1430(2)(b). In *Northern Air Services, Inc. v. Link*, the minority shareholder challenged the validity of the buy-sell agreement and, importantly, the company sought specific performance of said agreement. 2011 WI 75, ¶¶ 16-17. Thus, during the entirety of the trial court proceedings, the minority shareholder retained his shares, which provided him with standing to bring the minority shareholder oppression claim. *Id.* ¶ 77.  At the conclusion of the trial, the minority shareholder "complied with the circuit court order granting specific enforcement of the [b]uy-[s]ell [a]greement and *surrendered his shares in Link Snacks*." *Id.* (emphasis added). On appeal, the Wisconsin Supreme Court held that he no longer had standing to appeal because he was no longer a shareholder entitled to invoke Wisconsin Statute § 180.1430(2)(b). *Id.* ¶¶ 81-83. Meaning, because the appellant was no longer a shareholder *as of the trial court's ruling*, the appellant would no longer be able to bring the claim, just as he could no longer challenge the claim on appeal.

Similarly, because Randall is no longer a shareholder of Windy Waters, she lacks standing to bring this statutory claim. *See id.* ¶ 83.  Whether the Redemption Agreement is valid has no bearing on Randall's ability to bring the claim in the first instance. It bears emphasis that the judicial dissolution is simply not the proper vehicle for Randall to bring her claim. Section § 180.1430(2)(b) "is a judicial dissolution statute wherein shareholders may move to dissolve a business entity when they have been subject to oppressive conduct"—not an avenue for Randall to pursue alternative equitable relief. *N. Air Servs., Inc.*, 2011 WI 75, ¶ 94. Thus, this court should grant the Defendants' motion for summary judgment on Randall's claim of minority shareholder oppression under Wisconsin Statute § 180.1430(2)(b).

## X.   Randall Has Failed to Show Entitlement to Damages for Civil Conspiracy to Commit Fraud (Tenth Claim for Relief).

In ruling on Defendants' Motion to Dismiss, this Court agreed with Defendants that Randall cannot bring a cause of action for conspiracy alone but may seek to recover "damages caused by acts pursuant to a conspiracy." ECF No. 35 at 19 (quoting *Onderdonk v. Lamb*, 79 Wis. 2d 241, 246, 255 N.W.2d 507, 509 (1977) (citations omitted)). Defendants now move for judgment on the unavailability of such damages because Randall cannot make the requisite showing under Wisconsin law.

In Wisconsin, a civil conspiracy is "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, ¶ 168, 285 Wis. 2d 236, 701 N.W.2d 523 (citation omitted). A plaintiff may request related damages from a jury if she also shows "some agreement between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1078 (E.D. Wis. 2014).

First, as the Court recognized it would revisit at summary judgment, ECF No. 35 at 19-20, Randall's claims are barred by the intra-corporate conspiracy doctrine. "[C]orporate officers acting within the scope of their employment cannot conspire with one another or with the corporation." *Id.* That is because officers' acts are acts of the corporation, and a corporation cannot conspire with itself. *Id.* (citing *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990)). The undisputed facts here are that Kiesler was directed to call Randall on behalf of Windy Waters and offer an all-or-nothing redemption offer for her shares of Windy Waters. PFOF ¶ 244. Kiesler acted within his authority as Treasurer of Windy Waters and did not act on his own. PFOF ¶ 245. Moreover, every time Randall asked for cash from Windy Waters, she went to Reed who then directed Randall to Kiesler. PFOF ¶¶ 117, 124, 131, 138, 146. As a result, Randall's allegations amount to a conspiracy within Windy Waters, which is barred under the intra-corporate conspiracy doctrine. Randall's claim for conspiracy-related damages is foreclosed as a result.

Second, but notwithstanding Defendants' immunity from conspiracy damages, Randall has failed to prove a triable issue exists concerning any of the alleged "concerted action" toward an "unlawful purpose" or "unlawful means." Randall relies on the same alleged conduct from other claims, all to attain the "goal of fraudulently inducing Stacy into selling her stock in the Companies at a grossly unfair price, all to the benefit of the Defendants." Compl. ¶ 287. Randall's theory is both fantastical and meritless. The undisputed facts in this case refute her claims of fraud and fiduciary breaches. For this reason too, conspiracy damages cannot be awarded, and the Court should rule as such now.

