IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

       Plaintiff,

  v.

REED C. WIDEN, MICHAEL
KIESLER, WIDEN ENTERPRISES,
LLC, and WINDY WATERS, INC.,

       Defendants.

Case No. 22-cv-400-jdp

---

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

---

In support of her motion for partial summary judgment, Plaintiff Stacy L. Randall (Stacy) submits the following statement of undisputed facts.

1.     This is an action for securities fraud pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §§ 78j(b), 78t(a) and U.S. Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, as well as related claims under state law. (ECF No. 45, Defs.' First Am. Answer ("Answer") ¶ 10.)[1]

2.     This matter arises under federal law, and this Court has original subject matter jurisdiction over the parties' dispute pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a). This Court also has exclusive jurisdiction over the relief sought under the Exchange Act and SEC Rule 10b-5 pursuant to 15 U.S.C. § 78aa(a). (Answer ¶ 11.)

3.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to claims in the action within this Court's original

---

[1] *See* ECF No. 1, Complaint, for the corresponding complaint paragraphs where the First Amended Answer is cited herein.

jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. (Answer ¶ 12.)

4.     Venue is proper in this Court pursuant to 15 U.S.C. § 78aa(a) because the Defendants reside and/or transact business in this district. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial number of the events giving rise to this action occurred in this District, the Defendants reside or are located in this District, and because a substantial part of the property that is the subject of this action is situated in this District. (Answer ¶ 13.)

5.     Defendant Windy Waters, Inc. (Windy Waters) is a closely held Wisconsin corporation with its principal place of business in Monona, Wisconsin. (Answer ¶ 18.)

6.     Defendant Widen Enterprises, LLC (Widen Enterprises) is a Wisconsin limited liability company with its principal place of business in Monona, Wisconsin.  (Answer ¶ 17.)

7.     In or around 1997, Stacy's family created Windy Waters, a family-owned holding company, to own and "protect" Widen Enterprises. (Answer ¶ 3; 08/23/2023 R. Widen Dep. Tr. 221:20-222:11.)

8.     In September 2001, Stacy's father and his five children signed an amendment to the shareholder agreement of Widen Enterprises, which made the shareholder agreement applicable to Windy Waters, the holding company. (Answer ¶ 23; Declaration of David G. Palay ("Palay Decl."), ¶ 3, Ex. 1, STAFFORD001299, Recitals § 5.)

9.     The family, including Stacy and her brother, Defendant Reed C. Widen, traded in their shares of Widen Enterprises for shares of Windy Waters, which owned 100% of Widen Enterprises. (Answer ¶ 3.)

10.     The Bylaws of Windy Waters, Inc. were adopted on January 1, 1998. (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936.)

11.     Section 3.02 of Article 3 of the Bylaws of Windy Waters, Inc. provides that

██████████████████████████████████████████████████████████████████████████

████████████████████████████████ (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936 at

942.)

12.     Section 3.03 of Article 3 of the Bylaws of Windy Waters, Inc. provides, in relevant

part, that a ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████ (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936 at 942.)

13.     Until in or around September 2021, Widen Enterprises was a Wisconsin

corporation. (Answer ¶ 17; Widen Enterprises, LLC, Wis. Dep't of Financial Institutions,

https://www.wdfi.org/apps/corpsearch/Details.aspx?entityID=1W08924&hash=243114188&search

FunctionID=3b7fe989-1d2d-4d78-ad1a-39b2f2387f9a&type=Simple&q=widen+enterprises     (last

visited Sept. 20, 2023).)

14.     Widen Enterprises is now owned by a company called Acquia, Inc. (Acquia) (Answer

¶ 17.)

15.     From its creation in or around 1997 until in or around September 2021, Windy

Waters owned and controlled Widen Enterprises as the sole parent company of Widen Enterprises.

(Answer ¶¶ 3, 17, 18.)

16.     Pursuant to an Equity Purchase Agreement dated August 17, 2021, Acquia acquired

100% of the stock of Widen Enterprises for a purchase price of $162 million. (Answer ¶¶ 148-149;

Compl., Ex. C (filed under seal).)

17.     The purchase price of $162 million equates to approximately 6.3 times Widen

Enterprises' recurring revenues for 2020 of $25,528,245. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901

at 7985.)

3

18.     As of no later than 2008, Widen Enterprises was a Digital Asset Management (DAM) company. (09/21/2023 M. Gonnering Dep. Tr. 29:19-32:8; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906-7907.)

19.     As of no later than 2008, Widen Enterprises was a Software as a Service (SaaS) company. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7963; 09/21/2023 M. Gonnering Dep. Tr. 21:24-22:10, 76:9-77:22; Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065.)

20.     Widen Enterprises marketed itself to potential acquirers, including Acquia, using a "Confidential Information Memorandum," which noted Widen Enterprises' ███████████ ████████████████████████ (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26); 09/21/2023 M. Gonnering Dep. Tr. 52:7-53:22.)

21.     Widen Enterprises also marketed itself to potential acquirers, including Acquia, as a Software as a Service company. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7963.)

22.     [Intentionally left blank]

23.     Over the years, Widen Enterprises evolved from a pre-press company specializing in engraving, color-separation, printing and content-creation used by physical and then online catalogs, into a digital asset management (DAM) company that provided software as a service (SaaS). (08/23/2023 R. Widen Dep. Tr. 12:3-13:2, 17:4-18:7; 09/21/2023 M. Gonnering Dep. Tr. 15:11-16:9, 19:10-21:4, 22:11-23:5, 32:20-34:18.)

24.     By April 10, 2020, Widen Enterprises' transformation into a Digital Asset Management / Software as a Service company was complete, and Widen Enterprises made plans to dismiss the remainder of its pre-media workforce in the coming months. (Palay Decl., ¶ 7, Ex. 5, WINDY0000946.)

25.     At all relevant times, the shares of Windy Waters at issue in this matter were securities within the meaning of the federal securities laws and SEC Rule 10b-5. (Answer ¶¶ 200, 212.)

26.     At all relevant times, the shares of Windy Waters at issue in this matter were securities as defined by Wisconsin Statutes section 551.102(28). (Answer ¶ 238.)

27.     Plaintiff Stacy L. Randall (Stacy) is a sixty-five-year-old resident of the State of Wisconsin.  (Answer ¶ 14.)

28.     From Windy Waters' creation until on or around May 13, 2020, Stacy was a minority shareholder of Windy Waters, which at the time was the sole direct owner of Widen Enterprises. (Answer ¶¶ 2, 3, 14.)

29.     Stacy's highest level of formal education is high school. (09/28/2023 S. Randall Decl., p.1, ¶ 2.)

30.     During all relevant times, Stacy was not sophisticated regarding finance and business. (09/28/2023 S. Randall Decl., p.1, ¶ 3; 08/23/2023 R. Widen Dep. Tr. 177:20-178:4; 194:12-17.)

31.     [Intentionally left blank]

32.     Defendant Reed C. Widen (Reed) is a resident of the State of Wisconsin. (Answer ¶ 15.)

33.     Reed is Stacy's brother. (Answer ¶ 15.)

34.     Reed is the majority shareholder, an officer, and a director of Windy Waters. (Answer ¶ 15.)

35.     Until in or around September 2021, Reed indirectly owned a majority interest in Widen Enterprises through his ownership of Windy Waters. (Answer ¶ 15.)

36.     As of May 2020, Reed was the majority and controlling shareholder of Windy Waters. (Answer ¶ 4.)

37.    Immediately prior to Stacy's May 2020 redemption, Reed owned approximately ████ of the outstanding stock of Windy Waters. (Palay Decl., ¶¶ 105-106, Exs. 97-98, STAFFORD000061 attaching STAFFORD000076; Palay Decl., ¶ 31, Ex. 29, STAFFORD000172.)

38.    Reed served as Chairman of the Board of Widen Enterprises from in or around the late 1990s until in or around September 2021, and also unilaterally selected the board of directors of Widen Enterprises. (Answer ¶ 30; 08/23/2023 R. Widen Dep. Tr. 46:8-22; 09/21/2023 M. Gonnering Dep. Tr. 118:3-9; 09/19/2023 M. Kiesler Dep. Tr. 55:10-23.)

39.    As of May 13, 2020, Reed ran Windy Waters and Widen Enterprises (collectively, the Companies), along with Michael Kiesler, an officer of the Companies. (08/23/2023 R. Widen Dep. Tr. 44:24-45:13; Answer ¶¶ 4, 273.)

40.    As of May 13, 2020, Reed was an officer and director of Widen Enterprises. (Answer ¶ 273.)

41.    As of May 13, 2020, Reed was in control of the Companies and "ultimately called the shots" at the Companies. (08/23/2023 R. Widen Dep. Tr. 44:24-45:19, 16:2-3; Answer ¶ 273; 09/19/2023 M. Kiesler Dep. Tr. 225:8-19; 09/21/2023 M. Gonnering Dep. Tr. 113:24-114:7, 117:16-118:9, 119:20-24, 120:20-122:12, 123:21-124:4.)

