IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

        Plaintiff,

v.

REED C. WIDEN, MICHAEL KIESLER,       Civil Action No. 22-cv-400
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

        Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and the Honorable James D. Peterson's standing orders on motions for summary judgment, Reed C. Widen, Michael J. Kiesler, Widen Enterprises, LLC, and Windy Waters, Inc. (collectively, the "Defendants") submit the below Proposed Findings of Fact in support of their contemporaneously filed Motion for Summary Judgment.

## PROPOSED FINDINGS OF FACT

### *Entities and People*

1.     Windy Waters, Inc. is a closely held Wisconsin corporation with its principal place of business in Monona, Wisconsin. Am. Answer (ECF No. 45), ¶ 18.

2.     Widen Enterprises, LLC, was originally called Widen Engraving, and later Widen Colourgraphics, Ltd. and Widen Enterprises, Inc. This entity will be referred to as Widen Enterprises throughout for consistency, even if referring to a time the company had a different

1

name. Am. Answer (ECF No. 45), ¶¶ 2, 19; Michael J. Kiesler Decl. ("Kiesler Decl."), Sept. 29,

2023, p.1, ¶ 2; Reed C. Widen Decl. ("Reed Decl."), Sept. 29, 2023, p.1, ¶ 2.

3.      Reed is the majority shareholder of Windy Waters. Am. Answer (ECF No. 45), ¶

15.

4.      Prior to selling all of her shares in May 2020, Stacy Randall was a minority

shareholder of Windy Waters and had been since the company was formed in 1997. Am. Answer

(ECF No. 45), ¶¶ 14, 126; Stacy L. Randall Dep. ("Randall Dep."), Aug. 28, 2023, at 315:24-

317:3; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.1, ¶ 2, Ex. A (ECF No. 33-1); Reed

Decl., Sept. 29, 2023, p.3, ¶ 19.

5.      At various times, Reed and Randall's other siblings held shares in Windy Waters

too. Am. Answer (ECF No. 45), ¶¶ 20, 22, 24.

### Widen Enterprises History

6.      Widen Enterprises was formed as a family business in or around 1948 by Emily

and Arthur Widen, Randall's and Reed's grandparents. Am. Answer (ECF No. 45), ¶ 19.

7.      Widen Enterprises was in the printing industry, focused on the processes before the

creation of a print layout, called prepress. Reed Decl., Sept. 29, 2023, p.1, ¶ 3; Reed C. Widen

Dep. ("Reed Dep."), Aug. 23, 2023, at 12:4-22.

8.      Over time, Emily and Arthur Widen gifted small amounts of stock in Widen

Enterprises to Reed, Randall, and their three brothers—Tyler, Stewart, and Price. Am. Answer

(ECF No. 45), ¶ 20.

9.      In the mid-1990s, Widen Enterprises also developed software to store digital

images, and as the prepress and printing industry slowed, Widen Enterprises grew its software

services. Matthew R. Gonnering Dep. ("Gonnering Dep."), Sept. 21, 2023, at 16:10-20:3; Matthew R. Gonnering Decl. ("Gonnering Decl."), Sept. 29, 2023, p.1, ¶ 4.

10.     The shift to focusing on software services was gradual, and eventually, in 2020, Widen Enterprises decided to sunset its prepress services division after the COVID-19 pandemic caused sales to drop dramatically. Gonnering Dep., Sept. 21, 2023, at 19:10-20:19, 211:7-212:1-21; Gonnering Decl., Sept. 29, 2023, pp.1-2, ¶ 5; Michael J. Kiesler Dep. ("Kiesler Dep."), Sept. 19, 2023, at 152:3-10.

11.     Windy Waters is a holding company formed in 1997 to own Widen Enterprises; it has no operations of its own. Am. Answer (ECF No. 45), ¶¶ 3, 22; Kiesler Dep., Sept. 19, 2023, at 39:25-40:2, 40:22-41:7.

12.     In 1997, when Windy Waters was formed, the owners of Widen Enterprises stock exchanged that stock for shares of the holding company. Am. Answer (ECF No. 45), ¶¶ 3, 22; Bruce Hutler Decl. ("Hutler Decl."), Sept. 29, 2023, p.2, ¶ 6, Ex. 1 (Hutler Report) at 2; Kiesler Decl., Sept. 29, 2023, p.1, ¶ 3.

13.     At all times since 1997, the owners of Windy Waters have consisted solely of members of the Widen family or key employees of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.1, ¶ 4.

14.     From the time Windy Waters was formed in 1997 until it sold Widen Enterprises in September 2021, Windy Waters owned 100% of Widen Enterprises. Am. Answer (ECF No. 45), ¶¶ 3, 17; Kiesler Decl., Sept. 29, 2023, p.1, ¶ 5.

*Widen Enterprises Leadership*

15.     In the 1970s and 1980s, Widen Enterprises was run by Mark Widen, the father of Reed and Randall. Reed Decl., Sept. 29, 2023, p.1, ¶ 4.

3

16.     In the 1970s, Reed Widen worked at Widen Enterprises painting floors and walls. After finishing high school, he returned to the family business. Reed Dep., Aug. 23, 2023, at 11:19-12:2; Reed Decl., Sept. 29, 2023, p.1, ¶ 5.

17.     Reed worked in every department of Widen Enterprises over time so that he could learn all aspects of the business and every step of the production process. Reed Dep., Aug. 23, 2023, at 11:19-12:2, 13:17-20; Reed Decl., Sept. 29, 2023, pp.1-2, ¶ 6.

18.     Despite having only a high school education, Reed worked his way up in the company. He moved into a sales role, selling films to make plates to print images. Reed Decl., Sept. 29, 2023, p.2, ¶ 7.

19.     In the 1980s and 1990s, Reed was a sales director with responsibilities for meeting with clients to sell prepress services, eventually bringing in sales of approximately $5.5 million each year. Reed Decl., Sept. 29, 2023, p.2, ¶ 8.

20.     In the mid-1990s, Reed became a vice president of the company and had more responsibilities with management alongside his father. Reed Decl., Sept. 29, 2023, p.2, ¶ 9.

21.     Eventually, Reed became the president and CEO of Widen Enterprises, overseeing all operations of the company. Reed Decl., Sept. 29, 2023, p.2, ¶ 10.

22.     In 2009, Matthew Gonnering was promoted to be the CEO of Widen Enterprises, and Reed remained Widen Enterprises' president. Gonnering Dep., Sept. 21, 2023, at 27:16-21; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 6; Reed Decl., Sept. 29, 2023, p.2, ¶ 11.

23.     As Widen Enterprises' president, Reed oversaw operations atthe company. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work ; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he

made compensation and bonus decisions for key employees of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8, 208:10-209:8; Reed Decl., Sept. 29, 2023, p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 267:13-268:16; Gonnering Decl., Sept. 29, 2023, p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17.

24.     Reed worked around the clock to help the company thrive. In his deposition, he explained, "I lived and breathed this company 24/7." Reed Dep., Aug. 23, 2023, at 54:1-5, 207:25-209:8; Gonnering Dep., Sept. 21, 2023, at 123:13-20; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 8.

25.     Under Reed's direction, growth of the business was the objective and was a standing direction. This stemmed from a saying he learned from his father: "When you're green, you're growing; when you're ripe, you're dead." Reed Dep., Aug. 23, 2023, at 98:19-21; Gonnering Dep., Sept. 21, 2023, at 43:2-7, 49:6-25, 197:4-23; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 9.

26.     When Widen Enterprises had extra profits, it invested them back into the company in order to grow. Reed Decl., Sept. 29, 2023, p.2, ¶ 14.

27.     Kiesler served as the Chief Financial Officer of Widen Enterprises from approximately 2000 until approximately November 24, 2021. Before that, he was vice president of finance, and before that, the controller. Kiesler Dep., Sept. 19, 2023, at 23:8-11, 27:9-23; Kiesler Decl., Sept. 29, 2023, pp.1-2, ¶ 6; Am. Answer (ECF No. 45), ¶¶ 16, 32.

28.     Between approximately 2009 until 2021, Kiesler reported to Gonnering, who reported to Reed. Gonnering Dep., Sept. 21, 2023, at 114:5-7, 116:13-21; Kiesler Dep., Sept. 19, 2023, at 29:9-17; Reed Decl., Sept. 29, 2023, p.3, ¶ 16; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 10.

29.     Kiesler's role was to carry out the instructions of Gonnering and Reed and to advise on financial information. Kiesler Dep., Sept. 19, 2023, at 54:1-6; Reed Decl., Sept. 29, 2023, p.3, ¶ 17.

30.     Gonnering and Reed frequently interacted and discussed strategic decisions without Kiesler, and brought Kiesler in later to implement the decisions. Gonnering Decl., Sept. 29, 2023, p.2, ¶ 11; Reed Decl., Sept. 29, 2023, p.3, ¶ 18; Kiesler Dep., Sept. 19, 2023, at 38:6-18, 54:1-6, 60:5-61:3, 87:10-15.

31.     Key roles as to product investment, marketing spend, and strategic direction were also played by Mr. Gonnering and Gary Norris. Reed Decl., Sept. 29, 2023, p.2, ¶ 15.

### *Randall's Role in Widen Enterprises and Windy Waters*

32.     Randall worked for Widen Enterprises on two separate occasions. Reed Decl., Sept. 29, 2023, p.3, ¶ 20; Reed Dep., Aug. 23, 2023, at 64:1-2.

33.     Between 1977 and approximately 1990 or 1991, Randall worked in the dark room for Widen Enterprises working on the prepress process. Randall Dep., Aug. 28, 2023, at 35:4-24, 36:19-25, 37:12-17.

34.     Randall was terminated from this position by her father. Randall Dep., Aug. 28, 2023, at 36:19-37:17, 39:1-13.

35.     The second time she was employed by Widen Enterprises, roughly in 2000 and 2001, Randall worked as a receptionist. Reed Dep., Aug. 23, 2023, at 64:1-16; Reed Decl., Sept. 29, 2023, p.3, ¶ 21; Randall Dep., Aug. 28, 2023, at 20:1-15.

36.     Randall was fired from her position as a receptionist because she was not adequately performing her job duties—not showing up on time, not answering calls, taking long

lunches, and returning from lunch smelling like alcohol. Reed Dep., Aug. 23, 2023, at 64:1-16; Reed Decl., Sept. 29, 2023, p.3, ¶ 22; Randall Dep., Aug. 28, 2023, at 73:17-74:5, 75:2-5.

37.    Randall has not had any job at any time since her employment with Widen Enterprises ended in approximately 2001. Randall Dep., Aug. 28, 2023, at 19:24-20:8.

38.    Randall has never been employed by Windy Waters. Reed Decl., Sept. 29, 2023, p.3, ¶ 23; Randall Dep., Aug. 28, 2023, at 72:11-17.

39.    Randall was the sole director of Windy Waters from 2015 until May 13, 2020. She was a director, with others, from 1998 until May 13, 2020. Randall Dep., Aug. 28, 2023, at 179:21-24; Kiesler Decl., Sept. 29, 2023, p.2, ¶ 7; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Christa D. Wittenberg Decl. ("Wittenberg Decl."), Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

40.    Randall was paid directors' fees every year she was a director, around Thanksgiving each year. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 8.

41.    Randall was president of Windy Waters from approximately 2007 until May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 9; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.)

42.    Reed notified Randall that she would be serving as the Windy Waters president before she began the role. Reed Decl., Sept. 29, 2023, p.3, ¶ 24.

43.     Randall signed the Second Amendment to Shareholder Agreement, in her capacity as President. Reed Dep., Aug. 23, 2023, at 222:18-223:1; Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

44.     Randall affixed her signature via DocuSign to the third amendment to the Windy Waters shareholder agreement on a signature line below the company name and above words that read "Stacy Widen Randall, President," depicted below:



Kiesler Decl., Sept. 29, 2023, p.2, ¶ 10, Ex. A (Third Amendment to Shareholder Agreement) at WINDY0002906.

45.     Randall affixed her signature via DocuSign to a document approving her purchase of shares in Windy Waters on a signature line below the company name and above words that read "Stacy L. Randall, President," depicted below:

**WINDY WATERS, INC.**

By:  Stacy Randall
        Stacy L. Randall, President

Dated: December 31, 2012

Kiesler Decl., Sept. 29, 2023, p.2, ¶ 11, Ex. B (Agreement to Subscribe For Shares Of Windy Waters) at WINDY0002143.

46.     Randall was a passive shareholder and president who was not engaged in the business of Windy Waters or Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 12;

8

Gonnering Decl., Sept. 29, 2023, p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 141:1-10; Kiesler

Dep., Sept. 19, 2023, at 93:14-24; Reed Dep., Aug. 23, 2023, at 224:4-12, 21-25.

47.     Randall's primary interest in Windy Waters and reasons for contacting Kiesler

about the company was as a source of money for her, treating Windy Waters like a bank. Kiesler

Decl., Sept. 29, 2023, p.2, ¶ 13.

48.     Windy Waters caused its shareholders to receive direct or indirect payments

periodically, when the company was going to show a profit, to pay estimated taxes for its

shareholders. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 14.

49.     Randall directly received $126,018.00 for being a shareholder of Windy Waters in

2016 as a dividend. Kiesler Decl., Sept. 29, 2023, p.3, ¶ 17.

50.     Windy Waters also caused the IRS and Wisconsin Department of Revenue to

receive estimated tax payments on Randall's behalf in 2015 ($86,346.34), 2016 ($30,170), and

2018 ($22,132). Kiesler Decl., Sept. 29, 2023, p.3, ¶ 18.

### *Signatures and Signature Stamp*

51.     Randall was aware she had to sign documents related to Windy Waters or Widen

Enterprises, but claims she did not know why. Randall Dep., Aug. 28, 2023, at 93:6-94:7.

52.     To facilitate the signing of documents related to Windy Waters after she moved to

Florida, Randall created a rubber stamp to use in place of a wet ink signature on corporate

documents after 2001 but sometime before May 15, 2004. Randall Dep., Aug. 28, 2023, at 98:5-

18; Kiesler Dep., Sept. 19, 2023, at 100:4-13; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 19; Wittenberg

Decl., Sept. 29, 2023, p.1, ¶ 2, Ex. A (Defs.' Objections And Resps. To Pl.'s First Set of Interrogs.)

at Resp. No. 4.

53.    The idea of Randall getting a signature stamp came up on an occasion when Randall was in Kiesler's office signing a document for Windy Waters, and Stewart Widen (who was also there) suggested Randall get a signature stamp like he had so it could be used for her convenience. Kiesler Dep., Sept. 19, 2023, at 99:1-14; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 20.

