# In The Matter Of:

*Stacy L. Randall v*
*Reed C. Widen, et al.*

---

*Stacy L. Randall*
*August 28, 2023*
*Confidential*

---

*Colleen Reed Reporting LLC*
*P.O. Box 293*
*Milwaukee, Wisconsin 53201*
*www.colleenreed.com*

Original File 082823StacyRandallF.txt
**Min-U-Script® with Word Index**

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF WISCONSIN
 2
 3    -----------------------------------------------
 4    STACY L. RANDALL,
 5              Plaintiff,
 6
 7        -vs-                    CIVIL ACTION NO.
                                  22-CV-400
 8    REED C. WIDEN, MICHAEL
      KIESLER, WIDEN ENTERPRISES,
 9    LLC, and WINDY WATERS, INC.,
10
11              Defendants.
12    -----------------------------------------------
13    CONFIDENTIAL - VIDEO DEPOSITION OF: STACY L. RANDALL
14    DATE:          August 28, 2023
15    TIME:          9:21 a.m. to 7:02 p.m.
16    LOCATION:      Reinhart Boerner Van Deuren, S.C.
                     22 East Mifflin Street, Suite 700
17                   Suite 700
                     Madison, Wisconsin 53703
18
19    REPORTED BY:   Ali J. Kornburger
20
21
22
23
24
25
```

Page 2

```
 1            A P P E A R A N C E S
 2    REINHART BOERNER VAN DEUREN, S.C., by
      JESSICA HUTSON POLAKOWSKI, ATTORNEY AT LAW
 3    MARK A. CAMELI, ATTORNEY AT LAW
      DAVID G. PALAY, ATTORNEY AT LAW
 4    22 East Mifflin Street, Suite 700
      Madison, Wisconsin 53703
 5    jpolakowski@reinhartlaw.com
      mcameli@reinhartlaw.com
 6    dpalay@reinhartlaw.com
      appeared on behalf of the Plaintiff.
 7
      HOLLAND & KNIGHT, LLP, by
 8    MARK H. CHURCHILL, ATTORNEY AT LAW
      1650 Tysons Boulevard, Suite 1700
 9    Tysons, Virginia 22102
      mark.churchill@hklaw.com
10    appeared on behalf of the Defendants.
11    HOLLAND & KNIGHT, LLP, by
      SARAH MORAIN, ATTORNEY AT LAW
12    1650 Tysons Boulevard, Suite 1700
      Tysons, Virginia 22102
13    sarah.morain@hklaw.com
      appeared via telephone on behalf of the Defendants.
14
15    O'NEIL, CANNON, HOLLMAN, DEJONG & LAING, S.C., by
      CHRISTA D. WITTENBERG, ATTORNEY AT LAW
16    Bank One Plaza, Suite 1400
      111 East Wisconsin Avenue
17    Milwaukee, Wisconsin 53202-4870
      christa.wittenberg@wilaw.com
18    appeared on behalf of the Defendants.
19
20    ALSO PRESENT:
21    Mark Lyle, Videographer
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2
 3    EXAMINATION BY:                              PAGE
      Mr. Churchill                                  6
 4
 5    EXHIBITS:                                   MARKED
 6    Exhibit 1 - Notice of Deposition of Plaintiff   7
                   Stacy L. Randall
 7    Exhibit 2 - Complaint                           8
 8    Exhibit 3 - Plaintiff Stacy L. Randall's
                   Objections and Responses to
 9                 Defendant's First Requests for
                   Production of Documents
10    Exhibit 4 - Shareholder Agreement of Widen     40
                   Colourgraphics, LTD
11    Exhibit 5 - Amendment of Shareholder Agreement 55
                   of Widen Colourgraphics, LTD,
12                 Effective 9/12/2001
      Exhibit 6 - Second Amendment to Shareholder    77
13                 Agreement
      Exhibit 7 - Restated Stock Transfer Agreement 105
14    Exhibit 8 - Plaintiff Stacy L. Randall's       110
                   Objections and Responses to
15                 Defendant's First Set of
                   Interrogatories
16    Exhibit 9 - December 2019 string of text       131
                   messages
17    Exhibit 10 - Screenshot of text messages with  135
                    Reed Widen
18    Exhibit 11 - 2005 Stock Redemption Agreement   162
      Exhibit 12 - 2007 Stock Redemption Agreement   175
19    Exhibit 13 - 2011 Stock Redemption Agreement   187
      Exhibit 14 - 2017 Stock Redemption Agreement   203
20    Exhibit 15 - 2019 Stock Redemption Agreement   212
      Exhibit 16 - Joint Petition for Divorce        218
21    Exhibit 17 - 4/3/19 letter Amy T. Collins to   220
                    Stacy L. Randall
22    Exhibit 18 - Notice of Motion and Motion to    227
                    Modify Temporary Order
23    Exhibit 19 - Notice of Hearing                 239
      Exhibit 20 - Amended Temporary Order           242
24    Exhibit 21 - Text exchange Windy47391 to 47392 245
      Exhibit 22 - Text message From Stacy Randall to 279
25                    Mark Goff
      Exhibit 23 - Text message from Stacy Randall to 280
```

Page 4

```
 1    Exhibit 24 - Text message from Stacy Randall to 284
                     Mark Goff
 2    Exhibit 25 - Text message from Stacy Randall to 285
                     Mark Goff
 3    Exhibit 26 - Email chain Scott Spangler        298
      Exhibit 27 - Widen Financial Statements        301
 4                   Consolidated December 31, 2019
      Exhibit 28 - Text message from Stacy Randall to 313
 5                   Justin Randall
      Exhibit 29 - May 13, 2020, Stock Redemption    316
 6                   Agreement
      Exhibit 30 - Text message from Stacy Randall to 323
 7                   Mike Kiesler
      Exhibit 31 - Text message from Stacy Randall to 325
 8                   Mike Kiesler
 9
10
11
12
13
14
15
16
17
18
19
20
21
22    (Original transcript supplied to Attorney Christa D.
      Wittenberg)
23    (Originals of Exhibits 1 through 31 are attached to
      the original transcript. Scanned copies were provided
24    to all counsel)
25
```

Page 5

1  TRANSCRIPT OF PROCEEDINGS
2  (Exhibit No. 1 was marked.)
3  THE VIDEOGRAPHER: Good morning.
4  We're going on the record. The time is 9:21 a.m.
5  The date is August 28th, 2023. This is media unit
6  number 1 of the video recorded deposition of Stacy
7  Randall taken by counsel for the defendants in the
8  matter of Stacy Randall versus Reed Widen, et al.
9  The case is filed in the U.S. District
10  Court for the Western District of Wisconsin, case
11  number 322CV00400JDP. Today we are at the offices of
12  Reinhart Boerner Van Deuren, 22 East Mifflin in
13  Madison, Wisconsin.
14  My name is Mark Lyle. I'm today's
15  videographer with Ryker and Lyle Legal Video Service,
16  and our court reporter is Ali Kornburger who is here
17  on behalf of Colleen Reed Reporting.
18  First we will have counsel introduce
19  themselves and state whom they represent after which
20  the court reporter will swear in the witness. We
21  will begin with the noticing attorney.
22  MR. CHURCHILL: This is Mark Churchill
23  with Holland & Knight, and I represent the defendants
24  Reed Widen, Michael Kiesler, Widen Enterprises, LLC,
25  and Windy Waters, Inc., on the phone with me from

Page 6

1  my firm Holland & Knight as well as Sarah Morain.
2  MS. WITTENBERG: And Christa
3  Wittenberg from O'Neil Cannon on behalf of the
4  defendants as well.
5  MS. POLAKOWSKI: Good morning. Jess
6  Polakowski appearing on behalf of Stacy Randall.
7  Also with me is Mark Cameli and David Palay.
8  STACY L. RANDALL, called as a witness
9  herein, having been first duly sworn on oath, was
10  examined and testified as follows:
11  EXAMINATION
12  BY MR. CHURCHILL:
13  Q  Would you please state and spell your name for
14  the record?
15  A  Stacy, S-T-A-C-Y, Randall, R-A-N-D-A-L-L.
16  Q  And you are the same Stacy Randall that has
17  filed the lawsuit for which we're having your
18  deposition today, correct?
19  A  Correct.
20  Q  And your maiden name was Widen; is that correct?
21  A  That's right.
22  Q  And you are the sister of one of the defendants,
23  Reed Widen?
24  A  Yes.
25  Q  Ms. Randall, what is your date of birth?

Page 7

1  A  9/13/57.
2  Q  And this is a standard question when we take
3  depositions, is there anything medically or
4  medication-wise that might cause you to not be
5  able to give your full and honest testimony
6  today?
7  A  No, there's not.
8  Q  Are you aware that other depositions have been
9  taken in this case?
10  A  I am.
11  Q  And have you read any of those deposition
12  transcripts?
13  A  I have not.
14  Q  Ms. Randall, I have handed you what's been
15  marked for identification as defendant's Exhibit
16  1 to your deposition. It states that it's a
17  Notice of Deposition of Plaintiff Stacy L.
18  Randall. Have you seen this document before?
19  A  I don't believe so.
20  Q  Have you seen the Complaint in this case before?
21  A  Yes, I have.
22  Q  You can put that to the side. So on occasion
23  today there may be documents that I show you for
24  purposes of asking you questions that will have
25  this caption that was on the top there. And so

Page 8

1  when we do go over questions like that, that
2  should be an indication it's a filing or
3  document in this case. Have you been deposed
4  before?
5  A  Never.
6  Q  Okay.
7  (Exhibit No. 2 was marked.)
8  BY MR. CHURCHILL:
9  Q  We just mentioned the Complaint. I have just
10  handed you now what's been marked for
11  identification as Exhibit 2 to your deposition.
12  It does state that it's the Complaint at the
13  top. You can flip through that if you would
14  like. I just want to know whether or not you
15  recognize the document.
16  And I will say, Ms. Randall, that there
17  are exhibits that were attached to that document
18  that I have taken off for brevity sake, so the
19  exhibits are missing, but that should be a
20  complete copy, otherwise, of the Complaint you
21  filed in this case.
22  A  Yes. I have seen this. I recognize it.
23  Q  When was the last time you think you reviewed
24  it?
25  A  Last night.

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 9

1 Q   You said that you had not been deposed before,
2     correct?
3 A   Correct.
4 Q   Have you ever been a witness in a case, in a
5     legal case?
6 A   No, I have not.
7 Q   Have you ever testified in any way?
8 A   No, I have not.
9 Q   It probably makes sense, although I'm sure that
10    you have been prepared by your counsel for me to
11    explain a little bit the rules of the road
12    because this is -- although it's kind of
13    informal, it's also a formal process. So let's
14    go over a little bit of how I hope today can
15    proceed.
16 A   Okay.
17 Q   As you can tell we have a court reporter here.
18    She's taking down everything that I say and
19    everything that everybody else says including
20    you.
21 A   Okay.
22 Q   And it's also being videotaped, and so that will
23    ultimately help the court reporter if you and I
24    have issues, but I can already tell you're doing
25    a great job of waiting until I'm finished

---

Page 10

1     talking to speak. That's going to be important
2     because what we do need to be able to do is
3     understand what we did today. And so if I'm
4     speaking if you could wait until I finish my
5     speaking, and then when you're speaking I will
6     wait until you finish your answer. Does that
7     makes sense?
8 A   That sounds good.
9 Q   And it also is important, that you're already
10    doing, is to make sure you give a verbal
11    response.
12 A   Right.
13 Q   So there may be occasions that you do a "mm-hmm"
14    or something like that, and so I might ask you
15    what that meant, and I don't mean to be rude.
16 A   I understand.
17 Q   You understand also that you're testifying under
18    oath, correct?
19 A   Yes, I do.
20 Q   There may be times frankly that you don't
21    understand one of my questions, and if that's
22    the case, feel free to just tell me you don't
23    understand, and I will try to rephrase it or
24    restate it; is that fair?
25 A   That sounds good.

---

Page 11

1 Q   And if you do answer one of my questions, I'm
2     going to understand that you understood my
3     question. Is that also fair?
4 A   Yes.
5 Q   During the course of the day I do think we will
6     be here for a while, so we will want to take
7     some breaks. If you need a break for any
8     reason, please just ask and that will be totally
9     fine. If I have a question that's pending and
10    I'm expecting an answer, unless you have a
11    medical emergency, I would ask that you try to
12    finish the question and then we can break and
13    different people need different amounts of time.
14    So I certainly am sympathetic to when you will
15    need a break.
16 A   Okay.
17 Q   Your attorney may also have explained the
18    process of objections to questions, and the way
19    that works is if I ask a question that your
20    counsel finds objectionable based on an
21    evidentiary rule, she's going to state her
22    objection. And, again, that's a process where
23    you have to let her do that, and I will respect
24    her right to do that. Her objection may or may
25    not make me rephrase my question, but unless

---

Page 12

1     your counsel instructs you not to answer at all,
2     I'm entitled to an answer to my question. Does
3     that make sense?
4 A   Yes.
5 Q   Do you have any questions?
6 A   No, I don't.
7 Q   Let's talk a little bit about your preparation
8     for today. Specifically with respect to the
9     deposition, what did you do to prepare for
10    today's deposition?
11 A   Well, like I said, I reviewed the Complaint last
12    night. I got together with my attorneys three
13    times here at the office.
14 Q   Let's start with you reviewing the Complaint.
15    Did you just do that on your own?
16 A   It was kind of a mutual thing.
17 Q   Why did you review the Complaint? Were there
18    certain parts that you were interested in
19    reviewing?
20 A   There were certain parts that I just didn't
21    remember.
22 Q   And when you say you don't remember, do you mean
23    you don't remember the Complaint, or you don't
24    remember what's stated in the Complaint?
25 A   Well, it's been so long. Yes, I definitely

---

Colleen Reed Reporting LLC
414.322.3621

---

Page 13

```
 1    remember the Complaint.  I just didn't remember
 2    some of the exact dates and hopefully that will
 3    help me today.  Maybe it won't.  Maybe I still
 4    won't remember.
 5  Q  Understood.  You said that you met on three
 6    different occasions?
 7  A  Yes.
 8  Q  When you met with counsel, did you meet with
 9    anybody other than counsel, meaning persons
10    other than attorneys?
11  A  No.
12  Q  With respect to your deposition today, have you
13    discussed that topic with anyone other than
14    counsel?
15  A  My son.
16  Q  And is that your son Justin?
17  A  Yes.
18  Q  Do you have any other children?
19  A  Yes.
20  Q  Did you discuss the deposition with anyone other
21    than Justin?
22  A  No.
23  Q  And what did you talk with Justin about?
24  A  Well, actually he came to several of the
25    meetings when we were -- when we were bringing
```

Page 14

```
 1    the Complaint -- writing the Complaint up.  He
 2    helped me remember things and -- so he pretty
 3    much has been in the know all along.
 4  Q  And with respect to today's deposition, what did
 5    you talk with Justin about?
 6  A  I just asked him to think of me on Tuesday.
 7  Q  Did you talk with him this morning?
 8  A  No.
 9  Q  How old is Justin?
10  A  He's 42.
11  Q  My dad forgot my birthday almost every year.  No
12    judgment.
13  A  It's the mom's job.
14  Q  Are there particular parts of your Complaint
15    that Justin is helping you remember?  You
16    indicated that he helped you a little bit with
17    respect to remembering some facts.  Are there
18    particular portions of the Complaint that he's
19    helping you remember?
20        MS. POLAKOWSKI: I'm going to lodge an
21    objection here and just caution you not to reveal the
22    contents of things we have talked about with you --
23    we attorneys.
24        THE WITNESS: Can you repeat the
25    question, please?
```

Page 15

```
 1        MR. CHURCHILL: Sure.  Could you read
 2    it back?
 3        (Last question read back.)
 4        THE WITNESS: No.
 5  BY MR. CHURCHILL:
 6  Q  And I think we will talk about Justin later
 7    today.  So we can come back to that as well.
 8    Who is Steven Randall, that's your ex-husband?
 9  A  My ex-husband.
10  Q  Have you spoken with Steven Randall about your
11    deposition today?
12  A  No.
13  Q  Does he know you're being deposed?
14  A  No.
15  Q  When is the last time you spoke with your
16    ex-husband about this case?
17  A  Never.
18  Q  You have never spoken with your ex-husband about
19    this case?
20  A  Never.
21  Q  Does he know that you filed the lawsuit?
22        MS. POLAKOWSKI: Objection.  Calls for
23    speculation.
24        THE WITNESS: I'm not sure.
25  BY MR. CHURCHILL:
```

Page 16

```
 1  Q  You had a divorce proceeding with Mr. Randall,
 2    correct?
 3  A  Yes.
 4  Q  This lawsuit never came up in your divorce
 5    proceeding?
 6  A  No.
 7  Q  Didn't you have to disclose in your divorce
 8    proceeding that you had payments with respect to
 9    the May 2020 redemption agreement?
10        MS. POLAKOWSKI: Objection.  Calls for
11    a legal conclusion.
12        THE WITNESS: Can you repeat the
13    question?  I'm sorry.
14        MR. CHURCHILL: Sure.  Could you read
15    that back?
16        (Last question read back.)
17        THE WITNESS: Yes, I did.
18  BY MR. CHURCHILL:
19  Q  But the topic of the fact that there is a
20    lawsuit regarding those payments has never come
21    up with Mr. Randall?
22  A  I'm sorry.  Yes, it has.
23  Q  Okay.  And in what way has it come up?
24  A  Well, with the payments.  My -- because then I
25    had to pay him $4,000 a month once I started
```

Page 17

1    getting them.
2  Q   But if I understand your testimony correctly,
3      you're saying that you have not discussed the
4      lawsuit -- this lawsuit itself with your
5      ex-husband?
6  A   He vaguely knows what it's about. He does not
7      know details. I have not told him details.
8  Q   Has he discussed at all with you the amount of
9      money that you are seeking potentially under the
10     damages portion of your lawsuit?
11 A   No.
12 Q   Have you discussed that part of your Complaint
13     with Justin?
14 A   Yes.
15 Q   And what have you discussed with Justin about
16     the damages alleged in your Complaint?
17         MS. POLAKOWSKI: Again, I will caution
18 you not to reveal the contents of discussions that we
19 have had.
20         MR. CHURCHILL: I just want to know
21 what you've talked with Justin about only, not
22 anything about what counsel has told you.
23         THE WITNESS: Justin pretty much knows
24 everything, and he's the one that suggested I get
25 some lawyers.

Page 18

1  BY MR. CHURCHILL:
2  Q   And when you say that specifically, you're
3      talking about back in 2021?
4          MS. POLAKOWSKI: Objection. Form.
5  Mischaracterizes her testimony.
6  BY MR. CHURCHILL:
7  Q   When you say that he suggested that you get
8      lawyers, you're talking about back in September
9      of 2021?
10 A   Yeah. I'm talking about May of 2020.
11 Q   Okay. You're talking about when you were going
12     to enter the -- or when you were considering
13     entering the redemption agreement back in May of
14     2020?
15         MS. POLAKOWSKI: Objection. Form.
16 Mischaracterizes her testimony.
17         THE WITNESS: Yes.
18 BY MR. CHURCHILL:
19 Q   Do you understand my question?
20 A   Will you repeat?
21 Q   So you mentioned that Justin was the one that
22     recommended you get an attorney?
23 A   Mm-hmm.
24 Q   That's a "yes"?
25 A   Yes.

Page 19

1  Q   And the time period that you're talking about
2      where he made that suggestion was May of 2020?
3  A   Before my redemption he wanted me to -- he
4      suggested that I get somebody to look at the
5      financial records of Widens.
6  Q   And did Justin make any recommendations with
7      respect to getting a lawyer for purposes of this
8      lawsuit?
9  A   Yes.
10 Q   And when did he make that recommendation if you
11     remember?
12 A   Sometime after -- or before the sale of the
13     company.
14 Q   Was it after you had a conversation with your
15     brother Reed about the fact that Widen
16     Enterprises was going to be acquired?
17 A   Yes.
18 Q   We will get back to some of those details too.
19     I'm going to try, if I can, during the course of
20     the deposition to somewhat go chronologically
21     because I think that will help you --
22     potentially help you remember things.
23 A   Thank you.
24 Q   Ms. Randall, are you currently employed?
25 A   No, I am not.

Page 20

1  Q   And when was the last time that you were
2      employed?
3  A   I was briefly employed in 2000 and part of 2001.
4  Q   And who was your employer then?
5  A   Widen Enterprises.
6  Q   And what were you doing in 2000 and 2001 for
7      Widen Enterprises?
8  A   I was a receptionist.
9  Q   And was it that one job during that whole time
10     2000 to 2001?
11 A   Yes. I believe my mother passed away in January
12     of '01. So I didn't work for very long in '01.
13 Q   And were you a receptionist at the main company
14     location?
15 A   Yes, I was.
16 Q   Which is located where?
17 A   Mangrove Lane.
18 Q   Other than that job that ended in 2001 as a
19     receptionist, have you had any other sources of
20     income since that time?
21 A   No.
22 Q   Do you have any bank accounts?
23 A   Yes.
24 Q   With who?
25 A   Associated Bank, Summit Credit Union, and Lake

Confidential

Page 21

1    Ridge Bank.
2 Q   And is Associated Bank your checking account?
3 A   I have a checking account there, yes.
4 Q   Any other accounts there?
5 A   Savings.
6 Q   Any others?
7 A   No.
8 Q   And what is the account that you have at Summit
9     Credit Union?
10 A   I also have a savings and a checking.
11 Q   And what was the third institution?
12 A   Lake Ridge.
13 Q   And what accounts do you have there?
14 A   Checking and savings.
15 Q   I have multiple banks too, but I'm interested in
16     knowing why you have multiple banks with
17     multiple accounts?
18 A   Because my father always told me, don't put all
19     your eggs in one basket.
20 Q   Any other institutions that you have accounts?
21 A   Yes.
22 Q   Okay.  What are those?
23 A   I have an account at Raymond James.
24 Q   Is that a financial advisor?
25 A   Yes.

Page 22

1 Q   And what type of account is that?
2 A   I have a savings account.  I don't think it's
3     called a savings account, but it's pretty much a
4     savings account with higher interest, and I have
5     a few stocks.
6 Q   Do you have any certificates of deposit, CDs?
7 A   No, I do not.
8 Q   What about a retirement account, do you have one
9     of those?
10 A   I do.
11 Q   And who is that with?
12 A   Fidelity.
13 Q   How many retirement accounts do you have?
14 A   Just that one.
15 Q   And do you know what form of a retirement
16     account that is, for example is it a Roth IRA?
17 A   No.  I know it's not that.
18 Q   Do you have a 401K?
19 A   No.
20 Q   What, if any, direct deposits do you have to any
21     of your accounts, and what I mean by that is
22     money that is automatically deposited from some
23     source?
24 A   Just the payment for my stocks.
25 Q   And the payment from your stocks goes where, to

Page 23

1     which account?
2 A   Associated checking.
3 Q   Are you collecting any social security benefits?
4 A   I'm sorry.  Yes, I am.
5 Q   And where do they go, which account?
6 A   They go to Lake Ridge checking.
7 Q   Are you collecting any disability?
8 A   No.
9 Q   What about any other sources of money that are
10     directly deposited like that?
11 A   Nothing else.  I also do have a Roth.
12 Q   Okay.
13 A   That I'm a beneficiary for my son.  So my
14     husband and I split that.
15 Q   Explain to me what you mean when you say that
16     you're a beneficiary.
17 A   My husband took his own life.  My son took his
18     own life, and that was life insurance that he
19     had for work and they rolled it.
20 Q   I see.  So it was your son's policy, and you are
21     a beneficiary?
22 A   Correct.
23 Q   And which account does that one go into?
24 A   That actually is held at Lake Ridge.
25 Q   Okay.  Any other deposits that you know of or

Page 24

1     can think of?
2 A   No.
3 Q   What about from your dad's estate, is there
4     money that is still being distributed from your
5     father's estate to you?
6 A   No.
7 Q   I wanted to ask you a little bit more about the
8     stocks that you mentioned having at Raymond
9     James.  Do you know what companies you are
10     invested in?
11 A   I cannot recall.
12 Q   Do you know the size of the portfolio?
13 A   63,000.
14 Q   And that's as of your last check?
15 A   Correct.
16 Q   Have you sold stock -- I'm sorry, go ahead.
17 A   No check.  There's no -- I didn't get a check
18     for that.
19 Q   Understood.
20 A   Okay.
21 Q   That's money that's currently invested, correct?
22 A   Correct.
23 Q   Have you sold stocks recently?
24 A   Not since May of 2020.
25 Q   And none from your portfolio with Raymond James?

**Confidential**

---

Page 25

1  A   No.
2  Q   Ms. Randall, do you currently serve on any
3      boards of directors?
4  A   No.
5  Q   Do you currently hold any positions with any
6      associations?
7  A   No, I do not.
8  Q   Are there any groups that you belong to?
9  A   No.
10 Q   For example, are you on a church group or
11     anything like that?
12 A   No, I am not.
13 Q   Is there any other source of income that you
14     currently have that we have not discussed?
15 A   No, there is not.
16 Q   I want to talk a little bit about the document
17     collection process.  We will be going over some
18     documents today and some of them are yours and
19     some are mine.  I want to get a sense for where
20     your documents are in terms of your -- what you
21     have provided your counsel and what we may have
22     missed or not.
23         When you first were going to file this
24     lawsuit, did you collect any documents for your
25     counsel?

---

Page 26

1  A   No.
2  Q   In the course of this lawsuit, and by that I'm
3      going to mean -- when I say "this lawsuit," I'm
4      going to basically mean from filing in September
5      of 2021 until now; is that okay?
6  A   Yes.
7  Q   Have you handed documents to your counsel?
8  A   Not that I can remember.
9  Q   Have you ever been asked to search for
10     documents?
11 A   Not that I can recall.
12 Q   Have you ever searched your phone for documents
13     or, for example, messages?
14 A   No, I have not.
15 Q   So did you at any point turn your phone over to
16     have it searched?
17 A   Yes, I did.
18 Q   And with respect to what would have been on your
19     phone or what is on your phone, do you use your
20     message feature?
21 A   Yes.
22 Q   And is it an iPhone?
23 A   Yes.
24 Q   Do you have any other message platforms that you
25     use like WhatsApp?

---

Page 27

1  A   I don't even know what that is, so, no.
2  Q   Is the only message platform that you use your
3      iMessage platform?
4  A   Yes.
5  Q   What email accounts do you have, Ms. Randall?
6  A   I have one account.
7  Q   And which one is that?
8  A   StacyleeRandall6@gmail.com.
9  Q   Have you had prior email accounts in the past?
10 A   Yes.
11 Q   Which ones?
12 A   Oh, Lord.  It's been so long.  I have had this
13     email for a long time.  So I believe my first
14     email was SLR -- SLR13@yahoo.
15 Q   And when is the last time you used that account?
16 A   That was my very first account.  So that was a
17     long, long time ago.
18 Q   Can you estimate how long ago?
19 A   I didn't jump on the email train right away.  I
20     can't.  I'm sorry.
21 Q   That's okay.  Do you think you have used that
22     Yahoo account within the last ten years?
23 A   No.
24 Q   Within the last 20 years, so that would be 2003?
25 A   No.

---

Page 28

1  Q   Do you think you ever used that account, the
2      SLR13yahoo account while you were working at
3      Widen?
4  A   No.
5  Q   When you were working at Widen, the last time
6      being 2000 to 2001, did you use your personal
7      email?
8          MS. POLAKOWSKI:  Objection.  Form.
9  BY MR. CHURCHILL:
10 Q   For work purposes?
11 A   No.
12 Q   I assumed you used your personal email for
13     personal purposes?
14 A   Yes.
15 Q   And you had a Widen email account while working
16     at Widen?
17 A   No, I did not.
18 Q   You never had a Widen email account?
19 A   No.
20 Q   So did you ever send emails while working at
21     Widen related to Widen business?
22 A   No, I did not.
23 Q   When you were working as a receptionist no one
24     emailed you?
25         MS. POLAKOWSKI:  Objection.  Form.

---

Page 29

1 Mischaracterizes her testimony.
2           THE WITNESS: What do you mean by "no
3 one"?
4 BY MR. CHURCHILL:
5 Q   Back when you were working as a receptionist in
6     2000 to 2001 no one emailed you at work for work
7     purposes?
8 A   No.
9 Q   How did people communicate with you, just by
10    phone and in person?
11 A   Correct.
12 Q   When you were working at Widen in 2000 and 2001,
13    did anybody text you for work purposes?
14 A   No.
15 Q   In this case there have been some -- and when I
16    say "this case," I mean this litigation which
17    started in 2022 and, again, you have the
18    Complaint?
19 A   Correct.
20 Q   So the -- for your orientation purposes, the
21    filing date is actually listed at the top, so
22    July 21, 2022, is when you filed your Complaint.
23    There have been document requests that have been
24    served upon you.  Are you familiar with that
25    process at all?

Page 30

1 A   That have been served upon me?  Can you explain
2     what you mean?
3           MS. POLAKOWSKI: And, Stacy, again to
4 the extent that you would need to disclose contents
5 of conversations you have had with us to answer these
6 questions, I will caution you not to do so.
7           (Exhibit No. 3 was marked.)
8 BY MR. CHURCHILL:
9 Q   So the court reporter has handed you what's been
10    marked for identification as Exhibit 3 to your
11    deposition.
12 A   Okay.
13 Q   And I will just identify it for record.  It's a
14    document titled, Plaintiff Stacy L. Randall's
15    Objections and Responses to Defendant's First
16    Requests for Production of Documents.  Do you
17    see that?
18 A   Yes.
19 Q   I just mentioned document requests when I was
20    asking you a question.  I will represent to you
21    that this document is actually the responses
22    that your counsel provided to our request.  Have
23    you seen this document before?
24 A   No.  I don't -- I can't recall.  I remember
25    answering questions.

Page 31

1 Q   So you -- I may have already asked you this
2     question, but now that you have the benefit of
3     this document if you will permit me to ask you
4     again, do you remember looking for documents in
5     response to requests for documents?
6 A   Yes, I do.
7 Q   And did you provide documents to counsel?
8 A   Yes, I did.
9 Q   Did you search your -- your files at home, if
10    you have files, for any hard copy documents that
11    you might have?
12 A   No, I did not.
13 Q   Do you keep hard copy files?
14 A   No, I do not.
15 Q   What about audio or audiovisual files, do you
16    have anything like that that could relate to
17    this lawsuit?
18 A   No.
19 Q   For example, do you have any recordings of voice
20    messages that have been left for you by, for
21    example, your brother?
22 A   No.
23 Q   Have you ever in interacting with the defendants
24    in this case used an audio recorder to record
25    what somebody was saying?

Page 32

1 A   No.
2 Q   When you were meeting with -- I'm jumping ahead
3     a little bit, so you let me know if I need to
4     establish a background.  When you were meeting
5     with Mr. Kiesler related to the May redemption,
6     did you record any of that meeting?
7 A   No.
8 Q   When you were talking with your brother on the
9     phone in May of 2020, did you record that?
10 A   No.
11 Q   Did you search for any recordings in response to
12    the document request in this case?
13 A   No.
14 Q   But you're confident that you don't have any?
15 A   Yes.
16 Q   You can set that exhibit to the side.  It does
17    make sense during the course of the day to keep
18    the Complaint handy because I think that will be
19    helpful, and I'm going to be referring to it off
20    and on.  For the most part the other exhibits
21    you can push off to the side.
22 A   Okay.
23 Q   Are you aware of any documents that you have
24    related to this case that you have not provided
25    to your attorneys?

Page 33

1 A   No.
2 Q   Are you aware of any electronic files that
3      relate to this case that you have not provided
4      to your attorneys?
5 A   No.
6 Q   The reason why I mentioned September 20 of 2021
7      earlier was that that was a day that your
8      attorneys, Reinhart firm, sent something called
9      a Litigation Hold Notice to what now are the
10     defendants in this case.  Do you remember that
11     process?
12 A   No.  Not specifically.
13 Q   So I will have some documents that I can show
14     you that will help remind you a little bit.
15        Generally stating your attorneys sent
16     some letters telling your brother, for example,
17     as one of them to preserve documents because you
18     had some concerns about the redemption -- about
19     the redemption.  Do you remember that?
20 A   I remember them telling me that, yes.
21 Q   And, in fact, you reached out to your brother to
22     let him know that, you were giving him a heads
23     up to let him know that this was coming?
24 A   I did.
25 Q   Since that time period, that September time

Page 34

1      period, have you deleted any documents that are
2      relevant for this case?
3         MS. POLAKOWSKI: Object to form.
4      Calls for a legal conclusion as to relevance.
5         THE WITNESS: Can you rephrase?
6         MR. CHURCHILL: Sure.  Can you read
7      back the question?
8         (Last question read back.)
9         THE WITNESS: No.
10 BY MR. CHURCHILL:
11 Q   Are there any files that you have destroyed or
12     gotten rid of that are relevant to this case?
13        MS. POLAKOWSKI: Same objection.
14        THE WITNESS: No.
15 BY MR. CHURCHILL:
16 Q   I want to go back a little bit to your history
17     of working with the company and how you kind of
18     proceeded along the way.  So we're going to
19     start way back in time.
20        You are obviously part of the Widen
21     family, correct?
22 A   Yes.
23 Q   And do you have a recollection of when you first
24     got involved in any way with the company?
25 A   It was in 19 -- wait.  I believe it was in 1977.

Page 35

1 Q   Okay.  You're going to have to do the math for
2      me.  How old were you in 1977?
3 A   1977, I was born in '57, so 20 years.
4 Q   Okay.  So you were 20.  And what were you doing
5      in 1977 for the company?
6 A   I was working in the dark room as a contact
7      person.
8 Q   What does that mean?
9 A   At the time we were prepress and every page has
10     four colors, and the strippers were the ones
11     that made up the pages, like for a catalog, and
12     they made yellow, red, blue, and black.  And I
13     would have to combine different things that they
14     had and put it on film.
15 Q   So you were actually touching and working in the
16     process?
17 A   Yes.
18 Q   And how long did you do that particular job?
19 A   I did that until '86.
20 Q   And from 1977 to '86 were you pretty much doing
21     that same job the whole time?
22 A   Yes.
23 Q   Were you paid?
24 A   Yes.
25 Q   Do you remember how much?

Page 36

1 A   No.
2 Q   Did you have shares in Widen at the time?
3 A   Yes.
4 Q   Do you remember how much?
5 A   20 percent.
6 Q   And you grew up with four brothers, correct?
7 A   Yes, I did.
8 Q   And can you give me the birth order?
9 A   Stewart, Reed, Tyler, and Price.
10 Q   And where are you?
11 A   I'm at the top.
12 Q   You're first?
13 A   I am first.
14 Q   Okay.  What other jobs did you hold with the
15     Widen company?
16 A   Other than the receptionist, nothing.
17 Q   And so that first job ended in 1986?
18 A   Correct.
19 Q   And were you terminated from that position?
20        MS. POLAKOWSKI: Objection.  Calls for
21     a legal conclusion.
22 BY MR. CHURCHILL:
23 Q   Do you understand my question?
24 A   Yes, I do.  I was terminated sometime, but I
25     don't believe it was in '86.

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 37

1 Q   What do you recall about the termination?

2 A   That I and my husband were both called to the

3     front office and three of my brothers and my dad

4     were there.

5 Q   Which brothers?

6 A   Tyler -- Stewart, Reed, and Tyler.

7 Q   Okay.  And what happened?

8 A   They told me I was a distraction and that it

9     would be best if I left.

10 Q  Do you remember anything else that was said?

11 A  I don't remember.

12 Q  You weren't certain that this was in 1986.  Why?

13 A  Well, because after my youngest went to

14    kindergarten I went back like part time, and I

15    think it was during that time after I went back

16    when she started going to kindergarten, so that

17    would be '90, '91.  That is when it was.

18 Q  Why was Steven called, if you know, to be a part

19    of that meeting?

20 A  I'm not sure.

21 Q  Was he working for the company as well?

22 A  Yes.

23 Q  What was he doing?

24 A  I believe at that time he was -- he was a

25    stripper.

---

Page 38

1 Q   Who -- if there was a single person, who made

2     the determination to terminate you in that

3     period '90 to '91?

4         MS. POLAKOWSKI: Objection.  Calls for

5     speculation.

6         THE WITNESS: I don't know.

7     BY MR. CHURCHILL:

8 Q   Do you remember who said, Stacy, you're being a

9     distraction or something to that effect?

10 A  There was -- it was either Reed or Tyler.

11 Q  Do you remember who was in charge or running the

12    company at that time?

13 A  My father.

14 Q  Did you say anything to your father about the

15    decision?

16 A  I did not.

17 Q  Did you fight it?

18 A  No.

19 Q  Did you ever have any discussions with your

20    brothers or your father about that decision to

21    terminate?

22 A  No.

23 Q  Why not?

24 A  They are pretty scary people especially when

25    they are all in one room.  So I just decided

---

Page 39

1     that they want me gone, then I'm going to leave.

2 Q   I take it you disagreed with their

3     characterization of you?

4 A   I did.

5 Q   Do you have any idea what they were referring

6     to?

7 A   No, I do not.

8 Q   Have you ever talked about it with anyone since

9     this time?

10 A  No.

11 Q  Did you talk about it with your then husband

12    Steven?

13 A  Well, he was there so he knew.  So I don't

14    remember.

15 Q  Did that determination to terminate you have any

16    impact on your shares with either company at the

17    time?

18        MS. POLAKOWSKI: Object to the extent

19    it calls for a legal conclusion.  Calls for

20    speculation.

21        THE WITNESS: I'm not sure.

22        MR. CHURCHILL: So let's try to get

23    some -- ahold around the time period.

24        (Exhibit No. 4 was marked.)

25 BY MR. CHURCHILL:

---

Page 40

1 Q   Okay.  Ms. Randall, the court reporter has

2     handed you what's been marked for identification

3     as Exhibit 4 to your deposition.

4 A   Mm-hmm.

5 Q   And the document is not Bates labeled, but this

6     is a document that has been -- or is your

7     version Bates labeled?  Good.  Okay.  My version

8     is not Bates labeled.

9         This is a document that's been produced

10    in the case.  Do you recognize this document,

11    Shareholder Agreement of Widen Colourgraphics,

12    LTD?

13 A  No.

14 Q  Are you aware that there is a shareholder

15    agreement?

16 A  Yes.

17 Q  If you would -- and I don't have the benefit of

18    the Bates number.  The Bates number, when I say

19    that, that's going to be numbers in the bottom

20    right corner.  For the most part today I'm going

21    to use that as a guide to track with you where

22    we are talking.  For purposes of this document

23    I'm going to use the actual page number on the

24    document.  Would you flip to page 18?

25 A  Okay.

---

**Colleen Reed Reporting LLC**
414.322.3621

Page 41

1 Q   And do you see your signature there,
2       Ms. Randall?
3 A   Yes.
4 Q   And you -- as I read it, it says, "Stacy Widen
5       Randall," and you wrote above it "Stacy Widen
6       Randall."  Do you see that?
7 A   Yes, I do.
8 Q   And is that to the best of your knowledge your
9       signature?
10 A   Yes, it is.
11 Q   You don't have a recollection of signing this
12       document specifically?
