# In The Matter Of:

*Stacy L. Randall v*
*Reed C. Widen, et al.*

Duplicate Original

---

*Steven Randall*
*October 12, 2023*

---

*Colleen Reed Reporting LLC*
*P.O. Box 293*
*Milwaukee, Wisconsin 53201*
*www.colleenreed.com*

Original File 101223stevenrandallf.txt
**Min-U-Script® with Word Index**

Case: 3:22-cv-00400-jdp   Document #: 99   Filed: 11/09/23   Page 2 of 45

Stacy L. Randall v                                                          Steven Randall
Reed C. Widen, et al.                                                       October 12, 2023

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF WISCONSIN
 2  ------------------------------------------------------

 3  STACY L. RANDALL,        CIVIL ACTION NO. 22-CV-400

 4         Plaintiff,

 5      -vs-

 6  REED C. WIDEN, MICHAEL KIESLER,
    WIDEN ENTERPRISES, LLC, and
 7  WINDY WATERS, INC.,

 8         Defendants.

 9  ------------------------------------------------------

10  DEPOSITION OF:  STEVEN RANDALL

11  DATE:           October 12, 2023

12  TIME:           9:56 a.m. to 1:19 p.m.

13  LOCATION:       N4559 Trillium Court
                    Portage, Wisconsin  53901
14

15  REPORTED BY:    Janet D. Larsen, RPR

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1           A P P E A R A N C E S

 2

 3      REINHART BOERNER VAN DEUREN, S.C., by
        JESSICA HUTSON POLAKOWSKI
 4      ATTORNEY AT LAW
        22 East Mifflin Street, Suite 700
 5      Madison, Wisconsin  53703-4225
        jpolakowski@reinhartlaw.com
 6      appeared on behalf of the Plaintiff.

 7      REINHART BOERNER VAN DUEREN, S.C., by
        SAMUEL SYLVAN, ATTORNEY AT LAW
 8      1000 North Water Street, Suite 1700
        Milwaukee, Wisconsin  53202
 9      ssylvan@reinhartlaw.com
        appeared on behalf of the Plaintiff.
10

11      O'NEIL, CANNON, HOLLMAN, DEJONG &
        LAING, S.C., by
12      CHRISTA D. WITTENBERG, ATTORNEY AT LAW
        KYLE T. KASPER, ATTORNEY AT LAW
13      111 East Wisconsin Avenue, Suite 1400
        Milwaukee, Wisconsin  53202
14      christa.wittenberg@wilaw.com
        kyle.kasper@wilaw.com
15      appeared on behalf of the Defendants.

16      BOARDMAN & CLARK, LLP, by
        AUSTIN DOAN, ATTORNEY AT LAW
17      1 South Pinckney Street, Suite 410
        P.O. Box 927
18      Madison, Wisconsin  53701-0927
        adoan@boardmanclark.com
19      appeared on behalf of the Witness.

20

21

22

23

24

25
```

Page 3

```
 1                 I N D E X

 2

 3  EXAMINATION BY:                            PAGE

 4  Ms. Wittenberg                                5

 5

 6

 7  EXHIBITS:                                 MARKED

 8  Exhibit 1  - Joint Petition for Divorce       _
    Exhibit 2  - Notice of Motion and Motion to   15
 9               Modify Temporary Order
    Exhibit 3  - Findings of Fact, Conclusions of 17
10               Law and Judgment of Divorce
    Exhibit 4  - List of properties              37
11  Exhibit 5  - Warranty Deed between Steven T.  81
                 Randall and Stacy L. Randall
12               and Tim Buck 2 LLC, Document
                 No. 4243293
13  Exhibit 6  - Warranty Deed between Steven T.  81
                 Randall and Stacy L. Randall
14               and Tim Buck 2 LLC, Document
                 No. 4243290
15  Exhibit 7  - Warranty Deed between Steven T.  81
                 Randall and Stacy L. Randall
16               and Tim Buck 2 LLC, Document
                 No. 4243292
17  Exhibit 8  - Warranty Deed between Steven T.  81
                 Randall and Stacy L. Randall
18               and Rockford Hill LLC, Document
                 No. 4243295
19  Exhibit 9  - 2017 Income Tax Return          95
                 Bates WINDY0008985-9023
20  Exhibit 10 - 2018 Income Tax Return         100
                 Bates WINDY0008945-8984
21  Exhibit 11 - Email chain, top email from    103
                 Steve Randall to Scott Spangler
22               Bates Randall0000403-405

23

24  MATERIAL REQUESTED:                        PAGE

25  None
```

Page 4

```
 1  QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

 2  Page 115, line 11
    Page 118, line 5
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22  (Original transcript supplied to Attorney Christa D.
    Wittenberg) (Originals of Exhibit 1 through 11 are
23  attached to the original transcript.  Scanned copies
    were provided to all counsel)
24

