# In The Matter Of:

*Stacy L. Randall v*
*Reed C. Widen, et al.*

DUPLICATE ORIGINAL

---

*Steven Randall*
*Vol. II*
*November 6, 2023*

---

*Colleen Reed Reporting LLC*
*P.O. Box 293*
*Milwaukee, Wisconsin 53201*
*www.colleenreed.com*

Original File 110623stevenrandallvol2f.txt
**Min-U-Script® with Word Index**

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 2 of 48

Stacy L. Randall v                                                    Steven Randall - Vol. II
Reed C. Widen, et al.                                                 November 6, 2023

Page 124

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF WISCONSIN
    -------------------------------------------------
 3  STACY L. RANDALL,        CIVIL ACTION NO. 22-CV-400

 4            Plaintiff,

 5       -vs-

 6  REED C. WIDEN, MICHAEL KIESLER,
    WIDEN ENTERPRISES, LLC, and
 7  WINDY WATERS, INC.,

 8            Defendants.

 9  -------------------------------------------------
10  DEPOSITION OF:  STEVEN RANDALL, VOLUME II

11  DATE:           November 6, 2023

12  TIME:           9:58 a.m. to 1:24 p.m.

13  LOCATION:       N4559 Trillium Court
                    Portage, Wisconsin 53901
14
15  REPORTED BY:    Janet D. Larsen, RPR

16
17
18
19
20
21
22
23
24
25
```

Page 125

```
 1            A P P E A R A N C E S

 2
 3    REINHART BOERNER VAN DUEREN, S.C., by
      SAMUEL SYLVAN, ATTORNEY AT LAW
 4    MARY MARGARET EVANS, ATTORNEY AT LAW
      1000 North Water Street, Suite 1700
 5    Milwaukee, Wisconsin  53202
      ssylvan@reinhartlaw.com
 6    mevans@reinhartlaw.com
      appeared on behalf of the Plaintiff.
 7
      O'NEIL, CANNON, HOLLMAN, DEJONG &
 8    LAING, S.C., by
      CHRISTA D. WITTENBERG, ATTORNEY AT LAW
 9    KYLE T. KASPER, ATTORNEY AT LAW
      111 East Wisconsin Avenue, Suite 1400
10    Milwaukee, Wisconsin  53202
      christa.wittenberg@wilaw.com
11    kyle.kasper@wilaw.com
      appeared on behalf of the Defendants.
12
      BOARDMAN & CLARK, LLP, by
13    AUSTIN DOAN, ATTORNEY AT LAW
      1 South Pinckney Street, Suite 410
14    P.O. Box 927
      Madison, Wisconsin  53701-0927
15    adoan@boardmanclark.com
      appeared on behalf of the Witness.
16
17
18
19
20
21
22
23
24
25
```

Page 126

```
 1            I N D E X

 2  EXAMINATION BY:                           PAGE
    Ms. Wittenberg                            127
 3
 4  EXHIBITS:                                 MARKED
    Exhibit 12 - June 10, 2016, emails between  137
 5               Michael Kiesler and Steve Randall
                 with attached financial statements
 6               Bates WINDY0056318-56335
    Exhibit 13 - Mortgage Assistance Application  192
 7               Bates WINDY0009301-9303
    Exhibit 14 - Mortgage Assistance Application  192
 8               Bates WINDY0009298-9300
    Exhibit 15 - Shareholder Agreement of Widen.  213
 9               Colourgraphics, Ltd., March 1, 1992
                 Bates WINDY0033106-33130
10  Exhibit 16 - Form 2553, Election by a Small  228
                 Business Corporation, 1998
11               Bates WINDY0002068-2073
    Exhibit 17 - Second Amendment to Shareholder  230
12               Agreement, May 7, 2007
                 Bates WINDY0001341-1347
13  Exhibit 18 - Third Amendment to Shareholder  232
                 Agreement, January 8, 2013
14               Bates WINDY0001336-1340
    Exhibit 19 - Land Contract between Pleasant  248
15               Spring Enterprises L.L.C. and
                 Steven T. Randall & Stacy L.
16               Randall
                 Bates WINDY0008439-8444
17
18  MATERIAL REQUESTED:                       PAGE
    None
19
20  QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:
    None
21
22  (Original transcript supplied to Attorney Christa D.
    Wittenberg) (Originals of Exhibit 12 through 19 are
23  attached to the original transcript.  Scanned copies
    were provided to all counsel)
24
25
```

Page 127

1      TRANSCRIPT OF PROCEEDINGS

2      STEVEN RANDALL, having been first duly

3   sworn, was examined and testified as follows:

4      E X A M I N A T I O N

5   BY MS. WITTENBERG:

6   Q.  Good morning, Steven.

7   A.  Good morning.

8   Q.  Thanks for having us back here today.  So we're

9       here for part two of your deposition, and just to

10      remind you, we talked about some basic procedures

11      and ground rules for today.  The same would apply,

12      so if you need a break at any time, let us know,

13      and I'll be happy to break for you.  Okay?

14  A.  Okay.

15  Q.  Do you have a lawyer today for this deposition for

16      you in the room, Austin Doan?

17  A.  Yeah.

18  Q.  And, again, no attorney at Reinhart is your lawyer

19      today; right?

20  A.  No.

21  Q.  No, they're not your lawyer?

22  A.  No, they're not my lawyer.

23  Q.  Okay.  All right.  Have you had any discussions

24      with anyone since we were together last time on

25      October 12th about your deposition or your

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 128

1    testimony in this case?
2         MR. DOAN: I'm going to caution the
3    witness not to reveal any attorney-client
4    communication, so any other conversations you had
5    other than with your attorneys.
6  A. Okay.  I talked with him a couple times but --
7  Q. Okay.  You talked with Austin a couple of times.
8    Have you talked with any other lawyers --
9  A. No.
10 Q. -- since October 12th?
11 A. No.
12        MR. DOAN: I'll state for the record that
13   there is a common interest agreement between, I
14   forgot Stacy's last name, I apologize, is it
15   Ms. Randall?
16        MR. SYLVAN: Ms. Randall.
17        MR. DOAN: Yeah, Ms. Randall and   Mr.
18   Randall.
19 Q. Okay.  Do you have an understanding of what a
20   common interest agreement is, Mr. Randall?
21 A. No.
22        MR. DOAN: I'm just going to
23   object to the extent it calls for a legal
24   conclusion.
25        MR. SYLVAN: Same objection.

Page 129

1  Q. Fair.
2         Did you sign a document that was
3    unrelated to your interests being aligned with
4    Stacy in this case?
5         MR. DOAN: I'm going to have the same
6    objection.
7         MR. SYLVAN: Same here.
8         MR. DOAN: Go ahead and answer if you
9    understand the question.
10 A. I haven't signed anything.
11 Q. Okay.  Did you have any discussion with any
12   lawyers at Reinhart since October 12th when you
13   were here last time?
14        MR. SYLVAN: I'm going to object to the
15   extent that you'd be disclosing common interest
16   privileged communications.
17        MR. DOAN: I'll join that as well.
18 Q. I don't want to know what the content of the
19   conversation was at this point, I just want to
20   know if you've spoken with any lawyers at Reinhart
21   since the first part of your deposition.
22        MR. SYLVAN: The same objection.
23        MR. DOAN: Join.
24        THE WITNESS: So that means I don't have
25   to answer?

Page 130

1         MR. DOAN: No, go ahead and answer but
2    don't, don't reveal the substance of the
3    conversation.
4         THE WITNESS: Okay.
5         MR. DOAN: If you need it read back, the
6    court reporter can read it back to you.
7  A. Yes.
8  Q. You had conversations with one or more lawyers at
9    Reinhart?
10 A. Yes.
11 Q. Yes?
12        Do you recall the name of that lawyer?
13        MR. DOAN: I'm going to just, same
14   objection.
15        MR. SYLVAN: Same objection.
16 A. No.
17 Q. Is it one of the lawyers in the room today?
18 A. Yes.
19 Q. Is it the gentleman sitting to my right?  Did you
20   meet with Mr. Sylvan?
21 A. No, I didn't meet with him, we just did a phone,
22   talked on the phone.
23        MR. SYLVAN: I'm going to object to this
24   line of questioning to the extent it requires the
25   witness to disclose privileged communications and

Page 131

1    information.
2         MR. DOAN: Same objection.
3         MS. WITTENBERG: Understood.  So if I
4    were to ask the contents of any conversation
5    between Steve and you, Mr. Sylvan, you would, you
6    would say that it's privileged, and you would
7    instruct him not to answer; is that right?
8         MR. SYLVAN: Correct.
9  Q. Mr. Randall, will you follow those instructions?
10 A. Yes.
11 Q. Okay.  Last time we were together we talked about
12   you being called Grandpa Bling by your grandkids.
13   Did Stacy have a nickname that was a play on
14   grandma as well?
15 A. I think they called her Glandma.
16 Q. Glandma.  Why did she get that nickname?
17 A. She wanted to take that nickname.
18 Q. Okay.  Also last time we were here we had some
19   discussions about the, the value or the success of
20   Windy Waters or Widen Enterprises, and so I'm
21   going to ask you a few questions to follow up on
22   that line of questioning from last time.  I
23   understood your testimony to be that from, from
24   your perspective, it appeared that Widen
25   Enterprises or Windy Waters was doing quite well.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 132

1     Do you recall that testimony?
2 A.  Yes.
3 Q.  And is there anything that you could tell me that
4     would explain what gave you that impression?
5         MR. SYLVAN: Objection. Asked and
6     answered in the previous session.
7 A.  Just conversation.
8 Q.  Conversation with who?
9 A.  Reed.
10 Q.  Do you recall anything specific that Reed said
11     about how Windy Waters or Widen Enterprises was
12     doing at any time?
13 A.  Specific, no.
14 Q.  Do you know, was this something you would talk
15     with Reed frequently or only on certain
16     occasions?
17         MR. DOAN: Object to form.
18         Go ahead and answer.
19 A.  He would bring it up sometimes.
20 Q.  He would bring it up, it wasn't you asking?
21 A.  No.
22 Q.  It was -- Okay.
23         Did it seem, were there specific numbers
24     offered by Reed when he would discuss how the
25     companies were doing?

---

Page 133

1         MR. DOAN: Object to form.
2         MR. SYLVAN: Same objection.
3 A.  I don't remember.
4 Q.  Do you have any recollection of any specific
5     numbers that would indicate how Windy Waters or
6     Widen Enterprises was doing financially in 2020?
7         MR. DOAN: Object to form.
8         MR. SYLVAN: I'll join that objection.
9 A.  I, I don't remember, 2020, I mean we're talking
10     three years back.
11 Q.  When you worked at Widen Enterprises prior to
12     1999, do you recall how many employees the company
13     had?
14 A.  Maybe a hundred to 150. It would bounce around
15     quite a bit.
16 Q.  Were you aware generally about how many employees
17     the company had by about 2020?
18 A.  No.
19 Q.  Did you understand there to be more employees in
20     2020 than there were when you worked there?
21         MR. DOAN: I'm just going to object to
22     form.
23 A.  No.
24 Q.  Was, are you familiar with the Widen Enterprises
25     office?

---

Page 134

1 A.  Yes.
2 Q.  Is Widen Enterprises' office or was it in 2020 in
3     the same place where you worked when you worked at
4     Widen Enterprises?
5 A.  Yes.
6 Q.  Had the office undergone renovations or remodeling
7     since you worked there?
8         MR. SYLVAN: Objection. Calls for
9     speculation.
10         MR. DOAN: Same. Join.
11 A.  It was a brand-new building.
12 Q.  It's a brand-new building now or --
13 A.  It was a brand-new building when I worked there.
14 Q.  Okay. And as far as you know, the offices
15     remained in that location through 2020?
16         MR. SYLVAN: I'll object to form.
17 A.  I don't know.
18 Q.  Did you ever go to the offices after you stopped
19     working there?
20 A.  Yeah.
21 Q.  Do you recall ever being in a different location?
22 A.  Yeah. I used to be across the street.
23 Q.  Maybe I should clarify.
24         After you stopped working there, do you
25     recall the office ever being in a different

---

Page 135

1     location --
2 A.  No.
3 Q.  -- from the place where you worked? Okay.
4         Did you ever ask for and receive bank
5     records for Widen Enterprises or Windy Waters?
6         MR. DOAN: Object to form.
7         MR. SYLVAN: I'll join.
8 A.  I would ask for stuff for doing our taxes.
9 Q.  Do you ever recall that information you requested
10     including bank records?
11 A.  No.
12 Q.  And a brief follow-up on some of the inheritance
13     discussions we had last time as well. We talked
14     about the gold and silver coins and bars that
15     Stacy Randall had received from her parents.
16     Do you, do you understand why those were
17     sentimental to her or not?
18         MR. DOAN: Object to form.
19         MR. SYLVAN: I'll join.
20 A.  I would say the coin collection that I got from my
21     dad, I would not want to sell that, because it's
22     something that he handled, and I'm assuming that
23     Stacy was probably the same way with, I mean never
24     in our marriage did we talk about selling any of
25     it.

---

Colleen Reed Reporting LLC
414.322.3621

Page 136

1 Q.  Do you have, are there any other items you
2     believed that Stacy believed were sentimental?
3          MR. SYLVAN: I'll object to form.
4          MR. DOAN: The same objection.
5 A.  I don't know.
6 Q.  When your son passed away in, I believe it was
7     2015, was there a life insurance policy that was
8     in the name of either you or Stacy?
9 A.  Yes.
10         MR. DOAN: Objection. Compound.
11 Q.  Okay. And do you know specifically whether it was
12    in your name or Stacy's or both?
13         MR. DOAN: Same objection.
14 A.  Don't remember.
15 Q.  Do you recall the face amount of that life
16    insurance policy?
17 A.  No.
18 Q.  Do you recall what you or Stacy did with the life
19    insurance proceeds?
20         MR. DOAN: Objection. Compound.
21 A.  No.
22 Q.  Was it shared between the two of you?
23 A.  I mean it's family money. That's all I, so --
24 Q.  And we talk about it being family money, meaning
25    it was for common use for the whole family?

Page 137

1          MR. SYLVAN: Objection. Form.
2          MR. DOAN: Join.
3 A.  Just went in to be, went into the checking
4     account. I don't know.
5 Q.  And previously you explained that if you needed
6     information about Widen Enterprises or Windy
7     Waters, you would ask typically Mike Kiesler.
8     Does that sound correct to you?
9          MR. DOAN: Object to form.
10 A.  Yes.
11         (Exhibit 12 marked for identification)
12 Q.  Mr. Randall, you've been handed what's been marked
13    as Exhibit 12, and I'll ask if you recognize this
14    to be an email exchange between Mike Kiesler and
15    you.
16         MR. SYLVAN: I'll object to the extent
17    that it misrepresents what the document is.
18         MR. DOAN: Join. Go through it.
19 A.  I, I can't see that anyway since it's so small.
20         MS. WITTENBERG: Okay. Will the two of
21    you agree for the record this is an email from
22    Mike Kiesler to Mr. Randall and Stacy Randall?
23         MR. SYLVAN: The top email, that, that is
24    correct.
25         MS. WITTENBERG: Okay.

Page 138

1          MR. DOAN: I'll join that.
2 Q.  All right. If you're having a hard time reading,
3     I can read it out loud to you, too, and if you
4     think it looks other than that, let me know. I'll
5     focus on the first page for now. It's an email
6     that says dated June 10th of 2016. I don't know
7     if you see that date line towards the top.
8 A.  Yes.
9 Q.  Okay. And go towards the bottom. The original
10    email on, not the actual original, I guess,
11    but there's one on June 10th as well, 2016, at
12    1:11 p.m. from you to Mike Kiesler with the
13    subject of Profit and loss.
14         Do you see that?
15 A.  Yes.
16 Q.  All right. And the text of the email reads,
17    Michael, I need profit and loss for Millmont and
18    Windy Waters for 3 months, Feb, March, April, for
19    the bank. Please respond! ASAP! Thank you,
20    Steve Randall.
21         Do you see that there?
22 A.  Yes.
23 Q.  Do you have any recollection looking at this as to
24    why you needed profit and loss information for
25    Millmont and Windy Waters?

Page 139

1 A.  It said for the bank.
2 Q.  Do you have any recollection of why the bank may
3     have needed that --
4 A.  No.
5 Q.  -- information? Okay.
6          MR. DOAN: Just try to let her finish the
7     question --
8          THE WITNESS: Pardon me?
9          MR. DOAN: Let her finish the question
10    before you answer.
11 Q.  And attached to the exhibit, I'll represent to
12    you, are the documents that go with this email.
13    Take a moment to look, page through if you need
14    to. And my question will be if you would agree
15    that it includes the financials for Widen
16    Enterprises.
17         MR. SYLVAN: Object to form.
18         MR. DOAN: I'll join.
19 A.  It they're too small, I can't read it. Could you
20    grab on my desk a magnifying glass.
21         (Discussion off the record)
22         MS. WITTENBERG: We can go back on.
23 Q.  I do apologize for the small print, so when you're
24    able to, my question will be if you would agree
25    that what's attached to this document includes

Page 140

1 financial statements for Widen Enterprises from
2 2016.
3     MR. SYLVAN: Objection.  Form.
4     MR. DOAN: Join.
5 A. A lot of numbers.  April 2015 to April 2016.  So
6 this is a year's worth here; is that what this is?
7 Q. Well --
8 A. Must be.
9 Q. -- I understand this to be financial dated
10 April 30, 2016.  I'm looking at the second page of
11 the document.  That's, that's what I see it should
12 be.  I'm asking if that's what you understand them
13 to be as well.
14 A. I'm sorry, what?
15 Q. I'm asking if that's what you understand them to
16 be as well, which is financial statements of Widen
17 Enterprises dated April 30th, 2016.
18 A. It appears to be.
19 Q. And steventrandall@yahoo.com is your email address
20 and was at the time; right?
21 A. Yes it is, still is today.
22 Q. Glammyisme@gmail.com, is that an email that Stacy
23 Randall used?
24 A. That sounds like one of them she used, yeah.
25 Q. Did you ever withhold information from Stacy

Page 141

1 Randall about Windy Waters or Widen Enterprises?
2     MR. DOAN: Object to form.
3     MR. SYLVAN: I'll object to the extent it
4 calls for disclosing marital privileged
5 communications.
6     MR. DOAN: I'll join.
7     THE WITNESS: So do I answer or not?
8     MR. DOAN: Go ahead and answer but don't
9 reveal any communications --
10     THE WITNESS: Okay.
11     MR. DOAN: -- between you and Stacy.
12 A. No.
13 Q. And no meaning no you never did withhold
14 information from her?
15 A. Right.
16 Q. And would you agree any time you received
17 information about the company, meaning Widen
18 Enterprises or Windy Waters, you would share it
19 with her?
20     MR. SYLVAN: Objection to the extent it
21 mischaracterizes his testimony.
22     MR. DOAN: Join.
23 A. It would be available to her, yes.
24 Q. When we were together last, you testified that
25 there were, there were occasions that you asked

Page 142

1 for income and profit information of Windy Waters
2 or Widen Enterprises and was told no, that you
3 could not have that information.  I want to
4 revisit that conversation.
5     I, I believe you testified that was while
6 you were employed at Widen Enterprises.
7     MR. SYLVAN: Object to the --
8 Q. Is that your understanding?
9     MR. SYLVAN: Objection to the extent it
10 mischaracterizes his prior testimony.
11     MR. DOAN: I'll join.
12 A. What's your question?
13 Q. I'm happy -- I certainly don't want to
14 misrepresent anything.  I'm just trying to
15 understand what you were saying before.  I believe
16 you said that you had asked for income and profit
17 information about either Windy Waters or Widen
18 Enterprises and that Mike Kiesler refused to
19 provide that information to you.  Is that what
20 your testimony is?
21     MR. SYLVAN: Same objection.
22     MR. DOAN: Join.
23 A. I -- hmmm.  There was never a time where I or
24 Stacy could just sit down and talk to someone at
25 Widen about how good the company is doing or is

Page 143

1 not doing.  That just never happened.  If I needed
2 stuff for doing taxes or for the bank, evidently
3 they would, they would give it to me.  I know I
4 would always get enough to do the taxes.  I don't
5 remember this with the bank stuff, but it's right
6 here in an email so --
7 Q. Did you ever ask to sit down and have a
8 conversation with, we'll start with Mike Kiesler,
9 about how the company was doing?
10 A. I probably would have talked to Reed.
11 Q. Do you have a memory of talking to Reed and asking
12 for this, to have a sit-down conversation about
13 how the company was doing?
14 A. No.  I do remember Stacy trying to find out at
15 times, though.
16 Q. Okay.  Tell me about that.
17 A. Just that she would ask to see how the company is
18 doing.
19 Q. Did you hear her ask this of anyone?
20 A. Yeah.
21 Q. Who was, who was she asking?
22 A. I think Reed was on the other end of the phone.
23 Q. So it was a phone call that you observed?
24 A. Yes.
25 Q. Are you thinking of one occasion or multiple?

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 144

1 A.  I, I don't remember.

2 Q.  Is there a, is there a phone call that you are

3      recalling as you're giving this testimony?

4 A.  No.

5 Q.  Okay.  Do you have a memory of any occasion where

6      this occurred?

7      MR. SYLVAN: Objection.  Form.

8 A.  I would say that more than once over the years

9      that I heard her ask.

10 Q.  Is there anything more specific than over the

11      years that you can say about the timing of when

12      you recall these conversations occurring?

13 A.  No.

14 Q.  Okay.  Do you know whether it was before or after

15      2020?

16 A.  No, I don't.

17 Q.  Do you recall any specific questions that you

18      heard Stacy Randall ask about Widen Enterprises or

19      Windy Waters?

20      MR. SYLVAN: Objection.  Form.

21 A.  I don't remember.

22 Q.  Do you recall more generally what, what you

23      understood her to be asking for when you heard her

24      on a phone call with someone --

25      MR. SYLVAN: Same objection.

Page 145

1 Q.  -- about Windy Waters or Widen Enterprises?

2 A.  I don't remember.  And I would just assume she was

3      trying to find out how the company was doing.

4 Q.  What's the basis for that assumption?

5 A.  Well, it's her company, too.  She should know

6      what's going on, and that didn't always happen.

7 Q.  Okay.  What did, what, if anything, did she say

8      that would give some impression to you that she

9      was asking for financial information about Windy

10      Waters or Widen Enterprises?

11      MR. SYLVAN: I'll object to the extent

12      it's calling for communications that are

13      privileged by the marital privilege.

14      MR. DOAN: I'll join.

15 Q.  I want to know what she said to the person she was

16      talking to on the phone and not to you.  So I'm

17      asking, what did you hear her say to somebody on a

18      phone call that made you think she was asking for

19      financial information of Windy Waters or Widen

20      Enterprises?

21 A.  When she's asking about the business and how

22      they're doing, that leads me to believe that she's

23      asking to find out about the companies.

24 Q.  So was the question, is how are the businesses

25      doing, that you heard her ask somebody?

Page 146

1 A.  That sounds pretty good.

2 Q.  Okay.  Did you hear the other end of the phone

3      call to know what the person said in response?

4 A.  No, I don't know.

5 Q.  So it wasn't on speaker phone or something?

6 A.  No.

7 Q.  It's just you heard Stacy's side only?

8 A.  Right.

9 Q.  Okay.  And do you know, do you know from any

10      reason what, what that person responded when, if

11      and when she asked how the business was doing?

12      MR. SYLVAN: I'll object to the extent it

13      requires a disclosure of marital privileged

14      communications.

15      MR. DOAN: I'll join that objection.

16 A.  I, I don't remember.

17 Q.  Other than asking the question, how are the

18      businesses doing, is there any other question that

19      you heard Stacy ask someone about Windy Waters or

20      Widen Enterprises?

21 A.  I'm sure there was, but I, like I said, that's a

22      long time ago, I don't really remember.

23 Q.  There's nothing you can point to that would, that

24      would, no example you could give of any question

25      you heard her ask?

Page 147

1 A.  No.  Since 1999 my health has went down, and I

2      pretty much had to concentrate on getting my

3      health better, so everything's kind of a blur

4      since 1999 or 2000, whatever you want to say.

5 Q.  Okay.  Are you telling me that you don't have

6      memories between 1999 and the present day?

7 A.  I have memories.  It's just not --

8      MR. SYLVAN: Objection, objection to the

9      extent it mischaracterizes his testimony.

10 A.  It's just as strong as I'd like it to be.

11 Q.  And I can appreciate and understand that.  I'm

12      just asking you to do your best of what you can

13      recall.

14      So I think my question was something like

15      are there any other questions that Stacy Randall

16      asked, and if you don't remember any, that's okay,

17      I just want to know is there anything else that

18      you can remember Stacy Randall asking about

19      Windy Waters or Widen Enterprises at any time on

20      the phone call you overheard.

21 A.  I, I don't remember.

22 Q.  Now, going back to you asking for profit and

23      income information about the companies and being

24      denied it.  Do you remember that testimony from

25      last time?

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 148

1       MR. SYLVAN: Objection to the extent it
2   mischaracterizes his prior testimony.
3 Q.   Was there an occasion when you asked for a profit
4    and loss, or, I'm sorry, profit or income
5    information about Widen Enterprises and Windy
6    Waters that you can recall specifically?
7 A.   I know it was always very tough for them to give
8    out information on the companies.
9       MS. WITTENBERG: Can you read my question
10   back, please, Janet.
11       (Question read)
12 A.   I don't remember.
13 Q.   So, so there's not a certain occasion you can
14    remember right now; right?
15 A.   I don't remember.
16 Q.   Do you recall whether, any occasion where you
17    asked for information and were denied it was in
18    writing?
19       MR. SYLVAN: Objection. Form.
20 A.   I don't remember.
21 Q.   We talked generally about stock transactions
22    between Stacy and Windy Waters, times that she
23    sold stock back to the company. Do you recall
24    that, generally talking about that last time?
25 A.   Yeah.

---

Page 149

1 Q.   I'm going to go through some dates here, and I'm
2    going to ask if you recall specifically those
3    transactions occurring. Okay.
4       Do you recall in June 2005 approximately
5    that Stacy redeemed some shares of Windy Waters
6    and received money?
7       MR. DOAN: Objection. Foundation.
8 A.   I, I don't remember.
9 Q.   Okay. Do you recall needing or receiving $200,000
10   in 2005 --
11       MR. DOAN: Same --
12 Q.   -- related to her shares?
13       MR. DOAN: Same objection. Also object
14    to form.
15       MR. SYLVAN: I'll join.
16 A.   I really don't remember.
17 Q.   Were you aware of any need for money in 2005 and
18    need for $200,000?
19       MR. DOAN: Object to form. Vague.
20       MR. SYLVAN: Join.
21 A.   I don't remember.
22 Q.   Do you recall any, any indication of how the
23    price, the amount of money Stacy got for her stock
24    was calculated at any time?
25       MR. SYLVAN: Objection. Foundation.

---

Page 150

1    Calls for speculation and form.
2       MR. DOAN: Join.
3 A.   I was never comfortable with the amounts that she
4    would get, only because she didn't know how they
5    came up with them, the amount.
6 Q.   And you're referring to occasions when she sold
7    her stock back to Windy Waters; correct? Yes?
8 A.   When she would sell her stock, I wanted her to
9    find out how they came up with the price.
10 Q.   Did you have any conversations on her behalf with
11    anyone at Windy Waters or Widen Enterprises --
12 A.   I did not.
13 Q.   Let me -- If I have to finish just to keep the
14    record clear.
15       -- about how the price was calculated?
16       MR. DOAN: Object to form.
17       MR. SYLVAN: Join.
18 A.   I, I don't remember exactly, but I, I really don't
19    remember.
20 Q.   Do you have, I'll -- Outside of talking with Stacy
21    about the redemption, what, if anything, did you
22    learn about how much money she got from a stock
23    transaction on any occasion?
24       MR. SYLVAN: Objection. Form.
25       MR. DOAN: Same objection. Join.

---

Page 151

1 A.   I, I don't know.
2 Q.   What, if anything, did you understand about the
3    use of any formula to determine the amount of
4    money she would get when selling stock?
5       MR. SYLVAN: Objection. Foundation.
6    Calls for speculation and form.
7       MR. DOAN: Join.
8 A.   It would have been nice if we would have known how
9    that was, yeah, there was some type of formula
10   that they used, how they based it on, and any
11   information on the value would have been nice.
12 Q.   Did you ask for any information on the value?
13 A.   I think in the earlier years, yes, I was asked.
14 Q.   Who, who did you ask?
15 A.   I didn't ask, I think Stacy did.
16 Q.   Okay. You didn't ask for information on how her
17    stock would be valued?
18 A.   No.
19 Q.   Okay. And what leads you to think Stacy asked for
20    that information?
21       MR. SYLVAN: I'm going to object to the
22    extent that answering requires disclosing
23    communications that are protected by the marital
24    privilege.
25       MR. DOAN: I'll join.

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 152

