**In The Matter Of:**

*Stacy L. Randall v*
*Reed C. Widen, et al.*

<span style="color:red">DUPLICATE ORIGINAL</span>

*Justin Randall*
*October 25, 2023*

*Colleen Reed Reporting LLC*
*P.O. Box 293*
*Milwaukee, Wisconsin 53201*
*www.colleenreed.com*

Original File 102523JustinRandallF.txt
**Min-U-Script® with Word Index**

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 2 of 75

Stacy L. Randall v                                         Justin Randall
Reed C. Widen, et al.                                  October 25, 2023

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF WISCONSIN
 2
   -----------------------------------------------------
 3
 4  STACY L. RANDALL,         CIVIL ACTION NO. 22-CV-400

 5           Plaintiff,

 6       -vs-

 7  REED C. WIDEN, MICHAEL KIESLER,
    WIDEN ENTERPRISES, LLC, and
 8  WINDY WATERS, INC.,

 9           Defendants.

10
   -----------------------------------------------------
11

12  DEPOSITION OF:  JUSTIN RANDALL

13  DATE:           October 25, 2023

14  TIME:           9:28 a.m. to 3:54 p.m.

15  LOCATION:       Reinhart Boerner Van Deuren, S.C.
                    22 East Mifflin Street, Suite 700
16                  Madison, Wisconsin  53703

17  REPORTED BY:    Janet D. Larsen, RPR

18

19

20

21

22

23

24

25
```

Page 2

```
 1           A P P E A R A N C E S

 2

 3      REINHART BOERNER VAN DEUREN, S.C., by
        JESSICA HUTSON POLAKOWSKI, ATTORNEY AT LAW
 4      DAVID G. PALAY, ATTORNEY AT LAW
        22 East Mifflin Street, Suite 700
 5      Madison, Wisconsin  53703-4225
        jpolakowski@reinhartlaw.com
 6      dpalay@reinhartlaw.com
        appeared on behalf of the Plaintiff.
 7
        O'NEIL, CANNON, HOLLMAN, DEJONG &
 8      LAING, S.C., by
        DEAN P. LAING, ATTORNEY AT LAW
 9      CHRISTA D. WITTENBERG, ATTORNEY AT LAW
        111 East Wisconsin Avenue, Suite 1400
10      Milwaukee, Wisconsin  53202
        dean.laing@wilaw.com
11      christa.wittenberg@wilaw.com
        appeared on behalf of the Defendants.
12

13  ALSO PRESENT:  Reed Widen

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                    I N D E X

 2

 3  EXAMINATION BY:                          PAGE

    Mr. Laing                                   4
 4
    Ms. Polakowski                            201
 5
    EXHIBITS:                              MARKED

 6   1 - Declaration of Justin Randall in Support   59
         of Plaintiff's Motion for Partial Summary
 7       Judgment

     2 - May 6, 2020 email from Stacy Widen Randall  181
 8       to Justin Randall
         Bates Randall10000116
 9
     3 - May 13, 2020 email from Stacy Widen Randall 190
10       to Justin Randall
         Bates Randall10000117
11
     4 - May 13, 2020 email from Stacy Widen Randall 193
         to Justin Randall
12       Bates Randall10000118

13

14  MATERIAL REQUESTED:                      PAGE

15  None

16

17

18  QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

19  None

20
    (Original transcript supplied to Attorney Dean P.
21  Laing)
    (Originals of Exhibits 1 through 4 are attached to the
22  original transcript.  Scanned copies were provided to
    all counsel)

23

24

25
```

Page 4

```
 1           TRANSCRIPT OF PROCEEDINGS

 2           JUSTIN RANDALL, having been first duly

 3     sworn, was examined and testified as follows:

 4           E X A M I N A T I O N

 5  BY MR. LAING:

 6  Q.  Good morning.

 7  A.  Good morning.

 8  Q.  Can you state your name full name, please.

 9  A.  Justin Widen Randall.

10  Q.  Did your mother ever explain to you how it came to

11      be that you had the Widen middle name?

12  A.  No, not specifically that I recall.

13  Q.  Okay.  Did anyone ever explain to you how it came

14      to be that you had the Widen middle name?

15  A.  Not that I recall.

16  Q.  What's your date of birth?

17  A.  9-15-80.

18  Q.  And I understand you attended college; is that

19      right?

20  A.  Correct.

21  Q.  And you obtained a degree?

22  A.  I did.

23  Q.  And where did you go to college?

24  A.  It's a long story.

25  Q.  I don't need that detail.  So let me ask you this;
```

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 5

1  where did you graduate from?
2  A.  Edgewood.
3  Q.  Here in Madison, Edgewood College?
4  A.  Yes.
5  Q.  In what year?
6  A.  Around '08.  That might be '07, maybe '09, around
7  that time.
8  Q.  And what's your degree?
9  A.  Bachelor of science in business, a marketing
10  focus.
11  Q.  How are you currently employed?
12  A.  A commercial insurance broker for HUB
13  International.
14  Q.  Approximately how many years have you been
15  employed by HUB International?
16  A.  Twelve.
17  Q.  Okay.  Are you married?
18  A.  I am.
19  Q.  What's your wife's name?
20  A.  Julie.
21  Q.  Okay.  Do you have any children?
22  A.  Two.
23  Q.  What's your home address?
24  A.  5907 Winnequah Road, Monona, Wisconsin 53706.
25  Q.  Do you have any plans on moving from there in the

---

Page 6

1  near future?
2  A.  No.
3  Q.  Are you being represented by Reinhart Boerner and
4  Van Deuren in connection with this deposition
5  today?
6  A.  I am.
7  Q.  When did you retain them to represent you?
8  A.  Oh, I mean I signed some paperwork a week or two
9  ago, maybe three weeks, around that time.
10  Q.  Has Reinhart Boerner Van Deuren ever represented
11  you in any matter prior to a couple weeks ago?
12  A.  I did talk to them, I don't know if I signed any
13  paperwork on it, but I talked to another attorney
14  here about some real estate business investment
15  stuff.  It, I, I don't know if I signed any formal
16  paperwork on that.  It kind of, the conversation
17  started and then kind of died off.
18  Q.  When was that approximately?
19  A.  Within probably the last two years.
20  Q.  All right.  Other than in connection with this
21  deposition and the real estate issue that you
22  spoke with another lawyer here, has Reinhart
23  Boerner Van Deuren ever represented you in any
24  capacity at any time?
25  A.  No.

---

Page 7

1  Q.  Your mother is Stacy Randall who's the plaintiff
2  in this case; is that right?
3  A.  Yes.
4  Q.  Okay.  Describe your relationship with your
5  mother.  And if it's varied over the years just
6  tell me that.
7  A.  Yeah, I mean she's my mother.  I'm very, our, our
8  whole family is very family oriented, close, very
9  close with her.  Yeah, I mean there's a lot that I
10  could go into.  There's, you know, there's been
11  times she, we had difficulties with my brother
12  passing away, with her going through a, a divorce,
13  and she, you know, became a little difficult to
14  get along with at, at times, but I have a, you
15  know, I can't think of the word for it but, you
16  know, a, a love for her like a mother.
17  Q.  Okay.  How would you describe your mother's
18  personality?
19  A.  Social, generally kind of light-hearted, you know,
20  like, likes to have fun.  She, I'm trying to think
21  of other descriptors.  Yeah, just, I guess that's
22  kind of what comes to mind off the top of my
23  head.
24  Q.  All right.  Would you describe your mother as
25  being intelligent?

---

Page 8

1  A.  Yeah, she's intelligent.
2  Q.  Okay.  Is she strong-willed?
3  A.  Sure, yeah.
4  Q.  On occasion does she use profanity?
5  A.  Yes.
6  Q.  I'm not saying we all don't.
7  A.  As do I.
8  Q.  Is she, would you describe her as being
9  determined?
10  A.  Yeah, in some aspects.
11  Q.  Is she stubborn on occasion?
12  A.  Yeah.
13  Q.  Is she firm on occasions?
14  A.  Yes.
15  Q.  Is it difficult at times to sway her from her
16  position on matters?
17      MS. POLAKOWSKI: Object to form.
18  A.  I mean in like, give a, give a specific example,
19  yes.
20  Q.  Let's say she gets locked into some position on a
21  topic, would you say she's somebody that you can
22  easily sway from that position?
23      MS. POLAKOWSKI: Object to form.
24  A.  I mean it's the same question basically.  I mean I
25  don't, if there was a specific example of a time

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 9

1    that, I can't think of anything, but if there was
2    a specific example or, or a hypothetical example,
3    I could maybe answer that because I don't really
4    have a strong opinion or, or thought on that, you
5    know.
6 Q.  That's a fair answer.
7 A.  Yeah.
8 Q.  Do you believe your mother is competent
9    currently?
10 A.  Yeah.
11 Q.  Do you --
12 A.  Generally.
13 Q.  Do you have -- I won't tell her you said that.
14        Do you have any reason to believe that
15    your mother was ever incompetent?
16 A.  I mean incompetence, is she competent in the rules
17    of football, things like that, no, but generally,
18    yes, she's a competent human being, you know.
19 Q.  Your brother passed away when?
20 A.  Oh, was that 2015, April, I think.
21 Q.  And are you aware whether he had any life
22    insurance policies when he died?
23 A.  I am aware.
24 Q.  What do you know about that?
25 A.  He gifted my sister and I, I think it was a

Page 10

1    $20,000 policy, if I remember correctly.  Through
2    work he gifted my sister and I each half of it, I
3    believe I got $10,000.
4 Q.  Were you aware of any other life insurance
5    policies on his life when he passed?
6 A.  I mean I've, I don't know specifics but I can say
7    I've seen mail with things that look like,
8    potentially like an insurance policy that was
9    going to my father and my mother that also said
10    something about, you know, in regard to Andrew
11    Randall, but other than that, I mean just the
12    mail, and I'm just taking a guess that that's
13    maybe what it was.
14 Q.  For example, you don't know, I take it, what the
15    face value of the policy was if there was a
16    policy --
17 A.  No.
18 Q.  -- that your mom and dad were beneficiaries on?
19 A.  Yeah, I, I wouldn't.
20 Q.  Okay.  Are you aware whether your mother was ever
21    employed by Widen Enterprises?
22 A.  I am.
23 Q.  And are you aware that she was employed there on
24    two separate occasions?
25 A.  Yeah.

Page 11

1 Q.  All right.  Let's talk about the first one.
2    Do you know why that employment terminated?
3 A.  No.
4 Q.  Do you know if she was terminated?
5 A.  I don't.
6 Q.  Do you know why the second employment stint
7    ended?
8 A.  No.
9 Q.  Do you know whether she was terminated?
10 A.  I don't.
11 Q.  Did you ever discuss with her why she was no
12    longer employed by Widen Enterprises?
13 A.  I may have, but I mean this is years and years
14    ago.
15 Q.  What do you remember --
16 A.  So I --
17 Q.  What do you remember about that?
18 A.  Nothing.
19 Q.  Do you know whether your mother was ever a
20    director or officer of Windy Waters?
21 A.  I do as of today.
22 Q.  Okay.  What do you know about that?
23 A.  I do from --
24        MS. POLAKOWSKI: Hold on, I'll object to
25    the extent that it calls for attorney-client

Page 12

1    privilege information and direct you not to answer
2    to the extent that it would require you to divulge
3    attorney-client communications, but to the extent
4    that you can answer without divulging
5    attorney-client communications, please do so.
6 A.  I mean the first thing that comes to mind is
7    reading the Complaint, it talks about that she was
8    a director.  Prior to reading that Complaint I
9    probably assumed that she had some kind, I mean
10    she was a shareholder, right, I knew that, but I
11    didn't know specifically, like, what, if, like,
12    what title she had other than shareholder
13    really.
14 Q.  Okay.  Do you know whether or not your mother
15    was ever involved in any management issues with
16    Windy Waters?
17        MS. POLAKOWSKI: And same objection and
18    same instruction.
19 A.  I, no, I, from what I know, there was no, she had
20    no management or involvement in management of the
21    companies.
22 Q.  And why do you say that?
23 A.  I mean just from being around the family, right,
24    I, I know that my mom wasn't the business person,
25    right.  She wasn't making decisions based on, you

Page 13

1 know, the company and things like that.

2 Q. Did you ever talk to your mother about her being a
3 director or officer of Windy Waters?

4 A. No. Again, I didn't know her titles so I
5 definitely didn't even talk to her about her
6 director and officership.

7 Q. And by that question, I meant any time from the
8 day you were born until today.

9 A. Again, I did not necessarily that I recall know
10 that she had a title of some director or officer.
11 I knew that she was a shareholder of the company.
12 So I can answer that, no, that I recall.

13 Q. I think you said before that you assumed she was a
14 director or officer of Windy Waters. Was that
15 because you knew she was a shareholder?

16 A. Yeah, right.

17 Q. Any other reason you assume that?

18 A. No. I mean I, I guess I don't, I'm not an expert
19 in, like, the, you know, how the, like,
20 corporations work and, you know, like, I'm a
21 shareholder in some things, but not necessarily do
22 you know, but I guess I assumed in a small closely
23 held company that there, that could be a
24 possibility.

25 Q. Are you currently a director or officer of any

Page 14

1 company?

2 A. No.

3 Q. Have you ever been?

4 A. No.

5 Q. Are you currently a shareholder?

6 A. I am.

7 Q. Of privately held companies or publicly traded or
8 both?

9 A. Both.

10 Q. How many different privately held companies are
11 you a shareholder of?

12 A. Just one.

13 Q. What's the name of that one?

14 A. HUB International, my employer.

15 Q. Describe your relationship with your father.

16 A. Good. He's unfortunately in poor health. I don't
17 see him as much as I used to. We talk fairly
18 regularly, at least I would say monthly. You
19 know, we have totally different kind of interests
20 and personalities and things like that but we get
21 along fine.

22 Q. How often do you currently see your mother?

23 A. When you say -- Define currently.

24 Q. Yeah.

25 A. The last what?

Page 15

1 Q. Fair, fair question.

2 Let's say over the last year, how often

3 did you see your mom?

4 A. Probably about the same as I see my, maybe monthly

5 on average.

6 Q. How --

7 A. Maybe a little bit more frequently.

8 Q. How often over the last year have you spoken with

9 your mother?

10 A. I mean frequently. Like, like you want a time

11 frequency? I mean I would say on average every

12 week or two.

13 Q. All right. Would you say you have a closer

14 relationship currently with your mother or your

15 father?

16 A. Oh, I, I would say even. I mean --

17 Q. Reed Widen one of the defendants in this case is

18 your uncle; right?

19 A. Correct.

20 Q. Describe your relationship with Reed Widen.

21 A. One of my best friends, stood up in my wedding,

22 like a second father to me, someone that I love

23 dearly, and that unlike my father, we really get

24 along well, see eye to eye, enjoy the same

25 things.

Page 16

1 Q. How would you describe Reed Widen's personality?

2 A. Outgoing, fun, laid back, yeah, those are things

3 that come to the top of my head.

4 Q. Okay. Is Reed Widen generally reserved in his

5 personality?

6 A. No, no, he's outgoing.

7 Q. Is he generally humble?

8 A. No, I wouldn't, I wouldn't use that word to

9 describe him.

10 Q. Is he honest generally?

11 A. I think so.

12 Q. Is he an honorable person in your opinion?

13 A. I don't know. What's the -- I think so, yeah.

14 Q. Is he a braggart?

15 A. I'm not sure what that means.

16 Q. Does he brag?

17 MS. POLAKOWSKI: Object to form.

18 A. Yeah.

19 Q. Like about what things?

20 A. It's, it's, it's sort of like kind of a, I guess

21 his schickt or personality, like, you know, just

22 being, you know, big, braggadocious, I guess, that

23 sort of person kind of.

24 Q. Is Reed Widen a generous person?

25 MS. POLAKOWSKI: Object to form.

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 17

1 A. He's been generous to me.

2 Q. What types of things has Reed Widen done for you

3 over the years that would demonstrate the

4 generosity you just expressed?

5 MS. POLAKOWSKI: Same objection.

6 A. I mean just generous in, I mean I've known him

7 since I was a, a, baby basically, and he's just

8 generous with his time with me as well as, you

9 know, just helping me out. I think one time he,

10 when I was a kid I had, like, a water pump that

11 broke and I think he helped me out with that.

12 Yeah, like, when we go out for family dinners and

13 things like that that he would buy, just generosity

14 like that.

15 Q. Has he ever taken you on fishing trips to

16 Canada?

17 A. He has.

18 Q. How many times?

19 A. I, I mean it's been a lot of years since we've

20 done one of those, but I would say four.

21 Q. Okay. How long were the trips generally?

22 A. I, I mean I don't remember specifically.

23 Q. Were they a couple days, a week, a month?

24 A. I believe they were, like, five-day trips,

25 something like that.

---

Page 18

1 Q. And did he pay for everything in connection with

2 you traveling with him?

3 A. Not everything.

4 Q. He paid for the flight?

5 A. I don't believe so.

6 Q. You paid for that on your own?

7 A. I believe so.

8 Q. Okay. How about the accommodations?

9 A. Yes, the accommodations.

10 Q. He paid for those?

11 A. Yes.

12 Q. Has Reed ever taken you to South Dakota on hunting

13 trips?

14 A. Yes.

15 Q. How many times?

16 A. I would venture to guess ten.

17 Q. All right. Did he pay for those?

18 A. Portions.

19 Q. Okay. What portions did you pay for?

20 A. That's a tough question because, yeah, you know,

21 going, there was ten times and so it would change

22 from time to time. I mean --

23 Q. Let me break it up. Were there times where Reed

24 Widen paid for everything in connection with the

25 South Dakota trip?

---

Page 19

1 A. I don't know.

2 Q. Okay. What do you remember ever paying for with

3 respect to any of the South Dakota trips?

4 A. I mean licenses, gas, accommodations, dinners, you

5 know, shot that we needed to hunt, food, you know,

6 all those things.

7 Q. Generally speaking, did Reed Widen pay for the

8 great majority of the expenses for those trips?

9 MS. POLAKOWSKI: Object to form.

10 A. Not, no, I mean there were, I can say there were

11 some years that that would have happened, but I

12 can't say that generally, no.

13 Q. Well, for some years on the South Dakota hunting

14 trips did Reed Widen pay for virtually

15 everything?

16 A. Not that I recall.

17 Q. Did Reed Widen ever let you use his vehicles?

18 A. Yes.

19 Q. Which ones?

20 A. I mean, again, we're talking, I'm, I'm driving

21 for, you know, a lot of years. I mean, I

22 certainly recall him allowing me to use his

23 vehicle for, what was it, like, prom, and just

24 over the years just randomly, you know. I mean,

25 if we were together up north or South Dakota or

---

Page 20

1 something and I would be, like, you can use my

2 vehicle, it's, yours is parked in, I can, he can,

3 you know, it was just, we were a close family so

4 we jumped in each other's cars all the time.

5 Q. What vehicle did you use for your prom?

6 MS. POLAKOWSKI: Object to form.

7 A. It was a Corvette, a red one.

8 Q. Okay. Have you used over the years Reed Widen's

9 boats?

10 A. Yes.

11 Q. How often do you do that?

12 A. I mean multiple times in a summer.

13 Q. What type of boats?

14 A. Pontoon boats, fishing boats, ski boats, all

15 types.

16 Q. Are some of those boats boats that cost over a

17 hundred thousand dollars?

18 MS. POLAKOWSKI: Object to foundation.

19 A. Yeah.

20 Q. Have you ever gone golfing with Reed Widen?

21 A. I have.

22 Q. And has he on occasion paid for those, golfing?

23 A. Yes.

24 Q. Is that pretty much customary that he pays for

25 those?

---

**Colleen Reed Reporting LLC**
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 21

1  A.  Yeah.

2  Q.  Your wife at one time worked for Widen

3      Enterprises; correct?

4  A.  Correct.

5  Q.  And she currently works for Aquia?

6  A.  Correct.

7  Q.  Did Reed Widen play a role in getting her that job

8      at Widen Enterprises?

9          MS. POLAKOWSKI: Objection.  Foundation.

10     Form.

11  A.  I'm not sure how much of a role he did play.

12  Q.  What do you know about what role he played, if

13      anything?

14          MS. POLAKOWSKI: Same objections.

15  A.  I mean if I recall correctly, I think Julie, my

16      wife, spoke to Reed about, you know, hey, looking

17      at a job there, and Reed said, I'll mention

18      something to Matthew, but I can't guarantee you're

19      going to get, you know, you've got to perform on

20      your own and get the job.

21  Q.  Have you ever flown in private jets paid for by

22      Reed Widen?

23          MS. POLAKOWSKI: Objection.  Form and

24     foundation.

25  A.  Yes.

Page 22

1  Q.  How many times?

2  A.  One trip to South Dakota.

3  Q.  Okay.  Have you ever spent time at Reed Widen's

4      Arizona home?

5  A.  Yes.

6  Q.  How many times would you say you visited that

7      home?

8  A.  Hard to determine that.  I mean, we lived in

9      Arizona for a period of months, and, again, we're

10     a very close family so we would see each other all

11     the time, dozens.

12  Q.  Hundreds?

13  A.  Possibly.  I mean, we lived there in a separate

14     house but down the street for, I think four months

15     the first year of, the first winter of COVID.  So,

16     yeah, I mean that's a long period of time.

17  Q.  Have you had any discussions with your mother

18     about the topic of her giving you any proceeds of

19     her recovery in this case if she were to be

20     successful?

21  A.  No.

22  Q.  None?

23  A.  I'm sorry, what?

24  Q.  You've had none of those discussions with your

25     mother?

Page 23

1  A.  No.

2  Q.  Ever?

3  A.  No.

4  Q.  Have you ever heard your wife say something to the

5      effect that if we win this lawsuit, I won't have

6      to work anymore?

7  A.  No.  We're not in a lawsuit, by the way.

8  Q.  Oh, I understand that.

9  A.  Well, you said we.

10  Q.  Well, I'm asking you if you ever heard your wife

11     say that.

12  A.  Right.

13  Q.  Right.

14  A.  Yeah.

15  Q.  How many uncles do you currently have?

16  A.  Three on the Widen side and, what is there, I

17     think just Uncle Jeff on the, my dad's side.

18  Q.  So a total of four?

19  A.  Correct.

20  Q.  As to those four uncles would you say have, your

21     closest relationship is with Reed Widen?

22         MS. POLAKOWSKI: Object to form.

23  A.  Yes.

24  Q.  Describe the relationship you had with your

25     grandfather Mark Widen?  And I know he's since

Page 24

1     passed.

2  A.  He has.

3         MS. POLAKOWSKI: I'll object to form.

4  A.  I mean, it's, he was someone that I looked up to a

5     lot.  He taught me a lot of things about, you

6     know, entrepreneurship, I mean I was young, but

7     entrepreneurship, hard work, taking care of

8     things, you know, being, you know, just generally

9     a good person and, and, you know, kind of, he kind

10     of lived the American dream, and I really looked

11     up to that.

12  Q.  How old were you approximately when, when he died?

13  A.  Oh, God, I don't remember when he passed.  I think

14     I was in college, if I recall.  So low twenties.

15  Q.  How would you describe Mark Widen's personality?

16  A.  He was, I mean, for a young person like myself it

17     was intimidating a little bit, I mean, you know,

18     as an elderly kind of monarch of the family.  But

19     also, he was a very caring person that kind of,

20     was his first grandson so I think he kind of had

21     a, you know, a thing, or we had a thing together

22     that, although he could come across sometimes to

23     some people as maybe hard, I guess would be the

24     word, he was really loving at least to me.

25  Q.  How would you describe your mother's relationship

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 25

1  with her father?
2      MS. POLAKOWSKI: Object to form and
3  foundation.
4  A.  I mean, from what I know of their relationship, it
5  was good, yeah.
6  Q.  Did your mother seem to respect him?
7  A.  Absolutely.
8  Q.  Did it appear that your grandfather showed love
9  for your mother?
10     MS. POLAKOWSKI: Same objections.
11 A.  Yeah.
12 Q.  Did it appear that your mother showed love for her
13 father?
14 A.  I'm sorry.  Repeat that question.
15     MR. LAING: Would you read it back.
16     (Question read)
17     MR. POLAKOWSKI: I'm interposing the same
18 objections.  Form and foundation.
19 A.  Yes.
20 Q.  Was your father -- I'm sorry, strike that.
21     Was your grandfather Mark Widen someone
22 that you would describe as a caring and loving
23 person?
24 A.  Yes.
25 Q.  How would you describe your mother's relationship

Page 26

1  with Reed Widen over the years?
2      MS. POLAKOWSKI: Objection.  Form and
3  foundation.
4  A.  I mean generally good.
5  Q.  Has Reed Widen over the years been generous to
6  your mother?
7      MS. POLAKOWSKI: Objection.  Form and
8  foundation.
9  A.  I, I mean, you'd have to ask her that.  I'm not
10 aware of, you know, generous acts that took, took
11 place between my mom or my dad and Reed.
12 Q.  Has your mother ever said anything negative to you
13 relating to her brother Reed Widen?
14 A.  Yeah.
15 Q.  Okay.  When's the first time you can recall that?
16 A.  I, I can't really recall the first time.  Yeah, I
17 mean, it's, there's so much time, right, like, I'm
18 thinking back.  If there was something that was
19 prompted, I, I would remember, but I don't
20 remember, like, a specific first time.
21 Q.  Can you recall any time your mother was ever mad
22 or upset about her brother Reed Widen?
23 A.  Yes.
24 Q.  Tell me about those.
25 A.  I mean there's a couple things that are coming to

Page 27

1  mind, one was, like, related to the cottage, and
2  I'm trying to think.  So I think, I think Reed had
3  texted my mom or my mom had texted Reed about
4  something, you know, my mom was kind of, was
5  ruffling feathers of a few people there or
6  something, and my mom was upset that Reed had
7  texted her a handful of years ago.  You know, she
8  would, I remember her and my mom, or my dad
9  talking about times where, you know, related to
10 the family business stuff, like, you know, hey,
11 we, you know, we're not, Reed's got a brand-new
12 car and we're, you know, not, we're not living the
13 life, you know, we're, we're owners in this
14 company, too, just general stuff like that where
15 they would be somewhat upset.
16 Q.  Okay.  Any other times you can think of?
17 A.  I mean, obviously related to this.
18 Q.  Sure.
19 A.  You know.
20 Q.  Other than this, meaning the lawsuit situation?
21 A.  The lawsuit, right, yeah.
22 Q.  Can you think of any other examples?
23 A.  Yeah, I mean, most, most of the time that I
24 remember, there was stuff around just, you know,
25 brotherly/sisterly stuff where Reed said something

Page 28

1  at the Sunday dinner or Stacy said something at
2  the Sunday dinner, and they were just, you know,
3  quabbling, but most of the time the more, you
4  know, things that stick out in my mind was in
5  regard to, you know, the business stuff, like I
6  said, like, mom and dad arguing about or, or
7  talking about, you know, the, their treatment as
8  shareholders of the business versus what Reed was,
9  you know, doing.
10 Q.  What would they say about that?
11 A.  Just things like, you know, we don't have, you
12 know, we're, we're not doing, and I don't remember
13 specifically, but I guess I can say generally it
14 was like, look, we're not, you know, we can't buy
15 brand-new cars and, you know, some of these things
16 like that, and Reed is and, you know, we're not
17 seeing really anything from the company but he is.
18 That's kind of the general stuff.  I can't
19 remember anything real specific like, you know,
20 yeah.
21 Q.  Okay.  Have you reviewed all or any portion of the
22 transcript of your mother's deposition in this
23 case?
24 A.  No.
25 Q.  I think you said you read the Complaint filed in

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 29

1    this case; correct?
2 A. Correct.
3 Q. Okay. Did you review any drafts of the Complaint
4    before the Complaint was actually filed?
5         MS. POLAKOWSKI: I'll object to the
6    extent that it would require you to divulge
7    attorney-client communications and instruct you
8    not to answer to the extent you would have to
9    disclose attorney-client communications. To the
10   extent you can answer without doing so, go ahead
11   and answer.
12        MR. LAING: Well, that's impossible
13   because he's already testified he wasn't
14   represented by you folks at the time.
15 Q. So my question is, before the Complaint was
16   filed --
17 A. M-hm.
18 Q. -- did you review any drafts of the Complaint?
19        MS. POLAKOWSKI: And I'm going to
20   maintain my objection, and I'll clarify for you,
21   Dean, that he was serving as Stacy's power of
22   attorney. As her agent, communications between
23   the group of us are protected.
24        MR. LAING: Okay.
25 Q. Do you currently have a written power of attorney

---

Page 30

1    for your mother?
2         MS. POLAKOWSKI: Object to form.
3 A. I'm not sure.
4 Q. Okay. Have you ever had a written power of
5    attorney on behalf of your mother?
6 A. Again, I'm not sure.
7 Q. Are you aware of any?
8 A. Of a written power of attorney? Like, I, I don't,
9    I don't totally understand what that is. I don't
10   remember signing anything saying -- Well, I may
11   have signed something when she had surgery, or was
12   that my dad. I'm not aware.
13        MR. LAING: Counsel, will you agree to
14   produce that --
15        MS. POLAKOWSKI: Yes.
16        MR. LAING: -- written power of attorney?
17   And can you tell me when it was signed?
18        MS. POLAKOWSKI: I can. I can tell you
19   it expired on December 31st of 2022. I don't know
20   for sure when it was signed but we'll check
21   that.
22        MR. LAING: Okay. Yeah, if you can tell
23   me when it was signed so I'll know the effective
24   dates because I know when it was terminated.
25        MS. POLAKOWSKI: Sure.

---

Page 31

1 Q. Other than the Complaint you told me about that
2    you have reviewed, have you reviewed any other
3    documents that relate to this case as far as you
4    know?
5 A. I have.
6 Q. Which documents?
7 A. I don't really remember. I mean I've just looked,
8    like, on line, like, what's going on, things like
9    that.
10 Q. Other than looking at the court docket on line,
11   have you, and the Complaint, have you reviewed any
12   other documents that relate to this case?
13 A. The, I did sign something, I don't know what it's
14   called, but --
15 Q. The declaration?
16 A. Maybe.
17 Q. Okay. Anything else?
18 A. Not that I recall.
19        MS. POLAKOWSKI: And, Dean, I can clarify
20   for you. The POA was signed on September 20th of
21   2021, but I will produce it to you.
22        MR. LAING: Thank you.
23 Q. Okay. In the last two weeks have you reviewed any
24   documents that relate to this lawsuit?
25 A. The Complaint and the declaration, I don't know

---

Page 32

1    when that was signed though, but it was around a
2    few weeks ago.
3 Q. All right. Anything else?
4 A. Not that I recall.
5 Q. Okay. Prior to May of 2020, had you ever had any
6    discussions with Reed Widen regarding the
7    possibility of selling Widen Enterprises?
8 A. To clarify, just because I do want to make sure of
9    the timing on this point, the May of 2020 was when
10   my mom, when her stock was sold?
11 Q. When the last chunk of her stock --
12 A. Okay.
13 Q. -- was sold back to the company.
14 A. Okay. And then had I spoken to Reed about the
15   company selling --
16 Q. Yeah, so let me ask it again --
17 A. -- prior to that.
18 Q. -- so we have a clear question.
19 A. Yeah.
20 Q. Prior to May of 2020 when your mother sold the
21   last part of her stock back to Windy Waters, did
22   you ever have any discussions with Reed Widen
23   regarding the possibility of selling Widen
24   Enterprises or Windy Waters?
25 A. I do.

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 33

1  Q.  How many times did you have that type of
2      discussion prior to May 2020?
3  A.  I mean, I remember one time specifically.  There
4      may have been other times.
5  Q.  And I can only ask you about what you remember.
6  A.  Right.
7  Q.  So let me be sure on your answer.
8          As you sit here today you recall one time
9      prior to May 2020 having a discussion with Reed
10     Widen regarding the possibility of selling either
11     Widen Enterprises or Windy Waters; is that
12     correct?
13 A.  The, it was, it was, to me it was Widen
14     Enterprises.  I didn't really --
15 Q.  Okay.
16 A.  -- know what Windy Waters was, but, yes, as I
17     recall, that's the only time that I remember.
18 Q.  Okay.  Now let's talk about that.  When did that
19     occur?
20 A.  It was February 2020.
21 Q.  All right.  And where was it, where were you folks
22     when that discussion was had?
23 A.  On Reed's Arizona house pool deck.
24 Q.  Okay.  And who was all there?
25          MS. POLAKOWSKI: Object to form.

---

Page 34

1  A.  Well, I mean, like, there, define there.
2  Q.  Good, good question.  Good objection.  Good
3      comment.
4          On the property, who was all there on
5      that occasion in February of 2020 at the time this
6      discussion was had?
7  A.  The people that I recall there was my family so my
8      wife, kid, Reed's wife, Reed, you know, there was
9      a lot of comings and goings of, like, friends and
10     family at that time but that's what I can remember
11     that was definitely there.
12 Q.  Okay.
13 A.  There may have been others though.
14 Q.  So the ones you remember being there at the time
15     this discussion was held and not necessarily as
16     part of the discussion, but on the property --
17 A.  Yeah.
18 Q.  -- were you, your wife, did you say kid or kids?
19 A.  What was that 2020?  It would have been kids.
20 Q.  Okay.  Kids.  And then Reed and his wife; correct?
21 A.  Correct.
22 Q.  Do you recall anyone else present on the property
23     at the time the discussion was had?
24 A.  I, I mean I remember a time where there was, I
25     can't remember their names, Sally Waller's sister

---

Page 35

1      and her husband were at, I mean there, there could
2      have been, but I don't recall.
3  Q.  And when you say you remember a time, do you
4      recall that as being on this day that you had the
5      discussion with Reed or not?
6  A.  Not necessarily, but I mean it was, it could have
7      been.  I'm just thinking about, you know, sitting
8      out by the pool, and I remember them specifically
9      being there.  That could have been a different
10     time of year even.  It could have been, you know,
11     whatever.
12 Q.  I understand.  Who was in the vicinity that could
13     have overheard the conversation you had with Reed
14     on that occasion?
15          MS. POLAKOWSKI: Objection.  Foundation.
16 A.  I mean, I can't, I don't, I can't recall anyone in
17     the vicinity.
18 Q.  So other than you and Reed, is that what you're
19     telling me?
20 A.  Correct.
21 Q.  Okay.  Do you remember the specific day, date?
22 A.  No.
23 Q.  Do you remember the day of the week?
24 A.  No.
25 Q.  Do you remember the time of the day?

---

Page 36

1  A.  We had golfed that day, I believe.  So it was
2      later in the day.  I believe we were kind of
3      getting ready to go out to dinner.
4  Q.  When you said we golfed, was it just you and Reed
5      or others?
6  A.  I don't recall who was there.
7  Q.  Okay.  Do you remember who paid for that golf?
8  A.  I don't.
9  Q.  Okay.  So you and Reed were standing or sitting on
10     the pool deck?
11 A.  Both.  I mean --
12 Q.  I'm talking about when this discussion was had.
13 A.  Both.  We would, he would get up, I could stand
14     up, he would sit down, I would sit down.  I mean
15     we're moving around.
16 Q.  Okay.  How long did the discussion take on this
17     topic?
18 A.  Oh, we probably talked for 10, 15 minutes.
19 Q.  All right.  And what do you recall Reed Widen
20     saying on the topic during those 10 or 15
21     minutes?
22 A.  Specifically him?
23 Q.  Yes.  I'm going to divide it between what he said
24     and you said.
25 A.  Okay.

---

**Colleen Reed Reporting LLC**
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 37

1  Q.  So tell me first of all what he said on the topic.
2  A.  Well, he answered a question that I had asked or a
3      statement, I guess that I had made, which that
4      statement was, you know, our private equity
5      practice at work is crazy busy, there's all kinds
6      of transactions happening, and he answered with
7      something like, and I may have asked, well, I
8      don't recall if I did that, he answered with
9      something like, oh, we get calls all the time from
10     private equity firms, you know, looking to acquire
11     us.
12 Q.  Okay.  What else did he say?
13 A.  I was, like, oh, interesting.  It was, you know, a
14     conversation, like I say, I think he said that,
15     from what I recall he said that Matthew, you know,
16     Matthew would get the calls, and, you know, that
17     the, some of the numbers were really big and that,
18     you know, he, they, he's, like, I've considered
19     it, there's a, we won't really have a succession
20     plan in place, Jesse isn't necessarily a software
21     guy, I don't know what we would do if we didn't
22     sell, and I could, I could walk away with large
23     sums of, of money and just kind of be done.
24 Q.  What else did he say, if anything?
25 A.  I think, I mean, that's generally the, the, the

---

Page 38

1      specifics.  I mean, this conversation is many
2      years ago, but that's the, that was the the, the
3      specifics that I remember.
4  Q.  As you sit here today can you recall anything else
5      he said during that conversation?
6  A.  Oh, yeah.  I mean, there was, there was
7      conversation about specific numbers, like, I think
8      he said something like, you know, I can walk away
9      with 80, $50 million, something like that.
10 Q.  You said 80, $50 million, what did you mean by
11     that?
12 A.  As in you throw around numbers, right, like, you
13     know, heck, I could walk away with 50 million, I
14     could walk away with 70 million, I could walk with
15     80 million.  It could have been just that second
16     one, too.  The indications were that he could walk
17     away with large sums of money like those ballparks
18     from, you know, the inquiries that, that these
19     private equity firms or these firms that were
20     interested in buying Widen were making.
21 Q.  Did he specifically use the number 50 million?
22 A.  I mean there's, possibly, yeah, because there was,
23     I believe there was conversation of, like, if the
24     company sold for X number, I could potentially end
25     up with Y number.  So there's, like, math and, you

---

Page 39

1      know, was it, is it, is there taxes, I mean, so --
2  Q.  I don't want to know what he possibly said.  So can
3      want to know what you remember he said.  So can
4      you tell me what you remember he said with respect
5      to any numbers and their context?
6  A.  I remember the number 50 being used as, like, I
7      could walk away with 50 million.  I remember the
8      number 80 coming up.  I don't remember
9      specifically what that was.  That could have been
10     I could walk away with 80 million or I could, or
11     the company could sell for 80 million, I don't
12     remember exactly, but I remember both 50 and 80
13     being used.
14 Q.  Do you remember any other numbers being spoken by
15     Reed Widen during that conversation other than
16     $50 million and $80 million?
17 A.  I believe there was, you know, indication that the
18     company, I do remember this, it wasn't, you know,
19     I, I could walk away with a hundred million but
20     the company itself could be potentially acquired
21     or purchased for a hundred million is the
22     indication is received.
23 Q.  Okay.  Any other numbers that you recall him
24     referencing during that conversation other than
25     $50 million, $80 million, and $100 million?

---

Page 40

1  A.  Not that I recall.
2  Q.  Okay.  Do you remember anything else Reed Widen
3      said during this conversation other than what
4      you've told me about?
5  A.  Not that I recall.  I mean, this is a few years
6      ago.  If there's something that prompted me or
7      something reminded me maybe, but not right now.
8  Q.  Did Reed Widen tell you during that conversation
9      that he had no interest in following up any, on
10     any of those solicitations?
11 A.  No, he said that there was interest in following
12     up on those, because, again, there, there wasn't a
13     succession plan in place.  He was getting to an
14     age, right, where he's, like, I don't really want
15     to be involved with the business and I can just
16     walk away into the sunset with, you know, a large
17     sum of money that can take care of me and, you
18     know, my, my, my people for the rest of my life.
19 Q.  Did he imply at all or say at all that this was
20     something on the horizon meaning five, ten years
21     out or this was something that was going to happen
22     within the next couple months, or did he give you
23     any impression or say anything along those
24     lines?
25 A.  I don't recall any time period, but I mean it was,

---

Page 41

1     it was, I guess what I understood it was was,
2     like, I'm, it's something I would consider with
3     these large numbers.
4 Q. Did Reed Widen ever talk to you about
5     retirement?
6 A. Yeah.
7 Q. Okay. Was it that day or other days?
8 A. Yeah, other days and kind of, I mean that was what
9     that conversation was about regarding, you know,
10     potentially being acquired was, you know, I'd be
11     able to walk away, I mean retire, but, yeah, there
12     were other days, too.
13 Q. Did Reed ever target for you a date by which he
14     wanted to be retired?
15 A. Not a specific date, no.
16 Q. Did you have the understanding that that date was
17     somewhere when he was around 65 years old?
18 A. No. I mean, I think he wanted to retire, if I had
19     to guess, but as soon as possible.
20 Q. Did you have an understanding as of that
21     conversation that Reed or Matthew Gonnering or
22     anyone else was actively following up on those
23     solicitation offers?
24       MS. POLAKOWSKI: Object to form and
25     foundation.

Page 42

1 A. I mean, did, in the conversation though you're
2     talking about in Arizona?
3 Q. Yes.
4 A. Was there active follow up? I don't think that
5     was discussed, but what was discussed, I mean, it
6     was, like, there was interest, we were listening
7     was what was indicated.
8 Q. Did Reed say that he had talked to any of those
9     people who were soliciting him, his company?
10 A. I don't recall. I mean, he was not necessarily in
11     the office and would take those kind of calls,
12     right, just knowing what kind of what he, he did
13     for the company.
14 Q. Yeah, that wasn't my question. My question was,
15     during that conversation in February of 2020, did
16     Reed Widen tell you or imply to you that he had
17     responded to any of those solicitation efforts?
18 A. No, no.
19 Q. During that conversation in February of 2020, did
20     Reed Widen tell you that Matthew Gonnering had
21     followed up on those solicitation efforts?
22 A. I don't recall. I mean, I would, it could have
23     been did Matthew, I mean, all I know was that
24     Matthew had had conversations with people that
25     would inquire about the acquisition. Did he

Page 43

1     follow up on an email or a voicemail, I don't
2     know, it's just they, there was conversations had
3     is what I got.
4 Q. And to your knowledge, no one else overheard that
5     conversation that he had with Reed Widen in
6     February of 2020; is that right?
7 A. Correct.
8 Q. Okay. Did you make any notes ever of that
9     conversation?
10 A. No.
11 Q. You didn't record it; did you?
12 A. Like audio, audio recording?
13 Q. Yeah.
14 A. No.
15 Q. As you sit here today are you able to specifically
16     say that Reed Widen told you in February of
17     2020 that he could sell Widen Enterprises for
18     $50 million?
19 A. As I sit here today -- I'm sorry, repeat the
20     question.
21       MR. LAING: Read it back.
22       (Question read)
23 A. No, I mean the, the 50 million I remember
24     specifically being used where, God, I mean it's,
25     it's definitely of interest to me where I could

Page 44

1     just walk away with a $50 million check. So that
2     would mean the company would be sold for more than
3     that, with my understanding being that he didn't
4     own a hundred percent of the company.
5 Q. As you sit here today can you definitively tell me
6     that you recall Reed Widen telling you in February
7     of 2020 that he could sell Widen Enterprises for
8     $80 million?
9 A. I can't definitively say that. Like I said, there
10     was numbers thrown around, a hundred, 80, 50. The
11     one that I can definitively say I know that he
12     said was it's definitely of interest for me to be
13     able to walk away with let's say $50 million.
14 Q. Are you able to definitively say for me today that
15     Reed Widen told you in February of 2020 that he
16     could sell Windy Waters for $100 million?
17 A. I, I honestly don't even know what Windy Waters is
18     so I can't say anything definitive about that.
19 Q. Let me restate that.
20       Are you able to definitively tell me
21     today that Reed Widen told you in February of 2020
22     that he could sell Windy -- Widen Enterprises for
23     $100 million?
24 A. I can't definitively say that. Well, actually,
25     let me back up on that because the hundred, I know

Page 45

1 he didn't say I could walk away with a hundred.
2 So, yeah, it was, the hundred number was used in
3 context to the, being able to sell the company for
4 that.
5 Q. All right.
6 A. Now that, I just kind of backed into that.
7 Q. Okay. Other than Reed Widen telling you on
8 February, in February of 2020 that he could sell
9 Widen Enterprises for some number that would net
10 him personally $50 million, do you recall him
11 using any other number in that context?
12 A. Any other number of what he would net?
13 Q. Yes.
14 A. I mean, like I say, there was numbers thrown
15 around of 80, 50, and a hundred.
16 Q. All right. And were those numbers related to the
17 sale price for the company or --
18 A. Both.
19 Q. -- the price that he would get?
20 A. Sorry, both.
21 Q. So as to the $50 million number, was that in
22 reference to a sale price for the company or what
23 Reed Widen would net from the sale?
24 A. What Reed Widen would net.
25 Q. With respect to the $80 million, was that

Page 46

1 discussed in the context of what the company would
2 be sold for or what Reed Widen would net from the
3 sale?
4 A. That's the one that I can't definitively say what
5 the usage of that was. I just remember the number
6 being thrown around.
7 Q. Okay. With respect to the $100 million number,
8 was that number used in the context of what the
9 company could be sold for or what Reed Widen would
10 net from the sale?
11 A. That one was company sold for.
12 Q. Okay. I think you already answered this, but I
13 want to make sure I remember correctly.
14      Have you ever had any other conversation
15 with Reed Widen or overheard Reed Widen say
16 anything about the subject of potentially selling
17 Widen Enterprises other than this February 2020
18 discussion at Reed Widen's home in Arizona?
19 A. Yes.
20 Q. All right. How many times?
21 A. I mean, I can't give a specific count. I mean,
22 again, my relationship with Reed is 43 years long,
23 my entire life, and I've been, I've hung around
24 with him a lot of times so, and we've talked a
25 ton, so I can't give you a specific number. A lot

Page 47

1 probably. I mean, I don't know, yeah.
2 Q. Tell me the first time you recall that.
3 A. I believe the time that I recall was kind of, I
4 think I believe either Nike and/or Reebok was a
5 customer or a target customer for the companies at
6 the time, and Reed had talked about it would be,
7 you know, really interesting or really cool or
8 really great if Reebok would buy us.
9 Q. Was that before or after February 2020?
10 A. Before.
11 Q. Do you remember anything more specific that Reed
12 said other than what you told me?
13      MS. POLAKOWSKI: Object to form.
14 A. No, I mean the only other specific thing that I
15 remember is he got, I believe it was the Reebok
16 guy and he got along with him well, the
17 representative from Reebok.
18 Q. Okay. Tell me the next time you recall a
19 discussion on that topic.
20 A. That's the thing, I can't remember specifically.
21 The, the one sitting here today, the next time
22 that I can recall that kind of conversation was
23 the February of 2020.
24 Q. Okay. And then have you had any other occasions
25 where you had a discussion with Reed Widen or you

Page 48

1 overheard Reed Widen talk about the possibility of
2 selling Widen Enterprises?
3 A. Not that I can recall, no.
4 Q. Okay. So as you sit here today you recall one
5 occasion prior to February of 2020 where Reed said
6 something to the effect that wouldn't it be cool
7 if Nike or Reebok purchased Widen Enterprises or
8 something to that effect?
9 A. Yeah.
10 Q. And you don't recall any more detail other than,
11 other than Reed Widen seemed to get along good
12 with whoever that representative was?
13 A. From Reebok, yes.
14 Q. Okay. And then the only other time you recall
15 that conversation is on the pool deck at Reed
16 Widen's home in Arizona in February of 2020;
17 correct?
18 A. Yes.
19 Q. Okay. Have you ever shared either of those
20 conversations that you had with Reed Widen with
21 your mother?
22 A. I'm, there's kind of a compound question there.
23 So the Reebok one, let's take. I don't recall, I
24 mean that was, that was years ago. I don't recall
25 if I told her. The February 2020, yes.

Page 49

1 Q. All right. And when did you tell her about that
2    conversation?
3        It was, I believe she called me after
4    Reed had told her that the company had sold and,
5    you know, was distressed, I would guess, I would
6    describe it, and was kind of asking me, like, I
7    guess generally what I remember is that she was,
8    like, did you know that they were selling? And I
9    did, I did then at that point say, you know, I
10   didn't know that they were, they were interested
11   in selling or selling, but the only, but I did,
12   but then that kind of prompted this memory about
13   the February of 2020. And I said the only thing I
14   can remember that I heard about that was when we
15   were Arizona, Reed had said, and then what we
16   discussed in February of 2020.
17 Q. Okay.
18       MS. POLAKOWSKI: Dean, we've been going
19   about and hour.
20       MR. LAING: Take a break? Sure.
21       (Break taken)
22 Q. Mr. Randall, I've been asking you questions about
23   times where you heard Reed Widen discuss the
24   subject of the possible sale of Widen Enterprises.
25   Do you recall those generally?

Page 50

1 A. I do.
2 Q. Okay. And you told me about two occasions, the
3    first being a time, a reference Nike and Reebok,
4    and the second time on the pool deck at Reed
5    Widen's home in Arizona; correct?
6 A. Yes.
7 Q. I want to now change those questions just a little
8    bit and ask you about whether you have heard from
9    anyone at all that Reed Widen discussed the
10   possibility of selling Widen Enterprises with
11   anyone else. Do you understand what I'm asking?
12       MS. POLAKOWSKI: Object to form.
13 Q. Do you understand what I'm asking?
14 A. I mean, so you're, have I heard anyone else say
15   that Reed had considered selling the company?
16 Q. Yes, in other words, Reed would have told somebody
17   and somehow you would have heard from that person
18   directly or indirectly.
19 A. Yes, I did.
20 Q. Okay. On how many occasions?
21 A. One that I can recall.
22 Q. Okay. When was that?
23 A. I believe it would have been early summer, maybe
24   May, May of '22.
25 Q. Okay. And who's the person that told you whatever

Page 51

1    they told you?
2 A. Bill Nordland.
3 Q. Bill Nordland.
4        And he told you this in May of 2022?
5 A. If I'm recalling correctly, I mean, I'd have to
6    look at, but, yeah, that sounds correct.
7 Q. And where were the two of you when he told you
8    this?
9 A. I was at home.
10 Q. Was this a phone call?
11 A. Yes.
12 Q. And what did Mr. Nordland tell you during that
13   phone call in May of 2022?
14 A. He called, well, he texted and said, how are you
15   doing. And I just said, this is really difficult
16   because of the relationship that I have with Reed,
17   relationship that I have with my mother, like, I'm
18   in like a no-win, but both, both sides I love to
19   death, and it's a terrible situation. He knew
20   some things were going on that would put me in,
21   in, in the middle of this, and he kind of just
22   reached out and said, you know, I'm here if you
23   need anything. And I texted him back saying, I
24   appreciate that, and I may reach out to you, this is,
25   this is just really difficult. And then he called

Page 52

1    me when I texted him back, and he, I don't
2    remember how it came up, but it was, like,
3    basically it was repeating the, he said, like,
4    yeah, I remember in February sitting at the pool
5    and Reed basically kind of the, repeated back
6    to me almost the exact same story that I had been
7    told. So it sounds like the same, a very similar
8    conversation that had happened with Bill. And I
9    think I said that to him, I said, yeah, he said
10   that to me, too.
11 Q. So Mr. Nordland told you about a conversation he
12   had with Mr. Widen in Arizona; is that right?
13 A. Correct.
14 Q. At --
15 A. It sounded --
16 Q. -- Reed Widen's house?
17 A. Yeah, it sounded like really similar to the exact
18   same situation that happened to me, we were kind
19   of sitting by the pool in Arizona, and, you know,
20   Reed had talked about that, you know, like, the
21   numbers and, and the fact that there were
22   solicitations and those kind of things.
23 Q. And what do you recall, specifically recall
24   Mr. Nordland telling you during that telephone
25   call?

Page 53

1  A.  Just saying, you know, well, Reed, we were sitting
2      by the pool, and Reed said, oh, they were getting,
3      you know, solicitations for large sums of money.
4      I don't remember a specific number that he used.
5      And, you know, that, that there was consideration
6      of those, of those solicitations due to the large
7      sums of money.  And he was just kind of comfort,
8      like, hey, you know, if you, you know, try to hang
9      in there, I know this is really tough because of
10     your relationships with the two people that you
11     love so much, and, you know, I'm here as a
12     shoulder to cry on or, or lean on or, you know,
13     whatever.
14  Q.  Do you recall any more of the details of what
15     Mr. Nordland told you during that conversation?
16  A.  Well, I think the reason that I remember kind of
17     the timing was and the reason that I was kind of
18     kind of in a distressed situation, and I don't
19     know, the only thing I can assume is that Reed was
20     talking to Bill about this, too, which he was also
21     talking to me was, you know, he was talking about
22     selling the cottage, and it was, you know, it was,
23     that distressed me because the cottage means a, a,
24     a lot to me.  I grew up there.  I want my kids to
25     grow up there.  It's a place that I spent a ton of

Page 54

1      time with my family, with Reed and his family, my
2      grandparents.  You know, there's, there's a lot to
3      it.  So I think, and Bill knows that so I think he
4      knew that I would, you know, I think that's why he
5      texted me in the first place.
6   Q.  Do you recall as you sit here today any more
7      detail that Mr. Nordland said to you in May of
8      2022 about Mr. Nordland's conversation with Reed
9      Widen in Arizona?
10  A.  Is there anything else?
11  Q.  That you recall him saying.
12  A.  About the, the conversation that Mr. Nordland had
13     had in Arizona with Reed.  No, I think I kind of
14     described it.  Like I say, it was like, it was, I
15     don't want to, eerily isn't necessarily the word,
16     but it was like eerily similar to the, to the, to
17     the conversation I had had with Reed.
18  Q.  Do you recall Mr. Nordland using any numbers with
19     you when he had this conversation with you in May
20     of 2022?
21  A.  I don't recall.
22  Q.  Do you recall Mr. Nordland saying to you that Reed
23     Widen was planning on selling the company in two
24     years or five years or ten years from his
25     conversation with Mr. Widen in Arizona?

Page 55

1         MS. POLAKOWSKI: Object to form.
2   A.  I don't recall any of those numbers you used.
3   Q.  Do you recall whether Mr. Nordland said that Reed
4      Widen told him he planned to sell Widen
5      Enterprises right then and there or about at that
6      same time that the two of them had a conversation
7      or was it somewhere down the road or didn't you
8      mention anything on that?
9         MS. POLAKOWSKI: Objection.  Form and
10     foundation.
11  A.  I mean the option, yeah, none of the options that
12     you said really would apply.  I guess it was kind
13     of, it was kind of the inference that I made
14     where, you know, it was something that was in
15     consideration right now today when something like
16     that could go down, a sale, I mean.  I don't know
17     what that time period that that takes to put
18     together.
19  Q.  Have you ever talked to Reed Widen about the sale
20     of Widen Enterprises?
21         MS. POLAKOWSKI: Object to form.
22  A.  Yes.
23  Q.  Okay.  What did he tell you about that?
24         MS. POLAKOWSKI: Object to form.
25  A.  I mean, so we just discussed that in February.

Page 56

1   Q.  Of what year?
2   A.  2020.
3   Q.  I'm sorry.  Maybe you misunderstood my question.
4      My question was intended to say that after the
5      sale, have you ever had any discussions with Reed
6      Widen about the sale?
7   A.  Yeah.
8   Q.  And what did he tell you?
9   A.  I mean, there were a lot of conversations early
10     on.  I mean, I'm trying to, I'm trying to go
11     through that time period and things like that.
12     I mean, the, the, when the sale was happening, we
13     were golfing and he was talking about, in the UP,
14     and he was talking about the sale was happening
15     and they were going to get 162 million.  Then, you
16     know, there was conversations, a lot of
17     conversations around that that I don't recall
18     specifically, around the, on that, on that golf
19     outing.  Then the next thing I remember is, you
20     know, Reed was, like, I don't, you know, don't
21     tell Julie because I want to tell her, she works
22     there.  And I said, well, you've got to tell her
23     soon, right; I'm not going to keep something from
24     my wife, which then he did tell her.  He came over
25     to the small cottage and he said, you know, I want

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 57

1  to tell you that the company's selling.  I
2  remember Julie saying immediately, her reaction
3  was, Reed, Stacy just sold.  And Reed said, I
4  didn't know anything about that.
5      I think there was then a conversation at
6  that time, and this may have also been, like, at
7  the golf outing but it also may have been with
8  Julie in regard to, I'm going to give Stacy, you
9  know, a million dollar gift and have her do, sign
10  off on a release after the gift.  There was
11  conversation about, you know, it's just, it's just
12  a lot of money, and we're doing, you know, kind of
13  setting up foundation and meeting with people in
14  regard to, prior to the sale in regard to, like,
15  Reed's kids, my cousins, kind of preparing to get
16  this huge sum of money and how to, you know, do it
17  successfully, meeting with, like, trust attorneys,
18  and I think he even mentioned, like, a
19  psychologist that helps people, like, families
20  that come, come into money.
21      Then, yeah, then actually he, I remember
22  he called, he had left up north and we were still
23  there, he called and said, you know, hey, don't
24  tell, you know, make sure you keep this completely
25  quiet, don't tell anyone, this hasn't closed yet,

Page 58

1  it was really close.  I assured him, that hey, I
2  won't.  Then I, I think we got home, back to
3  Monona where we live and, you know, things were
4  becoming, it was coming closer and closer to it
5  kind of being public information, and I knew the
6  company was selling, Julie knew the company was
7  selling, a bunch of the people at the golf course
8  knew the company was selling, and I think I called
9  Reed and said, you know, have you told my mom,
10  because you probably should soon, I can't really
11  keep this from her, you know.  And I believe he
12  said that he, he just had or, like, that did just
13  recently within like a day or two of, of me asking
14  that.  And then from there, you know, there was a,
15  a bunch more conversations after that, but I mean
16  I'm just going from, like, the beginning of, of
17  time that I remember knowing that the company was
18  going to sell.
19  Q.  Do you remember Reed Widen telling you that he was
20      shocked at the sale price?
21  A.  I remember him saying, yeah, like, it's a crazy
22      amount of money, it's like lottery money.
23  Q.  Do you remember Reed Widen telling you that he
24      never dreamed that the company would be worth that
25      kind of money or something to that effect?

Page 59

1      MS. POLAKOWSKI: Object to form.
2  A.  I mean, I don't remember the, you know, like that
3      as a direct quote.  I remember him being, like,
4      it's a crazy amount of money, like, it's like
5      lottery money.
6      (Exhibit 1 marked for identification)
7  Q.  Okay.  Exhibit 1 is in front of you.  And that's a
8      declaration that you gave in support of
9      plaintiff's motion for partial summary judgment.
10      And this is the document that was filed with the
11      court on September 29, 2023, and it just has an
12      S slash with your name next to it on page 2.
13      Do you see that?
14  A.  I do.
15  Q.  Okay.  Did you actually sign a declaration like
16      this with your ink signature?
17  A.  Not that I really recall.
18  Q.  Now, on page 2 you say, I declare under penalty of
19      perjury that the foregoing is true and correct.
20      And it was executed on September 29, 2023.  Do you
21      see that?
22  A.  I do.
23  Q.  And I take it you authorized this declaration to
24      be filed with the court?
25  A.  I did.

Page 60

1  Q.  Okay.  And then on page 1, it says in paragraph 2
2      that in February 2020 you visited Reed Widen in
3      his home in Arizona.  And that's the conversation
4      you've told me about already; correct?  That's,
5      that's the time frame.
6  A.  Yes.
7  Q.  Then in paragraph 3 you said, During that visit,
8      Reed Widen told you that he and Matt Gonnering
9      regularly received solicitations to sell Widen
10      Enterprises.  And, and we've also talked about
11      that today; correct?
12  A.  Yes.
13  Q.  And that's a true and correct statement; isn't
14      it?
15  A.  Yes.
16  Q.  Okay.  And in paragraph 4 you say, During that
17      visit, Reed also told me that he was considering
18      selling Widen Enterprises because he could sell
19      the company for approximately $80 million.  Do you
20      see that?
21  A.  I do.
22  Q.  Now, you told me today that the only reference for
23      the $80 million during that conversation was a
24      reference that what Reed Widen would net from the
25      sale.  Do you remember telling me that today?

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 61

1      MS. POLAKOWSKI: Object to the extent
2 that it mischaracterizes his testimony.
3      MR. LAING: It doesn't.
4 Q. You can answer.
5 A. I don't, I mean, I don't remember specifically
6   saying, saying that, no.
7 Q. Well, let's, let me ask you it again then.
8      During your conversation with Reed Widen
9   in February of 2020, you remember Reed Widen using
10   the number $80 million; right?
11 A. Correct. There were multiple numbers thrown
12   around.
13 Q. And you already told me there were a $50 million
14   number mentioned, an $80 million number mentioned
15   and $100 million number mentioned; correct?
16 A. Correct.
17 Q. And those are the only three numbers you remember
18   him mentioning during that conversation;
19   correct?
20 A. Correct.
21 Q. And as to the $80 million, you told me, didn't
22   you, that that was in reference to what Reed Widen
23   would net from a sale of the company?
24      MS. POLAKOWSKI: Object.
25 Q. True?

Page 62

1      MS. POLAKOWSKI: Object to the extent
2 that it mischaracterizes his testimony.
3 A. Well, I, I think -- So, the, I, I signed this
4   declaration saying he can sell the company for
5   approximately $80 million. $80 million, a hundred
6   million dollars, they're all kind of approximate
7   to me, right, so --
8 Q. Oh, so when you signed this document you meant,
9   when you said approximately 80 million you meant
10   approximately 50, approximately 80, approximately
11   100, is that what approximately meant to
12   you?
13      MS. POLAKOWSKI: Object to the extent
14 that it mischaracterizes his testimony.
15 A. I mean 80 and 100 million, 100 million are
16   approximately the same number, yeah.
17 Q. Then why didn't you say approximately 100 million?
18 A. I don't, because I don't know, I mean, it was just
19   going on the lower end of the number that I
20   remembered, just being conservative, I guess.
21 Q. Well, did he tell you during that meeting in
22   February of 2020 that he was considering selling
23   Widen Enterprises because he could sell the
24   company for approximately $80 million?
25 A. Yeah.

Page 63

1 Q. He told you that?
2 A. I mean those exact words, no, but there was
3   numbers like 80 million, a hundred million thrown
4   around that, that, that, you know, the company
5   could potentially be sold, sold for.
6 Q. Well, earlier in today's deposition I specifically
7   asked you what the $80 million reference was, and
8   I specifically asked you was that what he would
9   sell the company for or what he would personally
10   net, and you told me that the only number you
11   recall him saying about what he could sell the
12   company for was $100 million; is that right or is
13   that wrong?
14 A. Well, I, I, again, it kind of, it's, it's twisting
15   it a little bit because I remember him saying that
16   he could walk away with at least $50 million,
17   okay, and these 80, this is, again, this is a long
18   conversation, it was 15 minutes at least, right,
19   so there was a lot of numbers thrown around,
20   details, and by the way, this is multiple years
21   ago, but there was numbers like 80 and a hundred
22   million thrown around which are to me in the
23   approximate range of the same thing, like, that
24   was kind of the tone of the conversation. It
25   wasn't, like, I have an offer for a hundred

Page 64

1   million dollars, it was more, like, you know,
2   heck, we could get 80 million, heck we could get a
3   hundred million, you know, those, those are the
4   numbers I remember, those to me are all
5   approximate to each other, so, you know.
6 Q. So to you the number $50 million is approximately
7   the same as $100 million?
8      MS. POLAKOWSKI: Object to the extent
9 that it mischaracterizes his testimony.
10 A. The 50 million was his, I remember the specifics
11   of the 50 million was I could walk away with
12   $50 million retire and be done so --
13 Q. Do you remember him saying any other number than
14   $50 million in the context of what he would net
15   from the sale?
16 A. Not that I recall.
17 Q. Okay. Do you specifically recall as you sit here
18   today Reed Widen telling you in February of 2020
19   in Arizona that he was considering selling Widen
20   Enterprises because he could sell the company for
21   approximately $80 million?
22      MS. POLAKOWSKI: Object to form.
23 A. Do I specifically recall that, yeah.
24 Q. Okay. Prior to authorizing the filing of this
25   declaration with the court, were there other

Colleen Reed Reporting LLC
414.322.3621

Page 65

1      drafts of the declaration that you reviewed?
2 A.   Not that I recall.
3 Q.   Okay.  So this was presented to you, you said it's
4      fine, and you have my approval to file it with the
5      court, is that how it went down?
6         MS. POLAKOWSKI: Objection.  To the
7      extent that it would require you to divulge the
8      contents of attorney-client privilege
9      communications, I'll instruct you not to answer.
10      If you can answer without disclosing conversations
11      you've had with your attorneys, you may do so.
12 A.   Yeah, I mean the whole thing was a conversation
13      with the attorney.
14 Q.   Well, you've already told me that there were no
15      prior drafts of this; correct?
16 A.   Not that I recall.
17 Q.   And so when you first saw this, it looked
18      completely accurate to you and you authorized the
19      filing of it; is that right?
20 A.   I believe so.  I don't believe there were
21      changes.
22 Q.   So during the conversation in Arizona in February
23      of 2020 did Reed Widen tell you that he was
24      considering selling Widen Enterprises because
25      he could sell the company for approximately

Page 66

1      $100 million?
2         MS. POLAKOWSKI: Object to form.
3         THE WITNESS: I'm sorry.  I need the
4      question again, please.
5         (Question read)
6 A.   I mean those words specifically weren't, I mean
7      that's, that's what, that's how I'm characterizing
8      the conversation.  He didn't specifically say, I
9      can sell the company for approximately a hundred
10      million dollars, no.  But what I characterized the
11      conversation as is numbers like 80, a hundred
12      million dollars were thrown around so
13      approximately $80 million, yes.
14 Q.   But my question related to the $100 million number
15      so let me ask it again.  Did Reed Widen tell you
16      in February 2020 in Arizona that he was
17      considering selling Widen Enterprises because he
18      could sell the company for approximately
19      $100 million?
20         MS. POLAKOWSKI: Object to form.
21 A.   So he didn't say those exact words, but, yes, a
22      hundred million dollars was thrown around in that
23      conversation when talking about what the, the
24      company could sell for.
25 Q.   And during the conversation in February of 2020 in

Page 67

1      Arizona did Reed Widen put any time frame at all
2      on the possibility of selling Widen Enterprises?
3 A.   I mean the, the way I recall it was, like, we're
4      getting these solicitations today, we're getting
5      interests from companies to buy our company today
6      and prior to that day when I say today, and it's
7      of interest to me because I could walk away with
8      $50 million.  So to me there was a time frame that
9      was a short horizon, right, because he wouldn't
10      have been talking about I could walk away with
11      $50 million and it's, you know, five years from
12      now, ten years from now if he, you know, because
13      things change, right.
14 Q.   Well, we know things change because COVID hit the
15      next month; right?
16 A.   Right.
17 Q.   Things greatly changed; didn't they?
18         MS. POLAKOWSKI: Object to form.
19 A.   I mean in, in regard to what?
20 Q.   The whole world.
21         MS. POLAKOWSKI: Same objection.
22 A.   The pandemic was a once in probably multiple
23      generation situation so, yeah, it was a crazy
24      world.
25 Q.   Do you know if the COVID pandemic that hit the

Page 68

1      next month changed Reed Widen's view on either
2      the, considering selling Widen Enterprises or the
3      value of the company?
4 A.   I don't know.
5 Q.   Did Reed Widen ever tell you prior to May of 2020
6      that he was considering selling Widen Enterprises
7      because he could personally receive $80 million
8      for his ownership interest in the company?
9 A.   That he could personally receive 80 million.  Not
10      that I recall.
11 Q.   Did anyone ever tell you that he said that to
12      someone else?
13 A.   No.
14 Q.   Prior to May of 2020, did you ever have any
15      conversations with Reed Widen while golfing on the
16      subject of the possibility of signing -- selling
17      Widen Enterprises?
18 A.   While golfing, not that I recall.
19 Q.   Prior to May 2020, did you ever have any
20      conversations with Reed Widen on the subject of
21      the possibility of selling Widen Enterprises while
22      hunting?
23 A.   Not that I recall.
24 Q.   Prior to May 2020, did you ever have any
25      conversations with Reed Widen on the subject of

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 69

1 possibility of selling Widen Enterprises while
2 staying at the cottage?
3 A. Not, not that I can recall.
4 Q. Other than the time in Arizona in February of 2020
5 that you already had told me about, have you ever
6 had any other conversations with Reed Widen on the
7 general subject of succession planning for the
8 company?
9 A. I mean, Reed had said a handful of times that you,
10 know, Jesse wasn't a software guy, his son, that
11 the conversation in February was the one that I
12 recall where we got kind of more specific into
13 the, into succession planning, but, you know, it
14 could have been hunting, fishing, golfing, those
15 kind of things where business would come up, and,
16 you know, Reed would use that, he's not a software
17 guy Jesse reference, I can't remember a specific
18 time, but one of the many many times that we've
19 been together different places.
20 Q. Did Reed Widen tell you in February of 2020 that
21 one of the things he was considering for Widen
22 Enterprises was selling the company to the
23 employees?
24 A. I don't believe, I don't recall that coming up in
25 February of 2020, no.

Page 70

1 Q. Do you recall him telling you in February of 2020
2 that it was another consideration to have Matthew
3 Gonnering and Mike Kiesler and some of the other
4 key players in the company purchase the company?
5 A. I don't --
6 MS. POLAKOWSKI: Object to form.
7 A. I don't recall that.
8 Q. You've already told me about a conversation you
9 had with Bill Nordland. I want to now ask you
10 whether you ever had any conversations with the
11 following people relating to the subject of Reed
12 Widen potentially selling Widen Enterprises prior
13 to May of 2020, and those people are Mark Winter,
14 Ryan Ely, David Simon, Rod Bochen, Tim Macht, and
15 Ben Sharpf.
16 MS. POLAKOWSKI: I'm sorry, and just for
17 my purposes I didn't hear the first part of your
18 question.
19 (Question read)
20 MS. POLAKOWSKI: Perfect. Thank you.
21 A. There's one person that I didn't recognize the
22 name, Rod Bochen.
23 MR. WIDEN: Bochen.
24 A. Bochen. You know, there's, there's a lot of
25 conversations, a lot of people there. I'd have to

Page 71

1 take one at a time.
2 Q. Okay. Let's do that. It'll be simpler.
3 Have you ever had any conversations with
4 Mark Winter --
5 A. No.
6 Q. Well, let me just finish the question.
7 A. Go ahead.
8 Q. Have you ever had any conversations with Mark
9 Winter where he explained to you or you were at
10 the same conversation that Reed Widen was
11 discussing the possibility of selling Widen
12 Enterprises before May of 2020?
13 A. Mark Winter, no.
14 Q. Okay. How about Ryan Ely?
15 A. Prior to, and, and you're talking a conversation
16 with this person. So, for instance, in this
17 scenario I talked with Ryan Ely about Reed had
18 mentioned that they're, they may sell the company
19 prior to May of 2020.
20 Q. Let me see if I can simplify it. Were any of
21 these people that I'm going to now mention in
22 attendance when you had conversations with Reed
23 Widen about the possibility of selling Widen
24 Enterprises? And those would be Mark Winter, Ryan
25 Ely, David Simon, Rod Bochen, Tim Macht, and Ben

Page 72

1 Scharpf?
2 MS. POLAKOWSKI: And, Dean, just to
3 clarify for the record, are we talking pre-May
4 2020?
5 MR. LAING: Yes.
6 MS. POLAKOWSKI: Okay.
7 A. And May of 2020 was when my mother's stock was
8 sold?
9 MS. POLAKOWSKI: Correct.
10 A. I've just to confirm that because these dates get
11 all convoluted.
12 I don't recall hearing a conversation
13 between Reed and any of those people prior to May
14 of 2020 that the, you know, in the context that
15 you just said.
16 Q. Okay. And I'm assuming from your testimony none
17 of those people were in attendance when you and
18 Reed Widen were talking about the Nike and Reebok
19 situation; correct?
20 A. That was a long time ago. Honestly, when you say
21 that it kind of prompts a memory with Tim Macht,
22 maybe. I can't be sure of that though because
23 again that was a long time ago.
24 Q. And none of those people were in attendance when
25 you had the conversation with Reed Widen in

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 73

1   February of 2020 in Arizona; correct?
2 A. Not that I recall.
3 Q. Okay. Let's jump ahead now to the May 2020 time
4     frame.
5        Your mother sold the last stock that
6     she owned in Windy Waters back to the company on
7     May 13 of 2020 for approximately $1.3 million
8     payable over seven years. I'm assuming you're
9     aware of that; correct?
10 A. I am.
11 Q. Okay. Are you aware that your mother sold some
12     stock she owned in Windy Waters back to the
13     company in years prior to 2020?
14 A. Yes.
15 Q. What do you know about that generally?
16 A. I know about it from reading the Complaint. I
17     mean, prior to that, prior to reading the
18     Complaint, I mean, I didn't necessarily get into a
19     lot of the details of, you know, if she sold
20     stock. I mean, I knew from, from, you know,
21     conversations Reed would have was, like, you know,
22     he would say things like Stacy needs money or, you
23     know, treats the company like a bank. So I knew
24     there was some kind of transaction, I guess, I
25     would call it, but I didn't really know if there

Page 74

1     was a stock sale or what, what it was.
2 Q. Okay. Prior to the May 2020 sale, were you aware
3     of any of the details of the stock sales that your
4     mom had with Windy Waters such as the number of
5     shares or the dollar amounts she received or how
6     those dollar amounts were calculated or anything
7     like that?
8 A. I mean, I knew that at some point she had
9     20 percent equity share because she was one of the
10     five children. I may have, you know, prior, and I
11     don't know, prior to reading the Complaint known
12     that, you know, she -- Well, no, I, I didn't
13     really, I mean, I think I'm just referring to my,
14     my memory of the, the share sales in the
15     Complaint. I mean, generally I guess my mom
16     wouldn't say, you know, over those, that period
17     of, of years, which is, if I remember quite, quite
18     a bit of years after my grandfather had passed, my
19     mom generally wouldn't come to me and say, you,
20     that she got X dollars in a transaction with
21     Widen.
22 Q. Prior to May of 2020, did you know why she sold
23     any of her stock in Windy Waters back to the
24     company?
25 A. Prior to May of 2020. So any of the prior

Page 75

1     transactions?
2 Q. Yes.
3 A. I didn't know.
4 Q. Did you know prior to May 2020 what she used the
5     money for when she received it from selling her
6     stock back to Windy Waters?
7 A. Not that I recall, no.
8 Q. Prior to May 2020, did you know how any of the
9     dollar amounts that your mother received for her
10     stock were calculated?
11 A. No.
12 Q. Prior to May of 2020, do you know whether your
13     mother ever was happy or unhappy with the amount
14     of money she received for her stock?
15 A. Yeah, I don't know if she's, either of those.
16 Q. Did your mother ever consult with you regarding
17     any of those prior transactions where she sold
18     stock back to Windy Waters prior to May of 2020?
19 A. Not that I recall.
20 Q. In other words, did she ever ask you for your
21     advice or suggestions or recommendations?
22 A. Not that I can specifically recall.
23 Q. Okay. How did you first learn that your mother
24     was considering selling her remaining stock back
25     to Windy Waters in 2020?

Page 76

1        MS. POLAKOWSKI: Object to form.
2 A. You know, I think, she was going through the
3     divorce, and I believe, I, I don't remember
4     specifically when I was made aware of, of it, but
5     I guess the first thing that I can specifically
6     remember is the, you know, she was dealing, she,
7     she had called or texted Reed that she needed some
8     funds due to the divorce, and my dad, you know,
9     was, was kind of, had shut her out of any, any
10     monies. You know, she needed, she was actually
11     kind of, she was actually kind of worried because
12     she had, like, not a lot, like, a couple thousand
13     dollars or something in the bank, and so she
14     reached out to Reed to, you know, try to get some,
15     some kind of funds from, out of the company. What
16     I recall Reed said to, you know, pass it off to
17     Kiesler.
18 Q. And this is something your mother told you?
19 A. Yeah, I'm thinking back to that time, you know,
20     the best I can remember.
21 Q. Now, at that time did you offer to help your mom
22     financially?
23 A. Not that I specifically recall.
24 Q. If your mom had asked, would you have helped her
25     financially?

---

Page 77

1 A.  I can't recall the situation we were in.  I mean,
2      we've done some pretty big upgrades on our home.
3      We had to do new siding, kitchen.  We had to
4      upgrade both of our cars that had two plus hundred
5      thousand, 150 plus thousand over this last, you
6      know, during that last three years.  So my, my
7      family's funds level has kind of gone up and down
8      quite a bit so I don't know if, you know, I can't
9      remember what the situation was at that point.
10 Q.  If you had funds available would you have helped
11      your mom out?
12 A.  That's a tough question.  I mean, there would have
13      to be specific conversations regarding, you know,
14      what is this, can I give you a loan.  I mean,
15      she's my mom, I love her so I would try to find a
16      way, but, you know, without like, and, and what's
17      the sum of money, I mean five dollars versus 50, a
18      hundred, $500,000, a big difference.
19 Q.  Did your mom tell you how much money she needed or
20      was looking to get?
21 A.  Yeah.  I mean, she told me that she had asked
22      Kiesler for I think a hundred thousand, and he
23      said that that wasn't possible so she went down to
24      50.
25 Q.  Would you have been willing to cosign a loan for

Page 78

1      her for $50,000?
2          MS. POLAKOWSKI: Objection.  Calls for
3      speculation.
4 A.  Yeah, I don't know.  I mean, it's, I'd have to,
5      like, I'm very, I work really hard so I'm, I'm
6      kind of careful with things so I don't know.  I
7      mean, it would depend specifically on that
8      situation for, the situation, the financial
9      situation I was in at that time.  I had kids, too,
10      that I have to feed, mortgages to pay.  Obviously,
11      I would do anything I can to, you know, make sure
12      she's not in, you know, homeless, right, but,
13      again, without specific, a specific deal as far as
14      numbers, agreements, all those things, because
15      obviously, when you start to work with money and
16      family, shit can go wrong.
17 Q.  Well, you told me she's your mother and you dearly
18      loved her; right?
19 A.  M-hm.
20 Q.  Yes?
21 A.  Correct.
22 Q.  So if your mother in May of 2020 would say, I'm
23      desperate, I need $50,000, would you please sign
24      a loan or cosign a loan for me, are you telling me
25      you wouldn't have done it?

Page 79

1 A.  I --
2          MS. POLAKOWSKI: Objection.
3      Mischaracterizes his testimony.  Also calls for
4      speculation.
5 A.  I'm not telling you that, no.
6 Q.  It's likely you would have done it; right?
7          MS. POLAKOWSKI: Objection.
8      Mischaracterizes his testimony.
9 A.  Again, there's a lot of specifics that, that go
10      on.  I mean I, I have a wife, too, right.  I have
11      to, and, again, it's, I don't know what I had in
12      the bank at that time.  I don't know what
13      obligations I had.  I, I love my family, including
14      my mother, and, yeah, I mean, but I don't, I can't
15      answer, right.  It's too many details that I can't
16      recall right now.
17 Q.  Is there a possibility in your mind you would have
18      told your mother no?
19 A.  It is possible.
20 Q.  It is.  Is it a possibility in your mind you would
21      have told your mother yes?
22 A.  It is possible.
23 Q.  Okay.  You were telling me that she told you that
24      she had reached out to Reed Widen and he had
25      passed her off to Mike Kiesler; correct?

Page 80

1 A.  That's what I recall.
2 Q.  Did she tell you anything else about any
3      conversations that she had with Reed Widen in that
4      time frame relating to her need for money?
5 A.  What's the time frame, like --
6 Q.  Prior to May 2020, let's say a couple months
7      before then.  And I mean to include May of 2020 as
8      well.
9 A.  Yeah, I mean I, from reviewing the Complaint I,
10      there was the conversation or comment about
11      possibly having to go through Milmont.
12 Q.  And I don't want you to repeat to me what you read
13      in the Complaint.  I want to know what your mother
14      told you.
15 A.  Yeah, and I can't remember if she told me that at
16      the time or if I'm recalling it because of the,
17      you know, the Complaint document.  It's possible
18      that she said, oh, Reed said, you know, in the
19      conversations that she had with me, oh, Reed said
20      that we may have to go through Milmont.
21 Q.  Is it possible she didn't tell you that as well?
22 A.  Yes.
23 Q.  So as you sit here --
24 A.  That I recall from the Complaint.
25 Q.  So as you sit here today what you remember your

Page 81

1    mother telling you just prior to May 13 of 2020 or
2    somewhere within the month or two before that is
3    she reached out to Reed Widen and said, I need
4    money, and Reed Widen passed her off to Mike
5    Kiesler; true?
6  A.  Yes, that's what I recall.
7  Q.  Do you remember any more details about, your
8    mother telling you relating to her conversation or
9    conversations with Reed Widen at that time?
10 A.  No, not that I can recall.
11 Q.  Okay.  All right.  What did your mother next tell
12    you after she explained to you that she reached
13    out to Reed Widen and he passed her off to Michael
14    Kiesler?
15 A.  I mean, there were multiple conversations in that
16    period of time which was, you know, whatever that
17    handful of days, and, you know, she, she told me
18    that Kiesler couldn't give her 50,000 even.  She
19    told me that they, Kiesler said that she's got to
20    sell all of her stock, it's the only way that they
21    could make it happen, which I, that didn't make
22    sense to me, because I'm, and I, I, I, she didn't
23    want to do that, and I advised her that it
24    probably wasn't, you know, great.
25 Q.  When did you tell her that?

Page 82

1  A.  When did I tell her that?
2  Q.  Yeah.
3  A.  Well, just when she, in the conversation when she
4    said, yeah, Mike Kiesler said that I have to sell
5    all my stock or get nothing, that's a take it
6    or leave it deal.  I was like really, that's,
7    that's not good.  And she, she was, like, no, it's
8    not, I don't want to do that at all.
9  Q.  Did you tell her why you didn't think that was a
10    great idea?
11 A.  I mean, just because, and she kind of, she, it's,
12    it's the only major asset that she has, right,
13    it's what she has for the rest of her life.  So I
14    think, you know, I don't remember if she had
15    actually said that when I said, oh, that's not
16    good.  And the other thing that I thought to
17    myself is if they can't give you 50,000, how are
18    they going to give you the value of the entire,
19    you know, your entire 20 percent or 20-ish
20    percent, that doesn't make any sense.
21 Q.  In addition to thinking that to yourself, did you
22    also tell your mother that?
23 A.  I believe I did.
24 Q.  Okay.
25 A.  Because I just, I just like, wait, it just doesn't

Page 83

1    make sense to me.  They're basically saying,
2    Mike's basically saying, you can't, I can't give
3    you a little bit, relatively small amount of
4    50,000, but I can give you, if you give us your
5    entire shares, I can give you a much larger
6    amount.  So it was like, it wasn't jibing.
7  Q.  Okay.  What do you remember your mother telling
8    you next about her need for money?
9  A.  That she was, she didn't know what to do, she, she
10    felt, she was in distress, she felt under pressure
11    because I think there was, like, a, you know, you
12    had, she had to come and sign the paperwork right
13    away.  She was kind of freaking out, and, of
14    course, I was extremely busy at work so she was
15    texting me, you know, call me when you get a
16    chance, now Kiesler said this.  I don't know,
17    there was just a, it was kind of a crazy time, and
18    she was just in distress is --
19 Q.  Did you -
20 A.  -- what I remember.
21 Q.  Did you give her any recommendations or
22    suggestions?
23     MS. POLAKOWSKI: Object to form.
24 A.  I recall in regard to the, you know, the deal and
25    Kiesler?  I recall saying I would talk to a tax

Page 84

1    accountant because, you know, you, depending on
2    how this potentially kind of plays out, the tax
3    implications could be different depending how it's
4    structured, the amounts, all those kind of
5    things.
6  Q.  And did you speak with a tax accountant?
7  A.  Did I?
8  Q.  Yes.
9  A.  Not in regard to this, no.
10 Q.  I thought you told me you told your mother you
11    would speak to a tax accountant.  Did you mean she
12    would or did you mean you would?
13 A.  No, I mean, I said you, mother, should talk to a
14    tax accountant, yeah.
15 Q.  Okay.  And do you know if she did?
16 A.  The only thing I recall on that is she said, she
17    asked Kiesler about taxes, and Kiesler said, I
18    can't really help you, I'm not a CPA, or something
19    to that effect, but I think it'll help you by
20    getting more money.  And I remember thinking to
21    myself, that doesn't make sense either because
22    when you get more money you get taxed more, and I
23    think I said that to her, that doesn't make sense.
24    But I don't, I don't specifically remember, other
25    than saying, I asked Kiesler about taxes, I don't

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 85

1 specifically remember her telling me that she had
2 spoken to a separate tax accountant.
3 Q. Did you suggest or recommend to your mother that
4 she speak with an attorney before doing any
5 transaction?
6 A. I don't believe I did that because she was talking
7 to an attorney.
8 Q. And who was she talking to?
9 A. I know at this time I believe it was Scott Seid
10 and another person from the same firm that Scott
11 works for that was the person that was
12 representing her for the divorce.
13 Q. Did you suggest or recommend to your mother that
14 she have an attorney review the financial records
15 of the company before doing any transaction?
16 A. I didn't do that. I mean that was, I, I thought,
17 you know, I'm not an attorney so I thought if
18 she's talking to an attorney, they'll advise her
19 that you should get financial records that I can
20 review, you know.
21 Q. Did you recommend or suggest to your mother that
22 she get financial records of the company before
23 entering into any transaction?
24 A. I don't believe I said that. Because she was
25 talking to an attorney, I thought that an attorney

---

Page 86

1 would advise her to, to ask for financial records
2 and all the other important documents that you
3 would need to review before selling basically
4 your, you know, the biggest asset in your whole
5 life.
6 Q. And what are those documents?
7 A. I don't know. I am not an attorney so I wouldn't
8 know what those documents are. I would, I would
9 confer with a, you know, someone that would be an
10 expert.
11 Q. Did you ever try to reach out to an attorney on
12 your mother's behalf prior to the transaction on
13 May 13 of 2020?
14 A. I didn't because she was advising me that she was
15 talking to an attorney so it sounded like she was
16 in, you know, good hands.
17 Q. Did you ever recommend to your mother that she not
18 enter into the transaction on May 13 of 2020?
19 A. I don't specifically recall doing that. I mean
20 we, you know, like I said, it was, it was, she
21 knew that I didn't think it was a, great idea to
22 sell all the stock, but that's the position she
23 was in. She didn't want to sell all the stock,
24 but that was the only option she was given. She
25 was in distress. If I would have told her at that

---

Page 87

1 time, you know, you absolutely shouldn't do that,
2 I think she would have, she would have, it would
3 have been tough on her because I think she, I
4 don't know what else she would have done. Again,
5 I was with a couple small kids, a family, a very
6 stressful, demanding job. I was, I was getting
7 pulled in a lot of directions, too. But I don't
8 recall saying, absolutely don't go and do that.
9 I, you know, she was in a position she needed to
10 do something.
11 Q. You said a couple times your mom was distressed.
12 Describe that distress for me.
13 A. I mean just, you know, you can tell when you're
14 talking to someone that you love that they're
15 under pressure, you know, the definition of
16 stress. You can tell that she was stressed out.
17 You could tell she didn't really, she felt
18 kind of cornered because of the all or nothing
19 option. She also was, like, running out of money.
20 She couldn't get a, you know, there are these
21 times limits, you know, like, all these things
22 pile on that, that put her in a position where she
23 was distressed. I mean, like, how are you going
24 to pay your rent; you have to make a decision in a
25 short period. You're potentially having to sell

---

Page 88

1 your entire, you know, stock. You're going
2 through a divorce. You know, just the, the, the
3 list goes on. You can just, I can tell, being
4 close to my mother, I can tell when she's
5 distressed.
6 Q. Was she screaming, crying? What symptoms did you
7 see to suggest to you that she was distressed?
8 A. Using, yeah, crying, using profanity, like I
9 can't, you know, f-ing believe this, I don't know
10 what the hell to do.
11 Q. Did you think it was a bad idea for her to do the
12 deal?
13 A. Like I said, I, I didn't think, I, I didn't think
14 it was a good idea for her to sell the entire
15 stake, but she had no other option.
16 Q. Did you offer her any other option, you're her
17 son, you love her, did you say, mom, don't do it
18 but here's another idea?
19      MS. POLAKOWSKI: Objection. Asked and
20 answered.
21 A. You know, again, she was working with an attorney.
22 I thought that she was, you know, in the best
23 position she could be. I didn't know the, you
24 know, the attorney relationship at the time. I'm
25 no expert in these kind of deals either so, yeah,

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 89

1  I don't, I, I can't recall if I gave her other
2  ideas.
3  Q.  I mean, did you suggest for her that she sell her
4  beautiful car?
5        MS. POLAKOWSKI: Objection.  Form.
6  A.  What's the -- I don't remember.  What car did she
7  have at that time?
8  Q.  Whatever it was, did you suggest she sell it?
9  A.  I, I, no, I didn't because I think she only had
10  one car and she would need to get around, right,
11  so I don't think that was necessarily an option.
12  Q.  Did you suggest that she sell her gold and silver?
13  A.  No.
14  Q.  All right.  Did you suggest that she try to get
15  a loan from somebody?
16  A.  Not that I recall.
17  Q.  Okay.
18  A.  Honestly, like in a, in a, now that I think about
19  it, my thing would be if, that there could be,
20  like, Kiesler could have offered those options,
21  right, hey, you may not want to do this.
22  Q.  No, I didn't ask about Kiesler.  I asked if you
23  made those recommendations or suggestions.
24  A.  Right, I'm just answering in the way, what's
25  coming off my mind.

---

Page 90

1  Q.  Did your mom tell you that Kiesler told her that
2  Windy Waters didn't care one way or the other
3  whether she sold her stock back to the company but
4  if she did sell, it had to be all of it?
5  A.  So there's two parts, right.  Did, did, did
6  Kiesler say that she didn't, that they didn't care
7  if she sold?  I don't think so.  And, obviously,
8  they did care because they wanted to buy it all.
9  And then secondly -- What was the second portion?
10       MR. LAING: Why don't you read that
11  question back.
12       (Question read)
13  A.  Yeah, the first part I don't recall, and the
14  second part, yes, it was an all or nothing
15  option.
16  Q.  Did you suggest to your mother that she have
17  somebody look at the financial records of the
18  company before she sold her stock in May of
19  2020?
20       MS. POLAKOWSKI: Objection.  Asked and
21  answered.
22  A.  Yeah, I mean I would have, with her working with
23  an attorney, I, it's assumed that would, that
24  would happen.
25  Q.  So did you make that suggestion to her?

---

Page 91

1  A.  Via, are you talking to an attorney type of
2  situation, yes, but specifically going into what
3  her attorney should have her look at, no, I didn't
4  do that.
5  Q.  Let me make sure I understand your answer.
6  Did you suggest to your mother that she hire
7  somebody to look at the financial records of the
8  company before engaging in the transaction?
9  A.  Not specifically hire someone to look at the
10  financial records, but, again, and I didn't
11  suggest that, I don't even think I suggested she
12  get an attorney because she was already talking to
13  an attorney, so, yeah.
14  Q.  Well, the reason I ask that is your mother
15  testified to that.
16  A.  To what?
17  Q.  That you suggested that she get someone to look at
18  the financial records in the company before she
19  did the transaction, and I just want to find out
20  from you if that's true or false.
21  A.  I mean, I did tell her, like I do, I do recall her
22  having, talking to her about looking for a tax
23  accountant.  I don't specifically recall about
24  having someone look at the financial records.
25  Q.  Did you suggest to your mother that she get an

---

Page 92

1  attorney before entering into the transaction on
2  May 13 of 2020?
3  A.  She already had one.
4  Q.  That wasn't my question.  Did you suggest to your
5  mother or recommend to your mother that she get an
6  attorney prior to entering into the May 13, 2020,
7  transaction?
8  A.  I did not suggest that because she already had
9  one.
10  Q.  Do you know why she would testify that you did
11  suggest that and she didn't do it because she
12  didn't have time?
13  A.  I don't, you know, I can't speak for why she would
14  say that.
15  Q.  Did your mother tell you that she's not going to
16  get an attorney because she doesn't have time?
17  A.  Yeah, I mean she couldn't, I remember at the time,
18  and that was part of her distress, she couldn't
19  get ahold of her attorney, I do remember that
20  because of the, the tight timeline.
21  Q.  Well, on May 6th, your mother says, you
22  recommended to her that she get an attorney, and
23  she didn't sign the transaction papers until
24  May 13, so that's a week; right?
25  A.  Is it?  I don't know.

---

Colleen Reed Reporting LLC
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 93

1 Q.  Well, May 6th to May 13th --
2 A.  I'd have to look at a calendar.
3 Q.  -- is always a week.
4 A.  I'd have to look at a calendar.
5 Q.  Why don't you pull up a calendar on your phone and
6      let me know if that's a week or not.
7 A.  I don't have a calendar that's easy to look at.
8 Q.  Let me show you I can pull it up for you.
9          Okay.  I'm showing you a calendar from
10     May of 2020, and can you tell me whether there's a
11     week between May 6 of 2013 and May 13 of 2020?
12 A.  It is a week, yeah.  Sorry, I'm just not good at,
13     like the mental math.  I've got to look at it.
14 Q.  Seven days is always a week; right?
15 A.  Yes, that would be a definition of a week.
16 Q.  Okay.  All right.  So my question to you is,
17     did your mother tell you that she wasn't going to
18     accept your recommendation that she get an
19     attorney because she didn't have the time?
20     MS. POLAKOWSKI:  Object to the extent
21     that it mischaracterizes or assumes facts not in
22     evidence.
23 A.  She didn't tell me that she wasn't going to get an
24     attorney, she told me that she couldn't get ahold
25     of her attorney.

---

Page 94

1 Q.  All right.  Did you ever tell your mother that you
2      were going to try to get ahold of an attorney on
3      her behalf prior to May 13 of 2020?
4 A.  Not that I recall.
5 Q.  Did you ever tell your mother that you tried to
6      reach out to an attorney to help her but that
7      attorney didn't have time to do what you were
8      asking him to do?
9      MS. POLAKOWSKI:  Same objection.
10 A.  Prior to the stock redemption in May of 2020, not
11     that I recall, no.
12 Q.  Okay.  Your mother testified that you suggested
13     that she hire an attorney.  Are you telling me
14     that that's untrue?
15 A.  What's the, what timing?
16 Q.  Prior to May 13 of 2020.
17 A.  So what I can recall, I mean, that, that sounds
18     like something that I would say, hey, you're
19     entering into this huge potentially life-changing
20     transaction, so I may have said that, but then she
21     was working with an attorney, which was, again,
22     Scott and, and the other person from the firm
23     that, from the divorce.  That's what, that's what
24     I can recall.  I just remember basically, if I did
25     say that, it was kind of like the attorney thing

---

Page 95

1      was done because she was working with one so it
2      was kind of like, it was over.  What I do recall
3      is having her talk to, you know, the attorney was
4      done, she's represented.  I do remember
5      specifically saying get an accountant, get a tax
6      accountant to make assure you, you structure
7      things as best can you.
8 Q.  And did you follow up on that, to your
9      knowledge?
10 A.  The tax accountant?
11 Q.  Yes.
12 A.  Well, she asked Kiesler.
13 Q.  Okay.
14 A.  Kiesler said he couldn't help.
15 Q.  Did she do anything beyond that, to your
16     knowledge?
17 A.  I don't recall if she had told me and she had
18     talked to, you know, her accountant or, or
19     investment manager.
20 Q.  I want to make sure I understand your testimony
21     on suggesting an attorney to your mother prior to
22     May 13 of 2020.  Initially you told me repeatedly
23     that you didn't do that and then you've just told
24     me that it's possible you did that.  Did you do
25     it, didn't you do it, don't you remember doing it?

---

Page 96

1      MS. POLAKOWSKI:  I'm going to --
2 Q.  What's your testimony?
3      MS. POLAKOWSKI:  I'm going to object to
4      the extent that it mischaracterizes your
5      testimony, but you can go ahead and answer.
6 A.  Yeah, I mean, so I don't, it, it wasn't, it, it
7      was kind of like a non-issue at the time because
8      she had, she then advised me that she had an
9      attorney which was Scott.  So I don't, it's not
10     something that I remember, there's, it, I may have
11     said at that time, you really should have an
12     attorney, and she just answered, I have one, I'm
13     working with Scott or what, something to that
14     effect.  So then that was done.  So there was no
15     further conversation.
16         So my answer to that is I may have said
17     that, I may have and just don't recall it.  If
18     she's saying I did, well, then that's the,
19     there's, I mean, it is something that I would
20     likely say, because if I was entering into a
21     transaction, I would be, the first thing I would
22     be doing is trying to get an attorney.
23 Q.  Would you have entered into a transaction like
24     this that's life changing you said without having
25     an attorney review things?

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 97

1           MS. POLAKOWSKI: Objection. Calls for
2      speculation.
3  A.   Into a a, this exact same, like a stock
4      transaction or something like that?
5  Q.   Yes.
6  A.   I, I initially wanted to say no, but I actually
7      just had a, a, a transaction or an event happened
8      at my company and my shares, and I don't believe I
9      had an attorney look at it.  It wasn't my entire,
10     my entire, it wasn't life changing, it was a
11     fairly significant amount of money though.
12 Q.   How much was that?
13 A.   I think my, my, I mean I think I sold a hundred
14     thousand shares, something like that.
15 Q.   How much did you receive?
16 A.   I sold about a hundred thousand in, in shares.
17 Q.   And how much did you receive for your shares?
18 A.   About a hundred thousand.
19 Q.   All right.
20 A.   I mean before taxes.  But, yeah, I, yeah, I don't,
21     I guess, no, that's why, I think that's why, you
22     know, she had an attorney representing her from
23     what I understood so, and, and, no, if I was
24     selling all my shares or there was, something felt
25     off, which obviously it did for her, it's, but I'm

---

Page 98

1      speculating on a lot of things here, but no, I
2      probably wouldn't do, I would have talked to an
3      attorney as well.
4  Q.   Did your mother tell you that Scott Seid was
5      representing her in the matter?
6  A.   Yeah, I mean it was Scott and this divorce
7      attorney person.  I didn't know the ins and outs
8      of, you know, who they were representing and
9      attorney-client stuff like that.
10 Q.   But my question is, did your mother tell you that
11     Scott Seid was representing her personally in the
12     transaction?
13 A.   I don't think she specifically said that.  I mean
14     she said, she would refer to Scott as, you know,
15     my attorney, but I don't think she used those
16     words.
17 Q.   Did she ever tell you that she spoke to Scott Seid
18     about anything relating to this transaction?
19         MS. POLAKOWSKI: Object to form.
20 A.   About anything, I can't, I mean I remember she
21     couldn't get ahold of him.  I don't recall her
22     saying that.
23 Q.   Did you ever reach out to anybody, whether an
24     accountant or an attorney on your mother's behalf
25     prior to May 13 of 2020?

---

Page 99

1           MS. POLAKOWSKI: Object to form.
2  A.   To anybody.  I think I reached out to a colleague
3      in the, in our PE practice and asked, you know,
4      hey, what are, how are software companies, you
5      know, valued or, or something like that, just to
6      get some, because I didn't really necessarily
7      know, but he works in that world so I was just
8      curious, you know, to get some kind of baseline to
9      advise my mom.
10 Q.   And when did you do that?
11 A.   Sometime between the period of the time that she
12     told me she was having the conversations with Reed
13     and Kiesler and the redemption so --
14 Q.   And what's this person's name?
15 A.   Jason Stuke.
16 Q.   How do you spell his last name?
17 A.   S-t-u-k-e.
18 Q.   Where does he live?
19 A.   I think he lives in the, over in the Milwaukee
20     area.
21 Q.   Okay.  And what was his position at the time?
22 A.   His position?
23 Q.   Yes.
24 A.   I don't know the title, his title.
25 Q.   Do you know who he worked with at the time?

---

Page 100

1  A.   HUB International.
2  Q.   And what did that person tell you?
3  A.   I don't, I mean I, I think it was, look, it's a
4      multiple of, of revenues typically, I don't
5      remember the specific conversation.  You know, he
6      kind of went into, well, it depends a lot of
7      things, on, you know, what the, what their balance
8      sheet is, what their, what the, what the specific
9      software is, those kind of things.  But he was,
10     like, it's all about multiples, right, is, is
11     basically what I kind of remember.  It didn't, the
12     conversation didn't give me a ton of, of help.
13 Q.   Okay.  Did you share any of that with your mother?
14 A.   I don't think so because like I said, the
15     conversation really didn't, it didn't give me a
16     lot of help, it didn't give me a lot of, he was
17     kind of like, look, generally it's this, but I
18     don't know anything about this company, right, so
19     it's hard for me to say.  So I don't believe I --
20     I think I told my mom, hey, yeah, I talked with a
21     guy and he, it didn't really help, didn't give,
22     didn't give us any good idea of what, if you're
23     getting some fair deal or anything like that.
24 Q.   Did you ever tell your mother that you reached out
25     to someone on her behalf but the person didn't

---

Page 101

1  have time to do what you were asking him to do?
2  A. I, I, I don't recall. I mean it's possible.
3  I don't, in, in what, what, like what was the
4  person?
5  Q. I'm just asking if you ever told your mother that
6  you reached out to anybody on her behalf but the
7  person didn't have the time to do what you wanted
8  that person to do.
9  A. That's a possibility. I can't recall what that
10  would be though.
11  Q. Okay. I was just going to ask you, do you recall
12  reaching out to anybody on your mother's behalf
13  and asking them to do something?
14  A. Ever in life?
15  Q. In connection with this transaction.
16  A. Yeah, I do.
17  Q. Who was that?
18  A. I don't remember the name of the firm but it was
19  basically when my mom was, you know, after she had
20  found out about the sale and --
21  Q. And I'm sorry --
22  A. Okay.
23  Q. -- to cut you off, but I was talking pre-May 13 of
24  2020. So let me ask that again.
25  A. Yeah.

Page 102

1  Q. Prior to May 13 of 2020, do you ever remember
2  telling your mother that you reached out to
3  someone on her behalf and asked the person to do
4  something but the person told you he didn't have
5  time to do it?
6  A. Not that I recall.
7  Q. Okay. So we were up to the point where you were
8  telling me that Michael Kiesler told your mother
9  that the company wasn't willing or interested or
10  something like that to provide her with a hundred
11  thousand dollars or $500,000 but was willing to
12  redeem all of her stock; is that right?
13  A. Correct.
14  Q. Okay. And then take me from there, the
15  conversations between you and your mother
16  pre-signing the redemption agreement on May 13
17  of 2020.
18  A. I mean, there were the conversations around, you
19  know, did you talk to a tax accountant, did you,
20  you know, are you represented by an attorney. I
21  believe after a couple days, you know, of the
22  first, that's the thing, that there was, like,
23  these time limits that kind of kept going and she
24  was, like, I have to make a decision, like,
25  tomorrow. And I'm, like, that's crazy, like, how

Page 103

1  can you do that. You know, the, the attorney
2  confirmed the tax accountant talked to someone.
3  Then some time passed and another time limit
4  became in place.
5  Q. And let me interrupt. Those time limits you're
6  referring to are time limits given to your mother
7  by the company?
8  A. Correct, yeah.
9  Q. Were there --
10  A. I'm sorry, go ahead.
11  Q. Were there other time restraints that your mother
12  had that related to the divorce proceeding during
13  this period of time?
14  A. I'm not, I'm not aware of any, no.
15  Q. Are you aware of a motion that your father had
16  filed for maintenance payments by your mother that
17  they were negotiating in the May 6th time frame
18  and there was a hearing coming up on May 8, 2020,
19  on that issue that your mother was stressed out
20  about?
21  A. I mean she was generally stressed about the
22  divorce, but I don't remember a specific, you
23  know, her specifically saying anything about any
24  hearing or anything, no.
25  Q. Did you know that your father was asking the court

Page 104

1  to order your mother to pay him maintenance?
2  A. At the time, I'm not sure if I did. I do know
3  that my mom said that, you know, that my dad had
4  kind of, like, locked him out of or locked, you
5  know, locked him out of, locked her out of the
6  account. She didn't have access to monies and
7  those things.
8  Q. Okay. Anyway, so go ahead and continue with what
9  you were telling me about the time frame here.
10  A. Oh, where was I. It was, oh, the time, okay. You
11  know, she was stressed out, she had to make a
12  decision. I think she went back and asked Kiesler
13  for like, hey, why it seems low, why is that
14  number low. Kiesler then advised her that she
15  would go back, he'd kind of go back to the drawing
16  board and see if he could find any more, which
17  then, I don't know a day or two passed and there
18  was a higher offer, which I think ended up being
19  the final one. I believe at that time she was
20  trying to get ahold of Scott, you know, right
21  before that. I think she, you know, she was,
22  then, then there was, like, I remember her texting
23  me or calling me and saying, you know, I have to
24  go over there and sign this before the end of the
25  day because that's the deadline, and basically,

**Page 105**

1     you know, I'm kind of, this is where I'm, I'm
2     stuck, I have to go and do it.
3 Q. And did you --
4 A. That's kind of what I remember.
5 Q. Did you recommend that she not do it?
6 A. I don't believe so.
7 Q. Did you recommend she do it?
8 A. I don't believe so.
9 Q. Do you remember anything else other than what
10     you've told me about relating to your
11     conversations with mother, with your mother during
12     the couple weeks prior to May 13, 2020, relating
13     to this redemption?
14 A. No.
15 Q. Did you discuss the topic of your mother's
16     potential sale of her stock with anyone other than
17     your mother and this person at your company prior
18     to May 13, 2020?
19 A. I mean I don't, I don't specifically remember, but
20     I'm sure I did with my wife, just because we have
21     those conversations.
22 Q. Anyone else that you can recall?
23 A. Not that I can recall. I may have. I would have
24     to be prompted though on or get some kind of
25     memory to, to kick that back up, you know.

**Page 106**

1 Q. Do you recall what you told your wife prior to
2     May 13, 2020, regarding the transaction with your
3     mother?
4 A. I don't recall any specific conversations.
5 Q. Did you make any notes of any of your
6     conversations with your mother prior to May 13,
7     2020?
8 A. I may have written down a note, I do do that, but
9     I don't recall what it would have been.
10 Q. Do you still have that note?
11 A. No.
12 Q. Do you recall sending any text messages?
13 A. Actually, actually, I retract that. I do put the
14     notebooks that I write in into a, into a desk at
15     my house. I, there's things that I don't know
16     what, honestly, how long they go back. I could
17     page through notes like that and potentially find
18     something.
19 Q. Is it all chronological?
20 A. I jump all over, no. Generally, it would be,
21     but --
22         MR. LAING: What was my last question?
23         (Question read)
24 Q. Do you recall sending any text messages to your
25     mother in the weeks prior to her signing the

**Page 107**

1     redemption agreement in, on May 13, 2020, on, on
2     that topic?
3 A. On the redemption topic?
4 Q. Yeah.
5 A. I know that there were text messages on that
6     topic. I believe the tax accountant was a text
7     message.
8 Q. Is this from you or your mother?
9 A. It would have been me sending it to my mother. If
10     I'm recalling correctly, I believe that was one of
11     the text messages but there were, but I don't
12     remember the context or content of those.
13 Q. Are you telling me that you know as you sit here
14     today that you sent some text messages to your
15     mother on this subject but you can't remember when
16     and exactly what was in them?
17 A. Correct. I know there was text messages going
18     back and forth on this subject because like I
19     said, I was really busy at work, she would text
20     me, you know, call me, even stuff like that, but,
21     yeah, I can't remember the context specifically.
22 Q. Okay. What do you remember about text messages
23     you sent to your mother during that time frame on
24     this topic? I know you said you sent one that you
25     recall about the tax, the tax accountant.

**Page 108**

1 A. What do I remember in regard to the text messages?
2 Q. That you sent to your mom.
3 A. That I sent. I can't recall any, any other
4     specifics.
5 Q. Okay. What do you remember telling her in the
6     text message regarding the tax accountant?
7 A. Something to the effect of, hey, you should talk
8     to a tax accountant because you can structure a
9     deal like this one way and get taxed at
10     20 percent, you can structure it another way and
11     get taxed at 40 percent. So it can be, you know,
12     with a deal this big, it could be multiple hundred
13     thousand dollar swing in taxes so it's going to be
14     important to do that, something to that effect.
15 Q. And I might have asked you this before but I'm not
16     sure. Do you know whether your mother followed up
17     on your recommendation and actually talked to some
18     tax accountant on that topic?
19 A. I'm not a hundred percent sure. I mean, I
20     believe, like I said, I, I think my last answer
21     was I believe that she talked to, like, her wealth
22     advisor or, or investment advisor, if I recall
23     correctly.
24 Q. Prior to your mom signing the redemption
25     agreement, did you have any knowledge as to how

Page 109

1    the sale amount was calculated?
2  A. No, I didn't.
3  Q. Prior to your mom signing the redemption agreement
4     on May 13, 2020, had you ever seen any of the
5     financial records of Windy Waters or Widen
6     Enterprises?
7  A. Not that I can recall.  In, in regard to the, the
8     calculation for the value, too, I just, I remember
9     asking, like, my mom, like, where did that number
10    come from, you know, and, she, she couldn't really
11    explain it.
12 Q. What did she tell you when you asked her that
13    question?
14 A. I don't know.  I'm, like, well, that just seems
15    kind of crazy where, I mean, you, you need to get
16    the back story of where that number came from
17    otherwise it just came out of thin air, right?
18    I, I just remember that conversation.  I don't
19    remember, you know, she may have said there's,
20    like, a calculation that they used, and that's
21    what led up to me going, well, how did, talking to
22    Jason Stuke and going, you know, how does, you
23    know, a company like this typically do a
24    transaction like this.  I believe that's what
25    happened.  Because the, there wasn't a lot of

Page 110

1     clarity as to where the number had come from, for
2     me.
3  Q. At least to your understanding.
4  A. For me or you, you know, my mom couldn't really tell
5     me either.
6  Q. Did you ever ask your mom how can you do or agree
7     to a deal this way if you don't even know where
8     the number is coming from or something to that
9     effect?
10         MS. POLAKOWSKI:  Object to form.
11 A. I mean like I said, no I, I don't think I said
12    that.  I said where did the number come from, and
13    I, I, I don't, the explanation that I got from her
14    didn't kind of compute with me, I guess.  I
15    didn't, I didn't totally understand.
16 Q. Okay.  Do you know one way or the other whether
17    your mother regularly reviewed financial records
18    of the companies?
19 A. I don't know for sure.
20 Q. Do you know one way or the other whether your
21    mother had access to the financial records of the
22    companies?
23 A. I, I mean my assumption, and I think it's pretty
24    accurate, is that she did not have access or
25    review financial records, but I don't know.

Page 111

1  Q. Do you know whether your mother ever requested any
2     financial records for the companies?
3  A. I'm not, I don't know.
4  Q. Did you suggest to your mother or recommend to
5     your mother that she request financial records of
6     the companies before entering into the May 2020
7     transaction?
8         MS. POLAKOWSKI:  Objection.  Asked and
9     answered.
10 A. Not that I recall.
11 Q. Did your mother ever tell you that she asked for
12    financial records of the companies and was told
13    no?
14         MS. POLAKOWSKI: I'm sorry.  Could you
15    read the question back.
16         (Question read)
17 A. Not that I recall.
18 Q. Okay.  Are you aware that your mother was the
19    president of Widen of Windy Waters -- of Windy
20    Waters at any point in time?
21 A. No, I was not.
22 Q. Do you recall anything other than what you've
23    already told me about any conversations your
24    mother had with Reed Widen relating to her need
25    for money or selling stock in 2020?

Page 112

1  A. Any conversations, not, not specifically, no, I
2     can't.
3  Q. And do you recall any conversations that your
4     mother told you about that she had with Michael
5     Kiesler other than what you've told me about today
6     in the deposition during 2020?
7  A. Any conversations she had with Michael Kiesler.
8     In the whole year of 2020?
9  Q. Let's say prior to May 13 of 2020.
10 A. I mean there was something, I don't remember when
11    this was, there was something about her key didn't
12    work or something when she had gone to the office
13    to get, like, some paperwork or sign some
14    paperwork.  I remember her, you know, I remember
15    her telling me about it because Kiesler came
16    across as very cocky was the word that she used,
17    and she just told me about it in the, a
18    conversation.  I believe Kiesler also commented
19    that, you don't have a key because you're just a
20    landlord or something like that.  That's --
21 Q. Anything else?
22 A. That's all I can remember, you know, without being
23    prompted for some kind of other memory.
24 Q. All right.  Did you have any basis as of May 13,
25    2020, to believe in your mind one way or the other

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

**Page 113**

1  whether $1.3 million was a fair price for your

2  mother's stock?

3  MS. POLAKOWSKI: Objection. Form.

4  THE WITNESS: What was the question

5  again. I'm sorry.

6  (Question read)

7  A. Well, yeah. I mean, I knew -- There was a few

8  points, I mean, from the conversation in February

9  of 2020 that Reed and I had would point to the

10  fact that it was worth much more than 1.3 million.

11  The fact that my wife works there and just kind of

12  hearing her have conversations about, you know,

13  their annual revenues. I think she was doing

14  nearly that amount in just new business of

15  1.3 million because she does sales for them.

16  So I mean, a company of their size, which I think

17  at that time, you know, had something like a

18  hundred employees, I mean, yeah, that number is

19  just small knowing what I know and some of the,

20  you know, just listing some of the reasons that

21  number would be so small.

22  Q. Do you know whether your mother had a right to

23  insist that the company purchase her stock in May

24  of 2020?

25  MS. POLAKOWSKI: Object to the extent

---

**Page 114**

1  that it calls for a legal conclusion.

2  A. Yeah, I wouldn't, I don't know.

3  Q. When your mother made the decision to sign the

4  agreement, what did she tell you about that, if

5  anything?

6  MS. POLAKOWSKI: Object to form.

7  A. I mean, honestly, she didn't really have a

8  decision from her perspective. She was stuck,

9  right, it was like, I need, I'm going to run out

10  of, I have a couple thousand dollars left and I

11  don't know where I'm going to get it, and it's

12  either I have to do it or I, I get -- or

13  nothing.

14  Q. Let's come talk about that. I'll come back to my

15  question.

16  A. Okay.

17  Q. You say she didn't have a choice because she

18  didn't have any money and that was going to give

19  her money; right?

20  A. The, the redemption would?

21  Q. Yes.

22  A. Yeah. Yeah, yeah.

23  Q. What do you mean she needed that money? I mean,

24  wouldn't you have allowed her to move in with

25  you?

---

**Page 115**

1  MS. POLAKOWSKI: Objection. Form. Calls

2  for speculation.

3  A. I mean, you're talking, you're talking some, you

4  know, life-changing decisions. Again, I have

5  kids, it's not just like I have extra space,

6  things like that. I mean, again, there would have

7  to be a lot of conversation around that.

8  Q. Well, if your mother called you in May of 2020 and

9  said, listen, I'm not going to sign the agreement,

10  I'm running out of money, can I live with you,

11  you're telling me you'd have to think about it and

12  get back to her?

13  MS. POLAKOWSKI: Objection. Form. Calls

14  for speculation.

15  A. I mean, I mean, well, regarding the specifics of

16  it, like, what's the time, all those things, but,

17  yeah, I would, I would help my mother out as, as

18  best as I could. Again, it's a conversation, too,

19  with my wife.

20  Q. Sure.

21  A. You know, you know, what is that going to do to

22  the kind of a family unit and all those things so

23  it's a tough one to answer. But, yeah, I would

24  help my mom as much as I can.

25  Q. I, mean if it's between your mom living on the

---

**Page 116**

1  street and living with you it's a no-brainer;

2  right?

3  A. Right.

4  MS. POLAKOWSKI: Same objections.

5  Q. So what exactly did your mother need the money

6  for?

7  MS. POLAKOWSKI: Objection.

8  Foundation.

9  Q. If you know.

10  A. I mean, I don't know. I, I wasn't, I don't know

11  what she wanted to, you know, spend money on, but

12  I know she had, she had to pay rent, she had an

13  apartment in McFarland, she had to buy food, she

14  had to pay gas, pay insurance, I mean, all those

15  things. You have to, you need to live, right.

16  From what I understand, she only had a couple

17  thousand dollars which, you know, rent these days,

18  that would eat it up.

19  Q. Well, she had other options; didn't she?

20  MS. POLAKOWSKI: Objection. Foundation.

21  A. I don't know if there were any other options.

22  Q. Well, one immediate option would be selling her

23  car that she had probably over $20,000 in equity

24  in and moving in with you to get her through her

25  crunch, that's one option she had; right?

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 117

1    MS. POLAKOWSKI: Objection. Foundation.
2    Calls for speculation.
3  A.  I think had she known -- Here's the thing, like, I
4    don't know, like, so she didn't know, I don't
5    believe at the time that her stock was worth, you
6    know, 20, 30 times what it, what she got. I don't
7    think she knew that. She didn't have the
8    information that Reed had in regard to the calls
9    and solicitations he was getting. She doesn't
10    understand software businesses like a Matthew
11    Gonnering or a Mike Kiesler or Reed Widen would
12    know where they know they can get multiples of it.
13    I didn't know that either, honestly.
14    So I mean here's the thing, if she, if
15    those, those guys, the leadership would have told
16    the shareholder, hey, Stacy, here's all the
17    information you should know, honestly, I think she
18    would have done anything to not sell her stock,
19    right. She would have done anything to be, like,
20    God, if I can just hold out for a short period of
21    time, I could get 30 times, maybe more what
22    they're offering me now. But so, so, but she
23    didn't know that, right.
24  Q.  Why didn't you tell her that, you knew that?
25    MS. POLAKOWSKI: Objection. Assumes

Page 118

1    facts not in evidence.
2  Q.  No, no. You knew as of May 13, 2020, what Reed
3    told you three months earlier. Why didn't you
4    tell your mom that?
5  A.  I, I, I didn't, I hoped, Kiesler, Mike,
6    or Gonnering or Reed would.
7  Q.  I know you hoped that but why didn't you tell her
8    that?
9  A.  I don't get, I don't get in the middle of that
10    kind of stuff.
11  Q.  But you knew your mother --
12  A.  I never have.
13  Q.  -- was going to cut this deal that was distressing
14    her, you love your mother. Why didn't you say,
15    hey, mom, Reed told me just three months earlier
16    this?
17    MS. POLAKOWSKI: Objection.
18  Q.  Why didn't you tell her that?
19    MS. POLAKOWSKI: Objection. Assumes
20    facts not in evidence. Argumentative.
21  A.  It wasn't, I, I didn't want to get in the middle
22    of it because that puts me, again, you have to
23    remember my relationship with Reed, he's like a
24    second father, a best friend, I love him. My
25    mother is my mother, love her dearly, okay. I

Page 119

1    don't want to, and I told Reed and my mom this
2    many a times, you, know, like, hey, you know, I,
3    I, Reed would kind of complain about my mom, my
4    mom would kind of complain about Reed, something
5    about the business like I talked about earlier, so
6    I didn't want to get in the middle of it. That's
7    not my responsibility to do that. I don't want to
8    look like the bad guy to Reed, I don't want to
9    look like the bad guy to my mom, that's what I was
10    thinking at the time, and it wasn't my
11    responsibility to do that. My hope was that they
12    would do that.
13  Q.  So you intentionally --
14  A.  But now that I, but now that I know that they
15    didn't do that, she didn't have the information to
16    make the decision that she did.
17  Q.  So you --
18  A.  And, and that like I'm saying, no one in their
19    right mind would have done the deal that she did
20    with the information, all with the information.
21  Q.  So you're saying you consciously and intentionally
22    decided to not tell your mother that in May of
23    2020, is that what you're telling me?
24    MS. POLAKOWSKI: Objection.
25    Mischaracterizes his testimony.

Page 120

1  A.  You know, I, I can't, you know, now that I'm
2    thinking about the timing, too, when she, that
3    memory came back to me clearly after the sale and
4    my mom said, I can't believe this, did you know
5    they were going to sell, it prompted that memory
6    of the conversation with Reed in Arizona.
7  Q.  So in May of 2020 you didn't remember that
8    conversation, is that what you're telling me?
9    MS. POLAKOWSKI: Object to the extent
10    that it mischaracterizes his testimony.
11  A.  I wasn't going to say, I, I can't recall if I
12    remembered it at the time, but generally, even if
13    I did remember it, that's what I'm saying, like, I
14    didn't really insert those conversations. I
15    didn't go, if I had a conversation with my mom
16    about, you know, her, her being upset with
17    something Reed did regarding the companies,
18    whatever, and by that, I mean, she didn't really
19    know, but, like, you know buying a car was one of
20    the things that I heard. I wouldn't go to Reed
21    and be, like, you know, hell, my mom's really mad
22    about the car, right, nor would I go, you know,
23    take that conversation that I had with Reed and,
24    and go tell my mother. Just generally I tried to,
25    you know, not get in the middle of that, because

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 121

1    of the relationship, relationships that I have.
2  Q.  But this isn't a car, this is a life-changing
3    event for the mother that you dearly loved;
4    correct?
5         MS. POLAKOWSKI: Objection.
6    Argumentative.  Asked and answered.  Form.
7  A.  Correct.
8  Q.  Did you suggest to your mother before May 13 of
9    2020 that she ask anybody at the company about
10   prospects for sale?
11  A.  I think she did ask.
12  Q.  That's not my question.  Listen to my question.
13       MR. LAING: Read it back.
14       (Question read)
15  A.  I didn't, and the reason that I would is because
16   directors, officers, owners, shareholders,
17   presidents, whatever you want to call them of a
18   company have a responsibility in my mind, and I
19   see it as a shareholder, my CEO tells us in our,
20   in our quarterly updates or semi-annual updates
21   everything about the company, they talk about how
22   they're going to bring, they're going to pay us
23   dividends, they're going to bring value to the
24   shareholders and the other stakeholders in the
25   company so I didn't say that because I would have

---

Page 122

1    thought that the, that the, the the, the leadership
2    within Widen Enterprises would have told her
3    that.
4  Q.  What responsibilities do a president of a company
5    have?
6         MS. POLAKOWSKI: Object to the extent
7    that it calls for a legal conclusion.
8         MR. LAING: Well, he just told me a
9    president has responsibilities.  I want to ask him
10   what responsibilities are those.
11        MS. POLAKOWSKI: Same objection.
12  A.  I mean, you know, I, I, I, there's a lot of
13   responsibilities that a president has, right.
14  Q.  Let's --
15  A.  Or CEO or CFO.
16  Q.  Let's limit it to the president.  What
17   responsibilities does a president of a company
18   have to its shareholders?
19  A.  I mean, I don't know the, I guess legal or, you
20   know, you know, the rules of a fiduciary, things
21   like that, but generally what the president knows,
22   the shareholders should know.  It should, it
23   should be all on the, you know, yeah, it's, it's,
24   everyone knows the same things as far as the
25   company.

---

Page 123

1  Q.  Does the president have the responsibilities to be
2    up to speed on the financial situation of the
3    company?
4         MS. POLAKOWSKI: Object to the extent
5    that it calls for a legal conclusion.
6  A.  And I mean, and what's, define up to speed.
7  Q.  Well, current, knowledgeable.
8         MS. POLAKOWSKI: Same objection.
9  A.  I mean, the CFO is the more important person with
10   the finances, right, and most -- I would say that
11   generally the president, yeah, should know the
12   financial health of the company.
13        MR. LAING: I don't know when you want to
14   break for lunch, but I'm fine going through or --
15        MS. POLAKOWSKI: Now is fine.
16        MR. LAING: -- or breaking.
17        MS. POLAKOWSKI: Whenever you, whenever
18   it's convenient.
19        MR. LAING: Well, I'm happy to go
20   through, too.  Probably have another hour, hour
21   and a half.
22        MS. POLAKOWSKI: Why don't we take a
23   half.
24        MR. LAING: Okay.
25        (Break taken)

---

Page 124

1  Q.  Earlier today in your deposition you testified
2    about comments made by your mother, and I think
3    you also said your father regarding, I don't know
4    if you said complaints or not, but I interpreted
5    it as complaints relating to your mother's failure
6    to get certain benefits from the companies versus
7    Reed or maybe others getting other things like
8    cars, that stuff.  Do you remember that testimony
9    generally?
10  A.  Yeah.
11  Q.  I want to come back and just ask you a little more
12   details on that.
13        Was this something that was just
14   discussed on occasion, or do you recall one
15   specific occasion where it was discussed?
16  A.  I mean, it was discussed on occasion and this is
17   going back a long time, I mean, I think even when
18   my dad was working at the company, just things,
19   you know, I, I think it's kind of common in family
20   businesses for the, the interested parties to be,
21   you know, concerned about the fairness of things.
22   And, yeah, so there were just, it was just like,
23   almost like, like budget conversations or things
24   like that that I would overhear my parents talk
25   about or they'd be talking about at the dinner

---

**Colleen Reed Reporting LLC**
414.322.3621

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 125

1     table. And I think it was just, and then, and
2     then after the, after the, my dad wasn't employed
3     there anymore, you know, I would hear it from time
4     to time, too, like, you know, we're, we're not
5     getting any value out of the company as in, you
6     know, really anything from what I understand so I
7     would just hear those general conversations.
8     There was one time at my house on Winnequah more
9     recently, I don't remember, but I don't remember
10    the context of what the kind of the complaint was
11    or what the topic of discussion was honestly.
12 Q. Are you able to give me any time frame during
13    which these comments were made? I know you said
14    it went back a long time.
15 A. Yeah, I mean, it was, like I say, for probably
16    20-ish years, I mean, putting myself, I'm thinking
17    about when I'm 20 years old and I feel like I,
18    that I kind of started to hear that stuff.
19 Q. Were they, were they just kind of grumblings or
20    were they, were they like, this isn't fair, it's improper,
21    or what, what were the tones?
22 A. Yeah, I mean it was grumblings, there was, there
23    was questions about, like, how did, you know, how
24    did Reed buy out one of the brothers, you know,
25    where did the funds come from for that, you know;

Page 126

1     I, I was never given the opportunity to buy out
2     one of the brothers. I mean, that's one specific,
3     you know, complaint or grumbling that I can
4     remember. The other specific one that I can
5     remember, and this is related more to the cottage,
6     but it was kind of the same tone of conversation
7     was, like, well, where, you know, the, the, where
8     did the money for the pontoon trade-in go, you
9     know, like just not, not having the, the
10    transparency or, or the insight into where, what,
11    you know, kind of some of these things were
12    happening.
13 Q. Do you remember your mother ever complaining about
14    not receiving dividends or distributions from the
15    companies?
16 A. Yes. I mean, that, that was kind of like we're
17    not getting anything, right, out of the company,
18    that was kind of, yeah, and I don't remember the
19    word distribution used, but, gosh, you know, you
20    know Reed keeps saying the company is doing really
21    good or whatever but we're not seeing anything out
22    of it.
23 Q. All right.
24 A. So, yeah.
25 Q. Was it more like we're not really getting anything

Page 127

1     from the companies or was it more like we have a
2     right to get something and we're not getting it or
3     somewhere in the middle?
4        MS. POLAKOWSKI: Object to form.
5 A. I mean it was, it was, you know, we're not getting
6     anything and it doesn't feel right, I feel is what
7     they, they, they felt, I'm talking my mom and my
8     dad. My mom would, you know, she never really
9     wanted to rock the boat though and go to and, and
10    push on that. I think she wanted to kind of keep
11    things between the family members as smooth as
12    possible because she had seen the way things had
13    gone between her brothers and infighting about the
14    business and things like that when things would
15    come to a head so, yeah, I mean, I think it was,
16    we're not getting anything and it doesn't seem
17    right, feel right to them.
18 Q. Okay. Did your mother ever complain about Reed
19    Widen's compensating from the companies?
20 A. Yeah, I mean, she like, I know Reed's getting
21    paid a bunch of money and we're not getting
22    anything type of thing, yeah.
23 Q. Did she ever suggest to you that that was an
24    unfair amount of compensation being paid to
25    Reed?

Page 128

1        MS. POLAKOWSKI: Object to form.
2 A. I mean, I, I don't know, I don't think, I don't
3     know if it was she thought what Reed was getting
4     was unfair, but it was more the fact that she
5     wasn't getting anything was, the more the concern.
6     I mean, if she would have been getting let's say a
7     dividend, you know, or some kind of shareholder
8     value, I think his compensation would be somewhat
9     irrelevant.
10 Q. Okay. When you first talked to your mother in I
11    think it was probably May of 2020 about her going
12    to Reed and asking for some money because she
13    needed some money, did she tell you the first time
14    you talked as to how much money she thought she
15    needed? And I'm trying to draw a distinction
16    between how much money she asked for versus how
17    much money she thought she needed.
18       MS. POLAKOWSKI: I'll object to form, but
19    go ahead and answer.
20 A. I, I don't recall, I mean, it didn't go, I don't
21    recall it going like she called me or texted me
22    and said, hey, I have, you know, I, I, I think
23    I'm, I'm having a hard time recalling the, the
24    timeline, be it, did she tell me before she
25    reached out to Reed that she was, I don't remember

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 129

1    if she did, or if it was after, but I don't, I
2    also don't remember her giving me any kind of
3    number prior to that other than, you know, later
4    on when she said Kiesler told her that she
5    couldn't get a hundred and she asked for 50 and
6    she, he also said no to that. I think that's the
7    first time I heard, you know, number, specific
8    numbers.
9  Q. Prior to May 13 of 2020, had your mother ever told
10    you how much money she thought she needed?
11       MS. POLAKOWSKI: Object to form. And
12    just for clarity, you're asking ever?
13 Q. I meant in connection with this May time frame.
14 A. I don't recall her telling me that, you know, what
15    specifically she, she was looking for.
16 Q. Prior to May of 2020, had your mother ever told
17    you that she needed money?
18 A. Ever. I don't think she, not that I can recall,
19    no.
20 Q. Has your mother ever asked you for a loan?
21 A. No.
22 Q. Has your mother ever asked you to give her any
23    money?
24 A. No.
25 Q. Do you know one way or the other whether your

---

Page 130

1    mother ever asked any of her brothers or her other
2    family members for a loan?
3       MS. POLAKOWSKI: Objection. Foundation.
4  A. Not that I'm aware of, no.
5  Q. Okay. Do you know one way or the other whether
6    your mother ever asked any members of her family
7    for money, other than the time we're talking about
8    now?
9       MS. POLAKOWSKI: Same objection.
10 A. I believe years ago, I believe she reached out to
11    my grandfather, her father about, about money. I
12    don't remember the context, if they were buying a
13    house or something, but I, I somewhat recall
14    that.
15 Q. And do you remember if her father gave her the
16    money?
17 A. I don't, I don't. I think, I believe, my guess
18    would be yes, but I don't know.
19 Q. Do you know anything about your mother's and your
20    father's ownership of real estate in Florida?
21 A. A little bit, yeah.
22 Q. What type of properties had, had they purchased in
23    Florida?
24 A. I believe they were, you know, they were, like,
25    single family or duplex type homes, rental

---

Page 131

1    homes.
2  Q. At some point in time did the market change such
3    that they owed more on some of those properties
4    than those properties were worth?
5       MS. POLAKOWSKI: Objection. Foundation.
6  A. I, I'm not, I don't know on that.
7  Q. Do you know whether your mother and/or your father
8    ever asked the banks which had liens on the
9    property to take a discount because they wanted to
10    do a short sale on a property?
11       MS. POLAKOWSKI: Objection. Foundation.
12 A. I'm not aware of them asking the bank that, no.
13 Q. Do you know whether the banks ever did that?
14       MS. POLAKOWSKI: Same objection.
15 A. I, I believe there was, I think there was a short
16    sale. I'm not, I'm not sure though.
17 Q. Do you know anything about the amount of the
18    shortness for that sale?
19 A. I don't.
20 Q. I had asked you earlier about drafts of the
21    Complaint, and there was an objection by counsel
22    on some of those questions. Do you remember that
23    generally?
24 A. Yes.
25 Q. Okay. My question to you is whether or not you

---

Page 132

1    reviewed any draft Complaints.
2  A. Are you talking the, the one that I signed in, in
3    September?
4  Q. No, that's a, that's a -- Oh, you mean your power
5    of attorney, is that what you're referring to?
6  A. No, just a couple weeks ago.
7  Q. Oh, your declaration?
8  A. Yes.
9  Q. Yeah, no, no. I'm talking about the Complaint
10    that was filed in July in this case.
11 A. Did I review the draft Complaint? Not that I
12    recall.
13 Q. Okay. Now, you did participate in some meetings
14    with lawyers prior to the filing of the Complaint;
15    correct?
16 A. Yes.
17 Q. Okay. When did you first learn that Widen
18    Enterprises was going to be sold?
19 A. At the golf course in the Upper Peninsula.
20 Q. Do you have a date for that or an approximate date
21    for that?
22 A. What was that, I think August of, you know, August
23    before, because I think it sold in September so it
24    was the month before that, I believe.
25 Q. Okay. And who was golfing with your group?

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 133

1  A.  Reed, myself, Ryan Ely, Rod Bochen, Mark Winter,
2      Dave Bisbee.
3  Q.  And you told me earlier about some comments that
4      you said Reed Widen made during that outing;
5      correct?
6  A.  Did we cover that?  I don't remember what we
7      talked about on it.
8  Q.  I think we did, but my question to you is, as a
9      follow up, were those comments that you attributed
10     to Reed Widen made on the course, in the
11     clubhouse, some other occasion?
12         MS. POLAKOWSKI: Objection.  Form.
13 A.  I mean, the, the conversation happened in multiple
14     locations at that, it's like a resort golf course,
15     then we went to dinner, we were in the car.  So
16     there were comments throughout that whole weekend
17     about, you know, this, this sale that was
18     happening.  Obviously, it was on top of mind of
19     Reed, it was kind of a big deal.
20 Q.  Tell me specifically what you remember Reed saying
21     what you heard about the impending sale.
22 A.  That, you know, there was 162 million, which was,
23     like, you know, a huge sum, that the deal hadn't
24     closed yet but it was going to soon, that the
25     calls he was taking was regarding, you know,

Page 134

1      finalizing the deal.  There was conversation in
2      the, in the truck on the way over to dinner about
3      it with Ryan Ely, and I can't remember
4      specifically what that was but I know we were
5      talking about it.  I can't remember the specifics
6      though right now.
7  Q.  After the closing, which was in September of 2021,
8      have you ever had any discussions with Reed Widen
9      relating to your mother?
10 A.  Yes.
11 Q.  Okay.  How many?
12 A.  Oh, quite a few.  I mean, particularly right after
13     the closing when, you know, the, the legal stuff
14     was starting to come to light.
15 Q.  Okay.  Well, what did he tell you, and what did
16     you tell him?
17 A.  He said that, you know, he, there was a lot,
18     right, there was a lot of conversations.  He said
19     that, he said that he did, you know, that, that he
20     did everything by the book, that Stacy didn't, you
21     know, deserve to get paid out.  You know, he would
22     ask me, like, if I had talked to my mom recently,
23     general stuff like that.  I'm trying to think of
24     what else.  I mean, I would tell him, look, I
25     don't really want to be in the middle of it, this

Page 135

1      is, you know, it's, it's not a good situation
2      obviously.  Those are the things that are coming
3      to mind right now.
4  Q.  Do you remember anything else that he told you?
5  A.  I can't remember those conversations really.  I
6      mean, what I just said is what I can remember.
7  Q.  Okay.  Did he tell you that the reason Stacy,
8      meaning your mother, wasn't entitled to any of the
9      proceeds from the sale was because she wasn't a
10     shareholder at the time of the sale?
11 A.  No.
12 Q.  Did he expand at all on, on what you told me he
13     said that Stacy wasn't entitled to it or something
14     like that?
15 A.  No, I don't think so.  It was just, you know,
16     there's, it was just kind of anger with, with her
17     for bringing, you know, for questioning it and
18     bringing the lawsuit.  So there wasn't really, you
19     know, this, well, it wasn't really indepth
20     conversation about the legal portion of it, it was
21     just, you know --
22 Q.  Did Reed Widen ever tell you that he had offered
23     to give your mother a $1 million gift?
24 A.  Yes.
25 Q.  What did he tell you about that?

Page 136

1  A.  I think that, that may have been actually the
2      conversation that was had in the truck up in the
3      UP was the first time I had heard about the
4      million dollar gift; well, I'm going to give Stacy
5      a million dollar gift and, you know, have her sign
6      off on a release.  And then shortly after that, I
7      think he told my mom about that gift.  And I
8      believe my mom told me, too, like, hey, Reed had
9      offered me a million dollar gift.
10 Q.  And what was your reaction when your mother told
11     you that?
12 A.  I already knew because he had already told me.
13 Q.  Did you respond or give any reaction to your
14     mother when she told you that Reed Widen was
15     prepared to give her a million dollar gift?
16 A.  No, not really.
17 Q.  Did you have a reaction to it?
18 A.  Not that I can really recall.  You know, like,
19     like Reed had already told me, so I knew, I didn't
20     tell my mom that because again, I don't, I'm not
21     the conduit between those two, nor the company
22     things, so, no, I don't recall any particular
23     reaction.
24 Q.  Okay.  After you heard what you heard in the UP
25     about a month before the sale, did you share any

Page 137

1      of that information with your mother?
2             MS. POLAKOWSKI: I'll object to form.
3  A.  I mean, I'm trying to remember.  I, I believe, I
4      didn't tell her, I didn't tell her anything until
5      after Reed had told Stacy that the, the sale was
6      happening.
7  Q.  Okay.
8  A.  What I would have told her I don't, you know, I
9      told her about the conversation in February 2020
10     when she, you know, prompted that memory.
11 Q.  After the sale in September of 2021, did you
12     recommend to your mother that she hire an attorney
13     to sue Reed Widen?
14 A.  No.
15 Q.  After the sale in September of 2021, did you
16     recommend that she hire an attorney?
17 A.  So the conversation with that was, like, I can't
18     believe this is happening, I can't ever imagining
19     trusting Reed again because of the information
20     that was kind of missed or not given to her prior
21     to the sale.  And I said to her -- She's, like, I
22     feel like I, you know, want to sue him.  And I
23     said something to the, the, you know, I feel like
24     I was wronged, well, my mom said this, I feel like
25     I was really wronged, and, you know, I want to

Page 138

1      talk to a lawyer potentially but then that's going
2      to ruin the relationship.  And I said to her, mom,
3      if you're never going to trust him again, you're
4      never going to have a relationship anyways because
5      without trust, you don't have a relationship.
6             And, you know, she was, like, she was
7      kind of torn, like, what do I do, do I just go on
8      with life, take this million dollar gift and have
9      this, you know, non-relationship with my, my
10     brother, or do I, you know, contact an attorney
11     and see where this goes.  And I kind of just put
12     it out there and said, look, you got two options,
13     right, you either just go with it, you don't have
14     a relationship with Reed because you're never
15     going to trust him again or you get a lawyer and
16     you find out where it goes.  And I also said to
17     her, if you don't, if you go the, the way of just
18     letting it go, are you going to have, are you
19     always going to look back and go, God, I wish I
20     would have done something.  And I think she kind
21     of came to the conclusion that what she wanted to
22     do, the best thing that she could do for her
23     conscience and for her finding the truth was to go
24     the route that she went.
25 Q.  Would you say you encouraged her to file a

Page 139

1      lawsuit?
2             MS. POLAKOWSKI: Object to form.
3  A.  No.
4  Q.  Did you help her look for attorneys to represent
5      her in a lawsuit?
6  A.  Yeah, I did -- I mean, I had the relationship
7      through the real estate and clients and things
8      from a different attorney here, and I reached out
9      to him, and, you know, told him the story and, and
10     connected my mom with the current team.
11 Q.  Other than lawyers at this law firm, the Reinhart
12     law firm, did you contact any other lawyers on
13     behalf of your mother?
14 A.  I did.  It was, I don't remember the name of the
15     firm, it was, it was a, it was a firm that I had
16     seen in the paper that was doing the New Glarus
17     Brewing, and so I'm like, well, this is similar,
18     right, it was shareholder disagreements, but I,
19     you know, they, at first they didn't call me back
20     for a while, and, and I called again, because I
21     also hadn't heard back from this firm, and they
22     were, they basically said that they, they, they
23     couldn't help because of their caseload.  And then
24     Reinhart ended up getting back, and that's, it all
25     went that way.

Page 140

1  Q.  Other than those two firms, did you have
2      discussions with any other law firm on behalf of
3      your mother?
4  A.  No, I believe it was just those two.
5  Q.  Do you know where the other law firm was located?
6  A.  I think in Dane County.
7  Q.  Why did you take that responsibility on your
8      shoulders instead of having your mom do it?
9  A.  She didn't, she didn't really, I mean, she would
10     have gone through, like, the, the Yellow Pages.
11     She didn't have any contacts.  Really the only one
12     that I did was here, and I didn't know if they
13     would help, because I didn't, you know, I don't
14     know a lot about this firm.  And I believe she
15     asked, like, hey, who would I talk to, right, so
16     yeah.
17 Q.  But I guess my question was, why didn't you give
18     your mom those two firm names that you had and let
19     her do the ground work, why were you calling on
20     her behalf?
21 A.  I've, I've called law firms in the past about,
22     about other things, they don't call you back.
23     It's, it helps to have a contact, which I did
24     here.
25 Q.  But on the other firm you didn't?

Page 141

1  A.  I did not.
2  Q.  So why didn't you give your mother the name of
3      that firm and have her call, why were you doing
4      that?
5  A.  It was just kind of like I'm going to, if I'm
6      going to reach out to the one that I do have a
7      contact, I'll reach out to this other one that
8      I've seen in the paper, I don't know, rather than,
9      I'll just, that's kind of what I do is see a job
10     through or a task rather than divide it up and did
11     you call and I called them, and I'll just do it
12     all, it was two calls.
13 Q.  Do you have any stake in the outcome of this case?
14 A.  What kind of stake?
15 Q.  Any kind.
16 A.  I mean obviously --
17 Q.  But --
18 A.  -- the relationships.  It's a huge stress on the,
19     the relationships involved.
20 Q.  But you're the one that suggested it and then
21     pursued and ultimately found a lawyer for your
22     mom; right?
23        MS. POLAKOWSKI: Objection to the extent
24     that it mischaracterizes his testimony.
25 A.  Yeah, I didn't, I mean, she asked, I guess there's

Page 142

1      multiple things there.  She asked do you know any
2      lawyers, so the one that I do is here, Reinhart.
3      And like we talked about before, if my mom's in a
4      position, I'll help her if I can, right.  I was
5      kind of counseling her.  So, yeah, I mean, I
6      helped her find the lawyer and connected her so
7      she could go on the route that she felt was the
8      best, best route for her.
9  Q.  Why was it that you were willing to help her when
10     she needed help looking for a lawyer but you
11     weren't willing to help her when she needed money
12     in May of 2020?
13        MS. POLAKOWSKI: Object to the extent
14     that it mischaracterizes her testimony, his
15     testimony.  Also object to form.
16 A.  I mean, I did help her in regard to the May
17     situation.  Like I said, I was texting, calling,
18     counseling her because she doesn't really have
19     anyone else to do that.  She was going through the
20     divorce and whatnot.  I'm her only son so I was
21     helping her in those situations.
22 Q.  She needed money back then in May of 2020;
23     right?
24 A.  Okay.
25 Q.  Didn't she?

Page 143

1  A.  Yeah.
2  Q.  Did you help her at all with that need?
3        MS. POLAKOWSKI: Objection.
4  A.  Giving her money?
5        MS. POLAKOWSKI: Asked and answered.
6  Q.  Assisting her and getting money, giving her money,
7      loaning her money.
8  A.  I did.
9  Q.  Talking to bankers.
10 A.  I counseled her on, on that situation.
11 Q.  What did you tell her?
12 A.  I mean, it was just, like, things about the
13     valuation, you know, not, you know, selling all
14     the stock isn't a great idea, trying to calm her
15     down, you know, things maybe to say to Kiesler
16     when she met with him, you know, questions to ask,
17     like, hey, how did you get to that valuation
18     specifically, yeah, just talking her through kind
19     of what I could at the time.
20 Q.  Do you know if your mother ever asked Kiesler how
21     he arrived at that valuation?
22        MS. POLAKOWSKI: I'm sorry.  Could you
23     read back the question.  I just didn't hear it.
24        (Question read)
25 A.  I don't know for sure.

Page 144

1  Q.  Did your mother ever tell you that Michael Kiesler
2      went through the valuation formula with her?
3  A.  I, I don't believe she told me that, no.
4  Q.  Did you ever contact any banks on behalf of your
5      mother in May of 2020?
6        MS. POLAKOWSKI: Objection.  Asked and
7      answered.
8  A.  I, I didn't because I don't know what I would have
9      said really.
10 Q.  Wouldn't you have said, my mom needs some money,
11     can you help her?
12 A.  I --
13        MS. POLAKOWSKI: Objection.  Calls for
14     speculation.
15 A.  I mean, I don't know.  I don't think that's how it
16     works.  No, I would -- No, I don't, I don't,
17     didn't reach out to any banks.
18 Q.  Well, have you ever obtained a loan from a bank?
19 A.  I have.
20 Q.  And did you go to the bank and say, I need some
21     money for this?
22 A.  Well, yeah, and, like, in regard to a mortgage,
23     something like that, but this wasn't that, right.
24     It was, she was going through a divorce, in a
25     tough situation, right.

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 145

1 Q. Was there anything stopping you from contacting a
2    bank on behalf of your mother in May of 2020?
3 A. Like I say --
4        MS. POLAKOWSKI: Objection. Calls for
5    speculation.
6 A. I wouldn't have known what to say. I mean, I
7    can't imagine calling a bank and being, like, hey,
8    my mom needs some money, what can you do. Because
9    I don't, I don't know if there's really an answer
10   for that, right, like, there's usually collateral
11   or something like that.
12 Q. Well, you could have given the bank collateral;
13   couldn't you?
14       MS. POLAKOWSKI: Objection. Calls for
15   speculation.
16 A. I suppose I could have, yeah.
17 Q. Did you ever consider that?
18 A. I don't recall considering that. I mean, I
19   remember talking to my wife a little bit about
20   the, the situation, but, you know, I don't, I
21   don't recall being, like, hey, we can maybe put
22   the house up and put a lien against our house, I
23   don't recall doing that. You know, this is a,
24   this is a family business. I figured, heck, my
25   mom needs money and she's a shareholder, maybe the

---

Page 146

1    business could help, right. The company's doing
2    really good, my wife worked there, I knew that,
3    so, like, right.
4 Q. So if you're a shareholder --
5 A. They're, they're also bringing in 30 some million
6    dollars a year. I certainly didn't have those
7    kind of resources and assets.
8 Q. So if you're a shareholder in a family-owned
9    business are you telling me that you have a right
10   to go to the company and say, give me money?
11       MS. POLAKOWSKI: Object to the extent
12   that it mischaracterizes his testimony. Also
13   object to the extent that it calls for a legal
14   conclusion.
15 A. Yeah, legally I have no idea. I would assume that
16   probably, no. I know I can't go to my company and
17   just say, I need money right now. I do get
18   dividends and liquidity options usually on an
19   annual basis, but, again, it's not the right, it's
20   just doing the right thing, helping people out,
21   you know, adding shareholder value, you know,
22   that's a thing. Like, in my, when we do our, I
23   hear my CEO talk about the, the shareholders and
24   do the shareholder updates it's all about, like,
25   it's, it's, like, we're doing this all for the

---

Page 147

1    shareholders and the employees and the clients and
2    all the stakeholders, but, like, the shareholders
3    are at the center of delivering value, and helping
4    them out. I mean, like, the, the, the, the event
5    that just happened where a PE firm came in and
6    bought a stake in, in HUB International it was,
7    the main reason from what I recall that that was
8    done is so that shareholders could get liquidity.
9    So I don't know, it just, it just, it just
10   seemed -- I thought that, I thought that Widen
11   Enterprises would take care of my mom.
12 Q. So you thought --
13 A. Long story short.
14 Q. -- if your mom went to Widen Enterprises in May of
15   2020 and said, hey, can you give me a hundred
16   grand, they would have just given her a hundred
17   grand?
18 A. Not just given it. I mean, there's, you know, a
19   give/take, you know, those kind of things, but,
20   yeah, they would, they would have found a way to,
21   you know, help her out. I mean, $50,000 in in,
22   you know, from what I understand the success of
23   the company was really not a lot of money, and by
24   the way, again, too, tie that together with the,
25   the, you know, the way that, the all or nothing

---

Page 148

1    option was proposed, too, it just, it feels like
2    it was, like, an almost adversarial situation
3    which I didn't think it would be.
4 Q. Well, your mom certainly had the right and the
5    ability to say no to the deal; right?
6        MS. POLAKOWSKI: Objection. Calls for
7    speculation. Foundation.
8 A. I mean, I, I don't think she had a really, she had
9    a right to do whatever she wanted, right, just
10   like Widen did, but I don't know if she really had
11   an option that she --
12 Q. Well, you could have given her an option?
13 A. -- that she, that she saw.
14 Q. But you could have given her an option?
15       MS. POLAKOWSKI: Objection. Calls for
16   speculation.
17 A. Again, I don't know what option that would be,
18   right. I, I don't know what my financial
19   situation was at that time.
20 Q. Well, she didn't need $50,000 that day; did she?
21       MS. POLAKOWSKI: Objection. Calls for
22   speculation. Foundation.
23 A. I don't know. Like I said, I don't know exactly
24   what she was using the money for but I know it was
25   things like rent, food.

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 149

1 Q. So her rent's not $50,000; right?

2 A. I don't, I don't know what her rent is but that

3   seems high.

4 Q. You would think it wouldn't be $50,000; right?

5 A. Right. She lives in a pretty small apartment.

6 Q. And you could have helped her along if she needed

7   money; couldn't you?

8       MS. POLAKOWSKI: Objection. Calls for

9   speculation.

10 A. You know, there were lawyer's fees, too. It's

11   just, when, when you bring in another, basically,

12   basically what you're proposing is bringing in a

13   whole other household rent, food, lawyer fees,

14   insurance, car payments, whatever there may have

15   been, that's, I don't know. I don't know if we

16   could have afforded that.

17 Q. Well, she could have moved in with you to help

18   avoid some of those expenses?

19       MS. POLAKOWSKI: Objection. Asked and

20   answered.

21 A. Did she have a lease, I don't know.

22 Q. Do you know?

23 A. I assume so. She lived in an apartment.

24 Q. Did you talk to her about the lease?

25 A. In May?

---

Page 150

1 Q. Yes.

2 A. I don't think so.

3 Q. In May of 2020, do you know when her lease was

4   expiring?

5 A. No, I have no idea.

6 Q. Did you offer to your mother to contact attorneys

7   on her behalf or did she ask you to do that?

8 A. She said, I don't know any attorneys, do you know

9   one. I said, I do. And so I contacted them.

10 Q. So my question is, did you offer to do that or did

11   your mother ask you to do that?

12 A. She asked.

13 Q. So she said to you, can you contact some attorneys

14   for me?

15       MS. POLAKOWSKI: Object to the extent

16   that it mischaracterizes his testimony.

17 A. I believe what I recall was she said, I don't know

18   anyone, do you. And this, again this is a

19   conversation that happened however long ago, but

20   from what I remember, she was, like, kind of, you

21   know, what do I do, I don't know people. So

22   either, I may have, when she made that statement,

23   I may have said, I know an attorney that I can

24   contact for you and try to connect you, or I may

25   have said, yes, I do, but I don't remember, you

---

Page 151

1   know, that specific conversation from multiple

2   years ago.

3 Q. Now, you were specifically looking for an attorney

4   on behalf of your mother to sue your uncle, Reed

5   Widen; right?

6 A. I was, I was looking for an attorney for her to

7   help her decide what the best route to go would

8   be. I mean, for all I knew, the attorney may have

9   heard the facts of the case and said, Stacy, you

10   have, there's nothing here, you know, like, see

11   ya.

12 Q. And if there was something there, it'd be to sue

13   her brother and your uncle, Reed Widen; right?

14       MS. POLAKOWSKI: Objection. Calls for

15   speculation.

16 A. I don't know the legal system that well.

17 Q. Well, who do you think, who did you think at that

18   time when were you hunting for lawyers were the

19   possible defendants in the claim by your mother?

20 A. I --

21       MS. POLAKOWSKI: Objection. Foundation.

22 A. I had no idea, you know.

23 Q. Did you think they were going to sue me?

24       MS. POLAKOWSKI: Same objection.

25 A. Of course not.

---

Page 152

1 Q. Did you think they might sue Reed Widen?

2       MS. POLAKOWSKI: Objection. Calls for

3   speculation. It assumes facts not in evidence.

4 A. Anyone related to the companies, particularly in

5   the leadership position, would probably be the,

6   the most likely, right.

7 Q. And that would include Reed Widen; right?

8 A. Yes. Reed was I believe the chairman of the

9   board.

10 Q. Did you have any written communications with this

11   other law firm?

12 A. I don't believe so.

13 Q. Did you have any written communications with the

14   Reinhart firm at that time?

15       MS. POLAKOWSKI: Object to form.

16 A. I mean, I believe, written communications as in,

17   like, a meeting invite maybe, but I don't remember

18   any specific, like, you know, emails going back

19   and forth or anything like that.

20 Q. Okay.

21 A. But I know when the connection was made to

22   Reinhart there was a meeting that would be

23   scheduled, right, so there'd be a written

24   communication that way.

25 Q. How many meetings did you attend with the

---

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 153

1  Reinhart firm prior to the filing of this lawsuit
2  on July 21, 2022?
3  A. I think I sat in on I would say probably five or
4  six.
5  Q. Okay. And who were the people attending those
6  meetings?
7  A. My mom and the Reinhart team.
8  Q. And you?
9  A. And me.
10  Q. Did you share any discussions during those
11  meetings with your wife?
12  A. Like, the substance of the meetings or --
13  Q. Anything.
14  A. Yeah, yeah.
15  Q. What types of things did you tell your wife about
16  those meetings?
17  A. Just the, like, some of the content that, that,
18  that came up.
19  Q. What type of content?
20  A. You know, what Reinhart told my mom, what my mom
21  told Reinhart, I mean things like that. What the,
22  the lawyers thought may have been, you know, may,
23  what they thought was potential issues, potential
24  issues the way she was treated, things like
25  that.

Page 154

1  Q. All right. What do you remember specifically
2  telling your wife about what the Reinhart lawyers
3  told your mom during these meetings?
4     MS. POLAKOWSKI: Just for clarity sake
5  he's asking specifically what you told Julie.
6  A. My wife. I, I mean I think generally what I
7  remember saying is, like, they said that, you
8  know, they'll take the case and because they, they
9  think that there's, you know, she's got some valid
10  complaints or issues.
11  Q. Okay. Did you tell your wife what the Reinhart
12  lawyers told your mother about the weaknesses of
13  her case?
14  A. I don't recall. Yeah, I don't recall specifically
15  what I would have told her on the weaknesses. I
16  don't, I don't recall necessarily what I told her
17  at that time, you know, prior to the Complaint the
18  strengths either, I may have.
19  Q. Well, you told me you told your wife about things
20  that the Reinhart lawyers told your mother during
21  the meetings. What things were those?
22     MS. POLAKOWSKI: Objection to the extent
23  that this has been asked and answered.
24  A. Things like, you know, that they didn't disclose
25  that there was, you know, there was known value

Page 155

1  differences. I mean, it's basically kind of the
2  things that are in the Complaint. You know, there
3  was the, the, the, cash, the free cash and the
4  money in the, in the market. It was over, you
5  know, five million dollars or whatever, that there
6  probably were multiple other options that they had
7  to than, other than doing the all or nothing buy
8  my stock or not. Those, those were kind of the,
9  the high level ones that I remember at the time.
10  Q. Do you remember telling your wife that the
11  Reinhart lawyers asked your mother why she didn't
12  get an attorney before signing the redemption
13  agreement on May 13 of 2020?
14     MS. POLAKOWSKI: Objection. Assumes
15  facts not in evidence.
16  A. Yeah, I don't recall.
17  Q. Do you recall whether you told your wife that the
18  Reinhart attorneys asked your mother why she
19  didn't request any financial records of the
20  companies?
21     MS. POLAKOWSKI: Same objection.
22  A. Yeah, same answer, I don't recall.
23  Q. Do you recall telling your wife about the
24  financial arrangement for attorney fees discussed
25  during any of those meetings?

Page 156

1  A. I do not.
2  Q. What do you recall telling your wife about things
3  that your mother told Reinhart?
4  A. Telling my wife about things that my mother told
5  Reinhart. I mean, it was, again, I think it was
6  kind of the high level stuff in the Complaint
7  about, you know, that she asked for a hundred and
8  they said no, it was 50, they said no, they
9  couldn't possibly do that; you have to sell all of
10  it. Not disclosing to her that, you know, there
11  was, they knew that the, the, the firm was worth,
12  you know, super high amounts, you know, nearing a
13  hundred thousand dollars, or a hundred million
14  dollars; that Reed had told my mom that, well,
15  when my mom told Kiesler that, you know -- I'm
16  sorry, when my mom told Reed that the company
17  wasn't doing, you know, in trouble because of
18  COVID and those things, and, and Reed said, you
19  know, that's not true, I don't know why Kiesler
20  would have said that. You know, things about my
21  mom not, not really wanting to push the, rock the
22  boat and ask Reed about financials and things like
23  that because she just over the years kind of got
24  intimidated and didn't want to, you know, anger
25  him. Those are the main things I recall.

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 157

1 Q. Now, you told me there were three general areas
2     that you discussed with your wife, one was what
3     Reinhart lawyers told your mother.  The second was
4     what your mother told Reinhart lawyers, and the
5     third, I can't remember exactly what you said but
6     it was something about circumstances of the case
7     or something like that.  Tell me what you remember
8     telling your wife on that third topic.
9 A.  On the circumstances of the case.
10        MS. POLAKOWSKI: I'm sorry, what was the
11    third topic?
12        MR. LAING: Let's go back and find it.
13        (Break taken)
14 Q. So before the break, I was trying to locate,
15    actually the court reporter was trying to locate
16    for me, what I was referring to, and, and she has,
17    the three topics that you mentioned that you
18    shared with your wife or what Reinhart told your
19    mother what your mother told Reinhart and then
20    what the lawyers thought may have been potential
21    issues in the matter.
22 A.  Okay.
23 Q. And so I want to follow up on the third one and
24    ask you what you told your wife about what the
25    Reinhart lawyers told your mother regarding

Page 158

1     potential issues in the case.
2 A.  Well, I guess to clarify here, too, so I'm talking
3     about I discussed stuff with my wife regarding the
4     Complaint.  When I kind of said everything's in
5     the Complaint, I wasn't necessarily discussing
6     with my wife things that were happening in the,
7     the Reinhart meetings, the meetings with Reinhart
8     and my mom.  It was more, you know, what, what was
9     in the Complaint.
10 Q. I understand why you'd say that, but my question
11    really was different than that.  My question was,
12    what did you tell your wife was said by the
13    Reinhart lawyers to your mom in meetings in which
14    you attended where they were discussing potential
15    issues in the case?
16        MS. POLAKOWSKI: And I will object to the
17    extent that it would require you to divulge the
18    existence of attorney-client privileged
19    information, and I will instruct you not to answer
20    to the extent that it would require you to divulge
21    that information.  To the extent that you can
22    answer without divulging information, please go
23    ahead and do so.
24 A.  Yeah, I --
25 Q. Let me just comment.  I'm not sure what that

Page 159

1     objection is.  If that objection applied to the
2     prior questions, it's been waived.  If this is
3     something different, I don't understand it.
4        What I'm asking you about is this, you
5     attended meetings with your mother and the
6     Reinhart lawyers; correct?
7 A.  Correct.
8 Q. And during those meetings the Reinhart lawyers
9     said certain things that you shared with your
10    wife; correct?
11        MS. POLAKOWSKI: Object to the extent
12    that it mischaracterizes his testimony.
13        MR. LAING: That's exactly what he told
14    me.
15 A.  Well, I, I didn't say specifics it was, like, high
16    level stuff, like, hey, we can move, like, they,
17    they're, they're going to take the case, they're
18    going to move forward, things like that, but not,
19    like, specifics about the, you know, the, the case
20    itself.  The, the discussions that we had on
21    specifics was after the Complaint came out, my
22    wife read the Complaint, and, you know, that's,
23    that's when those more specific conversations were
24    had.
25 Q. And really I'm not asking about any of those.

Page 160

1     I don't care about those at the moment.
2 A.  Okay.
3 Q. What I care specifically about is what did you
4     tell your wife the Reinhart lawyers told your
5     mother while you were present regarding potential
6     issues in the case?
7        MS. POLAKOWSKI: And I'll lodge the same
8     objection and the same instruction.
9 A.  I don't, I didn't tell my wife anything in those
10    meetings.
11 Q. Well, you told me earlier you did.  You told me --
12 A.  I know, but I was talking, I thought you were
13    talking about, like, in regard to, like, the
14    Complaint.
15 Q. Well, that can't be because you told me that you
16    told your wife what Reinhart told my mother,
17    that's what you told me.  That has nothing to do
18    with the Complaint; right?
19 A.  Well, right, again at the high level, right.
20 Q. I understand that.
21 A.  Like, Reinhart told my mother --
22 Q. I understand that.  Then you also told me that you
23    told your wife what your mother told Reinhart
24    during those meetings; correct?  Isn't that what
25    you said?

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 161

1    MS. POLAKOWSKI: And I'll object to the
2  extent that it mischaracterizes his testimony.
3  You can answer.
4 A.  I don't recall that, no.
5 Q.  Okay.  I, I can assure you that the transcript
6  will use those exact words, okay.  Then the third
7  thing you told me that you told your wife was what
8  the lawyers thought may have been, you know, may,
9  what they thought was potential issues in the
10  case.  So I want to ask you, what do you recall
11  telling your wife about that topic?
12    MS. POLAKOWSKI: And same objection, same
13  instruction.
14 A.  Yeah, I don't recall specifically telling anything
15  like that --
16 Q.  What do you recall generally?
17 A.  -- from, from the, from the meetings with, with
18  Reinhart.
19 Q.  What do you call generally, what do you recall
20  generally --
21 A.  Like, I do remember telling my wife, I can't talk
22  about specifics of what happened in the meeting.
23 Q.  What do you recall generally you told your wife
24  about what the Reinhart lawyers told your mother
25  when you were present about potential issues in

Page 162

1  the case?
2    MS. POLAKOWSKI: And I'll also object to
3  the extent that it calls for attorney-client
4  privilege.  To the extent that you're asking him
5  to waive privilege, he cannot do so, he's not
6  authorized to do so, and that would be acting
7  outside of the scope of his agency so cannot waive
8  such privilege.  To the extent that you're able to
9  answer without waving any privileged information,
10  you may go ahead and do so.
11 A.  Yeah, the, what, what I would tell her was I can't
12  tell you, we can't talk about specific things that
13  were discussed in the, in the meeting.
14 Q.  Yeah, I understand that, but I'm trying to -- You
15  told me that you told your wife about what the
16  Reinhart lawyers told your mother may be potential
17  issues in the case, you told me that already.  So
18  now I want to know, what do you recall telling
19  your wife on that subject?
20    MS. POLAKOWSKI: Same objection and same
21  instruction.
22 A.  I don't recall telling her specifics on that.
23  I think I was a little confused.  I was referring
24  again to the conversation that I had with my wife
25  after the Complaint came out, but we, we didn't

Page 163

1  talk about specifics of the meetings that happened
2  with Reinhart within the meeting.
3 Q.  I'm struggling with that testimony, and I know it
4  comes after a break where you had an opportunity
5  to confer with your lawyers, but you told me under
6  oath today before the break that you told your
7  wife what Reinhart told your mother.  Are you now
8  changing that testimony?
9    MS. POLAKOWSKI: I'll object to the
10  extent that it mischaracterizes his testimony, but
11  go ahead and answer.
12 A.  Yeah, I mean I was, I wasn't following the, you
13  know, the, the questioning and the timing that you
14  were talking about.  Again, I was talking, I was
15  thinking about, like, after the Complaint came out
16  and she had read the Complaint there were
17  discussions that we had.  And it wasn't, again
18  there was no, I told my wife when, after meetings
19  with Reinhart with the lawyer was, I can't talk
20  about specifics, you get it, I mean she did, and
21  we didn't talk about specifics about what happened
22  in those meetings.
23 Q.  So help me understand.  You testified that you
24  told your wife what Reinhart told your mother and
25  what your mother told Reinhart during those

Page 164

1  meetings that you attended?
2    MS. POLAKOWSKI: And I'll object to the
3  extent that mischaracterizes his testimony.
4 Q.  And it's virtually word-for-word what you already
5  said.  So my question is, help me understand that.
6  Were you just wrong when you told me that, are you
7  changing that, is that accurate testimony?
8    MS. POLAKOWSKI: Same objection.
9 A.  Yeah, I was wrong and I misunderstood what you
10  were kind of asking about.  Like I said, in the
11  meetings that we had, that I was in, the five or
12  six meetings that I was in with my mom, with the,
13  with Reinhart, I told Julie on those meetings,
14  like, you know, we can't talk about specifics.
15  And she knew that, honestly, she wouldn't even
16  really ask because she knew there's, there's the,
17  no specifics conversation, right.
18 Q.  So let's see if we can get a clear record.
19    Did you tell your wife at any point in
20  time what Reinhart lawyers told your mother during
21  meetings where you attended?
22 A.  No, other than high level things like it is moving
23  forward.
24 Q.  Okay.  Did you tell your wife what your mother
25  told Reinhart lawyers during meetings in which you

Page 165

1 attended?

2 A. I'm sorry. What was the question?

3      MR. LAING: Why don't you read it back.

4      (Question read)

5      THE WITNESS: I'm sorry. One more time.

6      (Question read)

7 A. Did I tell my wife what Reinhart lawyers, no.

8   Like I said, I didn't tell, we could, we could

9   never talk specifics about what happened in the

10   meetings with the lawyers.

11 Q. So it's wrong that you ever told your wife

12   anything about what Reinhart lawyers told your

13   mother during meetings that you attended; correct?

14 A. Correct.

15 Q. And it's wrong that you ever told your wife things

16   that your mother told the Reinhart lawyers during

17   meetings which you attended; correct?

18 A. Correct.

19 Q. And it's wrong that you ever told your wife what

20   the Reinhart lawyers said regarding potential

21   issues in the case during meetings in which you

22   attended; correct?

23 A. Correct.

24 Q. You testified earlier today that, I think --

25   Strike that.

Page 166

1      When I was asking you questions about

2   whether you thought that the deal that your mother

3   accepted in May of 2020 for $1.3 million was fair,

4   I think you said something to the effect of no or

5   something like that; is that right?

6      MS. POLAKOWSKI: Object to form. Also

7   object to the extent that mischaracterizes his

8   testimony.

9 A. If I thought the 1.3 was a fair number, I believe

10   that's what we discussed, yeah.

11 Q. And did you tell me you didn't think it was

12   fair?

13      MS. POLAKOWSKI: Same objection.

14 A. Yeah, I think that was in regard to, you know,

15   the, you know, the, the information that she had

16   or was available to her, yeah.

17 Q. And if I remember right, one of the reasons you

18   gave me for your opinion was that at the time

19   you knew that Widen Enterprises was bringing in

20   $30 million in revenue per year; is that right?

21 A. Yeah.

22 Q. Okay. How did you learn prior to May 13 of 2020

23   that Widen Enterprises was bringing in $30 million

24   in revenue per year?

25 A. I don't remember specifically. I mean, I think

Page 167

1   there's a couple different ways that I could have,

2   I could have learned that. It would have been

3   conversations with Reed, conversations with Julie,

4   because, you know, she would have, like, weekly

5   updates, and we talk about work quite a bit with

6   Matthew Gonnering. I may have even read it in,

7   like, the In Business where they talk about

8   company's, you know, revenues and things like

9   that, and I know sometimes those revenues and

10   stuff are estimated, but those would be probably

11   the most likely ways I would have learned.

12 Q. Are you certain that as of May 13 or 2020 you

13   were aware that Widen Enterprises was bringing in

14   $30 million in revenue per year?

15 A. Was I certain at that, that period in time?

16 Q. No, are you certain today that you knew that fact

17   in, on May 13 of 2020?

18 A. I mean I think I've, I knew that, I don't know,

19   yeah, I knew it was in that vicinity, about 30.

20 Q. Okay. And I think you -- Well, I'm not going to

21   ask about recollection. So let me ask the

22   question.

23      Was your mother and father aware to your

24   knowledge as of May 13, 2020, that Widen

25   Enterprises was bringing in $30 million in revenue

Page 168

1   per year?

2 A. I don't know what they were aware of, yeah.

3 Q. Okay. Did you tell your mother prior to May 13,

4   2020, that you knew that Widen Enterprises was

5   bringing in $30 million in revenue per year?

6 A. Prior to May of 2020?

7 Q. Prior to May 13 of 2020.

8 A. I don't recall if I did.

9 Q. Is that a fact you assumed your mother was aware

10   of?

11 A. I don't recall assuming that, yeah.

12 Q. Do you have any reason to believe that Reed Widen

13   would intentionally take advantage of your mother

14   for financial gain?

15      MS. POLAKOWSKI: Object to form.

16      I mean, there's one conversation that I

17   remember having that, you know, was concerning in

18   that manner. Basically we were sitting, I think

19   we were up at the cottage and sitting on the dock

20   and we were talking about the cottage, and I think

21   it was a period of time where my mom was kind of

22   going through being a little bit, a little bit

23   unstable due to some of the pressures, I think

24   with the divorce and my brother and stuff, and I

25   believe he said, you know, she'll run out of money

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 169

1  and, you know, then she'll be out, and, you know,
2  I wouldn't, I wouldn't help her out if she needed
3  it, something like that.
4  Q.  When did that conversation take place?
5  A.  I, within the last, I don't know exactly, I mean
6  within the last few years.
7  Q.  After your mother sued him?
8  A.  No.  It was, it was prior to that, and it was in
9  the summer, you know, June, July, August,
10  something like that, it might have butted up on
11  those other ones, but we were sitting outside, it
12  was a nice day so I don't remember that.
13  Q.  Do you remember or do you recall the summer of
14  what year?
15  A.  I don't recall the exact year right now.
16  Q.  Okay.  Do you recall whether it was after your
17  mother turned down the $1 million gift offered to
18  her by Reed Widen?
19  A.  No, it was previous to the lawsuit and the gift.
20  Q.  Do you remember when Reed Widen made the offer of
21  a million dollar gift to your mother?
22  A.  I believe --
23       MS. POLAKOWSKI: Object to form.
24  A.  I believe it, yeah, I believe it was September
25  of '21, right after the, right after the, the sale

Page 170

1  went through.
2  Q.  Okay.  So the comment that you're attributing to
3  Reed Widen occurred before September of 2021; is
4  that what you're saying?
5  A.  Yeah.
6  Q.  And do you know if it was that summer meaning 2021
7  or sometime prior to that?
8  A.  I believe it was prior to that.
9  Q.  Would you agree with me that Reed Widen is not a
10  greedy person?
11       MS. POLAKOWSKI: Object to form.
12  Foundation.
13  A.  I don't know.  I can't recall, I can't, I, I don't
14  know if he's greedy or not.  I don't know what's
15  going on in his head.
16  Q.  Well, you spent a ton of time with him --
17  A.  I have.
18  Q.  -- over the years; right?
19  A.  M-hm.
20  Q.  And you said he's like your second father; right?
21  You've been on a lot of trips with him; correct?
22  A.  I have.
23  Q.  You've been over at his house maybe hundreds of
24  times; right?
25  A.  (Witness indicating).

Page 171

1  Q.  You have to answer.
2  A.  Yes.
3  Q.  And you know him pretty well; don't you?
4  A.  I do.
5  Q.  Have you ever found him to be greedy?
6       MS. POLAKOWSKI: Same objections.
7  A.  No.
8  Q.  Are you aware that in this lawsuit your mother
9  seeks to rescind the Stock Redemption Agreement
10  she signed on May 13 of 2020?
11       MS. POLAKOWSKI: Object to the extent it
12  calls for a legal conclusion.
13  A.  Yeah, I don't, I don't know if I, I don't know, I
14  wasn't --
15  Q.  You don't know either way, is that what you're
16  saying?
17  A.  I don't know, I wasn't aware that she called to
18  rescind the, the agreement.  I guess I don't
19  totally understand what that means.
20  Q.  Did you ever have any discussions with your mother
21  regarding whether she would like to essentially
22  rip up and make null and void the Stock Redemption
23  Agreement she signed on May 13 of 2020?
24       MS. POLAKOWSKI: And I'll object to the
25  extent that it would require you to disclose

Page 172

1  attorney-client privileged information.  To the
2  extent that it would require you to disclose that
3  information, I'll instruct you not to answer.  Go
4  ahead and answer though to the extent that you can
5  do so without disclosing privileged information.
6  A.  No, she never said that.
7  Q.  Are you aware that your mother's been receiving
8  monthly payments for her stock since June of
9  2020?
10       MS. POLAKOWSKI: Object to form and
11  foundation.
12  A.  I am aware.
13  Q.  Do you know approximately how much she receives?
14       MS. POLAKOWSKI: Objection.
15  Foundation.
16  A.  I don't remember the number.
17  Q.  Are you aware of any range?
18       MS. POLAKOWSKI: Objection.  Foundation.
19  A.  I, I mean if I had to, were to guess, it'd be,
20  like, 25,000 a month or something.
21  Q.  Do you know what your mother has used those funds
22  for since she started receiving them in June of
23  2020?
24       MS. POLAKOWSKI: Objection.  Foundation.
25  A.  I don't really know what she spends her money

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

| | Page 173 |
|---|---|

1　　on.

2　Q.　Do you know what she spent her money on at all for

3　　any reason since May of 2020?

4　　　　MS. POLAKOWSKI: Same objection.

5　A.　No.

6　Q.　I mean, do you know, for example, if she's taken

7　　vacations, do you know if she's purchased vehicles

8　　or property or any of that stuff?

9　　　　MS. POLAKOWSKI: Same objection.

10　A.　I mean, I know that she went, she went on, like,

11　　an RV trip, I believe. I can't remember where.

12　　I think she, I think she was down in, I believe it

13　　was Maryland with some girl friends, that she'll

14　　go on a, you know, it's, like, kind of an annual

15　　thing that they do. I'm trying to think. Those

16　　are the things I can recall right now.

17　Q.　Do you know what type of vehicle she currently

18　　drives?

19　A.　She's got an Infiniti, the big one, a Q, their,

20　　their big SUV.

21　Q.　Do you know when she acquired it?

22　　　　MS. POLAKOWSKI: Object to form.

23　　Foundation.

24　A.　No.

25　Q.　Was it after the lawsuit was filed?

| | Page 174 |
|---|---|

1　　　　MS. POLAKOWSKI: Same objection.

2　A.　I don't, I don't know.

3　Q.　Was it after June of 2020?

4　　　　MS. POLAKOWSKI: Same objections.

5　A.　June of '20. I believe so.

6　Q.　Has your mother ever told you that she's thinking

7　　about not accepting the payments that she receives

8　　monthly under the Stock Redemption Agreement she

9　　signed on May 13 of 2020?

10　　　　MS. POLAKOWSKI: And I'll object to the

11　　extent that answering would require you to

12　　disclose any attorney-client privileged

13　　information. To the extent that you can answer

14　　without doing so, go ahead and answer.

15　A.　No.

16　Q.　No, she's never told you that?

17　A.　Correct.

18　Q.　I don't know if I asked you this previously.

19　　Are you aware that your mother inherited gold and

20　　silver from her parents?

21　A.　Yeah, as I sit here today I am.

22　Q.　Have you ever seen it?

23　A.　Not that I recall.

24　Q.　What do you know about that?

25　A.　That she's got, that grandma and grandpa gave her

| | Page 175 |
|---|---|

1　　gold and silver. That's really, I think they're

2　　gold bars, silver bars, something like that.

3　Q.　Do you know where she keeps them?

4　A.　I don't.

5　Q.　Do you know where she's ever kept them?

6　A.　I mean, I, my, yeah I don't, I don't.

7　Q.　Do you know if she's ever sold or gifted any of

8　　those that she got from her parents?

9　A.　I'm not sure.

10　Q.　Has she ever given any to you?

11　A.　No.

12　Q.　In connection with the $1 million gift offered by

13　　Reed Widen to your mother, did your mother ever

14　　ask you whether you thought she should accept or

15　　reject it?

16　A.　No.

17　　　　MS. POLAKOWSKI: I -- Never mind.

18　　　　THE WITNESS: Sorry.

19　Q.　Did you at the time you heard that consider that

20　　being a generous thing of Reed Widen to do?

21　　　　MS. POLAKOWSKI: Objection. Form.

22　A.　Yeah, I thought it was generous, but if they're

23　　with my mom's concerns, obviously it wasn't, you

24　　know, near what, what she thought she was, was

25　　supposed to be getting.

| | Page 176 |
|---|---|

1　Q.　Your mother testified in her deposition that on

2　　December 26th of 2019, she was under some extreme

3　　pressure and she wasn't in the right state of mind

4　　to be signing documents. Does that date have any

5　　significance to you?

6　A.　What was the date?

7　Q.　December 26th, 2019.

8　A.　I mean, it was the day after Christmas and it was

9　　very close to my second son being born, but other

10　　than that, no, I don't, nothing is sticking out.

11　Q.　Were you aware on December 26th, 2019, that your

12　　mother was under some extreme pressure?

13　A.　I don't specifically remember that date, no.

14　Q.　Was there ever a time that you believed your

15　　mother was not in a right state of mind to be

16　　signing documents?

17　A.　Yeah, I mean, like I said, during the, some of

18　　those periods where she was kind of under that

19　　stress with the divorce and all the other things

20　　she was, she was, you know, she would ruffle

21　　feathers and maybe be a little bit not the, not

22　　the most even flow person, kind of up and down and

23　　all over the place. Actually, yeah, I mean, I

24　　actually at one point reached out to Leanne and

25　　was like, I don't know what to do, my mom's really

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 177

1    being kind of difficult, just for counsel Leanne,
2    Reed's wife, on how to kind of manage, you know,
3    some of the ups and downs with my mom.
4  Q. Was that relating to the divorce or something
5    else?
6  A. It was, it was previous to that.  It was more
7    after my brother and, and those kind of things.
8  Q. You mentioned and all of those things.  And I
9    think you were referring to things that were
10   impacting your mother's state of mind.
11 A. Yeah.
12 Q. What did you mean when you said, all of those
13   things?
14 A. In relation to kind of, you know, the question
15   regarding, was there a time where she couldn't
16   sign documents or potentially couldn't?
17 Q. Yeah, I think that was the context of what you
18   were saying.
19 A. Yeah, I mean, just the, the pressure with my, or,
20   or the issues regarding my brother really was the
21   big one but then all the other things that kind of
22   come along with managing relationships with
23   people, you know.  Yeah, I mean those are, it, it
24   all kind of stemmed I think from my brother and,
25   and, you know, my, my mom and dad ended up getting

Page 178

1    divorced a couple years later so things weren't
2    great there at home, you know.  I can't think of
3    anything more specific than that.  It's just the
4    things that go on in life when someone's kind of
5    in, in a tough situation maybe mentally,
6    everything becomes harder, right.
7  Q. Do you know whether or not your mother has ever
8    been clinically diagnosed with depression?
9  A. I'm not a hundred percent sure of that, no.
10 Q. Do you know if your mother has ever received
11   professional assistance for mental health issues?
12     MS. POLAKOWSKI: Objection.  Form.
13 A. I do.
14 Q. And what do you know about that?
15 A. I know that she's seen doctors regarding
16   depression, things like that.
17 Q. During what time frame?
18 A. Going back quite a few years.  I mean, I think,
19   yeah, a long time, ten, 15, 20 years, maybe even.
20   I'm thinking again back to my early college, late
21   high school, I believe she was kind of starting to
22   have those issues.
23 Q. All right.
24 A. When I became aware of them.
25 Q. And when are you aware of the last time she

Page 179

1    obtained any of that counseling?
2  A. I mean, I think she regularly sees, you know, a, a
3    doctor for that.
4  Q. Currently?
5  A. Yeah, yeah.  Like, so this year, last year,
6    whatever frequency, you know, someone that would
7    help with that, would, would see someone.
8  Q. Was it your mother or your father, if you know,
9    who wanted the divorce?
10 A. I believe it was mutual.
11 Q. Do you believe your mother is an honest person?
12 A. Yes.
13 Q. Okay.  Do you have any reason to think she would
14   ever commit fraud on a bank?
15 A. No.
16 Q. Are you aware of any financial statements or
17   disclosure forms that she's ever prepared and
18   presented to a bank?
19     MS. POLAKOWSKI: Objection.  Foundation.
20 A. I'm not.
21     MS. POLAKOWSKI: MR. LAING: Okay.  Let's
22   take a break.  I'm close to done.
23     (Break taken)
24 Q. How would you describe Michael Kiesler's
25   personality?

Page 180

1  A. Dry, yeah, dry is a, the best descriptor I can
2    find.
3  Q. Okay.  Typical accountant?
4  A. Yes, right.
5  Q. Have you found him to be generally honest --
6     MS. POLAKOWSKI: Objection.
7    Foundation.
8  Q. -- in your dealings with him?
9  A. I'm, you know, I haven't done a lot of dealings
10   with him so I don't, I can't really say to his
11   honesty level.
12 Q. Okay.  How would you describe Matthew Gonnering's
13   personality?
14 A. Interesting, fairly high energy.  I think he is a
15   good leader, kind of a good leadership personality
16   where, you know, you kind of want to, want to
17   follow that energy, confident, yeah.
18 Q. Honorable?
19     MS. POLAKOWSKI: Same, same objection.
20 A. Yeah, I can't comment on his honor.  I just don't
21   know him that well.
22 Q. Have you socialized with him?
23 A. Yes.
24 Q. How often?
25 A. It would be when I would go to the company

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 181

1    Christmas parties, we did do, a, a, company outing
2    at the Milwaukee Bucks game just this last winter,
3    I did see him.  Oh, and we did a, there was a
4    Mallards, a company Mallards outing, Mallards
5    baseball that I did see him, too.  So maybe once a
6    year.
7  Q.  Have you and your wife and Matthew Gonnering and
8    his wife ever socialized together outside of
9    company events?
10 A.  No.
11 Q.  Is your wife a friend of his wife's?
12 A.  I believe so.
13 Q.  Do they socialize together?
14 A.  I don't think they have to this point.
15       (Exhibit 2 marked for identification)
16 Q.  Okay.  Mr. Randall, I've shown you Exhibit 2,
17    which is a document that your mother's produced in
18    this case, and it's an email or, I'm sorry, it's a
19    text from your mother to you dated May 6, 2012, or
20    2020 at 12:16 p.m.  Do you see that?
21 A.  Yes.
22 Q.  And is that your cell number listed there under
23    To, T-o?
24 A.  225-9882.  Yes.
25 Q.  And your mother tells you, Kiesler was extremely

Page 182

1    cocky with me.  He told me that Widens might even
2    be around in 7 years.  I think that's a typo,
3    maybe she meant might not even be around.  I could
4    end up with nothing if I don't take this offer.  I
5    tried to explain to him that this is a really big
6    deal, it is what I have to live for the rest of my
7    life, I need time to talk to my people.  He told
8    me I need to take it or leave it.  If I turn it
9    down sorry we can't help you.
10       Where your mother there says, I need time
11    to talk to my people, do you know who she was
12    referring to?
13 A.  I don't.
14 Q.  Okay.  Do you know if she ever talked to her
15    people about the subject of selling her stock back
16    to Windy Waters in May of 2020?
17       MS. POLAKOWSKI: Object to form.
18 A.  I don't.
19 Q.  Okay.  Did you respond to this text?
20 A.  I don't recall.
21 Q.  Did you talk to your mother on the subject of her
22    believing she needed time to talk to her people
23    after receiving this text?
24 A.  I don't recall having that specific conversation,
25    no.

Page 183

1  Q.  Did you ever ask your mother at any point in time
2    why she didn't talk to a lawyer before selling her
3    stock in May of 2020?
4       MS. POLAKOWSKI: Object to form.
5  A.  Did I ask her when?
6  Q.  No.
7       MR. LAING: Read that back.
8       THE WITNESS: Sorry.
9       (Question read)
10 A.  Well, she did talk to a lawyer.
11 Q.  And who, who did she talk to?
12 A.  Scott Seid and the other lawyer from the same
13    firm.
14 Q.  And when did she talk to Scott Seid?
15 A.  I don't know that.
16 Q.  Was it after she had already decided that she was
17    going to sign the Stock Redemption Agreement on
18    May 13 of 2020?
19       MS. POLAKOWSKI: Objection.
20    Foundation.
21 A.  I don't know that.
22 Q.  Do you know whether the only time she ever talked
23    to Scott Seid was a minute or two before she
24    signed that agreement?
25 A.  I don't know.

Page 184

1  Q.  And did your mother tell you that she thought
2    Scott Seid was her lawyer?
3  A.  Yeah, because she would talk about, I talked to my
4    lawyer or I'm trying to get ahold of my lawyer, I
5    can't get ahold of my lawyer, you know.
6  Q.  Did your mother tell you that she signed a form
7    acknowledging that Scott Seid was the company's
8    lawyer and not her lawyer?
9       MS. POLAKOWSKI: Objection.  Form.
10 A.  I don't recall that, no.
11 Q.  Have you ever seen that form?
12 A.  The, which form is it?
13 Q.  The form your mom signed.
14 A.  No, not that I recall.
15 Q.  Did your mother ever tell you that she talked to
16    her lawyer?
17 A.  Ever or just right around this May time?
18 Q.  Yeah, in the, at any time between May 6 and
19    May 13 of 2020.
20 A.  I don't believe so.  I, I don't recall that
21    because I think, yeah, I don't recall that.
22 Q.  Did you ever tell your mother not to sign the
23    Stock Redemption Agreement that she ultimately
24    signed on May 13 of 2020 without having a lawyer
25    look at it on her behalf?

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 48 of 75

Stacy L. Randall v                                                                 Justin Randall
Reed C. Widen, et al.                                                              October 25, 2023

Page 185

1  A.  I don't believe I made that statement.  Again I, I
2      think at that time, what I understood was that she
3      was talking to her lawyer to her representation.
4  Q.  Okay.
5  A.  So I thought, you know, it was kind of, it was, it
6      was taken care of.
7  Q.  But she never told you that she actually did talk
8      to her lawyer; is that accurate?
9  A.  Not that I recall, no.
10 Q.  I mean --
11 A.  I mean I remember her trying to get ahold of, of
12     them, and it was real right at that last minute
13     where she's, like, I got to go sign so, yeah, I, I
14     don't recall.  She may have after the, she met
15     with Kiesler, she may have mentioned that she
16     talked to Seid, but I don't remember, I don't,
17     sorry.
18 Q.  Did she ever tell you whether she ever talked to
19     Scott Seid?
20 A.  Ever in life?
21 Q.  Yes.
22 A.  Not in a, not that, that I can remember in a
23     specific, specific time, no.
24 Q.  Did she ever tell you that she did in fact talk to
25     Scott Seid in May of 2020?

Page 186

1  A.  Not that I can recall, no.
2  Q.  You mentioned earlier that you sent some text
3      messages to your mother at around this time frame.
4      Can you tell me what you remember those text
5      messages stating?
6  A.  The one that I can recall is advising her to get a
7      tax accountant.  That, that one I remember.  I
8      also believe I texted her, you know, sorry, I'm
9      busy, I'll call you back or something, but I don't
10     remember specific messages at that time.
11 Q.  Are you able to put any time frame on your text
12     message about the tax accountant?
13 A.  Just between this May 6th/13th.  That's all I
14     remember.
15 Q.  And as best as you can recall, what did that text
16     message say?
17 A.  The tax accountant one?
18 Q.  Yes.
19 A.  That, you know, you should get a tax accountant or
20     I would, I would talk to a tax accountant because
21     you can, with a deal of this size, you know,
22     structuring it different ways can swing the tax
23     percentages say 20 percent to 40 percent which can
24     equate to potentially hundreds of thousands of
25     dollars.

Page 187

1  Q.  Did you ever suggest to your mother how she should
2      structure the deal that she ultimately signed in
3      May of 2020?
4  A.  No.
5  Q.  Did you ever give her any suggestions on
6      structuring the deal?
7          MS. POLAKOWSKI: Objection.  Asked and
8      answered.
9  A.  No.
10 Q.  Did you ever tell your mother that you would like
11     to see the Stock Redemption Agreement before she
12     signs it?
13 A.  Not that I recall, no.
14 Q.  Did you ever suggest to your mother that she have
15     someone review the Stock Redemption Agreement
16     before she signs it?
17         MS. POLAKOWSKI: Objection to the extent
18     that it was asked and answered.
19 A.  I don't know if I specifically said, you know, the
20     Stock Redemption Agreement.  I think it was again,
21     you know, make sure you talk to your lawyer about,
22     you know, anything that you're going to do or sign
23     and review those kind of documents.  Because
24     honestly, I didn't know, you know, what, I, I
25     wouldn't even have known I think the word Stock

Page 188

1      Redemption Agreement, Agreements that would be
2      going on.  It was just kind of a talk to an
3      attorney that can help you with any documents and
4      any part of this deal.
5  Q.  And why were you making that recommendation to
6      your mother?
7  A.  Just so someone was there, like, looking out for
8      her best interests with no question about that,
9      yeah.
10 Q.  Do you know whether your mother ever had a lawyer
11     review the Stock Redemption Agreements that she
12     signed prior to May 13 of 2020 before she signed
13     them?
14 A.  I'm not aware of any that, no.
15 Q.  On occasion did your wife and your mother ever
16     have discussions prior to May 13 of 2020 regarding
17     Widen Enterprises or Windy Waters?
18 A.  I'm sorry.
19         MS. POLAKOWSKI: Object to foundation.
20     You can answer if you're able.
21         THE WITNESS: What was the question?  I'm
22     sorry.
23         (Question read)
24 A.  Yeah, I mean, they would talk about, I mean, my
25     mom would ask Julie, you know, how's work going

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 189

1  and things like that, just general conversations
2  like that, how do you, you know, are you liking
3  it, are you busy, things like that.
4  Q.  Do you recall any of those conversations where
5  they talked about details about the business,
6  revenue, sales, customers, those kinds of
7  things?
8  A.  Yeah, I mean, I think Julie would say, yeah, we
9  just, I, I just won this deal with customer X, I
10  don't remember specifically what it was but a name
11  that you would know, something like that, you
12  know, conversations, kind of around the, around
13  the dinner table, talking about life and work and
14  things like that.
15  Q.  Anything about revenue or sales volume or --
16  A.  I mean, I do, I don't remember, the only thing
17  that specifically that I can remember is Julie, I
18  believe it was early 2020, yeah, around January or
19  even the end of 2019, maybe, that might have been
20  a different time, sorry, I'm thinking about
21  something else.  But it was just, there was just a
22  really, I remember the conversation Julie was
23  really under pressure because there was a push,
24  like, hey, we've got to really bring in a lot of,
25  a lot of customers.  I remember that conversation

Page 190

1  kind of happening again with my mom around.
2  Q.  And do you remember as part of any of those
3  conversations, numbers being discussed?
4  A.  I, I don't recall specific numbers, no.
5         (Exhibit 3 marked for identification)
6  Q.  Okay.  Exhibit 3, which you have before you is a
7  text sent to you from your mother on May 13, 2020
8  at 3:56 p.m.  And she says to you, well, low and
9  behold, Kiesler did another evaluation of the
10  company and came up with another $250,000.
11  Nothing I can do about it I will be going over to
12  the office to sign the papers at 4:30.  And then
13  she continues.
14         My first question to you is, did you have
15  any discussions or communications of any other
16  type with your mother between 3:56 p.m. and
17  4:30 p.m. that day?
18         THE WITNESS: I'm sorry.
19         (Question read)
20  A.  Not that I recall.
21  Q.  In other words, did you call her and say, stop,
22  don't, or glad you're going and getting it done or
23  anything like that that you remember?
24  A.  I don't remember, no.
25  Q.  Okay.  Do you remember if you responded at all to

Page 191

1  this text message?
2  A.  I don't.
3  Q.  Did you talk to your mother about her decision
4  that she was going to go over to the office to
5  sign the papers?
6         MS. POLAKOWSKI: Object to form.
7  A.  I don't recall responding to this message saying
8  she's going to go do that.
9  Q.  Do you remember any reaction you had at all when
10  you received this text as surprise or joy or
11  anything like that?
12  A.  Yeah, I do remember sort of being like, well, I
13  don't know what else she can do, and she, she's
14  unfortunately, going to go and sign the papers due
15  to this, this kind of, this deadline.
16  Q.  Okay.  But despite that feeling you didn't try to
17  discourage her at all between 3:56 p.m. and
18  4:30 p.m.; is that what you're saying?
19  A.  Yeah, I don't know what I was actually, I may have
20  been in a meeting.  I may have been on a call.
21  I may have seen this text, you know, after
22  4:30 p.m. even.  I don't, I don't remember that
23  timeline.
24  Q.  After your mother signed the papers at around
25  4:30 p.m. on May 13 of 2020, did you have a

Page 192

1  discussion with her that evening or late afternoon
2  about her doing that?
3  A.  I don't recall.
4  Q.  When's the first time you do recall talking to her
5  about signing the papers after she signed the
6  papers?
7  A.  I cannot remember any specific time after that.
8  Q.  Did she ever tell you she ultimately signed the
9  papers?
10  A.  I believe so.  I mean, I, I know we would have, we
11  spoke after this 4:30, but I just don't remember
12  when it was or when, those things.
13  Q.  Okay.  When's the first time she showed you the
14  papers she signed?
15         MS. POLAKOWSKI: Objection.  Assumes
16  facts not in evidence.
17  A.  I'm not sure she did show me them.
18  Q.  Have you ever seen the Stock Redemption
19  Agreement?
20  A.  I believe as part of the Complaint.  If it was in
21  there, I think I did see it, yeah.
22  Q.  Are you referring to the actual document or are
23  you referring to some reference to the document?
24         MS. POLAKOWSKI: Object to form.
25  A.  What's ever in the Complaint.  I can picture, I

Stacy L. Randall v                                                                    Justin Randall
Reed C. Widen, et al.                                                              October 25, 2023

| | Page 193 |
|---|---|

1  think it, you know, laid out some of the, the
2  details of the Stock Redemption Agreement.
3  Q.  So if the actual Stock Redemption Agreement is not
4      in the Complaint, you have never seen it; is that
5      what you're telling me?
6          MS. POLAKOWSKI: Object to the extent
7      that it mischaracterizes his testimony.
8  A.  Not that I can recall.  If I saw, like, the
9      official one that my mom actually put pen to paper
10     on, not that I recall, no.
11         (Exhibit 4 marked for identification)
12 Q.  Exhibit 4 that's before you is a text message your
13     mother sent to you on May 13 of 2020 at 4:28 p.m.
14     And she tells you, I asked Kiesler about tax
15     issues.  He told me he is not my accountant so he
16     doesn't know.  He said he thought with getting
17     more money it would probably help me out.  I left
18     a message for Scott.  I also contacted my attorney
19     to see if she could find out if he is in the
20     office or if she could relay the message that I
21     need to talk to him now.
22         Do you see that?
23 A.  Yes.
24 Q.  Did you ever have any conversations with your
25     mother on the topics listed here in this email,

| | Page 194 |
|---|---|

1      text message?
2  A.  What specifically?
3  Q.  Well, did your mother ever tell you that Kiesler
4      told her he's not her accountant?
5  A.  Well, yeah, she texted me this, right.
6  Q.  I know.  Did you ever have any communications with
7      her other than this text where she told you
8      Kiesler told her that he's not her accountant?
9  A.  We, not specifically that I recall, no.
10 Q.  Okay.  Now, your mother here says to you that she
11     left a message for Scott and she also contacted my
12     attorney to see if she could find out if Scott's
13     in the office and tell him that she needs to talk
14     to him.  Do you see that?
15 A.  I do.
16 Q.  Scott you assume is Scott Seid; right?
17 A.  Yes.
18 Q.  And her attorney you assume she's referencing her
19     divorce lawyer or not?
20 A.  I don't -- Yeah, reading it now I think she's
21     referencing her divorce lawyer, but I'm not sure
22     if I knew what she meant by that at the time.
23 Q.  Okay.  Are you aware of any lawyer in Scott Seid's
24     law firm that ever represented your mother other
25     than the divorce lawyer she used?

| | Page 195 |
|---|---|

1          MS. POLAKOWSKI: Object to foundation.
2  A.  No.
3  Q.  Are you aware of any lawyer that your mother has
4      ever used for representation other than the
5      divorce lawyer from Scott Seid's firm?
6  A.  I feel like there is a guy named Tom Brush for
7      some reason that comes to mind years, years ago,
8      and I don't even know what it was, it might have
9      been a speeding ticket or something.  I, I don't
10     know.  But for some reason that name comes to
11     mind, Brush.
12 Q.  Anyone else?
13 A.  No, not that I can recall.
14 Q.  Does your mother have any friends that are
15     lawyers?
16 A.  Not that I'm aware of.
17 Q.  Has your mother ever have any friends that are
18     lawyers?
19 A.  Not that I'm aware of.
20 Q.  Other than some speeding ticket and her divorce
21     from your father, are you aware of any other times
22     where your mother was represented by an attorney,
23     and of course this case?
24 A.  Not, not that I can recall.
25 Q.  Do you have any friends that are lawyers?

| | Page 196 |
|---|---|

1  A.  I do.
2  Q.  And how many?
3  A.  I can think of two right off the top of my head.
4  Q.  And what are their names?
5  A.  Todd Bochen and Tim Macht.
6  Q.  And what type of -- Do they practice law, either
7      of them?
8  A.  I don't think, I don't think Tim does.  Last I
9      heard Todd was working in Minnesota, like, in
10     contract law, I believe.  I think he was working
11     for a county or a judge or something.
12 Q.  Have you ever spoken with either of them relating
13     to the circumstances of this lawsuit or your
14     mother's sale of her stock in May of 2020?
15 A.  Tim we ran into at a, a show downtown, Chelsea
16     Handler, I think it was, ran into him there, ran
17     into him at the bar after the show, and it, it
18     came up, the lawsuit somehow came up, I don't
19     remember specifically, I remember him saying that,
20     you know, it's really a tough situation.  And I
21     believe he said, you know, I just can't believe
22     your mom's doing that because I don't think she
23     will win is what I recall.
24 Q.  Do you recall anything else about the
25     conversation?

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

Page 197

1 A. I mean, we were at the, the, what the heck is the
2 place called, now I can't remember the name of
3 place, but it was on State Street, it was right
4 down here.
5 Q. And so do you remember anything else about that
6 conversation?
7 A. No. I mean, after that, that was kind of
8 uncomfortable for me, and after that we kind of
9 just started to socialize generally. That was
10 kind of it.
11 Q. And that was the only conversation you've ever had
12 with him about this situation?
13 A. Yes, that I can recall.
14 Q. How about your other friend lawyer who's in
15 Minnesota, have you ever had any discussions with
16 that person?
17 A. No, I don't think, unfortunately I don't think
18 I've talked to him since even 2020. I haven't
19 seen him in awhile.
20 Q. Did the gentleman that made those comments to you
21 in the bar in Milwaukee indicate why he said your
22 mom was going to lose?
23      MS. POLAKOWSKI: I'll object just because
24 you said Milwaukee. I think it's Madison.
25 Q. Oh.

Page 198

1 A. Yeah.
2      MS. POLAKOWSKI: Just for the record.
3 Q. When you say downtown I think of Milwaukee.
4 A. Yeah, right here in Madison. No, I don't recall
5 any other information about, about that comment.
6 Q. Did you ever have any follow up to discussions
7 with your mother after receiving this text that
8 we've marked as Exhibit 4 on any conversations she
9 had with Scott Seid?
10 A. Not that I recall, no.
11 Q. As you sit here today do you know whether or not
12 your mother has ever spoken to Scott Seid in her
13 entire life?
14 A. I believe she has, because I think he, I think
15 Scott worked for Widen for many years, if I recall
16 correctly. So I think that they had, they were,
17 knew each other and had conversations at some
18 point. I'm not, I can't say 100 percent that
19 they've spoken, but I would, my assumption would
20 be yes, just because of the length of time that
21 they kind of worked together.
22 Q. Did you ever tell your mother that if she's
23 uncomfortable with anything in the Stock
24 Redemption Agreement she shouldn't sign it?
25 A. I don't recall saying that, no.

Page 199

1 Q. Anything like that?
2      MS. POLAKOWSKI: Object to form.
3 A. No, and I don't recall anything like that.
4 Q. Did you offer to go with your mother to the
5 company offices on May 13, 2020, when she was
6 going to sign the paperwork?
7 A. I did at some point say do you want me to go with
8 you to meet with Kiesler. I don't remember if it
9 was this May 13th day. Yeah, I don't remember
10 when that was. It, it may have been not even in
11 the May 6th time, it may have been some other
12 time. I don't remember why she was seeking, you
13 know, kind of help.
14 Q. How did your mother respond when you asked her
15 that?
16 A. I don't remember. I didn't end up going to the
17 office, whatever time that was so, but I don't
18 remember what her response was.
19 Q. I think I'm done. Just give me a minute.
20      Are you aware of any financial records
21 that your mother reviewed regarding Widen
22 Enterprises or Windy Waters at any point in time?
23 A. I'm not.
24 Q. Did your mother ever complain to you that she
25 didn't receive or have access to financial records

Page 200

1 of Windy Waters or Widen Enterprises?
2 A. I recall over the years just her going, I don't
3 know what's going on with the, the company. I
4 don't remember her being like, gosh, darn it, I
5 want a financial document, but just that kind of,
6 that thing we were talking about earlier where
7 there was kind of quabbling about why is, why is
8 he getting this and we're not getting anything, it
9 was just, I don't know what's going on.
10 Q. Was there ever an occasion where your mother told
11 you that she requested anything from Widen
12 Enterprises or Windy Waters and they refused to
13 give it to her?
14 A. I don't, I don't remember that.
15      MS. POLAKOWSKI: And I'll object to form,
16 and I assume you're talking about, Dean, the basis
17 for the lawsuit?
18      MR. LAING: No, I meant anything.
19      MS. POLAKOWSKI: Do you need some water,
20 Dean?
21      MR. LAING: I think I'll be all right
22 because I think I'm done. I am done. Thank you.
23      MS. POLAKOWSKI: I have just a few
24 clarifying questions.
25      MR. LAING: Okay.

Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

---

Page 201

1          E X A M I N A T I O N

2    BY MS. POLAKOWSKI:

3  Q.  During your questioning earlier, Justin, you were

4      asked some questions about what you told your wife

5      Julie about your conversations between Reinhart

6      and Stacy.  Do you recall those questions?

7  A.  Generally, yeah.

8  Q.  Did you ever reveal to your wife any statements or

9      advice that was discussed at meetings between you,

10     Stacy, and Reinhart?

11  A.  No.

12  Q.  The conversations that you referenced earlier that

13     you had with your wife, were those conversations

14     limited to the facts that were contained in the

15     Complaint?

16  A.  Yes.

17  Q.  Did you ever tell your wife that you can't discuss

18     things that you talked about at Reinhart with your

19     mom?

20  A.  Yes.

21  Q.  What did you tell your wife about that?

22  A.  I just said that, you know, I can't talk about

23     specifics within the meetings because that's what

24     Reinhart advised was the, was the case.

25  Q.  Did you, did your wife respect that boundary?

---

Page 202

1  A.  Absolutely, yeah.

2  Q.  Did you ever leave a room where your wife was

3      present to have a conversation with your mother

4      about things that happened at Reinhart or things

5      that Reinhart had told you and/or Stacy?

6  A.  Yes, I do remember doing that.  I also

7      remember  a time where we were in the car

8      talking about things regarding the case and rather

9      than going home we just kept going so we could

10     continue to talk without, you know, other people

11     around.

12  Q.  When you say when we were in, you remember when we

13     were in the car, who is the we?

14  A.  Sorry.  Myself and my mom.

15  Q.  And no one else was present in the car during

16     those conversations?

17  A.  Correct.

18  Q.  Other than the Complaint, did you ever disclose

19     any documents that were discussed between

20     yourself, your mother, and Reinhart with your

21     wife?

22  A.  No.

23          MS. POLAKOWSKI: I have nothing

24     further.

25          MR. LAING: I don't either.  All

---

Page 203

1    witnesses are entitled to change their testimony.

2          (Proceedings concluded at 3:54 p.m.)

---

Page 204

1  STATE OF WISCONSIN)

2  MILWAUKEE COUNTY  )

3          I, JANET D. LARSEN, a Notary Public in

4  and for the State of Wisconsin, do hereby certify that

5  the deposition of JUSTIN RANDALL was taken before me

6  under and pursuant to the Federal Rules of Civil

7  Procedure on the 25th day of October, 2023.

8          That before said witness testified,

9  he was first duly sworn by me to testify the truth.

10         That I am not a relative or employee or

11  attorney or counsel of any of the parties, or a

12  relative or employee of such attorney or counsel, or

13  financially interested directly or indirectly in this

14  action.

15         That the foregoing pages are a true and

16  correct transcription of my original shorthand notes

17  taken at said time and place.

18         Dated this 30th day of October, 2023

19         at Milwaukee, Wisconsin.

20

21  JANET DONALDSON LARSEN
    REGISTERED PROFESSIONAL REPORTER
22  NOTARY PUBLIC, STATE OF WISCONSIN
    MY COMMISSION EXPIRES 1-22-26

23         Janet Donaldson Larsen
               NOTARY PUBLIC
24           STATE OF WISCONSIN

25

---

## $

**$1 (3)**
135:23;169:17;175:12

**$1.3 (3)**
73:7;113:1;166:3

**$10,000 (1)**
10:3

**$100 (10)**
39:25;44:16,23;46:7;
61:15;63:12;64:7;66:1,14,
19

**$20,000 (2)**
10:1;116:23

**$250,000 (1)**
190:10

**$30 (5)**
166:20,23;167:14,25;
168:5

**$50 (16)**
38:9,10;39:16,25;43:18;
44:1,13;45:10,21;61:13;
63:16;64:6,12,14;67:8,11

**$50,000 (7)**
78:1,23;102:11;147:21;
148:20;149:1,4

**$500,000 (1)**
77:18

**$80 (16)**
39:16,25;44:8;45:25;
60:19,23;61:10,14,21;
62:5,24;63:7;64:21;
66:13;68:7

## A

**ability (1)**
148:5

**able (10)**
41:11;43:15;44:13,14,
20;45:3;125:12;162:8;
186:11;188:20

**Absolutely (4)**
25:7;87:1,8;202:1

**accept (2)**
93:18;175:14

**accepted (1)**
166:3

**accepting (1)**
174:7

**access (4)**
104:6;110:21,24;199:25

**accommodations (3)**
18:8,9;19:4

**account (1)**
104:6

**accountant (27)**
84:1,6,11,14;85:2;
91:23;95:5,6,10,18;98:24;
102:19;103:2;107:6,25;
108:6,8,18;180:3;186:7,
12,17,19,20;193:15;194:4,

8

**accurate (4)**
65:18;110:24;164:7;
185:8

**acknowledging (1)**
184:7

**acquire (1)**
37:10

**acquired (3)**
39:20;41:10;173:21

**acquisition (1)**
42:25

**across (2)**
24:22;112:16

**acting (1)**
162:6

**active (1)**
42:4

**actively (1)**
41:22

**acts (1)**
26:10

**actual (2)**
192:22;193:3

**actually (18)**
29:4;44:24;57:21;
59:15;76:10,11;82:15;
97:6;106:13,13;108:17;
136:1;157:15;176:23,24;
185:7;191:19;193:9

**adding (1)**
146:21

**addition (1)**
82:21

**address (1)**
5:23

**advantage (1)**
168:13

**adversarial (1)**
148:2

**advice (2)**
75:21;201:9

**advise (3)**
85:18;86:1;99:9

**advised (4)**
81:23;96:8;104:14;
201:24

**advising (2)**
86:14;186:6

**advisor (2)**
108:22,22

**afforded (1)**
149:16

**afternoon (1)**
192:1

**Again (45)**
13:4,9;19:20;22:9;30:6;
32:16;40:12;46:22;61:7;
63:14,17;66:4,15;72:23;
78:13;79:9,11;87:4;88:21;
91:10;94:21;101:24;
113:5;115:4,6,18;118:22;
136:20;137:19;138:3,15;

139:20;146:19;147:24;
148:17;150:18;156:5;
160:19;162:24;163:14,17;
178:20;185:1;187:20;
190:1

**against (1)**
145:22

**age (1)**
40:14

**agency (1)**
162:7

**agent (1)**
29:22

**ago (16)**
6:9,11;11:14;27:7;32:2;
38:2;40:6;48:24;63:21;
72:20,23;130:10;132:6;
150:19;151:2;195:7

**agree (3)**
30:13;110:6;170:9

**agreement (22)**
102:16;107:1;108:25;
109:3;114:4;115:9;
155:13;171:9,18,23;
174:8;183:17,24;184:23;
187:11,15,20;188:1;
192:19;193:2,3;198:24

**agreements (3)**
78:14;188:1,11

**ahead (12)**
29:10;71:7;73:3;96:5;
103:10;104:8;128:19;
158:23;162:10;163:11;
172:4;174:14

**ahold (8)**
92:19;93:24;94:2;
98:21;104:20;184:4,5;
185:11

**air (1)**
109:17

**allowed (1)**
114:24

**allowing (1)**
19:22

**almost (3)**
52:6;124:23;148:2

**along (8)**
7:14;14:21;15:24;
40:23;47:16;48:11;149:6;
177:22

**although (1)**
24:22

**always (3)**
93:3,14;138:19

**American (1)**
24:10

**amount (10)**
58:22;59:4;75:13;83:3,
6;97:11;109:1;113:14;
127:24;131:17

**amounts (5)**
74:5,6;75:9;84:4;156:12

**and/or (3)**

47:4;131:7;202:5

**Andrew (1)**
10:10

**anger (2)**
135:16;156:24

**annual (3)**
113:13;146:19;173:14

**answered (15)**
37:2,6,8;46:12;88:20;
90:21;96:12;111:9;121:6;
143:5;144:7;149:20;
154:23;187:8,18

**anymore (2)**
23:6;125:3

**anyways (1)**
138:4

**apartment (3)**
116:13;149:5,23

**appear (2)**
25:8,12

**applied (1)**
159:1

**apply (1)**
55:12

**appreciate (1)**
51:24

**approval (1)**
65:4

**approximate (4)**
62:6;63:23;64:5;132:20

**Approximately (21)**
5:14;6:18;24:12;60:19;
62:5,9,10,10,10,11,16,17,
24;64:6,21;65:25;66:9,13,
18;73:7;172:13

**April (1)**
9:20

**Aquia (1)**
21:5

**area (1)**
99:20

**areas (1)**
157:1

**arguing (1)**
28:6

**Argumentative (2)**
118:20;121:6

**Arizona (21)**
22:4,9;33:23;42:2;
46:18;48:16;49:1;50:5;
52:12,19;54:9,13,25;60:3;
64:19;65:22;66:16;67:1;
69:4;73:1;120:6

**Around (34)**
5:6,6;6:9;12:23;27:24;
32:1;36:15;38:12;41:17;
44:10;45:15;46:6,23;
56:17,18;61:12;63:4,19,
22;66:12,22;89:10;
102:18;115:7;182:2,3;
184:17;186:3;189:12,12,
18;190:1;191:24;202:11

**arrangement (1)**

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 54 of 75

Stacy L. Randall v                                                        Justin Randall
Reed C. Widen, et al.                                                October 25, 2023

155:24
**arrived (1)**
  143:21
**aspects (1)**
  8:10
**asset (2)**
  82:12;86:4
**assets (1)**
  146:7
**assistance (1)**
  178:11
**Assisting (1)**
  143:6
**assume (7)**
  13:17;53:19;146:15;
  149:23;194:16,18;200:16
**assumed (5)**
  12:9;13:13,22;90:23;
  168:9
**assumes (6)**
  93:21;117:25;118:19;
  152:3;155:14;192:15
**assuming (3)**
  72:16;73:8;168:11
**assumption (2)**
  110:23;198:19
**assure (2)**
  95:6;161:5
**assured (1)**
  58:1
**attend (1)**
  152:25
**attendance (3)**
  71:22;72:17,24
**attended (9)**
  4:18;158:14;159:5;
  164:1,21;165:1,13,17,22
**attending (1)**
  153:5
**attorney (68)**
  6:13;29:22,25;30:5,8,
  16;65:13;85:4,7,14,17,18,
  25,25;86:7,11,15;88:21,
  24;90:23;91:1,3,12,13;
  92:1,6,16,19,22;93:19,24,
  25;94:2,6,7,13,21,25;95:3,
  21;96:9,12,22,25;97:9,22;
  98:3,7,15,24;102:20;
  103:1;132:5;137:12,16;
  138:10;139:8;150:23;
  151:3,6,8;155:12,24;
  188:3;193:18;194:12,18;
  195:22
**attorney-client (11)**
  11:25;12:3,5;29:7,9;
  65:8;98:9;158:18;162:3;
  172:1;174:12
**attorneys (7)**
  57:17;65:11;139:4;
  150:6,8,13;155:18
**attributed (1)**
  133:9
**attributing (1)**

170:2
**audio (2)**
  43:12,12
**August (3)**
  132:22,22;169:9
**authorized (3)**
  59:23;65:18;162:6
**authorizing (1)**
  64:24
**available (2)**
  77:10;166:16
**average (2)**
  15:5,11
**avoid (1)**
  149:18
**aware (38)**
  9:21,23;10:4,20,23;
  26:10;30:7,12;73:9,11;
  74:2;76:4;103:14,15;
  111:18;130:4;131:12;
  167:13,23;168:2,9;171:8,
  17;172:7,12,17;174:19;
  176:11;178:24,25;179:16;
  188:14;194:23;195:3,16,
  19,21;199:20
**away (20)**
  7:12;9:19;37:22;38:8,
  13,14,17;39:7,10,19;
  40:16;41:11;44:1,13;45:1;
  63:16;64:11;67:7,10;
  83:13
**awhile (1)**
  197:19

**B**

**baby (1)**
  17:7
**Bachelor (1)**
  5:9
**back (50)**
  16:2;25:15;26:18;32:13,
  21;43:21;44:25;51:23;
  52:1,5;58:2;73:6,12;
  74:23;75:6,18,24;76:19;
  90:3,11;104:12,15,15;
  105:25;106:16;107:18;
  109:16;111:15;114:14;
  115:12;120:3;121:13;
  124:11,17;125:14;138:19;
  139:19,21,24;140:22;
  142:22;143:23;152:18;
  157:12;165:3;178:18,20;
  182:15;183:7;186:9
**backed (1)**
  45:6
**bad (3)**
  88:11;119:8,9
**balance (1)**
  100:7
**ballparks (1)**
  38:17
**bank (11)**

73:23;76:13;79:12;
  131:12;144:18,20;145:2,7,
  12;179:14,18
**bankers (1)**
  143:9
**banks (3)**
  131:8,13;144:4,17
**bar (2)**
  196:17;197:21
**bars (2)**
  175:2,2
**baseball (1)**
  181:5
**based (1)**
  12:25
**baseline (1)**
  99:8
**basically (16)**
  8:24;17:7;52:3,5;83:1,2,
  86:3;94:24;100:11;
  101:19;104:25;139:22;
  149:11,12;155:1;168:18
**basis (3)**
  112:24;146:19;200:16
**beautiful (1)**
  89:4
**became (3)**
  7:13;103:4;178:24
**becomes (1)**
  178:6
**becoming (1)**
  58:4
**beginning (1)**
  58:16
**behalf (16)**
  30:5;86:12;94:3;98:24;
  100:25;101:6,12;102:3;
  139:13;140:2,20;144:4;
  145:2;150:7;151:4;184:25
**behold (1)**
  190:9
**believing (1)**
  182:22
**Ben (2)**
  70:15;71:25
**beneficiaries (1)**
  10:18
**benefits (1)**
  124:6
**best (13)**
  15:21;76:20;88:22;
  95:7;115:18;118:24;
  138:22;142:8,8;151:7;
  180:1;186:15;188:8
**beyond (1)**
  95:15
**big (10)**
  16:22;37:17;77:2,18;
  108:12;133:19;173:19,20;
  177:21;182:5
**biggest (1)**
  86:4
**Bill (6)**

51:2,3;52:8;53:20;54:3;
  70:9
**birth (1)**
  4:16
**Bisbee (1)**
  133:2
**bit (13)**
  15:7;24:17;50:8;63:15;
  74:18;77:8;83:3;130:21;
  145:19;167:5;168:22,22;
  176:21
**board (2)**
  104:16;152:9
**boat (2)**
  127:9;156:22
**boats (7)**
  20:9,13,14,14,14,16,16
**Bochen (7)**
  70:14,22,23,24;71:25;
  133:1;196:5
**Boerner (3)**
  6:3,10,23
**book (1)**
  134:20
**born (2)**
  13:8;176:9
**both (10)**
  14:8,9;36:11,13;39:12;
  45:18,20;51:18,18;77:4
**bought (1)**
  147:6
**boundary (1)**
  201:25
**brag (1)**
  16:16
**braggadocious (1)**
  16:22
**braggart (1)**
  16:14
**brand-new (2)**
  27:11;28:15
**break (11)**
  18:23;49:20,21;123:14,
  25;157:13,14;163:4,6;
  179:22,23
**breaking (1)**
  123:16
**Brewing (1)**
  139:17
**bring (4)**
  121:22,23;149:11;
  189:24
**bringing (9)**
  135:17,18;146:5;
  149:12;166:19,23;167:13,
  25;168:5
**broke (1)**
  17:11
**broker (1)**
  5:12
**brother (10)**
  7:11;9:19;26:13,22;
  138:10;151:13;168:24;

177:7,20,24
**brotherly/sisterly (1)**
27:25
**brothers (4)**
125:24;126:2;127:13;
130:1
**Brush (2)**
195:6,11
**Bucks (1)**
181:2
**budget (1)**
124:23
**bunch (3)**
58:7,15;127:21
**business (16)**
5:9;6:14;12:24;27:10;
28:5,8;40:15;69:15;
113:14;119:5;127:14;
145:24;146:1,9;167:7;
189:5
**businesses (2)**
117:10;124:20
**busy (5)**
37:5;83:14;107:19;
186:9;189:3
**butted (1)**
169:10
**buy (9)**
17:13;28:14;47:8;67:5;
90:8;116:13;125:24;
126:1;155:7
**buying (3)**
38:20;120:19;130:12

**C**

**calculated (3)**
74:6;75:10;109:1
**calculation (2)**
109:8,20
**calendar (5)**
93:2,4,5,7,9
**call (15)**
51:10,13;52:25;73:25;
83:15;107:20;121:17;
139:19;140:22;141:3,11;
161:19;186:9;190:21;
191:20
**called (15)**
31:14;49:3;51:14,25;
57:22,23;58:8;76:7;115:8;
128:21;139:20;140:21;
141:11;171:17;197:2
**calling (4)**
104:23;140:19;142:17;
145:7
**calls (28)**
11:25;37:9,16;42:11;
78:2;79:3;97:1;114:1;
115:1,13;117:2,8;122:7;
123:5;133:25;141:12;
144:13;145:4,14;146:13;
148:6,15,21;149:8;

151:14;152:2;162:3;
171:12
**calm (1)**
143:14
**came (17)**
4:10,13;52:2;56:24;
109:16,17;112:15;120:3;
138:21;147:5;153:18;
159:21;162:25;163:15;
190:10;196:18,18
**Can (114)**
4:8;8:8:21;10:6;12:4;
13:12;19:10;20:1,2,2;
26:15,21;27:16,22;28:13;
29:10;30:17,18,18,22;
31:19;33:5;34:10;38:4,8;
39:3;40:15,17;44:5,11;
47:22;48:3;49:14;50:21;
53:19;61:4;62:4;65:10;
66:9;69:3;71:20;75:22;
76:5,20;77:14;78:11,16;
81:10;83:4,5;85:19;87:13,
16;88:3,3,4;93:8,10;94:17,
24;95:7;96:5;103:1;
105:22,23;108:8,10,11;
109:7;110:6;112:22;
115:10,24;117:12,20;
126:3,4;129:18;135:6;
136:18;142:4;144:11;
145:8,21;147:15;150:13,
23;158:21;159:16;161:3,
5;164:18;172:4;173:16;
174:13;180:1;185:22;
186:1,4,6,15,21,22,23;
188:3,20;189:17;190:11;
191:13;192:25;193:8;
195:13,24;196:3;197:13
**Canada (1)**
17:16
**capacity (1)**
6:24
**car (13)**
27:12;89:4,6,10;116:23;
120:19,22;121:2;133:15;
149:14;202:7,13,15
**care (9)**
24:7;40:17;90:2,6,8;
147:11;160:1,3;185:6
**careful (1)**
78:6
**caring (2)**
24:19;25:22
**cars (4)**
20:4;28:15;77:4;124:8
**case (27)**
7:2;15:17;22:19;28:23;
29:1;31:3,12;132:10;
141:13;151:9;154:8,13;
157:6,9;158:1,15;159:17,
19;160:6;161:10;162:1,
17;165:21;181:18;195:23;
201:24;202:8
**caseload (1)**

139:23
**cash (2)**
155:3,3
**cell (1)**
181:22
**center (1)**
147:3
**CEO (3)**
121:19;122:15;146:23
**certain (5)**
124:6;159:9;167:12,15,
16
**certainly (3)**
19:22;146:6;148:4
**CFO (2)**
122:15;123:9
**chairman (1)**
152:8
**chance (1)**
83:16
**change (6)**
18:21;50:7;67:13,14;
131:2;203:1
**changed (2)**
67:17;68:1
**changes (1)**
65:21
**changing (4)**
96:24;97:10;163:8;
164:7
**characterized (1)**
66:10
**characterizing (1)**
66:7
**check (2)**
30:20;44:1
**Chelsea (1)**
196:15
**children (2)**
5:21;74:10
**choice (1)**
114:17
**Christmas (2)**
176:8;181:1
**chronological (1)**
106:19
**chunk (1)**
32:11
**circumstances (3)**
157:6,9;196:13
**claim (1)**
151:19
**clarify (5)**
29:20;31:19;32:8;72:3;
158:2
**clarifying (1)**
200:24
**clarity (3)**
110:1;129:12;154:4
**clear (2)**
32:18;164:18
**clearly (1)**
120:3

**clients (2)**
139:7;147:1
**clinically (1)**
178:8
**close (8)**
7:8,9;20:3;22:10;58:1;
88:4;176:9;179:22
**closed (2)**
57:25;133:24
**closely (1)**
13:22
**closer (3)**
15:13;58:4,4
**closest (1)**
23:21
**closing (2)**
134:7,13
**clubhouse (1)**
133:11
**cocky (2)**
112:16;182:1
**collateral (2)**
145:10,12
**colleague (1)**
99:2
**college (5)**
4:18,23;5:3;24:14;
178:20
**comfort (1)**
53:7
**coming (8)**
26:25;39:8;58:4;69:24;
89:25;103:18;110:8;135:2
**comings (1)**
34:9
**comment (6)**
34:3;80:10;158:25;
170:2;180:20;198:5
**commented (1)**
112:18
**comments (6)**
124:2;125:13;133:3,9,
16;197:20
**commercial (1)**
5:12
**commit (1)**
179:14
**common (1)**
124:19
**communication (1)**
152:24
**communications (11)**
12:3,5;29:7,9,22;65:9;
152:10,13,16;190:15;
194:6
**companies (18)**
12:21;14:7,10;47:5;
67:5;99:4;110:18,22;
111:2,6,12;120:17;124:6;
126:15;127:1,19;152:4;
155:20
**company (94)**
13:1,11,23;14:1;27:14;

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 56 of 75

Stacy L. Randall v                                                              Justin Randall
Reed C. Widen, et al.                                                        October 25, 2023

28:17;32:13,15;38:24;
39:11,18,20;42:9,13;44:2,
4;45:3,17,22;46:1,9,11;
49:4;50:15;54:23;58:6,6,
8,17,24;60:19;61:23;62:4,
24;63:4,9,12;64:20;65:25;
66:9,18,24;67:5;68:3,8;
69:8,22;70:4,4;71:18;
73:6,13,23;74:24;76:15;
85:15,22;90:3,18;91:8,18;
97:8;100:18;102:9;103:7;
105:17;109:23;113:16,23;
121:9,18,21,25;122:4,17,
25;123:3,12;124:18;
125:5;126:17,20;136:21;
146:10,16;147:23;156:16;
180:25;181:1,4,9;190:10;
199:5;200:3
**company's (4)**
57:1;146:1;167:8;184:7
**compensating (1)**
127:19
**compensation (2)**
127:24;128:8
**competent (3)**
9:8,16,18
**complain (4)**
119:3,4;127:18;199:24
**complaining (1)**
126:13
**Complaint (42)**
12:7,8;28:25;29:3,4,15,
18;31:1,11,25;73:16,18;
74:11,15;80:9,13,17,24;
125:10;126:3;131:21;
132:9,11,14;154:17;
155:2;156:6;158:4,5,9;
159:21,22;160:14,18;
162:25;163:15,16;192:20,
25;193:4;201:15;202:18
**complaints (4)**
124:4,5;132:1;154:10
**completely (2)**
57:24;65:18
**compound (1)**
48:22
**compute (1)**
110:14
**concern (1)**
128:5
**concerned (1)**
124:21
**concerning (1)**
168:17
**concerns (1)**
175:23
**concluded (1)**
203:2
**conclusion (6)**
114:1;122:7;123:5;
138:21;146:14;171:12
**conduit (1)**
136:21

**confer (2)**
86:9;163:5
**confident (1)**
180:17
**confirm (1)**
72:10
**confirmed (1)**
103:2
**confused (1)**
162:23
**connect (1)**
150:24
**connected (2)**
139:10;142:6
**connection (8)**
6:4,20;18:1,24;101:15;
129:13;152:21;175:12
**conscience (1)**
138:23
**consciously (1)**
119:21
**conservative (1)**
62:20
**consider (3)**
41:2;145:17;175:19
**consideration (3)**
53:5;55:15;70:2
**considered (2)**
37:18;50:15
**considering (10)**
60:17;62:22;64:19;
65:24;66:17;68:2,6;69:21;
75:24;145:18
**consult (1)**
75:16
**contact (8)**
138:10;139:12;140:23;
141:7;144:4;150:6,13,24
**contacted (3)**
150:9;193:18;194:11
**contacting (1)**
145:1
**contacts (1)**
140:11
**contained (1)**
201:14
**content (3)**
107:12;153:17,19
**contents (1)**
65:8
**context (12)**
39:5;45:3,11;46:1,8;
64:14;72:14;107:12,21;
125:10;130:12;177:17
**continue (2)**
104:8;202:10
**continues (1)**
190:13
**contract (1)**
196:10
**convenient (1)**
123:18
**conversation (87)**

6:16;35:13;37:14;38:1,
5,7,23;39:15,24;40:3,8;
41:9,21;42:1,15,19;43:5,9;
46:14;47:22;48:15;49:2;
52:8,11;53:15;54:8,12,17,
19,25;55:6;57:5,11;60:3,
23;61:8,18;63:18,24;
65:12,22;66:8,11,23,25;
69:11;70:8;71:10,15;
72:12,25;80:10;81:8;82:3;
96:15;100:5,12,15;
109:18;112:18;113:8;
115:7,18;120:6,8,15,23;
126:6;133:13;134:1;
135:20;136:2;137:9,17;
150:19;151:1;162:24;
164:17;168:16;169:4;
182:24;189:22,25;196:25;
197:6,11;202:3
**conversations (54)**
42:24;43:2;48:20;56:9,
16,17;58:15;65:10;68:15,
20,25;69:6;70:10,25;71:3,
8,22;73:21;77:13;80:3,19;
81:9,15;99:12;102:15,18;
105:11,21;106:4,6;
111:23;112:1,3,7;113:12;
120:14;124:23;125:7;
134:18;135:5;159:23;
167:3,3;189:1,4,12;190:3;
193:24;198:8,17;201:5,12,
13;202:16
**convoluted (1)**
72:11
**cool (2)**
47:7;48:6
**cornered (1)**
87:18
**corporations (1)**
13:20
**correctly (7)**
10:1;21:15;46:13;51:5;
107:10;108:23;198:16
**Corvette (1)**
20:7
**cosign (2)**
77:25;78:24
**cost (1)**
20:16
**cottage (8)**
27:1;53:22,23;56:25;
69:2;126:5;168:19,20
**Counsel (3)**
30:13;131:21;177:1
**counseled (1)**
143:10
**counseling (3)**
142:5,18;179:1
**count (1)**
46:21
**County (2)**
140:6;196:11
**couple (15)**

6:11;17:23;26:25;
40:22;76:12;80:6;87:5,11;
102:21;105:12;114:10;
116:16;132:6;167:1;178:1
**course (7)**
58:7;83:14;132:19;
133:10,14;151:25;195:23
**court (7)**
31:10;59:11,24;64:25;
65:5;103:25;157:15
**cousins (1)**
57:15
**cover (1)**
133:6
**COVID (4)**
22:15;67:14,25;156:18
**CPA (1)**
84:18
**crazy (7)**
37:5;58:21;59:4;67:23;
83:17;102:25;109:15
**crunch (1)**
116:25
**cry (1)**
53:12
**crying (2)**
88:6,8
**curious (1)**
99:8
**current (2)**
123:7;139:10
**currently (12)**
5:11;9:9;13:25;14:5,22,
23;15:14;21:5;23:15;
29:25;173:17;179:4
**customary (1)**
20:24
**customer (3)**
47:5,5;189:9
**customers (2)**
189:6,25
**cut (2)**
101:23;118:13

**D**

**dad (11)**
10:18;26:11;27:8;28:6;
30:12;76:8;104:3;124:18;
125:2;127:8;177:25
**dad's (1)**
23:17
**Dakota (6)**
18:12,25;19:3,13,25;
22:2
**Dane (1)**
140:6
**darn (1)**
200:4
**date (10)**
4:16;35:21;41:13,15,16;
132:20,20;176:4,6,13
**dated (1)**

181:19

dates (2)
30:24;72:10
Dave (1)
133:2
David (2)
70:14;71:25
day (17)
13:8;35:4,21,23,25;
36:1,2;41:7;58:13;67:6;
104:17,25;148:20;169:12;
176:8;190:17;199:9
days (8)
17:23;41:7,8,12;81:17;
93:14;102:21;116:17
deadline (2)
104:25;191:15
deal (21)
78:13;82:6;83:24;
88:12;100:23;108:9,12;
110:7;118:13;119:19;
133:19,23;134:1;148:5;
166:2;182:6;186:21;
187:2,6;188:4;189:9
dealing (1)
76:6
dealings (2)
180:8,9
deals (1)
88:25
Dean (6)
29:21;31:19;49:18;
72:2;200:16,20
dearly (4)
15:23;78:17;118:25;
121:3
death (1)
51:19
December (4)
30:19;176:2,7,11
decide (1)
151:7
decided (2)
119:22;183:16
decision (7)
87:24;102:24;104:12;
114:3,8;119:16;191:3
decisions (2)
12:25;115:4
deck (4)
33:23;36:10;48:15;50:4
declaration (9)
31:15,25;59:8,15,23;
62:4;64:25;65:1;132:7
declare (1)
59:18
defendants (2)
15:17;151:19
Define (3)
14:23;34:1;123:6
definitely (4)
13:5;34:11;43:25;44:12
definition (2)

87:15;93:15
definitive (1)
44:18
definitively (7)
44:5,9,11,14,20,24;46:4
degree (2)
4:21;5:8
delivering (1)
147:3
demanding (1)
87:6
demonstrate (1)
17:3
depend (1)
78:7
depending (2)
84:1,3
depends (1)
100:6
deposition (7)
6:4,21;28:22;63:6;
112:6;124:1;176:1
depression (2)
178:8,16
Describe (17)
7:4,17,24;8:8;14:15;
15:20;16:1,9;23:24;24:15,
25;25:22,25;49:6;87:12;
179:24;180:12
described (1)
54:14
descriptor (1)
180:1
descriptors (1)
7:21
deserve (1)
134:21
desk (1)
106:14
desperate (1)
78:23
despite (1)
191:16
detail (3)
4:25;48:10;54:7
details (9)
53:14;63:20;73:19;
74:3;79:15;81:7;124:12;
189:5;193:2
determine (1)
22:8
determined (1)
8:9
Deuren (3)
6:4,10,23
diagnosed (1)
178:8
died (3)
6:17;9:22;24:12
difference (1)
77:18
differences (1)
155:1

different (11)
14:10,19;35:9;69:19;
84:3;139:8;158:11;159:3;
167:1;186:22;189:20
difficult (5)
7:13;8:15;51:15,25;
177:1
difficulties (1)
7:11
dinner (7)
28:1,2;36:3;124:25;
133:15;134:2;189:13
dinners (2)
17:12;19:4
direct (2)
12:1;59:3
directions (1)
87:7
directly (1)
50:18
director (7)
11:20;12:8;13:3,6,10,
14,25
directors (1)
121:16
disagreements (1)
139:18
disclose (6)
29:9;154:24;171:25;
172:2;174:12;202:18
disclosing (3)
65:10;156:10;172:5
disclosure (1)
179:17
discount (1)
131:9
discourage (1)
191:17
discuss (4)
11:11;49:23;105:15;
201:17
discussed (17)
42:5,5;46:1;49:16;50:9;
55:25;124:14,15,16;
155:24;157:2;158:3;
162:13;166:10;190:3;
201:9;202:19
discussing (3)
71:11;158:5,14
discussion (15)
33:2,9,22;34:6,15,16,23;
35:5;36:12,16;46:18;
47:19,25;125:11;192:1
discussions (15)
22:17,24;32:6,22;56:5;
134:8;140:2;153:10;
159:20;163:17;171:20;
188:16;190:15;197:15;
198:6
distinction (1)
128:15
distress (5)
83:10,18;86:25;87:12;

92:18
distressed (7)
49:5;53:18,23;87:11,23;
88:5,7
distressing (1)
118:13
distribution (1)
126:19
distributions (1)
126:14
divide (2)
36:23;141:10
dividend (1)
128:7
dividends (3)
121:23;126:14;146:18
divorce (20)
7:12;76:3,8;85:12;88:2;
94:23;98:6;103:12,22;
142:20;144:24;168:24;
176:19;177:4;179:9;
194:19,21,25;195:5,20
divorced (1)
178:1
divulge (5)
12:2;29:6;65:7;158:17,
20
divulging (2)
12:4;158:22
dock (1)
168:19
docket (1)
31:10
doctor (1)
179:3
doctors (1)
178:15
document (7)
59:10;62:8;80:17;
181:17;192:22,23;200:5
documents (13)
31:3,6,12,24;86:2,6,8;
176:4,16;177:16;187:23;
188:3;202:19
dollar (11)
57:9;74:5,6;75:9;
108:13;136:4,5,9,15;
138:8;169:21
dollars (17)
20:17;62:6;64:1;66:10,
12,22;74:20;76:13;77:17;
102:11;114:10;116:17;
146:6;155:5;156:13,14;
186:25
done (22)
17:2,20;37:23;64:12;
77:2;78:25;79:6;87:4;
95:1,4;96:14;117:18,19;
119:19;138:20;147:8;
179:22;180:9;190:22;
199:19;200:22,22
down (15)
22:14;36:14,14;55:7,16;

Case: 3:22-cv-00400-jdp    Document #: 101    Filed: 11/09/23    Page 58 of 75

Stacy L. Randall v                                                    Justin Randall
Reed C. Widen, et al.                                              October 25, 2023

65:5;77:7,23;106:8;
143:15;169:17;173:12;
176:22;182:9;197:4
**downs (1)**
177:3
**downtown (2)**
196:15;198:3
**dozens (1)**
22:11
**draft (2)**
132:1,11
**drafts (5)**
29:3,18;65:1,15;131:20
**draw (1)**
128:15
**drawing (1)**
104:15
**dream (1)**
24:10
**dreamed (1)**
58:24
**drives (1)**
173:18
**driving (1)**
19:20
**Dry (2)**
180:1,1
**due (4)**
53:6;76:8;168:23;
191:14
**duly (1)**
4:2
**duplex (1)**
130:25
**during (42)**
36:20;38:5;39:15,24;
40:3,8;42:15,19;51:12;
52:24;53:15;60:7,16,23;
61:8,18;62:21;65:22;
66:25;77:6;103:12;
105:11;107:23;112:6;
125:12;133:4;153:10;
154:3,20;155:25;159:8;
160:24;163:25;164:20,25;
165:13,16,21;176:17;
178:17;201:3;202:15

**E**

**earlier (13)**
63:6;118:3,15;119:5;
124:1;131:20;133:3;
160:11;165:24;186:2;
200:6;201:3,12
**early (4)**
50:23;56:9;178:20;
189:18
**easily (1)**
8:22
**easy (1)**
93:7
**eat (1)**
116:18

**Edgewood (2)**
5:2,3
**eerily (2)**
54:15,16
**effect (10)**
23:5;48:6,8;58:25;
84:19;96:14;108:7,14;
110:9;166:4
**effective (1)**
30:23
**efforts (2)**
42:17,21
**either (17)**
33:10;47:4;48:19;68:1;
75:15;84:21;88:25;110:5;
114:12;117:13;138:13;
150:22;154:18;171:15;
196:6,12;202:25
**elderly (1)**
24:18
**else (28)**
31:17;32:3;34:22;37:12,
24;38:4;40:2;41:22;43:4;
50:11,14;54:10;68:12;
80:2;87:4;105:9,22;
112:21;134:24;135:4;
142:19;177:5;189:21;
191:13;195:12;196:24;
197:5;202:15
**Ely (6)**
70:14;71:14,17,25;
133:1;134:3
**email (3)**
43:1;181:18;193:25
**emails (1)**
152:18
**employed (6)**
5:11,15;10:21,23;11:12;
125:2
**employees (3)**
69:23;113:18;147:1
**employer (1)**
14:14
**employment (2)**
11:2,6
**encouraged (1)**
138:25
**end (6)**
38:24;62:19;104:24;
182:4;189:19;199:16
**ended (4)**
11:7;104:18;139:24;
177:25
**energy (2)**
180:14,17
**engaging (1)**
91:8
**enjoy (1)**
15:24
**enter (1)**
86:18
**entered (1)**
96:23

**entering (6)**
85:23;92:1,6;94:19;
96:20;111:6
**Enterprises (49)**
10:21;11:12;21:3,8;
32:7,24;33:11,14;43:17;
44:7,22;45:9;46:17;48:2,
7;49:24;50:10;55:5,20;
60:10,18;62:23;64:20;
65:24;66:17;67:2;68:2,6,
17,21;69:1,22;70:12;
71:12,24;109:6;122:2;
132:18;147:11,14;166:19,
23;167:13,25;168:4;
188:17;199:22;200:1,12
**entire (9)**
46:23;82:18,19;83:5;
88:1,14;97:9,10;198:13
**entitled (3)**
135:8,13;203:1
**entrepreneurship (2)**
24:6,7
**equate (1)**
186:24
**equity (5)**
37:4,10;38:19;74:9;
116:23
**essentially (1)**
171:21
**estate (4)**
6:14,21;130:20;139:7
**estimated (1)**
167:10
**evaluation (1)**
190:9
**even (23)**
13:5;15:16;35:10;
44:17;57:18;81:18;91:11;
107:20;110:7;120:12;
124:17;164:15;167:6;
176:22;178:19;182:1,3;
187:25;189:19;191:22;
195:8;197:18;199:10
**evening (1)**
192:1
**event (3)**
97:7;121:3;147:4
**events (1)**
181:9
**everyone (1)**
122:24
**everything's (1)**
158:4
**evidence (6)**
93:22;118:1,20;152:3;
155:15;192:16
**exact (7)**
52:6,17;63:2;66:21;
97:3;161:6;169:15
**exactly (7)**
39:12;107:16;116:5;
148:23;157:5;159:13;
169:5

**examined (1)**
4:3
**example (6)**
8:18,25;9:2,2;10:14;
173:6
**examples (1)**
27:22
**executed (1)**
59:20
**Exhibit (9)**
59:6,7;181:15,16;190:5,
6;193:11,12;198:8
**existence (1)**
158:18
**expand (1)**
135:12
**expenses (2)**
19:8;149:18
**expert (3)**
13:18;86:10;88:25
**expired (1)**
30:19
**expiring (1)**
150:4
**explain (4)**
4:10,13;109:11;182:5
**explained (2)**
71:9;81:12
**explanation (1)**
110:13
**expressed (1)**
17:4
**extent (42)**
11:25;12:2,3;29:6,8,10;
61:1;62:1,13;64:8;65:7;
93:20;96:4;113:25;120:9;
122:6;123:4;141:23;
142:13;146:11,13;150:15;
154:22;158:17,20,21;
159:11;161:2;162:3,4,8;
163:10;164:3;166:7;
171:11,25;172:2,4;174:11,
13;187:17;193:6
**extra (1)**
115:5
**extreme (2)**
176:2,12
**extremely (2)**
83:14;181:25
**eye (2)**
15:24,24

**F**

**face (1)**
10:15
**fact (7)**
52:21;113:10,11;128:4;
167:16;168:9;185:24
**facts (8)**
93:21;118:1,20;151:9;
152:3;155:15;192:16;
201:14

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 59 of 75

Stacy L. Randall v                                                          Justin Randall
Reed C. Widen, et al.                                                   October 25, 2023

**failure (1)**
124:5
**fair (9)**
9:6;15:1,1;100:23;
113:1;125:20;166:3,9,12
**fairly (3)**
14:17;97:11;180:14
**fairness (1)**
124:21
**false (1)**
91:20
**families (1)**
57:19
**family (22)**
7:8,8;12:23;17:12;20:3;
22:10;24:18;27:10;34:7,
10;54:1,1;78:16;79:13;
87:5;115:22;124:19;
127:11;130:2,6,25;145:24
**family-owned (1)**
146:8
**family's (1)**
77:7
**far (3)**
31:3;78:13;122:24
**father (19)**
10:9;14:15;15:15,22,23;
25:1,13,20;103:15,25;
118:24;124:3;130:11,15;
131:7;167:23;170:20;
179:8;195:21
**father's (1)**
130:20
**feathers (2)**
27:5;176:21
**February (36)**
33:20;34:5;42:15,19;
43:6,16;44:6,15,21;45:8,8;
46:17;47:9,23;48:5,16,25;
49:13,16;52:4;55:25;60:2;
61:9;62:22;64:18;65:22;
66:16,25;69:4,11,20,25;
70:1;73:1;113:8;137:9
**feed (1)**
78:10
**feel (8)**
125:17;127:6,6,17;
137:22,23,24;195:6
**feeling (1)**
191:16
**feels (1)**
148:1
**fees (3)**
149:10,13;155:24
**felt (6)**
83:10,10;87:17;97:24;
127:7;142:7
**few (8)**
27:5;32:2;40:5;113:7;
134:12;169:6;178:18;
200:23
**fiduciary (1)**
122:20

**figured (1)**
145:24
**file (2)**
65:4;138:25
**filed (8)**
28:25;29:4,16;59:10,24;
103:16;132:10;173:25
**filing (4)**
64:24;65:19;132:14;
153:1
**final (1)**
104:19
**finalizing (1)**
134:1
**finances (1)**
123:10
**financial (27)**
78:8;85:14,19,22;86:1;
90:17;91:7,10,18,24;
109:5;110:17,21,25;111:2,
5,12;123:2,12;148:18;
155:19,24;168:14;179:16;
199:20,25;200:5
**financially (2)**
76:22,25
**financials (1)**
156:22
**find (10)**
77:15;91:19;104:16;
106:17;138:16;142:6;
157:12;180:2;193:19;
194:12
**finding (1)**
138:23
**fine (4)**
14:21;65:4;123:14,15
**f-ing (1)**
88:9
**finish (1)**
71:6
**firm (23)**
8:13;85:10;94:22;
101:18;139:11,12,15,15,
21;140:2,5,14,18,25;
141:3;147:5;152:11,14;
153:1;156:11;183:13;
194:24;195:5
**firms (5)**
37:10;38:19,19;140:1,
21
**first (29)**
4:2;11:1;12:6;22:15,15;
24:20;26:15,16,20;37:1;
47:2;50:3;54:5;65:17;
70:17;75:23;76:5;90:13;
96:21;102:22;128:10,13;
129:7;132:17;136:3;
139:19;190:14;192:4,13
**fishing (3)**
17:15;20:14;69:14
**five (8)**
40:20;54:24;67:11;
74:10;77:17;153:3;155:5;

164:11
**five-day (1)**
17:24
**flight (1)**
18:4
**Florida (2)**
130:20,23
**flow (1)**
176:22
**flown (1)**
21:21
**focus (1)**
5:10
**folks (2)**
29:14;33:21
**follow (7)**
42:4;43:1;95:8;133:9;
157:23;180:17;198:6
**followed (2)**
42:21;108:16
**following (5)**
40:9,11;41:22;70:11;
163:12
**follows (1)**
4:3
**food (4)**
19:5;116:13;148:25;
149:13
**football (1)**
9:17
**foregoing (1)**
59:19
**form (68)**
8:17,23;16:17,25;19:9;
20:6;21:10,23;23:22;24:3;
25:2,18;26:2,7;30:2;
33:25;41:24;47:13;50:12;
55:1,9,21,24;59:1;64:22;
66:2,20;67:18;70:6;76:1;
83:23;89:5;98:19;99:1;
110:10;113:3;114:6;
115:1,13;121:6;127:4;
128:1,18;129:11;133:12;
137:2;139:2;142:15;
152:15;166:6;168:15;
169:23;170:11;172:10;
173:22;175:21;178:12;
182:17;183:4;184:6,9,11,
12,13;191:6;192:24;
199:2;200:15
**formal (1)**
6:15
**forms (1)**
179:17
**formula (1)**
144:2
**forth (2)**
107:18;152:19
**forward (2)**
159:18;164:23
**found (5)**
101:20;141:21;147:20;
171:5;180:5

**foundation (31)**
20:18;21:9,24;25:3,18;
26:3,8;35:15;41:25;55:10;
57:13;116:8,20;117:1;
130:3;131:5,11;148:7,22;
151:21;170:12;172:11,15,
18,24;173:23;179:19;
180:7;183:20;188:19;
195:1
**four (4)**
17:20;22:14;23:18,20
**frame (14)**
60:5;67:1,8;73:4;80:4,5;
103:17;104:9;107:23;
125:12;129:13;178:17;
186:3,11
**fraud (1)**
179:14
**freaking (1)**
83:13
**free (1)**
155:3
**frequency (2)**
15:11;179:6
**frequently (2)**
15:7,10
**friend (3)**
118:24;181:11;197:14
**friends (6)**
15:21;34:9;173:13;
195:14,17,25
**front (1)**
59:7
**full (1)**
4:8
**fun (2)**
7:20;16:2
**funds (6)**
76:8,15;77:7,10;125:25;
172:21
**further (2)**
96:15;202:24
**future (1)**
6:1

## G

**gain (1)**
168:14
**game (1)**
181:2
**gas (2)**
19:4;116:14
**gave (5)**
59:8;89:1;130:15;
166:18;174:25
**general (7)**
27:14;28:18;69:7;
125:7;134:23;157:1;189:1
**generally (35)**
7:19;9:12,17;16:4,7,10;
17:21;19:7,12;24:8;26:4;
28:13;37:25;49:7,25;

73:15;74:15,19;100:17;
103:21;106:20;120:12,24;
122:21;123:11;124:9;
131:23;154:6;161:16,19,
20,23;180:5;197:9;201:7
**generation (1)**
67:23
**generosity (2)**
17:4,13
**generous (8)**
16:24;17:1,6,8;26:5,10;
175:20,22
**gentleman (1)**
197:20
**gets (1)**
8:20
**gift (13)**
57:9,10;135:23;136:4,5,
7,9,15;138:8;169:17,19,
21;175:12
**gifted (3)**
9:25;10:2;175:7
**girl (1)**
173:13
**give/take (1)**
147:19
**given (10)**
86:24;103:6;126:1;
137:20;145:12;147:16,18;
148:12,14;175:10
**giving (4)**
22:18;129:2;143:4,6
**glad (1)**
190:22
**Glarus (1)**
139:16
**God (4)**
24:13;43:24;117:20;
138:19
**goes (3)**
88:3;138:11,16
**goings (1)**
34:9
**gold (4)**
89:12;174:19;175:1,2
**golf (6)**
36:7;56:18;57:7;58:7;
132:19;133:14
**golfed (2)**
36:1,4
**golfing (7)**
20:20,22;56:13;68:15,
18;69:14;132:25
**Gonnering (8)**
41:21;42:20;60:8;70:3;
117:11;118:6;167:6;181:7
**Gonnering's (1)**
180:12
**Good (22)**
4:6,7;14:16;24:9;25:5;
26:4;34:2,2,2,2;48:11;
82:7,16;86:16;88:14;
93:12;100:22;126:21;

135:1;146:2;180:15,15
**gosh (2)**
126:19;200:4
**graduate (1)**
5:1
**grand (2)**
147:16,17
**grandfather (5)**
23:25;25:8,21;74:18;
130:11
**grandma (1)**
174:25
**grandpa (1)**
174:25
**grandparents (1)**
54:2
**grandson (1)**
24:20
**great (7)**
19:8;47:8;81:24;82:10;
86:21;143:14;178:2
**greatly (1)**
67:17
**greedy (3)**
170:10,14;171:5
**grew (1)**
53:24
**ground (1)**
140:19
**group (2)**
29:23;132:25
**grow (1)**
53:25
**grumbling (1)**
126:3
**grumblings (2)**
125:19,22
**guarantee (1)**
21:18
**guess (28)**
7:21;10:12;13:18,22;
16:20,22;18:16;24:23;
28:13;37:3;41:1,19;49:5,
7;55:12;62:20;73:24;
74:15;76:5;97:21;110:14;
122:19;130:17;140:17;
141:25;158:2;171:18;
172:19
**guy (8)**
37:21;47:16;69:10,17;
100:21;119:8,9;195:6
**guys (1)**
117:15

## H

**half (3)**
10:2;123:21,23
**handful (1)**
27:7;69:9;81:17
**Handler (1)**
196:16
**hands (1)**

86:16
**hang (1)**
53:8
**happen (3)**
40:21;81:21;90:24
**happened (13)**
19:11;52:8,18;97:7;
109:25;133:13;147:5;
150:19;161:22;163:1,21;
165:9;202:4
**happening (9)**
37:6;56:12,14;126:12;
133:18;137:6,18;158:6;
190:1
**happy (2)**
75:13;123:19
**Hard (6)**
22:8;24:7,23;78:5;
100:19;128:23
**harder (1)**
178:6
**head (5)**
7:23;16:3;127:15;
170:15;196:3
**health (3)**
14:16;123:12;178:11
**hear (6)**
70:17;125:3,7,18;
143:23;146:23
**heard (17)**
23:4,10;49:14,23;50:8,
14,17;120:20;129:7;
133:21;136:3,24,24;
139:21;151:9;175:19;
196:9
**hearing (4)**
72:12;103:18,24;113:12
**heck (5)**
38:13;64:2,2;145:24;
197:1
**held (4)**
13:23;14:7,10;34:15
**hell (2)**
88:10;120:21
**help (32)**
76:21;84:18,19;94:6;
95:14;100:12,16,21;
115:17,24;139:4,23;
140:13;142:4,9,10,11,16;
143:2;144:11;146:1;
147:21;149:17;151:7;
163:23;164:5;169:2;
179:7;182:9;188:3;
193:17;199:13
**helped (5)**
17:11;76:24;77:10;
142:6;149:6
**helping (4)**
17:9;142:21;146:20;
147:3
**helps (2)**
57:19;140:23
**here's (4)**

88:18;117:3,14,16
**hey (23)**
21:16;27:10;53:8;
57:23;58:1;89:21;94:18;
99:4;100:20;104:13;
108:7;117:16;118:15;
119:2;128:22;136:8;
140:15;143:17;145:7,21;
147:15;159:16;189:24
**high (9)**
149:3;155:9;156:6,12;
159:15;160:19;164:22;
178:21;180:14
**higher (1)**
104:18
**hire (5)**
91:6,9;94:13;137:12,16
**hit (2)**
67:14,25
**Hold (2)**
11:24;117:20
**home (12)**
5:23;22:4,7;46:18;
48:16;50:5;51:9;58:2;
60:3;77:2;178:2;202:9
**homeless (1)**
78:12
**homes (2)**
130:25;131:1
**honest (3)**
16:10;179:11;180:5
**honestly (10)**
44:17;72:20;89:18;
106:16;114:7;117:13,17;
125:11;164:15;187:24
**honesty (1)**
180:11
**honor (1)**
180:20
**honorable (2)**
16:12;180:18
**hope (1)**
119:11
**hoped (2)**
118:5,7
**horizon (2)**
40:20;67:9
**hour (3)**
49:19;123:20,20
**house (9)**
22:14;33:23;52:16;
106:15;125:8;130:13;
145:22,22;170:23
**household (1)**
149:13
**how's (1)**
188:25
**HUB (5)**
5:12,15;14:14;100:1;
147:6
**huge (3)**
57:16;94:19;133:23;
141:18

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 61 of 75

Stacy L. Randall v                                                    Justin Randall
Reed C. Widen, et al.                                              October 25, 2023

**human (1)**
    9:18
**humble (1)**
    16:7
**hundred (34)**
    20:17;39:19,21;44:4,10,
    25;45:1,2,15;62:5;63:3,21,
    25;64:3;66:9,11,22;77:4,
    18,22;97:13,16,18;102:10;
    108:12,19;113:18;129:5;
    147:15,16;156:7,13,13;
    178:9
**Hundreds (3)**
    22:12;170:23;186:24
**hung (1)**
    46:23
**hunt (1)**
    19:5
**hunting (5)**
    18:12;19:13;68:22;
    69:14;151:18
**husband (1)**
    35:1
**hypothetical (1)**
    9:2

                 **I**

**idea (10)**
    82:10;86:21;88:11,14,
    18;100:22;143:14;146:15;
    150:5;151:22
**ideas (1)**
    89:2
**identification (4)**
    59:6;181:15;190:5;
    193:11
**imagine (1)**
    145:7
**imagining (1)**
    137:18
**immediate (1)**
    116:22
**immediately (1)**
    57:2
**impacting (1)**
    177:10
**impending (1)**
    133:21
**implications (1)**
    84:3
**imply (2)**
    40:19;42:16
**important (3)**
    86:2;108:14;123:9
**impossible (1)**
    29:12
**impression (1)**
    40:23
**improper (1)**
    125:20
**include (2)**
    80:7;152:7

**including (1)**
    79:13
**incompetence (1)**
    9:16
**incompetent (1)**
    9:15
**indepth (1)**
    135:19
**indicate (1)**
    197:21
**indicated (1)**
    42:7
**indicating (1)**
    170:25
**indication (2)**
    39:17,22
**indications (1)**
    38:16
**indirectly (1)**
    50:18
**inference (1)**
    55:13
**infighting (1)**
    127:13
**Infiniti (1)**
    173:19
**information (19)**
    12:1;58:5;117:8,17;
    119:15,20,20;137:1,19;
    158:19,21,22;162:9;
    166:15;172:1,3,5;174:13;
    198:5
**inherited (1)**
    174:19
**Initially (2)**
    95:22;97:6
**ink (1)**
    59:16
**inquire (1)**
    42:25
**inquiries (1)**
    38:18
**ins (1)**
    98:7
**insert (1)**
    120:14
**insight (1)**
    126:10
**insist (1)**
    113:23
**instance (1)**
    71:16
**instead (1)**
    140:8
**instruct (4)**
    29:7;65:9;158:19;172:3
**instruction (4)**
    12:18;160:8;161:13;
    162:21
**insurance (6)**
    5:12;9:22;10:4,8;
    116:14;149:14
**intelligent (2)**

    7:25;8:1
**intended (1)**
    56:4
**intentionally (3)**
    119:13,21;168:13
**interest (7)**
    40:9,11;42:6;43:25;
    44:12;67:7;68:8
**interested (4)**
    38:20;49:10;102:9;
    124:20
**interesting (3)**
    37:13;47:7;180:14
**interests (3)**
    14:19;67:5;188:8
**International (5)**
    5:13,15;14:14;100:1;
    147:6
**interposing (1)**
    25:17
**interpreted (1)**
    124:4
**interrupt (1)**
    103:5
**intimidated (1)**
    156:24
**intimidating (1)**
    24:17
**into (25)**
    7:10;8:20;40:16;45:6;
    57:20;69:12,13;73:18;
    85:23;86:18;91:2;92:1,6;
    94:19;96:20,23;97:3;
    100:6;106:14,14;111:6;
    126:10;196:15,16,17
**investment (3)**
    6:14;95:19;108:22
**invite (1)**
    152:17
**involved (3)**
    12:15;40:15;141:19
**involvement (1)**
    12:20
**irrelevant (1)**
    128:9
**issue (2)**
    6:21;103:19
**issues (16)**
    12:15;153:23,24;
    154:10;157:21;158:1,15;
    160:6;161:9,25;162:17;
    165:21;177:20;178:11,22;
    193:15

                 **J**

**January (1)**
    189:18
**Jason (2)**
    99:15;109:22
**Jeff (1)**
    23:17
**Jesse (3)**

    37:20;69:10,17
**jets (1)**
    21:21
**jibing (1)**
    83:6
**job (5)**
    21:7,17,20;87:6;141:9
**joy (1)**
    191:10
**judge (1)**
    196:11
**judgment (1)**
    59:9
**Julie (14)**
    5:20;21:15;56:21;57:2,
    8;58:6;154:5;164:13;
    167:3;188:25;189:8,17,
    22;201:5
**July (3)**
    132:10;153:2;169:9
**jump (2)**
    73:3;106:20
**jumped (1)**
    20:4
**June (5)**
    169:9;172:8,22;174:3,5
**JUSTIN (3)**
    4:2,9;201:3

                 **K**

**keep (4)**
    56:23;57:24;58:11;
    127:10
**keeps (2)**
    126:20;175:3
**kept (3)**
    102:23;175:5;202:9
**key (3)**
    70:4;112:11,19
**kick (1)**
    105:25
**kid (3)**
    17:10;34:8,18
**kids (8)**
    34:18,19,20;53:24;
    57:15;78:9;87:5;115:5
**Kiesler (43)**
    70:3;76:17;77:22;
    79:25;81:5,14,18,19;82:4;
    83:16,25;84:17,17,25;
    89:20,22;90:1,6;95:12,14;
    99:13;102:8;104:12,14;
    112:5,7,15,18;117:11;
    118:5;129:4;143:15,20;
    144:1;156:15,19;181:25;
    185:15;190:9;193:14;
    194:3,8;199:8
**Kiesler's (1)**
    179:24
**kind (142)**
    6:16,17;7:19,22;12:9;
    14:19;16:20,23;24:9,9,18,

19,20;27:4;28:18;36:2;
37:23;41:8;42:11,12;45:6;
47:3,22;48:22;49:6,12;
51:21;52:5,18,22;53:7,16,
17,18;54:13;55:12,13;
57:12,15;58:5,25;62:6;
63:14,24;69:12,15;72:21;
73:24;76:9,11,11,15;77:7;
78:6;82:11;83:13,17;84:2,
4;87:18;88:25;94:25;95:2;
96:7;99:8;100:6,9,11,17;
102:23;104:4,15;105:1,4,
24;109:15;110:14;112:23;
113:11;115:22;118:10;
119:3,4;124:19;125:10,18,
19;126:6,11,16,18;127:10;
128:7;129:2;133:19;
135:16;137:20;138:7,11,
20;141:5,9,14,15;142:5;
143:18;146:7;147:19;
150:20;155:1,8;156:6,23;
158:4;164:10;168:21;
173:14;176:18,22;177:1,2,
7,14,21,24;178:4,21;
180:15,16;185:5;187:23;
188:2;189:12;190:1;
191:15;197:7,8,10;
198:21;199:13;200:5,7
**kinds (2)**
37:5;189:6
**kitchen (1)**
77:3
**knew (31)**
12:10;13:11,15;51:19;
54:4;58:5,6,8;73:20,23;
74:8;86:21;113:7;117:7,
24;118:2,11;136:12,19;
146:2;151:8;156:11;
164:15,16;166:19;167:16,
18,19;168:4;194:22;
198:17
**knowing (3)**
42:12;58:17;113:19
**knowledge (5)**
43:4;95:9,16;108:25;
167:24
**knowledgeable (1)**
123:7
**known (6)**
17:6;74:11;117:3;
145:6;154:25;187:25
**knows (3)**
54:3;122:21,24

## L

**laid (2)**
16:2;193:1
**LAING (29)**
4:5;25:15;29:12,24;
30:13,16,22;31:22;43:21;
49:20;61:3;72:5;90:10;
106:22;121:13;122:8;
123:13,16,19,24;157:12;
159:13;165:3;179:21;
183:7;200:18,21,25;
202:25
**landlord (1)**
112:20
**large (6)**
37:22;38:17;40:16;
41:3;53:3,6
**larger (1)**
83:5
**last (20)**
6:19;14:25;15:2,8;
31:23;32:11,21;73:5;77:5,
6;99:16;106:22;108:20;
169:5,6;178:25;179:5;
181:2;185:12;196:8
**late (2)**
178:20;192:1
**later (3)**
36:2;129:3;178:1
**law (9)**
139:11,12;140:2,5,21;
152:11;194:24;196:6,10
**lawsuit (15)**
23:5,7;27:20,21;31:24;
135:18;139:1,5;153:1;
169:19;171:8;173:25;
196:13,18;200:17
**lawyer (30)**
6:22;138:1,15;141:21;
142:6,10;149:13;163:19;
183:2,10,12;184:2,4,4,5,8,
8,16,24;185:3,8;187:21;
188:10;194:19,21,23,25;
195:3,5;197:14
**lawyers (32)**
132:14;139:11,12;
142:2;151:18;153:22;
154:2,12,20;155:11;157:3,
4,20,25;158:13;159:6,8;
160:4;161:8,24;162:16;
163:5;164:20,25;165:7,10,
12,16,20;195:15,18,25
**lawyer's (1)**
149:10
**leader (1)**
180:15
**leadership (4)**
117:15;122:1;152:5;
180:15
**lean (1)**
53:12
**Leanne (2)**
176:24;177:1
**learn (3)**
75:23;132:17;166:22
**learned (2)**
167:2,11
**lease (3)**
149:21,24;150:3
**least (5)**
14:18;24:24;63:16,18;
110:3
**leave (3)**
82:6;182:8;202:2
**led (1)**
109:21
**left (4)**
57:22;114:10;193:17;
194:11
**legal (9)**
114:1;122:7,19;123:5;
134:13;135:20;146:13;
151:16;171:12
**legally (1)**
146:15
**length (1)**
198:20
**letting (1)**
138:18
**level (7)**
77:7;155:9;156:6;
159:16;160:19;164:22;
180:11
**licenses (1)**
19:4
**lien (1)**
145:22
**liens (1)**
131:8
**life (17)**
9:21;10:4,5;27:13;
40:18;46:23;82:13;86:5;
96:24;97:10;101:14;
138:8;178:4;182:7;
185:20;189:13;198:13
**life-changing (3)**
94:19;115:4;121:2
**light (1)**
134:14
**light-hearted (1)**
7:19
**likely (2)**
79:6;96:20;152:6;
167:11
**likes (1)**
7:20
**liking (1)**
189:2
**limit (2)**
103:3;122:16
**limited (1)**
201:14
**limits (4)**
87:21;102:23;103:5,6
**line (2)**
31:8,10
**lines (1)**
40:24
**liquidity (2)**
146:18;147:8
**list (1)**
88:3
**listed (2)**
181:22;193:25
**listen (2)**
115:9;121:12
**listening (1)**
42:6
**listing (1)**
113:20
**little (13)**
7:13;15:7;24:17;50:7;
63:15;83:3;124:11;
130:21;145:19;162:23;
168:22,22;176:21
**live (5)**
58:3;99:18;115:10;
116:15;182:6
**lived (4)**
22:8,13;24:10;149:23
**lives (2)**
99:19;149:5
**living (3)**
27:12;115:25;116:1
**loan (8)**
77:14,25;78:24,24;
89:15;129:20;130:2;
144:18
**loaning (1)**
143:7
**locate (2)**
157:14,15
**located (1)**
140:5
**locations (1)**
133:14
**locked (5)**
8:20;104:4,4,5,5
**lodge (1)**
160:7
**long (14)**
4:24;17:21;22:16;
36:16;46:22;63:17;72:20,
23;106:16;124:17;125:14;
147:13;150:19;178:19
**longer (1)**
11:12
**look (23)**
10:7;28:14;51:6;90:17;
91:3,7,9,17,24;93:2,4,7,
13;97:9;100:3,17;119:8,9;
134:24;138:12,19;139:4;
184:25
**looked (4)**
24:4,10;31:7;65:17
**looking (10)**
21:16;31:10;37:10;
77:20;91:22;129:15;
142:10;151:3,6;188:7
**lose (1)**
197:22
**lot (35)**
7:9;17:19;19:21;24:5,5;
34:9;46:24,25;53:24;54:2;
56:9,16;57:12;63:19;
70:24,25;73:19;76:12;
79:9;87:7;98:1;100:6,16,

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 63 of 75

Stacy L. Randall v                                                           Justin Randall
Reed C. Widen, et al.                                                     October 25, 2023

16;109:25;115:7;122:12;
134:17,18;140:14;147:23;
170:21;180:9;189:24,25
**lottery (2)**
58:22;59:5
**love (13)**
7:16;15:22;25:8,12;
51:18;53:11;77:15;79:13;
87:14;88:17;118:14,24,25
**loved (2)**
78:18;121:3
**loving (2)**
24:24;25:22
**low (4)**
24:14;104:13,14;190:8
**lower (1)**
62:19
**lunch (1)**
123:14

## M

**Macht (4)**
70:14;71:25;72:21;
196:5
**mad (2)**
26:21;120:21
**Madison (3)**
5:3;197:24;198:4
**mail (2)**
10:7,12
**main (2)**
147:7;156:25
**maintain (1)**
29:20
**maintenance (2)**
103:16;104:1
**major (1)**
82:12
**majority (1)**
19:8
**making (3)**
12:25;38:20;188:5
**Mallards (3)**
181:4,4,4
**manage (1)**
177:2
**management (3)**
12:15,20,20
**manager (1)**
95:19
**managing (1)**
177:22
**manner (1)**
168:18
**many (19)**
5:14;14:10;17:18;
18:15;22:1,6;23:15;33:1;
38:1;46:20;50:20;69:18,
18;79:15;119:2;134:11;
152:25;196:2;198:15
**Mark (9)**
23:25;24:15;25:21;

70:13;71:4,8,13,24;133:1
**marked (5)**
59:6;181:15;190:5;
193:11;198:8
**market (2)**
131:2;155:4
**marketing (1)**
5:9
**married (1)**
5:17
**Maryland (1)**
173:13
**math (2)**
38:25;93:13
**Matt (1)**
60:8
**matter (3)**
6:11;98:5;157:21
**matters (1)**
8:16
**Matthew (12)**
21:18;37:15,16;41:21;
42:20,23,24;70:2;117:10;
167:6;180:12;181:7
**may (156)**
11:13;30:10;32:5,9,20;
33:2,4,9;34:13;37:7;
50:24,24;51:4,13,24;54:7,
19;57:6,7;65:11;68:5,14,
19,24;70:13;71:12,18,19;
72:7,13;73:3,7;74:2,10,22,
25;75:4,8,12,18;78:22;
80:6,7,20;81:1;86:13,18;
89:21;90:18;92:2,6,21,24;
93:1,1,10,11,11;94:3,10,
16,20;95:22;96:10,16,17;
98:25;102:1,16;103:17,
18;105:12,18,23;106:2,6,
8;107:1;109:4,19;111:6;
112:9,24;113:23;115:8;
118:2;119:22;120:7;
121:8;128:11;129:9,13,
16;136:1;142:12,16,22;
144:5;145:2;147:14;
149:14,25;150:3,22,23,24;
151:8;153:22,22;154:18;
155:13;157:20;161:8,8;
162:10,16;166:3,22;167:6,
12,17,24;168:3,6,7;
171:10,23;173:3;174:9;
181:19;182:16;183:3,18;
184:17,18,19,24;185:14,
15,25;186:13;187:3;
188:12,16;190:7;191:19,
20,21,25;193:13;196:14;
199:5,9,10,11,11
**maybe (25)**
5:6;6:9;9:3;10:13;15:4,
7;24:23;31:16;40:7;50:23;
56:3;72:22;117:21;124:7;
143:15;145:21,25;152:17;
170:23;176:21;178:5,19;
181:5;182:3;189:19

**McFarland (1)**
116:13
**mean (231)**
6:8;7:7,9;8:18,24,24;
9:16;10:6,1,11;11:13;12:6,
9,23;13:18;15:10,11,16;
17:6,6,19,22;18:22;19:4,
10,20,21,24;20:12;21:15;
22:8,13,16;24:4,6,16,17;
25:4;26:4,9,17,25;27:17,
23;31:7;33:3;34:1,24;
35:1,6,16;36:11,14;37:25;
38:1,6,10,22;39:1;40:5,25;
41:8,11,18;42:1,5,10,22,
23;43:23,24;44:2;45:14;
46:21,21;47:1,14;48:24;
50:14;51:5;55:11,16,25;
56:9,10,12;58:15;59:2;
61:5;62:15,18;63:2;65:12;
66:6,6;67:3,19;69:9;
73:17,18,20;74:8,13,15;
77:1,12,14,17,21;78:4,7;
79:10,14;80:7,9;81:15;
82:11;84:11,12,13;85:16;
86:19;87:13,23;89:3;
90:22;91:21;92:17;94:17;
96:6,19;97:13,20;98:6,13,
20;100:3;101:2;102:18;
103:21;105:19;108:19;
109:15;110:11,23;112:10;
113:7,8,16,18;114:7,23,
23;115:3,6,15,15,25;
116:10,14;117:14;120:18;
122:12,19;123:6,9;124:16,
17;125:15,16,22;126:2,16;
127:5,15,20;128:2,6,20;
132:4;133:13;134:12,24;
135:6;137:3;139:6;140:9;
141:16,25;142:5,16;
143:12;144:15;145:6,18;
147:4,18,21;148:8;151:8;
152:16;153:21;154:6;
155:1;156:5;163:12,20;
166:25;167:18;168:16;
169:5;172:19;173:6,10;
175:6;176:8,17,23;177:12,
19,23;178:18;179:2;
185:10,11;188:24,24;
189:8,16;192:10;197:1,7
**meaning (4)**
27:20;40:20;135:8;
170:6
**means (3)**
16:15;53:23;171:19
**meant (8)**
13:7;62:8,9,11;129:13;
182:3;194:22;200:18
**meet (1)**
199:8
**meeting (9)**
57:13,17;62:21;152:17,
22;161:22;162:13;163:2;
191:20

**meetings (32)**
132:13;152:25;153:6,
11,12,16;154:3,21;155:25;
158:7,7,13;159:5,8;
160:10,24;161:17;163:1,
18,22;164:1,11,12,13,21,
25;165:10,13,17,21;201:9,
23
**members (3)**
127:11;130:2,6
**memory (8)**
49:12;72:21;74:14;
105:25;112:23;120:3,5;
137:10
**mental (2)**
93:13;178:11
**mentally (1)**
178:5
**mention (3)**
21:17;55:8;71:21
**mentioned (9)**
57:18;61:14,14,15;
71:18;157:17;177:8;
185:15;186:2
**mentioning (1)**
61:18
**message (11)**
107:7;108:6;186:12,16;
191:1,7;193:12,18,20;
194:1,11
**messages (11)**
106:12,24;107:5,11,14,
17,22;108:1;186:3,5,10
**met (2)**
143:16;185:14
**M-hm (3)**
29:17;78:19;170:19
**Michael (6)**
81:13;102:8;112:4,7;
144:1;179:24
**middle (9)**
4:11,14;51:21;118:9,21;
119:6;120:25;127:3;
134:25
**might (8)**
5:6;108:15;152:1;
169:10;182:1,3;189:19;
195:8
**Mike (6)**
70:3;79:25;81:4;82:4;
117:11;118:5
**Mike's (1)**
83:2
**million (95)**
38:9,10,13,14,15,21;
39:7,10,11,16,16,19,21,25,
25,25;43:18,23;44:1,8,13,
16,23;45:10,21,25;46:7;
56:15;57:9;60:19,23;
61:10,13,14,15,21;62:5,5,
6,9,11,15,15,17,24;63:3,3,
7,12,16,22;64:1,2,3,6,7,10,
11,12,14,21;66:1,10,12,13,

14,19,22;67:8,11;68:7,9;
73:7;113:1,10,15;133:22;
135:23;136:4,5,9,15;
138:8;146:5;155:5;
156:13;166:3,20,23;
167:14,25;168:5;169:17,
21;175:12

**Milmont (2)**
80:11,20

**Milwaukee (5)**
99:19;181:2;197:21,24;
198:3

**mind (18)**
7:22;12:6;27:1;28:4;
79:17,20;89:25;112:25;
119:19;121:18;133:18;
135:3;175:17;176:3,15;
177:10;195:7,11

**Minnesota (2)**
196:9;197:15

**minute (3)**
183:23;185:12;199:19

**minutes (3)**
36:18,21;63:18

**mischaracterizes (20)**
61:2;62:2,14;64:9;79:3,
8;93:21;96:4;119:25;
120:10;141:24;142:14;
146:12;150:16;159:12;
161:2;163:10;164:3;
166:7;193:7

**missed (1)**
137:20

**misunderstood (2)**
56:3;164:9

**mom (82)**
10:18;12:24;15:3;
26:11;27:3,3,4,6,8;28:6;
32:10;58:9;74:4,15,19;
76:21,24;77:11,15,19;
87:11;88:17;90:1;99:9;
100:20;101:19;104:3;
108:2,24;109:3,9;110:4,6;
115:24,25;118:4,15;119:1,
3,4,9;120:4,15;127:7,8;
134:22;136:7,8,20;
137:24;138:2;139:10;
140:8,18;141:22;144:10;
145:8,25;147:11,14;
148:4;153:7,20,20;154:3;
156:14,15,16,21;158:8,13;
164:12;168:21;177:3,25;
184:13;188:25;190:1;
193:9;197:22;201:19;
202:14

**moment (1)**
160:1

**mom's (5)**
120:21;142:3;175:23;
176:25;196:22

**monarch (1)**
24:18

**money (66)**

37:23;38:17;40:17;53:3,
7;57:12,16,20;58:22,22,
25;59:4,5;73:22;75:5,14;
77:17,19;78:15;80:4;81:4;
83:8;84:20,22;87:19;
97:11;111:25;114:18,19,
23;115:10;116:5,11;
126:8;127:21;128:12,13,
14,16,17;129:10,17,23;
130:7,11,16;142:11,22;
143:4,6,6,7;144:10,21;
145:8,25;146:10,17;
147:23;148:24;149:7;
155:4;168:25;172:25;
173:2;193:17

**monies (2)**
76:10;104:6

**Monona (1)**
5:24;58:3

**month (7)**
17:23;67:15;68:1;81:2;
132:24;136:25;172:20

**monthly (4)**
14:18;15:4;172:8;174:8

**months (6)**
22:9,14;40:22;80:6;
118:3,15

**more (32)**
15:7;28:3;44:2;47:11;
48:10;53:14;54:6;58:15;
64:1;69:12;81:7;84:20,22,
22;104:16;113:10;117:21;
123:9;124:11;125:8;
126:5,25;127:1;128:4,5;
131:3;158:8;159:23;
165:5;177:6;178:3;193:17

**morning (2)**
4:6,7

**mortgage (1)**
144:22

**mortgages (1)**
78:10

**most (7)**
27:23,23;28:3;123:10;
152:6;167:11;176:22

**mother (228)**
4:10;7:1,5,7,16,24;9:8,
15;10:9,20;11:19;12:14;
13:2;14:22;15:9,14;22:17,
25;25:6,9,12;26:6,12,21;
30:1,5;32:20;48:21;51:17;
73:5,11;75:9,13,16,23;
76:18;78:17,22;79:14,18,
21;80:13;81:1,8,11;82:22;
83:7;84:10,13;85:3,13,21;
86:17;88:4;90:16;91:6,14,
25;92:5,5,15,21;93:17;
94:1,5,12;95:21;98:4,10;
100:13,24;101:5;102:2,8,
15;103:6,11,16,19;104:1;
105:11,11,17;106:3,6,25;
107:8,9,15,23;108:16;
110:17,21;111:1,4,5,11,

18,24;112:4;113:22;
114:3;115:8,17;116:5;
118:11,14,25,25;119:22;
120:24;121:3,8;124:2;
126:13;127:18;128:10;
129:9,16,20,22;130:1,6;
131:7;134:9;135:8,23;
136:10,14;137:1,12;
139:13;140:3;141:2;
143:20;144:1,5;145:2;
150:6,11;151:4,19;154:12,
20;155:11,18;156:3,4;
157:3,4,19,19,25;159:5;
160:5,16,21,23;161:24;
162:16;163:7,24,25;
164:20,24;165:13,16;
166:2;167:23;168:3,9,13;
169:7,17,21;171:8,20;
172:21;174:6,19;175:13,
13;176:1,12,15;178:7,10;
179:8,11;181:19,25;
182:10,21;183:1;184:1,6,
15,22;186:3;187:1,10,14;
188:6,10,15;190:7,16;
191:3,24;193:13,25;194:3,
10,24;195:3,14,17,22;
198:7,12,22;199:4,14,21,
24;200:10;202:3,20

**mother's (16)**
7:17;24:25;25:25;
28:22;72:7;86:12;98:24;
101:12;105:15;113:2;
124:5;130:19;172:7;
177:10;181:17;196:14

**motion (2)**
59:9;103:15

**move (3)**
114:24;159:16,18

**moved (1)**
149:17

**moving (4)**
5:25;36:15;116:24;
164:22

**much (17)**
14:17;20:24;21:11;
26:17;53:11;77:19;83:5;
97:12,15,17;113:10;
115:24;128:14,16,17;
129:10;172:13

**multiple (11)**
20:12;61:11;63:20;
67:22;81:15;100:4;
108:12;133:13;142:1;
151:1;155:6

**multiples (2)**
100:10;117:12

**mutual (1)**
179:10

**myself (6)**
24:16;82:17;84:21;
125:16;133:1;202:14

18,24;112:4;113:22;
114:3;115:8,17;116:5;
118:11,14,25,25;119:22;
120:24;121:3,8;124:2;
126:13;127:18;128:10;
129:9,16,20,22;130:1,6;
131:7;134:9;135:8,23;
136:10,14;137:1,12;
139:13;140:3;141:2;
143:20;144:1,5;145:2;
150:6,11;151:4,19;154:12,
20;155:11,18;156:3,4;
157:3,4,19,19,25;159:5;
160:5,16,21,23;161:24;
162:16;163:7,24,25;
164:20,24;165:13,16;
166:2;167:23;168:3,9,13;
169:7,17,21;171:8,20;
172:21;174:6,19;175:13,
13;176:1,12,15;178:7,10;
179:8,11;181:19,25;
182:10,21;183:1;184:1,6,
15,22;186:3;187:1,10,14;
188:6,10,15;190:7,16;
191:3,24;193:13,25;194:3,
10,24;195:3,14,17,22;
198:7,12,22;199:4,14,21,
24;200:10;202:3,20

**N**

**name (16)**
4:8,8,11,14;5:19;14:13;
59:12;70:22;99:14,16;
101:18;139:14;141:2;
189:10;195:10;197:2

**named (1)**
195:6

**names (3)**
34:25;140:18;196:4

**near (2)**
6:1;175:24

**nearing (1)**
156:12

**nearly (1)**
113:14

**necessarily (12)**
13:9,21;34:15;35:6;
37:20;42:10;54:15;73:18;
89:11;99:6;154:16;158:5

**need (23)**
4:25;51:23;66:3;78:23;
80:4;81:3;83:8;86:3;
89:10;109:15;111:24;
114:9;116:5,15;143:2;
144:20;146:17;148:20;
182:7,8,10;193:21;200:19

**needed (17)**
19:5;76:7,10;77:19;
87:9;114:23;128:13,15,
17;129:10,17;142:10,11,
22;149:6;169:2;182:22

**needs (5)**
73:22;144:10;145:8,25;
194:13

**negative (1)**
26:12

**negotiating (1)**
103:17

**net (10)**
45:9,12,23,24;46:2,10;
60:24;61:23;63:10;64:14

**new (3)**
77:3;113:14;139:16

**next (9)**
40:22;47:18,21;56:19;
59:12;67:15;68:1;81:11;
83:8

**nice (1)**
169:12

**Nike (4)**
47:4;48:7;50:3;72:18

**no-brainer (1)**
116:1

**None (5)**
22:22,24;55:11;72:16,
24

**non-issue (1)**
96:7

**non-relationship (1)**
138:9

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 65 of 75

Stacy L. Randall v                                                    Justin Randall
Reed C. Widen, et al.                                              October 25, 2023

**nor (2)**
  120:22;136:21
**Nordland (12)**
  51:2,3,12;52:11,24;
  53:15;54:7,12,18,22;55:3;
  70:9
**Nordland's (1)**
  54:8
**north (2)**
  19:25;57:22
**note (2)**
  106:8,10
**notebooks (1)**
  106:14
**notes (3)**
  43:8;106:5,17
**no-win (1)**
  51:18
**null (1)**
  171:22
**number (39)**
  38:21,24,25;39:6,8;
  45:2,9,11,12,21;46:5,7,8,
  25;53:4;61:10,14,14,15;
  62:16,19;63:10;64:6,13;
  66:14;74:4;104:14;109:9,
  16;110:1,8,12;113:18,21;
  129:3,7;166:9;172:16;
  181:22
**numbers (24)**
  37:17;38:7,12;39:5,14,
  23;41:3;44:10;45:14,16;
  52:21;54:18;55:2;61:11,
  17;63:3,19,21;64:4;66:11;
  78:14;129:8;190:3,4

## O

**oath (1)**
  163:6
**Object (81)**
  8:17,23;11:24;16:17,25;
  19:9;20:6,18;23:22;24:3;
  25:2;29:5;30:2;33:25;
  41:24;47:13;50:12;55:1,
  21,24;59:1;61:1,24;62:1,
  13;64:8,22;66:2,20;67:18;
  70:6;76:1;83:23;93:20;
  96:3;98:19;99:1;110:10;
  113:25;114:6;120:9;
  122:6;123:4;127:4;128:1,
  18;129:11;137:2;139:2;
  142:13,15;146:11,13;
  150:15;152:15;158:16;
  159:11;161:1;162:2;
  163:9;164:2;166:6,7;
  168:15;169:23;170:11;
  171:11,24;172:10;173:22;
  174:10;182:17;183:4;
  188:19;191:6;192:24;
  193:6;195:1;197:23;
  199:2;200:15
**objection (82)**

**obligations (1)**
  12:17;17:5;21:9,23;
  26:2,7;29:20;34:2;35:15;
  55:9;65:6;67:21;78:2;
  79:2,7;88:19;89:5;90:20;
  94:9;97:1;111:8;113:3;
  115:1,13;116:7,20;117:1,
  25;118:17,19;119:24;
  121:5;122:11;123:8;
  130:3,9;131:5,11,14,21;
  133:12;141:23;143:3;
  144:6,13;145:4,14;148:6,
  15,21;149:8,19;151:14,21,
  24;152:2;154:22;155:14,
  21;159:1,1;160:8;161:12;
  162:20;164:8;166:13;
  172:14,18,24;173:4,9;
  174:1;175:21;178:12;
  179:19;180:6,19;183:19;
  184:9;187:7,17;192:15
**objections (6)**
  21:14;25:10,18;116:4;
  171:6;174:4
**obligations (1)**
  79:13
**obtained (3)**
  4:21;144:18;179:1
**obviously (9)**
  27:17;78:10,15;90:7;
  97:25;133:18;135:2;
  141:16;175:23
**occasion (2)**
  8:4,11;20:22;34:5;
  35:14;48:5;124:14,15,16;
  133:11;188:15;200:10
**occasions (5)**
  8:13;10:24;47:24;50:2,
  20
**occur (1)**
  33:19
**occurred (1)**
  170:3
**off (12)**
  6:17;7:22;57:10;76:16;
  79:25;81:4,13;89:25;
  97:25;101:23;136:6;196:3
**offer (9)**
  63:25;76:21;88:16;
  104:18;150:6,10;169:20;
  182:4;199:4
**offered (5)**
  89:20;135:22;136:9;
  169:17;175:12
**offering (1)**
  117:22
**offers (1)**
  41:23
**office (7)**
  42:11;112:12;190:12;
  191:4;193:20;194:13;
  199:17
**officer (5)**
  11:20;13:3,10,14,25
**officers (1)**

**officership (1)**
  121:16
**officership (1)**
  13:6
**offices (1)**
  199:5
**official (1)**
  193:9
**often (5)**
  14:22;15:2,8;20:11;
  180:24
**old (3)**
  24:12;41:17;125:17
**once (2)**
  67:22;181:5
**one (74)**
  11:1;14:12,13;15:17,21;
  17:9,20;20:7;21:2;22:2;
  27:1;33:3,8;38:16;43:4;
  44:11;46:4,11;47:21;48:4,
  23;50:21;69:11,18,21;
  70:21;71:1;74:9;89:10;
  90:2;92:3,9;95:1;96:12;
  104:19;107:10,24;108:9;
  110:16,20;112:25;115:23;
  116:22,25;119:18;120:19;
  124:14;125:8,24;126:2,2,
  4;129:25;130:5;132:2;
  140:11;141:6,7,20;142:2;
  150:9;157:2,23;165:5;
  166:17;168:16;173:19;
  176:24;177:21;186:6,7,
  17;193:9;202:15
**ones (4)**
  19:19;34:14;155:9;
  169:11
**only (21)**
  33:5,17;47:14;48:14;
  49:11,13;53:19;60:22;
  61:17;63:10;81:20;82:12;
  84:16;86:24;89:9;116:16;
  140:11;142:20;183:22;
  189:16;197:11
**opinion (3)**
  9:4;16:12;166:18
**opportunity (2)**
  126:1;163:4
**option (14)**
  55:11;86:24;87:19;
  88:15,16;89:11;90:15;
  116:22,25;148:1,11,12,14,
  17
**options (7)**
  55:11;89:20;116:19,21;
  138:12;146:18;155:6
**order (1)**
  104:1
**oriented (1)**
  7:8
**others (3)**
  34:13;36:5;124:7
**other's (1)**
  20:4
**otherwise (1)**

**109:17**
**out (70)**
  17:9,11,12;28:4;35:8;
  36:3;40:21;51:22,24;76:9,
  14,15;77:11;79:24;81:3,
  13;83:13;84:2;86:11;
  87:16,19;91:19;94:6;
  98:23;99:2;100:24;101:6,
  12,20;102:2;103:19;
  104:4,5,5,11;109:17;
  114:9;115:10,17;117:20;
  125:5,24;126:1,17,21;
  128:25;130:10;134:21;
  138:12,16;139:8;141:6,7;
  144:17;146:20;147:4,21;
  159:21;162:25;163:15;
  168:25;169:1,2;176:10,
  24;188:7;193:1,17,19;
  194:12
**outcome (1)**
  141:13
**Outgoing (2)**
  16:2,6
**outing (5)**
  56:19;57:7;133:4;181:1,
  4
**outs (1)**
  98:7
**outside (3)**
  162:7;169:11;181:8
**over (27)**
  7:5;15:2,8;17:3;19:24;
  20:8,16;26:1,5;56:24;
  73:8;74:16;77:5;95:2;
  99:19;104:24;106:20;
  116:23;134:2;155:4;
  156:23;170:18,23;176:23;
  190:11;191:4;200:2
**overhear (1)**
  124:24
**overheard (4)**
  35:13;43:4;46:15;48:1
**owed (1)**
  131:3
**own (3)**
  18:6;21:20;44:4
**owned (2)**
  73:6,12
**owners (2)**
  27:13;121:16
**ownership (2)**
  68:8;130:20

## P

**page (4)**
  59:12,18;60:1;106:17
**Pages (1)**
  140:10
**paid (10)**
  18:4,6,10,24;20:22;
  21:21;36:7;127:21,24;
  134:21

**pandemic (2)**
67:22,25
**paper (3)**
139:16;141:8;193:9
**papers (9)**
92:23;190:12;191:5,14,
24;192:5,6,9,14
**paperwork (7)**
6:8,13,16;83:12;112:13,
14;199:6
**paragraph (3)**
60:1,7,16
**parents (3)**
124:24;174:20;175:8
**parked (1)**
20:2
**part (9)**
32:21;34:16;70:17;
90:13,14;92:18;188:4;
190:2;192:20
**partial (1)**
59:9
**participate (1)**
132:13
**particular (1)**
136:22
**particularly (2)**
134:12;152:4
**parties (2)**
124:20;181:1
**parts (1)**
90:5
**pass (1)**
76:16
**passed (10)**
9:19;10:5;24:1,13;
74:18;79:25;81:4,13;
103:3;104:17
**passing (1)**
7:12
**past (1)**
140:21
**pay (12)**
18:1,17,19;19:7,14;
78:10;87:24;104:1;
116:12,14,14;121:22
**payable (1)**
73:8
**paying (1)**
19:2
**payments (4)**
103:16;149:14;172:8;
174:7
**pays (1)**
20:24
**PE (2)**
99:3;147:5
**pen (1)**
193:9
**penalty (1)**
59:18
**Peninsula (1)**
132:19

**people (26)**
24:23;27:5;34:7;40:18;
42:9,24;53:10;57:13,19;
58:7;70:11,13,25;71:21;
72:13,17,24;146:20;
150:21;153:5;177:23;
182:7,11,15,22;202:10
**per (5)**
166:20,24;167:14;
168:1,5
**percent (11)**
44:4;74:9;82:19,20;
108:10,11,19;178:9;
186:23,23;198:18
**percentages (1)**
186:23
**Perfect (1)**
70:20
**perform (1)**
21:19
**period (13)**
22:9,16;40:25;55:17;
56:11;74:16;81:16;87:25;
99:11;103:13;117:20;
167:15;168:21
**periods (1)**
176:18
**perjury (1)**
59:19
**person (29)**
12:24;16:12,23,24;24:9,
16,19;25:23;50:17,25;
70:21;71:16;85:10,11;
94:22;98:7;100:2,25;
101:4,7,8;102:3,4;105:17;
123:9;170:10;176:22;
179:11;197:16
**personalities (1)**
14:20
**personality (8)**
7:18;16:1,5,21;24:15;
179:25;180:13,15
**personally (5)**
45:10;63:9;68:7,9;98:11
**person's (1)**
99:14
**perspective (1)**
114:8
**phone (3)**
51:10,13;93:5
**picture (1)**
192:25
**pile (1)**
87:22
**place (10)**
26:11;37:20;40:13;
53:25;54:5;103:4;169:4;
176:23;197:2,3
**places (1)**
69:19
**plaintiff (1)**
7:1
**plaintiff's (1)**

59:9
**plan (2)**
37:20;40:13
**planned (1)**
55:4
**planning (3)**
54:23;69:7,13
**plans (1)**
5:25
**play (2)**
21:7,11
**played (1)**
21:12
**players (1)**
70:4
**plays (1)**
84:2
**please (5)**
4:8;12:5;66:4;78:23;
158:22
**plus (2)**
77:4,5
**pm (10)**
181:20;190:8,16,17;
191:17,18,22,25;193:13;
203:2
**POA (1)**
31:20
**point (15)**
32:9;49:9;74:8;77:9;
102:7;111:20;113:9;
131:2;164:19;176:24;
181:14;183:1;198:18;
199:7,22
**points (1)**
113:8
**POLAKOWSKI (188)**
8:17,23;11:24;12:17;
16:17,25;17:5;19:9;20:6,
18;21:9,14,23;23:22;24:3;
25:2,10,17;26:2,7;29:5,19;
30:2,15,18,25;31:19;
33:25;35:15;41:24;47:13;
49:18;50:12;55:1,9,21,24;
59:1;61:1,24;62:1,13;
64:8,22;65:6;66:2,20;
67:18,21;70:6,16,20;72:2,
6,9;76:1;78:2;79:2,7;
83:23;88:19;89:5;90:20;
93:20;94:9;96:1,3;97:1;
98:19;99:1;110:10;111:8,
14;113:3,25;114:6;115:1,
13;116:4,7,20;117:1,25;
118:17,19;119:24;120:9;
121:5;122:6,11;123:4,8,
15,17,22;127:4;128:1,18;
129:11;130:3,9;131:5,11,
14;133:12;137:2;139:2;
141:23;142:13;143:3,5,
22;144:6,13;145:4,14;
146:11;148:6,15,21;149:8,
19;150:15;151:14,21,24;
152:2,15;154:4,22;155:14,

21;157:10;158:16;159:11;
160:7;161:1,1,12;162:2,20;
163:9;164:2,8;166:6,13;
168:15;169:23;170:11;
171:6,11,24;172:10,14,18,
24;173:4,9,22;174:1,4,10;
175:17,21;178:12;179:19,
21;180:6,19;182:17;
183:4,19;184:9;187:7,17;
188:19;191:6;192:15,24;
193:6;195:1;197:23;
198:2;199:2;200:15,19,
23;201:2;202:23
**policies (2)**
9:22;10:5
**policy (4)**
10:1,8,15,16
**Pontoon (2)**
20:14;126:8
**pool (8)**
33:23;35:8;36:10;
48:15;50:4;52:4,19;53:2
**poor (1)**
14:16
**portion (3)**
28:21;90:9;135:20
**Portions (2)**
18:18,19
**position (11)**
8:16,20,22;86:22;87:9,
22;88:23;99:21,22;142:4;
152:5
**possibility (15)**
13:24;32:7,23;33:10;
48:1;50:10;67:2;68:16,21;
69:1;71:11,23;79:17,20;
101:9
**possible (11)**
41:19;49:24;77:23;
79:19,22;80:17,21;95:24;
101:2;127:12;151:19
**Possibly (5)**
22:13;38:22;39:2;
80:11;156:9
**potential (11)**
105:16;153:23,23;
157:20;158:1,14;160:5;
161:9,25;162:16;165:20
**potentially (14)**
10:8;38:24;39:20;
41:10;46:16;63:5;70:12;
84:2;87:25;94:19;106:17;
138:1;177:16;186:24
**power (6)**
29:21,25;30:4,8,16;
132:4
**practice (3)**
37:5;99:3;196:6
**pre-May (2)**
72:3;101:23
**prepared (2)**
136:15;179:17
**preparing (1)**

57:15
**present (5)**
34:22;160:5;161:25;
202:3,15
**presented (2)**
65:3;179:18
**president (9)**
111:19;122:4,9,13,16,
17,21;123:1,11
**presidents (1)**
121:17
**pre-signing (1)**
102:16
**pressure (6)**
83:10;87:15;176:3,12;
177:19;189:23
**pressures (1)**
168:23
**pretty (5)**
20:24;77:2;110:23;
149:5;171:3
**previous (2)**
169:19;177:6
**previously (1)**
174:18
**price (5)**
45:17,19,22;58:20;
113:1
**prior (69)**
6:11;12:8;32:5,17,20;
33:2,9;48:5;57:14;64:24;
65:15;67:6;68:5,14,19,24;
70:12;71:15,19;72:13;
73:13,17,17;74:2,10,11,
22,25,25;75:4,8,12,17,18;
80:6;81:1;86:12;92:6;
94:3,10,16;95:21;98:25;
102:1;105:12,17;106:1,6,
25;108:24;109:3;112:9;
129:3,9,16;132:14;
137:20;153:1;154:17;
159:2;166:22;168:3,6,7;
169:8;170:7,8;188:12,16
**private (4)**
21:21;37:4,10;38:19
**privately (2)**
14:7,10
**privilege (5)**
12:1;65:8;162:4,5,8
**privileged (5)**
158:18;162:9;172:1,5;
174:12
**probably (19)**
6:19;12:9;15:4;36:18;
47:1;58:10;67:22;81:24;
98:2;116:23;123:20;
125:15;128:11;146:16;
152:5;153:3;155:6;
167:10;193:17
**proceeding (1)**
103:12
**PROCEEDINGS (2)**
4:1;203:2

**proceeds (2)**
22:18;135:9
**produce (2)**
30:14;31:21
**produced (1)**
181:17
**profanity (2)**
8:4;88:8
**professional (1)**
178:11
**prom (2)**
19:23;20:5
**prompted (7)**
26:19;40:6;49:12;
105:24;112:23;120:5;
137:10
**prompts (1)**
72:21
**properties (3)**
130:22;131:3,4
**property (6)**
34:4,16,22;131:9,10;
173:8
**proposed (1)**
148:1
**proposing (1)**
149:12
**prospects (1)**
121:10
**protected (1)**
29:23
**provide (1)**
102:10
**psychologist (1)**
57:19
**public (1)**
58:5
**publicly (1)**
14:7
**pull (2)**
93:5,8
**pulled (1)**
87:7
**pump (1)**
17:10
**purchase (2)**
70:4;113:23
**purchased (4)**
39:21;48:7;130:22;
173:7
**purposes (1)**
70:17
**pursued (1)**
141:21
**push (3)**
127:10;156:21;189:23
**put (10)**
51:20;55:17;67:1;
87:22;106:13;138:11;
145:21,22;186:11;193:9
**puts (1)**
118:22
**putting (1)**

125:16

## Q

**quabbling (2)**
28:3;200:7
**quarterly (1)**
121:20
**quiet (1)**
57:25
**quite (6)**
74:17,17;77:8;134:12;
167:5;178:18
**quote (1)**
59:3

## R

**ran (3)**
196:15,16,16
**RANDALL (6)**
4:2,9;7:1;10:11;49:22;
181:16
**randomly (1)**
19:24
**range (2)**
63:23;172:17
**rather (3)**
141:8,10;202:8
**reach (7)**
51:24;86:11;94:6;
98:23;141:6,7;144:17
**reached (13)**
51:22;76:14;79:24;81:3,
12;99:2;100:24;101:6;
102:2;128:25;130:10;
139:8;176:24
**reaching (1)**
101:12
**reaction (6)**
57:2;136:10,13,17,23;
191:9
**read (28)**
25:15,16;28:25;43:21,
22;66:5;70:19;80:12;
90:10,12;106:23;111:15,
16;113:6;121:13,14;
143:23,24;159:22;163:16;
165:3,4,6;167:6;183:7,9;
188:23;190:19
**reading (6)**
12:7,8;73:16,17;74:11;
194:20
**ready (1)**
36:3
**real (6)**
6:14,21;28:19;130:20;
139:7;185:12
**really (74)**
9:3;12:13;15:23;24:10,
24;26:16;28:17;31:7;
33:14;37:17,19;40:14;
47:7,7,8;51:15,25;52:17;

53:9;55:12;58:1,10;59:17;
73:25;74:13;78:5;82:6;
84:18;87:17;96:11;99:6;
100:15,21;107:19;109:10;
110:4;114:7;120:14,18,
21;125:6;126:20,25;
127:8;134:25;135:5,18,
19;136:16,18;137:25;
140:9,11;142:18;144:9;
145:9;146:2;147:23;
148:8,10;156:21;158:11;
159:25;164:16;172:25;
175:1;176:25;177:20;
180:10;182:5;189:22,23,
24;196:20
**reason (13)**
9:14;13:17;53:16,17;
91:14;121:15;135:7;
147:7;168:12;173:3;
179:13;195:7,10
**reasons (2)**
113:20;166:17
**recall (195)**
4:12,15;13:9,12;19:16,
22;21:15;24:14;26:15,16,
21;31:18;32:4;33:8,17;
34:7,22;35:2,4,16;36:6,19;
37:8,15;38:4;39:23;40:1,
5,25;42:10,22;44:6;45:10;
47:2,3,18,22;48:3,4,10,14,
23,24;49:25;50:21;52:23,
23;53:14;54:6,11,18,21,
22;55:2,3;56:17;59:17;
63:11;64:16,17,23;65:2,
16;67:3;68:10,18,23;69:3,
12,24;70:1,7;72:12;73:2;
75:7,19,22;76:16,23;77:1;
79:16;80:1,24;81:6,10;
83:24,25;84:16;86:19;
87:8;89:1,16;90:13;91:21,
23;94:4,11,17,24;95:2,17;
96:17;98:21;101:2,9,11;
102:6;105:22,23;106:1,4,
9,12,24;107:25;108:3,22;
109:7;111:10,17,22;
112:3;120:11;124:14;
128:20,21;129:14,18;
130:13;132:12;136:18,22;
145:18,21,23;147:7;
150:17;154:14,14,16;
155:16,17,22,23;156:2,25;
161:4,10,14,16,19,23;
162:18,22;168:8,11;
169:13,15,16;170:13;
173:16;174:23;182:20,24;
184:10,14,20,21;185:9,14;
186:1,6,15;187:13;189:4;
190:4,20;191:7;192:3,4;
193:8,10;194:9;195:13,
24;196:23,24;197:13;
198:4,10,15,25;199:3;
200:2;201:6
**recalling (4)**

51:5;80:16;107:10;
128:23
**receive (5)**
68:7,9;97:15,17;199:25
**received (8)**
39:22;60:9;74:5;75:5,9,
14;178:10;191:10
**receives (2)**
172:13;174:7
**receiving (5)**
126:14;172:7,22;
182:23;198:7
**recently (3)**
58:13;125:9;134:22
**recognize (1)**
70:21
**recollection (1)**
167:21
**recommend (10)**
85:3,13,21;86:17;92:5;
105:5,7;111:4;137:12,16
**recommendation (3)**
93:18;108:17;188:5
**recommendations (3)**
75:21;83:21;89:23
**recommended (1)**
92:22
**record (4)**
43:11;72:3;164:18;
198:2
**recording (1)**
43:12
**records (19)**
85:14,19,22;86:1;90:17;
91:7,10,18,24;109:5;
110:17,21,25;111:2,5,12;
155:19;199:20,25
**recovery (1)**
22:19
**red (1)**
20:7
**redeem (1)**
102:12
**redemption (24)**
94:10;99:13;102:16;
105:13;107:1,3;108:24;
109:3;114:20;155:12;
171:9,22;174:8;183:17;
184:23;187:11,15,20;
188:1,11;192:18;193:2,3;
198:24
**Reebok (9)**
47:4,8,15,17;48:7,13,23;
50:3;72:18
**Reed (196)**
15:17,20;16:1,4,24;
17:2;18:12,23;19:7,14,17;
20:8,20;21:7,16,17,22;
22:3;23:21;26:1,5,11,13,
22;27:2,3,6,25;28:8,16;
32:6,14,22;33:9;34:8,20;
35:5,13,18;36:4,9,19;
39:15;40:2,8;41:4,13,21;

42:8,16,20;43:5,16;44:6,
15,21;45:7,23,24;46:2,9,
15,15,18,22;47:6,11,25;
48:1,5,11,15,20;49:4,15,
23;50:4,9,15,16;51:16;
52:5,16,20;53:1,2,19;54:1,
8,13,17,22;55:3,19;56:5,
20;57:3,3;58:9,19,23;60:2,
8,17,24;61:8,9,22;64:18;
65:23;66:15;67:1;68:1,5,
15,20,25;69:6,9,16,20;
70:11;71:10,17,22;72:13,
18,25;73:21;76:7,14,16;
79:24;80:3,18,19;81:3,4,9,
13;99:12;111:24;113:9;
117:8,11;118:2,6,15,23;
119:1,3,4,8;120:6,17,20,
23;124:7;125:24;126:20;
127:18,25;128:3,12,25;
133:1,4,10,19,20;134:8;
135:22;136:8,14,19;137:5,
13,19;138:14;151:4,13;
152:1,7,8;156:14,16,18,
22;167:3;168:12;169:18,
20;170:3,9;175:13,20
**Reed's (6)**
27:11;33:23;34:8;
57:15;127:20;177:2
**refer (1)**
98:14
**reference (8)**
45:22;50:3;60:22,24;
61:22;63:7;69:17;192:23
**referenced (1)**
201:12
**referencing (3)**
39:24;194:18,21
**referring (9)**
74:13;103:6;132:5;
157:16;162:23;177:9;
182:12;192:22,23
**refused (1)**
200:12
**regard (15)**
10:10;28:5;57:8,14,14;
67:19;83:24;84:9;108:1;
109:7;117:8;142:16;
144:22;160:13;166:14
**regarding (23)**
32:6,23;33:10;41:9;
75:16;77:13;106:2;108:6;
115:15;120:17;124:3;
133:25;157:25;158:3;
160:5;165:20;171:21;
177:15,20;178:15;188:16;
199:21;202:8
**regularly (4)**
14:18;60:9;110:17;
179:2
**Reinhart (55)**
6:3,10,22;139:11,24;
142:2;152:14,22;153:1,7,
20,21;154:2,11,20;155:11,

18;156:3,5;157:3,4,18,19,
25;158:7,7,13;159:6,8;
160:4,16,21,23;161:18,24;
162:16;163:2,7,19,24,25;
164:13,20,25;165:7,12,16,
20;201:5,10,18,24;202:4,
5,20
**reject (1)**
175:15
**relate (3)**
31:3,12,24
**related (8)**
27:1,9,17;45:16;66:14;
103:12;126:5;152:4
**relating (12)**
26:13;70:11;80:4;81:8;
98:18;105:10,12;111:24;
124:5;134:9;177:4;196:12
**relation (1)**
177:14
**relationship (20)**
7:4;14:15;15:14,20;
23:21,24;24:25;25:4,25;
46:22;51:16,17;88:24;
118:23;121:1;138:2,4,5,
14;139:6
**relationships (5)**
53:10;121:1;141:18,19;
177:22
**relatively (1)**
83:3
**relay (1)**
193:20
**release (2)**
57:10;136:6
**remaining (1)**
75:24
**remember (191)**
10:1;11:15,17;17:22;
19:2;24:13;26:19,20;27:8,
24;28:12,19;30:10;31:7;
33:3,5,17;34:10,14,24,25;
35:3,8,21,23,25;36:7;38:3;
39:3,4,6,7,8,12,12,14,18;
40:2;43:23;46:5,13;47:11,
15,20;49:7,14;52:2,4;53:4,
16;56:19;57:2,21;58:17,
19,21,23;59:2,3;60:25;
61:5,9,17;63:15;64:4,10,
13;69:17;74:17;76:3,6,20;
77:9;80:15,25;81:7;82:14;
83:7,20;84:20,24;85:1;
89:6;92:17,19;94:24;95:4,
25;96:10;98:20;100:5,11;
101:18;102:1;103:22;
104:22;105:4,9,19;107:12,
15,21,22;108:1,5;109:8,
18,19;112:10,14,14,22;
118:23;120:7,13;124:8;
125:9,9;126:4,5,13,18;
128:25;129:2;130:12,15;
131:22;133:6,20;134:3,5;
135:4,5,6;137:3;139:14;

145:19;150:20,25;152:17;
154:1,7;155:9,10;157:5,7;
161:21;166:17,25;168:17;
169:12,13,20;172:16;
173:11;176:13;185:11,16,
22;186:4,7,10,14;189:10,
16,17,22,25;190:2,23,24,
25;191:9,12,22;192:7,11;
196:19,19;197:2,5;199:8,
9,12,16,18;200:4,14;
202:6,7,12
**remembered (2)**
62:20;120:12
**reminded (1)**
40:7
**rent (6)**
87:24;116:12,17;
148:25;149:2,13
**rental (1)**
130:25
**rent's (1)**
149:1
**Repeat (3)**
25:14;43:19;80:12
**repeated (1)**
52:5
**repeatedly (1)**
95:22
**repeating (1)**
52:3
**reporter (1)**
157:15
**represent (2)**
6:7;139:4
**representation (2)**
185:3;195:4
**representative (2)**
47:17;48:12
**represented (8)**
6:3,10,23;29:14;95:4;
102:20;194:24;195:22
**representing (5)**
85:12;97:22;98:5,8,11
**request (2)**
111:5;155:19
**requested (2)**
111:1;200:11
**require (8)**
12:2;29:6;65:7;158:17,
20;171:25;172:2;174:11
**rescind (2)**
171:9,18
**reserved (1)**
16:4
**resort (1)**
133:14
**resources (1)**
146:7
**respect (6)**
19:3;25:6;39:4;45:25;
46:7;201:25
**respond (3)**
136:13;182:19;199:14

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 69 of 75

Stacy L. Randall v                                                                                  Justin Randall
Reed C. Widen, et al.                                                                            October 25, 2023

**responded (2)**
42:17;190:25
**responding (1)**
191:7
**response (1)**
199:18
**responsibilities (6)**
122:4,9,10,13,17;123:1
**responsibility (4)**
119:7,11;121:18;140:7
**rest (3)**
40:18;82:13;182:6
**restate (1)**
44:19
**restraints (1)**
103:11
**retain (1)**
6:7
**retire (3)**
41:11,18;64:12
**retired (1)**
41:14
**retirement (1)**
41:5
**retract (1)**
106:13
**reveal (1)**
201:8
**revenue (7)**
166:20,24;167:14,25;
168:5;189:6,15
**revenues (4)**
100:4;113:13;167:8,9
**review (11)**
29:3,18;85:14,20;86:3;
96:25;110:25;132:11;
187:15,23;188:11
**reviewed (9)**
28:21;31:2,2,11,23;
65:1;110:17;132:1;199:21
**reviewing (1)**
80:9
**right (146)**
4:19;6:20;7:2,24;11:1;
12:10,23,25;13:16;15:13,
18;18:17;23:12,13;26:17;
27:21;32:3;33:6,21;36:19;
38:12;40:7,14;42:12;43:6;
45:5,16;46:20;49:1;52:12;
55:5,15;56:23;61:10;62:7;
63:12,18;65:19;67:9,13,
15,16;78:12,18;79:6,10,
15,16;81:11;82:12;83:12;
89:10,14,21,24;90:5;
92:24;93:14,16;94:1;
97:19;100:10,18;102:12;
104:20;109:17;112:24;
113:22;114:9,19;116:2,3,
15,25;117:19,23;119:19;
120:22;122:13;123:10;
126:17,23;127:2,6,17,17;
134:6,12,18;135:3;
138:13;139:18;140:15;

141:22;142:4,23;144:23,
25;145:10;146:1,3,9,17,
19,20;148:4,5,9,9,18;
149:1,4,5;151:5,13;152:6,
7,23;154:1;160:18,19,19;
164:17;166:5,17,20;
169:15,25,25;170:18,20,
24;173:16;176:3,15;
178:6,23;180:4;184:17;
185:12;194:5,16;196:3;
197:3;198:4;200:21
**rip (1)**
171:22
**Road (2)**
5:24;55:7
**rock (2)**
127:9;156:21
**Rod (4)**
70:14,22;71:25;133:1
**role (3)**
21:7,11,12
**room (1)**
202:2
**route (4)**
138:24;142:7,8;151:7
**ruffle (1)**
176:20
**ruffling (1)**
27:5
**ruin (1)**
138:2
**rules (2)**
9:16;122:20
**run (2)**
114:9;168:25
**running (1)**
87:19;115:10
**RV (1)**
173:11
**Ryan (6)**
70:14;71:14,17,24;
133:1;134:3

**S**

**sake (1)**
154:4
**sale (38)**
45:17,22,23;46:3,10;
49:24;55:16,19;56:5,6,12,
14;57:14;58:20;60:25;
61:23;64:15;74:1,2;
101:20;105:16;109:1;
120:3;121:10;131:10,16,
18;133:17,21;135:9,10;
136:25;137:5,11,15,21;
169:25;196:14
**sales (5)**
74:3,14;113:15;189:6,
15
**Sally (1)**
34:25
**same (47)**

8:24;12:17,18;15:4,24;
17:5;21:14;25:10,17;52:6,
7,18;55:6;62:16;63:23;
64:7;67:21;71:10;85:10;
94:9;97:3;116:4;122:11,
24;123:8;126:6;130:9;
131:14;151:24;155:21,22;
160:7,8;161:12,12;162:20,
20;164:8;166:13;171:6;
173:4,9;174:1,4;180:19,
19;183:12
**sat (1)**
153:3
**saw (3)**
65:17;148:13;193:8
**saying (38)**
8:6;30:10;36:20;51:23;
53:1;54:11,22;57:2;58:21;
61:6,6;62:4;63:11,15;
64:13;83:1,2,25;84:25;
87:8;95:5;96:18;98:22;
103:23;104:23;119:18,21;
120:13;126:20;133:20;
154:7;170:4;171:16;
177:18;191:7,18;196:19;
198:25
**scenario (1)**
71:17
**Scharpf (1)**
72:1
**scheduled (1)**
152:23
**schickt (1)**
16:21
**school (1)**
178:21
**science (1)**
5:9
**scope (1)**
162:7
**Scott (27)**
85:9,10;94:22;96:9,13;
98:4,6,11,14,17;104:20;
183:12,14,23;184:2,7;
185:19,25;193:18;194:11,
16,16,23;195:5;198:9,12,
15
**Scott's (1)**
194:12
**screaming (1)**
88:6
**second (10)**
11:6;15:22;38:15;50:4;
90:9,14;118:24;157:3;
170:20;176:9
**secondly (1)**
90:9
**seeing (2)**
28:17;126:21
**seeking (1)**
199:12
**seeks (1)**
171:9

**seem (2)**
25:6;127:16
**seemed (2)**
48:11;147:10
**seems (3)**
104:13;109:14;149:3
**sees (1)**
179:2
**Seid (15)**
85:9;98:4,11,17;183:12,
14,23;184:2,7;185:16,19,
25;194:16;198:9,12
**Seid's (2)**
194:23;195:5
**sell (35)**
37:22;39:11;43:17;44:7,
16,22;45:3,8;55:4;58:18;
60:9,18;62:4,23;63:9,11;
64:20;65:25;66:9,18,24;
71:18;81:20;82:4;86:22,
23;87:25;88:14;89:3,8,12;
90:4;117:18;120:5;156:9
**selling (41)**
32:7,15,23;33:10;46:16;
48:2;49:8,11,11;50:10,15;
53:22;54:23;57:1;58:6,7,
8;60:18;62:22;64:19;
65:24;66:17;67:2;68:2,6,
16,21;69:1,22;70:12;
71:11,23;75:5,24;86:3;
97:24;111:25;116:22;
143:13;182:15;183:2
**semi-annual (1)**
121:20
**sending (3)**
106:12,24;107:9
**sense (5)**
81:22;82:20;83:1;84:21,
23
**sent (8)**
107:14,23,24;108:2,3;
186:2;190:7;193:13
**separate (3)**
10:24;22:13;85:2
**September (10)**
31:20;59:11,20;132:3,
23;134:7;137:11,15;
169:24;170:3
**serving (1)**
29:21
**setting (1)**
57:13
**seven (2)**
73:8;93:14
**share (5)**
74:9,14;100:13;136:25;
153:10
**shared (3)**
48:19;157:18;159:9
**shareholder (17)**
12:10,12;13:11,15,21;
14:5,11;117:16;121:19;
128:7;135:10;139:18;

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 70 of 75

Stacy L. Randall v                                                    Justin Randall
Reed C. Widen, et al.                                            October 25, 2023

145:25;146:4,8,21,24
**shareholders (9)**
28:8;121:16,24;122:18,
22;146:23;147:1,2,8
**shares (7)**
74:5;83:5;97:8,14,16,
17,24
**Sharpf (1)**
70:15
**sheet (1)**
100:8
**shit (1)**
78:16
**shocked (1)**
58:20
**short (6)**
67:9;87:25;117:20;
131:10,15;147:13
**shortly (1)**
136:6
**shortness (1)**
131:18
**shot (1)**
19:5
**shoulder (1)**
53:12
**shoulders (1)**
140:8
**show (4)**
93:8;192:17;196:15,17
**showed (3)**
25:8,12;192:13
**showing (1)**
93:9
**shown (1)**
181:16
**shut (1)**
76:9
**side (2)**
23:16,17
**sides (1)**
51:18
**siding (1)**
77:3
**sign (21)**
31:13;57:9;59:15;
78:23;83:12;92:23;
104:24;112:13;114:3;
115:9;136:5;177:16;
183:17;184:22;185:13;
187:22;190:12;191:5,14;
198:24;199:6
**signature (1)**
59:16
**signed (26)**
6:8,12,15;30:11,17,20,
23;31:20;32:1;62:3,8;
132:2;171:10,23;174:9;
183:24;184:6,13,24;
187:2;188:12,12;191:24;
192:5,8,14
**significance (1)**
176:5

**significant (1)**
97:11
**signing (9)**
30:10;68:16;106:25;
108:24;109:3;155:12;
176:4,16;192:5
**signs (2)**
187:12,16
**silver (4)**
89:12;174:20;175:1,2
**similar (4)**
52:7,17;54:16;139:17
**Simon (2)**
70:14;71:25
**simpler (1)**
71:2
**simplify (1)**
71:20
**single (1)**
130:25
**sister (3)**
9:25;10:2;34:25
**sit (15)**
33:8;36:14,14;38:4;
43:15,19;44:5;48:4;54:6;
64:17;80:23,25;107:13;
174:21;198:11
**sitting (9)**
35:7;36:9;47:21;52:4,
19;53:1;168:18,19;169:11
**situation (23)**
27:20;51:19;52:18;
53:18;67:23;72:19;77:1,9;
78:8,8,9;91:2;123:2;
135:1;142:17;143:10;
144:25;145:20;148:2,19;
178:5;196:20;197:12
**situations (1)**
142:21
**six (2)**
153:4;164:12
**size (2)**
113:16;186:21
**ski (1)**
20:14
**slash (1)**
59:12
**small (7)**
13:22;56:25;83:3;87:5;
113:19,21;149:5
**smooth (1)**
127:11
**Social (1)**
7:19
**socialize (2)**
181:13;197:9
**socialized (2)**
180:22;181:8
**software (6)**
37:20;69:10,16;99:4;
100:9;117:10
**sold (26)**
32:10,13,20;38:24;44:2;

46:2,9,11;49:4;57:3;63:5,
5;72:8;73:5,11,19;74:22;
75:17;90:3,7,18;97:13,16;
132:18,23;175:7
**solicitation (3)**
41:23;42:17,21
**solicitations (7)**
40:10;52:22;53:3,6;
60:9;67:4;117:9
**soliciting (1)**
42:9
**somebody (5)**
8:21;50:16;89:15;
90:17;91:7
**somehow (2)**
50:17;196:18
**someone (16)**
15:22;24:4;25:21;
68:12;86:9;87:14;91:9,17,
24;100:25;102:3;103:2;
179:6,7;187:15;188:7
**someone's (1)**
178:4
**Sometime (2)**
99:11;170:7
**sometimes (3)**
24:22;167:9
**somewhat (3)**
27:15;128:8;130:13
**somewhere (4)**
41:17;55:7;81:2;127:3
**son (4)**
69:10;88:17;142:20;
176:9
**soon (4)**
41:19;56:23;58:10;
133:24
**sorry (29)**
22:23;25:14,20;43:19;
45:20;56:3;66:3;70:16;
93:12;101:21;103:10;
111:14;113:5;143:22;
156:16;157:10;165:2,5;
175:18;181:18;182:9;
183:8;185:17;186:8;
188:18,22;189:20;190:18;
202:14
**sort (3)**
16:20,23;191:12
**sounded (3)**
52:15,17;86:15
**sounds (3)**
51:6;52:7;94:17
**South (6)**
18:12,25;19:3,13,25;
22:2
**space (1)**
115:5
**speak (4)**
84:6,11;85:4;92:13
**speaking (1)**
19:7
**specific (37)**

8:18,25;9:2;26:20;
28:19;35:21;38:7;41:15;
46:21,25;47:11,14;53:4;
69:12,17;77:13;78:13,13;
100:5,8;103:22;106:4;
124:15;126:2,4;129:7;
151:1;152:18;159:23;
162:12;178:3;182:24;
185:23,23;186:10;190:4;
192:7
**specifically (56)**
4:12;12:11;17:22;
28:13;33:3;35:8;36:22;
38:21;39:9;43:15,24;
47:20;52:23;56:18;61:5;
63:6,8;64:17,23;66:6,8;
75:22;76:4,5,23;78:7;
84:24;85:1;86:19;91:2,9,
23;95:5;98:13;103:23;
105:19;107:21;112:1;
129:15;133:20;134:4;
143:18;151:3;154:1,5,14;
160:3;161:14;166:25;
176:13;187:19;189:10,17;
194:2,9;196:19
**specifics (20)**
10:6;38:1,3;64:10;79:9;
108:4;115:15;134:5;
159:15,19,21;161:22;
162:22;163:1,20,21;
164:14,17;165:9;201:23
**speculating (1)**
98:1
**speculation (15)**
78:3;79:4;97:2;115:2,
14;117:2;144:14;145:5,
15;148:7,16,22;149:9;
151:15;152:3
**speed (2)**
123:2,6
**speeding (2)**
195:9,20
**spell (1)**
99:16
**spend (1)**
116:11
**spends (1)**
172:25
**spent (4)**
22:3;53:25;170:16;
173:2
**spoke (4)**
6:22;21:16;98:17;
192:11
**spoken (7)**
15:8;32:14;39:14;85:2;
196:12;198:12,19
**Stacy (15)**
7:1;28:1;57:3,8;73:22;
117:16;134:20;135:7,13;
136:4;137:5;151:9;201:6,
10;202:5
**Stacy's (1)**

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 71 of 75

Stacy L. Randall v                                                                    Justin Randall
Reed C. Widen, et al.                                                              October 25, 2023

29:21
**stake (4)**
    88:15;141:13,14;147:6
**stakeholders (2)**
    121:24;147:2
**stand (1)**
    36:13
**standing (1)**
    36:9
**start (1)**
    78:15
**started (4)**
    6:17;125:18;172:22;
    197:9
**starting (2)**
    134:14;178:21
**state (5)**
    4:8;176:3,15;177:10;
    197:3
**statement (5)**
    37:3,4;60:13;150:22;
    185:1
**statements (2)**
    179:16;201:8
**stating (1)**
    186:5
**staying (1)**
    69:2
**stemmed (1)**
    177:24
**stick (1)**
    28:4
**sticking (1)**
    176:10
**still (2)**
    57:22;106:10
**stint (1)**
    11:6
**stock (51)**
    32:10,11,21;72:7;73:5,
    12,20;74:1,3,23;75:6,10,
    14,18,24;81:20;82:5;
    86:22,23;88:1;90:3,18;
    94:10;97:3;102:12;
    105:16;111:25;113:2,23;
    117:5,18;143:14;155:8;
    171:9,22;172:8;174:8;
    182:15;183:3,17;184:23;
    187:11,15,20,25;188:11;
    192:18;193:2,3;196:14;
    198:23
**stood (1)**
    15:21
**stop (1)**
    190:21
**stopping (1)**
    145:1
**story (5)**
    4:24;52:6;109:16;
    139:9;147:13
**street (3)**
    22:14;116:1;197:3
**strengths (1)**

154:18
**stress (3)**
    87:16;141:18;176:19
**stressed (4)**
    87:16;103:19,21;104:11
**stressful (1)**
    87:6
**strike (2)**
    25:20;165:25
**strong (1)**
    9:4
**strong-willed (1)**
    8:2
**structure (4)**
    95:6;108:8,10;187:2
**structured (1)**
    84:4
**structuring (2)**
    186:22;187:6
**struggling (1)**
    163:3
**stubborn (1)**
    8:11
**stuck (2)**
    105:2;114:8
**stuff (20)**
    6:15;27:10,14,24,25;
    28:5,18;98:9;107:20;
    118:10;124:8;125:18;
    134:13,23;156:6;158:3;
    159:16;167:10;168:24;
    173:8
**Stuke (2)**
    99:15;109:22
**S-t-u-k-e (1)**
    99:17
**subject (12)**
    46:16;49:24;68:16,20,
    25;69:7;70:11;107:15,18;
    162:19;182:15,21
**substance (1)**
    153:12
**success (1)**
    147:22
**successful (1)**
    22:20
**successfully (1)**
    57:17
**succession (4)**
    37:19;40:13;69:7,13
**sue (6)**
    137:13,22;151:4,12,23;
    152:1
**sued (1)**
    169:7
**suggest (20)**
    85:3,13,21;88:7;89:3,8,
    12,14;90:16;91:6,11,25;
    92:4,8,11;111:4;121:8;
    127:23;187:1,14
**suggested (4)**
    91:11,17;94:12;141:20
**suggesting (1)**

95:21
**suggestion (1)**
    90:25
**suggestions (4)**
    75:21;83:22;89:23;
    187:5
**sum (4)**
    40:17;57:16;77:17;
    133:23
**summary (1)**
    59:9
**summer (5)**
    20:12;50:23;169:9,13;
    170:6
**sums (4)**
    37:23;38:17;53:3,7
**Sunday (2)**
    28:1,2
**sunset (1)**
    40:16
**super (1)**
    156:12
**support (1)**
    59:8
**suppose (1)**
    145:16
**supposed (1)**
    175:25
**Sure (31)**
    8:3;16:15;21:11;27:18;
    30:3,6,20,25;32:8;33:7;
    46:13;49:20;57:24;72:22;
    78:11;91:5;95:20;104:2;
    105:20;108:16,19;110:19;
    115:20;131:16;143:25;
    158:25;175:9;178:9;
    187:21;192:17;194:21
**surgery (1)**
    30:11
**surprise (1)**
    191:10
**SUV (1)**
    173:20
**sway (2)**
    8:15,22
**swing (2)**
    108:13;186:22
**sworn (1)**
    4:3
**symptoms (1)**
    88:6
**system (1)**
    151:16

─────────────

**T**

**table (2)**
    125:1;189:13
**talk (49)**
    6:12;11:1;13:2,5;14:17;
    33:18;41:4;48:1;83:25;
    84:13;95:3;102:19;108:7;
    114:14;121:21;124:24;

138:1;140:15;146:23;
    149:24;161:21;162:12;
    163:1,19,21;164:14;
    165:9;167:5,7;182:7,11,
    21,22;183:2,10,11,14;
    184:3;185:7,24;186:20;
    187:21;188:2,24;191:3;
    193:21;194:13;201:22;
    202:10
**talked (30)**
    6:13;36:18;42:8;46:24;
    47:6;52:20;55:19;60:10;
    71:17;95:18;98:2;100:20;
    103:2;108:17,21;119:5;
    128:10,14;133:7;134:22;
    142:3;182:14;183:22;
    184:3,15;185:16,18;
    189:5;197:18;201:18
**talking (49)**
    19:20;27:9;28:7;36:12;
    42:2;53:20,21,21;56:13,
    14;66:23;67:10;71:15;
    72:3,18;85:6,8,18,25;
    86:15;87:14;91:1,12,22;
    101:23;109:21;115:3,3;
    124:25;127:7;130:7;
    132:2,9;134:5;143:9,18;
    145:19;158:2;160:12,13;
    163:14,14;168:20;185:3;
    189:13;192:4;200:6,16;
    202:8
**talks (1)**
    12:7
**target (2)**
    41:13;47:5
**task (1)**
    141:10
**taught (1)**
    24:5
**tax (24)**
    83:25;84:2,6,11,14;
    85:2;91:22;95:5,10;
    102:19;103:2;107:6,25,
    25;108:6,8,18;186:7,12,
    17,19,20,22;193:14
**taxed (2)**
    84:22;108:9,11
**taxes (5)**
    39:1;84:17,25;97:20;
    108:13
**team (2)**
    139:10;153:7
**telephone (1)**
    52:24
**telling (40)**
    35:19;44:6;45:7;52:24;
    58:19,23;60:25;64:18;
    70:1;78:24;79:5,23;81:1,
    8;83:7;85:1;94:13;102:2,
    8;104:9;107:13;108:5;
    112:15;115:11;119:23;
    120:8;129:14;146:9;
    154:2;155:10,23;156:2,4;

157:8;161:11,14,21;
162:18,22;193:5
**tells (3)**
121:19;181:25;193:14
**ten (6)**
18:16,21;40:20;54:24;
67:12;178:19
**terminated (4)**
11:2,4,9;30:24
**terrible (1)**
51:19
**testified (8)**
4:3;29:13;91:15;94:12;
124:1;163:23;165:24;
176:1
**testify (1)**
92:10
**testimony (28)**
61:2;62:2,14;64:9;
72:16;79:3,8;95:20;96:2,
5;119:25;120:10;124:8;
141:24;142:14,15;146:12;
150:16;159:12;161:2;
163:3,8,10;164:3,7;166:8;
193:7;203:1
**texted (11)**
27:3,3,7;51:14,23;52:1;
54:5;76:7;128:21;186:8;
194:5
**texting (3)**
83:15;104:22;142:17
**there'd (1)**
152:23
**thin (1)**
109:17
**thinking (12)**
26:18;35:7;76:19;
82:21;84:20;119:10;
120:2;125:16;163:15;
174:6;178:20;189:20
**third (5)**
157:5,8,11,23;161:6
**though (11)**
32:1;34:13;42:1;72:22;
97:11;101:10;105:24;
127:9;131:16;134:6;172:4
**thought (29)**
9:4;82:16;84:10;85:16,
17,25;88:22;122:1;128:3,
14,17;129:10;147:10,10,
12;153:22,23;157:20;
160:12;161:8,9;166:2,9;
175:14,22,24;184:1;
185:5;193:16
**thousand (13)**
20:17;76:12;77:5,5,22;
97:14,16,18;102:11;
108:13;114:10;116:17;
156:13
**thousands (1)**
186:24
**three (8)**
6:9;23:16;61:17;77:6;

118:3,15;157:1,17
**throughout (1)**
133:16
**throw (1)**
38:12
**thrown (9)**
44:10;45:14;46:6;
61:11;63:3,19,22;66:12,22
**ticket (2)**
195:9,20
**tie (1)**
147:24
**tight (1)**
92:20
**Tim (6)**
70:14;71:25;72:21;
196:5,8,15
**timeline (3)**
92:20;128:24;191:23
**times (26)**
7:11,14;8:15;17:18;
18:15,21,23;20:12;22:1,6;
27:9,16;33:1,4;46:20,24;
49:23;69:9,18;87:11,21;
117:6,21;119:2;170:24;
195:21
**timing (5)**
32:9;53:17;94:15;
120:2;163:13
**title (4)**
12:12;13:10;99:24,24
**titles (1)**
13:4
**T-o (1)**
181:23
**today (30)**
6:5;11:21;13:8;33:8;
38:4;43:15,19;44:5,14,21;
47:21;48:4;54:6;55:15;
60:11,22,25;64:18;67:4,5,
6;80:25;107:14;112:5;
124:1;163:6;165:24;
167:16;174:21;198:11
**today's (1)**
63:6
**Todd (2)**
196:5,9
**together (8)**
19:25;24:21;55:18;
69:19;147:24;181:8,13;
198:21
**told (154)**
31:1;40:4;43:16;44:15,
21;47:12;48:25;49:4;50:2,
16,25;51:1,4,7;52:7,11;
53:15;55:4;58:9;60:4,8,
17,22;61:13,21;63:1,10;
65:14;69:5;70:8;76:18;
77:21;78:17;79:18,21,23;
80:14,15;81:17,19;84:10,
10;86:25;90:1;93:24;
95:17,22,23;99:12;
100:20;101:5;102:4,8;

105:10;106:1;111:12,23;
112:4,5,17;117:15;118:3,
15;119:1;122:2,8;129:4,9,
16;133:3;135:4,12;136:7,
8,10,12,14,19;137:5,8,9;
139:9;144:3;153:20,21;
154:3,5,12,15,16,19,19,20;
155:17;156:3,4,14,15,16;
157:1,3,4,18,19,24,25;
159:13;160:4,11,11,15,16,
16,17,21,22,23,23;161:7,7,
23,24;162:15,15,16,17;
163:5,6,7,18,24,24,25;
164:6,13,20,25;165:11,12,
15,16,19;174:6,16;182:1,
7;185:7;193:15;194:4,7,8;
200:10;201:4;202:5
**Tom (1)**
195:6
**tomorrow (1)**
102:25
**ton (4)**
46:25;53:25;100:12;
170:16
**tone (2)**
63:24;126:6
**tones (1)**
125:21
**took (2)**
26:10,10
**top (4)**
7:22;16:3;133:18;196:3
**topic (16)**
8:21;22:18;36:17,20;
37:1;47:19;105:15;107:2,
3,6,24;108:18;125:11;
157:8,11;161:11
**topics (2)**
157:17;193:25
**torn (1)**
138:7
**total (1)**
23:18
**totally (4)**
14:19;30:9;110:15;
171:19
**tough (8)**
18:20;53:9;77:12;87:3;
115:23;144:25;178:5;
196:20
**traded (1)**
14:7
**trade-in (1)**
126:8
**transaction (23)**
73:24;74:20;85:5,15,23;
86:12,18;91:8,19;92:1,7,
23;94:20;96:21,23;97:4,7;
98:12,18;101:15;106:2;
109:24;111:7
**transactions (2)**
37:6;75:1,17
**TRANSCRIPT (3)**

4:1;28:22;161:5
**transparency (1)**
126:10
**traveling (1)**
18:2
**treated (1)**
153:24
**treatment (1)**
28:7
**treats (1)**
73:23
**tried (3)**
94:5;120:24;182:5
**trip (3)**
18:25;22:2;173:11
**trips (8)**
17:15,21,24;18:13;19:3,
8,14;170:21
**trouble (1)**
156:17
**truck (2)**
134:2;136:2
**true (6)**
59:19;60:13;61:25;
81:5;91:20;156:19
**trust (4)**
57:17;138:3,5,15
**trusting (1)**
137:19
**truth (1)**
138:23
**try (8)**
53:8;76:14;77:15;
86:11;89:14;94:2;150:24;
191:16
**trying (16)**
7:20;27:2;56:10,10;
96:22;104:20;128:15;
134:23;137:3;143:14;
157:14,15;162:14;173:15;
184:4;185:11
**turn (1)**
182:8
**turned (1)**
169:17
**Twelve (1)**
5:16
**twenties (1)**
24:14
**twisting (1)**
63:14
**Two (24)**
5:22;6:8,19;10:24;
15:12;31:23;50:2;51:7;
53:10;54:23;55:6;58:13;
77:4;81:2;90:5;104:17;
136:21;138:12;140:1,4,
18;141:12;183:23;196:3
**type (10)**
20:13;33:1;91:1;
127:22;130:22,25;153:19;
173:17;190:16;196:6
**types (3)**

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 73 of 75

Stacy L. Randall v                                                          Justin Randall
Reed C. Widen, et al.                                                  October 25, 2023

17:2;20:15;153:15
**Typical (1)**
   180:3
**typically (2)**
   100:4;109:23
**typo (1)**
   182:2

## U

**ultimately (4)**
   141:21;184:23;187:2;
   192:8
**uncle (4)**
   15:18;23:17;151:4,13
**uncles (2)**
   23:15,20
**uncomfortable (2)**
   197:8;198:23
**under (10)**
   59:18;83:10;87:15;
   163:5;174:8;176:2,12,18;
   181:22;189:23
**understood (3)**
   41:1;97:23;185:2
**unfair (2)**
   127:24;128:4
**unfortunately (3)**
   14:16;191:14;197:17
**unhappy (1)**
   75:13
**unit (1)**
   115:22
**unlike (1)**
   15:23
**unstable (1)**
   168:23
**untrue (1)**
   94:14
**up (57)**
   15:21;18:23;19:25;24:4,
   11;36:13,14;38:25;39:8;
   40:9,12;41:22;42:4,21;
   43:1;44:25;52:2;53:24,25;
   56:13;57:13,22;69:15,24;
   77:7;93:5,8;95:8;102:7;
   103:18;104:18;105:25;
   108:16;109:21;116:18;
   123:2,6;133:9;136:2,3,24;
   139:24;141:10;145:22;
   153:18;157:23;168:19;
   169:10;171:22;176:22;
   177:25;182:4;190:10;
   196:18,18;198:6;199:16
**updates (4)**
   121:20,20;146:24;167:5
**upgrade (1)**
   77:4
**upgrades (1)**
   77:2
**Upper (1)**
   132:19
**ups (1)**

177:3
**upset (4)**
   26:22;27:6,15;120:16
**usage (1)**
   46:5
**use (9)**
   8:4;16:8;19:17,22;20:1,
   5;38:21;69:16;161:6
**used (17)**
   14:17;20:8;39:6,13;
   43:24;45:2;46:8;53:4;
   55:2;75:4;98:15;109:20;
   112:16;126:19;172:21;
   194:25;195:4
**using (6)**
   45:11;54:18;61:9;88:8,
   8;148:24
**usually (2)**
   145:10;146:18

## V

**vacations (1)**
   173:7
**valid (1)**
   154:9
**valuation (4)**
   143:13,17,21;144:2
**value (10)**
   10:15;68:3;82:18;
   109:8;121:23;125:5;
   128:8;146:21;147:3;
   154:25
**valued (1)**
   99:5
**Van (3)**
   6:4,10,23
**varied (1)**
   7:5
**vehicle (4)**
   19:23;20:2,5;173:17
**vehicles (2)**
   19:17;173:7
**venture (1)**
   18:16
**versus (4)**
   28:8;77:17;124:6;
   128:16
**Via (1)**
   91:1
**vicinity (3)**
   35:12,17;167:19
**view (1)**
   68:1
**virtually (2)**
   19:14;164:4
**visit (2)**
   60:7,17
**visited (2)**
   22:6;60:2
**voicemail (1)**
   43:1
**void (1)**

171:22
**volume (1)**
   189:15

## W

**wait (1)**
   82:25
**waive (2)**
   162:5,7
**waived (1)**
   159:2
**walk (18)**
   37:22;38:8,13,14,14,16;
   39:7,10,19;40:16;41:11;
   44:1,13;45:1;63:16;64:11;
   67:7,10
**Waller's (1)**
   34:25
**water (2)**
   17:10;200:19
**Waters (26)**
   11:20;12:16;13:3,14;
   32:21,24;33:11,16;44:16,
   17;73:6,12;74:4,23;75:6,
   18,25;90:2;109:5;111:19,
   20;182:16;188:17;199:22;
   200:1,12
**waving (1)**
   162:9
**way (25)**
   23:7;63:20;67:3;77:16;
   81:20;89:24;90:2;108:9,
   10;110:7,16,20;112:25;
   127:12;129:25;130:5;
   134:2;138:17;139:25;
   147:20,24,25;152:24;
   153:24;171:15
**ways (3)**
   167:1,11;186:22
**weaknesses (2)**
   154:12,15
**wealth (1)**
   108:21
**wedding (1)**
   15:21
**week (11)**
   6:8;15:12;17:23;35:23;
   92:24;93:3,6,11,12,14,15
**weekend (1)**
   133:16
**weekly (1)**
   167:4
**weeks (7)**
   6:9,11;31:23;32:2;
   105:12;106:25;132:6
**weren't (3)**
   66:6;142:11;178:1
**whatnot (1)**
   142:20
**What's (20)**
   4:16;5:8,19,23;14:13;
   16:13;31:8;77:16;80:5;

89:6,24;94:15;96:2;99:14;
   115:16;123:6;170:14;
   192:25;200:3,9
**Whenever (2)**
   123:17,17
**When's (3)**
   26:15;192:4,13
**whole (7)**
   7:8;65:12;67:20;86:4;
   112:8;133:16;149:13
**who's (3)**
   7:1;50:25;197:14
**Widen (161)**
   4:9,11,14;10:21;11:12;
   15:17,20;16:4,24;17:2;
   18:24;19:7,14,17;20:20;
   21:2,7,8,22;23:16,21,25;
   25:21;26:1,5,13,22;32:6,7,
   22,23;33:10,11,13;36:19;
   38:20;39:15;40:2,8;41:4;
   42:16,20;43:5,16;44:6,
   7,15,21,22;45:7,9,23,24;
   46:2,9,15,15,17;47:25;
   48:1,2,7,11,20;49:23,24;
   50:9,10;52:12;54:9,23,25;
   55:4,4,19,20;56:6;58:19,
   23;60:2,8,9,18,24;61:8,9,
   22;62:23;64:18,19;65:23,
   24;66:15,17;67:1,2;68:2,5,
   6,15,17,20,21,25;69:1,6,
   20,21;70:12,12,23;71:10,
   11,23,23;72:18,25;74:21;
   79:24;80:3;81:3,4,9,13;
   109:5;111:19,24;117:11;
   122:2;132:17;133:4,10;
   134:8;135:22;136:14;
   137:13;147:10,14;148:10;
   151:5,13;152:1,7;166:19,
   23;167:13,24;168:4,12;
   169:18,20;170:3,9;175:13,
   20;188:17;198:15;199:21;
   200:1,11
**Widens (1)**
   182:1
**Widen's (10)**
   16:1;20:8;22:3;24:15;
   46:18;48:16;50:5;52:16;
   68:1;127:19
**wife (69)**
   21:2,16;23:4,10;34:8,8,
   18,20;56:24;79:10;
   105:20;106:1;113:11;
   115:19;145:19;146:2;
   153:11,15;154:2,6,11,19;
   155:10,17,23;156:2,4;
   157:2,8,18,24;158:3,6,12;
   159:10,22;160:4,9,16,23;
   161:7,11,21,23;162:15,19,
   24;163:7,18,24;164:19,24;
   165:7,11,15,19;177:2;
   181:7,8,11;188:15;201:4,
   8,13,17,21,25;202:2,21
**wife's (2)**

5:19;181:11

**willing (5)**
77:25;102:9,11;142:9,
11

**win (2)**
23:5;196:23

**Windy (27)**
11:20;12:16;13:3,14;
32:21,24;33:11,16;44:16,
17,22;73:6,12;74:4,23;
75:6,18,25;90:2;109:5;
111:19,19;182:16;188:17;
199:22;200:1,12

**Winnequah (2)**
5:24;125:8

**winter (8)**
22:15;70:13;71:4,9,13,
24;133:1;181:2

**Wisconsin (1)**
5:24

**wish (1)**
138:19

**Within (9)**
6:19;40:22;58:13;81:2;
122:2;163:2;169:5,6;
201:23

**without (14)**
12:4;29:10;65:10;
77:16;78:13;96:24;
112:22;138:5;158:22;
162:9;172:5;174:14;
184:24;202:10

**WITNESS (8)**
66:3;113:4;165:5;
170:25;175:18;183:8;
188:21;190:18

**witnesses (1)**
203:1

**won (1)**
189:9

**word (7)**
7:15;16:8;24:24;54:15;
112:16;126:19;187:25

**word-for-word (1)**
164:4

**words (8)**
50:16;63:2;66:6,21;
75:20;98:16;161:6;190:21

**work (14)**
10:2;13:20;23:6;24:7;
37:5;78:5,15;83:14;
107:19;112:12;140:19;
167:5;188:25;189:13

**worked (5)**
21:2;99:25;146:2;
198:15,21

**working (8)**
88:21;90:22;94:21;
95:1;96:13;124:18;196:9,
10

**works (6)**
21:5;56:21;85:11;99:7;
113:11;144:16

**world (3)**
67:20,24;99:7

**worried (1)**
76:11

**worth (5)**
58:24;113:10;117:5;
131:4;156:11

**write (1)**
106:14

**written (9)**
29:25;30:4,8,16;106:8;
152:10,13,16,23

**wrong (7)**
63:13;78:16;164:6,9;
165:11,15,19

**wronged (2)**
137:24,25

**Y**

**ya (1)**
151:11

**year (18)**
5:5;15:2,8;22:15;35:10;
56:1;112:8;146:6;166:20,
24;167:14;168:1,5;
169:14,15;179:5,5;181:6

**years (47)**
5:14;6:19;7:5;11:13,13;
17:3,19;19:11,13,21,24;
20:8;26:1,5;27:7;38:2;
40:5,20;41:17;46:22;
48:24;54:24,24,24;63:20;
67:11,12;73:8,13;74:17,
18;77:6;125:16,17;
130:10;151:2;156:23;
169:6;170:18;178:1,18,
19;182:2;195:7,7;198:15;
200:2

**Yellow (1)**
140:10

**young (2)**
24:6,16

**0**

**07 (1)**
5:6

**08 (1)**
5:6

**09 (1)**
5:6

**1**

**1 (3)**
59:6,7;60:1

**1.3 (3)**
113:10,15;166:9

**10 (2)**
36:18,20

**100 (5)**
62:11,15,15,17;198:18

**12:16 (1)**
181:20

**13 (45)**
73:7;81:1;86:13,18;
92:2,6,24;93:11;94:3,16;
95:22;98:25;101:23;
102:1,16;105:12,18;106:2,
6;107:1;109:4;112:9,24;
118:2;121:8;129:9;
155:13;166:22;167:12,17,
24;168:3,7;171:10,23;
174:9;183:18;184:19,24;
188:12,16;190:7;191:25;
193:13;199:5

**13th (2)**
93:1;199:9

**15 (4)**
36:18,20;63:18;178:19

**150 (1)**
77:5

**162 (2)**
56:15;133:22

**2**

**2 (5)**
59:12,18;60:1;181:15,
16

**20 (8)**
74:9;82:19;108:10;
117:6;125:17;174:5;
178:19;186:23

**2012 (1)**
181:19

**2013 (1)**
93:11

**2015 (1)**
9:20

**2019 (4)**
176:2,7,11;189:19

**2020 (140)**
32:5,9,20;33:2,9,20;
34:5,19;42:15,19;43:6,17;
44:7,15,21;45:8;46:17;
47:9,23;48:5,16,25;49:13,
16;56:2;60:2;61:9;62:22;
64:18;65:23;66:16,25;
68:5,14,19,24;69:4,20,25;
70:1,13;71:12,19;72:4,7,
14;73:1,3,7,13;74:2,22,25;
75:4,8,12,18,25;78:22;
80:6,7;81:1;86:13,18;
90:19;92:2,6;93:10,11;
94:3,10,16;95:22;98:25;
101:24;102:1,17;103:18;
105:12,18;106:2,7;107:1;
109:4;111:6,25;112:6,8,9,
25;113:9,24;115:8;118:2;
119:23;120:7;121:9;
128:11;129:9,16;137:9;
142:12,22;144:5;145:2;
147:15;150:3;155:13;
166:3,22;167:12,17,24;

168:4,6,7;171:10,23;
172:9,23;173:3;174:3,9;
181:20;182:16;183:3,18;
184:19,24;185:25;187:3;
188:12,16;189:18;190:7;
191:25;193:13;196:14;
197:18;199:5

**2021 (6)**
31:21;134:7;137:11,15;
170:3,6

**2022 (6)**
30:19;51:4,13;54:8,20;
153:2

**2023 (2)**
59:11,20

**20-ish (2)**
82:19;125:16

**20th (1)**
31:20

**21 (2)**
153:2;169:25

**22 (1)**
50:24

**225-9882 (1)**
181:24

**25,000 (1)**
172:20

**26th (3)**
176:2,7,11

**29 (2)**
59:11,20

**3**

**3 (3)**
60:7;190:5,6

**3:54 (1)**
203:2

**3:56 (3)**
190:8,16;191:17

**30 (4)**
117:6,21;146:5;167:19

**31st (1)**
30:19

**4**

**4 (4)**
60:16;193:11,12;198:8

**4:28 (1)**
193:13

**4:30 (6)**
190:12,17;191:18,22,
25;192:11

**40 (2)**
108:11;186:23

**43 (1)**
46:22

**5**

**50 (15)**
38:13,21;39:6,7,12;

Case: 3:22-cv-00400-jdp   Document #: 101   Filed: 11/09/23   Page 75 of 75
Stacy L. Randall v
Reed C. Widen, et al.

Justin Randall
October 25, 2023

43:23;44:10;45:15;62:10;
64:10,11;77:17,24;129:5;
156:8
**50,000 (3)**
81:18;82:17;83:4
**53706 (1)**
5:24
**5907 (1)**
5:24

## 6

**6 (3)**
93:11;181:19;184:18
**65 (1)**
41:17
**6th (4)**
92:21;93:1;103:17;
199:11
**6th/13th (1)**
186:13

## 7

**7 (1)**
182:2
**70 (1)**
38:14

## 8

**8 (1)**
103:18
**80 (18)**
38:9,10,15;39:8,10,11,
12;44:10;45:15;62:9,10,
15;63:3,17,21;64:2;66:11;
68:9

## 9

**9-15-80 (1)**
4:17

**Colleen Reed Reporting LLC**
**414.322.3621**