# In the Matter Of:

*Stacy L. Randall v. Reed C. Widen, et al.*

---

*Corporate Rep of Widen Enterprises, LLC*

*November 06, 2023*



**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

**Page 1**

```
            UNITED STATES DISTRICT COURT

            WESTERN DISTRICT OF WISCONSIN

_____

STACY L. RANDALL,

              Plaintiff,

        -vs-                    Case No. 3:22-cv-00400-jdp

REED C. WIDEN, MICHAEL KIESLER,

WIDEN ENTERPRISES, LLC, and

WINDY WATERS, INC.,

              Defendants.

_____

        Video Deposition of MATTHEW R. GONNERING,

as the Corporate Representative of Widen Enterprises, LLC,

pursuant to Federal Rule of Civil Procedure Rule 30(b)(6),

taken at the instance of the Plaintiff, before

Peggy S. Christensen, RPR, CRR, a Notary Public in and

for the State of Wisconsin, at O'Neil, Cannon, Hollman,

DeJong & Laing S.C., 111 East Wisconsin Avenue, Suite 1400,

Milwaukee, Wisconsin, on November 6, 2023, commencing at

9:01 a.m. and concluding at 5:05 p.m.
```

**Page 2**

```
1               A P P E A R A N C E S
2
3   REINHART BOERNER VAN DEUREN S.C., by
        MS. JESSICA HUTSON POLAKOWSKI,
4       MR. DAVID G. PALAY, and
        MS. MONICA A. MARK,
5   22 East Mifflin Street, Suite 700,
    Madison, Wisconsin 53703,
6       appeared on behalf of the Plaintiff.
7
8   HOLLAND & KNIGHT LLP, by
        MR. MARK H. CHURCHILL,
9   1650 Tysons Boulevard, Suite 1700,
    Tysons, Virginia 22102,
10      appeared on behalf of the Defendants.
11
12  O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
        MR. DEAN P. LAING,
13  111 East Wisconsin Avenue, Suite 1400,
    Milwaukee, Wisconsin 53202,
14      appeared on behalf of the Defendants.
15
16  Also present:  Jon Hansen, CLVS, Videographer
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1               I N D E X
2   Examination:                                    Page
3   By Ms. Polakowski                                 6
4
5   Exhibits Identified:                            Page
6   Exhibit 1  Notice of Deposition                  24
7   Exhibit 2  11/6/2023 Notes regarding Topic 3     55
8   Exhibit 3  Grant Thornton report - Project      106
               Wildcat, Financial due diligence,
9              June 2021
10  Exhibit 4  11/3/2023 Notes regarding            139
               Windy Waters Topic 21
11
    Exhibit 5  7/22/2004 Valuation of              154
12             Windy Waters, Inc., prepared by
               Bruce Hutler, CFA, ASA, AVA,
13             Virchow Krause Valuation, LLC
14
    Exhibit 6  Widen 2008 Business Plan, prepared  157
15             by Matthew Gonnering
16  Exhibit 7  8/10/2018 Email from Matthew         171
               Gonnering to Reed Widen, Subject:
17             Operational Update, August 10
18  Exhibit 8  Widen Confidential Information       181
               Memorandum, prepared by Software
19             Equity Group
20  Exhibit 9  2/3/2018 Email from Matthew          187
               Gonnering to Reed Widen,
21             Subject: Operational Update, Feb 22
22  Exhibit 10 11/3/2023 Notes regarding            190
               Windy Waters Topic 11
23
    Exhibit 11 8/19/2020 Email from Matthew         192
24             Gonnering to Jeff Horein,
               Subject: Your expertise
25
```

**Page 4**

```
1   Exhibit 12 8/26/2020 Email from Reed Widen      203
               to Russ Wolff, forwarding the
2              8/25/2020 Email exchange between
               Matthew Gonnering and Reed Widen,
3              Subject:  Acquisition of BrandFolder
               ($155M)
4
    Exhibit 13 Defendants' Objections and Responses 207
5              to Plaintiff Stacy L. Randall's
               First Set of Interrogatories
6
    Exhibit 14 11/6/2023 Notes regarding Topic 9    217
7
8
9
10  Requests:                                       Page
11  Request 1   Operational updates not previously   12
                produced
12
    Request 2   Document retention policies not
13              previously produced                  13
14
15
16
17
18
19  (The original exhibits were attached to the original
       transcript and PDFs were provided to counsel)
20
21
22
23
24      (The original transcript was filed with
           Attorney Jessica Hutson Polakowski)
25
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 5

1　　　　THE VIDEOGRAPHER:  Good morning.
2　We are now on the record.  My name is
3　Jon Hansen, CLVS.  I'm the videographer with
4　For the Record, Madison, Wisconsin.
5　　　　Today's date is November 6, 2023.  The
6　time is 9:00.
7　　　　This deposition is being held in the
8　matter of Stacy L Randall vs. Reed C. Widen,
9　et al., Case No. 22-CV-400-jdp.  The deponent
10　this morning is corporate representative from
11　Widen Enterprises.
12　　　　At this time if counsel would state
13　their appearances for the record, after which
14　our reporter will swear in the witness and we
15　can proceed.
16　　　　MS. POLAKOWSKI:  Good morning.
17　Jess Polakowski of Reinhart Boerner
18　Van Deuren appearing on behalf of plaintiff,
19　Stacy Randall.
20　　　　MR. LAING:  Dean Laing and Mark
21　Churchill appearing on behalf of the
22　defendants.
23　　　　MS. POLAKOWSKI:  Also present with
24　me today is Monica Mark and David Palay.
25

Page 6

1　　　　MATTHEW R. GONNERING, called as a
2　　　witness, being first duly sworn, testified on
3　　　oath as follows:
4
5　　　　　　EXAMINATION
6　By Ms. Polakowski:
7　Q　Good morning, Mr. Gonnering.  We met briefly off
8　　　the record, but my name is Jess Polakowski, and
9　　　you understand that I'm here today representing
10　　　Stacy Randall in this lawsuit?
11　A　I do.
12　Q　Very good.  Please state for me your full name for
13　　　the record.
14　A　Matthew Richard Gonnering.
15　Q　You're here today because you've been designated
16　　　as what is called the 30(b)(6) witness for Widen
17　　　Enterprises.  Do understand that to be true?
18　A　I do.
19　Q　Do you understand that that also means that you
20　　　are charged with knowing, to the extent knowable,
21　　　the full scope of Widen Enterprises' knowledge
22　　　with regard to the topics that have been noticed?
23　A　I do.
24　Q　And are you prepared today to testify with regard
25　　　to each of the topics contained in the notice?

Page 7

1　A　I am.
2　Q　Other than your designation as Windy Waters'
3　　　corporate designee last Friday for the purpose of
4　　　that deposition, have you ever been designated as
5　　　a corporate designee for the purpose of testifying
6　　　in a deposition?
7　A　I have not.
8　Q　And I know you've now been deposed a number of
9　　　times, but I'll just remind you quickly of the
10　　　ground rules so that we can try to keep things
11　　　straight and make things go as quickly and
12　　　efficiently as possible today.
13　　　　I will ask you questions.  I would appreciate
14　　　it if you give me an opportunity to ask the full
15　　　scope of my question before you begin to answer,
16　　　and I will do my best to extend the same courtesy
17　　　to you without talking over one another.  Is that
18　　　fair?
19　A　Yes.
20　Q　I will take a break at any point in time if you
21　　　need one.  Please just go ahead and let me know.
22　　　The one exception to that rule is if there is a
23　　　question pending, I will ask that you answer the
24　　　question that is pending before we take a break.
25　　　Also fair?

Page 8

1　A　Yes.
2　Q　If you don't understand a question -- I
3　　　occasionally ask bad questions, and if you don't
4　　　understand a question that I ask, I want you to
5　　　ask me to clarify.  I do not want you to answer
6　　　any question that you don't understand.  Is that
7　　　fair?
8　A　Yes.
9　Q　If you answer a question that I ask, I will
10　　　interpret that to mean that you understood my
11　　　question.  Is that also fair?
12　A　Yes.
13　Q　You understand that you are testifying today under
14　　　oath; correct?
15　A　Correct.
16　Q　Is there anything that would prevent you from
17　　　telling the full truth today?
18　A　No.
19　Q　Are you taking any medications that would impair
20　　　your ability to answer my questions truthfully and
21　　　completely?
22　A　No.
23　Q　I'd like to explore what you did to prepare for
24　　　this deposition today.  Let me start with just
25　　　since Friday.  Have you done any additional

**Page 9**

1      preparation for this deposition, the 30(b)(6)
2      deposition of Widen Enterprises, since you were
3      deposed as a corporate representative for Windy
4      Waters on Friday?
5  A    I have.
6  Q    What have you done?
7  A    I met with counsel, and with counsel was also
8      Mike Kiesler, and we spent the weekend working on
9      the responses to the topics.
10  Q   When you say you spent the weekend, were you
11     physically together in the same room?
12  A   We were physically together in the same room
13     yesterday.  Yes.  Yesterday we were physically
14     together.
15  Q   And did you also meet on Saturday?
16  A   We did not meet on Saturday, but I spent the day
17     Saturday personally and the team also spent time
18     on Saturday as well.
19  Q   Did you spend any time Friday preparing for this
20     deposition?
21  A   I did.
22  Q   Okay.  Let me start with Friday.  What did you do
23     on Friday to prepare for this deposition?
24  A   On Friday, following the Windy Waters deposition,
25     we, working with counsel, turned our attention to

**Page 10**

1     the topics for Widen Enterprises and spent that
2     evening working through those topics.  And that
3     would -- talking with counsel, going through the
4     documents to include corporate records, to include
5     emails, and that's what we did on Friday.
6  Q   Who was all present at that meeting?
7  A   Counsel was present at the Friday evening meeting.
8  Q   Which counsel?
9  A   O'Neill, Cannon.  So Christa.  And Dean was part
10    of it as well.
11  Q   Did anyone participate by phone?
12  A   No.
13  Q   Or by any sort of videoconferencing mechanisms,
14    Zoom, Teams?
15  A   No.
16  Q   How long did you meet with Christa and Dean on
17    Friday?
18  A   I estimate that to be three hours.
19  Q   Do you recall -- you mentioned a number of
20    documents.  Do you recall any specific documents
21    you reviewed to prepare for this deposition on
22    Friday?
23  A   Corporate records.
24  Q   Which corporate records?
25  A   Of Widen Enterprises.  The operational updates

**Page 11**

1     that we provided, some revenue forecasts.
2  Q   Any other documents that you recall reviewing on
3    Friday?
4  A   Document retention policies.
5  Q   Okay.  You referenced operational updates.  Do you
6    know whether the operational updates that you
7    reviewed on Friday have been produced in this
8    case?
9  A   Everything that -- yeah, we produced operational
10    updates to counsel.  Yes.
11  Q   I just want to make sure I understand.  You
12    referenced operational updates, and you said
13    you have produced operational updates to counsel.
14    I understand that to be true, but my question to
15    you is a little different than that.
16      Do you know whether the operational updates
17    that you reviewed on Friday have all in their
18    entirety been produced in this case?
19  A   I know that the operational updates that we
20    reviewed on Friday were produced to counsel.
21  Q   And when you say to counsel, do you mean to your
22    counsel or to Ms. Randall's counsel?
23  A   To my counsel.
24  Q   Okay.  Do you know whether they have been produced
25    to the plaintiff in this litigation?

**Page 12**

1  A   I would defer to counsel.
2      MS. POLAKOWSKI:  And I will just
3      make a note on the record, Dean, to the
4      extent that those operational updates have
5      not yet been produced, I would ask that they
6      be produced immediately.
7      MR. LAING:  Okay.
8  Q   Revenue forecasts, you mentioned that you reviewed
9    revenue forecasts on Friday evening.  Do you know
10    whether the revenue forecasts that you reviewed on
11    Friday for the purpose of preparing for your
12    deposition have been produced to the plaintiff in
13    this case?
14  A   We reviewed the ITR Economics forecast, as well as
15    the 2008 business plan, and those are documents
16    that I have seen before.
17  Q   Anything other than the ITR -- I'm sorry.  What
18    did you call it?  You said the ITR Economic
19    forecast?
20  A   ITR Economics, yes.  The report.
21  Q   And you referenced the ITR Economics and your 2008
22    business plan?
23  A   Correct.
24  Q   Did you review any revenue forecasts other than
25    those two documents that you referenced?

**For the Record, Inc. | 888-892-0392 | office@FTRMadison.com**
**www.FTRMadison.com**
     **Pages 9..12**

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 13

1  A   Revenue forecasts were also present in the
2      operational updates.
3  Q   And you also referenced document retention
4      policies.  Have the document retention policies
5      that you reviewed on Friday been produced in the
6      course of this litigation to the plaintiff?
7  A   They've been provided to counsel, my counsel.
8          MS. POLAKOWSKI:  And we make note,
9      Dean.  To the extent there's anything that
10         was reviewed that hasn't been produced, I
11         would formally request that they be produced
12         in this litigation.
13             MR. LAING:  Yeah.  I understand
14         your request.
15 Q   Okay.  So you met for about three hours on Friday.
16     Did you review all of the topics or did you review
17     a subset of the topics on Friday?
18 A   We reviewed all of the topics generally, and then
19     we would have progressed through some of the
20     individual topics in greater depth.
21 Q   Do you recall how far you got on Friday in terms
22     of the topics?
23 A   Three hours into it, and they weren't linear in
24     terms of their progression.
25 Q   Sure.  Let's move then to Saturday.  Did you --

Page 14

1      you mentioned that you did some preparation on
2      Saturday as well.  What did you do on Saturday to
3      prepare for this deposition?
4  A   Saturday I again went through operational updates
5      and accessed the revenue projections that were in
6      those, in addition to any other relevant
7      information that was connected to the topics.
8  Q   I just want to make sure I understand.  You said
9      you accessed revenue projections that were
10     contained in the operational updates.  Is that
11     something that is outside of the operational
12     update itself, like a separate report that you
13     looked at, or are the revenue projections all
14     contained within the operational update itself?
15 A   With the exception of the ITR Economics report and
16     the 2008 business plan, those revenue projections
17     were in the operational updates.  They were
18     written in there.
19 Q   Okay.  Got it.  Your review on Saturday of these
20     documents, was that something you just did by
21     yourself?
22 A   Yes.
23 Q   And did you meet with anyone on Friday -- or,
24     excuse me, on Saturday to prepare for the
25     deposition?

Page 15

1  A   I messaged counsel on several occasions on
2      Saturday.  I did not meet with them.
3  Q   And just to be clear, when I say meet with,
4      I'm referring to either virtually or in person.
5      You didn't meet with them either virtually or in
6      person on Saturday?
7  A   Correct.
8  Q   How long did you prepare on Saturday for this
9      deposition?
10 A   Saturday, I spent approximately seven hours.
11 Q   Did you -- both Friday and Saturday, other than
12     counsel, did you speak with anyone to prepare for
13     this deposition?
14 A   Can you repeat again?
15 Q   Sure.  Other than counsel -- I'm not interested in
16     learning about what you may or may not have said
17     to counsel in those meetings, but I do want to
18     know if you spoke to anyone outside of the
19     presence of counsel about this deposition.
20 A   No.
21 Q   Okay.  And Sunday you said you met with counsel
22     yet again; is that right?
23 A   Correct.
24 Q   And who was all present at that meeting?
25 A   It was Dean and Christa and Mike Kiesler.

Page 16

1  Q   How long, approximately, did you meet on Sunday
2      to prepare for this deposition?
3  A   I arrived here approximately 1:00 p.m., and we
4      concluded in this room approximately 8:00 p.m.
5      And that was time with counsel.  And I proceeded
6      back to my room where I continued to prepare.
7  Q   How long would you estimate that you spent
8      preparing in your room last evening?
9  A   I estimate that I spent three hours, an additional
10     three hours.
11 Q   Did you -- during the course of your meeting with
12     counsel, did you review any additional documents
13     other than what we just discussed?
14 A   No.
15 Q   And what about when you went back to your room and
16     you spent the three hours on your own preparing
17     for this deposition, did you review any documents
18     other than the three categories that we've just
19     discussed?
20 A   No.
21 Q   And yesterday did you speak with anyone other than
22     counsel with regard to preparing for this
23     deposition?
24 A   No.  Present with counsel was Mike Kiesler.
25 Q   Sure.  Yeah.  Understood.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 17

1      During the course of your preparation for
2  this deposition, did you search for any documents?
3  A  I did.
4  Q  What documents did you search for?
5  A  I searched for document retention policies.  I
6     searched for operational updates and the emails
7     that were the operational updates.
8  Q  When did you perform that search?
9  A  I would have performed those searches on Saturday
10    and Sunday.
11 Q  Did you forward those documents then to counsel?
12 A  I provided document retention policies to counsel.
13 Q  Any other documents that you provided to counsel
14    as a result of your search?
15 A  Not that I recall.
16 Q  Last Friday I understand that when you were
17    testifying as the 30(b)(6) designee for Windy
18    Waters that you testified that you reviewed some
19    notes that were prepared during a meeting between
20    yourself and Mr. Kiesler and counsel.
21     Did you prepare -- or did you review any
22    notes similar in nature to those notes in
23    preparation for this deposition today?
24 A  We did.  I would also add that the preparation for
25    Friday's included Mr. Widen.  It was counsel with

Page 18

1     Mr. Kiesler and Mr. Widen.
2  Q  Just so I understand, when you were preparing for
3     the Windy Waters deposition that occurred on
4     Friday, Mr. Widen was also present for those
5     preparation sessions; is that right?
6  A  Correct.
7  Q  Okay.  So there was a set of notes that was
8     prepared for the purpose of that deposition;
9     correct?
10 A  Correct.
11 Q  Was there a similar set of notes that was prepared
12    for the purpose of this deposition?
13 A  We prepared notes for some of the topics.
14 Q  Okay.
15 A  I would like to clarify that when I say that
16    Mr. Widen was present, he was present by phone,
17    not present physically.
18 Q  Thank you.  I appreciate the clarification.
19     I'm going to focus on the notes that were
20    prepared for this deposition.  Did you review
21    those notes prior to this deposition today?
22 A  I did.
23 Q  And did those notes assist in your recollection of
24    facts pertaining to the topics that we're talking
25    about today?

Page 19

1  A  Yes.
2        MS. POLAKOWSKI:  Counsel, could I
3     see a copy of those notes?
4        MR. LAING:  That's all work
5     product.  I may or may not provide some to
6     the witness today depending on the questions
7     you ask.  And if I do, I'll give you copies.
8        MS. POLAKOWSKI:  I understand that
9     that's your position, and I respect that,
10    and, for the record, I'll just note that our
11    position is that pursuant to Rule 612 those
12    notes are discoverable because this witness
13    has reviewed them and relied upon them in
14    refreshing his recollection for the topics
15    that we're talking about today.  So we will
16    seek disclosure of those documents.
17 Q  Mr. Gonnering, it was represented to us that
18    certain documents were discovered in preparing for
19    the deposition of Windy Waters' testimony, in
20    particular certain emails of Mr. Kiesler were
21    discovered, and there were two late productions
22    last week.  I'd like to ask you about those late
23    document discoveries.
24     Do you know anything about them?
25 A  I do.

Page 20

1  Q  What occurred?  How were those documents
2     discovered?
3  A  The documents were discovered in preparation for
4     these depositions, and there was a -- in my work
5     with counsel, there was the review of some of
6     Mr. Kiesler's emails that I was able to access,
7     but counsel did not have.
8        And we reviewed the export procedures that
9     Acquia IT had performed, and we redid those
10    exports of Mike's emails so that they could be
11    provided to counsel, and they were.  And Reed's
12    emails were also exported to ensure that those
13    were also provided.
14       Reed's was confirmed, yes, those were all
15    provided, but it was some export complexity with
16    Mike's emails that has created the additional
17    production of responsive documents.
18 Q  Were your emails checked in terms of this export
19    complexity?
20 A  My emails were provided before that, and they were
21    provided in search for a variety of keywords and
22    those were -- yeah.  Those were provided before.
23 Q  Is it your testimony that Mr. Kiesler's emails
24    were not provided before?
25 A  Mr. Kiesler's emails were provided before, and it

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 21

1  was realized by prepping for these that the full
2  scope of the search terms were not returning the
3  results that I was able to see but counsel was
4  not.
5  Q  Do you know which search terms were not returned?
6  A  I don't have the specific search terms that were
7  related to that.
8  Q  Where would you look to find that?
9  A  There were search terms that counsel provided to
10  us, and I would ask counsel for those search
11  terms.
12  Q  So if I understand your testimony correctly, you
13  discovered that the full scope of the search terms
14  had not been returned for Mr. Kiesler's emails;
15  is that correct?
16  A  I understand that there were complexities to the
17  export related to Mr. Kiesler's emails, correct.
18  Q  And so you understand that there was some sort of
19  confirmation that was employed to ensure that the
20  full scope of those emails were produced last
21  week; correct?
22  A  There was, yeah, another export activity that
23  happened when that was discovered.
24  Q  And that was done for both Mr. Kiesler's emails
25  and Mr. Widen's emails?

Page 22

1  A  Correct.  To verify.
2  Q  And my question to you is was that same
3  verification done for your emails?
4  A  There was no need to verify that because mine were
5  produced, and there were no missing emails with
6  respect to the exports from my emails.
7  Q  Did you take any steps to confirm that there were
8  no missing emails from your export?
9  A  Worked with counsel to confirm.
10  Q  And that was done last week?
11  A  That was done recently.
12  Q  Where had those emails that were discovered last
13  week of Mr. Kiesler's been stored?
14             MR. LAING:  Objection to the form
15        of the question.  You can answer.
16  A  Mr. Kiesler's emails were in a Google email,
17  so Gmail, that was not part of Acquia.
18  Q  What email address would that have been?
19  A  Mikek@Widen.com was the email address.
20  Q  And the Gmail platform was used for that email
21  address?
22  A  Correct.
23  Q  Were there any other Gmail addresses or was the
24  Gmail platform used for any other emails at Widen?
25  A  The Google platform were used for all of Widen

Page 23

1  emails, so mine and Reed's would have been part of
2  that.
3         Michael Kiesler also had an Acquia email
4  address, so Michael.Kiesler@Acquia.com.
5  Q  And were both his Widen and his Acquia email
6  accounts searched for the purpose of this case?
7  A  They were.
8  Q  Likewise, you have an Acquia email account?
9  A  Correct.
10  Q  And was your Acquia email account also searched
11  for the purpose of this case?
12  A  Yes.
13  Q  Does Reed have an Acquia email account?
14  A  In the preservation of his emails, he was provided
15  an email account for Acquia so that those emails
16  could be held.
17  Q  And were those emails searched?
18  A  Those emails were searched, but there would not
19  have been -- Reed would not have access to a
20  Reed.Widen@Acquia.com email address.
21  Q  Why is that?
22  A  He was no longer with the organization when it was
23  under Acquia's ownership.
24  Q  On Thursday night, an additional 88 documents were
25  produced.  Do you know when those documents were

Page 24

1  discovered?
2  A  Those documents were discovered recently.
3  Q  Are those also Mike Kiesler's emails that weren't
4  all captured because of this export complexity?
5  A  I'd need to verify that with counsel.
6  Q  Okay.
7             (Exhibit No. 1 marked for
8              identification)
9  Q  Mr. Gonnering, I've just handed you what has been
10  marked as Exhibit 1.  Do you recognize Exhibit 1
11  as a Notice of Deposition for this 30(b)(6)
12  deposition today?
13  A  I do.
14  Q  And do you recognize the topics that are listed in
15  Exhibit 1?
16  A  I recognize topic 1.  I recognize topic 2.  Would
17  you like me to continue?
18  Q  Well, let me just ask you this.  You understand
19  that you've been designated as the corporate
20  witness to testify on behalf of each of the topics
21  contained in Exhibit 1 on behalf of Widen
22  Enterprises?
23  A  I do.
24  Q  And you're prepared today to testify with regard
25  to each of the topics listed in Exhibit 1?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 25

1    A    I am.

2    Q    And you understand that as the 30(b)(6) designee

3         for Widen Enterprises, you are charged with the

4         full scope of Widen Enterprises' knowledge with

5         regard to each of these topics; correct?

6    A    Yes.

7              MR. LAING:  Counsel, just to

8         clarify that, the last topic, I think it's

9         19, we've designated testimony, so he's not

10        prepared to testify on that topic today.

11             MS. POLAKOWSKI:  Thank you for that

12        clarification, and I will get to that in due

13        course.

14   Q    I'd like to start with topic 1.  That is the Widen

15        Enterprises' efforts to respond to discovery

16        requests, including Widen Enterprises' document

17        management systems and steps taken to locate and

18        produce responsive documents, but, of course,

19        excluding any attorney-client or work-product

20        privileged information.

21             What did you do to prepare to testify on

22        behalf of Widen Enterprises about this topic?

23   A    Reviewed the process that was used to respond to

24        discovery requests, the communications with

25        counsel regarding discovery requests, the vendors

Page 26

1         that were used to help gather those requests, the

2         sources of the requests.

3    Q    I'm going to break that answer down just a bit

4         here.

5              So first you said you reviewed the process

6         that was used to respond to discovery requests.

7         What was that process?

8    A    That process was receiving requests from counsel

9         for certain documents and then gathering those

10        documents wherever they might be, searching the

11        variety of sources, and then producing those

12        documents to counsel.

13   Q    And when you say counsel in your response, you're

14        referring to your counsel; correct?

15   A    I'm referring to, yes, my counsel.

16   Q    So just so I make sure I understand the process,

17        you would receive requests from your counsel for

18        information, and you would search for and respond

19        to your counsel with responsive information?

20   A    Mike, Reed, and I would receive requests from

21        counsel, and we would all respond in accordance

22        with those requests.

23   Q    Understood.  Would each of the three of you

24        respond on -- individually or was there a

25        spokesperson, so to speak?

Page 27

1    A    We would respond individually to counsel's

2         requests.

3    Q    Okay.  You stated that you would rely on vendors

4         to help gather information.  What vendors did you

5         use to help gather information?

6    A    Through our relationship with Holland & Knight,

7         we used two different vendors.  One was called

8         FTI Consulting, another one was called CohnReznick.

9    Q    And let's start with FTI.  What specific tasks did

10        FTI perform?

11   A    FTI went into emails that were Proton Mail

12        accounts to capture the full breadth of those,

13        and FTI also provided the laptop export from

14        Mike Kiesler.

15   Q    Okay.  With regard to the Proton email accounts,

16        what email accounts were the Proton email accounts

17        that you're referring to?

18   A    Proton email accounts that were with -- associated

19        with Reed, Mike, and me.  However, Reed's Proton

20        Mail account, there was a forgotten password on

21        his account, and as FTI tried to gain access to

22        it, there was a notification that Proton would

23        have flagged that, said if you proceed any further

24        given the password attempts that this whole email

25        will be destroyed.  So FTI had stopped at that

Page 28

1         point in time.

2              And we represent that the full breadth of

3         Mike's and my emails with Proton Mail would also

4         represent Reed's email since Reed did not use it

5         or dialogue with anybody else outside of including

6         Mike and mine.

7    Q    So if I understand your testimony correctly, there

8         was a Proton email account that Reed has that has

9         not been searched and produced for the purpose of

10        this litigation?

11   A    There is a Proton email account that Reed has that

12        would be included in the exports from Mike and

13        Matthew's Proton emails.

14   Q    I understand your testimony that they are

15        entirely duplicative, that Reed's account is

16        entirely duplicative of Mike and your accounts.

17        My question is a little bit different than that.

18             I want to make sure I understand correctly

19        what's been produced in this case.  And if I

20        understand what you just told me, it's that Reed

21        has an email account, a Proton email account, that

22        you were unable to access for the purpose of

23        searching and producing in this case?

24   A    FTI Consulting was unable to access Reed's Proton

25        Mail account directly.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 29

1  Q   Has anyone been able to access that email account
2      directly?
3  A   Not the email account directly, no.
4  Q   And so for the purpose of this litigation, that
5      email address has not been searched?
6  A   That email address would be comprehensive because
7      it would have been included in Mike's and
8      Matthew's, mine.
9  Q   I understand that that's your testimony, but
10     that's not my question.  My question is, so for
11     the purpose of this litigation, that email address
12     has not been searched?
13 A   The email account was not accessed, but the email
14     address would be, again, encompassed within mine
15     and Mike's.
16 Q   How do you know that to be true?
17 A   Because that was the dialogue that we had.  It was
18     dialogue with all three of us.
19 Q   So that's what Reed told you?
20 A   That's what I know.
21 Q   You know because Reed told you?
22 A   I know because that's how that dialogue
23     progressed, and that's what Reed told me.
24 Q   Okay.  Did FTI perform any other work for Widen
25     Enterprises with regard to the collection of

Page 30

1      documents in this case?
2  A   Outside of the Proton Mail, Mike's laptop.
3  Q   That's right.  And is that the old laptop that
4      Mr. Kiesler referenced as containing older
5      documents pertaining to Widen Enterprises and
6      Windy Waters?
7  A   Yes.
8  Q   And so FTI, if I understand correctly, was
9      retained for the purpose of exporting that laptop
10     for the purpose of production?
11 A   Yes.
12 Q   Is that the entirety of the scope of work that FTI
13     performed with regard to responding to discovery
14     in this case?
15 A   I would like to verify that with counsel.  That is
16     my understanding.
17 Q   Fair enough.  And you also referenced a vendor
18     called CohnReznick.
19 A   Correct.
20 Q   What was CohnReznick engaged to do with regard to
21     discovery in this case?
22 A   CohnReznick provided a phone scan of Reed and Mike
23     and Matthew.  They also provided the Slack
24     messages between Mike and I.
25 Q   And when you say phone scan, are you referring to

Page 31

1      mobile devices?
2  A   Correct.  Text messages.
3  Q   How many mobile devices did CohnReznick perform
4      these searches on?
5  A   I understand that to be three.  Mike, Reed,
6      Matthew.
7  Q   Do you know the duration that Mr. Kiesler used
8      that device that was searched by CohnReznick?
9  A   Do I know the duration of time that Mike Kiesler
10     used that particular device?
11 Q   Yes.
12 A   I do not.
13 Q   Do you know whether the searches that CohnReznick
14     performed and the collections that they performed
15     would have captured data that predated the device
16     that was searched?
17 A   I do not know that.
18 Q   Who would know that?
19 A   CohnReznick and Mr. Kiesler.
20 Q   And is your response the same -- would your
21     response be the same if I asked you the question
22     for all three, yourself, Mr. Kiesler, and Mr. Widen?
23 A   It would be.
24 Q   Okay.  You also referenced in your initial
25     response that you looked at the sources of data

Page 32

1      that were pulled for responding to the requests;
2      is that right?
3  A   Correct.
4  Q   What did you do to accomplish that task, to look
5      at the sources of the data that were collected?
6  A   I looked at emails.  I looked at documents.  I
7      looked at Slack messages.  I looked at a Box.com
8      account.
9  Q   Okay.  When you reviewed emails, did you review
10     them on the Google drive?
11 A   I reviewed them as part of the Google account.
12 Q   How long have you been at Widen Enterprises?
13 A   I've been at Widen Enterprises since 2000.
14 Q   During the course of your time at Widen
15     Enterprises, did Widen ever switch email servers?
16 A   I don't recall given the dating of that when we
17     started the Google relationship.  So I --
18 Q   Do you recall what server was used before you
19     started the Google relationship?
20 A   There may have been a -- Mike would have used a --
21     but it was still connected to Google.  But he had
22     a preference for Outlook, but it was still
23     connected with Google.  It was an interface.  Mike
24     just liked the Outlook interface to Google, so I'm
25     having trouble recalling when we would have

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 33

1 activated the Google relationship so --
2 Q And would Mr. Kiesler know the answer to that
3 question?
4 A It's possible. I didn't -- yeah. To my
5 knowledge, since working at Widen, I've used
6 Google, but I would have to verify.
7 Yes, my testimony is to my knowledge it was
8 Google, and what gives me pause is I know Mike
9 used an Outlook interface to Google, but it was
10 still Google at the back end.
11 Q And I just want to clarify because you said that
12 to your knowledge, your answer is to your
13 knowledge. But for the purpose of this
14 deposition, we're exploring more than just your
15 knowledge. We're exploring the scope of Widen
16 Enterprises' knowledge.
17 So is there anyone, other than Mr. -- well,
18 would Mr. Widen know what was used prior to the
19 Google drive?
20 A It's possible.
21 Q Anyone else at Widen that would know the answer to
22 that question?
23 A No.
24 Q You referenced documents that you reviewed. Where
25 did you look to review documents?

Page 34

1 A I looked in Google drive.
2 Q I want to understand how the document management
3 is maintained at -- or was maintained at Widen
4 Enterprises. Can you just explain to me how
5 documents were stored and organized at Widen
6 Enterprises?
7 A Documents were stored and organized mainly through
8 Google drive, and within Google drive you can
9 create a variety of document types, word
10 processing spreadsheets, and those documents would
11 be created and stored there and then capable of
12 being searched or categorized by folder structure.
13 Q You anticipated my next question which is were
14 documents stored by substantive matter?
15 A Can you expand on substantive?
16 Q Sure. So, for instance, you referenced a folder
17 structure.
18 A Yeah.
19 Q Were documents stored by client or by project?
20 How were documents categorized within the Google
21 structure?
22 A Mostly by user preference.
23 Q Okay.
24 So each user would have established their own
25 structure, and then there were some shared folders

Page 35

1 where they would have adopted a mutually agreed
2 upon structure.
3 Q And were all documents -- regardless of whether
4 they were specific to a user or shared, were all
5 documents searched for the purpose of responding
6 to discovery requests in this case?
7 A All documents for Mike and Reed and Matthew were
8 searched.
9 Q You referenced -- or you said in your response
10 that documents were mainly kept through Google
11 drive. What else would they have been kept in?
12 A Box.
13 Q Okay. And you referenced a single Box.com
14 account. Was there only one Box.com account?
15 A Yes.
16 Q And who was the holder of that account?
17 A Mike.
18 Q Do you know what the user name on that account
19 was?
20 A I don't.
21 Q You also referenced Slack, which I understand to
22 be a messaging service. Was that used just by you
23 and Mr. Kiesler?
24 A Slack was a communication tool used across the
25 organization.

Page 36

1 Q Okay. Thank you. So did you search for, in the
2 course of responding to discovery, Mr. Kiesler's
3 communications on Slack?
4 A CohnReznick searched for those.
5 Q Yes. Thank you.
6 A Yeah.
7 Q And they also would have searched for your
8 communications on Slack?
9 A Yes.
10 Q And they also would have searched for Mr. Widen's
11 communications on Slack?
12 A Mr. Widen did not use Slack.
13 Q Okay. Other than Slack, was any messaging
14 application or service ever employed by Widen
15 employees?
16 A Text messages.
17 Q Sure. Text message would be one. Was there any
18 other application? For instance, WhatsApp or
19 Teams or Zoom, were any of those communication
20 services utilized by Widen Enterprises?
21 A Zoom was a service used by Widen Enterprises.
22 Q Were Zoom messages searched for the purpose of
23 this litigation?
24 A Zoom wasn't used as a messaging platform. It was
25 used as a videoconferencing service.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 37

1  Q   Got it.  What about any other applications or
2      services for the purpose of communicating
3      intercompany or extracompany, were any other
4      applications utilized?
5  A   A chat service as part of Google would have been
6      utilized prior to Slack, and those chat messages
7      would have also been searched as part of a history
8      within the email.
9  Q   And those emails -- or those chats would have been
10     searched and produced by CohnReznick?
11 A   Email production -- CohnReznick's involvement was
12     with Slack and phones, text messages.  Email
13     production, I'd have to consult with counsel to
14     remind me of if a vendor was used for those
15     emails.  But they would have been searched for
16     those keywords.
17 Q   Do you know who would have performed that search?
18 A   They would have been searches performed in
19     response to counsel.  So Mike and Matthew would
20     have performed searches in response to counsel.
21 Q   Did you personally perform searches?
22 A   I did.
23 Q   Do you recall personally performing searches of
24     the chat services that were utilized by Widen
25     Enterprises?

Page 38

1  A   They would appear as part of a general search in
2      the Google accounts.
3  Q   That wasn't --
4  A   And that --
5  Q   Sorry.  Go ahead.
6          MS. POLAKOWSKI:  I was just going
7      to ask Peggy to go ahead and read my question
8      back.
9              (Question read)
10 A   A search of email would have also searched chat.
11 Q   Do you recall personally performing that search?
12 A   I do.
13 Q   Are you aware of any Widen Enterprises sources
14     that were not searched for the purpose of
15     responding to discovery requests?
16 A   I'm not.
17 Q   Since you've been at Widen Enterprises in the last
18     twenty years, has Widen Enterprises switched
19     document management systems?
20 A   Not that I can recall.
21 Q   With regard to document retention, how long are
22     documents retained by Widen Enterprises?
23 A   We have document retention policies and standards
24     and schedules that we adhere to.  And as an
25     example, corporate records are held with

Page 39

1      permanence.  Financial records are held for seven
2      years.
3  Q   What about emails?
4  A   I did not memorize the other components of that,
5      but we can review those policies.
6  Q   I take your testimony to mean that you would have
7      to review the actual document retention policy in
8      order to respond to my question?
9  A   Correct.  I did not memorize the document
10     retention policy.
11 Q   Okay.  Do you know whether the document
12     destruction policy, whatever it was, was put on
13     hold for the purpose of preserving documents for
14     this litigation?
15 A   It was.
16 Q   When was that?
17 A   When we received the litigation hold.
18 Q   Do you recall when that was?
19 A   I recall that to be around September the 20th.
20 Q   Of?
21 A   September 20, 2021, with the potential of
22     September 21.  I do not recall exactly what date,
23     but it would be one of those days.
24 Q   We've discussed the electronic files of Widen
25     Enterprises that were searched for the purpose of

Page 40

1      this litigation.  Does Widen maintain paper files
2      as well?
3  A   Widen had paper files, yes.
4  Q   What sorts of things did Widen maintain paper
5      copies of?
6  A   Financial statements and corporate records.
7  Q   Were those financial statements and corporate
8      records that existed in paper form searched for
9      the purpose of collecting documents for this
10     litigation?
11 A   They were.
12 Q   Likewise, were those corporate records that were
13     stored in paper form, were those searched for the
14     purpose of responding to discovery requests in
15     this litigation?
16 A   They were.
17 Q   Are there any other documents other than the
18     financial records and corporate records that are
19     stored by Widen or were stored by Widen in paper
20     format?
21 A   Generally speaking?  Can you repeat the question?
22          MS. POLAKOWSKI:  Sure.  I'll just
23      have it read back, Peggy.  Thank you.
24              (Question read)
25 A   Historically, there would have been timecards,

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 41

```
1        job jackets related to work performed.
2    Q   I am not familiar with the phrase job jackets.
3        What does that mean?
4    A   A job jacket would be a project that a customer
5        would contract us for that would get a job number,
6        and then everything related to that job would be
7        in the jacket.  It's like a big envelope with a
8        number on it and physical copies of proofs.
9        Instructions on what work needs to be performed
10       would be in the job jacket.
11   Q   I interpret your description that you just told
12       me to relate to the printing side of Widen
13       Enterprises' business.  Is that accurate or am I
14       misunderstanding?
15   A   No.  That would be correct.  I would refer to
16       that, it could be printing, yes, pre-press,
17       pre-media, content production as well.
18   Q   Okay.  You also referenced timecards.  Were
19       timecards being used at the time Widen was sold
20       to Acquia?
21   A   No.
22   Q   Do you recall when timecards stopped being used?
23   A   I don't.  It would have been a long time ago.
24   Q   Sure.  We started earlier to talk about
25       operational updates that you prepared and sent to
```

Page 42

```
1        Reed.  You referenced that you reviewed those in
2        advance of today's deposition; correct?
3    A   Correct.
4    Q   What was the frequency with which you sent those
5        operational updates?
6    A   I sent those operational updates with not
7        consistent frequency.  So sometimes it would have
8        been twice a month, sometimes it may have been
9        once a month, sometimes it may have skipped a
10       month.
11   Q   Do you recall when you began preparing and sending
12       those operational updates?
13   A   I believe those operational updates started in and
14       around 2016.
15   Q   Do you recall what was the catalyst for the
16       operational updates?
17   A   Reed's desire to engage deeply in some of the
18       activities that were happening in the organization.
19   Q   Tell me about that.  Was there a conversation that
20       you had with Reed that prompted the operational
21       updates?
22   A   Reed would be asking lots of questions, and this
23       was a way that I could provide him proactively
24       information to respond to questions that he would
25       normally ask.
```

Page 43

```
1    Q   So the preparation of the operational updates,
2        was that something that you proactively came up
3        with or did Reed ask you to prepare an operational
4        update?
5    A   We would have collaborated to arrive at that.
6    Q   And just so that we have a clear record, I'm not
7        interested in what may have or would have
8        happened.  I'm interested in what you recall
9        having happened.
10       So with regard to the operational updates,
11       what do you recall as being the catalyst for the
12       first operational update that you drafted in 2016?
13   A   I recall that being me taking a proactive stance
14       on helping respond to Reed's frequent questions in
15       a written form.
16   Q   And were the operational updates typically
17       intended to preempt Reed's questions or were they
18       typically in response to Reed's questions?
19   A   They were produced in anticipation of questions
20       that he had historically asked, and then they
21       would have been also part of all conversations
22       that we had from that point forward.  It was a way
23       to get deeper on topics faster.
24   Q   You said that the operational updates were
25       intended to respond to questions that he had
```

Page 44

```
1        historically asked.  What are those questions that
2        Reed had historically asked that the operational
3        updates were intended to respond to?
4    A   Questions about our financial performance, about
5        our cash positions, about customers, about growth,
6        about innovation, about internal process, about
7        employee activities, cultural advancements, legal
8        matters, employment matters, to name a few.
9    Q   I've reviewed a number of the operational updates,
10       and a number of them discuss estimates of value of
11       Widen Enterprises.  Was that something that Reed
12       had also historically asked about?
13            MR. LAING:  Objection to the form.
14       You can answer.
15   A   They would have included market updates, and they
16       did provide estimates of other companies in our
17       space.  So estimates of value from other
18       organizations who were similar to us were also
19       part of that.
20   Q   Yes.  I've seen those in the operational updates,
21       and my question to you was was your providing
22       those market updates, were you drafting that
23       because that's something that Reed had
24       historically asked for?
25   A   Reed asked for growth and grow the organizations
```

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 45

1   for growth, and those were provided in the updates
2   as evidence to we're in the right market.  It's a
3   healthy growth market based on these activities.
4   That's why they were provided.
5   Q   You testified that you prepared these operational
6       updates with varying frequency, sometimes one time
7       a month, sometimes twice a month, sometimes not at
8       all; is that right?
9   A   Sometimes once a month, sometimes twice a month.
10      Sometimes it may have gone a longer time duration.
11      It wouldn't have been not at all after when I
12      started it.
13  Q   Okay.  What would a longer duration be?
14  A   Can you expand?
15  Q   Sure.  Would you ever go, for instance, two months
16      without providing an operational update?
17  A   It's possible.
18  Q   Do you have any recollection -- well, let me ask
19      you this.  Did Reed ever ask you to provide an
20      operational update that contained any specific
21      information?
22  A   Can you expand or provide a level of -- specific
23      information about --
24  Q   Anything.  Do you have any recollection of Reed
25      ever asking for anything in particular to be

Page 46

1   contained in an operational update?
2   A   I don't.
3   Q   And back to the frequency of these operational
4       updates.  You said it's possible you may have gone
5       two months without an operational update.  Is it
6       possible that you went three months without an
7       operational update?
8   A   I'd have to look at the operational updates to
9       give you a factual answer.
10  Q   Are those operational updates all stored in a
11      specific location?
12  A   Email.
13  Q   And when you reviewed them this weekend, where did
14      you look to review those?
15  A   Email.
16  Q   Are they in an email folder?
17  A   No.
18  Q   So you just -- how did you search for and review
19      those documents this weekend?
20  A   Searched operational updates.
21  Q   When you reviewed those operational updates, did
22      they all have -- do you know what a Bates stamp
23      is?
24  A   I have heard of the term and --
25  Q   You've been around this litigation long enough to

Page 47

1   understand what a Bates stamp is?
2   A   I don't know the origin of it, but I've heard it
3       referenced.
4   Q   You understand that it's a number in the right-
5       hand corner of a page; correct?
6   A   I do.
7   Q   When you reviewed the operational updates this
8       weekend, did they have Bates numbers on them?
9   A   I did not look at operational updates that had
10      Bates numbers on them.
11  Q   Mr. Gonnering, are you aware of any documents that
12      have been withheld by Widen Enterprises from
13      production in this case?
14  A   I'm aware that all responsive documents have been
15      produced to counsel.
16  Q   Let me just get a little clarification.  When you
17      say to counsel, you mean your counsel?
18  A   Yes.
19  Q   Are you aware of any documents that -- any
20      responsive documents that you've provided to
21      counsel, that Widen has provided to counsel, that
22      have been withheld in this case?
23  A   I would need to consult with counsel.
24  Q   Okay.  Are you aware of any responsive documents
25      that were not produced because they were destroyed

Page 48

1   in the ordinary course of business?
2   A   I'm not.
3   Q   Are you aware of any responsive documents that
4       were not produced because they couldn't be
5       located?
6   A   I am not.
7   Q   Turning to topic 2, topic 2, looking at Exhibit 1,
8       is Widen Enterprises' document retention policies
9       that were effective during, or implemented
10      between, 2015 to present; correct?
11  A   Correct.
12  Q   And we've already touched on this quite a bit so
13      this will be quite quick.  You are prepared to
14      testify on this topic?
15  A   I am.
16  Q   Do you know whether all document retention
17      policies that were in place from 2015 to present
18      have been produced in this litigation?
19  A   They were produced to counsel.  And, for clarity,
20      my counsel.
21  Q   Thank you.  Other than the retention policies
22      themselves, did you review any documents to
23      prepare for this topic?
24  A   Other than the retention policies.  No.  Just the
25      review of the retention policies.

Page 49

1   Q   Was there one employee at Widen Enterprises who
2       was responsible for document retention?
3   A   There would not have been one employee responsible
4       for document retention.
5   Q   Who at Widen would have been responsible for
6       document retention?
7   A   Document retention was -- policies were written
8       by the information security management team and
9       reviewed by the information management security
10      committees that were assembled, and so those
11      committees would have included IT resources, in
12      addition to myself and Mike.
13  Q   So we talked about -- you just told me who was
14      responsible for writing and reviewing the
15      policies.  My question to you is who was
16      responsible for implementing those policies?
17  A   The same people who were involved with the
18      committees would be responsible for implementing
19      those.
20  Q   And who are those people?
21  A   Mike and I serving in a committee capacity there,
22      and then there were other IT resources at Widen
23      who were responsible over the years, to include
24      Matt Frank, who was an information security
25      person, Kevin Brinnehl, who would have been an

Page 50

1       information security person.
2   Q   Any others?
3   A   Those are who I recall.  And to present is also
4       noteworthy here because there is an Acquia
5       document retention policy which would have been
6       Acquia IT, and so the executive or VP of IT is
7       Kat Sweet.  She would have also been part of that.
8          In addition, general counsel at Acquia, Jason
9       Wagstaff.
10  Q   Got it.  So it sounds like -- so you mentioned
11      Matt Frank and Kevin Brinnehl as being responsible
12      in part for IT security; is that right?
13  A   Matt Frank was responsible for IT and security.
14      Kevin Brinnehl would have had multiple hats, one
15      of which would have included security following
16      Matt Frank's departure.
17  Q   Okay.  Did Widen Enterprises have a formal IT
18      department?
19  A   We did.
20  Q   You did?  I'm sorry.
21  A   Yes, we did.
22  Q   How many people were in that IT department?
23  A   It varied over time, and it would have been small.
24  Q   Okay.
25  A   I don't recall the exact count over time.

Page 51

1   Q   Did Widen Enterprises have -- So we've talked
2       about the formal document retention policies.
3       Did Widen Enterprises have any informal document
4       retention policies?
5   A   No.
6   Q   What happened -- When Widen Enterprises was
7       acquired by Acquia, what happened to Widen
8       Enterprises' records?
9   A   They were taken over by Acquia.
10  Q   And who is responsible for maintaining those
11      records now?
12  A   That would be Acquia IT.
13          MS. POLAKOWSKI:  We have been going
14      for about an hour, and I'm at the end of that
15      topic.  Why don't we just take a quick break.
16          MR. LAING:  Sure.
17          THE VIDEOGRAPHER:  Going off the
18      record at 10:04.
19          (Recess)
20          THE VIDEOGRAPHER:  We're back on
21      the record at 10:19.
22  Q   Mr. Gonnering, I'm going to ask you to turn to
23      topic 3 now.  It is the organization, management,
24      and governance of Widen Enterprises, including,
25      without limitation, the involvement of each of

Page 52

1       Stacy Randall, Reed Widen, Michael Gonnering, and
2       Michael Kiesler in the management and/or
3       governance of Widen Enterprises.  Are you prepared
4       to testify on topic 3?
5   A   I am.  And may I add something to previous --
6   Q   Of course.
7   A   -- document searches that we talked about?
8   Q   Sure.
9   A   Would you like me to do that now?
10  Q   Sure.  Go ahead.
11  A   In addition to the searches that I would run on my
12      email account, I want to make sure that you're
13      also aware that Acquia IT ran searches on the
14      account.  And so I did not say that last time, but
15      you asked related, and I did not respond that way.
16          So, yes, I searched email, and Acquia IT ran
17      searches on email as well.
18  Q   Understood.  So we're talking about what steps
19      Widen Enterprises took to collect documents for
20      the purpose of responding to discovery requests?
21  A   Correct.
22  Q   I understand that you had previously testified
23      that you personally recall performing searches on
24      emails, and you're supplementing your testimony to
25      indicate that not only did you personally run

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 53

1   searches, but Acquia IT also ran searches; is that
2   correct?
3   A   Correct.  In combination with counsel.
4   Q   Understood.
5   A   Yes.  Thank you.
6   Q   Are the searches that you ran the same as the
7   searches that Acquia IT ran?
8   A   The searches that Acquia IT ran and that I ran
9   would have been in response to counsel's request
10  for searches.
11  Q   Do you know whether the searches that were run
12  were the same or different?
13  A   I would have to consult with counsel.
14  Q   Okay.  Fair enough.  Back to topic 3.  So are you
15  prepared to testify with regard to topic 3?
16  A   I am.
17  Q   What documents did you review to prepare for topic
18  number 3?
19  A   I reviewed corporate records and spoke with
20  counsel, and present with counsel was Mike over
21  the weekend and Reed prior to that.
22  Q   When you say the corporate records, what are you
23  referring to?
24  A   I'm referring to the records that indicate when
25  people would have taken certain roles with the

Page 54

1   organization and also records that indicated when
2   the organization was established.
3   Q   Any other documents you're referring to when you
4   say corporate records?
5   A   Which would also include minutes, consent
6   resolutions.
7   Q   And when you are talking about all of these
8   corporate records, are you talking about corporate
9   records of Widen Enterprises?
10  A   Yes.  I also spoke with general counsel at Acquia
11  for current state management of Widen Enterprises.
12  Q   You said that the corporate records that you
13  reviewed would have reflected when people would
14  have taken certain roles.  What do you mean by
15  that?
16  A   I mean when, for example, Reed took on the role as
17  president, that I looked at that record to see
18  that role, and then I looked at the people who
19  agreed to that role.
20  Q   Who were the people that voted on whether or not
21  Reed should become president?
22  A   The people in the record that I reviewed that
23  agreed to that were Mark Widen, Stewart Widen,
24  Price Widen, Stacy Randall.
25  Q   When was that vote?

Page 55

1               MR. LAING:  Objection to the form.
2   A   The document I reviewed -- if we have that
3   document, I could review it to confirm the
4   accuracy of it -- I believe was 1997.
5               (Exhibit No. 2 marked for
6               identification)
7               MS. POLAKOWSKI:  And let the record
8       reflect that Attorney Laing just handed to
9       the witness a document that has now been
10      marked as Exhibit 2.
11  Q   Mr. Gonnering, your counsel just handed you what
12  has been marked as Exhibit 2 in this deposition.
13  Can you tell me what Exhibit 2 is?
14  A   Exhibit 2 is the notes that were prepared to
15  respond to topic 3, which is the organization --
16  you want me to read it?  The organization,
17  management, and governance of Widen Enterprises,
18  including, without limitation, the involvement
19  of each of Stacy Randall, Reed Widen, Matthew
20  Gonnering, and Michael Kiesler in the management
21  and/or governance of Widen Enterprises.
22  Q   The first sentence of Exhibit 2 indicates that
23  "Widen Enterprises, LLC, is a Wisconsin limited
24  liability company with a principal place of
25  business in Boston, Massachusetts."

Page 56

1               Did I read that correctly?
2   A   You did.
3   Q   When did the principal place of business of Widen
4   Enterprises, LLC, become Boston, Massachusetts?
5   A   When Acquia acquired Widen Enterprises.
6   Q   And that was in 2021?
7   A   That was September 24, 2021.
8   Q   The second bullet point under management, you have
9   a statement that says, "Prior to September of
10  2021, Widen Enterprises was managed by its board
11  of directors and officers."
12              Did I read that correctly?
13  A   You lost me for a second there.  Can you --
14  Q   I apologize.  I'm on the last sentence of the
15  second bullet point.
16  A   Okay.  Yes.  I'm there.  Wait.  The last sentence
17  of the second bullet point.
18  Q   Yes.  The sentence that reads, "Prior to September
19  2021," do you see that -- "Widen Enterprises was
20  managed by its board of directors and officers."
21  A   Can you point to it for me?
22  Q   Right here.
23  A   Right there.  Got it.  Thank you.  Thank you.
24  Sorry.  Yes.  Yes, you did.
25  Q   At the time -- well, let's start at the time that

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 57

1    Widen Enterprises was acquired by Acquia and work
2    backwards.
3        At the time that Widen Enterprises was
4    acquired by Acquia in September of 2021, did
5    Widen Enterprises have a board of directors?
6  A  **Widen Enterprises had a director, yes, and I was**
7     **that director.**
8  Q  Would you consider that to be a board of directors?
9  A  **I consider that to be I was a director so**
10    **singular.**
11 Q  Were there any other directors of Widen Enterprises
12    at the time it was acquired by Acquia in September
13    of 2021?
14 A  **No.**
15 Q  Did the -- well, starting in September of 2021 and
16    working backwards, when do you recall or when was
17    there another director of Widen Enterprises?
18 A  **There were -- Reed Widen was a director of Widen**
19    **Enterprises from January of 1998 until**
20    **September 13, 2020.**
21 Q  You may have misread.  You're reading the bullet
22    point that says, "Reed Widen was a director of
23    Widen Enterprises from January of 1988 until
24    May 13 of 2021."  Is that right?
25 A  **That's -- you read that correctly.  If I didn't**

Page 58

1     **read that correctly, then I'll take your reading.**
2  Q  Okay.  And that's accurate?
3  A  **It is.  In addition, the bullet point above that,**
4     **"Stacy Randall was a director of Widen Enterprises**
5     **between January of 1988 and December 1997."**
6  Q  Was Stacy Randall a director of Widen Enterprises
7     for the entirety of that time period?
8  A  **Yes.**
9  Q  Likewise, was Reed Widen a director of Widen
10    Enterprises for the entirety of the period from
11    January 1988 until May 13, 2020?
12 A  **Yes.**
13 Q  This bullet point also notes that Reed was made
14    part of the executive committee of Widen
15    Enterprises in May of 1995.  What is the executive
16    committee of Widen Enterprises?
17 A  **The executive committee is the responsible**
18    **committee for executive operations at Widen.**
19 Q  Other than Mr. Widen, who served on the executive
20    committee of Widen Enterprises?
21 A  **The executive committee would have consisted of**
22    **other employees of the organization at that**
23    **time --**
24 Q  Which employees?
25 A  **-- that were part of the Widen family.**

Page 59

1        **So the executive committee would have**
2     **consisted of Stewart Widen.  The executive**
3     **committee may have had Mike Kiesler on it, in**
4     **addition to a gentleman by the name of Tom Schmidt.**
5  Q  And I just want to stop you there.  You said the
6     executive committee may have had Mr. Kiesler on
7     it.  I'm interested in what the executive
8     committee was comprised of, not what it may have
9     been comprised of or could have been or might have
10    been.
11 A  **Understood.  I would want to consult the documents**
12    **again.  I did not memorize that executive**
13    **committee.**
14 Q  What documents would you have to consult?
15 A  **I would go back and look at corporate records to**
16    **see if there is evidence of who was on that**
17    **executive committee.  I did not memorize those.**
18 Q  Do you believe that there is a document that lists
19    the members of the executive committee?
20 A  **I do not know if that document exists.**
21 Q  Any other -- other than Stewart Widen, Mike
22    Kiesler, Reed Widen, and, I'm sorry, you said Tom?
23 A  **Schmidt.**
24 Q  Schmidt.  Who is Mr. Schmidt?
25 A  **Mr. Schmidt was an executive VP of sales.**

Page 60

1  Q  What period did he serve in that capacity?
2  A  **I didn't memorize the dates of his employment.**
3  Q  Do you recall generally?
4  A  **I do not.**
5  Q  Was he employed when Acquia acquired Widen in
6     2021?
7  A  **He was not.**
8  Q  Did he retire at some point?
9  A  **He did.**
10 Q  Okay.  Other than Tom Schmidt, Stewart Widen, and
11    Reed Widen, and maybe Mr. Kiesler, were there any
12    other members of the executive committee?
13 A  **I would need to confer the documents to verify.**
14 Q  Mr. Reed Widen became a member of the executive
15    committee in 1995.  Did the executive committee
16    continue to exist until Widen was acquired by
17    Acquia in 2021?
18 A  **The executive committee wasn't referred to as an**
19    **executive committee as such.  It would have been**
20    **referred to as an executive team, and that would**
21    **have changed at --**
22 Q  Who is -- I'm sorry.  Go ahead.
23 A  **-- at a time I didn't remember the detail for, but**
24    **it would have changed into the executive team.**
25 Q  And who was on the executive team?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 61

1  A  At what time?
2  Q  Well, let's start with the acquisition by Acquia.
3  A  Yep.  The executive team at the time Acquia
4     acquired Widen was me, it was Mike, and it was
5     Deanna Ballew, who is our chief innovation
6     officer, it was Ben Dotte.
7  Q  I'm sorry.  What was that?
8  A  Ben Dotte, Dotte, D-o-t-t-e, who was our head of
9     engineering.  It was Debby Leisner, L-e-i-s-n-e-r,
10    who was our head of operations.  It was Jake
11    Athey, A-t-h-e-y, who was our head of sales and
12    marketing.  Matthew, Mike, Deanna, Debby, Ben,
13    Jake.  Jake would also have had customer success
14    responsibility.  So that was the executive team at
15    the time.
16 Q  Did the executive team at the time of the
17    acquisition by Acquia have regular meetings?
18 A  The executive team had regular meetings, and I
19    would say in addition to the people I listed,
20    there was also Reed's involvement and Gary
21    Norris's involvement.  Gary Norris was referred to
22    as an executive advisor.  Prior to his role as an
23    executive advisor, he was the chief technology
24    officer.
25       So they would participate in executive team

Page 62

1     activities by way of -- I would read out to Reed
2     and report activities there, and Gary would also
3     get certain information from the executive team,
4     and both would confer to that executive team
5     through me related to business matters.
6  Q  I'll ask you about that in just one second, but
7     I do want to get an answer to the question that
8     I asked which was did the executive team have
9     regular meetings?
10 A  Yes.
11 Q  How frequently?
12 A  Weekly.
13 Q  Were there typically written agendas for executive
14    team meetings?
15 A  In the time period we're at, which is the time of
16    Acquia acquiring Widen?
17 Q  Correct.
18 A  Yes.
19 Q  Were minutes kept of these executive team meetings?
20 A  There were agendas and notes taken for these
21    meetings.
22 Q  Was there one person who was responsible for
23    taking notes?
24 A  There was a collaboration of people who would add
25    to the document as we addressed various topics.

Page 63

1  Q  Did that document then have a name?
2  A  It would be referred to as the executive team
3     document.  It would have that name.  I don't
4     remember at this very moment the exact file name,
5     but it would have a name related to executive
6     team.
7  Q  And you referenced that Reed and Gary Norris
8     were involved, and I just want to make sure
9     I understand the nature of their involvement.
10    I think you said that they were provided updates
11    after meetings?
12 A  They were.  Sometimes they would have topics for
13    those meetings, and, yeah, those would be brought
14    to that team.
15 Q  Did Reed and -- well, let me start with Reed.
16       Did Reed regularly participate in the
17    executive team meetings?
18 A  He would not have been in the room for those
19    executive team meetings.
20 Q  And when you say he wasn't in the room, did he
21    participate virtually in the executive team
22    meetings?
23 A  He did not.  The operational updates were also a
24    place where I would read out the -- or inform him
25    of activities related to certain things that we

Page 64

1     were talking about.
2  Q  Did -- Strike that.
3        How -- again looking backwards from September
4     of 2021 when I understand this was the composition
5     of the executive team, for what period of time
6     preceding 2021 was this the composition of the
7     executive team?
8  A  Ben and Debby were considered guests on that team
9     for a period of time.  They were titled with
10    senior director and would have participated in
11    that team as more of a guest status, and that was
12    for a duration of a few -- for a time.
13       That team existed -- Debby was the recent
14    addition to that team.  She started in 2018.  Ben
15    reported to Deanna, and he wouldn't have been on
16    the team for that long.
17       I would say that team was my team when I took
18    the CEO role in 2009.  So I would put it back to
19    that far for Jake, for Deanna, for Mike.  And then
20    Debby and Ben would have came on after that.
21       Gary was on that team as well.  And in his
22    CTO capacity, Terry Vial was another member of
23    that team in that tenure that I'm speaking of from
24    2009 forward.  He would have been in charge and he
25    was in charge of pre-media operations, a business

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 65

1   unit of Widen.
2       Brian Becker is another person who was on
3   that team.  He was in charge of the customer
4   relationships for the pre-media business unit.
5   Those two would have also been on that team at
6   that time.
7   Q   Other than the individuals that you've referenced,
8   are there any other members that you can think of
9   of the executive team from 2009 to 2021?
10  A   Not that I can recall.
11  Q   And during the duration of that time, from 2009
12  to 2021, was Stacy Randall ever a part of that
13  executive team?
14  A   She was not.
15  Q   During that time, from 2009 to 2021, did Reed
16  Widen ever regularly participate in the executive
17  team meetings?
18  A   He would have participated in some meetings, not
19  all meetings.
20  Q   During the course of time from 2019 to -- excuse
21  me.  I may have misspoke.  Let me just start over.
22      During the duration of time from 2009 until
23  2021, did Reed Widen ever regularly attend the
24  executive team meetings?
25  A   He attended the team meetings.  I don't have

Page 66

1   memory of whether or not that was regular or
2   irregular, just that he would have attended
3   meetings.
4   Q   Do you know how many meetings he attended of the
5   executive team?
6   A   We did not log attendance to those meetings, and
7   I don't -- I did not dig into those details, nor
8   would I have a source to dig into.  So he would
9   have attended meetings, and he would not have
10  attended all meetings, but he was attending some
11  meetings.
12  Q   Okay.  So from 2009 to 2021, Reed would have
13  attended some meetings of the executive committee,
14  but you don't recall how many or with what
15  frequency?
16  A   Correct.
17  Q   Did Reed -- when he attended these meetings, did
18  he attend them in person?
19  A   Yes.
20  Q   Did Reed attend any meetings of the executive
21  committee in 2021?
22  A   2021.  Not that I recall.
23  Q   Did Reed attend any meetings of the executive
24  committee in 2020?
25  A   We did not keep records of attendance.  It's

Page 67

1   possible he did.  But, again, I don't have those
2   details.
3   Q   Do you recall Reed Widen participating in any
4   meeting of the executive team in 2020?
5   A   Again, I don't -- we didn't keep attendance.
6   I didn't look into that level of detail, nor would
7   I have a source to look into.  So he may have
8   attended some executive team meetings in 2020.
9   Q   And it's likewise equally possible that he did not
10  attend any meetings of the executive team in 2020?
11  A   He may have attended meetings in 2020.
12  Q   And he may not have; correct?
13  A   Since it's a he may have, he also may not have.
14  Q   Prior to 2009 when you took over as the CEO, who
15  was on the executive committee at that time?
16  A   Prior to my tenure as CEO?
17  Q   Correct.
18  A   The executive team consisted of Reed, Terry Vial,
19  Brian Becker, Tom Schmidt, Stewart Widen, Gary
20  Norris.
21  Q   Any other members of the executive -- well, and
22  let me just clarify.
23      Before 2009 when you took over, was the
24  executive --
25  A   Mike Kiesler.  Sorry.  I'm sorry.  I just

Page 68

1   interrupted you.
2   Q   Nope.  No problem.
3       Prior to 2009, I understand that when you
4   took over it became the executive team.  Prior to
5   you taking over as the CEO, was it still called an
6   executive committee?
7   A   I don't recall the naming and how the naming of
8   that team changed over time.
9   Q   Do you know whether the executive team or
10  committee had regular meetings prior to you taking
11  over as CEO in 2009?
12  A   I observed those meetings.  Yes, they did have
13  meetings.
14  Q   How frequently were those meetings?
15  A   Weekly.
16  Q   And similar to the practice that you described of
17  taking notes during the executive team meetings,
18  after you took over in 2009, prior to you taking
19  over did the executive committee take similar
20  notes?
21  A   I -- yes, they did take notes.  Not in the same
22  fashion, but they would have taken notes.
23  Q   You said not in the same fashion.  Describe that
24  for me.  How would they have taken notes?
25  A   Well, they would have taken notes, perhaps paper

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 69

1   notes.  The collaboration that we ran in agendas
2   post-2009 would have been inviting other people to
3   post topics and comment on those topics, so you
4   were collaborating up until the point of the
5   meeting time and day.  So there was not the same
6   level of collaboration at that time but still
7   meeting notes.
8   Q   Do you know whether there was one person that was
9       charged with taking the notes of the executive
10      committee meeting prior to your taking over as the
11      CEO in 2009?
12  A   I don't.
13  Q   Exhibit 2 at the second bullet point that's
14      indented twice over indicates that Reed was the
15      director -- was a director of Widen from 1988
16      until May 13, 2020.
17          Do you know why Reed Widen was no longer a
18      director of Widen Enterprises as of May 13, 2020?
19  A   He moved to a director of Windy Waters at that
20      time.
21  Q   Why did becoming a director of Windy Waters
22      require Reed to stop being a director of Widen
23      Enterprises?
24          MR. LAING:  Objection as to the
25          form.

Page 70

1   A   Reed becoming a director of Windy Waters and no
2       longer being a director of Widen Enterprises was
3       something conferred with counsel at the time, and
4       that decision was made in collaboration with Reed
5       and Mike and Lee Kilkelly, the law firm at the
6       time.
7   Q   Do you know who at Lee Kilkelly Reed conferred
8       with with regard to that decision?
9   A   Scott Seid.  Reed and Mike conferred.
10  Q   And on the second page of Exhibit 2, it indicates
11      that you became the president and a director of
12      Widen on May 13, 2020.
13  A   Correct.
14  Q   Do you recall why you became the president and a
15      director of Widen Enterprises on May 13, 2020?
16  A   That was part of the dialogue that Reed and Mike
17      had with Scott Seid and that Reed was moving out
18      of his role for president and director and that
19      I was stepping into his role as president and
20      director.
21  Q   Did anything about your responsibilities at Widen
22      Enterprises change on May 13 of 2020?
23  A   I was taking on the president role and a director
24      status, and so I would have had additional
25      responsibilities related to those matters.

Page 71

1   Q   What were those additional responsibilities?
2   A   Oversight of the governance matters of the
3       organization, of Widen Enterprises.
4   Q   What governance matters were you taking on
5       oversight of when you became the president and a
6       director of Widen Enterprises?
7   A   That would be confirming the things like the
8       meetings and what needed to be talked about and
9       addressed.
10  Q   What meetings?
11  A   Those would have been meetings that Mr. Kiesler
12      and I would have had as part of the executive team
13      but also as part of general conversations about
14      things related to things that were stated in the
15      meeting minutes, such as profit sharing and --
16  Q   Are you talking about an annual meeting?
17  A   I'm talking about regular meetings.
18  Q   Of?
19  A   Of the executive team and also regular
20      conversations with Mike, who was the secretary at
21      the time.
22  Q   Let me back up, because you've already described
23      your role as the leader of the executive team
24      between 2009 and 2021, and I just want to --
25  A   Correct.

Page 72

1   Q   -- clarify what, if anything, about your role, and
2       I'm talking about your day-to-day responsibilities
3       at Widen Enterprises, changed when you became the
4       president and a director of the organization on
5       May 13 of 2020.
6   A   The day-to-day responsibilities were -- my role as
7       CEO did not change.  I continued to do day-to-day
8       responsibilities.  In addition to the day-to-day
9       responsibilities, I had oversight over other
10      matters, such as the meeting minutes and
11      conferring with Mike on those matters.
12  Q   What meeting minutes did you have responsibility
13      for that you didn't otherwise have responsibility
14      for when you became president on May 13 of 2020?
15  A   The formality of the minutes that were supplied as
16      part of our corporate governance documentation.
17  Q   I'm sorry.  I'm just not understanding.  Are those
18      executive team minutes that you're referring to?
19  A   No.  Those would be formal meeting minutes that
20      were assembled.
21  Q   How many formal meeting minutes did you personally
22      assemble as the president of Widen Enterprises
23      beginning on May 13, 2020?
24  A   I didn't personally assemble any meeting minutes,
25      but I reviewed meeting minutes that were assembled

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 73

1    in my tenure as president that were organized in
2    combination with Lee Kilkelly at the time and
3    Mike Kiesler based on a template that we had
4    followed prior.
5  Q  Do you recall how many of those you reviewed?
6  A  I recall reviewing one, and they were annual
7    meeting minutes.
8  Q  Prior to you becoming the president of Widen
9    Enterprises on May 13, 2020, whose responsibility
10   was it to review those meeting minutes?
11 A  That would have been Reed and -- Reed in his
12   capacity as president.
13 Q  Who did the executive team report to?  And let me
14   just be clear as to time.
15      From the time that you became CEO in 2009 to
16   the time that Acquia acquired Widen in 2021, who
17   did the executive team report to?
18 A  Most of the people on the executive team reported
19   to me.
20 Q  Who did not report to you?
21 A  There is a time period, as I mentioned earlier,
22   where Ben reported to Deanna.  But other than
23   that, all others would have been direct reports of
24   mine.
25 Q  Did anyone on the executive committee report to

Page 74

1    Reed Widen?
2  A  No.
3  Q  Who did Reed Widen report to, if anyone?  And just
4    for clarity's sake, I'm referring to 2009 to 2021.
5  A  Reed Widen would have reported to -- well, he was
6    the president, so he didn't report in the Widen
7    Enterprises to anyone.  He was the leader.
8  Q  Did Widen -- for any part of this time from 2009
9    to 2021, did Widen Enterprises have a board of
10   directors?
11 A  There was an informal assembly of advisors who
12   Reed put in place early in my tenure as CEO.
13 Q  Who was that?  Who was on that informal assembly
14   of advisors?
15 A  That would include a local entrepreneur by the
16   name of Ben Scharff, the president of Park Bank at
17   the time who was Jim Hegenbarth, a representative
18   from Baker Tilly.
19 Q  Do you recall that person's name who was a
20   representative of Baker Tilly?
21 A  Tim Christen was the first representative, and
22   subsequent to Tim it was Jeff Horein.  Gary Norris
23   was part of that, Mike Kiesler was part of that,
24   and Reed was part of that.
25 Q  Did you participate in the meetings of this

Page 75

1    informal assembly of advisors?
2  A  I presented to this group.
3  Q  How long did this assembly of advisors exist for?
4  A  It existed in the early part of my tenure as CEO.
5    I did not prepare for an exact date in response to
6    this.
7  Q  Do you know if they met regularly?
8  A  We met quarterly.
9  Q  Quarterly.  For one year?
10 A  Yes.
11 Q  For more than one year?
12 A  Again, I didn't prepare for that level of detail.
13   So --
14 Q  Where would you have to look to find out the
15   answer to that question?
16 A  I would look at presentations that were made to
17   that board to determine that.
18 Q  What types of topics did you cover in the
19   presentations to the board?
20 A  Business performance.
21 Q  Anything else?
22 A  That's quite a broad subject.  So all business
23   matters related to Widen Enterprises.
24 Q  Would the topics that you covered in these
25   presentations to the informal assembly of advisors

Page 76

1    be similar to the topics that you covered in your
2    operational updates?
3  A  The operational updates would have represented a
4    summary of like matters that were discussed during
5    those quarterly meetings.
6  Q  And you referenced that there were presentations
7    that you gave.  Were there written materials
8    associated with these presentations?
9  A  Yes.
10   PowerPoint presentations?
11 A  Presentations.  I don't know the format.
12 Q  Sure.  Okay.  Do you know whether those
13   presentations were collected and provided to
14   counsel for the purpose of this litigation?
15 A  I'd need to confer with counsel.
16 Q  Fair to say that Widen Enterprises has grown
17   significantly since you became the CEO?
18 A  Widen Enterprises has grown since I became the
19   CEO.
20 Q  Do you recall when you began in 2009 as the CEO
21   approximately how many employees Widen Enterprises
22   had?
23 A  I didn't prepare that level of detail for this
24   topic.
25 Q  Approximately, do you recall?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of Corporate Rep of Widen Enterprises, LLC*
**November 06, 2023**

Page 77

1  A  I do know the mix of employees was different, and
2     I might give you a very broad range to ensure that
3     because I don't have that level of detail.  80 to
4     120.
5  Q  And when Widen Enterprises sold to Acquia in 2021,
6     how many employees did Widen have at that time?
7  A  I didn't memorize that specific number.
8  Q  An approximation is fine.
9  A  An approximate of 150.  I would probably range
10     that.  Maybe 130 to 150.
11  Q  Sure.  Would it be fair to say that growth was an
12     important part of Widen Enterprises' strategy from
13     the time that you became CEO until 2021?
14  A  I think growth was always an important part of the
15     Widen strategy, not connected with my tenure as
16     CEO.
17  Q  I just want to make sure I understand your
18     testimony.  So growth at Widen Enterprises was
19     always an important part of Widen Enterprises'
20     strategy even preceding your tenure as CEO?
21  A  Correct.
22  Q  What was Stacy Randall's role in Widen Enterprises?
23  A  Stacy Randall would have been an employee at times
24     in Widen Enterprises.
25  Q  What was the nature of her employment with Widen

Page 78

1     Enterprises?
2  A  Administration.
3  Q  She was a receptionist?
4  A  I would refer to it as administration.  Reception
5     of guests and administrative matters would have
6     been part of that.
7  Q  At some point was her employment with Widen
8     Enterprises terminated?
9  A  It was.
10  Q  For what reason?
11  A  I would need to confer with counsel to recall that
12     reason.  I didn't prepare that level of detail here.
13  Q  Do you recall when that was?
14  A  Same.  I didn't prepare that level of detail for
15     this.
16  Q  Do you recall when Stacy Randall was last employed
17     by Widen Enterprises?
18  A  I didn't prepare that level of detail to those
19     dates.
20  Q  Other than her role as an employee at Widen
21     Enterprises, did Stacy have any other role in
22     Widen Enterprises?
23  A  Stacy's role was a director from January of 1988
24     until December of 1997.
25  Q  As a director of Widen Enterprises, did Stacy

Page 79

1     regularly attend meetings at Widen Enterprises?
2  A  No.
3  Q  Did Stacy, as a director of Widen Enterprises,
4     have regular interactions with anyone at Widen
5     Enterprises?
6  A  Her interactions would have been with the family,
7     so, yes, regular interactions with Reed Widen,
8     Price Widen, Stewart Widen --
9  Q  And, again --
10  A  -- Mark.
11  Q  -- I'm not interested in would have beens or could
12     have beens or should have beens.  I'm interested
13     in what you know actually occurred.
14         MS. POLAKOWSKI:  So with that in
15         mind, could you just read back my question,
16         please, Peggy.
17         (Question read)
18  A  Stacy had regular interactions with Stewart Widen,
19     Reed Widen, Price Widen, Mark Widen at that time.
20  Q  Let me be more specific in my question.  Did
21     Stacy have regular interactions with anyone at
22     Widen Enterprises in her capacity as a director of
23     Widen Enterprises with regard to the business of
24     Widen Enterprises?
25  A  She had exchanges with the previously

Page 80

1     aforementioned people, Reed Widen, Stewart Widen,
2     Mark Widen, Price Widen, for business matters.
3  Q  What were the business matters that Stacy had
4     regular interactions with Reed, Stewart, Mark,
5     and/or Price Widen regarding?
6  A  They would collaborate on the business matters of
7     the organization.
8  Q  What specific business matters of the organization?
9  A  I didn't prepare that level of detail here.
10  Q  Can you tell me any business matter of the
11     organization that Stacy ever collaborated with
12     anyone regarding?
13  A  As an example, when Reed was placed into the
14     president role, Stacy was part of a group of
15     people who signed that, so that would be an
16     example of her involvement.
17  Q  Stacy signed off on Reed becoming the president
18     of the Widen Enterprises organization.  Did Stacy
19     collaborate on any other business matter with
20     regard to Widen Enterprises that you can tell me
21     about?
22  A  I didn't prepare that level of detail.
23  Q  And when Stacy signed off on Reed becoming the
24     president of Widen Enterprises, was she physically
25     present to vote for him to become president?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 81

1  A  Stacy signed the agreement -- or not the
2     agreement.  Stacy signed the document, the
3     corporate record that I reviewed and looked at.
4  Q  Did she physically sign the document or was her
5     signature stamp used on that document?
6  A  I could not tell based on my observation of that
7     document, but her signature was on it next to Mark
8     and Stewart and Price and Reed.
9  Q  Other than her brothers and her father, did Stacy
10    have regular interactions with anyone at Widen
11    Enterprises while she was a director of Widen
12    Enterprises with regard to the business of Widen
13    Enterprises?
14 A  Not other than those people that you mentioned.
15 Q  Did Stacy regularly receive financial updates
16    for Widen Enterprises as a director of Widen
17    Enterprises?
18 A  She received financial updates in collaboration
19    with the people that were mentioned before.
20 Q  Tell me each and every financial update that was
21    provided to Stacy when she was a director of the
22    organization.
23 A  Those matters would have been collaborated --
24    those matters were collaborated by the family.
25 Q  So you don't know?

Page 82

1  A  Stacy and Mark and Reed and Stewart and Price
2     collaborated as a family for business matters and
3     conversed on business topics.
4            MS. POLAKOWSKI:  Could you read
5         back my question?
6            (Question read)
7  A  I don't have those details.
8  Q  So to be clear, you do not know any financial
9     update that was ever provided to Stacy Randall
10    while she was a director of Widen Enterprises?
11 A  I do not have documentation that would provide
12    that, no.
13 Q  When Stacy was no longer a director of the
14    organization after 1997, did Stacy ever receive
15    financial updates of Widen Enterprises?
16 A  Stacy -- Stacy may have received financial
17    information following that based, again, on her
18    collaboration with the family.
19 Q  Again, I'm not interested in what may have
20    happened or what could have happened.  I'm asking
21    you specifically what did happen.
22            MS. POLAKOWSKI:  And with that in
23         mind, Peggy, could you read the question
24         back, please.
25            (Question read)

Page 83

1  A  She received financial updates when she requested
2     them.
3  Q  Tell me each and every time that Stacy requested a
4     financial update after 1997.
5  A  I didn't prepare that level of detail.  There is
6     an example from -- that financials were provided
7     to her in April of 2019 when her then husband
8     asked for financial information, and that request
9     was made from Steven Randall to Mike Kiesler for a
10    three-month date range of financial performance,
11    and I believe that date range was February of '19
12    to April of '19, and Mike Kiesler delivered on
13    that request providing January of 2019 to April of
14    2019 financial performance to respond to Steven
15    Randall and then included Stacy Randall in that
16    matter.
17 Q  I will represent to you that I have seen a
18    three-month financial statement provided in
19    response to a request from Steven Randall to
20    Michael Kiesler in 2016.  Is it possible that
21    that's what you're thinking of?
22 A  Thank you for that help.  It's possible.
23 Q  Other than that 2016 three-month disclosure of
24    financial information, can you tell me any other
25    time that Stacy was provided financial updates of

Page 84

1     Widen Enterprises?
2  A  In 2020, she asked Mr. Kiesler for financial and
3     account information to be provided to her
4     attorneys, and that was provided to her.
5  Q  And that was in the context of her redemption;
6     is that right?
7  A  No.
8  Q  When in 2020 are you referring to Stacy asking for
9     financial information?  Was it after her
10    redemption?
11 A  No.  Before her redemption.
12 Q  When was that request made?
13 A  I believe that request was February of 2020.
14 Q  And what was provided to Stacy in response to her
15    request?
16 A  I didn't prepare that level of detail.  I know it
17    was financial information and account information
18    as she requested, but I did not provide that level
19    of -- I didn't prepare for that level of detail
20    here.
21 Q  You don't know whether revenues were disclosed to
22    her in February of 2020?
23 A  I know that the information that she requested was
24    delivered, and I do not know what that information
25    contained.  I did not prepare that level of detail

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 85

1     for this question.
2  Q  Was that provided to Stacy or to her attorney?
3  A  It was provided to her attorney as requested, and
4     I would, again, need to verify or look at details
5     related to that correspondence to see if she was
6     also included.
7  Q  And was that in the context of Stacy's divorce
8     that that was provided?
9  A  I do not know the context for which it was
10    provided.
11  Q  Do you know whether the attorney requesting it was
12    Stacy's divorce attorney?
13  A  I do not.
14  Q  Do you know whether that information has been
15    disclosed in this litigation?
16  A  Disclosed to counsel.
17  Q  Okay.  Other than the 2016 three-month disclosure
18    of financials and what you just referenced as a
19    February 2020 disclosure to counsel of financial
20    information, can you tell me any other time that
21    Stacy received financial updates of Widen
22    Enterprises?
23  A  I don't have any other examples for that.
24  Q  Did Widen Enterprises ever provide to Stacy
25    financial updates without Stacy specifically

Page 86

1     requesting it?
2  A  Stacy received -- financial, can you clarify
3     financial updates?  Or expand on what you mean by
4     financial updates?
5  Q  Sure.  Let's start with income statements.  Were
6     income statements ever provided to Stacy?
7  A  Without her request?
8  Q  Correct.
9  A  No.
10  Q  Were profit and loss statements ever disclosed to
11    Stacy?
12  A  One add on that last one.  With the exception of
13    the dates that -- or the examples that we
14    previously talked about.
15  Q  Sure.
16  A  The 2016 example that you corrected me on and then
17    the 2020 example, which is unknown in terms of the
18    detail of that.  But, yeah, with those two not in
19    consideration.
20  Q  I just want to be sure I understand the February
21    2020 disclosure that you're telling me about.
22    Do you know what specifically was disclosed in
23    that February 2020 disclosure?
24  A  I didn't look at that detail in preparation for
25    this.

Page 87

1  Q  Okay.  Was that disclosed in an email?
2  A  I did see an email with that referenced, yes.
3  Q  Was that going from Mr. Kiesler to her attorney?
4  A  It was a request from Stacy to Mike.
5  Q  Okay.  And the response was sent from Mike to
6     Stacy's attorney; is that right?
7  A  It was -- this is the detail that I did not
8     prepare for this, so I would need to look at that
9     again.
10  Q  Okay.  And I may have asked this already, and I
11    apologize if I have.  But other than the 2016 and
12    the 2020 disclosures that you just referenced, are
13    there any other instances of financial updates
14    being provided to Stacy that you are aware of?
15  A  Outside of other disclosures related to K-1s,
16    which I know were provided to her.  So K-1s and --
17    yeah, that would be it.  K-1s.
18  Q  I want to talk just briefly about your role as the
19    CEO of Widen.  You've been the CEO -- or I guess
20    you were the CEO from 2009 to 2021; correct?
21  A  Correct.
22  Q  What were your job responsibilities as the CEO of
23    Widen?
24  A  Oversight of day-to-day activities, to include the
25    two businesses that we ran at the time.  So the

Page 88

1     business unit of pre-media, the business unit of
2     software, the related customer service and
3     support, and implementing and executing on
4     strategy growth -- for growth.
5  Q  How was your job performance evaluated?
6  A  My job performance is evaluated on my individual
7     performance, how well was I doing at that job,
8     which would have been evidenced by how well the
9     organization was performing, which could be looked
10    at across a variety of factors, to include the
11    learning and growth of the company, how well were
12    we performing culturally, how well were we
13    innovating, operating, servicing, how satisfied
14    were customers, how were we doing financially.
15    Those were general matters that would indicate
16    performance.
17  Q  Who evaluated your performance?
18  A  Reed was ultimately the person who evaluated my
19    performance.
20  Q  Were you typically in the office every day?
21  A  I was.  For time periods that were pre-COVID, yes.
22    And there were time periods post-COVID as well.
23    So I don't have specific dates for that.  But I
24    know there is a topic related to COVID.
25  Q  Sure.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of Corporate Rep of Widen Enterprises, LLC*
*November 06, 2023*

Page 89

1  A   Do you want me to expand on the detail?
2  Q   No, that's fine.  2009 to 2021, how many hours a
3      week would you say you worked for Widen Enterprises?
4  A   Can you repeat the dates again?
5  Q   2009 to 2021.
6  A   How many hours per week?
7  Q   Correct.
8  A   It was not -- the role of the CEO is not a
9      40-hour-a-week job.  It was -- I suppose it was
10     all the time.  So it was responsive to whatever
11     the needs of the organization were whenever those
12     needs arose.
13 Q   And when you say it wasn't a 40-hour-a-week job,
14     you mean it was substantially more than 40 hours a
15     week; correct?
16 A   Correct.
17 Q   Tell me about your relationship with Reed Widen.
18 A   Reed was my boss.  He was the leader of the
19     company and provided direction to me and
20     mentorship to me in my capacity as CEO for the
21     duration of time when I was CEO.
22 Q   And let me start again with 2021 and work
23     backwards.  In 2021 when Widen was acquired by
24     Acquia, how frequently did you interact with Reed?
25 A   Frequent.  We would communicate -- well, the

Page 90

1      operational updates again would be indicative of
2      some of the topics and we would converse sometimes
3      multiple times a week.  There would be time
4      periods where we wouldn't converse for a couple
5      weeks.
6          So I would say it would be -- there was not
7      a regular interval of those dialogs, but we would
8      communicate.  I would cite that frequently and we
9      would -- I would address his questions that he
10     would ask.
11 Q   Other than the operational updates, did you
12     typically email with Reed Widen?
13 A   I would say it was a mix of email, meetings, phone
14     calls, lunches.
15 Q   Would it be fair to say that you reported to
16     Reed Widen?
17 A   It would.
18 Q   Who at Widen Enterprises, other than yourself,
19     worked directly with Reed in the period of 2009
20     to 2021?
21 A   In a reporting line?
22 Q   Yes.
23 A   No one.
24 Q   Did Widen Enterprises, to the -- well, did Widen
25     Enterprises ever direct the actions of Windy

Page 91

1      Waters' officers?
2  A   No.
3  Q   Did Widen Enterprises ever direct the actions of
4      Windy Waters' directors?
5  A   No.
6  Q   Did Reed Widen in his capacity as chairman of
7      Widen Enterprises ever direct the actions of
8      Windy Waters' officers?
9  A   Reed Widen would step in on Windy Waters' matters
10     when there was the need for people to step in and
11     take action, yes.
12 Q   Are you aware of any circumstance in which Stacy
13     Randall ever directed the actions of Windy Waters'
14     officers or directors?
15 A   Am I aware of any time Stacy would have directed
16     the actions of Windy Waters or its officers?  I'm
17     aware of Stacy's involvement on the governance
18     matters that required her signature for elections
19     and minutes.  So that's what I'm aware of.
20 Q   And my question -- that didn't quite answer my
21     question, which was did Stacy Randall ever direct
22     any officer or director of Windy Waters?
23 A   By direct, can you expand on what that might look
24     like?
25 Q   Well, let me go back to your response with regard

Page 92

1      to Reed.  You said that Reed stepped in when
2      needed to direct officers or directors of Windy
3      Waters.  What did you mean by that?
4  A   Give guidance.  And so with that definition of
5      guidance, then the answer to Stacy is no.
6  Q   And I want to just explore briefly.  You said Reed
7      did step in when needed to direct the officers or
8      directors of Windy Waters.  Tell me about the
9      circumstances that you're referring to when it was
10     needed for Reed to step in to direct the officers
11     or directors of Windy Waters.
12 A   When decisions were made about the, again, I would
13     say the meeting minutes and the elections that
14     took place for Windy Waters, Reed would involve
15     himself there, and there were other matters of
16     Windy Waters related to investments where Reed
17     would also be involved.
18 Q   And Reed ultimately stepped in to direct
19     Mr. Kiesler as the secretary of Windy Waters to
20     redeem all of Stacy's shares in May of 2020;
21     correct?
22         MR. LAING:  Objection to the form.
23 A   Can you restate it?
24         MS. POLAKOWSKI:  Would you mind
25     just reading it back, Peggy?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 93

```
1                    (Question read)
2                MR. LAING:  Objection to the form.
3    A   Stacy went to Reed for money, and that was the
4        first step in a process that resulted in her
5        redeeming her shares.
6    Q   Are you able to answer the question as it was
7        asked?
8                MR. LAING:  He did.
9    A   I did.
10   Q   Did Reed direct Mr. Kiesler to redeem all of Stacy
11       Randall's shares in May of 2020 or none at all?
12               MR. LAING:  Objection to the form.
13   A   Stacy came to Reed with a request for money, and
14       Reed did not want to be a bank account for Stacy
15       and he had advised Mike to offer to help by
16       redeeming all of her shares, and that was the
17       offer that Mike presented to Stacy.
18   Q   And that was the only offer that Reed authorized
19       Mr. Kiesler to make; correct?
20   A   And that was the only offer that Reed authorized
21       Mr. Kiesler to take -- to offer.  Yes.
22               MS. POLAKOWSKI:  Why don't we take
23       a ten-minute break.  We've been going about
24       an hour and a half.
25               MR. LAING:  Okay.
```

Page 94

```
1                THE VIDEOGRAPHER:  Going off the
2        record at 11:25.
3                (Recess)
4                THE VIDEOGRAPHER:  We are back on
5        the record at 11:43.
6    Q   Mr. Gonnering, I'd like to talk now about topic 4,
7        which is the day-to-day operations of Widen
8        Enterprises, including, without limitation, Reed
9        Widen's involvement in the day-to-day operations
10       of Widen Enterprises from 2015 through 2020.  Are
11       you prepared to testify on this topic?
12   A   I am.
13   Q   What did you do to prepare to testify with regard
14       to topic number 4?
15   A   I spoke with counsel in collaboration with Reed
16       and Mike.  I reviewed the operational updates.
17       I reviewed that which would have included a
18       variety of topics.  So that's what I did.
19   Q   Do you recall anything in the operational updates
20       that spoke specifically with regard to Reed's
21       involvement in the day-to-day operations of the
22       company?
23   A   Just that it reflected the dialogue that we would
24       have.
25   Q   Was Reed Widen involved in the day-to-day
```

Page 95

```
1        operations of Widen Enterprises from 2015 to 2018?
2    A   Reed was involved in the strategic operations, and
3        I would be daily.  So Reed would comment on daily
4        activities, but the daily day-to-day in the
5        trenches was my responsibility.
6    Q   How would Reed comment daily on operations of
7        Widen Enterprises?
8    A   He may not have commented daily, but we would have
9        dialogue about what was going on day-to-day
10       through the frequent communications that we had.
11       And --
12   Q   And -- sorry.  Didn't mean to interrupt.  Were you
13       done with your --
14   A   Yes.
15   Q   When you say the frequent conversations that you
16       had, would that be the considerations you
17       referenced earlier as being maybe a couple times
18       a week, maybe a couple times a month?
19   A   Yes.
20   Q   And that same duration also applied to 2015 to
21       2018?
22   A   2015 to -- yeah.  If we talked about it, isolate
23       it as '19 and '20 before?  I would represent that
24       it represents the duration of the time period,
25       yes.
```

Page 96

```
1    Q   Okay.  Thank you.  Did Reed participate in
2        strategic planning in 2019 and 2020?
3    A   Reed participated in strategic planning in 2019
4        and 2020, yes.
5    Q   What kinds of strategic planning was Widen
6        Enterprises involved in in 2019?
7    A   In 2019?  We were reviewing our strategy, our
8        brand, our corporate ideology.  And when I think
9        about that as 2019, that may also represent 2018.
10       And so now that I've got that, can you repeat your
11       question?
12               MS. POLAKOWSKI:  Sure.
13               (Question read)
14   A   So for 2018 and 2019, we were involved in
15       strategic planning for how to differentiate in our
16       market, for what the brand should stand for, and
17       what the corporate ideology of the organization
18       would represent.
19   Q   And what was Reed's -- what specifically did Reed
20       do with regard to strategic planning in 2019?
21   A   I reported to Reed the activities that we were
22       embarking on for those three categories, and then
23       Reed would offer commentary to me on those topics.
24       And then I would represent that in the planning
25       activities.
```

**Stacy L. Randall v.**
Reed C. Widen, et al.

*Video Deposition of Corporate Rep of Widen Enterprises, LLC*
**November 06, 2023**

Page 97

1  Q  Do you recall with any specificity what Reed
2     commented on with regard to strategic planning of
3     Widen Enterprises in 2019?
4  A  With that level of detail, I did not prepare.
5  Q  Did Reed provide any emails with regard to
6     strategic planning in 2019?
7  A  I didn't look for that level of detail.
8  Q  Did Reed provide any memos with regard to
9     strategic planning in 2019?
10 A  I didn't look for that level of detail.
11 Q  So you don't know?
12 A  I just didn't look for that level of detail.
13 Q  And so as you sit here today, you don't know?
14 A  As I sit here today, I can confirm that I did not
15    look for that level of detail related to the
16    preparation for this topic.
17 Q  And because you did not look for that level of
18    detail, you cannot say today whether it exists or
19    not; correct?
20 A  I can say that I didn't look for it.
21 Q  Same questions with regard to 2020, would your
22    answers be the same with regard to Reed's
23    involvement on strategic planning?
24 A  They would.
25 Q  And, likewise, can you tell me any specific input

Page 98

1     that Reed had with regard to strategic planning in
2     2020?
3  A  The dialogue that Reed and I would have as I would
4     share with him the planning activities and his
5     commentary on those.
6  Q  And as you sit here today, can you tell me any
7     specific input that Reed provided with regard to
8     the strategic planning of Widen Enterprises in
9     2020?
10 A  Reed's input to strategic planning would have been
11    generally the growth of the organization.  So his
12    input was what are we doing to grow, how might we
13    grow, what considerations should we be giving to
14    growth.
15       So that wouldn't represent just 2020.  That
16    would represent the time period here, which his
17    involvement was directing growth.
18 Q  What specifically did Reed direct with regard to
19    growth of the organization in 2020?
20 A  Not contained within 2020 but including 2020, it
21    would be related to how are we innovating to grow,
22    what are we doing to differentiate to realize
23    growth.  Those are matters there that Reed would
24    involve himself.
25 Q  Did Reed offer any suggestions or recommendations

Page 99

1     as to what the company should be doing to
2     innovate?
3           (Interruption - Knock on the door)
4  A  Should we?
5  Q  Go ahead and answer if you can.
6  A  Directionally, Reed would be guiding strategy as
7     it relates to differentiation in our current
8     product lines but also to diversify in the
9     products that we were going to market with.
10 Q  Do you recall with any level of specificity what
11    Reed directed with regard to diversification or
12    differentiation in 2020?
13 A  Including 2020, but not limited to it, Reed would
14    represent the customer experience.  So Reed was,
15    since I've known him, an advocate for the customer
16    experience.  And so that was -- and that flag has
17    been flown throughout our time at Widen, and that
18    was we will differentiate with customer experience
19    at the forefront, and Reed would always advocate
20    for that level of differentiation.  So what are we
21    going to be doing to bring the service experience
22    that we provide to customers in a way that
23    differentiates us from other people.
24 Q  Was that new in 2020 or was that consistent with
25    Reed's direction throughout the course of your

Page 100

1     tenure as CEO?
2  A  Consistent.
3  Q  Did Reed provide any memos with regard to
4     strategic planning in 2020?
5  A  I did not look.
6  Q  And, likewise, did he provide any emails with
7     regard to strategic planning in 2020?
8  A  I did not look.
9  Q  As you sit here today, can you recall any specific
10    examples of Reed's involvement in strategic
11    planning and the input that he provided with
12    regard to growth, innovation, or differentiation
13    of Widen Enterprises?
14 A  He would provide guidance on growth,
15    differentiation, and innovation in consultation
16    with me.  So the conversations we would have would
17    be, for example, Smartimage was a product that we
18    put into the market.  It was a new product, and he
19    would -- that was part of a diversification of
20    revenue that we were attempting.  And he would be
21    pressing on how that product was performing and
22    what reactions we would see from the market from
23    that.  So I would put that in the innovation
24    category.
25 Q  Smartimage, when was that implemented?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 101

1  A   I didn't prepare the details for Smartimage's
2      creation, but Smartimage was in existence in the
3      time period that you requested here.
4  Q   Was Smartimage Reed's idea?
5  A   It would not have been Reed's idea.  It would have
6      been the idea of a committee of people that were
7      responsible for organizing new product
8      development.  But that new product development
9      activity was a result of Reed's desire to continue
10     to diversify and grow.
11 Q   With the direction of diversify and grow, it would
12     be fair to say that any new product Widen
13     Enterprises on boarded would be consistent with a
14     direction to diversify and grow; correct?
15 A   Diversify and grow with new product, would every
16     new product fall under that category?  Some
17     products were adjacent to other products and there
18     was a dependency there, so it may not have been a
19     diversification play.  It may have been a
20     differentiation play.  So both would work in
21     tandem in that example.
22         The example that I'm thinking of is our entry
23     into product information management, or referred
24     to as PIM.  So that was an adjacent innovation
25     that was dependent on a core product that would

Page 102

1      diversify revenue, yes, but would also create
2      differentiation.  And so Reed was weighing in on
3      those matters.
4  Q   Did Reed participate in budgeting decisions in
5      2019 and 2020?
6  A   Yes.
7  Q   What specific budgeting decisions did Reed
8      participate in in 2019 and 2020?
9  A   He would participate in the direction of the
10     result, so the target that we were pursuing, and
11     he would set that target.  And then he would also,
12     as he looked at budget materials, he would
13     critique certain areas of the budget and ask
14     numerous questions about why we're spending money
15     in certain areas and seeking explanation.
16 Q   Other than yourself, was Reed involved with anyone
17     else on budgeting issues?
18 A   Reed would work with Mike.
19 Q   What tactical decisions was Reed involved in in
20     2019 and 2020?
21 A   Tactical decisions would be related to -- I'm
22     thinking about the operational updates is what I'm
23     thinking and conversation subsequent to those
24     operational updates, and tactically I would
25     represent, again, Reed would look at financial

Page 103

1      statements, and we would have conversations about
2      that.  So tactically, he would engage in
3      conversations around why are certain things
4      performing the way they are or not performing the
5      way I expected them to perform.
6          So that was a regular occurrence with respect
7      to the financial reviews that he would provide.
8      And --
9  Q   How often were financial statements provided to
10     Reed?
11 A   Monthly.
12 Q   Did Reed have to ask for those to be provided to
13     him?
14 A   I didn't surface the details for that related to
15     this topic.
16 Q   And so you don't know whether Reed asked -- had
17     to ask for financial statements monthly to be
18     provided to him?
19 A   I didn't look for that.
20 Q   Was Reed in charge of compensation and bonus
21     decisions?
22 A   Reed was in charge of compensation and bonus
23     decisions for me.
24 Q   Was Reed in charge of compensation and bonus
25     decisions for anyone other than you?

Page 104

1  A   For himself.
2  Q   Anyone other than himself --
3  A   He would --
4  Q   -- and you?
5  A   He would recommend a bonus for others.
6  Q   Do you recall what others Reed recommended bonus
7      decisions for?
8  A   Mike.
9  Q   Anyone else?
10 A   Not that I prepared for this.
11 Q   What information did Reed base his compensation
12     and bonus decisions on?
13 A   Reed would consult Baker Tilly for compensation
14     decisions.
15 Q   How often did Reed consult with Baker Tilly for
16     compensation decisions?
17 A   When compensation changes were made.
18 Q   So annually Reed would consult?
19 A   Annually.
20 Q   Did he do this in writing?
21 A   I didn't look for written materials related to
22     this in preparation for this topic.
23 Q   So you don't know?
24 A   I didn't look.
25 Q   So you don't know?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 105

1  A  I didn't look.
2  Q  Do you know whether Reed consulted with Baker Tilly
3     in writing?
4  A  I didn't look to see if he consulted with
5     Baker Tilly in writing.
6  Q  So as you sit here today, you're unable to say
7     whether he did or did not consult with Baker Tilly
8     in writing?
9              MR. LAING:  Well, let me object to
10             that.  You keep asking -- he's here as a
11             30(b)(6) witness, and you keep asking whether
12             he knows.  I'm assuming you're asking whether
13             the company knows.
14             MS. POLAKOWSKI:  Correct.
15             MR. LAING:  And he's saying the
16             company didn't look.  So he can't say if the
17             company knows or doesn't know, and I think
18             he's answered that four times.  So I don't
19             know what more you want him to do.
20 Q  As the company is testifying today, the company is
21    unable to answer the question of whether or not
22    Reed consulted with Baker Tilly in writing with
23    regard to compensation; correct?
24 A  The company didn't look for that level of detail
25    in preparation for the topics.

Page 106

1  Q  Other than consultation with Baker Tilly, which
2     you do not know was in writing or not, did Reed
3     rely on any other sources of information in making
4     his compensation and bonus decisions?
5  A  Reed relied on Baker Tilly.
6  Q  Do you know specifically who at Baker Tilly Reed
7     interacted with in determining compensation and
8     bonus decisions?
9  A  Russ Wolff and Brad DeNoyer.
10 Q  I'm sorry.  What was the last name?
11 A  Brad DeNoyer, D-e-N-o-y-e-r.
12             (Exhibit No. 3 marked for
13             identification)
14 Q  Mr. Gonnering, I've just handed you what has been
15    marked as Exhibit 3.  Do you recognize Exhibit 3?
16 A  I recognize the cover page of Exhibit 3.
17 Q  What was the -- First of all, you've reviewed this
18    document that's entitled Project Wildcat before?
19 A  I reviewed a Project Wildcat document from Grant
20    Thornton related to financial due diligence
21    before, yes.
22 Q  Take a minute and tell me if this is the report
23    that you've reviewed before with regard to
24    financial due diligence for Project Wildcat that
25    was prepared by Grant Thornton.

Page 107

1  A  It appears to be the report from Grant Thornton,
2     also referred to as quality of earnings.
3  Q  Do you recall -- well, first of all, were you
4     involved in engaging Grant Thornton for the
5     purpose of preparing this report?
6  A  I was involved with the relationship with Grant
7     Thornton in preparation for this report, yes.
8  Q  Do you recall what the purpose of this report was?
9  A  The purpose of this report was to have a third
10    party review our financial information.
11 Q  Why?
12 A  In connection with our go-to-market as a company.
13 Q  Were you involved in compiling and providing
14    documentation to Grant Thornton for the purpose of
15    this report?
16 A  I was involved with providing information to
17    Grant Thornton, yes.
18 Q  Who was your -- well, did you have a primary
19    contact at Grant Thornton that you were dealing
20    with with regard to this report?
21 A  We did.
22 Q  Who was that?
23 A  I'd like to look to see if his name is in here.
24    His name is Joe.  I do not recall his last name at
25    the moment.  I see the second page, if you flip,

Page 108

1     lower right corner, Joe Burke, Mike, and Austin.
2  Q  And I think you referenced Joe in your earlier
3     response.  Was Joe your primary point of contact?
4  A  Joe was my first point of contact.
5  Q  Sure.
6  A  Joe would have been involved at a high level.
7     Mike was involved in -- Mike with Grant Thornton
8     here, Serensits, was involved, and Austin would
9     have been involved as well.
10 Q  Did you have a primary point of contact or were
11    you in contact with each of these individuals?
12 A  I was in contact with each of these individuals.
13    My primary point of contact was Joe.
14 Q  Got it.  Who at Widen was the first to reach out
15    to Grant Thornton for the purpose of preparing a
16    financial due diligence for a go-to-market?
17 A  Me.
18 Q  When was your first contact with Grant Thornton
19    for that purpose?
20 A  It's a June 2021 report.  I'm going to connect a
21    few dates here.  We received a recommendation for
22    Grant Thornton from a combination of Software
23    Equity Group, SEG, and Holland & Knight, and I
24    would say that we have, the spring of 2021 would
25    have been our first engagement with Grant

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 109

1      Thornton.

2 Q   Okay. Was Reed involved in the compiling of
3      information for this report?

4 A   He did not individually provide information to
5      Grant Thornton, no.

6 Q   Is the report that is contained in Exhibit 3 true
7      and accurate to the best of Widen Enterprises'
8      knowledge?

9            MR. LAING: Let me object to the
10        form of that question. It's a 40 or --
11        49-page report, 50-page report. So unless
12        you want him to read it line by line now and
13        answer that, I think the question is humanly
14        impossible to answer. But if you're able to,
15        go ahead.

16 A   I can't answer that with the level of
17      sophistication that this report represents.

18 Q   You have reviewed this before, though; correct?

19 A   I've reviewed this financial due diligence that
20      Grant Thornton did, yes.

21 Q   Did you or anyone else at Widen Enterprises ever
22      contact Grant Thornton to make any corrections to
23      this report?

24 A   The process of assembling the report.

25 Q   And let me just clarify. I'm talking about the

Page 110

1      final report that is sitting here as Exhibit 3.

2            MR. LAING: The one that says
3        draft?

4            MS. POLAKOWSKI: The one that's
5        been provided to us.

6            MR. LAING: I'm just saying you
7        called it a final. It's stamped a draft.

8            MS. POLAKOWSKI: You can make your
9        record.

10            MR. LAING: So I would object to
11        the form of the question.

12 A   Can you repeat the question?

13 Q   Sure. Did anyone at Widen Enterprises ever
14      contact Grant Thornton with regard to this
15      Project Wildcat document to say there is anything
16      inaccurate about it?

17 A   The process of assembling this report would have
18      been a back and forth between Widen and Grant
19      Thornton.

20 Q   And after a final report was issued, did anyone at
21      Widen Enterprises ever contact Grant Thornton to
22      indicate that there was anything inaccurate about
23      the report?

24            MR. LAING: Objection to the form.

25 A   Did anyone at Widen Enterprises contact Grant

Page 111

1      Thornton after the final version was created? A
2      final version would represent the final, and so
3      following a final draft, we would not have engaged
4      Grant Thornton with further corrections, by
5      definition of the term final.

6 Q   And would it be fair to say that Widen Enterprises
7      relied on Grant Thornton's report?

8 A   Widen Enterprises relied on Grant Thornton's
9      report in combination with other reports, yes.

10 Q   Turn, please, to the page that has a Bates number
11      at the bottom SEG 00004142. Are you there?

12 A   I am.

13 Q   Do you see the section that is titled
14      Owner/President?

15 A   I see Section A, yeah, Owner/President, yes.

16 Q   It says, "This adjustment removes the company's
17      owner compensation (base salary, bonus, and
18      fringe) during the historical period as these
19      costs are not expected to continue
20      post-transaction. We understand the owner is not
21      actively involved in the operations of the company
22      and any role in the business will be absorbed by
23      current management."

24            Did I read that correctly?

25 A   You did.

Page 112

1 Q   Is the company's owner that's referred to there
2      Reed Widen?

3 A   It is.

4 Q   And based in part on the tables that are shown on
5      this page, SEG 00004142, Grant Thornton removed
6      Reed's salary, correct, in the EBITDA adjustments?

7 A   Grant Thornton created several EBITDA adjustments,
8      one of which was Reed's wages.

9 Q   To remove Reed's wages; correct?

10 A   To adjust them out so that a future owner could
11      see financial information without certain
12      adjustments in them.

13 Q   Is the statement, "We understand the owner is not
14      actively involved in the operations of the company
15      and any role in the business will be absorbed by
16      current management." Is that accurate?

17 A   That's what Grant Thornton wrote.

18 Q   That wasn't my question. Is that accurate?

19 A   Grant Thornton wrote, "We understand." So we, as
20      in Grant Thornton, understands the owner is not.

21 Q   Is it accurate that the owner was not actively
22      involved in the operations of the company?

23 A   The owner was actively involved in the operations
24      of the company.

25 Q   Did anyone at Widen Enterprises contact Grant

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 113

1  Thornton to say Reed Widen is actively involved in
2  the management of the company, you got that wrong?
3  A  We did not.
4  Q  Why not?
5  A  The framing of an EBITDA adjustment is why this
6  is relevant.  Because it is what would the
7  organization look like under new ownership and
8  what expenses would a new owner not incur.  So
9  generally the EBITDA adjustment is serving that
10  purpose.
11  Q  And this would reflect that a new owner wouldn't
12  compensate him or herself?
13  A  This reflects that one of the adjustments, Reed,
14  would not participate in the next generation of
15  the business or the next iteration of the business
16  under the new owner and, therefore, that potential
17  buyers of the organization could look at what the
18  company is without those expenses.
19  Q  And let's look at the first paragraph.  So the
20  first paragraph says, "This adjustment adds back
21  the total base compensation, bonus, and fringe for
22  the one owner/president/founder and executive
23  advisor.  These two current roles are nonessential
24  to the business operations, and we understand any
25  duties will be absorbed within the current

Page 114

1  management structure at no additional cost
2  burden."
3        Did I read that correctly?
4  A  You did.
5  Q  And this statement is accurate as well?
6  A  This is reflecting, again, what the EBITDA
7  adjustment is, which is a future buyer would be
8  able to look at the financial information of Widen
9  Enterprises without the expenses that would not
10  continue in the next iteration of the business.
11  Q  The owner/president/founder that's referenced,
12  that's Reed Widen; correct?
13  A  That's correct.
14  Q  The statement that that role is nonessential to
15  the business operations, that's accurate?
16  A  It is nonessential to the future business
17  operations as a new owner would not have Reed
18  part of it.
19  Q  That's not what it says here, though, is it?
20  A  It says it as part of the label of EBITDA
21  adjustments.
22  Q  And it's contemplated that Reed's role could be
23  replaced with no additional cost burden; correct?
24  A  That the new owners of Widen would have roles
25  related to what Reed would be providing and,

Page 115

1  therefore, they would not incur that expense and
2  Reed would not continue.
3  Q  And in the second paragraph that we talked about
4  already, it refers to a historical period, not a
5  future looking period; correct?
6  A  We're at the first chart?  Is that where you're --
7  Q  Right underneath the first chart.  It says,
8  "During the historical period."
9        "This adjustment removes the company owner's
10  compensation during the historical period."
11  A  Yep, I see it.
12  Q  So that's referring to something that happened in
13  the past; right?
14  A  A historical period represents the past.
15  Q  And with regard to the no additional cost burden
16  statement, it also says, "These two current roles
17  are nonessential to business operations, and we
18  understand that any duties will be absorbed within
19  the current management structure at no additional
20  cost burden."
21        Did I read that correctly?
22  A  I wasn't tracking the same sentence because you
23  ended with burden, and I ended with management.
24  Can you point me to that --
25  Q  Sure.  In the first bullet point on the page.

Page 116

1  A  Here?
2  Q  Yes.
3  A  Okay.
4  Q  Let's see.
5  A  This adjustment?
6  Q  Right.  The first -- at the end of the very first
7  paragraph.  "These two current roles are
8  nonessential."
9  A  Yes.
10  Q  It says, "Current roles are nonessential."
11  Correct?
12  A  It says, "These two current roles."
13  Q  And it says, "We understand any duties will be
14  absorbed within the current management structure."
15  Do you see that?
16  A  I do.
17  Q  It doesn't say within a future management
18  structure; correct?
19  A  Correct.
20  Q  And did anyone ever tell Grant Thornton they got
21  that wrong, and it should be a future management
22  structure?
23  A  No, because the assumption is under the label of
24  EBITDA adjustments, which represents what the new
25  owner would experience financially from those two

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 117

1  roles being adjusted out because they would not
2  continue.
3  Q  What information did Widen Enterprises provide to
4     Grant Thornton that created Grant Thornton or led
5     Grant Thornton to the conclusion that Reed was not
6     actively involved in the business operations of
7     Widen Enterprises?
8        MR. LAING:  Objection to the form.
9        It requires him to speculate and guess as to
10       what Grant Thornton relied on in making a
11       certain statement or assumption.  And if
12       you know, go ahead and answer.
13 A  I don't know.
14 Q  We would have to ask Grant Thornton that?
15 A  I would recommend asking Grant Thornton that, yes.
16 Q  Did Widen Enterprises provide Grant Thornton
17    with any information related to Reed's job
18    responsibilities for the purpose of preparing
19    this report?
20 A  I didn't prepare that level of detail for this
21    topic.
22 Q  If I wanted to see everything that Widen
23    Enterprises provided to Grant Thornton for the
24    purpose of preparing this report, is that
25    information preserved?

Page 118

1  A  We would have provided financial information to
2     Grant Thornton, and there were conversations with
3     Grant Thornton, and what we provided to Grant
4     Thornton is part of a data room that we used to
5     provide files to them.  So that information was
6     preserved in the data room.
7  Q  Is that data room still available?
8  A  The data room was provided to counsel.
9  Q  I'm sorry?
10 A  The data room was provided to our counsel.
11 Q  I see.  And just for clarity's sake, the data room
12    that was shared with Grant Thornton for the
13    purpose of preparing Exhibit 3 was provided to
14    your counsel for the purpose of responding to
15    discovery requests?
16 A  The data room was provided to counsel that
17    included information that we provided to Grant
18    Thornton.
19 Q  Did it include the entirety of information that
20    was provided to Grant Thornton?
21 A  I didn't look for that level of detail for this
22    topic.
23 Q  So as you sit here today, you do not, you being
24    Widen Enterprises, is unable to tell me what,
25    if any, information pertaining to Reed's role at

Page 119

1     Widen Enterprises was provided to Grant Thornton
2     for the purpose of preparing Exhibit 3?
3  A  Widen Enterprises is unable to provide that
4     because I didn't look for it.
5  Q  All right.  Turning back to Exhibit 1, the Notice
6     of Deposition, I'd like to talk about topic 5, any
7     and all work performed by Reed Widen on behalf of
8     Widen Enterprises from 2015 to 2021.  Are you
9     prepared to testify with regard to topic 5?
10 A  I am.
11 Q  What, if anything, did you review in preparation
12    to testify with regard to topic 5?
13 A  I reviewed the operational updates that were
14    provided to Mr. Widen.  I also had conversations
15    with counsel, and Reed and Mike were part of that.
16 Q  I'm sorry.  What was the last part of that?
17 A  I'm sorry.  I provided -- We had conversations
18    with our counsel with Reed and Mike present.
19 Q  Okay.
20 A  In preparation for this topic.
21 Q  Are you able to tell me today any specific
22    projects that Reed was a part of during 2015 to
23    2020 at Widen Enterprises?
24 A  The operational updates that were provided to Reed
25    reflect dialogue about the topics that we spoke

Page 120

1     about, and his involvement with those projects
2     were as earlier stated, strategic in nature.  So
3     oversight of those activities.
4  Q  So I want to make sure I understand the testimony.
5     Is it fair to say that any of the work that Reed
6     was performing for Widen Enterprises from 2015 to
7     2020 would be reflected in the operational updates
8     that you prepared?
9  A  Reed's involvement would be represented -- Reed's
10    involvement was in all of those topics, yes, by
11    way of his consultation on those and our
12    conversations regarding those matters.  So --
13 Q  What, if any, customers of Widen Enterprises did
14    Reed manage relationships with from 2015 to 2020?
15 A  There were two customers that predate 2015 but
16    existed through that time period.  One of which is
17    referred to as Edge Advertising.  Another one is
18    Reebok.  Reed was actively involved in executive
19    relationships for both those organizations.
20 Q  Did Reed provide any consultation to Widen
21    Enterprises in writing from 2015 to 2020?
22 A  I didn't look for that.
23 Q  Did Reed actively manage the relationships with
24    Edge Advertising and Reebok through 2020?
25 A  The executive relationships would have been

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 121

1     actively managed. I don't recall the end date of
2     some of those customers because they -- those
3     customers would have also parted ways with Widen
4     at some point in the latter part of that time
5     period.
6 Q  So as of 2020, is it accurate to say that neither
7     Edge Advertising nor Reebok were customers of
8     Widen Enterprises?
9 A  Edge Advertising was a customer at that time.
10     The ending of the Reebok relationship is something
11     that I did not prepare for this, but I do know it
12     to be before 2020.
13 Q  What was the catalyst for the end of the Reebok
14     relationship?
15 A  They absorbed that work internally, the work that
16     we performed for them.
17 Q  And how much revenue was Edge Advertising
18     generating for Widen Enterprises in 2020?
19 A  I didn't prepare that level of detail for Edge
20     Advertising for 2020. I could not memorize that.
21 Q  Are you able to answer how much revenue Edge
22     Advertising was providing to Widen Enterprises in
23     2019?
24 A  I can provide an average of what Edge Advertising
25     was providing annually.

Page 122

1 Q  What is the average?
2 A  2 million.
3 Q  And other than Reebok and Edge Advertising, was
4     Reed actively involved in the management of any
5     customer relationships from 2015 to 2020?
6 A  Those were the two customer relationships that --
7     where he was involved.
8 Q  You seem to draw a distinction surrounding the
9     term executive relationship, and I just want to
10     clarify what you mean by that. You said Reed was
11     responsible for managing the executive relationship.
12 A  Right.
13 Q  What do you mean by that?
14 A  That means he was in connection with the executive
15     contact at the customer location. So he would
16     have -- his relationship was with a party that was
17     in an executive role at Edge and at Reebok.
18 Q  Was there someone else at Widen Enterprises that
19     was responsible for managing the operational
20     aspects of those clients?
21 A  There were.
22 Q  Who were those people?
23 A  Numerous. These were two of the largest customers
24     that we've had in our history, so there were many
25     people involved with these accounts. And I did

Page 123

1     not prepare a list of employees that were involved
2     as preparation for this.
3 Q  What, if any, new customers did Reed Widen bring
4     in to Widen Enterprises from 2015 to 2020?
5 A  We changed the way new customers were brought in
6     to the organization, and so new customers came to
7     us. So no customer would have been brought to us
8     by way of our outbound effort. New customers
9     would express interest in us. So the model of
10     selling changed. So Reed and any other employee
11     would not have been involved with bringing in new
12     customers.
13 Q  Circling back to the executive relationship that
14     you said Reed was responsible for managing and
15     maintaining, what goes into -- what was he doing
16     to manage the executive relationship for Edge
17     Advertising and Reebok?
18 A  Regular dialogue and keeping with -- so for Edge,
19     the executive contact was Cheryl Crugland, and
20     Cheryl was the creative director at Edge. And so
21     Reed's dialogue with Cheryl was how he knew what
22     the customer perspective on the Widen experience
23     was like.
24        And then his contact with Reebok was Blake
25     Lundberg. And his connection with Blake was

Page 124

1     similar in that he would have dialogue with Blake
2     to ensure that what Blake's perspective on the
3     Widen experience was like was favorable and, if
4     not, then there would be subsequent conversations.
5 Q  I don't recall, and I apologize, I don't recall if
6     you said frequent or regular dialogue. But what
7     was your testimony? Was he in frequent or regular
8     dialogue with Cheryl Crugland and Blake Lundberg?
9 A  I don't recall the use of those words. Can we --
10     is that possible to look?
11 Q  I guess my question for you is how frequently was
12     Reed in contact with Edge Advertising and Reebok?
13 A  I didn't look for those details here as part of
14     this.
15 Q  Do you know how much time Reed devoted to his
16     executive relationships with Reebok and Edge
17     Advertising?
18 A  I do not know because I did not look for it, nor
19     did I ask him for that.
20 Q  I want to just circle back quickly to Exhibit 3,
21     the Project Wildcat document. We talked about the
22     fact that according to Grant Thornton, Reed's
23     compensation would be absorbed by the -- and his
24     role would be absorbed within the current
25     management structure.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 125

```
1              Is it Widen Enterprises' position that if
2      Reed was not working for the company, if Reed quit
3      in 2019 in his role as chairman, Widen Enterprises
4      would have to pay someone $1.5 million to replace
5      his position?
6                   MR. LAING:  Objection as to the
7              form.
8   A   Can you rephrase it for me?
9                   MS. POLAKOWSKI:  Just read it back,
10             Peggy.
11                  (Question read)
12  Q   And let me just clarify, to replace the services
13      that he provided.
14  A   Sure.
15                  MR. LAING:  Objection as to form.
16  A   So if Reed would have left, we would look at this
17      consistent with any other employee departure,
18      which would be you would look at what that
19      employee was contributing and then we would figure
20      out what are we going to do next.
21             So if Reed would have departed at this time,
22      in 2019 was the year?
23  Q   Yes.
24  A   Then we wouldn't have replaced Reed with someone
25      else individually because you can't replace Reed.
```

Page 126

```
1      Reed was a 40-plus-year employee.  His name is on
2      the building.  He's been involved in numerous
3      things through the decades, and you just don't
4      replace a guy like Reed.
5             So what I would do is I would replace him
6      with a team of advisors.  If he would have left in
7      2019, it's I have a budget, and I now have needs
8      across the organization that could be filled
9      through other means.  But I wouldn't hire back one
10     person to replace Reed.
11  Q   And just to be clear, I'm talking about the
12      services that Reed Widen was providing to Widen
13      Enterprises --
14  A   Yep.
15  Q   -- in 2019.
16  A   Uh-huh.
17  Q   Would Widen Enterprises pay someone $1.5 million
18      to perform the services that Reed Widen was
19      performing in 2019?
20  A   We wouldn't pay someone.  We would pay multiple
21      people or organizations.  I didn't go through a
22      simulation for what that would look like, but it
23      wouldn't be a one-for-one replacement.
24  Q   And just to be clear, would you pay those multiple
25      people who were providing those services on top of
```

Page 127

```
1      whatever services they may be providing already to
2      the organization, would you pay them a total of
3      $1.5 million to replace the services Reed Widen
4      was providing in 2019?
5   A   I don't know that we would use existing providers
6      or new providers.  I would just know that I had a
7      budget to work from, and that would be my
8      guidance.  I've got a budget of X, and now I can
9      spend that budget to provide services across the
10      spectrum that Reed provided it.
11  Q   Would your budget for replacing those services be
12      $1.5 million?
13  A   If that's what I had to work with in that time
14      period, then that would be my budget.  If Reed
15      decided to leave and we were paying Reed an
16      amount, then that amount would be then my budget
17      for how to replace Reed with a variety of other
18      services or people at that time.
19                  MS. POLAKOWSKI:  I think we are
20             done with -- I'm moving on to a new topic, so
21             we can take a lunch now if that's convenient.
22                  MR. LAING:  Your call.  I don't
23             care.  We can keep going or take a break.
24                  MS. POLAKOWSKI:  We might as well
25             take a break right now.
```

Page 128

```
1                   THE VIDEOGRAPHER:  Going off the
2              record at 12:33.
3                   (Lunch recess)
4                   THE VIDEOGRAPHER:  We are back on
5              the record at 1:17.
6   Q   Welcome back, Mr. Gonnering.  We left off at
7      topic 5.  I'm going to dive right into topic 6,
8      if you have Exhibit 1 in front of you.
9             Topic 6 is Widen Enterprises' relationship to
10      Windy Waters, including the nature and tracking of
11      financial transactions between or involving Widen
12      Enterprises and Windy Waters from 2015 through
13      2021.
14             Did I read that correctly?
15  A   You did.
16  Q   Are you prepared to testify with regard to
17      topic 6?
18  A   I am.
19  Q   What did you do to prepare with regard to topic 6?
20  A   I spoke with counsel, and with counsel was Mike
21      Kiesler, and we reviewed transaction documents as
22      part of that dialogue, and that's what I did.
23  Q   And as of May 2020, it's accurate to say that
24      Windy Waters had approximately five and a half
25      million dollars in investment portfolio funds
```

Page 129

1 available to it; correct?
2 A Can you read the question back, please?
3 (Question read)
4 MR. LAING: I'll just object to it
5 being outside the scope of the notice, but
6 you can answer.
7 Q Sorry. Go ahead and answer if you can,
8 Mr. Gonnering.
9 A I didn't look at or memorize the financial data.
10 Q In May of 2020, did Widen Enterprises ask Windy
11 Waters for a loan?
12 A In May of 2020 did Widen ask Windy Waters for a
13 loan? Everything I did in my preparation for
14 this, I don't recall details related to that.
15 So --
16 A I didn't prepare to get that question related to
17 this topic.
18 Q Are you able to answer the question as you sit
19 here today whether or not Widen Enterprises
20 requested a loan from Windy Waters in May of 2020?
21 A I am not able to answer that question as I sit
22 here today, because I did not prepare for that
23 line of questioning on that topic.
24 Q Is it fair to say that Windy Waters periodically
25 transferred money or assets to Widen Enterprises?

Page 130

1 A Windy Waters did transfer money to Widen
2 Enterprises, yes.
3 Q What would the impetus for a transfer of funds
4 from Windy Waters to Widen Enterprises have been?
5 A That would have been for operational needs of
6 Widen Enterprises.
7 Q And what did Widen Enterprises need to provide to
8 Windy Waters for Windy Waters to provide funding
9 to Widen Enterprises?
10 A What did -- I'm sorry. Can you slow that back for
11 me?
12 MS. POLAKOWSKI: Sure. I'll just
13 have Peggy read it back.
14 (Question read)
15 A There was dialogue between Mike and Reed related
16 to those transactions, and so -- yeah, and then a
17 subsequent tracking of those financial
18 transactions to and from Widen and Windy Waters.
19 Q So if I understand your testimony correctly, if
20 Widen Enterprises sought funds from Windy Waters,
21 Reed would have a conversation with Mike.
22 Subsequently, Mike would transfer funds from
23 Windy Waters to Widen Enterprises, and that
24 transfer would be recorded; is that right?
25 A Correct.

Page 131

1 Q And those transfers occurred periodically for
2 operational needs of Widen Enterprises?
3 A Correct. I believe, based on the financial
4 transactions that I reviewed, there were six
5 occasions of that.
6 Q Prior to May of 2020, was there ever a concern
7 among Widen Enterprises executives that someone
8 who had duties both to Widen Enterprises and to
9 Windy Waters would be distracted from his
10 duties -- his or her duties to one entity because
11 of the commitment he or she had to the other
12 entity?
13 A Was there ever a discussion about the distraction
14 of performing one duty relative to the other duty,
15 as in a duty of Widen and a duty of Windy Waters?
16 And I would have stated that I didn't want Mike,
17 the CFO of Widen, as the CEO of Widen, I did not
18 want him to be distracted from operational needs
19 for reasons of having to serve in excess capacity
20 of -- or serve his capacity as treasurer of Windy
21 Waters. So I have expressed that before.
22 Q Okay. Did you express that to Reed Widen?
23 A I expressed it to Mike. I didn't recall
24 expressing that to Reed, nor did I look for any
25 documentation that might be related to that

Page 132

1 expression.
2 Q And you anticipated my next question, which is
3 were those -- were any of your expressions of
4 concern with regard to individuals serving both
5 entities done in writing?
6 A I didn't look for it in writing.
7 Q So as you sit here today, you're unable to testify
8 as to whether or not those concerns were expressed
9 in writing?
10 A I'm not able to -- yeah. I'm able to confirm that
11 I didn't look for that communication in writing.
12 Q And when Reed -- we talked about the nature of how
13 transfers would occur between Widen Enterprises
14 and Windy Waters, and I think you said Reed would
15 call Mike, and they would have a dialogue, and
16 Reed would tell him, hey, Widen needs money, and
17 Mike would say, okay, and transfer funds from
18 Windy Waters to Widen Enterprises; correct?
19 A Yep. Correct.
20 Q So in that conversation that I just described,
21 Reed would be acting on behalf of Widen Enterprises?
22 A Reed would not be operating on behalf of Widen
23 Enterprises in that way.
24 Q Who would Reed have been operating on behalf of?
25 A Reed would have been operating as the -- there was

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 133

1   a decision that needed to be made at Windy Waters,
2   and there was not someone making that decision,
3   and Reed would step in and make that decision as
4   the majority shareholder.
5   Q   So in the scenario I just described is one where
6       Reed -- where Widen Enterprises needed funding --
7   A   Correct.
8   Q   -- and you said, I think, that Reed would contact
9       Mike Kiesler?
10  A   If Widen needed funding, Mike would make Reed
11      aware that Widen needed funding.  So Mike would
12      communicate with Reed regarding that funding, and
13      then that funding would be sent and recorded from
14      Windy Waters to Widen.
15  Q   Who would Reed talk to at Windy Waters to get
16      authorization to transfer funds from Windy Waters
17      to Widen Enterprises?
18  A   I didn't look for that level of detail.
19  Q   So you don't know?
20  A   I didn't look.
21  Q   And with regards to the concerns that you had
22      about Mike, in particular, serving as an officer
23      of both Widen Enterprises and Windy Waters, why --
24      well, first of all, did you ever suggest that
25      Windy Waters appoint someone else as the treasurer

Page 134

1   or secretary?
2   A   I expressed concerns about Mike in his role as
3       CFO, and so that was one point of clarification.
4       I expressed concerns in his role as CFO and did
5       not express to anyone a desire to change his role
6       at Windy Waters.
7   Q   What were your concerns with regard to Mike
8       serving as CFO?
9   A   I didn't have concerns that Mike would serve as
10      CFO.  If we go to May of 2020, my very specific
11      concern at that moment in time is I need Mike,
12      the CFO, because we have a lot of challenges as
13      Widen Enterprises, and performing duties at Windy
14      Waters while his role was not the primary focus of
15      what I needed to have done based on what was going
16      on in May of 2020.
17  Q   And I believe you told me you expressed that
18      concern to Mike, but you do not recall whether
19      you expressed that concern to Reed?
20  A   Correct.
21  Q   Do you recall having -- expressing that concern to
22      anyone other than Mike?
23  A   I recall saying I did not look for any
24      communications that I would have sent related to
25      Reed, but I definitely would have said it to Mike.

Page 135

1   So I do not recall talking to anybody else outside
2   of Mike or looking for information that I would
3   have provided to Reed.
4   Q   For individuals that had a role at both Widen
5       Enterprises and Windy Waters, what policies did
6       Widen Enterprises have in place to delineate when
7       actions were taken by Widen Enterprises'
8       executives were on behalf of Widen Enterprises as
9       opposed to the same individual acting on behalf of
10      Windy Waters in their capacity as an officer of
11      Windy Waters?
12  A   I didn't look for policies related to that.
13  Q   Did individuals who had roles with both Widen
14      Enterprises and Windy Waters have separate email
15      addresses?
16  A   They did not.
17  Q   Did they have separate offices?
18  A   They did not.
19  Q   Did they utilize separate equipment when they were
20      operating on behalf of Windy Waters?
21  A   They did not.
22  Q   Did Windy Waters compensate Widen Enterprises for
23      the use of its employees?
24          MR. LAING:  Objection to the form.
25  A   Windy Waters would compensate directors of Windy

Page 136

1   Waters.  But Windy Waters would not compensate
2   Widen Enterprises' employees outside of if they
3   were serving in a director capacity.
4   Q   I believe you said when transactions -- when
5       financial transactions occurred between Windy
6       Waters and Widen Enterprises, they were tracked;
7       is that right?
8   A   Correct.
9   Q   Where were they tracked?
10  A   They were tracked by Mike in an account statement
11      that provided detail of when money was going to an
12      entity or when money was coming from an entity.
13      So intercompany account tracking.
14  Q   And were those transactions treated as loans?
15  A   I didn't prepare for that question related to this
16      topic.  They were treated as entries in an account
17      statement about who is sending what to whom and
18      where is money being received from.  So --
19  Q   So with regard to whether or not interest was paid
20      to one entity for the use of its funds, you don't
21      know?
22  A   I didn't look for interest paid on the account
23      statement that I reviewed.
24  Q   And so as you sit here today, Widen Enterprises is
25      unable to testify as to whether or not the nature

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 137

1    of the financial relationship between Widen and
2    Windy Waters in the nature of a loan?
3  A  I didn't look for the terminology related to the
4    transfers, but I can verify that I -- that the
5    intercompany transfers were recorded and I don't
6    know the terms or the descriptions that were
7    placed to those.
8  Q  So whether or not they were loans or gifts or
9    transfers of a different nature, you're unable to
10   tell me?
11 A  I didn't look for what they were called.
12 Q  Nor did you look for how they were treated for
13   tax purposes?
14 A  I didn't look for that.
15 Q  Is the intercompany ledger that you just
16   discussed, is that separately kept from other
17   ledgers maintained by Widen Enterprises?
18 A  I understood that ledger to be kept in conjunction
19   with all the other financial information that was
20   recorded.
21 Q  And did I understand you correctly that
22   Mr. Kiesler was responsible for maintaining that
23   ledger?
24 A  Correct.
25 Q  Who -- well, who at Windy Waters was responsible

Page 138

1    for tracking the transactions between Windy Waters
2    and Widen Enterprises?
3         MR. LAING:  Objection as to the
4      form.  It's outside the scope.  It was a
5      topic for Friday, not today.
6  Q  Go ahead and answer if you can.
7  A  On advice of counsel, I'm not going to answer.
8         MS. POLAKOWSKI:  Are you
9      instructing him not to answer?
10        MR. LAING:  I should, but I'll give
11     you a little leeway here, so you can answer
12     if you know.
13        THE WITNESS:  Can you repeat the
14     question?
15        (Question read)
16 A  Mike.
17 Q  And Mike was also responsible for maintaining the
18   ledger on behalf of Widen Enterprises of the
19   transactions between Widen Enterprises and Windy
20   Waters; correct?
21 A  Correct.
22 Q  Do you know whether the ledger showing the
23   intercompany transactions was produced to your
24   counsel as part of this lawsuit?
25 A  It was produced to our counsel.

Page 139

1  Q  Prior to May 13 of 2020, what was your role,
2    if any, with Windy Waters?
3  A  Prior to May 13 of 2020, I did not have a role at
4    Windy Waters.
5  Q  Did you provide any services to Windy Waters prior
6    to May 13 of 2020?
7  A  I did not.
8  Q  And subsequent to May 13, 2020, did you provide
9    any services to Windy Waters?
10 A  I did not.
11 Q  Have you ever been paid for services you rendered
12   to Windy Waters?
13        MR. LAING:  Objection to the form.
14 A  I have not been paid for services to Widen -- or
15   to Windy because I haven't performed any services
16   to Windy.
17        (Exhibit No. 4 marked for
18        identification)
19        MR. LAING:  Are we remarking it?
20     Okay.  What number did we mark it?
21        MS. POLAKOWSKI:  It's 4; right?
22        MR. LAING:  You marked it as 4 for
23     today?  Okay.
24 Q  Mr. Gonnering, I've just handed you what has been
25   marked as Exhibit 4 in this deposition.  It was

Page 140

1    also marked in Friday's deposition as Exhibit 13.
2    Do you recognize this document?
3  A  I do.
4  Q  What is it?
5  A  It is the notes that we provided for the Windy
6    Waters deposition on topic 21, which is Windy
7    Waters' relationship to Widen Enterprises,
8    including the nature and tracking of financial
9    transactions between or involving Widen
10   Enterprises and Windy Waters from 2015 through
11   2021.
12 Q  I'd like to direct your attention to the
13   second-to-last paragraph where there is a
14   discussion of Widen Enterprises' transfer to
15   cash -- transfer of cash to Windy Waters.
16     It says, "Often, this was for the purpose of
17   tax payments for corporate and shareholder taxes.
18   Other times, this was due to payment of
19   distributions or stock redemptions.  Last,
20   sometimes, when Widen Enterprises had substantial
21   cash, it transferred some to Windy Waters so that
22   Windy Waters could invest it."
23     Did I read that correctly?
24 A  You did.
25 Q  Who decided when Widen Enterprises had substantial

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 141

1    enough cash that it would transfer some to Windy
2    Waters?
3  A  Mike would decide that.  And at times I would
4    collaborate with Mike on that.
5  Q  When you -- well, when Mike decided that Widen
6    Enterprises had substantial enough cash to
7    transfer some to Windy Waters, was he acting on
8    behalf of Widen Enterprises or Windy Waters?
9  A  Mike was just -- Mike was determining that we had
10   cash to provide to Windy Waters so that it could
11   be invested.  So Mike was operating in his CFO
12   capacity as assessing our current cash position
13   and --
14  Q  So --
15  A  -- making it --
16  Q  I'm sorry.  I didn't mean to interrupt.
17  A  And making a determination that we can send cash
18   for investment, and that would be sent to then
19   Windy Waters to be invested.
20  Q  Was that cash then invested by Windy Waters on
21   behalf of Widen Enterprises?
22          MR. LAING:  Objection as to the
23      form.  It's outside the scope.  You can
24      answer if you can.
25  A  Windy Waters invested the money when it received

Page 142

1    it from Widen.
2  Q  Did Windy Waters ever pay Widen Enterprises any
3    earnings it obtained on those amounts that were
4    transferred to it from Widen Enterprises?
5  A  I didn't look at any details related to that so --
6  Q  So you're unable to answer that question as you
7    sit here today?
8  A  I didn't look for that information, so I am not
9    able to provide an answer at this moment.
10  Q  When were the times between 2015 and 2021 that
11   Widen Enterprises had substantial cash and
12   transferred some to Windy Waters so that Windy
13   Waters could invest it?
14  A  When I reviewed the transactions that were
15   recorded, there were several, and I didn't
16   memorize that sheet of information, but there were
17   several times when Widen would transfer cash to
18   Windy Waters.
19  Q  Is there a sheet that you could review today that
20   would refresh your recollection on that?
21  A  If you have a sheet related to those things, I
22   could look at it and see if that would be helpful
23   in aiding in that answer.
24  Q  Okay.  We'll get there.  And do you recall whether
25   in 2020 Widen Enterprises had substantial cash

Page 143

1    such that it transferred some to Windy Waters so
2    that Windy Waters could invest?
3  A  I didn't look at the detail related to all of
4    those, nor did I memorize the details in that.
5    So I didn't memorize it, and, therefore, I cannot
6    recite that.
7  Q  And there is a reference here to stock
8    redemptions.  At other times the transfer was due
9    to payment of distributions or stock redemptions.
10      The stock redemptions there, would that
11   include Stacy's May of 2020 stock redemption?
12  A  That would include stock redemptions, which would
13   be for -- I would have to look at the detail
14   there, because I'm thinking of other stock
15   redemptions that were in that same time period or
16   know there to be other stock redemptions in that
17   same time period and do not know the detail
18   related to if it refers to Stacy's stock redemption.
19  Q  What other stock redemptions occurred during that
20   same time period that you're thinking of?
21  A  Price Widen was a redemption in that time period.
22  Q  And when you say in that time period, what are you
23   referring to?
24  A  I'm looking at the time period of 2015 through
25   2021.  I would also need to reference the register

Page 144

1    of activities to verify what other redemptions
2    were in there, because that's another one that I
3    did not commit to memory.
4  Q  The last paragraph of Exhibit 4 states that Windy
5    Waters has also transferred money to Widen
6    Enterprises when Widen Enterprises needed cash.
7    Do you see that?
8  A  I do.
9  Q  And there are a number of specific transactions
10   referenced there; correct?
11  A  Correct.
12  Q  The first is December 2015, Widen Enterprises --
13   excuse me, Windy Waters transferred $200,000 to
14   Widen Enterprises in December of 2015; is that
15   correct?
16  A  About 200, yes.
17  Q  What do you mean, about 200?
18  A  Again, I would like to verify the numbers with the
19   sheet that I looked at.  So I would say that's
20   what's typed here.
21  Q  Do you know why Widen Enterprises needed $200,000
22   from Windy Waters in December of 2015?
23  A  Any time Widen would need money for operational
24   matters, that's when Windy Waters would provide
25   it.  So that would have been for operational

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 145

1   matters.
2   Q   Do you recall what operational matters caused
3       Widen Enterprises to need $200,000 in December of
4       2015?
5   A   I didn't look for that detail.
6   Q   Okay. What about August of 2017, do you recall
7       what operational matters Widen Enterprises needed
8       money for such that it required $20,000 from Windy
9       Waters?
10  A   I didn't look for or memorize that detail.
11  Q   Where would you have to look to find an answer to
12      that question?
13  A   I would look at that intercompany account
14      reporting that showed the "to" and the "from" and
15      look for memos that might be related to those.
16  Q   Likewise, November of 2018 it looks like Windy
17      Waters transferred to Widen Enterprises $444,000.
18      Do you recall what operational needs Widen
19      Enterprises had in November of 2018 that required
20      transfer of $444,000 in cash?
21  A   I would need to look at the detail related to that
22      and see if there is any memos, and I did not
23      memorize that.
24  Q   August of 2020, Widen Enterprises received $70,000
25      from Windy Waters. Do you recall what the

Page 146

1       operational needs of Widen Enterprises were such
2       that it needed $70,000 in August of 2020?
3   A   I would need to look, because I did not memorize
4       the details related to that and would look for a
5       memo that would infer that.
6   Q   Likewise, in September of 2020, Widen Enterprises
7       received $90,000 from Windy Waters. Do you recall
8       what the operational needs were in September of
9       2020 that required Windy Waters to pay $90,000 to
10      Widen Enterprises?
11  A   I would need to look at the details, and I didn't
12      memorize that, and I would look for a memo related
13      to that.
14  Q   Okay. And, finally, in October of 2020, Widen
15      Enterprises apparently received a $1.5 million
16      cash transfer from Windy Waters for operational
17      needs. Do you recall what the operational needs
18      were in October of 2020 that required the transfer
19      of $1.5 million from Windy Waters to Widen
20      Enterprises?
21  A   I would need to look at the details for that and
22      didn't memorize that table and would look for a
23      memo related to that.
24  Q   With regard to each of those amounts that we just
25      discussed as being transferred from Windy Waters

Page 147

1       to Widen Enterprises, do you recall whether those
2       were loans?
3   A   I didn't look for any details related to what
4       those were referred to.
5   Q   Do you recall whether Widen Enterprises paid
6       interest to Windy Waters?
7   A   I didn't look for any details related to interest
8       payments related to those.
9   Q   Do you recall whether Windy Waters ever obtained
10      Stacy Randall's approval of those transfers,
11      including the 2020 transfers?
12  A   I didn't look for details related to that.
13  Q   I'd like to turn now to topic 7. Topic 7 is
14      financial information, valuations, estimates of
15      value, and appraisals of Widen Enterprises from
16      2004 to 2007 and 2015 through 2020. Are you
17      prepared to testify with regard to topic 7 today?
18  A   I am.
19  Q   What did you do to prepare for topic 7?
20  A   I reviewed financial statements. I spoke with
21      counsel, and in that conversation with counsel
22      I spoke with Reed and with Mike.
23  Q   Do you recall what financial statements you
24      reviewed?
25  A   I reviewed financials that would have been

Page 148

1       provided in the operational updates. I also
2       reviewed dialogue that I had with certain people.
3       Email dialogue with other companies during that
4       time was another thing that I reviewed.
5   Q   What specific email dialogue that you had with
6       other companies did you review for the purpose of
7       preparing to testify on topic 7?
8   A   I reviewed dialogue I had with Channel Advisor.
9   Q   I'm sorry. What was the name?
10  A   Channel Advisor.
11  Q   Who is Channel Advisor?
12  A   They're a software company that is located in
13      North Carolina.
14  Q   When were you having email dialogue with Channel
15      Advisor?
16  A   I had email dialogue with Channel Advisor in
17      August of 2020.
18  Q   And what did your August of 2020 dialogue with
19      Channel Advisor relate to?
20  A   Channel Advisor expressed interest in partnering
21      with Widen, and I had forwarded that information
22      onto our partner team and then received an email
23      from the CEO of Channel Advisor wanting to have a
24      conversation that would involve something deeper
25      than a partnership. And those are the emails that

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 149

1      I reviewed.
2 Q   Is that the entirety of the emails that you
3      reviewed pertaining to topic 7?
4 A   For Channel Advisor. And then the other emails
5      would have been related to the operational
6      updates.
7 Q   What was the fair market value of Widen
8      Enterprises in 2004?
9 A   We didn't gather fair market value for Widen
10     Enterprises.
11 Q   Are you aware that there was -- well, certainly
12     Widen Enterprises was aware that there was a fair
13     market value appraisal performed in 2004; correct?
14 A   Widen Enterprises is aware that Windy Waters
15     conducted an assessment in 2004.
16 Q   Of Widen Enterprises' value?
17 A   Of Windy Waters' value.
18 Q   And Windy Waters' largest asset is Widen
19     Enterprises; correct?
20 A   One of Windy Waters' assets is Widen Enterprises.
21 Q   Did Windy Waters have an asset that was more
22     valuable than Widen Enterprises?
23 A   Windy Waters had investment assets and Widen
24     Enterprises as an asset.
25 Q   Are you able to answer the question that I asked?

Page 150

1 A   Widen Enterprises didn't have a value independent
2     of Windy Waters. The Windy Waters value include
3     Widen and investments.
4 Q   And my question to you was did Windy Waters have
5     an asset that was more valuable than Widen
6     Enterprises?
7 A   We didn't look at the value of Widen Enterprises
8     independently.
9 Q   So you don't know?
10 A   Because we didn't look at the value of Widen
11     Enterprises, I don't know the answer to your
12     question.
13 Q   What did you -- what do you estimate the market
14     value of Widen Enterprises to have been in 2004?
15 A   I did not estimate the value of Widen Enterprises
16     in 2004.
17 Q   Have you reviewed the appraisal that was done of
18     Widen Enterprises in 2004?
19     MR. LAING: Objection as to form.
20 A   There was no appraisal of Widen Enterprises in
21     2004.
22 Q   Have you reviewed an appraisal of Windy Waters'
23     assets, which included an appraisal of Widen
24     Enterprises, in 2004?
25 A   I reviewed Windy Waters' expert valuation from

Page 151

1     Bruce Hutler in 2004 that was for Windy Waters.
2 Q   And that included a valuation of the fair market
3     value of Widen Enterprises; correct?
4 A   It included a valuation formula for Windy Waters.
5 Q   Do you know whether it included a fair market
6     value of Widen Enterprises?
7 A   Widen Enterprises didn't have an appraisal of fair
8     market value.
9 Q   So it's your testimony, as you sit here today on
10     behalf of Widen Enterprises, that the 2004
11     appraisal report performed by Bruce Hutler did
12     not come to a conclusion with regard to the fair
13     market value of Widen Enterprises?
14 A   My testimony is that the Bruce Hutler report in
15     2004 was for Windy Waters.
16 Q   Are you able to answer the question that I asked?
17 A   Please repeat the question.
18     (Question read)
19 A   The Bruce Hutler report was addressing Windy
20     Waters and it was not addressing Widen Enterprises
21     independent of that. So Widen Enterprises was
22     part of Windy Waters, and the Bruce Hutler report
23     was for Windy Waters but not for Widen Enterprises
24     alone.
25 Q   Is it your testimony today that the Bruce Hutler

Page 152

1     2004 report has nothing to do with the fair market
2     value of Widen Enterprises in 2004?
3 A   The Bruce Hutler report was for Windy Waters, and
4     so my testimony is that the Bruce Hutler report
5     was provided for Windy Waters, which had two
6     different assets, Widen and investments, and so we
7     did not have a Widen Enterprises view of that.
8 Q   And Widen Enterprises at that time had no opinion
9     as to its own fair market value. Is that your
10     testimony?
11 A   Widen Enterprises had no need for those
12     valuations, and we relied on Windy Waters and
13     their experts to assemble those.
14 Q   What did you rely on those for?
15 A   We relied on Windy Waters for their expert
16     opinions on the valuation reports, and Widen
17     Enterprises was not, nor did we involve ourselves,
18     in those matters.
19 Q   A couple of things. So you said you relied on
20     Windy Waters for the expert opinions of valuation
21     reports. What specifically did you rely on Windy
22     Waters for expert opinions of valuation reports
23     for?
24 A   That Windy Waters would address and calculate
25     valuation with their experts and that we didn't

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 153

1    have to worry about that.
2  Q   And it's your testimony that Widen Enterprises
3      took no position with regard to what value Windy
4      Waters assigned to Widen Enterprises?
5  A   Widen Enterprises was focused on growth and not
6      valuation.
7  Q   Are you able to answer the question that I asked?
8  A   Can you repeat the question?
9              (Question read)
10 A   We took no position with that because we weren't
11     focused on that.  That was not the focus, so we
12     did not take a position on that.
13 Q   Did you or Widen Enterprises in general ever make
14     estimations of Widen Enterprises' fair market
15     value from 2004 to 2007?
16 A   No.
17 Q   Is it your position that it wasn't important for
18     Widen Enterprises to know how much the company was
19     worth in 2004 to 2007?
20 A   It was important to know that we were in a growth
21     market.  That was the priority.  And that we were
22     growing.  That was the priority.
23 Q   And so circling back to my question, is it your
24     position that it wasn't important for Widen
25     Enterprises to know how much the company was worth

Page 154

1      from 2004 to 2007?
2  A   It wasn't important because it wasn't the focus,
3      so it wasn't important.
4  Q   From 2004 to 2007 did anyone at Widen Enterprises
5      consult with an outside entity to appraise Widen
6      Enterprises?
7  A   No.
8              (Exhibit No. 5 marked for
9                 identification)
10 Q   Mr. Gonnering, I've just handed you what has been
11     marked as Exhibit 5.  Do you recognize Exhibit 5
12     as the 2004 appraisal that you and I were just
13     discussing?
14 A   I recognize this as a valuation of Windy Waters
15     from July 22, 2004.
16 Q   Have you seen this before?
17 A   I have.
18 Q   And this was directed to Mr. Reed Widen; correct?
19 A   Correct.
20 Q   Do you know -- and it says, "Dear Mr. Widen:  At
21     your request, we have reviewed and analyzed
22     certain financial and other information regarding
23     Windy Waters, Inc."
24              Do you see that?
25 A   I do.

Page 155

1  Q   Why did Reed request this valuation to be done?
2          MR. LAING:  I'm going to object to
3      that and instruct him not to answer.  This
4      has been a topic that's been covered by him
5      personally as well as Windy Waters.  It's not
6      a Widen Enterprises issue.  You can see by
7      the caption this is a Windy Waters issue.
8          So if you have specific questions about
9      the document that relate to Widen, that's
10     fine, but not the question you asked.
11         MS. POLAKOWSKI:  I disagree.  It's
12     clearly a Widen Enterprises issue.  The asset
13     that's being valued here on behalf of Windy
14     Waters is Widen Enterprises.  I'm entitled to
15     understand.
16         The topic clearly indicates financial
17     information including valuations of Widen
18     Enterprises, which this is.  I'm entitled to
19     know Widen Enterprises' position on this
20     document.
21         MR. LAING:  And I didn't say you
22     couldn't ask certain questions about this,
23     but your current question is objectionable
24     and way outside the scope of this.
25         MS. POLAKOWSKI:  And so you're

Page 156

1      directing your client not to answer?
2          MR. LAING:  I am.
3          MS. POLAKOWSKI:  I'll note that we
4      do not have a prepared witness on that topic
5      in that instance.
6          MR. LAING:  You can note all you
7      want, but the truth of the matter is you're
8      not going to get outside the scope after
9      spending all of your time on him personally
10     and then on Windy Waters on Friday.
11 Q   Do you know whether this document was ever
12     provided to Stacy Randall?
13         MR. LAING:  Presumably she's asking
14     you on behalf of Widen Enterprises.
15 Q   Of course.
16 A   I don't.
17 Q   Turn, please, to page Windy 0047996.  Do you see a
18     heading there titled Conclusion?
19 A   I do.
20 Q   The first sentence of that paragraph reads,
21     "We have considered several valuation methods in
22     arriving at our opinion as to the fair market
23     value of a marketable, majority interest in
24     100 percent of the equity of the company as of
25     April 30, 2004."

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 157

1     Do you know whether the company being valued
2  there is Widen Enterprises?
3            MR. LAING:  It's a defined term on
4     page 1.  Windy Waters.
5            MS. POLAKOWSKI:  I believe your
6     counsel is directing you to look at page 1.
7  A  Here the company refers to Windy Waters.
8  Q  What, if anything -- what assets, other than
9  Widen Enterprises, did Windy Waters hold at the
10 time this appraisal was done in 2004?
11 A  I didn't look for the details of that related to
12 our topics.
13 Q  And the concluded value on page 47996 is
14 $7,441,000; correct?
15 A  If you're reading the conclusion of the value of
16 the company, which is Windy Waters, then I can
17 validate that the line that you're reading reads
18 with the same numbers that you just read.
19 Q  Does Widen Enterprises have any opinion as to
20 whether that $7,441,000 represents the fair market
21 value of Widen Enterprises as of 2004?
22 A  No.
23            (Exhibit No. 6 marked for
24             identification)
25 Q  Mr. Gonnering, you've just been handed what has

Page 158

1  been marked as Exhibit 6.  Do you recognize
2  Exhibit 6 as the 2008 business plan that you
3  referred to earlier today as having reviewed in
4  advance of today's deposition?
5  A  I recognize the cover page, yep.  Would you like
6  me to page through it?
7  Q  We'll get there in just a second.
8          And you, in fact, authored this document;
9  correct?
10 A  Correct.  If it's what it is, which presumably it
11 is.
12 Q  If you need a minute to take and review the
13 document and tell me if, in fact, that is the
14 business plan you reviewed in 2008, go ahead and
15 do so.  Or that you prepared.  Excuse me.
16 A  I'm good.
17 Q  And just to confirm, are you able now to testify
18 that Exhibit 6 is, in fact, the business plan that
19 you prepared for Widen Enterprises in 2008?
20 A  Yes.
21 Q  On page Acquia 0011047, there is a heading
22 Executive Summary.  Do you see that?
23 A  I do.
24 Q  The second paragraph, the second sentence states
25 that, "Widen is about to embark on another

Page 159

1  monumental shift."  Do you see that?
2  A  I do.  Second paragraph, second sentence, yes.
3  Q  What was the monumental shift that Widen
4  Enterprises was about to embark on at that time?
5  A  We would continue reading here.  "Widen is about
6  to embark on another monumental shift that
7  requires the transformation of process and the
8  alignment of resources to focus on the strategic
9  objectives of the organization," and "these
10 objectives include," which would be strengthening
11 customer relationships, advancing our software
12 architecture, gaining efficiencies in our
13 pre-media operations, and then dominating the
14 marketplace.
15 Q  The way that I read that is those are the
16 requirements for Widen to undertake or complete
17 the monumental shift, and my question to you is
18 what is the contemplated monumental shift?
19 A  The monumental shift is related to the four items
20 that I just went through.  So another monumental
21 shift that requires the transformation of process
22 and the alignment of resources to focus on these
23 four objectives.
24 Q  Is this monumental shift also, did this also
25 involve shifting the focus of Widen Enterprises

Page 160

1  from printing or prepress to the software side?
2  A  This involved the advancement of software in
3  conjunction with the continued growth of
4  pre-media, and both in growth in terms of revenue,
5  and then the key third objective here, which is
6  efficiencies in pre-media operations.  So this
7  plan was representing of software advancement and
8  pre-media advancement.
9  Q  And in 2008 when you drafted this plan, was
10 Widen Enterprises deeply into the software space?
11 A  Widen Enterprises entered this software space in
12 the mid '90s, and I guess can I ask a clarifying
13 question about what do you mean by deeply?
14 Q  Well, let me just rephrase.
15          Was Widen -- at the time you wrote this
16 business plan in 2008, was Widen contemplating
17 becoming more heavily invested in the software
18 side of the business?
19 A  At the time that this business plan was created,
20 we were going to advance our software business and
21 our pre-media business.  Both.  And what we could
22 find later is the revenue projections would show
23 growth in software and growth in pre-media, but
24 growth in software at a higher percentage than
25 growth in pre-media.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 161

1  Q  And along those lines, when you created this
2  business plan in 2008, did you understand that
3  increasing revenue on the software side of the
4  business would be a more effective way to grow
5  revenue than focusing solely on the pre-media
6  operations?
7  A  I would not use the word I in that.  There was a
8  group of us who also believed.  So as an example,
9  this is --
10 Q  And let me just stop you there.  When I ask a
11 question, I'm, for the purpose of today in
12 general, talking about Widen Enterprises.  So I'm
13 not interested in you personally and what you
14 thought.
15 A  Understood.
16 Q  So with that in mind, can we go back to my
17 question.
18              (Question read)
19 A  We knew that to create a sustainable business
20 going forward we needed to diversify our revenue,
21 and so creating a software business would help us
22 to sustain the business for the next generation,
23 in addition to maintaining and growing the
24 pre-media business.
25 Q  Did anyone at Widen at this time express a belief

Page 162

1  that investing in the software side of the
2  business would increase the company's value over
3  time more effectively than focusing on pre-media
4  operations?
5  A  It would increase the sustainability of the
6  organization.  And discussions of increasing the
7  value would only be in relation to the
8  sustainability, as in the continued existence of
9  Widen into the next generation.
10 Q  In 2008, was Widen Enterprises a software as a
11 service company?
12 A  The labeling of the company at various points in
13 time was different, and I didn't prepare details
14 on what the company label would be at various
15 points in time.
16       Software as a service is an appropriate label
17 to the delivery model to the software itself, and
18 we would have referred to ourselves as a software
19 as a service business at some points in time.
20 Q  Yeah.  And I'm trying to pin that down.  So let me
21 just ask this.  When Widen Enterprises was sold to
22 Acquia in 2021, would you have characterized Widen
23 Enterprises as a SaaS company?
24 A  I characterize Widen as a software company.
25 Q  At what point would you as a CEO of Widen have

Page 163

1  categorized Widen Enterprises as a software
2  company?
3  A  We would have been exclusively a software company
4  when we sunsetted our content production, formerly
5  pre-media, formerly prepress business unit, so
6  that would have been exclusively a software
7  company after that time.  So that timing was --
8  that timing was summer of 2020.  So after that,
9  we would have been only providing software.
10      We would have also labeled ourselves a
11 software company with services, so software and
12 services, which would encompass the pre-media
13 services and other professional services related
14 to the software.
15      So I can't point to a specific day or year on
16 when that might have been --
17 Q  Okay.
18 A  -- based on -- yeah, based on this.
19 Q  Was there a point in time when revenue that Widen
20 Enterprises derived from software exceeded revenue
21 that Widen Enterprises derived from prepress
22 operations?
23 A  Yes.
24 Q  Can you tell me when that was?
25 A  I didn't prepare that level of detail here.  This

Page 164

1  document would have projections of that, but I
2  didn't look at the actuals in that intersection of
3  events.  I do know that that did happen.  I just
4  do not have the level of detail on that in
5  preparation for this.
6  Q  I think you testified -- and correct me if I'm
7  wrong, but I think you testified that in 2008 it
8  was Widen Enterprises' view that diversifying to
9  include software as a service would enhance the
10 sustainability of the company.  Do I have that
11 right?
12 A  It would make the company more sustainable, yes.
13 Q  And by making the company more sustainable, you
14 mean would allow Widen Enterprises to continue to
15 operate?
16 A  Into the future, yes.
17 Q  Does Widen Enterprises have any opinion as to the
18 approximate fair market value of the company for
19 any year between 2015 and 2020?
20 A  No.
21 Q  Did Widen Enterprises' revenues change from 2004
22 to 2015?
23 Q  Did Widen's revenues change from 2004 to 2015?
24 Q  Correct.
25 A  Yes.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 165

1  Q  And in what way?
2  A  Probably a lot of ways.  I didn't memorize
3     financial statements.  If you've got some to look
4     at --
5  Q  Let me just ask you, did Widen's revenue increase
6     from 2004 to 2015?
7  A  Widen's revenue comparing 2004 to 2015, then the
8     answer to that question is yes.  We had more
9     revenue in 2015 than we did in 2004.
10 Q  Would Widen Enterprises say that the value of
11    Widen Enterprises also changed during that same
12    period of time?
13 A  Widen Enterprises didn't look at value.
14 Q  Is it your testimony today that Widen Enterprises
15    never, from 2004 to 2015, considered what its
16    value was on the open market?
17 A  We did not consider our value on the open market
18    during those time periods, no.
19 Q  Likewise, from 2015 to 2020, is it your testimony
20    today that Widen Enterprises did not at any point
21    in that period of time consider Widen Enterprises'
22    fair market value?
23 A  We didn't consider it relevant, and there was the
24    Channel Advisor conversation that I've cited
25    earlier in this conversation, which was in August

Page 166

1     and September of 2020.  But we didn't -- valuation
2     was not an objective.  Growth was the objective.
3  Q  And I believe when you just answered my question,
4     you said that Widen Enterprises didn't, past
5     tense, consider value.
6        As Widen is offering testimony today, does
7     Widen Enterprises have any opinions as to the
8     value of the company for any year between 2004 and
9     2020?
10                MR. LAING:  Objection to the form.
11       You can answer.
12 A  Any opinions of the value.  We have no opinion of
13    the value.
14 Q  And just to be clear, when I say value, I mean the
15    fair market value of the company.
16 A  We have no opinion.
17 Q  You, as the CEO of Widen Enterprises, monitored
18    software as a service merger and acquisition
19    activity prior to August of 2020; correct?
20 A  I monitored market activities prior to 2020?  Yes.
21    And that market activity included activity related
22    to other organizations that were transacting.
23 Q  In other words, it included sales of software as a
24    service companies; correct?
25 A  It included sales of companies that were in our

Page 167

1     industry.  I don't know that they would all
2     necessarily be identified as software as a service
3     companies.
4  Q  Sure.  Why were you monitoring that activity?
5  A  To make sure that we were in the right market for
6     growth.
7  Q  What do you mean by that?
8  A  I mean that it's easier to grow in a market that's
9     healthy and attractive than in a market that's not.
10 Q  And you considered the software as a service
11    market to be healthy and attractive?
12 A  I considered the software as a service market --
13    the software market and software as a service as a
14    delivery model to the software to be an attractive
15    market.
16 Q  Prior to May of 2020, did Widen Enterprises
17    executives ever communicate about the company's
18    estimated market value?
19 A  Did executives of the company communicate prior to
20    May of 2020 about estimated values of the company?
21    No.
22 Q  It's your testimony today that Widen Enterprises'
23    executives never communicated about the estimated
24    market value of Widen Enterprises?
25 A  I communicated value of other organizations and

Page 168

1     then would have applied those valuations based on
2     a variety of assumptions, as you've seen in the
3     operational updates, and I would have provided
4     that information as an indicator of attractive
5     markets, growth markets, and growth opportunities.
6  Q  Who would you provide that information to?
7  A  I provided that to Reed.
8  Q  What was the purpose of providing that information
9     to Reed?
10 A  To make sure that he was aware that we are in the
11    right market for growth.
12 Q  Prior to May of 2020, Widen executives did
13    communicate about when to advise Reed to sell the
14    company; correct?
15 A  There is a reference I recall with Mike Kiesler in
16    one of the operational updates with Reed where I
17    specified or called attention to something like
18    that.  So if you've got that, we can read through
19    that.
20 Q  And particularly when you were discussing advising
21    Reed as to when to sell, you were interested in
22    doing so to ensure that Reed was able to realize
23    the maximum value for his company; correct?
24 A  If you've got specifics to look at, I would be
25    happy to look at what you're referencing.

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 169

1  Q  Are you able to answer my question?
2  A  Can you reframe it?
3                    MS. POLAKOWSKI:  Read it back
4        first.
5                    (Question read)
6  A  Yeah, I did so to ensure that.  And in the context
7     of that, that was we're going to keep growing.
8     That's the objective, and that was stated in that.
9     And in the event that we anticipate growth slowing
10    down, then -- and we have proper -- we have
11    forecasts that would indicate as such, then there
12    would have been dialogue around advising to that
13    capacity.  But it was not -- that was not any
14    projection that we looked at at that time.
15 Q  As of May 2020, Widen Enterprises was aware that
16    annual recurring revenue is an indicator of market
17    value; correct?
18 A  There was -- Let me hear the question again,
19    please.  I'm sorry.
20                   (Question read)
21 A  Yeah.  As of May of 2020 and before, we, in those
22    operational updates, I would provide and estimate
23    the ARR of the other companies and then use that
24    as one of the indicators.
25 Q  Are you able to answer the question, Mr. Gonnering?

Page 170

1  A  I feel like I did.
2  Q  As of May of 2020, the company knew that recurring
3     revenue is an indicator of market value; correct?
4  A  We knew it was an indicator of market value of
5     other organizations, along with other measures.
6  Q  As of May of 2020, Widen Enterprises knew that a
7     three to five times multiple of revenue formula
8     was used in the market to estimate market value of
9     a company; correct?
10 A  The references you're making are to updates that
11    were provided in those operational updates, and
12    those would have been estimates that were of other
13    organizations in our space, and those would have
14    been assumptions that were made about those
15    companies.
16        And if I recall the one that you're thinking
17    about, it would be the Bynder's acquisition of
18    WebDAM where I made assumptions on what WebDAM's
19    revenue was and then organized what that ARR
20    multiple would be.
21                   MS. POLAKOWSKI:  Could you read
22       back the question, please, Peggy?
23                   (Question read)
24 A  That was the multiple of another organization that
25    I looked at and made assumptions about.

Page 171

1  Q  Did you or did you not use a three to five times
2     multiple of revenue to estimate the value of
3     another company in the market?
4  A  If you have that operational update, I can
5     reference specifically what I wrote in that.
6  Q  You don't know?
7  A  I know that I wrote about the market update of
8     the Bynder and WebDAM transaction, and I estimated
9     what that looked like based on assumptions that I
10    made.
11 Q  And in your estimate, do you know whether you used
12    a value of three to five times -- or a formula of
13    three to five times revenue to estimate the value
14    of that company?
15 A  I would need to look at that.
16 Q  Okay.
17                   (Exhibit No. 7 marked for
18                    identification)
19 Q  Mr. Gonnering, I've just handed what you has been
20    marked as Exhibit 7.  Do you recognize Exhibit 7
21    as one of the operational updates that you've
22    referenced?
23 A  I do.
24 Q  I'd like to direct your attention to the last
25    paragraph of this -- I'm sorry, not the last

Page 172

1     paragraph.  The paragraph titled Minority Stake
2     Interest.  Do you see that?
3  A  I do.
4  Q  It says, "As I've done infrequently" -- excuse me.
5         "As I have infrequently done in the last
6     handful of years, I've responded to a private
7     equity firm, Five Elms Capital, to listen.  They
8     focus on B2B SaaS companies, have 300 million in
9     investments, and are investing out of a 150 million
10    now."
11        Did I read that correctly?
12 A  Yes.
13 Q  And it says, later in the paragraph, that they
14    expressed an interest in this conversation in a
15    minority stake.
16        Does that refer to a minority stake in Widen
17    Enterprises?
18 A  They would have expressed it generally, yes.
19    That's the way that reads.
20 Q  And then in the -- toward the end of the paragraph
21    you state, "If we are valued at $80 million (four
22    times software revenue of 20 million), then a
23    10 percent stake provides us 8 million in capital
24    to deploy into labor and marketing our new
25    ventures."

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

| | |
|---|---|
| **Page 173** | **Page 175** |

Page 173

1      Did I read that correctly?

2 A   You did.

3 Q   So in August of 2018, Widen was looking at an
4      estimated value based on a formula of four times
5      software revenue; correct?

6 A   This is an "if we are valued." So this is back to
7      the origins of these, and I would go back to that
8      Bynder acquisition of WebDAM being the source of
9      what might be that multiple and saying based on
10     assumptions about WebDAM and their revenue and
11     their published price that Bynder paid for them,
12     that would be me applying that here to say "if we
13     are valued at 80 million (four times software
14     revenue of 20 million)." So that is the origin of
15     that.

16 Q   And I'm not right now asking about the origin.
17     I'm just asking whether in this email for the
18     purpose of your, we'll call it your hypothetical
19     valuation, you utilized a formula of four times
20     software revenue; correct?

21 A   I used in this hypothetical based on transactions
22     that were occurring in the market with other
23     companies and based on assumptions made about
24     those companies and then the hypothetical of if.

25 Q   And did you have any opinion as to whether or not

Page 174

1      a four times software revenue formula was a
2      reasonable estimate of what a software company
3      might be -- might sell for when you sent this
4      email?

5 A   Can you rephrase that?

6      MS. POLAKOWSKI: Peggy, would you
7      mind reading it back?

8      (Question read)

9 A   And I think the reason of this would be there is
10     a growth market here. There is an attractive
11     market. It has these kinds of valuations being
12     applied to it.

13 Q   And let me just stop you there. I didn't ask for
14     and I don't want to know about the reason or
15     anything. I want to know only the answer to the
16     question that I asked. And if you need it read
17     back, I can have it read back, but I would like
18     you to focus on the question that I asked.

19 A   Understood. Can you read it back and then maybe
20     reframe it.

21      (Question read)

22 A   I didn't have an opinion.

23 Q   Was it your practice to send the CEO of the
24     company numbers for which you had no basis in
25     fact?

Page 175

1      MR. LAING: Object to the form.

2      You can answer.

3 A   I sent -- as the CEO, I sent this to Reed as a way
4      to say we're in the right market.

5 Q   Are you able to answer my question?

6 A   With a hypothetical of if.

7      (Question read)

8      MR. LAING: Object as to the form.

9 A   It was my practice to make sure that the reports
10     that I provided were demonstrating that we're in
11     the right markets and that we could grow in those
12     markets to realize our growth objectives. That
13     was my practice.

14 Q   And when you testified that you didn't have an
15     opinion as to whether four times software revenue
16     is a reasonable estimation of value of a software
17     company, just to be clear, are you referring to
18     Widen Enterprises?

19 A   I'm going to need that one read back.

20 Q   No, no, no. That's fair.

21      Does Widen Enterprises have an opinion --
22     I'm not just asking for your personal opinion.
23     Does Widen Enterprises have an opinion as to
24     whether four times software revenue is a
25     reasonable way to estimate the fair market value

Page 176

1      of a software company?

2 A   No.

3      MS. POLAKOWSKI: Why don't we take
4      a short, ten-minute break.

5      MR. LAING: Sure.

6      THE VIDEOGRAPHER: Going off the
7      record at 2:37.

8      (Recess)

9      THE VIDEOGRAPHER: We're back on
10     the record at 2:58.

11 Q   Mr. Gonnering, before we leave Exhibit 7, I just
12     had a few more questions on that document. You
13     indicated that you responded to a private equity
14     firm, Five Elms Capital, to listen. Why were you
15     responding to Five Elms Capital?

16 A   I wanted to grow the company inorganically, as
17     well as organically, and I was pursuing what it
18     would be like to acquire another organization, and
19     I started engaging in some of these responses
20     infrequently to figure out how do these companies
21     work, not ever having dabbled in that, but knowing
22     that we have growth potential for Widen beyond the
23     organic, and so I started responding in the
24     interest of entertaining Widen acquiring other
25     companies.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 177

1  Q   And this particular company, Five Elms Capital,
2      was interested in acquiring a minority stake of
3      Widen; correct?
4  A   That would be a generic statement that they would
5      put out in the market.  That would be like other
6      PE, private equity, inquiries.  They would message
7      that in their marketing emails, and it would be a
8      standard introduction.
9  Q   And you specifically stated that they expressed an
10     interest in a minority stake; correct?
11 A   As they all express something like that in their
12     marketing emails, yes.
13 Q   What other private equity firms did Widen
14     Enterprises respond to over the years?
15 A   Well, there is -- in pursuit of the inorganic
16     growth option, I spoke to a few of them.
17     Companies like -- their names are escaping me at
18     this very moment.  Goldman Sachs is an example of
19     a company that would have sent a marketing email,
20     and I would have responded, and there were a
21     couple others as well.
22 Q   Do you recall any of those others?
23 A   I didn't prepare that level of detail for this.
24 Q   What about Goldman Sachs, do you recall when they
25     reached out about acquiring a minority interest in

Page 178

1      Widen Enterprises?
2  A   That wasn't necessarily why they reached out.
3      I don't know the specific outreach from that
4      particular company.  But if you've got some of
5      those emails, I'm happy to look at those emails
6      and review those inquiries.
7  Q   You referenced Goldman Sachs, so I want to
8      understand what Widen's memory is about an
9      outreach from Goldman Sachs.
10 A   Goldman Sachs, like several others, would send
11     marketing emails into the organization, and that
12     was a standard practice of those organizations,
13     marketing emails, sales calls, looking to invest
14     in organizations, and those were the emails that
15     I'm referencing, and I did respond to some of
16     those as a result of our interest in acquiring
17     other companies.
18         In fact, one that comes to mind now is in
19     2018, I responded to a company called Golding
20     Partners.  They came to us and were representing
21     a company called Chute, which was a company of
22     interest for us to acquire, and so I made
23     connections with Golding Partners at that time.
24     So Golding Partners is one that I responded to
25     because they were --

Page 179

1  Q   And I want to stay focused on companies that
2      reached out to Widen Enterprises for the purpose
3      of potentially investing in or acquiring an
4      interest in Widen Enterprises.  As we talked
5      about, Five Elms Capital was one.
6  A   Sure.
7  Q   And you mentioned, I believe, that a number of
8      private equity firms had reached out with similar
9      inquiries.  So my question to you is, as you sit
10     here today, what other private equity companies
11     reached out to Widen Enterprises over the years
12     for the purpose of exploring investment
13     opportunities with Widen?
14 A   Those were numerous, and I did not memorize those
15     names.  So I don't have those details for you.
16     But if you have things that I can look at, I'm
17     happy to do that.
18 Q   And did Widen Enterprises ever inform Stacy
19     Randall about those outreaches from private equity
20     firms?
21 A   Those outreaches would have been marketing emails
22     and sales cold calls and standard practice for
23     those organizations that wouldn't have required
24     others to be informed about.
25 Q   Well, you thought it rose to the level in 2018 of

Page 180

1      informing the CEO of the company about one of
2      these inquiries.  Did you at the same time inform
3      Stacy Randall or did Widen Enterprises inform
4      Stacy Randall about that outreach?
5  A   I informed Reed in this case as an indicator of a
6      healthy market, an attractive market, a growing
7      market to be consistent with our growth objective.
8          So I found it relevant for me to tell Reed
9      about it because it's good for the business and
10     the objective of keep growing.
11 Q   And I take it from your response that the answer
12     to my question as to whether Widen Enterprises
13     ever notified Stacy about these communications was
14     no?
15 A   That's correct.
16 Q   Okay.  What steps did Widen Enterprises take to
17     determine the value of Widen Enterprises in
18     connection with the buyback of Stacy's shares in
19     May of 2020?
20             MR. LAING:  Can you read that
21         question for me?
22             (Question read)
23             MR. LAING:  Thank you.
24 A   Widen didn't take any steps.
25 Q   Did Widen Enterprises provide any information to

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 181

1    Stacy in connection with the May 2013 -- excuse
2    me, May 13, 2020, redemption of her shares that
3    would allow her to determine the fair market value
4    of the company?
5  A  Widen Enterprises would have responded to requests
6    for information from Stacy, and there were no
7    requests for information.
8  Q  And, again, I don't care about what would have or
9    could have or should have happened.  I want to
10   know only what did happen.  And my question was
11   did Widen Enterprises provide any information to
12   Stacy in connection with her redemption on May 13,
13   2020, that would have enabled her to determine the
14   fair market value of the company?
15 A  In order to determine the fair market value of the
16   company.  We provided Stacy everything she asked
17   for, and that was -- and how she would have
18   assessed that is -- yeah.  So what did she ask
19   for?  She asked for nothing, and we provided her
20   that.
21                (Exhibit No. 8 marked for
22                identification)
23 Q  Mr. Gonnering, I've just handed you what has been
24   marked as Exhibit No. 8.  Do you recognize Exhibit
25   No. 8?

Page 182

1  A  I recognize the cover page.  That is a
2    confidential information memorandum.
3  Q  Who put this information together, if you know?
4  A  This information was assembled by the Software
5    Equity Group.
6  Q  Who is Software Equity Group?
7  A  Software Equity Group is an investment bank out of
8    San Diego.
9  Q  And am I -- is it accurate from its name that
10   Software Equity Group specializes in the marketing
11   and sale of software companies specifically?
12 A  The marketing and sale and investments in software
13   companies, yes.
14 Q  How did -- well, let me back up.
15       Did Widen Enterprises at some point engage
16   Software Equity Group?
17 A  Widen Enterprises did engage Software Equity
18   Group.
19 Q  When was that?
20 A  The engagement started -- the engagement letter
21   started in January of 2021.
22 Q  Did you -- were you involved in compiling
23   information for the purpose of transmitting it to
24   SEG to compile Exhibit 8?
25 A  If this is fully the CIM, confidential information

Page 183

1    memorandum, then, yes, I provided information to
2    Software Equity Group.
3  Q  Do you recall specifically what information you
4    were involved in providing to SEG?
5  A  I provided SEG with numerous information requests.
6  Q  Was anyone else at Widen Enterprises involved in
7    compiling and transmitting to SEG information for
8    the purpose of preparing Exhibit 8?
9  A  Mike and I both provided information to SEG.
10 Q  What was the purpose of creating Exhibit 8, the
11   confidential information memorandum?
12 A  This was a standard marketing profile of a company
13   that was exploring what the sale of that company
14   would look like, and this would be used to
15   distribute to potential buyers.
16 Q  Did you review the information contained in
17   Exhibit 8, and by you I mean Widen Enterprises,
18   to determine its accuracy?
19 A  Yes.
20 Q  And did you, in fact, confirm that the information
21   contained within Exhibit 8 is accurate?
22 A  I would have gone through it and confirmed that it
23   was accurate.
24 Q  Did you have a primary point of contact at SEG?
25 A  We had, yes, a primary point of contact.

Page 184

1  Q  Who was that?
2  A  The primary point of contact when the relationship
3    started was Brad Weekes.  Is their profile in here
4    like they were on the Grant Thornton one, I
5    wonder?
6  Q  It might help if you look at page 2.  There are a
7    number of names listed at the bottom of that page.
8  A  Thank you.  So the bottom of page 2, those were
9    the people that we worked with.  Brad was the
10   partner.  He was the primary point of contact.
11   Karam, she was someone who worked day-to-day with
12   as we went through this process.  Brandon was an
13   analyst, and Javier was also an analyst.
14 Q  If you're able to say, it sounds like, and I'm
15   inferring from your testimony, but it sounded to
16   me like Brad and Karam may have been your
17   principal points of contact.  Is that accurate?
18 A  Yeah.  That's accurate.  I would say there is --
19   Kris Beible is another person who we spoke with
20   before the formality of the relationship.
21 Q  So prior to an engagement?
22 A  Correct.
23 Q  And that was who, Kris Beible?
24 A  Kris, K-r-i-s, Beible, B-i-e-b-l-e, subject to the
25   E and the I changing there possibly.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of Corporate Rep of Widen Enterprises, LLC*
*November 06, 2023*

Page 185

```
 1  Q  Fair enough.  Did Reed have any involvement in the
 2     preparation of the CIM?
 3  A  No.
 4  Q  Did he review the CIM for accuracy as you did?
 5  A  I would have been the accountable party to
 6     accuracy in the CIM.
 7  Q  And you mentioned that Mike Kiesler was involved
 8     also in preparing -- excuse me, in providing
 9     information to SEG to prepare the CIM; correct?
10  A  Yes.
11  Q  Was he involved in providing the financial
12     information?
13  A  Financial information would have came from him,
14     yes.  Other people on our executive team at the
15     time would have also been providing information at
16     various points in time closer to the completion of
17     the CIM.
18  Q  Sure.
19  A  With me initially and Mike and then others later.
20  Q  Was this engagement with SEG the first time that
21     Widen executives ever considered what the value of
22     the company would be?
23  A  The first time that Widen executives ever
24     considered what the value of the company would be.
25     When you say Widen executives, can you clarify who
```

Page 186

```
 1     is in that group?
 2  Q  Sure.  For the purpose of this question, we'll
 3     just say the executive team that you previously
 4     identified.
 5  A  Okay.  And so when we -- now I lost it.  Can you
 6     repeat it, please?
 7            (Question read)
 8  A  No.
 9  Q  When, to the best of your recollection, was the
10     first time executives of Widen Enterprises
11     considered what the value of the company would be?
12  A  The first time when we received a review from
13     Channel Advisor in September of 2020.  That would
14     have been the first time we received a, Here is a
15     range for Widen given the information that's been
16     provided.
17  Q  And what was the range that Channel Advisor
18     provided to Widen Enterprises in September of
19     2020?
20  A  Channel Advisor stated that they saw the value of
21     the organization at 50 million, with the potential
22     to go to 75 million pending more diligence.
23  Q  After Channel Advisor provided that range of value
24     estimates, did you obtain any other valuations of
25     the company?
```

Page 187

```
 1  A  Channel Advisor was providing an informal
 2     indication of interest with that value range.
 3     Prior to engaging in SEG, we also engaged in
 4     dialogue with two other investment banks to
 5     explore a best path.  And so we received -- every
 6     investment bank that participated in the process,
 7     there were three, and as part of the process that
 8     we started in December of 2020, they organized a
 9     presentation for Widen, and in those presentations
10     they provided a range that they thought they could
11     go and earn in the market.
12  Q  What were those three investment bankers -- banks?
13     Excuse me.
14  A  One was Bridgepoint.  Another one was Statesman.
15     And another one -- the other one was SEG, Software
16     Equity Group.
17  Q  And did they all submit -- well, provide formal
18     presentations to Widen Enterprises?
19  A  They did.
20  Q  Do you know whether those formal presentations
21     have all been provided to your counsel?
22  A  They have.
23            (Exhibit No. 9 marked for
24             identification)
25  Q  Mr. Gonnering, I just handed you what has been
```

Page 188

```
 1     marked as Exhibit 9, and I apologize for taking
 2     this somewhat out of order, but it was lost in my
 3     box of documents.  So we will address it now.
 4  A  Okay.
 5  Q  Do you recognize Exhibit 9 as another operational
 6     update from yourself to Reed Widen copying Michael
 7     Kiesler?
 8  A  I do.
 9  Q  And this is dated February of 2018; correct?
10  A  February 23, 2018, correct.
11  Q  And in this particular email, again you're
12     discussing -- there is a paragraph heading called
13     Valuation.  Do you see that?
14  A  I do.
15  Q  And in that paragraph you're talking about a
16     Bynder acquisition of WebDAM; correct?
17  A  Correct.
18  Q  And you've referenced that a couple of times
19     today.  Then in this paragraph you state the
20     valuation -- you said your guess is the valuation
21     was three to four times revenue; correct?
22  A  "I am unsure of any other sizzle in the deal,
23     but if it's straight-up DAM, then my guess is
24     the valuation was three to four X revenue."
25  Q  And then you go on to say, "If they were
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 189

1   equivalent to our software revenue last year
2   (14 million) then it works out to 3 1/2 times
3   revenue.  Using our projected 2018 software
4   revenue of 18 million, our market valuation on
5   3 1/2 times revenue is $63 million."
6           Did I read that correctly?
7   A   You did.
8   Q   Did Reed ever respond to this email and say our
9       market valuation is not $63 million?
10  A   I don't recall what specific emails Reed responded
11      to in the operational updates.  I don't recall
12      anything that would be Reed responding in that
13      way.
14  Q   Likewise, did Mr. Kiesler ever respond to this
15      email and say our market valuation is not
16      $63 million?
17  A   I didn't -- I don't recall that either.  I didn't
18      look at the details related to reply threads on
19      these operational updates.
20  Q   Do you know whether the reply threads to these
21      operational updates were provided to your counsel
22      for the purpose of collecting information for this
23      litigation?
24  A   If there were reply threads on these operational
25      updates, they would have been provided to counsel,

Page 190

1       yes.
2   Q   Did you ever send an email to Reed Widen or
3       Michael Kiesler and say, I was wrong, our market
4       valuation is not $63 million?
5   A   That wouldn't have been something I sent, because
6       the reason for this is to demonstrate that the
7       market that we're in is a healthy, attractive
8       market, and that it has growth potential and that
9       we're in the right space.  So I wouldn't have
10      responded in that way.
11                  (Exhibit No. 10 marked for
12                  identification)
13          MS. POLAKOWSKI:  I apologize.  I
14      only have one copy of this.
15          MR. LAING:  What are we marking
16      this as?
17          MS. POLAKOWSKI:  10?
18          COURT REPORTER:  10.
19  Q   Mr. Gonnering, I'm handing you what has been
20      marked as Exhibit 10.  Do you recognize
21      Exhibit 10?
22  A   I recognize Exhibit 10 as a response to the
23      Windy Waters topic 11, which was the payment of
24      dividends and/or distributions, including with
25      respect to the pass-through or other tax

Page 191

1       obligations of any shareholders, from 2004 through
2       2008 and 2014 through 2020.
3   Q   Are you able to tell me -- we've discussed some
4       of the fund flow from Windy Waters to Widen
5       Enterprises and vice versa.  Are you able to tell
6       me with regard to the distributions that are
7       listed on Exhibit 10 whether any of these
8       distributions were paid with funds that were
9       received from Widen Enterprises?
10  A   I did not anticipate that as it relates to this
11      topic and would not be able to provide a response
12      to that with these distributions.
13  Q   And let me just simplify the question if I can.
14      Can you tell me any distribution out of Windy
15      Waters that was paid using Widen Enterprises'
16      funds?
17  A   I didn't prepare for that question, so I cannot
18      answer it.
19  Q   Okay.  All right.  I'd like to go now to topic 8,
20      deliberations into or communications regarding
21      deciding whether to obtain valuations of Widen
22      Enterprises from 2015 to 2020.  Are you prepared
23      to testify on topic 8?
24  A   I am.
25  Q   What did you do to testify -- excuse me.

Page 192

1           What did you do to prepare to testify with
2       regard to topic number 8?
3   A   I spoke with counsel, and present with counsel was
4       Reed and Mike, and I looked through communications
5       and emails related to the potential deliberations.
6   Q   Prior to May of 2020, it's fair to say that Widen
7       had dabbled in private equity conversations and
8       passively looked at valuation multiples; is that
9       right?
10  A   That's not right.  We would have engaged in
11      private equity conversations for the purpose of
12      acquiring other organizations as part of an
13      inorganic growth strategy, and to learn about what
14      the private equity process was like.
15          And the second part of your question, I'm
16      sorry, can you repeat that?
17                  (Question read)
18  A   And we looked at -- I conducted assessments of
19      other organizations who were transacting in the
20      market and then made assumptions based on what
21      their revenues might be to then assemble an
22      estimate of value of those companies and then
23      applied that to Widen's revenue.
24                  (Exhibit No. 11 marked for
25                  identification)

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

---

Page 193

1 Q  Mr. Gonnering, I've just handed you what has been
2    marked as Exhibit 11.  Do you recognize Exhibit 11
3    as an email from yourself to Jeff Horein?  How do
4    you say his last name?
5 A  Horein.
6 Q  Horein?
7 A  Horein.
8 Q  At Baker Tilly?
9 A  I do.
10 Q  And it's dated August 19, 2020; correct?
11 A  August 19, 2020, correct.
12 Q  In the first sentence of the email, you state the
13    context for your email which says, "Reed expressed
14    an interest in pursuing options to sell the
15    organization for a maximum return."
16       Did I read that correctly?
17 A  You did.
18 Q  And in the last paragraph of that document, you
19    state, "Over the last handful of years, I have
20    dabbled in private equity conversations, passively
21    looked at valuation multiples, and entertained
22    some dialogue with interested organizations to
23    better understand the landscape."
24       Did I read that correctly?
25 A  You did.

---

Page 194

1 Q  And then you conclude the email that, "I have
2    their information request list and they are
3    willing to provide a valuation range, but I have
4    not done anything with it.  I was thinking it
5    would be a nice way to determine market value from
6    a buyer instead of the generic range of revenue or
7    EBITDA multiples."
8       Did I read that correctly?
9 A  You did.
10 Q  So you recognized in August of 2020, that one way
11    to provide a valuation range, generic though it
12    may be, was to look at a range of revenue or
13    EBITDA multiples; correct?
14 A  "I was thinking it would be a nice way to
15    determine market value from a buyer instead of
16    the generic range of revenue or EBITDA multiples."
17    That is -- yeah, that is what I said.
18 Q  Do you know whether Jeff ever responded to this
19    email?
20 A  I don't know if he -- well, he would have had to
21    respond to the email because I ended up meeting
22    with Jeff at a -- which I'm going to say a week
23    after this is an approximate, but sometime later
24    in October I met with Jeff.  So he would have
25    responded, and we would have met.

---

Page 195

1 Q  And in the email you say, "It would be nice to
2    determine market value from a buyer?  Outside of
3    the acquisition by Acquia, was that ever done,
4    fair market value determined from a buyer?
5 A  The range in here, a nice way to determine
6    market value, the publicly-held reference here,
7    NYSE: ECOM, that is Channel Advisor.
8       So this is me reaching out following a
9    conversation with Reed regarding what his
10    succession looks like in two to five years and
11    exploring how Jeff can help me figure this out,
12    and then me saying, I have this request from
13    Channel Advisor who is interested in having
14    conversations, and then I was asking him if that
15    was a good idea.  And so that's what that is
16    referring to.
17 Q  So when did Channel Advisor first reach out to
18    Widen Enterprises?
19 A  It was in August.  So it would have been before
20    August 19, but in August we got outreach from, as
21    referenced earlier, from Derek Conlin, who was
22    their corporate development person and someone I
23    would have routed to our partnership team, and
24    then I got an email or a call from -- it would
25    have been likely an email from David, David S.

---

Page 196

1    His name escapes me at the moment.  He was the CEO
2    of Channel Advisor.  I would have had an email
3    from him asking to have further conversation.
4       So I don't know what of those Channel Advisor
5    dialogs were in August prior to this, but I
6    would -- I would testify here that I believe that
7    the dialogue with David, the CEO of Channel
8    Advisor, was before this, in August.  So in the
9    two weeks -- within the two-week timeframe
10    preceding this.
11 Q  In the paragraph at the end where you state,
12    "Over the last handful of years, I have dabbled
13    in private equity conversations," what is the
14    timeframe that you mean by "over the last handful
15    of years"?
16 A  I would have to -- I didn't prepare for that
17    particular question, so I don't recall the details
18    for that.
19 Q  So you can't, as you sit here today, tell me the
20    first time that you reached out or private equity
21    reached out to Widen with regard to investing in
22    the company?
23 A  I did not look for that information.
24 Q  And did you report your findings with regard to
25    your conversations with private equity and

---

**Stacy L. Randall v.**                    *Video Deposition of Corporate Rep of Widen Enterprises, LLC*
**Reed C. Widen, et al.**                                                    **November 06, 2023**

---

Page 197

1    passively looking at valuation multiples to Reed
2    Widen via your operational updates?
3  A  In the operational updates, I provided the
4     assumptions in valuation of other organizations,
5     as you've seen before, yes.
6  Q  And did Widen Enterprises ever provide that same
7     information to Stacy Randall?
8  A  No.
9  Q  Was it understood among Widen executives at the
10    time it began discussing a sale of the company
11    that the fair market value per share calculation
12    that was used to calculate the price at which
13    Stacy Randall's shares were redeemed in May of
14    2020 would not apply to the sale of Widen
15    Enterprises?
16 A  Can you break that question apart or reframe it?
17        MS. POLAKOWSKI:  Let's try reading
18     it back first.
19        (Question read)
20 A  It wasn't a thought.
21 Q  I need to make sure I understand your response
22    to that question.  When you say, "It wasn't a
23    thought," do you mean that no one at Widen ever
24    thought that the formula that was used to redeem
25    Stacy's shares would apply to a sale of Widen

Page 198

1     Enterprises?
2  A  No one at Widen would have thought about that.
3  Q  How do you know that?
4  A  I'm here to represent Widen, and no one would have
5     thought about that.
6  Q  Why not?
7  A  I don't know why we would.
8  Q  Is it Widen Enterprises' position that the formula
9     that was used to calculate the per share price for
10    the purpose of determining Stacy's redemption
11    amount also is indicative of the fair market value
12    of Widen Enterprises' stock?
13 A  I'm going to need that one read back again as
14    well.
15        (Question read)
16 A  The -- Windy Waters used valuation experts to
17    assemble that formula, and so that formula was
18    from Virchow Krause/Baker Tilly, and that formula
19    was used in redemptions.
20        And now can you reframe the question or give
21    it back, the parts that I'm not answering to your
22    satisfaction.
23 Q  Yeah.  My question is simply this:  Is it Widen
24    Enterprises' position that the formula that was
25    used to calculate the price per share that was

Page 199

1     paid to Stacy in her redemption is indicative of
2     the fair market value of Widen Enterprise stock?
3  A  The formula used was from Baker Tilly, and from
4     advice of experts at Baker Tilly that formula was
5     set in motion, so Widen Enterprises had -- was
6     adhering to the guidance that Baker Tilly provided
7     related to that formula.
8  Q  Let's give it one more try.  I'm trying to
9     understand, when Widen Enterprises used the
10    formula to determine the price per share value to
11    pay to Stacy, if Widen Enterprises thought that
12    that was the fair market value of the stock.
13        MR. LAING:  Objection to the form.
14 A  Windy Waters used the formula.  So Widen didn't
15    have an opinion on it.
16 Q  So as you sit here today, Widen Enterprises has no
17    opinion as to whether or not the formula that was
18    used to determine the redemption price of Stacy's
19    shares represented the fair market value of
20    Widen's stock?
21        MR. LAING:  Objection to the form.
22 A  Widen relied on Windy Waters, and Windy Waters
23    sought expertise from Baker Tilly on that formula.
24 Q  That still didn't answer my question.
25 A  Okay.  One more time.

Page 200

1        MS. POLAKOWSKI:  Can you just read
2     it back, Peggy?
3        (Question read)
4        MR. LAING:  Same objection.
5  A  Correct.  Widen has no opinion.
6  Q  Before we move on to the next document, the emails
7     we were just looking at were dated in August of
8     2020 where you were reaching out to Baker Tilly
9     with regard to Reed expressing an interest in
10    pursuing options to sell the organization for a
11    maximum return; correct?
12 A  That's the Jeff Horein email that was dated
13    August 19, yep.
14 Q  Of 2020; correct?
15 A  August 19, 2020, correct.
16 Q  In August of 2020, was Widen Enterprises still
17    experiencing significant uncertainty with regard
18    to the impact of the COVID pandemic?
19 A  The COVID pandemic would have continued rippling
20    at this time.
21 Q  But even though the COVID pandemic would have
22    continued rippling at this time, it was in August
23    of 2020 that Widen Enterprises saw fit to explore
24    a sale of the company; correct?
25        MR. LAING:  Objection to the form.

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 201

1  A  Widen Enterprises saw a transaction on August 24
2     that was with another organization in our industry
3     which prompted additional conversation.
4  Q  That's curious that you say August 24 because this
5     email is prior to August 24; correct?
6  A  It is.
7  Q  So you began exploring potential sales of Widen
8     Enterprises before you became aware of this other
9     market sale you're talking about; correct?
10        MR. LAING:  Objection to the form.
11  A  In two to five years from a conversation with Reed
12     that was in June/July 2020, he expressed that
13     we're going to figure out what the organization
14     looks like without him.  And so he said in two to
15     five years in June/July 2020, and that was part
16     of, all right, well, what does that mean, how do
17     we go about that, and it was initially brought up
18     as maybe this is an employee-owned organization,
19     so what would an ESOP look like, what would an
20     executive buy-in look like, what would a Matthew
21     buys it look like.
22        There was a lot of we don't know, but in two
23     to five years, this is what my time horizon is.
24     So part of that was reaching out to Baker Tilly,
25     Jeff Horein here, and exploring what I introduced

Page 202

1     here, which is, all right, well, what if Reed
2     cashed out in two to five years and what do I do,
3     I need help.
4  Q  So despite this cloud of uncertainty that you
5     testified existed with regard to the COVID
6     pandemic, Widen Enterprises started exploring a
7     potential sale of the company in August -- in
8     June, July, and August of 2020; correct?
9        MR. LAING:  Objection to the form.
10        Misstates his last answer.
11  A  Reed stated in two to five years.
12  Q  That wasn't my question.  My question was you
13     began exploring it in June, July, August of 2020;
14     correct?
15        MR. LAING:  Same objection.
16  A  Reed stated in two to five years.
17  Q  That wasn't my question.
18        MR. LAING:  Let him answer, and
19        then when he's done, you can ask him a
20        different question or the same question.  But
21        let him finish.  You've cut him off now
22        twice.
23  A  In June and July of 2020, Reed stated in two to
24     five years, I'm going to figure out what's next,
25     and so I engaged Jeff Horein and made him aware of

Page 203

1     this and needed help, which is what the reason for
2     this email was.  And then in between this email
3     and meeting with Jeff was this August 24
4     transaction that I referred to earlier, and that
5     was the company Brandfolder being acquired by a
6     company called Smartsheet.
7  Q  And that transaction happened amidst the
8     uncertainty of the COVID pandemic as well; correct?
9  A  It did.
10        (Exhibit No. 12 marked for
11        identification)
12  Q  Mr. Gonnering, you've just been handed what has
13     been marked as Exhibit 12.  Do you recognize
14     Exhibit 12 as an email exchange, at the bottom of
15     the page, between yourself and Reed Widen?
16  A  I do.
17  Q  And subsequently it looks like Mr. Widen forwarded
18     the email exchange to someone named Russ Wolff at
19     Baker Tilly; correct?
20  A  It appears as that is the case, yes.
21  Q  The subject line of the email is Acquisition of
22     Brandfolder; correct?
23  A  It is.
24  Q  And there is a parenthetical number in the subject
25     line, 155 million?

Page 204

1  A  Yes.
2  Q  And in the email on August 25 of 2020, you write
3     to Reed about a transaction that was announced
4     yesterday.  "Smartsheet will pay 155 million for
5     the acquisition" of the company Brandfolder.
6     Is that right?
7  A  Yes.
8  Q  And then you note, "Brandfolder does not have the
9     same market presence or size.  I would guess they
10     were between 15 to 20 million in annual revenue."
11     And then, "At 20 million, that is 7.75 times
12     revenue."  Correct?
13  A  Correct.
14  Q  And Reed responded, "Hmmm, that makes it very
15     interesting."  Correct?
16  A  He did.
17  Q  And he then responded again, "If our number is
18     over 200 million it's time to look at selling."
19     Correct?
20  A  Correct.
21  Q  And this was in August of 2020 as well; correct?
22  A  August 25, 2020, correct.
23  Q  Was Widen Enterprises at this time still
24     experiencing significant uncertainty related to
25     the COVID pandemic?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 205

1   A   Operationally there were residual impacts on
2       COVID-related matters.
3   Q   Prior to this email exchange, had Reed Widen ever
4       expressed an interest in selling Widen Enterprises?
5   A   In June and July of 2020, Reed talked about in two
6       to five years we're going to explore what's next,
7       and what's next looked like was to be determined
8       in that two to five-year time horizon.
9   Q   You mentioned that in June of 2020, Reed was
10      exploring all sorts of options, including a
11      potential ESOP; is that right?
12  A   It was brought up in the subject -- or the
13      conversation with him.  ESOP, executive team
14      buying in, Matthew buying the company.
15  Q   Matthew being yourself?
16  A   Correct.  Right.  Yeah.  An option for that.
17  Q   What were the purchase prices that were discussed
18      in the context?  Let's start with an ESOP.
19  A   We didn't go through that exercise.
20  Q   Likewise, when it was discussed that you,
21      Matthew Gonnering, would purchase the company,
22      what was the purchase price that was discussed?
23          MR. LAING:  Objection as to the
24          form.
25  A   We didn't go through this.

Page 206

1   Q   Did you discuss anything at all about the details
2       of what a transaction like that would look like?
3   A   We discussed that in two to five years' time there
4       would be something to figure out related to him
5       moving on.
6   Q   And you referenced a few minutes ago in your
7       testimony that the company was still experiencing
8       residual impacts related to the COVID pandemic.
9       What were those residual impacts that the company
10      was still experiencing in August of 2020?
11  A   Operationally by this time, August of 2020, we
12      would still be navigating the remote work
13      environment, which would have continued from the
14      initial March 2020 work from home.  So that was
15      still happening in August.
16      I would address the progression to August,
17      because when we first started planning, we labeled
18      the risk related to what was happening and planned
19      for, all right, how are we going to reduce
20      3 million in expenses, how are we going to reduce
21      6 million in expenses, and we progressed through
22      some of those expense reductions.
23      We did customer evaluations.  We would be --
24      As it progressed, we would have been monitoring
25      what customers were churning, how many were

Page 207

1       churning, how many needed help, how much -- how
2       many customers, new customers would we be no
3       longer earning.
4   Q   And I just want to be clear, my question was
5       solely related to August of 2020.  So is that your
6       answer?
7   A   I didn't look at the details in August and
8       isolating August specifically.  I'm representing
9       what would be deemed the COVID era of 2020.
10  Q   Okay.
11          (Exhibit No. 13 marked for
12           identification)
13  Q   Mr. Gonnering, you've been handed what has been
14      marked as Exhibit 13.  Do you recognize Exhibit 13
15      as Defendants' Objections and Responses to
16      Plaintiff's First Set of Interrogatories?
17  A   I do.
18  Q   Did you assist in providing information to counsel
19      for the purpose of responding to this -- to these
20      requests?
21  A   I would need to review this document thoroughly
22      to determine that.  Generally, I would say it was
23      responsive to counsel's request for all things
24      related to this matter.
25  Q   And I would like to focus your attention on

Page 208

1       Interrogatory No. 6, which begins at page 9.
2       Interrogatory No. 6 asks for the defendants to
3       describe in detail the M&A process undertaken by
4       defendants as described in SEG_00000094, including
5       but not limited to the date on which any of the
6       defendants first initiated the first three
7       milestones ("1, ownership desire." "2, find
8       trusted advisors."  And 3, "organize
9       information"), and the dates on which each of
10      these milestones was completed.
11      Do you see that?
12  A   I do.
13  Q   And the response begins, the substantive response
14      begins on page 10 with the paragraph beginning
15      "The first step."  Do you see that?
16  A   I do.
17  Q   In that paragraph, defendants reference that,
18      "Mr. Gonnering had three exploratory conversations
19      with Reed Widen" to gauge interest -- "to gauge
20      ownership desire in a sale."
21      Do you see that?
22  A   I do.
23  Q   And there are three conversations that were
24      referenced there, each occurring before the
25      Brandfolder sale; correct?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

1  A  Correct.
2  Q  Do you recall participating in these three
3     exploratory conversations with Reed Widen?
4  A  I recall that Reed and I spoke on several
5     occasions in this time period, yes, and that these
6     three were marked as dates with notes related to
7     them, that Reed and I spoke on that date, so --
8  Q  I had understood your testimony up to this point
9     to be that the Brandfolder acquisition for
10    $155 million was the catalyst for Reed exploring
11    whether to sell the company.
12       So my question to you is why were these
13    conversations happening to explore Reed's interest
14    in selling the company prior to the Brandfolder
15    acquisition?
16             MR. LAING:  Objection as to the
17    form.  You can answer.
18  A  Reed expressed in two to five years' time
19     from the June/July conversation that he was going
20     to figure out what was next, and so that's why
21     these exploratory conversations happened.
22  Q  And at any point in time during these exploratory
23    conversations and after at the time that the
24    Brandfolder acquisition was discovered, did anyone
25    at Widen think it might be a good idea to get a

1     formal valuation of the company?
2  A  A formal valuation.  No.
3  Q  And at this point in time when you were having
4     exploratory conversations with Reed about selling
5     the company and then subsequently learned about
6     the Brandfolder acquisition, did anyone at Widen
7     have any idea what Widen Enterprises was worth?
8             MR. LAING:  Objection as to the
9     form.  You can answer.
10  A  Did anyone at Widen Enterprises -- I'm sorry.
11     I'm not -- can you repeat that, please?
12             (Question read)
13  A  No.
14  Q  There is a step two in your response -- in
15    defendants' response.  It says, "Find trusted
16    advisors," and that was initiated on August 19 of
17    2020.  Do you see that?
18  A  I do.
19  Q  And there is a reference to a meeting that
20    occurred on August 27 of 2020; correct?
21  A  Correct.
22  Q  Who was present at that meeting?
23  A  The meeting with Jeff -- Mr. Horein specifically
24     occurred on August 27.  That was Jeff, Mike, and
25     me.

1  Q  Mike Kiesler?
2  A  Mike Kiesler.
3  Q  Was there a written agenda for that meeting?
4  A  I didn't look for a written agenda for that
5     meeting as part of this topic.
6  Q  So you don't know whether there was a written
7     agenda?
8  A  I didn't look for one.
9  Q  Were notes taken at that August 27, 2020, meeting?
10  A  I didn't look for any notes that were taken.
11  Q  If you didn't look for something, would it be fair
12    to say that Widen Enterprises cannot take a
13    position today as to whether or not it exists?
14  A  Widen Enterprises' position would be that I didn't
15     look for it.
16  Q  So it's possible that it does exist?
17  A  I just didn't look for it.
18  Q  Is it possible that it exists?
19  A  I just didn't look for it.
20  Q  Can you answer my question?
21  A  I didn't look for it.
22  Q  I don't care if you looked for it, respectfully.
23    What I care about is the possibility of whether it
24    exists or not.
25             MR. LAING:  She's asking you to

1     speculate if you -- but you're not required
2     to do that.  So answer if you can for the
3     fourth time.
4  A  I would just be consistent with my response and
5     say I didn't look.
6  Q  Okay.  When you met with Baker Tilly on August 27
7     of 2020, was there any discussion about how Widen
8     Enterprises would obtain an idea of what it would
9     sell for?
10  A  The email that I initiated to Jeff Horein on
11     August the 19th contained that reference to
12     Channel Advisor, and I spoke to Jeff about that in
13     this conversation, which was about whether or not
14     I respond to Channel Advisor's inquiry.
15  Q  And the Channel Advisor conversation had to do
16    with a multiple of revenue; correct?
17  A  The Channel Advisor conversation was should I
18     connect with and pursue the dialogue that I had
19     with the CEO of Channel Advisor prior to this
20     conversation, which is to give them information
21     and go have a conversation with them and let them
22     figure out what they would be willing to indicate
23     as an interest in Widen Enterprises.
24  Q  And when they expressed a range, I believe you
25    said between $50 and $75 million for Widen

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of Corporate Rep of Widen Enterprises, LLC*
**November 06, 2023**

Page 213

1  Enterprises, was that based on a multiple of
2  revenue?
3  A  I didn't know what that was based on.
4  Q  Okay.  Did you ask?
5  A  We provided -- I didn't ask.  I didn't -- we
6  provided financial information to them, and that's
7  what they returned.
8  Q  When was the first time, to your knowledge, that
9  Widen Enterprises obtained a valuation of Widen
10  Enterprises?
11  A  When did Widen Enterprises obtain a valuation of
12  Widen Enterprises?  Did I understand that question?
13  Q  Correct.
14  A  Widen Enterprises engaged Channel Advisor,
15  Statesman, Bridgepoint, SEG, and learned of
16  valuation ranges from all of those sources.
17  Q  And those valuation ranges that were provided to
18  Widen, those were estimates?
19  A  Those were ranges that those investment banks
20  looked at the organization and said this would be
21  where we think we could fall.  And those were in
22  January 2021.
23  Q  When was the first time that Widen Enterprises
24  developed an opinion as to what it was worth?
25  A  When was the first time Widen Enterprises

Page 214

1  developed an opinion for what it was worth.  The
2  Channel Advisor was the first time it was a real
3  company saying, with our financial information,
4  what range they would be willing to pay.
5  Q  So it would be January of '21?
6  A  That would have been September of 2020.
7  Q  Okay.
8  A  And I didn't memorize the date for that.
9  Q  Who at Widen Enterprises initiated the process of
10  the dialogue with Channel Advisor and also the
11  three investment banks that you referenced?
12  A  I would have -- I led that charge.  I led the
13  conversations with Channel Advisor, and I also
14  used another party, his name is Mark Huber,
15  H-u-b-e-r, to help with figuring out other
16  investment banks or what else we need to do in the
17  process, and he would have reached out to
18  Statesman and Bridgepoint initially --
19  Q  Where was --
20  A  -- while I --
21  Q  I'm sorry.  Go ahead.
22  A  -- while I reached out to SEG.
23  Q  Where was Mr. Huber employed?
24  A  Mr. Huber was an independent consultant.
25  Q  Did he have a company?

Page 215

1  A  I don't recall if he was -- he was an individual.
2  I don't recall if he had a company name.
3  Q  And just to be clear, we discussed a 2004
4  valuation of Windy Waters that included its
5  central asset, Widen Enterprises.  I want to
6  be very clear that Widen Enterprises did not
7  consider that appraisal, the 2004 appraisal,
8  to be representative of the fair market value of
9  Widen Enterprises?
10  A  Correct.
11  Q  I'd like to move now to topic number 9,
12  compensation of the president, chairman, officers,
13  directors, and consultants of Widen Enterprises
14  from 2015 through 2020.
15    Mr. Gonnering, are you prepared to testify
16  with regard to topic number 9?
17  A  I am.
18  Q  What did you do to prepare for testimony regarding
19  topic number 9?
20  A  Met with counsel, and present with counsel was
21  Reed and Mike.  Also reviewed compensation for the
22  roles specified.
23  Q  And what specifically did you review with regard
24  to compensation?
25  A  Salaries, bonuses, and other taxable income that

Page 216

1  would have been provided to these people in these
2  roles for the years specified.
3  Q  And in what form did you review that information?
4  A  We reviewed it in a table that would have provided
5  a gross amount of what was made, plus -- yeah, a
6  table, like a --
7  Q  Was it in a notes document similar to others that
8  we've reviewed today that was prepared for the
9  purpose of preparing for this deposition?
10  A  It was.
11  Q  And without reviewing that table for the purpose
12  of testifying today, would you be able to tell me,
13  for instance, what Reed Widen's salary was in
14  2019?
15  A  Not exactly what his salary was in 2019, no.  An
16  approximate, between 800,000 and a million dollars
17  in total compensation.
18  Q  And if you were to look at that document, would it
19  refresh your memory as to Reed's compensation in
20  2019?
21  A  It would give the specific amount --
22  Q  Okay.
23  A  -- of his compensation.
24    MS. POLAKOWSKI:  Dean, do you
25  intend to provide that to him?

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 217

| | |
|---|---|
| 1 | MR. LAING:  I do. |
| 2 | MS. POLAKOWSKI:  Okay. |
| 3 | (Exhibit No. 14 marked for |
| 4 | identification) |
| 5 | Q   Mr. Gonnering, you've just been handed what has |
| 6 | been marked as Exhibit 14.  Is this the notes |
| 7 | document that you were referring to as having been |
| 8 | prepared for the purpose of preparing for topic 9 |
| 9 | today? |
| 10 | A   It is. |
| 11 | Q   And what is your understanding of what this |
| 12 | document shows? |
| 13 | A   This document represents compensation for Reed |
| 14 | Widen, Mike Kiesler, Matthew Gonnering, and Gary |
| 15 | Norris from 2015 to 2020, which would include a |
| 16 | gross amount.  That would be the total of bonus, |
| 17 | taxable fringe, S Corp, and salary. |
| 18 | Q   I'd like to focus on Reed Widen's compensation. |
| 19 | What was the basis for determining Reed Widen's |
| 20 | compensation? |
| 21 | A   Reed consulted with Baker Tilly for compensation |
| 22 | decisions. |
| 23 | Q   I may have misunderstood you earlier, but I |
| 24 | thought I heard you say that you consulted with |
| 25 | Baker Tilly for the purpose of compensation. |

Page 218

| | |
|---|---|
| 1 | Is it Reed that did that consulting? |
| 2 | A   Reed did that, yes. |
| 3 | Q   Okay.  Did Reed report that to you or how do you |
| 4 | know that he consulted with Baker Tilly? |
| 5 | A   He communicated that to me. |
| 6 | Q   Did you ever confirm with Baker Tilly that he |
| 7 | consulted with them for the purpose of setting his |
| 8 | executive compensation? |
| 9 | A   I had -- didn't have a need to do that, so I did |
| 10 | not. |
| 11 | Q   Other than Reed Widen reporting that he consulted |
| 12 | with Baker Tilly, was anything else done by Widen |
| 13 | Enterprises to determine Reed Widen's compensation? |
| 14 | A   When I would look at his compensation, I would |
| 15 | generally understand where compensations were in |
| 16 | casual reviews of business literature based on my |
| 17 | own learnings and observations of things and would |
| 18 | give it a smell check, so to speak. |
| 19 | Q   What casual review of business literature -- What |
| 20 | business literature did you review in your casual |
| 21 | review of business literature for the purpose of |
| 22 | determining whether Reed's compensation passed the |
| 23 | sniff test? |
| 24 | A   I don't have a specific source.  I just know that |
| 25 | I've read a variety of things around compensation |

Page 219

| | |
|---|---|
| 1 | and seeing compensation for roles like president, |
| 2 | roles of CEOs, and how they've been expressed. |
| 3 | Q   Can you tell me any single company that you looked |
| 4 | at to determine the reasonableness of Reed's |
| 5 | compensation? |
| 6 | A   No. |
| 7 | Q   Did the company, Widen Enterprises, have any |
| 8 | written policies or procedures for determining |
| 9 | compensation in 2019? |
| 10 | A   The company considered individual performance, |
| 11 | company performance, and market activity as part |
| 12 | of compensation. |
| 13 | Q   And my question was with regard to a written |
| 14 | policy.  Did the company have a written policy |
| 15 | related to the manner of compensation of its |
| 16 | employees? |
| 17 | A   I didn't look at that for written policies of |
| 18 | compensation. |
| 19 | Q   Was Reed's compensation based on any performance |
| 20 | metrics, either of Reed's individual performance |
| 21 | or of the company? |
| 22 | A   Reed's salary was based on individual performance, |
| 23 | company performance, market information.  All |
| 24 | three of those combined. |
| 25 | Q   And it was set entirely by Reed; is that correct? |

Page 220

| | |
|---|---|
| 1 | A   In consultation with Baker Tilly, yes. |
| 2 | MS. POLAKOWSKI:  Can we take a |
| 3 | short break? |
| 4 | MR. LAING:  Sure. |
| 5 | THE VIDEOGRAPHER:  Going off the |
| 6 | record at 4:12. |
| 7 | (Recess) |
| 8 | THE VIDEOGRAPHER:  We're back on |
| 9 | the record at 4:31. |
| 10 | Q   Mr. Gonnering, I'd like to speak with you briefly |
| 11 | now regarding topic 10, which is the impact of |
| 12 | COVID-19, of the COVID-19 pandemic on Widen |
| 13 | Enterprises.  And we've talked about this |
| 14 | throughout the day at various different points, |
| 15 | but I'd like to cover just a few points here. |
| 16 | Can you tell me any customers that Widen lost |
| 17 | as a result of the pandemic? |
| 18 | A   I didn't prepare that level of detail related to |
| 19 | the pandemic, but there was increased churn that |
| 20 | we experienced, and I don't know a specific |
| 21 | customer name.  I did not memorize that. |
| 22 | Q   So as you sit here today testifying on behalf of |
| 23 | Widen Enterprises, you cannot tell me any customer |
| 24 | name that was lost during the COVID pandemic? |
| 25 | A   There were customers who were lost as a result of |

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 221

1    COVID and cutbacks that they had, and they chose
2    to no longer use Widen for services.
3  Q But you can't tell me any of their names?
4  A I did not memorize --
5  Q Okay.
6  A I did not memorize those customer names.
7  Q Did Widen Enterprises gain any customers during --
8    any new customers during the COVID pandemic?
9  A The organization was built for growth, and so we
10   had projected new customers for 2020.  We cut back
11   those new customer projections in April and May in
12   particular.  We cut back those projections to --
13   at one stage we cut those back to zero.
14 Q Mr. Gonnering, I'm just going to interrupt you
15   because we are running short on time, and I just
16   want you to focus on the questions that I'm asking
17   rather than the questions that you would prefer to
18   answer, and my question wasn't about projections
19   or estimates.  My question was did Widen gain any
20   new customers during the COVID pandemic?
21       MR. LAING:  Objection to the form.
22 A Widen gained new customers in 2020.
23 Q Did Widen also gain new customers in 2021?
24 A Widen did earn new customers in 2021.
25 Q How much revenue was lost by the customers that

Page 222

1    Widen Enterprises lost during the COVID pandemic?
2  A I didn't prepare that level of detail for this
3    topic.
4  Q At any time during the COVID-19 pandemic did
5    Widen Enterprises project negative growth?
6  A I didn't prepare the detail related to month-to-
7    month projections.  In our growth projections that
8    we provided that I would have given in the
9    operational updates to Reed, I stated what the
10   growth would be and how that growth would have
11   changed.  So there were not negative growth
12   numbers in those updates.  There was less growth.
13 Q And I'm just going to ask my question again and
14   ask you if you are able to answer it as a yes or
15   a no.
16       At any point during the COVID pandemic did
17   Widen Enterprises project negative growth?
18 A Total -- total company revenue, no.  In the
19   business unit, we would have sunsetted a business
20   unit, so that would have been negative growth, and
21   the software business would have had a lesser
22   growth projection.
23 Q Even though you sunsetted one entire portion of
24   Widen Enterprises' business in 2020, Widen
25   Enterprises continued to project positive growth

Page 223

1    during the COVID pandemic; correct?
2  A I would need to look at the updates that we made
3    that I provided to Reed in those operational
4    updates that would show that, and I believe that,
5    yes, there were growth projections in there, and
6    I could give you the specific growth projections
7    if we look at those.
8  Q So you would rely exclusively on the growth
9    projections contained within the operational
10   updates that you provided to Reed Widen to answer
11   the question I just asked with regard to growth
12   projections; is that right?
13 A If you're seeking a specific number, I would cite
14   the operational updates.
15 Q I'd like to turn now to topic 11, the Paycheck
16   Protection Program loan or loans obtained by
17   Widen Enterprises.  Are you prepared to testify
18   regarding topic 11?
19 A I am.
20 Q What, if any, documents did you review to prepare
21   to testify with regard to topic 11?
22 A I reviewed the operational updates where the
23   summary of the Paycheck Protection Program was
24   provided.
25   Widen Enterprises did, in fact, obtain a PPP loan;

Page 224

1    is that right?
2  A Correct.
3  Q Who at Widen Enterprises determined to pursue a
4    PPP loan?
5  A Mike and I collaborated to pursue that.
6  Q Why did Widen Enterprises conclude initially that
7    a PPP loan was economically necessary?
8  A Uncertainty.
9  Q What led Widen Enterprises to believe that it
10   qualified for a PPP loan?
11 A The parameters that were set forth for receiving
12   that loan.
13 Q Did Widen Enterprises ever consider repaying the
14   PPP loan?
15 A We did.
16 Q What would have triggered Widen Enterprises
17   repaying the PPP loan?
18 A That there was dialogue that I had with Mike and
19   that I shared with Reed considering paying back
20   that loan or -- not paying it back.  We had to pay
21   it back regardless, but not accepting -- or giving
22   it back instead of paying it back.  I should draw
23   a distinction there.  So giving it back was
24   considered in tandem with Stacy's redemption, and
25   I wrote to Reed regarding that.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 225

1  Q  Why was Widen Enterprises considering giving back
2     the PPP loan it received in connection with the
3     redemption of Stacy's shares?
4  A  Optics.
5  Q  Explain what you mean by that.
6  A  That organizations -- well, that we did -- there
7     were two things there.  One is we received PPP
8     money for -- and certified for and used it for all
9     the reasons and conditions that were set forth,
10    and so compliant with that program.  And then we
11    redeemed Stacy's shares, and it was to look at
12    both together as to say this might not look good.
13       And so I was concerned about reputation, and
14    that was my message to Reed with respect to
15    optics.  I did not want the potential negative
16    publicity related to this because I was very aware
17    of the shame that was going on in the market at
18    that time related to companies receiving it,
19    certifying for all the conditions that we
20    certified for, but yet shamed and their brand was
21    negatively impacted.  That was my concern.
22 Q  Got it.  I'm going to attempt to restate what you
23    just said, and I want you to tell me if you agree
24    with it.  And if you don't, let me know why.
25 A  Okay.

Page 226

1  Q  With regard to optics, was it your concern that
2     the company -- if the company were to buy back all
3     of Stacy's shares at some figure in the millions
4     of dollars and then also simultaneously accepted
5     government funding, that would create a negative
6     optic for the company.  Was that the concern?
7  A  When you represent it like that, it is like how
8     I wrote it in the operational updates.  So if you
9     have that, we could read that.  But what you're
10    saying sounds like what I wrote.
11 Q  In the interest of time, I'm not going to show you
12    that document, but I just want to make sure that
13    we're on the same page.
14 A  Yep.
15 Q  Let me back up for a second on COVID.  I
16    understand that you offered to -- you, Matthew
17    Gonnering, personally offered to take a pay cut in
18    the midst of the COVID pandemic; is that right?
19 A  And did.
20 Q  And did.  Did Reed Widen ever offer to reduce the
21    seven-figure salary he was receiving?
22 A  He would have been willing upon request --
23 Q  I'm not asking whether he would have been willing.
24 A  I did not, no.
25 Q  Turning to topic 12, Widen Enterprises' cash

Page 227

1     reserves and investments from 2015 through 2020,
2     are you prepared to testify with regard to this
3     topic?
4  A  I am.
5  Q  What documents did you review to testify on behalf
6     of Widen Enterprises on topic 12?
7  A  I reviewed operational updates where cash
8     information was provided to Reed and then also
9     spoke with counsel and got with counsel with Mike
10    and Reed.
11 Q  What was the status of Widen Enterprises' cash
12    reserves at the start of 2020?
13 A  I didn't memorize the specific cash reserve
14    amounts, so I don't have that.
15 Q  To the best of your recollection.  And I'll
16    represent to you that my recollection is, based on
17    the documents, that Widen Enterprises had millions
18    of dollars of cash on hand.  Is that consistent
19    with your recollection?
20 A  I didn't memorize the details for the cash
21    balances, so I would like to reference an
22    operational update that would express that cash at
23    the beginning of the year to accurately answer
24    your question.
25 Q  Topic number 12 is Widen Enterprises' cash

Page 228

1     reserves and investments from 2015 through 2020;
2     correct?
3  A  Correct.
4  Q  And my question to you is what were Widen's cash
5     reserves in the start of 2020?  And you do not
6     know the answer to that?
7  A  I did not memorize cash amounts that we had in
8     accounts.
9          MS. POLAKOWSKI:  Is there a notes
10         document that was prepared, Dean, that can
11         help him with this topic?
12         MR. LAING:  No.
13 Q  What was Widen Enterprises' cash position on
14    May 13, 2020, at the time of Stacy's redemption?
15 A  I did not memorize the cash amounts that we had.
16 Q  And you cannot provide a specific amount nor a
17    general amount?
18 A  I didn't memorize that, no.
19 Q  I'm not asking whether you memorized it.  I'm
20    asking whether you can provide an estimate of what
21    the cash reserves of the company were on May 13 of
22    2020.
23 A  By looking at documents that we've provided
24    through the operational updates, I can tell you
25    what that is, but I do not have an estimate or an

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 229

1 amount for you.
2 Q  Where were Widen Enterprises' cash reserves held
3 in 2020?
4 A  Widen used Associated Bank.
5 Q  And all of its cash reserves would have been held
6 in deposit accounts at Associated Bank?
7 A  Yes.
8 Q  So if we were to obtain statements from
9 Associated Bank from May of 2020, those would be
10 an accurate depiction of Widen Enterprises' cash
11 reserves in May of 2020?
12 A  Yes.
13 Q  Did Widen Enterprises have securities accounts?
14 A  No.
15 Q  Did Widen Enterprises maintain a reserve level for
16 its cash reserves that it attempted to maintain at
17 all points in time?
18 A  We attempted to maintain that based on certain
19 inputs, yes.
20 Q  And what was that amount?
21 A  The amount was dependent on the payrolls.  We
22 would add -- take a month with payrolls or two
23 payrolls and then we would add certain expenses to
24 those payroll amounts and say this is a balance
25 that we absolutely need to keep.

Page 230

1 Q  And can you tell me what that number was in May of
2 2020?
3 A  I can approximate that one.
4 Q  What is that?
5 A  The approximate payroll at that time was 5 to
6 600,000, and so times 2 for that would provide a
7 month of payroll, so 1 to 1.2, plus the primary
8 technology hosting service that we would use
9 called Amazon Web Services, which is AWS, and so
10 those amounts of monthly expenses were ranging
11 from 300 to 400,000, so that would get us to 1.5,
12 1.6, somewhere in that range.  It was used as a
13 guideline.
14 Q  So in May of 2020, the floor of cash reserves
15 that Widen Enterprises sought to maintain was
16 1.4 to 1.6 million; is that right?
17 A  That would have been used as a guideline.  I would
18 also add that this was a time of COVID.  We were,
19 May, one month after, and I was very deliberate in
20 saying we need to accumulate cash reserves in that
21 early phase of COVID.  So that was also issued as
22 guidance, and I would have messaged that as such
23 to both Reed and Mike.
24 Q  Despite your direction that the company should
25 be accumulating cash reserves in May of 2020, the

Page 231

1 company did, in fact, decide to redeem all of
2 Stacy's shares; correct?
3         MR. LAING:  Objection as to the
4     form.
5 A  Stacy decided to redeem her shares, and we
6 accepted to pay the amount of 16,000 per month
7 for that.
8 Q  Is it Widen Enterprises' testimony that Stacy
9 Randall came to Widen Enterprises and said,
10 I would like to redeem all of my shares?
11 A  Stacy went to Reed and made a request, and Reed
12 told Mike that we're not going to do this anymore
13 since she's redeemed several other times before
14 that and that it's all or nothing.
15 Q  What was your understanding of the request that
16 Stacy made to Reed?  And by you, I mean Widen
17 Enterprises.
18 A  Does Widen -- So Widen Enterprises knows --
19 There is a distinction here.  I'm not sure what
20 Widen -- Through the preparation activities, I
21 know that Reed fielded a request from Stacy for
22 $100,000, and that that was the original request
23 and that he told Mike it's all or nothing.  And
24 then Stacy had offered, well, what about 50,000,
25 to which the response was no.  All or nothing.

Page 232

1 Q  Is it Widen Enterprises' position that it did not
2 have adequate cash on hand in May of 2020 to pay
3 Stacy $50,000?
4 A  It's Widen's position that we were unwilling to
5 pay Stacy $50,000.
6 Q  And that wasn't my question.  If you could just
7 read my question back.
8         (Question read)
9         MR. LAING:  Objection as to the
10     form.  I think we're confusing companies, but
11     if you can answer it, go ahead.
12 A  The cash amounts that we previously talked about
13 with the payrolls and AWS expenses, plus the
14 uncertainty related to what was happening in that
15 moment, was also informing this decision around
16 we're not -- we need to hang onto cash.  And so we
17 weren't willing to do that.
18 Q  So despite the position from which Widen
19 Enterprises was informed, which was you need to
20 hang onto cash, you decided to pay Stacy
21 $1.3 million --
22         MR. LAING:  Objection.
23 Q  -- rather than $50,000; correct?
24         MR. LAING:  Objection as to form.
25     We're here for Widen Enterprises, not Windy

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

Page 233

1           Waters.  So when she asked you you, she's
2      asking you whether Widen Enterprises did
3      that.
4  A   So Widen Enterprises, can I get a repeat there
5      then so I can process it through the Widen lens
6      here?
7           MS. POLAKOWSKI:  Can you read it
8      back, Peggy?
9           (Question read)
10          MR. LAING:  Same objection.
11 A   Widen didn't want to pay anything.
12 Q   Are you able to answer the question?
13 A   Okay.  I'm going to need it again.  I'm saying
14     Widen didn't want to pay anything.  Widen didn't
15     want to provide anything.
16          MS. POLAKOWSKI:  Go ahead, Peggy.
17          (Question read)
18          MR. LAING:  Same objection.
19 A   We delivered on the desire for Reed to help his
20     sister despite not wanting to take any cash out of
21     the business, and so Mike also determined that
22     16,000 a month at that time versus a lump sum of
23     the requested amount was also something that we
24     were willing to do, and, therefore, we agreed to
25     that.

Page 234

1  Q   And I'm not an accountant, but if I were to take
2      16,000 per month and multiply it by 3, you would
3      get to that $50,000 amount very quickly, wouldn't
4      you?
5  A   I'm also not in accounting.
6  Q   16 plus 16 is 32?
7  A   Right.
8  Q   32 plus 16 is 48?
9  A   Understood.
10 Q   Look at us doing math.
11 A   Understood.
12 Q   So it would have taken less -- four months to get
13     to the $50,000 that Stacy requested; correct?
14 A   Widen Enterprises -- the math is correct.  The
15     amount at that time, the lump sum amounts in that
16     moment, April, May, we did not want to part with
17     any cash at all.
18 Q   And I just want to be clear, because of your
19     counsel's objections, that the money that was paid
20     to Stacy for the redemption of her shares was paid
21     to Stacy from Widen Enterprises; correct?
22 A   There was an intercompany recording of these
23     transactions, and out of convenience it was paid
24     out of Widen.
25 Q   I believe we've already covered topic 13,

Page 235

1      succession planning regarding Widen Enterprises,
2      but I just want to be crystal clear that it is
3      Widen Enterprises' testimony that Reed did not
4      begin discussing succession planning with others
5      at Widen until June of 2020.  Is that Widen's
6      position?
7  A   June/July 2020 is when Reed first expressed
8      succession planning in two to five years' time.
9  Q   And prior to June of 2020, the topic of Reed's
10     succession did not come up at Widen Enterprises?
11 A   The topic of succession planning looked like me
12     asking a question of what should I do if you die
13     in a plane crash, and it was met with talk to my
14     wife or my kids.  So that was the extent of it
15     prior to that.
16 Q   Topic 14 is solicitations to purchase or sell
17     Widen Enterprises.  Again, we've already talked
18     about this at some length, but I just want to be
19     crystal clear that between 2015 and up to 2020,
20     the only solicitations to purchase all or part of
21     a stake in Widen Enterprises were through these
22     private equity firms that you fielded; is that
23     right?
24 A   Solicitations to purchase.  I consider the Channel
25     Advisor, the September 2020, a solicitation, an

Page 236

1      indication of interest, an informal one.  The
2      other solicitations were the marketing emails that
3      we did receive from a variety of private equity
4      firms.
5  Q   And to the best of your knowledge, are all of the
6      emails that you received from those private equity
7      firms, have you collected and produced those to
8      your counsel?
9  A   We have.
10 Q   Topic 15 is potential mergers, acquisitions,
11     asset sales, or equity sales by or involving
12     Widen Enterprises from 2014 through 2020.
13          Is there anything with regard to topic 14
14     that we haven't already discussed with regard to
15     topic 13?
16 A   You read topic 15, and you referred to it as topic
17     14.
18 Q   I'm sorry.
19 A   Could you clarify?  So anything -- could you
20     repeat?  I'm sorry.
21 Q   I intended to ask you about topic 15.  I apologize.
22 A   Okay.
23 Q   Topic 15 is potential mergers, acquisitions, asset
24     sales, or equity sales by or involving Widen
25     Enterprises from 2014 through -- from 2014 through

**Page 237**

1    2020.
2        And my question that I intended to ask and
3    did not do so particularly artfully was are there
4    any such potential mergers, acquisitions,
5    et cetera, that would be responsive to topic 15
6    that we haven't already discussed?
7  A  We haven't discussed the quest that we went on to
8    acquire and look at other companies.
9  Q  And let me just set that aside for a moment.
10   Other than potential acquisitions of Widen of
11   other companies -- by Widen of other companies,
12   are there any other potential mergers,
13   acquisitions, asset sales of Widen by other
14   companies that we haven't already discussed?
15 A  Not in that time period.  Because we talked about
16   Channel Advisor.  So, yeah, and then that would be
17   2020.
18 Q  And I just want to be clear, when you say not in
19   that time period, are you aware of any such
20   potential mergers or acquisitions prior to 2014?
21 A  No.
22 Q  Okay.
23        MR. LAING:  I shouldn't have let
24   her ask that question, but I was just so
25   nice.

**Page 238**

1        MS. POLAKOWSKI:  You opened the
2    door.
3  Q  We've already discussed the retention of Software
4    Equity Group Advisors, LLC, topic 16.
5        17, very quickly, services performed by and
6    information provided to and from Baker Tilly and
7    Grant Thornton from 2015 through 2021 regarding
8    consulting or due diligence for potential or
9    planned mergers and acquisitions, succession
10   planning, and executive compensation.
11       Did Baker Tilly provide valuation estimates
12   between 2015 and 2021 to Widen Enterprises?
13 A  Not to Widen Enterprises.
14 Q  Did Baker Tilly provide valuation estimates of
15   Widen Enterprises to Windy Waters?
16 A  No.
17 Q  Is it Widen Enterprises' testimony that any
18   valuation that Baker Tilly performed between 2015
19   and 2021 was solely with regard to Windy Waters?
20 A  Yes.
21 Q  And does Widen Enterprises have any position as
22   to whether the valuations of Windy Waters that
23   Baker Tilly performed between 2015 and 2021
24   contained accurate estimates of the fair market
25   value of Widen Enterprises?

**Page 239**

1  A  No.
2  Q  Do you know -- You testified a bit ago about
3    Reed's consultation with Baker Tilly regarding
4    his compensation.  Do you know whether Widen
5    Enterprises paid Baker Tilly for that consultation?
6  A  I didn't prepare for that topic.  I know Widen
7    Enterprises paid Baker Tilly for services.  I
8    didn't prepare details around the line items of
9    services performed.
10 Q  So one of the topics is topic 17, services
11   performed by Baker Tilly for, among other things,
12   consulting work on executive compensation.  Do
13   you know whether Widen Enterprises ever paid
14   Baker Tilly for any analysis it ever performed
15   with regard to executive compensation?
16 A  I didn't look at details related to what we were
17   paying Baker Tilly for.  But knowing that we did
18   pay Baker Tilly, I didn't surface the details on
19   the line items within what we were paying.
20 Q  Did Baker Tilly ever provide a written report
21   regarding the reasonableness of Reed Widen's
22   compensation to Widen Enterprises?
23 A  I didn't look for that.
24 Q  And so because you didn't look for that, you are
25   unable to testify today whether Baker Tilly did or

**Page 240**

1    did not provide a written report regarding
2    Reed Widen's executive compensation to Widen
3    Enterprises?
4  A  I'm able to testify that I didn't look for a
5    written report for executive compensation, a
6    written report on executive compensation from
7    Baker Tilly regarding Reed Widen's compensation.
8  Q  I understand that it's your testimony that you
9    didn't look for it, but are you able to answer the
10   question that I asked?
11 A  I did.
12       MS. POLAKOWSKI:  Can you read back
13       the question?
14       (Question read)
15 A  I'm unable to testify because I didn't look for it.
16 Q  Is there a reason you didn't look for it?
17 A  In preparation for this topic, I, in conversation
18   with counsel, talked to Reed and Mike and learned
19   of the process that we went through for how that
20   was determined and didn't look beyond that.
21 Q  And I understand with regard to topic number 19
22   that your counsel has designated testimony and you
23   are not prepared to testify today regarding topic
24   number 19; is that correct?
25 A  That's correct.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023**

---

Page 241

```
1        MS. POLAKOWSKI:  Okay.  And with
2   that, I believe I'm done for today with the
3   note on the record that I will reserve the
4   remainder of my time to discuss with a
5   prepared 30(b)(6) witness the topics that
6   this witness was not prepared today to
7   discuss.
8        MR. LAING:  Just let's make sure
9   for the record how we calculate how many
10  minutes you have left, if that does happen.
11       MS. POLAKOWSKI:  And I think it
12  might be simplest just to ask Jon.
13       MR. LAING:  Sure.  That's good.
14       THE VIDEOGRAPHER:  We have a total
15  as of right now of 6 hours 8 minutes.
16       MR. LAING:  Thank you.
17       MS. POLAKOWSKI:  So 52.  Look at me
18  doing math again.
19       THE VIDEOGRAPHER:  Off the record?
20  Going off the record at 5:05.
21       (Adjourning at 5:05 p.m.)
22
23
24
25
```

Page 242

```
1   STATE OF WISCONSIN )
                        ) ss.
2   COUNTY OF DANE      )
3
4        I, Peggy S. Christensen, Registered Professional
5   Reporter and Notary Public in and for the State of
6   Wisconsin, do hereby certify that the foregoing video
7   deposition of MATTHEW R. GONNERING was taken before
8   me on November 6, 2023, and reduced to writing by me,
9   a professional court reporter and disinterested
10  person, approved by all parties in interest and
11  thereafter converted to typewriting using
12  computer-aided transcription.
13       I further certify that I am not related to nor
14  an employee of counsel or any of the parties to the
15  action, nor am I in any way financially interested in
16  the outcome of this case.
17       IN WITNESS WHEREOF, I have hereunto set my hand
18  and affixed my notarial seal of office at Madison,
19  Wisconsin, this 7th day of November 2023.
20
21
22  _____
                 Peggy S. Christensen
    Notary Public, State of Wisconsin
23  My Commission Expires August 7, 2024
24
25
```

| Exhibits | $ | 1 |
|---|---|---|

**Exhibits**

**Widen Enterprises 11-6-23 Exhibit 1**
  3:6 24:7,10,15,21,25 48:7 119:5 128:8

**Widen Enterprises 11-6-23 Exhibit 2**
  3:7 55:5,10,12,13,14,22 69:13 70:10

**Widen Enterprises 11-6-23 Exhibit 3**
  3:8 106:12,15,16 109:6 110:1 118:13 119:2 124:20

**Widen Enterprises 11-6-23 Exhibit 4**
  3:10 139:17,25 144:4

**Widen Enterprises 11-6-23 Exhibit 5**
  3:11 154:8,11

**Widen Enterprises 11-6-23 Exhibit 6**
  3:14 157:23 158:1,2,18

**Widen Enterprises 11-6-23 Exhibit 7**
  3:16 171:17,20 176:11

**Widen Enterprises 11-6-23 Exhibit 8**
  3:18 181:21,24,25 182:24 183:8,10,17,21

**Widen Enterprises 11-6-23 Exhibit 9**
  3:20 187:23 188:1,5

**Widen Enterprises 11-6-23 Exhibit 10**
  3:22 190:11,20,21,22 191:7

**Widen Enterprises 11-6-23 Exhibit 11**
  3:23 192:24 193:2

**Widen Enterprises 11-6-23 Exhibit 12**
  4:1 203:10,13,14

**Widen Enterprises 11-6-23 Exhibit 13**
  4:4 140:1 207:11,14

**Widen Enterprises 11-6-23 Exhibit 14**
  4:6 217:3,6

**$**

**$1.3**
  232:21
**$1.5**
  125:4 126:17 127:3,12 146:15,19
**$100,000**
  231:22
**$155**
  209:10
**$20,000**
  145:8
**$200,000**
  144:13,21 145:3
**$444,000**
  145:17,20
**$50**
  212:25
**$50,000**
  232:3,5,23 234:3,13
**$63**
  189:5,9,16 190:4
**$7,441,000**
  157:14,20
**$70,000**
  145:24 146:2
**$75**
  212:25
**$80**
  172:21
**$90,000**
  146:7,9

**0**

**00004142**
  111:11 112:5
**0011047**
  158:21
**0047996**
  156:17

**1**

**1**
  24:7,10,15,16,21,25 25:14 48:7 119:5 128:8 157:4,6 208:7 230:7
**1.2**
  230:7
**1.4**
  230:16
**1.5**
  230:11
**1.6**
  230:12,16
**1/2**
  189:2,5
**10**
  172:23 190:11,17,18,20,21,22 191:7 208:14 220:11
**100**
  156:24
**10:04**
  51:18
**10:19**
  51:21
**11**
  190:23 192:24 193:2 223:15,18,21
**11:25**
  94:2
**11:43**
  94:5
**12**
  203:10,13,14 226:25 227:6,25
**120**
  77:4
**12:33**
  128:2
**13**
  57:20,24 58:11 69:16,18 70:12,15,22 72:5,14,23 73:9 139:1,3,6,8 140:1 181:2,12 207:11,14 228:14,21 234:25 236:15
**130**
  77:10
**14**
  189:2 217:3,6 235:16 236:13,17

**15**
204:10 236:10,16,21,23 237:5

**150**
77:9,10 172:9

**155**
203:25 204:4

**16**
234:6,8 238:4

**16,000**
231:6 233:22 234:2

**17**
238:5 239:10

**18**
189:4

**19**
25:9 83:11,12 95:23 193:10,11 195:20
200:13,15 210:16 240:21,24

**1988**
57:23 58:5,11 69:15 78:23

**1995**
58:15 60:15

**1997**
55:4 58:5 78:24 82:14 83:4

**1998**
57:19

**19th**
212:11

**1:00**
16:3

**1:17**
128:5

---

**2**

---

**2**
24:16 48:7 55:5,10,12,13,14,22 69:13
70:10 122:2 184:6,8 208:7 230:6

**20**
39:21 95:23 172:22 173:14 204:10,11

**200**
144:16,17 204:18

**2000**
32:13

**2004**
147:16 149:8,13,15 150:14,16,18,21,

**24** 151:1,10,15 152:1,2 153:15,19
154:1,4,12,15 156:25 157:10,21
164:21,23 165:6,7,9,15 166:8 191:1
215:3,7

**2007**
147:16 153:15,19 154:1,4

**2008**
12:15,21 14:16 158:2,14,19 160:9,16
161:2 162:10 164:7 191:2

**2009**
64:18,24 65:9,11,15,22 66:12 67:14,
23 68:3,11,18 69:11 71:24 73:15 74:4,
8 76:20 87:20 89:2,5 90:19

**2013**
181:1

**2014**
191:2 236:12,25 237:20

**2015**
48:10,17 94:10 95:1,20,22 119:8,22
120:6,14,15,21 122:5 123:4 128:12
140:10 142:10 143:24 144:12,14,22
145:4 147:16 164:19,22,23 165:6,7,9,
15,19 191:22 215:14 217:15 227:1
228:1 235:19 238:7,12,18,23

**2016**
42:14 43:12 83:20,23 85:17 86:16
87:11

**2017**
145:6

**2018**
64:14 95:1,21 96:9,14 145:16,19
173:3 178:19 179:25 188:9,10 189:3

**2019**
65:20 83:7,13,14 96:2,3,6,7,9,14,20
97:3,6,9 102:5,8,20 121:23 125:3,22
126:7,15,19 127:4 216:14,15,20 219:9

**2020**
57:20 58:11 66:24 67:4,8,10,11 69:16,
18 70:12,15,22 72:5,14,23 73:9 84:2,
8,13,22 85:19 86:17,21,23 87:12
92:20 93:11 94:10 96:2,4 97:21 98:2,
9,15,19,20 99:12,13,24 100:4,7 102:5,
8,20 119:23 120:7,14,21,24 121:6,12,
18,20 122:5 123:4 128:23 129:10,12,
20 131:6 134:10,16 139:1,3,6,8
142:25 143:11 145:24 146:2,6,9,14,18
147:11,16 148:17,18 163:8 164:19
165:19 166:1,9,19,20 167:16,20
168:12 169:15,21 170:2,6 180:19
181:2,13 186:13,19 187:8 191:2,22

192:6 193:10,11 194:10 197:14 200:8,
14,15,16,23 201:12,15 202:8,13,23
204:2,21,22 205:5,9 206:10,11,14
207:5,9 210:17,20 211:9 212:7 214:6
215:14 217:15 221:10,22 222:24
227:1,12 228:1,5,14,22 229:3,9,11
230:2,14,25 232:2 235:5,7,9,19,25
236:12 237:1,17

**2021**
39:21 56:6,7,10,19 57:4,13,15,24
60:6,17 64:4,6 65:9,12,15,23 66:12,
21,22 71:24 73:16 74:4,9 77:5,13
87:20 89:2,5,22,23 90:20 108:20,24
119:8 128:13 140:11 142:10 143:25
162:22 182:21 213:22 221:23,24
238:7,12,19,23

**2023**
5:5

**20th**
39:19

**21**
39:22 140:6 214:5

**22**
154:15

**22-cv-400-jdp**
5:9

**23**
188:10

**24**
56:7 201:1,4,5 203:3

**25**
204:2,22

**27**
210:20,24 211:9 212:6

**2:37**
176:7

**2:58**
176:10

---

**3**

---

**3**
51:23 52:4 53:14,15,18 55:15 106:12,
15,16 109:6 110:1 118:13 119:2
124:20 189:2,5 206:20 208:8 234:2

**30**
156:25

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
November 06, 2023Index: 30(b)(6)..accurate

**30(b)(6)**
  6:16 9:1 17:17 24:11 25:2 105:11
  241:5

**300**
  172:8 230:11

**32**
  234:6,8

---

**4**

**4**
  94:6,14 139:17,21,22,25 144:4

**40**
  89:14 109:10

**40-hour-a-week**
  89:9,13

**40-plus-year**
  126:1

**400,000**
  230:11

**47996**
  157:13

**48**
  234:8

**49-page**
  109:11

**4:12**
  220:6

**4:31**
  220:9

---

**5**

**5**
  119:6,9,12 128:7 154:8,11 230:5

**50**
  186:21

**50,000**
  231:24

**50-page**
  109:11

**52**
  241:17

**5:05**
  241:20,21

---

**6**

**6**
  5:5 128:7,9,17,19 157:23 158:1,2,18
  206:21 208:1,2 241:15

**600,000**
  230:6

**612**
  19:11

---

**7**

**7**
  147:13,17,19 148:7 149:3 171:17,20
  176:11

**7.75**
  204:11

**75**
  186:22

---

**8**

**8**
  172:23 181:21,24,25 182:24 183:8,10,
  17,21 191:19,23 192:2 241:15

**80**
  77:3 173:13

**800,000**
  216:16

**88**
  23:24

**8:00**
  16:4

---

**9**

**9**
  187:23 188:1,5 208:1 215:11,16,19
  217:8

**90s**
  160:12

**9:00**
  5:6

---

**A**

**A-T-H-E-Y**
  61:11

**ability**
  8:20

**absolutely**
  229:25

**absorbed**
  111:22 112:15 113:25 115:18 116:14
  121:15 124:23,24

**accepted**
  226:4 231:6

**accepting**
  224:21

**access**
  20:6 23:19 27:21 28:22,24 29:1

**accessed**
  14:5,9 29:13

**accomplish**
  32:4

**accordance**
  26:21

**account**
  23:8,10,13,15 27:20,21 28:8,11,15,21,
  25 29:1,3,13 32:8,11 35:14,16,18
  52:12,14 84:3,17 93:14 136:10,13,16,
  22 145:13

**accountable**
  185:5

**accountant**
  234:1

**accounting**
  234:5

**accounts**
  23:6 27:12,15,16,18 28:16 38:2
  122:25 228:8 229:6,13

**accumulate**
  230:20

**accumulating**
  230:25

**accuracy**
  55:4 183:18 185:4,6

**accurate**
  41:13 58:2 109:7 112:16,18,21 114:5,

15 121:6 128:23 182:9 183:21,23
184:17,18 229:10 238:24

**accurately**
227:23

**Acquia**
20:9 22:17 23:3,5,8,10,13,15 41:20
50:4,6,8 51:7,9,12 52:13,16 53:1,7,8
54:10 56:5 57:1,4,12 60:5,17 61:2,3,
17 62:16 73:16 77:5 89:24 158:21
162:22 195:3

**Acquia's**
23:23

**acquire**
176:18 178:22 237:8

**acquired**
51:7 56:5 57:1,4,12 60:5,16 61:4
73:16 89:23 203:5

**acquiring**
62:16 176:24 177:2,25 178:16 179:3
192:12

**acquisition**
61:2,17 166:18 170:17 173:8 188:16
195:3 203:21 204:5 209:9,15,24 210:6

**acquisitions**
236:10,23 237:4,10,13,20 238:9

**acting**
132:21 135:9 141:7

**action**
91:11

**actions**
90:25 91:3,7,13,16 135:7

**activated**
33:1

**actively**
111:21 112:14,21,23 113:1 117:6
120:18,23 121:1 122:4

**activities**
42:18 44:7 45:3 62:1,2 63:25 87:24
95:4 96:21,25 98:4 120:3 144:1
166:20 231:20

**activity**
21:22 101:9 166:19,21 167:4 219:11

**actual**
39:7

**actuals**
164:2

**add**
17:24 52:5 62:24 86:12 229:22,23
230:18

**addition**
14:6 49:12 50:8 52:11 58:3 59:4 61:19
64:14 72:8 161:23

**additional**
8:25 16:9,12 20:16 23:24 70:24 71:1
114:1,23 115:15,19 201:3

**address**
22:18,19,21 23:4,20 29:5,6,11,14 90:9
152:24 188:3 206:16

**addressed**
62:25 71:9

**addresses**
22:23 135:15

**addressing**
151:19,20

**adds**
113:20

**adequate**
232:2

**adhere**
38:24

**adhering**
199:6

**adjacent**
101:17,24

**adjourning**
241:21

**adjust**
112:10

**adjusted**
117:1

**adjustment**
111:16 113:5,9,20 114:7 115:9 116:5

**adjustments**
112:6,7,12 113:13 114:21 116:24

**administration**
78:2,4

**administrative**
78:5

**adopted**
35:1

**advance**
42:2 158:4 160:20

**advancement**
160:2,7,8

**advancements**
44:7

**advancing**
159:11

**Advertising**
120:17,24 121:7,9,17,20,22,24 122:3
123:17 124:12,17

**advice**
138:7 199:4

**advise**
168:13

**advised**
93:15

**advising**
168:20 169:12

**advisor**
61:22,23 113:23 148:8,10,11,15,16,
19,20,23 149:4 165:24 186:13,17,20,
23 187:1 195:7,13,17 196:2,4,8
212:12,15,17,19 213:14 214:2,10,13
235:25 237:16

**Advisor's**
212:14

**advisors**
74:11,14 75:1,3,25 126:6 208:8
210:16 238:4

**advocate**
99:15,19

**aforementioned**
80:1

**agenda**
211:3,4,7

**agendas**
62:13,20 69:1

**agree**
225:23

**agreed**
35:1 54:19,23 233:24

**agreement**
81:1,2

**ahead**

7:21 38:5,7 52:10 60:22 99:5 109:15
117:12 129:7 138:6 158:14 214:21
232:11 233:16

**aiding**
142:23

**alignment**
159:8,22

**Amazon**
230:9

**amidst**
203:7

**amount**
127:16 198:11 216:5,21 217:16
228:16,17 229:1,20,21 231:6 233:23
234:3,15

**amounts**
142:3 146:24 227:14 228:7,15 229:24
230:10 232:12 234:15

**analysis**
239:14

**analyst**
184:13

**analyzed**
154:21

**and/or**
52:2 55:21 80:5 190:24

**announced**
204:3

**annual**
71:16 73:6 169:16 204:10

**annually**
104:18,19 121:25

**answering**
198:21

**answers**
97:22

**anticipate**
169:9 191:10

**anticipated**
34:13 132:2

**anticipation**
43:19

**anymore**
231:12

**apologize**
56:14 87:11 124:5 188:1 190:13
236:21

**apparently**
146:15

**appearances**
5:13

**appearing**
5:18,21

**appears**
107:1 203:20

**application**
36:14,18

**applications**
37:1,4

**applied**
95:20 168:1 174:12 192:23

**apply**
197:14,25

**applying**
173:12

**appoint**
133:25

**appraisal**
149:13 150:17,20,22,23 151:7,11
154:12 157:10 215:7

**appraisals**
147:15

**appraise**
154:5

**approval**
147:10

**approximate**
77:9 164:18 194:23 216:16 230:3,5

**approximately**
15:10 16:1,3,4 76:21,25 128:24

**approximation**
77:8

**April**
83:7,12,13 156:25 221:11 234:16

**architecture**
159:12

**areas**
102:13,15

**arose**
89:12

**ARR**
169:23 170:19

**arrive**
43:5

**arrived**
16:3

**arriving**
156:22

**artfully**
237:3

**asks**
208:2

**aspects**
122:20

**assemble**
72:22,24 152:13 192:21 198:17

**assembled**
49:10 72:20,25 182:4

**assembling**
109:24 110:17

**assembly**
74:11,13 75:1,3,25

**assessed**
181:18

**assessing**
141:12

**assessment**
149:15

**assessments**
192:18

**asset**
149:18,21,24 150:5 155:12 215:5
236:11,23 237:13

**assets**
129:25 149:20,23 150:23 152:6 157:8

**assigned**
153:4

**assist**
18:23 207:18

**assuming**
105:12

**assumption**

116:23 117:11

**assumptions**
168:2 170:14,18,25 171:9 173:10,23
192:20 197:4

**Athey**
61:11

**attempt**
225:22

**attempted**
229:16,18

**attempting**
100:20

**attempts**
27:24

**attend**
65:23 66:18,20,23 67:10 79:1

**attendance**
66:6,25 67:5

**attended**
65:25 66:2,4,9,10,13,17 67:8,11

**attending**
66:10

**attention**
9:25 140:12 168:17 171:24 207:25

**attorney**
55:8 85:2,3,11,12 87:3,6

**attorney-client**
25:19

**attorneys**
84:4

**attractive**
167:9,11,14 168:4 174:10 180:6 190:7

**August**
145:6,24 146:2 148:17,18 165:25
166:19 173:3 193:10,11 194:10
195:19,20 196:5,8 200:7,13,15,16,22
201:1,4,5 202:7,8,13 203:3 204:2,21,
22 206:10,11,15,16 207:5,7,8 210:16,
20,24 211:9 212:6,11

**Austin**
108:1,8

**authored**
158:8

**authorization**
133:16

**authorized**
93:18,20

**average**
121:24 122:1

**aware**
38:13 47:11,14,19,24 48:3 52:13
87:14 91:12,15,17,19 133:11 149:11,
12,14 168:10 169:15 201:8 202:25
225:16 237:19

**AWS**
230:9 232:13

**B**

**B-I-E-B-L-E**
184:24

**B2b**
172:8

**back**
16:6,15 33:10 38:8 40:23 46:3 51:20
53:14 59:15 64:18 71:22 79:15 82:5,
24 91:25 92:25 94:4 110:18 113:20
119:5 123:13 124:20 125:9 126:9
128:4,6 129:2 130:10,13 153:23
161:16 169:3 170:22 173:6,7 174:7,
17,19 175:19 176:9 182:14 197:18
198:13,21 200:2 220:8 221:10,12,13
224:19,20,21,22,23 225:1 226:2,15
232:7 233:8 240:12

**backwards**
57:2,16 64:3 89:23

**bad**
8:3

**Baker**
74:18,20 104:13,15 105:2,5,7,22
106:1,5,6 193:8 199:3,4,6,23 200:8
201:24 203:19 212:6 217:21,25 218:4,
6,12 220:1 238:6,11,14,18,23 239:3,5,
7,11,14,17,18,20,25 240:7

**balance**
229:24

**balances**
227:21

**Ballew**
61:5

**bank**
74:16 93:14 182:7 187:6 229:4,6,9

**bankers**
187:12

**banks**
187:4,12 213:19 214:11,16

**base**
104:11 111:17 113:21

**based**
45:3 73:3 81:6 82:17 112:4 131:3
134:15 163:18 168:1 171:9 173:4,9,
21,23 192:20 213:1,3 218:16 219:19,
22 227:16 229:18

**basis**
174:24 217:19

**Bates**
46:22 47:1,8,10 111:10

**Becker**
65:2 67:19

**beens**
79:11,12

**began**
42:11 76:20 197:10 201:7 202:13

**begin**
7:15 235:4

**beginning**
72:23 208:14 227:23

**begins**
208:1,13,14

**behalf**
5:18,21 24:20,21 25:22 119:7 132:21,
22,24 135:8,9,20 138:18 141:8,21
151:10 155:13 156:14 220:22 227:5

**Beible**
184:19,23,24

**belief**
161:25

**believed**
161:8

**Ben**
61:6,8,12 64:8,14,20 73:22 74:16

**big**
41:7

**bit**
26:3 28:17 48:12 239:2

**Blake**
123:24,25 124:1,8

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
November 06, 2023Index: Blake's..case

**Blake's**
124:2

**board**
56:10,20 57:5,8 74:9 75:17,19

**boarded**
101:13

**Boerner**
5:17

**bonus**
103:20,22,24 104:5,6,12 106:4,8
111:17 113:21 217:16

**bonuses**
215:25

**boss**
89:18

**Boston**
55:25 56:4

**bottom**
111:11 184:7,8 203:14

**box**
35:12 188:3

**Box.com**
32:7 35:13,14

**Brad**
106:9,11 184:3,9,16

**brand**
96:8,16 225:20

**Brandfolder**
203:5,22 204:5,8 208:25 209:9,14,24
210:6

**Brandon**
184:12

**breadth**
27:12 28:2

**break**
7:20,24 26:3 51:15 93:23 127:23,25
176:4 197:16 220:3

**Brian**
65:2 67:19

**Bridgepoint**
187:14 213:15 214:18

**briefly**
6:7 87:18 92:6 220:10

**bring**
99:21 123:3

**bringing**
123:11

**Brinnehl**
49:25 50:11,14

**broad**
75:22 77:2

**brothers**
81:9

**brought**
63:13 123:5,7 201:17 205:12

**Bruce**
151:1,11,14,19,22,25 152:3,4

**budget**
102:12,13 126:7 127:7,8,9,11,14,16

**budgeting**
102:4,7,17

**building**
126:2

**built**
221:9

**bullet**
56:8,15,17 57:21 58:3,13 69:13
115:25

**burden**
114:2,23 115:15,20,23

**Burke**
108:1

**business**
12:15,22 14:16 41:13 48:1 55:25 56:3
62:5 64:25 65:4 75:20,22 79:23 80:2,
3,6,8,10,19 81:12 82:2,3 88:1 111:22
112:15 113:15,24 114:10,15,16
115:17 117:6 158:2,14,18 160:16,18,
19,20,21 161:2,4,19,21,22,24 162:2,
19 163:5 180:9 218:16,19,20,21
222:19,21,24 233:21

**businesses**
87:25

**buy**
226:2

**buy-in**
201:20

**buyback**
180:18

**buyer**
114:7 194:6,15 195:2,4

**buyers**
113:17 183:15

**buying**
205:14

**buys**
201:21

**Bynder**
171:8 173:8,11 188:16

**Bynder's**
170:17

---

**C**

**calculate**
152:24 197:12 198:9,25 241:9

**calculation**
197:11

**call**
12:18 127:22 132:15 173:18 195:24

**called**
6:1,16 27:7,8 30:18 68:5 110:7 137:11
168:17 178:19,21 188:12 203:6 230:9

**calls**
90:14 178:13 179:22

**Cannon**
10:9

**capable**
34:11

**capacity**
49:21 60:1 64:22 73:12 79:22 89:20
91:6 131:19,20 135:10 136:3 141:12
169:13

**capital**
172:7,23 176:14,15 177:1 179:5

**caption**
155:7

**capture**
27:12

**captured**
24:4 31:15

**care**
127:23 181:8 211:22,23

**Carolina**
148:13

**case**

5:9 11:8,18 12:13 23:6,11 28:19,23
30:1,14,21 35:6 47:13,22 180:5
203:20

**cash**
44:5 140:15,21 141:1,6,10,12,17,20
142:11,17,25 144:6 145:20 146:16
226:25 227:7,11,13,18,20,22,25
228:4,7,13,15,21 229:2,5,10,16
230:14,20,25 232:2,12,16,20 233:20
234:17

**cashed**
202:2

**casual**
218:16,19,20

**catalyst**
42:15 43:11 121:13 209:10

**categories**
16:18 96:22

**categorized**
34:12,20 163:1

**category**
100:24 101:16

**caused**
145:2

**central**
215:5

**CEO**
64:18 67:14,16 68:5,11 69:11 72:7
73:15 74:12 75:4 76:17,19,20 77:13,
16,20 87:19,20,22 89:8,20,21 100:1
131:17 148:23 162:25 166:17 174:23
175:3 180:1 196:1,7 212:19

**CEOS**
219:2

**certified**
225:8,20

**certifying**
225:19

**cetera**
237:5

**CFO**
131:17 134:3,4,8,10,12 141:11

**chairman**
91:6 125:3 215:12

**challenges**
134:12

**change**
70:22 72:7 134:5 164:21,23

**changed**
60:21,24 68:8 72:3 123:5,10 165:11
222:11

**changing**
184:25

**Channel**
148:8,10,11,14,16,19,20,23 149:4
165:24 186:13,17,20,23 187:1 195:7,
13,17 196:2,4,7 212:12,14,15,17,19
213:14 214:2,10,13 235:24 237:16

**characterize**
162:24

**characterized**
162:22

**charge**
64:24,25 65:3 103:20,22,24 214:12

**charged**
6:20 25:3 69:9

**chart**
115:6,7

**chat**
37:5,6,24 38:10

**chats**
37:9

**check**
218:18

**checked**
20:18

**Cheryl**
123:19,20,21 124:8

**chief**
61:5,23

**chose**
221:1

**Christa**
10:9,16 15:25

**Christen**
74:21

**Churchill**
5:21

**churn**
220:19

**churning**
206:25 207:1

**Chute**
178:21

**CIM**
182:25 185:2,4,6,9,17

**circle**
124:20

**circling**
123:13 153:23

**circumstance**
91:12

**circumstances**
92:9

**cite**
90:8 223:13

**cited**
165:24

**clarification**
18:18 25:12 47:16 134:3

**clarify**
8:5 18:15 25:8 33:11 67:22 72:1 86:2
109:25 122:10 125:12 185:25 236:19

**clarifying**
160:12

**clarity**
48:19

**clarity's**
74:4 118:11

**clear**
15:3 43:6 73:14 82:8 126:11,24
166:14 175:17 207:4 215:3,6 234:18
235:2,19 237:18

**client**
34:19 156:1

**clients**
122:20

**closer**
185:16

**cloud**
202:4

**CLVS**
5:3

**Cohnreznick**
27:8 30:18,20,22 31:3,8,13,19 36:4

37:10

**Cohnreznick's**
37:11

**cold**
179:22

**collaborate**
80:6,19 141:4

**collaborated**
43:5 80:11 81:23,24 82:2 224:5

**collaborating**
69:4

**collaboration**
62:24 69:1,6 70:4 81:18 82:18 94:15

**collect**
52:19

**collected**
32:5 76:13 236:7

**collecting**
40:9 189:22

**collection**
29:25

**collections**
31:14

**combination**
53:3 73:2 108:22 111:9

**combined**
219:24

**comment**
69:3 95:3,6

**commentary**
96:23 98:5

**commented**
95:8 97:2

**commit**
144:3

**commitment**
131:11

**committee**
49:21 58:14,16,17,18,20,21 59:1,3,6,
8,13,17,19 60:12,15,18,19 66:13,21,
24 67:15 68:6,10,19 69:10 73:25
101:6

**committees**
49:10,11,18

**communicate**
89:25 90:8 133:12 167:17,19 168:13

**communicated**
167:23,25 218:5

**communicating**
37:2

**communication**
35:24 36:19 132:11

**communications**
25:24 36:3,8,11 95:10 134:24 180:13
191:20 192:4

**companies**
44:16 148:3,6 166:24,25 167:3 169:23
170:15 172:8 173:23,24 176:20,25
177:17 178:17 179:1,10 182:11,13
192:22 225:18 232:10 237:8,11,14

**company**
55:24 88:11 89:19 94:22 99:1 105:13,
16,17,20,24 107:12 111:21 112:14,22,
24 113:2,18 115:9 125:2 148:12
153:18,25 156:24 157:1,7,16 162:11,
12,14,23,24 163:2,3,7,11 164:10,12,
13,18 166:8,15 167:19,20 168:14,23
170:2,9 171:3,14 174:2,24 175:17
176:1,16 177:1,19 178:4,19,21 180:1
181:4,14,16 183:12,13 185:22,24
186:11,25 196:22 197:10 200:24
202:7 203:5,6 204:5 205:14,21 206:7,
9 209:11,14 210:1,5 214:3,25 215:2
219:3,7,10,11,14,21,23 222:18 226:2,
6 228:21 230:24 231:1

**company's**
111:16 112:1 162:2 167:17

**comparing**
165:7

**compensate**
113:12 135:22,25 136:1

**compensation**
103:20,22,24 104:11,13,16,17 105:23
106:4,7 111:17 113:21 115:10 124:23
215:12,21,24 216:17,19,23 217:13,18,
20,21,25 218:8,13,14,22,25 219:1,5,9,
12,15,18,19 238:10 239:4,12,15,22
240:2,5,6,7

**compensations**
218:15

**compile**
182:24

**compiling**
107:13 109:2 182:22 183:7

**complete**
159:16

**completed**
208:10

**completely**
8:21

**completion**
185:16

**complexities**
21:16

**complexity**
20:15,19 24:4

**compliant**
225:10

**components**
39:4

**composition**
64:4,6

**comprehensive**
29:6

**comprised**
59:8,9

**concern**
131:6 132:4 134:11,18,19,21 225:21
226:1,6

**concerned**
225:13

**concerns**
132:8 133:21 134:2,4,7,9

**conclude**
194:1 224:6

**concluded**
16:4 157:13

**conclusion**
117:5 151:12 156:18 157:15

**conditions**
225:9,19

**conducted**
149:15 192:18

**confer**
60:13 62:4 76:15 78:11

**conferred**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023Index: conferring..corrected**

70:3,7,9

**conferring**
72:11

**confidential**
182:2,25 183:11

**confirm**
22:7,9 55:3 97:14 132:10 158:17
183:20 218:6

**confirmation**
21:19

**confirmed**
20:14 183:22

**confirming**
71:7

**confusing**
232:10

**conjunction**
137:18 160:3

**Conlin**
195:21

**connect**
108:20 212:18

**connected**
14:7 32:21,23 77:15

**connection**
107:12 122:14 123:25 180:18 181:1,
12 225:2

**connections**
178:23

**consent**
54:5

**consideration**
86:19

**considerations**
95:16 98:13

**considered**
64:8 156:21 165:15 167:10,12 185:21,
24 186:11 219:10 224:24

**consisted**
58:21 59:2 67:18

**consistent**
42:7 99:24 100:2 101:13 125:17 180:7
212:4 227:18

**consult**
37:13 47:23 53:13 59:11,14 104:13,

15,18 105:7 154:5

**consultant**
214:24

**consultants**
215:13

**consultation**
100:15 106:1 120:11,20 220:1 239:3,5

**consulted**
105:2,4,22 217:21,24 218:4,7,11

**consulting**
27:8 28:24 218:1 238:8 239:12

**contact**
107:19 108:3,4,10,11,12,13,18 109:22
110:14,21,25 112:25 122:15 123:19,
24 124:12 133:8 183:24,25 184:2,10,
17

**contained**
6:25 14:10,14 24:21 45:20 46:1 84:25
98:20 109:6 183:16,21 212:11 223:9
238:24

**contemplated**
114:22 159:18

**contemplating**
160:16

**content**
41:17 163:4

**context**
84:5 85:7,9 169:6 193:13 205:18

**continue**
24:17 60:16 101:9 111:19 114:10
115:2 117:2 159:5 164:14

**continued**
16:6 72:7 160:3 162:8 200:19,22
206:13 222:25

**contract**
41:5

**contributing**
125:19

**convenience**
234:23

**convenient**
127:21

**conversation**
42:19 102:23 130:21 132:20 147:21
148:24 165:24,25 172:14 195:9 196:3
201:3,11 205:13 209:19 212:13,15,17,

20,21 240:17

**conversations**
43:21 71:13,20 95:15 100:16 103:1,3
118:2 119:14,17 120:12 124:4 192:7,
11 193:20 195:14 196:13,25 208:18,
23 209:3,13,21,23 210:4 214:13

**converse**
90:2,4

**conversed**
82:3

**copies**
19:7 40:5 41:8

**copy**
19:3 190:14

**copying**
188:6

**core**
101:25

**corner**
47:5 108:1

**Corp**
217:17

**corporate**
5:10 7:3,5 9:3 10:4,23,24 24:19 38:25
40:6,7,12,18 53:19,22 54:4,8,12 59:15
72:16 81:3 96:8,17 140:17 195:22

**correct**
8:14,15 12:23 15:7,23 18:6,9,10
21:15,17,21 22:1,22 23:9 25:5 26:14
30:19 31:2 32:3 39:9 41:15 42:2,3
47:5 48:10,11 52:21 53:2,3 62:17
66:16 67:12,17 70:13 71:25 77:21
86:8 87:20,21 89:7,15,16 92:21 93:19
97:19 101:14 105:14,23 109:18 112:6,
9 114:12,13,23 115:5 116:11,18,19
129:1 130:25 131:3 132:18,19 133:7
134:20 136:8 137:24 138:20,21
144:10,11,15 149:13,19 151:3 154:18,
19 157:14 158:9,10 164:6,24 166:19,
24 168:14,23 169:17 170:3,9 173:5,20
177:3,10 180:15 184:22 185:9 188:9,
10,16,17,21 193:10,11 194:13 200:5,
11,14,15,24 201:5,9 202:8,14 203:8,
19,22 204:12,13,15,19,20,21,22
205:16 208:25 209:1 210:20,21
212:16 213:13 215:10 219:25 223:1
224:2 228:2,3 231:2 232:23 234:13,
14,21 240:24,25

**corrected**

86:16

**corrections**
109:22 111:4

**correctly**
21:12 28:7,18 30:8 56:1,12 57:25 58:1
111:24 114:3 115:21 128:14 130:19
137:21 140:23 172:11 173:1 189:6
193:16,24 194:8

**correspondence**
85:5

**cost**
114:1,23 115:15,20

**costs**
111:19

**counsel**
5:12 9:7,25 10:3,7,8 11:10,13,20,21,
22,23 12:1 13:7 15:1,12,15,17,19,21
16:5,12,22,24 17:11,12,13,20,25 19:2
20:5,7,11 21:3,9,10 22:9 24:5 25:7,25
26:8,12,13,14,15,17,19,21 30:15
37:13,19,20 47:15,17,21,23 48:19,20
50:8 53:3,13,20 54:10 55:11 70:3
76:14,15 78:11 85:16,19 94:15 118:8,
10,14,16 119:15,18 128:20 138:7,24,
25 147:21 157:6 187:21 189:21,25
192:3 207:18 215:20 227:9 236:8
240:18,22

**counsel's**
27:1 53:9 207:23 234:19

**count**
50:25

**couple**
90:4 95:17,18 152:19 177:21 188:18

**COURT**
190:18

**courtesy**
7:16

**cover**
75:18 106:16 158:5 182:1 220:15

**covered**
75:24 76:1 155:4 234:25

**COVID**
88:24 200:18,19,21 202:5 203:8
204:25 206:8 207:9 220:24 221:1,8,20
222:1,16 223:1 226:15,18 230:18,21

**COVID-19**
220:12 222:4

**COVID-RELATED**
205:2

**crash**
235:13

**create**
34:9 102:1 161:19 226:5

**created**
20:16 34:11 111:1 112:7 117:4 160:19
161:1

**creating**
161:21 183:10

**creation**
101:2

**creative**
123:20

**critique**
102:13

**Crugland**
123:19 124:8

**crystal**
235:2,19

**CTO**
64:22

**cultural**
44:7

**culturally**
88:12

**curious**
201:4

**current**
54:11 99:7 111:23 112:16 113:23,25
115:16,19 116:7,10,12,14 124:24
141:12 155:23

**customer**
41:4 61:13 65:3 88:2 99:14,15,18
121:9 122:5,6,15 123:7,22 159:11
206:23 220:21,23 221:6,11

**customers**
44:5 88:14 99:22 120:13,15 121:2,3,7
122:23 123:3,5,6,8,12 206:25 207:2
220:16,25 221:7,8,10,20,22,23,24,25

**cut**
202:21 221:10,12,13 226:17

**cutbacks**
221:1

**D**

**D-E-N-O-Y-E-R**
106:11

**D-O-T-T-E**
61:8

**dabbled**
176:21 192:7 193:20 196:12

**daily**
95:3,4,6,8

**DAM**
188:23

**data**
31:15,25 32:5 118:4,6,7,8,10,11,16
129:9

**date**
5:5 39:22 75:5 83:10,11 121:1 208:5
209:7 214:8

**dated**
188:9 193:10 200:7,12

**dates**
60:2 78:19 86:13 88:23 89:4 108:21
208:9 209:6

**dating**
32:16

**David**
5:24 195:25 196:7

**day**
9:16 69:5 88:20 163:15 220:14

**day-to-day**
72:2,6,7,8 87:24 94:7,9,21,25 95:4,9
184:11

**days**
39:23

**deal**
188:22

**dealing**
107:19

**Dean**
5:20 10:9,16 12:3 13:9 15:25 216:24
228:10

**Deanna**
61:5,12 64:15,19 73:22

**Dear**
154:20

**Debby**
61:9,12 64:8,13,20

**decades**
126:3

**December**
58:5 78:24 144:12,14,22 145:3 187:8

**decide**
141:3 231:1

**decided**
127:15 140:25 141:5 231:5 232:20

**deciding**
191:21

**decision**
70:4,8 133:1,2,3 232:15

**decisions**
92:12 102:4,7,19,21 103:21,23,25
104:7,12,14,16 106:4,8 217:22

**deemed**
207:9

**deeper**
43:23 148:24

**deeply**
42:17 160:10,13

**defendants**
5:22 208:2,4,6,17

**defendants'**
207:15 210:15

**defer**
12:1

**defined**
157:3

**definition**
92:4 111:5

**deliberate**
230:19

**deliberations**
191:20 192:5

**delineate**
135:6

**delivered**
83:12 84:24 233:19

**delivery**
162:17 167:14

**demonstrate**

190:6

**demonstrating**
175:10

**Denoyer**
106:9,11

**departed**
125:21

**department**
50:18,22

**departure**
50:16 125:17

**dependency**
101:18

**dependent**
101:25 229:21

**depending**
19:6

**depiction**
229:10

**deploy**
172:24

**deponent**
5:9

**deposed**
7:8 9:3

**deposit**
229:6

**deposition**
5:7 7:4,6 8:24 9:1,2,20,23,24 10:21
12:12 14:3,25 15:9,13,19 16:2,17,23
17:2,23 18:3,8,12,20,21 19:19 24:11,
12 33:14 42:2 55:12 119:6 139:25
140:1,6 158:4 216:9

**depositions**
20:4

**depth**
13:20

**Derek**
195:21

**derived**
163:20,21

**describe**
68:23 208:3

**description**
41:11

**descriptions**
137:6

**designated**
6:15 7:4 24:19 25:9 240:22

**designation**
7:2

**designee**
7:3,5 17:17 25:2

**desire**
42:17 101:9 134:5 208:7,20 233:19

**destroyed**
27:25 47:25

**destruction**
39:12

**detail**
60:23 67:6 75:12 76:23 77:3 78:12,14,
18 80:9,22 83:5 84:16,19,25 86:18,24
87:7 89:1 97:4,7,10,12,15,18 105:24
117:20 118:21 121:19 133:18 136:11
143:3,13,17 145:5,10,21 163:25 164:4
177:23 208:3 220:18 222:2,6

**details**
66:7 67:2 82:7 85:4 101:1 103:14
124:13 129:14 142:5 143:4 146:4,11,
21 147:3,7,12 157:11 162:13 179:15
189:18 196:17 206:1 207:7 227:20
239:8,16,18

**determination**
141:17

**determine**
75:17 180:17 181:3,13,15 183:18
194:5,15 195:2,5 199:10,18 207:22
218:13 219:4

**determined**
195:4 205:7 224:3 233:21 240:20

**determining**
106:7 141:9 198:10 217:19 218:22
219:8

**Deuren**
5:18

**developed**
213:24 214:1

**development**
101:8 195:22

**device**
31:8,10,15

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
November 06, 2023Index: devices..draw

**devices**
31:1,3

**devoted**
124:15

**dialogs**
90:7 196:5

**dialogue**
28:5 29:17,18,22 70:16 94:23 95:9
98:3 119:25 123:18,21 124:1,6,8
128:22 130:15 132:15 148:2,3,5,8,14,
16,18 169:12 187:4 193:22 196:7
212:18 214:10 224:18

**die**
235:12

**Diego**
182:8

**differentiate**
96:15 98:22 99:18

**differentiates**
99:23

**differentiation**
99:7,12,20 100:12,15 101:20 102:2

**dig**
66:7,8

**diligence**
106:20,24 108:16 109:19 186:22
238:8

**direct**
73:23 90:25 91:3,7,21,23 92:2,7,10,18
93:10 98:18 140:12 171:24

**directed**
91:13,15 99:11 154:18

**directing**
98:17 156:1 157:6

**direction**
89:19 99:25 101:11,14 102:9 230:24

**Directionally**
99:6

**directly**
28:25 29:2,3 90:19

**director**
57:6,7,9,17,18,22 58:4,6,9 64:10
69:15,18,19,21,22 70:1,2,11,15,18,20,
23 71:6 72:4 78:23,25 79:3,22 81:11,
16,21 82:10,13 91:22 123:20 136:3

**directors**
56:11,20 57:5,8,11 74:10 91:4,14
92:2,8,11 135:25 215:13

**disagree**
155:11

**disclosed**
84:21 85:15,16 86:10,22 87:1

**disclosure**
19:16 83:23 85:17,19 86:21,23

**disclosures**
87:12,15

**discoverable**
19:12

**discovered**
19:18,21 20:2,3 21:13,23 22:12 24:1,2
209:24

**discoveries**
19:23

**discovery**
25:15,24,25 26:6 30:13,21 35:6 36:2
38:15 40:14 52:20 118:15

**discuss**
44:10 206:1 241:4,7

**discussed**
16:13,19 39:24 76:4 137:16 146:25
191:3 205:17,20,22 206:3 215:3
236:14 237:6,7,14 238:3

**discussing**
154:13 168:20 188:12 197:10 235:4

**discussion**
131:13 140:14 212:7

**discussions**
162:6

**distinction**
122:8 224:23 231:19

**distracted**
131:9,18

**distraction**
131:13

**distribute**
183:15

**distribution**
191:14

**distributions**
140:19 143:9 190:24 191:6,8,12

**dive**
128:7

**diversification**
99:11 100:19 101:19

**diversify**
99:8 101:10,11,14,15 102:1 161:20

**diversifying**
164:8

**dividends**
190:24

**divorce**
85:7,12

**document**
11:4 13:3,4 17:5,12 19:23 25:16 34:2,
9 38:19,21,23 39:7,9,11 48:8,16 49:2,
4,6,7 50:5 51:2,3 52:7 55:2,3,9 59:18,
20 62:25 63:1,3 81:2,4,5,7 106:18,19
110:15 124:21 140:2 155:9,20 156:11
158:8,13 164:1 176:12 193:18 200:6
207:21 216:7,18 217:7,12,13 226:12
228:10

**documentation**
72:16 82:11 107:14 131:25

**documents**
10:4,20 11:2 12:15,25 14:20 16:12,17
17:2,4,11,13 19:16,18 20:1,3,17
23:24,25 24:2 25:18 26:9,10,12 30:1,5
32:6 33:24,25 34:5,7,10,14,19,20
35:3,5,7,10 38:22 39:13 40:9,17 46:19
47:11,14,19,20,24 48:3,22 52:19
53:17 54:3 59:11,14 60:13 128:21
188:3 223:20 227:5,17 228:23

**dollars**
128:25 216:16 226:4 227:18

**dominating**
159:13

**door**
99:3 238:2

**Dotte**
61:6,8

**draft**
110:3,7 111:3

**drafted**
43:12 160:9

**draw**
122:8 224:22

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023** Index: drive..Enterprises

**drive**
32:10 33:19 34:1,8 35:11

**due**
25:12 106:20,24 108:16 109:19
140:18 143:8 238:8

**duly**
6:2

**duplicative**
28:15,16

**duration**
31:7,9 45:10,13 64:12 65:11,22 89:21
95:20,24

**duties**
113:25 115:18 116:13 131:8,10
134:13

**duty**
131:14,15

---

**E**

---

**earlier**
41:24 73:21 95:17 108:2 120:2 158:3
165:25 195:21 203:4 217:23

**early**
74:12 75:4 230:21

**earn**
187:11 221:24

**earning**
207:3

**earnings**
107:2 142:3

**easier**
167:8

**EBITDA**
112:6,7 113:5,9 114:6,20 116:24
194:7,13,16

**ECOM**
195:7

**Economic**
12:18

**economically**
224:7

**Economics**
12:14,20,21 14:15

**Edge**
120:17,24 121:7,9,17,19,21,24 122:3,

17 123:16,18,20 124:12,16

**effective**
48:9 161:4

**effectively**
162:3

**efficiencies**
159:12 160:6

**efficiently**
7:12

**effort**
123:8

**efforts**
25:15

**elections**
91:18 92:13

**electronic**
39:24

**Elms**
172:7 176:14,15 177:1 179:5

**email**
22:16,18,19,20 23:3,5,8,10,13,15,20
27:15,16,18,24 28:4,8,11,21 29:1,3,5,
6,11,13 32:15 37:8,11,12 38:10 46:12,
15,16 52:12,16,17 87:1,2 90:12,13
135:14 148:3,5,14,16,22 173:17 174:4
177:19 188:11 189:8,15 190:2 193:3,
12,13 194:1,19,21 195:1,24,25 196:2
200:12 201:5 203:2,14,18,21 204:2
205:3 212:10

**emails**
10:5 17:6 19:20 20:6,10,12,16,18,20,
23,25 21:14,17,20,24,25 22:3,5,6,8,
12,16,24 23:1,14,15,17,18 24:3 27:11
28:3,13 32:6,9 37:9,15 39:3 52:24
97:5 100:6 148:25 149:2,4 177:7,12
178:5,11,13,14 179:21 189:10 192:5
200:6 236:2,6

**embark**
158:25 159:4,6

**embarking**
96:22

**employed**
21:19 36:14 60:5 78:16 214:23

**employee**
44:7 49:1,3 77:23 78:20 123:10
125:17,19 126:1

**employee-owned**
201:18

**employees**
36:15 58:22,24 76:21 77:1,6 123:1
135:23 136:2 219:16

**employment**
44:8 60:2 77:25 78:7

**enabled**
181:13

**encompass**
163:12

**encompassed**
29:14

**end**
33:10 51:14 116:6 121:1,13 172:20
196:11

**ended**
115:23 194:21

**ending**
121:10

**engage**
42:17 103:2 182:15,17

**engaged**
30:20 111:3 187:3 192:10 202:25
213:14

**engagement**
108:25 182:20 184:21 185:20

**engaging**
107:4 176:19 187:3

**engineering**
61:9

**enhance**
164:9

**ensure**
20:12 21:19 77:2 124:2 168:22 169:6

**entered**
160:11

**Enterprise**
199:2

**Enterprises**
5:11 6:17 9:2 10:1,25 24:22 25:3,22
29:25 30:5 32:12,13,15 34:4,6 36:20,
21 37:25 38:13,17,18,22 39:25 44:11
47:12 49:1 50:17 51:1,3,6,24 52:3,19
54:9,11 55:17,21,23 56:4,5,10,19
57:1,3,5,6,11,17,19,23 58:4,6,10,15,

16,20 69:18,23 70:2,15,22 71:3,6
72:3,22 73:9 74:7,9 75:23 76:16,18,21
77:5,18,22,24 78:1,8,17,21,22,25
79:1,3,5,22,23,24 80:18,20,24 81:11,
12,13,16,17 82:10,15 84:1 85:22,24
89:3 90:18,24,25 91:3,7 94:8,10 95:1,
7 96:6 97:3 98:8 100:13 101:13
109:21 110:13,21,25 111:6,8 112:25
114:9 117:3,7,16,23 118:24 119:1,3,8,
23 120:6,13,21 121:8,18,22 122:18
123:4 125:3 126:13,17 128:12 129:10,
19,25 130:2,4,6,7,9,20,23 131:2,7,8
132:13,18,21,23 133:6,17,23 134:13
135:5,6,8,14,22 136:6,24 137:17
138:2,18,19 140:7,10,20,25 141:6,8,
21 142:2,4,11,25 144:6,12,14,21
145:3,7,17,19,24 146:1,6,10,15,20
147:1,5,15 149:8,10,12,14,19,20,22,
24 150:1,6,7,11,14,15,18,20,24 151:3,
6,7,10,13,20,21,23 152:2,7,8,11,17
153:2,4,5,13,18,25 154:4,6 155:6,12,
14,18 156:14 157:2,9,19,21 158:19
159:4,25 160:10,11 161:12 162:10,21,
23 163:1,20,21 164:14,17 165:10,11,
13,14,20 166:4,7,17 167:16,24 169:15
170:6 172:17 175:18,21,23 177:14
178:1 179:2,4,11,18 180:3,12,16,17,
25 181:5,11 182:15,17 183:6,17
186:10,18 187:18 191:5,9,22 195:18
197:6,15 198:1 199:5,9,11,16 200:16,
23 201:1,8 202:6 204:23 205:4 210:7,
10 211:12 212:8,23 213:1,9,10,11,12,
14,23,25 214:9 215:5,6,9,13 218:13
219:7 220:13,23 221:7 222:1,5,17,25
223:17,25 224:3,6,9,13,16 225:1
227:6,17 229:13,15 230:15 231:9,17,
18 232:19,25 233:2,4 234:14,21
235:1,10,17,21 236:12,25 238:12,13,
15,21,25 239:5,7,13,22 240:3

**Enterprises'**
6:21 25:4,15,16 33:16 41:13 48:8 51:8
77:12,19 109:7 125:1 128:9 135:7
136:2 140:14 149:16 153:14 155:19
164:8,21 165:21 167:22 191:15 198:8,
12,24 211:14 222:24 226:25 227:11,
25 228:13 229:2,10 231:8 232:1 235:3
238:17

**entertained**
193:21

**entertaining**
176:24

**entire**
222:23

**entirety**
11:18 30:12 58:7,10 118:19 149:2

**entities**
132:5

**entitled**
106:18 155:14,18

**entity**
131:10,12 136:12,20 154:5

**entrepreneur**
74:15

**entries**
136:16

**entry**
101:22

**envelope**
41:7

**environment**
206:13

**equally**
67:9

**equipment**
135:19

**equity**
108:23 156:24 172:7 176:13 177:6,13
179:8,10,19 182:5,6,7,10,16,17 183:2
187:16 192:7,11,14 193:20 196:13,20,
25 235:22 236:3,6,11,24 238:4

**equivalent**
189:1

**era**
207:9

**escapes**
196:1

**escaping**
177:17

**ESOP**
201:19 205:11,13,18

**established**
34:24 54:2

**estimate**
10:18 16:7,9 150:13,15 169:22 170:8
171:2,11,13 174:2 175:25 192:22
228:20,25

**estimated**
167:18,20,23 171:8 173:4

**estimates**
44:10,16,17 147:14 170:12 186:24
213:18 221:19 238:11,14,24

**estimation**
175:16

**estimations**
153:14

**et al**
5:9

**evaluated**
88:5,6,17,18

**evaluations**
206:23

**evening**
10:2,7 12:9 16:8

**event**
169:9

**events**
164:3

**evidence**
45:2 59:16

**evidenced**
88:8

**exact**
50:25 63:4 75:5

**EXAMINATION**
6:5

**examples**
85:23 86:13 100:10

**exceeded**
163:20

**exception**
7:22 14:15 86:12

**excess**
131:19

**exchange**
203:14,18 205:3

**exchanges**
79:25

**excluding**
25:19

**exclusively**
163:3,6 223:8

**excuse**

14:24 65:20 144:13 158:15 172:4
181:1 185:8 187:13 191:25

**executing**
88:3

**executive**
50:6 58:14,15,17,18,19,21 59:1,2,6,7,
12,17,19,25 60:12,14,15,18,19,20,24,
25 61:3,14,16,18,22,23,25 62:3,4,8,
13,19 63:2,5,17,19,21 64:5,7 65:9,13,
16,24 66:5,13,20,23 67:4,8,10,15,18,
21,24 68:4,6,9,17,19 69:9 71:12,19,23
72:18 73:13,17,18,25 113:22 120:18,
25 122:9,11,14,17 123:13,16,19
124:16 158:22 185:14 186:3 201:20
205:13 218:8 238:10 239:12,15 240:2,
5,6

**executives**
131:7 135:8 167:17,19,23 168:12
185:21,23,25 186:10 197:9

**exercise**
205:19

**exhibit**
24:7,10,15,21,25 48:7 55:5,10,12,13,
14,22 69:13 70:10 106:12,15,16 109:6
110:1 118:13 119:2,5 124:20 128:8
139:17,25 140:1 144:4 154:8,11
157:23 158:1,2,18 171:17,20 176:11
181:21,24 182:24 183:8,10,17,21
187:23 188:1,5 190:11,20,21,22 191:7
192:24 193:2 203:10,13,14 207:11,14
217:3,6

**exist**
60:16 75:3 211:16

**existed**
40:8 64:13 75:4 120:16 202:5

**existence**
101:2 162:8

**existing**
127:5

**exists**
59:20 97:18 211:13,18,24

**expand**
34:15 45:14,22 86:3 89:1 91:23

**expected**
103:5 111:19

**expense**
115:1 206:22

**expenses**

113:8,18 114:9 206:20,21 229:23
230:10 232:13

**experience**
99:14,16,18,21 116:25 123:22 124:3

**experienced**
220:20

**experiencing**
200:17 204:24 206:7,10

**expert**
150:25 152:15,20,22

**expertise**
199:23

**experts**
152:13,25 198:16 199:4

**explain**
34:4 225:5

**explanation**
102:15

**exploratory**
208:18 209:3,21,22 210:4

**explore**
8:23 92:6 187:5 200:23 205:6 209:13

**exploring**
33:14,15 179:12 183:13 195:11 201:7,
25 202:6,13 205:10 209:10

**export**
20:8,15,18 21:17,22 22:8 24:4 27:13

**exported**
20:12

**exporting**
30:9

**exports**
20:10 22:6 28:12

**express**
123:9 131:22 134:5 161:25 177:11
227:22

**expressed**
131:21,23 132:8 134:2,4,17,19 148:20
172:14,18 177:9 193:13 201:12 205:4
209:18 212:24 219:2 235:7

**expressing**
131:24 134:21 200:9

**expression**
132:1

**expressions**
132:3

**extend**
7:16

**extent**
6:20 12:4 13:9 235:14

**extracompany**
37:3

---

**F**

**fact**
124:22 158:8,13,18 174:25 178:18
183:20 223:25 231:1

**factors**
88:10

**facts**
18:24

**factual**
46:9

**fair**
7:18,25 8:7,11 30:17 53:14 76:16
77:11 90:15 101:12 111:6 120:5
129:24 149:7,9,12 151:2,5,7,12 152:1,
9 153:14 156:22 157:20 164:18
165:22 166:15 175:20,25 181:3,14,15
185:1 192:6 195:4 197:11 198:11
199:2,12,19 211:11 215:8 238:24

**fall**
101:16 213:21

**familiar**
41:2

**family**
58:25 79:6 81:24 82:2,18

**fashion**
68:22,23

**faster**
43:23

**father**
81:9

**favorable**
124:3

**February**
83:11 84:13,22 85:19 86:20,23 188:9,
10

**feel**

170:1

**fielded**
231:21 235:22

**figure**
125:19 176:20 195:11 201:13 202:24
206:4 209:20 212:22 226:3

**figuring**
214:15

**file**
63:4

**files**
39:24 40:1,3 118:5

**filled**
126:8

**final**
110:1,7,20 111:1,2,3,5

**finally**
146:14

**financial**
39:1 40:6,7,18 44:4 81:15,18,20 82:8,
15,16 83:1,4,8,10,14,18,24,25 84:2,9,
17 85:19,21,25 86:2,3,4 87:13 102:25
103:7,9,17 106:20,24 107:10 108:16
109:19 112:11 114:8 118:1 128:11
129:9 130:17 131:3 136:5 137:1,19
140:8 147:14,20,23 154:22 155:16
165:3 185:11,13 213:6 214:3

**financially**
88:14 116:25

**financials**
83:6 85:18 147:25

**find**
21:8 75:14 145:11 160:22 208:7
210:15

**findings**
196:24

**fine**
77:8 89:2 155:10

**finish**
202:21

**firm**
70:5 172:7 176:14

**firms**
177:13 179:8,20 235:22 236:4,7

**fit**
200:23

**five-year**
205:8

**flag**
99:16

**flagged**
27:23

**flip**
107:25

**floor**
230:14

**flow**
191:4

**flown**
99:17

**focus**
18:19 134:14 153:11 154:2 159:8,22,
25 172:8 174:18 207:25 217:18
221:16

**focused**
153:5,11 179:1

**focusing**
161:5 162:3

**folder**
34:12,16 46:16

**folders**
34:25

**forecast**
12:14,19

**forecasts**
11:1 12:8,9,10,24 13:1 169:11

**forefront**
99:19

**forgotten**
27:20

**form**
22:14 40:8,13 43:15 44:13 55:1 69:25
92:22 93:2,12 109:10 110:11,24 117:8
125:7,15 135:24 138:4 139:13 141:23
150:19 166:10 175:1,8 199:13,21
200:25 201:10 202:9 205:24 209:17
210:9 216:3 221:21 231:4 232:10,24

**formal**
50:17 51:2 72:19,21 187:17,20 210:1,
2

**formality**
72:15 184:20

**formally**
13:11

**format**
40:20 76:11

**formula**
151:4 170:7 171:12 173:4,19 174:1
197:24 198:8,17,18,24 199:3,4,7,10,
14,17,23

**forward**
17:11 43:22 64:24 161:20

**forwarded**
148:21 203:17

**found**
180:8

**fourth**
212:3

**framing**
113:5

**Frank**
49:24 50:11,13

**Frank's**
50:16

**frequency**
42:4,7 45:6 46:3 66:15

**frequent**
43:14 89:25 95:10,15 124:6,7

**frequently**
62:11 68:14 89:24 90:8 124:11

**Friday**
7:3 8:25 9:4,19,22,23,24 10:5,7,17,22
11:3,7,17,20 12:9,11 13:5,15,17,21
14:23 15:11 17:16 18:4 138:5 156:10

**Friday's**
17:25 140:1

**fringe**
111:18 113:21 217:17

**front**
128:8

**FTI**
27:8,9,10,11,13,21,25 28:24 29:24
30:8,12

**full**
6:12,21 7:14 8:17 21:1,13,20 25:4
27:12 28:2

**fully**

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023Index: fund..handed**

182:25

**fund**
191:4

**funding**
130:8 133:6,10,11,12,13 226:5

**funds**
128:25 130:3,20,22 132:17 133:16
136:20 191:8,16

**future**
112:10 114:7,16 115:5 116:17,21
164:16

---

**G**

---

**gain**
27:21 221:7,19,23

**gained**
221:22

**gaining**
159:12

**Gary**
61:20,21 62:2 63:7 64:21 67:19 74:22
217:14

**gather**
26:1 27:4,5 149:9

**gathering**
26:9

**gauge**
208:19

**gave**
76:7

**general**
38:1 50:8 54:10 71:13 88:15 153:13
161:12 228:17

**generally**
13:18 40:21 60:3 98:11 113:9 172:18
207:22 218:15

**generating**
121:18

**generation**
113:14 161:22 162:9

**generic**
177:4 194:6,11,16

**gentleman**
59:4

**gifts**
137:8

**give**
7:14 19:7 46:9 77:2 92:4 138:10
198:20 199:8 212:20 216:21 218:18
223:6

**giving**
98:13 224:21,23 225:1

**Gmail**
22:17,20,23,24

**go-to-market**
107:12 108:16

**Golding**
178:19,23,24

**Goldman**
177:18,24 178:7,9,10

**Gonnering**
6:1,7,14 19:17 24:9 47:11 51:22 52:1
55:11,20 94:6 106:14 128:6 129:8
139:24 154:10 157:25 169:25 171:19
176:11 181:23 187:25 190:19 193:1
203:12 205:21 207:13 208:18 215:15
217:5,14 220:10 221:14 226:17

**good**
5:1,16 6:7,12 158:16 180:9 195:15
209:25 225:12 241:13

**Google**
22:16,25 32:10,11,17,19,21,23,24
33:1,6,8,9,10,19 34:1,8,20 35:10 37:5
38:2

**governance**
51:24 52:3 55:17,21 71:2,4 72:16
91:17

**government**
226:5

**Grant**
106:19,25 107:1,4,6,14,17,19 108:7,
15,18,22,25 109:5,20,22 110:14,18,
21,25 111:4,7,8 112:5,7,17,19,20,25
116:20 117:4,5,10,14,15,16,23 118:2,
3,12,17,20 119:1 124:22 184:4 238:7

**greater**
13:20

**gross**
216:5 217:16

**ground**
7:10

**group**
75:2 80:14 108:23 161:8 182:5,6,7,10,
16,18 183:2 186:1 187:16 238:4

**grow**
44:25 98:12,13,21 101:10,11,14,15
161:4 167:8 175:11 176:16

**growing**
153:22 161:23 169:7 180:6,10

**grown**
76:16,18

**growth**
44:5,25 45:1,3 77:11,14,18 88:4,11
98:11,14,17,19,23 142:18 153:5,20
160:3,4,23,24,25 166:2 167:6 168:5,
11 169:9 174:10 175:12 176:22
177:16 180:7 190:8 192:13 221:9
222:5,7,10,11,12,17,20,22,25 223:5,6,
8,11

**guess**
87:19 117:9 124:11 160:12 188:20,23
204:9

**guest**
64:11

**guests**
64:8 78:5

**guidance**
92:4,5 100:14 127:8 199:6 230:22

**guideline**
230:13,17

**guiding**
99:6

**guy**
126:4

---

**H**

---

**H-U-B-E-R**
214:15

**half**
93:24 128:24

**hand**
47:5 227:18 232:2

**handed**
24:9 55:8,11 106:14 139:24 154:10
157:25 171:19 181:23 187:25 193:1
203:12 207:13 217:5

**handful**
172:6 193:19 196:12,14

**handing**
190:19

**hang**
232:16,20

**Hansen**
5:3

**happen**
82:21 164:3 181:10 241:10

**happened**
21:23 43:8,9 51:6,7 82:20 115:12
181:9 203:7 209:21

**happening**
42:18 206:15,18 209:13 232:14

**happy**
168:25 178:5 179:17

**hats**
50:14

**head**
61:8,10,11

**heading**
156:18 158:21 188:12

**healthy**
45:3 167:9,11 180:6 190:7

**hear**
169:18

**heard**
46:24 47:2 217:24

**heavily**
160:17

**Hegenbarth**
74:17

**held**
5:7 23:16 38:25 39:1 229:2,5

**helpful**
142:22

**helping**
43:14

**hey**
132:16

**high**
108:6

**higher**

**160:24**

**hire**
126:9

**historical**
111:18 115:4,8,10,14

**historically**
40:25 43:20 44:1,2,12,24

**history**
37:7 122:24

**Hmmmm**
204:14

**hold**
39:13,17 157:9

**holder**
35:16

**Holland**
27:6 108:23

**home**
206:14

**Horein**
74:22 193:3,5,6,7 200:12 201:25
202:25 210:23 212:10

**horizon**
201:23 205:8

**hosting**
230:8

**hour**
51:14 93:24

**hours**
10:18 13:15,23 15:10 16:9,10,16 89:2,
6,14 241:15

**Huber**
214:14,23,24

**humanly**
109:13

**husband**
83:7

**Hutler**
151:1,11,14,19,22,25 152:3,4

**hypothetical**
173:18,21,24 175:6

_____

**I**
_____

**idea**

**101:4,5,6 195:15 209:25 210:7 212:8**

**identification**
24:8 55:6 106:13 139:18 154:9 157:24
171:18 181:22 187:24 190:12 192:25
203:11 207:12 217:4

**identified**
167:2 186:4

**ideology**
96:8,17

**immediately**
12:6

**impact**
200:18 220:11

**impacted**
225:21

**impacts**
205:1 206:8,9

**impair**
8:19

**impetus**
130:3

**implemented**
48:9 100:25

**implementing**
49:16,18 88:3

**important**
77:12,14,19 153:17,20,24 154:2,3

**impossible**
109:14

**inaccurate**
110:16,22

**include**
10:4 49:23 54:5 74:15 87:24 88:10
118:19 143:11,12 150:2 159:10 164:9
217:15

**included**
17:25 28:12 29:7 44:15 49:11 50:15
83:15 85:6 94:17 118:17 150:23
151:2,4,5 166:21,23,25 215:4

**including**
25:16 28:5 51:24 55:18 94:8 98:20
99:13 128:10 140:8 147:11 155:17
190:24 205:10 208:4

**income**
86:5,6 215:25

**increase**
  162:2,5 165:5

**increased**
  220:19

**increasing**
  161:3 162:6

**incur**
  113:8 115:1

**indented**
  69:14

**independent**
  150:1 151:21 214:24

**independently**
  150:8

**indication**
  187:2 236:1

**indicative**
  90:1 198:11 199:1

**indicator**
  168:4 169:16 170:3,4 180:5

**indicators**
  169:24

**individual**
  13:20 88:6 135:9 215:1 219:10,20,22

**individually**
  26:24 27:1 109:4 125:25

**individuals**
  65:7 108:11,12 132:4 135:4,13

**industry**
  167:1 201:2

**infer**
  146:5

**inferring**
  184:15

**inform**
  63:24 179:18 180:2,3

**informal**
  51:3 74:11,13 75:1,25 187:1 236:1

**information**
  14:7 25:20 26:18,19 27:4,5 42:24
  45:21,23 49:8,9,24 50:1 62:3 82:17
  83:8,24 84:3,9,17,23,24 85:14,20
  101:23 104:11 106:3 107:10,16 109:3,
  4 112:11 114:8 117:3,17,25 118:1,5,
  17,19,25 135:2 137:19 142:8,16

**informed**
  147:14 148:21 154:22 155:17 168:4,6,
  8 180:25 181:6,7,11 182:2,3,4,23,25
  183:1,3,5,7,9,11,16,20 185:9,12,13,15
  186:15 189:22 194:2 196:23 197:7
  207:18 208:9 212:20 213:6 214:3
  216:3 219:23 227:8 238:6

**informed**
  179:24 180:5 232:19

**informing**
  180:1 232:15

**infrequently**
  172:4,5 176:20

**initial**
  31:24 206:14

**initially**
  185:19 201:17 214:18 224:6

**initiated**
  208:6 210:16 212:10 214:9

**innovate**
  99:2

**innovating**
  88:13 98:21

**innovation**
  44:6 61:5 100:12,15,23 101:24

**inorganic**
  177:15 192:13

**inorganically**
  176:16

**input**
  97:25 98:7,10,12 100:11

**inputs**
  229:19

**inquiries**
  177:6 178:6 179:9 180:2

**inquiry**
  212:14

**instance**
  34:16 36:18 45:15 156:5 216:13

**instances**
  87:13

**instruct**
  155:3

**instructing**
  138:9

**Instructions**
  41:9

**intend**
  216:25

**intended**
  43:17,25 44:3 236:21 237:2

**interact**
  89:24

**interacted**
  106:7

**interactions**
  79:4,6,7,18,21 80:4 81:10

**intercompany**
  37:3 136:13 137:5,15 138:23 145:13
  234:22

**interest**
  123:9 136:19,22 147:6,7 148:20
  156:23 172:2,14 176:24 177:10,25
  178:16,22 179:4 187:2 193:14 200:9
  205:4 208:19 209:13 212:23 226:11
  236:1

**interested**
  15:15 43:7,8 59:7 79:11,12 82:19
  161:13 168:21 177:2 193:22 195:13

**interesting**
  204:15

**interface**
  32:23,24 33:9

**internal**
  44:6

**internally**
  121:15

**interpret**
  8:10 41:11

**Interrogatories**
  207:16

**Interrogatory**
  208:1,2

**interrupt**
  95:12 141:16 221:14

**interrupted**
  68:1

**interruption**
  99:3

**intersection**

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023** Index: interval..knowing

164:2

**interval**
90:7

**introduced**
201:25

**introduction**
177:8

**invest**
140:22 142:13 143:2 178:13

**invested**
141:11,19,20,25 160:17

**investing**
162:1 172:9 179:3 196:21

**investment**
128:25 141:18 149:23 179:12 182:7
187:4,6,12 213:19 214:11,16

**investments**
92:16 150:3 152:6 172:9 182:12 227:1
228:1

**inviting**
69:2

**involve**
92:14 98:24 148:24 152:17 159:25

**involved**
49:17 63:8 92:17 94:25 95:2 96:6,14
102:16,19 107:4,6,13,16 108:6,7,8,9
109:2 111:21 112:14,22,23 113:1
117:6 120:18 122:4,7,25 123:1,11
126:2 160:2 182:22 183:4,6 185:7,11

**involvement**
37:11 51:25 55:18 61:20,21 63:9
80:16 91:17 94:9,21 97:23 98:17
100:10 120:1,9,10 185:1

**involving**
128:11 140:9 236:11,24

**irregular**
66:2

**isolate**
95:22

**isolating**
207:8

**issue**
155:6,7,12

**issued**
110:20 230:21

**issues**
102:17

**items**
159:19 239:8,19

**iteration**
113:15 114:10

**ITR**
12:14,17,18,20,21 14:15

**J**

**jacket**
41:4,7,10

**jackets**
41:1,2

**Jake**
61:10,13 64:19

**January**
57:19,23 58:5,11 78:23 83:13 182:21
213:22 214:5

**Jason**
50:8

**Javier**
184:13

**Jeff**
74:22 193:3 194:18,22,24 195:11
200:12 201:25 202:25 203:3 210:23,
24 212:10,12

**Jess**
5:17 6:8

**Jim**
74:17

**job**
41:1,2,4,5,6,10 87:22 88:5,6,7 89:9,13
117:17

**Joe**
107:24 108:1,2,3,4,6,13

**Jon**
5:3 241:12

**July**
154:15 202:8,13,23 205:5

**June**
108:20 202:8,13,23 205:5,9 235:5,9

**June/july**
201:12,15 209:19 235:7

**K**

**K-1S**
87:15,16,17

**K-R-I-S**
184:24

**Karam**
184:11,16

**Kat**
50:7

**keeping**
123:18

**Kevin**
49:25 50:11,14

**key**
160:5

**keywords**
20:21 37:16

**kids**
235:14

**Kiesler**
9:8 15:25 16:24 17:20 18:1 19:20 23:3
27:14 30:4 31:7,9,19,22 33:2 35:23
52:2 55:20 59:3,6,22 60:11 67:25
71:11 73:3 74:23 83:9,12,20 84:2 87:3
92:19 93:10,19,21 128:21 133:9
137:22 168:15 185:7 188:7 189:14
190:3 211:1,2 217:14

**Kiesler's**
20:6,23,25 21:14,17,24 22:13,16 24:3
36:2

**Kilkelly**
70:5,7 73:2

**kinds**
96:5 174:11

**knew**
123:21 161:19 170:2,4,6

**Knight**
27:6 108:23

**Knock**
99:3

**knowable**
6:20

**knowing**
6:20 176:21 239:17

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023Index: knowledge..longer**

**knowledge**
6:21 25:4 33:5,7,12,13,15,16 109:8
213:8 236:5

**Krause/baker**
198:18

**Kris**
184:19,23,24

---

**L**

---

**L-E-I-S-N-E-R**
61:9

**label**
114:20 116:23 162:14,16

**labeled**
163:10 206:17

**labeling**
162:12

**labor**
172:24

**Laing**
5:20 12:7 13:13 19:4 22:14 25:7 44:13
51:16 55:1,8 69:24 92:22 93:2,8,12,25
105:9,15 109:9 110:2,6,10,24 117:8
125:6,15 127:22 129:4 135:24 138:3,
10 139:13,19,22 141:22 150:19 155:2,
21 156:2,6,13 157:3 166:10 175:1,8
176:5 180:20,23 190:15 199:13,21
200:4,25 201:10 202:9,15,18 205:23
209:16 210:8 211:25 217:1 220:4
221:21 228:12 231:3 232:9,22,24
233:10,18 237:23 241:8,13,16

**landscape**
193:23

**laptop**
27:13 30:2,3,9

**largest**
122:23 149:18

**late**
19:21,22

**law**
70:5

**lawsuit**
6:10 138:24

**leader**
71:23 74:7 89:18

**learn**
192:13

**learned**
210:5 213:15 240:18

**learning**
15:16 88:11

**learnings**
218:17

**leave**
127:15 176:11

**led**
117:4 214:12 224:9

**ledger**
137:15,18,23 138:18,22

**ledgers**
137:17

**Lee**
70:5,7 73:2

**leeway**
138:11

**left**
125:16 126:6 128:6 241:10

**legal**
44:7

**Leisner**
61:9

**length**
235:18

**lens**
233:5

**lesser**
222:21

**letter**
182:20

**level**
45:22 67:6 69:6 75:12 76:23 77:3
78:12,14,18 80:9,22 83:5 84:16,18,19,
25 97:4,7,10,12,15,17 99:10,20
105:24 108:6 109:16 117:20 118:21
121:19 133:18 163:25 164:4 177:23
179:25 220:18 222:2 229:15

**liability**
55:24

**likewise**
23:8 40:12 58:9 67:9 97:25 100:6

**145:16 146:6 165:19 189:14 205:20**

**limitation**
51:25 55:18 94:8

**limited**
55:23 99:13 208:5

**linear**
13:23

**lines**
99:8 161:1

**list**
123:1 194:2

**listed**
24:14,25 61:19 184:7 191:7

**listen**
172:7 176:14

**lists**
59:18

**literature**
218:16,19,20,21

**litigation**
11:25 13:6,12 28:10 29:4,11 36:23
39:14,17 40:1,10,15 46:25 48:18
76:14 85:15 189:23

**LLC**
55:23 56:4 238:4

**loan**
129:11,13,20 137:2 223:16,25 224:4,
7,10,12,14,17,20 225:2

**loans**
136:14 137:8 147:2 223:16

**local**
74:15

**locate**
25:17

**located**
48:5 148:12

**location**
46:11 122:15

**log**
66:6

**long**
10:16 15:8 16:1,7 32:12 38:21 41:23
46:25 64:16 75:3

**longer**
23:22 45:10,13 69:17 70:2 82:13

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
November 06, 2023 Index: looked..meet

207:3 221:2

**looked**
14:13 31:25 32:6,7 34:1 54:17,18 81:3
88:9 102:12 144:19 169:14 170:25
171:9 192:4,8,18 193:1 205:7 211:22
213:20 219:3 235:11

**loss**
86:10

**lost**
56:13 186:5 188:2 220:16,24,25
221:25 222:1

**lot**
134:12 165:2 201:22

**lots**
42:22

**lower**
108:1

**lump**
233:22 234:15

**lunch**
127:21 128:3

**lunches**
90:14

**Lundberg**
123:25 124:8

---

**M**

**M&a**
208:3

**made**
58:13 70:4 75:16 83:9 84:12 92:12
104:17 133:1 170:14,18,25 171:10
173:23 178:22 192:20 202:25 216:5
223:2 231:11,16

**Madison**
5:4

**Mail**
27:11,20 28:3,25 30:2

**maintain**
40:1,4 229:15,16,18 230:15

**maintained**
34:3 137:17

**maintaining**
51:10 123:15 137:22 138:17 161:23

**majority**
133:4 156:23

**make**
7:11 11:11 12:3 14:8 26:16 28:18
52:12 63:8 77:17 93:19 109:22 110:8
120:4 133:3,10 153:13 164:12 167:5
168:10 175:9 197:21 226:12 241:8

**makes**
204:14

**making**
106:3 117:10 133:2 141:15,17 164:13
170:10

**manage**
120:14,23 123:16

**managed**
56:10,20 121:1

**management**
25:17 34:2 38:19 49:8,9 51:23 52:2
54:11 55:17,20 56:8 101:23 111:23
112:16 113:2 114:1 115:19,23 116:14,
17,21 122:4 124:25

**managing**
122:11,19 123:14

**manner**
219:15

**March**
206:14

**mark**
5:20,24 54:23 79:10,19 80:2,4 81:7
82:1 139:20 214:14

**marked**
24:7,10 55:5,10,12 106:12,15 139:17,
22,25 140:1 154:8,11 157:23 158:1
171:17,20 181:21,24 187:23 188:1
190:11,20 192:24 193:2 203:10,13
207:11,14 209:6 217:3,6

**market**
44:15,22 45:2,3 96:16 99:9 100:18,22
149:7,9,13 150:13 151:2,5,8,13 152:1,
9 153:14,21 156:22 157:20 164:18
165:16,17,22 166:15,20,21 167:5,8,9,
11,12,13,15,18,24 168:11 169:16
170:3,4,8 171:3,7 173:22 174:10,11
175:4,25 177:5 180:6,7 181:3,14,15
187:11 189:4,9,15 190:3,7,8 192:20
194:5,15 195:2,4,6 197:11 198:11
199:2,12,19 201:9 204:9 215:8
219:11,23 225:17 238:24

**marketable**
156:23

**marketing**
61:12 172:24 177:7,12,19 178:11,13
179:21 182:10,12 183:12 236:2

**marketplace**
159:14

**markets**
168:5 175:11,12

**marking**
190:15

**Massachusetts**
55:25 56:4

**materials**
76:7 102:12 104:21

**math**
234:10,14 241:18

**Matt**
49:24 50:11,13,16

**matter**
5:8 34:14 80:10,19 83:16 156:7
207:24

**matters**
44:8 62:5 70:25 71:2,4 72:10,11 75:23
76:4 78:5 80:2,3,6,8 81:23,24 82:2
88:15 91:9,18 92:15 98:23 102:3
120:12 144:24 145:1,2,7 152:18 205:2

**Matthew**
6:1,14 30:23 31:6 35:7 37:19 55:19
61:12 201:20 205:14,15,21 217:14
226:16

**Matthew's**
28:13 29:8

**maximum**
168:23 193:15 200:11

**means**
6:19 122:14 126:9

**measures**
170:5

**mechanisms**
10:13

**medications**
8:19

**meet**
9:15,16 10:16 14:23 15:2,3,5 16:1

**meeting**
10:6,7 15:24 16:11 17:19 67:4 69:5,7,
10 71:15,16 72:10,12,19,21,24,25
73:7,10 92:13 194:21 203:3 210:19,
22,23 211:3,5,9

**meetings**
15:17 61:17,18 62:9,14,19,21 63:11,
13,17,19,22 65:17,18,19,24,25 66:3,4,
6,9,10,11,13,17,20,23 67:8,10,11
68:10,12,13,14,17 71:8,10,11,17
74:25 76:5 79:1 90:13

**member**
60:14 64:22

**members**
59:19 60:12 65:8 67:21

**memo**
146:5,12,23

**memorandum**
182:2 183:1,11

**memorize**
39:4,9 59:12,17 60:2 77:7 121:20
129:9 142:16 143:4,5 145:10,23
146:3,12,22 165:2 179:14 214:8
220:21 221:4,6 227:13,20 228:7,15,18

**memorized**
228:19

**memory**
66:1 144:3 178:8 216:19

**memos**
97:8 100:3 145:15,22

**mentioned**
10:19 12:8 14:1 50:10 73:21 81:14,19
179:7 185:7 205:9

**mentorship**
89:20

**merger**
166:18

**mergers**
236:10,23 237:4,12,20 238:9

**message**
36:17 177:6 225:14

**messaged**
15:1 230:22

**messages**
30:24 31:2 32:7 36:16,22 37:6,12

**messaging**
35:22 36:13,24

**met**
6:7 9:7 13:15 15:21 75:7,8 194:24,25
212:6 215:20 235:13

**methods**
156:21

**metrics**
219:20

**Michael**
23:3 52:1,2 55:20 83:20 188:6 190:3

**Michael.kiesler@acquia.com.**
23:4

**mid**
160:12

**midst**
226:18

**Mike**
9:8 15:25 16:24 24:3 26:20 27:14,19
28:6,12,16 30:22,24 31:5,9 32:20,23
33:8 35:7,17 37:19 49:12,21 53:20
59:3,21 61:4,12 64:19 67:25 70:5,9,16
71:20 72:11 73:3 74:23 83:9,12 87:4,5
93:15,17 94:16 102:18 104:8 108:1,7
119:15,18 128:20 130:15,21,22
131:16,23 132:15,17 133:9,10,11,22
134:2,7,9,11,18,22,25 135:2 136:10
138:16,17 141:3,4,5,9,11 147:22
168:15 183:9 185:7,19 192:4 210:24
211:1,2 215:21 217:14 224:5,18 227:9
230:23 231:12,23 233:21 240:18

**Mike's**
20:10,16 28:3 29:7,15 30:2

**Mikek@widen.com**
22:19

**milestones**
208:7,10

**million**
122:2 125:4 126:17 127:3,12 128:25
146:15,19 172:8,9,21,22,23 173:13,14
186:21,22 189:2,4,5,9,16 190:4
203:25 204:4,10,11,18 206:20,21
209:10 212:25 216:16 230:16 232:21

**millions**
226:3 227:17

**mind**
79:15 82:23 92:24 161:16 174:7
178:18

**mine**
22:4 23:1 28:6 29:8,14 73:24

**minority**
172:1,15,16 177:2,10,25

**minute**
106:22 158:12

**minutes**
54:5 62:19 71:15 72:10,12,15,18,19,
21,24,25 73:7,10 91:19 92:13 206:6
241:10,15

**misread**
57:21

**missing**
22:5,8

**misspoke**
65:21

**Misstates**
202:10

**misunderstanding**
41:14

**misunderstood**
217:23

**mix**
77:1 90:13

**mobile**
31:1,3

**model**
123:9 162:17 167:14

**moment**
63:4 107:25 134:11 142:9 177:18
196:1 232:15 234:16 237:9

**money**
93:3,13 102:14 129:25 130:1 132:16
136:11,12,18 141:25 144:5,23 145:8
225:8 234:19

**Monica**
5:24

**monitored**
166:17,20

**monitoring**
167:4 206:24

**month**
42:8,9,10 45:7,9 95:18 222:7 229:22
230:7,19 231:6 233:22 234:2

**month-to-**

222:6

**monthly**
103:11,17 230:10

**months**
45:15 46:5,6 234:12

**monumental**
159:1,3,6,17,18,19,20,24

**morning**
5:1,10,16 6:7

**motion**
199:5

**move**
13:25 200:6 215:11

**moved**
69:19

**moving**
70:17 127:20 206:5

**multiple**
50:14 90:3 126:20,24 170:7,20,24
171:2 173:9 212:16 213:1

**multiples**
192:8 193:21 194:7,13,16 197:1

**multiply**
234:2

**mutually**
35:1

---

**N**

**named**
203:18

**names**
177:17 179:15 184:7 221:3,6

**naming**
68:7

**nature**
17:22 63:9 77:25 120:2 128:10 132:12
136:25 137:2,9 140:8

**navigating**
206:12

**necessarily**
167:2 178:2

**needed**
71:8 92:2,7,10 133:1,6,10,11 134:15
144:6,21 145:7 146:2 161:20 203:1

207:1

**negative**
222:5,11,17,20 225:15 226:5

**negatively**
225:21

**nice**
194:5,14 195:1,5 237:25

**night**
23:24

**nonessential**
113:23 114:14,16 115:17 116:8,10

**Norris**
61:21 63:7 67:20 74:22 217:15

**Norris's**
61:21

**North**
148:13

**note**
12:3 13:8 19:10 156:3,6 204:8 241:3

**notes**
17:19,22 18:7,11,13,19,21,23 19:3,12
55:14 58:13 62:20,23 68:17,20,21,22,
24,25 69:1,7,9 140:5 209:6 211:9,10
216:7 217:6 228:9

**noteworthy**
50:4

**notice**
6:25 24:11 119:5 129:5

**noticed**
6:22

**notification**
27:22

**notified**
180:13

**November**
5:5 145:16,19

**number**
7:8 10:19 41:5,8 44:9,10 47:4 53:18
77:7 94:14 111:10 139:20 144:9 179:7
184:7 192:2 203:24 204:17 215:11,16,
19 223:13 227:25 230:1 240:21,24

**numbers**
47:8,10 144:18 157:18 174:24 222:12

**numerous**
102:14 122:23 126:2 179:14 183:5

**NYSE**
195:7

---

**O**

**O'NEILL**
10:9

**oath**
6:3 8:14

**object**
105:9 109:9 110:10 129:4 155:2
175:1,8

**objection**
22:14 44:13 55:1 69:24 92:22 93:2,12
110:24 117:8 125:6,15 135:24 138:3
139:13 141:22 150:19 166:10 199:13,
21 200:4,25 201:10 202:9,15 205:23
209:16 210:8 221:21 231:3 232:9,22,
24 233:10,18

**objectionable**
155:23

**objections**
207:15 234:19

**objective**
160:5 166:2 169:8 180:7,10

**objectives**
159:9,10,23 175:12

**obligations**
191:1

**observation**
81:6

**observations**
218:17

**observed**
68:12

**obtain**
186:24 191:21 212:8 213:11 223:25
229:8

**obtained**
142:3 147:9 213:9 223:16

**occasionally**
8:3

**occasions**
15:1 131:5 209:5

**occur**
132:13

**occurred**
18:3 20:1 79:13 131:1 136:5 143:19 210:20,24

**occurrence**
103:6

**occurring**
173:22 208:24

**October**
146:14,18 194:24

**offer**
93:15,17,18,20,21 96:23 98:25 226:20

**offered**
226:16,17 231:24

**offering**
166:6

**office**
88:20

**officer**
61:6,24 91:22 133:22 135:10

**officers**
56:11,20 91:1,8,14,16 92:2,7,10 215:12

**offices**
135:17

**older**
30:4

**one-for-one**
126:23

**open**
165:16,17

**opened**
238:1

**operate**
164:15

**operating**
88:13 132:22,24,25 135:20 141:11

**operational**
10:25 11:5,6,9,12,13,16,19 12:4 13:2 14:4,10,11,14,17 17:6,7 41:25 42:5,6, 12,13,16,20 43:1,3,10,12,16,24 44:2, 9,20 45:5,16,20 46:1,3,5,7,8,10,20,21 47:7,9 63:23 76:2,3 90:1,11 94:16,19 102:22,24 119:13,24 120:7 122:19 130:5 131:2,18 144:23,25 145:2,7,18 146:1,8,16,17 148:1 149:5 168:3,16 169:22 170:11 171:4,21 188:5 189:11,

19,21,24 197:2,3 222:9 223:3,9,14,22 226:8 227:7,22 228:24

**Operationally**
205:1 206:11

**operations**
58:18 61:10 64:25 94:7,9,21 95:1,2,6 111:21 112:14,22,23 113:24 114:15, 17 115:17 117:6 159:13 160:6 161:6 162:4 163:22

**opinion**
152:8 156:22 157:19 164:17 166:12, 16 173:25 174:22 175:15,21,22,23 199:15,17 200:5 213:24 214:1

**opinions**
152:16,20,22 166:7,12

**opportunities**
168:5 179:13

**opportunity**
7:14

**opposed**
135:9

**optic**
226:6

**optics**
225:4,15 226:1

**option**
177:16 205:16

**options**
193:14 200:10 205:10

**order**
39:8 181:15 188:2

**ordinary**
48:1

**organic**
176:23

**organically**
176:17

**organization**
23:22 35:25 42:18 51:23 54:1,2 55:15, 16 58:22 71:3 72:4 80:7,8,11,18 81:22 82:14 88:9 89:11 96:17 98:11,19 113:7,17 123:6 126:8 127:2 159:9 162:6 170:24 176:18 178:11 186:21 193:15 200:10 201:2,13,18 213:20 221:9

**organizations**

44:18,25 120:19 126:21 166:22 167:25 170:5,13 178:12,14 179:23 192:12,19 193:22 197:4 225:6

**organize**
208:8

**organized**
34:5,7 73:1 170:19 187:8

**organizing**
101:7

**origin**
47:2 173:14,16

**original**
231:22

**origins**
173:7

**outbound**
123:8

**Outlook**
32:22,24 33:9

**outreach**
178:3,9 180:4 195:20

**outreaches**
179:19,21

**oversight**
71:2,5 72:9 87:24 120:3

**owner**
111:17,20 112:1,10,13,20,21,23 113:8,11,16 114:17 116:25

**owner's**
115:9

**Owner/president**
111:14,15

**owner/president/founder**
113:22 114:11

**owners**
114:24

**ownership**
23:23 113:7 208:7,20

---

**P**

---

**p.m.**
16:3,4 241:21

**paid**
136:19,22 139:11,14 147:5 173:11

191:8,15 199:1 234:19,20,23 239:5,7,
13

**Palay**
    5:24

**pandemic**
    200:18,19,21 202:6 203:8 204:25
    206:8 220:12,17,19,24 221:8,20
    222:1,4,16 223:1 226:18

**paper**
    40:1,3,4,8,13,19 68:25

**paragraph**
    113:19,20 115:3 116:7 140:13 144:4
    156:20 158:24 159:2 171:25 172:1,13,
    20 188:12,15,19 193:18 196:11
    208:14,17

**parameters**
    224:11

**parenthetical**
    203:24

**Park**
    74:16

**part**
    10:9 22:17 23:1 32:11 37:5,7 38:1
    43:21 44:19 50:7,12 58:14,25 65:12
    70:16 71:12,13 72:16 74:8,23,24 75:4
    77:12,14,19 78:6 80:14 100:19 112:4
    114:18,20 118:4 119:15,16,22 121:4
    124:13 128:22 138:24 151:22 187:7
    192:12,15 201:15,24 211:5 219:11
    234:16 235:20

**parted**
    121:3

**participate**
    10:11 61:25 63:16,21 65:16 74:25
    96:1 102:4,8,9 113:14

**participated**
    64:10 65:18 96:3 187:6

**participating**
    67:3 209:2

**partner**
    148:22 184:10

**partnering**
    148:20

**Partners**
    178:20,23,24

**partnership**
    148:25 195:23

**parts**
    198:21

**party**
    107:10 122:16 185:5 214:14

**pass-through**
    190:25

**passed**
    218:22

**passively**
    192:8 193:20 197:1

**password**
    27:20,24

**past**
    115:13,14 166:4

**path**
    187:5

**pause**
    33:8

**pay**
    125:4 126:17,20,24 127:2 142:2 146:9
    199:11 204:4 214:4 224:20 226:17
    231:6 232:2,5,20 233:11,14 239:18

**Paycheck**
    223:15,23

**paying**
    127:15 224:19,20,22 239:17,19

**payment**
    140:18 143:9 190:23

**payments**
    140:17 147:8

**payroll**
    229:24 230:5,7

**payrolls**
    229:21,22,23 232:13

**PE**
    177:6

**Peggy**
    38:7 40:23 79:16 82:23 92:25 125:10
    130:13 170:22 174:6 200:2 233:8,16

**pending**
    7:23,24 186:22

**people**
    49:17,20 50:22 53:25 54:13,18,20,22
    61:19 62:24 69:2 73:18 80:1,15 81:14,
    19 91:10 99:23 101:6 122:22,25

126:21,25 127:18 148:2 184:9 185:14
216:1

**percent**
    156:24 172:23

**percentage**
    160:24

**perform**
    17:8 27:10 29:24 31:3 37:21 103:5
    126:18

**performance**
    44:4 75:20 83:10,14 88:5,6,7,16,17,19
    219:10,11,19,20,22,23

**performed**
    17:9 20:9 30:13 31:14 37:17,18,20
    41:1,9 119:7 121:16 139:15 149:13
    151:11 238:5,18,23 239:9,11,14

**performing**
    37:23 38:11 52:23 88:9,12 100:21
    103:4 120:6 126:19 131:14 134:13

**period**
    58:7,10 60:1 62:15 64:5,9 73:21 90:19
    95:24 98:16 101:3 111:18 115:4,5,8,
    10,14 120:16 121:5 127:14 143:15,17,
    20,21,22,24 165:12,21 209:5 237:15,
    19

**periodically**
    129:24 131:1

**periods**
    88:21,22 90:4 165:18

**permanence**
    39:1

**person**
    15:4,6 49:25 50:1 62:22 65:2 66:18
    69:8 88:18 126:10 184:19 195:22

**person's**
    74:19

**personal**
    175:22

**personally**
    9:17 37:21,23 38:11 52:23,25 72:21,
    24 155:5 156:9 161:13 226:17

**perspective**
    123:22 124:2

**pertaining**
    18:24 30:5 118:25 149:3

**phase**

230:21

**phone**
   10:11 18:16 30:22,25 90:13

**phones**
   37:12

**phrase**
   41:2

**physical**
   41:8

**physically**
   9:11,12,13 18:17 80:24 81:4

**PIM**
   101:24

**pin**
   162:20

**place**
   48:17 55:24 56:3 63:24 74:12 92:14
   135:6

**plaintiff**
   5:18 11:25 12:12 13:6

**Plaintiff's**
   207:16

**plan**
   12:15,22 14:16 158:2,14,18 160:7,9,
   16,19 161:2

**plane**
   235:13

**planned**
   206:18 238:9

**planning**
   96:2,3,5,15,20,24 97:2,6,9,23 98:1,4,
   8,10 100:4,7,11 206:17 235:1,4,8,11
   238:10

**platform**
   22:20,24,25 36:24

**play**
   101:19,20

**point**
   7:20 28:1 43:22 56:8,15,17,21 57:22
   58:3,13 60:8 69:4,13 78:7 108:3,4,10,
   13 115:24,25 121:4 134:3 162:25
   163:15,19 165:20 182:15 183:24,25
   184:2,10 209:8,22 210:3 222:16

**points**
   162:12,15,19 184:17 185:16 220:14,
   15 229:17

**Polakowski**
   5:16,17,23 6:6,8 12:2 13:8 19:2,8
   25:11 38:6 40:22 51:13 55:7 79:14
   82:4,22 92:24 93:22 96:12 105:14
   110:4,8 125:9 127:19,24 130:12 138:8
   139:21 155:11,25 156:3 157:5 169:3
   170:21 174:6 176:3 190:13,17 197:17
   200:1 216:24 217:2 220:2 228:9
   233:7,16 238:1 240:12 241:1,11,17

**policies**
   11:4 13:4 17:5,12 38:23 39:5 48:8,17,
   21,24,25 49:7,15,16 51:2,4 135:5,12
   219:8,17

**policy**
   39:7,10,12 50:5 219:14

**portfolio**
   128:25

**portion**
   222:23

**position**
   19:9,11 125:1,5 141:12 153:3,10,12,
   17,24 155:19 198:8,24 211:13,14
   228:13 232:1,4,18 235:6 238:21

**positions**
   44:5

**positive**
   222:25

**possibility**
   211:23

**possibly**
   184:25

**post**
   69:3

**post-2009**
   69:2

**post-covid**
   88:22

**post-transaction**
   111:20

**potential**
   39:21 113:16 176:22 183:15 186:21
   190:8 192:5 201:7 202:7 205:11
   225:15 236:10,23 237:4,10,12,20
   238:8

**potentially**
   179:3

**Powerpoint**
   76:10

**PPP**
   223:25 224:4,7,10,14,17 225:2,7

**practice**
   68:16 174:23 175:9,13 178:12 179:22

**pre-covid**
   88:21

**pre-media**
   41:17 64:25 65:4 88:1 159:13 160:4,6,
   8,21,23,25 161:5,24 162:3 163:5,12

**pre-press**
   41:16

**preceding**
   64:6 77:20 196:10

**predate**
   120:15

**predated**
   31:15

**preempt**
   43:17

**prefer**
   221:17

**preference**
   32:22 34:22

**preparation**
   9:1 14:1 17:1,23,24 18:5 20:3 43:1
   86:24 97:16 104:22 105:25 107:7
   119:11,20 123:2 129:13 164:5 185:2
   231:20 240:17

**prepare**
   8:23 9:23 10:21 14:3,24 15:8,12 16:2,
   6 17:21 25:21 43:3 48:23 53:17 75:5,
   12 76:23 78:12,14,18 80:9,22 83:5
   84:16,19,25 87:8 94:13 97:4 101:1
   117:20 121:11,19 123:1 128:19
   129:16,22 136:15 147:19 162:13
   163:25 177:23 185:9 191:17 192:1
   196:16 215:18 220:18 222:2,6 223:20
   239:6,8

**prepared**
   6:24 17:19 18:8,11,13,20 24:24 25:10
   41:25 45:5 48:13 52:3 53:15 55:14
   94:11 104:10 106:25 119:9 120:8
   128:16 147:17 156:4 158:15,19
   191:22 215:15 216:8 217:8 223:17
   227:2 228:10 240:23 241:5,6

**preparing**
9:19 12:11 16:8,16,22 18:2 19:18
42:11 107:5 108:15 117:18,24 118:13
119:2 148:7 183:8 185:8 216:9 217:8

**prepping**
21:1

**prepress**
160:1 163:5,21

**presence**
15:19 204:9

**present**
5:23 10:6,7 13:1 15:24 16:24 18:4,16,
17 48:10,17 50:3 53:20 80:25 119:18
192:3 210:22 215:20

**presentation**
187:9

**presentations**
75:16,19,25 76:6,8,10,11,13 187:9,18,
20

**presented**
75:2 93:17

**preservation**
23:14

**preserved**
117:25 118:6

**preserving**
39:13

**president**
54:17,21 70:11,14,18,19,23 71:5 72:4,
14,22 73:1,8,12 74:6,16 80:14,17,24,
25 215:12 219:1

**pressing**
100:21

**prevent**
8:16

**previous**
52:5

**previously**
52:22 79:25 86:14 186:3 232:12

**price**
54:24 79:8,19 80:2,5 81:8 82:1 143:21
173:11 197:12 198:9,25 199:10,18
205:22

**prices**
205:17

**primary**
107:18 108:3,10,13 134:14 183:24,25
184:2,10 230:7

**principal**
55:24 56:3 184:17

**printing**
41:12,16 160:1

**prior**
18:21 33:18 37:6 53:21 56:9,18 61:22
67:14,16 68:3,4,10,18 69:10 73:4,8
131:6 139:1,3,5 166:19,20 167:16,19
168:12 184:21 187:3 192:6 196:5
201:5 205:3 209:14 212:19 235:9,15
237:20

**priority**
153:21,22

**private**
172:6 176:13 177:6,13 179:8,10,19
192:7,11,14 193:20 196:13,20,25
235:22 236:3,6

**privileged**
25:20

**proactive**
43:13

**proactively**
42:23 43:2

**problem**
68:2

**procedures**
20:8 219:8

**proceed**
5:15 27:23

**proceeded**
16:5

**process**
25:23 26:5,7,8,16 44:6 93:4 109:24
110:17 159:7,21 184:12 187:6,7
192:14 208:3 214:9,17 233:5 240:19

**processing**
34:10

**produce**
25:18

**produced**
11:7,9,13,18,20,24 12:5,6,12 13:5,10,
11 21:20 22:5 23:25 28:9,19 37:10
43:19 47:15,25 48:4,18,19 138:23,25
236:7

**producing**
26:11 28:23

**product**
19:5 99:8 100:17,18,21 101:7,8,12,15,
16,23,25

**production**
20:17 30:10 37:11,13 41:17 47:13
163:4

**productions**
19:21

**products**
99:9 101:17

**professional**
163:13

**profile**
183:12 184:3

**profit**
71:15 86:10

**program**
223:16,23 225:10

**progressed**
13:19 29:23 206:21,24

**progression**
13:24 206:16

**project**
34:19 41:4 106:18,19,24 110:15
124:21 222:5,17,25

**projected**
189:3 221:10

**projection**
169:14 222:22

**projections**
14:5,9,13,16 160:22 164:1 221:11,12,
18 222:7 223:5,6,9,12

**projects**
119:22 120:1

**prompted**
42:20 201:3

**proofs**
41:8

**proper**
169:10

**Protection**
223:16,23

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023Index: Proton..read**

**Proton**
27:11,15,16,18,19,22 28:3,8,11,13,21,
24 30:2

**provide**
19:5 42:23 44:16 45:19,22 82:11
84:18 85:24 97:5,8 99:22 100:3,6,14
103:7 109:4 117:3,16 118:5 119:3
120:20 121:24 127:9 130:7,8 139:5,8
141:10 142:9 144:24 168:6 169:22
180:25 181:11 187:17 191:11 194:3,
11 197:6 216:25 228:16,20 230:6
233:15 238:11,14 239:20 240:1

**provided**
11:1 13:7 17:12,13 20:11,13,15,20,21,
22,24,25 21:9 23:14 27:13 30:22,23
45:1,4 47:20,21 63:10 76:13 81:21
82:9 83:6,18,25 84:3,4,14 85:2,3,8,10
86:6 87:14,16 89:19 98:7 100:11
103:9,12,18 110:5 117:23 118:1,3,8,
10,13,16,17,20 119:1,14,17,24 125:13
127:10 135:3 136:11 140:5 148:1
152:5 156:12 168:3,7 170:11 175:10
181:16,19 183:1,5,9 186:16,18,23
187:10,21 189:21,25 197:3 199:6
213:5,6,17 216:1,4 222:8 223:3,10,24
227:8 228:23 238:6

**providers**
127:5,6

**providing**
44:21,22 45:16 83:13 107:13,16
114:25 121:22,25 126:12,25 127:1,4
163:9 168:8 183:4 185:8,11,15 187:1
207:18

**publicity**
225:16

**publicly-held**
195:6

**published**
173:11

**pulled**
32:1

**purchase**
205:17,21,22 235:16,20,24

**purpose**
7:3,5 12:11 18:8,12 23:6,11 28:9,22
29:4,11 30:9,10 33:13 35:5 36:22 37:2
38:14 39:13,25 40:9,14 52:20 76:14
107:5,8,9,14 108:15,19 113:10
117:18,24 118:13,14 119:2 140:16
148:6 161:11 168:8 173:18 179:2,12

182:23 183:8,10 186:2 189:22 192:11
198:10 207:19 216:9,11 217:8,25
218:7,21

**purposes**
137:13

**pursuant**
19:11

**pursue**
212:18 224:3,5

**pursuing**
102:10 176:17 193:14 200:10

**pursuit**
177:15

**put**
39:12 64:18 74:12 100:18,23 177:5
182:3

---

**Q**

**qualified**
224:10

**quality**
107:2

**quarterly**
75:8,9 76:5

**quest**
237:7

**question**
7:15,23,24 8:2,4,6,9,11 11:14 22:2,15
28:17 29:10 31:21 33:3,22 34:13 38:7,
9 39:8 40:21,24 44:21 49:15 62:7
75:15 79:15,17,20 82:5,6,23,25 85:1
91:20,21 93:1,6 96:11,13 105:21
109:10,13 110:11,12 112:18 124:11
125:11 129:2,3,16,18,21 130:14 132:2
136:15 138:14,15 142:6 145:12
149:25 150:4,12 151:16,17,18 153:7,
8,9,23 155:10,23 159:17 160:13
161:11,17,18 165:8 166:3 169:1,5,18,
20,25 170:22,23 174:8,16,18,21
175:5,7 179:9 180:12,21,22 181:10
186:2,7 191:13,17 192:15,17 196:17
197:16,19,22 198:15,20,23 199:24
200:3 202:12,17,20 207:4 209:12
210:12 211:20 213:12 219:13 221:18,
19 222:13 223:11 227:24 228:4 232:6,
7,8 233:9,12,17 235:12 237:2,24
240:10,13,14

**questioning**
129:23

**questions**
7:13 8:3,20 19:6 42:22,24 43:14,17,
18,19,25 44:1,4 90:9 97:21 102:14
155:8,22 176:12 221:16,17

**quick**
48:13 51:15

**quickly**
7:9,11 124:20 234:3 238:5

**quit**
125:2

---

**R**

**ran**
52:13,16 53:1,6,7,8 69:1 87:25

**Randall**
5:8,19 6:10 52:1 54:24 55:19 58:4,6
65:12 77:23 78:16 82:9 83:9,15,19
91:13,21 156:12 179:19 180:3,4 197:7
231:9

**Randall's**
11:22 77:22 93:11 147:10 197:13

**range**
77:2,9 83:10,11 186:15,17,23 187:2,
10 194:3,6,11,12,16 195:5 212:24
214:4 230:12

**ranges**
213:16,17,19

**ranging**
230:10

**reach**
108:14 195:17

**reached**
177:25 178:2 179:2,8,11 196:20,21
214:17,22

**reaching**
195:8 200:8 201:24

**reactions**
100:22

**read**
38:7,9 40:23,24 55:16 56:1,12 57:25
58:1 62:1 63:24 79:15,17 82:4,6,23,25
93:1 96:13 109:12 111:24 114:3
115:21 125:9,11 128:14 129:2,3
130:13,14 138:15 140:23 151:18

153:9 157:18 159:15 161:18 168:18
169:3,5,20 170:21,23 172:11 173:1
174:8,16,17,19,21 175:7,19 180:20,22
186:7 189:6 192:17 193:16,24 194:8
197:19 198:13,15 200:1,3 210:12
218:25 226:9 232:7,8 233:7,9,17
236:16 240:12,14

**reading**
57:21 58:1 92:25 157:15,17 159:5
174:7 197:17

**reads**
56:18 156:20 157:17 172:19

**real**
214:2

**realize**
98:22 168:22 175:12

**realized**
21:1

**reason**
78:10,12 174:9,14 190:6 203:1 240:16

**reasonable**
174:2 175:16,25

**reasonableness**
219:4 239:21

**reasons**
131:19 225:9

**recall**
10:19,20 11:2 13:21 17:15 32:16,18
37:23 38:11,20 39:18,19,22 41:22
42:11,15 43:8,11,13 50:3,25 52:23
57:16 60:3 65:10 66:14,22 67:3 68:7
70:14 73:5,6 74:19 76:20,25 78:11,13,
16 94:19 97:1 99:10 100:9 104:6
107:3,8,24 121:1 124:5,9 129:14
131:23 134:18,21,23 135:1 142:24
145:2,6,18,25 146:7,17 147:1,5,9,23
168:15 170:16 177:22,24 183:3
189:10,11,17 196:17 209:2,4 215:1,2

**recalling**
32:25

**receive**
26:17,20 81:15 82:14 236:3

**received**
39:17 81:18 82:16 83:1 85:21 86:2
108:21 136:18 141:25 145:24 146:7,
15 148:22 186:12,14 187:5 191:9
225:2,7 236:6

**receiving**

26:8 224:11 225:18 226:21

**recent**
64:13

**recently**
22:11 24:2

**Reception**
78:4

**receptionist**
78:3

**recess**
51:19 94:3 128:3 176:8 220:7

**recite**
143:6

**recognize**
24:10,14,16 106:15,16 140:2 154:11,
14 158:1,5 171:20 181:24 182:1 188:5
190:20,22 193:2 203:13 207:14

**recognized**
194:10

**recollection**
18:23 19:14 45:18,24 142:20 186:9
227:15,16,19

**recommend**
104:5 117:15

**recommendation**
108:21

**recommendations**
98:25

**recommended**
104:6

**record**
5:2,4,13 6:8,13 12:3 19:10 43:6 51:18,
21 54:17,22 55:7 81:3 94:2,5 110:9
128:2,5 176:7,10 220:6,9 241:3,9,19,
20

**recorded**
130:24 133:13 137:5,20 142:15

**recording**
234:22

**records**
10:4,23,24 38:25 39:1 40:6,8,12,18
51:8,11 53:19,22,24 54:1,4,8,9,12
59:15 66:25

**recurring**
169:16 170:2

**redeem**
92:20 93:10 197:24 231:1,5,10

**redeemed**
197:13 225:11 231:13

**redeeming**
93:5,16

**redemption**
84:5,10,11 143:11,18,21 181:2,12
198:10 199:1,18 224:24 225:3 228:14
234:20

**redemptions**
140:19 143:8,9,10,12,15,16,19 144:1
198:19

**redid**
20:9

**reduce**
206:19,20 226:20

**reductions**
206:22

**Reebok**
120:18,24 121:7,10,13 122:3,17
123:17,24 124:12,16

**Reed**
5:8 23:13,19 26:20 27:19 28:4,8,11,20
29:19,21,23 30:22 31:5 35:7 42:1,20,
22 43:3 44:2,11,23,25 45:19,24 52:1
53:21 54:16,21 55:19 57:18,22 58:9,
13 59:22 60:11,14 62:1 63:7,15,16
65:15,23 66:12,17,20,23 67:3,18
69:14,17,22 70:1,4,7,9,16,17 73:11
74:1,3,5,12,24 79:7,19 80:1,4,13,17,
23 81:8 82:1 88:18 89:17,18,24 90:12,
16,19 91:6,9 92:1,6,10,14,16,18 93:3,
10,13,14,18,20 94:8,15,25 95:2,3,6
96:1,3,19,21,23 97:1,5,8 98:1,3,7,18,
23,25 99:6,11,13,14,19 100:3 102:2,4,
7,16,18,19,25 103:10,12,16,20,22,24
104:6,11,13,15,18 105:2,22 106:2,5,6
109:2 112:2 113:1,13 114:12,17,25
115:2 117:5 119:7,15,18,22,24 120:5,
14,18,20,23 122:4,10 123:3,10,14
124:12,15 125:2,16,21,24,25 126:1,4,
10,12,18 127:3,10,14,15,17 130:15,21
131:22,24 132:12,14,16,21,22,24,25
133:3,6,8,10,12,15 134:19,25 135:3
147:22 154:18 155:1 168:7,9,13,16,
21,22 175:3 180:5,8 185:1 188:6
189:8,10,12 190:2 192:4 193:13 195:9
197:1 200:9 201:11 202:1,11,16,23
203:15 204:3,14 205:3,5,9 208:19
209:3,4,7,10,18 210:4 215:21 216:13

217:13,18,19,21 218:1,2,3,11,13
219:25 222:9 223:3,10 224:19,25
225:14 226:20 227:8,10 230:23
231:11,16,21 233:19 235:3,7 239:21
240:2,7,18

**Reed's**
20:11,14 23:1 27:19 28:4,15,24 42:17
43:14,17,18 61:20 94:20 96:19 97:22
98:10 99:25 100:10 101:4,5,9 112:6,8,
9 114:22 117:17 118:25 120:9 123:21
124:22 209:13 216:19 218:22 219:4,
19,20,22 235:9 239:3

**Reed.widen@acquia.com**
23:20

**refer**
41:15 78:4 172:16

**reference**
143:7,25 168:15 171:5 195:6 208:17
210:19 212:11 227:21

**referenced**
11:5,12 12:21,25 13:3 30:4,17 31:24
33:24 34:16 35:9,13,21 41:18 42:1
47:3 63:7 65:7 76:6 85:18 87:2,12
95:17 108:2 114:11 144:10 171:22
178:7 188:18 195:21 206:6 208:24
214:11

**references**
170:10

**referencing**
168:25 178:15

**referred**
60:18,20 61:21 63:2 101:23 107:2
112:1 120:17 147:4 158:3 162:18
203:4 236:16

**referring**
15:4 26:14,15 27:17 30:25 53:23,24
54:3 72:18 74:4 84:8 92:9 115:12
143:23 175:17 195:16 217:7

**refers**
115:4 143:18 157:7

**reflect**
55:8 113:11 119:25

**reflected**
54:13 94:23 120:7

**reflecting**
114:6

**reflects**
113:13

**reframe**
169:2 174:20 197:16 198:20

**refresh**
142:20 216:19

**refreshing**
19:14

**regard**
6:22,24 16:22 24:24 25:5 27:15 29:25
30:13,20 38:21 43:10 53:15 70:8
79:23 80:20 81:12 91:25 94:13,20
96:20 97:2,5,8,21,22 98:1,7,18 99:11
100:3,7,12 105:23 106:23 107:20
110:14 115:15 119:9,12 128:16,19
132:4 134:7 136:19 146:24 147:17
151:12 153:3 191:6 192:2 196:21,24
200:9,17 202:5 215:16,23 219:13
223:11,21 226:1 227:2 236:13,14
238:19 239:15 240:21

**register**
143:25

**regular**
61:17,18 62:9 66:1 68:10 71:17,19
79:4,7,18,21 80:4 81:10 90:7 103:6
123:18 124:6,7

**regularly**
63:16 65:16,23 75:7 79:1 81:15

**Reinhart**
5:17

**relate**
41:12 148:19 155:9

**related**
21:7,17 41:1,6 52:15 62:5 63:5,25
70:25 71:14 75:23 85:5 87:15 88:2,24
92:16 97:15 98:21 102:21 103:14
104:21 106:20 114:25 117:17 129:14,
16 130:15 131:25 134:24 135:12
136:15 137:3 142:5,21 143:3,18
145:15,21 146:4,12,23 147:3,7,8,12
149:5 157:11 159:19 163:13 166:21
189:18 192:5 199:7 204:24 206:4,8,18
207:5,24 209:6 219:15 220:18 222:6
225:16,18 232:14 239:16

**relates**
99:7 191:10

**relation**
162:7

**relationship**
27:6 32:17,19 33:1 89:17 107:6
121:10,14 122:9,11,16 123:13,16

128:9 137:1 140:7 184:2,20

**relationships**
65:4 120:14,19,23,25 122:5,6 124:16
159:11

**relative**
131:14

**relevant**
14:6 113:6 165:23 180:8

**relied**
19:13 106:5 111:7,8 117:10 152:12,
15,19 199:22

**rely**
27:3 106:3 152:14,21 223:8

**remainder**
241:4

**remarking**
139:19

**remember**
60:23 63:4

**remind**
7:9 37:14

**remote**
206:12

**remove**
112:9

**removed**
112:5

**removes**
111:16 115:9

**rendered**
139:11

**repaying**
224:13,17

**repeat**
15:14 40:21 89:4 96:10 110:12 138:13
151:17 153:8 186:6 192:16 210:11
233:4 236:20

**rephrase**
125:8 160:14 174:5

**replace**
125:4,12,25 126:4,5,10 127:3,17

**replaced**
114:23 125:24

**replacement**
126:23

**replacing**
127:11

**reply**
189:18,20,24

**report**
12:20 14:12,15 62:2 73:13,17,20,25
74:3,6 106:22 107:1,5,7,8,9,15,20
108:20 109:3,6,11,17,23,24 110:1,17,
20,23 111:7,9 117:19,24 151:11,14,
19,22 152:1,3,4 196:24 218:3 239:20
240:1,5,6

**reported**
64:15 73:18,22 74:5 90:15 96:21

**reporter**
5:14 190:18

**reporting**
90:21 145:14 218:11

**reports**
73:23 111:9 152:16,21,22 175:9

**represent**
28:2,4 83:17 95:23 96:9,18,24 98:15,
16 99:14 102:25 111:2 198:4 226:7
227:16

**representative**
5:10 9:3 74:17,20,21 215:8

**represented**
19:17 76:3 120:9 199:19

**representing**
6:9 160:7 178:20 207:8

**represents**
95:24 109:17 115:14 116:24 157:20
217:13

**reputation**
225:13

**request**
13:11,14 53:9 83:8,13,19 84:12,13,15
86:7 87:4 93:13 154:21 155:1 194:2
195:12 207:23 226:22 231:11,15,21,
22

**requested**
83:1,3 84:18,23 85:3 101:3 129:20
233:23 234:13

**requesting**
85:11 86:1

**requests**
25:16,24,25 26:1,2,6,8,17,20,22 27:2
32:1 35:6 38:15 40:14 52:20 118:15

181:5,7 183:5 207:20

**require**
69:22

**required**
91:18 145:8,19 146:9,18 179:23 212:1

**requirements**
159:16

**requires**
117:9 159:7,21

**reserve**
227:13 229:15 241:3

**reserves**
227:1,12 228:1,5,21 229:2,5,11,16
230:14,20,25

**residual**
205:1 206:8,9

**resolutions**
54:6

**resources**
49:11,22 159:8,22

**respect**
19:9 22:6 103:6 190:25 225:14

**respectfully**
211:22

**respond**
25:15,23 26:6,18,21,24 27:1 39:8
42:24 43:14,25 44:3 52:15 55:15
83:14 177:14 178:15 189:8,14 194:21
212:14

**responded**
172:6 176:13 177:20 178:19,24 181:5
189:10 190:10 194:18,25 204:14,17

**responding**
30:13 32:1 35:5 36:2 38:15 40:14
52:20 118:14 176:15,23 189:12
207:19

**response**
26:13 31:20,21,25 35:9 37:19,20
43:18 53:9 75:5 83:19 84:14 87:5
91:25 108:3 180:11 190:22 191:11
197:21 208:13 210:14,15 212:4
231:25

**responses**
9:9 176:19 207:15

**responsibilities**
70:21,25 71:1 72:2,6,8,9 87:22 117:18

**responsibility**
61:14 72:12,13 73:9 95:5

**responsible**
49:2,3,5,14,16,18,23 50:11,13 51:10
58:17 62:22 101:7 122:11,19 123:14
137:22,25 138:17

**responsive**
20:17 25:18 26:19 47:14,20,24 48:3
89:10 207:23 237:5

**restate**
92:23 225:22

**result**
17:14 101:9 102:10 178:16 220:17,25

**resulted**
93:4

**results**
21:3

**retained**
30:9 38:22

**retention**
11:4 13:3,4 17:5,12 38:21,23 39:7,10
48:8,16,21,24,25 49:2,4,6,7 50:5 51:2,
4 238:3

**retire**
60:8

**return**
193:19 200:11

**returned**
21:5,14 213:7

**returning**
21:2

**revenue**
11:1 12:8,9,10,24 13:1 14:5,9,13,16
100:20 102:1 121:17,21 160:4,22
161:3,5,20 163:19,20 165:5,7,9
169:16 170:3,7,19 171:2,13 172:22
173:5,10,14,20 174:1 175:15,24
188:21,24 189:1,3,4,5 192:23 194:6,
12,16 204:10,12 212:16 213:2 221:25
222:18

**revenues**
84:21 164:21,23 192:21

**review**
12:24 13:16 14:19 16:12,17 17:21
18:20 20:5 32:9 33:25 39:5,7 46:14,18
48:22,25 53:17 55:3 73:10 107:10
119:11 142:19 148:6 158:12 178:6

183:16 185:4 186:12 207:21 215:23
216:3 218:19,20,21 223:20 227:5

**reviewed**
10:21 11:7,17,20 12:8,10,14 13:5,10,
18 17:18 19:13 20:8 25:23 26:5 32:9,
11 33:24 42:1 44:9 46:13,21 47:7 49:9
53:19 54:13,22 55:2 72:25 73:5 81:3
94:16,17 106:17,19,23 109:18,19
119:13 128:21 131:4 136:23 142:14
147:20,24,25 148:2,4,8 149:1,3
150:17,22,25 154:21 158:3,14 215:21
216:4,8 223:22 227:7

**reviewing**
11:2 49:14 73:6 96:7 216:11

**reviews**
103:7 218:16

**Richard**
6:14

**right-**
47:4

**rippling**
200:19,22

**risk**
206:18

**role**
54:16,18,19 61:22 64:18 70:18,19,23
71:23 72:1,6 77:22 78:20,21,23 80:14
87:18 89:8 111:22 112:15 114:14,22
118:25 122:17 124:24 125:3 134:2,4,
5,14 135:4 139:1,3

**roles**
53:25 54:14 113:23 114:24 115:16
116:7,10,12 117:1 135:13 215:22
216:2 219:1,2

**room**
9:11,12 16:4,6,8,15 63:18,20 118:4,6,
7,8,10,11,16

**rose**
179:25

**routed**
195:23

**rule**
7:22 19:11

**rules**
7:10

**run**
52:11,25 53:11

**running**
221:15

**Russ**
106:9 203:18

---

**S**

**Saas**
162:23 172:8

**Sachs**
177:18,24 178:7,9,10

**sake**
74:4 118:11

**Salaries**
215:25

**salary**
111:17 112:6 216:13,15 217:17
219:22 226:21

**sale**
182:11,12 183:13 197:10,14,25
200:24 201:9 202:7 208:20,25

**sales**
59:25 61:11 166:23,25 178:13 179:22
201:7 236:11,24 237:13

**San**
182:8

**satisfaction**
198:22

**satisfied**
88:13

**Saturday**
9:15,16,17,18 13:25 14:2,4,19,24
15:2,6,8,10,11 17:9

**scan**
30:22,25

**scenario**
133:5

**Scharff**
74:16

**schedules**
38:24

**Schmidt**
59:4,23,24,25 60:10 67:19

**scope**
6:21 7:15 21:2,13,20 25:4 30:12 33:15
129:5 138:4 141:23 155:24 156:8

**Scott**
70:9,17

**search**
17:2,4,8,14 20:21 21:2,5,6,9,10,13
26:18 36:1 37:17 38:1,10,11 46:18

**searched**
17:5,6 23:6,10,17,18 28:9 29:5,12
31:8,16 34:12 35:5,8 36:4,7,10,22
37:7,10,15 38:10,14 39:25 40:8,13
46:20 52:16

**searches**
17:9 31:4,13 37:18,20,21,23 52:7,11,
13,17,23 53:1,6,7,8,10,11

**searching**
26:10 28:23

**second-to-last**
140:13

**secretary**
71:20 92:19 134:1

**section**
111:13,15

**securities**
229:13

**security**
49:8,9,24 50:1,12,13,15

**seek**
19:16

**seeking**
102:15 223:13

**SEG**
108:23 111:11 112:5 182:24 183:4,5,
7,9,24 185:9,20 187:3,15 213:15
214:22

**SEG_00000094**
208:4

**Seid**
70:9,17

**sell**
168:13,21 174:3 193:14 200:10
209:11 212:9 235:16

**selling**
123:10 204:18 205:4 209:14 210:4

**send**
141:17 174:23 178:10 190:2

**sending**
42:11 136:17

**senior**
  64:10

**sentence**
  55:22 56:14,16,18 115:22 156:20
  158:24 159:2 193:12

**separate**
  14:12 135:14,17,19

**separately**
  137:16

**September**
  39:19,21,22 56:7,9,18 57:4,12,15,20
  64:3 146:6,8 166:1 186:13,18 214:6
  235:25

**Serensits**
  108:8

**serve**
  60:1 131:19,20 134:9

**served**
  58:19

**server**
  32:18

**servers**
  32:15

**service**
  35:22 36:14,21,25 37:5 88:2 99:21
  162:11,16,19 164:9 166:18,24 167:2,
  10,12,13 230:8

**services**
  36:20 37:2,24 125:12 126:12,18,25
  127:1,3,9,11,18 139:5,9,11,14,15
  163:11,12,13 221:2 230:9 238:5
  239:7,9,10

**servicing**
  88:13

**serving**
  49:21 113:9 132:4 133:22 134:8 136:3

**sessions**
  18:5

**set**
  18:7,11 102:11 199:5 207:16 219:25
  224:11 225:9 237:9

**setting**
  218:7

**seven-figure**
  226:21

**shame**
  225:17

**shamed**
  225:20

**share**
  98:4 197:11 198:9,25 199:10

**shared**
  34:25 35:4 118:12 224:19

**shareholder**
  133:4 140:17

**shareholders**
  191:1

**shares**
  92:20 93:5,11,16 180:18 181:2
  197:13,25 199:19 225:3,11 226:3
  231:2,5,10 234:20

**sharing**
  71:15

**sheet**
  142:16,19,21 144:19

**shift**
  159:1,3,6,17,18,19,21,24

**shifting**
  159:25

**short**
  176:4 220:3 221:15

**show**
  160:22 223:4 226:11

**showed**
  145:14

**showing**
  138:22

**shown**
  112:4

**shows**
  217:12

**side**
  41:12 160:1,18 161:3 162:1

**sign**
  81:4

**signature**
  81:5,7 91:18

**signed**
  80:15,17,23 81:1,2

**significant**
  200:17 204:24

**significantly**
  76:17

**similar**
  17:22 18:11 44:18 68:16,19 76:1
  124:1 179:8 216:7

**simplest**
  241:12

**simplify**
  191:13

**simply**
  198:23

**simulation**
  126:22

**simultaneously**
  226:4

**single**
  35:13 219:3

**singular**
  57:10

**sister**
  233:20

**sit**
  97:13,14 98:6 100:9 105:6 118:23
  129:18,21 132:7 136:24 142:7 151:9
  179:9 196:19 199:16 220:22

**sitting**
  110:1

**size**
  204:9

**sizzle**
  188:22

**skipped**
  42:9

**Slack**
  30:23 32:7 35:21,24 36:3,8,11,12,13
  37:6,12

**slow**
  130:10

**slowing**
  169:9

**small**
  50:23

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Corporate Rep of Widen Enterprises, LLC
November 06, 2023Index: Smartimage..statements

**Smartimage**
100:17,25 101:2,4

**Smartimage's**
101:1

**Smartsheet**
203:6 204:4

**smell**
218:18

**sniff**
218:23

**software**
88:2 108:22 148:12 159:11 160:1,2,7,
10,11,17,20,23,24 161:3,21 162:1,10,
16,17,18,24 163:1,3,6,9,11,14,20
164:9 166:18,23 167:2,10,12,13,14
172:22 173:5,13,20 174:1,2 175:15,
16,24 176:1 182:4,6,7,10,11,12,16,17
183:2 187:15 189:1,3 222:21 238:3

**sold**
41:19 77:5 162:21

**solely**
161:5 207:5 238:19

**solicitation**
235:25

**solicitations**
235:16,20,24 236:2

**sophistication**
109:17

**sort**
10:13 21:18

**sorts**
40:4 205:10

**sought**
130:20 199:23 230:15

**sounded**
184:15

**sounds**
50:10 184:14 226:10

**source**
66:8 67:7 173:8 218:24

**sources**
26:2,11 31:25 32:5 38:13 106:3
213:16

**space**
44:17 160:10,11 170:13 190:9

**speak**
15:12 16:21 26:25 218:18 220:10

**speaking**
40:21 64:23

**specializes**
182:10

**specific**
10:20 21:6 27:9 35:4 45:20,22 46:11
77:7 79:20 80:8 88:23 97:25 98:7
100:9 102:7 119:21 134:10 144:9
148:5 155:8 163:15 178:3 189:10
216:21 218:24 220:20 223:6,13
227:13 228:16

**specifically**
82:21 85:25 86:22 94:20 96:19 98:18
106:6 152:21 171:5 177:9 182:11
183:3 207:8 210:23 215:23

**specificity**
97:1 99:10

**specifics**
168:24

**spectrum**
127:10

**speculate**
117:9 212:1

**spend**
9:19 127:9

**spending**
102:14 156:9

**spent**
9:8,10,16,17 10:1 15:10 16:7,9,16

**spoke**
15:18 53:19 54:10 94:15,20 119:25
128:20 147:20,22 177:16 184:19
192:3 209:4,7 212:12 227:9

**spokesperson**
26:25

**spreadsheets**
34:10

**spring**
108:24

**Stacy**
5:8,19 6:10 52:1 54:24 55:19 58:4,6
65:12 77:22,23 78:16,21,25 79:3,18,
21 80:3,11,14,17,18,23 81:1,2,9,15,21
82:1,9,13,14,16 83:3,15,25 84:8,14
85:2,21,24,25 86:2,6,11 87:4,14

91:12,15,21 92:5 93:3,10,13,14,17
147:10 156:12 179:18 180:3,4,13
181:1,6,12,16 197:7,13 199:1,11
231:5,8,11,16,21,24 232:3,5,20
234:13,20,21

**Stacy's**
78:23 85:7,12 87:6 91:17 92:20
143:11,18 180:18 197:25 198:10
199:18 224:24 225:3,11 226:3 228:14
231:2

**stage**
221:13

**stake**
172:1,15,16,23 177:2,10 235:21

**stamp**
46:22 47:1 81:5

**stamped**
110:7

**stance**
43:13

**stand**
96:16

**standard**
177:8 178:12 179:22 183:12

**standards**
38:23

**start**
8:24 9:22 25:14 27:9 56:25 61:2 63:15
65:21 86:5 89:22 205:18 227:12 228:5

**started**
32:17,19 41:24 42:13 45:12 64:14
176:19,23 182:20,21 184:3 187:8
202:6 206:17

**starting**
57:15

**state**
5:12 6:12 54:11 172:21 188:19
193:12,19 196:11

**stated**
27:3 71:14 120:2 131:16 169:8 177:9
186:20 202:11,16,23 222:9

**statement**
56:9 83:18 112:13 114:5,14 115:16
117:11 136:10,17,23 177:4

**statements**
40:6,7 86:5,6,10 103:1,9,17 147:20,23
165:3 229:8

**states**
144:4 158:24

**Statesman**
187:14 213:15 214:18

**status**
64:11 70:24 227:11

**stay**
179:1

**step**
91:9,10 92:7,10 93:4 133:3 208:15
210:14

**stepped**
92:1,18

**stepping**
70:19

**steps**
22:7 25:17 52:18 180:16,24

**Steven**
83:9,14,19

**Stewart**
54:23 59:2,21 60:10 67:19 79:8,18
80:1,4 81:8 82:1

**stock**
140:19 143:7,9,10,11,12,14,16,18,19
198:12 199:2,12,20

**stop**
59:5 69:22 161:10 174:13

**stopped**
27:25 41:22

**stored**
22:13 34:5,7,11,14,19 40:13,19 46:10

**straight**
7:11

**straight-up**
188:23

**strategic**
95:2 96:2,3,5,15,20 97:2,6,9,23 98:1,
8,10 100:4,7,10 120:2 159:8

**strategy**
77:12,15,20 88:4 96:7 99:6 192:13

**strengthening**
159:10

**Strike**
64:2

**structure**
34:12,17,21,25 35:2 114:1 115:19
116:14,18,22 124:25

**subject**
75:22 184:24 203:21,24 205:12

**submit**
187:17

**subsequent**
74:22 102:23 124:4 130:17 139:8

**subsequently**
130:22 203:17 210:5

**subset**
13:17

**substantial**
140:20,25 141:6 142:11,25

**substantially**
89:14

**substantive**
34:14,15 208:13

**success**
61:13

**succession**
195:10 235:1,4,8,10,11 238:9

**suggest**
133:24

**suggestions**
98:25

**sum**
233:22 234:15

**summary**
76:4 158:22 223:23

**summer**
163:8

**Sunday**
15:21 16:1 17:10

**sunsetted**
163:4 222:19,23

**supplementing**
52:24

**supplied**
72:15

**support**
88:3

**suppose**

89:9

**surface**
103:14 239:18

**surrounding**
122:8

**sustain**
161:22

**sustainability**
162:5,8 164:10

**sustainable**
161:19 164:12,13

**swear**
5:14

**Sweet**
50:7

**switch**
32:15

**switched**
38:18

**sworn**
6:2

**systems**
25:17 38:19

---

**T**

---

**table**
146:22 216:4,6,11

**tables**
112:4

**tactical**
102:19,21

**tactically**
102:24 103:2

**taking**
8:19 43:13 62:23 68:5,10,17,18 69:9,
10 70:23 71:4 188:1

**talk**
41:24 87:18 94:6 119:6 133:15 235:13

**talked**
49:13 51:1 52:7 71:8 86:14 95:22
115:3 124:21 132:12 179:4 205:5
220:13 232:12 235:17 237:15 240:18

**talking**
7:17 10:3 18:24 19:15 52:18 54:7,8

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023** Index: tandem..titled

64:1 71:16,17 72:2 109:25 126:11
135:1 161:12 188:15 201:9

**tandem**
101:21 224:24

**target**
102:10,11

**task**
32:4

**tasks**
27:9

**tax**
137:13 140:17 190:25

**taxable**
215:25 217:17

**taxes**
140:17

**team**
9:17 49:8 60:20,24,25 61:3,14,16,18,
25 62:3,4,8,14,19 63:2,6,14,17,19,21
64:5,7,8,11,13,14,16,17,21,23 65:3,5,
9,13,17,24,25 66:5 67:4,8,10,18 68:4,
8,9,17 71:12,19,23 72:18 73:13,17,18
126:6 148:22 185:14 186:3 195:23
205:13

**Teams**
10:14 36:19

**technology**
61:23 230:8

**telling**
8:17 86:21

**template**
73:3

**ten-minute**
93:23 176:4

**tense**
166:5

**tenure**
64:23 67:16 73:1 74:12 75:4 77:15,20
100:1

**term**
46:24 111:5 122:9 157:3

**terminated**
78:8

**terminology**
137:3

**terms**
13:21,24 20:18 21:2,5,6,9,11,13 86:17
137:6 160:4

**Terry**
64:22 67:18

**test**
218:23

**testified**
6:2 17:18 45:5 52:22 164:6,7 175:14
202:5 239:2

**testify**
6:24 24:20,24 25:10,21 48:14 52:4
53:15 94:11,13 119:9,12 128:16 132:7
136:25 147:17 148:7 158:17 191:23,
25 192:1 196:6 215:15 223:17,21
227:2,5 239:25 240:4,15,23

**testifying**
7:5 8:13 17:17 105:20 216:12 220:22

**testimony**
19:19 20:23 21:12 25:9 28:7,14 29:9
33:7 39:6 52:24 77:18 120:4 124:7
130:19 151:9,14,25 152:4,10 153:2
165:14,19 166:6 167:22 184:15 206:7
209:8 215:18 231:8 235:3 238:17
240:8,22

**text**
31:2 36:16,17 37:12

**thing**
148:4

**things**
7:10,11 40:4 63:25 71:7,14 103:3
126:3 142:21 152:19 179:16 207:23
218:17,25 225:7 239:11

**thinking**
83:21 101:22 102:22,23 143:14,20
170:16 194:4,14

**Thornton**
106:20,25 107:1,4,7,14,17,19 108:7,
15,18,22 109:1,5,20,22 110:14,19,21
111:1,4 112:5,7,17,19,20 113:1
116:20 117:4,5,10,14,15,16,23 118:2,
3,4,12,18,20 119:1 124:22 184:4
238:7

**Thornton's**
111:7,8

**thought**
161:14 179:25 187:10 197:20,23,24
198:2,5 199:11 217:24

**threads**
189:18,20,24

**three-month**
83:10,18,23 85:17

**Thursday**
23:24

**Tilly**
74:18,20 104:13,15 105:2,5,7,22
106:1,5,6 193:8 198:18 199:3,4,6,23
200:8 201:24 203:19 212:6 217:21,25
218:4,6,12 220:1 238:6,11,14,18,23
239:3,5,7,11,14,17,18,20,25 240:7

**Tim**
74:21,22

**time**
5:6,12 7:20 9:17,19 16:5 28:1 31:9
32:14 41:19,23 45:6,10 50:23,25
52:14 56:25 57:3,12 58:7,23 60:23
61:1,3,15,16 62:15 64:5,9,12 65:6,11,
15,20,22 67:15 68:8 69:5,6,20 70:3,6
71:21 73:2,14,15,16,21 74:8,17 77:6,
13 79:19 83:3,25 85:20 87:25 88:21,
22 89:10,21 90:3 91:15 95:24 98:16
99:17 101:3 120:16 121:4,9 124:15
125:21 127:13,18 134:11 143:15,17,
20,21,22,24 144:23 148:4 152:8 156:9
157:10 159:4 160:15,19 161:25 162:3,
13,15,19 163:7,19 165:12,18,21
169:14 178:23 180:2 185:15,16,20,23
186:10,12,14 196:20 197:10 199:25
200:20,22 201:23 204:18,23 205:8
206:3,11 209:5,18,22,23 210:3 212:3
213:8,23,25 214:2 221:15 222:4
225:18 226:11 228:14 229:17 230:5,
18 233:22 234:15 235:8 237:15,19
241:4

**timecards**
40:25 41:18,19,22

**timeframe**
196:9,14

**times**
7:9 77:23 90:3 95:17,18 105:18
140:18 141:3 142:10,17 143:8 170:7
171:1,12,13 172:22 173:4,13,19 174:1
175:15,24 188:18,21 189:2,5 204:11
230:6 231:13

**timing**
163:7,8

**titled**
64:9 111:13 156:18 172:1

**today**
5:24 6:9,15,24 7:12 8:13,17,24 17:23
18:21,25 19:6,15 24:12,24 25:10
97:13,14,18 98:6 100:9 105:6,20
118:23 119:21 129:19,22 132:7
136:24 138:5 139:23 142:7,19 147:17
151:9,25 158:3 161:11 165:14,20
166:6 167:22 179:10 188:19 196:19
199:16 211:13 216:8,12 217:9 220:22
239:25 240:23 241:2,6

**today's**
5:5 42:2 158:4

**told**
28:20 29:19,21,23 41:11 49:13 134:17
231:12,23

**Tom**
59:4,22 60:10 67:19

**tool**
35:24

**top**
126:25

**topic**
24:16 25:8,10,14,22 48:7,14,23 51:15,
23 52:4 53:14,15,17 55:15 76:24
88:24 94:6,11,14 97:16 103:15 104:22
117:21 118:22 119:6,9,12,20 127:20
128:7,9,17,19 129:17,23 136:16 138:5
140:6 147:13,17,19 148:7 149:3
155:4,16 156:4 190:23 191:11,19,23
192:2 211:5 215:11,16,19 217:8
220:11 222:3 223:15,18,21 226:25
227:3,6,25 228:11 234:25 235:9,11,16
236:10,13,15,16,21,23 237:5 238:4
239:6,10 240:17,21,23

**topics**
6:22,25 9:9 10:1,2 13:16,17,18,20,22
14:7 18:13,24 19:14 24:14,20,25 25:5
43:23 62:25 63:12 69:3 75:18,24 76:1
82:3 90:2 94:18 96:23 105:25 119:25
120:10 157:12 239:10 241:5

**total**
113:21 127:2 216:17 217:16 222:18
241:14

**touched**
48:12

**tracked**
136:6,9,10

**tracking**
115:22 128:10 130:17 136:13 138:1
140:8

**transacting**
166:22 192:19

**transaction**
128:21 171:8 201:1 203:4,7 204:3
206:2

**transactions**
128:11 130:16,18 131:4 136:4,5,14
138:1,19,23 140:9 142:14 144:9
173:21 234:23

**transfer**
130:1,3,22,24 132:17 133:16 140:14,
15 141:1,7 142:17 143:8 145:20
146:16,18

**transferred**
129:25 140:21 142:4,12 143:1 144:5,
13 145:17 146:25

**transfers**
131:1 132:13 137:4,5,9 147:10,11

**transformation**
159:7,21

**transmitting**
182:23 183:7

**treasurer**
131:20 133:25

**treated**
136:14,16 137:12

**trenches**
95:5

**triggered**
224:16

**trouble**
32:25

**true**
6:17 11:14 29:16 109:6

**trusted**
208:8 210:15

**truth**
8:17 156:7

**truthfully**
8:20

**turn**
51:22 111:10 147:13 156:17 223:15

**turned**
9:25

**Turning**

48:7 119:5 226:25

**twenty**
38:18

**two-week**
196:9

**typed**
144:20

**types**
34:9 75:18

**typically**
43:16,18 62:13 88:20 90:12

---

**U**

**Uh-huh**
126:16

**ultimately**
88:18 92:18

**unable**
28:22,24 105:6,21 118:24 119:3 132:7
136:25 137:9 142:6 239:25 240:15

**uncertainty**
200:17 202:4 203:8 204:24 224:8
232:14

**underneath**
115:7

**understand**
6:9,17,19 8:2,4,6,13 11:11,14 13:13
14:8 17:16 18:2 19:8 21:12,16,18
24:18 25:2 26:16 28:7,14,18,20 29:9
30:8 31:5 34:2 35:21 47:1,4 52:22
63:9 64:4 68:3 77:17 86:20 111:20
112:13,19 113:24 115:18 116:13
120:4 130:19 137:21 155:15 161:2
178:8 193:23 197:21 199:9 213:12
218:15 226:16 240:8,21

**understanding**
30:16 72:17 217:11 231:15

**understands**
112:20

**understood**
8:10 16:25 26:23 52:18 53:4 59:11
137:18 161:15 174:19 197:9 209:8
234:9,11

**undertake**
159:16

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
**November 06, 2023Index: undertaken..week**

**undertaken**
208:3

**unit**
65:1,4 88:1 163:5 222:19,20

**unknown**
86:17

**unsure**
188:22

**unwilling**
232:4

**update**
14:12,14 43:4,12 45:16,20 46:1,5,7
81:20 82:9 83:4 171:4,7 188:6 227:22

**updates**
10:25 11:5,6,10,12,13,16,19 12:4 13:2
14:4,10,17 17:6,7 41:25 42:5,6,12,13,
16,21 43:1,10,16,24 44:3,9,15,20,22
45:1,6 46:4,8,10,20,21 47:7,9 63:10,
23 76:2,3 81:15,18 82:15 83:1,25
85:21,25 86:3,4 87:13 90:1,11 94:16,
19 102:22,24 119:13,24 120:7 148:1
149:6 168:3,16 169:22 170:10,11
171:21 189:11,19,21,25 197:2,3
222:9,12 223:2,4,10,14,22 226:8
227:7 228:24

**user**
34:22,24 35:4,18

**utilize**
135:19

**utilized**
36:20 37:4,6,24 173:19

---

**V**

**validate**
157:17

**valuable**
149:22 150:5

**valuation**
150:25 151:2,4 152:16,20,22,25 153:6
154:14 155:1 156:21 166:1 173:19
188:13,20,24 189:4,9,15 190:4 192:8
193:21 194:3,11 197:1,4 198:16
210:1,2 213:9,11,16,17 215:4 238:11,
14,18

**valuations**
147:14 152:12 155:17 168:1 174:11
186:24 191:21 238:22

**valued**
155:13 157:1 172:21 173:6,13

**values**
167:20

**Van**
5:18

**varied**
50:23

**variety**
20:21 26:11 34:9 88:10 94:18 127:17
168:2 218:25 236:3

**varying**
45:6

**vendor**
30:17 37:14

**vendors**
25:25 27:3,4,7

**ventures**
172:25

**verification**
22:3

**verify**
22:1,4 24:5 30:15 33:6 60:13 85:4
137:4 144:1,18

**versa**
191:5

**version**
111:1,2

**versus**
233:22

**Vial**
64:22 67:18

**vice**
191:5

**videoconferencing**
10:13 36:25

**view**
152:7 164:8

**Virchow**
198:18

**virtually**
15:4,5 63:21

**vote**
54:25 80:25

**voted**
54:20

**VP**
50:6 59:25

---

**W**

**wages**
112:8,9

**Wagstaff**
50:9

**Wait**
56:16

**wanted**
117:22 176:16

**wanting**
148:23 233:20

**Waters**
9:4,24 17:18 18:3 30:6 69:19,21 70:1
91:16,22 92:3,8,11,14,16,19 128:10,
12,24 129:11,12,20,24 130:1,4,8,18,
20,23 131:9,15,21 132:14,18 133:1,
14,15,16,23,25 134:6,14 135:5,10,11,
14,20,22,25 136:1,6 137:2,25 138:1,
20 139:2,4,5,9,12 140:6,10,15,21,22
141:2,7,8,10,19,20,25 142:2,12,13,18
143:1,2 144:5,13,22,24 145:9,17,25
146:7,9,16,19,25 147:6,9 149:14,21,
23 150:2,4 151:1,4,15,20,22,23 152:3,
5,12,15,20,22,24 153:4 154:14,23
155:5,7,14 156:10 157:4,7,9,16
190:23 191:4,15 198:16 199:14,22
215:4 233:1 238:15,19,22

**Waters'**
7:2 19:19 91:1,4,8,9,13 140:7 149:17,
18,20 150:22,25

**ways**
121:3 165:2

**Web**
230:9

**Webdam**
170:18 171:8 173:8,10 188:16

**Webdam's**
170:18

**week**
19:22 21:21 22:10,13 89:3,6,15 90:3
95:18 194:22

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Rep of Widen Enterprises, LLC**
November 06, 2023Index: weekend..years

**weekend**
9:8,10 46:13,19 47:8 53:21

**Weekes**
184:3

**Weekly**
62:12 68:15

**weeks**
90:5 196:9

**weighing**
102:2

**Whatsapp**
36:18

**Widen**
5:8,11 6:16,21 9:2 10:1,25 17:25 18:1,
4,16 22:24,25 23:5 24:21 25:3,4,14,
16,22 29:24 30:5 31:22 32:12,13,14,
15 33:5,15,18,21 34:3,5 36:12,14,20,
21 37:24 38:13,17,18,22 39:24 40:1,3,
4,19 41:12,19 44:11 47:12,21 48:8
49:1,5,22 50:17 51:1,3,6,7,24 52:1,3,
19 54:9,11,23,24 55:17,19,21,23 56:3,
5,10,19 57:1,3,5,6,11,17,18,22,23
58:4,6,9,14,16,18,19,20,25 59:2,21,22
60:5,10,11,14,16 61:4 62:16 65:1,16,
23 67:3,19 69:15,17,18,22 70:2,12,15,
21 71:3,6 72:3,22 73:8,16 74:1,3,5,6,
8,9 75:23 76:16,18,21 77:5,6,12,15,
18,19,22,24,25 78:7,17,20,22,25 79:1,
3,4,7,8,18,19,22,23,24 80:1,2,5,18,20,
24 81:10,11,12,16 82:10,15 84:1
85:21,24 87:19,23 89:3,17,23 90:12,
16,18,24 91:3,6,7,9 94:7,10,25 95:1,7
96:5 97:3 98:8 99:17 100:13 101:12
108:14 109:7,21 110:13,18,21,25
111:6,8 112:2,25 113:1 114:8,12,24
117:3,7,16,22 118:24 119:1,3,7,8,14,
23 120:6,13,20 121:3,8,18,22 122:18
123:3,4,22 124:3 125:1,3 126:12,17,
18 127:3 128:9,11 129:10,12,19,25
130:1,4,6,7,9,18,20,23 131:2,7,8,15,
17,22 132:13,16,18,21,22 133:6,10,
11,14,17,23 134:13 135:4,6,7,8,13,22
136:2,6,24 137:1,17 138:2,18,19
139:14 140:7,9,14,20,25 141:5,8,21
142:1,2,4,11,17,25 143:21 144:5,6,12,
14,21,23 145:3,7,17,18,24 146:1,6,10,
14,19 147:1,5,15 148:21 149:7,9,12,
14,16,18,20,22,23 150:1,3,5,7,10,14,
15,18,20,23 151:3,6,7,10,13,20,21,23
152:2,6,7,8,11,16 153:2,4,5,13,14,18,
24 154:4,5,18,20 155:6,9,12,14,17,19
156:14 157:2,9,19,21 158:19,25
159:3,5,16,25 160:10,11,15,16
161:12,25 162:9,10,21,22,24,25
163:1,19,21 164:8,14,17,21 165:10,
11,13,14,20,21 166:4,6,7,17 167:16,
22,24 168:12 169:15 170:6 172:16
173:3 175:18,21,23 176:22,24 177:3,
13 178:1 179:2,4,11,13,18 180:3,12,
16,17,24,25 181:5,11 182:15,17
183:6,17 185:21,23,25 186:10,15,18
187:9,18 188:6 190:2 191:4,9,15,21
192:6 195:18 196:21 197:2,6,9,14,23,
25 198:2,4,8,12,23 199:2,5,9,11,14,
16,22 200:5,16,23 201:1,7 202:6
203:15,17 204:23 205:3,4 208:19
209:3,25 210:6,7,10 211:12,14 212:7,
23,25 213:9,11,12,14,18,23,25 214:9
215:5,6,9,13 217:14 218:11,12 219:7
220:12,16,23 221:2,7,19,22,23,24
222:1,5,17,24 223:10,17,25 224:3,6,9,
13,16 225:1 226:20,25 227:6,11,17,25
228:13 229:2,4,10,13,15 230:15
231:8,9,16,18,20 232:1,18,25 233:2,4,
5,11,14 234:14,21,24 235:1,3,5,10,17,
21 236:12,24 237:10,11,13 238:12,13,
15,17,21,25 239:4,6,13,22 240:2

**Widen's**
21:25 36:10 94:9 164:23 165:5,7
178:8 192:23 199:20 216:13 217:18,
19 218:13 228:4 232:4 235:5 239:21
240:2,7

**wife**
235:14

**Wildcat**
106:18,19,24 110:15 124:21

**Windy**
7:2 9:3,24 17:17 18:3 19:19 30:6
69:19,21 70:1 90:25 91:4,8,9,13,16,22
92:2,8,11,14,16,19 128:10,12,24
129:10,12,20,24 130:1,4,8,18,20,23
131:9,15,20 132:14,18 133:1,14,15,
16,23,25 134:6,13 135:5,10,11,14,20,
22,25 136:1,5 137:2,25 138:1,19
139:2,4,5,9,12,15,16 140:5,6,10,15,
21,22 141:1,7,8,10,19,20,25 142:2,12,
18 143:1,2 144:4,13,22,24 145:8,16,
25 146:7,9,16,19,25 147:6,9 149:14,
17,18,20,21,23 150:2,4,22,25 151:1,4,
15,19,22,23 152:3,5,12,15,20,21,24
153:3 154:14,23 155:5,7,13 156:10,17
157:4,7,9,16 190:23 191:4,14 198:16
199:14,22 215:4 232:25 238:15,19,22

**Wisconsin**
5:4 55:23

**withheld**
47:12,22

**Wolff**
106:9 203:18

**word**
34:9 161:7

**words**
124:9 166:23

**work**
19:4 20:4 29:24 30:12 41:1,9 57:1
89:22 101:20 102:18 119:7 120:5
121:15 127:7,13 176:21 206:12,14
239:12

**work-product**
25:19

**worked**
22:9 89:3 90:19 184:9,11

**working**
9:8,25 10:2 33:5 57:16 125:2

**works**
189:2

**worry**
153:1

**worth**
153:19,25 210:7 213:24 214:1

**write**
204:2

**writing**
49:14 104:20 105:3,5,8,22 106:2
120:21 132:5,6,9,11

**written**
14:18 43:15 49:7 62:13 76:7 104:21
211:3,4,6 219:8,13,14,17 239:20
240:1,5,6

**wrong**
113:2 116:21 164:7 190:3

**wrote**
112:17,19 160:15 171:5,7 224:25
226:8,10

**Y**

**year**
75:9,11 125:22 163:15 164:19 166:8
189:1 227:23

**years**

For the Record, Inc. | 888-892-0392 | office@FTRMadison.com
www.FTRMadison.com

38:18 39:2 49:23 172:6 177:14 179:11
193:19 195:10 196:12,15 201:11,15,
23 202:2,11,16,24 205:6 216:2

**years'**
206:3 209:18 235:8

**yesterday**
9:13 16:21 204:4

---

**Z**

---

**Zoom**
10:14 36:19,21,22,24