# In the Matter Of:

*Stacy L. Randall v. Reed C. Widen, et al.*

---

*Corporate Representative of Windy Waters, Inc.*

*November 03, 2023*

---



Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

**Page 1**

```
            UNITED STATES DISTRICT COURT

            WESTERN DISTRICT OF WISCONSIN

_____

STACY L. RANDALL,

            Plaintiff,

      -vs-                    Case No. 3:22-cv-00400-jdp

REED C. WIDEN, MICHAEL KIESLER,

WIDEN ENTERPRISES, LLC, and

WINDY WATERS, INC.,

            Defendants.

_____

            Video Deposition of MATTHEW R. GONNERING,

as the Corporate Representative of Windy Waters, Inc.,

pursuant to Federal Rule of Civil Procedure Rule 30(b)(6),

taken at the instance of the Plaintiff, before

Peggy S. Christensen, RPR, CRR, a Notary Public in and

for the State of Wisconsin, at O'Neil, Cannon, Hollman,

DeJong & Laing S.C., 111 East Wisconsin Avenue, Suite 1400,

Milwaukee, Wisconsin, on November 3, 2023, commencing at

8:56 a.m. and concluding at 5:05 p.m.
```

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3   REINHART BOERNER VAN DEUREN S.C., by
         MR. MARK A. CAMELI and
 4       MS. MARY MARGARET EVANS,
         1000 North Water Street, Suite 1700
 5       Milwaukee, Wisconsin 53202
             appeared on behalf of the Plaintiff.
 6
 7
         O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
 8       MR. DEAN P. LAING and
         MR. CHRISTA D. WITTENBERG,
 9       111 East Wisconsin Avenue, Suite 1400,
         Milwaukee, Wisconsin 53202,
10           appeared on behalf of the Defendants.
11
12   Also present:  Jon Hansen, CLVS, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                I N D E X                        Page
 2   Examination:
 3   By Mr. Cameli                                   6
 4
 5   Exhibits Identified:                           Page
 6   Exhibit 1     Notice of Deposition, Corporate  11
                   Representative, Windy Waters, Inc.
 7
 8   Exhibit 2     Defendants' Objections and       13
                   Responses to Plaintiff
 9                 Stacy L. Randall's First Set
                   of Interrogatories
10   Exhibit 3     11/3/2023 Notes regarding Topic 1 19
11   Exhibit 4     11/3/2023 Notes regarding Topic 3 30
12   Exhibit 5     10/23/2023 through 11/2/2023     48
                   Emails between counsel, Subject:
13                 Randall v Widen, et al. -
                   Memorializing Conversation on
14                 Rule 30(b)(6) Deposition
15   Exhibit 6     11/3/2023 Notes regarding Topic 8 65
16   Exhibit 7     Declaration of Michael Kiesler   86
17   Exhibit 8     11/3/2023 Notes regarding Topic 9 88
18   Exhibit 9     Defendants' Proposed Findings of 92
                   Facts in Support of Motion for
19                 Summary Judgment
20   Exhibit 10    Windy Waters, Inc. - Class B     93
                   Stock Register
21
22   Exhibit 11    11/3/2023 Notes regarding Topic 6 98
23   Exhibit 12    7/22/2004 Valuation of           99
                   Windy Waters, Inc., prepared by
24                 Bruce Hutler, CFA, ASA, AVA,
                   Virchow Krause Valuation, LLC
25
```

**Page 4**

```
 1   Exhibit 13    11/3/2023 Notes regarding Topic 21 117
 2   Exhibit 14    Shareholder Agreement of         133
                   Widen Colourgraphics, Ltd.
 3
     Exhibit 15    Second Amendment to Shareholder  137
 4                 Agreement
 5   Exhibit 16    5/8/2020 Email from Matthew       165
                   Gonnering to Reed Widen,
 6                 Subject:  Operational Update, May 8
 7   Exhibit 17    Transcript of the 9/19/2023 Video 174
                   Deposition of Michael J. Kiesler
 8
     Exhibit 18    ITR Economics, EVP Flex December 180
 9                 2020 report on Widen
10   Exhibit 19    11/3/2023 Notes regarding Topic 11 186
11   Exhibit 20    11/3/2023 Notes regarding Topic 17 201
12   Exhibit 21    11/3/2023 Notes regarding Topic 7 206
13   Exhibit 22    Minutes of the 2019 Annual       210
                   Meeting of the Shareholders of
14                 Windy Waters, Inc.
15
16
17
18      (The original exhibits were attached to the original
           transcript and PDFs were provided to counsel)
19
20
21
22
23
24           (The original transcript was filed with
              Attorney Jessica Hutson Polakowski)
25
```

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 5

1 　　　　THE VIDEOGRAPHER:  Good morning.
2 　We are now on the record.  My name is
3 　Jon Hansen, CLVS.  I'm the videographer today
4 　with For the Record, Madison, Wisconsin.
5 　　　　Today's date is November 3, 2023.  The
6 　time is 8:56.
7 　　　　This video deposition is being held in
8 　the matter of Stacy L. Randall vs. Reed C.
9 　Widen, et al., Case No. 22-cv-400-jdp.  The
10 　deponent this morning is the corporate
11 　representative of Windy Waters.
12 　　　　The court reporter today is Peggy
13 　Christensen, also from For the Record.  At
14 　this time if the court reporter could swear
15 　the witness after the introductions of
16 　counsel.
17 　　　　MR. CAMELI:  Good morning.  On
18 　behalf of the plaintiff, Mark Cameli and
19 　Mary Margaret Evans of the Reinhart Boerner
20 　Van Deuren firm.
21 　　　　MS. WITTENBERG:  Good morning.
22 　Christa Wittenberg and Dean Laing of O'Neil,
23 　Cannon, Hollman, DeJong & Laing for the
24 　defendants.
25

Page 6

1 　　　　MATTHEW R. GONNERING, called as a
2 　　witness, being first duly sworn, testified on
3 　　oath as follows:
4
5 　　　　　　EXAMINATION
6 BY MR. CAMELI:
7 Q　Will you please state your full name for the record.
8 A　Matthew Richard Gonnering.
9 Q　Good morning, Mr. Gonnering.  My name is Mark
10 　Cameli.  I think we've met before.  I represent
11 　the plaintiff in this case.
12 　　　　And I understand you're here today because
13 　Windy Waters has designated you to testify on
14 　behalf of Windy Waters about one or more topics;
15 　is that correct?
16 A　Correct.
17 Q　And I know you've been deposed before in this
18 　case.  But other than this case, remind me, how
19 　many other times have you been deposed?
20 A　Zero.
21 Q　And have you ever been designated as a witness to
22 　testify on behalf of an organization such as a
23 　corporation or LLC?
24 A　I have not.
25 Q　Okay.  So this is the first for you in that regard?

Page 7

1 A　Correct.
2 Q　These have been covered with you previously, but
3 　I'll just rattle through them just by way of
4 　making sure that this goes as smoothly as possible.
5 　　　　I don't want us to talk over each other, and
6 　so it's most helpful if you can also respond
7 　verbally using words, not a nod or shake of your
8 　head.
9 　　　　So if you don't understand something that I'm
10 　asking, just say so.  Do you understand that?
11 A　I do.
12 Q　Okay.  If you do answer, I'll assume you
13 　understood my question, and if you need to take a
14 　break at any time, just let me know, and we can do
15 　that.  Okay?
16 A　Okay.
17 Q　All right.  If you realize later that you forgot
18 　something to include in some earlier response,
19 　just let us know, and we'll see about correcting
20 　that.  Okay?
21 A　Okay.
22 Q　And you're going to have an opportunity to read
23 　your transcript that's being taken today and make
24 　transcription corrections.  Do you understand that?
25 A　I do.

Page 8

1 Q　And you understand, of course, that you're under
2 　oath today?
3 A　I do.  My microphone just fell off.
4 Q　That's okay.
5 A　Good?
6 Q　And this similar, then, in that regard to
7 　testifying in court under oath.  You understand
8 　that?
9 A　I do.
10 Q　Is there anything that's going to prevent you from
11 　providing me with complete and honest testimony
12 　here today?
13 A　There is not.
14 Q　You don't have any -- I apologize if this is
15 　intruding on you personally.  You're not on any
16 　medications or have any conditions that impact
17 　your ability to answer my questions completely and
18 　honestly?
19 A　No.
20 Q　Nor to understand them?
21 A　No.
22 Q　Good.  So you prepared for today's deposition,
23 　I presume; right?
24 A　I did.
25 Q　And did you review documents?

Page 9

1  A  I did.
2  Q  And can you give me -- we're going to get into
3     this in greater depth later, but can you give me
4     kind of an overview of the type of things that you
5     were looking at with respect to this testimony
6     preparation?
7  A  Uh-huh.  I looked at depositions, previous
8     depositions, the transcripts of those depositions.
9     I looked at some financial statements.  I looked
10    at emails.  I looked at corporate records related
11    to stock and distributions.
12       I met with counsel, with Christa, with Dean,
13    with Mark.  In that same several meetings, we also
14    had Reed and Mike, and I spoke with them as well.
15 Q  Do you know whether any of the documents that you
16    reviewed, whether any of them were not produced to
17    us in the course of discovery to date?
18 A  I am not aware of that.
19 Q  Okay.  And did you review any notes that you had
20    taken or others had taken in anticipation of this
21    testimony today?
22 A  We did assemble notes for this testimony by topic
23    and prepared those notes by reviewing the
24    documents and in conversations with counsel.
25 Q  Okay.  And do you have those notes with you today?

Page 10

1  A  We have some notes, yes.
2       MR. CAMELI:  Okay.  So I would like
3     those produced as part of this testimony.
4     Can we have that done?
5       MS. WITTENBERG:  Well, the way it's
6     set up is if he needs notes, we have them
7     available and then at that time if we do --
8     if he needs them, then, yes, of course, we
9     would be happy to do that.
10      MR. CAMELI:  But I believe that I
11    would be entitled to anything that he
12    reviewed in anticipation of his testimony
13    today.
14      MS. WITTENBERG:  Until it's used to
15    refresh recollection, it's just work product
16    material that we created.
17      MR. CAMELI:  So our position is
18    that if it was reviewed to prepare for
19    testimony, that it should be produced, and if
20    your position is different, that's okay, and
21    I'll respect that.  Is that --
22      MS. WITTENBERG:  Yes.
23      MR. CAMELI:  And is it?
24      MS. WITTENBERG:  And to be clear,
25    and I don't mean to misstate this, it was not

Page 11

1     reviewed in anticipation of today.  It was
2     prepared as notes, as sort of a collective
3     work product while we were preparing and one
4     way to cohesively combine those thoughts was
5     to put it on the paper.
6        So it's not that it was something that
7     existed before the prep began.  So I
8     understand your position --
9       MR. CAMELI:  Yeah.
10      MS. WITTENBERG:  -- and you
11    understand mine.
12      MR. CAMELI:  And I understand yours.
13      MS. WITTENBERG:  Yes.
14      MR. CAMELI:  Very good.
15 BY MR. CAMELI:
16 Q  So I think you identified everyone that you had
17    spoken with in preparation of your testimony
18    today; is that right?
19 A  I did.
20 Q  So what I would like to do now is show you what's
21    been marked as Exhibit 1.
22        (Exhibit No. 1 marked for
23        identification)
24 Q  And Exhibit 1 is a Notice of Deposition of
25    Windy Waters pursuant to Rule 30(b)(6) of the

Page 12

1     Federal Rules of Civil Procedure.  Do you
2     recognize that document?
3  A  By looking at the first page of the document,
4     I see that, yes.
5  Q  Okay.  And I want to take you now to noticed topic
6     number 1.  Do you see that?  It's on page 2.
7  A  Page 2.  Number 1.  I see it.
8  Q  All right.  And I believe that says that one of
9     the topics is Windy Waters' efforts to respond to
10    discovery requests, including Windy Waters'
11    document management systems and steps taken to
12    locate and produce responsive documents, but
13    excluding any attorney-client or work product
14    privileged information.  Did I read that
15    correctly?
16 A  You did.
17 Q  And you prepared to testify on that topic?
18 A  I did.
19 Q  And what documents specifically did you review to
20    prepare for that topic?
21 A  For this topic, I reviewed documents that were how
22    information was asked from counsel over time and
23    the parties that were involved in gathering that
24    information.
25 Q  Okay.  Great.  So we're going to now share with

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

**Page 13**

1  you what will be marked as Exhibit 2.
2      MR. CAMELI: You should take this
3  one.
4      MS. WITTENBERG: Will he need this
5  more?
6      MR. CAMELI: Yes. We'll be
7  referencing that.
8      MS. WITTENBERG: I assumed as much.
9      (Exhibit No. 2 marked for
10      identification)
11  Q  So I'm showing you now what's been marked as
12     Exhibit 2, and do you recognize that document?
13  A  **I recognize it marked as Exhibit 2.**
14  Q  And the first page says Defendants' Objections and
15     Responses to Plaintiff Stacy L. Randall's First
16     Set of Interrogatories. Do you see that?
17  A  **I do see that.**
18  Q  Okay. And would this have been a document that
19     you reviewed in anticipation of your testimony
20     here today?
21  A  **I would have reviewed it by skimming it.**
22  Q  Okay. Who at Windy Waters was involved in
23     responding to these requests?
24  A  **The responses to these requests would have been**
25     **prepared by counsel and involved conversations**

**Page 14**

1     with Reed and Mike and me.
2  Q  Was there anyone else involved in terms of being
3     consulted for the responses, other than those that
4     you've just identified?
5  A  **There is specific items in here perhaps that may**
6     **have involved others. I do not know that by just**
7     **casual observation here. But those were the main**
8     **people. Additional people at Holland & Knight**
9     **were also involved.**
10  Q  And I guess I'm more interested in knowing who at
11     Windy Waters would have been involved.
12  A  **Understood. So just those three, then. Reed,**
13     **Mike, and me.**
14  Q  Okay. And for Widen Enterprises, as well, did
15     anyone from there assist?
16      MS. WITTENBERG: I'm going to
17      object to that as being outside of the scope
18      of the topic for the Windy Waters deposition
19      today.
20      MR. CAMELI: Sure. Thank you.
21  Q  You may answer that, if you know.
22  A  **My affiliation with Widen Enterprises.**
23  Q  Okay. Were the same people -- was it the same
24     people that you just identified for Windy Waters
25     that would have been involved, as well, in

**Page 15**

1     answering these interrogatories?
2  A  **Yes.**
3  Q  Okay. Would your answer be the same with respect
4     to who was involved in locating responsive
5     documents to this?
6  A  **So people who were not counsel, yes, it would be**
7     **Reed and Mike and me. Yes. We would have**
8     **retrieved documents on request of counsel.**
9  Q  Did you employ the services of a computer forensic
10     person to assist you in searching any electronic
11     media?
12  A  **Through counsel, counsel would pull in third**
13     **parties to gather certain data requests, yes.**
14  Q  Okay. And do you know who those third parties
15     were?
16  A  **There was a consulting firm with Holland & Knight**
17     **that they chose, which was called FTI Consulting,**
18     **and there was another consulting firm or a firm**
19     **that Holland & Knight chose, which was called**
20     **CohnReznick. So those were two third-party data**
21     **collection providers.**
22  Q  Great. Now, I want to talk about what was
23     actually searched. Why don't you tell me what you
24     understand in terms of devices that were searched
25     in order to respond to these requests.

**Page 16**

1  A  **There was a device that would be Mike's laptop**
2     **that was searched. There were mobile devices.**
3  Q  You're referring to Mr. Kiesler?
4  A  **Correct.**
5  Q  Okay.
6  A  **There were mobile devices, Reed's, Mike Kiesler's,**
7     **and Matthew Gonnering's, mine, that were searched.**
8  Q  And what do you call a mobile device more
9     specifically? Phones? Tablets? Notebooks?
10  A  **A phone. A phone.**
11  Q  Phones?
12  A  **Yep. Phones were searched, yes.**
13  Q  Okay. Go on.
14  A  **There was a Google Drive that was searched, which**
15     **is a place where documents would be stored.**
16  Q  Uh-huh.
17  A  **There was an account in a system called Box that**
18     **was also searched. So that's the laptop, those**
19     **were the phones, the Google Drive, and Box. There**
20     **were also Slack messages that were searched.**
21     **There were emails that were searched as well.**
22  Q  And Slack messages, any other form of a text
23     message related content?
24  A  **Text messages would have been searched as part of**
25     **the phone, yes.**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 17

1  Q  Any servers belonging to Windy Waters searched at
2     all?
3  A  There were no -- the servers would have been.
4     Google Drive would have been.  You may consider
5     that a server.  There were no other servers.
6  Q  I understand.  And was there anything related to
7     Widen Enterprises that was searched in connection
8     with these responses?
9  A  Anything related to, that would have been the
10    emails, the Widen.com emails for Reed and Mike and
11    me, and Widen information would have been part of
12    the other -- would have been part of the laptop,
13    would have been part of the Slack messages.
14 Q  Oh, what about paper files?
15 A  Yes.  Mike did provide paper files to counsel on
16    request as well.
17 Q  Are you aware of whether there were any specific
18    responsive documents that were withheld based on
19    claims of privilege or any other objection?
20 A  I'm aware that all responsive documents have been
21    provided and continue to be provided.
22 Q  Okay.  So just to be clear, my question is whether
23    any were withheld that you're aware of, really for
24    any reason.
25 A  I'm not aware of any.

Page 18

1          MS. WITTENBERG:  And just for the
2       record, Mark, we did produce a privilege log,
3       so I don't know if he's necessarily familiar
4       with that.
5          MR. CAMELI:  Privy to that.
6          MS. WITTENBERG:  Yeah.  He may not
7       have known that himself.
8          MR. CAMELI:  So those would have
9       been accounted for on the privilege log?
10         MS. WITTENBERG:  Right.
11         MR. CAMELI:  Okay.  Perfect.
12 BY MR. CAMELI:
13 Q  Are you aware of any responsive documents that
14    were not produced because they may have been
15    destroyed in the ordinary course of business?
16 A  I'm aware of a setting on Mike Kiesler's phone
17    that was deleting text messages that were older
18    than a certain time period.
19         MS. WITTENBERG:  I didn't want to
20       interrupt your flow, but since he is looking
21       at it now, these are some notes that were put
22       in front of him about some of these issues,
23       and there is a copy for you.
24         MR. CAMELI:  Okay.
25 A  Yeah.  Due to the settings prior to the

Page 19

1     litigation, Mike's text messages from the year
2     prior to the September 20 of 2021 litigation hold
3     had auto deleted.  That auto deletion setting was
4     disabled when the litigation hold was provided.
5  Q  Okay.  So let me ask, then, the document that was
6     just provided to me and that you are reviewing,
7     and we'll mark this --
8          MS. WITTENBERG:  We'll mark this
9       one?
10         MR. CAMELI:  Yeah.  That would be
11      great.
12         (Exhibit No. 3 marked for
13          identification)
14 Q  That's Exhibit 3; is that right?
15 A  Yes, it is.
16 Q  And these are notes that were prepared and
17    reviewed by you that pertain to topic 1; is that
18    correct?
19 A  That's correct.
20 Q  All right.  I just want to talk about this
21    deleting function on Mr. Kiesler's phone.  Was
22    that ever disabled at any point?
23 A  It was disabled when the litigation hold was
24    received.
25 Q  And so presumably, then, all emails from a year

Page 20

1     before that and forward -- excuse me, messages
2     from a year before that and forward would still be
3     preserved; is that correct?
4  A  Presumably, yes.
5  Q  All right.  So the other -- two days ago we
6     received some additional documents, and yesterday
7     we received -- last night we received some
8     additional documents.  Do you understand why that
9     happened and how that happened?
10 A  I understand that we did -- we provided emails
11    early based on the search terms, and there may
12    have been some export complexity related to Mike
13    Kiesler's email that was requiring us to go back
14    and redo that because there were things that were
15    not appearing in the first export.  And so counsel
16    worked with the IT department at Acquia to go back
17    and gather all of those emails again.
18 Q  When was this anomaly discovered?
19 A  I am not prepared to provide an exact date for
20    that.  I would say --
21 Q  Approximate --
22 A  -- recently.
23 Q  -- would be okay.  Recently?
24 A  Recently.
25 Q  So in the last -- would it have been less than

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 21

1    30 days?
2  A  I'm not prepared to provide that.  So --
3  Q  Okay.  Were there any other reasons that documents
4     were recently produced to us, meaning last evening
5     and two days ago?
6  A  Any other reason that they would have been
7     produced recently would have been because they
8     were responsive documents, so that then the
9     realization that they may not have been produced
10     prior.
11  Q  Yeah.  And I appreciate that.  I'm asking, though,
12     about whether there were any other reasons why
13     they weren't produced earlier.  You mentioned an
14     anomaly in the search of Mr. Kiesler's data.
15  A  Yeah.
16  Q  Was there any other glitches or other reasons why
17     they weren't produced earlier?
18  A  Not that I'm aware of.
19  Q  So all of this is a reflection of the explanation
20     you've just provided concerning Mr. Kiesler's
21     data?
22  A  Correct.
23  Q  Okay.
24  A  We also went and retrieved Mr. Widen's data at the
25     same time to verify that that was also done.

Page 22

1     So --
2  Q  And what was the result of that retrieval?
3  A  That it was all there initially.
4  Q  So everything that was responsive was provided?
5  A  Yes.
6  Q  Is that your testimony?
7  A  Yes.
8          MR. CAMELI:  Okay.  So I think it
9     makes sense for us to state on the record
10     here that memorializes the correspondence
11     from last evening, that we're reserving our
12     right to continue this deposition to explore
13     topics related to these recent productions.
14          I understand that counsel for the
15     defense has said that they may object to
16     that, and if there is anything further on the
17     record you wish to state, feel free to do so.
18          MS. WITTENBERG:  Sure.  Thank you.
19     And to be clear on what you are stating is
20     that you're reserving the right to, as we
21     understand it, continue a portion of the
22     deposition to explore specifically the
23     documents that were produced yesterday
24     evening.  Is that the understanding?
25          MR. CAMELI:  Yesterday and two days

Page 23

1     ago.
2          MS. WITTENBERG:  And two days ago.
3     Understood.  We may oppose it, we may not,
4     but thank you for stating that on the record.
5  BY MR. CAMELI:
6  Q  Okay.  Let's move to topic 2.  And why don't you
7     reference the Notice of Deposition, Exhibit 1,
8     that I gave you previously, and the bottom of
9     page 2 says that we are going to be talking with
10     you today about Windy Waters' document retention
11     policies that were effective during, or
12     implemented between, 2015 to the present.  Did I
13     read that correctly?
14  A  You did.
15  Q  And did you prepare to testify with respect to
16     topic number 2?
17  A  I did.
18  Q  And what documents did you review to prepare for
19     testifying on behalf of Windy Waters with respect
20     to this topic?
21  A  I reviewed the document retention policy that
22     Windy Waters adopted.
23  Q  Do you know if that policy was produced?
24  A  I believe that it was.
25  Q  Do you know when that policy was implemented?

Page 24

1  A  It was in effect for the time period requested,
2     which was 2015 to present.
3  Q  Was it ever suspended?
4  A  No.
5  Q  So upon receiving the litigation hold in this
6     case, was anything changed with respect to the
7     document retention policy you just referenced?
8  A  Upon receiving the litigation hold was anything
9     changed with respect to that document retention?
10     No.
11  Q  Do you know if that referred at all to the
12     deletion of data after a prescribed period of time?
13  A  There were references in that policy related to
14     deleting certain records after a certain period of
15     time, yes.
16  Q  And did I understand you to say that that did
17     not -- that was not suspended after the litigation
18     hold was provided?
19  A  Correct.
20  Q  So after the litigation hold was provided,
21     Windy Waters continued to delete data that met
22     the criteria of the policy?
23  A  Yes.
24  Q  Okay.
25  A  Well, wait a minute.  Let me pause there.  After

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

---

Page 25

1    the litigation hold, we would have not deleted
2    information that was related to the litigation
3    hold, and in that respect it would have -- it may
4    have suspended some of those.
5  Q  Because the litigation hold was very broad, and so
6    I would be interested in knowing what documents
7    you didn't suspend from the litigation hold.
8  A  Yeah.  Which is why I was incorrect in that.  So
9    the document -- the retention policy would have
10   been suspended when receiving the litigation hold
11   to comply with the litigation hold.
12 Q  All right.  So that I'm clear -- and I appreciate
13   you correcting that -- was there anything that was
14   excepted from, in other words, that you didn't
15   suspend, the document retention policy for?
16 A  Can you repeat that?
17 Q  Sure.  I'll try to rephrase it to make it even
18   clearer.
19 A  Yeah.
20 Q  Was there any sort of documents that you continued
21   to destroy, any sort, any sort of documents that
22   were part of Windy Waters that you continued to
23   destroy consistent with the document retention
24   policy after the litigation hold was received?
25 A  Not that I'm aware of.

Page 26

1  Q  How was the litigation hold itself transmitted to
2    employees, directors, officers, or anyone
3    affiliated with Windy Waters?
4  A  It was received by counsel and provided to
5    Windy Waters' affiliates at that time, Windy Waters.
6  Q  Okay.  Do you know if anyone wasn't provided the
7    document hold, the litigation hold?
8  A  I'm aware that everyone with Windy Waters'
9    affiliation was provided the document, the
10   litigation hold.
11 Q  Thank you.  All right.  Let's move to topic -- I
12   want to combine topics 3 and 8 for a moment.  And,
13   again, reference your Notice of Deposition,
14   Exhibit 1, and noticed topic 3 reads, "The
15   organization, management, and governance of
16   Windy Waters, including, without limitation, the
17   involvement of each of Stacy Randall, Reed Widen,
18   Matthew Gonnering, and Michael Kiesler in the
19   management and/or governance of Windy Waters."
20   Did I read that correctly?
21 A  You did.
22 Q  And you prepared testimony -- for your testimony
23   today on that topic?
24 A  I did.
25 Q  And what documents specifically did you review to

Page 27

1    prepare for testifying about that topic?
2  A  I reviewed corporate records of Windy Waters.
3  Q  Anything else?
4  A  Not that comes to mind at the moment.
5  Q  Do you think you would have looked at
6    correspondence at all related to this topic?
7  A  I may have.
8  Q  Let's look at topic 8.  And that refers to the
9    election of officers and directors from 2004
10   through 2020.  Did I read that correctly?
11 A  You did.
12 Q  And you prepared your testimony to that topic as
13   well?
14 A  Yes.
15 Q  And what documents did you review to prepare for
16   testifying on behalf of Windy Waters about this
17   topic?
18 A  The corporate records of Windy Waters.
19 Q  Anything else?
20 A  Not that I recall at this moment.
21 Q  Did you speak with anyone in connection with
22   preparing for your deposition on topics 3 and 8
23   other than your counsel?
24 A  I spoke with Reed and Mike and counsel collectively.
25 Q  Everyone was in the same room?

Page 28

1  A  Yes.
2  Q  Okay.
3  A  Or phone calls, multiple.
4  Q  And those conversations, again, were with legal
5    counsel present?
6  A  That's correct.
7  Q  All right.  Tell me, what is Windy Waters as an
8    entity?  How would you describe it?
9  A  I would describe Windy Waters as a holding company.
10 Q  For what?
11 A  For assets.
12 Q  And what assets?
13 A  Windy Waters was a holding company for an asset
14   that was referred to as Widen Enterprises, which
15   is an operating entity, and also for another asset
16   that was investments.
17 Q  And could you be a little more specific about what
18   you mean by an asset that was for investments?
19 A  Marketable securities that Windy Waters managed.
20 Q  How did those marketable securities get into
21   Windy Waters' control or oversight?
22 A  They would be at times provided from the operating
23   entity, Widen Enterprises.
24 Q  Were they provided from any other source other
25   than Widen Enterprises?

---

Stacy L. Randall v.                    **Video Deposition of Corporate Representative of Windy Waters, Inc.**
Reed C. Widen, et al.                                                          **November 03, 2023**

Page 29

1   A   Not to my knowledge.
2   Q   Was there any other assets that were held by
3       Windy Waters?
4   A   Other than Widen Enterprises and marketable
5       securities?
6   Q   Yes, sir.
7   A   Not to my knowledge.
8   Q   All right.  Are you familiar with a Widen UK?
9   A   I am.
10  Q   Was that part of Windy Waters?  Was that held by
11      Windy Waters?
12  A   That was part of Widen Enterprises.  So I would
13      not deem that part of Windy Waters since it was
14      held by Widen Enterprises.
15  Q   Okay.  And as such, because Widen Enterprises was
16      held by Windy Waters, it would be held by them via
17      that relationship; is that correct?
18  A   That would be correct.
19  Q   When was Windy Waters formed?
20                  MS. WITTENBERG:  I have a copy here
21          too, Mark.
22                  MR. CAMELI:  Thank you.
23                  MS. WITTENBERG:  Do you want to
24          have the court reporter --
25                  MR. CAMELI:  Yeah.  Let's just have

Page 30

1           it marked.  Yeah.  That's a good idea.  We're
2           at 4?
3                   COURT REPORTER:  Yes.
4                   (Exhibit No. 4 marked for
5                    identification)
6   Q   So your counsel has given you a document
7       identified as Exhibit 4.  Do you have that in
8       front of you?
9   A   I do.
10  Q   And does this purport to be notes regarding topic
11      number 3?
12  A   It is.
13  Q   And are these notes that you prepared to assist
14      you with your testimony here today?
15  A   These notes were prepared collectively with
16      counsel in preparation for today.
17  Q   All right.  And did you also involve any other
18      parties other than your counsel in preparing these
19      notes?
20  A   Reed and Mike.
21  Q   Okay.  So who owns Windy Waters?
22  A   The shareholders.
23  Q   I'm not sure if you answered, when was
24      Windy Waters formed?
25  A   1997.

Page 31

1   Q   And who are those shareholders that own
2       Windy Waters?
3   A   I believe that is another topic that we also
4       prepared.
5   Q   Okay.  Would you need to look at anything in order
6       to answer that question?
7   A   I would like to look at the stock register to make
8       sure that I am providing accurate information.
9   Q   Okay.  Well, we'll come back to that later, then.
10      Without regard for percentages owned by
11      particular shareholders, do you know who those
12      people are, who those entities are off the top of
13      your head, or do you prefer that we wait to look
14      at that?
15  A   I would prefer to wait to look at the register.
16  Q   Okay.  Were the shareholders members of the Widen
17      family or key employees of Widen Enterprises?
18  A   Yes.
19  Q   Were they both?
20  A   At various times, it was only the Widen family,
21      and then key employees were introduced at a later
22      point.
23  Q   Key employees of Widen Enterprises?
24  A   Correct.
25  Q   Were you ever an officer or director of

Page 32

1       Windy Waters?
2   A   I was not.
3   Q   And despite that, though, you are the appointed
4       representative of Windy Waters as their corporate
5       representative for today's testimony?
6   A   That is correct.
7   Q   Why do you think that is?  Why are you the
8       appointed representative?
9                   MS. WITTENBERG:  Objection.  Vague.
10          Calls for privileged information.  I'm going
11          to instruct you not to answer anything that
12          would have been a communication between us
13          about why you're here today.
14  Q   So let me rephrase that question.  Are you here
15      today because of your role as CEO of Widen
16      Enterprises?
17                  MS. WITTENBERG:  Same objections
18          and same instruction.
19                  MR. CAMELI:  All right.  So you are
20          instructing the witness not to answer that
21          question?
22                  MS. WITTENBERG:  I'm instructing
23          him not to answer anything that would be a
24          communication between counsel and our client
25          with respect to why he was chosen as the

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 33

1          designee.
2               MR. CAMELI:  Got it.
3    Q   All right.  So respecting counsel's wishes here,
4         can you answer the question of whether you are
5         here as a designee for Windy Waters because of
6         your role as CEO of Widen Enterprises?
7               MS. WITTENBERG:  You can answer to
8         the extent that you know anything outside of
9         what we told you in communications.
10   A   **I'm here today because counsel asked me to be**
11       **here.**
12   Q   All right.  Let's go to the next -- we're going to
13        stay on the same topic, but where were
14        Windy Waters' offices between 2004 and 2020?
15   A   **Windy Waters' offices between 2004 and 2020 were**
16       **located at 6911 Mangrove Lane in Monona, Wisconsin.**
17   Q   Those were shared offices with Widen Enterprises;
18        isn't that correct?
19   A   **That is correct.**
20   Q   Widen Enterprises rented that office space from
21        Millmont; is that correct?
22   A   **That is correct.**
23   Q   Did Windy Waters pay rent for its use of those
24        offices to Millmont?
25   A   **I did not expect that question here, and I do not**

Page 34

1        have that.
2    Q   That's fine.  Did Windy Waters pay rent for its
3        use of those offices to Widen Enterprises?
4    A   **Same response.**
5    Q   You don't know the answer to that?
6    A   **I didn't prepare for that, not expecting that line**
7        **of questioning.**
8    Q   Did Windy Waters pay for its office supplies?
9    A   **I did not anticipate this question related to the**
10       **topic.**
11   Q   Okay.  So do you not know the answer?
12   A   **I do not.**
13   Q   Did they pay for their own computers?
14              MS. WITTENBERG:  I'm going to
15        object here.  I know the witness has
16        expressed this already, but this seems to be
17        getting outside of the scope of the topic,
18        and so I'm going to object that this is
19        beyond the scope and any testimony that he
20        would give would be individual and not the
21        company's testimony.
22              MR. CAMELI:  So your objection is
23        noted.  I do believe that it is within the
24        scope of the topic because these are relevant
25        inquiries as to the organization, management,

Page 35

1        and governance of Windy Waters.
2               So I want to re-ask it, and if counsel
3        wishes to instruct the witness not to answer,
4        then that's what we'll do.  I will abide by
5        that.
6    Q   So did Windy Waters pay for its own computers?
7               MS. WITTENBERG:  I will assert the
8        same objection.  I'm willing to give a little
9        bit of flexibility here and just preserve
10       that objection for later.  Our position is it
11       would be his personal testimony if he knows
12       personally.
13              MR. CAMELI:  Okay.
14   Q   You may answer if you can.
15   A   **I don't know personally.**
16   Q   Okay.  Do you know in your capacity as a
17        representative of Windy Waters whether it paid for
18        its own computers?
19   A   **I do not.**
20   Q   What about with respect to payment for staff,
21        cleaning, and maintenance?
22              MS. WITTENBERG:  Objection.
23        Compound.
24   Q   Sure.  Did Windy Waters pay for its staff?
25   A   **I'm thinking of staff and wondering what staff**

Page 36

1        we're referring to.
2    Q   Employees.  Anyone --
3    A   **Windy Waters had -- go ahead.  Sorry.**
4    Q   Go ahead.  Did they not have staff?  Maybe we
5        should start with that.  Did it not have any
6        employees?
7    A   **There were officers of Windy Waters, and can you**
8        **go back to your question then with respect to --**
9    Q   Sure.  Did Windy Waters pay for any of its staff?
10       And I want you to think of staff broadly.
11   A   **Windy Waters paid directors' fees to officers.**
12   Q   Okay.  Did it pay for the cleaning of its office
13        spaces?
14              MS. WITTENBERG:  I'm going to
15        object on the same basis as before.  Just to
16        this line of questioning on specific expense
17        items, I'll object again, and we'll have
18        this -- you can answer if you can, if
19        you know personally.
20   A   **I do not know personally.**
21   Q   And, finally, did it pay for the maintenance
22        required of its rented space, it meaning
23        Windy Waters?
24   A   **Again, personally, I do not know that.**
25   Q   Do you know in your capacity as a representative

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 37

```
1        of Windy Waters whether that's the case?
2    A   I did not expect this line of questioning, so I
3        did not prepare for that.
4    Q   Do you know, were there any staff or anyone other
5        than the directors' fees that you mentioned
6        earlier that was paid at all by Windy Waters?
7    A   I do not.
8    Q   How many employees did Windy Waters have?
9    A   Windy Waters had officers so --
10   Q   And who were they?
11   A   We did prepare the list of officers, I have with
12       Exhibit 4, Stacy Randall being a director of
13       Windy Waters between a certain date range.  So she
14       was director between 1998 and May 13, 2020.  In
15       that window of time, she was the side director,
16       from 2015 to May 13 of 2020, and she was also the
17       president of Windy Waters from 2007 to May 13, 2020.
18           Currently Reed is the sole director and
19       president of Windy Waters.
20   Q   Anyone else?
21   A   Mike Kiesler has been the secretary of
22       Windy Waters since 2007 and then the treasurer
23       since 2003.
24   Q   Okay.  After now reviewing Exhibit 4, are you able
25       to offer any testimony as to how many employees
```

Page 38

```
1        Windy Waters had?
2    A   What do you mean by employees?
3    Q   People who were employed by Windy Waters to work
4        there to support it.
5            MS. WITTENBERG:  I'll object to the
6            extent that it calls for a legal conclusion
7            as to who constitutes an employee.
8    A   Yeah.  The management of Windy Waters was limited
9        in terms of its operations.  So the officers and
10       directors were the only people who were affiliated
11       with it.
12   Q   So there were no W-2 paid employees of Windy Waters?
13   A   Not to my knowledge.
14   Q   Okay.  With respect to the officers or directors
15       of Windy Waters, did they use Windy Waters email
16       addresses when they corresponded?
17   A   Not to my knowledge.
18   Q   Rather, they used the Widen Enterprises email
19       addresses; is that correct?
20   A   Some would have used Widen email accounts.
21   Q   What other accounts would they have used?
22   A   I'm unaware that Stacy Randall would have had a
23       Widen email account.  So I do not know what
24       account she may have used.
25   Q   So with the exception of Stacy Randall, did the
```

Page 39

```
1        officers, directors then all use Widen Enterprises
2        email accounts?
3    A   To my knowledge, yes.
4    Q   What time of day did Windy Waters' officers and
5        directors perform their jobs?
6            MS. WITTENBERG:  I'm going to
7            object to this as outside of the scope of the
8            topic, but, again, this is one where I'm
9            willing to give a little leeway and just
10           preserve that objection here if you want to
11           answer if you know.
12   A   Yeah.  I, again, did not expect this line of
13       questioning related to this topic.  I would say
14       that whenever a task needed to be completed, it
15       would have been completed.
16   Q   So is it fair to say, then, that Windy Waters'
17       officers performed their duties to Windy Waters
18       while simultaneously working their normal paid
19       jobs at Widen Enterprises?
20           MS. WITTENBERG:  Objection.
21           Misstates testimony.  Answer if you can.
22   A   The tasks performed by the officers of Windy Waters
23       were performed as needed.
24   Q   Yes, but did they perform them while working as
25       part of their jobs at Widen Enterprises?
```

Page 40

```
1            MS. WITTENBERG:  Same objection.
2    A   They performed them when there was a task that
3        needed to be completed.
4    Q   So is it that you don't know whether they
5        performed those while working their normal paid
6        job at Widen Enterprises?  Because you haven't
7        answered my question.  I'm just curious as to why.
8            So my question, I want to repeat it.  Did
9        they perform their duties as they arose while
10       working their normal paid jobs at Widen Enterprises?
11   A   I would say they did their jobs for Windy Waters
12       as needed at whatever time they were needed to be
13       performed, and whether that was middle of the day
14       or into the evening, that was -- the job was done
15       that needed to be done at whatever time it needed
16       to be delivered.
17   Q   Were there any resources that Windy Waters
18       provided its officers or staff that were not owned
19       by Widen Enterprises?
20           MS. WITTENBERG:  I'm going to
21           object again that it's outside of the scope
22           of the organization, management, and
23           governance of Windy Waters.  And I know
24           Matthew Gonnering took, I believe it's seven,
25           just about seven full hours of his testimony
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 41

1    here.
2         Again, I'm trying to work with you here,
3    but we're going to reach a point where we're
4    going to be cutting him off.  If you know
5    individually, go ahead and answer.
6  A  Can you repeat the question?
7  Q  Sure.  I'll rephrase that.
8         Did Widen -- excuse me.  Did Windy Waters
9    provide all the resources that were required of
10   its officers and staff or were those resources
11   provided by another entity, such as Widen
12   Enterprises?
13              MS. WITTENBERG:  Same objections
14        and object to it being vague as well.  But
15        go ahead.
16  A  Personally, I do not know who provided those
17    resources.
18  Q  Who directed the activities of Windy Waters'
19    officers or employees?
20              MS. WITTENBERG:  Objection.  Vague.
21  A  Can you be more --
22  Q  Can you answer it?
23  A  Can you be more specific?
24  Q  Yeah.  Who oversaw Windy Waters' officers and
25    employees?

Page 42

1              MS. WITTENBERG:  Again, object to
2        form as vague, but go ahead if you can.
3  A  By way of time, so in current state, the
4    president, which is Reed, oversees Windy Waters
5    and the officers, and the same would be true in
6    previous time periods by way of the role of the
7    president.  They would oversee the organization
8    and officers.
9  Q  Okay.  So I'm going to try and phrase it another
10    way.
11        Who had management authority over
12    Windy Waters' officers and employees?
13              MS. WITTENBERG:  And I'll object
14        to the extent that it calls for a legal
15        conclusion, but go ahead.
16  A  Generally, the president of the organization is
17    responsible for that.
18  Q  And that would have been Reed Widen?
19  A  At various points it would have been Reed.  At
20    other points it would have been Stacy.
21  Q  Tell me the points that Stacy would have had
22    management authority over officers and employees
23    of Windy Waters.
24              MS. WITTENBERG:  And, again, I'll
25        object to the extent that it's calling for a

Page 43

1    legal conclusion, but go ahead.
2  A  Stacy was president of Windy Waters from 2007
3    until May 13, 2020, so in that timeframe.
4  Q  Okay.  So did Stacy -- would Stacy then have
5    directed Mr. Kiesler to refuse Windy Waters buying
6    back $50,000 worth of her shares?
7  A  Can you repeat that?
8              MR. CAMELI:  Sure.  Will you please
9        repeat that?
10              (Question read)
11  A  Would Stacy have refused Mike to buy back her
12    shares?  Stacy, in her role as president, would
13    have presidential duties related to that, and she
14    would have had oversight over Mike in his role as
15    treasurer and secretary.
16  Q  So she -- you're saying she had the authority to
17    direct Mr. Kiesler in May of 2020 to determine
18    whether her shares, $50,000, would be bought back
19    by the company or not, is that what you're saying?
20              MS. WITTENBERG:  And, again, I'm
21        going to object that it calls for a legal
22        conclusion, but go ahead, if you know.
23  A  The role of the president would be to have that,
24    and the role of the treasurer in this case would
25    be to determine if that was feasible.  But

Page 44

1    ultimately Stacy would have had, in her role as
2    president, the president would have oversight
3    over --
4  Q  She had the -- she would have had the authority to
5    direct those types of buybacks; correct?
6              MS. WITTENBERG:  And, again,
7        objection that it calls for a legal conclusion.
8  Q  If you know.  If you know.  If you don't know it,
9    you don't know.
10  A  Yeah.  In her role as president, that would be my
11    understanding.
12  Q  Okay.  On May 13 of 2020, what was Reed Widen's
13    role at Windy Waters?
14  A  Reed was sole director and president of
15    Windy Waters from May 13, 2020, to present.
16  Q  And what about before?
17  A  He did not have a role at Windy Waters as an
18    official capacity but did provide input based on
19    his familiarity with the organization.
20  Q  How else would you describe his role prior to
21    May 13 of 2020 at Windy Waters?
22              MS. WITTENBERG:  Objection.  Vague.
23        But answer if you can.
24  A  I would say that because this was his role at
25    Windy Waters based on his familiarity with

For the Record, Inc. | 888-892-0392 | office@FTRMadison.com
www.FTRMadison.com
Pages 41..44

Page 45

1   Windy Waters and the operating entity of Widen and
2   that it was a family-owned business, that he would
3   provide input where it was needed.
4   Q   Did he have any authority at Windy Waters prior to
5       May 13 of 2020?
6           MS. WITTENBERG:  And, again, I'll
7       object to the extent that it calls for a
8       legal conclusion.  Answer if you can.
9   A   Reed would have provided input into those -- into
10      matters that were related to the family business.
11  Q   But did he have any authority to make decisions
12      about Windy Waters prior to May 13 of 2020?
13          MS. WITTENBERG:  Same objection.
14  A   He did not have an officer or a director role
15      before that.
16  Q   And prior to May 13 of 2020, did you ever observe
17      him exercise management control over decisions of
18      Windy Waters?
19          MS. WITTENBERG:  Objection.  Are
20      you asking him individually, for an individual
21      capacity information?
22          MR. CAMELI:  Both, really.
23      Whatever the basis of his knowledge is.
24  A   I observed Reed making decisions in a management
25      capacity when decisions needed to be made and no

Page 46

1   other people were making those decisions.
2   Q   Again, we're talking about prior to May 13 of
3       2020; is that correct?
4   A   Correct.  That's correct.
5   Q   All right.  Did Reed Widen ever direct operations
6       at Windy Waters before May 13 of 2020?
7           MS. WITTENBERG:  Objection.  Vague.
8   A   I wouldn't say that Windy Waters had operations.
9       There were very little management responsibilities
10      there, so I wouldn't consider it operations.  Reed
11      would step in as needed when decisions were needed
12      to be made.
13  Q   Did Reed Widen tell Mr. Kiesler not to buy back
14      $50,000 of shares of Stacy Randall's that belonged
15      to Windy Waters?
16          MS. WITTENBERG:  Object to it being
17      outside the scope of the deposition topics
18      here.  If you can point to one this is under,
19      I could maybe -- let me know, but I think
20      we're to the point where we've approached the
21      boundary and need to say let's move on.
22          MR. CAMELI:  Yeah.  So I would say
23      that this is all part of topic 3.  It goes to
24      the organization, management, and governance
25      of Windy Waters, and those who had -- which

Page 47

1   necessarily means that it concerns those who
2   had decisionmaking authority.
3           MS. WITTENBERG:  What was the
4       question, though?  I may have misheard it.
5       I heard something different.  Can you read it
6       back?
7           MR. CAMELI:  Sure.  Will you read
8       it back, please?
9           (Question read)
10          MS. WITTENBERG:  Okay.  So I've
11      made the objections, but go ahead and give an
12      answer if you can.
13  A   I didn't expect that line of questioning for this
14      topic, so I do not have --
15  Q   Yeah.  So if we look at -- go to your Exhibit 1,
16      which are the topics identified in the Notice of
17      Deposition.  I want to talk about this a little
18      bit more later, but go to item 10, please.
19      So the first topic identified under item 10
20      refers to all stock transactions involving
21      Windy Waters.  Did I read that correctly?
22  A   You did.
23  Q   Okay.  So I'm asking about the stock transaction
24      concerning Stacy Randall's request for the company
25      to buy $50,000 worth of her stock.

Page 48

1   Now, with that in mind, I'm asking if Reed
2   Widen directed Mr. Kiesler or any other party to
3   not buy back Ms. Randall's stock.
4           MS. WITTENBERG:  I'm going to
5       object for the record, and you weren't on
6       these calls, I know, Mark, but we had
7       discussions with counsel that were
8       memorialized in emails about what the scope
9       of this topic was, topic 10 that you just
10      read, where plaintiff's counsel, I don't
11      recall who, explained that they were looking
12      for confirmation of the details in the stock
13      transaction register, correct any details
14      that were wrong, and information about
15      whether the stock price was negotiated, or
16      that person had counsel, and who initiated
17      that sale.  So that was the scope of the
18      topic as it was agreed by counsel, so this
19      question goes beyond that scope.
20          MR. CAMELI:  So I appreciate that,
21      Counsel.  I'm just looking now at the email
22      that you're referencing, and it's item 5.
23      We probably should mark this.
24          (Exhibit No. 5 marked for
25          identification)

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 49

```
1        MR. CAMELI:  If we go to page 7
2   of what's been marked as Exhibit 5, it
3   references on item 5, I believe here,
4   Ms. Wittenberg, that you had written to
5   members of our firm that with respect to
6   item 10 of the notice, you explained you were
7   looking for -- recapping the conversation
8   with our folks, that you were looking for
9   confirmation of the details in the stock
10  transaction register, and any correction of
11  any details that are incorrect, as well as
12  information about whether stock price -- the
13  stock price was negotiated, whether the
14  individuals were represented by counsel, and
15  who initiated the sale, and I believe our
16  response to that were these were examples
17  only and do not limit the topics to these
18  narrow categories.
19       So that's why we're asking this
20  question.  And will you allow the witness to
21  respond to it?
22       MS. WITTENBERG:  Again, I will
23  restate the objection.  I understand what
24  you've pointed me to.  Still, to the best of
25  our ability trying to understand the scope of
```

Page 50

```
1            the topic, we did not understand this to be
2            within it.  If you can answer, go ahead.
3   A   In preparing for topic 10, I did not anticipate
4       that, and I did not expect that.
5   Q   So you don't know the answer -- either in your
6       capacity as a Windy Waters representative or in
7       your individual capacity, you do not know the
8       answer to that question?
9   A   Correct.
10  Q   Now, Mr. Gonnering, you became a shareholder of
11      Windy Waters sometime before 2008; is that correct?
12  A   I believe it was in 2008, and I can refer to a
13      stock register to confirm that.
14  Q   Okay.  Why did you become a shareholder?  Tell me
15      a little bit about how that came about.
16  A   As Matthew -- why did Matthew Gonnering become --
17      why did I become a shareholder?
18  Q   Yes, sir.
19  A   To participate in the ownership of Windy Waters.
20  Q   Yeah.  And, really, Windy Waters and Widen at that
21      time were not distinguishing between themselves
22      for purposes of ownership interests; isn't that
23      correct?
24           MS. WITTENBERG:  Objection.  Vague.
25           Argumentative.  Calls for a conclusion.
```

Page 51

```
1        Answer if you can.
2   A   Windy Waters had owned Widen Enterprises, and
3       Windy Waters also had investments, so there were
4       differences between Windy and Widen.
5   Q   And the sole difference was the assets, the
6       securities that you previously identified;
7       correct?
8   A   The marketable securities, yes.  That was part of
9       Windy Waters.
10  Q   Uh-huh.  So with respect to Mr. Kiesler as
11      treasurer of Windy Waters, would he report his
12      activities with respect to ownership transactions
13      at Windy Waters to you?
14  A   Would he report his transactions of ownership
15      responsibilities to me?
16  Q   His activities with respect to ownership
17      transactions of Windy Waters, would he have
18      reported those to you?
19  A   I don't know that he did, but he would not have
20      had to.
21  Q   Okay.  So he was -- you were his boss at Widen
22      Enterprises; correct?
23  A   Correct.
24  Q   So you had no expectation that ownership
25      transactions of Windy Waters would ever come to
```

Page 52

```
1   your attention that he may have been engaged in?
2   A   I would have known that he was involved in those
3       in my capacity as his manager as the CFO of Widen
4       in that he was performing other tasks related to
5       Windy Waters.
6   Q   And that's really because you were really
7       supervising his actions as treasurer of
8       Windy Waters; right?
9   A   I would be supervising his actions as the CFO of
10      Widen.
11  Q   And having -- and none of your supervisory roles
12      concerned his as treasurer of Windy Waters?
13  A   Correct.
14  Q   Was that always the case?
15  A   In my role as CEO of Widen and his role as CFO of
16      Widen, that was always the case.
17  Q   And what about with respect to Windy Waters and
18      his role as treasurer, did you ever supervise him
19      in that capacity?
20  A   I did not.
21  Q   Okay.  And just so I'm clear on his role at
22      Windy Waters, that is Mr. Kiesler's role, he was
23      treasurer; correct?
24  A   Correct.
25  Q   What did you understand his duties to be as
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

---

Page 53

```
 1    treasurer?
 2  A  His duties as treasurer were financial oversight.
 3  Q  Do you recall when he became treasurer?
 4  A  He became treasurer in 2003.
 5  Q  And you're looking at Exhibit 4 to refresh your
 6     memory on that?
 7  A  Correct.
 8  Q  Was he paid compensation as the treasurer of
 9     Windy Waters?
10  A  Not to my knowledge.
11  Q  Did he report to anyone in his capacity as
12     treasurer of Windy Waters?
13  A  As treasurer, generally he would have reported to
14     the president.
15  Q  And who would that have been at various times?
16  A  At various times that was Stacy.  At other times
17     that was Reed.
18  Q  Okay.  And at what points would it have been
19     Stacy?
20  A  Stacy was president from 2007 to May 13, 2020.
21  Q  And so he would have reported to Stacy during that
22     period of time; correct?
23  A  Correct.
24  Q  He would have taken direction from her during that
25     time?
```

Page 54

```
 1  A  If it was provided.
 2  Q  Do you recall when he received shares of
 3     Windy Waters' stock?
 4  A  I have a stock register prepared to review and can
 5     do that.
 6  Q  Okay.  So we'll get to that shortly.
 7        I'm sorry.  You said you do have a stock
 8     register prepared?
 9  A  We did prepare the stock.
10  Q  So would you like to reference that right now to
11     answer that question?
12  A  If you would like an answer to that question right
13     now.
14  Q  I would like an answer to that question.
15  A  Okay.
16           MS. WITTENBERG:  And to be clear,
17        it's the stock register that's referenced in
18        topic 10.  I don't know if you have them and
19        you were going to use them anyway.
20           MR. CAMELI:  Okay.  Yes, we have
21        that.
22           MS. WITTENBERG:  It's those two.
23        You can go ahead and use that.
24           MR. CAMELI:  We'll come back to
25        that.
```

Page 55

```
 1           MS. WITTENBERG:  Sure.
 2           MR. CAMELI:  I was just curious as
 3        to whether something had been prepared
 4        otherwise.
 5           MS. WITTENBERG:  Not separate from
 6        that.
 7           MR. CAMELI:  Okay.
 8  BY MR. CAMELI:
 9  Q  Do you recall when Mr. Kiesler -- well, I think
10     we're going to hold off until we get to number 10
11     on that.
12        How would you describe Stacy Randall's
13     involvement in the operations of Windy Waters?
14  A  Absent.
15  Q  And can you be a little more specific about that?
16  A  Did not participate.
17  Q  And I think you mentioned that she was a
18     shareholder of Windy Waters' stock from its
19     creation until her redemption of her stock in
20     May of 2020; is that correct?
21  A  She was a shareholder, yeah, from when she was
22     provided shares up until her redemption May 13,
23     yes, 2020.
24  Q  And then she was, you mentioned, president from
25     2004 to 2020; correct?
```

Page 56

```
 1           MS. WITTENBERG:  Objection.
 2        Misstates testimony.
 3           MR. CAMELI:  Ope, sorry.  Don't
 4        want to do that.
 5  A  2007.  2007 to May 13, 2020.
 6  Q  Sorry.  Thank you for correcting me.
 7        How was the fact of her roles ever recorded?
 8     Are there meetings minutes, appointment documents,
 9     anything like that that would have recorded her
10     role at Windy Waters?
11  A  In the corporate records it would have been
12     recorded.
13  Q  And when you say corporate records, do you mean
14     meeting minutes?
15  A  Yes.
16  Q  So if I looked at Windy Waters' meeting minutes,
17     I will see references to her appointment as a
18     director?
19  A  In preparation for this, we did surface that,
20     and we can look at that now if you would like.
21  Q  Did the meetings reflected in the minutes ever
22     take place?
23  A  No.
24  Q  What qualified Stacy Randall to be a director in
25     Windy Waters, if you know?
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 57

| | | |
|---|---|---|
| 1 | A | I understand the family would determine who would |
| 2 | | be a director. |
| 3 | Q | And when you say the family, you mean all members |
| 4 | | of the Widen family or particular members of the |
| 5 | | Widen family? |
| 6 | A | It may vary at points in time.  I would -- |
| 7 | Q | Well, tell me about how that would vary in points |
| 8 | | of time. |
| 9 | A | When the family was involved with ownership. |
| 10 | Q | Uh-huh. |
| 11 | A | So, for example, Stewart Widen would have |
| 12 | | participated in things when he was a shareholder |
| 13 | | but not after he was no longer a shareholder.  So |
| 14 | | the family, to include those who owned the voting |
| 15 | | shares, would participate in determining the |
| 16 | | directors. |
| 17 | Q | And you said at other times it was different; |
| 18 | | correct? |
| 19 | A | When those family members were no longer involved, |
| 20 | | it would have been different. |
| 21 | Q | Okay.  And at what point, if any, was Reed Widen |
| 22 | | the only family member to participate in such |
| 23 | | decisions? |
| 24 | A | When he was the only voting shareholder. |
| 25 | Q | Was there a time when he wasn't the only voting |

Page 58

| | | |
|---|---|---|
| 1 | | shareholder where he was making those decisions |
| 2 | | himself, notwithstanding that? |
| 3 | | MS. WITTENBERG:  Objection.  Vague. |
| 4 | | Go ahead. |
| 5 | A | What decision? |
| 6 | Q | Decisions about who is and who wasn't going to be |
| 7 | | a director. |
| 8 | A | Was there a time that he would make a decision |
| 9 | | about who was going to be a director when he |
| 10 | | wasn't the only -- |
| 11 | Q | No, when he was the only -- |
| 12 | A | When he was the only. |
| 13 | Q | Yeah.  I'm sorry.  You had it right.  When he |
| 14 | | wasn't the only. |
| 15 | | Did he ever exercise authority on his own |
| 16 | | even though there were others that were involved |
| 17 | | in an ownership interest? |
| 18 | A | I understood it to be collaborative amongst the |
| 19 | | family. |
| 20 | Q | Okay.  Are you aware of whether Stacy Randall had |
| 21 | | any prior experience as a director before she |
| 22 | | became one with Widen -- Windy Waters? |
| 23 | A | I am not. |
| 24 | Q | And she didn't have any such experience at Widen |
| 25 | | as well; right? |

Page 59

| | | |
|---|---|---|
| 1 | A | Experience as a director? |
| 2 | Q | Yes. |
| 3 | A | Not to my knowledge. |
| 4 | Q | So you were mentioning that you thought she had |
| 5 | | become -- or, excuse me. |
| 6 | | Did she become president in 2008 of |
| 7 | | Windy Waters?  Is that right? |
| 8 | A | She was the president of Windy Waters in 2007. |
| 9 | Q | 2007.  Thank you.  Do you recall what qualified |
| 10 | | her to be president of Windy Waters? |
| 11 | A | What qualified her to be president, I do not. |
| 12 | Q | Do you believe she had qualifications to be |
| 13 | | president of Windy Waters? |
| 14 | A | I believe the family would collaborate to |
| 15 | | determine who would be best to serve in that |
| 16 | | capacity. |
| 17 | Q | So you had and have no opinion as to whether she |
| 18 | | was qualified to be president? |
| 19 | A | I know that amongst the family they would |
| 20 | | collaborate to determine that, and so -- |
| 21 | Q | Okay.  But as a corporate representative here |
| 22 | | today, you have no specifics as to what qualified |
| 23 | | her to be president? |
| 24 | A | I have no specifics of what qualified her to be |
| 25 | | president, correct. |

Page 60

| | | |
|---|---|---|
| 1 | Q | Would Reed Widen have been more qualified to be |
| 2 | | president than Stacy? |
| 3 | A | The family determined who would be the most |
| 4 | | appropriate for that role.  So when they |
| 5 | | collaborated, that's what they determined. |
| 6 | Q | Okay.  So there is -- again, in your capacity as |
| 7 | | a representative of the company, you're unable to |
| 8 | | offer an answer as to whether Reed would have been |
| 9 | | more qualified than Stacy? |
| 10 | A | My answer is that Stacy was the person chosen. |
| 11 | Q | Are you familiar with whether she had any prior |
| 12 | | experience at Windy Waters or Widen Enterprises or |
| 13 | | anywhere else in a leadership capacity? |
| 14 | | MS. WITTENBERG:  I'm going to |
| 15 | | object.  I think this goes outside the scope |
| 16 | | of the topics, but if it's within the context |
| 17 | | of topic 8, which is the election of the |
| 18 | | officers and directors, go ahead and answer. |
| 19 | A | Did she have a leadership capacity prior to this, |
| 20 | | is that the way I understand it? |
| 21 | Q | And prior experience. |
| 22 | A | I'm aware that she was an employee of Widen |
| 23 | | Enterprises. |
| 24 | Q | Doing what? |
| 25 | A | In various administrative roles. |

**Stacy L. Randall v.**                    **Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**                                                              **November 03, 2023**

<table>
<tr><td>

Page 61

1  Q  She was a receptionist; correct?
2  A  Yeah.  Administrative roles.
3  Q  Okay.
4  A  I don't know the official title.
5  Q  When you say administrative roles, you mean like a
6     support staff in an office setting?
7  A  That's what I would mean by administrative, yes.
8  Q  Okay.  Was there any discussion with Stacy by
9     anyone at Windy Waters about her being president
10    of Windy Waters prior to her being appointed as
11    such?
12 A  Reed communicated to Stacy.
13 Q  He communicated to her ahead of her becoming
14    president that she would be president?
15 A  Yes.
16 Q  And do you recall what the substance of that
17    conversation was?
18 A  We do not have recollection of that detail.
19 Q  Do you recall when that conversation would have
20    occurred?
21 A  Prior to her role of president.
22 Q  Did Reed or anyone ever provide a justification
23    for naming her to -- naming her as president of
24    Windy Waters?
25 A  Can you repeat that again?

</td><td>

Page 63

1     that correct?
2  A  That's my understanding.
3  Q  Did Stacy direct the actions of other officers at
4     Windy Waters?
5  A  Did Stacy direct the actions of other officers at
6     Windy Waters?  At what point in time?
7  Q  During her presidency.
8  A  Her role as president was a nonparticipatory
9     president or an absent president, so I do not know
10    if she directed the officers on anything.
11 Q  So it would seem, would you agree, that if she was
12    nonparticipatory, she would not have been
13    directing any actions of any officers at
14    Windy Waters; correct?
15 A  That would be -- yes, I agree.
16 Q  For each year that Stacy was elected a director,
17    what was the vote breakdown of those who voted for
18    her to be a director?
19 A  We prepared the corporate records and minutes that
20    we could go back and look to see those elections.
21    I did not prepare and did not expect that line of
22    questioning for this topic, but we can go and look
23    at those records.
24 Q  Did Stacy ever vote her shares in favor of herself
25    becoming a director?

</td></tr>
<tr><td>

Page 62

1            MR. CAMELI:  Sure.  Can you repeat
2        that, please?
3            (Question read)
4  A  Not to my knowledge.
5  Q  Do you know who had the idea of making her
6     president?
7  A  The family would collaborate and determine that.
8  Q  Is that deliberative process documented anywhere
9     that you're aware of?
10 A  The process of the family collaborating?
11 Q  And appointing Stacy as president.
12 A  I would want to check the corporate records around
13    the appointment of her to that role.
14 Q  So you're not sure whether that's documented
15    without looking at those first?
16 A  We prepared those documents to reference for
17    accuracy.
18 Q  I'm not sure if I understood that.  When you say
19    we prepared those, do you mean the business
20    documents?
21 A  I'd like to confirm that, in the corporate records
22    that we can see and look at that.
23 Q  So prior to her becoming president, Stacy was
24    actually terminated as a receptionist at
25    Windy Waters' subsidiary Widen Enterprises; isn't

</td><td>

Page 64

1  A  Again, I did not anticipate that and cannot
2     provide that answer.
3  Q  Did Reed ever vote his shares in favor of Stacy
4     becoming a director?
5  A  Same.
6  Q  Were you familiar with the process by which votes
7     were gathered with respect to electing directors?
8  A  The process involved the collaboration of the
9     family in determining what those officers looked
10    like.
11 Q  And that was in the absence of any meeting.  There
12    were no corporate meetings; right?
13 A  Correct.
14 Q  So let me ask these same -- similar questions with
15    respect to her appointment as president.
16       Would she have voted in favor of herself to
17    become president of Windy Waters?
18 A  I did not prepare for that line of questioning.
19 Q  Did the voting majority of the board of directors
20    vote in favor of her to be appointed president?
21 A  Again, I did not prepare for that.  The family
22    would collaborate on those matters and determine
23    those.
24 Q  Did anyone other than Reed participate in voting
25    to appoint Stacy as officer of -- excuse me, as

</td></tr>
</table>

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 65

1   president or officer of Windy Waters?
2   A   The family at that time would have collaborated to
3       determine that.
4   Q   And what would that -- where would that be
5       documented?
6   A   We could look at the corporate records and
7       determine where that might be.
8   Q   Okay.
9           MS. WITTENBERG:  Helpful to have
10          some notes on this?
11          THE WITNESS:  Sure.
12          MS. WITTENBERG:  Here.  Counsel,
13          I'll give you a copy, too, here.  I've just
14          got to find it.
15          (Exhibit No. 6 marked for
16              identification)
17  Q   So you're being shown what has been marked now as
18      Exhibit 6.  Are these notes that you used in
19      preparing for your testimony today?
20  A   They are.
21  Q   And they are -- they reference topic 8, the
22      election of officers; is that correct?
23  A   That is correct.
24  Q   And would you like to review those in order to
25      answer my previous question?

Page 66

1   A   Can you restate your previous question so that we
2       can go to that specific line and date?
3   Q   In fact, I would like to hear what my previous
4       question was.
5           MS. WITTENBERG:  We all would.
6           MR. CAMELI:  If you could do that,
7           though, that would be great.
8           (Question read)
9           THE WITNESS:  Thank you.
10  A   As I look on the top of the second page of
11      Exhibit 6, I'm looking at the top row, which has
12      the document of consent of BOD with the date of
13      1/1/2007, and the election action item stated
14      there is -- there are two bullet points there.
15      The one is the acknowledgment of the resignation
16      of Stewart as president, and then the second
17      bullet point is elect Stacy as president and Mike
18      Kiesler as secretary/treasurer.  And then in the
19      rightmost column, I look at the signatory in that
20      as Stacy and Price as directors.
21          So at least in my understanding of that
22      question playback, it would be Stacy and Price
23      determining or electing Stacy as president.
24  Q   So for each year, then, that she would have been
25      appointed president, would there have been a

Page 67

1   record of votes in favor of that?
2   A   These are the records that I prepared for today.
3   Q   So this would be the extent of whatever record
4       there was --
5   A   To my knowledge, yes.
6   Q   -- under Exhibit 6?
7   A   In preparation for today, yes.
8   Q   And is this a compilation of data you obtained
9       from another source?
10  A   This is the data that was the corporate records
11      of Windy Waters, the elections of directors and
12      officers, specifically between the date range of
13      2004 and 2020.
14  Q   Okay.  So when you say in these notes of yours,
15      "The below chart shows a list of all elections of
16      directors and officers between 2004 and 2020," the
17      chart came from corporate records that you
18      examined?
19  A   Correct.
20          MS. WITTENBERG:  I know we've been
21          going a while here.  Is there going to be a
22          breaking point at some point?  Not a huge
23          rush from my perspective.
24          MR. CAMELI:  Yeah.  We have been.
25          Let me finish up this line before we move

Page 68

1   then to another topic.  So it won't be too
2   long, if that's okay.
3           MS. WITTENBERG:  Sure.
4           MR. CAMELI:  All right.
5   BY MR. CAMELI:
6   Q   Was Stacy paid for her role as president?
7   A   Not to my knowledge.
8   Q   What were her duties as president?
9   A   General duties of a president would be oversight
10      of the organization, accountability for its
11      actions.
12  Q   But if I heard your testimony earlier, she was
13      absent and actually did not perform those duties;
14      is that correct?
15  A   She would be the president of the organization but
16      not performing her duties as president.  But --
17  Q   Who -- go ahead.  I'm sorry.
18  A   But still accountable for it.
19  Q   Who did she report to as president?
20  A   The president would report to a board.
21  Q   And did she take direction from the board?
22  A   I did not prepare for that question, and I am not
23      aware of that.
24  Q   Okay.  Are you aware of any instance in which she
25      ever took direction from or an instance in which

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 69

1    the board actually did provide her direction?
2  A  I am not.
3  Q  Did the board ever confront Stacy about her
4     absence?
5  A  I am unaware of any action to confront her.
6  Q  So that would mean also that she was never
7     reprimanded, that you know of, regarding her role
8     or inaction as president?
9  A  I am unaware of any reprimands related to that.
10 Q  Did she ever participate -- did Stacy, that is,
11    ever participate in any decisionmaking or
12    governance at Windy Waters?
13 A  She did participate in those matters as she was
14    made aware of certain actions that she needed to
15    take in her capacity as president.
16 Q  And what would -- can you describe with greater
17    detail what those actions were?
18 A  When she would need to agree to -- for example,
19    we prepared waivers of minutes, as an example.
20    She would need to sign off on those, and she would
21    be made aware of what those documents were, and
22    Reed and Mike would make her aware of those, and
23    she would give approval for those, as an example.
24 Q  Was Stacy notified of corporate actions and
25    transactions of Windy Waters?

Page 70

1  A  She was.
2  Q  And how was she notified of those?
3  A  Reed and Mike notified her.
4  Q  And did they do that by telephone, by email, or
5     some other means?
6  A  They would have notified her through conversation,
7     possibly through email.  But she was notified.
8  Q  Do you believe that there were any instances in
9     which she was notified in writing of corporate
10    actions and transactions of Windy Waters?
11 A  I'm not aware.
12 Q  What about share subscriptions and purchases,
13    was she notified of those types of things at
14    Windy Waters?
15 A  She was.
16 Q  How was she notified?
17 A  Reed or Mike would have notified her by phone or
18    other communication.
19 Q  Okay.  Is your answer the same to your earlier
20    answers regarding how she was notified of
21    corporate actions?
22 A  Yeah.  By phone or in person or other means of
23    communications, yes.
24 Q  Okay.  But you're unaware of any instance in which
25    that was done in writing?

Page 71

1  A  Correct.
2  Q  What about the actions by the board of -- what
3     about actions of the board of Windy Waters, was
4     she ever notified of those?
5  A  Any action that she needed to be notified on she
6     was notified on by Reed or Mike by --
7  Q  Now -- I'm sorry.  Now, once again, without any
8     written record of that that you're aware of?
9  A  That I'm aware of, yes.
10 Q  Same answer with respect to actions of officers?
11 A  That she was made aware of those?
12 Q  Yes.
13 A  Same answer.
14 Q  Same answer?
15 A  Same answer.
16 Q  Is that also the same answer with respect to being
17    made aware of the financial performance of
18    Windy Waters or the compensation of its officers?
19 A  That when she needed to be made aware of those,
20    she was made aware of those.
21 Q  Well, is there ever an instance in which the
22    financial performance of Windy Waters or
23    compensation of officers was not, was not shared
24    with her?
25 A  Information would have been shared with her when

Page 72

1     she would ask for it.  So, no, there would not
2     have been cases of withholding information from
3     her.
4  Q  Okay.  So it was communicated to her only if she
5     asked for it, is that what I understand you to
6     say?
7            MS. WITTENBERG:  Objection.  Vague.
8  A  Is there a level of specificity we can go to
9     there?
10 Q  Yeah.  So with respect to compensation of
11    officers, she would have been advised of it if
12    she had asked about it; is that correct?
13 A  I believe she would have been made aware of it
14    from Reed or Mike --
15 Q  Yeah.
16 A  -- about the compensation.  And she also received
17    compensation as an officer, so she would have been
18    made aware of it because of receiving it.
19 Q  I'm just trying to get a sense here, Mr. Gonnering,
20    as to the method by which or what was the trigger
21    by which she was notified.
22 A  Uh-huh.
23 Q  So with that in mind, with that in mind, would
24    all of these notifications only have occurred if
25    she asked specifics about such actions?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

---

Page 73

1   A   I think these notifications would have occurred
2      for the matters that we've gone through up until
3      financial performance of the operating entity, as
4      an example. That would have been provided to her
5      upon her request but also likely provided to her
6      as part of her dialogue with Reed and Mike.
7   Q   Okay. Once again, we're not aware of whether any
8      of that would have been communicated in writing?
9   A   I'm thinking about something else that we prepared
10     for this with respect to disclosures, that Stacy
11     was provided information. So there are some
12     things that have been disclosed to her. So --
13   Q   Yeah. We're going to, I think, come back to
14     disclosures in a little bit, so maybe that will
15     be a more topical time for you to talk about some
16     of that again.
17   A   Okay.
18   Q   Okay. Did Stacy receive compensation each year
19     that she served as an officer and/or director of
20     Windy Waters?
21   A   She did.
22             MR. CAMELI: Okay. All right.
23      So I think this is a good time for a break.
24             MS. WITTENBERG: Sure.
25             THE VIDEOGRAPHER: Going off the

Page 74

1      record at 10:49.
2             (Recess)
3             THE VIDEOGRAPHER: We're back on
4      the record at 11:13.
5   BY MR. CAMELI:
6   Q   Mr. Gonnering, I have one other follow-up question
7     based on testimony that we were discussing prior
8     to the break, and that is this idea of family
9     collaboration on decisionmaking concerning
10     Windy Waters.
11      Will you tell me who you understand that
12     to include when you say the family in the context
13     of family collaboration on Windy Waters'
14     decisionmaking?
15   A   I understand that to be the family who was
16     shareholders in the business at that time.
17   Q   So it actually changed over the years as some
18     people, Mr. Widen, Mark Widen, passed away and
19     others came -- you know, redeemed stock and things
20     of this sort so that it would change based on
21     those types of things; right?
22   A   Yeah. And the example that I provided when we
23     did talk about was the Stewart example, so
24     that was my understanding, yes.
25   Q   When do you estimate that it was ultimately just

Page 75

1      Reed Widen making those decisions? When do you
2     estimate that that happened?
3   A   Consistent with the family collaboration with
4     respect to the shareholder status, I would say if
5     Reed ever was the only family member with shares,
6     then that would be the case.
7   Q   Because eventually it was just Reed and Stacy,
8     correct, as to family members?
9   A   I would need to verify that with the ownership
10     records.
11   Q   If it were Reed and Stacy at any point, would you
12     agree that it would really be Reed who was the
13     decision maker in that dynamic?
14   A   I would say it would be a collaboration of Reed
15     and Stacy if that dynamic --
16   Q   So you do believe, then, that Stacy was making
17     decisions when only she and Reed -- or was
18     participating in board decisions when it would
19     have been only she and Reed as the family members?
20   A   To the degree that she would have chosen to
21     participate.
22   Q   Yeah. But how do you reconcile that with your
23     earlier testimony that she was absent, she wasn't
24     there, she wasn't participating in Windy Waters'
25     affairs?

Page 76

1   A   To the degree she was willing to participate was
2     the amount that she would have collaborated in
3     that. So --
4   Q   Okay.
5   A   -- there was a collaboration and the parties that
6     would collaborate would have to be willing to
7     collaborate, and that would be her unwilling to
8     collaborate in that example.
9   Q   Okay. Well, can you think of an instance in which
10     then she would have been part of a collaboration
11     in the decisionmaking?
12   A   When she would have wanted to be.
13   Q   Okay. So you're speaking in hypotheticals, and
14     I understand that. But I'm asking the question
15     in terms of what happened or didn't happen.
16      Are you aware of any instance in which she
17     would have been collaborating in Windy Waters'
18     board decisions when it was only she and Reed as
19     family shareholders?
20   A   I'm -- well, I'm aware that she would be invited
21     to collaborate in all of those cases, all of those
22     matters.
23   Q   Yeah. So is your answer that -- again, that
24     refers more to the hypothetical construct. I'm
25     just trying to figure out -- and if the answer is

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 77

1     you're unaware of any specific instance, that's
2     okay.  But that's what I'm trying to get at here.
3          Are you aware of an instance in which she
4     actively and actually did collaborate with Reed
5     on board making decisions for Windy Waters?
6   A   I would restate again I'm aware that she would be
7     invited to collaborate and whether or not she
8     chose to is unknown to me at this time.
9                    MR. CAMELI:  Okay.  So let's just
10            turn to topic 19, which, Counsel, I believe
11            is subject to a designation on other
12            testimony; correct?
13                    MS. WITTENBERG:  Yes.
14                    MR. CAMELI:  And that designation,
15            from what I understand, is that the testimony
16            that would have been elicited today, that
17            those designations represent the entirety of
18            what is known or reasonably available to
19            Windy Waters with respect to topic 19?
20                    MS. WITTENBERG:  The witness is not
21            prepared to testify on that topic today.
22                    MR. CAMELI:  Yeah.  So, again, I
23            just want to make sure I understand the
24            designation significance, though.
25                    My understanding is that the designated

Page 78

1     testimony -- and I'll read that into the
2     record here -- of Mr. Kiesler, that the
3     designated testimony represents the entirety
4     of what is known or reasonably available to
5     Windy Waters with respect to topic 19.
6              MS. WITTENBERG:  And I believe we
7     clarified this over email.  I understand your
8     position, your client's position is that that
9     is what the standard is and ours is not the
10    same, but we do confirm, and we do agree,
11    that the testimony that we designated
12    reflects the position of Windy Waters and
13    that it covered the topic fully and
14    thoroughly with those witnesses.
15        For example, there are documents that
16    are relevant on those cases -- or on those
17    topics that weren't read into the record but
18    that would be knowledge outside the scope of
19    what was testified about, but we're not
20    fighting over that.
21        So the point is any further testimony
22    would be superfluous.  He's not prepared to
23    talk on those topics.  We've met our
24    obligation to 30(b)(6) to designate those
25    portions of testimony.

Page 79

1              MR. CAMELI:  Yeah.  So, again, just
2     so our record is clear for motion practice
3     that might arise out of this, so there are --
4     there is evidence in your view that goes
5     outside the designated testimony of
6     Mr. Kiesler as it concerns topic 19 and
7     specifically as it concerns particular
8     documents; is that right?
9              MS. WITTENBERG:  I don't know that
10    there is or isn't evidence outside of what he
11    talked about.  I know that the topic listed
12    is use of Stacy Randall's signature stamp on
13    corporate documents of Windy Waters and that
14    Mike Kiesler testified at great length about
15    the practices, about the handling of the
16    signature stamp of even specific documents,
17    and it was covered thoroughly and well by
18    your co-counsel and that any further
19    testimony on the topic would be duplicative,
20    cumulative, and unnecessary.
21              MR. CAMELI:  But you're not willing
22    to say that designated testimony
23    represents the entirety of what is known or
24    reasonably available to Windy Waters with
25    respect to our topic 19?

Page 80

1              MS. WITTENBERG:  I couldn't --
2     I couldn't commit to that, no, and I don't
3     think that that's necessary for the testimony
4     that could be above and beyond that to be
5     cumulative, duplicative, superfluous,
6     unnecessary, and overly burdensome.
7              MR. CAMELI:  So let me read into
8     the water what -- read into the record what
9     we understand that testimony to be.  It's
10    Mr. Kiesler's excerpted testimony on topic 19
11    at pages 31, 61 to 63, 67 to 68, 98 to 105,
12    107 to 137, 197, and 281 to 283, and this all
13    refers to his September 19, 2023, deposition.
14    Did I state that correctly?
15              MS. WITTENBERG:  I did not pull it
16    up in time to confirm the numbers were right,
17    but if you read the email correctly, that is
18    our position, yes.
19              MR. CAMELI:  Okay.  So the one
20    objection that I have here is that unless you
21    are willing to say that that excerpted
22    testimony represents the entirety of what is
23    known and reasonably available to Windy Waters
24    with respect to topic 19, we don't believe
25    that the designation would sufficiently cover

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 81

1  the topic as we would explore it otherwise.
2       So if you are not willing to say that,
3  we would proceed with asking questions on
4  topic 19.
5       MS. WITTENBERG:  The witness is
6  not prepared to talk on those topics today.
7  We've made that very clear in email traffic.
8  Our position is well stated in email traffic.
9  We disagree with your understanding of the
10  case law.
11       MR. CAMELI:  So we won't proceed,
12  then, with your representation that he's
13  unprepared to talk about those, but we would
14  reserve the right to raise it as a matter of
15  concern with the Court and possibly call --
16  recall Mr. Gonnering to talk about those
17  topics.
18       MS. WITTENBERG:  You've made your
19  record.  We don't agree that that's
20  appropriate.  We also would -- we would
21  perhaps take the position that that argument
22  has been waived because we have been trying
23  to work on this for weeks with you.  But
24  understood.  Record stated.  We can move on.
25       MR. CAMELI:  Yeah.  Are you also --

Page 82

1  are you willing to say, as well, that there
2  isn't any information that will be offered by
3  defendants at trial that is otherwise not
4  contained in these designations as it
5  concerns topic 19?
6       MS. WITTENBERG:  Again, I can't
7  state that.  That's not the point of the
8  designation.
9       MR. CAMELI:  Okay.  I think you're
10  right, the record is made.  So thank you.
11       All right.  Moving on.  We're going to
12  turn to topics 4 and 10.
13       Oh, I'm sorry.  Before we move on,
14  let's go to 20, because I think 20 also was
15  a designated topic, is that correct,
16  Ms. Wittenberg?
17       MS. WITTENBERG:  I believe that's
18  right.  I've got to reopen that.
19       MR. CAMELI:  Yeah.  Go right ahead.
20       MS. WITTENBERG:  Yes, that's
21  correct.
22       MR. CAMELI:  Okay.  And topic 20
23  concerns the sale of Widen Enterprises to
24  Acquia on September 24 of '21, and my
25  understanding is that the following testimony

Page 83

1  has been designated in lieu of 30(b)(6)
2  testimony, and that is the testimony of Reed
3  Widen of August 23, 2023, at pages 40 to 41
4  and 93 to 96, the testimony of Mike Kiesler
5  of September 19, 2023, at page 25, at page 33
6  to 34, and page 262 to 268, and then,
7  finally, the previous testimony of
8  Mr. Gonnering of September 21, 2023, at
9  pages 89 to 97, page 106, 174, and 190.
10       Do you believe I stated those correctly?
11       MS. WITTENBERG:  I believe you did.
12       MR. CAMELI:  And I will ask again
13  whether this testimony, like I did with topic
14  19, does this testimony represent the
15  entirety of what is known or reasonably
16  available to Windy Waters with respect to
17  topic 20?
18       MS. WITTENBERG:  And, again, our
19  position on this designation is the same as
20  it is with 19, that the topic was covered
21  thoroughly with the individuals who have the
22  most personal knowledge about this topic, and
23  it would be cumulative, unnecessary, overly
24  burdensome, duplicative to have a witness
25  prepare to testify on the topic when it's the

Page 84

1  same individuals who have that information
2  that have already been deposed.
3       MR. CAMELI:  And Windy Waters --
4  are you willing to say that Windy Waters has
5  no knowledge that's not contained in that
6  designated testimony?
7       MS. WITTENBERG:  Again, I can't
8  make the representation.  For example, there
9  could be documents that weren't read into the
10  record that would contain information on
11  those topics that were not within those pages
12  of testimony.  But the topics were fully
13  covered, thoroughly covered.
14       MR. CAMELI:  Okay.  So because of
15  that qualification, we would be prepared to
16  discuss with this witness topic number 20.
17  Is the witness prepared to testify?
18       MS. WITTENBERG:  No.
19       MR. CAMELI:  Okay.  Then we will
20  reserve our right to seek relief from the
21  Court as appropriate in that regard.
22       MS. WITTENBERG:  Understood.
23  BY MR. CAMELI:
24  Q  All right.  Now let's move to topics 4 and 10.
25       So, Mr. Gonnering, if you can take the Notice of

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 85

1    Deposition that's in front of you, Exhibit 1,
2    let's go to topic 4.  Topic 4 states that you are
3    designated -- or that the designated topic on 4 is
4    the ownership, past and present, of Windy Waters.
5    Did I read that correctly?
6  A  You did.
7  Q  And you're prepared to testify about that topic
8    today?
9  A  I am.
10  Q  And what documents did you review to prepare for
11    testifying on behalf of Windy Waters about that
12    topic?
13  A  I reviewed the stock ownership of Windy Waters
14    over time.
15  Q  And then we have a noticed topic 10, which is
16    all stock transactions involving Windy Waters,
17    specifically the stock activity reflected in
18    Windy Waters' Class B stock register, to the
19    extent that such documents purport -- or document
20    purports to show all Class B stock transactions
21    involving Windy Waters as of February 22, 2021,
22    and the stock activity reflected in Windy Waters'
23    Class A stock register, to the extent that such
24    document purports to show all Class A stock
25    activity involving Windy Waters as of February 22,

Page 86

1    2021.  Did I read that correctly?
2  A  You did.
3  Q  And you are also prepared to testify about topic
4    10; is that correct?
5  A  Correct.
6  Q  And will you explain what documents or what
7    individuals you spoke with to prepare -- what
8    documents you reviewed or individuals you spoke
9    to to prepare for testifying on behalf of
10    Windy Waters about topic 10.
11  A  I reviewed the stock activity for Class A and
12    Class B shares, and I had conversations with
13    counsel and Reed and Mike were also present.
14  Q  Okay.  So we're going to mark an exhibit here.
15    It will be number 7.  Here you go.
16        (Exhibit No. 7 marked for
17         identification)
18  Q  Okay.  I'm showing you what's been marked as
19    Exhibit 7, and this is the declaration of
20    Mr. Kiesler used in support of his Motion for
21    Summary Judgment.  Do you see that?
22  A  I do.
23  Q  Now, will you turn to page 4 and paragraph 35.
24    That begins at the bottom of the page, and it goes
25    in to the next page, page 5.  Do you recognize

Page 87

1    that chart from Mr. Kiesler's declaration?
2  A  I do.
3  Q  And that shows stock transactions for Windy Waters
4    from 2004 to 2020; is that correct?
5  A  It shows stock transactions from an effective date
6    of 5/15/2004 to 5/13/2020, yes.
7  Q  And to your knowledge is this information
8    accurate?
9  A  In preparation for this, we also revisited this,
10    and I'd like to look at that --
11  Q  Please do.
12  A  -- next to this.
13  Q  Yeah.  Please do.  Is this a document you would
14    have prepared to assist you with recalling your
15    testimony today?
16  A  In collaboration with counsel and Mike and Reed,
17    it is a document that we prepared, yes.
18        MR. CAMELI: All right.  And is
19    this a previously marked --
20        MS. WITTENBERG:  It is not.  It was
21    for a different topic, and I realize my notes
22    are in the other room, so I don't have it
23    physically with me.  Do you want me to
24    briefly run over there and grab them?
25        MR. CAMELI: Sure.  Yeah.  We could

Page 88

1    take a quick break, come off the record.
2        MS. WITTENBERG:  It will take a
3    minute or less.
4        THE VIDEOGRAPHER:  Going off the
5    record at 11:35.
6        (Recess)
7        THE VIDEOGRAPHER:  We're back on
8    the record at 11:36.
9        MS. WITTENBERG:  Do you want to
10    mark this right away?
11        MR. CAMELI:  Yes, please.
12        MS. WITTENBERG:  This is for a
13    different topic, but I know what he's talking
14    about.
15        (Exhibit No. 8 marked for
16         identification)
17        MR. CAMELI:  So this will be
18    Exhibit 8, I believe.  Do you have a --
19        MS. WITTENBERG:  It was in a
20    different order.
21        MR. CAMELI:  That's okay.
22  Q  So you have, I believe, what's been marked as
23    Exhibit 8.  I believe you're referencing to
24    determine whether my question about the chart at
25    paragraph 35 of Mr. Kiesler's declaration is

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 89

```
1    accurate.
2  A Correct.
3  Q Okay.  And let me know when you're ready to answer
4    that question.
5  A Okay.  I am just going to go.  Gary, yes.  Terry,
6    yes.  Tom, yes.  Tom, yes.  Mike, yes.  Stacy,
7    yes.  Stewart, yes.  Gary, yes.  Michael, yes.
8    Terry, yes.  Stacy, yes.
9       There was a miss in between Stacy Randall's
10   effective date of 6/30/2007 and Reed Widen's
11   effective date of 1/1/2008, and that miss was for
12   Matthew Gonnering, which had an effective date of
13   1/1/2008, and that was the subscription for 148.54
14   shares at a price per share of $337.61.
15 Q Okay.
16 A I'm continuing to check.  Reed, Tom, Matthew.
17 Q I'm sorry, Mr. Gonnering, I just want to make sure
18   I got these two.  It was Stacy Randall 6/30 of '07
19   and yours of 1/1 of '08?
20 A In between Stacy's of 6/30/07 and Reed's 1/1/08,
21   in between that there is one.
22 Q I see.
23 A And that's the one I read off.
24 Q And that's yours.  All right.  Thank you.
25 A Okay.  So let me go back then.  Reed, Tom,
```

Page 90

```
1    Matthew, Stacy, Terry, Brian, Gary, Matthew, Mike,
2    Reed, Stacy, Price, Brian, Terry, Stacy, Stacy,
3    Reed Trust, Stacy.
4       So I've verified the names that are listed
5    there, and I did not look at the effective dates,
6    but I did insert that one missing line.
7  Q Okay.
8  A Would you like me to go through effective dates,
9    subscription/redemption, number of shares, and
10   price per share to validate that right now?
11 Q Yes.  I just want to make sure that what
12   Mr. Kiesler's -- I would like to know what, in
13   any way, Mr. Kiesler's declaration might be not
14   entirely accurate.
15 A Okay.  So I'm going to go back through.  5/14/04
16   subscription 285.68, $350.04.  Gary's line is
17   correct.
18        MS. WITTENBERG:  To save the court
19        reporter a little bit of typing, you don't
20        necessarily have to say those out loud.
21 A Don't say them, okay.  Terry's is correct.
22        MR. CAMELI:  Counsel, while the
23        witness is looking at that and to make sure
24        my record is clear with respect to designated
25        topics 19 and 20, I know you mentioned that
```

Page 91

```
1    he is not prepared to testify to those topics
2    today, beyond adopting the designations.
3       And I just want to make sure that that
4    means that you would not permit him to
5    testify should I ask him questions about
6    those topics; is that correct?
7        MS. WITTENBERG:  We have not
8    prepared him, so we would be telling him that
9    we have designated testimony, and he should
10   not answer those questions, yes.
11        MR. CAMELI:  Okay.  Thank you.
12        MS. WITTENBERG:  Are you done,
13   Matt?
14        THE WITNESS:  I am.
15        MS. WITTENBERG:  He's done.
16        MR. CAMELI:  You are?
17        THE WITNESS:  Yep.
18        MR. CAMELI:  Great.  Thank you.
19 BY MR. CAMELI:
20 Q So I just want to come back then to Exhibit 7 and
21   just want to now ask the question, to your
22   knowledge is the information on the chart that
23   appears at page 5, paragraph -- excuse me, it's
24   page 4 to page 5, paragraph 35 of Exhibit 7, is
25   that true and correct with the exception of the
```

Page 92

```
1    one transaction that you noted earlier of your own
2    on January 1 of 2008?
3  A It is.
4  Q So now I'd like you to turn to what we're going to
5    mark as Exhibit 9.
6        (Exhibit No. 9 marked for
7        identification)
8  Q Exhibit 9 are the Proposed Findings of Fact and
9    Conclusions of Law that accompanied the
10   Defendants' Motion for Summary Judgment and is
11   found at Docket 76 in the court record.
12      And do you see that?
13 A I see it.
14 Q Will you turn to page 14, and go to paragraph 82.
15 A Yes.
16 Q And does this appear to be the same chart as
17   appears in Mr. Kiesler's declaration?
18 A It appears to be, without a detailed review, but
19   it appears to be.
20 Q And if it is identical to what is in Mr. Kiesler's
21   declaration, would your testimony be the same
22   regarding this chart's version as it was in the
23   previous question concerning Exhibit 7?
24 A It is.
25 Q Good.  So this appears to be true and correct,
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 93

| | |
|---|---|
| 1 | except for the entry of your subscription of |
| 2 | January 1 of 2008? Again, that presumes that it |
| 3 | is the identical document that you reviewed in 7, |
| 4 | Exhibit 7. |
| 5 A | **Correct.** |
| 6 Q | All right. So now I'm going to -- we're going to |
| 7 | go to another exhibit, Exhibit 9. I'm sorry, |
| 8 | Exhibit 10. |
| 9 | (Exhibit No. 10 marked for |
| 10 | identification) |
| 11 Q | And do you recognize Exhibit 10 as Windy Waters' |
| 12 | Class B stock register? |
| 13 A | **I have two copies. I recognize the exhibit as** |
| 14 | **Windy Waters' Class B stock register, yes.** |
| 15 Q | All right. And there are two pages. They're |
| 16 | marked Windy 35810 and 35811; correct? Lower |
| 17 | right corner. |
| 18 A | **Correct. Yep.** |
| 19 Q | Yeah. And to your knowledge is this information |
| 20 | accurate as produced by Windy Waters? |
| 21 A | **To my knowledge.** |
| 22 Q | And it purports to show all of the subscriptions |
| 23 | and redemptions, again, of stock at Windy Waters |
| 24 | between 2004 and 2020; right? |
| 25 A | **For Class B shares.** |

Page 94

| | |
|---|---|
| 1 Q | For Class B shares, that's right. Okay. |
| 2 | So staying focused on Exhibit 10 for a second |
| 3 | here, the Class B stock register, which of these |
| 4 | transactions do you believe took place at fair |
| 5 | market value? |
| 6 | MS. WITTENBERG: I'm going to |
| 7 | object. This is outside the scope of any of |
| 8 | the topics that I can think of. I can't see |
| 9 | where this comes into play. |
| 10 | MR. CAMELI: So, let me see. We're |
| 11 | at item 9, the development, implementation, |
| 12 | and use of the fair market value per share |
| 13 | formula described in the May 7, 2007, second |
| 14 | amendment to shareholder agreement. So we do |
| 15 | believe that questions concerning fair market |
| 16 | value are part of -- part and parcel of these |
| 17 | inquiries. |
| 18 | So can the witness answer unless |
| 19 | directed otherwise by counsel? |
| 20 | MS. WITTENBERG: So hold on, |
| 21 | though. You're saying topic 9, which is use |
| 22 | of the fair market value per share formula |
| 23 | described in the amendment. Was your |
| 24 | question asking if the formula was used? |
| 25 | That he can answer and is prepared to answer. |

Page 95

| | |
|---|---|
| 1 | MR. CAMELI: Yeah. So I'm asking |
| 2 | related questions. Okay? So 4 and 10, 4 and |
| 3 | 10 were about ownership, past and present. |
| 4 | 10 was about all stock transactions, and 9 is |
| 5 | the formula and the fair market value per |
| 6 | share formula, which in our view would permit |
| 7 | us to ask the question I just asked. |
| 8 | MS. WITTENBERG: Okay. I disagree |
| 9 | that that's within the scope of topics -- of |
| 10 | the topics that are listed here, an opinion |
| 11 | on whether a share was fair market value or |
| 12 | not. |
| 13 | MR. CAMELI: Okay. |
| 14 Q | Can you answer the question, Mr. Gonnering? |
| 15 | MS. WITTENBERG: Separately, |
| 16 | outside of that, I would object, if you are |
| 17 | going to ask him individually, that it calls |
| 18 | for an expert opinion. |
| 19 Q | Okay. So to repeat my question, as to Exhibit 10, |
| 20 | which of the transactions listed took place at |
| 21 | fair market value? |
| 22 A | **In preparation for this, I have prepared to talk** |
| 23 | **about the development and implementation and use** |
| 24 | **of the per share formula that was adopted as the** |
| 25 | **second amendment and expected that line of** |

Page 96

| | |
|---|---|
| 1 | questioning. |
| 2 Q | So let's go there. Which took place -- which one |
| 3 | of these transactions took place using the fair |
| 4 | market value per share formula from the |
| 5 | Windy Waters shareholder agreement? |
| 6 A | **If we go to Exhibit 8, you will see the table** |
| 7 | **provided at the bottom of page 1, page 2, the top** |
| 8 | **half of page 3.** |
| 9 | Yes, sir. I see that. |
| 10 A | **These were -- The stock price formula is** |
| 11 | **calculated based on what is a per share formula** |
| 12 | **that was adopted in 2007 that was created based** |
| 13 | **on a 2004 report, and that formula in 2004 was** |
| 14 | **adopted as a second amendment to the shareholder** |
| 15 | **agreement, which is a multiple EBITDA, weighted** |
| 16 | **EBITDA formula, and that was used for these** |
| 17 | **transactions.** |
| 18 Q | Even that formula -- are you saying the formula |
| 19 | was used even for transactions preceding 2007? |
| 20 A | **The formula was used for transactions preceding** |
| 21 | **2007, specifically as early as 2004.** |
| 22 Q | Even though the formula wasn't developed until |
| 23 | 2007? |
| 24 A | **The formula was developed before 2007. It was** |
| 25 | **developed based on a report that was generated in** |

**Stacy L. Randall v.**       **Video Deposition of Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**                                                 **November 03, 2023**

Page 97

```
 1     2004 by an advisor for Virchow Krause at the time,
 2     now Baker Tilly.  His name was Bruce Hutler.  He
 3     developed a report that was used, and that report
 4     was then used to create the formula that was used
 5     in 2004 for 2004 transactions, also by a
 6     representative of Baker Tilly, Virchow Krause at
 7     the time, named Brad DeNoyer, and applied to those
 8     transactions.
 9  Q  All right.  Let's go to -- I want to move away
10     from this topic for just a second, and I want to
11     move over to topic 6.  And, again, we'll look at
12     our Notice of Deposition, and topic 6 is for
13     financial information, valuations, estimates of
14     value, and appraisals of Windy Waters from 2004
15     through 2007 and 2015 through 2020.  Did I read
16     that correctly?
17  A  You did.
18  Q  Okay.  And you're prepared to testify about that
19     topic here?
20  A  I am.
21  Q  And what documents did you review and what people
22     did you speak with to assist you in your
23     preparation?
24  A  The people I spoke with were counsel.  Inclusive
25     in that conversation was Reed and Mike.  I
```

Page 98

```
 1     reviewed and we collectively reviewed financial
 2     information with respect to income statements,
 3     balance sheets.  We reviewed the valuations from
 4     the experts that we used during those time
 5     periods, and that is what I did to prepare for
 6     this one.
 7  Q  Very good.  Were there any valuations between 2004
 8     and 2007 of Windy Waters' stock?
 9        MS. WITTENBERG:  I'm just going
10        to -- Mark, I'm handing him some notes that
11        may help him here, and I'll give you a copy
12        momentarily.
13           MR. CAMELI:  Thank you.
14        THE WITNESS:  Do you want her --
15           MR. CAMELI:  Yes, please.  Have
16        that marked.
17           (Exhibit No. 11 marked for
18             identification)
19  Q  So you're looking now at what's been marked as
20     Exhibit 11, and these are notes that reflect your
21     preparation for topic 6; is that right?
22  A  The collective preparation of the --
23  Q  The collective preparation?
24  A  Yep.
25  Q  So my question to you was were there any
```

Page 99

```
 1     valuations of Windy Waters or its stock between
 2     2004 and 2007?
 3  A  In 2004, there was a valuation done.
 4  Q  And was that after Mark Widen's death?
 5  A  That was in 2004, and Mark Widen's death was in
 6     2003.  So, yes, that would have been after.
 7  Q  It was done after.  So now we're going to show you
 8     an exhibit which we're going to mark as Exhibit 12.
 9           (Exhibit No. 12 marked for
10             identification)
11  Q  Have you seen this before?
12  A  I don't know by just glancing at it.  This appears
13     to be the Hutler report.
14  Q  Yeah.  This is the 2004 Bruce Hutler appraisal
15     report; is that correct?
16  A  That's correct.
17  Q  And this appraisal states that appraiser's
18     opinions of the fair market value of the companies
19     as of the date of the appraisal; right?
20  A  Can you point me to if you're reading something?
21  Q  Yeah.  So look at page 1, the third paragraph.
22     Just read that over.
23  A  I read the first sentence.
24  Q  Okay.  And so you'll agree that it states, this
25     appraisal states that the appraiser's opinion of
```

Page 100

```
 1     fair market value of the company is as of the
 2     date of the appraisal.  Well, actually it's as of
 3     April 30, 2004; correct?
 4  A  Correct.
 5  Q  And by fair market value, the appraisal means --
 6     I want you to go to the next paragraph also on
 7     page 1 where it says, "Fair market value is
 8     defined in the International Glossary of Business
 9     Valuation Terms."
10        And then it goes on to say that it's the
11     price, expressed in terms of cash equivalents, at
12     which property would change hands -- it's the same
13     thing -- between a hypothetical willing and able
14     buyer and a hypothetical willing and able seller,
15     acting at arm's length in an open and unrestricted
16     market, when neither is under compulsion to buy or
17     sell and when both have reasonable knowledge of
18     the relevant facts.
19        Did I read that correctly?
20  A  You did.
21  Q  So now what I would like you to do is -- oh.
22     In this context, the property being appraised is
23     the 100 percent equity value of Windy Waters,
24     Incorporated; isn't that true?
25  A  The 100 percent of the equity in Windy Waters as
```

Page 101

1    of April 30, 2004, yes.
2  Q  Thank you.  So now turning to page 7 of this
3    same document, in the first paragraph, I believe
4    the end of the sentence of that paragraph says,
5    "It is our opinion that the fair market value of
6    a marketable majority interest in 100 percent of
7    the equity of the company was $7,441,000 as of
8    April 30, 2004."
9      Did I read that correctly?
10 A  You did.
11 Q  Would you agree that the fair market value of the
12   company increased then between 2004 and 2020?
13      MS. WITTENBERG:  Objection.  Calls
14      for expert opinion, but go ahead and answer
15      if you can.
16 A  It would depend on the formula.
17 Q  So right now we're talking about fair market value
18   as that was defined, as we just read it on page 1
19   of that document, of the appraisal, and I'm just
20   asking if you believe that the fair market value
21   of the company increased between 2004 and 2020.
22      MS. WITTENBERG:  Same objection.
23      Answer if you can.
24 A  The fair market value formula that was assembled
25   would be used to determine what changes would

Page 102

1    occur from that point in time.
2  Q  But isn't it -- so, first of all, let me just say
3    this.  Windy Waters was, of course, the sole
4    shareholder of Widen Enterprises, right, at this
5    time?
6  A  Correct.
7  Q  All right.  So during that period of 2004 to 2020,
8    you authored some documents about your views on
9    the value of the company, didn't you?
10 A  I authored operational updates as Matthew
11   Gonnering to Reed about other activity in the
12   industry.
13 Q  And from that, you expressed views on the value of
14   Widen Enterprises, again, between this 2004 and
15   2020; correct?
16 A  Of Widen Enterprises?
17 Q  Uh-huh.
18 A  I looked at other transactions in the market for
19   other organizations and made some assumptions and
20   then applied those assumptions to Widen Enterprises'
21   numbers, and that was part of those operational
22   updates.
23 Q  And when you did that, the value of the company as
24   you determined with that market research was far
25   in excess at times of $7.441 million; right?

Page 103

1  A  That was based on assumptions of what I gathered
2    based on publicly available information.  That
3    would not have been an expert opinion such as this
4    2004 Bruce Hutler expert opinion on valuation.
5  Q  So I want to come back to then my question of
6    would you agree that the fair market value of the
7    company increased between 2004 and 2020?
8      MS. WITTENBERG:  Same objection.
9      Calls for a legal conclusion.  If you can
10     answer, go ahead.
11 A  I would agree that it changed based on the inputs
12   to the formula.
13 Q  You would agree that Widen Enterprises is one of
14   Windy Waters' assets; correct?
15 A  Widen Enterprises is one of Windy Waters' assets,
16   yes.
17 Q  And the other being the marketable securities that
18   we talked about; correct?
19 A  Correct.
20 Q  None other than those two; correct?
21 A  Correct.
22 Q  So the health of Widen Enterprises would
23   necessarily be an indicator of the health of
24   Windy Waters?
25 A  One of them, yes.

Page 104

1  Q  The marketable securities being the other?
2  A  Correct.
3  Q  Do you recall why this valuation marked as
4    Exhibit 12, do you recall why that was
5    commissioned?
6  A  If I go back to the first page of Exhibit 12 and
7    the second paragraph, it references the death of
8    Mark Widen, and it says, "This letter serves as an
9    update to our complete valuation report presenting
10   our opinion as to the fair market value of the
11   common stock of Windy Waters as of July 6, 2003,
12   the date of Mr. Mark A. Widen's death, dated
13   December 8, 2003.  This letter should not be
14   construed as a complete valuation report in and of
15   itself.  Rather, it should be interpreted as means
16   of communicating our updated valuation conclusions
17   within the context of our complete valuation
18   report dated December 3, 2003."
19     So I read that, and I think the death of
20   Mark Widen was what prompted this.
21 Q  Was Stacy provided a copy of this valuation report?
22 A  Shareholders at the time likely would have been
23   provided this report.
24 Q  So is the answer yes, that she was provided this?
25 A  The answer is she was likely provided this, and

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 105

1      there is no reason to believe that this was
2      withheld from her for any reason.
3   Q   When would that have occurred and who would have
4      provided it to her?
5   A   This is addressed to Reed, and it would have
6      occurred sometime after the date of this or
7      perhaps the day of.  So this is dated July 22,
8      2004, so at some point on that day or after Reed
9      would have shared it with her.
10   Q   How would Reed have shared that with her?  Would
11      it have been through a transmitted email?
12      Something put in the U.S. mail?  Handed it to her
13      in person?  How did he do that?
14   A   I do not have recollection of how that would have
15      been transmitted to her.
16   Q   Did he tell you that he did that at any time?
17   A   There is not a recollection of that.
18   Q   Why were there no valuations or appraisals done
19      after this one?
20           MS. WITTENBERG:  Objection.
21         Assumes facts not in evidence.
22   Q   Can you answer that or am I -- I guess I am
23      assuming facts that are not in evidence.
24         Was there ever a valuation or appraisal done
25      after this one?

Page 106

1   A   There was.
2   Q   And when was that?
3   A   2017, 2018, 2019, 2020.
4   Q   And who did those?
5   A   Baker Tilly.
6   Q   And did they prepare a similar valuation report as
7      the one that is marked here as Exhibit 12?
8   A   They prepared a report, yes.
9   Q   And was that produced to the plaintiff in
10      connection with this litigation?
11   A   It was produced to counsel.
12   Q   Okay.  Did Windy Waters estimate its own value at
13      any point after 2004?
14   A   As with the case in 2004, Windy Waters used
15      experts for valuations, and we would not have been
16      experts.
17   Q   What was the fair market value, based on what
18      those experts provided to you in 2015?
19   A   It was not an expert opinion in 2015.
20   Q   So was there anything?  Was there an appraised
21      value conducted by experts in 2015?
22   A   There was -- was there an appraised value
23      conducted by experts in 2015?  There was an
24      appraised value conducted by experts in 2004,
25      2017, 2018, 2019, and 2020.

Page 107

1   Q   Nothing in 2015 or '16; is that correct?
2   A   That is correct.
3   Q   Okay.  Now let's turn to 2017, then.  What was the
4      value determined at that time by experts?
5   A   I'll point you to Exhibit 11.  At the bottom of
6      the page, you see Baker Tilly's assessment as of
7      those four dates.
8   Q   So does the bottom of page 11 purport to show
9      under all Windy Waters' shares the appraised value
10      of the company for years '17, '18, '19, and '20?
11   A   It does.
12   Q   Okay.  And so that then would suggest that the
13      value declined from the 7.441 of 2004?
14   A   Correct.
15   Q   And did the value of Widen Enterprises decline
16      commensurately?
17   A   The value of Windy Waters would be inclusive of
18      the value of Widen Enterprises.
19   Q   So that would -- to answer the question, then, the
20      value of Widen Enterprises would have declined
21      commensurate with the value set forth in
22      Exhibit 11?
23           MS. WITTENBERG:  Objection.  Calls
24         for an expert opinion.  Go ahead and answer
25         to the extent you can.

Page 108

1   A   I would restate that the value of Windy Waters
2      would be inclusive of the value of Widen
3      Enterprises.
4   Q   So is the answer yes, then, to my question?
5   A   The answer is maybe.
6   Q   Okay.  Under what circumstance could the value of
7      Windy Waters go down except as it concerns the
8      possibility of marketable securities devaluing?
9      Other than that, under what circumstance can the
10      value of Windy Waters go down and the value of
11      Widen Enterprises not go down really equally if we
12      were to take the marketable securities out of the
13      equation?
14   A   You referenced marketable securities, which was on
15      my mind as I think about this, which is I don't
16      know how each played with each other to this.  So
17      that is what I do not know.  I have not looked at
18      that.  But I would just restate that Windy Waters'
19      valuation here is inclusive of the Widen
20      Enterprises and the marketable securities at that
21      time.
22   Q   I see.  So it is conceivable that the reason that
23      the Windy Waters value is where it is is because
24      the marketable securities that it held
25      substantially decreased in value?  Is that what

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 109

1   your testimony is?
2 A   My testimony is I didn't look at that level
3   of detail in response or preparation for this.
4   I prepared what's been provided as Exhibit 11.
5 Q   If you assume that the value of Widen Enterprises
6   only increased from 2004 to 2020, how would it be
7   possible for the value of Windy Waters to go down
8   in that same time?
9 A   The other asset would have to have gone down.
10 Q   And your testimony here today is that you don't
11   know whether that occurred or not because that was
12   not part of how you prepared for this testimony?
13 A   Correct.
14 Q   Okay.  So I want to come back to this notion of
15   whether those appraisals from '17, '18, '19, and
16   '20 were actually produced to the plaintiff in the
17   course of this litigation.  Do you know?
18 A   They were produced to counsel.
19              MR. CAMELI:  And can counsel tell
20   me whether they were produced to us?
21              MS. WITTENBERG:  I'm quite
22   confident they were.  I couldn't tell you
23   what Bates number or anything, but yes.
24              MR. CAMELI:  Okay.  So what we
25   might do is I know I talked about going until

Page 110

1   12:30.  It's about 12:22.  Why don't we take
2   a break right now --
3              MS. WITTENBERG:  Sure.
4              MR. CAMELI:  -- and then maybe
5   reassemble at 1:00.  Does that sound great?
6              MS. WITTENBERG:  Yes.  Thank you.
7              THE VIDEOGRAPHER:  Going off the
8   record at 12:23.
9              (Lunch recess)
10              THE VIDEOGRAPHER:  We are back on
11   the record at 1:08.
12 BY MR. CAMELI:
13 Q   All right.  Mr. Gonnering, I want to go back to
14   the issue of this formula, and what formula was
15   used to redeem Stacy Randall's shares in June --
16   on June 30 of 2005?
17 A   On June 30, 2005.  So the -- I'm thinking about my
18   exhibits here.  There was an exhibit where we
19   listed transactions using the formula.  I'm
20   looking at Exhibit 8.
21 Q   Exhibit 8.
22 A   And I understand the question to be 2005 for Stacy
23   Randall redemption?
24 Q   Correct.
25 A   I have an effective date of 6/30 of 611.88 shares,

Page 111

1   and that would be the stock formula price that was
2   used for the other transactions that stemmed from
3   the Bruce Hutler report that was the second
4   amendment to the shareholder agreement consistent
5   with the shareholders, which is the weighted
6   EBITDA formula that was, yeah, derived by
7   Baker Tilly.
8 Q   And then if we go into June 30 of 2007 and her
9   redemption, what formula is used there?
10 A   June 30 of 2007, also on this Exhibit 8, which is
11   citing the use of that same formula that I just
12   referenced.
13 Q   Okay.  And then going into, I believe, the next is
14   January 18 of 2011.
15 A   January 18, 2011, I see it, and consistent with
16   the previous references, the same formula.
17 Q   And was that the same formula used then to redeem
18   all of her shares subsequent to that?
19 A   That was the formula.  So if we could get
20   specific, we could go to --
21 Q   Yeah.  I just want to know if it's the same
22   formula used to redeem all of her shares
23   subsequent to that.
24 A   I would note that subsequent to her January 18,
25   2011, redemption, she had three additional

Page 112

1   redemptions, and those -- sorry.  That's not true.
2   One was a subscription, two were redemptions.
3              So the redemptions were in 2017 and 2019 and
4   her 2020 redemption, so it is three, that those
5   used the formula, as well, that same formula, yes.
6 Q   Was the formula ever changed from that 2005
7   redemption forward?
8 A   Was the formula ever changed?  For her?  Or can
9   you specify?
10 Q   Yeah.  Sure.  With respect to the redemption of
11   her shares going from 2005 forward, you kept
12   referencing it with respect to the one developed
13   by Bruce Hutler.
14 A   Yep.
15 Q   And my question is was it ever changed at all?
16 A   The formula was not changed, but there was -- we
17   introduced a -- in 2013, that same Baker Tilly
18   advisor, Bruce Hutler, had -- based on his expert
19   opinion, had offered that we start to evaluate the
20   net assets alongside that formula and provide any
21   transaction favorability to the higher of the two.
22              So in Stacy's redemptions following the
23   consideration for net assets, she would have been
24   provided the higher of the two.  And for Stacy's
25   shares, the higher of the two was the formula.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 113

1  Q   You're referencing a recommendation from
2      Mr. Hutler.  Was that produced to us, that
3      you know of?
4  A   **Everything was provided to counsel.**
5                    MR. CAMELI:  Okay.  Do you --
6                    MS. WITTENBERG:  I believe it was,
7          yes.
8                    MR. CAMELI:  Okay.
9  Q   I want to go to topic 21.  And, again, let's go to
10     Exhibit 1 and go to what's been identified as 21.
11     It reads, "Windy Waters' relationship to Widen
12     Enterprises, including the nature and tracking of
13     financial transactions between or involving Widen
14     Enterprises and Windy Waters from 2015 through
15     2021."
16         Did I read that correctly?
17 A   **You did.**
18 Q   Are you prepared to testify as to that item as
19     well?
20 A   **I am.**
21 Q   And what documents did you review and who did you
22     speak to with respect to that to prepare?
23 A   **I spoke to counsel and also present with counsel**
24     **was Reed and Mike, and we reviewed the accounts**
25     **where there were the tracking of these financial**

Page 114

1      transactions.
2  Q   So we talked a little bit about the relationship
3      between Widen Enterprises and Windy Waters on a
4      day-to-day basis, and I want to just explore that
5      a little bit more.
6          They did share office space between each
7      other; isn't that correct?
8  A   **They did because of the people that were involved.**
9  Q   Were the same?
10 A   **Yes.**
11 Q   Yeah.  That was going to be my next question.  It
12     was the same personnel between the two; right?
13 A   **Their roles may have been different, so I would**
14     **want to reference the -- well, the role of Mike**
15     **Kiesler as we had previously talked about in his**
16     **role is his capacity as secretary and treasurer**
17     **remained the same, and so -- okay.  I'm sorry.**
18     **Can you repeat that?**
19 Q   Sure.  Again, we're trying to just compare and
20     contrast, if you will --
21 A   **Yes.**
22 Q   -- the Widen Enterprises relationship with
23     Windy Waters.
24 A   **Yep.**
25 Q   We're talking about them sharing the same office

Page 115

1      space.
2  A   **Yep.**
3  Q   And then I asked about personnel.
4  A   **Yep.**
5  Q   I think what you're saying is they had the same
6      personnel, but some of the personnel had different
7      roles in each of those companies, is that what I'm
8      hearing?
9  A   **Correct.**
10 Q   Okay.  And I think I asked you this earlier.
11     Did they share the same computer systems?
12 A   **Yeah.  That was my response earlier, consistent**
13     **with this, which is I did not expect that line of**
14     **questioning or I didn't prepare that level of**
15     **detail in response to that.**
16 Q   Earlier it might have been about who paid for it.
17 A   **Yeah.**
18 Q   This is just are they selling -- or, excuse me,
19     are they sharing the same actual physical hardware
20     computers?  That's what I wanted to know.
21 A   **Sure.**
22 Q   Do you know the answer to that?
23 A   **And the answer to that is yes.  Mike Kiesler used**
24     **the same equipment for that, yes.**
25 Q   And what about Reed?

Page 116

1  A   **Reed would have used the same equipment, yes.**
2  Q   And what about any other shareholders of
3      Windy Waters and Widen, either shareholders or
4      staff, same equipment, I presume as well, shared
5      between them?
6  A   **To my knowledge.**
7  Q   I'm sorry?
8  A   **To my knowledge.**
9  Q   To your knowledge yes?
10 A   **To my knowledge, yes.**
11 Q   Okay.  And then how about the email accounts, did
12     they share the same email accounts?
13 A   **Specifically like Mike would have had an email**
14     **account for at Widen.com, and he would have used**
15     **that email account for Windy Waters-related**
16     **matters.  Reed is the same.**
17 Q   Okay.  Is there anyone that was different?  Did
18     anyone have a Windy Waters email account?
19 A   **Not to my knowledge, no.**
20 Q   Okay.  Did Windy Waters ever transfer funds to
21     Widen Enterprises?
22 A   **It did.**
23                    MS. WITTENBERG:  I'm handing him
24         some notes here.  I'll give you a copy.
25                    MR. CAMELI:  Okay.  Let's mark

**Stacy L. Randall v.**  **Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**  **November 03, 2023**

Page 117

1      that, then, as?
2          COURT REPORTER:  13.
3          (Exhibit No. 13 marked for
4          identification)
5  Q  So you have in front of you what has been marked
6      as Exhibit 13, and I believe this purports to be
7      notes that you have prepared with others on the
8      topic -- Topic 21; is that correct?
9  A  That is correct.
10 Q  And you are now reviewing that to assist you in
11     answering the question that I just asked about the
12     transfer of funds between Windy Waters and Widen
13     Enterprises.
14 A  Correct.  And the last paragraph of Exhibit 13
15     states those transfers.  Windy Waters transferred
16     money on several occasions to Windy Waters (sic).
17     December of 2015, August of 2017, November of
18     2018, August of 2020, September of 2020, October
19     of 2020.
20 Q  And what about Widen transferring to Windy Waters?
21 A  Yes.
22 Q  And when did that occur?
23 A  That occurred on several occasions.  I did not
24     prepare the details related to those transactions.
25     But those would have occurred for tax payments and

Page 118

1      other distributions.
2  Q  Would it have been possible for Widen Enterprises
3      to transfer money to Windy Waters if Windy Waters
4      ever needed the cash?
5  A  Widen Enterprises did transfer money to Windy
6      Waters.
7  Q  And for what reason?
8  A  Reasons of tax payments or distributions or when
9      Widen Enterprises would have cash that would be
10     deemed excess.
11 Q  So what was the reason for transferring excess
12     cash from Widen to Windy Waters?
13 A  To move it out of Widen Enterprises.
14 Q  But why would you want to move it out of there?
15 A  To put it into the holding company.
16 Q  Why put it with the holding company?
17 A  To put it under a different corporate entity.
18 Q  And was there a strategic reason for using a
19     different corporate entity?
20 A  As the holding company, they would then apply that
21     to other investments, which were these marketable
22     securities.
23 Q  Were there other reasons, such as, you know,
24     liability shielding or anything of this sort?
25 A  The excess cash was -- when it was no longer

Page 119

1      needed at the Widen level, so if it was no longer
2      needed at the Widen level, the strategic reason
3      for keeping it at the Widen level, it was not
4      strategic, so to be more strategic was to move it
5      to Windy Waters to be more strategic.
6  Q  Yeah.  I'm just trying to identify what those
7      strategies are.  Is one of them to add a layer of
8      protection for liability purposes?  In other
9      words, not let the Widen Enterprises cash be
10     accessible to, I'll say, a creditor or things of
11     this sort?
12         MS. WITTENBERG:  And I'll object
13         the question calls for a legal conclusion,
14         but go ahead and answer if you can.
15 A  My understanding is the primary was that it was
16     not needed at the Widen Enterprises level, and
17     therefore, we could put it to work at the
18     Windy Waters level.
19 Q  And when you say that, you mean mostly in the
20     context of purchasing marketable securities?
21 A  That would be, yes, for the investments that
22     Windy Waters would make elsewhere.
23 Q  Were there investments beyond marketable
24     securities?
25 A  Not to my knowledge.

Page 120

1  Q  Did Widen Enterprises pay expenses on behalf of
2      Windy Waters?
3  A  It did.
4  Q  What was the nature of those expenses?
5  A  Some of those expenses, as I'll point you to
6      Exhibit 13, the middle of the second paragraph,
7      Stacy Randall redeemed all of her shares and
8      payments were made pursuant to the note by Widen
9      Enterprises on behalf of Windy Waters.  So that
10     was an example.  And then we tracked those in an
11     intercompany account.
12 Q  Was there any reason that Windy Waters had
13     marketable securities?
14 A  Investment reasons.
15 Q  That's it?  Just as a means of trying to grow
16     those funds?
17 A  Yeah.
18 Q  And were there other expenses other than those
19     delineated in Exhibit 13 where Widen was paid
20     expenses on behalf of Windy Waters?
21 A  There was two examples shared here.  One is the
22     one that I previously shared, and the other is
23     Price Widen's example, as well, and there were
24     other transactions that I -- yeah, that were
25     tracked in the intercompany report so this is not

Page 121

1 comprehensive.
2 Q And I assume there was a ledger of some sort that
3 kept track of these transfers?
4 A There was.
5 Q And where can that ledger be found?
6 A It was provided to counsel.
7 MR. CAMELI: And counsel then would
8 have provided that to us?
9 MS. WITTENBERG: I would assume. I
10 don't know about that document specifically.
11 MR. CAMELI: Okay.
12 Q Who at Widen Enterprises maintained the
13 intercompany account ledger?
14 A Mike Kiesler.
15 Q And who at Windy Waters maintained the
16 intercompany account ledger?
17 A The treasurer.
18 Q Also Mike Kiesler?
19 A Mike Kiesler.
20 Q The same person?
21 A Yes. CFO capacity with Widen and treasurer
22 capacity with Windy Waters, yes.
23 Q So it would be fair to say that Windy Waters had
24 access to Widen Enterprises' funds as needed?
25 A Windy Waters would have had access to Widen

Page 122

1 Enterprises' funds as needed.
2 Q Was it fair to say that, in your view? And if it
3 isn't fair to say that, that's fine. Just tell
4 me.
5 A Widen Enterprises would receive -- well, let's
6 see. Windy Waters would receive from Widen.
7 Widen would receive from Windy Waters. So there
8 was a bidirectional exchange there.
9 So Windy Waters would have received funds
10 from Widen in excess of cash in tax payments and
11 distributions, so those were the reasons why Widen
12 would be providing funds to Windy Waters.
13 Windy Waters wouldn't otherwise go into Widen to
14 access financials.
15 Q Yeah. And I think what you're trying to say is it
16 wouldn't be something that would be done just
17 without reason. That if there was a reason, it
18 would be done; right?
19 A Correct.
20 Q And they each had access to each other's assets as
21 needed?
22 A For specific reasons.
23 Q For specific reasons, of course. All right. So
24 what I would like to do is -- I'm sorry. I have
25 one more question about this.

Page 123

1 So Windy Waters could have used Widen
2 Enterprises money to buy back Stacy's shares in
3 May of '20; isn't that correct?
4 A Widen Enterprises would provide Windy Waters with
5 cash for distributions, tax, or excess cash.
6 Q And -- well, I'm now just going to read from your
7 notes here. It says, "Stacy Randall -- after
8 Stacy Randall redeemed all of her shares in May of
9 2020, the payments that were made to her pursuant
10 to promissory notes were paid by Widen Enterprises
11 on behalf of Windy Waters." Right?
12 A That's what that says.
13 Q I read that correctly?
14 A That's what that says, yep, and it was tracked in
15 the intercompany accounts and it was done for
16 convenience.
17 Q Yeah. So in May of 2020, Windy Waters could have
18 easily afforded to buy back her shares using Widen
19 funds?
20 A Repeat that question again.
21 Q Sure. Will you repeat it?
22 (Question read)
23 A If Widen could provide the funds.
24 Q Well, they did; right? They did under the terms
25 of the promissory note, which was for far more

Page 124

1 than the $50,000 that she was asking for; right?
2 A And tracked in accordance with the intercompany
3 agreements to make sure that there was proper
4 accounting of those.
5 Q Yeah.
6 A And Widen Enterprises at the time was not in a
7 state where they could do that.
8 Q They were not in a state to pay 50,000, but they
9 were in a state to pay over a million dollars over
10 time? Am I understanding you correctly?
11 A The over time was an estimate that amounted to
12 $16,000 a month, and so the one-time of 50,000
13 versus the 16,000 was considered, and the ability
14 to afford 16,000 per month versus one-time amount
15 of 50 were considered.
16 Q Sure. That makes sense to me. But that could
17 have also -- the 50 could have been paid at that
18 same rate over about 90 days, a little more than
19 90 days; isn't that true?
20 A I didn't prepare that math for this or consider --
21 Q Well, let's just -- you can do that, I think.
22 16,000 in two months is 32,000. You add another
23 16 to that, that's 48,000. You get a few weeks
24 after that, you've got her paid off in less than
25 four months; right?

Page 125

1  A   If that was being considered, which it was not at
2      that time.
3  Q   All right.  So let's go to topic 9.  So in
4      topic 9, we talked about, "The development,
5      implementation, and use of the fair market value
6      per share formula described in the May 7, 2007,
7      second amendment to shareholder agreement of
8      Windy Waters and any other formulas used with
9      respect to transactions involving Windy Waters'
10     stock."
11          Did I read that correctly?
12 A   You did.
13 Q   And you prepared to testify with respect to that
14     topic here today; right?
15 A   I did.
16 Q   And what specific documents did you review and who
17     did you speak with in order to prepare for this?
18 A   I spoke to counsel, and present with counsel was
19     Reed and Mike.  We reviewed the second amendment.
20     We reviewed the investment -- excuse me, the
21     valuation formula as part of that.
22 Q   And I believe you said -- and you're aware of the
23     formula then that was used to redeem Stacy
24     Randall's shares on May 13 of 2020; right?
25 A   I am.

Page 126

1  Q   And I think we spoke earlier about that being
2      created by Bruce Hutler some years prior to that;
3      correct?
4  A   The Bruce Hutler report was the base for that
5      creation, and then additional experts at
6      Baker Tilly were involved to then come up with the
7      weighted EBITDA formula, and then attorneys at
8      that time got involved to put that in place.
9  Q   Yeah.  And that formula, it was based on
10     Mr. Hutler's appraisal; right?
11 A   Mr. Hutler's appraisal was the base of that EBITDA
12     formula, yes.
13 Q   Is it the company's position that the formula
14     gives the fair market value of Windy Waters'
15     stock?
16 A   The formula when it was created was intended to
17     represent rough justice of a fair market value.
18 Q   And was that the only time that it was ever meant
19     to give rough justice or approximate the fair
20     market value of Windy Waters' stock?
21 A   The reason for the formula was to represent that
22     approximate -- the approximation of a fair market
23     value because the formula represented it as such.
24 Q   And did it -- did that remain the case throughout
25     the duration of the formula as used to redeem

Page 127

1      stock?
2  A   Based on the expert opinions of Virchow Krause
3      then and now Baker Tilly, the rough estimates of
4      fair market value were baked into the formula
5      itself.
6  Q   So even -- so going up to the time of Stacy's
7      redemption in May of 2020, you would say that from
8      its inception to that time it always was designed
9      and actually did reflect a rough fair market
10     value?
11 A   It's an approximation.
12 Q   An approximation.  Let me use your words.  An
13     approximation of fair market value; correct?
14          MS. WITTENBERG:  I'm going to
15     object just to the extent that it's calling
16     for an expert opinion on what the fair market
17     value actually was, but go ahead and answer.
18          MR. CAMELI:  And I want to know his
19     understanding more than anything here.
20 A   Yeah.  Our understanding was it was a rough
21     approximation of what fair market value was.
22 Q   And, again, that remained the same from its
23     inception up to the time that Stacy's shares were
24     redeemed in May of 2020?
25 A   Based on the expert opinions of, yes, Baker Tilly

Page 128

1      and their assembly of it, yes.
2  Q   And when you say that, when you say the expert
3      opinions of Baker Tilly, what opinions are you
4      referring to?
5  A   Their valuations that they created, the report
6      that we looked at prior.
7  Q   Yeah.  That would be -- you're referring to
8      Exhibit -- the one with the valuations and the
9      chart?
10 A   12.
11 Q   12, there we go.  Pull out 12 for me.  His 12.
12     Okay.  It is our exhibit.  I'm sorry.
13          So that's the valuations -- the valuation
14     that you're talking about?
15 A   One of them.
16 Q   One of them.  And the others are where?
17 A   2017, 2018, 2019, and 2020.
18 Q   And that is reflected in Exhibit 11?
19 A   Correct.
20 Q   Okay.  Before the formula was created, what was
21     the procedure used to value shares for purchase or
22     redemption?
23 A   I prepared to address the formula use and the date
24     ranges that were provided.  I did not prepare --
25          MS. WITTENBERG:  And I was trying

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023

Page 129

```
1              to give you some leeway here to see if there
2              was some topic. I was scanning through the
3              list myself at the moment, and I'm not seeing
4              what topic this would fall under.
5  Q   So I think this kind of ties in to topic 10 about
6              all stock transactions involving Windy Waters
7              because some of those preceded the formula.
8              So that's what I'm trying to ask about is
9              before the formula, how was it all determined?
10             Again, value for purchase, value for redemption.
11 A   I prepared at length on the formula for the dates
12             that were specified. So I'm not prepared to
13             answer that.
14 Q   Okay. All right. Was a formula mandated for
15             voluntary redemptions?
16                 MS. WITTENBERG: I'll object to the
17             extent that I think it calls for a legal
18             conclusion, but go ahead and answer to the
19             best of your ability.
20 A   The formula was used extensively for all
21             transactions, with the exception of one, since
22             2004, and it was adopted as the second amendment
23             to the shareholder agreement in 2007. So its
24             practice was extensive to use it. And was it
25             mandated is your question then?
```

Page 130

```
1  Q   Uh-huh.
2  A   And the answer to that was no.
3  Q   Why? Why was the formula not mandated for
4              voluntary redemptions in the eyes of the company?
5  A   The way it was presented in the shareholder
6              agreements would have stated it as such.
7  Q   Because it really -- and we'll talk about this
8              more, because it really talked about redemption
9              upon death or permanent and total disability;
10             right?
11 A   It did.
12 Q   So -- looking at Exhibit 11 here and your summary
13             of these estimated fair market value of
14             Windy Waters shares as determined by Baker Tilly,
15             you have the dates at the bottom here of page 11,
16             '17, '18, '19, '20. Were those all done in
17             accordance with the formula?
18 A   Those were all done as valuations of Windy Waters
19             in the time periods requested, and they did
20             include a formula.
21 Q   Include the formula.
22 A   They were -- they used a formula.
23 Q   That's what I'm getting at. So these numbers are
24             the output from using the formula?
25 A   These numbers are the output from using a
```

Page 131

```
1              Baker Tilly formula that was organized in 2017 --
2  Q   Oh, so it's not --
3  A   -- and '18.
4  Q   Okay. So it's not -- and I apologize because my
5              question is probably confused here.
6              When I talk about the formula, I'm referring
7              to the formula contained in the shareholder
8              agreement.
9  A   Understood.
10 Q   And what I'm trying to figure out is whether the
11             numbers, the valuation numbers on Exhibit 11 that
12             appear on the bottom of the page, are derived from
13             the shareholder agreement formula or not.
14 A   No.
15 Q   And instead they are derived from -- how would you
16             finish that sentence?
17 A   I would --
18                 MS. WITTENBERG: Object to the
19             extent that it calls for a legal conclusion
20             to interpret an expert opinion, but go ahead
21             and answer to the best you can.
22 A   These are provided because they were valuations of
23             the organization consistent with the topic 6 that
24             was requested, so they were formal valuations done
25             by an expert, and they were using a formula that
```

Page 132

```
1              was a combination of income-based and market-based
2              calculations.
3  Q   So in your -- from your understanding as a company
4              representative, it had nothing to do with the
5              formula as contained in the shareholder agreement?
6  A   From my understanding, it's different than that
7              formula.
8  Q   Okay. Got it. All right. So you said that the
9              formula was not -- now we're, again, talking about
10             the shareholder agreement formula, that it was not
11             mandatory -- mandated for voluntary redemptions.
12             Do you know why the formula was not mandated for
13             voluntary redemptions?
14 A   The preparation for this did not include the why
15             for that.
16 Q   Okay. So you don't know?
17 A   Correct.
18 Q   Okay. Have you ever heard that it was -- the
19             formula was created as a courtesy to minority
20             shareholders?
21 A   I'm not familiar with that language.
22 Q   Did minority shareholders have a right to compel
23             the company to purchase their shares at the
24             formula value?
25                 MS. WITTENBERG: Objection to the
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 133

1          extent that it calls for a legal conclusion,
2          but go ahead.
3     A    Please repeat that question.
4                   MR. CAMELI:  Sure.
5                   (Question read)
6     A    I think the minority shareholders historically
7          were transacting using that formula.  Those were
8          the offers that were provided to minority
9          shareholders, based on that formula.
10    Q    So let me just -- I'll repeat it one more time.
11         Did minority shareholders have a right to
12         compel the company to purchase their shares at the
13         formula value?
14                  MS. WITTENBERG:  Same objection.
15    A    I don't believe they did.
16                  (Exhibit No. 14 marked for
17                  identification)
18    Q    I'm going to provide you now what has been marked
19         as Exhibit 14.  Would you identify this as -- it
20         appears to be the 1993 shareholder agreement for
21         Widen Colourgraphics, Limited; correct?
22    A    I've got a 1992 date.
23    Q    '92.  Sorry about that.
24         I'm sorry.  Did you say that this is the '92
25         shareholder agreement with Widen Colourgraphics?

Page 134

1     A    This is a shareholder agreement of Widen
2          Colourgraphics, LTD, that is executed as of the
3          1st day of March, 1992.
4     Q    And Widen Colourgraphics, Limited, preceded the
5          name Windy Waters; is that correct?
6     A    Widen Colourgraphics would have preceded the same
7          Widen Enterprises.
8     Q    Do you know why Windy Waters retained a copy of
9          this document in its records?
10    A    Widen Enterprises would have retained a copy
11         consistent with its policies on document
12         retention.
13    Q    I was just curious because I thought you said it
14         preceded as an entity Widen Enterprises, not
15         Windy Waters.  So why would it -- why would
16         Windy Waters retain a copy of this document in its
17         records?
18    A    Because Widen Enterprises -- Windy Waters owned
19         Widen Enterprises.
20    Q    Did Windy Waters provide a copy of this document
21         to each of its shareholders?
22    A    I did not prepare a topic -- on this topic to
23         determine if a shareholder agreement from 1992 was
24         provided to shareholders.
25    Q    Okay.  So you don't know the answer to that

Page 135

1          question; correct?
2     A    Correct.
3     Q    So let's go to page 8 of this exhibit.  So at the
4          bottom of page 8, there is a Section 2.1 titled
5          Redemption of Stock.  Do you see that?
6     A    I do.
7     Q    And it's titled, if you move to the next page, to
8          2.2, that subsection is titled Death?  Interesting
9          subtitle to have in a shareholder agreement.  And
10         that talks about what is to occur with respect to
11         redeeming shares or purchasing shares upon the
12         death of an agreeing shareholder; correct?
13    A    At a glance, I'm reviewing that and reading
14         sentences with you.
15    Q    And you can just look at 2.2A is where I stated
16         that from.
17    A    Yep.
18    Q    Do you agree that that's what it says, that this
19         section deals with the redemption or purchase of
20         stock upon the death of an agreeing shareholder;
21         correct?
22    A    I'd like to read it aloud just to make sure that
23         I'm processing it here.
24    Q    Sure.
25    A    "Upon the death of an agreeing shareholder,

Page 136

1          deceased shareholder, the company and the
2          surviving shareholders shall redeem or purchase
3          and the personal representative of the deceased
4          shareholder shall sell all of the deceased
5          shareholder's redemption stock upon the terms
6          provided herein.  The redemption shall be closed
7          at the time and place specified by the company
8          within 90 days after the determination of fair
9          market value pursuant to Section 3.2 hereof."
10    Q    Okay.  So the answer to my question is yes?
11    A    Can you repeat the question?
12                  MR. CAMELI:  Sure.  Why don't you
13         repeat the question.
14                  (Question read)
15    A    For this document, yes.  Correct.
16    Q    And if you go to 2.2B, it says that, "The deceased
17         shareholder's redemption stock shall be redeemed
18         at fair market value determined as set forth in
19         Section 3.2 hereof and upon the payment terms as
20         provided in Section 3.3 hereof."
21         Did I read that correctly?
22    A    You did.
23    Q    Okay.  So then if we go to 3.2, 3.2 is entitled
24         Fair Market Value.  We're on page 11.  Do you see
25         that?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 137

1  A  I do.
2  Q  And in the middle of page 11 there, it defines
3     fair market value as, "A value an informed and
4     willing buyer and seller agree upon for the sale
5     and purchase of 100 percent of the issued and
6     outstanding stock of the company without any
7     discount for lack of liquidity, marketability, or
8     minority status."  Do you see that?
9  A  I do.
10 Q  So this was actually amended in 2007; isn't that
11    correct?
12 A  I didn't prepare to address this topic with this
13    agreement based on my understanding of what was
14    provided.
15 Q  Okay.  So let's walk through it, then.  Let's go
16    to the next exhibit.
17              (Exhibit No. 15 marked for
18               identification)
19 Q  So I'm showing you here what has been marked as
20    Exhibit 15.  And this is entitled Second Amendment
21    to Shareholder Agreement Executed 7th day of May,
22    2007; is that right?
23 A  That's correct.
24 Q  Okay.  And Windy Waters retained a copy of this
25    document in its records that is the original;

Page 138

1     isn't that correct?
2  A  Of the second amendment?
3  Q  Yes.
4  A  That is a copy that I'm looking at right here,
5     yes.
6  Q  Yes.  But Windy Waters retained that in their
7     records; is that correct?
8  A  Based on my understanding.
9  Q  So did Windy Waters provide a copy of this
10    document to each of its shareholders?
11 A  This document would have been provided.  It would
12    have been consistent with the disclosure policies,
13    and it would have been provided to those who would
14    have had to sign it.
15 Q  Yeah.  So what you're saying is it was the
16    practice to have provided this to its
17    shareholders; right?
18 A  I would say it was the -- it would be the
19    adherence to the disclosure practice that we had,
20    yes.
21 Q  Do you know if Windy Waters provided a copy of
22    this document, Exhibit 15, to Stacy Randall?
23 A  This document was signed by Stacy Randall and,
24    therefore, would have been provided to her.
25 Q  Do you know if that's her signature?

Page 139

1  A  This document was signed by Stacy Randall, and it
2     is her signature.
3  Q  Okay.  So you are familiar with her signature, and
4     you're saying that is her signature based on your
5     understanding of what her signature is?
6  A  I see Stacy Randall's signature line in two
7     different places.  One is Windy Waters and one as
8     a shareholder.  I see her signing this document,
9     and I know that prior to signing any document she
10    would have been provided the document.  So she
11    would have seen the document and signed the
12    document.
13 Q  And I just want to make sure that we're clear on
14    this.  Do you believe that on page 2, which
15    actually appears on Bates stamped Stafford 1292
16    and 1293, because it looks as if these were signed
17    in counterparts, you see that Stacy Randall is
18    listed as a signatory on that; is that correct?
19 A  Correct.
20 Q  And you see a signature above the line that says
21    by Stacy Widen-Randall; is that correct?
22 A  Correct.
23 Q  Okay.  And is it your testimony that you know --
24    you are familiar enough with her signature to say
25    this is indeed, in your opinion, her signature.

Page 140

1     Is that your testimony?
2  A  My testimony is that she was provided this
3     document, and she signed it.
4  Q  All right.  So you have personal knowledge of her
5     actually being provided it and signing it?
6              MS. WITTENBERG:  I'm just going to
7         object -- or clarify, he's the representative
8         of Windy Waters.  So on behalf of Windy
9         Waters, you're asking him does Windy Waters
10        know that she signed it?
11             MR. CAMELI:  I am asking that, yes.
12 A  Windy Waters provided this to Stacy for her
13    signature, and she signed it.
14 Q  Okay.  And now I'm going to ask that of you
15    personally.  Do you know, do you know if she was
16    provided this document?  Do you, Mr. Gonnering,
17    know that she was provided this document and that
18    she signed it?
19 A  So now I'm speaking as Matthew Gonnering?
20             MS. WITTENBERG:  Yeah.  And this is
21        questionable here because he's here today on
22        behalf of Windy Waters, and he's been deposed
23        for a full day's testimony here.  So I don't
24        think that's an appropriate question.
25             It's an objection.  It's just I don't --

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 141

1  we've got to focus on him as the
2  representative today.
3             MR. CAMELI:  Sure.  So can he
4  answer the question?
5             MS. WITTENBERG:  I think you've
6  used your time with him as an individual.
7             MR. CAMELI:  Okay.  So are you
8  telling him not to answer the question?
9             MS. WITTENBERG:  I'm saying it's an
10  objection.  I think that you have gone beyond
11  the scope.  If you want to just preserve
12  this.
13             Again, we've objected to it as his
14  individual testimony.  We wouldn't want you
15  to use it because you've expanded your seven
16  hours, but if you want to get an answer just
17  to avoid the possibility of having to come
18  back, I'm okay with that.
19             MR. CAMELI:  Okay.  Let's do that,
20  then.  So my question is -- I'll have it read
21  back to you.
22             (Question read)
23  A  **I know based on conversations with others but not**
24     **directly did I see her receive this and/or see her**
25     **sign this.**

Page 142

1  Q  So now let's go back to your hat as a corporate
2     representative today and your view that on behalf
3     of the corporation that she did get it and that
4     she signed it.
5        My question to you is who did you speak with
6     and what did they say that led you to the
7     conclusion as a corporate representative to say
8     that she received it and that she signed it?
9             MS. WITTENBERG:  I'll object
10             because this would have come within the scope
11             of attorney-client privilege.  It was during
12             a privileged communication that this topic
13             was discussed.
14                So I guess to follow up with that, that
15             would be an instruction to not answer
16             specific conversations that were held
17             among -- in a privileged communication.  If
18             you know outside of that, then go ahead and
19             give the answer.  Does that instruction make
20             sense to you?
21  A  **Yes.  On the advice of counsel, I won't answer.**
22  Q  All right.  Looking at page 1 of Exhibit 15, after
23     the recitals, paragraph 1, it reads, "Section 3.2
24     of the shareholder agreement is hereby deleted and
25     the following language is inserted in its place."

Page 143

1  I see the word "and," at least on my copy, is a
2  little fuzzy.  Did I read that correctly?
3  A  **You did.**
4  Q  And then it goes on to spell out how 3.2 of the
5     shareholder agreement, Exhibit 14, was indeed
6     amended.  Do you see that?
7  A  **I do.**
8  Q  And it says specifically, "Except as otherwise
9     provided, the price for each share of stock or
10    interest therein redeemed or purchased pursuant to
11    Sections 2.2 and 2.3 shall be equal to the fair
12    market value per share of stock as determined
13    pursuant to this Section 3.2."
14       Did I read that correctly?
15  A  **You did.**
16  Q  And when it refers to that shareholder agreement,
17    it's the 1992 shareholder agreement, Exhibit 14,
18    that we were just talking about; correct?
19  A  **Uh-huh.  Yes.**
20  Q  So this really says, does it not, that the fair
21    market value per share as calculated pursuant to
22    3.2 equals the fair market value per share?
23             MS. WITTENBERG:  Objection.  Calls
24             for a legal conclusion, but go ahead and
25             answer.

Page 144

1  A  **In reading it.  That's how I read it, yes.**
2  Q  And do you think that statement is true?
3  A  **I would use the expert opinions from Virchow**
4     **Krause and Baker Tilly for determinations on**
5     **value.**
6  Q  Well, do you think that statement was true for
7     certain periods of time but not true for other
8     periods of time?
9  A  **What statement, again?**
10  Q  The statement that we just recited here.
11  A  **Which is that, "Except as otherwise provided, the**
12     **price for each share of stock or interest therein**
13     **redeemed or purchased pursuant to Sections 2.2 and**
14     **2.3 shall be equal to the fair market value per**
15     **share of stock as determined pursuant to this**
16     **Section 3.2 (fair market value)."**
17  Q  Yeah.
18  A  **And I think except as otherwise provided is what**
19     **I'm saying is the expert opinions of Baker Tilly**
20     **that were providing rough justice to fair market**
21     **value.**
22  Q  So you think that the Baker Tilly opinions are
23     what's being contemplated here, or is an example
24     of what is being contemplated by the except as
25     otherwise provided?

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 145

```
1              MS. WITTENBERG:  Objection.  Calls
2          for a legal conclusion.
3              MR. CAMELI:  I'm just asking his
4          understanding.
5    A    That's my understanding.
6    Q    Okay.  So let's go to page 4 of this exhibit.
7         Do you see on page 4 that there is a fair market
8         value per share calculation listed there as
9         Exhibit C?
10   A    I do.
11   Q    And, in fact, that's the words that are used on
12        the exhibit itself, "Fair market value per share
13        calculation."  Is that correct?
14   A    It is.
15   Q    And is this the formula, then, that was used to
16        redeem Stacy Randall's shares on May 13 of 2020?
17   A    This is the weighted EBITDA formula that was
18        assembled by Baker Tilly and used to redeem
19        shareholders -- or used as the formula for
20        shareholders since 2004.  So, yes, this was the
21        formula.
22   Q    That, again, was based on the 2004 Bruce Hutler
23        report that provided, as I think you said earlier,
24        the foundation for that; correct?
25   A    That's correct.
```

Page 146

```
1    Q    And when we talk about the stock price formula or
2         the formula more generally, this is what everyone
3         has been talking about in this litigation the
4         whole time; correct?
5    A    I know that it's an active subject.
6    Q    I'm sorry?
7    A    I know that it's an active subject, yes.
8    Q    Okay.  So do you feel that it's fair to say as a
9         company representative here that this was amended
10        to substitute the stock price formula instead of
11        the appraisal provision that was in Section 3.2
12        originally?
13             MS. WITTENBERG:  Objection.  Calls
14         for a legal conclusion.  But go ahead.
15   Q    What's the company's understanding of that,
16        Mr. Gonnering?
17   A    The company's understanding is that we sought
18        expertise from outside representatives on
19        valuation and assembled this formula to represent
20        that in the interests of representing what those
21        experts concluded.
22   Q    And what I'm trying to get at here, Mr. Gonnering,
23        though, is this amendment, and if you can't answer
24        it, you can't answer it, but this amendment was
25        really meant to substitute the stock price formula
```

Page 147

```
1         instead of the appraisal provision that was in
2         Section 3.2 originally; isn't that correct?
3              MS. WITTENBERG:  Same objection.
4    A    My understanding is that it was created -- well,
5         it was created by Baker Tilly based on the
6         previously disclosed methods and put in place for
7         this amendment.  And used in practice prior to
8         this and subsequent to this.
9              MR. CAMELI:  All right.  So we're
10         going to pull you in a different direction
11         here with another exhibit.
12             MS. WITTENBERG:  Would it be a good
13         time for a quick break?
14             MR. CAMELI:  Absolutely, if that
15         works.
16             MS. WITTENBERG:  I'm just saying it
17         would work well to do it now.
18             MS. EVANS:  When is your call?
19             MS. WITTENBERG:  I have a 3:30
20         call.  I won't do that now, just the spacing
21         would work well to do it now and then at
22         3:30.
23             MR. CAMELI:  All right.  Good.
24             THE VIDEOGRAPHER:  Going off the
25         record at 2:16.
```

Page 148

```
1              (Recess)
2              THE VIDEOGRAPHER:  We're back on
3          the record at 2:31.
4    Q    Mr. Gonnering, did you or someone else from the
5         company disclose to Stacy that the formula used to
6         redeem her shares on May 13 of 2020 was the same
7         formula intended to be used for death and
8         disability under the shareholder agreement?
9    A    All the relevant information that Stacy would have
10        been provided would have been provided to her.  I
11        don't know if that specific statement was provided
12        to her.
13   Q    Let's move to topic 12.  And I will again draw
14        your attention to Exhibit 1, Notice of Deposition,
15        and topic 12, it says, "The impact of the COVID-19
16        pandemic on Windy Waters."  Did I read that
17        correctly?
18   A    You did.
19   Q    And are you prepared to testify about that?
20   A    I am.
21   Q    And what documents did you review to prepare for
22        testifying on behalf of Windy Waters about the
23        impact of COVID-19 on Windy Waters?
24   A    I reviewed previous depositions, the transcripts
25        of those.  I reviewed a confidential memo that was
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 149

1    provided related to that.  I reviewed financial
2    information in and around that time period, and
3    also spoke with counsel and present with counsel
4    was Reed and Mike.
5  Q  You've talked before about reviewing depositions,
6    and I just want to make sure that I understand
7    whose depositions you reviewed.  Can you run those
8    by me again?
9  A  Those would be snippets of depositions that were
10    provided by Reed, Mike, or myself.
11  Q  Mike Kiesler or yourself.  So whenever you've
12    talked about reviewing depositions, are those the
13    three that you're talking about?
14  A  Those are the three that I'm talking about.
15  Q  Okay.  No others?
16  A  Correct.
17  Q  Okay.  Good.  So give me kind of an overview of
18    the financial and economic impact of COVID-19 on
19    Windy Waters.
20  A  Windy Waters had two main areas.  One was the
21    operating entity that was Widen and the other that
22    was the investments.  So Windy Waters' concern
23    was, and what would be best summarized as,
24    significant uncertainty in that time period.  The
25    operating entity of Widen Enterprises was

Page 150

1    navigating significant risk related to COVID-19
2    for a variety of reasons.
3        One in particular, the contract terms that we
4    provided with customers allowed them to terminate
5    upon 30-day written notice.  That was a
6    significant concern at that time, that customers
7    would exercise that right.
8        In addition to no longer being customers of
9    the organization, we would have also paid some of
10    those customers back because we were receiving
11    payments for services that were yet to be
12    provided, and so they would have been owed a
13    significant amount of money provided they left.
14        We also -- those were some economic impacts.
15    The impact was also significant on the workforce
16    as we figured out how to move from a physical work
17    environment to a remote work environment, and we
18    did that in March.
19        We reviewed economic uncertainty in the
20    business related to what we saw as growth changes.
21    We anticipated a certain amount of growth and were
22    no longer able to make those projections.  So we
23    cut those growth expectations.  And the quantity
24    of new customers that we were -- that we expected
25    to get, we changed that considerably.

Page 151

1    We also experienced in March a net income of
2    almost negative $700,000, which was significant.
3    So we had significant concerns, uncertainty, risk
4    in the business, and had to figure out how were we
5    going to survive.
6        Some steps were taken to cut expenses.  We
7    looked at reducing expenses in areas that involved
8    nonlabor expenses, things like merit increases,
9    things like new hires, things like learning and
10    growth, or learning opportunities.  We removed all
11    of those expenses.
12        We also had other scenarios that would have
13    reduced additional expenses.  And we had plans up
14    to about 6 million in expense reductions on that.
15    We ended up taking action on about 3 million of
16    expense reductions.
17        We also had a business unit at that time that
18    was our pre-media business function, which we
19    really just stopped getting work.  Customers would
20    no longer provide work.  The business was
21    dependent on getting work, and we ended up exiting
22    that business as a result of changes in that time.
23        So those were some of the impacts.  In
24    addition, the CEO took a wage cut at that time,
25    early in April of 2020 as a result of the

Page 152

1    anticipated expense reductions and also did not
2    plan for an increase that was slated and promised
3    later that year, and that was removed as well.  So
4    those were some of the things that we navigated in
5    that time.
6  Q  CEO of Windy Waters?
7  A  Widen.  Me.  I took a 10 percent pay cut, and I
8    took my wages that were planned for increases
9    later that year off.
10  Q  So does that pretty much cover the kinds of risks
11    that you were navigating at the time?  Is there
12    anything else you want to talk about?
13  A  Well, the risk of our future was significant, and
14    those are the risks that are top of mind for me.
15    I don't represent that to be comprehensive, but
16    those are --
17  Q  Some of the primary ones?
18  A  Well, I could continue because there was real risk
19    to this point of differentiation that we used,
20    which was we provided to compete against other
21    larger players a 30-day out to these agreements,
22    and there was a real concern at that time that,
23    again, that would be exercised by these customers.
24        We also knew that there were certain
25    customers in industries that were more impacted

**Stacy L. Randall v.**                    **Video Deposition of Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**                                                      **November 03, 2023**

Page 153

1  than others at the time, so we looked at
2  hospitality and food service and travel and
3  tourism, and we had looked at those customers and
4  thought, well, we're going to have to assess our
5  risk on this front, as well, because these
6  customers are subject to not renewing or more
7  likely than others to leave sooner.  So we had an
8  understanding of that.
9       Yeah.  And the employee impact was
10 significant here, too, which was how do we manage
11 a remote workforce because we had not done that at
12 scale before.  We had a few remote employees that
13 could serve in that function, but to transition an
14 entire workforce, approximately 150 people, out of
15 a building and into a home where there are also
16 other things happening, kids going to school, all
17 their spouses working collectively, this was --
18 these were things that we hadn't figured out
19 before, so we had to go through those.
20      And we provided a great deal of understanding
21 to employees throughout that.  We took great pride
22 in making sure that they tended to their families
23 but also that we are -- we still need -- we need
24 to do things here.  We need to continue to serve
25 our customers because we are at great risk.

Page 154

1       We also provided credits to customers who
2  asked for them, and when customers would threaten
3  to leave, we would say, well, can we help, and
4  they would leave because of the uncertainty.  And
5  we said, well, all right, can we help.  So we
6  provided a program that would help them to keep
7  them but also to do our best to retain them
8  despite the challenges that they were working
9  with, with increased risk then of, well, maybe
10 they just don't survive either, and we don't
11 survive as a result then because now we have
12 nonpayment for things that we've been providing
13 services to.
14      So those were a few additions that came to
15 mind as I was thinking about this, which is a
16 horrible thing to continue to think about.  This
17 was one of the most significant challenges that
18 I've ever dealt with as a business leader.
19 Q  I want to put all of this into a temporal context
20    now because COVID hit the American economy, if you
21    will, in, I believe, March of 2020; correct?
22 A  We started to organize in March of 2020 around
23    that, and generally I would say that's a date
24    that's used, March of 2020 as the impact, yes.
25 Q  So help me understand as you go over -- the

Page 155

1  testimony that you just gave on the impact, that
2  narrative, were you referring to what was going on
3  in March of 2020 or was it a different protracted
4  period?
5       Help me understand it in terms of timing.
6  Were these concerns you had in the early part of
7  the pandemic?  Which we'll start with March, and
8  we're going to go through some months here
9  because, you know, we're going to lead up to the
10 redemption in May.
11      So is what you testified to just now concerns
12 that had evolved in March only and then changed in
13 April or were they March, April, May?  Tell me --
14 give me a sense of that.
15 A  It started in March.  Early March when we first
16    started to assess it, and I wouldn't lock it to
17    March.  It continued because our assessments of
18    things continued.
19 Q  It was a rapidly evolving landscape; right?
20 A  Correct.  Right.  And we continued to meet as a
21    COVID team, so we organized a team to respond to
22    this and to help figure things out.  So that team,
23    I believe, met until the spring/summer of 2021.
24    So we continued to navigate those challenges in
25    the business through that team up until around

Page 156

1  that point in time.
2  Q  And so now let's go into April.  Same concerns?
3     Anything changing in April at all for you?  Are
4     you starting to see a little more clarity about
5     the impact that this will have or not have on the
6     company in April?
7  A  I would say April's concerns were continued.
8  Q  So it was all the same in April of 2020 as it was
9     in March of 2020?
10 A  April also had the PPP loan at Widen Enterprises
11    applied to and received as part of the economic
12    uncertainty.  So that was inserted into the
13    equation, and I believe that was in April.  But
14    our April uncertainty was equal to, if not greater
15    than, the March uncertainty because it --
16 Q  So that's helpful.  Or helpful to know.
17      So now May, going into May, how, if at all,
18    are things changing for you in terms of your
19    outlook, in terms of, you know, what's in store
20    for the company and its future and its customer
21    relations?  How, if at all, does that change in
22    May of 2020?
23 A  I think it continues.  In May we would have had
24    visibility on -- we would have had final
25    visibility on March's financials, so that was --

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 157

1    March's financials would have been made available
2    in about mid-April, and so we would have been
3    seeing the results of these activities financially
4    speaking then but also living it in the moment
5    with the customer responses. So I don't consider
6    May any different.
7  Q  Than March or April?
8  A  In terms of uncertainty, massive.
9  Q  Well, how was it different other than uncertainty,
10   if at all?
11 A  How was it different other than uncertainty? In
12   May versus all the previous months?
13 Q  Yes, sir.
14 A  There was -- well, in about that time there was
15   also the sunsetting of our pre-media business
16   unit, so there was actions that we were also
17   trying to figure out there. So that was also
18   indicative of this continued uncertainty.
19       So relative, it's stuff to go back and think
20   about it relative to those months. I would just
21   say it continued.
22 Q  Would it have even gotten worse maybe in May?
23 A  Things were more known. Some of those things may
24   have been -- well, like the financial statements,
25   that some things were bad news, and we would have

Page 158

1    come to know those things.
2  Q  Nothing --
3  A  There was a lagging.
4  Q  Yeah. So nothing -- nothing improving, nothing
5    looking positive for you when it comes to May of
6    2020 compared, again, to March and April?
7  A  Well, we were keeping a positive spirit of things
8    to sustain what we were -- as a business. We were
9    certainly adopting the spirit of positivity.
10 Q  Beyond the spirit of positivity, were there any
11   other things that gave you a positive outlook in
12   May that you didn't have in March or April?
13 A  I don't have anything that comes to mind
14   specifically. I'm not saying that that wouldn't
15   be the case, but I couldn't think of anything at
16   the moment.
17 Q  Sure. Well, let's talk a little bit more, then,
18   about the PPP, better known as the Paycheck
19   Protection Program, that you referenced earlier;
20   okay?
21 A  Yep.
22 Q  So did Windy Waters obtain a loan under the
23   Paycheck Protection Program?
24 A  I understood the loan to be at Widen Enterprises.
25 Q  Do you know why Windy Waters would not have

Page 159

1    received or applied for a Paycheck Protection
2    Program loan?
3  A  The most significant uncertainty was in the
4    operating entity of Widen, and that's where the
5    terms of that certification were based on economic
6    uncertainty, and that's where we had the
7    significance of it.
8  Q  Well, there were no paychecks to start with in
9    Windy Waters; right?
10 A  Correct.
11 Q  So it's hard to apply for a loan for the Paycheck
12   Protection Program if there is no paychecks;
13   right?
14 A  That would be --
15 Q  You agree?
16 A  Yeah.
17 Q  But obviously Widen Enterprises was different in
18   that regard. It was, as you say, an operating
19   entity; correct?
20 A  Correct.
21 Q  How much was the loan that Widen Enterprises
22   received?
23 A  Approximately 2.6 million.
24 Q  Other than what you just testified to, at any
25   point did COVID-19 threaten the viability of Widen

Page 160

1    Enterprises and then, in turn, Windy Waters?
2  A  It threatened the viability of Widen Enterprises,
3    yes, and as a result of it being a significant
4    asset for Windy Waters, that would have cascaded.
5  Q  It was then a threat to Windy Waters as a result;
6    right?
7  A  Because the operating entity of Widen was a
8    significant asset of Windy Waters, the threat of
9    viability within Widen was also inherited by
10   Windy Waters.
11 Q  Okay. So let's just take a look here at --
12       So how many customers did Widen lose in March
13   of 2020, if any?
14 A  I didn't prepare details related to new customer
15   accounts based on the topics that were provided.
16 Q  Okay. So do you know if it lost any customers in
17   March of 2020?
18 A  There were impacts to customers in March of 2020,
19   evidenced by the activities of 2020. The churn
20   revenue or entity was something, again, I did not
21   prepare in accordance with the topics that were
22   provided here. The detail there I did not
23   memorize.
24 Q  Did you gain any customers in March of 2020?
25 A  Same response. Same response.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 161

1  Q  Did any of the customers who you were concerned
2     with cancel?  Did they cancel?
3  A  I recall customers cancelling.  I don't recall
4     the --
5  Q  How many?
6  A  I don't recall the count based on -- yeah.  Again,
7     based on the topics, I didn't get to that level of
8     detail, nor was I capable of memorizing some of
9     those things.
10 Q  Once again, do you have any recollection at all
11    about what customers you actually gained in March
12    of 2020?
13 A  I know that we've provided documentation for
14    certain things.  If you want to point me to
15    something, I'm happy to look at it, but, again, I
16    did not memorize those things, nor did I prepare
17    with that level of specificity.
18 Q  Well, I'm not asking you to quantify.  I'm just
19    asking you to tell me whether you believe you
20    gained customers, increased your customer base --
21    no.  Excuse me.  Whether you gained any new
22    customers in March of 2020.
23 A  It's possible that we gained new customers.
24 Q  Okay.  And you believe that you lost some
25    customers as well?

Page 162

1  A  It's possible that we lost customers.
2  Q  How about for April and May, are your answers the
3     same?
4  A  It would be the same.  It's possible that we
5     gained some.  It's possible that we lost some.
6        I do recall the scenarios that we did speak
7     in to estimate that the new customer projections
8     were going to be greatly reduced, and so I do
9     recall projections that we made in April and May,
10    that we assumed that there would be no new and
11    that we would cut in half the amount of customers
12    that we expected to earn in the remainder of the
13    year.
14 Q  And that happened in April?
15 A  I don't recall when that would have happened.
16 Q  Okay.  It would have been in the early part of
17    COVID, March, April, May, somewhere in there?
18 A  I would say because we were thinking about an
19    April and May new customer projection count being
20    reduced to nothing, then it would have to have
21    been in March or the first part of April.  And
22    that -- yeah.
23 Q  So really did you do any risk assessments at all during
24    this time?  I'm now talking about March, April,
25    May of 2020.  You've testified to some.  Did you

Page 163

1     do any in writing?
2  A  Any risk assessments?
3     Uh-huh.  Yes.
4  A  I was forthcoming with the risk in updates that
5     were provided to Reed.
6  Q  Did you prepare any memoranda on the subject of
7     risk assessments to the company in March, April,
8     and May of 2020?
9  A  I prepared an internal memo to Reed related to the
10    COVID activities in response to the PPP loan.
11 Q  And do you know if that was provided to the
12    plaintiff in this case?
13 A  It was provided to counsel.
14          MR. CAMELI:  Okay.  Does counsel
15       know if it was provided?
16          MS. WITTENBERG:  I believe so.
17 Q  Did you search for, find, or know of any written
18    documentation of any threat posed to the company
19    as a result of COVID during the months of March,
20    April, and May of 2020?
21 A  Did we search for anything related to COVID risks?
22 Q  Search for or find any written documentation
23    related to COVID risks to the company during
24    March, April, and May of 2020?
25 A  We would have searched risk related to certain

Page 164

1     industries, which is where we would have assembled
2     lists of customers that were in greater jeopardy
3     than others.
4  Q  Yeah, and I'm referring more now to -- I wasn't
5     clear on this.  Referring to how you prepared for
6     your testimony here.  Did you search for whether
7     there was any kind of written documentation going
8     to risk assessments during March, April, May of
9     2020?
10 A  One of the things that I said in preparation is I
11    reviewed that memo, and that memo is the one that
12    I just referenced.
13 Q  Got it.
14 A  So I did, yes, review that.  In addition to the
15    updates that were provided in and around that time
16    to Reed.
17 Q  And were any of your -- how would you characterize
18    the impact of your Widen Enterprises assessments
19    on Windy Waters?  Was it -- were those same
20    negative impacts going to affect Windy Waters?
21 A  Because Widen was an asset of Windy Waters, then
22    Windy Waters would inherit that risk.
23 Q  So really a threat to Widen was a threat to
24    Windy Waters; right?
25 A  A threat to Widen was a threat to Windy.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 165

1  Q  So I want you to look at something we're going to
2     mark as an exhibit here.
3              (Exhibit No. 16 marked for
4              identification)
5  Q  And you have in front of you something marked as
6     Exhibit 16.  And I want you to look at the very
7     first page, and it looks like it's from you,
8     Matthew Gonnering, to Reed Widen, and it copies
9     Michael Kiesler; is that correct?
10 A  That's correct.
11 Q  And this is dated May 8 of 2020; correct?
12 A  Correct.
13 Q  And that's five days before the redemption of
14    Stacy Randall's shares on May 13; correct?
15 A  Correct.
16 Q  Now, I want to the direct your attention to the
17    paragraph that starts, "Software revenue."  Do you
18    see that there?
19 A  I do.
20 Q  And it says that currently, and I think it's
21    referring to software revenue, right, "Currently
22    software revenue is projected at $27.44 million
23    and we'll likely reduce it by a few hundred
24    thousand due to increased chum --"
25              MS. EVANS:  Churn.

Page 166

1  Q  "Churn," sorry, "from existing customers.  We will
2     adjust more frequently, given the circumstances,
3     pulling in current data to estimate departures.
4     Software revenue growth in 2020 is about
5     10 percent better when compared to 2019."
6              So did I read that correctly?
7  A  You did.
8  Q  And those are your words back on May 8 of 2020;
9     correct?
10 A  They are.
11 Q  And you believed those numbers to be correct at
12    that time; right?
13 A  At that time, yes.
14 Q  And would these numbers have been based on
15    Windy Waters' accounting system?
16 A  These numbers would have been based on the Widen
17    Enterprises entity.
18 Q  So do you see a paragraph heading that says 2021
19    Planning?  It's sort of near the bottom, second
20    from the last.  Do you see that?
21 A  I do.
22 Q  Let me just read that with you.  "In our last
23    executive session we set forth four areas of
24    investment in 2021 that we need to spend more time
25    with.  Win in PIM, P-I-M; increase stickiness of

Page 167

1     existing customers; diversify our channels into
2     combinations of inbound, outbound, and
3     partnerships; and pursue other opportunity that we
4     currently are researching.  An early projection
5     shows 2021 around $31.5 million, an 18 percent
6     increase over 2020."
7              Did I read that correctly?
8  A  You did.
9  Q  Now, does that dollar amount refer to Widen's
10    software revenue?
11 A  That 31.5 may include the pre-media business, in
12    addition to the software business.
13 Q  And --
14 A  I am not clear -- sorry.  Go ahead.
15 Q  No, I'm sorry.  I cut you off.  You can finish.
16 A  But I am not clear based on what I wrote here if
17    that would be inclusive of that.
18 Q  And refresh my memory about what percentage the
19    pre-media would have been against the software at
20    this time in 2020.
21 A  I don't have the percentage.  I would think it was
22    around -- let me just see if I had an update about
23    that in here, and I did not.  I would say
24    around -- this is difficult to say because I don't
25    know when we would have dialed back the

Page 168

1     projections based on the work that stopped showing
2     up.  So I'd like to guess at --
3  Q  Yeah, you can approximate this.  I'm not going to
4     hold you to a precise percentage.  But I'm
5     trying -- I'm just trying to recall, because I
6     know you've testified about this in the past, but
7     for the purposes of context here, I'm just trying
8     to determine what percentage you would have
9     attributed of that 31 million to pre-media based
10    on what was going on at the company at the time.
11    Is it 10 percent?  20 percent?  You know, those
12    just kind of rough numbers.
13 A  If it's in there, it would be, my guess is between
14    5 and 10 percent.
15 Q  So at any point did the COVID-19 pandemic then
16    cause Windy Waters or Widen to incur a negative
17    revenue projection?
18 A  A negative revenue projection?  I would need to
19    look at the monthly revenue performance, which I
20    did not go into that level of specificity in
21    preparation for this topic.  But that is where I
22    would go to see if that event occurred.
23 Q  That's significant; right?  When you think about a
24    negative revenue projection here, we're talking
25    about significant revenue, positive revenue

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

| | Page 169 |
|---|---|
| 1 | projections and even significant growth. |
| 2 | Don't you think you would have remembered if |
| 3 | there were ever negative revenue projections if |
| 4 | there ever were any? I'm not asking how many or |
| 5 | how much. I'm just asking whether you ever had to |
| 6 | incur a negative revenue projection? |
| 7 A | I wasn't specifically looking for a negative |
| 8 | revenue projection month over month, but that is |
| 9 | where I would look. |
| 10 Q | So is your testimony you can't really -- you don't |
| 11 | know? You don't have a recollection as you sit |
| 12 | here, and you don't know the answer to that |
| 13 | without additional research? |
| 14 A | My testimony is that I didn't prepare to that |
| 15 | level of specificity to remember the level of |
| 16 | detail regarding that. |
| 17 Q | What about year-to-year revenue, negative revenue |
| 18 | projection? |
| 19 A | What you read represents an increase in '21. The |
| 20 | 2020 growth that was projected was 10 percent, and |
| 21 | I would note these are reductions of previously |
| 22 | expressed growth that the organization was built |
| 23 | for. We were directed to grow. We were built for |
| 24 | growth. And when the growth slowed, that is a |
| 25 | significant event when you're built for growth. |

| | Page 170 |
|---|---|
| 1 Q | Sure. So as high as these were, you're saying |
| 2 | that previously they were even higher? |
| 3 A | These are reductions in growth based on where they |
| 4 | were before. |
| 5 Q | So where were they before? Where were they, do |
| 6 | you remember? |
| 7 A | I could look at previous documents that have been |
| 8 | provided to give you that level of specificity if |
| 9 | you would like that. |
| 10 Q | Yeah. Do you have those available to you to look |
| 11 | at right now or no? |
| 12 A | I didn't prepare that level of specificity based |
| 13 | on this topic, but I know we provided those, and |
| 14 | I'm happy to look at it if you would like to go |
| 15 | through it. |
| 16 Q | Okay. I think we covered the issue of lost |
| 17 | customers. And did you actually engage in any |
| 18 | layoffs at Windy Waters or Widen Enterprises? |
| 19 A | Widen Enterprises conducted a layoff. |
| 20 Q | And when did it do it and how many people? |
| 21 A | There would be documentation related to that. I |
| 22 | would say it was approximately the summer of 2020 |
| 23 | and approximately 16 people. |
| 24 Q | Which represented what percent of your workforce? |
| 25 A | I would say our approximate workforce at that time |

| | Page 171 |
|---|---|
| 1 | was between 140 to 150 people. |
| 2 Q | And were those positions -- you said that was -- |
| 3 | I'm sorry. You said that was June of 2020? |
| 4 A | I think approximately summer. I don't know the -- |
| 5 Q | Okay. Summer of 2020. So sometime after this |
| 6 | redemption with Stacy Randall? |
| 7 A | Correct. |
| 8 Q | And were those positions ever refilled? |
| 9 A | The positions related to that were because of the |
| 10 | exiting of the business that was pre-media. |
| 11 Q | Yes. |
| 12 A | And we chose to stop doing work in that based on |
| 13 | work that no longer was being earned or coming to |
| 14 | us. |
| 15 Q | I see. I remember that, again, from your other |
| 16 | testimony. So that was a result of just exiting a |
| 17 | service or product line; correct? |
| 18 A | Correct. |
| 19 Q | Salary reductions, were there any salary |
| 20 | reductions other than what you had mentioned as |
| 21 | the CEO taking a 10 percent cut to your salary? |
| 22 A | We would have reduced the future merit increases |
| 23 | that were budgeted. But outside of my reduction, |
| 24 | there were no other reductions to a wage in that |
| 25 | moment. |

| | Page 172 |
|---|---|
| 1 Q | When did you recover that 10 percent reduction? |
| 2 | When were you no longer taking it? |
| 3 A | I don't recall. |
| 4 Q | Do you recall approximately how many months you |
| 5 | were subjected to that 10 percent reduction? |
| 6 A | I didn't prepare the details related to my wage |
| 7 | recovery. That's the extent of my understanding |
| 8 | of the topic. |
| 9 Q | I want to talk about this PPP loan again. Did you |
| 10 | ever return it to the government? |
| 11 A | We did not. |
| 12 Q | So it was kept, and it was, you said, |
| 13 | approximately 2.6 million? |
| 14 A | Yes. |
| 15 Q | All right. It looks like we're heading to |
| 16 | topic 13. I'll ask you to pull up Exhibit 1 |
| 17 | again, the notice, and you would agree that that |
| 18 | identifies as a topic, "Windy Waters' cash |
| 19 | reserves and investments from 2015 through 2020." |
| 20 | Correct? |
| 21 | Did I read that correctly? |
| 22 A | You did. |
| 23 Q | Are you prepared to testify on that? |
| 24 A | I am. |
| 25 Q | And, again, can you tell us what documents you |

Page 173

1    reviewed to prepare for testifying?
2  A  I reviewed financial information for Windy Waters
3     and the investment accounts and in conversation
4     with counsel, also spoke to Mike and Reed.
5  Q  In May of 2020, what was the amount that
6     Windy Waters had in cash?
7  A  In preparation for this topic, I wasn't expected
8     to recall specific dollar amounts for areas of the
9     financial statements, and so I -- if you've got
10    financial information in front of you, I'm happy
11    to look at that.
12 Q  So the topic was Windy Waters' cash reserves and
13    investments from 2015 through 2020.  You didn't
14    do, like, a summary or anything of that sort of
15    what those were like month to month or month over
16    month?
17 A  I did not come prepared to talk about the cash
18    reserves that are investments into the
19    specificity of individual numbers that changed
20    over time.
21 Q  Maybe Mr. Kiesler's deposition could be helpful.
22    I'm going to give you Mr. Kiesler's deposition.
23    We'll mark that as an exhibit and see if that can
24    help refresh your memory.  Okay?
25 A  Thank you.

Page 174

1                (Exhibit No. 17 marked for
2                 identification)
3  Q  I'm showing you what's been marked as Exhibit
4     No. 17.  I'm going to ask you to go to page 294,
5     and let's start -- and it's on page 74.  Let's
6     start with line 6, and I'll just -- maybe you can
7     read along with me here.
8        "Q.  Earlier today, we talked about the
9     funds in Windy Waters as of May 2020, and
10    specifically, we talked about Windy Waters having
11    about $5.5 million of cash or cash equivalents on
12    hand.  Do you recall, generally speaking, our
13    conversation about that?
14       "A.  Generally.
15       "Q.  When, if ever, were Windy Waters funds
16    used to pay the expenses of Widen Enterprises?
17       "A.  Again, it was a consolidated parent."
18       Is that refreshing your recollection at all
19    about what was in Windy Waters' accounts back in
20    May of 2020?
21 A  Generally, yes.
22 Q  And does that seem like that's about what was in
23    the accounts back then?
24 A  I will echo Mike's statement here.  Generally,
25    yes.

Page 175

1  Q  Yeah.  And if you actually go to page 177,
2     page 45.  We're at line 14.
3  A  What number?  I'm sorry.
4            MS. EVANS:  It's on page 45 of the
5        whole deposition transcript.
6            THE WITNESS:  Okay.  And what block
7        are we in?
8            MS. EVANS:  177.
9            THE WITNESS:  177.  Okay.  Thank
10       you.
11 Q  And, again, just to put a finer point on this,
12    if you read it from line 14:
13       "Q.  You aren't aware that at that time
14    Windy Waters had $5.5 million invested in the
15    money market?
16       "A.  Which included PPP.  Well --
17       "Q.  2.7?
18       "A.  -- cash equivalents, yes.
19       "Q.  So if we deduct the 2.7 million PPP loan
20    from the 5.5 million that you had on hand, there
21    is still ample money --"
22       Did I read that correctly?
23 A  Yeah.  You read the question directed to Mike
24    correctly, yes.
25 Q  Yeah.  And I think he was agreeing that that was a

Page 176

1     correct -- those were correct numbers.  But more
2     importantly, I'm just, again, trying to help you
3     with remembering what was on hand at about that
4     time.  And you agree that that's roughly what it
5     was, taking into account that PPP loan; right?
6  A  Yeah.  The way Mike -- yeah, I agree with Mike's
7     general statement here when asked about having
8     5.5 million.
9  Q  And the loan was never repaid; right?  They
10    ultimately got a waiver on that?
11 A  We applied for forgiveness in accordance with
12    the terms of that agreement.
13 Q  And you were granted that?
14 A  And we were granted that, yes.
15 Q  Very good.  Why don't you take a look now at the
16    declaration of Mr. Kiesler.
17           MR. CAMELI:  It was previously
18       marked; right?  I don't believe -- was it
19       previously marked?
20           MS. WITTENBERG:  Exhibit 7.
21 Q  Exhibit 7.  We talked earlier about that, and I
22    would like you to go to page 13, paragraph 95.
23       And Mr. Kiesler says in paragraph 95, let me
24    read that, "In May of 2020, neither Widen
25    Enterprises nor Windy Waters could spare $50,000

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 177

```
1    from its cash reserves for anything other than
2    operating expenses."
3         Did I read that correct?
4  A  You did.
5  Q  And do you agree with Mr. Kiesler's statement in
6    his declaration in that regard?
7  A  I do.
8  Q  And how did Windy Waters determine what it could
9    spare?
10 A  Windy Waters looked at the investments as a source
11   to cover the operating entity's potential
12   downturns with three months of expenses
13   approximately.  And so approximately we could say
14   that Widen Enterprises was -- I'm going to insert
15   some numbers here, but we could go to the
16   specifics of these numbers, but approximately
17   Widen Enterprises was spending $2 million per
18   month, and with having three months on the ready
19   in the event of a significant downturn, especially
20   based on the uncertainty here, Widen --
21   Windy Waters would not have had enough to meet the
22   criteria that was set forth for that condition.
23 Q  But a determination was made that there was enough
24   to pay Ms. Randall $16,000 and some change per
25   month for a protracted period.  That it could do;
```

Page 178

```
1    correct?
2  A  In that moment that determination was made, yes.
3  Q  And did anyone offer to her the option of taking
4    $10,000 over 5 months or the $16,000 over
5    3 1/2 months to get her to the 50,000 that I
6    understand you're saying could not be made
7    outright at that time?
8  A  I don't recall what options were provided to
9    Ms. Randall in that moment.
10 Q  Who would know if such options were provided?
11   And, again, I'm asking you here as the company
12   rep.  If you as a company don't know, who would
13   know if those options were provided?
14 A  Ms. Randall would have come to Reed, and then Reed
15   would have directed to Mike this conversation.
16   And to our knowledge, it was her asking for
17   things, and we said no to the 50,000.
18 Q  As you sit here with me today, though, you would
19   agree that that was obviously something that the
20   company could have done is paid her $50,000 over a
21   three to four-month period; correct?
22 A  Given the uncertainty and the condition of having
23   three months of operating expenses on the ready,
24   that answer is no.
25        MR. CAMELI:  Okay.
```

Page 179

```
1         MS. WITTENBERG:  Sorry to
2    interrupt.
3         MR. CAMELI:  It's a good time for a
4    break.
5         MS. WITTENBERG:  It's 2:27.  Great.
6         MR. CAMELI:  It's a good time.
7    We'll go off the record.
8         THE VIDEOGRAPHER:  Off the record
9    at 3:27.
10        (Recess)
11        THE VIDEOGRAPHER:  We're back on
12   the record at 4:00.
13        MR. CAMELI:  Thank you.  Just a
14   quick statement on the record.  We're going
15   to try and wrap this up today in about
16   45 minutes, 45 or 50 minutes, and reserve
17   approximately an hour of deposition time to
18   address or potentially address productions
19   that were made last night and two days ago,
20   and we don't know where we'll land on that
21   without first getting through those.
22        But I just want counsel to know that
23   we're doing that, and I believe you have
24   something you would like to say as well.
25        MS. WITTENBERG:  Understood.  Yes.
```

Page 180

```
1         And we would reserve the right to object to
2    that, but we're certainly willing to work
3    with you to see if we can reach some sort of
4    an agreement on that front.
5         MR. CAMELI:  Great.  Thank you.
6  Q  All right.  So let's jump over to a document that
7    we are marking now as Exhibit 18.
8         (Exhibit No. 18 marked for
9         identification)
10 Q  Mr. Gonnering, we're showing you what's been
11   marked as Exhibit 18.  I believe this is entitled
12   ITR Economics EVP FLEX, Widen - Total, and it's
13   dated December 20 of -- excuse me, December of
14   2020.  Do you have that in front of you?
15 A  I do.
16 Q  If you go to the first page after that, it says
17   Widen - Total Outlook; is that correct?
18 A  It does.
19 Q  And what I would like you to do is go five pages
20   in, and it looks like these are not Bates stamped,
21   but there is a chart, and I'm looking at -- you
22   have it open right now, and it says Widen - Total,
23   Data Trends, Millions of $.
24        And you have that in front of you; correct?
25 A  I do.
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

---

**Page 181**

1 Q   And it shows quarterly -- in the right column it
2     says Quarterly Revenue, Annual Revenue, and then
3     Outlook.  Do you see that?
4 A   I do.
5 Q   What is this document?
6 A   This document is a document produced by ITR
7     Economics, which is an economics firm that we
8     contracted to look at our historical revenue to
9     determine what leading indicators they might find
10    that are macroeconomic in nature, such that they
11    could indicate future revenue.
12 Q  And the chart on page 5 that we were just talking
13    about here depicts revenue growth of the company
14    from 2005 to 2023 projected; is that right?
15 A  2005 to -- what was your end date?
16 Q  2023.
17 A  I have a 2024 date on this, which I don't know
18    that -- it looks like it has a line.
19 Q  Yeah.  It looks like it might be maybe the end of
20    '23.  I'm not sure if it quite touches '24.
21 A  Sure.  It goes to September of' 23 at the table on
22    the bottom.
23 Q  And would you agree that this shows significant
24    growth and projections from 2005 to 2023?
25 A  I would agree that this shows growth.

---

**Page 182**

1 Q   And you would agree, based on the chart, that
2     Windy Waters was worth substantially more in 2020
3     than it was in 2004, for example?
4               MS. WITTENBERG: Objection. Calls
5          for expert opinion.
6 Q   Let me -- I'm just asking you to base it on what
7     the chart reflects.
8 A   And so you're asking -- can you repeat that again,
9     please?
10 Q  Sure.  Would you agree that based on this chart
11    that Windy Waters was worth substantially more in
12    2020 than it was in 2004?
13              MS. WITTENBERG: Same objection.
14 A  The worth of Windy Waters was determined through
15    consultation with Virchow Krause/Baker Tilly.  So
16    that's --
17 Q  Yeah.  So you hired -- I mean, the company,
18    Windy Waters, hired this ITR Economics to do this;
19    right?
20 A  Widen Enterprises.
21 Q  Oh, Widen Enterprises did.  Excuse me.  Widen
22    Enterprises hired ITR to put together Exhibit 18;
23    right?
24 A  Correct.
25 Q  Okay.  And all I'm asking you is, based on the

---

**Page 183**

1     chart that we are looking at here, that
2     Windy Waters was worth substantially more in 2020
3     than it was in 2004.  If you disagree with that,
4     tell me you disagree with that.
5               MS. WITTENBERG:  Again, objection.
6          Calls for expert opinion.  But go ahead and
7          answer if you can.
8 A   Windy Waters was worth what the consultants from
9     Virchow Krause and Baker Tilly said it was worth
10    based on their expert opinion, and this is revenue
11    representation of Widen.
12 Q  So why don't you tell me in your own words what
13    you believe this chart depicts about Widen
14    Enterprises and its fiscal health in 2004 versus
15    that of 2020.
16 A  From 2004 to 2020, this is one component of fiscal
17    health.  And so this would be only revenue and
18    would not be indicative of fiscal health.  It does
19    represent revenue growth.
20 Q  Right.  Because at the end of the day, expenses
21    can easily exceed revenue and, therefore, you're
22    not very healthy at all; correct?
23 A  Correct.
24 Q  But based on revenue growth alone, what would you
25    say this chart depicts?

---

**Page 184**

1 A   Growth in revenue.
2 Q   And do you think it depicts anything else with
3     respect to the value of the company in 2004 versus
4     2020?
5 A   Windy Waters' value is based on the expert
6     opinions of Virchow Krause and Baker Tilly and
7     what they created and advised on, and this is
8     representative of Widen revenue.
9 Q   So your answer is it is not -- this chart does not
10    reflect, in your view, the worth of Windy Waters
11    comparatively between 2004 and 2020?
12 A   My testimony is that the chart represents revenue
13    growth over the time period specified here and
14    that Windy Waters' value is from the previously
15    disclosed expert Virchow Krause/Baker Tilly
16    activities.
17 Q   Okay.  Let's go to topic number 11.  I'll take you
18    over to Exhibit 1 and note that topic 11 calls for
19    testimony regarding the payment of dividends
20    and/or distributions, including with respect to
21    the pass-through or other tax obligations of any
22    shareholders, from 2004 through 2008 and 2014
23    through 2020.
24        Did I read that correctly?
25 A   Yes.

---

**Stacy L. Randall v.**                    **Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**                                                              **November 03, 2023**

---

Page 185

1  Q   And you're prepared to testify on that today;
2      is that correct?
3  A   That is correct.
4  Q   And what did you do to prepare for your testimony
5      in that regard?
6  A   I spoke with counsel, and present with counsel was
7      Reed and Mike, and we collectively reviewed those
8      dividends and/or distributions during those time
9      periods from the records that we held.
10 Q   Was Stacy Randall paid as a president of
11     Windy Waters?
12 A   She was paid as a director, not as a president.
13 Q   And how much was she paid?
14 A   She was paid $5,000 annually.
15 Q   During the entirety of her presidency?
16 A   She was not paid as a president.  She would have
17     been paid as a director.  For the times that she
18     was a director, she would have been paid $5,000
19     annually.
20 Q   And that didn't change at all when she was also
21     president?
22 A   Correct.
23 Q   It was always 5,000?
24 A   Correct.
25 Q   Okay.  Did Windy Waters ever make dividend

---

Page 186

1      payments to its shareholders?
2  A   Yes.
3  Q   When did it do that?
4  A   In preparation for this, we assembled some notes
5      that I would like to reference.
6  Q   That would be perfect.  Let's call that
7      Exhibit 19.
8                  (Exhibit No. 19 marked for
9                  identification)
10 Q   Do you have that in front of you?
11 A   Not yet.
12 Q   And Exhibit 19 purports to be the notes that you
13     and others put together in anticipation of your
14     testimony here today with respect to topic 11;
15     correct?
16 A   Correct.
17 Q   So going back to my question, when, then, did
18     Windy Waters make dividend payments to its
19     shareholders?
20 A   Windy Waters made dividend payments to its
21     shareholders or distributions for tax reasons and
22     when it was determined that a distribution should
23     be paid for nontax reasons.
24 Q   And does Exhibit 19 set forth what the amounts
25     were and the approximate times when those were

---

Page 187

1      made, those payments?
2  A   It does.
3  Q   And I see the word distribution here.  Tell me how
4      you differentiate, if at all, the word
5      distribution from dividend.
6  A   We used distribution in the memo in our
7      documentation and did not differentiate with
8      dividends.  It was used as our terminology.
9  Q   Do you differentiate between a dividend and
10     compensation in Exhibit 19?
11 A   We don't have any compensation listed here.
12     Compensation is different than a distribution.
13 Q   Okay.  So I'm still unclear about how you -- the
14     meaning -- the difference in meaning between the
15     word distribution and the word dividend as you use
16     it in Exhibit 19.
17 A   We didn't contemplate the use of the word dividend
18     or distribution.  We used distribution as the
19     word, and that's what was captured in the memos
20     and the records that we held.
21 Q   What do you understand the word dividend to mean?
22 A   A payment to a shareholder pro rata.
23 Q   And do any of the distributions here identify a
24     payment to a shareholder pro rata?
25 A   Yes.  Can I correct one thing here?

---

Page 188

1  Q   Of course.
2  A   A payment to a shareholder or on behalf of a
3      shareholder.
4  Q   Pro rata.
5  A   Pro rata.
6  Q   Okay.  And so these payments characterized as
7      distributions do include payments to a shareholder
8      or on behalf of a shareholder pro rata?
9  A   Correct.
10 Q   Where, if at all, or how, how can I determine
11     whether -- using the definition of a dividend,
12     whether a distribution or any payment in
13     Exhibit 19 is a dividend or not?
14             MS. WITTENBERG:  I'll object to the
15         extent that it calls for a legal conclusion
16         as to the definition of dividend, but go
17         ahead and answer to the extent that you can.
18 A   What's provided in Exhibit 19 is representative of
19     pro rata distributions to shareholders or on
20     behalf of shareholders.
21 Q   So let me just review the first sentence there at
22     the top of -- or below the header line.  It says,
23     "The below chart shows all dividends and/or
24     distributions during the requested time periods."
25         Did I read that correctly?

---

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of Corporate Representative of Windy Waters, Inc.
November 03, 2023

Page 189

1  A   You did.
2  Q   So are you saying that these payments, all of
3      these payments in Exhibit 19, do represent
4      payments to a shareholder or on behalf of a
5      shareholder pro rata?
6  A   Yes.
7  Q   And I noticed that some of these are made out to
8      the U.S. Treasury and some are made out to the
9      Department of Revenue.  Why is that?
10 A   Those are payments on behalf of the shareholders
11     for tax, federal or state.
12 Q   And did you always pay taxing authorities directly
13     or did you ever pay the individual shareholders to
14     cover their tax liability?
15 A   We usually paid the taxing authority, and there
16     was a known event where we paid the individual
17     based on their request.  And I'm attempting to
18     locate that one now.
19         That would have been on January the 15th,
20     2008.  We received a request from Stacy Randall
21     to pay her directly instead of to the taxing
22     authority, in this case the United States Treasury.
23 Q   And then was there a tax liability incurred by the
24     payee or on behalf of the -- excuse me.
25         Was there a tax liability incurred by the

Page 190

1      shareholder when such payments were made on their
2      behalf to either of these taxing authorities?
3          MS. WITTENBERG:  Objection.  I
4      think that comes outside the scope of the
5      topics and is a lack of foundation that
6      Windy Waters would know that.  If you think
7      you can answer on behalf of Windy Waters,
8      feel free to.
9  A   Windy Waters used Baker Tilly to generate these
10     and provide these to the taxing authorities.
11 Q   So if there were a tax liability, that would have
12     been something that was Baker Tilly's
13     responsibility to determine and issue appropriate
14     tax-related documents to the shareholder; is that
15     right?
16 A   Windy Waters would have used Baker Tilly for
17     tax-related matters, and so -- and these payments
18     to these taxing authorities would have been to
19     cover for their tax liability.
20 Q   Yeah.  And I'm just trying to figure out from you,
21     though, whether -- who made the determination as
22     to whether there was a tax liability incurred by
23     virtue of these distributions made for taxes on
24     behalf of the shareholders?
25 A   We would have consulted with Baker Tilly on that

Page 191

1      matter.
2  Q   Got it.  So if I want the answer to that question,
3      I've got to talk to them as far as whether there
4      was such a liability imposed or not because of
5      this distribution for tax purposes?
6  A   That would be the next place to go.
7  Q   Okay.  The last question I have on Exhibit 19 is
8      from where was this document made?  What original
9      source did you consult in order to put this chart
10     together?
11 A   This was from our records that we held at
12     Windy Waters.
13 Q   Okay.  Mr. Kiesler testified that -- in a
14     declaration that in 2016 Stacy Randall received
15     dividend payments from the companies totaling in
16     excess of $156,000, including a nontax dividend
17     payment in April of 2016.
18         Does that appear to be consistent with the
19     chart that you put together here as Exhibit 19?
20 A   I just flipped to 2016.  I see a distribution here
21     to Stacy Randall directly and on her behalf to the
22     United States Treasury.  Can you restate the
23     numbers that you were citing there?
24 Q   Yeah.  He believes in his declaration that she
25     received dividend payments from the companies

Page 192

1      totaling in excess of $156,000, including a nontax
2      dividend payment in April of 2016.  And I'm simply
3      asking if you believe that this accurately
4      represents that.
5  A   And that number was over 150?
6  Q   Yes, sir.
7  A   So I see two distributions to Stacy or on behalf
8      of Stacy, one for $126,018 on 4/7/16, and then I
9      see on her behalf to the United States Treasury
10     for 30,170.  So I do see amounts in excess of 150
11     to Stacy or on Stacy's behalf.
12 Q   Okay.  And, again, we would characterize those as
13     dividends as he did or something else?  Earlier we
14     were talking about distributions and the
15     difference between those and dividends.  How would
16     you -- is his characterization correct in your
17     view?
18         MS. WITTENBERG:  And, again, I'll
19     just object to the extent that it calls for a
20     legal conclusion as to the meaning of
21     dividend, but go ahead and answer to the best
22     of your ability.
23 A   Our records have the use of the word distribution,
24     and I would say that the definition of
25     distribution and dividend by our application of it

**Stacy L. Randall v.**                    **Video Deposition of Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**                                                            **November 03, 2023**

| | Page 193 |
|---|---|

1    is the same.
2  Q  Good.  Let's go to 15, topic 15, and pull out the
3     Notice of Deposition that's Exhibit 1.  That calls
4     for, "Solicitation to purchase or sell
5     Windy Waters or any of its assets or subsidiaries
6     from 2015 through 2021."
7        Do you see that?  Did I read that correctly?
8  A  You did.
9  Q  And you are prepared to testify on that topic?
10 A  I am.
11 Q  And what did you do to prepare?
12 A  I reviewed the emails that were received that were
13    part of email accounts and also conversations with
14    counsel and present with counsel, Mike and Reed.
15 Q  So do you know someone named Jeff Horein over at
16    Baker Tilly?
17 A  I do.
18 Q  So in August of 2020, do you recall having
19    correspondence with him regarding the fact that
20    you were engaged -- currently engaged in a
21    dialogue with a publicly held company who recently
22    expressed interest because of your -- and I
23    presume interest of purchasing Widen because of
24    our market position and products and services.  Do
25    you recall that occurring and you sending

| | Page 194 |
|---|---|

1     something like that in August of 2020?
2  A  I do.
3  Q  What public company was that?
4  A  Channel Advisor.
5  Q  Channel, C-h-a-n-n-e-l.  And what is their line of
6     business?
7  A  They're a software company.
8  Q  And what was -- tell us, what can you recall about
9     those discussions?
10 A  My discussion with Jeff was related to the
11    succession planning primarily and simultaneous
12    with that there was this inquiry from Channel
13    Advisor, and I was asking Jeff about what to do
14    related to this and how I might prepare.
15 Q  Did you ask him that before you responded to them?
16 A  I don't recall the sequence of events.
17 Q  Do you recall your interactions with Channel?
18 A  I recall some interactions with Channel.
19 Q  Were they written or oral or both?
20 A  Mostly written.  Email dialogue.
21 Q  Okay.  And do you believe that we were provided,
22    the plaintiff was provided that correspondence
23    related to those?
24 A  I believe you were -- they were provided to
25    counsel.

| | Page 195 |
|---|---|

1        MR. CAMELI:  Okay.  And does
2     counsel believe they were provided to us?
3        MS. WITTENBERG:  I believe so.
4        MR. CAMELI:  Okay.
5  Q  All right.  What do you recall substantively about
6     those communications, at least the ones that you
7     can remember?
8  A  We would have received inquiry from Channel
9     Advisor from a person named Derek Conlin, I
10    believe was his last name.
11 Q  C-o-n-l-o-n?
12 A  C-o-n-l-i-n.
13 Q  Okay.
14 A  And he would have been in a capacity at Channel
15    Advisor to make outreaches to organizations of
16    interest and --
17 Q  Target companies for them to acquire?
18 A  Or partner.
19 Q  Okay.
20 A  Or align.  So not necessarily to acquire or to
21    partner or form some kind of alliance or technical
22    partnership.  So the nature of it was not -- it
23    was partnership related.
24       And then I would have forwarded that to our
25    partner team, as I would with those types of

| | Page 196 |
|---|---|

1     inquiries, to explore what a partnership with
2     Channel Advisor might look like.  And then I would
3     not have followed up with Derek.
4        I would have received then an inquiry from
5     the CEO of Channel Advisor in and around the
6     August 2020 timeframe and following up with
7     interest in having a conversation, and I would
8     have -- I replied with a, "Let's have a talk"
9     then.  So I had a conversation with the CEO of
10    Channel Advisor.
11 Q  So was there ever a discussion with them about
12    their interest in purchasing or partnering with
13    the company with respect to financial terms
14    associated with that?
15 A  I don't recall any documents that were received in
16    relation to financial terms related to any
17    partnership with Channel Advisor.
18 Q  How about discussions or any other communications
19    regarding potential financial considerations of a
20    partnership, an acquisition, things of that sort?
21    Do you have a recollection of any of that?
22 A  We provided financial information to Channel
23    Advisor.  I don't believe we reviewed any
24    agreements with Channel Advisor related to the
25    partnership.

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

| | Page 197 |
|---|---|

1  Q   No letters of intent ever given to you?

2  A   No.  No.

3  Q   Were there other solicitations between 2015 and
4      May of 2020 that Widen received, Widen Enterprises
5      received to purchase or sell Widen Enterprises or
6      Windy Waters?

7  A   **We received marketing emails or cold calls from a**
8      **variety of parties in that timeframe.**

9  Q   Did anyone during 2015 to May of 2020 ever discuss
10      with you or in written correspondence communicate
11      with you what they believed the value of Widen
12      Enterprises or Windy Waters to be?

13  A   Not that I recall.

14  Q   Let's move to topic 16.  I'm just going to ask one
15      question on topic 16.  Besides the sale of Widen
16      Enterprises to Acquia, did Windy Waters ever
17      engage in negotiations for a potential merger with
18      any other company?

19  A   **As part of the process we went through with**
20      **Software Equity Group, in 2021 we would have**
21      **received indications of interest and letters of**
22      **intent from other organizations.  We did receive**
23      **indications of interest and letters of intent from**
24      **other organizations.**

25  Q   And were those written letters of intent provided

| | Page 198 |
|---|---|

1      to us or to the plaintiffs in discovery?

2  A   **They were provided to counsel.**

3          MR. CAMELI:  Okay.  Does counsel
4      know if those were provided to us?

5          MS. WITTENBERG:  I believe so.

6  Q   And do you recall whether any financial terms were
7      ever shared with respect to any of those companies
8      interests in Widen Enterprises or Windy Waters?

9  A   **Those indications of interest and letters of**
10      **intent would have expressed some terms, yes.**

11  Q   And do you recall what any of those dollar amounts
12      would have been that were expressed by way of
13      interest in Widen Enterprises or Windy Waters?

14  A   **I do.**

15  Q   And what were they?

16  A   **In the summer of 2021, we received an indication**
17      **of interest from a company called Syndigo for**
18      **105 million.  We received an indication of**
19      **interest from Vista, the private equity company,**
20      **in combination with their portfolio company,**
21      **Acquia, and the first indication from them would**
22      **have been a range, and I believe that range to be**
23      **100 to 125 million.**

24  Q   What timeframe?

25  A   **The summer of 2021.**

| | Page 199 |
|---|---|

1  Q   Okay.

2  A   **And we would have received -- we did receive also**
3      **an indication of interest from a private equity**
4      **company called Marlin and their portfolio company**
5      **called Aprimo, and that would have been in the**
6      **same range as the Vista/Acquia one that I**
7      **previously had shared, but I don't recall the**
8      **exact number at this moment sitting here.  Those**
9      **were a few of the indications of interest that**
10      **were provided.**

11      **In addition, there were indications of**
12      **interest that were provided through conversations**
13      **that those parties, parties being the parties**
14      **interested in Widen and/or Windy Waters, to SEG,**
15      **Software Equity Group, that were not written but**
16      **were below $100 million, and those companies were**
17      **not progressed through the process.**

18  Q   This all occurs in the summer of 2021?

19  A   **Correct.**

20  Q   Did anything like that occur with any company
21      prior to the summer of 2021?

22  A   **It did not.**

23  Q   Okay.  We're going to move to topic 17.  So this
24      concerns, "Services performed by and information
25      provided to and from Baker Tilly and Grant

| | Page 200 |
|---|---|

1      Thornton LLP, from 2015 through 2021 regarding
2      consulting or due diligence for potential or
3      planned mergers and acquisitions, succession
4      planning, and planned or completed stock
5      transactions."

6          Did I read that correctly?

7  A   **You did.**

8  Q   And you prepared to testify in that regard?

9  A   **I am.**

10  Q   Did Windy Waters ever retain an outside accounting
11      service?

12  A   **Windy Waters used Baker Tilly for accounting**
13      **services.**

14  Q   And that is where, again, Bruce Hutler worked;
15      correct?

16  A   **For Virchow Krause prior to Baker Tilly, correct.**

17  Q   Who at Widen Enterprises or Windy Waters gave
18      information to Grant Thornton in connection with
19      consulting or due diligence on potential or
20      planned mergers and acquisitions or succession
21      planning?

22          MS. WITTENBERG:  Object to the
23      scope of this topic being outside the scope
24      of the Windy Waters topic specifically and
25      also assumes facts not in evidence.

**Stacy L. Randall v.**       **Video Deposition of Corporate Representative of Windy Waters, Inc.**
**Reed C. Widen, et al.**                                                            **November 03, 2023**

---

**Page 201**

1  Q  Okay. Let's start with Windy Waters. Who at
2     Windy Waters gave information to Grant Thornton
3     with respect to the noticed topic 17?
4           MS. WITTENBERG: I'm handing him
5        the notes that he had on this topic in case
6        he needs them, and I'll hand you a copy as
7        well.
8           (Exhibit No. 20 marked for
9           identification)
10 Q  So you have in front of you Exhibit 20; is that
11    correct?
12 A  That is correct.
13 Q  And that purports to be your notes with respect to
14    information contained in topic 17?
15 A  It is.
16 Q  So can you answer the question with respect to who
17    at Windy Waters provided information to
18    Baker Tilly and Grant Thornton with respect to the
19    matters identified in topic 17?
20 A  Windy Waters did not engage in a relationship with
21    Grant Thornton. Widen Enterprises did.
22 Q  So there was never any information provided to
23    Baker Tilly by Windy or Grant Thornton regarding
24    the subject of noticed topic 17?
25 A  We were talking about Grant Thornton before.

---

**Page 202**

1     Windy Waters didn't engage with Grant Thornton,
2     Widen did. Windy Waters would provide Baker Tilly
3     with information, and the person at Windy Waters
4     who would provide Baker Tilly information was Mike
5     Kiesler.
6  Q  And, again, I'm talking with respect to consulting
7     or due diligence for potential of planned mergers,
8     an acquisition, succession planning, and planned
9     or completed stock transactions.
10 A  Understood.
11 Q  Okay. So that would have been Mr. Kiesler in his
12    capacity -- he would have been providing
13    information on that topic to Baker Tilly?
14 A  Baker Tilly in the capacity of the mergers and
15    acquisitions topic would have supported
16    tax-related matters in June of 2021. So that is
17    when they would have engaged on that topic.
18 Q  And as to Grant Thornton, your testimony is
19    Windy Waters would have had no engagement with
20    them for the topic noticed in 17?
21 A  Correct.
22         MR. CAMELI: Okay. Do you know --
23      So I'm looking now under the Windy Waters
24      notice topic 20, and it talks about the sale
25      of Widen Enterprises to Acquia. And I

---

**Page 203**

1     realize that was a designated topic from
2     previous testimony, is that right, Counsel?
3           MS. WITTENBERG: Correct.
4  Q  Was there a quality of earnings report made in
5     connection with the sale of Widen -- of Windy
6     Waters to Acquia or, excuse me, of Widen
7     Enterprises to Acquia?
8           MS. WITTENBERG: Again, this goes
9        outside the topic as to Windy Waters
10       specifically, but if you want to give that
11       answer, go ahead.
12 A  Widen Enterprises contracted Grant Thornton to run
13    a quality of earnings report in connection with
14    the merger and acquisition process.
15 Q  And did you ever look at that report?
16 A  I did.
17 Q  And did it appear accurate to you?
18 A  It did.
19 Q  And who -- Did Mr. Kiesler interface with Grant
20    Thornton on that?
21           MS. WITTENBERG: Again, this is a
22       topic for, I think, Widen Enterprises, and
23       the topic is, in fact, noticed for Widen
24       Enterprises, and that is the entity that
25       engaged Grant Thornton.

---

**Page 204**

1        So this witness has not prepared for the
2     Widen Enterprises aspect of that topic. So
3     I'm going to ask him not to answer right now,
4     but he'll be back on Monday to answer for
5     Widen Enterprises.
6           MR. CAMELI: And that would be the
7        same, Counsel, with respect to who at Widen
8        Enterprises was interfacing with Grant
9        Thornton?
10          MS. WITTENBERG: Correct.
11          MR. CAMELI: And who Grant Thornton
12       was interfacing with at Widen Enterprises?
13          MS. WITTENBERG: Correct.
14          MR. CAMELI: Okay. Let's go off
15       the record just for a minute.
16          THE VIDEOGRAPHER: Going off the
17       record at 4:44.
18          (Recess)
19          THE VIDEOGRAPHER: We're back on
20       the record at 4:52.
21 Q  Mr. Gonnering, I would now like to move to
22    topic 7, and that refers to, "Policies regarding
23    disclosures to shareholders, directors, and
24    officers and all disclosures made to shareholders,
25    directors, and officers from 2004 through 2020."

---

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of  Corporate Representative of Windy Waters, Inc.*
**November 03, 2023**

Page 205

```
1       Is that correct?
2   A   That is correct.
3   Q   And you prepared to testify on this topic?
4   A   I am.
5   Q   How, if at all, did you organize disclosures made
6       to the shareholders, directors, and officers from
7       2004 through 2020?
8   A   How did we organize the disclosures to --
9   Q   I'm sorry.  No.  In preparing for this testimony,
10      how did you personally, on behalf of the company,
11      organize this information?  So if I ask you
12      questions about it, did you create a summary
13      chart?  What did you do?
14  A   I spoke to counsel, and present in the room was
15      Reed and Mike, and we collectively organized the
16      things that have been disclosed and provided a
17      summary of those disclosures.
18  Q   Okay.
19  A   Assembled a summary of those disclosures.
20  Q   Got it.  Something similar to what you had used
21      previously in some of your other topic testimony?
22  A   Similar in the format of notes, are you referring?
23  Q   Yes.
24  A   Yes.
25  Q   Okay.  So I'm going to ask about those
```

Page 206

```
1       disclosures.  I don't know if you want to provide
2       that at this point.
3                   (Exhibit No. 21 marked for
4                    identification)
5   Q   So you have in front of you Exhibit 21, and this
6       purports to be your notes to help recollect your
7       testimony as it concerns topic 7; is that correct?
8   A   Correct.
9   Q   All right.  And do you adopt this Exhibit 21 as
10      your testimony with respect to topic 7?
11  A   I will use Exhibit 21 to testify to topic 7.
12  Q   So Windy Waters did not have any formal policies
13      about disclosures to shareholders, directors, or
14      officers; is that correct?
15  A   That is correct.
16  Q   And the shareholders were sent K-1s each year by
17      either Baker Tilly or Mr. Kiesler?
18  A   Correct.
19  Q   Shareholders, directors, officers were provided
20      with information when they requested it, but Windy
21      Waters has no records of any specific formal
22      disclosures made to all Class B shareholders or to
23      all Class A shareholders or to all directors or
24      all officers; is that correct?
25  A   That is correct.
```

Page 207

```
1   Q   And the company believes that Stacy Randall was
2       kept informed of company business, Windy Waters
3       business, by Reed Widen and Michael Kiesler about
4       any action requiring her approval as president or
5       director or shareholder; is that correct?
6   A   That is correct.
7   Q   And the company believes that Reed Widen or
8       Mr. Kiesler disclosed to Ms. Randall basic
9       information about each transaction that required
10      her approval?
11  A   That's correct.
12  Q   And one example of her being provided information
13      she requested occurred in June of 2016 when her
14      then husband asked on her behalf for a profit and
15      loss statement for Windy Waters for three months;
16      is that correct?
17  A   That is correct.
18  Q   And that same day Mr. Kiesler sent Mr. Randall
19      copies of Windy Waters financial statements for
20      January through April of 2016?
21  A   Sent him and Stacy together those copies.
22  Q   Very good.  And then you provide another example
23      of Ms. Randall, or is it Mr. Randall, in March of
24      2020 asking Reed Widen?
25  A   Stacy.
```

Page 208

```
1   Q   Okay.  So Stacy Randall in March of 20 asks Reed
2       Widen and Mr. Kiesler for detailed financial
3       information and accountant statements and
4       requested that that information be provided to her
5       lawyer; is that correct?
6   A   That is correct.
7   Q   And Mr. Kiesler gathered that and provided it to
8       her counsel as requested?
9   A   That's correct.
10  Q   And Ms. Randall came into the office of Windy
11      Waters and Widen Enterprises on occasion, and you
12      believe, or the company believes that she was
13      likely provided information during those visits
14      but no such record of whatever information was
15      disclosed is available?
16  A   That's correct.
17  Q   Have all the disclosures made to directors,
18      officers, and shareholders been produced in this
19      litigation that you know of?
20          MS. WITTENBERG:  Objection.  Vague.
21      Go ahead and answer if you can.
22  A   Disclosures that --
23  Q   To directors, officers, and shareholders, have all
24      of those been produced in this litigation?
25  A   We have produced the substantive ones to counsel
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 209

1     that are related to this matter.
2  Q  And were disclosures ever made in writing?
3  A  The K-1 disclosures would be made with written
4     communications.
5  Q  And was information ever transmitted -- other than
6     as outlined in the testimony we just went over,
7     was any information ever provided by email or
8     U.S. mail?
9  A  Information would have been provided by email, as
10    I stated, with some of the K-1s.  So that would
11    have occurred.  And by email for the requests for
12    the profit and loss statement, the first example
13    that was provided.  And the second example, that
14    was provided also as email activity.
15  Q  So with respect to the policies about disclosures
16    to shareholder, you mentioned -- and directors and
17    officers, you mentioned there is no formal policy.
18    Were there informal policies?
19  A  Yes.
20  Q  And how were those documented?
21  A  They were not documented.  By way of being
22    informal, it was to provide information upon
23    request.
24  Q  That was essentially the policy then.  You got
25    information if you asked for it?

Page 210

1  A  Correct.
2  Q  Okay.  Now, did you ever provide board books to
3    directors of Windy Waters for board meetings?
4  A  Corporate records, did we provide --
5  Q  No.  Board books, meaning books that are assembled
6    pertaining to company business, such as their
7    financials.
8       Did you ever provide anything that resembled
9    that to directors of Windy Waters in conjunction
10    with any board meetings that would have been held?
11  A  Not to my recollection.
12  Q  In fact, there weren't any board meetings ever
13    held; correct?
14  A  There were no -- there were meeting minutes and no
15    meetings, correct.
16  Q  Yeah.  But there were meeting minutes, but there
17    were no meetings?
18  A  Correct.
19  Q  And if I -- I want to show you one exhibit.  This
20    will be 22.
21         (Exhibit No. 22 marked for
22           identification)
23  Q  Exhibit 22, would you agree it purports to be
24    minutes of a 2019 annual meeting of shareholders
25    of Windy Waters; is that correct?

Page 211

1  A  That's the title, yes.
2  Q  And then that is signed by Mr. Kiesler, and there
3    is a waiver signed by Reed Widen and Stacy Randall
4    that are attached to Exhibit 22; correct?
5  A  Correct.
6  Q  And that is -- if we look at the waiver for a
7    moment, that is Stacy Randall's stamp; is that
8    correct?
9  A  By looking at this document, I do not know what is
10    a stamp and what is not a stamp.
11  Q  Do you believe that she -- that either her consent
12    to use her stamp was used for this waiver or that
13    she actually signed it?
14  A  Every time there was an action requiring her
15    signature, she was made aware, and then she would
16    direct accordingly.
17  Q  Was she ever notified of a waiver of any and all
18    notice of the time and place of a shareholder
19    meeting?
20  A  She was notified of documents that required her
21    action, and this required her action, and,
22    therefore, she would have been notified.
23  Q  And how do you believe she was notified?
24  A  She was communicated to by Reed or Mike.
25  Q  Orally or in writing or both?

Page 212

1  A  The recollection of the method is not known.
2  Q  And there are a series of similar minutes of
3    annual shareholder meetings that go from 2004
4    through 2019 as evidenced here in Exhibit 22.  You
5    would agree that none of those shareholder meeting
6    minutes reflect an actual meeting that took place?
7  A  There were no meetings that took place.
8         MR. CAMELI:  Okay.  Subject to the
9    reservation of time that we have placed on
10    the record and our intended use thereof and
11    counsel's reservation of objections to the
12    same, we have no further questions, and we're
13    ready to go off the record.
14         THE VIDEOGRAPHER:  Going off the
15    record at 5:05.
16       (Adjourning at 5:05 p.m.)

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023**

Page 213

```
1    STATE OF WISCONSIN )
                        ) ss.
2    COUNTY OF DANE     )

3

4         I, Peggy S. Christensen, Registered Professional
5    Reporter and Notary Public in and for the State of
6    Wisconsin, do hereby certify that the foregoing video
7    deposition of MATTHEW R. GONNERING, as the Corporate
8    Representative of Windy Waters, Inc., was taken
9    before me on November 3, 2023, and reduced to writing
10   by me, a professional court reporter and
11   disinterested person, approved by all parties in
12   interest and thereafter converted to typewriting
13   using computer-aided transcription.
14        I further certify that I am not related to nor
15   an employee of counsel or any of the parties to the
16   action, nor am I in any way financially interested in
17   the outcome of this case.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   and affixed my notarial seal of office at Madison,
20   Wisconsin, this 4th day of November 2023.
21
22
23   _____
     Notary Public, State of Wisconsin
24   My Commission Expires August 7, 2024
25
```

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Corporate Representative of Windy Waters, Inc.
November 03, 2023Index: $10,000..11:13

## Exhibits

**Windy Waters 11-3-23 Exhibit 1**
3:6 11:21,22,24 23:7 26:14 47:15 85:1
113:10 148:14 172:16 184:18 193:3

**Windy Waters 11-3-23 Exhibit 2**
3:7 13:1,9,12,13

**Windy Waters 11-3-23 Exhibit 3**
3:10 19:12,14

**Windy Waters 11-3-23 Exhibit 4**
3:11 30:4,7 37:12,24 53:5

**Windy Waters 11-3-23 Exhibit 5**
3:12 48:24 49:2

**Windy Waters 11-3-23 Exhibit 6**
3:15 65:15,18 66:11 67:6

**Windy Waters 11-3-23 Exhibit 7**
3:16 86:16,19 91:20,24 92:23 93:4
176:20,21

**Windy Waters 11-3-23 Exhibit 8**
3:17 88:15,18,23 96:6 110:20,21
111:10

**Windy Waters 11-3-23 Exhibit 9**
3:18 92:5,6,8 93:7

**Windy Waters 11-3-23 Exhibit 10**
3:20 93:8,9,11 94:2 95:19

**Windy Waters 11-3-23 Exhibit 11**
3:21 98:17,20 107:5,22 109:4 128:18
130:12 131:11

**Windy Waters 11-3-23 Exhibit 12**
3:22 99:8,9 104:4,6 106:7

**Windy Waters 11-3-23 Exhibit 13**
4:1 117:3,6,14 120:6,19

**Windy Waters 11-3-23 Exhibit 14**
4:2 133:16,19 143:5,17

**Windy Waters 11-3-23 Exhibit 15**
4:3 137:17,20 138:22 142:22

**Windy Waters 11-3-23 Exhibit 16**
4:5 165:3,6

**Windy Waters 11-3-23 Exhibit 17**
4:7 174:1,3,4

**Windy Waters 11-3-23 Exhibit 18**
4:8 180:7,8,11 182:22

**Windy Waters 11-3-23 Exhibit 19**
4:10 186:7,8,12,24 187:10,16 188:13,
18 189:3 191:7,19

**Windy Waters 11-3-23 Exhibit 20**
4:11 201:8,10

**Windy Waters 11-3-23 Exhibit 21**
4:12 206:3,5,9,11

**Windy Waters 11-3-23 Exhibit 22**
4:13 210:21,23 211:4 212:4

## $

**$10,000**
178:4

**$100**
199:16

**$126,018**
192:8

**$156,000**
191:16 192:1

**$16,000**
124:12 177:24 178:4

**$2**
177:17

**$27.44**
165:22

**$31.5**
167:5

**$337.61**
89:14

**$350.04**
90:16

**$5,000**
185:14,18

**$5.5**
174:11 175:14

**$50,000**
43:6,18 46:14 47:25 124:1 176:25
178:20

**$7,441,000**
101:7

**$7.441**
102:25

**$700,000**
151:2

## 0

**07**
89:18
**08**
89:19

## 1

**1**
11:21,22,24 12:6,7 19:17 23:7 26:14
47:15 85:1 92:2 93:2 96:7 99:21 100:7
101:18 113:10 142:22,23 148:14
172:16 184:18 193:3

**1/1**
89:19

**1/1/08**
89:20

**1/1/2007**
66:13

**1/1/2008**
89:11,13

**1/2**
178:5

**10**
47:18,19 48:9 49:6 50:3 54:18 55:10
82:12 84:24 85:15 86:4,10 93:8,9,11
94:2 95:2,3,4,19 129:5 152:7 166:5
168:11,14 169:20 171:21 172:1,5

**100**
100:23,25 101:6 137:5 198:23

**105**
80:11 198:18

**106**
83:9

**107**
80:12

**10:49**
74:1

**11**
98:17,20 107:5,8,22 109:4 128:18
130:12,15 131:11 136:24 137:2
184:17,18 186:14

**11:13**
74:4

**11:35**
88:5

**11:36**
88:8

**12**
99:8,9 104:4,6 106:7 128:10,11
148:13,15

**125**
198:23

**1292**
139:15

**1293**
139:16

**12:22**
110:1

**12:23**
110:8

**12:30**
110:1

**13**
37:14,16,17 43:3 44:12,15,21 45:5,12,
16 46:2,6 53:20 55:22 56:5 117:2,3,6,
14 120:6,19 125:24 145:16 148:6
165:14 172:16 176:22

**137**
80:12

**14**
92:14 133:16,19 143:5,17 175:2,12

**140**
171:1

**148.54**
89:13

**15**
137:17,20 138:22 142:22 193:2

**150**
153:14 171:1 192:5,10

**15th**
189:19

**16**
107:1 124:23 165:3,6 170:23 197:14,
15

**16,000**
124:13,14,22

**17**
107:10 109:15 130:16 174:1,4 199:23

201:3,14,19,24 202:20

**174**
83:9

**177**
175:1,8,9

**18**
107:10 109:15 111:14,15,24 130:16
131:3 167:5 180:7,8,11 182:22

**19**
77:10,19 78:5 79:6,25 80:10,13,24
81:4 82:5 83:5,14,20 90:25 107:10
109:15 130:16 186:7,8,12,24 187:10,
16 188:13,18 189:3 191:7,19

**190**
83:9

**197**
80:12

**1992**
133:22 134:3,23 143:17

**1993**
133:20

**1997**
30:25

**1998**
37:14

**1:00**
110:5

**1:08**
110:11

**1st**
134:3

---

**2**

**2**
12:6,7 13:1,9,12,13 23:6,9,16 96:7
139:14

**2.1**
135:4

**2.2**
135:8 143:11 144:13

**2.2A**
135:15

**2.2B**
136:16

**2.3**
143:11 144:14

**2.6**
159:23 172:13

**2.7**
175:17,19

**20**
19:2 82:14,22 83:17 84:16 90:25
107:10 109:16 123:3 130:16 168:11
180:13 201:8,10 202:24 208:1

**2003**
37:23 53:4 99:6 104:11,13,18

**2004**
27:9 33:14,15 55:25 67:13,16 87:4
93:24 96:13,21 97:1,5,14 98:7 99:2,3,
5,14 100:3 101:1,8,12,21 102:7,14
103:4,7 105:8 106:13,14,24 107:13
109:6 129:22 145:20,22 182:3,12
183:3,14,16 184:3,11,22 204:25 205:7
212:3

**2005**
110:16,17,22 112:6,11 181:14,15,24

**2007**
37:17,22 43:2 53:20 56:5 59:8,9 94:13
96:12,13,19,21,23,24 97:15 98:8 99:2
111:8,10 125:6 129:23 137:10,22

**2008**
50:11,12 59:6 92:2 93:2 184:22
189:20

**2011**
111:14,15,25

**2013**
112:17

**2014**
184:22

**2015**
23:12 24:2 37:16 97:15 106:18,19,21,
23 107:1 113:14 117:17 172:19
173:13 193:6 197:3,9 200:1

**2016**
191:14,17,20 192:2 207:13,20

**2017**
106:3,25 107:3 112:3 117:17 128:17
131:1

**2018**
106:3,25 117:18 128:17

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: 2019..50

**2019**
  106:3,25 112:3 128:17 166:5 210:24
  212:4

**2020**
  27:10 33:14,15 37:14,16,17 43:3,17
  44:12,15,21 45:5,12,16 46:3,6 53:20
  55:20,23,25 56:5 67:13,16 87:4 93:24
  97:15 101:12,21 102:7,15 103:7
  106:3,25 109:6 112:4 117:18,19
  123:9,17 125:24 127:7,24 128:17
  145:16 148:6 151:25 154:21,22,24
  155:3 156:8,9,22 158:6 160:13,17,18,
  19,24 161:12,22 162:25 163:8,20,24
  164:9 165:11 166:4,8 167:6,20 169:20
  170:22 171:3,5 172:19 173:5,13
  174:9,20 176:24 180:14 182:2,12
  183:2,15,16 184:4,11,23 193:18 194:1
  196:6 197:4,9 204:25 205:7 207:24

**2021**
  19:2 85:21 86:1 113:15 155:23
  166:18,24 167:5 193:6 197:20 198:16,
  25 199:18,21 200:1 202:16

**2023**
  5:5 80:13 83:3,5,8 181:14,16,24

**2024**
  181:17

**21**
  82:24 83:8 113:9,10 117:8 169:19
  206:3,5,9,11

**22**
  85:21,25 105:7 210:20,21,23 211:4
  212:4

**22-cv-400-jdp**
  5:9

**23**
  83:3 181:20,21

**24**
  82:24 181:20

**25**
  83:5

**262**
  83:6

**268**
  83:6

**281**
  80:12

**283**
  80:12

**285.68**
  90:16

**294**
  174:4

**2:16**
  147:25

**2:27**
  179:5

**2:31**
  148:3


**3**
  5:5 19:12,14 26:12,14 27:22 30:11
  46:23 96:8 104:18 151:15 178:5

**3.2**
  136:9,19,23 142:23 143:4,13,22
  144:16 146:11 147:2

**3.3**
  136:20

**30**
  21:1 100:3 101:1,8 110:16,17 111:8,
  10

**30(b)(6)**
  11:25 78:24 83:1

**30,170**
  192:10

**30-day**
  150:5 152:21

**31**
  80:11 168:9

**31.5**
  167:11

**32,000**
  124:22

**33**
  83:5

**34**
  83:6

**35**
  86:23 88:25 91:24

**35810**
  93:16

**35811**


  93:16

**3:27**
  179:9

**3:30**
  147:19,22


**4**
  30:2,4,7 37:12,24 53:5 82:12 84:24
  85:2,3 86:23 91:24 95:2 145:6,7

**4/7/16**
  192:8

**40**
  83:3

**41**
  83:3

**45**
  175:2,4 179:16

**48,000**
  124:23

**4:00**
  179:12

**4:44**
  204:17

**4:52**
  204:20


**5**
  48:22,24 49:2,3 86:25 91:23,24
  168:14 178:4 181:12

**5,000**
  185:23

**5.5**
  175:20 176:8

**5/13/2020**
  87:6

**5/14/04**
  90:15

**5/15/2004**
  87:6

**50**
  124:15,17 179:16

**50,000**
124:8,12 178:5,17

**5:05**
212:15,16

**6**

**6**
65:15,18 66:11 67:6 97:11,12 98:21
104:11 131:23 151:14 174:6

**6/30**
89:18 110:25

**6/30/07**
89:20

**6/30/2007**
89:10

**61**
80:11

**611.88**
110:25

**63**
80:11

**67**
80:11

**68**
80:11

**6911**
33:16

**7**

**7**
49:1 86:15,16,19 91:20,24 92:23 93:3,
4 94:13 101:2 125:6 176:20,21 204:22
206:7,10,11

**7.441**
107:13

**74**
174:5

**76**
92:11

**7th**
137:21

**8**

**8**
26:12 27:8,22 60:17 65:21 88:15,18,
23 96:6 104:13 110:20,21 111:10
135:3,4 165:11 166:8

**82**
92:14

**89**
83:9

**8:56**
5:6

**9**

**9**
92:5,6,8 93:7 94:11,21 95:4 125:3,4

**90**
124:18,19 136:8

**92**
133:23,24

**93**
83:4

**95**
176:22,23

**96**
83:4

**97**
83:9

**98**
80:11

**A**

**abide**
35:4

**ability**
8:17 49:25 124:13 129:19 192:22

**absence**
64:11 69:4

**absent**
55:14 63:9 68:13 75:23

**Absolutely**
147:14

**access**
121:24,25 122:14,20

**accessible**
119:10

**accompanied**
92:9

**accordance**
124:2 130:17 160:21 176:11

**account**
16:17 38:23,24 116:14,15,18 120:11
121:13,16 176:5

**accountability**
68:10

**accountable**
68:18

**accountant**
208:3

**accounted**
18:9

**accounting**
124:4 166:15 200:10,12

**accounts**
38:20,21 39:2 113:24 116:11,12
123:15 160:15 173:3 174:19,23
193:13

**accuracy**
62:17

**accurate**
31:8 87:8 89:1 90:14 93:20 203:17

**accurately**
192:3

**acknowledgment**
66:15

**Acquia**
20:16 82:24 197:16 198:21 202:25
203:6,7

**acquire**
195:17,20

**acquisition**
196:20 202:8 203:14

**acquisitions**
200:3,20 202:15

**acting**
100:15

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: action..anticipation

**action**
66:13 69:5 71:5 151:15 207:4 211:14, 21

**actions**
52:7,9 63:3,5,13 68:11 69:14,17,24 70:10,21 71:2,3,10 72:25 157:16

**active**
146:5,7

**actively**
77:4

**activities**
41:18 51:12,16 157:3 160:19 163:10 184:16

**activity**
85:17,22,25 86:11 102:11 209:14

**actual**
115:19 212:6

**add**
119:7 124:22

**addition**
150:8 151:24 164:14 167:12 199:11

**additional**
14:8 20:6,8 111:25 126:5 151:13 169:13

**additions**
154:14

**address**
128:23 137:12 179:18

**addressed**
105:5

**addresses**
38:16,19

**adherence**
138:19

**adjourning**
212:16

**adjust**
166:2

**administrative**
60:25 61:2,5,7

**adopt**
206:9

**adopted**
23:22 95:24 96:12,14 129:22

**adopting**
91:2 158:9

**advice**
142:21

**advised**
72:11 184:7

**advisor**
97:1 112:18 194:4,13 195:9,15 196:2, 5,10,17,23,24

**affairs**
75:25

**affect**
164:20

**affiliated**
26:3 38:10

**affiliates**
26:5

**affiliation**
14:22 26:9

**afford**
124:14

**afforded**
123:18

**agree**
63:11,15 69:18 75:12 78:10 81:19 99:24 101:11 103:6,11,13 135:18 137:4 159:15 172:17 176:4,6 177:5 178:19 181:23,25 182:1,10 210:23 212:5

**agreed**
48:18

**agreeing**
135:12,20,25 175:25

**agreement**
94:14 96:5,15 111:4 125:7 129:23 131:8,13 132:5,10 133:20,25 134:1,23 135:9 137:13,21 142:24 143:5,16,17 148:8 176:12 180:4

**agreements**
124:3 130:6 152:21 196:24

**ahead**
36:3,4 41:5,15 42:2,15 43:1,22 47:11 50:2 54:23 58:4 60:18 61:13 68:17 82:19 101:14 103:10 107:24 119:14 127:17 129:18 131:20 133:2 142:18 143:24 146:14 167:14 183:6 188:17 192:21 203:11 208:21

**align**
195:20

**alliance**
195:21

**allowed**
150:4

**alongside**
112:20

**aloud**
135:22

**amended**
137:10 143:6 146:9

**amendment**
94:14,23 95:25 96:14 111:4 125:7,19 129:22 137:20 138:2 146:23,24 147:7

**American**
154:20

**amount**
76:2 124:14 150:13,21 162:11 167:9 173:5

**amounted**
124:11

**amounts**
173:8 186:24 192:10 198:11

**ample**
175:21

**and/or**
26:19 73:19 141:24 184:20 185:8 188:23 199:14

**annual**
181:2 210:24 212:3

**annually**
185:14,19

**anomaly**
20:18 21:14

**answering**
15:1 117:11

**answers**
70:20 162:2

**anticipate**
34:9 50:3 64:1

**anticipated**
150:21 152:1

**anticipation**
9:20 10:12 11:1 13:19 186:13

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023Index: apologize..back**

**apologize**
8:14 131:4

**appearing**
20:15

**appears**
91:23 92:17,18,19,25 99:12 133:20
139:15

**application**
192:25

**applied**
97:7 102:20 156:11 159:1 176:11

**apply**
118:20 159:11

**appoint**
64:25

**appointed**
32:3,8 61:10 64:20 66:25

**appointing**
62:11

**appointment**
56:8,17 62:13 64:15

**appraisal**
99:14,17,19,25 100:2,5 101:19 105:24
126:10,11 146:11 147:1

**appraisals**
97:14 105:18 109:15

**appraised**
100:22 106:20,22,24 107:9

**appraiser's**
99:17,25

**approached**
46:20

**approval**
69:23 207:4,10

**approximate**
20:21 126:19,22 168:3 170:25 186:25

**approximately**
153:14 159:23 170:22,23 171:4 172:4,
13 177:13,16 179:17

**approximation**
126:22 127:11,12,13,21

**April**
100:3 101:1,8 151:25 155:13 156:2,3,
6,8,10,13,14 157:7 158:6,12 162:2,9,
14,17,19,21,24 163:7,20,24 164:8

191:17 192:2 207:20

**April's**
156:7

**Aprimo**
199:5

**areas**
149:20 151:7 166:23 173:8

**argument**
81:21

**Argumentative**
50:25

**arise**
79:3

**arm's**
100:15

**arose**
40:9

**asks**
208:1

**aspect**
204:2

**assemble**
9:22

**assembled**
101:24 145:18 146:19 164:1 186:4
205:19 210:5

**assembly**
128:1

**assert**
35:7

**assess**
153:4 155:16

**assessment**
107:6

**assessments**
155:17 162:23 163:2,7 164:8,18

**asset**
28:13,15,18 109:9 160:4,8 164:21

**assets**
28:11,12 29:2 51:5 103:14,15 112:20,
23 122:20 193:5

**assist**
14:15 15:10 30:13 87:14 97:22 117:10

**assume**

7:12 109:5 121:2,9

**assumed**
13:8 162:10

**assumes**
105:21 200:25

**assuming**
105:23

**assumptions**
102:19,20 103:1

**attached**
211:4

**attempting**
189:17

**attention**
52:1 148:14 165:16

**attorney-client**
12:13 142:11

**attorneys**
126:7

**attributed**
168:9

**August**
83:3 117:17,18 193:18 194:1 196:6

**authored**
102:8,10

**authorities**
189:12 190:2,10,18

**authority**
42:11,22 43:16 44:4 45:4,11 47:2
58:15 189:15,22

**auto**
19:3

**avoid**
141:17

**aware**
9:18 17:17,20,23,25 18:13,16 21:18
25:25 26:8 58:20 60:22 62:9 68:23,24
69:14,21,22 70:11 71:8,9,11,17,19,20
72:13,18 73:7 76:16,20 77:3,6 125:22
175:13 211:15

**B**

**back**
20:13,16 31:9 36:8 43:6,11,18 46:13
47:6,8 48:3 54:24 63:20 73:13 74:3

88:7 89:25 90:15 91:20 103:5 104:6
109:14 110:10,13 123:2,18 141:18,21
142:1 148:2 150:10 157:19 166:8
167:25 174:19,23 179:11 186:17
204:4,19

**bad**
157:25

**baked**
127:4

**Baker**
97:2,6 106:5 107:6 111:7 112:17
126:6 127:3,25 128:3 130:14 131:1
144:4,19,22 145:18 147:5 183:9 184:6
190:9,12,16,25 193:16 199:25 200:12,
16 201:18,23 202:2,4,13,14 206:17

**balance**
98:3

**base**
126:4,11 161:20 182:6

**based**
17:18 20:11 44:18,25 74:7,20 96:11,
12,25 103:1,2,11 106:17 112:18 126:9
127:2,25 133:9 137:13 138:8 139:4
141:23 145:22 147:5 159:5 160:15
161:6,7 166:14,16 167:16 168:1,9
170:3,12 171:12 177:20 182:1,10,25
183:10,24 184:5 189:17

**basic**
207:8

**basis**
36:15 45:23 114:4

**Bates**
109:23 139:15 180:20

**began**
11:7

**begins**
86:24

**behalf**
5:18 6:14,22 23:19 27:16 85:11 86:9
120:1,9,20 123:11 140:8,22 142:2
148:22 188:2,8,20 189:4,10,24 190:2,
7,24 191:21 192:7,9,11 205:10 207:14

**believed**
166:11 197:11

**believes**
191:24 207:1,7 208:12

**belonged**

**belonging**
17:1

**bidirectional**
122:8

**bit**
35:9 47:18 50:15 73:14 90:19 114:2,5
158:17

**block**
175:6

**board**
64:19 68:20,21 69:1,3 71:2,3 75:18
76:18 77:5 210:2,3,5,10,12

**BOD**
66:12

**Boerner**
5:19

**books**
210:2,5

**boss**
51:21

**bottom**
23:8 86:24 96:7 107:5,8 130:15
131:12 135:4 166:19 181:22

**bought**
43:18

**boundary**
46:21

**Box**
16:17,19

**Brad**
97:7

**break**
7:14 73:23 74:8 88:1 110:2 147:13
179:4

**breakdown**
63:17

**breaking**
67:22

**Brian**
90:1,2

**briefly**
87:24

**broad**
25:5

**broadly**
36:10

**Bruce**
97:2 99:14 103:4 111:3 112:13,18
126:2,4 145:22 200:14

**budgeted**
171:23

**building**
153:15

**built**
169:22,23,25

**bullet**
66:14,17

**burdensome**
80:6 83:24

**business**
18:15 45:2,10 62:19 74:16 100:8
150:20 151:4,17,18,20,22 154:18
155:25 157:15 158:8 167:11,12
171:10 194:6 207:2,3 210:6

**buy**
43:11 46:13 47:25 48:3 100:16 123:2,
18

**buybacks**
44:5

**buyer**
100:14 137:4

**buying**
43:5

---

**C**

**C-H-A-N-N-E-L**
194:5

**C-O-N-L-I-N**
195:12

**C-O-N-L-O-N**
195:11

**calculated**
96:11 143:21

**calculation**
145:8,13

**calculations**
132:2

**call**
16:8 81:15 147:18,20 186:6

**called**
6:1 15:17,19 16:17 198:17 199:4,5

**calling**
42:25 127:15

**calls**
28:3 32:10 38:6 42:14 43:21 44:7 45:7
48:6 50:25 95:17 101:13 103:9 107:23
119:13 129:17 131:19 133:1 143:23
145:1 146:13 182:4 183:6 184:18
188:15 192:19 193:3 197:7

**Cameli**
5:17,18 6:6,10 10:2,10,17,23 11:9,12,
14,15 13:2,6 14:20 18:5,8,11,12,24
19:10 22:8,25 23:5 29:22,25 32:19
33:2 34:22 35:13 43:8 45:22 46:22
47:7 48:20 49:1 54:20,24 55:2,7,8
56:3 62:1 66:6 67:24 68:4,5 73:22
74:5 77:9,14,22 79:1,21 80:7,19
81:11,25 82:9,19,22 83:12 84:3,14,19,
23 87:18,25 88:11,17,21 90:22 91:11,
16,18,19 94:10 95:1,13 98:13,15
109:19,24 110:4,12 113:5,8 116:25
121:7,11 127:18 133:4 136:12 140:11
141:3,7,19 145:3 147:9,14,23 163:14
176:17 178:25 179:3,6,13 180:5
195:1,4 198:3 202:22 204:6,11,14
212:8

**cancel**
161:2

**cancelling**
161:3

**Cannon**
5:23

**capable**
161:8

**capacity**
35:16 36:25 44:18 45:21,25 50:6,7
52:3,19 53:11 59:16 60:6,13,19 69:15
114:16 121:21,22 195:14 202:12,14

**captured**
187:19

**cascaded**
160:4

**case**
5:9 6:11,18 24:6 37:1 43:24 52:14,16
75:6 81:10 106:14 126:24 158:15
163:12 189:22 201:5

**cases**
72:2 76:21 78:16

**cash**
100:11 118:4,9,12,25 119:9 122:10
123:5 172:18 173:6,12,17 174:11
175:18 177:1

**casual**
14:7

**categories**
49:18

**CEO**
32:15 33:6 52:15 151:24 152:6 171:21
196:5,9

**certification**
159:5

**CFO**
52:3,9,15 121:21

**challenges**
154:8,17 155:24

**change**
74:20 100:12 156:21 177:24 185:20

**changed**
24:6,9 74:17 103:11 112:6,8,15,16
150:25 155:12 173:19

**changing**
156:3,18

**Channel**
194:4,5,12,17,18 195:8,14 196:2,5,10,
17,22,24

**channels**
167:1

**characterization**
192:16

**characterize**
164:17 192:12

**characterized**
188:6

**chart**
67:15,17 87:1 88:24 91:22 92:16
128:9 180:21 181:12 182:1,7,10
183:1,13,25 184:9,12 188:23 191:9,19
205:13

**chart's**
92:22

**check**
62:12 89:16

**chose**
15:17,19 77:8 171:12

**chosen**
32:25 60:10 75:20

**Christa**
5:22 9:12

**Christensen**
5:13

**chum**
165:24

**churn**
160:19 165:25 166:1

**circumstance**
108:6,9

**circumstances**
166:2

**citing**
111:11 191:23

**Civil**
12:1

**claims**
17:19

**clarified**
78:7

**clarify**
140:7

**clarity**
156:4

**Class**
85:18,20,23,24 86:11,12 93:12,14,25
94:1,3 206:22,23

**cleaning**
35:21 36:12

**clear**
10:24 17:22 22:19 25:12 52:21 54:16
79:2 81:7 90:24 139:13 164:5 167:14,
16

**clearer**
25:18

**client**
32:24

**client's**
78:8

**closed**
136:6

**CLVS**
5:3

co-counsel
79:18

cohesively
11:4

Cohnreznick
15:20

cold
197:7

collaborate
59:14,20 62:7 64:22 76:6,7,8,21 77:4,
7

collaborated
60:5 65:2 76:2

collaborating
62:10 76:17

collaboration
64:8 74:9,13 75:3,14 76:5,10 87:16

collaborative
58:18

collection
15:21

collective
11:2 98:22,23

collectively
27:24 30:15 98:1 153:17 185:7 205:15

Colourgraphics
133:21,25 134:2,4,6

column
66:19 181:1

combination
132:1 198:20

combinations
167:2

combine
11:4 26:12

commensurate
107:21

commensurately
107:16

commissioned
104:5

commit
80:2

common

104:11

communicate
197:10

communicated
61:12,13 72:4 73:8 211:24

communicating
104:16

communication
32:12,24 70:18 142:12,17

communications
33:9 70:23 195:6 196:18 209:4

companies
99:18 115:7 191:15,25 195:17 198:7
199:16

company
28:9,13 43:19 47:24 60:7 100:1 101:7,
12,21 102:9,23 103:7 107:10 118:15,
16,20 130:4 132:3,23 133:12 136:1,7
137:6 146:9 148:5 156:6,20 163:7,18,
23 168:10 178:11,12,20 181:13
182:17 184:3 193:21 194:3,7 196:13
197:18 198:17,19,20 199:4,20 205:10
207:1,2,7 208:12 210:6

company's
34:21 126:13 146:15,17

comparatively
184:11

compare
114:19

compared
158:6 166:5

compel
132:22 133:12

compensation
53:8 71:18,23 72:10,16,17 73:18
187:10,11,12

compete
152:20

compilation
67:8

complete
8:11 104:9,14,17

completed
39:14,15 40:3 200:4 202:9

completely
8:17

complexity
20:12

comply
25:11

component
183:16

Compound
35:23

comprehensive
121:1 152:15

compulsion
100:16

computer
15:9 115:11

computers
34:13 35:6,18 115:20

conceivable
108:22

concern
81:15 149:22 150:6 152:22

concerned
52:12 161:1

concerns
47:1 79:6,7 82:5,23 108:7 151:3
155:6,11 156:2,7 199:24 206:7

concluded
146:21

conclusion
38:6 42:15 43:1,22 44:7 45:8 50:25
103:9 119:13 129:18 131:19 133:1
142:7 143:24 145:2 146:14 188:15
192:20

conclusions
92:9 104:16

condition
177:22 178:22

conditions
8:16

conducted
106:21,23,24 170:19

confident
109:22

confidential
148:25

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: confirm..correspondence

**confirm**
50:13 62:21 78:10 80:16

**confirmation**
48:12 49:9

**confront**
69:3,5

**confused**
131:5

**conjunction**
210:9

**Conlin**
195:9

**connection**
17:7 27:21 106:10 200:18 203:5,13

**consent**
66:12 211:11

**considerably**
150:25

**consideration**
112:23

**considerations**
196:19

**considered**
124:13,15 125:1

**consistent**
25:23 75:3 111:4,15 115:12 131:23
134:11 138:12 191:18

**consolidated**
174:17

**constitutes**
38:7

**construct**
76:24

**construed**
104:14

**consult**
191:9

**consultants**
183:8

**consultation**
182:15

**consulted**
14:3 190:25

**consulting**

15:16,17,18 200:2,19 202:6

**contained**
82:4 84:5 131:7 132:5 201:14

**contemplate**
187:17

**contemplated**
144:23,24

**content**
16:23

**context**
60:16 74:12 100:22 104:17 119:20
154:19 168:7

**continue**
17:21 22:12,21 152:18 153:24 154:16

**continued**
24:21 25:20,22 155:17,18,20,24 156:7
157:18,21

**continues**
156:23

**continuing**
89:16

**contract**
150:3

**contracted**
181:8 203:12

**contrast**
114:20

**control**
28:21 45:17

**convenience**
123:16

**conversation**
49:7 61:17,19 70:6 97:25 173:3
174:13 178:15 196:7,9

**conversations**
9:24 13:25 28:4 86:12 141:23 142:16
193:13 199:12

**copies**
93:13 165:8 207:19,21

**copy**
18:23 29:20 65:13 98:11 104:21
116:24 134:8,10,16,20 137:24 138:4,
9,21 143:1 201:6

**corner**
93:17

**corporate**
5:10 9:10 27:2,18 32:4 56:11,13 59:21
62:12,21 63:19 64:12 65:6 67:10,17
69:24 70:9,21 79:13 118:17,19 142:1,
7 210:4

**corporation**
6:23 142:3

**correct**
6:15,16 7:1 16:4 19:18,19 20:3 21:22
24:19 28:6 29:17,18 31:24 32:6 33:18,
19,21,22 38:19 44:5 46:3,4 48:13
50:9,11,23 51:7,22,23 52:13,23,24
53:7,22,23 55:20,25 57:18 59:25 61:1
63:1,14 64:13 65:22,23 67:19 68:14
71:1 72:12 75:8 77:12 82:15,21 86:4,5
87:4 89:2 90:17,21 91:6,25 92:25
93:5,16,18 99:15,16 100:3,4 102:6,15
103:14,18,19,20,21 104:2 107:1,2,14
109:13 110:24 114:7 115:9 117:8,9,14
122:19 123:3 126:3 127:13 128:19
132:17 133:21 134:5 135:1,2,12,21
136:15 137:11,23 138:1,7 139:18,19,
21,22 143:18 145:13,24,25 146:4
147:2 149:16 154:21 155:20 159:10,
19,20 165:9,10,11,12,14,15 166:9,11
171:7,17,18 172:20 176:1 177:3
178:1,21 180:17,24 182:24 183:22,23
185:2,3,22,24 186:15,16 187:25 188:9
192:16 199:19 200:15,16 201:11,12
202:21 203:3 204:10,13 205:1,2
206:7,8,14,15,18,24,25 207:5,6,11,16,
17 208:5,6,9,16 210:1,13,15,18,25
211:4,5,8

**correcting**
7:19 25:13 56:6

**correction**
49:10

**corrections**
7:24

**correctly**
12:15 23:13 26:20 27:10 47:21 80:14,
17 83:10 85:5 86:1 97:16 100:19
101:9 113:16 123:13 124:10 125:11
136:21 143:2,14 148:17 166:6 167:7
172:21 175:22,24 184:24 188:25
193:7 200:6

**corresponded**
38:16

**correspondence**
22:10 27:6 193:19 194:22 197:10

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: counsel..degree

**counsel**
5:16 9:12,24 12:22 13:25 15:6,8,12
17:15 20:15 22:14 26:4 27:23,24 28:5
30:6,16,18 32:24 33:10 35:2 48:7,10,
16,18,21 49:14 65:12 77:10 86:13
87:16 90:22 94:19 97:24 106:11
109:18,19 113:4,23 121:6,7 125:18
142:21 149:3 163:13,14 173:4 179:22
185:6 193:14 194:25 195:2 198:2,3
203:2 204:7 205:14 208:8,25

**counsel's**
33:3 212:11

**count**
161:6 162:19

**counterparts**
139:17

**court**
5:12,14 8:7 29:24 30:3 81:15 84:21
90:18 92:11 117:2

**courtesy**
132:19

**cover**
80:25 152:10 177:11 189:14 190:19

**covered**
7:2 78:13 79:17 83:20 84:13 170:16

**COVID**
154:20 155:21 162:17 163:10,19,21,
23

**COVID-19**
148:15,23 149:18 150:1 159:25
168:15

**create**
97:4 205:12

**created**
10:16 96:12 126:2,16 128:5,20 132:19
147:4,5 184:7

**creation**
55:19 126:5

**creditor**
119:10

**credits**
154:1

**criteria**
24:22 177:22

**cumulative**
79:20 80:5 83:23

**curious**
40:7 55:2 134:13

**current**
42:3 166:3

**customer**
156:20 157:5 160:14 161:20 162:7,19

**customers**
150:4,6,8,10,24 151:19 152:23,25
153:3,6,25 154:1,2 160:12,16,18,24
161:1,3,11,20,22,23,25 162:1,11
164:2 166:1 167:1 170:17

**cut**
150:23 151:6,24 152:7 162:11 167:15
171:21

**cutting**
41:4

---

**D**

**data**
15:13,20 21:14,21,24 24:12,21 67:8,
10 166:3 180:23

**date**
5:5 9:17 20:19 37:13 66:2,12 67:12
87:5 89:10,11,12 99:19 100:2 104:12
105:6 110:25 128:23 133:22 154:23
181:15,17

**dated**
104:12,18 105:7 165:11 180:13

**dates**
90:5,8 107:7 129:11 130:15

**day**
39:4 40:13 105:7,8 134:3 137:21
183:20 207:18

**day's**
140:23

**day-to-day**
114:4

**days**
20:5 21:1,5 22:25 23:2 124:18,19
136:8 165:13 179:19

**deal**
153:20

**deals**
135:19

**dealt**
154:18

**Dean**
5:22 9:12

**death**
99:4,5 104:7,12,19 130:9 135:8,12,20,
25 148:7

**deceased**
136:1,3,4,16

**December**
104:13,18 117:17 180:13

**decision**
58:5,8 75:13

**decisionmaking**
47:2 69:11 74:9,14 76:11

**decisions**
45:11,17,24,25 46:1,11 57:23 58:1,6
75:1,17,18 76:18 77:5

**declaration**
86:19 87:1 88:25 90:13 92:17,21
176:16 177:6 191:14,24

**decline**
107:15

**declined**
107:13,20

**decreased**
108:25

**deduct**
175:19

**deem**
29:13

**deemed**
118:10

**defendants**
5:24 82:3

**Defendants'**
13:14 92:10

**defense**
22:15

**defined**
100:8 101:18

**defines**
137:2

**definition**
188:11,16 192:24

**degree**
75:20 76:1

**Dejong**
5:23

**delete**
24:21

**deleted**
19:3 25:1 142:24

**deleting**
18:17 19:21 24:14

**deletion**
19:3 24:12

**deliberative**
62:8

**delineated**
120:19

**delivered**
40:16

**Denoyer**
97:7

**department**
20:16 189:9

**departures**
166:3

**depend**
101:16

**dependent**
151:21

**depicts**
181:13 183:13,25 184:2

**deponent**
5:10

**deposed**
6:17,19 84:2 140:22

**deposition**
5:7 8:22 11:24 14:18 22:12,22 23:7
26:13 27:22 46:17 47:17 80:13 85:1
97:12 148:14 173:21,22 175:5 179:17
193:3

**depositions**
9:7,8 148:24 149:5,7,9,12

**depth**
9:3

**Derek**
195:9 196:3

**derived**
111:6 131:12,15

**describe**
28:8,9 44:20 55:12 69:16

**designate**
78:24

**designated**
6:13,21 77:25 78:3,11 79:5,22 82:15
83:1 84:6 85:3 90:24 91:9 203:1

**designation**
77:11,14,24 80:25 82:8 83:19

**designations**
77:17 82:4 91:2

**designed**
127:8

**designee**
33:1,5

**destroy**
25:21,23

**destroyed**
18:15

**detail**
61:18 69:17 109:3 115:15 160:22
161:8 169:16

**detailed**
92:18 208:2

**details**
48:12,13 49:9,11 117:24 160:14 172:6

**determination**
136:8 177:23 178:2 190:21

**determinations**
144:4

**determine**
43:17,25 57:1 59:15,20 62:7 64:22
65:3,7 88:24 101:25 134:23 168:8
177:8 181:9 188:10 190:13

**determined**
60:3,5 102:24 107:4 129:9 130:14
136:18 143:12 144:15 182:14 186:22

**determining**
57:15 64:9 66:23

**Deuren**
5:20

**devaluing**
108:8

**developed**
96:22,24,25 97:3 112:12

**development**
94:11 95:23 125:4

**device**
16:1,8

**devices**
15:24 16:2,6

**dialed**
167:25

**dialogue**
73:6 193:21 194:20

**difference**
51:5 187:14 192:15

**differences**
51:4

**differentiate**
187:4,7,9

**differentiation**
152:19

**difficult**
167:24

**diligence**
200:2,19 202:7

**direct**
43:17 44:5 46:5 63:3,5 165:16 211:16

**directed**
41:18 43:5 48:2 63:10 94:19 169:23
175:23 178:15

**directing**
63:13

**direction**
53:24 68:21,25 69:1 147:10

**directly**
141:24 189:12,21 191:21

**director**
31:25 37:12,14,15,18 44:14 45:14
56:18,24 57:2 58:7,9,21 59:1 63:16,
18,25 64:4 73:19 185:12,17,18 207:5

**directors**
26:2 27:9 38:10,14 39:1,5 57:16 60:18
64:7,19 66:20 67:11,16 204:23,25
205:6 206:13,19,23 208:17,23 209:16
210:3,9

**directors'**
36:11 37:5

**disability**

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Corporate Representative of Windy Waters, Inc.
November 03, 2023 Index: disabled..election

130:9 148:8

**disabled**
19:4,22,23

**disagree**
81:9 95:8 183:3,4

**disclose**
148:5

**disclosed**
73:12 147:6 184:15 205:16 207:8
208:15

**disclosure**
138:12,19

**disclosures**
73:10,14 204:23,24 205:5,8,17,19
206:1,13,22 208:17,22 209:2,3,15

**discount**
137:7

**discovered**
20:18

**discovery**
9:17 12:10 198:1

**discuss**
84:16 197:9

**discussed**
142:13

**discussing**
74:7

**discussion**
61:8 194:10 196:11

**discussions**
48:7 194:9 196:18

**distinguishing**
50:21

**distribution**
186:22 187:3,5,6,12,15,18 188:12
191:5,20 192:23,25

**distributions**
9:11 118:1,8 122:11 123:5 184:20
185:8 186:21 187:23 188:7,19,24
190:23 192:7,14

**diversify**
167:1

**dividend**
185:25 186:18,20 187:5,9,15,17,21
188:11,13,16 191:15,16,25 192:2,21,

25

**dividends**
184:19 185:8 187:8 188:23 192:13,15

**Docket**
92:11

**document**
12:2,3,11 13:12,18 19:5 23:10,21
24:7,9 25:9,15,23 26:7,9 30:6 66:12
85:19,24 87:13,17 93:3 101:3,19
121:10 134:9,11,16,20 136:15 137:25
138:10,11,22,23 139:1,8,9,10,11,12
140:3,16,17 180:6 181:5,6 191:8
211:9

**documentation**
161:13 163:18,22 164:7 170:21 187:7

**documented**
62:8,14 65:5 209:20,21

**documents**
8:25 9:15,24 12:12,19,21 15:5,8 16:15
17:18,20 18:13 20:6,8 21:3,8 22:23
23:18 25:6,20,21 26:25 27:15 56:8
62:16,20 69:21 78:15 79:8,13,16 84:9
85:10,19 86:6,8 97:21 102:8 113:21
125:16 148:21 170:7 172:25 190:14
196:15 211:20

**dollar**
167:9 173:8 198:11

**dollars**
124:9

**downturn**
177:19

**downturns**
177:12

**draw**
148:13

**Drive**
16:14,19 17:4

**due**
18:25 165:24 200:2,19 202:7

**duly**
6:2

**duplicative**
79:19 80:5 83:24

**duration**
126:25

**duties**

39:17 40:9 43:13 52:25 53:2 68:8,9,
13,16

**dynamic**
75:13,15

—————————————————

**E**

**earlier**
7:18 21:13,17 37:6 68:12 70:19 75:23
92:1 115:10,12,16 126:1 145:23
158:19 174:8 176:21 192:13

**early**
20:11 96:21 151:25 155:6,15 162:16
167:4

**earn**
162:12

**earned**
171:13

**earnings**
203:4,13

**easily**
123:18 183:21

**EBITDA**
96:15,16 111:6 126:7,11 145:17

**echo**
174:24

**economic**
149:18 150:14,19 156:11 159:5

**economics**
180:12 181:7 182:18

**economy**
154:20

**effect**
24:1

**effective**
23:11 87:5 89:10,11,12 90:5,8 110:25

**efforts**
12:9

**elect**
66:17

**elected**
63:16

**electing**
64:7 66:23

**election**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
**November 03, 2023Index: elections..exchange**

27:9 60:17 65:22 66:13

**elections**
63:20 67:11,15

**electronic**
15:10

**elicited**
77:16

**email**
20:13 38:15,18,20,23 39:2 48:21 70:4,
7 78:7 80:17 81:7,8 105:11 116:11,12,
13,15,18 193:13 194:20 209:7,9,11,14

**emails**
9:10 16:21 17:10 19:25 20:10,17 48:8
193:12 197:7

**employ**
15:9

**employed**
38:3

**employee**
38:7 60:22 153:9

**employees**
26:2 31:17,21,23 36:2,6 37:8,25 38:2,
12 41:19,25 42:12,22 153:12,21

**end**
101:4 181:15,19 183:20

**ended**
151:15,21

**engage**
170:17 197:17 201:20 202:1

**engaged**
52:1 193:20 202:17 203:25

**engagement**
202:19

**Enterprises**
14:14,22 17:7 28:14,23,25 29:4,12,14,
15 31:17,23 32:16 33:6,17,20 34:3
38:18 39:1,19,25 40:6,10,19 41:12
51:2,22 60:12,23 62:25 82:23 102:4,
14,16 103:13,15,22 107:15,18,20
108:3,11,20 109:5 113:12,14 114:3,22
116:21 117:13 118:2,5,9,13 119:9,16
120:1,9 121:12 122:5 123:2,4,10
124:6 134:7,10,14,18,19 149:25
156:10 158:24 159:17,21 160:1,2
164:18 166:17 170:18,19 174:16
176:25 177:14,17 182:20,21,22
183:14 197:4,5,12,16 198:8,13 200:17

201:21 202:25 203:7,12,22,24 204:2,
5,8,12 208:11

**Enterprises'**
102:20 121:24 122:1

**entire**
153:14

**entirety**
77:17 78:3 79:23 80:22 83:15 185:15

**entities**
31:12

**entitled**
10:11 136:23 137:20 180:11

**entity**
28:8,15,23 41:11 45:1 73:3 118:17,19
134:14 149:21,25 159:4,19 160:7,20
166:17 203:24

**entity's**
177:11

**entry**
93:1

**environment**
150:17

**equal**
143:11 144:14 156:14

**equally**
108:11

**equals**
143:22

**equation**
108:13 156:13

**equipment**
115:24 116:1,4

**equity**
100:23,25 101:7 197:20 198:19 199:3,
15

**equivalents**
100:11 174:11 175:18

**essentially**
209:24

**estimate**
74:25 75:2 106:12 124:11 162:7 166:3

**estimated**
130:13

**estimates**
97:13 127:3

**et al**
5:9

**evaluate**
112:19

**Evans**
5:19 147:18 165:25 175:4,8

**evening**
21:4 22:11,24 40:14

**event**
168:22 169:25 177:19 189:16

**events**
194:16

**eventually**
75:7

**evidence**
79:4,10 105:21,23 200:25

**evidenced**
160:19 212:4

**evolved**
155:12

**evolving**
155:19

**EVP**
180:12

**exact**
20:19 199:8

**EXAMINATION**
6:5

**examined**
67:18

**examples**
49:16 120:21

**exceed**
183:21

**excepted**
25:14

**exception**
38:25 91:25 129:21

**excerpted**
80:10,21

**excess**
102:25 118:10,11,25 122:10 123:5
191:16 192:1,10

**exchange**

122:8

**excluding**
  12:13

**excuse**
  20:1 41:8 59:5 64:25 91:23 115:18
  125:20 161:21 180:13 182:21 189:24
  203:6

**executed**
  134:2 137:21

**executive**
  166:23

**exercise**
  45:17 58:15 150:7

**exercised**
  152:23

**exhibit**
  11:21,22,24 13:1,9,12,13 19:12,14
  23:7 26:14 30:4,7 37:12,24 47:15
  48:24 49:2 53:5 65:15,18 66:11 67:6
  85:1 86:14,16,19 88:15,18,23 91:20,
  24 92:5,6,8,23 93:4,7,8,9,11,13 94:2
  95:19 96:6 98:17,20 99:8,9 104:4,6
  106:7 107:5,22 109:4 110:18,20,21
  111:10 113:10 117:3,6,14 120:6,19
  128:8,12,18 130:12 131:11 133:16,19
  135:3 137:16,17,20 138:22 142:22
  143:5,17 145:6,9,12 147:11 148:14
  165:2,3,6 172:16 173:23 174:1,3
  176:20,21 180:7,8,11 182:22 184:18
  186:7,8,12,24 187:10,16 188:13,18
  189:3 191:7,19 193:3 201:8,10 206:3,
  5,9,11 210:19,21,23 211:4 212:4

**exhibits**
  110:18

**existed**
  11:7

**existing**
  166:1 167:1

**exiting**
  151:21 171:10,16

**expanded**
  141:15

**expect**
  33:25 37:2 39:12 47:13 50:4 63:21
  115:13

**expectation**
  51:24

**expectations**
  150:23

**expected**
  95:25 150:24 162:12 173:7

**expecting**
  34:6

**expense**
  36:16 151:14,16 152:1

**expenses**
  120:1,4,5,18,20 151:6,7,8,11,13
  174:16 177:2,12 178:23 183:20

**experience**
  58:21,24 59:1 60:12,21

**experienced**
  151:1

**expert**
  95:18 101:14 103:3,4 106:19 107:24
  112:18 127:2,16,25 128:2 131:20,25
  144:3,19 182:5 183:6,10 184:5,15

**expertise**
  146:18

**experts**
  98:4 106:15,16,18,21,23,24 107:4
  126:5 146:21

**explain**
  86:6

**explained**
  48:11 49:6

**explanation**
  21:19

**explore**
  22:12,22 81:1 114:4 196:1

**export**
  20:12,15

**expressed**
  34:16 100:11 102:13 169:22 193:22
  198:10,12

**extensive**
  129:24

**extensively**
  129:20

**extent**
  33:8 38:6 42:14,25 45:7 67:3 85:19,23
  107:25 127:15 129:17 131:19 133:1
  172:7 188:15,17 192:19

**eyes**
  130:4

---

**F**

---

**fact**
  56:7 66:3 92:8 145:11 193:19 203:23
  210:12

**facts**
  100:18 105:21,23 200:25

**fair**
  39:16 94:4,12,15,22 95:5,11,21 96:3
  99:18 100:1,5,7 101:5,11,17,20,24
  103:6 104:10 106:17 121:23 122:2,3
  125:5 126:14,17,19,22 127:4,9,13,16,
  21 130:13 136:8,18,24 137:3 143:11,
  20,22 144:14,16,20 145:7,12 146:8

**fall**
  129:4

**familiar**
  18:3 29:8 60:11 64:6 132:21 139:3,24

**familiarity**
  44:19,25

**families**
  153:22

**family**
  31:17,20 45:10 57:1,3,4,5,9,14,19,22
  58:19 59:14,19 60:3 62:7,10 64:9,21
  65:2 74:8,12,13,15 75:3,5,8,19 76:19

**family-owned**
  45:2

**favor**
  63:24 64:3,16,20 67:1

**favorability**
  112:21

**feasible**
  43:25

**February**
  85:21,25

**federal**
  12:1 189:11

**feel**
  22:17 146:8 190:8

**fees**
  36:11 37:5

**fell**

8:3

**fighting**
78:20

**figure**
76:25 131:10 151:4 155:22 157:17
190:20

**figured**
150:16 153:18

**files**
17:14,15

**final**
156:24

**finally**
36:21 83:7

**financial**
9:9 53:2 71:17,22 73:3 97:13 98:1
113:13,25 149:1,18 157:24 173:2,9,10
196:13,16,19,22 198:6 207:19 208:2

**financially**
157:3

**financials**
122:14 156:25 157:1 210:7

**find**
65:14 163:17,22 181:9

**Findings**
92:8

**fine**
34:2 122:3

**finer**
175:11

**finish**
67:25 131:16 167:15

**firm**
5:20 15:16,18 49:5 181:7

**fiscal**
183:14,16,18

**FLEX**
180:12

**flexibility**
35:9

**flipped**
191:20

**flow**
18:20

**focus**
141:1

**focused**
94:2

**folks**
49:8

**follow**
142:14

**follow-up**
74:6

**food**
153:2

**forensic**
15:9

**forgiveness**
176:11

**forgot**
7:17

**form**
16:22 42:2 195:21

**formal**
131:24 206:12,21 209:17

**format**
205:22

**formed**
29:19 30:24

**formula**
94:13,22,24 95:5,6,24 96:4,10,11,13,
16,18,20,22,24 97:4 101:16,24 103:12
110:14,19 111:1,6,9,11,16,17,19,22
112:5,6,8,16,20,25 125:6,21,23 126:7,
9,12,13,16,21,23,25 127:4 128:20,23
129:7,9,11,14,20 130:3,17,20,21,22,
24 131:1,6,7,13,25 132:5,7,9,10,12,
19,24 133:7,9,13 145:15,17,19,21
146:1,2,10,19,25 148:5,7

**formulas**
125:8

**forthcoming**
163:4

**forward**
20:1,2 112:7,11

**forwarded**
195:24

**found**
92:11 121:5

**foundation**
145:24 190:5

**four-month**
178:21

**free**
22:17 190:8

**frequently**
166:2

**front**
18:22 30:8 85:1 117:5 153:5 165:5
173:10 180:4,14,24 186:10 201:10
206:5

**FTI**
15:17

**full**
6:7 40:25 140:23

**fully**
78:13 84:12

**function**
19:21 151:18 153:13

**funds**
116:20 117:12 120:16 121:24 122:1,9,
12 123:19,23 174:9,15

**future**
152:13 156:20 171:22 181:11

**fuzzy**
143:2

**G**

**gain**
160:24

**gained**
161:11,20,21,23 162:5

**Gary**
89:5,7 90:1

**Gary's**
90:16

**gather**
15:13 20:17

**gathered**
64:7 103:1 208:7

**gathering**
12:23

**gave**

23:8 155:1 158:11 200:17 201:2

**general**
68:9 176:7

**generally**
42:16 53:13 146:2 154:23 174:12,14,
21,24

**generate**
190:9

**generated**
96:25

**give**
9:2,3 34:20 35:8 39:9 47:11 65:13
69:23 98:11 116:24 126:19 129:1
142:19 149:17 155:14 170:8 173:22
203:10

**glance**
135:13

**glancing**
99:12

**glitches**
21:16

**Glossary**
100:8

**Gonnering**
6:1,8,9 26:18 40:24 50:10,16 72:19
74:6 81:16 83:8 84:25 89:12,17 95:14
102:11 110:13 140:16,19 146:16,22
148:4 165:8 180:10 204:21

**Gonnering's**
16:7

**good**
5:1,17,21 6:9 8:5,22 11:14 30:1 73:23
92:25 98:7 147:12,23 149:17 176:15
179:3,6 193:2 207:22

**Google**
16:14,19 17:4

**governance**
26:15,19 35:1 40:23 46:24 69:12

**government**
172:10

**grab**
87:24

**Grant**
199:25 200:18 201:2,18,21,23,25
202:1,18 203:12,19,25 204:8,11

**granted**
176:13,14

**great**
12:25 15:22 19:11 66:7 79:14 91:18
110:5 153:20,21,25 179:5 180:5

**greater**
9:3 69:16 156:14 164:2

**greatly**
162:8

**Group**
197:20 199:15

**grow**
120:15 169:23

**growth**
150:20,21,23 151:10 166:4 169:1,20,
22,24,25 170:3 181:13,24,25 183:19,
24 184:1,13

**guess**
14:10 105:22 142:14 168:2,13

---

**H**

**half**
96:8 162:11

**hand**
174:12 175:20 176:3 201:6

**Handed**
105:12

**handing**
98:10 116:23 201:4

**handling**
79:15

**hands**
100:12

**Hansen**
5:3

**happen**
76:15

**happened**
20:9 75:2 76:15 162:14,15

**happening**
153:16

**happy**
10:9 161:15 170:14 173:10

**hard**

159:11

**hardware**
115:19

**hat**
142:1

**he'll**
204:4

**head**
7:8 31:13

**header**
188:22

**heading**
166:18 172:15

**health**
103:22,23 183:14,17,18

**healthy**
183:22

**hear**
66:3

**heard**
47:5 68:12 132:18

**hearing**
115:8

**held**
5:7 29:2,10,14,16 108:24 142:16
185:9 187:20 191:11 193:21 210:10,
13

**helpful**
7:6 65:9 156:16 173:21

**hereof**
136:9,19,20

**high**
170:1

**higher**
112:21,24,25 170:2

**hired**
182:17,18,22

**hires**
151:9

**historical**
181:8

**historically**
133:6

**hit**

154:20

**hold**
19:2,4,23 24:5,8,18,20 25:1,3,5,7,10,
11,24 26:1,7,10 55:10 94:20 168:4

**holding**
28:9,13 118:15,16,20

**Holland**
14:8 15:16,19

**Hollman**
5:23

**home**
153:15

**honest**
8:11

**honestly**
8:18

**Horein**
193:15

**horrible**
154:16

**hospitality**
153:2

**hour**
179:17

**hours**
40:25 141:16

**huge**
67:22

**hundred**
165:23

**husband**
207:14

**Hutler**
97:2 99:13,14 103:4 111:3 112:13,18
113:2 126:2,4 145:22 200:14

**Hutler's**
126:10,11

**hypothetical**
76:24 100:13,14

**hypotheticals**
76:13

—— I ——

**idea**

30:1 62:5 74:8

**identical**
92:20 93:3

**identification**
11:23 13:10 19:13 30:5 48:25 65:16
86:17 88:16 92:7 93:10 98:18 99:10
117:4 133:17 137:18 165:4 174:2
180:9 186:9 201:9 206:4 210:22

**identified**
11:16 14:4,24 30:7 47:16,19 51:6
113:10 201:19

**identifies**
172:18

**identify**
119:6 133:19 187:23

**impact**
8:16 148:15,23 149:18 150:15 153:9
154:24 155:1 156:5 164:18

**impacted**
152:25

**impacts**
150:14 151:23 160:18 164:20

**implementation**
94:11 95:23 125:5

**implemented**
23:12,25

**importantly**
176:2

**imposed**
191:4

**improving**
158:4

**inaction**
69:8

**inbound**
167:2

**inception**
127:8,23

**include**
7:18 57:14 74:12 130:20,21 132:14
167:11 188:7

**included**
175:16

**including**
12:10 26:16 113:12 184:20 191:16

192:1

**inclusive**
97:24 107:17 108:2,19 167:17

**income**
98:2 151:1

**income-based**
132:1

**Incorporated**
100:24

**incorrect**
25:8 49:11

**increase**
152:2 166:25 167:6 169:19

**increased**
101:12,21 103:7 109:6 154:9 161:20
165:24

**increases**
151:8 152:8 171:22

**incur**
168:16 169:6

**incurred**
189:23,25 190:22

**indication**
198:16,18,21 199:3

**indications**
197:21,23 198:9 199:9,11

**indicative**
157:18 183:18

**indicator**
103:23

**indicators**
181:9

**individual**
34:20 45:20 50:7 141:6,14 173:19
189:13,16

**individually**
41:5 45:20 95:17

**individuals**
49:14 83:21 84:1 86:7,8

**industries**
152:25 164:1

**industry**
102:12

**informal**

209:18,22

**information**
12:14,22,24 17:11 25:2 31:8 32:10
45:21 48:14 49:12 71:25 72:2 73:11
82:2 84:1,10 87:7 91:22 93:19 97:13
98:2 103:2 148:9 149:2 173:2,10
196:22 199:24 200:18 201:2,14,17,22
202:3,4,13 205:11 206:20 207:9,12
208:3,4,13,14 209:5,7,9,22,25

**informed**
137:3 207:2

**inherit**
164:22

**inherited**
160:9

**initially**
22:3

**initiated**
48:16 49:15

**input**
44:18 45:3,9

**inputs**
103:11

**inquiries**
34:25 94:17 196:1

**inquiry**
194:12 195:8 196:4

**insert**
90:6 177:14

**inserted**
142:25 156:12

**instance**
68:24,25 70:24 71:21 76:9,16 77:1,3

**instances**
70:8

**instruct**
32:11 35:3

**instructing**
32:20,22

**instruction**
32:18 142:15,19

**intended**
126:16 148:7 212:10

**intent**
197:1,22,23,25 198:10

**interactions**
194:17,18

**intercompany**
120:11,25 121:13,16 123:15 124:2

**interest**
58:17 101:6 143:10 144:12 193:22,23
195:16 196:7,12 197:21,23 198:9,13,
17,19 199:3,9,12

**interested**
14:10 25:6 199:14

**Interesting**
135:8

**interests**
50:22 146:20 198:8

**interface**
203:19

**interfacing**
204:8,12

**internal**
163:9

**International**
100:8

**interpret**
131:20

**interpreted**
104:15

**interrogatories**
13:16 15:1

**interrupt**
18:20 179:2

**introduced**
31:21 112:17

**introductions**
5:15

**intruding**
8:15

**invested**
175:14

**investment**
120:14 125:20 166:24 173:3

**investments**
28:16,18 51:3 118:21 119:21,23
149:22 172:19 173:13,18 177:10

**invited**
76:20 77:7

**involve**
30:17

**involved**
12:23 13:22,25 14:2,6,9,11,25 15:4
52:2 57:9,19 58:16 64:8 114:8 126:6,8
151:7

**involvement**
26:17 55:13

**involving**
47:20 85:16,21,25 113:13 125:9 129:6

**issue**
110:14 170:16 190:13

**issued**
137:5

**issues**
18:22

**item**
47:18,19 48:22 49:3,6 66:13 94:11
113:18

**items**
14:5 36:17

**ITR**
180:12 181:6 182:18,22

___

**J**

**January**
92:2 93:2 111:14,15,24 189:19 207:20

**Jeff**
193:15 194:10,13

**jeopardy**
164:2

**job**
40:6,14

**jobs**
39:5,19,25 40:10,11

**Jon**
5:3

**Judgment**
86:21 92:10

**July**
104:11 105:7

**jump**
180:6

**June**

110:15,16,17 111:8,10 171:3 202:16
207:13

**justice**
126:17,19 144:20

**justification**
61:22

---

**K**

**K-1**
209:3

**K-1S**
206:16 209:10

**keeping**
119:3 158:7

**key**
31:17,21,23

**kids**
153:16

**Kiesler**
16:3 26:18 37:21 43:5,17 46:13 48:2
51:10 55:9 66:18 78:2 79:6,14 83:4
86:20 114:15 115:23 121:14,18,19
149:11 165:9 176:16,23 191:13 202:5,
11 203:19 206:17 207:3,8,18 208:2,7
211:2

**Kiesler's**
16:6 18:16 19:21 20:13 21:14,20
52:22 80:10 87:1 88:25 90:12,13
92:17,20 173:21,22 177:5

**kind**
9:4 129:5 149:17 164:7 168:12 195:21

**kinds**
152:10

**knew**
152:24

**Knight**
14:8 15:16,19

**knowing**
14:10 25:6

**knowledge**
29:1,7 38:13,17 39:3 45:23 53:10 59:3
62:4 67:5 68:7 78:18 83:22 84:5 87:7
91:22 93:19,21 100:17 116:6,8,9,10,
19 119:25 140:4 178:16

**Krause**
97:1,6 127:2 144:4 183:9 184:6

200:16

**Krause/baker**
182:15 184:15

---

**L**

**lack**
137:7 190:5

**lagging**
158:3

**Laing**
5:22,23

**land**
179:20

**landscape**
155:19

**Lane**
33:16

**language**
132:21 142:25

**laptop**
16:1,18 17:12

**larger**
152:21

**law**
81:10 92:9

**lawyer**
208:5

**layer**
119:7

**layoff**
170:19

**layoffs**
170:18

**lead**
155:9

**leader**
154:18

**leadership**
60:13,19

**leading**
181:9

**learning**
151:9,10

**leave**
153:7 154:3,4

**led**
142:6

**ledger**
121:2,5,13,16

**leeway**
39:9 129:1

**left**
150:13

**legal**
28:4 38:6 42:14 43:1,21 44:7 45:8
103:9 119:13 129:17 131:19 133:1
143:24 145:2 146:14 188:15 192:20

**length**
79:14 100:15 129:11

**letter**
104:8,13

**letters**
197:1,21,23,25 198:9

**level**
72:8 109:2 115:14 119:1,2,3,16,18
161:7,17 168:20 169:15 170:8,12

**liability**
118:24 119:3 189:14,23,25 190:11,19,
22 191:4

**lieu**
83:1

**limit**
49:17

**limitation**
26:16

**limited**
38:8 133:21 134:4

**liquidity**
137:7

**list**
37:11 67:15 129:3

**listed**
79:11 90:4 95:10,20 110:19 139:18
145:8 187:11

**lists**
164:2

**litigation**
19:1,2,4,23 24:5,8,17,20 25:1,2,5,7,

10,11,24 26:1,7,10 106:10 109:17
146:3 208:19,24

**living**
157:4

**LLC**
6:23

**LLP**
200:1

**loan**
156:10 158:22,24 159:2,11,21 163:10
172:9 175:19 176:5,9

**locate**
12:12 189:18

**located**
33:16

**locating**
15:4

**lock**
155:16

**log**
18:2,9

**long**
68:2

**longer**
57:13,19 118:25 119:1 150:8,22
151:20 171:13 172:2

**looked**
9:7,9,10 27:5 56:16 64:9 102:18
108:17 128:6 151:7 153:1,3 177:10

**lose**
160:12

**loss**
207:15 209:12

**lost**
160:16 161:24 162:1,5 170:16

**loud**
90:20

**Lower**
93:16

**lunch**
110:9

————————————————

**M**

————————————————

**macroeconomic**

181:10

**made**
45:25 46:12 47:11 69:14,21 71:11,17,
19,20 72:13,18 81:7,18 82:10 102:19
120:8 123:9 157:1 162:9 177:23
178:2,6 179:19 186:20 187:1 189:7,8
190:1,21,23 191:8 203:4 204:24 205:5
206:22 208:17 209:2,3 211:15

**Madison**
5:4

**mail**
105:12 209:8

**main**
14:7 149:20

**maintained**
121:12,15

**maintenance**
35:21 36:21

**majority**
64:19 101:6

**make**
7:23 25:17 31:7 45:11 58:8 69:22
77:23 84:8 89:17 90:11,23 91:3
119:22 124:3 135:22 139:13 142:19
149:6 150:22 185:25 186:18 195:15

**maker**
75:13

**makes**
22:9 124:16

**making**
7:4 45:24 46:1 58:1 62:5 75:1,16 77:5
153:22

**manage**
153:10

**managed**
28:19

**management**
12:11 26:15,19 34:25 38:8 40:22
42:11,22 45:17,24 46:9,24

**manager**
52:3

**mandated**
129:14,25 130:3 132:11,12

**mandatory**
132:11

**Mangrove**
33:16

**March**
134:3 150:18 151:1 154:21,22,24
155:3,7,12,13,15,17 156:9,15 157:7
158:6,12 160:12,17,18,24 161:11,22
162:17,21,24 163:7,19,24 164:8
207:23 208:1

**March's**
156:25 157:1

**Margaret**
5:19

**mark**
5:18 6:9 9:13 18:2 19:5,7,8 29:21
48:6,23 74:18 86:14 88:10 92:5 98:10
99:4,5,8 104:8,12,20 116:25 165:2
173:23

**marked**
11:21,22 13:1,9,11,13 19:12 30:1,4
48:24 49:2 65:15,17 86:16,18 87:19
88:15,22 92:6 93:9,16 98:16,17,19
99:9 104:3 106:7 117:3,5 133:16,18
137:17,19 165:3,5 174:1,3 176:18,19
180:8,11 186:8 201:8 206:3 210:21

**market**
94:5,12,15,22 95:5,11,21 96:4 99:18
100:1,5,7,16 101:5,11,17,20,24
102:18,24 103:6 104:10 106:17 125:5
126:14,17,20,22 127:4,9,13,16,21
130:13 136:9,18,24 137:3 143:12,21,
22 144:14,16,20 145:7,12 175:15
193:24

**market-based**
132:1

**marketability**
137:7

**marketable**
28:19,20 29:4 51:8 101:6 103:17
104:1 108:8,12,14,20,24 118:21
119:20,23 120:13

**marketing**
197:7

**marking**
180:7

**Marlin**
199:4

**Mary**
5:19

**massive**
157:8

**material**
10:16

**math**
124:20

**Matt**
91:13

**matter**
5:8 81:14 191:1 209:1

**matters**
45:10 64:22 69:13 73:2 76:22 116:16
190:17 201:19 202:16

**Matthew**
6:1,8 16:7 26:18 40:24 50:16 89:12,16
90:1 102:10 140:19 165:8

**meaning**
21:4 36:22 187:14 192:20 210:5

**means**
47:1 70:5,22 91:4 100:5 104:15
120:15

**meant**
126:18 146:25

**media**
15:11

**medications**
8:16

**meet**
155:20 177:21

**meeting**
56:14,16 64:11 210:14,16,24 211:19
212:5,6

**meetings**
9:13 56:8,21 64:12 210:3,10,12,15,17
212:3,7

**member**
57:22 75:5

**members**
31:16 49:5 57:3,4,19 75:8,19

**memo**
148:25 163:9 164:11 187:6

**memoranda**
163:6

**memorialized**
48:8

**memorializes**
22:10

**memorize**
160:23 161:16

**memorizing**
161:8

**memory**
53:6 167:18 173:24

**memos**
187:19

**mentioned**
21:13 37:5 55:17,24 90:25 171:20
209:16,17

**mentioning**
59:4

**merger**
197:17 203:14

**mergers**
200:3,20 202:7,14

**merit**
151:8 171:22

**message**
16:23

**messages**
16:20,22,24 17:13 18:17 19:1 20:1

**met**
6:10 9:12 24:21 78:23 155:23

**method**
72:20 212:1

**methods**
147:6

**Michael**
26:18 89:7 165:9 207:3

**microphone**
8:3

**mid-april**
157:2

**middle**
40:13 120:6 137:2

**Mike**
9:14 14:1,13 15:7 16:6 17:10,15 18:16
20:12 27:24 30:20 37:21 43:11,14
66:17 69:22 70:3,17 71:6 72:14 73:6
79:14 83:4 86:13 87:16 89:6 90:1
97:25 113:24 114:14 115:23 116:13

121:14,18,19 125:19 149:4,10,11
173:4 175:23 176:6 178:15 185:7
193:14 202:4 205:15 211:24

**Mike's**
16:1 19:1 174:24 176:6

**million**
102:25 124:9 151:14,15 159:23
165:22 167:5 168:9 172:13 174:11
175:14,19,20 176:8 177:17 198:18,23
199:16

**Millions**
180:23

**Millmont**
33:21,24

**mind**
27:4 48:1 72:23 108:15 152:14 154:15
158:13

**mine**
11:11 16:7

**minority**
132:19,22 133:6,8,11 137:8

**minute**
24:25 88:3 204:15

**minutes**
56:8,14,16,21 63:19 69:19 179:16
210:14,16,24 212:2,6

**misheard**
47:4

**missing**
90:6

**misstate**
10:25

**Misstates**
39:21 56:2

**mobile**
16:2,6,8

**moment**
26:12 27:4,20 129:3 157:4 158:16
171:25 178:2,9 199:8 211:7

**momentarily**
98:12

**Monday**
204:4

**money**
117:16 118:3,5 123:2 150:13 175:15,
21

**Monona**
  33:16

**month**
  124:12,14 169:8 173:15,16 177:18,25

**monthly**
  168:19

**months**
  124:22,25 155:8 157:12,20 163:19
  172:4 177:12,18 178:4,5,23 207:15

**morning**
  5:1,10,17,21 6:9

**motion**
  79:2 86:20 92:10

**move**
  23:6 26:11 46:21 67:25 81:24 82:13
  84:24 97:9,11 118:13,14 119:4 135:7
  148:13 150:16 197:14 199:23 204:21

**Moving**
  82:11

**multiple**
  28:3 96:15

---

**N**

**named**
  97:7 193:15 195:9

**names**
  90:4

**naming**
  61:23

**narrative**
  155:2

**narrow**
  49:18

**nature**
  113:12 120:4 181:10 195:22

**navigate**
  155:24

**navigated**
  152:4

**navigating**
  150:1 152:11

**necessarily**
  18:3 47:1 90:20 103:23 195:20

**needed**

**negative**
  151:2 164:20 168:16,18,24 169:3,6,7,
  17

**negotiated**
  48:15 49:13

**negotiations**
  197:17

**net**
  112:20,23 151:1

**news**
  157:25

**night**
  20:7 179:19

**nod**
  7:7

**nonlabor**
  151:8

**nonparticipatory**
  63:8,12

**nonpayment**
  154:12

**nontax**
  186:23 191:16 192:1

**normal**
  39:18 40:5,10

**note**
  111:24 120:8 123:25 169:21 184:18

**Notebooks**
  16:9

**noted**
  34:23 92:1

**notes**
  9:19,22,23,25 10:1,6 11:2 18:21 19:16
  30:10,13,15,19 65:10,18 67:14 87:21
  98:10,20 116:24 117:7 123:7,10
  186:4,12 201:5,13 205:22 206:6

**notice**
  11:24 23:7 26:13 47:16 49:6 84:25
  97:12 148:14 150:5 172:17 193:3
  202:24 211:18

**noticed**
  12:5 26:14 85:15 189:7 201:3,24
  202:20 203:23

  39:14,23 40:3,12,15 45:3,25 46:11
  69:14 71:5,19 118:4 119:1,2,16
  121:24 122:1,21

**notifications**
  72:24 73:1

**notified**
  69:24 70:2,3,6,7,9,13,16,17,20 71:4,5,
  6 72:21 211:17,20,22,23

**notion**
  109:14

**notwithstanding**
  58:2

**November**
  5:5 117:17

**number**
  12:6,7 23:16 30:11 55:10 84:16 86:15
  90:9 109:23 175:3 184:17 192:5 199:8

**numbers**
  80:16 102:21 130:23,25 131:11
  166:11,14,16 168:12 173:19 176:1
  177:15,16 191:23

---

**O**

**O'NEIL**
  5:22

**oath**
  6:3 8:2,7

**object**
  14:17 22:15 34:15,18 36:15,17 38:5
  39:7 40:21 41:14 42:1,13,25 43:21
  45:7 46:16 48:5 60:15 94:7 95:16
  119:12 127:15 129:16 131:18 140:7
  142:9 180:1 188:14 192:19 200:22

**objected**
  141:13

**objection**
  17:19 32:9 34:22 35:8,10,22 39:10,20
  40:1 41:20 44:7,22 45:13,19 46:7
  49:23 50:24 56:1 58:3 72:7 80:20
  101:13,22 103:8 105:20 107:23
  132:25 133:14 140:25 141:10 143:23
  145:1 146:13 147:3 182:4,13 183:5
  190:3 208:20

**objections**
  13:14 32:17 41:13 47:11 212:11

**obligation**
  78:24

**obligations**
  184:21

**observation**
14:7

**observe**
45:16

**observed**
45:24

**obtain**
158:22

**obtained**
67:8

**occasion**
208:11

**occasions**
117:16,23

**occur**
102:1 117:22 135:10 199:20

**occurred**
61:20 72:24 73:1 105:3,6 109:11
117:23,25 168:22 207:13 209:11

**occurring**
193:25

**occurs**
199:18

**October**
117:18

**of'**
181:21

**offer**
37:25 60:8 178:3

**offered**
82:2 112:19

**offers**
133:8

**office**
33:20 34:8 36:12 61:6 114:6,25
208:10

**officer**
31:25 45:14 64:25 65:1 72:17 73:19

**officers**
26:2 27:9 36:7,11 37:9,11 38:9,14
39:1,4,17,22 40:18 41:10,19,24 42:5,
8,12,22 60:18 63:3,5,10,13 64:9 65:22
67:12,16 71:10,18,23 72:11 204:24,25
205:6 206:14,19,24 208:18,23 209:17

**offices**

33:14,15,17,24 34:3

**official**
44:18 61:4

**older**
18:17

**one-time**
124:12,14

**Ope**
56:3

**open**
100:15 180:22

**operating**
28:15,22 45:1 73:3 149:21,25 159:4,
18 160:7 177:2,11 178:23

**operational**
102:10,21

**operations**
38:9 46:5,8,10 55:13

**opinion**
59:17 95:10,18 99:25 101:5,14 103:3,
4 104:10 106:19 107:24 112:19
127:16 131:20 139:25 182:5 183:6,10

**opinions**
99:18 127:2,25 128:3 144:3,19,22
184:6

**opportunities**
151:10

**opportunity**
7:22 167:3

**oppose**
23:3

**option**
178:3

**options**
178:8,10,13

**oral**
194:19

**Orally**
211:25

**order**
15:25 31:5 65:24 88:20 125:17 191:9

**ordinary**
18:15

**organization**
6:22 26:15 34:25 40:22 42:7,16 44:19

46:24 68:10,15 131:23 150:9 169:22

**organizations**
102:19 195:15 197:22,24

**organize**
154:22 205:5,8,11

**organized**
131:1 155:21 205:15

**original**
137:25 191:8

**originally**
146:12 147:2

**other's**
122:20

**outbound**
167:2

**outlined**
209:6

**outlook**
156:19 158:11 180:17 181:3

**output**
130:24,25

**outreaches**
195:15

**outright**
178:7

**outstanding**
137:6

**overly**
80:6 83:23

**oversaw**
41:24

**oversee**
42:7

**oversees**
42:4

**oversight**
28:21 43:14 44:2 53:2 68:9

**overview**
9:4 149:17

**owed**
150:12

**owned**
31:10 40:18 51:2 57:14 134:18

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: ownership..phones

**ownership**
50:19,22 51:12,14,16,24 57:9 58:17
75:9 85:4,13 95:3

**owns**
30:21

---

**P**

**P-I-M**
166:25

**p.m.**
212:16

**pages**
80:11 83:3,9 84:11 93:15 180:19

**paid**
35:17 36:11 37:6 38:12 39:18 40:5,10
53:8 68:6 115:16 120:19 123:10
124:17,24 150:9 178:20 185:10,12,13,
14,16,17,18 186:23 189:15,16

**pandemic**
148:16 155:7 168:15

**paper**
11:5 17:14,15

**paragraph**
86:23 88:25 91:23,24 92:14 99:21
100:6 101:3,4 104:7 117:14 120:6
142:23 165:17 166:18 176:22,23

**parcel**
94:16

**parent**
174:17

**part**
10:3 16:24 17:11,12,13 25:22 29:10,
12,13 39:25 46:23 51:8 73:6 76:10
94:16 102:21 109:12 125:21 155:6
156:11 162:16,21 193:13 197:19

**participate**
50:19 55:16 57:15,22 64:24 69:10,11,
13 75:21 76:1

**participated**
57:12

**participating**
75:18,24

**parties**
12:23 15:13,14 30:18 76:5 197:8
199:13

**partner**
195:18,21,25

**partnering**
196:12

**partnership**
195:22,23 196:1,17,20,25

**partnerships**
167:3

**party**
48:2

**pass-through**
184:21

**passed**
74:18

**past**
85:4 95:3 168:6

**pause**
24:25

**pay**
33:23 34:2,8,13 35:6,24 36:9,12,21
120:1 124:8,9 152:7 174:16 177:24
189:12,13,21

**Paycheck**
158:18,23 159:1,11

**paychecks**
159:8,12

**payee**
189:24

**payment**
35:20 136:19 184:19 187:22,24 188:2,
12 191:17 192:2

**payments**
117:25 118:8 120:8 122:10 123:9
150:11 186:1,18,20 187:1 188:6,7
189:2,3,4,10 190:1,17 191:15,25

**Peggy**
5:12

**people**
14:8,23,24 15:6 31:12 38:3,10 46:1
74:18 97:21,24 114:8 153:14 170:20,
23 171:1

**percent**
100:23,25 101:6 137:5 152:7 166:5
167:5 168:11,14 169:20 170:24
171:21 172:1,5

**percentage**
167:18,21 168:4,8

**percentages**
31:10

**perfect**
18:11 186:6

**perform**
39:5,24 40:9 68:13

**performance**
71:17,22 73:3 168:19

**performed**
39:17,22,23 40:2,5,13 199:24

**performing**
52:4 68:16

**period**
18:18 24:1,12,14 53:22 102:7 149:2,
24 155:4 177:25 178:21 184:13

**periods**
42:6 98:5 130:19 144:7,8 185:9
188:24

**permanent**
130:9

**permit**
91:4 95:6

**person**
15:10 48:16 60:10 70:22 105:13
121:20 195:9 202:3

**personal**
35:11 83:22 136:3 140:4

**personally**
8:15 35:12,15 36:19,20,24 41:16
140:15 205:10

**personnel**
114:12 115:3,6

**perspective**
67:23

**pertain**
19:17

**pertaining**
210:6

**phone**
16:10,25 18:16 19:21 28:3 70:17,22

**phones**
16:9,11,12,19

**phrase**
42:9

**physical**
115:19 150:16

**physically**
87:23

**PIM**
166:25

**place**
16:15 56:22 94:4 95:20 96:2,3 126:8
136:7 142:25 147:6 191:6 211:18
212:6,7

**places**
139:7

**plaintiff**
5:18 6:11 13:15 106:9 109:16 163:12
194:22

**plaintiff's**
48:10

**plaintiffs**
198:1

**plan**
152:2

**planned**
152:8 200:3,4,20 202:7,8

**planning**
166:19 194:11 200:4,21 202:8

**plans**
151:13

**play**
94:9

**playback**
66:22

**played**
108:16

**players**
152:21

**point**
19:22 31:22 41:3 46:18,20 57:21 63:6
66:17 67:22 75:11 78:21 82:7 99:20
102:1 105:8 106:13 107:5 120:5
152:19 156:1 159:25 161:14 168:15
175:11 206:2

**pointed**
49:24

**points**
42:19,20,21 53:18 57:6,7 66:14

**policies**
23:11 134:11 138:12 204:22 206:12
209:15,18

**policy**
23:21,23,25 24:7,13,22 25:9,15,24
209:17,24

**portfolio**
198:20 199:4

**portion**
22:21

**portions**
78:25

**posed**
163:18

**position**
10:17,20 11:8 35:10 78:8,12 80:18
81:8,21 83:19 126:13 193:24

**positions**
171:2,8,9

**positive**
158:5,7,11 168:25

**positivity**
158:9,10

**possibility**
108:8 141:17

**possibly**
70:7 81:15

**potential**
177:11 196:19 197:17 200:2,19 202:7

**potentially**
179:18

**PPP**
156:10 158:18 163:10 172:9 175:16,
19 176:5

**practice**
79:2 129:24 138:16,19 147:7

**practices**
79:15

**pre-media**
151:18 157:15 167:11,19 168:9
171:10

**preceded**
129:7 134:4,6,14

**preceding**
96:19,20

**precise**
168:4

**prefer**
31:13,15

**prep**
11:7

**preparation**
9:6 11:17 30:16 56:19 67:7 87:9 95:22
97:23 98:21,22,23 109:3 132:14
164:10 168:21 173:7 186:4

**prepare**
10:18 12:20 23:15,18 27:1,15 34:6
37:3,11 54:9 63:21 64:18,21 68:22
83:25 85:10 86:7,9 98:5 106:6 113:22
115:14 117:24 124:20 125:17 128:24
134:22 137:12 148:21 160:14,21
161:16 163:6 169:14 170:12 172:6
173:1 185:4 193:11 194:14

**prepared**
8:22 9:23 11:2 12:17 13:25 19:16
20:19 21:2 26:22 27:12 30:13,15 31:4
54:4,8 55:3 62:16,19 63:19 67:2 69:19
73:9 77:21 78:22 81:6 84:15,17 85:7
86:3 87:14,17 91:1,8 94:25 95:22
97:18 106:8 109:4,12 113:18 117:7
125:13 128:23 129:11,12 148:19
163:9 164:5 172:23 173:17 185:1
193:9 200:8 204:1 205:3

**preparing**
11:3 27:22 30:18 50:3 65:19 205:9

**prescribed**
24:12

**present**
23:12 24:2 28:5 44:15 85:4 86:13 95:3
113:23 125:18 149:3 185:6 193:14
205:14

**presented**
130:5

**presenting**
104:9

**preserve**
35:9 39:10 141:11

**preserved**
20:3

**presidency**
63:7 185:15

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of  Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: president..purchased

**president**
37:17,19 42:4,7,16 43:2,12,23 44:2,
10,14 53:14,20 55:24 59:6,8,10,11,13,
18,23,25 60:2 61:9,14,21,23 62:6,11,
23 63:8,9 64:15,17,20 65:1 66:16,17,
23,25 68:6,8,9,15,16,19,20 69:8,15
185:10,12,16,21 207:4

**presidential**
43:13

**presume**
8:23 116:4 193:23

**presumes**
93:2

**pretty**
152:10

**prevent**
8:10

**previous**
9:7 42:6 65:25 66:1,3 83:7 92:23
111:16 148:24 157:12 170:7 203:2

**previously**
7:2 23:8 51:6 87:19 114:15 120:22
147:6 169:21 170:2 176:17,19 184:14
199:7 205:21

**price**
48:15 49:12,13 66:20,22 89:14 90:2,
10 96:10 100:11 111:1 120:23 143:9
144:12 146:1,10,25

**pride**
153:21

**primarily**
194:11

**primary**
119:15 152:17

**prior**
18:25 19:2 21:10 44:20 45:4,12,16
46:2 58:21 60:11,19,21 61:10,21
62:23 74:7 126:2 128:6 139:9 147:7
199:21 200:16

**private**
198:19 199:3

**privilege**
17:19 18:2,9 142:11

**privileged**
12:14 32:10 142:12,17

**Privy**
18:5

**pro**
187:22,24 188:4,5,8,19 189:5

**procedure**
12:1 128:21

**proceed**
81:3,11

**process**
62:8,10 64:6,8 197:19 199:17 203:14

**processing**
135:23

**produce**
12:12 18:2

**produced**
9:16 10:3,19 18:14 21:4,7,9,13,17
22:23 23:23 93:20 106:9,11 109:16,
18,20 113:2 181:6 208:18,24,25

**product**
10:15 11:3 12:13 171:17

**productions**
22:13 179:18

**products**
193:24

**profit**
207:14 209:12

**program**
154:6 158:19,23 159:2,12

**progressed**
199:17

**projected**
165:22 169:20 181:14

**projection**
162:19 167:4 168:17,18,24 169:6,8,18

**projections**
150:22 162:7,9 168:1 169:1,3 181:24

**promised**
152:2

**promissory**
123:10,25

**prompted**
104:20

**proper**
124:3

**property**
100:12,22

**Proposed**
92:8

**protection**
119:8 158:19,23 159:1,12

**protracted**
155:3 177:25

**provide**
17:15 20:19 21:2 41:9 44:18 45:3
61:22 64:2 69:1 112:20 123:4,23
133:18 134:20 138:9 151:20 190:10
202:2,4 206:1 207:22 209:22 210:2,4,
8

**provided**
17:21 19:4,6 20:10 21:20 22:4 24:18,
20 26:4,6,9 28:22,24 40:18 41:11,16
45:9 54:1 55:22 73:4,5,11 74:22 96:7
104:21,23,24,25 105:4 106:18 109:4
112:24 113:4 121:6,8 128:24 131:22
133:8 134:24 136:6,20 137:14 138:11,
13,16,21,24 139:10 140:2,5,12,16,17
143:9 144:11,18,25 145:23 148:10,11
149:1,10 150:4,12,13 152:20 153:20
154:1,6 160:15,22 161:13 163:5,11,
13,15 164:15 170:8,13 178:8,10,13
188:18 194:21,22,24 195:2 196:22
197:25 198:2,4 199:10,12,25 201:17,
22 205:16 206:19 207:12 208:4,7,13
209:7,9,13,14

**providers**
15:21

**providing**
8:11 31:8 122:12 144:20 154:12
202:12

**provision**
146:11 147:1

**public**
194:3

**publicly**
103:2 193:21

**pull**
15:12 80:15 128:11 147:10 172:16
193:2

**pulling**
166:3

**purchase**
128:21 129:10 132:23 133:12 135:19
136:2 137:5 193:4 197:5

**purchased**
143:10 144:13

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: purchases..receiving

**purchases**
70:12

**purchasing**
119:20 135:11 193:23 196:12

**purport**
30:10 85:19 107:8

**purports**
85:20,24 93:22 117:6 186:12 201:13
206:6 210:23

**purposes**
50:22 119:8 168:7 191:5

**pursuant**
11:25 120:8 123:9 136:9 143:10,13,21
144:13,15

**pursue**
167:3

**put**
11:5 18:21 105:12 118:15,16,17
119:17 126:8 147:6 154:19 175:11
182:22 186:13 191:9,19

**Q**

**qualification**
84:15

**qualifications**
59:12

**qualified**
56:24 59:9,11,18,22,24 60:1,9

**quality**
203:4,13

**quantify**
161:18

**quantity**
150:23

**quarterly**
181:1,2

**question**
7:13 17:22 31:6 32:14,21 33:4,25 34:9
36:8 40:7,8 41:6 43:10 47:4,9 48:19
49:20 50:8 54:11,12,14 62:3 65:25
66:1,4,8,22 68:22 74:6 76:14 88:24
89:4 91:21 92:23 94:24 95:7,14,19
98:25 103:5 107:19 108:4 110:22
112:15 114:11 117:11 119:13 122:25
123:20,22 129:25 131:5 133:3,5 135:1
136:10,11,13,14 140:24 141:4,8,20,22
142:5 175:23 186:17 191:2,7 197:15
201:16

**questionable**
140:21

**questioning**
34:7 36:16 37:2 39:13 47:13 63:22
64:18 96:1 115:14

**questions**
8:17 64:14 81:3 91:5,10 94:15 95:2
205:12 212:12

**quick**
88:1 147:13 179:14

**R**

**raise**
81:14

**Randall**
5:8 26:17 37:12 38:22,25 56:24 58:20
89:18 110:23 120:7 123:7,8 138:22,23
139:1,17 171:6 177:24 178:9,14
185:10 189:20 191:14,21 207:1,8,18,
23 208:1,10 211:3

**Randall's**
13:15 46:14 47:24 48:3 55:12 79:12
89:9 110:15 125:24 139:6 145:16
165:14 211:7

**range**
37:13 67:12 198:22 199:6

**ranges**
128:24

**rapidly**
155:19

**rata**
187:22,24 188:4,5,8,19 189:5

**rate**
124:18

**rattle**
7:3

**re-ask**
35:2

**reach**
41:3 180:3

**read**
7:22 12:14 23:13 26:20 27:10 43:10
47:5,7,9,21 48:10 62:3 66:8 78:1,17
80:7,8,17 84:9 85:5 86:1 89:23 97:15

99:22,23 100:19 101:9,18 104:19
113:16 123:6,13,22 125:11 133:5
135:22 136:14,21 141:20,22 143:2,14
144:1 148:16 166:6,22 167:7 169:19
172:21 174:7 175:12,22,23 176:24
177:3 184:24 188:25 193:7 200:6

**reading**
99:20 135:13 144:1

**reads**
26:14 113:11 142:23

**ready**
89:3 177:18 178:23 212:13

**real**
152:18,22

**realization**
21:9

**realize**
7:17 87:21 203:1

**reason**
17:24 21:6 105:1,2 108:22 118:7,11,
18 119:2 120:12 122:17 126:21

**reasonable**
100:17

**reasons**
21:3,12,16 118:8,23 120:14 122:11,
22,23 150:2 186:21,23

**reassemble**
110:5

**recall**
27:20 48:11 53:3 54:2 55:9 59:9
61:16,19 81:16 104:3,4 161:3,6 162:6,
9,15 168:5 172:3,4 173:8 174:12
178:8 193:18,25 194:8,16,17,18 195:5
196:15 197:13 198:6,11 199:7

**recalling**
87:14

**recapping**
49:7

**receive**
73:18 122:5,6,7 141:24 197:22 199:2

**received**
19:24 20:6,7 25:24 26:4 54:2 72:16
122:9 142:8 156:11 159:1,22 189:20
191:14,25 193:12 195:8 196:4,15
197:4,5,7,21 198:16,18 199:2

**receiving**
24:5,8 25:10 72:18 150:10

**recent**
22:13

**recently**
20:22,23,24 21:4,7 193:21

**receptionist**
61:1 62:24

**recess**
74:2 88:6 110:9 148:1 179:10 204:18

**recitals**
142:23

**recited**
144:10

**recognize**
12:2 13:12,13 86:25 93:11,13

**recollect**
206:6

**recollection**
10:15 61:18 105:14,17 161:10 169:11
174:18 196:21 210:11 212:1

**recommendation**
113:1

**reconcile**
75:22

**record**
5:2,4,13 6:7 18:2 22:9,17 23:4 48:5
67:1,3 71:8 74:1,4 78:2,17 79:2 80:8
81:19,24 82:10 84:10 88:1,5,8 90:24
92:11 110:8,11 147:25 148:3 179:7,8,
12,14 204:15,17,20 208:14 212:10,13,
15

**recorded**
56:7,9,12

**records**
9:10 24:14 27:2,18 56:11,13 62:12,21
63:19,23 65:6 67:2,10,17 75:10 134:9,
17 137:25 138:7 185:9 187:20 191:11
192:23 206:21 210:4

**recover**
172:1

**recovery**
172:7

**redeem**
110:15 111:17,22 125:23 126:25
136:2 145:16,18 148:6

**redeemed**
74:19 120:7 123:8 127:24 136:17

143:10 144:13

**redeeming**
135:11

**redemption**
55:19,22 110:23 111:9,25 112:4,7,10
127:7 128:22 129:10 130:8 135:5,19
136:5,6,17 155:10 165:13 171:6

**redemptions**
93:23 112:1,2,3,22 129:15 130:4
132:11,13

**redo**
20:14

**reduce**
165:23

**reduced**
151:13 162:8,20 171:22

**reducing**
151:7

**reduction**
171:23 172:1,5

**reductions**
151:14,16 152:1 169:21 170:3 171:19,
20,24

**Reed**
5:8 9:14 14:1,12 15:7 17:10 26:17
27:24 30:20 37:18 42:4,18,19 44:12,
14 45:9,24 46:5,10,13 48:1 53:17
57:21 60:1,8 61:12,22 64:3,24 69:22
70:3,17 71:6 72:14 73:6 75:1,5,7,11,
12,14,17,19 76:18 77:4 83:2 86:13
87:16 89:10,16,25 90:2,3 97:25
102:11 105:5,8,10 113:24 115:25
116:1,16 125:19 149:4,10 163:5,9
164:16 165:8 173:4 178:14 185:7
193:14 205:15 207:3,7,24 208:1
211:3,24

**Reed's**
16:6 89:20

**refer**
50:12 167:9

**reference**
23:7 26:13 54:10 62:16 65:21 114:14
186:5

**referenced**
24:7 54:17 108:14 111:12 158:19
164:12

**references**

24:13 49:3 56:17 104:7 111:16

**referencing**
13:7 48:22 88:23 112:12 113:1

**referred**
24:11 28:14

**referring**
16:3 36:1 128:4,7 131:6 155:2 164:4,5
165:21 205:22

**refers**
27:8 47:20 76:24 80:13 143:16 204:22

**refilled**
171:8

**reflect**
98:20 127:9 184:10 212:6

**reflected**
56:21 85:17,22 128:18

**reflection**
21:19

**reflects**
78:12 182:7

**refresh**
10:15 53:5 167:18 173:24

**refreshing**
174:18

**refuse**
43:5

**refused**
43:11

**regard**
6:25 8:6 31:10 84:21 159:18 177:6
185:5 200:8

**register**
31:7,15 48:13 49:10 50:13 54:4,8,17
85:18,23 93:12,14 94:3

**Reinhart**
5:19

**related**
9:10 16:23 17:6,9 20:12 22:13 24:13
25:2 27:6 34:9 39:13 43:13 45:10 52:4
69:9 95:2 117:24 149:1 150:1,20
160:14 163:9,21,23,25 170:21 171:9
172:6 194:10,14,23 195:23 196:16,24
209:1

**relation**
196:16

**relations**
 156:21

**relationship**
 29:17 113:11 114:2,22 201:20

**relative**
 157:19,20

**relevant**
 34:24 78:16 100:18 148:9

**relief**
 84:20

**remain**
 126:24

**remainder**
 162:12

**remained**
 114:17 127:22

**remember**
 169:15 170:6 171:15 195:7

**remembered**
 169:2

**remembering**
 176:3

**remind**
 6:18

**remote**
 150:17 153:11,12

**removed**
 151:10 152:3

**renewing**
 153:6

**rent**
 33:23 34:2

**rented**
 33:20 36:22

**reopen**
 82:18

**rep**
 178:12

**repaid**
 176:9

**repeat**
 25:16 40:8 41:6 43:7,9 61:25 62:1
 95:19 114:18 123:20,21 133:3,10
 136:11,13 182:8

**rephrase**
 25:17 32:14 41:7

**replied**
 196:8

**report**
 51:11,14 53:11 68:19,20 96:13,25
 97:3 99:13,15 104:9,14,18,21,23
 106:6,8 111:3 120:25 126:4 128:5
 145:23 203:4,13,15

**reported**
 51:18 53:13,21

**reporter**
 5:12,14 29:24 30:3 90:19 117:2

**represent**
 6:10 77:17 83:14 126:17,21 146:19
 152:15 183:19 189:3

**representation**
 81:12 84:8 183:11

**representative**
 5:11 32:4,5,8 35:17 36:25 50:6 59:21
 60:7 97:6 132:4 136:3 140:7 141:2
 142:2,7 146:9 184:8 188:18

**representatives**
 146:18

**represented**
 49:14 126:23 170:24

**representing**
 146:20

**represents**
 78:3 79:23 80:22 169:19 184:12 192:4

**reprimanded**
 69:7

**reprimands**
 69:9

**request**
 15:8 17:16 47:24 73:5 189:17,20
 209:23

**requested**
 24:1 130:19 131:24 188:24 206:20
 207:13 208:4,8

**requests**
 12:10 13:23,24 15:13,25 209:11

**required**
 36:22 41:9 207:9 211:20,21

**requiring**
 20:13 207:4 211:14

**research**
 102:24 169:13

**researching**
 167:4

**resembled**
 210:8

**reservation**
 212:9,11

**reserve**
 81:14 84:20 179:16 180:1

**reserves**
 172:19 173:12,18 177:1

**reserving**
 22:11,20

**resignation**
 66:15

**resources**
 40:17 41:9,10,17

**respect**
 9:5 10:21 15:3 23:15,19 24:6,9 25:3
 32:25 35:20 36:8 38:14 49:5 51:10,12,
 16 52:17 64:7,15 71:10,16 72:10
 73:10 75:4 77:19 78:5 79:25 80:24
 83:16 90:24 98:2 112:10,12 113:22
 125:9,13 135:10 184:3,20 186:14
 196:13 198:7 201:3,13,16,18 202:6
 204:7 206:10 209:15

**respecting**
 33:3

**respond**
 7:6 12:9 15:25 49:21 155:21

**responded**
 194:15

**responding**
 13:23

**response**
 7:18 34:4 49:16 109:3 115:12,15
 160:25 163:10

**responses**
 13:15,24 14:3 17:8 157:5

**responsibilities**
 46:9 51:15

**responsibility**
 190:13

**responsible**
 42:17

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

***Video Deposition of  Corporate Representative of Windy Waters, Inc.***
November 03, 2023Index: responsive..Separately

**responsive**
  12:12 15:4 17:18,20 18:13 21:8 22:4

**restate**
  49:23 66:1 77:6 108:1,18 191:22

**result**
  22:2 151:22,25 154:11 160:3,5 163:19
  171:16

**results**
  157:3

**retain**
  134:16 154:7 200:10

**retained**
  134:8,10 137:24 138:6

**retention**
  23:10,21 24:7,9 25:9,15,23 134:12

**retrieval**
  22:2

**retrieved**
  15:8 21:24

**return**
  172:10

**revenue**
  160:20 165:17,21,22 166:4 167:10
  168:17,18,19,24,25 169:3,6,8,17
  181:2,8,11,13 183:10,17,19,21,24
  184:1,8,12 189:9

**review**
  8:25 9:19 12:19 23:18 26:25 27:15
  54:4 65:24 85:10 92:18 97:21 113:21
  125:16 148:21 164:14 188:21

**reviewed**
  9:16 10:12,18 11:1 12:21 13:19,21
  19:17 23:21 27:2 85:13 86:8,11 93:3
  98:1,3 113:24 125:19,20 148:24,25
  149:1,7 150:19 164:11 173:1,2 185:7
  193:12 196:23

**reviewing**
  9:23 19:6 37:24 117:10 135:13 149:5,
  12

**revisited**
  87:9

**Richard**
  6:8

**rightmost**
  66:19

**risk**

**risks**
  152:10,14 163:21,23

**role**
  32:15 33:6 42:6 43:12,14,23,24 44:1,
  10,13,17,20,24 45:14 52:15,18,21,22
  56:10 60:4 61:21 62:13 63:8 68:6 69:7
  114:14,16

**roles**
  52:11 56:7 60:25 61:2,5 114:13 115:7

**room**
  27:25 87:22 205:14

**rough**
  126:17,19 127:3,9,20 144:20 168:12

**roughly**
  176:4

**row**
  66:11

**Rule**
  11:25

**Rules**
  12:1

**run**
  87:24 149:7 203:12

**rush**
  67:23

— S —

**salary**
  171:19,21

**sale**
  48:17 49:15 82:23 137:4 197:15
  202:24 203:5

**save**
  90:18

**scale**
  153:12

**scanning**
  129:2

**scenarios**
  151:12 162:6

**school**
  153:16

**scope**
  14:17 34:17,19,24 39:7 40:21 46:17
  48:8,17,19 49:25 60:15 78:18 94:7
  95:9 141:11 142:10 190:4 200:23

**search**
  20:11 21:14 163:17,21,22 164:6

**searched**
  15:23,24 16:2,7,12,14,18,20,21,24
  17:1,7 163:25

**searching**
  15:10

**secretary**
  37:21 43:15 114:16

**secretary/treasurer**
  66:18

**section**
  135:4,19 136:9,19,20 142:23 143:13
  144:16 146:11 147:2

**Sections**
  143:11 144:13

**securities**
  28:19,20 29:5 51:6,8 103:17 104:1
  108:8,12,14,20,24 118:22 119:20,24
  120:13

**seek**
  84:20

**SEG**
  199:14

**sell**
  100:17 136:4 193:4 197:5

**seller**
  100:14 137:4

**selling**
  115:18

**sending**
  193:25

**sense**
  22:9 72:19 124:16 142:20 155:14

**sentence**
  99:23 101:4 131:16 188:21

**sentences**
  135:14

**separate**
  55:5

**Separately**

Stacy L. Randall v.
Reed C. Widen, et al.

Video Deposition of  Corporate Representative of Windy Waters, Inc.
November 03, 2023Index: September..sole

95:15

**September**
19:2 80:13 82:24 83:5,8 117:18
181:21

**sequence**
194:16

**series**
212:2

**serve**
59:15 153:13,24

**served**
73:19

**server**
17:5

**servers**
17:1,3,5

**serves**
104:8

**service**
153:2 171:17 200:11

**services**
15:9 150:11 154:13 193:24 199:24
200:13

**session**
166:23

**set**
10:6 13:16 107:21 136:18 166:23
177:22 186:24

**setting**
18:16 19:3 61:6

**settings**
18:25

**shake**
7:7

**share**
12:25 70:12 89:14 90:10 94:12,22
95:6,11,24 96:4,11 114:6 115:11
116:12 125:6 143:9,12,21,22 144:12,
15 145:8,12

**shared**
33:17 71:23,25 105:9,10 116:4
120:21,22 198:7 199:7

**shareholder**
50:10,14,17 55:18,21 57:12,13,24
58:1 75:4 94:14 96:5,14 102:4 111:4
125:7 129:23 130:5 131:7,13 132:5,10

133:20,25 134:1,23 135:9,12,20,25
136:1,4 137:21 139:8 142:24 143:5,
16,17 148:8 187:22,24 188:2,3,7,8
189:4,5 190:1,14 207:5 209:16 211:18
212:3,5

**shareholder's**
136:5,17

**shareholders**
30:22 31:1,11,16 74:16 76:19 104:22
111:5 116:2,3 132:20,22 133:6,9,11
134:21,24 136:2 138:10,17 145:19,20
184:22 186:1,19,21 188:19,20 189:10,
13 190:24 204:23,24 205:6 206:13,16,
19,22,23 208:18,23 210:24

**shares**
43:6,12,18 46:14 54:2 55:22 57:15
63:24 64:3 75:5 86:12 89:14 90:9
93:25 94:1 107:9 110:15,25 111:18,22
112:11,25 120:7 123:2,8,18 125:24
127:23 128:21 130:14 132:23 133:12
135:11 145:16 148:6 165:14

**sharing**
114:25 115:19

**sheets**
98:3

**shielding**
118:24

**shortly**
54:6

**show**
11:20 85:20,24 93:22 99:7 107:8
210:19

**showing**
13:11 86:18 137:19 168:1 174:3
180:10

**shown**
65:17

**shows**
67:15 87:3,5 167:5 181:1,23,25
188:23

**sic**
117:16

**sign**
69:20 138:14 141:25

**signatory**
66:19 139:18

**signature**

79:12,16 138:25 139:2,3,4,5,6,20,24,
25 140:13 211:15

**signed**
138:23 139:1,11,16 140:3,10,13,18
142:4,8 211:2,3,13

**significance**
77:24 159:7

**significant**
149:24 150:1,6,13,15 151:2,3 152:13
153:10 154:17 159:3 160:3,8 168:23,
25 169:1,25 177:19 181:23

**signing**
139:8,9 140:5

**similar**
8:6 64:14 106:6 205:20,22 212:2

**simply**
192:2

**simultaneous**
194:11

**simultaneously**
39:18

**sir**
29:6 50:18 96:9 157:13 192:6

**sit**
169:11 178:18

**sitting**
199:8

**skimming**
13:21

**Slack**
16:20,22 17:13

**slated**
152:2

**slowed**
169:24

**smoothly**
7:4

**snippets**
149:9

**software**
165:17,21,22 166:4 167:10,12,19
194:7 197:20 199:15

**sole**
37:15,18 44:14 51:5 102:3

**Solicitation**
193:4

**solicitations**
197:3

**sooner**
153:7

**sort**
11:2 25:20,21 74:20 118:24 119:11
121:2 166:19 173:14 180:3 196:20

**sought**
146:17

**sound**
110:5

**source**
28:24 67:9 177:10 191:9

**space**
33:20 36:22 114:6 115:1

**spaces**
36:13

**spacing**
147:20

**spare**
176:25 177:9

**speak**
27:21 97:22 113:22 125:17 142:5
162:6

**speaking**
76:13 140:19 157:4 174:12

**specific**
14:5 17:17 28:17 36:16 41:23 55:15
66:2 77:1 79:16 111:20 122:22,23
125:16 142:16 148:11 173:8 206:21

**specifically**
12:19 16:9 22:22 26:25 67:12 79:7
85:17 96:21 116:13 121:10 143:8
158:14 169:7 174:10 200:24 203:10

**specificity**
72:8 161:17 168:20 169:15 170:8,12
173:19

**specifics**
59:22,24 72:25 177:16

**spell**
143:4

**spend**
166:24

**spending**
177:17

**spirit**
158:7,9,10

**spoke**
9:14 27:24 86:7,8 97:24 113:23
125:18 126:1 149:3 173:4 185:6
205:14

**spoken**
11:17

**spouses**
153:17

**spring/summer**
155:23

**Stacy**
5:8 13:15 26:17 37:12 38:22,25 42:20,
21 43:2,4,11,12 44:1 46:14 47:24
53:16,19,20,21 55:12 56:24 58:20
60:2,9,10 61:8,12 62:11,23 63:3,5,16,
24 64:3,25 66:17,20,22,23 68:6 69:3,
10,24 73:10,18 75:7,11,15,16 79:12
89:6,8,9,18 90:1,2,3 104:21 110:15,22
120:7 123:7,8 125:23 138:22,23
139:1,6,17,21 140:12 145:16 148:5,9
165:14 171:6 185:10 189:20 191:14,
21 192:7,8,11 207:1,21,25 208:1
211:3,7

**Stacy's**
89:20 112:22,24 123:2 127:6,23
192:11

**staff**
35:20,24,25 36:4,9,10 37:4 40:18
41:10 61:6 116:4

**Stafford**
139:15

**stamp**
79:12,16 211:7,10,12

**stamped**
139:15 180:20

**standard**
78:9

**start**
36:5 112:19 155:7 159:8 174:5,6
201:1

**started**
154:22 155:15,16

**starting**

156:4

**starts**
165:17

**state**
6:7 22:9,17 42:3 80:14 82:7 124:7,8,9
189:11

**stated**
66:13 81:8,24 83:10 130:6 135:15
209:10

**statement**
144:2,6,9,10 148:11 174:24 176:7
177:5 179:14 207:15 209:12

**statements**
9:9 98:2 157:24 173:9 207:19 208:3

**states**
85:2 99:17,24,25 117:15 189:22
191:22 192:9

**stating**
22:19 23:4

**status**
75:4 137:8

**stay**
33:13

**staying**
94:2

**stemmed**
111:2

**step**
46:11

**steps**
12:11 151:6

**Stewart**
57:11 66:16 74:23 89:7

**stickiness**
166:25

**stock**
9:11 31:7 47:20,23,25 48:3,12,15
49:9,12,13 50:13 54:3,4,7,9,17 55:18,
19 74:19 85:13,16,17,18,20,22,23,24
86:11 87:3,5 93:12,14,23 94:3 95:4
96:10 98:8 99:1 104:11 111:1 125:10
126:15,20 127:1 129:6 135:5,20
136:5,17 137:6 143:9,12 144:12,15
146:1,10,25 200:4 202:9

**stop**
171:12

**stopped**
151:19 168:1

**store**
156:19

**stored**
16:15

**strategic**
118:18 119:2,4,5

**strategies**
119:7

**stuff**
157:19

**subject**
77:11 146:5,7 153:6 163:6 201:24
212:8

**subjected**
172:5

**subscription**
89:13 90:16 93:1 112:2

**subscription/redemption**
90:9

**subscriptions**
70:12 93:22

**subsection**
135:8

**subsequent**
111:18,23,24 147:8

**subsidiaries**
193:5

**subsidiary**
62:25

**substance**
61:16

**substantially**
108:25 182:2,11 183:2

**substantive**
208:25

**substantively**
195:5

**substitute**
146:10,25

**subtitle**
135:9

**succession**

**194:11 200:3,20 202:8**

**sufficiently**
80:25

**suggest**
107:12

**summarized**
149:23

**summary**
86:21 92:10 130:12 173:14 205:12,17,
19

**summer**
170:22 171:4,5 198:16,25 199:18,21

**sunsetting**
157:15

**superfluous**
78:22 80:5

**supervise**
52:18

**supervising**
52:7,9

**supervisory**
52:11

**supplies**
34:8

**support**
38:4 61:6 86:20

**supported**
202:15

**surface**
56:19

**survive**
151:5 154:10,11

**surviving**
136:2

**suspend**
25:7,15

**suspended**
24:3,17 25:4,10

**sustain**
158:8

**swear**
5:14

**sworn**
6:2

**Syndigo**
198:17

**system**
16:17 166:15

**systems**
12:11 115:11

---

**T**

**table**
96:6 181:21

**Tablets**
16:9

**taking**
151:15 171:21 172:2 176:5 178:3

**talk**
7:5 15:22 19:20 47:17 73:15 74:23
78:23 81:6,13,16 95:22 130:7 131:6
146:1 152:12 158:17 172:9 173:17
191:3 196:8

**talked**
79:11 103:18 109:25 114:2,15 125:4
130:8 149:5,12 174:8,10 176:21

**talking**
23:9 46:2 88:13 101:17 114:25 128:14
132:9 143:18 146:3 149:13,14 162:24
168:24 181:12 192:14 201:25 202:6

**talks**
135:10 202:24

**Target**
195:17

**task**
39:14 40:2

**tasks**
39:22 52:4

**tax**
117:25 118:8 122:10 123:5 184:21
186:21 189:11,14,23,25 190:11,19,22
191:5

**tax-related**
190:14,17 202:16

**taxes**
190:23

**taxing**
189:12,15,21 190:2,10,18

**team**

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023Index: technical..topic

155:21,22,25 195:25

**technical**
195:21

**telephone**
70:4

**telling**
91:8 141:8

**temporal**
154:19

**tended**
153:22

**terminate**
150:4

**terminated**
62:24

**terminology**
187:8

**terms**
14:2 15:24 20:11 38:9 76:15 100:9,11
123:24 136:5,19 150:3 155:5 156:18,
19 157:8 159:5 176:12 196:13,16
198:6,10

**Terry**
89:5,8 90:1,2

**Terry's**
90:21

**testified**
6:2 78:19 79:14 155:11 159:24 162:25
168:6 191:13

**testify**
6:13,22 12:17 23:15 77:21 83:25
84:17 85:7 86:3 91:1,5 97:18 113:18
125:13 148:19 172:23 185:1 193:9
200:8 205:3 206:11

**testifying**
8:7 23:19 27:1,16 85:11 86:9 148:22
173:1

**testimony**
8:11 9:5,21,22 10:3,12,19 11:17 13:19
22:6 26:22 27:12 30:14 32:5 34:19,21
35:11 37:25 39:21 40:25 56:2 65:19
68:12 74:7 75:23 77:12,15 78:1,3,11,
21,25 79:5,19,22 80:3,9,10,22 82:25
83:2,4,7,13,14 84:6,12 87:15 91:9
92:21 109:1,2,10,12 139:23 140:1,2,
23 141:14 155:1 164:6 169:10,14
171:16 184:12,19 185:4 186:14

202:18 203:2 205:9,21 206:7,10 209:6

**text**
16:22,24 18:17 19:1

**thereof**
212:10

**thing**
100:13 154:16 187:25

**things**
9:4 20:14 57:12 70:13 73:12 74:19,21
119:10 151:8,9 152:4 153:16,18,24
154:12 155:18,22 156:18 157:23,25
158:1,7,11 161:9,14,16 164:10 178:17
196:20 205:16

**thinking**
35:25 73:9 110:17 154:15 162:18

**third-party**
15:20

**Thornton**
200:1,18 201:2,18,21,23,25 202:1,18
203:12,20,25 204:9,11

**thought**
59:4 134:13 153:4

**thoughts**
11:4

**thousand**
165:24

**threat**
160:5,8 163:18 164:23,25

**threaten**
154:2 159:25

**threatened**
160:2

**ties**
129:5

**Tilly**
97:2,6 106:5 111:7 112:17 126:6
127:3,25 128:3 130:14 131:1 144:4,
19,22 145:18 147:5 182:15 183:9
184:6,15 190:9,16,25 193:16 199:25
200:12,16 201:18,23 202:2,4,13,14
206:17

**Tilly's**
107:6 190:12

**time**
5:6,14 7:14 10:7 12:22 18:18 21:25
24:1,12,15 26:5 37:15 39:4 40:12,15

42:3,6 50:21 53:22,25 57:6,8,25 58:8
63:6 65:2 73:15,23 74:16 77:8 80:16
85:14 97:1,7 98:4 102:1,5 104:22
105:16 107:4 108:21 109:8 124:6,10,
11 125:2 126:8,18 127:6,8,23 130:19
133:10 136:7 141:6 144:7,8 146:4
147:13 149:2,24 150:6 151:17,22,24
152:5,11,22 153:1 156:1 157:14
162:24 164:15 166:12,13,24 167:20
168:10 170:25 173:20 175:13 176:4
178:7 179:3,6,17 184:13 185:8 188:24
211:14,18 212:9

**timeframe**
43:3 196:6 197:8 198:24

**times**
6:19 28:22 31:20 53:15,16 57:17
102:25 185:17 186:25

**timing**
155:5

**title**
61:4 211:1

**titled**
135:4,7,8

**today**
5:3,12 6:12 7:23 8:2,12 9:21,25 10:13
11:1,18 13:20 14:19 23:10 26:23
30:14,16 32:13,15 33:10 59:22 65:19
67:2,7 77:16,21 81:6 85:8 87:15 91:2
109:10 125:14 140:21 141:2 142:2
174:8 178:18 179:15 185:1 186:14

**today's**
5:5 8:22 32:5

**told**
33:9

**Tom**
89:6,16,25

**top**
31:12 66:10,11 96:7 152:14 188:22

**topic**
9:22 12:5,17,20,21 14:18 19:17 23:6,
16,20 26:11,14,23 27:1,6,8,12,17
30:10 31:3 33:13 34:10,17,24 39:8,13
46:23 47:14,19 48:9,18 50:1,3 54:18
60:17 63:22 65:21 68:1 77:10,19,21
78:5,13 79:6,11,19,25 80:10,24 81:1,4
82:5,15,22 83:13,17,20,22,25 84:16
85:2,3,7,12,15 86:3,10 87:21 88:13
94:21 97:10,11,12,19 98:21 113:9
117:8 125:3,4,14 129:2,4,5 131:23
134:22 137:12 142:12 148:13,15

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of  Corporate Representative of Windy Waters, Inc.*
*November 03, 2023* Index: topical..update

168:21 170:13 172:8,16,18 173:7,12
184:17,18 186:14 193:2,9 197:14,15
199:23 200:23,24 201:3,5,14,19,24
202:13,15,17,20,24 203:1,9,22,23
204:2,22 205:3,21 206:7,10,11

**topical**
73:15

**topics**
6:14 12:9 22:13 26:12 27:22 46:17
47:16 49:17 60:16 78:17,23 81:6,17
82:12 84:11,12,24 90:25 91:1,6 94:8
95:9,10 160:15,21 161:7 190:5

**total**
130:9 180:12,17,22

**totaling**
191:15 192:1

**touches**
181:20

**tourism**
153:3

**track**
121:3

**tracked**
120:10,25 123:14 124:2

**tracking**
113:12,25

**traffic**
81:7,8

**transacting**
133:7

**transaction**
47:23 48:13 49:10 92:1 112:21 207:9

**transactions**
47:20 51:12,14,17,25 69:25 70:10
85:16,20 87:3,5 94:4 95:4,20 96:3,17,
19,20 97:5,8 102:18 110:19 111:2
113:13 114:1 117:24 120:24 125:9
129:6,21 200:5 202:9

**transcript**
7:23 175:5

**transcription**
7:24

**transcripts**
9:8 148:24

**transfer**
116:20 117:12 118:3,5

**transferred**
117:15

**transferring**
117:20 118:11

**transfers**
117:15 121:3

**transition**
153:13

**transmitted**
26:1 105:11,15 209:5

**travel**
153:2

**treasurer**
37:22 43:15,24 51:11 52:7,12,18,23
53:1,2,3,4,8,12,13 114:16 121:17,21

**Treasury**
189:8,22 191:22 192:9

**Trends**
180:23

**trial**
82:3

**trigger**
72:20

**true**
42:5 91:25 92:25 100:24 112:1 124:19
144:2,6,7

**Trust**
90:3

**turn**
77:10 82:12 86:23 92:4,14 107:3
160:1

**turning**
101:2

**type**
9:4

**types**
44:5 70:13 74:21 195:25

**typing**
90:19

---

**U**

**U.S.**
105:12 189:8 209:8

**Uh-huh**

9:7 16:16 51:10 57:10 72:22 102:17
130:1 143:19 163:3

**UK**
29:8

**ultimately**
44:1 74:25 176:10

**unable**
60:7

**unaware**
38:22 69:5,9 70:24 77:1

**uncertainty**
149:24 150:19 151:3 154:4 156:12,14,
15 157:8,9,11,18 159:3,6 177:20
178:22

**unclear**
187:13

**understand**
6:12 7:9,10,24 8:1,7,20 11:8,11,12
15:24 17:6 20:8,10 22:14,21 24:16
49:23,25 50:1 52:25 57:1 60:20 72:5
74:11,15 76:14 77:15,23 78:7 80:9
110:22 149:6 154:25 155:5 178:6
187:21

**understanding**
22:24 44:11 63:2 66:21 74:24 77:25
81:9 82:25 119:15 124:10 127:19,20
132:3,6 137:13 138:8 139:5 145:4,5
146:15,17 147:4 153:8,20 172:7

**understood**
7:13 14:12 23:3 58:18 62:18 81:24
84:22 131:9 158:24 179:25 202:10

**unit**
151:17 157:16

**United**
189:22 191:22 192:9

**unknown**
77:8

**unnecessary**
79:20 80:6 83:23

**unprepared**
81:13

**unrestricted**
100:15

**unwilling**
76:7

**update**

Stacy L. Randall v.
Reed C. Widen, et al.

**Video Deposition of Corporate Representative of Windy Waters, Inc.**
November 03, 2023 Index: updated..Widen

104:9 167:22

**updated**
104:16

**updates**
102:10,22 163:4 164:15

─────────────

**V**

**vague**
32:9 41:14,20 42:2 44:22 46:7 50:24
58:3 72:7 208:20

**validate**
90:10

**valuation**
99:3 100:9 103:4 104:3,9,14,16,17,21
105:24 106:6 108:19 125:21 128:13
131:11 146:19

**valuations**
97:13 98:3,7 99:1 105:18 106:15
128:5,8,13 130:18 131:22,24

**Van**
5:20

**variety**
150:2 197:8

**vary**
57:6,7

**verbally**
7:7

**verified**
90:4

**verify**
21:25 75:9

**version**
92:22

**versus**
124:13,14 157:12 183:14 184:3

**viability**
159:25 160:2,9

**video**
5:7

**view**
79:4 95:6 122:2 142:2 184:10 192:17

**views**
102:8,13

**Virchow**

97:1,6 127:2 144:3 182:15 183:9
184:6,15 200:16

**virtue**
190:23

**visibility**
156:24,25

**visits**
208:13

**Vista**
198:19

**Vista/acquia**
199:6

**voluntary**
129:15 130:4 132:11,13

**vote**
63:17,24 64:3,20

**voted**
63:17 64:16

**votes**
64:6 67:1

**voting**
57:14,24,25 64:19,24

─────────────

**W**

**W-2**
38:12

**wage**
151:24 171:24 172:6

**wages**
152:8

**wait**
24:25 31:13,15

**waived**
81:22

**waiver**
176:10 211:3,6,12,17

**waivers**
69:19

**walk**
137:15

**wanted**
76:12 115:20

**water**
80:8

**Waters**
5:11 6:13,14 11:25 13:22 14:11,18,24
17:1 23:19,22 24:21 25:22 26:3,5,16,
19 27:2,16,18 28:7,9,13,19 29:3,10,
11,13,16,19 30:21,24 31:2 32:1,4
33:5,23 34:2,8 35:1,6,17,24 36:3,7,9,
11,23 37:1,6,8,9,13,17,19,22 38:1,3,8,
12,15 39:17,22 40:11,17,23 41:8 42:4,
23 43:2,5 44:13,15,17,21,25 45:1,4,
12,18 46:6,8,15,25 47:21 50:6,11,19,
20 51:2,3,9,11,13,17,25 52:5,8,12,17,
22 53:9,12 55:13 56:10,25 58:22 59:7,
8,10,13 60:12 61:9,10,24 63:4,6,14
64:17 65:1 67:11 69:12,25 70:10,14
71:3,18,22 73:20 74:10 77:5,19 78:5,
12 79:13,24 80:23 83:16 84:3,4 85:4,
11,13,16,21,25 86:10 87:3 93:20,23
96:5 97:14 99:1 100:23,25 102:3
103:24 104:11 106:12,14 107:17
108:1,7,10,23 109:7 113:14 114:3,23
116:3,18,20 117:12,15,16,20 118:3,6,
12 119:5,18,22 120:2,9,12,20 121:15,
22,23,25 122:6,7,9,12,13 123:1,4,11,
17 125:8 129:6 130:14,18 134:5,8,15,
16,18,20 137:24 138:6,9,21 139:7
140:8,9,12,22 148:16,22,23 149:19,20
152:6 158:22,25 159:9 160:1,4,5,8,10
164:19,20,21,22,24 168:16 170:18
173:2,6 174:9,10,15 175:14 176:25
177:8,10,21 182:2,11,14,18 183:2,8
184:10 185:11,25 186:18,20 190:6,7,
9,16 191:12 193:5 197:6,12,16 198:8,
13 199:14 200:10,12,17,24 201:1,2,
17,20 202:1,2,3,19,23 203:6,9 206:12,
21 207:2,15,19 208:11 210:3,9,25

**Waters'**
12:9,10 23:10 26:5,8 28:21 33:14,15
39:4,16 41:18,24 42:12 54:3 55:18
56:16 62:25 74:13 75:24 76:17 85:18,
22 93:11,14 98:8 103:14,15 107:9
108:18 113:11 125:9 126:14,20
149:22 166:15 172:18 173:12 174:19
184:5,14

**Waters-related**
116:15

**weeks**
81:23 124:23

**weighted**
96:15 111:5 126:7 145:17

**Widen**
5:9 14:14,22 17:7,11 26:17 28:14,23,
25 29:4,8,12,14,15 31:16,17,20,23
32:15 33:6,17,20 34:3 38:18,20,23

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

*Video Deposition of  Corporate Representative of Windy Waters, Inc.*
*November 03, 2023*Index: Widen's..yesterday

39:1,19,25 40:6,10,19 41:8,11 42:18
45:1 46:5,13 48:2 50:20 51:2,4,21
52:3,10,15,16 57:4,5,11,21 58:22,24
60:1,12,22 62:25 74:18 75:1 82:23
83:3 102:4,14,16,20 103:13,15,22
104:8,20 107:15,18,20 108:2,11,19
109:5 113:11,13 114:3,22 116:3,21
117:12,20 118:2,5,9,12,13 119:1,2,3,
9,16 120:1,8,19 121:12,21,24,25
122:5,6,7,10,11,13 123:1,4,10,18,23
124:6 133:21,25 134:1,4,6,7,10,14,18,
19 149:21,25 152:7 156:10 158:24
159:4,17,21,25 160:2,7,9,12 164:18,
21,23,25 165:8 166:16 168:16 170:18,
19 174:16 176:24 177:14,17,20
180:12,17,22 182:20,21 183:11,13
184:8 193:23 197:4,5,11,15 198:8,13
199:14 200:17 201:21 202:2,25 203:5,
6,12,22,23 204:2,5,7,12 207:3,7,24
208:2,11 211:3

**Widen's**
21:24 44:12 89:10 99:4,5 104:12
120:23 167:9

**Widen-randall**
139:21

**Widen.com**
17:10 116:14

**Win**
166:25

**window**
37:15

**Windy**
5:11 6:13,14 11:25 12:9,10 13:22
14:11,18,24 17:1 23:10,19,22 24:21
25:22 26:3,5,8,16,19 27:2,16,18 28:7,
9,13,19,21 29:3,10,11,13,16,19 30:21,
24 31:2 32:1,4 33:5,14,15,23 34:2,8
35:1,6,17,24 36:3,7,9,11,23 37:1,6,8,
9,13,17,19,22 38:1,3,8,12,15 39:4,16,
17,22 40:11,17,23 41:8,18,24 42:4,12,
23 43:2,5 44:13,15,17,21,25 45:1,4,
12,18 46:6,8,15,25 47:21 50:6,11,19,
20 51:2,3,4,9,11,13,17,25 52:5,8,12,
17,22 53:9,12 54:3 55:13,18 56:10,16,
25 58:22 59:7,8,10,13 60:12 61:9,10,
24 62:25 63:4,6,14 64:17 65:1 67:11
69:12,25 70:10,14 71:3,18,22 73:20
74:10,13 75:24 76:17 77:5,19 78:5,12
79:13,24 80:23 83:16 84:3,4 85:4,11,
13,16,18,21,22,25 86:10 87:3 93:11,
14,16,20,23 96:5 97:14 98:8 99:1
100:23,25 102:3 103:14,15,24 104:11

106:12,14 107:9,17 108:1,7,10,18,23
109:7 113:11,14 114:3,23 116:3,15,
18,20 117:12,15,16,20 118:3,5,12
119:5,18,22 120:2,9,12,20 121:15,22,
23,25 122:6,7,9,12,13 123:1,4,11,17
125:8,9 126:14,20 129:6 130:14,18
134:5,8,15,16,18,20 137:24 138:6,9,
21 139:7 140:8,9,12,22 148:16,22,23
149:19,20,22 152:6 158:22,25 159:9
160:1,4,5,8,10 164:19,20,21,22,24,25
166:15 168:16 170:18 172:18 173:2,6,
12 174:9,10,15,19 175:14 176:25
177:8,10,21 182:2,11,14,18 183:2,8
184:5,10,14 185:11,25 186:18,20
190:6,7,9,16 191:12 193:5 197:6,12,
16 198:8,13 199:14 200:10,12,17,24
201:1,2,17,20,23 202:1,2,3,19,23
203:5,9 206:12,20 207:2,15,19 208:10
210:3,9,25

**Wisconsin**
5:4 33:16

**wishes**
33:3 35:3

**withheld**
17:18,23 105:2

**withholding**
72:2

**witnesses**
78:14

**Wittenberg**
5:21,22 10:5,14,22,24 11:10,13 13:4,8
14:16 18:1,6,10,19 19:8 22:18 23:2
29:20,23 32:9,17,22 33:7 34:14 35:7,
22 36:14 38:5 39:6,20 40:1,20 41:13,
20 42:1,13,24 43:20 44:6,22 45:6,13,
19 46:7,16 47:3,10 48:4 49:4,22 50:24
54:16,22 55:1,5 56:1 58:3 60:14 65:9,
12 66:5 67:20 68:3 72:7 73:24 77:13,
20 78:6 79:9 80:1,15 81:5,18 82:6,16,
17,20 83:11,18 84:7,18,22 87:20 88:2,
9,12,19 90:18 91:7,12,15 94:6,20
95:8,15 98:9 101:13,22 103:8 105:20
107:23 109:21 110:3,6 113:6 116:23
119:12 121:9 127:14 128:25 129:16
131:18 132:25 133:14 140:6,20 141:5,
9 142:9 143:23 145:1 146:13 147:3,
12,16,19 163:16 176:20 179:1,5,25
182:4,13 183:5 188:14 190:3 192:18
195:3 198:5 200:22 201:4 203:3,8,21
204:10,13 208:20

**wondering**
35:25

**word**
143:1 187:3,4,15,17,19,21 192:23

**words**
7:7 25:14 119:9 127:12 145:11 166:8
183:12

**work**
10:15 11:3 12:13 38:3 41:2 81:23
119:17 147:17,21 150:16,17 151:19,
20,21 168:1 171:12,13 180:2

**worked**
20:16 200:14

**workforce**
150:15 153:11,14 170:24,25

**working**
39:18,24 40:5,10 153:17 154:8

**works**
147:15

**worse**
157:22

**worth**
43:6 47:25 182:2,11,14 183:2,8,9
184:10

**wrap**
179:15

**writing**
70:9,25 73:8 163:1 209:2 211:25

**written**
49:4 71:8 150:5 163:17,22 164:7
194:19,20 197:10,25 199:15 209:3

**wrong**
48:14

**wrote**
167:16

---

**Y**

---

**year**
19:1,25 20:2 63:16 66:24 73:18 152:3,
9 162:13 206:16

**year-to-year**
169:17

**years**
74:17 107:10 126:2

**yesterday**
20:6 22:23,25