IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

STACY L. RANDALL,

                         Plaintiff,

        v.
                                             Case No. 3:22-cv-00400-jdp

REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

                         Defendants.

---

## PLAINTIFF STACY L. RANDALL'S
## RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and the Honorable James D. Peterson's standing orders on motions for summary judgment, Stacy L. Randall ("Plaintiff," "Stacy," or "Ms. Randall") submits the below response to Defendants' Proposed Findings of Fact in support of their Motion for Summary Judgment.

## PROPOSED FINDINGS OF FACT

*Entities and People*

1.      Windy Waters, Inc. is a closely held Wisconsin corporation with its principal place of business in Monona, Wisconsin. Am. Answer (ECF No. 45), ¶ 18.

**RESPONSE**: Undisputed.

2.      Widen Enterprises, LLC, was originally called Widen Engraving, and later Widen Colourgraphics, Ltd. and Widen Enterprises, Inc. This entity will be referred to as Widen Enterprises throughout for consistency, even if referring to a time the company had a different name. Am. Answer (ECF No. 45), ¶¶ 2, 19; Michael J. Kiesler Decl. ("Kiesler Decl."), Sept. 29, 2023, p.1, ¶ 2; Reed C. Widen Decl. ("Reed Decl."), Sept. 29, 2023, p.1, ¶ 2.

**RESPONSE**: Undisputed.

3.      Reed is the majority shareholder of Windy Waters. Am. Answer (ECF No. 45), ¶ 15.

**RESPONSE**: Undisputed.

4.      Prior to selling all of her shares in May 2020, Stacy Randall was a minority shareholder of Windy Waters and had been since the company was formed in 1997. Am. Answer (ECF No. 45), ¶¶ 14, 126; Stacy L. Randall Dep. ("Randall Dep."), Aug. 28, 2023, at 315:24-317:3; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.1, ¶ 2, Ex. A (ECF No. 33-1); Reed Decl., Sept. 29, 2023, p.3, ¶ 19.

**RESPONSE**: Undisputed.

5.      At various times, Reed and Randall's other siblings held shares in Windy Waters too. Am. Answer (ECF No. 45), ¶¶ 20, 22, 24.

**RESPONSE**: Undisputed.

*Widen Enterprises History*

6.      Widen Enterprises was formed as a family business in or around 1948 by Emily and Arthur Widen, Randall's and Reed's grandparents. Am. Answer (ECF No. 45), ¶ 19.

**RESPONSE**: Undisputed.

7.      Widen Enterprises was in the printing industry, focused on the processes before the creation of a print layout, called prepress. Reed Decl., Sept. 29, 2023, p.1, ¶ 3; Reed C. Widen Dep. ("Reed Dep."), Aug. 23, 2023, at 12:4-22.

**RESPONSE**: **Undisputed** as to the time period referenced in Proposed Finding of Fact No. 6. **Disputed** to the extent that this Proposed Finding of Fact is intended to reference a broader time period. Widen Enterprises eventually transitioned into a Software as a Service company, which transition began in the 1990s, accelerated in 2008, and was completed in 2020. (*See, e.g.*, 09/21/2023 M. Gonnering Dep. Tr. 30:4-22, 40:22-41:25, 211:7-212:21; 09/19/2023 M. Kiesler Dep. Tr. 151:25-152:2.)

8.      Over time, Emily and Arthur Widen gifted small amounts of stock in Widen Enterprises to Reed, Randall, and their three brothers—Tyler, Stewart, and Price. Am. Answer (ECF No. 45), ¶ 20.

**RESPONSE**: Undisputed.

9.      In the mid-1990s, Widen Enterprises also developed software to store digital images, and as the prepress and printing industry slowed, Widen Enterprises grew its software services. Matthew R. Gonnering Dep. ("Gonnering Dep."), Sept. 21, 2023, at 16:10-20:3; Matthew R. Gonnering Decl. ("Gonnering Decl."), Sept. 29, 2023, p.1, ¶ 4.

**RESPONSE**: Undisputed.

10.     The shift to focusing on software services was gradual, and eventually, in 2020, Widen Enterprises decided to sunset its prepress services division after the COVID-19 pandemic caused sales to drop dramatically. Gonnering Dep., Sept. 21, 2023, at 19:10-20:19, 211:7-212:1-21; Gonnering Decl., Sept. 29, 2023, pp.1-2, ¶ 5; Michael J. Kiesler Dep. ("Kiesler Dep."), Sept. 19, 2023, at 152:3-10.

**RESPONSE**: **Disputed**. Widen Enterprises planned for a "monumental shift" to focus on its software as a service business in 2008, which plan was implemented. (09/21/2023 M. Gonnering Dep. Tr. 30:4-22, 40:22-41:25; 09/29/2023 Palay Decl. Ex. 10, ECF No. 63-9.)


11.     Windy Waters is a holding company formed in 1997 to own Widen Enterprises; it has no operations of its own. Am. Answer (ECF No. 45), ¶¶ 3, 22; Kiesler Dep., Sept. 19, 2023, at 39:25-40:2, 40:22-41:7.

**RESPONSE**: Undisputed.


12.     In 1997, when Windy Waters was formed, the owners of Widen Enterprises stock exchanged that stock for shares of the holding company. Am. Answer (ECF No. 45), ¶¶ 3, 22; Bruce Hutler Decl. ("Hutler Decl."), Sept. 29, 2023, p.2, ¶ 6, Ex. 1 (Hutler Report) at 2; Kiesler Decl., Sept. 29, 2023, p.1, ¶ 3.

**RESPONSE**: Undisputed.


13.     At all times since 1997, the owners of Windy Waters have consisted solely of members of the Widen family or key employees of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.1, ¶ 4.

**RESPONSE**: Undisputed.

14.     From the time Windy Waters was formed in 1997 until it sold Widen Enterprises in September 2021, Windy Waters owned 100% of Widen Enterprises. Am. Answer (ECF No. 45), ¶¶ 3, 17; Kiesler Decl., Sept. 29, 2023, p.1, ¶ 5.

**RESPONSE**: Undisputed.

*Widen Enterprises Leadership*

15.     In the 1970s and 1980s, Widen Enterprises was run by Mark Widen, the father of Reed and Randall. Reed Decl., Sept. 29, 2023, p.1, ¶ 4.

**RESPONSE**: Undisputed.

16.     In the 1970s, Reed Widen worked at Widen Enterprises painting floors and walls. After finishing high school, he returned to the family business. Reed Dep., Aug. 23, 2023, at 11:19-12:2; Reed Decl., Sept. 29, 2023, p.1, ¶ 5.

**RESPONSE**: Undisputed.

17.     Reed worked in every department of Widen Enterprises over time so that he could learn all aspects of the business and every step of the production process. Reed Dep., Aug. 23, 2023, at 11:19-12:2, 13:17-20; Reed Decl., Sept. 29, 2023, pp.1-2, ¶ 6.

**RESPONSE**: Undisputed.

18.     Despite having only a high school education, Reed worked his way up in the company. He moved into a sales role, selling films to make plates to print images. Reed Decl., Sept. 29, 2023, p.2, ¶ 7.

**RESPONSE**: Undisputed.

19.     In the 1980s and 1990s, Reed was a sales director with responsibilities for meeting with clients to sell prepress services, eventually bringing in sales of approximately $5.5 million each year. Reed Decl., Sept. 29, 2023, p.2, ¶ 8.

**RESPONSE**: Undisputed.

20.     In the mid-1990s, Reed became a vice president of the company and had more responsibilities with management alongside his father. Reed Decl., Sept. 29, 2023, p.2, ¶ 9.

**RESPONSE**: Undisputed.

21.     Eventually, Reed became the president and CEO of Widen Enterprises, overseeing all operations of the company. Reed Decl., Sept. 29, 2023, p.2, ¶ 10.

**RESPONSE**: Undisputed.

22.     In 2009, Matthew Gonnering was promoted to be the CEO of Widen Enterprises, and Reed remained Widen Enterprises' president. Gonnering Dep., Sept. 21, 2023, at 27:16-21; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 6; Reed Decl., Sept. 29, 2023, p.2, ¶ 11.

**RESPONSE**: Undisputed.

23.    As Widen Enterprises' president, Reed oversaw operations at[]the company. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8, 208:10-209:8; Reed Decl., Sept. 29, 2023, p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 267:13-268:16; Gonnering Decl., Sept. 29, 2023, p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17.

**RESPONSE**: **Disputed**. During 2019 and 2020, Reed oversaw Gonnering's oversight of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owners is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not

even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.)

24.     Reed worked around the clock to help the company thrive. In his deposition, he explained, "I lived and breathed this company 24/7." Reed Dep., Aug. 23, 2023, at 54:1-5, 207:25-209:8; Gonnering Dep., Sept. 21, 2023, at 123:13-20; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 8.

**RESPONSE**: **Disputed**. During 2019 and 2020, Reed oversaw Gonnering's oversight of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owners is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.)

25.     Under Reed's direction, growth of the business was the objective and was a standing direction. This stemmed from a saying he learned from his father: "When you're green, you're growing; when you're ripe, you're dead." Reed Dep., Aug. 23, 2023, at 98:19-21; Gonnering Dep., Sept. 21, 2023, at 43:2-7, 49:6-25, 197:4-23; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 9.

**RESPONSE**: Undisputed.

26.     When Widen Enterprises had extra profits, it invested them back into the company in order to grow. Reed Decl., Sept. 29, 2023, p.2, ¶ 14.

**RESPONSE**: **Disputed**. Reed funneled company profits into his own compensation and bonuses, which fluctuated widely from year to year and tracked the company's financial performance as determined by Reed. (08/23/2023 R. Widen Dep. Tr. 46:23-25, 47:1-17, 47:19-48:3, 48:12-17, 50:11-14, 51:1-4, 58:17-20, 61:8-13, 61:19-62:8; 09/29/2023 Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 09/21/2023 M. Gonnering Dep. Tr. 123:21-124:6 47:19-48:3, 50:11-14, 51:1-4.) And at times when Widen Enterprises had extra cash it would send it to Windy Waters to be invested, rather than investing it directly into Widen Enterprises. (11/03/2023 Dep. Tr. of Windy Waters 117:20-118:1, 119:6-22; 11/06/2023 Dep. Tr. of Widen Enterprises 140:25-142:1.)

27.     Kiesler served as the Chief Financial Officer of Widen Enterprises from approximately 2000 until approximately November 24, 2021. Before that, he was vice president of finance, and before that, the controller. Kiesler Dep., Sept. 19, 2023, at 23:8-11, 27:9-23; Kiesler Decl., Sept. 29, 2023, pp.1-2, ¶ 6; Am. Answer (ECF No. 45), ¶¶ 16, 32.

**RESPONSE**: Undisputed.

9

28.     Between approximately 2009 until 2021, Kiesler reported to Gonnering, who reported to Reed. Gonnering Dep., Sept. 21, 2023, at 114:5-7, 116:13-21; Kiesler Dep., Sept. 19, 2023, at 29:9-17; Reed Decl., Sept. 29, 2023, p.3, ¶ 16; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 10. **RESPONSE**: Undisputed.

29.     Kiesler's role was to carry out the instructions of Gonnering and Reed and to advise on financial information. Kiesler Dep., Sept. 19, 2023, at 54:1-6; Reed Decl., Sept. 29, 2023, p.3, ¶ 17. **RESPONSE**: Undisputed.

30.     Gonnering and Reed frequently interacted and discussed strategic decisions without Kiesler, and brought Kiesler in later to implement the decisions. Gonnering Decl., Sept. 29, 2023, p.2, ¶ 11; Reed Decl., Sept. 29, 2023, p.3, ¶ 18; Kiesler Dep., Sept. 19, 2023, at 38:6-18, 54:1-6, 60:5-61:3, 87:10-15. **RESPONSE**: **Disputed**. While Gonnering and Reed may have interacted frequently in prior years, during 2019 and 2020, Reed oversaw Gonnering's running of the company's operations at a "higher level," was "not actively involved in the operations of the company," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 09/21/2023 M. Gonnering Dep. Tr. 122:24-124:4.)

31.     Key roles as to product investment, marketing spend, and strategic direction were also played by Mr. Gonnering and Gary Norris. Reed Decl., Sept. 29, 2023, p.2, ¶ 15.

**RESPONSE**: Undisputed.


*Randall's Role in Widen Enterprises and Windy Waters*

32.     Randall worked for Widen Enterprises on two separate occasions. Reed Decl., Sept. 29, 2023, p.3, ¶ 20; Reed Dep., Aug. 23, 2023, at 64:1-2.

**RESPONSE**: Undisputed.


33.     Between 1977 and approximately 1990 or 1991, Randall worked in the dark room for Widen Enterprises working on the prepress process. Randall Dep., Aug. 28, 2023, at 35:4-24, 36:19-25, 37:12-17.

**RESPONSE**: Undisputed.


34.     Randall was terminated from this position by her father. Randall Dep., Aug. 28, 2023, at 36:19-37:17, 39:1-13.

**RESPONSE**: **Undisputed**, but immaterial. The cited testimony does not support the proposed fact.


35.     The second time she was employed by Widen Enterprises, roughly in 2000 and 2001, Randall worked as a receptionist. Reed Dep., Aug. 23, 2023, at 64:1-16; Reed Decl., Sept. 29, 2023, p.3, ¶ 21; Randall Dep., Aug. 28, 2023, at 20:1-15.

**RESPONSE**: Undisputed.


36.     Randall was fired from her position as a receptionist because she was not adequately performing her job duties—not showing up on time, not answering calls, taking long lunches, and

returning from lunch smelling like alcohol. Reed Dep., Aug. 23, 2023, at 64:1-16; Reed Decl., Sept. 29, 2023, p.3, ¶ 22; Randall Dep., Aug. 28, 2023, at 73:17-74:5, 75:2-5.

**RESPONSE**: **Undisputed as to** Randall being occasionally late for work, a single occasion where she returned from lunch after having a drink on her birthday, taking long lunches on Mondays on occasion because she was required to have lunch with her father at his house, and a Widen Enterprises sales representative named Brian Becker telling Reed that Brian's clients were complaining that phone calls were not answered and were sent to voicemail. (Suppl. Decl. of Stacy Randall ¶ 2.) **Disputed as to** Defendants' Proposed Finding of Fact No. 36's characterization of Ms. Randall.

37.     Randall has not had any job at any time since her employment with Widen Enterprises ended in approximately 2001. Randall Dep., Aug. 28, 2023, at 19:24-20:8.

**RESPONSE**: **Undisputed**.

38.     Randall has never been employed by Windy Waters. Reed Decl., Sept. 29, 2023, p.3, ¶ 23; Randall Dep., Aug. 28, 2023, at 72:11-17.

**RESPONSE**: **Undisputed**.

39.     Randall was the sole director of Windy Waters from 2015 until May 13, 2020. She was a director, with others, from 1998 until May 13, 2020. Randall Dep., Aug. 28, 2023, at 179:21-24; Kiesler Decl., Sept. 29, 2023, p.2, ¶ 7; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Christa D. Wittenberg Decl. ("Wittenberg Decl."), Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

**RESPONSE**: **Disputed**. Stacy did not actually serve as a director of Windy Waters at any time. Between 2015 and 2020, Stacy was nominally appointed to this position through Kiesler's use of her signature stamp without her knowledge or consent, although Kiesler testified that he believed that he had Stacy's "implied consent." (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 106:20-137:17, 109:18-111:16, 111:25-113:17, 114:4-24; 117:9-118:7, 124:5-127:4, 127:8-128:18, 128:23-130:2, 130:9-135:18, 135:22-137:17, 280:22-24; *see* Palay Decl., ¶¶ 81, Ex. 73, STAFFORD001059 (2020 director); 82, Ex. 74, STAFFORD001055 (2019 director); 83, Ex. 75, STAFFORD001051 (2018 President); 84, Ex. 76, STAFFORD001050 (2018 director); 86, Ex. 78, STAFFORD001047 (2017 director); 87, Ex. 79, STAFFORD001041 (2016 director); 88, Ex. 80, STAFFORD001037 (2015 director); 89, Ex. 81, STAFFORD001032 (2014 director); 90, Ex. 82, STAFFORD001019 (2012 director); 91, Ex. 83, STAFFORD001010 (2011 director); 92, Ex. 84, STAFFORD001007 (2010 director); 93, Ex. 85, STAFFORD001005 (2009 director); 94, Ex. 86, STAFFORD000997 (2008 director); 95, Ex. 87, STAFFORD000975 (2004).) Windy Waters testified that Stacy did not participate in the operations of Windy Waters, and both of the Companies confirmed that Stacy did not direct the actions of any officers or directors of Windy Waters. (11/03/2023 Dep. Tr. of Windy Waters 55:12-16, 63:3-15; 11/06/2023 Dep. Tr. of Widen Enterprises 91:20-92:5.)

40.     Randall was paid directors' fees every year she was a director, around Thanksgiving each year. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 8.

**RESPONSE**: **Undisputed** that Stacy was paid directors' fees in certain years; **disputed** that Stacy ever was a director. (*See* Plaintiff's Response to Proposed Finding of Fact No. 39.) As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for

"directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays before his death. (09/28/2023 S. Randall Decl., p.5, ¶ 33.)

41.    Randall was president of Windy Waters from approximately 2007 until May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 9; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.)

**RESPONSE**: **Disputed**. Stacy did not actually serve as President of Windy Waters at any time. Stacy was nominally appointed to this position through Kiesler's use of her signature stamp without her knowledge or consent, although Kiesler testified that he believed that he had Stacy's "implied consent." In other instances, Stacy was nominally appointed to this position in documents that Kiesler signed alone of which she was not aware. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 109:18-111:16, 111:25-113:17, 114:4-24, 117:9-118:7, 124:5-127:4, 127:8-128:18, 128:23-130:2, 130:9-135:18, 132:2-133:2, 134:16-135:15, 135:22-137:17, 280:22-24; *see generally id.* 106:20-137:17; 08/29/2023 R. Widen Dep. Tr. 225:4-6; *see* 09/29/2023 Palay Decl., ¶¶ 96, Ex. 88, STAFFORD001057 (2020 President); 97, Ex. 89, STAFFORD001053 (2019 President); 83, Ex. 75, STAFFORD001051 (2018 President); 85, Ex. 77, STAFFORD001048 (2017 President); 98, Ex. 90, STAFFORD001043 (2016 President); 99, Ex. 91, STAFFORD000999 (2008 President).) Windy Waters testified that Stacy was not paid for her purported service as President and both of the Companies confirmed that Stacy did not direct the actions of any officers or directors of Windy Waters. (11/03/2023 Dep. Tr. of Windy Waters 63:3-15, 68:6-7, 185:10-12; 11/06/2023 Dep. Tr. of Widen Enterprises 91:20-92:5.)

42.     Reed notified Randall that she would be serving as the Windy Waters president before she began the role. Reed Decl., Sept. 29, 2023, p.3, ¶ 24.

**RESPONSE**: **Disputed**. Reed previously testified that he did not remember if he ever informed Stacy that she was the President of Windy Waters. (08/29/2023 R. Widen Dep. Tr. 223:17-224:3.) He cannot contradict that testimony with an affidavit now, particularly where he previously testified that he "do[es]n't have fact" on this issue. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Furthermore, the cited testimony does not support the Proposed Finding of Fact. Mr. Widen's Declaration states only that, "[b]ased on the timing and my habitual practices at the time to notify Ms. Randall of important corporate matters, I am confident I talked with Ms. Randall about the role before she became president." (09/29/2023 R. Widen Decl. ¶ 24.)

43.     Randall signed the Second Amendment to Shareholder Agreement, in her capacity as President. Reed Dep., Aug. 23, 2023, at 222:18-223:1; Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: **Undisputed** that Stacy signed the Second Amendment to the Shareholder Agreement above the by line that includes "President." **Disputed** that Stacy actually served as President of Windy Waters at any time. Stacy was nominally appointed to this position through Kiesler's use of her signature stamp without her knowledge or consent, although Kiesler testified that he believed that he had Stacy's "implied consent." In other instances, Stacy was nominally appointed to this position in documents that Kiesler signed alone of which she was not aware. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 109:18-111:16, 111:25-113:17, 114:4-24, 117:9-118:7, 124:5-127:4, 127:8-128:18, 128:23-130:2, 130:9-135:18, 132:2-133:2, 134:16-135:15, 135:22-137:17, 280:22-24; *see generally id.* 106:20-137:17; 08/29/2023 R. Widen Dep. Tr. 225:4-6; *see* Palay Decl., ¶¶ 96, Ex. 88, STAFFORD001057 (2020 President); 97, Ex. 89, STAFFORD001053 (2019 President); 83, Ex.

75, STAFFORD001051 (2018 President); 85, Ex. 77, STAFFORD001048 (2017 President); 98, Ex. 90, STAFFORD001043 (2016 President); 99, Ex. 91, STAFFORD000999 (2008 President).) Windy Waters testified that Stacy was not paid for her purported service as President and both of the Companies confirmed that Stacy did not direct the actions of any officers or directors of Windy Waters. (11/03/2023 Dep. Tr. of Windy Waters 63:3-15, 68:6-7, 185:10-12; 11/06/2023 Dep. Tr. of Widen Enterprises 91:20-92:5.)

44.     Randall affixed her signature via DocuSign to the third amendment to the Windy Waters shareholder agreement on a signature line below the company name and above words that read "Stacy Widen Randall, President," depicted below:

**WINDY WATERS, INC.**

DocuSigned by:

*Stacy Randall*

By: Stacy Widen Randall, President

Kiesler Decl., Sept. 29, 2023, p.2, ¶ 10, Ex. A (Third Amendment to Shareholder Agreement) at WINDY0002906.

**RESPONSE**: Undisputed.

45.     Randall affixed her signature via DocuSign to a document approving her purchase of shares in Windy Waters on a signature line below the company name and above words that read "Stacy L. Randall, President," depicted below:

**WINDY WATERS, INC.**

By: _Stacy Randall_

Stacy L. Randall, President

Dated: December 31, 2012

Kiesler Decl., Sept. 29, 2023, p.2, ¶ 11, Ex. B (Agreement to Subscribe For Shares Of Windy Waters) at WINDY0002143.

**RESPONSE**: Undisputed.

46. Randall was a passive shareholder and president who was not engaged in the business of Windy Waters or Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 12; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 141:1-10; Kiesler Dep., Sept. 19, 2023, at 93:14-24; Reed Dep., Aug. 23, 2023, at 224:4-12, 21-25.

**RESPONSE**: **Undisputed** that Stacy was a passive shareholder and was not engaged in the business of Windy Waters or Widen Enterprises; **disputed** that Stacy was President of either Windy Waters or Widen Enterprises. (*See* Response to Proposed Finding of Fact No. 41.)

47. Randall's primary interest in Windy Waters and reasons for contacting Kiesler about the company was as a source of money for her, treating Windy Waters like a bank. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 13.

**RESPONSE**: **Disputed**. Stacy's primary interest in Windy Waters was her approximate 20% ownership interest in the corporation. (Suppl. Decl. of Stacy Randall ¶ 3.) Her primary reason for

17

contacting Kiesler about the company was for the purpose of selling her shares of Windy Waters six times over an approximate 15-year period. (Suppl. Decl. of Stacy Randall ¶ 3.)

48.     Windy Waters caused its shareholders to receive direct or indirect payments periodically, when the company was going to show a profit, to pay estimated taxes for its shareholders. Kiesler Decl., Sept. 29, 2023, p.2, ¶ 14.

**RESPONSE**: **Disputed**. In at least 2019 Reed arranged for Widen Enterprises to pay his estimated tax obligation as a "bonus" that was not distributed to other shareholders. (Palay Decl., ¶¶ 36, Ex. 34, WINDY0047424 at 47425; 35, Ex. 33, WINDY0001100; Suppl. Decl. of Stacy Randall ¶¶ 11-12; 08/23/2023 R. Widen Dep. Tr. 203:22-204-10, 210:25-211:21.)

49.     Randall directly received $126,018.00 for being a shareholder of Windy Waters in 2016 as a dividend. Kiesler Decl., Sept. 29, 2023, p.3, ¶ 17.

**RESPONSE**: Undisputed.

50.     Windy Waters also caused the IRS and Wisconsin Department of Revenue to receive estimated tax payments on Randall's behalf in 2015 ($86,346.34), 2016 ($30,170), and 2018 ($22,132). Kiesler Decl., Sept. 29, 2023, p.3, ¶ 18.

**RESPONSE**: Undisputed.

*Signatures and Signature Stamp*

51.     Randall was aware she had to sign documents related to Windy Waters or Widen Enterprises, but claims she did not know why. Randall Dep., Aug. 28, 2023, at 93:6-94:7.

**RESPONSE**: **Undisputed**, although the cited testimony does not support this Proposed Finding of Fact. In the cited testimony, Ms. Randall does not testify she was aware she "had to sign documents related to Windy Waters or Widen Enterprises." In fact, she testified that she needed to sign "[w]hatever Mike Kiesler asked me to sign." (08/28/2023 S. Randall Dep. Tr. 94:12-15.) Further **undisputed** that Ms. Randall did not know why she needed to sign documents. (08/28/2023 S. Randall Dep. Tr. 93:21-94:7.)

