IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

        Plaintiff,

   v.

                                    Civil Action No. 22-cv-400

REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

        Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

SUMMARY OF FACTS ....................................................................................................... 1

    Historical Application of the Stock Price Formula ...................................................... 2

    Stark Differences Between Expert Valuations and Widen Enterprises CEO's Guesses ........... 4

    Status of Windy Waters in Spring 2020 ...................................................................... 6

    Discussions with Randall Regarding Her Final Stock Redemption ............................ 7

    Availability of Financial Information ......................................................................... 12

    Dividends and Reed's Compensation ........................................................................ 13

LEGAL STANDARD ......................................................................................................... 14

ARGUMENT ..................................................................................................................... 15

    I.   Randall Released All of Her Claims, Including the Claims on Which She Seeks Summary Judgment. ....................................................................................................... 15

    II.  Randall's Fiduciary Duty Claim Fails As a Matter of Law and Involves Disputed Facts. ................................................................................................................ 16

        A.   Reed and Kiesler did not have fiduciary duties to advise Randall on the transaction. ........................................................................................................... 16

            1.   Context is key for determining the specific duties owed. ................................... 17

            2.   Reed was not an officer of Windy Waters. ......................................................... 18

            3.   Kiesler had fiduciary duties to Windy Waters to put the company first, above the interests of individual shareholders. .............................................................. 19

            4.   The only duty Kiesler owed to Randall with respect to the stock transaction was to deal fairly and in good faith, not to proactively disclose information. .................... 22

        B.   Even if there were any duty to disclose any information, Kiesler disclosed all material information. ......................................................................................... 26

        C.   Kiesler acted fairly and in good faith. ........................................................ 29

        D.   Randall cannot prove reliance on any representation in Kiesler's explanation of the Stock Price Formula. ................................................................................ 33

        E.   Randall's additional fiduciary duty claim based on compensation to Reed is a derivative claim Randall cannot pursue in this direct action. ........................... 34

        F.   Any claims Randall brings related to constructive dividends are time-barred. ...... 38

        G.   Randall's claims related to Reed's compensation are also without merit and involve disputed facts. ................................................................................................. 39

        H.   Randall has not proven entitlement to any remedy. ................................... 42

    III.  Randall is not entitled to judgment in her favor on her securities fraud claim either. ... 43

        A.   Defendants acted in good faith and without the requisite scienter. ...................... 44

B.    Randall misinterprets the special facts doctrine......................................................... 46

C.    The alleged omissions do not support Randall's securities fraud claim................. 51

  1.    Randall misinterprets materiality. ......................................................................... 51

  2.    Randall cannot prove or cannot meet the materiality standard for the nine omissions she identifies. ............................................................................................. 52

D.    The four alleged misstatements during Kiesler's conversation with Randall are disputed and were not false, and all are non-actionable opinions..................................... 56

E.    Randall cannot show reliance causing damages. ..................................................... 58

F.    This claim cannot be maintained against Widen Enterprises. ............................... 59

IV. Randall is not entitled to judgment in her favor on the issue of ratification. ................. 59

CONCLUSION............................................................................................................................ 60

Plaintiff Stacy Randall's woe-is-me tale casts blame on Defendants Reed Widen and Michael Kiesler for failing to hold her hand and act as her guardian when she came to Reed and Kiesler asking to sell shares just as she had five times before. Even though Kiesler, Defendant Windy Waters, Inc.'s lawyer, and her own son each told Randall she should consult a lawyer and financial advisors, she did not. She claims she was duped because she trusted Kiesler and Reed— but her text messages in real time make very clear she did *not* trust them.

Randall's claims fail as a matter of law on the many grounds raised in Defendants' own motion for summary judgment (ECF No. 62 and supporting materials). But even if this Court does not agree that the fiduciary duty and securities fraud claims should be dismissed as a matter of law, partial summary judgment in Randall's favor is not warranted. Randall's motion is based on an overstatement of the duties imposed by law. Beyond that, many of the facts essential to Randall's claims are disputed, including the content of the very conversation on which Randall relies. Reed and Kiesler met or exceeded their duties to act in good faith and honestly. Kiesler provided all information relevant to the transaction when he walked her through the same calculation she had used six times before (five times to sell stock and once to buy) and the same calculation the company used for every stock redemption since 2004. In the procedural posture of Randall's motion, Defendants must be given all inferences in their favor. Thus, Plaintiff's Motion for Summary Judgment (ECF No. 59) should be denied.

## SUMMARY OF FACTS

Defendants' summary of the undisputed facts that form the backdrop to Randall's stock redemption on May 13, 2020, is described in their brief in support of motion for summary judgment and not repeated in full here. Defs.' Brf. at 2-20 (ECF No. 71 at 13-31). In short, between 2005 and 2019, Randall sold over 3,000 of her shares (more than half of her stock) back to Windy Waters

over the course of five transactions, in which she was paid $848,000 in total. Defs.' Statement of Additional Proposed Findings of Fact ("SOAF") ¶ 66. Each time, Randall came asking for cash in the form of a sale of her Windy Waters stock. SOAF ¶¶ 197–234. And each time, Windy Waters applied the same formula (the "Stock Price Formula") to calculate the price per share. SOAF ¶¶ 55, 67. Randall has not complained about any of these prior transactions, then or now, but initiated this lawsuit complaining about the sixth and final redemption of her stock. The additional facts below provide more detail and support denial of Randall's motion.

### Historical Application of the Stock Price Formula

For every stock redemption and every stock subscription for Windy Waters since 2004, the Stock Price Formula was calculated, and—except on one occasion when the book value was higher than the formula showed—the Stock Price Formula price was used. SOAF ¶¶ 55–61.

The Stock Price Formula was originally created in 2004 by Baker Tilly,[1] the accounting firm used by Windy Waters. SOAF ¶ 49. Baker Tilly explained the formula would be a fair way to approximate a price in the ballpark of fair market value, and would eliminate the need to obtain a formal valuation each time a stock transaction was requested. SOAF ¶ 50. The Stock Price Formula is based on a commonly used metric in accounting called EBITDA, short for earnings before interest, taxes, depreciation, and amortization. SOAF ¶ 47. The starting point for calculating the EBITDA of Windy Waters was Windy Waters' net income (which itself was a function of revenue minus expenses). SOAF ¶ 48.

After its creation, the Stock Price Formula was used for stock subscriptions for Michael Kiesler, Gary Norris, Thomas Schmidt, and Terry Vial when they acquired stock in 2004. SOAF ¶ 51. In 2005, Stacy sought $200,000 in cash and agreed to sell some of her Windy Waters shares

---

[1] In 2004, Baker Tilly was known as Virchow Krause Valuation, LLC. Baker Tilly is used throughout as shorthand but meant to refer to the accounting firm, even though it has used other names.

under the same Stock Price Formula. SOAF ¶¶ 197–203. Additional redemptions and subscriptions followed in early 2007, each employing the Stock Price Formula. SOAF ¶¶ 55–61.

In 2007, Windy Waters' counsel recommended memorializing use of the Stock Price Formula in the Second Amendment to Shareholder Agreement of Windy Waters. SOAF ¶¶ 46, 52. The lawyer drafted the agreement and asked Kiesler to circulate it for signature. SOAF ¶ 53. Randall and the other two voting shareholders at the time signed it, along with their spouses. SOAF ¶ 46, 195. Randall actually signed in two places, as President and as Shareholder. SOAF ¶ 195.

The Second Amendment revises provisions in the original shareholder agreement addressing mandatory redemptions of deceased or disabled shareholders, and the amendment speaks more broadly about its use as well:

> 2. The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions.
>
> 2.[sic] The Shareholders desire to amend the Shareholder Agreement to adopt such formula as the basis for determining the fair market value of the Stock.

SOAF ¶ 46. Through definitions, the Second Amendment further makes clear that the fair market value of stock meant, for purposes of the Shareholder Agreement among the voting shareholders, the price reached using the Stock Price Formula. SOAF ¶ 46. Three months after the effective date of the Second Amendment, in August 2007, Randall sold Windy Waters shares a second time under the Stock Price Formula, on this occasion because she needed $250,000 more in cash, and signed a redemption agreement. SOAF ¶¶ 204–210.

Regardless of whether the formula's application was mandatory or not under the Second Amendment, by custom, practice, and understanding among the shareholders, the Stock Price Formula was calculated for all stock transactions, even in voluntary transactions, since it was established in 2004. SOAF ¶¶ 55–61. The formula was consistently used for valuing shares for

redemptions or subscriptions before and after the Second Amendment was signed by Randall in 2007 on dozens of occasions. SOAF ¶¶ 55–61. Prior to Randall's final redemption in May 2020, Windy Waters' lawyer stated in an email that he was "thinking" that the price was negotiated, but he later confirmed it was a misunderstanding because Price Widen's buyout was based on the same formula. Resp. to Pl.'s Statement of Undisputed Facts ("Resp. to PSUF") ¶ 150. Kiesler did not know the Stock Price Formula was not required under the Second Amendment and had always been told to be consistent so as to treat all shareholders equally. Resp. to PSUF ¶¶ 157–58; SOAF ¶ 60.

For stock redemptions due to death and disability, the Stock Price Formula was mandated by the Second Amendment. Resp. to PSUF ¶ 141. For all other stock redemptions, the formula was mandated by Windy Waters, since the shareholders had no right to require the company to purchase the shareholders' stock and, if the company was going to do so, it required the price be calculated based on the formula. *See* SOAF ¶¶ 58–60.

### Stark Differences Between Expert Valuations and Widen Enterprises CEO's Guesses

Reed, Kiesler, and Widen Enterprises CEO Matthew Gonnering did not know the fair market value of Defendant Widen Enterprises, of Windy Waters, or of a share of stock in Windy Waters as of May 13, 2020. SOAF ¶ 26.

Prior to May 13, 2020, the three most recent valuations of Windy Waters were for the years 2017, 2018, and 2019—and these valuations showed the fair market value price per share was far below the price Randall was paid. SOAF ¶¶ 91–94. After the 2004 valuation by Bruce Hutler, described in Defendants' opening brief at pages 5 to 6, the next time any expert valuation was completed was in relation to the creation of a deferred compensation plan—the Widen Enterprises, Inc. Performance Unit Employee Compensation Plan (the "Plan")—for key executives. SOAF

¶¶ 85–92. Reed set up this Plan with the goal of motivating executives to continue growing the business. SOAF ¶ 86. The Plan allowed a committee to award performance units to the participants based on the fair market value of Class B common stock of Windy Waters. SOAF ¶ 88. By agreement, that fair market value of stock was calculated by averaging a weighted income-approach formula and a weighted market-approach formula (the "Deferred Comp Valuation Method"). SOAF ¶ 89. This methodology was recommended by Baker Tilly, the certified public accountants used by Windy Waters and Widen Enterprises. SOAF ¶ 90.

Baker Tilly provided reports estimating fair market value of the equity (i.e., stock) in Windy Waters for the years 2017 through 2020 for purposes of the Plan using the Deferred Comp Valuation Method. SOAF ¶¶ 91–93. The below chart shows the results of each valuation.

**Estimated Fair Market Value of Windy Water Shares**
**(As determined by Baker Tilly)**

| Date | All WW Shares | Each Class A Share | Each Class B Share |
|------|---------------|--------------------|--------------------|
| 10/31/17 | $ 662,258 | $55.07 | $52.45 |
| 12/31/18 | $ 319,614 | $26.59 | $25.32 |
| 12/31/19 | $ 459,718 | $38.23 | $36.41 |
| 12/31/20 | $ 443,497 | $51.68 | $49.22 |

SOAF ¶ 94.

To deflect attention from these expert calculations from Baker Tilly, Randall instead points the Court to sporadic references to competitor acquisitions in Gonnering's emails in an attempt to show Reed and Kiesler knew the value of Windy Waters was much higher than the Stock Price Formula showed. *See* Pl.'s Br. in Supp. of Summ. J. (ECF No. 60) ("Pl.'s Br.") at 7–10. Gonnering sent lengthy operational updates to Reed at least once or twice a month as a way to memorialize the big-picture issues and activities of the company. SOAF ¶ 151. Sometimes, Gonnering would include news of competitor acquisitions among the topics he addressed in the updates. SOAF ¶ 152. On a handful of occasions, he reported the high-level information he had gleaned from news

of acquisitions, made numerous assumptions about the company's revenues and transaction information, and then provided a "guess and a pretend and a what if" that Widen Enterprises could sell for a certain number under all of those assumptions. SOAF ¶ 153. He described the exercise as follows:

> Q:   Okay. You never told Reed the fair market – the market value of Widen Enterprises is around number on a given date?
>
> A:   I would tell Reed based on my estimates of other organizations who were in our market, and I would take what those organizations were doing, I would estimate their revenues, back of the napkin, and then I would apply it to ours as a guess.
>
> Q:   Okay. So you'd apply it to Widen Enterprises and give a guess of Widen Enterprises' value?
>
> MR. CHURCHILL: Objection. Mischaracterizes testimony.
>
> A:   I would take what I guessed to be what was going on with someone else in our industry and then I would apply that to Widen numbers.
>
> Q:   And the result would be a guess about Widen's value?
>
> MR. CHURCHILL: Objection. Ambiguous.
>
> A:   It would be a[n] indication that we're headed in the right direction, not the value of Widen.

SOAF ¶ 153. Gonnering made these reports to show that Widen Enterprises was in the right industry with potential for growth, and were nothing but speculative guesses of value. SOAF ¶¶ 153–55. Gonnering is not an accountant or an economist, nor has he ever valued or appraised a company. SOAF ¶ 156.

