IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

          Plaintiff,

v.

REED C. WIDEN, MICHAEL KIESLER,          Civil Action No. 22-cv-400
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

          Defendants.

## PLAINTIFF STACY L. RANDALL'S RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL PROPOSED FINDINGS OF FACT REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and the Honorable James D. Peterson's standing orders on motions for summary judgment, Plaintiff Stacy L. Randall ("Plaintiff," "Stacy," or "Ms. Randall") submits the below response to Defendants' Additional Proposed Findings of Fact regarding Plaintiff's Motion for Partial Summary Judgment.

## RESPONSES TO ADDITIONAL PROPOSED FINDINGS OF FACT

1.      In November 2019, just 11 months after her fifth stock redemption, when she received $120,000 for selling 281 shares under the Stock Price Formula, Plaintiff Stacy L. Randall ("Randall") reached out to Michael Kiesler ("Kiesler") to alert him she may be requesting money again in early 2020. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.9-10, ¶¶ 62-67, Ex. I (ECF No. 75-14); Kiesler Decl., Nov. 10, 2023, p.3, ¶ 12, Ex. D (WINDY0056317).

**RESPONSE:** **Undisputed**, but immaterial.

2.      In an email with the subject line "What else $$$$," Randall stated: "I know you just love hearing from me...... Especially when I need money!!" Kiesler Decl., Nov. 10, 2023, p.3, ¶ 12, Ex. D (WINDY0056317).

**RESPONSE:** **Undisputed** that the quoted text composes a part of said e-mail but omits most of the content of said e-mail, but immaterial.


3.      As she had predicted, Randall asked Reed Widen ("Reed") for money in May 2020 and wanted to sell stock. Reed Dep., Aug. 23, 2023, at 66:11-67:20; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.5-6, ¶ 49, Ex. B (ECF No. 67-1); Randall Dep., Aug. 28, 2023, at 245:6-246:11; Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27.

**RESPONSE:** **Disputed** insofar as this Proposed Finding of Fact suggests that Stacy wanted to sell *all* her shares of Windy Waters, Inc. in May 2020.  Stacy only wanted to sell the number of shares needed to obtain $100,000 or $50,000 to fund her divorce. (ECF No. 45, Am. Answer, ¶¶ 71-74; ECF No. 100, 11/6/23 Steven Randall Dep. Tr. (Vol. II) 178:18-180:16.) Otherwise, **undisputed**.


4.      Windy Waters did not request or initiate any stock transaction by Randall. Reed Decl., Nov. 10, 2023, p.4, ¶ 21; Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27.

**RESPONSE:** **Disputed** insofar as it was Kiesler who, on May 11 and May 13—after being reminded and prompted by Matthew Gonnering—contacted Stacy, not vice-versa, to carry out the May 2020 redemption. (Suppl. Palay Decl. Ex. 16; ECF No. 45, Am. Answer, ¶ 94; 9/29/23 Kiesler Dep. Tr. 246:23-247:7.)

5.     Reed directed Kiesler to call Randall on behalf of Windy Waters to offer an all-or- nothing redemption for her shares of Windy Waters and, if she accepted, to carry out the transaction, and Kiesler did. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶ 54; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.15, ¶ 110.

**RESPONSE**: **Disputed** insofar as this Proposed Finding of Fact suggests that Kiesler, in fact, did act only on behalf of Windy Waters or only in his capacity as Treasurer of Windy Waters. Reed and Kiesler were each also acting in their capacities as officers of Widen Enterprises, with Reed as president and director of Widen Enterprises exercising authority over Kiesler in his capacity as CFO of Widen Enterprises. (ECF No. 102, 11/06/2023 Widen Enterprises Dep. Tr. 70:14-20, 74:3-7.) Defendants testified that the Companies were "consolidated," and Defendants treated the Companies in a "consolidated" manner, including complete consolidation of resources and only Widen Enterprises compensated Defendants for work done in their Windy Waters capacity. (ECF No. 55, 9/19/23 M. Kiesler Dep. Tr. 39:4-10, 294:13-18; ECF No. 102, Widen Enterprises Dep. Tr. 135:4-21; ECF No. 103, Windy Waters Dep. Tr. 53:2-10.) On May 5, 2020, Reed directed Kiesler to purchase all of Stacy's Windy Waters shares. (09/19/2023 M. Kiesler Dep. Tr. 167:22-168:16.) Though Kiesler served as Treasurer of Windy Waters, Reed was neither an officer of Windy Waters in name nor a director of Windy Waters in name prior to May 13, 2020, and thus, in order to "direct Kiesler to call Randall on behalf of Windy Waters," Reed necessarily had to have authority over Kiesler in such a capacity. (*See* ECF No. 115, Pl.'s Resp. to Defs.' PFOF No. 245; 11/03/2023 Dep. Tr. of Windy Waters 45:4-46:4.) Otherwise, **undisputed**.

6.     Reed understood any purchase of Randall's shares would be done consistently with the Stock Price Formula that had been used with all prior stock redemptions between 2005 and 2020, and never even considered any other options (nor did Randall request any). Reed Dep.,

Aug. 23, 2023, at 80:18-81:14; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶ 55; Reed Decl., Nov. 10, 2023, p.3, ¶ 19; Kiesler Dep., Sept. 19, 2023, at 168:24-169:7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.6-7, 15-16, ¶¶ 41-45, 112, 116.

**RESPONSE: Undisputed** except Reed lacks foundation to testify as to Stacy's communications with Kiesler relating to redemptions, including Stacy's May 2020 redemption (i.e., "nor did Randall request any").

7.       After Randall reached out to Reed, and Reed talked to Kiesler and asked him to help Randall, Kiesler spoke to Randall on the morning of May 6, 2020. Kiesler Dep., Sept. 19, 2023, at 172:23-173:2; Randall Dep., Aug. 28, 2023, at 261:19-24; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.5-6, ¶¶ 49-51; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.15, ¶¶ 109-13.

**RESPONSE: Disputed.** The record evidence does not support the Proposed Finding of Fact insofar as it suggests that Reed's actual motivation in directing Kiesler to purchase all of Stacy's Windy Waters shares was "to help" Stacy. Reed's true motivation was the "opportunity" to purchase Stacy's stock using a formula he had been informed was "low," and which produced a purchase price at a small fraction of Widen Enterprises' CEO's latest estimate of the company's market value. (*See, e.g.,* 09/29/2023 Palay Decl., ¶¶ 17, 19, 21, 30, Exs. 15, 17, 19, 28; *See also* Pl.'s Resp. to Defs.' PFOF No. 241.) Kiesler's testimony is in accord with this motivation; he testified that Reed left him a voicemail on May 5, 2020, saying that "Stacy needs money again" and, when he called him back, Reed told him that "he wanted to [buy] all of [Stacy's] shares [] using the formula that we used for Price [Widen]." (09/19/2023 M. Kiesler Dep. Tr. 168:1-16.) Reed, Kiesler, Gonnering, Widen Enterprises, and Windy Waters were also motivated to get Stacy to redeem all of her Windy Waters shares so that "the remaining shareholders [would get] a portion of their compensation as pro-rata dividends instead of wages" for perceived beneficial tax

purposes. (08/23/2023 R. Widen Dep. Tr. 195:5; Palay Decl., ¶ 37, Ex. 35, WINDY0044692; Palay Decl., ¶ 38, Ex. 36, WINDY0044312; Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.) Otherwise, **undisputed.**

8.      During that conversation, Kiesler walked Randall through the calculation of the Stock Price Formula using November 2019 numbers. Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27.

**RESPONSE:** **Disputed.** Kiesler did not walk Stacy through the stock price calculation. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶¶ 14, 41; *see also* 8/23/23 S. Randall Dep. Tr. 263:20-265:15.)

9.      Randall never received a copy of the spreadsheet Kiesler used to calculate the price per share Windy Waters was willing to pay for Randall's stock in May 2020. Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.16, 20, ¶¶ 119, 156, Ex. U (ECF No. 75-23); Kiesler Decl., Nov. 10, 2023, pp.5, 7-8, ¶¶ 23, 29.

**RESPONSE:** **Undisputed.**

10.      Kiesler never used the phrases "estimated value of Windy Waters," "fair value," or "concluded value of Windy Waters" when talking to Randall in May 2020. Kiesler Dep., Sept. 19, 2023, at 70:1-20, 71:10-21; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.16, ¶ 119, Ex. U (ECF No. 75-23); Kiesler Decl., Nov. 10, 2023, pp.5-8, ¶¶ 23, 27, 30.

**RESPONSE:** **Undisputed.** (*See* ECF No. 61, Pl.'s PFOF Nos. 175, 178, 188, 272; 08/28/2023 S. Randall Dep. Tr. 268:18-25.) Kiesler did not walk Stacy through the stock price calculation or explain the formula (ECF No. 118, Suppl. Decl. of Stacy Randall ¶¶ 14, 41; *see also* 8/23/23 S. Randall Dep. Tr. 263:20-265:15). To the extent that Defendants are trying to walk back their

statement in their Amended Answer that Kiesler walked Stacy through the calculation model "line by line," Defendants cannot now try to claim otherwise. (ECF No. 45, Am. Answer ¶ 77 ("Kiesler went through the Companies' standard price-per-share calculation model for voluntary redemptions with Plaintiff, <u>line by line</u>, using the November 2019 financial information of the Companies." (emphasis added)); ECF No. 75-23, Kiesler Dep. Ex. U (two lines in the first column in the formula spreadsheet: "Estimated Value of Windy Waters" and "Concluded Value of Windy Waters (higher of A or B)"); 09/19/2019 M. Kiesler Dep. Tr. 71:10-73:25, 233:14-21 ("went over the formula . . . line by line" with Stacy and "started at the top and worked [his] way down" the calculation).)

11.     Prior to executing the May 13, 2020 Redemption Agreement, Randall did not ask to see and did not see the spreadsheet Kiesler used to make the calculation. Kiesler Decl., Nov. 10, 2023, pp.7-8, ¶ 29; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.20, ¶ 156; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 5, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 58.

**<u>RESPONSE</u>: Undisputed.**

12.     Kiesler never showed Randall any version of the spreadsheet he used to calculate the Stock Price Formula in any form or on any occasion prior to May 13, 2020. Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16, 20, ¶¶ 119, 156, Ex. U (ECF No. 75-23); Kiesler Decl., Nov. 10, 2023, pp.7-8, ¶ 29.

**<u>RESPONSE</u>: Undisputed.**

13.     When Kiesler walked Randall through the calculation of the per-share price he used to calculate the amount Windy Waters offered Randall for her stock, he did not read the words listed in the first column of the chart; rather, he explained the concepts conversationally. Kiesler Decl., Nov. 10, 2023, pp.6-8, ¶¶ 27, 30-31; Kiesler Dep., Sept. 19, 2023, at 70:1-6, 70:18-71:2; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.16, ¶ 119, Ex. U (ECF No. 75-23).

**RESPONSE: Disputed.** Kiesler did not walk Stacy through the stock price calculation or explain the concepts used to calculate the amount he offered her for her stock. (Suppl. Decl. of Stacy Randall ¶¶ 14, 41; *see also* 8/23/23 S. Randall Dep. Tr. 263:20-265:15.) To the extent that Defendants are trying to walk back their statement in their Amended Answer that Kiesler walked Stacy through the calculation model "line by line," Defendants cannot now try to claim otherwise. (ECF No. 45, Am. Answer ¶ 77 ("Kiesler went through the Companies' standard price-per-share calculation model for voluntary redemptions with Plaintiff, line by line, using the November 2019 financial information of the Companies" (emphasis added)); ECF No. 75-23, Kiesler Dep. Ex. U (two lines in the first column in the formula spreadsheet: "Estimated Value of Windy Waters" and "Concluded Value of Windy Waters (higher of A or B)"); 09/19/2019 M. Kiesler Dep. Tr. 71:10-73:25, 233:14-21 ("went over the formula . . . line by line" with Stacy and "started at the top and worked [his] way down" the calculation).)

14.     When Kiesler got to the row labeled "Estimated Value of Windy Waters" on his calculation spreadsheet, he explained the figure represented the total dollar amount for all of the shares of Windy Waters using the Stock Price Formula. Kiesler Decl., Nov. 10, 2023, pp. 6-7, ¶ 27.

**RESPONSE: Disputed.** Kiesler did not walk Stacy through the stock price calculation or explain the formula. (Suppl. Decl. of Stacy Randall ¶¶ 14, 41; *see also* 8/23/23 S. Randall Dep. Tr. 263:20-

265:15.) Further **disputed** that Kiesler explained that the row labeled "Estimated Value of Windy Waters" represented the total dollar amount for all of the shares of Windy Waters stock using the Stock Price Formula; rather, Kiesler told Stacy that the Companies wanted to purchase her entire interest using the price given by the price-per-share calculation model in the EBITDA Formula, which calculates the "Fair Market Value per share" under the Windy Waters Shareholder Agreement. (ECF No. 61, Pl.'s PFOF No. 175; Answer ¶ 77; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.) Further **disputed** that the Stock Price Formula's "Estimated Value of Windy Waters" amount of $6,896,973 represented the actual total value of all the Companies' shares or came anywhere close to the actual value. (*Compare* ECF No. 75-23, Kiesler Dep. Ex. U, *with* Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl., Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113.)

15.     Next, when he explained the next two rows on his calculation spreadsheet, Kiesler explained only that he compared the formula price to the price using net assets and concluded that the formula price was more favorable to Randall. Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27.

**RESPONSE: Disputed.** Kiesler did not walk Stacy through the stock price calculation or explain the formula. (Suppl. Decl. of Stacy Randall ¶¶ 14, 41; *see also* 8/23/23 S. Randall Dep. Tr. 263:20-265:15.)

16. Kiesler made no representation to Randall in May 2020 about the value of Windy Waters or its stock or Randall's stock specifically. Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p. 2, ¶ 5, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 58; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.19-20, ¶¶ 151, 156; Kiesler Decl., Nov. 10, 2023, p.8, ¶ 32.

**RESPONSE: Disputed.** None of the cited evidence supports the proposed finding of fact that Kiesler made no representation to Randall in May 2020 about the value of Windy Waters or its stock or Randall's stock specifically. Further, Kiesler twice assured Stacy that the price he offered for her approximately 20% interest in Windy Waters was "fair." (ECF No. 45, Am. Answer ¶¶ 79, 89; ECF No. 61, Pl.'s PFOF Nos. 175, 178, 188, 272; 08/28/2023 S. Randall Dep. Tr. 268:18-25.) Moreover, Kiesler representing that the "Estimated Value of Windy Waters" on May 13, 2020, was $6,896,973 was a misrepresentation, as the Companies were valued at that time between $95-96 million. (Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."); Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781); Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."); Palay Decl., Ex. 17; Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; ECF No. 75-23, Kiesler Dep. Ex. U.) Kiesler's additional misrepresentations are identified at ECF No. 61, Pl.'s PFOF Nos. 265-287.

17.     Randall denied that Kiesler ever walked her through the formula. Randall Dep., Aug. 28, 2023, at 263:20-265:23, 303:22-304:3, 317:8-17.

**RESPONSE**: **Undisputed**. (*See also* Suppl. Decl. of Stacy Randall ¶¶ 14, 41.)

18.     Kiesler assured Randall she could "take it or leave it," making it clear she was not obligated to sell her shares. Randall Dep., Aug. 28, 2023, at 267:20-21; Kiesler Dep., Sept. 19, 2023, at 227:22-24; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.17, ¶ 128.

**RESPONSE**: **Undisputed** that Kiesler told Stacy that his offer was "take-it-or-leave-it." (Kiesler Dep., Sept. 19, 2023, at 227:22-24.) **Disputed** as to the remainder of the proposed fact. Kiesler lacks foundation to testify as to what was "clear," including what was "clear" to Stacy.

19.     Kiesler's best recollection of the conversation between him and Randall on May 6, 2020, is as follows:

> Randall – Hello
>
> Kiesler – Hi Stacy, it's Mike. Reed called and told me to call you about needing money.
>
> Randall – I need it for fucking legal fees. I need $100,000.
>
> Kiesler – Is there any other way you can get the money?
> Randall – No.
> Kiesler – Did Reed tell you we just received PPP money from the government?
> Randall – He said something about a COVID problem and that I might have to go through Millmont.
>
> Kiesler – Based on my conversation with Reed, we aren't willing to make $100,000 available to you. We just can't do that.
>
> Randall – How about $50,000?
> Kiesler – I still don't know if we can make that available to you. Reed did say the company would be willing to purchase all of your shares. He said that the only way to get you money is by selling all your shares and spreading payments over time like we did with your brothers Stewart and Price. We'd create a note and pay you over 7 years like we did with Stewart and Price, if you would like.
> Randall – How much would I get for my shares?

Kiesler – I'd have to look at the formula that we base it on. Hold on, let me bring it up on my computer. [He opens a spreadsheet and stock summary on his computer.] I only have November 2019 numbers right now, and I would have to update it with year-end numbers, but let me do some math using this. [He calculates.] Based on the calculation, it comes to $1,126,125.04 for all your shares.

Randall – That seems awfully low. This is all I have to live on.

Kiesler – Well, let me explain to you how we went through it. It's the same formula we've always used. We treat all shareholders the same way, to be fair to everyone, and we've used it consistently for you and everyone, including Price and Stewart. Let me go through it with you so that you know how it works.

Randall – Okay.

Kiesler – The calculation starts with Net Income which is revenue less expenses which was a loss of $971,438. Then it adds back income tax expense and depreciation. Then it subtracts other income and adds back other expenses. It then subtracts gains from one of our investment accounts and adds losses for the other investment account. So Net Income plus and minus all those items equals earnings before income tax, depreciation and amortization.

Randall – Okay.

Kiesler – Then there is a weighted average that is used which looks at the current year and two previous years and multiplies that number by a multiple that has been used throughout time. Then cash and investment amounts are added back and Price's stock redemption note is subtracted to come up with a formula value for the whole company, which is $6,185,398. That is compared to the stockholders' equity amount from the company's financials, which is $1,326,205. We take the higher number to figure out the price per share amount, then divide by the number of shares. From these numbers, the formula value is higher, and that is $538.17 per share of voting stock and $512.54 per share for common stock. And like I said, these numbers are all November numbers and I'll have to update the calculation with December numbers and let you know.

Randall – Okay. I don't know what to do.

Kiesler – Well, you can do whatever you want, but it could be smart to sell your shares and be in control of your finances. With COVID continuing, the amount may be lower in the future. And worse case if COVID continues to be a problem for however long or even gets worse, who knows if Widen may even be around in a few years. But it's up to you.

Randall – It could go up, too.

Kiesler – It could, that is true. We are dealing with a huge unknown here.

Randall – Okay. I'm not sure I want to sell all my shares.

Kiesler – The decision isn't up to me. Reed makes the decision. Reed has the ultimate decision. I have to verify to make sure with him, but this is all we are willing to offer, so you'll have to either take it or leave it. Let me

> know what you think before the end of the day, because if you want to
> do this, we have to decide whether to return the PPP money.
>
> Randall – Okay.

Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27.

**RESPONSE: Undisputed** that Kiesler provided the above recollection in his November 10 declaration of a phone call that occurred over 3 years prior to the declaration. **Disputed** insofar as, if Defendants are attempting to admit Kiesler's above out-of-court statements for the truth of the matter asserted, such statements are hearsay, and no exemption or exception applies, and thus the above reconstruction of Kiesler's statements is inadmissible. (*See* Fed. R. Evid. 801-804.) Further, the above recollection of the May 6, 2020 conversation is "reconstruct[ed]" entirely "from [Kiesler's] memory of it" and was not was made or adopted by Kiesler when the matter was fresh in his memory, because November 10, 2023 was over 3 years after the May 6, 2020 conversation. **Disputed** that the above recalled conversation accurately represents what was said during that conversation. (Suppl. Decl. of Stacy Randall ¶¶ 14, 41; Randall Dep., Aug. 28, 2023, at 263:20-265:23, 303:22-304:3; ECF No. 45, Am. Answer ¶¶ 71-74.)


20.    The entire conversation was approximately 10-15 minutes long. Kiesler Decl., Nov. 10, 2023, p.7, ¶ 28.

**RESPONSE: Disputed.** Conversationally reciting the conversation as Kiesler recalls it in his Declaration takes, at most, 4 or 5 minutes; thus, Defendants' own assertions (11/10/23 Kiesler Decl. ¶ 27) refute this proposed finding of fact. Further, Kiesler's recollection of the conversation does not accurately represent what was said during that conversation. (Suppl. Decl. of Stacy Randall ¶¶ 14, 41; Randall Dep., Aug. 28, 2023, at 263:20-265:23, 303:22-304:3; ECF No. 45, Am. Answer ¶¶ 71-74.)

21.      Kiesler called Randall on May 13 to communicate the updated calculation under the Stock Price Formula, using December 2019 financials as promised, of over $1.3 million. Randall Dep., Aug. 23, 2023, at 303:17-304:3, 304:9-12; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.18, ¶ 140; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶ 4, Ex. D (ECF No. 70- 4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 63.

**RESPONSE:** **Undisputed** that Kiesler called Stacy on May 13 to communicate the updated offer, which was undertaken by inserting the December 2019 financial information into the Stock Price Formula. **Disputed** that Kiesler communicated to Stacy the updated offer was undertaken by inserting the December 2019 financial information into the Stock Price Formula as promised. Kiesler called Stacy and told her that "they found another $250,000," and Stacy believed the updated offer was not related to use of a formula but rather additional money that Defendants "found." (08/28/2023 S. Randall Dep. Tr. 303:17-304:3; Suppl. Decl. of Stacy Randall ¶ 22.)


