IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

       Plaintiff,

v.

REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

       Defendants.

Civil Action No. 22-cv-400

---

**PLAINTIFF STACY L. RANDALL'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSED STATEMENT OF UNDISPUTED FACTS**

---

1.    This is an action for securities fraud pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §§ 78j(b), 78t(a) and U.S. Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, as well as related claims under state law. (ECF No. 45, Defs.' First Am. Answer ("Answer") ¶ 10.)

**RESPONSE:** Undisputed[1] that this action includes these claims; disputed that this action only includes these claims. Compl. (ECF No. 1).

**REPLY: Undisputed.** Defendants have not raised a genuine dispute to this fact, as the proposed fact does not state that this action includes "only" claims arising under the Securities Exchange Act. The dispute Defendants identify is immaterial.

---

[1] For all facts identified as undisputed in this document, Defendants intend that they are undisputed only for purposes of summary judgment, and do not waive any right to dispute the facts later in the case.

2.      This matter arises under federal law, and this Court has original subject matter jurisdiction over the parties' dispute pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a). This Court also has exclusive jurisdiction over the relief sought under the Exchange Act and SEC Rule 10b-5 pursuant to 15 U.S.C. § 78aa(a). (Answer ¶ 11.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

**REPLY:** No reply is required.

3.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. (Answer ¶ 12.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

**REPLY:** No reply is required.

4.      Venue is proper in this Court pursuant to 15 U.S.C. § 78aa(a) because the Defendants reside and/or transact business in this district. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial number of the events giving rise to this action occurred in this District, the Defendants reside or are located in this District, and because a substantial part of the property that is the subject of this action is situated in this District. (Answer ¶ 13.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

**REPLY:** No reply is required.

5.     Defendant Windy Waters, Inc. (Windy Waters) is a closely held Wisconsin corporation with its principal place of business in Monona, Wisconsin. (Answer ¶ 18.)

**RESPONSE:** Undisputed that Windy Waters, Inc. ("Windy Waters") is a closely held Wisconsin corporation; disputed that Windy Waters' principal place of business is in Monona, Wisconsin. Windy Waters now has a principal place of business in Cottage Grove, Wisconsin. Windy Waters, Inc., Wis. Dep't of Fin. Insts., ttps://www.wdfi.org/apps/corpsearch/Details.aspx?entityID=W038147&hash=434457099&searchFunctionID=8fb2446b-6b80-48d8-bacb-bfcd97dd1a1f&type=Simple&q=windy+waters (last visited Nov. 9, 2023).

**REPLY: Undisputed.** The dispute Defendants identify is immaterial. This fact is otherwise undisputed.


6.     Defendant Widen Enterprises, LLC (Widen Enterprises) is a Wisconsin limited liability company with its principal place of business in Monona, Wisconsin. (Answer ¶ 17.)

**RESPONSE:** Undisputed that Widen Enterprises, LLC ("Widen Enterprises") is a Wisconsin limited liability company; disputed that Widen Enterprises' principal place of business is in Monona, Wisconsin. Widen Enterprises now has a principal place of business in Boston, Massachusetts.

Widen Enterprises, LLC, Wis. Dep't of Fin. Insts.,

https://www.wdfi.org/apps/corpsearch/Details.aspx?entityID=1W08924&hash=243114188&searchFunctionID=b2356c43-7005-41dd-ac54-488e9c9232b2&type=Simple&q=widen+enterprises

(last visited Oct. 25, 2023).

**REPLY: Undisputed.** The dispute Defendants identify is immaterial. This fact is otherwise undisputed.

7.      In or around 1997, Stacy's family created Windy Waters, a family-owned holding company, to own and "protect" Widen Enterprises. (Answer ¶ 3; 08/23/2023 R. Widen Dep. Tr. 221:20-222:11.)

**RESPONSE:** Disputed to the point that Windy Waters was always a family-owned company; otherwise, undisputed. At times since 1997, long-term employees of Widen Enterprises also had ownership stakes in Windy Waters. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.1, ¶ 4.

**REPLY: Undisputed.** Defendants do not raise a genuine dispute to this fact, which proposes that Windy Waters was a family-owned holding company when it was created in 1997. The dispute identified is immaterial.

8.      In September 2001, Stacy's father and his five children signed an amendment to the shareholder agreement of Widen Enterprises, which made the shareholder agreement applicable to Windy Waters, the holding company. (Answer ¶ 23; Declaration of David G. Palay ("Palay Decl."), ¶ 3, Ex. 1, STAFFORD001299, Recitals § 5.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

9.      The family, including Stacy and her brother, Defendant Reed C. Widen, traded in their shares of Widen Enterprises for shares of Windy Waters, which owned 100% of Widen Enterprises. (Answer ¶ 3.)

**RESPONSE:** Undisputed, except that Windy Waters only owned all of Widen Enterprises after the transfer was complete. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.1, ¶¶ 3, 5; Kiesler Dep., Sept. 19, 2023, at 42:14-17.

**REPLY: Undisputed.** The dispute Defendants identify is immaterial.

10.     The Bylaws of Windy Waters, Inc. were adopted on January 1, 1998. (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

11.     Section 3.02 of Article 3 of the Bylaws of Windy Waters, Inc. provides that "Directors shall be elected by the shareholders at each annual shareholders' meeting . . . by a plurality of the votes cast by the shares entitled to vote ...." (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936 at 942.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

12.     Section 3.03 of Article 3 of the Bylaws of Windy Waters, Inc. provides, in relevant part, that a "director[] shall hold office until the next annual shareholders' meeting and until his or her successor shall have been elected by the shareholders or until his or her prior death, resignation, or removal." (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936 at 942.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

13.     Until in or around September 2021, Widen Enterprises was a Wisconsin corporation. (Answer ¶ 17; Widen Enterprises, LLC, Wis. Dep't of Financial Institutions, https://www.wdfi.org/apps/corpsearch/Details.aspx?entityID=1W08924&hash=243114188&sear   h

FunctionID=3b7fe989-1d2d-4d78-ad1a-39b2f2387f9a&type=Simple&q=widen+enterprises    (last visited Sept. 20, 2023).)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

14.    Widen Enterprises is now owned by a company called Acquia, Inc. (Acquia) (Answer ¶ 17.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

15.    From its creation in or around 1997 until in or around September 2021, Windy Waters owned and controlled Widen Enterprises as the sole parent company of Widen Enterprises. (Answer ¶¶ 3, 17, 18.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

16.    Pursuant to an Equity Purchase Agreement dated August 17, 2021, Acquia acquired 100% of the stock of Widen Enterprises for a purchase price of $162 million. (Answer ¶¶ 148-149; Compl., Ex. C (filed under seal).)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

17.  The purchase price of $162 million equates to ████████████████ ████████████████████████████████. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

18.  As of no later than 2008, Widen Enterprises was a Digital Asset Management (DAM) company. (09/21/2023 M. Gonnering Dep. Tr. 29:19-32:8; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906-7907.)

**RESPONSE:** Undisputed that Widen Enterprises did Digital Asset Management ("DAM") as of 2008; disputed that Widen Enterprises only did DAM as of 2008. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.1-2, ¶¶ 4-5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The fact does not propose that Widen Enterprises "only did DAM as of 2008." The dispute identified is immaterial.

19.  As of no later than 2008, Widen Enterprises was a Software as a Service (SaaS) company. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7963; 09/21/2023 M. Gonnering Dep. Tr. 1:24-22:10, 76:9-77:22; Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065.)

**RESPONSE:** Undisputed that Widen Enterprises did Software as a Service ("SaaS") as of 2008; disputed that Widen Enterprises only did SaaS as of 2008. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.1-2, ¶¶ 4-5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The fact does not propose that Widen Enterprises "only did SaaS as of 2008." The dispute identified is immaterial.

20.     Widen Enterprises marketed itself to potential acquirers, including Acquia, using a "Confidential Information Memorandum," which noted Widen Enterprises' ███████████ ████████████████████████ (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26); 09/21/2023 M. Gonnering Dep. Tr. 52:7-53:22.)

**RESPONSE:** Disputed that Widen Enterprises "marketed itself." Software Equity Group Advisors, L.L.C. (SEG) marketed Widen Enterprises. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The distinction Defendants draw between Widen Enterprises marketing itself and Widen Enterprises engaging an agent to market the company is immaterial.

21.     Widen Enterprises also marketed itself to potential acquirers, including Acquia, as a Software as a Service company. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7963.)

**RESPONSE:** Disputed that Widen Enterprises "marketed itself." SEG marketed Widen Enterprises. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The distinction Defendants draw between Widen Enterprises marketing itself and Widen Enterprises engaging an agent to market the company is immaterial.

22.     [Intentionally left blank]

**RESPONSE:** This paragraph was intentionally left blank and therefore no response is required.

**REPLY:** No reply is required.

23.     Over the years, Widen Enterprises evolved from a pre-press company specializing in engraving, color-separation, printing and content-creation used by physical and then online catalogs, into a digital asset management (DAM) company that provided software as a service (SaaS). (08/23/2023 R. Widen Dep. Tr. 12:3-13:2, 17:4-18:7; 09/21/2023 M. Gonnering Dep. Tr. 15:11-16:9, 19:10-21:4, 22:11-23:5, 32:20-34:18.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

24.     By April 10, 2020, Widen Enterprises' transformation into a Digital Asset Management / Software as a Service company was complete, and Widen Enterprises made plans to dismiss the remainder of its pre-media workforce in the coming months. (Palay Decl., ¶ 7, Ex. 5, WINDY0000946.)

**RESPONSE:** Disputed. By April 10, 2020, the transformation into a Digital Asset Management/Software as a Service company was not "complete." As of April 10, 2020, Widen Enterprises planned to depart the content production services market sometime between June and

August, contingent on its receipt of PPP funding. The last official day for its content production service line was July 10, 2020. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.2 ¶¶ 4, 7, Exs. 2 (ECF No. 63-2, at 7984), 5 (ECF No. 63-5).

**REPLY: Undisputed.** The dispute Defendants identify is immaterial.

25.     At all relevant times, the shares of Windy Waters at issue in this matter were securities within the meaning of the federal securities laws and SEC Rule 10b-5. (Answer ¶¶ 200, 212.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

**REPLY:** No reply is required.

26.     At all relevant times, the shares of Windy Waters at issue in this matter were securities as defined by Wisconsin Statutes section 551.102(28). (Answer ¶ 238.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

**REPLY:** No reply is required.

27.     Plaintiff Stacy L. Randall (Stacy) is a sixty-five-year-old resident of the State of Wisconsin. (Answer ¶ 14.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

28.     From Windy Waters' creation until on or around May 13, 2020, Stacy was a minority shareholder of Windy Waters, which at the time was the sole direct owner of Widen Enterprises. (Answer ¶¶ 2, 3, 14.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

29.     Stacy's highest level of formal education is high school. (09/28/2023 S. Randall Decl., p.1, ¶ 2.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

30.     During all relevant times, Stacy was not sophisticated regarding finance and business. (09/28/2023 S. Randall Decl., p.1, ¶ 3; 08/23/2023 R. Widen Dep. Tr. 177:20-178:4; 194:12-17.)

**RESPONSE:** Disputed. Stacy Randall is competent in business affairs. Kiesler Dep., Sept. 19, 2023, at 32:10-12.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Defendants' response is not supported by admissible evidence. Mr. Kiesler lacks foundation to testify as to Stacy's competence or sophistication in business affairs. Furthermore, Mr. Kiesler did not testify as to Stacy's *sophistication* in *business affairs*, but merely that she was "competent" in general. (09/19/2023 M. Kiesler Dep. Tr. 32:10-12.) Mr. Kiesler went on to testify that he did not know if Stacy was involved in the business of Widen Enterprises. (*Id.* at 32:13-18.)

31.     [Intentionally left blank]

**RESPONSE:** This paragraph was intentionally left blank and therefore no response is required.

**REPLY:** No reply is required.

32.     Defendant Reed C. Widen (Reed) is a resident of the State of Wisconsin. (Answer ¶ 15.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

33.     Reed is Stacy's brother. (Answer ¶ 15.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

34.     Reed is the majority shareholder, an officer, and a director of Windy Waters. (Answer ¶ 15.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

35.     Until in or around September 2021, Reed indirectly owned a majority interest in Widen Enterprises through his ownership of Windy Waters. (Answer ¶ 15.)

**RESPONSE:** Although the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013 owned a majority interest in Windy Waters, the holding company of Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this resulted in Reed (as trustee) "indirectly own[ing] a majority interest in Widen Enterprises."

**REPLY:** No reply is required.

36.     As of May 2020, Reed was the majority and controlling shareholder of Windy Waters. (Answer ¶ 4.)

12

**RESPONSE:** Disputed that Reed was a "controlling shareholder"; otherwise, undisputed for purposes of this motion. Reed (as trustee) was a voting shareholder, but its control is set out in its bylaws. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.5, ¶ 32, Ex. 30 (ECF No. 63-29); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.11, ¶ 94, Ex. H (ECF No. 67-5); Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp. 2, 6, ¶¶ 10, 37, Exs. A (ECF No. 74-1), D (ECF No. 74-4); Am Answer (ECF No. 45), ¶ 273.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. At Paragraph 4 of Defendants' Amended Answer, Defendants state: "Defendants admit that for a period of time, Defendant Reed was the majority and controlling shareholder of Windy Waters, the sole shareholder of Widen Enterprises, Inc." (Am. Answer ¶ 4.) This admission is binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).)

37.   Immediately prior to Stacy's May 2020 redemption, Reed owned approximately 55.463% of the outstanding stock of Windy Waters. (Palay Decl., ¶¶ 105-106, Exs. 97- 98, STAFFORD000061 attaching STAFFORD000076; Palay Decl., ¶ 31, Ex. 29, STAFFORD000172.)

**RESPONSE:** Although 55.463% of Windy Waters' stock was owned by the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013, for purposes of this motion only, Defendants do not dispute that this resulted in Reed's ownership (as trustee) of 55.463% of Windy Waters' stock. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.14, ¶ 106, Ex. 98 (ECF No. 63-97).

**REPLY:** No reply is required.

38.     Reed served as Chairman of the Board of Widen Enterprises from in or around the late 1990s until in or around September 2021, and also unilaterally selected the board of directors of Widen Enterprises. (Answer ¶ 30; 08/23/2023 R. Widen Dep. Tr. 46:8-22; 09/21/2023 M. Gonnering Dep. Tr. 118:3-9; 09/19/2023 M. Kiesler Dep. Tr. 55:10-23.)

**RESPONSE:** Disputed that Reed unilaterally selected the Board of Directors of Widen Enterprises. Reed was elected the sole director of Widen Enterprises by its then-shareholders and directors. Reed created an external advisory board to advise him on various matters, but this advisory board did not engage in any corporate governance. Reed Decl., Nov. 10, 2023, p.2, ¶¶ 5, 8-10, Ex. C (WINDY0001702); Corp. Representative of Windy Waters, Inc. Dep. ("Windy Waters Dep."), Nov. 3, 2023, at 37:8-17. Otherwise, undisputed.

**REPLY: Undisputed.** The dispute Defendants identify is immaterial.

39.     As of May 13, 2020, Reed ran Windy Waters and Widen Enterprises (collectively, the Companies), along with Michael Kiesler, an officer of the Companies. (08/23/2023 R. Widen Dep. Tr. 44:24-45:13; Answer ¶¶ 4, 273.)

**RESPONSE:** Disputed. Regarding Windy Waters, as a holding company, there was nothing to "run." Moreover, Stacy Randall was president of Windy Waters from approximately 2007 until May 13, 2020. Regarding Widen Enterprises, Matthew Gonnering was the CEO beginning in 2009, and Michael Kiesler was the CFO beginning in approximately 2000. Kiesler Dep., Sept. 19, 2023, at 40:22-41:7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.1-2, ¶¶ 6, 9; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A (ECF No. 1-6), B (ECF No. 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept.

29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6); Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶ 6; Gonnering Dep., Sept. 21, 2023, at 27:16-21; Windy Waters Dep., Nov. 3, 2023, at 37:8-17.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Reed testified as follows: "Q: Okay. Fair to say you ran those companies in that period of time? A: Yes. Q: You were in control of what happened at those companies? [objection] A: Matthew ran the companies – Q: Okay. A: -- with my – with me I should say. Q: Did Matthew report to you, or did you report to Matthew? A: Matthew reported to me. Q: Okay. So you ultimately called the shots? A: Yes." (08/23/2023 R. Widen Dep. Tr. 44:24-45:13; Answer ¶¶ 4, 273.)

40.     As of May 13, 2020, Reed was an officer and director of Widen Enterprises. (Answer ¶ 273.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

41.     As of May 13, 2020, Reed was in control of the Companies and "ultimately called the shots" at the Companies. (08/23/2023 R. Widen Dep. Tr. 44:24-45:19, 16:2-3; Answer ¶ 273; 09/19/2023 M. Kiesler Dep. Tr. 225:8-19; 09/21/2023 M. Gonnering Dep. Tr. 113:24-114:7, 117:16-118:9, 119:20-24, 120:20-122:12, 123:21-124:4.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

42.     In 2019 and 2020, Reed was Gonnering's (CEO of Widen Enterprises) manager, and Gonnering was Kiesler's manager. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections &

Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11; 09/21/2023 M. Gonnering Dep. Tr. 114:2-7, 119:20-24.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

43.     Defendant Michael Kiesler (Kiesler) is a resident of the State of Wisconsin. (Answer ¶ 16.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

44.     Until in or around September 2021, Kiesler served as the Chief Financial Officer (CFO) of Widen Enterprises and the Treasurer of Windy Waters. (Answer ¶¶ 4, 16.)

**RESPONSE:** Disputed. Kiesler served as the CFO of Widen Enterprises until approximately November 24, 2021, and Kiesler is still the Treasurer of Windy Waters. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.1-2, ¶ 6; Kiesler Decl., Nov. 10, 2023, p.1, ¶ 4.

**REPLY:  Undisputed.** The dispute Defendants identify is immaterial.

45.     Prior to May 5, 2020, Kiesler became a shareholder of Windy Waters. (Answer ¶¶ 4, 16.)

**RESPONSE:** Undisputed

**REPLY:** No reply is required.

46.     In 2004, Reed received a "Personal & Confidential" appraisal of Windy Waters. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

47.     The 2004 appraisal explained that "[f]air market value" was defined as "The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts." (Palay Decl., ¶ 11, Ex. 9, WINDY0047991).

