IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

STACY L. RANDALL,

     Plaintiff,

v.

REED C. WIDEN, MICHAEL KIESLER,          Civil Action No. 22-cv-400
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

     Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL
STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

1.     [Pl.'s PFOF ¶ 10[1]] The Bylaws of Windy Waters, Inc. were adopted on January 1,

1998. (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936.)

**RESPONSE:** Undisputed.[2]

2.     [Pl.'s PFOF ¶ 11] Section 3.02 of Article 3 of the Bylaws of Windy Waters, Inc.

provides that "Directors shall be elected by the shareholders at each annual shareholders'

meeting . . . by a plurality of the votes cast by the shares entitled to vote …." (Palay Decl., ¶ 32,

Ex. 30, STAFFORD000936 at 942.)

**RESPONSE:** Undisputed.

3.     [Pl.'s PFOF ¶ 12] Section 3.03 of Article 3 of the Bylaws of Windy Waters, Inc.

---

[1] As Plaintiff noted in her filing (ECF No. 116), where the facts are duplicated from Plaintiff's Proposed Finding of Fact in support of her own motion (ECF No. 61), the paragraph begins with a bracketed indication that the fact is identical. In turn, Defendants' responses are mostly identical to the responses to Plaintiff's Proposed Findings of Fact (*see* ECF No. 110), *except* for corrected typos, providing additional information that was not previously in the record, and providing additional information relevant to responding to the fact in context of Defendants' motion for summary judgment.

[2] For all facts identified as undisputed in this document, Defendants intend that they are undisputed only for purposes of summary judgment, and do not waive any right to dispute the facts later in the case.

provides, in relevant part, that a "director[] shall hold office until the next annual shareholders' meeting and until his or her successor shall have been elected by the shareholders or until his or her prior death, resignation, or removal." (Palay Decl., ¶ 32, Ex. 30, STAFFORD000936 at 942.)

**RESPONSE:** Undisputed.

4.      [Pl.'s PFOF ¶ 16] Pursuant to an Equity Purchase Agreement dated August 17, 2021, Acquia acquired 100% of the stock of Widen Enterprises for a purchase price of $162 million. (Answer ¶¶ 148-149; Compl., Ex. C (filed under seal).)

**RESPONSE:** Undisputed.

5.      [Pl.'s PFOF ¶ 17] The purchase price of $162 million equates to ████████. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed.

6.      [Pl.'s PFOF ¶ 18] As of no later than 2008, Widen Enterprises was a Digital Asset Management (DAM) company. (09/21/2023 M. Gonnering Dep. Tr. 29:19-32:8; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906-7907.)

**RESPONSE:** Undisputed that Widen Enterprises did Digital Asset Management ("DAM") as of 2008; disputed that Widen Enterprises only did DAM as of 2008. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.1-2, ¶¶ 4-5.

7.      [Pl.'s PFOF ¶ 19] As of no later than 2008, Widen Enterprises was a Software as a Service (SaaS) company. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7963; 09/21/2023 M. Gonnering Dep. Tr. 21:24-22:10, 76:9-77:22; Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065.)

**RESPONSE:** Undisputed that Widen Enterprises did Software as a Service ("SaaS") as of 2008; disputed that Widen Enterprises only did SaaS as of 2008. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.1-2, ¶¶ 4-5.

8.     [Pl.'s PFOF ¶ 24] By April 10, 2020, Widen Enterprises' transformation into a Digital Asset Management / Software as a Service company was complete, and Widen Enterprises made plans to dismiss the remainder of its pre-media workforce in the coming months. (Palay Decl., ¶ 7, Ex. 5, WINDY0000946.)

**RESPONSE:** Disputed. By April 10, 2020, the transformation into a Digital Asset Management/Software as a Service company was not "complete." As of April 10, 2020, Widen Enterprises planned to depart the content production services market sometime between June and August, contingent on its receipt of PPP funding. The last official day for its content production service line was July 10, 2020. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.2 ¶¶ 4, 7, Exs. 2 (ECF No. 63-2, at 7984), 5 (ECF No. 63-5).

9.     [Pl.'s PFOF ¶ 25] At all relevant times, the shares of Windy Waters at issue in this matter were securities within the meaning of the federal securities laws and SEC Rule 10b-5. (Answer ¶¶ 200, 212.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

10.     [Pl.'s PFOF ¶ 26] At all relevant times, the shares of Windy Waters at issue in this matter were securities as defined by Wisconsin Statutes section 551.102(28). (Answer ¶ 238.)

**RESPONSE:** This paragraph sets forth a legal conclusion to which no response is required.

11.     [Pl.'s PFOF ¶ 27] Plaintiff Stacy L. Randall (Stacy) is a sixty-five-year-old resident of the State of Wisconsin. (Answer ¶ 14.)

**RESPONSE:** Undisputed.

12.     [Pl.'s PFOF ¶ 29] Stacy's highest level of formal education is high school. (09/28/2023 S. Randall Decl., p.1, ¶ 2.)

**RESPONSE:** Undisputed.

13.     [Pl.'s PFOF ¶ 30] During all relevant times, Stacy was not sophisticated regarding finance and business. (09/28/2023 S. Randall Decl., p.1, ¶ 3; 08/23/2023 R. Widen Dep. Tr. 177:20-178:4, 194:12-17.)

**RESPONSE:** Disputed. Stacy Randall is competent in business affairs. Kiesler Dep., Sept. 19, 2023, at 32:10-12.

14.     [Pl.'s PFOF ¶ 34] Reed is the majority shareholder, an officer, and a director of Windy Waters. (Answer ¶ 15.)

**RESPONSE:** Undisputed.

15.     [Pl.'s PFOF ¶ 36] As of May 2020, Reed was the majority and controlling shareholder of Windy Waters. (Answer ¶ 4.)

**RESPONSE:** Disputed that Reed was a "controlling shareholder"; otherwise, undisputed for purposes this motion. Reed (as trustee) was a voting shareholder, but its control is set out in its bylaws. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.5, ¶ 32, Ex. 30 (ECF No. 63-29); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.11, ¶ 94, Ex. H (ECF No. 67-5); Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp. 2, 6, ¶¶ 10, 37, Exs. A (ECF No. 74-1), D (ECF No. 74-4); Am Answer (ECF No. 45), ¶ 273.

16.     [Pl.'s PFOF ¶ 37] Immediately prior to Stacy's May 2020 redemption, Reed

owned approximately 55.463% of the outstanding stock of Windy Waters. (Palay Decl., ¶¶ 105-106, Exs. 97-98, STAFFORD000061 attaching STAFFORD000076; Palay Decl., ¶ 31, Ex. 29, STAFFORD000172.)

**RESPONSE:** Although 55.463% of Windy Waters' stock was owned by the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013, for purposes of this motion only, Defendants do not dispute that this resulted in Reed's ownership (as trustee) of 55.463% of Windy Waters' stock. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.14, ¶ 106, Ex. 98 (ECF No. 63-97).

17.   [Pl.'s PFOF ¶ 38] Reed served as Chairman of the Board of Widen Enterprises from in or around the late 1990s until in or around September 2021, and also unilaterally selected the board of directors of Widen Enterprises. (Answer ¶ 30; 08/23/2023 R. Widen Dep. Tr. 46:8-22; 09/21/2023 M. Gonnering Dep. Tr. 118:3-9; 09/19/2023 M. Kiesler Dep. Tr. 55:10-23.)

**RESPONSE:** Disputed that Reed unilaterally selected the Board of Directors of Widen Enterprises. Reed was elected the sole director of Widen Enterprises by its then-shareholders and directors. Reed created an external advisory board to advise him on various matters, but this advisory board did not engage in any corporate governance. Reed Decl., Nov. 10, 2023, p.2, ¶¶ 5, 8-10, Ex. C (WINDY0001702); Corp. Representative of Windy Waters, Inc. Dep. ("Windy Waters Dep."), Nov. 3, 2023, at 37:8-17. Otherwise, undisputed.

18.   [Pl.'s PFOF ¶ 39] As of May 13, 2020, Reed ran Windy Waters and Widen Enterprises (collectively, the Companies), along with Michael Kiesler, an officer of the Companies. (08/23/2023 R. Widen Dep. Tr. 44:24-45:13; Answer ¶¶ 4, 273.)

**RESPONSE:** Disputed. Regarding Windy Waters, as a holding company, there was

nothing to "run." Moreover, Stacy Randall was president of Windy Waters from approximately 2007 until May 13, 2020. Regarding Widen Enterprises, Matthew Gonnering was the CEO beginning in 2009, and Michael Kiesler was the CFO beginning in approximately 2000. Kiesler Dep., Sept. 19, 2023, at 40:22-41:7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.1-2, ¶¶ 6, 9; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A (ECF No. 1-6), B (ECF No. 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6); Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶ 6; Gonnering Dep., Sept. 21, 2023, at 27:16-21; Windy Waters Dep., Nov. 3, 2023, at 37:8-17.

19.     [Pl.'s PFOF ¶ 40] As of May 13, 2020, Reed was an officer and director of Widen Enterprises. (Answer ¶ 273.)

**RESPONSE:** Undisputed.

20.     [Pl.'s PFOF ¶ 41] As of May 13, 2020, Reed was in control of the Companies and "ultimately called the shots" at the Companies. (08/23/2023 R. Widen Dep. Tr. 16:2-3, 44:24-45:19; Answer ¶ 273; 09/19/2023 M. Kiesler Dep. Tr. 225:8-19; 09/21/2023 M. Gonnering Dep. Tr. 113:24-114:7, 117:16-118:9, 119:20-24, 120:20-122:12, 123:21-124:4.)

**RESPONSE:** Undisputed.

21.     [Pl.'s PFOF ¶ 44] Until in or around September 2021, Kiesler served as the Chief Financial Officer (CFO) of Widen Enterprises and the Treasurer of Windy Waters. (Answer ¶¶ 4, 16.)

**RESPONSE:** Disputed. Kiesler served as the CFO of Widen Enterprises until approximately November 24, 2021, and Kiesler is still the Treasurer of Windy Waters. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.1-2, ¶ 6; Kiesler Decl., Nov. 10, 2023, p.1, ¶ 4.

22.     [Pl.'s PFOF ¶ 46] In 2004, Reed received a "Personal & Confidential" appraisal of Windy Waters. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

**RESPONSE:** Undisputed.

23.     [Pl.'s PFOF ¶ 47] The 2004 appraisal explained that "[f]air market value" was defined as "The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts." (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

**RESPONSE:** Undisputed.

24.     [Pl.'s PFOF ¶ 48] Based on a weighted analysis of three separate approaches to calculating value, the 2004 appraisal estimated that Windy Waters' fair market value was approximately $7,441,000 as of April 30, 2004. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991 at 47996-97.)

**RESPONSE:** Undisputed that the 2004 Bruce Hutler Report estimated that "the fair market value of a marketable, majority interest in 100% of the equity" of Windy Waters was $7,441,000 as of April 30, 2004, under which the price-per-share for Class A stock was estimated at $367.54, and the price-per-share for Class B stock was estimated at $350.04; disputed that such values remained the same when considering non-marketable, minority shares. After accounting for the factors "an investor would consider relevant to establishing value," minority control and lack of marketability, the price-per-share for Class A stock decreased by $188.36, and the price-per-share for Class B stock decreased by $179.39. Hutler Decl., Sept. 29, 2023, (ECF No. 68) pp.2-3, ¶¶ 6-7, 12-13, Ex. 1 (ECF No. 68-1) at pp.1, 8.

25.     [Pl.'s PFOF ¶ 49] In 2004, Widen Enterprises had software revenue less than $1 million. (Palay Decl., ¶ 12, Ex. 10, ACQUIA0011046 at 11065.)

**RESPONSE:** Undisputed.

26.     [Pl.'s PFOF ¶ 50] By no later than December 1, 2014, the CEO of Widen Enterprises, Matthew Gonnering, had notified Reed and Kiesler that the "enterprise value" or "[m]arket value" of a Software as a Service company, such as Widen Enterprises, was based primarily on a multiple of such company's revenue. (Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl., ¶ 14, Ex. 12, WINDY0034382; 08/23/2023 R. Widen Dep. Tr. 48:18-22, 110:6-111:1.)

**RESPONSE:** Disputed. Gonnering's email does not say that a Software as a Service company's value "was based primarily on a multiple of such company's revenue." Rather, Gonnering's email simply notes that the value of such companies, on "average[,]" is a certain multiple of their revenue. Palay Decl., Sept. 29, 2023, (ECF No. 63), p.2. ¶ 13, Ex. 11 (ECF No. 63-10).

27.     [Pl.'s PFOF ¶ 52] On or around December 1, 2014, Gonnering wrote to Reed and Kiesler and another shareholder of Windy Waters regarding the valuation of Widen Enterprises. (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed that on or around December 1, 2014, Gonnering emailed Reed, Kiesler, and Gary Norris; disputed that Gonnering's email involved "the valuation of Widen Enterprises." Rather, Gonnering's email "provid[ed] a reference to an article from the Milwaukee business journal from Gartner" that was used as an "indication" to ensure Widen Enterprises was "in the right market," that "there's growth to be had," and that it was "making the right decisions to grow the business." Gonnering testified, "[t]hat doesn't mean that [was] the

company's market valuation . . . . I show the assumptions that I make, and the reason for these is to indicate that . . . we're playing in the right market." Gonnering Dep., Sept. 21, 2023, at 103:8-104:3, 182:17-184:11; Gonnering Decl., Nov. 10, 2023, p.1-2, ¶¶ 3-5.

28.     [Pl.'s PFOF ¶ 53] In that December 1, 2014 e-mail, Gonnering stated that ██████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ (Palay Decl., ¶ 13,  Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

29.     [Pl.'s PFOF ¶ 54] In that same December 1, 2014 e-mail, Gonnering stated that ███████████████████████████████████████████████████████████████████████████ █████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:**  The  December  1,  2014,  email  provides  that  "the  valuations  .  .  .  ." Otherwise undisputed, but immaterial.

30.     [Pl.'s PFOF ¶ 55] In that same December 1, 2014 e-mail, Gonnering stated that █████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

31.     [Pl.'s PFOF ¶ 56] In that same December 1, 2014 e-mail, Gonnering stated that █████████████████████████████████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

32.     [Pl.'s PFOF ¶ 57] In that same December 1, 2014 e-mail, Gonnering stated that

██████████████████████████████████████████████████████

████████████████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383.)

**RESPONSE:** Undisputed, but immaterial.

33.    [Pl.'s PFOF ¶ 58] In that same December 1, 2014 e-mail, Gonnering estimated

that Widen Enterprises' ███████████████████████████████████████████████

██████ (Palay Decl., ¶ 13, Ex. 11, WINDY0034383; 09/21/2023 M. Gonnering Dep. Tr. 183:3-

184:11.)

**RESPONSE:** Disputed that such language constituted, or was intended to constitute, an

estimate of an actual market value. Gonnering specifically testified that "[t]he way to

understand" the language quoted in paragraph 58 "is to say we're in the right market, there's

growth to be had, and this is [a] good indication of that." Gonnering further explained, "[t]hat

doesn't mean that [was] the company's market valuation . . . . I show the assumptions that I

make, and the reason for these is to indicate that . . . we're playing in the right market."

Gonnering Dep., Sept. 21, 2023, at 103:8-104:3, 182:17-184:11; Gonnering Decl., Nov. 10,

2023, p.1-2, ¶¶ 3-5. Otherwise, undisputed, but immaterial.

34.    [Pl.'s PFOF ¶ 60] On or around February 23, 2018, Gonnering communicated via

e-mail to Kiesler and Reed regarding Widen Enterprises' ████████████████ (Palay Decl., ¶ 17,

Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed that Gonnering sent an email to Kiesler and Reed on or around

February 23, 2018; disputed that such email involved "Widen Enterprises' █████████████████

Gonnering was reporting news in the industry, and applying various assumptions in the February

23, 2018, email. Applying these assumptions was "a guess and a pretend and a what if," not an

actual ████████████, which Gonnering is not qualified to make. Gonnering Dep., Sept. 21,

2023, at 103:8-104:3, 152:13-154:1, 154:20-157:11, 192:19-194:17; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶ 46; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.8, ¶ 73, Ex. D (ECF No. 75-6); Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 3-5.

35.     [Pl.'s PFOF ¶ 61] In that same February 23, 2018 correspondence, Gonnering stated to Reed and Kiesler that in the global Digital Asset Management market, Widen Enterprises was the ████████████████████████████████████████████ ████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed, but immaterial.

36.     [Pl.'s PFOF ¶ 62] In that same February 23, 2018 correspondence, Gonnering explained to Reed and Kiesler that Widen Enterprises had a ████████████ and had users ██ ████████████████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed, but immaterial.

37.     [Pl.'s PFOF ¶ 63] In that same February 23, 2018 correspondence, ███████████ ███████████████████████████████████████████████████████████████ ██████████████████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed, but immaterial.

38.     [Pl.'s PFOF ¶ 64] In that same February 23, 2018 communication, under the heading ██████████ Gonnering explained to Kiesler and Reed that ██████████████ ███████████████████████████████████████████████████████████████ ██████████████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Disputed in part. Gonnering did not say the valuation of WebDAM was *based on* a multiple of revenue, only that he guessed the valuation of WebDAM was *equal to* 3-4 times revenue. The omitted lead-in to the above-quoted language in Gonnering's email states

that, ███████████████████████████████████████ Gonnering "guessed" what WebDAM's annual recurring revenue was because he did not know that number, nor would it "be a known number" since companies do not publish those numbers. Accordingly, Gonnering "guessed [WebDAM's] revenue" and then "applied a multiplier to that [guessed] number." Palay Decl., Sept. 29, 2023, (ECF No. 63) p.3, ¶ 17, Ex. 15 (ECF No. 63-14); Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 155:2-157:11; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 3-5. Otherwise, undisputed.

39.    [Pl.'s PFOF ¶ 65] In that same February 23, 2018 communication, Gonnering stated to Reed and Kiesler that ████████████████████████████████ ███████████████████████ (Palay Decl., ¶ 17, Ex. 15, WINDY0034048.)

**RESPONSE:** Undisputed, but immaterial.

40.    [Pl.'s PFOF ¶ 66] If the 3.5x revenue multiple Gonnering used was applied to the trailing-twelve-month subscription revenue of ██████████ for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen on an enterprise basis would be ██████████ (Palay Decl., ¶ 18, Ex. 16, WINDY0015630.)

**RESPONSE:** Disputed. There is no support for the fair market value of a company being equal to the simple math equation of 3.5 times revenue. The cited email states only that based on Gonnering's "guess" of WebDAM's unknown annual recurring revenue, the company sold for 3.5 times that revenue. Applying these assumptions is "a guess and a pretend and a what if." It was not a valuation. Gonnering is not an economist or accountant or otherwise an expert in valuation. Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11, 192:19-194:17; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 4-5.

41.    [Pl.'s PFOF ¶ 67] On August 10, 2018, Gonnering provided to Kiesler and Reed

Gonnering's estimation of the value of Widen Enterprises when Gonnering estimated what a minority stake in Widen Enterprises is worth, writing to Reed and Kiesler, "█████████ ███████████████████████████████████████████████████████████ █████ . . . ." (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Disputed. Gonnering did not "estimate[] what a minority stake in Widen Enterprises is worth." The omitted language from the end of the sentence quoted in paragraph 67, that Gonnering testified was "the real part of the conversation," provides, █████████ ███████████████████████████████████ The purpose was to explain a hypothetical capital infusion, not estimate the value of a minority interest in a company, which Gonnering is not qualified to do. Gonnering is not an economist or accountant or otherwise an expert in valuation. Gonnering's guessing is apparent by the fact that a 10% minority stake would not be worth 10% of the value of a company, given the discounts that would apply for lack of control and lack of marketability. Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11, 192:19-194:17, 202:2-203:13; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶ 46; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.8, ¶ 73, Ex. E (ECF No. 75-7); Hutler Decl., Sept. 29, 2023, (ECF No. 68), p.3, ¶ 12; Gonnering Decl., Nov. 10, 2023, pp.1-2, ¶¶ 4-5.

42.    [Pl.'s PFOF ¶ 68] On August 10, 2018, Gonnering sent Kiesler and Reed a written communication that stated that Gonnering had responded to an inquiry from a private equity firm called Five Elms Capital "to listen." (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

43.    [Pl.'s PFOF ¶ 69] Gonnering stated in that same August 10, 2018 correspondence that Five Elms Capital █████████████████████████████████████████████ █████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

44.     [Pl.'s PFOF ¶ 70] Gonnering stated in that same August 10, 2018 correspondence that Five Elms Capital ██████████████████████████████ (Palay Decl., 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

45.     [Pl.'s PFOF ¶ 71] Gonnering stated in that same August 10, 2018 correspondence that ████████████████████████████████████████ ██████ of the potential minority investment. (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

46.     [Pl.'s PFOF ¶ 72] Gonnering stated in that same August 10, 2018 correspondence that ████████████████████████████████████████ ████████████████████████████████ (Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

47.     Applying Gonnering's August 2018 metric of 4x recurring revenue to the trailing-twelve-month subscription revenue for Widen Enterprises as of April 30, 2020, the estimated fair market value of Widen Enterprise on an enterprise basis would be approximately ██████ (Palay Decl., ¶ 18, Ex. 16, WINDY0015630; Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Disputed. There is no support for the fair market value of a company being equal to the simple math equation of 4 times recurring revenue. Gonnering's August 2018 email referencing ████████████████ was used "as a place holder" and was based on the guess that ████████████████████████████████. Gonnering did not say ██ ████████████████████████████████████████████

████████████████████████████ The purpose was to ████████████████

████, not estimate the value of the company, which Gonnering is not qualified to do. A true

fair market value calculation as of August 2018 requires expert testimony. Gonnering is not an

economist or accountant or otherwise an expert in valuation. Palay Decl., (ECF No. 63) p.3, ¶ 17,

Ex. 15 (ECF No. 63-14); Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11,

192:19-194:17, 202:16-23; Gonnering Decl., Nov. 10, 2023, p.2, ¶¶ 4-5.