## XI.   Randall's Declaratory Relief Remedies Cannot be Granted

Finally, Randall's requests for declaratory relief all must be rejected. As the Court previously explained, rather than independent claims for relief, what Randall seeks in "Claims for Relief 11-14" are certain remedies for underlying actions. ECF No. 35 at 20. Randall has failed to

prove either the underlying actions or the entitlement to such relief. Accordingly, this Court must deny the requested remedies.

### A. No Fraud Can Justify Voiding the Redemption Documents and Avoiding the Release.

As argued extensively in addressing Randall's first and second claims for relief, Randall has not created a triable issue with respect to her allegations of securities fraud. *See* Sec. II, *supra*. Therefore, no declaratory relief may be granted voiding the Redemption Documents predicated on such claims. The parties' Release must be enforced, as agreed.

### B. Neither Procedural nor Substantive Unconscionability Exist to Justify Voiding the Redemption Documents.

Second, Randall cannot support her claim that the Redemption Documents "are procedurally and substantively unconscionable under Wisconsin law." *Id.* ¶ 298. The undisputed facts refute such a finding, and Randall's requested relief may be denied as a matter of law.

Unconscionability generally refers to "an absence of meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other party." *Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶ 27, 259 Wis. 2d 587, 657 N.W.2d 411. For a contract to be declared invalid as unconscionable, it must be determined to be both procedurally and substantively unconscionable. *Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 29, 290 Wis. 2d 514, 714 N.W.2d 155.

In *Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Co.*, the Wisconsin Supreme Court laid out the factors to be considered in determining procedural and substantive unconscionability:

> Under the "procedural" rubric come those factors bearing upon . . . the real and voluntary meeting of the minds of the contracting parties: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative

> sources of supply for the goods in question. The substantive heading embraces the contractual terms themselves, and requires a determination whether they are commercially reasonable.

117 Wis. 2d 587, 602, 345 N.W.2d 417, 425 (1984); *see also Wis. Auto Title Loans*, 2006 WI 53, ¶¶ 34-35. Substantive unconscionability "is usually found in cases where commercial interests have preyed on poor and disadvantaged consumers, unduly restricting the consumer's remedies or unduly expanding their own." *Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 509 F. Supp. 2d 752, 759 (W.D. Wis. 2007).

The undisputed facts here foreclose both types of unconscionability. The Redemption Documents represented Randall's _sixth_ time selling her shares in Windy Waters for cash. PFOF ¶¶ 111-113. On each occasion, Randall had signed an agreement. PFOF ¶¶ 120-121, 127-128, 134-135, 141-142, 151-152, 365-366. Randall initiated the negotiation through a request for cash. PFOF ¶¶ 117, 124, 131, 138, 146, 236-237. In the course of their final negotiation, Kiesler explained the Stock Price Formula used, walked Randall through the Redemption Documents and confirmed she understood, and told her she could consult an attorney.

Randall had the option of rejecting the complete redemption arrangement. PFOF ¶ 264. She could have sold her interest in Millmont, or explored other options she had for cash.[6] PFOF ¶¶ 274-298. A full week passed from the time Randall first considered she would consider selling all her shares and the Redemption. In that time frame, she consulted with at least her financial advisor, Mark Goff, who led her to threaten to "hire someone that would represent me to look at the books and do their own evaluation of the company." PFOF ¶ 311. The fact that Randall declined to further consult with an attorney and did not engage a consultant does not reflect a lack of sophistication or education, but an acceptance of the offered stock valuation in lieu of other

---

[6] Notably, one of the assets Plaintiff held onto at the time were her eight condominiums, which Plaintiff had the wherewithal to purchase and use to derive rental income. PFOF ¶¶ 276, 278.

options. Regardless, when faced with the complete redemption offer on May 6, it was Randall who identified a need and desire to speak with Goff, along with an attorney, her "friends in the wealth management industry," and her "personal accountant." PFOF ¶¶ 307-312; Compl. ¶¶ 91, 97. Randall also was sophisticated enough to question "whether the Companies' executives were preparing to sell Widen enterprises," implicitly recognizing that her standard formula for redemption was not based on the sale/acquisition value of Widen Enterprises, and that the price on the open market could be higher. Compl. ¶ 117.

Substantive unconscionability is also lacking as a matter of law. The terms of the stock redemption agreement are reasonable and fair. The release language was and is bilateral, thus also releasing any claims Windy Waters may have had against Randall. PFOF ¶ 366. The Redemption Documents also included a total payment amount in excess of $1.3 million, plus interest accrued over the installments. PFOF ¶¶ 366-367. Randall's share redemption price also represented an increase in share value over the most recent partial redemption from 2019. PFOF ¶¶ 82, 370. Given the COVID pandemic, Randall was accepting certainty of a share price, which would be locked in for seven years (the length of the installments) over possible threats to Widen Enterprises' viability. PFOF ¶ 256.