42.    In 2019 and 2020, Reed was Gonnering's (CEO of Widen Enterprises) manager, and Gonnering was Kiesler's manager. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11; 09/21/2023 M. Gonnering Dep. Tr. 114:2-7, 119:20-24.)

43.    Defendant Michael Kiesler (Kiesler) is a resident of the State of Wisconsin. (Answer ¶ 16.)

6

44.     Until in or around September 2021, Kiesler served as the Chief Financial Officer (CFO) of Widen Enterprises and the Treasurer of Windy Waters. (Answer ¶¶ 4, 16.)

45.     Prior to May 5, 2020, Kiesler became a shareholder of Windy Waters. (Answer ¶¶ 4, 16.)

46.     In 2004, Reed received a ███████████████ appraisal of Windy Waters. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

47.     The 2004 appraisal explained that ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████ (Palay Decl., ¶ 11, Ex. 9, WINDY0047991).

48.     Based on a weighted analysis of three separate approaches to calculating value, the 2004 appraisal estimated that Windy Waters' fair market value was approximately $7,441,000 as of April 30, 2004. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991 at 47996-97).

49.     In 2004, Widen Enterprises had software revenue less than $1 million. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065).

50.     By no later than December 1, 2014, the CEO of Widen Enterprises, Matthew Gonnering, had notified Reed and Kiesler that the ████████████████████████ of a Software as a Service company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue. (Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl., ¶ 14, Ex. 12, WINDY0034382; 08/23/2023 R. Widen Dep. Tr. 48:18-22, 110:6-111:1.)

51.     Matthew Gonnering became a shareholder of Windy Waters in or before 2008. (Palay Decl., ¶ 15, Ex. 13, STAFFORD001432; Palay Decl., ¶ 16, Ex. 14, STAFFORD001423.)

52.     On or around December 1, 2014, Gonnering wrote to Reed and Kiesler and another shareholder of Windy Waters regarding the valuation of Widen Enterprises.  (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

53.     In that December 1, 2014 email, Gonnering stated that ███████████ █████████████████████████████████████████████████████████ ████████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

54.     In that same December 1, 2014 email, Gonnering stated that ████████ ███████████████████████████████████████████████████████████ ████████ Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

55.     In that same December 1, 2014 email, Gonnering stated that ████████ █████████████████████████████████████████████ ███████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

56.     In that same December 1, 2014 email, Gonnering stated that ████████ █████████████████████ Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

57.     In that same December 1, 2014 email, Gonnering stated that ███████ ██████████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

58.     In that same December 1, 2014 email, Gonnering estimated that Widen Enterprises' ███████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383; 09/21/2023 M. Gonnering Dep. Tr. 183:3-184:11.)

59.     In response to that December 1, 2014 email, one of the shareholders of Windy Waters stated ████████████████████████████████████████ █████████████████████████████████████████████████████████

█████████████████████████████████ (Palay Decl., ¶ 14, Ex. 12, WINDY0034382; Palay Decl., ¶ 9, Ex. 7, STAFFORD000437-38.)

60.    On or around February 23, 2018, Gonnering communicated via e-mail to Kiesler and Reed regarding Widen Enterprises' ████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

61.    In that same February 23, 2018 correspondence, Gonnering stated to Reed and Kiesler that in the global Digital Asset Management market, Widen Enterprises was the ███████ ████████████████████████████████████. (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

62.    In that same February 23, 2018 correspondence, Gonnering explained to Reed and Kiesler that Widen Enterprises had a ███████████ and had users ████████████ ████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

63.    In that same February 23, 2018 correspondence, ████████████████ ██████████████████████████████████████████████ ████████████. (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

64.    In that same February 23, 2018 communication, under the heading ██████████ Gonnering explained to Kiesler and Reed that he believed that ██████████████████ ████████████████████████████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

65.    In that same February 23, 2018 communication, Gonnering stated to Reed and Kiesler that ██████████████████████████████████████ ████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

66.    If the 3.5x revenue multiple Gonnering used was applied to the trailing-twelve-month subscription revenue of $24,001,394 for Widen Enterprises as of April 30, 2020, the estimated fair

market value of Widen on an enterprise basis would be $84,004,879. (Palay Decl., ¶ 18, Ex. 16, WINDY0015630.)

67.     On August 10, 2018, Gonnering provided to Kiesler and Reed Gonnering's estimation of the value of Widen Enterprises when Gonnering estimated what a minority stake in Widen Enterprises is worth, writing to Reed and Kiesler ███████████████████████ ███████████████████████████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

68.     On August 10, 2018, Gonnering sent Kiesler and Reed a written communication that stated that Gonnering had responded to an inquiry from a private equity firm called Five Elms Capital ██████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

69.     Gonnering stated in that same August 10, 2018 correspondence that Five Elms Capital ████████████████████████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

70.     Gonnering stated in that same August 10, 2018 correspondence that Five Elms Capital ███████████████████ in Widen Enterprises. (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

71.     Gonnering stated in that same August 10, 2018 correspondence that ██████ ████████████████████████████████████████ ████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

72.     Gonnering stated in that same August 10, 2018 correspondence that ██████ ████████████████████████████████████████ ████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

73.     The use of a multiple of recurring revenue to estimate Widen Enterprises' market value is widely accepted in the SaaS industry. For example, SaaS Capital, a firm that provides debt capital to SaaS businesses, explains that:

> For SaaS businesses, however, earnings are generally understated for two reasons: customer acquisition costs are expensed up front, and most SaaS companies are still in an aggressive growth stage. For this reason, current earnings are not as good an indicator of future cash flows as current revenues, and that is why SaaS company valuations are more highly correlated to their size than their profitability. As a result, SaaS businesses trade on a price to revenue basis, or "Revenue Multiple."

(Private SaaS Company Valuations: 2019, SaaS Capital, June 11, 2019, https://www.saas-capital.com/blog-posts/private-saas-company-valuations-2019.)

74.     Applying Gonnering's August 2018 metric of 4x recurring revenue to the trailing-twelve-month subscription revenue of $24,001,394 for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen Enterprise on an enterprise basis would be $96,005,576. (Palay Decl., ¶ 18, Ex. 16, WINDY0015630.)

75.     Kiesler testified that he did not read the Operational Update e-mail memoranda that Gonnering sent to Reed and copied Kiesler on containing Gonnering's $63 million and $80 estimates of Widen Enterprises' market value, and that he "very rarely read" Gonnering's operational update reports, "if ever," because Kiesler "was living in the moment." (09/19/2023 M. Kiesler Dep. Tr. 152:17-154:16, 156:16-158:21; 159:14-25; 161:16-164:11.)

76.     In February 2020, Justin Randall, Reed's nephew and Stacy's son, visited Reed at Reed's home in Arizona. (09/29/2023 J. Randall Decl., p.1, ¶ 2.)

77.     During Justin's February 2020 visit, Reed told Justin that the Companies regularly received solicitations to sell Widen Enterprises. (09/29/2023 J. Randall Decl., p.1, ¶ 3.)

78. During Justin's February 2020 visit, Reed told Justin that Reed was considering a sale of Widen Enterprises because Reed could sell the company for around $80 million. (09/29/2023 J. Randall Decl., p.1, ¶ 4.)

79. In 2018, Widen Enterprises had total revenues of $23,296,439.69. (Answer ¶ 195.)

80. In 2019, Widen Enterprises had total revenues of $28,689,686.70, and gross profit of $16,782,732 (Answer ¶ 195.)

81. In 2019, Widen Enterprises had recurring revenues of $22,542,781, and recurring gross profit of $14,667,154. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

82. In 2020, Widen Enterprises had total revenues of $29,142,311, and gross profit of $19,313,952. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

83. In 2020, Widen Enterprises had recurring revenues of $25,528,245, and recurring gross profit of $18,227,866. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

84. Reed testified that, as of around April 2020, Reed "constantly" received solicitations from people looking to buy Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 120:1-20.)

85. On May 8, 2020, Gonnering e-mailed Reed and Kiesler, projecting that Widen Enterprises ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ (Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

86. In the "Confidential Information Memorandum" that Widen Enterprises used to market itself to potential acquirers in 2021, Widen Enterprises marketed its ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████████. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7902, 7982; Palay Decl., ¶ 107, Ex. 99, SEG_00003893.)

87.     In the "Confidential Information Memorandum" that Widen Enterprises used to market itself to potential acquirers in 2021, Widen Enterprises stated its ████████████ ████████████████████ (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7902, 7983.)

88.     In 2020, the year prior to Acquia's purchase of Widen Enterprises for $162 million, Widen Enterprises had EBITDA of negative $139,040. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.5, Defs.' Response to Request for Admission No. 10; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985; Answer ¶¶ 148-149.)