54.    Randall went to a Staples store to have the signature stamp created and purchased it. Randall Dep., Aug. 28, 2023, at 98:8-13, 103:20-21, 116:17-24; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. to Defs.' First Set of Interrogs.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 95.

55.    Randall gave the stamp to Kiesler and instructed that it could be used in place of a wet ink signature as long as someone "let [her] know when [they're] using it." Randall Dep., Aug. 28, 2023, at 101:10-25, 102:15-21, 103:20-25, 104:10-20, 120:9-16; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 21; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 96.

56.    Randall understood the stamp would be used as a substitute for her handwritten signature. Randall Dep., Aug. 28, 2023, at 104:6-14.

57.    Reed or Kiesler contacted Randall each time the stamp was used on something she had not already approved. Reed Dep., Aug. 23, 2023, at 218:22-219:6; Kiesler Dep., Sept. 19, 2023, at 61:14-20, 62:18-63:1, 100:22-101:3, 103:14-19, 115:14-116:4; Randall Dep., Aug. 28, 2023, at 117:6-9; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 22; Reed Decl., Sept. 29, 2023, pp.3-4, ¶ 25.

58.    The only time Randall denied permission to use the signature stamp on request was in late December 2019, but she admitted she later consented to use of the stamp on that occasion. Randall Dep. 131:12-133:7, 138:17-20.

10

59.     Randall largely could not recall approving the use of her stamp, but admitted it was possible someone reached out on occasions beyond the one she recalled during her deposition. Randall Dep., Aug. 28, 2023, at 117:6-9, 119:9-11, 120:9-121:5, 122:5-12.

60.     After Kiesler explained the *pro forma* corporate documents Windy Waters completed each year, Randall gave blanket approval for Kiesler to use the signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 23.

61.     Windy Waters never used the signature stamp outside of the scope of authority given by Randall to do so. Kiesler Dep., Sept. 19, 2023, at 61:14-20; Reed Decl., Sept. 29, 2023, p.4, ¶ 26; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 24.

62.     Randall never asked anyone at Windy Waters to stop using the rubber signature stamp. Randall Dep., Aug. 28, 2023, at 148:7-11; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 25; Reed Decl., Sept. 29, 2023, p.4, ¶ 27.

63.     Randall trusted Reed and Kiesler "with everything they wrote and had [her] sign." Randall Dep., Aug. 28, 2023, at 215:16-18.

64.     Randall never asked to see copies of documents on which the signature stamp was used. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 26; Reed Decl., Sept. 29, 2023, p.4, ¶ 28; Kiesler Dep., Sept. 19, 2023, at 105:3-9.

65.     Neither Kiesler nor Reed ever prevented Randall from seeing a document that required her signature. Randall Dep., Aug. 28, 2023, at 128:25-126:5; Kiesler Dep., Sept. 19, 2023, at 257:1-6; Kiesler Decl., Sept. 29, 2023, p.4, ¶ 27; Reed Decl., Sept. 29, 2023, p.4, ¶ 29.

66.     None of the Defendants concealed from Randall any documents on which the rubber signature stamp was used. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 28; Reed Decl., Sept. 29, 2023, p.4, ¶ 30.

67.     Randall routinely did not review documents before signing them, typically only "skimming" the contents, if that, and even accepting only the signature page without demanding to see the entire document. Randall Dep. 41:11-42:15, 50:21-23, 59:3-7, 206:11-18, 210:15-18, 257:5-11 (related to LLCs), 257:22-25.

### *Access to Financials and Miscellaneous Financial Information*

68.     Randall never once asked to see the financial records of Widen Enterprises. Randall Dep., Aug. 28, 2023, at 82:23-25; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Kiesler Decl., Sept. 29, 2023, p.4, ¶ 29; Reed Decl., Sept. 29, 2023, p.4, ¶ 31.

69.     No one ever told Randall that she could not have financial records for Widen Enterprises or Windy Waters. Randall Dep., Aug. 28, 2023, at 83:8-13.

70.     When funds were available, Windy Waters paid dividends to shareholders, either to assist with tax liability or when the financial statements showed an excess of funds that did not need to be reinvested into the company. Reed Decl., Sept. 29, 2023, p.4, ¶ 32.

71.     In 2015, Randall received dividend payments from Windy Waters totaling in excess of $86,000. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 111.

72.     In 2016, Randall received dividend payments from the Companies, totaling in excess of $156,000, including a non-tax dividend payment in April 2016. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 112; Kiesler Decl., Sept. 29, 2023, p.2, ¶ 15.

12

73.   Randall was treated like every other shareholder with respect to dividends and was paid her pro rata share each time dividends were paid. Kiesler Decl., Sept. 29, 2023, p.3, ¶ 16.

74.   Widen Enterprises and Windy Waters had separate bank accounts used only for business purposes. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 30.

75.   No personal funds of Reed's were mingled with the funds in these accounts. Reed Decl., Sept. 29, 2023, p.5, ¶ 44.

76.   Any time Widen Enterprises paid an expense on behalf of Windy Waters, it was tracked on an inter-company account ledger. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 31.

*Compensation Decisions*

77.   Compensation for employees and officers of Widen Enterprises is determined by a mix of individual performance, company performance, and market conditions. Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 2, Ex. A (Defs.' Objections and Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 7.

78.   To help inform the decision of setting executive compensation, Reed consulted with advisors at Widen Enterprises' accounting firm. Reed Dep., Aug. 23, 2023, at 55:17-24, 56:3-7, 195:5.

79.   The compensation Reed received for serving as board chairman was within the range of salaries and bonuses for comparable companies in the market. Gonnering Dep., Sept. 21, 2023, at 269:13-270:3; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 13; Reed Decl., Sept. 29, 2023, p.2, ¶ 13.

80.   Reed's compensation for the services he performed for the company was paid solely from Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 32.

81.     When Gonnering was asked about what he would have done if Reed had retired, he

provided the following testimony:

> I would look to, as it goes for anybody with any departure or retirement, I would reexamine what do we really need and how are we going to staff this back. In Reed's case, I would have staffed back probably with a team of advisors, a team of people who would represent various advisory capacities that Reed provided to me. . . .I mean, Reed was not a -- you couldn't replace Reed. Reed was the -- Reed was there 30, 40 years he's been.· It's his name on the building, his name in the marketplace.· He's got -- yes, he's got the rich legacy knowledge, but also how he takes that knowledge and repurposes it with his monitorship with me was very important to me.· So to replace him is – you couldn't replace. You don't replace Reed. But I would replace his advisory capacity with a team of advisors.

Gonnering Dep., Sept. 21, 2023, at 124:24-125:22

***Prior Stock Transactions***

82.     A chart showing each stock transaction for Windy Waters from 2004 to 2020 is

below:

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Gary Norris | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Terry Vial | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Thomas Schmidt | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Michael Kiesler | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Stacy Randall | 06/30/2005 | Redemption | 611.88 | $326.86 |
| Stewart Widen | 01/01/2007 | Redemption | 232.75   (Class A) 5063.903 (Class B) | $294.70 (Class A) $280.66 (Class B) |
| Gary Norris | 01/01/2007 | Subscription | 712.606 | $280.66 |
| Michael Kiesler | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Terry Vial | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Stacy Randall | 06/30/2007 | Redemption | 801.05 | $312.09 |
| Reed Widen | 01/01/2008 | Subscription | 594.16 | $336.61 |
| Thomas Schmidt | 12/31/2009 | Redemption | 285.68 | $155.34 |
| Matthew Gonnering | 01/01/2011 | Subscription | 592.77 | $168.70 |
| Stacy Randall | 01/18/2011 | Redemption | 1185.5364 | $168.70 |

14

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Terry Vial | 02/07/2011 | Redemption | 264.7308 | $168.70 |
| Brian Becker | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Gary Norris | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Matthew Gonnering | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Michael Kiesler | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Reed Widen | 12/31/2012 | Subscription | 446.7078 | 223.86 |
| Stacy Randall | 12/31/2012 | Subscription | 44.6708 | 223.86 |
| Price Widen | 06/01/2015 | Redemption | 232.75 (Class A) 5063.9025 (Class B) | $178.44 (Class A) $169.94 (Class B) |
| Brian Becker | 04/30/2016 | Redemption | 104.4923 | $334.14 |
| Terry Vial | 04/30/2016 | Redemption | 377.2522 | $334.14 |
| Stacy Randall | 08/01/2017 | Redemption | 275.5210 | $283.10 |
| Stacy Randall | 01/01/2019 | Redemption | 281.8291 | $425.79 |
| Reed C. Widen Children's Trust | 12/24/2019 | Redemption | 861 | $512.54 |
| Stacy Randall | 05/13/2020 | Redemption | 232.75 (Class A) 1952.7568 (Class B) | $646.19 (Class A) $615.42 (Class B) |

Kiesler Decl., Sept. 29, 2023, pp.4-5, ¶ 35; *see also* Proposed Findings of Fact, ¶¶ 83-194.

83.     Between 2005 and 2019, on 12 occasions, Windy Waters purchased all or some stock owned by certain stockholders. Kiesler Decl., Sept. 29, 2023, p.4, ¶¶ 33-35, Ex. C (WINDY0035810).

84.     On each occasion, Mike Kiesler made calculations using a formula (the "Stock Price Formula") that resulted in a per-share price. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 36; Kiesler Dep., Sept. 19, 2023, at 175:14-18, 200:15-21; Gonnering Dep., Sept. 21, 2023, at 148:1-5, 148:19-20, 149:4-8; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 14.

15

85.     The Stock Price Formula was described in the May 7, 2007 Second Amendment to Shareholder Agreement of Windy Waters (the "Second Amendment"). A true and correct copy of the document is attached to Michael J. Kielser's Declaration as Exhibit D. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

86.     The Second Amendment states, "The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions." Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement) at WINDY0001341.

87.     The Second Amendment contains signatures in blue ink on the signature lines for Stacy Randall as not only a shareholder, but also as then-President of Windy Waters, as depicted below:

WINDY WATERS, INC.

By:  Stacy Widen Randall, President

SHAREHOLDER:

Reed C. Widen

Stacy Widen Randall

Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

88.     The Stock Price Formula was created based on a report from Bruce Hutler, an advisor at the accounting firm used by Windy Waters at the time—then called Virchow Krause, which later changed its name to Baker Tilly. In 2004, Hutler provided this report to give an estimated value of the stock of Windy Waters. This was a follow-up to a report to Reed and Randall

16

valuing the company's stock after Mark Widen died in 2003. Bruce Hutler Decl. ("Hutler Decl."), Sept. 29, 2023, pp. 1-2, ¶¶ 1-6, Ex. 1 (Hutler Report); Reed Decl., Sept. 29, 2023, p.4, ¶¶ 33-34.

89.     The 2004 Hutler report provided an estimate of the fair market value of a marketable, majority interest in 100% of stock in Windy Waters, Inc. as of April 30, 2004. Hutler Decl., Sept. 29, 2023, p.2, ¶ 6 Ex. 1 (Hutler Report) at p.1.

90.     The value Hutler calculated for a 100% interest in Windy Waters Inc. as of April 30, 2004, was $7,441,000. Hutler Decl., Sept. 29, 2023, p.2, ¶ 6 Ex. 1 (Hutler Report) at p.1.

91.     The report Baker Tilly was able to locate in its records does not include a signature because it was not standard practice at the time to scan final reports before they were sent. However, the document is the final version that was sent to Reed Widen. Hutler Decl., Sept. 29, 2023, p.2, ¶ 6.

92.     The Hutler report was provided for "management planning and a possible transaction of the Company's shares of stock." Hutler Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. 1 (Hutler Report) at p.1.

93.     The Hutler report estimated the value of 100% of the shares in Windy Waters based on generally accepted valuation theory and gave appropriate consideration to the market approach and income approach. Hutler then weighted these approaches based on a determination of what was appropriate in light of Windy Waters' circumstances. Hutler Decl., Sept. 29, 2023, p.2, ¶ 8.

94.     Hutler discounted the price of shares in Windy Waters by 25% for any shares that were less than majority interest because those shares have no control of the company. The report explains as follows:

17

> The interest being valued represents a lack of control in the common stock. Under the by-laws of the corporation and the laws of the State of Wisconsin, in which the Company was incorporated, this particular stock interest exercises minority control over the affairs of the business. Such interests must collaborate with other minority shareholders to be more than 50% to exercise prerogatives of ownership. Therefore, we must consider a lack of control discount to reflect monetarily the lack of rights by this block of stock. In valuing a lack of control interest in the equity of the Company, we have concluded a 25% discount is appropriate . . . .

Hutler Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. 1 (Hutler Report) at p.7.

95.     Hutler also discounted the price of shares in Windy Waters by 35% because the company is a closely held corporation and the shares are therefore not marketable on the open market. The report explains as follows:

> A substantial difference exists between the marketability of a publicly traded company versus a company that is closely held. As a result, shares of closely held companies tend to be discounted from the value of marketable, minority interests of publicly traded companies. All things being equal, an investment with greater liquidity will command a higher value than an illiquid investment. The discount for lack of marketability measures the difference in value between securities based on their relative liquidity. Therefore, based upon the factors above, we conclude that a lack of marketability discount of [35]% is appropriate.

Hutler Decl., Sept 29, 2023, p.2, ¶¶ 6-7. Ex. 1 (Hutler Report) at p8.

96.     For a company like Windy Waters, there is virtually no market for its shares because very few persons are willing to purchase a minority block of shares in a family-run, privately owned company and, if they are willing to do so, they expect a large discount from the pro rata value. Hutler Decl., Sept. 29, 2023, p.3, ¶ 12.

97.     Unless the company agrees to buy the shares back or other shareholders agree to purchase the shares, or the company is obligated to do so based on an existing agreement, a minority shareholder often has no way to sell their shares and exit from ownership. As a result, the shares of a minority owner are heavily discounted. Hutler Decl., Sept. 29, 2023, p.3, ¶ 12.

98.     To address the concerns of minority shareholders from the lack of an ability to exit from ownership, it is common for corporations and their shareholders to agree on the use of a formula by which shares will be redeemed if the shareholder is interested in severing their relationship with the company. Hutler Decl., Sept. 29, 2023, p.3, ¶ 13.

99.     Usually, such a formula does not reflect fair market value. Instead, it is simply a formula agreed upon by the shareholders by which their stock will be redeemed if they wish to do so. This is done as a courtesy to the shareholder, who would otherwise not have a market to provide liquidity for their shares. Hutler Decl., Sept. 29, 2023, p.3, ¶ 13.