13 A   When my dad wanted us to sign something, we
14       signed.  And I probably just saw this paper.
15 Q   Why do you say that?
16 A   Because that's just the way he operated.
17 Q   So do you believe that you didn't actually
18       review the 1992 shareholder agreement before you
19       signed it?
20 A   I did not review it.
21 Q   You know that for certain?
22 A   Yes.
23 Q   Were you concerned that you weren't reviewing a
24       document before signing it?
25 A   Like I said, if my dad told me to do something,

Page 42

1       like sign here, I did.
2 Q   And do you have a specific memory of your dad
3       telling you that in this instance?
4 A   No.
5 Q   So you are assuming that's what happened or
6       you're not sure?
7 A   There were many things that I had to sign.  So I
8       don't specifically remember this time.
9 Q   So is there a chance that you actually did
10       review the 1992 shareholder agreement before
11       signing it?
12 A   No.
13 Q   Why do you say that?
14 A   Because I probably wasn't given it.  I was not
15       given it.
16 Q   Was it important for you at the time to review a
17       document before signing it?
18       MS. POLAKOWSKI: Object to form.
19       THE WITNESS: Can you rephrase that,
20 please?
21 BY MR. CHURCHILL:
22 Q   Sure.  Let me back up a little bit.  Did it
23       concern you if you were given a document by your
24       father that you weren't reviewing it before
25       signing it?

Page 43

1 A   No.
2 Q   Why?
3 A   I just never thought about it.
4 Q   Do you know in what capacity you were signing
5       this particular document?  As you look at it do
6       you know what capacity you were signing?
7       MS. POLAKOWSKI: Objection to the
8 extent that it calls for a legal conclusion.
9       THE WITNESS: Capacity, what do you
10 mean by "capacity"?
11 BY MR. CHURCHILL:
12 Q   Sure.  So for example, on page 18 your dad is
13       Mark Widen -- was Mark Widen, correct?
14 A   Mm-hmm.
15 Q   So he was signing as president, do you see that?
16 A   Yes.
17 Q   Do you know why your signature line is there?
18       MS. POLAKOWSKI: Objection.  Calls for
19 speculation.
20       THE WITNESS: Somebody put it there.
21 BY MR. CHURCHILL:
22 Q   Well, you were a shareholder, right?
23 A   Yes.
24 Q   So do you think that was why you were signing?
25 A   I can't say.

Page 44

1 Q   Would you flip the page -- actually, you don't
2       need to flip.  You got it right there.  I have
3       to flip.  So the page titled Exhibit A, schedule
4       of shareholders.  Do you see that?
5 A   Yes.
6 Q   And your name is listed first under name, right,
7       "Stacy Widen Randall."  Do you see that?
8 A   Yes.
9 Q   And then in the second column it's titled "Class
10       A Common Stock."  Do you see that?
11 A   Yes.
12 Q   And then there's a number underneath, 4,655.  Do
13       you see that?
14 A   Yes.
15 Q   And then there's a third column, "Class B Common
16       Stock."  Do you see that?
17 A   Yes.
18 Q   And then there's a number underneath listed
19       56,790.  Do you also see that?
20 A   Yes.
21 Q   In addition to your name here, there are four
22       additional people listed.  Do you see that?
23 A   Yes.
24 Q   Your brothers Reed, right?
25 A   Yes.

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 45

1 Q  Stewart, right?
2 A  Yes.
3 Q  Tyler, correct?
4 A  Yes.
5 Q  And Price, correct?
6 A  Yes.
7 Q  Is it your understanding that this Exhibit A
8    schedule of shareholders was the listing of
9    stock provided to you and all of your brothers
10   under the 1992 shareholder agreement?
11       MS. POLAKOWSKI: Object to the extent
12 that it calls for a legal conclusion.
13       THE WITNESS: I don't know that.
14 BY MR. CHURCHILL:
15 Q  Do you recall whether or not as of 1992 this
16   division of shares was the actual amount of
17   shares that you held in the company then known
18   as Widen Colourgraphics?
19 A  I had no way of knowing.
20 Q  You didn't know how many shares you possessed at
21   the time?
22 A  That's right.
23 Q  Did you think it was important for you to know
24   how many shares you held?
25       MS. POLAKOWSKI: Object to form.

---

Page 46

1       THE WITNESS: I probably never thought
2  about it or I never thought about it.
3  BY MR. CHURCHILL:
4  Q  You never thought about what exactly?
5  A  What you just asked me.
6  Q  You never thought about how many shares you
7     held?
8  A  Yes.
9  Q  Why not?
10 A  And whether it was important.  I knew I had 20
11    percent.
12 Q  Okay.
13 A  That's all I knew.
14 Q  And if you go back to that page 18 that we were
15    looking at before, you see that the other
16    persons that signed in addition to your dad were
17    your brothers, correct?
18 A  Yes.
19 Q  Do you now have a better recollection as to why
20    you signed the 1992 shareholder agreement?
21 A  Now I do, yes.
22 Q  Okay.  And is it your understanding that you
23    were signing as a shareholder of the company?
24 A  As of right now I do.
25 Q  If you had an issue or a concern about signing

---

Page 47

1    something, would you have said something to your
2    father?
3  A  No.
4  Q  Would you have said something to one of your
5     brothers?
6  A  No.
7  Q  Did you ever have a concern -- let's go back to
8     this time frame, the 1992 time frame.  Did you
9     have a concern that you were signing something
10    that somehow you shouldn't be signing or didn't
11    want to sign?
12       MS. POLAKOWSKI: Object to form.
13       THE WITNESS: Well, like I said
14  before, I never questioned my dad.
15  BY MR. CHURCHILL:
16  Q  But as to my question specifically, did you have
17     a concern that you were signing something?
18  A  No.
19  Q  You weren't concerned that your dad was somehow
20     treating you unfairly?
21  A  No.
22  Q  Were you concerned in 1992 that one of your
23     brothers was treating you unfairly?
24  A  No.
25  Q  Did you have an attorney help you at all with

---

Page 48

1    respect to this 1992 shareholder agreement at
2    the time?
3  A  No.
4  Q  If you recall, when was the first time you ever
5     engaged an attorney for anything?
6  A  Right now.  This.  I'm sorry, my divorce.
7  Q  You never engaged an attorney prior to that?
8  A  Never.
9        MS. POLAKOWSKI: Mark, we have been
10  going about an hour.  Whenever you're at a good spot,
11  can we just take a short break?
12       MR. CHURCHILL: We can take one now.
13  That's fine.  We're going to come back to this
14  document.  So you can leave that there, but now is a
15  good time for a break.
16       THE VIDEOGRAPHER: Off the record
17  10:18 a.m.
18       (Brief recess taken.)
19       THE VIDEOGRAPHER: We are back on the
20  record at 10:36 a.m.
21  BY MR. CHURCHILL:
22  Q  So, Ms. Randall, we were still working with that
23     Exhibit 4, the 1992 shareholder agreement.  Do
24     you recall whether or not any of your brothers
25     had an attorney representing them for purposes

---

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 49

1    of signing the 1992 shareholder agreement?
2         MS. POLAKOWSKI: Objection.
3    Foundation.
4         THE WITNESS: I don't know.
5    BY MR. CHURCHILL:
6  Q    Do you recall at all the actual signing?
7  A    Of this particular document?
8  Q    Yes.
9  A    No.
10 Q    Do you recall if at the time Widen
11   Colourgraphics had an attorney that it used for
12   documents like this?
13        MS. POLAKOWSKI: Objection.
14   Foundation.
15        THE WITNESS: I would have no idea.
16   BY MR. CHURCHILL:
17 Q    Do you have a memory of any attorney that the
18   Widen company used at any point in time?
19 A    The only one I knew of was Scott Seid.
20 Q    With the Stafford Rosenbaum firm?
21 A    Yes.
22 Q    You don't remember any attorney prior to Scott
23   Seid?
24 A    My dad, when my dad was around he used a guy by
25   the name -- last name was Kilkelly.

---

Page 50

1  Q    Did you ever meet Mr. Kilkelly?
2  A    I'm not sure.
3  Q    Do you remember whether or not you ever
4    communicated with Mr. Kilkelly yourself?
5  A    No.
6  Q    You don't remember?
7  A    No, I did not communicate.
8  Q    So did you ever ask Mr. Kilkelly for any legal
9    help?
10 A    No.
11 Q    Did you ever reach out to an attorney to the
12   best of your knowledge with respect to the 1992
13   shareholder agreement?
14 A    No.
15 Q    Do you recall whether you considered speaking
16   with an attorney about the 1992 shareholder
17   agreement?
18 A    I did not consider it.
19 Q    Can you tell me why you didn't consider it, if
20   you remember?
21 A    Like I said, my dad was a very intimidating,
22   mean person and if he told me to sign something
23   I signed it.  No questions asked.
24 Q    But, again, you weren't concerned to the best of
25   your recollection that something was wrong with

---

Page 51

1    the 1992 shareholder agreement when you signed
2    it?
3  A    I didn't know what I was signing.
4  Q    Tell me a little bit more about your dad and how
5    he was mean and intimidating.  Can you give me a
6    little more explanation on that?
7  A    You met my brother Reed, very similar, had no
8    patience, no tolerance, didn't want to talk
9    about the weather, business, and he was a jerk.
10   He was physically and mentally abusive.
11 Q    Was he physically abusive to you?
12 A    No.
13 Q    Was he mentally abusive to you?
14 A    Yes.
15 Q    In what way?
16 A    He was just mean and putting me down all the
17   time.  The one thing that sticks in my mind the
18   most was I was walking through the living room
19   into their sun room, and it was a big room.  So
20   he watched me walk for quite a while, and he
21   looked at me and said, "I thought you said you
22   were trying to lose weight, not gain it."
23   Constant things like that.
24 Q    And this is your dad saying that about when, do
25   you remember?  Like what year or how old were

---

Page 52

1    you?
2  A    I don't know how old I was.  I was married.  I
3    can tell you that.
4  Q    Any other ways that he was mentally abusive to
5    you?
6  A    Every day.
7  Q    Did you interact with him every day?
8  A    Well, every day that I spoke with him, and I
9    honestly tried not to interact with him.
10 Q    Your dad died in 2003; is that correct?
11 A    I thought '02, but I don't know.
12 Q    How was your relationship with your father at
13   the time that he passed, in and around that
14   time?
15 A    It was civil.
16 Q    You're not sure in 1992 whether you were still
17   working for the company at the time, right?  If
18   I remember your testimony from earlier you may
19   have been terminated in '91?
20 A    I may have been.
21 Q    What do you recall, Ms. Randall, about the
22   evolution of the business?  You were talking
23   before about the prepress business.  Did the
24   company change the business that it was in?
25 A    Yes.

---

**Colleen Reed Reporting LLC**
414.322.3621

Page 53

1 Q   What do you recall about that?

2 A   I recall Reed appointing Matthew Gonnering as

3     CEO and then all of a sudden things changed.

4 Q   How so?

5 A   I was not working there. I never talked about

6     it with anybody. So I know that they did

7     software of some kind.

8 Q   Do you remember what the business line was like

9     when you were working as a receptionist in 2000

10    to 2001, was it still prepress then?

11 A  Yes.

12 Q  Do you have any recollection of the creation of

13    Windy Waters as an entity?

14 A  I do not.

15 Q  Did you at some point come to understand that

16    Windy Waters was what's known as a holding

17    company?

18       MS. POLAKOWSKI: Object to the extent

19 it calls for a legal conclusion.

20       THE WITNESS: I don't know what a

21 holding company is. So I would have to say no.

22 BY MR. CHURCHILL:

23 Q   You did know that you essentially traded in your

24    stock in the Widen company for stock in Windy

25    Waters, correct?

Page 54

1        MS. POLAKOWSKI: Objection. Form to

2 the extent it calls for a legal conclusion.

3        THE WITNESS: I did not -- I'm not

4 aware of that.

5 BY MR. CHURCHILL:

6 Q   You know that the stock that you ultimately

7     redeemed in May 2020 was Windy Waters stock,

8     though, correct?

9        MS. POLAKOWSKI: Same objection.

10       THE WITNESS: No.

11 BY MR. CHURCHILL:

12 Q  Did you believe you had Widen Enterprises stock?

13       MS. POLAKOWSKI: Objection.

14 Mischaracterizes her testimony.

15       THE WITNESS: Yes.

16       (Exhibit No. 5 was marked.)

17       THE WITNESS: Are we done with Exhibit

18 4?

19 BY MR. CHURCHILL:

20 Q  Who knows if we come back to it, but you can put

21    it to the side for now. I can't promise you,

22    Ms. Randall.

23       You have been handed what's been marked

24 for identification as Exhibit 5 to your

25 deposition. Take a moment to look at it.

Page 55

1     Exhibit 5, Ms. Randall, is a document titled

2     "Amendment of Shareholder Agreement of Widen

3     Colourgraphics, Limited." Do you see that at

4     the top?

5 A   Yes, I do.

6 Q   And the date indicated there in that first

7     sentence is an effective date of September 12th,

8     2001. Do you see that as well?

9 A   I do.

10 Q  And if you flip to the second page of Exhibit 5,

11    Ms. Randall, do you see your signature?

12 A  Yes, I do.

13 Q  And it states, "Stacy Widen Randall," correct?

14 A  Yes.

15 Q  And similar to the 1992 shareholder agreement

16    that we were just looking at, your dad is listed

17    there as the president, correct?

18 A  Yes.

19 Q  And then your four brothers also each signed,

20    correct?

21 A  Yes.

22 Q  If you flip back to the first page, Ms. Randall,

23    there is a portion of the document titled

24    "Recitals." Do you see that up at the top?

25 A  Yes.

Page 56

1 Q   And I'm going to orient you a little bit to the

2     document by reading through a couple things, and

3     then I will get to a question here.

4        Under the first recital it says, "The

5     undersigned (collectively shareholders,

6     individually shareholder) entered into that

7     certain shareholder agreement of Widen

8     Colourgraphics, Limited, as of March 1, 1992,"

9     and then it defines it as Widen shareholder

10    agreement. Do you see that?

11 A  Yes.

12 Q  And then in paragraph 2, "The shareholders,

13    except for Tyler Widen, exchanged all the shares

14    of stock they held in Widen Colourgraphics,

15    Limited, NKA" -- which means now known as --

16    "Widen Enterprises, Inc., for sales of Windy

17    Waters, Inc." Do you see that?

18 A  Yes.

19 Q  Paragraph 3, "Tyler Widen sold his shares in

20    Widen Colourgraphics, Limited, to the

21    shareholders pursuant to a shareholder agreement

22    dated January 1, 1995." Do you see that?

23 A  Yes.

24 Q  And then paragraph 4, "Subsequently Tyler Widen

25    and the shareholders received additional shares

Page 57

1 of Windy Waters, Inc., by virtue of a
2 distribution from grantor retained annuity
3 trusts of Mark Widen and Betty Widen."  Do you
4 see that?
5 A  Yes.
6 Q  Is Betty Widen your mother?
7 A  Yes.
8 Q  And then paragraph 5, "The shareholders desire
9 to amend the Widen shareholder agreement to have
10 it apply to their shares of Windy Waters, Inc."
11 Do you see that?
12 A  I do.
13 Q  Do you have a recollection of signing this
14 amendment September 12th, 2001?
15 A  I can't recall.
16 Q  Does this document at all help you recall that
17 your shares were now in Windy Waters, Inc.?
18 MS. POLAKOWSKI: Object to the extent
19 it calls for a legal conclusion.
20 THE WITNESS: I didn't know.
21 BY MR. CHURCHILL:
22 Q  Do you remember anything about your brother
23 Tyler selling his shares back to Widen
24 Colourgraphics?
25 A  No.

Page 58

1 Q  So you don't remember maybe why he did that?
2 A  You said sold them back to Widen?
3 Q  Right.  If you look at paragraph 3 on that first
4 page, do you have any recollection of Tyler
5 being less involved in the business?
6 A  Yes.
7 Q  Do you remember why?
8 A  Yes.
9 Q  What was the reason?
10 A  Because my dad told him that he was going to be
11 taking over the business as president and then
12 changed his mind said he was going to appoint
13 Reed.
14 Q  So Tyler wanted to be more involved, and he
15 wasn't allowed to be.  Is that what you are
16 saying?
17 A  Tyler wanted to be president.
18 Q  And is that your understanding as to why Tyler
19 sold his shares or you don't remember Tyler
20 choosing to sell his shares?
21 A  I did not know that Tyler sold his shares.
22 Q  Do you remember that you got more shares because
23 Tyler sold his shares?
24 MS. POLAKOWSKI: Objection.  Form.
25 THE WITNESS: I did not know.

Page 59

1 BY MR. CHURCHILL:
2 Q  Did you review this first amendment -- it's
3 actually just called amendment.  Did you review
4 the September 12, 2001, amendment of shareholder
5 agreement of Widen Colourgraphics that I handed
6 you as Exhibit 5 prior to signing it?
7 A  No.
8 Q  Do you think you reviewed it after signing it?
9 A  I can't say.  I don't remember.
10 Q  Why do you think you didn't review it?
11 MS. POLAKOWSKI: Objection.
12 Mischaracterizes her testimony.
13 THE WITNESS: Can you --
14 BY MR. CHURCHILL:
15 Q  Sure.
16 A  Yeah.  Why do I think I didn't --
17 Q  Let me go back to address counsel's objection.
18 Do you remember whether or not you reviewed it,
19 Exhibit 5?
20 A  I don't believe I did.
21 Q  And why do you believe that?
22 A  Again, because my dad probably just gave us all
23 the signature page and told us to sign it.
24 Q  Do you actually remember that that's the way it
25 happened or you are speculating?

Page 60

1 A  I remember that that's the way he did it, sign
2 here.
3 Q  Was it important for you at the time to review a
4 document like this before signing it?
5 A  No.
6 Q  Why not?
7 A  I trusted my dad.
8 Q  And you didn't believe your dad was being unfair
9 to you?
10 A  Correct.
11 Q  Do you recall whether you had an attorney
12 representing you with respect to the execution
13 of this document?
14 A  I did not have an attorney.
15 Q  Do you recall whether any of your brothers had
16 an attorney that they were using?
17 A  I wouldn't know that.
18 Q  When you signed -- if you recall, when you
19 signed a document like this, would you all get
20 together and sign at the same time or would you
21 sign separately?
22 A  Most of the time we all signed at the same time.
23 Q  Can you remember a specific example that you
24 could walk me through where that happened?
25 A  My mom and dad always had Sunday dinner, and

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

Page 61

1 this is the type of stuff that he would bring
2 when we were all there and told us to sign it.
3 Q And when you say "he," you mean your father?
4 A My dad.
5 Q And how were those dinners? Were those good
6 events, bad events?
7 A Horrible.
8 Q Why do you say that?
9 A Because he sat at the head of the table, and it
10 was a glass dining room table, and he'd pound
11 his fists and just told us what losers we were
12 and just verbal abuse pretty much every Sunday.
13 Q Did you know when you were going to the dinners
14 that there might be business that was going to
15 be discussed?
16 A Never.
17 Q Was it common that your dad would discuss
18 business at the Sunday dinners?
19 A Only when Widens wasn't doing well.
20 Q But he wouldn't tell you necessarily ahead of
21 time that I need you to review a document?
22 A Never.
23 Q How did your father communicate with you, let's
24 say at this time frame in September of 2001?
25 Would he call you on the phone to say come to

Page 62

1 Sunday dinner?
2 A No. We all just always went to Sunday dinner.
3 It was expected of us.
4 Q What about communications with your mom at the
5 time, would she communicate with you about
6 dinner ahead of time and say, hey, are you
7 coming to Sunday dinner?
8 A No.
9 Q How was your relationship with your mom?
10 A Very good.
11 Q Where did she sit at the table?
12 A The other end.
13 Q Did you always sit in the same place?
14 A Yes.
15 Q Next to your father?
16 A Yes.
17 Q If the dinners were so horrible, why did you go?
18 A It was expected of us.
19 Q Did you ever say, I'm not going?
20 A Never.
21 Q Did Steven go with you?
22 A Yes.
23 Q Did you have children at the time, and to be
24 specific let's say 2001?
25 A Yes.

Page 63

1 Q Did your children attend also?
2 A Yes.
3 Q Did you ever discuss with Steven your thoughts
4 about the Sunday dinners?
5 A Well, the first time he witnessed it as most of
6 the in-laws they were horrified and shocked.
7 They'd never seen a family operate like that.
8 Q How big was the table that you're talking about,
9 like how many people did it seat?
10 A I can't remember offhand. It was a big, long
11 table.
12 Q Is it your memory that everybody sat at the
13 table including children and spouses?
14 A The kids sat at the table when they got older.
15 Q It's my understanding that you don't have a
16 specific recollection of the day that you signed
17 this document?
18 A I do not.
19 Q Is it possible that you did not sign it at
20 Sunday dinner, in other words, might you have
21 signed it at the office?
22 A No.
23 Q Why is that not possible?
24 A Because we always signed them on Sunday dinner.
25 Q Did your dad have an office at the Widen

Page 64

1 business building?
2 A Yes.
3 Q Do you recall where it was located at the time?
4    MS. POLAKOWSKI: Objection. Form.
5 Are we still talking about 2001?
6 BY MR. CHURCHILL:
7 Q Yeah. So in 2001 where was Widens building?
8 A We had two.
9 Q Okay. And did your father have an office in one
10 of the buildings?
11 A He had an office in the old building and in the
12 new building.
13 Q And did you ever meet with him at the old
14 building in his office?
15 A Yes.
16 Q And did he ever call you into his office at the
17 old building to sign documents?
18 A I don't think so. I don't know.
19 Q He had an office in the new building as well?
20 A Yes.
21 Q In this time frame, 2001?
22 A I can't remember when they built the new one.
23 Q Did your father ever call you into his office in
24 the new building to sign documents?
25 A No.

Page 65

1 Q   In Exhibit 5, the same document, Ms. Randall, if
2     you would turn to the page -- you're on it --
3     directly after the signature page.  This is
4     titled Exhibit A.  Do you see that?
5 A   Yes.
6 Q   And similar to the 1992 agreement that we went
7     over, this is a listing of shares of stock.  Do
8     you agree with that?
9 A   Yes.
10 Q   And the numbers -- and you can compare it to
11     Exhibit 4, the numbers have changed.  Would you
12     agree with me?
13 A   Yes.
14 Q   Do you recall -- let me first just remark what
15     this document Exhibit 5 indicates.  Under your
16     name with an address of 5106 Rustic Way,
17     McFarland.  Do you see that?
18 A   Yes.
19 Q   And that's where you were living at the time?
20 A   Yes.
21 Q   You have under Class A common stock 232.75
22     shares.  Do you see that?
23 A   I do.
24 Q   If you go back to the 1992 agreement, see, we're
25     already going back to the document.  You asked.

Page 66

1     I know.  If you go back to the 1992 agreement
2     and if you turn to what effectively is page 19
3     of the document --
4         MS. POLAKOWSKI: Of Exhibit 4?
5         MR. CHURCHILL: Yes.  Exhibit 4.
6         MS. POLAKOWSKI: Here you go.
7         THE WITNESS: 19.
8 BY MR. CHURCHILL:
9 Q   Yeah, it will be right after 18.  Do you agree
10     that your shares have changed between the 1992
11     agreement and the 2001 agreement?  Do you see
12     that?
13 A   I see that.
14 Q   And also with respect to Class B common stock
15     whereas in 1992 you had 56,790 and in the 2000
16     agreement you have 5,063.9025.  Do you see that?
17 A   Is that a point or a comma?
18 Q   I think it's a decimal.
19 A   Yes, I see that.
20 Q   And your Class A common stock has gone up from
21     4,655 shares to 232.75 shares, correct?
22         MS. POLAKOWSKI: Objection.  Form.
23         THE WITNESS: It looks like it to me,
24     but this definitely isn't a decimal sign or a period.
25     It's a comma.

Page 67

1 BY MR. CHURCHILL:
2 Q   Which document are you looking at?
3 A   The --
4 Q   Right.  So --
5 A   These are commas.
6 Q   Yes.  And then look at Exhibit 5.
7 A   Yes, those are dots.
8 Q   I agree.  So some are commas and some are dots.
9     I agree.  Do you recall specifically with
10     respect to Exhibit 5, the later document, why
11     your shares were different from, for example,
12     Reed's under Class A common stock?
13         MS. POLAKOWSKI: Objection.  Calls for
14     speculation.  Legal conclusion.
15         THE WITNESS: I don't know why.
16 BY MR. CHURCHILL:
17 Q   Do you agree that Reed has more Class A common
18     stock shares listed than you do?
19         MS. POLAKOWSKI: Objection.  Calls for
20     a legal conclusion.
21         THE WITNESS: That Reed has more than
22     I?
23 BY MR. CHURCHILL:
24 Q   Yeah.  You can -- to reduce potential confusion,
25     you can put Exhibit 4 away now, the older one,

Page 68

1     and just focus on the newer one.  Put that one
2     away.  Okay.  So let's focus on the 2001
3     document.
4         You agree that Reed has more Class A
5     common stock shares listed than you, correct?
6 A   It appears that way, yes.
7 Q   Do you recall why that was the case?
8 A   I wouldn't know.
9 Q   And in turn, you agree that you have more Class
10     B common stock shares listed than Reed does?
11     He's directly below you.  You agree with that as
12     well?
13 A   Yes.
14 Q   And do you have a recollection of why that was
15     the case?
16 A   No, I don't.
17 Q   Do you recall whether or not you questioned why
18     Reed had more Class A common stock shares than
19     you at that time in 2001?
20         MS. POLAKOWSKI: Objection.  Form.
21         THE WITNESS: I didn't see this
22     document.
23 BY MR. CHURCHILL:
24 Q   When you say that, you mean you don't believe
25     you saw this document at the time that you

**Confidential**

---

Page 69

1  signed it?
2 A  That's correct.
3 Q  Do you believe that you ever saw Exhibit A?
4 A  I can say I never saw this.
5 Q  Are you guessing that you never saw it, or
6  you're confident that you never saw it?
7 A  I'm confident that I never saw it.
8 Q  And why is that, Ms. Randall?
9 A  Because we signed these at the Sunday dinner
10  table and this was all we saw.
11 Q  And you were just pointing at a document.  When
12  you say this was all you saw, you mean the
13  signature page?
14 A  The signature.
15 Q  I know this goes back some time, but do you have
16  a recollection in your mind of when you first
17  realized that your shares in the company might
18  be different than your brothers?
19 A  I did not -- after -- after my dad passed away,
20  I know something went on about A and B and
21  different types of stock because we got a letter
22  from -- I don't know if it was Kilkelly or if it
23  was from Dan Harding who is the estate attorney
24  saying that Reed was going to do this, whatever
25  it was.  I didn't understand it, and I remember

---

Page 70

1  calling my youngest brother Price because he and
2  I were executors.  And I said, "What is this
3  thing we're supposed to sign about Reed?"  And
4  he said, "Stac, just sign it.  Reed's going
5  to -- Reed's going to do what Reed wants to do."
6  So that's the only time I knew there was any
7  type of exchange of stocks.
8 Q  So you understood with respect to that
9  communication that that concerned a difference
10  in stock ownership or share ownership?
11 A  An A and a B is all I know.
12 Q  Before coming here to today's deposition have
13  you ever reviewed a document such as Exhibit 5
14  that lists ownership of Class A and Class B
15  stock involving you?
16 A  I can't say for sure.
17 Q  Was it important to you in 2001 to know how many
18  shares you had in the company?
19 A  I assumed I knew.
20 Q  What do you think you knew?
21 A  That I had 20 percent of the company.
22 Q  And so when you signed the 2001 amendment to the
23  shareholder agreement, you did not believe that
24  your shares might be adjusted under that
25  document?

---

Page 71

1         MS. POLAKOWSKI: Objection.  Legal
2  conclusion.
3         THE WITNESS: No.  I don't think -- I
4  don't remember.  I don't think so, but I can't
5  remember.  I didn't really understand it.
6 BY MR. CHURCHILL:
7 Q  Did you feel like you needed to have an attorney
8  help you with respect to understanding the first
9  amendment to the 1992 shareholder agreement?
10 A  No.
11 Q  Are you making a claim or are you contesting in
12  this lawsuit the adjustment of your brothers
13  shares as represented in the first amendment to
14  the 1992 shareholder agreement?
15         MS. POLAKOWSKI: Objection.  Calls for
16  a legal conclusion.  Foundation.
17         THE WITNESS: I would probably have to
18  talk with my lawyers about that.
19 BY MR. CHURCHILL:
20 Q  Are you questioning whether or not the change in
21  the share ownership in the first amendment -- as
22  represented in the first amendment was proper?
23         MS. POLAKOWSKI: Same objections.
24         THE WITNESS: I wouldn't know.
25 BY MR. CHURCHILL:

---

Page 72

1 Q  You would need to talk to your attorneys?
2 A  Yes.
3 Q  You agree that your Class A common stock share
4  amount represented in Exhibit 5 is the same as
5  Stewart and Price, correct?
6 A  Yes.
7 Q  And you agree that your Class B common stock
8  amount is the same as your brothers Stewart and
9  Price, correct?
10 A  Yes.
11 Q  You were never employed by Windy Waters,
12  correct?
13         MS. POLAKOWSKI: Objection.  Calls for
14  a legal conclusion.
15         THE WITNESS: I don't recall where I
16  was employed.  I thought it was Widen Colourgraphics
17  or Widen Enterprises.
18 BY MR. CHURCHILL:
19 Q  Do you remember receiving a paycheck at any
20  time?
21 A  Yes.
22 Q  Do you remember who wrote the paychecks --
23  sorry, what company's name was on the paychecks?
24 A  That's a long time ago.  I can't recall.
25 Q  We were talking a little bit before about the

---

Page 73

1    fact that Tyler wanted to be president and that
2    didn't happen.  Do you remember that testimony?
3  A   Yes.
4  Q   Was there some reason why Tyler wasn't the
5    person that became president, do you remember?
6        MS. POLAKOWSKI: Objection.  Calls for
7  speculation.
8        THE WITNESS: I wasn't involved in any
9  of that.  I don't know.
10  BY MR. CHURCHILL:
11  Q   Do you know whether Tyler's vision of the
12    company was different than Reed's, for example?
13        MS. POLAKOWSKI: Same objection.
14        THE WITNESS: I don't know what Tyler
15  was thinking.
16  BY MR. CHURCHILL:
17  Q   The time that you were working as a receptionist
18    in 2000, 2001, do you remember that?
19  A   Yes.
20  Q   I wanted to go back to that.  You were
21    terminated from that position as well; isn't
22    that correct?
23  A   Yes, I was.
24  Q   And do you recall the circumstances under which
25    you were terminated?

Page 74

1  A   I was told or maybe Reed -- I was told by Reed
2    that Brian Becker said -- maybe I went to Reed's
3    office.  Brian Becker told Reed that his clients
4    were complaining because his phone calls weren't
5    answered.
6  Q   And who was Brian Becker?
7  A   He was a sales rep or something.  I'm not sure
8    what he did.  He had numerous jobs.
9  Q   And if I understand your testimony correctly,
10    you're saying that Brian said his phones weren't
11    being answered?
12  A   His phone calls, answered all the calls that
13    came in.  And you don't really like that job
14    anyway, do you?  I said, "No, I can't stand it."
15  Q   Who said that to you?
16  A   Reed.  I would pace back and forth.  I
17    couldn't -- my dad kind of made me take that
18    job, and I said, no, I really don't, and he
19    said, "Well, why don't you just go," and, again,
20    I said okay.
21  Q   Anything else?
22  A   No.
23  Q   Do you recall Reed raising a question about
24    whether or not you had been drinking at lunch,
25    drinking meaning alcohol at lunch?

Page 75

1  A   Not Reed, no.
2  Q   Do you recall anyone raising a question about
3    whether or not you had been drinking at lunch on
4    the job?
5  A   Yes.
6  Q   Did Reed tell you that you were being terminated
7    because you had been drinking on the job?
8  A   No.
9  Q   Did anyone ever say that that was a reason why
10    you were terminated for that receptionist
11    position?
12  A   No.
13  Q   To this day have you ever heard anybody say that
14    was the reason you were terminated?
15        MS. POLAKOWSKI: I will object and
16  caution you not to disclose conversations you have
17  had with counsel.
18        THE WITNESS: Can you repeat the
19  question, please?
20        MR. CHURCHILL: Can you read it back?
21        (Last question read back.)
22        THE WITNESS: No.
23  BY MR. CHURCHILL:
24  Q   Ms. Randall, at a certain point you took on the
25    office of president of Windy Waters; isn't that

Page 76

1    correct?
2        MS. POLAKOWSKI: Objection.
3  Foundation.
4        THE WITNESS: I don't know.
5  BY MR. CHURCHILL:
6  Q   You don't know whether or not you ever served as
7    president of Windy Waters?
8  A   No.
9  Q   Is it a surprise to you that I'm asking you
10    whether or not you served as president of Windy
11    Waters?
12  A   I was told by my attorneys.
13        MS. POLAKOWSKI: Objection.  Stop
14  talking.
15        (Exhibit No. 6 was marked.)
16  BY MR. CHURCHILL:
17  Q   You have been handed by the court reporter
18    what's been marked as Exhibit 6 to your
19    deposition, and this is one of those documents
20    that the order is a little funky.  So I'm going
21    to have you turn to page 2.  That really is kind
22    of the beginning of the document.  It's
23    double-sided.  It's the page you're looking at
24    now, Ms. Randall.  The front page is actually
25    related to the document, and it's a consent to

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

Page 77

1     shareholder agreement. We're probably not going
2     to look at that. The real beginning of this
3     document is Bates labeled in the bottom right
4     corner. You will see Windy0033092. Do you see
5     that?
6 A   Yes.
7 Q   And then there are several more pages in the
8     document, and there's some more of those
9     consents in the back. So Exhibit 6 to your
10    deposition is titled Second Amendment to
11    Shareholder Agreement. Do you see that at the
12    top?
13 A   Yes.
14 Q   And on the third page of the exhibit, second
15    page of the agreement, Bates number Windy0033093
16    is a page that has some signature lines on it.
17    Do you see that as well?
18 A   Yes.
19 Q   And do you see under Windy Waters, Inc., your
20    name Stacy Widen Randall, president?
21 A   I do.
22 Q   And do you see your signature there?
23 A   Yes.
24 Q   And then do you also see under shareholders on
25    the right side Reed C. Widen, Stacy Widen

Page 78

1     Randall and Price Widen?
2 A   I do.
3 Q   And do you see your signature there?
4 A   Yes.
5 Q   And those signatures from you, they aren't the
6    same signature, correct?
7        MS. POLAKOWSKI: Objection.
8    Foundation.
9        THE WITNESS: What do you mean by
10  that?
11  BY MR. CHURCHILL:
12 Q   Well, I'm not a handwriting expert, but would
13    you say in looking at the two different
14    signatures that they are not identical?
15 A   Yes.
16 Q   Do you have a recollection of signing Exhibit 6,
17    the portion that has your signature on it?
18 A   I don't remember.
19 Q   But you don't have any reason to doubt that that
20    is your signature, correct, in both places?
21 A   I'm pretty sure the one under Reed Widen is not
22    mine.
23 Q   Why do you say that?
24 A   Because that's not how I signed my name.
25 Q   So are you -- are you saying that you think

Page 79

1     somebody signed for you?
2 A   I can't say.
3 Q   What about the version of your signature under
4    Windy Waters, Inc., is that your signature where
5    it says, "Stacy Widen Randall, president"?
6 A   That one is also questionable. I can't say for
7    sure.
8 Q   And can you tell me -- let's go through each
9    one. What's questionable about it? Why are you
10    saying that?
11 A   It does not look like my signature.
12 Q   Do you have any recollection of speaking to
13    anyone about the second amendment to shareholder
14    agreement and your need to sign it?
15 A   I don't remember.
16 Q   If you -- does this help at all with your
17    recollection of serving as president of Windy
18    Waters?
19 A   Recollection?
20 Q   Yeah. Does seeing this document remind you at
21    all that you did have a role as president of
22    Windy Waters?
23 A   It does not.
24 Q   Other than I'm assuming your meetings with
25    counsel, which I don't want you to talk about,

Page 80

1     do you have a recollection of seeing this
2     document?
3 A   I do not.
4 Q   So I take it you don't know how long you may
5    have served as president of Windy Waters,
6    assuming that you held that title?
7        MS. POLAKOWSKI: Objection. Form.
8        THE WITNESS: Assuming -- I
9  wouldn't -- I don't -- I don't remember any of it.
10  BY MR. CHURCHILL:
11 Q   Do you remember ever holding any meetings as
12    president of Windy Waters?
13 A   No meetings were held.
14 Q   In this time frame, which is you will see back
15    on the first page of the agreement, second page
16    of the exhibit, May 7, 2007, do you see that?
17 A   Mm-hmm. I do.
18 Q   So in the 2007 time frame, do you remember what
19    your involvement was with respect to Widen
20    Enterprises?
21 A   I was a director.
22 Q   You were a director of Widen Enterprises or of
23    Windy Waters?
24 A   That I'm not sure.
25 Q   You were not employed at that time by Widen

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

**Page 81**

1 Enterprises, correct?
2 A Correct.
3 Q Do you remember whether or not you were
4 reviewing any financial documents of Widen
5 Enterprises --
6 MS. POLAKOWSKI: Objection.
7 BY MR. CHURCHILL:
8 Q -- in 2007?
9 A I can't say for sure. I don't remember.
10 Q Do you remember in this time frame, 2007,
11 whether or not any financial documents were
12 provided to you?
13 A No, they were not.
14 Q When I say "financial documents," what do you
15 think that means, like what does it mean to you?
16 A Checkbook, bank accounts, anything that has to
17 do with money.
18 Q Profit and loss statements?
19 A Mm-hmm.
20 Q That's a "yes"?
21 A Yes.
22 Q Revenues, revenue statements?
23 A Yes. I don't -- yes.
24 Q Do you know who would have made the decision --
25 I'm asking you to speculate -- do you know who

---

**Page 82**

1 would have made a decision to appoint you as
2 president of Windy Waters?
3 MS. POLAKOWSKI: Objection. Calls for
4 a legal conclusion and speculation.
5 THE WITNESS: I wouldn't -- I have no
6 idea.
7 BY MR. CHURCHILL:
8 Q Do you know who was the president of Windy
9 Waters prior to 2007?
10 A No.
11 Q Do you know who was the president of Windy
12 Waters at any point in time?
13 A No.
14 Q Are you aware whether at the time that you
15 redeemed your shares in May 2020, so the final
16 redemption, whether you were then resigning as
17 president of Windy Waters as well?
18 MS. POLAKOWSKI: Objection. Calls for
19 a legal conclusion. Calls for speculation.
20 THE WITNESS: I would not know. I
21 don't know. I don't remember.
22 BY MR. CHURCHILL:
23 Q Do you recall a time that you ever asked to see
24 the financial records of Widen Enterprises?
25 A I never did.

---

**Page 83**

1 Q Until this lawsuit. You agree that you asked
2 with respect to this lawsuit, correct?
3 A I would not agree with that.
4 Q You would agree that your attorneys have asked
5 for the financial records with respect to this
6 lawsuit?
7 A I'm not aware of that. I don't know.
8 Q Did anyone ever tell you that you could not have
9 financial records for Widen Enterprises?