25
```

Page 5

1    TRANSCRIPT OF PROCEEDINGS
2        STEVEN RANDALL, having been first duly
3    sworn, was examined and testified as follows:
4        E X A M I N A T I O N
5    BY MS. WITTENBERG:
6    Q.   Would you start by stating your name and spelling
7         it?
8    A.   Steven Tracy Randall, S-t-e-v-e-n, Tracy,
9         T-r-a-c-y, Randall, R-a-n-d-a-l-l.
10   Q.   Good morning, Mr. Randall. I'm Christa
11        Wittenberg. I'm an attorney for Windy Waters,
12        Widen Enterprises, Reed Widen, and Mike Kiesler.
13        I'm going to be asking you some questions today.
14            Have you ever been deposed before?
15   A.   No.
16   Q.   Okay. I'm going to go through some ground rules.
17        You may have heard these already by talking with a
18        lawyer to help you prepare for today. I'll run
19        through just some basic ground rules of what to
20        expect.
21            If ever you don't understand a question
22        that I'm asking, please tell me that. If you give
23        an answer, I'm going to have assume you understood
24        the question. Is that understood?
25   A.   Yes.

Page 6

1    Q.   Okay. Please wait for me to finish my question
2         before you give your answer so we can avoid
3         talking over each other. Is that understood?
4    A.   Yes.
5    Q.   And please give a clear yes or no answer to each
6         question so the court reporter can take it down
7         for the transcript. You're doing wonderfully so
8         far, so if you keep that up, you'll be great. And
9         if you need a break, just let us know that. I
10        understand from talking to your lawyers you're
11        going to need breaks frequently. That's perfectly
12        fine. Just let us know. Ideally, it would be not
13        with a question pending. So if I'm in the middle
14        of a question or if you're, before you answer or
15        in the middle of an answer, if you can finish that
16        answer, and just let us know if you need to take a
17        break at that time. Okay? Is that understood?
18   A.   Yes.
19   Q.   Wonderful.
20            Do you have a lawyer representing today
21        for this deposition?
22   A.   Yes.
23   Q.   And is it Austin Doan here?
24   A.   I'm sorry, what?
25   Q.   Is your lawyer Austin Doan here?

Page 7

1    A.   Yes.
2    Q.   Are any attorneys from Reinhart representing you
3         today?
4    A.   Are they what?
5    Q.   Representing you today.
6    A.   No.
7    Q.   Okay. They did represent you previously; is that
8         right?
9    A.   Just to -- yes.
10   Q.   Okay. Do you have an understanding of why they
11        are not your counsel today?
12            MR. DOAN: I'm just going to object to
13        make sure that, do not reveal any communications
14        you had with your attorneys, but you can answer to
15        the best you understand the question, if you
16        understand the question.
17   A.   Do you want to repeat the question?
18   Q.   Sure. Do you have an understanding as to why
19        lawyers at the Reinhart law firm are not your
20        lawyers today?
21            MS. POLAKOWSKI: And I'll join in the
22        objection.
23   A.   No, I just thought it necessary to have my own
24        attorney.
25   Q.   Okay. Did you have any disagreement with Stacy

Page 8

1         that resulted in Reinhart not being your lawyers
2         today?
3    A.   No.
4    Q.   Let's start by going through some, some background
5         dates here. Date of birth, as I understand it, is
6         July 19th of 1956; is that right?
7    A.   Yes.
8    Q.   And you were married to Stacy Randall for many
9         years; is that right?
10   A.   Yes.
11   Q.   And you got married on August 5th, 1978; is that
12        right?
13   A.   Sounds right.
14   Q.   Okay. We'll eventually see a document that might
15        help you to remember that to be sure, but that's
16        my understanding.
17            And how many children do you have?
18   A.   We had three.
19   Q.   And two are living today?
20   A.   Two are living today.
21   Q.   How long have you lived in Wisconsin?
22   A.   All but ten years of, that we moved to Florida.
23   Q.   When did you move to Florida?
24   A.   2000.
25   Q.   And if you lived there ten years, did you move

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

Page 9

1   back in 2010, back to Wisconsin?
2 A.  I, I don't remember exactly when.
3 Q.  Sometime around 2010, you think, though?
4 A.  Well, if we lived ten years in Wisconsin, yeah,
5   that'd be --
6 Q.  And if I'm not mistaken, your son Andrew died in
7   2015?
8 A.  Yes.
9 Q.  And you were living in Wisconsin at that time?
10 A.  Yes.
11 Q.  Were you ever employed by Widen Enterprises?
12 A.  Yes.
13 Q.  Do you recall what years?
14 A.  I don't remember exactly.
15 Q.  Was it before you moved to Florida?
16 A.  Yes.
17 Q.  Do you recall how, how long you were employed by
18   Widen Enterprises?
19 A.  I worked there until 1999, and then I became
20   disabled.
21 Q.  So you, your employment there ended in 1999?
22 A.  1999, yes.
23 Q.  How long, if you recall, were you, were you
24   employed there before it stopped in '99?
25 A.  I don't remember exactly.  I might say in the

Page 10

1   '80s.
2 Q.  So more than ten years?
3 A.  Yes.
4 Q.  What was your job there?
5 A.  Final job I had was sales.
6 Q.  What did you do before you were in sales?
7 A.  Manager, management.
8 Q.  And by that, do you mean you were managing other
9   employees?
10 A.  Yes.
11 Q.  What were the employees you managed responsible
12   for doing?
13 A.  Graphic arts.
14 Q.  You said you became disabled in I believe 1999.
15   And I understand you are still disabled today; is
16   that right?
17 A.  Yes.
18 Q.  Do any of your conditions impact your ability to
19   remember facts or details?
20 A.  Yeah, I, I think, I think the MS kind of impacts
21   that a little bit.
22 Q.  Can you describe what the impact is on your, on
23   your memory of any of your conditions?  Is it, is
24   it, do you have a harder time remembering certain
25   details or facts?

Page 11

1 A.  It may be just old age.  I, I don't know.
2 Q.  Fair enough, fair enough.
3        Is there any reason you think you could
4   not give accurate testimony today?
5 A.  I'm sorry.  Can you repeat that?
6 Q.  Is there any reason you think you could not give
7   accurate testimony today?
8 A.  No reason.
9 Q.  Any reason you think you could not give truthful
10   testimony today to the best of your ability?
11 A.  No, no reason.
12 Q.  Okay.  Going back to some dates here, I understand
13   you and Stacy filed for divorce on April 1st,
14   2019.  Does that sound correct to you?
15 A.  I really don't remember what dates.
16 Q.  Okay.  Then let me pull something out that may
17   help.
18        (Exhibit 1 marked for identification)
19 Q.  Okay.  Mr. Randall, you've been handed what's been
20   marked as Exhibit 1 to your deposition.
21 A.  I'm sorry.  Can you speak a little louder?
22 Q.  Sure.  Yes.
23        You've been handed what's been marked as
24   Exhibit 1 to your deposition.  Do you recognize
25   this to be a Petition for Divorce that you and

Page 12

1   Stacy Randall filed?
2 A.  Yeah, that, I, I don't remember, but it looks like
3   something that we both signed.
4 Q.  Okay.  And on the last page you were just on, is
5   that your signature on the back page?
6 A.  Yes.
7 Q.  That looks to be dated April 1st, 2019.  Do you
8   see that there?
9 A.  Yes.
10 Q.  Does that refresh your memory on the date that you
11   signed and filed the Petition for Divorce?
12 A.  If that's, that's written down, that's what it
13   is.
14 Q.  Okay.  And you see a signature there for Stacy Lee
15   Randall.  Is that your wife's signature?
16 A.  Yes.
17 Q.  Were you together when you signed this?
18 A.  No.
19 Q.  But you do know this to be her signature?
20 A.  You know, I really don't remember if we were
21   together, but it appears to be.
22 Q.  Okay.
23 A.  Mine appears to be mine, too.
24 Q.  And if you go to the first page, the first
25   paragraph, it lists an address for Ms. Randall on

Page 13

1      Grizzly Lane in McFarland, Wisconsin?
2   A.   Yes.
3   Q.   Do you see that?
4   A.   Yes.
5   Q.   Is that your understanding of where Ms. Randall
6      lived in April of 2019?
7   A.   Yes.
8   Q.   And if you go to paragraph 2 on the next page, it
9      lists an address for you of 1972 Barber Drive in
10      Stoughton, Wisconsin?
11   A.   Yes.
12   Q.   Is that where you lived in April 2019?
13   A.   Yes.
14   Q.   So you and Stacy did not live together as of
15      April 1st, 2019; is that right?
16   A.   Evidently not.
17   Q.   Does you, do you recall something different being
18      true at that time?  Do you think you did live
19      together?
20   A.   I don't remember exact times --
21   Q.   Okay.
22   A.   -- when she moved into the Grizzly address.
23   Q.   So at some point the two of you lived together at
24      the Barber Drive address?
25   A.   Yes.

Page 14

1   Q.   And then at some point in time Ms. Randall moved
2      to the Grizzly Lane address?
3   A.   Yes.
4   Q.   And you didn't live at the Grizzly Lane home?
5   A.   No.
6   Q.   Okay.  Do you have any reason to think that she
7      moved out after this document was signed or filed?
8   A.   I need to turn my hearing aids up.
9         MR. DOAN:  Oh, sorry, okay.
10   Q.   Oh, sure.
11   A.   It says, please wait.
12   Q.   Well, I'll try and be louder until then.
13   A.   Okay.
14   Q.   Do you have any reason to think that Ms. Randall
15      moved out after this document was signed in April
16      2019?
17   A.   I really don't remember.
18   Q.   Okay.  Do you have any reason to doubt that this
19      is accurate, that as of April 1st, 2019, you were
20      living separately?
21   A.   It appears to be correct.
22   Q.   Okay.  After Ms. Randall moved out, did you, did
23      you and Ms. Randall ever live together again?
24   A.   No.
25   Q.   And did you ever share a roof together for any

Page 15

1      occasion after April of 2019, after you separated?
2   A.   No.
3   Q.   Does the date December 26th, 2019, have any
4      significance to you?
5   A.   No.
6         (Exhibit 2 marked for identification)
7   Q.   You've been handed what was marked as Exhibit 2 to
8      your deposition.  Do you recognize this document
9      to be a, on the first page a Notice of Motion and
10      Motion to Modify Temporary Order?  Is that not
11      what you have?  Oh, I'm sorry, just a little
12      farther down the page underneath the case caption,
13      do you see where it says Notice of Motion and
14      Motion to Modify Temporary Order?
15   A.   Yes.
16   Q.   Okay.  And if you turn to the second page, do you
17      see a heading where it says, Declaration of Steven
18      Randall in Support of Motion to Modify Temporary
19      Order?
20   A.   Yes.
21   Q.   And on the back page, page 3 of the document, do
22      you see your signature?
23   A.   Yes.
24   Q.   And that is your, your signature?
25   A.   It appears to be.

Page 16

1   Q.   Do you recall through your lawyers filing a Motion
2      to Modify a Temporary Order in the divorce case
3      between you and Stacy?
4   A.   Do I remember, no.  I don't really remember all
5      this.
6   Q.   Okay.  If you turn to paragraph 3, which is, I'm
7      sorry, on page 2 of the document that you're on,
8      there's a paragraph marked paragraph 3.  The
9      paragraph starts by saying, I have significant
10      health issues.
11         Do you see that one?
12   A.   Yes.
13   Q.   The last sentence reads, When Stacy and I lived
14      together, she helped with expenses by accessing
15      money from her family owned businesses.
16         Do you see that sentence?
17   A.   Yes.
18   Q.   What did you mean by that?
19   A.   What did I mean?  I really don't remember.  I
20      don't know.
21   Q.   Okay.  Let's turn to the next page as paragraph
22      No. 10.  The second sentence in that paragraph
23      says, Stacy inherited significant assets and, upon
24      information and belief, has been able to meet her
25      budget by relying on those assets.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 17

1       What did you mean by that?
2 A. I, I really don't know.
3 Q. Do you, do you believe that Stacy inherited
4     significant assets?
5 A. I know she inherited some money.
6 Q. Do you have any specific assets in mind that you
7     recall that Stacy inherited?
8 A. I, you know, I, I did not write this, but I would
9     imagine it would be from Windy Waters or whatever
10    you called it, from Widen Enterprises.
11 Q. Okay. We've been going a little over 15 minutes.
12    Do you need to take a break, or do you want to
13    keep going?
14 A. I'm okay.
15 Q. Just let me know when you need a break, okay.
16     (Exhibit 3 marked for identification)
17 Q. All right. Mr. Randall, you have been handed
18    what's been marked as Exhibit 3. Do you recognize
19    this document to be Findings of Fact, Conclusions
20    of Law and Judgment of Divorce in the divorce case
21    between you and Stacy Randall?
22 A. I don't remember, but --
23 Q. Do you have any reason to think that's not what
24    this is?
25 A. I'm not. I'm sorry, can you repeat the question?

---

Page 18

1 Q. Do you have any reason to think that this document
2    is not the judgment of divorce in the divorce
3    proceedings between you and Stacy Randall?
4 A. That it's not? It appears to be.
5 Q. At the top of the first page you'll see a date
6    signed of November 20th, 2020. Would you agree
7    that that's the date that your divorce became
8    final?
9 A. The date the divorce became final. I thought it
10    was close to the end of the year. Date of filing,
11    date of service, date of final hearing,
12    November 20th, 2020, is what it says here.
13 Q. Okay. And final hearing you understand to mean
14    the final hearing in your divorce with Stacy?
15 A. That would have been the end of the divorce
16    then.
17 Q. And was Judge Bailey-Rihn the judge for your
18    divorce?
19 A. I don't remember.
20 Q. Do you have any reason to doubt that
21    November 20th, 2020, is the date your divorce
22    became final?
23 A. No, that sounds right.
24 Q. If you turn to the, near the end, there's a page
25    that has signatures on it. It's about three pages

---

Page 19

1    from the back. Sorry. They're not easily marked
2    to where I can easily point you to. There's an 8
3    at the very bottom of it if that helps.
4 A. Okay.
5 Q. I think you're there. Do you recognize your
6    signature on this page?
7 A. Yes.
8 Q. And do you recognize Stacy Randall's signature on
9    this page?
10 A. Yes.
11 Q. You've seen Stacy Randall's signature on many
12    occasions before; right?
13 A. Yes.
14 Q. Okay. And this looks like her signature?
15 A. Yes.
16 Q. How would you describe your relationship with
17    Stacy currently?
18 A. Currently? Oh, boy. How do I -- I just, I just
19    try to remain friends and whatever.
20 Q. Do you still talk with Stacy?
21 A. No.
22 Q. Do you ever see her at any family gatherings?
23 A. Yes.
24 Q. When you see her, do you say hi to each other?
25 A. Yes.

---

Page 20

1 Q. Do you say anything beyond that?
2 A. No, no, it's really not --
3 Q. Would you say you have a civil relationship,
4    you're not fighting when you see her?
5 A. We are definitely not fighting. Neither one of us
6    go that direction.
7 Q. I understand you have a nickname Bling; is that
8    right?
9 A. Yes.
10 Q. Okay. How did you get that nickname?
11 A. How did I get the name? I have a lot of rings --
12 Q. Okay.
13 A. -- that are blingy.
14 Q. Who calls you, who calls you Bling or has called
15    you Bling?
16 A. Well, all my grandkids call me Grandpa Bling. We
17    already had a Grandpa Steve in the family, so it
18    was confusing --
19 Q. M-hm.
20 A. -- when I became a grandpa, and so the Grandpa
21    Bling came because I have all the bling.
22 Q. Have you ever spoken with Stacy about a lawsuit
23    she filed?
24 A. I knew of the lawsuit. Have I talked to her about
25    it, no, no, it's not --

---

**Colleen Reed Reporting LLC**
**414.322.3621**

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 21

1  Q.  Okay.  And to be very specific, we're talking
2      about a lawsuit Stacy Randall against Widen
3      Enterprises, Windy Waters, Michael Kiesler, and
4      Reed Widen.  You're aware of that lawsuit
5      existing?
6  A.  Mike Kiesler, Reed Widen, Windy Waters, and who
7      else?
8  Q.  Widen Enterprises.
9  A.  Okay.
10 Q.  That's the lawsuit you're referring to.  You may
11     not know all the parties, but you're aware of a
12     lawsuit between Widen Enterprises and Windy
13     Waters.
14 A.  Okay.
15 Q.  Is there any other lawsuit that you're aware of
16     that Stacy is involved in?
17 A.  No.
18 Q.  How did you learn that a lawsuit involving Stacy
19     existed?
20 A.  I don't remember.
21 Q.  Did you ever talk with your son Justin about the
22     lawsuit that Stacy filed?
23 A.  No.
24 Q.  Did you ever talk with your daughter about this,
25     the lawsuit that Stacy filed?

---

Page 22

1  A.  No, not that I remember.
2  Q.  And you said you have not talked with Stacy at all
3      about the lawsuit?
4  A.  It's, I'm sure it was mentioned at some point, but
5      I really don't remember when or what was said
6      because somehow I knew about it.
7  Q.  And you just don't recall how you learned about
8      it?
9  A.  I don't recall, no.
10 Q.  Other than it existing, what do you know about the
11     lawsuit?
12         MS. POLAKOWSKI:  I'll object and just
13     caution you not to disclose any information you've
14     discussed with your attorneys.
15         MR. DOAN:  Join.
16 A.  I, I, I don't know how to answer that.  Can you
17     repeat it again?
18 Q.  Sure.  Other than the fact that the lawsuit
19     exists, what, if anything, do you know about the
20     lawsuit?
21         MS. POLAKOWSKI:  And same objection.
22         MR. DOAN:  Join.
23 A.  I really don't know, know about it.  I mean all I
24     can say -- no, I don't need to say that.
25 Q.  Do you have an understanding of what it's about?

---

Page 23

1  A.  I would imagine probably about the amount that she
2      was paid for the stock, I would imagine.
3  Q.  Okay.  And why do you imagine that that's what the
4      case is about?
5  A.  My own opinion of what the value of that company
6      was compared to what she ended up with.
7  Q.  What, do you know how much Stacy received for
8      stock in 2020?
9  A.  Yes.
10 Q.  Did you know what the company was worth in May
11     2020?
12 A.  The exact amount, no.
13 Q.  Did you have an estimated value of Windy Waters or
14     Widen Enterprises in your mind in May 2020?
15 A.  Yeah, I estimated it being worth a lot more than
16     what she got.
17 Q.  What, what did you estimate the value of Windy
18     Waters?
19 A.  I don't remember.  I just know it was a joke
20     almost.
21 Q.  So you understood it to be worth more than
22     $1.3 million?
23 A.  Yes.
24 Q.  Many more times more than $1.3 million?
25 A.  Yes.

---

Page 24

1  Q.  Did you have an understanding in May 2020 that
2      Windy Waters was worth more than $10 million?
3  A.  Yes.
4  Q.  Was it your understanding and belief in May 2020
5      that Windy Waters was worth more than
6      $40 million?
7  A.  You know, I really don't know.
8  Q.  Is there a number that you have in your mind that
9      you think Windy Waters was worth at least that
10     amount in May 2020?
11 A.  I don't know.  I don't, I don't really remember
12     what my thinking was at that point in time.
13 Q.  Okay.  Why, what caused you to form a belief about
14     the value of Windy Waters?
15 A.  Just by seeing how much work went through there
16     and just to me, it appeared that they were doing
17     quite well.
18 Q.  Were you aware of -- Let me back up.
19         You understand that Windy Waters is the
20     holding company that owns Widen Enterprises?
21 A.  If you're saying that, that, yes.
22 Q.  Well, I want to know if you understood that to be
23     the case.
24 A.  You know, I know they have different companies
25     that own different stuff.  It sounds familiar to

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 25

1     me.
2 Q.  Okay. And so you understood that at least Windy
3     Waters was in some way related to Widen
4     Enterprises; is that right?
5 A.  Yes.
6 Q.  And Widen Enterprises was a company that you
7     understood and were familiar with; right?
8 A.  Yes.
9 Q.  Did you, when you were saying that there was, you
10    saw a lot of work coming out of Widen Enterprises,
11    what does that mean to you?
12 A.  It didn't seem that, it seemed like they were
13    doing probably better than they had in the past.
14 Q.  Did you observe growth in the number of employees
15    the company had?
16 A.  Yes.
17 Q.  Did you ever see advertisements or commercials for
18    Widen Enterprises outside of your affiliation with
19    the company?
20 A.  No.
21 Q.  Did you ever hear people talk about Widen
22    Enterprises in other circles?
23 A.  Yes.
24 Q.  Can you explain an example of that?
25 A.  Well, my son worked there.

---

Page 26

1 Q.  Sure.
2 A.  So --
3 Q.  Outside of your family or the Widen family, did
4    you ever hear people talk about Widen
5    Enterprises?
6 A.  No.
7 Q.  Is there anything else that informed your opinion
8    of the value of Windy Waters or Widen Enterprises?
9 A.  I'm sorry, can you repeat that?
10 Q.  Is there anything else that informed your opinion
11    of Windy Waters or Widen Enterprises, and this is
12    as of May of 2020?
13 A.  No.
14 Q.  When you said it seemed like the company was doing
15    well, what, what are some specific examples of
16    what seemed like the company was doing well?
17 A.  Well, just by the amount of people that they
18    employed, and I don't know.
19 Q.  Okay. All right. Getting back to my original
20    train of thought here, I think I asked did you
21    have any discussions with Stacy Randall about the
22    lawsuit?
23 A.  I, I don't remember.
24 Q.  Okay. Do you and Stacy ever exchange text
25    messages?

---

Page 27

1 A.  I'm sure we have. I can look if you want me to.
2 Q.  Do you think you have exchanged any text messages
3    since 2021?
4 A.  I know I get text message from my son and his wife
5    and Stacy's included in that.
6 Q.  On sort of a family thread or a family chat?
7 A.  Right.
8 Q.  Okay. Do you and Stacy ever communicate, just the
9    two of you, by text message?
10 A.  I don't remember.
11 Q.  Has Stacy ever told you what her lawyers told her
12    about the lawsuit?
13 A.  No.
14 Q.  Did Stacy ever talk to you about the fact that she
15    had her deposition taken in the lawsuit?
16 A.  No, I didn't even know she had her deposition.
17 Q.  Do you recall any conversations you've had with
18    anyone about the lawsuit?
19       MS. POLAKOWSKI: And I'll object and
20    caution you not to disclose the conversations with
21    your attorneys.
22       MR. DOAN: Join.
23       MS. WITTENBERG: Fair, fair, good
24    objection.
25 Q.  Other than talking to any lawyer who's represented

---

Page 28

1    you personally, have you had any discussions with
2    anyone about the lawsuit?
3 A.  No, I don't think so.
4 Q.  Do you have any interest in the outcome of the