```
 1  A.  Okay.
 2          MR. DOAN: Try to answer.
 3  Q.  Answer if you can.
 4          MR. DOAN: Try to answer, Steve, but do
 5      not disclose any communications --
 6  A.  I probably would have heard her trying to ask and
 7      whether a phone conversation or right to Reed or
 8      Mike Kiesler.
 9  Q.  Okay.  You say you probably would have.  Do you
10      recall an occasion when she asked how her stock
11      was valued that you overheard?
12  A.  I remember conversations over the years.  Do I
13      recall them exactly, no.
14  Q.  All right.  What do you recall from those
15      conversation?
16  A.  That she questioned how they came up with the
17      amount.
18  Q.  These are phone calls you overheard?
19  A.  Could have been a phone call, could have been
20      right in person, right next to her.  I don't
21      know.
22  Q.  Okay.  We'll start with the phone calls then.
23      Are there any phone calls that come to mind that
24      you're imagining recalling in your head where she
25      asked how the price was calculated?
```

Page 153

```
 1          MR. DOAN: I'm just going to object to
 2      form on imagining.
 3          MR. SYLVAN: I'm going to object to the
 4      extent answering --
 5  A.  Imagining?
 6          MR. SYLVAN: If you just -- Sorry, I'm
 7      going a little slow on my objections, but I'm
 8      going to object to the extent answering that
 9      question requires disclosing marital privileged
10      communications.
11  A.  So I don't need to answer it?
12  Q.  I'll try again.
13          There was a phone call, if I'm
14      understanding your testimony, there were times
15      where there were phone calls you overheard where
16      Stacy was talking on the phone to someone asking
17      how the shares that she owned in Windy Waters were
18      valued.  Am I understanding that correctly?
19          MR. SYLVAN: Same objection and form.
20  A.  I don't remember.
21  Q.  There's not any phone call that you right now can
22      recall where she asked over a phone to someone how
23      the shares in Windy Waters were calculated?
24  A.  I know in, over the years that she had tried to
25      get a finger on how they were doing all that, so,
```

Page 154

```
 1      yeah, I know she would have asked or had asked.
 2  Q.  Okay.
 3  A.  When and how, I don't remember the exact specifics
 4      of it, of it all, but I know, I know it was
 5      something that was asked.
 6  Q.  Okay.  And so I'm trying to find out specifically
 7      times that you can recall this happening.  Are
 8      there any, is there anything you can say that it
 9      would have happened, you think it happened, what
10      can you tell me about these conversations?
11          MR. SYLVAN: Objection.  Asked and
12      answered.
13  A.  You know, I can remember things being done and
14      said, but to know exactly what was done and said,
15      I mean it's hard for me to remember stuff that
16      happened last week, exactly what was said, but do
17      I know something was said, yes.
18  Q.  Okay.  And I'm trying to get at least as much as
19      you recall, and you're saying, your recollection
20      is that at some point over the years she had a
21      conversation with someone asking how her shares
22      would be valued.
23  A.  Yes.
24  Q.  Is that what you're saying?
25  A.  Yes.
```

Page 155