52.    To facilitate the signing of documents related to Windy Waters after she moved to Florida, Randall created a rubber stamp to use in place of a wet ink signature on corporate documents after 2001 but sometime before May 15, 2004. Randall Dep., Aug. 28, 2023, at 98:5-18; Kiesler Dep., Sept. 19, 2023, at 100:4-13; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 19; Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 2, Ex. A (Defs.' Objections And Resps. To Pl.'s First Set of Interrogs.) at Resp. No. 4.

**RESPONSE**: **Disputed.** No admissible cited evidence supports the proposition that Ms. Randall created a rubber stamp "[t]o facilitate the signing of documents related to Windy Waters after she moved to Florida" or that her intent was to use the stamp "in place of a wet ink signature on corporate documents . . . ." Those facts appear only in the Declaration of Michael Kiesler, but Kiesler cannot testify to Ms. Randall's intention or motivation in obtaining the stamp. Kiesler came up with the idea for Ms. Randall to obtain the signature stamp. (08/28/2023 S. Randall Dep. Tr. 100:5-10, 101:5-9; Suppl. Decl. of Stacy Randall ¶ 6.) **Undisputed** that sometime after 2001, Ms. Randall obtained a stamp of her signature at Staples.

53.    The idea of Randall getting a signature stamp came up on an occasion when Randall was in Kiesler's office signing a document for Windy Waters, and Stewart Widen (who was also

there) suggested Randall get a signature stamp like he had so it could be used for her convenience. Kiesler Dep., Sept. 19, 2023, at 99:1-14; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 20.

**RESPONSE**: **Disputed.** Kiesler came up with the idea of Ms. Randall obtaining a signature stamp. (08/28/2023 S. Randall Dep. Tr. 100:5-10, 101:5-9; Suppl. Decl. of Stacy Randall ¶ 6.)

54.     Randall went to a Staples store to have the signature stamp created and purchased it. Randall Dep., Aug. 28, 2023, at 98:8-13, 103:20-21, 116:17-24; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. to Defs.' First Set of Interrogs.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 95.

**RESPONSE**: Undisputed.

55.     Randall gave the stamp to Kiesler and instructed that it could be used in place of a wet ink signature as long as someone "let [her] know when [they're] using it." Randall Dep., Aug. 28, 2023, at 101:10-25, 102:15-21, 103:20-25, 104:10-20, 120:9-16; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 21; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 96.

**RESPONSE**: Undisputed.

56.     Randall understood the stamp would be used as a substitute for her handwritten signature. Randall Dep., Aug. 28, 2023, at 104:6-14.

**RESPONSE**: **Disputed.** Stacy Randall understood that the stamp could be used as a substitute for her handwritten signature only if Defendants "ask[ed] [her] first or let [her] know first" — said

differently, "as long as [Kiesler] let [her] know when [he is] using it." (08/28/2023 S. Randall Dep. Tr. 101:10-14, 102:15-21, 104:10-14.)

57.     Reed or Kiesler contacted Randall each time the stamp was used on something she had not already approved. Reed Dep., Aug. 23, 2023, at 218:22-219:6; Kiesler Dep., Sept. 19, 2023, at 61:14-20, 62:18-63:1, 100:22-101:3, 103:14-19, 115:14-116:4; Randall Dep., Aug. 28, 2023, at 117:6-9; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 22; Reed Decl., Sept. 29, 2023, pp.3-4, ¶ 25.

**RESPONSE**: **Disputed.** The cited testimony does not support this Proposed Finding of Fact. Reed Widen testified that protocol required Kiesler to contact Ms. Randall every time the stamp was used but that he did not know if Kiesler actually did so. (08/23/2023 R. Widen Dep. Tr. 219:7-24.) Kiesler testified that there were times where he affixed Ms. Randall's signature stamp to a document without obtaining her permission directly. (09/19/2023 M. Kiesler Dep. Tr. 63:11-15.) He also testified that he sometimes obtained "permission" by asking Reed Widen, who would tell Kiesler that Reed Widen had obtained Ms. Randall's approval, but that he did not know what Reed actually did to obtain Ms. Randall's approval. (09/19/2023 M. Kiesler Dep. Tr. 104:10-13, 23-25.) He also testified that Ms. Randall "gave [him] permission to use the stamp when she gave it to [him]." (09/19/2023 M. Kiesler Dep. Tr. 107:14-18.) Kiesler only recalls one specific instance in which he contacted Ms. Randall to obtain her consent to the use of the stamp. (09/19/2023 M. Kiesler Dep. Tr. 107:22-108:4, 109:3-12; *see, e.g.* 09/19/2023 M. Kiesler Dep. Tr. 68:5-21, 111:1-8, 113:2-17.)

58.     The only time Randall denied permission to use the signature stamp on request was in late December 2019, but she admitted she later consented to use of the stamp on that occasion. Randall Dep. 131:12-133:7, 138:17-20.

**RESPONSE**: **Disputed.** Stacy issued a blanket denial of permission to use her signature stamp when she instructed Kiesler that the stamp could be used as a substitute for her handwritten signature only if Defendants "ask[ed] [her] first or let [her] know first." (08/28/2023 S. Randall Dep. Tr. 104:10-14; Suppl. Decl. of Stacy Randall ¶¶ 7-8.) In addition, the cited testimony does not support the proposition that this was the "only time" Ms. Randall denied permission to use the signature stamp upon request. Kiesler testified that there was *not* only one instance where he asked her specifically to use her signature stamp and she said no. (09/19/2023 M. Kiesler Dep. Tr. 107:22-25.) **Undisputed** that Stacy initially denied permission to use her signature stamp in late December 2019 and later consented to the use of the stamp on that occasion.

59.     Randall largely could not recall approving the use of her stamp, but admitted it was possible someone reached out on occasions beyond the one she recalled during her deposition. Randall Dep., Aug. 28, 2023, at 117:6-9, 119:9-11, 120:9-121:5, 122:5-12.

**RESPONSE**: **Undisputed**, but immaterial.

60.     After Kiesler explained the pro forma corporate documents Windy Waters completed each year, Randall gave blanket approval for Kiesler to use the signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 23.

**RESPONSE**: **Disputed.** Randall issued a blanket denial of permission to use her signature stamp when she instructed Kiesler that the stamp could be used as a substitute for her handwritten signature only if Defendants "ask[ed] [her] first or let [her] know first." (08/28/2023 S. Randall Dep. Tr. 104:10-14; Suppl. Decl. of Stacy Randall ¶¶ 7-8.) There were never any documents with respect to

22

which Stacy agreed to allow the use of her stamp without her advance approval. (08/28/2023 S. Randall Dep. Tr. 105:6-11.)

61.    Windy Waters never used the signature stamp outside of the scope of authority given by Randall to do so. Kiesler Dep., Sept. 19, 2023, at 61:14-20; Reed Decl., Sept. 29, 2023, p.4, ¶ 26; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 24.

**RESPONSE**: **Disputed**. (*See* Pl.'s Resp. to Defs.' Proposed Finding of Fact 56-57, 60.)

62.    Randall never asked anyone at Windy Waters to stop using the rubber signature stamp. Randall Dep., Aug. 28, 2023, at 148:7-11; Kiesler Decl., Sept. 29, 2023, p.3, ¶ 25; Reed Decl., Sept. 29, 2023, p.4, ¶ 27.

**RESPONSE**: **Undisputed**, but this Proposed Finding of Fact implies—incorrectly—that Stacy knew the signature stamp was being used without her consent. Stacy did not know that the signature stamp was being used without her consent or knowledge. (08/28/2023 S. Randall Dep. Tr. 103:4-11, 104:25-105:5; Suppl. Decl. of Stacy Randall ¶¶ 7-10.)

63.    Randall trusted Reed and Kiesler "with everything they wrote and had [her] sign." Randall Dep., Aug. 28, 2023, at 215:16-18.

**RESPONSE**: **Undisputed**.

64.    Randall never asked to see copies of documents on which the signature stamp was used. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 26; Reed Decl., Sept. 29, 2023, p.4, ¶ 28; Kiesler Dep., Sept. 19, 2023, at 105:3-9.

**RESPONSE**: **Undisputed**, but this Proposed Finding of Fact implies—incorrectly—that Ms. Randall knew the signature stamp was being used without her consent. Ms. Randall did not know that the signature stamp was being used without her consent or knowledge. (08/28/2023 S. Randall Dep. Tr. 103:4-11, 104:25-105:5; Suppl. Decl. of Stacy Randall ¶¶ 7-10.)

65.    Neither Kiesler nor Reed ever prevented Randall from seeing a document that required her signature. Randall Dep., Aug. 28, 2023, at 128:25-126:5; Kiesler Dep., Sept. 19, 2023, at 257:1-6; Kiesler Decl., Sept. 29, 2023, p.4, ¶ 27; Reed Decl., Sept. 29, 2023, p.4, ¶ 29.

**RESPONSE**: **Disputed.** By failing to inform her of the stamp's use for many years, Kiesler and Reed prevented Stacy from seeing the documents on which it was used. Except when consent to use her stamp was specifically requested by Kiesler or Reed, Stacy was unaware that her stamp was being used. As far as Ms. Randall can recall, Defendants specifically requested such consent in writing on three occasions: December 2019, March 2010, and August 2010. (08/28/2023 S. Randall Dep. Tr. 103:4-11, 104:25-105:5, 138:17-20; Suppl. Decl. of Stacy Randall ¶¶ 7-10; 11/09/2023 Suppl. Decl. of D. Palay, ¶¶ 9-12, Exs. 7-10.)

66.    None of the Defendants concealed from Randall any documents on which the rubber signature stamp was used. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 28; Reed Decl., Sept. 29, 2023, p.4, ¶ 30.

**RESPONSE**: **Disputed.** Ms. Randall was unaware that her stamp was being used except when consent to use her stamp was specifically requested by Kiesler or Reed. As far as Ms. Randall can recall, Defendants specifically requested such consent in writing on three occasions: December

24

2019, March 2010, and August 2010. (08/28/2023 S. Randall Dep. Tr. 103:4-11, 104:25-105:5, 138:17-20; Suppl. Decl. of Stacy Randall ¶¶ 7-10; Suppl. Decl. of D. Palay, ¶¶ 9-12, Exs. 7-10.)

67.    Randall routinely did not review documents before signing them, typically only "skimming" the contents, if that, and even accepting only the signature page without demanding to see the entire document. Randall Dep. 41:11-42:15, 50:21-23, 59:3-7, 206:11-18, 210:15-18, 257:5-11 (related to LLCs), 257:22-25.

**RESPONSE**: **Disputed.** The cited testimony does not support this Proposed Finding of Fact. Ms. Randall routinely signed documents provided to her by her father without reading them, and she typically did not read documents she was asked to sign when they were written by people she trusted. (08/28/2023 S. Randall Dep. Tr. 41:11-42:15, 50:21-23, 59:3-7, 206:11-18, 210:15-18, 257:5-11, 257:22-25.)

*Access to Financials and Miscellaneous Financial Information*

68.    Randall never once asked to see the financial records of Widen Enterprises. Randall Dep., Aug. 28, 2023, at 82:23-25; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Kiesler Decl., Sept. 29, 2023, p.4, ¶ 29; Reed Decl., Sept. 29, 2023, p.4, ¶ 31.

**RESPONSE**: Undisputed.

69.    No one ever told Randall that she could not have financial records for Widen Enterprises or Windy Waters. Randall Dep., Aug. 28, 2023, at 83:8-13.

**RESPONSE**: Undisputed.

70.     When funds were available, Windy Waters paid dividends to shareholders, either to assist with tax liability or when the financial statements showed an excess of funds that did not need to be reinvested into the company. Reed Decl., Sept. 29, 2023, p.4, ¶ 32.

**RESPONSE**: **Disputed.** Windy Waters maintained significant cash reserves that were speculatively invested in securities portfolios and were not used for operating capital, in years in which no dividends were paid, including 2019. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19, 294:6-296:9; 09/29/2023 Palay Decl. Ex. 8, Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5, ECF No. 63-7; 09/29/2023 Palay Decl. Ex. 20, Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp. 17-18, Defs.' Response to Request for Admission Nos. 37-39, ECF No. 63-19; Suppl. Decl. of D. Palay, ¶ 3, Ex. 1, STAFFORD002276 at 2287; Suppl. Decl. of Stacy Randall ¶¶ 11-12.)

71.     In 2015, Randall received dividend payments from Windy Waters totaling in excess of $86,000. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 111.

**RESPONSE**: Undisputed.

72.     In 2016, Randall received dividend payments from the Companies, totaling in excess of $156,000, including a non-tax dividend payment in April 2016. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 112; Kiesler Decl., Sept. 29, 2023, p.2, ¶ 15.

**RESPONSE**: Undisputed.

73.     Randall was treated like every other shareholder with respect to dividends and was paid her pro rata share each time dividends were paid. Kiesler Decl., Sept. 29, 2023, p.3, ¶ 16.

**RESPONSE**: **Disputed.** Reed Widen paid himself purported "bonuses" to cover his tax liabilities, which were in reality constructive or disguised dividends. (08/23/2023 R. Widen Dep. Tr. 203:22-204:8.) Ms. Randall received no such "bonuses." (Suppl. Decl. of Stacy Randall ¶ 11.) Reed Widen also received $1 million or more annually when he was not actively involved in the operations of the company, which were in reality constructive or disguised dividends. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23.) Ms. Randall received no such dividends. (Suppl. Decl. of Stacy Randall ¶ 12.)

74.     Widen Enterprises and Windy Waters had separate bank accounts used only for business purposes. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 30.

**RESPONSE**: **Undisputed** (but see Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 73).

75.     No personal funds of Reed's were mingled with the funds in these accounts. Reed Decl., Sept. 29, 2023, p.5, ¶ 44.

**RESPONSE**: **Undisputed** (but see Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 73).

76.     Any time Widen Enterprises paid an expense on behalf of Windy Waters, it was tracked on an inter-company account ledger. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 31.

**RESPONSE**: **Undisputed.**

*Compensation Decisions*

77.     Compensation for employees and officers of Widen Enterprises is determined by a mix of individual performance, company performance, and market conditions. Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 2, Ex. A (Defs.' Objections and Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 7.

**RESPONSE**: **Disputed.** Reed Widen unilaterally determined his own compensation without any process, which was based on his assessment of the company's performance and on his own personal monetary needs and was not based on market conditions. (08/23/2023 R. Widen Dep. Tr. 46:23-25, 48:12-17, 58:17-20, 203:22-204:8; 61:19-62:8; 58:17-20, 61:8-13.)

78.     To help inform the decision of setting executive compensation, Reed consulted with advisors at Widen Enterprises' accounting firm. Reed Dep., Aug. 23, 2023, at 55:17-24, 56:3-7, 195:5.

**RESPONSE**: **Disputed.** Reed did not consult with advisors at Widen Enterprises' accounting firm "year to year" as to his executive compensation decisions and did not consult with them in the years 2019 and 2020, specifically. (08/23/2023 R. Widen Dep. Tr. 56:8-13; 11/06/2023 Dep. Tr. of Widen Enterprises 105:20-25.)

79.     The compensation Reed received for serving as board chairman was within the range of salaries and bonuses for comparable companies in the market. Gonnering Dep., Sept. 21, 2023, at 269:13-270:3; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 13; Reed Decl., Sept. 29, 2023, p.2, ¶ 13.

**RESPONSE**: **Disputed.** Defendants have not supported this proposed finding of fact with admissible evidence. Gonnering is not an expert in executive compensation, did not consult with such an expert, and lacks foundation to offer these proposed opinions. Gonnering merely claimed to have read

"popular business literature" but could not point to a single piece of information supporting the statement that Reed's 2019 and 2020 compensation for serving as board chairman "was within the range of salaries and bonuses for comparable companies in the market." (*See* 09/21/2023 M. Gonnering Dep. Tr. 270:15-271:19.) Widen Enterprises testified that it had no knowledge of any specific literature or company comparators. (11/06/2023 Dep. Tr. of Widen Enterprises 218:19-219:6.) A voluminous survey of private companies' executive compensation conducted by Chief Executive Research shows that Reed's compensation for serving as board chairman was not within the range of compensation for comparable companies, and that does not even take into account that Reed was not actively involved in the operations of Widen Enterprises in 2019 and 2020 and his role was non-essential to the business operations. (Suppl. Decl. of D. Palay, ¶ 4, Ex. 2; 09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142.)

80.     Reed's compensation for the services he performed for the company was paid solely from Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.4, ¶ 32.

**RESPONSE**: **Disputed** that Reed's compensation was "for the services he performed for the company," as he was not actively involved in the companies in 2019 and 2020. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; *see id* at 90:18-23; 96:19-97:24, 121:6-12, 122:3-123:2; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) **Undisputed** that Reed's purported compensation came solely from Widen Enterprises.

81.     When Gonnering was asked about what he would have done if Reed had retired, he

provided the following testimony:

> I would look to, as it goes for anybody with any departure or retirement, I would reexamine what do we really need and how are we going to staff this back. In Reed's case, I would have staffed back probably with a team of advisors, a team of people who would represent various advisory capacities that Reed provided to me. . . .I mean, Reed was not a -- you couldn't replace Reed. Reed was the -- Reed was there 30, 40 years he's been.· It's his name on the building, his name in the marketplace.· He's got -- yes, he's got the rich legacy knowledge, but also how he takes that knowledge and repurposes it with his monitorship with me was very important to me.· So to replace him is – you couldn't replace. You don't replace Reed. But I would replace his advisory capacity with a team of advisors.

Gonnering Dep., Sept. 21, 2023, at 124:24-125:22

**RESPONSE**: **Undisputed** that Gonnering provided the above testimony.


*Prior Stock Transactions*

82.     A chart showing each stock transaction for Windy Waters from 2004 to 2020 is

below:

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Gary Norris | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Terry Vial | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Thomas Schmidt | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Michael Kiesler | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Stacy Randall | 06/30/2005 | Redemption | 611.88 | $326.86 |
| Stewart Widen | 01/01/2007 | Redemption | 232.75 (Class A)<br>5063.903 (Class B) | $294.70 (Class A)<br>$280.66 (Class B) |
| Gary Norris | 01/01/2007 | Subscription | 712.606 | $280.66 |
| Michael Kiesler | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Terry Vial | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Stacy Randall | 06/30/2007 | Redemption | 801.05 | $312.09 |
| Reed Widen | 01/01/2008 | Subscription | 594.16 | $336.61 |
| Thomas Schmidt | 12/31/2009 | Redemption | 285.68 | $155.34 |
| Matthew Gonnering | 01/01/2011 | Subscription | 592.77 | $168.70 |
| Stacy Randall | 01/18/2011 | Redemption | 1185.5364 | $168.70 |

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Terry Vial | 02/07/2011 | Redemption | 264.7308 | $168.70 |
| Brian Becker | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Gary Norris | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Matthew Gonnering | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Michael Kiesler | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Reed Widen | 12/31/2012 | Subscription | 446.7078 | 223.86 |
| Stacy Randall | 12/31/2012 | Subscription | 44.6708 | 223.86 |
| Price Widen | 06/01/2015 | Redemption | 232.75 (Class A) 5063.9025 (Class B) | $178.44 (Class A) $169.94 (Class B) |
| Brian Becker | 04/30/2016 | Redemption | 104.4923 | $334.14 |
| Terry Vial | 04/30/2016 | Redemption | 377.2522 | $334.14 |
| Stacy Randall | 08/01/2017 | Redemption | 275.5210 | $283.10 |
| Stacy Randall | 01/01/2019 | Redemption | 281.8291 | $425.79 |
| Reed C. Widen Children's Trust | 12/24/2019 | Redemption | 861 | $512.54 |
| Stacy Randall | 05/13/2020 | Redemption | 232.75 (Class A) 1952.7568 (Class B) | $646.19 (Class A) $615.42 (Class B) |

Kiesler Decl., Sept. 29, 2023, pp.4-5, ¶ 35; see also Proposed Findings of Fact, ¶¶ 83-194.

**RESPONSE**: **Disputed.** Some stock transactions for Windy Waters from 2004 to 2020 are omitted from the table, including Reed's 1/1/2004 redemption, Reed's transfers of shares to a revocable trust on 12/2/2013, Gonnering's 1/1/2008 subscription (which Windy Waters confirmed was omitted, *see* 11/03/2023 Dep. Tr. of Windy Waters 88:22-89:14), Mr. Norris's 5/1/2006 subscription, and Tyler Widen's 4/1/2004 redemption (*see* Kiesler Decl. Ex. C, ECF No. 74-3).

83.     Between 2005 and 2019, on 12 occasions, Windy Waters purchased all or some stock owned by certain stockholders. Kiesler Decl., Sept. 29, 2023, p.4, ¶¶ 33-35, Ex. C (WINDY0035810).

31

**RESPONSE**: Undisputed.

84.     On each occasion, Mike Kiesler made calculations using a formula (the "Stock Price Formula") that resulted in a per-share price. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 36; Kiesler Dep., Sept. 19, 2023, at 175:14-18, 200:15-21; Gonnering Dep., Sept. 21, 2023, at 148:1-5, 148:19-20, 149:4-8; Gonnering Decl., Sept. 29, 2023, p.2, ¶ 14.

**RESPONSE**: Undisputed.

85.     The Stock Price Formula was described in the May 7, 2007 Second Amendment to Shareholder Agreement of Windy Waters (the "Second Amendment"). A true and correct copy of the document is attached to Michael J. Kielser's Declaration as Exhibit D. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: Undisputed.

86.     The Second Amendment states, "The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions." Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement) at WINDY0001341.

**RESPONSE**: Undisputed.

87.     The Second Amendment contains signatures in blue ink on the signature lines for Stacy Randall as not only a shareholder, but also as then-President of Windy Waters, as depicted below:

**WINDY WATERS, INC.**

By: Stacy Widen Randall, President

**SHAREHOLDERS:**

Reed C. Widen

Stacy Widen Randall

Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: Undisputed.

88.     The Stock Price Formula was created based on a report from Bruce Hutler, an advisor at the accounting firm used by Windy Waters at the time—then called Virchow Krause, which later changed its name to Baker Tilly. In 2004, Hutler provided this report to give an estimated value of the stock of Windy Waters. This was a follow-up to a report to Reed and Randall valuing the company's stock after Mark Widen died in 2003. Bruce Hutler Decl. ("Hutler Decl."), Sept. 29, 2023, pp. 1-2, ¶¶ 1-6, Ex. 1 (Hutler Report); Reed Decl., Sept. 29, 2023, p.4, ¶¶ 33-34.

**RESPONSE**: **Disputed** that the "Hutler Report" was a follow-up report to Reed and Ms. Randall. The Hutler Report is addressed only to Reed Widen and is described as "Confidential" and "Personal" (Hutler Decl. Ex. 1, at 1, ECF No. 68-1), and Ms. Randall has no recollection of ever receiving it prior to this lawsuit. (Suppl. Decl. of Stacy Randall ¶ 13.) As to the other facts contained in Proposed Finding of Fact No. 88, **undisputed.**

89.     The 2004 Hutler report provided an estimate of the fair market value of a marketable, majority interest in 100% of stock in Windy Waters, Inc. as of April 30, 2004. Hutler Decl., Sept. 29, 2023, p.2, ¶ 6 Ex. 1 (Hutler Report) at p.1.

**RESPONSE**:  Undisputed.

90.     The value Hutler calculated for a 100% interest in Windy Waters Inc. as of April 30, 2004, was $7,441,000. Hutler Decl., Sept. 29, 2023, p.2, ¶ 6 Ex. 1 (Hutler Report) at p.1.

**RESPONSE**: Undisputed.

91.     The report Baker Tilly was able to locate in its records does not include a signature because it was not standard practice at the time to scan final reports before they were sent. However, the document is the final version that was sent to Reed Widen. Hutler Decl., Sept. 29, 2023, p.2, ¶ 6.

**RESPONSE**: Undisputed.

92.     The Hutler report was provided for "management planning and a possible transaction of the Company's shares of stock." Hutler Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. 1 (Hutler Report) at p.1.

**RESPONSE**: Undisputed.

93.     The Hutler report estimated the value of 100% of the shares in Windy Waters based on generally accepted valuation theory and gave appropriate consideration to the market approach and income approach. Hutler then weighted these approaches based on a determination of what was appropriate in light of Windy Waters' circumstances. Hutler Decl., Sept. 29, 2023, p.2, ¶ 8.

**RESPONSE**: Undisputed.

94.     Hutler discounted the price of shares in Windy Waters by 25% for any shares that were less than majority interest because those shares have no control of the company. The report explains as follows:

> The interest being valued represents a lack of control in the common stock. Under the by-laws of the corporation and the laws of the State of Wisconsin, in which the Company was incorporated, this particular stock interest exercises minority control over the affairs of the business. Such interests must collaborate with other minority shareholders to be more than 50% to exercise prerogatives of ownership. Therefore, we must consider a lack of control discount to reflect monetarily the lack of rights by this block of stock. In valuing a lack of control interest in the equity of the Company, we have concluded a 25% discount is appropriate . . . .

Hutler Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. 1 (Hutler Report) at p.7.