### *Status of Windy Waters in Spring 2020*

The revenue of Widen Enterprises declined sharply in the early part of 2020. Resp. to PSUF ¶ 308. Widen Enterprises showed negative net income in March and April 2020, which means Widen Enterprises means that Widen Enterprises recognized more expense than revenue in those

months. SOAF ¶ 109. In March 2020, Windy Waters' investments dropped by more than $500,000. SOAF ¶ 110.

Given the uncertainty with the COVID-19 pandemic, Windy Waters determined that it was not willing to spend $100,000 or $50,000 to give to a single shareholder who wanted money, and it had every right to take that position, as it was not obligated to buy a shareholder's shares on demand. SOAF ¶¶ 5, 6, 19, 115. Windy Waters' treasurer believed the company would put itself at risk if it paid $50,000 in May 2020. SOAF ¶ 115.

***Discussions with Randall Regarding Her Final Stock Redemption***

Randall knew her periodic requests for money were a nuisance to Reed and Kiesler: In November 2019, just 11 months after her fifth stock redemption, when she received a lump sum cash payment of $120,000 for selling 281 shares under the Stock Price Formula, Randall reached out to Kiesler to alert him she may be requesting money again in early 2020. SOAF ¶ 1. In an email with the subject line "What else $$$$," Randall stated: "I know you just love hearing from me…… Especially when I need money!!" SOAF ¶ 2. When Randall came back to Windy Waters in May 2020 to once again sell shares, by then she owned only 1,952.7568 non-voting shares and 232.75 voting shares, having sold over 3,000 shares in prior transactions. SOAF ¶¶ 3, 66. In the ten years between 2011 and May 2020, Randall had received $398,000 from stock redemptions and $371,667.34 in dividends from Windy Waters, and continued to ask Windy Waters to purchase her stock in increments—a right she did not possess. SOAF ¶¶ 66, 127.

Kiesler was not in favor of redeeming any of Randall's stock, given the uncertainty of COVID, but Reed wanted to help his sister again. SOAF ¶¶ 7, 236. So, Kiesler spoke to Randall on the morning of May 6, 2020. SOAF ¶ 7. During that call, he explained that Windy Waters was not in a position to provide her the partial redemption she seemed to need quickly, but was willing

to allow her to redeem all of her shares at the Stock Price Formula price, one last time. SOAF ¶¶ 19, 27–28.

Kiesler then walked Randall through the calculation of the Stock Price Formula using November 2019 numbers. SOAF ¶¶ 7–19. He did not read her the words listed in the first column of the chart he used to calculate that price; rather, he explained the concepts conversationally. SOAF ¶ 13. From Kiesler's best efforts to reconstruct his first phone call with Randall on May 6, 2020, he believes the following represents the contents of that conversation:

Randall – Hello

Kiesler – Hi Stacy, it's Mike.  Reed called and told me to call you about needing money.

Randall – I need it for fucking legal fees. I need $100,000.

Kiesler – Is there any other way you can get the money?

Randall – No.

Kiesler – Did Reed tell you we just received PPP money from the government?

Randall – He said something about a COVID problem and that I might have to go through Millmont.

Kiesler – Based on my conversation with Reed, we aren't willing to make $100,000 available to you. We just can't do that.

Randall – How about $50,000?

Kiesler – I still don't know if we can make that available to you. Reed did say the company would be willing to purchase all of your shares.  He said that the only way to get you money is by selling all your shares and spreading payments over time like we did with your brothers Stewart and Price.  We'd create a note and pay you over 7 years like we did with Stewart and Price, if you would like.

Randall – How much would I get for my shares?

Kiesler –I'd have to look at the formula that we base it on.  Hold on, let me bring it up on my computer. [Kiesler opens a spreadsheet and stock summary on his computer.] I only have November 2019

numbers right now, and I would have to update it with year-end numbers, but let me do some math using this. [Kiesler calculates.] Based on the calculation, it comes to $1,126,125.04 for all your shares.

Randall – That seems awfully low.  This is all I have to live on.

Kiesler – Well, let me explain to you how we went through it.  It's the same formula we've always used. We treat all shareholders the same way, to be fair to everyone, and we've used it consistently for you and everyone, including Price and Stewart.  Let me go through it with you so that you know how it works.

Randall – Okay.

Kiesler – The calculation starts with Net Income which is revenue less expenses which was a loss of $971,438. Then it adds back income tax expense and depreciation. Then it subtracts other income and adds back other expenses. It then subtracts gains from one of our investment accounts and adds losses for the other investment account. So Net Income plus and minus all those items equals earnings before income tax, depreciation and amortization.

Randall – Okay.

Kiesler – Then there is a weighted average that is used which looks at the current year and two previous years and multiplies that number by a multiple that has been used throughout time. Then cash and investment amounts are added back and Price's stock redemption note is subtracted to come up with a formula value for the whole company, which is $6,185,398. That is compared to the stockholders' equity amount from the company's financials, which is $1,326,205. We take the higher number to figure out the price per share amount, then divide by the number of shares. From these numbers, the formula value is higher, and that is $538.17 per share of voting stock and $512.54 per share for common stock. And like I said, these numbers are all November numbers and I'll have to update the calculation with December numbers and let you know.

Randall – Okay. I don't know what to do.

Kiesler – Well, you can do whatever you want, but it could be smart to sell your shares and be in control of your finances.  With COVID continuing, the amount may be lower in the future. And worse case if COVID continues to be a problem for however long or even gets worse, who knows if Widen may even be around in a few years. But it's up to you.

> Randall – It could go up, too.
>
> Kiesler – It could, that is true. We are dealing with a huge unknown here.
>
> Randall – Okay. I'm not sure I want to sell all my shares.
>
> Kiesler – The decision isn't up to me. Reed makes the decision. Reed has the ultimate decision. I have to verify to make sure with him, but this is all we are willing to offer, so you'll have to either take it or leave it. Let me know what you think before the end of the day, because if you want to do this, we have to decide whether to return the PPP money.
>
> Randall – Okay.

SOAF ¶ 19. Kiesler estimates the call lasted ten to fifteen minutes. SOAF ¶ 20.

The entire conversation between Kiesler and Randall on the morning of May 6, 2020, was in the context of explaining the Stock Price Formula Randall had used five times before when she redeemed shares and based on the history of Randall redeeming shares periodically. SOAF ¶¶ 19, 197–234. Kiesler never told Randall anything that suggested he knew the value of Windy Waters, and did not represent any dollar amount to be the estimated value or concluded value or fair value or fair market value or any other value of the company. SOAF ¶¶ 9–16. Nor could he, as he did not know Windy Waters' value or its shares' value. SOAF ¶¶ 25–26.

After this call, Randall's son, Justin Randall, told her she should get a lawyer prior to redeeming all of her stock and told her she should have an attorney look at the financials of Widen Enterprises. SOAF ¶¶ 30–31. He also suggested Randall talk to an accountant. SOAF ¶ 32.

In their second conversation on May 6, 2020, Randall told Kiesler she wanted to talk with her lawyer and financial advisor, and Kiesler told her she should do that. SOAF ¶ 34. Randall also told Kiesler that she had never thought he and Reed had an interest in Randall's well-being and made it clear that she did not trust them. SOAF ¶ 33. She confirmed as much in a text message to her financial advisor after that call:

10

> Thanks for helping me know what I should say. Mikes [sic] attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought that they have had an interest in my well being. . . . Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all. I could tell he was in disbelief and I could hear some sadness in his voice.

SOAF ¶ 35.[2] In the same text message, Randall also confirmed Kiesler made no representation about the company's value, stating, "He gave me the way they have evaluated the company shares since 1991. It has nothing to do with how good or bad the company is doing." SOAF ¶ 35.

On May 13, 2020, Kiesler called Randall to communicate the updated offer of over $1.3 million based on December 2019 numbers. SOAF ¶ 21. She accepted on the spot, during the call. SOAF ¶ 22.

Initially, Randall made it seem as though she needed the money quickly. SOAF ¶ 28. She had a divorce hearing coming up on May 18, during which her husband's request for maintenance payments would be heard. SOAF ¶ 29. Windy Waters also had timing considerations because the deadline to return the government-funded Paycheck Protection Program ("PPP") loan to Widen Enterprises under the safe harbor provisions was first May 7, 2020, and then May 14, 2020. SOAF ¶¶ 118–121. Whether or not Randall would be redeeming her shares impacted whether Widen Enterprises would return the funds because it wanted to avoid the potential negative optics from accepting government funds and, at the same time, paying a shareholder $1.3 million for her stock. SOAF ¶ 121. After Randall had already accepted the offer to redeem her shares on May 13, Kiesler learned of new guidance that reduced the risks of keeping the PPP loan, so Widen Enterprises decided to keep the funds even though it would be purchasing Randall's shares. SOAF ¶¶ 22, 122.

---

[2] Randall's current position that "she trusted that her brother and the CFO—both her fiduciaries—had her best interests at heart," Pl.'s Br. at 2, is directly contrary to her text message on May 6, 2020.

In the week between May 6 and May 13, 2020, Randall did not ask for any financial information or documents about Windy Waters or widen Enterprises. SOAF ¶¶ 23–24. Randall did not contact any attorneys following her May 6 conversation with Kiesler until May 13, the day she signed the redemption agreement. SOAF ¶ 37. On May 13, when she spoke with Windy Waters' counsel, he offered to provide her with the names of attorneys she could consult with, but she declined the offer. SOAF ¶ 38.

### *Availability of Financial Information*

Windy Waters—a family-operated, privately held holding company—provided information to shareholders on request. SOAF ¶ 100; Resp. to PSUF ¶¶ 5, 7. That has always been the company's practice. SOAF ¶ 100. Randall never asked for any information about the company directly. PFOF ¶ 66; SOAF ¶ 101. However, when other individuals have asked for financial information on Randall's behalf or when she needed to provide that information to someone else, she received it promptly. SOAF ¶ 102. One time, in June 2016, Randall's then-husband asked Kiesler on Randall's behalf for "profit and loss" for Windy Waters "for 3 months (Feb, Mar, April) for the bank." SOAF ¶ 103. The same day, Kiesler sent copies of Windy Waters financial statements for January through April 2016 to both Randall and her husband. SOAF ¶ 104.

Another occasion was about two months before she redeemed her stock. In March 2020, Randall asked Reed, and then Kiesler, to work with her divorce lawyer to provide responses to discovery requests in her divorce proceedings, forwarding the discovery requests. SOAF ¶ 105. The information requested included detailed monthly statements for checking, deposit, and savings accounts in Windy Waters' name, as well as detailed monthly or quarterly statements for all investment accounts owned by Windy Waters, since January 2019. SOAF ¶ 105. To allow Randall to respond to those discovery requests, Kiesler uploaded bank statements and investment account

statements to a file link Randall's counsel provided. SOAF ¶¶ 106–08. Those records included investment account statements showing Windy Waters held over $4.5 million in three investment accounts through the statement dates in 2019, and included bank statements of Widen Enterprises, the most recent showing a balance of over $3 million as of February 20, 2020. SOAF ¶ 107. On March 26, 2020, Randall's counsel confirmed she had received the records. SOAF ¶ 108. While it is currently unknown whether Randall's attorney gave all of this information to Randall, she, as Randall's agent, had this information. SOAF ¶ 108.

### *Dividends and Reed's Compensation*

All dividends that were paid by Windy Waters were paid pro rata to all shareholders. SOAF ¶ 123. Randall was treated like every other Windy Waters shareholder with respect to dividends and was paid her pro rata share each time dividends were paid, whether for tax payments or otherwise. SOAF ¶¶ 124–25. Between 2011 and 2020, Randall received $371,667.34 in dividends from Windy Waters, which included one non-tax-related dividend of $126,018. SOAF ¶ 127. Separately, Windy Waters also paid directors' fees, which Randall received every year she was a director of Windy Waters. SOAF ¶ 129. Other than directors' fees and pro rata distributions to owners, Windy Waters never paid any compensation to anyone, including Reed. SOAF ¶ 130. Tax distributions were made quarterly based on calculations from Baker Tilly. SOAF ¶ 124.

Widen Enterprises paid bi-weekly compensation to Reed because of his work. SOAF ¶¶ 136–48; Resp. to PSUF ¶ 116. He made a market wage for the president and chairman of a software company. SOAF ¶ 146. Widen Enterprises had a history of paying its executives well: As just one example, in 1991, Mark Widen, as the president of Widen Enterprises, was paid a bonus of $566,348.03, which was in addition to his wages. SOAF ¶ 147. Reed had critical job duties at Widen Enterprises and had been employed there since the 1970s. SOAF ¶¶ 132–41. As

president and chairman, Reed was actively involved in overseeing the company with a focus on strategy and big-picture issues, while Gonnering, the CEO, oversaw the day-to-day activities. SOAF ¶¶ 137–38. In 2019 and 2020, specifically, Reed was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. SOAF ¶ 137. He worked around the clock in the best interests of the company and was irreplaceable. SOAF ¶¶ 140–41.

Paying employees who were also shareholders compensation through dividends rather than wages was a theory Gonnering learned about in business school. SOAF ¶ 75. After Stacy sold her shares, the four remaining shareholders were all Widen Enterprises employees, meaning all shareholders were also employees for the first time since Gonnering became the CEO. SOAF ¶ 77. Kiesler explored payment through dividends rather than wages with employment tax at Gonnering's request, but the companies' accounting firm, Baker Tilly, did not recommend it. SOAF ¶¶ 76–79.