22.      Randall agreed with the terms on the spot during the call and said she would be coming in later that day to sign the documents. Randall Dep., Aug. 28, 2023, at 303:17-304:23, 313:2-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.18, ¶ 142; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 14, Ex. N (ECF No. 70-13).

**RESPONSE:** **Disputed**. Stacy did not agree with those terms on the spot. (Suppl. Decl. of Stacy Randall ¶¶ 21-22; *see* 08/28/2023 S. Randall Dep. Tr. at 303:17-304:8 ("Q. Do you remember saying something to him along the lines of, 'That's more like it,' when you found out about the 250,000? A. No. I said, 'That's all?'").)

23.     Randall did not ask for any financial information or documents about the company during her discussion with Kiesler in May 2020. Randall Dep., Aug. 28, 2023, at 266:23-267:1; Kiesler Dep., Sept. 19, 2023, at 232:2-22; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.16, ¶ 122.

**RESPONSE:** Undisputed.


24.     From May 5 through May 13, 2020, Randall never asked any of the Defendants what the value of Windy Waters or Widen Enterprises was. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.7, ¶ 62; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.20, ¶ 154.

**RESPONSE:** **Disputed.** Stacy sought to engage in a conversation with Kiesler about what the Companies were worth, but Kiesler did not provide her with that information. (*See* Defs.' PFOF No. 257 ("Randall told Kiesler she thought that the price was too low because she 'had a feeling that the company was worth more than' an amount that would make her shares worth $1.1 million, but did not explain a basis for that belief."); Suppl. Decl. of Stacy Randall ¶ 19.)


25.     From May 5 through May 13, 2020, Kiesler never told Randall what the value of Windy Waters or Widen Enterprises was because he did not know. Kiesler Decl., Nov. 10, 2023, p.8, ¶ 33; Kiesler Dep., Sept. 19, 2023, at 78:7-17, 139:7-14, 149:5-12; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16, 21, ¶¶ 123, 164-65.

**RESPONSE:** **Disputed.** Kiesler's offer on behalf of Windy Waters to purchase Stacy's shares for approximately $1.35 million represented—more precisely, misrepresented—that the value of the Companies was $6,896,973. (ECF No. 75-23, Kiesler Dep. Ex. U.) Kiesler knew and had information as of May 13, 2020, that informed him that the Companies were worth significantly

more than the formula price and he failed, among other material omissions and misrepresentations, to disclose that to Stacy: Kiesler did not disclose to Stacy that Widen Enterprises' CEO, Matthew Gonnering, had stated to Reed and Kiesler on multiple occasions over a period of years that Widen Enterprises' market value was based on a multiple of the company's revenue or recurring revenue and that, as of August 2018, the CEO had stated to Reed and Kiesler that he believed that Widen Enterprises had a fair market value of approximately $80 million. (09/28/2023 S. Randall Decl., p.4, ¶¶ 23, 24; 09/29/2023 Palay Decl., ¶¶ 10, 13, 17, 19, Exs. 8, 11, 15, 17; 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

26.     Reed, Matthew Gonnering ("Gonnering"), and Kiesler did not know the fair market value of Widen Enterprises, Windy Waters, or a share of stock in Windy Waters as of May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:25-99:5, 127:15-25, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶¶ 77-78; Reed Decl., Nov. 10, 2023, p.4, ¶ 22; Kiesler Dep., Sept. 19, 2023, at 78:7-17, 139:7-14, 149:5-12; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶¶ 164-65; Kiesler Decl., Nov. 10, 2023, p.8, ¶ 34; Gonnering Dep., Sept. 21, 2023, at 100:4-12, 106:17-22, 107:22-23, 109:1-7, 110:7-8; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.7, ¶¶ 49-50; Gonnering Decl., Nov. 10, 2023, p.2, ¶ 7; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 6, Ex. E (ECF No. 70-5: Windy Waters' Objections And Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 11.

**RESPONSE: Disputed.** Defendants discussed Widen Enterprises' market value over many years. (*See* ECF No. 61, Pl.'s Proposed Findings of Fact ¶¶ 50-72, 74, 76-78.) Gonnering also explained to Reed and Kiesler that the "[m]arket value" of a Software as a Service (SaaS) company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue, enabling Reed

and Kiesler to make their own approximations based on Widen Enterprises recurring revenues. (*See* ECF No. 61, Pl.'s Proposed Findings of Fact ¶¶ 64 ("3.5x"), 72 ("4x"); *see also* Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."); Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781).) Reed also had the Companies valued by Bruce Hutler of Virchow Krause Valuation, LLC in July 2004. (09/29/2023 Palay Decl. Ex. 9.)

27.     Reed believed it was in the company's best interest to buy Randall out in full rather than in part, if it was going to do anything, for three reasons: (1) Windy Waters was no longer willing to be Randall's bank every time she needed money, (2) each time Randall redeemed shares it cost Windy Waters attorneys' fees and required time by Kiesler to calculate the formula and confer with counsel; and (3) Windy Waters preferred active, as opposed to passive, shareholders going forward. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶ 52; Kiesler Dep. 168:1-16; Gonnering Dep., Sept. 21, 2023, at 161:6-25, 166:6-168:15; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶¶ 42-43.

**RESPONSE: Disputed.** Reed did not form a belief prior to Stacy's 2020 redemption as to a full rather than partial redemption being in the company's best interest, and Reed's true motivation was the completion of the "previously outlined" plan to get all of Stacy's shares via redemption and jumping on the "opportunity" when it presented itself in May 2020, given Gonnering's communication to Reed and Kiesler in November 2019 that the "weighted EBITDA valuation is low." (09/29/2023 Palay Decl., ¶¶ 30, Ex. 28, WINDY0033900; 21, Ex. 19, WINDY0009851; 57, Ex. 55, WINDY0047517; 58, Ex. 56, WINDY0047370; 09/21/2023 M. Gonnering Dep. Tr. 164:8-165:1; Suppl. Decl. of D. Palay Ex. 11; Suppl. Decl. of Stacy Randall ¶ 3; *Compare*

Suppl. Decl. of D. Palay Ex. 15, *with* Palay Decl. Ex. 33 (Stafford Rosenbaum invoiced Windy Waters $2,242.00 for its work regarding the May 2020 redemption, including post-redemption work, which is around 0.1% of Reed's compensation for that year).)

28.　　Initially, Randall made it seem as though she needed the money quickly. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.15, ¶ 113.

**RESPONSE: Disputed.** This proposed finding of fact is not supported by admissible evidence. Kiesler can testify to what Stacy said but lacks foundation to testify as to how Stacy "made it seem."

29.　　She had a divorce proceeding coming up on May 18, 2020, during which her husband's request for maintenance payments would be heard. Randall Dep., Aug. 28, 2023, at 239:18-243:7.

**RESPONSE: Undisputed.**

30.　　On May 6, 2020, after her first call with Kiesler, Randall contacted her son, Justin Randall ("Justin"), and told him about the offer. Randall Dep., Aug. 28, 2023, at 280:24-281:24; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 11, Ex. K (ECF No. 70-10).

**RESPONSE: Undisputed**, but immaterial.

31.　　Justin told her she should get a lawyer prior to redeeming all of her stock and told her she should have an attorney look at the financials of Widen Enterprises. Randall Dep., Aug. 28, 2023, at 276:4-14, 294:20-295:9.

**RESPONSE: Disputed**, but immaterial. (10/25/23 Justin Randall Dep. Tr. 85:3-12.)

32.     Justin also advised Randall to contact an accountant. Justin Randall Dep. ("Justin Dep."), Oct. 25, 2023, at 83:21-84:14, 91:5-24, 94:12-95:7, 186:2-25.

**RESPONSE: Undisputed**, but immaterial.

33.     During their second phone call on May 6, 2020, Randall told Kiesler that she had never thought he and Reed had an interest in Randall's well-being and believed she made it clear that she did not trust them. Randall Dep., Aug. 28, 2023, at 285:23-286:18, 291:18-293:3; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

**RESPONSE: Disputed** to the extent that the proposed fact alleges that Stacy did not, in fact, trust Kiesler or Reed. (09/29/2023 Decl. of Stacy Randall ¶ 9.) When asked about this document, Stacy testified that she "had the utmost trust and respect in Mike Kiesler" until she found out that the company had sold for $162 million and this lawsuit began. (08/28/2023 S. Randall Dep. Tr. 292:14-294:12.)

34.     In their second conversation on May 6, 2020, Randall told Kiesler she wanted to talk with her lawyer and financial advisor, and Kiesler told her she should do that. Kiesler Dep., Sept. 19, 2023, at 212:15-24, 213:9-18; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.17, ¶¶ 129-30; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 3, Ex. B (ECF No. 70-2: Defs.' First Am. Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 34.

**RESPONSE: Disputed.** Kiesler did not tell Stacy that she should talk with her lawyer and/or financial advisor. (Suppl. Decl. of Stacy Randall ¶ 16.) **Undisputed** that Stacy said she needed more time so she could talk to a lawyer or financial advisor. (Randall Dep., Aug. 28, 2023, at 274:23-275:7.)

35.     She expressed her actual understanding of the share price calculation and the conversation after her second phone call with Kiesler on May 6, explaining to her financial advisor Mark Goff directly after the call as follows:

> Mikes [sic] attitude sure turned around in a hurry when I told him that I would like to hire someone that would represent me to look at the books and do their own evaluation of the company. I told him I have never thought that they have had an interest in my well being. He told me that the company puts all of the in coming [sic] "profit" right back into the business. So they never make any money.... He gave me the way they have evaluated the company shares since 1991. It has nothing to do with how good or bad the company is doing. He was trying to tell me in 7 years my stock would still be worth 1.1 mill. I don't understand how that could be. Just when I was going to call him back he was calling me, it was at 3:58. I had to chuckle thinking he was going to pressure me for a decision. What he told me was that he had just received an email saying the government has pushed back the deadline for another week so he doesn't need my answer today after all. Now I have time to talk to Scott Spangler on Monday to see what he thinks I should do. Kiesler now knows I don't trust he or Reed and that I don't believe they have my best interest in mind at all. I could tell he was in disbelief and I could hear some sadness in his voice.

Randall Dep., Aug. 28, 2023, at 285:23-286:18; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

**RESPONSE:** **Disputed** to the extent that the proposed finding of fact implies that Ms. Randall had an "actual understanding of the share price calculation." The cited evidence does not support that portion of the proposed finding of fact. (*See* Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 13, Ex. M, ECF No. 70-12 ("I don't understand how that could be.").) Prior to the May 2020 redemption, nobody explained the stock price formula calculation to Stacy, and she did not have an independent understanding of it. (Suppl. Decl. of Stacy Randall ¶¶ 14, 41; 08/28/2023 S. Randall Dep. Tr. 200:10-16.) **Undisputed**, but immaterial, that Ms. Randall sent Mr. Goff the above-quoted message.

36.     Randall denied that Kiesler walked through the formula with her. Randall Dep., Aug. 28, 2023, at 263:20-265:23, 303:22-304:3, 317:8-17.

**RESPONSE**: Undisputed.

37.     Randall did not contact any attorneys following her May 6 conversation with Kiesler until May 13, the day she signed the redemption agreement. Randall Dep., Aug. 28, 2023, at 276:4-25.

**RESPONSE**: **Undisputed**, but immaterial. (*See also* Suppl. Decl. of David Palay Ex. 4.)

38.     On May 13, when Randall spoke with Windy Waters' counsel, he offered to provide her with the names of attorneys she could consult with, but she declined the offer. Scott Seid Dep. ("Seid Dep."), Aug. 17, 2023, at 33:9-34:12, 39:1-14, 122:10-21.

**RESPONSE**: **Disputed.** Attorney Seid did not offer to provide Stacy with names of attorneys she could consult with. (08/28/2023 S. Randall Dep. Tr. 314:18-315:21; Suppl. Decl. of Stacy Randall ¶ 25.)

39.     Seid also told Randall (1) he could not give her advice because the firm represents the company, (2) that if she was uncomfortable signing the documents, there was no reason to do it, and (3) that if she felt like she needed to talk to an attorney first, that she absolutely had the right to do that and should do that. Am. Answer (ECF No. 45), ¶¶ 110-11, 113; Seid Dep., Aug. 17, 2023, at 33:9-34:14, 38:2-39:12, 40:6-11; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16).

**RESPONSE: Disputed**. When Stacy spoke with Attorney Seid on the phone on May 13, 2020, she told Attorney Seid she was not comfortable signing the agreement, and he responded by saying that nobody can force her to sign the contract. (Suppl. Decl. of Stacy Randall ¶¶ 23, 25-37.) Mr. Seid did not tell Stacy that he could not give her advice because his firm represented the company. (Suppl. Decl. Stacy Randall ¶¶ 26-28, 30, 32, 33, 35, 37.)

40.     Between May 6, 2020, and May 13, 2020, Reed and Randall had no contact and did not communicate in any way. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.7, ¶ 64; Randall Dep., Aug. 28, 2023, at 261:12-18.

**RESPONSE: Undisputed** to the extent that this fact indicates that Reed and Stacy had no *direct* communications. **Disputed** that Reed did not communicate with Stacy "in any way." Reed communicated with Stacy through his agent, Kiesler. (*See* ECF No. 61, Pl.'s PFOF No. 187; Answer ¶ 85; Palay Decl., ¶ 51, Ex. 49, WINDY0047397-40.)

41.     Between May 5 and May 13, 2020, Reed and Kiesler had no discussions about what information Randall did or did not have about Windy Waters, and Reed did not otherwise know what information Randall did or did not have about Windy Waters. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.7, ¶ 65.

**RESPONSE: Undisputed** that Reed and Kiesler had no discussions about what information Randall did or did not have about Windy Waters between May 5 and May 13, 2020. **Disputed** that Reed did not otherwise know what information Randall did or did not have about Windy Waters. (*See, e.g.*, ECF No. 61, Pl.'s Proposed Findings of Fact Nos. 170, 171, 178, 181, 184, 188, 200, 238, 239, 265-287; Suppl. Decl. of D. Palay, ¶ 13, Ex. 11 (*see* section in the operational update e-mail under the header "Valuation").)

42.      Reed made no statement of fact to Randall related to her stock redemption between May 5, 2020 and May 13, 2020. Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.7-8, ¶¶ 64, 66-67.

**RESPONSE**: Undisputed.


43.      Windy Waters' bylaws provided for only the standard officer roles of president, one or more vice-presidents, secretary, and a treasurer. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.20, ¶ 159, Ex. X (ECF No. 74-10).

**RESPONSE**: **Disputed** that, to the extent this proposed finding of fact is referring to (without a pin cite) Article 4.01 of the bylaws, Article 4.03 states: "In addition to the officers referred to in Section 4.01 of these bylaws, the corporation may have such other officers, assistants to officers, acting officers, and agents"; thus, the officer positions mentioned in the proposed finding of fact are not the only officer roles permitted under the bylaws. (Kiesler Decl., Ex. X at 10 §§ 4.01 & 4.03 (ECF No. 74-10).) Further **disputed** because the cited evidence does not support that officer roles of president, one or more vice-presidents, secretary, and a treasurer are "standard."


44.      Between 2007 and the time of Randall's final redemption, Reed was never elected to be an officer or director of Windy Waters. Reed Decl., Nov. 10, 2023, p.2, ¶ 7; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1).

**RESPONSE**: Undisputed.

45.     Between 2007 and the time of Randall's final redemption, Reed was not an officer or director of Windy Waters. Reed Decl., Nov. 10, 2023, p.2, ¶ 7; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1).

**RESPONSE:** **Undisputed** that Reed was not elected by a board of directors to be an officer or director of Windy Waters between 2007 and May 13, 2020. **Disputed** that Reed did not exercise authority as an officer or director over Kiesler with respect to the May 13, 2020 redemption at issue, because Reed did exercise such authority. (*See* ECF No. 61, Pl.'s PFOF No. 187; ECF No. 55, 9/19/23 M. Kiesler Dep. Tr. 218:16-20, 225:1-4; Answer ¶ 85; Palay Decl., ¶ 51, Ex. 49, WINDY0047397-40.)

46.     The Stock Price Formula was described in the May 7, 2007 Second Amendment to Shareholder Agreement of Windy Waters (the "Second Amendment"). A true and correct copy of the document is attached to Michael J. Kiesler's September 29, 2023, Declaration as Exhibit D. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, ¶ 37, Ex. D (ECF No. 74-4).

**RESPONSE:** **Undisputed** that the calculation referred to by Defendants as the "Stock Price Formula" is described in the May 7, 2007 Second Amendment to Shareholder Agreement of Windy Waters, and the Second Amendment to Shareholder Agreement refers to it as "Fair Market Value per share Calculation." (Palay Decl. Ex. 39 at STAFFORD001294.)

47.     The Stock Price Formula is based on a commonly used metric in accounting called EBITDA, short for earnings before interest, taxes, depreciation, and amortization. Kiesler Decl., Nov. 10, 2023, p.4, ¶ 17.

**RESPONSE:** **Disputed** that describing Stock Price Formula as being "based on" EBITDA is accurate. The Stock Price Formula was created based on a report from Bruce Hutler, an advisor at

the accounting firm used by Windy Waters at the time—then called Virchow Krause, which later changed its name to Baker Tilly. (*See* Defs.' PFOF No. 88). **Undisputed** that the Stock Price Formula uses the inputs identified in "Exhibit C" (STAFFORD001294) to the Second Amendment to Shareholder Agreement (ECF No. 68-2) which refers to, in part, "[t]aking the weighted average of EBITDA for the three previous fiscal years . . . ." ECF No. 68-2 at 4.

48.     The starting point for calculating the EBITDA of Windy Waters was Windy Waters' net income (which itself was a function of revenue minus expenses). Kiesler Decl., Nov. 10, 2023, p.4, ¶ 18.

**RESPONSE**: **Undisputed,** but immaterial.

49.     The Stock Price Formula was originally created in 2004 by Baker Tilly, the accounting firm used by Windy Waters. Bruce Hutler Decl. ("Hutler Decl."), Sept. 29, 2023, (ECF No. 68) pp. 1-2, ¶¶ 1-6, Ex. 1 (ECF No. 68-1); Declaration of Brad DeNoyer, Nov. 10, 2023, ("DeNoyer Decl."), p.1, ¶ 4; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-34; Kiesler Decl., Nov. 10, 2023, p.5, ¶¶ 19-20, Ex. K (WINDY0056415).

**RESPONSE**: **Undisputed**.

50.     Baker Tilly explained to Kiesler that the formula would be a fair way to approximate a price in the ballpark of fair market value, and would eliminate the need to obtain a formal valuation each time a stock transaction was requested. DeNoyer Decl., Nov. 10, 2023, p.2, ¶ 5; Kiesler Decl., Nov. 10, 2023, p.5, ¶ 22.

**RESPONSE: Disputed.** (Palay Decl. Ex. 39 at 2, ECF No. 63-38; Palay Decl. Ex. 38 at 10-11, ECF No. 63-37). The cited evidence does not support the proposed finding of fact. Neither Brad DeNoyer's declaration paragraph 5 nor Kiesler's declaration paragraph 22 says or supports the proposition that Baker Tilly explained to Kiesler that the formula would be a fair way to approximate a price in the ballpark of fair market value. (B. DeNoyer Decl., ECF No. 112 ¶ 5.) Further **disputed** to the extent the proposed finding of fact suggests that the formula is, in fact, a "fair way to approximate a price in the ballpark of fair market value." (Palay Decl., ¶ 17, Ex. 15, WINDY0034048; Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl., ¶ 19, Ex. 17, WINDY0033985; *Compare* ECF No. 75-23, Kiesler Dep. Ex. U, *with* Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), *and* Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), *and* Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), *and* Palay Decl., Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113 ("Based on my analysis, I determined that the Enterprise Value of Widen was $95,610,000 and the Equity Value of Widen was $103,267,485 at the Valuation Date [May 13, 2020].").) Further **disputed** insofar as the Second Amendment to Shareholder Agreement and Exhibit C thereto expressly indicate that the Stock Price Formula was implemented to eliminate the need to obtain a third-party valuation for involuntary redemptions in the case of death or permanent disability, not voluntary redemptions like Stacy's May 2020 redemption. (Palay Decl. Ex. 39 at 2, ECF No. 63-38; Palay Decl. Ex. 38 at 10-11, ECF No. 63-37.)

51.    After its creation in 2004, the Stock Price Formula was included in stock transfer agreements for Mike Kiesler, Gary Norris, Thomas Schmidt, and Terry Vial when they acquired stock in 2004. Kiesler Decl., Nov. 10, 2023, p.5, ¶¶ 19-20, Ex. K (WINDY0056415).

**RESPONSE**: Undisputed.


52.    Then, in 2007, Windy Waters' counsel recommended memorializing use of the Stock Price Formula in the Second Amendment to Shareholder Agreement of Windy Waters. Kiesler Decl., Nov. 10, 2023, p.5, ¶ 21, Ex. L (WINDY0056348).

**RESPONSE:** **Disputed** to the extent that this proposed finding of fact asserts or implies that Windy Waters' counsel memorialized that the Stock Price Formula is to be used in a redemption like Stacy's May 2020 redemption. (Kiesler Decl., Nov. 10, 2023, p.5, ¶ 21, Ex. L at WINDY0056349 (Second Amendment to the Shareholder Agreement makes the formula described therein applicable only to "each share of Stock or interest therein redeemed or purchased pursuant to Sections 2.2 and 2.3 ...." (*Id.*) Section 2.2 of the Shareholder Agreement applies in cases of redemption upon a shareholder's death. (ECF No. 63-37, 09/29/2023 Palay Decl. Ex. 38 at STAFFORD001315.) Section 2.3 of the Shareholder Agreement applies in cases of redemption upon a shareholder's permanent disability. (ECF No 63-37, 09/29/2023 Palay Decl. Ex. 38 at STAFFORD001316.)