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

48.     Based on a weighted analysis of three separate approaches to calculating value, the 2004 appraisal estimated that Windy Waters' fair market value was approximately $7,441,000 as of April 30, 2004. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991 at 47996-97).

**RESPONSE:** Undisputed that the 2004 Bruce Hutler Report estimated that "the fair market value of a marketable, majority interest in 100% of the equity" of Windy Waters was $7,441,000 as of April 30, 2004, under which the price-per-share for Class A stock was estimated at $367.54, and the price-per-share for Class B stock was estimated at $350.04; disputed that such values remained the same when considering non-marketable, minority shares. After accounting for the factors "an investor would consider relevant to establishing value," minority control and lack of marketability, the price-per-share for Class A stock decreased by $188.36, and the price- per-share for Class B stock decreased by $179.39. Hutler Decl., Sept. 29, 2023, (ECF No. 68) pp.2- 3, ¶¶ 6-7, 12-13, Ex. 1 (ECF No. 68-1) at pp.1, 8.

17

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The fact does not address the value of a minority interest in Windy Waters.

49.     In 2004, Widen Enterprises had software revenue less than $1 million. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065).

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

50.     By no later than December 1, 2014, the CEO of Widen Enterprises, Matthew Gonnering, had notified Reed and Kiesler that the "enterprise value" or "[m]arket value" of a Software as a Service company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue. (Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl., ¶ 14, Ex. 12, WINDY0034382; 08/23/2023 R. Widen Dep. Tr. 48:18-22, 110:6-111:1.)

**RESPONSE:** Disputed. Gonnering's email does not say that a Software as a Service company's value "was based primarily on a multiple of such company's revenue." Rather, Gonnering's email simply notes that the value of such companies, on "average[,]" is a certain multiple of their revenue. Palay Decl., Sept. 29, 2023, (ECF No. 63), p.2. ¶ 13, Ex. 11 (ECF No. 63-10).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. In the relevant email, Gonnering stated: "Traditional software companies have an average enterprise value of three times revenue, while SaaS companies trade at a much higher multiple of 6.5 times revenue."

51.     Matthew Gonnering became a shareholder of Windy Waters in or before 2008. (Palay Decl., ¶ 15, Ex. 13, STAFFORD001432; Palay Decl., ¶ 16, Ex. 14, STAFFORD001423.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


52.     On or around December 1, 2014, Gonnering wrote to Reed and Kiesler and another shareholder of Windy Waters regarding the valuation of Widen Enterprises. (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed that on or around December 1, 2014, Gonnering emailed Reed, Kiesler, and Gary Norris; disputed that Gonnering's email involved "the valuation of Widen Enterprises." Rather, Gonnering's email "provid[ed] a reference to an article from the Milwaukee business journal from Gartner" that was used as an "indication" to ensure Widen Enterprises was "in the right market," that "there's growth to be had," and that it was "making the right decisions to grow the business." Gonnering testified, "[t]hat doesn't mean that [was] the company's market valuation . . . . I show the assumptions that I make, and the reason for these is to indicate that . . . we're playing in the right market." Gonnering Dep., Sept. 21, 2023, at 103:8-104:3, 182:17- 184:11; Gonnering Decl., Nov. 10, 2023, p.1-2, ¶¶ 3-5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The subject of Gonnering's email is ███████   and the email ends by stating ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Gonnering's post hoc characterizations of the email do not create a dispute as to the proposed fact. For convenience, Stacy has reproduced a screen grab of the email below:



53.     In that December 1, 2014 email, Gonnering stated that  (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

54.     In that same December 1, 2014 email, Gonnering stated that (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** The December 1, 2014, email provides that "the valuations..."Otherwise undisputed, but immaterial.

**REPLY:** No reply is required.

55.    In that same December 1, 2014 email, Gonnering stated that ████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████. (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

56.    In that same December 1, 2014 email, Gonnering stated that ██████████████ ████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

57.    In that same December 1, 2014 email, Gonnering stated that ██████████████ ██████████████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

58.    In that same December 1, 2014 email, Gonnering estimated that Widen Enterprises' ████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383; 09/21/2023 M. Gonnering Dep. Tr. 183:3-184:11.)

**RESPONSE:** Disputed that such language constituted, or was intended to constitute, an estimate of an actual market value. Gonnering specifically testified that "[t]he way to understand" the language quoted in paragraph 58 "is to say we're in the right market, there's growth to be had, and

21

this is [a] good indication of that." Gonnering further explained, "[t]hat doesn't mean that [was] the company's market valuation   I show the assumptions that I make, and the reason for these is to indicate that   we're playing in the right market." Gonnering Dep., Sept. 21, 2023, at 103:8-104:3, 182:17-184:11; Gonnering Decl., Nov. 10, 2023, p.1-2, ¶¶ 3-5. Otherwise, undisputed, but immaterial.

**REPLY: Undisputed.** The dispute Defendants identify is immaterial. (*See* Proposed Finding of Fact No. 52 where the relevant email is reproduced in its entirety.)

59. In response to that December 1, 2014 email, one of the shareholders of Windy Waters stated ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████ (Palay Decl., ¶ 14, Ex. 12, WINDY0034382; Palay Decl., ¶ 9, Ex. 7, STAFFORD000437-38.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

60. On or around February 23, 2018, Gonnering communicated via e-mail to Kiesler and Reed regarding Widen Enterprises' ████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed that Gonnering sent an email to Kiesler and Reed on or around February 23, 2018; disputed that such email involved "Widen Enterprises' 'market valuation.'" Gonnering was reporting news in the industry, and applying various assumptions in the February 23, 2018, email. Applying these assumptions was "a guess and a pretend and a what if," not an actual market valuation, which Gonnering is not qualified to make. Gonnering Dep., Sept. 21, 2023, at

103:8-104:3, 152:13-154:1, 154:20-157:11, 192:19-194:17; Gonnering Decl., Sept. 29, 2023, (ECF

No. 69) p.6, ¶ 46; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.8, ¶ 73, Ex. D (ECF No. 75-6);

Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 3-5.

       **REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact.

The relevant portion of Gonnering's communication appeared under the heading ▮▮▮▮▮▮ and

stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Gonnering's post hoc characterizations of the email do not create a dispute as to

the proposed fact. For convenience, Stacy has reproduced a screen grab of the email below:



      61.    In that same February 23, 2018 correspondence, Gonnering stated to Reed and

Kiesler that in the global Digital Asset Management market, Widen Enterprises was the ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Palay Decl., ¶ 17,

Ex. 15, WINDY0034048.)

       **RESPONSE:** Undisputed, but immaterial.

       **REPLY:** No reply is required.

62.     In that same February 23, 2018 correspondence, Gonnering explained to Reed and Kiesler that Widen Enterprises had a ████████ and had users ████████████ ████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

63.     In that same February 23, 2018 correspondence, Gonnering alerted Kiesler and Reed to ████████████████████████████████████ ████████████████. (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

64.     In that same February 23, 2018 communication, under the heading ████████ Gonnering explained to Kiesler and Reed that he believed that the ████████████████ ████████████████████████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Disputed in part. Gonnering did not say the valuation of WebDAM was based on a multiple of revenue, only that he guessed the valuation of WebDAM was equal to 3-4 times revenue. The omitted lead-in to the above-quoted language in Gonnering's email states that, ████ ████████████████████████████ Gonnering "guessed" what WebDAM's annual recurring revenue was because he did not know that number, nor would it "be a known number" since companies do not publish those numbers. Accordingly, Gonnering "guessed

[WebDAM's] revenue" and then "applied a multiplier to that [guessed] number." Palay Decl., Sept. 29, 2023, (ECF No. 63) p.3, ¶ 17, Ex. 15 (ECF No. 63-14); Gonnering Dep., Sept. 21,

2023, at 152:13-154:1, 155:2-157:11; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 3-5. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as the proposed fact. (*See* Proposed Finding of Fact No. 60, where the relevant portion of the communication is reproduced in full.)


65.     In that same February 23, 2018 communication, Gonnering stated to Reed and Kiesler that ████████████████████████████████████ ████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


66.     If the 3.5x revenue multiple Gonnering used was applied to the trailing-twelve- month subscription revenue of ████████ for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen on an enterprise basis would be ████████. (Palay Decl., ¶ 18, Ex. 16, WINDY0015630.)


**RESPONSE:** Disputed. There is no support for the fair market value of a company being equal to the simple math equation of 3.5 times revenue. The cited email states only that based on Gonnering's "guess" of WebDAM's unknown annual recurring revenue, the company sold for 3.5 times that revenue. Applying these assumptions is "a guess and a pretend and a what if." It was not a valuation. Gonnering is not an economist or accountant or otherwise an expert in valuation.

Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11, 192:19-194:17; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 4-5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The fact is based on a hypothetical application of the methodology Gonnering used. Gonnering's post hoc characterizations do not create a genuine dispute as to the proposed fact.

67.    On August 10, 2018, Gonnering provided to Kiesler and Reed Gonnering's estimation of the value of Widen Enterprises when Gonnering estimated what a minority stake in Widen Enterprises is worth, writing to Reed and Kiesler, ████████████████████████████ ████████████████████████████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985).

**RESPONSE: Disputed.** Gonnering did not "estimate[] what a minority stake in Widen Enterprises is worth." The omitted language from the end of the sentence quoted in paragraph 67, that Gonnering testified was "the real part of the conversation," provides, ████████████ ████████████████████████████ The purpose was to explain a hypothetical capital infusion, not estimate the value of a minority interest in a company, which Gonnering is not qualified to do. Gonnering is not an economist or accountant or otherwise an expert in valuation. Gonnering's guessing is apparent by the fact that a 10% minority stake would not be worth 10% of the value of a company, given the discounts that would apply for lack of control and lack of marketability. Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11, 192:19-194:17, 202:2-203:13; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶ 46; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.8, ¶ 73, Ex. E (ECF No. 75-7); Hutler Decl., Sept. 29, 2023, (ECF No. 68), p.3, ¶ 12; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 4-5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Gonnering's post hoc characterizations of the communication do not create a dispute as to the proposed fact. For convenience, Stacy has reproduced a screen grab of the relevant portion of the communication below:

68.    On August 10, 2018, Gonnering sent Kiesler and Reed a written communication that stated that Gonnering had responded to an inquiry from a private equity firm called Five Elms Capital "to listen." (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

69.    Gonnering stated in that same August 10, 2018 correspondence that Five Elms Capital ███████████████████████████████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

70.    Gonnering stated in that same August 10, 2018 correspondence that Five Elms Capital ████████████████████████████. (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

71.     Gonnering stated in that same August 10, 2018 correspondence that ████████

████████████████████████████████████████████████████████████████████████████████

████████████. (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

72.     Gonnering stated in that same August 10, 2018 correspondence that ████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

73.     The use of a multiple of recurring revenue to estimate Widen Enterprises' market

value is widely accepted in the SaaS industry. For example, SaaS Capital, a firm that provides debt

capital to SaaS businesses, explains that:

> For SaaS businesses, however, earnings are generally understated for two
> reasons: customer acquisition costs are expensed up front, and most SaaS companies
> are still in an aggressive growth stage. For this reason, current earnings are not as
> good an indicator of future cash flows as current revenues, and that is why SaaS
> company valuations are more highly correlated to their size than their profitability.
> As a result, SaaS businesses trade on a price to revenue basis, or "Revenue Multiple."

(Private SaaS Company Valuations: 2019, SaaS Capital, June 11, 2019, https://www.saas-capital.com/blog-posts/private-saas-company-valuations-2019.)

**RESPONSE:** Disputed. The SaaS capital internet article is inadmissible hearsay because it constitutes a statement made outside of court offered for the truth of the matter asserted, and no exception exists.

**REPLY:** The proposed fact is supported by the expert report of Gary Kleinrichert, which relies on the same source for the same proposition, and which was disclosed to Defendants on October 2, 2023 and submitted in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment on November 10, 2023. (*See* ECF No. 117, 11/10/2023 Decl. of David Palay, Ex. 3 ¶ 76.)

74.   Applying Gonnering's August 2018 metric of 4x recurring revenue to the trailing-twelve-month subscription revenue of ███████ for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen Enterprise on an enterprise basis would be ████████. (Palay Decl., ¶ 18, Ex. 16, WINDY0015630.)

**RESPONSE:** Disputed. There is no support for the fair market value of a company being equal to the simple math equation of 4 times recurring revenue. Gonnering's August 2018 email referencing ███████ as 4x revenue was used "as a place holder" and was based on the guess that WebDAM's eventual sale price was equal to 3-4x revenue. Gonnering did not say the valuation of WebDAM was based on a multiple of revenue, only that he guessed the valuation of WebDAM was equal to 3-4 times revenue. The purpose was to explain a hypothetical capital infusion, not estimate the value of the company, which Gonnering is not qualified to do. A true fair market value calculation as of August 2018 requires expert testimony. Gonnering is not an economist or accountant or otherwise an expert in valuation. Palay Decl., (ECF No. 63) p.3, ¶ 17, Ex. 15 (ECF No. 63-14);

Gonnering Dep., Sept. 21, 2023, at 152:13-153:16, 155:2-157:11, 202:16-23; Gonnering Decl., Nov. 10, 2023, p.2, ¶ 5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The fact is based on a hypothetical application of the methodology Gonnering used. Gonnering's post hoc characterizations do not create a genuine dispute as to the proposed fact.

75.     Kiesler testified that he did not read the Operational Update e-mail memoranda that Gonnering sent to Reed and copied Kiesler on containing Gonnering's ███████████ estimates of Widen Enterprises' market value, and that he "very rarely read" Gonnering's operational update reports, "if ever," because Kiesler "was living in the moment." (09/19/2023 M. Kiesler Dep. Tr. 152:17-154:16, 156:16-158:21; 159:14-25; 161:16-164:11.)

**RESPONSE:** Disputed that Gonnering's operational update contained ███████ and ███████ estimates of Widen Enterprises' market value." Applying these assumptions was "a guess and a pretend and a what if," not an actual market valuation. To arrive at those numbers, Gonnering assumed multipliers of 3.5- and 4-times revenue based on his "guess" of WebDAM's unknown annual recurring revenue, "which is to say pretend these things, and . . . if those are the assumptions, this is the result." Neither of these emails was a market valuation of the company, which Gonnering is not qualified to do. A true fair market value calculation as of August 2018 requires expert testimony. Gonnering is not an economist or accountant or otherwise an expert in valuation. Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11, 192:19-194:17, 202:2-203:13; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶ 46; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.8-9 ¶ 73, Exs. D (ECF No. 75-6), E (ECF No. 75-7); Gonnering Decl., Nov. 10, 2023, p.2, ¶ 5. Otherwise, undisputed and immaterial.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. (*See* Proposed Fact Nos. 60 and 67 where the relevant portions of correspondence are produced in full.)

76.     In February 2020, Justin Randall, Reed's nephew and Stacy's son, visited Reed at Reed's home in Arizona. (09/29/2023 J. Randall Decl., p.1, ¶ 2.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

77.     During Justin's February 2020 visit, Reed told Justin that the Companies regularly received solicitations to sell Widen Enterprises. (09/29/2023 J. Randall Decl., p.1, ¶ 3.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

78.     During Justin's February 2020 visit, Reed told Justin that Reed was considering a sale of Widen Enterprises because Reed could sell the company for around $80 million. (09/29/2023 J. Randall Decl., p.1, ¶ 4.)

**RESPONSE:** Disputed. Reed did not tell Justin he was considering selling Widen Enterprises, as Reed was not interested in selling Widen Enterprises prior in February 2020. Not only was Reed not interested in selling Widen Enterprises at that time, but such a statement "would have sounded like [Reed] was conceded [sic] or bragging, and [he] wouldn't have done that." Reed Dep., Aug. 23, 2023, at 97:18-21, 30:20-31:5, 127:15-16, 128:8-15, 132:7-19, 133:1-10, 133:21-134:11, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶¶ 74-78; Reed Decl., Nov. 10, 2023, p.4, ¶ 26; Justin Randall Dep. ("Justin Dep."), Oct. 25, 2023, at 35:12-20,

43:4-7, 118:2-121:7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶¶ 163-67; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.6-7, ¶¶ 47-50.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. When asked "Did you tell Justin that you thought you could sell the companies for enough money so that you could personally receive around $80 million?" Reed responded "I don't recall that." When asked if there was "anything that would refresh your recollection about whether you said that?" Reed responded "I don't think I would have done that. It would have sounded like I was conceded or bragging, and I wouldn't have done that." See 08/23/2023 R. Widen Dep. Tr. 133:21-134:11. Having disavowed any recollection of his conversation with Justin, Reed cannot now create a dispute of fact by testifying as to what he "would" or "wouldn't" have done.

79.     In 2018, Widen Enterprises had total revenues of $23,296,439.69. (Answer ¶ 195.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

80.     In 2019, Widen Enterprises had total revenues of $28,689,686.70, and gross profit of $16,782,732 (Answer ¶ 195.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

81.     In 2019, Widen Enterprises had recurring revenues of ███████, and recurring gross profit of ███████. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

82.     In 2020, Widen Enterprises had total revenues of ██████████, and gross profit of ██████████. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

83.     In 2020, Widen Enterprises had recurring revenues of ██████████, and recurring gross profit of ██████████. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

84.     Reed testified that, as of around April 2020, Reed "constantly" received solicitations from people looking to buy Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 120:1- 20.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

85.     On May 8, 2020, Gonnering e-mailed Reed and Kiesler, projecting that Widen Enterprises ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ (Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

86.     In the "Confidential Information Memorandum" that Widen Enterprises used to market itself to potential acquirers in 2021, Widen Enterprises marketed its ███████████ ████████████████████████████████████████████████████ including:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7902, 7982; Palay Decl., ¶ 107, Ex. 99, SEG_00003893.)

**RESPONSE:** Disputed that Widen Enterprises "marketed itself." SEG marketed Widen Enterprises. Further disputed that "the company's investment bankers used recurring revenue to estimate the company's fair market value." SEG's valuation accounted for a wide array of factors, of which Widen Enterprises' recurring revenue was merely one such factor. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167; Palay Decl., Sept. 29, 2023 (ECF No. 63) p.14, ¶ 107, Ex. 99 (ECF No. 63-98). Otherwise, undisputed and immaterial.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The distinction Defendants draw between Widen Enterprises marketing itself and Widen Enterprises engaging an agent to market the company is immaterial.

87.     In the "Confidential Information Memorandum" that Widen Enterprises used to market itself to potential acquirers in 2021, Widen Enterprises stated its ████████████ ██████████████████████████ (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7902, 7983.)