48.     [Pl.'s PFOF ¶ 75] Kiesler testified that he did not read the Operational

Update e-mail memoranda that Gonnering sent to Reed and copied Kiesler on containing

Gonnering's ████████████ estimates of Widen Enterprises' market value, and that he

"very rarely read" Gonnering's operational update reports, "if ever," because Kiesler "was living

in the moment." (09/19/2023 M. Kiesler Dep. Tr. 152:17-154:16, 156:16-158:21, 159:14-25,

161:16-164:11.)

**RESPONSE:** Disputed that Gonnering's operational update contained ████████████

████████████ of Widen Enterprises' market value."  Applying these assumptions was "a

guess and a pretend and a what if," not an actual market valuation. To arrive at those numbers,

Gonnering assumed multipliers of ████████████ based on his "guess" of ████████

████████████, "which is to say pretend these things, and . . . if those are the

assumptions, this is the result." Neither of these emails was a market valuation of the company,

which Gonnering is not qualified to do. A true fair market value calculation as of August 2018

requires expert testimony. Gonnering is not an economist or accountant or otherwise an expert in

valuation. Gonnering Dep., Sept. 21, 2023, at 152:13-154:1, 154:20-157:11, 192:19-194:17,

202:2-203:13; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.6, ¶ 46; Reed Decl., Sept. 29,

2023, (ECF No. 67) pp.8-9 ¶ 73, Exs. D (ECF No. 75-6), E (ECF No. 75-7); Gonnering Decl.,

Nov. 10, 2023, p.2, ¶ 5. Otherwise, undisputed and immaterial.

49.     [Pl.'s PFOF ¶ 76] In February 2020, Justin Randall, Reed's nephew and Stacy's son, visited Reed at Reed's home in Arizona. (09/29/2023 J. Randall Decl., p.1, ¶ 2.)

**RESPONSE:** Undisputed and immaterial.

50.     [Pl.'s PFOF ¶ 77] During Justin's February 2020 visit, Reed told Justin that the Companies regularly received solicitations to sell Widen Enterprises. (09/29/2023 J. Randall Decl., p.1, ¶ 3.)

**RESPONSE:** Undisputed and immaterial.

51.     [Pl.'s PFOF ¶ 78] During Justin's February 2020 visit, Reed told Justin that Reed was considering a sale of Widen Enterprises because Reed could sell the company for around $80 million. (09/29/2023 J. Randall Decl., p.1, ¶ 4.)

**RESPONSE:** Disputed. Reed did not tell Justin he was considering selling Widen Enterprises, as Reed was not interested in selling Widen Enterprises prior in February 2020. Not only was Reed not interested in selling Widen Enterprises at that time, but such a statement "would have sounded like [Reed] was conceded [sic] or bragging, and [he] wouldn't have done that." Reed Dep., Aug. 23, 2023, at 97:18-21, 30:20-31:5, 127:15-16, 128:8-15, 132:7-19, 133:1-10, 133:21-134:11, 164:25-165:20, 168:9-16; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.9, ¶¶ 74-78; Reed Decl., Nov. 10, 2023, p.4, ¶ 26; Justin Randall Dep. ("Justin Dep."), Oct. 25, 2023, at 35:12-20, 43:4-7, 118:2-121:7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.21, ¶¶ 163-67; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.6-7, ¶¶ 47-50.

52.     [Pl.'s PFOF ¶ 84] Reed testified that, as of around April 2020, Reed ███ received solicitations from people looking to buy Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 120:1-20.)

**RESPONSE:** Undisputed and immaterial.

53.    [Pl.'s PFOF ¶ 85] On May 8, 2020, Gonnering e-mailed Reed and Kiesler, projecting that Widen Enterprises' ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ (Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

**RESPONSE:** Undisputed and immaterial, particularly given that this projection was lowered compared to projections pre-COVID. *See* Reed Dep., Aug. 23, 2023, at 136:23-137:14; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 24, Ex. B (ECF No. 75-1); Palay Decl., Sept. 29, 2023, (ECF No. 63) p.3 ¶ 21, Ex. 19 (ECF No. 63-18).

54.    [Pl.'s PFOF ¶ 92] Kiesler testified that he did not know the fair market value of Widen Enterprises on May 13, 2020, that he did not do anything to investigate what Widen Enterprises' fair market value was in connection with Stacy's May 2020 redemption, and that it ████████████████████ whether any other information was relevant to the value of Stacy's shares because he was applying the EBITDA formula. (09/19/2023 M. Kiesler Dep. Tr. 74:5-15, 77:23-78:17, 219:20-220:1.)

**RESPONSE:** Undisputed.

55.    [Pl.'s PFOF ¶ 93] When Defendants marketed Widen Enterprises to potential acquirers, they repeatedly included the company's recurring revenue and Annual Recurring Revenue (ARR) in their promotional materials. (Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7906, 7917, 7958, 7982, 7985; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (Palay Decl., ¶ 28, Ex. 26) (duplicate of Palay Decl., ¶ 4, Ex. 2, WINDY0007901).)

**RESPONSE:** Disputed. Defendants did not market Widen Enterprises. Rather, SEG acted as a sales broker to market Widen Enterprises and solicit possible buyers with a goal of obtaining as high a price as possible. Defendants did not "include[]" anything in the materials cited in paragraph 93 because Defendants did not create the materials. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167; Gonnering Decl., Nov. 10, 2023, pp.2-3, ¶ 12.

56.    [Pl.'s PFOF ¶ 94] On October 16, 2019, Gonnering messaged Kiesler:



(Palay Decl., ¶ 29, Ex. 27, WINDY0047426 at 47427.)

**RESPONSE:** Undisputed and immaterial.

57.    [Pl.'s PFOF ¶ 95] "Gary" referred to Gary Norris, a longtime employee of Widen Enterprises who oversaw software development. (09/19/2023 M. Kiesler Dep. Tr. 26:10-27:8.)

**RESPONSE:** Undisputed.

58.    [Pl.'s PFOF ¶ 96] About one month later, on November 22, 2019, Gonnering e-mailed Reed and copied Kiesler on the e-mail, explaining that Norris, a shareholder of Windy Waters, had ███████████████████████ (Palay Decl., ¶ 30, Ex. 28, WINDY0033900; Palay Decl., ¶ 31, Ex. 29, STAFFORD000172.)

**RESPONSE:** Undisputed and immaterial.

59.    [Pl.'s PFOF ¶ 97] In that same November 22, 2019 correspondence, Gonnering wrote that he told the shareholder that the shareholder ████████████████ about the

request to purchase additional shares of Windy Waters with Reed. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed and immaterial.

60.  [Pl.'s PFOF ¶ 98] In that same November 22, 2019 correspondence, Gonnering wrote that ████████████████████████████████████████ ████████ (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed and immaterial.

61.  [Pl.'s PFOF ¶ 99] In that same November 22, 2019 correspondence, Gonnering explained to Reed and Kiesler that ████████████████████ ████████████████████████████████████████ ██████████████████████████ (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed.

62.  [Pl.'s PFOF ¶ 100] In that same November 22, 2019 correspondence, Gonnering told Reed that Widen Enterprises was projecting to finish 2019 with software revenue of ████████ and total revenue of ████████, representing ████████ from the prior year. (Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed and immaterial.

63.  [Pl.'s PFOF ¶ 101] As of May 13, 2020, Reed had not permitted the requesting shareholder to purchase more shares. (Palay Decl., ¶ 31, Ex. 29, STAFFORD000172 at 173.)

**RESPONSE:** Disputed and immaterial. Gary Norris never asked Reed to purchase additional shares after November 22, 2019. Reed Decl., Nov. 10, 2023, p.4, ¶ 25.

64.     [Pl.'s PFOF ¶ 102] Stacy was one of the "specific shareholders" to whom Gonnering was referring. (09/21/2023 M. Gonnering Dep. Tr. 164:8-165:1.)

**RESPONSE:** Undisputed that Stacy was a "specific shareholder" that was "part of that passive shareholder group" to whom Gonnering was referring regarding "buy[ing] passive shareholders back." Gonnering Dep., Sept. 21, 2023, at 164:4-165:1.

65.     [Pl.'s PFOF ¶ 103] In the three-and-a-half years prior to Gonnering's advice that he and Reed ████████████████████████████ only Stacy had engaged in such a buyback. (Palay Decl., ¶ 31, Ex. 29, STAFFORD000172 at 173; Palay Decl., ¶ 33, Ex. 31, WINDY0033899.)

**RESPONSE:** Disputed. Pursuant to Stock Redemption Agreements dated May 12, 2016, Brian Becker and Terry Vial each sold stock back to the corporation, and Gonnering shared his advice within three-and-a-half years of those transactions. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.12, ¶¶ 82-86, Exs. N (ECF No. 75-19), O (ECF No. 75-20); Gonnering Dep., Sept. 21, 2023, at 164:4-165:11.

66.     [Pl.'s PFOF ¶ 104] Gonnering had advised Reed to buy out Stacy and other passive shareholders of the Companies because Gonnering learned in business school that having passive shareholders was suboptimal and because he wanted "all hands on deck." (09/21/2023 M. Gonnering Dep. Tr. 158:16-162:5, 166:6-169:25.)

**RESPONSE:** Disputed. Gonnering did not advise Reed on buying out passive shareholders solely for those reasons. Gonnering testified that: "active shareholders were important to running a small business with growth desires"; passive shareholders "weren't engaged"; "engaged people in the organization" would help the company to "grow faster"; and each time Stacy sought to redeem her shares, it was "a distraction" for leaders such as Kiesler

who had significant operational responsibilities. Gonnering Dep., Sept. 21, 2023, at 161:13-15, 161:22, 166:16-20, 167:12-168:15; Gonnering Decl., Sept. 29, 2023, (ECF No. 69), p.6, ¶¶ 41-43; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶¶ 52-53; Kiesler Dep., Sept. 19, 2023, at 168:1-10; Kiesler Decl., Nov. 10, 2023, p.3, ¶ 12, Ex. D (WINDY0056317).

67.     [Pl.'s PFOF ¶ 105] In 2019 Reed was █████████████████████ of Widen Enterprises. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.)

**RESPONSE:** Disputed. As Widen Enterprises' president, Reed oversaw operations at the company. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Grant Thornton's understanding to the contrary was wrong. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 264:4-265:14, 267:7-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Corporate Rep. of Widen Enterprises, LLC Dep. ("Widen Enterprises Dep."), Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

68.     [Pl.'s PFOF ¶ 106] In 2020 Reed was █████████████████████ of Widen Enterprises. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; 09/19/2023 M. Kiesler Dep. Tr. 82:11-83:21.)

**RESPONSE:** Disputed. As Widen Enterprises' president, Reed oversaw operations at the company. He was involved with strategic planning, budgeting, and tactical decisions; he oversaw

and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Grant Thornton's understanding to the contrary was wrong. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 264:4-265:14, 267:7-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

69.    [Pl.'s PFOF ¶ 107] During 2019 and 2020, Gonnering ran the day-to-day operations at Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 202:17-204:10.)

**RESPONSE:** Undisputed.

70.    [Pl.'s PFOF ¶ 108] Reed testified that during those years he visited the Companies' offices every few weeks, or sometimes every few months, and he spent around 6 months per year in Arizona or the family cottage. (08/23/2023 R. Widen Dep. Tr. 207:15-20, 209:9-23.)

**RESPONSE:** Disputed. Reed testified that he would go to the office "[s]ometimes weekly, sometimes monthly," and further that he spent "[t]hree months maybe" in Arizona," and "about three months" at the family cottage, but that his time at the cottage was not "not all at once . . . . [He] was back and forth." Reed Dep., Aug. 23, 2023, at 207:15-20, 209:9-25.

71.    [Pl.'s PFOF ¶ 109] Reed testified that he was constantly thinking and strategizing about the Companies, but he could not identify any work he performed, other than meeting with Gonnering. (08/23/2023 R. Widen Dep. Tr. 207:25-209:8.)

**RESPONSE:** Undisputed that Reed testified he was constantly thinking and strategizing

about the companies; disputed that Reed "could not identify the work he performed, other than meeting with Gonnering." Reed testified that he worked "[o]n a daily basis" and that "[m]eeting with [Gonnering] was another part." After Reed answered that the scope of his work included strategic planning and meeting with Gonnering, he was not asked a follow-up question regarding his scope of work aside from the non-exhaustive examples he provided. He would have been able to identify other work. Reed Dep., Aug. 23, 2023, at 45:6-11, 207:25-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-121:18, 122:13-23, 264:4-265:14, 267:7-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24.

72.     [Pl.'s PFOF ¶ 110] Reed was unable to explain what the Companies' software did or how it worked. (08/23/2023 R. Widen Dep. Tr. 62:14-25.)

**RESPONSE:** Disputed. Reed explained the companies' software to the best of his ability as a non-computer programmer, and acknowledged his limitations, stating, "[i]t's hard. [W]e would listen to customers, and we built products, code. There were templates for automation, those types of things." Reed Dep., Aug. 23, 2023, at 62:14-25.

73.     [Pl.'s PFOF ¶ 111] For 2019 and 2020, Reed set his own compensation for his roles at Widen Enterprises "by considering [his] individual performance, the company's performance, and the market conditions." (08/23/2023 R. Widen Dep. Tr. 46:23-25; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 09/21/2023 M. Gonnering Dep. Tr. 123:21-124:6.)

**RESPONSE:** Undisputed.

74.     [Pl.'s PFOF ¶ 112] Reed testified that his "individual performance" was based

entirely on "the company's performance." (08/23/2023 R. Widen Dep. Tr. 47:1-17, 48:12-17.)

**RESPONSE:** Disputed. Reed testified that his individual performance was measured by the company's performance because, "how else would [he] measure [his individual performance]" other than "how well the company was doing," since "[t]he company's performance is . . . . measured" by its financial performance. If the company's financial performance was strong, Reed knew he was doing his job well. Reed Dep., Aug. 23, 2023, at 47:1-24.

75.     [Pl.'s PFOF ¶ 113] Reed determined the company's performance based on how it was doing financially, mainly measured by its revenues. (08/23/2023 R. Widen Dep. Tr. 47:19-48:3, 50:11-14, 51:1-4.)

**RESPONSE:** Undisputed.

76.     [Pl.'s PFOF ¶ 114] Reed's testimony established that there was no process for determining his compensation, and that he "just" thought of "my effort and how well the company was doing," and "picked a number." (08/23/2023 R. Widen Dep. Tr. 61:19-62:8.)

**RESPONSE:** Disputed. The process Reed used to determine his compensation was based on a mix of his individual performance, the company's performance, and market conditions. Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 2, Ex. A (ECF No. 70-1: Defs.' Objections and Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 7; Reed Dep., Aug. 23, 2023, at 46:23-47:4, 55:13-56:7, 195:5.

77.     [Pl.'s PFOF ¶ 115] Reed could not say what was meant by the "market conditions" that Defendants claim he considered. (08/23/2023 R. Widen Dep. Tr. 58:17-20, 61:8-13.)

**RESPONSE:** Disputed. Reed's consultation with Widen Enterprises' advisors at Baker

Tilly informed him whether his income was consistent with the market conditions for companies the size of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 55:13-56:7, 195:5.

78.      [Pl.'s PFOF ¶ 116] Reed testified that in 2019 and 2020 he was paid bi-weekly. (08/23/2023 R. Widen Dep. Tr. 200:2-13.)

**RESPONSE:** Undisputed.

79.      [Pl.'s PFOF ¶ 117] In 2019, Reed determined that his total compensation would be ██████, made up of ██████ of ██████ and ██████ of ██████ and, in 2018, ██████ total compensation. (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed.

80.      [Pl.'s PFOF ¶ 118] In 2020, Reed determined that his total compensation would be ██████, made up of ██████ of ██████ and ██████ of ██████ (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed.

81.      A 2019-2020 survey published by Chief Executive Research of 1,668 companies about their 2018 and expected 2019 compensation levels, reported that:

> Consistent with prior years, most Chairmen (who are not also the CEO) in our survey received relatively low compensation. In fact, their median base salary was $50,000 in 2018. The majority of Chairmen in private companies don't work full time in their companies but own substantial equity positions; therefore, many forego cash compensation and prefer to take owner's dividends.

(Suppl. Palay Decl. ¶ 4, Ex. 2 at 6.)

**RESPONSE:** Disputed and inadmissible. The proposed fact requires an expert opinion

and is not supported by admissible evidence.

82.     The same Chief Executive Research survey reported that the median total compensation for a Chairman for 2018 was $72,000. (Suppl. Palay Decl. ¶ 4, Ex. 2 at 7.)

**RESPONSE:** Disputed and inadmissible. The proposed fact requires an expert opinion and is not supported by admissible evidence.

83.     The same Chief Executive Research survey reported that, for a President, the median total compensation for 2018 was $287,000, and $359,000 for a Chairman and President. (Suppl. Palay Decl. ¶ 4, Ex. 2 at 7.)

**RESPONSE:** Disputed and inadmissible. The proposed fact requires an expert opinion and is not supported by admissible evidence.

84.     [Pl.'s PFOF ¶ 119] In 2019, Reed determined that Gonnering's total compensation would be $495,244, made up of $454,105 of "Salary" and $41,139 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11.)

**RESPONSE:** Undisputed.

85.     [Pl.'s PFOF ¶ 120] In 2020, Reed determined that Gonnering's total compensation would be $1,085,536, made up of $471,448 of "Salary" and $614,087 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 45:9-11.)

**RESPONSE:** Undisputed.

86.     The Chief Executive Research survey found that, for a company of Widen

Enterprises' size ████████████████████████████████████ the median CEO salary was $358,500. (Suppl. Palay Decl. ¶ 4, Ex. 2 at 3.)

**RESPONSE:** Disputed and inadmissible. The proposed fact requires an expert opinion and is not supported by admissible evidence.

87.    [Pl.'s PFOF ¶ 121] In 2019, Gonnering determined that Kiesler's total compensation would be $249,160, made up of $219,693 of "Salary" and $29,468 of "Bonus." (Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7; 08/23/2023 R. Widen Dep. Tr. 60:20-61:4.)

**RESPONSE:** Undisputed.

88.    [Pl.'s PFOF ¶ 123] On April 12, 2019, Kiesler messaged Gonnering that ████ ████████████████████████████████████████████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

89.    [Pl.'s PFOF ¶ 124] Gonnering asked whether the payment would need to be ████████████████████ to which Kiesler responded that it would. (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

90.    [Pl.'s PFOF ¶ 125] Gonnering asked, "██████████████████████████ ████████████████ Kiesler responded that he was ████████████████████ ████████████████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

91.    [Pl.'s PFOF ¶ 126] Gonnering clarified that ████████████████████████

███████ (Palay Decl., ¶ 36, Ex. 34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

92.    [Pl.'s PFOF ¶ 127] Kiesler responded that such a dividend ███████

███████ which would be a ███████ (Palay Decl., ¶ 36, Ex.

34, WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

93.    [Pl.'s PFOF ¶ 128] Gonnering then told Kiesler to go with "Plan A," i.e., ███████

███████ from Widen Enterprises. (Palay Decl., ¶ 36, Ex. 34,

WINDY0047424 at 47425.)

**RESPONSE:** Undisputed.

94.    [Pl.'s PFOF ¶ 129] Reed testified consistent with the above-described texting

conversation: When asked how he determined that he should receive a bonus of

approximately ███████ in 2019, Reed testified that this was based on his need to pay a tax

obligation stemming from Windy Waters' pass-through taxation status. (08/23/2023 R. Widen

Dep. Tr. 203:22-204-10, 210:25-211:21.)

**RESPONSE:** Disputed. Reed testified he "assume[d]," when showed some figures that

the money referenced was payment for taxes, but didn't remember. His actual tax liability in

2019 was only $30,000. Moreover, Windy Waters had made quarterly tax distributions intended

to cover tax liability stemming from Windy Waters to Reed and all other shareholders. Reed

Dep., Aug. 23, 2023, at 203:22-204:3, 211:2-5; Reed Decl., Nov. 10, 2023, p.5, ¶ 31 Ex. N;

Kiesler Decl., Nov. 10, 2023, p.2, ¶ 8; Windy Waters Dep., Nov. 3, 2023, at 185:25-187:2,

187:21-188:9, 190:9-191:1; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 10, Ex. I (Ex. 19 to Windy

Waters Dep.).

95.     [Pl.'s PFOF ¶ 130] Reed acknowledged that the other shareholders had similar tax obligations but that none received a similar bonus. (08/23/2023 R. Widen Dep. Tr. 210:25-211:21.)