The case law is in accord. *See Hankee v. Menard, Inc.*, No. 01-C-661-C, 2002 WL 23257167, at *4 (W.D. Wis. Apr. 15, 2002). It is perhaps unsurprising that after learning of the $162 million gross purchase price in September 2021, Randall experienced seller's remorse and wished that she had not sold her stock. Hindsight, however, is not a proper consideration under the law of unconscionability. *See In re Est. of Katze-Miller*, 158 Wis. 2d 559, 578, 463 N.W.2d 853, 861 (Ct. App. 1990) (citing *Brobeck v. Telex Corp.*, 602 F.2d 866, 875 (9th Cir. 1979) ("[W]hether a contract is fair or works an unconscionable hardship is determined with reference to the time

66

when the contract was made and cannot be resolved by hindsight.")). As such, this Court should rule that Randall is foreclosed, as a matter of law, from an award of the requested declaratory relief.

> **C.** **Duress Was Absent and Thus Cannot Justify Voiding the Redemption Documents.**

Randall's claims of duress are disproved by the undisputed facts, and this Court cannot thereby declare the Redemption Documents void and unenforceable.

To establish duress, Randall must show that she was "the victim of a wrongful or unlawful act or threat" that deprived her of her "unfettered will" and "compelled [her] to make a disproportionate exchange." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 109, 293 N.W.2d 155, 160 (1980). Although a party's lack of sophistication in business matters or unequal bargaining power may provide a basis for voiding exculpatory or disclaimer clauses, *see Finch v. Southside Lincoln-Mercury, Inc*., 2004 WI App 110, ¶ 22, 274 Wis. 2d 719, 685 N.W.2d 154, under Wisconsin law such economic duress must be proved by the higher burden of clear, satisfactory and convincing evidence. *See Pope v. Ziegler*, 127 Wis. 2d 56, 60, 377 N.W.2d 201, 203 (Ct. App. 1985). In addition, Randall must prove that she had "no reasonable alternative" but to sign the contract. Restatement (Second) of Contracts § 175(1). "A threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it." *Id*. at § 175 cmt. b. Further, "merely driving a hard bargain or taking advantage of another's financial difficulties is not duress." *Stillwell v. Linda*, 110 Wis. 2d 388, 391, 329 N.W.2d 257, 258 (Ct. App. 1984).

It is undisputed that Defendants played no role in Randall's financial hardship, rather such hardship was caused by Randall's divorce. PFOF ¶¶ 236-237. The stress Randall claims to have been feeling was, therefore, self-induced and not duress. *See Selmer Co. v. Blakeslee-Midwest Co.*,

704 F.2d 924, 928 (7th Cir. 1983) ("The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions.").

Randall was not forced either to sell her stock or sign the Redemption Agreement. Each time there was a supposed deadline to accept the "all-or-nothing" offer according to the Stock Price Formula, Randall either let it lapse or Defendants did not enforce it. PFOF ¶¶ 261, 263, 267-269, 272. As Seid assured Randall before she signed the Redemption Agreement and while offering her possible names of attorneys, "nobody could force her sign the documents." PFOF ¶¶ 335, 337, *see also* Compl. ¶ 113. Seid also offered to provide Randall with names of attorneys to speak with. PFOF ¶¶ 337, 339. Kiesler reviewed the Redemption Documents with Randall, reading each paragraph and stopping to ask her after each whether she understood. PFOF ¶ 343. Kiesler also asked Randall whether she wished to take the Redemption Documents to review with her son Justin or an attorney, which offer Randall declined. PFOF ¶¶ 342, 346-347. Randall knew she had options for cash, but she declined to pursue them. PFOF ¶¶ 274-298. After all of that, Randall chose to sell her stock. Just like *Mendelson*, she had a choice and made one—she could either hold onto her stock or sell it for $1.3 million. That is not duress.

### D.     The Redemption Documents Are Not Violative of Wisconsin Public Policy.

Randall also cannot prove that the Redemption Documents, and more specifically the Release, is against Wisconsin public policy. *Contra* Compl. ¶¶ 320-33. Accordingly, the requested declaratory relief must again be rejected by this Court.