89.     At or around the time Widen Enterprises was acquired by Acquia for $162 million, Widen Enterprises projected negative EBITDA for 2021 of $2.7 million. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp.5-6, Defs.' Response to Request for Admission No. 11; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985; Answer ¶¶ 148-149.)

90.     Reed and Kiesler have each professed an inability to report their own subjective beliefs with respect to the value of the Companies at the time of Stacy's May 2020 redemption. (08/23/2023 R. Widen Dep. Tr. 89:14-90:14; Palay Decl., ¶ 23, Ex. 21, 08/28/2023 M. Kiesler's Objections & Responses to Pl.'s Third Set of Interrogatories, pp. 1-2, M. Kiesler's Answer to Interrogatory No. 12; Palay Decl., ¶ 24, Ex. 22, 08/28/2023 R. Widen's Objections & Responses to Pl.'s Third Set of Interrogatories, pp.1-2, R. Widen's Answer to Interrogatory No. 12; Palay Decl., ¶ 25, Ex. 23, 08/28/2023 M. Kiesler's Objections & Responses to Pl.'s Second Set of Requests for Admission, pp. 2-3, M. Kiesler's Response to Requests for Admission Nos. 81 and 82; Palay Decl.,

¶ 26, Ex. 24, 08/28/2023 R. Widen's Objections & Responses to Pl.'s Second Set of Requests for Admission, pp.1-3, R. Widen's Response to Requests for Admission Nos. 81 and 82.)

91.     Reed testified that he never considered the value of Widen Enterprises prior to selling it. (08/23/2023 R. Widen Dep. Tr. 126:22-128:20.)

92.     Kiesler testified that he did not know the fair market value of Widen Enterprises on May 13, 2020, that he did not do anything to investigate what Widen Enterprises' fair market value was in connection with Stacy's May 2020 redemption, and that it "never crossed my mind" whether any other information was relevant to the value of Stacy's shares because he was applying the EBITDA formula. (09/19/2023 M. Kiesler Dep. Tr. 74:5-15, 77:23-78:17, 219:20-220:1.)

93.     When Defendants marketed Widen Enterprises to potential acquirers, they repeatedly included the company's recurring revenue and Annual Recurring Revenue (ARR) in their promotional materials. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906, 7917, 7958, 7982, 7985; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26) (duplicate of Palay Decl., ¶ 4, Ex. 2, WINDY0007901).)

94.     On October 16, 2019, Gonnering messaged Kiesler: ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(Palay Decl., ¶ 29, Ex. 27, WINDY0047426 at 47427.)

95.      "Gary" referred to Gary Norris, a longtime employee of Widen Enterprises who oversaw software development. (09/19/2023 M. Kiesler Dep. Tr. 26:10-27:8.)

96.     About one month later, on November 22, 2019, Gonnering e-mailed Reed and copied Kiesler on the e-mail, explaining that Norris, a shareholder of Windy Waters, had ███████████

████████████████████████████████. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900; Palay Decl., ¶ 31, Ex. 29, STAFFORD000172.)

97.     In that same November 22, 2019 correspondence, Gonnering wrote that he told the shareholder that the shareholder ████████████████ about the request to purchase additional shares of Windy Waters with Reed. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

98.     In that same November 22, 2019 correspondence, Gonnering wrote that ████████ ████████████████████████████████████████. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

99.     In that same November 22, 2019 correspondence, Gonnering explained to Reed and Kiesler that ████████████████████████████████████ ████████████████████████████████████████ ████████████ (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

100.    In that same November 22, 2019 correspondence, Gonnering told Reed that Widen Enterprises was projecting to finish 2019 with software revenue of $23,970,000 and total revenue of $27,960,000, representing ████████ from the prior year. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

101.    As of May 13, 2020, Reed had not permitted the requesting shareholder to purchase more shares. (Palay Decl., ¶ 31, Ex. 29, STAFFORD000172 at 173.)

102.    Stacy was one of the "specific shareholders" to whom Gonnering was referring. (09/21/2023 M. Gonnering Dep. Tr. 164:8-165:1.)

103.    In the three-and-a-half years prior to Gonnering's advice that he and Reed ████████ ████████████████████████████████ only Stacy had engaged in such a buyback. (Palay Decl., ¶ 31, Ex. 29, STAFFORD000172 at 173; Palay Decl., ¶ 33, Ex. 31, WINDY0033899.)

104.    Gonnering had advised Reed to buyout Stacy and other passive shareholders of the Companies because Gonnering learned in business school that having passive shareholders was suboptimal and because he wanted "all hands on deck." (09/21/2023 M. Gonnering Dep. Tr. 158:16-162:5, 166:6-169:25.)

105.    In 2019 Reed was ███████████████████████ of Widen Enterprises. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.)

106.    In 2020 Reed was ███████████████████████ of Widen Enterprises. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.)

107.    During 2019 and 2020, Gonnering ran the day-to-day operations at Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 202:17-204:10.)

108.    Reed testified that during those years he visited the companies' offices every few weeks, or sometimes every few months, and he spent around 6 months per year in Arizona or the family cottage. (08/23/2023 R. Widen Dep. Tr. 207:15-20, 209:9-23.)

109.    Reed testified that he was constantly thinking and strategizing about the companies, but he could not identify any work he performed, other than meeting with Gonnering. (08/23/2023 R. Widen Dep. Tr. 207:25-209:8.)

110.    Reed was unable to explain what the companies' software did or how it worked. (08/23/2023 R. Widen Dep. Tr. 62:14-25.)

111.    For 2019 and 2020, Reed set his own compensation for his roles at Widen Enterprises "by considering [his] individual performance, the company's performance, and the market conditions." (08/23/2023 R. Widen Dep. Tr. 46:23-25; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 09/21/2023 M. Gonnering Dep. Tr. 123:21-124:6.)

112.    Reed testified that his "individual performance" was based entirely on "the company's performance." (08/23/2023 R. Widen Dep. Tr. 47:1-17, 48:12-17.)

113.    Reed determined the company's performance based on how it was doing financially, mainly measured by its revenues. (08/23/2023 R. Widen Dep. Tr. 47:19-48:3, 50:11-14, 51:1-4.)

114.    Reed's testimony established that there was no process for determining his compensation, and that he "just" thought of "my effort and how well the company was doing," and "picked a number." (08/23/2023 R. Widen Dep. Tr. 61:19-62:8.)

115.    Reed could not say what was meant by the "market conditions" that Defendants claim he considered. (08/23/2023 R. Widen Dep. Tr. 58:17-20, 61:8-13.)

116.    Reed testified that in 2019 and 2020 he was paid bi-weekly. (08/23/2023 R. Widen Dep. Tr. 200:2-13.)

117.    In 2019, Reed determined that his total compensation would be $1,459,328, made up of $938,063 of "Salary" and $521,264 of "Bonus," and, in 2018, $900,752 total compensation. (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

118.    In 2020, Reed determined that his total compensation would be $2,001,517, made up of $1,075,317 of "Salary" and $926,200 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

119.    In 2019, Reed determined that Gonnering's total compensation would be $495,244, made up of $454,105 of "Salary" and $41,139 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11.)

120.    In 2020, Reed determined that Gonnering's total compensation would be $1,085,536, made up of $471,448 of "Salary" and $614,087 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11.)

121.    In 2019, Gonnering determined that Kiesler's total compensation would be $249,160, made up of $219,693 of "Salary" and $29,468 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 60:20-61:4.)

122.    In 2020, Gonnering determined that Kiesler's total compensation would be $550,264, made up of $237,149 of "Salary" and $313,115 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 60:20-61:4.)

123.    On April 12, 2019, Kiesler messaged Gonnering that ███████████ ████████████████████████████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

124.    Gonnering asked whether the payment would need to be ████████████ ████████ to which Kiesler responded that it would. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

125.    Gonnering asked, ██████████████████████████████████████ Kiesler responded that he was ████████████████████████████████. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

126.    Gonnering clarified that ███████████████████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

127.    Kiesler responded that such a dividend ████████████████████ ████████ which would be a █████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

128.    Gonnering then told Kiesler to go with ████████████████████ ████████████. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

129.    Reed testified consistent with the above-described texting conversation: When asked how he determined that he should receive a bonus of approximately $500,000 in 2019, Reed testified that this was based on his need to pay a tax obligation stemming from Windy Waters' pass-through taxation status. (08/23/2023 R. Widen Dep. Tr. 203:22-204-10, 210:25-211:21.)

130.    Reed acknowledged that the other shareholders had similar tax obligations but that none received a similar bonus. (08/23/2023 R. Widen Dep. Tr. 210:25-211:21.)

131.    In 2021, in preparing to market itself to potential acquirers, Widen Enterprises hired Grant Thornton LLP, a national accounting firm, to perform a "Quality of [E]arnings" study on Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 194:24-195:3; Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4132, 4140.)