100.     The Stock Price Formula adopted the valuation from the Hutler report and turned it into a formula using an implied multiple of EBITDA to arrive at an estimated value of all shares of Windy Waters. The formula then divided that dollar amount by the amount of shares to arrive at a price per share. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶¶ 6, 9, Exs. 1 (Hutler Report), 2 (Second Amendment to Shareholder Agreement); Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

101.     Just like the Hutler report, the Stock Price Formula also includes a 5% adjustment for the difference between the price for class A voting shares and class B non-voting shares. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶¶ 6, 9-10, Exs. 1 (Hutler Report), 2 (Second Amendment to Shareholder Agreement); Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

102.     Unlike the Hutler 2004 report, the formula in the Second Amendment to Shareholder Agreement does not include any discount for lack of control or minority status or any discount for lack of marketability. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶¶ 6, 9, 11, Exs. 1 (Hutler

Report), 2 (Second Amendment to Shareholder Agreement); Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

103.    This Stock Price Formula was agreed to by the voting shareholders as the way to calculate a price for Windy Waters shares. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶ 9, Ex. 2 (Second Amendment to Shareholder Agreement); Reed Decl., Sept. 29, 2023, p.4, ¶ 35; Kiesler Decl., Sept. 29, 2023, p.6, ¶¶ 37-38, Ex. D (Second Amendment to Shareholder Agreement).

104.    There was only one exception to the use of the per-share price calculated using the Stock Price Formula: On occasions where Kiesler compared the formula per-share price to a per-share price using the company's assets minus liabilities—that is, the net assets, referred to as the stockholder's equity amount in Windy Waters' financial statements—if he found the price calculated from net assets was higher than the result using the Stock Price Formula (and therefore more favorable to the shareholder), the price based on net assets was used. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 39.

105.    Hutler advised Kiesler that the price based on net assets would be appropriate to use if the Share Price Formula resulted in a number that was lower than the net asset price. Hutler Decl., Sept. 29, 2023, p.4, ¶ 14; Kiesler Decl., Sept. 29, 2023, p.6, ¶ 40.

106.    For a closely held company like Windy Waters, there is no market for shares and few potential buyers. Unless the company agrees to buy the shares back or other shareholders agree to purchase the shares, or is obligated to do so based on an existing agreement, a minority shareholder often has no way to sell their shares and exit from ownership. Hutler Decl., Sept. 29, 2023, p.3, ¶ 12.

107.    To address the concerns of minority shareholders from the lack of an ability to exit from ownership, it is common for corporations to agree to a formula to approximate a fair price

for the company's shares and to have an agreement allowing the minority shareholder to force the sale of shares using that formula. A formula allows the transaction to occur without a costly valuation of the company each time a shareholder wants to redeem stock. Hutler Decl., Sept. 29, 2023, p.3, ¶ 13.

108.     Kiesler used the Stock Price Formula to obtain a per-share price for every stock transaction, and only deviated on the occasions when Kiesler compared the formula per-share price to a per-share price using the company's assets and found the price calculated from net assets was higher. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 41 Kiesler Dep., Sept. 19, 2023, at 195:1-8, 204:3-7; Gonnering Dep., Sept. 21, 2023, at 148:1-5, 148:19-20, 149:4-8.

109.     Kiesler did it this way every time because he "was always told to be consistent." Kiesler Dep., Sept. 19, 2023, at 195:1-8.

110.     Randall was aware this Stock Price Formula was used to determine the price of shares. Randall Dep., Aug. 28, 2023, at 200:10-16.

111.     Between 2005 and 2019, Randall herself sold some of her stock in Windy Waters back to Windy Waters in five transactions. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶ 42; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. E (Windy Waters' Objections And Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 9. & Attach. A.

112.     Prior to Randall executing the May 13, 2020 Redemption Agreement, she had executed five other stock redemption agreements for the sale of Windy Waters stock. Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.'First Set of Reqs. For Admis.) at Resp. No. 1.

113.     A chart showing each of Randall's stock redemptions is below:

21

| Effective Date: | # of Shares: | Price Per Share: | Total Price: |
|---|---|---|---|
| 06/30/2005 | 611.88 | $326.86 | $200,000.00 |
| 06/30/2007 | 801.05 | $312.09 | $250,000.00 |
| 01/18/2011 | 1185.5364 | $168.70 | $200,000.00 |
| 08/01/2017 | 275.5210 | $283.10 | $78,000.00 |
| 01/01/2019 | 281.8291 | $425.79 | $120,000.00 |
| 05/13/2020 | 232.75      (Class A) 1952.7568 (Class B) | $646.19 (Class A) $615.42 (Class B) | $1,352,166.31 |

Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶ 42.

114.    Each of these stock transactions was willing and voluntary on both sides. Both Randall and Windy Waters had the right to say no. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶¶ 37, 43, Ex. D (Second Amendment to Shareholder Agreement); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

115.    The shareholder agreement did not contain any provisions obligating the company to buy back shares at any price, or at all, nor did it give Randall the right to sell her shares back. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶¶37, 44, Ex. D (Second Amendment to Shareholder Agreement); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

116.    For each of those transactions, the amount paid was based on the calculation of the Stock Price Formula. Each time, the price calculated from the Stock Price Formula was more favorable than the price would have been if calculated from net assets. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶¶ 37, 45, Ex. D (Second Amendment to Shareholder Agreement).

117.    In 2005, Randall said she needed money, so she asked Reed for $200,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 162:3-19, 163:21-164:12, 173:10-13, 246:9-11; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 48, Ex. E (WINDY0055042).

118.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $200,000. Randall Dep., Aug. 28, 2023, at 164:14-17, 164:25-165:2, 171:14-172:3; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 46.

119.    Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $200,000 she said she needed. Randall Dep., Aug. 28, 2023, at 171:20-23; Kiesler Decl., Sept. 29, 2023, p.7, ¶¶ 47-48, Ex. E (WINDY0055042).

120.    The stock purchase was undertaken pursuant to a "June 30, 2005 Redemption Agreement" dated September 2, 2005, and made effective as of June 30, 2005, signed by Randall and other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $200,000. Randall Dep., Aug. 28, 2023, at 162:3-163:9; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 48, Ex. E (WINDY0055042).

121.    The price per share Randall was paid in 2005 was $326.86 and was the amount arrived at using the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 17; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 49.

122.    Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she reviewed the redemption agreement before signing it. Randall Dep., Sept. 29, 2023, at 166:10-168:4, 170:12-171:13, 173:19-174:8, 206:11-18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 20.

23

123.     Randall was happy to get the money she asked for. Randall Dep., Aug. 28, 2023, at 171:14-16.

124.     In 2007, Randall again said she needed money, so she asked Reed for money, and Reed told her to talk to Kiesler. Randall Dep. 177:2-16, 185:15-186:2, 164:12, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 36.

125.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $250,000. Randall Dep., Aug. 28, 2023, at 176:4-22, 177:2-16, 180:8-22, 198:4-9, 211:20-212:1; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 50.

126.     Kiesler calculated the price per share under the Stock Price Formula in the Second Amendment to offer to purchase enough stock to give Randall the $250,000 she needed. Kiesler Decl., Sept. 29, 2023, pp.6, 8, ¶¶ 37, 51, Ex. D (Second Amendment to Shareholder Agreement).

127.     The stock purchase was undertaken pursuant to a "June 30, 2007 Redemption Agreement" dated August 2, 2007, and made effective as of June 30, 2007, signed by Randall and other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $250,000. Randall Dep., Aug. 28, 2023, at 175:7-24, 184:2-4; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 52, Ex. F (Ex. 12 to Randall Dep.).

128.     The price per share Randall was paid in 2007 was $312.09, and was the amount arrived at using the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 25; Kiesler Decl., Sept. 29, 2023, p.8, ¶¶ 52-53, Ex. F (Ex. 12 to Randall Dep.).

129.     Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was

24

or how it was calculated, and does not believe she reviewed the redemption agreement before signing it. Randall Dep., Aug. 28, 2023, at 180:8-181:6, 182:13-17, 184:13-21, 206:11-18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 27.

130.    Randall received the money she asked for. Randall Dep., Aug. 28, 2023, at 181:17-23.

131.    In 2011, Randall again said she needed money, so she asked Reed for $200,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 189:22-190:10, 164:12, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 37.

132.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $200,000. Randall Dep., Aug. 28, 2023, at 189:22-190:10, 212:3-9; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 54.

133.    Kiesler calculated the price per share under the Stock Price Formula in the Second Amendment to offer to purchase enough stock to give Randall the $200,000 she said she needed, and Randall was aware that a formula was being used. Kiesler Decl., Sept. 29, 2023, p.8, ¶ 55; Randall Dep., Aug. 28, 2023, at 200:10-16.

134.    The stock purchase was undertaken pursuant to a "January 18, 2011 Redemption Agreement" dated January 18, 2011, containing the signature stamp of Randall and signed by other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $200,000. Randall Dep., Aug. 28, 2023, at 187:4-21; Kiesler Decl., Sept. 29, 2023, pp.8-9, ¶ 56, Ex. G (Ex. 13 to Randall Dep.).

135.    The price per share Randall was paid in 2011 was $168.70, and was based on the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And

Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 33; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 57.

136.     Randall did not know how many shares she sold in exchange for that amount of money, did not inquire about the value of her shares or how it was calculated, did not think about or inquire about whether a document would need to be signed, and does not believe she reviewed the stock redemption agreement. Randall Dep., Aug. 28, 2023, at 191:5-12, 196:12-20, 206:11-18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 35.

137.     Randall received the money she asked for. Randall Dep., Aug. 28, 2023, at 199:8-13, 272:13-21.

138.     In 2017, Randall again said she needed money, so she asked Reed for $78,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 164:12, 205:4-7, 205:20-206:10, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 38.

139.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $78,000. Randall Dep., Aug. 28, 2023, at 207:5-16, 212:11-18; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 58.

140.     Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $78,000 she said she needed. Kiesler Decl., Sept. 29, 2023, p.9, ¶ 59.

141.     The stock purchase was undertaken pursuant to a "August 1, 2017 Redemption Agreement" dated August 1, 2017, signed by Randall and Reed and Kiesler, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $78,000. Randall Dep., Aug. 28, 2023, at 203:5-204:15, 209:25-210:5; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 60, Ex. H (Ex.

14 to Randall Dep.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 40.

142.     The price per share Randall was paid in 2017 was $283.10 and was the number arrived at from calculating the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 41; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 61.

143.     Randall did not know how many shares she sold in exchange for that amount of money and did not think about or inquire about whether her shares had value or what that value was or how it was calculated. Randall Dep., Aug. 28, 2023, at 210:6-10; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 43.

144.     Randall did not review the document before signing it, nor did she skim it, because she had "gone through this a number of times" by this fourth stock redemption. Randall Dep., Aug. 28, 2023, at 206:11-207:1.

145.     Randall got the money she asked for. Randall Dep., Aug. 28, 2023, at 204:11-15, 205:16-19.

146.     In 2019, Randall again said she needed money, so she asked Reed for $100,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 164:12, 213:12-23, 216:14, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 39.

147.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $100,000. Randall Dep., Aug. 28, 2023, at 216:12-22, 217:7-21; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 62.

148.    In January 2019, Randall also borrowed $20,000 from Widen Enterprises. Kiesler Dep., Sept. 19, 2023, at 222:14-24; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 63.

149.    In order to repay that loan, Randall sold enough shares to obtain $120,000, and applied the extra $20,000 to pay off her loan. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 64; Randall Dep., Aug. 28, 2023, at 215:3-5, 216:8-22.

150.    Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $120,000 she said she needed for her own purposes and to repay the loan. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 65.

151.    The stock purchase was undertaken pursuant to a "January 1, 2019 Redemption Agreement" effective January 1, 2019, signed by Randall and Kiesler and consented to by Randall as a shareholder and director and Reed as majority shareholder, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $120,000. The documents were signed in April 2019. Randall Dep., Aug. 28, 2023, at 212:21-213:16; Kiesler Decl., Sept. 29, 2023, p.10, ¶ 66, Ex. I (Ex. 15 to Randall Dep.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 48.

152.    The price per share Randall was paid in 2019 was $425.79, and was the price that Kiesler reached as the result of the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 49; Kiesler Decl., Sept. 29, 2023, p.10, ¶ 67; Kiesler Dep., Sept. 19, 2023, at 257:22-258:1.

153.    Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she ever reviewed or skimmed the redemption agreement. Randall Dep., Aug. 28, 2023, at 206:11-18, 214:2-12; Wittenberg Decl., Sept. 29, 2023,

p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 51.

154.    Randall received the money she asked for and said she needed. Randall Dep., Aug. 28, 2023, at 217:15-21.

155.    Randall never asked for any financial information in relation to any of her stock redemptions. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 68; Reed Decl., Sept. 29, 2023, p.5, ¶ 40.

156.    Nobody ever provided Randall with financial information in relation to any of her stock redemptions. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 69; Reed Decl., Sept. 29, 2023, p.5, ¶ 41.

157.    Randall never thought about the number of shares she owned and did not think it was important because she knew she, at one point, had owned 20% of Windy Waters. Randall Dep., Aug. 28, 2023, at 45:23-46:13.

158.    Randall never thought about the value of the shares she owned, either. Randall Dep., Aug. 28, 2023, at 169:13-170:22.

159.    Randall did not have an attorney representing her with respect to any of her prior stock redemptions. Randall Dep., Aug. 28, 2023, at 48:4-8, 172:7-8, 209:12-17, 215:20-22.

160.    Other stock owners sold their shares back to Windy Waters over time, as well. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 70.

161.    Pursuant to a stock redemption agreement dated January 1, 2007, Windy Waters purchased all of the shares owned by Stewart Widen, the brother of Reed and Randall. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 71, Ex. J (WINDY0055274).

162.    The price per share that Windy Waters paid for that stock was $280.66 for his Class B stock and $294.70 for his Class A stock. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 71, Ex. J (WINDY0055274).

163.     The price paid for Stewart's shares was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 72.

164.     Pursuant to a stock redemption agreement dated March 17, 2010, and effective as of December 31, 2009, Thomas Schmidt sold all of the Windy Waters shares he owned. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 73, Ex. K (WINDY0055112).

165.     The price per share that Windy Waters paid Schmidt for his stock was $155.34. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 73, Ex. K (WINDY0055112).