10 A No.
11 Q Did anyone ever tell you that you could not have
12 financial records for Windy Waters?
13 A No.
14 Q You said that you had served as a director,
15 correct?
16 A Yes.
17 Q And you didn't associate or differentiate
18 between being a director of Windy Waters versus
19 being a director of Widen Enterprises, correct?
20 A Correct.
21 Q Do you remember what period of time you served
22 as a director?
23 A I do not remember when it started.
24 Q Were you a director back in 2000 and 2001 when
25 you were working as a receptionist at Widen?

---

**Page 84**

1 A Yes.
2 Q Were you a director back in 1992 when the 1992
3 shareholder agreement was signed?
4 MS. POLAKOWSKI: Objection. Calls for
5 a legal conclusion.
6 THE WITNESS: I don't remember.
7 BY MR. CHURCHILL:
8 Q In your capacity as a director, did you ever
9 talk to other directors about the performance of
10 Widen Enterprises?
11 A I did.
12 Q Okay. And what type of conversations are you
13 thinking of?
14 A It was just how -- with Reed, how is the company
15 doing.
16 Q And when would you have conversations like that?
17 A Normally they were up north at our cottage.
18 Q And where is the cottage located?
19 A Boulder Junction, Wisconsin.
20 Q And when you say "up north," you mean north of
21 here?
22 A Yes. Boulder Junction is north of here.
23 Q How far is it?
24 A 257 miles from my door step to that door step.
25 Q And how long have you made that trip to the

---

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 85

1  cottage?

2  A   Since I was a baby.

3  Q   In your role as a director did you ever

4      establish any company policies?

5  A   No.

6  Q   In your role as a director did you ever revise

7      any company policies?

8          MS. POLAKOWSKI: Objection.  Form.

9  Calls for a legal conclusion.

10         THE WITNESS: Not that I remember.

11  BY MR. CHURCHILL:

12  Q   In your role as a director did you ever review

13     any company policies?

14  A   No.

15  Q   In your role as a director did you ever hire

16     anyone?

17  A   No.

18  Q   In your role as a director did you ever fire

19     anyone?

20  A   No.

21  Q   In your role as a director did you ever inquire

22     about an employee's compensation?

23  A   No.

24  Q   In your role as a director did you ever set

25     anyone's compensation, like the amount?

---

Page 86

1  A   No.

2  Q   In your role as a director did you ever declare

3      any dividends for shareholders?

4  A   No.

5  Q   In your role as a director did you ever consult

6      with any advisors to Widen Enterprises?

7  A   No.

8  Q   Did you ever consult with any advisors to Windy

9      Waters?

10  A   No.

11  Q   In your role as a director did you ever meet

12     with attorneys to the companies?

13  A   No.

14  Q   In your role as a director did you ever consult

15     with accountants to either company?

16  A   No.

17  Q   Let's say in this time frame, 2007, did you know

18     who were accountants to the company?

19  A   No, I don't.

20  Q   Did you ever use Baker Tilly, the firm Baker

21     Tilly?

22  A   Yes.

23  Q   Do you remember whether Baker Tilly were the

24     accountants to the company in 2007 to either

25     company?

---

Page 87

1  A   They changed their name.  It was -- gosh.

2      Virtual -- what was it?  Was it Virtual Krause.

3      Baker Tilly is now something -- it's a different

4      name than the original name.

5  Q   They were called something before and then they

6      became Baker Tilly?

7  A   Yes.

8  Q   Did you ever consult with the predecessor

9      entity?

10  A   No.

11         MS. POLAKOWSKI: Object to form.

12  BY MR. CHURCHILL:

13  Q   Ms. Randall, have you heard of the term before

14     fiduciary duty?

15  A   I have heard it, yes.

16  Q   What is your understanding of what a fiduciary

17     duty is?

18         MS. POLAKOWSKI: I will object to the

19  extent that the question would require you disclose

20  information that was discussed between yourself and

21  counsel.  I will instruct you not to answer.  If you

22  have an understanding independent of what we have

23  told you, you can provide that.

24  BY MR. CHURCHILL:

25  Q   Do you have an independent understanding outside

---

Page 88

1      of your conversations with counsel about what a

2      fiduciary duty is?

3  A   I always just thought it was -- yeah, that it

4      had to do with a person that was looking out for

5      my best interest.

6  Q   Did you have an understanding that fiduciary

7      duties can be owed to shareholders?

8          MS. POLAKOWSKI: Same objection and

9  same instruction.

10         THE WITNESS: No.

11  BY MR. CHURCHILL:

12  Q   Did you understand in your role as a director

13     that you might owe fiduciary duties to anyone?

14         MS. POLAKOWSKI: Same objection.

15  Calls for a legal conclusion.

16  BY MR. CHURCHILL:

17  Q   Do you understand my question?

18  A   Repeat it, please.

19  Q   Sure.  Let me break it down a little bit.  So

20     you testified that you were a director, right?

21  A   Yes.

22  Q   And you knew that you were a director?

23  A   Yes.

24  Q   Although you're not sure as to which company you

25     were a director?

---

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 89

1 A   Correct.
2 Q   At the time that you were serving as a director,
3      did you believe that you owed fiduciary duties
4      to anyone?
5 A   I was not sure what fiduciary duties was.  So I
6      didn't know.
7 Q   In your role as a director did you believe that
8      you had any type of duty to anyone other than
9      yourself?
10         MS. POLAKOWSKI: Objection.  Calls for
11     a legal conclusion.
12         THE WITNESS: Can you rephrase that,
13     please?
14 BY MR. CHURCHILL:
15 Q   Let me try it this way.  So backing away from
16     fiduciary duty because my understanding of your
17     testimony just now is that you didn't consider
18     fiduciary duty like as a legal concept at the
19     time.  In your role when you were serving as a
20     director, did you consider that you had any type
21     of duty or obligation to anyone other than
22     yourself with respect to your role with the
23     companies?
24         MS. POLAKOWSKI: Object to the extent
25     that it calls for a legal conclusion.

---

Page 90

1          THE WITNESS: I wouldn't know that.
2 BY MR. CHURCHILL:
3 Q   It wasn't something that was in your mindset at
4      the time?
5 A   No.
6 Q   Let's look at the second amendment again and
7      back to your signature.
8          MS. POLAKOWSKI: Is that Exhibit 5?
9          MR. CHURCHILL: That is Exhibit 6.
10         THE WITNESS: I have got it.
11 BY MR. CHURCHILL:
12 Q   Exhibit 6.  So I wanted to look at your
13     signature again, and with that in your mind,
14     you're aware that the question of the use of a
15     signature stamp has come up in this litigation,
16     right?
17 A   Yes.
18 Q   And the signature stamp that we're talking about
19     or at least one of them would be your signature
20     stamp, correct?
21 A   Yes.
22 Q   As you sit here, can you tell whether or not one
23     of the signatures on Exhibit 6 is the signature
24     stamp?
25 A   It is not.

---

Page 91

1 Q   And why do you know that?
2 A   The signature stamp was more bold and darker.
3 Q   Okay.  The signature stamp was first an issue
4      that came up after you moved to Florida, right?
5 A   Yes.
6 Q   And do you remember when you moved to Florida in
7      2001, roughly when?
8 A   December.
9 Q   What precipitated or caused that decision to
10     move to Florida?
11 A   Can you ask me that in a different way?
12 Q   Yeah.  Why did you move?
13 A   To get away from my dad.
14 Q   Any other reasons?
15 A   No.
16 Q   Did you move with the rest of your family?
17 A   I moved with my husband and my youngest child
18     because she was still in high school.
19 Q   Justin did not go with you?
20 A   No.
21 Q   And what's your daughter's name?
22 A   Lindsey.
23 Q   A-Y?
24 A   L-I-N-D-S-E-Y.
25 Q   E-Y.  And so in December of 2001 you were not

---

Page 92

1      working for Widen Enterprises anymore?
2 A   No.
3 Q   But you were a director of Widen Enterprises at
4      the time, correct?
5          MS. POLAKOWSKI: Objection.
6      Foundation.
7          THE WITNESS: I don't know for sure.
8 BY MR. CHURCHILL:
9 Q   Do you know whether you were president of Windy
10     Waters at the time?
11         MS. POLAKOWSKI: Same objection.
12     Calls for a legal conclusion.
13         THE WITNESS: I didn't know that I was
14     ever president.
15 BY MR. CHURCHILL:
16 Q   How did you notify, if at all, your family that
17     you were moving to Florida?
18 A   I told my dad face to face.  I don't recall how
19     I told my brothers.
20 Q   And what part of Florida did you move to?
21 A   Tampa area.
22 Q   Were you concerned at all about being able to
23     fulfill any responsibilities that you had to the
24     companies by moving to Florida?
25         MS. POLAKOWSKI: Objection.  Calls for

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 93

1 a legal conclusion. Also assumes facts not in
2 evidence.
3         THE WITNESS: I don't believe I was in
4 my right frame of mind when that was all going on.
5 BY MR. CHURCHILL:
6 Q   Did you have -- in your mind did you have
7     responsibilities to the companies in 2001 when
8     you moved to Florida?
9         MS. POLAKOWSKI: Same objections.
10        THE WITNESS: I know that I had to
11 sign things.
12 BY MR. CHURCHILL:
13 Q   And in what capacity were you signing things?
14 A   What do you mean "capacity"?
15 Q   You said that you had to sign things. Why did
16     you have to sign things?
17        MS. POLAKOWSKI: Object to the extent
18 it calls for a legal conclusion.
19        THE WITNESS: I don't know.
20 BY MR. CHURCHILL:
21 Q   Well, you knew you had to sign things. Did you
22     believe you had to sign things because you were
23     a director?
24        MS. POLAKOWSKI: Same objection.
25        THE WITNESS: I wasn't sure why I had

---

Page 94

1 to sign actually.
2 BY MR. CHURCHILL:
3 Q   Did you believe that you had to sign things
4     because you were a shareholder?
5         MS. POLAKOWSKI: Same objection.
6         THE WITNESS: I didn't know why I had
7 to sign things.
8 BY MR. CHURCHILL:
9 Q   But you knew that you had to sign things as
10     you're calling them?
11 A   Documents.
12 Q   So that was -- you have anticipated my next
13     question. What kind of things do you think you
14     would need to sign?
15 A   Whatever Mike Kiesler asked me to sign.
16 Q   That's the first time Mike's name has come up.
17     When did he first start getting involved in the
18     company as far as you can remember?
19 A   I know my dad hired him. I don't recall when.
20 Q   So in 2001 when you moved to Florida, do you
21     remember what position or role Mike Kiesler had?
22 A   He was CFO.
23 Q   And anybody else other than Mike Kiesler that
24     might need you to sign something?
25 A   No.

---

Page 95

1 Q   What about your dad?
2 A   In '01 he wasn't doing much at the office.
3 Q   Okay. So who was doing much at the office in
4     '01, Reed?
5         MS. POLAKOWSKI: Objection.
6 Foundation.
7         THE WITNESS: I don't know what Reed
8 was doing.
9 BY MR. CHURCHILL:
10 Q   I know this is back in time, but in 2001 when
11     you moved, who was running the companies?
12        MS. POLAKOWSKI: Objection. Calls for
13 speculation.
14        THE WITNESS: I am not sure --
15 BY MR. CHURCHILL:
16 Q   So --
17 A   -- about that.
18 Q   So you mentioned that you did tell your dad that
19     you were moving, right?
20 A   Yes.
21 Q   Did you tell your dad because you felt like he
22     was the person that needed to know from a
23     company perspective, or did you tell your dad
24     because he's your dad?
25        MS. POLAKOWSKI: Objection. Calls for

---

Page 96

1 speculation.
2         THE WITNESS: I told him because he's
3 my dad.
4 BY MR. CHURCHILL:
5 Q   Were you concerned about your ability to sign
6     documents remotely?
7 A   I was not.
8 Q   Why were you not concerned?
9 A   I don't think I even thought about it.
10        MS. POLAKOWSKI: We have been going
11 about another hour. At a convenient time can we take
12 a break whether for lunch or otherwise?
13        MR. CHURCHILL: Sure.
14 BY MR. CHURCHILL:
15 Q   Let me just ask a couple more questions so we
16     can finish with that issue.
17        So you said you're not sure if you ever
18     thought about it. When did you first realize
19     I'm going to need to sign some things?
20 A   When Kiesler sent me something to sign.
21 Q   And do you remember what that was?
22 A   I have no idea.
23 Q   How often did Kiesler send you things to sign in
24     this time frame, let's say 2001, 2002?
25 A   I don't remember.

---

**Colleen Reed Reporting LLC**
**414.322.3621**

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 97

1 Q   Do you remember the types of things that you had
2     to sign?
3 A   Pretty much stuff like sign this.
4 Q   And Mike Kiesler is not your dad, so did he give
5     you the whole document or just the signature
6     page?
7 A   I can't remember.
8 Q   Would Mike Kiesler explain to you what it was
9     that he wanted you to sign or that they needed
10    signed?
11 A   I don't remember for sure.
12        MR. CHURCHILL: We can take a break.
13        THE VIDEOGRAPHER: We will go off the
14   record. The time is 11:43 a.m.
15        (Lunch recess taken.)
16        THE VIDEOGRAPHER: We are back on the
17   record. This will mark the beginning of media unit
18   number 2 of the video recorded deposition of Stacy
19   Randall. Today's date is August 28th, 2023, and the
20   time is 12:39 p.m.
21 BY MR. CHURCHILL:
22 Q   Good afternoon, Ms. Randall.
23 A   Good afternoon.
24 Q   Before we broke for lunch we had started talking
25    about your move to Florida. Do you recall that?

---

Page 98

1 A   Yes.
2 Q   And we were also talking about your signature as
3     well. Do you remember that?
4 A   Mm-hmm.
5 Q   I wanted to talk more about the stamp, your
6     signature stamp.
7 A   Okay.
8 Q   If I understand correctly, you purchased the
9     stamp from a Staples in Florida; is that
10    correct?
11 A   No.
12 Q   Where did you purchase the stamp from?
13 A   Staples in Monona.
14 Q   And is that in Wisconsin?
15 A   Yes. It's about two miles from the office.
16 Q   Do you have a recollection of when you purchased
17    the stamp?
18 A   I don't. It was after '01.
19 Q   Do you think it was in 2002?
20 A   I can't even guess.
21 Q   I have got a document that I'm pretty confident
22    is the stamp, and we will go over that so we can
23    try to figure out when it was used.
24        Is there a date in your mind when you
25    could say I know as of this date no question the

---

Page 99

1     stamp was being used?
2 A   No, there's not.
3 Q   Can you tell me how you had the stamp made, like
4     the process?
5 A   Well, I just signed a piece of paper at Staples,
6     and then they took it, and when I came back in I
7     went back and got it.
8 Q   Are you left-handed?
9 A   I am.
10 Q   And so do you remember what type of pen you used
11    to sign it?
12 A   No.
13 Q   You were mentioning that the ink is a little
14    thicker on the stamp, correct?
15 A   Yes.
16 Q   Do you remember if it was a felt tip point pen
17    as opposed to a ball point pen?
18 A   I paid no attention to that. I can't tell you.
19 Q   Do you know if the stamp was supposed to be used
20    with a certain color ink or did that matter?
21 A   It was self-inking.
22 Q   How does that work?
23 A   When you just press down on it and it turns
24    black. So I think when it turns upside down it
25    gets the ink, and then when you press it down,

---

Page 100

1     that was my signature.
2 Q   I see. So there's ink in the stamp, you don't
3     use a blotter?
4 A   Right.
5 Q   I'm showing my age now. Do you remember how it
6     was that the decision to use a stamp came about?
7        MS. POLAKOWSKI: Objection.
8 Foundation.
9        THE WITNESS: I don't know what Mike
10 Kiesler was thinking, no.
11 BY MR. CHURCHILL:
12 Q   Isn't it true that one of your brothers was
13    using a stamp also?
14 A   I'm not aware of that.
15 Q   Do you remember having a conversation in Mike
16    Kiesler's office with your brother Stewart and
17    Mike where the fact that Stewart was using a
18    stamp came up?
19 A   No. I don't recall that.
20 Q   Do you ever remember any of your brothers
21    telling you that they sometimes use a signature
22    stamp instead of their ink signature?
23 A   No, I don't remember that.
24 Q   Is it your understanding that any of your family
25    sometimes used an ink stamp besides yourself?

---

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 101

1          MS. POLAKOWSKI: Objection.
2  Foundation.
3          THE WITNESS: I don't know.
4  BY MR. CHURCHILL:
5  Q   Tell me what you remember about whose decision
6      it was to use the stamp, initially I mean?
7  A   I don't know who it was; either Reed or Kiesler.
8  Q   Was it your suggestion or Reed or Kiesler?
9  A   It was one of those two.
10 Q   Did you agree that the stamp was something that
11     could be used on occasion?
12         MS. POLAKOWSKI: Objection.  Form.
13         THE WITNESS: Well, it depended.  I
14  needed to know when they used it.
15  BY MR. CHURCHILL:
16 Q   Tell me what you recall about the conversation
17     where it was decided that the stamp could be
18     used on occasion.
19 A   I don't remember a conversation.
20 Q   Did you communicate with anyone, with the
21     companies about the conditions under which your
22     stamp could be used?
23 A   They were supposed to let me know.
24 Q   And who did you tell that to?
25 A   Mike Kiesler.

---

Page 102

1  Q   And did that happen on the telephone or over
2      email?
3          MS. POLAKOWSKI: Object to form.
4  BY MR. CHURCHILL:
5  Q   Do you understand my question?
6  A   You want to know --
7  Q   Don't guess.  Let me tell you or let me reask
8      it.  I'm interested in you telling me about the
9      conversation or communication you had with Mike
10     Kiesler or Reed where it was decided when the
11     stamp could be used.  Do you remember discussing
12     it with anyone?
13 A   I remember -- I remember a little bit of the
14     conversation, yes.
15 Q   And who was the conversation with?
16 A   Mike Kiesler.
17 Q   What was said?
18 A   I told him that -- when he asked me about
19     getting a stamp, I said I don't have a problem
20     with that as long as you let me know when you're
21     using it.
22 Q   And was that a conversation that was had in
23     person or over the telephone?
24 A   That I don't remember.
25 Q   You said that he asked.  What do you mean, it

---

Page 103

1      was Mike's idea to use the stamp?
2  A   I don't know if it was Reed or Mike who made the
3      decision.  I don't know.
4  Q   Did you agree to use the stamp when it was to be
5      used?  In other words, under the conditions did
6      you say, yes, I agree that the stamp can be used
7      under certain conditions?
8  A   I don't recall them ever asking except for in
9      late -- I don't remember.  Was it December or
10     something he texted me or emailed me and asked
11     me if I could use my stamp.
12 Q   You agree that you knew the stamp was going to
13     be used at certain times because you got the
14     stamp and gave it to Mike, right?
15         MS. POLAKOWSKI: Objection.  Calls for
16  speculation.
17         THE WITNESS: I didn't agree with
18  that.  No.
19  BY MR. CHURCHILL:
20 Q   You purchased the stamp, right?
21 A   Yes.
22 Q   And you brought it to Mike Kiesler?
23 A   Yes.
24 Q   And you gave it to him?
25 A   Yes.

---

Page 104

1  Q   Did you hand it to him yourself?
2  A   I don't remember that.
3  Q   Do you remember what you said to Mike when you
4      gave him the stamp?
5  A   Here it is.
6  Q   Okay.  And you understood that when the stamp
7      was used, the stamp would be a substitute for
8      your actual handwritten signature, correct?
9  A   That's what I was told.
10 Q   And you understood that, correct, you understood
11     that it was going to be a substitute for your
12     handwritten signature?
13 A   Yes.  But they needed to ask me first or let me
14     know first.
15 Q   I understand that part of your testimony as
16     well.  So tell me what you remember as well as
17     you can remember about how you directed the
18     stamp to be used?
19 A   When they needed my signature they could use the
20     stamp as long as I was aware of it.
21 Q   And did it matter how they communicated with you
22     to get your approval, for example, was text
23     okay?
24 A   I don't recall if we talked about that.
25 Q   Did you ever text your approval to use the

---

---

Page 105

1 signature?

2 A   Never.

3 Q   Was phone conversation okay to get your

4     approval?

5 A   I don't recall ever a phone conversation.

6 Q   Were there any documents that you're aware of

7     that you agreed to have the stamp used where you

8     didn't have to approve it in advance?  In other

9     words, you knew it would be used and you said,

10    that's okay, I don't need to approve those?

11 A   No.

12        (Exhibit No. 7 was marked.)

13 BY MR. CHURCHILL:

14 Q   Ms. Randall, you have been handed what's been

15    marked for identification as Exhibit 7 to your

16    deposition.

17 A   Yes.

18 Q   And this is a document that's titled, "Restated

19    Stock Transfer Agreement."  Do you see that at

20    the top of page 1?

21 A   Yes, I do.

22 Q   And the date for this document it says that it's

23    made effective December 31, 2012.  Do you see

24    that?

25 A   Yes, I do.

---

Page 106

1 Q   And this document appears to concern a

2     transaction between Terry Vial.  Do you see that

3     that?

4 A   Yes, I do.

5 Q   Windy Waters and Widen Enterprises.  Do you see

6     that?

7 A   Yes.

8 Q   Do you remember Terry Vial?

9 A   Yes.

10 Q   Who is Terry Vial?

11 A   A very good friend of Reed's.

12 Q   And was he a shareholder in the company -- or

13    Windy Waters at a certain point in time?

14        MS. POLAKOWSKI: Objection.

15 Foundation.

16        THE WITNESS: I'm not aware of that.

17 BY MR. CHURCHILL:

18 Q   You don't remember whether Terry Vial ever held

19    shares in the company?

20 A   I don't know if he did.

21 Q   If -- I will note for the record that this

22    document is not Bates labeled, Exhibit 7, but I

23    do believe it's been produced in the case.  And

24    we can provide the Bates number if you guys need

25    it on the break.

---

Page 107

1        If you would flip, Ms. Randall, in

2     Exhibit 7 to page 13 of the document?

3 A   That's my stamp.

4 Q   That is your stamp?

5 A   Yup.

6 Q   And I think I know what you're going to say, but

7     tell me why you say that's your stamp.

8 A   Because it's bold and very dark black.

9 Q   And to the best of your recollection that's what

10    the piece of paper looked like that you

11    submitted to have the stamp created?

12 A   Yes.

13 Q   Can you go back, if you would, to an exhibit

14    that we discussed prior to lunch, Exhibit 6,

15    it's the second amendment to the shareholder

16    agreement, the first page is a consent to

17    shareholder agreement page, and then we were

18    discussing your signature.  So this would be on

19    page 3 of the exhibit that I wanted you to turn

20    to.

21 A   Mm-hmm.

22 Q   So you said before that you were -- that you did

23    not believe that -- or at least you weren't

24    certain that the signature on page 3 of Exhibit

25    6 was actually your signature; am I remembering

---

Page 108

1     your testimony correctly?

2 A   Yes.

3 Q   Can you compare the signatures between these two

4     documents and tell me whether or not you still

5     wonder if it's your signature?

6        MS. POLAKOWSKI: Objection.

7 Foundation.

8        THE WITNESS: If I still think this is

9 my signature or not my signature?

10 BY MR. CHURCHILL:

11 Q   Yes.  Or if you can tell.

12 A   I can't really tell.

13 Q   Let's go to Exhibit 4, the one that I told you

14    you wouldn't need to see again.  I didn't really

15    say that.  You asked me.  I'm bringing back

16    Exhibit 4, and that's the 1992 shareholder

17    agreement.  Do you have that?

18 A   Yes.

19 Q   And do you remember we were looking at page 18?

20 A   Yes.

21 Q   Can you go to page 18?

22 A   Sure.

23 Q   And you see your signature on that page?

24 A   I do.

25 Q   And now comparing the three, it looks like your

---

Page 109

1 signatures are a little different on each
2 document.  Do you agree with that?
3 A   Yes.
4 Q   Is it possible that you sign documents
5 differently at times?
6 A   Yes.
7 Q   Have you always written out your middle name
8 when you sign documents or do you sometimes not
9 write it out?
10 A   Sometimes I don't write it out.
11 Q   In your signature that's in the signature stamp
12 for Exhibit 7, I'm going to ask you to look at
13 it with me.  It looks like you did write out
14 Widen, maybe, but it's super quick or quick?
15 A   Yes.
16 Q   I don't want to say sloppy because I'm not
17 trying to offend you, but it's quickly written.
18 Do you agree with that?
19 A   I don't think it was quick.  I don't recall it
20 being quick.  I don't know what I was thinking
21 at the time.
22 Q   Fair to say that you -- when you signed things
23 sometimes your signature is more legible than
24 other times?
25 A   When I changed my signature to this.

Page 110

1 Q   On Exhibit 7?
2 A   Yeah, the initials.
3 Q   Yes.
4 A   Was when we started doing real estate in
5 Florida, and there was so many documents that I
6 had to sign that I got tired of doing that.  So
7 I just went (noise) and that's been my signature
8 ever since.
9 Q   And just for the record when you said "doing
10 that," you got tired of writing it --
11 A   Stacy Widen Randall, writing it all out.
12 Q   Okay.  And if I can find other examples of the
13 stamp, I will.  But you agree the stamp is the
14 version of the signature in Exhibit 7?
15 A   Yes, I do.
16        MR. CHURCHILL:  Okay.  Thank you,
17 Ms. Randall.
18        (Exhibit No. 8 was marked.)
19 BY MR. CHURCHILL:
20 Q   Ms. Randall, the court reporter has handed you
21 now what's been marked for identification as
22 Exhibit 8 --
23 A   Yes.
24 Q   -- to your deposition, and this is a document
25 titled, "Plaintiff Stacy L. Randall's Objections

Page 111

1 and Responses to Defendant's First Set of
2 Interrogatories."  Do you see that?
3 A   Yes.
4 Q   And on the last -- we're missing from this
5 version actually your verification, but do you
6 recall reviewing interrogatory responses for
7 purposes of this case to then respond to
8 questions from defendants?
9 A   Can you tell me what an interrogatory is?
10 Q   Sure.  So an interrogatory, I will state for the
11 record, is a written question that you can serve
12 on another party in a case.  So you have served
13 interrogatories on defendants and defendants
14 have served interrogatories on you.
15 In this particular example this is a set of
16 questions, the interrogatories, that you have
17 answered.
18 A   Yes.
19 Q   And your attorneys worked with you, and there's
20 one about the stamp that I just wanted you to
21 look at.
22 A   Okay.
23 Q   And I believe it is -- it starts on page 7 of
24 Exhibit 8, interrogatory number 3.  Tell me when
25 you're there.

Page 112

1 A   Yes.
2 Q   I will just read it out loud.  Interrogatory
3 number 3 reads, "Identify and describe your
4 decision to obtain and provide for use by the
5 companies a 'rubber signature stamp' as
6 referenced in paragraphs," and then it lists a
7 number of paragraphs in the Complaint.  Do you
8 see that?
9 A   Yes.
10 Q   And then there's some lawyer speak on bottom of
11 page 7, and then we're going to flip over and
12 look at your answer.  It's at the top of page 8.
13 That reads, "Plaintiff purchased a stamp with
14 her signature at the request of Mr. Kiesler."
15 Do you see that?
16 A   Yes.
17 Q   Is that still correct?
18 A   I guess I was assuming -- yes, he's the one that
19 asked me.
20 Q   And next line, "Plaintiff moved to Florida from
21 Madison, Wisconsin, in or around 2001.  Because
22 plaintiff lived in Florida, Mr. Kiesler or other
23 members of company management would fax or scan
24 documents to plaintiff to sign."  Do you see
25 that?

Page 113

1  A   Yes.

2  Q   And do you recall that prior to using the stamp

3      Mr. Kiesler or other members of company

4      management would fax or scan documents for you

5      to sign?

6  A   Yes.

7  Q   Are you aware of any instance where Mr. Kiesler

8      or members of management did not send you a

9      document to sign?

10         MS. POLAKOWSKI: Object to the form of

11  the question.

12         THE WITNESS: Can you rephrase that,

13  please?

14         MR. CHURCHILL: Can you read it back?

15         (Last question read back.)

16         MR. CHURCHILL: And I'm speaking

17  specifically in this time frame after you moved to

18  Florida and your interrogatory response says that --

19  Mr. Kiesler or other members of company management

20  would fax or scan documents for you to sign.  So what

21  I'm asking is whether you're aware of a situation

22  where something that needed to be signed by you was

23  not faxed or scanned to you?

24         MS. POLAKOWSKI: Objection to the form

25  of the question.

Page 114

1          THE WITNESS: I wouldn't know because

2   I didn't -- all I know is the ones that they did send

3   me, and by the looks of the stamps I was not aware of

4   those.

5   BY MR. CHURCHILL:

6   Q   Okay.  But before the stamp was being used,

7       you're not aware of an occasion where something

8       wasn't sent to you that needed to be signed?

9   A   I don't know what I don't know, I guess.

10  Q   The interrogatory then continues, "Following

11      plaintiff's move, Mr. Kiesler asked plaintiff to

12      get a stamp with her signature in the event a

13      document needed to be signed quickly and

14      plaintiff was unavailable to sign and scan

15      and/or fax the document to Windy Waters."  Do

16      you see that?

17  A   Yes.

18  Q   And does that still reflect your testimony

19      regarding the stamp?

20  A   Yes, it does.

21  Q   Reading on, "Plaintiff agreed, provided the

22      stamp was used for the limited purposes of

23      signing documents that required a quick

24      turnaround and on the express condition that

25      Mr. Kiesler or another member of Windy Waters'

Page 115

1      leadership notified plaintiff each time they

2      wished to use the signature stamp.  Mr. Kiesler

3      agreed to plaintiff's terms."  Do you see that

4      as well?

5  A   Yes.

6  Q   Do you remember the discussion about

7      distinguishing between documents that required a

8      quick turnaround versus documents that did not

9      require a quick turnaround?

10  A  It seemed everything that he sent me was quick

11     turnaround.

12  Q  But do you remember saying to Mr. Kiesler or

13     anyone else in management that if a document

14     doesn't require a quick turnaround, the stamp is

15     not to be used?

16  A  No.

17  Q  Do you remember the quick turnaround requirement

18     at all?

19         MS. POLAKOWSKI: Object to the form of

20  the question.

21         THE WITNESS: Like I said, everything

22  that Kiesler sent me seemed to be needed quickly.

23  BY MR. CHURCHILL:

24  Q  My understanding of your interrogatory responses

25     is that the stamp was not to be used unless the

Page 116

1      signature required a quick turnaround, was that

2      the case?

3  A   I'm not sure.

4  Q   Did you go back to Wisconsin at any point for

5      the express purpose of signing documents?

6  A   Not that I can remember.

7  Q   Did you ever say that if a document that

8      required signing didn't require a quick

9      turnaround that you expected to be able to come

10     back to sign the documents in person?

11  A  No.

12  Q  Do you remember anything about the quick

13     turnaround requirement other than the fact that

14     documents normally needed to be signed on a

15     quick turnaround basis?

16  A  I don't.

17  Q  The next statement is, "Following the

18     conversation with Mr. Kiesler, plaintiff went to

19     a Staples in Monona, Wisconsin, and purchased

20     the stamp.  Plaintiff then provided the stamp to

21     Mr. Kiesler."  Do you see that?

22  A  Yes.

23  Q  And that's your testimony here today as well?

24  A  Yes.

25  Q  After the stamp was acquired and we're not sure

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 117

1    exactly when, but sometime after 2001, do you
2    remember occasions when Mike would reach out to
3    you to ask you if the stamp could be used?
4  A    Just one time and that was in December of '19,
5    maybe.
6  Q    Is it possible that Mike did reach out to you to
7    ask your permission to use the stamp on other
8    occasions and you had forgotten?
9  A    That's possible.
10  Q    You may have already answered this, Ms. Randall,
11    but remember we just looked at Exhibit 7 --
12  A    Yes.
13  Q    -- which had the example of the stamp?
14  A    Yes.
15  Q    Do you remember signing this document involving
16    Terry Vial and the companies that has your
17    signature stamp that's dated December 31, 2012?
18  A    I did not sign that.
19  Q    My mistake.  Do you remember agreeing to have
20    the stamp used?
21  A    No.
22  Q    Is it possible that you agreed to have the stamp
23    used and you don't remember?
24        MS. POLAKOWSKI: Objection.  Calls for
25    speculation.

---

Page 118

1        THE WITNESS: Anything is possible.
2    So, yes, maybe I don't remember, but --
3  BY MR. CHURCHILL:
4  Q    Do you remember every occasion that your stamp
5    was used in 2012?
6        MS. POLAKOWSKI: Objection.  Calls for
7    speculation.  Foundation.
8        THE WITNESS: No.
9  BY MR. CHURCHILL:
10  Q    Is it your testimony in this case that other
11    than the time that you remember your stamp being
12    used, which you said was sometime in late 2019,
13    that that use of your stamp was without your
14    approval?
15  A    Can you repeat that, please?
16        MR. CHURCHILL: Can you read it back,
17    please?
18        (Last question read back.)
19        THE WITNESS: The use of my stamp
20    was -- I don't recall any phone call or text or email
21    other than that one in December of '21.
22  BY MR. CHURCHILL:
23  Q    So this takes me back to the same question.  I
24    want to make sure you can answer it if you can.
25        So is it your position then that for all

---

Page 119

1    the other occasions where the stamp may have
2    been used but you don't remember that that use
3    was without your approval?
4        MS. POLAKOWSKI: Objection.
5    Speculation.
6        THE WITNESS: Yeah.  It was a long
7    time ago.  Possible.  I can't answer that for sure.
8  BY MR. CHURCHILL:
9  Q    If you did give your approval to use the stamp,
10    you agree that it could be used?
11  A    The one time, yes.
12  Q    Let's say on any time that you gave your
13    approval, if it's shown that you gave your
14    approval and you just have forgotten, you agree
15    the stamp could be used, correct?
16        MS. POLAKOWSKI: Objection calls for
17    speculation.
18        THE WITNESS: I don't recall ever
19    giving permission to use my stamp.
20  BY MR. CHURCHILL:
21  Q    And I understand that.  What I'm asking is
22    slightly different.  Let's assume that you did
23    give your approval on another occasion, pick a
24    date, 2015.  Do you agree that if on that
25    occasion you gave your approval to Mike Kiesler

---

Page 120

1    or to Reed or to whomever, if you gave approval
2    to use it, do you agree that that was a proper
3    use of the stamp?
4        MS. POLAKOWSKI: Objection calls for
5    speculation.  Foundation.
6        THE WITNESS: I didn't assume
7    anything.  So I would have to say no.
8  BY MR. CHURCHILL:
9  Q    Tell me again the conditions on which you were
10    going to allow the use of your stamp.  From the
11    moment that it was created the conditions were
12    what?
13        MS. POLAKOWSKI: Objection.  Asked and
14    answered.
15        THE WITNESS: The conditions were that
16    I needed to know when they were using my stamp.
17  BY MR. CHURCHILL:
18  Q    And were there further conditions in terms of
19    how you needed to know?
20  A    No.
21  Q    So let's assume that there was an occasion other
22    than late 2019 where you were told in advance
23    that they wanted to use your stamp, and you
24    said, yes, would that be an approved use of your
25    stamp?

---

Min-U-Script®

Colleen Reed Reporting LLC
414.322.3621

(30) Pages 117 - 120

Page 121

1          MS. POLAKOWSKI: Objection.  Calls for
2   speculation.
3          THE WITNESS: I don't ever recall
4   anything -- them ever calling and asking except for
5   that one time.
6   BY MR. CHURCHILL:
7   Q   I understand that.  And at the risk of incurring
8       another objection from your counsel, I'm asking
9       you to assume -- it's a hypothetical.  So by
10      assuming and as a hypothetical it doesn't mean
11      it actually happened.  It's a hypothetical.
12      Just like I can assume that I'm Donald Trump,
13      and I'm sitting in the room.
14          Assume that you actually did agree to
15      the use of your stamp in a conversation with
16      Mike Kiesler.  If it was then used, would that
17      have been okay?
18          MS. POLAKOWSKI: Objection.  Calls for
19   speculation.
20          THE WITNESS: I don't know what I
21   would have done at the time.
22   BY MR. CHURCHILL:
23   Q   So if you approved use of the stamp, you would
24      then have been upset or disagreed if the stamp
25      was used?

Page 122

1          MS. POLAKOWSKI: Objection.
2   Mischaracterizes her testimony.  Calls for
3   speculation.
4          THE WITNESS: The only reason they
5   were allowed to use my stamp was if I knew about it.
6   There's not much more to say.
7   BY MR. CHURCHILL:
8   Q   Not only if you knew about it, right, but if you
9       had agreed?
10  A   Yes.
11  Q   Not just if you knew?
12  A   Knew and I agreed.
13  Q   So if you knew and agreed, would it have been
14      okay to use the stamp?
15          MS. POLAKOWSKI: Same objections.
16          THE WITNESS: I don't know what I
17   would have done in that situation.
18   BY MR. CHURCHILL:
19  Q   So is it your testimony that if you had known
20      about use of the stamp and agreed to its use
21      that you may have protested if it was used?
22          MS. POLAKOWSKI: Objection.  Calls for
23   speculation.  Mischaracterizes her testimony.
24          THE WITNESS: I can't say that for
25   sure.

Page 123

1   BY MR. CHURCHILL:
2   Q   It's important to you, right, to know whether or
3       not your signature was being validity used, do
4       you agree with that?
5   A   Yes.
6   Q   And you agree that the stamp when approved by
7       you substituted for your signature, correct?
8   A   Yes.
9   Q   You understand that your signature is a
10      significant thing, in other words, that the
11      signing of a document has legal consequences.
12      Do you agree with that?
13          MS. POLAKOWSKI: Objection.  Calls for
14   a legal conclusion.
15          THE WITNESS: Can you give me a for
16   instance?
17   BY MR. CHURCHILL:
18  Q   Well, if you sign a document, does that have
19      significance to you?
20          MS. POLAKOWSKI: Same objections.
21   Calls for speculation.
22          THE WITNESS: Yes.
23   BY MR. CHURCHILL:
24  Q   Okay.  And what do you understand it to mean if
25      you decide to sign a document?

Page 124

1          MS. POLAKOWSKI: Same objections.
2          THE WITNESS: It depends on what kind
3   of a document it is.
4   BY MR. CHURCHILL:
5   Q   Let's say that it's the shareholder agreement
6       and you signed it.  Isn't signing an agreement
7       in your mind what you're thinking when you sign
8       something, doesn't that mean that you are
9       agreeing to the contents of the document?
10          MS. POLAKOWSKI: Object to form.
11   Mischaracterizes her testimony.  Also calls for a
12   legal conclusion.