5    lawsuit?
6 A.  No.
7 Q.  Do you have any understanding that you would
8    receive any money if Stacy prevails in the
9    lawsuit?
10 A.  No.
11 Q.  Do you have any sort of a deal with Stacy to
12    receive any amount of money from the lawsuit?
13 A.  No.
14 Q.  We've gone about a half hour, maybe a little more.
15    Do you want to take a little break here?
16 A.  I do.
17 Q.  Okay. Great, let's do that.
18       MS. WITTENBERG: Go off the record.
19       (Break taken)
20       MS. WITTENBERG: We can go back on the
21    record.
22 Q.  Okay. I'd like to ask you some questions now just
23    generally about your and Stacy's finances between
24    2005 and 2019, okay. Thinking of that time
25    period, are there any, any good years that stick

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 29

1  out to you as to where you were, had a good
2  financial year?
3      MS. POLAKOWSKI: Object to form.
4  A.  Between what dates?
5  Q.  2005 and 2019.
6  A.  I don't really remember.  I, I don't.
7  Q.  Would you say that you and Stacy lived a
8  comfortable lifestyle?
9  A.  In the most part, yes.
10  Q.  Did you each own vehicles typically during those
11  years?
12  A.  Yes.
13  Q.  Did you have nice vehicles?
14  A.  Yes.  They may have had a ton of miles on them,
15  but they were nice.
16  Q.  Sure.  Did you and Stacy go on a lot of
17  vacations?
18  A.  I don't know what you consider a lot.  I, I think
19  we at least tried to take a trip to Florida once a
20  year when we weren't there to visit our daughter
21  or my sister and her husband.
22  Q.  Did you go on vacations to places other than
23  Florida between 2005 and 2019?
24  A.  I really don't remember.
25  Q.  Do you remember any especially nice Christmas

---

Page 30

1  gifts you received or bought for any family member
2  during those years?
3      MR. DOAN: Object to form.
4      You can answer if you understand the
5  question.
6  A.  I would say we always had nice Christmases.  I
7  don't know what anybody else experiences, but it
8  usually was sufficient.
9  Q.  Did you and Stacy have any significant assets
10  during those years?
11      MS. POLAKOWSKI: Object to form.
12      MR. DOAN: Join.
13      You can answer if you understand the
14  question.
15  A.  Significant assets.  I, I don't know what you'd
16  consider significant.
17  Q.  Sure.  Did you and Stacy own any, any boats
18  between 2005 and 2019?
19  A.  Yes, we did have a boat.
20  Q.  Did you have a boat during all those years?
21  A.  No.
22  Q.  Do you recall what years you did have a boat?
23  A.  I, I don't remember exactly when, but I know that
24  when we were at Stoughton, we were on the lake,
25  we, so we did have a boat there.

---

Page 31

1  Q.  When you were in Wisconsin.  When you were in
2  Florida, did you have a boat?
3  A.  No.
4  Q.  So am I right that the years you lived in
5  Wisconsin you did have a boat?
6  A.  Yes.
7  Q.  Did the two of you own any guns that were of
8  significant value or firearms?
9  A.  The two of us, no.
10  Q.  Did you own any firearms worth any value?
11      MS. POLAKOWSKI: Object to form and
12  foundation.
13      MR. DOAN: Join.
14  A.  I, I really don't know.
15  Q.  Did you ever, you personally ever inherit anything
16  from Mark or Betty Widen?
17  A.  I, I don't, I don't know.  I don't know.
18  Q.  You don't have any memory of ever inheriting
19  anything from them?
20  A.  It would have been, if it was inherited, it would
21  have been inherited through Stacy, I think.
22  Q.  Okay.  Am I right that while you and Stacy were
23  married, you were in charge of the finances?
24  A.  Yes.
25  Q.  Okay.  You monitored the bank accounts, for

---

Page 32

1  example?
2  A.  No, I don't think I ever did any monitoring.
3  Q.  Did you keep track of how much money the, the
4  family had at any given time?
5  A.  Yeah, I would check to see, yeah, just to kind of
6  get an idea of what we can spend, yeah.
7  Q.  Were you in charge of paying the bills?
8  A.  Yes.
9  Q.  Were you in charge of family budgeting?
10  A.  I don't know if we ever really had a budget.
11  Q.  You were responsible for making sure that the
12  family could afford the things that the family was
13  buying?
14  A.  Yeah.
15  Q.  Did you keep track of the money that the family
16  brought in?
17  A.  Money that we brought in?
18  Q.  Right.
19  A.  I suppose, yeah.
20  Q.  And you were aware that Stacy received an
21  inheritance from Mark or Betty Widen?
22  A.  Yes.
23  Q.  And I should back up.
24      You know that Mark Widen is Stacy
25  Randall's father; right?

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 33

1 A.  Right.
2 Q.  And Betty Widen was her mother; right?
3 A.  Right.
4 Q.  Did Stacy inherit cash, like money, from Mark or
5      Betty Widen?
6 A.  I don't remember.
7 Q.  Did she inherit jewelry from Mark or Betty
8      Widen?
9 A.  I am -- I think she may have, but I'm not sure.
10 Q.  Are you aware that she inherited gold and silver
11      from Mark or Betty Widen?
12 A.  Yes.
13 Q.  What do you know about that gold and silver?
14 A.  I, just that it's old, gold and silver.
15 Q.  Did you see it?
16 A.  Yes.
17 Q.  Did you see it at the time Stacy received it?
18 A.  Yes.
19 Q.  Were you present when she received that gold and
20      silver?
21 A.  Yes.
22 Q.  Was it, was it a family gathering to divide up the
23      gold and silver?
24 A.  I, God, I'm so -- I really don't remember.
25 Q.  Did you see how much gold and silver Stacy

---

Page 34

1      received?
2 A.  Yes.
3 Q.  How large, if you put it all in a pile, how large
4      would that pile be?
5      MS. POLAKOWSKI: Object.
6      MR. DOAN: Object to form.
7      MS. POLAKOWSKI: Calls for speculation.
8      MR. DOAN: Answer to the best of your
9      ability.
10 A.  I, I don't know, I really don't even know how to
11      answer that.  There's some gold coins, and there
12      was some silver bars, and, but I don't know how
13      much there really, I mean, like you said, like,
14      like that maybe.  I don't know.
15 Q.  If you stacked it up, would it fit in a mixing
16      bowl, a large mixing bowl?
17      MR. DOAN: Same objections.
18      MS. POLAKOWSKI: Same objections.
19 A.  Again, I really don't know how much --
20 Q.  Would it fit in a bread box?
21      MS. POLAKOWSKI: Same objection.
22      MR. DOAN: Same objection.
23 A.  I'm actually trying to remember what it, what it
24      was like when she took it out of the safe when she
25      moved out, and I really, say I can't even remember

---

Page 35

1      how much it was.
2 Q.  Could you hold all of it, so all the coins and
3      bars, could you fit it all in your two hands if
4      you tried to?
5      MS. POLAKOWSKI: Same objections.
6      MR. DOAN: Same objections.
7 A.  I, I don't know.
8 Q.  Do you know how many coins, coins specifically,
9      she received?
10 A.  No, I don't.
11 Q.  Do you know how many bars she received?
12 A.  I really don't know.
13 Q.  I think you said they were stored in your safe?
14 A.  Yeah, stored in my safe.
15 Q.  And then when she moved out, she took them out of
16      your safe and moved them?
17 A.  (Witness indicating).
18 Q.  Yes?
19 A.  Yes.
20 Q.  And so they, they fit into your safe?
21 A.  Yes.
22 Q.  Do you know the dimensions of your safe?
23 A.  (Witness indicating).
24 Q.  Say it's like 18 inches tall roughly and maybe 18
25      inches wide?

---

Page 36

1 A.  It's taller than it is wide, but, yeah, somewhere
2      around there.  Maybe 12 to 18.  I don't know.
3 Q.  Did it fit in the safe with room to spare --
4 A.  No.
5 Q.  -- or did it fill the safe?
6 A.  No, there was room to spare.
7 Q.  To your knowledge, did Stacy ever give away or
8      sell any of the gold or silver she received?
9 A.  Not when we were married.
10 Q.  Did Stacy have the combination to the safe?
11      MS. POLAKOWSKI: Objection.  Foundation.
12 A.  It was available to her if she wanted it, yeah.
13 Q.  Is it possible she took some and sold it without
14      telling you while you were married?
15      MS. POLAKOWSKI: Objection.
16      MR. DOAN: Objection.  Calls for
17      speculation.
18      MS. POLAKOWSKI: Calls for speculation.
19 A.  Yeah, exactly, I don't, I, I wouldn't think so.
20      I don't know.
21 Q.  You wouldn't think she did that?
22      MR. DOAN: Same objection.
23 A.  So I don't know.
24 Q.  Do you know if Stacy inherited any ownership
25      interests in any business?

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 37

1   A.   Yes.
2   Q.   What did she inherit regarding ownership interests
3        in businesses?
4   A.   I believe each one of the five kids ended up with
5        20 percent.
6   Q.   20 percent of Windy Waters?
7   A.   Yes.
8   Q.   Do you recall the year that Mark Widen died?
9   A.   No.
10  Q.   You were living in Florida at the time?
11  A.   Yes.
12            (Exhibit 4 marked for identification)
13  Q.   Okay.  Mr. Randall, you have been handed what's
14       been marked as Exhibit 4.  This is a document that
15       lists properties, and I thought it'd just be
16       easier to have a list in front of you so we're
17       looking at the same information instead of me just
18       saying things out loud, so I made this list that I
19       understand and believe to be properties that you
20       or Stacy owned at some point int time, and I'll be
21       asking questions about each one to see if I
22       understand the facts correctly.
23            So before we get into the detailed list,
24       do I understand right that you and Stacy invested
25       in real estate?

---

Page 38

1   A.   Yes.
2   Q.   Did that investment, your investing begin in 2006?
3   A.   I don't remember exactly what year.
4   Q.   Did you start investing in real estate when you
5        moved down to Florida?
6   A.   Yes.
7   Q.   All right.  We will start with just the first one
8        on the list, and I'll ask for each one if you
9        could read what's there and then tell me if
10       anything in that sentence or list, that bullet
11       pointed numbered, numbered paragraph is
12       inaccurate.  So for the first one, I'm going to
13       ask you on Exhibit 4 that you're looking at, this
14       first one describes 101 East School Road and 103
15       East School Road, if you can read that listing and
16       tell me if that is accurate.
17  A.   You want me to read it out loud or --
18  Q.   You don't have to.  I can save you the --
19  A.   It appears to be correct.
20  Q.   Okay.  And this one was purchased in 2004.  You
21       were living in Florida at the time?
22  A.   That sounds correct.
23  Q.   Is there a reason you purchased properties in
24       Wisconsin while you were living in Florida?
25  A.   Investment, place for the boys to live.

---

Page 39

1   Q.   And you're referring to your sons?
2   A.   Yes.
3   Q.   Was this property a source of rental income?
4   A.   The rents pretty much paid for all the property in
5        Wisconsin so all the, the rents.
6   Q.   I'm not sure I understand.  Are you saying that
7        the Wisconsin properties were rented out and made
8        rental income?
9   A.   Yes, which paid for themselves.
10  Q.   Understood.
11            So you made, you made money on those
12       properties because you charged and rent more than
13       they cost you?
14            MS. POLAKOWSKI: Object to the extent it
15       mischaracterizes his testimony.
16            MR. DOAN: Join.
17  A.   Yeah, I, I, I don't know.  I don't --
18  Q.   Then what did you mean when you said something
19       like the rents paid, paid for themselves?  What
20       did that mean to you?
21  A.   It means that they weren't costing us money, they
22       were paying for themselves.
23  Q.   You think you broke even on them, you brought in
24       as much as it cost you?
25  A.   Yes.

---

Page 40

1   Q.   Did you rent them to your sons?
2   A.   Yes.
3   Q.   Okay.  We can go to the next one, No. 2, if you
4        could read that to yourself and tell me if
5        anything, tell me if this is an accurate summary.
6   A.   It seems to be correct.
7   Q.   Were these properties listed in No. 2 next to the
8        ones or near the ones in No. 1?
9   A.   Yes.
10  Q.   Are they in a row in a street in Cottage Grove?
11  A.   Yes.
12  Q.   Were these also intended to be a place for your
13       sons to live?
14  A.   No.
15  Q.   Were these rented out?
16  A.   Yes.
17  Q.   Okay.  We'll go to No. 3, which is the 102B Maria
18       Lane in Cottage Grove, if you could read that and
19       tell me if it's accurate.
20  A.   Yes.
21  Q.   And in 2005, you were still living in Florida;
22       right?
23  A.   Yes, I believe so.
24  Q.   This refers to a transfer to Tin Buck 2, LLC.
25       Do you see that there?

---

**Colleen Reed Reporting LLC**
414.322.3621

Stacy L. Randall v                                          Steven Randall
Reed C. Widen, et al.                                       October 12, 2023

| Page 41 | Page 43 |
|---|---|

**Page 41**

1  A.  Yes.

2  Q.  Is that an LLC that you owned in whole or in part?

3  A.  Yes.

4  Q.  Did Stacy also own some part of Tin Buck 2, LLC?

5  A.  No.

6  Q.  Why did you transfer that property from your

7      ownership together to this LLC?

8  A.  I believe we had talked to an attorney on our

9      finances, and we were instructed to put --

10     MS. POLAKOWSKI: Hold.

11     MR. DOAN: Object. Don't reveal any

12     communication between you and your attorney.

13     THE WITNESS: Oh, okay.

14 Q.  So you did this following a discussion with, with

15     your lawyer?

16 A.  Yes.

17 Q.  And Tin Buck 2, was anyone else an owner of Tin

18     Buck 2, LLC, besides yourself?

19 A.  At this time, no.

20 Q.  So you're saying in 2006, no one else owned it?

21 A.  Right.

22 Q.  Was Stacy ever an owner in, in whole or in part of

23     Tin Buck 2, LLC?

24 A.  No.

25 Q.  Was this property listed in No. 3, is this rented

**Page 42**

1      out?

2  A.  Yes.

3  Q.  Did this rental property make money, was it a

4      source of income?

5  A.  Paid its own way.

6  Q.  So this was another one that broke even, you're

7      saying?

8  A.  Yes.

9  Q.  Did you rent this to people that you knew?

10 A.  No.

11 Q.  How did you pay for the down payment for this

12     property?

13 A.  There was no down payment.

14 Q.  Okay. Are you still an owner in whole or in part

15     of Tin Buck 2, LLC?

16 A.  Yes.

17 Q.  Does Tin Buck 2, LLC, still own this property

18     listed in No. 3?

19 A.  Yes.

20 Q.  Is the property worth more than what you paid for

21     it today?

22     MS. POLAKOWSKI: Objection. Foundation.

23     Calls for speculation.

24     MR. DOAN: Join.

25 A.  Don't know.

**Page 43**

1  Q.  Do you know the value of this property listed in

2      No. 3?

3      MS. POLAKOWSKI: Same objections.

4  A.  Not off the top of my head, no.

5  Q.  All right. No. 4, if you can read that line and

6      tell me if it looks accurate to you.

7  A.  Yes.

8  Q.  Okay. So just to be clear --

9  A.  To be honest --

10 Q.  -- yes, it looks accurate?

11 A.  Yes, it looks accurate. But to be honest with

12     you, I don't remember if we owned these jointly or

13     not.

14 Q.  Okay.

15 A.  I don't remember for sure. I mean we'd have to

16     look back in the records to see.

17 Q.  Sure. That's fair.

18     Do you have, so you have a recollection

19     that sometimes properties may have been owned

20     jointly or by just one of you?

21 A.  Right.

22     MS. POLAKOWSKI: Wait, hold on. I'm

23     going to object to the extent that it

24     mischaracterizes his testimony.

25 Q.  I think you answered, though, it's right that you,

**Page 44**

1      sometimes you owned property in your own name?

2  A.  Possibly.

3  Q.  Sometimes Stacy owned property in her own name?

4  A.  (Witness indicating).

5  Q.  That's a yes?

6  A.  Possible, yes.

7  Q.  And sometimes the two of you owned it jointly?

8  A.  You know, I really don't remember how we did, did

9      things back then.

10 Q.  Okay. And sometimes as seen here, for example, as

11     No. 3, properties were owned by an LLC as opposed

12     to one of you individually?

13     MR. DOAN: I'm going to object to form.

14     Answer if you understand the question.

15     MS. POLAKOWSKI: I'll join.

16 A.  Can you repeat the question again?

17 Q.  Sure. Sometimes, at times that you have owned

18     properties it has been through an LLC as opposed to

19     through you or Stacy or both of you

20     individually?

21     MS. POLAKOWSKI: Same objection.

22     MR. DOAN: Join.

23 A.  I don't know how to answer that.

24 Q.  Like, looking at No. 3, you agree that this

25     property on 102B Maria Lane, Cottage Grove,

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 45

1　　Wisconsin, was originally purchased by someone
2　　individually, Steven and/or Stacy Randall;
3　　right?
4　A.　Yeah.
5　Q.　And the two of you then transferred that property
6　　to an LLC?
7　A.　That is correct.
8　Q.　Okay.  And there were other occasions when
9　　properties were owned by LLCs that you owned in
10　　whole or in part; right?
11　　　MS. POLAKOWSKI: Object to form.
12　　　MR. DOAN: Join.
13　A.　I'm just basically going off of this right now.
14　　I, I, I don't know what to --
15　Q.　Well, I, I want to know what you remember, and I
16　　want you to tell me if think anything looks
17　　incorrect in these.  That's what I want to talk
18　　about.
19　　　Let's go back to No. 3.  Is there
20　　anything that you think may be incorrect about
21　　what's written in paragraph 3?
22　A.　I don't know who the exact owners were to start
23　　with on all of these.  I really don't remember.
24　Q.　Okay.  Let's go back to No. 1 then.
25　　　MS. POLAKOWSKI: Just with regard to this

---

Page 46

1　　exhibit, I'm going to lodge an objection as to
2　　foundation.
3　　　MS. WITTENBERG: Okay.
4　Q.　You agree that someone, you or Stacy or both of
5　　you, owned the property listed in paragraph 1;
6　　right?
7　　　MS. POLAKOWSKI: Objection.  Form.
8　　　MR. DOAN: Join.
9　　　MS. POLAKOWSKI: Vague as to time.
10　　　MR. DOAN: Join.
11　A.　Where are you talking about, this whole paragraph,
12　　this whole --
13　Q.　The very first line up there.
14　A.　Oh, the very first one.  What was the question
15　　again?
16　Q.　Do you agree that you and/or Stacy owned the
17　　properties at 101 East School Road and 103 East
18　　School Road?
19　　　MS. POLAKOWSKI: Same objection.
20　　　MR. DOAN: Join.
21　A.　I don't remember who exactly owned it, if we both
22　　did or just me or just Stacy, I'm not sure.
23　Q.　But one of you or both of you did own these two
24　　properties, 101 East School Road and 103 East
25　　School Road in Cottage Grove, Wisconsin?

---

Page 47

1　　　MS. POLAKOWSKI: Same objections.
2　　　MR. DOAN: Join.
3　A.　That, that is one building.
4　Q.　Okay.  But that one building that has those two
5　　addresses, you may not know whether it was you or
6　　Stacy or both of you, but you would agree that
7　　either you or Stacy or both of you owned the
8　　building with the addresses 101 East School Road
9　　and 103 East School Road?
10　　　MS. POLAKOWSKI: Same objection.  Also to
11　　the extent it mischaracterizes his testimony.
12　　　MR. DOAN: Join.
13　A.　I don't, I don't, I don't remember.  I'm just
14　　going off what this sheet says.
15　Q.　Do you have memory of, of purchasing properties in
16　　Cottage Grove, Wisconsin, for your boys?
17　A.　Yes.
18　Q.　Was it the building at 101 East School Road and
19　　103 East School Road in Cottage Grove?
20　A.　Yes.
21　Q.　And you, you or Stacy or both of you made that
22　　purchase?
23　　　MS. POLAKOWSKI: Same objections.
24　　　MR. DOAN: Join.
25　A.　Yes.  And I don't really remember what, I, I don't

---

Page 48

1　　remember who owned it at that time before it went
2　　into the LLCs.
3　Q.　Okay.  Are you, do you own in whole or in part
4　　Three Willow Lake, LLC?
5　A.　Yes.
6　Q.　Did you --
7　A.　Wait a minute.  Can you repeat that?
8　Q.　Do you own currently in whole or in part Three
9　　Willow Lake, LLC?
10　A.　Yes, I am part owner.
11　Q.　Who is the, who are the other owners, if any?
12　A.　I, I sold half of the company.
13　Q.　To who?
14　A.　To Five Ducks.
15　Q.　Did you say Five Ducks?
16　A.　LLC.
17　Q.　Do you know who owns Five Ducks, LLC?
18　A.　No.
19　Q.　What individual did you talk to to make that
20　　transaction happen?
21　A.　Dave Bisbee.
22　Q.　Is David Bisbee someone you are acquainted with?
23　A.　Yes.
24　Q.　How long have you known him?
25　A.　You know, our boys played football, and he was the

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 49

1  coach for them, so 30 years I've known of him.
2  Q.  Do you, how long have you done business with him?
3  A.  Since the divorce.
4  Q.  So since 2020?
5  A.  Yes.
6  Q.  As of May 2020, did Stacy Randall have any
7     ownership interest in Three Willow Lake, LLC?
8        MS. POLAKOWSKI: Object to the extent
9     that it calls for a legal conclusion.
10       MR. DOAN: Join.
11 A.  I don't remember.
12 Q.  How many LLCs have you owned in your life?
13       MR. DOAN: Object to form.
14       MS. POLAKOWSKI: Same.  I'll join.
15 A.  I, I don't remember.
16 Q.  Have you heard of a company called GIBSRUSKIN,
17    LLC, G-I-B-S-R-U-S-K-I-N LLC?
18 A.  Yes.
19 Q.  Is that an entity that you formed?
20 A.  Yes.
21 Q.  Do you recall when you formed that entity?
22 A.  No.
23 Q.  Was it when you were living in Florida?
24 A.  Yes.
25 Q.  What's the purpose of that entity?

---

Page 50

1        MR. DOAN: Object to form.
2        Answer to the, to the best that you can.
3  A.  Property holding company.  I, I don't know it ever
4     got used for anything.
5  Q.  Was Stacy an owner at any time in any part of
6     GIBSRUSKIN, LLC?
7  A.  I, I don't know.  I don't remember.
8  Q.  Does GIBSRUSKIN, LLC, own any properties?
9  A.  I don't believe so.
10 Q.  Did GIBSRUSKIN, LLC, own any properties or assets
11    in 2020?
12       MR. DOAN: I'm just going to object.  I
13    think he answered the question but try to.
14       MS. POLAKOWSKI: Join.
15 A.  I, I really don't remember.  This is, you're
16    talking 20 some years ago.  I mean --
17 Q.  I'm sorry, so I misspoke.  In 2020, did
18    GIBSRUSKIN, LLC, own any assets or properties?
19       MR. DOAN: Same objection.
20 A.  Oh, I, I don't think so.
21 Q.  Are you familiar with an entity called Indian Joe,
22    LLC?
23 A.  Yes.  Where are you getting this from?  Is this --
24 Q.  It's not on the list at all.  I'm just asking, I'm
25    just asking questions.  It's not about the

---

Page 51

1  exhibit.
2  A.  Okay.
3  Q.  Indian Joe, LLC, is that an entity that you
4     formed?
5  A.  Yes.
6  Q.  Was Stacy Randall ever an owner in whole or in
7     part of Indian Joe, LLC?
8  A.  No.
9  Q.  Do you recall when Indian Joe, LLC, was formed?
10 A.  No, I don't remember.
11 Q.  Was it formed while you lived in Florida?
12 A.  I don't remember.
13 Q.  To your knowledge, in 2020, did Indian Joe, LLC,
14    own any properties or assets?
15 A.  Yes, it has assets.
16 Q.  As of 2020, did it have assets?
17 A.  Yes, I think so.
18 Q.  What does, what did Indian Joe, LLC, own in, let's
19    say May 2020?
20 A.  I don't, I don't remember.
21 Q.  Did it own properties?
22       MS. POLAKOWSKI: Objection.  Asked and
23    answered.
24       MR. DOAN: Objection.  Asked and
25    answered.

---

Page 52

1  A.  I really don't remember what, I, I, I don't