```
 1  Q.  Is there anything beyond that that you recall,
 2      other than the fact that it happened at some
 3      point?
 4          MR. SYLVAN: Objection.  Asked and
 5      answered, and form.
 6  A.  I don't, I don't know what, what are you looking
 7      for, what -- I'm not sure.  What are you asking?
 8  Q.  I want to know if there's anything else you recall
 9      about these conversations other than the fact that
10      she asked something that would suggest she wanted
11      to know how her shares were calculated.
12          MR. SYLVAN: Same objection.
13  A.  I remember conversations.  I don't remember the
14      total specifics of them because it's been so
15      long.
16  Q.  Do you recall who she was talking to on any
17      occasion where she asked about the value of her
18      shares?
19  A.  I know Reed, and I know she probably talked to
20      Mike Kiesler, but I'm not sure.
21  Q.  Do you recall any in-person conversations?  We
22      were talking about phone calls a little bit.
23      Do you recall any in-person conversations
24      specifically where Stacy asked somebody about the
25      value of her shares in Windy Waters?
```

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 156

1  A.  I wasn't there when she asked, but, yes, she has
2      told me --
3          MR. SYLVAN: I'm going to caution you --
4  A.  Stop.
5          MR. SYLVAN: -- to not disclose --
6  A.  I'm going to stop there.
7          MR. SYLVAN: -- communications you had in
8      private with Stacy during the marriage.
9  A.  Okay.
10 Q.  And were any of those conversations I think you
11     were alluding to, did Stacy ever tell you in the
12     presence of someone else that she had asked about
13     how the value of her shares would be calculated?
14         MR. SYLVAN: Same objection. Same
15     caution.
16 A.  I don't remember.
17 Q.  We've been going a little while here. Do you want
18     to take a little break?
19 A.  No. Go ahead.
20 Q.  Okay. Let me know any time you want to take a
21     break. Okay?
22 A.  Soon.
23 Q.  I started with a 2005 date. I'm going to march
24     through now. So 2007, do you have any
25     recollection of needing $250,000 for the family in

---

Page 157

1      2007?
2          MR. DOAN: I'm going to object to form.
3      Vague.
4          MR. SYLVAN: I'm also going to object,
5      foundation.
6          MR. DOAN: Try to, if you understand the
7      question, go ahead and answer, Steve.
8  A.  Let's see, in 2007. That's when I started out
9      with the cancer. I think I had cancer, I had
10     surgery to remove a tumor on my kidney, so I mean
11     there was not -- I remember from that area.
12 Q.  So I understand you to be saying you don't recall
13     a need for the family to get $250,000 in 2007?
14         MR. SYLVAN: Objection to the extent it
15     mischaracterizes his testimony.
16         MR. DOAN: I'll join.
17 A.  I, I don't, I don't know.
18 Q.  You don't recall?
19 A.  I don't recall.
20 Q.  Do you have memory of the family receiving
21     $250,000 in 2007 for Stacy selling some shares?
22 A.  I don't recall.
23 Q.  I'll fast forward a few years to 2011. Do you
24     have any memory of the family needing $200,000 in
25     2011?

---

Page 158

1          MR. DOAN: Object to form.
2          MR. SYLVAN: And foundation.
3  A.  I, I don't remember.
4  Q.  And do you have any recollection of receiving
5      $200,000 in 2011 from Stacy selling some shares?
6          MR. SYLVAN: Same --
7  A.  No.
8          MR. SYLVAN: Same objections.
9  A.  I don't.
10 Q.  Do you have any recollection of the family needing
11     $78,000 in 2017?
12         MR. SYLVAN: Same objections.
13         MR. DOAN: Object to form. Join.
14 A.  I don't recall.
15 Q.  Do you have any recollection of receiving $78,000
16     as a family in 2017 from Stacy selling her
17     shares?
18 A.  I don't recall.
19         MR. SYLVAN: Same objections.
20 Q.  Do you have any memories specifically of any times
21     that Stacy received money for shares?
22         MR. SYLVAN: Object to form and
23     foundation.
24         MR. DOAN: Same objection.
25 A.  Yes, I remember when, I remember she would get, I,

---

Page 159

1      I, I guess I'm not sure what was -- When she was
2      getting paid, she would get money from the company
3      in the earlier days as a stockholder without
4      selling her stocks.
5  Q.  Do I understand you to be saying that you just
6      aren't sure when you look back and think about
7      Stacy getting money because of her ownership, you
8      couldn't differentiate between whether she was
9      getting it for selling shares --
10 A.  Well --
11 Q.  -- versus other purposes?
12         MR. SYLVAN: I'll object to the extent it
13     mischaracterizes his testimony.
14 Q.  Do you need the question read back?
15 A.  Yeah, read the question back.
16         MS. WITTENBERG: Could you read it back,
17     Janet.
18         (Question read)
19         MR. SYLVAN: Same objection.
20 A.  I would know because she would tell me what was
21     going on.
22         MR. SYLVAN: I'm going to caution you --
23 A.  And that's as far as I'm going.
24         MR. SYLVAN: -- not to disclose marital
25     communications.

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 160

1 Q.  And I guess my, my question is, you're saying you
2      don't recall any stock transactions, any, any time
3      that stock was sold for money?
4 A.  No, you're saying that, I'm not.
5 Q.  Okay.  So you do recall times that she sold stock
6      for money?
7 A.  That's what I just said.
8 Q.  Okay.  Do you recall on those occasions, any
9      occasions you can recall, what the money was
10     needed for?
11 A.  No.
12          MR. SYLVAN: Objection to form.
13 Q.  Are there any occasions that you recall, do you
14     recall what the money was used for?
15 A.  No.
16 Q.  In 2019, if I recall from the discussion last
17     time, you and Stacy filed for divorce; is that
18     right?
19 A.  Yes.
20 Q.  Did you have a discussion around the time you
21     filed for divorce with her about another stock
22     redemption where she was selling some stock?
23          MR. DOAN: I'm just going to caution the
24     deponent not to answer, not to disclose any
25     communications between you and Stacy in private

Page 161

1      during your marriage.
2          MR. SYLVAN: Same objection.
3 A.  I can't answer it.
4 Q.  So I'm asking for conversations specifically after
5      the two of you filed for divorce, when you were
6      already separated, and I'm wondering if after that
7      time you had any discussions in 2019 about Stacy
8      selling her stock.
9          MR. DOAN: I'm going to, I'm going to do
10     the same instruction to the witness to the extent
11     that I don't know when the divorce was, the final
12     judgment was entered for the divorce.
13          MR. SYLVAN: I'm going to join that
14     objection.
15 A.  And I don't remember either so, when the exact
16     dates were.
17          MS. WITTENBERG: Let's take a short
18     break.  Maybe we can talk about privilege for a
19     second because I do have some thoughts on that.
20     Let's take five or ten.
21          (Break taken)
22 Q.  All right.  Before we took the break, I had asked
23     a question.  I'm going to rephrase it here now.
24     Actually, I'll back up a little bit here.
25          Does the date that you filed for divorce

Page 162

1      stick out as a marker in your mind, like a before
2      and after, you can kind of pinpoint if it was
3      before or after you filed for divorce?
4 A.  I think it, I remember it being like November or
5      December, somewhere in there, towards the end of
6      the year that we finalized it.
7 Q.  And to be clear, I wasn't actually asking --
8 A.  What year, I don't know.
9 Q.  Yeah, sorry.  I wasn't asking what the date was; I
10     have that from records.  I'm trying to know, I
11     was, I assume the date that you and Stacy filed
12     for divorce was, was a big date for you, a big
13     deal; right?
14 A.  No, I, I don't know what the date would be.
15     I guess I didn't look at it that way, but, no, I
16     don't know what the date would be for that.
17 Q.  Okay.  And I'm going to ask you to try to the best
18     of your ability to only tell me conversations that
19     occurred after you filed for divorce, okay.  So I
20     recognize that might be hard for you to do.  So
21     after the two of you filed for divorce, did you
22     have any discussions with Stacy at any point about
23     redeeming, her redeeming shares in Windy Waters?
24          MR. SYLVAN: I'm going to object to the
25     extent it requires disclosing marital

Page 163

1      communications while you were still living
2      together.
3 A.  It would, too, yeah.
4          MR. SYLVAN: Just to be clear, I'm going
5      to instruct you not to answer if it requires
6      disclosing communications you had with Stacy while
7      you were living together.
8 A.  I'm trying to think when the mediation was, if we
9      were still living together.  I don't think we
10     were, but I know when we went to mediation, we
11     talked about, we talked about her having to sell
12     all of her stock.
13          MR. SYLVAN: I'm going to object to the
14     extent that conversation --
15          THE WITNESS: Yeah.
16          MR. SYLVAN: -- occurred in private with
17     Stacy while you were living together.
18 A.  It was, okay.  I can't answer that then.
19 Q.  Are you talking about a mediation that occurred
20     during the course --
21 A.  Yes.
22 Q.  -- of divorce proceedings?
23 A.  Yes.
24 Q.  And you're saying you don't recall as you sit here
25     if you lived together or not at that point; right?

Page 164

1  A.  I'm not sure when she ended up going, moving
2      out.
3          MS. WITTENBERG: Okay.  I don't want to
4      revisit the old testimony before that.  I
5      believe -- Do you want me to go ahead and get that
6      document back out and show him the petition?
7          MR. SYLVAN: Yes.  I'm not quite sure
8      where you're going, but --
9          MS. WITTENBERG: Okay.  I only have one
10     copy because it's, I didn't plan ahead for this
11     one.
12         MR. DOAN: You can just tell me the
13     exhibit, Christa.
14         MS. WITTENBERG: Sure, Exhibit 1 for
15     his.
16  Q.  I'm sorry.  It's got a couple markings on it, but
17     this is Exhibit 1 that I'm handing you from your
18     deposition from the last time we were together.
19     And I believe on the first page, it lists
20     addresses --
21  A.  Okay.
22  Q.  -- for you and Ms. Randall.  Do you see that?
23  A.  Yeah.
24  Q.  They're different addresses; right?
25  A.  Right.

Page 165

1  Q.  And can you turn to the back page and find some
2      signatures and a date, I believe, on the back
3      page.  I think there's one more there.
4  A.  Okay.  This is April of 2019.
5  Q.  Does this refresh your recollection that you were
6      living in different locations at least as of
7      April 1st of 2019?
8  A.  Yes.
9          MR. SYLVAN: I'm going to --
10  A.  It appears that way.
11         MR. SYLVAN: I'm going to object to the
12     extent it mischaracterizes what the testimony
13     shows.
14  Q.  Okay.  So I'll, I'm just asking does this refresh
15     your memory, so would you agree that before, by
16     April 1st, 2019, you and Stacy no longer lived
17     together; is that right?
18  A.  That would appear from this document.
19  Q.  Do you have any reason to believe that document
20     would have been inaccurate in any way?
21  A.  I'm not sure when she took the lease, whether she
22     was already in it already at this point.
23  Q.  When you say when she took the lease, do you mean
24     there, the property she moved into was a rental
25     property?

Page 166

1  A.  Yes.
2  Q.  And if you were trying to verify when she obtained
3      that property, you would look at when the lease
4      started?
5  A.  I, yeah, that would tell you when she, yeah.
6          MR. DOAN: I don't know if it's cleaner
7      to have a discussion on the record about maybe if
8      you want to ask questions after April 1st, 2019.
9          MS. WITTENBERG: Yes, that is my intent,
10     only after that date.
11         MR. SYLVAN: I just want to make clear
12     the, the document uses the word resides, so I just
13     want to be sure, make clear that that is not
14     necessarily the same thing as cohabitation, so I
15     just want to put that on the record.
16         MS. WITTENBERG: Okay.  And so, again,
17     your client's position is that they were still
18     living together as of April 1st, 2019?
19         MR. SYLVAN: That is not our position.
20     Our position is what I just stated.
21         MS. WITTENBERG: Okay.  All right.
22  Q.  So then going back to the line of questioning we
23     were talking about before now that your
24     recollection was refreshed, do you recall
25     discussions during mediation during the divorce

Page 167

1      proceedings after it had been filed where you
2      talked about Stacy redeeming shares?
3          MR. DOAN: I'm going to object to be
4      form.  I don't know if you're asking him the whole
5      divorce proceedings or just mediation.
6  Q.  Sure.  Okay.  So any time after the divorce was
7      filed do you recall any discussions with Stacy
8      Randall about her selling shares in Windy
9      Waters?
10         MR. SYLVAN: I'm going to object to the
11     extent answering will require you to disclose
12     communications you had in private with Stacy while
13     you were still living together.
14  A.  Yeah, it would.
15  Q.  Is your recollection that the mediation occurred
16     before the divorce was filed?
17  A.  I'm sorry, what?
18  Q.  Is it your recollection that there was a mediation
19     before the divorce was filed?
20  A.  I, I still don't understand what --
21  Q.  Did you and Stacy with, with lawyers or with not,
22     have a mediation before you filed for divorce?
23  A.  No.
24  Q.  Okay.  So the mediation, you're thinking of the
25     mediation it seems, you recall a mediation

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 168

1    occurring; right?
2 A. Yes.
3 Q. And it was after the divorce was filed?
4 A. Yes.
5 Q. Okay. And we just established that you would
6    agree that you were not living together as of the
7    time that the divorce was filed; right?
8       MR. SYLVAN: I'm going to object to the
9    extent it mischaracterizes his prior testimony.
10 A. I don't, I don't know.
11 Q. Okay. Maybe I misunderstood.
12 A. I don't know for sure.
13 Q. Maybe I misunderstood here, but this was Exhibit 1
14    where it showed different addresses and a date of
15    April 1st, 2019.
16 A. This is actually the petition for the divorce,
17    this is --
18 Q. Don't let me tell you that. Take a look at it
19    yourself and see if you would agree with it.
20 A. Petition for, okay, okay. I don't remember the
21    timeline of all this, but I sure appears from
22    this that that would be so.
23 Q. So then, then would you agree that by the time
24    there was a mediation in the divorce, that you and
25    Stacy weren't living together; right?

Page 169

1 A. By the time of the mediation, yes.
2 Q. Then what at mediation was discussed about Stacy
3    possibly selling stock?
4       MR. DOAN: I'm just going to caution that
5    mediation is very vague. To the extent you were
6    represented by counsel during your mediation and
7    you were in breakout rooms, do not review, reveal
8    any communications between you and your attorney
9    at the time, your divorce attorney.
10       MR. SYLVAN: I'm going to have same
11    objection, and form.
12 Q. I'm going to make it a little simpler to make that
13    clearer for you. You had a mediation. Was there
14    a mediator with you as well? Do you know what a
15    mediator is?
16 A. There was a lawyer that did the mediation.
17 Q. Okay. And you had a lawyer yourself?
18 A. Yes.
19 Q. And Stacy had a lawyer?
20 A. Yes.
21 Q. Right?
22       Is there anything during the mediation
23    that you recall Stacy saying about selling shares
24    in Windy Waters?
25       MR. SYLVAN: Same objection that counsel

Page 170

1    put on the record previously.
2 A. I don't recall her saying anything.
3 Q. Is there anything that you recall Stacy's lawyer
4    saying during the course of the mediation about
5    Stacy selling shares in Windy Waters?
6       MR. SYLVAN: Same objection.
7       THE WITNESS: So do I answer that or not?
8       MR. DOAN: Answer with the caution that
9    you should not review anything that your divorce
10    attorney and you spoke about in private.
11 A. Okay. Yes.
12 Q. Okay. What did Stacy's lawyer say about Stacy
13    selling shares in Windy Waters?
14 A. She just told us that she sold shares in Windy
15    Waters.
16 Q. So after the fact, as in it was, it was something
17    that had occurred?
18 A. This was the first thing that came about at the
19    mediation.
20 Q. And to clarify, Stacy's lawyer said she had
21    redeemed shares as it had happened or that she was
22    going to?
23 A. It had happened, I believe.
24 Q. Do you recall when this mediation took place, a
25    year or a month?

Page 171

1 A. I don't remember the exact date, no, or the
2    month.
3 Q. It was aft -- before the divorce was final, I
4    assume; right?
5 A. That is correct.
6 Q. Okay. Do you recall whether it was before or
7    after you started receiving maintenance payments
8    from Ms. Randall?
9       MR. DOAN: Object to form.
10       MR. SYLVAN: And to the extent it calls
11    for a legal conclusion.
12       MR. DOAN: Join.
13       THE WITNESS: So I don't answer that?
14       MR. DOAN: You can answer if you
15    understand the question.
16 A. It seems to me, I don't remember exactly, but it
17    seems to me during mediation is when a lot of this
18    stuff was handled and came to a conclusion.
19 Q. Okay. Do you recall a time that you began
20    receiving $4,000 a month from Stacy during the
21    course of your divorce proceedings?
22       MR. SYLVAN: Objection. Form.
23       MR. DOAN: Join.
24 A. I remember getting money from Stacy during that
25    time, yes.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 172

1 Q. Do you -- Was the mediation before or after you
2   started getting $4,000 a month from Stacy?
3 A. After.
4 Q. Okay.  Going back to Stacy's lawyer's comment that
5   her shares had been sold in Windy Waters, was that
6   the first time you learned that Stacy's shares in
7   Windy Waters had been sold?
8       MR. SYLVAN: I'm going to object, form,
9   and calls for speculation.
10      MR. DOAN: Join.
11 A. Boy, I don't know.
12 Q. Okay.
13 A. I don't know.
14 Q. And other than the fact that the shares had been
15   redeemed, what else did Stacy's lawyers, if
16   anything, say about Stacy redeeming her shares?
17 A. I think I came away that she redeemed all of her
18   shares, and that was a shock to me, but especially
19   during that time of the divorce.
20 Q. Okay.  And, and it was a shock that she had
21   redeemed all of her shares as opposed to less than
22   all of them?
23 A. Right.
24 Q. That's the part that shocked you, the fact that it
25   was all of them?

Page 173

1 A. Yeah.
2 Q. Why was that a shock to you?
3 A. Normally she would get what she needed and then
4   move on. It's not, and she did not need that,
5   especially at that time of the divorce.
6 Q. Did not need what exactly?
7 A. The full amount.
8 Q. The dollar amount that she got, she didn't need
9   that much money?
10 A. Right.
11 Q. Did Stacy's lawyer tell you the dollar amount that
12   she got during mediation?
13      MR. SYLVAN: Objection.  Form.
14      MR. DOAN: Join.
15 A. Yes.
16 Q. Do you recall whether that was the first time you
17   had learned the amount that she got?
18 A. Yes.
19 Q. And it was the first time you had learned the
20   amount she got?
21 A. Yeah.
22 Q. And I think maybe I interrupted you.  Is there
23   anything else that Stacy's lawyer said about the
24   fact she had redeemed all of her shares?
25      MR. SYLVAN: Objection.  Form.

Page 174

1 A. I, I don't remember anything else.
2 Q. And I think you said that that was one of the
3   first topics for discussion at mediation; is that
4   right?
5 A. I believe so.
6 Q. Okay.  And is that because you and Stacy had to
7   figure out how that impacted your, your divorce?
8       MR. SYLVAN: Objection.  Foundation.
9       MR. DOAN: Object to form as well.
10 A. I, I don't know.
11 Q. What's your understanding of why it was discussed
12   at mediation that she had redeemed all of her
13   shares?
14      MR. DOAN: I'm just going to caution you
15   not to reveal any communications between you and
16   your divorce attorney at the time.
17      THE WITNESS: Okay.  So I shouldn't
18   answer that?
19      MR. DOAN: No, you can answer but don't
20   reveal anything that, that your divorce attorney
21   told you at the time of the divorce, during the
22   divorce proceedings.
23 A. I think one of, one of the reasons for the
24   mediation was to establish where we were going to
25   go financially, and then we were going to try to

Page 175

1   make a settlement at that mediation, also.
2 Q. Okay.  And did the mediator explain that one of
3   the things that had to be done was to figure out
4   how to divide the property that the two of you
5   owned?
6       MR. SYLVAN: Objection.  Form and
7   foundation.
8 A. I don't know if we talked about it, and I don't
9   remember for sure, but I know that we did find a
10   solution for that by the end of that mediation.
11 Q. And when you're talking about a solution, is it
12   that there was a, a settlement was reached and you
13   were able to agree upon how to divide your assets
14   at that time?
15 A. Yes.
16 Q. Okay.  Was that eventually reflected in a document
17   that became part of your divorce judgment?
18 A. I would, yes, I would think so.
19 Q. Do you recall what the agreement was reached with
20   respect to her, the money she got from redeeming
21   her shares?
22      MR. SYLVAN: Objection.  Form.  Calls for
23   speculation and foundation.
24 A. Can you say that, repeat that again.
25 Q. Sure.  What's your understanding of, of what

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 176

1  happened to the $1.3 million that Stacy got for
2  selling her shares?  Did you get some benefit of
3  that?
4      MR. DOAN: Object to form.
5      MR. SYLVAN: Compound.
6      MR. DOAN: Same, join.
7 A. You know, in my thinking right now, I don't
8  remember at the time, but in my thinking right
9  now, if I would have heard that that's all that
10  she got, I probably wouldn't have went for it.
11 Q. But you did, you did go for it, so you didn't know
12  the amount that she received?
13 A. I did not --
14      MR. DOAN: Objection.
15 A. -- go for it.
16 Q. Okay.  Understood.
17      So you understand that you didn't get a
18  portion of the money that she received from
19  redeeming her shares?
20      MR. SYLVAN: Objection.  Mischaracterizes
21  prior testimony.  Foundation.
22 A. I just figured --
23      MR. DOAN: Do you need the question read
24  back?
25      THE WITNESS: Huh?

---

Page 177

1      MR. DOAN: Do you need the question read?
2      THE WITNESS: What?
3      MR. DOAN: Do you need the question read
4  back?
5      THE WITNESS: Sure.
6      (Question read)
7      MR. DOAN: Same objections.
8 A. Yes.
9 Q. After the mediation, any time after that
10  mediation, has there been an occasion or more than
11  one when you've talked with Stacy about her
12  redeeming all of her shares?
13 A. Yes.
14 Q. Can you, can you tell me about one of those times?
15  When was the first time that you talked with Stacy
16  after the mediation about her redeeming all of her
17  shares?
18      MR. SYLVAN: I'm going to object, and
19  don't disclose communications you had while you
20  were still living with Stacy.
21      MR. DOAN: Same caution.
22 A. Well then I can't really answer that because we
23  were still married.
24 Q. After the mediation --
25 A. After the mediation.

---

Page 178

1 Q. After the mediation, was there, what was the next
2  time that you talked with Stacy about her
3  redeeming her shares?
4      MR. SYLVAN: Same objection and same
5  caution.
6 A. We were still married so --
7      MS. WITTENBERG: Are you instructing him
8  not to answer a question about a discussion after
9  mediation occurred in the divorce?
10      MR. SYLVAN: No, just while they were
11  still living together.
12 Q. So I only want to know of any conversation you had
13  after the mediation occurred, and I think counsel
14  is saying he's not telling you not to answer that
15  question, okay.  So when was the next time after
16  mediation that you spoke with Stacy about her
17  redeeming all of her shares in Windy Waters?
18 A. I don't remember the exact date, but I know it was
19  very soon after the mediation that I was asking
20  her why would she do that.
21 Q. Okay.  And what did she say?
22 A. She said she didn't have a choice, she was going
23  to get her money for her stock.  They told her she
24  had to sell all of it.
25 Q. What else did she say?

---

Page 179

1 A. I don't remember, but I do remember that.
2 Q. Is there anything else you recall about that
3  conversation?
4      MR. SYLVAN: Object to form.
5 A. I recall that both of us were upset about it.
6 Q. How could you tell that Stacy was upset?
7 A. I lived with her for 40 years.
8 Q. Was she crying?
9 A. No, she wasn't outright crying.  I think she
10  had -- I just know, I mean I just know that.
11 Q. Did she seem angry?
12 A. Huh?
13 Q. Did she seem angry?
14      MR. SYLVAN: Objection.  Form.  Calls for
15  speculation.
16 A. She wasn't happy.
17 Q. Okay.  Did you, did she say anything about the
18  reasons that she asked in the first place to sell
19  shares?
20      MR. SYLVAN: Object to form.
21      MR. DOAN: Same objection.  I'm just
22  going to clarify, we're talking after still, after
23  mediation?
24 Q. I can rephrase that if that helps.