**RESPONSE**: Undisputed.

95.     Hutler also discounted the price of shares in Windy Waters by 35% because the company is a closely held corporation and the shares are therefore not marketable on the open market. The report explains as follows:

> A substantial difference exists between the marketability of a publicly traded company versus a company that is closely held. As a result, shares of closely held companies tend to be discounted from the value of marketable, minority interests of publicly traded companies. All things being equal, an investment with greater liquidity will command a higher value than an illiquid investment. The discount for lack of marketability measures the difference in value between securities based on their relative liquidity. Therefore, based upon the factors above, we conclude that a lack of marketability discount of [35]% is appropriate.

Hutler Decl., Sept 29, 2023, p.2, ¶¶ 6-7. Ex. 1 (Hutler Report) at p8.

**RESPONSE**: Undisputed.

96.     For a company like Windy Waters, there is virtually no market for its shares because very few persons are willing to purchase a minority block of shares in a family-run, privately owned

company and, if they are willing to do so, they expect a large discount from the pro rata value. Hutler Decl., Sept. 29, 2023, p.3, ¶ 12.

**RESPONSE**: **Disputed.** The proposed fact is not supported by admissible evidence. (*See* Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed contemporaneously herewith.) The marketability of shares "for a company like Windy Waters" are fact-specific, there is no one-size-fits-all solution for the determination of the marketability of shares, as marketability is based on numerous factors. (Suppl. Decl. of D. Palay, ¶ 5, Ex. 3, 10/02/23 Expert Report of Gary Kleinrichert at 44-46.)

97.     Unless the company agrees to buy the shares back or other shareholders agree to purchase the shares, or the company is obligated to do so based on an existing agreement, a minority shareholder often has no way to sell their shares and exit from ownership. As a result, the shares of a minority owner are heavily discounted. Hutler Decl., Sept. 29, 2023, p.3, ¶ 12.

**RESPONSE**: **Disputed.** The proposed fact is not supported by admissible evidence. (*See* Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed contemporaneously herewith.) The extent to which shares of a minority owner in any given private company are discounted is fact-specific, affected by the terms of the relevant shareholder agreement, and based on numerous factors and different methodologies. (Suppl. Decl. of D. Palay, ¶ 5, Ex. 3, 10/02/23 Expert Report of Gary Kleinrichert at 44-46.)

98.     To address the concerns of minority shareholders from the lack of an ability to exit from ownership, it is common for corporations and their shareholders to agree on the use of a formula by which shares will be redeemed if the shareholder is interested in severing their relationship with the company. Hutler Decl., Sept. 29, 2023, p.3, ¶ 13.

**RESPONSE**: **Disputed**. The proposed fact is not supported by admissible evidence. (*See* Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed contemporaneously herewith.)

99.    Usually, such a formula does not reflect fair market value. Instead, it is simply a formula agreed upon by the shareholders by which their stock will be redeemed if they wish to do so. This is done as a courtesy to the shareholder, who would otherwise not have a market to provide liquidity for their shares. Hutler Decl., Sept. 29, 2023, p.3, ¶ 13.

**RESPONSE**: **Disputed**. The proposed fact is not supported by admissible evidence. (*See* Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed contemporaneously herewith.)

100.    The Stock Price Formula adopted the valuation from the Hutler report and turned it into a formula using an implied multiple of EBITDA to arrive at an estimated value of all shares of Windy Waters. The formula then divided that dollar amount by the amount of shares to arrive at a price per share. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶¶ 6, 9, Exs. 1 (Hutler Report), 2 (Second Amendment to Shareholder Agreement); Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: **Disputed** to the extent the proposed fact suggests that the formula's estimation of "value" yields an accurate estimate of fair market value, which implication is not supported by admissible evidence. Otherwise, **undisputed.**

101.    Just like the Hutler report, the Stock Price Formula also includes a 5% adjustment for the difference between the price for class A voting shares and class B non-voting shares. Hutler

Decl., Sept. 29, 2023, pp.2-3, ¶¶ 6, 9-10, Exs. 1 (Hutler Report), 2 (Second Amendment to Shareholder Agreement); Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: Undisputed.

102.    Unlike the Hutler 2004 report, the formula in the Second Amendment to Shareholder Agreement does not include any discount for lack of control or minority status or any discount for lack of marketability. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶¶ 6, 9, 11, Exs. 1 (Hutler Report), 2 (Second Amendment to Shareholder Agreement); Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: Undisputed.

103.    This Stock Price Formula was agreed to by the voting shareholders as the way to calculate a price for Windy Waters shares. Hutler Decl., Sept. 29, 2023, pp.2-3, ¶ 9, Ex. 2 (Second Amendment to Shareholder Agreement); Reed Decl., Sept. 29, 2023, p.4, ¶ 35; Kiesler Decl., Sept. 29, 2023, p.6, ¶¶ 37-38, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: **Disputed.** The Second Amendment to the Shareholder Agreement makes the formula described therein applicable only to "each share of Stock or interest therein redeemed or purchased pursuant to Sections 2.2 and 2.3 . . . ." (09/29/2023 Palay Decl. Ex. 39 at 2, ECF No. 63-38.) Section 2.2 of the Shareholder Agreement applies in cases of redemption upon a shareholder's death. (09/29/2023 Palay Decl. Ex. 38 at 10, ECF No. 63-37.) Section 2.3 of the Shareholder Agreement applies in cases of redemption upon a shareholder's permanent disability. (09/29/2023 Palay Decl. Ex. 38 at 11, ECF No 63-37.)

104.    There was only one exception to the use of the per-share price calculated using the Stock Price Formula: On occasions where Kiesler compared the formula per-share price to a per-share price using the company's assets minus liabilities—that is, the net assets, referred to as the stockholder's equity amount in Windy Waters' financial statements—if he found the price calculated from net assets was higher than the result using the Stock Price Formula (and therefore more favorable to the shareholder), the price based on net assets was used. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 39.

**RESPONSE**: **Disputed.** There was not "only one exception to the use of the per-share price calculated using the Stock Price Formula." The Second Amendment to the Shareholder Agreement makes the formula described therein applicable only to "each share of Stock or interest therein redeemed or purchased pursuant to Sections 2.2 and 2.3 . . . ." (09/29/2023 Palay Decl. Ex. 39 at 2, ECF No. 63-38.) Section 2.2 of the Shareholder Agreement applies in cases of redemption upon a shareholder's death. (09/29/2023 Palay Decl. Ex. 38 at 10, ECF No. 63-37.) Section 2.3 of the Shareholder Agreement applies in cases of redemption upon a shareholder's permanent disability. (09/29/2023 Palay Decl. Ex. 38 at 11, ECF No 63-37.)

105.    Hutler advised Kiesler that the price based on net assets would be appropriate to use if the Share Price Formula resulted in a number that was lower than the net asset price. Hutler Decl., Sept. 29, 2023, p.4, ¶ 14; Kiesler Decl., Sept. 29, 2023, p.6, ¶ 40.

**RESPONSE**: **Undisputed.**

106.    For a closely held company like Windy Waters, there is no market for shares and few potential buyers. Unless the company agrees to buy the shares back or other shareholders agree to purchase the shares, or is obligated to do so based on an existing agreement, a minority

shareholder often has no way to sell their shares and exit from ownership. Hutler Decl., Sept. 29, 2023, p.3, ¶ 12.

**RESPONSE**: **Disputed.** (*See* Pl.'s Resp. to Defs.' Proposed Finding of Fact Nos. 96-97.)

107.    To address the concerns of minority shareholders from the lack of an ability to exit from ownership, it is common for corporations to agree to a formula to approximate a fair price for the company's shares and to have an agreement allowing the minority shareholder to force the sale of shares using that formula. A formula allows the transaction to occur without a costly valuation of the company each time a shareholder wants to redeem stock. Hutler Decl., Sept. 29, 2023, p.3, ¶ 13.

**RESPONSE**: **Disputed.** The proposed fact is not supported by admissible evidence. (*See* Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed contemporaneously herewith; *see* Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 98.)

108.    Kiesler used the Stock Price Formula to obtain a per-share price for every stock transaction, and only deviated on the occasions when Kiesler compared the formula per-share price to a per-share price using the company's assets and found the price calculated from net assets was higher. Kiesler Decl., Sept. 29, 2023, p.6, ¶ 41 Kiesler Dep., Sept. 19, 2023, at 195:1-8, 204:3-7; Gonnering Dep., Sept. 21, 2023, at 148:1-5, 148:19-20, 149:4-8.

**RESPONSE**: **Undisputed.**

109.    Kiesler did it this way every time because he "was always told to be consistent." Kiesler Dep., Sept. 19, 2023, at 195:1-8.

**RESPONSE**: **Disputed.** In the stock transaction at issue in this case, the "opportunity" to purchase Stacy's stock using a formula he had been informed was "low," and which produced a purchase price

40

at a small fraction of Widen Enterprises' CEO's estimate of the company's market value in August 2018, was Kiesler's reason for using the Stock Price Formula in Stacy's 2020 redemption. (09/29/2023 Palay Decl., ¶¶ 17, 19, 21, 30, Exs. 17, 19, 28.)

110.    Randall was aware this Stock Price Formula was used to determine the price of shares. Randall Dep., Aug. 28, 2023, at 200:10-16.

**RESPONSE**: **Disputed.** The cited testimony does not support the proposed finding of fact. Ms. Randall testified that she was "aware that there was a formula to figure them out, but [she] didn't know what, where, or how." (08/28/2023 S. Randall Dep. Tr. 200:10-16.) Further, for the May 13, 2020 redemption at issue, Stacy's understanding was that the increase from the $1.1 million offer to the $1.35 million offer was not a result of the formula but instead was "found" by Defendants. (Suppl. Decl. of Stacy Randall ¶ 22.)

111.    Between 2005 and 2019, Randall herself sold some of her stock in Windy Waters back to Windy Waters in five transactions. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶ 42; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. E (Windy Waters' Objections And Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 9. & Attach. A.

**RESPONSE**: **Undisputed.**

112.    Prior to Randall executing the May 13, 2020 Redemption Agreement, she had executed five other stock redemption agreements for the sale of Windy Waters stock. Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.'First Set of Reqs. For Admis.) at Resp. No. 1.

**RESPONSE**: Undisputed.

113.    A chart showing each of Randall's stock redemptions is below:

| Effective Date: | # of Shares: | Price Per Share: | Total Price: |
|---|---|---|---|
| 06/30/2005 | 611.88 | $326.86 | $200,000.00 |
| 06/30/2007 | 801.05 | $312.09 | $250,000.00 |
| 01/18/2011 | 1185.5364 | $168.70 | $200,000.00 |
| 08/01/2017 | 275.5210 | $283.10 | $78,000.00 |
| 01/01/2019 | 281.8291 | $425.79 | $120,000.00 |
| 05/13/2020 | 232.75       (Class A)<br>1952.7568 (Class B) | $646.19 (Class A)<br>$615.42 (Class B) | $1,352,166.31 |

Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶ 42.

**RESPONSE**: Undisputed.

114.    Each of these stock transactions was willing and voluntary on both sides. Both Randall and Windy Waters had the right to say no. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶¶ 37, 43, Ex. D (Second Amendment to Shareholder Agreement); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

**RESPONSE**: **Disputed.** The stock transaction was not willing and voluntary on both sides. (*See* Suppl. Decl. of D. Palay, ¶ 6, Ex. 4; Suppl. Decl. of S. Randall, ¶¶ 39, 47, 48; 11/06/2023 S. Randall Dep. Tr. 178:22-24, 180:5-16.) Ms. Randall was defrauded into at least the May 13, 2020 redemption because, among other things, Defendants did not provide her relevant, material information she needed to make her investment decisions. (*See* Pl.'s Proposed Findings of Fact Nos. ¶¶ 180, 265-287.)

115.    The shareholder agreement did not contain any provisions obligating the company to buy back shares at any price, or at all, nor did it give Randall the right to sell her shares back.

Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶¶37, 44, Ex. D (Second Amendment to Shareholder Agreement); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

**RESPONSE**: **Disputed.** The Shareholder Agreement states that Windy Waters "shall" redeem shares in the case of shareholder death or permanent disability. (09/29/2023 Palay Decl. Ex. 38 at 10-11, ECF No. 63-37.)

116.     For each of those transactions, the amount paid was based on the calculation of the Stock Price Formula. Each time, the price calculated from the Stock Price Formula was more favorable than the price would have been if calculated from net assets. Kiesler Decl., Sept. 29, 2023, pp.6-7, ¶¶ 37, 45, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: **Undisputed** that Defendants calculated the purchase price for each of Ms. Randall's redemptions using the formula contained in the Second Amendment to the Shareholder Agreement, and that the price was higher than it would have been if calculated based on a pro rata portion of the company's net assets attributable to that amount of stock.[1]

117.     In 2005, Randall said she needed money, so she asked Reed for $200,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 162:3-19, 163:21-164:12, 173:10-13, 246:9-11; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 48, Ex. E (WINDY0055042).

**RESPONSE**: **Undisputed.**

---

[1] Plaintiff objects that this Proposed Finding of Fact is ambiguous. It is unclear what Defendants mean by "each of those transactions." Plaintiff has answered to the best of her understanding but reserves the right to dispute this Proposed Finding of Fact in the event that Defendants intended a different meaning.

118.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $200,000. Randall Dep., Aug. 28, 2023, at 164:14-17, 164:25-165:2, 171:14-172:3; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 46.

**RESPONSE**: Undisputed.


119.     Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $200,000 she said she needed. Randall Dep., Aug. 28, 2023, at 171:20-23; Kiesler Decl., Sept. 29, 2023, p.7, ¶¶ 47-48, Ex. E (WINDY0055042).

**RESPONSE**: Undisputed.


120.     The stock purchase was undertaken pursuant to a "June 30, 2005 Redemption Agreement" dated September 2, 2005, and made effective as of June 30, 2005, signed by Randall and other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $200,000. Randall Dep., Aug. 28, 2023, at 162:3-163:9; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 48, Ex. E (WINDY0055042).

**RESPONSE**: Undisputed.


121.     The price per share Randall was paid in 2005 was $326.86 and was the amount arrived at using the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 17; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 49.

**RESPONSE**: **Undisputed** that Defendants calculated the $326.86 price per share Ms. Randall was paid in 20105 using the Stock Price Formula.

122.    Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she reviewed the redemption agreement before signing it. Randall Dep., Sept. 29, 2023, at 166:10-168:4, 170:12-171:13, 173:19-174:8, 206:11-18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 20.

**RESPONSE**: **Disputed** that Ms. Randall "did not think about . . . whether her shares had value." In response to the question "Did you think about whether your shares had value?" she testified: "I guess I figured that they did because I was getting money by cashing in my stock." (09/29/2023 S. Randall Dep. Tr. 170:24-171:4.) **Undisputed** as to the remainder of the facts set forth in Defendants' Proposed Finding of Fact No. 122.

123.    Randall was happy to get the money she asked for. Randall Dep., Aug. 28, 2023, at 171:14-16.

**RESPONSE**: **Undisputed.**

124.    In 2007, Randall again said she needed money, so she asked Reed for money, and Reed told her to talk to Kiesler. Randall Dep. 177:2-16, 185:15-186:2, 164:12, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 36.

**RESPONSE**: **Undisputed.**

125.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $250,000. Randall Dep., Aug. 28, 2023, at 176:4-22, 177:2-16, 180:8-22, 198:4-9, 211:20-212:1; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 50.

**RESPONSE**: Undisputed.


126.     Kiesler calculated the price per share under the Stock Price Formula in the Second Amendment to offer to purchase enough stock to give Randall the $250,000 she needed. Kiesler Decl., Sept. 29, 2023, pp.6, 8, ¶¶ 37, 51, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: Undisputed.


127.     The stock purchase was undertaken pursuant to a "June 30, 2007 Redemption Agreement" dated August 2, 2007, and made effective as of June 30, 2007, signed by Randall and other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $250,000. Randall Dep., Aug. 28, 2023, at 175:7-24, 184:2-4; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 52, Ex. F (Ex. 12 to Randall Dep.).

**RESPONSE**: Undisputed.


128.     The price per share Randall was paid in 2007 was $312.09, and was the amount arrived at using the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 25; Kiesler Decl., Sept. 29, 2023, p.8, ¶¶ 52-53, Ex. F (Ex. 12 to Randall Dep.).

**RESPONSE**: **Undisputed** that Defendants calculated the $312.09 price per share Ms. Randall was paid in 2007 using the Stock Price Formula.

129.     Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she reviewed the redemption agreement before signing it. Randall Dep., Aug. 28, 2023, at 180:8-181:6, 182:13-17, 184:13-21, 206:11-18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 27.

**RESPONSE**: **Disputed** that Ms. Randall "did not think about . . . whether her shares had value." In response to the question "When you say you never thought about it, does that mean you didn't know that there was a value, or you just didn't care what the value was?" she testified: "I didn't know what the value was." (09/29/2023 S. Randall Dep. Tr. 180:24-181:3.) **Undisputed** as to the remainder of the facts set forth in Defendants' Proposed Finding of Fact No. 129.

130.     Randall received the money she asked for. Randall Dep., Aug. 28, 2023, at 181:17-23.

**RESPONSE**: **Undisputed**.

131.     In 2011, Randall again said she needed money, so she asked Reed for $200,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 189:22-190:10, 164:12, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 37.

**RESPONSE**: **Undisputed**.

132.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $200,000. Randall Dep., Aug. 28, 2023, at 189:22-190:10, 212:3-9; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 54.

**RESPONSE**: Undisputed.


133.     Kiesler calculated the price per share under the Stock Price Formula in the Second Amendment to offer to purchase enough stock to give Randall the $200,000 she said she needed, and Randall was aware that a formula was being used. Kiesler Decl., Sept. 29, 2023, p.8, ¶ 55; Randall Dep., Aug. 28, 2023, at 200:10-16.

**RESPONSE**: Undisputed.


134.     The stock purchase was undertaken pursuant to a "January 18, 2011 Redemption Agreement" dated January 18, 2011, containing the signature stamp of Randall and signed by other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $200,000. Randall Dep., Aug. 28, 2023, at 187:4-21; Kiesler Decl., Sept. 29, 2023, pp.8-9, ¶ 56, Ex. G (Ex. 13 to Randall Dep.).

**RESPONSE**: Undisputed.


135.     The price per share Randall was paid in 2011 was $168.70, and was based on the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 33; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 57.

**RESPONSE**: **Undisputed** that Defendants calculated the $168.70 price per share Ms. Randall was paid in 2011 using the Stock Price Formula.

136.     Randall did not know how many shares she sold in exchange for that amount of money, did not inquire about the value of her shares or how it was calculated, did not think about or inquire about whether a document would need to be signed, and does not believe she reviewed the stock redemption agreement. Randall Dep., Aug. 28, 2023, at 191:5-12, 196:12-20, 206:11-18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 35.

**RESPONSE**: Undisputed.

137.     Randall received the money she asked for. Randall Dep., Aug. 28, 2023, at 199:8-13, 272:13-21.

**RESPONSE**: Undisputed.

138.     In 2017, Randall again said she needed money, so she asked Reed for $78,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 164:12, 205:4-7, 205:20-206:10, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 38.

**RESPONSE**: Undisputed.

139.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $78,000. Randall Dep., Aug. 28, 2023, at 207:5-16, 212:11-18; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 58.

**RESPONSE**: Undisputed.

140.    Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $78,000 she said she needed. Kiesler Decl., Sept. 29, 2023, p.9, ¶ 59.

**RESPONSE**: Undisputed.


141.    The stock purchase was undertaken pursuant to a "August 1, 2017 Redemption Agreement" dated August 1, 2017, signed by Randall and Reed and Kiesler, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $78,000. Randall Dep., Aug. 28, 2023, at 203:5-204:15, 209:25-210:5; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 60, Ex. H (Ex. 14 to Randall Dep.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 40.

**RESPONSE**: Undisputed.


142.    The price per share Randall was paid in 2017 was $283.10 and was the number arrived at from calculating the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 41; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 61.

**RESPONSE**: Undisputed.


143.    Randall did not know how many shares she sold in exchange for that amount of money and did not think about or inquire about whether her shares had value or what that value was or how it was calculated. Randall Dep., Aug. 28, 2023, at 210:6-10; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 43.

**RESPONSE**: **Disputed** that Stacy did not think about whether her shares had value. The cited evidence does not support the proposed fact that Stacy "did not know how many shares she sold in exchange for that amount of money and did not think about or inquire about whether her shares had value." **Undisputed** as to the remainder of Proposed Finding of Fact No. 143.

144.    Randall did not review the document before signing it, nor did she skim it, because she had "gone through this a number of times" by this fourth stock redemption. Randall Dep., Aug. 28, 2023, at 206:11-207:1.

**RESPONSE**: Undisputed.

145.    Randall got the money she asked for. Randall Dep., Aug. 28, 2023, at 204:11-15, 205:16-19.

**RESPONSE**: Undisputed.

146.    In 2019, Randall again said she needed money, so she asked Reed for $100,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 164:12, 213:12-23, 216:14, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 39.

**RESPONSE**: Undisputed.

147.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $100,000. Randall Dep., Aug. 28, 2023, at 216:12-22, 217:7-21; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 62.

**RESPONSE**: Undisputed.

148.     In January 2019, Randall also borrowed $20,000 from Widen Enterprises. Kiesler Dep., Sept. 19, 2023, at 222:14-24; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 63.

**RESPONSE**: Undisputed.


149.     In order to repay that loan, Randall sold enough shares to obtain $120,000, and applied the extra $20,000 to pay off her loan. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 64; Randall Dep., Aug. 28, 2023, at 215:3-5, 216:8-22.

**RESPONSE**: Undisputed.


150.     Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $120,000 she said she needed for her own purposes and to repay the loan. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 65.

**RESPONSE**: Undisputed.


151.     The stock purchase was undertaken pursuant to a "January 1, 2019 Redemption Agreement" effective January 1, 2019, signed by Randall and Kiesler and consented to by Randall as a shareholder and director and Reed as majority shareholder, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $120,000. The documents were signed in April 2019. Randall Dep., Aug. 28, 2023, at 212:21-213:16; Kiesler Decl., Sept. 29, 2023, p.10, ¶ 66, Ex. I (Ex. 15 to Randall Dep.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 48.

**RESPONSE**: **Disputed** that Stacy consented to the 2019 redemption agreement as a director. (*See* Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 39.) **Undisputed** as to the remainder of the facts in Defs.' Proposed Finding of Fact No. 151.

152.    The price per share Randall was paid in 2019 was $425.79, and was the price that Kiesler reached as the result of the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 49; Kiesler Decl., Sept. 29, 2023, p.10, ¶ 67; Kiesler Dep., Sept. 19, 2023, at 257:22-258:1.

**RESPONSE**: Undisputed.

153.    Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she ever reviewed or skimmed the redemption agreement. Randall Dep., Aug. 28, 2023, at 206:11-18, 214:2-12; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 51.

**RESPONSE**: **Disputed** that Stacy "did not think about or inquire about whether her shares had value." The cited evidence does not support that proposition. **Undisputed** as to the remaining facts in Defs.' Proposed Finding of Fact No. 153.

154.    Randall received the money she asked for and said she needed. Randall Dep., Aug. 28, 2023, at 217:15-21.

**RESPONSE**: Undisputed.

155.    Randall never asked for any financial information in relation to any of her stock redemptions. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 68; Reed Decl., Sept. 29, 2023, p.5, ¶ 40.

**RESPONSE**: Undisputed.

156.    Nobody ever provided Randall with financial information in relation to any of her stock redemptions. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 69; Reed Decl., Sept. 29, 2023, p.5, ¶ 41.

**RESPONSE**: Undisputed.

157.    Randall never thought about the number of shares she owned and did not think it was important because she knew she, at one point, had owned 20% of Windy Waters. Randall Dep., Aug. 28, 2023, at 45:23-46:13.

**RESPONSE**: Undisputed.

158.    Randall never thought about the value of the shares she owned, either. Randall Dep., Aug. 28, 2023, at 169:13-170:22.

**RESPONSE**: **Disputed.** The cited evidence does not support the proposed fact. The line of questioning that Defendants cite is specific to Stacy's 2005 partial redemption in the amount of $200,000. (08/28/2023 S. Randall Dep. Tr. 167:22-172:3.) Stacy believed that her shares did have value. (08/28/2023 S. Randall Dep. Tr. 170:24-171:4.)

159.    Randall did not have an attorney representing her with respect to any of her prior stock redemptions. Randall Dep., Aug. 28, 2023, at 48:4-8, 172:7-8, 209:12-17, 215:20-22.

**RESPONSE**: Undisputed.

160.    Other stock owners sold their shares back to Windy Waters over time, as well. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 70.

**RESPONSE**: Undisputed.


161.    Pursuant to a stock redemption agreement dated January 1, 2007, Windy Waters purchased all of the shares owned by Stewart Widen, the brother of Reed and Randall. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 71, Ex. J (WINDY0055274).

**RESPONSE**: Undisputed.


162.    The price per share that Windy Waters paid for that stock was $280.66 for his Class B stock and $294.70 for his Class A stock. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 71, Ex. J (WINDY0055274).