## LEGAL STANDARD

When a party moving for summary judgment has the burden of proof, the "burden on summary judgment is aligned with [that party's] trial burden" and the plaintiff must prove there is no genuine dispute as to each element of her claims. *Prop. Owners Ins. Co. v. Cope*, 772 F. Supp. 1096, 1098 (N.D. Ind. 1991). "Because of the difficulty of proving a subjective state of mind, cases involving motivation and intent are often inappropriate for summary judgment." *Sallie v. Thiel*, 23 F. App'x 586, 589 (7th Cir. 2001); *see Turner v. Rataczak*, 28 F. Supp. 3d 818, 822 (W.D. Wis. 2014). Courts find that "resolution by summary judgment of the issues raised by an allegation of

14

fraud is often difficult or impossible." *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th

Cir. 1986). Accordingly, it is advised that in most cases "scienter should not be resolved by

summary judgment." *Provenz v. Miller*, 102 F.3d 1478, 1479 (9th Cir. 1996).

## ARGUMENT

The Court should deny Randall's motion for partial summary judgment on her claims of

breach of fiduciary duty (Claim for Relief Six) and federal securities fraud under the Securities

and Exchange Act and SEC Rule 10b-5(b) (Claim for Relief Two). First and simplest, Randall has

released all of her claims, including these two. Turning to the fiduciary duty claim, Randall is

incorrect on the law and ignores the disputed facts that preclude summary judgment. Similarly,

her securities fraud claim is based on a misunderstanding of the law and involves disputed facts

on the elements she must prove to prevail. Last, Randall is not entitled to judgment on her request

for rescission.

### I.    *Randall Released All of Her Claims, Including the Claims on Which She Seeks Summary Judgment.*

The simplest reason Randall's motion should be denied is that she released all of her claims.

The redemption agreement Randall signed on May 13, 2020, contains a broad mutual release.

SOAF ¶ 69. The release states:

> For and in consideration of the payments and agreements herein,
> Seller, for herself, her heirs and assigns, hereby releases [Windy
> Waters] and its subsidiary, Widen Enterprises, Inc., and all their
> employees and directors, from any and all claims of any kind or
> nature, known or unknown, she may have against them, including
> but not limited to any claim arising from the sale and purchase of
> the Shares, excluding the obligations in the Company's Promissory
> Note.

ECF No. 1-7 and ECF No. 33-1 at ¶ 5; *see also* SOAF ¶ 69. As Defendants argued in support of

their own motion for summary judgment, ECF No. 71 at 21–22, this release should be enforced

and Randall's claims should be dismissed.

## II.    *Randall's Fiduciary Duty Claim Fails As a Matter of Law and Involves Disputed Facts.*

For at least eight different reasons, Randall is not entitled to judgment as a matter of law on her breach of fiduciary duty claim (Claim for Relief Six of her complaint, against Reed and Kiesler only). First, Reed and Kiesler had no duty of disclosure in the transaction. Second, even if there were some duty of disclosure, Kiesler provided Randall with the information relevant to the stock redemption. Third, Kiesler (and Reed, to the extent he had any duty) complied with his duty to act in good faith and dealt honestly with Randall. Fourth, Randall cannot prove reliance on the alleged misstatements or omissions. Fifth, Randall's claims that Reed was paid excessive compensation are not only derivative claims she cannot pursue in this individual action, but also require expert testimony, and she has none. Sixth, any claims of constructive dividends are time-barred. Seventh, the facts show Reed earned his compensation for the work he performed. Eighth, Randall has not proven entitlement to any remedy.

### A.    *Reed and Kiesler did not have fiduciary duties to advise Randall on the transaction.*

Randall's motion is premised on a duty of loyalty and disclosure that is not the standard in the setting of a stock redemption by an individual shareholder. In the two-sided transaction, with Randall selling and Windy Waters buying stock, Randall was adverse to Windy Waters. In that situation, Kiesler and Reed owed higher duties to the corporation that were in conflict with Randall's interests. For this reason, consistent with Delaware law (which Wisconsin courts find persuasive for business law issues), this Court should conclude that the only fiduciary duties Kiesler or Reed owed to Randall with respect to the stock transaction were to act in good faith and deal fairly, which they did, and that Kiesler and Reed owed no fiduciary duty to disclose any information to Randall beyond what was disclosed.

16

### 1. *Context is key for determining the specific duties owed.*

To analyze a breach of fiduciary duty claim, the nature and scope of the duty at issue is the critical starting point. The nature of the duty depends on the relationship and the circumstances, and "clearly defining the duties of a fiduciary in a particular situation is difficult." *Zastrow v. J. Commc'ns, Inc.*, 2006 WI 72, ¶ 26, 291 Wis. 2d 426, 443, 718 N.W.2d 51, 59. Though Randall briefly mentions a contention that Kiesler and Reed had fiduciary duties implied in law, she only argues that the duties arising from Kiesler's and Reed's formal roles support her summary judgment motion. Pl.'s Br. at 23. Defendants will follow Randall's lead and present argument only with respect to the duties by formal legal relationship.

As a starting point, Kiesler and Reed (and the corporation) had no duty to buy back Randall's shares, at any price. Close corporations in Wisconsin have no duty to "maintain a market or to purchase a [shareholder's] stock at a price acceptable to him." *Reget v. Paige*, 2001 WI App 73, ¶ 26, 242 Wis. 2d 278, 300, 626 N.W.2d 302, 313. That is, Windy Waters had zero obligation to give Randall any cash or buy her shares at any price. When Randall came to Reed asking to redeem shares and begging for money, Reed had no duty to say yes. Even after Reed agreed to approve the purchase of shares, Windy Waters was under no obligation to pay any particular price for those shares. As Randall herself argues, there was no provision in the Windy Waters shareholder agreement that made repurchase of shares at a shareholder's request mandatory. Pl.'s Br. at 30-33. However, by custom, and as memorialized in the Second Amendment to the shareholder agreement that Randall herself signed, when Windy Waters chose to redeem stock in a non-mandatory setting, it always used the same Stock Price Formula that it was obligated to use for involuntary transactions. SOAF ¶¶ 55–61.

17

### 2. *Reed was not an officer of Windy Waters.*

Randall makes the unsubstantiated leap from the fact that Kiesler followed Reed's direction with respect to certain transactions to a conclusion that Reed was therefore "an officer" of Windy Waters. Pl.'s Br. at 24-25. A corporation has the officers described in its bylaws or appointed by the board of directors. Wis. Stat. § 180.0840. Windy Waters' bylaws provided for only the standard officer roles of president, one or more vice-presidents, secretary, and a treasurer. SOAF ¶ 43. Prior to Randall's redemption on May 13, 2020, Reed did not hold any of those roles for Windy Waters and his only role with respect to Windy Waters was as the majority shareholder.[3] SOAF ¶¶ 44–45; Resp to PFOF ¶ 34. He did not appoint a board of directors for Widen Enterprises. Resp. to PSUF ¶ 38. Rather, as the chairman and president of Widen Enterprises, he assembled an advisory board for a short period of time. SOAF ¶¶ 80–84. But this board did not engage in any corporate governance or otherwise act as a true board of directors. SOAF ¶ 82.

The need for Reed's involvement in Randall's stock transaction was because Randall, as president and sole director of Windy Waters, had a conflict of interest that would have prevented her from acting on both sides of the transaction. Reed, as the majority voting shareholder, was logically the only other person who could act on behalf of Windy Waters to authorize the transaction. Reed, to help his sister, agreed to purchase her shares even though it put Widen Enterprises in a difficult position with having to determine whether or not to return its much-needed PPP funds to avoid the appearance of impropriety. This did not make him an officer.

In Wisconsin, "majority shareholders have a very limited fiduciary duty to minority shareholders. Simply stated, majority shareholders cannot use their voting power to require

---

[3] In 2013, Reed transferred all of the shares he owned individually into a revocable trust for the benefit of himself and his wife, and acted as the trustee of that trust. SOAF ¶ 171. For simplicity's sake only, for purposes of the pending motions, Defendants will ignore that distinction.

corporate action that grants majority shareholders an improper material benefit at the expense of minority shareholders." *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶ 59, 356 Wis. 2d 665, 691, 849 N.W.2d 693, 706. Treating all shareholders equally is a safe harbor from a breach of fiduciary duty claim against a majority shareholder. *See id.* ¶¶ 59–64.

It is undisputed that Reed (and Kiesler) treated Randall the same as any other shareholder with respect to this transaction, using the same Stock Price Formula that had been used for her five prior redemptions (including one as recent as 2019, about which she had not complained) and when other shareholders redeemed shares. SOAF ¶¶ 55–61. In fact, the Reed C. Widen Children's Trust of 2007, established by Reed for the benefit of his children, sold shares back to the corporation six months before Randall's final redemption, and the same Stock Price Formula was used. SOAF ¶¶ 61–63. Reed did not violate any duties as majority shareholder and his equal treatment entitles him to safe harbor protection.

However, if for any reason this Court concludes Reed owed any greater duty by virtue of any office he held, the arguments below with respect to Kiesler apply with equal force to Reed.

### 3. Kiesler had fiduciary duties to Windy Waters to put the company first, above the interests of individual shareholders.

When the various duties of an officer play out in the context of a transaction pitting an individual shareholder against the corporation, as here, the duties owed by the officer are primarily to the corporation. Officers of a corporation owe a fiduciary duty to the corporation. *Polsky v. Virnich*, 2010 WI App 20, ¶ 13 n.2, 323 Wis. 2d 811, 817, 779 N.W.2d 712, 716 ("[T]he general rule is that officers and directors of a corporation owe a fiduciary duty not only to shareholders but also to the corporation itself."). This fiduciary duty requires officers to put the corporation's interests ahead of their own. *McGivern v. AMASA Lumber Co.*, 77 Wis. 2d 241, 252, 252 N.W.2d 371, 376 (1977) ("This court has often recognized that directors and officers of corporations

19

occupy fiduciary positions and are held to strict rules of honesty and fair dealing between themselves and their corporations. If they violate their fiduciary duty they are liable."); *Racine v. Weisflog*, 165 Wis. 2d 184, 190, 477 N.W.2d 326, 329 (Ct. App. 1991). "[A]s a fiduciary in this sense, a director's or officer's first duty is to act in all things of trust wholly for the benefit of the corporation." 3 William Meade Fletcher, Cyclopedia of the Law of Corporations § 837.50 (West 2023). That is, the corporation must come first. The consequence for failing to put the corporation first is that the officer faces the corporation's right to recover for a breach of fiduciary duty.

Consistent with this basic principle, courts explain officers and directors have duties to corporations and their shareholders **in the aggregate**. *See, e.g.*, *Walworth Invs.-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, ¶ 79, 215 N.E.3d 843, 866, *reh'g denied* (Jan. 23, 2023) ("A director's fiduciary duties run to the corporation and to the body of shareholders generally, as opposed to specific shareholders. . . . 'The reference [to fiduciary duties running] to 'stockholders' means all of the corporation's stockholders as a collective. It means the stockholders as a whole.'" (citations omitted)).

To the extent there are any fiduciary duties owed to shareholders in any way other than as a collective in Wisconsin, the duties are only for a director to act in good faith and deal fairly and these duties are subordinate to the duties owed to the corporation. *See Jorgensen v. Water Works, Inc.*, 2001 WI App 135, ¶ 10, 246 Wis. 2d 614, 620, 630 N.W.2d 230, 233 (describing duties to shareholders as an obligation to "act in good faith and to deal fairly with them"); *Notz v. Everett Smith Grp., Ltd.*, 2009 WI 30, ¶ 19, 316 Wis. 2d 640, 653, 764 N.W.2d 904, 910 ("[T]hough each shareholder has an individual right to be treated fairly by the board of directors, when the injury from such actions is primarily to the corporation, there can be no direct claim by minority shareholders."). "[T]he existence of a fiduciary duty does not prevent a fiduciary from dealing in

transactions in which he or she has an interest adverse to the object of his or her fiduciary duty as long as, in the final analysis, the transaction can be said to be fair." *Jacobson v. Am. Tool Cos.*, 222 Wis. 2d 384, 397, 588 N.W.2d 67, 73 (Ct. App. 1998). Defendants could find no case in Wisconsin describing a higher duty than the duty to act in good faith and deal fairly with respect to treatment toward *individual* shareholders, and Randall cites none. This good faith obligation forbids an officer or director from self-dealing, but *not* from taking steps in the corporation's best interests.

This is consistent with common sense. If Kiesler owed duties of loyalty to individual shareholders that bowed to no other interests and rose above his duties to Windy Waters and its shareholders in the aggregate, Kiesler would have been required to give Randall the keys to the kingdom and as much money as she wished. That would make no sense. The fiduciary duties Kiesler had in this transaction were to the corporation first, and then otherwise to deal fairly with Randall. It would have been wrong for Kiesler to put Randall's interests above those of Windy Waters or the rest of the shareholders in the aggregate.

The corporation's best interests when offering to buy Randall's stock were to pay as low of a price per share as possible, to avoid tapping into its cash reserves in the height of the COVID pandemic, to part ways with passive shareholders, and to avoid the distraction to its treasurer and the CFO of its operating subsidiary when stock redemption requests arose. *See* SOAF ¶¶ 27, 111–12, 184–85, 187. Randall wanted as high a price as possible, wanted to receive a lump sum payment quickly, and wanted to only redeem some shares (which would leave a passive shareholder and require Kiesler to continue to be distracted by future transactions). Resp. to PSUF ¶¶ 169, 171, 173, 177; SOAF ¶ 28. Randall's interests were all adverse to Windy Waters' interest in the stock transaction.

21

### 4. The only duty Kiesler owed to Randall with respect to the stock transaction was to deal fairly and in good faith, not to proactively disclose information.