53.    The lawyer drafted the agreement and asked Kiesler to circulate it for signature. Kiesler Decl., Nov. 10, 2023, p.5, ¶ 21, Ex. L (WINDY0056348).

**RESPONSE:** **Undisputed** insofar as the proposed finding of fact asserts that the lawyer only drafted the Second Amendment to Shareholder Agreement, not the Shareholder Agreement itself,

and asked Kiesler to circulate the Second Amendment to Shareholder Agreement for signature. (Kiesler Decl., Nov. 10, 2023, Ex. L (WINDY0056348).) Otherwise, **disputed.**

54.    Randall and the other two voting shareholders at the time signed it, along with their spouses. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, ¶ 37, Ex. D (ECF No. 74-4).

**RESPONSE: Disputed** that Stacy voted her shares at any time or was given the opportunity to do so, as the annual meetings of the shareholders of Windy Waters, Inc. did not actually occur. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 114:4-24; 117:9-118:7, 132:2-133:2, 134:16-135:15, 280:22-24; *see generally id.* 106:20-137:17.) Further **disputed** that Steven Randall signed the document, because he did not recognize his signature and did not have any recollection signing the document. (ECF No. 100, 11/6/23 Steven Randall Dep. Tr. (Vol. II) 230:2-231:12.) Otherwise, **undisputed** for the purpose of summary judgment that Stacy signed it but does not recall doing so and does not recognize the signature as her own.

55.    Kiesler calculated the Stock Price Formula to obtain a per-share price for every stock transaction since 2004. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-6, ¶¶ 35-36, 41 Kiesler Dep., Sept. 19, 2023, at 195:1-8, 204:3-7; Gonnering Dep., Sept. 21, 2023, at 148:1-5, 148:19-20, 149:4-8; Corp. Representative of Windy Waters, Inc. Dep. ("Windy Waters Dep."), Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-93:5; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

**RESPONSE: Undisputed**, but immaterial.

56.     Since 2013, based on advice from Windy Waters' advisor, Bruce Hutler, every time Kiesler calculated the stock price, Kiesler compared the formula price to a per-share price using the company's assets minus liabilities—that is, the net assets, referred to as the stockholder's equity amount in Windy Waters' financial statements. Hutler Decl., Sept. 29, 2023, (ECF No. 68) pp.1, 4, ¶¶ 3, 14; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, ¶¶ 39-41; Windy Waters Dep., Nov. 3, 2023, at 112:15-25.

**RESPONSE: Disputed.** The proposed fact is not supported by admissible evidence. (See ECF No. 104, Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed on November 10, 2020.)


57.     The only time a price other than the Stock Price Formula price was paid was on the one occasion after 2013 when Kiesler compared the formula per-share price to a per-share price using the company's assets and found the price calculated from net assets was higher. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-6, 11, ¶¶ 35-41, 78-80, Ex. M (ECF No. 75-18); Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

**RESPONSE: Undisputed.**


58.     This use of the Stock Price Formula, even in voluntary transactions, was based on the custom, practice, and understanding among the shareholders. Reed Decl., Nov. 10, 2023, p.3, ¶ 19; Randall Dep., Aug. 28, 2023, at 200:10-16.

**RESPONSE: Disputed.** In the stock transaction at issue in this case, the "opportunity" to purchase Stacy's stock using a formula Defendants had been informed was "low," and which produced a purchase price at a small fraction of Widen Enterprises' CEO's estimate of the

company's market value in August 2018, was Defendants' reason for using (i.e., the basis upon which they used) the Stock Price Formula in Stacy's 2020 redemption. (09/29/2023 Palay Decl., Exs. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue."), 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), 19 ("One opportunity would trip our decision to give the money back without waiting, and that would be fulfilling the liquidity request of Stacy Randall. If we buy her shares, we would not keep the funds."), 28 ("We have been working on buying back shares as the weighted EBITDA valuation is low."); Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."); Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781); Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; Palay Decl. Ex. 55 ("Windy Waters, Inc. has purchased all Randall shares. Mission accomplished.").) Further, Stacy testified that she did not understand the Stock Price Formula: she was "aware that there was a formula to figure them out, but [she] didn't know what, where, or how." (08/28/2023 S. Randall Dep. Tr. 200:10-16.)

59.     [intentionally left blank]

**RESPONSE:** No response necessary.

60.     Kiesler did it this way every time because he "was always told to be consistent." Kiesler Dep., Sept. 19, 2023, at 195:1-8.

**RESPONSE: Disputed.** In the stock transaction at issue in this case, the "opportunity" to purchase Stacy's stock using a formula Kiesler had been informed was "low," and which produced a

purchase price at a small fraction of Widen Enterprises' CEO's estimate of the company's market value in August 2018, was Kiesler's reason for using the Stock Price Formula in Stacy's 2020 redemption. (09/29/2023 Palay Decl., Exs. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue."), 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), 19 ("One opportunity would trip our decision to give the money back without waiting, and that would be fulfilling the liquidity request of Stacy Randall. If we buy her shares, we would not keep the funds."), 28 ("We have been working on buying back shares as the weighted EBITDA valuation is low."); Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."); Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781); Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; Palay Decl. Ex. 55 ("Windy Waters, Inc. has purchased all Randall shares. Mission accomplished.").)

61.     A chart showing each stock transaction for Windy Waters from 2004 to 2020 is below:

| Shareholder Name: | Effective Date: | Redemption or Subscription: | # of Shares: | Price Per Share: |
|---|---|---|---|---|
| Gary Norris | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Terry Vial | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Thomas Schmidt | 05/15/2004 | Subscription | 285.68 | $350.04 |
| Michael Kiesler | 05/15/2004 | Subscription | 285.68 | $350.04 |

| Stacy Randall | 06/30/2005 | Redemption | 611.88 | $326.86 |
|---|---|---|---|---|
| Stewart Widen | 01/01/2007 | Redemption | 232.75 (Class A) 5063.903 (Class B) | $294.70 (Class A) $280.66 (Class B) |
| Gary Norris | 01/01/2007 | Subscription | 712.606 | $280.66 |
| Michael Kiesler | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Terry Vial | 01/01/2007 | Subscription | 356.303 | $280.66 |
| Stacy Randall | 06/30/2007 | Redemption | 801.05 | $312.09 |
| Matthew Gonnering | 01/01/2008 | Subscription | 148.54 | $336.61 |
| Reed Widen | 01/01/2008 | Subscription | 594.16 | $336.61 |
| Thomas Schmidt | 12/31/2009 | Redemption | 285.68 | $155.34 |
| Matthew Gonnering | 01/01/2011 | Subscription | 592.77 | $168.70 |
| Stacy Randall | 01/18/2011 | Redemption | 1185.5364 | $168.70 |
| Terry Vial | 02/07/2011 | Redemption | 264.7308 | $168.70 |
| Brian Becker | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Gary Norris | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Matthew Gonnering | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Michael Kiesler | 12/31/2012 | Subscription | 104.4923 | 223.86 |
| Reed Widen | 12/31/2012 | Subscription | 446.7078 | 223.86 |
| Stacy Randall | 12/31/2012 | Subscription | 44.6708 | 223.86 |
| Price Widen | 06/01/2015 | Redemption | 232.75 (Class A) 5063.9025 (Class B) | $178.44 (Class A) $169.94 (Class B) |

| | | | | |
|---|---|---|---|---|
| **Brian Becker** | 04/30/2016 | Redemption | 104.4923 | $334.14 |
| **Terry Vial** | 04/30/2016 | Redemption | 377.2522 | $334.14 |
| **Stacy Randall** | 08/01/2017 | Redemption | 275.5210 | $283.10 |
| **Stacy Randall** | 01/01/2019 | Redemption | 281.8291 | $425.79 |
| **Reed C. Widen Children's Trust** | 12/24/2019 | Redemption | 861 | $512.54 |
| **Stacy Randall** | 05/13/2020 | Redemption | 232.75 (Class A) 1952.7568 (Class B) | $646.19 (Class A) $615.42 (Class B) |

Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-6, ¶¶ 35-36; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-93:5; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

**RESPONSE: Disputed.** Some stock transactions for Windy Waters from 2004 to 2020 are omitted from the table, including Reed's 1/1/2004 redemption, Reed's transfers of shares to a revocable trust on 12/2/2013, Mr. Norris's 5/1/2006 subscription, and Tyler Widen's 4/1/2004 redemption (*see* Kiesler Decl. Ex. C, ECF No. 74-3).

62.     As with all other transactions since 2004, when the Reed C. Widen Children's Trust of 2007 redeemed its shares in 2019, the price of $512.54 was calculated using the Stock Price Formula, and that price exceeded the net assets price. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.12, ¶¶ 87-88, Ex. Q (ECF No. 75-21).

**RESPONSE: Disputed** that all other transactions since 2004 involved price per share of $512.54 and that all other transactions since 2004 had price per share that exceeded the net assets price. (*See supra* Defs.' Suppl. PFOF No. 57; Kiesler Decl., Sept. 29, 2023, Ex. M (ECF No. 75-18).)

**Undisputed** that all other transactions since 2004 involved using the formula to calculate price per share and that, except for Price Widen's in 2015, those transactions had price per share that exceeded the net assets price calculation. (*See supra* Defs.' Suppl. PFOF No. 57; Kiesler Decl., Sept. 29, 2023, Ex. M (ECF No. 75-18).) **Undisputed** that the price per share that Windy Waters paid the Children's Trust for its stock was $512.54 per share and that price was calculated using the formula.

63.     Randall authorized use of her signature stamp on the document effectuating the stock transfer involving the Reed C. Widen Children's Trust of 2007 without asking any questions. Randall Dep., Aug. 28, 2023, at 132:6-13, 138:17-20, 141:16-21; Kiesler Dep., Sept. 19, 2023, at 106:20-121:6, 120:19-121:3, 121:15-122:23; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.12, ¶¶ 87-89, Ex. P (ECF No. 74-5).

**RESPONSE**: Undisputed.

64.     The Reed C. Widen Children's Trust of 2007 was established by Reed Widen for the benefit of his children. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.5, ¶ 45.

**RESPONSE**: Undisputed.

65.     The Reed C. Widen Children's Trust of 2007 was terminated in 2019 and the trust then paid Reed's children the funds it received from selling the Windy Waters shares it owned. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.5, ¶ 46.

**RESPONSE**: Undisputed.

66.     A chart showing each of Randall's stock redemptions is below:

| Effective Date: | # of Shares: | Price Per Share: | Total Price: |
|---|---|---|---|
| 06/30/2005 | 611.88 | $326.86 | $200,000.00 |
| 06/30/2007 | 801.05 | $312.09 | $250,000.00 |
| 01/18/2011 | 1185.5364 | $168.70 | $200,000.00 |
| 08/01/2017 | 275.5210 | $283.10 | $78,000.00 |
| 01/01/2019 | 281.8291 | $425.79 | $120,000.00 |
| 05/13/2020 | 232.75     (Class A)<br>1952.7568 (Class B) | $646.19 (Class A)<br>$615.42 (Class B) | $1,352,166.31 |

Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.6-10, ¶¶ 42-67, Exs. G (ECF No. 75-12), H (ECF No. 75-13), I (ECF No. 75-14).

**RESPONSE:** Undisputed.


67.     Each time Randall redeemed stock, the amount paid was based on the calculation of the Stock Price Formula, and each time, the price calculated from the Stock Price Formula was more favorable than the price would have been if calculated from net assets. She never asked for nor received financial statements in relation to those prior transactions. Randall Dep., Aug. 28, 2023, at 82:23-25; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4, 6-7, 10, ¶¶ 29, 37, 45, 68-69, Ex. D (ECF No. 74-4); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶ 31.

**RESPONSE:** **Undisputed** that Defendants calculated the purchase price for each of Ms. Randall's redemptions using the formula contained in the Second Amendment to the Shareholder Agreement, and that the price was higher than it would have been if calculated based on a pro rata portion of the company's net assets attributable to that amount of stock. **Undisputed** that Randall did not ask for and did not receive financial statements in relation to her prior stock redemptions.

68.     As had been consistently done with prior stock transactions, the price calculated using the Stock Price Formula was the amount Windy Waters was willing to pay for the rest of Randall's shares on May 13, 2020. Reed Dep., Aug. 23, 2023, at 80:18-81:14; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶ 55; Kiesler Dep., Sept. 19, 2023, at 168:24-169:7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-18, ¶¶ 118-20, 133-35, 140-41.

**RESPONSE**: Undisputed.

69.     A true and correct copy of the signed stock redemption agreement dated May 13, 2020, by which Randall sold all her shares in Widen Enterprises, is attached to the Complaint as Exhibit B (ECF No. 1-6) and to the Reed C. Widen Declaration dated July 14, 2023 (ECF No. 33) as Exhibit A (ECF No. 33-1). Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6); Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1).

**RESPONSE**: **Disputed.** The cited evidence does not support the proposed finding of fact. The May 13, 2020 redemption agreement expressly relates to Stacy's shares of Windy Waters, not Widen Enterprises. (See Kieler Decl. Ex. V, ECF No. 74-8.) Further, the May 13, 2020 redemption agreement is void because Defendants fraudulently induced Stacy to sign it. (See, e.g., ECF No. 61, Pl.'s Proposed Findings of Fact Nos. 164-206, 265-87.)

70.     When Randall redeemed all of her shares in May 2020, she resigned from her role as sole director and president of Windy Waters. Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1).

**RESPONSE**: **Disputed.** *See* ECF No. 115, Pl.'s Resp. to Defs.' PFOF Nos. 39, 41.

71.     After Randall redeemed all of her shares in May 2020, the only remaining shareholders of Windy Waters were Reed (as trustee of the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013), Gary Norris, Kiesler, and Gonnering. Kiesler Decl., Nov. 10, 2023, p.8, ¶ 35.

**RESPONSE:** Undisputed.

72.     As of May 2020, Reed, Gary Norris, Kiesler, and Gonnering were all employed by Widen Enterprises. Kiesler Decl., Nov. 10, 2023, p.8, ¶ 36.

**RESPONSE:** Undisputed.

73.     Randall was not employed by Widen Enterprises or Windy Waters in 2020. Randall Dep., Aug. 28, 2023, at 19:24-20:8, 72:11-17; Reed Decl., Sept. 29, 2023, (ECF No. 67) p. 3, ¶ 23.

**RESPONSE:** Undisputed.

74.     After May 13, 2020, for the first time since Gonnering became CEO, all Windy Waters shareholders were also Widen Enterprises employees (Reed was trustee of the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013). Kiesler Decl., Nov. 10, 2023, p.8, ¶ 37; *see also* Palay Decl., Sept. 29, 2023, (ECF No. 63) p.5, ¶ 37, Ex. 35 (ECF No. 63-34).

**RESPONSE:** Undisputed.

75.     Paying employees who were also shareholders compensation through dividends rather than wages was a theory Gonnering learned about in business school. Gonnering Dep., Sept. 21, 2023, at 169:9-13.

**RESPONSE: Undisputed**, but immaterial.

76.     In 2020, Kiesler explored payment through dividends rather than wages with employment tax at Gonnering's request, but the companies' accounting firm, Baker Tilly, did not recommend it. Kiesler Decl., Nov. 10, 2023, pp.8-9, ¶ 38, Exs. M (WINDY0044692), N (WINDY0044193).

**RESPONSE: Undisputed.**

77.     In June 2020, because all Windy Waters shareholders were also Widen Enterprises employees for the first time since Gonnering became CEO, Gonnering instructed Kiesler to explore options for reducing its employment tax burden by reducing payroll compensation to the four shareholders and instead paying an equal amount through a dividend paid pro rata to those shareholders. Kiesler Decl., Nov. 10, 2023, pp.8-9, ¶¶ 37-38; Palay Decl., Sept. 29, 2023, (ECF No. 63) p.5, ¶ 37, Ex. 35 (ECF No. 63-34).

**RESPONSE: Disputed.** The cited evidence does not support the proposed finding of fact that "reducing its employment tax burden" was Gonnering's motivation for Gonnering's instruction to Kiesler, and Kiesler's testimony on this point would not be admissible as it lacks foundation. Otherwise, **undisputed.**

78.     However, advisors at Baker Tilly advised against paying dividends instead of compensation. Kiesler Decl., Nov. 10, 2023, pp.8-9, ¶ 38, Ex. N (WINDY0044193).

**RESPONSE:** Undisputed.

79.     After receiving this advice, Widen Enterprises did not further pursue paying Windy Waters shareholders through dividends instead of compensation. Kiesler Decl., Nov. 10, 2023, pp.8-9, ¶ 38.

**RESPONSE:** Undisputed.

80.     In approximately 2009 or 2010, Reed assembled an advisory board to advise Widen Enterprises on various matters. Reed Decl., Nov. 10, 2023, p.2, ¶ 8.

**RESPONSE:** Undisputed.

81.     The advisory board was made up of external advisors, such as its accountants and lawyers. Reed Decl., Nov. 10, 2023, p.2, ¶ 9.

**RESPONSE: Disputed** insofar as this proposed finding of fact asserts the "informal" advisory board was entirely composed of external advisors. (ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 74:8-75:8.) Reed, Kiesler, Gonnering, and Gary Norris were a part of that group. (ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 74:13-24.) Further **disputed** that lawyers were a part of that group. (ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 74:8-24.) Otherwise, **undisputed.**

82.     The advisory board members were not directors of Widen Enterprises or Windy Waters and did not engage in any corporate governance. Reed Decl., Nov. 10, 2023, p.2, ¶ 10.

**RESPONSE:** **Disputed**. Kiesler, Gonnering, and Reed were on the advisory board and Reed was a director of Widen Enterprises from January 1998 until May 13, 2020. (ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 58:9-12, 74:13-24.) Reed was engaged in corporate governance of the Companies because he was in control of the Companies dating back to at least 2003. (ECF No. 45, Am. Answer ¶ 273; ECF No. 54, 08/23/2023 R. Widen Dep. Tr. 44:24-46:25, 16:2-3; ECF No. 56, 09/21/2023 M. Gonnering Dep. Tr. 113:24-114:7, 117:16-118:9, 119:20-24, 120:20-122:12, 123:21-124:4; ECF No. 55, 09/19/2023 M. Kiesler Dep. Tr. 225:8-19.) Kiesler and Gonnering were also engaged in corporate governance of the Companies. (ECF No. 103, 11/3/23 Windy Waters Dep. Tr. 37:20-23, ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 131:6-132:11; Palay Decl. Ex. 28, 11/22/19 operational update email from Gonnering to Reed and copying Kiesler ("In a conversation with Gary this week he requested the purchase of additional Windy Waters shares. I communicated that he should have that conversation with you. I also told him how I would advise you on this request to manage his expectations, and that advice is as follows: We have been working on buying back [Windy Waters] shares as the weighted EBITDA valuation is low. I recommend we do not sell more [Windy Waters] shares and continue the [Windy Waters] share buybacks of specific shareholders, as previously outlined.").)

83.     Reed originally thought an advisory board would provide a way to collaborate with trusted advisors in an efficient manner. Reed Decl., Nov. 10, 2023, p.2, ¶ 11.

**RESPONSE:** **Undisputed**, but immaterial.

84.     Reed did not see the efficiencies he'd hoped from the advisory board, and eventually stopped coordinating meetings and reverted to consulting advisors on an as-needed basis. Reed Decl., Nov. 10, 2023, p.2, ¶ 12.

**RESPONSE: Undisputed**, but immaterial.

85.     In 2018, Widen Enterprises created a deferred compensation plan—the Widen Enterprises, Inc. Performance Unit Employee Compensation Plan (the "Plan")—for key executives. Reed Decl., Nov. 10, 2023, p.2, ¶ 14.

**RESPONSE: Undisputed**, but immaterial.

86.     Reed set up this Plan with the goal of motivating executives to continue growing the business. Reed Decl., Nov. 10, 2023, p.3, ¶ 15.

**RESPONSE: Undisputed**, but immaterial.

87.     Gonnering and Kiesler were both participants under the Plan. Reed Decl., Nov. 10, 2023, p.3, ¶ 16, Exs. D (WINDY0049602), E (WINDY0049621).

**RESPONSE: Undisputed,** but immaterial.

88.     The Plan allowed a committee to award performance units to the participants based on the fair market value of Class B common stock of Windy Waters. Reed Decl., Nov. 10, 2023, p.3, ¶ 16, Exs. D (WINDY0049602), E (WINDY0049621).

**RESPONSE: Disputed** insofar as the Plan's method for calculating "Fair Market Value" (defined at ECF No. 108-4 at WINDY0049603) involved "using the valuation methodology set forth in the attached Exhibit A" that did not yield—or come anywhere close to—the actual fair market value of Windy Waters Class B common stock. (*Compare* ECF No. 108-4 at WINDY0049610-13, *with* Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three

times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), Palay Decl. Ex. 96 at WINDY0048041 (graphing historical upward trending revenue data, including 2018), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113).) Otherwise, **undisputed**.

89.     By agreement, that fair market value of stock was calculated by averaging a weighted income-approach formula and a weighted market-approach formula (the "Deferred Comp Valuation Method"). Reed Decl., Nov. 10, 2023, p.3, ¶ 16, Exs. D (WINDY0049602, at 0049610-11), E (WINDY0049621, at 0049630-31).

**RESPONSE:** **Disputed** insofar as the Plan's method for calculating "Fair Market Value" (defined at ECF No. 108-4 at WINDY0049603) involved "using the valuation methodology set forth in the attached Exhibit A" that did not yield—or come anywhere close to—the actual fair market value of Windy Waters stock. (*Compare* ECF No. 108-4 at WINDY0049610-13, *with* Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation

perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), Palay Decl. Ex. 96 at WINDY0048041 (graphing historical upward trending revenue data, including 2018), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113).) Otherwise, **undisputed**.