**RESPONSE:** Disputed that Widen Enterprises "marketed itself." SEG marketed Widen Enterprises. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3);

Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167. Otherwise, undisputed and immaterial.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The distinction Defendants draw between Widen Enterprises marketing itself and Widen Enterprises engaging an agent to market the company is immaterial.

88.     In 2020, the year prior to Acquia's purchase of Widen Enterprises for $162 million, Widen Enterprises had EBITDA of negative $139,040. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.5, Defs.' Response to Request for Admission No. 10; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985; Answer ¶¶ 148-149.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

89.     At or around the time Widen Enterprises was acquired by Acquia for $162 million, Widen Enterprises projected negative EBITDA for 2021 of $2.7 million. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp.5-6, Defs.' Response to Request for Admission No. 11; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985; Answer ¶¶ 148-149.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

90.     Reed and Kiesler have each professed an inability to report their own subjective beliefs with respect to the value of the Companies at the time of Stacy's May 2020 redemption.

(08/23/2023 R. Widen Dep. Tr. 89:14-90:14; Palay Decl., ¶ 23, Ex. 21, 08/28/2023 M. Kiesler's Objections & Responses to Pl.'s Third Set of Interrogatories, pp. 1-2, M. Kiesler's Answer to Interrogatory No. 12; Palay Decl., ¶ 24, Ex. 22, 08/28/2023 R. Widen's Objections & Responses to Pl.'s Third Set of Interrogatories, pp.1-2, R. Widen's Answer to Interrogatory No. 12; Palay Decl., ¶ 25, Ex. 23, 08/28/2023 M. Kiesler's Objections & Responses to Pl.'s Second Set of Requests for Admission, pp. 2-3, M. Kiesler's Response to Requests for Admission Nos. 81 and 82; Palay Decl., ¶ 26, Ex. 24, 08/28/2023 R. Widen's Objections & Responses to Pl.'s Second Set of Requests for Admission, pp.1-3, R. Widen's Response to Requests for Admission Nos. 81 and 82.)

**RESPONSE:** Disputed. Reed and Kiesler reported that they had no beliefs regarding the value of Widen Enterprises at the time of Randall's May 2020 redemption because, at that time, there was no interest in selling Widen Enterprises and therefore they had not had Widen Enterprises valued. Reed Dep., Aug. 23, 2023, at 97:25-99:5, 127:15-25, 128:8-15, 132:7-19, 133:1-10, 164:25-165:20; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶¶ 74-78; Kiesler Dep., Sept. 19, 2023, at 78:7-17, 139:7-14, 149:5-12; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶¶ 163-65; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 6, Ex. E (ECF No. 70-5: Windy Waters' Objections And Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 11.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. When asked to "Admit that as of May 13, 2020, [Kiesler and Reed] subjectively believed that a willing buyer, acting with all relevant information and without compulsion in an arms' length transaction, would pay more than $6,896,973 to acquire a 100% ownership interest in Widen Enterprises," Kiesler and Reed each stated, after interposing boilerplate objections, that "after reasonable inquiry, the information known and readily obtainable by Defendant is insufficient to enable Defendant to admit or deny this Request." (09/29/2023 Palay Decl., Ex. 23, 08/28/2023 M. Kiesler's Objections & Responses to Pl.'s Second Set of Requests for Admission, pp. 2-3, M.

Kiesler's Response to Requests for Admission Nos. 81 and 82; 09/29/2023 Palay Decl., Ex. 24, 08/28/2023 R. Widen's Objections & Responses to Pl.'s Second Set of Requests for Admission, pp.1-3, R. Widen's Response to Requests for Admission Nos. 81 and 82.)

91.     Reed testified that he never considered the value of Widen Enterprises prior to selling it. (08/23/2023 R. Widen Dep. Tr. 126:22-128:20.)

**RESPONSE:** Disputed. Reed testified that he believes the value of a company matters only when it is being sold. Reed first gave serious thought to selling Widen Enterprises in August 2020, and he did not think about its value until a sale of Widen Enterprises became likely. Reed Dep., Aug. 23, 2023, at 128:13-15, 129:5-7; Reed Decl., Sept. 29, 2023 (ECF No. 67) p.10, ¶ 85; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.7, ¶ 56; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) p.21, ¶ 166.

**REPLY:** The disputed Defendants identify is not genuine. Reed testified "I never considered the value of it" in reference to Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 128:6-7.)

92.     Kiesler testified that he did not know the fair market value of Widen Enterprises on May 13, 2020, that he did not do anything to investigate what Widen Enterprises' fair market value was in connection with Stacy's May 2020 redemption, and that it "never crossed my mind" whether any other information was relevant to the value of Stacy's shares because he was applying the EBITDA formula. (09/19/2023 M. Kiesler Dep. Tr. 74:5-15, 77:23-78:17, 219:20-220:1.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

93.     When Defendants marketed Widen Enterprises to potential acquirers, they repeatedly included the company's recurring revenue and Annual Recurring Revenue (ARR) in their promotional materials. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906, 7917, 7958, 7982, 7985; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26) (duplicate of Palay Decl., ¶ 4, Ex. 2, WINDY0007901).)

**RESPONSE:** Disputed. Defendants did not market Widen Enterprises. Rather, SEG acted as a sales broker to market Widen Enterprises and solicit possible buyers with a goal of obtaining as high a price as possible. Defendants did not "include[]" anything in the materials cited in paragraph 93 because Defendants did not create the materials. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167; Gonnering Decl., Nov. 10, 2023, pp.2-3, ¶ 12.

**REPLY:** Defendants do not identify a genuine dispute as to the proposed fact. The distinction Defendants draw between Widen Enterprises marketing itself and Widen Enterprises engaging an agent to market the company is immaterial.

94.     On October 16, 2019, Gonnering messaged Kiesler: ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

(Palay Decl., ¶ 29, Ex. 27, WINDY0047426 at 47427.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

95.     "Gary" referred to Gary Norris, a longtime employee of Widen Enterprises who oversaw software development. (09/19/2023 M. Kiesler Dep. Tr. 26:10-27:8.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


96.     About one month later, on November 22, 2019, Gonnering e-mailed Reed and copied Kiesler on the e-mail, explaining that Norris, a shareholder of Windy Waters, had ████████ ████████████████████████████████. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900; Palay Decl., ¶ 31, Ex. 29, STAFFORD000172.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.


97.     In that same November 22, 2019 correspondence, Gonnering wrote that he told the shareholder that the shareholder ████████████████████ about the request to purchase additional shares of Windy Waters with Reed. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.


98.     In that same November 22, 2019 correspondence, Gonnering wrote that ████ ████████████████████████████████████████████. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.

99.     In that same November 22, 2019 correspondence, Gonnering explained to Reed and

Kiesler that ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████     (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


100.    In that same November 22, 2019 correspondence, Gonnering told Reed that Widen

Enterprises was projecting to finish 2019 with software revenue of $23,970,000 and total revenue of

$27,960,000, representing ████████████ from the prior year. (Palay Decl., ¶ 30, Ex. 28,

WINDY0033900.)

**RESPONSE:** Undisputed and immaterial.

**REPLY:** No reply is required.


101.    As of May 13, 2020, Reed had not permitted the requesting shareholder to purchase

more shares. (Palay Decl., ¶ 31, Ex. 29, STAFFORD000172 at 173.)

**RESPONSE:** Disputed and immaterial. Gary Norris never asked Reed to purchase

additional shares after November 22, 2019. Reed Decl., Nov. 10, 2023, p.4, ¶ 25.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute to the proposed fact.


102.    Stacy was one of the "specific shareholders" to whom Gonnering was referring.

(09/21/2023 M. Gonnering Dep. Tr. 164:8-165:1.)

**RESPONSE:** Undisputed that Stacy was a "specific shareholder" that was "part of that passive shareholder group" to whom Gonnering was referring regarding "buy[ing] passive shareholders back." Gonnering Dep., Sept. 21, 2023, at 164:4-165:1.

**REPLY:** No reply is required.

103.    In the three-and-a-half years prior to Gonnering's advice that he and Reed ███████ ████████████████████████████████ only Stacy had engaged in such a buyback. (Palay Decl., ¶ 31, Ex. 29, STAFFORD000172 at 173; Palay Decl., ¶ 33, Ex. 31, WINDY0033899.)

**RESPONSE:** Disputed. Pursuant to Stock Redemption Agreements dated May 12, 2016, Brian Becker and Terry Vial each sold stock back to the corporation, and Gonnering shared his advice within three-and-a-half years of those transactions. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.12, ¶¶ 82-86, Exs. N (ECF No. 75-19), O (ECF No. 75-20); Gonnering Dep., Sept. 21, 2023, at 164:4-165:11.

**REPLY:** Defendants do not identify a genuine dispute as to the proposed fact. There are 1,289 days between May 12, 2016 and November 22, 2019 (the date Gonnering provided his "advice" to Reed, *see supra* Proposed Finding of Fact 99), which represents three years, six months and 10 days excluding the end date.

104.    Gonnering had advised Reed to buyout Stacy and other passive shareholders of the Companies because Gonnering learned in business school that having passive shareholders was suboptimal and because he wanted "all hands on deck." (09/21/2023 M. Gonnering Dep. Tr. 158:16-162:5, 166:6-169:25.)

**RESPONSE:** Disputed. Gonnering did not advise Reed on buying out passive shareholders solely for those reasons. Gonnering testified that: "active shareholders were important to running a

small business with growth desires"; passive shareholders "weren't engaged"; "engaged people in the organization" would help the company to "grow faster"; and each time Stacy sought to redeem her shares, it was "a distraction" for leaders such as Kiesler who had significant operational responsibilities. Gonnering Dep., Sept. 21, 2023, at 161:13-15, 161:22, 166:16-20, 167:12-168:15; Gonnering Decl., Sept. 29, 2023, (ECF No. 69), p.6, ¶¶ 41-43; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶¶ 52-53; Kiesler Dep., Sept. 19, 2023, at 168:1-10; Kiesler Decl., Nov. 10, 2023, p.3, ¶ 12, Ex. D (WINDY0056317).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Any dispute identified by Defendants is immaterial.

105.    In 2019 Reed was ██████████████████████████ of Widen Enterprises. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.)

**RESPONSE:** Disputed. As Widen Enterprises' president, Reed oversaw operations at the company. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Grant Thornton's understanding to the contrary was wrong. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 264:4-265:14, 267:7-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Corporate Rep. of Widen Enterprises, LLC Dep. ("Widen Enterprises Dep."), Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

**REPLY: Undisputed.** Defendants cannot raise a genuine dispute over whether Grant Thornton's understanding, which is memorialized in the Confidential Information Memorandum used to market Widen Enterprises, and which Kiesler testified was accurate, was wrong. Kiesler testified that the report was accurate. (09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.) Reed did not run the day-to-day operations of Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 203:1-11.) Reed spent six months of the year either in Arizona or at the family cottage in northern Wisconsin. (08/23/2023 R. Widen Dep. Tr. 207:15-20, 209:9-23.) When asked what work he performed on a daily basis, Reed could identify only "strategic thinking" about the Companies and meeting with Gonnering. (08/23/2023 R. Widen Dep. Tr. 207:25-209:8.) Reed could not explain what Widen Enterprises' software did or how it worked. (08/23/2023 R. Widen Dep. Tr. 62:14-25.) When asked, Defendants could not identify any tangible work product stemming from Reed's "strategic planning, budgeting, and tactical decisions." (11/6/2023 Dep. Tr. of Widen Enterprises 96:19-97:24.) Defendants could identify only two relationships that Reed managed, only one of which persisted into 2020. (11/6/2023 Dep. Tr. of Widen Enterprises. 120:13-121:12.) Reed himself confirmed he followed no actual process in setting his own compensation – that he simply thought of his "effort and how well the company was doing" and "picked a number." (08/23/2023 R. Widen Dep. Tr. 61:19-62:8.)

106.    In 2020 Reed was ███████████████████████ of Widen Enterprises. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.)

**RESPONSE:** Disputed. As Widen Enterprises' president, Reed oversaw operations at the company. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as

needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Grant Thornton's understanding to the contrary was wrong. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 264:4-265:14, 267:7-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

**REPLY: Undisputed.** Defendants cannot raise a genuine dispute over whether Grant Thornton's understanding, which is memorialized in the Confidential Information Memorandum used to market Widen Enterprises, and which Kiesler testified was accurate, was wrong. Kiesler testified that the report was accurate.  (09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.) Reed did not run the day-to-day operations of Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 203:1-11.) Reed spent six months of the year either in Arizona or at the family cottage. (08/23/2023 R. Widen Dep. Tr. 207:15-20, 209:9-23.) When asked what work he performed on a daily basis, Reed could identify only "strategic thinking" about the Companies and meeting with Gonnering. (08/23/2023 R. Widen Dep. Tr. 207:25-209:8.) Reed could not explain what Widen Enterprises' software did or how it worked. (08/23/2023 R. Widen Dep. Tr. 62:14-25.) When asked, Defendants could not identify any tangible work produce stemming from Reed's "strategic planning, budgeting, and tactical decisions." (11/6/2023 Dep. Tr. of Widen Enterprises 96:19-97:24.) Defendants could identify only two relationships that Reed managed, only one of which persisted into 2020. (11/6/2023 Dep. Tr. of Widen Enterprises. 120:13-121:12.) Reed himself confirmed he followed no actual process in setting his own compensation – that he simply thought of his "effort and how well the company was doing" and "picked a number." (08/23/2023 R. Widen Dep. Tr. 61:19-62:8.)

107.    During 2019 and 2020, Gonnering ran the day-to-day operations at Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 202:17-204:10.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


108.    Reed testified that during those years he visited the companies' offices every few weeks, or sometimes every few months, and he spent around 6 months per year in Arizona or the family cottage. (08/23/2023 R. Widen Dep. Tr. 207:15-20, 209:9-23.)

**RESPONSE:** Disputed. Reed testified that he would go to the office "[s]ometimes weekly, sometimes monthly," and further that he spent "[t]hree months maybe" in Arizona," and "about three months" at the family cottage, but that his time at the cottage was not "not all at once . . . . [He] was back and forth." Reed Dep., Aug. 23, 2023, at 207:15-20, 209:9-25.

**REPLY:** The dispute Defendants identify is immaterial and not genuine.


109.    Reed testified that he was constantly thinking and strategizing about the companies, but he could not identify any work he performed, other than meeting with Gonnering. (08/23/2023 R. Widen Dep. Tr. 207:25-209:8.)

**RESPONSE:** Undisputed that Reed testified he was constantly thinking and strategizing about the companies; disputed that Reed "could not identify the work he performed, other than meeting with Gonnering." Reed testified that he worked "[o]n a daily basis" and that "[m]eeting with [Gonnering] was another part." After Reed answered that the scope of his work included strategic planning and meeting with Gonnering, he was not asked a follow-up question regarding his scope of work aside from the non-exhaustive examples he provided. He would have been able to identify other work. Reed Dep., Aug. 23, 2023, at 45:6-11, 207:25-209:8; Reed Decl., Sept. 29, 2023, (ECF

No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 264:4-265:14, 267:7-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Reed did not identify any work he performed other than meeting with Gonnering.

110.    Reed was unable to explain what the companies' software did or how it worked. (08/23/2023 R. Widen Dep. Tr. 62:14-25.)

**RESPONSE:** Disputed. Reed explained the companies' software to the best of his ability as a non-computer programmer, and acknowledged his limitations, stating, "[i]t's hard. [W]e would listen to customers, and we built products, code. There were templates for automation, those types of things." Reed Dep., Aug. 23, 2023, at 62:14-25.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact.

111.    For 2019 and 2020, Reed set his own compensation for his roles at Widen Enterprises "by considering [his] individual performance, the company's performance, and the market conditions." (08/23/2023 R. Widen Dep. Tr. 46:23-25; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 09/21/2023 M. Gonnering Dep. Tr. 123:21-124:6.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

112.    Reed testified that his "individual performance" was based entirely on "the company's performance." (08/23/2023 R. Widen Dep. Tr. 47:1-17, 48:12-17.)

**RESPONSE:** Disputed. Reed testified that his individual performance was measured by the company's performance because, "how else would [he] measure [his individual performance]" other than "how well the company was doing," since "[t]he company's performance is . . . . measured" by its financial performance. If the company's financial performance was strong, Reed knew he was doing his job well. Reed Dep., Aug. 23, 2023, at 47:1-24.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact.

113.    Reed determined the company's performance based on how it was doing financially, mainly measured by its revenues. (08/23/2023 R. Widen Dep. Tr. 47:19-48:3, 50:11- 14, 51:1-4.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

114.    Reed's testimony established that there was no process for determining his compensation, and that he "just" thought of "my effort and how well the company was doing," and "picked a number." (08/23/2023 R. Widen Dep. Tr. 61:19-62:8.)

**RESPONSE:** Disputed. The process Reed used to determine his compensation was based on a mix of his individual performance, the company's performance, and market conditions. Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 2, Ex. A (ECF No. 70-1: Defs.' Objections and Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 7; Reed Dep., Aug. 23, 2023, at 46:23-47:4, 55:13-56:7, 195:5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Defendants do not identify any process Reed used to determine his compensation.

115.    Reed could not say what was meant by the "market conditions" that Defendants claim he considered. (08/23/2023 R. Widen Dep. Tr. 58:17-20, 61:8-13.)

**RESPONSE:** Disputed. Reed's consultation with Widen Enterprises' advisors at Baker Tilly informed him whether his income was consistent with the market conditions for companies the size of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 55:13-56:7, 195:5.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. When asked, "So when it says that each person's compensation was determined by considering that person's individual performance, the company's performance, and the market conditions, what are the market conditions referring to?" Reed responded, "I'm not sure." (08/23/2023 R. Widen Dep. Tr. 61:8-13.)