**RESPONSE:** Disputed. Not only is "similar tax obligations" ambiguous, Reed testified that he was "not sure what [Randall's] tax liability was." Reed Dep., Aug. 23, 2023, at 210:12-13.

96.     [Pl.'s PFOF ¶ 131] In 2021, in preparing to market itself to potential acquirers, Widen Enterprises hired Grant Thornton LLP, a national accounting firm, to perform a "Quality of [E]arnings" study on Widen Enterprises. (08/23/2023 R. Widen Dep. Tr. 194:24-195:3; Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4132, 4140.)

**RESPONSE:** Disputed that Widen Enterprises "market[ed] itself." SEG acted as a sales broker to market Widen Enterprises and solicit possible buyers with a goal of obtaining as high a price as possible. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3); Gonnering Dep., Sept. 21, 2023, at 72:6-21; Compl. (ECF No. 1), ¶ 167, Ex. E (ECF No. 5); Am. Answer (ECF No. 45), ¶ 167. Otherwise, undisputed.

97.     [Pl.'s PFOF ¶ 132] Grant Thornton ██████████ Widen Enterprises' EBITDA to add back all of Reed's salary, bonus, and fringe benefits for 2019 and 2020 based on its stated understanding that Reed's roles as ████████████████████████ ████████████████████████████ in 2019 and 2020, and that Reed was ████████████ ██████████████████ of Widen Enterprises in 2019 or 2020. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142.)

**RESPONSE:** Disputed. As Widen Enterprises' president, Reed oversaw operations at the company. He was actively involved with strategic planning, budgeting, and tactical decisions; he

oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. The purpose of the EBITDA adjustment to back out two key employees' compensation was to allow potential buyers to have a clearer metric of profit by removing those expenses that would not exist following the sale, "given these . . . roles that are not going to be a part of the transaction." Reed was essential to Widen Enterprises, but his role would be absorbed within the existing organizational structure of any potential buyer. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-122:23, 258:12-24, 261:2-265:14, 267:13-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24, 112:4-115:2.

98.     In February 2021, Widen Enterprises retained Grant Thornton LLP to perform a Quality of Earnings study on its finances. (Palay Decl. Ex. 32 at SEG_00004132.)

**RESPONSE:** Undisputed.

99.     In the Quality of Earnings study that Widen Enterprises commissioned, Grant Thornton ▮▮▮▮ Gonnering's salary ▮▮▮ to ▮▮▮▮ annually, which Grant Thornton ▮▮▮▮▮▮ (Palay Decl. Ex. 32 at SEG_00004142.)

**RESPONSE:** Disputed, immaterial, and inadmissible. The cited source is inadmissible, as neither Defendants nor Randall created or prepared the source and thus do not have personal knowledge of the specific calculations Grant Thornton performed therein. Gonnering Decl., Nov. 10, 2023, (ECF No. 107) p.2, ¶ 11.

100.    In the Quality of Earnings study that Widen Enterprises commissioned, Grant Thornton ███████ Widen Enterprises EBITDA to add back the entirety of Reed's compensation for 2019 and 2020 in part because his role was ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ (09/29/2023 Palay Decl. Ex. 32 at SEG_00004142.)

**RESPONSE:** Disputed, immaterial, and inadmissible. The cited source is inadmissible, as neither Defendants nor Randall created or prepared the source and thus do not have personal knowledge of the specific calculations Grant Thornton performed therein. Gonnering Decl., Nov. 10, 2023, (ECF No. 107) p.2, ¶ 11. Further, although Reed's role would be absorbed within the existing organizational structure of any potential buyer, Reed, as Widen Enterprises' president, was essential. Reed oversaw operations at the company. He was actively involved with strategic planning, budgeting, and tactical decisions; he oversaw and coached Gonnering and held him accountable for the results of his work; he developed and maintained key relationships with bankers, tax advisors, and customers; he managed personnel as needed; and he made compensation and bonus decisions for key employees of Widen Enterprises. Reed Dep., Aug. 23, 2023, at 45:6-11, 208:10-209:8, 208:10-209:8; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.2, ¶ 12; Gonnering Dep., Sept. 21, 2023, at 120:20-122:23, 258:12-24, 261:2-265:14, 267:13-268:16; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.2, ¶¶ 6-7; Kiesler Dep., Sept. 19, 2023, at 260:12-17; Widen Enterprises Dep., Nov. 6, 2023, at 87:18-21, 89:17-21, 96:1-25, 97:21-24, 112:4-115:2.

101.    [Pl.'s PFOF ¶ 133] Reed and Kiesler testified that the information provided to Grant Thornton was accurate. (08/23/2023 R. Widen Dep. Tr. 196:1-3; 09/19/2023 M. Kiesler Dep. Tr. 82:1-7.)

**RESPONSE:** Undisputed.

102.    [Pl.'s PFOF ¶ 134] Grant Thornton adjusted Widen Enterprises' EBITDA to add back Reed's compensation, which adjusted EBITDA was then used in the Confidential Information Memorandum to market Widen Enterprises to potential acquirers. (Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142; Palay Decl., ¶ 4, Ex. 2, WINDY0007901 at 7988; Palay Decl., ¶ 27, Ex. 25, ACQUIA0006832 attaching ACQUIA0006834 (09/29/2023 Palay Decl., ¶ 28, Ex. 26).)

**RESPONSE:** Disputed, immaterial, and inadmissible. The cited sources do not support the proposed facts, nor are the cited sources admissible, as neither Defendants nor Randall created the sources and thus do not have personal knowledge of the specific calculations Grant Thornton performed therein. Gonnering Decl., Nov. 10, 2023, p.2, ¶ 11.

103.    [Pl.'s PFOF ¶ 135] On June 3, 2020, a few weeks after the May 2020 redemption discussed below, Kiesler contacted a tax partner at Baker Tilly, Widen Enterprises' accounting firm, to ask, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████    (08/23/2023 R. Widen Dep. Tr. 195:5; Palay Decl., ¶ 37, Ex. 35, WINDY0044692.)

**RESPONSE:** Disputed to the extent this arrangement of the quotations distorts the meaning of the email. The email states, in full, ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████    Palay Decl., Sept. 29, 2023, (ECF No. 63), p.5, ¶ 37 Ex. 35 (ECF No. 63-34).

104.    [Pl.'s PFOF ¶ 136] On July 3, 2020, approximately six weeks after the May 13, 2020 redemption discussed below, Gonnering explained to Reed and Kiesler that Gonnering and Kiesler ███████████████████████████████████ for the owners of Windy Waters. (Palay Decl., ¶ 38, Ex. 36, WINDY0044312.)

**RESPONSE:** Undisputed and immaterial.

105.    [Pl.'s PFOF ¶ 141] On May 7, 2007, the shareholder agreement for Windy Waters was amended to include a formula for calculating the "Fair Market Value per share" of Windy Waters stock for purposes of determining the price that shareholders were paid in situations where the company redeemed their shares in a <u>non-voluntary</u> redemption, such as a shareholder's death or permanent disability. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18, Palay Decl., ¶ 3, Ex. 1, STAFFORD001299; Palay Decl., ¶ 42, Ex. 40, STAFFORD001285.)

**RESPONSE:** Undisputed.

106.    One purpose for establishing the Stock Price Formula (as Defendants refer to it) was "for the determination of the fair market value of the stock," and "for determining the fair market value of the Stock." (ECF No. 74-4, Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement) at WINDY0001341.)

**RESPONSE:** Undisputed that those are quotes from the Stock Price Formula in the May 7, 2007 Second Amendment to Shareholder Agreement of Windy Waters, where "Fair Market Value per share shall be *defined to equal* the value of the Corporation, as determined by the Corporation using *the formula described on Exhibit C* attached hereto . . . divided by the total number of all shares of stock." Disputed that the purpose of the formula was to determine a precise fair market value of stock. The formula in the Second Amendment, originally initially

33

called the "Base Price per Share Calculation," was created by Baker Tilly, who explained that the formula was a fair way to approximate a price in the ballpark of fair market value, and would eliminate the need to obtain a formal valuation each time a stock transaction was requested. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, ¶ 37, Ex. D (ECF No. 74-4); Kiesler Decl., Nov. 10, 2023, (ECF No. 105) p.5, ¶¶ 19-22, Ex. K, at WINDY0056429, WINDY0056443, WINDY0056457, WINDY0056471, WINDY0056487; DeNoyer Decl., Nov. 10, 2023, (ECF No. 112) p.2, ¶ 5.

107.    The Second Amendment to the Windy Waters shareholder agreement states, "The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions." (ECF No. 74-4, Kiesler Decl., Sept. 29, 2023, p.6, ¶ 37, Ex. D (Second Amendment to Shareholder Agreement) at WINDY0001341.)

**RESPONSE:** Undisputed.

108.    [Pl.'s PFOF ¶ 142] Stacy does not recognize the signature above her name on the May 7, 2007 Second Amendment to Shareholder Agreement as her signature. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291; 09/28/2023 S. Randall Decl., p.1, ¶ 4.)

**RESPONSE:** Disputed. The Second Amendment contains Randall's signature, signed both as then-President of Windy Waters and separately as a shareholder. She admits she signed it. *See* Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 43. The signature on this document looks just like other signatures confirmed to be hers. Randall Dep., Aug. 28, 2023, at 175:7-24, 209:25-210:5, 212:21-213:16; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.6, 8-10, ¶¶ 37, 52, 60, 66, Exs. D (ECF No. 74-4), F (ECF No. 75-11), H (ECF No. 75-13), I (ECF No. 75-14); Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶¶ 5, 7, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. Nos. 24, 40, 48; Steven

Randall Dep. ("Steven Dep."), Oct. 12, 2023, at 11:19-12:23, 17:16-18:4, 18:20-19:15, 81:19-85:4, 85:9-87:6; Steven Dep., Nov. 6, 2023, at 230:1-232:10; Wittenberg Decl., Nov. 10, 2023, pp.1-2, ¶¶ 2-7, Exs. A (Ex. 1 to Steven Dep.), B (Ex. 3 to Steven Dep.), C (Ex. 5 to Randall Dep.), D (Ex. 6 to Steven Dep.), E (Ex. 7 to Steven Dep.), F (Ex. 8 to Steven Dep.); Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6); Seid Dep., Aug. 17, 2023, at 40:22-41:2.

109.     [Intentionally left blank.]

**RESPONSE:** This paragraph was intentionally left blank and therefore no response is required.

110.     [Pl.'s PFOF ¶ 143] The formula for calculating the "Fair Market Value per share," referenced above, is based on a weighted average of Windy Waters' EBITDA (Earnings Before Interest Taxes Depreciation and Amortization) over the three years leading up to a non-voluntary redemption (the EBITDA Formula). (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Undisputed.

111.     [Pl.'s PFOF ¶ 144] In the EBITDA Formula, the weighted average of Windy Waters' EBITDA is multiplied by 3.6. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Undisputed.

112.     [Pl.'s PFOF ¶ 145] The following items are then added to the amount calculated in the preceding paragraph: cash and cash equivalents, securities available for sale and other investments, and stock subscription notes receivable. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Undisputed.

113.    [Pl.'s PFOF ¶ 146] Accrued deferred compensation and interest bearing debt as of the preceding fiscal year are then subtracted from the amount calculated in the preceding paragraph to reach the "Estimated Value of Windy Waters, Inc." and "Concluded Value of Windy Waters." (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Disputed that the referenced formula calculated the "Concluded Value of Windy Waters." The phrase appears on a spreadsheet Kiesler used internally to calculate the formula, but it simply represents the higher of the book value and the total the formula reaches for 100% of shares based on the calculation. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.6, ¶¶ 37-38, Ex. D (ECF No. 74-4); Kiesler Decl., Nov. 10, 2023, pp.5, 7-8, ¶¶ 23, 29-31; Hutler Decl., Sept. 29, 2023 (ECF No. 68) pp.2-3, ¶¶ 6, 9-10, 12-13, Exs. 1 (ECF No. 68-1), 2 (ECF No. 68-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-35. Otherwise, undisputed.

114.    [Pl.'s PFOF ¶ 148] As of May 13, 2020, the EBITDA Formula did not apply to or limit the purchase price paid to Stacy for the stock purchased from her pursuant to the May 13, 2020 redemption agreement. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.7, Defs.' Response to Request for Admission No. 16; Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1317-18; Palay Decl., ¶ 3, Ex. 1, STAFFORD001299; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291; Palay Decl., ¶ 42, Ex. 40, STAFFORD001285; 09/19/2023 M. Kiesler Dep. Tr. 195:1-17.)

**RESPONSE:** Disputed. It was the custom, practice, and understanding among the shareholders to use the Stock Price Formula to calculate a price for Windy Water shares, and was used for every stock redemption and subscription since 2004, except the one occasion where the

book value of shares was calculated and it exceeded the formula price. Kiesler did in fact apply the Stock Price Formula to calculate the price Windy Waters paid for Randall's shares, just as he had for each of her prior redemptions. Kiesler Dep., Sept. 19, 2023, at 203:20-204:7; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Hutler Decl., Sept. 29, 2023 (ECF No. 68) pp.2-3, ¶¶ 6, 9-10, 12-13, Exs. 1 (ECF No. 68-1), 2 (ECF No. 68-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-35; Reed Decl., Nov. 10, 2023, p.3, ¶ 19; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

115.    [Pl.'s PFOF ¶ 150] On May 12, 2020, one day before Stacy's redemption, Windy Waters' corporate counsel stated to Kiesler, via an e-mail with the subject line ███████████ ███████  that the ████████████████████████████████████████ ████████████████████████████████████████  (Palay Decl., ¶ 45, Ex. 43, STAFFORD000040.)

**RESPONSE:** Disputed. Scott Seid's May 12, 2020, email says nothing about the Stock Price Formula. Further, since Seid acknowledged that the math of Price Widen's buyout "did work out[,]" he realized he was misunderstood and "must have been looking at a different valuation" when he sent this email. Seid Dep., Aug. 17, 2023, at 91:23-93:9; Palay Decl., Sept. 29, 2023, (ECF No. 63) p.6, ¶ 45, Ex. 43 (ECF No. 63-42).

116.    [Pl.'s PFOF ¶ 151] The EBITDA formula does not take into account the revenues of Windy Waters or Widen Enterprises. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-14; Palay Decl., ¶ 43, Ex. 41, WINDY0036828.)

**RESPONSE:** Disputed. The Stock Price Formula does account for the revenues of Windy Waters and Widen Enterprises. "E" in EBITDA stands for "earnings," and "earnings" are

a function of "revenues." Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.1, ¶ 5; Kiesler Dep., Sept. 19, 2023, at 40:22-41:7; Kiesler Decl., Nov. 10, 2023, p.4, ¶¶ 17-18.

117.   [Pl.'s PFOF ¶ 152] As of May 13, 2020, the fair market value of Windy Waters was the price at which 100% ownership of Windy Waters would change hands between a hypothetical willing buyer and a hypothetical willing seller where the seller is not under any compulsion to sell and the buyer is not under any compulsion to buy, both parties having reasonable knowledge of the relevant facts. (Palay Decl., ¶ 11, Ex. 9, WINDY0047991.)

**RESPONSE:** Disputed. The proposed fact requires an expert opinion and is not supported by the source cited.

118.   As of May 13, 2020, the fair market value of the Companies was approximately ▮▮▮▮▮▮▮ (Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113.)

**RESPONSE:** Disputed. The report from Baker Tilly showing the Deferred Comp Valuation method for 2019, dated February 6, 2020, calculated the estimated fair market value of all Windy Waters shares at $459,718. Reed Decl., Nov. 10, 2023, (ECF No. 109) p.3, ¶ 18, Ex. H (WINDY0001128, at 0001129); *see also* Reed Decl., Nov. 10, 2023, (ECF No. 109) p.3, ¶ 18, Exs. F (WINDY0001102, at 0001105), G (WINDY0001121, at 0001122), I (WINDY0041505, at 0041506). Further, Defendants will be naming their expert witness who is qualified to opine on the fair market value of the Companies as of May 13, 2020, and that report will be disclosed by December 1, 2023.

119.   Defendants used the Stock Price Formula in Stacy's 2020 redemption because it presented the ▮▮▮▮▮▮▮ to purchase Stacy's stock using a formula the Companies' executives knew was ▮▮▮▮ and it produced a purchase price ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ as of May 13, 2020, of approximately ▮▮▮▮▮▮▮ (Palay Decl.,

¶¶ 17, 19, 21, 30, Exs. 17, 19, 28; Suppl. Palay Decl. ¶ 5, Ex. 3 (Kleinrichert Report) ¶ 113.)

**RESPONSE:** Disputed. Defendants used the Stock Price Formula for Randall's May 13, 2020, redemption to be consistent and treat all shareholders equally because the Stock Price Formula was used to calculate a price-per-share for every stock subscription and redemption since 2004, including all of Randall's transactions, of which Randall was aware. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-7, 18, ¶¶ 35-45, 137, Ex. D (ECF No. 74-4); Kiesler Dep., Sept. 19, 2023, at 195:1-8, 204:3-7, 215:3-7; Gonnering Dep., Sept. 21, 2023, at 148:1-5, 148:19-20, 149:4-8; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-93:5, 112:15-25; Wittenberg Decl., Nov. 10, 2023, (ECF No. 113) p.2, ¶ 8, Ex. G (ECF No. 113-7); Hutler Decl., Sept. 29, 2023, (ECF No. 68) pp.4, ¶ 14; Reed Decl., Nov. 10, 2023, (ECF No. 109) p.3, ¶ 19; Randall Dep., Aug. 28, 2023, at 200:10-16, 285:23-288:19; Seid Dep., Aug. 17, 2023, at 29:17-21; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12); Supplemental Christa Wittenberg Decl., Sept. 30, 2023, (ECF No. 77) p.1, ¶ 2, Ex. V (ECF No. 77-1).

120.    [Pl.'s PFOF ¶ 153] WINDY0036828 is the version of the EBITDA formula used to calculate the per-share redemption price that Stacy was paid under the May 13, 2020 Redemption Agreement. (09/19/2023 M. Kiesler Dep. Tr. 71:10-21; 09/29/2023 Palay Decl., ¶ 46, Ex. 44, WINDY0036797 attaching WINDY0036828 (Palay Decl., ¶ 43, Ex. 41 (filename: "WindyWaters-31Dec2019StockValue-ModifiedLookBack.xlsx")).)

**RESPONSE:** Disputed. WINDY0036828 is not "the version of the EBITDA formula . . . ." Rather, the document is the version of the *spreadsheet* that shows the calculation of the formula performed in May 2020. Palay Decl., Sept. 29, 2023, (ECF No. 63), p.6, ¶ 43, Ex. 41 (ECF No. 63-40); Kiesler Dep. Sept. 19, 2023, at 71:10-21.

121.    [Pl.'s PFOF ¶ 154] As of May 2020, the EBITDA formula did not calculate the fair market value of Windy Waters. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

**RESPONSE:** Undisputed, but immaterial.

122.    [Pl.'s PFOF ¶ 155] As of May 13, 2020, the EBITDA formula did not approximate the fair market value of Windy Waters. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

**RESPONSE:** Disputed. This proposed fact requires an expert opinion, and thus the sources cited by Randall are insufficient. Further, the most recent calculation of the fair market value of Windy Waters in February 2020, showed a lower value of $459,718 and involved some similar calculations. Reed Decl., Nov. 10, 2023, p.3, ¶ 18, Ex. H (WINDY0001128, at 1129).

123.    [Pl.'s PFOF ¶ 156] Kiesler testified that calculating the fair market value of Windy Waters stock "wasn't the purpose of that formula," which was intended only "to calculate the redemption price or subscription price per share." (09/19/2023 M. Kiesler Dep. Tr. 141:6-13.)

**RESPONSE:** Undisputed.

124.    [Pl.'s PFOF ¶ 157] Kiesler testified that he could not say whether or not he believed at the time of Stacy's May 2020 redemption that the formula was required but that it was used because it had been used in prior redemptions, and he "was always told to be consistent." (09/19/2023 M. Kiesler Dep. Tr. 195:1-17, 203:20-204:7.)

**RESPONSE:** Undisputed.

125.    [Pl.'s PFOF ¶ 159] In situations where the EBITDA formula *does* apply (i.e.,

death or permanent disability), Section 3.4(a) of the Windy Waters shareholder agreement provides that if the company is sold to a third party within 1 year of the closing of the redemption, then the redeemed shareholder is entitled to receive 66.6% of the amount that shareholder would have received had they been a shareholder at the closing of the sale. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1319.)

**RESPONSE:** Undisputed.

126.    [Pl.'s PFOF ¶ 160] In situations where the EBITDA formula *does* apply (i.e., death or permanent disability), Section 3.4(b) of the Windy Waters shareholder agreement provides that if the company is sold to a third party more than 1 year but less than 3 years after the shareholder's redemption, then the redeemed shareholder is entitled to receive 33.3% of the amount that shareholder would have received had they been a shareholder at the closing of the sale. (Palay Decl., ¶ 40, Ex. 38, STAFFORD001307 at 1319-20.)

**RESPONSE:** Undisputed.

127.    [Pl.'s PFOF ¶ 161] Defendants never offered Stacy any of the catchup rights described in the preceding two paragraphs. (Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.8, Defs.' Response to Request for Admission No. 19.)