Randall asserts that the Release provision in the Redemption Agreement should be declared unenforceable, and the Redemption Documents voided, because "Wisconsin has a public policy against enforcing a contractual term that exempts one party from tort liability for harm caused intentionally or recklessly." *Id.* ¶¶ 326, 328, 329. Randall's statement is patently false. Wisconsin law does *not* have a public policy against enforcing a contractual term that exempts one party from

tort liability for harm caused by past intentional or reckless conduct. *See Love v. Med. Coll. of Wis.*, 371 F. Supp. 3d 489, 493 (E.D. Wis. 2016) (limiting holding to "[c]ontracts which release a party from liability for *future* intentional or reckless conduct are unenforceable because they encourage such conduct" (emphasis added)). Furthermore, "Wisconsin public policy favors freedom of contract." *Parsons v. Associated Banc-Corp*, 2017 WI 37, ¶ 31, 374 Wis. 2d 513, 893 N.W.2d 212; *see also Sonday v. Dave Kohel Agency, Inc.*, 2006 WI 92, ¶ 53, 293 Wis. 2d 458, 718 N.W.2d 631 ("This court has consistently recognized that parties are free to contract and has endeavored to protect the right to contract by ensuring that promises will be performed.").

Randall's requests for declaratory relief should be dismissed as a matter of law.

## XII. Randall's Veil Piercing Remedy Is Improper and Should be Dismissed (Count XV)

Framed as her "Fifteenth Claim for Relief," Randall requests that the Court disregard the limited liability corporate structure and "pierce the corporate veil." Compl. ¶ 340. Randall's requested remedy is not available on the facts and law. As a fundamental and indisputable fact, Reed was uninvolved with the Redemption, which was negotiated, papered, and executed without Reed, who found out that Randall had agreed to sell her shares after the fact. PFOF ¶¶ 360-364.

Regardless, Wisconsin courts have routinely held that piercing the corporate veil is not a cause of action. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) ("Piercing the corporate veil, after all, is not itself an action; it is merely a procedural means of allowing liability on a substantive claim, here breach of contract."). Instead, this doctrine is a remedy (and rarely imposed). To the extent Randall's claims survive this Motion, the parties may take up Randall's requested remedy.

## XIII. Randall's Request for Rescission Remains Improper.

Still pending before this Court is Defendants' Motion to Strike, as filed on July 14, 2023. ECF Nos. 31-33. As argued therein, Randall has accepted the benefits of the Stock Redemption Agreement and the related Promissory Note for more than three years, including after learning of the sale of Windy Waters, after her lawyers sent demand letters and a draft complaint to the defendants, and even after filing this lawsuit. ECF No. 32 at 10. Since the filing of the motion, hree additional payments, in July, August, and September 2021, were paid to Randall and accepted without objection. PFOF ¶ 437. This conduct affirmed and ratified the Stock Redemption Agreement and Promissory Note and Randall has therefore waived her right to request that these agreements be rescinded or voided. *See generally* ECF No. 32 (citing cases). Defendants incorporate the arguments in their briefing on the Motion to Strike (ECF No. 32 and 37) herein by reference and asks the Court to grant summary judgment on this basis.

## CONCLUSION

This case is solely about seller's remorse. No matter how she tries to spin the facts, Randall cannot escape from the fact that Windy Waters made an offer to her—based on a formula that had been consistently used by every shareholder since 2004—to purchase her shares, and she accepted it without doing any due diligence. She failed to confer with counsel, despite being told to do so by her son and being offered names of counsel by Windy Water's attorney. She failed to negotiate the price, despite having the ability to do so. She failed to take the agreement home to further review it before signing, as offered by Kiesler. She decided to take the money in a stock sale and according to a formula she had used five prior times, rather than pursue other options she had for money. She wanted the money, and thought that $1.3 million was acceptable. There is no fraud here. Her case should be dismissed, as no reasonable jury could find in her favor on the undisputed facts.

Dated this 29th day of September 2023.

Respectfully submitted,


s/ *Mark H. Churchill*

Mark H. Churchill
Martin Durkin
Sarah Morain
HOLLAND & KNIGHT LLP
1650 Tysons Boulevards, Suite 1700
Tysons, Virginia 22102
Phone: 703.720.8600
mark.churchill@hklaw.com
martin.durkin@hklaw.com
sarah.morain@hklaw.com


Dean P. Laing
Christa D. Wittenberg
O'Neil, Cannon, Hollman, DeJong & Laing S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
Phone: 414.276.5000
dean.laing@wilaw.com
christa.wittenberg@wilaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of September 2023, I electronically filed the foregoing document using the Court's CM/ECF system, copies of which will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing.

s/ *Mark H. Churchill*

Mark H. Churchill

*Counsel for Defendants*