132.    Grant Thornton ████████ Widen Enterprises' EBITDA to add back all of Reed's salary, bonus, and fringe benefits for 2019 and 2020 based on its stated understanding that Reed's roles as ███████████████████████████████████████████████ ████████████ in 2019 and 2020, and that Reed was ███████████████████ of Widen Enterprises in 2019 or 2020. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142.)

133.    Reed and Kiesler testified that the information provided to Grant Thornton was accurate. (08/23/2023 R. Widen Dep. Tr. 196:1-3; 09/19/2023 M. Kiesler Dep. Tr. 82:1-7.)

134. Grant Thornton adjusted Widen Enterprise' EBITDA to add back Reed's compensation, which adjusted EBITDA was then used in the Confidential Information Memorandum to market Widen Enterprises to potential acquirers. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7988; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26).)

135. On June 3, 2020, a few weeks after the May 2020 redemption discussed below, Kiesler contacted a tax partner at Baker Tilly, Widen Enterprises' accounting firm, to ask, ███ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████ (08/23/2023 R. Widen Dep. Tr. 195:5; Palay Decl., ¶ 37, Ex. 35, WINDY0044692.)

136. On July 3, 2020, approximately six weeks after the May 13, 2020 redemption discussed below, Gonnering explained to Reed and Kiesler that Gonnering and Kiesler ████ █████████████████████████████████████████████ for the owners of Windy Waters. (Palay Decl., ¶ 38, Ex. 36, WINDY0044312.)

137. In January 2020, while at his home in Arizona, Reed told a Widen Enterprises employee that he planned to stay in Arizona ██████████████████ (Palay Decl., ¶ 39, Ex. 37, WINDY0033885.)

138. The original Widen Colourgraphics shareholder agreement, adopted by Windy Waters in 2001, provided for the company to redeem shareholders of their stock upon their death or permanent disability. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1314-1317; Palay Decl., ¶ 3, Ex. 1, STAFFORD001299.)

139. Such redemptions were to occur at what the agreement defined as "Fair Market Value," which the agreement defined as █████████████████████████████████ ███████████████████████████████████████████████████████████████████████

(Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317.)

140.    This determination could be made by agreement of the parties or by a professional appraisal. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18.)

141.    On May 7, 2007, the shareholder agreement for Windy Waters was amended to include a formula for calculating the "Fair Market Value per share" of Windy Waters stock for purposes of determining the price that shareholders were paid in situations where the company redeemed their shares in a <u>non-voluntary</u> redemption, such as a shareholder's death or permanent disability. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18, Palay Decl., ¶ 3, Ex. 1, STAFFORD001299; Palay Decl., ¶ 42, Ex. 40, STAFFORD001285.)

142.    Stacy does not recognize the signature above her name on the May 7, 2007 Second Amendment to Shareholder Agreement as her signature. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291; 09/28/2023 S. Randall Decl., p.1, ¶ 4.)

143.    The formula for calculating the "Fair Market Value per share," referenced above, is based on a weighted average of Windy Waters' EBITDA (Earnings Before Interest Taxes Depreciation and Amortization) over the three years leading up to a non-voluntary redemption (the EBITDA Formula). (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

144.    In the EBITDA Formula, the weighted average of Windy Waters' EBITDA is multiplied by 3.6. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

145.    The following items are then added to the amount calculated in the preceding paragraph: cash and cash equivalents, securities available for sale and other investments, and stock

subscription notes receivable. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

146.    Accrued deferred compensation and interest bearing debt as of the preceding fiscal year are then subtracted from the amount calculated in the preceding paragraph to reach the "Estimated Value of Windy Waters, Inc." and "Concluded Value of Windy Waters." (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

147.    At the time of the Second Amendment to the Windy Waters Shareholder Agreement's execution, Widen Enterprises had annual software revenues close to or less than $2 million. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065.)

148.    As of May 13, 2020, the EBITDA Formula did not apply to or limit the purchase price paid to Stacy for the stock purchased from her pursuant to the May 13, 2020 redemption agreement. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.7, Defs.' Response to Request for Admission No. 16; Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18; Palay Decl., ¶ 3, Ex. 1, STAFFORD001299; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291; Palay Decl., ¶ 42, Ex. 40, STAFFORD001285; 09/19/2023 M. Kiesler Dep. Tr. 195:1-17.)

149.    On December 20, 2018, Reed's lawyer stated to Reed and Kiesler that ███████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ (Palay Decl., ¶ 44, Ex. 42, WINDY0033984.)

150.    On May 12, 2020, one day before Stacy's redemption, Windy Waters' corporate counsel stated to Kiesler, via an e-mail with the subject line ██████████████████ that the ████████████████████████████████████████████████████████████████████████████ ██████████████████████ (Palay Decl., ¶ 45, Ex. 43, STAFFORD000040.)

151. The EBITDA formula does not take into account the revenues of Windy Waters or Widen Enterprises. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-14; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

152. As of May 13, 2020, the fair market value of Windy Waters was the price at which 100% ownership of Windy Waters would change hands between a hypothetical willing buyer and a hypothetical willing seller where the seller is not under any compulsion to sell and the buyer is not under any compulsion to buy, both parties having reasonable knowledge of the relevant facts. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

153. WINDY0036828 is the version of the EBITDA formula used to calculate the per-share redemption price that Stacy was paid under the May 13, 2020 Redemption Agreement. (09/19/2023 M. Kiesler Dep. Tr. 71:10-21; Palay Decl., ¶ 46, Ex. 44, WINDY0036797 attaching WINDY0036828 (Palay Decl., ¶ 43, Ex. 41 (filename: "WindyWaters-31Dec2019StockValue-ModifiedLookBack.xlsx")).)

154. As of May 2020, the EBITDA formula did not calculate the fair market value of Windy Waters. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

155. As of May 13, 2020, EBITDA formula did not approximate the fair market value of Windy Waters. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

156. Kiesler testified that calculating the fair market value of Windy Waters stock "wasn't the purpose of that formula," which was intended only "to calculate the redemption price or subscription price per share." (09/19/2023 M. Kiesler Dep. Tr. 141:6-13.)

157. Kiesler testified that he could not say whether or not he believed at the time of Stacy's 2020 redemption that the formula was required but that it was used because it had been used in

prior redemptions, and he "was always told to be consistent." (09/19/2023 M. Kiesler Dep. Tr. 195:1-17, 203:20-204:7.)

158. Reed and Gonnering testified that they believed or were unsure at the time of Stacy's 2020 redemption that the shareholder agreement required the use of the EBITDA formula for Stacy's 2020 redemption. (08/23/2023 R. Widen Dep. Tr. 81:15-82:2; 09/21/2023 M. Gonnering Dep. Tr. 147:6-149:16, 231:17-233:1.)

159. In situations where the EBITDA formula *does* apply (i.e., death or permanent disability), ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1319.)

160. In situations where the EBITDA formula *does* apply (i.e., death or permanent disability), ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1319-20.)

161. Defendants never offered Stacy any of the catchup rights described in the preceding two paragraphs. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.8, Defs.' Response to Request for Admission No. 19.)

162. On or around January 3, 2019, Widen Enterprises loaned Stacy $20,000. (Palay Decl., ¶ 47, Ex. 45, WINDY0049644.)

163. [Intentionally left blank]

164.     On or around May 5, 2020, Stacy reached out to her brother, Reed, for help. (Answer ¶¶ 67-68.)

165.     Stacy told Reed that her then-husband was initiating legal proceedings and demanding maintenance payments and that she was going to need to get some money. (Answer ¶ 68.)

166.     Reed responded that Stacy's timing was unfortunate because the Companies had a ██████████████████████████████████████████ a reference to a separate family-owned company that holds real estate that had been left to Stacy, Reed, and their siblings. (Answer ¶ 69; Palay Decl., ¶ 48, Ex. 46, WINDY0047392.)

167.     Kiesler testified that, on that same day (May 5, 2020), Kiesler and Reed spoke by phone and Reed told Kiesler that Stacy was "asking for money again" and that "he (i.e., Reed) was kind of annoyed with the fact that she kept coming back to the company for money, and him personally," and that Reed "wanted to [buy] all of her shares . . . using the formula that we used for Price [Widen]." (09/19/2023 M. Kiesler Dep. Tr. 168:1-10, 168:24-169:7.)

168.     Early the next morning, May 6, 2020, Kiesler, who also helped the family administer Millmont, contacted Stacy, and they had a phone conversation. (Answer ¶ 70; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-8, Defs.' Answer to Interrogatory No. 5.)

169.     Stacy told Kiesler that she would need approximately $100,000 for her divorce and living expenses. (Answer ¶ 71.)

170.     Kiesler told Stacy that the Companies did not have $100,000 they could make available to her. (Answer ¶ 72.)

171.     Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that either. (Answer ¶ 73.)

172.    Kiesler told Stacy that the only way she could get any cash from the Companies was to sell her entire interest in Windy Waters—approximately 20% of the outstanding shares—to Windy Waters. (Answer ¶ 74.)