166.     The price paid for Schmidt's shares was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 74.

167.     Pursuant to a stock redemption agreement dated February 7, 2011, Terry Vial sold some of the Windy Waters shares he owned. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 75, Ex. L (WINDY0055144).

168.     This transaction occurred less than a month after Randall's third stock redemption. Kiesler Decl., Sept. 29, 2023, pp.8-9, 11, ¶¶ 56, 75, Exs, G (WINDY0055005), L (WINDY0055144).

169.     The price per share that Windy Waters paid Vial for his Class B stock in 2011 was $168.70—the same price Randall was paid for the Class B stock she redeemed a few weeks earlier. Kiesler Decl., Sept. 29, 2023, pp.8,11, ¶¶ 56, 75, Exs. L (WINDY0055144), G (Ex. 13 to Randall Dep.).

170.     The price paid for Vial's shares in 2011 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 76.

171.     In 2015, Price Widen (Randall and Reed's brother) sold back all of his shares in Windy Waters to the company. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 77.

30

172.    On June 1, 2015, Price sold 232.75 shares of Class A voting common stock back to the corporation at $178.44 per share and 5,063.9025 shares of Class B non-voting common stock back to the corporation at $169.94 per share. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 78, Ex. M (WINDY0055185).

173.    Kiesler calculated the Stock Price Formula and compared it to the value using Windy Waters' net assets. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 79.

174.    In this instance, the per-share price calculated from net assets exceeded the amount arrived at using the Stock Price Formula, so the per-share price calculated from net assets was offered instead. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 80.

175.    Prior to the transaction, Windy Waters sent Price Widen a letter of intent on April 8, 2015, explaining the offer to purchase his shares. Reed Decl., Sept. 29, 2023, p.5, ¶ 42, Ex. A (WINDY0050386).

176.    Price Widen was represented by counsel for purposes of his transaction, and ultimately accepted the price offered. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 81; Reed Decl. Sept. 29, 2023, p.5, ¶ 43.

177.    In 2016, two shareholders redeemed all of their Windy Waters shares. Kiesler Decl., Sept. 29, 2023, p.81, ¶ 82.

178.    Pursuant to a stock redemption agreement dated May 12, 2016, and effective April 30, 2016, Terry Vial sold 377.2522 shares of Class B non-voting common stock back to the corporation. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 83, Ex. N (WINDY0055165).

179.    The price per share that Windy Waters paid Vial for his stock in 2016 was $334.14. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 83, Ex. N (WINDY0055165).

180.   The price paid for Vial's shares in 2016 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 84.

181.   Pursuant to a stock redemption agreement dated May 12, 2016, and effective April 30, 2016, Brian Becker sold 104.4923 shares of Class B non-voting common stock back to the corporation. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 85, Ex. O (WINDY0054801).

182.   The price per share that Windy Waters paid Becker for his stock in 2016 was $334.14. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 85, Ex. O (WINDY0054801).

183.   The price paid for Becker's shares in 2016 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 86.

184.   In December 2019, the Reed C. Widen Children's Trust of 2007 sold 861 shares of Class B non-voting common stock back to the corporation. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 87, Ex. P (WINDY0001211); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. E (Windy Waters' Objections And Resps. To Pl.'s Second Set of Interoggs.) at Resp. No. 9 & Attach. B.

185.   The price per share that Windy Waters paid the Children's Trust for its stock was $512.54 per share. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 87, Ex. P (WINDY0001211).

186.   The price paid for the Children's Trust shares in 2019 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 88.

187.   The Reed C. Widen Children's Trust of 2007 was established by Reed Widen for the benefit of his children. Reed Decl., Sept. 29, 2023, p.5, ¶ 45.

188.   The Reed C. Widen Children's Trust of 2007 was terminated in 2019 and the trust then paid Reed's children the funds it received from selling the Windy Waters shares it owned. Reed Decl., Sept. 29, 2023, p.5, ¶ 46.

189.    Randall authorized use of her signature stamp on the document effectuating this stock transfer without asking any questions. Randall Dep., Aug. 28, 2023, at 132:6-13, 138:17-20, 141:16-21; Kiesler Dep., Sept. 19, 2023, at 106:20-121:6, 120:19-121:3, 121:15-122:23; Kiesler Decl, Sept. 29, 2023, p.12, ¶¶ 87, 89, Ex. P (WINDY0001177).

190.    Under the Shareholder Agreement, Windy Waters shareholders had preemptive rights—that is, the right to purchase additional stock that would maintain their interest at the same level. Kiesler Decl, Sept. 29, 2023, p.12-13, ¶ 90, Ex. R (WINDY0052046); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

191.    In January 2013, because Windy Waters had issued shares, Randall, as a then-current shareholder, was notified of her preemptive rights to subscribe to the number of shares to keep her proportional ownership the same. Kiesler Decl, Sept. 29, 2023, pp.12-13, ¶ 90, Ex. R (WINDY0052046); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

192.    Randall exercised her preemptive rights in part, but only wished to purchase $10,000 worth of stock. Using the Stock Price Formula, Kiesler calculated the per-share price to be $223.86 per share, and Randall therefore purchased 44.6708 shares, effective December 31, 2012, for a total price of $10,000. Kiesler Decl., Sept. 29, 2023, pp.2, 13, ¶¶ 11, 90, Exs. B (WINDY0002142), R (WINDY0052046).

193.    Each shareholder who bought or was issued shares at that time paid the same price per share. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 92.

194.    The Stock Price Formula was used for each shareholder each time a shareholder exercised preemptive rights to acquire shares. Kielser Decl., Sept. 29, 2023, p.13, ¶ 93.

195.    Kiesler and Matthew Gonnering both would have expected to apply the formula if they had redeemed shares prior to Widen Enterprises being sold. Kiesler Dep., Sept. 19, 2023, at 175:14-18; Gonnering Dep., Sept. 21, 2023, at 147:6-148:9.

**COVID**

196.    Governor Tony Evers declared a public health emergency due to COVID-19 in Wisconsin on March 12, 2020. 2020 Exec. Order No. 72 (Wis. Office of the Governor Mar. 12, 2020), https://docs.legis.wisconsin.gov/code/executive_orders/2019_tony_evers/2020-72.pdf.

197.    President Donald Trump declared a national emergency concerning COVID-19 on March 13, 2020. Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), 85 Fed. Reg. 15337, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

198.    The State of Wisconsin Department of Health Services ("DHS") implemented many restrictions and regulations in response to COVID-19, including banning gatherings of more than 10 people, closing schools, and prohibiting on-site consumption at restaurants and bars. Wis. Dep't of Health Servs., Emergency Order #8 (Mar. 20, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

199.    COVID caused extreme uncertainty for both Windy Waters and Widen Enterprises. Reed Dep., Aug. 23, 2023, at 212:14-25; Kiesler Dep., Sept. 19, 2023, at 179:6-10; Reed Decl., Sept. 29, 2023, p.5, ¶ 47.

200.    Widen Enterprises first formed a COVID-19 Response Team on March 3, 2020. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 18; Gonnering Dep., Sept. 21, 2023, at 212:25-213:17

34

201.    In March 2020, Widen Enterprises created a plan to reduce expenses by up to approximately $6 million "to offset potential revenue declines." The spending cuts included reductions to employee development, merit-based wage increases, new hires, promotional spending, and executive wage reductions, and the company even considered layoffs. Gonnering Decl., Sept. 29, 2023, pp.3-4, ¶¶ 20, 28, Ex. C (WINDY0031833).

202.    Gonnering promptly reduced his compensation by 10% in approximately April 2020, and forewent a planned pay increase. Gonnering Decl., Sept. 29, 2023, p.3-4, ¶¶ 23-24, Ex. 24 (WINDY0000947).

203.    Expenses were ultimately reduced by about $3 million. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 21.

204.    Beginning in March 2020, and through May 2021, executive leadership met on several occasions to discuss scenarios, expense reduction, potential for layoffs, and other strategic planning. Gonnering Decl., Sept. 29, 2023, pp.3-4, ¶ 19.

205.    In late March 2020, Kiesler and the company's controller ran extensive modeling and updated reports and financials to try to plan for the major negative impact COVID was having on the economy. Kiesler Decl., Sept. 19, 2023, p.13, ¶ 94.

206.    As part of its forecasting, Widen Enterprises assumed in April 2020 that it would have no new customers in April or May 2020 and only half the usual number of new customers for the rest of 2020. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 22.

207.    The CEO of Widen Enterprises highlighted the importance of cash reserves in April 2020, stating: "While cash is good at the moment, this is critical to our operational success. As you'll read in the scenarios below, maintaining a strong cash position will help us weather the

storm. Given the persistent market uncertainty, an even stronger cash position is desired." Windy 946 (Reed Ex. 11); Gonnering Decl., Sept. 29, 2023, p.4, ¶ 24, Ex. B (Ex. 11 to Reed Dep.)

208.    The cash reserves held by Widen Enterprises in May 2020 were equal to roughly three months of expenses and were retained as a rainy day fund. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 25.

209.    Accumulating cash reserves was necessary "[d]ue to the uncertainty" from COVID. Kiesler Dep., Sept. 19, 2023, at 295:20-296:1

210.    In May 2020, neither Widen Enterprises nor Windy Waters could spare $50,000 from its cash reserves for anything other than operating expenses. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 95.

211.    In early April 2020, Widen Enterprises applied for a government-funded Paycheck Protection Program ("PPP") loan in excess of $2.6 million to ensure payroll for 149 employees could be consistently maintained. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 26.

212.    Gonnering and Kiesler had primary and direct responsibility for decisions related to the PPP loan. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 27.

213.    The loan was necessary because, "given the economic uncertainty, [Widen Enterprises] did not know if [its] line of credit was going to be sufficient to fund a recovery without a clear timeline, let alone a survival." Gonnering Decl., Sept. 29, 2023, p.4, ¶ 28, Ex. C (WINDY0031833).

214.    At the time, the ability to obtain forgiveness, and for how much, was uncertain. Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 3, Ex. B (Defs.' First Amended Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 37.

215.    The PPP loan was approved. Widen Enterprises received funds through the PPP loan in the amount of $2,697,700 on April 13, 2020. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 97; Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 3, Ex. B (Defs.' First Amended Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 37; Gonnering Decl., Sept. 29, 2023, p.4, ¶ 29.

216.    As a condition to loan forgiveness, PPP loan proceeds had to be used on certain expense items. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 98.

217.    Kiesler was greatly concerned about requirements for use of the funds and the certifications required for the loan application in light of the ever-changing guidance for the program. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 99; Seid Dep., Aug. 17, 2023, at 45:12-19

218.    Widen Enterprises analyzed the certifications required for the PPP loan and in early May 2020, Widen Enterprises was contemplating whether it needed to return the PPP funds. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 100; Gonnering Decl., Sept. 29, 2023, p.4, ¶ 28, Ex. C (WINDY0031833).

219.    The deadline to return the PPP funds to take advantage of the safe harbor was May 7, 2020, but was eventually pushed back to May 14, 2020. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 28, Ex. C (WINDY0031833); Kiesler Decl., Sept. 29, 2023, p.14, ¶ 101.

220.    Widen Enterprises originally planned to return the PPP funds if it purchased Randall's shares to avoid even the risk of criminal sanctions and the appearance of impropriety of accepting government funding and at the same time redeeming shareholders. Gonnering Dep., Sept. 21, 2023, at 219:20-23, 221:5-222:11; Kiesler Decl., Sept. 29, 2023, p.14, ¶ 102; Gonnering Decl., Sept. 29, 2023, p.4, ¶ 31.

221.    However, on May 13, 2020, the day Randall sold her shares, Kiesler learned of new government guidance announcing criminal penalties would not be suffered by companies who

took PPP funds even if the government later concluded the companies should not have qualified for the program. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 103, Ex. T.

222.    As a result, Widen Enterprises decided to keep the PPP funds despite also purchasing Randall's shares. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 104.

223.    The PPP loan allowed Widen Enterprises to delay laying off employees. Gonnering Decl., Sept. 29, 2023, p.4, ¶¶ 28, 30, Ex. C (WINDY0031833)

224.    May 2020 was a time of risk, uncertainty, and fear, and Widen Enterprises and Windy Waters were sensitive to that risk and uncertainty, which impacted their business decisions in numerous ways and threatened the viability of Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 32; Kiesler Dep., Sept. 19, 2023, at 179:6-10; Kiesler Decl., Sept. 29, 2023, p.14, ¶ 105.

225.    Defendants' focus in May 2020 was on making payroll and running Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 33; Reed Decl., Sept. 29, 2023, p.5, ¶ 48; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 106.

226.    As explained in an internal memorandum from Gonnering to Reed dated May 1, 2020:

> There is massive uncertainty and our business is subject to that uncertainty in the form of less revenue from existing customers as a result of bankruptcies, cutbacks, and reduced upselling opportunities. There is also uncertainty in our new customer volume as buying behavior for our services has slowed significantly. We built an organization around this expected growth and that growth is in jeopardy. Our spending levels, including labor spending, is structured based on revenue projections that are no longer accurate. We are funded by our own working capital and our ability to sustain operations continues to be threatened by economic uncertainty."

Gonnering Decl., Sept. 29, 2023, p.4, ¶ 24, Ex. B (WINDY0031833)

227.    Kiesler was worried the company might not be around in a few years if these COVID-related circumstances persisted. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 107.

228.    In spring of 2020, many of Widen Enterprises' customers were cutting spending and avoiding risks, especially its many customers in travel, food service, entertainment, and hospitality. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 34; Gonnering Dep., Sept. 21, 2023, at 213:9-214:8, 215:3-7

229.    A key differentiator in the standard Widen Enterprises customer contract also involved substantial risk because the vast majority of its customers had contracts that allowed them to terminate on 30 days' notice. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 35.

230.    Though typically customers paid up-front for a year of services, if they terminated before the year was over, the Widen Enterprises standard contract required that the customer be refunded pro rata for the portion of time not used. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 36; Kiesler Dep., Sept. 19, 2023, at 228:13-25

231.    This resulted in significant deferred revenue appearing on Widen Enterprises' financial statements because a large portion of the money the company had been paid had not been earned and the company could be required to repay customers out of its own cash reserves. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 37.

232.    It was a very serious risk and concern to Widen Enterprises in May 2020 that its customers facing business pressures in the uncertain and tumultuous months ahead would terminate contracts early and require Widen Enterprises to pay substantial refunds. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 38; Kiesler Dep., Sept. 19, 2023, at 228:13-25.

233.    Widen Enterprises was concerned in spring 2020 that its existing software customers would cancel early or not renew contracts when their terms ended. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 39.