13          THE WITNESS: I would have to talk to
14   my lawyers.
15   BY MR. CHURCHILL:
16  Q   I'm not asking what your lawyer thinks.  I'm
17      asking what you think.
18  A   I don't know what I think, and I probably would
19      need an explanation from my lawyers.
20          MR. CHURCHILL: Okay.  So can you read
21   my question back, please?
22          (Last question read back.)
23          MS. POLAKOWSKI: And I will restate my
24   objections.
25          THE WITNESS: Regarding the

Page 125

1  stockholders agreement, I believe that was one that
2  my dad had us sign.  I didn't know what I was
3  signing.
4  BY MR. CHURCHILL:
5  Q   Okay.  So I'm trying --
6  A   I didn't understand what I was signing.
7  Q   I heard your testimony.  So I'm trying to be
8      more basic.  I will be as basic as I can because
9      I'm not trying to trick you.  I'm trying to
10     understand what you are thinking when you sign
11     something.
12         If you sign a document that's like an
13     agreement, what does your signature mean to
14     you -- not to your attorney -- what does your
15     signature mean to you when you sign it?
16         MS. POLAKOWSKI: Objection.  Calls for
17  a legal conclusion.  Also calls for speculation.
18  Incomplete hypothetical.
19         THE WITNESS: Like a check or
20  something like that is a document.
21  BY MR. CHURCHILL:
22  Q   Okay.  What does it mean to you when you sign a
23      check to you?
24  A   That I just paid a bill, and it's my proof.
25  Q   So you're agreeing -- in the case of a check do

Page 126

1      you agree that if you write a check, you're
2      agreeing that this is money that can be taken
3      from your account to pay for something?
4  A   Yes.
5  Q   Okay.  So if you agreed to have the stamp used
6      in a certain circumstance, right, let's say that
7      you agreed, you approved of its use and you
8      agreed that the stamp could be used, are you
9      then agreeing that your stamp has the same power
10     as your handwritten signature?
11         MS. POLAKOWSKI: Objection.  Calls for
12  a legal conclusion.  Calls for speculation.
13         THE WITNESS: If I knew about it and I
14  understood it, my stamp could be used.
15  BY MR. CHURCHILL:
16  Q   Okay.  And if you had approved the use of your
17      stamp, then you agree that that use could be
18      relied on, like your stamp was something that
19      could be used and could be relied on if you
20      agreed to have it used?
21         MS. POLAKOWSKI: Objection.  Calls for
22  a legal conclusion.
23         THE WITNESS: I was under -- that's
24  what I was told.
25  BY MR. CHURCHILL:

Page 127

1  Q   That's what you were told by who?
2  A   Mike Kiesler.
3  Q   What do you mean?
4  A   Well, he could -- I guess I told him if I knew
5      about it and I understood it, he could use my
6      signature.  I can't assume that I would or not
7      because I don't remember them ever asking me.
8  Q   Okay.  So then back to my earlier question.  If
9      there was an occasion when you approved the use
10     of the stamp and you remember one, right, late
11     2019, if there was an occasion where you
12     approved the use of the stamp, you agree that
13     the stamp could be used for your signature?
14         MS. POLAKOWSKI: Objection.  Calls for
15  speculation.  Legal conclusion.
16         THE WITNESS: That day was not a good
17  day for me, and I do recall then, Reed and Mike
18  Kiesler trying to call me numerous times, and I was
19  just getting irritated with them.  And when Mike
20  Kiesler first asked me, I told him, no, you could not
21  use it.
22  BY MR. CHURCHILL:
23  Q   I know exactly -- I'm going to try one more time
24      and -- I'm going to try one more time.  I'm not
25      talking about that situation yet.  I'm going to

Page 128

1      get to it and show you documents so that you're
2      comfortable with that situation.  Because I
3      think I know the time you're talking about in
4      late 2019.
5         Just more generally, Ms. Randall, if
6      you -- hypothetically, I'm not saying you
7      remember an occasion, but hypothetically if you
8      gave approval to use the stamp, right, you knew
9      about it ahead of time and you gave approval,
10     then you agree that the stamp could be used,
11     correct?
12         MS. POLAKOWSKI: Objection.  Calls for
13  a legal conclusion.  Speculation.
14         THE WITNESS: I don't know whether I
15  agree or not.
16  BY MR. CHURCHILL:
17  Q   Was there something else required besides your
18      approval?
19  A   Me understanding what the document said.
20  Q   So was a condition of using the stamp you also
21      saying to someone I know what the document is,
22      and I understand the document?
23  A   That was not said.  That was just in my mind.  I
24      did not say it, per se.
25  Q   Do you remember an occasion where you were

Page 129

1     prevented from looking at a document that
2     required your signature?
3 A   Yes.
4 Q   What occasion is that?
5 A   These ones from my dad.
6 Q   Well, if I understood your testimony earlier,
7     you said you only remembered seeing the
8     signature page. You didn't say somebody
9     prevented you from seeing the document.
10 A   Well, he prevented me from seeing the document.
11 Q   Did you ask to see the document?
12 A   No. It was my dad, no.
13 Q   So how did your dad prevent you from looking at
14     the document before you signed it?
15 A   He did not give it to me.
16 Q   Did you ask?
17 A   I did not ask, and I would not ask.
18 Q   But you could have asked?
19        MS. POLAKOWSKI: Objection. Calls for
20  speculation.
21        THE WITNESS: I don't feel I could
22  have asked.
23  BY MR. CHURCHILL:
24 Q   Why don't you feel you could have asked?
25 A   Because he was mean and scary.

Page 130

1 Q   So on occasions when you had to sign a document
2     -- strike that.
3       Your father being mean and scary
4     prevented you from asking to review a document,
5     or you think that that's what happened?
6        MS. POLAKOWSKI: Objection to the
7   extent it mischaracterizes her testimony.
8        THE WITNESS: I know that I wouldn't
9   have asked my dad to see the document.
10  BY MR. CHURCHILL:
11 Q   Do you know that your father would have said no
12     if you had asked?
13       MS. POLAKOWSKI: Objection. Calls for
14  speculation.
15        THE WITNESS: I don't know what my dad
16  thought.
17  BY MR. CHURCHILL:
18 Q   So your dad might have shown you the document if
19     you asked to see the document --
20       MS. POLAKOWSKI: Same objection.
21       MR. CHURCHILL: -- isn't that true?
22       THE WITNESS: I don't know what my dad
23  would have thought.
24  BY MR. CHURCHILL:
25 Q   It's possible that your dad would have said --

Page 131

1     yeah, let me finish my question before you
2     object and before you answer.
3       It's possible, right, if you had asked
4     your father to review the document that he would
5     have said yes?
6       MS. POLAKOWSKI: I will object. Calls
7  for speculation. Also asked and answered.
8       THE WITNESS: I don't know what my dad
9  would have said.
10       (Exhibit No. 9 was marked.)
11  BY MR. CHURCHILL:
12 Q   Ms. Randall, you have been handed what's been
13     marked as Exhibit 9 for identification, and this
14     is a -- it's a four-page printout of a string of
15     emails. You can take a moment to review that.
16     I think this is the late 2019 exchange that you
17     were talking about.
18 A   There's no print or anything.
19 Q   So let's go to the first page. At the very top
20     do you see where the date is Thursday, December
21     26th, 2019, at 3:05 p.m.?
22 A   Yes.
23 Q   And this is from Mike Kiesler to you, correct?
24 A   Yes.
25 Q   And I believe the chat means that this is a text

Page 132

1     exchange?
2 A   Possible.
3 Q   It looks like Mike's cell phone is listed there
4     under the from, 608-212-7825. Do you see that?
5 A   Yes.
6 Q   And Mike says, "Hi, Stacy, hope you had a
7     wonderful Christmas" -- and I assume that square
8     used to be some type of emoji -- "and are
9     enjoying the warm temps. Is it okay that I use
10     your signature stamp on the consent resolution
11     for the buy back of the children's trust
12     shares." Do you see that?
13 A   Yes.
14 Q   And is this the exchange you were talking about
15     before in late 2019 where someone asked for your
16     approval to use the stamp?
17 A   Yes.
18 Q   Do you remember that particular request from
19     Mike or just now remember it because you see the
20     document?
21 A   I remember that Reed and Mike were trying to get
22     ahold of me all day, and I wasn't answering
23     their calls.
24 Q   If you flip -- go ahead.
25 A   And I believe I said, no, when I finally did

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 133

1  answer it.
2 Q  So if you flip to page 2, there's a response
3  from you. It looks like at 4:15 p.m. Do you
4  see that?
5 A  Mm-hmm.
6 Q  And you said, "No," correct?
7 A  Mm-hmm.
8 Q  It looks like the next response, if you go to
9  the next page, Mike two minutes later texts back
10  and says, "Are you just kidding?" Do you see
11  that?
12 A  Yup.
13 Q  And then shortly after you responded at 4:18
14  p.m. you texted back and said, "No, I am not
15  kidding. I cannot talk right now. I'm under
16  some extreme pressure right now. This will have
17  to wait." Do you see that?
18 A  Mm-hmm.
19      MS. POLAKOWSKI: That's a "yes,"
20  Stacy?
21      THE WITNESS: Yes.
22  BY MR. CHURCHILL:
23 Q  Do you remember what your extreme pressure was
24  at the time?
25 A  Yes.

---

Page 134

1 Q  What was it?
2 A  I can't -- I really would rather not talk about
3  it.
4 Q  Okay.
5      MS. POLAKOWSKI: Stacy, do you need to
6  take a break?
7      MR. CHURCHILL: Do you need a break?
8      THE WITNESS: Yes. Can I for a few
9  minutes?
10      MR. CHURCHILL: Yes.
11      THE VIDEOGRAPHER: We will go off the
12  record. The time is 1:24 p.m.
13      (Brief recess taken.)
14      (Exhibit No. 10 was marked.)
15      THE VIDEOGRAPHER: We are back on the
16  record. The time is 1:39 p.m.
17  BY MR. CHURCHILL:
18 Q  Okay. Ms. Randall, I wanted to go back and talk
19  about Exhibit 9 again. That was the email or
20  the text exchange between you and Mike. Do you
21  have that?
22 A  Yes, I do.
23 Q  At the time that you were texting with
24  Mr. Kiesler in late December 2019, did you know
25  what his reference was to the consent resolution

---

Page 135

1  for the buy back of the children's trust shares?
2 A  No, I did not.
3 Q  Do you recall whether your brother Reed had
4  reached out to you earlier that day on this
5  issue?
6 A  I believe he did.
7 Q  You have been handed what's been marked for
8  identification as Exhibit 10 to your deposition.
9  And this looks like it's a colored picture of a
10  screenshot from your phone. Do you agree with
11  that?
12 A  Yes.
13 Q  That is your phone, right?
14 A  I'm not sure because it says "Reed Widen" at the
15  top. Maybe it's his phone.
16 Q  This was produced by you. Do you see the Bates
17  number on the bottom is Randall390? And if I
18  understand it correctly, your brother Reed's
19  communication in this text string are on the
20  left-hand side of the phone and your responses
21  are on the right-hand side. Do you agree with
22  that?
23 A  Well, his are black and mine is green.
24 Q  So his black ones are leaning to the left and
25  your green ones are leaning to the right?

---

Page 136

1 A  Correct.
2 Q  So it looks like on December 26th, 2019, at 9:21
3  a.m., which would have been the same morning
4  that Mike texted you, Reed wrote and said, "Can
5  you talk to Mike Kiesler? We need your
6  signature." Do you see that?
7 A  Yes.
8 Q  Is that the communication that you were
9  remembering that he made on this issue earlier
10  in the day?
11 A  Yes.
12 Q  Did he talk to you by telephone as well?
13 A  I cannot remember.
14 Q  Is this the type of communication that you would
15  get from Reed from time to time regarding a need
16  to get your signature?
17      MS. POLAKOWSKI: Objection. Form.
18  Vague.
19      THE WITNESS: I normally didn't get
20  things from Reed for signature.
21  BY MR. CHURCHILL:
22 Q  Do you recall another time that Reed texted you
23  asking you for your signature on something other
24  than Exhibit 10?
25 A  I do not recall that.

---

Page 137

1 Q   And then I'm going to combine the two documents
2     for purposes of giving a time chronology here.
3     So it looks like after you responded to Mike at
4     4:15 p.m., that was part of Exhibit 9, when you
5     said, no, you then responded to your brother
6     Reed and said, "Sorry, I can't talk right now."
7     Do you see that?
8 A   Yes.
9 Q   And I don't think we know the exact time frame
10    of his responses, but he responds after you and
11    says, "Call me soon." Do you see that?
12 A   Yes.
13 Q   "Can you talk," and then he says, "Call me,
14    please. I have only tomorrow left to get your
15    signature." Do you see that?
16 A   Yes.
17 Q   You agree that your brother was trying to get
18    your signature for purposes of signing some
19    documents, correct?
20 A   Yes.
21 Q   And you agree that Mike Kiesler was trying to
22    get your signature and asking for your
23    signature?
24 A   Yes.
25 Q   And then at 6:01 p.m. still December 26th your

Page 138

1     brother Reed says, "Are you okay? Can I help
2     you somehow?" Do you see that?
3 A   I do.
4 Q   And then it doesn't look like you texted back in
5     this thread because the next communication is
6     from March the 3rd, 2020. Do you agree with
7     that?
8 A   Yes.
9 Q   Do you recall if you called your brother on the
10    phone in response to his question about whether
11    you were okay and can I help you somehow?
12 A   I don't know for sure who called who, if I
13    called him or he called me.
14 Q   But you did speak to him about what was
15    troubling you?
16 A   No. I did not.
17 Q   Did you ultimately give your consent that was
18    being requested on December 26th that you
19    originally said no to?
20 A   Yes, I did.
21 Q   And was there a business related reason to you
22    initially saying no to the request to use your
23    signature stamp?
24         MS. POLAKOWSKI: Objection. Form.
25    Vague.

Page 139

1 BY MR. CHURCHILL:
2 Q   Do you understand my question?
3 A   No.
4 Q   You originally said no, correct?
5 A   Right.
6 Q   And was that a personal reason as opposed to a
7     business reason related to Widen Enterprises or
8     Windy Waters?
9 A   I think it may have been a little bit of both.
10 Q   Were you -- I didn't want to ask you why you
11    were upset, but now I'm going to have to ask
12    you. What was the reason that you were upset?
13 A   I don't want to talk about it.
14 Q   If it's a business related reason to the request
15    for signature, I'm going to have to ask you to
16    respond. If it's not related to the request for
17    signature at all, then I don't need to try and
18    we don't need to know. But understand that if
19    it's related at all to your saying no to the
20    request for the signature, like if you had a
21    reason that should have prevented them from
22    using your signature, I need to ask you to
23    provide that reason, please.
24 A   I didn't know what they needed my signature for.
25 Q   Okay.

Page 140

1 A   They were just asking for my signature.
2 Q   Okay.
3 A   And I wasn't -- I don't feel I was in my right
4     state of mind to be signing documents or giving
5     a signature.
6 Q   And why do you say that?
7 A   Because I was extremely -- it was an extremely
8     bad day for me.
9 Q   Okay. Did the badness of the day have to do at
10    all with the business of the company?
11 A   No.
12 Q   Okay. And that's what I meant when I was asking
13    before about a business related reason. So was
14    the badness of the day a personal reason?
15 A   Yes.
16         MS. POLAKOWSKI: Can we just take a --
17         MR. CHURCHILL: Sure.
18 BY MR. CHURCHILL:
19 Q   Do you need a moment, Ms. Randall?
20 A   No, I'm okay.
21 Q   You understand why I have to ask you the
22    question, right? You understand why I have to
23    ask you the question?
24 A   About why I was so upset that day?
25 Q   Just about whether or not it was a business

---

Page 141

1 reason because I just need to know whether or
2 not there was a reason related to the actual
3 request that caused you to say no. And I think
4 you're saying that that's not the case. It was
5 a personal issue.
6 A I didn't know why they needed my signature.
7 They were pressuring me for my signature, and I
8 didn't know why, and I wanted to know why.
9 Q But Mike Kiesler was offering to tell you why,
10 correct?
11 A I never talked to Mike.
12 Q When you ultimately gave your consent to use the
13 signature stamp, did you do that by telephone or
14 by text?
15 A I don't remember. I don't remember.
16 Q Do you remember asking any questions about what
17 the use of the signature stamp was for other
18 than the issue that Mike raised in Exhibit 9
19 concerning the consent resolution for the buy
20 back of the children's trust shares?
21 A I asked no questions.
22 Q Did you look at the entire document that your
23 stamp was going to be affixed to or attached to?
24 A No.
25 Q Did you ask for it?

---

Page 142

1 A I did not.
2 Q Did you understand what was happening through
3 that document that your stamp was being applied
4 to, in other words, the purpose of the document?
5 MS. POLAKOWSKI: Objection. Form.
6 Calls for a legal conclusion.
7 THE WITNESS: I didn't see or read it.
8 BY MR. CHURCHILL:
9 Q Did you understand, however, what the actual
10 document was intending to do in terms of the
11 consent resolution for the buy back of the
12 children's trust shares?
13 MS. POLAKOWSKI: Same objections.
14 THE WITNESS: I did not know that.
15 BY MR. CHURCHILL:
16 Q Did you think it was important to review that
17 document at the time?
18 A At the time, no.
19 Q And you knew that providing your consent to use
20 the stamp meant that your stamp was a
21 substitution for your ink signature, correct?
22 MS. POLAKOWSKI: Objection. Calls for
23 a legal conclusion.
24 THE WITNESS: I don't know what I was
25 thinking that day.

---

Page 143

1 BY MR. CHURCHILL:
2 Q Did you know that you were giving your approval?
3 A I felt I was being pressured to give my
4 approval.
5 Q Did you tell anybody that you felt like you were
6 being pressured to give your approval?
7 A No.
8 Q Did -- was there any other communication with
9 respect to -- strike that.
10 You said you didn't remember how you
11 ultimately gave your approval?
12 A No.
13 Q No, meaning you don't remember?
14 A No, I don't remember.
15 Q So you don't remember there being any additional
16 pressure provided either, correct?
17 MS. POLAKOWSKI: Objection.
18 Mischaracterizes her testimony.
19 THE WITNESS: I don't remember that.
20 BY MR. CHURCHILL:
21 Q Would it be fair to say that you and Reed, your
22 brother Reed, have had an up and down
23 relationship?
24 MS. POLAKOWSKI: Object to form.
25 Vague.

---

Page 144

1 BY MR. CHURCHILL:
2 Q Do you know what I mean by "up and down"?
3 A Will you please explain to me what you mean by
4 up and down?
5 Q Sure. So if I'm asking you about your
6 relationship with Reed, would you say that
7 sometimes you guys get along well and sometimes
8 you don't get along well?
9 MS. POLAKOWSKI: Objection. Form. Is
10 there a time frame you're asking about?
11 BY MR. CHURCHILL:
12 Q How about let's do your entire relationship with
13 Reed to start and then we can narrow it down.
14 Would you say that sometimes you guys have
15 gotten along well and sometimes you haven't?
16 A Yes.
17 Q Would you agree that on occasion Reed has looked
18 out for you?
19 A No.
20 Q How did you take his comment in Exhibit 10 at
21 6:01 p.m. where he says, "Are you okay? Can I
22 help you somehow?" How did you take that or how
23 did you interpret that?
24 A I don't remember.
25 Q Are you saying that Reed was not showing some

---

Confidential

Page 145

1    concern about the way you were feeling?
2            MS. POLAKOWSKI: Objection.  Form.
3    Mischaracterizes her testimony.
4            THE WITNESS: I don't know what Reed
5    was thinking or feeling that day.  He's a
6    manipulator.
7    BY MR. CHURCHILL:
8    Q    And you don't remember that particular comment
9        anyhow, correct?
10           MS. POLAKOWSKI: Object to form.
11           THE WITNESS: I don't -- I don't
12   remember it.
13   BY MR. CHURCHILL:
14   Q    Has Reed not looked out for you over the years
15       by helping you financially?
16   A    No, he has not.
17   Q    Reed has never helped you out financially?
18           MS. POLAKOWSKI: Objection.  Form.
19   Mischaracterizes her testimony.
20           THE WITNESS: How do mean financially?
21   BY MR. CHURCHILL:
22   Q    When you needed help, has Reed found a way to
23       help you out financially?
24           MS. POLAKOWSKI: Objection.  Form.
25   Assumes facts not in evidence.

Page 146

1            THE WITNESS: Personally or through
2    business he -- after I asked for some money from my
3    stock, first he would blow up at me because this is
4    ridiculous and we're not a bank and blah, blah, blah,
5    and then he would eventually tell me to talk to
6    Kiesler.
7    BY MR. CHURCHILL:
8    Q    And what did you understand him to mean when he
9        said we're not a bank?
10           MS. POLAKOWSKI: Objection.  Calls for
11   speculation.
12           THE WITNESS: I'm not sure what Reed
13   was thinking when he said that.
14   BY MR. CHURCHILL:
15   Q    That's not really what I asked.  I'm asking what
16       did you understand him to mean, not what he
17       actually meant.  What did you understand his
18       comment to mean?  I'm asking for your
19       understanding.
20   A    I was thinking that they don't have money to be
21       giving me.
22   Q    Did you ever say to him, well, the companies are
23       a bank or something to that effect?
24   A    No, I did not say that.
25   Q    Did you understand his response -- did that mean

Page 147

1    to you that you felt that he was annoyed with
2    you?
3    A    When he was asking, are you okay, can I help
4    you?
5    Q    No, the comment about the bank.
6    A    Yes.
7    Q    Do you feel like you treated the companies like
8        a bank?
9    A    No, I did not.
10   Q    After the creation of the stamp, were you aware
11       that it was being used from time to time?
12   A    No.
13           MS. POLAKOWSKI: Objection.  Form.
14   Vague.
15   BY MR. CHURCHILL:
16   Q    So after its creation, which we don't have
17       pinpointed exactly, but let's just say after its
18       creation until when you ultimately redeemed the
19       rest of your shares in May of 2020, you were not
20       aware that the stamp was being used from time to
21       time?
22   A    I was never called, text, or emailed to find out
23       if they could use my stamp.  So I did not know
24       that they were using my stamp.
25   Q    Regardless of whether you were called or texted,

Page 148

1    did you know it was being used?
2            MS. POLAKOWSKI: Objection.  Asked and
3    answered.
4            THE WITNESS: No.  I did not know it
5    was being used.
6    BY MR. CHURCHILL:
7    Q    Did you ever tell anyone after the stamp was
8        created to stop using your stamp?
9            MS. POLAKOWSKI: Objection.  Calls for
10   speculation.
11           THE WITNESS: I don't believe so.
12   BY MR. CHURCHILL:
13   Q    Did you ever suspect that the stamp was being
14       used without your approval after its creation?
15   A    I don't think I ever really thought about it.
16   Q    Did you ever receive copies of documents that
17       may have had your stamp on it, but you just
18       didn't look at the documents?
19           MS. POLAKOWSKI: Objection.  Calls for
20   speculation.
21           THE WITNESS: I did not receive
22   documents.
23   BY MR. CHURCHILL:
24   Q    You never received any documents?
25   A    Not with my stamp on it, no.

Page 149

1 Q   What kind of documents did you receive?
2       MS. POLAKOWSKI: Objection. Vague.
3       THE WITNESS: I can't think of any.
4   Probably nothing else.
5   BY MR. CHURCHILL:
6 Q   I took from your last answer that maybe you did
7       receive documents. So, again, let's pinpoint it
8       after the creation of the stamp. Did you ever
9       receive documents from the companies either
10      Windy Waters or Widen Enterprises?
11 A   No, not that I can recall.
12 Q   What about related to your taxes that you had to
13      file, did you receive documents related -- from
14      the companies related to your taxes that you had
15      to file?
16      MS. POLAKOWSKI: Object to form.
17      THE WITNESS: I think I did.
18   BY MR. CHURCHILL:
19 Q   And what do you think those were, what documents
20      would they have been?
21      MS. POLAKOWSKI: Objection. Form.
22   Calls for speculation.
23   BY MR. CHURCHILL:
24 Q   Are you thinking of official tax documents like
25      your K-1 or something like that, or are you

Page 150

1       thinking of something different?
2 A   I got -- I got stuff for the cottage.
3 Q   What kind of stuff did you get for the cottage?
4 A   I don't know. I look at it and -- I'm not an
5       accountant. I don't know.
6 Q   And when you say stuff for the cottage, you mean
7       the cottage that was part of Milmont, LLC?
8 A   Yes.
9 Q   And you understand that Milmont, LLC, is a
10      different corporate entity than Windy Waters and
11      Widen Enterprises, correct?
12      MS. POLAKOWSKI: Objection. Calls for
13   a legal conclusion.
14   BY MR. CHURCHILL:
15 Q   Do you understand that?
16 A   I realize it's a different LLC, yes.
17 Q   Any other documents that you received
18      specifically -- sorry, not any other. I don't
19      think we have heard any documents yet. You
20      think you may have received some documents from
21      Windy Waters or Widen Enterprises. I'm trying
22      to figure out if you remember what they may have
23      been.
24 A   I believe I got things from the company for -- I
25      don't know, for tax reasons. I just knew I had

Page 151

1       to send it off to my accountant.
2 Q   But those documents came to you first as far as
3       you remember?
4 A   Yes.
5 Q   Did you ever review the documents that you got
6       before sending them to your accountant?
7 A   No, I did not.
8 Q   Do you remember at all what type of documents
9       they would be or when you received them?
10 A   When I received them was random. It was never
11      at the same time. I'm not sure what -- I don't
12      know what.
13 Q   Do you remember if you filed taxes at a
14      particular time each year?
15 A   I did not file taxes at a particular time each
16      year.
17 Q   Did you have your own accountant to help you
18      with taxes?
19 A   Yes.
20 Q   And who would that have been?
21 A   Scott Spangler. I still haven't filed my taxes
22      this year.
23 Q   When you got documents from the company for
24      purposes of taxes, did you then forward them to
25      Scott Spangler?

Page 152

1 A   I -- I had a folder that I put everything in,
2       so, no.
3 Q   When you say you had a folder, do you mean like
4       an electronic folder?
5 A   No. I do nothing electronically like that. I
6       don't know how.
7 Q   So how did you get the documents to
8       Mr. Spangler?
9 A   I had a folder that I put anything that I
10      thought had to do with taxes in this folder, and
11      I would take it to him when I got everything.
12 Q   And is Mr. Spangler still your accountant today?
13 A   Yes.
14 Q   Is he located in -- I'm going to mispronounce
15      it, Stoughton?
16 A   Stoughton. It's very Norwegian.
17 Q   Stoughton.
18 A   Stoughton.
19 Q   And is he with H&R Block still?
20 A   Yes, he is.
21 Q   And how long has he been your accountant, if you
22      remember?
23 A   Since I came back from Florida. Let me see.
24      Probably since '15.
25 Q   And 2015 is roughly when you moved back from the

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 153

1  Tampa area?
2  A  No.  We moved back in '11 or '12.  We had an
3     accountant in Florida that we used.
4  Q  And who was that?
5  A  I don't know his name.  My husband took care of
6     all that stuff.
7  Q  Do you remember the name of the firm if it was a
8     firm?
9  A  He worked out of his house.
10 Q  And so you started using Scott Spangler roughly
11    in 2015?
12 A  Yes.
13 Q  Who did you use in Wisconsin between the time
14    when you moved back and 2015, if anyone?
15 A  We used the guy in Florida.
16 Q  You still used the person in Florida?
17 A  For like three or four years, but it became
18    pretty obvious that he didn't know Wisconsin law
19    and taxes.
20 Q  And so did you use the same procedure with the
21    accountant in Florida that you did with
22    Mr. Spangler, you would send hard copies to him
23    in Florida?
24 A  My husband took care of all that.  I'm not sure
25    what he did.

---

Page 154

1  Q  When you say all of that, that would have
2     included any documents that you had from Windy
3     Waters or Widen Enterprises that you needed to
4     submit for tax purposes, correct?
5         MS. POLAKOWSKI: Object to the extent
6  it calls for speculation.
7         THE WITNESS: Can you repeat that
8  question, please?
9         MR. CHURCHILL: Can you read it back?
10        (Last question read back.)
11        MS. POLAKOWSKI: Also object to the
12 extent it calls for a legal conclusion.
13        THE WITNESS: My husband got the mail.
14 That was like his job.  So I don't know what all he
15 sent to the tax accountant.  Anything that came in
16 the mail, I guess.
17 BY MR. CHURCHILL:
18 Q  Did you understand him to be submitting your
19    documents related to Windy Waters and Widen
20    Enterprises for tax purposes to your accountant?
21 A  Yes.
22 Q  It was his responsibility to do it?
23 A  Yeah.  He took care of the taxes, took care of
24    all the money.
25 Q  Is there something that would jog your memory on

---

Page 155

1  the name of that Florida accountant?
2  A  I never talked to him.  I don't know.
3  Q  You never talked to him?
4  A  No.
5  Q  When you and your husband did your taxes back
6     when you were living in Florida, did you go meet
7     personally with the accountant to review the
8     taxes before signing?
9  A  I did not go, but Steve went.
10 Q  Didn't you have to sign your return?
11 A  I did, but he probably brought it home to me.  I
12    don't remember.
13 Q  You can put that one to the side.  Ms. Randall,
14    can you go back to Exhibit 6 again.  That's the
15    second amendment to the shareholder agreement
16    with the consent on the first page.  This is the
17    one we were looking at when we were looking at
18    your signature.
19 A  Okay.
20 Q  So I think I didn't quite finish a couple
21    questions that I had about this one.  In part
22    because you didn't remember whether or not you
23    signed this document, correct?
24 A  Correct.
25 Q  So I take it you don't have a memory of

---

Page 156

1  reviewing the document?
2  A  No, I do not.
3  Q  If you signed this document yourself in 2007,
4     would you have reviewed it before signing it?
5         MS. POLAKOWSKI: Objection.  Calls for
6  speculation.
7         THE WITNESS: I was living in Florida
8  at the time.  I don't remember reviewing it.
9  BY MR. CHURCHILL:
10 Q  Do you think you would have reviewed it before
11    signing?
12        MS. POLAKOWSKI: Same objection.
13 Asked and answered.
14        THE WITNESS: I probably would have
15 reviewed it, but I -- I wouldn't understand it.
16 BY MR. CHURCHILL:
17 Q  Do you recall whether or not you had an attorney
18    look at this document?
19 A  I did not have an attorney.
20 Q  Would it have been important for you to review
21    it before signing it?
22        MS. POLAKOWSKI: Object to form.
23 Vague.
24        THE WITNESS: What do you mean by
25 "important"?

---

Page 157

1  BY MR. CHURCHILL:
2  Q   Well, if you were going to sign a document,
3      would it be important for you to review it
4      before signing it?
5          MS. POLAKOWSKI: Same objection.
6          THE WITNESS: I would have to say
7  that -- I would have to say, no, because I don't --
8  so much legal words, and I wouldn't understand it
9  anyways.  I would need a lawyer.
10  BY MR. CHURCHILL:
11  Q   Say that last part.  I didn't understand.
12  A   I would need a lawyer.
13  Q   But you don't remember getting a lawyer for
14      purposes of reviewing this document, correct?
15  A   I did not get a lawyer.
16  Q   Let me have you look at page 2, again, which is
17      the first page of the agreement.
18  A   Yes.
19  Q   Again, this document is dated May 7, 2007,
20      right?
21  A   Yes.
22  Q   And this is the document that has a signature
23      for you under president.  Do you remember going
24      over that before?
25  A   Yes.

Page 158

1  Q   So on the first page of the agreement, which is
2      Windy33092, do you see under the recitals there
3      are three paragraphs and two number twos for
4      some reason?
5  A   Yes, I do see that.
6  Q   I think we call that a typo.  So that probably
7      should have been a 3.  Let me go through those
8      recitals with you.
9          So the first paragraph reads, "The
10      shareholders entered into a shareholder
11      agreement under the name of Widen
12      Colourgraphics, LTD, as of March 1, 1992, which
13      agreement was made applicable to the corporation
14      with an amendment of shareholders agreement
15      dated effective September 12, 2001."  And then
16      it says, "together, the shareholder agreement."
17      Do you see that?
18  A   Yes.
19  Q   And then under paragraph 2 it states, "The
20      corporation has established a formula for the
21      determination of the fair market value of the
22      stock that it has used for previous stock
23      transactions."  Do you see that?
24  A   Yes.
25  Q   And do you know what that's a reference to?

Page 159

1          MS. POLAKOWSKI: Objection.
2  Foundation.
3          THE WITNESS: I do not.
4  BY MR. CHURCHILL:
5  Q   The second paragraph 2, but should have been
6      paragraph 3, reads, "The shareholders desire to
7      amend the shareholder agreement to adopt such
8      formula as the basis for determining the fair
9      market value of the stock."  Do you see that?
10  A   Yes.
11  Q   And there's another document that's included in
12      this or attached as a part of this agreement.
13      It's an Exhibit C.  So if you flip to the page
14      after your signature titled Exhibit C, do you
15      see that?
16  A   Yes.
17  Q   Okay.  And that Exhibit C, this is Windy33095
18      titled, "Exhibit C Fair Market Value Per Share
19      Calculation."  Do you see that?
20  A   Yes.
21  Q   And then there's a bunch of words and some
22      numbers and something referred to the weighted
23      average EBITDA.  Do you see that as well?
24  A   Yes.
25  Q   Have you seen Exhibit C before?

Page 160

1  A   I don't believe so.  I don't recall.
2  Q   If you signed this agreement in 2007, would you
3      have reviewed the exhibits that were attached to
4      the agreement?
5          MS. POLAKOWSKI: Objection.  Calls for
6  speculation.  Assumes facts not in evidence.
7          THE WITNESS: I don't think that I saw
8  this.
9  BY MR. CHURCHILL:
10  Q   Do you remember generally at this time in 2007 a
11      discussion about amending the shareholder
12      agreement?
13  A   I don't remember anything about that.
14  Q   Do you remember anything about amending the
15      shareholder agreement to formalize a formula?
16          MS. POLAKOWSKI: Objection.  Vague as
17  to timing.
18          THE WITNESS: I don't remember.  I
19  wasn't told about most of this stuff.
20  BY MR. CHURCHILL:
21  Q   You agree that if you did sign the 2007
22      agreement, that you would have been agreeing to
23      the statements in the agreement, correct?
24          MS. POLAKOWSKI: Objection.  Calls for
25  a legal conclusion.  Calls for speculation.

Page 161

1    THE WITNESS: I wouldn't understand
2 all this. I don't know whatever it is EBITDA.
3 BY MR. CHURCHILL:
4 Q   But would you have understood if you signed that
5    you were agreeing to the contents of the
6    agreement even if you didn't understand it
7    yourself?
8    MS. POLAKOWSKI: Same objections.
9 Legal conclusion. Calls for speculation.
10    THE WITNESS: I don't know.
11 BY MR. CHURCHILL:
12 Q   The reference in the recitals to this first
13    paragraph 2, the fact that, "The corporation has
14    established a formula for the determination of
15    the fair market value of the stock that it has
16    used for previous stock transactions." That's a
17    reference to one of your prior stock
18    redemptions; isn't it?
19    MS. POLAKOWSKI: Objection. Calls for
20 speculation. Calls for a legal conclusion.
21    THE WITNESS: I have no idea what it's
22 in reference to.
23    MR. CHURCHILL: Hold that off to the
24 side, not too far because we might need to look at it
25 again, and I'm going to give you a new document.

Page 162

1    (Exhibit No. 11 was marked.)
2 BY MR. CHURCHILL:
3 Q   Ms. Randall, you have been handed what's been
4    marked as Exhibit 11 for identification. Take a
5    look, and then I want to ask you a few questions
6    about it.
7 A   Okay.
8 Q   And for the record, this is a document labeled
9    Windy688 through 692. Ms. Randall, this
10    document is titled, "Stock Redemption
11    Agreement." Do you see that on the first page?
12 A   Yes, I do.
13 Q   And the date listed is September 2, 2005, with
14    an effective date of January 30, 2005. Do you
15    see that?
16 A   Yes, I do.
17 Q   And this is a written agreement between Windy
18    Waters, Inc., and Stacy Randall, correct?
19 A   It looks like that, yes.
20 Q   And do you have a recollection of signing this
21    document?
22 A   No, I do not.
23 Q   If you look at page 3 of the exhibit, which is
24    Windy690 --
25 A   Yes.

Page 163

1 Q   -- do you see your signature?
2 A   Yes.
3 Q   It looks like another version of your signature?
4 A   That's my signature.
5 Q   This is the one you were using at the time?
6 A   I don't know.
7 Q   You don't have any reason to believe that
8    somebody else signed this for you?
9 A   That looks like my signature.
10 Q   And do you remember getting $200,000 by
11    redeeming some shares in Windy Waters in
12    September time frame of 2005?
13 A   I don't remember when I got it. I remember that
14    I got it.
15 Q   You do remember getting $200,000?
16 A   I don't specifically remember the amount.
17 Q   Do you remember -- I'm sorry. Go ahead.
18 A   There were several amounts of money that I got
19    different amounts. I don't recall when or how
20    much.
21 Q   So let me -- I'm going to try to get you to
22    remember what was happening in your life back in
23    '05. So do you remember needing money?
24    MS. POLAKOWSKI: Object to form.
25 Vague.

Page 164

1    THE WITNESS: Only time I ever asked
2 for money was because I needed it.
3 BY MR. CHURCHILL:
4 Q   So do you remember asking for some amount of
5    money from anyone related to the companies in
6    2005?
7 A   I can't say when it was.
8 Q   Do you remember who you asked?
9 A   I probably asked Reed.
10 Q   And do you remember anything about the
11    conversation?
12 A   "Talk to Kiesler" is what he would always say.
13 Q   So he said, "Talk to Kiesler." And did you say,
14    I want to redeem shares in Windy Waters, or did
15    you leave it more open than that?
16 A   I said I would like to get some money from my
17    stock.
18 Q   For your stock in Windy Waters?
19 A   I'm not sure where my stock was from.
20 Q   Did Milmont exist at this time?
21 A   Yes.
22 Q   Did you ask for money from Milmont, or did you
23    ask for money from Windy Waters?
24 A   I asked -- I just asked for stock.
25 Q   And you knew then that would mean that you would

Stacy L. Randall v                                  **Confidential**                              Stacy L. Randall
Reed C. Widen, et al.                                                                          August 28, 2023

---

Page 165

1    sell some of your stock and get money in return?
2  A   Correct.
3  Q   And if you look in the recitals in Exhibit No.
4      11, you will see in recital A that there is a
5      statement of the stock that you then owned.  If
6      you go on -- go on the first page, Ms. Randall,
7      of the exhibit -- I'm looking at recitals
8      paragraph A, very first page --
9  A   Okay.
10 Q   -- do you see where it says, "Randall is the
11     owner of two hundred thirty-two and 75/100
12     shares of Class A voting common stock."
13 A   I see that.
14 Q   And five thousand six thirty-three and 90.25/100
15     shares of Class B nonvoting common stock, do you
16     see that as well?
17 A   Yes, I do.
18         MS. POLAKOWSKI: Just so the record is
19     clear, I think you said 5,033.
20         MR. CHURCHILL: I should have said 63.
21 BY MR. CHURCHILL:
22 Q   So 5,063.9025.  Do you see that?
23 A   Yes.
24 Q   Do you remember when we were looking at the
25     chart before of your stock ownership, and it had

---

Page 166

1      the columns?