2     remember.
3  Q.  Did you form LLCs that owned anything other than
4     properties?
5  A.  Yes.
6  Q.  What, can you give me one LLC that you formed that
7     didn't own properties but owned something else?
8        MR. DOAN: I'm going to object.  Vague as
9     to time, but you can, if you understand the
10    question, go ahead and try and answer.
11 A.  I -- Can you repeat the question again?
12       MS. WITTENBERG: Could you read it back,
13    please.
14       (Question read)
15       MR. DOAN: Same objection.
16       MS. POLAKOWSKI: Join.
17 A.  Well, yes, Indian Joe does own, owns stuff,
18    yeah.
19 Q.  What, what are things that Indian Joe, LLC, owned?
20       MR. DOAN: I'm going to object.  Asked
21    and answered, but --
22       MS. POLAKOWSKI: I'll join.
23 A.  Unless I looked, I, I'm not sure what exactly
24    they, they own.
25 Q.  Where would you look to find that answer?

---

Page 53

1  A.  I'm trying to just look in the paperwork, in the
2       books.
3  Q.  Are you referring to books that, a company,
4       company books for Indian Joe, LLC?
5  A.  Yeah, a company book.
6  Q.  Records kept by Indian Joe, LLC?
7  A.  (Witness indicating).
8  Q.  Is that a yes?
9  A.  The LLC books, yeah.
10 Q.  Okay.
11       MR. DOAN:  Do you need a break?  Are you
12       doing okay?
13       THE WITNESS:  Yeah.
14       MS. WITTENBERG:  Do you want a break?
15       Okay.  We can go off the record.
16       (Break taken)
17 Q.  All right.  Before the break, we were talking
18       about LLC properties and ownership.  I'm going to
19       try and make this a little bit simpler and try and
20       go through this.  If you can pull up what we
21       marked as Exhibit 4, again, I think it's the one
22       right there, I'm trying to break this down to make
23       it simpler.  I'm really not trying to confuse or
24       complicate.
25       Here in paragraph 1 it refers to 101 East

Page 54

1       School Road.
2       (Discussion off the record)
3  Q.  Paragraph 1 refers to 101 East School Road and
4       103 East School Road, and I believe you said that
5       is one building at those addresses; is that
6       right?
7  A.  101 East School Road and 103 East School Road are
8       one address.
9  Q.  Okay.  And it's in Cottage Grove, Wisconsin?
10 A.  Yes.
11 Q.  And you're familiar with those properties?
12 A.  Yes.
13 Q.  And as far as you know, either you or Stacy or the
14       two of you or an LLC have owned that property at
15       some point; right?
16 A.  Yes.
17 Q.  And as far as you know, either you or Stacy or the
18       two of you individually or an LLC that you
19       controlled owned that property in May 2020; right?
20 A.  Yes.
21 Q.  Okay.  Then for the second property listed here,
22       105 East School Road and 107 East School Road, are
23       those one building?
24 A.  Yes.
25 Q.  Okay.  You're familiar with those, with that

Page 55

1       property?
2  A.  Yes.
3  Q.  As far as you know, you or Stacy or the two of you
4       or an LLC you controlled have owned that property
5       at some point in time; right?
6  A.  Yes.
7  Q.  Okay.  And as of May 2020, did either you or Stacy
8       or the two of you individually or an LLC that one
9       or both of you controlled own that property?
10 A.  I'm not sure.  That property was sold, but I don't
11       know when.
12 Q.  The property at 105 East School Road and the
13       107 East School Road was sold?
14 A.  Yes.
15 Q.  It is not owned by, as far as you know, Rockford
16       Hill, LLC, any longer?
17 A.  No, the, it was bought completely.  There's
18       nothing in Rockford Hills right now.
19 Q.  Okay.  And Rockford Hill, LLC, is an entity that
20       you set up; right?
21 A.  Yes, and I think Stacy may have owned that one.
22 Q.  Do you currently have any ownership interest,
23       whether through you individually or through an
24       LLC, of 105 East School Road and 107 East School
25       Road, Cottage Grove?

Page 56

1  A.  No.
2  Q.  We'll go on to No. 3 now.  102B Maria Lane in
3       Cottage Grove, are you familiar with that
4       property?
5  A.  Yes.
6  Q.  Would you agree that at some point in time either
7       you or Stacy or the two of you together or an LLC
8       that one or both of you controlled has owned that
9       property?
10 A.  Yes.
11 Q.  And would you agree that as of May 2020, either
12       you or Stacy or the two of you or an LLC that one
13       or both of you controlled owned that property?
14 A.  Yes.
15 Q.  Okay.  The next one, 104 Maria Lane in Cottage
16       Grove, are you familiar with that property?
17 A.  Yes.
18 Q.  And would you agree that you or Stacy or the two
19       of you individually or an LLC that one or both of
20       you controlled owned that property as of May
21       2020?
22 A.  Yes.
23 Q.  106 Maria Lane, which is the next point down,
24       No. 5, do you recognize that property?
25 A.  Yes.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 57

1 Q. Okay. And would you agree that you or Stacy or
2    the two of you individually or an LLC that one or
3    both of you controlled owned that property as of
4    May 2020?
5 A. Yes.
6 Q. Then the next one, 108 Maria Lane in Cottage
7    Grove, Wisconsin, do you recognize that
8    property?
9 A. Yes.
10 Q. Do you agree that you or Stacy or the two of you
11    individually or an entity that one or both of you
12    controlled owned that property as of May 2020?
13 A. Yes.
14    MS. POLAKOWSKI: I'm just going to object
15    on the record. Certainly this is all in the
16    property distribution that's in the divorce. I
17    don't think it's appropriate to put Mr. Randall
18    through this exercise at this point.
19    MS. WITTENBERG: I don't understand what
20    you're referring to. If there's a document where
21    this was clear, I'd be happy to do that. Do you
22    want to talk off the record for a minute here?
23    MS. POLAKOWSKI: It's in the divorce.
24    MS. WITTENBERG: Okay. Great. Is this
25    an exhibit we marked already?

---

Page 58

1    MS. POLAKOWSKI: You've already marked
2    it. It's your Exhibit 3.
3 Q. Okay. Mr. Randall, we can try and short circuit
4    some of this hopefully for some of these. If you
5    pull up Exhibit 3.
6    MR. DOAN: Just put Exhibit 3 in front of
7    you.
8    THE WITNESS: Oh, yeah.
9    MR. DOAN: Just put Exhibit 3 here.
10 Q. It looks like it's the 7th page from the front,
11    but it has a 2 at the bottom.
12 A. There it is.
13 Q. Okay. You see a list towards the, about
14    two-thirds down, it says, Property Division, and
15    it refers to, it says, so paragraph A, it says,
16    Business Interests. Steven is awarded the
17    following LLC interests, including the assets
18    owned by companies.
19    Do you see that there?
20 A. Yes.
21 Q. Do you see a list here with Title Holder and then
22    Property Address?
23 A. Yeah.
24 Q. Okay. This document is dated as of October 26th,
25    2020; is that correct?

---

Page 59

1    MR. DOAN: I don't know about that.
2    MS. POLAKOWSKI: Yeah, I don't either.
3    MS. WITTENBERG: You have to go to
4    page 8, on the bottom, it says, but it's the
5    13-ish page in.
6    MR. DOAN: Do you need the question read
7    back?
8 Q. So I can do it a different way, so if you go
9    towards the end, I think it's the third from the
10    back, it's got a page 8 at the bottom, there are
11    some signatures.
12 A. Yes.
13 Q. Okay. You see the date on there of October 26th,
14    2020?
15 A. Yeah.
16 Q. Do you agree that you signed this document as of
17    October 6, 2020?
18    MR. DOAN: I just want -- 26th?
19    MS. WITTENBERG: What did I say?
20    MR. DOAN: 6th, 6th.
21 Q. October 26th, 2020.
22 A. It appears I have signed that, yes.
23 Q. Okay. And if you go back to the page you had
24    opened, which has a 2 at the bottom. Was this
25    information that's listed here showing Title

---

Page 60

1    Holder and Property, is this accurate as of
2    October 2020?
3 A. I believe so.
4 Q. Okay. Was this information also true as of May
5    2020?
6    MS. POLAKOWSKI: Object to form.
7    MR. DOAN: Join.
8 A. I, I don't remember.
9 Q. Okay. Then we'll have to go back to the other
10    exhibit, I'm sorry.
11    We were on, I think No. 5, 6, okay. 7.
12    Excellent. If you can go back to Exhibit 4.
13 A. I'm sorry, what?
14    MR. DOAN: Go back to Exhibit 4.
15 Q. Okay. Are you on No. 7, line 7 of that document?
16    It refers to 110 Maria Lane in Cottage Grove,
17    Wisconsin.
18    Do you see that there?
19 A. Yes.
20 Q. Is that a property you recognize?
21 A. Wasn't that on here?
22 Q. Yeah, and I think we saw that it was owned by Tin
23    Buck 2, LLC, as of October 2020?
24 A. Okay.
25 Q. Do you agree that as of May 2020, either you or

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 61

1 Stacy or the two of you or an LLC that you
2 controlled owned 110 Maria Lane in Cottage
3 Grove?
4     MR. DOAN: I'm going to object. Asked
5 and answered. I think his answer is he doesn't
6 remember but feel free to --
7     MS. POLAKOWSKI: Join.
8 A. Yeah, I think, yes, I think we owned it.
9 Q. Okay. No. 8, this is a different town now, so
10 1972 Barber Drive, Unit 3, in Stoughton,
11 Wisconsin. Is that a residence that you and/or
12 Stacy lived in?
13 A. Yes.
14 Q. Did one or both of you own that property?
15 A. Yes, both of us.
16 Q. And that sold in July 2020; is that correct?
17 A. I don't remember, but that's what it says here.
18 Q. Did you remember selling it during the divorce
19 proceedings?
20 A. Yes.
21 Q. There's a sale price listed there of 486,000. Do
22 you see that?
23 A. Yes.
24 Q. Does that match your recollection of what the
25 property sold for in 2020?

---

Page 62

1     MR. DOAN: Objection. Foundation.
2     MS. POLAKOWSKI: Same objection.
3 A. I really don't remember.
4 Q. Okay. The next one listed there is 6310 Hidden
5 Farm Road in McFarland, Wisconsin.
6     Do you see that?
7 A. Yes.
8 Q. Is that a property that you owned prior to 1997?
9     MS. POLAKOWSKI: Objection. Foundation.
10     MR. DOAN: Join.
11 A. I, I'm not sure of the dates.
12 Q. Do you recognize that address?
13 A. I do recognize that address.
14 Q. Did you or Stacy or the two of you ever own that
15 property?
16 A. Yes.
17 Q. Did you or Stacy or the two of you own that
18 property in 2020?
19     MR. DOAN: Objection.
20 A. I don't remember. Oh, that's 6310. We were in
21 6312, okay. Yeah, I, I don't really remember
22 when.
23 Q. Okay. The next one is 6312, which you just said,
24 so 6312 Hidden Farm Road, McFarland. Do you
25 recognize that address?

---

Page 63

1 A. Yes.
2 Q. Is that a house that you lived at?
3 A. Yes.
4 Q. And did you or Stacy or the two of you
5 individually own it?
6 A. Yes.
7     MS. POLAKOWSKI: Objection. Vague as to
8 time.
9 Q. Ever? You owned it at some point in time?
10 A. Yes.
11 Q. Did you own that property before you moved to
12 Florida?
13 A. Yes.
14 Q. Did you or Stacy or the two of you eventually sell
15 that property?
16 A. Yes.
17 Q. Did you sell it while you lived in Florida?
18 A. I don't remember.
19 Q. Okay. The next one there is 5106 Rustic Way in
20 McFarland, Wisconsin. Do you see that one?
21 A. Yes.
22 Q. Is that a property you recognize?
23 A. Yes.
24 Q. Did you or Stacy or the two of you ever own that
25 property?

---

Page 64

1 A. Yes.
2 Q. Did any of you own it as of May 2020?
3     MR. DOAN: Objection. Foundation.
4     MS. POLAKOWSKI: Join.
5 A. I, I don't remember.
6 Q. Okay.
7 A. I, I --
8 Q. 5802 Winnequah Road in Monona Village, Wisconsin,
9 do you see that one?
10 A. Yes.
11 Q. Did you or Stacy or the two of you ever own that
12 property?
13     MS. POLAKOWSKI: Objection. Foundation.
14     MR. DOAN: Join.
15 A. I, I don't recognize it.
16 Q. Okay. The next one is No. 13, 6116 Avocetridge
17 Drive in Lithia, Florida. Do you recognize
18 that?
19 A. Avocetridge Drive.
20 Q. Say that again. Avocetridge?
21 A. Avocetridge Drive.
22 Q. Do you recognize that address?
23 A. Yes.
24 Q. Is that a property that you or Stacy or the two of
25 you ever owned?

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 65

1  A.  Yes.
2  Q.  Do you recall when you purchased that?
3  A.  I don't remember.
4  Q.  Was it while you were Living in Florida?
5  A.  Yes.
6  Q.  Did you live at this address ever?
7  A.  No.
8  Q.  Was it a rental property?
9  A.  Yes.
10 Q.  Did it provide rental income for you or Stacy or
11     the two of you?
12        MS. POLAKOWSKI: Objection.  Form.
13        MR. DOAN: Join.
14 A.  I, I don't remember.
15 Q.  Okay.  The next one listed, No. 14, is 6118 in
16     Avocetridge Drive, Lithia, Florida.
17        Do you see that one?
18 A.  Yeah.
19 Q.  Is that a property you recognize?
20 A.  Yes.
21 Q.  Did you or Stacy or the two of you own that
22     property?
23 A.  Yes.
24 Q.  Do you recall when you acquired that property?
25 A.  I don't remember.

---

Page 66

1  Q.  Was it while you were living in Florida?
2  A.  Yes.
3  Q.  Did you ever live at this property?
4  A.  Yes.
5  Q.  Did you ever rent it out?
6  A.  Yes.
7  Q.  When you rented it out, did you make rental income
8      from it?
9         MS. POLAKOWSKI: Objection.  Form.
10        MR. DOAN: Join.
11 A.  I don't remember.
12 Q.  Did you charge rent when it was rented out?
13 A.  Yes.
14 Q.  Do you recall when you no longer owned the
15     property listed in No. 14?
16 A.  No.
17 Q.  And going up to No. 1, the property, No. 13, which
18     is 6116 Avocetridge Drive --
19 A.  Yes.
20 Q.  -- do you recall, do you still own that property
21     you or Stacy or the two of you?
22 A.  No.
23 Q.  Do you recall when you no longer owned that
24     property?
25 A.  I don't remember.

---

Page 67

1  Q.  Next one, No. 15, 7441 Surrey Wood Lane in Apollo
2      Beach, Florida.  Do you see that?
3  A.  Yes.
4  Q.  Do you recognize that property?
5  A.  Yes.
6  Q.  Is that a property that you or Stacy or the two of
7      you have ever owned?
8  A.  Yes.
9  Q.  Do you recall when you acquired it?
10 A.  I don't remember.
11        MR. DOAN: Do you need a break?  Speak up
12     if you ever need a break.
13 Q.  Yes, please do.
14 A.  Yeah, I, I don't remember.
15 Q.  Okay.  Do you recall, do you still own that
16     property, you or Stacy or the two of you?
17 A.  No.
18 Q.  Do you recall when you no longer owned that
19     property?
20 A.  No.
21 Q.  Do you or Stacy or the two of you own any
22     properties in Florida currently?
23 A.  None.
24 Q.  Did you or Stacy or the two of you own any
25     properties in Florida as of May 2020?

---

Page 68

1  A.  No, I don't remember.
2  Q.  Okay.
3  A.  I don't remember that.  No, I don't think so.
4  Q.  No. 16, 7871 Carriage Pointe Drive, Gibsonton,
5      Florida, is that a property you recognize?
6  A.  Yes.
7  Q.  Is that a property that you or Stacy or the two of
8      you owned at some point in time?
9  A.  Yes.
10 Q.  Do you recall when that property was acquired?
11 A.  No.
12 Q.  Do you recall --
13 A.  Don't remember.
14 Q.  Do you recall when you no longer owned that
15     property?
16 A.  I don't remember.
17 Q.  Do you recall how you came to no longer own that
18     property?
19 A.  I'm sorry, what?
20 Q.  Do you recall how it was that you came to no
21     longer own that property?
22 A.  It says on here that it was foreclosed on.
23 Q.  I'm asking if you have any recollection of, of how
24     you came to no longer own that property.
25 A.  I know a lot of the properties in Florida were

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

**Page 69**

1  foreclosed on, yes.
2  Q. A lot of properties in Florida were foreclosed.
3      Were you impacted by market conditions and real
4      estate in Florida?
5          MS. POLAKOWSKI: Object to form.
6          MR. DOAN: Objection. Form.
7  Q. You can answer.
8  A. Yes.
9  Q. What was your experience with owning properties in
10     Florida with respect to the market?
11 A. The market went way down, and the houses weren't
12     even worth what they were paid for.
13 Q. Do you recall that time frame when the market went
14     way down?
15 A. You know, I believe it was right around the time
16     that I had cancer surgery, and I was here in
17     Wisconsin when, when the market turned. I do
18     remember that.
19 Q. Do you recall what year that was?
20 A. 2007.
21 Q. Do you know what time of year that was that you
22     had, that you were in Wisconsin and had that
23     surgery?
24 A. No, I don't remember.
25 Q. Okay. I can try and group some of these here to

---

**Page 70**

1  short circuit them. There's No. 16 through 19,
2  there are four properties all listed on Carriage
3  Pointe Drive, Gibsonton, Florida. Do you
4  recognize those to be properties that you or Stacy
5  or the two of you owned?
6  A. Yes.
7  Q. And were those properties all either foreclosed or
8  sold through a short sale?
9  A. Yes.
10 Q. No. 20 is 6527 Carrington Sky Drive in Apollo
11     Beach, Florida. Do you recognize that property?
12 A. I do.
13 Q. Is that a property that you or Stacy or the two of
14     you ever owned?
15 A. Yes.
16 Q. Do you recall when you acquired that one?
17 A. I don't remember.
18 Q. Was it after you moved to Florida?
19 A. Yes.
20 Q. There are several properties that were acquired in
21     Florida after you moved down there. How did you
22     pay for the down payments?
23         MR. DOAN: I'm going to object to form.
24 A. I don't remember.
25         MS. POLAKOWSKI: I'll join.

---

**Page 71**

1  Q. Did you have to pay down payments for the
2      properties you acquired when you moved down to
3      Florida?
4          MS. POLAKOWSKI: Object to form.
5          MR. DOAN: Object to form.
6  A. I really don't remember.
7  Q. Okay. No. 21 is 5909 Jaegerglen Drive in Lithia,
8      Florida. Do you recognize that address?
9  A. Yes.
10 Q. Is that a property that you or Stacey or the two
11     of you owned at some point in time?
12 A. Yes.
13 Q. Do you recall when you no longer owned that
14     property?
15 A. I, I don't remember the exact date that we sold
16     it.
17 Q. No. 22 is 7320 Carrington Oaks Lane in Apollo
18     Beach, Florida.
19         Do you see that?
20 A. Yes.
21 Q. Is that an address you recognize?
22 A. Yes, I recognize it.
23 Q. Is that a property that you or Stacy or the two of
24     you owned at some point in time?
25 A. Yes.

---

**Page 72**

1  Q. Did you acquire it after you moved to Florida?
2  A. Yes.
3  Q. Is that one that was foreclosed on?
4  A. That's what it says here. I think we may have
5      sold that. I'm not sure at all.
6          MS. WITTENBERG: Okay. All right. I may
7      be off one, but did we just talk about the
8      Jaegerglen Drive or the Carrington Oaks? I didn't
9      mark my list well.
10         MR. DOAN: I think we're on 23.
11         MS. WITTENBERG: 23, okay.
12 Q. All right. No. 23 says, 6833 Guilford Bridge
13     Drive, Apollo Breach, Florida.
14         Do you see that one?
15 A. Yes.
16 Q. Do you recognize that address?
17 A. I remember it, yes.
18 Q. Okay. Is that a property that you or Stacy or the
19     two of you ever owned?
20 A. Yes.
21 Q. Do you recall when you acquired it?
22 A. No.
23 Q. No. 24, 7428 Surrey Wood Lane, Apollo Beach,
24     Florida, do you recognize that address?
25 A. Yeah, I remember it.

---

**Colleen Reed Reporting LLC**
414.322.3621

Page 73

1  Q.  Is that a property that you or Stacy or the two of
2      you ever owned?
3  A.  Yes.
4  Q.  Did you acquire it after the two of you moved to
5      Florida?
6  A.  Yes.
7  Q.  Do you recall when you stopped owning that
8      property?
9  A.  No.
10 Q.  The next one, No. 25, 7104 Cromwell Park Lane in
11     Apollo Beach, Florida, do you see that address?
12 A.  Yes.
13 Q.  Is that a property that you or Stacy or the two of
14     you owned?
15 A.  Yes.
16 Q.  Do you recall when you acquired it?
17 A.  I don't remember.
18 Q.  Was it after you moved to Florida?
19 A.  Yes.
20 Q.  And do you recall when you no longer owned it?
21 A.  No, I don't remember it.
22 Q.  No. 26 is 2401 Roanoke Springs Drive, Ruskin,
23     Florida.
24         Do you see that one?
25 A.  Yes.

Page 74

1  Q.  Is that an address you recognize?
2  A.  Yes.
3  Q.  Is that a property that you or Stacy or the two of
4      you have ever owned?
5  A.  Yes.
6  Q.  Did you acquire it after you moved to Florida?
7  A.  Yes.
8  Q.  Do you recall when you no longer owned it?
9  A.  No, I don't remember.
10 Q.  Do you recall if this property was ever foreclosed
11     on?
12 A.  I don't remember.  I'm just looking at what you
13     have on this sheet of paper.
14 Q.  And, again, I'm not really trying to, and it's
15     just a visual for the addresses really.  I want to
16     make sure I'm getting your memory and not what I'm
17     saying here.  If you don't remember, that's fine.
18         No. 27, 2230 Roanoke Springs, Ruskin,
19     Florida, do you see that address?
20 A.  Yes.
21 Q.  Is that a property that you or Steven or --
22 A.  Yes.
23 Q.  I'm sorry, you or Stacy owned at some point?  Yes?
24         Did you acquire it after you moved to
25     Florida?

Page 75

1  A.  Yes.
2  Q.  Do you have any memory of whether this was ever
3      foreclosed on?
4  A.  I don't remember.
5  Q.  Okay.  We went through a number of Florida
6      properties.  I'm going to pause there for a
7      moment.
8          There are, by my count, there are 15
9      properties in Florida.  Is that, do you agree that
10     you or Stacy or the two of you at some point in
11     time owned 15 properties in Florida?
12 A.  I --
13         MR. DOAN: Object to form.
14 A.  -- don't remember.
15 Q.  Are there any others that we have not talked about
16     that are properties in Florida that you or Stacy
17     or you have ever owned?
18         MS. POLAKOWSKI: Object to form and
19     foundation.
20 A.  I --
21         MR. DOAN: Join.
22 A.  I don't remember.
23 Q.  Which addresses, if any, of the ones that we
24     talked about did you and Stacy live at when you
25     were in Florida?

Page 76

1  A.  6118 Avocetridge.
2  Q.  Any others?
3  A.  5909 Jaegerglen Drive.
4  Q.  Any others?
5  A.  No.
6  Q.  Other than those two Florida addresses, of all the
7      Florida properties we've been talking about, that
8      we've talked about today, were those intended to
9      be rental properties?
10         MR. DOAN: Object to form.
11         MS. POLAKOWSKI: Join.
12 A.  Intended to be rental, no.
13 Q.  Okay.  Why, why did you acquire these properties?
14 A.  We're going to flip them.
15 Q.  Flip, okay.
16         Is that true of each of the ones except
17     for the two that you lived in, was your intent
18     when you purchased them to flip them?
19 A.  Yes.
20 Q.  Did you ever rent out any of these properties in
21     Florida?
22 A.  I, yes, I think so.
23 Q.  Did you make any rental income from owning these
24     properties in Florida?
25         MS. POLAKOWSKI: Object to form.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 77

1      MR. DOAN: Object to form.
2  A.  I really don't remember.
3  Q.  It seems like the timing may have been really
4      unfortunate with when you went down to Florida to
5      purchase some properties.  Would you agree with
6      that?
7      MR. DOAN: Object to form.
8      MS. POLAKOWSKI: Join.
9  A.  Yes, I would agree with that.
10 Q.  And would you agree that you purchased a number of
11     properties, you or Stacy or the two of you