25      So this conversation that you're thinking

---

Page 180

1    of that happened the first time after mediation,
2    did she say anything during that conversation
3    about the reasons that she sold all of her, the
4    rest of her shares in Windy Waters?
5 A.   She did not want to sell all of her shares. That
6    was the only way that they would let her get money
7    was to sell all of her shares. I don't know if
8    she wanted 50,000, a hundred thousand, but she was
9    just going to get enough for us to make it through
10    this, and so that wasn't her intentions to sell
11    all of it.
12 Q.   And those were things that she told you during
13    that conversation shortly after mediation that
14    you're thinking of?
15 A.   Yeah. And that fits right, right with how she was
16    through our entire marriage about selling all --
17       MR. DOAN: I think --
18       THE WITNESS: Okay.
19       MR. DOAN: Just answer the question --
20       THE WITNESS: Sorry.
21       MR. DOAN: -- that's pending, Steve.
22 Q.   Did you ask any questions of her during that
23    conversation? Other than you said, why did you do
24    it, anything else you asked her about it?
25 A.   I don't remember.

Page 181

1 Q.   Where were you when you had this conversation?
2 A.   Probably at home and talking to her on the
3    phone.
4 Q.   Okay. Do you recall whether it was before or
5    after your divorce was finalized?
6 A.   I think it was before.
7 Q.   And I think you said you were both upset during
8    this conversation. Why were you upset? What,
9    what made you feel upset about it?
10 A.   Two things that upset me were that they made her
11    sell all of it, and the second thing was how much
12    it was. It was a joke to me.
13 Q.   Well, take those part by part. So that they made
14    her sell it all. During that conversation, did
15    Stacy tell you who made her sell it all?
16 A.   I don't remember.
17 Q.   Did Stacy report anything that, any of the details
18    of conversations she had with people at Windy
19    Waters about this stock sale?
20 A.   Seems --
21       MR. SYLVAN: Objection. Form.
22 A.   Seems to me Reed's name was mentioned, and Michael
23    Kiesler's names was mentioned.
24 Q.   But nothing specific you remember that you can
25    remember about --

Page 182

1 A.   I can't remember, no. I was just pretty --
2 Q.   Okay.
3 A.   -- upset.
4 Q.   And then you also mentioned you thought how much
5    it was, how much she got seemed like a joke.
6 A.   Yes.
7 Q.   Why did you think that?
8 A.   Well, the little that I know, it just seems to me,
9    and stuff I read it said through the years, that
10    the company was worth a lot more than what, than
11    what she ended up with.
12 Q.   Okay. Is there anything specific that comes to
13    mind as something that Reed had said that made you
14    think the company was worth a lot?
15 A.   I remember years and years ago that Reed threw out
16    like 50 million, 60 million, something like that,
17    years ago about the value of the company. So if
18    that was the value of the company being sold, then
19    1.3 million that Stacy received was just, just
20    wasn't right.
21 Q.   Do you remember -- Well, when Reed mentioned the
22    value being 50 million, is that a conversation
23    between just you and Reed, or was anyone else
24    around?
25 A.   I don't know who all was there. I remember it was

Page 183

1    up north.
2 Q.   Was it up north at the family cottage?
3 A.   Yes.
4 Q.   Was your wife with you at the time, Stacy?
5       MR. SYLVAN: Objection. Form.
6 A.   She was in the cottage, and me and Reed, I don't
7    know, maybe the guys all went out or something.
8 Q.   Do you recall whether you were, where you were at
9    the time, what you were doing?
10       MR. SYLVAN: Objection. Form.
11 A.   No, I don't.
12 Q.   And am I understanding right that you don't know
13    one way or the other if Stacy was among the people
14    who was around when he said that?
15       MR. SYLVAN: Objection. Mischaracterizes
16    his prior testimony.
17       MR. DOAN: Join.
18 A.   No, I said that it was probably just the guys.
19 Q.   So you remember that she was, she was not around?
20       MR. DOAN: Object to form.
21       MR. SYLVAN: Object to form.
22 A.   I don't remember.
23 Q.   When you referred to just the guys, who would that
24    be?
25 A.   I don't know. I don't know. Could be my sons.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 184

1  Could be Reed's son.

2  Q.  Other than recalling that he used the number

3  50 million in reference to the value of the

4  company, do you remember anything else that Reed

5  said during that conversation about giving an

6  indication of the value of Windy Waters or Widen

7  Enterprises?

8  MR. SYLVAN: Objection. Mischaracterizes

9  prior testimony. I believe he said 50 to

10  60 million.

11  MR. DOAN: So compound.

12  A.  It was, I mean that was a lot of years ago, too,

13  so --

14  MS. WITTENBERG: Could you read my

15  question back, Janet.

16  (Question read)

17  MR. SYLVAN: Same objection and it

18  further mischaracterizes his prior testimony.

19  A.  I, I don't know how to answer that.

20  Q.  And to address counsel's objection, so Reed, your

21  memory was that Reed said the company was worth

22  50 to 60 million during this conversation?

23  A.  Yes.

24  Q.  Is that right?

25  A.  I remember that.

---

Page 185

1  Q.  And you said it was a number of years ago, but you

2  don't know when it was specifically?

3  A.  No, I don't. I do remember it's quite a few years

4  ago.

5  Q.  Was it before you and Stacy filed for divorce?

6  A.  Oh, yeah, way before that.

7  Q.  Okay. Was it while you were living in Florida?

8  A.  I don't, I don't remember the timeline. It was a

9  ten-year period. It could have been before that.

10  I don't, I'm not sure. I don't know.

11  Q.  Were there any other occasions besides the one you

12  just told me about where Reed has given you an

13  indication of the value of Widen Enterprises or

14  Windy Waters?

15  MR. SYLVAN: Objection. Form.

16  MR. DOAN: Join.

17  A.  I, I think he had mentioned it on and off just

18  every now and then.

19  Q.  Is there ever a time that you can remember that

20  Reed gave you an indication of the value of Windy

21  Waters or Widen Enterprises when Stacy was also

22  part of the conversation?

23  MR. DOAN: Object to form.

24  MR. SYLVAN: Join.

25  A.  I don't remember.

---

Page 186

1  Q.  How many times approximately do you recall Reed

2  talking to you about generally how the companies

3  were doing?

4  MR. DOAN: Object to form.

5  MR. SYLVAN: Object to form.

6  A.  I, I'm not sure. I wouldn't know that exactly.

7  Q.  And I think you said this occurred frequently; did

8  I hear that right?

9  MR. SYLVAN: Objection. I believe that

10  mischaracterizes his testimony.

11  MR. DOAN: Join. I think the transcript

12  will say on and off.

13  A.  I don't, I didn't say frequently. I'm not sure

14  how many times that he had talked about the

15  condition of the company.

16  Q.  Okay. And if I get the -- I'm not taking notes

17  the whole time here, so if I get something wrong

18  that you said, please just go ahead and tell me.

19  I didn't mean to put words in your mouth there.

20  But is there something you could say to describe

21  the frequency that Reed would give, would tell you

22  things about how Windy Waters or Widen Enterprises

23  was doing?

24  MR. SYLVAN: Objection. Form. Asked and

25  answered.

---

Page 187

1  MR. DOAN: Join.

2  A.  I, I don't know. It just, it was just

3  conversation that would go on through the years,

4  on and off. I --

5  Q.  Okay.

6  A.  It was not a lot of information, but sometimes it

7  kind of gave me a little idea what condition the

8  company was in.

9  Q.  Okay. Other than conversations with Reed, is

10  there anything else that led you to form a belief

11  that the amount that Stacy got for redeeming her

12  shares was low?

13  MR. DOAN: Object to form.

14  MR. SYLVAN: I'm mostly going to object

15  to the extent answering requires you to disclose

16  communications you had with Stacy while you were

17  married, living together, and instruct you not to

18  disclose communications.

19  A.  I --

20  MR. DOAN: Go ahead and try to answer,

21  Steve, without disclosing --

22  A.  I don't know how to answer that.

23  Q.  Okay. I can try and phrase it a little bit

24  differently to maybe knock out of one of the

25  objections, make it little simpler.

---

Case: 3:22-cv-00400-jdp  Document #: 100  Filed: 11/09/23  Page 18 of 48

Stacy L. Randall v                                                    Steven Randall - Vol. II
Reed C. Widen, et al.                                                     November 6, 2023

Page 188

1     Other than discussions with Reed and
2  other than discussions with Stacy, is there
3  anything that caused you to form a belief about
4  Stacy's, the amount that she got for her shares to
5  be low?
6     MR. SYLVAN: Objection to form, and I
7  will give you the same instructions and caution.
8  A. As I said, years ago Reed had told me 50 to
9  60 million that he felt the company was worth, and
10  I knew it had to be worth a hell of a lot more
11  than that in today's world, and if you just figure
12  out percentage-wise what he thought it was worth
13  way back when, and it's got to be worth more today
14  than it was then, it just, it's a no-brainer to
15  think that something is not right.
16  Q. And we were, kind of circling back now, we were
17  talking about a conversation soon after mediation
18  between you and Stacy, so I'm going to jump
19  forward in time a little bit. I think you
20  mentioned that you talked with her more than once
21  about her having redeemed her shares, so I'm going
22  to ask you for the next time that you can recall
23  talking with Stacy about her having redeemed her
24  shares.
25     MR. SYLVAN: Objection. I believe that

Page 189

1  mischaracterizes his testimony.
2  A. I don't, I don't remember.
3  Q. Sitting here now, is there any other conversation
4  you can recall having with Stacy following
5  mediation to the present about her redeeming her
6  shares?
7  A. To the present?
8  Q. Right.
9  A. I, I don't really recall.
10  Q. You don't, as you're sitting here, you don't
11  recall any other times you've talked with Stacy
12  about --
13  A. No, I, I recall talking to her, but I don't recall
14  what the conversations were.
15  Q. Okay. And, and to be clear, you're saying you
16  think there were times that you --
17  A. Yes.
18  Q. -- talked -- Let me finish just for a clear
19  record. I know what you mean, I think, but I want
20  to make sure that the transcript shows it, too.
21     You think that there were times after
22  that first conversation following mediation when
23  you did talk with her about her redeeming her
24  shares, but you don't recall specifically when
25  those were; is that right?

Page 190

1     MR. SYLVAN: Objection. That
2  mischaracterizes his testimony. I did not
3  understand that to be what he was saying.
4  Q. Well, you tell me. I just want to know what
5  you're saying.
6  A. What, what am I saying? I'm saying she got
7  ripped off, period. I mean that's just all it is.
8  I mean how -- You're asking me all -- Anyway.
9  Q. Okay. Do you want to take a little break?
10     MR. DOAN: He might need a break.
11     MS. WITTENBERG: Let's take five, ten
12  minutes or so.
13     (Break taken)
14  Q. Before the break, Mr. Randall, we were talking
15  about discussions you had with Stacy following
16  your mediation and your divorce about Stacy having
17  redeemed all of her shares in Windy Waters and
18  Widen Enterprises. I want to know if there is any
19  other conversation that you, sitting here, can
20  recall in your mind occurring after that first one
21  that we talked about.
22     MR. SYLVAN: Object to form.
23  A. Yes, I'm sure there was times we talked after
24  that, but I don't remember when or what.
25  Q. Okay. Do you right now sitting here know the date

Page 191

1  when Stacy redeemed the rest of her shares in
2  Windy Waters?
3  A. It was right before the mediation.
4  Q. Okay. I'll represent to you it was May 13, 2020,
5  and I'm assuming counsel will agree with me that's
6  sort of the date in time that this occurred. Do
7  you recall whether you had any discussions with
8  Ms. Randall on or before that date, before she
9  actually went through with redeeming all of her
10  shares, about her redeeming all of her shares?
11     MR. SYLVAN: I'm going to object and
12  caution you not to disclose any communications you
13  had with Stacy while you were married and living
14  together.
15     MR. DOAN: Same instruction. So if you
16  need the question read back, just --
17     THE WITNESS: Do I need to answer it?
18     MR. DOAN: You should answer but try not
19  to disclose any information, conversation you had
20  with Stacy during the time you were married.
21     THE WITNESS: Okay.
22  Q. I can rephrase it a different way that might help
23  with this, so is there any conversation that you
24  recall having with Ms. Randall between May of 2019
25  and May of 2020 about her redeeming shares in

Page 192

1    Windy Waters?
2        MR. SYLVAN: Object to form.
3  A. About her redeeming them or about them, about the
4    redemption that she made; what are you asking?
5  Q. Before it was done, so the reason I picked that
6    May 13th date just for your context is that's when
7    it, that's when it occurred, okay.  So I want to
8    know before she actually redeemed the rest of her
9    shares and in the year leading up to it, did you
10   have any discussions with her about her redeeming
11   the rest of her shares?
12       MR. SYLVAN: Objection.  Vague as to
13   time.
14 A. Not that I remember.
15       (Exhibits 13 and 14 marked for
16   identification)
17 A. Is this the same thing?
18 Q. They're different documents.  You've been handed
19   two exhibits; there's Exhibit 13 and Exhibit 14.
20   They may be useful to look at side by side.  And,
21   unfortunately, this is the best copies that I
22   have, so I apologize in advance for the incredible
23   fuzziness on this.
24       Let's start with Exhibit 13.  Do you see
25   your name in the middle of the first page,

Page 193

1    Steven T. Randall?
2  A. Yes.
3        MR. SYLVAN: I'm going to object to
4    foundation.  The quality of this, of both these
5    exhibits is very poor so I just want to put that
6    on the record.
7  Q. Understood.
8        Turn to the last page of Exhibit 13.  Do
9    you see a signature on it?
10 A. Yes.
11 Q. Does it appear to be your signature?
12 A. This is, it's pretty hard to read this because of
13   the poor quality.
14 Q. Understood, and I agree it is, it is hard to read,
15   but looking at this, do you think it looks like
16   your signature or not?
17       MR. SYLVAN: Objection.  Foundation.
18 Q. You've seen your signature many times, I assume,
19   Mr. Randall?
20 A. You know --
21       MR. DOAN: Just focus on, her question
22   is, do you recognize your signature or not.  Just
23   answer that.
24 A. It's very poor, but, yeah, it looks like my
25   signature.

Page 194

1  Q. Okay.  And do you see a date there listed as
2    May 13th, 2020?
3  A. Yes.
4  Q. Okay.  And turn back to the front page again.
5    In the bottom section there, it looks like there's
6    an address written of 611 or maybe 1116?
7  A. Avocet Ridge Drive.
8  Q. Is that an address you recognize?
9  A. Yes.
10 Q. I think we talked last time this was a property
11   you and/or Stacy Randall owned either individually
12   or through an entity?
13       MR. SYLVAN: Objection to the extent that
14   it mischaracterizes prior testimony.
15       MR. DOAN: Same objection.
16 A. Do I answer that or not?
17 Q. Yes, you answer.
18       MR. DOAN: You can answer if you
19   understood the question.
20 A. Can you read me back the question.
21 Q. Sure.  I'll try a different way here.
22       The address you see listed here, this
23   Avocet Ridge Drive address, does that correspond
24   to a property that you or Stacy or both of you
25   owned individually or through an entity?

Page 195

1        MR. DOAN: I'm going to object.
2    Compound.
3        MR. SYLVAN: And object, vague as to time
4    and foundation.
5  A. You know, by looking at the forms here, I would
6    say, yeah, it would be me and Stacy.
7  Q. And I guess I'm not really too concerned about
8    which of you or who owned it necessarily.  I just,
9    it's a property that you were affiliated with at
10   some point in time; right?
11 A. It appears, yes.
12 Q. Okay.  And just, if I can actually, is it 6116
13   Avocet Ridge, or is it a different number, if you
14   remember?
15       MR. DOAN: Same.
16 A. Yeah.
17 Q. And 6116 Avocet Ridge, is that a property that the
18   two of you ever lived at?
19 A. No.
20 Q. Was it a rental property that one or both of you
21   own?
22       MR. SYLVAN: Objection.  Asked and
23   answered in the prior session.
24       MR. DOAN: Compound.  Objection.
25   Compound.

Page 196

1       THE WITNESS: So do I answer that?
2       MR. DOAN: Yes, go ahead if you
3   understood the question.
4 A.  Yes, yes.
5 Q.  Okay.  Do you, again, not looking at the documents
6   necessarily, just from memory, do you recall how
7   long you owned that property, roughly?
8 A.  No, I don't.
9 Q.  Okay.  Do you, outside of seeing these documents,
10   do you recall whether or not you owned them the
11   time you were, around the time you were going
12   through divorce proceedings?
13       MR. SYLVAN: Objection.  Vague as to
14   time.
15 A.  I, I don't know.
16 Q.  Do you remember having owned this property even
17   after you moved away from Florida?
18       MR. SYLVAN: Same objection.
19 A.  Yes.
20 Q.  It seemed like most of the Florida properties were
21   sold while you were still living in Florida; is
22   that accurate?
23       MR. SYLVAN: Objection.  Mischaracterizes
24   prior testimony, and foundation.
25       MR. DOAN: Join.

Page 197

1 A.  I don't know that to be true or not.
2 Q.  Okay.  And around the time that you were going
3   through the divorce proceedings did you own more
4   than one Florida property?
5       MR. DOAN: Object to form.
6       MR. SYLVAN: Calls for a legal
7   conclusion.
8 A.  I have no idea.
9 Q.  Do you have a recollection of there being one last
10   Florida property at some point in time that you
11   still owned?
12       MR. DOAN: Object to form.
13 A.  No, I don't remember.
14 Q.  Okay.  Now, looking at this document, do you --
15   Take a look at it the best that you can and tell
16   me if there's anything that you see on this that
17   reminds you of whether or not you owned this
18   property in May of 2020.
19       MR. SYLVAN: I'm going to object to
20   foundation, the same issues with the quality of
21   this exhibit.
22       MR. DOAN: I'll join.  Are you asking him
23   to look at both the documents?
24 Q.  I'm sorry.  Just 13.  Take a look at Exhibit 13
25   and see if there's anything in there that would

Page 198

1   indicate to you and remind you whether or not you
2   owned the property on Avocet Ridge Drive in 2020.
3       MR. SYLVAN: I'm going to object to form,
4   and calls for a legal conclusion.
5 A.  It appears that, that we owned it in 2020.
6 Q.  Can you tell from looking at this form what, what
7   the form was for?
8 A.  I can't really read it to what it says on the top
9   there.  It seems Mortgage, and then there's a,
10   might be Assistance Application.
11 Q.  That's how I read it, too.  Do you have memory of
12   filling out a Mortgage Assistance Application in
13   2020?
14 A.  Whenever this is, yeah, that's what it says.
15 Q.  And what was the purpose of completing a Mortgage
16   Assistance Application in May of 2020?
17       MR. DOAN: I'm just going to object to
18   form.
19       To the extent that you remember.
20 A.  I guess I don't remember exactly why.
21 Q.  Was there a mortgage on this Avocet Ridge Drive
22   property that you owned?
23       MR. SYLVAN: Objection.  Vague as to
24   time.
25 A.  Yes.

Page 199

1 Q.  Did there come a time when you and/or Stacy were
2   finding it difficult to make payments on the
3   mortgage?
4 A.  Yes.
5       MR. SYLVAN: Objection.  Form.
6 Q.  Did you or Stacy or both of you ask the lender to
7   assist with the mortgage on the property?
8 A.  It appears that we did.
9 Q.  Okay.  Do you remember doing that?
10 A.  I remember, yeah, I remember doing that, yeah.
11 Q.  And so let me back up.
12       The, there were mortgage payments for, to
13   pay for the mortgage on this Avocet Ridge Drive
14   Florida address; right?
15 A.  Yeah.
16 Q.  Okay.  Who was making those payments, if you
17   recall?  Was it you or Stacy?
18 A.  Me.
19 Q.  Did the lender -- Do you recall who the lender was
20   for this mortgage?
21       MR. DOAN: Go off your memory.
22 A.  No.
23 Q.  Do you recall whether there was a lender in
24   Florida for this property?
25       MR. SYLVAN: Objection.  Form.

Page 200

1 A. I don't remember.

2 Q. And so with the mortgage payments that you were
3    paying, am I understanding right that you were at
4    a point having a hard time making those
5    payments?

6 A. That's correct.

7 Q. And did you then ask the lender to make an
8    adjustment to the mortgage?

9 A. I don't know if we asked them for an adjustment.
10    I just know that we asked them if there was any
11    help to give us to help rectify this situation.

12 Q. Okay. And is that the purpose of the form that we
13    looked at that was Exhibit 13 was to ask if there
14    was anything that the bank could do to provide
15    assistance with the mortgage?

16 A. I --

17        MR. DOAN: Objection to the extent it
18    calls for a legal conclusion. I also will say the
19    document speaks for itself.

20        MR. SYLVAN: Join.

21 A. I believe we talked to them, and they suggested
22    that we fill this out.

23 Q. Do you recall the name of any individual that you
24    were speaking with?

25 A. No.

Page 201

1 Q. But it was someone on behalf of the lending
2    institution, the lender?

3        MR. DOAN: Object to form.

4 A. It was -- What are you asking?

5 Q. I wanted to know who you were having conversations
6    with about when you were, when you were told you
7    should try this form.

8 A. Somebody at the lender.

9 Q. Okay. Did, do you recall what happened after you
10    submitted this form? Did you get the assistance
11    you needed?

12        MR. DOAN: Objection. Compound.

13 A. Not exactly, no.

14 Q. Do you remember there being a short sale for this
15    property after this application was submitted?

16        MR. SYLVAN: Objection. Form.

17 A. Yes.

18 Q. Okay. Do you understand what a short sale is?

19 A. Yes.

20 Q. Can you describe in your words what you understand
21    it to be?

22 A. You sell the property without getting enough to
23    pay off the mortgage.

24 Q. Okay. And in that instance, the lender gets less
25    than what they were owed on the mortgage; right?

Page 202

1 A. That is correct.

2 Q. Do you -- Was there -- So on this property, this
3    Avocet Ridge Drive property, eventually it
4    resulted in a short sale; is that right?

5 A. That's what you're telling me.

6 Q. I don't want to know what, I'm asking what you
7    remember. Do you remember that the Avocet Ridge
8    Drive property that you and/or Stacy or the both
9    of you owned eventually turned into a short sale?

10 A. I believe that's true.

11 Q. Okay. Was there any mortgage assistance offered
12    or provided by the lender before it got to a short
13    sale point?

14        MR. DOAN: Object to form.

15        MR. SYLVAN: Join.

16 A. I, I don't remember.

17 Q. Do you have a memory of how much money was owed on
18    the mortgage?

19        MR. SYLVAN: Objection. Vague as to
20    time.

21        MR. DOAN: Join.

22 A. No.

23 Q. Okay. Do you recall how much was owed on the
24    mortgage at the time of the short sale?

25 A. No, I don't remember.

Page 203

1 Q. Do you have any memory of how much the difference
2    was between what the amount was that was owed on
3    the mortgage and how much the property sold for?

4 A. No.

5        MR. SYLVAN: Objection. Asked and
6    answered.

7        MR. DOAN: I'm going to join in that
8    objection.

9 A. No, I don't.

10 Q. Did you understand this form to be, Exhibit 13
11    that we talked about, to be related to the short
12    sale?

13        MR. DOAN: Object to form.

14        MR. SYLVAN: Join. And foundation.

15 A. I see real estate agents signed it at the bottom
16    here, so I assume at that point we were trying to
17    sell it.

18 Q. So does that indicate to you that the form may
19    have been related to the possibility of a short
20    sale?

21        MR. DOAN: Same objections.

22        MR. SYLVAN: Join.

23 A. I don't remember but probably.

24 Q. Did you have a fax machine at your home in May
25    2020?

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 204

1         MR. DOAN: I'm going to object to form.
2 A.  A fax machine.  I have no idea how long we had a
3     fax machine.
4 Q.  Okay.  Do you have one now?
5 A.  No.
6 Q.  Okay.  All right.  If you look at the other
7     exhibit here, Exhibit 14, would you agree that
8     this is the same form but different names on it?
9         MR. SYLVAN: Objection to the extent that
10    it mischaracterizes the two exhibits.
11        MR. DOAN: I'll join.  Could I get the
12    question again, please.
13        (Question read)
14        MR. SYLVAN: Same objection, and it does
15    misrepresent the two exhibits in comparison.
16        MS. WITTENBERG: So you're telling me you
17    think these are different forms?
18        MR. SYLVAN: No.
19 Q.  Okay.  Mr. Randall, would you agree that the
20    documents Exhibit 13 and Exhibit 14, except for
21    the information filled in on them, are the same
22    form?
23 A.  You know --
24        MR. DOAN: I'm going to object to the
25    extent the documents speak for themselves.

---

Page 205