**RESPONSE**: Undisputed.


163.    The price paid for Stewart's shares was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 72.

**RESPONSE**: Disputed. The January 1, 2007 Stock Redemption Agreement states that "[t]he parties have agreed that the redemption of the shares held by Shareholder shall be at fair market value, and that the price and terms of redemption have been negotiated at arms length by unrelated parties with opposing financial interests." (*See* 09/29/2023 Kiesler Decl. Ex. J at 1.)


164.    Pursuant to a stock redemption agreement dated March 17, 2010, and effective as of December 31, 2009, Thomas Schmidt sold all of the Windy Waters shares he owned. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 73, Ex. K (WINDY0055112).

**RESPONSE**: Undisputed.

165.    The price per share that Windy Waters paid Schmidt for his stock was $155.34. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 73, Ex. K (WINDY0055112).

**RESPONSE**: Undisputed.

166.    The price paid for Schmidt's shares was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 74.

**RESPONSE**: Undisputed.

167.    Pursuant to a stock redemption agreement dated February 7, 2011, Terry Vial sold some of the Windy Waters shares he owned. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 75, Ex. L (WINDY0055144).

**RESPONSE**: Undisputed.

168.    This transaction occurred less than a month after Randall's third stock redemption. Kiesler Decl., Sept. 29, 2023, pp.8-9, 11, ¶¶ 56, 75, Exs, G (WINDY0055005), L (WINDY0055144).

**RESPONSE**: Undisputed.

169.    The price per share that Windy Waters paid Vial for his Class B stock in 2011 was $168.70—the same price Randall was paid for the Class B stock she redeemed a few weeks earlier. Kiesler Decl., Sept. 29, 2023, pp.8,11, ¶¶ 56, 75, Exs. L (WINDY0055144), G (Ex. 13 to Randall Dep.).

**RESPONSE**: Undisputed.

170.    The price paid for Vial's shares in 2011 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 76.

**RESPONSE**: Undisputed.

171.    In 2015, Price Widen (Randall and Reed's brother) sold back all of his shares in Windy Waters to the company. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 77.

**RESPONSE**: Undisputed.

172.    On June 1, 2015, Price sold 232.75 shares of Class A voting common stock back to the corporation at $178.44 per share and 5,063.9025 shares of Class B non-voting common stock back to the corporation at $169.94 per share. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 78, Ex. M (WINDY0055185).

**RESPONSE**: Undisputed.

173.    Kiesler calculated the Stock Price Formula and compared it to the value using Windy Waters' net assets. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 79.

**RESPONSE**: Undisputed.

174.    In this instance, the per-share price calculated from net assets exceeded the amount arrived at using the Stock Price Formula, so the per-share price calculated from net assets was offered instead. Kiesler Decl., Sept. 29, 2023, p.11, ¶ 80.

**RESPONSE**: Undisputed.

175.     Prior to the transaction, Windy Waters sent Price Widen a letter of intent on April 8, 2015, explaining the offer to purchase his shares. Reed Decl., Sept. 29, 2023, p.5, ¶ 42, Ex. A (WINDY0050386).

**RESPONSE**: Undisputed.

176.     Price Widen was represented by counsel for purposes of his transaction, and ultimately accepted the price offered. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 81; Reed Decl. Sept. 29, 2023, p.5, ¶ 43.

**RESPONSE**: Undisputed.

177.     In 2016, two shareholders redeemed all of their Windy Waters shares. Kiesler Decl., Sept. 29, 2023, p.81, ¶ 82.

**RESPONSE**: Undisputed.

178.     Pursuant to a stock redemption agreement dated May 12, 2016, and effective April 30, 2016, Terry Vial sold 377.2522 shares of Class B non-voting common stock back to the corporation. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 83, Ex. N (WINDY0055165).

**RESPONSE**: Undisputed.

179.     The price per share that Windy Waters paid Vial for his stock in 2016 was $334.14. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 83, Ex. N (WINDY0055165).

**RESPONSE**: Undisputed.

180.    The price paid for Vial's shares in 2016 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 84.

**RESPONSE**: Undisputed.

181.    Pursuant to a stock redemption agreement dated May 12, 2016, and effective April 30, 2016, Brian Becker sold 104.4923 shares of Class B non-voting common stock back to the corporation. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 85, Ex. O (WINDY0054801).

**RESPONSE**: Undisputed.

182.    The price per share that Windy Waters paid Becker for his stock in 2016 was $334.14. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 85, Ex. O (WINDY0054801).

**RESPONSE**: Undisputed.

183.    The price paid for Becker's shares in 2016 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 86.

**RESPONSE**: Undisputed.

184.    In December 2019, the Reed C. Widen Children's Trust of 2007 sold 861 shares of Class B non-voting common stock back to the corporation. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 87, Ex. P (WINDY0001211); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. E (Windy Waters' Objections And Resps. To Pl.'s Second Set of Interoggs.) at Resp. No. 9 & Attach. B.

**RESPONSE**: Undisputed.[2]

185.     The price per share that Windy Waters paid the Children's Trust for its stock was $512.54 per share. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 87, Ex. P (WINDY0001211).

**RESPONSE**: Undisputed.

186.     The price paid for the Children's Trust shares in 2019 was calculated using the Stock Price Formula. Kiesler Decl., Sept. 29, 2023, p.12, ¶ 88.

**RESPONSE**: Undisputed.

187.     The Reed C. Widen Children's Trust of 2007 was established by Reed Widen for the benefit of his children. Reed Decl., Sept. 29, 2023, p.5, ¶ 45.

**RESPONSE**: Undisputed.

188.     The Reed C. Widen Children's Trust of 2007 was terminated in 2019 and the trust then paid Reed's children the funds it received from selling the Windy Waters shares it owned. Reed Decl., Sept. 29, 2023, p.5, ¶ 46.

**RESPONSE**: Undisputed.

189.     Randall authorized use of her signature stamp on the document effectuating this stock transfer without asking any questions. Randall Dep., Aug. 28, 2023, at 132:6-13, 138:17-20,

---

[2] It appears that Defendants are referring to Exhibit Q of Kiesler's September 29, 2023 Declaration, rather than Exhibit P.

141:16-21; Kiesler Dep., Sept. 19, 2023, at 106:20-121:6, 120:19-121:3, 121:15-122:23; Kiesler Decl, Sept. 29, 2023, p.12, ¶¶ 87, 89, Ex. P (WINDY0001177).

**RESPONSE**: Undisputed.


190.    Under the Shareholder Agreement, Windy Waters shareholders had preemptive rights—that is, the right to purchase additional stock that would maintain their interest at the same level. Kiesler Decl, Sept. 29, 2023, p.12-13, ¶ 90, Ex. R (WINDY0052046); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

**RESPONSE**: Undisputed.


191.    In January 2013, because Windy Waters had issued shares, Randall, as a then-current shareholder, was notified of her preemptive rights to subscribe to the number of shares to keep her proportional ownership the same. Kiesler Decl, Sept. 29, 2023, pp.12-13, ¶ 90, Ex. R (WINDY0052046); Reed Decl., Sept. 29, 2023, p.11, ¶ 94, Ex. H (1992 Shareholder Agreement).

**RESPONSE**: Undisputed.


192.    Randall exercised her preemptive rights in part, but only wished to purchase $10,000 worth of stock. Using the Stock Price Formula, Kiesler calculated the per-share price to be $223.86 per share, and Randall therefore purchased 44.6708 shares, effective December 31, 2012, for a total price of $10,000. Kiesler Decl., Sept. 29, 2023, pp.2, 13, ¶¶ 11, 90, Exs. B (WINDY0002142), R (WINDY0052046).

**RESPONSE**: **Disputed.** The cited evidence does not support the proposition with respect to what Stacy "wished" to do. **Undisputed** as to the remainder of Defs.' Proposed Finding of Fact No. 192.

193.    Each shareholder who bought or was issued shares at that time paid the same price per share. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 92.

**RESPONSE**: Undisputed.

194.    The Stock Price Formula was used for each shareholder each time a shareholder exercised preemptive rights to acquire shares. Kielser Decl., Sept. 29, 2023, p.13, ¶ 93.

**RESPONSE**: Undisputed.

195.    Kiesler and Matthew Gonnering both would have expected to apply the formula if they had redeemed shares prior to Widen Enterprises being sold. Kiesler Dep., Sept. 19, 2023, at 175:14-18; Gonnering Dep., Sept. 21, 2023, at 147:6-148:9.

**RESPONSE**: **Disputed**. The cited evidence does not support the proposed finding as to what Kiesler would have expected. **Undisputed** as to the remainder of the proposed fact.

*COVID*

196.    Governor Tony Evers declared a public health emergency due to COVID-19 in Wisconsin on March 12, 2020. 2020 Exec. Order No. 72 (Wis. Office of the Governor Mar. 12, 2020), https://docs.legis.wisconsin.gov/code/executive_orders/2019_tony_evers/2020-72.pdf.

**RESPONSE**: Undisputed.

197.    President Donald Trump declared a national emergency concerning COVID-19 on March 13, 2020. Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), 85 Fed. Reg. 15337,

https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

**RESPONSE**: Undisputed.

198.    The State of Wisconsin Department of Health Services ("DHS") implemented many restrictions and regulations in response to COVID-19, including banning gatherings of more than 10 people, closing schools, and prohibiting on-site consumption at restaurants and bars. Wis. Dep't of Health Servs., Emergency Order #8 (Mar. 20, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

**RESPONSE**: Undisputed.

199.    COVID caused extreme uncertainty for both Windy Waters and Widen Enterprises. Reed Dep., Aug. 23, 2023, at 212:14-25; Kiesler Dep., Sept. 19, 2023, at 179:6-10; Reed Decl., Sept. 29, 2023, p.5, ¶ 47.

**RESPONSE**: **Disputed**. While COVID-19 caused some uncertainty for Widen Enterprises, it was not "extreme," particularly given Widen Enterprises' April and May 2020 financial performance and forecasts. (*See* ECF No. 61, Pl.'s Proposed Findings of Fact Nos. 221, 310. 08/23/2023 R. Widen Dep. Tr. 213:7-15; 09/19/2023 M. Kiesler Dep. Tr. 228:11-13.) Evidence indicating the uncertainty was not "extreme" includes Kiesler refusing Stacy's request for a $50,000 or $100,000 partial redemption and insisting on a total redemption of $1.3 million. (ECF No. 45, Am. Answer ¶¶ 71-74.) Defendants were willing to return the $2.7 million PPP loan for the "opportunity" to purchase Stacy's shares. (09/29/2023 Palay Decl. Ex. 19.) As of May 8, 2020, Widen Enterprises was projecting $27.44 million in software revenue for 2020, "[s]oftware revenue growth in 2020 [was]

about 10% better when compared to 2019," and "[a]n early projection shows 2021 [total revenue] around [$]31.5M, an 18% increase over 2020." (09/29/2023 Palay Decl. Ex. 19.) As of the week of May 8, 2020, Widen Enterprises had $4.95 million in cash, which represented an increase in cash by $2.2 million from the week of April 10, 2020. (09/29/2023 Palay Decl. Exs. 5, 19.) Windy Waters held approximately $5.5M speculatively invested in securities that was not being used as operating capital for the Companies. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19, 294:6-296:9; 09/29/2023 Palay Decl. Ex. 20, Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp. 17-18, Defs.' Response to Request for Admission Nos. 37-39.) Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies. (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.) Widen Enterprises testified that it did not ever project a negative growth month and that it gained customers during the COVID-19 pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 221:7-24, 222:4-18.) Together, the Companies could not identify a single customer that Widen lost nor could they provide information on how much revenue was lost as a result of the pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 220:16-221:6, 221:25-222:3; 11/03/2023 Dep. Tr. of Windy Waters 160:12-162:4.)


200.    Widen Enterprises first formed a COVID-19 Response Team on March 3, 2020. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 18; Gonnering Dep., Sept. 21, 2023, at 212:25-213:17

**RESPONSE**: Undisputed.


201.    In March 2020, Widen Enterprises created a plan to reduce expenses by up to approximately $6 million "to offset potential revenue declines." The spending cuts included

reductions to employee development, merit-based wage increases, new hires, promotional spending, and executive wage reductions, and the company even considered layoffs. Gonnering Decl., Sept. 29, 2023, pp.3-4, ¶¶ 20, 28, Ex. C (WINDY0031833).

**RESPONSE**: Undisputed.


202.    Gonnering promptly reduced his compensation by 10% in approximately April 2020, and forewent a planned pay increase. Gonnering Decl., Sept. 29, 2023, p.3-4, ¶¶ 23-24, Ex. 24 (WINDY0000947).

**RESPONSE**: Undisputed.


203.    Expenses were ultimately reduced by about $3 million. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 21.

**RESPONSE**: Undisputed.


204.    Beginning in March 2020, and through May 2021, executive leadership met on several occasions to discuss scenarios, expense reduction, potential for layoffs, and other strategic planning. Gonnering Decl., Sept. 29, 2023, pp.3-4, ¶ 19.

**RESPONSE**: Undisputed.


205.    In late March 2020, Kiesler and the company's controller ran extensive modeling and updated reports and financials to try to plan for the major negative impact COVID was having on the economy. Kiesler Decl., Sept. 19, 2023, p.13, ¶ 94.

**RESPONSE**: Undisputed.

206.    As part of its forecasting, Widen Enterprises assumed in April 2020 that it would have no new customers in April or May 2020 and only half the usual number of new customers for the rest of 2020. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 22.

**RESPONSE**: Undisputed.


207.    The CEO of Widen Enterprises highlighted the importance of cash reserves in April 2020, stating: "While cash is good at the moment, this is critical to our operational success. As you'll read in the scenarios below, maintaining a strong cash position will help us weather the storm. Given the persistent market uncertainty, an even stronger cash position is desired." Windy 946 (Reed Ex. 11); Gonnering Decl., Sept. 29, 2023, p.4, ¶ 24, Ex. B (Ex. 11 to Reed Dep.)

**RESPONSE**: Undisputed.


208.    The cash reserves held by Widen Enterprises in May 2020 were equal to roughly three months of expenses and were retained as a rainy day fund. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 25.

**RESPONSE**: Undisputed.


209.    Accumulating cash reserves was necessary "[d]ue to the uncertainty" from COVID. Kiesler Dep., Sept. 19, 2023, at 295:20-296:1

**RESPONSE: Disputed.** The cited evidence would not be admissible as it lacks foundation. (*See* 09/19/2023 M. Kiesler Dep. Tr. 183:2-6 (Q: Back to that May 6th conversation you had with Stacy, did you do any analysis to determine whether the company could afford to buy $100,000 worth of Stacy's stock at that time? A: No. But going back to the previously question that you asked, we felt that it would be easier to pay her in payments, small payments, over time rather than a lump sum,

and it would look maybe different to the government if they audited us.").) Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies. (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.)

210.    In May 2020, neither Widen Enterprises nor Windy Waters could spare $50,000 from its cash reserves for anything other than operating expenses. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 95.

**RESPONSE**: **Disputed.** Kiesler's testimony on this point would not be admissible as it lacks foundation. (*See* 09/19/2023 M. Kiesler Dep. Tr. 183:2-6 (Q: Back to that May 6th conversation you had with Stacy, did you do any analysis to determine whether the company could afford to buy $100,000 worth of Stacy's stock at that time? A: No. But going back to the previously question that you asked, we felt that it would be easier to pay her in payments, small payments, over time rather than a lump sum, and it would look maybe different to the government if they audited us.").) Kiesler testified that he did not know if "we" could make $50,000 "available" to Stacy. (09/19/2023 M. Kiesler Dep. Tr. 173:3-11.) Moreover, as of April 24, 2020, the marketable securities accounts owned or controlled by Windy Waters were not being used as operating capital for the Companies. (09/29/2023 Wittenberg Decl. Ex. B at Defs.' Resp. to Pl.'s RFA No. 39.) Also, as of the week of May 8, 2020, Widen Enterprises had $4.95 million in cash, which represented an increase in cash by $2.2 million from the week of April 10, 2020. (09/29/2023 Palay Decl. Exs. 5, 19.) Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—far less than the approximately $5.5M Windy Waters held that was

not being used as operating capital for the Companies. (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.)

211.    In early April 2020, Widen Enterprises applied for a government-funded Paycheck Protection Program ("PPP") loan in excess of $2.6 million to ensure payroll for 149 employees could be consistently maintained. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 26.

**RESPONSE**: Undisputed.

212.    Gonnering and Kiesler had primary and direct responsibility for decisions related to the PPP loan. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 27.

**RESPONSE**: Undisputed.

213.    The loan was necessary because, "given the economic uncertainty, [Widen Enterprises] did not know if [its] line of credit was going to be sufficient to fund a recovery without a clear timeline, let alone a survival." Gonnering Decl., Sept. 29, 2023, p.4, ¶ 28, Ex. C (WINDY0031833).

**RESPONSE**: **Disputed**. The cited evidence does not support the proposition that the PPP loan was "necessary." Exhibit C to Gonnering's September 29, 2023 Declaration states:

> As stated in the response, the CARES Act suspended the requirement that borrowers are unable to obtain credit elsewhere. We have available credit that is based on our accounts receivable, calculated as 80% of A/R, up to $2,000,000. Our ability to access credit elsewhere prevented us from pursuing another SBA program, referred to as the Economic Injury Disaster Loan (EIDL). The PPP waiver of available credit elsewhere was favorable to us and, given the economic uncertainty, we did not know if our line of credit was going to be sufficient to fund a recovery without a clear

timeline, let alone a survival. It was prudent for our long-term economic sustainability that we secure funding above-and-beyond the available credit.

. . .

We made a certification in good faith that our use of PPP funds, for their intended purpose, was necessary to support ongoing operations, even with access to other sources of liquidity. As a fiercely-independent, privately-held company, we needed to ensure our future was not placed in jeopardy and PPP funds allow us to do that. Without these funds, we are more exposed to this economic uncertainty and risk employee layoffs. These layoffs would be determinantal to the growth areas of the business and hamper future employment opportunities.

. . .

In conclusion, I believe we submitted in good faith despite having access to our own capital and a line of credit. **As for public relations, in the event the Freedom of Information act reveals us a recipient of PPP funds, I am happy to defend our position with this same uncertainty language that appears throughout** There is some risk in that the government conducts an audit and this documentation is insufficient.

. . .

**In the event you or Mike do not want us to accept this risk, we will return the funds and move on.** However, in discussions with both our attorneys and accountants, we feel justified in receiving these funds for the aforementioned reasons and prepared for an audit.

ECF No. 75-2 at 2-3 (emphasis added). Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—far less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies, further suggesting that the PPP load was not "necessary." (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.) Widen Enterprises testified that it did not project any negative growth months and that it gained customers during the COVID-19 pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 221:7-24, 222:4-18.) Together, the Companies could not identify a single customer that Widen lost nor could they provide information on how much revenue was lost as a result of the pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 220:16-221:6, 221:25-222:3; 11/03/2023 Dep. Tr. of Windy Waters 160:12-162:4.)

214.    At the time, the ability to obtain forgiveness, and for how much, was uncertain. Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 3, Ex. B (Defs.' First Amended Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 37.

**RESPONSE**: **Disputed**. The proposed fact is not supported by admissible evidence. Defendants may not cite unsupported attorney argument included in their own responses to Plaintiff's request for admission as admissible evidence.

215.    The PPP loan was approved. Widen Enterprises received funds through the PPP loan in the amount of $2,697,700 on April 13, 2020. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 97; Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 3, Ex. B (Defs.' First Amended Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 37; Gonnering Decl., Sept. 29, 2023, p.4, ¶ 29.

**RESPONSE**: Undisputed.

216.    As a condition to loan forgiveness, PPP loan proceeds had to be used on certain expense items. Kiesler Decl., Sept. 29, 2023, p.13, ¶ 98.

**RESPONSE**: Undisputed.

217.    Kiesler was greatly concerned about requirements for use of the funds and the certifications required for the loan application in light of the ever-changing guidance for the program. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 99; Seid Dep., Aug. 17, 2023, at 45:12-19

**RESPONSE**: Undisputed.

218.    Widen Enterprises analyzed the certifications required for the PPP loan and in early May 2020, Widen Enterprises was contemplating whether it needed to return the PPP funds. Kiesler

Decl., Sept. 29, 2023, p.14, ¶ 100; Gonnering Decl., Sept. 29, 2023, p.4, ¶ 28, Ex. C (WINDY0031833).

**RESPONSE**: Undisputed.

219.    The deadline to return the PPP funds to take advantage of the safe harbor was May 7, 2020, but was eventually pushed back to May 14, 2020. Gonnering Decl., Sept. 29, 2023, p.4, ¶ 28, Ex. C (WINDY0031833); Kiesler Decl., Sept. 29, 2023, p.14, ¶ 101.

**RESPONSE**: Undisputed.

220.    Widen Enterprises originally planned to return the PPP funds if it purchased Randall's shares to avoid even the risk of criminal sanctions and the appearance of impropriety of accepting government funding and at the same time redeeming shareholders. Gonnering Dep., Sept. 21, 2023, at 219:20-23, 221:5-222:11; Kiesler Decl., Sept. 29, 2023, p.14, ¶ 102; Gonnering Decl., Sept. 29, 2023, p.4, ¶ 31.

**RESPONSE**: Undisputed.

221.    However, on May 13, 2020, the day Randall sold her shares, Kiesler learned of new government guidance announcing criminal penalties would not be suffered by companies who took PPP funds even if the government later concluded the companies should not have qualified for the program. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 103, Ex. T.

**RESPONSE**: Undisputed.

222.    As a result, Widen Enterprises decided to keep the PPP funds despite also purchasing Randall's shares. Kiesler Decl., Sept. 29, 2023, p.14, ¶ 104.

**RESPONSE**: Undisputed.

223.    The PPP loan allowed Widen Enterprises to delay laying off employees. Gonnering Decl., Sept. 29, 2023, p.4, ¶¶ 28, 30, Ex. C (WINDY0031833)

**RESPONSE**: Undisputed.

224.    May 2020 was a time of risk, uncertainty, and fear, and Widen Enterprises and Windy Waters were sensitive to that risk and uncertainty, which impacted their business decisions in numerous ways and threatened the viability of Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 32; Kiesler Dep., Sept. 19, 2023, at 179:6-10; Kiesler Decl., Sept. 29, 2023, p.14, ¶ 105.

**RESPONSE**: **Disputed** that the viability of Widen Enterprises was threatened in May 2020. Widen Enterprises remained profitable during the COVID-19 pandemic, and Kiesler testified that the company was not facing any risk of insolvency at the time it redeemed Stacy's shares. (08/23/2023 R. Widen Dep. Tr. 13:7-15, 213:7-15; 09/19/2023 M. Kiesler Dep. Tr. 228:11-13; *see* ECF No. 61, Pl.'s Proposed Findings of Fact Nos. 221, 310; *see* ECF No. 45, Am. Answer ¶¶ 71-74.) Defendants were willing to return the $2.7 million PPP loan for the "opportunity" to purchase Stacy's shares. (09/29/2023 Palay Decl. Ex. 19.) As of May 8, 2020, Widen Enterprises was projecting $27.44 million in software revenue for 2020, "[s]oftware revenue growth in 2020 [was] about 10% better when compared to 2019," and "[a]n early projection shows 2021 [total revenue] around [$]31.5M, an 18% increase over 2020." (09/29/2023 Palay Decl. Ex. 19.) As of the week of May 8, 2020, Widen Enterprises had $4.95 million in cash, which represented an increase in cash by $2.2 million from the week of April 10, 2020. (09/29/2023 Palay Decl. Exs. 5, 19.) Windy Waters held approximately $5.5M speculatively invested in securities that was not being used as operating capital for the Companies. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19, 294:6-296:9; 09/29/2023 Palay Decl.

Ex. 20, Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp. 17-18, Defs.' Response to Request for Admission Nos. 37-39.) Widen Enterprises testified that it did not ever project a negative growth month and that it gained customers during the COVID-19 pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 221:7-24, 222:4-18.) Together, the Companies could not identify a single customer that Widen lost nor could they provide information on how much revenue was lost as a result of the pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 220:16-221:6, 221:25-222:3; 11/03/2023 Dep. Tr. of Windy Waters 160:12-162:4.)

225.   Defendants' focus in May 2020 was on making payroll and running Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 33; Reed Decl., Sept. 29, 2023, p.5, ¶ 48; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 106.

**RESPONSE**: **Disputed.** In May 2020, Defendants' focus was on the "opportunity" to "fulfill[] the liquidity request of Stacy Randall," and the appearance of mixing share buybacks and receipt of federal funds. (09/29/2023 Palay Decl. Ex. 19.) Kiesler's focus on May 11, 2020, was on pursuing Stacy's redemption. (Suppl. Decl. of D. Palay, ¶ 18, Ex. 16.) Gonnering's focus on May 12, 2020, was on Defendants' "previously outlined" plan to redeem Stacy's shares such that Gonnering reminded Kiesler on May 12, 2020, to pursue the redemption of Stacy's shares. (Suppl. Decl. of D. Palay ¶ 16, Ex. 13; 09/29/2023 Palay Decl., ¶ 33, Ex. 31, WINDY0033899; 09/21/2023 M. Gonnering Dep. Tr. 164:8-165:18; Palay Decl. Ex. 19; Suppl. Decl. of D. Palay, ¶¶ 16, 18, Exs. 13, 16.)