Randall relies on a duty to disclose that does not exist under the circumstances of an individual shareholder seeking to redeem her shares. Defendants are aware of no Wisconsin cases directly on point, but Wisconsin courts routinely look to Delaware law for "guidance on corporate law." *Notz*, 2009 WI 30, ¶ 35, 316 Wis. 2d at 664, 764 N.W.2d at 915. Courts in Delaware and elsewhere have limited the duty of disclosure to only apply to communications made in connection with a corporation's request for collective shareholder action, and not to transactions with individual shareholders. *Latesco, L.P. v. Wayport, Inc.*, No. CIV.A. 4167-VCL, 2009 WL 2246793, at *6 n.18 (Del. Ch. July 24, 2009) ("[F]or the duty of disclosure to be implicated, it is necessary as a threshold matter to conclude that the board was seeking 'shareholder action.'"); *Dohmen v. Goodman*, 234 A.3d 1161, 1171 (Del. 2020) ("We agree with the Court of Chancery's analysis in *Wayport* and its decision not to impose an affirmative fiduciary duty of disclosure for individual transactions."); *see also* 3 William Meade Fletcher, Cyclopedia of the Law of Corporations § 848 (West 2023) ("The fiduciary obligations of a corporate director to shareholders does not extend to business transactions between the corporation and individual shareholders.").

Communications requesting shareholder action that give rise to the duty of disclosure are requests for approval of mergers, proxy solicitations, tender offers, self-tender offers, and shareholder votes. *Sims v. Tezak*, 694 N.E.2d 1015, 1018–19 (Ill. App. Ct. 1998) ("[T]he Delaware cases considering the duty of disclosure all do so in the circumscribed context of shareholder votes and proxy solicitation materials.") (applying Delaware law). For example, in one of the cases cited by *Sims*, the Supreme Court of Delaware noted, "All of our previous decisions involving disclosure requirements, and subsequent shareholder ratification, involved proxy solicitations." *Stroud v. Grace*, 606 A.2d 75, 86 (Del. 1992). Multiple courts addressing this issue have agreed that an

individual shareholder's request to redeem its stock, or even a corporation's offer to repurchase an individual shareholder's stock, is not a request for stockholder action that gives rise to a duty of disclosure. *Sims*, 694 N.E.2d at 1018–19; *Wayport, Inc.* 2009 WL 2246793, at *6 n.18 ("This court agrees with the Illinois court in *Sims* that a call for an individual stockholder to sell his shares does not, without more, qualify as a call for stockholder action.").

Therefore, when dealing with one shareholder with respect to a stock redemption, the duty to disclose does not exist. *See Sims*, 694 N.E.2d at 1018–19; *Mu Sigma, Inc.*, 2022 IL 127177, ¶ 91, 215 N.E.3d at 869 ("Although Delaware law imposes upon corporate directors a fiduciary duty of disclosure to fully and fairly disclose material information within the directors' control when it seeks shareholder action, Delaware law does not impose a fiduciary duty of candor whenever a company repurchases its own shares.").

The Delaware Supreme Court recently explained why the duty of disclosure does not apply to a transaction between the corporation and an individual shareholder as follows:

> The rule requiring calls for stockholder action to be accompanied by full and fair disclosure of all material information regarding the decision presented to the stockholders is premised on the collective action problem that stockholders, in the aggregate, are faced with when asked to vote or tender their shares. In such a situation, it would be impractical, if not impossible, for each stockholder to ask and have answered by the corporation its own set of questions regarding the decision presented for consideration. In the absence of a fiduciary duty by the corporation and its directors to engage in full and fair disclosure, stockholders would thus be forced to make a decision in an information vacuum. These same factors do not, however, come into play when the corporation asks a stockholder as an individual to enter into a purchase or sale. There, the stockholder may refuse to do so until he is satisfied the corporation has given him sufficient information to evaluate the decision presented to him.

*Dohmen*, 234 A.3d at 1171 (quoting *Wayport, Inc.*, 2009 WL 2246793, at *6).

The Illinois Supreme Court recently explained similarly as follows:

> Plaintiff's interest in obtaining a higher redemption price was in opposition to the interests of Mu Sigma and its shareholders generally. That circumstance is not one that, by itself, would give rise to a fiduciary relationship.

*Mu Sigma, Inc.*, 2022 IL 127177, ¶ 83, 215 N.E.3d at 867.

The *Sims* case involves analogous facts. In *Sims*, minority shareholders of closely held Delaware corporations sued the majority shareholders, officers, and directors of the corporations for, among other things, breach of their fiduciary duties in connection with the corporations' repurchase of their shares. 694 N.E.2d at 1016–18. To settle a prior lawsuit, the corporation entered into a Stock Sale Agreement to repurchase its shares from the plaintiffs. *Id.* at 1017. Plaintiffs later discovered that the shares were worth substantially more than the corporation paid for them. *Id.* at 1017-18. Plaintiffs alleged that the defendants made misrepresentations and concealed information during the course of negotiations. *Id.* The Illinois Court of Appeals surveyed cases and concluded that the duty of disclosure only applied when officers and directors seek shareholder action, as with mergers, proxy solicitations, tender offers, self-tender offers, and shareholder votes. *Id.* at 1018–19. Accordingly, the Court "decline[d] plaintiffs' invitation to extend Delaware's director disclosure requirements to the facts of the case at hand" and held that "defendants did not owe plaintiffs a fiduciary duty of candor with respect to [the corporation]'s repurchase of plaintiffs' shares." *Id.* at 1019.

Outside of the explicit duty to disclose in the context of requests for stockholder action, which does not apply, some cases have separately found a narrower duty to provide material information that exists in certain circumstances involving a fiduciary. In each of the cases cited by Randall that found a fiduciary had a duty to provide information, either of two scenarios applied: (1) the fiduciary was one party to the transaction, not acting as an agent of the corporation to which he owed a higher fiduciary duty, or (2) the fiduciary promoted the transaction. In this way, these

cases are consistent with the cases finding a duty to disclose where a corporate action is called for by the fiduciary and are equally distinguishable.

For example, in *Schneider v. Schneider*, No. 19-CV-980-JDP, 2021 WL 1574709 (W.D. Wis. Apr. 22, 2021), the majority shareholder sought the approval of a sale of the majority of the company's assets, but did not disclose to the minority shareholder a side agreement the majority shareholder had negotiated with the purchaser. *Id.* at *8. The majority shareholder who sought approval of this decision from the minority shareholder did not dispute he had a fiduciary duty to disclose information about this side deal. *Id.* As a result, the court ordered supplemental briefing on damages. *Id.*

Each of the Wisconsin state court cases involving liability for failure to disclose information also fits the same pattern where the fiduciary promoted the transaction or was on the other side of it. In *Killeen v. Parent*, 23 Wis. 2d 244, 127 N.W.2d 38 (1964), the defendants were promoters who solicited the plaintiff's investment in an enterprise they formed. *Id.* at 250–51, 127 N.W.2d at 42. In *Groshek v. Trewin*, 2010 WI 51, 325 Wis. 2d 250, 784 N.W.2d 163, the plaintiffs' lawyer proposed buying his insolvent client's land and the "idea for the whole transaction" was the lawyer's. *Id.* ¶¶ 5, 8. Finally, in *Zastrow v. J. Commc'ns, Inc.*, 2006 WI 72, 291 Wis. 2d 426, 718 N.W.2d 51, the trustee told the beneficiaries of a plan that they had to sell their stock because their employment ended, compelling them to do so. *Id.* ¶¶ 5, 42.

In contrast with these cases, Reed and Kiesler were neither engaging in transactions on their own behalf nor promoting the transaction. Randall undisputedly came to Reed asking to sell stock. SOAF ¶ 3; Resp. to PSUF ¶¶ 164–71. Windy Waters did not request or initiate this action. SOAF ¶ 4. Randall was told very clearly that she could accept the offer and redeem her shares, or she could leave the offer on the table and keep her shares. SOAF ¶ 18. Kiesler emphasized that he

did not care whether Randall moved ahead or not, and made clear she was free to decline. SOAF ¶ 19. Even Windy Waters' lawyer told Randall she did not need to sign the documents. SOAF ¶ 39. In this context, where Kiesler and Reed did not request or require the transaction and were not parties to it, they had no obligation to disclose any information to Randall whatsoever.

The only duty Kiesler owed to Randall in the stock transaction was to treat her fairly and act in good faith. Kiesler did so by ensuring Randall was treated exactly like each other shareholder who had redeemed shares since 2004, using the same Stock Price Formula used dozens of times before, for redemptions and subscriptions, including for Randall herself and for Reed and Kiesler. SOAF ¶¶ 46–68.

### B. Even if there were any duty to disclose any information, Kiesler disclosed all material information.

Even though not required to do so, Kiesler disclosed to Randall all of the information material to the stock transaction. None of the very few Wisconsin cases addressing when a duty to disclose arises from a fiduciary relationship analyzes what it means for a fact to be material. However, in the separate context of fraud claims, when a duty to disclose is found, the fact must be "material to the transaction," specifically. *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶¶ 19–20, 283 Wis. 2d 555, 573, 699 N.W.2d 205, 213. Randall takes a different view of materiality—she argues, with no supporting case law, that a duty to disclose required Kiesler to disclose all information material to the value of her shares or, even further, the value of the company. That is not what the law requires.

Kiesler provided all information material to the transaction. He informed Randall that Windy Waters was willing to purchase all of her shares (but not any lesser amount), that the price would be calculated using the same Stock Price Formula used with each of Randall's prior stock redemptions and those of all other shareholders, and that Windy Waters always used the same

26

method for valuing shares. SOAF ¶¶ 7–20. Kiesler accurately informed Randall how the Stock Price Formula was calculated to arrive at a share price. SOAF ¶ 19. He then compared that price to the price that would be paid using net assets, or book value, of the company. SOAF ¶ 19. The data points on which the price was calculated were all clearly disclosed to Randall, and Randall was told she could accept the offer or keep her shares. SOAF ¶ 19. That represented full disclosure of the facts material to the transaction.

The "facts" Plaintiff complains Defendants did not "disclose" to her on pages 29-32 of her brief were either untrue, immaterial, or were not known to Kiesler at the time he discussed the redemption with Randall.

The company's revenue or recurring revenue standing alone was immaterial to the transaction. Randall pretends revenue is the only metric that mattered, but it is only one side of the coin. Expenses have to be balanced against revenues to understand profit. Just as revenues had increased over the years, so had expenses. SOAF ¶ 157. Someone considering buying or selling a company may consider revenue or even recurring revenue in isolation as a data point among many, but in May 2020, no sale of Widen Enterprises was contemplated. SOAF ¶¶ 165–67. The Confidential Information Memorandum sent to prospective buyers was 99 pages long and revenue is just one of numerous metrics used to promote Widen Enterprises. SOAF ¶¶ 168–69. Moreover, Windy Waters' revenue was one of the inputs to arrive at net income to calculate EBITDA and the Stock Price Formula, and the net income was disclosed to Randall by Kiesler. SOAF ¶ 19.

Similarly, Randall points to an email from February 2018 in which Gonnering reports an industry acquisition and provided a "guess and a pretend and a what if" that if some assumptions were applied to that transaction, Widen Enterprises could theoretically be worth a certain amount. Resp. to PSUF ¶¶ 60, 64. Gonnering is not an expert on company valuations. *See* SOAF ¶ 156.

27

This two-year-old guess was dramatically different from the more contemporary valuation by Windy Waters' accountants in February 2020 that valued stock prices *15 times lower* than the price per share Stacy received. SOAF ¶¶ 94–96. Information about Gonnering's hypothetical musings about market transactions were immaterial to the transaction based on the Stock Price Formula, which was the only method of valuation Windy Waters was willing to use if it voluntarily chose to purchase Randall's shares.

Kiesler did not withhold information that the Stock Price Formula did not apply to a voluntary redemption because that is untrue. That formula applied by custom and understanding among the shareholders, even in voluntary transactions, and it was the price Windy Waters was willing to pay. SOAF ¶¶ 6, 58. Windy Waters' lawyer confirmed that his initial "thinking" that the price was negotiated was a misunderstanding because Price Widen's buyout was based on the same formula. Resp. to PSUF ¶ 150. And regardless of whether application of the Stock Price Formula was mandatory or not, Kiesler did not know it was not required, Resp. to PSUF ¶¶ 157–58, so it could not have been an omission for him not to tell Randall something he didn't know. Regardless, Randall had every right to try to negotiate a different price, using a different valuation, had she wanted, but she chose not to do so.

Randall has seemingly backed down from her initial contention that Windy Waters was already planning to sell prior to May 13, 2020, as this is not among the omissions she argues support her fiduciary duty claim. Yet Randall points to a conversation (that Reed disputes)[4] between Reed and Randall's son, when she claims Reed told Randall's son that he was considering

---

[4] Reed testified that a statement like that "would have sounded like I was conceded [sic] or bragging, and I wouldn't have done that." Resp. to PSUF ¶ 78. He confirmed this in a supporting declaration. *Id.* Despite Stacy's assertions, Pl.'s Br. at 32 n.18, Reed's additional testimony does not constitute a sham affidavit. First, it is not a change in testimony at all—Reed already denied that he made the statement. Second, due to the jury's role in assessing credibility, the sham-affidavit rule should be used with "great caution" and "applies *only when a change in testimony is incredible and unexplained.*" *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) (emphasis added) (internal quotation marks omitted).

a sale of Widen Enterprises because he thought he could sell it for approximately $80 million. *See* Resp. to PSUF ¶ 78. Reed and Justin's conflicting accounts on verbal statements occurring over three years ago can only be resolved via credibility determinations by the fact finder in this case. Regardless, there is no suggestion that *Kiesler* knew of any nascent dreaming and certainly no evidence of any conversations within the company about any sale, so it was completely true when Kiesler told Randall there had been no talk of sale.

### C.  *Kiesler acted fairly and in good faith.*

Kiesler fully complied with any fiduciary duty he had to treat Randall fairly and to act in good faith. The duty of good faith involves a state of mind. *Zastrow*, 2006 WI 72, ¶¶ 30, 36, 291 Wis. 2d at 445, 718 N.W.2d at 60–62. Therefore, it is particularly difficult for a plaintiff to show on summary judgment without testing the credibility of the witnesses. *Sallie*, 23 F. App'x at 589.