90.     This methodology was recommended by Baker Tilly, the certified public accountants used by Windy Waters and Widen Enterprises. Reed Decl., Nov. 10, 2023, p.3, ¶ 17.

**RESPONSE: Disputed**. Reed's testimony on this point would not be admissible as it lacks foundation.

91.     For years between 2017 and 2020, the estimated fair market value ("FMV") of the equity (i.e., stock) in Windy Waters, Inc. was determined by Baker Tilly for purposes of the Plan. Reed Decl., Nov. 10, 2023, p.3, ¶ 18.

**RESPONSE: Disputed** insofar as the estimated fair market value of the equity (i.e., stock) in Windy Waters determined for the purposes of the Plan did not reflect, come anywhere close to, or accurately approximate the fair market value of Windy Waters. (*Compare* 11/10/23 Reed Decl. Exs. F (at WINDY0001105, showing "Indicated Value" for 2017 of $662,258), G (at WINDY0001122, showing "Indicated Value" for 2018 of $319,614), I (at WINDY0041506, showing "Indicated Value" for 2019 of $459,718 and "Indicated Value" for 2020 of $443,497),

*with* Palay Decl. Ex. 9 (July 2004 valuation of Windy Waters assessing fair market value of $7,441,000), Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), Palay Decl. Ex. 96 at WINDY0048041 (graphing historical upward trending revenue data, including 2018), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113); ECF No. 54, 8/23/23 R. Widen Dep. Tr. 90:6-14.) Further **disputed** to the extent that this proposed finding of fact asserts that Baker Tilly's valuation formula schedules for the Plan were the only estimates of the Companies' fair market value conducted or determined from 2017 through 2020. (Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."); Palay Decl., Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . .").) Otherwise, **undisputed.**

92.     After the Hutler valuation in 2004, the next time any expert valuation of Windy Waters was completed was when Baker Tilly provided a valuation for purposes of the Plan. Hutler Decl., Sept. 29, 2023, (ECF No. 68) p.2, ¶ 6, Ex. 1 (ECF No. 68-1); Windy Waters Dep., Nov. 3, 2023, at 98:17-99:16, 105:25-106:5, 106:23-107:14.

**RESPONSE: Disputed.** The proposed fact is not supported by admissible evidence. (See ECF No. 104, Pl.'s Mot. to Strike with respect to certain portions of Mr. Hutler's Declaration, filed on November 10, 2020.) Defendants did not disclose Bruce Hutler or any Baker Tilly employee as an expert under Fed. R. Civ. P. 26(a)(2)(A)-(C).

93.     Baker Tilly used the Deferred Comp Valuation Method to calculate the estimated fair market value of the Windy Waters equity and then determined the estimated fair market value of each Class A share of Windy Waters stock and each Class B share of Windy Waters stock. Baker Tilly did this calculation annually in the ordinary course under the Plan. Reed Decl., Nov. 10, 2023, p.3, ¶ 18, Exs. F (WINDY0001102), G (WINDY0001121), H (WINDY0001128), I (WINDY0041505).

**RESPONSE: Disputed.** Reed's testimony on this point would not be admissible as it lacks foundation. Reed is not qualified to testify to what Baker Tilly did in its ordinary course. Further **disputed** insofar as the estimated fair market value of Windy Waters equity and Class A and B stock determined for the purposes of the Plan did not reflect, come anywhere close to, or accurately approximate the fair market value of Windy Waters equity or Class A and B stock. (*Compare* 11/10/23 Reed Decl. Exs. F (at WINDY0001105, showing "Indicated Value" for 2017 of $662,258), G (at WINDY0001122, showing "Indicated Value" for 2018 of $319,614), I (at WINDY0041506, showing "Indicated Value" for 2019 of $459,718 and "Indicated Value" for 2020 of $443,497), *with* Palay Decl. Ex. 9 (July 2004 valuation of Windy Waters assessing fair market value of $7,441,000), Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value

somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), Palay Decl. Ex. 96 at WINDY0048041 (graphing historical upward trending revenue data, including 2018), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; ECF No. 54, 8/23/23 R. Widen Dep. Tr. 90:6-14.) Otherwise, **undisputed**.

94.     The below chart shows the results of each valuation by Baker Tilly under the Plan:

### Estimated Fair Market Value of Windy Water Shares (As determined by Baker Tilly)

| Date | All WW Shares | Each Class A Share | Each Class B Share |
|------|---------------|--------------------|--------------------|
| 10/31/17 | $ 662,258 | $55.07 | $52.45 |
| 12/31/18 | $ 319,614 | $26.59 | $25.32 |
| 12/31/19 | $ 459,718 | $38.23 | $36.41 |
| 12/31/20 | $ 443,497 | $51.68 | $49.22 |

Windy Waters Dep., Nov. 3, 2023, at 98:17-24, 107:5-11; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 9, Ex. H (Ex. 11 to Windy Waters Dep.); Reed Decl., Nov. 10, 2023, p.3, ¶ 18, Exs. F (WINDY0001102, at 0001105), G (WINDY0001121, at 0001122), H (WINDY0001128, at 0001129), I (WINDY0041505, at 0041506).

**RESPONSE**: **Undisputed** that the chart shows such results. **Disputed** insofar as the estimated fair market value of Windy Waters equity and Class A and B stock determined for the purposes of the Plan did not reflect, come anywhere close to, or accurately approximate the fair market value of

Windy Waters equity (stock) or Class A and B stock. (*Compare* 11/10/23 Reed Decl. Exs. F (at WINDY0001105, showing "Indicated Value" for 2017 of $662,258), G (at WINDY0001122, showing "Indicated Value" for 2018 of $319,614), I (at WINDY0041506, showing "Indicated Value" for 2019 of $459,718 and "Indicated Value" for 2020 of $443,497), *with* Palay Decl. Ex. 9 (July 2004 valuation of Windy Waters assessing fair market value of $7,441,000), Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), Palay Decl. Ex. 96 at WINDY0048041 (graphing historical upward trending revenue data, including 2018), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; ECF No. 54, 8/23/23 R. Widen Dep. Tr. 90:6-14.)

95.     Baker Tilly calculated the estimated fair market value of Windy Waters shares, as of 12/31/19, to be $38.23 per share for Class A shares, and $36.41 per share for Class B shares. Reed Decl., Nov. 10, 2023, p.3, ¶ 18, Ex. H (WINDY0001128, at 0001129).

**RESPONSE:** **Undisputed** that Baker Tilly made such calculations. **Disputed** insofar as the estimated fair market value of Windy Waters shares determined for the purposes of the Plan did

not reflect, come anywhere close to, or accurately approximate the actual fair market value of Windy Waters shares. (*Compare* 11/10/23 Reed Decl., Ex. H (WINDY0001128 at 0001129), *with* Palay Decl. Ex. 9 (July 2004 valuation of Windy Waters assessing fair market value of $7,441,000), Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; ECF No. 54, 8/23/23 R. Widen Dep. Tr. 90:6-14.)

96.     A true and correct copy of the report from Baker Tilly showing the Deferred Comp Valuation Method for 2019, dated February 6, 2020, is attached as Exhibit H to Reed's November 10, 2023, Declaration. Reed Decl., Nov. 10, 2023, p.3, ¶ 18, Ex. H (WINDY0001128).

**RESPONSE:** Undisputed except the estimated fair market value of Windy Waters shares determined for the purposes of the Plan did not reflect, come anywhere close to, or accurately approximate the actual fair market value of Windy Waters shares. (*Compare* 11/10/23 Reed Decl., Ex. H (WINDY0001128 at 0001129), *with* Palay Decl. Ex. 9 (July 2004 valuation of Windy

Waters assessing fair market value of $7,441,000), Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA."), Palay Decl. Ex. 26 at ACQUIA0006917 (Widen Enterprises' 2019 recurring revenue of $22,542,781), *and* Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113; ECF No. 54, 8/23/23 R. Widen Dep. Tr. 90:6-14.)

97.     Randall received tax forms each year she was a shareholder to help her file her taxes that provided information about Windy Waters' financials. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶ 171; Randall Dep., Aug. 28, 2023, at 149:12-17, 150:17-151:4; Steven Randall Dep. ("Steven Dep."), Oct. 12, 2023, at 91:21-92:25.

**RESPONSE: Disputed.** In response to whether "other than the – if there are annual meeting minutes that she signed, other than those documents, did you ever provide Stacy with any information pertaining to the operations, performance, and financial health of the companies?" Kiesler testified "She never asked for any, no." (ECF No. 55, 09/19/2023 M. Kiesler Dep. Tr. 280:9-15; *see also id.* 64:2-19, 284:24-285:16.)

98.     Randall had access to her tax forms every year and knew where they were kept. Steven Dep., Oct. 12, 2023, at 93:1-25.

**RESPONSE: Disputed** insofar as Steven Randall's testimony on what Stacy "knew" would not be admissible as it lacks foundation. Otherwise, **undisputed**, but immaterial.

99.     Randall's accountant explained her taxes to her every year. Randall Dep., Aug. 28, 2023, at 298:25-299:13.

**RESPONSE: Undisputed**, but immaterial.

100.    It has always been the practice of Windy Waters to provide information to shareholders on request. Windy Waters Dep., Nov. 3, 2023, at 206:3-25; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 11, Ex. J (Ex. 21 to Windy Waters Dep.); Kiesler Decl., Nov. 10, 2023, pp.3-4, ¶¶ 11, 13, 15-16, Exs. C (WINDY0056318), E (WINDY0055942), F (WINDY0059720), G (WINDY0059740), H (WINDY0059752), I (WINDY0038393), J (WINDY0057416).

**RESPONSE: Disputed**. Steven and Stacy Randall asked for information about the Companies numerous times over the years but were rarely provided any answers. (ECF No. 99, 10/12/23 Steven Randall Dep. Tr. (Vol. I of II) 109:12-110:13.) Further **disputed** to the extent this proposed finding of fact purports to set forth the full scope of Windy Waters' practice on the topic of information, or lack thereof, to shareholders. It was the practice of Windy Waters to not have any formal policies about disclosures to shareholders, directors, and officers, and Windy Waters has no records of any specific formal disclosures made to all Class B shareholders or all Class A shareholders or all directors or all officers. (ECF No. 103, 11/3/23 Windy Waters Dep. Tr. 206:12-25.)

101.     Randall never asked for any financial information about the company directly. Randall Dep., Aug. 28, 2023, at 82:23-25; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4, 10, 16, 19, ¶¶ 29, 68, 122, 149-50; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.4, 8 ¶¶ 31, 68.

**RESPONSE: Undisputed** for purposes of summary judgment, *but see* ECF No. 100, Steven Randall Dep. Tr. (Vol. II of II) 143:11-144:9 (Stacy asked Reed for information about the Companies at times).

102.     However, when other individuals have asked for financial information on Randall's behalf or when she needed to provide that information to someone else, she received it promptly. Kiesler Decl., Nov. 10, 2023, pp.3-4, ¶¶ 11, 13, 15-16, Exs. C (WINDY0056318), E (WINDY0055942), F (WINDY0059720), G (WINDY0059740), H (WINDY0059752), I (WINDY0038393), J (WINDY0057416).

**RESPONSE: Disputed**. Steven Randall asked for information about the Companies numerous times over the years but was rarely provided any answers. (ECF No. 99, 10/12/23 Steven Randall Dep. Tr. (Vol. I of II) 109:12-110:13.) Further **disputed** that many of the documents that Defendants cite in support of this proposed finding of fact were received by Stacy, as they were sent directly to Stacy's divorce attorney and not reviewed at the time or after by Stacy. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 5.)

103.     One time, in June 2016, Randall's then-husband asked Kiesler on Randall's behalf for "profit and loss" for Windy Waters "for 3 months (Feb, Mar, April) for the bank." Kiesler Decl., Nov. 10, 2023, p.3, ¶ 11, Ex. C (WINDY0056318).

**RESPONSE:** **Undisputed**, but immaterial.

104.     The same day, Kiesler sent copies of Windy Waters financial statements for January through April 2016 to both Randall and her husband. Kiesler Decl., Nov. 10, 2023, p.3, ¶ 11, Ex. C (WINDY0056318).

**RESPONSE:** **Disputed,** but immaterial. The cited evidence shows that Kiesler sent a copy of Widen Enterprises, not Windy Waters, financial statements for January through April 2016. Kiesler Decl., Nov. 10, 2023, p.3, ¶ 11, Ex. C at WINDY0056319-33.

105.     In March 2020, Randall asked Reed and then Kiesler to work with her divorce lawyer to provide responses to discovery requests in her divorce proceedings, forwarding the discovery requests. The information requested included detailed monthly statements for checking, deposit, and savings accounts in Windy Waters' name, as well as detailed monthly or quarterly statements for all investment accounts owned by Windy Waters, since January 2019. Reed Decl., Nov. 10, 2023, p.4, ¶ 20; Kiesler Decl., Nov. 10, 2023, p.3, ¶ 13, Ex. E (WINDY0059942).

**RESPONSE:** **Undisputed**, but immaterial.

106.     To allow Randall to respond to those discovery requests, using a file link Randall's counsel provided, Kiesler uploaded bank statements and investment account statements he had gathered to that link. A screenshot of the folder structure for the files he uploaded is below, and the file names indicate to which request the documents related and accurate summarize the documents in that folder:



Kiesler Decl., Nov. 10, 2023, pp.3-4, ¶ 14.

**RESPONSE:** **Undisputed** except to the extent that this proposed finding of fact asserts or suggests that Stacy received or reviewed the documents and information provided by Kiesler directly to Stacy's divorce attorney (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 5), as Defendants did not disclose to Stacy prior to the May 2020 redemption that Windy Waters held millions of dollars in investment portfolios or the amount of money in Widen Enterprises' bank account. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19; 294:6-296:9; 09/28/2023 S. Randall Decl., p.3, ¶ 15; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

107.    Those records included investment account statements showing Windy Waters held over $4.5 million in three investment accounts through the statement dates in 2019, and included bank statements of Widen Enterprises, the most recent showing a balance of $3.172 million as of February 29, 2020. Kiesler Decl., Nov. 10, 2023, p.4, ¶ 15, Exs. F (WINDY0059720), G (WINDY0059740), H (WINDY0059752), I (WINDY0038393).

**RESPONSE: Undisputed** except to the extent that this proposed finding of fact asserts or suggests that Stacy received or reviewed the documents and information provided by Kiesler directly to Stacy's divorce attorney (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 5), as Defendants did not disclose to Stacy prior to the May 2020 redemption that Windy Waters held millions of dollars in investment portfolios or the amount of money in Widen Enterprises' bank account. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19; 294:6-296:9; 09/28/2023 S. Randall Decl., p.3, ¶ 15; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

108.   On March 26, 2020, Randall's counsel confirmed she had received the records. Kiesler Decl., Nov. 10, 2023, p.4, ¶ 16 Ex. J (WINDY0057416).

**RESPONSE: Undisputed** except to the extent that this proposed finding of fact asserts or suggests that Stacy personally received or reviewed the documents and information provided by Kiesler directly to Stacy's divorce attorney. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 5.)

109.   Widen Enterprises showed negative net income in March and April 2020, which means that Widen Enterprises recognized more expense than revenue in those months. Kiesler Decl., Nov. 10, 2023, p.5, ¶ 24.

**RESPONSE: Disputed.** Kiesler's testimony on this point would not be admissible as it lacks foundation. (See 09/19/2023 M. Kiesler Dep. Tr. 183:2-6 (Q: Back to that May 6th conversation you had with Stacy, did you do any analysis to determine whether the company could afford to buy $100,000 worth of Stacy's stock at that time? A: No. But going back to the previously question that you asked, we felt that it would be easier to pay her in payments, small payments, over time rather than a lump sum, and it would look maybe different to the government if they audited us.").)

Further **disputed** because Widen Enterprises' decision to spend its free cash and therefore recognize negative net income during certain months did not make the company unprofitable, as Reed testified. (ECF No. 54, 08/23/2023 R. Widen Dep. Tr. 213:7-15.) Further, Widen Enterprises testified through its corporate representative, Matthew Gonnering, that it did not ever experience negative growth during the COVID-19 pandemic. (11/06/2023 Widen Enterprises Dep. Tr. 221:25-222:22.) In fact, Reed increased his total compensation by over $500,000 for 2020, comparing his 2019 total compensation of $1,459,328 to 2020 total compensation of $2,001,517, and his compensation decisions were based on the company's performance. (Palay Decl. Ex. 33; ECF No. 54, 08/23/2023 R. Widen Dep. Tr. 46:23-48:3.)

110.     In March 2020, Windy Waters' investments dropped in value. In just that one month, the company's investments lost more than $500,000. Kiesler Decl., Nov. 10, 2023, p.6, ¶ 25.

**RESPONSE: Disputed.** Kiesler's testimony on this point would not be admissible as it lacks foundation. (See 09/19/2023 M. Kiesler Dep. Tr. 183:2-6 (Q: Back to that May 6th conversation you had with Stacy, did you do any analysis to determine whether the company could afford to buy $100,000 worth of Stacy's stock at that time? A: No. But going back to the previously question that you asked, we felt that it would be easier to pay her in payments, small payments, over time rather than a lump sum, and it would look maybe different to the government if they audited us.").) Further **disputed** to the extent this proposed finding of fact mischaracterizes *Widen Enterprises'* profitability during the COVID-19 pandemic. Widen Enterprises remained profitable during the COVID-19 pandemic (ECF No. 54, 08/23/2023 R. Widen Dep. Tr. 213:7-15.) Widen Enterprises testified through its corporate representative, Matthew Gonnering, that it did not ever

experience negative growth during the COVID-19 pandemic. (11/06/2023 Widen Enterprises Dep. Tr. 221:25-222:22.)

111.    The CEO of Widen Enterprises highlighted the importance of cash reserves in April 2020, stating: "While cash is good at the moment, this is critical to our operational success. As you'll read in the scenarios below, maintaining a strong cash position will help us weather the storm. Given the persistent market uncertainty, an even stronger cash position is desired." Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 24, Ex. B (ECF No. 75-1.).

**RESPONSE:** Undisputed.

112.    Accumulating cash reserves was necessary "[d]ue to the uncertainty" from COVID. Kiesler Dep., Sept. 19, 2023, at 295:20-296:1.

**RESPONSE:** Disputed. The cited evidence would not be admissible as it lacks foundation. (See 09/19/2023 M. Kiesler Dep. Tr. 183:2-6 (Q: Back to that May 6th conversation you had with Stacy, did you do any analysis to determine whether the company could afford to buy $100,000 worth of Stacy's stock at that time? A: No. But going back to the previously question that you asked, we felt that it would be easier to pay her in payments, small payments, over time rather than a lump sum, and it would look maybe different to the government if they audited us.").) Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies. (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.)

113.     In spring of 2020, many of Widen Enterprises' customers were cutting spending and avoiding risks, and Widen Enterprises was concerned its customers would take advantage of a contract provision allowing them to terminate on 30 days' notice. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.5, ¶¶ 34-35; Gonnering Dep., Sept. 21, 2023, at 213:9-214:8, 215:3-7.

**RESPONSE**: **Disputed**. Gonnering lacks foundation to state what unidentified third-party customers were doing in the spring of 2020. The evidence shows Gonnering's knowledge is limited to customers' communications to Widen Enterprises in the spring of 2020 with respect to their business with Widen Enterprises: "Several customers [were] asking for discounts and concessions in support of their own budgets and cash flow. There [were] ˜16 customers (of 667 total) requesting discounts amounting to 8k and ˜8 customers requesting payment concessions (e.g. extending terms), of which 5 are approved." (09/29/2023 Palay Decl. Ex. 5, at WINDY0000947.) Otherwise, **undisputed**.

114.     If any customers terminated before the year was over, the Widen Enterprises standard contract required that the customer be refunded pro rata for the portion of time not used out of Widen Enterprises' cash reserves. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.5, ¶¶ 36-37; Kiesler Dep., Sept. 19, 2023, at 228:13-25.

**RESPONSE**: **Undisputed** except to the extent that this proposed finding of fact ignores that Widen Enterprises had constant access to Windy Waters' funds, and Windy Waters transferred funds to Widen Enterprises on numerous occasions "for [the] operational needs of Widen Enterprises." (ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 129:24-130:25.)

115.    Windy Waters' treasurer believed the company would put itself at risk if it paid $50,000 for non-operating expenses in May 2020. Kiesler Decl., Nov. 10, 2023, p.6, ¶ 26; Kiesler Decl., Sept. 29, 2023, (ECF No. 69) p.13, ¶ 95.

**RESPONSE: Disputed.** Kiesler's testimony on this point would not be admissible as it lacks foundation. (See 09/19/2023 M. Kiesler Dep. Tr. 183:2-6 (Q: Back to that May 6th conversation you had with Stacy, did you do any analysis to determine whether the company could afford to buy $100,000 worth of Stacy's stock at that time? A: No. But going back to the previously question that you asked, we felt that it would be easier to pay her in payments, small payments, over time rather than a lump sum, and it would look maybe different to the government if they audited us.").) Kiesler further testified that he did not know if "we" could make $50,000 "available" to Stacy. (09/19/2023 M. Kiesler Dep. Tr. 173:3-11.) Further, the evidence shows that Kiesler did *not* believe the company would put itself at risk if it paid $50,000 for non-operating expenses in May 2020. Widen Enterprises' corporate representative could not identify a single lost customer during his deposition (11/06/2023 Dep. Tr. of Widen Enterprises 220:20-21) and Kiesler testified that the company was not facing any risk of insolvency in May 2020. (09/19/2023 M. Kiesler Dep. Tr. 228:11-13.) As of the week of May 8, 2020, Widen Enterprises had $4.95 million in cash, which represented an increase in cash by $2.2 million from the week of April 10, 2020. (09/29/2023 Palay Decl. Exs. 5, 19.) Moreover, as of April 24, 2020, the marketable securities accounts owned or controlled by Windy Waters, which in May 2020 was over $5.5 million (ECF No. 55, M. Kiesler Dep. Tr. 178:15-19), were not being used as operating capital for the Companies. (09/29/2023 Wittenberg Decl. Ex. B at Defs.' Resp. to Pl.'s RFA No. 39.) Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—far less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies. (11/06/2023 Dep. Tr. of Widen

Enterprises 230:14-23.) And in the spring of 2020 Widen Enterprises was projecting 87 new customers in 2020—the same amount of new customers earned in 2019. (Palay Decl. Ex. 5 at WINDY0000947.)