116.    Reed testified that in 2019 and 2020 he was paid bi-weekly. (08/23/2023 R. Widen Dep. Tr. 200:2-13.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

117.    In 2019, Reed determined that his total compensation would be $1,459,328, made up of $938,063 of "Salary" and $521,264 of "Bonus," and, in 2018, $900,752 total compensation. (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

118.     In 2020, Reed determined that his total compensation would be $2,001,517, made up of $1,075,317 of "Salary" and $926,200 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

119.     In 2019, Reed determined that Gonnering's total compensation would be $495,244, made up of $454,105 of "Salary" and $41,139 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

120.     In 2020, Reed determined that Gonnering's total compensation would be $1,085,536, made up of $471,448 of "Salary" and $614,087 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

121.    In 2019, Gonnering determined that Kiesler's total compensation would be $249,160, made up of $219,693 of "Salary" and $29,468 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 60:20-61:4.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


122.    In 2020, Gonnering determined that Kiesler's total compensation would be $550,264, made up of $237,149 of "Salary" and $313,115 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 60:20-61:4.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


123.    On April 12, 2019, Kiesler messaged Gonnering that ████████████████ ████████████████████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

124.   Gonnering asked whether the payment would need to be ████████████ ████████ to which Kiesler responded that it would. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

125.   Gonnering asked, ██████████████████████████████ Kiesler responded that he was ███████████ ███████████ ██████████████████. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

126.   Gonnering clarified that ████████████████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

127.   Kiesler responded that such a dividend ███████████████ ████████ which would be a ██████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

128.    Gonnering then told Kiesler to go with "Plan A," i.e., paying Reed's tax obligations through a "bonus" from Widen Enterprises. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

129.    Reed testified consistent with the above-described texting conversation: When asked how he determined that he should receive a bonus of approximately $500,000 in 2019, Reed testified that this was based on his need to pay a tax obligation stemming from Windy Waters' pass-through taxation status. (08/23/2023 R. Widen Dep. Tr. 203:22-204-10, 210:25-211:21.)

**RESPONSE:** Disputed. Reed testified he "assume[d]," when showed some figures that the money referenced was payment for taxes, but didn't remember. His actual tax liability in 2019 was only $30,000. Moreover, Windy Waters had made quarterly tax distributions intended to cover tax liability stemming from Windy Waters to Reed and all other shareholders. Reed Dep., Aug. 23, 2023, at 203:22-204:3, 211:2-5; Reed Decl., Nov. 10, 2023, p.5, ¶ 31 Ex. N; Kiesler Decl., Nov. 10, 2023, p.2, ¶ 8; Windy Waters Dep., Nov. 3, 2023, at 185:25-187:2, 187:21-188:9, 190:9-191:1; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 10, Ex. I (Ex. 19 to Windy Waters Dep.).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Reed did not testify that he "didn't remember" whether he paid himself the 2019 bonus because of his tax obligations. (08/23/2023 R. Widen Dep. Tr. 203:22-204-10, 210:25-211:21.) Reed testified that he "didn't remember" why he decided to increase his compensation by over $500,000 between 2019 and 2020. (08/23/2023 R. Widen Dep. Tr. 210:25-211:5.) Reed's actual tax liability is immaterial to the proposed fact.

130.    Reed acknowledged that the other shareholders had similar tax obligations but that none received a similar bonus. (08/23/2023 R. Widen Dep. Tr. 210:25-211:21.)

**RESPONSE:** Disputed. Not only is "similar tax obligations" ambiguous, Reed testified that he was "not sure what [Randall's] tax liability was." Reed Dep., Aug. 23, 2023, at 210:12-13.

**REPLY: Undisputed.** The dispute Defendants identify is immaterial. When asked "But you got a bonus for your taxes, and other shareholder didn't?" Reed responded (after an objection) "Yes." (08/23/2023 R. Widen Dep. Tr. 211:17-21.)


131.    In 2021, in preparing to market itself to potential acquirers, Widen Enterprises hired Grant Thornton LLP, a national accounting firm, to perform a "Quality of [E]arnings" study on Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 194:24-195:3; Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4132, 4140.)

**RESPONSE:** Disputed that Widen Enterprises "market[ed] itself." SEG acted as a sales broker to market Widen Enterprises and solicit possible buyers with a goal of obtaining as high a price as possible. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The distinction Defendants draw between Widen Enterprises marketing itself and Widen Enterprises engaging an agent to market the company is immaterial.


132.    Grant Thornton ███████ Widen Enterprises' EBITDA to add back all of Reed's salary, bonus, and fringe benefits for 2019 and 2020 based on its stated understanding that Reed's roles as ████████████████████████████████████████████████████

████████ in 2019 and 2020, and that Reed was ████████████████████████ of Widen

Enterprises in 2019 or 2020. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142.)

**RESPONSE:** Disputed. As Widen Enterprises' president, Reed oversaw operations at the

company. He was actively involved with strategic planning, budgeting, and tactical decisions; he

oversaw and coached Gonnering and held him accountable for the results of his work; he developed

and maintained key relationships with bankers, tax advisors, and customers; he managed personnel

as needed; and he made compensation and bonus decisions for key employees of Widen

Enterprises. The purpose of the EBITDA adjustment to back out two key employees' compensation

was to allow potential buyers to have a clearer metric of profit by removing those expenses that would

not exist following the sale, "given these . . . roles that are not going to be a part of the transaction."

Reed was essential to Widen Enterprises, but his role would be absorbed within the existing

organizational structure of any potential buyer. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8,

208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023,

at 120:20-122:23, 258:12-24, 261:2-265:14, 267:13-268:16; Gonnering Decl., Sept. 29, 2023, (ECF

No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6,

2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24, 112:4-115:2.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact.

The statements in Grant Thornton's Quality of Earnings report speak for themselves, and

Defendants' post hoc arguments are irrelevant to what those statements say.


133.    Reed and Kiesler testified that the information provided to Grant Thornton was

accurate. (08/23/2023 R. Widen Dep. Tr. 196:1-3; 09/19/2023 M. Kiesler Dep. Tr. 82:1-7.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

134.    Grant Thornton adjusted Widen Enterprise' EBITDA to add back Reed's compensation, which adjusted EBITDA was then used in the Confidential Information Memorandum to market Widen Enterprises to potential acquirers. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7988; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26).)

**RESPONSE:** Disputed, immaterial, and inadmissible. The cited sources do not support the proposed facts, nor are the cited sources admissible, as neither Defendants nor Randall created the sources and thus do not have personal knowledge of the specific calculations Grant Thornton performed therein. Gonnering Decl., Nov. 10, 2023, p.2, ¶ 11.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute of fact. The EBITDA adjustment as calculated by Grant Thornton in its Quality of Earnings (SEG_00004131 at 4142) is directly reflected in the Confidential Information Memorandum (WINDY0007901 at 7988), and each document will be reduced to admissible evidence through representatives of Grant Thornton and SEG at trial.


135.    On June 3, 2020, a few weeks after the May 2020 redemption discussed below, Kiesler contacted a tax partner at Baker Tilly, Widen Enterprises' accounting firm, to ask, ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██ (08/23/2023 R. Widen Dep. Tr. 195:5; Palay Decl., ¶ 37, Ex. 35, WINDY0044692.)

**RESPONSE:** Disputed to the extent this arrangement of the quotations distorts the meaning of the email. The email states, in full, "Now that all of the Shareholders of Windy Waters, Inc. are employees (Windy Waters bought all of Stacy's shares from her on May 13)... Would it make any

sense to pay the remaining shareholders a portion of their compensation as pro-rata dividends instead of wages." Palay Decl., Sept. 29, 2023, (ECF No. 63), p.5, ¶ 37 Ex. 35 (ECF No. 63-34).

      **REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The dispute identified by Defendants is immaterial and not genuine.

136.    On July 3, 2020, approximately six weeks after the May 13, 2020 redemption discussed below, Gonnering explained to Reed and Kiesler that Gonnering and Kiesler ████████ ███████████████████████████████████████████ for the owners of Windy Waters. (Palay Decl., ¶ 38, Ex. 36, WINDY0044312.)

      **RESPONSE:** Undisputed and immaterial.

      **REPLY:** No reply is required.

137.    In January 2020, while at his home in Arizona, Reed told a Widen Enterprises employee that he planned to stay in Arizona ██████████████████ (Palay Decl., ¶ 39, Ex. 37, WINDY0033885.)

      **RESPONSE:** Undisputed and immaterial.

      **REPLY:** No reply is required.

138.    The original Widen Colourgraphics shareholder agreement, adopted by Windy Waters in 2001, provided for the company to redeem shareholders of their stock upon their death or permanent disability. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1314-1317; Palay Decl., ¶ 3, Ex. 1, STAFFORD001299.)

      **RESPONSE:** Undisputed.

      **REPLY:** No reply is required.

139.    Such redemptions were to occur at what the agreement defined as "Fair Market Value," which the agreement defined as ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


140.    This determination could be made by agreement of the parties or by a professional appraisal. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


141.    On May 7, 2007, the shareholder agreement for Windy Waters was amended to include a formula for calculating the "Fair Market Value per share" of Windy Waters stock for purposes of determining the price that shareholders were paid in situations where the company redeemed their shares in a <u>non-voluntary</u> redemption, such as a shareholder's death or permanent disability. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18, Palay Decl., ¶ 3, Ex. 1, STAFFORD001299; Palay Decl., 42, Ex. 40, STAFFORD001285.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

142.    Stacy does not recognize the signature above her name on the May 7, 2007 Second Amendment to Shareholder Agreement as her signature. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291; 09/28/2023 S. Randall Decl., p.1, ¶ 4.)

**RESPONSE:** Disputed. The Second Amendment contains Randall's signature, signed as then-President of Windy Waters. The signature on this document looks just like other signatures confirmed to be hers. Randall Dep., Aug. 28, 2023, at 175:7-24, 209:25-210:5, 212:21-213:16; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.6, 8-10, ¶¶ 37, 52, 60, 66, Exs. D (ECF No. 74-4), F (ECF No. 75-11), H (ECF No. 75-13), I (ECF No. 75-14); Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶¶ 5, 7, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. Nos. 24, 40, 48; Steven Randall Dep. ("Steven Dep."), Oct. 12, 2023, at 11:19-12:23, 17:16-18:4, 18:20-19:15, 81:19-85:4, 85:9-87:6; Steven Dep., Nov. 6, 2023, at 230:1-232:10; Wittenberg Decl., Nov. 10, 2023, pp.1-2, ¶¶ 2-7, Exs. A (Ex. 1 to Steven Dep.), B (Ex. 3 to Steven Dep.), C (Ex. 5 to Randall Dep.), D (Ex. 6 to Steven Dep.), E (Ex. 7 to Steven Dep.), F (Ex. 8 to Steven Dep.); Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6); Seid Dep., Aug. 17, 2023, at 40:22-41:2.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Defendants are not competent to testify as to what Stacy recognizes, nor do Defendants have the requisite expertise to offer an admissible opinion about whether the signature "looks just like" other purported signatures.

143.    The formula for calculating the "Fair Market Value per share," referenced above, is based on a weighted average of Windy Waters' EBITDA (Earnings Before Interest Taxes Depreciation and Amortization) over the three years leading up to a non-voluntary redemption (the

EBITDA Formula). (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

144.    In the EBITDA Formula, the weighted average of Windy Waters' EBITDA is multiplied by 3.6. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

145.    The following items are then added to the amount calculated in the preceding paragraph: cash and cash equivalents, securities available for sale and other investments, and stock subscription notes receivable. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

146.    Accrued deferred compensation and interest bearing debt as of the preceding fiscal year are then subtracted from the amount calculated in the preceding paragraph to reach the "Estimated Value of Windy Waters, Inc." and "Concluded Value of Windy Waters." (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Disputed that the referenced formula calculated the "Estimated Value of Windy Waters, Inc." and "Concluded Value of Windy Waters." Those phrases appear on a

spreadsheet Kiesler used internally to calculate the formula, but they simply represent the total the formula reaches for 100% of shares based on the calculation. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, ¶¶ 37-38, Ex. D (ECF No. 74-4); Kiesler Decl., Nov. 10, 2023, pp.5, 7-8, ¶¶ 23, 29- 31; Hutler Decl., Sept. 29, 2023 (ECF No. 68) pp.2-3, ¶¶ 6, 9-10, 12-13, Exs. 1 (ECF No. 68-1), 2 (ECF No. 68-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-35. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The phrase "Estimated Value of Windy Waters" appears in both the example formula calculation in the Second Amendment to the Windy Waters shareholder agreement (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294) and the spreadsheet that Kiesler actually used to calculate the offered price for Stacy's stock. (Palay Decl., ¶ 43, Ex. 41, WINDY0036828.) Defendants' post hoc characterizations of the meaning of the "Estimated Value of Windy Waters" are irrelevant to the proposed fact and do not raise a genuine dispute of material fact.

147.   At the time of the Second Amendment to the Windy Waters Shareholder Agreement's execution, Widen Enterprises had annual software revenues close to or less than $2 million. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

148.   As of May 13, 2020, the EBITDA Formula did not apply to or limit the purchase price paid to Stacy for the stock purchased from her pursuant to the May 13, 2020 redemption agreement. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.7, Defs.' Response to Request for Admission No. 16; Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18; Palay Decl., ¶ 3, Ex. 1, STAFFORD001299;

Palay Decl., ¶ 41, Ex. 39, STAFFORD001291; Palay Decl., ¶ 42, Ex. 40, STAFFORD001285; 09/19/2023 M. Kiesler Dep. Tr. 195:1-17.)

**RESPONSE:** Disputed. It was the custom, practice, and understanding among the shareholders to use the Stock Price Formula to calculate a price for Windy Water shares, and was used for every stock redemption and subscription since 2004, except the one occasion where the book value of shares was calculated and it exceeded the formula price. Kiesler did in fact apply the Stock Price Formula to calculate the price Windy Waters paid for Randall's shares, just as he had for each of her prior redemptions. Kiesler Dep., Sept. 19, 2023, at 203:20-204:7; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Hutler Decl., Sept. 29, 2023 (ECF No. 68) pp.2-3, ¶¶ 6, 9-10, 12-13, Exs. 1 (ECF No. 68-1), 2 (ECF No. 68-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-35; Reed Decl., Nov. 10, 2023, p.3, ¶ 19; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Nothing about the parties' purported "custom and practice" made the formula applicable to or limited the redemption price. It is undisputed that the parties were free to negotiate any price they wanted. Defendants have admitted as much, and their own attorney told them as much one day before Stacy's May 13, 2020 redemption. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.7, Defs.' Response to Request for Admission No. 16; *see supra* Proposed Fact No. 141; Palay Decl. Ex. 43.)

149.    On December 20, 2018, Reed's lawyer stated to Reed and Kiesler that ████

████████████████████████████████████████████████

████████████████████████████████████████████████████ (Palay Decl., ¶ 44, Ex. 42,

WINDY0033984.)

**RESPONSE:** Disputed. Nothing in the cited source states that Loren Paulson was "Reed's

lawyer." Further, Loren Paulson's email, which provides that ████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████ does not support Randall's proposed fact that Loren Paulsen stated "that voluntary

redemptions by Stacy were not subject to the terms of the Windy Waters shareholder agreement."

Palay Decl., Sept. 29, 2023, (ECF No. 63) p.6, ¶ 44, Ex. 42 (ECF No. 63-41).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact,

nor do they propose a fact inconsistent therewith. Attorney Paulson advised Reed that, after

reviewing the Windy Waters shareholder agreement, he determined that the proposed offer to Stacy

would not ██████████████████████████████████████████ which would not be

possible if the redemption were subject to the terms of the shareholder agreement. (Palay Decl.,

¶ 44, Ex. 42, WINDY0033984 ("██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ").)

150.     On May 12, 2020, one day before Stacy's redemption, Windy Waters' corporate

counsel stated to Kiesler, via an e-mail with the subject line ██████████████████████ that the

████████████████████████████████████████████████████████████████████████████████████

████████████████████ (Palay Decl., ¶ 45, Ex. 43, STAFFORD000040.)

**RESPONSE:** Disputed. Scott Seid's May 12, 2020, email says nothing about the Stock Price

Formula. Further, since Seid acknowledged that the math of Price Widen's buyout "did work out[,]"

he realized he was misunderstood and "must have been looking at a different valuation" when he

sent this email. Seid Dep., Aug. 17, 2023, at 91:23-93:9; Palay Decl., Sept. 29, 2023, (ECF No. 63) p.6, ¶ 45, Ex. 43 (ECF No. 63-42).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The fact that ███████████████████████████████████ means that the formula did not apply, because where the formula applies under the terms of the shareholder agreement, the formula price is mandatory, not negotiated. Attorney Seid's post hoc characterizations do not create a genuine dispute as to the proposed fact.

151.     The EBITDA formula does not take into account the revenues of Windy Waters or Widen Enterprises. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-14; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Disputed. The Stock Price Formula does account for the revenues of Windy Waters and Widen Enterprises. "E" in EBITDA stands for "earnings," and "earnings" are a function of "revenues." Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.1, ¶ 5; Kiesler Dep., Sept. 19, 2023, at 40:22-41:7; Kiesler Decl., Nov. 10, 2023, p.4, ¶¶ 17-18.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. It is undisputed that the revenues of Windy Waters or Widen Enterprises appear nowhere in the EBITDA formula, as an input, or otherwise, and cannot be identified from reviewing the formula inputs. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-14; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

152.     As of May 13, 2020, the fair market value of Windy Waters was the price at which 100% ownership of Windy Waters would change hands between a hypothetical willing buyer and a hypothetical willing seller where the seller is not under any compulsion to sell and the buyer is not

under any compulsion to buy, both parties having reasonable knowledge of the relevant facts. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

**RESPONSE:** Disputed. The proposed fact requires an expert opinion and is not supported by the source cited.

**REPLY: Undisputed.** Defendants' own appraisal defined "[f]air market value" as "The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts." (Palay Decl., ¶ 11, Ex. 9, WINDY0047991). Defendants admit as much. (*See supra* Proposed Finding of Fact No. 47.)

153.   WINDY0036828 is the version of the EBITDA formula used to calculate the per-share redemption price that Stacy was paid under the May 13, 2020 Redemption Agreement. (09/19/2023 M. Kiesler Dep. Tr. 71:10-21; Palay Decl., ¶ 46, Ex. 44, WINDY0036797 attaching WINDY0036828 (Palay Decl., ¶ 43, Ex. 41 (filename: "WindyWaters-31Dec2019StockValue-ModifiedLookBack.xlsx")).)

**RESPONSE:** Disputed. WINDY0036828 is not "the version of the EBITDA formula . . . ." Rather, the document is the version of the spreadsheet that shows the calculation of the formula performed in May 2020. Palay Decl., Sept. 29, 2023, (ECF No. 63), p.6, ¶ 43, Ex. 41 (ECF No. 63-40); Kiesler Dep. Sept. 19, 2023, at 71:10-21.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. WINDY0036828 reflects the calculation of the EBITDA formula as performed by Defendants to calculate the per-share redemption price that Stacy was paid under the May 13, 2020 Redemption Agreement. The dispute Defendants identify is immaterial and not genuine.