**RESPONSE:** Undisputed, but immaterial.

164.    [Pl.'s PFOF ¶ 164] On or around May 5, 2020, Stacy reached out to her brother, Reed, for help. (Answer ¶¶ 67-68.)

**RESPONSE:** Undisputed.

165.    [Pl.'s PFOF ¶ 165] Stacy told Reed that her then-husband was initiating legal proceedings and demanding maintenance payments and that she was going to need to get some

money. (Answer ¶ 68.)

**RESPONSE:** Undisputed.

166.    [Pl.'s PFOF ¶ 166] Reed responded that Stacy's timing was unfortunate because the Companies had a ███████████████████████████████████████ ████████ a reference to a separate family-owned company that holds real estate that had been left to Stacy, Reed, and their siblings. (Answer ¶ 69; Palay Decl., ¶ 48, Ex. 46, WINDY0047392.)

**RESPONSE:** Undisputed.

167.    [Pl.'s PFOF ¶ 167] Kiesler testified that, on that same day (May 5, 2020), Kiesler and Reed spoke by phone and Reed told Kiesler that Stacy was "asking for money again" and that "he (i.e., Reed) was kind of annoyed with the fact that she kept coming back to the company for money, and him personally," and that Reed "wanted to [buy] all of her shares . . . using the formula that we used for Price [Widen]." (09/19/2023 M. Kiesler Dep. Tr. 168:1-10, 168:24-169:7.)

**RESPONSE:** Undisputed.

168.    [Pl.'s PFOF ¶ 168] Early the next morning, May 6, 2020, Kiesler, who also helped the family administer Millmont, contacted Stacy, and they had a phone conversation. (Answer ¶ 70; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-8, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed.

169.    [Pl.'s PFOF ¶ 169] Stacy told Kiesler that she would need approximately $100,000 for her divorce and living expenses. (Answer ¶ 71.)

**RESPONSE:** Undisputed.

170.    [Pl.'s PFOF ¶ 170] Kiesler told Stacy that the Companies did not have $100,000 they could make available to her. (Answer ¶ 72.)

**RESPONSE:** Undisputed.

171.    [Pl.'s PFOF ¶ 171] Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that either. (Answer ¶ 73.)

**RESPONSE:** Disputed as to the characterization that the Companies "could not afford" to buy $50,000 worth of Randall's stock. From his best efforts at reconstructing the conversation, Kiesler believes he told Randall "I still don't know if we can make [$50,000] available to you." Kiesler Dep., Sept. 19, 2023, at 173:3-11, 179:6-10, 295:20-296:1; Kiesler Decl., Sept. 29, 2023, (ECF No. 74), p.13, ¶ 95; Reed Dep., Aug. 23, 2023, at 212:14-25; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.5, ¶ 47; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 24, Ex. B (ECF No. 75-1); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶¶ 26-27. Otherwise, undisputed.

172.    [Pl.'s PFOF ¶ 172] Kiesler told Stacy that the only way she could get any cash from the Companies was to sell her entire interest in Windy Waters—approximately 20% of the outstanding shares—to Windy Waters. (Answer ¶ 74.)

**RESPONSE:** Undisputed.

173.    [Pl.'s PFOF ¶ 173] Stacy told Kiesler that she did not want to sell her entire interest. (Answer ¶ 76.)

**RESPONSE:** Undisputed.

174.    [Pl.'s PFOF ¶ 174] Stacy's and Kiesler's conversation did not include an explanation from Kiesler as to why Windy Waters could afford to purchase all, but not some, of Stacy's shares. (Answer ¶ 75.)

**RESPONSE:** Disputed. From his best efforts at reconstructing the conversation, Kiesler

believes he told Randall "I still don't know if we can make [$50,000] available to you." Kiesler Dep., Sept. 19, 2023, at 173:3-11, 179:6-10, 295:20-296:1; Kiesler Decl., Sept. 29, 2023, (ECF No. 74), p.13, ¶ 95; Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶¶ 26-27; Reed Dep., Aug. 23, 2023, at 212:14-25; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.5, ¶ 47; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.4, ¶ 24, Ex. B (ECF No. 75-1). Otherwise, undisputed.

175.    [Pl.'s PFOF ¶ 175] Kiesler reiterated that the Companies wanted to purchase her entire interest using the price given by the price-per-share calculation model in the EBITDA Formula, which calculates the (so-called) "Fair Market Value per share" under the Windy Waters Shareholder Agreement. (Answer ¶ 77; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

**RESPONSE:** Disputed that "the Companies" wanted to purchase Randall's shares. Only Windy Waters wanted to purchase Randall's shares. Reed Decl., Sept. 29, 2023, (ECF No. 67) p.6, ¶¶ 50, 54; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.15, ¶¶ 110-11; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶¶ 80-82. Otherwise, undisputed.

176.    [Pl.'s PFOF ¶ 176] Kiesler offered Stacy $1.1 million dollars for her approximately 20% interest in Windy Waters. (Answer ¶¶ 74, 77.)

**RESPONSE:** Disputed. Kiesler offered Randall the share price calculated using the Stock Price Formula, which as of November 2019, was approximately $1.1 million, but Kiesler represented the number would be updated to reflect the final December 2019 financial numbers. Kiesler Decl., Nov. 10, 2023, p.6-7, ¶ 27.

177.    [Pl.'s PFOF ¶ 177] Stacy told Kiesler that that price seemed too low. (Answer ¶ 78.)

**RESPONSE:** Undisputed.

178.    [Pl.'s PFOF ¶ 178] Kiesler assured Stacy that the price was "fair," purportedly

"because [it used the] standard price-per-share calculation model for voluntary redemptions, which Kiesler explained was the same formula that had been used for [Stacy's] prior partial share redemptions and for the complete share redemptions of [her] brothers." (Answer ¶ 79; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

**RESPONSE:** Disputed to the extent that this proposed fact suggests Kiesler explicitly told Randall the price was "fair." Rather, Kiesler expressed the general sentiment that the method for reaching the price was fair because it was calculated using the Stock Price Formula, Windy Waters' standard price-per-share calculation model for voluntary redemptions, and that it was "the same formula that had been used for [her] prior partial share redemptions[,] . . . for the complete share redemptions of [her] brothers[,]" and for every prior Windy Waters stock transaction (deviating only on the occasions when Kiesler compared the formula per-share price to a per-share price using the company's assets and found that the price calculated from net assets was higher). Compl. (ECF No. 1), ¶ 79; Am. Answer (ECF No. 45), ¶ 79; Kiesler Dep., Sept. 19, 2023, at 174:19-175:18, 227:10-13; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.).

179.    [Pl.'s PFOF ¶ 179] Defendants claim that Kiesler walked Stacy through the model price-per-share formula calculation he had used to calculate the $1.1 million offer price. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-8, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Disputed in that Randall was not offered $1.1 million but instead was offered whatever stock price would be calculated using final December 2019 financials in the

Stock Price Formula after he updated the numbers. Kiesler Decl., Nov. 10, 2023, p.6-7, ¶ 27. Otherwise, undisputed.

180.    [Pl.'s PFOF ¶ 180] In response to Plaintiff's Interrogatory No. 5, which requests that Defendants "[s]tate every fact about Widen Enterprises that you contend any of Defendants disclosed to Plaintiff in connection with the Redemption, including identification of every document provided or shown to Plaintiff in connection with the Redemption; the person(s) making such disclosure or providing such document; and the date(s) on which such disclosure was made or such document was provided," Defendants only allege that, "in a telephone conversation on May 6, 2020, Mr. Kiesler went through the price-per-share calculation model with Plaintiff, line by line, using November 2019 financial information of the Companies and shared with her the redemption price. Mr. Kiesler explained to Plaintiff in that conversation that he would have to update the calculation with End-of-Year numbers. After closing the Companies' April 2020 books, Mr. Kiesler updated the price-per-share calculation model using December 2019 financial information and telephoned Plaintiff again, this time on May 13, 2020, during which conversation Mr. Kiesler shared the updated redemption price," and that Kiesler "read aloud" the redemption agreement and promissory note, "stopping after each paragraph to ask if she understood and whether she had any questions." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed.

181.    [Pl.'s PFOF ¶ 181] Kiesler also told Stacy that she would be smart to sell her interest in the Companies while she had the chance because Widen Enterprises, the operating company, might not even be around in seven years, and she risked ending up with nothing if she

didn't take his offer. (Palay Decl., ¶ 49, Ex. 47, Randall0000116; Answer ¶ 81.)

**RESPONSE:** Disputed. From his best efforts at reconstructing the conversation, Kiesler believes he told Randall, "you can do whatever you want, but it could be smart to sell your shares and be in control of your finances. With COVID continuing, the amount may be lower in the future." Compl. (ECF No. 1), ¶ 81; Am. Answer (ECF No. 45), ¶ 81; Kiesler Dep., Sept. 19, 2023, at 227:14-21; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-17, ¶¶ 121, 131; Kiesler Decl., Nov. 10, 2023, pp.6-7, 9, ¶¶ 27, 41.

182.    [Pl.'s PFOF ¶ 182] Defendants admit that Kiesler expressed the general sentiment that it could be smart given the current financial state of affairs, including the uncertainty presented by the onset of the COVID-19 pandemic, for Stacy to sell her shares because there was no guarantee that Widen Enterprises would remain a viable company. (Answer ¶ 81.)

**RESPONSE:** Undisputed.

183.    [Pl.'s PFOF ¶ 183] Kiesler could not identify any financial difficulties the Companies faced at the time of Stacy's redemption. (09/19/2023 M. Kiesler Dep. Tr. 178:9-179:19.)

**RESPONSE:** Disputed. Kiesler explained that "[t]here was so much uncertainty, so much fear, and so much economic volatility" at this time due to COVID-19. Specifically, Kiesler was worried that the company might not be around in a few years if COVID-related circumstances persisted. Widen Enterprises showed negative net income in March and April 2020, which means that Widen Enterprises recognized more expense than revenue in those months. Kiesler Dep., Sept. 19, 2023, at 179:2-10, 227:25-228:3; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp. 14-15, ¶¶ 105-107; Kiesler Decl., Nov. 10, 2023, pp.5-6, ¶¶ 24-26.

184.    [Pl.'s PFOF ¶ 184] Kiesler also represented to Stacy before the May 2020

redemption that, because the company continually reinvested most of its profits back into the business, the value of her stock would not change substantially over the next seven years. (Palay Decl., ¶ 50, Ex. 48, Randall0000328.)

**RESPONSE:** Undisputed.

185.    [Pl.'s PFOF ¶ 185] Stacy explained that her investment in the Companies was really important to her because her investment in the Companies was all she had to live on for the rest of her life. (Palay Decl., ¶ 49, Ex. 47, Randall0000116; Answer ¶ 82.)

**RESPONSE:** Undisputed.

186.    [Pl.'s PFOF ¶ 186] Kiesler told Stacy the deal was "take it or leave it" and had an end-of-day deadline, and that if she turned it down, the Companies could not be a source of the cash she needed to finance her divorce proceedings. (Answer ¶¶ 82-83; Palay Decl., ¶ 49, Ex. 47, Randall0000116.)

**RESPONSE:** Undisputed.

187.    [Pl.'s PFOF ¶ 187] After speaking with Stacy, Kiesler contacted Reed to confirm that Kiesler should arrange for Windy Waters to purchase ███ of Stacy's shares in the company, to which Reed responded 6 minutes later, ███ (Answer ¶ 85; Palay Decl., ¶ 51, Ex. 49, WINDY0047397-40 (capitalization in original).)

**RESPONSE:** Undisputed.

188.    [Pl.'s PFOF ¶ 188] In a second conversation with Stacy, Kiesler again insisted the price was "fair." (Answer ¶ 89.)

**RESPONSE:** Disputed. Kiesler did not tell Randall the price was "fair," but that the calculation method using the Stock Price Formula once more was fair, since it had been used for everyone. Compl. (ECF No. 1), ¶¶ 79, 89; Am. Answer (ECF No. 45), ¶¶ 79, 89; Kiesler Dep.,

Sept. 19, 2023, at 174:19-175:18, 227:10-13; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27; Reed Decl., Nov. 10, 2023, p.3, ¶ 19.

189.    [Pl.'s PFOF ¶ 189] On May 8, 2020, Gonnering stated in an e-mail to Reed and Kiesler, with respect to a Paycheck Protection Program loan to Widen Enterprises of approximately $2.7 million, that ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ and Gonnering testified at his deposition that he viewed the PPP money as "[n]ecessary for the uncertainty of the company." (Palay Decl., ¶ 21, Ex. 19, WINDY0009851; 09/21/2023 M. Gonnering Dep. Tr. 218:9-12.)

**RESPONSE:** Undisputed.

190.    [Pl.'s PFOF ¶ 190] On May 12, 2020, Kiesler e-mailed the Companies' corporate attorney and told him that ████████████████████████████████████ ████████████████████████ (Palay Decl., ¶ 52, Ex. 50, STAFFORD000258.)

**RESPONSE:** Undisputed.

191.    [Pl.'s PFOF ¶ 191] On May 13, 2020, Kiesler called Stacy again, after not hearing from her, and told her that he had updated his offer to approximately $1.3 million. (Suppl. Decl. of Stacy Randall ¶ 22.)

**RESPONSE:** Undisputed.

192.    [Pl.'s PFOF ¶ 192] This time, too, Kiesler told Stacy that she had until the end of the day to accept the offer. (Answer ¶ 96.)

**RESPONSE:** Disputed. Randall agreed with the terms on the spot and said she would be

coming in later that day to sign the documents. Randall Dep., Aug. 28, 2023, at 303:17-304:23; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.18, ¶ 142.

193.   [Pl.'s PFOF ¶ 194] On May 13, 2020, Stacy told her son, Justin, that "Kiesler did another evaluation of the company and came up with another $250 thousand.[] Nothing I can do about it[.] I will be going over to the office to sign the papers at 4:30." (Palay Decl., ¶ 54, Ex. 52, Randall0000117.)

**RESPONSE:** Undisputed.

194.   [Pl.'s PFOF ¶ 195] Stacy sought legal advice from her divorce attorney via e-mail on May 13, 2020, asking for help, but her attorney informed her that the buyout was beyond her expertise and that she could offer Stacy no assistance. (09/28/2023 S. Randall Decl., p.2, ¶ 6.)

**RESPONSE:** Undisputed.

195.   [Pl.'s PFOF ¶ 196] When Stacy entered the Companies' office to sign the documents, Kiesler was waiting for her in the lobby, talking on the phone with Windy Waters' corporate attorney. (Answer ¶ 109.)

**RESPONSE:** Undisputed.

196.   [Pl.'s PFOF ¶ 197] Kiesler handed Stacy the phone upon Stacy asking to speak to the Companies' corporate attorney, and Stacy spoke to the Companies' corporate attorney. (Answer ¶¶ 110-111.)

**RESPONSE:** Undisputed.

197.   [Pl.'s PFOF ¶ 198] When Stacy spoke with Attorney Scott Seid on the phone on May 13, 2020, Stacy told Seid she was not comfortable signing the contract, and he responded by saying that nobody can force her to sign the contract. (Suppl. Decl. of Stacy Randall ¶ 23.)

**RESPONSE:** Undisputed.

198.    Attorney Scott Seid did not work on Stacy Randall's behalf or act in her best interests at any time. (Suppl. Decl. of Stacy Randall ¶ 24.)

**RESPONSE:** Disputed that Attorney Scott Seid did not act in Randall's best interests to the extent he was permitted to do so. Attorney Seid told Randall that if she was uncomfortable signing the documents, there was no reason to do it, and that nobody could force her to sign the documents; that if she felt like she needed to talk to an attorney first, she absolutely had the right to do that and should do that; and that he would be happy to provide Randall with names of business law attorneys who could help her if she wanted. This was all in her best interest. Otherwise, undisputed that Attorney Seid did not work on Randall's behalf because he could not give her advice since he represented Windy Waters and Randall had expressly agreed to the continued representation of Windy Waters and waived any conflict, including with respect to stock redemptions by Randall, under the terms of a signed conflict waiver. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:16, 40:6-11; Randall Dep., Aug. 28, 2023, at 220:16-223:25; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2–3, ¶¶ 9, 17, Exs. H (ECF No. 70-8), R (ECF No. 70-16).

199.    On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy that he did not represent her or her best interests in the transaction. (Suppl. Decl. of Stacy Randall ¶ 26.)

**RESPONSE:** Disputed. Attorney Seid told Randall he could not give her advice because his law firm represents the company. Seid Dep., Aug. 17, 2023, at 33:9-34:12.

200.    On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not state that he had a "conflict of interest." (Suppl. Decl. of Stacy Randall ¶ 27.)

**RESPONSE:** Disputed. Though Attorney Seid may not have used the words "conflict of

interest" exactly, he told Randall he could not give her advice because his law firm represents the company. Seid Dep., Aug. 17, 2023, at 33:9-34:12.

201.    On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not explain the nature of his conflict of interest. (Suppl. Decl. of Stacy Randall ¶ 28.)

**RESPONSE:** Disputed. Although Attorney Seid did not explain in detailed terms that attorneys are prohibited under ethical rules from concurrently representing clients directly adverse to one another if the representation of one client would preclude the attorney from competently and diligently representing the other client's best interests, Attorney Seid told Randall he could not give her advice because his law firm represents the company. Seid Dep., Aug. 17, 2023, at 33:9-34:12.

202.    On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy what he understood to be the value of the Companies. (Suppl. Decl. of Stacy Randall ¶ 29.)

**RESPONSE:** Undisputed, but immaterial. Attorney Seid testified he "had no idea" as to the "true value" of the Companies as of May 13, 2020. Seid Dep., Aug. 17, 2023, at 37:1-9.

203.    On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy what rights Stacy had as a shareholder or director, despite Attorney Seid knowing that Stacy was nominally a director of Windy Waters. (Suppl. Decl. of Stacy Randall ¶ 30.)

**RESPONSE:** Disputed that Randall was only "nominally" a director of Windy Waters. Randall Dep., Aug. 28, 2023, at 179:21-24; Kiesler Decl., Sept. 29, 2023, p.2, ¶¶ 7–8; Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, B (ECF Nos. 1-6, 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Christa D. Wittenberg Decl. ("Wittenberg Decl."), Sept. 29, 2023, p.2, ¶ 7, Ex. F (Ex. 14 to Seid Dep.).

Otherwise, undisputed, but immaterial.

204.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not offer Stacy any advice about her rights with respect to the Companies or the fairness of the proposed transaction. (Suppl. Decl. of Stacy Randall ¶ 31.)

**RESPONSE:** Disputed. Attorney Seid told Randall that if she was uncomfortable signing the documents, there was no reason to do it, and that nobody could force her to sign the documents; that if she felt like she needed to talk to an attorney first, she absolutely had the right to do that and should do that; and that he would be happy to provide Randall with names of business law attorneys who could help her if she wanted. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:16, 40:6-11; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16). Otherwise, undisputed.

205.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy that neither he nor his law firm nor Kiesler nor Reed were working in her best interests or on terms fair to her. (Suppl. Decl. of Stacy Randall ¶ 32.)

**RESPONSE:** Disputed. Attorney Seid told Randall he could not give her advice because his law firm represents the company. Seid Dep., Aug. 17, 2023, at 33:9-34:12.

206.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy that she should obtain other legal counsel before proceeding further with the proposed transaction. (Suppl. Decl. of Stacy Randall ¶ 33.)

**RESPONSE:** Disputed. Attorney Seid told Randall that if she felt like she needed to talk to an attorney first, she absolutely had the right to do that and should do that, and that he would be happy to provide Randall with names of business law attorneys who could help her if she wanted. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:16, 40:6-11; Wittenberg Decl., Sept.

29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16).

207.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not give Stacy any names of other business law attorneys. (Suppl. Decl. of Stacy Randall ¶ 34.)

**RESPONSE:** Undisputed.

208.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy that he would find her an attorney to represent her regarding the transaction or offer to do so. (Suppl. Decl. of Stacy Randall ¶ 25.)

**RESPONSE:** Undisputed that Attorney Seid did not tell Randall he *would* find her an attorney to represent her in the transaction. Disputed that he did not offer to assist with finding an attorney. Attorney Seid offered to give Randall names of attorneys who could help her if she wanted, but Randall did not ask Attorney Seid for names of attorneys then, or ever. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-12, 39:1-12; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16); Randall Dep. Aug. 28, 2023, at 220:1-14.

209.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not offer to help Stacy find an attorney to represent her with respect to the redemption taking place that day. (Suppl. Decl. of Stacy Randall ¶ 25.)

**RESPONSE:** Disputed. Attorney Seid said he would be happy to provide Randall with names of business law attorneys that could help her if she wanted, but Randall never asked Attorney Seid for names of those attorneys, then or ever. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-12, 39:6-12; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16); Randall Dep. Aug. 28, 2023, at 220:1-14.

210.   On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not offer to extend Kiesler's end-of-day deadline so that Stacy could obtain an attorney. (Suppl.

Decl. of Stacy Randall ¶ 35.)

**RESPONSE:** Disputed. Attorney Seid told Randall that if she was uncomfortable signing the documents, there was no reason to do it, and that nobody could force her to sign the documents; that if she felt like she needed to talk to an attorney first, she absolutely had the right to do that and should do that. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:16, 40:6-11; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16).