173.    Stacy told Kiesler that she did not want to sell her entire interest. (Answer ¶ 76.)

174.    Stacy's and Kiesler's conversation did not include an explanation from Kiesler as to why Windy Waters could afford to purchase all, but not some, of Stacy's shares. (Answer ¶ 75.)

175.    Kiesler reiterated that the Companies wanted to purchase her entire interest using the price given by the price-per-share calculation model in the EBITDA Formula, which calculates the (so-called) "Fair Market Value per share" under the Windy Waters Shareholder Agreement. (Answer ¶ 77; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

176.    Kiesler offered Stacy $1.1 million dollars for her approximately 20% interest in Windy Waters. (Answer ¶¶ 74, 77.)

177.    Stacy told Kiesler that that price seemed too low. (Answer ¶ 78.)

178.    Kiesler assured Stacy that the price was "fair," purportedly "because [it used the] standard price-per-share calculation model for voluntary redemptions, which Kiesler explained was the same formula that had been used for [Stacy's] prior partial share redemptions and for the complete share redemptions of [her] brothers." (Answer ¶ 79; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

179.    Defendants claim that Kiesler walked Stacy through the model price-per-share formula calculation he had used to calculate the $1.1 million offer price. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-8, Defs.' Answer to Interrogatory No. 5.)

180.    In response to Plaintiff's Interrogatory No. 5, which requests that Defendants "[s]tate every fact about Widen Enterprises that you contend any of Defendants disclosed to Plaintiff in

connection with the Redemption, including identification of every document provided or shown to Plaintiff in connection with the Redemption; the person(s) making such disclosure or providing such document; and the date(s) on which such disclosure was made or such document was provided," Defendants only allege that, "in a telephone conversation on May 6, 2020, Mr. Kiesler went through the price-per-share calculation model with Plaintiff, line by line, using November 2019 financial information of the Companies and shared with her the redemption price. Mr. Kiesler explained to Plaintiff in that conversation that he would have to update the calculation with End-of-Year numbers. After closing the Companies' April 2020 books, Mr. Kiesler updated the price-per-share calculation model using December 2019 financial information and telephoned Plaintiff again, this time on May 13, 2020, during which conversation Mr. Kiesler shared the updated redemption price," and that Kiesler "read aloud" the redemption agreement and promissory note, "stopping after each paragraph to ask if she understood and whether she had any questions." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)[2]

181.    Kiesler also told Stacy that she would be smart to sell her interest in the Companies while she had the chance because Widen Enterprises, the operating company, might not even be around in seven years, and she risked ending up with nothing if she didn't take his offer. (Palay Decl., ¶ 49, Ex. 47, Randall0000116; Answer ¶ 81.)

182.    Defendants admit that Kiesler expressed the general sentiment that it could be smart given the current financial state of affairs, including the uncertainty presented by the onset of the

---

[2] Plaintiff disputes whether Kiesler did, in fact, "read aloud" the redemption agreement and promissory note, or whether he went through the EBITDA formula with Plaintiff over the phone "line by line." However, for purposes of this motion only, Plaintiff accepts those statements as true.

COVID-19 pandemic, for Stacy to sell her shares because there was no guarantee that Widen Enterprises would remain a viable company. (Answer ¶ 81.)

183.    Kiesler could not identify any financial difficulties the Companies faced at the time of Stacy's redemption. (09/19/2023 M. Kiesler Dep. Tr. 178:9-179:19.)

184.    Kiesler also represented to Stacy before the May 2020 redemption that, because the company continually reinvested most of its profits back into the business, the value of her stock would not change substantially over the next seven years. (Palay Decl., ¶ 50, Ex. 48, Randall0000328.)

185.    Stacy explained that her investment in the Companies was really important to her because her investment in the Companies was all she had to live on for the rest of her life. (Palay Decl., ¶ 49, Ex. 47, Randall0000116; Answer ¶ 82.)

186.    Kiesler told Stacy the deal was "take it or leave it" and had an end-of-day deadline, and that if she turned it down, the Companies could not be a source of the cash she needed to finance her divorce proceedings. (Answer ¶¶ 82-83; Palay Decl., ¶ 49, Ex. 47, Randall0000116.)

187.    After speaking with Stacy, Kiesler contacted Reed to confirm that Kiesler should arrange for Windy Waters to purchase ██████ of Stacy's shares in the company, to which Reed responded 6 minutes later, ██████ (Answer ¶ 85; Palay Decl., ¶ 51, Ex. 49, WINDY0047397-40 (capitalization in original).)

188.    In a second conversation with Stacy, Kiesler again insisted the price was "fair." (Answer ¶ 89.)

189.    On May 8, 2020, Gonnering stated in an e-mail to Reed and Kiesler, with respect to a Paycheck Protection Program loan to Widen Enterprises of approximately $2.7 million, that ██████

████████████████████████████████████████

████████████████████████████████████████

and Gonnering testified at his deposition that he viewed the PPP money as "[n]ecessary for the uncertainty of the company." (Palay Decl., ¶ 21, Ex. 19, WINDY0009851; 09/21/2023 M. Gonnering Dep. Tr. 218:9-12.)

190.    On May 12, 2020, Kiesler emailed the Companies' corporate attorney and told him that ███████████████████████████████████████████████████████████████ ████████ (Palay Decl., ¶ 52, Ex. 50, STAFFORD000258.)

191.    On May 13, 2020, Kiesler called Stacy again, after not hearing from her, and told her that he had updated the price-per-share calculation model using the December 2019 financials, as promised previously, and that as a result, the redemption price Windy Waters would offer in the proposed redemption had increased to approximately $1.3 million. (Answer ¶ 94.)

192.    This time, too, Kiesler told Stacy that she had until the end of the day to accept the offer. (Answer ¶ 96.)

193.    On May 13, 2020, Kiesler messaged Gonnering that "███ [(the Companies' corporate attorney)] has everything he needs from me. Waiting for ████ to turn around agreements and then will share with Stacy and hopefully meet for signatures." Kiesler added an emoji at the end of his text. (Palay Decl., ¶ 53, Ex. 51, WINDY0047497-98.)

194.    On May 13, 2020, Stacy told her son, Justin, that "Kiesler did another evaluation of the company and came up with another $250 thousand.[] Nothing I can do about it[.] I will be going over to the office to sign the papers at 4:30." (Palay Decl., ¶ 54, Ex. 52, Randall0000117.)

195.    Stacy sought legal advice from her divorce attorney via email on May 13, 2020 asking for help, but her attorney informed her that the buyout was beyond her expertise and that she could offer Stacy no assistance. (09/28/2023 S. Randall Decl., p.2, ¶ 6.)

196.     When Stacy entered the Companies' office to sign the documents, Kiesler was waiting for her in the lobby, talking on the phone with Windy Waters' corporate attorney. (Answer ¶ 109.)

197.     Kiesler handed Stacy the phone upon Stacy asking to speak to the Companies' corporate attorney, and Stacy spoke to the Companies' corporate attorney. (Answer ¶¶ 110-111.)

198.     While the exact contents of that conversation are disputed, it is undisputed that Stacy told the Companies' attorney that she was uncomfortable about signing the documents for the buyout. (Palay Decl., ¶ 55, Ex. 53, STAFFORD000112.)

199.     Stacy asked Kiesler whether he and the Companies' executives were preparing to sell Widen Enterprises. (Answer ¶ 117.)

200.     Kiesler responded, in sum and substance, "No, there's been no talk of that." (Answer ¶ 118.)

201.     Kiesler did not provide any financial information or disclosure about the Companies during this interaction. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

202.     During this interaction Kiesler did not show Stacy how the purchase price he had offered her had been calculated. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

203.     This was the first time Stacy had been shown the May 13, 2020 redemption agreement and promissory note (the Redemption Documents). (Answer ¶ 121.)

204.     Stacy signed the redemption agreement on May 13, 2020 while she was at the Companies' offices with Kiesler, and Kiesler signed the redemption agreement on behalf of Windy Waters. (09/28/2023 S. Randall Decl., p.2, ¶ 7; Palay Decl., ¶ 56, Ex. 54, WINDY0003172 (redemption agreement).)

205.    Stacy relied on the representations Kiesler had made to her over the preceding week in deciding to sign the redemption agreement. (09/28/2023 S. Randall Decl., p.2, ¶ 8.)

206.    In deciding to sign the redemption agreement, Stacy relied on her trust that Kiesler and Reed would disclose to her all of the relevant information she needed to make an informed decision on whether or not to sign the redemption agreement. (09/28/2023 S. Randall Decl., p.2, ¶ 9.)

207.    The next day, May 14, 2020, Kiesler messaged Gonnering, ████████████████ ████████████████████████████████████████ (Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

208.    Gonnering responded, ██████████████████████ (Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

209.    The same day, May 14, 2020, Kiesler texted Reed, ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ (Palay Decl., ¶ 58, Ex. 56, WINDY0047370; Answer ¶ 123.)