234.    Outside of Widen Enterprises' software revenue, its content production revenue steeply declined after March 2020. Orders stopped coming in. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 40; Gonnering Dep., Sept. 21, 2023, at 20:4-21:4.

235.    Kiesler did not believe that Windy Waters would be in a financial position to have spare funds to provide to Randall at any time in the foreseeable future as of May 2020 due to the extreme market uncertainty due to the COVID-19 pandemic. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 108.

### *Randall Asks to Redeem in May 2020, but Declines Company's First Offer*

236.    Randall sent Reed a text message on May 5, 2020, informing him that her husband was asking for maintenance in their divorce proceedings and saying "I'm going to need to get some money." Reed Dep., Aug. 23, 2023, at 66:11-67:20; Reed Decl., Sept. 29, 2023, pp.5-6, ¶ 49, Ex. B (Ex. 3 to Reed Dep.); Randall Dep., Aug. 28, 2023, at 245:6-246:2.

237.    Randall sent Reed a text message on May 5, 2020, informing him that her husband was asking for maintenance in their divorce proceedings and saying "I'm going to need to get some money." Reed Dep., Aug. 23, 2023, at 66:11-67:20; Reed Decl., Sept. 29, 2023, pp.5-6, ¶ 49, Ex. B (Ex. 3 to Reed Dep.); Randall Dep., Aug. 28, 2023, at 245:6-246:2.

238.    Reed explained COVID was a concern for the companies, but ultimately talked with Kiesler about options. Am. Answer (ECF No. 45), ¶ 69; Randall Dep., Aug. 28, 2023, at 246:3-8.

239.    Reed then contacted Kiesler and asked him to talk with Randall about Windy Waters purchasing her shares as a way to get her money. Reed Decl., Sept. 29, 2023, p.6, ¶ 5-; Kiesler Dep., Sept. 19, 2023, at 167:22-168:10.

240.    Kiesler was concerned about the idea of paying money in light of the uncertainty with the PPP loan and would have been content not buying back any of Randall's shares, but Reed wanted Kiesler to help his sister. Reed Decl., Sept. 29, 2023, p.6, ¶ 51; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 109.

241.    Reed believed it was in the company's best interest to buy Randall out in full rather than in part, if it was going to do anything, for three reasons: (1) Windy Waters was no longer willing to be Randall's bank every time she needed money, (2) each time Randall redeemed shares it cost Windy Waters attorneys' fees and required time by Kiesler to calculate the formula and confer with counsel; and (3) Windy Waters preferred active, as opposed to passive, shareholders going forward. Reed Decl., Sept. 29, 2023, p.6, ¶ 52; Kiesler Dep. 168:1-16; Gonnering Dep., Sept. 21, 2023, at 161:6-25, 166:6-168:15; Gonnering Decl., Sept. 29, 2023, p.6, ¶¶ 42-43.

242.    Randall had been showing no interest in the company and distracted leaders from their daily work each time she wanted to sell shares. Reed Decl., Sept. 29, 2023, p.6, ¶ 53; Gonnering Dep., Sept. 21, 2023, at 167:7-168:15; Gonnering Decl., Sept. 29, 2023, p.6, ¶¶ 41-42.

243.    Reed understood any purchase of Randall's shares would be done consistently with the Stock Price Formula that had been used with all prior stock redemptions between 2005 and 2020, and never even considered any other options (nor did Randall request any). Reed Dep., Aug. 23, 2023, at 80:18-81:14; Reed Decl., Sept. 29, 2023, p.6, ¶ 55; Kiesler Dep., Sept. 19, 2023, at 168:24-169:7; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 116.

244.    Reed directed Kiesler to call Randall on behalf of Windy Waters to offer an all-or-nothing redemption for her shares of Windy Waters and, if she accepted, to carry out the transaction. Reed Decl., Sept. 29, 2023, p.6, ¶ 54; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 110.

245.    Kiesler complied with this instruction as Treasurer of Windy Waters. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 111.

246.    On May 6, 2020, Kiesler called Randall, and Randall told Kiesler that she needed money for legal fees and was seeking $100,000. Am. Answer (ECF No. 45), ¶¶ 70-71; Kiesler Dep., Sept. 19, 2023, at 172:23-173:5; Randall Dep., Aug. 28, 2023, at 261:19-24.

247.    Randall made it sound like she needed the money quickly. Kiesler Decl., Sept. 29, 2023, p.15, ¶13.

248.    Kiesler explained to Randall that COVID was a concern for the company and that it was struggling with a decision about whether to keep or return PPP money. Randall Dep., Aug. 28, 2023, at 262:15-263:8, 283:24-284:6; Ex. 24 to Randall Dep.; Wittenberg Decl., Sept. 29, 2023, p. 2, ¶ 12, Ex. L (Ex. 24 to Randall Dep.); Kiesler Decl., Sept. 29, 2023, p.15, ¶ 114.

249.    Kiesler told Randall that Windy Waters was only interested in purchasing stock if it could purchase all shares (consistent with what Reed had told him), rather than any further partial sales as had occurred previously. Kiesler Dep., Sept. 19, 2023, at 173:10-11, 214:11-19, 218:16-20; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 115.

250.    A redemption of all of Randall's shares was the only way that Defendants wished to provide Randall cash from Windy Waters or Widen Enterprises. Reed Decl., Sept. 29, 2023, p.6, ¶ 56.

251.    Kiesler did not offer, nor did Randall request, a partial redemption, a loan, or some other financial arrangement, and did not have any authority to make any such offer. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 116.

252.    Kiesler further explained the company was not able to make available the full redemption cost in one lump sum, but would pay the amount over a period of seven years. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 117.

253.    Kiesler explained Windy Waters was willing to buy Randall's remaining shares using the price-per-share calculation model using the Stock Price Formula, and explained that model valued Randall's remaining shares at approximately $1.1 million using financial data through November 2019. Am. Answer (ECF No. 45), ¶ 77; Kiesler Dep., Sept. 19, 2023, at 172:23-174:14; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 118; Randall Dep., Aug. 28, 2023, at 263:9-19, 264:6-16, 265:6-15, 285:23-286:18, 287:12-21, 288:9-19; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶¶ 4, 13, Exs. C (Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, M (Ex. 25 to Randall Dep.).

254.    Kiesler walked Randall through the stock price calculation on the phone, including explaining the company's net income. Kiesler Dep., Sept. 19, 2023, at 70:15-17, 71:10-21, 72:4-73:25, 172:23-174:14, 175:19-23, 233:18-20; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 119, Ex. U (Ex. 5 to Kiesler Dep.).

255.    Kiesler explained to Randall in that conversation that he would have to update the calculation with end-of-year numbers if she wanted to move ahead. Kiesler Dep., Sept. 19, 2023, at 172:23-174:14; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 119, Ex. U; Randall Dep., Aug. 28, 2023, at 264:6-19.

256.    Kiesler explained to Randall that by redeeming all of her shares then, she would be able to lock in that value for her shares by locking in a share price and providing certainty in an otherwise uncertain time due to COVID, which threatened the viability of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 121; Kiesler Dep., Sept. 19, 2023, at 227:14-18.

257.    Randall told Kiesler she thought that the price was too low because she "had a feeling that the company was worth more than" an amount that would make her shares worth $1.1. million, but did not explain a basis for that belief. Randall Dep., Aug. 28, 2023, at 269:11-21; Am. Answer (ECF No. 45), ¶ 78.

258.    Randall did not ask for any financial information or documents about the company during her discussion with Kiesler in May 2020. Randall Dep., Aug. 28, 2023, at 266:23-267:1; Kiesler Dep., Sept. 19, 2023, at 232:2-22; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 122.

259.    Kiesler never told Randall in May 2020 that he had a market value to provide or had obtained any market valuation or report on the value of Windy Waters, because he had not. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 123.

260.    In light of the extreme uncertainty about the PPP loan, Windy Waters was not willing to leave any offer open. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 124; Kiesler Dep., Sept. 19, 2023, at 176:23-177:4, 179:6-10.

261.    Kiesler wanted to know the answer prior to the safe harbor deadline to return PPP funds, which at the time was May 7, 2020, so he could determine whether or not to return the PPP funds. Kiesler Dep., Sept. 19, 2023, at 176:17-177:4.

262.    Moreover, Kiesler did not want the issue to linger while he was focused on so many other business issues at the time, and wanted to have it resolved promptly. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 125.

263.    Windy Waters left the offer open for the rest of the day, and Kiesler asked Randall to give a response before he left for the day. Kiesler Dep., Sept. 19, 2023, at 172:23-174:14; Kiesler Decl., Sept. 29, 2023, p.17, ¶ 127.

264.    Kiesler assured Randall she could "take it or leave it," making it clear she was not obligated to sell her shares. Randall Dep., Aug. 28, 2023, at 267:20-21; Kiesler Dep., Sept. 19, 2023, at 227:22-24; Kiesler Decl., Sept. 29, 2023, p.17, ¶ 128.

265.    Randall told Kiesler the decision was a "really big deal" and she wanted "time to talk to [her] people." Randall Dep., Aug. 28, 2023, at 280:24-281:24; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 11, Ex. K (Ex. 23 to Randall Dep.).

266.    After Randall and Kiesler spoke, Kiesler confirmed with Reed that he approved Windy Waters purchasing all of Randall's shares. Reed Dep., Aug. 23, 2023, at 71:24-73:15; Reed Decl., Sept. 29, 2023, pp.6-7, ¶ 57, Ex. C (Ex. 4 to Reed Dep.).

267.    Late in the day on May 6, around 4 pm, Randall and Kiesler spoke again. Randall said she needed more time so she could talk to a lawyer or financial advisor. Randall Dep., Aug. 28, 2023, at 274:23-275:7, 285:11-286:18; Ex. 25 to Randall Dep.; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.); Kiesler Decl., Sept. 29, 2023, p.17, ¶ 129.

268.    Kiesler told Randall she should talk with her financial advisor and consult with counsel, and extended the offer for three more days. Kiesler Dep., Sept. 19, 2023, at 212:15-18, 213:9-16; Kiesler Decl., Sept. 29, 2023, p.17, ¶ 130; Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 3, Ex. B (Defs.' First Am. Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 34.

269.    Kiesler also explained that the government safe harbor deadline for the PPP loan money had been extended another week, and so he did not need Randall's answer that day. Ex. 25

to Randall Dep., Aug. 28, 2023, at 285:23-286:18, 291:12-16; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

270.     As of May 6, 2020, Kiesler believed Randall redeeming her shares at the offered share price could be a smart move given the uncertainties of COVID, which threatened the viability of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 131.

271.     Randall told Kiesler that she had never thought he and Reed had an interest in Randall's well-being and made it clear that she did not trust them. Randall Dep., Aug. 28, 2023, at 285:23-286:18, 291:18-293:3; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

272.     Randall did not accept Windy Waters' May 6, 2020, offer to buy her shares at around $1.1 million and did not contact Kiesler by May 9. Randall Dep., Aug. 28, 2023, at 268:4-9, 277:1-13; Am. Answer (ECF No. 45), ¶ 93; Kiesler Decl, Sept. 29, 2023, p.17, ¶ 132.

### *Randall Was Not Desperate*

273.      Randall is a 20% owner of a different family-owned company, Millmont, that owns two cottages, some land, and, until 2021, owned an office building. She has owned this interest since before 2005 and owned it as of May 13, 2020. Randall Dep., Aug. 28, 2023, at 164:20-24, 208:4-20; Reed Decl., Sept. 29, 2023, p.7, ¶ 59; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 72.

274.     Randall "never thought of" the possibility of selling her interest in Millmont when she needed money, including in May 2020. Randall Dep., Aug. 28, 2023, at 207:24-209:10, 248:9-15, 305:12-17.

46

275.    Randall did not ask Reed about the possibility of her obtaining money from or through Millmont in May 2020. Randall Dep., Aug. 28, 2023, at 246:17-247:9; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections and Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 74.

276.    As of May 2020, Randall and her husband together owned eight condominiums that they rented out. Randall Dep., Aug. 28, 2023, at 230:12-21, 250:21-251:2.

277.    Five of the rental properties were worth $230,000 each in November 2020; another three were worth a combined $510,000 Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 19, Ex. U (STAFFORD004358).

278.    Randall did not consider selling any of the condos at that time because that was a source of income to her. Randall Dep., Aug. 28, 2023, at 250:21-251:18.

279.    Randall did not consider refinancing any mortgages in May 2020 when she needed money. Randall Dep., Aug. 28, 2023, at 254:5-9.

280.    In May 2020, Randall owned a Cadillac worth $28,000 with no loan on it. Randall Dep., Aug. 28, 2023, at 254:11-17; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 19, Ex. T (STAFFORD004353).

281.    In May 2019, Randall owned $17,000 of cash kept in a safe. Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 19, Ex. T (STAFFORD004353).

282.    Randall owns numerous gold coins and gold and silver bars that she inherited in approximately 2003. Randall Dep., Aug. 28, 2023, at 231:6-23; Reed Decl., Sept. 29, 2023, p.7, ¶ 58.

283.    Randall "didn't think of" the possibility of selling any of her gold coins or gold or silver bars when she needed money. Randall Dep., Aug. 28, 2023, at 232:17-23, 233:4-8.

47

284.    She "never ever, ever thought about" selling those items and did not want to sell them for money. Randall Dep., Aug. 28, 2023, at 232:17-23, 233:19-234:19, 236:15-24.

285.    Nothing prevented Randall from selling her gold coins or gold and silver bars other than that she did not want to sell them. Randall Dep., Aug. 28, 2023, at 233:12-236:24.

286.    Randall also owned an heirloom watch and pearls that she inherited from her mother that she did not have appraised or sell for money in May 2020. Randall Dep., Aug. 28, 2023, at 236:25-238:9.

287.    On April 22, 2020, Randall's husband filed a motion in their divorce proceedings seeking maintenance. Randall Dep., Aug. 28, 2023, at 227:7-24.

288.    The motion was set for a hearing on May 18, 2020. Randall Dep., Aug. 28, 2023, at 239:12-240:25.

289.    The motion and upcoming hearing and Randall's need to pay her attorneys caused Randall to try to obtain additional money. Randall Dep., Aug. 28, 2023, at 227:7-24, 240:17-25.

290.    Other than asking Reed about getting money by selling her stock, Randall did not explore any other way to obtain money when she needed it in May 2020. Randall Dep., Aug. 28. 2023, at 249:7-10.