2  A   Yes.
3  Q   And do you understand that by entering into this
4      agreement you decided to redeem some of your
5      Class B nonvoting shares of stock?
6         MS. POLAKOWSKI: Objection.  Form.
7      Calls for a legal conclusion.
8         THE WITNESS: I did not know that.
9  BY MR. CHURCHILL:
10 Q   Did you specify what shares you wanted to
11     redeem?
12         MS. POLAKOWSKI: Objection.  Form.
13         THE WITNESS: I didn't know that I had
14     different shares.  I didn't have the information to
15     specify which share I wanted.
16 BY MR. CHURCHILL:
17 Q   Did you review this 2005 Stock Redemption
18     Agreement before signing it?
19         MS. POLAKOWSKI: Objection.  Form.
20         THE WITNESS: I can't specifically
21     remember.  This --
22 BY MR. CHURCHILL:
23 Q   You were redeeming --
24 A   -- long time ago.
25 Q   You were redeeming shares for $200,000.  Do you

---

Page 167

1      think you reviewed it?
2         MS. POLAKOWSKI: Same objection.
3      Asked and answered.
4         THE WITNESS: I was probably just
5      given the signature page.
6  BY MR. CHURCHILL:
7  Q   Well, you said that was something that your dad
8      did.  Was that something that other people did
9      to you as well?
10 A   Yes.
11 Q   Do you know for sure that you were only given
12     the signature page or you're speculating?
13 A   I do not know for sure.
14 Q   Was it important for you to review a document
15     like this?
16         MS. POLAKOWSKI: Objection.  Form.
17     Calls for a legal conclusion.
18         THE WITNESS: I didn't know the
19     importance of -- the importance or unimportance of
20     any document.
21 BY MR. CHURCHILL:
22 Q   Well, in 2007 -- or excuse me, in 2005 you were
23     going to get $200,000 from redeeming shares.
24     What I'm asking you is at the time was it
25     important to you to review the document before

---

Page 168

1      signing it?
2         MS. POLAKOWSKI: Same objection.
3      Calls for a legal conclusion.  Vague.
4         THE WITNESS: No.
5  BY MR. CHURCHILL:
6  Q   Why not?
7  A   I trusted my brother and Mike Kiesler.
8  Q   So do you have a recollection of reviewing how
9      many shares you were redeeming in order to be
10     paid $200,000?
11 A   No.  I don't remember.
12 Q   Did you understand that there was some type of
13     computation involved in order to decide how many
14     shares you would redeem in order to be paid
15     $200,000?
16         MS. POLAKOWSKI: Objection.  Calls for
17     speculation.  Assumes facts not in evidence.
18         THE WITNESS: I don't understand the
19     question.
20         MR. CHURCHILL: Can you read it back?
21         (Last question read back.)
22         MS. POLAKOWSKI: I will restate my
23     objections.
24         THE WITNESS: No.
25 BY MR. CHURCHILL:

---

Page 169

1  Q    You knew that there was a value that was being
2       assigned to those shares, correct?
3  A    I wasn't aware that there was a value.
4  Q    Didn't you understand that you were going to
5       sell back some shares?  In other words, you were
6       losing some shares that you had owned in order
7       to get the money?
8            MS. POLAKOWSKI: Objection.  Calls for
9  a legal conclusion.
10           THE WITNESS: I believe that's
11 probably what I thought.
12 BY MR. CHURCHILL:
13 Q    And so, therefore, you knew that there was a
14      value that those shares had, that in order to
15      get a certain price each share had a value.  You
16      knew that, didn't you?
17           MS. POLAKOWSKI: Objection.
18 Mischaracterizes her testimony.  Assumes facts not in
19 evidence.
20           THE WITNESS: I don't believe I knew
21 that.
22 BY MR. CHURCHILL:
23 Q    Did you think at the time that if you sold more
24      of your shares you would get more money?
25           MS. POLAKOWSKI: Objection.  Calls for

Page 170

1  speculation.
2            THE WITNESS: I don't know what I
3  thought at that time.
4  Q    Did you think if you sold less of your shares
5       you would get less money?
6            MS. POLAKOWSKI: Objection.  Calls for
7  speculation.
8            THE WITNESS: I don't know what I was
9            THE WITNESS: I don't know what I was
10 thinking at that time.
11 BY MR. CHURCHILL:
12 Q    So it's your testimony that you didn't care what
13      you were being paid for the shares that you were
14      redeeming?
15           MS. POLAKOWSKI: Objection.
16 Mischaracterizes her testimony.
17           THE WITNESS: I did not say that.
18 BY MR. CHURCHILL:
19 Q    Did you care?
20           MS. POLAKOWSKI: Objection.  Form.
21           THE WITNESS: I never thought about
22 it.
23 BY MR. CHURCHILL:
24 Q    Did you wonder if your shares had value?
25           MS. POLAKOWSKI: Objection.  Calls for

Page 171

1  speculation.
2            THE WITNESS: I guess I figured that
3  they did because I was getting money by cashing in my
4  stock.
5  BY MR. CHURCHILL:
6  Q    Did you wonder what the value that you were
7       being paid was based on?
8            MS. POLAKOWSKI: Objection.  Calls for
9  speculation.
10           THE WITNESS: No, I did not.
11 BY MR. CHURCHILL:
12 Q    Did you ask anyone?
13 A    No, I did not.
14 Q    Were you happy with the $200,000 that you
15      received?
16 A    I believe I asked for it.  So, yes, I was happy.
17 Q    And when you say you believe asked for it, do
18      you mean that you asked for a specific sum?
19 A    Yes.
20 Q    So is it your understanding that you specified
21      the amount and someone else determined how many
22      shares that meant you would redeem?
23 A    Yes.
24 Q    Do you remember why the amount $2,000 was chosen
25      by you -- $200,000 was chosen by you?

Page 172

1  A    I needed money.
2  Q    Why 200,000?
3  A    That I'm not sure of.
4  Q    Do you recall anything about a negotiation with
5       anyone in order to reach this agreement?
6  A    No, I don't remember.
7  Q    Did you have an attorney representing you?
8  A    No.  I did not.
9  Q    Did the companies have an attorney representing
10      them?
11           MS. POLAKOWSKI: Objection.
12 Foundation.
13 BY MR. CHURCHILL:
14 Q    Let me strike that.  Did Windy Waters have an
15      attorney representing it?
16           MS. POLAKOWSKI: Same objection.
17           THE WITNESS: I don't know.
18 BY MR. CHURCHILL:
19 Q    Did you meet with any attorneys?
20           MS. POLAKOWSKI: Objection.  Vague.
21           THE WITNESS: No, I did not.
22 BY MR. CHURCHILL:
23 Q    Do you remember that you received the $200,000
24      as a lump sum payment?  Do you know what I mean
25      by lump sum?

Page 173

1 A   Yes, I do.

2 Q   Did you receive the $200,000 as a lump sum

3       payment?

4 A   I think I did.

5 Q   And how did you receive that money?

6 A   In a check.

7 Q   Handed to you?

8 A   I was living in Florida at the time.  So I'm not

9       sure if I was back home or if I was in Florida.

10 Q   And did you talk with Reed about this

11      transaction, if you remember?

12 A   I just told him that I needed $200,000, and he

13      told me to talk to Kiesler.

14 Q   Do you remember any other communications with

15      Reed about it?

16 A   No.

17 Q   Did you say "thank you"?

18 A   No.

19 Q   Now that you have had an opportunity to look at

20      Exhibit 11, Ms. Randall, and you have Exhibit 6,

21      which is that second amendment to the

22      shareholder agreement, right on your right hand,

23      do you agree that this is one of the previous

24      stock transactions that's referenced in

25      paragraph 2 of the recitals of the second

Page 174

1       amendment?

2            MS. POLAKOWSKI: Objection.  Calls for

3   legal conclusion.  Assumes facts not in evidence.

4            THE WITNESS: I don't agree to that

5   because I didn't know.

6   BY MR. CHURCHILL:

7 Q   Because you didn't know what?

8 A   How they were figuring anything out.

9 Q   You agree that the 2005 redemption is a stock

10      transaction, correct?

11           MS. POLAKOWSKI: Objection.  Calls for

12  a legal conclusion.

13           THE WITNESS: Well, I asked them if I

14  could get $200,000 from my stock.  Yes.

15  BY MR. CHURCHILL:

16 Q   And it's your stock transaction, right, from

17      2005?

18 A   Yes.

19           (Exhibit No. 12 was marked.)

20           MR. CHURCHILL: Ms. Randall, you have

21  been handed now by the court reporter what's been

22  marked as Exhibit 12 for identification.  My copy

23  doesn't have a Bates number on it.  What do you have,

24  Jess?

25           MS. POLAKOWSKI: Windy0002954.

Page 175

1   BY MR. CHURCHILL:

2 Q   So the first page is labeled Windy2954.  Take a

3       moment to look at that document, please.

4 A   Okay.

5 Q   Do you recognize this document, Ms. Randall?

6 A   I do not.

7 Q   If you flip to -- well, first of all, just to

8       identify the document further it's titled --

9       Exhibit 12 is titled "Stock Redemption

10      Agreement," which is just like what Exhibit 11

11      was titled, right, Stock Redemption Agreement.

12      But this one is dated August 2, 2007, with an

13      effective date of June 30, 2007.  Do you see

14      that?

15 A   Yes, I do.

16 Q   And I'm just going to refer to it as 2007 Stock

17      Redemption Agreement to distinguish it from

18      2005; is that okay?

19 A   Yes.

20 Q   In this 2007 Stock Redemption Agreement you have

21      a signature here.  Do you see that on page 3?

22 A   Yes, I do.

23 Q   And is that your signature?

24 A   Yes.

25 Q   It's another slightly different form, I think.

Page 176

1       You have no reason to believe that's not your

2       signature?

3 A   No.

4 Q   You this time were paid for redeeming some stock

5       $250,000; is that correct?  If you look at the

6       first page under the second paragraph price and

7       terms.

8 A   It seems like an awful lot that I would have

9       asked for.

10 Q   So you anticipated my next question.  Is the

11      process similar to what happened the last time,

12      the first time in 2005, did you say I need X

13      amount of dollars, and then the determination of

14      the amount of shares was computed?

15 A   I can't remember the amount of money that I

16      asked for.

17 Q   Do you have any reason to believe that you did

18      not ask for $250,000?

19           MS. POLAKOWSKI: Objection.  Calls for

20  speculation.

21           THE WITNESS: I just say that it seems

22  like a lot of money for me to have asked for.

23  BY MR. CHURCHILL:

24 Q   Do you have a memory of this being given to you

25      without you asking?

Page 177

1  A   No.
2  Q   Is it fair to assume that you asked for $250,000
3      or you're just not sure you needed that much?
4  A   I'm just not sure that I needed that much.
5  Q   What was happening in your life at this point in
6      time?  So this is kind of three quarters of the
7      way through '07.
8  A   My husband was in charge of the money.
9  Q   Does that mean that he was the one that needed
10     the 250,000?
11 A   Well, he asked me if I could get whatever amount
12     of money, and I always said yes.
13 Q   You have no reason to believe that you didn't
14     ask for $250,000.  You just don't remember; is
15     that correct?
16 A   I just don't remember.
17 Q   Just like that 2005 agreement, if you look under
18     recitals, there's a statement again of the
19     amount of shares that you owned at the time.  Do
20     you see that?
21     MS. POLAKOWSKI: I'm sorry, are we
22 looking at 12?
23     MR. CHURCHILL: We're looking at 12.
24 You have got 12.
25 BY MR. CHURCHILL:

Page 178

1  Q   I'm having trouble -- my eyes have gotten bad,
2      so I can't see.
3  A   Yeah.  I took my contacts out.  So I can't
4      really see.  What did you want to know?
5  Q   You see under recitals section A there's a
6      statement of the amount of shares that you have,
7      right?  Do you see that?
8  A   Yes.
9  Q   And it looks like your Class A shares are
10     remaining the same still, do you see that?  You
11     still have 232.75 shares?
12 A   Yes.
13     MS. POLAKOWSKI: Objection. Form.
14     THE WITNESS: I see it.
15 BY MR. CHURCHILL:
16 Q   Do you understand that the Class A shares were
17     voting shares as distinguished from nonvoting
18     shares?
19     MS. POLAKOWSKI: Objection. Calls for
20 legal conclusion.
21     THE WITNESS: No.  I had no idea.
22 BY MR. CHURCHILL:
23 Q   You agree that your voting shares have stayed
24     the same, though, from document to document,
25     they are still at 232.75 shares?

Page 179

1      MS. POLAKOWSKI: Same objection.
2      THE WITNESS: That's what they say.
3  BY MR. CHURCHILL:
4  Q   Do you know what the difference is between a
5      voting and a nonvoting stock share?
6      MS. POLAKOWSKI: Objection.
7  Foundation.  Calls for a legal conclusion.
8      THE WITNESS: No.  I don't know the
9  difference.
10 BY MR. CHURCHILL:
11 Q   At this time you were still a member of the
12     board of directors, correct?
13     MS. POLAKOWSKI: Objection.  Assumes
14 facts not in evidence.
15     THE WITNESS: I don't know if I was or
16 not.
17 BY MR. CHURCHILL:
18 Q   2007?
19     MS. POLAKOWSKI: Same objection.
20 BY MR. CHURCHILL:
21 Q   Didn't you state earlier that you were a member
22     of the board of directors in 2007?
23     MS. POLAKOWSKI: Same objection.
24     THE WITNESS: I thought I was.
25 BY MR. CHURCHILL:

Page 180

1  Q   Do you think that had anything to do with your
2      voting shares?
3      MS. POLAKOWSKI: Objection.  Calls for
4  a legal conclusion.
5      THE WITNESS: I would have no idea of
6  that.
7  BY MR. CHURCHILL:
8  Q   Did you have an understanding when you obtained
9      the price and terms under this 2007 Stock
10     Redemption Agreement that your shares were being
11     given a certain value?
12     MS. POLAKOWSKI: Objection.  Legal
13 conclusion.  Assumes facts not in evidence.
14     THE WITNESS: I really never thought
15 about it.  I didn't assume because I really never
16 thought about it.
17 BY MR. CHURCHILL:
18 Q   You knew that some of your shares were being
19     redeemed in order to get the money, though,
20     correct?
21     MS. POLAKOWSKI: Same objections.
22     THE WITNESS: Yes, I did.
23 BY MR. CHURCHILL:
24 Q   When you say you never thought about it, does
25     that mean you didn't know that there was a

Stacy L. Randall v                          Confidential                          Stacy L. Randall
Reed C. Widen, et al.                                                             August 28, 2023

---

Page 181

1     value, or you just didn't care what the value
2     was?
3  A   I didn't know what the value was.
4  Q   That was option C.  You knew there was a value.
5     You just didn't know what it was, correct?
6  A   Yes.
7         MS. POLAKOWSKI: Mark, we have been
8  going about another hour.  At your convenience, can
9  we take a short break?
10        MR. CHURCHILL: If you could just let
11 me finish on this one.
12 BY MR. CHURCHILL:
13 Q   Ms. Randall, do you remember anything now that
14    you had a chance to look at it needing the
15    $250,000?
16 A   I do not remember.
17 Q   Again, you were paid in a lump sum.  You got the
18    money all at once, right?
19 A   Yes.
20 Q   And you were still in Florida?
21 A   Yes.
22 Q   Did you get a check again?
23 A   Yes.
24 Q   Do you remember what you used the money for once
25    you got it?

---

Page 182

1  A   Well, it was usually for taxes or to pay the
2     accountant.  Those are the two big ones I can
3     remember.
4  Q   Do you remember at all comparing the two
5     agreements at the time in 2007, meaning the 2005
6     agreement and the 2007 agreement?
7  A   Do I remember what?
8  Q   Do you remember at the time comparing the two
9     agreements that you had signed, the 2005 and the
10    2007 agreement?
11 A   I did not compare them because I didn't have
12    these papers.
13 Q   So when you signed the 2007 agreement, did you
14    review it?
15        MS. POLAKOWSKI: Object to form.
16        THE WITNESS: I didn't review it.  I
17 say I probably skimmed over it.
18 BY MR. CHURCHILL:
19 Q   So you believe you had the whole agreement
20    before you signed it, right?
21        MS. POLAKOWSKI: Objection.
22 Mischaracterizes her testimony.
23        THE WITNESS: I don't remember.
24 BY MR. CHURCHILL:
25 Q   Would it have been important for you to review

---

Page 183

1     it?
2         MS. POLAKOWSKI: Objection.  Form.
3  Calls for a legal conclusion.
4         THE WITNESS: Probably not because I
5  trusted my brother and Kiesler.
6  BY MR. CHURCHILL:
7  Q   But you don't know whether in fact you reviewed
8     the 2007 agreement before you signed it,
9     correct?
10 A   I don't believe I had it.  So I don't remember
11    reviewing it.
12 Q   And when you say you don't believe you have it,
13    that's because you believe you only saw the
14    signature page?
15 A   Well, I didn't have it to take home and look at.
16 Q   Did you sign it at home?
17 A   No.
18 Q   Where did you sign it?
19 A   This I probably signed at the office.
20 Q   Which office?
21 A   Widens.
22 Q   So you went to Wisconsin to sign this one?
23 A   What was the month?  June.
24 Q   August of '07.  It was effective June 30, it
25    says, but it was entered into in August of '07.

---

Page 184

1  A   I was in Wisconsin.
2  Q   So you believe you went into Widen's office to
3     execute this one?
4  A   Yes, I do.
5  Q   And just one more question before we break.  Why
6     do you believe that you didn't review the whole
7     document if you were in the office and there to
8     sign it?
9         MS. POLAKOWSKI: Object to the extent
10 it misstates her testimony.  Calls for speculation.
11        THE WITNESS: I don't know.
12 BY MR. CHURCHILL:
13 Q   Do you actually -- so I have another follow-up
14    question.  Do you actually remember not
15    reviewing the document or you're speculating?
16 A   I don't remember reviewing this or skimming it.
17 Q   But do you remember not reviewing it?  In other
18    words, do you know that you didn't review it, or
19    you just don't remember one way or the other?
20 A   I know I did not review it.  Mike Kiesler may
21    have told me what it says.
22 Q   So when you said skimming it, was that you
23    skimming it or him holding it and --
24 A   It was me skimming it.
25 Q   So you held the document in your hand?

---

Page 185

1 A   Well, I can't remember if I had it.

2 Q   So how did you skim it?

3 A   You are assuming that I had it.

4 Q   You tell me how -- you didn't like my term

5    reviewed, I take it.

6 A   Right.

7 Q   So how did you look at it?  Let's just use look.

8    How did you look at it?  If you didn't review

9    it, what did you do?

10 A   I don't know that I had this to review or look

11    at.

12 Q   But you also don't know you didn't have it,

13    correct?

14 A   Correct.

15 Q   And this was a transaction that you wanted to

16    enter into, right, you wanted the money?

17        MS. POLAKOWSKI: Objection.  Form.

18 Mischaracterizes her testimony.  Assumes facts not in

19 evidence.

20        THE WITNESS: I asked for the money,

21 yes.

22 BY MR. CHURCHILL:

23 Q   So you wanted to enter into a transaction to

24    redeem your shares to get $250,000?

25        MS. POLAKOWSKI: Same objections.

Page 186

1        THE WITNESS: Well, I needed the

2 money, so, yes.

3        MR. CHURCHILL: We can break.

4        THE VIDEOGRAPHER: Off the record at

5 2:45 p.m.

6        (Brief recess taken.)

7        THE VIDEOGRAPHER: We are back on the

8 record.  This will mark the beginning of media unit

9 number 3 of the video recorded deposition of Stacy

10 Randall.  Today's date is August 28th, 2023, and the

11 time is 3:05 p.m.

12        MR. CHURCHILL: So just to state for

13 the record, and I should have read Christa's note to

14 me at the time, Exhibit 7 which was that agreement

15 between Terry Vial and the companies, that was

16 produced as Windy0002150 through 2164.  I'm not going

17 to ask any more questions about it, but I just wanted

18 to provide the Bates numbers.

19        MS. POLAKOWSKI: You're not asking her

20 to confirm because there's --

21        MR. CHURCHILL: Correct.  Because the

22 version I marked for purposes of your deposition is

23 unmarked.  I just wanted to track that for everyone.

24 Something you truly don't care about, Ms. Randall.

25        THE WITNESS: No.  I really don't.  I

Page 187

1 don't know what the heck you're talking about.

2        (Exhibit No. 13 was marked.)

3 BY MR. CHURCHILL:

4 Q   So, Ms. Randall, the court reporter has handed

5    you what's been marked for identification as

6    Exhibit 13 to your deposition.  Would you take a

7    moment to review it?  Do you recognize this

8    document?

9 A   I do not.

10 Q   So Exhibit 13 is another document titled, "Stock

11    Redemption Agreement."  Do you see that at the

12    top?

13 A   Yes, I do.

14 Q   And it looks to be in fairly similar form as the

15    other Stock Redemption Agreements.  Do you agree

16    with that kind of general statement?

17 A   Yes, I do.

18 Q   And on page 3 you have signed the document or

19    maybe it's your signature stamp.  I'm interested

20    in your conclusion on that one.

21 A   For sure it's my signature stamp.

22 Q   Okay.  Do you remember asking in early -- well,

23    sometime in late 2010 or early 2011 to redeem

24    some more shares in Windy Waters?

25 A   I don't remember asking.  If that's what this

Page 188

1    says.

2 Q   Well, let's look at the first page.

3 A   I am.

4 Q   Do you see in the middle under price in terms

5    that the total redemption price shall be

6    $200,000?

7 A   Yes, I do.

8 Q   Do you remember asking to obtain $200,000 in

9    early 2011?

10 A   I don't remember.

11 Q   Is it fair to assume that you did ask?

12 A   Yes.

13 Q   And so if your stamp was used, is it also fair

14    to assume that you approved the use of the stamp

15    in order to get the document executed?

16        MS. POLAKOWSKI: Object to form.

17 Misstates her testimony.  Calls for a legal

18 conclusion.

19        THE WITNESS: I did not okay the use

20 of my stamp.

21 BY MR. CHURCHILL:

22 Q   You did not okay the use of your stamp for

23    purposes of getting the $200,000?

24 A   I was never asked.

25 Q   Did you know that a redemption agreement was

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 189

1  being entered into for purposes of obtaining the
2  $200,000?
3        MS. POLAKOWSKI: Objection.  Form.
4        THE WITNESS: Can you repeat that
5  question?
6  BY MR. CHURCHILL:
7  Q   Sure.  Let me state it differently.  Do you now
8     recall that you got $200,000 in 2011?
9        MS. POLAKOWSKI: Object to form.
10       THE WITNESS: If that's what this
11  says.  I trust my brother and Mike Kiesler, so, yes.
12  BY MR. CHURCHILL:
13  Q   You don't remember asking for it, though?
14  A   No.  I do -- I don't know when I asked for all
15     these.  I honestly don't.
16  Q   Well, let's -- let's go through them quickly.
17     There was one in 2005 for $200,000, right?
18  A   Yes.
19  Q   And then in 2007 there was another one for
20     250,000, correct?
21  A   Yes.
22  Q   So now in 2011 another $200,000, right?
23  A   Correct.
24  Q   Do you remember why you needed the money?
25        MS. POLAKOWSKI: Object to form.

---

Page 190

1  Vague as to time.
2  BY MR. CHURCHILL:
3  Q   Let me orient you specifically.  Let me specify.
4     Do you remember why you needed the money for the
5     third redemption, the one in 2011?
6  A   I think it was probably because he owed taxes,
7     property taxes.
8  Q   Who is "he"?
9  A   My husband.  We.  Did I say he?  Because he took
10     care of all the money, and we had bills to pay.
11  Q   For the 2007 redemption agreement you said that
12     you signed that one in Wisconsin, correct?
13  A   Yes.
14  Q   And this 2011 agreement you're saying that that
15     is your stamp that's being used, correct?
16  A   Yes.
17  Q   Do you remember where you were in 2011 in
18     January when this would have been happening?
19     Were you in Florida?
20  A   Yes.  Yes.  Because we always went back right
21     after the first of the year.
22  Q   Tell me again when you moved back to Wisconsin,
23     what year.
24  A   '11 or '12, I said.
25  Q   But January of '11 you think you were still in

---

Page 191

1  Florida?
2  A   In January I believe I was living in Florida,
3     and I believe I was back in Florida on January
4     11th.
5  Q   Do you know whether or not you ever reviewed
6     this 2011 Stock Redemption Agreement?
7        MS. POLAKOWSKI: Object to form.
8        THE WITNESS: Review, no.  I did not
9  review it.
10  BY MR. CHURCHILL:
11  Q   Do you know whether you ever looked at it?
12  A   I probably never looked at it.
13  Q   Do you know whether it was sent to you in
14     advance to review or look at?
15        MS. POLAKOWSKI: Object to form.
16  Vague as to -- hold on.  Vague as to -- I lost my
17  train of thought.
18        THE WITNESS: Sorry.
19        MS. POLAKOWSKI: What was the last
20  question?
21        (Last question read back.)
22        MS. POLAKOWSKI: Vague as to in
23  advance of what.
24  BY MR. CHURCHILL:
25  Q   Do you know whether or not you asked to look at

---

Page 192

1  the 2011 Stock Redemption Agreement prior to
2  having it executed?
3        MS. POLAKOWSKI: Objection that it
4  assumes facts not in evidence.
5        THE WITNESS: I did not look at this
6  prior.
7  BY MR. CHURCHILL:
8  Q   And why do you say that?  Why do you know that?
9  A   Because I normally didn't see these papers.
10  Q   Well, you saw the 2007 one, right?
11        MS. POLAKOWSKI: Objection.
12  Mischaracterizes her testimony.
13        THE WITNESS: Well, I -- I thought I
14  have seen it, but I did not review it nor did I
15  review this one.
16  BY MR. CHURCHILL:
17  Q   With respect to 2007 agreement?
18  A   Yes.
19  Q   You said you thought you skimmed it.  Is that no
20     longer your testimony?
21  A   I probably skimmed it if they gave it to me.
22  Q   Do you think you skimmed the 2011 Stock
23     Redemption Agreement?
24  A   I do not.
25  Q   Tell me what -- because I feel like you're

---

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 193

1   having a problem with my word review. Tell me
2   what skim means to you.
3  A  You're just like looking at it quickly. I'm not
4   one of those speed readers.
5  Q  Okay.
6  A  So I'm just looking at it quickly looking for
7   keywords.
8  Q  And how are you using the word review? Like you
9   agree with me that you're differentiating
10   between review and skim?
11  A  Reviewing and skimming are two different things.
12  Q  So what is reviewing to you?
13  A  That I would read it word for word.
14  Q  Okay. And remind me, your testimony with
15   respect to the 2011 agreement was you don't
16   believe you skimmed it?
17  A  Was that this one?
18  Q  The third one.
19  A  The one with the stamp.
20  Q  What about going back to the 2005 agreement that
21   was the one Exhibit 11, the first one for
22   $200,000. Did you skim that one?
23  A  I don't remember.
24  Q  Do you know whether your ex-husband Steven ever
25   spoke with anyone about your stock redemptions?

---

Page 194

1   Let's start with the first one. Do you know
2   whether Steven spoken with anyone about your
3   2005 stock redemption?
4  A  No. He wouldn't have.
5  Q  He wouldn't have or he didn't?
6  A  He didn't.
7  Q  And how do you know that?
8  A  Because he knew that they were my stocks, and
9   the money I got was for me to give to him.
10  Q  What about the 2007 agreement, did Steven to
11   your knowledge speak with anyone about that
12   agreement?
13  A  No, he did not.
14  Q  Was he with you when you were at the office
15   skimming the 2007 agreement?
16  A  No, he was not.
17  Q  What about the 2011 agreement, was Steven
18   involved at all with that one?
19  A  No. He didn't come to any of this.
20  Q  So to the extent -- if I understand correctly,
21   to the extent Steven had involvement it was that
22   you and he discussed the money that you would
23   need, but otherwise he was not involved?
24       MS. POLAKOWSKI: Object to form.
25       THE WITNESS: He wasn't involved in --

---

Page 195

1   he was not included in any of this.
2  BY MR. CHURCHILL:
3  Q  Did he ever ask Reed for money?
4  A  No.
5  Q  Did he ever ask Kiesler for money?
6  A  No.
7  Q  Did Steven ever ask your dad for money?
8  A  No.
9  Q  Did Steven ask any of your brothers for money?
10  A  No.
11  Q  Did Steven have any role with respect to the use
12   of your signature stamp?
13  A  Role?
14       MS. POLAKOWSKI: Objection. Form.
15  Calls for a legal conclusion.
16       THE WITNESS: What do you mean by
17  "role"?
18  BY MR. CHURCHILL:
19  Q  Did Steven talk to you at all initially about
20   getting the stamp?
21  A  He did not.
22  Q  Did Steven ever talk to you about the use of the
23   stamp for a particular document?
24  A  He did not.
25  Q  Do you ever remember discussing the use of your

---

Page 196

1   signature stamp with Steven?
2  A  I'm sure that I told him that Mike Kiesler asked
3   me to have one made, but other than that there
4   was no discussion.
5  Q  You may have already answered this, Ms. Randall.
6   Did you say you did skim the 2011 agreement or
7   not?
8       MS. POLAKOWSKI: Objection. Asked and
9  answered.
10       THE WITNESS: I don't believe I did.
11  BY MR. CHURCHILL:
12  Q  So you didn't know at the time how your shares
13   of stock in Windy Waters were changing as a
14   result of this agreement?
15  A  No. I did not know that.
16  Q  Is it your testimony that you didn't know that
17   agreement -- that an agreement was being signed
18   at all?
19  A  I did not know that they were signing an
20   agreement -- that I was signing an agreement.
21  Q  But you knew that you had signed one in 2007,
22   correct?
23  A  I knew that I signed one, yes.
24  Q  Didn't you assume that you would have to sign an
25   agreement again in 2011?

---

**Colleen Reed Reporting LLC**
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 197

1       MS. POLAKOWSKI: Objection. Calls for
2   a legal conclusion. Assumes facts not in evidence.
3       THE WITNESS: I didn't know what the
4   formula was or how you -- I guess I never really
5   thought about it.
6   BY MR. CHURCHILL:
7   Q   Okay. And I didn't ask about the formula just
8       yet. I was asking about the signing of an
9       agreement at all. So let me be really clear
10      because I don't want you to guess. Did you
11      think you didn't have to sign a document for
12      purposes of getting the $200,000 in 2011?
13      MS. POLAKOWSKI: Objection.
14  Mischaracterizes her testimony. Calls for a legal
15  conclusion, and assumes facts not in evidence.
16      THE WITNESS: I did not know that I
17  needed to sign every time.
18  BY MR. CHURCHILL:
19  Q   That's what you thought in 2011?
20  A   That's what I thought in all of them. I didn't
21      know.
22  Q   Now you have lost me a little bit. You were
23      present in 2007 when you signed the 2007
24      agreement, correct?
25  A   Yes.

---

Page 198

1   Q   Okay. And you knew you were signing an
2       agreement, correct?
3   A   Yes.
4   Q   And you knew that you were receiving money as a
5       result of redeeming some shares in Windy Waters,
6       correct?
7   A   I did not know where the stocks were coming
8       from. Windy Waters, Widen Enterprises I didn't
9       know, but I knew I was getting money.
10  Q   And you knew that you were signing?
11  A   Yes.
12  Q   And so 2011 you're saying that you did not
13      expect that you would have to sign a new
14      agreement?
15      MS. POLAKOWSKI: Objection.
16  Mischaracterizes her testimony. Assumes facts not in
17  evidence. Calls for a legal conclusion.
18      THE WITNESS: At that time I don't
19  know what I expected.
20  BY MR. CHURCHILL:
21  Q   Is it possible that you have just forgotten,
22      Ms. Randall?
23      MS. POLAKOWSKI: Objection. Calls for
24  speculation.
25      THE WITNESS: Yeah, it is.

---

Page 199

1   BY MR. CHURCHILL:
2   Q   You trusted Mike Kiesler at this time in 2011?
3   A   I trusted Reed and Mike Kiesler through the
4       whole thing.
5   Q   And this was the third time that you had gotten
6       some money from -- you didn't discern between
7       Windy Waters and Widen, but let's say the
8       companies. This is the third time you had gone
9       to them for money, correct?
10  A   Yes.
11  Q   And this was the third time that you had gotten
12      it, correct?
13  A   Yes.
14  Q   Do you remember what you spent this money on?
15  A   Probably taxes, and I don't -- in '11. Steve
16      bought a lot of real estate, and I'm thinking
17      that -- well, I know the crash really affected
18      us.
19  Q   The stock market crash?
20  A   Yes. And he probably was behind on some of
21      those loans.
22  Q   Steve you mean?
23  A   Or us. We. My name was always attached.
24  Q   And you mean the loans for the homes?
25  A   Mortgages, yes.

---

Page 200

1   Q   Mortgages. Okay. Did it occur to you in 2011
2       what the value of your shares might be compared
3       to what they had been, say, in 2007 when you had
4       done the last redemption?
5       MS. POLAKOWSKI: Objection.
6   Foundation.
7       THE WITNESS: I never thought about
8   it.
9   BY MR. CHURCHILL:
10  Q   Did it occur to you how the value of your shares
11      might be computed for purposes of knowing how
12      many shares were redeemed for the $200,000?
13      MS. POLAKOWSKI: Same objection.
14      THE WITNESS: I was aware that there
15  was a formula to figure them out, but I didn't know
16  what, where, or how.
17  BY MR. CHURCHILL:
18  Q   And when you say you were aware that there was a
19      formula, when were you first aware that there
20      was a formula?
21  A   I honestly can't remember that.
22  Q   Was it prior to the third redemption in 2011?
23  A   I honestly don't remember.
24  Q   Did you know when you signed the 2007 redemption
25      agreement that that was pursuant to a formula?

---

Colleen Reed Reporting LLC
414.322.3621

Page 201

1         MS. POLAKOWSKI: Objection. Assumes
2 facts not in evidence. Calls for a legal conclusion.
3         THE WITNESS: I don't think so.
4 BY MR. CHURCHILL:
5 Q   Why do you say you don't think so?
6 A   I can't remember.
7 Q   What does a formula mean to you?
8 A   It's a way to make things.
9 Q   Do you remember when we were looking at the
10   second shareholder amendment, Exhibit 6, and
11   there is this Exhibit C page?
12 A   Yes.
13         MS. POLAKOWSKI: Which exhibit was
14   that?
15         MR. CHURCHILL: It's 6.
16         THE WITNESS: Okay.
17 BY MR. CHURCHILL:
18 Q   And if you go to Exhibit C, it should be
19   Windy33095 if you're looking at the bottom right
20   corner.
21 A   Okay. That helps me a lot. Yes.
22 Q   Do you remember us talking about this before,
23   fair market value per share calculation?
24 A   Yes.
25 Q   Is this a formula to you?

Page 202

1         MS. POLAKOWSKI: Objection. Vague.
2 Foundation.
3         THE WITNESS: No. I never thought of
4 it that way.
5 BY MR. CHURCHILL:
6 Q   Do you see up at the top it says, "The value of
7   the corporation shall be determined by," and
8   then there's a colon?
9 A   Mm-hmm.
10 Q   And then there's an explanation of how the value
11   should be determined?
12 A   Yes.
13 Q   Is this the formula that you thought was being
14   used to value your shares at any point in time?
15 A   I didn't see these documents, and if I did, I
16   did not read them or skim them.
17 Q   Did you possibly skim Exhibit C, not review but
18   skim?
19 A   I honestly don't remember seeing this.
20 Q   Do you recall with respect to that 2011 stock
21   redemption that you were not redeeming your
22   voting shares?
23         MS. POLAKOWSKI: Objection. Calls for
24 a legal conclusion and assumes facts not in evidence.
25         THE WITNESS: I was never told what

Page 203

1 kind of shares I was redeeming. I didn't even know
2 there's different kinds.
3         (Exhibit No. 14 was marked.)
4 BY MR. CHURCHILL:
5 Q   Ms. Randall, you have now been handed what's
6   been marked for identification as Exhibit 14 to
7   your deposition. It's a document Bates labeled
8   Windy705 through Windy710.
9 A   Yes.
10 Q   And this document is also titled, "Stock
11   Redemption Agreement." Do you see that on the
12   first page?
13 A   Yes, I do.
14 Q   And do you recognize this document?
15 A   I do not.
16 Q   If you're on the first page, do you see that,
17   "This agreement is entered into effective the
18   1st day of August 2017 by and between Windy
19   Waters Inc., (the corporation) a Wisconsin
20   corporation having offices at 6911 Mangrove
21   Lane, Madison, Wisconsin 53713, and Stacy L.
22   Randall of 1972 Barber Drive, No. 3,
23   Stoughton" --
24 A   Stoughton.
25 Q   "Stoughton, Wisconsin 53589." Do you see that?

Page 204

1 A   Yes, I do.
2 Q   Does that refresh your recollection at all?
3         MS. POLAKOWSKI: Objection. Vague.
4         THE WITNESS: Of what?
5 BY MR. CHURCHILL:
6 Q   Of entering into the agreement.
7 A   How much did I get this time?
8 Q   It looks like $78,000, so less.
9 A   275? No, that's the number of shares.
10 Q   If you look down under price -- I think it's
11   always going to be the same. So if you look
12   under price and terms, do you see in the middle
13   paragraph 2? It looks like you got $78,000 this
14   time, right?
15 A   Looks like it, yes.
16 Q   Do you remember why $78,000?
17 A   I don't specific -- no. I don't specifically
18   remember.
19 Q   Let's look at page 3 and your signature. Do you
20   agree that that's not your stamp?
21 A   I agree that's not my stamp.
22 Q   Do you remember signing Exhibit 14?
23 A   No.
24 Q   In 2017 now you're back in Wisconsin obviously,
25   right?

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

Page 205

1  A   Yes.
2  Q   You're in Stoughton?
3  A   Stoughton.
4  Q   And do you remember what was going on in your
5      life then that you might need $78,000 as a
6      particular sum?
7  A   2017 I was contemplating filing for divorce.
8  Q   And did Steven have anything to do with this
9      request, if you recall?
10 A   I'm not sure.
11 Q   Do you think that the fact that you were
12     contemplating filing for divorce had something
13     to do with you needing the money?
14 A   I don't believe I had talked to an attorney.  I
15     don't know.
16 Q   You did get paid the $78,000?
17 A   Yes.
18 Q   And, again, that was in a lump sum?
19 A   Yes.
20 Q   And you had to redeem some shares in order to
21     get the $78,000, right?
22         MS. POLAKOWSKI: Objection.  Assumes
23 facts not in evidence.  Calls for a legal conclusion.
24 Calls for speculation.
25         THE WITNESS: I didn't specifically

Page 206

1  say that I needed shares.  I just asked for -- I
2  would like to get -- I would like to get $78,000 from
3  my stock.  That's what I would say.