12     purchased a number of properties before the market
13     went bad in Florida; right?
14     MR. DOAN: Object to form.
15     MS. POLAKOWSKI: Join.
16 A.  I, I don't remember.  I don't remember.
17 Q.  When you purchased the properties in Florida with
18     the intent to flip them, was the goal to make
19     money from flipping them?
20 A.  Yes.
21 Q.  Was that intended to be a source of income for you
22     and Stacy?
23 A.  Yes.  It would have been a nice income.
24 Q.  And were, were some sold at a profit?
25     MS. POLAKOWSKI: Object to form.

---

Page 78

1      MR. DOAN: Object to form.
2  A.  I, I, I don't remember.  By looking at it, it
3      doesn't appear like it was sold at a profit.
4  Q.  I imagine that was hard on your marriage?
5  A.  I, I don't know if it was or not.  I, I guess I
6      didn't look at that.
7  Q.  Did you feel some responsibility for this
8      unfortunate event of the, of the Florida real
9      estate market --
10     MR. DOAN: I'm going to object to form.
11 Q.  -- downturn?
12     MR. DOAN: I'm going to object to form.
13     MS. POLAKOWSKI: Join.
14 A.  Boy, I don't remember.  I don't remember --
15 Q.  Okay.
16 A.  -- how I felt at that point.
17 Q.  Okay.  We have two more on the list here.  The
18     next one is 102A Maria Lane, and I know we talked
19     about a 102B Maria Lane already.  Is, is 102A
20     Maria Lane a property you recognize?
21 A.  Yes.
22 Q.  Is that one that you, you at some point owned?
23 A.  Yes.
24 Q.  Was that --
25 A.  Well, no, maybe not.

---

Page 79

1  Q.  Was it owned at some point by your son?
2  A.  Yes.
3  Q.  Did you own it as of December, I'm sorry, May
4      2020?
5  A.  I don't know when it was transferred.  I don't
6      think it was over transferred to me before it --
7      It might have been later on in the year.
8  Q.  Okay.  And the last one here, 101 East Main
9      Street, Suite 4 in Waunakee, Wisconsin.  Do you
10     see that?  Do you see that No. 29?
11 A.  Yeah, I do.
12 Q.  Okay.  Was that an address you recognize?
13 A.  No.
14 Q.  Okay.  All right.  Other than that one, so numbers
15     1 through 28 on this list I think we established
16     you recognize all those that you and Stacy or the
17     two of you or an entity owned those 28 properties;
18     is that right?
19     MS. POLAKOWSKI: Objection.  Vague as to
20     time.  Also asked and answered.
21     MR. DOAN: Join.
22 A.  I, I don't remember.  I mean it's --
23 Q.  Okay.
24     MR. DOAN: Do you need a break?
25     THE WITNESS: No, I'm okay.

---

Page 80

1  Q.  Are there any properties that you or an entity
2      owned or controlled as of May 2020 that you knew
3      the value of as of May 2020?
4      MR. DOAN: Object to form.
5      MS. POLAKOWSKI: Join.
6      MR. DOAN: You can try to answer if you
7      it understand it.
8      THE WITNESS: I'm sorry, what?
9      MR. DOAN: You can answer if you
10     understand the question.
11 A.  Can you ask it again?
12 Q.  Sure.  We just talked about 29 properties, and
13     except for the last one, which you didn't
14     recognize, there were 28 properties that you
15     recognized the address for, so for any of those 28
16     addresses we talked about, properties we talked
17     about, did you know the value of any of them in
18     May 2020?
19     MR. DOAN: Same objection.
20     MS. POLAKOWSKI: Join.
21 A.  What was May of 2020?
22 Q.  It was a month that may not mean much to you but
23     means something to the case, so it's just a point
24     in time.  As of May 2020, did you happen to know
25     the value of any of the properties that you owned

---

Page 81

1  at that time?
2       MS. POLAKOWSKI: Objection to the extent
3  that it mischaracterizes his testimony.  He
4  already testified that he did not own a number of
5  those properties in May of 2020.
6       MR. DOAN: I'll join.
7  A.  I don't really remember --
8  Q.  Okay.
9  A.  -- what I knew at that time.
10      MS. WITTENBERG: Let's start marking a
11  few here, Janet.
12      (Exhibits 5 through 8 marked for
13  identification)
14      MS. WITTENBERG: Why don't we take five
15  minutes.
16      (Break taken)
17      MS. WITTENBERG: We'll go back on the
18  record.
19  Q.  And, Mr. Randall, you have in front of you now
20  four new exhibits that have been marked,
21  Exhibit 5, Exhibit 6, Exhibit 7, and Exhibit 8.
22  Do you have all four of those documents there?
23  A.  I do.
24  Q.  They're all very similar.  I'll start with just
25  the first one, which is Exhibit 5, which should

Page 82

1  have a 000238, just to make sure we're all on the
2  same page, on top of there.
3  A.  Okay.
4  Q.  It looks like this is a Warranty Deed, and if you
5  go down to, well, let's see, down, down at the
6  bottom where there's a notary stamp.  Do you see a
7  date down there?
8  A.  Yes.
9  Q.  19th of September, 2006, it looks like?
10  A.  Okay.
11  Q.  Okay.  And do you see your signature on this
12  document?
13  A.  I'm sorry, what?
14  Q.  Do you see your signature on this document?
15  A.  Yes.
16  Q.  Okay.  And do you see a signature, a signature for
17  Stacy on this document?
18  A.  Yes.
19  Q.  Okay.  Do you have a recollection of, of this
20  document?
21  A.  I really don't remember it, but it appears that
22  was when we deeded it into Tin Buck 2.
23  Q.  Okay.  And by that, you're referring to a property
24  that you and Stacy owned that you transferred to
25  Tin Buck 2, LLC?

Page 83

1  A.  Yeah.  I really don't -- Yeah, it could be.
2  Q.  And the date that's on there, this 19th of
3  September, 2006, is that the date that the, the
4  property was transferred by the two of you to Tin
5  Buck 2, LLC?
6       MS. POLAKOWSKI: Object to foundation.
7       MR. DOAN: Object.
8       MS. POLAKOWSKI: Also calls for a legal
9  conclusion.
10      MR. DOAN: Same.
11  A.  Like I said, I really don't remember.
12  Q.  Okay.  If you don't remember it happening, but you
13  see the, you see the documents --
14  A.  Yeah.
15  Q.  -- and the signatures here, you just don't have a
16  recollection of it happening?
17  A.  Yes.
18  Q.  Okay.  You don't doubt that this took place, you
19  just don't remember it?
20      MS. POLAKOWSKI: Objection.  Form.
21      MR. DOAN: Same.  Join.
22  A.  Do you want me to answer that?  I mean --
23  Q.  I do.  I do.  You don't have any reason to doubt
24  that this document isn't what it says it is;
25  right?

Page 84

1       MS. POLAKOWSKI: Objection.
2  Foundation.
3       MR. DOAN: Join.
4  A.  I, I believe it is what it's -- Yes, I, I think
5  it's to deed it over to Tin Buck 2, but does it
6  say where the properties are?
7  Q.  That I haven't actually focused on to this point.
8  You don't need to know that for the purposes of
9  this question.  You're certain that that's your
10  signature on there?
11  A.  Yes.
12  Q.  You're certain that that's Stacy Randall's
13  signature on there?
14  A.  Yes.
15  Q.  Okay.  Do you, do you recall, I know you don't
16  recall the actual time frame of it, but do you
17  have a memory of transferring properties that you
18  or Stacy or the two of you owned to Tin Buck 2,
19  LLC?
20      MS. POLAKOWSKI: Objection.  Asked and
21  answered.
22      MR. DOAN: Join.
23  A.  Yes.
24  Q.  Okay.  Did you and Stacy, were you together when,
25  at whatever date it was when you transferred

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 85

1    properties to Tin Buck 2, LLC?
2       MS. POLAKOWSKI: Object to form.
3       MR. DOAN: Join.
4 A.  Yes.
5 Q.  Okay. And you went to, do you know Amos Pearson,
6    the notary that's listed here, do you know that
7    person?
8 A.  I don't remember. I don't remember, no.
9 Q.  Okay. We can go to the next one, which is
10   Exhibit 6. Do you see your signature on this one?
11 A.  On Exhibit 6?
12 Q.  Yes.
13 A.  Yes.
14 Q.  Okay. And do you see Stacy's signature on this as
15   well?
16 A.  Yes.
17 Q.  And the date's a little bit obscured by the notary
18   stamp, but it looks like it's also 19th of
19   September of 2006?
20 A.  Yes.
21 Q.  Okay. And is this part of the same, did you do it
22   the same time where you went together to have
23   these deeds signed?
24       MS. POLAKOWSKI: Objection. Form.
25       MR. DOAN: Join.

---

Page 86

1 A.  I don't remember.
2 Q.  Okay. Are you certain that's your signature?
3 A.  Yes.
4 Q.  Are you certain that's Stacy's signature?
5 A.  Yes.
6 Q.  Okay. The next one is Exhibit 7. Do you see your
7   signature?
8 A.  Yes.
9 Q.  And do you see Stacy's signature there?
10 A.  I do.
11 Q.  Are you certain that's your signature?
12 A.  Yes.
13 Q.  Are you certain that's Stacy's signature?
14 A.  You know, I'm not an expert on signatures, but it
15   appears to be her signature.
16 Q.  Okay. And the date on here, 19th of September,
17   2006, you agree that's the same date as the other
18   two documents we just saw?
19 A.  Yes.
20 Q.  Okay. Then the next one is Exhibit 8. Do you see
21   your signature on this deed as well?
22 A.  I do.
23 Q.  And do you see Stacy's signature?
24 A.  Yeah.
25 Q.  Are you certain that's your signature?

---

Page 87

1 A.  Yes.
2 Q.  Are you certain that's Stacy's signature?
3 A.  Yes.
4 Q.  And it's dated again 19th of September, 2006;
5   right?
6 A.  Right.
7 Q.  I believe we have not yet talked about an LLC
8   called Randall Investments. Are you familiar with
9   that entity?
10 A.  Yes.
11 Q.  Is that an entity that you formed?
12 A.  Yes.
13 Q.  Do you recall when you formed it?
14 A.  No.
15 Q.  Was Stacy ever an owner or member of that LLC?
16 A.  I --
17       MR. DOAN: Object to the extent it calls
18   for a legal conclusion.
19 A.  I don't remember.
20       MS. POLAKOWSKI: Join.
21 A.  I don't remember anyway so --
22 Q.  And Rockford Hill, LLC, that's an entity that you
23   formed?
24 A.  I think, I think that, I think that Stacy, I think
25   Stacy was on Rockford.

---

Page 88

1 Q.  You're saying that you think maybe Stacy formed
2   that LLC?
3 A.  Yes.
4 Q.  Okay. Did you also have an ownership interest in
5   it?
6 A.  No, I don't think so.
7 Q.  Did you help keep the, the papers and documents
8   for that LLC?
9       MR. DOAN: Object to form.
10       MS. POLAKOWSKI: Join.
11 A.  Yes.
12 Q.  Do you recall whether Stacy was the manager of
13   that LLC?
14       MS. POLAKOWSKI: Object.
15       MR. DOAN: Object to form.
16       MS. POLAKOWSKI: And to the extent that
17   it calls for a legal conclusion.
18 A.  Don't, don't remember.
19 Q.  Do you know in what year it was formed?
20 A.  What, were these all 2006?
21 Q.  I'm sorry, say that again.
22 A.  These were all 2006?
23 Q.  The deeds that we just saw were all 2006.
24 A.  So I would imagine it would have been at the same
25   time.

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

---

Page 89

1 Q. Okay. So in your mind, you tie the two of them
2    together with setting up LLCs and transferring
3    some properties?
4 A. I think we would have done it all at once, yeah.
5 Q. Okay. Three Willow Lake, LLC, is that an entity
6    that you or Stacy formed?
7 A. Yes.
8 Q. Did Stacy ever have an ownership interest in that
9    LLC?
10        MS. POLAKOWSKI: Object to form. Calls
11   for a legal conclusion.
12        MR. DOAN: Join.
13 A. I, I don't think so, but I don't remember.
14 Q. Okay. And Tin Buck 2, LLC, I think you mentioned
15   that there are currently other owners of that
16   LLC --
17 A. Yes.
18 Q. -- besides yourself; is that right?
19        Who are the other owners?
20 A. I think it was Three Ducks, right, Three, Five
21   Ducks.
22 Q. It may have been something else I was thinking of.
23   That may be. I may have gotten those mixed up.
24   But your recollection is that Tin Buck 2 is now
25   partly owned by either Three Ducks or Five

---

Page 90

1    Ducks?
2        MS. POLAKOWSKI: Objection. Asked and
3    answered.
4        MR. DOAN: Joan.
5 A. Half owned, yes.
6 Q. And that's an entity that David Bisbee owns or
7    controls?
8 A. Yes.
9        (Discussion off the record)
10 Q. All right. Now, Mr. Randall, you were aware as
11   we've discussed that Stacy owned stock in Windy
12   Waters; right?
13 A. Yes.
14 Q. Were you aware that she was a director of Windy
15   Waters?
16        MR. DOAN: Object to form.
17        MS. POLAKOWSKI: Foundation.
18 A. I, I don't remember.
19 Q. Were you aware that she was the president of Windy
20   Waters?
21        MS. POLAKOWSKI: Objection. Foundation.
22        MR. DOAN: Join.
23        You can answer if you know.
24 A. No.
25 Q. Did you -- I understood that you received and

---

Page 91

1    reviewed mail for the family; is that right?
2 A. I what?
3 Q. You received and reviewed mail on behalf of the
4    family; is that right?
5        MS. POLAKOWSKI: Objection to form.
6        MR. DOAN: Object to form.
7 A. Whatever brought out of the mailbox I looked at.
8 Q. Did you ever receive tax documents that were
9    addressed to Stacy Randall?
10 A. Did I what?
11 Q. Did you ever receive tax documents that were
12   addressed to Stacy Randall?
13        MR. DOAN: I'm going to object to form.
14        MS. POLAKOWSKI: Join.
15        MR. DOAN: Vague and ambiguous as to
16   receive.
17 A. No, I don't remember any tax documents, or if
18   anything, it would be for both of us.
19 Q. Okay.
20 A. Tax documents from the company.
21 Q. If that helps, I can be more specific. I -- Did
22   you ever recall receiving any tax documents like
23   K-1s?
24 A. K-1s.
25 Q. That were addressed to Stacy Randall?

---

Page 92

1 A. Yes, yes.
2 Q. Those were --
3 A. And they were --
4 Q. -- K-1s related to Windy Waters?
5 A. They were sent to me.
6 Q. They were, they were addressed to you?
7 A. Yes, because I was the one that pulled together
8    then the taxes.
9 Q. Okay. Did you receive them every year between
10   1997 and 2019 as far as you know?
11        MS. POLAKOWSKI: Objection. Foundation.
12 A. I, I really don't remember.
13 Q. So you said you were responsible for ensuring the
14   taxes got completed and filed; right?
15 A. Yeah.
16 Q. Do you ever recall a year where you did not
17   receive K-1s, again for Stacy Randall for Windy
18   Waters?
19        MR. DOAN: Object to form.
20        MS. POLAKOWSKI: Join.
21 A. I, I would imagine I did get them every year, but
22   I really don't remember.
23 Q. And you have no memory of --
24 A. I have to get them every year, otherwise I
25   couldn't do the tax.

---

Page 93

1 Q. Right. When you received tax forms, the K-1s
2 again for Windy Waters, did you show them to
3 Stacy?
4 A. I would imagine that she would look at them just
5 as much as I did when we were pulling our taxes
6 together.
7 Q. And can you explain why, why you believe that to
8 be the case?
9 A. Well, it wasn't, when I got the K-1 for the taxes,
10 I wouldn't, I don't take it and show it right to
11 her, but she normally stacks it up on my desk,
12 and, you know, we'd both go through it and see
13 what we needed to --
14 Q. Is there a spot, you're saying there's a spot that
15 you would collect tax documents as they came to
16 you?
17 A. Yeah.
18 Q. Okay. And it was your practice to make a stack of
19 them on your desk?
20 A. Yes.
21 Q. And Stacy knew that?
22 A. And still, yes, there's a stack on my desk right
23 now.
24 Q. So it's still your practice even today?
25 A. Yeah.

Page 94

1 Q. Okay. And after you collected all of the tax
2 documents, would you then work with an accountant
3 to make sure your taxes got filed each year?
4 A. Yes.
5 Q. Was Stacy involved in those discussions with the
6 accountant?
7      MS. POLAKOWSKI: Objection.
8 Mischaracterizes testimony.
9 A. Yes, I, I, I think we both would, yeah, I, you
10 know, I'm not sure, but I think we both did.
11 Q. Okay. Did, did the two of you sign your tax
12 returns typically?
13 A. M-hm.
14 Q. Did you, did the two of you go together to sign
15 tax returns?
16 A. Yes.
17 Q. Did you do that with an accountant?
18 A. I don't -- Yeah.
19 Q. Was it your standard practice to go to the
20 accountant's office to review your tax returns,
21 each year?
22 A. And then sign them.
23 Q. Okay. And that involved reviewing the tax returns
24 each year?
25 A. I would think so.

Page 95

1 Q. Did your accountant walk the two of you through
2 what was in the tax returns each year?
3      MR. DOAN: Object to form.
4      MS. POLAKOWSKI: Join.
5 A. You know, I, I don't remember how, how much he
6 went through with it.
7 Q. Okay.
8 A. I do remember, you know, obviously looking for the
9 bottom dollar that we ever owed or were going to
10 get back.
11 Q. Sure.
12      (Exhibit 9 marked for identification)
13 Q. All right. Mr. Randall, you've been handed the
14 thick document that's marked as Exhibit 9. Do you
15 recognize this document to be tax returns for you
16 and Stacy Randall for tax year 2017?
17      MR. DOAN: Look through it.
18 Q. Feel free to look through it as long as you need.
19 A. Why has it got the black areas on it?
20 Q. That I don't know. I imagine when you signed it,
21 you probably didn't have the black areas on it.
22 This is the best copy I could get. So except for
23 the black markings on it, which I don't know where
24 they came from, do you recognize this to otherwise
25 be a copy of your tax returns from year 2017?

Page 96

1      MR. DOAN: Go ahead and go through it,
2 Steven, take your time.
3 A. Okay. What was the question now?
4 Q. Sure. Now that you've flipped through the
5 document, do you recognize this to be a copy of
6 your 2017 tax returns for you and Stacy Randall?
7 A. By looking at the document here, yes, it appears
8 to be that.
9 Q. Okay. And starting towards the back, you'll see
10 on the document there are some numbers that say
11 PHH and then numbers at the very bottom. Do you
12 see those?
13 A. Where?
14 Q. At the very bottom of each page --
15 A. Yes.
16 Q. -- you'll see PHH and some numbers.
17 A. Yes.
18 Q. If you go towards the back, that says, PHH 0082.
19 Okay. Does this look like a copy of a
20 Schedule K-1 for Stacy Randall as to ownership in
21 Windy Waters, Inc.?
22      MS. POLAKOWSKI: Objection. Foundation.
23      MR. DOAN: Join.
24 A. That's what it looks like, yes.
25 Q. And earlier when were you describing receiving

Page 97

1     K-1s, are you talking about documents that looked
2     like this?
3 A.   I don't, I don't know if they looked like that but
4     it probably carried the same information.
5 Q.   Right. I imagine it differed from year to year on
6     what numbers were in there and things like that.
7     In general, you're talking about a document that
8     is called a Schedule K-1?
9       MS. POLAKOWSKI: Objection. Form.
10 A.   Yes.
11 Q.   Now, if you go back up towards the beginning
12     again. There's a page about four in that's
13     PHH 0048. Did you -- Before I ask the documents
14     to -- my question, did you have an understanding
15     that Stacy sometimes received dividends from Windy
16     Waters?
17       MS. POLAKOWSKI: Objection. Foundation.
18     Also object to the extent it calls for a legal
19     conclusion.
20 A.   I, I don't remember.
21 Q.   You don't have any recollection of Stacy ever
22     receiving dividends from Windy Waters?
23       MS. POLAKOWSKI: Objection. Asked and
24     answered.
25 A.   What do you mean by dividends, like a payout from

Page 98

1     the company, you mean, or --
2 Q.   Did you ever have a recollection of Stacy
3     receiving money from Windy Waters without selling
4     anything to Windy Waters?
5       MR. DOAN: Object to form.
6       MS. POLAKOWSKI: Objection. Foundation.
7 A.   I, I really don't remember.
8 Q.   Okay. On this page that we're looking at here,
9     there's a part 2, it's called Ordinary Dividends.
10     Do you see that part on page 0048?
11 A.   Yes.
12 Q.   And do you see where it says Windy Waters in that
13     section?
14 A.   Yes.
15 Q.   And do you see a number on the far right on that
16     row, it's 80 --
17 A.   I do.
18 Q.   -- 22? Do you see that?
19 A.   Yes.
20 Q.   Does that number mean anything to you?
21       MR. DOAN: Object to form.
22       MS. POLAKOWSKI: Join.
23 A.   It appears that she got a dividend for that.
24 Q.   Do you have any memory of Stacy Randall receiving
25     money from Windy Waters --

Page 99

1       MR. DOAN: Objection.
2 Q.   -- in 2017?
3       MS. POLAKOWSKI: Same objection.
4       MR. DOAN: Objection. Asked and
5     answered.
6 A.   I don't remember an awful lot towards the last few
7     years so --
8 Q.   Okay.
9 A.   I mean the last, I mean I, I think she, I don't
10     know.
11 Q.   Okay. And then if you turn a couple pages up to
12     page PHH 0046, that's the second page of the
13     exhibit. Do you see towards the bottom of the
14     page signatures?
15 A.   Yes.
16 Q.   And do you see your signature there?
17 A.   I do.
18 Q.   Do you see Stacy Randall's signature there?
19 A.   I do.
20 Q.   And am I, if I'm not mistaken, yours is on top;
21     right?
22 A.   Yes.
23 Q.   And Stacy's is below yours?
24 A.   Yes.
25 Q.   It looks like the dates, if I'm reading them

Page 100

1     right, are from January of 2020 or November of
2     2020.
3 A.   Yes.
4 Q.   Do you see that? Do you remember that that is the
5     timing when these tax returns were signed?
6 A.   I, I really don't remember.
7 Q.   Okay.
8       MR. DOAN: Do you need a break?
9       THE WITNESS: No. Soon, but --
10       MS. WITTENBERG: Okay. Just let me know
11     when you're ready for a break and we can take one.
12       MS. POLAKOWSKI: We'll break for the day.
13       (Exhibit 10 marked for identification)
14 Q.   All right. You have now been handed a document
15     marked as Exhibit 10. Take whatever time you need
16     to look through it before you answer, but I'm
17     going to want to know if this looks to be your
18     2018 tax returns for you and Stacy Randall.
19       MS. WITTENBERG: Do you want to go off
20     the record for a minute.
21       (Break taken)
22       MS. WITTENBERG: We can go back on the
23     record if we're all set here.
24 Q.   All right. Mr. Randall, before the break, you
25     were handed what was marked as Exhibit 10.

Page 101

1  A.  Yes.
2  Q.  And take whatever time you need to ensure that
3      you've seen what you need to see.  My question is
4      going to be whether or not you recognize this to
5      be the 2018 tax return for you and Stacy.
6  A.  It appears to be, yeah.
7  Q.  On the very first page, I see some signatures
8      here.  And, again, I'm going to ask that first
9      signature for, I can't read what it says there,
10     but do you see your signature there in the Sign
11     Here section?
12 A.  I do.
13 Q.  And do you see a signature for Stacy Randall in
14     that same section?
15 A.  I do.
16 Q.  And it looks again like the date is sometime in
17     2020.  Do you have a recollection of that being
18     the case, this was signed in 2020 as opposed to
19     2019?
20 A.  I mean it appears that way.  I don't, I don't
21     remember, but, yeah.
22 Q.  Okay.  And, again, near the back, I'll direct your
23     attention to the page that's marked PHH 0033.  Are
24     you there?
25 A.  I am.

Page 102

1  Q.  Okay.  Do you see at the top it's listed as a 2018
2      Federal S Corporation Schedule K-1 Summary
3      Attachment?
4  A.  Yes.
5  Q.  Do you agree this is another K-1 to Stacy
6      regarding her ownership interest in Windy
7      Waters?
8  A.  Yes.
9          MS. POLAKOWSKI: Objection.
10     Foundation.
11 Q.  And, again, we were talking about you receiving