1         MR. SYLVAN: Join.
2         MR. DOAN: He's a layperson.  You can
3     continue, but I don't --
4         MS. WITTENBERG: If we could just all
5     agree that we're looking at the two.  That's what
6     I'm trying to get at here, they're two same
7     forms.
8         MR. SYLVAN: You said except for the
9     names, and I don't see that as the case.  There's
10    different content.
11 Q.  Is the content that's not filled in, Mr. Randall,
12    you're looking at documents that are the same
13    template document from someone that you and
14    Ms. Randall filled in on Exhibit 13 and
15    Exhibit 14; right?
16        MR. DOAN: I'm going to state the same
17    objection.  I don't know that it's been
18    established that he filled them out or that he
19    remembers filling them out.
20 A.  I, I'm lost.  What are you asking?
21 Q.  Okay.  Well, we actually can start there.  That's
22    a good point.  Exhibit 13, is that your
23    handwriting on Exhibit 13?
24 A.  Yes.
25 Q.  Okay.  Do you remember filling out this form or at

---

Page 206

1     all?
2 A.  I don't remember it, no.
3 Q.  Okay.  But you would say it does look like your
4     handwriting?
5 A.  Yes.
6 Q.  Then turn to Exhibit 13 -- I'm sorry, 14.  It
7     lists the same address in that bottom box of the
8     6116 Avocet Ridge Drive; right?
9 A.  Yeah.
10 Q.  Is that your handwriting?
11        MR. SYLVAN: Objection.  Foundation.
12 A.  I, I don't know.
13 Q.  Okay.
14 A.  I don't think so, but I don't know.
15 Q.  Why don't we turn a couple pages in on Exhibit 14.
16    So it has some -- I'm sorry, go to page 3 of it.
17    There you go.  It has some boxes with the, a zero
18    on it.  Is that how you, is that your handwriting?
19 A.  I --
20        MR. SYLVAN: Objection.
21 A.  I don't know.
22        MR. SYLVAN: Calls for speculation.
23 A.  I have no idea.
24        MR. SYLVAN: Foundation.
25 Q.  Let's turn to the last page of Exhibit 14.  Do you

---

Page 207

1     see a signature and date at the bottom?
2 A.  Yes.
3 Q.  Okay.  Is that your signature?
4 A.  I would say not.
5 Q.  Is it Stacy Randall's signature?
6 A.  It could be.
7 Q.  Okay.  Does it look like her signature?
8 A.  It does.
9 Q.  And, again, the date here is May 13th, 2020; you
10    see that?
11 A.  I do see that.
12 Q.  Were you, do you, have you seen this document, had
13    you seen this document as signed by Ms. Randall,
14    if you recall?
15        MR. SYLVAN: Objection.
16        MR. DOAN: I object to form.
17        MR. SYLVAN: Join.
18 Q.  Prior to today.
19 A.  I don't remember.
20 Q.  Do you have any memory of meeting with Ms. Randall
21    on May 13th, 2020, in relation to these documents?
22 A.  I don't remember.
23 Q.  You said the mortgage was paid by you.  Did you
24    ask Ms. Randall to complete this form?  I'm
25    talking about Exhibit 14.

---

Page 208

1   A.   We were working with Tammy Brewster, a real estate
2        agent, so I really don't know who asked who
3        what.
4   Q.   Okay.  Did you fill out Ms. Randall's form,
5        Exhibit --
6   A.   It doesn't appear that I did.
7   Q.   -- 14?
8            MR. DOAN: Let her finish the question.
9   Q.   From looking at it, can you tell who did fill out
10       Exhibit 14?
11           MR. SYLVAN: I'm going to object.
12       Foundation.  The exhibit's quality, same issue.
13           MR. DOAN: I'm also going to object as
14       speculation.  I think he testified he doesn't
15       recognize his handwriting or least doesn't know on
16       Exhibit 14.  So to the extent you're asking
17       questions on who could it be on Exhibit 14, I
18       think that's speculation.
19   Q.   Okay.  Answer if you can.
20   A.   That's probably correct.
21           MR. DOAN: No.  Can we read back the
22       question.
23       Steven, listen to the question.
24           (Question read)
25   A.   No.

Page 209

1            MR. DOAN: Do you need a break?  Are you
2        okay?
3            THE WITNESS: M-hm.
4            MS. WITTENBERG: I am about to change
5        gears.  Should we take a quick break here and
6        evaluate how much more we can do today?
7            THE WITNESS: I'm okay.
8            MR. DOAN: You want a break, you're
9        saying?
10           MS. WITTENBERG: I don't need one.  I'm
11       just happy to.  We'll go ahead then.
12   Q.   Mr. Randall, I think you've established you're
13       familiar with Stacy Randall's signature; right?
14   A.   Yes.
15   Q.   You watched her sign her name before?
16   A.   I, yes.
17   Q.   Many times?
18           MR. SYLVAN: Objection.  Form.
19           MR. DOAN: Join.
20   A.   Yes.
21   Q.   Have you seen her sign checks before?
22   A.   Have I seen her do it, no.
23   Q.   Have you seen checks that you know she has signed
24       with her signature on it?
25   A.   I, I don't know.

Page 210

1   Q.   And you've seen deeds that the two of you signed;
2        right?
3   A.   Yes.
4   Q.   On occasions that you have seen her sign a
5        document, did, was it her practice to review the
6        document before signing it?
7            MR. SYLVAN: Objection.  Calls for
8        speculation.
9            MR. DOAN: I'm going to join.
10   A.   I think, I think when --
11           MR. DOAN: Can we get the question, can
12       we have the question read back.
13           (Question read)
14   A.   Yes.
15   Q.   And by review, I want to make sure I'm specific
16       enough.  Was it Ms. Randall's practice to read a
17       document before signing it?
18           MR. DOAN: Same objections.
19           MR. SYLVAN: Join.
20   A.   Yeah, I think we both would go over it.
21   Q.   Did Ms. Randall ever ask you to sign anything on
22       her behalf?
23           MR. SYLVAN: I'm going to object.  Don't
24       disclose conversations you had with Stacy while
25       you were married in private with her.

Page 211

1   A.   Okay.  I, I don't know.
2   Q.   Okay.  Have you ever signed Stacy's signature on
3        her behalf?
4   A.   Over 40 years, you know, she told me to sign
5        something, I probably would have done it.
6   Q.   Do you recall any specific instances where you did
7        sign Stacy's signature on, not her signing, but
8        you signing her name on a document?
9   A.   Not on a document, no.
10   Q.   Okay.  Have you signed her name on something else?
11           MR. SYLVAN: I'm going to object.  I just
12       want to be clear, are you asking with her consent
13       or --
14           MS. WITTENBERG: Either way.
15   A.   I, I don't know, I don't know.  I just may have
16       over a 40-year period at some time put her
17       signature down that she wanted me to do.  I don't
18       know.
19   Q.   Okay.
20   A.   But I would never do that on anything like
21       documents like this.
22   Q.   And by that, you mean documents like Exhibit
23       No. 14; right?
24   A.   Right.
25   Q.   And that leads you to believe that that would have

Page 212

1  been her signature and not you signing on her
2  behalf on Exhibit 14; right?
3        MR. DOAN: I'm just going to object to
4  form.
5        MR. SYLVAN: And mischaracterizes his
6  testimony.
7  A.  I, I would not do that.
8  Q.  And I think what you're saying is that, you're
9  saying it's theoretically possible you could have
10  signed her name at some point in the course of
11  your marriage, you just don't recall any occasion
12  when you would have signed --
13  A.  No, I don't.
14  Q.  -- her name?
15        Okay.  And I know we have talked about
16  you being familiar with her signature.  Do you
17  remember there being a time that she shortened her
18  signature, made it just the letters S and L as
19  opposed to writing Stacy Lee out?
20        MR. SYLVAN: Objection.  Form and
21  foundation.  Calls for speculation.
22        MR. DOAN: Join.  Can we read back the
23  question.
24        (Question read)
25  A.  Yes, I remember her doing that.

Page 213

1  Q.  Did you sometimes have to sign documents related
2  to Windy Waters or Widen Enterprises?
3        MR. DOAN: Object to form.
4        MR. SYLVAN: Join.
5  A.  I don't really remember.
6        (Exhibit 15 marked for identification)
7  Q.  Mr. Randall, you've been handed a document that's
8  been marked as Exhibit 15, and you can flip
9  through it if you'd like.  I'm going to eventually
10  ask you to turn to the third to last page, which
11  has Windy0033128 on the bottom.
12        Are you looking at a page that has your
13  name on it?
14  A.  I am.
15  Q.  And is that your signature above the line where it
16  says Steven Randall?
17  A.  It appears to be.
18  Q.  Do you have any recollection now looking at this
19  of signing this document?
20  A.  March 1992.
21        MR. DOAN: Just --
22  A.  I, I don't remember.
23  Q.  Okay.  Looking at the front of it, it looks like
24  it's a Shareholder Agreement of Widen
25  Colourgraphics, L.T.D. on the first page.

Page 214

1  A.  What's that?
2  Q.  On the first page, it looks like this is a
3  Shareholder Agreement of Widen Colourgraphics,
4  L.T.D.
5  A.  Okay.  Okay.  Shareholder Agreement.
6  Q.  Now, does this refresh your memory as to whether
7  or not you were ever asked to sign documents
8  related to Widen Enterprises or Windy Waters?
9        MR. SYLVAN: Objection.  Foundation.
10  A.  Like I said, I did not remember, but that
11  definitely is my signature.
12  Q.  Okay.  I'll also ask you to turn to page 18 of
13  this document.
14        MR. DOAN: So this one.  Not Bates.
15  Q.  I'm sorry, also, okay, yeah, 18 of the document,
16  which has the Bates number WINDY0033123.  Okay.
17  Do you see a bunch of signatures on that page?
18  A.  I do.
19  Q.  Do you see a signature for Stacy Widen Randall?
20  A.  I do.
21  Q.  This is an example of a time when her signature
22  was a full spelled out signature instead of just
23  some letters?
24        MR. SYLVAN: Objection.  Form.
25  A.  I'm not an analyst, but it looks like her

Page 215

1  signature.
2  Q.  Okay.  Do you remember ever being asked to sign
3  documents by Mark Widen?
4        MR. DOAN: I'm going to object to form.
5  A.  That was so far back I, I really, I, I do
6  remember, though, and if it's money you sign
7  something, you just signed it.
8  Q.  So you do remember there were times that you were
9  asked to sign documents by Mark Widen?
10  A.  I didn't remember signing this, but I'm just
11  saying that when Stacy would sign something or
12  we'd be over at the house, that just put your
13  signature on, you don't read it, you don't do
14  anything, you just put your signature on.
15  Q.  Okay.
16  A.  And that's probably what I ended up doing here.
17  Q.  So there were times where you were asked to sign a
18  document by Mark Widen?
19  A.  Evidently, because here's a signed document by
20  me.
21  Q.  Okay.  Do you think this document was something
22  that Mark Widen asked you to sign?
23        MR. DOAN: Objection.  Asked and
24  answered.
25  A.  It appears that way.

---

Page 216

1 Q. And you mentioned that, okay, you think you didn't
2     read it before you signed it?
3         MR. SYLVAN: Objection. Mischaracterizes
4     his prior testimony.
5         MR. DOAN: Join.
6         THE WITNESS: Do I answer it or not?
7         MR. DOAN: Go ahead and answer it if you
8     understand the question. So can you read --
9 A.  I don't really know if I was given a chance to
10    read it over.
11 Q. So there were times that you would sign documents
12    without reading them?
13 A.  I don't remember signing anything so I don't know
14    how I could answer whether there was times, so I
15    can't answer that.
16 Q. Is it your practice to sign documents without
17    having read them?
18 A.  No, it is not mine.
19 Q. Okay.
20 A.  But that seems to be -- Okay.
21 Q. Would you have ever signed a document without
22    reading it first?
23        MR. SYLVAN: Objection. Form.
24        MR. DOAN: Join.
25 A.  I don't remember.

---

Page 217

1 Q. Okay. And I'm kind of unpacking something you
2     said in this testimony here that you think there
3     were times that Stacy was asked to sign something
4     when you were present; is that right?
5 A.  That's right.
6 Q. Are you referring to the occasions at Mark Widen's
7     home?
8 A.  Yeah, mark Widen's home.
9 Q. Are you recalling a specific instance when --
10 A.  No, I can't recall any. I mean this, you're
11    talking, this is 1992.
12 Q. Right.
13 A.  This is way back.
14 Q. Okay. And I think you said that there were times
15    that she was asked to sign a document that you
16    observed where she was told she needed to sign it
17    without reading it?
18        MR. SYLVAN: Objection.
19 Q. Is that right?
20        MR. SYLVAN: I'm sorry. Objection to the
21    extent that mischaracterizes his prior testimony.
22        MR. DOAN: Join.
23        THE WITNESS: Do I answer that?
24        MR. DOAN: Yes, but let's read it back so
25    you understand the question.

---

Page 218

1         (Question read)
2 A.  Yes.
3 Q. Okay. And this was an occasion at Mark Widen's
4     home?
5 A.  Probably.
6 Q. Was it at a Sunday dinner at their home?
7 A.  Yeah.
8 Q. Okay. Who else was present?
9 A.  I don't know. The whole family.
10 Q. The Widen family?
11 A.  Yes.
12 Q. And who told her that she could not review the
13    document before signing it?
14        MR. DOAN: Objection.
15        MR. SYLVAN: Objection. Form. And to
16    the extent it mischaracterizes his prior
17    testimony.
18        MR. DOAN: Join.
19 A.  I don't know who said what, but I just know it was
20    a practice of when Mark Widen wanted something
21    signed, he'd just throw it in front of you and
22    say, sign it.
23 Q. And by throw it in front of you, do you mean the
24    document in its entirety?
25        MR. SYLVAN: Objection. Form.

---

Page 219

1 A.  I think everything was there, yes.
2 Q. And the occasion you're thinking of when Stacy was
3     asked to sign something but was told she couldn't
4     read it, are you saying she was handed the whole
5     document?
6         MR. SYLVAN: Objection.
7 A.  You know, I really don't know. You're talking
8     about way back when.
9 Q. Okay. What do you recall from the occasion when
10    she was asked to sign something?
11 A.  I just recall when she was asked to sign
12    something, that wasn't allowed for her to read
13    through it.
14        MR. SYLVAN: I'm going to object to
15    you're referring to a specific occasion, and I
16    don't believe that reflects his testimony.
17 Q. Is there a specific occasion you can recall when
18    Stacy was asked to sign something but told she
19    could not read it?
20 A.  It was so far back I just, I, I mean this was
21    back, way back when. And, yes, I do remember that
22    her dad saying, well, I've already read through
23    it, I made this form, it's all okay, you need to
24    sign it.
25 Q. Okay. And then handing it to her and asking her

---

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 220

1    to sign it?
2  A.  And have her sign it, yeah.
3  Q.  Is there a time limit given before she had to
4     complete signing it?
5        MR. SYLVAN: Objection. Form. Calls for
6     speculation.
7  A.  Right now.
8  Q.  Did he say that she had to sign it on the spot?
9  A.  Pretty much.
10  Q.  Did Stacy ever say, no, I want to read the
11     document?
12        MR. SYLVAN: Objection. Calls for
13     speculation.
14  A.  I, I don't know, I don't know how to answer
15     that.
16  Q.  Well, to the best of your recollection, was there
17     ever a time that Stacy objected and said, no, I
18     don't want to sign it, I want to read it first?
19        MR. SYLVAN: Same objection.
20  A.  I cannot imagine her doing that because it would
21     really upset everything.
22  Q.  What do you mean by really upset everything?
23  A.  Somebody would get pissed because they, they
24     weren't getting what they wanted right away.
25  Q.  By someone, are you referring to Mark Widen?

Page 221

1  A.  M-hm.
2  Q.  Other than in the context of Mark Widen asking for
3     signatures, have you ever observed somebody else
4     asking Stacy Randall to sign something without
5     letting her at it?
6        MR. SYLVAN: Objection. Form.
7  A.  It was carried on the same way with Reed.
8  Q.  Are there occasions -- Well, let's go back. Why
9     don't you read back my last question.
10     (Question read)
11        MR. SYLVAN: Same objection.
12  A.  After Mark passed away, it was carried on the same
13     way with Reed.
14  Q.  Okay. I'll try again.
15        Have you observed a time that someone
16     other than Mark Widen asked Stacy to sign
17     something and told her she could not look at it?
18        MR. SYLVAN: Objection. Calls for
19     speculation.
20  A.  I, I really don't remember.
21  Q.  Okay. Do you recall any time that Stacy Randall
22     was asked to sign something in your presence but
23     not given the whole document?
24        MR. SYLVAN: Objection. Form. And calls
25     for speculation.

Page 222

1  A.  I was not with her all the time.
2  Q.  Sure. I'm only asking what times.
3  A.  When she went to work to sign something, I was not
4     there.
5  Q.  Sure. Understood. I want to know times you were
6     with Stacy when someone asked her to sign
7     something related to Windy Waters or Widen
8     Enterprises that she was told she could not look
9     at the document by someone other than Mark Widen,
10     did that ever occur that you can recall?
11        MR. SYLVAN: Objection. Form.
12  A.  I, I --
13        MR. SYLVAN: It calls for --
14  A.  I really don't remember.
15        MR. DOAN: Same objection.
16        MR. SYLVAN: Calls for speculation.
17  A.  Like I said, you're talking about years and years
18     ago.
19  Q.  I think the answer is that, no, you don't recall a
20     time that someone other than Mark Widen asked
21     Stacy to sign something while you were there and
22     didn't let her look at the document?
23        MR. SYLVAN: Objection. Mischaracterizes
24     his testimony.
25  A.  I don't know. I, I know what was expected of her,

Page 223

1     and that's all I can say. I mean she was expected
2     just to sign it.
3  Q.  Okay. Again, I'm --
4  A.  I'm sure she felt the same way.
5  Q.  Okay. Is there an instance that you can think of
6     that you can recall when someone other than Mark
7     Widen while you were with her asked her to sign
8     something and said, you can't look at the rest of
9     the document?
10        MR. SYLVAN: Objection. Form. Asked and
11     answered.
12  A.  I, I have no idea. I have no idea. I know there
13     was times when Mike Kiesler would have stuff for
14     her to sign, and I don't think there was, I don't
15     think she was given the time to read through it.
16  Q.  You're talking about times that you were with her
17     and Mike Kiesler?
18  A.  No, I wasn't with her --
19  Q.  Okay.
20  A.  -- but I --
21        MR. SYLVAN: I'm going to, I'm going to
22     caution you not to disclose --
23        THE WITNESS: Okay.
24        MR. SYLVAN: -- disclose communications
25     you had with her while you were married.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 224

1 A.  Okay.

2 Q.  So, again, I'm trying to understand if there's any

3     occasion that you can think of that you were with

4     Stacy where you observed someone other than Mark

5     Widen asking her to sign a document related to the

6     business, Widen Enterprises or Windy Waters, and

7     not letting her see the document.

8         MR. SYLVAN: Objection to form.

9 A.  I can't answer that.

10 Q. I do need you to answer it.  There's a time you

11    can recall or not.

12 A. I feel there was maybe a couple times with Mike

13    Kiesler that she did not have time to read the

14    document before she signed it.

15 Q. Okay.  And in those --

16 A. That, that I would have been in front of at the

17    time.  What was said to bring it to the point, I'm

18    not sure.

19 Q. Okay.  On those occasions, you're saying, I think

20    what you said is you don't recall if Mike Kiesler

21    said, you can't look at the whole document; right?

22        MR. SYLVAN: Objection.  Mischaracterizes

23    his testimony.

24        MR. DOAN: Have it read back.  Pay

25    attention to the question and then answer it.

---

Page 225

1         (Question read)

2         MR. SYLVAN: Same objection.

3 A. I, I, I don't know exactly what was said.  I don't

4    remember.

5 Q. Okay.  And on the occasions you're thinking of

6    when Mike Kiesler asked Stacy to sign something,

7    are you thinking she was not given enough time to

8    read the document?

9 A. That is correct.

10 Q. Okay.  Do you recall on those occasions what type

11    of document Stacy was signing?

12 A. No.

13        MR. SYLVAN: Objection.  Calls for a

14    legal conclusion.

15 Q. Do you recall where this took place?

16 A. At the company.

17 Q. At the Widen Enterprises or Windy Waters office?

18 A. (Witness indicating).

19 Q. Yes?

20 A. Yes.

21 Q. Did, on those occasions, did Mike Kiesler set a

22    time limit on how long Stacy would have before she

23    would complete --

24        MR. DOAN: I'm going to --

25        THE COURT REPORTER: Before she would

---

Page 226

1     what?

2 Q.  Complete her signature.

3         MR. DOAN: I'm going to do objection,

4     asked and answered.

5         MR. SYLVAN: I'm going to join and calls

6     for speculation.

7         MR. DOAN: I think his testimony is he

8     doesn't really remember so, but --

9 A.  And I don't.

10 Q. What gave you the impression that she was not

11    allowed to read the document?

12        MR. SYLVAN: I'm going to caution you not

13    to disclose communications you had with Stacy --

14 A. Okay.

15        MR. SYLVAN: -- in private when you were

16    married.

17 A. Okay.  So that would have been --

18        MR. DOAN: Can you read the back

19    question.

20        (Question read)

21        MR. DOAN: So other than your

22    conversation with Stacy during your marriage, the

23    question.

24 A. Just what she's told me what.

25        MR. SYLVAN: I'm going to, I'm going to

---

Page 227

1     caution you same caution, same objection.

2         THE WITNESS: Okay.

3 Q. From the conversation you observed between Mike

4    and Stacy, what gave you the impression that Stacy

5    was not going to be allowed to read the document

6    she was asked to sign?

7 A. Just what I saw.  I mean just, you know, sign

8    here.

9 Q. She was handed --

10 A. That was about it.  That was about it.

11 Q. So he was pointing to where she should sign --

12 A. Yeah.

13 Q. -- the document?

14        But was handed the whole document?

15        MR. SYLVAN: Objection.

16    Mischaracterizes.

17 A. I don't remember.

18        MR. SYLVAN: Calls for speculation.

19 A. I don't remember.

20        MS. WITTENBERG: Okay.  Let's take a

21    short break here.

22        (Break taken)

23 Q. All right.  We were talking before about documents

24    related to the business that you and Stacy were

25    asked to sign.  I showed you an example of the

---

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 28 of 48

Stacy L. Randall v                                                    Steven Randall - Vol. II
Reed C. Widen, et al.                                                        November 6, 2023

Page 228

1    Shareholder Agreement, which was Exhibit 15. It's
2    not tied to this particular document, but I'm
3    wondering if there's ever a time that you were
4    asked to sign something for Widen Enterprises or
5    Windy Waters that had a place for you to sign and
6    a place for Stacy to sign?
7  A. Don't remember.
8  Q. At all, any time that you were asked to sign
9    anything that had a signature spot for you and a
10   signature spot for Stacy?
11 A. Don't remember.
12 Q. Okay.
13          (Exhibit 16 marked for identification)
14 Q. Okay. You've been handed what's been marked
15   Exhibit 16, and I will ask you to turn to the
16   third page, which has Windy0002070 at the bottom.
17   Do you see a bunch of signatures on that page?
18 A. I do.
19 Q. Do you see a signature for yourself on that
20   page?
21 A. I do.
22 Q. And do you see a signature for Stacy on that
23   page?
24 A. I do.
25 Q. It looks like it's dated January 1st of 1998; is

Page 229

1    that right?
2  A. Yeah.
3  Q. Okay. If you don't recall, I'm, it's okay, but I
4    want to know if you remember signing this
5    document --
6  A. No.
7  Q. -- in 1998.
8          MR. SYLVAN: Objection. Asked and
9    answered.
10 A. No.
11 Q. Okay. Do you recall an occasion where you were
12   handed a document with signature lines like this,
13   that looks like this for the business that Stacy
14   hadn't already signed but you were asked to sign?
15         MR. SYLVAN: Objection. Form.
16         MR. DOAN: Join.
17 A. Don't remember.
18 Q. Okay. On this occasion, do you have any
19   recollection of this occasion at all when you
20   signed this document?
21         MR. DOAN: Objection. Asked and
22   answered.
23         MR. SYLVAN: And form.
24 A. No.
25 Q. Okay.

Page 230

1          (Exhibit 17 marked for identification)
2  Q. You've been handed Exhibit 17. I will ask you to
3    turn to the second to last page of the document.
4    It has WINDY0001346 at the bottom. Okay. Do you
5    see your name on that page?
6  A. I do.
7  Q. And do you see a signature on a signature line for
8    Steven Randall?
9  A. I do.
10 Q. Is that your signature?
11 A. I don't know.
12 Q. Does it look like your signature?
13         MR. SYLVAN: Objection. Form.
14 A. I, I don't know.
15 Q. What's calling you to question whether or not it's
16   your signature?
17         MR. DOAN: I'm just going to object to
18   form.
19 A. It's a pretty messy signature. I don't know.
20 Q. I think last time you testified that in 2007, you
21   had cancer surgery, if I recall?
22 A. Yes.
23 Q. Did that impact how you signed your name in any
24   way?
25         MR. SYLVAN: Objection.

Page 231

1          MR. DOAN: Objection.
2          MR. SYLVAN: Calls for an expert
3    opinion.
4  A. I don't, don't remember.