226.    As explained in an internal memorandum from Gonnering to Reed dated May 1, 2020:

> There is massive uncertainty and our business is subject to that uncertainty in the form of less revenue from existing customers as a result of bankruptcies, cutbacks, and reduced upselling opportunities. There is also uncertainty in our new customer volume as buying behavior for our services has slowed significantly. We built an organization around this expected growth and that growth is in jeopardy. Our spending levels, including labor spending, is structured based on revenue projections that are no longer accurate. We are funded by our own working capital and our ability to sustain operations continues to be threatened by economic uncertainty."

Gonnering Decl., Sept. 29, 2023, p.4, ¶ 24, Ex. B (WINDY0031833)

**RESPONSE**: **Disputed**. The proposed finding of fact is not supported by admissible evidence. Undisputed that the quoted language comes from Exhibit C (not B) to Gonnering's September 29, 2023 Declaration. That memorandum is hearsay and not admissible to prove the truth of the statements contained therein. Further disputed that the referenced memorandum is accurate with respect to whether there was, in fact, "massive uncertainty." (*See* Pl.'s Response to Defs.' PFOF No. 199.)

227.    Kiesler was worried the company might not be around in a few years if these COVID-related circumstances persisted. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 107.

**RESPONSE**: **Disputed**. Kiesler was not, in fact, worried about Widen Enterprises' long-term viability. (*See* Pl.'s Response to Defs.' PFOF No. 199.)

228.    In spring of 2020, many of Widen Enterprises' customers were cutting spending and avoiding risks, especially its many customers in travel, food service, entertainment, and hospitality. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 34; Gonnering Dep., Sept. 21, 2023, at 213:9-214:8, 215:3-7

**RESPONSE**: **Disputed**. Gonnering lacks foundation to state what unidentified third-party customers were doing in the spring of 2020. The evidence shows Gonnering's knowledge is limited to customers' communications to Widen Enterprises in the spring of 2020 with respect to their business with Widen Enterprises: "Several customers [were] asking for discounts and concessions in support of their own budgets and cash flow. There [were] ˜16 customers (of 667 total) requesting discounts amounting to 8k and ˜8 customers requesting payment concessions (e.g. extending terms), of which 5 are approved." (09/29/2023 Palay Decl. Ex. 5, at WINDY0000947.)

229.   A key differentiator in the standard Widen Enterprises customer contract also involved substantial risk because the vast majority of its customers had contracts that allowed them to terminate on 30 days' notice. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 35.

**RESPONSE**: **Undisputed**.

230.   Though typically customers paid up-front for a year of services, if they terminated before the year was over, the Widen Enterprises standard contract required that the customer be refunded pro rata for the portion of time not used. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 36; Kiesler Dep., Sept. 19, 2023, at 228:13-25

**RESPONSE**: **Undisputed**.

231.   This resulted in significant deferred revenue appearing on Widen Enterprises' financial statements because a large portion of the money the company had been paid had not been earned and the company could be required to repay customers out of its own cash reserves. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 37.

**RESPONSE**: **Disputed**. Gonnering has not laid foundation to support whether any portion of money Widen Enterprises might hypothetically be required to return was "large" or whether any portion of deferred revenue recognized based on this arrangement was "significant."

232.     It was a very serious risk and concern to Widen Enterprises in May 2020 that its customers facing business pressures in the uncertain and tumultuous months ahead would terminate contracts early and require Widen Enterprises to pay substantial refunds. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 38; Kiesler Dep., Sept. 19, 2023, at 228:13-25.

**RESPONSE**: **Disputed**. Neither Gonnering nor Kiesler has laid any foundation that would allow them to opine as to whether a "very serious risk" that Widen Enterprises would have to "pay substantial refunds" existed.

233.     Widen Enterprises was concerned in spring 2020 that its existing software customers would cancel early or not renew contracts when their terms ended. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 39.

**RESPONSE**: **Undisputed**.

234.     Outside of Widen Enterprises' software revenue, its content production revenue steeply declined after March 2020. Orders stopped coming in. Gonnering Decl., Sept. 29, 2023, p.5, ¶ 40; Gonnering Dep., Sept. 21, 2023, at 20:4-21:4.

**RESPONSE**: **Undisputed**.

235.     Kiesler did not believe that Windy Waters would be in a financial position to have spare funds to provide to Randall at any time in the foreseeable future as of May 2020 due to the

extreme market uncertainty due to the COVID-19 pandemic. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 108.

**RESPONSE**: **Disputed.** (*See* Pl.'s Response to Defs.' PFOF No. 199.)

*Randall Asks to Redeem in May 2020, but Declines Company's First Offer*

236.     Randall sent Reed a text message on May 5, 2020, informing him that her husband was asking for maintenance in their divorce proceedings and saying "I'm going to need to get some money." Reed Dep., Aug. 23, 2023, at 66:11-67:20; Reed Decl., Sept. 29, 2023, pp.5-6, ¶ 49, Ex. B (Ex. 3 to Reed Dep.); Randall Dep., Aug. 28, 2023, at 245:6-246:2.

**RESPONSE**: **Undisputed.**

237.     Randall sent Reed a text message on May 5, 2020, informing him that her husband was asking for maintenance in their divorce proceedings and saying "I'm going to need to get some money." Reed Dep., Aug. 23, 2023, at 66:11-67:20; Reed Decl., Sept. 29, 2023, pp.5-6, ¶ 49, Ex. B (Ex. 3 to Reed Dep.); Randall Dep., Aug. 28, 2023, at 245:6-246:2.

**RESPONSE**: **Undisputed.**

238.     Reed explained COVID was a concern for the companies, but ultimately talked with Kiesler about options. Am. Answer (ECF No. 45), ¶ 69; Randall Dep., Aug. 28, 2023, at 246:3-8.

**RESPONSE**: **Undisputed** that Reed "explained COVID was a concern for the companies." **Disputed** that Reed "ultimately talked with Kiesler about options." On May 5, 2020, Reed directed Kiesler to purchase all of Ms. Randall's shares. (09/19/2023 M. Kiesler Dep. Tr. 167:22-168:16.)

239.     Reed then contacted Kiesler and asked him to talk with Randall about Windy Waters purchasing her shares as a way to get her money. Reed Decl., Sept. 29, 2023, p.6, ¶ 5-; Kiesler Dep., Sept. 19, 2023, at 167:22-168:10.

**RESPONSE**: Undisputed.[3]

240.     Kiesler was concerned about the idea of paying money in light of the uncertainty with the PPP loan and would have been content not buying back any of Randall's shares, but Reed wanted Kiesler to help his sister. Reed Decl., Sept. 29, 2023, p.6, ¶ 51; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 109.

**RESPONSE**: **Disputed.** Mr. Widen's true motivation for purchasing all, and not less than all, of her stock in May 2020 was the "opportunity" to purchase Stacy's stock using a formula he had been informed was "low," and which produced a purchase price at a small fraction of Widen Enterprises' CEO's latest estimate of the company's market value. (*See, e.g.*, 09/29/2023 Palay Decl., ¶¶ 17, 19, 21, 30, Exs. 15, 17, 19, 28; *See also* Defs.' PFOF No. 241.)

241.     Reed believed it was in the company's best interest to buy Randall out in full rather than in part, if it was going to do anything, for three reasons: (1) Windy Waters was no longer willing to be Randall's bank every time she needed money, (2) each time Randall redeemed shares it cost Windy Waters attorneys' fees and required time by Kiesler to calculate the formula and confer with counsel; and (3) Windy Waters preferred active, as opposed to passive, shareholders going forward. Reed Decl., Sept. 29, 2023, p.6, ¶ 52; Kiesler Dep. 168:1-16; Gonnering Dep., Sept. 21, 2023, at 161:6-25, 166:6-168:15; Gonnering Decl., Sept. 29, 2023, p.6, ¶¶ 42-43.

---

[3] Supporting evidence appears at paragraph 50 of Mr. Widen's declaration.

**RESPONSE: Disputed.** Reed did not form a belief prior to Stacy's 2020 redemption as to a full rather than partial redemption being in the company's best interest, and Reed's true motivation was the completion of the previously "outlined" plan to get all of Stacy's shares via redemption and jumping on the "opportunity" when it presented itself in May 2020. (09/29/2023 Palay Decl., ¶¶ 30, Ex. 28, WINDY0033900; 21, Ex. 19, WINDY0009851; 57, Ex. 55, WINDY0047517; 58, Ex. 56, WINDY0047370; 09/21/2023 M. Gonnering Dep. Tr. 164:8-165:1; Suppl. Decl. of D. Palay Ex. 11; Suppl. Decl. of Stacy Randall ¶ 3; *Compare* Suppl. Decl. of D. Palay Ex. 15, *with* Palay Decl. Ex. 33 (Stafford Rosenbaum invoiced Windy Waters $2,242.00 for its work regarding the May 2020 redemption, including post-redemption work, which is around 0.1% of Reed's compensation for that year).)

242.    Randall had been showing no interest in the company and distracted leaders from their daily work each time she wanted to sell shares. Reed Decl., Sept. 29, 2023, p.6, ¶ 53; Gonnering Dep., Sept. 21, 2023, at 167:7-168:15; Gonnering Decl., Sept. 29, 2023, p.6, ¶¶ 41-42.

**RESPONSE**: Undisputed.

243.    Reed understood any purchase of Randall's shares would be done consistently with the Stock Price Formula that had been used with all prior stock redemptions between 2005 and 2020, and never even considered any other options (nor did Randall request any). Reed Dep., Aug. 23, 2023, at 80:18-81:14; Reed Decl., Sept. 29, 2023, p.6, ¶ 55; Kiesler Dep., Sept. 19, 2023, at 168:24-169:7; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 116.

**RESPONSE**: Undisputed.

244.    Reed directed Kiesler to call Randall on behalf of Windy Waters to offer an all-or-nothing redemption for her shares of Windy Waters and, if she accepted, to carry out the transaction. Reed Decl., Sept. 29, 2023, p.6, ¶ 54; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 110.

**RESPONSE**: Undisputed.

245.    Kiesler complied with this instruction as Treasurer of Windy Waters. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 111.

**RESPONSE**: Undisputed that Kiesler acted in his capacity as Treasurer of Windy Waters, among other capacities.

246.    On May 6, 2020, Kiesler called Randall, and Randall told Kiesler that she needed money for legal fees and was seeking $100,000. Am. Answer (ECF No. 45), ¶¶ 70-71; Kiesler Dep., Sept. 19, 2023, at 172:23-173:5; Randall Dep., Aug. 28, 2023, at 261:19-24.

**RESPONSE**: Undisputed.

247.    Randall made it sound like she needed the money quickly. Kiesler Decl., Sept. 29, 2023, p.15, ¶13.

**RESPONSE**: Disputed. This proposed finding of fact is not supported by admissible evidence. Kiesler can testify to what Stacy said but lacks foundation to testify as to how Stacy "made it sound."

248.    Kiesler explained to Randall that COVID was a concern for the company and that it was struggling with a decision about whether to keep or return PPP money. Randall Dep., Aug. 28, 2023, at 262:15-263:8, 283:24-284:6; Ex. 24 to Randall Dep.; Wittenberg Decl., Sept. 29, 2023, p. 2, ¶ 12, Ex. L (Ex. 24 to Randall Dep.); Kiesler Decl., Sept. 29, 2023, p.15, ¶ 114.

**RESPONSE**: Undisputed.

249.    Kiesler told Randall that Windy Waters was only interested in purchasing stock if it could purchase all shares (consistent with what Reed had told him), rather than any further partial sales as had occurred previously. Kiesler Dep., Sept. 19, 2023, at 173:10-11, 214:11-19, 218:16-20; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 115.

**RESPONSE**: Undisputed.

250.    A redemption of all of Randall's shares was the only way that Defendants wished to provide Randall cash from Windy Waters or Widen Enterprises. Reed Decl., Sept. 29, 2023, p.6, ¶ 56.

**RESPONSE**: Undisputed.

251.    Kiesler did not offer, nor did Randall request, a partial redemption, a loan, or some other financial arrangement, and did not have any authority to make any such offer. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 116.

**RESPONSE: Disputed**. Stacy Randall asked to redeem enough stock to obtain $100,000 and then, when told the Companies could not afford that, she asked to redeem enough stock to obtain $50,000. (Am. Answer ¶¶ 71-73, ECF No. 45.)

252.    Kiesler further explained the company was not able to make available the full redemption cost in one lump sum, but would pay the amount over a period of seven years. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 117.

**RESPONSE**: **Undisputed** that Kiesler stated to Stacy that the company "was not able to make available the full redemption cost in one lump sum" but would pay the price owed for her stock over a period of years. **Disputed** as to whether the company was, in fact, "able" to pay the entire price in one lump sum. Windy Waters maintained significant cash reserves that were speculatively invested in securities portfolios and were not used for operating capital. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19, 294:6-296:9; 09/29/2023 Palay Decl. Ex. 8, Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5, ECF No. 63-7; 09/29/2023 Palay Decl. Ex. 20, Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp. 17-18, Defs.' Response to Request for Admission No. 37-39, ECF No. 63-19; Suppl. Decl. of D. Palay, ¶ 3, Ex. 1, STAFFORD002276 at 2287.) Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies. (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.)

253.   Kiesler explained Windy Waters was willing to buy Randall's remaining shares using the price-per-share calculation model using the Stock Price Formula, and explained that model valued Randall's remaining shares at approximately $1.1 million using financial data through November 2019. Am. Answer (ECF No. 45), ¶ 77; Kiesler Dep., Sept. 19, 2023, at 172:23-174:14; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 118; Randall Dep., Aug. 28, 2023, at 263:9-19, 264:6-16, 265:6-15, 285:23-286:18, 287:12-21, 288:9-19; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶¶ 4, 13, Exs. C (Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, M (Ex. 25 to Randall Dep.).

**RESPONSE**: **Undisputed**.

254.    Kiesler walked Randall through the stock price calculation on the phone, including explaining the company's net income. Kiesler Dep., Sept. 19, 2023, at 70:15-17, 71:10-21, 72:4-73:25, 172:23-174:14, 175:19-23, 233:18-20; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 119, Ex. U (Ex. 5 to Kiesler Dep.).

**RESPONSE**: **Disputed.** Kiesler did not walk Stacy through the stock price calculation or explain the company's net income. (Suppl. Decl. of Stacy Randall ¶ 14.)

255.    Kiesler explained to Randall in that conversation that he would have to update the calculation with end-of-year numbers if she wanted to move ahead. Kiesler Dep., Sept. 19, 2023, at 172:23-174:14; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 119, Ex. U; Randall Dep., Aug. 28, 2023, at 264:6-19.

**RESPONSE**: **Disputed**. Stacy testified that she did not recall Kiesler discussing November 2019 financials at all. (08/28/2023 S. Randall Dep. Tr. 264:6-19.)

256.    Kiesler explained to Randall that by redeeming all of her shares then, she would be able to lock in that value for her shares by locking in a share price and providing certainty in an otherwise uncertain time due to COVID, which threatened the viability of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 121; Kiesler Dep., Sept. 19, 2023, at 227:14-18.

**RESPONSE**: **Undisputed** that Kiesler stated to Stacy that COVID threatened the viability of Widen Enterprises. **Disputed** as to the remainder of the proposed fact, including that COVID, in fact, threatened the viability of Widen Enterprises. Kiesler told Stacy that she would be "smart" to sell her stock because Widen Enterprises might not be around in 7 years and she risked ending up with nothing if she didn't take his offer. (Suppl. Decl. of Stacy Randall ¶¶ 15, 45; 09/29/2023 Palay Decl., ¶¶ 21, 49, Exs. 19, 47, Randall0000116; Am. Answer ¶ 81; 09/21/2023 M. Gonnering Dep. Tr.

218:9-12; 08/23/2023 R. Widen Dep. Tr. 213:7-15; 09/19/2023 M. Kiesler Dep. Tr. 228:11-13 (Q: Was the company facing any risk of insolvency at that time? A: At that time, no."); *see also* Pl.'s Resps. to Defs.' PFOF ¶¶ 199, 224-226, 235.)

257.    Randall told Kiesler she thought that the price was too low because she "had a feeling that the company was worth more than" an amount that would make her shares worth $1.1. million, but did not explain a basis for that belief. Randall Dep., Aug. 28, 2023, at 269:11-21; Am. Answer (ECF No. 45), ¶ 78.

**RESPONSE**: Undisputed.

258.    Randall did not ask for any financial information or documents about the company during her discussion with Kiesler in May 2020. Randall Dep., Aug. 28, 2023, at 266:23-267:1; Kiesler Dep., Sept. 19, 2023, at 232:2-22; Kiesler Decl., Sept. 29, 2023, p.16, ¶ 122.

**RESPONSE**: Undisputed.

259.    Kiesler never told Randall in May 2020 that he had a market value to provide or had obtained any market valuation or report on the value of Windy Waters, because he had not. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 123.

**RESPONSE**: **Undisputed** that Kiesler never told Stacy that he had any market valuation or report on the value of Windy Waters. **Disputed** that Kiesler, in fact, had no such information. Kiesler did not disclose to Stacy that Widen Enterprises' CEO had stated to Reed and Kiesler on multiple occasions over a period of years that Widen Enterprises' market value was based on a multiple of the company's revenue or recurring revenue and that, as of August 2018, the CEO had stated to Reed and Kiesler that he believed that Widen Enterprises had a fair market value of approximately

$80 million. (09/28/2023 S. Randall Decl., p.4, ¶¶ 23, 24; 09/29/2023 Palay Decl., ¶¶ 10, 13, 17, 19, Exs. 8, 11, 15, 17; 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

260.    In light of the extreme uncertainty about the PPP loan, Windy Waters was not willing to leave any offer open. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 124; Kiesler Dep., Sept. 19, 2023, at 176:23-177:4, 179:6-10.

**RESPONSE**: **Disputed**. On May 8, 2020, Gonnering stated in an e-mail to Reed and Kiesler, with respect to a Paycheck Protection Program loan to Widen Enterprises of approximately $2.7 million, that "One opportunity would trip our decision to give the money back without waiting, and that would be fulfilling the liquidity request of Stacy Randall. If we buy her shares, we would not keep the funds." (09/29/2023 Palay Decl. Ex. 19; *see also* Pl.'s Resps. to Defs.' PFOF ¶¶ 224-226, 235.) **Undisputed** that Windy Waters was not willing to leave any offer open.

261.    Kiesler wanted to know the answer prior to the safe harbor deadline to return PPP funds, which at the time was May 7, 2020, so he could determine whether or not to return the PPP funds. Kiesler Dep., Sept. 19, 2023, at 176:17-177:4.

**RESPONSE**: **Undisputed**.

262.    Moreover, Kiesler did not want the issue to linger while he was focused on so many other business issues at the time, and wanted to have it resolved promptly. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 125.

**RESPONSE**: **Undisputed**, but immaterial.

263.    Windy Waters left the offer open for the rest of the day, and Kiesler asked Randall to give a response before he left for the day. Kiesler Dep., Sept. 19, 2023, at 172:23-174:14; Kiesler Decl., Sept. 29, 2023, p.17, ¶ 127.

**RESPONSE**: Undisputed.


264.    Kiesler assured Randall she could "take it or leave it," making it clear she was not obligated to sell her shares. Randall Dep., Aug. 28, 2023, at 267:20-21; Kiesler Dep., Sept. 19, 2023, at 227:22-24; Kiesler Decl., Sept. 29, 2023, p.17, ¶ 128.

**RESPONSE**: **Undisputed** that Kiesler told Ms. Randall that his offer was "take-it-or-leave-it." **Disputed** as to the remainder of the proposed fact. Kiesler lacks foundation to testify as to what was "clear."


265.    Randall told Kiesler the decision was a "really big deal" and she wanted "time to talk to [her] people." Randall Dep., Aug. 28, 2023, at 280:24-281:24; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 11, Ex. K (Ex. 23 to Randall Dep.).

**RESPONSE**: Undisputed.


266.    After Randall and Kiesler spoke, Kiesler confirmed with Reed that he approved Windy Waters purchasing all of Randall's.shares. Reed Dep., Aug. 23, 2023, at 71:24-73:15; Reed Decl., Sept. 29, 2023, pp.6-7, ¶ 57, Ex. C (Ex. 4 to Reed Dep.).

**RESPONSE**: Undisputed.


267.    Late in the day on May 6, around 4 pm, Randall and Kiesler spoke again. Randall said she needed more time so she could talk to a lawyer or financial advisor. Randall Dep., Aug. 28,

2023, at 274:23-275:7, 285:11-286:18; Ex. 25 to Randall Dep.; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.); Kiesler Decl., Sept. 29, 2023, p.17, ¶ 129.

**RESPONSE**: Undisputed.

268.    Kiesler told Randall she should talk with her financial advisor and consult with counsel, and extended the offer for three more days. Kiesler Dep., Sept. 19, 2023, at 212:15-18, 213:9-16; Kiesler Decl., Sept. 29, 2023, p.17, ¶ 130; Wittenberg Decl., Sept. 29, 2023, p.1, ¶ 3, Ex. B (Defs.' First Am. Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 34.

**RESPONSE**: **Disputed**. Kiesler did not tell Stacy that she "should talk with her financial advisor." (Suppl. Decl. of Stacy Randall ¶ 16.)

269.    Kiesler also explained that the government safe harbor deadline for the PPP loan money had been extended another week, and so he did not need Randall's answer that day. Ex. 25 to Randall Dep., Aug. 28, 2023, at 285:23-286:18, 291:12-16; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

**RESPONSE**: Undisputed.

270.    As of May 6, 2020, Kiesler believed Randall redeeming her shares at the offered share price could be a smart move given the uncertainties of COVID, which threatened the viability of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 131.

**RESPONSE**: **Disputed**. Kiesler did not believe that Ms. Randall redeeming her shares at the offered share price could be smart, or that Widen Enterprises' viability was threatened. (*See* Pl.s' Response to Defs.' PFOF No. 199.) When asked if he believed whether it was smart for Stacy to sell all of her

stock, Kiesler testified that he did not know the definition of smart. (09/19/2023 M. Kiesler Dep. Tr. 229:23-230:3, 08/23/2023 R. Widen Dep. Tr. 213:7-15.)

271.   Randall told Kiesler that she had never thought he and Reed had an interest in Randall's well-being and made it clear that she did not trust them. Randall Dep., Aug. 28, 2023, at 285:23-286:18, 291:18-293:3; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

**RESPONSE**: **Disputed** to the extent that the proposed fact alleges that Stacy did not, in fact, trust Kiesler or Reed. (09/29/2023 Decl. of Stacy Randall ¶ 9.) When asked about this document, Stacy testified that she "had the utmost trust and respect in Mike Kiesler" until she found out that the company had sold for $162 million and this lawsuit began. (08/28/2023 S. Randall Dep. Tr. 292:14-294:12.)

272.   Randall did not accept Windy Waters' May 6, 2020, offer to buy her shares at around $1.1 million and did not contact Kiesler by May 9. Randall Dep., Aug. 28, 2023, at 268:4-9, 277:1-13; Am. Answer (ECF No. 45), ¶ 93; Kiesler Decl, Sept. 29, 2023, p.17, ¶ 132.

**RESPONSE**: Undisputed.

*Randall Was Not Desperate*

273.   Randall is a 20% owner of a different family-owned company, Millmont, that owns two cottages, some land, and, until 2021, owned an office building. She has owned this interest since before 2005 and owned it as of May 13, 2020. Randall Dep., Aug. 28, 2023, at 164:20-24, 208:4-20; Reed Decl., Sept. 29, 2023, p.7, ¶ 59; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 72.

**RESPONSE**: Undisputed, but immaterial.

274.    Randall "never thought of" the possibility of selling her interest in Millmont when she needed money, including in May 2020. Randall Dep., Aug. 28, 2023, at 207:24-209:10, 248:9-15, 305:12-17.

**RESPONSE**: Undisputed, but immaterial.

275.    Randall did not ask Reed about the possibility of her obtaining money from or through Millmont in May 2020. Randall Dep., Aug. 28, 2023, at 246:17-247:9; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections and Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 74.

**RESPONSE**: Undisputed, but immaterial.

276.    As of May 2020, Randall and her husband together owned eight condominiums that they rented out. Randall Dep., Aug. 28, 2023, at 230:12-21, 250:21-251:2.

**RESPONSE**: Undisputed, but immaterial.

277.    Five of the rental properties were worth $230,000 each in November 2020; another three were worth a combined $510,000 Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 19, Ex. U (STAFFORD004358).

**RESPONSE**: Undisputed, but immaterial.

278.    Randall did not consider selling any of the condos at that time because that was a source of income to her. Randall Dep., Aug. 28, 2023, at 250:21-251:18.

**RESPONSE**: **Disputed.** Stacy testified the condos contributed to her and her husband's joint income. (08/28/2023 S. Randall Dep. Tr. 251:6-12.) During her divorce, Stacy did not have access to the rental income from the condos. (Suppl. Decl. of Stacy Randall ¶ 17.)