Kiesler and Randall have different recollections of their key conversation on May 6, 2020. *See* Resp. to PSUF ¶¶ 171, 174–76, 178–79; SOAF ¶¶ 8–20. That alone is a basis on which to deny Randall's motion. But even focusing on the similarities in their recollections, Randall cannot show any misrepresentations or failure to act in good faith.

In asserting Kiesler made misrepresentations to her, Randall focuses on a few specific words within a ten- to fifteen-minute conversation. This improper focus on cherry-picked words rather than the whole conversation is inconsistent with the standards for analyzing a breach of fiduciary duty claim. "The equitable factors to be considered in determining a breach of fiduciary duties of loyalty, good faith and fair dealings focuses on the existing relationship between the officer and corporation, and the circumstances at the time of the seized opportunity as well as the time before and immediately after the seizure." *Racine*, 165 Wis. 2d at 195, 477 N.W.2d at 331; *see also Dohmen*, 234 A.3d at 1168 ("A director's specific disclosure obligations are defined by

the context in which the director communicates . . . ."). That is, the court must look at the communications and relationship as a whole, not just particular words.

As an initial matter, the long history between Kiesler and Randall is relevant. Randall had redeemed shares five times before using the same calculation and a similar process. SOAF ¶¶ 66–67, 197–234. Moreover, during the phone conversation in which Randall claims Kiesler made misrepresentations, it was clear from the entirety of the conversation that Kiesler was focused on explaining the application of the formula, and that he was not implying a formal valuation had been done. SOAF ¶¶ 8–20. Within that conversation, all of Kiesler's statements were accurate, reasonable, and fair. Randall attempts to isolate four words or phrases to support her claims, but none show any misstatements.

First, Randall argues Kiesler misrepresented fact to her by saying the price was a "fair" price, which Defendants dispute. *See* Resp. to PSUF ¶¶ 178, 188, 272. Without factual support, Randall argues in her brief that Kiesler said the formula was a fair measure of the value of her stock. *See* Pl.'s Br. at 35. That did not happen. Kiesler made no statement at all, on May 6 or any time leading up to the redemption, to the effect that the price had any relation at all to the fair market value of the stock she owned, because he did not know that value. SOAF ¶¶ 16, 25–26. Even to the extent the conversation could be construed to have implied the price per share was fair, that was completely accurate because it was based on the exact same price calculation used with every shareholder who bought or redeemed shares. SOAF ¶¶ 55–61. And it was nothing more than Kiesler's opinions—he thought it was fair because it was the same formula used by everyone and he had been told it would be a fair way to approximate a price in the ballpark of fair market value by Baker Tilly. SOAF ¶¶ 50, 55–61. The price was also the highest price per share anyone had received in the history of Windy Waters, and *15 times* the fair market value calculated by Baker

Tilly. SOAF ¶ 94–96, 237. In February 2020, Baker Tilly concluded the estimated fair market value of Windy Waters shares, as of 12/31/19, was $38.23 per share for Class A shares, and $36.41 per share for Class B shares, and the entirety of Windy Waters stock to be worth $459,718. SOAF ¶¶ 94–96. The process used to calculate a price for her shares was completely fair.

Second, Randall claims "the men" (presumably referring to Kiesler and Reed) "represented to Stacy that the EBITDA formula calculated the 'Estimated Value of Windy Waters' at $6,896,973." Pl.'s Br. at 35. In doing so, she makes a great unsupported leap—that when Kiesler was explaining the formula calculation to Randall, he told her the estimated or fair market value of Windy Waters or its stock was a certain amount because the spreadsheet includes those words. This too is not supported by a fact statement, and completely false. Kiesler never used the phrases "estimated value of Windy Waters" or "concluded value of Windy Waters" (or any indication of non-formula value) when talking to Randall in May 2020. SOAF ¶¶ 10, 16, 19. When Kiesler walked Randall through the calculation of the per-share price Windy Waters offered Randall for her stock, he did not read the words listed in the first column of the spreadsheet he used; rather, he explained the concepts conversationally. SOAF ¶ 13. He was simply walking her through the math of how the formula worked. SOAF ¶¶ 13, 19. Randall never saw the spreadsheet Kiesler used to calculate the Stock Price Formula, in any form, on or before May 13, 2020. SOAF ¶¶ 9, 11–12. As a result, it doesn't matter what the words on that spreadsheet said. Reed never made any representation about the value of Windy Waters either. SOAF ¶ 42.

Third, Randall points to Kiesler's statement that her selling her shares could be "smart" in light of the COVID-19 pandemic. Pl.'s Br. at 36. Taken in context, his statement was an accurate opinion. Randall asked for $100,000 initially because it would last her a year. SOAF ¶ 172. This was consistent with her pattern of coming back time after time. SOAF ¶¶ 197–234. Given this

history, Kiesler explained that Randall could be smart taking out the fluctuation in pricing from the Stock Price Formula and the uncertainty (especially in the midst of the pandemic that caused Widen Enterprises to cut expenses and threatened to impact its viability going forward), so that she could invest her funds in a way she could control. SOAF ¶ 19. Kiesler's forewarning that the stock price could go down was accurate: Had Randall come back again later, the formula price using financials through the end of 2020 would have been $227.70 for Class A shares and $216.86 for Class B shares—less than half the price she received in May 2020. *See* SOAF ¶¶ 66, 173. Without the benefit of hindsight, not knowing that future events would lead to a sale 16 months later, Kiesler's opinion that it could be smart for Randall to accept this offer if she needed money and knew she would need more was accurate.

Fourth, Randall complains that Kiesler told her Windy Waters could not "afford" to make $50,000 available to her at that time. Pl.'s Br. at 36. This is not accurate. Resp. to SOF ¶ 171. Kiesler did not use the specific word "afford," but conveyed that Windy Waters couldn't make the money available to her for a partial redemption, SOAF ¶ 19, which Randall may have interpreted to mean something similar to being unable to afford the payment. But even leaving the impression of an inability to afford payments of $50,000 or $100,000 would not have been false. To be able to afford something does not mean merely having enough cash in the bank to cover the bill. The word *afford* is synonymous with making something available: "Afford means to carry out, to give, to furnish, or to offer." *Bermudez v. Dielectrics, Inc.*, 113 N.E.3d 927, 931 (Mass. App. Ct. 2018) (internal quotation marks omitted) (citing Webster's Third New International Dictionary 36 (2002)). "Dictionaries define 'afford' as 'to make available, give forth or to provide naturally or inevitably' and as "to provide somebody with something." *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, No. CVN18C09211AMLCCLD, 2021 WL 4130631, at *14 (Del. Super.

Ct. Sept. 10, 2021) (citing dictionary definitions). Another dictionary defines afford as "to manage to bear without serious detriment." *Afford*, Marriam-Webster, https://www.merriam-webster.com/dictionary/afford (last visited Nov. 9, 2023).

Just as people make decisions about what to personally spend money on (even if the amount requested does not exceed the amount in their bank account), businesses do too. Windy Waters and Widen Enterprises needed to preserve their cash reserves as a buffer against the economic uncertainty in spring 2020 at the height of the COVID-19 pandemic. SOAF ¶¶ 111–14. Windy Waters' treasurer believed the company would put itself at risk if it paid $50,000 on an unnecessary expenditure in May 2020. SOAF ¶ 114. Indeed, in the two months preceding Randall's redemption, Widen Enterprises showed negative net income. SOAF ¶ 109.

The entire context of the conversation between Kiesler and Randall matters, and reveals a fair and truthful conversation providing facts and opinions about the transaction Randall had requested. There was no breach of any duty owed to Randall.

### D. Randall cannot prove reliance on any representation in Kiesler's explanation of the Stock Price Formula.

The core of Randall's claim is based on allegations that she relied on misrepresentations about the value of the company. This reliance is critical to her meeting the third element of a breach of fiduciary duty claim—that the breach caused the plaintiff's damages. *See Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 270, 752 N.W.2d 800, 809.

Randall cannot satisfy this element because Randall herself denies that Kiesler walked her through the formula used to value her shares or explained any financial information. *See* Resp. to PSUF ¶ 205; SOAF ¶ 17. Additionally, Randall admitted that she understood the formula used for the share value offered to Plaintiff was not based on a "market valuation" of Widen Enterprises: Late in the day on May 6, following her call with Kiesler, Randall texted her financial advisor

Mark Goff as follows: "[Kiesler] gave me the way they have evaluated the company shares since 1991. It has nothing to do with how good or bad the company is doing." SOAF ¶ 35.

Nor can Randall say she relied on her belief that Reed and Kiesler would treat her fairly. First, treating someone fairly is in the eyes of the beholder. Second, in her own words a week before the redemption, Randall admits she did not trust either of them. SOAF ¶ 35.

Randall cannot possibly prove reliance on the very statements she denies ever occurred or a sentiment of trust she denies existed. She therefore cannot prove any harm or damages were caused by any alleged breach of fiduciary duty on this basis. This further supports denial of her motion for summary judgment.

### E. Randall's additional fiduciary duty claim based on compensation to Reed is a derivative claim Randall cannot pursue in this direct action.

A claim that someone has misappropriated money from a corporation must be brought by the corporation, not an individual shareholder. The test for determining whether a claim by a shareholder against a director of a corporation is an individual claim or a derivative claim is whether the alleged injury is primarily to the individual or the corporation:

> So the question to be asked is, Whose right is sought to be enforced by the . . . cause of action? . . .
>
> That such primary and direct injury to a corporation may have a subsequent impact on the value of the stockholders' shares is clear, but that is not enough to create a right to bring a direct, rather than derivative, action. Where the injury to the corporation is the primary injury, and any injury to stockholders secondary, it is the derivative action alone that can be brought and maintained.

*Rose v. Schantz*, 56 Wis. 2d 222, 229, 201 N.W.2d 593, 597–98 (1972) (footnote omitted).

Wisconsin law is clear that "[w]hen money is being misappropriated or stolen from a corporation, the damage is to the corporation, and as a result, the appropriate action is a derivative action and not a direct action." *Krier v. Vilione*, 2009 WI 45, ¶ 31, 317 Wis. 288, 310, 766 N.W.2d

34

517, 527. The Wisconsin Court of Appeals has held that an individual receiving excessive compensation causes harm primarily to the corporation and must be brought as a derivative action. *Reget*, 2001 WI App 73, ¶ 16 & n.10, 242 Wis. 2d at 292, 626 N.W.2d at 310. The court explained as follows:

> In regard to the third allegation that "substantial compensation" is being paid to five employees of the corporation, therefore wasting corporate assets, that is usually an allegation of an injury primarily to the corporation. Generally, a claim of waste of corporate assets must be pursued in a derivative action; it cannot be brought as a direct action . . . .

> Other jurisdictions have also concluded that paying compensation in excess of what a minority shareholder believes is appropriate is a claim of injury primarily to the corporation and must be brought as a derivative action.

*Id.*

Further, the fact that Reed may have personally benefitted from the compensation does not change the analysis that these alleged omissions could have only been brought in a derivative action. Any "[a]lleged self-dealing by a corporate director does not transform an action that primarily injures the corporation into one that primarily injures a shareholder." *Link v. Link*, No. 2018AP1715, 2019 WL 5700610, at *13 (Wis. Ct. App. Nov. 5, 2019) (unpublished). In *Link*, where the injury from the self-dealing of three directors caused harm to the company and all shareholders, the claim could only be brought through a derivative claim. *Id.* at *13–14. "[W]hen the injury from such actions is primarily to the corporation, there can be no direct claim by minority shareholders." *Notz*, 2009 WI 30, ¶ 19, 316 Wis. 2d at 653, 764 N.W.2d at 910. In short, to bring a direct claim, the action must have caused the individual shareholder to be uniquely harmed in a way the rest of the shareholders did not feel—*i.e.*, they were singled out. *Jorgensen*, 2001 WI App 135, ¶ 16, 246 Wis. 2d at 624, 630 N.W.2d at 235 ("An injury due to a director's action is primarily

35

an injury to an individual shareholder if it affects a shareholder's rights in a manner distinct from the effect upon other shareholders.").

Randall's claim that Reed was overpaid is a complaint of an injury primarily to the corporation, not to Randall. Just like in *Reget* and *Krier*, Randall asserts that Reed was paid more than what she believed was appropriate. *See* Pl.'s Br. at 40 (arguing "Reed's compensation did not reflect his actual contributions"). Randall attempts to shoehorn her claim into the narrow scope of constructive dividends claims, but it does not fit.

A company has no obligation to pay dividends to its shareholders. *Welch v. St. Helens Petroleum Co.*, 78 F.2d 631, 634 (9th Cir. 1935). Yet, when Windy Waters did occasionally pay dividends, Randall was treated like every other Windy Waters shareholder and was paid her pro rata share each time, whether for tax payments or otherwise. SOAF ¶¶ 123–25. Windy Waters paid no other form of compensation, other than directors' fees to Randall. SOAF ¶¶ 129–30. Randall did not own shares in Widen Enterprises, so no dividends could be claimed as owed from that entity. Resp. to PSUF ¶ 15. Widen Enterprises also typically reinvested any funds in growth. SOAF ¶ 131.

Separately, Widen Enterprises paid Reed a market wage for his work. SOAF ¶¶ 136–48; Resp. to PSUF ¶ 116. He worked around the clock in the best interests of the company, focusing on strategic and tactical issues, managing relationships, and overseeing the CEO. SOAF ¶¶ 137–38, 140–41. The CEO said he was irreplaceable. SOAF ¶ 141. Reed did not need to be physically in the office to do that work. SOAF ¶ 139. It was sweat equity and not shareholder equity that caused Reed to receive his compensation, and his payments were not dividends but compensation for services rendered.