116.     In April 2020, Windy Waters applied for and received a loan through the deadline government-funded Paycheck Protection Program ("PPP") in excess of $2.6 million to ensure payroll for 149 employees could be consistently maintained. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶¶ 26, 29; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.13, ¶ 97; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 3, Ex. B (ECF No. 70-2: Defs.' First Amended Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 37.

**RESPONSE**: Undisputed.

117.     The loan was necessary because, "given the economic uncertainty, [Widen Enterprises] did not know if [its] line of credit was going to be sufficient to fund a recovery without a clear timeline, let alone a survival." Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 28, Ex. C (ECF No. 75-2).

**RESPONSE**: **Disputed**. The cited evidence does not support the proposition that the PPP loan was "necessary." Exhibit C to Gonnering's September 29, 2023 Declaration states:

> As stated in the response, the CARES Act suspended the requirement that borrowers are unable to obtain credit elsewhere. We have available credit that is based on our accounts receivable, calculated as 80% of A/R, up to $2,000,000. Our ability to access credit elsewhere prevented us from pursuing another SBA program, referred to as the Economic Injury Disaster Loan (EIDL). The PPP waiver of available credit elsewhere was favorable to us and, given the economic uncertainty, we did not know if our line of credit was going to be sufficient to fund a recovery without a clear timeline, let alone a survival. It was prudent for our long-term economic sustainability that we secure funding above-and-beyond the available credit.
> . . .

We made a certification in good faith that our use of PPP funds, for their intended purpose, was necessary to support ongoing operations, even with access to other sources of liquidity. As a fiercely-independent, privately-held company, we needed to ensure our future was not placed in jeopardy and PPP funds allow us to do that. Without these funds, we are more exposed to this economic uncertainty and risk employee layoffs. These layoffs would be determinantal to the growth areas of the business and hamper future employment opportunities.

. . .

In conclusion, I believe we submitted in good faith despite having access to our own capital and a line of credit. **As for public relations, in the event the Freedom of Information act reveals us a recipient of PPP funds, I am happy to defend our position with this same uncertainty language that appears throughout** There is some risk in that the government conducts an audit and this documentation is insufficient.

. . .

**In the event you or Mike do not want us to accept this risk, we will return the funds and move on.** However, in discussions with both our attorneys and accountants, we feel justified in receiving these funds for the aforementioned reasons and prepared for an audit.

ECF No. 75-2 at 2-3 (emphasis added). Widen Enterprises testified that the floor of cash reserves it sought to maintain would have been around $1.4M to $1.6M in May 2020—far less than the approximately $5.5M Windy Waters held that was not being used as operating capital for the Companies, further suggesting that the PPP load was not "necessary." (11/06/2023 Dep. Tr. of Widen Enterprises 230:14-23.) Widen Enterprises testified that it did not project any negative growth months and that it gained customers during the COVID-19 pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 221:7-24, 222:4-18.) Together, the Companies could not identify a single customer that Widen lost nor could they provide information on how much revenue was lost as a result of the pandemic. (11/06/2023 Dep. Tr. of Widen Enterprises 220:16-221:6, 221:25-222:3; 11/03/2023 Dep. Tr. of Windy Waters 160:12-162:4.)

118.    As a condition to loan forgiveness, PPP loan proceeds had to be used on certain expense items. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.13, ¶ 98.

**RESPONSE:** Undisputed.

119.     Due to uncertainty over forgiveness, changing program guidance, requirements for use of the funds, and the certifications required for the loan application, in early May 2020, Widen Enterprises was contemplating whether it needed to return the PPP funds. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.13-14, ¶¶ 98-100; Seid Dep., Aug. 17, 2023, at 45:12-19; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 28, Ex. C (ECF No. 75-2); Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 3, Ex. B (ECF No. 70-2: Defs.' First Amended Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 37.

**RESPONSE:** **Disputed** insofar as the proposed fact is not supported by admissible evidence. Defendants may not cite unsupported attorney argument included in their own responses to Plaintiff's request for admission as admissible evidence. Further **disputed** insofar as Defendants were also contemplating whether to return the PPP funds because of the "opportunity" to "fulfill[] the liquidity request of Stacy Randall. If we buy her shares, we would not keep the funds. Share buybacks and receiving federal funds don't mix well." (Palay Decl. Ex. 19.) Otherwise, **undisputed**.

120.     The deadline to return the PPP funds to take advantage of the safe harbor was May 7, 2020, but was eventually pushed back to May 14, 2020. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 28, Ex. C (ECF No. 75-2); Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.14, ¶ 101.

**RESPONSE:** Undisputed.

121.     Widen Enterprises originally planned to return the PPP funds if it purchased Randall's shares to avoid even the risk of criminal sanctions and the appearance of impropriety of accepting government funding and at the same time paying a shareholder $1.3 million for her

stock. Gonnering Dep., Sept. 21, 2023, at 219:20-23, 221:5-222:11; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.14, ¶ 102; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 31.

**RESPONSE:** Undisputed.


122.     However, on May 13, 2020, after Randall had accepted the offer to redeem shares, Kiesler learned of new government guidance announcing criminal penalties would not be suffered by companies who took PPP funds even if the government later concluded the companies should not have qualified for the program. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.14, ¶ 103, Ex. T (ECF No. 74-7); Kiesler Dep., Sept. 19, 2023, at 208:4-21, 209:23-210:17; Seid Dep., Aug. 17, 2023, at 32:23-33:6, 45:3-19.

**RESPONSE:** **Disputed.** The newly proposed temporal part of this proposed finding of fact, that is, that Kiesler learned of the new guidance *after* Randall had accepted the offer to redeem shares, is not supported by the cited evidence. (*Compare* this proposed finding of fact, *with* Defs.' Proposed Finding of Facts ¶ 221 ("the day Randall sold her shares").) Stacy did not agree with the redemption offer during her call with Kiesler on May 13, 2020, prior to Stacy going to Widen Enterprises' office. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 21.) Given the timing of Kiesler's phone call with Attorney Seid, the cited evidence shows that Kiesler learned of the new government guidance *before* Randall accepted the offer.


123.     All dividends that were paid by Windy Waters were paid pro rata to all shareholders. Windy Waters Dep., Nov. 3, 2023, at 185:25-187:2, 187:21-188:9; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 10, Ex. I (Ex. 19 to Windy Waters Dep.).

**RESPONSE:** **Disputed.** Reed Widen paid himself purported "bonuses" to cover his tax liabilities, which were in reality constructive or disguised dividends. (08/23/2023 R. Widen Dep. Tr. 203:22-

204:8.) Ms. Randall received no such "bonuses." (Suppl. Decl. of Stacy Randall ¶ 11.) Reed Widen also received $1 million or more annually in "compensation" when he was not actively involved in the operations of the company, which was in reality constructive or disguised dividends. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23.) Ms. Randall received no such dividends. (Suppl. Decl. of Stacy Randall ¶ 12.)


124.    Tax distributions were made quarterly based on calculations performed or provided by Baker Tilly. Windy Waters Dep., Nov. 3, 2023, at 185:25-187:2, 187:21-188:9, 190:9-191:1; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 10, Ex. I (Ex. 19 to Windy Waters Dep.); Kiesler Decl., Nov. 10, 2023, p.2, ¶ 8.

**RESPONSE: Disputed.** Reed received constructive or disguised dividends in 2019 and 2020 that were not provided to Stacy. Reed Widen paid himself purported "bonuses" to cover his tax liabilities, which were in reality constructive or disguised dividends. (08/23/2023 R. Widen Dep. Tr. 203:22-204:8.) Ms. Randall received no such "bonuses." (Suppl. Decl. of Stacy Randall ¶ 11.) Reed Widen also received $1 million or more annually in "compensation" when he was not actively involved in the operations of the company, which was in reality constructive or disguised dividends. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23.) Ms. Randall received no distributions or dividends in 2019 or 2020 from Windy Waters or Widen Enterprises. (Suppl. Decl. of Stacy Randall ¶ 12; *see also* ECF No. 103, Windy Water Dep. Tr. 187:3-8.)

125.     Randall was treated like every other shareholder with respect to dividends and was paid her pro rata share each time dividends were paid. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶ 16.

**RESPONSE: Disputed.** Reed Widen paid himself purported "bonuses" to cover his tax liabilities, which were in reality constructive or disguised dividends. (08/23/2023 R. Widen Dep. Tr. 203:22-204:8.) Ms. Randall received no such "bonuses." (Suppl. Decl. of Stacy Randall ¶ 11.) Reed Widen also received $1 million or more annually in "compensation" when he was not actively involved in the operations of the company, which was in reality constructive or disguised dividends. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23.) Ms. Randall received no such dividends. (Suppl. Decl. of Stacy Randall ¶ 12.)

126.     In 2016, Randall received dividend payments from the Companies, totaling in excess of $156,000, including a non-tax dividend payment in April 2016. Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 5, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 112; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.2, ¶ 15.

**RESPONSE: Undisputed.**

127.     Below is a chart listing dividends paid to Randall, or to Wisconsin or federal taxing authorities on her behalf, from 2011 through 2020:

| Date | Payee | Memo | Amount (USD) |
| --- | --- | --- | --- |
| 1/18/2011 | United States Treasury | Stacy Randall | 3,662.00 |
| 1/18/2011 | Wisconsin Department of Revenue | Stacy Randall | 4,543.00 |

| 4/07/2011 | Stacy Randall | Distribution | 48,589.00 |
| 4/15/2013 | Stacy Randall | Distribution | 44,828.00 |
| 9/15/2014 | Wisconsin Department of Revenue | Stacy Randall | 5,379.00 |
| 1/15/2015 | United States Treasury | Stacy Randall | 26,477.34 |
| 6/15/2015 | United States Treasury | Stacy Randall | 14,913.00 |
| 6/15/2015 | Wisconsin Department of Revenue | Stacy Randall | 2,881.00 |
| 9/15/2015 | United States Treasury | Stacy Randall | 35,263.00 |
| 9/15/2015 | Wisconsin Department of Revenue | Stacy Randall | 6,812.00 |
| 1/15/2016 | United States Treasury | Stacy Randall | 30,170.00 |
| 4/7/2016 | Stacy L. Randall | Distribution | 126,018.00 |
| 1/16/2018 | United States Treasury | Stacy Randall | 18,970 |
| 1/16/2018 | Wisconsin Department of Revenue | Stacy Randall | 3,162.00 |

Kiesler Decl., Nov. 10, 2023, p.2, ¶ 9; Windy Waters Dep., Nov. 3, 2023, at 185:25-187:2, 187:21-188:9.

**RESPONSE:** Undisputed.


128.    In 2018, Windy Waters made estimated tax payments on behalf of shareholders of Windy Waters. Waters Dep., Nov. 3, 2023, at 185:25-187:2, 187:21-188:20; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 10, Ex. I (Ex. 19 to Windy Waters Dep.).

**RESPONSE: Disputed.** The cited evidence does not support this proposed finding of fact. Further, Defendants may not cite their own notes created in preparation for a Rule 30(b)(6) deposition for the truth of the matter asserted. (*See* Wittenberg Decl., Nov. 10, 2023, Ex. I; ECF No. 103, Windy Waters Dep. Tr. 11:1-8; Fed. R. Evid. 801-804.)

129.     Windy Waters also paid directors' fees, which Randall received every year she was a director of Windy Waters, around Thanksgiving each year. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.2, ¶ 8.

**RESPONSE:** **Undisputed** that Stacy was paid directors' fees in certain years; **disputed** that Stacy ever served as a director. (*See* ECF No. 115, Plaintiff's Response to Proposed Finding of Fact No. 39.) As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for "directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays each year before his death. (09/28/2023 S. Randall Decl., p. 5, ¶ 33.)

130.     Other than directors' fees and pro rata distributions to owners, Windy Waters never paid any compensation to anyone, including Reed. Kiesler Decl., Nov. 10, 2023, p.2, ¶ 7.

**RESPONSE:** **Disputed** to the extent this proposed finding of fact asserts or implies that Reed's "compensation" from Widen Enterprises was not, in fact, constructive or disguised dividends regarding Windy Waters. Reed Widen paid himself purported "bonuses" to cover his tax liabilities, which were in reality constructive or disguised dividends. (08/23/2023 R. Widen Dep. Tr. 203:22-204:8.) Ms. Randall received no such "bonuses." (Suppl. Decl. of Stacy Randall ¶ 11.) Reed Widen also received $1 million or more annually in "compensation" when he was not actively involved in the operations of the company, which was in reality constructive or disguised dividends. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142; ECF No. 55, 9/19/23 M. Kiesler Dep. Tr. 39:4-10, 82:11-83:21, 294:13-18; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23.) Ms. Randall received no such dividends. (Suppl. Decl. of Stacy Randall ¶ 12.)

131.     Widen Enterprises also typically reinvested any funds in growth. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 14.

**RESPONSE: Disputed.** Reed funneled company profits into his own compensation and bonuses, which fluctuated widely from year to year and tracked the company's financial performance as determined exclusively by Reed. (08/23/2023 R. Widen Dep. Tr. 46:23-25, 47:1-17, 47:19-48:3, 48:12-17, 50:11-14, 51:1-4, 58:17-20, 61:8-13, 61:19-62:8; 09/29/2023 Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 09/21/2023 M. Gonnering Dep. Tr. 123:21-124:6 47:19-48:3, 50:11-14, 51:1-4.) And at times when Widen Enterprises had extra cash it would send it to Windy Waters to be invested, rather than investing it directly into Widen Enterprises. (11/03/2023 Dep. Tr. of Windy Waters 117:20-118:1, 119:6-22; 11/06/2023 Dep. Tr. of Widen Enterprises 140:25-142:1.)

132.     Prior to 2021, Reed had worked at Widen Enterprises since the 1970s. Reed Dep., Aug. 23, 2023, at 11:19-12:2, 13:17-20; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.1-2, ¶¶ 5-11.

**RESPONSE: Disputed.** Defendants' assertion that Reed "worked at Widen Enterprises" during 2019 and 2020 is inaccurate. During 2019 and 2020, Reed oversaw Gonnering's management of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage in northern Wisconsin. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within

the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises, through its corporate representative, testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed and nobody other than Gonnering reported to Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.)

133.    Reed was elected the president of Widen Enterprises by a unanimous consent resolution in August 1997, signed by all of the directors of Widen Enterprises—which, at the time, included Randall—and was elected to that role "continuing until [his] successor[ is] duly elected and qualified." Reed Decl., Nov. 10, 2023, pp.1-2, ¶ 4, Ex. B (WINDY0001701).

**RESPONSE: Undisputed** that Reed became the president of Widen Enterprises by a unanimous consent resolution in August 1997 and the resolution states that "the [listed] individuals be elected to the offices set next to their respective names for the ensuing year and continuing until their

successors are duly elected and qualified"; **disputed** that Stacy ever served as a director of either Windy Waters or Widen Enterprises. (*See* ECF No. 115, Plaintiff's Response to Proposed Finding of Fact No. 39; ECF No. 102, Widen Enterprises Dep. Tr. 77:22-86:9.) As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for "directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays every year before his death. (09/28/2023 S. Randall Decl., p.5, ¶ 33.)

134.    In 1998, around the time when Randall became a director of Windy Waters instead of Widen Enterprises, a consent resolution signed by the then-shareholders and directors (including Randall) amended the Widen Enterprises bylaws to change the number of directors to one, and Reed was elected to be the sole director and president of Widen Enterprises "until his successor is duly elected and qualified." Reed Decl., Nov. 10, 2023, p.2, ¶ 5 Ex. C (WINDY0001702); Windy Waters Dep., Nov. 3, 2023, at 37:8-17.

**RESPONSE:** **Undisputed** that in 1998, a consent resolution amended the Widen Enterprises bylaws to change the number of directors to one, and Reed was elected as the director and president of Widen Enterprises "until [his] successor [is] duly elected and qualified." **Disputed** that Stacy ever served as a director of either Windy Waters or Widen Enterprises. (*See* ECF No. 115, Plaintiff's Response to Proposed Finding of Fact No. 39; ECF No. 102, Widen Enterprises Dep. Tr. 77:22-86:9.) As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for "directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays each year before his death. (09/28/2023 S. Randall Decl., p.5, ¶ 33.)

135.    Prior to 2020, Reed had been a director of Widen Enterprises since 1988. Corp. Representative of Widen Enterprises, LLC Dep. ("Widen Enterprises Dep."), Nov. 6, 2023, at 55:5-21, 58:9-12; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 12, Ex. K (Ex. 2 to Widen Enterprises Dep.).

**RESPONSE: Undisputed** except that the cited testimony states that Reed was a director of Widen Enterprises in 2020, specifically, until May 13, 2020. (ECF No. 102, Widen Enterprises Dep. Tr. 58:9-12.)


136.    Reed was actively involved in overseeing Widen Enterprises in 2019 and 2020. Gonnering Dep., Sept. 21, 2023, at 120:20-122:23, 264:4-265:14, 267:7-268:16; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

**RESPONSE: Disputed.** During 2019 and 2020, Reed oversaw Gonnering's management of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage in northern Wisconsin. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters

203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.)

137.    As Widen Enterprises' president and chairman, Reed oversaw operations at the company, including during in 2019 and 2020. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-122:23, 267:13-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-8; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 88:5-19, 89:17-21, 94:25-95:5, 96:1-25, 97:21-100:2, 100:9-24, 102:4-103:7.

**RESPONSE:** **Disputed.** During 2019 and 2020, Reed oversaw Gonnering's management of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage in northern Wisconsin. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role

70

was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.)

138.     Reed was actively involved in overseeing the company with a focus on strategy and big-picture issues, while Gonnering, the CEO, oversaw the day-to-day activities. Widen Enterprises Dep., Nov. 6, 2023, at 87:18-88:19, 89:17-21, 94:25-95:5, 96:1-25, 97:21-100:2, 100:9-24, 102:4-103:7.

**RESPONSE:** **Disputed** that Reed was actively involved in overseeing the company with a focus on strategy and big-picture issues. During 2019 and 2020, Reed oversaw Gonnering's oversight of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the

year at his home in Arizona or at the family cottage. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.) Widen Enterprises also testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.) **Undisputed** that Gonnering, the CEO, oversaw the day-to-day activities.

139.    Reed did not need to be physically in the office to do his work. Widen Enterprises Dep., Nov. 6, 2023, at 87:18-88:4, 89:17-90:17, 94:25-95:5, 96:1-25, 97:21-24.

**RESPONSE: Disputed.** The cited testimony does not support this proposed finding of fact. Further, Matthew Gonnering in his capacity as designee for Widen Enterprises lacks foundation to testify to the "need[s]" of Reed's position.

140.    Reed worked around the clock to help the company thrive. In his deposition, he explained, "I lived and breathed this company 24/7." Reed Dep., Aug. 23, 2023, at 54:1-5, 207:25-209:8; Gonnering Dep., Sept. 21, 2023, at 123:13-20; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶ 8; Windy Waters Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 94:25-10.

**RESPONSE: Disputed.** During 2019 and 2020, Reed oversaw Gonnering's oversight of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.)

141.     When Gonnering was asked about what he would have done if Reed had retired, he provided the following testimony:

> I would look to, as it goes for anybody with any departure or retirement, I would reexamine what do we really need and how are we going to staff this back. In Reed's case, I would have staffed back probably with a team of advisors, a team of people who would represent various advisory capacities that Reed provided to me.  I mean, Reed was not a -- you couldn't replace Reed. Reed was the -- Reed was there 30, 40 years he's been. It's his name on the building, his name in the marketplace. He's got -- yes, he's got the rich legacy knowledge, but also how he takes that knowledge and repurposes it with his monitorship with me was very important to me. So to replace him is -- you couldn't replace. You don't replace Reed. But I would replace his advisory capacity with a team of advisors.

Gonnering Dep., Sept. 21, 2023, at 124:24-125:22.

**RESPONSE**: **Undisputed** that Gonnering provided the above testimony. **Disputed** to the extent that Gonnering's testimony mischaracterizes or misrepresents Reed's lack of an active role at Widen Enterprises in 2019 and 2020. During 2019 and 2020, Reed oversaw Gonnering's management of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage in northern Wisconsin. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21;

08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises, through its corporate representative, testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed and nobody other than Gonnering reported to Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.)

142.    Compensation for employees and officers of Widen Enterprises is determined by a mix of individual performance, company performance, and market conditions. Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 2, Ex. A (ECF No. 70-1: Defs.' Objections and Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 7.

**RESPONSE: Disputed.** Reed Widen unilaterally determined his own compensation without any process, which was based on his subjective assessment of the company's performance and on his own personal monetary needs and was not based on market conditions. (08/23/2023 R. Widen Dep. Tr. 46:23-25, 48:12-17, 58:17-20, 203:22-204:8; 61:19-62:8; 58:17-20, 61:8-13.)

143.    To help inform the decision of setting executive compensation, including his own, Reed consulted with advisors at Widen Enterprises' accounting firm. Reed Dep., Aug. 23, 2023, at

55:13-24, 56:3-7, 195:5; Widen Enterprises Dep., Nov. 6, 2023, at 103:24-104:14; 217:18- 218:2, 219:25-220:1.