154.    As of May 2020, the EBITDA formula did not calculate the fair market value of Windy Waters. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

155.    As of May 13, 2020, EBITDA formula did not approximate the fair market value of Windy Waters. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

**RESPONSE:** Disputed. This proposed fact requires an expert opinion, and thus the sources cited by Randall are insufficient. Further, the most recent calculation of the fair market value of Windy Waters in February 2020, showed a lower value of $459,718 and involved some similar calculations. Reed Decl., Nov. 10, 2023, p.3, ¶ 18, Ex. H (WINDY0001128, at 1129).

**REPLY:** The proposed fact is supported by the expert report of Gary Kleinrichert, which was disclosed to Defendants on October 2, 2023 and submitted in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment on November 10, 2023. (*See* ECF No. 117, 11/10/2023 Decl. of David Palay, Ex. 3 ¶ 113.) Moreover, Defendants have consistently disavowed the existence, and their possession, of any calculations of the Companies' fair market value and therefore may not now create a fact dispute by contradicting those assertions. (*See, e.g.*, Aug. 23, 2023 Dep. Tr. of Reed Widen 100:16-25 ("Q: Did you ever consider the values of those companies [Windy Waters or Widen Enterprises] while you were running them? A: Absolutely not. Q: Okay. And did anyone at those companies ever advise you about what the value of those companies might be? . . . A: Okay. On a dollar amount, no."); Sept. 19, 2023 Dep. Tr. of Michael Kiesler 148:23-

149:8 ("Q: Who at the companies would you say has the most knowledge of the companies' value? . . . A: . . . Nobody – we didn't track that. . . . Q: And so when you purchased 20 percent of the shares of the company in May 2020, you had no idea what the fair market value of the company was? A: Nope."); Sept. 21, 2023 Dep. Tr. of Matthew Gonnering 109:1-7, 20-22 ("Q: So do you have any idea of the fair market value of Widen Enterprises in May of 2020? A: . . . There was not a willing buyer, and therefore there's no market valuation at that time. . . . So, like, I'm trying to put myself back in May of 2020.  The furthest thing from our mind was valuation."); Nov. 6, 2023 Dep. Tr. of Widen Enterprises 165:19-166:2 ("Q: Likewise, from 2015 to 2020, is it your testimony today that Widen Enterprises did not at any point in that period of time consider Widen Enterprises' fair market value? A: We didn't consider it relevant . . . valuation was not an objective.").) Defendants have also proposed as facts that Reed, Gonnering, and Kiesler "had not had the company valued and did not know its fair market value as of May 13, 2020" (ECF No. 76, Def.'s PFOF ¶ 387) and "Defendants did not solicit (and thus, did not possess) a market valuation of Widen Enterprises at any point in May 2020." (*Id.* ¶ 388.) Finally, it is notable that the calculation from February 2020 that Defendants now point to, which was not disclosed to Stacy, purports to value the Companies at millions of dollars below the value of their cash and liquid assets. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19, 294:6-296:9; 09/29/2023 Palay Decl. Ex. 20, Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, pp. 17-18, Defs.' Response to Request for Admission Nos. 37-39.)

156.    Kiesler testified that calculating the fair market value of Windy Waters stock "wasn't the purpose of that formula," which was intended only "to calculate the redemption price or subscription price per share." (09/19/2023 M. Kiesler Dep. Tr. 141:6-13.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

157.    Kiesler testified that he could not say whether or not he believed at the time of Stacy's 2020 redemption that the formula was required but that it was used because it had been used in prior redemptions, and he "was always told to be consistent." (09/19/2023 M. Kiesler Dep. Tr. 195:1-17, 203:20-204:7.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

158.    Reed and Gonnering testified that they believed or were unsure at the time of Stacy's 2020 redemption that the shareholder agreement required the use of the EBITDA formula for Stacy's 2020 redemption. (08/23/2023 R. Widen Dep. Tr. 81:15-82:2; 09/21/2023 M. Gonnering Dep. Tr. 147:6-149:16, 231:17-233:1.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

159.   In situations where the EBITDA formula *does* apply (i.e., death or permanent disability), Section 3.4(a) of the Windy Waters shareholder provides ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1319.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

160.    In situations where the EBITDA formula *does* apply (i.e., death or permanent disability), Section 3.4(b) of the Windy Waters shareholder provides ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1319-20.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

161.    Defendants never offered Stacy any of the catchup rights described in the preceding two paragraphs. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.8, Defs.' Response to Request for Admission No. 19.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

162.    On or around January 3, 2019, Widen Enterprises loaned Stacy $20,000. (Palay Decl., ¶ 47, Ex. 45, WINDY0049644.)

**RESPONSE:** Undisputed

**REPLY:** No reply is required.

163.    [Intentionally left blank]

**RESPONSE:** This paragraph was intentionally left blank and therefore no response is required.

**REPLY:** No reply is required.

164.     On or around May 5, 2020, Stacy reached out to her brother, Reed, for help. (Answer ¶¶ 67-68.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

165.     Stacy told Reed that her then-husband was initiating legal proceedings and demanding maintenance payments and that she was going to need to get some money. (Answer ¶ 68.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

166.     Reed responded that Stacy's timing was unfortunate because the Companies had a ████████████████ and that ████████████████████████████████████ a reference to a separate family-owned company that holds real estate that had been left to Stacy, Reed, and their siblings. (Answer ¶ 69; Palay Decl., ¶ 48, Ex. 46, WINDY0047392.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

167.     Kiesler testified that, on that same day (May 5, 2020), Kiesler and Reed spoke by phone and Reed told Kiesler that Stacy was "asking for money again" and that "he (i.e., Reed) was kind of annoyed with the fact that she kept coming back to the company for money, and him personally," and that Reed "wanted to [buy] all of her shares . . . using the formula that we used for Price [Widen]." (09/19/2023 M. Kiesler Dep. Tr. 168:1-10, 168:24-169:7.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

168.     Early the next morning, May 6, 2020, Kiesler, who also helped the family administer Millmont, contacted Stacy, and they had a phone conversation. (Answer ¶ 70; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-8, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

169.     Stacy told Kiesler that she would need approximately $100,000 for her divorce and living expenses. (Answer ¶ 71.)

**RESPONSE:** Undisputed

**REPLY:** No reply is required.

170.     Kiesler told Stacy that the Companies did not have $100,000 they could make available to her. (Answer ¶ 72.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

171.     Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that either. (Answer ¶ 73.)

**RESPONSE:** Disputed as to the characterization that the Companies "could not afford" to buy $50,000 worth of Randall's stock. From his best efforts at reconstructing the conversation,

Kiesler believes he told Randall "I still don't know if we can make [$50,000] available to you." Kiesler Dep., Sept. 19, 2023, at 173:3-11, 179:6-10, 295:20-296:1; Kiesler Decl., Sept. 29, 2023, (ECF No. 74), p.13, ¶ 95; Reed Dep., Aug. 23, 2023, at 212:14-25; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.5, ¶ 47; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 24, Ex. B (ECF No. 75-1); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶¶ 26-27. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. In Paragraph 73 of their Amended Answer, Defendants admit that "Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that, either." (Answer ¶ 73.) This admission is binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).)


172.    Kiesler told Stacy that the only way she could get any cash from the Companies was to sell her entire interest in Windy Waters—approximately 20% of the outstanding shares—to Windy Waters. (Answer ¶ 74.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


173.    Stacy told Kiesler that she did not want to sell her entire interest. (Answer ¶ 76.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

174.    Stacy's and Kiesler's conversation did not include an explanation from Kiesler as to why Windy Waters could afford to purchase all, but not some, of Stacy's shares. (Answer ¶ 75.)

**RESPONSE:** Disputed. From his best efforts at reconstructing the conversation, Kiesler believes he told Randall "I still don't know if we can make [$50,000] available to you." Kiesler Dep., Sept. 19, 2023, at 173:3-11, 179:6-10, 295:20-296:1; Kiesler Decl., Sept. 29, 2023, (ECF No. 74), p.13, ¶ 95; Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶¶ 26-27; Reed Dep., Aug. 23, 2023, at 212:14-25; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.5, ¶ 47; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 24, Ex. B (ECF No. 75-1). Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. At Paragraph 75 of their Amended Answer, Defendants state: "Defendants admit that Kiesler and Plaintiff did not discuss why the Companies could afford to purchase all, but not some, of Plaintiff's shares." That admission is binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).)


175.    Kiesler reiterated that the Companies wanted to purchase her entire interest using the price given by the price-per-share calculation model in the EBITDA Formula, which calculates the (so-called) "Fair Market Value per share" under the Windy Waters Shareholder Agreement. (Answer ¶ 77; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

**RESPONSE:** Disputed that "the Companies" wanted to purchase Randall's shares. Only Windy Waters wanted to purchase Randall's shares. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6,

¶¶ 50, 54; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.15, ¶¶ 110-11; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶¶ 80-82. Otherwise, undisputed.

**REPLY: Undisputed.** The dispute identified by Defendants is immaterial and not genuine.

176.    Kiesler offered Stacy $1.1 million dollars for her approximately 20% interest in Windy Waters. (Answer ¶¶ 74, 77.)

**RESPONSE:** Disputed. Kiesler offered Randall the share price calculated using the Stock Price Formula, which as of November 2019, was approximately $1.1 million, but Kiesler the number represented would be updated to reflect the final December 2019 financial numbers. Kiesler Decl., Nov. 10, 2023, p.6-7, ¶ 27.

**REPLY: Undisputed.** The dispute Defendants identify regarding whether Kiesler's $1.1 million calculation was in retrospect a preliminary or final offer is immaterial and not genuine.

177.    Stacy told Kiesler that that price seemed too low. (Answer ¶ 78.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

178.    Kiesler assured Stacy that the price was "fair," purportedly "because [it used the] standard price-per-share calculation model for voluntary redemptions, which Kiesler explained was the same formula that had been used for [Stacy's] prior partial share redemptions and for the complete share redemptions of [her] brothers." (Answer ¶ 79; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

**RESPONSE:** Disputed to the extent that this proposed fact suggests Kiesler explicitly told Randall the price was "fair." Rather, Kiesler expressed the general sentiment that the method for

reaching the price was fair because it was calculated using the Stock Price Formula, Windy Waters' standard price-per-share calculation model for voluntary redemptions, and that it was "the same formula that had been used for [her] prior partial share redemptions[,] . . . for the complete share redemptions of [her] brothers[,]" and for every prior Windy Waters stock transaction (deviating only on the occasions when Kiesler compared the formula per-share price to a per-share price using the company's assets and found that the price calculated from net assets was higher). Compl. (ECF No. 1), ¶ 79; Am. Answer (ECF No. 45), ¶ 79; Kiesler Dep., Sept. 19, 2023, at 174:19- 175:18, 227:10-13; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

 **REPLY: Undisputed.** At Paragraph 79 of their Amended Answer, Defendants state: "Defendants admit that Kiesler expressed the general sentiment that the $1.1 million currently calculated was fair because it was calculated using the Companies' standard price-per share calculation model for voluntary redemptions, which Kiesler explained was the same formula that had been used for Plaintiff's prior partial share redemptions and for the complete share redemptions of Plaintiff's brothers." While that admission invokes "the method for reaching the price" as a basis for Kiesler's assertion, the admission speaks to the fairness of the "$1.1 million currently calculated," itself. This admission is binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).)

179.    Defendants claim that Kiesler walked Stacy through the model price-per-share formula calculation he had used to calculate the $1.1 million offer price. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-8, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Disputed in that Randall was not offered $1.1 million but instead was offered whatever stock price would be calculated using final December 2019 financials in the Stock Price Formula after he updated the numbers. Kiesler Decl., Nov. 10, 2023, p.6-7, ¶ 27. Otherwise, undisputed.

**REPLY: Undisputed.** The dispute that Defendants identify, that the $1.1 million was not an "offer price," is immaterial to the proposed fact, which relates to Defendants' claim that Kiesler walked Stacy through the price-per-share formula calculation used to reach the $1.1 million value.


180.    In response to Plaintiff's Interrogatory No. 5, which requests that Defendants "[s]tate every fact about Widen Enterprises that you contend any of Defendants disclosed to Plaintiff in connection with the Redemption, including identification of every document provided or shown to Plaintiff in connection with the Redemption; the person(s) making such disclosure or providing such document; and the date(s) on which such disclosure was made or such document was provided," Defendants only allege that, "in a telephone conversation on May 6, 2020, Mr. Kiesler went through the price-per-share calculation model with Plaintiff, line by line, using November 2019 financial information of the Companies and shared with her the redemption price. Mr. Kiesler explained to Plaintiff in that conversation that he would have to update the calculation with End-of-Year numbers. After closing the Companies' April 2020 books, Mr. Kiesler updated the price-per-share calculation model using December 2019 financial information and telephoned Plaintiff again, this time on May 13, 2020, during which conversation Mr. Kiesler shared the updated redemption price," and that

Kiesler "read aloud" the redemption agreement and promissory note, "stopping after each paragraph to ask if she understood and whether she had any questions." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

181.    Kiesler also told Stacy that she would be smart to sell her interest in the Companies while she had the chance because Widen Enterprises, the operating company, might not even be around in seven years, and she risked ending up with nothing if she didn't take his offer. (Palay Decl., ¶ 49, Ex. 47, Randall0000116; Answer ¶ 81.)

**RESPONSE:** Disputed. From his best efforts at reconstructing the conversation, Kiesler believes he told Randall, "you can do whatever you want, but it could be smart to sell your shares and be in control of your finances. With COVID continuing, the amount may be lower in the future." Compl. (ECF No. 1), ¶ 81; Am. Answer (ECF No. 45), ¶ 81; Kiesler Dep., Sept. 19, 2023, at 227:14-21; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-17, ¶¶ 121, 131; Kiesler Decl., Nov. 10, 2023, pp.6-7, 9, ¶¶ 27, 41.

**REPLY: Undisputed.** In Paragraph 81 of their Amended Answer, Defendants state: "Defendants admit that Kiesler expressed the general sentiment that it could be smart given the current financial state of affairs, including the uncertainty presented by the onset of the COVID-19 pandemic, for Plaintiff to sell her shares because there was no guarantee that Widen Enterprises would remain a viable company." This admission is binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the

pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'")
(quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).) Furthermore, the dispute
identified by Defendants is immaterial and not genuine.

182.    Defendants admit that Kiesler expressed the general sentiment that it could be smart
given the current financial state of affairs, including the uncertainty presented by the onset of the
COVID-19 pandemic, for Stacy to sell her shares because there was no guarantee that Widen
Enterprises would remain a viable company. (Answer ¶ 81.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

183.    Kiesler could not identify any financial difficulties the Companies faced at the time
of Stacy's redemption. (09/19/2023 M. Kiesler Dep. Tr. 178:9-179:19.)

**RESPONSE:** Disputed. Kiesler explained that "[t]here was so much uncertainty, so much
fear, and so much economic volatility" at this time due to COVID-19. Specifically, Kiesler was
worried that the company might not be around in a few years if COVID-related circumstances
persisted. Widen Enterprises showed negative net income in March and April 2020, which means
that Widen Enterprises recognized more expense than revenue in those months. Kiesler Dep., Sept.
19, 2023, at 179:2-10, 227:25-228:3; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp. 14-15, ¶¶ 105-
107; Kiesler Decl., Nov. 10, 2023, pp.5-6, ¶¶ 24-26.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact.
"[U]ncertainty, so much fear, and so much economic volatility" are not "financial difficulties the
Companies faced." It is undisputed that Kiesler could not identify any such difficulties when asked.

184.    Kiesler also represented to Stacy before the May 2020 redemption that, because the company continually reinvested most of its profits back into the business, the value of her stock would not change substantially over the next seven years. (Palay Decl., ¶ 50, Ex. 48, Randall0000328.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


185.    Stacy explained that her investment in the Companies was really important to her because her investment in the Companies was all she had to live on for the rest of her life. (Palay Decl., ¶ 49, Ex. 47, Randall0000116; Answer ¶ 82.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


186.    Kiesler told Stacy the deal was "take it or leave it" and had an end-of-day deadline, and that if she turned it down, the Companies could not be a source of the cash she needed to finance her divorce proceedings. (Answer ¶¶ 82-83; Palay Decl., ¶ 49, Ex. 47, Randall0000116.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


187.    After speaking with Stacy, Kiesler contacted Reed to confirm that Kiesler should arrange for Windy Waters to purchase ▮▮▮▮ of Stacy's shares in the company, to which Reed responded 6 minutes later, ▮▮▮▮ (Answer ¶ 85; Palay Decl., ¶ 51, Ex. 49, WINDY0047397-40 (capitalization in original).)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

188.    In a second conversation with Stacy, Kiesler again insisted the price was "fair." (Answer ¶ 89.)

**RESPONSE:** Disputed. Kiesler did not tell Randall the price was "fair," but that the calculation method using the Stock Price Formula once more was fair, since it had been used for everyone. Compl. (ECF No. 1), ¶¶ 79, 89; Am. Answer (ECF No. 45), ¶¶ 79, 89; Kiesler Dep., Sept. 19, 2023, at 174:19-175:18, 227:10-13; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27; Reed Decl., Nov. 10, 2023, p.3, ¶ 19.

**REPLY: Undisputed.** In Paragraph 89 of their Amended Answer, Defendants state in relevant part: "Defendants admit that Kiesler again expressed the general sentiment that *the price was fair.*" (Am. Answer ¶ 89 (emphasis added).) This admission is binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).)

189.    On May 8, 2020, Gonnering stated in an e-mail to Reed and Kiesler, with respect to a Paycheck Protection Program loan to Widen Enterprises of approximately $2.7 million, that ███ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ and Gonnering testified at his deposition that he viewed the PPP money as "[n]ecessary for the

uncertainty of the company." (Palay Decl., ¶ 21, Ex. 19, WINDY0009851; 09/21/2023 M. Gonnering Dep. Tr. 218:9-12.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

190.    On May 12, 2020, Kiesler emailed the Companies' corporate attorney and told him that ████████████████████████████████████████████████████ ████████ (Palay Decl., ¶ 52, Ex. 50, STAFFORD000258.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

191.    On May 13, 2020, Kiesler called Stacy again, after not hearing from her, and told her that he had updated the price-per-share calculation model using the December 2019 financials, as promised previously, and that as a result, the redemption price Windy Waters would offer in the proposed redemption had increased to approximately $1.3 million. (Answer ¶ 94.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

192.    This time, too, Kiesler told Stacy that she had until the end of the day to accept the offer. (Answer ¶ 96.)

**RESPONSE:** Disputed. Randall agreed with the terms on the spot and said she would be coming in later that day to sign the documents. Randall Dep., Aug. 28, 2023, at 303:17-304:23; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.18, ¶ 142.