211.    On the May 13, 2020 phone call between Stacy and Scott Seid, Attorney Seid did not tell Stacy that the day prior, on May 12, 2020, he communicated to Kiesler via e-mail that ██████████████████████████████████ which is shown in Palay Decl., Ex. 43, STAFFORD000040. (Suppl. Decl. of Stacy Randall ¶ 36.)

**RESPONSE:** Undisputed, but immaterial.

212.    On the May 13, 2020 phone call between Stacy and Scott Seid, she did not tell Seid that she would let him know if she wanted to be given names of other lawyers. (Suppl. Decl. of Stacy Randall ¶ 37.)

**RESPONSE:** Disputed. Randall told Attorney Seid she would let him know if she wanted Attorney Seid to provide her with names of business law attorneys who could help her. Seid Dep., Aug. 17, 2023, at 33:9-34:12, 38:2-39:16; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16).

213.    After Stacy got off the phone with Seid, Kiesler did not ask Stacy whether she wanted her son or anyone else to review the documents before she signed them. (Suppl. Decl. of Stacy Randall ¶ 38.)

**RESPONSE:** Disputed. After Randall and Attorney Seid spoke on the phone, Kiesler and Randall went into another area of the building, and Kiesler asked Randall if she wanted to

review the documents alone, review the documents with an attorney and not sign them that day, or review the documents with her son or anyone else before signing them. Randall declined. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.19, ¶ 144.

214.    Stafford Rosenbaum invoiced Windy Waters $2,242.00 for its work regarding the May 2020 redemption, including post-redemption work. (Suppl. Decl. of D. Palay, ¶ 14, Ex. 15, STAFFORD004140.)

**RESPONSE:** Undisputed, but immaterial.

215.    [Pl.'s PFOF ¶ 199] Stacy asked Kiesler whether he and the Companies' executives were preparing to sell Widen Enterprises. (Answer ¶ 117.)

**RESPONSE:** Undisputed.

216.    [Pl.'s PFOF ¶ 200] Kiesler responded, in sum and substance, "No, there's been no talk of that." (Answer ¶ 118.)

**RESPONSE:** Undisputed.

217.    [Pl.'s PFOF ¶ 201] Kiesler did not provide any financial information or disclosure about the Companies during this interaction. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed if and only if "during this interaction" refers to the time period before Keisler walked Randall through the stock redemption agreement and promissory note line-by-line. If any other interpretation is intended, then disputed. Kiesler Dep., Sept. 19, 2023, at 225:23-226:10; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.19, ¶ 145; Randall Dep., Aug. 28, 2023, at 318:16-24.

218.    [Pl.'s PFOF ¶ 202] During this interaction Kiesler did not show Stacy how the

purchase price he had offered her had been calculated. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed.

219.    [Pl.'s PFOF ¶ 203] This was the first time Stacy had been shown the May 13, 2020 redemption agreement and promissory note (the Redemption Documents). (Answer ¶ 121.)

**RESPONSE:** Undisputed.

220.    [Pl.'s PFOF ¶ 204] Stacy signed the redemption agreement on May 13, 2020, while she was at the Companies' offices with Kiesler, and Kiesler signed the redemption agreement on behalf of Windy Waters. (09/28/2023 S. Randall Decl., p.2, ¶ 7; Palay Decl., ¶ 56, Ex. 54, WINDY0003172 (redemption agreement).)

**RESPONSE:** Undisputed.

221.    [Pl.'s PFOF ¶ 205] Stacy relied on the representations Kiesler had made to her over the preceding week in deciding to sign the redemption agreement. (09/28/2023 S. Randall Decl., p.2, ¶ 8.)

**RESPONSE:** Disputed. Randall told her financial advisor that she did not trust Reed and Kiesler, so she could not have relied on Kiesler's representations. Further, Randall cannot have relied on all of Kiesler's representations to her between May 6, 2020, and May 13, 2020, since Randall denies that Kiesler made certain representations. For example, Randall denies that Kiesler made any representations to her about the calculation of the Stock Price Formula, and therefore Randall could not have relied upon Kiesler's representations regarding the Stock Price Formula. Randall Dep., Aug. 28, 2023, at 263:20-265:23, 285:23-286:18, 303:22-304:3, 317:8-17; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-19, ¶¶ 119-20, 133, 140-41, 145, 151;

Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12); Pl.'s Statement of Facts (ECF No. 61), at p.27, n.2.

222.    Stacy did not review the May 13, 2020 redemption agreement or promissory note or push back on their terms because she did not know the relevant questions to ask or issues to dispute or clarify and felt she had run out of time, leaving her with no choice but to sign, given her immediate need for the money to fund her divorce proceeding. (Suppl. Decl. of Stacy Randall ¶ 39.)

**RESPONSE:** Disputed that Randall had no choice but to sign the May 13, 2020 Redemption Agreement and Promissory Note. Kiesler assured Randall she could "take it or leave it," making it clear she was not obligated to sell her shares. Attorney Seid told Randall that if she was uncomfortable signing the documents, there was no reason to do it, and that nobody could force her to sign the documents; and that if she felt like she needed to talk to an attorney first, she absolutely had the right to do that and should do that. Randall Dep., Aug. 28, 2023, at 267:20-21; Kiesler Dep., Sept. 19, 2023, at 225:23-226:10, 227:22-24; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.17, 19, ¶¶ 128, 145-48; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.6-7, ¶ 27; Seid Dep., 33:9-34:12, 38:2:12, 39:1-16; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.3, ¶ 17, Ex. R (ECF No. 70-16). Otherwise, undisputed that after Kiesler read aloud the stock redemption agreement and promissory note word for word while Randall followed along, stopping after each paragraph to ask if she understand and had any questions, Randall did not disagree with anything in the documents or ask for anything to be changed, and executed the documents.

223.    Kiesler did not ask Stacy if she wanted to take the Redemption Documents with her to review alone or with an attorney. (Suppl. Decl. of Stacy Randall ¶ 40.)

**RESPONSE:** Disputed. Kiesler asked Randall if she wanted to review the documents alone, review the documents with an attorney and not sign them that day, or review the documents with her son or anyone else before signing them. Randall declined. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.19, ¶ 144.

224.    Stacy would not have signed the May 2020 redemption agreement had she known Defendants were considering selling Widen Enterprises. (Suppl. Decl. of Stacy Randall ¶ 42.)

**RESPONSE:** Disputed. Defendants were not considering selling Widen Enterprises on May 13, 2020. Moreover, whether Randall would have signed the May 13, 2020 Redemption Agreement had Randall known certain information is contested in this case. Defendants maintain that Randall would have signed the May 13, 2020 Redemption Agreement of her own volition regardless of what information was or was not known to her. Randall desperately sought money and had an "immediate need for money to fund [her] divorce"; Randall did not obtain financial or legal advice, despite being advised to do so; Randall did not ask for any financial information on Windy Waters or Widen Enterprises; Randall did not ask for any information regarding how the value of her shares was calculated; and, after signing the May 13, 2020 Redemption Agreement, as of September 29, 2023, Randall received 40 monthly payments totaling $657,203.60, without objection and including throughout the duration of this litigation. Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.6-7, 9, 11, ¶¶ 49, 50, 62-64, 74-78, 82, 92, Ex. B (ECF No. 67-1); Reed Decl., Nov. 10, 2023, (ECF No. 105) p.4, ¶¶ 21-22; Reed Dep., Aug. 23, 2023, at 66:11-67:20, 68:21-69:1, 97:18-99:5, 127:8-128:15, 132:7-133:1-10, 151:15-152:12, 155:3-8, 164:25-165:20, 168:9-16; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.15-21, ¶¶ 109-13, 122-30, 132-33, 140-58, 163-67; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.3, 8, ¶¶ 12, 27, 33-34, Ex. D (ECF No. 105-4); Kiesler Dep., Sept. 19, 2023, at 176:8-177:4, 261:13-21; Gonnering

Decl., Sept. 29, 2023, (ECF No. 69) pp.6-7, ¶¶ 47-50, 56; Gonnering Dep., Sept. 21, 2023, at 106:17-110:2, 227:11-228:17; Randall Dep., Aug. 28, 2023, at 245:6-246:11, 261:12-263:8, 265:6-15, 266:23-267:1, 276:4-277:13, 277:22-280:20, 283:24-284:6, 285:23-286:18, 287:22-288:19, 296:5-14, 304:13-20, 307:5-16, 313:19-314:17, 318:8-18, 319:16-321:12; Suppl. Decl. of Randall, Nov. 10, 2023, (ECF No. 118) p.5, ¶ 39; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶¶ 4, 10, 12, Exs. C (ECF No. 70-3: Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, I (ECF No. 70-9), L (ECF No. 70-11), M (ECF No. 70-12).

225.    Stacy would not have signed the May 2020 redemption agreement had she known Defendants had information indicating that the purchase price they proposed was significantly lower than the fair market value of Stacy's stock. (Suppl. Decl. of Stacy Randall ¶ 48.)

**RESPONSE:** Disputed. Randall knew Defendants were offering the stock price calculated under the Stock Price Formula, as had been done with Randall's five prior sales of Widen Enterprises stock and not a price based on an actual market valuation of the company. Moreover, whether Randall would have signed the May 13, 2020 Redemption Agreement had Randall known certain information is contested in this case. Defendants maintain that Randall would have signed the May 13, 2020 Redemption Agreement of her own volition regardless of what information was or was not known to her. Randall desperately sought money and had an "immediate need for money to fund [her] divorce"; Randall did not obtain financial or legal advice, despite being advised to do so; Randall did not ask for any financial information on Windy Waters or Widen Enterprises; Randall did not ask for any information regarding how the value of her shares was calculated; and, after signing the May 13, 2020 Redemption Agreement, as of September 29, 2023, Randall received 40 monthly payments totaling $657,203.60, without objection and including throughout the duration of this litigation. Reed Decl., Sept. 29, 2023,

(ECF No. 67) pp.6-7, 9, 11, ¶¶ 49, 50, 62-64, 74-78, 92, Ex. B (ECF No. 67-1); Reed Decl., Nov.

10, 2023, (ECF No. 105) p.4, ¶¶ 21-22; Reed Dep., Aug. 23, 2023, at 66:11-67:20, 68:21-69:1,

97:18-99:5, 127:8-128:15, 132:7-133:1-10, 164:25-165:20, 168:9-16; Kiesler Decl., Sept. 29,

2023, (ECF No. 74) pp.15-21, ¶¶ 109-13, 122-30, 132-33, 140-58, 163-67; Kiesler Decl., Nov.

10, 2023, (ECF No. 105) pp.3, 8, ¶¶ 12, 27, 33-34, Ex. D (ECF No. 105-4); Kiesler Dep., Sept.

19, 2023, at 78:7-17, 139:7-14, 149:5-12, 176:8-177:4, 261:13-21; Gonnering Decl., Sept. 29,

2023, (ECF No. 69) pp.6-7, ¶¶ 47-50; Gonnering Decl., Nov. 10, 2023, (ECF No. 107) p.2, ¶ 7;

Gonnering Dep., Sept. 21, 2023, at 99:24-100:12, 106:17-110:2, 227:11-228:17; Widen

Enterprises Dep., Nov. 3, 2023, at 165:10-166:2, 186:9-16, 213:8-214:6; Windy Waters Dep.,

Nov. 6, 2023, at 197:9-13; Randall Dep., Aug. 28, 2023, at 200:10-16, 245:6-246:11, 261:12-

263:8, 265:6-15, 266:23-267:1, 276:4-277:13, 277:22-280:20, 283:24-284:6, 285:23-286:18,

287:22-288:19, 296:5-14, 304:13-20, 307:5-16, 313:19-314:17, 318:8-18, 319:16-321:12; Suppl.

Decl. of Randall, Nov. 10, 2023, (ECF No. 118) p.5, ¶ 39; Wittenberg Decl., Sept. 29, 2023,

(ECF No. 70) pp.1-2, ¶¶ 4, 6, 10, 12, Exs. C (ECF No. 70-3: Pl.'s Objections And Resps. To

Defs.' First Set Of Interrogs.) at Resp. No. 2, E (ECF No. 70-5: Windy Waters' Objections And

Resps. To Pl.'s Second Set of Interrogs.) at Resp. No. 11; I (ECF No. 70-9), L (ECF No. 70-11),

M (ECF No. 70-12).

226.    [Pl.'s PFOF ¶ 206] In deciding to sign the redemption agreement, Stacy relied on

her trust that Kiesler and Reed would disclose to her all of the relevant information she needed to

make an informed decision on whether or not to sign the redemption agreement. (09/28/2023

S. Randall Decl., p.2, ¶ 9.)

**RESPONSE:** Disputed. Randall told Kiesler that she never thought he and Reed had an

interest in Randall's well-being and made it clear that she did not trust them. Randall Dep., Aug.

28, 2023, at 285:23-287:17, 291:18-293:3; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

227.   At no point between May 6, 2020 and May 13, 2020 did anyone walk Stacy through, line-by-line, the Fair Market Value formula calculation Kiesler used to determine the price Defendants were willing to offer Stacy for her Windy Waters stock. (Suppl. Decl. of Stacy Randall ¶ 41.)

**RESPONSE:** Disputed. During Kiesler's phone call with Randall on May 6, 2023, Kiesler walked Randall through the calculation of the Stock Price Formula using November 2019 numbers. Kiesler then called Randall on May 13 to communicate the updated calculation under the Stock Price Formula, using December 2019 financials as promised, of over $1.3 million. Kiesler Dep., Sept. 19, 2023, at 71:10-21, 172:23-173:2; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-18, ¶¶ 118-20, 133, 140-41, Ex. U (ECF No. 75-23); Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶ 4, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 63; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.5-7, ¶¶ 23, 27-32; Randall Dep., Aug. 28, 2023, at 261:19-24, 303:17-304:12.

228.   At no point between May 6, 2020 and May 13, 2020 did Kiesler explain to Stacy that she could lock in a share price and provide certainty in an otherwise uncertain time due to COVID by accepting Defendants' offer. (Suppl. Decl. of Stacy Randall ¶¶ 15, 45.)

**RESPONSE:** Disputed. Kiesler explained to Randall that by redeeming all of her shares then, she would be able to lock in that value for her shares by locking in a share price and providing certainty in an otherwise uncertain time due to COVID, which threatened the viability of Widen Enterprises. Kiesler Decl., Sept. 29, 2023, p.16, ¶ 121; Kiesler Dep., Sept. 19, 2023, at 227:14-18; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.6-7, 9, ¶¶ 27, 41.

229.    At no point between May 6, 2020 and May 13, 2020 did Kiesler advise Stacy to speak with her financial advisor about Defendants' offer. (Suppl. Decl. of Stacy Randall ¶ 16.)

**RESPONSE:** Disputed. In a phone conversation with Randall on May 6, 202, Kiesler told Randall she should talk with her financial advisor and consult with counsel. Kiesler Dep., Sept. 19, 2023, at 212:15-18, 213:9-16; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.17, ¶ 130; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 3, Ex. B (ECF No. 70-2: Defs.' First Am. Objections And Resps. To Pl.'s First Reqs. For Admis.) at Resp. No. 34.

230.    On May 13, 2020, Stacy sent her divorce attorney an e-mail with the subject "I need help!!" and the following text:

> Mike Keisler just called, they have done another evaluation of the company. Somehow it came with me getting more money. Because of the Covid thing I have to sign these papers today, like now.
> I feel like I need to have someone look at them on my behalf. I don't know who to talk to other than Scott [Seid, the Companies' attorney]. I just left him a message. I don't know if he is in the office today or if he can even get back to me today.
> I am wondering if there was any way for you to get ahold of him and let him know I really need to talk with him or someone who is familiar with the situation. I know I am probably asking for the impossible.
> Thank you,
>
> *Stacy Widen Randall*

(Suppl. Decl. of D. Palay, ¶ 6, Ex. 4.)

**RESPONSE:** Undisputed.

231.    On May 13, 2020, Kiesler did not offer to pause the redemption transaction so that Stacy could have her son or anyone else review the redemption agreement and promissory note before signing. (Suppl. Decl. of Stacy Randall ¶¶ 38, 40.)

**RESPONSE:** Disputed. After Randall and Attorney Seid spoke on the phone, Kiesler and Randall went into another area of the building, and Kiesler asked Randall if she wanted to

review the documents alone, review the documents with an attorney and not sign them that day, or review the documents with her son or anyone else before signing them. Randall declined. Kiesler also did not prevent Randall from leaving, or give her a time limit that she could remain in the office while she was there to sign the documents. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.19, ¶¶ 144, 147.

232.    On May 13, 2020, Kiesler did not read aloud the redemption agreement and promissory note to Stacy. (Suppl. Decl. of Stacy Randall ¶ 49.)

**RESPONSE:** Disputed. Kiesler read aloud the stock redemption agreement and promissory note word for word while Randall followed along, stopping after each paragraph to ask if she understand and had any questions. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p. 19, ¶ 145; Kiesler Dep., Sept. 19, 2023, at 225:23-226:10; Randall Dep. Aug. 28, 2023, at 318:16-24.

233.    Prior to May 13, 2020, Reed did not offer to purchase Stacy's interest in Millmont. (Suppl. Decl. of Stacy Randall ¶ 20.)

**RESPONSE:** Undisputed.

234.    [Pl.'s PFOF ¶ 207] The next day, May 14, 2020, Kiesler messaged Gonnering, ███████████████████████████████████████████ ██████████████████████████ (Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

**RESPONSE:** Undisputed.

235.    [Pl.'s PFOF ¶ 208] Gonnering responded, ████████████████████ ███████ (Palay Decl., ¶ 57, Ex. 55, WINDY0047517.)

**RESPONSE:** Undisputed.

236.    [Pl.'s PFOF ¶ 209] The same day, May 14, 2020, Kiesler texted Reed, ████ ████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████ (Palay Decl.,

¶ 58, Ex. 56, WINDY0047370; Answer ¶ 123.)

**RESPONSE:** Undisputed.

237.    [Pl.'s PFOF ¶ 211] On May 22, 2020, Gonnering e-mailed Reed and Kiesler about Widen Enterprises' operations. (Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

**RESPONSE:** Undisputed.

238.    [Pl.'s PFOF ¶ 212] In that May 22, 2020 correspondence, Gonnering stated ████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

(Palay Decl., ¶ 61, Ex. 59, WINDY0000955.)

**RESPONSE:** Undisputed.

239.    [Pl.'s PFOF ¶ 214] In that same May 22, 2020 correspondence, under the heading ███████████████ Gonnering stated that ████████████████████████████████

█████████████████████████████████████████████████████████

████████ (Palay Decl., ¶ 61, Ex. 59, WINDY0000955 at 956.)

**RESPONSE:** Undisputed.

240.    [Pl.'s PFOF ¶ 215] Defendants say that in "late June or early July" 2020—i.e., approximately 6 to 8 weeks after Stacy's redemption—Reed "first expressed an interest to Mr. Gonnering in selling Widen Enterprises, Inc. somewhere between two to five years' time (*i.e.*, between mid-2022 to 2025)." (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp.9-10, Defs.' Answer to Interrogatory No. 6.)

**RESPONSE:** Undisputed.

241.     [Pl.'s PFOF ¶ 216] On June 3, 2020, Kiesler contacted a tax partner at the Companies' accounting firm, inquiring, ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ (Palay Decl., ¶ 37, Ex. 35, WINDY0044692.)

**RESPONSE:** Undisputed.

242.     [Pl.'s PFOF ¶ 217] One month later, on July 3, 2020, Gonnering wrote to Reed and Kiesler about ████████████████ stating that ████████████████████ ████████████████████████████████████████████████████ ████████████████████ (Palay Decl., ¶ 38, Ex. 36, WINDY0044312.)

**RESPONSE:** Undisputed.

243.     [Pl.'s PFOF ¶ 218] On August 19, 2020, Reed explicitly ████████████ ████████████████████████████████████ (Palay Decl., ¶ 62, Ex. 60, WINDY0047301.)

**RESPONSE:** Undisputed.

244.     [Pl.'s PFOF ¶ 220] By October 8, 2020, Gonnering had spoken with Software Equity Group, the investment bank that later brokered the sale of Widen Enterprises to Acquia, about a possible engagement. (Palay Decl., ¶ 63, Ex. 61, SEG_00000001; Palay Decl., ¶ 28, Ex. 26, ACQUIA0006834 at 6835.)

**RESPONSE:** Undisputed.

245.     [Pl.'s PFOF ¶ 221] Widen Enterprises ended up keeping the $2.7 million in PPP loans, which Reed testified went ████████████████████ (08/23/2023 R. Widen Dep. Tr. 213:1-6.)

**RESPONSE:** Disputed as to how the PPP funds were utilized. Widen Enterprises' CFO, the individual with personal knowledge, confirmed that the PPP funds were used to continue operations. Kiesler Dep., Sept. 19, 2023, at 288:20-22. Otherwise, undisputed.

246.   [Pl.'s PFOF ¶ 222] The documents Stacy signed at the Companies' office on May 13, 2020, consisted of a Stock Redemption Agreement, dated May 13, 2020, and a Promissory Note, also dated May 13, 2020. (Answer ¶¶ 119, 125; Compl. ¶ 125; Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3172, 3176.)