210.    Because of Stacy's redemption, Reed's ownership stake in Windy Waters increased by approximately 8.1%. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-188:25. *Compare* Palay Decl., ¶ 106, Ex. 98, STAFFORD000076, *with* Palay Decl., ¶ 60, Ex. 58, WINDY0004372 at 4515.)

211.    On May 22, 2020, Gonnering e-mailed Reed and Kiesler about Widen Enterprises' operations. (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

212.    In that May 22, 2020 correspondence, Gonnering stated that ██████████████ ████████████████████████████████████████

████████████████████████████████████████████ (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

213.    In that same May 22, 2020 correspondence, Gonnering stated that Widen Enterprises projected $27,180,000 in software revenue, which was a decrease from the May 8, 2020 projection of $27,440,000 in software revenue. (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

214.    In that same May 22, 2020 correspondence, under the heading ██████████ Gonnering stated that ████████████████████████████████████████████ ████████████████████████████████████████████ (Palay Decl., ¶ 61, Ex. 59, WINDY0000955 at 956.)

215.    Defendants say that in "late June or early July" 2020—i.e., approximately 6 to 8 weeks after Stacy's redemption—Reed "first expressed an interest to Mr. Gonnering in selling Widen Enterprises, Inc. somewhere between two to five years' time (*i.e.,* between mid-2022 to 2025)." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.9-10, Defs.' Answer to Interrogatory No. 6.)

216.    On June 3, 2020, Kiesler contacted a tax partner at the Companies' accounting firm, inquiring, ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ (Palay Decl., ¶ 37, Ex. 35, WINDY0044692.)

217.    One month later, on July 3, 2020, Gonnering wrote to Reed and Kiesler about ████████████████████ stating that ████████████████████████████ ████████████████████████████████████████████ ████████████ (Palay Decl., ¶ 38, Ex. 36, WINDY0044312.)

218.    On August 19, 2020, Reed explicitly ████████████████████████████ ████████████████████████ (Palay Decl., ¶ 62, Ex. 60, WINDY0047301.)

219.    On August 25, 2020, Reed emailed Gonnering back-to-back emails, writing, ████████████████████████ and then writing one minute later ████████████████ ████████████████████████ which emails were in response to Gonnering's email to Reed earlier on that day in which Gonnering wrote, ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ (Palay Decl., ¶ 5, Ex. 3, WINDY0044983).

220.    By October 8, 2020, Gonnering had spoken with Software Equity Group, the investment bank that later brokered the sale of Widen Enterprises to Acquia, about a possible engagement. (Palay Decl., ¶ 63, Ex. 61, SEG_00000001; Palay Decl., ¶ 28, Ex. 26, ACQUIA0006834 at 6835.)

221.    Widen Enterprises ended up keeping the $2.7 million in PPP loans, which Reed testified went "in the bank for a rainy day." (08/23/2023 R. Widen Dep. Tr. 213:1-6.)

222.    The documents Stacy signed at the Companies' office on May 13, 2020, consisted of a Stock Redemption Agreement, dated May 13, 2020, and a Promissory Note, also dated May 13, 2020. (Answer ¶¶ 119, 125; Compl. ¶ 125; Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3172, 3176.)

223.    The redemption agreement states that Windy Waters would purchase 232.75 shares of Class A common stock of Windy Waters for $646.19 per share, and 1,952.7568 shares of Class B common stock of Windy Waters for $615.42 per share, for a total purchase price of $1,352,166.31. (Answer ¶ 126; Palay Decl., ¶ 56, Ex. 54, WINDY0003172.)

224.    Under the redemption agreement, Windy Waters represented to Stacy that ███

████████████████████████████████████████████████████████████████

████████████████████, that "████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ that ██████████████████████████████████████████

██████████" and that "███████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3173, Recitals § 4; Answer ¶ 132.)

225.    The promissory note provided for an annual interest rate on Windy Waters' outstanding obligations to Stacy of only 0.580%, the Applicable Federal Rate—the lowest rate that may be charged without the U.S. Internal Revenue Service ("IRS") requiring that interest income be imputed—as published by the IRS for May 2020. (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3176; Answer ¶¶ 139, 140.)

226.    The promissory note was not secured by collateral or guaranteed by a guarantor or surety. (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3176; Answer ¶ 141.)

227.    Defendants calculated the price paid to Stacy for her shares using the EBITDA Formula for the "Fair Market Value per share" from Windy Waters' shareholder agreement. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Answer ¶ 178.)

228.     Based on that calculation, Defendants had calculated the "Estimated Value of Windy Waters" to be $6,896,973, less than 5% of the value that Defendants sold Widen for sixteen months after Stacy's May 2020 redemption. (Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Answer ¶¶ 148, 179; Compl., Ex. F, ECF No. 1-11.)

229.     After Stacy learned of the sale of Widen Enterprises to Acquia, but prior to the closing of that transaction, Stacy spoke to Reed on the phone and told him that she had concerns about how her redemption had been handled in May 2020. (09/28/2023 S. Randall Decl., p.2, ¶ 10; Answer ¶ 154.)

230.     On September 10, 2021, after Stacy expressed her concerns, Reed sent Stacy a text message saying: "I haven't talked to Kiesler yet but I did find out that we that we (sic) didn't start talking about selling it until February this year." (Palay Decl., ¶ 64, Ex. 62, Randall0000051; Answer ¶ 166.)

231.     Later that same day, Reed asked Kiesler how much stock Stacy had owned. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 186:18-187:25.)

232.     Kiesler told Reed ██████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:1-25.)

233.     Reed responded, ████████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-25.)

234.     Kiesler told him, ██████████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-188:17.)

235.     Reed responded, ████████████████████████ ████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 188:18-25.)

236.   Kiesler explained that ███████████████████████. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 189:19-22.)

237.   Referring to the balance of the promissory note and a $1 million "gift" Reed had offered Stacy until she hired attorneys to represent her with respect to the May 13, 2020 redemption, Reed told Kiesler, █████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 190:5-11).

238.   The next day, September 11, 2021, Reed texted Kiesler, ██████████ ████████████████████ to which Kiesler responded ███████ ██████████ (Palay Decl., ¶ 65, Ex. 63, WINDY0047403 at 47404; 08/23/2023 R. Widen Dep. Tr. 172:7-173:8).

239.   Reed then texted Kiesler, ██████████████ ██████████████████ which message Kiesler texted to Gonnering to ask if Reed had talked to Gonnering about the same. (Palay Decl., ¶ 66, Ex. 64, WINDY0047405 at 47406; Palay Decl., ¶ 67, Ex. 65, WINDY0047401 at 47402.)

240.   Gonnering responded that Reed ██████████████ ████████████████████████ ██████ (Palay Decl., ¶ 67, Ex. 65, WINDY0047401 at 47402.)

241.   Pursuant to the sale of Widen Enterprises to Acquia, Kiesler received approximately $12,354,238.37 based on his 8.32% indirect ownership of Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI"; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.3, Defs.' Response to Request for Admission No. 3.)

242.   Pursuant to the sale of Widen Enterprises to Acquia, Gonnering received approximately $13,998,109.30 based on his 9.43% indirect ownership of Widen Enterprises upon

the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI".)

243.    Pursuant to the sale of Widen Enterprises to Acquia, Reed received approximately $102,430,634.54 based on his approximately 68.97% indirect ownership of Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.3, Defs.' Response to Request for Admission No. 2.)

244.    As of September 19, 2023, Windy Waters had approximately $8 million on hand. (09/19/2023 M. Kiesler Dep. Tr. 270:8-9.)

245.    If Stacy had owned the approximately 20% of Windy Waters stock that Defendants purchased under the May 13, 2020 redemption agreement at the time of Widen Enterprises' sale to Acquia, Stacy would have been entitled to receive approximately $31,727,700 based on her 19.585% indirect ownership of Widen Enterprises, and would have received approximately $29,403,545.30 upon the closing of the transaction after expenses. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheets titled "Shareholder Proceeds" and "Definitions.")

246.    After learning about the sale of Widen Enterprises, Stacy's son, Justin, introduced her to an attorney. (09/28/2023 S. Randall Decl., p.2, ¶ 11.)

247.    On September 20, 2021, prior to the close of the Widen Enterprises sale, Stacy's attorneys sent notices to Defendants alerting them to a potential dispute. (Answer ¶ 170.)

248.    A week later, on September 27, 2021, Stacy's counsel spoke with Defendant's counsel by phone. (Answer ¶ 177; Palay Decl., ¶¶ 69-70, Ex. 67 at 2-3, 10/05/2021 Email from D. Palay to J. Friedman.)

249. On October 6, 2021, Stacy's counsel again spoke with Defendants' counsel by phone. (Palay Decl., ¶¶ 70-71, Ex. 67 at 1-2, 10/06/2021 Email from D. Palay to J. Friedman.)