291.    Randall did not try to sell any personal items when she needed money in May 2020. She did not sell any furniture, jewelry, heirlooms, or other items. Randall Dep., Aug. 28, 2023, at 259:2-24.

292.    Randall did not apply for any jobs in May 2020 or at any time since 2015. Randall Dep., Aug. 28, 2023, at 259:25-260:2.

293.    Randall has never applied for any public benefits or food stamps. Randall Dep., Aug. 28, 2023, at 260:3-10.

294.    Randall did not ask Reed between May 5 and May 13, 2020, whether she could obtain money from Millmont, and did not want to sell her interest in Millmont. Reed Decl., Sept. 29, 2023, p.7, ¶ 60; Randall Dep., Aug. 28, 2023, at 246:25-247:9, 248:9-15, 248:22-249-5.

295.    Randall did not apply for any loans in May 2020. Randall Dep., Aug. 28, 2023, at 249:7-18.

296.    Randall did not ask for a loan from Windy Waters in May 2020. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 153.

297.    Randall did not ask any other family members for money in May 2020. Randall Dep., Aug. 28, 2023, at 249:19-22.

298.    Randall did not take any money out of retirement accounts in May 2020 when she needed money. Randall Dep., Aug. 28, 2023, at 249:23-25-25.

299.    Between May 5 and May 13, 2020, Randall never asked any of the Defendants what the value of Windy Waters or Widen Enterprises was. Reed Decl., Sept. 29, 2023, p.7, ¶ 62; Kiesler Decl., Sept. 29, 2023, p.20, ¶ 154.

300.    Between May 5 and May 13, 2020, Randall never asked any of the Defendants to see any financial statements or other business records. Reed Decl., Sept. 29, 2023, p.7, ¶ 63; Kiesler Decl.

301.    Reed was willing to consider buying Randall's interest in Millmont instead, but Randall never brought it up again. Reed Decl., Sept. 29, 2023, p.7, ¶ 61.

302.    Between about 2002 and 2019, Randall and her husband made expensive real estate investments in Florida and Wisconsin. Randall Dep., Aug. 28, 2023, at 252:7-15.

303.    Randall was not happy with her husband's real estate investments in Florida, specifically, which resulted in foreclosures or short sales. Randall Dep, Aug. 28, 2023, at 253:1-16.

304.    On May 6, 2020, after her first call with Kiesler, Randall contacted her son, Justin Randall, and told him about the offer. Randall Dep., Aug. 28, 2023, at 280:24-281:24; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 11, Ex. K (Ex. 23 to Randall Dep.).

305.    Randall's son, Justin Randall, told her she should get a lawyer prior to redeeming all of her stock and told her she should have an attorney look at the financials of Widen Enterprises. Randall Dep., Aug. 28, 2023, at 276:4-14, 294:20-295:9.

306.    Randall did not contact any attorneys between May 6 and May 12. Randall Dep., Aug. 28, 2023, at 276:4-25.

307.    Randall reached out to her financial advisor, Mark Goff, on May 6, 2020, after hanging up with Kiesler during the first phone call when he relayed the offer to purchase all shares for $1.1 million. She texted him asking him to call because she needed advice about the offer from Windy Waters. Randall Dep., Aug. 28, 2023, at 277:22-280:20; Ex. 22 to Randall Dep.; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶¶ 4, 10, Exs. C (Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, I (Ex. 22 to Randall Dep.).

308.    Goff did not respond right away. Randall texted Goff again shortly before 3 pm on May 6 and asked him if she should consider the offer. Randall Dep., Aug. 28, 2023, at 282:14-285:15; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, 12, Exs. C (Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, L (Ex. 24 to Randall Dep.).

309.    Within the next 90 minutes, Goff and Randall communicated and Goff provided her with advice about what she should say. Randall Dep., Aug. 28, 2023, at 285:11-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

310.    After Randall and Kiesler's second call ended around 4:30 on May 6, 2020, Randall contacted Goff again and indicated she would need advice on how to make the money she was offered for her stock grow. Randall Dep., Aug. 28, 2023, at 285:11-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

311.    She expressed her actual understanding of the share price calculation and the conversation after her phone call with Kiesler on May 6, explaining to her financial advisor Mark Goff directly after the call as follows:

> Mikes [sic] attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought that they have had an interest in my well being. He told me that the company puts all of the in coming [sic] "profit" right back into the business. So they never make any money…. He gave me the way they have evaluating shares since 1991. It has nothing to do with how good or bad the company is doing. He was trying to tell me in 7 years my stock would still be worth 1.1 mill. I don't understand how that could be. Just when I was going to call him back he was calling me, it was at 3:58. I had to chuckle thinking he was going to pressure me for a decision. What he told me was that he had just received an email saying the government has pushed back the deadline for another week so he doesn't need my answer today after all. Now I have time to talk to Scott Spangler on Monday to see what he thinks I should do. Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all. I could tell he was in disbelief and I could hear some sadness in his voice.

Randall Dep., Aug. 28, 2023, at 285:23-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

312.    Randall also planned to talk with her accountant about the offer to get his advice. Randall Dep., Aug. 28, 2023, at 285:23-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

313.    Randall does not recall whether she ever did reach out to her accountant. Randall Dep., Aug. 28, 2023, at 293: 4-9.

**Windy Receives Updated Financials and Communicates New Offer**

314.    On approximately May 12, 2020, Kiesler updated the price-per-share calculation model by inserting the December 2019 financial information into the Stock Price Formula, as promised previously. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 133.

315.    Based on his calculations, the redemption price Windy Waters would offer in the proposed redemption had increased to approximately $1.3 million. Kiesler Decl., Sept. 29, 2023, p.18, ¶ 134.

316.    On May 12, 2020, Kiesler contacted Scott Seid, the lawyer for Windy Waters, for two reasons. Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid Dep.); Seid Dep., Aug. 17, 2023, at 18:4-12, 20:17-20; Kiesler Decl., Sept. 29, 2023, p.18, ¶¶ 136-39; Kiesler Dep., Sept. 19, 2023, at 189:22-190-3.

317.    The first reason Kiesler contacted Seid was to ask if his calculation of $1.3 million for Randall's shares using the Stock Price Formula was appropriate, and Seid responded "it would be consistent to do it that way." Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid. Dep.); Seid Dep., Aug. 17, 2023, at 18:4-12, 20:17-20; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 136; Kiesler Dep., Sept. 19, 2021, at 189:22-190:3.

318.    Kiesler expressed that Windy Waters intended to treat Randall's transaction precisely the same as it had treated her brother, Price Widen, when he had redeemed all of his

shares in 2015. Seid Dep., Aug. 17, 2023, at 29:17-21; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 137; Supplemental Christa Wittenberg Decl., p.1, ¶ 2, Ex. V (Ex. 41 to Kiesler Dep.); Kiesler Dep., Sept. 19, 2023, at 215:3-7.

319.    The second reason Kiesler contacted Seid was to ask him to prepare a draft redemption agreement to use for a potential transaction. Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid Dep.); Seid Dep., Aug. 17, 2023, at 18:4-12; Kiesler Decl. Sept. 29, 2023, p.18, ¶ 138; Kiesler Dep., Sept. 19, 2021, at 189:22-190:3.

320.    Seid prepared the redemption agreement for Randall using the redemption agreement from when Price Widen redeemed the remainder of his shares as a template. Seid Dep., Aug. 17, 2023, at 18:22-19:5.

321.    To create Randall's stock redemption agreement from Price Widen's agreement, Seid changed only the name, the number of shares being redeemed, and the pronouns in most places (leaving "he" in a few places in the first draft by mistake). Seid Dep., Aug. 17, 2023, at 13:2-6, 18:1-18, 19:23-20:9; Wittenberg Decl., Sept. 29, 2023, pp.2-3, ¶¶ 8, 15 Exs. G (Ex. 2 to Seid Dep.), P (Ex. 5 to Seid Dep.).

322.    Seid also created a promissory note for the payments to Randall by using the promissory note from when Price Widen redeemed all of his shares in 2015 as a template. Seid Dep., Aug. 17, 2023, at 13:2-6, 18:1-18, 20:5-9; Wittenberg Decl., Sept. 29, 2023, pp.2-3, ¶¶ 8, 15, Exs. G (Ex. 2 to Seid Dep.), P (Ex. 5 to Seid Dep.).

323.    Kiesler asked Seid to use the price per share he calculated using the Stock Price Formula based on the updated financials through December 31, 2019, for the stock redemption agreement and promissory note. Seid Dep., Aug. 17, 2023, at 20:17-20, 26:2-5; Kiesler Decl., Sept.

29, 2023, p.18, ¶ 139, Ex. V (2020 Stock Redemption Agreement); Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid Dep.).

324.    The price per share Kiesler calculated using the Stock Price Formula was $615.42 for Class B common stock and $646.19 for Class A stock. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.); Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, p.16, 18, ¶¶ 119, 134, Ex. U (Ex. 5 to Kiesler Dep.).

325.    The price per share based on the net assets from Windy Waters' financial statements would have been only $172.85 for Class B shares and $181.49 for Class A shares, so Kiesler used the higher price based on the Stock Price Formula. Kiesler Decl., Sept. 19, 2023, p.16, 18, ¶¶ 119, 135, Ex. U (Ex. 5 to Kiesler Dep.).

326.    Kiesler called Randall on May 13 to communicate that updated offer of over $1.3 million. Randall Dep., Aug. 23, 2023, at 303:17-304:3, 304:9-12; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 140; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 63.

327.    Kiesler made it clear to Randall that the Stock Price Formula was being used again for this calculation. Kiesler Decl., Sept. 29, 2023, p.18, ¶ 141.

328.    Randall agreed with those terms on the spot, and said she would be coming in later that day to sign the documents. Randall Dep., Aug. 28, 2023, at 303:17-304:3, 304:9-12; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 142.

329.    Randall emailed her divorce attorney after talking with Kiesler asking for advice. Randall Dep., Aug. 28, 2023, at 307:14-308:12.

330.     When Randall hired Stafford Rosenbaum to represent her in her divorce, she had signed a conflict waiver letter confirming she waived any conflict due to the fact that the firm also represented Windy Waters and Widen Enterprises with respect to business matters, including her stock redemptions. Randall Dep., Aug. 28, 2023, at 220:16-223:25; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 9, Ex. H (Ex. 17 to Randall Dep.).

331.     The same day, Randall also called and left a voicemail for Seid. Seid Dep., Aug. 17, 2023, at 31:4-20; Randall Dep., Aug. 23, 2023, at 310:11-13.

332.     Randall texted to her son Justin prior to heading over to meet Kiesler at 4:30 p.m., "Kiesler did another evaluation of the company and came up with another $250 thousand. Nothing I can do about it. I will be going over to the office to sign the papers at 4:30." Randall Dep., Aug. 28, 2023, at 313:2-15; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 14, Ex. N (Ex. 28 to Randall Dep.).

333.     Randall came to see Kiesler on May 13 at the office to review and consider the stock redemption agreement and promissory note that Seid had prepared to effectuate the redemption of her shares. Am. Answer (ECF No. 45), ¶¶ 109-10; Randall Dep., Aug. 28, 2023, at 312:19-24; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 143.

334.     When she arrived, Kiesler was talking with Seid about an issue related to the PPP loan. Seid said he owed Randall a call and asked to speak with her. Kiesler Dep., Sept. 19, 2023, at 207:16-208:3; Seid Dep., Aug. 17, 2023, at 31:21-32:14, 32:23-33:6; Randall Dep., Aug. 28, 2023, at 313:25-314:4; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

335.     Randall and Seid then spoke, and Seid told her that no one could force her to sign the documents. Randall Dep., Aug. 28, 2023, at 314:5-17; Am. Answer (ECF No. 45), ¶¶ 110-11, 113; Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

55

336.    Seid also told Randall (1) he could not give her advice because the firm represents the company, (2) that if she was uncomfortable signing the documents, there was no reason to do it, and (3) that if she felt like she needed to talk to an attorney first, that she absolutely had the right to do that and should do that. Am. Answer (ECF No. 45), ¶¶ 110-11, 113; Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

337.    Seid testified that he also told Randall that he would be happy to give her some names of other business law attorneys who could help her. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

338.    Randall did not ask Seid for any financial statements, tax returns, or other information during that phone call or ever. Seid Dep., Aug. 17, 2023, at 42:15-43:24.

339.    Randall said she would let Seid know if she wanted to be given names of other lawyers. Seid Dep., Aug. 17, 2023, at 38:2-12, 39:6-12; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

340.    A few minutes after that conversation, Seid sent an email to Randall's divorce lawyer stating:

> Just talked to her. . . . She is uncomfortable about signing documents for the sale of her stock, which are consistent with the way in which everyone else has sold their stock. I told her that she absolutely had the right to seek outside counsel before signing anything and that I would be happy to give her names of attorneys to do that. She said she would let me know.

Seid Dep., Aug. 17, 2023, at 38:2-39:14; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

341.     This was the only time Randall and Seid had spoken, and Randall never contacted Seid again after that discussion. Seid Dep., Aug. 17, 2023, at 39:6-16; Randall Dep., Aug. 28, 2023, at 220:1-14.

342.     Kiesler then asked whether Randall wanted her son or anyone else to review the documents before she signed, and Randall declined. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

343.     Kiesler then read aloud both the stock redemption agreement and the promissory note word for word while Randall followed along, stopping after each paragraph to ask if she understood and whether she had any questions. Kiesler Dep., Sept. 19, 2023, at 225:23-226:10; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 145; Randall Dep., Aug. 28, 2023, at 318:16-24.

344.     Randall did not disagree with anything in the documents or ask for anything to be changed. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 146.

345.     Kiesler did not prevent Randall from leaving or give Randall a time limit she could remain in the office while she was there to sign the documents. Randall Dep. 319:16-25; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 147.

346.     Kiesler asked Randall if she wanted to take the documents with her to review alone or with an attorney and not sign them that day, but she declined. Kiesler Dep., Sept. 21, 2023, at 213:22-214:2; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

347.     Kiesler asked Randall if she wanted to take the documents with her to review alone or with an attorney and not sign them that day, but she declined. Kiesler Dep., Sept. 21, 2023, at 213:22-214:2; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

348.     Kiesler and Randall then executed the documents, copies of which are attached to the Complaint as Ex A and Ex B and attached to the Kiesler Declaration as Ex V and Ex W. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 148, Exs. V (Stock Redemption Agreement), W (Promissory Note);

Am. Answer (ECF No. 45), ¶ 125; Randall Dep., Aug. 28, 2023, at 315:24-317:3; Reed C. Widen

Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125,

Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept.