4  BY MR. CHURCHILL:
5  Q   And do you remember specifically saying that?
6  A   No.
7  Q   Who would you have said that to, Reed?
8  A   Reed.
9  Q   And he referred you to Mike Kiesler?
10 A   Yup.  Talk to Kiesler.
11 Q   And do you remember whether you reviewed this
12     2017 Stock Redemption Agreement prior to signing
13     it?
14         MS. POLAKOWSKI: Object to form.
15         THE WITNESS: I did not review it.
16 BY MR. CHURCHILL:
17 Q   And how do you know that?
18 A   Because I didn't review any of them.
19 Q   Did you skim it?
20 A   At this point probably not.
21 Q   What do you mean by that, "at this point
22     probably not?"
23 A   I have gone through this a number of times.
24 Q   And when you say that you're referring to the
25     2005, 2007, and 2011 redemptions?

Page 207

1  A   Correct.
2  Q   And do you have any specific recollection of
3      being given this document in advance?
4  A   No, I do not.
5  Q   It's fair to say that you knew that in order to
6      be paid the $78,000 that you were redeeming
7      Windy Waters shares, right?
8          MS. POLAKOWSKI: Objection.  Calls for
9  a legal conclusion and assumes facts not in evidence.
10         THE WITNESS: I didn't know what kind
11 of stocks I was redeeming.
12 BY MR. CHURCHILL:
13 Q   You just knew they were stocks, but you didn't
14     know whether it was Windy Waters or another
15     company?
16 A   Correct.
17 Q   Who else could it have been?
18 A   Widen Enterprises.
19 Q   Did you have shares in Widen Enterprises?
20 A   I don't know what I had shares in.
21 Q   So you thought you were either redeeming shares
22     in Widen Enterprises or Windy Waters?
23 A   Yes.
24 Q   Did you ask to do anything through Milmont or
25     that didn't come up?

Page 208

1  A   No, I did not.
2  Q   Why didn't you?
3  A   Because I never thought of it.
4  Q   When we talk about Milmont, is that -- for you
5      is that the same as talking about the cottage?
6  A   Yes.
7  Q   And so would redeeming shares in Milmont mean
8      you were losing your right to the cottage?
9          MS. POLAKOWSKI: Objection.  Calls for
10 a legal conclusion.
11         THE WITNESS: I'm not really sure what
12 it would have done because it's never happened.
13 BY MR. CHURCHILL:
14 Q   I guess I'm wondering whether or not there's
15     something to Milmont other than the cottage?
16 A   There's a cottage and then there's another piece
17     of land.  There's two cottages on the same
18     property.  Well, no, they are not on the same
19     property, but they cannot be divided, and then
20     we have a piece of land on a fishing lake.
21 Q   But Milmont was not something that you were
22     interested in when you said I want to sell some
23     stock for some money?
24         MS. POLAKOWSKI: Objection.  Form.
25 Mischaracterizes her testimony.

Page 209

1    THE WITNESS: I never even thought
2 about Milmont.
3 BY MR. CHURCHILL:
4 Q   Why?
5    MS. POLAKOWSKI: Calls for
6 speculation.
7    THE WITNESS: Why didn't I think of
8 it?  I don't know why I didn't think of it.  I just
9 had always gotten it from whatever company I got --
10 where my stocks were.
11 BY MR. CHURCHILL:
12 Q   Okay.  Did you have an attorney representing
13    you?
14 A   No.
15 Q   With respect to the 2017 Stock Redemption
16    Agreement?
17 A   No, I did not.
18 Q   Why not?
19 A   Because I trusted Reed and Mike Kiesler to be
20    doing the best thing for me.
21 Q   Did you interact with an attorney for Windy
22    Waters or Widen Enterprises with respect to the
23    2017 Stock Redemption Agreement?
24 A   No, I did not.
25 Q   Do you have a memory of signing the 2017 Stock

Page 210

1    Redemption Agreement?
2 A   I don't have a memory of that.
3 Q   You don't have any reason to believe that you
4    didn't sign the agreement, correct?
5 A   Correct.
6 Q   Did you ask any questions about how your shares
7    were being valued for purposes of the redemption
8    that is represented by the 2017 Stock Redemption
9    Agreement?
10 A   No, I did not.
11 Q   Did you -- do you remember thinking at all that
12    this Stock Redemption Agreement looked a lot
13    like the prior ones you had signed?
14    MS. POLAKOWSKI: Objection.  Form.
15    THE WITNESS: I don't really remember
16 thinking that, but it kind of all looked the same to
17 me.  I didn't really look at them that closely.  I
18 didn't think I needed to.
19 BY MR. CHURCHILL:
20 Q   Was there any reason in your mind that any of
21    those prior Stock Redemption Agreements were not
22    authorized by you?  In other words, would you
23    say today that you did not authorize the 2005
24    Stock Redemption Agreement?
25    MS. POLAKOWSKI: Objection.  Calls for

Page 211

1 a legal conclusion.
2    THE WITNESS: Authorize?  What are you
3 meaning when you say "authorize"?
4 BY MR. CHURCHILL:
5 Q   What does authorize mean to you?
6 A   I asked you what you meant by authorized.
7 Q   Do you like approved better?  How about
8    approved?  Would you say that you didn't
9    ultimately approve the 2005 Stock Redemption
10    Agreement?
11    MS. POLAKOWSKI: Object again.  Calls
12 for a legal conclusion.
13    THE WITNESS: I asked for the money
14 so, yes, I would say I authorized.
15 BY MR. CHURCHILL:
16 Q   And you agree that you authorized the sale of
17    stock in order to get the money, correct?
18 A   Yes.  As far as I knew that's the only way I
19    could get money.
20 Q   And using that same definition, asking for money
21    and authorizing the sale of stock to get the
22    money, you also authorized the 2007 Stock
23    Redemption Agreement, correct?
24    MS. POLAKOWSKI: Object to the extent
25 it calls for a legal conclusion.

Page 212

1    THE WITNESS: I would say yes.
2 BY MR. CHURCHILL:
3 Q   And same for 2011, you authorized that Stock
4    Redemption Agreement, right, you knew that you
5    were getting money and authorizing the sale of
6    stock in order to get that money, correct?
7    MS. POLAKOWSKI: Same objection.
8 Calls for a legal conclusion.
9    THE WITNESS: Yes.
10 BY MR. CHURCHILL:
11 Q   And then with respect to Exhibit 14, the 2017
12    Stock Redemption Agreement, again, you
13    authorized the sale of your stock in exchange
14    for $78,000, correct?
15    MS. POLAKOWSKI: Objection.  Calls for
16 a legal conclusion.
17    THE WITNESS: Well, each time I asked
18 for money from my stock, so, yes.
19    (Exhibit No. 15 was marked.)
20 BY MR. CHURCHILL:
21 Q   Ms. Randall, the court reporter has now handed
22    you what's been marked for identification as
23    Exhibit 15 to your deposition as a document
24    Bates labeled Windy711 through 716 titled,
25    "Stock Redemption Agreement."  Again, this one

Confidential

Page 213

1    dated January 1, 2019.  Do you recognize Exhibit
2    <u>15</u>?
3 A  No.  I do not.
4 Q  Your signature is on page 3.  Do you see that?
5 A  Yes, I do.
6 Q  And do you agree that's your signature?
7 A  Yes, I do.
8 Q  And going to price and terms, Ms. Randall, on
9    page 1, it looks like you sold your Windy Waters
10   stock for $120,000.  Do you see that?
11 A  I do see that.
12 Q  Do you have a recollection of doing this in
13   early January of '19?
14       MS. POLAKOWSKI: Object to form.
15 Vague as to doing this.
16       THE WITNESS: Yes, I do.
17 BY MR. CHURCHILL:
18 Q  And what do you remember about that particular
19   stock redemption?
20 A  That I needed money.
21 Q  Do you remember why?
22 A  I needed money to pay my divorce lawyer, and I
23   didn't have any money.
24 Q  And so you entered into this agreement.  Did you
25   get a copy in advance of signing it?

Page 214

1 A  No.
2 Q  Did you skim it before signing it?
3 A  I don't remember doing that.
4 Q  Do you think you didn't skim it before signing
5    it?
6 A  Probably not.
7 Q  Was it important for you to skim it before
8    signing it?
9        MS. POLAKOWSKI: Object to form.
10 Calls for a legal conclusion.
11       THE WITNESS: I did not feel that it
12 was.
13 BY MR. CHURCHILL:
14 Q  Why?
15 A  Because I trusted Mike Kiesler and Reed Widen.
16 Q  Would it be fair to say that this is a very
17   similar agreement to four others that you had
18   entered for purposes of selling your Windy
19   Waters stock?
20       MS. POLAKOWSKI: Objection.  Calls for
21 a legal conclusion.  Objection.  Foundation.
22       THE WITNESS: No.
23 BY MR. CHURCHILL:
24 Q  It doesn't look a lot like the other agreements
25   that you had signed?

Page 215

1        MS. POLAKOWSKI: Misstates her
2  testimony.
3        THE WITNESS: Well, now that I see
4  this I remember there's something about a note.  He
5  added the 20,000 on for -- I don't recall.
6  BY MR. CHURCHILL:
7 Q   Isn't one of the reasons why you were
8     comfortable signing this Stock Redemption
9     Agreement because it was the fifth time that you
10    had done it?
11       MS. POLAKOWSKI: Objection.  Form.
12 Assumes facts not in evidence.  It calls for a legal
13 conclusion.
14       THE WITNESS: Well, this wasn't the
15 same because there was a note -- I can't remember
16 what was involved in this one, and again, I trusted
17 my brother and Mike Kiesler with everything they
18 wrote and had me sign.
19 BY MR. CHURCHILL:
20 Q   Did you have an attorney represent you for
21    purposes of the 2019 Stock Redemption Agreement?
22 A   No, I did not.
23 Q   Do you remember whether Windy Waters had
24    attorneys represent it for the purposes of the
25    2019 Stock Redemption Agreement?

Page 216

1 A   I never had information about that.
2 Q   Do you have any memory of receiving the document
3     prior to signing it?
4 A   No.  I did not get it before I signed.
5 Q   Did you have to negotiate any of the terms in
6     the 2019 Stock Redemption Agreement?
7        MS. POLAKOWSKI: Object to form.
8        THE WITNESS: There was something
9  about the added 20,000, but I don't remember what
10 that was.
11 BY MR. CHURCHILL:
12 Q   Can you -- Ms. Randall, can you point to me
13    where the added 20,000 is?
14 A   Well, I asked for 100,000.
15 Q   Okay.
16 A   And for some reason he gave me 120, and I don't
17    remember what that was for.
18 Q   Who is "he"?
19 A   Mike Kiesler.
20 Q   So your memory is that you only asked for
21    100,000 and he gave you 120 instead?
22 A   Yes.
23 Q   Were you okay with that or you didn't want to do
24    that?
25       MS. POLAKOWSKI: Objection.  Calls for

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 217

1 a legal conclusion.
2         THE WITNESS: I didn't feel like I had
3 much of a choice.
4 BY MR. CHURCHILL:
5 Q   But you did sign this document, correct?
6 A   Yes, I did.
7 Q   And you did redeem some of your shares in Windy
8     Waters, Inc., in order to obtain the $120,000,
9     correct?
10        MS. POLAKOWSKI: Objection. Calls for
11 a legal conclusion.
12        THE WITNESS: I don't remember the
13 specifics about this.
14 BY MR. CHURCHILL:
15 Q   Like the other redemption agreements, you
16     authorized the sale of some of your stock in
17     order to get some money back, correct?
18        MS. POLAKOWSKI: Same objections.
19 Calls for a legal conclusion.
20        THE WITNESS: Yes. I did because
21 that's the only way I knew to get money.
22        (Exhibit No. 16 was marked.)
23 BY MR. CHURCHILL:
24 Q   Do you remember when you filed for divorce?
25 A   November of '18 or '19.

---

Page 218

1 Q   So this is -- the court reporter has handed you
2     what's been marked for identification as Exhibit
3     16 to your deposition. And when I think of
4     filing dates, I think of when you filed your
5     joint petition for divorce. This is a document
6     that's not Bates labeled, but this is taken from
7     the docket in your divorce proceeding. Do you
8     agree that this is your Joint Petition for
9     Divorce filed on April 1 of 2019?
10 A   I did not file on April 1st.
11 Q   Look at page 4 of Exhibit 16. Do you see your
12     signature there?
13 A   Yes, I do.
14 Q   And that is your signature on the left side
15     above Stacy Lee Randall?
16 A   Yes, it is.
17 Q   Do you remember when you started using the L for
18     Lee instead of the W for Widen?
19 A   No, I don't.
20 Q   So you mentioned earlier that you knew that you
21     needed some money for your divorce expenses.
22     Was part of that need to pay counsel?
23 A   Yes.
24 Q   And your divorce attorney was Maureen Collins,
25     correct?

---

Page 219

1 A   Amy.
2 Q   Amy, sorry. I don't know why I said Maureen.
3     Amy Collins, sorry, and she later became Amy
4     Collins O'Hara, correct?
5 A   Yes.
6 Q   And you retained her in roughly November of
7     2018. Does that sound right?
8 A   Yes.
9 Q   And Amy Collins, later Amy Collins O'Hara was an
10     attorney with the firm Stafford Rosenbaum; is
11     that right?
12 A   Yes.
13 Q   And Stafford Rosenbaum was also the firm that
14     employed Scott Seid who you spoke about before,
15     right?
16 A   Yes.
17 Q   When you engaged Ms. Collins, you knew that
18     Scott Seid was also an attorney for Windy
19     Waters, correct?
20 A   I knew there was an attorney in the building
21     because they had to do a conflict of interest.
22     I didn't know who it was.
23 Q   You didn't know that Scott Seid was the attorney
24     for Windy Waters at the time?
25 A   I wasn't aware of the name, no.

---

Page 220

1 Q   When is the first time that you interacted with
2     Scott Seid at all?
3 A   The only time was when I was signing the
4     redemption.
5 Q   Had you met him before?
6 A   Never.
7 Q   And when you say "redemption," you mean May
8     2020, right?
9 A   Yes.
10 Q   So had you not met Scott Seid prior to that?
11 A   No, I had not.
12 Q   You had only spoken with him on the telephone
13     prior to May 20 -- May 13, 2020?
14 A   Just that day.
15        (Exhibit No. 17 was marked.)
16        MR. CHURCHILL: You have been handed,
17 Ms. Randall, what's been marked as Exhibit 17 to your
18 deposition. What's your Bates number on that, Jess?
19        MS. POLAKOWSKI: Stafford000868.
20 BY MR. CHURCHILL:
21 Q   You mentioned earlier something about a conflict
22     waiver, correct?
23 A   Yes.
24 Q   And do you recognize Exhibit 17 as the conflict
25     waiver that you signed with Stafford Rosenbaum?

---

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 221

1 A   I don't exactly remember what it looked like.
2 Q   Sure.  So this is a letter dated April 3, 2019.
3       Do you see that at the top?
4 A   Yes.
5 Q   And it's signed by Amy T. Collins.  Do you see
6       that at the bottom?
7 A   Yes, I do.
8 Q   And it's addressed to you?
9 A   Yes, it is.
10 Q   And the letter says, "Dear, Stacy, in November
11       2018 you engaged Stafford Rosenbaum, LLP, to
12       represent you with respect to a divorce matter.
13       As you know, we also represent Windy Waters,
14       Inc., (the company) in unrelated corporate
15       matters including your redemption of shares of
16       the company."  Do you see that?
17 A   Yes.
18 Q   And then in the next paragraph it states, "We
19       believe that our firm's continued representation
20       of the company would not adversely affect our
21       representation of you; however, in situations
22       like this, which happen from time to time, we're
23       allowed to represent both clients in the matters
24       only if both clients consent.  We, therefore,
25       have asked whether you will consent to our

---

Page 222

1       representation of the company in unrelated
2       corporate matters while we represent you with
3       respect to your divorce.  Please confirm by
4       signing one copy of this letter and returning it
5       to me by email, fax, or mail.  Please call or
6       email me if you have any questions."  And then
7       she signs that.  Do you see all of that?
8 A   Yes, I do.
9 Q   Does this refresh your recollection as to
10       whether or not this was the waiver conflict that
11       you signed?
12 A   Well, this is the one that I signed, yes.
13 Q   And I assume 2018 down at the bottom is just a
14       typo, you meant to probably write 2019 and you
15       accidently wrote 2018?
16 A   When you said that I retained her in 2019 --
17 Q   I said 2018, actually.  Do you remember November
18       2018?
19 A   Okay.
20 Q   You agree that in order to use Ms. Collins as
21       your attorney that you were waiving any claim of
22       conflict with respect to her firm's
23       representation of Windy Waters, correct?
24       MS. POLAKOWSKI: I will object to the
25       extent it calls for a legal conclusion.  And, Mark, I

---

Page 223

1       just note on this document, Exhibit 17, there are a
2       couple of different dates on here that make it a
3       little bit ambiguous including April 3rd, 2019.  It
4       looks like it was signed it says April 2018, and then
5       there's a fax on the top that appears to be April 9,
6       2019.  All of which are after the date of divorce
7       proceeding was filed on the 1st of April.
8       MR. CHURCHILL: Right.  So I asked
9       Ms. Randall if she believes that 2018 was a typo or
10       just a mistake on her part, and she doesn't remember,
11       but she testified that she engaged Ms. Collins in
12       November of '18.  So we know -- or we don't know.  We
13       can suspect that maybe you just wrote the wrong date
14       that you weren't backdating your conflict waiver.
15       Let's set aside the document for a second then and
16       ask you generally.
17 BY MR. CHURCHILL:
18 Q   Do you agree that you waived any conflict with
19       Stafford Rosenbaum as to its representation of
20       Windy Waters including with respect to the
21       redemption of shares of the company by you?
22       MS. POLAKOWSKI: Objection.  Calls for
23       a legal conclusion.
24       THE WITNESS: I agreed to it, but I'm
25       not sure what I was agreeing to.

---

Page 224

1 BY MR. CHURCHILL:
2 Q   Did you ask Ms. Collins to explain it?
3 A   No.  No.  Because it seemed like it was no big
4       deal.
5 Q   Did you skim this letter before you signed it?
6 A   I read it.
7 Q   So you reviewed this one?
8 A   Yes, I did.
9 Q   Word for word?
10 A   Yes, I did.
11 Q   And did you have an opportunity to ask her any
12       questions?
13 A   I probably could have.
14 Q   Did you?
15 A   No.
16 Q   And are you aware whether Windy Waters had to
17       sign its own conflict waiver with Stafford
18       Rosenbaum in order for Stafford Rosenbaum to
19       represent you?
20 A   I was not aware of that.
21 Q   Have you ever seen the form of waiver that Windy
22       Waters signed with Stafford Rosenbaum in order
23       for Stafford Rosenbaum to represent it and also
24       you?
25       MS. POLAKOWSKI: Objection.  Assumes

---

| Page 225 |
| --- |

1 facts not in evidence.

2         THE WITNESS: I did not see that.

3 BY MR. CHURCHILL:

4 Q   Have you ever been told that there was a waiver

5     signed by Windy Waters just like the waiver or

6     similar to the waiver that you signed?

7 A   No.

8 Q   Do you believe that Stafford Rosenbaum had a

9     conflict that you had not waived?

10         MS. POLAKOWSKI: Objection. Calls for

11 a legal conclusion.

12         THE WITNESS: What do you mean by

13 that? Can you rephrase it?

14 BY MR. CHURCHILL:

15 Q   Sure. Do you believe that Stafford Rosenbaum

16     had a conflict of interest in that it was

17     representing Windy Waters for purposes of your

18     share redemptions and also representing you for

19     purposes of your divorce?

20         MS. POLAKOWSKI: Same objection. Also

21 vague as to timing.

22         THE WITNESS: For my divorce I don't

23 think that -- it was just Amy that was dealing with

24 my divorce. Nobody else.

25 BY MR. CHURCHILL:

| Page 226 |
| --- |

1 Q   And nobody else includes also not Scott Seid,

2     correct?

3 A   As far as I knew.

4 Q   You knew he was not your attorney, didn't you?

5 A   I didn't even know his name.

6 Q   But your understanding was that Amy Collins was

7     your attorney and no one else?

8 A   For my divorce?

9 Q   Yes.

10 A   Yes.

11 Q   Did you believe that Stafford Rosenbaum was your

12     attorney for any other purpose?

13 A   Yes.

14 Q   What purpose was that?

15 A   When it came to all that, why we're here. I

16     thought that Scott Seid would be an attorney for

17     me also.

18 Q   And he did ultimately tell you that he was not

19     your attorney, correct?

20 A   I don't believe he told me that.

21         MS. POLAKOWSKI: Mark, we have been

22 going about another hour. Is now a good spot?

23         MR. CHURCHILL: Now is probably a good

24 time.

25         THE VIDEOGRAPHER: Off the record.

| Page 227 |
| --- |

1 3:59 p.m.

2         (Brief recess taken.)

3         (Exhibit No. 18 was marked.)

4         THE VIDEOGRAPHER: We are back on the

5 record at 4:17 p.m.

6 BY MR. CHURCHILL:

7 Q   Ms. Randall, the court reporter has handed you

8     what's been marked for identification as Exhibit

9     18 to your deposition. It's a document titled,

10     "Notice of Motion and Motion to Modify Temporary

11     Order." Do you see that?

12 A   Yes.

13 Q   And in the top right corner it indicates a

14     filing date, if you see that, of April 22, 2020.

15     Do you see that?

16 A   Yes.

17 Q   Am I correct that this was a filing in the

18     divorce proceeding with your ex-husband?

19 A   Yes.

20 Q   And did this particular filing to modify

21     temporary order by your ex-husband have anything

22     to do with the reason why you came to Reed in

23     May asking for additional money?

24 A   Yes.

25 Q   I don't want to pretend to summarize the whole

| Page 228 |
| --- |

1     document, but to state it generally your husband

2     was basically asking for you to pay him for

3     money, correct?

4         MS. POLAKOWSKI: Objection.

5 Foundation.

6         THE WITNESS: When is this dated?

7 BY MR. CHURCHILL:

8 Q   April 22 of 2020, April 22 of 2020.

9 A   No. I didn't have any money.

10 Q   Flip to the last page of the filing, if you

11     would. If you need to review other portions of

12     it, obviously please do so, but I'm looking at

13     paragraph 13 of Exhibit 18. Are you there?

14 A   Mm-hmm.

15 Q   And "I" -- that's your husband is the I --

16     ex-husband, sorry. "I am asking that the court

17     modify the existing temporary order," then

18     subpart A, "Requiring Stacy to either take over

19     some additional expenses or pay temporary

20     maintenance to me. B, requiring Stacy to

21     contribute to my future attorney fees which are

22     necessary to proceed with this case, and C, for

23     any additional relief the court deems

24     appropriate." Do you see that?

25 A   Yes.

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

Page 229

1  Q   So does this refresh your recollection that your
2        husband was essentially asking for you to pay
3        him more money?
4              MS. POLAKOWSKI: Objection.  Form.
5  Mischaracterizes the document.  Foundation.
6              THE WITNESS: Yes, it does.
7  BY MR. CHURCHILL:
8  Q   Were you concerned at the time that if your
9        husband was successful with this filing that you
10       were going to have to pay something called
11       maintenance to him?
12  A   No.
13  Q   Why were you not concerned about that?  You just
14       said you didn't have any money.
15  A   I wasn't concerned because I didn't have any
16       money.  So I had no money to give him.
17  Q   If -- strike that.
18              Did developments in your divorce
19       proceeding cause you to reach out to Reed on May
20       the 5th and say that you needed some money?
21  A   It probably had something to do with it, yes.
22  Q   I'm going to ask you a couple questions or a few
23       questions about Exhibit 18.
24  A   Okay.
25  Q   Would you look at paragraph 10, please?

Page 230

1  A   Yes.
2  Q   That paragraph reads, "My attorney contacted
3        Stacy's attorney to see if Stacy would agree to
4        contribute to some of the costs.  Stacy
5        inherited significant assets and upon
6        information and belief has been able to meet her
7        budget by relying on those assets.  The response
8        that we received was that Stacy was not willing
9        to provide any financial help and that I should
10       sell my condominium instead."  Do you see that?
11  A   Yes.
12  Q   Do you know what condominium?
13  A   1972 Barber Drive.
14  Q   And was that a condominium that he owned?
15  A   We owned.
16  Q   And so if he sold the Barber Drive condominium,
17       the assets would have been split between the two
18       of you?
19              MS. POLAKOWSKI: Objection.  Calls for
20  a legal conclusion.
21              THE WITNESS: Yes, they would have.
22  BY MR. CHURCHILL:
23  Q   And was he living there alone at the time?
24  A   Yes, he was.
25  Q   You saw his reference to the fact -- or what he

Page 231

1        alleges was a fact that Stacy inherited
2        significant assets in line 2.  Do you see that?
3  A   Yes.
4  Q   Do you know what he was referring to?
5  A   I really don't.
6  Q   Did you inherit gold coins from your parents?
7  A   Yes, I did.
8  Q   Did you inherit silver bars from your parents?
9  A   Yes, I did.
10  Q   Did you inherit any gold bars from your parents?
11  A   I haven't looked in there in a while.  I believe
12       there's one or two small bars.
13  Q   And when you say "there," what are you referring
14       to, a safe?
15  A   My safe.
16  Q   And where is your safe, at your house?
17  A   Yes.
18  Q   Do you still own the gold coins?
19  A   Yes, I do.
20  Q   Do you still own the silver bars?
21  A   Yes, I do.
22  Q   Do you still own the gold bars?
23  A   Yes, I do.
24  Q   Do you know the value of the gold coins?
25  A   I do not.

Page 232

1  Q   Do you know the value of the silver bars?
2  A   No.
3  Q   Do you know the value of the gold bars?
4  A   No.
5  Q   Have you ever had anyone estimate the value of
6        the gold coins?
7  A   No.
8  Q   Have you ever had anyone estimate the value of
9        the silver bars?
10  A   No.
11  Q   Have you ever had anyone value an estimate of
12       the gold bars?
13  A   No.
14  Q   Why have you not redeemed any of those -- any of
15       that gold or silver for cash?
16  A   Because I had no reason to.
17  Q   Did you ever consider redeeming any of those
18       assets, specifically I mean the gold coins, the
19       silver bars and the gold bars, instead of going
20       to Reed for more cash?
21  A   No, I did not.
22  Q   Why did you not?
23  A   I just didn't think of it.
24  Q   Was it an option for you?
25              MS. POLAKOWSKI: Objection.  Calls for

Page 233

1 speculation.
2        THE WITNESS: No.
3 BY MR. CHURCHILL:
4 Q   Why not?
5 A   Well, I just because I never thought about it.
6     So I don't think it was an option.  Those are
7     put away.  You don't see them; you don't think
8     about them.
9 Q   If you had -- so are you stating that you didn't
10    remember that you had them in the safe?
11 A  No.
12 Q   So if you had wanted to you could have redeemed
13    the gold coins for cash, couldn't you?
14       MS. POLAKOWSKI: Objection.  Calls for
15 speculation.
16       THE WITNESS: I didn't think about
17 redeeming those for cash then or ever.
18 BY MR. CHURCHILL:
19 Q   I understand that's your testimony, but my
20    question is could you have redeemed the gold
21    coins for cash?
22       MS. POLAKOWSKI: And I will object
23 again.  Calls for speculation.
24       THE WITNESS: Could I have?  No.
25 BY MR. CHURCHILL:

Page 234

1 Q   Why not?
2 A   Because I don't want to.
3 Q   So is that the only reason why you couldn't
4     have?
5        MS. POLAKOWSKI: Objection.  Calls for
6 speculation.
7        THE WITNESS: I have never ever, ever
8 thought about it until just now.
9 BY MR. CHURCHILL:
10 Q   If you had wanted to redeem the gold coins for
11    cash, could you have, or is there something
12    that's preventing you from doing so other than
13    your desire not to?
14       MS. POLAKOWSKI: Objection calls for
15 speculation.  Calls for legal conclusion.
16       THE WITNESS: I just don't want to.
17 BY MR. CHURCHILL:
18 Q   So that's the only reason, correct?
19 A   Yes.
20       MS. POLAKOWSKI: Same objections.
21 BY MR. CHURCHILL:
22 Q   No one else has a claim to the gold coins other
23    than you, correct?
24       MS. POLAKOWSKI: Objection.  Calls for
25 speculation.

Page 235

1        THE WITNESS: Nobody has -- can you
2 read that back for me, please?
3        (Last question read back.)
4        MS. POLAKOWSKI: And same objections.
5        THE WITNESS: Until I die.
6 BY MR. CHURCHILL:
7 Q   Same question with respect to the silver bars,
8     the only thing that prevented you from redeeming
9     them for cash is that you didn't want to, right?
10       MS. POLAKOWSKI: Objection.  Calls for
11 speculation.
12       THE WITNESS: I didn't think of it.
13 BY MR. CHURCHILL:
14 Q   There's that, and then otherwise it's just
15    because you didn't want to redeem them for cash,
16    correct?
17       MS. POLAKOWSKI: Same objection.
18       THE WITNESS: I didn't think of it.  I
19 never thought about selling, and I never have.
20 BY MR. CHURCHILL:
21 Q   So if you had thought about selling the silver
22    bars as a way to get cash, was there anything
23    preventing you from doing so?
24       MS. POLAKOWSKI: Objection.  Calls for
25 speculation and for a legal conclusion.

Page 236

1        THE WITNESS: I don't know what I
2 would have done.
3 BY MR. CHURCHILL:
4 Q   That wasn't my question.  This is just like the
5     gold coins.  Isn't the only thing that stopped
6     you from redeeming the silver bars for cash was
7     your desire not to?
8        MS. POLAKOWSKI: Objection.  Calls for
9 a legal conclusion and speculation.
10       THE WITNESS: And that I never thought
11 about it.
12 BY MR. CHURCHILL:
13 Q   So those two things?
14 A   Correct.
15 Q   Same question for the gold bars, the only thing
16    that stopped you from redeeming them for cash
17    was that you never thought about them and that
18    you don't want to, correct?
19       MS. POLAKOWSKI: Same objections.
20       THE WITNESS: The biggest reason is
21 because I never even thought about it.
22 BY MR. CHURCHILL:
23 Q   And the other reason is that you don't want to?
24 A   Right.
25 Q   Do you have any other heirlooms from your

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

Page 237

1    parents through your inheritance?
2         MS. POLAKOWSKI: Object to form.
3    BY MR. CHURCHILL:
4    Q   Do you know what I mean by "heirloom," like a
5        family heirloom?
6    A   Like a watch?
7         MS. POLAKOWSKI: Vague as to time.
8         THE WITNESS: I have my mother's
9        watch.
10   BY MR. CHURCHILL:
11   Q   You got that as part of your inheritance through
12       the estate?
13   A   Yes.
14   Q   Any other -- strike that.
15        Do you know what the value is of your
16       mother's watch?
17   A   I do not.
18   Q   Have you ever had it appraised?
19   A   No.
20   Q   Do you believe it's valuable?
21        MS. POLAKOWSKI: Objection.  Calls for
22   speculation.
23        THE WITNESS: That I don't know.
24   BY MR. CHURCHILL:
25   Q   Is there anything else that you inherited that

Page 238

1        would be considered a valuable asset to you?
2         MS. POLAKOWSKI: Objection.  Calls for
3    speculation.  Also vague as to value.
4         THE WITNESS: I got her pearls.
5    BY MR. CHURCHILL:
6    Q   Do you know their value?
7    A   No.
8    Q   Have you ever had them appraised?
9    A   No.
10   Q   Anything else?
11   A   I cannot think of anything else.  It's been so
12       long.
13   Q   Any vehicles of any type?
14   A   No.
15   Q   Any boats of any type?
16   A   Other than the ones at Milmont.
17   Q   You didn't obtain a boat through inheritance,
18       right, it wasn't something you were inherited?
19   A   Well, it was -- the cottage was given to us.  So
20       I don't know if that's inheritance or not.
21   Q   Is there anything else that you can think of
22       that might qualify as a significant asset that
23       Steven was talking about in his filing on April
24       22?
25        MS. POLAKOWSKI: Objection.

Page 239

1    Foundation.  Form.
2    BY MR. CHURCHILL:
3    Q   When Steven wrote -- or his attorney wrote that
4        you inherited significant assets, that's what
5        I'm speaking of specifically, something that you
6        inherited that's considered a significant asset.
7        Those are his words, but anything else that
8        occurs to you?
9         MS. POLAKOWSKI: Same objections.
10        THE WITNESS: Not that I can think of.
11   BY MR. CHURCHILL:
12   Q   Do you recall that there was going to be a
13       hearing set on your ex-husband's motion to
14       modify temporary order for May 18 of 2020?
15   A   Do I have recollection of that?  Yes.
16        (Exhibit No. 19 was marked.)
17   BY MR. CHURCHILL:
18   Q   The court reporter has now handed you what's
19       been marked as Exhibit 19 for identification,
20       and this is another document from your divorce
21       proceeding.  Do you agree?
22   A   Yes.
23   Q   And it's a notice of hearing, if you look at the
24       top, from the circuit court of Dane County filed
25       April 23, 2020.  Do you see that, Ms. Randall,

Page 240

1        up at the top right?
2    A   Yes.
3    Q   And it states that there is a motion hearing set
4        for May 18, 2020.  Do you see that?
5    A   Yes.
6    Q   And in the middle there's a single line
7        paragraph that states, "Attorney Hazen's motion
8        to modify the temporary order."  Do you see
9        that?
10   A   Yes.
11   Q   And that's a reference to your ex-husband's
12       attorney, right?
13   A   Yes.
14   Q   And do you remember that this hearing was going
15       to be scheduled in May?
16   A   I don't remember the date, no.
17   Q   Was the fact that this hearing was upcoming on
18       your ex-husband's motion to modify temporary
19       order one of the reasons why you called Reed on
20       May the 5th?
21   A   Yes.
22   Q   Were there other reasons that you called Reed on
23       May the 5th?
24   A   I needed to pay my attorney, and I was running
25       out of money.

Page 241

1 Q   Were you concerned that the temporary order was
2     going to be modified as your husband had
3     requested in the motion filed with the divorce
4     court?
5 A   I honestly don't remember what the original
6     agreement was, so.  I don't know what you mean
7     by modified.
8 Q   Were you originally paying your husband
9     maintenance on a monthly basis prior to the
10    order being modified?
11 A  No.  I was not.
12 Q  Do you remember the court issuing an order that
13    you were to pay your ex-husband monthly amounts
14    in maintenance?
15        MS. POLAKOWSKI: Objection.
16 Foundation.
17        THE WITNESS: I'm not certain.
18        (Exhibit No. 20 was marked.)
19 BY MR. CHURCHILL:
20 Q   I got a document for you.
21 A   I'm sure you do.
22 Q   The court reporter has handed you now what's
23    been marked for identification as Exhibit 20 to
24    your deposition.  And you will see in the top
25    right corner that this was filed on May the

Page 242

1     21st.  So this would be after that April -- May
2     18 hearing, correct?
3 A   Yes.
4 Q   Did you attend the May 18 hearing?
5 A   No.
6 Q   Why didn't you attend?
7 A   There was no place to go because it was COVID.
8 Q   Was it a remote hearing?
9 A   Video.
10 Q  Okay.  That makes sense.  And do you recognize
11    this document titled, "Amended Temporary Order"?
12 A  Yes.  I do remember this.
13 Q  Okay.  Under the order part of the temporary
14    order, do you see down kind of towards the
15    bottom in capitals, it says, "It is hereby
16    ordered," do you see that?
17 A  Yes.
18 Q  The document says, "Effective June 15, 2020,
19    Stacy Randall shall pay directly to Steven
20    Randall $4,000 per month.  Characterization of
21    these payments as either contribution to
22    expenses or an advance on property division
23    shall be determined by agreement of the parties
24    or by the court at the final hearing."  And then
25    paragraph 2, "Steven Randall shall place the

Page 243

1     condominium at 1972 Barber Drive, Unit 3,
2     Stoughton, Wisconsin, on the market for sale."
3     Do you see that?
4 A   Yes, I do.
5 Q   And, in fact, you did have to start paying your
6     ex-husband $4,000 per month, correct?
7 A   Yes.
8 Q   Do you remember when the $4,000 figure
9     specifically first came out?
10        MS. POLAKOWSKI: Objection.
11 Foundation.
12        THE WITNESS: After I sold my stock.
13 BY MR. CHURCHILL:
14 Q   Did that number get set at the hearing itself,
15    or was that a proposed figure prior to the May
16    18 hearing?
17        MS. POLAKOWSKI: Objection.
18 Foundation.
19        THE WITNESS: I believe they came in
20    asking for 6,000.
21 BY MR. CHURCHILL:
22 Q   "They" meaning Steven and his attorney?
23 A   Steve and his attorney.
24 Q   And how did you settle on $4,000?
25 A   My attorney --

Page 244

1        MS. POLAKOWSKI: I'm going to caution
2     you at this point to not disclose things that you
3     discussed with your attorney.
4        THE WITNESS: My attorney came up with
5     it.  That's not true.  The person that was listening
6     to all of this because I had to give expenses and
7     Steve had to give his expenses, she or he said that
8     he won't agree to the 6,000, but he would agree to
9     4,000.
10 BY MR. CHURCHILL:
11 Q   To your best recollection did you know about the
12    $4,000 as something that you would owe prior to
13    the hearing on May 18th, or did it get decided
14    on May 18th?
15        MS. POLAKOWSKI: Objection.
16 Foundation.
17        THE WITNESS: I had no idea why he
18    wanted this.
19 BY MR. CHURCHILL:
20 Q   Did you remember when you first learned that you
21    would have to pay the 4,000, like what date?
22 A   No.  I don't remember what date that was.
23 Q   Do you think you knew or learned about it prior
24    to receiving the order that is Exhibit 20?
25        MS. POLAKOWSKI: Objection.  Calls for

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 245

1 speculation.
2         THE WITNESS: I did not know about it
3 prior.
4         (Exhibit No. 21 was marked.)
5 BY MR. CHURCHILL:
6 Q   The court reporter has now handed you what's
7     been marked for identification as Exhibit 21 to
8     your deposition, Ms. Randall.
9 A   Yes.
10 Q   It is a two-page document labeled Windy47391 to
11     47392, and it is a series of texts on the second
12     page. First page I believe is just a cover
13     page. There's a series of texts on page 2. Do
14     you see those?
15 A   Yes.
16 Q   Do you recognize these as texts between you and
17     your brother Reed?
18 A   Yes.
19 Q   That's his -- he's indicated as owner, that's
20     his phone number, right, 608-217-5910?
21 A   Last I knew that was his phone number.
22 Q   Okay. And you did, in fact, text your brother
23     on the 5th day of May 2020 at 4:14 p.m. and write,
24     "Steve is taking me to court. He wants me to
25     pay him maintenance. His reasons are all

---

Page 246

1     bullshit. I'm going to need to get some money."
2 A   Yes.
3 Q   And your brother Reed wrote back at 5:25 p.m.,
4     "We have a Covod problem." He accidently
5     misspelled COVID, right? "Your timing couldn't
6     be worse. We might have to take care of it in
7     Milmont." Do you see that?
8 A   Yes.
9 Q   Why did you reach out to your brother?
10 A   I always reached out to my brother when I wanted
11     to cash in some of my stock.