12     K-1s each year.  You're talking about a form that
13     was similar to this; right?
14         MR. DOAN: Object to form.
15         MS. POLAKOWSKI: Join.
16 A.  Yes.
17 Q.  Do you have a memory of going to sign this
18     document with an accountant?
19 A.  No.
20 Q.  I believe you said it was your standard practice
21     when signing tax returns that the two of you would
22     go together to the accountant?
23 A.  Yes.
24 Q.  Do you recall any occasion where you did not
25     follow that practice while you were married?

Page 103

1  A.  I don't recall.
2  Q.  Okay.  Based on that habit and practice, would you
3      say that you likely signed this document together?
4          Mr. DOAN: Object to form.
5          MS. POLAKOWSKI: Object to form.  Calls
6      for speculation.
7  A.  It appears that way.
8          (Exhibit 11 marked for identification)
9  Q.  All right.  You have in front of you a document
10     that was marked Exhibit 11.  I'm just going to ask
11     some questions about some specific parts of this
12     document.  On the first page, it says, Steve
13     Randall, and it says, steventrandall@yahoo.com.
14     Is that your email address?
15 A.  It is.
16 Q.  A little bit down that same page it refers to
17     Scott E. Spangler, which is SSpangler@hrblock.com.
18         Do you see that?
19 A.  Yes.
20 Q.  Was Scott the accountant for you and Stacy at some
21     point in time?
22 A.  Yes.
23 Q.  Do you recall for what years he was an accountant
24     for you and Stacy?
25 A.  I do not.

Page 104

1  Q.  A little bit down the page, halfway down the first
2      page you see Michael Kiesler, mikek@widen.com.  Do
3      you know Mike Kiesler?
4  A.  Yes.
5  Q.  Do you understand that he was affiliated with
6      Widen Enterprises and Windy Waters?
7  A.  Yes.
8  Q.  And if you go to the second page of this document,
9      which has the number Randall0000404 at the bottom
10     of it, there's an email from Scott Spangler to you
11     on November 19th, 2018.  Do you see that email?
12 A.  Yes.
13 Q.  All right.  Safe to say you don't recall this
14     specific email being sent to you?
15 A.  No, I, I don't recall it.
16 Q.  Okay.  Was it, was it uncommon for Scott Spangler
17     to send you emails when he had questions about any
18     financial information about you or Stacy?
19         MS. POLAKOWSKI: Object to form.
20         MR. DOAN: Join.
21 A.  I believe he would send me those, yeah.
22 Q.  Okay.  There's, one of my questions here is
23     there's some handwriting on this particular email
24     that's about two-thirds down the page and then one
25     kind of near the bottom.  The one near the bottom,

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

Page 105

1  it looks like it says, See 11-24 email.  Do you
2  recognize the handwriting?
3  A.  I'm sorry, where?
4  Q.  Towards the bottom there's a line crossed out, and
5  then it says, See 11-24 email in handwriting.  Do
6  you see that?
7  A.  Yes.
8  Q.  Do you recognize that handwriting?
9  A.  No.
10  Q.  So if you look at this email, it looks like, if
11  you follow the chain kind of back up the page,
12  there's an email from Scott to you on
13  November 19th, 2018, and then you forwarded that
14  email to Mike Kiesler on November 20th, 2018, at
15  the top of that page.
16      Do you see that?
17  A.  Yes.
18  Q.  If you had questions about Widen Enterprises or
19  Windy Waters, who did you talk to?
20  A.  Who did I talk to?  For getting stuff for taxes?
21  Q.  Sure.
22  A.  That would be Stacy and then Mike Kiesler.
23  Q.  Why would Mike Kiesler be a source of information
24  to you?
25      MS. POLAKOWSKI: Objection of calls for

Page 106

1  speculation.
2  A.  He would do the company taxes.  I, I don't know.
3  Q.  Did you often ask him questions about Widen
4  Enterprises or Windy Waters information?
5      MR. DOAN: Object to form.
6      MS. POLAKOWSKI: Join.
7  A.  Would I what?
8  Q.  Often ask Mike Kiesler questions about, when you
9  had them about Windy Waters or Widen Enterprises.
10      MR. DOAN: Same objection.
11      MS. POLAKOWSKI: Join.
12  A.  Yes.
13  Q.  Was there anyone else you would ever ask questions
14  of when you had questions about Windy Waters or
15  Widen Enterprises besides Stacy or Mike Kiesler?
16      MR. DOAN: Object to form.
17      MS. POLAKOWSKI: Join.
18      MR. DOAN: You can answer if you can.
19  A.  I talked to Mike Kiesler and Stacy.  I, I don't
20  think I talked to anybody else, no.
21  Q.  When you have -- I should back up.  You agree here
22  that you had a question in this particular email
23  about something regarding Widen Enterprises and it
24  looks like specifically about a, the Widen
25  Enterprises UK.

Page 107

1      Do you see that?
2  A.  Yeah.
3  Q.  When you asked, looks like then you forwarded this
4  email to Michael Kiesler and said, Michael, 2017
5  Tax Info needed.  Thanks, Steve.
6      And you see that; right?
7  A.  It's whatever is down here.
8  Q.  Okay.  And if you go to the first page of the
9  document, it looks like Mike Kiesler responded to
10  you the same day; right?
11  A.  Okay.
12  Q.  Okay.  Did, did Mike Kiesler get you the
13  information you needed when you asked him
14  questions about Widen UK in November of 2018?
15      MR. DOAN: I'm going to object.  I think
16  he already answered he doesn't remember this
17  conversation but --
18      MS. POLAKOWSKI: I'll join.
19  A.  I, I would imagine that, yes.
20  Q.  Do you ever recall a time where you asked Mike
21  Kiesler a question about Widen Enterprises or
22  Windy Waters and he didn't give you an answer?
23  A.  Yeah, I'm sure there's times when he didn't answer
24  my questions, yeah.
25  Q.  Can you think of an example?

Page 108

1  A.  No.
2  Q.  Can you think of what type of information you had
3  requested on an occasion when Mike Kiesler did not
4  give you the information you had asked for?
5      MS. POLAKOWSKI: Objection.  Form.
6      MR. DOAN: Join.
7  A.  I, I, I'm usually asking stuff about the company
8  and then get an idea where the company was at, and
9  there was times when he would just not answer
10  me.
11  Q.  By not answer you, do you mean are you thinking of
12  a time in your mind right now --
13  A.  No, no.
14  Q.  -- that this happened?
15  A.  I just remember that over the last 40 years.
16  Q.  Okay.  And you're saying that there are occasions
17  that you recall where you asked for information
18  and then he did not give you that information?
19      MS. POLAKOWSKI: Objection.  Asked and
20  answered.
21  A.  I, I would say yes.
22  Q.  Do you recall anything about that, any occasion
23  where that happened?
24      MR. DOAN: Objection.  Asked and answered
25  now.

Page 109

1 　　　　MS. POLAKOWSKI: Join.
2 A. You know, I, I really don't remember stuff like
3 　　this. I, I just don't.
4 Q. Okay. What -- So I'm asking about tax documents
5 　　specifically. Was there ever a time you asked for
6 　　tax information and then didn't get an answer?
7 A. If I didn't feel like I got the right answer to
8 　　pass it on to Mr. Spangler, I think I had Michael
9 　　Kiesler call him direct.
10 Q. Okay.
11 A. I kind of remember that, but --
12 Q. Okay. Was there ever a time that you had
13 　　questions about the profits or income to Widen
14 　　Enterprises or Windy Waters?
15 A. Oh, I, I would never ask that. Those were
16 　　definitely probably the questions I asked and
17 　　didn't get any answers.
18 Q. Okay. You don't recall specifically asking for
19 　　information about income or profits of Windy
20 　　Waters or Widen Enterprises though?
21 A. Oh, I asked, but I'd never get any answer.
22 Q. Did you ask this while you were still married to
23 　　Stacy?
24 A. Yes.
25 Q. Did you ask it while you were an employee of Widen

Page 110

1 　　Enterprises?
2 A. Probably.
3 Q. Did you ask it after you were no longer an
4 　　employee of Widen Enterprises?
5 A. Yes, I, I would say, it was during our marriage.
6 　　At what points, I'm, I'm not sure.
7 Q. Was it a frequent occurrence for you to ask about
8 　　the income or profits of Widen Enterprises or
9 　　Windy Waters?
10 　　　　MR. DOAN: Object to form.
11 　　　　Go ahead and answer if you can.
12 A. No, it wasn't worth asking. I didn't get any
13 　　answers.
14 Q. Is it, do you have a recollection of Mike Kiesler
15 　　simply not responding when you asked a question,
16 　　or was it that he responded and said he would not
17 　　give you information?
18 　　　　MR. DOAN: I'm going to object.
19 　　Compound.
20 A. I don't remember.
21 　　　　MS. POLAKOWSKI: Join.
22 A. I don't remember.
23 Q. Looking at Exhibit 11 still, I don't know if you
24 　　put that one, is it this one here? I don't see
25 　　Stacy copied on anything here. Would you agree

Page 111

1 　　with that?
2 　　　　MS. POLAKOWSKI: Objection. Foundation.
3 A. On these, I don't see anything here, but I do
4 　　remember Stacy, one attachment, STACY
5 　　RANDALL.pdf.
6 Q. What are you pointing to on this one?
7 A. Right here.
8 Q. Oh, I see the, the file name there, STACY
9 　　RANDALL.pdf.
10 A. Yeah. Oh, that's a file name?
11 Q. You, you, are you saying that you think that Stacy
12 　　Randall was aware this was going on?
13 A. Oh, yeah, she, I think she would have been.
14 Q. Okay. And that's because you kept her informed
15 　　about tax information?
16 　　　　MS. POLAKOWSKI: Object to form.
17 　　　　MR. DOAN: Object to form.
18 A. Just, I mean there was no secrets to be, about
19 　　anything so --
20 Q. She knew how to get the information that she
21 　　needed?
22 　　　　MS. POLAKOWSKI: Objection to form.
23 　　　　MR. DOAN: Object to form.
24 A. I don't know if -- I would say that she probably
25 　　did, yeah, but --

Page 112

1 Q. And she knew that you kept the tax documents in a
2 　　stack on your desk?
3 　　　　MS. POLAKOWSKI: Objection. Asked and
4 　　answered.
5 　　　　MR. DOAN: Objection. Asked and
6 　　answered.
7 　　　　MS. POLAKOWSKI: Calls for speculation.
8 　　　　THE COURT REPORTER: Was there an answer?
9 　　(Question read)
10 A. I think she knew that.
11 Q. All right. Mr. Randall, you can put that document
12 　　away now.
13 　　　　Are you aware that on occasions, Stacy
14 　　Randall has sold some shares of stock in Windy
15 　　Waters back to Windy Waters?
16 　　　　MR. DOAN: Object to form.
17 　　　　MS. POLAKOWSKI: Same.
18 　　　　MR. DOAN: Vague, but you can try to
19 　　answer if you understand.
20 　　　　MS. POLAKOWSKI: I'll join.
21 A. I, I don't know.
22 Q. Are you aware that on occasions, she asked Windy
23 　　Waters for money between 2005 and 2019?
24 　　　　MR. DOAN: Same objection.
25 　　　　MS. POLAKOWSKI: Join.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

Page 113

1 A.  Usually we talked about, about it, so yeah, I
2      normally knew when she was doing it, yeah.
3 Q.  Okay.  And what was your understanding of what she
4      was doing?
5 A.  Just bringing in money for the family.
6 Q.  Do you have an understanding of how she received
7      that money?
8          MS. POLAKOWSKI: Objection.  Form.
9 A.  Yes.
10 Q.  What is your understanding?
11 A.  I understand that she was selling some of her
12      stocks was the only way she could get money.
13 Q.  And by selling stocks, you're referring to selling
14      her stock in Windy Waters; right?
15 A.  Yes.
16 Q.  Did you, were you aware of who she was selling
17      that stock to when it happened?
18 A.  I don't think she was aware who was selling it.
19      She, I think she was thinking the company was
20      buying it back.  I don't, I'm not sure.
21 Q.  Did you -- Well, we'll start with one occasion in
22      2005.  Do you recall a time in 2005 when Stacy
23      sold stock back to Windy Waters?
24 A.  In 2005?
25 Q.  Right.

Page 114

1 A.  I, I don't -- I don't remember that far back.
2 Q.  Okay.  Do you recall a time in 2005 when you asked
3      Stacy to try and get some money because the family
4      needed money?
5 A.  I don't remember.
6 Q.  On any occasion have you ever seen any
7      documentation to reflect Stacy's selling shares
8      back to Windy Waters?
9 A.  No.
10          MR. DOAN: Object to form.
11          MS. POLAKOWSKI: Join.
12 A.  No.
13 Q.  Did you ever see what's called a Stock Redemption
14      Agreement between Windy Waters and Stacy
15      Randall?
16 A.  No.
17 Q.  Did you have any understanding about how the price
18      she was getting paid for those shares was
19      calculated?
20 A.  No.
21 Q.  Regardless of the time, I know you don't recall
22      the exact years, I think you said you are aware
23      that on occasions she did sell stock --
24 A.  Yes.
25 Q.  -- in Windy Waters.  Yes.  You recall it being

Page 115

1      more than once that it happened?
2 A.  Yes.
3 Q.  As far as you know, when she did sell stock, was
4      it because you said that the family needed money?
5 A.  Yes.
6 Q.  Did Stacy and you get the money you needed each of
7      those times?
8          MS. POLAKOWSKI: Objection.  Form.
9          MR. DOAN: I'll join.
10 A.  I don't remember.  I don't remember.
11 Q.  On the occasions you're thinking of when you know
12      Stacy sold stock, did you ask that she obtain a
13      specific dollar amount?
14 A.  Did I -- I think at times we discussed --
15          MS. POLAKOWSKI: And I'm going to object
16      to the extent you're about to disclose information
17      that would be protected by the marital privilege,
18      and I'll instruct you not to answer with regard to
19      conversations that you had with Stacy in
20      private.
21          MR. DOAN: I'll join.
22          MS. WITTENBERG: On this issue, Stacy has
23      discussed this during her deposition on page 177
24      of her transcript where she talked him telling her
25      that she needed to get some money, and so I, I

Page 116

1      think she's waived the privilege as to this topic.
2          MS. POLAKOWSKI: I don't have the
3      deposition in front of me.
4          MS. WITTENBERG: I can give it to you if
5      you want to take a look at it.
6          MS. POLAKOWSKI: Please do.
7          MS. WITTENBERG: 177.
8          MS. POLAKOWSKI: Could you read back the
9      last question for me, please.
10          (Question read)
11          MS. POLAKOWSKI: You're not -- I'm going
12      to instruct him not to answer.
13          MS. WITTENBERG: Okay.  Then let me ask a
14      few follow-up questions here.  And just so I know,
15      you're objecting on the basis of marital
16      communications privilege?
17          MS. POLAKOWSKI: Correct.
18          MS. WITTENBERG: Okay.  And you're
19      instructing him not to answer?
20          MS. POLAKOWSKI: Yeah.
21          MS. WITTENBERG: Right?
22 Q.  Okay.  All right.  Mr. Randall, you're going to
23      accept the instruction not to answer; right?
24 A.  Right.
25 Q.  Okay.  Do you know the answer to the question I

Page 117

1 asked?  Without telling me what the answer is, do
2 you know the answer?
3       MS. POLAKOWSKI: If you need it read
4 back, that's fine, too.  Do you want the question
5 read back?
6       THE WITNESS: Yes.
7       (Question read)
8       MR. DOAN: The question is --
9 Q.  The question is, yeah, do you know the answer to
10 that question?  Don't say what the answer is, but
11 do you know the answer?
12 A.  I'm -- Yes.
13 Q.  And you would have given an answer if you hadn't
14 been instructed not to answer; right?
15 A.  I don't know.  Yes, I suppose.
16 Q.  Do you believe that the answer you have in your
17 mind, if you told me, it would require you to
18 disclose the contents of a communication between
19 you and Stacy that was in private during your
20 marriage?
21 A.  Wow, that's a -- Yeah, that was a private
22 conversation.
23 Q.  Was anyone else present when you had that
24 conversation --
25 A.  No.

Page 118

1 Q.  -- you're thinking of?
2 A.  No.
3 Q.  Was it, did it occur in your home?
4 A.  In my home, yes.
5 Q.  And was the communication about the, related to
6 the sale of stock?
7       MS. POLAKOWSKI: I'm going to object and
8 instruct you not to answer to the extent that it
9 would require you to disclose information --
10      THE WITNESS: I'm sorry?
11      MS. POLAKOWSKI: I'm going to object and
12 instruct you not to answer to the extent that
13 answering the question would require you to
14 disclose something that you and Stacy discussed in
15 private.
16 A.  I don't think I should answer it then.
17 Q.  Okay.  And is there any portion of the answer you
18 can give without disclosing the contents of the
19 communication between you and Stacy in private?
20 A.  No.
21 Q.  Okay.  Other than Stacy, did you ever talk to
22 anyone else about her selling stock in Windy
23 Waters?
24 A.  No.
25 Q.  Do you know how much money Stacy obtained from

Page 119

1 selling stock on any occasion?
2 A.  At the time I'm sure, I'm sure I would have
3 known.
4 Q.  But as you sit here today, you don't know how much
5 it was?
6 A.  I couldn't tell you, no.
7 Q.  Do you recall any occasion where she sold stock
8 and received money that you know what the money
9 was used for?
10 A.  I'm sorry, can you repeat that?
11 Q.  So you said that you knew of occasions when she
12 sold stock.  On any of those occasions, do you
13 recall what the money that you guys received was
14 used for?
15 A.  I probably would have known at the time, yeah.
16 Q.  But right now you don't remember?
17 A.  I don't remember.
18 Q.  Okay.
19 A.  I mean you're talking 40 years of --
20 Q.  Do you know whether the sales of stock that Stacy
21 did occurred after you moved to Florida?
22      MS. POLAKOWSKI: Objection.  Vague.
23 A.  I don't remember.
24 Q.  Do you recall whether any of the occasions when
25 Stacy sold stock occurred because there was a need

Page 120

1 for money related to any real estate?
2       MS. POLAKOWSKI: Objection.  Vague.  Also
3 object to the extent that it would require you to
4 disclose conversations that --
5 A.  I really don't remember what -- No, I don't
6 remember.
7 Q.  Other than related to compensation for your
8 employment with Widen Enterprises, have you ever
9 asked Mike Kiesler for money?
10 A.  My personal self?
11 Q.  Have you asked him for money?
12 A.  No, I have not asked him for money.
13 Q.  Have you ever asked Reed Widen for money?
14 A.  I don't believe so.
15 Q.  Have you ever asked Mark Widen for money?
16 A.  I have not.
17 Q.  Have you ever asked Price Widen for money?
18 A.  No.
19 Q.  Did you ever ask Stuart Widen for money?
20 A.  No.
21 Q.  Did you ever ask Tyler Widen for money?
22 A.  No.
23 Q.  Are you aware of an occasion when Stacy Randall
24 purchased additional stock from Windy Waters?
25 A.  I think I do remember something like that.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

Page 121

1 Q.  Do you recall any details about --

2 A.  No.

3 Q.  -- that?

4 A.  None.

5 Q.  No, just that it happened?

6 A.  (Witness indicating).

7 Q.  Is that a yes?

8 A.  It happened.

9 Q.  Okay.

10      MS. WITTENBERG: How are we doing on

11 time?  Do you want to take another break?  Do you

12 want to stop for the day?  What would you like to

13 do, Mr. Randall?

14      MR. DOAN: How are you doing?

15      THE WITNESS: I don't know.  How much

16 more stuff have you got?

17      MS. WITTENBERG: I would estimate --

18      MR. DOAN: Can this be off the record?

19      MS. WITTENBERG: Sure.  Why don't we go

20 off.

21      (Discussion off the record)

22      MS. WITTENBERG: We can go back on the

23 record just briefly to memorialize what we just

24 talked about.  Off the record we had some

25 discussions with counsel and the witness about a

Page 122

1 date to continue the deposition.  We've selected

2 November 6th at 10 a.m., so we will stop here for

3 the day.  We will resume here again at

4 Mr. Randall's home at 10 a.m. November 6th.  Okay?

5      MS. POLAKOWSKI: Thank you, Steven.

6      MS. WITTENBERG: Thank you for your time

7 today.

8      (Proceedings adjourned at 1:19 p.m.)

Page 123

1 STATE OF WISCONSIN)

2 MILWAUKEE COUNTY  )

3      I, JANET D. LARSEN, a Notary Public in

4 and for the State of Wisconsin, do hereby certify that

5 the deposition of STEVEN RANDALL was taken before me

6 under and pursuant to the Federal Rules of Civil

7 Procedure on the 12th day of October, 2023.

8      That before said witness testified,

9 he was first duly sworn by me to testify the truth.

10      That I am not a relative or employee or

11 attorney or counsel of any of the parties, or a

12 relative or employee of such attorney or counsel, or

13 financially interested directly or indirectly in this

14 action.

15      That the foregoing pages are a true and

16 correct transcription of my original shorthand notes

17 taken at said time and place.

18      Dated this 16th day of October, 2023

19      at Milwaukee, Wisconsin.

20

21 JANET DONALDSON LARSEN
   REGISTERED PROFESSIONAL REPORTER
   NOTARY PUBLIC, STATE OF WISCONSIN
22 MY COMMISSION EXPIRES 1-22-26

23      Janet Donaldson Larsen
        NOTARY PUBLIC
24      STATE OF WISCONSIN

25

**$**

**$1.3 (2)**
23:22,24
**$10 (1)**
24:2
**$40 (1)**
24:6

**A**

**ability (3)**
10:18;11:10;34:9
**able (1)**
16:24
**accept (1)**
116:23
**accessing (1)**
16:14
**accountant (8)**
94:2,6,17;95:1;102:18,
22;103:20,23
**accountant's (1)**
94:20
**accounts (1)**
31:25
**accurate (10)**
11:4,7;14:19;38:16;
40:5,19;43:6,10,11;60:1
**acquainted (1)**
48:22
**acquire (5)**
72:1;73:4;74:6,24;76:13
**acquired (8)**
65:24;67:9;68:10;70:16,
20;71:2;72:21;73:16
**actual (1)**
84:16
**actually (2)**
34:23;84:7
**additional (1)**
120:24
**address (22)**
12:25;13:9,22,24;14:2;
54:8;58:22;62:12,13,25;
64:22;65:6;71:8,21;72:16,
24;73:11;74:1,19;79:12;
80:15;103:14
**addressed (4)**
91:9,12,25;92:6
**addresses (7)**
47:5,8;54:5;74:15;
75:23;76:6;80:16
**adjourned (1)**
122:8
**advertisements (1)**
25:17
**affiliated (1)**
104:5
**affiliation (1)**
25:18
**afford (1)**

32:12
**again (20)**
14:23;22:17;34:19;
44:16;46:15;52:11;53:21;
64:20;74:14;80:11;87:4;
88:21;92:17;93:2;97:12;
101:8,16,22;102:11;123:3
**against (1)**
21:2
**age (1)**
11:1
**ago (1)**
50:16
**agree (20)**
18:6;44:24;46:4,16;
47:6;56:6,11,18;57:1,10;
59:16;60:25;75:9;77:5,9,
10;86:17;102:5;106:21;
110:25
**Agreement (1)**
114:14
**ahead (3)**
52:10;96:1;110:11
**aids (1)**
14:8
**almost (1)**
23:20
**always (1)**
30:6
**ambiguous (1)**
91:15
**Amos (1)**
85:5
**amount (6)**
23:1,12;24:10;26:17;
28:12;115:13
**and/or (3)**
45:2;46:16;61:11
**Andrew (1)**
9:6
**answered (16)**
43:25;50:13;51:23,25;
52:21;61:5;79:20;84:21;
90:3;97:24;99:5;107:16;
108:20,24;112:4,6
**Apollo (1)**
67:1;70:10;71:17;72:13,
23;73:11
**appear (1)**
78:3
**appeared (1)**
24:16
**appears (14)**
12:21,23;14:21;15:25;
18:4;38:19;59:22;82:21;
86:15;96:7;98:23;101:6,
20;103:7
**appropriate (1)**
57:17
**April (8)**
11:13;12:7;13:6,12,15;
14:15,19;15:1
**areas (2)**

95:19,21
**around (3)**
9:3;36:2;69:15
**arts (1)**
10:13
**assets (12)**
16:23,25;17:4,6;30:9,
15;50:10,18;51:14,15,16;
58:17
**assume (1)**
5:23
**Attachment (2)**
102:3;111:4
**attention (1)**
101:23
**attorney (4)**
5:11;7:24;41:8,12
**attorneys (4)**
7:2,14;22:14;27:21
**August (1)**
8:11
**Austin (2)**
6:23,25
**available (1)**
36:12
**Avocetridge (7)**
64:16,19,20,21;65:16;
66:18;76:1
**avoid (1)**
6:2
**awarded (1)**
58:16
**aware (16)**
21:4,11,15;24:18;32:20;
33:10;90:10,14,19;
111:12;112:13,22;113:16,
18;114:22;120:23
**away (2)**
36:7;112:12
**awful (1)**
99:6

**B**

**back (39)**
9:1,1;11:12;12:5;15:21;
19:1;24:18;26:19;28:20;
32:23;43:16;44:9;45:19,
24;52:12;59:7,10,23;60:9,
12,14;81:17;95:10;96:9,