5  Q. Okay. Let's turn to -- I guess one more question
6    on this page. Do you have any recollection of
7    having signed this document?
8          MR. DOAN: She's asking --
9  Q. Sorry.
10         MR. DOAN: -- still this page, do you
11   have a recollection signing this document?
12 A. No, I don't.
13 Q. Okay. Then if you could turn two, three pages up,
14   which has pages Windy0001343. Okay. And do you
15   seeing signatures on this page?
16         MR. SYLVAN: I'm sorry. What page again?
17         MS. WITTENBERG: 1343.
18 A. Okay.
19 Q. Do you see signatures for Stacy Randall on those,
20   on this page?
21         MR. SYLVAN: Objection to form.
22 A. Yes.
23 Q. And those appear to be her signature?
24         MR. SYLVAN: Objection. Form. Calls for
25   speculation.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 232

1       MR. DOAN: Join.

2 A.  Can you repeat that. I didn't hear what you

3     said.

4 Q.  Sure. Those signatures above the lines where it

5     says, Stacy Widen Randall, those appear to be her

6     signature?

7       MR. SYLVAN: Objection to form and calls

8     for speculation.

9       MR. DOAN: Same objection.

10 A.  It appears to be.

11 Q.  I'm going to one more one here.

12      (Exhibit 18 marked for identification).

13 Q.  And you've been handed now Exhibit 18. I'm going

14     to ask you to turn to the last page. Do you see

15     your name on this page?

16 A.  Yeah.

17 Q.  Do you recognize, do you know what DocuSign is?

18 A.  Yeah.

19 Q.  Okay. Do you recall there being a time around

20     January 8th, 2013, that you DocuSigned a document

21     related to Widen Enterprises or Windy Waters?

22       MR. SYLVAN: Objection. Form.

23       MR. DOAN: Join.

24 A.  Don't remember.

25 Q.  You can put that one aside, too.

Page 233

1       MR. SYLVAN: Was that Exhibit 18?

2       MR. DOAN: 18.

3       THE COURT REPORTER: That was 18.

4       MR. SYLVAN: Thanks.

5 Q.  Are you aware that Ms. Randall had a signature

6     stamp that was made at one point in time for her

7     signature?

8 A.  Yes.

9 Q.  Okay. Were you with her when she had it made?

10 A.  No.

11 Q.  Have you seen it?

12       MR. SYLVAN: Objection. Form. Vague as

13     to time.

14 A.  I, I think I've seen it.

15 Q.  Okay. Have you ever spoken with Stacy about it?

16       MR. SYLVAN: I'm going to instruct you

17     not to answer to the extent answering would

18     disclose communications you had with Stacy during

19     your marriage.

20 A.  So I don't answer that?

21 Q.  We'll start by asking any time after April 1st of

22     2019, after you filed for divorce, was there any

23     occasion you spoke with Stacy about her signature

24     stamp?

25       MR. SYLVAN: I'm going to object. Same

Page 234

1     caution with respect to when you were still living

2     together.

3 A.  I don't remember anyways.

4 Q.  Then I will ask the question and give counsel a

5     chance to consider the privilege objection because

6     I believe it's been waived.

7       My question will still be then any time

8     ever that you have spoken with Stacy about her

9     signature stamp. And I can show the part where

10     she testified about it and let you decide if you

11     want to instruct him not to answer.

12       MR. SYLVAN: Sure.

13 Q.  So one moment, Mr. Randall.

14       MS. WITTENBERG: It's page 196. And I

15     can reask the question.

16       MR. SYLVAN: Let me just take a look at

17     it.

18      (Discussion off the record)

19 Q.  Was there ever a time, Mr. Randall, that you have

20     spoken with Stacy Randall about the signature

21     stamp that she had made?

22       MR. SYLVAN: I'm going to object and

23     instruct you not to answer with respect to

24     disclosing communications you would have had with

25     Stacy while were you married --

Page 235

1       THE WITNESS: Okay.

2       MR. SYLVAN: -- and living together.

3 Q.  So, now, I have a few follow-up questions -- Are

4     you going to accept that instruction?

5 A.  Yes.

6       MS. WITTENBERG: Okay. And this is the

7     basis of marital communications privilege; right,

8     Counsel?

9       MR. SYLVAN: Correct.

10      MS. WITTENBERG: And do you know the

11     answer to the question that I asked, Mr. Randall?

12      MR. DOAN: Do you know the answer without

13     revealing the communication?

14      MS. WITTENBERG: Correct.

15      MR. DOAN: So listen to her question

16     again.

17 Q.  The question, I'll just make this a little simpler

18     for our court reporter having to repeat it back.

19     I'm asking you about conversations you had with

20     Stacy Randall about her signature stamp, and the

21     instruction is to not answer anything that would

22     reveal a communication while you were married and

23     living together. Is there a conversation that you

24     can think of, that you recall that would come in

25     that category of a conversation while you were

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 236

1   married on this topic?

2 A.  Yes.

3 Q.  Okay.  And if you hadn't been instructed not to

4   answer, you would have given me information about

5   that conversation?

6       MR. DOAN: I'm just going to object to

7   the extent it calls for a legal conclusion.  He

8   has to answer if there's no privilege.

9 Q.  Would you have answered if not for the instruction

10   by counsel to not give that answer?

11 A.  I probably would have, yeah.

12       THE COURT REPORTER: Wouldn't or would?

13       THE WITNESS: Would.

14       THE COURT REPORTER: Thank you.

15 Q.  Did anyone else overhear the conversation you're

16   thinking of?

17 A.  Don't remember.

18 Q.  And did the two of you intend for the conversation

19   to remain confidential?

20 A.  Yes.

21       MR. SYLVAN: I'm going to, I'm going to

22   instruct you --

23 Q.  I don't want to know what it is, I just want to

24   know enough to know if it's privileged or not.

25       Did Stacy ever tell anyone, as far as you

Page 237

1   know, the contents of that conversation?

2       MR. SYLVAN: Objection.  Calls for

3   speculation.

4 A.  Yeah, I don't know.

5       MR. SYLVAN: And I'm going to caution you

6   not to reveal communications you had with Stacy

7   during your marriage in private.

8 Q.  Did you ever hear Stacy talk with anyone else

9   about her signature stamp?

10       MR. SYLVAN: Object to form.

11       MR. DOAN: Join.

12 A.  I don't remember.

13 Q.  Did you ever see or hear Stacy give her approval

14   to use a signature stamp?

15       MR. DOAN: Objection.  Compound.

16 A.  No.

17 Q.  Did you ever speak with Mike Kiesler about Stacy's

18   signature stamp?

19       MR. SYLVAN: Object to form.

20 A.  No.

21 Q.  Did you ever speak with Reed Widen about Stacy's

22   signature stamp?

23       MR. SYLVAN: Object to form.

24 A.  I don't remember.

25 Q.  Have you ever used Stacy's signature stamp?

Page 238

1 A.  I don't think so.  I really don't remember.

2 Q.  You're aware that Stacy used to work for Widen

3   Enterprises; right?

4 A.  Yes.

5 Q.  Is there any other job that you know of that Stacy

6   has held for any employer, other than Widen

7   Enterprises?

8 A.  Yes.

9 Q.  Okay.  On what occasions?

10 A.  She worked at, in retail.

11 Q.  Do you recall approximately when that was?

12 A.  Well, it was when the kids were growing up.  She

13   worked at a -- because she could buy them nice

14   clothes and stuff like that.

15 Q.  Was it before you moved to Florida?

16 A.  Yes.

17 Q.  Okay.  That was about in year 2000; is that right?

18 A.  Would have been before that, I think.

19 Q.  When you moved to Florida, was it around the year

20   2000?

21       MR. SYLVAN: I'm going to object.

22 Q.  Or, I'm sorry, before?

23 A.  Yes.

24 Q.  Just for a clear record, so you recall that Stacy

25   has had employment outside of Widen Enterprises,

Page 239

1   and it was before moving to Florida; right?

2 A.  Yes.

3 Q.  Is there any time after the two of you moved to

4   Florida that Stacy has had a job with anyone other

5   than Widen Enterprises?

6 A.  I, no, I don't, no, no, I would say no.

7 Q.  Do you recall times when the two of you in the

8   presence of Justin Randall, your son, would talk

9   about or complain about not getting money from

10   Windy Waters or Widen Enterprises?

11       MR. SYLVAN: I'm going to caution you not

12   to disclose communications you had with Stacy

13   during your marriage in private.

14 Q.  And I'm only asking right now about the

15   conversations you had with your son present

16   complaining or talking about not receiving --

17 A.  I really don't remember.

18 Q.  -- money from Windy Waters or Widen Enterprises.

19 A.  I really don't.

20 Q.  Okay.  Now, I'm not talking about the contents of

21   any conversations, but were there times when you

22   thought it unfair that Stacy was not receiving

23   money from the companies?

24       MR. SYLVAN: Objection.  Form.

25       MR. DOAN: Join.

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

Page 240

1 A.  Yeah, I think she should have been paid out money,
2      yeah.
3 Q.  And are those things that you complained about in
4      the presence of anyone other than your wife alone?
5           MR. SYLVAN: I'm going to caution you not
6      to reveal communications you had with Stacy in
7      private during your marriage.
8 A.  I don't remember.
9 Q.  How would you describe Mark Widen's personality?
10          MR. SYLVAN: Objection.  Form.
11          MR. DOAN: Join.
12 A.  I, I, I don't know.  I've never thought about his
13      personality.
14 Q.  Well, if you can think about it now, how would you
15      describe his personality?
16          MR. DOAN: Same objection.
17          MR. SYLVAN: Join.
18 A.  Strong willed.
19 Q.  Were you afraid of him?
20          MR. SYLVAN: Objection.
21          MR. DOAN: Object to form.
22          MR. SYLVAN: Join.
23 A.  I'm normally not afraid of anybody.
24 Q.  And how would you describe Reed Widen's
25      personality?

Page 241

1           MR. DOAN: Same objection.
2           MR. SYLVAN: Join.
3 A.  I don't know how I'd describe it.
4 Q.  How would you describe Mike Kiesler's personality?
5           MR. DOAN: Same objection.
6           MR. SYLVAN: Join.
7 A.  I, I really don't know how to describe his
8      personality.
9 Q.  Let's go back to Reed.  Are you, are you afraid of
10      Reed Widen?
11          MR. DOAN: Object to form.
12          MR. SYLVAN: Join.
13          MR. DOAN: Also asked and answered.
14      I think he said he's not afraid of anybody.
15 A.  Right.
16 Q.  Okay.  So you're not afraid of Reed Widen then;
17      right?
18 A.  I'm not afraid of anybody.
19 Q.  Are you afraid of Mike Kiesler?
20 A.  I'm not --
21          MR. DOAN: Same objection.
22          MR. SYLVAN: Asked and answered.
23 A.  I'm not afraid of anybody.
24 Q.  Do you know Matthew Gonnering?
25 A.  No.

Page 242

1           MR. SYLVAN: I'm going to object to form
2      on that question as well.
3 Q.  Does Stacy have memory problems?
4           MR. SYLVAN: Objection.
5           MR. DOAN: Object to form.
6           MR. SYLVAN: Calls for speculation and
7      expert opinion.
8           MR. DOAN: I'll join that.
9 A.  I don't think so.
10 Q.  Now, thinking back before you and Stacy were
11      married, I assume there was a time that the two of
12      you were dating but not married?
13 A.  (Witness indicating).
14 Q.  Is that a yes?
15 A.  Yes.
16 Q.  Okay.  Did you have discussions with Stacy before
17      the two of you were married about the family
18      business?
19 A.  I would say no.
20 Q.  Before the two of you got married, did you know
21      that her family owned a business?
22          MR. SYLVAN: Object to form and calls for
23      a legal conclusion.
24 A.  I really don't remember what I was thinking at the
25      time.

Page 243

1 Q.  Okay.
2 A.  Whether they did or not, I don't know.
3 Q.  Did you ask Mark Widen for permission to marry his
4      daughter?
5 A.  I did.
6 Q.  Did that conversation include any discussion about
7      the family business?
8 A.  Did not.
9 Q.  I assume he said yes?
10 A.  He was pretending he was having a heart attack.  I
11      thought he was going to hit me, but he just was
12      padding his chest.
13 Q.  And there were times that you attended Sunday
14      dinners at the Widen family; is that right?
15 A.  Yes.
16 Q.  Do I understand right that those were routine
17      occurrences?
18 A.  Yes.
19 Q.  And it was expected that the family would all
20      attend?
21 A.  Yes.
22 Q.  Do you recall when you started going; was it
23      before you were married?
24 A.  I don't remember.
25 Q.  How would you describe --

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 244

1 A. Yes, yes, I do remember because I remember they
2     made me wash dishes.
3 Q. So this was before, before the two of you were
4     married --
5 A. Before we were married.
6 Q. -- your job was to wash dishes?
7 A. We were engaged.
8 Q. Okay.
9 A. They were just playing with me, but --
10 Q. All right. How would you describe these dinners?
11         MR. DOAN: Object to form.
12         MR. SYLVAN: Join.
13 A. I, I don't know. I can't describe them.
14 Q. Were they pleasant?
15         MR. DOAN: Object to form.
16         MR. SYLVAN: Join.
17 A. Sometimes.
18 Q. Were, was business discussed during these
19     dinners?
20         MR. DOAN: Object to form.
21         MR. SYLVAN: Join.
22 A. I don't remember.
23 Q. Okay. Besides just generally, do you remember
24     there being times business was discussed, or are
25     you saying you don't remember that ever

---

Page 245

1     happening?
2         MR. DOAN: Object to form.
3 A. I just don't remember, but I'm sure it, it could
4     have, but I don't remember.
5 Q. Do you remember any occasion when Mark Widen
6     pounded the table?
7         MR. DOAN: Object to form. It calls for
8     speculation.
9 A. More than once.
10 Q. Can you tell me what, if you recall, what caused
11     Mark Widen to pound the table?
12         MR. DOAN: I'm going to object to form to
13     the extent that I think his answer is more than
14     once so I don't know --
15 Q. Sure. On any occasion, do you recall what
16     caused --
17 A. Don't remember.
18 Q. What was your reaction when that happened?
19 A. I didn't need to be there at that time, so I
20     probably got up and went in the other room.
21 Q. And the pounding the table, was that out of
22     anger?
23         MR. DOAN: Object to form.
24         MR. SYLVAN: Join. Calls for
25     speculation.

---

Page 246

1 A. Yeah, I don't know.
2 Q. Okay. I'm trying to imagine a scenario where that
3     would make sense in context. Was, was, do you
4     recall anything that was said right before Mark
5     Widen pounded the table?
6 A. You're talking so many years ago, I don't really
7     remember.
8 Q. Okay. Do you recall anything else about an
9     occasion when Mark Widen pounded the table other
10     than the fact that it occurred?
11         MR. SYLVAN: I'm going to object to form.
12 A. I just don't remember, it's too long ago.
13 Q. Okay. Do you recall ever being asked to sign a
14     document other than the ones we talked about at a
15     Sunday dinner?
16         MR. DOAN: Object to form.
17         MR. SYLVAN: Join.
18 A. Document, what?
19 Q. Were you ever asked to sign documents as a part of
20     a Sunday dinner?
21         MR. DOAN: Same objection.
22 A. I don't --
23         MR. SYLVAN: Join.
24 A. I don't remember, but somehow I signed some of
25     these.

---

Page 247

1 Q. Okay.
2 A. Where that was, I don't know but maybe on Sunday
3     dinners.
4 Q. Now, talk a little bit about the employment period
5     when I believe there was a time where both you and
6     Stacy were employed by Widen Enterprises; is that
7     right?
8 A. That is correct.
9 Q. And that's the time leading up to when you moved
10     to Florida; right?
11         MR. SYLVAN: Object to form.
12 A. I'm sorry, what?
13 Q. And that's the time leading up to when you moved
14     Florida; right?
15         MR. SYLVAN: Same objection.
16 A. When we moved to Florida, I was no longer working
17     for Widen.
18 Q. When you moved to Florida, Stacy was no longer
19     working for Widen as well, or did she continue
20     working after you moved?
21 A. I don't, I don't remember.
22 Q. When your employment ended, I believe you said it
23     was due to disability?
24 A. (Witness indicating).
25 Q. I'm sorry. For the record, that was a yes?

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Steven Randall - Vol. II
November 6, 2023

---

Page 248

1 A. Yes.

2 Q. Do you recall the reason that Stacy's employment
3    ended with Widen Enterprises?

4      MR. SYLVAN: Objection. Calls for
5    speculation.

6 A. No, I don't remember.

7 Q. Were you present at the time when there was a
8    discussion with Stacy and Mark Widen or any other
9    Widen family member about the end of her
10   employment?

11     MR. DOAN: Object to form.

12     MR. SYLVAN: Join.

13 A. Don't remember.

14     MS. WITTENBERG: Let's take a quick
15   break. I'm getting near the end of my notes and I
16   can collect some thoughts.

17     (Exhibit identification 19 marked for
18   identification)

19 Q. Mr. Randall, you have in front of you a document
20   that's marked Exhibit 19. I'll ask you to turn to
21   the signature page, which is, well, the signature
22   page is three from the end, WINDY0008442. Do you
23   see a date on that page of November 11, 2015?

24 A. Yes.

25 Q. Okay. And do you see a signature on the line for

---

Page 249

1    Steven T. Randall?

2 A. Yes.

3 Q. Is that your signature?

4 A. Yes.

5 Q. Do you see a signature line for Stacy L.
6    Randall?

7 A. Yes.

8 Q. Is that her signatures?

9 A. I, I don't know. I think so.

10 Q. It looks like the two of you were before a notary
11   when this was signed; is that right?

12 A. It appears that way.

13 Q. Do you have any recollection of signing this
14   document?

15 A. Yeah, I remember it.

16 Q. What did this document relate to?

17     MR. SYLVAN: Object to form.

18 A. I believe it's a Land Contract like it says on the
19   front.

20 Q. Is it related to one of the properties that was
21   owned by you or Stacy or both of you?

22 A. Both of us.

23 Q. And to make sure I've asked the right questions, I
24   wanted to ask a follow-up. I know I asked a few
25   times whether or not -- You can put that away,

---

Page 250

1    Mr. Randall. We're done with that document now.

2      I think I asked you whether or not there
3    were any conversations after the one following
4    mediation about the transaction between Stacy and
5    Windy Waters. We've covered that ground. I'm
6    asking a different question now. I want to know
7    any time after the mediation and your divorce if
8    you've had any discussions with Stacy about Windy
9    Waters generally.

10     MR. SYLVAN: Object to form.

11 A. No.

12 Q. And in that same time period, have you had any
13   discussions with Stacy about Reed Widen?

14 A. I'm not sure.

15 Q. Have you had any discussions, again when in that
16   same time frame, since the mediation and your
17   divorce, with Stacy about Mike Kiesler?

18 A. After the mediation?

19 Q. Right.

20 A. Yes.

21 Q. Okay. What can you tell me about that
22   conversation?

23 A. I, I really don't remember the conversation, but I
24   believe it was about selling her stock completely
25   out.

---

Page 251

1 Q. And is that --

2 A. And that included that we talked about Reed and
3    Michael Kiesler and Gonnering she talked to. I
4    really don't remember.

5 Q. Are you thinking of the conversation that we
6    talked about earlier, it was shortly after
7    mediation, or is this a different time that you
8    talked with her about these topics?

9      MR. SYLVAN: Object to form.

10 A. Probably the same time. I don't know.

11 Q. Okay. And, again, it's a different question, just
12   to make sure that we've asked the right ones, is
13   there any time since the mediation and your
14   divorce that you've had a discussion with Stacy
15   Randall except that conversation about the buyout
16   that we've already talked about that you talked
17   about Widen Enterprises with Stacy?

18     MR. SYLVAN: Object to form.

19 A. I, I don't know.

20     MS. WITTENBERG: All right. Nothing else
21   from me at this time.

22     Do you have some questions, Counsel?

23     MR. SYLVAN: We don't want to keep you
24   longer, so we're, we're fine. No questions from
25   us.

---

Page 252

1      MS. WITTENBERG: Oh, okay.

2      MR. SYLVAN: Yes.

3      MS. WITTENBERG: Okay.  Nothing else.

4   Then we're all done.

5      (Proceedings concluded at 1:24 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 253

1   STATE OF WISCONSIN)

2   MILWAUKEE COUNTY  )

3          I, JANET D. LARSEN, a Notary Public in

4   and for the State of Wisconsin, do hereby certify that

5   the deposition of STEVEN RANDALL was taken before me

6   under and pursuant to the Federal Rules of Civil

7   Procedure on the 6th day of November, 2023.

8             That before said witness testified,

9   he was first duly sworn by me to testify the truth.

10             That I am not a relative or employee or

11   attorney or counsel of any of the parties, or a

12   relative or employee of such attorney or counsel, or

13   financially interested directly or indirectly in this

14   action.

15             That the foregoing pages are a true and

16   correct transcription of my original shorthand notes

17   taken at said time and place.

18        Dated this 7th day of November, 2023
                at Milwaukee, Wisconsin.

19

20   _____

21   JANET DONALDSON LARSEN
     REGISTERED PROFESSIONAL REPORTER
     NOTARY PUBLIC, STATE OF WISCONSIN
     MY COMMISSION EXPIRES 1-22-26

22

23            Janet Donaldson Larsen
                  NOTARY PUBLIC
                STATE OF WISCONSIN

24

25

**$**

**$1.3 (1)**
176:1
**$200,000 (4)**
149:9,18;157:24;158:5
**$250,000 (3)**
156:25;157:13,21
**$4,000 (2)**
171:20;172:2
**$78,000 (2)**
158:11,15

**A**

**ability (1)**
162:18
**able (2)**
139:24;175:13
**above (2)**
213:15;232:4
**accept (1)**
235:4
**account (1)**
137:4
**accurate (1)**
196:22
**across (1)**
134:22
**actual (1)**
138:10
**Actually (7)**
161:24;162:7;168:16;
191:9;192:8;195:12;
205:21
**address (8)**
140:19;184:20;194:6,8,
22,23;199:14;206:7
**addresses (3)**
164:20,24;168:14
**adjustment (2)**
200:8,9
**advance (1)**
192:22
**affiliated (1)**
195:9
**afraid (8)**
240:19,23;241:9,14,16,
18,19,23
**aft (1)**
171:3
**again (15)**
127:18;153:12;166:16;
175:24;194:4;196:5;
204:12;207:9;221:14;
223:3;224:2;231:16;
235:16;250:15;251:11
**agent (1)**
208:2
**agents (1)**
203:15
**ago (10)**

146:22;182:15,17;
184:12;185:1,4;188:8;
222:18;246:6,12
**agree (14)**
137:21;139:14,24;
141:16;165:15;168:6,19,
23;175:13;191:5;193:14;
204:7,19;205:5
**agreement (7)**
128:13,20;175:19;
213:24;214:3,5;228:1
**ahead (13)**
129:8;130:1;132:18;
141:8;156:19;157:7;
164:5,10;186:18;187:20;
196:2;209:11;216:7
**aligned (1)**
129:3
**allowed (3)**
219:12;226:11;227:5
**alluding (1)**
156:11
**alone (1)**
240:4
**always (3)**
143:4;145:6;148:7
**among (1)**
183:13
**amount (14)**
136:15;149:23;150:5;
151:3;152:17;173:7,8,11,
17,20;176:12;187:11;
188:4;203:2
**amounts (1)**
150:3
**analyst (1)**
214:25
**and/or (3)**
194:11;199:1;202:8
**anger (1)**
245:22
**angry (2)**
179:11,13
**answered (14)**
132:6;154:12;155:5;
186:25;195:23;203:6;
215:24;223:11;226:4;
229:9,22;236:9;241:13,22
**anyways (1)**
234:3
**apologize (3)**
128:14;139:23;192:22
**appear (5)**
165:18;193:11;208:6;
231:23;232:5
**appeared (1)**
131:24
**appears (10)**
140:18;165:10;168:21;
195:11;198:5;199:8;
213:17;215:25;232:10;
249:12
**Application (4)**

198:10,12,16;201:15
**apply (1)**
127:11
**appreciate (1)**
147:11
**approval (1)**
237:13
**approximately (3)**
149:4;186:1;238:11
**April (12)**
138:18;140:5,5,10,17;
165:4,7,16;166:8,18;
168:15;233:21
**area (1)**
157:11
**around (9)**
133:14;160:20;182:24;
183:14,19;196:11;197:2;
232:19;238:19
**ASAP! (1)**
138:19
**aside (1)**
232:25
**assets (1)**
175:13
**assist (1)**
199:7
**Assistance (6)**
198:10,12,16;200:15;
201:10;202:11
**assume (7)**
145:2;162:11;171:4;
193:18;203:16;242:11;
243:9
**assuming (2)**
135:22;191:5
**assumption (1)**
145:4
**attached (2)**
139:11,25
**attack (1)**
243:10
**attend (1)**
243:20
**attended (1)**
243:13
**attention (1)**
224:25
**attorney (6)**
127:18;169:8,9;170:10;
174:16,20
**attorney-client (1)**
128:3
**attorneys (1)**
128:5
**Austin (2)**
127:16;128:7
**available (1)**
141:23
**Avocet (10)**
194:7,23;195:13,17;
198:2,21;199:13;202:3,7;
206:8

**aware (4)**
133:16;149:17;233:5;
238:2
**away (6)**
136:6;172:17;196:17;
220:24;221:12;249:25

**B**

**back (45)**
127:8;130:5,6;133:10;
139:22;147:22;148:10,23;
150:7;159:6,14,15,16;
161:24;164:6;165:1,2;
166:22;172:4;176:24;
177:4;184:15;188:13,16;
191:16;194:4,20;199:11;
208:21;210:12;212:22;
215:5;217:13,24;219:8,20,
21,21;221:8,9;224:24;
226:18;235:18;241:9;
242:10
**bank (8)**
135:4,10;138:19;139:1,
2;143:2,5;200:14
**bars (1)**
135:14
**based (1)**
151:10
**basic (1)**
127:10
**basis (2)**
145:4;235:7
**Bates (2)**
214:14,16
**became (1)**
175:17
**began (1)**
171:19
**behalf (5)**
150:10;201:1;210:22;
211:3;212:2
**belief (2)**
187:10;188:3
**benefit (1)**
176:2
**besides (2)**
185:11;244:23
**best (5)**
147:12;162:17;192:21;
197:15;220:16
**better (1)**
147:3
**beyond (1)**
155:1
**big (2)**
162:12,12
**bit (6)**
133:15;155:22;161:24;
187:23;188:19;247:4
**Bling (1)**
131:12
**blur (1)**

147:3
**both (13)**
  136:12;179:5;181:7;
  193:4;194:24;195:20;
  197:23;199:6;202:8;
  210:20;247:5;249:21,22
**bottom (8)**
  138:9;194:5;203:15;
  206:7;207:1;213:11;
  228:16;230:4
**bounce (1)**
  133:14
**box (1)**
  206:7
**boxes (1)**
  206:17
**Boy (1)**
  172:11
**brand-new (3)**
  134:11,12,13
**break (17)**
  127:12,13;156:18,21;
  161:18,21,22;190:9,10,13,
  14;209:1,5,8;227:21,22;
  248:15
**breakout (1)**
  169:7
**Brewster (1)**
  208:1