279.    Randall did not consider refinancing any mortgages in May 2020 when she needed money. Randall Dep., Aug. 28, 2023, at 254:5-9.

**RESPONSE**: **Undisputed**, but immaterial.

280.    In May 2020, Randall owned a Cadillac worth $28,000 with no loan on it. Randall Dep., Aug. 28, 2023, at 254:11-17; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 19, Ex. T (STAFFORD004353).

**RESPONSE**: **Undisputed**, but immaterial.

281.    In May 2019, Randall owned $17,000 of cash kept in a safe. Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 19, Ex. T (STAFFORD004353).

**RESPONSE**: **Disputed.** In May 2020, during the divorce between Steven and Stacy Randall, Steven was in possession of the safe that Defendants reference had cash in it in 2019, and Stacy did not know the combination to the safe. (Suppl. Decl. of Stacy Randall ¶ 18.)

282.    Randall owns numerous gold coins and gold and silver bars that she inherited in approximately 2003. Randall Dep., Aug. 28, 2023, at 231:6-23; Reed Decl., Sept. 29, 2023, p.7, ¶ 58.

**RESPONSE**: **Undisputed**, but immaterial.

283.     Randall "didn't think of" the possibility of selling any of her gold coins or gold or silver bars when she needed money. Randall Dep., Aug. 28, 2023, at 232:17-23, 233:4-8.

**RESPONSE**: Undisputed, but immaterial.


284.     She "never ever, ever thought about" selling those items and did not want to sell them for money. Randall Dep., Aug. 28, 2023, at 232:17-23, 233:19-234:19, 236:15-24.

**RESPONSE**: Undisputed, but immaterial.


285.     Nothing prevented Randall from selling her gold coins or gold and silver bars other than that she did not want to sell them. Randall Dep., Aug. 28, 2023, at 233:12-236:24.

**RESPONSE**: Undisputed, but immaterial.


286.     Randall also owned an heirloom watch and pearls that she inherited from her mother that she did not have appraised or sell for money in May 2020. Randall Dep., Aug. 28, 2023, at 236:25-238:9.

**RESPONSE**: Undisputed, but immaterial.


287.     On April 22, 2020, Randall's husband filed a motion in their divorce proceedings seeking maintenance. Randall Dep., Aug. 28, 2023, at 227:7-24.

**RESPONSE**: Undisputed.


288.     The motion was set for a hearing on May 18, 2020. Randall Dep., Aug. 28, 2023, at 239:12-240:25.

**RESPONSE**: Undisputed.

289.     The motion and upcoming hearing and Randall's need to pay her attorneys caused Randall to try to obtain additional money. Randall Dep., Aug. 28, 2023, at 227:7-24, 240:17-25.

**RESPONSE**: Undisputed.

290.     Other than asking Reed about getting money by selling her stock, Randall did not explore any other way to obtain money when she needed it in May 2020. Randall Dep., Aug. 28. 2023, at 249:7-10.

**RESPONSE**: Undisputed, but immaterial.

291.     Randall did not try to sell any personal items when she needed money in May 2020. She did not sell any furniture, jewelry, heirlooms, or other items. Randall Dep., Aug. 28, 2023, at 259:2-24.

**RESPONSE**: Undisputed, but immaterial.

292.     Randall did not apply for any jobs in May 2020 or at any time since 2015. Randall Dep., Aug. 28, 2023, at 259:25-260:2.

**RESPONSE**: Undisputed, but immaterial.

293.     Randall has never applied for any public benefits or food stamps. Randall Dep., Aug. 28, 2023, at 260:3-10.

**RESPONSE**: Undisputed, but immaterial.

294.     Randall did not ask Reed between May 5 and May 13, 2020, whether she could obtain money from Millmont, and did not want to sell her interest in Millmont. Reed Decl., Sept. 29, 2023, p.7, ¶ 60; Randall Dep., Aug. 28, 2023, at 246:25-247:9, 248:9-15, 248:22-249-5.

**RESPONSE**: **Disputed**. The cited testimony does not support the proposition that Stacy did not want to sell her interest in Millmont. When asked if she would have been interested in selling off part of her interest in Millmont, Stacy testified "I don't know what I would have thought at that time." (08/28/2023 S. Randall Dep. Tr. 248:9-20.)

295.     Randall did not apply for any loans in May 2020. Randall Dep., Aug. 28, 2023, at 249:7-18.

**RESPONSE**: **Undisputed**, but immaterial.

296.     Randall did not ask for a loan from Windy Waters in May 2020. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 153.

**RESPONSE**: **Undisputed**, but immaterial.

297.     Randall did not ask any other family members for money in May 2020. Randall Dep., Aug. 28, 2023, at 249:19-22.

**RESPONSE**: **Undisputed**, but immaterial.

298.     Randall did not take any money out of retirement accounts in May 2020 when she needed money. Randall Dep., Aug. 28, 2023, at 249:23-25-25.

**RESPONSE**: **Undisputed**, but immaterial.

299. Between May 5 and May 13, 2020, Randall never asked any of the Defendants what the value of Windy Waters or Widen Enterprises was. Reed Decl., Sept. 29, 2023, p.7, ¶ 62; Kiesler Decl., Sept. 29, 2023, p.20, ¶ 154.

**RESPONSE**: **Disputed**. Ms. Randall sought to engage in a conversation with Kiesler about what the Companies were worth, but Kiesler did not provide her with that information. (*See* Defs.' Proposed Finding of Fact No. 257 ("Randall told Kiesler she thought that the price was too low because she 'had a feeling that the company was worth more than' an amount that would make her shares worth $1.1. million, but did not explain a basis for that belief."); Suppl. Decl. of Stacy Randall ¶ 19.)

300. Between May 5 and May 13, 2020, Randall never asked any of the Defendants to see any financial statements or other business records. Reed Decl., Sept. 29, 2023, p.7, ¶ 63; Kiesler Decl.

**RESPONSE**: **Undisputed**, but immaterial.

301. Reed was willing to consider buying Randall's interest in Millmont instead, but Randall never brought it up again. Reed Decl., Sept. 29, 2023, p.7, ¶ 61.

**RESPONSE**: **Undisputed**.

302. Between about 2002 and 2019, Randall and her husband made expensive real estate investments in Florida and Wisconsin. Randall Dep., Aug. 28, 2023, at 252:7-15.

**RESPONSE**: **Disputed**, but immaterial. The cited testimony does not support the proposed fact. Before May 2020, Ms. Randall's then-husband purchased properties in Florida, and those properties were not possessed by Ms. Randall in May 2020. (08/28/2023 S. Randall Dep. Tr. 252:7-15.)

303.     Randall was not happy with her husband's real estate investments in Florida, specifically, which resulted in foreclosures or short sales. Randall Dep, Aug. 28, 2023, at 253:1-16.

**RESPONSE**: **Disputed**, but immaterial. The cited testimony does not support the proposed finding of fact.

304.     On May 6, 2020, after her first call with Kiesler, Randall contacted her son, Justin Randall, and told him about the offer. Randall Dep., Aug. 28, 2023, at 280:24-281:24; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 11, Ex. K (Ex. 23 to Randall Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

305.     Randall's son, Justin Randall, told her she should get a lawyer prior to redeeming all of her stock and told her she should have an attorney look at the financials of Widen Enterprises. Randall Dep., Aug. 28, 2023, at 276:4-14, 294:20-295:9.

**RESPONSE**: **Undisputed**, but immaterial.

306.     Randall did not contact any attorneys between May 6 and May 12. Randall Dep., Aug. 28, 2023, at 276:4-25.

**RESPONSE**: **Undisputed**, but immaterial.

307.     Randall reached out to her financial advisor, Mark Goff, on May 6, 2020, after hanging up with Kiesler during the first phone call when he relayed the offer to purchase all shares for $1.1 million. She texted him asking him to call because she needed advice about the offer from Windy Waters. Randall Dep., Aug. 28, 2023, at 277:22-280:20; Ex. 22 to Randall Dep.; Wittenberg

Decl., Sept. 29, 2023, pp.1-2, ¶¶ 4, 10, Exs. C (Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, I (Ex. 22 to Randall Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

308.    Goff did not respond right away. Randall texted Goff again shortly before 3 pm on May 6 and asked him if she should consider the offer. Randall Dep., Aug. 28, 2023, at 282:14-285:15; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, 12, Exs. C (Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, L (Ex. 24 to Randall Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

309.    Within the next 90 minutes, Goff and Randall communicated and Goff provided her with advice about what she should say. Randall Dep., Aug. 28, 2023, at 285:11-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

310.    After Randall and Kiesler's second call ended around 4:30 on May 6, 2020, Randall contacted Goff again and indicated she would need advice on how to make the money she was offered for her stock grow. Randall Dep., Aug. 28, 2023, at 285:11-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

**RESPONSE**: **Disputed.** The cited testimony and evidence does not support all of the facts contained in Defendants' Proposed Finding of Fact No. 310. After Ms. Randall and Kiesler's second call on May 6, 2020, Ms. Randall contacted Goff again and stated, "I'm going to need your knowledge on

how to make my money grow." (Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M, ECF No. 70-12.)

311.   She expressed her actual understanding of the share price calculation and the conversation after her phone call with Kiesler on May 6, explaining to her financial advisor Mark Goff directly after the call as follows:

> Mikes [sic] attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought that they have had an interest in my well being. He told me that the company puts all of the in coming [sic] "profit" right back into the business. So they never make any money.... He gave me the way they have evaluating shares since 1991. It has nothing to do with how good or bad the company is doing. He was trying to tell me in 7 years my stock would still be worth 1.1 mill. I don't understand how that could be. Just when I was going to call him back he was calling me, it was at 3:58. I had to chuckle thinking he was going to pressure me for a decision. What he told me was that he had just received an email saying the government has pushed back the deadline for another week so he doesn't need my answer today after all. Now I have time to talk to Scott Spangler on Monday to see what he thinks I should do. Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all. I could tell he was in disbelief and I could hear some sadness in his voice.

Randall Dep., Aug. 28, 2023, at 285:23-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

**RESPONSE**: **Disputed** to the extent that the proposed finding of fact implies that Ms. Randall had an "actual understanding of the share price calculation." The cited evidence does not support that portion of the proposed finding of fact. (*See* Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M, ECF No. 70-12 ("I don't understand how that could be.").) **Undisputed**, but immaterial, that Ms. Randall sent Mr. Goff the above-quoted message.

312.    Randall also planned to talk with her accountant about the offer to get his advice. Randall Dep., Aug. 28, 2023, at 285:23-286:18; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M (Ex. 25 to Randall Dep.).

**RESPONSE**: Undisputed, but immaterial.

313.    Randall does not recall whether she ever did reach out to her accountant. Randall Dep., Aug. 28, 2023, at 293: 4-9.

**RESPONSE**: Undisputed, but immaterial.

*Windy Receives Updated Financials and Communicates New Offer*

314.    On approximately May 12, 2020, Kiesler updated the price-per-share calculation model by inserting the December 2019 financial information into the Stock Price Formula, as promised previously. Kiesler Decl., Sept. 29, 2023, p.17, ¶ 133.

**RESPONSE**: Undisputed.

315.    Based on his calculations, the redemption price Windy Waters would offer in the proposed redemption had increased to approximately $1.3 million. Kiesler Decl., Sept. 29, 2023, p.18, ¶ 134.

**RESPONSE**: Undisputed.

316.    On May 12, 2020, Kiesler contacted Scott Seid, the lawyer for Windy Waters, for two reasons. Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid Dep.); Seid Dep., Aug. 17, 2023, at 18:4-12, 20:17-20; Kiesler Decl., Sept. 29, 2023, p.18, ¶¶ 136-39; Kiesler Dep., Sept. 19, 2023, at 189:22-190-3.

**RESPONSE**: Undisputed.

317.    The first reason Kiesler contacted Seid was to ask if his calculation of $1.3 million for Randall's shares using the Stock Price Formula was appropriate, and Seid responded "it would be consistent to do it that way." Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid. Dep.); Seid Dep., Aug. 17, 2023, at 18:4-12, 20:17-20; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 136; Kiesler Dep., Sept. 19, 2021, at 189:22-190:3.

**RESPONSE**: **Disputed** to the extent that the proposed finding of fact implies that Seid's response was, in its entirety, "it would be consistent to do it that way." (*See* Pl.'s Proposed Findings of Fact No. 150 ("[T]he EBITDA formula did not apply to voluntary redemptions because 'with a voluntary sale to the corp, the price is negotiated.'").) Otherwise, **undisputed.**

318.    Kiesler expressed that Windy Waters intended to treat Randall's transaction precisely the same as it had treated her brother, Price Widen, when he had redeemed all of his shares in 2015. Seid Dep., Aug. 17, 2023, at 29:17-21; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 137; Supplemental Christa Wittenberg Decl., p.1, ¶ 2, Ex. V (Ex. 41 to Kiesler Dep.); Kiesler Dep., Sept. 19, 2023, at 215:3-7.

**RESPONSE**: **Undisputed** as to what Kiesler "expressed," but immaterial.

319.    The second reason Kiesler contacted Seid was to ask him to prepare a draft redemption agreement to use for a potential transaction. Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid Dep.); Seid Dep., Aug. 17, 2023, at 18:4-12; Kiesler Decl. Sept. 29, 2023, p.18, ¶ 138; Kiesler Dep., Sept. 19, 2021, at 189:22-190:3.

**RESPONSE**: **Undisputed**, but immaterial.

320.    Seid prepared the redemption agreement for Randall using the redemption agreement from when Price Widen redeemed the remainder of his shares as a template. Seid Dep., Aug. 17, 2023, at 18:22-19:5.

**RESPONSE**: **Undisputed**, but immaterial.

321.    To create Randall's stock redemption agreement from Price Widen's agreement, Seid changed only the name, the number of shares being redeemed, and the pronouns in most places (leaving "he" in a few places in the first draft by mistake). Seid Dep., Aug. 17, 2023, at 13:2-6, 18:1-18, 19:23-20:9; Wittenberg Decl., Sept. 29, 2023, pp.2-3, ¶¶ 8, 15 Exs. G (Ex. 2 to Seid Dep.), P (Ex. 5 to Seid Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

322.    Seid also created a promissory note for the payments to Randall by using the promissory note from when Price Widen redeemed all of his shares in 2015 as a template. Seid Dep., Aug. 17, 2023, at 13:2-6, 18:1-18, 20:5-9; Wittenberg Decl., Sept. 29, 2023, pp.2-3, ¶¶ 8, 15, Exs. G (Ex. 2 to Seid Dep.), P (Ex. 5 to Seid Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

323.    Kiesler asked Seid to use the price per share he calculated using the Stock Price Formula based on the updated financials through December 31, 2019, for the stock redemption agreement and promissory note. Seid Dep., Aug. 17, 2023, at 20:17-20, 26:2-5; Kiesler Decl., Sept.

29, 2023, p.18, ¶ 139, Ex. V (2020 Stock Redemption Agreement); Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. Q (Ex. 6 to Seid Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

324.     The price per share Kiesler calculated using the Stock Price Formula was $615.42 for Class B common stock and $646.19 for Class A stock. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.); Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, p.16, 18, ¶¶ 119, 134, Ex. U (Ex. 5 to Kiesler Dep.).

**RESPONSE**: **Undisputed**.

325.     The price per share based on the net assets from Windy Waters' financial statements would have been only $172.85 for Class B shares and $181.49 for Class A shares, so Kiesler used the higher price based on the Stock Price Formula. Kiesler Decl., Sept. 19, 2023, p.16, 18, ¶¶ 119, 135, Ex. U (Ex. 5 to Kiesler Dep.).

**RESPONSE**: **Undisputed**, but immaterial.

326.     Kiesler called Randall on May 13 to communicate that updated offer of over $1.3 million. Randall Dep., Aug. 23, 2023, at 303:17-304:3, 304:9-12; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 140; Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 63.

**RESPONSE**: **Undisputed**.

327.     Kiesler made it clear to Randall that the Stock Price Formula was being used again for this calculation. Kiesler Decl., Sept. 29, 2023, p.18, ¶ 141.

**RESPONSE**: **Disputed.** This proposed finding of fact is not supported by admissible evidence. Kiesler cannot testify to what was "clear" to Ms. Randall. Kiesler called Ms. Randall and told her that "they found another $250,000," and Stacy believed the updated offer was not related to use of a formula but rather additional money that Defendants "found." (08/28/2023 S. Randall Dep. Tr. 303:17-21; Suppl. Decl. of Stacy Randall ¶ 22.)

328.     Randall agreed with those terms on the spot, and said she would be coming in later that day to sign the documents. Randall Dep., Aug. 28, 2023, at 303:17-304:3, 304:9-12; Kiesler Decl., Sept. 29, 2023, p.18, ¶ 142.

**RESPONSE**: **Disputed.** Stacy did not agree with those terms on the spot. (Suppl. Decl. of Stacy Randall ¶¶ 21-22; *see* Randall Dep., Aug. 28, 2023, at 303:17-304:12 ("Q. Do you remember saying something to him along the lines of, 'That's more like it,' when you found out about the 250,000? A. No. I said, 'That's all?'").)

329.     Randall emailed her divorce attorney after talking with Kiesler asking for advice. Randall Dep., Aug. 28, 2023, at 307:14-308:12.

**RESPONSE**: **Undisputed.**

330.     When Randall hired Stafford Rosenbaum to represent her in her divorce, she had signed a conflict waiver letter confirming she waived any conflict due to the fact that the firm also represented Windy Waters and Widen Enterprises with respect to business matters, including her

stock redemptions. Randall Dep., Aug. 28, 2023, at 220:16-223:25; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 9, Ex. H (Ex. 17 to Randall Dep.).

**RESPONSE**: **Disputed.** The cited evidence does not support the proposed finding of fact. Stacy engaged Stafford Rosenbaum LLP to represent her in her divorce in "November 2018." (Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 9, Ex. H (Ex. 17 to Randall Dep.).) In April 2019, Stafford Rosenbaum asked Stacy to sign a conflict waiver letter regarding her "redemption of shares of the Company," the most recent of which had occurred as of January 2019, prior to the conflict waiver letter. (*See* 09/29/2023 M. Kiesler Decl. Ex. I.)

331.    The same day, Randall also called and left a voicemail for Seid. Seid Dep., Aug. 17, 2023, at 31:4-20; Randall Dep., Aug. 23, 2023, at 310:11-13.

**RESPONSE**: Undisputed.

332.    Randall texted to her son Justin prior to heading over to meet Kiesler at 4:30 p.m., "Kiesler did another evaluation of the company and came up with another $250 thousand. Nothing I can do about it. I will be going over to the office to sign the papers at 4:30." Randall Dep., Aug. 28, 2023, at 313:2-15; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 14, Ex. N (Ex. 28 to Randall Dep.).

**RESPONSE**: Undisputed.

333.    Randall came to see Kiesler on May 13 at the office to review and consider the stock redemption agreement and promissory note that Seid had prepared to effectuate the redemption of her shares. Am. Answer (ECF No. 45), ¶¶ 109-10; Randall Dep., Aug. 28, 2023, at 312:19-24; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 143.

**RESPONSE**: **Disputed** to the extent that this proposed finding of fact implies that Ms. Randall had the motivation, opportunity, or ability "to review and consider the stock redemption agreement and promissory note." The cited evidence does not support that fact, and Kiesler cannot testify admissibly as to what Ms. Randall's purpose was in coming to the office on May 13. Ms. Randall went to see Kiesler at the office on May 13 because she "felt like [she] had to sign." (08/28/2023 S. Randall Dep. Tr. 313:19-21; Suppl. Decl. of Stacy Randall ¶ 39.)

334.    When she arrived, Kiesler was talking with Seid about an issue related to the PPP loan. Seid said he owed Randall a call and asked to speak with her. Kiesler Dep., Sept. 19, 2023, at 207:16-208:3; Seid Dep., Aug. 17, 2023, at 31:21-32:14, 32:23-33:6; Randall Dep., Aug. 28, 2023, at 313:25-314:4; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

**RESPONSE**: **Undisputed**, but immaterial.

335.    Randall and Seid then spoke, and Seid told her that no one could force her to sign the documents. Randall Dep., Aug. 28, 2023, at 314:5-17; Am. Answer (ECF No. 45), ¶¶ 110-11, 113; Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

**RESPONSE**: **Undisputed**.

336.    Seid also told Randall (1) he could not give her advice because the firm represents the company, (2) that if she was uncomfortable signing the documents, there was no reason to do it, and (3) that if she felt like she needed to talk to an attorney first, that she absolutely had the right to do that and should do that. Am. Answer (ECF No. 45), ¶¶ 110-11, 113; Seid Dep., Aug. 17, 2023,

at 33:9-34:12, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

**RESPONSE**: **Disputed**. When Stacy spoke with Attorney Seid on the phone on May 13, 2020, she told Attorney Seid she was not comfortable signing the agreement, and he responded by saying that nobody can force her to sign the contract. (Suppl. Decl. of Stacy Randall ¶¶ 23, 25-37.) Mr. Seid did not tell Stacy that he could not give her advice because his firm represented the company. (Suppl. Decl. Stacy Randall ¶¶ 26-28, 30, 32, 33, 35, 37.)

337.     Seid testified that he also told Randall that he would be happy to give her some names of other business law attorneys who could help her. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

**RESPONSE**: **Undisputed** that Mr. Seid testified as such. **Disputed** that Mr. Seid did in fact tell Ms. Randall he would be happy to give her some names of other business law attorneys who could help her. He did not. (08/28/2023 S. Randall Dep. Tr. 314:18-315:21; Suppl. Decl. of Stacy Randall ¶¶ 23, 25-37.)

338.     Randall did not ask Seid for any financial statements, tax returns, or other information during that phone call or ever. Seid Dep., Aug. 17, 2023, at 42:15-43:24.

**RESPONSE**: **Undisputed.**

339.     Randall said she would let Seid know if she wanted to be given names of other lawyers. Seid Dep., Aug. 17, 2023, at 38:2-12, 39:6-12; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

**<u>RESPONSE</u>: Disputed.** On the May 13, 2020 phone call between Stacy and Attorney Seid, Stacy did not tell Attorney Seid she would let him know if she wanted to be given names of other lawyers. (Suppl. Decl. of Stacy Randall ¶ 37.)

340. A few minutes after that conversation, Seid sent an email to Randall's divorce lawyer stating:

> Just talked to her. . . . She is uncomfortable about signing documents for the sale of her stock, which are consistent with the way in which everyone else has sold their stock. I told her that she absolutely had the right to seek outside counsel before signing anything and that I would be happy to give her names of attorneys to do that. She said she would let me know.

Seid Dep., Aug. 17, 2023, at 38:2-39:14; Wittenberg Decl., Sept. 29, 2023, p.3, ¶ 17, Ex. R (Ex. 13 to Seid Dep.).

**<u>RESPONSE</u>: Undisputed.**

341. This was the only time Randall and Seid had spoken, and Randall never contacted Seid again after that discussion. Seid Dep., Aug. 17, 2023, at 39:6-16; Randall Dep., Aug. 28, 2023, at 220:1-14.

**<u>RESPONSE</u>: Undisputed.**

342. Kiesler then asked whether Randall wanted her son or anyone else to review the documents before she signed, and Randall declined. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

**<u>RESPONSE</u>: Disputed.** After Stacy got off the phone with Attorney Seid, Kiesler did not ask Stacy whether she wanted her son or anyone else to review the documents before she signed them. **(**Suppl. Decl. of Stacy Randall ¶ 38.)

106

343.     Kiesler then read aloud both the stock redemption agreement and the promissory note word for word while Randall followed along, stopping after each paragraph to ask if she understood and whether she had any questions. Kiesler Dep., Sept. 19, 2023, at 225:23-226:10; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 145; Randall Dep., Aug. 28, 2023, at 318:16-24.

**RESPONSE**: **Disputed.** Kiesler did not read the stock redemption agreement and promissory note aloud word for word while Ms. Randall followed along, stopping after each paragraph to ask if she understood and whether she had any questions. (08/28/2023 S. Randall Dep. Tr. 317:8-17.)

344.     Randall did not disagree with anything in the documents or ask for anything to be changed. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 146.

**RESPONSE**: **Undisputed.**

345.     Kiesler did not prevent Randall from leaving or give Randall a time limit she could remain in the office while she was there to sign the documents. Randall Dep. 319:16-25; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 147.

**RESPONSE**: **Undisputed.**

346.     Kiesler asked Randall if she wanted to take the documents with her to review alone or with an attorney and not sign them that day, but she declined. Kiesler Dep., Sept. 21, 2023, at 213:22-214:2; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

**RESPONSE**: **Disputed.** Kiesler did not ask Stacy if she wanted to take the redemption documents with her to review alone or with an attorney. (Suppl. Decl. of Stacy Randall ¶ 40.)

347.     Kiesler asked Randall if she wanted to take the documents with her to review alone or with an attorney and not sign them that day, but she declined. Kiesler Dep., Sept. 21, 2023, at 213:22-214:2; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 144.