None of the points Randall makes in an attempt to show these payments were constructive dividends have merit. First, Randall states in a footnote that Reed's individual performance was largely tied to company performance. Plf's Br. at 39 n.19. Of course it was—he was the chairman of the company and led the organization. *See* Resp. to PSUF 111. How else would one measure the performance of the person whose job it was to ensure the company was performing as well as possible? That does not mean his compensation was a constructive dividend.

Second, Randall argues based on misconstrued facts that Reed's bonus was a payment for tax liability. Pl.'s Br. at 11, 41. As Gonnering explained during his deposition, Reed earned his bonus, and if he wanted to direct it toward taxes or for any other purpose, that was his choice. SOAF ¶ 149. Further, Reed's Windy Waters tax liability for 2018 had been paid periodically through dividends, just as the 2018 tax liability for each other Windy Waters shareholder (including Randall) was paid through dividends. SOAF ¶¶ 127–28. Reed and his wife owed only roughly $30,000 on their 2018 tax returns that were completed in April 2019. SOAF ¶ 178.

Moreover, a bonus to one shareholder is exactly the opposite of the facts in the *Jorgensen* case Randall relies upon: In *Jorgensen*, all of the shareholders except the plaintiffs (a married couple) continued receiving profit sharing payments, shutting out and singling out the plaintiffs from that money. 2001 WI App 135, ¶ 18, 246 Wis. 2d at 624–25, 630 N.W.2d at 235. The court concluded the plaintiffs had a right to be treated like all other shareholders, and because they were treated differently, they could bring their claim directly. *Id.* Here, all of the other shareholders, including Kiesler, were treated the same because they were not given a bonus to cover taxes. Reed's bonus was not a dividend, and Randall was not uniquely harmed by the bonus.

Third, Randall also points to comments between Gonnering and Kiesler about the benefits of paying through dividends or compensation to show Reed's intent for his compensation was to

pay a secret dividend. Pl.'s Br. at 10–12. This is unsupported by the facts. Paying shareholder-employees compensation through dividends rather than wages was a theory Gonnering learned and asked about. SOAF ¶ 75. But when the company explored the idea in 2020, Baker Tilly did not recommend it. SOAF ¶ 76.

For all these reasons, Randall's claim regarding Reed's compensation is a derivative claim that cannot be pursued by her directly because it alleges harm to the company and harm that did not impact her uniquely. Randall has not brought a derivative action. Randall has also never made a demand on Windy Waters to take suitable action. SOAF ¶ 150. This is a preliminary step required before any shareholder may commence a derivative proceeding. Wis. Stat. § 180.0742(1); *see also Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 785, 582 N.W.2d 98, 108 (Ct. App. 1998). In addition, she would not have standing to do so because a plaintiff bringing a derivative action must be a current shareholder. *Notz*, 2009 WI 30, ¶ 35, 316 Wis. 2d at 664, 764 N.W.2d at 915 (recognizing the "general rule that a loss of standing as a shareholder for any reason, including a merger, is fatal to a derivative claim"). Randall is not entitled to judgment in her favor on her claim for breach of fiduciary duty for Reed receiving too much compensation.

### F.   Any claims Randall brings related to constructive dividends are time-barred.

Any claim Randall asserts that Reed was paid constructive dividends in which she did not share is barred by the statute of limitations, even if the Court concludes that none of the other bases raised in this brief are sufficient to deny Randall's motion. Defendants raised this issue in their brief in support of their own motion for summary judgment, ECF No. 71 at 55–58.

Since Defendants' motion for summary judgment was filed, additional facts learned during the deposition of Randall's son, Justin Randall, further confirm that Randall has known of the facts that underlie her constructive dividends claim for at least twenty years. As Justin described it, his mother argued or talked with his father about "their treatment as shareholders of the business" and

complaining that "Reed's got a brand-new car and we're . . . not living the life . . . we're owners in this company too." SOAF ¶ 181. Justin testified this was "discussed on occasion" as far back as when Randall's then-husband worked for Widen Enterprises, around 20 years ago. SOAF ¶ 182. Justin specifically confirmed these complaints were about "not receiving dividends or distributions from the companies" and that "Reed keeps saying the company is doing really good or whatever but we're not seeing anything out of it" and even that "Reed's getting paid a bunch of money and we're not getting anything." SAOF ¶ 183.

This further confirms that Randall has known of her constructive dividend claims for 20 years, far longer than the limitations period. For this additional reason, her motion should be denied and her claims ultimately dismissed.

### G. Randall's claims related to Reed's compensation are also without merit and involve disputed facts.

Even ignoring the direct/derivative distinction and the limitations period, and assuming Randall had an ability to bring her claims that Reed was paid excessive compensation, her claims are baseless and involve many disputed facts. Randall has not and cannot prove her claim.

Randall has an exceedingly high bar to prove Reed was overpaid. In Wisconsin, it is presumed that compensation is fair for services performed. *See Reget v. Paige*, 2001 WI App 73, ¶ 18, 242 Wis. 2d at 294–95, 626 N.W.2d at 311. The Wisconsin Court of Appeals has explained:

> One who complains about the compensation paid to a director who is employed by the corporation must show something more than the compensation paid is higher than he believes is reasonable to overcome the presumption that "the laborer is worthy of his hire." In *Einhorn v. Culea*, 2000 WI 65, 235 Wis.2d 646, 612 N.W.2d 78, the supreme court recently discussed the business judgment rule. The court opined that judicial review of internal corporate business decisions is unavailable for informed good faith decisions made in the honest belief that the actions taken were in the corporation's best interests.

*Id.* (citation omitted).

As another court explained:

> The business judgment rule is designed to limit judicial involvement in business decision-making so long as a minimum level of care is exercised in arriving at the decision. The rule is based on a presumption that the director of a corporation, in making business decisions, acted in good faith and with the honest belief that his or her decision was in the best interest of the company. Where applicable, the rule protects a director from liability for honest errors of judgment if he or she acted with good faith. The rule does not, however, shield a corporate director who has acted in bad faith.

*Yates v. Holt-Smith*, 2009 WI App 79, ¶ 22, 319 Wis. 2d 756, 770–71, 768 N.W.2d 213, 219–20 (citations omitted).[5]

Randall has no evidentiary support that would allow her to meet her burden. Opinions about the reasonableness of compensation are exclusively expert opinions, not lay opinions, and Randall has not offered any expert opinion to support her claim that Reed's compensation was excessive. In one instructive case, a CPA offered testimony but was not offered as an expert, so the defendants moved to strike portions of his testimony. *In re Perry H. Koplik & Sons, Inc.*, 382 B.R. 599, 600 (Bankr. S.D.N.Y. 2008). The court, applying Fed. R. Evid. 701 and cases interpreting the rule, concluded the witness could only offer lay opinions and therefore excluded any opinions that were based on specialized knowledge rather than personal observations. *Id.* at 600–03. Among the opinions excluded was an opinion that the salary received by a defendant was excessive. *Id.* at 603, ¶¶ 58–59. Randall cannot prove excessive compensation with no expert opinion.

Randall's only evidentiary support for her allegations are based on misinformation and misunderstandings and are insufficient to support summary judgment in her favor (or to defeat

---

[5] *Yates* involved a claim brought as a direct action. It was undisputed in *Yates* that the plaintiff could bring a direct claim based on that conduct, and the defendant made no argument that the plaintiff could assert only a derivative claim. *See id.* ¶¶ 12, 14, 21. That was likely based on the fact that the payments at issue were made every year to two co-owners to distribute profits for the year, and eventually one co-owner caused the other to stop receiving those year-end payments, and there was no evidence that the payments were related to contributions to the company or as "an incentive to retain either party's services." *Id.* ¶ 17. The court found those were dividends. *See id.*

Defendants' motion). For example, one of Randall's leading arguments is that Reed was not always physically in the office. This is no evidence of anything related to work performance. Randall also points out that Reed did not know how to explain how the software worked. Pl.'s Br. at 40. But it was not his job to create the software—he left that to others so that he could use his skills in leadership and business management to run Widen Enterprises. *See* SOAF ¶¶ 137–38.

Randall also fundamentally misunderstands the adjusted EBITDA figures contained in the materials prepared by Widen Enterprises' hired experts for purposes of soliciting potential buyers. She argues Widen Enterprises' leaders and advisors must have thought Reed was not working for his compensation because the compensation was excluded from the adjusted EBITDA in information presented to potential buyers in 2021. Pl.'s Br. at 40. But the calculation of adjusted EBITDA in these reports had nothing to do with work performed. Rather, the purpose of the EBITDA adjustment to back out the compensation to Reed and another key senior employee was to allow potential buyers to have a clearer metric of profit by ignoring those expenses that would not exist following the sale. SOAF ¶ 174. In so doing, the advisor recognized that Reed's responsibilities would not be essential to the potential buyer and that it would absorb those duties within its organization or spread roles among other leaders of Widen Enterprises. Resp. to PSUF ¶ 132. Indeed, once Acquia acquired Widen Enterprises, Reed's role was replaced by the CEO of Acquia and others within that organization. SOAF ¶ 194. Gonnering confirmed Reed was actively involved in overseeing the company in 2019 and 2020, and any comment to the contrary was a mistake. Resp. to PSUF ¶ 132.

Last, Kiesler had absolutely no role in setting Reed's compensation, SOAF ¶ 145, so he could not have breached any fiduciary duties with respect to those decisions. There is no fact showing Kiesler had any authority over what Reed, his boss's boss, was paid in compensation. As

41

a result, there is no way he could have violated a fiduciary duty in this respect, and no claim against Kiesler on this basis can be maintained. This is an independent sufficient reason to dismiss this claim as to Kiesler.

### H. Randall has not proven entitlement to any remedy.

In conflicting footnotes, Randall first seemingly reserves for trial the issue of damages, but then claims she seeks a ruling that she is entitled to compensatory/restitution damage. Pl.'s Br. at 42-43 & nn.23-24. But Randall has not even properly identified what specific relief she believes she should be awarded, at times referencing the equitable relief of rescission and at others damages.

Randall has not provided any sufficient basis for this Court to find, as a matter of law, that she is entitled to any damages or relief whatsoever. The numbers Randall tosses out are unsupported, double-count any alleged harm, and are inappropriate measures of harm. Damages are intended to put a plaintiff back *only* in as good a position as (not better than) they were in prior to the harm. *See Berner Cheese*, 2008 WI 95, ¶ 57 n.14, 312 Wis. 2d at 277, 752 N.W.2d at 813 ("Double recovery for a single wrong generally is not permitted under the common law."). "The election of remedies doctrine requires a [sic] injured party to choose a remedy, where the remedies sought are inconsistent with one another." *Jarosch v. Am. Fam. Mut. Ins. Co.*, 837 F. Supp. 2d 980, 1017 (E.D. Wis. 2011). Randall apparently seeks a disgorgement of profits, a proportionate share of all constructive dividends, and the difference between what she was paid and what she would have received in a sale if she hadn't sold her shares. She cannot receive them all, as that would put her in a far better position than she would have been in absent the alleged misconduct.

The specific damage items are also unproven. Randall questioning the propriety of the amount of compensation Reed received does not allow her to claim every penny of it was a constructive dividend. Yet she seeks a proportionate share of his entire compensation for a year and 19 weeks. To prove a constructive dividend claim, Randall must prove that (1) Reed was paid

an unreasonable amount of compensation, and (2) Windy Waters would have declared a dividend if Reed was paid less. Randall cannot prove either. As to the damages for alleged fiduciary duty breaches regarding the stock transaction itself, the damages she asserts would put her in a better position than she would have been in but for the breach. Randall herself claims she was financially desperate and needed the money. The true measure of damages should be the price she would have negotiated to receive had she taken Kiesler's and her son's advice and consulted counsel—the facts to determine that amount are not in the record.

Last, Randall has not proven what would have happened had the injury not occurred. For a plaintiff to be able to receive damages, "[t]he evidence must be sufficient to enable the jury to estimate with reasonable probability what would have happened had the injury not occurred." *Schulz v. St. Mary's Hosp.*, 81 Wis. 2d 638, 657, 260 N.W.2d 783, 790 (1978). As shown by all of the facts, taken in the light most favorable to Defendants, even if Kiesler and Reed had disclosed all of the information available to Windy Waters about its value, its revenue, and the company's wish for active shareholders, the offer would have remained the same and Randall would still be (as she claims) financially desperate and would have accepted the offer.

Defendants intend to contest any damages claim at trial, including through expert opinion testimony from experts that will be disclosed by the deadline of December 1, 2023. The question of what relief, if any, to award in the event the Court grants any aspect of Plaintiff's summary judgment motion should be decided at trial.

### III.     Randall is not entitled to judgment in her favor on her securities fraud claim either.

In reliance on the same alleged conduct that fails to establish any breach of fiduciary duty, Randall asks the Court to grant her judgment on her Second Claim for Relief, alleging securities fraud for acts or omissions under the Exchange Act and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

Randall has not and cannot prove the elements for a 10b-5(b) claim. Randall's motion should be denied for six reasons. First, Randall cannot meet the high burden to prove scienter. Second, none of the Defendants had any obligation to disclose anything more than they did. Third, the alleged misrepresentations and omissions are disputed or do not meet the heightened materiality standard for securities claims, or both. Fourth, the alleged misrepresentations are non-actionable opinions. Fifth, Randall cannot prove reliance on the key alleged misrepresentation because she denies the statement was made. Last, and independently, the claim should be dismissed as to Widen Enterprises because no facts show any basis for that entity to have liability.