**RESPONSE: Disputed.** Reed did not consult with advisors at Widen Enterprises' accounting firm "year to year" as to his executive compensation decisions and did not consult with them regarding his executive compensation decisions in the years 2019 and 2020, specifically. (08/23/2023 R. Widen Dep. Tr. 56:8-13; 11/06/2023 Dep. Tr. of Widen Enterprises 105:20-25.)

144.     Reed set his own compensation in consultation with Gonnering and advisors. Reed Dep., Aug. 23, 2023, at 46:23-47:4, 55:13-24, 195:5; Widen Enterprises Dep., Nov. 6, 2023, at 103:24:104:14, 217:18-218:2, 218:11-219:2; 219:25-220:1. Gonnering Dep., Sept. 21, 2023, at 124:5-11.

**RESPONSE: Disputed.** Reed Widen unilaterally determined his own compensation without any process, which was based on his subjective assessment of the company's performance and on his own personal monetary needs. (08/23/2023 R. Widen Dep. Tr. 46:23-25, 48:12-17, 58:17-20, 203:22-204:8; 61:19-62:8; 58:17-20, 61:8-13.)

145.     Kiesler was not involved in setting Reed's compensation. Kiesler Decl., Nov. 10, 2023, p.1, ¶ 5.

**RESPONSE: Undisputed.**

146.     The compensation Reed received for serving as chairman of the company was within the range of salaries and bonuses for comparable companies in the market. Widen Enterprises Dep., Nov. 6, 2023, at 218:11-219:2; Gonnering Dep., Sept. 21, 2023, at 269:13-270:3;

Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶ 13; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 13.

**RESPONSE: Disputed.** Defendants have not supported this proposed finding of fact with admissible evidence. Gonnering is not an expert in executive compensation, did not consult with such an expert, and lacks foundation to offer these proposed opinions. Gonnering merely claimed to have read "popular business literature" but could not point to a single piece of information supporting the statement that Reed's 2019 and 2020 compensation for serving as board chairman "was within the range of salaries and bonuses for comparable companies in the market." (*See* 09/21/2023 M. Gonnering Dep. Tr. 270:15-271:19.) Widen Enterprises testified that it had no knowledge of any specific literature or company comparators. (11/06/2023 Dep. Tr. of Widen Enterprises 218:19-219:6.) A voluminous survey of private companies' executive compensation conducted by Chief Executive Research shows that Reed's compensation for serving as board chairman was not within the range of compensation for comparable companies, and that does not even take into account that Reed was not actively involved in the operations of Widen Enterprises in 2019 and 2020 and his role was non-essential to the business operations. (Suppl. Decl. of D. Palay, ¶ 4, Ex. 2; 09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142.)

147.     In 1991, Mark Widen, as the president of Widen Enterprises, was paid a bonus of $566,348.03, which was in addition to his wages. Reed Decl., Nov. 10, 2023, p.1, ¶ 3, Ex. A (WINDY0001643).

**RESPONSE: Undisputed,** but immaterial, that, in 1991, Mark Widen was awarded a "special bonus" of $566,348.03 pursuant to a compensation agreement between the company and Mark Widen and that Mark Widen requested $166,348.03 of the special bonus amount be retained by the company as working capital with the option for Mark Widen to get paid that $166,348.03

within 30 days of his request. **Disputed** that the cited document shows the "special bonus" was in addition to his wages. Further **disputed** that the cited evidence shows Mark Widen was actually paid any sum. Reed lacks foundation to testify to what funds the company may have transmitted to Mark Widen in 1991 or what Mark Widen may have received from the company in 1991. (ECF No. 67, 9/29/23 Reed Widen Decl., ¶¶ 8-9 (Reed was a sales director in 1991).)

148.     Reed's compensation for the services he performed for the company was paid solely from Widen Enterprises. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.4, ¶ 32.

**RESPONSE: Disputed** that Reed's compensation was "for the services he performed for the company," as he was not actively involved in the companies in 2019 and 2020. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at SEG_00004142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; *see id* at 90:18-23; 96:19-97:24, 121:6-12, 122:3-123:2; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) **Undisputed** that Reed's purported "compensation" came nominally solely from Widen Enterprises.

149.     Gonnering explained during his deposition that how Reed wanted to direct payment for his compensation, bonus or otherwise, was not relevant. He had earned his bonus. Gonnering Dep., Sept. 21, 2023, at 129:14-23, 130:22-131:4, 132:18-133:13, 137:15-138:1.

**RESPONSE: Disputed.** The cited evidence shows that Gonnering testified that how Reed *used* Reed's bonus was "not [Gonnering's] concern," and that "we owed [Reed] a bonus." (ECF No. 56, 9/21/23 M. Gonnering Dep. Tr. 129:20-23, 131:1-4.) Further, Gonnering is not qualified to testify to what is relevant to Plaintiff's claims in this litigation. Further **disputed** that the Companies paying

Reed, and how and why the Companies paid Reed, is not relevant. (*See generally* Compl., putting Reed's constructive or disguised dividends at issue throughout the Complaint across numerous Claims for Relief.) Further **disputed** that Reed *earned* his bonus. During 2019 and 2020, Reed oversaw Gonnering's oversight of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises could not identify any specific strategic planning contributions Reed carried out at the company and testified that Reed was responsible for the executive relationship with just two Widen customers, one of which was not even a customer in 2020. (11/06/2023 Dep. Tr. of Widen Enterprises 96:19-97:24, 121:6-12, 122:3-123:2.) Widen Enterprises also testified that from 2009 to 2021, no one at the company other than Gonnering worked directly with Reed. (11/06/2023 Dep. Tr. of Widen Enterprises 90:18-23.) Widen Enterprises also testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.) **Undisputed** that Gonnering testified, in response to being asked

79

"So you were thinking of a dividend that would get Reed the same exact amount as this bonus?", that "[t]hat was the thinking of how might I be able to do this, and if I put this in front of Reed, would he go for it, instead of just taking his bonus that he earned. . . ." (ECF No. 56, 9/21/23 M. Gonnering Dep. Tr. 137:15-21.)

150.    Randall has never made any demand on Windy Waters to take suitable action to redress the alleged excessive compensation paid to Reed. Reed Decl., Nov. 10, 2023, p.2, ¶ 6; Kiesler Decl., Nov. 10, 2023, p.2, ¶ 6.

**RESPONSE**: **Disputed**. This lawsuit—and the Complaint therein—is such a demand. Further, to make such demand prior to the filing of the Complaint in this suit, Stacy would have needed knowledge of Reed's constructive or disguised dividends, which Stacy did not learn about until Defendants produced a document on April 29, 2022, showing Reed's compensation for 2018-2020. Specifically, Stacy did not learn that Reed's compensation from the companies was around $1.5 million for 2019 and $2 million for 2020 until the Defendants produced a document showing Reed's compensation for 2018-2020 on April 29, 2022. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 46; ECF No. 117, Suppl. Decl. of D. Palay ¶ 7, Ex. 5.) Promptly within 3 months of learning of Reed's constructive or disguised dividends, Stacy filed her Complaint demanding redress for, in part, Reed's constructive or disguised dividends. (ECF No. 1, Compl. (filed on July 21, 2022).)

151.    Between 2017 and 2020, Gonnering sent lengthy operational updates to Reed at least once or twice a month as a way to memorialize the big-picture issues and activities of the company. Gonnering Decl., Nov. 10, 2023, p.1, ¶ 3.

**RESPONSE**: **Disputed**. In his capacity as designee for Widen Enterprises, Gonnering testified that he sent operational updates with varying frequency: "sometimes it would have been twice a month, sometimes it may have been once a month, sometimes it may have skipped a month" and it is possible he went two months without sending an operational update. (ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 42:4-10, 45:15-17.) Gonnering started sending operational updates in or around 2016. (*Id.* at 42:11-14.) Further **disputed** that "big-picture issues and activities of the company" were the only topics and subjects covered in the operational update e-mails, because other topics like when to sell the company and estimates of the company's market value were also included in the operational updates. (*Id.* at 43:24-44:8; Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl., Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("Related to Gary's desire to retain shares, we discussed market valuation and your ownership intentions. . . . I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA . . . . As disclosed before, Mike and I have chatted about when we would advise to sell based on the realization of maximum valuation").) Further **disputed** that the operational update e-mails only related to "the company" (Widen Enterprises) because in reality they related to the Companies, i.e., Gonnering also included Windy Waters' subjects and topics in the operational update e-mails. (E.g., Palay Decl. Ex. 19 ("One opportunity would trip our decision to give the money back without waiting, and that would be fulfilling the liquidity request of Stacy Randall. If we buy her [Windy Waters] shares, [Widen Enterprises] would not keep the [PPP] funds."); Palay Decl. Ex. 28 ("In a conversation with Gary this week he requested the purchase of additional Windy Waters shares. I communicated that he should have that conversation with you. I also told him how I would advise you on this request to manage his

81

expectations, and that advice is as follows: We have been working on buying back shares as the weighted EBITDA valuation is low. I recommend we do not sell more shares and continue the share buybacks of specific shareholders, as previously outlined.").) Further **disputed** as to Defendants' description of the operational updates as "lengthy," because in many instances the operational update emails are less than or around one page in length. (E.g., Palay Decl. Exs. 15, 17.) Undisputed that Gonnering sent operational update emails to Reed and copied Kiesler on the emails, including from 2017 through 2020.

152.     Sometimes, Gonnering would include news of competitor acquisitions among the topics he addressed in the updates. Gonnering Decl., Nov. 10, 2023, p.1, ¶ 3.

**RESPONSE:** Undisputed.

153.     On a handful of occasions, he reported the high-level information he had gleaned from news of acquisitions, made numerous assumptions about the company's revenues and transaction information, and then provided a "guess and a pretend and a what if" that Widen Enterprises could sell for a certain number under all of those assumptions. Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶ 4; Gonnering Dep., Sept. 21, 2023, at 103:8-104:3, 152:13-22; Widen Enterprises Dep., Nov. 6, 2023, at 193:1-17.

**RESPONSE: Disputed.** Gonnering estimated the market value of the company using "the WebDAM formula"—3.5x or 4x software revenue to yield a market value estimate—and applied that formula at least "several times" in communications with Reed and Kiesler. (ECF No. 56, 9/21/23 M. Gonnering Dep. Tr. 202:16-25, 153:12-20.) Gonnering's use of that formula is not a "guess and a pretend and a what if" but rather estimates of the company's market value, which he used over the years in communications to Reed and Kiesler, based on Gonnering's communicated

knowledge that SaaS companies are bought and sold based on the formula of the company's revenue times a multiple. (Palay Decl. Ex. 11.) Specifically, the "WebDAM formula" is a reference to Gonnering's operational update email to Reed and Kiesler wherein Gonnering wrote, "Bynder acquired WebDAM from Shutterstock for approximately $49M. WebDAM was likely close to our software revenue totals, possibly less. I am unsure of any other sizzle in the deal but if it's straight-up DAM, then my guess is the valuation was 3-4x revenue. If they were equivalent to our software revenue last year ($14M) then it works out to 3.5x revenue. Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M." (Palay Decl. Ex. 15.) Consistent with that February 2018 operational update email, in August 2018, Gonnering reapplied the formula in an operational update to Reed and Kiesler wherein Gonnering wrote, "If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ." (Palay Decl. Ex. 17.) The earliest identified example of Gonnering using the formula of revenue times a multiple to estimate the market value of the company, because of his communicated knowledge that SaaS companies are bought and sold based on said formula, is an email dated December 1, 2014, subject: "Valuation," wherein Gonnering wrote to Kiesler, Reed, and Gary Norris, "Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM." (Palay Decl. Ex. 11.) **Undisputed** that Gonnering reported to Reed and Kiesler what Widen Enterprises could sell for based on the company's revenues. (Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation

perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."); Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."); Palay Decl., Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."); Suppl. Palay Decl. Ex. 11 ("Related to Gary's desire to retain shares, we discussed market valuation and your ownership intentions. . . . I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA . . . . As disclosed before, Mike and I have chatted about when we would advise to sell based on the realization of maximum valuation").)

154.    Gonnering described this exercise as follows:

Q:  Okay. You never told Reed the fair market – the market value of Widen Enterprises is around number on a given date?

A:  I would tell Reed based on my estimates of other organizations who were in our market, and I would take what those organizations were doing, I would estimate their revenues, back of the napkin, and then I would apply it to ours as a guess.

Q:  Okay. So you'd apply it to Widen Enterprises and give a guess of Widen Enterprises' value?

MR. CHURCHILL: Objection. Mischaracterizes testimony.
A:     I would take what I guessed to be what was going on with someone else in our industry and then I would apply that to Widen numbers.

Q:  And the result would be a guess about Widen's value?

MR. CHURCHILL: Objection. Ambiguous.

A:     It would be a[n] indication that we're headed in the right direction, not the value of Widen.

Gonnering Dep., Sept. 21, 2023, at 103:8-104:3.

**RESPONSE:** **Undisputed** that Gonnering provided the above testimony. **Disputed** that Gonnering's testimony accurately reflects his exercise of the revenue multiplier formula to yield an estimate of the market value of the Companies. (*See* Pl.'s Resp. to Defs.' Suppl. PFOF No. 153.)

155.     Gonnering made these reports to show that Widen Enterprises was in the right industry with potential for growth, and did not intend them to be taken as formal valuations. Gonnering Dep., Sept. 21, 2023, at 182:17-184:11; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 4-5.

**RESPONSE:** **Disputed**. Gonnering made these reports to communicate estimates of Widen Enterprises' market value to Reed and Kiesler. (Palay Decl. Ex. 15 ("Bynder acquired WebDAM from Shutterstock for approximately $49M. WebDAM was likely close to our software revenue totals, possibly less. I am unsure of any other sizzle in the deal but if it's straight-up DAM, then my guess is the valuation was 3-4x revenue. If they were equivalent to our software revenue last year ($14M) then it works out to 3.5x revenue. Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl., Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("Related to Gary's desire to retain shares, we discussed market valuation and your ownership intentions. . . . I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA . . . . As disclosed before, Mike and I have chatted about when we would advise to sell based on the realization of maximum valuation.").) **Undisputed** that Gonnering's reports were not formal third-party valuations.

156.     Gonnering is not an accountant or an economist, nor has he ever valued or appraised a company. Gonnering Decl., Nov. 10, 2023, p.2, ¶ 5.

**RESPONSE: Undisputed** except to the extent that Gonnering communicated estimates of the company's market value to Reed and Kiesler using a formula of revenue times a multiple on numerous occasions. (*See* Pl.'s Resp. to Defs.' Suppl. PFOF No. 153.)

157.     Just as Widen Enterprises' revenues had increased over the years, so had its expenses. Gonnering Decl., Nov. 10, 2023, p.2, ¶ 6; Gonnering Dep., Sept. 21, 2023, at 39:12-40:21.

**RESPONSE: Undisputed**, but immaterial. (*See* Palay Decl., Ex. 12 ("Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue. If you're keeping score at home, that's $8MM*6.5=52MM. If you throttled the EBITDA for purposes of market valuation perhaps we run at 2MM*12=24MM. Market value somewhere between 24-52MM."), Palay Decl. Ex. 15 ("Using our projected 2018 software revenue of $18M, our market valuation on 3.5x revenue is $63M."), Palay Decl. Ex. 17 ("If we are valued at $80M (4x software revenue of 20M), then a 10% stake provides us $8M in capital . . . ."), Suppl. Palay Decl. Ex. 11 ("I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA.").)

158.     In February 2020, Tequity Advisors reached out to Gonnering about a potential opportunity to *acquire* another company with code name Hercules. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.3, ¶ 16, Ex. A (ECF No. 69-1).

**RESPONSE: Undisputed**, but immaterial.

159.     Widen Enterprises considered this opportunity to purchase another entity to inorganically grow business, and even signed a non-disclosure agreement to explore the opportunity, but ultimately did not pursue it. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p. 3, ¶¶ 15-16, Ex. A (ECF No. 69-1).

**RESPONSE: Undisputed**, but immaterial.

160.     After Reed turned 60 in June 2020, Gonnering and Reed began talking about succession planning for Widen Enterprises, and Reed told Gonnering to begin preparing for next steps within 2-5 years. Reed Decl., Sept. 29, 2023, p.9, ¶ 79; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.7, ¶¶ 51, 53; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 13, Ex. L (Ex. 11 to Widen Enterprises Dep.).

**RESPONSE: Disputed**. The newly proposed temporal part of this proposed finding of fact is inaccurate. (*Compare* this proposed finding of fact ("began talking"), *with* ECF No. 115, Defs.' PFOF No. 391 ("talked").) Succession planning communications among Reed, Gonnering, and Kiesler began as early as September 2019. (Suppl. Palay Decl. Ex. 11, 9/6/2019 operational update email from Gonnering to Reed, copying Kiesler ("Related to Gary's desire to retain shares, we discussed market valuation and your ownership intentions. . . . I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA . . . . As disclosed before, Mike and I have chatted about when we would advise to sell based on the realization of maximum valuation").) **Undisputed**, but immaterial, that on July 21, 2020, July 24, 2020, and August 14, 2020, Gonnering and Reed had exploratory conversations about succession planning, focusing on the timeframe of two to five years down the road. (*See* ECF No. 115, Pl.'s Resp. to Defs.' PFOF No. 395.)

161.     At that time, Reed was considering many possible forms of succession plans, including letting Gonnering run the company, creating an employee stock ownership plan, or making plans to sell. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶ 81.

**RESPONSE: Disputed.** "At that time" (June 2020), Reed was interested in selling the company. (09/29/2023 Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.9-10, Defs.' Answer to Interrogatory No. 6 (In "late June or early July" 2020, Reed "first expressed an interest to Gonnering in selling Widen Enterprises, Inc. somewhere between two and five years' time.").) This is consistent with Gonnering and Reed's communications about selling Widen Enterprises at least as early as September 6, 2019, *see* ECF No. 115, Pl.'s Response to Defs.' PFOF No. 373, and Reed beginning to consider selling the company by as early as February 2020. (*See* ECF No. 61, Pl.'s Proposed Findings of Fact ¶¶ 76-78.)


162.     In late August 2020, the focus honed in on selling to a third party within 2-5 years. Reed Dep., Aug. 23, 2023, at 151:15-152:12, 155:3-8; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.9-10, ¶¶ 82, 84, Ex. F (ECF No. 67-3); Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.7, ¶ 56.

**RESPONSE: Disputed.**[1] Reed had his focus on selling Widen Enterprises as early as September 2019, as well as February 2020 and in late June or early July of 2020. (Suppl. Decl. of D. Palay ¶ 13, Ex. 11; *see also* ECF No. 61, Pl.'s Proposed Findings of Fact ¶ 215; 09/29/2023 Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 9-

---

[1] The proposed finding of fact does not identify whose focus "honed in on selling." For purposes of this response, Plaintiff will assume that Defendants mean Reed's focus.

10, Defs.' Answer to Interrogatory No. 6 (In "late June or early July" 2020, Reed "first expressed an interest to Gonnering in selling Widen Enterprises, Inc. somewhere between two and five years' time.").) In February 2020, Reed had his focus on selling Widen Enterprises: Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

163.    The timeframe shortened in January 2021 when an investment banker, Software Equity Group Advisors, L.L.C. (SEG), told Reed the company could possibly sell for upwards of $200 million. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.8, ¶¶ 65-66; Gonnering Decl., Nov. 10. 2023, p.2, ¶ 10; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.9-10, ¶¶ 82, 84, Ex. F (ECF No. 67-3).

**RESPONSE**: **Undisputed** that SEG told Reed, Kiesler, and Gonnering that the company could sell for upwards of $200 million. **Disputed** that the "timeframe shortened" in January 2021; rather, the timeframe to sell shortened prior to January 2021. In February 2020, Reed had his focus on selling Widen Enterprises: Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.) On August 25, 2020, Gonnering informed Reed that a company called Brandfolder, which was in the same industry as Widen Enterprises and smaller size, had sold for $155 million. (Defs.' PFOF No. 398.) Reed responded to the Brandfolder news by stating, "Hmmm, that makes it very interesting[.] If our number is over 200 million it's time to look at selling." (*See* ECF No. 115, Pl.'s Response to Defs.' PFOF No. 402; 09/29/2023 Palay Decl. ¶ 5, Ex. 3, (WINDY00449833).)

164.    After that meeting, on January 19, 2021, Gonnering, Reed, and Kiesler met to discuss the final decision about whether or not to put Widen Enterprises on the market for sale.

During that meeting, Reed made the decision to put Widen Enterprises on the market for sale. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.8, ¶ 66.

**RESPONSE:** Undisputed.

165.     Reed was not interested in Windy Waters selling Widen Enterprises on or prior to May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:18-21, 30:20-31:5, 127:15-16, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶ 74.

**RESPONSE: Disputed.** Gonnering and Reed had communications about selling Widen Enterprises at least as early as September 6, 2019. (Suppl. Decl. of D. Palay ¶ 13, Ex. 11; ECF No. 115, Pl.'s Response to Defs.' PFOF No. 373.) In February 2020, Reed was interested in selling Widen Enterprises when Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

166.     There had been no discussion among Windy Waters or Widen Enterprises executives about selling Widen Enterprises on or prior to May 13, 2020. Reed Dep., Aug. 23, 2023, at 97:18-21, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶ 75; Gonnering Dep., Sept. 21, 2023, at 100:8-12, 102:19-23; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶ 47; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶ 167.

**RESPONSE: Disputed.** There had been discussions among Windy Waters and Widen Enterprises executives about selling Widen Enterprises prior to May 13, 2020. (*See* ECF No. 115, Pl.'s Response to Defs.' PFOF No. 373.)