**REPLY: Undisputed**. In Paragraph 96 of their Amended Answer, Defendants state: "Defendants admit that Kiesler provided Plaintiff with an end-of-day deadline but deny that Plaintiff was told she had to accept the offer to 'get any money out of her investment in the Companies.' Rather, Defendants believe Plaintiff understood she could keep her shares and reject the offer." (Am. Answer ¶ 96.) Defendants' admission that "Kiesler provided Plaintiff with an end-of-day deadline" is binding on them. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).)

193.    On May 13, 2020, Kiesler messaged Gonnering that ███ [(the Companies' corporate attorney)] has everything he needs from me. Waiting for ███ to turn around agreements and then will share with Stacy and hopefully meet for signatures." Kiesler added an emoji at the end of his text. (Palay Decl., ¶ 53, Ex. 51, WINDY0047497-98.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

194.    On May 13, 2020, Stacy told her son, Justin, that "Kiesler did another evaluation of the company and came up with another $250 thousand.[] Nothing I can do about it[.] I will be going over to the office to sign the papers at 4:30." (Palay Decl., ¶ 54, Ex. 52, Randall0000117.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

195.     Stacy sought legal advice from her divorce attorney via email on May 13, 2020 asking for help, but her attorney informed her that the buyout was beyond her expertise and that she could offer Stacy no assistance. (09/28/2023 S. Randall Decl., p.2, ¶ 6.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


196.     When Stacy entered the Companies' office to sign the documents, Kiesler was waiting for her in the lobby, talking on the phone with Windy Waters' corporate attorney. (Answer ¶ 109.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


197.     Kiesler handed Stacy the phone upon Stacy asking to speak to the Companies' corporate attorney, and Stacy spoke to the Companies' corporate attorney. (Answer ¶¶ 110-111.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


198.     While the exact contents of that conversation are disputed, it is undisputed that Stacy told the Companies' attorney that she was uncomfortable about signing the documents for the buyout. (Palay Decl., ¶ 55, Ex. 53, STAFFORD000112.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

199.    Stacy asked Kiesler whether he and the Companies' executives were preparing to sell Widen Enterprises. (Answer ¶ 117.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

200.    Kiesler responded, in sum and substance, "No, there's been no talk of that." (Answer ¶ 118.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

201.    Kiesler did not provide any financial information or disclosure about the Companies during this interaction. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed if and only if "during this interaction" refers to the time period before Keisler walked Randall through the stock redemption agreement and promissory note line-by-line. If any other interpretation is intended, then disputed. Kiesler Dep., Sept. 19, 2023, at 225:23-226:10; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.19, ¶ 145; Randall Dep., Aug. 28, 2023, at 318:16-24.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to this fact. The redemption agreement and promissory note do not contain any financial information or disclosures about the Companies.

202.     During this interaction Kiesler did not show Stacy how the purchase price he had offered her had been calculated. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

203.     This was the first time Stacy had been shown the May 13, 2020 redemption agreement and promissory note (the Redemption Documents). (Answer ¶ 121.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

204.     Stacy signed the redemption agreement on May 13, 2020 while she was at the Companies' offices with Kiesler, and Kiesler signed the redemption agreement on behalf of Windy Waters. (09/28/2023 S. Randall Decl., p.2, ¶ 7; Palay Decl., ¶ 56, Ex. 54, WINDY0003172 (redemption agreement).)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

205.     Stacy relied on the representations Kiesler had made to her over the preceding week in deciding to sign the redemption agreement. (09/28/2023 S. Randall Decl., p.2, ¶ 8.)

**RESPONSE:** Disputed. Randall told her financial advisor that she did not trust Reed and Kiesler, so she could not have relied on Kiesler's representations. Further, Randall cannot have relied on all of Kiesler's representations to her between May 6, 2020, and May 13, 2020, since Randall denies that Kiesler made certain representations. For example, Randall denies that Kiesler

made any representations to her about the calculation of the Stock Price Formula, and therefore Randall could not have relied upon Kiesler's representations regarding the Stock Price Formula. Randall Dep., Aug. 28, 2023, at 263:20-265:23, 285:23-286:18, 303:22-304:3, 317:8-17; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-19, ¶¶ 119-20, 133, 140-41, 145, 151; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12); Pl.'s Statement of Facts (ECF No. 61), at p.27, n.2.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to this fact. Whether Stacy expressed subjective distrust of Defendants at one point in time does not speak to whether Stacy relied on those representations when she ultimately took action in signing the redemption agreement. Stacy has submitted sworn testimony that she did so rely. Defendants have offered no evidence contradicting that.

206.    In deciding to sign the redemption agreement, Stacy relied on her trust that Kiesler and Reed would disclose to her all of the relevant information she needed to make an informed decision on whether or not to sign the redemption agreement. (09/28/2023 S. Randall Decl., p.2, ¶ 9.)

**RESPONSE:** Disputed. Randall told Kiesler that she never thought he and Reed had an interest in Randall's well-being and made it clear that she did not trust them. Randall Dep., Aug. 28, 2023, at 285:23-287:17, 291:18-293:3; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

**REPLY: Undisputed.** Despite her initial concern that Kiesler and Reed did not have her best interests at heart, Stacy has offered sworn testimony that she trusted that they would *disclose all relevant information* she needed to make an informed decision. (ECF No. 65, 9/29/23 Stacy Randall Decl. ¶ 9.) Defendants do not identify a genuine dispute as to the proposed fact.

207.     The next day, May 14, 2020, Kiesler messaged Gonnering, ████████████████ ████████████████████████████████████████████████████ (Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

208.     Gonnering responded, ████████████████████████████ (Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

209.     The same day, May 14, 2020, Kiesler texted Reed, ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ (Palay Decl., ¶ 58, Ex. 56, WINDY0047370; Answer ¶ 123.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

210.     Because of Stacy's redemption, Reed's ownership stake in Windy Waters increased by approximately 8.1%. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-188:25. *Compare* Palay Decl., ¶ 106, Ex. 98, STAFFORD000076, *with* Palay Decl., ¶ 60, Ex. 58, WINDY0004372 at 4515.)

**RESPONSE:** Undisputed that the ownership stake of the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013, of which Reed was the trustee, increased by approximately 8.1%.

**REPLY:** No reply is required.

211.    On May 22, 2020, Gonnering e-mailed Reed and Kiesler about Widen Enterprises' operations. (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

212.    In that May 22, 2020 correspondence, Gonnering stated that ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

213.    In that same May 22, 2020 correspondence, Gonnering stated that Widen Enterprises projected $27,180,000 in software revenue, which was a decrease from the May 8, 2020 projection of $27,440,000 in software revenue. (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

214.    In that same May 22, 2020 correspondence, under the heading ██████████████ Gonnering stated that ████████████████████████████████████████████████████

███████████████████████████████████████████ (Palay Decl., ¶ 61, Ex. 59, WINDY0000955 at 956.)

> **RESPONSE:** Undisputed.

> **REPLY:** No reply is required.

215.    Defendants say that in "late June or early July" 2020—i.e., approximately 6 to 8 weeks after Stacy's redemption—Reed "first expressed an interest to Mr. Gonnering in selling Widen Enterprises, Inc. somewhere between two to five years' time (*i.e.*, between mid-2022 to 2025)." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.9-10, Defs.' Answer to Interrogatory No. 6.)

> **RESPONSE:** Undisputed.

> **REPLY:** No reply is required.

216.    On June 3, 2020, Kiesler contacted a tax partner at the Companies' accounting firm, inquiring, ██████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ (Palay Decl., ¶ 37, Ex. 35, WINDY0044692.)

> **RESPONSE:** Undisputed.

> **REPLY:** No reply is required.

217.    One month later, on July 3, 2020, Gonnering wrote to Reed and Kiesler about ████████████████████ stating that ████████████████████████████████

████████████████████████████████████████████████████

██████████ (Palay Decl., ¶ 38, Ex. 36, WINDY0044312.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

218.    On August 19, 2020, Reed explicitly ████████████████████████████

████████████████████████████ (Palay Decl., ¶ 62, Ex. 60, WINDY0047301.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

219.    On August 25, 2020, Reed emailed Gonnering back-to-back emails, writing,

███████████████████████████ and then writing one minute later ████████████████

███████████████████████████ which emails were in response to Gonnering's email to

Reed earlier on that day in which Gonnering wrote, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ (Palay Decl.,

¶ 5, Ex. 3, WINDY0044983).

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

220. By October 8, 2020, Gonnering had spoken with Software Equity Group, the investment bank that later brokered the sale of Widen Enterprises to Acquia, about a possible engagement. (Palay Decl., ¶ 63, Ex. 61, SEG_00000001; Palay Decl., ¶ 28, Ex. 26, ACQUIA0006834 at 6835.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

221. Widen Enterprises ended up keeping the $2.7 million in PPP loans, which Reed testified went "in the bank for a rainy day." (08/23/2023 R. Widen Dep. Tr. 213:1-6.)

**RESPONSE:** Disputed as to how the PPP funds were utilized. Widen Enterprises' CFO, the individual with personal knowledge, confirmed that the PPP funds were used to continue operations. Kiesler Dep., Sept. 19, 2023, at 288:20-22. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Kiesler's declaration does not alter Reed's testimony.

222. The documents Stacy signed at the Companies' office on May 13, 2020, consisted of a Stock Redemption Agreement, dated May 13, 2020, and a Promissory Note, also dated May 13, 2020. (Answer ¶¶ 119, 125; Compl. ¶ 125; Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3172, 3176.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

223. The redemption agreement states that Windy Waters would purchase 232.75 shares of Class A common stock of Windy Waters for $646.19 per share, and 1,952.7568 shares of Class

B common stock of Windy Waters for $615.42 per share, for a total purchase price of $1,352,166.31. (Answer ¶ 126; Palay Decl., ¶ 56, Ex. 54, WINDY0003172.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

224.    Under the redemption agreement, Windy Waters represented to Stacy that ███
███████████████████████████████████████████████████████████████
███████████████████, that ████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████ that ████████████████████████████████████████████
██████████ and that ████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████ (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3173, Recitals § 4; Answer ¶ 132.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

225.    The promissory note provided for an annual interest rate on Windy Waters' outstanding obligations to Stacy of only 0.580%, the Applicable Federal Rate—the lowest rate that may be charged without the U.S. Internal Revenue Service ("IRS") requiring that interest income be imputed—as published by the IRS for May 2020. (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3176; Answer ¶¶ 139, 140.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

226. The promissory note was not secured by collateral or guaranteed by a guarantor or surety. (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3176; Answer ¶ 141.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


227. Defendants calculated the price paid to Stacy for her shares using the EBITDA Formula for the "Fair Market Value per share" from Windy Waters' shareholder agreement. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Answer ¶ 178.)

**RESPONSE:** Disputed that Widen Enterprises had any involvement, and that Reed performed the calculations. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶ 80; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, (ECF No. 1-6), B (ECF No. 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6); Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, p.16, 18, ¶¶ 119, 134, Ex. U (ECF No. 75-23). Otherwise, undisputed.

**REPLY: Undisputed.** The dispute Defendants identify is immaterial and not genuine for purposes of this fact.


228. Based on that calculation, Defendants had calculated the "Estimated Value of Windy Waters" to be $6,896,973, less than 5% of the value that Defendants sold Widen for sixteen months after Stacy's May 2020 redemption. (Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Answer ¶¶ 148, 179; Compl., Ex. F, ECF No. 1-11.)

**RESPONSE:** Disputed that Widen Enterprises had any involvement, and that Reed performed the calculations. Further, disputed that the referenced formula calculated the "Estimated Value of Windy Waters, Inc." That phrase appears on a spreadsheet Kiesler used internally to calculate the formula, but it simply represents the total the formula reaches for 100% of shares based on the calculation. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶ 80; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, (ECF No. 1-6), B (ECF No. 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6); Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, 16, 18, ¶¶ 37-38, 119, 134, Exs. D (ECF No. 74-4), U (ECF No. 75-23); Kiesler Decl., Nov. 10, 2023, pp.5-8, ¶¶ 23, 27-34; Hutler Decl., Sept. 29, 2023, (ECF No. 68) pp.2-3, ¶¶ 6, 9-10, 12-13, Exs. 1 (ECF No. 68-1), 2 (ECF No. 68-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-35. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The spreadsheet Defendants undisputedly used to calculate the redemption price (ECF 75-23, Kiesler Decl. Ex. U) states that the "Estimated Value of Windy Waters" is "$6,896,973," which is indisputably less than 5% of the value that Defendants sold Widen for sixteen months after Stacy's May 2020 redemption. (Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Am. Answer ¶¶ 148 ("Defendants admit the allegation in Paragraph 148 that Acquia purchased Widen Enterprises, Inc. for $162 million," 179; Compl., Ex. F, ECF No. 1-11.)


229.     After Stacy learned of the sale of Widen Enterprises to Acquia, but prior to the closing of that transaction, Stacy spoke to Reed on the phone and told him that she had concerns about how her redemption had been handled in May 2020. (09/28/2023 S. Randall Decl., p.2, ¶ 10; Answer ¶ 154.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


230.    On September 10, 2021, after Stacy expressed her concerns, Reed sent Stacy a text message saying: "I haven't talked to Kiesler yet but I did find out that we that we (sic) didn't start talking about selling it until February this year." (Palay Decl., ¶ 64, Ex. 62, Randall0000051; Answer ¶ 166.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


231.    Later that same day, Reed asked Kiesler how much stock Stacy had owned. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 186:18-187:25.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


232.    Kiesler told Reed ███████    (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:1-25.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


233.    Reed responded, ███████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-25.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

234.   Kiesler told him, ████████████████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-188:17.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

235.   Reed responded, ████████████████████████████ ████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 188:18-25).

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

236.   Kiesler explained that ████████████████████████████. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 189:19-22.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

237.   Referring to the balance of the promissory note and a $1 million "gift" Reed had offered Stacy until she hired attorneys to represent her with respect to the May 13, 2020 redemption, Reed told Kiesler, ████████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 190:5-11.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

238.    The next day, September 11, 2021, Reed texted Kiesler, ███████████████ ███████████████████████████████████ to which Kiesler responded ████████████ █████████████████. (Palay Decl., ¶ 65, Ex. 63, WINDY0047403 at 47404; 08/23/2023 R. Widen Dep. Tr. 172:7-173:8).

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

239.    Reed then texted Kiesler, ████████████████████████████████████ ███████████████████████████████████████ which message Kiesler texted to Gonnering to ask if Reed had talked to Gonnering about the same. (Palay Decl., ¶ 66, Ex. 64, WINDY0047405 at 47406; Palay Decl., ¶ 67, Ex. 65, WINDY0047401 at 47402.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

240.    Gonnering responded that Reed ████████████████████████████ ██████████████████████████████████████████████████████ ████████████████ (Palay Decl., ¶ 67, Ex. 65, WINDY0047401 at 47402.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

241.    Pursuant to the sale of Widen Enterprises to Acquia, Kiesler received approximately $12,354,238.37 based on his 8.32% indirect ownership of Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to

Owners of WWI"; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.3, Defs.' Response to Request for Admission No. 3.)

**RESPONSE:** Although Kiesler owned 8.32% of Windy Waters, the holding company of Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this resulted in his 8.32% "indirect ownership of Widen Enterprises." Further, Defendants do not dispute that Kiesler received approximately $12,354,238.37 based on that 8.32% ownership of Windy Waters.

**REPLY:** No reply is required.

242.    Pursuant to the sale of Widen Enterprises to Acquia, Gonnering received approximately $13,998,109.30 based on his 9.43% indirect ownership of Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI".)

**RESPONSE:** Although Gonnering owned 9.43% of Windy Waters, the holding company of Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this resulted in his 9.43% "indirect ownership of Widen Enterprises." Further, Defendants do not dispute that Gonnering received approximately $13,998,109.30 based on that 9.43% ownership of Windy Waters.

**REPLY:** No reply is required.

243.    Pursuant to the sale of Widen Enterprises to Acquia, Reed received approximately $102,430,634.54 based on his approximately 68.97% indirect ownership of Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections

& Responses to Pl.'s First Set of Requests for Admission, p.3, Defs.' Response to Request for Admission No. 2.)

**RESPONSE:** Although the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013 owned approximately 68.97% of Windy Waters, the holding company of Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this resulted in Reed (as trustee) having a 68.97% "indirect ownership of Widen Enterprise." Further, Defendants do not dispute that Reed received approximately $102,430,634.54 based on that 68.97% ownership of Windy Waters.

**REPLY:** No reply is required.

244.    As of September 19, 2023, Windy Waters had approximately $8 million on hand. (09/19/2023 M. Kiesler Dep. Tr. 270:8-9.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

245.    If Stacy had owned the approximately 20% of Windy Waters stock that Defendants purchased under the May 13, 2020 redemption agreement at the time of Widen Enterprises' sale to Acquia, Stacy would have been entitled to receive approximately $31,727,700 based on her 19.585% indirect ownership of Widen Enterprises, and would have received approximately $29,403,545.30 upon the closing of the transaction after expenses. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheets titled "Shareholder Proceeds" and "Definitions.")

**RESPONSE:** Although Defendants arrived at a slightly different calculation for what Randall would have received upon the closing of the transaction after expenses, for purposes of this motion only, undisputed.