**RESPONSE:** Undisputed.

247.   [Pl.'s PFOF ¶ 225] The promissory note provided for an annual interest rate on Windy Waters' outstanding obligations to Stacy of only 0.580%, the Applicable Federal Rate—the lowest rate that may be charged without the U.S. Internal Revenue Service ("IRS") requiring that interest income be imputed—as published by the IRS for May 2020. (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3176; Answer ¶¶ 139, 140.)

**RESPONSE:** Undisputed.

248.   [Pl.'s PFOF ¶ 226] The promissory note was not secured by collateral or guaranteed by a guarantor or surety. (Palay Decl., ¶ 56, Ex. 54, WINDY0003172 at 3176; Answer ¶ 141.)

**RESPONSE:** Undisputed.

249.   [Pl.'s PFOF ¶ 227] Defendants calculated the price paid to Stacy for her shares using the EBITDA Formula for the "Fair Market Value per share" from Windy Waters' shareholder agreement. (Palay Decl., ¶ 41, Ex. 39, STAFFORD001291 at 1294; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Answer ¶ 178.)

**RESPONSE:** Disputed that Widen Enterprises had any involvement at all, and disputed

that Reed performed the calculations. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶ 80; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, (ECF No. 1-6), B (ECF No. 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6); Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, p.16, 18, ¶¶ 119, 134, Ex. U (ECF No. 75-23). Otherwise, undisputed.

250.    [Pl.'s PFOF ¶ 228] Based on that calculation, Defendants had calculated the "Estimated Value of Windy Waters" to be $6,896,973, less than 5% of the value that Defendants sold Widen Enterprises for sixteen months after Stacy's May 2020 redemption. (Palay Decl., ¶ 43, Ex. 41, WINDY0036828; Answer ¶¶ 148, 179; Compl., Ex. F, ECF No. 1-11.)

**RESPONSE:** Disputed that Widen Enterprises had any involvement, and that Reed performed the calculations. Further, disputed that the referenced formula calculated the "Estimated Value of Windy Waters, Inc." That phrase appears on a spreadsheet Kiesler used internally to calculate the formula, but it simply represents the total the formula reaches for 100% of shares based on the calculation. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.10, ¶ 80; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Exs. A, (ECF No. 1-6), B (ECF No. 1-7); Seid Dep., Aug. 17, 2023, at 40:22-41:2; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 7, Ex. F (ECF No. 70-6); Kiesler Dep., Sept. 19, 2023, at 71:10-21; Kiesler Decl., Sept. 29, 2023, p.16, 18, ¶¶ 119, 134, Ex. U (ECF No. 75-23); Kiesler Decl., Nov. 10, 2023, pp.5-8, ¶¶ 23, 27-34; Hutler Decl., Sept. 29, 2023, (ECF No. 68) pp.2-3, ¶¶ 6, 9-10, 12-13, Exs. 1 (ECF No. 68-1), 2 (ECF No. 68-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) p.4, ¶¶ 33-35. Otherwise, undisputed.

251.    [Pl.'s PFOF ¶ 229] After Stacy learned of the sale of Widen Enterprises to

Acquia, but prior to the closing of that transaction, Stacy spoke to Reed on the phone and told him that she had concerns about how her redemption had been handled in May 2020. (09/28/2023 S. Randall Decl., p.2, ¶ 10; Answer ¶ 154.)

**RESPONSE:** Undisputed.

252.     One goal of the sale of Widen Enterprises was to find "a good home" for Widen Enterprises. (9/29/23 M. Gonnering Dep. Tr. 97:6-14.)

**RESPONSE:** Disputed. The goal was to obtain as high of a price as possible. Gonnering Decl., Sept. 29, 2023, (ECF No. 69) p.9, ¶¶ 67-68, Ex. E (ECF No. 75-3). The cited testimony simply states that Gonnering agreed with executing on the sale because Acquia was also a good home for Widen Enterprises.

253.     [Pl.'s PFOF ¶ 230] On September 10, 2021, after Stacy expressed her concerns, Reed sent Stacy a text message saying: "I haven't talked to Kiesler yet but I did find out that we that we (sic) didn't start talking about selling it until February this year." (Palay Decl., ¶ 64, Ex. 62, Randall0000051; Answer ¶ 166.)

**RESPONSE:** Undisputed.

254.     [Pl.'s PFOF ¶ 231] Later that same day, Reed asked Kiesler how much stock Stacy had owned. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep.  Tr. 186:18-187:25.)

**RESPONSE:** Undisputed.

255.     [Pl.'s PFOF ¶ 232] Kiesler told Reed ██████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:1-25.)

**RESPONSE:** Undisputed.

256.     [Pl.'s PFOF ¶ 233] Reed responded, ███████████████████████████

████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-25.)

**RESPONSE:** Undisputed.

257.    [Pl.'s PFOF ¶ 234] Kiesler told him, ████████████████████ ████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 187:9-188:17.)

**RESPONSE:** Undisputed.

258.    [Pl.'s PFOF ¶ 235] Reed responded, ████████████████ ████████████████████████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 188:18-25.)

**RESPONSE:** Undisputed.

259.    [Pl.'s PFOF ¶ 236] Kiesler explained that ████████████████ ██████████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 189:19-22.)

**RESPONSE:** Undisputed.

260.    [Pl.'s PFOF ¶ 237] Referring to the balance of the promissory note and a $1 million "gift" Reed had offered Stacy until she hired attorneys to represent her with respect to the May 13, 2020 redemption, Reed told Kiesler, ████████████████████ ██████ (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 190:5-11.)

**RESPONSE:** Undisputed.

261.    Reed's offer to Stacy of $1 million in September 2021 was an attempt by Reed to "keep [Stacy] happy" and stop Stacy from pursuing her legal and equitable rights and

remedies relating to Defendants' acts and omissions regarding the May 2020 redemption. (Palay Decl., ¶ 59, Ex. 57, WINDY0047417 at 47418; 08/23/2023 R. Widen Dep. Tr. 188:18-25, 190:5-11; Suppl. Decl. of Stacy Randall ¶ 43.)

**RESPONSE:** Disputed. Reed offered each of his living siblings (including Randall) a gift of $1 million each, and his wife's siblings $500,000, which he assumed would make them happy, not to prevent Randall for pursuing her rights.  Reed Dep., Aug. 23, 2023, at 163:11-164:1, 175:24-176:14, 185:9-185:21; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.10, ¶¶ 89-90.

262.    In the September 2021 call between Reed and Stacy, Reed said he was going to write Stacy a check for $1 million, to which she did not respond, then Reed said he was also going to write Price and Tyler checks for $1 million and said he was ███████████ █████████████ to which Stacy responded by saying, "That's very nice of you." (Suppl. Decl. of Stacy Randall ¶ 44.)

**RESPONSE:** Undisputed for purposes of this motion and immaterial.

263.    [Pl.'s PFOF ¶ 238] The next day, September 11, 2021, Reed texted Kiesler, ██████████████████████████████████████████████████████████ to which Kiesler responded with an emoji indicating he understood Reed's text. (Palay Decl., ¶ 65, Ex. 63, WINDY0047403 at 47404; 08/23/2023 R. Widen Dep. Tr. 172:7-173:8.)

**RESPONSE:** Undisputed.

264.    [Pl.'s PFOF ¶ 239] Reed then texted Kiesler, ████████████████████ ██████████████████████████████████████████████████████████ which message Kiesler texted to Gonnering to ask if Reed had talked to Gonnering about the same. (Palay Decl., ¶ 66, Ex. 64, WINDY0047405 at 47406; Palay Decl., ¶ 67, Ex. 65, WINDY0047401 at 47402.)

**RESPONSE:** Undisputed.

265.    [Pl.'s PFOF ¶ 240] Gonnering responded that Reed ███████████
███████████████████████████████████████████████████████████████████
██████████████████████ (Palay Decl., ¶ 67, Ex. 65, WINDY0047401
at 47402.)

**RESPONSE:** Undisputed.

266.    [Pl.'s PFOF ¶ 241] Pursuant to the sale of Widen Enterprises to Acquia, Kiesler
received approximately $12,354,238.37 based on his 8.32% indirect ownership of Widen
Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490
(excerpted), sheet titled "Proceeds to Owners of WWI"; Palay Decl., ¶ 22, Ex. 20, 07/19/2023
Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.3, Defs.'
Response to Request for Admission No. 3.)

**RESPONSE:** Although Kiesler owned 8.32% of Windy Waters, the holding company of
Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this resulted
in his 8.32% "indirect ownership of Widen Enterprises." Further, Defendants do not dispute that
Kiesler received approximately $12,354,238.37 based on that 8.32% ownership of Windy
Waters.

267.    [Pl.'s PFOF ¶ 242] Pursuant to the sale of Widen Enterprises to Acquia,
Gonnering received approximately $13,998,109.30 based on his 9.43% indirect ownership of
Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66,
ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI".)

**RESPONSE:** Although Gonnering owned 9.43% of Windy Waters, the holding company
of Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this

resulted in his 9.43% "indirect ownership of Widen Enterprises." Further, Defendants do not dispute that Gonnering received approximately $13,998,109.30 based on that 9.43% ownership of Windy Waters.

268.    [Pl.'s PFOF ¶ 243] Pursuant to the sale of Widen Enterprises to Acquia, Reed received approximately $102,430,634.54 based on his approximately 68.97% indirect ownership of Widen Enterprises upon the closing of the transaction. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheet titled "Proceeds to Owners of WWI; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.3, Defs.' Response to Request for Admission No. 2.)

    **RESPONSE:** Although the Reed C. Widen and Leanne M. Widen Revocable Trust of 2013 owned approximately 68.97% of Windy Waters, the holding company of Widen Enterprises, for purposes of this motion only, Defendants do not dispute that this resulted in Reed (as trustee) having a 68.97% "indirect ownership of Widen Enterprise." Further, Defendants do not dispute that Reed received approximately $102,430,634.54 based on that 68.97% ownership of Windy Waters.

269.    [Pl.'s PFOF ¶ 245] If Stacy had owned the approximately 20% of Windy Waters stock that Defendants purchased under the May 13, 2020 redemption agreement at the time of Widen Enterprises' sale to Acquia, Stacy would have been entitled to receive approximately $31,727,700 based on her 19.585% indirect ownership of Widen Enterprises, and would have received approximately $29,403,545.30 upon the closing of the transaction after expenses. (Palay Decl., ¶ 68, Ex. 66, ACQUIA0001490 (excerpted), sheets titled "Shareholder Proceeds" and "Definitions.")

    **RESPONSE:** Although Defendants arrived at a slightly different calculation for what

Randall would have received upon the closing of the transaction after expenses, for purposes of this motion only, undisputed.

270.    [Pl.'s PFOF ¶ 257] During settlement negotiations with Defendants' counsel prior to filing the Complaint, Stacy's counsel demanded certain discovery, including text and e-mail correspondence among the defendant parties, and the shareholder agreement Defendants' counsel had mentioned in prior correspondence. (Palay Decl., ¶ 76, Ex. 71, 03/03/2022 E-mail from D. Palay to J. Friedman.)

**RESPONSE:** Undisputed.

271.    [Pl.'s PFOF ¶ 258] Those documents were not provided until May 2022. (Palay Decl., ¶ 77.)

**RESPONSE:** Undisputed.

272.    [Pl.'s PFOF ¶ 259] To address Stacy's concerns that settlement negotiations could delay or prejudice her assertion of claims, on March 1, 2022, Stacy, Defendants, and third parties entered into a written Standstill and Tolling Agreement. (Palay Decl., ¶¶ 76-78, Exs. 71-72, Standstill and Tolling Agreement.)

**RESPONSE:** Undisputed, except to the extent that the Standstill and Tolling Agreement is inadmissible. Paragraph 6 of the Standstill and Tolling Agreement states, "[t]he Parties agree further that this Agreement will not be admissible for any purpose other than to rebut a defense based on the passage of time." Palay Decl., Sept. 29, 2023, (ECF No. 63) p.10, ¶ 78, Ex. 72 (ECF No. 63-71).

273.    [Pl.'s PFOF ¶ 260] The Standstill and Tolling Agreement provides that "the Parties wish to continue to investigate the Dispute and negotiate to determine a prudent resolution of any alleged claims," and that "during the period of this investigation and any

subsequent negotiations  or resolution, the Parties wish to avoid litigation and toll any applicable statutes of limitations or similar defenses and to provide for the retention of any legal or equitable actions or defenses that the Parties may have." (Palay Decl., ¶ 78, Ex. 72, Standstill and Tolling Agreement at 1.)

**RESPONSE:** Disputed. The Standstill and Tolling Agreement is inadmissible. Paragraph 6 of the Standstill and Tolling Agreement states, "[t]he Parties agree further that this Agreement will not be admissible for any purpose other than to rebut a defense based on the passage of time." Palay Decl., Sept. 29, 2023, (ECF No. 63) p.10, ¶ 78, Ex. 72 (ECF No. 63-71).

274.    Stacy, by her counsel, terminated the Standstill and Tolling Agreement among her and Defendants as of June 10, 2022. (Suppl. Decl. of D. Palay ¶ 17, Ex. 14.)

**RESPONSE:** Undisputed.

275.    Defendants did not produce the document Bates stamped WINDY0001100 until on or around April 29, 2022. (Suppl. Decl. of D. Palay ¶ 7, Ex. 5 (4/29/2022 document production cover letter from M. Churchill to Stacy's counsel).)

**RESPONSE:** Undisputed, but immaterial.

276.    Upon counsel's investigation, the metadata for WINDY0001100 appears to state that it was last modified on March 25, 2022, but was not created until April 29, 2022. (Suppl. Decl. of D. Palay ¶ 7.)

**RESPONSE:** Undisputed for purposes of this motion only that the metadata shows WINDY0001100 was last modified on March 25, 2022. Disputed that the metadata shows WINDY0001100 was created on April 29, 2022. The metadata available to Defendants' counsel shows WINDY0001100 was "created" on April 28, 2022, the date on which Defendants' counsel's ediscovery team downloaded the document for its production to Randall's counsel the

following day.

277.     [Pl.'s PFOF ¶ 265] The only financial information that Defendants claim to have provided Stacy prior to her May 13, 2020 redemption consists of a price-per-share calculation model based on the EBITDA Formula for the (so-called) "Fair Market Value per share" from Windy Waters' shareholder agreement. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; *see* Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94.)

**RESPONSE:** If and only if "prior to her May 13, 2020 redemption" means the period of time between May 6, 2020, and May 13, 2020, then undisputed that the price-per-share calculation model was the only financial information provided to Randall during that time period. If "prior to her May 13, 2020 redemption" means a broader time period, then it is disputed: Randall received tax forms each year she was a shareholder to help her file taxes, and such tax forms provided information about Windy Waters' financials. In April 2016, at her then-husband's request, Randall received financial statements of the company. In March 2020, through her counsel, she received bank statements and investment account statements for Windy Waters. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.21, ¶ 171; Kiesler Decl., Nov. 10, 2023, pp.3-4, ¶¶ 11, 13-16, Exs. C (WINDY0056318), E (WINDY0059942), F (WINDY0059720), G (WINDY0059740), H (WINDY0059752), I (WINDY0038393), J (WINDY0057416); Randall Dep., Aug. 28, 2023, at 149:12-17, 150:17-151:4.

278.     [Pl.'s PFOF ¶ 266] Defendants did not tell Stacy prior to the May 2020 redemption that at least two different lawyers communicated to Reed and ████████████ ██████████████████████████████████████████████████████████████████ (Palay Decl., ¶ 45, Ex. 43, STAFFORD000040; Palay Decl., ¶ 44, Ex. 42, WINDY0033984), or

that no provision of the Shareholder Agreement of Windy Waters in effect as of May 13, 2020, limited the purchase price paid to her for her stock in Windy Waters on May 13, 2020. (09/28/2023 S. Randall Decl., p.2, ¶ 12; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

279.     [Pl.'s PFOF ¶ 267] Defendants did not tell Stacy prior to the May 2020 redemption that the "Fair Market Value per share" calculated with the EBITDA formula under the Windy Waters shareholder agreement did not equal or approximate the fair market value of Stacy's shares. (09/28/2023 S. Randall Decl., p.2, ¶ 13; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

280.     [Pl.'s PFOF ¶ 268] Defendants did not tell Stacy prior to the May 2020 redemption that the value of her interest in Windy Waters was negotiable. (09/28/2023 S. Randall Decl., p.3, ¶ 14; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 45, Ex. 43, STAFFORD000040; Palay Decl., ¶ 44, Ex. 42, WINDY0033984.)

**RESPONSE:** Undisputed, but immaterial.

281.     [Pl.'s PFOF ¶ 269] Defendants did not disclose to Stacy prior to the May 2020 redemption that Windy Waters held nearly $5.5 million in investment portfolios. (09/19/2023 M. Kiesler Dep. Tr. 177:14-179:19, 294:6-296:9; 09/28/2023 S. Randall Decl., p.3, ¶ 15; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

282.     [Pl.'s PFOF ¶ 270] Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of April 24, 2020, the marketable securities owned or controlled by Windy Waters were not being used as operating capital for the Companies. (09/28/2023 S. Randall Decl., p.3, ¶ 16; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 22, Ex. 20, 07/19/2023 Defs.' First Am. Objections & Responses to Pl.'s First Set of Requests for Admission, p.18, Defs.' Response to Request for Admission No. 39.)

**RESPONSE:** Undisputed, but immaterial.

283.     [Pl.'s PFOF ¶ 271] Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula did not capture or approximate the fair market value of Windy Waters. (09/28/2023 S. Randall Decl., p.3, ¶ 17; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 41, Ex. 39, STAFFORD001291-94; Palay Decl., ¶ 43, Ex. 41, WINDY0036828; 08/23/2023 R. Widen Dep. Tr. 90:6-93:2; 09/19/2023 M. Kiesler Dep. Tr. 141:6-13.)

**RESPONSE:** Disputed. Randall knew from the consistent use of the Stock Price Formula for her own prior subscription and five prior stock redemptions that the share price produced was not the actual "fair market value of Windy Waters." Kiesler also walked Randall through the Stock Price Formula used to calculate the $1.1 million share price as of company financials through the end of November 2019, which Randall says Kiesler explained had "nothing to do with how good or bad the company is doing." When Kiesler received the updated share price of over $1.3 million under the Stock Price Formula she distinguished between the

market value and the formula, asking whether the executives were preparing to sell Widen Enterprises. Randall Dep., Aug. 28, 2023, at 82:23-25, 285:23-286:18 321:2-12; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

284.    [Pl.'s PFOF ¶ 272] Kiesler represented to Stacy that the EBITDA formula calculation was a "fair" price for Windy Waters to pay Stacy for her shares. (Answer ¶ 79, 89.)

**RESPONSE:** Disputed. Kiesler did not tell Randall the price was "fair," but that the calculation method was fair, since it had been used for everyone. Compl. (ECF No. 1), ¶¶ 79, 89; Am. Answer (ECF No. 45), ¶¶ 79, 89; Kiesler Dep., Sept. 19, 2023, at 174:19-175:18, 227:10-13; Kiesler Decl., Sept. 29, 2023 (ECF No. 74) pp.4-7, 17-18, ¶¶ 35-45, 133-37, Ex. D (ECF No. 74-4); Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-92:3; Wittenberg Decl., Nov. 10, 2023, p.2, ¶ 8, Ex. G (Ex. 8 to Windy Waters Dep.); Kiesler Decl., Nov. 10, 2023, pp.6-7, ¶ 27; Reed Decl., Nov. 10, 2023, p.3, ¶ 19.

285.    [Pl.'s PFOF ¶ 273] Defendants did not disclose to Stacy prior to the May 2020 redemption that the fair market value of Windy Waters would necessarily take into account the fair market value of Widen Enterprises. (09/28/2023 S. Randall Decl., p.3, ¶ 18; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; 08/23/2023 R. Widen Dep. Tr. 90:6-14.)

**RESPONSE:** Undisputed, but immaterial.

286.    [Pl.'s PFOF ¶ 274] Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula calculation did not take into account the fair market value of Widen Enterprises. (09/28/2023 S. Randall Decl., p.3, ¶ 19; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.'

Answer to Interrogatory No. 5; 08/23/2023 R. Widen Dep. Tr. 90:6-20.)

**RESPONSE:** Disputed. Randall knew from the consistent use of the Stock Price Formula for her own prior subscription and five prior stock redemptions that the share price produced was not the actual "fair market value of Windy Waters." Kiesler also walked Randall through the Stock Price Formula used to calculate the $1.1 million share price as of company financials through the end of November 2019, which Randall says Kiesler explained had "nothing to do with how good or bad the company is doing." When Kiesler received the updated share price of over $1.3 million under the Stock Price Formula she distinguished between the market value and the formula, asking whether the executives were preparing to sell Widen Enterprises. Randall Dep., Aug. 28, 2023, at 82:23-25, 285:23-286:18, 321:2-12; Kiesler Dep., Sept. 19, 2023, at 280:9-15; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶ 13, Ex. M (ECF No. 70-12).

287.    [Pl.'s PFOF ¶ 275] Defendants did not disclose to Stacy prior to the May 2020 redemption that the EBITDA Formula value for Windy Waters was low compared to the fair market value of Windy Waters. (09/28/2023 S. Randall Decl., p.3, ¶ 20; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

288.    [Pl.'s PFOF ¶ 276] Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises' CEO had stated to Reed and Kiesler that the EBITDA Formula value for Windy Waters was ▮▮▮ (09/28/2023 S. Randall Decl., p.3, ¶ 21; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 30, Ex. 28, WINDY0033900.)