250. In reference to potential settlement negotiations, Stacy's counsel followed up with an email explaining that "a helpful first step in these discussions would be if your client could share the process and calculations used to determine the purchase price for Ms. Randall's shares in 2020." (Palay Decl., ¶ 70, Ex. 67 at 1-2, 10/06/2021 Email from D. Palay to J. Friedman.)

251. Approximately one week later, on October 14, Defendants' counsel followed up via e-mail with the Companies' 2019 financial statements and the calculation of Stacy's purchase price. (Palay Decl., ¶ 72, Ex. 68, 10/14/2021 Email from J. Friedman to D. Palay & M. Cameli.)

252. Over the next several months, the parties engaged in extensive settlement discussions and negotiations. (Palay Decl., ¶ 73 & Exs. 67-72.)

253. Stacy's counsel requested further information about the sale of Widen Enterprises, and originally demanded that any settlement take place before the end of 2021. (Palay Decl., ¶ 74, Ex. 69, 12/15/2021 Email from M. Cameli to J. Friedman; Palay Decl., ¶ 75, Ex. 70, 01/31/2022 Email from M. Cameli to J. Friedman.)

254. Defendants' counsel requested an extension to allow him to engage with the new owner of Widen Enterprises about the terms of disclosing documents about the purchase. (Palay Decl., ¶ 74, Ex. 69, 12/15/2021 Emails between M. Cameli and J. Friedman.)

255. In January 2022, Defendants produced certain documents relating to Acquia's purchase of Widen Enterprises, raised the possibility of mediation, and had made an initial settlement offer. (Palay Decl., ¶ 75, Ex. 70, 01/31/2022 Emails between M. Cameli and J. Friedman.)

256. Stacy's counsel explained in responsive correspondence that:

> In general, our client is reluctant to undertake mediation based on your client's offer because of the potential for that process to delay her asserting her claims. That's particularly true if the process is used to stall her from advancing her claims through

38

the discovery process or if she risks running over any statutes of limitations. We would therefore need any mediation to include both reasonable discovery and a tolling agreement.

(Palay Decl., ¶ 76, Ex. 71, 03/03/2022 Email from D. Palay to J. Friedman.)

257.     Stacy's counsel also demanded additional discovery, including text and email correspondence among the defendant parties, and the shareholder agreement Defendants' counsel had mentioned in prior correspondence. (Palay Decl., ¶ 76, Ex. 71, 03/03/2022 Email from D. Palay to J. Friedman.)

258.     Those documents were not provided until May 2022. (Palay Decl., ¶ 77.)

259.     To address Stacy's concerns that settlement negotiations could delay or prejudice her assertion of claims, on March 1, 2022, Stacy, Defendants, and third parties entered into a written Standstill and Tolling Agreement. (Palay Decl., ¶¶ 76-78, Exs. 71-72, Standstill and Tolling Agreement).

260.     The Standstill and Tolling Agreement provides that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any legal or equitable actions or defenses that the Parties may have." (Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement at 1.)

261.     The parties' discussions culminated in a formal mediation held on or around May 11, 2022. (Palay Decl., ¶ 79.)

262.     Although negotiations stretched on for multiple weeks after the mediation, they were ultimately unsuccessful. (Palay Decl., ¶ 80.)

263.     On July 21, 2022, after nearly a year of seeking to avoid litigation, Stacy commenced this lawsuit, seeking recission of the Redemption Agreement, among other relief. (ECF No. 1 at 55-56.)

264.     Reed testified that he thinks that Stacy does "[n]ot have financial strength." (08/23/2023 R. Widen Dep. Tr. 177:20-178:4; 194:12-17.)

265.     The only financial information that Defendants claim to have provided Stacy prior to her May 13, 2020 redemption consists of a price-per-share calculation model based on the EBITDA Formula for the (so-called) "Fair Market Value per share" from Windy Waters' shareholder agreement. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; *see* Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

266.     Defendants did not tell Stacy prior to the May 2020 redemption that at least two different lawyers communicated to Reed and Kiesler ███████████████████████ ███████████████████████████████████ (Palay Decl., ¶ 45, Ex. 43, STAFFORD000040; Palay Decl., ¶ 44, Ex. 42, WINDY0033984), or that no provision of the Shareholder Agreement of Windy Waters in effect as of May 13, 2020 limited the purchase price paid to her for her stock in Windy Waters on May 13, 2020. (09/28/2023 S. Randall Decl., p.2, ¶ 12; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

267.     Defendants did not tell Stacy prior to the May 2020 redemption that the "Fair Market Value per share" calculated with the EBITDA formula under the Windy Waters shareholder agreement did not equal or approximate the fair market value of Stacy's shares. (09/28/2023 S. Randall Decl., p.2, ¶ 13; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

268.    Defendants did not tell Stacy prior to the May 2020 redemption that the value of her interest in Windy Waters was negotiable. (09/28/2023 S. Randall Decl., p.3, ¶ 14; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 45, Ex. 43, STAFFORD000040; Palay Decl., ¶ 44, Ex. 42, WINDY0033984.)

269.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Windy Waters held nearly $5.5 million in investment portfolios. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19; 294:6-296:9; 09/28/2023 S. Randall Decl., p.3, ¶ 15; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

270.    Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of April 24, 2020, the marketable securities owned or controlled by Windy Waters were not being used as operating capital for the Companies. (09/28/2023 S. Randall Decl., p.3, ¶ 16; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.18, Defs.' Response to Request for Admission No. 39.)

271.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula did not capture or approximate the fair market value of Windy Waters. (09/28/2023 S. Randall Decl., p.3, ¶ 17; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2; 09/19/2023 M. Kiesler Dep. Tr. 141:6-13.)

272.    Kiesler represented to Stacy that the EBITDA formula calculation was a "fair" price for Windy Waters to pay Stacy for her shares. (Answer ¶ 79, 89.)

273.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the fair market value of Windy Waters would necessarily take into account the fair market value of Widen Enterprises. (09/28/2023 S. Randall Decl., p.3, ¶ 18; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; 08/23/2023 R. Widen Dep. Tr. 90:6-14.)

274.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula calculation did not take into account the fair market value of Widen Enterprises. (09/28/2023 S. Randall Decl., p.3, ¶ 19; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; 08/23/2023 R. Widen Dep. Tr. 90:6-20.)

275.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula value for Windy Waters was low compared to the fair market value of Windy Waters. (09/28/2023 S. Randall Decl., p.3, ¶ 20; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

276.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises' CEO had stated to Reed and Kiesler that the EBITDA Formula value for Windy Waters was ████ (09/28/2023 S. Randall Decl., p.3, ¶ 21; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

277.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering had stated that the fair market value of Widen Enterprises was based in large part on a

multiple of that company's recurring revenue. (09/28/2023 S. Randall Decl., p.4, ¶ 22; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

278.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering had stated to Reed and Kiesler on multiple occasions over a period of years that Widen Enterprises' market value was based on a multiple of the company's revenue or recurring revenue. (09/28/2023 S. Randall Decl., p.4, ¶ 23; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 17, Ex. 15, WINDY0034048; Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

279.    Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of August 2018, Gonnering had stated to Reed and Kiesler that he believed that Widen Enterprises had a fair market value of approximately $80 million. (09/28/2023 S. Randall Decl., p.4, ¶ 24; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

280.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering's 2018 estimate of the company's fair market value was based on applying a multiple to a substantially lower amount of revenue than company was projecting for 2020 as of the May 2020 redemption. (09/28/2023 S. Randall Decl., p.4, ¶ 25; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 19, Ex. 17, WINDY0033985; Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

281.    Defendants did not disclose to Stacy prior to the May 2020 redemption that they had

(09/28/2023 S. Randall Decl., p.4, ¶ 26; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 33, Ex. 31, WINDY0033899; 09/21/2023 M. Gonnering Dep. Tr. 164:8-165:18.)

282.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises had total revenues of $28,689,686.70 for 2019. (09/28/2023 S. Randall Decl., p.4, ¶ 27; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Answer ¶ 195.)

283.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises had $22,542,781 of recurring revenue in 2019. (09/28/2023 S. Randall Decl., p.4, ¶ 28; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

284.    Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of May 8, 2020, Widen Enterprises CEO projected software revenue for 2020 of approximately $27,440,000. (09/28/2023 S. Randall Decl., p.5, ¶ 29; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

285.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed received compensation from the Companies of approximately $1,500,000 for 2019. (09/28/2023 S. Randall Decl., p.5, ¶ 30; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

286.     Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed received compensation from the Companies of approximately $2,000,000 for 2020. (09/28/2023 S. Randall Decl., p.5, ¶ 31; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

287.     Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed was ███████████████████████ of Widen Enterprises in 2019 or 2020. (09/28/2023 S. Randall Decl., p.5, ¶ 32; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142.)