29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

349.    Randall physically signed the documents of her own volition. Randall Dep., Aug.

28, 2023, at 296:5-14; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And

Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 67.

350.    Randall did not ask for any financial documents on May 13. Randall Dep., Aug. 28,

2023, at 320:1-3; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 149.

351.    Randall did not request any information at all regarding the redemption on May 13,

2020. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 150; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D

(Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 68.

352.    Prior to executing the May 13, 2020 Redemption Agreement, Randall did not ask

Defendants how the value of the shares redeemed under that agreement was calculated, nor to see

the calculation. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To

Defs.' First Set Of Reqs. For Admis.) at Resp. No. 58; Kiesler Decl., Sept. 29, 2023, p.20, ¶ 156.

353.    At the time of execution, Randall was the sole director and president of Windy

Waters, and resigned that role via the Stock Redemption Agreement. Reed C. Widen Decl. (ECF

No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B

(ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023,

p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.); Kiesler Decl., Sept. 29, 2023, p.20, ¶ 157.

354.    Kiesler made no false representation to Randall related to the stock redemption on

May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 151.

355.    When Randall asked Kiesler if there was any "thought about selling the company," Kiesler responded, "No, there's been no talk of that." Randall Dep., Aug. 28, 2023, at 320:13-321:12.

356.    Kiesler did not know of any facts about which Randall was mistaken related to the stock redemption on May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 152.

357.    [OMITTED]

358.    Randall contends that, "[i]f [she] was financially stable, [she] probably wouldn't have signed" the 2020 redemption agreement. Randall Dep., Aug. 28, 2023, at 296:5-9.

359.    On the other hand, Randall contends she would have held onto her shares no matter what if she had known Windy Waters was considering selling Widen Enterprises. Compl. (ECF No. 1), ¶¶ 50-51, 117-18, 144, 156, 164-66, 206, 209, 213-14, 219, 229, 230-31, 234-35.

**_Reed's Lack of Involvement_**

360.    Between May 6, 2020, and May 13, 2020, Reed and Randall had no contact and did not communicate in any way. Reed Decl., Sept. 29, 2023, p.7, ¶ 64; Randall Dep., Aug. 28, 2023, at 261:12-18.

361.    Between May 5 and May 13, 2020, Reed and Kiesler had no discussions about what information Randall did or did not have about Windy Waters, and Reed did not otherwise know what information Randall did or did not have about Windy Waters. Reed Decl., Sept. 29, 2023, p.7, ¶ 65.

362.    Reed made no false or misleading statement of fact to Randall between May 5, 2020 and May 13, 2020. Reed Decl., Sept. 29, 2023, pp.7-8, ¶ 66.

363.    Reed never made any statements of fact to Randall with respect to any of her prior stock redemptions, either. Reed Decl., Sept. 29, 2023, p.8, ¶ 67.

364.   Reed never provided Randall with financial information in relation to any of her prior stock redemptions. Reed Decl., Sept. 29, 2023, p.8, ¶ 68.

***Transaction Documents***

365.   Pursuant to the stock redemption agreement, Randall sold all of her remaining shares in Windy Waters, consisting of 232.75 shares of Class A common stock of Windy Waters sold for $646.19 per share, and 1,952.7568 shares of Class B common stock of Windy Waters sold for $615.42 per share, for a total purchase price of $1,352,166.31. Am. Answer (ECF No. 45), ¶ 126; Randall Dep., Aug. 28, 2023, at 315:24-317:3; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

366.   A true and correct copy of the signed stock redemption agreement dated May 13, 2020, by which Randall sold all her shares in Widen Enterprises, is attached to the Complaint as Exhibit A (ECF No. 1-6) and to the first Widen Declaration (ECF No. 33) as Ex. A (ECF No. 33-1). Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

367.   A true and correct copy of the signed promissory note that accompanied the signed stock redemption agreement dated May 13, 2020, by which Widen Enterprises became obligated to pay Randall for her shares on the stated terms, is attached to the Complaint as Exhibit B (ECF No. 1-7) and to the first Widen Declaration (ECF No. 33) as Ex. A (ECF No. 33-1).

368.   The release from Randall's redemption agreement was identical to the release in Price Widen's redemption agreement and was included to ensure they were treated the same. Reed

C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 13:2-14:28, 40:22-41:2, 41:23-42:14; Wittenberg Decl., Sept. 29, 2023, p.2, ¶¶ 7-8, Exs. F (Ex. 14 to Seid Dep.), G (Ex. 2 to Seid Dep.).

369.    Through this transaction, Randall received over $400,000 more than her brother, Price Widen, had received when he redeemed a larger number of shares in 2015. Seid Dep. 41:14-17; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 13:2-10, 40:22-41:2, 41:14-17; Wittenberg Decl., Sept. 29, 2023, p.2, ¶¶ 7-8, Exs. F (Ex. 14 to Seid Dep.), G (Ex. 2 to Seid Dep).

370.    The price per share that Randall was paid in 2020 was the highest share price anyone had paid or received for Windy Waters stock in the history of the company. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 158.

371.    No prior approvals of the redemption were necessary. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 159, Ex. X (WINDY0033072).

372.    The Stock Redemption Agreement covered the entirety of the issues related to the stock transaction. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1) § 7(b); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6) § 6(b); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.) § 7(b).

### *Later Discussion About Sale*

373.    The first time Reed and Gonnering had any serious communication about selling Widen Enterprises was August 25, 2020. Reed Dep., Aug. 23, 2023, at 151:15-152:12, 155:3-8; Reed Decl., Sept. 29, 2023, p.9, ¶ 82; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 56.

374.    From as early as they can remember and frequently through 2021, Reed, Kiesler, and Gonnering received solicitations and cold calls about the possible sale of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 120:18-22; Reed Decl., Sept. 29, 2023, p.8, ¶ 70; Kiesler Decl., Sept. 29, 2023, p.20, ¶ 160; Gonnering Decl., Sept. 29, 2023, p.6, ¶ 44.

375.    Reed usually deleted solicitation emails. He never talked to any of those individuals or responded to their emails. Reed Dep., Aug. 23, 2023, at 120:18-22, 122:18-125:13; Reed Decl., Sept. 29, 2023, p.8, ¶ 70.

376.    One time Reed took a solicitation call because he didn't recognize the number, and Reed told the caller he was not interested in selling Widen Enterprises. Reed Decl., Sept. 29, 2023, p.8, ¶ 71.

377.    Kiesler never talked to any of the individuals who sent solicitations about Widen Enterprises or responded to their emails. He would usually either delete them or forward them to Gonnering. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 161.

378.    Gonnering, as the CEO, received many emails and calls about potential sale of Widen Enterprises, and still does. Gonnering Decl., Sept. 29, 2023, p.6, ¶ 44; Gonnering Dep., Sept. 21, 2023, at 200:1-14.

379.    Gonnering infrequently responded to the inquiries in an effort to learn more about the private equity industry and to ensure he was educated and informed for the possibility of inorganic growth (acquiring other companies) or in the event the owner of Widen Enterprises ever wanted to sell the company. Gonnering Decl., Sept. 29, 2023, p.6, ¶ 45; Gonnering Dep., Sept. 21, 2023, at 199:17-25 (partial).

380.    In February 2020, Tequity Advisors reached out to Gonnering about a potential opportunity to *acquire* another company with code name Hercules. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. A (WINDY0000863).

381.    Widen Enterprises considered this opportunity to purchase another entity to inorganically grow business, but ultimately did not pursue it. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 16.

382.    Tequity Advisors never approached any of the defendants about a sale of Widen Enterprises or its assets. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 17; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 162; Reed Decl., Sept. 29, 2023, p.8, ¶ 72.

383.    Gonnering, as part of his duties as CEO, tracked headlines in the software industry so that he could be better informed about his competitors and the overall market, including news about company mergers and acquisitions, and occasionally included this information in operational updates to Reed, his supervisor. Gonnering Decl., Sept. 29, 2023, p.6, ¶ 46, Ex. D (WINDY0034382); Gonnering Dep., Sept. 21, 2023, at 157:13-158:12, 191:20-24, 198:7-11, 276:3-11; Reed Decl., Sept. 29, 2023, pp.8-9, ¶ 73, Exs. D (Ex. 9 to Reed Dep.), F (Ex. 10 to Reed Dep.).

384.    Reed was not interested in Windy Waters selling Widen Enterprises prior to May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:18-21, 30:20-31:5, 127:15-16, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, p.9, ¶ 74.

385.    There had been no discussion among Windy Waters or Widen Enterprises executives about selling Widen Enterprises prior to May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:18-21, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, p.9, ¶ 75;

Gonnering Dep., Sept. 21, 2023, at 100:8-12, 102:19-23; Gonnering Decl., Sept. 29, 2023, p.6, ¶ 47.

386.    As of May 13, 2020, neither Reed, nor Gonnering, nor Kiesler were preparing, planning, contemplating, or even ruminating over a sale of Widen Enterprises. Reed Decl., Sept. 29, 2023, p.9, ¶ 76; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 163; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 48.

387.    Because there was no interest in selling Widen Enterprises, Reed, Gonnering, and Kiesler had not had the company valued and did not know its fair market value as of May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:25-99:5, 127:15-25, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20; Reed Decl., Sept. 29, 2023, p.9, ¶ 77 ; Kiesler Dep., Sept. 19, 2023, at 78:7-17, 139:7-14, 149:5-12; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 164; Gonnering Dep., Sept. 21, 2023, at 100:4-12, 106:17-22, 107:22-23, 109:1-7, 110:7-8; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 49; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. E (Windy Waters' Objections And Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 11.

388.    Defendants did not solicit (and thus, did not possess) a market valuation of Widen Enterprises at any point in May 2020. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 165; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 50; Reed Decl., Sept. 29, 2023, p.9, ¶ 78.

389.    Gonnering testified, "I didn't know the value of the company in May of 2020.· That wasn't something we were monitoring or looking at. We were looking at growth.  And in May of 2020 in particular, which was two months after COVID, managing uncertainty." Gonnering Dep., Sept. 21, 2023, at 100:8-12.

390.    As Gonnering explained:

> [I]f I put myself in May of 2020, that was a way different time. That was . . . the height of the COVID time. . . . [A]ll we were thinking about was how are we navigating this particular uncertainty, which was remote employees, which was uncertainty from what we have as the objective, which is growth, and what happens to the organization given the risk that we had at that time, which was significant based on the customer agreements that we had. So, like, I'm -- I'm trying to put myself back in May of 2020. The furthest thing from our mind was valuation, because I was worried about survival.

Gonnering Dep., Sept. 21, 2023, at 108:19-22, 109:13-23.

391.    After Reed turned 60 in June 2020, Gonnering and Reed talked about what his long-term plans were so they could begin succession planning for Widen Enterprises. Reed Decl., Sept. 29, 2023, p.9, ¶ 79; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 51.

392.    At that time, Reed did not have any succession plan in place and did not have any plan or intent for Windy Waters to sell Widen Enterprises. Reed Dep., Aug. 23, 2023, at 142:10-12, 150:13-18; Reed Decl., Sept. 29, 2023, p.9, ¶ 80.

393.    Previously, the only discussions about succession planning had been Reed's instruction that if he died in a plane crash, Gonnering should talk to Reed's wife or children about what to do. Gonnering Dep., Sept. 21, 2023, at 253:20-254:11; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 52.

394.    At this stage of the succession planning process, Reed started considering many possible forms of succession plans, including letting Gonnering run the company, creating an employee stock ownership plan, or making plans to sell, all during the timeframe of two to five years. Reed Decl., Sept. 29, 2023, p.9, ¶ 81

395.    On July 21, 2020, July 24, 2020, and August 14, 2020, Gonnering and Reed had exploratory conversations about succession planning, focusing on the timeframe of two to five years down the road. Gonnering Decl., Sept. 29, 2023, p.7, ¶ 53.

396.    On August 19, 2020, Gonnering asked Reed if he could reach out to Jeff Horein, a Baker Tilly advisor, to ask his advice on the process, and Reed agreed that would be acceptable. Gonnering Decl., Sept. 29, 2023, p.7, ¶ 54.

397.    Gonnering sought this guidance because he had no experience or familiarity with succession planning and had no idea what to do. Gonnering Decl., Sept. 29, 2023, p.7, ¶ 55.

398.    On August 25, 2020, Gonnering informed Reed that a company called Brandfolder, which was in the same industry as Widen Enterprises and smaller size, had sold for $155 million. Reed Decl., Sept. 29, 2023, pp.9-10, ¶ 83; Gonnering Dep., Sept. 21, 2023, at 272:15-274:7, 278:16-279:11; Gonnering Decl., Sept. 29, 2023, pp.7, ¶ 57.

399.    When Gonnering saw the announcement about the Brandfolder acquisition price, he "had to read [it] a lot of times because that was a shocker" and was "unfathomable." Gonnering Dep., Sept. 21, 2023, at 272:15-273:7.

400.    Brandfolder was a close competitor of Widen Enterprises. They had similar products and often were competing over the same customers and were both in the final stages of bidding processes together. Gonnering Dep., Sept. 21, 2023, at 273:1-7; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 58.

401.    Gonnering suspected Brandfolder had revenue smaller than or comparable to Widen Enterprises, and believed Widen Enterprises had a stronger reputation in their industry. Gonnering Dep., Sept. 21, 2023, at 278:16-280:3, 281:19-282:5; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 59.

402.    Reed was shocked to hear that number, and Reed told Gonnering it would be foolish not to at least consider selling Widen Enterprises if it could sell for $200 million. Reed Dep., Aug. 23, 2023, at 134:12-135:3, 151:15-153:17; Reed Decl., Sept. 29, 2023, p.10, ¶ 84, Ex. F (Ex. 17 to

Reed Dep.); Gonnering Dep., Sept. 21, 2023, at 280:4-281:5, 282:21-283:7; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 60.

403. The news of the Brandfolder acquisition Gonnering shared in August 2020 was the first time Reed gave any serious thought to Windy Waters attempting to sell Widen Enterprises. Reed Dep., Aug. 23, 2023, at 134:12-135:3; Reed Decl., Sept. 29, 2023, p.10, ¶ 85.

404. Gonnering reached out to network contacts over the following several weeks in an effort to gain advice about the long-term sale process. Gonnering Decl., Sept. 29, 2023, p.8, ¶ 61.

405. Between approximately August and October 2020, Gonnering talked to Baker Tilly about "preliminary work" that would be needed related to succession planning over the next two to five years. Reed Dep., Aug. 23, 2023, at 157:2-21; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 62.