12 Q   And your brother had always agreed, right?
13 A   No. He told me to talk to Kiesler.
14 Q   Ultimately, you had redeemed the stock when you
15     had requested it, though, correct?
16 A   Yes.
17 Q   What did you understand at the time him to mean
18     by his reference to might have to take care of
19     it in Milmont?
20 A   I didn't ask. I don't know. It never came up
21     again.
22 Q   But what did it mean to you at the time,
23     anything?
24 A   No.
25 Q   You said it never came up again. Did you ever

---

Page 247

1     ask after this May 5, 2020, text exchange with
2     your brother about whether or not there was
3     money that could be provided to you through
4     Milmont?
5 A   Did not.
6 Q   Why not?
7 A   I didn't know what he meant by take care of
8     through Milmont. So I didn't have questions to
9     ask because I didn't know.
10 Q   You knew at the time that Milmont included the
11     cottages, correct?
12 A   Yes.
13 Q   So is it your testimony that you didn't
14     understand that taking care of it in Milmont
15     referred to something to do with the cottages?
16         MS. POLAKOWSKI: Objection.
17     Mischaracterizes her testimony.
18         THE WITNESS: I figured that it
19     probably had something to do with the cottages.
20 BY MR. CHURCHILL:
21 Q   Do you have a sentimental attachment to the
22     cottages?
23         MS. POLAKOWSKI: Objection. Form.
24     Vague.
25         THE WITNESS: I used to have a huge

---

Page 248

1     sentimental value, but I don't have that anymore.
2 BY MR. CHURCHILL:
3 Q   At the time of this redemption, which would have
4     been -- well, actually we're not at the
5     redemption yet. So May of 2020. So more than
6     three years ago did you have that sentimental
7     attachment to Milmont?
8 A   Yes.
9 Q   Would you have been interested in that time
10     frame, May of 2020, in selling off part of your
11     interest in the cottages?
12         MS. POLAKOWSKI: Objection. Calls for
13     speculation.
14         THE WITNESS: I never thought about
15     it.
16 BY MR. CHURCHILL:
17 Q   But you would have been interested?
18         MS. POLAKOWSKI: Same objection.
19         THE WITNESS: I don't know what I
20     would have thought at that time.
21 BY MR. CHURCHILL:
22 Q   Isn't it true that when the topic of Milmont
23     came up later after the redemption and closer to
24     the time of you filing suit that you made it
25     clear that you didn't want to part with your

---

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 249

1     interest in Milmont?
2         MS. POLAKOWSKI: Objection.
3  Foundation.  Assumes facts not in evidence.
4         THE WITNESS: Milmont had nothing to
5  do with this suit.
6  BY MR. CHURCHILL:
7  Q    Did you try to explore other ways to obtain
8       money other than a sale of your stock from Windy
9       Waters?
10  A   No.
11  Q   Did you apply for any loans?
12        MS. POLAKOWSKI: Objection.  Vague as
13  to timing.
14  BY MR. CHURCHILL:
15  Q   We're still talking in this May 2020 time frame
16       prior to your May 18 hearing in your divorce
17       case.
18  A   No.
19  Q   In that same time frame prior to your May 18
20       hearing while your divorce proceeding was going
21       on, did you ask other family members for money?
22  A   No.
23  Q   In that same time frame did you take money out
24       of retirement accounts?
25  A   No.

---

Page 250

1  Q    Did you consider moving?
2  A    In May of 2020?
3  Q    Yes.
4  A    I had already moved, so, no.
5  Q    Where were you living at the time?
6  A    I was living in an apartment that I'm still in
7       in McFarland.
8  Q    Did you have an obligation in May of 2020 for
9       condo payments?
10        MS. POLAKOWSKI: Objection.  Calls for
11  a legal conclusion.
12        THE WITNESS: I didn't think so.
13  BY MR. CHURCHILL:
14  Q   But did you?  You said you didn't think so.  Did
15       you have an obligation for condo payments in May
16       of 2020?
17        MS. POLAKOWSKI: Objection.  Calls for
18  a legal conclusion.  Asked and answered.
19        THE WITNESS: I don't know.
20  BY MR. CHURCHILL:
21  Q   Did you have any rental properties at the time
22       in May of 2020 prior to May 18?
23  A   Yes.
24  Q   What were those rental properties?
25  A   They were condominiums in Cottage Grove.

---

Page 251

1  Q    How many?
2  A    I believe there was eight.
3  Q    And do you know their approximate value at the
4       time?
5  A    I did not.
6  Q    Did you consider selling any of the eight condos
7       that you owned?
8  A    No.
9  Q    Why not?
10  A   That was part of our income at the time.
11  Q   When you say "our income," you mean --
12  A   Steve and I.
13  Q   -- you and Steven?  And how did you get that
14       income, you rented them out?
15  A   Yes.
16  Q   And did you obtain lease -- excuse me, did you
17       obtain rental income on all eight?
18  A   Yes.
19  Q   Where is Cottage Grove?
20  A   It's between --
21  Q   Sorry.  I don't know.
22  A   I think it's south of Madison, but I don't know.
23  Q   How long had you had those condos?
24  A   I really don't know.
25  Q   Do you still own those condos today?

---

Page 252

1  A    I do not.
2  Q    Were those -- any of those eight condo
3       properties that you and Steven purchased with
4       some of the money you got from the prior stock
5       redemptions?
6  A    No.
7  Q    You mentioned earlier in your testimony that
8       there were properties that Steven had purchased.
9       Do you remember that?
10  A   Yes.
11  Q   What properties were you discussing then?
12  A   The properties in Florida.
13  Q   And did you still have those properties in May
14       of 2020?
15  A   No.
16        MS. POLAKOWSKI: Objection to form.
17  Mischaracterizes her testimony.
18  BY MR. CHURCHILL:
19  Q   What were those properties exactly?
20  A   I didn't have much interest in that.  I believe
21       most of them were homes.
22  Q   When you say you didn't have much interest, do
23       you mean like personal intellectual interest or
24       financial interest?
25  A   Intellectual.

---

---

Page 253

1 Q   Do you know when those homes were sold?
2 A   Most of them were not sold.
3 Q   What happened to them?
4 A   They were -- unbeknownst to me I thought my
5      husband was paying the whatever and he was not.
6 Q   The whatever you mean a mortgage?
7 A   Yes.  And so most of them went to short sales.
8 Q   The bank foreclosed on the mortgages?
9 A   I don't believe there was any foreclosures, but
10     I'm not positive.
11 Q  And how many Florida properties are you talking
12     about?
13     MS. POLAKOWSKI: Objection.
14 Foundation.
15     THE WITNESS: I can't even guess.  I
16 was not happy about it.
17 BY MR. CHURCHILL:
18 Q   As of let's say May 18, again, 2020 all of those
19     Florida properties were gone, in other words,
20     you didn't have an interest in them anymore?
21     MS. POLAKOWSKI: Objection.
22 Foundation.
23     THE WITNESS: I didn't have -- I
24 didn't have an interest in them?
25 BY MR. CHURCHILL:

---

Page 254

1 Q   Financial interest.  They were no longer part of
2      the property -- or they were no longer a
3      financial asset of you and Steven?
4 A   That's right.
5 Q   Did you consider refinancing any mortgages prior
6      to the hearing on May 18, 2020?
7      MS. POLAKOWSKI: Objection.  Assumes
8 facts not in evidence.
9      THE WITNESS: I did not.
10 BY MR. CHURCHILL:
11 Q   What cars did you have at that time leading up
12     to May 18, 2020?  Did you still have your
13     Cadillac?
14 A   I had my Cadillac, yes.
15 Q   And you owned that car at that time, right?  You
16     no longer had to pay any finance payments?
17 A   Correct.
18 Q   What about the Infinity, did you have the
19     Infinity?
20 A   No.  I did not.  Steve did.
21 Q   That was his car?
22 A   Supposed to be my car, but, yes, it turned out
23     to be his.
24 Q   When you say it was his, do you mean that he
25     actually had paid you to drive it or he was just

---

Page 255

1      possessing it?
2 A   He was possessing it.
3 Q   So was it really your car?
4 A   That's --
5      MS. POLAKOWSKI: Objection.  Calls for
6 a legal conclusion.
7      THE WITNESS: That's what the
8 agreement was when we walked into the dealership.
9 BY MR. CHURCHILL:
10 Q   Whose name was the title in?
11 A   It was in one of our LLCs.
12 Q   Which LLC?
13 A   I don't recall.
14 Q   How many LLCs did you and Steven have?
15 A   I'm not really sure.
16 Q   Do you know the names of any of your LLCs?
17 A   One of them was a number Willows.  I can't
18     remember if it was Two Willows or Three Willows
19     something Willows.
20 Q   And what was the purpose of that LLC?
21 A   I don't know.
22 Q   Did you have anything to do with its creation?
23 A   No, I did not.
24 Q   Was any of your money used for purposes of its
25     operation?

---

Page 256

1      MS. POLAKOWSKI: Objection.
2 Foundation.
3      THE WITNESS: I would have to say that
4 everything that we had was from my money.
5 BY MR. CHURCHILL:
6 Q   Do you know whether or not your personal
7      finances were co-mingled with Two Willows, LLC?
8      MS. POLAKOWSKI: Objection.
9 Foundation.
10     THE WITNESS: I don't know that.
11 BY MR. CHURCHILL:
12 Q   Do you remember the name of any other LLCs set
13     up by you and Steve?
14 A   Set up by Steve.
15 Q   Set up by Steve.
16 A   I don't.  It's been quite a while.
17 Q   Do you remember roughly how many?
18     MS. POLAKOWSKI: Objection.
19 Foundation.
20     THE WITNESS: (Shakes head.)
21 BY MR. CHURCHILL:
22 Q   So you said "set up by Steve."  He was using
23     your name also?
24     MS. POLAKOWSKI: Objection.
25 Foundation.

---

Page 257

1      THE WITNESS: I don't know how LLCs
2  work. I don't know how many names you have to put on
3  them, but I'm assuming, yes, my name was on them.
4  BY MR. CHURCHILL:
5  Q   Do you ever remember signing any documents
6      related to those LLCs?
7  A   I remember signing documents, but I'm not
8      certain what they were for.
9  Q   Did you review the documents before signing
10     them?
11 A   I did not.
12 Q   Ms. Randall, would you say that it was your
13     practice to skim documents before signing rather
14     than reviewing them?
15     MS. POLAKOWSKI: Objection. Form.
16 Mischaracterizes her testimony.
17 BY MR. CHURCHILL:
18 Q   Do you understand what I mean by my question as
19     to whether it was your practice?
20 A   Did I normally do it?
21 Q   Yeah.
22 A   Yes. Any of the documents that I signed were
23     all written or however you want to explain it by
24     people that I trusted. So I did not normally
25     read things.

Page 258

1  Q   So far the only document that you indicated that
2      you -- that we have talked about today that you
3      indicated that you reviewed word for word was
4      the conflict waiver. Would you agree with that?
5  A   Yes.
6  Q   In May of 2020, again, leading up to May 18, did
7      you have hired help for you?
8      MS. POLAKOWSKI: Objection. Form.
9  Vague.
10     THE WITNESS: Like what kind of hired
11 help?
12 BY MR. CHURCHILL:
13 Q   So, for example, did you have somebody helping
14     keep up your house or apartment?
15 A   Prior to that? Steve did hire somebody. He had
16     a reason. I can't remember what it was.
17 Q   And what was that person doing?
18 A   Cleaning.
19 Q   Okay. Sorry, I didn't mean to cut you off.
20 A   They cleaned.
21 Q   And how often did they come?
22 A   Every other week.
23 Q   What about a lawn service, did you have one of
24     those?
25 A   We lived in a condo, and it was included in the

Page 259

1  condo association.
2  Q   Did you in this time frame, again prior to May
3      18, 2020, try to sell any of the personal items
4      that you had? We have already gone over the
5      gold and silver, and we know that's a no, but
6      did you try to sell anything else?
7  A   I don't think so.
8  Q   Like any furniture?
9  A   No.
10 Q   Any jewelry?
11 A   Definitely not jewelry.
12 Q   Any heirlooms or parts of your inheritance?
13 A   No.
14 Q   Did you consider holding a garage sale or yard
15     sale, rummage sale?
16 A   Before we moved back to Wisconsin we had a big
17     garage sale.
18 Q   Was that down in Florida?
19 A   Yes.
20 Q   Did you do that at any time leading up to the
21     May 18 time frame of 2020?
22 A   No.
23     After you moved to Wisconsin?
24 A   No.
25 Q   Did you apply for any jobs once you got back to

Page 260

1  Wisconsin leading up to the May 18, 2020, date?
2  A   I did not.
3  Q   Did you ever apply for public benefits?
4  A   No. I did not.
5  Q   Do you know if you qualified?
6  A   No. I do not.
7  Q   Did you ever apply for food stamps?
8  A   No. I did not.
9  Q   Do you know if you qualified?
10 A   I don't know.
11 Q   Tell me what happened after your text exchange
12     that we just went over with your brother. So
13     that's kind of the early evening of May the 5th.
14     Do you remember what happened next?
15     MS. POLAKOWSKI: Objection. Form.
16 Vague.
17 BY MR. CHURCHILL:
18 Q   Did you have any more conversations that day
19     with anybody at Windy Waters or Widen?
20 A   I don't remember specifically the dates.
21 Q   Do you remember -- I told you to keep your
22     Complaint close because I think that might be
23     helpful for you as we move through some of the
24     remaining facts.
25     Ms. Randall, if you would, and this is

Page 261

1  Exhibit 2 for your deposition, I think if you
2  turn to page 14 that will get us on track in
3  terms of where we are.  You certainly can refer
4  to 13 if you need to see.  I was going to start
5  asking you about some of your allegations in
6  paragraph 70 and after.  Do you need a moment to
7  look at it?
8  A  Yes, I do.  I remember this.
9  Q  Okay.  So I think you said again that Reed told
10  you to speak with Kiesler?
11  A  Yes.
12  Q  And to the best of your recollection once you
13  got done with that text exchange with your
14  brother Reed on May 5, did you speak with him
15  again or text or communicate with him again in
16  any way until your actual signing of the
17  redemption on May 13, do you remember?
18  A  I'm not -- not before my redemption.
19  Q  Is it correct that Mike Kiesler called you on
20  May 6th?
21  A  Yes.
22  Q  And you told him that you needed $100,000; is
23  that correct?
24  A  Yes.
25  Q  Why $100,000?

Page 262

1  A  Because I had no money.
2  Q  But why the amount $100,000?
3  A  I figured that -- I thought that would get me
4  through a year.
5  Q  And what did he say?
6  A  He told me that they didn't have $100,000 to
7  give me.
8  Q  And when you say he said, "They didn't," who did
9  you think he meant?
10  A  The company.
11  Q  And so did you then change the amount to 50,000?
12  A  Yes.
13  Q  And what did he say in response to that?
14  A  Same thing.
15  Q  Did Mike Kiesler mention COVID at all?
16  A  Oh, yes.
17  Q  In that conversation on the phone?
18  A  I don't know if it was that particular
19  conversation.
20  Q  Tell me -- you said, "Oh, yes."  Tell me what he
21  said to you about COVID in the context of this
22  redemption negotiation or discussion.
23  A  He told me they could not give me 100,000 or
24  50,000 because COVID had been very hard on the
25  company and that they -- he did not know whether

Page 263

1  the company was going to be around or not, and
2  also he said something about accepting or not
3  accepting COVID money.  I have no idea what that
4  meant, but they had to let somebody know whether
5  they were going to take it or leave it.
6  Q  Did you understand him to be referencing the
7  government or you don't know?
8  A  I assumed that.
9  Q  What else do you remember him saying?
10  A  The only way we can give you any money would be
11  to redeem all your stocks.
12  Q  And what did you say in response?
13  A  I don't want to redeem all my stocks.  That's my
14  life savings.
15  Q  And at some point he discussed with you a dollar
16  figure, right, in that conversation 1.1 million
17  dollars?
18  A  I can't remember what conversation, but
19  somewhere in there he mentioned that.
20  Q  So we're still in this May 6 phone call that I
21  believe was in the morning.  Do you remember
22  that he mentioned the 1.1 million dollar value
23  in that phone conversation?
24  A  I do.
25  Q  Do you remember Mr. Kiesler discussing how that

Page 264

1  value was computed?
2  A  No.
3  Q  You don't remember or he didn't do it?
4  A  He didn't tell me.
5  Q  Sorry, I have a tickle in my nose.
6       Do you remember him stating that the
7  figure that he computed was based only on
8  November 2019 financials and that he would need
9  to update that number?
10       MS. POLAKOWSKI:  Objection.  Form.
11  Are we still talking about the May 6 conversation?
12       MR. CHURCHILL:  Yeah.
13  BY MR. CHURCHILL:
14  Q  Do you remember him talking about November 2019
15  financials?
16  A  I do not remember that.
17  Q  Do you remember him telling you that the 1.1
18  million dollar figure would need to be updated?
19  A  No.
20  Q  Do you remember him walking through any part of
21  the financials that were the basis for the 1.1
22  million dollars?
23       MS. POLAKOWSKI:  Objection.  Form.
24  Vague.
25       THE WITNESS:  Walk me through the

Page 265

1  financials?
2  BY MR. CHURCHILL:
3  Q   Did he walk through any calculations for you?
4      Did he explain anything to you?
5  A   Not at that time.
6  Q   Did there come a time that he did explain part
7      of the calculation to you or any of the
8      calculation to you?
9          MS. POLAKOWSKI: Objection. Form.
10         THE WITNESS: There was a time when I
11  was arguing with him about redeeming all my stocks
12  and how I did not want to do that, that he told me
13  that the same formula that we used for your other
14  brothers is the same -- is the one we're using for
15  you.
16  BY MR. CHURCHILL:
17  Q   Did that reassure you at all?
18  A   No.
19  Q   Did you discuss with him, with Mr. Kiesler, that
20      the same formula that was used for your prior
21      redemptions was also being used for this
22      redemption?
23  A   No.
24  Q   Did you believe that the formula that was being
25      used in May 2020, that was being offered to you,

Page 266

1      was different than any of your prior
2      redemptions?
3          MS. POLAKOWSKI: Objection.
4  Foundation. Assumes facts not in evidence.
5          THE WITNESS: I don't remember
6  thinking that.
7  BY MR. CHURCHILL:
8  Q   You did remember that you had redeemed shares
9      before, correct?
10  A  Yes.
11  Q   Were you concerned that the formula was
12      different?
13         MS. POLAKOWSKI: Same objections.
14         THE WITNESS: I can't remember
15  thinking that.
16  BY MR. CHURCHILL:
17  Q   Did you think it might be the same, the formula?
18         MS. POLAKOWSKI: Objection. Assumes
19  facts not in evidence.
20         THE WITNESS: I don't remember what I
21  was thinking. I was so angry.
22  BY MR. CHURCHILL:
23  Q   When you were in that conversation with
24      Mr. Kiesler, did you make any request to see
25      financial information of the company?

Page 267

1  A   No. I did not.
2  Q   Did you understand that there was going to need
3      to be an agreement written up for your stock
4      redemption if you were to pursue it?
5          MS. POLAKOWSKI: Objection. Calls for
6  speculation.
7          THE WITNESS: I don't know what I
8  thought.
9  BY MR. CHURCHILL:
10  Q   Is there any reason why you wouldn't have
11      expected a Stock Redemption Agreement to be
12      drawn up like you had drawn up for the prior
13      five times?
14         MS. POLAKOWSKI: Same objection. Also
15  calls for a legal conclusion.
16         THE WITNESS: I did not think about
17  it.
18  BY MR. CHURCHILL:
19  Q   You said you were so mad. Why were you so mad?
20  A   Because he was telling me I had to do this, take
21      it or leave it. And he gave me three hours to
22      make my decision.
23  Q   And you ultimately decided to leave it, right,
24      you didn't do it?
25         MS. POLAKOWSKI: Objection. Vague.

Page 268

1          THE WITNESS: I didn't decide
2  anything.
3  BY MR. CHURCHILL:
4  Q   Did you accept the 1.1 million dollar redemption
5      price for all of your shares?
6  A   No, I did not.
7  Q   And you intentionally did not accept it,
8      correct?
9  A   Yes.
10         MS. POLAKOWSKI: Objection. Calls for
11  a legal conclusion.
12  BY MR. CHURCHILL:
13  Q   In your Complaint you used the word fair with
14      respect to your conversation with Mr. Kiesler,
15      for example, if you look at paragraph 79. Do
16      you see that?
17  A   Yes.
18  Q   Paragraph 79 reads, "Kiesler insured Stacy that
19      the price was fair." Do you see that?
20  A   Yes.
21  Q   Is that the word Mr. Kiesler used, or is that
22      you summarizing the conversation?
23  A   I believe that's his words.
24  Q   You believe he used the word "fair"?
25  A   Yes.

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 269

1 Q    You testified that Mr. Kiesler told you that the
2       formula that was used was the same formula that
3       had been used for your brothers, correct?
4 A    Yes.
5 Q    Was that part of his explanation for why it was
6       fair?
7 A    I'm not sure why he said that was fair.  I told
8       him I am not my brothers.  I don't care what
9       they did.  I don't know what they did, but I
10      don't feel that this is a fair price.
11 Q   And what was the reason -- again, we're talking
12      May 6, right?  What was the reason in that
13      conversation why you thought it was not a fair
14      price?
15 A   1 million dollars.  Well, I had a feeling that
16      the company was worth more than that, and he
17      continued to tell me they had no money.  We
18      don't know if we're going to be around.  COVID
19      was really hard on us.  I don't know if we will
20      ever be able to give you money if you don't take
21      this.  So that's the extent of it.
22 Q   Did you know at the time that your brother Price
23      Widen had redeemed his remaining shares of his
24      stock in Windy Waters in 2015, in other words,
25      had completely bought out?

---

Page 270

1 A    I did not know when any of them sold out.
2 Q    Other than knowing the exact date, were you
3       aware in May of 2020 that Price no longer held
4       any shares in the company?
5 A    I did not know that.
6 Q    Did you know that -- at the time in May 2020 did
7       you know that Price had signed a redemption
8       agreement?
9         MS. POLAKOWSKI: Objection.  Assumes
10      facts not in evidence.
11        THE WITNESS: I didn't know anything
12      about what Price was doing.
13        MS. POLAKOWSKI: Mark, we have been at
14      it for just about another hour.  If there's time to
15      take a break, that would be great.
16        MR. CHURCHILL: I just have a couple
17      more and then I'll take a break.
18 BY MR. CHURCHILL:
19 Q    You mentioned the three-hour time frame, and
20      then you mentioned that a few -- I'm looking at
21      paragraph 86 of your Complaint.  "A few minutes
22      before the three-hour deadline ran Kiesler
23      called Stacy again."  Do you see that?
24 A    Yes.
25 Q    And what did Mr. Kiesler say to you?

---

Page 271

1 A    He told me that he had really good news, that
2       Matthew and he came up with another $250,000.
3       And he also told me that he was given another
4       three days to decide whether they wanted the
5       COVID money or not.
6         MR. CHURCHILL: We can take a break
7       now, not quite this second.  I think that the
8       additional money came up in a later conversation, but
9       I will have you figure out whether or not that's the
10      case.
11        Your Complaint states that in his call
12      back on May 6th he gave you more time, but it doesn't
13      look like there was additional money discussed until
14      May 13th.  But I will get some documents together
15      that will help you as well.  Why don't we take a
16      break?
17        THE VIDEOGRAPHER: Off the record at
18      5:17 p.m.
19        (Brief recess taken.)
20        THE VIDEOGRAPHER: We are back on the
21      record.  This will mark the beginning of media unit
22      number 4 of the video recorded deposition of Stacy
23      Randall.  Today's date is August 28th, 2023, and the
24      time is 5:34 p.m.
25 BY MR. CHURCHILL:

---

Page 272

1 Q    Ms. Randall, I actually put a document on top of
2       your pile there.  It was Exhibit 13.  Do you see
3       that?
4 A    Yes.
5 Q    I realize that I forgot to ask you one question
6       about that stock redemption.  So this is the
7       January 2011 stock redemption, and you remember
8       we discussed this one earlier.  In the order of
9       things it would be number 3.  Do you remember
10      that, or do you remember that testimony from
11      earlier today?
12 A    Yes.
13 Q    And you got the $200,000 as a result of
14      redeeming your stock, correct?
15        MS. POLAKOWSKI: Objection.  Calls for
16      a legal conclusion.
17        THE WITNESS: Yes.
18 BY MR. CHURCHILL:
19 Q    And my question, which I forgot to ask you was,
20      was that a lump sum payment like the other ones?
21 A    Yes.
22 Q    Thank you.  You can put that to the side now.
23      We were talking a little bit about COVID in that
24      conversation -- in some conversation that you
25      had with Mike Kiesler.  You testified you

---

Page 273

1     weren't sure which conversation it was, but that
2     it came up; is that correct?
3  A   That is correct.
4  Q   Was it your understanding that COVID was
5     presenting challenges for the companies or did
6     you not know one way or the other?
7         MS. POLAKOWSKI: Objection.
8  Foundation.
9         THE WITNESS: I had no way of knowing.
10 BY MR. CHURCHILL:
11 Q   Did Mr. Kiesler say anything about the
12    possibility that COVID might impact the actual
13    payments to you if you were to reach an
14    agreement for the stock redemption?
15        MS. POLAKOWSKI: Same objection.
16        THE WITNESS: Can you say that again,
17 please?
18        MR. CHURCHILL: Can you read that back
19 for me?
20        (Last question read back.)
21        THE WITNESS: Not in so many words.
22 BY MR. CHURCHILL:
23 Q   Did you understand that there was a potential
24    that you might have to repay any money that you
25    got back as a part of a Stock Redemption

Page 274

1     Agreement if COVID had certain impacts on the
2     company?
3         MS. POLAKOWSKI: Objection.
4  Foundation. Also assumes facts not in evidence.
5         THE WITNESS: It never occurred to me.
6  I never heard anything about that.
7  BY MR. CHURCHILL:
8  Q   If COVID had had that type of impact on the
9     company, would you have repaid the money that
10    you had gotten from any of your Stock Redemption
11    Agreements?
12        MS. POLAKOWSKI: Objection. Calls for
13 speculation.
14        THE WITNESS: I have no idea what it
15 would have done.
16 BY MR. CHURCHILL:
17 Q   Going back to your Complaint if you still have
18    that handy.
19 A   I sure do.
20 Q   I'm on page 16 and paragraph 91. Are you there,
21    Ms. Randall?
22 A   Yes.
23 Q   Paragraph 91 reads, "Stacy told Kiesler that she
24    would need to talk with her financial advisor
25    and attorney." Do you see that?

Page 275

1  A   Yes.
2  Q   And, again, to orient you on where we are, this
3     is end of the day May 6th, right, are you with
4     me?
5  A   Yes.
6  Q   Do you remember saying that to Mr. Kiesler?
7  A   Yes, I do.
8  Q   The financial advisor that you were referencing,
9     was that Mark Goff?
10 A   Yes, it was.
11 Q   And the attorney that you were referencing, who
12    would that have been?
13 A   Probably Scott Seid.
14 Q   Not Ms. Collins O'Hara?
15 A   No.
16 Q   Why not her?
17 A   I don't think -- I probably thought that she
18    doesn't know anything about -- she's a divorce
19    attorney.
20 Q   Did you reach out to Scott Seid after the
21    conversation with Mr. Kiesler on May the 6th?
22 A   I did not.
23 Q   Did you reach out to any other attorney, other
24    than Scott Seid, after the conversation with
25    Mike Kiesler on May the 6th?

Page 276

1  A   Well, the only other one that I would have
2     reached out to because I don't know lawyers
3     would be Amy, but I don't recall.
4  Q   You mentioned earlier that you had discussed
5     things with your son Justin; isn't that correct?
6  A   Yes.
7  Q   Didn't he recommend that you get an attorney?
8  A   This is on May 6th?
9  Q   Any time after the conversation with Mike
10    Kiesler.
11        MS. POLAKOWSKI: The May 6th
12 conversation?
13        MR. CHURCHILL: Yes.
14        THE WITNESS: Yes.
15 BY MR. CHURCHILL:
16 Q   And why didn't you do what your son suggested?
17 A   Because I didn't have the time.
18 Q   Did you reach out to any attorneys on May the
19    7th or May the 8th, May the 9th, May the 10th,
20    May the 11th, or May the 12th?
21 A   May 12th I did.
22 Q   Who did you reach out to on May 12th?
23 A   Was that the day I signed?
24 Q   May 13 is the day you signed.
25 A   Then I didn't reach out to anybody.

Confidential

Page 277

1 Q   Why didn't you have the time in the week between
2     May 6 and May 13 to reach out to an attorney?
3 A   Because I was given three hours to make my
4     decision, and then Kiesler called me back and
5     told me that they -- and I don't know who "they"
6     was or is -- gave him another three days.
7 Q   Okay.  And then -- but you didn't sign anything
8     or redeem your stock in those three days,
9     correct?
10 A   Correct.
11 Q   So no three-day deadline was enforced; isn't
12     that right?
13 A   That's right.
14 Q   So, again, why didn't you ever call an attorney
15     until you called Scott Seid?
16 A   I didn't know any attorneys to call.
17 Q   Did your son Justin know any attorneys to call?
18 A   He was going to try to get ahold of somebody.
19 Q   And what happened, do you know?
20 A   This person said that they didn't have time to
21     do what Justin was asking, I believe.
22 Q   What about conversations with Mr. Goff, you did
23     reach out to him, didn't you?
24 A   Yes.
25 Q   How long had he been your financial advisor, if

Page 278

1     you recall?
2 A   I don't know.
3 Q   Well, let's say starting in May 2020, was it
4     more than ten years?
5 A   No.
6 Q   Can you give me an estimate of roughly when you
7     started using Mark Goff?
8 A   It was after I moved back to Wisconsin.
9 Q   Which I think you said was 2012.
10 A   Yes.  So it was between probably -- I didn't do
11     it then.  Maybe '16 to '18.  I'm questioning
12     myself.
13 Q   That's fair.  Did Mr. Goff help you at all with
14     any of the LLCs that Steven had set up?
15 A   No, he did not.
16 Q   Did he only help you with your personal
17     portfolio, or did he help you with more than
18     that?
19 A   Just me.
20     (Exhibit No. 22 was marked.)
21 BY MR. CHURCHILL:
22 Q   The court reporter is handing you what's been
23     marked for identification as Exhibit 22 to your
24     deposition.  I will just note for the record
25     that we discovered something funky about the

Page 279

1     timing on the email.  The metadata actually
2     indicates that this email is not from 4:59 p.m.,
3     but is from 11:59 a.m.  I'm not sure why that is
4     or why that happens.  Sometimes it's something
5     where things convert to something known as GMT
6     time.  I don't really know, but I will represent
7     to you that the time stamp on what's printed out
8     is wrong and the actual time stamp is on
9     something that your counsel is holding right
10     now.
11         The reason why I raise it is because
12     there's a couple communications that you have
13     and the time is jumping around a little bit, but
14     I think that when we get through with it, you
15     will agree with me on the order of things.
16         So regardless, let's look at the content
17     of Exhibit 22.  This is a text between you and
18     Mark Goff.  Do you see that?
19 A   Yes.
20 Q   And it's on May 6th?
21 A   Yes.
22 Q   And it's actually right before lunch time,
23     believe it or not, and not 4:59 p.m.  You say,
24     "Mark, Steve is taking me to court.  I'm going
25     to need -- I'm going to need to pull money from

Page 280

1     my stock to cover all this divorce bullshit.
2     The accountant at Widens just called me with an
3     offer.  He told me I have to either take it or
4     leave it.  If I leave it, they cannot give me
5     any money at this time or in the foreseeable
6     future.  He told me I need to decide by 3:00
7     p.m. today.  Please call me.  I need your
8     advice."  Did I read that correctly?
9 A   Yes.
10 Q   And the accountant that you're talking about is
11     Mike Kiesler, right?
12 A   Yes.
13 Q   And you state in there the bit about the take it
14     or leave it, which is what you testified to
15     earlier today, correct?
16 A   Yes.
17         MS. POLAKOWSKI:  Mark, just for the
18     record, I accept your representation as to the timing
19     of this text message, obviously subject to
20     confirmation.
21         MR. CHURCHILL:  Yeah.
22         (Exhibit No. 23 was marked.)
23 BY MR. CHURCHILL:
24 Q   You now have in front of you what's been marked
25         for identification as Exhibit 23.  Do you have

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 281

1  it, Ms. Randall?
2  A   Yes.
3  Q   And you can see why I was focused on the time
4      because this says 12:16, and I think that is
5      correct.  So I will represent to you that I
6      believe this was a subsequent text from you to
7      Mark Goff -- excuse me, to Justin Randall.
8          And this is a document produced as
9      Randall116.  You said to Justin in your text,
10     "Kiesler was extremely cocky with me.  He told
11     me that Widens might even be around in seven
12     years.  I could end up with nothing if I don't
13     take this offer.  I tried to explain to him that
14     this is a really big deal.  It's what I have to
15     live on for the rest of my life.  I need time to
16     talk to my people.  He told me I need to take it
17     or leave it.  If I turn it down, sorry we can't
18     help you."  Do you see that?
19 A   Yes.
20 Q   Do you remember if Justin responded to your
21     text?
22 A   I'm sure he did.  That's probably maybe when he
23     told me that I need to get an attorney to look
24     at Widens' financials.
25 Q   You think as a result of that text from you?

---

Page 282

1  A   Mm-hmm.
2  Q   Did you speak with Justin on the phone?
3  A   We talked back and forth in all different ways
4      during this time.
5          MR. CHURCHILL:  I'm going to hand this
6      document to the court reporter, and it has what I
7      think is the correct time written on it if that's
8      okay, Jess, just because I think it will be helpful
9      for the record.  It's written in a time and circled.
10     It's reflected in the metadata report that I just
11     gave you.
12         (Exhibit No. 24 was marked.)
13 BY MR. CHURCHILL:
14 Q   Okay.  So, Ms. Randall, the court reporter has
15     handed you what's been marked for identification
16     as Exhibit 24, and I just indicated that there's
17     a different time stamp written on it because I
18     believe the actual time of this communication is
19     2:58 p.m. and not 7:58 p.m.
20         MS. POLAKOWSKI:  I will just note for
21     the record, I'm confused now because we weren't
22     talking about that email previously, I don't believe.
23         MR. CHURCHILL:  Right.  So the first
24     one -- this is another text from her to Mr. Goff, and
25     it's just a couple hours after Exhibit 22.

---

Page 283

1          MS. POLAKOWSKI:  Okay.  So your
2      suggestion is that the timing on both of these texts
3      is off?
4          MR. CHURCHILL:  Correct.  So the two
5      to Goff are both off.  So the first Goff text was at
6      11:59 a.m., not 4:59 a.m., and this Goff text is at
7      2:58 p.m., not 7:58 p.m.  The timing on the one with
8      Justin I think is correct.
9          MS. POLAKOWSKI:  Just so the record is
10     clear as well, note that the email found on Exhibit
11     24 is also on the backside of Exhibit 22.
12         MR. CHURCHILL:  Double-sided?
13         MS. POLAKOWSKI:  Yeah.  That was part
14     of my confusion.
15         MR. CHURCHILL:  Is that on the
16     witness's copy?
17         MS. POLAKOWSKI:  I believe so, but we
18     can check.  Do you have Exhibit 22, Stacy?  It is on
19     the witness's copy.
20         MR. CHURCHILL:  Okay.  I don't think
21     that was intentional.  Okay.  That just means we
22     could have used one document instead of two.
23 BY MR. CHURCHILL:
24 Q   So Exhibit 24 is also on the back of Exhibit 22
25     apparently, but let's use 24 now because it's

---

Page 284

1      got the time written on it in a circle as 2:58
2      p.m.  Are you there?
3  A   Yes.
4  Q   Exhibit 24 is a follow up text from you to Mark
5      Goff.  Do you see that?
6  A   I do.
7  Q   And you state in your text, "Are you alive?
8      Have COVID-19?  Maybe you are on some tropical
9      island some place soaking in the sun.  I am in
10     need of money.  I asked Reed if I could please
11     pull some cash from stocks.  This is what I was
12     told, Widens is telling me that the only way
13     they can help me is for them to buy me out.  It
14     would be 1.1 million dollars over seven years
15     paying me monthly $14,000.  Supposedly it has
16     something to do with COVID bail-out money.  I
17     would obviously have to invest this money.  My
18     accountant is out until Monday so I don't have
19     an opinion from a tax point."
20         Do you remember who the accountant was?
21     Was that Scott Spangler that you're talking
22     about?
23 A   Yes.
24 Q   So you asked Mr. Goff continuing, "Do you think
25     this is something I should consider?  I found

---

**Colleen Reed Reporting LLC**
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 285

1  out about this offer at around 10:00 a.m. this
2  morning.  They are giving me until 3:00 p.m. to
3  decide.  If I don't take this offer, there's
4  nothing they can do to help me.  Sorry is what
5  the accountant at Widens told me.  Mind you this
6  is the only money I have to live on for the rest
7  of my life.  Yours truly, Stacy Randall."  Do
8  you remember sending that text?
9 A   I remember the first sentence for sure.  Yeah, I
10  do remember it.
11 Q   And do you remember communicating with Mr. Goff
12  after sending this text?
13 A   I can't remember where he was or if he was just
14  ignoring me or what.  That's why I asked all
15  those questions.
16 Q   Do you remember whether or not you had a phone
17  call after texting him?
18       MS. POLAKOWSKI: Objection.  Vague as
19  to timing.
20       THE WITNESS: I do not remember.
21       (Exhibit No. 25 was marked.)
22  BY MR. CHURCHILL:
23 Q   Ms. Randall, now you have been handed what's
24  been marked as Exhibit 25 for identification.
25  It's a document produced as Randall328, and this

---

Page 286

1  is another text from you to Mr. Goff, correct?
2 A   It appears that way.
3 Q   And, again, May 6th, 2020, and the time is 4:30
4  p.m.  Do you agree with that?
5 A   Yes.
6 Q   And I have no change to make to the time.  This
7  seems to be correct.  And you state in your
8  text, "Thanks for helping me know what I should
9  say."  Do you see that first sentence?
10 A   I do.
11 Q   Does that help remind you whether you had a
12  phone call or not?
13 A   I don't remember if it was a phone -- just the
14  way it's worded I think that I was just thanking
15  him for his help.
16 Q   You had communicated somehow with Mr. Goff,
17  correct?
18 A   Yes.
19 Q   And you wrote -- you texted here, "Mike's
20  attitude sure turned around in a hurry when I
21  told him that I would like to hire someone that
22  would represent me to look at the books and do
23  their own evaluation of the company.  I told him
24  I have never thought they had an interest in my
25  well-being.  He told me that the company puts

---

Page 287

1  all of the incoming profit right back into the
2  business.  So they never make any money.  He
3  gave me the way they have evaluated the company
4  shares since 1991.  It has nothing to do with
5  how good or how bad the company is doing.  He
6  was trying to tell me in seven years my stock
7  would still be worth 1.1 million.  I don't
8  understand how that could be.  Just when I was
9  going to call him back, he was calling me.  It
10  was at 3:58."  Do you see that?
11 A   Yes, I do.
12 Q   And it references a discussion that Mike had
13  with you where he gave you -- he gave -- you
14  wrote, "He gave me the way they have evaluated
15  the company shares since 1991."  Do you see
16  that?
17 A   Yes.
18 Q   So was that a discussion that Mr. Kiesler had
19  with you about the redemption agreements or you
20  just don't remember?