18;97:11;100:22;101:22;
105:11;106:21;112:15;
113:20,23;114:1,8;116:8;
117:4,5;121:22
**background (1)**
8:4
**bad (1)**
77:13
**Bailey-Rihn (1)**
18:17
**bank (1)**
31:25
**Barber (3)**

13:9,24;61:10
**bars (3)**
34:12;35:3,11
**Based (1)**
103:2
**basic (1)**
5:19
**basically (1)**
45:13
**basis (1)**
116:15
**Beach (5)**
67:2;70:11;71:18;
72:23;73:11
**became (6)**
9:19;10:14;18:7,9,22;
20:20
**begin (1)**
38:2
**beginning (1)**
97:11
**behalf (1)**
91:3
**belief (3)**
16:24;24:4,13
**below (1)**
99:23
**besides (3)**
41:18;89:18;106:15
**best (5)**
7:15;11:10;34:8;50:2;
95:22
**better (1)**
25:13
**Betty (6)**
31:16;32:21;33:2,5,7,11
**beyond (1)**
20:1
**bills (1)**
32:7
**birth (1)**
8:5
**Bisbee (3)**
48:21,22;90:6
**bit (5)**
10:21;53:19;85:17;
103:16;104:1
**black (3)**
95:19,21,23
**Bling (6)**
20:7,14,15,16,21,21
**blingy (1)**
20:13
**boat (6)**
30:19,20,22,25;31:2,5
**boats (1)**
30:17
**book (1)**
53:5
**books (4)**
53:2,3,4,9
**both (20)**
12:3;44:19;46:4,21,23;

47:6,7,21;55:9;56:8,13,19;
57:3,11;61:14,15;91:18;
93:12;94:9,10
**bottom (14)**
19:3;58:11;59:4,10,24;
82:6;95:9;96:11,14;99:13;
104:9,25,25;105:4
**bought (2)**
30:1;55:17
**bowl (2)**
34:16,16
**box (1)**
34:20
**boy (2)**
19:18;78:14
**boys (3)**
38:25;47:16;48:25
**Breach (1)**
72:13
**bread (1)**
34:20
**break (21)**
6:9,17;17:12,15;28:15,
19;53:11,14,16,17,22;
67:11,12;79:24;81:16;
100:8,11,12,21,24;121:11
**breaks (1)**
6:11
**Bridge (1)**
72:12
**briefly (1)**
121:23
**bringing (1)**
113:5
**broke (2)**
39:23;42:6
**brought (4)**
32:16,17;39:23;91:7
**Buck (16)**
40:24;41:4,17,18,23;
42:15,17;60:23;82:22,25;
83:5;84:5,18;85:1;89:14,
24
**budget (2)**
16:25;32:10
**budgeting (1)**
32:9
**building (6)**
47:3,4,8,18;54:5,23
**bullet (1)**
38:10
**business (3)**
36:25;49:2;58:16
**businesses (2)**
16:15;37:3
**buying (2)**
32:13;113:20

**C**

**calculated (1)**
114:19
**call (2)**

20:16;109:9
**called (8)**
17:10;20:14;49:16;
50:21;87:8;97:8;98:9;
114:13
**calls (15)**
20:14,14;34:7;36:16,18;
42:23;49:9;83:8;87:17;
88:17;89:10;97:18;103:5;
105:25;112:7
**came (6)**
20:21;68:17,20,24;
93:15;95:24
**can (56)**
6:2,6,15;7:14;10:22;
11:5,21;17:25;19:2;22:16,
24;25:24;26:9;27:1;28:20;
30:4,13;32:6;38:15,18;
40:3;43:5;44:16;48:7;
50:2;52:6,9,11;53:15,20;
58:3;59:8;60:12;69:7,25;
80:6,9,11;85:9;90:23;
91:21;93:7;100:11,22;
106:18,18;107:25;108:2;
110:11;112:11,18;116:4;
118:18;119:10;121:18,22
**cancer (1)**
69:16
**caption (1)**
15:12
**Carriage (2)**
68:4;70:2
**carried (1)**
97:4
**Carrington (3)**
70:10;71:17;72:8
**case (8)**
15:12;16:2;17:20;23:4;
24:23;80:23;93:8;101:18
**cash (1)**
33:4
**caused (1)**
24:13
**caution (2)**
22:13;27:20
**certain (9)**
10:24;84:9,12;86:2,4,
11,13,25;87:2
**Certainly (1)**
57:15
**chain (1)**
105:11
**charge (4)**
31:23;32:7,9;66:12
**charged (1)**
39:12
**chat (1)**
27:6
**check (1)**
32:5
**children (1)**
8:17
**Christa (1)**

5:10
**Christmas (1)**
29:25
**Christmases (1)**
30:6
**circles (1)**
25:22
**circuit (2)**
58:3;70:1
**civil (1)**
20:3
**clear (3)**
6:5;43:8;57:21
**close (1)**
18:10
**coach (1)**
49:1
**coins (4)**
34:11;35:2,8,8
**collect (1)**
93:15
**collected (1)**
94:1
**combination (1)**
36:10
**comfortable (1)**
29:8
**coming (1)**
25:10
**commercials (1)**
25:17
**communicate (1)**
27:8
**communication (4)**
41:12;117:18;118:5,19
**communications (2)**
7:13;116:16
**companies (2)**
24:24;58:18
**company (20)**
23:5,10;24:20;25:6,15,
19;26:14,16;48:12;49:16;
50:3;53:3,4,5;91:20;98:1;
106:2;108:7,8;113:19
**compared (1)**
23:6
**compensation (1)**
120:7
**completed (1)**
92:14
**completely (1)**
55:17
**complicate (1)**
53:24
**Compound (1)**
110:19
**conclusion (6)**
49:9;83:9;87:18;88:17;
89:11;97:19
**Conclusions (1)**
17:19
**conditions (3)**
10:18,23;69:3

**confuse (1)**
53:23
**confusing (1)**
20:18
**consider (2)**
29:18;30:16
**contents (2)**
117:18;118:18
**continue (1)**
122:1
**controlled (10)**
54:19;55:4,9;56:8,13,
20;57:3,12;61:2;80:2
**controls (1)**
90:7
**conversation (3)**
107:17;117:22,24
**conversations (4)**
27:17,20;115:19;120:4
**copied (1)**
110:25
**copy (4)**
95:22,25;96:5,19
**Corporation (1)**
102:2
**correctly (1)**
37:22
**cost (2)**
39:13,24
**costing (1)**
39:21
**Cottage (13)**
40:10,18;44:25;46:25;
47:16,19;54:9;55:25;56:3,
15;57:6;60:16;61:2
**counsel (2)**
7:11;121:25
**count (1)**
75:8
**couple (1)**
99:11
**court (2)**
6:6;112:8
**Cromwell (1)**
73:10
**crossed (1)**
105:4
**currently (6)**
19:17,18;48:8;55:22;
67:22;89:15

**D**

**Date (20)**
8:5;12:10;15:3;18:5,7,9,
10,11,11,21;59:13;71:15;
82:7;83:2,3;84:25;86:16,
17;101:16;122:1
**dated (3)**
12:7;58:24;87:4
**dates (6)**
8:5;11:12,15;29:4;
62:11;99:25

**date's (1)**
    85:17
**daughter (2)**
    21:24;29:20
**Dave (1)**
    48:21
**David (2)**
    48:22;90:6
**day (4)**
    100:12;107:10;121:12;
    122:3
**deal (1)**
    28:11
**December (2)**
    15:3;79:3
**Declaration (1)**
    15:17
**Deed (3)**
    82:4;84:5;86:21
**deeded (1)**
    82:22
**deeds (2)**
    85:23;88:23
**definitely (2)**
    20:5;109:16
**deposed (1)**
    5:14
**deposition (9)**
    6:21;11:20,24;15:8;
    27:15,16;115:23;116:3;
    122:1
**describe (2)**
    10:22;19:16
**describes (1)**
    38:14
**describing (1)**
    96:25
**desk (4)**
    93:11,19,22;112:2
**detailed (1)**
    37:23
**details (3)**
    10:19,25;121:1
**died (2)**
    9:6;37:8
**differed (1)**
    97:5
**different (5)**
    13:17;24:24,25;59:8;
    61:9
**dimensions (1)**
    35:22
**direct (2)**
    101:22;109:9
**direction (1)**
    20:6
**director (1)**
    90:14
**disabled (3)**
    9:20;10:14,15
**disagreement (1)**
    7:25
**disclose (7)**

22:13;27:20;115:16;
    117:18;118:9,14;120:4
**disclosing (1)**
    118:18
**discussed (5)**
    22:14;90:11;115:14,23;
    118:14
**discussion (4)**
    41:14;54:2;90:9;121:21
**discussions (4)**
    26:21;28:1;94:5;121:25
**distribution (1)**
    57:16
**divide (1)**
    33:22
**dividend (1)**
    98:23
**dividends (4)**
    97:15,22,25;98:9
**Division (1)**
    58:14
**divorce (18)**
    11:13,25;12:11;16:2;
    17:20,20;18:2,2,7,9,14,15,
    18,21;49:3;57:16,23;
    61:18
**Doan (127)**
    6:23,25;7:12;14:9;
    22:15,22;27:22;30:3,12;
    31:13;34:6,8,17,22;35:6;
    36:16,22;39:16;41:11;
    42:24;44:13,22;45:12;
    46:8,10,20;47:2,12,24;
    49:10,13;50:1,12,19;
    51:24;52:8,15,20;53:11;
    58:6,9;59:1,6,18,20;60:7,
    14;61:4;62:1,10,19;64:3,
    14;65:13;66:10;67:11;
    69:6;70:23;71:5;72:10;
    75:13,21;76:10;77:1,7,14;
    78:1,10,12;79:21,24;80:4,
    6,9,19;81:6;83:7,10,21;
    84:3,22;85:3,25;87:17;
    88:9,15;89:12;90:4,16,22;
    91:6,13,15;92:19;95:3,17;
    96:1,23;98:5,21;99:1,4;
    100:8;102:14;103:4;
    104:20;106:5,10,16,18;
    107:15;108:6,24;110:10,
    18;111:17,23;112:5,16,18,
    24;114:10;115:9,21;
    117:8;121:14,18
**document (32)**
    8:14;14:7,15;15:8,21;
    16:7;17:19;18:1;37:14;
    57:20;58:24;59:16;60:15;
    82:12,14,17,20;83:24;
    95:14,15;96:5,7,10;97:7;
    100:14;102:18;103:3,9,
    12;104:8;107:9;112:11
**documentation (1)**
    114:7
**documents (15)**

81:22;83:13;86:18;
    88:7;91:8,11,17,20,22;
    93:15;94:2;97:1,13;109:4;
    112:1
**dollar (2)**
    95:9;115:13
**done (2)**
    49:2;89:4
**doubt (4)**
    14:18;18:20;83:18,23
**down (25)**
    6:6;12:12;15:12;38:5;
    42:11,13;53:22;56:23;
    58:14;69:11,14;70:21,22;
    71:1,2;77:4;82:5,5,5,7;
    103:16;104:1,1,24;107:7
**downturn (1)**
    78:11
**Drive (16)**
    13:9,24;61:10;64:17,19,
    21;65:16;66:18;68:4;70:3,
    10;71:7;72:8,13;73:22;
    76:3
**Ducks (7)**
    48:14,15,17;89:20,21,
    25;90:1
**duly (1)**
    5:2
**during (8)**
    29:10;30:2,10,20;61:18;
    110:5;115:23;117:19

## E

**earlier (1)**
    96:25
**easier (1)**
    37:16
**easily (2)**
    19:1,2
**East (22)**
    38:14,15;46:17,17,
    24;47:8,9,18,19;53:25;
    54:3,4,7,7,22,22;55:12,13,
    24,24;79:8
**either (10)**
    47:7;54:13,17;55:7;
    56:6,11;59:2;60:25;70:7;
    89:25
**else (12)**
    21:7;26:7,10;30:7;
    41:17,20;52:7;89:22;
    106:13,20;117:23;118:22
**email (12)**
    103:14;104:10,11,14,
    23;105:1,5,10,12,14;
    106:22;107:4
**emails (1)**
    104:17
**employed (4)**
    9:11,17,24;26:18
**employee (2)**
    109:25;110:4

**employees (2)**
    10:9,11;25:14
**employment (2)**
    9:21;120:8
**end (4)**
    18:10,15,24;59:9
**ended (3)**
    9:21;23:6;37:4
**enough (2)**
    11:2,2
**ensure (1)**
    101:2
**ensuring (1)**
    92:13
**Enterprises (31)**
    5:12;9:11,18;17:10;
    21:3,8,12;23:14;24:20;
    25:4,6,10,18,22;26:5,8,11;
    104:6;105:18;106:4,9,15,
    23,25;107:21;109:14,20;
    110:1,4,8;120:8
**entity (14)**
    49:19,21,25;50:21;51:3;
    55:19;57:11;79:17;80:1;
    87:9,11,22;89:5;90:6
**especially (1)**
    29:25
**established (1)**
    79:15
**estate (5)**
    37:25;38:4;69:4;78:9;
    120:1
**estimate (2)**
    23:17;121:17
**estimated (2)**
    23:13,15
**even (7)**
    27:16;34:10,25;39:23;
    42:6;69:12;93:24
**event (1)**
    78:8
**eventually (2)**
    8:14;63:14
**Evidently (1)**
    13:16
**exact (5)**
    13:20;23:12;45:22;
    71:15;114:22
**exactly (8)**
    9:2,14,25;30:23;36:19;
    38:3;46:21;52:23
**examined (1)**
    5:3
**example (4)**
    25:24;32:1;44:10;
    107:25
**examples (1)**
    26:15
**Excellent (1)**
    60:12
**except (3)**
    76:16;80:13;95:22
**exchange (1)**

26:24
**exchanged (1)**
  27:2
**exercise (1)**
  57:18
**Exhibit (39)**
  11:18,20,24;15:6,7;
  17:16,18;37:12,14;38:13;
  46:1;51:1;53:21;57:25;
  58:2,5,6,9;60:10,12,14;
  81:21,21,21,21,25;85:10,
  11;86:6,20;95:12,14;
  99:13;100:13,15,25;103:8,
  10;110:23
**Exhibits (2)**
  81:12,20
**existed (1)**
  21:19
**existing (2)**
  21:5;22:10
**exists (1)**
  22:19
**expect (1)**
  5:20
**expenses (1)**
  16:14
**experience (1)**
  69:9
**experiences (1)**
  30:7
**expert (1)**
  86:14
**explain (2)**
  25:24;93:7
**extent (12)**
  39:14;43:23;47:11;
  49:8;81:2;87:17;88:16;
  97:18;115:16;118:8,12;
  120:3

**F**

**Fact (3)**
  17:19;22:18;27:14
**facts (3)**
  10:19,25;37:22
**Fair (5)**
  11:2,2;27:23,23;43:17
**familiar (8)**
  24:25;25:7;50:21;54:11,
  25;56:3,16;87:8
**family (19)**
  16:15;19:22;20:17;26:3,
  3;27:6,6;30:1;32:4,9,12,
  12,15;33:22;91:1,4;113:5;
  114:3;115:4
**far (9)**
  6:8;54:13,17;55:3,15;
  92:10;98:15;114:1;115:3
**Farm (2)**
  62:5,24
**farther (1)**
  15:12

**father (1)**
  32:25
**Federal (1)**
  102:2
**feel (4)**
  61:6;78:7;95:18;109:7
**felt (1)**
  78:16
**few (3)**
  81:11;99:6;116:14
**fighting (2)**
  20:4,5
**file (2)**
  111:8,10
**filed (9)**
  11:13;12:1,11;14:7;
  20:23;21:22,25;92:14;
  94:3
**filing (2)**
  16:1;18:10
**fill (1)**
  36:5
**Final (7)**
  10:5;18:8,9,11,13,14,22
**finances (3)**
  28:23;31:23;41:9
**financial (2)**
  29:2;104:18
**find (1)**
  52:25
**Findings (1)**
  17:19
**fine (2)**
  6:12;74:17;117:4
**finish (2)**
  6:1,15
**firearms (2)**
  31:8,10
**firm (1)**
  7:19
**first (16)**
  5:2;12:24,24;15:9;18:5;
  38:7,12,14;46:13,14;
  81:25;101:7,8;103:12;
  104:1;107:8
**fit (5)**
  34:15,20;35:3,20;36:3
**five (7)**
  37:4;48:14,15,17;81:14;
  89:20,25
**flip (4)**
  76:14,15,18;77:18
**flipped (1)**
  96:4
**flipping (1)**
  77:19
**Florida (58)**
  8:22,23;9:15;29:19,23;
  31:2;37:10;38:5,21,24;
  40:21;49:23;51:11;63:12,
  17;64:17;65:4,16;66:1;
  67:2,22,25;68:5,25;69:2,4,
  10;70:3,11,18,21;71:3,8,

18;72:1,13,24;73:5,11,18,
  23;74:6,19,25;75:5,9,11,
  16,25;76:6,7,21,24;77:4,
  13,17;78:8;119:21
**focused (1)**
  84:7
**follow (2)**
  102:25;105:11
**following (2)**
  41:14;58:17
**follows (1)**
  5:3
**follow-up (1)**
  116:14
**football (1)**
  48:25
**foreclosed (7)**
  68:22;69:1,2;70:7;72:3;
  74:10;75:3
**form (63)**
  24:13;29:3;30:3,11;
  31:11;34:6;44:13;45:11;
  46:7;49:13;50:1;52:3;
  60:6;65:12;66:9;69:5,6;
  70:23;71:4,5;75:13,18;
  76:10,25;77:1,7,14,25;
  78:1,10,12;80:4;83:20;
  85:2,24;88:9,15;89:10;
  90:16;91:5,6,13;92:19;
  95:3;97:9;98:5,21;102:12,
  14;103:4,5;104:19;106:5,
  16;108:5;110:10;111:16,
  22,23;112:16;113:8;
  114:10;115:8
**formed (12)**
  49:19,21;51:4,9,11;
  52:6;87:11,13,23;88:1,19;
  89:6
**forms (1)**
  93:1
**forwarded (2)**
  105:13;107:3
**foundation (19)**
  31:12;36:11;42:22;
  46:2;62:1,9;64:3,13;
  75:19;83:6;84:2;90:17,21;
  92:11;96:22;97:17;98:6;
  102:10;111:2
**four (3)**
  70:2;81:20,22;97:12
**frame (2)**
  69:13;84:16
**free (2)**
  61:6;95:18
**frequent (1)**
  110:7
**frequently (1)**
  6:11
**friends (1)**
  19:19
**front (6)**
  37:16;58:6,10;81:19;
  103:9;116:3

**G**

**gathering (1)**
  33:22
**gatherings (1)**
  19:22
**general (1)**
  97:7
**generally (1)**
  28:23
**Gibsonton (2)**
  68:4;70:3
**GIBSRUSKIN (5)**
  49:16;50:6,8,10,18
**G-I-B-S-R-U-S-K-I-N (1)**
  49:17
**gifts (1)**
  30:1
**given (2)**
  32:4;117:13
**goal (1)**
  77:18
**God (1)**
  33:24
**gold (8)**
  33:10,13,14,19,23,25;
  34:11;36:8
**Good (4)**
  5:10;27:23;28:25;29:1
**grandkids (1)**
  20:16
**Grandpa (4)**
  20:16,17,20,20
**Graphic (1)**
  10:13
**great (3)**
  6:8;28:17;57:24
**Grizzly (4)**
  13:1,22;14:2,4
**ground (2)**
  5:16,19
**group (1)**
  69:25
**Grove (13)**
  40:10,18;44:25;46:25;
  47:16,19;54:9;55:25;56:3,
  16;57:7;60:16;61:3
**growth (1)**
  25:14
**guess (1)**
  78:5
**Guilford (1)**
  72:12
**guns (1)**
  31:7
**guys (1)**
  119:13

**H**

**habit (1)**
  103:2

Case: 3:22-cv-00400-jdp   Document #: 99   Filed: 11/09/23   Page 37 of 45

Stacy L. Randall v                                          Steven Randall
Reed C. Widen, et al.                                       October 12, 2023

**half (3)**
28:14;48:12;90:5
**halfway (1)**
104:1
**handed (8)**
11:19,23;15:7;17:17;
37:13;95:13;100:14,25
**hands (1)**
35:3
**handwriting (4)**
104:23;105:2,5,8
**happen (2)**
48:20;80:24
**happened (6)**
108:14,23;113:17;
115:1;121:5,8
**happening (2)**
83:12,16
**happy (1)**
57:21
**hard (1)**
78:4
**harder (1)**
10:24
**head (1)**
43:4
**heading (1)**
15:17
**health (1)**
16:10
**hear (2)**
25:21;26:4
**heard (2)**
5:17;49:16
**hearing (4)**
14:8;18:11,13,14
**help (4)**
5:18;8:15;11:17;88:7
**helped (1)**
16:14
**helps (2)**
19:3;91:21
**hi (1)**
19:24
**Hidden (2)**
62:4,24
**Hill (3)**
55:16,19;87:22
**Hills (1)**
55:18
**hold (3)**
35:2;41:10;43:22
**Holder (2)**
58:21;60:1
**holding (2)**
24:20;50:3
**home (4)**
14:4;118:3,4;122:4
**honest (2)**
43:9,11
**hopefully (1)**
58:4
**hour (1)**

28:14
**house (1)**
63:2
**houses (1)**
69:11
**husband (1)**
29:21

**I**

**idea (2)**
32:6;108:8
**Ideally (1)**
6:12
**identification (8)**
11:18;15:6;17:16;
37:12;81:13;95:12;
100:13;103:8
**imagine (11)**
17:9;23:1,2,3;78:4;
88:24;92:21;93:4;95:20;
97:5;107:19
**impact (2)**
10:18,22
**impacted (1)**
69:3
**impacts (1)**
10:20
**inaccurate (1)**
38:12
**Inc (1)**
96:21
**inches (2)**
35:24,25
**included (1)**
27:5
**including (1)**
58:17
**income (11)**
39:3,8;42:4;65:10;66:7;
76:23;77:21,23;109:13,
19;110:8
**incorrect (2)**
45:17,20
**Indian (10)**
50:21;51:3,7,9,13,18;
52:17,19;53:4,6
**indicating (5)**
35:17,23;44:4;53:7;
121:6
**individual (1)**
48:19
**individually (10)**
44:12,20;45:2;54:18;
55:8,23;56:19;57:2,11;
63:5
**Info (1)**
107:5
**information (21)**
16:24;22:13;37:17;
59:25;60:4;97:4;104:18;
105:23;106:4;107:13;
108:2,4,17,18;109:6,19;

110:17;111:15,20;115:16;
118:9
**informed (3)**
26:7,10;111:14
**inherit (4)**
31:15;33:4,7;37:2
**inheritance (1)**
32:21
**inherited (8)**
16:23;17:3,5,7;31:20,
21;33:10;36:24
**inheriting (1)**
31:18
**instead (1)**
37:17
**instruct (4)**
115:18;116:12;118:8,12
**instructed (2)**
41:9;117:14
**instructing (1)**
116:19
**instruction (1)**
116:23
**int (1)**
37:20
**intended (4)**
40:12;76:8,12;77:21
**intent (2)**
76:17;77:18
**interest (6)**
28:4;49:7;55:22;88:4;
89:8;102:6
**interests (4)**
36:25;37:2;58:16,17
**into (5)**
13:22;35:20;37:23;
48:2;82:22
**invested (1)**
37:24
**investing (2)**
38:2,4
**investment (2)**
38:2,25
**Investments (1)**
87:8
**involved (3)**
21:16;94:5,23
**involving (1)**
21:18
**issue (1)**
115:22
**issues (1)**
16:10

**J**

**Jaegerglen (3)**
71:7;72:8;76:3
**Janet (1)**
81:11
**January (1)**
100:1
**jewelry (1)**

33:7
**Joan (1)**
90:4
**job (2)**
10:4,5
**Joe (10)**
50:21;51:3,7,9,13,18;
52:17,19;53:4,6
**join (68)**
7:21;22:15,22;27:22;
30:12;31:13;39:16;42:24;
44:15,22;45:12;46:8,10,
20;47:2,12,24;49:10,14;
50:14;52:16,22;60:7;61:7;
62:10;64:4,14;65:13;
66:10;70:25;75:21;76:11;
77:8,15;78:13;79:21;80:5,
20;81:6;83:21;84:3,22;
85:3,25;87:20;88:10;
89:12;90:22;91:14;92:20;
95:4;96:23;98:22;102:15;
104:20;106:6,11,17;
107:18;108:6;109:1;
110:21;111:17;112:20,25;
114:11;115:9,21
**jointly (3)**
43:12,20;44:7
**joke (1)**
23:19
**Judge (2)**
18:17,17
**Judgment (2)**
17:20;18:2
**July (2)**
8:6;61:16
**Justin (1)**
21:21

**K**

**K-1 (5)**
93:9;96:20;97:8;102:2,5
**K-1s (7)**
91:23,24;92:4,17;93:1;
97:1;102:12
**keep (5)**
6:8;17:13;32:3,15;88:7
**kept (3)**
53:6;111:14;112:1
**kids (1)**
37:4
**Kiesler (19)**
5:12;21:3,6;104:2,3;
105:14,22,23;106:8,15,19;
107:4,9,12,21;108:3;
109:9;110:14;120:9
**kind (5)**
10:20;32:5;104:25;
105:11;109:11
**knew (11)**
20:24;22:6;42:9;80:2;
81:9;93:21;111:20;112:1,
10;113:2;119:11

**knowledge (2)**
36:7;51:13
**known (4)**
48:24;49:1;119:3,15

## L

**lake (5)**
30:24;48:4,9;49:7;89:5
**Lane (18)**
13:1;14:2,4;40:18;
44:25;56:2,15,23;57:6;
60:16;61:2;67:1;71:17;
72:23;73:10;78:18,19,20
**large (3)**
34:3,3,16
**last (8)**
12:4;16:13;79:8;80:13;
99:6,9;108:15;116:9
**later (1)**
79:7
**law (2)**
7:19;17:20
**lawsuit (22)**
20:22,24;21:2,4,10,12,
15,18,22,25;22:3,11,18,
20;26:22;27:12,15,18;
28:2,5,9,12
**lawyer (5)**
5:18;6:20,25;27:25;
41:15
**lawyers (6)**
6:10;7:19,20;8:1;16:1;
27:11
**learn (1)**
21:18
**learned (1)**
22:7
**least (3)**
24:9;25:2;29:19
**Lee (1)**
12:14
**legal (6)**
49:9;83:8;87:18;88:17;
89:11;97:18
**life (1)**
49:12
**lifestyle (1)**
29:8
**likely (1)**
103:3
**line (4)**
43:5;46:13;60:15;105:4
**list (11)**
37:16,18,23;38:8,10;
50:24;58:13,21;72:9;
78:17;79:15
**listed (14)**
40:7;41:25;42:18;43:1;
46:5;54:21;59:25;61:21;
62:4;65:15;66:15;70:2;
85:6;102:1
**listing (1)**

38:15
**lists (3)**
12:25;13:9;37:15
**Lithia (3)**
64:17;65:16;71:7
**little (10)**
10:21;11:21;15:11;
17:11;28:14,15;53:19;
85:17;103:16;104:1
**live (9)**
13:14,18;14:4,23;38:25;
40:13;65:6;66:3;75:24
**lived (14)**
8:21,25;9:4;13:6,12,23;
16:13;29:7;31:4;51:11;
61:12;63:2,17;76:17
**living (11)**
8:19,20;9:9;14:20;
37:10;38:21,24;40:21;
49:23;65:4;66:1
**LLC (62)**
40:24;41:2,4,7,18,23;
42:15,17;44:11,18;45:6;
48:4,9,16,17;49:7,17,17;
50:6,8,10,18,22;51:3,7,9,
13,18;52:6,19;53:4,6,9,18;
54:14,18;55:4,8,16,19,24;
56:7,12,19;57:2;58:17;
60:23;61:1;82:25;83:5;
84:19;85:1;87:7,15,22;
88:2,8,13;89:5,9,14,16
**LLCs (5)**
45:9;48:2;49:12;52:3;
89:2
**lodge (1)**
46:1
**long (6)**
8:21;9:17,23;48:24;
49:2;95:18
**longer (12)**
55:16;66:14,23;67:18;
68:14,17,21,24;71:13;
73:20;74:8;110:3
**look (12)**
27:1;43:16;52:25;53:1;
78:6;93:4;95:17,18;96:19;
100:16;105:10;116:5
**looked (4)**
52:23;91:7;97:1,3
**looking (9)**
37:17;38:13;44:24;
74:12;78:2;95:8;96:7;
98:8;110:23
**looks (20)**
12:2,7;19:14;43:6,10,
11;45:16;58:10;82:4,9;
85:18;96:24;99:25;
100:17;101:16;105:1,10;
106:24;107:3,9
**lot (8)**
20:11;23:15;25:10;
29:16,18;68:25;69:2;99:6
**loud (2)**

37:18;38:17
**louder (2)**
11:21;14:12

## M

**mail (2)**
91:1,3
**mailbox (1)**
91:7
**Main (1)**
79:8
**making (1)**
32:11
**managed (1)**
10:11
**management (1)**
10:7
**Manager (2)**
10:7;88:12
**managing (1)**
10:8
**many (5)**
8:8,17;19:11;23:24;
35:8,11;49:12
**Maria (11)**
40:17;44:25;56:2,15,23;
57:6;60:16;61:2;78:18,19,
20
**marital (2)**
115:17;116:15
**Mark (9)**
31:16;32:21,24;33:4,7,
11;37:8;72:9;120:15
**marked (24)**
11:18,20,23;15:6,7;
16:8;17:16,18;19:1;37:12,
14;53:21;57:25;58:1;
81:12,20;95:12,14;100:13,
15,25;101:23;103:8,10
**market (7)**
69:3,10,11,13,17;77:12;
78:9
**marking (1)**
81:10
**markings (1)**
95:23
**marriage (3)**
78:4;110:5;117:20
**married (7)**
8:8,11;31:23;36:9,14;
102:25;109:22
**match (1)**
61:24
**may (42)**
5:17;11:1,16;21:10;
23:10,14;24:1,4,10;26:12;
29:14;33:9;43:19;45:20;
47:5;49:6;51:19;54:19;
55:7,21;56:11,20;57:4,12;
60:4,25;64:2;67:25;72:4,
6;77:3;79:3;80:2,3,18,21,
22,24;81:5;89:22,23,23

**maybe (6)**
28:14;34:14;35:24;
36:2;78:25;88:1
**McFarland (4)**
13:1;62:5,24;63:20
**mean (24)**
10:8;16:18,19;17:1;
18:13;22:23;25:11;34:13;
39:18,20;43:15;50:16;
79:22;80:22;83:22;97:25;
98:1,20;99:9,9;101:20;
108:11;111:18;119:19
**means (2)**
39:21;80:23
**meet (1)**
16:24
**member (2)**
30:1;87:15
**memorialize (1)**
121:23
**memory (10)**
10:23;12:10;31:18;
47:15;74:16;75:2;84:17;
92:23;98:24;102:17
**mentioned (2)**
22:4;89:14
**message (2)**
27:4,9
**messages (2)**
26:25;27:2
**M-hm (2)**
20:19;94:13
**Michael (5)**
21:3;104:2;107:4,4;
109:8
**middle (2)**
6:13,15
**might (3)**
8:14;9:25;79:7
**Mike (15)**
5:12;21:6;104:3;105:14,
22,23;106:8,15,19;107:9,
12,20;108:3;110:14;120:9
**mikek@widencom (1)**
104:2
**miles (1)**
29:14
**million (4)**
23:22,24;24:2,6
**mind (6)**
17:6;23:14;24:8;89:1;
108:12;117:17
**mine (2)**
12:23,23
**minute (3)**
48:7;57:22;100:20
**minutes (2)**
17:11;81:15
**mischaracterizes (5)**
39:15;43:24;47:11;
81:3;94:8
**misspoke (1)**
50:17

**mistaken (2)**
9:6;99:20
**mixed (1)**
89:23
**mixing (2)**
34:15,16
**Modify (4)**
15:10,14,18;16:2
**moment (1)**
75:7
**money (36)**
16:15;17:5;28:8,12;
32:3,15,17;33:4;39:11,21;
42:3;77:19;98:3,25;
112:23;113:5,7,12;114:3,
4;115:4,6,25;118:25;
119:8,8,13;120:1,9,11,12,
13,15,17,19,21
**monitored (1)**
31:25
**monitoring (1)**
32:2
**Monona (1)**
64:8
**month (1)**
80:22
**more (14)**
10:2;23:15,21,24,24;
24:2,5;28:14;39:12;42:20;
78:17;91:21;115:1;121:16
**morning (1)**
5:10
**most (1)**
29:9
**mother (1)**
33:2
**Motion (6)**
15:9,10,13,14,18;16:1
**move (2)**
8:23,25
**moved (21)**
8:22;9:15;13:22;14:1,7,
15,22;34:25;35:15,16;
38:5;63:11;70:18,21;71:2;
72:1;73:4,18;74:6,24;
119:21
**much (15)**
23:7;24:15;32:3;33:25;
34:13,19;35:1;39:4,24;
80:22;93:5;95:5;118:25;
119:4;121:15

**N**

**name (6)**
5:6;20:11;44:1,3;111:8,
10
**near (5)**
18:24;40:8;101:22;
104:25,25
**necessary (1)**
7:23
**need (20)**

6:9,11,16;14:8;17:12,
15;22:24;53:11;59:6;
67:11,12;79:24;84:8;
95:18;100:8,15;101:2,3;
117:3;119:25
**needed (8)**
93:13;107:5,13;111:21;
114:4;115:4,6,25
**Neither (1)**
20:5
**new (1)**
81:20
**next (18)**
13:8;16:21;40:3,7;
56:15,23;57:6;62:4,23;
63:19;64:16;65:15;67:1;
73:10;78:18;85:9;86:6,20
**nice (5)**
29:13,15,25;30:6;77:23
**nickname (2)**
20:7,10
**None (2)**
67:23;121:4
**normally (2)**
93:11;113:2
**notary (3)**
82:6;85:6,17
**Notice (2)**
15:9,13
**November (10)**
18:6,12,21;100:1;
104:11;105:13,14;107:14;
122:2,4
**number (9)**
24:8;25:14;75:5;77:10,
12;81:4;98:15,20;104:9
**numbered (2)**
38:11,11
**numbers (5)**
79:14;96:10,11,16;97:6

**O**

**Oaks (2)**
71:17;72:8
**object (72)**
7:12;22:12;27:19;29:3;
30:3,11;31:11;34:5,6;
39:14;41:11;43:23;44:13;
45:11;49:8,13;50:1,12;
52:8,20;57:14;60:6;61:4;
69:5;70:23;71:4,5;75:13,
18;76:10,25;77:1,7,14,25;
78:1,10,12;80:4;83:6,7;
85:2;87:17;88:9,14,15;
89:10;90:16;91:6,13;
92:19;95:3;97:18;98:5,21;
102:14;103:4,5;104:19;
106:5,16;107:15;110:10,
18;111:16,23;112:16;
114:10;115:15;118:7,11;
120:3
**objecting (1)**

116:15
**objection (64)**
7:22;22:21;27:24;34:21,
22;36:11,15,16,22;42:22;
44:21;46:1,7,19;47:10;
50:19;51:22,24;52:15;
62:1,2,9,19;63:7;64:3,13;
65:12;66:9;69:6;79:19;
80:19;81:2;83:20;84:1,20;
85:24;90:2,21;91:5;92:11;
94:7;96:22;97:9,17,23;
98:6;99:1,3,4;102:9;
105:25;106:10;108:5,19,
24;111:2,22;112:3,5,24;
113:8;115:8;119:22;120:2
**objections (7)**
34:17,18;35:5,6;43:3;
47:1,23
**obscured (1)**
85:17
**observe (1)**
25:14
**obtain (1)**
115:12
**obtained (1)**
118:25