**brief (1)**
  135:12
**bring (3)**
  132:19,20;224:17
**building (3)**
  134:11,12,13
**bunch (2)**
  214:17;228:17
**business (10)**
  145:21;146:11;224:6;
  227:24;229:13;242:18,21;
  243:7;244:18,24
**businesses (2)**
  145:24;146:18
**buy (1)**
  238:13
**buyout (1)**
  251:15

**C**

**calculated (6)**
  149:24;150:15;152:25;
  153:23;155:11;156:13
**call (9)**
  143:23;144:2,24;
  145:18;146:3;147:20;
  152:19;153:13,21
**called (2)**
  131:12,15
**calling (2)**
  145:12;230:15
**calls (39)**
  128:23;134:8;141:4;

150:1;151:6;152:18,22,
23;153:15;155:22;171:10;
172:9;175:22;179:14;
197:6;198:4;200:18;
206:22;210:7;212:21;
220:5,12;221:18,24;
222:13,16;225:13;226:5;
227:18;231:2,24;232:7;
236:7;237:2;242:6,22;
245:7,24;248:4
**came (6)**
  150:5,9;152:16;170:18;
  171:18;172:17
**can (70)**
  130:6;138:3;139:22;
  144:11;146:23;147:11,12,
  18;148:6,9,13;152:3;
  153:21;154:7,8,10,13;
  160:9;161:18;162:2;
  164:12;165:1;171:14;
  174:19;175:24;177:14,14;
  179:24;181:24;185:19;
  187:23;188:22;189:4;
  190:19;191:22;194:18,20;
  195:12;197:15;198:6;
  201:20;205:2,21;208:9,19,
  21;209:6;210:11,11;
  212:22;213:8;216:8;
  219:17;222:10;223:1,5,6;
  224:3,11;226:18;232:2,
  25;234:9,15;235:24;
  240:14;245:10;248:16;
  249:25;250:21
**cancer (3)**
  157:9,9;230:21
**carried (2)**
  221:7,12
**case (3)**
  128:1;129:4;205:9
**category (1)**
  235:25
**caused (3)**
  188:3;245:10,16
**caution (20)**
  128:2;156:3,15;159:22;
  160:23;169:4;170:8;
  174:14;177:21;178:5;
  188:7;191:12;223:22;
  226:12;227:1,1;234:1;
  237:5;239:11;240:5
**certain (2)**
  132:15;148:13
**certainly (1)**
  142:13
**chance (2)**
  216:9;234:5
**change (1)**
  209:4
**checking (1)**
  137:3
**checks (2)**
  209:21,23
**chest (1)**

243:12
**choice (1)**
  178:22
**Christa (1)**
  164:13
**circling (1)**
  188:16
**clarify (3)**
  134:23;170:20;179:22
**cleaner (1)**
  166:6
**clear (9)**
  150:14;162:7;163:4;
  166:11,13;189:15,18;
  211:12;238:24
**clearer (1)**
  169:13
**client's (1)**
  166:17
**clothes (1)**
  238:14
**cohabitation (1)**
  166:14
**coin (1)**
  135:20
**coins (1)**
  135:14
**collect (1)**
  248:16
**collection (1)**
  135:20
**Colourgraphics (2)**
  213:25;214:3
**comfortable (1)**
  150:3
**comment (1)**
  172:4
**common (4)**
  128:13,20;129:15;
  136:25
**communication (3)**
  128:4;235:13,22
**communications (29)**
  129:16;130:25;141:5,9;
  145:12;146:14;151:23;
  152:5;153:10;156:7;
  159:25;160:25;163:1,6;
  167:12;169:8;174:15;
  177:19;187:16,18;191:12;
  223:24;226:13;233:18;
  234:24;235:7;237:6;
  239:12;240:6
**companies (6)**
  132:25;145:23;147:23;
  148:8;186:2;239:23
**company (21)**
  133:12,17;141:17;
  142:25;143:9,13,17;145:3,
  5;148:23;159:2;182:10,
  14,17,18;184:4,21;186:15;
  187:8;188:9;225:16
**comparison (1)**
  204:15

**complain (1)**
  239:9
**complained (1)**
  240:3
**complaining (1)**
  239:16
**complete (4)**
  207:24;220:4;225:23;
  226:2
**completely (1)**
  250:24
**completing (1)**
  198:15
**Compound (9)**
  136:10,20;176:5;
  184:11;195:2,24,25;
  201:12;237:15
**concentrate (1)**
  147:2
**concerned (1)**
  195:7
**concluded (1)**
  252:5
**conclusion (9)**
  128:24;171:11,18;
  197:7;198:4;200:18;
  225:14;236:7;242:23
**condition (2)**
  186:15;187:7
**confidential (1)**
  236:19
**consent (1)**
  211:12
**consider (1)**
  234:5
**content (3)**
  129:18;205:10,11
**contents (3)**
  131:4;237:1;239:20
**context (3)**
  192:6;221:2;246:3
**continue (3)**
  205:3;247:19
**Contract (1)**
  249:18
**conversation (45)**
  129:19;130:3;131:4;
  132:7,8;142:4;143:8,12;
  152:7,15;154:21;163:14;
  178:12;179:3,25;180:2,13,
  23;181:1,8,14;182:22;
  184:5,22;185:22;187:3;
  188:17;189:3,22;190:19;
  191:19,23;226:22;227:3;
  235:23,25;236:5,15,18;
  237:1;243:6;250:22,23;
  251:5,15
**conversations (22)**
  128:4;130:8;144:12;
  150:10;152:12;154:10;
  155:9,13,21,23;156:10;
  161:4;162:18;181:18;
  187:9;189:14;201:5;

210:24;235:19;239:15,21;
250:3
**copies (1)**
192:21
**copy (1)**
164:10
**correctly (1)**
153:18
**correspond (1)**
194:23
**cottage (2)**
183:2,6
**counsel (8)**
169:6,25;178:13;191:5;
234:4;235:8;236:10;
251:22
**counsel's (1)**
184:20
**couple (5)**
128:6,7;164:16;206:15;
224:12
**course (4)**
163:20;170:4;171:21;
212:10
**court (6)**
130:6;225:25;233:3;
235:18;236:12,14
**covered (1)**
250:5
**crying (2)**
179:8,9

## D

**dad (2)**
135:21;219:22
**date (21)**
138:7;156:23;161:25;
162:9,11,12,14,16;165:2;
166:10;168:14;171:1;
178:18;190:25;191:6,8;
192:6;194:1;207:1,9;
248:23
**dated (4)**
138:6;140:9,17;228:25
**dates (2)**
149:1;161:16
**dating (1)**
242:12
**daughter (1)**
243:4
**day (1)**
147:6
**days (1)**
159:3
**deal (1)**
162:13
**December (1)**
162:5
**decide (1)**
234:10
**deeds (1)**
210:1

**definitely (1)**
214:11
**denied (2)**
147:24;148:17
**deponent (1)**
160:24
**deposition (5)**
127:9,15,25;129:21;
164:18
**describe (11)**
186:20;201:20;240:9,
15,24;241:3,4,7;243:25;
244:10,13
**desk (1)**
139:20
**details (1)**
181:17
**determine (1)**
151:3
**difference (1)**
203:1
**different (15)**
134:21,25;164:24;
165:6;168:14;191:22;
192:18;194:21;195:13;
204:8,17;205:10;250:6;
251:7,11
**differentiate (1)**
159:8
**differently (1)**
187:24
**difficult (1)**
199:2
**dinner (3)**
218:6;246:15,20
**dinners (1)**
243:14;244:10,19;247:3
**disability (1)**
247:23
**disclose (17)**
130:25;152:5;156:5;
159:24;160:24;167:11;
177:19;187:15,18;191:12,
19;210:24;223:22,24;
226:13;233:18;239:12
**disclosing (8)**
129:15;141:4;151:22;
153:9;162:25;163:6;
187:21;234:24
**disclosure (1)**
146:13
**discuss (1)**
132:24
**discussed (4)**
169:2;174:11;244:18,24
**discussion (11)**
129:11;139:21;160:16,
20;166:7;174:3;178:8;
234:18;243:6;248:8;
251:14
**discussions (16)**
127:23;131:19;135:13;
161:7;162:22;166:25;

167:7;188:1,2;190:15;
191:7;192:10;242:16;
250:8,13,15
**dishes (2)**
244:2,6
**divide (2)**
175:4,13
**divorce (43)**
160:17,21;161:5,11,12,
25;162:3,12,19,21;163:22;
166:25;167:5,6,16,19,22;
168:3,7,16,24;169:9;
170:9;171:3,21;172:19;
173:5;174:7,16,20,21,22;
175:17;178:9;181:5;
185:5;190:16;196:12;
197:3;233:22;250:7,17;
251:14
**Doan (193)**
127:16;128:2,12,17,22;
129:5,8,17,23;130:1,5,13;
131:2;132:17;133:1,7,21;
134:10;135:6,18;136:4,10,
13,20;137:2,9,18;138:1;
139:6,9,18;140:4;141:2,6,
8,11,22;142:11,22;145:14;
146:15;149:7,11,13,19;
150:2,16,25;151:7,25;
152:2,4;153:1;157:2,6,16;
158:1,13,24;160:23;
161:9;164:12;166:6;
167:3;169:4;170:8;171:9,
12,14,23;172:10;173:14;
174:9,14,19;176:4,6,14,
23;177:1,3,7,21;179:21;
180:17,19,21;183:17,20;
184:11;185:16,23;186:4,
11;187:1,13,20;190:10;
191:15,18;193:21;194:15,
18;195:1,15,24;196:2,25;
197:5,12,22;198:17;
199:21;200:17;201:3,12;
202:14,21;203:7,13,21;
204:1,11,24;205:2,16;
207:16;208:8,13,21;209:1,
8,19;210:9,11,18;212:3,
22;213:3,21;214:14;
215:4,23;216:5,7,24;
217:22,24;218:14,18;
222:15;224:24;225:24;
226:3,7,18,21;229:16,21;
230:17;231:1,8,10;232:1,
9,23;233:2;235:12,15;
236:6;237:11,15;239:25;
240:11,16,21;241:1,5,11,
13,21;242:5,8;244:11,15,
20;245:2,7,12,23;246:16,
21;248:11
**document (60)**
129:2;137:17;139:25;
140:11;164:6;165:18,19;
166:12;175:16;197:14;
200:19;205:13;207:12,13;

210:5,6,17;211:8,9;213:7,
19;214:13,15;215:18,19,
21;216:21;217:15;218:13,
24;219:5;220:11;221:23;
222:9,22;223:9;224:5,7,
14,21;225:8,11;226:11;
227:5,13,14;228:2;229:5,
12,20;230:3;231:7,11;
232:20;246:14,18;248:19;
249:14,16;250:1
**documents (19)**
139:12;192:18;196:5,9;
197:23;204:20,25;205:12;
207:21;211:21,22;213:1;
214:7;215:3,9;216:11,16;
227:23;246:19
**DocuSign (1)**
232:17
**DocuSigned (1)**
232:20
**dollar (2)**
173:8,11
**done (7)**
154:13,14;175:3;192:5;
211:5;250:1;252:4
**down (4)**
142:24;143:7;147:1;
211:17
**Drive (8)**
194:7,23;198:2,21;
199:13;202:3,8;206:8
**due (1)**
247:23
**duly (1)**
127:2
**during (28)**
156:8;161:1;163:20;
166:25,25;169:6,22;
170:4;171:17,20,24;
172:19;173:12;174:21;
180:2,12,22;181:7,14;
184:5,22;191:20;226:22;
233:18;237:7;239:13;
240:7;244:18

## E

**earlier (3)**
151:13;159:3;251:6
**either (5)**
136:8;142:17;161:15;
194:11;211:14
**else (20)**
147:17;155:8;156:12;
172:15;173:23;174:1;
178:25;179:2;180:24;
182:23;184:4;187:10;
211:10;218:8;221:3;
236:15;237:8;246:8;
251:20;252:3
**email (10)**
137:14,21,23;138:5,10,
16;139:12;140:19,22;

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 38 of 48

Stacy L. Randall v                                     Steven Randall -  Vol. II
Reed C. Widen, et al.                                       November 6, 2023

143:6
**employed (2)**
  142:6;247:6
**employees (3)**
  133:12,16,19
**employer (1)**
  238:6
**employment (5)**
  238:25;247:4,22;248:2,
  10
**end (7)**
  143:22;146:2;162:5;
  175:10;248:9,15,22
**ended (5)**
  164:1;182:11;215:16;
  247:22;248:3
**engaged (1)**
  244:7
**enough (6)**
  143:4;180:9;201:22;
  210:16;225:7;236:24
**entered (1)**
  161:12
**Enterprises (46)**
  131:20,25;132:11;
  133:6,11,24;134:4;135:5;
  137:6;139:16;140:1,17;
  141:1,18;142:2,6,18;
  144:18;145:1,10,20;
  146:20;147:19;148:5;
  150:11;184:7;185:13,21;
  186:22;190:18;213:2;
  214:8;222:8;224:6;
  225:17;228:4;232:21;
  238:3,7,25;239:5,10,18;
  247:6;248:3;251:17
**Enterprises' (1)**
  134:2
**entire (1)**
  180:16
**entirety (1)**
  218:24
**entity (2)**
  194:12,25
**especially (2)**
  172:18;173:5
**establish (1)**
  174:24
**established (3)**
  168:5;205:18;209:12
**estate (2)**
  203:15;208:1
**evaluate (1)**
  209:6
**even (1)**
  196:16
**eventually (4)**
  175:16;202:3,9;213:9
**everything's (1)**
  147:3
**evidently (2)**
  143:2;215:19
**exact (4)**

154:3;161:15;171:1;
  178:18
**exactly (10)**
  150:18;152:13;154:14,
  16;171:16;173:6;186:6;
  198:20;201:13;225:3
**examined (1)**
  127:3
**example (3)**
  146:24;214:21;227:25
**except (3)**
  204:20;205:8;251:15
**exchange (1)**
  137:14
**Exhibit (45)**
  137:11,13;139:11;
  164:13,14,17;168:13;
  192:19,19,24;193:8;
  197:21,24;200:13;203:10;
  204:7,7,20,20;205:14,15,
  22,23;206:6,15,25;207:25;
  208:5,10,16,17;211:22;
  212:2;213:6,8;228:1,13,
  15;230:1,2;232:12,13;
  233:1;248:17,20
**Exhibits (5)**
  192:15,19;193:5;
  204:10,15
**exhibit's (1)**
  208:12
**expected (2)**
  222:25;223:1;243:19
**expert (2)**
  231:2;242:7
**explain (2)**
  132:4;175:2
**explained (1)**
  137:5
**extent (36)**
  128:23;129:15;130:24;
  137:16;141:3,20;142:9;
  145:11;146:12;147:9;
  148:1;151:22;153:4,8;
  157:14;159:12;161:10;
  162:25;163:14;165:12;
  167:11;168:9;169:5;
  171:10;187:15;194:13;
  198:19;200:17;204:9,25;
  208:16;217:21;218:16;
  233:17;236:7;245:13

**F**

**face (1)**
  136:15
**fact (7)**
  155:2,9;170:16;172:14,
  24;173:24;246:10
**Fair (1)**
  129:1
**familiar (3)**
  133:24;209:13;212:16
**family (18)**

136:23,24,25;156:25;
  157:13,20,24;158:10,16;
  183:2;218:9,10;242:17,
  21;243:7,14,19;248:9
**far (5)**
  134:14;159:23;215:5;
  219:20;236:25
**fast (1)**
  157:23
**fax (3)**
  203:24;204:2,3
**Feb (1)**
  138:18
**feel (2)**
  181:9;224:12
**felt (2)**
  188:9;223:4
**few (5)**
  131:21;157:23;185:3;
  235:3;249:24
**figure (3)**
  174:7;175:3;188:11
**figured (1)**
  176:22
**filed (17)**
  160:17,21;161:5,25;
  162:3,11,19,21;167:1,7,
  16,19,22;168:3,7;185:5;
  233:22
**fill (3)**
  200:22;208:4,9
**filled (4)**
  204:21;205:11,14,18
**filling (3)**
  198:12;205:19,25
**final (2)**
  161:11;171:3
**finalized (2)**
  162:6;181:5
**financial (5)**
  140:1,9,16;145:9,19
**financially (2)**
  133:6;174:25
**financials (1)**
  139:15
**find (7)**
  143:14;145:3,23;150:9;
  154:6;165:1;175:9
**finding (1)**
  199:2
**fine (1)**
  251:24
**finger (1)**
  153:25
**finish (5)**
  139:6,9;150:13;189:18;
  208:8
**first (19)**
  127:2;129:21;138:5;
  164:19;170:18;172:6;
  173:16,19;174:3;177:15;
  179:18;180:1;189:22;
  190:20;192:25;213:25;

214:2;216:22;220:18
**fits (1)**
  180:15
**five (2)**
  161:20;190:11
**flip (1)**
  213:8
**Florida (16)**
  185:7;196:17,20,21;
  197:4,10;199:14,24;
  238:15,19;239:1,4;247:10,
  14,16,18
**focus (2)**
  138:5;193:21
**follow (2)**
  131:9,21
**following (4)**
  189:4,22;190:15;250:3
**follows (1)**
  127:3
**follow-up (3)**
  135:12;235:3;249:24
**forgot (1)**
  128:14
**form (134)**
  132:17;133:1,7,22;
  134:16;135:6,18;136:3;
  137:1,9;139:17;140:3;
  141:2;144:7,20;148:19;
  149:14,19;150:1,16,24;
  151:6;153:2,19;155:5;
  157:2;158:1,13,22;
  160:12;167:4;169:11;
  171:9,22;172:8;173:13,
  25;174:9;175:6,22;176:4;
  179:4,14,20;181:21;183:5,
  10,20,21;185:15,23;186:4,
  5,24;187:10,13;188:3,6;
  190:22;192:2;197:5,12;
  198:3,6,7,18;199:5,25;
  200:12;201:3,7,10,16;
  202:14;203:10,13,18;
  204:1,8,22;205:25;207:16,
  24;208:4;209:18;212:4,
  20;213:3;214:24;215:4;
  216:23;218:15,25;219:23;
  220:5;221:6,24;222:11;
  223:10;224:8;229:15,23;
  230:13,18;231:21,24;
  232:7,22;233:12;237:10,
  19,23;239:24;240:10,21;
  241:11;242:1,5,22;244:11,
  15,20;245:2,7,12,23;
  246:11,16;247:11;248:11;
  249:17;250:10;251:9,18
**forms (3)**
  195:5;204:17;205:7
**formula (2)**
  151:3,9
**forward (2)**
  157:23;188:19
**Foundation (21)**
  149:7,25;151:5;157:5;

158:2,23;174:8;175:7,23;
176:21;193:4,17;195:4;
196:24;197:20;203:14;
206:11,24;208:12;212:21;
214:9
**frame (1)**
250:16
**frequency (1)**
186:21
**frequently (3)**
132:15;186:7,13
**front (7)**
194:4;213:23;218:21,
23;224:16;248:19;249:19
**full (2)**
173:7;214:22
**further (1)**
184:18
**fuzziness (1)**
192:23

## G

**gave (5)**
132:4;185:20;187:7;
226:10;227:4
**gears (1)**
209:5
**generally (7)**
133:16;144:22;148:21,
24;186:2;244:23;250:9
**gentleman (1)**
130:19
**gets (1)**
201:24
**given (7)**
185:12;216:9;220:3;
221:23;223:15;225:7;
236:4
**giving (2)**
144:3;184:5
**Glammyisme@gmailcom (1)**
140:22
**Glandma (2)**
131:15,16
**glass (1)**
139:20
**gold (1)**
135:14
**Gonnering (2)**
241:24;251:3
**Good (5)**
127:6,7;142:25;146:1;
205:22
**grab (1)**
139:20
**grandkids (1)**
131:12
**grandma (1)**
131:14
**Grandpa (1)**
131:12
**ground (2)**

127:11;250:5
**growing (1)**
238:12
**guess (7)**
138:10;159:1;160:1;
162:15;195:7;198:20;
231:5
**guys (3)**
183:7,18,23

## H

**handed (10)**
137:12;192:18;213:7;
219:4;227:9,14;228:14;
229:12;230:2;232:13
**handing (2)**
164:17;219:25
**handled (2)**
135:22;171:18
**handwriting (5)**
205:23;206:4,10,18;
208:15
**happen (1)**
145:6
**happened (11)**
143:1;154:9,9,16;155:2;
170:21,23;176:1;180:1;
201:9;245:18
**happening (2)**
154:7;245:1
**happy (4)**
127:13;142:13;179:16;
209:11
**hard (6)**
138:2;154:15;162:20;
193:12,14;200:4
**head (1)**
152:24
**health (2)**
147:1,3
**hear (7)**
143:19;145:17;146:2;
186:8;232:2;237:8,13
**heard (9)**
144:9,18,23;145:25;
146:7,19,25;152:6;176:9
**heart (1)**
243:10
**held (1)**
238:6
**hell (1)**
188:10
**help (3)**
191:22;200:11,11
**helps (1)**
179:24
**here's (1)**
215:19
**hit (1)**
243:11
**hmmm (1)**
142:23

**home (6)**
181:2;203:24;217:7,8;
218:4,6
**house (1)**
215:12
**Huh (2)**
176:25;179:12
**hundred (2)**
133:14;180:8

## I

**idea (6)**
187:7;197:8;204:2;
206:23;223:12,12
**identification (8)**
137:11;192:16;213:6;
228:13;230:1;232:12;
248:17,18
**imagine (2)**
220:20;246:2
**imagining (3)**
152:24;153:2,5
**impact (1)**
230:23
**impacted (1)**
174:7
**impression (4)**
132:4;145:8;226:10;
227:4
**inaccurate (1)**
165:20
**include (1)**
243:6
**included (1)**
251:2
**includes (2)**
139:15,25
**including (1)**
135:10
**income (3)**
142:1,16;147:23;148:4
**incredible (1)**
192:22
**indicate (3)**
133:5;198:1;203:18
**indicating (3)**
225:18;242:13;247:24
**indication (4)**
149:22;184:6;185:13,20
**individual (1)**
200:23
**individually (2)**
194:11,25
**information (26)**
131:1;135:9;137:6;
138:24;139:5;140:25;
141:14,17;142:1,3,17,19;
145:9,19;147:23;148:5,8,
17;151:11,12,16,20;187:6;
191:19;204:21;236:4
**inheritance (1)**
135:12

**in-person (2)**
155:21,23
**instance (3)**
201:24;217:9;223:5
**instances (1)**
211:6
**instead (1)**
214:22
**institution (1)**
201:2
**instruct (7)**
131:7;163:5;187:17;
233:16;234:11,23;236:22
**instructed (1)**
236:3
**instructing (1)**
178:7
**instruction (5)**
161:10;191:15;235:4,
21;236:9
**instructions (2)**
131:9;188:7
**insurance (3)**
136:7,16,19
**intend (1)**
236:18
**intent (1)**
166:9
**intentions (1)**
180:10
**interest (3)**
128:13,20;129:15
**interests (1)**
129:3
**interrupted (1)**
173:22
**into (3)**
137:3;165:24;202:9
**issue (1)**
208:12
**issues (1)**
197:20
**items (1)**
136:1

## J

**Janet (3)**
148:10;159:17;184:15
**January (2)**
228:25;232:20
**job (3)**
238:5;239:4;244:6
**join (77)**
129:17,23;133:8;
134:10;135:7,19;137:2,
18;138:1;139:18;140:4;
141:6,22;142:11,22;
145:14;146:15;149:15,20;
150:2,17,25;151:7,25;
157:16;158:13;161:3;
171:12,23;172:10;173:14;
176:6;183:17;185:16,24;

186:11;187:1;196:25;
197:22;200:20;202:15,21;
203:7,14,22;204:11;
205:1;207:17;209:19;
210:9,19;212:22;213:4;
216:5,24;217:22;218:18;
226:5;229:16;232:1,23;
237:11;239:25;240:11,17,
22;241:2,6,12;242:8;
244:12,16,21;245:24;
246:17,23;248:12
**joke (2)**
   181:12;182:5
**judgment (2)**
   161:12;175:17
**jump (1)**
   188:18
**June (3)**
   138:6,11;149:4
**Justin (1)**
   239:8

### K

**keep (2)**
   150:13;251:23
**kidney (1)**
   157:10
**kids (1)**
   238:12
**Kiesler (18)**
   137:7,14,22;138:12;
   142:18;143:8;152:8;
   155:20;223:13,17;224:13,
   20;225:6,21;237:17;
   241:19;250:17;251:3
**Kiesler's (2)**
   181:23;241:4
**kind (5)**
   147:3;162:2;187:7;
   188:16;217:1
**knew (1)**
   188:10
**knock (1)**
   187:24
**known (1)**
   151:8

### L

**Land (1)**
   249:18
**last (22)**
   127:24;128:14;129:13;
   131:11,18,22;135:13;
   141:24;147:25;148:24;
   154:16;160:16;164:18;
   193:8;194:10;197:9;
   206:25;213:10;221:9;
   230:3,20;232:14
**lawyer (13)**
   127:15,18,21,22;
   130:12;169:16,17,19;

170:3,12,20;173:11,23
**lawyers (7)**
   128:8;129:12,20;130:8,
   17;167:21;172:15
**lawyer's (1)**
   172:4
**layperson (1)**
   205:2
**leading (3)**
   192:9;247:9,13
**leads (3)**
   145:22;151:19;211:25
**learn (1)**
   150:22
**learned (3)**
   172:6;173:17,19
**lease (3)**
   165:21,23;166:3
**least (3)**
   154:18;165:6;208:15
**led (1)**
   187:10
**Lee (1)**
   212:19
**legal (8)**
   128:23;171:11;197:6;
   198:4;200:18;225:14;
   236:7;242:23
**lender (9)**
   199:6,19,19,23;200:7;
   201:2,8,24;202:12
**lending (1)**
   201:1
**less (2)**
   172:21;201:24
**letters (2)**
   212:18;214:23
**letting (2)**
   221:5;224:7
**life (3)**
   136:7,15,18
**limit (2)**
   220:3;225:22
**line (8)**
   130:24;131:22;138:7;
   166:22;213:15;230:7;
   248:25;249:5
**lines (2)**
   229:12;232:4
**listed (2)**
   194:1,22
**listen (2)**
   208:23;235:15
**lists (2)**
   164:19;206:7
**little (14)**
   153:7;155:22;156:17,
   18;161:24;169:12;182:8;
   187:7,23,25;188:19;
   190:9;235:17;247:4
**lived (4)**
   163:25;165:16;179:7;
   195:18

**living (18)**
   163:1,7,9,17;165:6;
   166:18;167:13;168:6,25;
   177:20;178:11;185:7;
   187:17;191:13;196:21;
   234:1;235:2,23
**location (3)**
   134:15,21;135:1
**locations (1)**
   165:6
**long (6)**
   146:22;155:15;196:7;
   204:2;225:22;246:12
**longer (4)**
   165:16;247:16,18;
   251:24
**look (20)**
   139:13;159:6;162:15;
   166:3;168:18;192:20;
   197:15,23,24;204:6;
   206:3;207:7;221:5,17;
   222:8,22;223:8;224:21;
   230:12;234:16
**looked (1)**
   200:13
**looking (14)**
   138:23;140:10;155:6;
   193:15;195:5;196:5;
   197:14;198:6;205:5,12;
   208:9;213:12,18,23
**looks (10)**
   138:4;193:15,24;194:5;
   213:23;214:2,25;228:25;
   229:13;249:10
**loss (4)**
   138:13,17,24;148:4
**lost (1)**
   205:20
**lot (7)**
   140:5;171:17;182:10,
   14;184:12;187:6;188:10
**loud (1)**
   138:3
**low (2)**
   187:12;188:5
**LTD (2)**
   213:25;214:4

### M

**machine (3)**
   203:24;204:2,3
**magnifying (1)**
   139:20
**maintenance (1)**
   171:7
**making (2)**
   199:16;200:4
**many (7)**
   133:12,16;186:1,14;
   193:18;209:17;246:6
**March (3)**
   138:18;156:23;213:20

**marital (8)**
   141:4;145:13;146:13;
   151:23;153:9;159:24;
   162:25;235:7
**Mark (23)**
   215:3,9,18,22;217:6,8;
   218:3,20;220:25;221:2,12,
   16;222:9,20;223:6;224:4;
   240:9;243:3;245:5,11;
   246:4,9;248:8
**marked (11)**
   137:11,12;192:15;
   213:6,8;228:13,14;230:1;
   232:12;248:17,20
**marker (1)**
   162:1
**markings (1)**
   164:16
**marriage (10)**
   135:24;156:8;161:1;
   180:16;212:11;226:22;
   233:19;237:7;239:13;
   240:7
**married (18)**
   177:23;178:6;187:17;
   191:13,20;210:25;223:25;
   226:16;234:25;235:22;
   236:1;242:11,12,17,20;
   243:23;244:4,5
**marry (1)**
   243:3
**Matthew (1)**
   241:24
**may (14)**
   139:2;191:4,24,25;
   192:6,20;194:2;197:18;
   198:16;203:18,24;207:9,
   21;211:15
**Maybe (12)**
   133:14;134:23;161:18;
   166:7;168:11,13;173:22;
   183:7;187:24;194:6;
   224:12;247:2
**mean (19)**
   133:9;135:23;136:23;
   154:15;157:10;165:23;
   179:10;184:12;186:19;
   189:19;190:7,8;211:22;
   217:10;218:23;219:20;
   220:22;223:1;227:7
**meaning (3)**
   136:24;141:13,17
**means (1)**
   129:24
**mediation (54)**
   163:8,10,19;166:25;
   167:5,15,18,22,24,25,25;
   168:24;169:1,2,5,6,13,16,
   22;170:4,19,24;171:17;
   172:1;173:12;174:3,12,
   24;175:1,10;177:9,10,16,
   24,25;178:1,9,13,16,19;
   179:23;180:1,13;188:17;

189:5,22;190:16;191:3;
250:4,7,16,18;251:7,13
**mediator (3)**
169:14,15;175:2
**meet (2)**
130:20,21
**meeting (1)**
207:20
**member (1)**
248:9
**memories (3)**
147:6,7;158:20
**memory (14)**
143:11;144:5;157:20,
24;165:15;184:21;196:6;
198:11;199:21;202:17;
203:1;207:20;214:6;242:3
**mentioned (7)**
181:22,23;182:4,21;
185:17;188:20;216:1
**messy (1)**
230:19
**M-hm (2)**
209:3;221:1
**Michael (3)**
138:17;181:22;251:3
**middle (1)**
192:25
**might (4)**
162:20;190:10;191:22;
198:10
**Mike (19)**
137:7,14,22;138:12;
142:18;143:8;152:8;
155:20;223:13,17;224:12,
20;225:6,21;227:3;
237:17;241:4,19;250:17
**million (9)**
176:1;182:16,16,19,22;
184:3,10,22;188:9
**Millmont (2)**
138:17,25
**mind (4)**
152:23;162:1;182:13;
190:20
**mine (1)**
216:18
**minutes (1)**
190:12
**mischaracterizes (25)**
141:21;142:10;147:9;
148:2;157:15;159:13;
165:12;168:9;176:20;
183:15;184:8,18;186:10;
189:1;190:2;194:14;
196:23;204:10;212:5;
216:3;217:21;218:16;
222:23;224:22;227:16
**misrepresent (2)**
142:14;204:15
**misrepresents (1)**
137:17
**misunderstood (2)**

168:11,13
**moment (2)**
139:13;234:13
**money (26)**
136:23,24;149:6,17,23;
150:22;151:4;158:21;
159:2,7;160:3,6,9,14;
171:24;173:9;175:20;
176:18;178:23;180:6;
202:17;215:6;239:9,18,
23;240:1
**month (4)**
170:25;171:2,20;172:2
**months (1)**
138:18
**more (17)**
130:8;133:19;144:8,10,
22;165:3;177:10;182:10;
188:10,13,20;197:3;
209:6;231:5;232:11;
245:9,13
**morning (2)**
127:6,7
**Mortgage (19)**
198:9,12,15,21;199:3,7,
12,13,20;200:2,8,15;
201:23,25;202:11,18,24;
203:3;207:23
**most (1)**
196:20
**mostly (1)**
187:14
**mouth (1)**
186:19
**move (1)**
173:4
**moved (10)**
165:24;196:17;238:15,
19;239:3;247:9,13,16,18,
20
**moving (2)**
164:1;239:1
**much (13)**
147:2;150:22;154:18;
173:9;181:11;182:4,5;
202:17,23;203:1,3;209:6;
220:9
**multiple (1)**
143:25
**Must (1)**
140:8

## N

**name (16)**
128:14;130:12;136:8,
12;181:22;192:25;200:23;
209:15;211:8,10;212:10,
14;213:13;230:5,23;
232:15
**names (3)**
181:23;204:8;205:9
**near (1)**

248:15
**necessarily (3)**
166:14;195:8;196:6
**need (23)**
127:12;130:5;138:17;
139:13;149:17,18;153:11;
157:13;159:14;173:4,6,8;
176:23;177:1,3;190:10;
191:16,17;209:1,10;
219:23;224:10;245:19
**needed (8)**
137:5;138:24;139:3;
143:1;160:10;173:3;
201:11;217:16
**needing (4)**
149:9;156:25;157:24;
158:10
**next (3)**
152:20;178:1,15;188:22
**nice (3)**
151:8,11;238:13
**nickname (3)**
131:13,16,17
**no-brainer (1)**
188:14
**Normally (2)**
173:3;240:23
**north (2)**
183:1,2
**notary (1)**
249:10
**notes (2)**
186:16;248:15
**November (2)**
162:4;248:23
**number (4)**
184:2;185:1;195:13;
214:16
**numbers (3)**
132:23;133:5;140:5

## O

**object (105)**
128:23;129:14;130:23;
132:17;133:1,7,21;
134:16;135:6,18;136:3;
137:9,16;139:17;141:2,3;
142:7;145:11;146:12;
149:13,19;150:16;151:21;
153:1,3,8;157:2,4;158:1,
13,22;159:12;162:24;
163:13;165:11;167:3,10;
168:8;171:9;172:8;174:9;
176:4;177:18;179:4,20;
183:20,21;185:23;186:4,
5;187:13,14;190:22;
191:11;192:2;193:3;
195:1,3;197:5,12,19;
198:3,17;201:3;202:14;
203:13;204:1,24;207:16;
208:11,13;210:23;211:11;
212:3;213:3;215:4;

219:14;230:17;233:25;
234:22;236:6;237:10,19,
23;238:21;240:21;241:11;
242:1,5,22;244:11,15,20;
245:2,7,12,23;246:11,16;
247:11;248:11;249:17;
250:10;251:9,18
**objected (1)**
220:17
**objection (153)**
128:25;129:6,22;
130:14,15;131:2;132:5;
133:2,8;134:8;136:4,10,
13,20;137:1;140:3;
141:20;142:9,21;144:7,20,
25;146:15;147:8,8;148:1,
19;149:7,13,25;150:24,25;
151:5;153:19;154:11;
155:4,12;156:14;157:14;
158:24;159:19;160:12;
161:2,14;169:11,25;
170:6;171:22;173:13,25;
174:8;175:6,22;176:14,
20;178:4;179:14,21;
181:21;183:5,10,15;184:8,
17,20;185:15;186:9,24;
188:6,25;190:1;192:12;
193:17;194:13,15;195:22,
24;196:13,18,23;198:23;
199:5,25;200:17;201:12,
16;202:19;203:5,8;204:9,
14;205:17;206:11,20;
207:15;209:18;210:7;
212:20;214:9,24;215:23;
216:3,23;217:18,20;
218:14,15,25;219:6;220:5,
12,19;221:6,11,18,24;
222:11,15,23;223:10;
224:8,22;225:2,13;226:3;
227:1,15;229:8,15,21;
230:13,25;231:1,21,24;
232:7,9,22;233:12;234:5;
237:2,15;239:24;240:10,
16,20;241:1,5,21;242:4;
246:21;247:15;248:4
**objections (8)**
153:7;158:8,12,19;
177:7;187:25;203:21;
210:18
**observed (6)**
143:23;217:16;221:3,
15;224:4;227:3
**obtained (1)**
166:2
**occasion (23)**
143:25;144:5;148:3,13,
16;150:23;152:10;155:17;
177:10;212:11;218:3;
219:2,9,15,17;224:3;
229:11,18,19;233:23;
245:5,15;246:9
**occasions (15)**
132:16;141:25;150:6;

160:8,9,13;185:11;210:4;
217:6;221:8;224:19;
225:5,10,21;238:9
**occur (1)**
222:10
**occurred (12)**
144:6;162:19;163:16,
19;167:15;170:17;178:9,
13;186:7;191:6;192:7;
246:10
**occurrences (1)**
243:17
**occurring (4)**
144:12;149:3;168:1;
190:20
**October (3)**
127:25;128:10;129:12
**off (8)**
139:21;185:17;186:12;
187:4;190:7;199:21;
201:23;234:18
**offered (2)**
132:24;202:11
**office (5)**
133:25;134:2,6,25;
225:17
**offices (2)**
134:14,18
**old (1)**
164:4
**once (4)**
144:8;188:20;245:9,14
**one (32)**
130:8,17;138:11;
140:24;143:25;164:9,11;
165:3;174:2,23,23;175:2;
177:11,14;183:13;185:11;
187:24;190:20;195:20;
197:4,9;204:4;209:10;
214:14;231:5;232:11,11,
25;233:6;234:13;249:20;
250:3
**ones (2)**
246:14;251:12
**only (10)**
132:15;146:7;150:4;
162:18;164:9;166:10;
178:12;180:6;222:2;
239:14