**RESPONSE**: **Disputed.** Kiesler did not ask Stacy if she wanted to take the redemption documents with her to review alone or with an attorney. **(**Suppl. Decl. of Stacy Randall ¶ 40.**)**

348.     Kiesler and Randall then executed the documents, copies of which are attached to the Complaint as Ex A and Ex B and attached to the Kiesler Declaration as Ex V and Ex W. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 148, Exs. V (Stock Redemption Agreement), W (Promissory Note); Am. Answer (ECF No. 45), ¶ 125; Randall Dep., Aug. 28, 2023, at 315:24-317:3; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

**RESPONSE**: **Undisputed.**

349.     Randall physically signed the documents of her own volition. Randall Dep., Aug. 28, 2023, at 296:5-14; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 67.

**RESPONSE**: **Disputed.** Ms. Randall physically signed the documents, but she would not have signed had she been financially stable, 08/28/2023 S. Randall Dep. Tr. 296:5-9, or had she known how much the companies were actually worth. (Suppl. Decl. of Stacy Randall ¶ 47.)

350.     Randall did not ask for any financial documents on May 13. Randall Dep., Aug. 28, 2023, at 320:1-3; Kiesler Decl., Sept. 29, 2023, p.19, ¶ 149.

**RESPONSE**: **Undisputed**, but immaterial.

351.     Randall did not request any information at all regarding the redemption on May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 150; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 68.

**RESPONSE**: **Disputed.** Ms. Randall asked Kiesler, for example, if there had been any talk of selling the companies. (08/28/2023 S. Randall Dep. Tr. 320:22-321:5.)

352.     Prior to executing the May 13, 2020 Redemption Agreement, Randall did not ask Defendants how the value of the shares redeemed under that agreement was calculated, nor to see the calculation. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 58; Kiesler Decl., Sept. 29, 2023, p.20, ¶ 156.

**RESPONSE**: **Undisputed.**

353.     At the time of execution, Randall was the sole director and president of Windy Waters, and resigned that role via the Stock Redemption Agreement. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.); Kiesler Decl., Sept. 29, 2023, p.20, ¶ 157.

**RESPONSE**: **Disputed.** (*See* Pl.'s Resp. to Defs.' Proposed Finding of Fact Nos. 39, 41.)

354.     Kiesler made no false representation to Randall related to the stock redemption on May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.19, ¶ 151.

**RESPONSE**: **Disputed.** (*See, e.g.*, Pl.'s Proposed Findings of Fact Nos. 157, 170, 171, 178, 181, 183, 184, 188, 200, 201, 202, 207, 235, 237, 238, 239, 265-287; Suppl. Decl. of D. Palay, ¶ 13, Ex. 11 (*see* section in the operational update e-mail under the header "Valuation").)

355.    When Randall asked Kiesler if there was any "thought about selling the company," Kiesler responded, "No, there's been no talk of that." Randall Dep., Aug. 28, 2023, at 320:13-321:12. **RESPONSE**: Undisputed.

356.    Kiesler did not know of any facts about which Randall was mistaken related to the stock redemption on May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 152. **RESPONSE**: **Disputed.** (*See, e.g.*, Pl.'s Proposed Findings of Fact Nos. 157, 170, 171, 178, 181, 183, 184, 188, 200, 201, 202, 207, 235, 237, 238, 239, 265-287; Suppl. Decl. of D. Palay, ¶ 13, Ex. 11 (*see* section in the operational update e-mail under the header "Valuation").)

357.    [OMITTED] **RESPONSE**: No response is necessary.

358.    Randall contends that, "[i]f [she] was financially stable, [she] probably wouldn't have signed" the 2020 redemption agreement. Randall Dep., Aug. 28, 2023, at 296:5-9. **RESPONSE**: Undisputed.

359.    On the other hand, Randall contends she would have held onto her shares no matter what if she had known Windy Waters was considering selling Widen Enterprises. Compl. (ECF No. 1), ¶¶ 50-51, 117-18, 144, 156, 164-66, 206, 209, 213-14, 219, 229, 230-31, 234-35.

**RESPONSE**: **Disputed.** Stacy contends that she would not have signed the May 2020 stock redemption agreement had she known Defendants were considering selling Widen Enterprises. (Suppl. Decl. of Stacy Randall ¶ 42.) The cited evidence does not support Defendants' Proposed Finding of Fact No. 359, particularly with respect to whether Stacy would have sold any stock "no matter what."

### Reed's Lack of Involvement

360.    Between May 6, 2020, and May 13, 2020, Reed and Randall had no contact and did not communicate in any way. Reed Decl., Sept. 29, 2023, p.7, ¶ 64; Randall Dep., Aug. 28, 2023, at 261:12-18.

**RESPONSE**: **Undisputed** to the extent that this fact indicates that Reed and Stacy had no *direct* communications. **Disputed** that Reed did not communicate with Stacy "in any way." Reed communicated with Stacy through his agent, Kiesler. (*See* Pl.'s PFOF No. 187.)

361.    Between May 5 and May 13, 2020, Reed and Kiesler had no discussions about what information Randall did or did not have about Windy Waters, and Reed did not otherwise know what information Randall did or did not have about Windy Waters. Reed Decl., Sept. 29, 2023, p.7, ¶ 65.

**RESPONSE**: **Undisputed** that Reed and Kiesler had no discussions about what information Randall did or did not have about Windy Waters between May 5 and May 13, 2020. **Disputed** that Reed did not otherwise know what information Randall did or did not have about Windy Waters. (*See, e.g.*, Pl.'s Proposed Findings of Fact Nos. 170, 171, 178, 181, 184, 188, 200, 238, 239, 265-287; Suppl.

Decl. of D. Palay, ¶ 13, Ex. 11 (*see* section in the operational update e-mail under the header "Valuation").)

362.    Reed made no false or misleading statement of fact to Randall between May 5, 2020 and May 13, 2020. Reed Decl., Sept. 29, 2023, pp.7-8, ¶ 66.

**RESPONSE**: Undisputed.

363.    Reed never made any statements of fact to Randall with respect to any of her prior stock redemptions, either. Reed Decl., Sept. 29, 2023, p.8, ¶ 67.

**RESPONSE**: Undisputed.

364.    Reed never provided Randall with financial information in relation to any of her prior stock redemptions. Reed Decl., Sept. 29, 2023, p.8, ¶ 68.

**RESPONSE**: Undisputed.

*Transaction Documents*

365.    Pursuant to the stock redemption agreement, Randall sold all of her remaining shares in Windy Waters, consisting of 232.75 shares of Class A common stock of Windy Waters sold for $646.19 per share, and 1,952.7568 shares of Class B common stock of Windy Waters sold for $615.42 per share, for a total purchase price of $1,352,166.31. Am. Answer (ECF No. 45), ¶ 126; Randall Dep., Aug. 28, 2023, at 315:24-317:3; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

**RESPONSE**: Undisputed.

366.    A true and correct copy of the signed stock redemption agreement dated May 13, 2020, by which Randall sold all her shares in Widen Enterprises, is attached to the Complaint as Exhibit A (ECF No. 1-6) and to the first Widen Declaration (ECF No. 33) as Ex. A (ECF No. 33-1). Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

**RESPONSE**: **Disputed**. The cited evidence does not support the proposed finding of fact. The May 13, 2020 redemption agreement expressly relates to Stacy's shares of Windy Waters, not Widen Enterprises. (*See* Kieler Decl. Ex. V, ECF No. 74-8.) Further, the May 13, 2020 redemption agreement is void because Defendants fraudulently induced Stacy to sign it. (*See, e.g.,* Pl.'s Proposed Findings of Fact Nos. 164-206, 265-87.)

367.    A true and correct copy of the signed promissory note that accompanied the signed stock redemption agreement dated May 13, 2020, by which Widen Enterprises became obligated to pay Randall for her shares on the stated terms, is attached to the Complaint as Exhibit B (ECF No. 1-7) and to the first Widen Declaration (ECF No. 33) as Ex. A (ECF No. 33-1).

**RESPONSE**: **Disputed**. The cited evidence does not support the proposed finding of fact. The May 13, 2020 promissory note relates to Stacy's shares of Windy Waters, not Widen Enterprises. (*See* Kieler Decl. Ex. V, ECF No. 74-8.) Further, the May 13, 2020 promissory note is void because Defendants fraudulently induced Stacy to sign the May 13, 2020 redemption agreement. (*See, e.g.,* Pl.'s Proposed Findings of Fact Nos. 164-206, 265-87.)

368.    The release from Randall's redemption agreement was identical to the release in Price Widen's redemption agreement and was included to ensure they were treated the same. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 13:2-14:28, 40:22-41:2, 41:23-42:14; Wittenberg Decl., Sept. 29, 2023, p.2, ¶¶ 7-8, Exs. F (Ex. 14 to Seid Dep.), G (Ex. 2 to Seid Dep.).

**RESPONSE**: **Disputed.** The release in the Price Widen redemption agreement and the release in the May 13, 2020 redemption agreement are not identical. (*Compare* Kiesler Decl. Ex. M, ECF No. 75-18, *with* Kiesler Decl. Ex. V, ECF No. 74-8.)

369.    Through this transaction, Randall received over $400,000 more than her brother, Price Widen, had received when he redeemed a larger number of shares in 2015. Seid Dep. 41:14-17; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 13:2-10, 40:22-41:2, 41:14-17; Wittenberg Decl., Sept. 29, 2023, p.2, ¶¶ 7-8, Exs. F (Ex. 14 to Seid Dep.), G (Ex. 2 to Seid Dep).

**RESPONSE**: **Disputed.** Through September 2023 Stacy had received approximately $657,203.60. (*See* Widen Decl. ¶ 92.) Under Price Widen's redemption agreement, Windy Waters was obligated to pay him $902,091.50 by June 2020. (Kiesler Decl. Ex. M, ECF No. 75-18.)

370.    The price per share that Randall was paid in 2020 was the highest share price anyone had paid or received for Windy Waters stock in the history of the company. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 158.

**RESPONSE**: Undisputed.

371.    No prior approvals of the redemption were necessary. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 159, Ex. X (WINDY0033072).

**RESPONSE: Disputed**. Kiesler does not have the foundation to testify as to the legal conclusion of whether or not the Windy Waters bylaws, to which Defendants cite generally, permit the Windy Waters Treasurer to enter into contracts without the prior consent of the company. As best Plaintiff can discern, Section 5.01 provides that the "board of directors may authorize any officer . . . to execute or deliver any instrument in the corporation's name and on its behalf," meaning that Kiesler required the consent of the board of directors to execute the May 13, 2020 redemption agreement on the company's behalf. (09/29/2023 Kiesler Decl., Ex. X (WINDY0033085).)

372.    The Stock Redemption Agreement covered the entirety of the issues related to the stock transaction. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1) § 7(b); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6) § 6(b); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.) § 7(b).

**RESPONSE: Disputed** (*see* Pl.'s Proposed Findings of Fact ¶¶ 265-287), but immaterial. This case does not involve claims for breach of contract. (*See* Compl.)

*Later Discussion About Sale*

373.    The first time Reed and Gonnering had any serious communication about selling Widen Enterprises was August 25, 2020. Reed Dep., Aug. 23, 2023, at 151:15-152:12, 155:3-8; Reed Decl., Sept. 29, 2023, p.9, ¶ 82; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 56.

**RESPONSE**: **Disputed**. Gonnering and Reed had serious communications about selling Widen Enterprises at least as early as September 6, 2019, as well as in late June or early July of 2020. (Suppl. Decl. of D. Palay ¶ 13, Ex. 11; *see also* Pl.'s Proposed Findings of Fact ¶ 215; 09/29/2023 Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.9-10, Defs.' Answer to Interrogatory No. 6 (In "late June or early July" 2020, Reed "first expressed an interest to Gonnering in selling Widen Enterprises, Inc. somewhere between two and five years' time.").)

374.    From as early as they can remember and frequently through 2021, Reed, Kiesler, and Gonnering received solicitations and cold calls about the possible sale of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 120:18-22; Reed Decl., Sept. 29, 2023, p.8, ¶ 70; Kiesler Decl., Sept. 29, 2023, p.20, ¶ 160; Gonnering Decl., Sept. 29, 2023, p.6, ¶ 44.

**RESPONSE**: **Undisputed**.

375.    Reed usually deleted solicitation emails. He never talked to any of those individuals or responded to their emails. Reed Dep., Aug. 23, 2023, at 120:18-22, 122:18-125:13; Reed Decl., Sept. 29, 2023, p.8, ¶ 70.

**RESPONSE**: **Disputed** insofar as the cited testimony indicates that Reed responded to at least one such solicitation. (08/23/2023 R. Widen Dep. Tr., at 124:20-25.)

376.    One time Reed took a solicitation call because he didn't recognize the number, and Reed told the caller he was not interested in selling Widen Enterprises. Reed Decl., Sept. 29, 2023, p.8, ¶ 71.

**RESPONSE**: Undisputed.

377.    Kiesler never talked to any of the individuals who sent solicitations about Widen Enterprises or responded to their emails. He would usually either delete them or forward them to Gonnering. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 161.

**RESPONSE**: Undisputed.

378.    Gonnering, as the CEO, received many emails and calls about potential sale of Widen Enterprises, and still does. Gonnering Decl., Sept. 29, 2023, p.6, ¶ 44; Gonnering Dep., Sept. 21, 2023, at 200:1-14.

**RESPONSE**: Undisputed.

379.    Gonnering infrequently responded to the inquiries in an effort to learn more about the private equity industry and to ensure he was educated and informed for the possibility of inorganic growth (acquiring other companies) or in the event the owner of Widen Enterprises ever wanted to sell the company. Gonnering Decl., Sept. 29, 2023, p.6, ¶ 45; Gonnering Dep., Sept. 21, 2023, at 199:17-25 (partial).

**RESPONSE**: **Disputed**. Gonnering also responded to private equity solicitations for purposes of considering a minority investment in Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 67-72.)

380.    In February 2020, Tequity Advisors reached out to Gonnering about a potential opportunity to acquire another company with code name Hercules. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 16, Ex. A (WINDY0000863).

**RESPONSE**: **Undisputed**, but immaterial.

381.    Widen Enterprises considered this opportunity to purchase another entity to inorganically grow business, but ultimately did not pursue it. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 16.

**RESPONSE**: **Undisputed**, but immaterial.

382.    Tequity Advisors never approached any of the defendants about a sale of Widen Enterprises or its assets. Gonnering Decl., Sept. 29, 2023, p.3, ¶ 17; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 162; Reed Decl., Sept. 29, 2023, p.8, ¶ 72.

**RESPONSE**: **Undisputed**.

383.    Gonnering, as part of his duties as CEO, tracked headlines in the software industry so that he could be better informed about his competitors and the overall market, including news about company mergers and acquisitions, and occasionally included this information in operational updates to Reed, his supervisor. Gonnering Decl., Sept. 29, 2023, p.6, ¶ 46, Ex. D (WINDY0034382); Gonnering Dep., Sept. 21, 2023, at 157:13-158:12, 191:20-24, 198:7-11, 276:3-11; Reed Decl., Sept. 29, 2023, pp.8-9, ¶ 73, Exs. D (Ex. 9 to Reed Dep.), F (Ex. 10 to Reed Dep.).

**RESPONSE**: **Undisputed**.

384.    Reed was not interested in Windy Waters selling Widen Enterprises prior to May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:18-21, 30:20-31:5, 127:15-16, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, p.9, ¶ 74.

**RESPONSE**: **Disputed**. Gonnering and Reed had communications about selling Widen Enterprises at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.) In February 2020, Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

385.    There had been no discussion among Windy Waters or Widen Enterprises executives about selling Widen Enterprises prior to May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:18-21, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, p.9, ¶ 75; Gonnering Dep., Sept. 21, 2023, at 100:8-12, 102:19-23; Gonnering Decl., Sept. 29, 2023, p.6, ¶ 47.

**RESPONSE**: **Disputed**. There had been discussions among Windy Waters and Widen Enterprises executives about selling Widen Enterprises prior to May 13, 2020. (*See* Pl.'s Response to Defs.' PFOF No. 373.)

386.    As of May 13, 2020, neither Reed, nor Gonnering, nor Kiesler were preparing, planning, contemplating, or even ruminating over a sale of Widen Enterprises. Reed Decl., Sept. 29, 2023, p.9, ¶ 76; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 163; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 48.

**RESPONSE**: **Disputed**. Gonnering and Reed had communications about selling Widen Enterprises at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.) In February 2020, Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

387.    Because there was no interest in selling Widen Enterprises, Reed, Gonnering, and Kiesler had not had the company valued and did not know its fair market value as of May 13, 2020.

Reed Dep., Aug. 23, 2023, at 97:25-99:5, 127:15-25, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20; Reed Decl., Sept. 29, 2023, p.9, ¶ 77; Kiesler Dep., Sept. 19, 2023, at 78:7-17, 139:7-14, 149:5-12; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 164; Gonnering Dep., Sept. 21, 2023, at 100:4-12, 106:17-22, 107:22-23, 109:1-7, 110:7-8; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 49; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 6, Ex. E (Windy Waters' Objections And Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 11.

**RESPONSE**: **Disputed**. Defendants discussed Widen Enterprises' market value over many years. (*See* Pl.'s Proposed Findings of Fact ¶¶ 50—72, 74, 76-78.) Gonnering also explained to Reed and Kiesler that the "[m]arket value" of a Software as a Service company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue, enabling Reed and Kiesler to make their own approximations based on Widen Enterprises recurring revenues. (*See* Pl.'s Proposed Findings of Fact ¶¶ 64 ("3.5x"), 72 ("4x").) Reed also had the Companies valued by Bruce Hutler of Virchow Krause Valuation, LLC in July 2004. (09/29/2023 Palay Decl. Ex. 9.) **Undisputed** that Defendants did not otherwise "[have] the company valued" by any third party through May 13, 2020.


388.    Defendants did not solicit (and thus, did not possess) a market valuation of Widen Enterprises at any point in May 2020. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 165; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 50; Reed Decl., Sept. 29, 2023, p.9, ¶ 78.

**RESPONSE**: **Disputed**. It does not follow that because Defendants did not "solicit" a market valuation in May 2020 that Defendants "did not possess" a market valuation in May 2020. Defendants discussed Widen Enterprises' market value over many years. (*See* Pl.'s Proposed Findings of Fact ¶¶ 50-72, 74, 76-78.) Gonnering also explained to Reed and Kiesler that the "[m]arket value" of a Software as a Service company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue, enabling Reed and Kiesler to make their own

approximations based on Widen Enterprises recurring revenues. (*See* Pl.'s Proposed Findings of Fact ¶¶ 64 ("3.5x"), 72 ("4x").) **Undisputed** that Defendants did not "solicit" a market valuation from a third party in May 2020.

389.    Gonnering testified, "I didn't know the value of the company in May of 2020.· That wasn't something we were monitoring or looking at. We were looking at growth. And in May of 2020 in particular, which was two months after COVID, managing uncertainty." Gonnering Dep., Sept. 21, 2023, at 100:8-12.

**RESPONSE**: Undisputed.

390.    As Gonnering explained:

[I]f I put myself in May of 2020, that was a way different time. That was . . . the height of the COVID time. . . . [A]ll we were thinking about was how are we navigating this particular uncertainty, which was remote employees, which was uncertainty from what we have as the objective, which is growth, and what happens to the organization given the risk that we had at that time, which was significant based on the customer agreements that we had. So, like, I'm -- I'm trying to put myself back in May of 2020. The furthest thing from our mind was valuation, because I was worried about survival.

Gonnering Dep., Sept. 21, 2023, at 108:19-22, 109:13-23.

**RESPONSE**: **Undisputed** that the above quotation reflects portions of Gonnering's testimony in response to questions whether Gonnering had reason to believe that Widen Enterprises' fair market value changed by more than $150 million between May 2020 and September 2021 and whether Widen Enterprises had any fair market value at all in May 2020.

391.    After Reed turned 60 in June 2020, Gonnering and Reed talked about what his long-term plans were so they could begin succession planning for Widen Enterprises. Reed Decl., Sept. 29, 2023, p.9, ¶ 79; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 51.

**RESPONSE**: **Undisputed**, but immaterial.

392.     At that time, Reed did not have any succession plan in place and did not have any plan or intent for Windy Waters to sell Widen Enterprises. Reed Dep., Aug. 23, 2023, at 142:10-12, 150:13-18; Reed Decl., Sept. 29, 2023, p.9, ¶ 80.

**RESPONSE**: **Disputed**. Gonnering and Reed had communications about selling Widen Enterprises at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.) In February 2020, Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

393.     Previously, the only discussions about succession planning had been Reed's instruction that if he died in a plane crash, Gonnering should talk to Reed's wife or children about what to do. Gonnering Dep., Sept. 21, 2023, at 253:20-254:11; Gonnering Decl., Sept. 29, 2023, p.7, ¶ 52.

**RESPONSE**: **Undisputed** insofar as the proposed fact refers only to discussions between Reed and Gonnering. **Disputed** to the extent that the proposed fact purports to offer evidence as to conversations others may have had, which Gonnering lacks foundation to testify about.

394.     At this stage of the succession planning process, Reed started considering many possible forms of succession plans, including letting Gonnering run the company, creating an employee stock ownership plan, or making plans to sell, all during the timeframe of two to five years. Reed Decl., Sept. 29, 2023, p.9, ¶ 81

**RESPONSE**: **Disputed**. Gonnering and Reed had communications about selling Widen Enterprises at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.) Reed had begun considering selling the company by February 2020. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

395.     On July 21, 2020, July 24, 2020, and August 14, 2020, Gonnering and Reed had exploratory conversations about succession planning, focusing on the timeframe of two to five years down the road. Gonnering Decl., Sept. 29, 2023, p.7, ¶ 53.

**RESPONSE**: **Undisputed**, but immaterial.

396.     On August 19, 2020, Gonnering asked Reed if he could reach out to Jeff Horein, a Baker Tilly advisor, to ask his advice on the process, and Reed agreed that would be acceptable. Gonnering Decl., Sept. 29, 2023, p.7, ¶ 54.

**RESPONSE**: **Undisputed**, but immaterial.

397.     Gonnering sought this guidance because he had no experience or familiarity with succession planning and had no idea what to do. Gonnering Decl., Sept. 29, 2023, p.7, ¶ 55.

**RESPONSE**: **Undisputed**, but immaterial.

398.     On August 25, 2020, Gonnering informed Reed that a company called Brandfolder, which was in the same industry as Widen Enterprises and smaller size, had sold for $155 million. Reed Decl., Sept. 29, 2023, pp.9-10, ¶ 83; Gonnering Dep., Sept. 21, 2023, at 272:15-274:7, 278:16-279:11; Gonnering Decl., Sept. 29, 2023, pp.7, ¶ 57.

**RESPONSE**: **Undisputed**.

399.     When Gonnering saw the announcement about the Brandfolder acquisition price, he "had to read [it] a lot of times because that was a shocker" and was "unfathomable." Gonnering Dep., Sept. 21, 2023, at 272:15-273:7.

**RESPONSE**: **Disputed**. Gonnering alerted Reed to what Gonnering referred to as "[a] noteworthy transaction" and expressed no "shock[]" or surprise in that communication. (09/29/2023 Palay Decl. ¶ 5, Ex. 3, (WINDY0044983).)

400.     Brandfolder was a close competitor of Widen Enterprises. They had similar products and often were competing over the same customers and were both in the final stages of bidding processes together. Gonnering Dep., Sept. 21, 2023, at 273:1-7; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 58.

**RESPONSE**: **Undisputed**.

401.     Gonnering suspected Brandfolder had revenue smaller than or comparable to Widen Enterprises, and believed Widen Enterprises had a stronger reputation in their industry. Gonnering Dep., Sept. 21, 2023, at 278:16-280:3, 281:19-282:5; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 59.

**RESPONSE**: **Undisputed**.

402.     Reed was shocked to hear that number, and Reed told Gonnering it would be foolish not to at least consider selling Widen Enterprises if it could sell for $200 million. Reed Dep., Aug. 23, 2023, at 134:12-135:3, 151:15-153:17; Reed Decl., Sept. 29, 2023, p.10, ¶ 84, Ex. F (Ex. 17 to Reed Dep.); Gonnering Dep., Sept. 21, 2023, at 280:4-281:5, 282:21-283:7; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 60.

**RESPONSE**: **Disputed**. Reed responded to the Brandfolder news by stating "Hmmm, that makes it very interesting[.] If our number is over 200 million it's time to look at selling." (*See* 09/29/2023 Palay Decl. ¶ 5, Ex. 3, (WINDY00449833).)

403.    The news of the Brandfolder acquisition Gonnering shared in August 2020 was the first time Reed gave any serious thought to Windy Waters attempting to sell Widen Enterprises. Reed Dep., Aug. 23, 2023, at 134:12-135:3; Reed Decl., Sept. 29, 2023, p.10, ¶ 85.

**RESPONSE**: **Disputed**. Gonnering and Reed had discussed selling Widen Enterprises at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.) In February 2020, Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

404.    Gonnering reached out to network contacts over the following several weeks in an effort to gain advice about the long-term sale process. Gonnering Decl., Sept. 29, 2023, p.8, ¶ 61.

**RESPONSE**: **Undisputed**, but immaterial.

405.    Between approximately August and October 2020, Gonnering talked to Baker Tilly about "preliminary work" that would be needed related to succession planning over the next two to five years. Reed Dep., Aug. 23, 2023, at 157:2-21; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 62.