### A.  Defendants acted in good faith and without the requisite scienter.

Without scienter, a misrepresentation or omission of material fact is insufficient to prove securities fraud. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Scienter for securities fraud is equivalent to an "intent to deceive, manipulate, or defraud." *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). The plaintiff must prove either an intentional lie or conduct that was "willful, deliberate, or reckless disregard of the truth that is the equivalent of knowledge." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1305 (2d Cir. 1973). A plaintiff necessarily fails to prove scienter if he or she only shows that the defendant knew the allegedly undisclosed facts. *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1193 (N.D. Ill. 2000) (citing *Schlike v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)). "[I]f a trial judge found, for example, that a defendant genuinely forgot to disclose information or that it never came to his mind, etc., this prong of the Franke test would defeat a finding of recklessness . . . ." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 n.20 (7th Cir. 1977). Thus, the element of scienter ensures that securities fraud claims only succeed against malevolent actors.

Randall falls far short of this high bar. The facts show Reed and Kiesler acted in good faith at all times with no intent to defraud Randall. Randall came to Windy Waters, not the other way

around. SOAF ¶¶ 1–4. With Reed's blessing, Kiesler relied upon the advice of Windy Waters' attorneys and tax advisors to be certain to treat Randall exactly like all other shareholders and apply the same methodology for her share redemption that was used for her prior redemptions and that of former shareholders. SOAF ¶¶ 5–7, 49–61. Kiesler explained to Randall exactly how that formula worked, explained the comparison to the book value of the shares, and encouraged Randall to seek the help of a lawyer or advisor before agreeing to anything. SOAF ¶¶ 8–20, 34. Would a person seeking to defraud someone tell that person to consult with an attorney before agreeing? The suggestion of fraud on these facts is absurd.

All Randall relies upon to show scienter are some out-of-context messages and conjecture about Defendants' state of mind. Gonnering had recommended to Reed that Windy Waters would be better off with active shareholders, not passive ones, because he "want[ed] all hands on deck." SOAF ¶ 188. Randall was indisputably a passive shareholder. SOAF ¶ 189; Resp. to PSUF ¶ 302. Randall points to an email in November 2019 confirming that recommendation, Pl.'s Br. at 12, in an attempt to show a scheme. But Gonnering confirmed that it was entirely up to the shareholders as to whether they sold or not, and it was not his or the company's choice. SOAF ¶ 190. Kiesler, for himself, was not part of any discussions about buying out passive shareholders. SOAF ¶ 188.

After the fact, Kiesler reported a "mission accomplished" because he had completed another item on his to-do list and could get back to focus on his job as CFO of Widen Enterprises during the craziness of the COVID-19 pandemic. SOAF ¶ 191. Gonnering was pleased to know that Reed's request had been fulfilled. SOAF ¶ 192. In September 2021, when Randall expressed unjustified anger and jumped to an incorrect conclusion that Windy Waters had been planning to sell Widen Enterprises since before she sold her shares (a positions she now seems to retract), Reed was concerned that Randall would do something to jeopardize the pending sale. SOAF ¶ 193. His

45

requests that Kiesler not share the calculations of Randall's ownership percentage were intended to avoid stirring the pot and threatening the impending sale—not because he thought anyone did anything wrong. SOAF ¶ 193.

The only intent these facts show is an intent to be consistent with how all shareholders were treated, not to lie or withhold information. The facts show Reed and Kiesler were motivated by fairness and consistency, so no one accused them of treating a family-member shareholder more favorably than a non-family-member shareholder. Kiesler even testified that disclosing information about the value of the company "never crossed [his] mind" because Windy Waters was using the Stock Price Formula that had always been used. Resp. to PSUF ¶¶ 92, 157. It was simply a math calculation. This shows there was no fraudulent intent.

Taking all of the facts in the light most favorable to Defendants, Reed and Kiesler acted fairly and in good faith. Randall has not proven Defendants intentionally lied or were so reckless with the truth that it amounts to knowledge of falsity. Cases requiring proof of a state of mind or intent are inappropriate for summary judgment. *See Sallie*, 23 F. App'x at 589. Randall's motion should be denied on this basis alone, without the need to parse through each alleged statement and omission.

### B. Randall misinterprets the special facts doctrine.

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Courts considering securities fraud claims hold that "an insider has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation, at least where that information is readily available; the outsider has knowledge that it is available and makes no inquiry; and the information thus available is not of an unusual or extraordinary nature." *Arber v. Essex Wire Corp.*, 490 F.2d 414, 420 (6th Cir. 1974).

46

The nature and source of the Second Claim for Relief in Randall's Complaint is the key starting point to understanding the duties involved. Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of any "manipulative or deceptive device or contrivance" in "connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). The implementing regulation, Rule 10b–5, promulgated by the Securities and Exchange Commission to implement section 10(b), makes certain more specific conduct unlawful. 17 C.F.R. § 240.10b–5. In the Second Claim for Relief, Randall alleges a violation of the subsection making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact ***necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading***." 17 C.F.R. § 240.10b–5(b) (emphasis added). That is to say, the rule forming the basis of Randall's claim imposes only a duty to disclose facts that, if not disclosed, would make affirmative statements misleading.

In the unique context of a company actively negotiating a sale of assets while also selling or buying stock, courts separately developed a "special facts" doctrine. The impetus of the doctrine can be traced to *Strong v. Repide*, 213 U.S. 419 (1909). In *Strong*, the director and majority shareholder of a corporation solicited a minority shareholder to sell her stock while simultaneously negotiating the sale of the corporation's sole valuable asset. *Id.* at 421–25. Under those circumstances, and particularly because of the ongoing negotiation to sell the sole corporate asset, the Court concluded the director had a duty to disclose those sale negotiations. *Id.* at 431–33.

The Seventh Circuit, in cases applying the special facts doctrine, has not identified the source of these duties within Section 10b-5 and has not found this duty to stem from Section 10b-5(b). *See, e.g., Jordan v. Duff & Phelps, Inc.*, 815 F. 2d 429 (7th Cir. 1989); *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir. 1985). The Eleventh Circuit has addressed the issue, and confirmed that

Rule 10b-5(b), as its text states, does not impose a duty to disclose anything beyond facts that, if not disclosed, would make affirmative statements misleading. *Fried v. Stiefel Lab'ys, Inc.*, 814 F.3d 1288, 1290 (11th Cir. 2016). In other words, a plaintiff must identify a statement that was made misleading by the defendant's failure to disclose material information under the plain language of 10b-5(b) regardless of any duty to disclose. *Id.* at 1294. Other securities law provisions could impose a duty to disclose even in the absence of a statement made misleading by that failure to disclose, but Section 10b-5(b) does not. *Id.* at 1294–95. Randall does not point to any statement that was made misleading by Defendants' alleged omissions. Instead, Randall simply states that Defendants omitted all material information. This reason is sufficient to deny Randall's request for judgment on her claim under Section 10b-5(b) based on omissions of material information.

The source of the duty to disclose that Randall relies upon for her Section 10b-5(b) claim is the special facts doctrine. Even setting aside that it is not a doctrine applying Section 10b-5(b), it does not require the disclosure of every piece of information that impacts the value of stock. Randall relies heavily on *Jordan* and *Michaels*. In *Michaels*, a minority shareholder sued the other two shareholders (his uncles) after they concealed information about discussions with an investment broker related to a sale of the company from him when he sold his shares. 767 F.2d at 1191–92. The court concluded that a preliminary meeting with an investment broker was not a material fact that was required to be disclosed, but later conversations with a different broker that successfully reactivated interest in a sale of the company was material because one shareholder had told the minority shareholder plaintiff he would report any news from that meeting. *Id.* at 1194–98. In *Jordan*, a former minority shareholder sued the corporation and two officers after he sold his shares and was not informed of ongoing merger negotiations. 815 F.2d at 431–33. Prior to the plaintiff's sale of stock, the corporation was negotiating a sale of the firm and had even

reached agreement on the price of a tentative merger, but the corporation did not disclose that information to the shareholder. *Id.* at 432-33. After the plaintiff had sold his shares but before he cashed a single check, he learned that a merger had closed. *Id.* Both of these cases are consistent with the typical fact pattern where the special facts doctrine is applied: When a closely held corporation is actively negotiating a sale and does not share that information with a shareholder who is selling shares, that is found to be unlawful.

Citing *Jordan* and *Michaels*, Randall argues Defendants had a duty of complete and unfettered disclosure of all information relevant to the value of her shares. Pl.'s Br. at 45. This exact argument has been rejected by another court. In *Scarabello v. Reichle*, 856 F. Supp. 404 (N.D. Ill. 1994), the plaintiff argued that "the Defendants, confronted with a minority shareholder's desire to sell, had a fiduciary duty to automatically provide the shareholder with information from which the shareholder could determine the fair value of the stock." *Id.* at 408. The court concluded that neither *Jordan* nor *Michaels* stands for such a proposition. Considering this argument in the context of a closely held corporation, the *Scarabello* court reasoned:

> [T]he Court notes first, that the Plaintiff never requested any materials regarding the value of the stock. Second, and more importantly, the fiduciary duty owed to minority stockholders *does not include a duty to automatically reveal materials regarding the value of the stock* when the minority shareholder expresses a desire to sell. Such materials must be provided to a minority shareholder upon request, and thus such materials do not constitute special facts known only to the controlling shareholder because of his unique position.

*Id.* (emphasis added). Later, when clarifying on reconsideration, the court highlighted the fact that information that would have allowed the shareholder to calculate the book value of the shares was made available (even if not provided) to him confirmed nothing further had to be disclosed. *Scarabello v. Reichle*, No. 93 C 4606, 1995 WL 153338, at *2-3 (N.D. Ill. Apr. 6, 1995). The court "reaffirm[ed] its prior conclusion that, under the circumstances, Defendants did not have a duty to

automatically provide Plaintiff with information from which he could determine the book value, and ultimately the fair value, of the shares immediately in response to Plaintiff's indication that he wanted to sell." *Id.* at *3.

Another court similarly concluded the *Jordan* and *Michael* cases were not so far-reaching as they seemed. *Connelly v. Gen. Med. Corp.*, 880 F. Supp. 1100, 1114-15 (E.D. Va. 1995). In *Connelly*, the Eastern District of Virginia analyzed the Seventh Circuit's holding in *Jordan* and *Michaels*, and recognized that the Seventh Circuit neither "eviscerate[d] the requirement of materiality" nor "mandated the disclosure of every pre-merger occurrence" as the plaintiff wished it would. *Id.*

The special facts doctrine does not apply to the facts of this case because there were no sale negotiations prior to May 13, 2020. As of May 13, 2020, neither Reed, nor Gonnering, nor Kiesler were preparing, planning, contemplating, or even ruminating over a sale of Widen Enterprises. SOAF ¶¶ 158–167. After Reed turned 60 in June 2020, Gonnering and Reed began talking about succession planning for Widen Enterprises, and Reed told Gonnering to begin preparing for next steps within 2-5 years. SOAF ¶ 160. At that time, Reed was considering many possible forms of succession plans, including letting Gonnering run the company, creating an employee stock ownership plan, or making plans to sell. SOAF ¶ 161. In late August 2020, the focus honed in on selling to a third party within 2-5 years. SOAF ¶ 162. The timeframe shortened in January 2021 when an investment banker, SEG, told Reed the company could possibly sell for upwards of $200 million. SOAF ¶ 163. Shortly after that news, Reed decided to put Widen Enterprises on the market, they worked with SEG to provide information, and the first bids were received in June 2021. SOAF ¶¶ 164, 168-70. The special facts doctrine imposed no duty on Windy Waters, Kiesler, or Reed to disclose anything. Randall is not entitled to judgment as a matter of law on this claim.

### C. The alleged omissions do not support Randall's securities fraud claim.

#### 1. Randall misinterprets materiality.

As a preliminary matter, as argued above, Section 10b-5(b) only prohibits omissions of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). As a result, an omission must be material to an affirmative statement of fact made by a defendant, not just a piece of information that was not provided at all. Randall has not identified any statements by Kiesler related to the stock transaction that were misleading without disclosing the alleged omissions. That alone is a reason to deny Randall's motion.

Turning to the materiality standard generally applicable to 10b-5 claims, that is a standard that Randall cannot meet. The Supreme Court has clarified that a fact is material in the context of a sale of stock if there is "a **substantial likelihood** that the disclosure of the omitted fact would have been viewed by the **reasonable investor** as having **significantly altered** the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (emphasis added) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Put another way, for a party to face liability for failing to disclose information under Section 10b-5(b) that would have made affirmative statements not misleading, it must be substantially likely that the fact would have significantly altered the total mix of information available under the circumstances. *See id.* Materiality must be determined as of the date of the alleged misstatement or omission, not with the benefit of hindsight. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002); *see also Connelly*, 880 F. Supp. at 1115.

The materiality standard is designed so that it does not "bring an overabundance of information within its reach, and lead management 'simply to bury the shareholders in an

avalanche of trivial information—a result that is hardly conducive to informed decisionmaking.'" *Basic*, 485 U.S. at 231 (quoting *TSC Indus.*, 426 U.S. at 448–49).

Additionally, materiality is a highly fact-intensive inquiry that is normally decided by the jury. *Id.* at 238 ("[M]ateriality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." (internal quotation marks omitted)). Courts must consider all of the facts and circumstances of the case and the information otherwise available to the shareholder. *Id.* at 240. This fact question is inappropriate for summary judgment unless the misstatement or omission is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Indus.*, 426 U.S. at 450 (citation omitted).

### 2. *Randall cannot prove or cannot meet the materiality standard for the nine omissions she identifies.*

Nothing material was withheld from or misstated to Randall with respect to the stock redemption. Many of the alleged misrepresentations and omissions are disputed. Many are immaterial. Some are both.