167.     As of May 13, 2020, neither Reed, nor Gonnering, nor Kiesler were preparing, planning, contemplating, or even ruminating over a sale of Widen Enterprises. Reed Decl., Sept.

29, 2023, (ECF No. 67) p.9, ¶ 76; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶ 163; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.7, ¶ 48.

**RESPONSE:** **Disputed.** Gonnering and Reed had communications about selling Widen Enterprises at least as early as September 6, 2019. (*See* ECF No. 115, Pl.'s Response to Defs.' PFOF No. 373.) In February 2020, Reed told his nephew, Justin Randall, that Reed was considering selling Widen Enterprises. (*See* ECF No. 61, Pl.'s Proposed Findings of Fact ¶¶ 76-78.)

168.    A true and correct copy of the Confidential Information Memorandum prepared by SEG, the investment advisory firm who marketed Widen Enterprises for sale, is attached to David Palay's September 29, 2023, Declaration as Exhibit 26. Palay Decl., Sept. 29, 2023, (ECF No. 63), p.4, ¶ 28, Ex. 26 (ECF No. 63-25).

**RESPONSE:** Undisputed.

169.    The Confidential Information Memorandum was sent by SEG to prospective buyers in 2021. Compl. (ECF No. 45), ¶ 167, Ex. E (ECF No. 5); Widen Enterprises Dep., Nov. 6, 2023, at 183:10-15; Gonnering Dep., Sept. 21, 2023, at 72:6-21; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 68-70.

**RESPONSE:** Undisputed.

170.    In June 2021, SEG received several first-round indications of interest, with some suggesting values over $100 million. Gonnering Decl., Sept. 29, 2023, p.9, ¶¶ 71-72. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 71-72.

**RESPONSE:** Undisputed.

171.    In 2013, Reed transferred all of the Windy Waters shares he owned individually into a revocable trust for the benefit of himself and his wife, and acted as the trustee of that trust. Reed Decl., Nov. 10, 2023, p.2, ¶ 13.

**RESPONSE:** Undisputed.

172.    Randall testified that she chose to ask for $100,000 in May 2020 because she thought it would last her a year. Randall Dep., Aug. 28, 2023, at 262:2-4.

**RESPONSE: Disputed.** She testified she asked for a partial redemption worth $100,000 in May 2020 "[b]ecause [she] had no money," ECF No. 82, Stacy Randall Dep. Tr. 261:25-262:1, and upon Kiesler mispresenting that the company didn't have $100,000 to give Stacy, she then asked for a partial redemption worth $50,000, to which Kiesler again misrepresented that the company didn't have $50,000 to give Stacy. (ECF No. 82, Stacy Randall Dep. Tr. 262:5-14; ECF No. 45, Am. Answer ¶¶ 71-74.) Stacy also testified that she requested a partial redemption of $100,000 in May 2020 because of developments in her divorce proceeding. (ECF No. 82, Stacy Randall Dep. Tr. 229:18-21, 279:24-280:16.) **Undisputed** that, when asked why she chose to ask for the specific amount of $100,000 via a partial redemption, Stacy said she thought that amount would get her through a year.

173.    The Stock Price Formula price using financials through the end of 2020 would have been $227.70 for Class A shares and $216.86 for Class B shares. Kiesler Decl., Nov. 10, 2023, p.9, ¶ 41.

**RESPONSE: Undisputed,** but immaterial.

174.     The purpose of the EBITDA adjustment to back out two key employees'
compensation was to allow potential buyers to have a clearer metric of profit assuming those
expenses that would not exist following the sale were eliminated. Gonnering Dep., Sept. 21, 2023,
at 258:12-24, 261:2-264:3; Widen Enterprises Dep., Nov. 6, 2023, at 112:4-115:2.

**RESPONSE: Disputed.** In the Quality of Earnings study that Widen Enterprises commissioned,
Grant Thornton adjusted Gonnering's salary down to $350,000 annually, which Grant Thornton
"determined to be market value," (Palay Decl. Ex. 32 at SEG_00004142; *see also* ECF No. 116,
Pl.'s Suppl. PFOF No. 99). Grant Thornton adjusted Widen Enterprises EBITDA to add back
the entirety of Reed's compensation for 2019 and 2020 in part because his role was "non-essential
to business operations, and [Grant Thornton] underst[ood] any duties [would] be absorbed within
the current Management structure at no additional cost burden." (09/29/2023 Palay Decl. Ex. 32 at
SEG_00004142; *see also* Pl.'s Suppl. PFOF No. 100 (ECF No. 116).) Reed and Kiesler testified
that the information provided to Grant Thornton was accurate. (08/23/2023 R. Widen Dep.
Tr. 196:1-3; 09/19/2023 M. Kiesler Dep. Tr. 82:1-7; *see* 11/03/2023 Dep. Tr. of Windy Waters
203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings
report was accurate).)


175.     The standstill and tolling agreement states, in paragraph 6, "The Parties agree
further that this Agreement will not be admissible for any purpose other than to rebut a defense
based on the passage of time." Palay Decl., Sept. 29, 2023, p.10, ¶ 78, Ex. 72 (ECF No. 63-71).

**RESPONSE: Undisputed** that the quoted language constitutes part of paragraph 6. Paragraph 6 in
its entirety states: "No Admissions. Nothing in this Agreement shall constitute an admission by any
Party of any wrongdoing, liability, fault, waiver of any right or defense (except as provided in
Section 3), or an admission as to any matter of law or fact. The Parties agree further that this

Agreement will not be admissible for any purpose other than to rebut a defense based on the passage of time." (Palay Decl. Ex. 72 at 3 ¶ 6.) Stacy, by her counsel, terminated the Standstill and Tolling Agreement among her and Defendants as of June 10, 2022. (Suppl. Decl. of D. Palay Ex. 14; *see also* ECF No. 116, Pl.'s Suppl. PFOF No. 274.) The Standstill and Tolling Agreement is admissible to rebut defenses based on the passage of time. Defendants' defense of ratification is based on the passage of time after Stacy's counsel first reached out to Defendants with concerns about the redemption.

176.    At times, Windy Waters has transferred money to Widen Enterprises when Widen Enterprises needed cash for operations. Kiesler Decl., Nov. 10, 2023, p.9, ¶ 42.

**RESPONSE**: **Undisputed.** Widen Enterprises also transferred money to Windy Waters for "tax payments or distributions or when Widen Enterprises would have cash that would be deemed excess." (ECF No. 117, Windy Waters Dep. Tr. 117:10-118:22.)

177.    This happened in December 2015 ($200,000), August 2017 ($20,000), November 2018 ($444,000), August 2020 ($70,000), September 2020 ($90,000), and December 2020 ($1,500,000). Kiesler Decl., Nov. 10, 2023, p.9, ¶ 43.

**RESPONSE**: **Undisputed** that the transfers occurred in the amounts and on the dates asserted. **Disputed** that the cited evidence supports that each of these transfers occurred because of a need for cash.

178.    Reed and his wife owed only a total of roughly $30,000 on their 2018 tax returns that were completed in April 2019. Reed Decl., Nov. 10, 2023, p.5, ¶ 31, Ex. N.

**RESPONSE: Disputed** insofar as the cited evidence shows Reed and his wife had a tax amount of over $500,000 and does not show what or when amounts were paid. **Undisputed** that the amount due was approximately $30,000.

179.     Randall did not own any shares of Widen Enterprises in May 2020. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶ 79.

**RESPONSE: Undisputed** that Randall did not own any shares of Widen Enterprises, LLC, in May 2020. **Disputed** insofar as this proposed finding of fact asserts or suggests that Randall did not have an ownership interest in Widen Enterprises, LLC, as a wholly owned subsidiary of Windy Waters, Inc., of which Randall owned approximately 20% in May 2020. (Answer ¶¶ 3, 23; Palay Decl. Ex. 1, STAFFORD001299, Recitals § 5; Palay Decl. Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:1-25.)

180.     Widen Enterprises did not purchase any shares from Randall in May 2020 or ever, and was not involved with or a party to the stock redemption agreement in May 2020. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶¶ 80-82; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A (ECF No. 1-6), B (ECF Nos 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6). Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶¶ 50, 54; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.15, ¶¶ 110-11.

**RESPONSE: Disputed** that Widen Enterprises was not involved with the May 2020 stock redemption. Widen Enterprises, through its agents Reed, Kiesler, and Gonnering, directed Windy Waters' actions with respect to the May 2020 redemption. (Answer ¶ 30; 08/23/2023 R. Widen

Dep. Tr. 46:8-22; 09/21/2023 M. Gonnering Dep. Tr. 118:3-9; 09/19/2023 M. Kiesler Dep. Tr. 55:10-23, 214:17-19, 247:4-7; 09/29/2023 Palay Decl., ¶ 57, Ex. 55, WINDY0047517.) Further, "after Stacy Randall redeemed all of her shares in May of 2020, the payments that were made to her pursuant to promissory notes were paid by Widen Enterprises on behalf of Windy Waters." (11/03/2023 Dep. Tr. of Windy Waters 120:1-123:16.)

181.    Justin testified that his mother argued or talked with his father about "their treatment as shareholders of the business" and complaining that "Reed's got a brand-new car and we're . . . not living the life . . . we're owners in this company too." Justin Dep., Oct. 25, 2023, at 27:8-28:20.

**RESPONSE:** **Undisputed** that Justin Randall testified, "I remember her and . . . my dad talking about times where, you know, related to the family business stuff, like, you know, hey, we, you know, we're not, Reed's got a brand-new car and we're, you know, not, we're not living the life, you know, we're, we're owners in this company, too, just general stuff like that where they would be somewhat upset." (ECF No. 101, 10/25/23 Justin Randall Dep. Tr. 27:8-15.) **Undisputed** that Justin Randall testified, "[M]om and dad arguing about or, or talking about, you know, the, their treatment as shareholders of the business versus what Reed was, you know, doing." (*Id.* at 28:6-9.) **Disputed** insofar as this proposed finding of fact asserts or suggests Stacy had any knowledge prior to April 29, 2022, of Reed's constructive or disguised dividends. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 46; ECF No. 117, Suppl. Decl. of David Palay, ¶ 7, Ex. 5.)

182.    Justin testified Randall's complaints about her treatment as a shareholder was "discussed on occasion" as far back as when Randall's then-husband worked for Widen Enterprises, around 20 years ago. Justin Dep., Oct. 25, at 124:1-125:18.

**RESPONSE:** **Undisputed** except to the extent that the questioning attorney characterized Stacy's and Steven's comments as complaints where Justin did not. (ECF No. 101, 10/25/23 Justin Randall Dep. Tr. 124:3-5 (Q . . . . I don't know if you said complaints or not, but I interpreted it as complaints . . . .") **Disputed** insofar as this proposed finding of fact asserts or suggests Stacy had any knowledge prior to April 29, 2022, of Reed's constructive or disguised dividends. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 46; ECF No. 117, Suppl. Decl. of David Palay, ¶ 7, Ex. 5.)

183.    Justin specifically confirmed these complaints were about "not receiving dividends or distributions from the companies" and that "Reed keeps saying the company is doing really good or whatever but we're not seeing anything out of it" and even that "Reed's getting paid a bunch of money and we're not getting anything." Justin Dep., Oct. 25, at 126:13-127:22.

**RESPONSE:** **Disputed** that Justin's testimony was "specific[] confirm[ation]." The proposed finding of fact's third quote excerpt from Justin's deposition was not specific but rather he testified that "it was like" and "type of thing." Further, Justin lacks foundation to testify as to what Stacy knew; he testified to not knowing what Stacy thought. (ECF No. 101, 10/25/23 Justin Randall Dep. Tr. 127:23-128:5.) Further **disputed** insofar as this proposed finding of fact asserts or suggests Stacy had any knowledge prior to April 29, 2022, of Reed's constructive or disguised dividends. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶ 46; ECF No. 117, Suppl. Decl. of David Palay, ¶ 7, Ex. 5.) Otherwise, **undisputed** that Justin's testimony included the proposed finding of fact's excerpted quotes.

184.    Nobody was in the vicinity during the alleged Arizona conversation between Justin and Reed in February 2020. Justin Dep., Oct. 23, 2023, at 35:12-20.

**RESPONSE: Undisputed.** *See* ECF No. 60, Pl.'s Br. in Support of Pl.'s Mot. for Partial Summ. J. at 32 n.18 (Reed's testimony confirms Defendants cannot now create a genuine dispute of fact on Reed's statements to Justin in February 2020.)

185.    Nobody overheard the alleged Arizona conversation between Justin and Reed in Arizona in February 2020. Justin Dep., Oct. 25, 2023, at 43:4-7.

**RESPONSE: Undisputed.** *See* ECF No. 60, Pl.'s Br. in Support of Pl.'s Mot. for Partial Summ. J. at 32 n.18 (Reed's testimony confirms Defendants cannot now create a genuine dispute of fact on Reed's statements to Justin in February 2020.)

186.    Justin first testified that he did not tell Randall of the alleged Arizona conversation between him and Reed before his mother's May 13, 2020 redemption because he "do[es]n't get in the middle of that kind of stuff[,]" but he later testified that he only remembered the alleged Arizona conversation after Widen Enterprises was sold. Justin Dep., Oct. 25, 2023, at 118:2-121:7.

**RESPONSE: Disputed.** The proposed finding of fact mischaracterizes Justin's testimony. Justin testified, in part, that "I didn't want to get in the middle of it because that puts me, again, you have to remember my relationship with Reed, he's like a second father, a best friend, I love him. My mother is my mother, love her dearly, okay . . . ." (ECF No. 101, 10/25/2023 J. Randall Dep. Tr. 118:21-24.) Justin testified that the memory of the Arizona conversation between him and Reed "came back to [him] clearly after the sale" and after "my mom [Stacy] said, I can't believe this, did you know they were going to sell, it prompted that memory of the conversation with Reed in Arizona." (ECF No. 101, 10/25/2023 J. Randall Dep. Tr. 120:2-6.)

187.     Although Justin testified that Widen Enterprises' sale caused his "memory" of the alleged Arizona conversation with Reed to "c[o]me back to [him] clearly[,]" Justin could not testify to the date, day of week, time of day, specific place, orientation, or interactions leading up to the alleged conversation he claims to recall "clearly." Justin Dep., Oct. 23, 2023, at 35:12-36:15, 119:21-120:8.

**RESPONSE: Disputed.** Justin testified that the conversation with Reed occurred in "February 2020," took place "[o]n Reed's Arizona house pool deck," and "We had golfed that day, I believe. So it was later in the day. I believe we were kind of getting ready to go out to dinner." (10/25/2023 J. Randall Dep. Tr. 33:20, 33:23, 36:1-3.) Justin testified that during his conversation with Reed in Arizona in February 2020, he and Reed were both standing and sitting on the pool deck and both men alternated between sitting and standing. (10/25/2023 J. Randall Dep. Tr. 36:9-15.) Justin testified his conversation with Reed in February 2020 in Arizona was "10, 15 minutes." (*Id.* at 36:16-18.) And Justin described the substance of this conversation during his deposition. (*Id.* at 37:1-40:18.) *See also* ECF No. 60, Pl.'s Br. in Support of Pl.'s Mot. for Partial Summ. J. at 32 n.18 (Reed's testimony confirms Defendants cannot now create a genuine dispute of fact on Reed's statements to Justin in February 2020.)

188.     Gonnering had recommended to Reed that Windy Waters would be better off with active, as opposed to passive, shareholders because he "want[ed] all hands on deck." Kiesler was not part of these discussions. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶¶ 42-43; Gonnering Dep., Sept. 21, 2023, at 161:2-25, 165:2-22.

**RESPONSE: Undisputed** that Gonnering testified to the above. **Disputed** that Gonnering's, Reed's and Kiesler's motivation for wanting or recommending to "buy back passive shareholders" (Stacy) was because Gonnering "want[ed] all hands on deck." Defendants' true motivation was the

completion of the "previously outlined" plan to get all of Stacy's shares via redemption and jumping on the "opportunity" when it presented itself in May 2020. (09/29/2023 Palay Decl., ¶¶ 30, Ex. 28, WINDY0033900 ("We have been working on buying back shares as the weighted EBITDA valuation is low. I recommend we do not sell more shares and continue the share buybacks of specific shareholders, as previously outlined."); 21, Ex. 19, WINDY0009851; 57, Ex. 55, WINDY0047517; 58, Ex. 56, WINDY0047370; 09/21/2023 M. Gonnering Dep. Tr. 164:4-165:1; Suppl. Decl. of D. Palay Ex. 11.) Kiesler was a part of the communications between Reed and Gonnering on this subject. (E.g., Palay Decl. Ex. 28 (Gonnering copying Kiesler on the 11/22/19 operational update e-mail to Reed).)

189.     Randall was a passive shareholder and president who was not engaged in the business of Windy Waters or Widen Enterprises. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.2, ¶ 12; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 141:1-16; Kiesler Dep., Sept. 19, 2023, at 93:14-24; Reed Dep., Aug. 23, 2023, at 224:4-225:6.

**RESPONSE:** Undisputed that Stacy was a passive shareholder and was not engaged in the business of Windy Waters or Widen Enterprises; disputed that Stacy ever served as president of either Windy Waters or Widen Enterprises. (*See* ECF No. 115, Pl.'s Response to Proposed Finding of Fact No. 41; ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 77:22-78:2.)

190.     Gonnering acknowledged it was the shareholder's choice as to whether they sold shares or not, and not his or the company's choice. Gonnering Dep., Sept. 21, 2023, at 141:1-16; 160:22-161:5; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.7, 11-12, ¶¶ 43, 78-81, Ex. M (ECF No. 75-18); Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1);

Compl. (ECF No. 1), ¶ 125, Exs. A (ECF No. 1-6), B (ECF Nos 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6).

**RESPONSE: Disputed.** The Shareholder Agreement states that Windy Waters "shall" redeem shares in the case of shareholder death or permanent disability. (09/29/2023 Palay Decl. Ex. 38 at 9-11, ECF No. 63-37.) In cases other than death or permanent disability, Defendants had the choice whether to effectuate the sale of shareholder's shares. (09/19/2023 M. Kiesler Dep. Tr. 167:22-168:16; Answer ¶ 85; Palay Decl., ¶ 51, Ex. 49, WINDY0047397-40.) Stacy's May 2020 redemption was not a "choice" because it was not willing and voluntary. (*See* Suppl. Decl. of D. Palay, ¶ 6, Ex. 4; Suppl. Decl. of S. Randall, ¶¶ 39, 47, 48; 11/06/2023 Steven Randall Dep. Tr. 178:22-24, 180:5-16.) Ms. Randall was defrauded into at least the May 13, 2020 redemption because, among other things, Defendants did not provide her relevant, material information she needed to make her investment decisions. (*See* ECF No. 61, Pl.'s Proposed Findings of Fact Nos. ¶¶ 180, 265-287; Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525.)

191.   After Randall redeemed all her shares, Kiesler reported a "mission accomplished" because he had completed another item on his to-do list and could get back to focus on his job as CFO of Widen Enterprises during the craziness of the COVID-19 pandemic. Kiesler Dep., Sept. 19, 2023, at 246:19-247:16.

**RESPONSE: Disputed.** Kiesler reported to Gonnering a "mission accomplished" because Defendants accomplished their "previously outlined" plan (their "mission") to get all of Stacy's shares via redemption and jumped on the "opportunity" when it presented itself in May 2020, as the formula was "low," which produced a purchase price at a small fraction of Widen Enterprises' CEO's latest estimate of the company's market value, and Defendants did not provide Stacy relevant, material information she needed to make her investment decisions in May 2020. (*See*

ECF No. 61, Pl.'s Proposed Findings of Fact Nos. ¶¶ 180, 265-287; Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525; 09/29/2023 Palay Decl., ¶¶ 30, Ex. 28, WINDY0033900 ("We have been working on buying back shares as the weighted EBITDA valuation is low. I recommend we do not sell more shares and continue the share buybacks of specific shareholders, as previously outlined."); 21, Ex. 19, WINDY0009851; 57, Ex. 55, WINDY0047517; 58, Ex. 56, WINDY0047370; 09/21/2023 M. Gonnering Dep. Tr. 164:4-165:1; Suppl. Decl. of D. Palay Ex. 11; Palay Decl. Exs. 15, 17.) Further, Kiesler testified that by May 12, 2020, the Randall redemption had dropped off his radar, but that he was reminded about it by Gonnering via a Slack message that read: "Stacy?" (09/19/2023 M. Kiesler Dep. Tr. 246:25-247:4; *see also* ECF No. 116, Pl.'s Suppl. PFOF No. 349.) Kiesler testified that he called Gonnering in response to his message and that Gonnering "suggested that I [Kiesler] go ahead and update the numbers and call [Stacy] the following day. So then I did – so it was like a task that he was – he had had me do." (09/19/2023 M. Kiesler Dep. Tr. 246:25-247:7; *see also* ECF No. 116, Pl.'s Suppl. PFOF Nos. 350-352.) **Undisputed** that Kiesler sent Gonnering a message saying "Mission accomplished" the day after Kiesler completed the redemption of Stacy's shares, to which Gonnering responded "Excellent. Thank you for making it happen." (Palay Decl. Ex. 55.)

192.     Gonnering was pleased to know that Reed's request had been fulfilled. Gonnering Dep., Sept. 21, 2023, at 244:21-245:6.

**RESPONSE: Undisputed** that Gonnering testified that his response to Kiesler—"Excellent. Thank you for making it happen."—expressed pleasure "[b]ecause it fulfilled what Reed wanted to do here, which was helping Stacy." (09/21/2023 M. Gonnering Dep. Tr. 244:14-245:6; 09/19/2023 M. Kiesler Dep. Tr. 247:13-19; Palay Decl. Ex. 55.) **Disputed** that Reed's motivation was to help

Stacy. (*See* ECF No. 115, Pl.'s Resp. to Defs.' PFOF Nos. 240-241; ECF No. 116, Pl.'s Suppl. PFOF Nos. 118-119; Pl.'s Response to Defs.' Suppl. PFOF No. 193.)