**REPLY:** No reply is required.

246.    After learning about the sale of Widen Enterprises, Stacy's son, Justin, introduced her to an attorney. (09/28/2023 S. Randall Decl., p.2, ¶ 11.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

247.    On September 20, 2021, prior to the close of the Widen Enterprises sale, Stacy's attorneys sent notices to Defendants alerting them to a potential dispute. (Answer ¶ 170.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

248.    A week later, on September 27, 2021, Stacy's counsel spoke with Defendant's counsel by phone. (Answer ¶ 177; Palay Decl., ¶¶ 69-70, Ex. 67 at 2-3, 10/05/2021 Email from D. Palay to J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

249.    On October 6, 2021, Stacy's counsel again spoke with Defendants' counsel by phone. (Palay Decl., ¶¶ 70-71, Ex. 67 at 1-2, 10/06/2021 Email from D. Palay to J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

250.    In reference to potential settlement negotiations, Stacy's counsel followed up with an email explaining that "a helpful first step in these discussions would be if your client could share the

process and calculations used to determine the purchase price for Ms. Randall's shares in 2020." (Palay Decl., ¶ 70, Ex. 67 at 1-2, 10/06/2021 Email from D. Palay to J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

251.    Approximately one week later, on October 14, Defendants' counsel followed up via e-mail with the Companies' 2019 financial statements and the calculation of Stacy's purchase price. (Palay Decl., ¶ 72, Ex. 68, 10/14/2021 Email from J. Friedman to D. Palay & M. Cameli.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

252.    Over the next several months, the parties engaged in extensive settlement discussions and negotiations. (Palay Decl., ¶ 73 & Exs. 67-72.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

253.    Stacy's counsel requested further information about the sale of Widen Enterprises, and originally demanded that any settlement take place before the end of 2021. (Palay Decl., ¶ 74, Ex. 69, 12/15/2021 Email from M. Cameli to J. Friedman; Palay Decl., ¶ 75, Ex. 70, 01/31/2022 Email from M. Cameli to J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

254.    Defendants' counsel requested an extension to allow him to engage with the new owner of Widen Enterprises about the terms of disclosing documents about the purchase. (Palay Decl., ¶ 74, Ex. 69, 12/15/2021 Emails between M. Cameli and J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

255.    In January 2022, Defendants produced certain documents relating to Acquia's purchase of Widen Enterprises, raised the possibility of mediation, and had made an initial settlement offer. (Palay Decl., ¶ 75, Ex. 70, 01/31/2022 Emails between M. Cameli and J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

256.    Stacy's counsel explained in responsive correspondence that:

> In general, our client is reluctant to undertake mediation based on your client's offer because of the potential for that process to delay her asserting her claims. That's particularly true if the process is used to stall her from advancing her claims through the discovery process or if she risks running over any statutes of limitations. WE would therefore need any mediation to include both reasonable discovery and a tolling agreement.

(Palay Decl., ¶ 76, Ex. 71, 03/03/2022 Email from D. Palay to J. Friedman.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

257.    Stacy's counsel also demanded additional discovery, including text and email correspondence among the defendant parties, and the shareholder agreement Defendants' counsel

had mentioned in prior correspondence. (Palay Decl., ¶ 76, Ex. 71, 03/03/2022 Email from D. Palay to J. Friedman.)

> **RESPONSE:** Undisputed.

> **REPLY:** No reply is required.

258.    Those documents were not provided until May 2022. (Palay Decl., ¶ 77.)

> **RESPONSE:** Undisputed.

> **REPLY:** No reply is required.

259.    To address Stacy's concerns that settlement negotiations could delay or prejudice her assertion of claims, on March 1, 2022, Stacy, Defendants, and third parties entered into a written Standstill and Tolling Agreement. (Palay Decl., ¶¶ 76-78, Exs. 71-72, Standstill and Tolling Agreement).

> **RESPONSE:** Undisputed.

> **REPLY:** No reply is required.

260.    The Standstill and Tolling Agreement provides that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any subsequent negotiations or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any legal or equitable actions or defenses that the Parties may have." (Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement at 1.)

> **RESPONSE:** Disputed. The Standstill and Tolling Agreement is inadmissible. Paragraph 6 of the Standstill and Tolling Agreement states, "[t]he Parties agree further that this Agreement will

not be admissible for any purpose other than to rebut a defense based on the passage of time." Palay Decl., Sept. 29, 2023, (ECF No. 63) p.10, ¶ 78, Ex. 72 (ECF No. 63-71).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. The Standstill and Tolling Agreement is admissible to rebut defenses based on the passage of time. Defendants' defense of ratification is based on the passage of time after Stacy's counsel first reached out to Defendants with concerns about the redemption.

261.    The parties' discussions culminated in a formal mediation held on or around May 11, 2022. (Palay Decl., ¶ 79.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

262.    Although negotiations stretched on for multiple weeks after the mediation, they were ultimately unsuccessful. (Palay Decl., ¶ 80.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

263.    On July 21, 2022, after nearly a year of seeking to avoid litigation, Stacy commenced this lawsuit, seeking recission of the Redemption Agreement, among other relief. (ECF No. 1 at 5-56.)

**RESPONSE:** Disputed. Randall sought to pursue litigation. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.10, ¶¶ 75-76, Exs. 70 (ECF No. 63-69), 71 (ECF No. 63-70).

**REPLY: Undisputed.** The dispute Defendants identify is immaterial to the proposed fact. It is undisputed that Stacy did not pursue litigation until she filed the Complaint.

264.    Reed testified that he thinks that Stacy does "[n]ot have financial strength." (08/23/2023 R. Widen Dep. Tr. 177:20-178:4; 194:12-17.)

**RESPONSE:** Disputed. Reed did not testify to the quote cited in this paragraph. Reed testified that "financial strength" was not Randall's strongest attribute as a "business partner." Reed Dep., Aug. 23, 2023, at 194:12-17.

**REPLY: Undisputed.** Stacy acknowledges that the word "have" in the quoted language should have included brackets. However, this is immaterial to the meaning of Reed's testimony.


265.    The only financial information that Defendants claim to have provided Stacy prior to her May 13, 2020 redemption consists of a price-per-share calculation model based on the EBITDA Formula for the (so-called) "Fair Market Value per share" from Windy Waters' shareholder agreement. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; *see* Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

**RESPONSE:** If and only if "prior to her May 13, 2020 redemption" means the period of time between May 6, 2020, and May 13, 2020, then undisputed that the price-per-share calculation model was the only financial information provided to Randall during that time period. If "prior to her May 13, 2020 redemption" means a broader time period, then it is disputed: Randall received tax forms each year she was a shareholder to help her file taxes, and such tax forms provided information about Windy Waters' financials. In April 2016, at her then-husband's request, Randall received financial statements of the company. In March 2020, through her counsel, she received bank statements and investment account statements for Windy Waters. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.21, ¶ 171; Kiesler Decl., Nov. 10, 2023, pp.3-4, ¶¶ 11, 13-16, Exs. C

(WINDY0056318), E (WINDY0059942), F (WINDY0059720), G (WINDY0059740), H (WINDY0059752), I (WINDY0038393), J (WINDY0057416); Randall Dep., Aug. 28, 2023, at 149:12-17, 150:17-151:4.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. A disclosure to Stacy's husband in 2016 does not raise a genuine dispute that Defendants did not disclose any such information to Stacy. (*See* Kiesler Decl., Nov. 10, 2023, Ex. C.) Kiesler's sending of certain account information to Stacy's divorce lawyer in response to her ex-husband's discovery requests does not raise a genuine dispute that Kiesler did not disclose such information to Stacy, who was never shown and did not review the information or documents. (*See* Kiesler Decl., Nov. 10, 2023, Exs. E, F, G, H, I, J; ECF No. 118, S. Randall Decl., Nov. 10, 2023, ¶ 5.) Defendants' vague claim that "Randall received tax forms each year she was a shareholder to help her file taxes, and such tax forms provided information about Windy Waters' financials" does not raise a genuine dispute as to the proposed fact, as it is not supported by any admissible evidence.

266.    Defendants did not tell Stacy prior to the May 2020 redemption that at least two different lawyers communicated to Reed and Kiesler that ███████████████████████ ████████████████████████████████████████ (Palay Decl., ¶ 45, Ex. 43, STAFFORD000040; Palay Decl., ¶ 44, Ex. 42, WINDY0033984), or that no provision of the Shareholder Agreement of Windy Waters in effect as of May 13, 2020 limited the purchase price paid to her for her stock in Windy Waters on May 13, 2020. (09/28/2023 S. Randall Decl., p.2, ¶ 12; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

267.    Defendants did not tell Stacy prior to the May 2020 redemption that the "Fair Market Value per share" calculated with the EBITDA formula under the Windy Waters shareholder agreement did not equal or approximate the fair market value of Stacy's shares. (09/28/2023 S. Randall Decl., p.2, ¶ 13; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

268.    Defendants did not tell Stacy prior to the May 2020 redemption that the value of her interest in Windy Waters was negotiable. (09/28/2023 S. Randall Decl., p.3, ¶ 14; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 45, Ex. 43, STAFFORD000040; Palay Decl., ¶ 44, Ex. 42, WINDY0033984.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

269.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Windy Waters held nearly $5.5 million in investment portfolios. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19; 294:6-296:9; 09/28/2023 S. Randall Decl., p.3, ¶ 15; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

270.    Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of April 24, 2020, the marketable securities owned or controlled by Windy Waters were not being used as operating capital for the Companies. (09/28/2023 S. Randall Decl., p.3, ¶ 16; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.18, Defs.' Response to Request for Admission No. 39.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.


271.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula did not capture or approximate the fair market value of Windy Waters. (09/28/2023 S. Randall Decl., p.3, ¶ 17; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2; 09/19/2023 M. Kiesler Dep. Tr. 141:6-13.)

**RESPONSE:** Disputed. Randall knew from the consistent use of the Stock Price Formula for her own prior subscription and five prior stock redemptions that the share price produced was not the actual "fair market value of Windy Waters." Kiesler also walked Randall through the Stock Price Formula used to calculate the $1.1 million share price as of company financials through the end of November 2019, which Randall says Kiesler explained had "nothing to do with how good or bad the company is doing." When Kiesler received the updated share price of over $1.3 million under the Stock Price Formula she distinguished between the market value and the formula, asking

whether the executives were preparing to sell Widen Enterprises. Randall Dep., Aug. 28, 2023, at 82:23-25, 285:23-286:18 321:2-12; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

**REPLY: Undisputed.** Defendants are not competent to testify as to what Stacy "knew." Furthermore, each of the five prior stock redemption agreements that Defendants claim raises a genuine dispute as to the proposed fact, states that "The parties have agreed that the redemption of the shares held by Randall *shall be at fair market value*, and that the price and terms of redemption have been negotiated at arms length by unrelated parties with opposing financial interests." (Kiesler Decl., Sept. 29, 2023, Exs. E, F, G, H, I (emphasis added).) Kiesler's claim to have walked Stacy through his formula calculation does not raise a genuine dispute as to the proposed fact, as the formula was "established . . . for the determination of the fair market value of the stock," is called the "Fair Market Value per share Calculation," and calculates an "Estimated Value of Windy Waters, Inc." (*See* Kiesler Decl., Sept. 29, 2023, Ex. D at 1, 4.) Whether Stacy understood the formula to have had anything to do with "how good or bad the company is doing" does not raise a genuine dispute as to whether Defendants disclosed to Stacy that the formula did not capture or approximate the fair market value of Windy Waters. Stacy's question to Kiesler of whether the Widen Enterprises executives were preparing to sell the company did not "distinguish[] between the market value and the formula" or otherwise raise a genuine dispute as to whether Defendants disclosed to Stacy that the formula did not capture or approximate the fair market value of Windy Waters. Thus, Defendants fail to raise a genuine dispute of material fact as to this proposed fact.

272.   Kiesler represented to Stacy that the EBITDA formula calculation was a "fair" price for Windy Waters to pay Stacy for her shares. (Answer ¶ 79, 89.)

**RESPONSE:** Disputed. Kiesler did not tell Randall the price was "fair," but that the calculation method was fair, since it had been used for everyone. Compl. (ECF No. 1), ¶¶ 79, 89; Am. Answer (ECF No. 45), ¶¶ 79, 89; Kiesler Dep., Sept. 19, 2023, at 174:19-175:18, 227:10-13; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27; Reed Decl., Nov. 10, 2023, p.3, ¶ 19.

**REPLY: Undisputed.** At Paragraph 79 of their Amended Answer, Defendants state: "Defendants admit that Kiesler expressed the general sentiment that the $1.1 million currently calculated was fair because it was calculated using the Companies' standard price-per share calculation model for voluntary redemptions, which Kiesler explained was the same formula that had been used for Plaintiff's prior partial share redemptions and for the complete share redemptions of Plaintiff's brothers." That admission does not speak to the fairness of the "method for reaching the price," but rather to the "$1.1 million currently calculated." In Paragraph 89 of their Amended Answer, Defendants state in relevant part: "Defendants admit that Kiesler again expressed the general sentiment that *the price was fair*." (Am. Answer ¶ 89 (emphasis added).) Both admissions are binding on Defendants. *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (referring to "the well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.'") (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).) Thus, Defendants fail to raise a genuine dispute of material fact as to this proposed fact.

273.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the fair market value of Windy Waters would necessarily take into account the fair market value of Widen Enterprises. (09/28/2023 S. Randall Decl., p.3, ¶ 18; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; 08/23/2023 R. Widen Dep. Tr. 90:6-14.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.


274.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula calculation did not take into account the fair market value of Widen Enterprises. (09/28/2023 S. Randall Decl., p.3, ¶ 19; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; 08/23/2023 R. Widen Dep. Tr. 90:6-20.)

**RESPONSE:** Disputed. Randall knew from the consistent use of the Stock Price Formula for her own prior subscription and five prior stock redemptions that the share price produced was not the actual "fair market value of Windy Waters." Kiesler also walked Randall through the Stock Price Formula used to calculate the $1.1 million share price as of company financials through the end of November 2019, which Randall says Kiesler explained had "nothing to do with how good or bad the company is doing." When Kiesler received the updated share price of over $1.3 million under the Stock Price Formula she distinguished between the market value and the formula, asking whether the executives were preparing to sell Widen Enterprises. Randall Dep., Aug. 28, 2023, at 82:23-25, 285:23-286:18, 321:2-12; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

110

**REPLY: Undisputed.** Defendants are not competent to testify as to what Stacy "knew." Furthermore, each of the five prior stock redemption agreements that Defendants claim raises a genuine dispute as to the proposed fact, states that "The parties have agreed that the redemption of the shares held by Randall *shall be at fair market value*, and that the price and terms of redemption have been negotiated at arms length by unrelated parties with opposing financial interests." (Kiesler Decl., Sept. 29, 2023, Exs. E, F, G, H, I (emphasis added).) Kiesler's claim to have walked Stacy through his formula calculation does not raise a genuine dispute as to the proposed fact, as the formula was "established . . . for the determination of the fair market value of the stock," is called the "Fair Market Value per share Calculation," and calculates an "Estimated Value of Windy Waters, Inc." (*See* Kiesler Decl., Sept. 29, 2023, Ex. D at 1, 4.) Whether the formula had anything to do with "how good or bad the company is doing" does not raise a genuine dispute as to whether Defendants disclosed to Stacy that the formula did not take into account the fair market value of Widen Enterprises. Stacy's question to Kiesler of whether the Widen Enterprises executives were preparing to sell the company did not "distinguish[] between the market value and the formula" or otherwise raise a genuine dispute as to whether Defendants disclosed to Stacy that the formula did not take into account the fair market value of Widen Enterprises. Thus, Defendants fail to raise a genuine dispute of material fact as to this proposed fact.

275.    Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula value for Windy Waters was low compared to the fair market value of Windy Waters. (09/28/2023 S. Randall Decl., p.3, ¶ 20; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

276.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises' CEO had stated to Reed and Kiesler that the EBITDA Formula value for Windy Waters was ███ (09/28/2023 S. Randall Decl., p.3, ¶ 21; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

277.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering had stated that the fair market value of Widen Enterprises was based in large part on a multiple of that company's recurring revenue. (09/28/2023 S. Randall Decl., p.4, ¶ 22; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7- 9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

278.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering had stated to Reed and Kiesler on multiple occasions over a period of years that Widen Enterprises' market value was based on a multiple of the company's revenue or recurring revenue. (09/28/2023 S. Randall Decl., p.4, ¶ 23; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay

Decl., ¶ 17, Ex. 15, WINDY0034048; Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl.,

¶ 19, Ex. 17, WINDY0033985.)

     **RESPONSE:** Undisputed, but immaterial.

     **REPLY:** No reply is required.


279.    Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of

August 2018, Gonnering had stated to Reed and Kiesler that he believed that Widen Enterprises

had a fair market value of approximately $80 million. (09/28/2023 S. Randall Decl., p.4, ¶ 24; Palay

Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories,

pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

     **RESPONSE:** Undisputed, but immaterial.

     **REPLY:** No reply is required.


280.    Defendants did not disclose to Stacy prior to the May 2020 redemption that

Gonnering's 2018 estimate of the company's fair market value was based on applying a multiple to

a substantially lower amount of revenue than the company was projecting for 2020 as of the May

2020 redemption. (09/28/2023 S. Randall Decl., p.4, ¶ 25; Palay Decl., ¶ 10, Ex. 8, 06/23/2023

Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to

Interrogatory No. 5; Palay Decl., ¶ 19, Ex. 17, WINDY0033985; Palay Decl., ¶ 21, Ex. 19,

WINDY0009851.)

     **RESPONSE:** Undisputed, but immaterial.

     **REPLY:** No reply is required.

281.     Defendants did not disclose to Stacy prior to the May 2020 redemption that they had

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

(09/28/2023 S. Randall Decl., p.4, ¶ 26; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 33, Ex. 31, WINDY0033899; 09/21/2023 M. Gonnering Dep. Tr. 164:8-165:18.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.


282.     Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises had total revenues of $28,689,686.70 for 2019. (09/28/2023 S. Randall Decl., p.4, ¶ 27; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Answer ¶ 195.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.


283.     Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises had $22,542,781 of recurring revenue in 2019. (09/28/2023 S. Randall Decl., p.4, ¶ 28; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

284.     Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of May 8, 2020, Widen Enterprises CEO projected software revenue for 2020 of approximately $27,440,000. (09/28/2023 S. Randall Decl., p.5, ¶ 29; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

285.     Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed received compensation from the Companies of approximately $1,500,000 for 2019. (09/28/2023 S. Randall Decl., p.5, ¶ 30; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

286.     Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed received compensation from the Companies of approximately $2,000,000 for 2020. (09/28/2023 S. Randall Decl., p.5, ¶ 31; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

287.    Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed was ███████████████████████ of Widen Enterprises in 2019 or 2020. (09/28/2023 S. Randall Decl., p.5, ¶ 32; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142.)

**RESPONSE:** Undisputed, but immaterial.

**REPLY:** No reply is required.

288.    Beginning no later than May 15, 2004, Defendants began using a signature stamp of Stacy's signature to affix her signature to corporate documents of Windy Waters, which Stacy had made and provided to Defendants. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

**RESPONSE:** Disputed to the extent Randall asserts that all Defendants no later than May 15, 2004, began affixing Randall's signature stamp, as Widen Enterprises never affixed Randall's signature stamp. In fact, Randall's signature stamp was kept "locked in [Kiesler's] drawer[,]" and no one other than Kiesler affixed Randall's signature stamp on documents. Otherwise, undisputed. Kiesler Dep. Sept. 19, 2023, at 67:7-23.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Defendants' argument that Kiesler, the CFO of Widen Enterprises, was not acting on behalf of Widen Enterprises when he used Stacy's stamp is unsupported by admissible evidence and is immaterial for purposes of the proposed fact.