**RESPONSE:** Undisputed, but immaterial.

289.     [Pl.'s PFOF ¶ 277] Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering had stated that the fair market value of Widen Enterprises was based in large part on a multiple of that company's recurring revenue. (09/28/2023 S. Randall Decl., p.4, ¶ 22; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5.)

**RESPONSE:** Undisputed, but immaterial.

290.     [Pl.'s PFOF ¶ 278] Defendants did not disclose to Stacy prior to the May 2020 redemption that Gonnering had stated to Reed and Kiesler on multiple occasions over a period of years that Widen Enterprises' market value was based on a multiple of the company's revenue or recurring revenue. (09/28/2023 S. Randall Decl., p.4, ¶ 23; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 17, Ex. 15, WINDY0034048; Palay Decl., ¶ 13, Ex. 11, WINDY0034383; Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

291.     [Pl.'s PFOF ¶ 279] Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of August 2018, Gonnering had stated to Reed and Kiesler that he believed that Widen Enterprises had a fair market value of approximately $80 million. (09/28/2023 S. Randall Decl., p.4, ¶ 24; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 19, Ex. 17, WINDY0033985.)

**RESPONSE:** Undisputed, but immaterial.

292.     [Pl.'s PFOF ¶ 280] Defendants did not disclose to Stacy prior to the May 2020

redemption that Gonnering's 2018 estimate of the company's fair market value was based on applying a multiple to a substantially lower amount of revenue than the company was projecting for 2020 as of the May 2020 redemption. (09/28/2023 S. Randall Decl., p.4, ¶ 25; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 19, Ex. 17, WINDY0033985; Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

**RESPONSE:** Undisputed, but immaterial.

293.     [Pl.'s PFOF ¶ 281] Defendants did not disclose to Stacy prior to the May 2020 redemption that they had ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ (09/28/2023 S. Randall Decl., p.4, ¶ 26; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 33, Ex. 31, WINDY0033899; 09/21/2023 M. Gonnering Dep. Tr. 164:8-165:18.)

**RESPONSE:** Undisputed, but immaterial.

294.     [Pl.'s PFOF ¶ 282] Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises had total revenues of █████████ for 2019. (09/28/2023 S. Randall Decl., p.4, ¶ 27; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Answer ¶ 195.)

**RESPONSE:** Undisputed, but immaterial.

295.     [Pl.'s PFOF ¶ 283] Defendants did not disclose to Stacy prior to the May 2020 redemption that Widen Enterprises had ██████████ of recurring revenue in 2019.

(09/28/2023 S. Randall Decl., p.4, ¶ 28; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 4,  Ex. 2, WINDY0007901 at 7985.)

**RESPONSE:** Undisputed, but immaterial.

296.   [Pl.'s PFOF ¶ 284] Defendants did not disclose to Stacy prior to the May 2020 redemption that, as of May 8, 2020, Widen Enterprises' CEO projected software revenue for 2020 of approximately ██████████ (09/28/2023 S. Randall Decl., p.5, ¶ 29; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 21, Ex. 19, WINDY0009851.)

**RESPONSE:** Undisputed, but immaterial.

297.   [Pl.'s PFOF ¶ 285] Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed received compensation from the Companies of approximately ██████ for 2019. (09/28/2023 S. Randall Decl., p.5, ¶ 30; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed, but immaterial.

298.   [Pl.'s PFOF ¶ 286] Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed received compensation from the Companies of approximately ██████ for 2020. (09/28/2023 S. Randall Decl., p.5, ¶ 31; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 35, Ex. 33, WINDY0001100; Palay Decl., ¶ 10, Ex. 8,

06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, p. 11, Defs.' Answer to Interrogatory No. 7.)

**RESPONSE:** Undisputed, but immaterial.

299.    [Pl.'s PFOF ¶ 287] Defendants did not disclose to Stacy prior to the May 2020 redemption that Reed was ███████████████████ Widen Enterprises in 2019 or 2020. (09/28/2023 S. Randall Decl., p.5, ¶ 32; Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 7-9, Defs.' Answer to Interrogatory No. 5; Palay Decl., ¶ 34, Ex. 32, SEG_00004131 at 4142.)

**RESPONSE:** Undisputed, but immaterial.

300.    [Pl.'s PFOF ¶ 289] Defendants claim that Stacy provided the stamp with implied, ongoing permission for them to ████████████████████████ (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

**RESPONSE:** Undisputed.

301.    [Pl.'s PFOF ¶ 290] Reed testified that █████ required that Kiesler contact Stacy ██████████ to obtain her consent for each specific document that Defendants wanted to stamp with her signature. (08/23/2023 R. Widen Dep. Tr. 219:3-220:23.)

**RESPONSE:** Disputed. Reed's testimony was referencing occasions on which Randall had not already approved the usage of the stamp, either through her blanket permission or when he had already done so. Kiesler followed that protocol. Reed Dep., Aug. 23, 2023, at 218:22-219:6; Kiesler Dep., Sept. 19, 2023, at 31:12-18, 61:9-20, 62:18-63:1, 67:7-68:8, 100:22-101:3, 103:11-19, 115:14-116:4, 126:11-15; Randall Dep., Aug. 28, 2023, at 117:6-9; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 22-24; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.3-4, ¶¶

25-26; Reed Decl., Nov. 10, 2023, p.4, ¶ 24; Kiesler Decl., Nov. 10, 2023, pp.2-3, ¶ 10, Exs. A (WINDY0056342), B (WINDY0056344).

302.   [Pl.'s PFOF ¶ 291] Reed testified that he ███████ Kiesler would have contacted Stacy as described in the preceding paragraph, but he could not be certain because he was not always present when Kiesler allegedly did contact Stacy for permission to use her signature stamp. (08/23/2023 R. Widen Dep. Tr.219:3-220:23.)

**RESPONSE:** Undisputed.

303.   [Pl.'s PFOF ¶ 292] Kiesler testified that he relied on Reed's representation that Reed had discussed a document with Stacy before Kiesler affixed Stacy's stamp but that ███ ████████████████████████ (09/19/2023 M. Kiesler Dep. Tr. 100:22-104:25.)

**RESPONSE:** Undisputed.

304.   [Pl.'s PFOF ¶ 293] Kiesler testified that Stacy gave him ████████ to affix her signature stamp to annual corporate resolutions, such as "minutes of annual meetings of the shareholders of Windy Waters, Inc." for meetings that did not actually occur, which included documents purporting to appoint Stacy as director and/or President of Windy Waters. (09/19/2023 M. Kiesler Dep. Tr. 104:4-13, 114:4-24; 117:9-118:7, 132:2-133:2, 134:16-135:15, 280:22-24; *see generally id.* 106:20-137:17.)

**RESPONSE:** Disputed. The phrase "implied consent" calls for a legal conclusion, and Defendants objected on that basis during Kiesler's deposition. In actuality, as Kiesler's testimony showed, Randall gave Kiesler *express* blanket consent to use the signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. Kiesler Dep., Sept. 19, 2023, at 104:4-9, 115:14-116:4, 126:11-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 23-24.

305.    [Pl.'s PFOF ¶ 294] Kiesler could not recall ever sending Stacy any of the annual resolutions shown to him at his deposition, and he had no basis to believe that Stacy ever saw these documents or that she knew of their contents. (09/19/2023 M. Kiesler Dep. Tr. 109:18-111:16,   111:25-113:17,   124:5-127:4,   127:8-128:18,   128:23-130:2,   130:9-135:18,   135:22-137:17.)

**RESPONSE:** Undisputed.

306.    [Pl.'s PFOF ¶ 295] Using the stamp, Defendants affixed Stacy's signature to Windy Waters corporate documents from 2004 to 2019, including documents appointing or electing  Stacy to various roles at Windy Waters, including director and, in certain instances, President. (Palay Decl., ¶ 81, Ex. 73, STAFFORD001059 (2020 director); Palay Decl., ¶ 82, Ex. 74, STAFFORD001055 (2019 director); Palay Decl., ¶ 83, Ex. 75, STAFFORD001051 (2018 President); Palay Decl., ¶ 84, Ex. 76, STAFFORD001050 (2018 director); Palay Decl., ¶ 85, Ex. 77, STAFFORD001048 (2017 President); Palay Decl., ¶ 86, Ex. 78, STAFFORD001047 (2017 director); Palay Decl., ¶ 87, Ex. 79, STAFFORD001041 (2016 director); Palay Decl., ¶ 88, Ex. 80, STAFFORD001037 (2015 director); Palay Decl., ¶ 89, Ex. 81, STAFFORD001032 (2014 director); Palay Decl., ¶ 90, Ex. 82, STAFFORD001019 (2012 director); Palay Decl., ¶ 91, Ex. 83, STAFFORD001010 (2011 director); Palay Decl., ¶ 92, Ex. 84, STAFFORD001007 (2010 director); Palay Decl., ¶ 93, Ex. 85, STAFFORD001005 (2009 director); Palay Decl., ¶ 94, Ex. 86, STAFFORD000997 (2008 director); Palay Decl., ¶ 95, Ex. 87, STAFFORD000975 (2004).)

**RESPONSE:** Disputed to the extent that Randall asserts that all Defendants affixed Randall's signature stamp to Windy Waters corporate documents from 2004 to 2019, as Widen Enterprises never affixed Randall's signature stamp. In fact, Randall's signature stamp was kept

"locked in [Kiesler's] drawer[,]" and no one other than Kiesler affixed Randall's signature stamp on documents. Otherwise, undisputed. Kiesler Dep. Sept. 19, 2023, at 67:7-23.

307.    [Pl.'s PFOF ¶ 296] Kiesler, alone, signed documents appointing Stacy as President. (Palay Decl., ¶ 96, Ex. 88, STAFFORD001057 (2020 President); Palay Decl., ¶ 97, Ex. 89, STAFFORD001053 (2019 President); Palay Decl., ¶ 98, Ex. 90, STAFFORD001043 (2016 President); Palay Decl., ¶ 99, Ex. 91, STAFFORD000999 (2008 President).)

**RESPONSE:** Undisputed.

308.    [Pl.'s PFOF ¶ 299] Despite saying that they believed they had been granted implied, ongoing permission to use Stacy's signature stamp in lieu of her actual signature in 2004, Defendants nonetheless chose to obtain Stacy's actual signature on certain documents throughout the years, notably four of the five redemption agreements she executed prior to the May 13, 2020 redemption agreement at issue in this case. (Palay Decl., ¶ 102, Ex. 94, STAFFORD000810 (2019); Palay Decl., ¶ 103, Ex. 95, STAFFORD000804 (2017); Palay Decl., ¶ 20, Ex. 18, STAFFORD000786 (2007); Palay Decl., ¶ 6, Ex. 4, STAFFORD000781 (2005).)

**RESPONSE:** Undisputed.

309.    [Pl.'s PFOF ¶ 300] The only instance where Defendants can specifically recall Stacy providing specific consent for the use of her signature stamp was via text message on December 26, 2019, for a document that did not elect or appoint Stacy to any position at the Companies. (Palay Decl., ¶ 10, Ex. 8, 06/23/2023 Defs.' Objections & Responses to Pl.'s First Set of Interrogatories, pp. 6-7, Defs.' Answer to Interrogatory No. 4.)

**RESPONSE:** Disputed. Defendants responded to Interrogatory No. 4 of Plaintiff's First Set of Interrogatories by acknowledging that "Defendants cannot recall *every* occasion" on

which a person discussed with Randall the usage of her signature stamp, but that "[o]ne occasion Defendants *can* recall" occurred on December 26, 2019, as further described in Defendants' response. Nonetheless, to provide another example, on March 23, 2010, Randall provided Kiesler with her specific consent to affix her signature stamp on a consent to redeem stock for Thomas Schmidt, writing, "Yes, Mr. [] Mike that would be just fine if you used my signature stamp!!!! :)" before Randall proceeded to "crack [her]self" up by replying in colored font that was "prettier than [Kiesler's]." Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 2, Ex. A (ECF No. 70-1: Defs.' Objections And Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 4 (emphasis added); Kiesler Decl., Nov. 10, 2023, pp.2-3, ¶ 10, Ex. A (WINDY0056342).

310.   Stacy was not contacted, either by Reed or Kiesler, each time the signature stamp was used on a document. (09/19/2023 M. Kiesler Dep. Tr. 63:11-15, 107:22-108:4, 109:3-12; 08/23/2023 R. Widen Dep. Tr. 219:7-24; Suppl. Decl. of Stacy Randall ¶¶ 9-10, 50.)

**RESPONSE:** Disputed. Each time Randall's signature stamp was affixed to a document that she had not already given her express blanket consent (as she had for Windy Waters' annual meeting minutes and annual consent resolutions), either Reed or Kiesler contacted Randall. Reed Dep., Aug. 23, 2023, at 218:22-219:6; Kiesler Dep., Sept. 19, 2023, at 31:12-18, 61:9-20, 62:18-63:1, 67:7-68:8, 100:22-101:3, 103:11- 19, 115:14-116:4, 126:11-15; Randall Dep., Aug. 28, 2023, at 117:6-9; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 22-24; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.3-4, ¶¶ 25-26; Reed Decl., Nov. 10, 2023, p.4, ¶ 24; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.2-3, ¶ 10, Exs. A (ECF No. 105-1), B (ECF No. 105-2).

311.   Other than two instances in 2010, Kiesler did not send Stacy copies of the documents that he was affixing Stacy's signature to. (ECF No. 55, 09/19/2023 M. Kiesler Dep. Tr. 105:3-6; Suppl. Decl. of D. Palay ¶¶ 9-10, Exs. 7-8.)

**RESPONSE:** Undisputed for purposes of this motion, and immaterial.

312.   Stacy never knew the signature stamp was being used without her consent or knowledge. (Suppl. Decl. of Stacy Randall ¶¶ 9-10.)

**RESPONSE:** Disputed. Randall's signature stamp was never used outside of the scope of authority given by Randall to do so. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶ 24; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.4, ¶ 26.

313.   When providing Kiesler with the signature stamp, Stacy told Kiesler that she expected to be informed each time that Kiesler wanted to use the signature stamp. (Suppl. Decl. of Stacy Randall ¶ 8.)

**RESPONSE:** Undisputed.

314.   Stacy did not give blanket approval for Kiesler to use the signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. (Suppl. Decl. of Stacy Randall ¶¶ 7-8.)

**RESPONSE:** Disputed. After Kiesler explained to Randall the *pro forma* corporate documents Windy Waters completed each year, Randall gave blanket approval for Kiesler to use Randall's signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶ 23; Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15.

315.   The idea for obtaining the signature stamp was Kiesler's idea. (08/28/2023 S. Randall Dep. Tr. 100:5-10, 101:5-9; Suppl. Decl. of Stacy Randall ¶ 6.)

**RESPONSE:** Disputed. The idea of Randall getting a signature stamp came up on an occasion when Randall was in Kiesler's office signing a document for Windy Waters, and Stewart Widen (who was also there) suggested Randall get a signature stamp like he had so it

could be used for her convenience. Subsequently, Randall went to a Staples store to have the signature stamp created and purchased it. Kiesler Dep., Sept. 19, 2023, at 99:1-14; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶ 20; Randall Dep., Aug. 28, 2023, at 98:8-13, 103:20-21, 116:17-24; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶¶ 4-5, Exs. C (ECF No. 70-3: Pl.'s Objections And Resps. to Defs.' First Set of Interrogs.) at Resp. No. 3, D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 95.

316.    Stacy issued a blanket restriction of permission to use her signature stamp when she instructed Kiesler that the stamp could be used as a substitute for her handwritten signature only if Defendants "ask[ed] [her] first or let [her] know first." (08/28/2023 S. Randall Dep. Tr. 104:10-14; Suppl. Decl. of Stacy Randall ¶¶ 7-8.)

**RESPONSE:** Disputed that the condition of contacting Randall whenever the stamp was used is a "blanket restriction of permission." Further disputed that this condition was always in place: After Kiesler explained to Randall the *pro forma* corporate documents Windy Waters completed each year, Randall gave blanket approval for Kiesler to use Randall's signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year without contacting her each time. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 21-24; Kiesler Dep., Sept. 19, 2023, at 115:14:116:4, 126:13-15; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.3-4, ¶¶ 25-26; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.2-3, ¶ 10, Exs. A (ECF No. 105-1), B (ECF No. 105-2). Otherwise, undisputed.

317.    Stacy was unaware that her stamp was being used except when consent to use her stamp was specifically requested by Kiesler or Reed, and Defendants specifically requested such consent in writing on three occasions: December 2019, March 2010, and August 2010. (08/28/2023 S. Randall Dep. Tr. 103:4-11, 104:25-105:5, 138:17-20; Suppl. Decl. of Stacy

Randall ¶¶ 7-10; Suppl. Decl. of D. Palay ¶¶ 9-12, Exs. 7-10.)

**RESPONSE:** Disputed. Randall's signature stamp was never used outside of the scope of authority given by Randall to do so. Randall gave blanket approval for Kiesler to use Randall's signature stamp on annual meeting minutes and annual consent resolutions for Windy Waters each year. Either Reed or Kiesler requested and obtained Randall's consent to affix her stamp on all other documents, but cannot recall each such occasion or recall which were in writing. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p.3, ¶¶ 21-24; Kiesler Dep., Sept. 19, 2023, at 115:14:116:4, 126:13-15; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.2-3, ¶ 10, Exs. A (ECF No. 105-1), B (ECF No. 105-2); Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.3-4, ¶¶ 25-26; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.1, ¶ 2, Ex. A (ECF No. 70-1: Defs.' Objections And Resps. to Pl.'s First Set of Interrogs.) at Resp. No. 4.

318.    [Pl.'s PFOF ¶ 301] As far as Stacy was aware, she and her other siblings were named as "directors" so that they could receive checks for "directors' fees," which her father had distributed to his children around the Thanksgiving and/or Christmas holidays before his death. (09/28/2023 S. Randall Decl., p.5, ¶ 33.)

**RESPONSE:** Disputed. Neither Randall nor her siblings were named as directors solely so they could collect directors' fees; Randall and her siblings were named as directors for legitimate business purposes and undertook actions in that capacity for legitimate business purposes. Palay Decl., Sept. 29, 2023, (ECF No. 63) p. 13, ¶ 100, Ex. 92 (ECF No. 63-91); Reed Dep., Aug. 23, 2023, at 222:18-223:1; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.11, ¶ 94, Ex. H (ECF No. 67-5); Reed Decl., Nov. 10, 2023, p.5, ¶¶ 27-30, Exs. J (WINDY0001638), K (WINDY0001641), L (WINDY0001649), M (WINDY0001700); Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.2, 6, ¶¶ 10, 37, Exs. A

(ECF No. 74-1), D (ECF No. 74-4).

319.     [Pl.'s PFOF ¶ 302] However, Stacy has never participated in any decision-making or governance at the Companies. (09/28/2023 S. Randall Decl., p.5, ¶ 34; 09/19/2023 M. Kiesler Dep. Tr. 243:21-244:18; 08/23/2023 R. Widen Dep. Tr. 64:17-65:15.)

**RESPONSE:** Disputed. Randall gave approval to various decisions and governance matters for the Companies, including approving use of the Stock Price Formula in the Second Amendment, though she was not an active participant beyond giving her approval. Palay Decl., Sept. 29, 2023, (ECF No. 63) p. 13, ¶ 100, Ex. 92 (ECF No. 63-91); Reed Dep., Aug. 23, 2023, at 222:18-223:1; Reed Decl., Sept. 29, 2023, (ECF No. 67) p.11, ¶ 94, Ex. H (ECF No. 67-5); Reed Decl., Nov. 10, 2023, p.5, ¶¶ 27-30, Exs. J (WINDY0001638), K (WINDY0001641), L (WINDY0001649), M (WINDY0001700); Kiesler Dep., Sept. 19, 2023, at 115:14-116:4, 126:13-15; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.2, 6, 12, ¶¶ 10, 37, 87, 89, Exs. A (ECF No. 74-1), D (ECF No. 74-4), P (ECF No. 74-5), Q (ECF No. 75-21).

320.     [Pl.'s PFOF ¶ 303] Stacy lived in Florida from approximately 2001 until approximately 2011. (09/28/2023 S. Randall Decl., p.5, ¶ 35.)

**RESPONSE:** Undisputed.

321.     [Pl.'s PFOF ¶ 304] Reed testified that Stacy had "no active role in the Companies" since her termination as a receptionist in the early 2000s, Stacy attended no meetings, and Stacy did nothing at all at the Companies, while Kiesler testified that Stacy was not notified of the corporate meetings. (08/23/2023 R. Widen Dep. Tr. 64:1-65:15; 09/28/2023 S. Randall Decl., p.5, ¶ 36; Answer ¶ 33; Compl. ¶ 33 n.3; 09/19/2023 M. Kiesler Dep. Tr. 118:14-25, 241:9-243:14.)