288.     Beginning no later than May 15, 2004, Defendants began using a signature stamp of Stacy's signature to affix her signature to corporate documents of Windy Waters, which Stacy had made and provided to Defendants. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

289.     Defendants claim that Stacy provided the stamp with implied, ongoing permission for them to "use as required in lieu of her handwritten signature." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

290.     Reed testified that "protocol" required that Kiesler contact Stacy "every single time" to obtain her consent for each specific document that Defendants wanted to stamp with her signature. (08/23/2023 R. Widen Dep. Tr. 219:3-220:23.)

291.     Reed testified that he "assum[ed]" Kiesler would have contacted Stacy as described in the preceding paragraph, but he could not be certain because he was not always present when

Kiesler allegedly did contact Stacy for permission to use her signature stamp. (08/23/2023 R. Widen Dep. Tr.219:3-220:23.)

292.   Kiesler testified that he relied on Reed's representation that Reed had discussed a document with Stacy before Kiesler affixed Stacy's stamp but that "I don't know what [Reed] would have done." (09/19/2023 M. Kiesler Dep. Tr. 100:22-104:25.)

293.   Kiesler testified that Stacy gave him "implied consent" to affix her signature stamp to annual corporate resolutions, such as "minutes of annual meetings of the shareholders of Windy Waters, Inc." for meetings that did not actually occur, which included documents purporting to appoint Stacy as director and/or President of Windy Waters. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 114:4-24; 117:9-118:7; 132:2-133:2, 134:16-135:15; 280:22-24; *see generally id.* 106:20-137:17.)

294.   Kiesler could not recall ever sending Stacy any of the annual resolutions shown to him at his deposition, and he had no basis to believe that Stacy ever saw these documents or that she knew of their contents. (09/19/2023 M. Kiesler Dep. Tr. 109:18-111:16, 111:25-113:17, 124:5-127:4, 127:8-128:18, 128:23-130:2, 130:9-135:18, 135:22-137:17.)

295.   Using the stamp, Defendants affixed Stacy's signature to Windy Waters corporate documents from 2004 to 2019, including documents appointing or electing Stacy to various roles at Windy Waters, including director and, in certain instances, President. (Palay Decl., ¶ 81, Ex. 73, STAFFORD001059 (2020 director); Palay Decl., ¶ 82, Ex. 74, STAFFORD001055 (2019 director); Palay Decl., ¶ 83, Ex. 75, STAFFORD001051 (2018 President); Palay Decl., ¶ 84, Ex. 76, STAFFORD001050 (2018 director); Palay Decl., ¶ 85, Ex. 77, STAFFORD001048 (2017 President); Palay Decl., ¶ 86, Ex. 78, STAFFORD001047 (2017 director); Palay Decl., ¶ 87, Ex. 79, STAFFORD001041 (2016 director); Palay Decl., ¶ 88, Ex. 80, STAFFORD001037 (2015 director); Palay Decl., ¶ 89, Ex. 81, STAFFORD001032 (2014 director); Palay Decl., ¶ 90, Ex. 82,

STAFFORD001019 (2012 director); Palay Decl., ¶ 91, Ex. 83, STAFFORD001010 (2011 director); Palay Decl., ¶ 92, Ex. 84, STAFFORD001007 (2010 director); Palay Decl., ¶ 93, Ex. 85, STAFFORD001005 (2009 director); Palay Decl., ¶ 94, Ex. 86, STAFFORD000997 (2008 director); Palay Decl., ¶ 95, Ex. 87, STAFFORD000975 (2004).)

296.    Kiesler, alone, signed documents appointing Stacy as President. (Palay Decl., ¶ 96, Ex. 88, STAFFORD001057 (2020 President); Palay Decl., ¶ 97, Ex. 89, STAFFORD001053 (2019 President); Palay Decl., ¶ 98, Ex. 90, STAFFORD001043 (2016 President); Palay Decl., ¶ 99, Ex. 91, STAFFORD000999 (2008 President).)

297.    In one instance in 2012, Stacy signed a consent resolution as a director of Windy Waters using DocuSign. (Palay Decl., ¶ 100, Ex. 92, STAFFORD001030 at 1031.)

298.    In one instance in December 2004, Stacy signed a waiver for attendance at a meeting where she was elected as a director of Windy Waters, along with two of her brothers. (Palay Decl., ¶ 101, Ex. 93, STAFFORD000973 at 974.)

299.    Despite saying that they believed they had been granted implied, ongoing permission to use Stacy's signature stamp in lieu of her actual signature in 2004, Defendants nonetheless chose to obtain Stacy's actual signature on certain documents throughout the years, notably four of the five redemption agreements she executed prior to the May 13, 2020 redemption agreement at issue in this case. (Palay Decl., ¶ 102, Ex. 94, STAFFORD000810 (2019); Palay Decl., ¶ 103, Ex. 95, STAFFORD000804 (2017); Palay Decl., ¶ 20, Ex. 18, STAFFORD000786 (2007); Palay Decl., ¶ 6, Ex. 4, STAFFORD000781 (2005).

300.    The only instance where Defendants can specifically recall Stacy providing specific consent for the use of her signature stamp was via text message on December 26, 2019 for a document that did not elect or appoint Stacy to any position at the Companies. (Palay Decl., ¶ 10,

Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

301.    As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for "directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays before his death. (09/28/2023 S. Randall Decl., p.5, ¶ 33.)

302.    However, Stacy has never participated in any decision-making or governance at the Companies. (09/28/2023 S. Randall Decl., p.5, ¶ 34; 09/19/2023 M. Kiesler Dep. Tr. 243:21-244:18; 08/23/2023 R. Widen Dep. Tr. 64:17-65:15.)

303.    Stacy lived in Florida from approximately 2001 until approximately 2011. (09/28/2023 S. Randall Decl., p.5, ¶ 35.)

304.    Reed testified that Stacy had "no active role in the companies" since her termination as a receptionist in the early 2000s, Stacy attended no meetings, and Stacy did nothing at all at the Companies, while Kiesler testified that Stacy was not notified of the corporate meetings. (08/23/2023 R. Widen Dep. Tr. 64:1-65:15; 09/28/2023 S. Randall Decl., p.5, ¶ 36; Answer ¶ 33; Compl. ¶ 33 n.3; 09/19/2023 M. Kiesler Dep. Tr. 118:14-25, 241:9-243:14.)

305.    Stacy never attended a shareholders or board of directors meeting for Windy Waters or Widen Enterprises. (09/28/2023 S. Randall Decl., p.5, ¶ 36; 08/23/2023 R. Widen Dep. Tr. 65:14-15.)

306.    Mark Widen, Stacy and Reed's father, died in 2003, and, as Stacy understands, upon Mark's death she, Reed, and at least two of their three other siblings became equal one-fifth owners in the Companies. (08/23/2023 R. Widen Dep. Tr. 15:25-16:1; 09/28/2023 S. Randall Decl., p.5, ¶ 37.)

307.    In Gonnering's 2008 Business Plan for Widen Enterprises, he wrote, ███████████ ███████████████████████████████████████████████ ████████████████ and he forecasted that the company's software revenues would increase sharply into the following decade, while its net income would increase only modestly. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11067, 11070.)

308.    Widen Enterprises commissioned ITR Economics to do an analysis, which it completed in December 2020, in preparation for bringing Widen Enterprises to market for sale. (Palay Decl., ¶ 104, Ex. 96, WINDY0048037 at 48041.)

309.    Reed testified that, "[b]ecause I put 43 years of my life in [the company]," he "guess[ed]" he was entitled to a different calculation of the company's value than any other shareholders were entitled to, and that "[b]ecause I put 43 years of my life in [the company]," he "thinks . . . absolutely" his stock price was more valuable than Stacy's stock price. (08/23/2023 R. Widen Dep. Tr. 178:5-179:10.)

310.    Widen Enterprises remained profitable during the COVID-19 epidemic. (08/23/2023 R. Widen Dep. Tr. 213:7-15.)

311.    Acquia used Widen Enterprises' recurring revenue to assess its then-potential purchase of the company, including noting ██████████████████████ in a slide deck. (Palay Decl., ¶ 108, Ex. 100 at slide 3.)

312.    Reed testified that a person would need to know revenue information in order to understand the Companies' value. (08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

313.    Kiesler testified that he "[d]o[es]n't know the definition of 'smart.'" (09/19/2023 M. Kiesler Dep. Tr. 229:23-230:7.)

Respectfully submitted this 29th day of September, 2023.

<div style="margin-left: 40%;">

_s/ David G. Palay_

Mark A. Cameli
mcameli@reinhartlaw.com
David G. Palay
dpalay@reinhartlaw.com
Monica A. Mark
mmark@reinhartlaw.com
Elizabeth Elving
eelving@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965
Telephone:  414-298-1000
Facsimile:  414-298-8097

_Attorneys for Stacy L. Randall_

</div>