406. At some point in the process, an advisor told Reed the company could sell for four times revenue, rather than a multiple of EBIDTA as Jeff Horein had told Reed previously, and Reed was surprised. Reed Decl., Sept. 29, 2023, p.10, ¶ 86.

407. The first time Kiesler was made aware of any discussion of Windy Waters selling Widen Enterprises at all was in approximately late August 2020 when he learned Reed and Gonnering were considering the possibility of selling in the next two to five years. Kiesler Dep., Sept. 19, 2023, at 261:13-19; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 166.

408. There had been no talk of selling Widen Enterprises to Kiesler's knowledge prior to May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 167.

409. Kiesler was not aware of any of the succession planning discussions between Reed and Gonnering prior to August 2020. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 168.

410.    Randall admitted during her deposition that she had no basis to assert that Reed was telling people that he was considering selling the company within a year of February 2020. Randall Dep. 318:18–23.

411.    On October 5, 2020, Gonnering had an exploratory meeting with Software Equity Group Advisors, L.L.C. (SEG). Gonnering Decl., Sept. 29, 2023, p.8, ¶ 63.

412.    After that meeting, Gonnering, Kiesler, and Reed met to discuss the possibility of sale, and decided to start the long process of trying to sell the business within the next 2-5 years. Seid Dep., Aug. 17, 2023, at 55:8-25; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 64; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 169; Reed Decl., Sept. 29, 2023, p.10, ¶ 87.

413.    Seid first learned about Windy Waters' potential desire to sell the company in 2-5 years on October 6, 2020. Seid Dep., Aug. 17, 2023, at 53:15-55:25.

414.    Seid explained, "It completely took me by surprise that Reed was considering selling the company. . . . I just thought that Widen was such a great company and a family-owned company that, that they would just continue on doing what they were doing. Matthew had done such a great job with the company. I was just surprised." Seid Dep., Aug. 17, 2023, at 54:20-56:16.

415.    Seid was also surprised to learn the price paid for Brandfolder, calling it "crazy money," and realized this had caused Windy Waters to consider the possibility of selling in the 2-to-5-year timeframe. Seid Dep., Aug. 17, 2023, at 56:1-57:3.

416.    In December 2020 and January 2021, discussions about potential efforts to market the company for sale became more serious and Reed and Gonnering met with multiple investment banks who were interested in providing their services as sales broker. Gonnering Decl., Sept. 29, 2023, p.8, ¶ 65.

68

417.    On January 19, 2021, Gonnering, Reed, and Kiesler met to discuss the final decision about whether or not to put Widen Enterprises on the market for sale. During that meeting, Reed made the decision to put Widen Enterprises on the market for sale. Gonnering Decl., Sept. 29, 2023, p.8, ¶ 66.

418.    In January 2021, Widen Enterprises entered into an M & A Advisory Services Agreement with Software Equity Group Advisors, L.L.C. (SEG), effective January 27, 2021. A true and correct copy of this agreement is attached to the Complaint as Exhibit E and to the Gonnering Declaration as Ex. E. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 67, Ex. E; Compl. (ECF No. 45), ¶ 167, Ex. E (ECF No. 5), Am. Answer (ECF No. 45), ¶ 167.

419.    Pursuant to this SEG agreement, SEG acted as a sales broker to market Widen Enterprises and solicit possible buyers with a goal of obtaining as high a price as possible. Compl. (ECF No. 45), ¶ 167, Ex. E (ECF No. 5); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Gonnering Decl., Sept. 29, 2023, p.9, ¶ 68.

420.    Between January and May 2021, with the assistance of Gonnering, SEG gathered details about Widen Enterprises and prepared extensive marketing materials and due diligence information to share with buyers. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 69.

421.    In May and June 2021, SEG solicited numerous possible buyers who they thought could be interested in buying Widen Enterprises by reaching out with a teaser using the name "Project Wildcat" and offering to provide more detailed information if the buyer signed a non-disclosure agreement. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 70.

422.    The goal of marketing Widen Enterprises for sale was to obtain the highest possible price. Gonnering Dep., Sept. 21, 2023, at 72:6-21.

423.    To try to solicit the highest possible sale price, SEG used a bidding process, setting a deadline for first-round bids for companies to show interest, followed by a second round among the serious competitors that would drive the price up further. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 71.

424.    In June 2021, SEG received several first-round indications of interest, with some suggesting values over $100 million. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 72.

425.    The response far exceeded the expectations of Reed, Gonnering, and Kiesler. Reed Decl., Sept. 29, 2023, p.10, ¶ 88; Gonnering Decl., Sept. 29, 2023, p.9, ¶ 73; Kiesler Dep., Sept. 19, 2023, at 259:19-21; Kiesler Decl., Sept. 29, 2023, p.21. ¶ 170.

426.    In July 2021, SEG received three second-round letters of intent. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 74.

427.    In August 2021, Windy Waters negotiated with Acquia Inc. to arrive at the terms for a sale of all of its stock in Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 75.

*Sale*

428.    Windy Waters sold Widen Enterprises to Acquia Inc. for $162 million on September 24, 2021, when the transaction closed. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 76; Compl. (ECF No. 1), ¶ 149, Ex. C (ECF No. 3); Am. Answer (ECF No. 45), ¶ 148.

429.    A true and correct copy of the Equity Purchase Agreement (the "Purchase Agreement"), dated August 17, 2021, by which Acquia acquired Widen Enterprises, is attached to the Complaint as Exhibit C and to the Gonnering Declaration as Exhibit F. Compl. (ECF No. 1), ¶ 149, Ex. C (ECF No. 3); Am. Answer (ECF No. 45), ¶ 149; Gonnering Decl., Sept. 29, 2023, p.10, ¶ 77, Ex. F (Purchase Agreement).

430.    The net closing purchase price after subtracting indebtedness, transaction costs, and other expenses was $148.5 million. Compl. (ECF No. 1), ¶ 152, Ex. D (ECF No. 4); Am Answer (ECF No. 45), ¶ 152; Gonnering Decl., Sept. 29, 2023, p.10, ¶ 78.

**Randall's Reaction**

431.    In early September 2021, when Reed knew the sale of Widen Enterprises was to be closing soon, Reed decided he wanted to give each of his three living siblings a gift of $1 million each. Reed Dep., Aug. 23, 2023, at 162:11-163:24; Reed Decl., Sept. 29, 2023, p.10, ¶ 89.

432.    Reed's two living brothers happily accepted the gifts. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 4.

433.    When Reed called Randall and offered her the gift of $1 million, she got angry, turned it down, and then hired an attorney, eventually filing this suit. Am. Answer (ECF No. 45), ¶¶ 142-43; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 4; Reed Dep., Aug. 23, 2023, at 163:19-164:9, 176:6-9, 185:7-186:5; Reed Decl., Sept. 29, 2023, p.10, ¶ 90.

434.    Randall also expressed to Reed that she believed she had been misled. Am. Answer (ECF No. 45), ¶¶ 154-55.

435.    Randall then hired counsel, and her lawyers sent a preservation notice to the Defendants and alleged misconduct. Am. Answer (ECF No. 45), ¶ 170; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 5, Ex. B (ECF No. 33-2).

**Randall Accepts Payments from June 2020 to September 2023**

436.    When Randall sold her remaining shares to Windy Waters on May 13, 2020, she and Windy Waters agreed the purchase price of $1,352,166.31 would be payable in monthly payments of $16,430.09 over seven years, beginning on June 13, 2020 and ending on May 13, 2027. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Reed

71

Decl., Sept. 29, 2023, p.8, ¶ 69; Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.); Am. Answer (ECF No. 45), ¶¶ 125-26, 138.

437.   Since June 16, 2020, Windy Waters has caused a total of 40 monthly payments of $16,430.09, totaling $657,203.60, to be paid to Randall under the Stock Redemption Agreement and Promissory Note:

- June 16, 2020
- July 13, 2020
- August 13, 2020
- September 14, 2020
- October 13, 2020
- November 13, 2020
- December 14, 2020
- January 13, 2021
- February 16, 2021
- March 15, 2021
- April 13, 2021
- May 13, 2021
- June 14, 2021
- July 13, 2021
- August 13, 2021
- September 13, 2021

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.2, 4 ¶¶ 3, 11, Ex. D (ECF No. 33-4).

438.     Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 3.

439.     On September 20, 2021 that attorney sent a letter to Windy Waters stating, in part, as follows:

> Ms. Stacy Randall has retained our firm to represent her with respect to rights and legal claims that she may have arising out of her relationship with Windy Waters, Inc. ("Windy Waters"), Widen Enterprises, Inc. ("Widen," and, collectively with Windy Waters, the "Company"), the apparent redemption of her stock in May of 2020, and rights she may have with respect to proceeds from a pending sale of Widen to a third-party buyer. While Ms. Randall hopes that her rights and claims can be addressed privately, we believe there is a substantial likelihood that Ms. Randall will need to pursue legal recourse in order to protect her rights. Accordingly, please find enclosed with this letter a Litigation Hold Notice directed to Windy Waters and Widen and their affiliates for you to circulate. Among other troubling facts, it appears that Ms. Randall, who was not represented by counsel in the transaction and was not given sufficient time to obtain independent legal advice or an independent financial analysis, was misled as to key elements of the transaction. In substance, it is particularly troubling that Ms. Randall's stock was redeemed at a price that was pennies on the dollar in comparison with the price that Acquia, Inc. ("Acquia") has offered for the business as a third-party buyer.

Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.2, ¶ 5, Ex. B (ECF No. 33-2).

440.     After making these allegations, Randall received the following additional monthly payments of $16,430.09 from Windy Waters during the period September 20, 2021 to December 10, 2021:

- October 13, 2021

- November 12, 2021

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.3-4, ¶¶ 6, 11, Ex. D (ECF No. 33-4).

441.     Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 6.

442.    On December 10, 2021, Randall's attorney sent a letter to Windy Waters' attorney stating, in part, that Windy Waters "knowingly deceived and took advantage of Ms. Randall's trust in them, redeeming her interest in the companies at a small fraction of their actual value and then turning around and reaping a windfall by selling Widen Enterprises at a fair price months later." Id. ¶ 7, Ex. C. Enclosed with the letter was a "working draft of a complaint," and the letter stated that Randall "will proceed to file the complaint" unless a settlement agreement is "signed and funds delivered to us by no later than December 31, 2021." The draft complaint alleges many facts contained in the complaint filed in this case. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 7; Second Demand Letter (ECF No. 34).

443.    After making those allegations—the same allegations now being made in this lawsuit—Randall continued to accept monthly payments of $16,430.09 from Windy Waters under the Stock Redemption Agreement and Promissory Note. From December 10, 2021, to July 21, 2022, Randall received the following additional monthly payments from Windy Waters:

- December 13, 2021
- January 11, 2022
- February 10, 2022
- March 10, 2022
- April 11, 2022
- May 11, 2022
- June 9, 2022
- July 11, 2022

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.3, ¶¶ 8, 11, Ex. D (ECF No. 33).

444. Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p. 3, ¶ 8.

445. On July 21, 2022 Randall filed this lawsuit against Windy Waters, Widen Enterprises, Widen and Kiesler, seeking declaratory judgments, among other remedies, declaring the Stock Redemption Agreement and Promissory Note void due to the defendants' fraud, the agreements' unconscionable nature, duress, and as violative of Wisconsin public policy. Compl. (ECF No. 1).

446. After making these allegations in this lawsuit filed on July 21, 2022, Randall continued to accept monthly payments of $16,430.09 from Windy Waters under the Stock Redemption Agreement and Promissory Note. She received the following additional monthly payments from Windy Waters from July 21, 2022 to the date of this filing:

- August 11, 2022
- September 9, 2022
- October 11, 2022
- November 9, 2022
- December 9, 2022
- January 11, 2023
- February 9, 2023
- March 9, 2023
- April 11, 2023
- May 11, 2023
- June 9, 2023
- July 11, 2023
- August 10, 2023

75

- September 11, 2023

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.3-4 ¶¶ 9, 11, Ex. D (ECF No. 33); Reed Decl., Sept. 29, 2023, pp.10-11, ¶¶ 91-93, Ex. G.

447.    Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 9; Reed Decl., Sept. 29, 2023, pp.10-11, ¶ 91.

448.    Randall has never told Windy Waters or anyone else to stop paying her under the Stock Redemption Agreement or Promissory Note, nor has she returned any of the payments she received thereunder to Windy Waters or offered to unconditionally return to Windy Waters any of the 40 monthly payments she received. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 9; Reed Decl., Sept. 29, 2023, p.11, ¶ 92.

*Miscellaneous*

449.    Randall did not own any shares of Widen Enterprises in May 2020. Gonnering Decl., Sept. 29, 2023, p.10, ¶ 79.

450.    Widen Enterprises did not purchase any shares from Randall in May 2020 or ever. Gonnering Decl., Sept. 29, 2023, p.10, ¶ 80.

451.    Widen Enterprises was not a party to the stock redemption agreement and did not buy any of Randall's shares in Windy Waters. Widen Enterprises has no role in deciding whether or not its parent company, Windy Waters, buys stocks back from its shareholders. Gonnering Decl., Sept. 29, 2023, p.10, ¶¶ 81-82; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

452.    Gonnering was Kiesler's direct supervisor for Kiesler's activities on behalf of Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.10, ¶ 83.

453.    Kiesler was not acting on behalf of Widen Enterprises when talking with Randall about stock redemption in May 2020. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 11; Gonnering Decl., Sept. 29, 2023, p.10, ¶ 84.

454.    Randall received tax forms each year she was a shareholder to help her file her taxes that provided information about Windy Waters' financials. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 171; Randall Dep., Aug. 28, 2023, at 149:12-17, 150:17-151:4.

455.    Randall's accountant explained her taxes to her every year. Randall Dep., Aug. 28, 2023, at 298:25-299:13.

Dated this 29th day of September 2023.

Respectfully submitted,

s/Christa D. Wittenberg
Dean P. Laing
Christa D. Wittenberg
O'Neil, Cannon, Hollman, DeJong & Laing S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, Wisconsin 53202
Phone: 414.276.5000
dean.laing@wilaw.com
christa.wittenberg@wilaw.com

Mark H. Churchill
Martin Durkin
Sarah Morain
HOLLAND & KNIGHT LLP
1650 Tysons Boulevards, Suite 1700
Tysons, Virginia 22102
Phone: 703.720.8600
mark.churchill@hklaw.com
martin.durkin@hklaw.com
sarah.morain@hklaw.com

*Attorneys for Defendants*