21 A   I don't remember.
22 Q   Do you remember me asking you earlier whether or
23  not Mr. Kiesler had gone over financial
24  information with you?
25 A   Yes.

---

Page 288

1 Q   And this appears to indicate that he did go over
2  some financial information with you on May the
3  6th; isn't that right?
4       MS. POLAKOWSKI: Objection.
5  Mischaracterizes the document.
6       THE WITNESS: I wasn't thinking of
7  this as financial information.
8  BY MR. CHURCHILL:
9 Q   You told Mr. Goff that Mr. Kiesler gave you the
10  way they had evaluated the company shares since
11  1991; isn't that right?
12 A   Yes.
13 Q   And you have no reason to believe that what you
14  texted to Mr. Goff wasn't true when you wrote
15  it?
16       MS. POLAKOWSKI: Objection.
17  Foundation.
18       THE WITNESS: I'm sure that it was the
19  truth.
20  BY MR. CHURCHILL:
21 Q   And then you said to Mr. Goff, you said -- and
22  I'm going right back to the middle here.  We
23  just were reading up where it says, "Just when I
24  was going to call him back, he was calling me.
25  It was at 3:58.  I had to chuckle thinking he

---

Stacy L. Randall v
Reed C. Widen, et al.

**Confidential**

Stacy L. Randall
August 28, 2023

---

Page 289

1  was going to pressure me for a decision." Why
2  did you say that?
3  A   Because I hadn't contacted him and the three
4  hours was nearing.
5  Q   It says that you were going to chuckle.  It
6  sounds like you had one over on him.  He was
7  calling you --
8  A   Well, I had my answer.
9  Q   So why did you say you were going to chuckle?
10  You weren't feeling very pressed, it doesn't
11  seems like.
12          MS. POLAKOWSKI: Objection.  Form.
13  Mischaracterizes the document.
14          THE WITNESS: I had to chuckle because
15  he was calling.  He wasn't waiting for me to call
16  him.
17  BY MR. CHURCHILL:
18  Q   You wrote, "I had to chuckle thinking he was
19  going to pressure me for a decision."  Isn't
20  that an indication that you weren't feeling
21  pressure?
22          MS. POLAKOWSKI: Objection.
23  Mischaracterizes her testimony.
24          THE WITNESS: That I wasn't feeling
25  pressure?

---

Page 290

1  BY MR. CHURCHILL:
2  Q   Yeah.
3  A   Absolutely not.
4  Q   You wrote, "What he told me was that he had just
5  received an email saying the government has
6  pushed back the deadline for another week so he
7  doesn't need my answer today after all."  Do you
8  see that?
9  A   Yes.
10  Q   Didn't you say on your Complaint that
11  Mr. Kiesler didn't provide any reason for why
12  you got additional time to consider the offer?
13          MS. POLAKOWSKI: Objection.  And,
14  Stacy, if you need to look at the Complaint to see
15  what was said, you can take the time you need to do
16  that.
17          THE WITNESS: Can you repeat that
18  question or comment?
19  BY MR. CHURCHILL:
20  Q   Sure.  Why don't you go first to page 15 of your
21  Complaint.  Paragraph 86 to start.
22  A   Okay.
23  Q   Paragraph 86 reads, "Stacy decided not to call
24  Kiesler back; however, a few minutes before the
25  three-hour deadline ran Kiesler called Stacy

---

Page 291

1  again."  Do you see that?
2  A   Yes.
3  Q   Paragraph 87 the reads, "Kiesler told Stacy that
4  he had good news, that he had been given another
5  three days for Stacy to accept the all or
6  nothing offer."  Do you see that?
7  A   Yes.
8  Q   And then paragraph 88, "Kiesler offered no
9  explanation for this new time constraint."  Do
10  you see that as well?
11  A   I do.
12  Q   Didn't you just tell Mark Goff that Kiesler did
13  give a explanation for the new time constraint?
14          MS. POLAKOWSKI: Objection.
15  Mischaracterizes the documents.
16          THE WITNESS: Yes, I did.
17  BY MR. CHURCHILL:
18  Q   You then said to Mr. Goff, "Now I have time to
19  talk to Scott Spangler on Monday to see what he
20  thinks I should do.  Kiesler now knows I don't
21  trust he or Reed, and I don't believe they have
22  my best interest in mind at all.  I could tell
23  he was in disbelief, and I could hear some
24  sadness in his voice.  So that's where we are
25  sitting at this moment.  Things will be changing

---

Page 292

1  daily I am sure.  I will keep you posted.  I'm
2  going to need your knowledge on how to make my
3  money grow.  Thank you for your time, Mark."
4          Did I read that accurately?
5  A   Yes, you did.
6  Q   It seems like you weren't feeling much pressure
7  as a result of this situation based on your
8  statements to Mr. Goff, wouldn't you agree with
9  that, Ms. Randall?
10          MS. POLAKOWSKI: Objection.  Form.
11          THE WITNESS: What are you talking
12  about pressure?
13  BY MR. CHURCHILL:
14  Q   Why did you say, "Kiesler now knows I don't
15  trust he or Reed"?
16  A   I had a lot of pressure on me.  I really --
17  these days were so stressful because I knew
18  nothing.
19  Q   So why did you tell Mr. Goff that Kiesler knows
20  you don't trust he or Reed?
21  A   Maybe I just thought that because of the way --
22  the tone of his voice.
23  Q   And was that true that you didn't trust Mike or
24  Reed as a result of that situation?
25  A   I was beginning to question it.

---

Page 293

1 Q   Certainly no reason to believe that you would
2     tell Goff that if it wasn't true, correct?
3 A   Yes.
4 Q   Did you, in fact, get in touch with Scott
5     Spangler on Monday like you said you were going
6     to?
7 A   That I can't remember, and if I did, he would
8     have said -- I don't know what he would have
9     said.
10 Q   You agree that between the time that you wrote
11     this text to Mark Goff on May the 6th and the
12     time that you eventually signed the redemption
13     agreement that a week passed, right?
14 A   Yes.
15 Q   Did you change how you felt about trusting Reed
16     and Mike in that weeks' time frame?
17 A   Yes.
18 Q   Why?
19 A   Just the way that Mike Kiesler was talking to
20     me.
21 Q   That made you trust him more or trust him less?
22 A   I had the utmost trust and respect in Mike
23     Kiesler until this, and I can't identify why. I
24     have been told that I'm a good people reader,
25     and so far pretty much what I think is what --

Page 294

1     when people ask me it's been true.
2 Q   Just for the record, you said you trusted Mike
3     Kiesler until this and you pointed at the table.
4     What do you mean until which --
5 A   I meant until this whole thing started.
6 Q   The lawsuit, you mean?
7 A   Yes.
8 Q   And when you say that you trusted Mike Kiesler
9     until the lawsuit, you trusted Mike Kiesler
10     until you found out that the company sold for
11     162 million dollars; is that what you mean?
12 A   Yeah.
13 Q   You said that your son Justin was suggesting
14     that you hire an attorney, correct?
15 A   He did suggest that.
16 Q   And Justin also suggested that you obtain
17     counsel to find out what the companies were
18     worth.  Is that what you testified to?
19 A   No.
20 Q   You said something about Justin suggesting that
21     you have the books checked out or the financials
22     checked out?
23 A   Yes.  Find an attorney to look at the financial
24     books.
25 Q   And it's true that you never had that done prior

Page 295

1     to signing the redemption agreements, correct?
2 A   Justin thought he knew somebody, but this person
3     did not have the time to do what he was asking.
4 Q   So the answer is, yes, you did not do that
5     between your conversation --
6 A   I did not do that.
7 Q   -- with Justin and when you signed the
8     redemption agreements?
9 A   Correct.
10 Q   Isn't it true that none of the deadlines that
11     you have complained about in your Complaint
12     related to the redemption in May were actually
13     enforced by any of the defendants?
14 A   Like the three days and the three hours?
15 Q   Yeah.
16 A   There's a reason why Mike Kiesler called me at
17     3:58.  So like I said, I thought that he was
18     calling me to pressure me for an answer.
19 Q   And then he didn't, correct?
20 A   Correct.  So those to me were, hmm, I wonder why
21     he did that.  Those three hours were hell.
22     We're talking about my stock and my life.
23 Q   And is it your understanding that you didn't
24     have an ability not to sign any agreement?
25         MS. POLAKOWSKI: Object to the form of

Page 296

1 the question.
2 BY MR. CHURCHILL:
3 Q   Do you understand what I'm asking?
4 A   Not really.
5 Q   Couldn't you have just not signed?
6         MS. POLAKOWSKI: Objection.  Calls for
7 speculation.
8         THE WITNESS: If I was financially
9 stable, I probably wouldn't have signed.
10 BY MR. CHURCHILL:
11 Q   No one was holding the pen and forcing you to
12     sign, correct?
13 A   Nobody was holding the pen and forcing me to
14     sign.
15 Q   And in fact, you had other assets that you could
16     have redeemed instead of the stocks, correct?
17         MS. POLAKOWSKI: Objection.  Calls for
18 speculation.  Calls for a legal conclusion.
19         THE WITNESS: Are you talking about my
20 silver and my gold?
21 BY MR. CHURCHILL:
22 Q   Silver and your gold is some, right?  You could
23     have redeemed those?
24 A   Like I said, I never even thought about it.
25 Q   But you could have which you also said, correct?

Page 297

1           MS. POLAKOWSKI: Objection. Calls for
2   speculation. Calls for legal conclusion.
3           THE WITNESS: If I thought about it,
4   but I wouldn't have.
5   BY MR. CHURCHILL:
6   Q   And you could have sold your condos in the
7       Cottage Grove area, correct?
8           MS. POLAKOWSKI: Objection. Calls for
9   speculation. Calls for a legal conclusion.
10          THE WITNESS: This is May of 20 --
11  BY MR. CHURCHILL:
12  Q   May of 2020.
13  A   I didn't want to have anything to do with those
14      condos.
15  Q   But you could have sold them?
16  A   I don't --
17          MS. POLAKOWSKI: Hold on. Objection.
18  Calls for speculation and calls for a legal
19  conclusion.
20  BY MR. CHURCHILL:
21  Q   What's your answer, Ms. Randall?
22  A   I don't know if I could have or not.
23          (Exhibit No. 26 was marked.)
24  BY MR. CHURCHILL:
25  Q   Ms. Randall, you have been handed what's been

Page 298

1   marked for identification as Exhibit 26 to your
2   deposition, and it's a document produced by you
3   Randall403 through 405. Do you have that in
4   front of you?
5   A   Yes, I do.
6   Q   And this was a document that I found out was an
7       example of a communication that you had with
8       Scott Spangler. Do you see him listed at the
9       top of the first page of the exhibit?
10          MS. POLAKOWSKI: I will object to form
11  and foundation. Also it mischaracterizes the
12  document. I'm not seeing Stacy's name anywhere on
13  these documents.
14  BY MR. CHURCHILL:
15  Q   So this is a communication between -- at the top
16      it's between Steve and Scott Spangler. Do you
17      see that? I'm sorry, on the very first page. I
18      said your name, but it's actually Steven's name.
19      Do you see that?
20  A   Yes.
21  Q   And then there's a PDF that's got your name and
22      the title of the PDF. Do you see that at the
23      top?
24  A   Yes.
25  Q   Did you ever have any involvement in the

Page 299

1   exchanges with Scott Spangler regarding tax
2   information?
3           MS. POLAKOWSKI: Object. Vague as to
4   time.
5           THE WITNESS: With Scott Spangler
6   talking about tax information?
7   BY MR. CHURCHILL:
8   Q   Yes.
9   A   Yes. He was my accountant.
10  Q   And I said ever meaning ever. Did you ever have
11      an exchange with Scott Spangler on tax
12      information?
13  A   He explained my taxes to me every year.
14  Q   Did you know in November of 2018 that Steven
15      Randall was communicating regarding your K-1
16      with Scott Spangler?
17          MS. POLAKOWSKI: Objection. It
18  assumes facts not in evidence.
19          THE WITNESS: No. I did not know
20  that.
21  BY MR. CHURCHILL:
22  Q   When Steven was dealing with tax issues, he was
23      acting on your behalf; isn't that correct?
24          MS. POLAKOWSKI: Objection. Calls for
25  a legal conclusion and also foundation.

Page 300

1           THE WITNESS: We were still married,
2   so, yes.
3   BY MR. CHURCHILL:
4   Q   Let me go back quickly to Exhibit 25. This was
5       your last text that I showed you to Mark Goff.
6       Do you have that one?
7   A   Yes, I do.
8   Q   Near the second to bottom line you texted,
9       "Things will be changing daily I am sure." Do
10      you see that?
11  A   Yes, I do.
12  Q   Do you remember why you said that?
13  A   Because I was being told different things.
14  Q   Did you anticipate there would be more
15      negotiations with Mike Kiesler?
16          MS. POLAKOWSKI: Objection. Form.
17  Vague as to negotiations.
18          THE WITNESS: I don't know if that's
19  what I meant or what I --
20  BY MR. CHURCHILL:
21  Q   Did you remember at the time that Mike Kiesler
22      had told you that he needed to update the figure
23      for the redemption with December 2019
24      financials?
25  A   I do not remember him telling me that.

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 301

1          (Exhibit No. 27 was marked.)
2    BY MR. CHURCHILL:
3    Q   Ms. Randall, you have been handed what's been
4        marked for identification as Exhibit 27 to your
5        deposition.  It's a document produced by you in
6        this case, Randall178 through Randall187.
7    A   It's a -- what did you say?
8    Q   I was reading the Bates numbers.
9    A   Okay.
10   Q   So I gave you -- the front page should be
11       Randall178 and that back page should be
12       Randall187.
13   A   Okay.  Yes.
14   Q   Do you recognize this document?
15   A   No.
16   Q   For the record, it's a document titled, "Widen
17       Financial Statements Consolidated December 31,
18       2019," and I'm interested in knowing when you
19       obtained this document, if you know, since it
20       was produced by you in this case.
21          MS. POLAKOWSKI: Object.  Foundation.
22          THE WITNESS: Produced by me?
23   BY MR. CHURCHILL:
24   Q   Yeah.  Remember that process we were talking
25       about before where I said there were document

---

Page 302

1        requests served on you, and then I asked you if
2        you had searched for documents.
3    A   Yes.
4    Q   I'm wondering if you have this document or if
5        this document was provided to you actually from
6        the defendants.
7          MS. POLAKOWSKI: Objection.
8        Foundation.
9          THE WITNESS: I don't remember
10       anything about this.
11   BY MR. CHURCHILL:
12   Q   Have you ever seen it before today?
13   A   No.
14   Q   Okay.  You can put that to the side.  Let's go
15       back to your Complaint so we can walk through
16       the rest of the timeline here.  On -- in
17       paragraph 93 on page 16.  Are you there?
18   A   Yes.
19   Q   Paragraph 93 reads, "Stacy did not want to
20       accept Kiesler's offer," and by that you mean
21       the offer from May the 6th, the 1.1 million; is
22       that what you meant by that?
23   A   "Stacy did not want" --
24          MS. POLAKOWSKI: I will object to form
25       and foundation.

---

Page 303

1    BY MR. CHURCHILL:
2    Q   I will keep reading.  Let's see if I can jog
3        your memory.  "Stacy did not want to accept
4        Keisler's offer so despite her financial
5        situation she allowed the three-day time limit
6        to lapse without responding."  Do you see that?
7    A   Yes.
8        And then you allege that, "On or around May 13
9        Kiesler called Stacy again."  Do you see that?
10   A   Yes.
11   Q   What do you remember about that conversation?
12          MS. POLAKOWSKI: Mark, I apologize can
13       you orient me?
14          MR. CHURCHILL: Sure.  Paragraph 94.
15          MS. POLAKOWSKI: Thank you.
16   BY MR. CHURCHILL:
17   Q   What do you remember about Mike calling you on
18       May 13?  This is when you wrote that he had come
19       up with another $250,000.
20   A   He told me, guess what, I have more good news.
21       He told me that they found another 250,000.
22   Q   Isn't it true that Mr. Kiesler told you that he
23       was just updating the formula for the December
24       2019 financials?
25          MS. POLAKOWSKI: Objection.

---

Page 304

1    Mischaracterizes her testimony.
2          THE WITNESS: I don't remember that at
3    all.
4    BY MR. CHURCHILL:
5    Q   Do you remember saying something to him along
6        the lines of, "That's more like it," when you
7        found out about the 250,000?
8    A   No.  I said, "That's all?"
9    Q   And so the offer that was made then was in
10       excess of 1.3 million dollars for the rest of
11       your stock, correct?
12   A   Yes.
13   Q   Ms. Randall, if you were so upset about the
14       amount of money being offered, why didn't you
15       turn it down?
16   A   I was told I had to take it or leave it, and
17       they didn't know when they could give me money
18       if they could give me money.
19   Q   So why didn't you leave it?
20   A   I didn't have any money.
21   Q   That's not been your testimony today.  You
22       testified that you had other assets and other
23       money.
24          MS. POLAKOWSKI: I will object to the
25   form of the question.  It mischaracterizes her

---

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 305

1  testimony.
2  BY MR. CHURCHILL:
3  Q   Isn't it true that you had other assets that you
4      could have redeemed and not had to sell your
5      stock?
6          MS. POLAKOWSKI: Objection. Calls for
7  speculation.
8          THE WITNESS: No.
9  BY MR. CHURCHILL:
10 Q   That's not true?
11 A   No.
12 Q   Isn't it true that you knew that this did not
13     involve Milmont, which was a different asset
14     that you could have redeemed instead?
15         MS. POLAKOWSKI: Object to the form of
16 the question. Also calls for speculation.
17         THE WITNESS: I didn't think about it.
18 BY MR. CHURCHILL:
19 Q   But you knew Milmont wasn't one of -- wasn't
20     being discussed with respect to the stock
21     redemption, correct?
22         MS. POLAKOWSKI: Objection.
23 Speculation. Calls for -- excuse me, just one
24 second. Foundation.
25         THE WITNESS: What do you mean by --

---

Page 306

1  who discussed?
2  BY MR. CHURCHILL:
3  Q   When you were having the discussion with Mike
4      Kiesler --
5  A   Yes.
6  Q   -- on May the 6th and then again on May the 13th
7      you knew this was not a discussion about
8      Milmont, correct?
9          MS. POLAKOWSKI: Object to the form of
10 the question. Vague.
11         THE WITNESS: Right.
12 BY MR. CHURCHILL:
13 Q   Okay. In paragraph 97, again, of the Complaint
14     page 16 it states, "Frantic for advice, Stacy
15     contacted friends in the wealth management
16     industry and her personal accountant, but nobody
17     could provide advice before Kiesler's deadline
18     lapsed." Do you see that?
19 A   Yes.
20 Q   So is it true then that you did reach out to
21     additional people after getting off the
22     telephone with Mike Kiesler?
23 A   I reached out to Mark Goff.
24 Q   Again? On May 13?
25         MS. POLAKOWSKI: Object to the form of

---

Page 307

1  the question. Mischaracterizes the document.
2  BY MR. CHURCHILL:
3  Q   Are you following me, Ms. Randall?
4  A   Yes, I am.
5  Q   Who are the people that you reached out to that
6      are referenced in paragraph 97 of your
7      Complaint?
8  A   Wealth management would be Mark Goff.
9  Q   And then personal accountant would be Scott
10     Spangler?
11 A   Yes.
12 Q   Anybody else?
13 A   I do not believe so.
14 Q   And then you reached out to your attorney,
15     right, your divorce Attorney Ms. Collins O'Hara?
16 A   Yes, I did.
17 Q   In paragraph 105 -- strike that.
18         Let's back up a little bit to orient
19     you. Paragraph 103, let's start with -- of the
20     Complaint on page 17 -- "Stacy then emailed
21     Attorney B with a frantic subject line, 'I need
22     help.'" Do you see that?
23 A   Yes.
24 Q   And do you remember who Attorney B was?
25 A   It would be Amy.

---

Page 308

1  Q   And you -- then it says, "Stacy told Attorney B
2      that Kiesler had just called her and apparently
3      revised his valuation of Windy Waters, but that
4      because of the COVID thing I have to sign these
5      papers today, like now." Do you see that?
6  A   Yes.
7  Q   So you knew that you were going to see some
8      papers?
9          MS. POLAKOWSKI: Object to the form of
10 the question.
11         THE WITNESS: I knew that I was going
12 to be seeing -- I had to sign some papers today.
13 BY MR. CHURCHILL:
14 Q   You expected to see -- if you were going to do
15     the deal, you expected to see a redemption
16     agreement again, correct?
17         MS. POLAKOWSKI: Objection
18 mischaracterizes her testimony.
19         THE WITNESS: No. I did not expect to
20 see that.
21 BY MR. CHURCHILL:
22 Q   What papers did you think you were going to need
23     to see?
24         MS. POLAKOWSKI: Objection.
25 Mischaracterizes the document.

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

Page 309

1    THE WITNESS: I didn't know.
2  BY MR. CHURCHILL:
3  Q   Did you think to ask to see the papers that you
4     might have to sign prior to signing them?
5    MS. POLAKOWSKI: Object to the form of
6  the question. It's vague.
7    THE WITNESS: Can you repeat that?
8    MR. CHURCHILL: Would you read it
9  back, please?
10    (Last question read back.)
11    THE WITNESS: No. I did not think of
12  that.
13  BY MR. CHURCHILL:
14  Q   Isn't it true that you agreed with Mike Kiesler
15     that Scott Seid would draft up papers for you to
16     sign for the May 2020 redemption agreement?
17  A   That's not true.
18  Q   You didn't agree for Scott Seid to draft those
19     papers?
20  A   I knew nothing about Scott Seid.
21  Q   Well, that's not true because in paragraph 102
22     you admit you called and left Scott Seid a
23     message.
24  A   Right. But I did not know that he was going to
25     be drafting papers.

---

Page 310

1  Q   That never came up?
2  A   Are you asking me if Mike Kiesler ever told me
3     that Scott Seid was going to draft papers?
4  Q   Isn't it true that you and Mike Kiesler agreed
5     that Scott Seid would draft up the papers for
6     you to review and sign?
7    MS. POLAKOWSKI: Objection.
8  Mischaracterizes her testimony.
9    THE WITNESS: No, that's not true.
10  BY MR. CHURCHILL:
11  Q   Ultimately you left Scott Seid a voicemail,
12     right?
13  A   Yes, I did.
14  Q   And was it your understanding at the time that
15     Mr. Seid could advise you with respect to the
16     potential redemption of your shares?
17  A   Yes, it was.
18  Q   And that's true even though you had signed a
19     conflict waiver earlier saying that you knew
20     that the Stafford Rosenbaum firm was handling
21     the redemptions of your shares for the company?
22  A   I did not know that Rosenbaum was doing --
23     writing redemption things.
24  Q   You remember that you signed that conflict
25     waiver that says expressly that the Stafford

---

Page 311

1  Rosenbaum firm would be handling redemptions of
2     your stock?
3    MS. POLAKOWSKI: Objection to the
4  extent it mischaracterizes the document and calls for
5  a legal conclusion. Also vague as to timing.
6    THE WITNESS: I know that I signed the
7  paper.
8    MS. POLAKOWSKI: And, Stacy, if you
9  need to look at the waiver letter to determine what
10  it says, go ahead and take the time that you need to
11  do that.
12    THE WITNESS: Yeah. Where is that?
13    MR. CHURCHILL: It should be Exhibit
14  17.
15    MR. PALAY: Mark, I just want to ask
16  you a question about this document when it's a good
17  time, so just let me know.
18    MR. CHURCHILL: Sure.
19  BY MR. CHURCHILL:
20  Q   All right. So second sentence, first paragraph
21     of Exhibit 17 letter to you from Amy T. Collins,
22     "As you know, we also represent Windy Waters,
23     Inc., (the company) in unrelated corporate
24     matters including your redemption of shares of
25     the company." Do you see that?

---

Page 312

1  A   Yes.
2  Q   Okay. Do you now recall that you waived that
3     conflict and therefore knew that Stafford
4     Rosenbaum was representing Windy Waters in the
5     redemption of your shares?
6    MS. POLAKOWSKI: Objection.
7  Mischaracterizes the document. Also calls for
8  a legal conclusion.
9    THE WITNESS: I don't think that I had
10  enough information to say that.
11    MR. CHURCHILL: Why don't we take a
12  break?
13    THE VIDEOGRAPHER: Going off the
14  record. The time is 6:29 p.m.
15    (Brief recess taken.)
16    THE VIDEOGRAPHER: We are back on the
17  record. The time is 6:44 p.m.
18  BY MR. CHURCHILL:
19  Q   Ms. Randall, you got off the phone with
20     Ms. O'Hara and then ultimately made the decision
21     to go to Widens offices, correct?
22  A   That is right.
23  Q   Did Mike Kiesler know you were coming?
24  A   Yes.
25    (Exhibit No. 28 was marked.)

---

Stacy L. Randall v
Reed C. Widen, et al.

Confidential

Stacy L. Randall
August 28, 2023

---

**Page 313**

1  BY MR. CHURCHILL:
2  Q  Ms. Randall, you have been handed what's been
3      marked for identification as Exhibit 28 to your
4      deposition.  And this is a text from you to
5      Justin sent at 3:56 p.m. on May 13.  Do you see
6      that?
7  A  Yes.
8  Q  And you wrote, "Well lo and behold, Kiesler did
9      another evaluation of the company and came up
10     with another 250,000."  Do you see that?
11 A  Yes.
12 Q  "Nothing I can do about it.  I will be going
13     over to the office to sign the papers at 4:30."
14     Do you see that?
15 A  Yes.
16 Q  Why did you say, "Nothing I can do about it"?
17 A  He made it perfectly clear to me there is
18     nothing I can do about it.
19 Q  So you already knew before you went to the
20     offices that you were going to sign?
21 A  I felt like I had to sign.
22 Q  And you hadn't reviewed what you were calling
23     the papers yet, correct?
24 A  Correct.
25 Q  When you arrived at the office, you saw Mike

---

**Page 314**

1      Kiesler on his phone, correct?
2  A  Yes.
3  Q  And he was talking to Scott Seid?
4  A  Yes.
5  Q  And you asked Mike if you could speak to Scott
6      Seid, correct?
7  A  That's right.
8  Q  And Mike handed you his phone; isn't that right?
9  A  Yes.
10 Q  And in the course of talking with Scott Seid on
11     the telephone you indicated that you were
12     uncomfortable redeeming your shares?
13 A  Yes, I did.
14 Q  And isn't it true that Scott Seid said to you
15     that nobody could force you to sign any
16     documents?
17 A  Yes.
18 Q  And isn't it also true that Scott Seid offered
19     to provide you names of attorneys that could
20     advise you if you wanted them?
21 A  That is not true.
22 Q  Are you aware that Scott Seid gave a deposition
23     in this case?
24 A  Yes, I am.
25 Q  And are you aware that he testified to the fact

---

**Page 315**

1      that he gave you -- that he offered to give you
2      names of attorneys in that phone conversation?
3          MS. POLAKOWSKI: Object to the extent
4  it assumes facts not in evidence.
5          THE WITNESS: Am I aware of the fact
6  that he says he did?
7  BY MR. CHURCHILL:
8  Q  Yes.
9  A  No.
10 Q  Is it possible that you don't remember that
11     Scott Seid offered to give you attorneys names?
12         MS. POLAKOWSKI: Objection.  Calls for
13 speculation.
14         THE WITNESS: I honestly don't believe
15 that he did.
16 BY MR. CHURCHILL:
17 Q  So do you believe that Scott Seid is lying?
18         MS. POLAKOWSKI: Object to the form of
19 the question.  Foundation.  Calls for speculation.
20         THE WITNESS: I wouldn't call it
21 lying.  I just think he doesn't remember.
22         (Exhibit No. 29 was marked.)
23 BY MR. CHURCHILL:
24 Q  Ms. Randall, the court reporter has now handed
25     you what's been marked for identification as

---

**Page 316**

1      Exhibit 29 to your deposition.
2  A  Okay.
3  Q  It's Bates labeled Windy2919 through 2924.  Do
4      you recognize this as your May 13, 2020,
5      redemption agreement?
6  A  No.
7  Q  Do you see on the first page the date, May 13,
8      2020, up at the top?
9  A  On the first page?
10 Q  Yes.  At the top of the first page, "13th day of
11     May 2020."  Do you see that up top?
12 A  Yes, I do.
13 Q  And do you see your signature on page 3?
14 A  Yes, I do.
15 Q  And do you also see a Promissory Note attached
16     to the agreement?
17 A  I see that.
18 Q  And do you see that amount listed as
19     $1,352,166.31?
20 A  Yes, I see that.
21 Q  And you agree that this is the agreement that
22     you entered into for the redemption of the
23     remaining shares that you had in Windy Waters
24     corporation?
25         MS. POLAKOWSKI: Objection.  Form.

---

Page 317

1 Calls for a legal conclusion.
2          THE WITNESS: I can't be exactly sure.
3 I didn't really look at it.
4 BY MR. CHURCHILL:
5 Q   Did you review this document at all before
6      signing it?
7 A   No, I did not.
8 Q   Do you remember Mike Kiesler reading through the
9      Stock Redemption Agreement for you line by line?
10 A   No.
11 Q   Do you remember Mike Kiesler reading the
12      Promissory Note for you line by line?
13 A   No, I do not.
14 Q   Do you remember Mike Kiesler asking whether you
15      understood the contents as he read through both
16      documents to you?
17 A   He did not read.
18 Q   Did you pay any attention to paragraph 5 or
19      section 5 on page 2 of Exhibit 29 titled
20      "Release"?
21          MS. POLAKOWSKI: Object to the form of
22 the question. Also assumes facts not in evidence.
23 BY MR. CHURCHILL:
24 Q   Do you remember noticing that at all when you
25      were with Mr. Kiesler before signing the

Page 318

1      document?
2          MS. POLAKOWSKI: Also object to the
3 extent it mischaracterizes her testimony.
4          THE WITNESS: I -- no.
5 BY MR. CHURCHILL:
6 Q   You don't remember?
7 A   Huh-uh.
8 Q   Would it have been important for you to review
9      this document prior to signing it?
10          MS. POLAKOWSKI: Object to the form of
11 the question. Calls for a legal conclusion.
12          THE WITNESS: Would it be important to
13 me?
14 BY MR. CHURCHILL:
15 Q   Yeah.
16 A   Well, he explained -- now that I'm rereading
17      this, he explained to me what he wanted me to
18      know.
19 Q   So you felt like you didn't need to review it
20      because he explained it for you?
21          MS. POLAKOWSKI: Objection.
22 Mischaracterizes her testimony.
23          THE WITNESS: Again, I trusted Mike
24 Kiesler. I thought he was being honest with me.
25 BY MR. CHURCHILL:

Page 319

1 Q   Would you say that you treated this document the
2      same way that you treated the other redemption
3      agreements, that you skimmed it?
4 A   No. I did not skim it.
5 Q   You didn't even skim this document?
6 A   No, I did not.
7 Q   Even though you knew that you were redeeming the
8      rest of your shares in the company?
9          MS. POLAKOWSKI: Object to the form of
10 the question. It assumes facts not in evidence. It
11 also calls for a legal conclusion.
12          THE WITNESS: I was just -- I felt
13 totally pressured to sign this. So I don't know what
14 I thought.
15 BY MR. CHURCHILL:
16 Q   Mr. Kiesler didn't say that you couldn't leave,
17      correct?
18 A   No. He didn't say that.
19 Q   Mr. Kiesler didn't give you a specific time
20      frame for when you had to sign on that day, did
21      he?
22 A   He told me I had to be there at 4:30 to sign.
23 Q   Did he give you an end time when you had to
24      leave?
25 A   I don't recall.

Page 320

1 Q   Did you ask him for any financial documents in
2      that meeting?
3 A   No.
4 Q   In paragraph 117 of your Complaint, Ms. Randall,
5      it says, "Stacy" --
6          MS. POLAKOWSKI: Hold on. Let me get
7 it in front of her.
8          MR. CHURCHILL: Sure.
9          MS. POLAKOWSKI: It's right here,
10 Stacy.
11          THE WITNESS: Okay.
12 BY MR. CHURCHILL:
13 Q   So on page 18 paragraph 117 that reads, "Stacy
14      asked Kiesler whether he and the companies'
15      executives were preparing to sell Widen
16      Enterprises." Do you see that?
17 A   Yes.
18 Q   And what, to the best of your recollection, were
19      the words that you actually used?
20 A   That I used?
21 Q   Yes.
22 A   I asked him if there was any thought about
23      selling the company.
24 Q   Did you say, "Are the companies' executives
25      preparing to sell Widen Enterprises"?

Page 321

1 A   No.

2 Q   So tell me what it is you think you remember

3     asking exactly.

4 A   Are you -- is there any thought about selling

5     the company.

6 Q   And in paragraph 118 in the Complaint there's

7     quotes around the statement, "No, there's been

8     no talk of that."  Do you see that?

9 A   Yes.

10 Q   And is that quoted because you recall that

11     that's exactly what Mike Kiesler said?

12 A   Yes.

13 Q   Would you turn to paragraph 50 of the Complaint

14     which is on page 11?  Are you there?

15 A   Yes.

16 Q   Paragraph 50 reads, "During this period" -- and

17     the period is in the prior paragraph.  Do you

18     see the date February 2020?

19 A   Yes, I do.

20 Q   "During this period Reed made statements to

21     third parties to the effect that Widen

22     Enterprises regularly receives solicitations and

23     offers from potential acquirers and that he was

24     considering selling Widen Enterprises because he

25     could personally receive 80 million dollars for

Page 322

1     his ownership interest in Widen Enterprises,

2     implying a fair market value of Widen

3     Enterprises of at least 100 million dollars."

4     Do you see that?

5 A   Yes.

6 Q   Is it my understanding that the basis for that

7     allegation in paragraph 50 is statements that

8     your son says that he heard?

9 A   My son was told that.

10 Q   And what is it -- I know your son is not here,

11     but what is your understanding of what your son

12     heard exactly?

13 A   I'm not exactly sure what he heard.

14 Q   Okay.  This is your Complaint, and you're making

15     the allegation.  So what is it you believe --

16     what is it that you're saying that your brother

17     was saying in February of 2020?

18 A   He told Justin that -- I'm not sure.  I wasn't

19     there.  I don't know what Reed said.

20 Q   Okay.  So you're relying on your son Justin for

21     that allegation in the Complaint?

22 A   Yes.

23 Q   Do you have any basis to believe that your

24     brother was stating to anyone in the February

25     2020 time frame that he was considering selling

Page 323

1     Widen Enterprises within the next year?

2         MS. POLAKOWSKI:  And, Stacy, I will

3     caution you, as has been true throughout the day, if

4     you have to rely on conversations that you have had

5     with us as counsel in order to answer that question,

6     I will instruct you not to answer.

7         THE WITNESS:  I need an explanation on

8     what you -- what you're asking me.  Can you rephrase?

9 BY MR. CHURCHILL:

10 Q   Sure.  I will try to rephrase it.  Do you have

11     any basis for asserting that your brother, Reed

12     Widen, was telling people that he was

13     considering selling the company within a year of

14     February 2020?

15 A   No, I don't.

16     (Exhibit Nos. 30 and 31 were marked.)

17 BY MR. CHURCHILL:

18 Q   So, Ms. Randall, I have handed you what's been

19     marked for identification as Exhibit 30 and 31

20     to your deposition, and we will end with these

21     today.  Exhibit 30 is a text between you and

22     Mike Kiesler.  Do you see that?

23 A   Yes, I do.

24 Q   And it's September of 2020.  Do you see that?

25 A   Yes, I do.

Page 324

1 Q   And you say, "Hey, dude.  I hope you are doing

2     well.  Fucking asshole and I have a mediation

3     tomorrow morning at 9:00. " You mean Steven

4     Randall by that reference?

5 A   Yes, I do.

6 Q   And you ask Mike, "Could you temporarily lower

7     the monthly payment I am receiving right now or

8     adjust it to say 10 or 11K per month.  My

9     thought being I would not be able to afford to

10     continue giving him $4,000 a month.  I shouldn't

11     have to anyway."  Do you see that?

12 A   Yes, I do.

13 Q   Did Mike Kiesler adjust the promissory note to

14     reduce the amount of money you were receiving?

15     MS. POLAKOWSKI:  Objection.

16 Foundation.

17     THE WITNESS:  I don't recall him even

18 responding to this.

19 BY MR. CHURCHILL:

20 Q   Okay.  And did you adjust how much that you had

21     to pay your ex-husband, or did you keep on

22     having to pay him the same amount of 4,000?

23     MS. POLAKOWSKI:  Objection.  Calls for

24 a legal conclusion.

25     THE WITNESS:  I was told at that

Page 325

1  meeting that he -- they were denying his $6,000 a
2  month and they are going to do 4,000.
3  BY MR. CHURCHILL:
4  Q   Last document then, Exhibit 31, June 15, 2020.
5      It's a little earlier.  Again, to Mike you
6      wrote, "Hi, Mike.  Are you trying to get me
7      killed?  Let me know if I'm mistaken please.  I
8      was under the impression that I would get my
9      checks on the 13th of every month.  I realize
10     that was Saturday.  I thought it would show up
11     today.  Problem is I am supposed to be giving a
12     fucking $4,000 check to fucking asshole on the
13     15th of each month.  The check has not hit my
14     bank yet.  I love that I can't pay him today.
15     Ha ha ha.  I guess he isn't very happy."
16         This is in reference to the check that's
17     being discussed here in reference to the payment
18     that was supposed to be made under the May 13,
19     2020, redemption agreement, correct?
20         MS. POLAKOWSKI: Objection.
21  Foundation.
22  BY MR. CHURCHILL:
23  Q   So this is June 2020.  And you were expecting a
24     check, right, from the May redemption agreement?
25         MS. POLAKOWSKI: Objection.  Misstates

Page 326

1  her testimony.
2          THE WITNESS: I can't say that I was
3  expecting it.
4  BY MR. CHURCHILL:
5  Q   Is it fair to say that you and your brother Reed
6     engaged in colorful language at times?
7  A   Oh, yes.
8          MS. POLAKOWSKI: I think we're all
9  done.
10         MR. CHURCHILL: I think I'm out of
11  time.
12         THE VIDEOGRAPHER: There being nothing
13  further, this will conclude the deposition.  We will
14  go off the record at 7:02 p.m., and four media units
15  were used.
16         (Proceedings concluded at 7:02 p.m.)
17
18
19
20
21
22
23
24
25

Page 327

1  STATE OF WISCONSIN  )
                        )  SS:
2  COUNTY OF MILWAUKEE )
3
4
5          I, ALI KORNBURGER, Notary Public in and
6  for the State of Wisconsin, do hereby certify that
7  the above deposition of STACY RANDALL was recorded by
8  me on August 28, 2023, and reduced to writing under
9  my personal direction.
10         I further certify that I am not a
11  relative or employee or attorney or counsel of any of
12  the parties, or a relative or employee of such
13  attorney or counsel, or financially interested
14  directly or indirectly in this action.
15         In witness whereof I have hereunder set
16  my hand and affixed my seal of office at Milwaukee,
17  Wisconsin, this 7th day of September, 2023.
18
19
20
21
22
23
24
25

My Commission Expires:   February 22, 2024.