**obviously (1)**
95:8
**occasion (9)**
15:1;102:24;108:3,22;
113:21;114:6;119:1,7;
120:23
**occasions (10)**
19:12;45:8;108:16;
112:13,22;114:23;115:11;
119:11,12,24
**occur (1)**
118:3
**occurred (2)**
119:21,25
**occurrence (1)**
110:7
**October (6)**
58:24;59:13,17,21;60:2,
23
**off (14)**
28:18;43:4;45:13;
47:14;53:15;54:2;57:22;
72:7;90:9;100:19;121:18,
20,21,24
**office (1)**
94:20
**often (2)**
106:3,8
**old (2)**
11:1;33:14
**once (3)**
29:19;89:4;115:1
**one (68)**
16:11;20:5;37:4,21;
38:7,8,12,14,20;40:3;
41:20;42:6;43:20;44:12;
46:14,23;47:3,4;52:6;

116:15
**ones (4)**
40:8,8;75:23;76:16
**only (1)**
113:12
**opened (1)**
59:24
**opinion (3)**
23:5;26:7,10
**opposed (3)**
44:11,18;101:18
**Order (4)**
15:10,14,19;16:2
**Ordinary (1)**
98:9
**original (1)**
26:19
**originally (1)**
45:1
**others (3)**
75:15;76:2,4
**otherwise (2)**
92:24;95:24
**out (21)**
11:16;14:7,15,22;25:10;
29:1;34:24,25;35:15,15;
37:18;38:17;39:7;40:15;
42:1;66:5,7,12;76:20;
91:7;105:4
**outcome (1)**
28:4
**outside (2)**
25:18;26:3
**over (5)**
6:3;17:11;79:6;84:5;
108:15
**owed (1)**
95:9
**own (43)**
7:23;23:5;24:25;29:10;
30:17;31:7,10;41:4;42:5,
17;44:1,3;46:23;48:3,8;
50:8,10,18;51:14,18,21;
52:7,17,24;55:9;61:14;
62:14,17;63:5,11,24;64:2,
11;65:21;66:20;67:15,21,
24;68:17,21,24;79:3;81:4
**owned (69)**
16:15;37:20;41:2,20;
43:12,19;44:1,3,7,11,17;
45:9,9;46:5,16,21;47:7;
48:1;49:12;52:3,7,19;
54:14,19;55:4,15,21;56:8,
13,20;57:3,12;58:18;

53:21;54:5,8,23;55:8,21;
56:8,12,15,19;57:2,6,11;
61:14;62:4,23;63:19,20;
64:9,16;65:15,17;67:1;
70:16;72:3,7,14;73:10,24;
78:18,22;79:8,14;80:13;
81:25;85:9,10;86:6,20;
92:7;100:11;104:22,24,
25;110:24,24;111:4,6;
113:21

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall
October 12, 2023

60:22;61:2,8;62:8;63:9;
64:25;66:14,23;67:7,18;
68:8,14;70:5,14;71:11,13,
24;72:19;73:2,14,20;74:4,
8,23;75:11,17;78:22;79:1,
17;80:2,25;82:24;84:18;
89:25;90:5,11
owner (7)
41:17,22;42:14;48:10;
50:5;51:6;87:15
owners (4)
45:22;48:11;89:15,19
ownership (10)
36:24;37:2;41:7;49:7;
53:18;55:22;88:4;89:8;
96:20;102:6
owning (3)
69:9;73:7;76:23
owns (4)
24:20;48:17;52:17;90:6

**P**

page (40)
12:4,5,24;13:8;15:9,12,
16,21,21;16:7,21;18:5,24;
19:6,9;58:10;59:4,5,10,23;
82:2;96:14;97:12;98:8,10;
99:12,12,14;101:7,23;
103:12,16;104:1,2,8,24;
105:11,15;107:8;115:23
pages (2)
18:25;99:11
paid (9)
23:2;39:4,9,19,19;42:5,
20;69:12;114:18
paper (1)
74:13
papers (1)
88:7
paperwork (1)
53:1
paragraph (15)
12:25;13:8;16:6,8,8,9,
21,22;38:11;45:21;46:5,
11;53:25;54:3;58:15
Park (1)
73:10
part (14)
29:9;41:2,4,22;42:14;
45:10;48:3,8,10;50:5;
51:7;85:21;98:9,10
particular (2)
104:23;106:22
parties (1)
21:11
partly (1)
89:25
parts (1)
103:11
pass (1)
109:8
past (1)

25:13
pause (1)
75:6
pay (3)
42:11;70:22;71:1
paying (1)
32:7;39:22
payment (2)
42:11,13
payments (2)
70:22;71:1
payout (1)
97:25
Pearson (1)
85:5
pending (1)
6:13
people (4)
25:21;26:4,17;42:9
percent (2)
37:5,6
perfectly (1)
6:11
period (1)
28:25
person (1)
85:7
personal (1)
120:10
personally (2)
28:1;31:15
Petition (2)
11:25;12:11
PHH (6)
96:11,16,18;97:13;
99:12;101:23
pile (2)
34:3,4
place (3)
38:25;40:12;83:18
places (1)
29:22
played (1)
48:25
please (8)
5:22;6:1,5;14:11;52:13;
67:13;116:6,9
pm (1)
122:8
point (23)
13:23;14:1;19:2;22:4;
24:12;37:20;54:15;55:5;
56:6,23;57:18;63:9;68:8;
71:11,24;74:23;75:10;
78:16,22;79:1;80:23;84:7;
103:21
Pointe (2)
68:4;70:3
pointed (1)
38:11
pointing (1)
111:6
points (1)

110:6
POLAKOWSKI (129)
7:21;22:12,21;27:19;
29:3;30:11;31:11;34:5,7,
18,21;35:5;36:11,15,18;
39:14;41:10;42:22;43:3,
22;44:15,21;45:11,25;
46:7,9,19;47:1,10,23;49:8,
14;50:14;51:22;52:16,22;
57:14,23;58:1;59:2;60:6;
61:7;62:2,9;63:7;64:4,13;
65:12;66:9;69:5;70:25;
71:4;75:18;76:11,25;77:8,
15,25;78:13;79:19;80:5,
20;81:2;83:6,8,20;84:1,
20;85:2,24;87:20;88:10,
14,16;89:10;90:2,17,21;
91:5,14;92:11,20;94:7;
95:4;96:22;97:9,17,23;
98:6,22;99:3;100:12;
102:9,15;103:5;104:19;
105:25;106:6,11,17;
107:18;108:5,19;109:1;
110:21;111:2,16,22;112:3,
7,17,20,25;113:8;114:11;
115:8,15;116:2,6,8,11,17,
20;117:3;118:7,11;
119:22;120:2;122:5
portion (1)
118:17
possible (2)
36:13;44:6
Possibly (1)
44:2
practice (6)
93:18,24;94:19;102:20,
25;103:2
prepare (1)
5:18
present (2)
33:19;117:23
president (1)
90:19
pretty (1)
39:4
prevails (1)
28:8
previously (1)
7:7
price (3)
61:21;114:17;120:17
prior (1)
62:8
private (5)
115:20;117:19,21;
118:15,19
privilege (3)
115:17;116:1,16
probably (8)
23:1;25:13;95:21;97:4;
109:16;110:2;111:24;
119:15
PROCEEDINGS (4)

5:1;18:3;61:19;122:8
profit (2)
77:24;78:3
profits (3)
109:13,19;110:8
properties (56)
37:15,19;38:23;39:7,12;
40:7;43:19;44:11,18;45:9;
46:17,24;47:15;50:8,10,
18;51:14,21;52:4,7;53:18;
54:11;67:22,25;68:25;
69:2,9;70:2,4,7,20;71:2;
75:6,9,11,16;76:7,9,13,20,
24;77:5,11,12,17;79:17;
80:1,12,14,16,25;81:5;
84:6,17;85:1;89:3
property (83)
39:3,4;41:6,25;42:3,12,
17,20;43:1;44:1,3,25;
45:5;46:5;50:3;54:14,19,
21;55:1,4,9,10,12;56:4,9,
13,16,20,24;57:3,8,12,16;
58:14,22;60:1,20;61:14,
25;62:8,15,18;63:11,15,
22,25;64:12,24;65:8,19,
22,24;66:3,15,17,20,24;
67:4,6,16,19;68:5,7,10,15,
18,21,24;70:11,13;71:10,
14,23;72:18;73:1,8,13;
74:3,10,21;78:20;82:23;
83:4
protected (1)
115:17
provide (1)
65:10
pull (3)
11:16;53:20;58:5
pulled (1)
92:7
pulling (1)
93:5
purchase (2)
47:22;77:5
purchased (9)
38:20,23;45:1;65:2;
76:18;77:10,12,17;120:24
purchasing (1)
47:15
purpose (1)
49:25
purposes (1)
84:8
put (7)
34:3;41:9;57:17;58:6,9;
110:24;112:11

**Q**

quite (1)
24:17

**R**

Case: 3:22-cv-00400-jdp   Document #: 99   Filed: 11/09/23   Page 41 of 45
Stacy L. Randall v                                                    Steven Randall
Reed C. Widen, et al.                                              October 12, 2023

**RANDALL (49)**
5:2,8,9,10;8:8;11:19;
12:1,15,25;13:5;14:1,14,
22,23;15:18;17:17,21;
18:3;21:2;26:21;37:13;
45:2;49:6;51:6;57:17;
58:3;81:19;87:8;90:10;
91:9,12,25;92:17;95:13,
16;96:6,20;98:24;100:18,
24;101:13;103:13;111:12;
112:11,14;114:15;116:22;
120:23;121:13

**R-a-n-d-a-l-l (1)**
5:9

**Randall0000404 (1)**
104:9

**RANDALLpdf (2)**
111:5,9

**Randall's (6)**
19:8,11;32:25;84:12;
99:18;122:4

**read (16)**
38:9,15,17;40:4,18;
43:5;52:12,14;59:6;101:9;
112:9;116:8,10;117:3,5,7

**reading (1)**
99:25

**reads (1)**
16:13

**ready (1)**
100:11

**real (5)**
37:25;38:4;69:3;78:8;
120:1

**really (44)**
11:15;12:20;14:17;16:4,
19;17:2;20:2;22:5,23;
24:7,11;29:6,24;31:14;
32:10;33:24;34:10,13,19,
25;35:12;44:8;45:23;
47:25;50:15;52:1;53:23;
62:3,21;71:6;74:14,15;
77:2,3;81:7;82:21;83:1,
11;92:12,22;98:7;100:6;
109:2;120:5

**reason (13)**
11:3,6,8,9,11;14:6,14,
18;17:23;18:1,20;38:23;
83:23

**recall (59)**
9:13,17,23;13:17;16:1;
17:7;22:7,9;27:17;30:22;
37:8;49:21;51:9;65:2,24;
66:14,20,23;67:9,15,18;
68:10,12,14,17,20;69:13,
19;70:16;71:13;72:21;
73:7,16,20;74:8,10;84:15,
16;87:13;88:12;91:22;
92:16;102:24;103:1,23;
104:13,15;107:20;108:17,
22;109:18;113:22;114:2,
21,25;119:7,13,24;121:1

**receive (7)**

**received (16)**
23:7;30:1;32:20;33:17,
19;34:1;35:9,11;36:8;
90:25;91:3;93:1;97:15;
113:6;119:8,13

**receiving (6)**
91:22;96:25;97:22;98:3,
24;102:11

**recognize (36)**
11:24;15:8;17:18;19:5,
8;56:24;57:7;60:20;62:12,
13,25;63:22;64:15,17,22;
65:19;67:4;68:5;70:4,11;
71:8,21,22;72:16,24;74:1;
78:20;79:12,16;80:14;
95:15,24;96:5;101:4;
105:2,8

**recognized (1)**
80:15

**recollection (10)**
43:18;61:24;68:23;
82:19;83:16;89:24;97:21;
98:2;101:17;110:14

**record (14)**
28:18,21;53:15;54:2;
57:15,22;81:18;90:9;
100:20,23;121:18,21,23,
24

**records (2)**
43:16;53:6

**Redemption (1)**
114:13

**Reed (4)**
5:12;21:4,6;120:13

**referring (6)**
21:10;39:1;53:3;57:20;
82:23;113:13

**refers (6)**
40:24;53:25;54:3;
58:15;60:16;103:16

**reflect (1)**
114:7

**refresh (1)**
12:10

**regard (2)**
45:25;115:18

**regarding (3)**
37:2;102:6;106:23

**Regardless (1)**
114:21

**Reinhart (3)**
7:2,19;8:1

**related (5)**
25:3;92:4;118:5;120:1,7

**relationship (2)**
19:16;20:3

**relying (1)**
16:25

**remain (1)**
19:19

**remember (133)**

28:8,12;91:8,11,16;
92:9,17

8:15;9:2,14,25;10:19;
11:15;12:2,20;13:20;
14:17;16:4,4,19;17:22;
18:19;21:20;22:1,5;23:19;
24:11;26:23;27:10;29:6,
24,25;30:23;33:6,24;
34:23,25;38:3;43:12,15;
44:8;45:15,23;46:21;
47:13,25;48:1;49:11,15;
50:7,15;51:10,12,20;52:1,
2;60:8;61:6,17,18;62:3,20,
21;63:18;64:5;65:3,14,25;
66:11,25;67:10,14;68:1,3,
13,16;69:18,24;70:17,24;
71:6,15;72:17,25;73:17,
21;74:9,12,17;75:4,14,22;
77:2,16,16;78:2,14,14;
79:22;81:7;82:21;83:11,
12,19;85:8,8;86:1;87:19,
21;88:18;89:13;90:18;
91:17;92:12,22;95:5,8;
97:20;98:7;99:6;100:4,6;
101:21;107:16;108:15;
109:2,11;110:20,22;
111:4;114:1,5;115:10,10;
119:16,17,23;120:5,6,25

**remembering (1)**
10:24

**rent (6)**
39:12;40:1;42:9;66:5,
12;76:20

**rental (9)**
39:3,8;42:3;65:8,10;
66:7;76:9,12,23

**rented (5)**
39:7;40:15;41:25;66:7,
12

**rents (3)**
39:4,5,19

**repeat (9)**
7:17;11:5;17:25;22:17;
26:9;44:16;48:7;52:11;
119:10

**reporter (2)**
6:6;112:8

**represent (1)**
7:7

**represented (1)**
27:25

**representing (3)**
6:20;7:2,5

**requested (1)**
108:3

**require (4)**
117:17;118:9,13;120:3

**residence (1)**
61:11

**respect (1)**
69:10

**responded (2)**
107:9;110:16

**responding (1)**
110:15

**responsibility (1)**
78:7

**responsible (3)**
10:11;32:11;92:13

**resulted (1)**
8:1

**resume (1)**
122:3

**return (1)**
101:5

**returns (11)**
94:12,15,20,23;95:2,15,
25;96:6;100:5,18;102:21

**reveal (2)**
7:13;41:11

**review (1)**
94:20

**reviewed (2)**
91:1,3

**reviewing (1)**
94:23

**right (84)**
7:8;8:6,9,12,13;10:16;
13:15;17:17;18:23;19:12;
20:8;25:4,7;26:19;27:7;
31:4,22;32:18,25;33:1,2,3;
37:24;38:7;40:22;41:21;
43:5,21,25;45:3,10,13;
46:6;53:17,22;54:6,15,19;
55:5,18,20;69:15;72:6,12;
77:13;79:14,18;83:25;
87:5,6;89:18,20;90:10,12;
91:1,4;92:14;93:1,10,22;
95:13;97:5;98:15;99:21;
100:1,14,24;102:13;
103:9;104:13;107:6,10;
108:12;109:7;111:7;
112:11;113:14,25;116:21,
22,23,24;117:14;119:16

**rings (1)**
20:11

**Road (24)**
38:14,15;46:17;18,24,
25;47:8,9,18,19;54:1,3,4,
7,7,22,22;55:12,13,24,25;
62:5,24;64:8

**Roanoke (2)**
73:22;74:18

**Rockford (5)**
55:15,18,19;87:22,25

**roof (1)**
14:25

**room (2)**
36:3,6

**roughly (1)**
35:24

**row (2)**
40:10;98:16

**rules (2)**
5:16,19

**run (1)**
5:18

**Ruskin (2)**

73:22;74:18
**Rustic (1)**
63:19

## S

**safe (10)**
34:24;35:13,14,16,20,
22;36:3,5,10;104:13
**sale (3)**
61:21;70:8;118:6
**sales (3)**
10:5,6;119:20
**same (35)**
22:21;34:17,18,21,22;
35:5,6;36:22;37:17;43:3;
44:21;46:19;47:1,10,23;
49:14;50:19;52:15;62:2;
80:19;82:2;83:10,21;
85:21,22;86:17;88:24;
97:4;99:3;101:14;103:16;
106:10;107:10;112:17,24
**save (1)**
38:18
**saw (4)**
25:10;60:22;86:18;
88:23
**saying (12)**
16:9;24:21;25:9;37:18;
39:6;41:20;42:7;74:17;
88:1;93:14;108:16;111:11
**Schedule (3)**
96:20;97:8;102:2
**School (21)**
38:14,15;46:17,18,24,
25;47:8,9,18,19;54:1,3,4,
7,7,22,22;55:12,13,24,24
**Scott (5)**
103:17,20;104:10,16;
105:12
**second (5)**
15:16;16:22;54:21;
99:12;104:8
**secrets (1)**
111:18
**section (3)**
98:13;101:11,14
**seeing (1)**
24:15
**seem (1)**
25:12
**seemed (3)**
25:12;26:14,16
**seems (2)**
40:6;77:3
**selected (1)**
122:1
**self (1)**
120:10
**sell (5)**
36:8;63:14,17;114:23;
115:3
**selling (10)**

61:18;98:3;113:11,13,
13,16,18;114:7;118:22;
119:1
**send (2)**
104:17,21
**sent (2)**
92:5;104:14
**sentence (4)**
16:13,16,22;38:10
**separated (1)**
15:1
**separately (1)**
14:20
**September (5)**
82:9;83:3;85:19;86:16;
87:4
**service (1)**
18:11
**set (2)**
55:20;100:23
**setting (1)**
89:2
**several (1)**
70:20
**share (1)**
14:25
**shares (3)**
112:14;114:7,18
**sheet (2)**
47:14;74:13
**short (3)**
58:3;70:1,8
**show (2)**
93:2,10
**showing (1)**
59:25
**sign (5)**
94:11,14,22;101:10;
102:17
**signature (34)**
12:5,14,15,19;15:22,24;
19:6,8,11,14;82:11,14,16,
16;84:10,13;85:10,14;
86:2,4,7,9,11,13,15,21,23,
25;87:2;99:16,18;101:9,
10,13
**signatures (6)**
18:25;59:11;83:15;
86:14;99:14;101:7
**signed (13)**
12:3,11,17;14:7,15;
18:6;59:16,22;85:23;
95:20;100:5;101:18;103:3
**significance (1)**
15:4
**significant (7)**
16:9,23;17:4;30:9,15,
16;31:8
**signing (1)**
102:21
**silver (8)**
33:10,13,14,20,23,25;
34:12;36:8

similar (2)
81:24;102:13
**simpler (1)**
53:19,23
**simply (1)**
110:15
**sister (1)**
29:21
**sit (1)**
119:4
**Sky (1)**
70:10
**sold (7)**
36:13;48:12;55:10,13;
61:16,25;70:8;71:15;72:5;
77:24;78:3;112:14;
113:23;115:12;119:7,12,
25
**somehow (1)**
22:6
**someone (3)**
45:1;46:4;48:22
**Sometime (2)**
9:3;101:16
**sometimes (7)**
43:19;44:1,3,7,10,17;
97:15
**somewhere (1)**
36:1
**son (5)**
9:6;21:21;25:25;27:4;
79:1
**sons (3)**
39:1;40:1,13
**Soon (1)**
100:9
**sorry (21)**
6:24;11:5,21;14:9;
15:11;16:7;17:25;19:1;
26:9;50:17;60:10,13;
68:19;74:23;79:3;80:8;
82:13;88:21;105:3;
118:10;119:10
**sort (2)**
27:6;28:11
**sound (1)**
11:14
**Sounds (4)**
8:13;18:23;24:25;38:22
**source (4)**
39:3;42:4;77:21;105:23
**Spangler (4)**
103:17;104:10,16;109:8
**spare (2)**
36:3,6
**speak (2)**
11:21;67:11
**specific (7)**
17:6;21:1;26:15;91:21;
103:11;104:14;115:13
**specifically (4)**
35:8;106:24;109:5,18
**speculation (7)**

34:7;36:17,18;42:23;
103:6;106:1;112:7
**spelling (1)**
5:6
**spend (1)**
32:6
**spoken (1)**
20:22
**spot (2)**
93:14,14
**Springs (2)**
73:22;74:18
**SSpangler@hrblockcom (1)**
103:17
**Stacey (1)**
71:10
**stack (3)**
93:18,22;112:2
**stacked (1)**
34:15
**stacks (1)**
93:11
**Stacy (164)**
7:25;8:8;11:13;12:1,14;
13:14;16:3,13,23;17:3,7,
21;18:3,14;19:8,11,17,20;
20:22;21:2,16,18,22,25;
22:2;23:7;26:21,24;27:8,
11,14;28:8,11;29:7,16;
30:9,17;31:21,22;32:20,
24;33:4,17,25;36:7,10,24;
37:20,24;41:4,22;44:3,19;
45:2;46:4,16,22;47:6,7,21;
49:6;50:5;51:6;54:13,17;
55:3,7,21;56:7,12,18;57:1,
10;61:1,12;62:14,17;63:4,
14,24;64:11,24;65:10,21;
66:21;67:6,16,21,24;68:7;
70:4,13;71:23;72:18;73:1,
13;74:3,23;75:10,16,24;
77:11,22;79:16;82:17,24;
84:12,18,24;87:15,24,25;
88:1,12;89:6,8;90:11;
91:9,12,25;92:17;93:3,21;
94:5;95:16;96:6,20;97:15,
21;98:2,24;99:18;100:18;
101:5,13;102:5;103:20,
24;104:18;105:22;106:15,
19;109:23;110:25;111:4,
4,8,11;112:13;113:22;
114:3,14;115:6,12,19,22;
117:19;118:14,19,21,25;
119:20,25;120:23
**Stacy's (10)**
27:5;28:23;85:14;86:4,
9,13,23;87:2;99:23;114:7
**stamp (2)**
82:6;85:18
**standard (2)**
94:19;102:20
**start (8)**
5:6;8:4;38:4,7;45:22;
81:10,24;113:21

**starting (1)**
96:9
**starts (1)**
16:9
**stating (1)**
5:6
**Steve (3)**
20:17;103:12;107:5
**STEVEN (8)**
5:2,8;15:17;45:2;58:16;
74:21;96:2;122:5
**S-t-e-v-e-n (1)**
5:8
**steventrandall@yahoocom (1)**
103:13
**stick (1)**
28:25
**still (11)**
10:15;19:20;40:21;
42:14,17;66:20;67:15;
93:22,24;109:22;110:23
**stock (19)**
23:2,8;90:11;112:14;
113:14,17,23;114:13,23;
115:3,12;118:6,22;119:1,
7,12,20,25;120:24
**stocks (2)**
113:12,13
**stop (2)**
121:12;122:2
**stopped (2)**
9:24;73:7
**stored (2)**
35:13,14
**Stoughton (3)**
13:10;30:24;61:10
**street (2)**
40:10;79:9
**Stuart (1)**
120:19
**stuff (6)**
24:25;52:17;105:20;
108:7;109:2;121:16
**sufficient (1)**
30:8
**Suite (1)**
79:9
**summary (2)**
40:5;102:2
**Support (1)**
15:18
**suppose (2)**
32:19;117:15
**sure (36)**
7:13,18;8:15;11:22;
14:10;22:4,18;26:1;27:1;
29:16;30:17;32:11;33:9;
39:6;43:15,17;44:17;
46:22;52:23;55:10;62:11;
72:5;74:16;80:12;82:1;
94:3,10;95:11;96:4;
105:21;107:23;110:6;
113:20;119:2,2;121:19

**surgery (2)**
69:16,23
**Surrey (2)**
67:1;72:23
**sworn (1)**
5:3

**T**

**talk (13)**
19:20;21:21,24;25:21;
26:4;27:14;45:17;48:19;
57:22;72:7;105:19,20;
118:21
**talked (16)**
20:24;22:2;41:8;75:15,
24;76:8;78:18;80:12,16,
16;87:7;106:19,20;113:1;
115:24;121:24
**talking (14)**
5:17;6:3,10;21:1;27:25;
46:11;50:16;53:17;76:7;
97:1,7;102:11,12;119:19
**tall (1)**
35:24
**taller (1)**
36:1
**tax (27)**
91:8,11,17,20,22;92:25;
93:1,15;94:1,11,15,20,23;
95:2,15,16,25;96:6;100:5,
18;101:5;102:21;107:5;
109:4,6;111:15;112:1
**taxes (7)**
92:8,14;93:5,9;94:3;
105:20;106:2
**telling (3)**
36:14;115:24;117:1
**Temporary (4)**
15:10,14,18;16:2
**ten (2)**
8:22,25;9:4;10:2
**testified (2)**
5:3;81:4
**testimony (8)**
11:4,7,10;39:15;43:24;
47:11;81:3;94:8
**Thanks (1)**
107:5
**that'd (1)**
9:5
**thick (1)**
95:14
**thinking (7)**
24:12;28:24;89:22;
108:11;113:19;115:11;
118:1
**third (1)**
59:9
**though (3)**
9:3;43:25;109:20
**thought (4)**
7:23;18:9;26:20;37:15

**thread (1)**
27:6
**three (9)**
8:18;18:25;48:4,8;49:7;
89:5,20,20,25
**tie (1)**
89:1
**times (2)**
13:20;23:24;44:17;
107:23;108:9;115:7,14
**timing (2)**
77:3;100:5
**Tin (2)**
40:24;41:4,17,17,23;
42:15,17;60:22;82:22,25;
83:4;84:5,18;85:1;89:14,
24
**Title (2)**
58:21;59:25
**today (19)**
5:13,18;6:20;7:3,5,11,
20;8:2,19,20;10:15;11:4,7,
10;42:21;76:8;93:24;
119:4;122:7
**together (18)**
12:17,21;13:14,19,23;
14:23,25;16:14;41:7;56:7;
84:24;85:22;89:2;92:7;
93:6;94:14;102:22;103:3
**told (3)**
27:11,11;117:17
**ton (1)**
29:14
**took (4)**
34:24;35:15;36:13;
83:18
**top (6)**
18:5;43:4;82:2;99:20;
102:1;105:15
**topic (1)**
116:1
**towards (8)**
58:13;59:9;96:9,18;
97:11;99:6,13;105:4
**town (1)**
61:9
**track (2)**
32:3,15
**Tracy (2)**
5:8,8
**T-r-a-c-y (1)**
5:9
**train (1)**
26:20
**transaction (1)**
48:20
**TRANSCRIPT (3)**
5:1;6:7;115:24
**transfer (2)**
40:24;41:6
**transferred (6)**
45:5;79:5,6;82:24;83:4;
84:25

**transferring (2)**
84:17;89:2
**tried (2)**
29:19;35:4
**trip (1)**
29:19
**true (3)**
13:18;60:4;76:16
**truthful (1)**
11:9
**try (11)**
14:12;19:19;50:13;
52:10;53:19,19;58:3;
69:25;80:6;112:18;114:3
**trying (5)**
34:23;53:1,22,23;74:14
**turn (6)**
14:8;15:16;16:6,21;
18:24;99:11
**turned (1)**
69:17
**two (60)**
8:19,20;13:23;27:9;
31:7,9;35:3;44:7;45:5;
46:23;47:4;54:14,18;55:3,
8;56:7,12,18;57:2,10;
61:1;62:14,17;63:4,14,24;
64:11,24;65:11,21;66:21;
67:6,16,21,24;68:7;70:5,
13;71:10,23;72:19;73:1,4,
13;74:3;75:10,17;76:6,17;
77:11;78:17;79:17;83:4;
84:18;86:18;89:1;94:11,
14;95:1;102:21
**two-thirds (2)**
58:14;104:24
**Tyler (1)**
120:21
**type (1)**
108:2
**typically (2)**
29:10;94:12

**U**

**UK (2)**
106:25;107:14
**uncommon (1)**
104:16
**underneath (1)**
15:12
**understood (10)**
5:23,24;6:3,17;23:21;
24:22;25:2,7;39:10;90:25
**unfortunate (2)**
77:4;78:8
**Unit (1)**
61:10
**Unless (1)**
52:23
**up (21)**
6:8;14:8;23:6;24:18;
32:23;33:22;34:15;37:4;

46:13;53:20;55:20;58:5;
66:17;67:11;89:2,23;
93:11;97:11;99:11;
105:11;106:21
**upon (1)**
16:23
**used (3)**
50:4;119:9,14
**usually (3)**
30:8;108:7;113:1

### V

**vacations (2)**
29:17,22
**Vague (8)**
46:9;52:8;63:7;79:19;
91:15;112:18;119:22;
120:2
**value (11)**
23:5,13,17;24:14;26:8;
31:8,10;43:1;80:3,17,25
**vehicles (2)**
29:10,13
**Village (1)**
64:8
**visit (1)**
29:20
**visual (1)**
74:15

### W

**wait (4)**
6:1;14:11;43:22;48:7
**waived (1)**
116:1
**walk (1)**
95:1
**Warranty (1)**
82:4
**Waters (49)**
5:11;17:9;21:3,6,13;
23:13,18;24:2,5,9,14,19;
25:3;26:8,11;37:6;90:12,
15,20;92:4,18;93:2;96:21;
97:16,22;98:3,4,12,25;
102:7;104:6;105:19;
106:4,9,14;107:22;109:14,
20;110:9;112:15,15,23;
113:14,23;114:8,14,25;
118:23;120:24
**Waunakee (1)**
79:9
**way (9)**
25:3;42:5;59:8;63:19;
69:11,14;101:20;103:7;
113:12
**weren't (3)**
29:20;39:21;69:11
**what's (8)**
11:19,23;17:18;37:13;
38:9;45:21;49:25;114:13

**whole (9)**
41:2,22;42:14;45:10;
46:11,12;48:3,8;51:6
**who's (1)**
27:25
**wide (2)**
35:25;36:1
**Widen (49)**
5:12,12;9:11,18;17:10;
21:2,4,6,8,12;23:14;24:20;
25:3,6,10,18,21;26:3,4,8,
11;31:16;32:21,24;33:2,5,
8,11;37:8;104:6;105:18;
106:3,9,15,23,24;107:14,
21;109:13,20,25;110:4,8;
120:8,13,15,17,19,21
**wife (1)**
27:4
**wife's (1)**
12:15
**Willow (4)**
48:4,9;49:7;89:5
**Windy (49)**
5:11;17:9;21:3,6,12;
23:13,17;24:2,5,9,14,19;
25:2;26:8,11;37:6;90:11,
14,19;92:4,17;93:2;96:21;
97:15,22;98:3,4,12,25;
102:6;104:6;105:19;
106:4,9,14;107:22;109:14,
19;110:9;112:14,15,22;
113:14,23;114:8,14,25;
118:22;120:24
**Winnequah (1)**
64:8
**Wisconsin (24)**
8:21;9:1,4;13:1,10;
31:1,5;38:24;39:5,7;45:1;
46:25;47:16;54:9;57:7;
60:17;61:11;62:5;63:20;
64:8;69:17,22;79:9
**without (4)**
36:13;98:3;117:1;
118:18
**Witness (15)**
35:17,23;41:13;44:4;
53:7,13;58:8;79:25;80:8;
100:9;117:6;118:10;
121:6,15,25
**WITTENBERG (31)**
5:5,11;27:23;28:18,20;
46:3;52:12;53:14;57:19,
24;59:3,19;72:6,11;81:10,
14,17;100:10,19,22;
115:22;116:4,7,13,18,21;
121:10,17,19,22;122:6
**Wonderful (1)**
6:19
**wonderfully (1)**
6:7
**Wood (2)**
67:1;72:23
**work (3)**

24:15;25:10;94:2
**worked (2)**
9:19;25:25
**worth (10)**
23:10,15,21;24:2,5,9;
31:10;42:20;69:12;110:12
**Wow (1)**
117:21
**write (1)**
17:8
**written (2)**
12:12;45:21

### Y

**year (22)**
18:10;29:2,20;37:8;
38:3;69:19,21;79:7;88:19;
92:9,16,21,24;94:3,21,24;
95:2,16,25;97:5,5;102:12
**years (20)**
8:9,22,25;9:4,13;10:2;
28:25;29:11;30:2,10,20,
22;31:4;49:1;50:16;99:7;
103:23;108:15;114:22;
119:19

### 0

**000238 (1)**
82:1
**0033 (1)**
101:23
**0046 (1)**
99:12
**0048 (2)**
97:13;98:10
**0082 (1)**
96:18

### 1

**1 (10)**
11:18,20,24;40:8;45:24;
46:5;53:25;54:3;66:17;
79:15
**1:19 (1)**
122:8
**10 (6)**
16:22;100:13,15,25;
122:2,4
**101 (9)**
38:14;46:17,24;47:8,18;
53:25;54:3,7;79:8
**102A (2)**
78:18,19
**102B (4)**
40:17;44:25;56:2;78:19
**103 (7)**
38:14;46:17,24;47:9,19;
54:4,7
**104 (1)**
56:15

**105 (3)**
54:22;55:12,24
**106 (1)**
56:23
**107 (3)**
54:22;55:13,24
**108 (1)**
57:6
**11 (3)**
103:8,10;110:23
**110 (2)**
60:16;61:2
**11-24 (2)**
105:1,5
**12 (1)**
36:2
**13 (2)**
64:16;66:17
**13-ish (1)**
59:5
**14 (2)**
65:15;66:15
**15 (4)**
17:11;67:1;75:8,11
**16 (2)**
68:4;70:1
**177 (2)**
115:23;116:7
**18 (3)**
35:24,24;36:2
**19 (1)**
70:1
**1956 (1)**
8:6
**1972 (2)**
13:9;61:10
**1978 (1)**
8:11
**1997 (2)**
62:8;92:10
**1999 (4)**
9:19,21,22;10:14
**19th (8)**
8:6;82:9;83:2;85:18;
86:16;87:4;104:11;105:13
**1st (4)**
11:13;12:7;13:15;14:19

### 2

**2 (25)**
13:8;15:6,7;16:7;40:3,7,
24;41:4,17,18,23;42:15,
17;58:11;59:24;60:23;
82:22,25;83:5;84:5,18;
85:1;89:14,24;98:9
**20 (4)**
37:5,6;50:16;70:10
**2000 (1)**
8:24
**2004 (1)**
38:20
**2005 (10)**

28:24;29:5,23;30:18;
40:21;112:23;113:22,22,
24;114:2
**2006 (10)**
38:2;41:20;82:9;83:3;
85:19;86:17;87:4;88:20,
22,23
**2007 (1)**
69:20
**2010 (2)**
9:1,3
**2015 (1)**
9:7
**2017 (5)**
95:16,25;96:6;99:2;
107:4
**2018 (7)**
100:18;101:5;102:1;
104:11;105:13,14;107:14
**2019 (16)**
11:14;12:7;13:6,12,15;
14:16,19;15:1,3;28:24;
29:5,23;30:18;92:10;
101:19;112:23
**2020 (47)**
18:6,12,21;23:8,11,14;
24:1,4,10;26:12;49:4,6;
50:11,17;51:13,16,19;
54:19;55:7;56:11,21;57:4,
12;58:25;59:14,17,21;
60:2,5,23,25;61:16,25;
62:18;64:2;67:25;79:4;
80:2,3,18,21,24;81:5;
100:1,2;101:17,18
**2021 (1)**
27:3
**20th (4)**
18:6,12,21;105:14
**21 (1)**
71:7
**22 (2)**
71:17;98:18
**2230 (1)**
74:18
**23 (3)**
72:10,11,12
**24 (1)**
72:23
**2401 (1)**
73:22
**25 (1)**
73:10
**26 (1)**
73:22
**26th (5)**
15:3;58:24;59:13,18,21
**27 (1)**
74:18
**28 (4)**
79:15,17;80:14,15
**29 (2)**
79:10;80:12

| 3 |
| --- |

**3 (19)**
15:21;16:6,8;17:16,18;
40:17;41:25;42:18;43:2;
44:11,24;45:19,21;56:2;
58:2,5,6,9;61:10
**30 (1)**
49:1

| 4 |
| --- |

**4 (8)**
37:12,14;38:13;43:5;
53:21;60:12,14;79:9
**40 (2)**
108:15;119:19
**486,000 (1)**
61:21

| 5 |
| --- |

**5 (5)**
56:24;60:11;81:12,21,
25
**5106 (1)**
63:19
**5802 (1)**
64:8
**5909 (2)**
71:7;76:3
**5th (1)**
8:11

| 6 |
| --- |

**6 (5)**
59:17;60:11;81:21;
85:10,11
**6116 (2)**
64:16;66:18
**6118 (2)**
65:15;76:1
**6310 (2)**
62:4,20
**6312 (3)**
62:21,23,24
**6527 (1)**
70:10
**6833 (1)**
72:12
**6th (4)**
59:20,20;122:2,4

| 7 |
| --- |

**7 (5)**
60:11,15,15;81:21;86:6
**7104 (1)**
73:10
**7320 (1)**
71:17

**7428 (1)**
72:23
**7441 (1)**
67:1
**7871 (1)**
68:4
**7th (1)**
58:10

| 8 |
| --- |

**8 (7)**
19:2;59:4,10;61:9;
81:12,21;86:20
**80 (1)**
98:16
**80s (1)**
10:1

| 9 |
| --- |

**9 (2)**
95:12,14
**99 (1)**
9:24