**opinion (2)**
231:3;242:7
**opposed (2)**
172:21;212:19
**original (2)**
138:9,10
**out (29)**
138:3;143:14;145:3,23;
148:8;150:9;154:6;157:8;
162:1;164:2,6;174:7;
175:3;182:15;183:7;
187:24;188:12;198:12;
200:22;205:18,19,25;
208:4,9;212:19;214:22;

240:1;245:21;250:25
**outright (1)**
179:9
**Outside (3)**
150:20;196:9;238:25
**over (11)**
144:8,10;152:12;
153:22,24;154:20;210:20;
211:4,16;215:12;216:10
**overhear (1)**
236:15
**overheard (4)**
147:20;152:11,18;
153:15
**owed (4)**
201:25;202:17,23;203:2
**own (2)**
195:21;197:3
**owned (16)**
153:17;175:5;194:11,
25;195:8;196:7,10,16;
197:11,17;198:2,5,22;
202:9;242:21;249:21
**ownership (1)**
159:7

## P

**padding (1)**
243:12
**page (34)**
138:5;139:13;140:10;
164:19;165:1,3;192:25;
193:8;194:4;206:16,25;
213:10,12,25;214:2,12,17;
228:16,17,20,23;230:3,5;
231:6,10,15,16,20;232:14,
15;234:14;248:21,22,23
**pages (3)**
206:15;231:13,14
**paid (3)**
159:2;207:23;240:1
**Pardon (1)**
139:8
**parents (1)**
135:15
**part (9)**
127:9;129:21;172:24;
175:17;181:13,13;185:22;
234:9;246:19
**particular (1)**
228:2
**passed (2)**
136:6;221:12
**pay (3)**
199:13;201:23;224:24
**paying (1)**
200:3
**payments (6)**
171:7;199:2,12,16;
200:2,5
**pending (1)**
180:21

**people (2)**
181:18;183:13
**percentage-wise (1)**
188:12
**period (5)**
185:9;190:7;211:16;
247:4;250:12
**permission (1)**
243:3
**person (4)**
145:15;146:3,10;152:20
**personality (6)**
240:9,13,15,25;241:4,8
**perspective (1)**
131:24
**petition (3)**
164:6;168:16,20
**phone (23)**
130:21,22;143:22,23;
144:2,24;145:16,18;146:2,
5;147:20;152:7,18,19,22,
23;153:13,15,16,21,22;
155:22;181:3
**phrase (1)**
187:23
**picked (1)**
192:5
**pinpoint (1)**
162:2
**pissed (1)**
220:23
**place (7)**
134:3;135:3;170:24;
179:18;225:15;228:5,6
**plan (1)**
164:10
**play (1)**
131:13
**playing (1)**
244:9
**pleasant (1)**
244:14
**Please (4)**
138:19;148:10;186:18;
204:12
**pm (2)**
138:12;252:5
**point (16)**
129:19;146:23;154:20;
155:3;162:22;163:25;
165:22;195:10;197:10;
200:4;202:13;203:16;
205:22;212:10;224:17;
233:6
**pointing (1)**
227:11
**policy (2)**
136:7,16
**poor (3)**
193:5,13,24
**portion (1)**
176:18
**position (3)**

166:17,19,20
**possibility (1)**
203:19
**possible (1)**
212:9
**possibly (1)**
169:3
**pound (1)**
245:11
**pounded (3)**
245:6;246:5,9
**pounding (1)**
245:21
**practice (4)**
210:5,16;216:16;218:20
**presence (4)**
156:12;221:22;239:8;
240:4
**present (7)**
147:6;189:5,7;217:4;
218:8;239:15;248:7
**pretending (1)**
243:10
**pretty (6)**
146:1;147:2;182:1;
193:12;220:9;230:19
**previous (1)**
132:6
**previously (2)**
137:5;170:1
**price (4)**
149:23;150:9,15;152:25
**print (1)**
139:23
**prior (15)**
133:11;142:10;148:2;
168:9;176:21;183:16;
184:9,18;194:14;195:23;
196:24;207:18;216:4;
217:21;218:16
**private (10)**
156:8;160:25;163:16;
167:12;170:10;210:25;
226:15;237:7;239:13;
240:7
**privilege (6)**
145:13;151:24;161:18;
234:5;235:7;236:8
**privileged (8)**
129:16;130:25;131:6;
141:4;145:13;146:13;
153:9;236:24
**probably (16)**
135:23;143:10;152:6,9;
155:19;176:10;181:2;
183:18;203:23;208:20;
211:5;215:16;218:5;
236:11;245:20;251:10
**problems (1)**
242:3
**procedures (1)**
127:10
**PROCEEDINGS (9)**

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 43 of 48

Stacy L. Randall v                                                    Steven Randall - Vol. II
Reed C. Widen, et al.                                                November 6, 2023

127:1;163:22;167:1,5;
171:21;174:22;196:12;
197:3;252:5

**proceeds (1)**
136:19

**Profit (8)**
138:13,17,24;142:1,16;
147:22;148:3,4

**properties (2)**
196:20;249:20

**property (24)**
165:24,25;166:3;175:4;
194:10,24;195:9,17,20;
196:7,16;197:4,10,18;
198:2,22;199:7,24;201:15,
22;202:2,3,8;203:3

**protected (1)**
151:23

**provide (2)**
142:19;200:14

**provided (1)**
202:12

**purpose (2)**
198:15;200:12

**purposes (1)**
159:11

**put (9)**
166:15;170:1;186:19;
193:5;211:16;215:12,14;
232:25;249:25

## Q

**quality (4)**
193:4,13;197:20;208:12

**quick (2)**
209:5;248:14

**quite (4)**
131:25;133:15;164:7;
185:3

## R

**RANDALL (54)**
127:2;128:15,16,17,18,
20;131:9;135:15;137:12,
22,22;138:20;140:23;
141:1;144:18;147:15,18;
164:22;167:8;171:8;
190:14;191:8,24;193:1,
19;194:11;204:19;205:11,
14;207:13,20,24;209:12;
210:21;213:7,16;214:19;
221:4,21;230:8;231:19;
232:5;233:5;234:13,19,
20;235:11,20;239:8;
248:19;249:1,6;250:1;
251:15

**Randall's (4)**
207:5;208:4;209:13;
210:16

**reached (2)**
175:12,19

**reaction (1)**
245:18

**read (55)**
130:5,6;138:3;139:19;
148:9,11;159:14,15,16,18;
176:23;177:1,3,6;182:9;
184:14,16;191:16;193:12,
14;194:20;198:8,11;
204:13;208:21,24;210:12,
13,16;212:22,24;215:13;
216:2,8,10,17;217:24;
218:1;219:4,12,19,22;
220:10,18;221:9,10;
223:15;224:13,24;225:1,
8;226:11,18,20;227:5

**reading (4)**
138:2;216:12,22;217:17

**reads (1)**
138:16

**real (2)**
203:15;208:1

**really (25)**
146:22;149:16;150:18;
177:22;189:9;195:7;
198:8;208:2;213:5;215:5;
216:9;219:7;220:21,22;
221:20;222:14;226:8;
238:1;239:17,19;241:7;
242:24;246:6;250:23;
251:4

**reask (1)**
234:15

**reason (4)**
146:10;165:19;192:5;
248:2

**reasons (3)**
174:23;179:18;180:3

**recall (109)**
130:12;132:1,10;
133:12;134:21,25;135:9;
136:15,18;144:12,17,22;
147:13;148:6,16,23;149:2,
4,9,22;152:10,13,14;
153:22;154:7,19;155:1,8,
16,21,23;157:12,18,19,22;
158:14,18;160:2,5,8,9,13,
14,16;163:24;166:24;
167:7,25;169:23;170:2,3,
24;171:6,19;173:16;
175:19;179:2,5;181:4;
183:8;186:1;188:22;
189:4,9,11,13,13,24;
190:20;191:7,24;196:6,
10;199:17,19,23;200:23;
201:9;202:23;207:14;
211:6;212:11;217:10;
219:9,11,17;221:21;
222:10,19;223:6;224:11,
20;225:10,15;229:3,11;
230:21;232:19;235:24;
238:11,24;239:7;243:22;
245:10,15;246:4,8,13;
248:2

**recalling (4)**
144:3;152:24;184:2;
217:9

**receive (1)**
135:4

**received (7)**
135:15;141:16;149:6;
158:21;176:12,18;182:19

**receiving (8)**
149:9;157:20;158:4,15;
171:7,20;239:16,22

**recognize (6)**
137:13;162:20;193:22;
194:8;208:15;232:17

**recollection (19)**
133:4;138:23;139:2;
154:19;156:25;158:4,10,
15;165:5;166:24;167:15,
18;197:9;213:18;220:16;
229:19;231:6,11;249:13

**record (12)**
128:12;137:21;139:21;
150:14;166:7,15;170:1;
189:19;193:6;234:18;
238:24;247:25

**records (3)**
135:5,10;162:10

**rectify (1)**
200:11

**redeemed (12)**
149:5;170:21;172:15,
17,21;173:24;174:12;
188:21,23;190:17;191:1;
192:8

**redeeming (18)**
162:23,23;167:2;
172:16;175:20;176:19;
177:12,16;178:3,17;
187:11;189:5,23;191:9,10,
25;192:3,10

**redemption (3)**
150:21;160:22;192:4

**Reed (33)**
132:9,10,15,24;143:10,
11,22;152:7;155:19;
182:13,15,21,23;183:6;
184:4,20,21;185:12,20;
186:1,21;187:9;188:1,8;
221:7,13;237:21;240:24;
241:9,10,16;250:13;251:2

**Reed's (2)**
181:22;184:1

**reference (1)**
184:3

**referred (1)**
183:23

**referring (4)**
150:6;217:6;219:15;
220:25

**reflected (1)**
175:16

**reflects (1)**
219:16

**refresh (3)**
165:5,14;214:6

**refreshed (1)**
166:24

**refused (1)**
142:18

**Reinhart (4)**
127:18;129:12,20;130:9

**relate (1)**
249:16

**related (10)**
149:12;203:11,19;
213:1;214:8;222:7;224:5;
227:24;232:21;249:20

**relation (1)**
207:21

**remain (1)**
236:19

**remained (1)**
134:15

**remember (136)**
133:3,9;136:14;143:5,
14;144:1,21;145:2;
146:16,22;147:16,18,21,
24;148:12,14,15,20;149:8,
16,21;150:18,19;152:12;
153:20;154:3,13,15;
155:13,13;156:16;157:11;
158:3,25,25;161:15;
162:4;168:20;171:1,16,
24;174:1;175:9;176:8;
178:18;179:1,1;180:25;
181:16,24,25;182:1,15,21,
25;183:19,22;184:4,25;
185:3,8,19,25;189:2;
190:24;192:14;195:14;
196:16;197:13;198:19,20;
199:9,10,10;200:1;
201:14;202:7,7,16,25;
203:23;205:25;206:2;
207:19,22;212:17,25;
213:5,22;214:10;215:2,6,
8,10;216:13,25;219:21;
221:20;222:14;225:4;
226:8;227:17,19;228:7,
11;229:4,17;231:4;
232:24;234:3;236:17;
237:12,24;238:1;239:17;
240:8;242:24;243:24;
244:1,1,22,23,25;245:3,4,
5,17;246:7,12,24;247:21;
248:6,13;249:15;250:23;
251:4

**remembers (1)**
205:19

**remind (2)**
127:10;198:1

**reminds (1)**
197:17

**remodeling (1)**
134:6

**remove (1)**
157:10

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 44 of 48

Stacy L. Randall v                                    Steven Randall - Vol. II
Reed C. Widen, et al.                                 November 6, 2023

**renovations (1)**
 134:6
**rental (2)**
 165:24;195:20
**repeat (3)**
 175:24;232:2;235:18
**rephrase (3)**
 161:23;179:24;191:22
**report (1)**
 181:17
**reporter (6)**
 130:6;225:25;233:3;
 235:18;236:12,14
**represent (2)**
 139:11;191:4
**represented (1)**
 169:6
**requested (1)**
 135:9
**require (1)**
 167:11
**requires (7)**
 130:24;146:13;151:22;
 153:9;162:25;163:5;
 187:15
**resides (1)**
 166:12
**respect (3)**
 175:20;234:1,23
**respond! (1)**
 138:19
**responded (1)**
 146:10
**response (1)**
 146:3
**rest (5)**
 180:4;191:1;192:8,11;
 223:8
**resulted (1)**
 202:4
**retail (1)**
 238:10
**reveal (9)**
 128:3;130:2;141:9;
 169:7;174:15,20;235:22;
 237:6;240:6
**revealing (1)**
 235:13
**review (5)**
 169:7;170:9;210:5,15;
 218:12
**revisit (2)**
 142:4;164:4
**Ridge (10)**
 194:7,23;195:13,17;
 198:2,21;199:13;202:3,7;
 206:8
**right (87)**
 127:19,23;130:19;
 131:7;138:2,16;140:20;
 141:15;143:5;146:8;
 148:14,14;152:7,14,20,20;
 153:21;160:18;161:22;

162:13;163:25;164:24,25;
 165:17;166:21;168:1,7,
 25;169:21;171:4;172:23;
 173:10;174:4;176:7,8;
 180:15,15;182:20;183:12;
 184:24;186:8;188:15;
 189:8,25;190:25;191:3;
 195:10;199:14;200:3;
 201:25;202:4;204:6;
 205:15;206:8;209:13;
 210:2;211:23,24;212:2;
 217:4,5,12,19;220:7,24;
 224:21;227:23;229:1;
 235:7;238:3,17;239:1,14;
 241:15,17;243:14,16;
 244:10;246:4;247:7,10,
 14;249:11,23;250:19;
 251:12,20
**ripped (1)**
 190:7
**room (3)**
 127:16;130:17;245:20
**rooms (1)**
 169:7
**roughly (1)**
 196:7
**routine (1)**
 243:16
**rules (1)**
 127:11

**S**

**sale (9)**
 181:19;201:14,18;
 202:4,9,13,24;203:12,20
**same (79)**
 127:11;128:25;129:5,7,
 22;130:13,15;131:2;
 133:2;134:3,10;135:23;
 136:4,13;142:21;144:25;
 149:11,13;150:25;153:19;
 155:12;156:14,14;158:6,8,
 12,19,24;159:19;161:2,10;
 166:14;169:10,25;170:6;
 176:6;177:7,21;178:4,4;
 179:21;184:17;188:7;
 191:15;192:17;194:15;
 195:15;196:18;197:20;
 203:21;204:8,14,21;205:6,
 12,16;206:7;208:12;
 210:18;220:19;221:7,11,
 12;222:15;223:4;225:2;
 227:1,1;232:9;233:25;
 240:16;241:1,5,21;
 246:21;247:15;250:12,16;
 251:10
**saw (1)**
 227:7
**saying (25)**
 142:15;154:19,24;
 157:12;159:5;160:1,4;
 163:24;169:23;170:2,4;

178:14;189:15;190:3,5,6,
 6;209:9;212:8,9;215:11;
 219:4,22;224:19;244:25
**scenario (1)**
 246:2
**second (4)**
 140:10;161:19;181:11;
 230:3
**section (1)**
 194:5
**seeing (2)**
 196:9;231:15
**seem (3)**
 132:23;179:11,13
**seemed (2)**
 182:5;196:20
**seems (8)**
 167:25;171:16,17;
 181:20,22;182:8;198:9;
 216:20
**sell (13)**
 135:21;150:8;163:11;
 178:24;179:18;180:5,7,
 10;181:11,14,15;201:22;
 203:17
**selling (7)**
 135:24;151:4;157:21;
 158:5,16;159:4,9;160:22;
 161:8;167:8;169:3,23;
 170:5,13;176:2;180:16;
 250:24
**sense (1)**
 246:3
**sentimental (2)**
 135:17;136:2
**separated (1)**
 161:6
**session (2)**
 132:6;195:23
**set (1)**
 225:21
**settlement (2)**
 175:1,12
**share (1)**
 141:18
**shared (1)**
 136:22
**Shareholder (4)**
 213:24;214:3,5;228:1
**shares (54)**
 149:5,12;153:17,23;
 154:21;155:11,18,25;
 156:13;157:21;158:5,17,
 21;159:9;162:23;167:2,8;
 169:23;170:5,13,14,21;
 172:5,6,14,16,18,21;
 173:24;174:13;175:21;
 176:2,19;177:12,17;178:3,
 17;179:19;180:4,5,7;
 187:12;188:4,21,24;189:6,
 24;190:17;191:1,10,10,25;
 192:9,11
**shock (3)**

172:18,20;173:2
**shocked (1)**
 172:24
**short (10)**
 161:17;201:14,18;
 202:4,9,12,24;203:11,19;
 227:21
**shortened (1)**
 212:17
**shortly (2)**
 180:13;251:6
**show (2)**
 164:6;234:9
**showed (2)**
 168:14;227:25
**shows (2)**
 165:13;189:20
**side (3)**
 146:7;192:20,20
**sign (52)**
 129:2;209:15,21;210:4,
 21;211:4,7;213:1;214:7;
 215:2,6,9,11,17,22;
 216:11,16;217:3,15,16;
 218:22;219:3,10,11,18,24;
 220:1,2,8,18;221:6,12;
 222:3,6,21;223:2,7,14;
 224:5;225:6;227:6,7,11,
 25;228:4,5,6,8;229:14;
 246:13,19
**signature (56)**
 193:9,11,16,18,22,25;
 207:1,3,5,7;209:13,24;
 211:2,7,17;212:1,16,18;
 213:15;214:11,19,21,22;
 215:1,13,14;226:2;228:9,
 10,19,22;229:12;230:7,7,
 10,12,16,19;231:23;232:6;
 233:5,7,23;234:9,20;
 235:20;237:9,14,18,22,25;
 248:21,21,25;249:3,5
**signatures (8)**
 165:2;214:17;221:3;
 228:17;231:15,19;232:4;
 249:8
**signed (21)**
 129:10;203:15;207:13;
 209:23;210:1;211:2,10;
 212:10,12;215:7,19;216:2,
 21;218:21;224:14;229:14,
 20;230:23;231:7;246:24;
 249:11
**signing (14)**
 210:6,17;211:7,8;212:1;
 213:19;215:10;216:13;
 218:13;220:4;225:11;
 229:4;231:11;249:13
**silver (1)**
 135:14
**simpler (3)**
 169:12;187:25;235:17
**sit (3)**
 142:24;143:7;163:24

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 45 of 48

Stacy L. Randall v                                                    Steven Randall -  Vol. II
Reed C. Widen, et al.                                                  November 6, 2023

**sit-down (1)**
  143:12
**sitting (5)**
  130:19;189:3,10;
  190:19,25
**situation (1)**
  200:11
**slow (1)**
  153:7
**small (3)**
  137:19;139:19,23
**sold (11)**
  148:23;150:6;160:3,5;
  170:14;172:5,7;180:3;
  182:18;196:21;203:3
**solution (2)**
  175:10,11
**somebody (6)**
  145:17,25;155:24;
  201:8;220:23;221:3
**somehow (1)**
  246:24
**someone (16)**
  142:24;144:24;146:19;
  153:16,22;154:21;156:12;
  201:1;205:13;220:25;
  221:15;222:6,9,20;223:6;
  224:4
**sometimes (4)**
  132:19;187:6;213:1;
  244:17
**somewhere (1)**
  162:5
**son (4)**
  136:6;184:1;239:8,15
**sons (1)**
  183:25
**Soon (3)**
  156:22;178:19;188:17
**sorry (17)**
  140:14;148:4;153:6;
  162:9;164:16;167:17;
  180:20;197:24;206:6,16;
  214:15;217:20;231:9,16;
  238:22;247:12,25
**sort (1)**
  191:6
**sound (1)**
  137:8
**sounds (2)**
  140:24;146:1
**speak (3)**
  204:25;237:17,21
**speaker (1)**
  146:5
**speaking (1)**
  200:24
**speaks (1)**
  200:19
**specific (13)**
  132:10,13,23;133:4;
  144:10,17;181:24;182:12;
  210:15;211:6;217:9;

  219:15,17
**specifically (9)**
  136:11;148:6;149:2;
  154:6;155:24;158:20;
  161:4;185:2;189:24
**specifics (2)**
  154:3;155:14
**speculation (25)**
  134:9;150:1;151:6;
  172:9;175:23;179:15;
  206:22;208:14,18;210:8;
  212:21;220:6,13;221:19,
  25;222:16;226:6;227:18;
  231:25;232:8;237:3;
  242:6;245:8,25;248:5
**spelled (1)**
  214:22
**spoke (3)**
  170:10;178:16;233:23
**spoken (4)**
  129:20;233:15;234:8,20
**spot (3)**
  220:8;228:9,10
**Stacy (151)**
  129:4;131:13;135:15,
  23;136:2,8,18;137:22;
  140:22,25;141:11;142:24;
  143:14;144:18;146:19;
  147:15,18;148:22;149:5,
  23;150:20;151:15,19;
  153:16;155:24;156:8,11;
  157:21;158:5,16,21;
  159:7;160:17,25;161:7;
  162:11,22;163:6,17;
  165:16;167:2,7,12,21;
  168:25;169:2,19,23;170:5,
  12;171:20,24;172:2,16;
  174:6;176:1;177:11,15,
  20;178:2,16;179:6;
  181:15,17;182:19;183:4,
  13;185:5,21;187:11,16;
  188:2,18,23;189:4,11;
  190:15,16;191:1,13,20;
  194:11,24;195:6;199:1,6,
  17;202:8;207:5;209:13;
  210:24;212:19;214:19;
  215:11;217:3;219:2,18;
  220:10,17;221:4,16,21;
  222:6,21;224:4;225:6,11,
  22;226:13,22;227:4,4,24;
  228:6,10,22;229:13;
  231:19;232:5;233:15,18,
  23;234:8,20,25;235:20;
  236:25;237:6,8,13;238:2,
  5,24;239:4,12,22;240:6;
  242:3,10,16;247:6,18;
  248:8;249:5,21;250:4,8,
  13,17;251:14,17
**Stacy's (18)**
  128:14;136:12;146:7;
  170:3,12,20;172:4,6,15;
  173:11,23;188:4;211:2,7;
  237:17,21,25;248:2

  **stamp (10)**
  233:6,24;234:9,21;
  235:20;237:9,14,18,22,25
**start (5)**
  143:8;152:22;192:24;
  205:21;233:21
**started (6)**
  156:23;157:8;166:4;
  171:7;172:2;243:22
**state (2)**
  128:12;205:16
**stated (1)**
  166:20
**statements (2)**
  140:1,16
**Steve (6)**
  131:5;138:20;152:4;
  157:7;180:21;187:21
**STEVEN (5)**
  127:2,6;193:1;208:23;
  213:16;230:8;249:1
**steventrandall@yahoocom (1)**
  140:19
**stick (1)**
  162:1
**still (9)**
  140:21;163:1,9;166:17;
  167:13,20;177:20,23;
  178:6,11;179:22;196:21;
  197:11;231:10;234:1,7
**stock (20)**
  148:21,23;149:23;
  150:7,8,22;151:4,17;
  152:10;160:2,3,5,21,22;
  161:8;163:12;169:3;
  178:23;181:19;250:24
**stockholder (1)**
  159:3
**stocks (1)**
  159:4
**Stop (2)**
  156:4,6
**stopped (2)**
  134:18,24
**street (1)**
  134:22
**strong (2)**
  147:10;240:18
**stuff (8)**
  135:8;143:2,5;154:15;
  171:18;182:9;223:13;
  238:14
**subject (1)**
  138:13
**submitted (2)**
  201:10,15
**substance (1)**
  130:2
**success (1)**
  131:19
**suggest (1)**
  155:10
**suggested (1)**

  200:21
**Sunday (5)**
  218:6;243:13;246:15,
  20;247:2
**sure (34)**
  146:21;155:7,20;159:1,
  6;164:1,7,14;165:21;
  166:13;167:6;168:12,21;
  175:9,25;177:5;185:10;
  186:6,13;189:20;190:23;
  194:21;210:15;222:2,5;
  223:4;224:18;232:4;
  234:12;245:3,15;249:23;
  250:14;251:12
**surgery (2)**
  157:10;230:21
**sworn (1)**
  127:3
**SYLVAN (253)**
  128:16,25;129:7,14,22;
  130:15,20,23;131:5,8;
  132:5;133:2,8;134:8,16;
  135:7,19;136:3;137:1,16,
  23;139:17;140:3;141:3,
  20;142:7,9,21;144:7,20,
  25;145:11;146:12;147:8;
  148:1,19;149:15,20,25;
  150:17,24;151:5,21;153:3,
  6,19;154:11;155:4,12;
  156:3,5,7,14;157:4,14;
  158:2,6,8,12,19,22;
  159:12,19,22,24;160:12;
  161:2,13;162:24;163:4,13,
  16;164:7;165:9,11;
  166:11,19;167:10;168:8;
  169:10,25;170:6;171:10,
  22;172:8;173:13,25;
  174:8;175:6,22;176:5,20;
  177:18;178:4,10;179:4,14,
  20;181:21;183:5,10,15,21;
  184:8,17;185:15,24;186:5,
  9,24;187:14;188:6,25;
  190:1,22;191:11;192:2,
  12;193:3,17;194:13;
  195:3,22;196:13,18,23;
  197:6,19;198:3,23;199:5,
  25;200:20;201:16;202:15,
  19;203:5,14,22;204:9,14,
  18;205:1,8;206:11,20,22,
  24;207:15,17;208:11;
  209:18;210:7,19,23;
  211:11;212:5,20;213:4;
  214:9,24;216:3,23;217:18,
  20;218:15,25;219:6,14;
  220:5,12,19;226:6,11,18,
  24;222:11,13,16,23;
  223:10,21,24;224:8,22;
  225:2,13;226:5,12,15,25;
  227:15,18;229:8,15,23;
  230:13,25;231:2,16,21,24;
  232:7,22;233:1,4,12,16,
  25;234:12,16,22;235:2,9;
  236:21;237:2,5,10,19,23;

238:21;239:11,24;240:5,
10,17,20,22;241:2,6,12,
22;242:1,4,6,22;244:12,
16,21;245:24;246:11,17,
23;247:11,15;248:4,12;
249:17;250:10;251:9,18,
23;252:2

**T**

**table (5)**
245:6,11,21;246:5,9
**talk (9)**
132:14;135:24;136:24;
142:24;161:18;189:23;
237:8;239:8;247:4
**talked (34)**
127:10;128:6,7,8;
130:22;131:11;135:13;
143:10;148:21;155:19;
163:11,11;167:2;175:8;
177:11,15;178:2;186:14;
188:20;189:11,18;190:21,
23;194:10;200:21;203:11;
212:15;246:14;251:2,3,6,
8,16,16
**talking (27)**
133:9;143:11;145:16;
148:24;150:20;153:16;
155:16,22;163:19;166:23;
175:11;179:22;181:2;
186:2;188:17,23;189:13;
190:14;207:25;217:11;
219:7;222:17;223:16;
227:23;239:16,20;246:6
**Tammy (1)**
208:1
**taxes (3)**
135:8;143:2,4
**telling (4)**
147:5;178:14;202:5;
204:16
**template (1)**
205:13
**ten (2)**
161:20;190:11
**ten-year (1)**
185:9
**testified (6)**
127:3;141:24;142:5;
208:14;230:20;234:10
**testimony (34)**
128:1;131:23;132:1;
141:21;142:10,20;144:3;
147:9,24;148:2;153:14;
157:15;159:13;164:4;
165:12;168:9;176:21;
183:16;184:9,18;186:10;
189:1;190:2;194:14;
196:24;212:6;216:4;
217:2,21;218:17;219:16;
222:24;224:23;226:7
**Thanks (2)**

117:8;233:4
**theoretically (1)**
212:9
**thinking (13)**
143:25;167:24;176:7,8;
179:25;180:14;219:2;
225:5,7;236:16;242:10,
24;251:5
**third (2)**
213:10;228:16
**though (2)**
143:15;215:6
**thought (5)**
182:4;188:12;239:22;
240:12;243:11
**thoughts (2)**
161:19;248:16
**thousand (1)**
180:8
**three (3)**
133:10;231:13;248:22
**threw (1)**
182:15
**throw (2)**
218:21,23
**tied (1)**
228:2
**timeline (2)**
168:21;185:8
**times (33)**
128:6,7;143:15;148:22;
153:14;154:7;158:20;
160:5;177:14;186:1,14;
189:11,16,21;190:23;
193:18;209:17;215:8,17;
216:11,14;217:3,14;222:2,
5;223:13,16;224:12;
239:7,21;243:13;244:24;
249:25
**timing (1)**
144:11
**today (9)**
127:8,11,15,19;130:17;
140:21;188:13;207:18;
209:6
**today's (1)**
188:11
**together (20)**
127:24;131:11;141:24;
163:2,7,9,17,25;164:18;
165:17;166:18;167:13;
168:6,25;178:11;187:17;
191:14;234:2;235:2,23
**told (17)**
142:2;156:2;170:14;
174:21;178:23;180:12;
185:12;188:8;201:6;
211:4;217:16;218:12;
219:3,18;221:17;222:8;
226:24
**took (2)**
161:22;165:21,23;
170:24;225:15

**top (3)**
137:23;138:7;198:8
**topic (1)**
236:1
**topics (2)**
174:3;251:8
**total (1)**
155:14
**tough (1)**
148:7
**towards (3)**
138:7,9;162:5
**transaction (2)**
150:23;250:4
**transactions (3)**
148:21;149:3;160:2
**TRANSCRIPT (3)**
127:1;186:11;189:20
**tried (1)**
153:24
**true (2)**
197:1;202:10
**try (13)**
139:6;152:2,4;153:12;
157:6;162:17;174:25;
187:20,23;191:18;194:21;
201:7;221:14
**trying (13)**
142:14;143:14;145:3;
152:6;154:6,18;162:10;
163:8;166:2;203:16;
205:6;224:2;246:2
**tumor (1)**
157:10
**turn (14)**
165:1;193:8;194:4;
206:6,15,25;213:10;
214:12;228:15;230:3;
231:5,13;232:14;248:20
**turned (1)**
202:9
**two (23)**
127:9;136:22;137:20;
161:5;162:21;175:4;
181:10;192:19;195:18;
204:10,15;205:5,6;210:1;
231:13;236:18;239:3,7;
242:11,17,20;244:3;
249:10
**type (2)**
151:9;225:10
**typically (1)**
137:7

**U**

**undergone (1)**
134:6
**Understood (9)**
131:3,23;144:23;
176:16;193:7,14;194:19;
196:3;222:5
**unfair (1)**

239:22
**unfortunately (1)**
192:21
**unpacking (1)**
217:1
**unrelated (1)**
129:3
**up (19)**
131:21;132:19,20;
150:5,9;152:16;161:24;
164:1;182:11;183:1,2;
192:9;199:11;215:16;
231:13;238:12;245:20;
247:9,13
**upon (1)**
175:13
**upset (9)**
179:5,6;181:7,8,9,10;
182:3;220:21,22
**use (3)**
136:25;151:3;237:14
**used (8)**
134:22;140:23,24;
151:10;160:14;184:2;
237:25;238:2
**useful (1)**
192:20
**uses (1)**
166:12

**V**

**Vague (9)**
149:19;157:3;169:5;
192:12;195:3;196:13;
198:23;202:19;233:12
**value (13)**
131:19;151:11,12;
155:17,25;156:13;182:17,
18,22;184:3,6;185:13,20
**valued (4)**
151:17;152:11;153:18;
154:22
**verify (1)**
166:2
**versus (1)**
159:11

**W**

**waived (1)**
234:6
**wash (2)**
244:2,6
**watched (1)**
209:15
**Waters (55)**
131:20,25;132:11;
133:5;135:5;137:7;
138:18,25;141:1,18;142:1,
17;144:19;145:1,10,19;
146:19;147:19;148:6,22;
149:5;150:7,11;153:17,

Case: 3:22-cv-00400-jdp   Document #: 100   Filed: 11/09/23   Page 47 of 48

Stacy L. Randall v                                                    Steven Randall -  Vol. II
Reed C. Widen, et al.                                                      November 6, 2023

23;155:25;162:23;167:9;
169:24;170:5,13,15;172:5,
7;178:17;180:4;181:19;
184:6;185:14,21;186:22;
190:17;191:2;192:1;
213:2;214:8;222:7;224:6;
225:17;228:5;232:21;
239:10,18;250:5,9
**way (20)**
135:23;162:15;165:10,
20;180:6;183:13;185:6;
188:13;191:22;194:21;
211:14;215:25;217:13;
219:8,21;221:7,13;223:4;
230:24;249:12
**week (1)**
154:16
**weren't (2)**
168:25;220:24
**what's (10)**
137:12;139:25;142:12;
145:4,6;174:11;175:25;
214:1;228:14;230:15
**Whenever (1)**
198:14
**whole (8)**
136:25;167:4;186:17;
218:9;219:4;221:23;
224:21;227:14
**Widen (79)**
131:20,24;132:11;
133:6,11,24;134:2,4;
135:5;137:6;139:15;
140:1,16;141:1,17;142:2,
6,17,25;144:18;145:1,10,
19;146:20;147:19;148:5;
150:11;184:6;185:13,21;
186:22;190:18;213:2,24;
214:3,8,19;215:3,9,18,22;
218:10,20;220:25;221:2,
16;222:7,9,20;223:7;
224:5,6;225:17;228:4;
232:5,21;237:21;238:2,6,
25;239:5,10,18;241:10,16;
243:3,14;245:5,11;246:5,
9;247:6,17,19;248:3,8,9;
250:13;251:17
**Widen's (5)**
217:6,8;218:3;240:9,24
**wife (2)**
183:4;240:4
**willed (1)**
240:18
**Windy (55)**
131:20,25;132:11;
133:5;135:5;137:6;
138:18,25;141:1,18;142:1,
17;144:19;145:1,9,19;
146:19;147:19;148:5,22;
149:5;150:7,11;153:17,
23;155:25;162:23;167:8;
169:24;170:5,13,14;172:5,
7;178:17;180:4;181:18;

184:6;185:14,20;186:22;
190:17;191:2;192:1;
213:2;214:8;222:7;224:6;
225:17;228:5;232:21;
239:10,18;250:5,8
**Windy0001343 (1)**
231:14
**WINDY0001346 (1)**
230:4
**Windy0002070 (1)**
228:16
**WINDY0008442 (1)**
248:22
**WINDY0033123 (1)**
214:16
**Windy0033128 (1)**
213:11
**withhold (2)**
140:25;141:13
**without (9)**
159:3;187:21;201:22;
216:12,16,21;217:17;
221:4;235:12
**witness (31)**
128:3;129:24;130:4,25;
139:8;141:7,10;161:10;
163:15;170:7;171:13;
174:17;176:25;177:2,5;
180:18,20;191:17,21;
196:1;209:3,7;216:6;
217:23;223:23;225:18;
227:2;235:1;236:13;
242:13;247:24
**WITTENBERG (32)**
127:5;131:3;137:20,25;
139:22;148:9;159:16;
161:17;164:3,9,14;166:9,
16,21;178:7;184:14;
190:11;204:16;205:4;
209:4,10;211:14;227:20;
231:17;234:14;235:6,10,
14;248:14;251:20;252:1,3
**wondering (2)**
161:6;228:3
**word (1)**
166:12
**words (2)**
186:19;201:20
**work (2)**
222:3;238:2
**worked (9)**
133:11,20;134:3,3,7,13;
135:3;238:10,13
**working (6)**
134:19,24;208:1;
247:16,19,20
**world (1)**
188:11
**worth (8)**
140:6;182:10,14;
184:21;188:9,10,12,13
**writing (2)**
148:18;212:19

**written (1)**
194:6
**wrong (1)**
186:17

**Y**

**year (6)**
162:6,8;170:25;192:9;
238:17,19
**years (22)**
133:10;144:8,11;
151:13;152:12;153:24;
154:20;157:23;179:7;
182:9,15,15,17;184:12;
185:1,3;187:3;188:8;
211:4;222:17,17;246:6
**year's (1)**
140:6

**Z**

**zero (1)**
206:17

**1**

**1 (3)**
164:14,17;168:13
**1.3 (1)**
182:19
**1:11 (1)**
138:12
**1:24 (1)**
252:5
**10th (2)**
138:6,11
**11 (1)**
248:23
**1116 (1)**
194:6
**12 (2)**
137:11,13
**12th (3)**
127:25;128:10;129:12
**13 (14)**
191:4;192:15,19,24;
193:8;197:24,24;200:13;
203:10;204:20;205:14,22,
23;206:6
**1343 (1)**
231:17
**13th (4)**
192:6;194:2;207:9,21
**14 (15)**
192:15,19;204:7,20;
205:15;206:6,15,25;
207:25;208:7,10,16,17;
211:23;212:2
**15 (3)**
213:6,8;228:1
**150 (1)**
133:14

**16 (2)**
228:13,15
**17 (2)**
230:1,2
**18 (7)**
214:12,15;232:12,13;
233:1,2,3
**19 (2)**
248:17,20
**196 (1)**
234:14
**1992 (2)**
213:20;217:11
**1998 (2)**
228:25;229:7
**1999 (4)**
133:12;147:1,4,6
**1st (7)**
165:7,16;166:8,18;
168:15;228:25;233:21

**2**

**2000 (3)**
147:4;238:17,20
**2005 (4)**
149:4,10,17;156:23
**2007 (6)**
156:24;157:1,8,13,21;
230:20
**2011 (3)**
157:23,25;158:5
**2013 (1)**
232:20
**2015 (3)**
136:7;140:5;248:23
**2016 (6)**
138:6,11;140:2,5,10,17
**2017 (2)**
158:11,16
**2019 (10)**
160:16;161:7;165:4,7,
16;166:8,18;168:15;
191:24;233:22
**2020 (18)**
133:6,9,17,20;134:2,15;
144:15;191:4,25;194:2;
197:18;198:2,5,13,16;
203:25;207:9,21

**3**

**3 (2)**
138:18;206:16
**30 (1)**
140:10
**30th (1)**
140:17

**4**

**40 (2)**
179:7;211:4

**40-year (1)**
  211:16

## 5

**50 (6)**
  182:16,22;184:3,9,22;
  188:8
**50,000 (1)**
  180:8

## 6

**60 (4)**
  182:16;184:10,22;188:9
**611 (1)**
  194:6
**6116 (3)**
  195:12,17;206:8

## 8

**8th (1)**
  232:20