**RESPONSE**: **Undisputed**, but immaterial.

406.    At some point in the process, an advisor told Reed the company could sell for four times revenue, rather than a multiple of EBIDTA as Jeff Horein had told Reed previously, and Reed was surprised. Reed Decl., Sept. 29, 2023, p.10, ¶ 86.

**RESPONSE**: **Disputed**. Gonnering told Reed in 2014 that "SaaS companies trade at a much higher multiple of 6.5 times revenue." (09/29/2023 Palay Decl., ¶ 13, Ex. 11.) At least three other times, Gonnering estimated the market value of Widen Enterprises by explicitly using a multiple of recurring software revenues. (*See* Pl.'s Proposed Findings of Fact ¶¶ 64 ("3.5x"), 72 ("4x"); *see* Pl.'s Response to Defs.' PFOF No. 373.)

407.    The first time Kiesler was made aware of any discussion of Windy Waters selling Widen Enterprises at all was in approximately late August 2020 when he learned Reed and Gonnering were considering the possibility of selling in the next two to five years. Kiesler Dep., Sept. 19, 2023, at 261:13-19; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 166.

**RESPONSE**: **Disputed**. Gonnering reported to Reed that he and Kiesler had discussed when they would advise Reed to sell Widen Enterprises to realize maximum valuation at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.)

408.    There had been no talk of selling Widen Enterprises to Kiesler's knowledge prior to May 13, 2020. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 167.

**RESPONSE**: **Disputed**. Gonnering, Kiesler, and Reed had discussed selling Widen Enterprises at least as early as September 6, 2019. (*See* Pl.'s Response to Defs.' PFOF No. 373.)

409.    Kiesler was not aware of any of the succession planning discussions between Reed and Gonnering prior to August 2020. Kiesler Decl., Sept. 29, 2023, p.21, ¶ 168.

**RESPONSE**: **Undisputed**.

410.     Randall admitted during her deposition that she had no basis to assert that Reed was telling people that he was considering selling the company within a year of February 2020. Randall Dep. 318:18–23.

**RESPONSE**: **Disputed**. The cited testimony does not support the proposed fact.


411.     On October 5, 2020, Gonnering had an exploratory meeting with Software Equity Group Advisors, L.L.C. (SEG). Gonnering Decl., Sept. 29, 2023, p.8, ¶ 63.

**RESPONSE**: Undisputed.


412.     After that meeting, Gonnering, Kiesler, and Reed met to discuss the possibility of sale, and decided to start the long process of trying to sell the business within the next 2-5 years. Seid Dep., Aug. 17, 2023, at 55:8-25; Gonnering Decl., Sept. 29, 2023, p.8, ¶ 64; Kiesler Decl., Sept. 29, 2023, p.21, ¶ 169; Reed Decl., Sept. 29, 2023, p.10, ¶ 87.

**RESPONSE**: Undisputed.


413.     Seid first learned about Windy Waters' potential desire to sell the company in 2-5 years on October 6, 2020. Seid Dep., Aug. 17, 2023, at 53:15-55:25.

**RESPONSE**: Undisputed.


414.     Seid explained, "It completely took me by surprise that Reed was considering selling the company. . . . I just thought that Widen was such a great company and a family-owned company that, that they would just continue on doing what they were doing. Matthew had done such a great job with the company. I was just surprised." Seid Dep., Aug. 17, 2023, at 54:20-56:16.

**RESPONSE: Undisputed** that Mr. Seid testified as stated in the proposed fact.

415.    Seid was also surprised to learn the price paid for Brandfolder, calling it "crazy money," and realized this had caused Windy Waters to consider the possibility of selling in the 2-to-5-year timeframe. Seid Dep., Aug. 17, 2023, at 56:1-57:3.

**RESPONSE: Disputed.** Mr. Seid lacks foundation to testify as to Windy Waters' motivations, nor does the cited testimony purport to support that fact. **Undisputed** that Mr. Seid testified that the purchase price sounded like "crazy money" to him.

416.    In December 2020 and January 2021, discussions about potential efforts to market the company for sale became more serious and Reed and Gonnering met with multiple investment banks who were interested in providing their services as sales broker. Gonnering Decl., Sept. 29, 2023, p.8, ¶ 65.

**RESPONSE: Undisputed.**

417.    On January 19, 2021, Gonnering, Reed, and Kiesler met to discuss the final decision about whether or not to put Widen Enterprises on the market for sale. During that meeting, Reed made the decision to put Widen Enterprises on the market for sale. Gonnering Decl., Sept. 29, 2023, p.8, ¶ 66.

**RESPONSE: Undisputed.**

418.    In January 2021, Widen Enterprises entered into an M & A Advisory Services Agreement with Software Equity Group Advisors, L.L.C. (SEG), effective January 27, 2021. A true and correct copy of this agreement is attached to the Complaint as Exhibit E and to the Gonnering

Declaration as Ex. E. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 67, Ex. E; Compl. (ECF No. 45), ¶ 167, Ex. E (ECF No. 5), Am. Answer (ECF No. 45), ¶ 167.

**RESPONSE**: Undisputed.


419.    Pursuant to this SEG agreement, SEG acted as a sales broker to market Widen Enterprises and solicit possible buyers with a goal of obtaining as high a price as possible. Compl. (ECF No. 45), ¶ 167, Ex. E (ECF No. 5); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Gonnering Decl., Sept. 29, 2023, p.9, ¶ 68.

**RESPONSE**: Undisputed.


420.    Between January and May 2021, with the assistance of Gonnering, SEG gathered details about Widen Enterprises and prepared extensive marketing materials and due diligence information to share with buyers. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 69.

**RESPONSE**: Undisputed.


421.    In May and June 2021, SEG solicited numerous possible buyers who they thought could be interested in buying Widen Enterprises by reaching out with a teaser using the name "Project Wildcat" and offering to provide more detailed information if the buyer signed a non-disclosure agreement. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 70.

**RESPONSE**: Undisputed.


422.    The goal of marketing Widen Enterprises for sale was to obtain the highest possible price. Gonnering Dep., Sept. 21, 2023, at 72:6-21.

**RESPONSE**: Undisputed.

423.     To try to solicit the highest possible sale price, SEG used a bidding process, setting a deadline for first-round bids for companies to show interest, followed by a second round among the serious competitors that would drive the price up further. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 71.

**RESPONSE**: **Undisputed** that SEG used a multi-round bidding process. Otherwise, **disputed**. Gonnering lacks foundation to testify as to SEG's motivation and rationale.

424.     In June 2021, SEG received several first-round indications of interest, with some suggesting values over $100 million. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 72.

**RESPONSE**: Undisputed.

425.     The response far exceeded the expectations of Reed, Gonnering, and Kiesler. Reed Decl., Sept. 29, 2023, p.10, ¶ 88; Gonnering Decl., Sept. 29, 2023, p.9, ¶ 73; Kiesler Dep., Sept. 19, 2023, at 259:19-21; Kiesler Decl., Sept. 29, 2023, p.21. ¶ 170.

**RESPONSE**: **Disputed**. Defendants discussed Widen Enterprises' market value over many years. (*See* Pl.'s Proposed Findings of Fact ¶¶ 50—72, 74, 76-78.) Gonnering also explained to Reed and Kiesler that the "[m]arket value" of a Software as a Service company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue, enabling Reed and Kiesler to make their own approximations based on Widen Enterprises recurring revenues. (*See* Pl.'s Proposed Findings of Fact ¶¶ 64 ("3.5x"), 72 ("4x").) As of May 8, 2020, applying Gonnering's most recent "4x" multiple to Widen Enterprises' then-projected annual software revenue of $27.44 million yields

an estimated purchase price of approximately $109 million. (*See* Pl.'s Proposed Findings of Fact No. 85.)

426.    In July 2021, SEG received three second-round letters of intent. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 74.

**RESPONSE**: Undisputed.

427.    In August 2021, Windy Waters negotiated with Acquia Inc. to arrive at the terms for a sale of all of its stock in Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 75.

**RESPONSE**: Undisputed.

*Sale*

428.    Windy Waters sold Widen Enterprises to Acquia Inc. for $162 million on September 24, 2021, when the transaction closed. Gonnering Decl., Sept. 29, 2023, p.9, ¶ 76; Compl. (ECF No. 1), ¶ 149, Ex. C (ECF No. 3); Am. Answer (ECF No. 45), ¶ 148.

**RESPONSE**: Undisputed.

429.    A true and correct copy of the Equity Purchase Agreement (the "Purchase Agreement"), dated August 17, 2021, by which Acquia acquired Widen Enterprises, is attached to the Complaint as Exhibit C and to the Gonnering Declaration as Exhibit F. Compl. (ECF No. 1), ¶ 149, Ex. C (ECF No. 3); Am. Answer (ECF No. 45), ¶ 149; Gonnering Decl., Sept. 29, 2023, p.10, ¶ 77, Ex. F (Purchase Agreement).

**RESPONSE**: Undisputed.

430.    The net closing purchase price after subtracting indebtedness, transaction costs, and other expenses was $148.5 million. Compl. (ECF No. 1), ¶ 152, Ex. D (ECF No. 4); Am Answer (ECF No. 45), ¶ 152; Gonnering Decl., Sept. 29, 2023, p.10, ¶ 78.

**RESPONSE**: Undisputed.

*Randall's Reaction*

431.    In early September 2021, when Reed knew the sale of Widen Enterprises was to be closing soon, Reed decided he wanted to give each of his three living siblings a gift of $1 million each. Reed Dep., Aug. 23, 2023, at 162:11-163:24; Reed Decl., Sept. 29, 2023, p.10, ¶ 89.

**RESPONSE**: Undisputed.

432.    Reed's two living brothers happily accepted the gifts. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 4.

**RESPONSE**: **Disputed**. Mr. Widen lacks foundation to testify as to his brothers' emotional state upon receiving the transfer.

433.    When Reed called Randall and offered her the gift of $1 million, she got angry, turned it down, and then hired an attorney, eventually filing this suit. Am. Answer (ECF No. 45), ¶¶ 142-43; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 4; Reed Dep., Aug. 23, 2023, at 163:19-164:9, 176:6-9, 185:7-186:5; Reed Decl., Sept. 29, 2023, p.10, ¶ 90.

**RESPONSE**: **Disputed**. In the September 2021 call between Reed and Stacy, Reed said he was going to write Stacy a check for $1 million, to which she did not respond, then Reed said he was also going to write Price and Tyler checks for $1 million and said he was "not trying to mend any

relationships," to which Stacy responded by saying, "That's very nice of you." (Suppl. Decl. of Stacy Randall ¶ 44.)

434.    Randall also expressed to Reed that she believed she had been misled. Am. Answer (ECF No. 45), ¶¶ 154-55.

**RESPONSE**: **Disputed.** The cited evidence does not support the fact proposed.

435.    Randall then hired counsel, and her lawyers sent a preservation notice to the Defendants and alleged misconduct. Am. Answer (ECF No. 45), ¶ 170; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 5, Ex. B (ECF No. 33-2).

**RESPONSE**: **Disputed.** The cited evidence does not support the proposition that Stacy's lawyers "alleged misconduct." Stacy's lawyers stated that "[b]ased on our understanding of the facts, the circumstances of the Redemption—how it came about, how it proceeded, and the substance of the transaction--violated Ms. Randall's legal rights as a shareholder and a seller." (07/14/2023 Widen Decl., (ECF No. 33), p.2, ¶ 5, Ex. B (ECF No. 33-2).)

*Randall Accepts Payments from June 2020 to September 2023*

436.    When Randall sold her remaining shares to Windy Waters on May 13, 2020, she and Windy Waters agreed the purchase price of $1,352,166.31 would be payable in monthly payments of $16,430.09 over seven years, beginning on June 13, 2020 and ending on May 13, 2027. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Reed Decl., Sept. 29, 2023, p.8, ¶ 69; Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.); Am. Answer (ECF No. 45), ¶¶ 125-26, 138.

**RESPONSE**: **Disputed** as to what the parties "agreed." Stacy was fraudulently induced into signing the agreement. (*See, e.g.*, Pl.'s Proposed Findings of Fact Nos. 165-206, 265-287.) Undisputed that the May 13, 2020 promissory note provides for monthly payments of $16,430.09 over seven years, beginning on June 13, 2020, and ending on May 13, 2027.

437.    Since June 16, 2020, Windy Waters has caused a total of 40 monthly payments of $16,430.09, totaling $657,203.60, to be paid to Randall under the Stock Redemption Agreement and Promissory Note:

- June 16, 2020
- July 13, 2020
- August 13, 2020
- September 14, 2020
- October 13, 2020
- November 13, 2020
- December 14, 2020
- January 13, 2021
- February 16, 2021
- March 15, 2021
- April 13, 2021
- May 13, 2021
- June 14, 2021
- July 13, 2021
- August 13, 2021
- September 13, 2021

134

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.2, 4 ¶¶ 3, 11, Ex. D (ECF No. 33-4).

**RESPONSE**: Undisputed.


438.    Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.2, ¶ 3.

**RESPONSE**: **Disputed**. Stacy's counsel began settlement negotiations with Defendants' counsel on September 27, 2021, which lasted through approximately May 2022. (Pl.'s Proposed Findings of Fact Nos. 247-262.) On July 21, 2022, Stacy filed a Complaint alleging that the May 13, 2020 redemption agreement and promissory note were void. (Pl.'s Proposed Findings of Fact No. 263; Am. Compl. ECF No. 1.)


439.    On September 20, 2021 that attorney sent a letter to Windy Waters stating, in part, as follows:

> Ms. Stacy Randall has retained our firm to represent her with respect to rights and legal claims that she may have arising out of her relationship with Windy Waters, Inc. ("Windy Waters"), Widen Enterprises, Inc. ("Widen," and, collectively with Windy Waters, the "Company"), the apparent redemption of her stock in May of 2020, and rights she may have with respect to proceeds from a pending sale of Widen to a third-party buyer. While Ms. Randall hopes that her rights and claims can be addressed privately, we believe there is a substantial likelihood that Ms. Randall will need to pursue legal recourse in order to protect her rights. Accordingly, please find enclosed with this letter a Litigation Hold Notice directed to Windy Waters and Widen and their affiliates for you to circulate. Among other troubling facts, it appears that Ms. Randall, who was not represented by counsel in the transaction and was not given sufficient time to obtain independent legal advice or an independent financial analysis, was misled as to key elements of the transaction. In substance, it is particularly troubling that Ms. Randall's stock was redeemed at a price that was pennies on the dollar in comparison with the price that Acquia, Inc. ("Acquia") has offered for the business as a third-party buyer.

Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.2, ¶ 5, Ex. B (ECF No. 33-2).

**RESPONSE**: Undisputed.

440.    After making these allegations, Randall received the following additional monthly payments of $16,430.09 from Windy Waters during the period September 20, 2021 to December 10, 2021:

- October 13, 2021
- November 12, 2021

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.3-4, ¶¶ 6, 11, Ex. D (ECF No. 33-4).

**RESPONSE**: Undisputed.

441.    Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 6.

**RESPONSE**: **Disputed.** Stacy's counsel began settlement negotiations with Defendants' counsel on September 27, 2021, which lasted through approximately May 2022. (Pl.'s Proposed Findings of Fact Nos. 247-262.)

442.    On December 10, 2021, Randall's attorney sent a letter to Windy Waters' attorney stating, in part, that Windy Waters "knowingly deceived and took advantage of Ms. Randall's trust in them, redeeming her interest in the companies at a small fraction of their actual value and then turning around and reaping a windfall by selling Widen Enterprises at a fair price months later." Id. ¶ 7, Ex. C. Enclosed with the letter was a "working draft of a complaint," and the letter stated that Randall "will proceed to file the complaint" unless a settlement agreement is "signed and funds delivered to us by no later than December 31, 2021." The draft complaint alleges many facts

136

contained in the complaint filed in this case. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 7; Second Demand Letter (ECF No. 34).

**RESPONSE**: Undisputed.

443.     After making those allegations—the same allegations now being made in this lawsuit—Randall continued to accept monthly payments of $16,430.09 from Windy Waters under the Stock Redemption Agreement and Promissory Note. From December 10, 2021, to July 21, 2022, Randall received the following additional monthly payments from Windy Waters:

- December 13, 2021
- January 11, 2022
- February 10, 2022
- March 10, 2022
- April 11, 2022
- May 11, 2022
- June 9, 2022
- July 11, 2022

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.3, ¶¶ 8, 11, Ex. D (ECF No. 33).

**RESPONSE**: **Disputed.** Stacy's counsel continued ongoing settlement negotiations with Defendants' counsel in December 2021, which lasted through approximately May 2022. (Pl.'s Proposed Findings of Fact Nos. 247-262.) On March 1, 2020, Stacy and Defendants entered into a Standstill and Tolling Agreement, which provided that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any

legal or equitable actions or defenses that the Parties may have." (*See* Pl.'s Proposed Findings of Fact No. 259-260; 09/29/2023 Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement 1.)

444.    Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p. 3, ¶ 8.

**RESPONSE**: **Disputed**. Stacy's counsel began settlement negotiations with Defendants' counsel on September 27, 2021, which lasted through approximately May 2022. (Pl.'s Proposed Findings of Fact Nos. 247-262.) On March 1, 2020, Stacy and Defendants entered into a Standstill and Tolling Agreement, which provided that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any legal or equitable actions or defenses that the Parties may have." (*See* Pl.'s Proposed Findings of Fact No. 259-260; 09/29/2023 Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement 1.) On July 21, 2022, Stacy filed a Complaint alleging that the May 13, 2020 redemption agreement and promissory note were void. (Pl.'s Proposed Findings of Fact No. 263; Am. Compl. ECF No. 1.) The settlement negotiations, Standstill and Tolling Agreement, and Complaint all expressed a clear objection to the May 13, 2020 redemption agreement and promissory note.

445.    On July 21, 2022 Randall filed this lawsuit against Windy Waters, Widen Enterprises, Widen and Kiesler, seeking declaratory judgments, among other remedies, declaring the Stock Redemption Agreement and Promissory Note void due to the defendants' fraud, the agreements' unconscionable nature, duress, and as violative of Wisconsin public policy. Compl. (ECF No. 1).

138

**RESPONSE**: Undisputed.

446.    After making these allegations in this lawsuit filed on July 21, 2022, Randall continued to accept monthly payments of $16,430.09 from Windy Waters under the Stock Redemption Agreement and Promissory Note. She received the following additional monthly payments from Windy Waters from July 21, 2022 to the date of this filing:

- August 11, 2022
- September 9, 2022
- October 11, 2022
- November 9, 2022
- December 9, 2022
- January 11, 2023
- February 9, 2023
- March 9, 2023
- April 11, 2023
- May 11, 2023
- June 9, 2023
- July 11, 2023
- August 10, 2023
- September 11, 2023

Reed C. Widen Decl., July 14, 2023, (ECF No. 33), pp.3-4 ¶¶ 9, 11, Ex. D (ECF No. 33); Reed Decl., Sept. 29, 2023, pp.10-11, ¶¶ 91-93, Ex. G.

**RESPONSE**: **Disputed.** The Complaint expresses a clear objection to the May 13, 2020 redemption agreement and promissory note.

447.    Randall accepted each of the payments listed in the previous paragraph without objection. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 9; Reed Decl., Sept. 29, 2023, pp.10-11, ¶ 91.

**RESPONSE**: **Disputed.** Stacy's counsel began settlement negotiations with Defendants' counsel on September 27, 2021, which lasted through approximately May 2022. (Pl.'s Proposed Findings of Fact Nos. 247-262.) On March 1, 2020, Stacy and Defendants entered into a Standstill and Tolling Agreement, which provided that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any legal or equitable actions or defenses that the Parties may have." (*See* Pl.'s Proposed Findings of Fact No. 259-260; 09/29/2023 Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement 1.) On July 21, 2022, Stacy filed a Complaint alleging that the May 13, 2020 redemption agreement and promissory note were void. (Pl.'s Proposed Findings of Fact No. 263; Am. Compl. ECF No. 1.) The settlement negotiations, Standstill and Tolling Agreement, and Complaint all expressed a clear objection to the May 13, 2020 redemption agreement and promissory note.

448.    Randall has never told Windy Waters or anyone else to stop paying her under the Stock Redemption Agreement or Promissory Note, nor has she returned any of the payments she received thereunder to Windy Waters or offered to unconditionally return to Windy Waters any of

the 40 monthly payments she received. Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.3, ¶ 9;
Reed Decl., Sept. 29, 2023, p.11, ¶ 92.

**RESPONSE**: **Disputed**. Stacy's counsel began settlement negotiations with Defendants' counsel on
September 27, 2021, which lasted through approximately May 2022. (Pl.'s Proposed Findings of
Fact Nos. 247-262.) On March 1, 2020, Stacy and Defendants entered into a Standstill and Tolling
Agreement, which provided that "the Parties wish to continue to investigate the Dispute and negotiate
to determine a prudent resolution of any alleged claims," and that "during the period of this
investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and
toll any applicable statutes of limitations or similar defenses and to provide for the retention of any
legal or equitable actions or defenses that the Parties may have." (*See* Pl.'s Proposed Findings of
Fact No. 259-260; 09/29/2023 Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement 1.) On
July 21, 2022, Stacy filed a Complaint alleging that the May 13, 2020 redemption agreement and
promissory note were void. (Pl.'s Proposed Findings of Fact No. 263; Am. Compl. ECF No. 1.) The
settlement negotiations, Standstill and Tolling Agreement, and Complaint all expressed a clear
objection to the May 13, 2020 redemption agreement and promissory note.

*Miscellaneous*

449.    Randall did not own any shares of Widen Enterprises in May 2020. Gonnering
Decl., Sept. 29, 2023, p.10, ¶ 79.

**RESPONSE**: **Undisputed**.

450.    Widen Enterprises did not purchase any shares from Randall in May 2020 or ever.
Gonnering Decl., Sept. 29, 2023, p.10, ¶ 80.

**RESPONSE**: Undisputed.

451. Widen Enterprises was not a party to the stock redemption agreement and did not buy any of Randall's shares in Windy Waters. Widen Enterprises has no role in deciding whether or not its parent company, Windy Waters, buys stocks back from its shareholders. Gonnering Decl., Sept. 29, 2023, p.10, ¶¶ 81-82; Reed C. Widen Decl., July 14, 2023, (ECF No. 33), p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

**RESPONSE**: **Disputed.** Widen Enterprises, through its agents Reed, Kiesler, and Gonnering, directed Windy Waters' actions with respect to the May 2020 redemption. (Answer ¶ 30; 08/23/2023 R. Widen Dep. Tr. 46:8-22; 09/21/2023 M. Gonnering Dep. Tr. 118:3-9; 09/19/2023 M. Kiesler Dep. Tr. 55:10-23, 214:17-19, 247:4-7; 09/29/2023 Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

452. Gonnering was Kiesler's direct supervisor for Kiesler's activities on behalf of Widen Enterprises. Gonnering Decl., Sept. 29, 2023, p.10, ¶ 83.

**RESPONSE**: Undisputed.

453. Kiesler was not acting on behalf of Widen Enterprises when talking with Randall about stock redemption in May 2020. Kiesler Decl., Sept. 29, 2023, p.15, ¶ 11; Gonnering Decl., Sept. 29, 2023, p.10, ¶ 84.

**RESPONSE**: **Disputed.** Widen Enterprises, through its agents Reed, Kiesler, and Gonnering, directed Windy Waters' actions with respect to the May 2020 redemption. (Answer ¶ 30; 08/23/2023

R. Widen Dep. Tr. 46:8-22; 09/21/2023 M. Gonnering Dep. Tr. 118:3-9; 09/19/2023 M. Kiesler

Dep. Tr. 55:10-23, 214:17-19, 247:4-7; 09/29/2023 Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)


454.    Randall received tax forms each year she was a shareholder to help her file her taxes

that provided information about Windy Waters' financials. Kiesler Decl., Sept. 29, 2023, p.21,

¶ 171; Randall Dep., Aug. 28, 2023, at 149:12-17, 150:17-151:4.

**RESPONSE**: **Disputed.** In responses to whether "other than the – if there are annual meeting

minutes that she signed, other than those documents, did you ever provide Stacy with any

information pertaining to the operations, performance, and financial health of the companies?"

Kiesler testified "She never asked for any, no." (09/19/2023 M. Kiesler Dep. Tr. 280:9-15; *see also*

*id.* 64:2-19, 284:24-285:13.)


455.    Randall's accountant explained her taxes to her every year. Randall Dep., Aug. 28,

2023, at 298:25-299:13.

**RESPONSE**: **Undisputed.**

Dated this 10th day of November, 2023.

s/ *David Palay*

Mark A. Cameli
WI State Bar ID No. 1012040
mcameli@reinhartlaw.com
David Palay
WI State Bar ID No. 1115862
dpalay@reinhartlaw.com
Elizabeth Elving
WI State Bar ID No. 1115903
eelving@reinhartlaw.com
Monica A. Mark
WI State Bar ID No. 1082428
mmark@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965

Attorneys for Plaintiff