Rather than explaining the materiality of any given omission, Randall requests a finding of blanket materiality. She falsely claims that "Defendants withheld all relevant information about the Companies' value and the price paid for Stacy's securities." Pl.'s Br. at 47. Based on that conclusion, Randall argues that all she needs to prove is the existence of "*any* material information." *Id.* She then provides a bulleted list of allegedly withheld information—altogether failing to explain why any of it would be material to a reasonable shareholder seeking to sell her stock. *Id.* at 47–48. This argument is based on a flawed premise. Kiesler *did* disclose exactly how the formula would be calculated. SOAF ¶ 19. He explained the methodology and a comparison of the formula price to book value for the stock, and recommended that Randall consult with counsel

or an advisor. SOAF ¶¶ 19, 34. Between what Kiesler disclosed during his discussions with Randall and what Randall already knew or had available to her, Randall had all material information about the stock transaction.

From prior history, it is undisputed that none of the alleged omissions were considered material to Randall. She had sold shares on five separate occasions and never had any of the information she now claims she needed. SOAF ¶ 197–234. When she sold stock previously, she never asked for financial statements, bank records, investment records, or anything else. SOAF ¶¶ 101, 235. She never asked questions, showing that Randall herself did not find any of this information significant to her decision. All of the facts suggest Randall understood that if Windy Waters was going to agree to redeem shares, it would be based on the Stock Price Formula used by all shareholders. SOAF ¶¶ 46, 55–61, 195, 197–234. Randall's argument that this time things were different flies in the face of her past conduct.

Each of the nine specific alleged misstatements or omissions (*see* Pl.'s Br. at 46) are disputed, immaterial, or both, as explained below.

1. Gonnering shared news suggesting value is a function of recurring revenues. This is immaterial because the Stock Price Formula was used for the transaction, just as it was for every stock transaction since 2004. As in *Scarabello*, the market value for shares is immaterial to a stock transaction when it is done in a consistent way each time and there is no public market for the stock. 1995 WL 153338, at *5. It is also immaterial because Gonnering is not an expert in valuations, and was merely reporting news he had heard. SOAF ¶¶ 151–56.

2. Gonnering had reported that a multiple of six times recurring revenues in 2018 would equal $80 million. This is immaterial because this estimate was a "guess and a pretend and a what if." SOAF ¶ 153. The Seventh Circuit has explicitly held that there is no duty to disclose guesswork

about the value of shares, even where special facts imposed a duty to disclose. *Kohler v. Kohler Co.*, 319 F.2d 634, 640 (7th Cir. 1963), *abrogated on other grounds by S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). No reasonable investor would find guesswork from news reports to be material.

    3. Recurring revenues had increased and were projected to be $27,440,000 in 2020. This is immaterial because recurring revenue was not the basis for the Stock Price Formula. That number is also immaterial because revenue is only one side of the profit equation and recurring revenue is only one of numerous factors that inform the value of a company. No one knew the fair market value of Windy Waters or its shares in May 2020. SOAF ¶ 26. Further, because the Stock Price Formula was used, and no sale was contemplated in May 2020, the amount Windy Waters could obtain if it sold Widen Enterprises on the open market was not material to the stock transaction.

    4. The Stock Price Formula did not apply. This is false. The Second Amendment to Shareholder Agreement, which Randall signed (as President), memorializes use of the Stock Price Formula outside of death and disability. SOAF ¶¶ 46, 195. And the company consistently used the formula, starting in 2004, for redemptions and subscriptions for all of its shareholders. SOAF ¶¶ 55–61. Randall has never claimed she believed she was required to sell her shares, and Kiesler confirmed she could take the offer or leave it. SOAF ¶¶ 18–19. It would have been immaterial to separately tell her the offer was negotiable, as that was obvious from the fact that she was not required to accept it. And the Stock Price Formula did apply, if Windy Waters was going to redeem Randall's shares, as that was a condition to its offer. *See* SOAF ¶¶ 5–6, 19.

    5. Reed received solicitations to purchase Widen Enterprises. This is immaterial. Defendants were not discussing or planning any sale of Widen Enterprises on May 13, 2020. SOAF

¶¶ 165–67. That disputed fact forecloses summary judgment. Moreover, the number of spam emails received by a person is no indicator of interest by the recipient. Reed confirmed the solicitations never resulted in a discussion or even an offered price because he "never acknowledged them" and usually deleted their emails. SOAF ¶ 238. Courts do not find "every pre-merger occurrence" to be material—rather, there must be "indicia of interest in the transaction at the highest corporate levels . . . [e.g.,] board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest." *Basic*, 485 U.S. at 239. There must be an "'event' that could be predicted, let alone measured" in order to even begin a materiality assessment. *Connelly*, 880 F. Supp. at 1115. The receipt of solicitation emails is not material.

6. One or both companies had $5.5 million in cash and liquid securities not used for operations. This is both false and immaterial. First, Kiesler provided account statements to Randall's lawyer less than two months prior to the redemption that showed the balances in both companies' accounts, so there is no omission at all. SOAF ¶¶ 105–08. Second, the amount of cash reserves held by Widen Enterprises and Windy Waters was not material because they were not free pots of money to pay shareholders upon request—they were critical to weathering the COVID-19 pandemic, particularly with the risk of customers cancelling customers and requiring Widen Enterprises to provide refunds. SOAF ¶¶ 111–15. Even Windy Waters' investment funds were sometimes used to pay for operations and cover cash flow gaps. SOAF ¶ 176.

7. Widen Enterprises had received a PPP loan that it was considering returning if Randall redeemed her stock. Kiesler did tell Randall that Widen Enterprises received a PPP loan and he asked her to tell him if she wanted to sell her stock so that they could make a decision about whether to return the funds. SOAF ¶ 19. Moreover, it was not material because the PPP loan had

to be used on certain expense items in order to be forgiven, SOAF ¶ 118, so it was not a pot of funds from which to pay shareholders.

8. Reed's compensation and alleged lack of involvement. This is false and immaterial. Reed provided leadership and oversight for Widen Enterprises, working at all hours and providing valuable input to Gonnering. SOAF ¶¶ 134–41. In their division of labor, Reed focused on strategic, big-picture matters, while Gonnering focused on day-to-day operations. SOAF ¶ 138. It was not material that Reed was paid for his hard work because he is presumed to have earned it. *Reget*, 2001 WI App 73, ¶ 18, 242 Wis. 2d at 294–95, 626 N.W.2d at 311.

9. Compensation decreased EBITDA. This is immaterial. Every expense of the company decreased the net income and, therefore, decreased EBITDA, thereby impacting the calculation of the Stock Price Formula. *See* SOAF ¶¶ 47–48. Because Reed's compensation was proper, any impact on the Stock Price Calculation also was proper. Identifying one isolated expense item would not impact Randall's decision.

### D. The four alleged misstatements during Kiesler's conversation with Randall are disputed and were not false, and all are non-actionable opinions.

Randall relies on the same four alleged misrepresentations from the lengthy conversation between Randall and Kiesler on May 6, 2020, to support her securities fraud claim as she does to support the fiduciary duty claim. *See* Pl.'s Br. at 45-46. As explained above, none of the statements Kiesler made were false, and the contents of the conversation are disputed. Kiesler never made a representation to Randall about the fair market value of the company. SOAF ¶¶ 19, 26. The remaining three alleged misrepresentations are also statements of opinion that cannot be fraud as a matter of law.

In securities fraud jurisprudence, statements of facts must be distinguished from statements of opinion. To determine whether a misrepresentation or omission has occurred, a court inquires

"into the meaning of the statement to the reasonable investor and its relationship to truth." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968). Ascertaining the truth of a statement of fact is simple, but statements of opinion require further scrutiny. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189–92 (2015). To assess whether an opinion statement is misleading and, therefore, actionable, a court must apply the reasonable investor inquiry. *Id.* Opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Id.* at 189–90. Critically, "the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 190. A reasonable investor would be discerning—attending to the specificity of the opinion, the method by which the statement is conveyed, "customs and practices of the relevant industries," the "surrounding text, including hedges, disclaimers, and apparently conflicting information," among other factors. *Id.*

Whether or not someone can afford something—that is, to bear it without detriment—is necessarily a judgment call. Though Kiesler did not use the word "afford," Kiesler did express that Windy Waters could not make the money available because it was not willing to do so. SOAF ¶ 19. Kiesler did not believe the company could give Randall in a large lump sum payment in May 2020 without putting itself at risk. SOAF ¶¶ 115, 236. The financial uncertainty from the COVID-19 pandemic generally placed the company at risk of losing its customers, including by having customers take advantage of the 30-day out on contracts. SOAF ¶¶ 113–14. Windy Waters was unprofitable in March through April 2020. SOAF ¶ 109.

Whether a course of conduct is smart is also a matter of opinion and depends on the context of the situation. In light of Randall's history of periodically redeeming shares and concerns with

COVID, Kiesler reasonably expressed an opinion that Randall could be smart to sell all of her shares. In fact, the price per share a year later would have been less than half the price she got in May 2020. SOAF ¶ 173.

Finally, whether something is fair is the epitome of a subjective opinion. Kiesler had good reason to believe that using the Stock Price Formula price was fair—it was consistent with how the stock price had been calculated for each redemption since the formula was created in 2004, including Randall's five prior redemptions. SOAF ¶¶ 55–61.

### E.  Randall cannot show reliance causing damages.

Randall argues that her "reliance is presumed" because Defendants "omi[tted] all relevant information about the Companies' value and financial status." Pl.'s Br. at 51. Again, Defendants dispute the factual premise—Kiesler fully disclosed all material information to Randall when explaining the Stock Price Formula calculation and its comparison to the stock's book value. Moreover, reliance cannot be presumed. "Justifiable reliance . . . is a limitation on a rule 10b-5 action which insures that there is causal connection between misrepresentation and the plaintiff's harm." *See Teamsters Local 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985).

Randall cannot now prove reliance because she *expressly disclaimed reliance on statements or omissions of Kiesler and Reed*. In a text exchange on May 6 with her financial advisor, Mark Goff, Randall said the following: "Thanks for helping me know what I should say. Mikes [sic] attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought that they have had an interest in my well being." SOAF ¶ 35. Her final thoughts shared with Goff made her lack of reliance crystal clear: "Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all. I could tell he was in disbelief and I could hear some sadness in his voice." SOAF ¶ 35.

### F.  This claim cannot be maintained against Widen Enterprises.

Widen Enterprises is not a proper defendant to this claim. As of May 13, 2020, Randall did not own any shares in Widen Enterprises. SOAF ¶ 179. Further, Widen Enterprises never owned shares in Windy Waters and did not purchase Randall's shares. SOAF ¶ 180. Widen Enterprises had no involvement with the transaction, and the only allegations against it are those against "Defendants" generally. Randall cannot meet the elements for a claim against Widen Enterprises, including that Widen Enterprises made a misstatement or omitted information, and that it had a duty. As a result, it cannot be liable for Randall's securities fraud claim.

### IV.      Randall is not entitled to judgment in her favor on the issue of ratification.

Randall focuses a large portion of her brief on the ratification and waiver defenses that result from Randall's acceptance of payments, each month, from the very contract she now claims is invalid. This waiver supports a dismissal of her claims seeking rescission of the stock redemption agreement.

This issue was already fully briefed in connection with Defendants' motion to strike (ECF No. 31). In a text only order on October 4, 2023, the Court denied the motion to strike as moot, noting the argument was renewed by Defendants on summary judgment. Defendants stand by the arguments raised in their brief in support of their motion to strike (ECF No. 32) and their reply brief (ECF No. 37). Rather than repeat them here, Defendants incorporate those arguments by reference. Defendants ask the Court to rule on this issue in conjunction with the pending summary judgment motions, and rule that Randall has ratified the Stock Redemption Agreement and waived her right to seek rescission.

The additional facts Randall now raises, related to the settlement discussions between counsel prior to the suit being filed, serve only to bolster a finding of ratification or waiver. They further show Randall was well aware of the basis for her claims and the existence (in her mind) of

a basis to invalidate the stock redemption agreement from May 2020, yet continued accepting payments. Resp. to PSUF ¶¶ 247–63.

The Standstill and Tolling Agreement between the parties only preserved whatever rights Randall had at the time the was signed in March 2022. *See* Resp. to PSUF ¶ 259; ECF No. 63-71. Specifically, it was intended to foreclose any timeliness complaints if Randall waited any further to initiate suit. Indeed, the agreement specifically provides that it "will not be admissible for any purpose other than to rebut a defense based on the passage of time." Resp. to PSUF ¶ 259; ECF No. 63-71. It did not revive rights already lost or undo waiver already accomplished prior to March 2022, or conduct occurring after it was terminated.

## CONCLUSION

Randall's stock redemption on May 13, 2020, was a routine transaction by which Windy Waters calculated the price it would pay using the same formula that was applied consistently over the preceding 16 years. None of the Defendants had any duty to proactively advise her on the transaction, and Kiesler provided all of the information she needed to understand her choice, taking care to treat her just as Windy Waters treated other shareholders who wished to redeem shares. Randall cannot prove any breach of fiduciary duty or securities fraud. Plaintiff's Motion for Summary Judgment (ECF No. 59) should be denied.

Dated: November 10, 2023                    Respectfully submitted,

                                                            s/Christa D. Wittenberg
                                                            Dean P. Laing
                                                            Christa D. Wittenberg
                                                            O'Neil, Cannon, Hollman, DeJong & Laing S.C.
                                                            111 East Wisconsin Avenue, Suite 1400
                                                            Milwaukee, Wisconsin 53202
                                                            Phone: 414.276.5000
                                                            dean.laing@wilaw.com
                                                            christa.wittenberg@wilaw.com

Mark H. Churchill
Martin Durkin
Sarah Morain
HOLLAND & KNIGHT LLP
1650 Tysons Boulevards, Suite 1700
Tysons, Virginia 22102
Phone: 703.720.8600
mark.churchill@hklaw.com
martin.durkin@hklaw.com
sarah.morain@hklaw.com

*Attorneys for Defendants*