193. In September 2021, when Randall expressed unjustified anger and jumped to an incorrect conclusion that Windy Waters had been planning to sell Widen Enterprises since before she sold her shares, Reed was concerned that Randall would do something to jeopardize the pending sale. Reed requested that Kiesler not share the calculations of Randall's ownership percentage were intended to avoid stirring the pot and threatening the impending sale—not because he thought anyone did anything wrong. Reed Dep., Aug. 23, 2023, at 9:10-12, 97:18-21, 127:12-16, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶¶ 74-78; Reed Decl., Nov. 10, 2023, p.4, ¶ 26; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶¶ 163-67; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.6-7, ¶¶ 47-50.

**RESPONSE**: Disputed. Stacy's conclusion was correct. (*See* Pl.'s Response to Defs.' Suppl. PFOF Nos. 161-162.) Also, Stacy did not express anger in September 2021, nor would it have been "unjustified" if she had, given that Defendants, among other things, defrauded Stacy. (ECF No. 118, Suppl. Decl. of Stacy Randall ¶¶ 43-44; ECF No. 61, Pl.'s Proposed Findings of Fact Nos. ¶¶ 180, 265-287.) After Stacy expressed her concerns about how her redemption had been handled, Reed asked Kiesler how much stock Stacy had owned, and the men exchanged the following messages:

Kiesler: 19.585%

Reed: Dam. How much was her buy out?

Reed: Roughly

Kiesler: $1,352,166.31

Kiesler: For reference, you received 13.5% of her 20%

Reed: We don't ever mention that again. But thanks. So as a part of the deal did we pay her out in full?

Kiesler: The balance on the note to her at 8/31/21 was 1,130,599.46. It is up to you how you'd like to handle paying her out once the transaction's funds are wired to Windy Waters.

Reed: Pay her in full 2.3m should keep her happy

Kiesler: [thumb's up emoji]But let's chat about this. You in town next week?

(Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 186:18-190:11; *see* ECF No. 116, Pl.'s Suppl. PFOF Nos. 251, 253-262.) Reed's offer to pay Stacy "2.3m"—a reference to the balance of the promissory note and a $1 million "gift"—was an attempt to "keep [Stacy] happy" and stop her from pursuing her legal and equitable rights and remedies relating to Defendants' acts and omissions regarding the May 2020 redemption. (*See* ECF No. 116, Pl.'s Suppl. PFOF Nos. 261-262.) Reed's September 11, 2021 text to Kiesler—"I don't think Stacy will call you but don't tell her how much stock she had"—was intended to prevent Stacy from discovering how much stock she had before the May 2020 redemption and to stop her from realizing that she would have been entitled to receive approximately $31,727,700 from the sale of Widen Enterprises to Acquia, had she still owned the approximately 20% of Windy Waters stock that Defendants obtained via, among other things, fraud. (Palay Decl., ¶ 65, Ex. 63, WINDY0047403 at 47404; 08/23/2023 R. Widen Dep. Tr. 172:7-173:8; ECF No. 116, Pl.'s Suppl. PFOF No. 269; ECF No. 61, Pl.'s Proposed Findings of Fact Nos. ¶¶ 180, 265-287.) Reed also testified contrary to this proposed finding of fact, including that Reed told Kiesler not to tell Stacy how much stock she had "because she had that information" and Reed did not know why he told Kiesler not to tell Stacy how much stock she had. (08/23/2023 R. Widen Dep. Tr. 172:16-173:8.)

194.    Once Acquia acquired Widen Enterprises, Reed's role was replaced by the CEO of Acquia and others within that organization. Gonnering Dep., Sept. 21, 2023, at 124:24-126:13, 295:19-296:6.

**RESPONSE:** Undisputed that Gonnering testified that once Acquia acquired Widen Enterprises, Reed's "coaching and mentoring and guidance" role to Gonnering was replaced by the CEO of Acquia. Otherwise, **disputed.** Gonnering lacks foundation to testify as to Reed's role beyond the role's interactions with Gonnering. Further **disputed** insofar as the proposed finding of fact suggests that Reed had an active role at Widen Enterprises prior to the sale. During 2019 and 2020, Reed oversaw Gonnering's management of the company's operations at a "higher level," was "not actively involved in the operations of the company," had a role that could be absorbed "at no additional cost burden," and visited the companies only every few months or every few weeks, spending approximately 6 months of the year at his home in Arizona or at the family cottage in northern Wisconsin. (09/29/2023 Palay Decl. Ex. 32, ECF No. 63-31 at 13 (Widen Enterprises' accountants determined that Reed's role was "non-essential to business operations, and we understand any duties will be absorbed within the current Management structure at no additional cost burden" and therefore "remove[d] the Company's Owners compensation (base salary, bonus and fringe) during the Historical Period as these costs are not expected to continue post-transaction. We understand the owner is not actively involved in the operations of the company and any role in the business will be absorbed by current Management."); 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21; 08/23/2023 R. Widen Dep. Tr. 202:17-204:10, 207:15-20, 209:9-23; 11/03/2023 Dep. Tr. of Windy Waters 203:12-18 (confirming that the information contained in the Grant Thornton Quality of Earnings report was accurate).) Widen Enterprises testified that Reed was not actually involved daily with the operations of the company. (11/06/2023 Dep. Tr. of Widen Enterprises 94:25-95:10.)

195.    The Second Amendment contains signatures in blue ink on the signature lines for Stacy Randall as not only a shareholder, but also as then-President of Windy Waters, as depicted below:



Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement); Steven Randall Dep. ("Steven Dep."), Oct. 12, 2023, at 228:14-232:10.

**RESPONSE: Undisputed** that the Second Amendment contains signatures in blue ink on the signature lines for Stacy Randall. **Disputed** that Stacy actually served as President of Windy Waters at any time. Stacy was nominally appointed to this position through Kiesler's use of her signature stamp without her knowledge or consent, although Kiesler testified that he believed that he had Stacy's "implied consent." In other instances, Stacy was nominally appointed to this position in documents that Kiesler signed alone of which she was not aware. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 109:18-111:16, 111:25-113:17, 114:4-24, 117:9-118:7, 124:5-127:4, 127:8-128:18, 128:23-130:2, 130:9-135:18, 132:2-133:2, 134:16-135:15, 135:22-137:17, 280:22-24; *see generally id.* 106:20-137:17; 08/29/2023 R. Widen Dep. Tr. 225:4-6; see Palay Decl., ¶¶ 96, Ex. 88, STAFFORD001057 (2020 President); 97, Ex. 89, STAFFORD001053 (2019 President); 83, Ex.. 75, STAFFORD001051 (2018 President); 85, Ex. 77, STAFFORD001048 (2017 President); 98, Ex. 90, STAFFORD001043 (2016 President); 99, Ex. 91, STAFFORD000999 (2008 President).) Windy Waters testified that Stacy was not paid for her purported service as President

and both of the Companies confirmed that Stacy did not direct the actions of any officers or directors of Windy Waters. (11/03/2023 Dep. Tr. of Windy Waters 63:3-15, 68:6-7, 185:10-12; 11/06/2023 Dep. Tr. of Widen Enterprises 91:20-92:5.)

*Background Facts Repeated Verbatim* [2]

196.    Prior to Randall executing the May 13, 2020 Redemption Agreement, she had executed five other stock redemption agreements for the sale of Windy Waters stock. Wittenberg Decl., Sept. 29, 2023, pp.1-2, ¶ 4, Ex. C (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 1.

**RESPONSE:** Undisputed.

197.    In 2005, Randall said she needed money, so she asked Reed for $200,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 162:3-19, 163:21-164:12, 173:10-13, 246:9-11; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 48, Ex. E (WINDY0055042).

**RESPONSE:** Undisputed.

198.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $200,000. Randall Dep., Aug. 28, 2023, at 164:14-17, 164:25-165:2, 171:14-172:3; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 46.

**RESPONSE:** Undisputed.

---

[2] Rather than repeat every fact from Defendants' Proposed Findings of Fact in support of their motion for summary judgment (ECF No. 76) in this statement of additional facts, Defendants attempted to limit the facts to those most important to ruling on Plaintiff's motion. However, some of the same background facts are repeated below, verbatim, to ensure they are considered for purposes of ruling on Plaintiff's motion, not just for Defendants' motion.

199.     Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $200,000 she said she needed. Randall Dep., Aug. 28, 2023, at 171:20-23; Kiesler Decl., Sept. 29, 2023, p.7, ¶¶ 47-48, Ex. E (WINDY0055042).

**RESPONSE:** **Undisputed.**

200.     The stock purchase was undertaken pursuant to a "June 30, 2005 Redemption Agreement" dated September 2, 2005, and made effective as of June 30, 2005, signed by Randall and other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $200,000. Randall Dep., Aug. 28, 2023, at 162:3-163:9; Kiesler Decl., Sept. 29, 2023, p.7, ¶ 48, Ex. E (WINDY0055042).

**RESPONSE:** **Undisputed.**

201.     The price per share Randall was paid in 2005 was $326.86 and was the amount arrived at using the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 17; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 49.

**RESPONSE:** **Undisputed** that Defendants calculated the $326.86 price per share Ms. Randall was paid in 2015 using the Stock Price Formula.

202.     Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she reviewed the redemption agreement before signing it. Randall Dep., Sept. 29, 2023, at 166:10-168:4, 170:12-171:13, 173:19-174:8, 206:11-18;

Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set of Reqs. For Admis.) at Resp. No. 20.

**RESPONSE: Disputed** that Ms. Randall "did not think about . . . whether her shares had value." In response to the question "Did you think about whether your shares had value?" she testified: "I guess I figured that they did because I was getting money by cashing in my stock." (09/29/2023 S. Randall Dep. Tr. 170:24-171:4.) **Undisputed** as to the remainder of the facts set forth in this proposed finding of fact.

203.    Randall was happy to get the money she asked for. Randall Dep., Aug. 28, 2023, at 171:14-16.

**RESPONSE: Undisputed.**

204.    In 2007, Randall again said she needed money, so she asked Reed for money, and Reed told her to talk to Kiesler. Randall Dep. 177:2-16, 185:15-186:2, 164:12, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 36.

**RESPONSE: Undisputed.**

205.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $250,000. Randall Dep., Aug. 28, 2023, at 176:4-22, 177:2-16, 180:8-22, 198:4-9, 211:20-212:1; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 50.

**RESPONSE: Undisputed.**

206.     Kiesler calculated the price per share under the Stock Price Formula in the Second Amendment to offer to purchase enough stock to give Randall the $250,000 she needed. Kiesler Decl., Sept. 29, 2023, pp.6, 8, ¶¶ 37, 51, Ex. D (Second Amendment to Shareholder Agreement).

**RESPONSE**: Undisputed.

207.     The stock purchase was undertaken pursuant to a "June 30, 2007 Redemption Agreement" dated August 2, 2007, and made effective as of June 30, 2007, signed by Randall and other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $250,000. Randall Dep., Aug. 28, 2023, at 175:7-24, 184:2-4; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 52, Ex. F (Ex. 12 to Randall Dep.).

**RESPONSE**: Undisputed.

208.     The price per share Randall was paid in 2007 was $312.09, and was the amount arrived at using the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 25; Kiesler Decl., Sept. 29, 2023, p.8, ¶¶ 52-53, Ex. F (Ex. 12 to Randall Dep.).

**RESPONSE**: **Undisputed** that Defendants calculated the $312.09 price per share Ms. Randall was paid in 2007 using the Stock Price Formula.

209.     Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she reviewed the redemption agreement before signing it. Randall Dep., Aug. 28, 2023, at 180:8-181:6, 182:13-17, 184:13-21, 206:11-18;

Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 27.

**RESPONSE**: **Disputed** that Ms. Randall "did not think about . . . whether her shares had value." In response to the question "When you say you never thought about it, does that mean you didn't know that there was a value, or you just didn't care what the value was?" she testified: "I didn't know what the value was." (09/29/2023 S. Randall Dep. Tr. 180:24-181:3.) **Undisputed** as to the remainder of the facts set forth in this proposed finding of fact.

210.    Randall received the money she asked for. Randall Dep., Aug. 28, 2023, at 181:17-23.

**RESPONSE**: **Undisputed.**

211.    In 2011, Randall again said she needed money, so she asked Reed for $200,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 189:22-190:10, 164:12, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 37.

**RESPONSE**: **Undisputed.**

212.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $200,000. Randall Dep., Aug. 28, 2023, at 189:22-190:10, 212:3-9; Kiesler Decl., Sept. 29, 2023, p.8, ¶ 54.

**RESPONSE**: **Undisputed.**

213.     Kiesler calculated the price per share under the Stock Price Formula in the Second Amendment to offer to purchase enough stock to give Randall the $200,000 she said she needed, and Randall was aware that a formula was being used. Kiesler Decl., Sept. 29, 2023, p.8, ¶ 55; Randall Dep., Aug. 28, 2023, at 200:10-16.

**RESPONSE:** Undisputed.

214.     The stock purchase was undertaken pursuant to a "January 18, 2011 Redemption Agreement" dated January 18, 2011, containing the signature stamp of Randall and signed by other shareholders, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $200,000. Randall Dep., Aug. 28, 2023, at 187:4-21; Kiesler Decl., Sept. 29, 2023, pp.8-9, ¶ 56, Ex. G (Ex. 13 to Randall Dep.).

**RESPONSE:** Undisputed.

215.     The price per share Randall was paid in 2011 was $168.70, and was based on the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 33; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 57.

**RESPONSE:** Undisputed that Defendants calculated the $168.70 price per share Ms. Randall was paid in 2011 using the Stock Price Formula.

216.     Randall did not know how many shares she sold in exchange for that amount of money, did not inquire about the value of her shares or how it was calculated, did not think about or inquire about whether a document would need to be signed, and does not believe she reviewed the stock redemption agreement. Randall Dep., Aug. 28, 2023, at 191:5-12, 196:12-20, 206:11-18;

Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 35.

**RESPONSE**: Undisputed.

217.    Randall received the money she asked for. Randall Dep., Aug. 28, 2023, at 199:8- 13, 272:13-21.

**RESPONSE**: Undisputed.

218.    In 2017, Randall again said she needed money, so she asked Reed for $78,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 164:12, 205:4-7, 205:20-206:10, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 38.

**RESPONSE**: Undisputed.

219.    Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $78,000. Randall Dep., Aug. 28, 2023, at 207:5-16, 212:11-18; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 58.

**RESPONSE**: Undisputed.

220.    Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $78,000 she said she needed. Kiesler Decl., Sept. 29, 2023, p.9, ¶ 59.

**RESPONSE**: Undisputed.

221.     The stock purchase was undertaken pursuant to a "August 1, 2017 Redemption Agreement" dated August 1, 2017, signed by Randall and Reed and Kiesler, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $78,000. Randall Dep., Aug. 28, 2023, at 203:5-204:15, 209:25-210:5; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 60, Ex. H (Ex. 14 to Randall Dep.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 40.

**RESPONSE**: Undisputed.

222.     The price per share Randall was paid in 2017 was $283.10 and was the number arrived at from calculating the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 41; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 61.

**RESPONSE**: Undisputed.

223.     Randall did not know how many shares she sold in exchange for that amount of money and did not think about or inquire about whether her shares had value or what that value was or how it was calculated. Randall Dep., Aug. 28, 2023, at 210:6-10; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 43.

**RESPONSE: Disputed** that Stacy did not think about whether her shares had value. The cited evidence does not support the proposed fact that Stacy "did not know how many shares she sold in exchange for that amount of money and did not think about or inquire about whether her shares had value." **Undisputed** as to the remainder of this proposed finding of fact.

224.     Randall did not review the document before signing it, nor did she skim it, because she had "gone through this a number of times" by this fourth stock redemption. Randall Dep., Aug. 28, 2023, at 206:11-207:1.

**RESPONSE**: Undisputed.

225.     Randall got the money she asked for. Randall Dep., Aug. 28, 2023, at 204:11-15, 205:16-19.

**RESPONSE**: Undisputed.

226.     In 2019, Randall again said she needed money, so she asked Reed for $100,000, and Reed told her to talk to Kiesler. Randall Dep., Aug. 28, 2023, at 164:12, 213:12-23, 216:14, 246:9-11; Reed Decl., Sept. 29, 2023, p.5, ¶ 39.

**RESPONSE**: Undisputed.

227.     Randall then told Kiesler she wanted to get some money from her stock, which she knew meant she would be selling some of her stock, and specifically asked for $100,000. Randall Dep., Aug. 28, 2023, at 216:12-22, 217:7-21; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 62.

**RESPONSE**: Undisputed.

228.     In January 2019, Randall also borrowed $20,000 from Widen Enterprises. Kiesler Dep., Sept. 19, 2023, at 222:14-24; Kiesler Decl., Sept. 29, 2023, p.9, ¶ 63.

**RESPONSE**: Undisputed.

229.    In order to repay that loan, Randall sold enough shares to obtain $120,000, and applied the extra $20,000 to pay off her loan. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 64; Randall Dep., Aug. 28, 2023, at 215:3-5, 216:8-22.

**RESPONSE**: Undisputed.

230.    Kiesler calculated the price per share under the Stock Price Formula to offer to purchase enough stock to give Randall the $120,000 she said she needed for her own purposes and to repay the loan. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 65.

**RESPONSE**: Undisputed.

231.    The stock purchase was undertaken pursuant to a "January 1, 2019 Redemption Agreement" effective January 1, 2019, signed by Randall and Kiesler and consented to by Randall as a shareholder and director and Reed as majority shareholder, by which Windy Waters purchased some of its shares of stock from Randall in exchange for $120,000. The documents were signed in April 2019. Randall Dep., Aug. 28, 2023, at 212:21-213:16; Kiesler Decl., Sept. 29, 2023, p.10, ¶ 66, Ex. I (Ex. 15 to Randall Dep.); Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 48.

**RESPONSE**: **Disputed** that Stacy consented to the 2019 redemption agreement as a director. (*See* ECF No. 115, Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 39.) **Undisputed** as to the remainder of the facts in this proposed finding of fact.

232.    The price per share Randall was paid in 2019 was $425.79, and was the price that Kiesler reached as the result of the Stock Price Formula. Wittenberg Decl., Sept. 29, 2023,

p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 49; Kiesler Decl., Sept. 29, 2023, p.10, ¶ 67; Kiesler Dep., Sept. 19, 2023, at 257:22-258:1.

**RESPONSE:** Undisputed.

233.     Randall did not know how many shares she sold in exchange for that amount of money, did not think about or inquire about whether her shares had value or what that value was or how it was calculated, and does not believe she ever reviewed or skimmed the redemption agreement. Randall Dep., Aug. 28, 2023, at 206:11-18, 214:2-12; Wittenberg Decl., Sept. 29, 2023, p.2, ¶ 5, Ex. D (Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 51.

**RESPONSE: Disputed** that Stacy "did not think about or inquire about whether her shares had value." The cited evidence does not support that proposition. **Undisputed** as to the remaining facts in this proposed finding of fact.

234.     Randall received the money she asked for and said she needed. Randall Dep., Aug. 28, 2023, at 217:15-21.

**RESPONSE:** Undisputed.

235.     Randall never asked for any financial information in relation to any of her stock redemptions. Kiesler Decl., Sept. 29, 2023, p.10, ¶ 68; Reed Decl., Sept. 29, 2023, p.5, ¶ 40.

**RESPONSE:** Undisputed.

236.     Kiesler was concerned about the idea of paying money in light of the uncertainty with the PPP loan and would have been content not buying back any of Randall's shares, but Reed wanted Kiesler to help his sister. Reed Decl., Sept. 29, 2023, p.6, ¶ 51; Kiesler Decl., Sept. 29, 2023, p.15, ¶ 109.

**RESPONSE:** **Disputed.** Mr. Widen's true motivation for purchasing all, and not less than all, of her stock in May 2020 was the "opportunity" to purchase Stacy's stock using a formula he had been informed was "low," and which produced a purchase price at a small fraction of Widen Enterprises' CEO's latest estimate of the company's market value. (*See, e.g.,* 09/29/2023 Palay Decl., ¶¶ 17, 19, 21, 30, Exs. 15, 17, 19, 28; *see also* Pl.'s Resp. to Defs.' Suppl. PFOF No. 27.)

237.     The price per share that Randall was paid in 2020 was the highest share price anyone had paid or received for Windy Waters stock in the history of the company. Kiesler Decl., Sept. 29, 2023, p.20, ¶ 158.

**RESPONSE:** **Undisputed.**

238.     Reed usually deleted solicitation emails. He never talked to any of those individuals or responded to their emails. Reed Dep., Aug. 23, 2023, at 120:18-22, 122:18-125:13; Reed Decl., Sept. 29, 2023, p.8, ¶ 70.

**RESPONSE:** **Disputed.** The cited testimony indicates that Reed responded to at least one such solicitation. (08/23/2023 R. Widen Dep. Tr. 124:20-25.)

Dated this 20th day of November, 2023.

s/ David Palay
Mark A. Cameli
WI State Bar ID No. 1012040
mcameli@reinhartlaw.com
David Palay
WI State Bar ID No. 1115862
dpalay@reinhartlaw.com
Monica A. Mark
WI State Bar ID No. 1082428
mmark@reinhartlaw.com
Elizabeth Elving
WI State Bar ID No. 1115903
eelving@reinhartlaw.com
Samuel C. Sylvan
WI State Bar ID No. 1131339
ssylvan@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965

*Attorneys for Plaintiff*