289.     Defendants claim that Stacy provided the stamp with implied, ongoing permission for them to "use as required in lieu of her handwritten signature." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.


290.     Reed testified that "protocol" required that Kiesler contact Stacy "every single time" to obtain her consent for each specific document that Defendants wanted to stamp with her signature. (08/23/2023 R. Widen Dep. Tr. 219:3-220:23.)

**RESPONSE:** Disputed. Reed's testimony was referencing occasions on which Randall had not already approved the usage of the stamp, either through her blanket permission or when he had already done so. Kiesler followed that protocol. Reed Dep., Aug. 23, 2023, at 218:22-219:6; Kiesler Dep., Sept. 19, 2023, at 31:12-18, 61:9-20, 62:18-63:1, 67:7-68:8, 100:22-101:3, 103:11-19, 115:14-116:4, 126:11-15; Randall Dep., Aug. 28, 2023, at 117:6-9; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 22-24; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.3-4, ¶¶ 25-26; Reed Decl., Nov. 10, 2023, p.4, ¶ 24; Kiesler Decl., Nov. 10, 2023, pp.2-3, ¶ 10, Exs. A (WINDY0056342), X (WINDY0056344).

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Not only did Reed testify exactly as the fact proposes, but the only testimony from Reed's deposition that Defendants cite further supports the proposed fact. (*See* Reed Widen Dep., Aug. 23, 2023, at 218:22-219:6 (Q: Okay. So one thing that's come up in this case is the fact that there was a stamp of Stacy's signature at the company, right? A: yes. Q: You were aware of that, right? A: Absolutely. Q: Did you ever ask Stacy if you or anyone at the companies could use the stamp on any particular

documents? A: Every time we used it we asked her.") None of the evidence Defendants cite can raise a genuine dispute of material fact as to whether Reed in fact testified as proposed by the fact.

291.    Reed testified that he "assum[ed]" Kiesler would have contacted Stacy as described in the preceding paragraph, but he could not be certain because he was not always present when Kiesler allegedly did contact Stacy for permission to use her signature stamp. (08/23/2023 R. Widen Dep. Tr.219:3-220:23.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

292.    Kiesler testified that he relied on Reed's representation that Reed had discussed a document with Stacy before Kiesler affixed Stacy's stamp but that "I don't know what [Reed] would have done." (09/19/2023 M. Kiesler Dep. Tr. 100:22-104:25.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

293.    Kiesler testified that Stacy gave him "implied consent" to affix her signature stamp to annual corporate resolutions, such as "minutes of annual meetings of the shareholders of Windy Waters, Inc." for meetings that did not actually occur, which included documents purporting to appoint Stacy as director and/or President of Windy Waters. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 114:4-24; 117:9-118:7; 132:2-133:2, 134:16-135:15; 280:22-24; *see generally id.* 106:20-137:17.)

**RESPONSE:** Disputed. The phrase "implied consent" calls for a legal conclusion, and Defendants objected on that basis during Kiesler's deposition. In actuality, as Kiesler's testimony

showed, Randall gave Kiesler express blanket consent to use the signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. Kiesler Dep., Sept. 19, 2023, at 104:4-9, 115:14-116:4, 126:11-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 23-24.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Kiesler, himself, testified multiple times that he used Stacy's stamp with her "implied consent." (09/19/2023 M. Kiesler Dep. Tr. 104:4-9, 132:2-133:23, 134:16-135:15; 137:1-6, 137:14-17.)

294.    Kiesler could not recall ever sending Stacy any of the annual resolutions shown to him at his deposition, and he had no basis to believe that Stacy ever saw these documents or that she knew of their contents. (09/19/2023 M. Kiesler Dep. Tr. 109:18-111:16, 111:25-113:17, 124:5-127:4, 127:8-128:18, 128:23-130:2, 130:9-135:18, 135:22-137:17.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

295.    Using the stamp, Defendants affixed Stacy's signature to Windy Waters corporate documents from 2004 to 2019, including documents appointing or electing Stacy to various roles at Windy Waters, including director and, in certain instances, President. Palay Decl., ¶ 81, Ex. 73, STAFFORD001059 (2020 director); Palay Decl., ¶ 82, Ex. 74, STAFFORD001055 (2019 director); Palay Decl., ¶ 83, Ex. 75, STAFFORD001051 (2018 President); Palay Decl., ¶ 84, Ex. 76, STAFFORD001050 (2018 director); Palay Decl., ¶ 85, Ex. 77, STAFFORD001048 (2017 President); Palay Decl., ¶ 86, Ex. 78, STAFFORD001047 (2017 director); Palay Decl., ¶ 87, Ex. 79, STAFFORD001041 (2016 director); Palay Decl., ¶ 88, Ex. 80, STAFFORD001037 (2015 director); Palay Decl., ¶ 89, Ex. 81, STAFFORD001032 (2014 director); Palay Decl., ¶ 90, Ex. 82, STAFFORD001019 (2012 director); Palay Decl., ¶ 91, Ex. 83, STAFFORD001010 (2011 director);

Palay Decl., ¶ 92, Ex. 84, STAFFORD001007 (2010 director); Palay Decl., ¶ 93, Ex. 85, STAFFORD001005 (2009 director); Palay Decl., ¶ 94, Ex. 86, STAFFORD000997 (2008 director); Palay Decl., ¶ 95, Ex. 87, STAFFORD000975 (2004).)

**RESPONSE:** Disputed to the extent that Randall asserts that all Defendants affixed Randall's signature stamp to Windy Waters corporate documents from 2004 to 2019, as Widen Enterprises never affixed Randall's signature stamp. In fact, Randall's signature stamp was kept "locked in [Kiesler's] drawer[,]" and no one other than Kiesler affixed Randall's signature stamp on documents. Otherwise, undisputed. Kiesler Dep. Sept. 19, 2023, at 67:7-23.

**REPLY:** Defendants do not identify a genuine dispute as to the proposed fact. Defendants' argument that Kiesler, the CFO of Widen Enterprises, was not acting on behalf of Widen Enterprises when he used Stacy's stamp is unsupported by admissible evidence and is immaterial for purposes of the proposed fact.

296.    Kiesler, alone, signed documents appointing Stacy as President. (Palay Decl., ¶ 96, Ex. 88, STAFFORD001057 (2020 President); Palay Decl., ¶ 97, Ex. 89, STAFFORD001053 (2019 President); Palay Decl., ¶ 98, Ex. 90, STAFFORD001043 (2016 President); Palay Decl., ¶ 99, Ex. 91, STAFFORD000999 (2008 President).)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

297.    In one instance in 2012, Stacy signed a consent resolution as a director of Windy Waters using DocuSign. (Palay Decl., ¶ 100, Ex. 92, STAFFORD001030 at 1031.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

298.    In one instance in December 2004, Stacy signed a waiver for attendance at a meeting where she was elected as a director of Windy Waters, along with two of her brothers. (Palay Decl., ¶ 101, Ex. 93, STAFFORD000973 at 974.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

299.    Despite saying that they believed they had been granted implied, ongoing permission to use Stacy's signature stamp in lieu of her actual signature in 2004, Defendants nonetheless chose to obtain Stacy's actual signature on certain documents throughout the years, notably four of the five redemption agreements she executed prior to the May 13, 2020 redemption agreement at issue in this case. (Palay Decl., ¶ 102, Ex. 94, STAFFORD000810 (2019); Palay Decl., ¶ 103, Ex. 95, STAFFORD000804 (2017); Palay Decl., ¶ 20, Ex. 18, STAFFORD000786 (2007); Palay Decl., ¶ 6, Ex. 4, STAFFORD000781 (2005).)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

300.    The only instance where Defendants can specifically recall Stacy providing specific consent for the use of her signature stamp was via text message on December 26, 2019 for a document that did not elect or appoint Stacy to any position at the Companies. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

**RESPONSE:** Disputed. Defendants responded to Interrogatory No. 4 of Plaintiff's First Set of Interrogatories by acknowledging that "Defendants cannot recall every occasion" on which a

person discussed with Randall the usage of her signature stamp, but that "[o]ne occasion Defendants can recall" occurred on December 26, 2019, as further described in Defendants' response. Nonetheless, to provide another example, on March 23, 2010, Randall provided Kiesler with her specific consent to affix her signature stamp on a consent to redeem stock for Thomas Schmidt, writing, "Yes, Mr. [] Mike that would be just fine if you used my signature stamp!!!! :)" before Randall proceeded to "crack [her]self" up by replying in colored font that was "prettier than [Kiesler's]." Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 2, Ex. A (ECF No. 70-1: Defs.' Objections And Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 4 (emphasis added); Kiesler Decl., Nov. 10, 2023, pp.2-3, ¶ 10, Ex. A (WINDY0056342).

**REPLY:** The dispute Defendants identify is immaterial and not genuine.


301.   As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for "directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays before his death. (09/28/2023 S. Randall Decl., p.5, ¶ 33.)

**RESPONSE:** Disputed. Neither Randall nor her siblings were named as directors solely so they could collect directors' fees; Randall and her siblings were named as directors for legitimate business purposes and undertook actions in that capacity for legitimate business purposes. Palay Decl., Sept. 29, 2023, (ECF No. 63) p. 13, ¶ 100, Ex. 92 (ECF No. 63-91); Reed

Dep., Aug. 23, 2023, at 222:18-223:1; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.11, ¶ 94, Ex. H (ECF No. 67-5); Reed Decl., Nov. 10, 2023, p.5, ¶¶ 27-30, Exs. J (WINDY0001638), K (WINDY0001641), L (WINDY0001649), M (WINDY0001700); Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.2, 6, ¶¶ 10, 37, Exs. A (ECF No. 74-1), D (ECF No. 74-4).

**REPLY: Undisputed.** Defendants are not competent to testify as to what Stacy was aware of. None of the materials Defendants cite establishes, or even claims, that Stacy was "named as a director[] for legitimate business purposes."

302.     However, Stacy has never participated in any decision-making or governance at the Companies. (09/28/2023 S. Randall Decl., p.5, ¶ 34; 09/19/2023 M. Kiesler Dep. Tr. 243:21-244:18; 08/23/2023 R. Widen Dep. Tr. 64:17-65:15.)

**RESPONSE:** Disputed. Randall gave approval to various decisions and governance matters for the Companies, including approving use of the Stock Price Formula in the Second Amendment, though she was not an active participant beyond giving her approval. Palay Decl., Sept. 29, 2023, (ECF No. 63) p. 13, ¶ 100, Ex. 92 (ECF No. 63-91); Reed Dep., Aug. 23, 2023, at 222:18-223:1; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.11, ¶ 94, Ex. H (ECF No. 67-5); Reed Decl., Nov. 10, 2023, p.5, ¶¶ 27-30, Exs. J (WINDY0001638), K (WINDY0001641), L (WINDY0001649), M (WINDY0001700); Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.2, 6, 12, ¶¶ 10, 37, 87, 89, Exs. A (ECF No. 74-1), D (ECF No. 74-4), P (ECF No. 74-5), Q (ECF No. 75-21).

**REPLY:  Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact, which speaks to whether Stacy "participated in any decision-making or governance at the Companies," not to whether Stacy ever "gave approval" to decisions and governance matters decided by others by signing a document. There is no dispute that Stacy did not ever participate in any decision-making or governance at the Companies. (09/28/2023 S. Randall Decl., p.5, ¶ 34; 09/19/2023 M. Kiesler Dep. Tr. 243:21- 244:18; 08/23/2023 R. Widen Dep. Tr. 64:17-65:15; ECF No. 102, 11/6/23 Widen Enterprises Dep. Tr. 77:22-78:6.)

303.    Stacy lived in Florida from approximately 2001 until approximately 2011. (09/28/2023 S. Randall Decl., p.5, ¶ 35.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

304.    Reed testified that Stacy had "no active role in the companies" since her termination as a receptionist in the early 2000s, Stacy attended no meetings, and Stacy did nothing at all at the Companies, while Kiesler testified that Stacy was not notified of the corporate meetings. (08/23/2023 R. Widen Dep. Tr. 64:1-65:15; 09/28/2023 S. Randall Decl., p.5, ¶ 36; Answer ¶ 33; Compl. ¶ 33 n.3; 09/19/2023 M. Kiesler Dep. Tr. 118:14-25, 241:9-243:14.)

**RESPONSE:** Disputed to the extent this paragraph suggests corporate meetings were held. Annual corporate meetings were not held, of which Randall was aware, and thus Defendants do not dispute that Randall was not notified of such non-existent "corporate meetings." Windy Waters Dep., Nov. 3, 2023, 56:21-23; Kiesler Dep., Sept. 19, 2023, at 114:4:115-3, 117:16-118:4, 125:14-20, 127:16-20, 243:7-10. Otherwise, undisputed.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact, which speaks to the content of Reed's testimony, not the testimony of other Defendants. Nor does any of the materials Defendants cite establish that Stacy was "aware" that corporate meetings were not held.

305.    Stacy never attended a shareholders or board of directors meeting for Windy Waters or Widen Enterprises. (09/28/2023 S. Randall Decl., p.5, ¶ 36; 08/23/2023 R. Widen Dep. Tr. 65:14-15.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

306.     Mark Widen, Stacy and Reed's father, died in 2003, and, as Stacy understands, upon Mark's death she, Reed, and at least two of their three other siblings became equal one-fifth owners in the Companies. (08/23/2023 R. Widen Dep. Tr. 15:25-16:1; 09/28/2023 S. Randall Decl., p.5, ¶ 37.)

**RESPONSE:** Undisputed that Mark Widen was Reed and Randall's father, and that Mark Widen died in 2003. Defendants do not know what Randall "understands" to be the case, but sources show Randall's understanding is incorrect, and therefore Defendants dispute the remainder of the paragraph. As of December 31, 2003, Reed, Randall, Price, and Stewart owned the same number of total shares. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.2, ¶ 9, Ex. 7 (ECF No. 63-6); Kiesler Decl., Nov. 10, 2023, p.9, ¶ 39, Ex. O (WINDY0035809).

**REPLY:** The dispute Defendants identify is immaterial and not genuine.

307.     In Gonnering's 2008 Business Plan for Widen Enterprises, he wrote, ██████████ ████████████████████████████████████████████████████████ ████████████████ and he forecasted that the company's software revenues would increase sharply into the following decade, while its net income would increase only modestly. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11067, 11070.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

308.     Widen Enterprises commissioned ITR Economics to do an analysis, which it completed in December 2020, in preparation for bringing Widen Enterprises to market for sale. (Palay Decl., ¶ 104, Ex. 96, WINDY0048037 at 48041.)

**RESPONSE:** Disputed. The ITR Economics analysis was completely separate from the sale of Widen Enterprises. Gonnering Decl., Nov. 10, 2023, p.2, ¶ 9.

**REPLY:** The dispute Defendants identify is immaterial to the proposed fact.


309.     Reed testified that, "[b]ecause I put 43 years of my life in [the company]," he "guess[ed]" he was entitled to a different calculation of the company's value than any other shareholders were entitled to, and that "[b]ecause I put 43 years of my life in [the company]," he "thinks . . . absolutely" his stock price was more valuable than Stacy's stock price. (08/23/2023 R. Widen Dep. Tr. 178:5-179:10.)

**RESPONSE:** Disputed. The sentence is inaccurate. Reed testified that the Stock Price Formula was not used when Widen Enterprises was sold because Windy Waters was selling its asset, not stock. Reed Dep., Aug. 23, 2023, at 178:5-22, 179:12-14.

**REPLY: Undisputed.** Defendants do not identify a genuine dispute as to the proposed fact. Reed testified as proposed by the fact, except that Stacy acknowledges there should be a bracket around the "s" in the word "thinks."


310.     Widen Enterprises remained profitable during the COVID-19 epidemic. (08/23/2023 R. Widen Dep. Tr. 213:7-15.)

**RESPONSE:** Disputed. Widen Enterprises showed negative net income throughout March and April 2020, which means that Widen Enterprises recognized more expense than revenue in those months. Kiesler Decl., Nov. 10, 2023, p.5, ¶ 24.

**REPLY: Undisputed.** Widen Enterprises' decision to spend its free cash and therefore recognize negative net income during certain months did not make the company unprofitable, as Reed testified. Further, Widen Enterprises testified through its corporate representative, Gonnering, that it did not ever experience negative growth during the COVID-19 pandemic. (11/06/2023 Widen Enterprises Dep. Tr. 221:25-222:22.)

311.    Acquia used Widen Enterprises' recurring revenue to assess its then-potential purchase of the company, including noting ██████████████████ in a slide deck. (Palay Decl., ¶ 108, Ex. 100 at slide 3.)

**RESPONSE:** Undisputed, but immaterial. Acquia used a wide array of factors in assessing its purchase of Widen Enterprises, of which Widen Enterprises' recurring revenue was merely one such factor. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.14, ¶ 108, Ex. 100 (ECF No. 63-99).

**REPLY:** No reply is required.

312.    Reed testified that a person would need to know revenue information in order to understand the Companies' value. (08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

**RESPONSE:** Undisputed.

**REPLY:** No reply is required.

313.    Kiesler testified that he "[d]o[es]n't know the definition of 'smart.'" (09/19/2023 M. Kiesler Dep. Tr. 229:23-230:7.)

**RESPONSE:** Disputed. In response to a question that asked Kiesler whether something was "smart," Defendants' counsel objected on the basis that the question was ambiguous and speculative; Kiesler answered to the best of his ability; and when Randall's counsel had the court reporter read

back the question, Kiesler's response clearly indicated that he did not know the meaning Randall's counsel's intended by the word "smart" in the context of the specific question. Kiesler Dep., Sept. 19, 2023, at 229:13-230:13.

**REPLY:** The dispute Defendants identify is immaterial and not genuine.


Dated this 20th day of November 2023.

*s/ David Palay*
Mark A. Cameli
WI State Bar ID No. 1012040
mcameli@reinhartlaw.com
David Palay
WI State Bar ID No. 1115862
dpalay@reinhartlaw.com
Elizabeth Elving
WI State Bar ID No. 1115903
eelving@reinhartlaw.com
Monica A. Mark
WI State Bar ID No. 1082428
mmark@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965

*Attorneys for Plaintiff*