**RESPONSE:** Disputed to the extent this paragraph suggests corporate meetings were

held. Annual corporate meetings were not held at any time, of which Randall was aware, and thus Defendants do not dispute that Randall was not notified of such non-existent "corporate meetings." Windy Waters Dep., Nov. 3, 2023, 56:21-23; Kiesler Dep., Sept. 19, 2023, at 114:4:115-3, 117:16-118:4, 125:14-20, 127:16-20, 243:7-10. Otherwise, undisputed.

322.    [Pl.'s PFOF ¶ 305] Stacy never attended a shareholder or board of directors meeting for Windy Waters or Widen Enterprises. (09/28/2023 S. Randall Decl., p.5, ¶ 36; 08/23/2023 R. Widen Dep. Tr. 65:14-15.)

**RESPONSE:** Undisputed.

323.    Kiesler did not provide Stacy with written notice of the shareholder meetings of the Companies from at least 2015 through May 13, 2020. (ECF No. 55, 09/19/2023 M. Kiesler Dep. Tr. 241:16-242:24.)

**RESPONSE:** Disputed to the extent this paragraph suggests corporate meetings were held. Annual corporate meetings were not held, of which Randall was aware, and thus Defendants do not dispute that Randall was not notified of such non-existent "shareholder meetings." Windy Waters Dep., Nov. 3, 2023, 56:21-23; Kiesler Dep., Sept. 19, 2023, at 114:4:115-3, 117:16-118:4, 125:14-20, 127:16-20, 243:7-10.

324.    [Pl.'s PFOF ¶ 310] Widen Enterprises remained profitable during the COVID-19 epidemic. (08/23/2023 R. Widen Dep. Tr. 213:7-15.)

**RESPONSE:** Disputed. Widen Enterprises showed negative net income throughout March and April 2020, which means that Widen Enterprises recognized more expense than revenue in those months. Kiesler Decl., Nov. 10, 2023, p.5, ¶ 24.

325.    [Pl.'s PFOF ¶ 311] Acquia used Widen Enterprises' recurring revenue to assess its then-potential purchase of the company, including noting █████████████████ in

a slide deck. (Palay Decl., ¶ 108, Ex. 100 at slide 3.)

**RESPONSE:** Undisputed, but immaterial. Acquia used a wide array of factors in assessing its purchase of Widen Enterprises, of which Widen Enterprises' recurring revenue was merely one such factor. Palay Decl., Sept. 29, 2023, (ECF No. 63) p.14, ¶ 108, Ex. 100 (ECF No. 63-99).

326.    [Pl.'s PFOF ¶ 312] Reed testified that a person would need to know revenue information in order to understand the Companies' value. (08/23/2023 R. Widen Dep. Tr. 90:6-93:2.)

**RESPONSE:** Undisputed.

327.    In May 2020, during Stacy's divorce, her then-husband, Steven, was in possession of the safe that had cash in it in 2019. (Suppl. Decl. of Stacy Randall ¶ 18.)

**RESPONSE:** Undisputed.

328.    Stacy did not know the combination to that safe. (Suppl. Decl. of Stacy Randall ¶ 18.)

**RESPONSE:** Disputed. Steven testified that the safe's combination "was available to her if she wanted it." Steven Dep., Oct. 25, 2023, at 36:10-12.

329.    Gonnering and Reed first discussed "market valuation [of Widen Enterprises] and your [Reed's] ownership intentions" no later than September 6, 2019. (Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525.)

**RESPONSE:** Disputed that Gonnering and Reed discussed market valuation. A true fair market value calculation requires an expert. Gonnering is not an economist or accountant or otherwise an expert in valuation. Gonnering monitored activity in the market and included information of such activity in his operational updates to Reed for the purpose of ensuring Widen

Enterprises was in a growing market, and sometimes included guesses of various numbers. Undisputed that Gonnering and Reed discussed Reed's ownership intentions on or before September 6, 2019, and that Reed confirmed he intended to continue owning Widen Enterprises and instructed that Widen Enterprises keep growing. Suppl. Decl. of Palay, (ECF No. 117), pp.2-3, ¶ 13, Ex. 11 (WINDY0056524); Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.2, 6, ¶¶ 9, 46; Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.2, 8-9, ¶¶ 14, 73; Gonnering Decl., Nov. 10, 2023, (ECF No. 107) pp.1-2, ¶¶ 3-5; Reed Dep., Aug. 23, 2023, at 98:19-21; Gonnering Dep., Sept. 21, 2023, at 41:12-43:7, 99:19-23, 103:8-104:3, 179:1-80:2, 152:13-154:1, 154:20-157:11, 192:19-194:17, 196:17-197:23, 203:1-10; Widen Enterprises Dep., Nov. 6, 2023, at 167:4-168:11.

330.     Gonnering and Kiesler had already begun discussing the sale of Widen Enterprises, and had disclosed those conversations to Reed, no later than September 6, 2019. (Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525.)

**RESPONSE:** Disputed. Gonnering's operational update stated, among other things, that Gonnering and Kiesler "chatted about when [they] would advise to sell." That is, they discussed the preconditions for when Gonnering and Kiesler *may* advise Reed to sell, but there is no suggestion this happened on or before September 6, 2019, or ever. Suppl. Decl. of Palay, (ECF No. 117), pp.2-3, ¶ 13, Ex. 11 (WINDY0056524).

331.     Gonnering and Kiesler had already begun contemplating the sale of Widen Enterprises, and had disclosed the same to Reed, no later than September 6, 2019. (Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525.)

**RESPONSE:** Disputed. Gonnering's operational update stated, among other things, that Gonnering and Kiesler "chatted about when [they] would advise to sell." That is, they discussed

the preconditions for when Gonnering and Kiesler *may* advise Reed to sell, but there is no suggestion this happened on or before September 6, 2019, or ever. Suppl. Decl. of Palay, (ECF No. 117), pp.2-3, ¶ 13, Ex. 11 (WINDY0056524).

332.    Gonnering and Kiesler's conversations about when they would advise Reed to sell Widen Enterprises were "based on the realization of maximum valuation." (Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525.)

**RESPONSE:** Undisputed, but immaterial.

333.    In his September 6, 2019 Operational Update, Gonnering promised to "continue to keep you [Reed] apprised of industry multiples," and indicated that he did not see "major changes" since his "last commentary on 3-5x multiple of revenue or 10-13x multiple of EBITDA." (Suppl. Decl. of D. Palay ¶ 13, Ex. 11, WINDY0056524 at 56525.)

**RESPONSE:** Undisputed, but immaterial.

334.    Stacy is unaware of ever receiving a copy of the executed May 7, 2007 Second Amendment to Shareholder Agreement (Palay Declaration, Exhibit 39, STAFFORD001293) prior to the May 13, 2020 redemption. (Suppl. Decl. of Stacy Randall ¶ 4.)

**RESPONSE:** Disputed. The Second Amendment contains Randall's signature, signed both as then-President of Windy Waters and separately as a shareholder. She admits she signed it. *See* Pl.'s Resp. to Defs.' Proposed Finding of Fact No. 43. The signature on this document looks just like other signatures confirmed to be hers. Having signed the May 7, 2007 Second Amendment to Shareholder Agreement of Windy Waters, Randall received a copy of the document, whether or not she retained possession of it. Randall Dep., Aug. 28, 2023, at 175:7-24, 209:25-210:5, 212:21-213:16; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.6, 8-10, ¶¶ 37, 52, 60, 66, Exs. D (ECF No. 74-4), F (ECF No. 75-11), H (ECF No. 75-13), I (ECF No. 75-14);

Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) p.2, ¶¶ 5, 7, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. Nos. 24, 40, 48; Seid Dep., Aug. 17, 2023, at 40:22-41:2; Reed C. Widen Decl., July 14, 2023, (ECF No. 33) p.1, ¶ 2, Ex. A (ECF No. 33-1); Compl. (ECF No. 1), ¶ 125, Ex. A (ECF No. 1-6); Steven Dep., Oct. 12, 2023, at 11:19-12:23, 17:16-18:4, 18:20-19:15, 81:19-85:4, 85:9-87:6; Steven Dep., Nov. 6, 2023, at 230:1-232:10; Wittenberg Decl., Nov. 10, 2023, (ECF No. 113) pp.1-2, ¶¶ 2-7, Exs. A (ECF No. 113-1), B (ECF No. 113-2), C (ECF No. 113-3) D (ECF No. 113-4), E (ECF No. 113-5), F (ECF No. 113-6)

335.    In March 2020, Kiesler sent directly to Stacy's divorce attorney documents and information relating to discovery requests in Stacy's divorce proceeding with her now ex-husband, Steven Randall, and Stacy did not review those documents or information at the time or prior to this litigation. (Suppl. Decl. of Stacy Randall ¶ 5; Suppl. Decl. of D. Palay ¶ 8, Ex. 6.)

**RESPONSE:** Undisputed that, in response to Randall's request to help her respond to discovery requests, Kiesler sent Randall's lawyer detailed financial information, including bank statements for Widen Enterprises and investment account statements for Windy Waters, and for purposes this motion only, undisputed that she did not personally review those documents or that information prior to this litigation. Suppl. Decl. of D. Palay, ¶ 8, Ex. 6.

336.    Stacy did not receive bonuses from Widen Enterprises or Windy Waters. (Suppl. Decl. of Stacy Randall ¶ 11.)

**RESPONSE:** Undisputed.

337.    Stacy did not receive any distributions or dividends in 2019 or 2020 from Windy Waters or Widen Enterprises. (Suppl. Decl. of Stacy Randall ¶ 12.)

**RESPONSE:** Undisputed.

338.     At no time in May 2020 did Kiesler walk Stacy through the stock price calculation including explaining the company's net income. (Suppl. Decl. of Stacy Randall ¶ 14.)

**RESPONSE:** Disputed. During Kiesler's phone call with Randall on May 6, 2023, Kiesler walked Randall through the calculation of the Stock Price Formula using November 2019 numbers, including the net income. Kiesler then called Randall on May 13 to communicate the updated calculation under the Stock Price Formula, using December 2019 financials as promised, of over $1.3 million. Kiesler Dep., Sept. 19, 2023, at 71:10-21, 172:23-173:2; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-18, ¶¶ 118-20, 133, 140-41, Ex. U (ECF No. 75-23); Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶ 4, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 63; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.5-7, ¶¶ 23, 27-32; Randall Dep., Aug. 28, 2023, at 261:19-24, 303:17-304:12.

339.     Stacy has no recollection of ever receiving the July 22, 2004 "Valuation of Windy Waters, Inc." document authored by Bruce Hutler (Hutler Declaration, Exhibit 1) until after the filing of this lawsuit. (Suppl. Decl. of Stacy Randall ¶ 13.)

**RESPONSE:** Undisputed.

340.     Kiesler did not read the stock redemption agreement and promissory note aloud word for word while Ms. Randall followed along, stopping after each paragraph to ask if she understood and whether she had any questions. (08/28/2023 S. Randall Dep. Tr. 317:8-17.)

**RESPONSE:** Disputed. Kiesler read aloud the stock redemption agreement and promissory note word for word while Randall followed along, stopping after each paragraph to ask if she understand and had any questions. Kiesler Decl., Sept. 29, 2023, (ECF No. 74) p. 19, ¶ 145; Kiesler Dep., Sept. 19, 2023, at 225:23-226:10; Randall Dep. Aug. 28, 2023, at 318:16-24.

341.    At no time on or prior to May 13, 2020, did anyone explain or read to Stacy the Stock Price Formula. (Suppl. Decl. of Stacy Randall ¶ 41.)

**RESPONSE:** Disputed. During Kiesler's phone call with Randall on May 6, 2023, Kiesler walked Randall through the calculation of the Stock Price Formula using November 2019 numbers. Kiesler then called Randall on May 13 to communicate the updated calculation under the Stock Price Formula, using December 2019 financials as promised, of over $1.3 million. Kiesler Dep., Sept. 19, 2023, at 71:10-21, 172:23-173:2, 195:1-8, 204:3-7; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.4-7, 16-18, ¶¶ 35-45, 118-20, 133, 140-41, Exs. D (ECF No. 74-4), U (ECF No. 75-23); Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.5-7, ¶¶ 23, 27-31; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶¶ 4, 13, Exs. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. Nos. 17, 24, 32, 40, 48, 63, M (ECF No. 70-12); Randall Dep., Aug. 28, 2023, at 200:10-16, 261:19-24, 285:23-288:19, 303:17-304:12; Gonnering Dep., Sept. 21, 2023, at 148:1-149:8; Windy Waters Dep., Nov. 3, 2023, at 86:18-87:5, 88:22-90:21, 91:20-93:5, 112:15-25; Wittenberg Decl., Nov. 10, 2023, (ECF No. 113) p.2, ¶ 8, Ex. G (ECF No. 113-7); Reed Decl., Nov. 10, 2023, (ECF No. 109) p.3, ¶ 19.

342.    When Stacy informed Reed that Stacy's attorney was going to contact the Companies' attorney to see if they could work something out, Reed responded, ███████ ████████████ and he concluded with ███████████ (Suppl. Decl. of D. Palay, ¶ 15, Ex. 12.)

**RESPONSE:** Undisputed, but immaterial.

343.    After Stacy "did not accept Windy Waters' May 6, 2020, offer," and after Kiesler reached out to Stacy on May 11, it was Kiesler who reached back out to Stacy on May 13 after

Gonnering's prompting on May 12, to pursue the transaction. (Suppl. Decl. of D. Palay, ¶¶ 16, 18, Exs. 13, 16.)

**RESPONSE:** Disputed that Gonnering prompted Kiesler to pursue the transaction. In the source cited by Randall, all Gonnering wrote to Kiesler was, "Stacy?" Gonnering testified that it "didn't matter" to him whether the company bought Randall's shares, and that he inquired with Kiesler about the status of Randall's redemption because, as CEO, he wanted to know how Kiesler, his CFO, was spending his time. Suppl. Palay Decl., Nov. 10, 2023, (ECF No. 117) p.3, ¶ 16, Ex. 13 (WINDY0047495); Gonnering Dep., Sept. 21, 2023, at 243:20-244:10.

344.    On June 10, 2022, Stacy's counsel e-mailed Defendants' counsel stating in part that "Ms. Randall is exercising her right to terminate the Standstill and Tolling Agreement under paragraph 5 thereof, as of today." (Suppl. Decl. of D. Palay, ¶ 17, Ex. 14.)

**RESPONSE:** Undisputed.

345.    Stacy did not learn that Reed's compensation from the Companies was around $1.5 million for 2019 and around $2 million for 2020 until the Defendants produced a spreadsheet showing Reed's compensation for 2018 through 2020 on or around April 29, 2022. (Suppl. Decl. of Stacy Randall ¶ 46; Suppl. Decl. of D. Palay, ¶ 7, Ex. 5.)

**RESPONSE:** Undisputed.

346.    Stacy would not have signed the Redemption Documents in May 2020 if she had known how much the Companies were actually worth. (Suppl. Decl. of Stacy Randall ¶ 47.)

**RESPONSE:** Disputed. Randall knew Defendants were offering the stock price calculated under the Stock Price Formula, as had been done with Randall's five prior sales of Widen Enterprises stock and not a price based on an actual market valuation of the company. Moreover, whether Randall would have signed the May 13, 2020 Redemption Agreement had

Randall known certain information is contested in this case. Defendants maintain that Randall would have signed the May 13, 2020 Redemption Agreement of her own volition regardless of what information was or was not known to her. Randall desperately sought money and had an "immediate need for money to fund [her] divorce"; Randall did not obtain financial or legal advice, despite being advised to do so; Randall did not ask for any financial information on Windy Waters or Widen Enterprises; Randall did not ask for any information regarding how the value of her shares was calculated; and, after signing the May 13, 2020 Redemption Agreement, as of September 29, 2023, Randall received 40 monthly payments totaling $657,203.60, without objection and including throughout the duration of this litigation. Reed Decl., Sept. 29, 2023, (ECF No. 67) pp.6-7, 9, 11, ¶¶ 49, 50, 62-64, 74-78, 92, Ex. B (ECF No. 67-1); Reed Decl., Nov. 10, 2023, (ECF No. 105) p.4, ¶¶ 21-22; Reed Dep., Aug. 23, 2023, at 66:11-67:20, 68:21-69:1, 97:18-99:5, 127:8-128:15, 132:7-133:1-10, 164:25-165:20, 168:9-16; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.15-21, ¶¶ 109-13, 122-30, 132-33, 140-58, 163-67; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.3, 8, ¶¶ 12, 27, 33-34, Ex. D (ECF No. 105-4); Kiesler Dep., Sept. 19, 2023, at 176:8-177:4, 261:13-21; Gonnering Decl., Sept. 29, 2023, (ECF No. 69) pp.6-7, ¶¶ 47-50; Gonnering Dep., Sept. 21, 2023, at 106:17-110:2, 227:11-228:17; Randall Dep., Aug. 28, 2023, at 200:10-16, 245:6-246:11, 261:12-263:8, 265:6-15, 266:23-267:1, 276:4-277:13, 277:22-280:20, 283:24-284:6, 285:23-286:18, 287:22-288:19, 296:5-14, 304:13-20, 307:5-16, 313:19-314:17, 318:8-18, 319:16-321:12; Suppl. Decl. of Randall, Nov. 10, 2023, (ECF No. 118) p.5, ¶ 39; Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶¶ 4, 10, 12, Exs. C (ECF No. 70-3: Pl.'s Objections And Resps. To Defs.' First Set Of Interrogs.) at Resp. No. 2, I (ECF No. 70-9), L (ECF No. 70-11), M (ECF No. 70-12).

347.    Each of the stock redemption agreements between Stacy and Windy Waters from

2005, 2007, 2011, 2017, and 2019 stated that the purchase price was at "fair market value" as "negotiated at arms length by unrelated parties with opposing financial interests." (Kiesler Decl. Exs. E, F, G, H, I.)

**RESPONSE:** Undisputed.

348.    In the spring of 2020, Widen Enterprises was projecting 87 new customers in 2020, which is the same amount as new customers earned in 2019. Each new customer was projected with a $50,000 average subscription. (09/29/2023 Palay Decl. Ex. 5, at WINDY0000947.)

**RESPONSE:** Undisputed.

349.    Kiesler testified that by May 12, 2020, the Randall redemption had dropped off his radar, but that he was reminded about it by Gonnering via a Slack message that read: "Stacy?" (09/19/2023 M. Kiesler Dep. Tr. 246:23-25.)

**RESPONSE:** Undisputed.

350.    Kiesler testified that he called Gonnering in response to his message and that Gonnering requested "an update on where we were with Stacy." (09/19/2023 M. Kiesler Dep. Tr. 246:25-247:4.)

**RESPONSE:** Undisputed.

351.    Kiesler testified that Gonnering "suggested that I (Kiesler) go ahead and update the numbers and call [Stacy] the following day. So then I did – so it was like a task that he was – he had had me do." (09/19/2023 M. Kiesler Dep. Tr. 247:4-7.)

**RESPONSE:** Undisputed.

352.    On May 14, 2020, the day after Kiesler completed the redemption of Stacy's shares, he sent Gonnering a message saying "Mission accomplished" to which Gonnering

responded "Excellent. Thank you for making it happen." (09/19/2023 M. Kiesler Dep. Tr. 247:13-19 (*see also* Ex. 45 to Kiesler Dep.).)

**RESPONSE:** Undisputed.

353.    Defendants provided Stacy with nothing in connection with the May 2020 redemption. (11/06/2023 Dep. Tr. of Widen Enterprises 180:25-181:20.)

**RESPONSE:** Disputed. The proposed fact is not supported by the cited testimony, which only states that Widen Enterprises did not provide any information to Randall. Windy Waters issued a note to Randall for the purchase price of her shares. Windy Waters, through Kiesler, also provided information about how the stock price was calculated. Reed C. Widen Decl. (ECF No. 33), July 14, 2023, p.1, ¶ 2, Ex. A (ECF No. 33-1); Kiesler Dep., Sept. 19, 2023, at 71:10-21, 172:23-173:2; Kiesler Decl., Sept. 29, 2023, (ECF No. 74) pp.16-18, ¶¶ 118-20, 133, 140-41, Ex. U (ECF No. 75-23); Wittenberg Decl., Sept. 29, 2023, (ECF No. 70) pp.1-2, ¶ 4, Ex. D (ECF No. 70-4: Pl.'s Objections And Resps. To Defs.' First Set Of Reqs. For Admis.) at Resp. No. 63; Kiesler Decl., Nov. 10, 2023, (ECF No. 105) pp.5-7, ¶¶ 23, 27-32; Randall Dep., Aug. 28, 2023, at 261:19-24, 303:17-304:12.


Dated this 20th day of November 2023.

                                     *s/Christa D. Wittenberg*
                                     Dean P. Laing
                                     State Bar No. 1000032
                                     Christa D. Wittenberg
                                     State Bar No. 1096703
                                     O'Neil, Cannon, Hollman, DeJong & Laing S.C.
                                     111 East Wisconsin Avenue, Suite 1400
                                     Milwaukee, Wisconsin 53202-4870
                                     Telephone: (414) 276-5000
                                     dean.laing@wilaw.com
                                     christa.wittenberg@wilaw.com

Mark H. Churchill
Martin Durkin
Holland & Knight LLP
1650 Tysons Blvd., Suite 1700
Tysons, VA 22102
Phone: 703.720.8600
mark.churchill@hklaw.com
martin.durkin@hklaw.com

*Attorneys for Defendants*