IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

STACY L. RANDALL,

                Plaintiff,

      v.

                                    Civil Action No. 22-cv-400

REED C. WIDEN, MICHAEL KIESLER,
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

                Defendants.

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

FACT ISSUES ..................................................................................................................... 1

Formula's Relationship to Fair Market Value ......................................................... 1

Randall's Role ......................................................................................................... 4

Approval of the Formula .......................................................................................... 4

LEGAL ISSUES ................................................................................................................ 6

I.   Randall Concedes Her Fourteenth Claim for Relief Should Be Dismissed. ................... 6

II.   Randall Cannot Meet the First and Third Elements of Her False Statements Securities Fraud Claim as a Matter of Law (Second Claim for Relief) ..................................... 6

   A.   Randall cannot prove any affirmative statement was false or made misleading by an omission. ......................................................................................................... 6

      1.   "Afford." ............................................................................................... 9

      2.   "Smart." ............................................................................................... 11

      3.   "Fair." ................................................................................................. 12

      4.   "Estimated Value." ............................................................................... 15

      5.   "No talk of that." ................................................................................. 16

      6.   "All or nothing." ................................................................................. 18

   B.   No other omissions are actionable under Rule 10b-5(b). ................................. 19

   C.   Defendants do not seek a ruling on materiality, but Randall's discussion on the point supports Defendants' arguments regarding the scope of Rule 10b-5(b) claims. ..... 22

   D.   Randall cannot prove scienter as a matter of law. ................................... 24

III.  Randall Cannot Maintain Any Claim for Excessive Compensation. ........................... 27

   A.   Randall's claims are derivative claims she cannot pursue in this direct action. ..... 27

   B.   Claims for breach of fiduciary duty cannot be bootstrapped into securities claims. ................................................................................................................ 27

   C.   Randall has not identified any genuine dispute of material fact related to Reed's compensation. .................................................................................................... 29

   D.   Any claim related to constructive dividends is time-barred. ............................. 32

IV.  Randall's First Claim for Relief for Scheme Liability Should Be Dismissed. ............. 34

V.   Control Liability and State Securities Claims Fall with Federal Claims. ..................... 36

VI.  Randall's Intentional Misrepresentation Claim Should Be Dismissed. ...................... 36

   A.   Randall cannot meet the heightened burden of proof. ...................................... 36

   B.   Randall cannot show justifiable reliance. ......................................................... 36

   C.   Defendants had no duty to disclose. ................................................................ 38

D.      No alleged false or misleading statements were material. ...................................... 41

VII. Randall Cannot Prove a Breach of Fiduciary Duty. ....................................................... 42

VIII.      The 2020 Redemption Agreement Stands, Including the Release. ........................ 43

A.      Randall's specific challenges to the release are without merit. ............................. 43

B.      Randall has ratified the contract and waived rescission. ........................................ 44

C.      Randall's Eleventh Claim for Relief is tied to her federal securities claims. ......... 45

D.      Randall cannot show unconscionability. ................................................................ 46

E.      Randall cannot prove duress. .................................................................................. 47

IX. Unjust Enrichment Is Barred Because the 2020 Redemption Agreement Is Valid. ...... 48

X.   Randall Has No Standing to Seek Judicial Dissolution, Even If the 2020 Redemption Agreement Is Rescinded. ..................................................................................................... 49

XI. Randall's Conspiracy Claim Is Barred. .......................................................................... 49

XII. The Civil Theft Statute Does Not Fit. ........................................................................... 50

XIII.      Veil-Piercing Remains Improper. ........................................................................ 51

XIV.      There Is No Basis for Any Claim Against Widen Enterprises. ............................. 51

CONCLUSION ..................................................................................................................... 52

The inquiry on summary judgment is not whether there are no disputed facts, but whether there are no *genuine* disputes of *material* facts. Plaintiff Stacy Randall's apparent tactic is to point to a series of side issues to generate disputes of fact and shift the focus away from the elements of her claims. To be sure, there are unquestionably facts in this case that are disputed, as Defendants have argued in opposition to Randall's motion for summary judgment. *See generally* Defs.' Br. in Opp'n to Pl.'s Mot. Summ. J. (ECF No. 123) ("Defs.' Resp. Br."). But the Court need not ever reach those disputed facts because for each of Randall's claims, there is a core set of material, undisputed facts that are sufficient for this Court to dismiss the claims as a matter of law. Randall cannot meet the elements of her claims, and no reasonable jury could find in her favor. Defendants' motion for summary judgment (ECF No. 62) should be granted.

Many of these issues have been briefed at length already. This reply focuses on those areas not yet fully addressed, with the intent of simplifying the analysis for the Court.

## FACT ISSUES

As a preliminary matter, there are three overarching fact topics where there are no *genuine* disputes of *material* facts, and the tangential issues raised by Randall do not preclude summary judgment. These points are addressed below.

### *Formula's Relationship to Fair Market Value*

The stock price calculation method—what Defendants call the "Stock Price Formula" and what Randall calls the "Fair Market Value formula"—is an important starting point. There is no dispute over who created the formula, what it was intended to be used for, what the formula says, or that it was consistently applied for each and every stock transaction from the time it was created in 2004 until 2020 (including five times by Randall before May 13, 2020. Defs.' Reply to Pl.'s Resp. to Defs.' Proposed Findings of Fact ("Reply to PFOF") ¶¶ 82–95, 100–05, 108–13, 116;

Defs.' Resp. to Pl.'s Suppl. Statement of Undisputed Facts ("Resp. to PSOAF"[1]) ¶ 106; ECF No. 74-4; *see also* Defs.' Statement of Additional Proposed Findings of Fact (ECF No. 124) ("DSOAF") ¶¶ 49–50. Randall, however, misinterprets the Second Amendment to Shareholder Agreement that memorialized Windy Waters' use of this formula, getting the purpose of it backwards and arguing it was intended to determine fair market value, when the document itself and the creators' uncontested declarations show it was actually adopted to eliminate the need to determine fair market value for each transaction. *See* ECF No. 74-4; ECF No. 112, ¶ 5; Resp. to PSOAF ¶ 106; *see also* DSOAF ¶ 50.

Prior to the Second Amendment, the formula was called the "Base Price per Share Calculation." Resp. to PSOAF ¶ 106; ECF No. 105-11, at WINDY0056429, WINDY0056443, WINDY0056457, WINDY0056471, WINDY0056487. Randall correctly notes the Second Amendment describes the same calculation as the "Fair Market Value per share Calculation." ECF No. 63-38 at STAFFORD001291; *see also* Resp. to PSOAF ¶ 105–07. But Randall is incorrect when she concludes, *see* Pl.'s Br. in Opp'n to Defs.'s Mot. Summ. J. (ECF No. 114) ("Pl.'s Resp. Br.") at 24, that the point of the formula was to calculate an actual fair market value. This gets the point of the formula exactly backwards. The reason for a reference to "fair market value" in the Second Amendment was because the original Shareholder Agreement it was amending required redemptions for shareholders' death or disability to be at fair market value. ECF No. 63-37 at STAFFORD001314–17. The formula was not adopted because it would equal the precise fair market value of stock; rather, the voting shareholders agreed that going forward, the "Fair Market Value per share shall be *defined to equal* the value of the Corporation, as determined by the Corporation using *the formula described on Exhibit C* attached hereto . . . divided by the total

---

[1] When only the proposed fact, and not the response to it, is relevant, the citation is to "PSOAF," though this can be found in the same document.

number of all shares of stock." ECF No. 63-38 at STAFFORD001291–92 (emphasis added). That is, Randall and her brothers agreed that the formula would stand in *instead of a precise fair market value*. *Id.* While the Second Amendment did not mandate use of the formula in voluntary situations, it did clearly memorialize Windy Waters' practice of using it for voluntary redemptions—whether fair market value or not. *Id.*

Though the Stock Price Formula was not intended to always result in a precise calculation of the fair market value of stock, it was explained by Baker Tilly, Windy Waters' accountants, that it would provide a reasonable price and would eliminate the need to obtain a formal valuation each time a stock transaction was requested. *See* Reply to PFOF ¶¶ 100–03; Resp. to PSOAF ¶ 106; DSOAF ¶ 50. The formula was simply a way for Windy Waters and its shareholders—if they agreed—to calculate a per-share price without having to spend the time and money for a full-blown appraisal. Reply to PFOF ¶¶ 100–03; Resp. to PSOAF ¶ 106; DSOAF ¶ 50.

Randall now concocts an argument that because her five prior stock redemption agreements when she redeemed only some of her shares stated the parties "agreed that the redemption of the shares held by Randall shall be at a fair market value"—language included for tax purposes[2]—that she believed she had been paid fair market value each prior time. Pl.'s Resp. Br. at 39, 59. She admits she never reviewed these documents. Reply to PFOF ¶¶ 122, 129, 136, 144, 153. This language is also entirely consistent with the Second Amendment, where Randall and the other voting shareholders acknowledged the Stock Price Formula would stand in for fair market value.

None of this raises any genuine dispute of material facts. Randall admits the formula was used consistently by Windy Waters after it was implemented and does not argue that she was

---

[2] Whether a redemption of shares was at fair market value significantly determines whether a redemption qualifies as a distribution in exchange for stock, or whether it's treated as a sale or exchange, directly impacting the shareholder's tax liability. *See* 26 U.S.C. §§ 301, 302.

required to use it for redemptions not based on death or disability. Reply to PFOF ¶¶ 82–85, 108–13, 115, 116, 119, 121, 126, 128, 133, 135, 140, 142, 150, 152, 163, 166, 170, 173–74, 180, 183, 186, 192–94, 243, 253, 314, 323–26; Pl.'s Resp. Br. at 8.

### *Randall's Role*

Randall claims in the introduction of her brief that a jury could find Randall was not the president or a director of Windy Waters, Pl.'s Resp. Br. at 4, but does not expand on that point further. That is impossible. Randall does not dispute that she signed documents as the president and as a director of Windy Waters, and that she received director's fees every year. Reply to PFOF ¶¶ 39–41, 43–45, 151, 353. There is simply no genuine dispute that she was both the president and a director of Windy Waters.

### *Approval of the Formula*

There is no genuine dispute that Randall agreed to Windy Waters' practice of using the Stock Price Formula. At a bare minimum, Randall admits she signed the Second Amendment to Shareholder Agreement in two places, as president and as shareholder. ECF No. 74-4, at WINDY00001342–43; Reply to PFOF ¶¶ 43, 85–87 ("Undisputed that Stacy signed the Second Amendment to the Shareholder Agreement above the by line that includes 'President.'"). On six occasions before May 2020, Randall used the same formula for her own stock transactions (five redemptions and one subscription), including an occasion just three months after the effective date of the Second Amendment, and never sought to negotiate a different per-share price. Reply to PFOF ¶¶ 111–58, 344.  And she didn't just agree to use the formula for her own redemptions and subscriptions—she approved other stock redemptions and subscriptions for other shareholders using the same formula, on behalf of Windy Waters. ECF No. 74-5; ECF No. 105-2; Reply to PFOF ¶¶ 184–89; Resp. to PSOAF ¶ 309; DSOAF ¶ 63. If Randall did not understand how the

formula worked, that does not create a dispute of material fact—she approved the method and its repeated use.

The Second Amendment that Randall signed plainly states the formula would be used:

> 2. The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions.
>
> 2.[sic] The Shareholders desire to amend the Shareholder Agreement to adopt such formula as the basis for determining the fair market value of the Stock.

ECF No. 74-4, at WINDY0001341; Reply to PFOF ¶ 85. That the Second Amendment only specifically mandated its use in the case of redemptions of deceased or disabled shareholders does not detract from the expressed intent to use the formula more generally. As noted above, through definitions, the Second Amendment further makes clear that the fair market value of stock meant, for purposes of the Shareholder Agreement among the voting shareholders, the price reached using the Stock Price Formula. *Id.* at WINDY0001341–42. As a result, it is undisputed that Randall approved of the use of the Stock Price Formula as a general practice and never once objected to or complained about its use between 2004 and 2020. Reply to PFOF ¶¶ 43, 108, 110–16, 253, 324–26, 366–67. While the Second Amendment only mandates the formula's use in situations of death or disability, Windy Waters mandated its use in all other situations if shareholders wished to sell their stock back to the company where the company had no obligation to purchase it. *See* Resp. to PSOAF ¶¶ 119, 124; DSOAF ¶¶ 58–60.

The point of the Stock Price Formula was to provide a way to calculate the share price of stock without a full-blown, expensive valuation. Reply to PFOF ¶¶ 100–03; Resp. to PSOAF ¶ 106; DSOAF ¶ 50. If Randall insists on claiming she did not agree it was the "best" method, that particular word is not essential to Defendants' motion. Whether any formula is the "best" is certainly open to reasonable debate, but that is not the issue here. It is undisputed that Randall

approved the formula's use, and that it was used consistently when shareholders bought and sold stock.

## LEGAL ISSUES

Summary judgment is appropriate on each of Randall's claims for relief.

### I.      *Randall Concedes Her Fourteenth Claim for Relief Should Be Dismissed.*

First, and simplest, Randall concedes she is "not pressing" her Fourteenth Claim for Relief, that the stock redemption agreement she signed in May 2020 effectuating the sale of the rest of her shares in Windy Waters (the "2020 Redemption Agreement") is void as a matter of public policy. Pl.'s Resp. Br. at 92. By this concession, this claim must be dismissed.

### II.     *Randall Cannot Meet the First and Third Elements of Her False Statements Securities Fraud Claim as a Matter of Law (Second Claim for Relief).*

Defendants moved for summary judgment on Randall's Second Claim for Relief under Section 10b-5(b) on just two bases: (1) that Randall had not shown any false, actionable statements were made (and so could not meet the first element that the defendant made a misrepresentation or omission that rendered a statement misleading), and (2) that she could not prove scienter as a matter of law. Randall cannot prove the other elements to her claim, either, but Defendants did not ask the Court to rule as a matter of law on those elements.

On the issues of falsity and scienter, Randall has not raised any genuine dispute of material fact. The Court should rule as a matter of law that Randall cannot prove one or both of these elements, either of which would result in dismissal of her Second Claim for Relief.

#### A.   *Randall cannot prove any affirmative statement was false or made misleading by an omission.*

Even taking the facts in the light most favorable to Randall, she has not identified any statements of fact that were false or any statements made misleading by the omission of other material facts. To prevail on her Second Claim for Relief under SEC Rule 10b-5(b), Randall must

6

prove the existence of either an "untrue statement of a material fact" or an omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).[3] A reasonable investor understands the full context of statements and is discerning of the details. *Id.* at 190. A reasonable investor also considers statements in light of all of the information available to her. *See id.* The standard is not the same as a duty to investigate, but it does prohibit a plaintiff from basing a case on claims of ignorance of information available to her.

The statements at issue are all opinions. Randall seems to argue the phrase "we believe" is a magic phrase that is necessary to state an opinion. That is incorrect. The Supreme Court explained the following distinction:

> A fact is "a thing done or existing" or "[a]n actual happening." Webster's New International Dictionary 782 (1927). An opinion is "a belief[,] a view," or a "sentiment which the mind forms of persons or things." *Id.*, at 1509.

*Omnicare*, 575 U.S. at 183. In one instructive case, the court was tasked with determining whether the defendants' statements regarding a portfolio as "very strong," "robust," and "growing," and statements about financial returns, were statements of opinion. *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 648–49 (N.D. Ill. 2020). After considering the context in which the statements were made, the court held that these were opinions "rather than representations of verifiable fact." *Id.* at 649–50. This was true even though the

---

[3] The *Omnicare* case interprets a different securities law imposing strict liability on a corporation that includes false or misleading statements in a registration statement. *See id.* at 178–79, 186–87, 192 n.11. However, the discussion on evaluating allegedly false or misleading statements has been applied to other securities laws prohibiting false statements and statements made misleading by omission of material facts, including Section 10b-5(b). *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, --- F. Supp. 3d ----, No. 1:21-CV-04349, 2023 WL 5748359, at *10 & n.11 (N.D. Ill. Sept. 6, 2023).

speaker did not start each sentence by saying "I think" or "I believe." *Id.* at 648–50. Accordingly, it is not determinative whether the statement includes the magic words "I believe" or "I think," but rather it is whether the statement shows certainty or can be objectively verified based on the facts. *See id.* This depends on the nature of the words used.

Moreover, to survive summary judgment on her securities fraud claim with respect to opinions stated, it is not enough for Randall to show that there were facts inconsistent with these opinions because "[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. at 190. Rather, Randall must show that, in light of *all* of the facts—including other statements made, the context of the statements, custom and practice, and conflicting statements—the opinion was misleading. *Id.* at 190–91; *see also Phoenix Ins. Co.*, 2023 WL 5748359, at *10 n.11. "The reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading." *Omnicare*, 575 U.S. at 190–91.

Randall seems to argue to the contrary, and to suggest that any fact incompatible with the opinion could render the opinion misleading. Pl.'s Resp. Br. at 17. That is a misread of *Omnicare*, and is based on quotes from a paragraph in which the Court explains general guidelines in the common law related to the tort of misrepresentation. 575 U.S. at 191–92. The explicit holding and rule from *Omnicare* is as follows: "The [plaintiff] must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. As the Court noted, "[t]hat is no small task." *Id.* Randall has not and cannot meet this standard, and summary judgment is appropriate.

In Randall's response brief, she identifies the material misstatements she contends supports her claim. Pl.'s Resp. Br. at 15. Defendants contest her description of the statements made, *see* Defs.' Resp. Br. at 6–11, but set that dispute aside for purposes of Defendants' motion. Taking each of the affirmative misstatements Randall identifies in turn, and taking the facts in the light most favorable to Randall (that is, setting aside that Defendants dispute her descriptions), she cannot prevail as a matter of law for the reasons explained below.

### 1. *"Afford."*

By Randall's telling, she claims that she first asked for $100,000 for divorce and living expenses, and after Michael Kiesler told her the Companies could not make that amount available, "Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that either." PSOAF ¶¶ 169–71. Therefore, even taking Randall's version of the disputed conversation, she does not claim Kiesler told her Windy Waters could not afford a partial redemption at all, only that it could not afford for Randall to "**obtain**" the lump sum of $100,000 or $50,000 she needed quickly. PSOAF ¶ 171; ECF No. 118, ¶ 39. Any statement that the Companies could not afford (i.e., bear without adverse effect) an immediate lump sum payment was an opinion. It was also consistent with the undisputed facts, including that Kiesler had been instructed to maintain cash reserves, that PPP funds could not be used for this purpose, and that there was great uncertainty and fear within the company arising from the COVID-19 pandemic. Reply to PFOF ¶¶ 199–219, 223–34, 252. These arguments are further explained in Defendants' response to Randall's motion, Defs.' Resp. Br. at 32–33, 57, incorporated here by reference.

The only supposedly contrary facts Randall cites are inaccurate, but taking them as true, they do not make the opinion misleading to a reasonable investor. First, Randall points out that Windy Waters had $5.5 million in its investment accounts that was not used for operations.

Assuming that were accurate, it would not make the opinion misleading because the funds were being held as important cash reserves to help Windy Waters weather the COVID crisis. Reply to PFOF ¶¶ 207–10, 229–34; *see also* DSOAF ¶¶ 111–14. Kiesler also undisputedly *did* disclose to Randall's lawyer in March 2020 that Windy Waters had over $4.5 million in three investment accounts through the statement dates in 2019, and Widen Enterprises had a balance of over $3 million as of February 20, 2020.[4] Resp. to PSOAF ¶ 335; DSOAF ¶¶ 107–08. Second, Randall notes the companies offered a full redemption for more money. This was obviously disclosed to Randall and was the deal she accepted, so this cannot be an omission that would make the opinion misleading. It also is undisputed that the $1.3 million Randall was to be paid would be spread over seven years with monthly payments beginning in late June 2020—not a lump sum in May 2020. Reply to PFOF ¶¶ 252, 436–37, 440, 443, 446; ECF No. 1-6; ECF No. 1-7. There is no inconsistency. Third, Randall cites the receipt of PPP funds. But this was a loan, and could only be spent on certain line items (not shareholder redemptions) if it could someday be forgiven, and was used to stave off layoffs. Reply to PFOF ¶¶ 211, 215-17, 223. That Widen Enterprises had initially planned to return the PPP funds if Randall agreed to the stock redemption shows only that Widen Enterprises was concerned enough about the then-existing government guidance that it would accept laying off its employees sooner, not that it was not concerned about preserving cash. Reply to PFOF ¶¶ 218–23. Facts about the PPP loan did not make the opinion misleading either.

---

[4] How much of this information Randall's lawyer shared with her is currently unknown to Defendants, but it doesn't matter. An attorney is an agent for her client, and the attorney's knowledge is imputed to the client. *See Estate of Miller v. Storey*, 2017 WI 99, ¶ 61, 378 Wis. 2d 358, 392, 903 N.W.2d 759, 774–75 ("It is well established that attorneys are agents of their clients."); *Johnson v. Associated Seed Growers*, 240 Wis. 278, 282–83, 3 N.W.2d 332, 334 (1942); Restatement (Second) of Agency § 272 (Am. L. Inst. 1958). At the very least, Kiesler would have had no reason to assume Randall did not know this information.

### 2. *"Smart."*

Randall's description of this portion of the conversation is, "Kiesler also told Stacy that she would be smart to sell her interest in the Companies while she had the chance because Widen Enterprises, the operating company, might not even be around in seven years, and she risked ending up with nothing if she didn't take his offer." PSOAF ¶ 181. Even assuming this was how it was phrased, this, too, was an opinion and was supported by the circumstances. At the height of COVID, with existing customers threatening to cancel, and after two months of negative net income, the risk that Widen Enterprises could not survive the economic struggles that accompanied the pandemic was front and center for Kiesler. Reply to PFOF ¶¶ 199, 205, 217, 224, 226–35, 252, 256, 311; Resp. to PSOAF ¶¶ 183, 324; DSOAF ¶¶ 109–10. Virtually every company in this country had these same fears, and they were real, and scary. These arguments are further explained in Defendants' response to Randall's motion, Defs.' Resp. Br. at 31–32, 57–58, incorporated here by reference.

Randall argues the recurring revenue projections were inconsistent with the idea that it could be smart for Randall to sell her shares and the possibility that the company may not survive the pandemic, but that is insufficient for her to succeed on her claim. Revenue is meaningless without a comparison to costs. Indeed, revenue projections in May 2020 were *down* compared to revenue projections at the start of the year, and costs exceeded revenues in the two months prior to the redemption. Resp. to PSOAF ¶¶ 53, 183, 324; DSOAF ¶¶ 109–10. Those revenues could also have been further offset by refunds owed if customers took advantage of the standard Widen Enterprises contract provision giving them a 30-day right to terminate and obtain a pro rata refund, as Widen Enterprises' leaders feared. Reply to PFOF ¶¶ 229–33. Beyond the amount of revenues, Randall only notes that, during his deposition, Kiesler could not recite on the spot financial

11

difficulties the companies faced. *See* Resp. to PSOAF ¶ 183. Widen Enterprises' CEO, however, did so at his deposition in great detail. *See, e.g.*, Reply to PFOF ¶¶ 200, 224, 389–90. Randall needs more than showing Widen Enterprises ultimately did not go under, with the benefit of hindsight, to show that Kiesler's opinion in the moment about the risks facing Widen Enterprises was misleading. Randall cannot show that a reasonable investor, when considering all of the circumstances, would find that an opinion that it could be smart for Randall to sell now rather than risk uncertainty was misleading.

### 3.   *"Fair."*

Randall's position is that "Kiesler assured Stacy that the price was 'fair,' purportedly 'because [it used the] standard price-per-share calculation model for voluntary redemptions, which Kiesler explained was the same formula that had been used for [Stacy's] prior partial share redemptions and for the complete share redemptions of [her] brothers.'" PSOAF ¶ 178; *see also* PSOAF ¶ 284. Whether something is fair is inherently opinion. It was also true that the stock price was fair because it was calculated the same way it was done for all other shareholders with all other stock transactions. Reply to PFOF ¶¶ 82–113, 116, 119, 121, 126, 128, 133, 135, 140, 142, 150, 152, 163, 166, 170, 173–74, 180, 183, 186, 192–95, 243, 253, 314, 323–26. These arguments are further explained in Defendants' response to Randall's motion, Defs.' Resp. Br. at 30–31, 58, incorporated here by reference.

The holding in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), is inapposite. It does not involve the same statute, as Randall states (Pl.'s Resp. Br. at 22), but interprets a different statute (Section 14(a)) prohibiting false misleading statements similar to Section 10b-

5(b) in the specific context of proxy solicitations.[5] *Id.* at 1086–87, 1087 n.2. The unremarkable

point of *Virginia Bankshares* is that stating in a fairness opinion that a requested action was at a

fair price *can* be materially misleading if the speaker has knowledge that it is not true. *Id.* at 1091–

95. In that case, the opinion of fairness was found to be misleading because the company falsely

stated the price was above book value and gave false reasons for the proposed merger. *Id.* at 1093–

94, 1098. In light of those facts, it was misleading to call the price fair. *Id.* at 1093–94. There was

no formula or established method for calculating stock prices for the merger in *Virginia*

*Bankshares*. *See id.* at 1087–89.

"The ruling of *Virginia Bankshares* is essentially seen as a contextual one." *In re Integrated*

*Res. Real Est. Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1154 (S.D.N.Y. 1993). As a result, it

has limited value beyond its facts. The case certainly does not establish a rule that anytime anyone

uses the word "fair" in reference to a price calculation that it had to be referencing fair market

value. In fact, the Seventh Circuit clarified just this month that "a statement by directors that a

transaction is 'fair' and in the 'best interests' of shareholders is not actionable, even if the directors

personally disbelieve it, when there is no objective evidence 'that the statement also expressly or

impliedly asserted something false or misleading about its subject matter.'" *Smykla v. Molinaroli*,

--- F.4th ----, No. 21-3234, 2023 WL 7289414, at *5 (7th Cir. Nov. 6, 2023) (quoting *Virginia*

*Bankshares*, 501 U.S. at 1095–96); *see also Schmitt v. Artforum Int'l Mag., Inc.*, 178 A.D.3d 578,

589, 115 N.Y.S.3d 291, 301 (2019) ("Fairness is innately subjective, and an expression of [the

defendant's] opinion, whether realistic or not and whether disingenuous or not, and importuning

their help in clarifying 'reality' for plaintiff cannot be reasonably interpreted as conveying false

---

[5] Proxy statements are governed by detailed disclosure requirements, inapplicable in this case, including a requirement
for the disclosure to contain an opinion about the fairness of the consideration if there is an offer to purchase stock.
17 C.F.R. § 240.14a-101 (Item 15(b)).

factual content."). Relatedly, the motive of a corporate actor in a stock transaction is not a material fact that could render an opinion misleading. *Smykla*, 2023 WL 7289414, at *5; *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-CV-9992 (PAC), 2021 WL 4443258, at *13 (S.D.N.Y. Sept. 27, 2021). Another court stated the takeaway from *Virginia Bankshares* is as follows: "In the case of a fairness opinion, then, the plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000).

Randall has not identified any specific, provable facts that would show an opinion that the price calculated using the Stock Price Formula was fair would be misleading to a reasonable investor. Randall does not dispute that the Stock Price Formula was used each time a stock price was calculated by Windy Waters for the 16 years before her 2020 redemption. This alone renders the opinion not misleading as a matter of law.

Randall's citation of emails confirming that Windy Waters had offered and would continue to offer to buy back shares of passive shareholders is immaterial and cannot support a claim that an opinion that the price was fair was misleading. As a matter of law, the motive of a corporate actor in a stock transaction is not a material fact that could render an opinion misleading. *Smykla*, 2023 WL 7289414, at *5; *Enzo Biochem*, 2021 WL 4443258, at *13. As a result, this is irrelevant.

Kiesler's opinion was not made misleading by the existence of any of the array of additional facts Randall cites in her brief. Neither the guesses of fair market value by Widen Enterprises' CEO Matthew Gonnering suggesting a higher value of the company cited by Randall, Resp. to PSOAF ¶¶ 27–41, nor the calculations of fair market value by Baker Tilly suggesting a lower value of the company conveniently ignored by Randall, *see* Resp. to PSOAF ¶ 118; ECF No. 109-8, at WINDY0001129; DSOAF ¶¶ 85–96, are inconsistent with an opinion that the price

was fair because it had been used consistently. Revenue, growth, profit, and executive compensation are also not inconsistent with the fairness of a price calculated using the same formula as always—and a price that was indisputably the highest stock price the formula had ever calculated. Reply to PFOF ¶ 370. Even a comment from Gonnering that the weighted EBITDA valuation was low six months prior to Randall's redemption, Resp. to PSOAF ¶ 61, did not suggest consistent use of the formula was in any way unfair.

Randall's argument turns on unsupported characterizations of Kiesler's actual words. Randall argues that a "reasonable investor would understand the fairness of a security's price to refer to the relationship between that price and the security's value, not to the 'consistency' of that price over time." Pl.'s Resp. Br. at 23. Setting aside all of the disputes over the nuances, though, even Randall acknowledges that Kiesler did not say the price was fair in a vacuum and that he said it was fair *because it had been done using the formula*. PSOAF ¶ 178. A reasonable investor would understand these words to mean exactly what he said, not infer that fair was actually referring to fair market value. As a result, no reasonable investor would find the opinion misleading, even without disclosure of facts that could be relevant to the separate question of fair market value of the shares.

### 4. *"Estimated Value."*

No one ever told Randall that the "Estimated Value of Windy Waters" was $6.8 million. There is no support for this contention at all. In her brief, Randall claims "Kiesler explicitly stated that the 'Estimated Value of Windy Waters' was $6.8 million." Pl.'s Resp. Br. at 15. But the supporting facts do not say that. *See* PSOAF ¶¶ 118, 179–80, 228. Rather, the relevant facts put forth by Randall state only that "Kiesler walked Stacy through the model price-per-share formula calculation he had used to calculate the $1.1 million offer price" and that in responding to

discovery, Defendants explained that "Kiesler went through the price-per-share calculation model with Plaintiff, line by line, using November 2019 financial information of the Companies and shared with her the redemption price." PSOAF ¶¶ 179–80. Notably, Randall herself disputes that this ever took place, so *she* cannot and does not say Kiesler told her the "Estimated Value of Windy Waters" was $6.8 million. PSOAF ¶ 228; Pl.'s Br. at 52 ("Kiesler never read aloud or explained the formula to her . . . ."); Resp. to PFOF ¶¶ 254, 255; ECF No. 118, ¶¶ 15, 45. Kiesler confirmed he never made this statement while explaining the formula to Randall. ECF No. 105, ¶¶ 27–34; DSOAF ¶¶ 10, 13-16. This is an invented representation that never took place, and neither of the participants in the conversation say it happened.[6] But even if Kiesler had made this statement— which he did not—that statement would merely be an opinion. The value of something such as a corporation is not black and white; it is merely the opinion of the person expressing it. Experts who value businesses for a living rarely if ever agree on a valuation. This cannot form the basis of a claim.

### 5. *"No talk of that."*

Taking Randall's version of events, she claims she asked if there had been "thought about selling the company" and Kiesler answered, "there's been no talk of that." Reply to PFOF ¶ 355. Randall has all but conceded she was wrong when she initially alleged in her complaint that Reed Widen and Kiesler had been plotting to sell Widen Enterprises before Randall sold her shares. Setting aside Defendants' position on Kiesler's actual words and the facts, and taking the evidence in the light most favorable to Randall, all Randall can point to are shreds of evidence that do not make Kiesler's statement false or misleading.

---

[6] It also would have been accurate if it had been stated: The Stock Price Formula calculation using December 2019 numbers showed an estimated value for Windy Waters of approximately $6.8 million. Resp. to PSOAF ¶ 113; ECF No. 75-23

First, the only (disputed) evidence Randall proffered in support of this theory in her own motion for summary judgment was her claim that Reed told Randall's son (who would benefit dramatically from his mother reaping a windfall in this case) that he could sell the company. Pl.'s Br. Supp. Mot. for Partial Summ. J. (ECF No. 60) ("Pl.'s Opening Br.") at 10; *see also* Resp. to PSOAF ¶ 51. Even assuming that occurred, it does not show any talk of selling the company that Kiesler could have known about.

Second, Randall points to a solitary email to suggest there was indeed a plan to sell the company. *See* Resp. to PSOAF ¶¶ 330–31. But the email shows that when Gonnering asked Reed if he was interested in a sale in September 2019 (eight months before Randall's last redemption), Reed said no. *See* ECF No. 117-11. The relevant portion of the email states:

> Related to Gary's desire to retain shares, we discussed market valuation and your ownership intentions. **The intent I am operating within is 'keep growing'.** I will continue to keep you apprised of industry multiples. I don't see major changes in this since my last commentary on 3-5x multiple of revenue or 10- 13x multiple of EBITDA. The macro environment may change these multiples in the coming years as global activity ripples through the economy. As disclosed before, Mike and I have chatted about when we would advise to sell based on the realization of maximum valuation. Our top line growth focus, especially on annual recurring revenue, is an indicator. As in, if we can be [sic] accurately predict a significant slow down in revenue growth in the years ahead, that would be handy (and we do have leading indicators by monitoring pipeline activity, leads, opportunities, etc.) We do not see that at this time. . . . **As always, let me know if you start feeling a change in your position.**

ECF No. 117-11. That is, when Gonnering broached the subject of even the possibility of a sale, Reed's answer was a resounding no with an instruction to keep growing. *Id.* Further, the email confirms that even Gonnering and Kiesler did not advise that Reed should sell at that time. *Id.* Rather, Gonnering would monitor the industry (as he had been doing) and if he and Kiesler saw certain indicators, they would *then* approach Reed to gauge his interest in selling. *Id.* There is no

evidence that these developments ever occurred prior to May 13, 2020. All this email shows is that when Gonnering asked Reed if there was any interest in selling, Reed said no, just as Defendants have explained all along. This is exactly in line with the undisputed facts that Reed and Gonnering began discussing a variety of succession planning options in late June and early July 2020 (after Reed turned 60) and that the earliest discussions about selling Widen Enterprises on a two- to five-year timeframe were in late August 2020, spurred by the sale of a competitor. Resp. to PSOAF ¶¶ 240, 243–44; Reply to PFOF ¶¶ 373, 391–403.

Third, Randall points to the frequent solicitation inquiries received by Kiesler, Gonnering, and Reed. She highlights that even though Reed and Kiesler ignored those solicitations, Gonnering infrequently responded to learn more about the private equity industry. *See* Pl.'s Resp. Br. at 41–42; *see also* Resp. to PFOF ¶ 379. Randall does not contend that any of these solicitations developed into anything resembling a negotiation of or even a discussion about a possible sale of Widen Enterprises. Randall also does not suggest that Kiesler was even aware of these discussions. Randall cannot genuinely dispute that Kiesler was being truthful when he said there had been no talk of selling Widen Enterprises prior to May 13, 2020.

### 6. *"All or nothing."*

Randall complains that nobody told her about other means of obtaining cash, and so the offer to sell all or nothing was false. This representation is made up: Randall does not contend Kiesler stated to her that the offer was all or nothing. Rather, she points to Reed's direction to Kiesler to offer to buy all of Randall's stock or nothing. Reply to PFOF ¶ 244. Kiesler did not use those words with her. ECF No. 105, ¶ 27.

Even if a statement like that had been made, that is also not actionable as a matter of law. The Seventh Circuit recently confirmed that failing to present other options does not make a statement about the deal being offered false or misleading.

> [T]here is nothing in the Exchange Act that entitles investors to receive a list of alternative deal options that may provide a better return on their investment. . . .
>
> . . . Were we to adopt plaintiffs' position, we would be creating a new rule requiring proxy statements to include a laundry list of potential merger options and disclose the potential benefits and drawbacks of each option. That is not what Congress intended with the Exchange Act. . . . [T]he inclusion of such information would create unnecessary noise and confusion . . . .

*Smykla*, 2023 WL 7289414, at *4.

Windy Waters had no legal duty to purchase Randall's shares. As a result, if it was going to do so voluntarily, it had the right to set the terms, and those terms were that it would purchase all or none of Randall's shares. Of course, Randall had the right to do so or not do so. Neither Reed nor Kiesler had a duty to try to come up with a way for Randall to get cash.

### B. No other omissions are actionable under Rule 10b-5(b).

Under Randall's Second Claim for Relief, pursuant to Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5(b), the only actionable omissions are omitted material facts necessary to make statements that were affirmatively made not misleading. *See* 17 C.F.R. § 240.10b–5(b) (making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"). The alleged omissions that are even debatably material to statements made by Kiesler are all addressed above. No other omissions are actionable under Randall's Second Claim for Relief.

Randall is mistaken that Rule 10b-5(b) imposes a duty to disclose any and all possible material information about a stock transaction. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). This argument is addressed in Defendants' response to Randall's motion for summary judgment, and incorporated by reference. Defs.' Resp. Br. at 46–50. As argued there, the special facts doctrine does not apply to Randall's claim, and none of the Defendants were under any duty to affirmatively disclose any information to Randall.

The frequent cold-call solicitation emails Reed, Kiesler, and Gonnering received do not bring this case within the fold of the special facts doctrine. As explained in Defendants' response to Randall's motion for summary judgment, courts have held the doctrine requires disclosure when there are actual negotiations of a sale. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 431–33 (7th Cir. 1987) (finding doctrine required disclosure of merger negotiations that included tentative agreement on a price); *Michaels v. Michaels*, 767 F.2d 1185, 1191–98 (7th Cir. 1985) (finding doctrine did not require disclosure of a preliminary meeting with an investment broker but did require disclosure of engaging a broker when plaintiff had been promised an update from that meeting); *Connelly v. Gen. Med. Corp.*, 880 F. Supp. 1100, 1113–15 (E.D. Va. 1995) (finding no duty to disclose preliminary or highly tentative merger discussions, like internal dissension over whether or not to consider sale). Courts do not find "every pre-merger occurrence" to be material under the special facts doctrine—rather, there must be "indicia of interest in the transaction at the highest corporate levels . . . [e.g.,] board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 (1988).

The case that is the closest analogue to the facts as Randall portrays them is *Connelly*, where executives had conflicting opinions about the possibility of sale—some in favor, some

opposed. 880 F. Supp. at 1107–08. The court found the special facts doctrine did not impose any duty to disclose that fact, stating, "the plaintiff can point only to internal dissension between the General Medical senior management and its superiors in New York. This is not evidence of a material fact, even in the Seventh Circuit." *Id.* at 1115. Similarly, here, all Randall points to is that Gonnering asked Reed if he was interested in a sale, Reed said no, and Gonnering and Kiesler would monitor the industry and decide if and when they would recommend a sale. The special facts doctrine does not impose a duty to disclose that fact. The undisputed facts are that Reed never considered selling Windy Waters until June or July 2020, and even then, only one option among many in the timeframe of two to five years. *See* Reply to PFOF ¶¶ 373–403. Prior to that, there were no internal or external discussions about selling Windy Waters (other than the time Gonnering asked Reed of his intentions and Reed confirmed he did not want to sell); there were no contacts with any potential buyers; and there were no discussions with any brokers. *Id.*

Even if the Court finds the special facts doctrine could apply, the *Scarabello* case explains its scope and confirms based on the undisputed facts that Windy Waters provided all information arguably required. Interpreting and applying the special facts doctrine, the Northern District of Illinois held that there was no duty to "automatically reveal materials regarding the value of the stock when the minority shareholder expresses a desire to sell." *Scarabello v. Reichle*, 856 F. Supp. 404, 408 (N.D. Ill. 1994). Later, when clarifying on reconsideration, the court reaffirmed its holding and highlighted the fact that information that would have allowed the shareholder to calculate the book value of the shares was made available (even if not provided) to him confirmed nothing further had to be disclosed. *Scarabello v. Reichle*, No. 93 C 4606, 1995 WL 153338, at *2-3 (N.D. Ill. Apr. 6, 1995). Because there was no market for minority stock of a closely held

corporation and the company had always purchased shares at a set price, the plaintiff also already knew the "market value" of the stock. *Id.* at *5.

Kiesler disclosed even more than what *Scarabello* found adequate: Kiesler told Randall the book value for her shares when he explained the net assets, or stockholder's equity, value for the shares. Resp. to PSOAF ¶¶ 179–80, 250; Reply to PFOF ¶¶ 104–05, 255, 314–15; DSOAF ¶¶ 8, 13–15, 19. That is, in contrast with *Scarabello*, where the shareholder could have gotten information at shareholder meetings that could have allowed him to calculate the book value on his own, Kiesler did that work for Randall and told her the book value of her shares. Randall also knew there was no public market for her shares and that the company used the same formula each time it purchased shares. Reply to PFOF ¶¶ 82–85, 104–13, 116, 119, 121, 126, 128, 133, 135, 140, 142, 150, 152, 163, 166, 170, 173–74, 180, 183, 186, 188, 192–94, 243, 253, 311, 314, 323–26. Thus, even if the special facts doctrine imposed any additional duty of disclosure, Defendants complied.

### C. Defendants do not seek a ruling on materiality, but Randall's discussion on the point supports Defendants' arguments regarding the scope of Rule 10b-5(b) claims.

Defendants also did not move on the basis of materiality, recognizing that this issue is widely recognized as a jury issue. *See, e.g.*, *Basic*, 485 U.S. at 238; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) ("The [materiality] determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.").

Though Defendants do not seek summary judgment on the question of materiality, Randall sets up a straw man argument and argues that it is not just formal appraisals that can be material to a stock transaction (Defendants do not contend otherwise). Randall offers a string cite of cases giving examples of the types of information found material in a variety of different contexts,

seemingly to show that facts other than valuations may be material. Pl.'s Resp. Br. at 49. These cases only further underscore the limited scope of omissions that are actionable under Rule 10b-5(b).

Except one case discussing the actionability of an opinion rather than materiality, *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, Nos. 05-1151 (SRC), 05-2367 (SRC), 2015 WL 2250472 (D.N.J. May 13, 2015), and another involving insider trading rather than a Rule 10b-5 claim, *S.E.C. v. Gaspar*, No. 83 CIV. 3037 (CBM), 1985 WL 521 (S.D.N.Y. Apr. 16, 1985), each of the cases Randall cites contradicts Randall's expansive view of a duty to disclose. The cases involve either a false statement, *e.g.*, *United States v. Litvak*, 808 F.3d 160, 176 (2d Cir. 2015) (false statements of handling fees), or an omission of an additional undisclosed fact that was found material because the court concluded that affirmative statements made to the plaintiff were made misleading by not disclosing the additional fact, *e.g.*, *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 247–51 (2d Cir. 2014) (hiding information about poor environmental protection practices making representation of adequate measures misleading). Thus, it is unremarkable that, for example, omitting the fact that patients using nasal spray lost their sense of smell could be material to (and render misleading) a representation that the drug was safe. *Matrixx Initiatives*, 563 U.S. at 36. The cases do not support Randall's claim that Reed or Kiesler had a duty to disclose every possible piece of information bearing on the value of shares to Randall. In fact, the Supreme Court explicitly noted in *Matrixx Initiatives* that under Section 10b-5(b), "[d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.[']" *Id.* at 44.

These cases confirm that the focus of the materiality inquiry is on whether or not omitted facts make affirmative statements false or misleading. Randall has not undertaken to do that in this

case. In response to Randall's summary judgment motion, Defendants explain why materiality is an element that is inappropriate for summary judgment and why Defendants contend Randall cannot meet that standard. Defs.' Resp. Br. at 51–55. The materiality issue should be reserved for trial if the Court denies Defendants' summary judgment motion, and Randall will have to prove that all of the alleged false or misleading statements were material to her decision to sell her shares.

### D. Randall cannot prove scienter as a matter of law.

The other basis supporting judgment as a matter of law dismissing Randall's Second Claim for Relief, based on the undisputed facts, is that Randall does not have sufficient evidence of intentional deception to proceed with her claim. Randall has insufficient evidence as a matter of law that Kiesler intended to lie to Randall.

Claims of securities fraud under Section 10(b) require a plaintiff to prove "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). This may be established by an intentional lie. *Id.* Alternatively, scienter can be established with respect to an affirmative statement by showing "the danger of misleading buyers [was] actually known or so obvious that any reasonable man would be legally bound as knowing." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (footnote omitted). On the other hand, for liability to arise from an omission, a subjective test applies, and the plaintiff must show the omission "derive[s] from something more egregious than even 'white heart/empty head' good faith," meaning even forgetting a fact no reasonable person would forget is insufficient. *Id.* at 1045 & n.20. A plaintiff opposing summary judgment bears a high burden of presenting "significant probative evidence" of scienter. *In re Twitter, Inc. Secs. Litig.*, No. 16-cv-05314-JST, 2020 WL 4187915, at *5 (N.D. Cal. Apr. 17, 2020). The facts must "clearly suggest fraud," and summary

judgment should be granted "when the inferences offered to prove fraud establish negligence at best." *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1196 (N.D. Ill. 2000).

Randall attempts to establish scienter through three categories of evidence. The first evidence Randall cites to try to show an intent to deceive with respect to misstatements is the same evidence she uses to argue Kiesler's statements were false. Pl.'s Resp. Br. at 45–46, 51–52. These points are insufficient for the scienter inquiry because they do not show Kiesler considered these facts or intended to deceive. *Danis*, 121 F. Supp. 2d at 1193 ("In order to establish intentional deception, a plaintiff must do more than show that the defendant had knowledge of the undisclosed facts."). In particular, Randall highlights facts that show Widen Enterprises did, ultimately, survive after the initial struggle and uncertainty of the COVID pandemic—for example, pointing out a projected increase in revenues that does not acknowledge that this was a lowered projection and ignores the cost side of the profit equation. *See* Resp. to PSOAF ¶ 53; DSOAF ¶¶ 109–10, 159. Randall assembles the evidence with the benefit of hindsight in direct contradiction to the scienter standard: "This [scienter test for misrepresentations] is an objective test although the circumstances must be viewed in their contemporaneous configuration rather than in the blazing light of hindsight." *Sundstrand*, 553 F.2d at 1045 n.19. Similarly, Randall cannot show any subjective intent or recklessness with respect to any alleged omissions. There is no reason to believe that, for example, an email from Gonnering from 2014 suggesting the company had a high market value (*see* PSOAF ¶ 33) was at the front of Kiesler's mind and intentionally withheld, but a valuation from February 2020 from Windy Waters' accountants showing a significantly lower value (*see* Resp. to PSOAF ¶ 118; ECF No. 109-8, at WINDY0001129; DSOAF ¶¶ 85–96) was not. Further, Randall cannot show Kiesler was aware of Gonnering's responses to solicitation emails, so cannot show intent or recklessness that is equivalent to willful fraud.

The next type of evidence Randall relies upon is circumstantial evidence showing Kiesler and Reed intended to carry out the stock transaction. In particular, Randall focuses on an email acknowledging Windy Waters had bought back shares held by passive shareholders and would continue to do so. Pl.'s Resp. Br. at 46–47. If an intent to carry out the transaction were the only intent necessary for securities fraud, there would be scienter in every case. There must be intent *to defraud*, and intending to effectuate the deal is not the same thing.

The last category of evidence Randall cites in support of her scienter argument is an alleged coverup by Reed. Pl.'s Resp. Br. at 47–48. Defendants contend Randall profoundly misunderstands these communications, but taking them in the light most favorable to Randall, they still do not show any intentional false or misleading statement for one key reason: Even Randall does not contend that *Kiesler* engaged in any coverup. Any after-the-fact actions taken by Reed cannot show *Kiesler*'s intent when communicating with Randall in May 2020.

Randall has no evidence to genuinely dispute that Kiesler (1) was not genuine when he said that the offer made to Randall was, in his opinion, fair; (2) had any knowledge of anyone considering selling Widen Enterprises at any time down the road, including in the near future; (3) was not genuine when he said the COVID pandemic could cripple the company; and (4) was not genuine when he said the company was not willing to give Randall $100,000 or $50,000, since it had no obligation to do so. *See* Reply to PFOF ¶¶ 114, 199, 227, 235, 249–50, 256, 264, 270; Resp. to PSOAF ¶¶ 178, 182–83; DSOAF ¶ 19. In light of the undisputed facts, Kiesler could have no intent to deceive and did not deceive Randall.

Because Randall cannot meet her burden of proof on the scienter or falsity elements of her securities fraud claim in her Second Claim for Relief, this claim should be dismissed on summary judgment.

### III.     Randall Cannot Maintain Any Claim for Excessive Compensation.

Randall's arguments that Reed was paid excessive compensation are variably described as securities fraud, breach of fiduciary duty, and common law fraud. No matter the label, any claim related to Reed's compensation should be dismissed for the four reasons explained below.

#### A. Randall's claims are derivative claims she cannot pursue in this direct action.

First, as explained at length in prior briefs and incorporated here by reference, any claim seeking to recover based on the overcompensation itself is a derivative claim. Br. Supp. Defs.' Mot. Summ. J. (ECF No. 60) ("Defs.' Opening Br.") at 35–36, 55; Defs.' Resp. Br. at 34–38. These arguments can be summed up as follows: To have a direct claim, a shareholder must have had her rights impaired "in a manner distinct from the effect upon other shareholders," as explained in the case Randall relies upon most heavily. *Jorgensen v. Water Works, Inc.*, 2001 WI App 135, ¶ 16, 246 Wis. 2d 614, 624, 630 N.W.2d 230, 235. In *Jorgensen*, that was satisfied by failing to pay the plaintiff shareholders (a married couple) the dividends all other shareholders received. *Id.* ¶ 18, 246 Wis. 2d at 624–25, 630 N.W.2d at 235. Here, the exact opposite is true—all of the shareholders were impacted in the same manner by any alleged overcompensation to Reed. Randall was not singled out or impacted personally. This is a classic derivative claim that Randall cannot maintain.

#### B. Claims for breach of fiduciary duty cannot be bootstrapped into securities claims.

Even if recast as a securities fraud claim for Reed or Kiesler failing to disclose Reed's compensation prior to the stock transaction or a scheme related to constructive dividends, Randall's claim based on Reed's compensation fails as a matter of law. As argued above, only facts that make an affirmative statement misleading can be actionable omissions under Rule 10b-5(b). No statement by Kiesler was made misleading by not telling Randall how much Reed made as chairman of Widen Enterprises. Further, Randall cannot turn a breach of fiduciary duty claim

into a federal securities claim under any Rule 10b-5 provision. "Congress by [Section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (citation omitted).

"[C]ourts have consistently held that since a shareholder cannot recover under 10b-5 for a breach of fiduciary duty, neither can he 'bootstrap' such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981). "[I]f 'the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law. To hold otherwise would be to . . . permit evasion of that decision by artful legal draftsmanship.'" *Id.* at 289 (quoting *Hundahl v. United Benefit Life Ins. Co.*, 465 F. Supp. 1349, 1365–66 (N.D. Tex. 1979)).

Randall does just that. When describing her claim for scheme liability under Rule 10b-5(a) and (c), Randall describes the scheme as follows: "[T]he squeeze-out effectively forced Stacy to initiate those redemptions by denying her the portion of the dividends Reed received and to which she is entitled." Pl.'s Resp. Br. at 60–61. That is, Randall is pointing to solely a breach of fiduciary duty and corporate mismanagement issue and bootstrapping it into a securities fraud claim. This also fails to recognize that Randall must prove that had Reed received less compensation, Widen Enterprises would have issued dividends to Windy Waters and Windy Waters would have issued dividends to its shareholders in the amount of the excess compensation—an issue Randall entirely ignores. Privately held companies rarely issue dividends. *Taxy v. Worden*, 181 Ill. App. 3d 97, 104, 536 N.E.2d 901, 906 (1989) ("The court gave no weight to the dividends or the lack thereof in light of the fact that close corporations seldom declare dividends . . . ."); *Berreman v. W. Publ'g*

*Co.*, 615 N.W.2d 362, 368 (Minn. Ct. App. 2000) ("[D]ividends are rarely distributed in a close corporation."). There is no duty to issue dividends. *See Reget v. Paige*, 2001 WI App 73, ¶ 15, 242 Wis. 2d 278, 291, 626 N.W.2d 302, 309 ("Reget cites no authority for the assertion that a board of directors has a duty to pay dividends to shareholders instead of using profits for other purposes." (footnote omitted)). Randall's securities claims should be dismissed to the extent they relate to Reed's compensation.

### C. *Randall has not identified any genuine dispute of material fact related to Reed's compensation.*

Assuming there were some legal theory to fit Randall's allegations, Randall cannot contest the facts showing Reed was compensated appropriately and has shown no genuine dispute of material fact in her opposition to summary judgment. In Wisconsin, Randall must meet an extremely high burden to prove Reed was overpaid. The court in *Gauger v. Hintz*, 262 Wis. 333, 55 N.W.2d 426 (1952), wrote:

> [S]omething besides the fact that the individual was a director must be existent to destroy or overcome the accepted doctrine that "the laborer is worthy of his hire." Under such circumstances transactions should be subject to close and searching scrutiny . . . .

*Id.* at 346, 55 N.W.2d at 433. "[T]he business judgment rule creates an evidentiary presumption that the acts of the board of directors were done in good faith and in the honest belief that its decisions were in the best interest of the company." *Reget*, 2001 WI App 73, ¶ 18, 242 Wis. 2d at 294, 626 N.W.2d at 311; *see also Einhorn v. Culea*, 2000 WI 65, ¶ 19, 235 Wis. 2d 646, 656, 612 N.W.2d 78, 84. As a result, substantial evidence is needed to overcome the business judgment rule and survive summary judgment when alleging excessive compensation. *See Reget*, 2001 WI App 73, ¶¶ 17–22, 242 Wis. 2d at 293–97, 626 N.W.2d at 310–12.

Randall has no admissible evidence, lay or expert, that could lead a reasonable jury to find that Reed's compensation was a constructive dividend, or excessive. This is an issue for which

expert testimony is required. *In re Perry H. Koplik & Sons, Inc.*, 382 B.R. 599, 600–03 (Bankr. S.D.N.Y. 2008); *see also* Defs.' Resp. Br. at 40–41. But even if it weren't, Randall cannot support this argument herself since she was not actively engaged in the business of Windy Waters or Widen Enterprises and she therefore has no perception from which to form an opinion. Reply to PFOF ¶ 46; ECF No. 118, ¶ 46. Even if Randall had other witnesses to offer (she does not), individuals outside of the company do not know what work was performed or what compensation is reasonable for the president and chairman of Widen Enterprises.

Rather than expert opinion, Randall submits the unauthenticated and unexplained executive summary from the results of a survey conducted by "Chief Executive Research." PSOAF ¶¶ 81–83, 86. This is inadmissible and may not be considered. Rule 26 of the Federal Rules of Civil Procedure requires Randall to identify and disclose an expert who is qualified to proffer an opinion on this subject matter—not sneak an unsubstantiated survey through the back gate. Fed. R. Civ. Pro. 26(a)(2).

"[T]he district court acts as the gate-keeper for expert evidence . . . ." *Downing v. Abbott Laboratories*, 48 F.4th 793, 809 (7th Cir. 2022) (citation omitted). But before the court can even consider using its key to open the gate, there must first be a qualified expert before it. Fed. R. Evid. 702. In other words, a prerequisite to the admission of expert testimony is an expert who is qualified to opine on the subject matter by virtue of his or her "knowledge, skill, experience, training, or education." *Id.*; *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).

The survey offered by Randall is not a replacement for a qualified expert opinion. First, Randall's deadline to disclose expert witnesses has passed, and Randall identified no expert who would offer an opinion on Reed's compensation, and did not identify the author of the survey as an expert. *See* ECF No. 83. Second, Randall has no witness to introduce the survey and no witness

to testify that the survey is a reliable authority. *See* Fed. R. Evid. 803(18). Third, even assuming that the source had been authored by a disclosed, qualified expert, conducting a survey hardly constitutes the "reliable principles and methods" for an admissible expert opinion. Fed. R. Evid 702(c); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591–95 (1993). Even if a survey may be a reliable methodology under certain circumstances, those circumstances are not shown here. The survey does not identify the participants or offer any indication of why these results are applicable to this case. *See* ECF No. 117-2, at Randall0000425. Undisclosed authors' overgeneralizations premised on an undisclosed, irrelevant data set do not constitute admissible expert opinions under Federal Rule of Evidence 702.

In short, Randall has no admissible evidence that Reed was overpaid to genuinely dispute that his compensation was reasonable and overcome the presumption of reasonableness. She has no testimony from anyone with personal knowledge to contradict Reed's and Gonnering's testimony about the work Reed performed for Widen Enterprises. Rather, she apparently intends to carry her burden of proof by pointing out that Reed often worked remotely, that he could not articulate more specific descriptions of what he did than what was provided during his deposition, and he could not describe how Widen Enterprises' software worked during his deposition. *See* Resp. to PSOAF ¶¶ 70–72. These points do not create any genuine dispute of material fact. Moreover, Randall's incorrect understanding of the adjusted EBITDA figures contained in the materials prepared by Widen Enterprises' hired experts for purposes of soliciting potential buyers does not create a dispute of fact. Gonnering, who consulted with Grant Thornton on this analysis, explained the purpose was to provide a metric for potential buyers (who would not be hiring Reed but would have their own leadership team to provide the same role) of the profit the new parent company could receive from acquiring Widen Enterprises. Resp. to PSOAF ¶¶ 100, 102; DSOAF

31

¶¶ 174, 194. No reasonable jury could credit Randall's intended lay testimony, with no expert testimony in support, and find Reed was overcompensated. As a matter of law, any claim based on this compensation issue should be dismissed.

### D.  Any claim related to constructive dividends is time-barred.

Randall argues her constructive dividend claim is not barred by the statute of limitations and argues that claims related to bonuses and salary paid in 2019 and 2020 should survive.[7] Randall emphasizes that she received a document in 2022 which described the specific salaries and bonuses at issue. Randall essentially argues that the statute of limitations for her claims did not run until she learned the amount of her alleged damages. The law does create such a wide loophole around the statute of limitations.

Since Defendants' motion for summary judgment was filed, Randall's own family confirmed that she was complaining at least twenty years prior to filing suit that she was "not receiving dividends or distributions from the companies." DSOAF ¶¶ 182-83.  Meanwhile, Randall was well aware that "Reed's got a brand new car and we're . . . not living the life . . . ." DSOAF ¶ 181. Further, Randall does not dispute that over the twenty years prior to filing suit, she complained that "Reed's getting paid a bunch of money and we're not getting anything." DSOAF ¶¶ 182-83.

This is all that was needed for Randall to bring suit on this issue. In fact, Randall's own Complaint describes this claim with just such information, as follows:

> Controlling Defendants further breached their fiduciary duties to Stacy by issuing constructive dividends to Reed, in the form of outsized and unearned "salary" and "bonuses," while withholding nearly all dividends to Stacy.

---

[7] Randall does not argue that claims for salary and bonuses paid prior to 2018 do not survive this motion for summary judgment.

*Compl.,* ECF No. 1, ¶ 252. Randall knew exactly these facts for over twenty years, yet chose not to bring suit.

Randall further argues that new bonus payments constitute later injuries which should restart the statute of limitations. However, the fact that bonuses were paid out in a series of transactions does not restart the statute of limitations. "A later injury from the same tortious act does not restart the running of the statute [of limitations]." *Segall v. Hurwitz*, 114 Wis. 2d 471, 482, 339 N.W.2d 333, 339 (Ct. App. 1983). The Wisconsin Supreme Court has ruled that a series of transactions constitutes a single cause of action and the limitations period does not restart with each successive injury:

> According to the single cause of action rule, all injuries caused by a single transaction *or series of transactions* by a tortfeasor are part of a single cause of action so that "a later injury from the same tortious act does not restart the running of the statute [of limitations]."

*Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 224, 601 N.W.2d 627, 633 (1999) (emphasis added) (citation omitted).

Ultimately, Randall's argument that obtaining information about the amount of her damages starts or restarts the limitations period does not make any sense. Once an injury, its nature, its cause, and the identity of the responsible person is known or reasonably should be known through reasonable diligence, the claim has accrued. *Hennekens v. Hoerl*, 160 Wis. 2d 144, 160, 465 N.W.2d 812, 819 (1991). This does not require knowledge of the specific dollar amount of the damages. *See id.* In fact, even if there are no known or existing monetary loss at the time, if some harm has occurred, the claim has accrued. *Id.* at 153, 465 N.W.2d at 816. Moreover, parties learn new facts regarding the amount of their damages all the time. If obtaining this knowledge restarted the statute of limitations, then courts would never be able to enforce the statute of limitations.

Accordingly, Randall's constructive-dividend-based claims should be dismissed in their entirety under the statute of limitations.

Even if, somehow, each additional payment to Reed constituted a new cause of action, at least a portion of the compensation in 2019 was paid outside of the limitations period. The suit was filed on July 21, 2022. Compl., ECF No. 1. Crediting Randall with 102 days under the Tolling and Standstill Agreement, and taking a three-year limitations period, the limitations cutoff is April 10, 2019. At a minimum, no claim that arose before that date can be maintained.

### IV.    *Randall's First Claim for Relief for Scheme Liability Should Be Dismissed.*

Randall cannot prevail on her First Claim for Relief for a securities fraud scheme as a matter of law. Defendants moved for summary judgment based on an insufficient set of facts to support a claim for scheme liability. *See* Defs.' Opening Br. at 36–39. In response, Randall has failed to show that she can prove any scheme claim. As best as Defendants can tell, this scheme claim is based on the use of a signature stamp to conduct business, failure to hold meetings, and failure to pay dividends.

As an initial matter, the plainly undisputable fact is that Randall received quarterly tax distributions to apply towards any tax liability for her ownership. Reply to PFOF ¶¶ 48–50; *see also* DSOAF ¶¶ 94, 123–28. Randall's suggestion that no tax payments were made on her behalf is simply false under the undisputed facts. Beyond that, taking the facts in the light most favorable to Randall, she cannot meet at least three elements of this claim.

First, Randall cannot show any deceptive or manipulative actions in furtherance of a scheme. Randall focuses heavily on the allegation that Reed was paid compensation that was a constructive dividend. As argued above, Randall cannot bootstrap this alleged breach of fiduciary duty into a securities fraud claim, particularly when she cannot show that she would have received dividends if not for Reed's compensation. Randall also fails to identify any deceptive or

34

manipulative action in relation to Reed's compensation. Regarding the other aspects of this alleged scheme, Randall has not identified causation between use of her signature stamp or a failure to conduct annual meetings and her selling all of her shares in May 2020. She does not argue the signature stamp was used to authorize self-dealing by others, or that the annual meetings were avoided with an intent that Randall not learn information about Windy Waters. Nor could she—it is undisputed that annual meetings never occurred, even before Randall was president. Resp. to PSOAF ¶ 321. These issues are entirely unrelated to her stock sale, and do not constitute a fraudulent securities scheme.

Second, Randall cannot show the requisite scienter. The same scienter standard for claims under Rule 10b-5(b) applies to Randall's scheme liability claim under Rule 10b-5(a) and (c). For this scheme liability claim, the plaintiff must have sufficient evidence to prove intent to defraud the plaintiff through use of the scheme. Randall has made no effort to tie together the alleged scheme with an intent to force Randall to sell her shares for an amount less than their worth.

Third, she cannot show reliance. In fact, Randall does not even address the reliance element. In a footnote, Randall incorporates a non-existent discussion of reliance regarding her Rule 10b-5(b) claim. Pl.'s Resp. Br. at 55 n.22. With no argument and no facts showing reliance on an alleged scheme that resulted in her selling her shares, Randall's claims fail as a matter of law.

Finally, as argued in Defendants' opening brief, this claim is time-barred with respect to the signature stamp. Randall does not even address Defendants' argument on this issue—that she was on inquiry notice of Defendants' use of the stamp, and that as the president of Windy Waters who knew a signature stamp had been provided and that she would have to sign documents, *see*

Reply to PFOF ¶¶ 41–45, 87, 51–56, she should have inquired about its use. For this additional reason, the scheme fraud claim should be dismissed.

## V.      *Control Liability and State Securities Claims Fall with Federal Claims.*

All parties agree that if Randall's First and Second Claims for Relief are dismissed, her Third and Fifth Claims for Relief must also be dismissed. *See* Defs.' Opening Br. at 39–41; Pl.'s Resp. Br. at 63.

## VI.     *Randall's Intentional Misrepresentation Claim Should Be Dismissed.*

The facts Randall relies upon for her intentional misrepresentation claim (Fourth Claim for Relief) are no different from the facts relied upon for her securities fraud claims. But, the requirements for Randall to prevail on the claim are different. For all of the reasons Randall's securities fraud claims should be dismissed, her intentional misrepresentation claim should be dismissed as well. The claim also fails for four additional reasons, discussed below.

### A.  *Randall cannot meet the heightened burden of proof.*

The burden of proof for an intentional misrepresentation claim is higher: Randall must prove each element by clear and convincing evidence. *Korhumel Steel Corp. v. Wandler*, 229 Wis. 2d 395, 403, 600 N.W.2d 592, 596 (Ct. App. 1999). As a result, even if the Court concludes there are sufficient facts that a jury could find in her favor on securities fraud by a preponderance of the evidence, the Court should still dismiss this claim because the tenuous facts Randall cites would not allow a jury to find in her favor by clear and convincing evidence.

### B.  *Randall cannot show justifiable reliance.*

Defendants requested summary judgment based on a failure by Randall to meet her burden of proof on all elements, including reliance. *See* Defs.' Opening Br. at 50–53. Intentional misrepresentation includes an element of justifiable reliance. *Hennig v. Ahearn*, 230 Wis. 2d 149,

169, 601 N.W.2d 14, 23 (Ct. App. 1999). Randall cannot prevail when she buried her head in the sand. *See id.*

>       In response, Randall points to self-serving assertions of reliance that state as follows:

>>       8. I relied on the representations that Defendant Michael Kiesler made to me prior to May 13 as well as on May 13 in deciding to sign the May 2020 redemption agreement.

>>       9. In deciding to sign the May 2020 redemption agreement, I trusted and relied that Defendant Michael Kiesler and my brother Reed Widen had disclosed to me all the relevant information I needed to make an informed decision on whether or not to sign the May 2020 redemption agreement.

ECF No. 65 ¶¶ 8–9; *see also* Resp. to PSOAF ¶¶ 221, 226. These conclusory statements are contradicted by the facts: During her prior five redemptions, Reed and Kiesler disclosed no information to Randall, and she nevertheless signed the redemption agreements. Reply to PFOF ¶¶ 112, 155–56. Beyond that, Randall fails to identify any specific statements she relied upon in May 2020. However, in sworn statements, she has conflictingly stated she would not have redeemed her stock if she had known the Defendants were considering selling Widen Enterprises, ECF No. 118, ¶ 42, that she would not have agreed to sell her shares if she knew how much the companies were worth, *id.* ¶ 47, that she would not have signed the agreement if she had known of information showing the price was significantly lower than fair market value of her stock, *id.* ¶ 48, and that she felt she had no choice but to sign because of her "immediate need for money to fund my divorce," *id.* ¶ 39. Which is it? Even Randall's own statements do not support her blanket assertion of reliance on every statement Kiesler made or complete trust that every bit of relevant information would be disclosed. To the contrary, she expressly disclaimed trust in Kiesler or Reed shortly before the redemption. Resp. to PSOAF ¶¶ 221, 226; Reply to PFOF ¶¶ 271, 359.

>       Nor was Randall's reliance on any alleged affirmative misstatement justified. If she wanted to know whether the companies could afford paying her $50,000 and believed having enough cash

in the bank was enough to equate to affordability, she could have looked at the bank statements in her possession (constructive or actual). *See* Resp. to PSOAF ¶ 335. Likewise, if Randall believes an abundance of cash reserves was enough to show it was not smart for her to redeem her shares, she had that information available to her. *Id.* If she thought a fair price meant something other than a price calculated the same way it had been done for her and others since 2004, she was not justified in that reliance.

Randall goes to great lengths to distinguish *Moseman v. Van Leer*, 263 F.3d 129 (4th Cir. 2001), in the context of her argument about the validity of releases under securities laws. Pl.'s Resp. Br. at 13–14. She argues that her case is distinguishable from *Moseman* and that she can show justifiable reliance. *Id.* The problem is, two of the three reasons the court in *Moseman* listed as reasons the plaintiffs had not justifiably relied on the defendant's representations about the value of the property at issue are also present in this case. Specifically, in *Moseman*, the plaintiffs' attorney acknowledged suspicion of the defendant prior to the transaction, and the plaintiffs "failed to inquire further" "when full information was not forthcoming." 263 F.3d at 133. Here, Randall also acknowledged suspicion of the defendants prior to the transaction, and also failed to inquire further. Reply to PFOF ¶¶ 271, 344–45. Just as in *Moseman*, this Court should conclude that Randall cannot show justifiable reliance.

### C.  Defendants had no duty to disclose.

Just as there was no duty of disclosure under securities law, there was no duty to disclose under intentional misrepresentation common law.[8] Randall argues there was a duty to disclose a wide range of information both because it was solely in Defendants' possession and because of a

---

[8] Randall argues Defendants "do not contest that they had a duty to disclose," Pl.'s Resp. Br. at 64, but that is untrue. Defendants argued both that Randall did not meet her burden on all of the elements of her claim, Defs.' Opening Br. at 41–53, and specifically that there was no duty to disclose, *id.* at 46.

fiduciary duty, *see* Pl.'s Resp. Br. at 64–67, but she is wrong. The well-established general rule is that there is no duty to speak. *Lecic v. Lane Co.*, 104 Wis. 2d 592, 604, 312 N.W.2d 773, 779 (1981) ("The general rule is that silence, a failure to disclose a fact, is not misrepresentation unless the nondisclosing party has a duty to disclose that fact."). A party seeking to impose liability for a failure to disclose must begin by proving four elements required to impose a duty to disclose:

> [A] party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 20, 283 Wis. 2d 555, 573–74, 699 N.W.2d 205, 213; *see also* Restatement (Second) of Torts § 551 cmt. *l* (Am. L. Ins. 1977) (noting cases finding a duty to disclose typically are "those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap"). In addition, the plaintiff must still prove the standard elements of intentional misrepresentation. *Kaloti*, 2005 WI 111, ¶¶ 12, 26, 283 Wis. 2d at 569, 578, 699 N.W.2d at 211, 215.

The key element Randall overlooks in her argument is that a duty to disclose arises only when one party knows the other party is mistaken. The *Kaloti* example Randall discusses, Pl.'s Resp. Br. at 68–69, is a case in point. There, a duty to disclose was found to exist because the manufacturer induced a long-term distributor to order product while knowing it had changed its marketing strategy and was going to sell directly to the supermarkets in direct competition with its distributor, and necessarily knowing its distributor did not yet know that fact. *Kaloti*, 2005 WI 111,

¶ 22, 283 Wis. 2d at 574–75, 699 N.W.2d at 214. As another example, a court found a plaintiff had shown    enuinee dispute of fact sufficient that a jury could conclude a commercial real estate seller had a duty to disclose rent deficiencies after the seller had affirmatively disclosed the annual rent the buyer could expect that necessarily included no rent deficiencies and therefore knew the buyer was mistaken. *Kailin v. Armstrong*, 2002 WI App 70, ¶¶ 32–36, 252 Wis. 2d 676, 703–05, 643 N.W.2d 132, 146–47.

Under Wisconsin law, none of the Defendants had any duty to disclose information to Randall in connection with her stock redemption. In addition to all of the same reasons argued above with respect to securities fraud, under the Wisconsin standards, there is no basis for finding a duty to disclose. Randall has not pointed to any evidence suggesting that any of the Defendants were aware that she was acting under a misapprehension of facts—a requirement before finding a duty to disclose. Whether or not she was subjectively mistaken about a fact is irrelevant—the other side must be aware of that mistake and fail to disclose information exclusively in its possession to correct that mistake. *See Kaloti*, 2005 WI 111, ¶ 20, 283 Wis. 2d at 573–74, 699 N.W.2d at 213. Randall cannot meet this test.

Randall also does not discuss and cannot meet the last requirement for a duty to disclose—that under the circumstances, "the mistaken party would reasonably expect disclosure of the fact." *Id.* The best evidence that she could not have reasonably expected disclosure of any other information about the companies was that she had never requested nor been given this information on the five prior occasions when she sold shares. Reply to PFOF ¶¶ 112–13, 155–56. When she sold stock previously, she never asked for financial statements, bank records, investment records, or anything else, and never received it, showing that Randall herself could not have expected this to be disclosed on her sixth redemption. Randall's argument that this time things were different

flies in the face of her past conduct and common sense. Randall set the standard—not once or twice, but five times—for what she thought (or didn't think) was material when she sold back her shares to Windy Waters. There was no way for Windy Waters to believe she would expect anything different the sixth time.

Randall is not saved by pointing to a fiduciary relationship. The existence of a fiduciary relationship, alone, does not create a duty to speak. *Lecic*, 104 Wis. 2d at 608–09, 312 N.W.2d at 780–81. In *Lecic*, the Wisconsin Supreme Court addressed whether a special administrator of an estate—who indisputably owed a fiduciary duty to creditors of the estate—had a duty to disclose to creditors the information about filing claims. *Id.* The court concluded there was no duty to disclose; rather, the special administrator's fiduciary duty was only to carry out her tasks "in good faith and with reasonable care." *Id.* As argued in the context of Randall's fiduciary duty claim below and in prior briefs, the relationship between Randall and Kiesler or Reed did not give rise to any duty to disclose related to this transaction.

Finally, there is also no duty to disclose facts that would allow the other party to predict future economic events. *Bellon v. Ripon Coll.*, 2005 WI App 29, ¶ 11, 278 Wis. 2d 790, 797–98, 693 N.W.2d 330, 333. In *Bellon*, a professor argued her employer should have disclosed to her when discussing her employment offer "information about the college's budget deficit, withdrawals from the endowment over the preceding nine years, dependence on enrollment levels, and enrollments over the past ten years." *Id.* The court concluded there was no duty to disclose. *Id.* Much of the allegedly omitted information falls in this category.

### D. No alleged false or misleading statements were material.

While Defendants do not request a ruling on materiality with respect to the securities fraud claims, they do contend the undisputed facts support a ruling as a matter of law that Randall cannot prove by clear and convincing evidence that any false or misleading statements (or omissions)

were material. Case law is clear in Wisconsin that the materiality analysis requires an analysis about whether the information was "material to the transaction." *Kaloti*, 2005 WI 111, ¶¶ 19–20, 283 Wis. 2d at 573–74, 699 N.W.2d at 213. Randall's materiality argument boils down to a contention that everything about the company could be material to the value of her shares, even though she deemed none of it material in the past. This does not show why any such information was material *to the transaction*. Randall needed money and wanted to sell shares. The only way Windy Waters was going to do that was through buying back all of her shares using the Stock Price Formula. This was Windy Waters' condition for a purchase—a position it had every right to take. No amount of information would have changed that or would have changed her calculus.

## VII.    Randall Cannot Prove a Breach of Fiduciary Duty.

Defendants moved for summary judgment on Randall's breach of fiduciary duty claim (her Sixth Claim for Relief) on three grounds: (1) she fails to meet her evidentiary burden as to the entire claim, (2) the claim is a derivative rather than direct claim, and (3) it is barred by the limitations period. Defs.' Opening Br. at 53–58. Defendants' arguments in reply to the second and third arguments, relating to Reed's compensation, are contained in Section IV, above. As it relates to Randall's wider theory of a fiduciary obligation with respect to the transaction, Defendants incorporate the arguments they made in response to Randall's motion for summary judgment. Defs.' Resp. Br. at 16–43.

Other than the arguments already set out in these places, just one point remains to be addressed. Randall briefly argues her fiduciary duty claim based on use of a signature stamp survives summary judgment because facts about her authorization of its use are disputed. Pl.'s Resp. Br. at 79. That does not save her claim. She still has not identified any facts suggesting that use of her signature stamp *caused any harm*. She does not identify any specific document with her signature stamp on it that she identifies as causing her some harm and she did not dispute that she

routinely did not review documents before signing them anyway. Resp. to PFOF ¶¶ 39, 59, 63–64, 67. Randall cannot satisfy the element of a breach of fiduciary duty claim that use of her signature stamp caused her any harm; her argument is a complete red herring.

## VIII.   The 2020 Redemption Agreement Stands, Including the Release.

Regardless of the label put on Randall's arguments against enforcement of the release or the 2020 Redemption Agreement as a whole, they are without basis in fact and law. The Court should enforce the agreement and the release within it should bar all of Randall's claims.

### A.   Randall's specific challenges to the release are without merit.

The release in the 2020 Redemption Agreement bars all claims existing when it was signed, whether or not Randall knew of those claims at the time. *See Goodman v. Epstein*, 582 F.2d 388, 404 (7th Cir. 1978); *Moseman v. Van Leer*, 263 F.3d 129, 133–34 (4th Cir. 2001). In the absence of the release being avoided in some way, the release bars all of Randall's claims. Randall does not contest this starting point, but argues the release provision violates the Securities Exchange Act of 1934—specifically, 15 U.S.C. § 78cc—and should be set aside. In large part, Randall seemingly argues that because the agreement was (she claims) fraudulently induced as a whole, the agreement and the release within it should be avoided. That broader argument is addressed in section VIII.B. below and in sections addressing the merits of Randall's misrepresentation claims.

Separately, Randall also seems to maintain that the release, in and of itself, violates 15 U.S.C. § 78cc. This issue was already briefed, and Defendants reiterate their arguments in response to this position as stated in their reply in support of their motion to strike (ECF No. 37, at 2–9). In short, the release did not portend to bar future claims or anticipatorily waive compliance with securities laws. Rather, it releases only claims existing at the time it was signed. *See* ECF No. 33-1, ¶ 5. As a result, there is no basis to invalidate the release provision under securities laws. *Lancer Offshore, Inc. v. Dominion Income Mgmt. Corp.*, No. 01 CIV 4860(LMM), 2002 WL 441309, at

*5 (S.D.N.Y. Mar. 20, 2002) ("[I]t is well settled that Section 29(a) only invalidates releases between parties which, in attempt to circumvent compliance with the federal laws, are anticipatory waivers of compliance with the Exchange Act."). The release provision is valid and enforceable.

### B.  Randall has ratified the contract and waived rescission.

As has been briefed at length, Randall's belated attempts to rescind the contract as a whole are barred by the related doctrines of ratification and waiver. Defendants stand by the extensive arguments raised in their brief in support of their motion to strike (ECF No. 32) and their reply brief (ECF No. 37). As reiterated in Defendants' opening brief in support of summary judgment, that waiver continues with Randall's collection of payments to this day. *See* Defs.' Opening Br. at 70. For the reasons explained in those briefs, Randall has ratified the Stock Redemption Agreement or has waived her right to seek rescission. Randall's request for rescission should be denied and her Eleventh, Twelfth, and Thirteenth Claims for Relief should be dismissed.

Seeking another shot at arguing the issue, Randall resurrects and doubles down on arguments related to the tender-back doctrine. Pl.'s Resp. Br. at 94–97. As Defendants already argued in their reply in support of the motion to strike, incorporated here, it is not Randall's failure to tender back the money she was paid that results in her ratification of the 2020 Redemption Agreement—a tender back would be too little, too late. Rather, it is Randall's continued acceptance of payments that constitutes ratification of the agreement and waiver of any right to argue the same contract by which she received payment month after month is somehow also invalid. *See* ECF No. 37 at 9–14.

Beyond the issues already addressed in the briefing on the motion to strike, Randall raises on summary judgment the existence of pre-suit settlement discussions that she contends undermines ratification and waiver or supports equitable estoppel. These settlement discussions do not change the result. The Standstill and Tolling Agreement was in no way a representation that

Defendants would not raise defenses available to them. It preserved only whatever rights Randall had at the time it was signed in March 2022 and is not "admissible for any purpose other than to rebut a defense based on the passage of time." ECF No. 63-71, ¶ 6; Resp. to PSOAF ¶¶ 272–73. Randall's labeling her argument "equitable estoppel" also does not change the analysis. As explained in Defendants' response brief, Defs.' Resp. Br. at 59–60, this tolling agreement related only to limitations defenses. Put another way, there was no representation that Defendants would not raise ratification and waiver defenses and there can be no estoppel and no reliance. In addition, the Standstill and Tolling Agreement does not save Randall's conduct since filing this lawsuit in accepting and retaining monthly payments made under an agreement she claims is void. A party cannot have her cake and eat it too. *Seward v. B.O.C. Div. of Gen. Motors Corp.*, 805 F. Supp. 623, 633 (N.D. Ill. 1992).

Relatedly, Randall contends that if *any* of her claims have merit, equitable estoppel would preclude enforcement of the release. Pl.'s Resp. Br. at 11. That is wrong. Even if the Court denies Defendants' request that the Court rule as a matter of law that Randall cannot seek rescission of the Stock Redemption Agreement, Randall would still have to prove her claims, and show rescission is available as a remedy for that claim and that she is entitled to that relief, in order for the release to be avoided. That trial issue cannot be resolved on the pending cross motions for summary judgment.

### C. Randall's Eleventh Claim for Relief is tied to her federal securities claims.

In the Eleventh Claim for Relief in the Complaint, Randall seeks a ruling that the 2020 Redemption Agreement is void because of violations of SEC Rule 10b-5, as alleged in her First and Second Claims for Relief. Essentially, this claim seeks a specific remedy for other claims and is not its own cause of action. This claim should be dismissed for that reason alone. But in any

event, if the Court dismisses Randall's First and Second Claims for Relief, Randall acknowledges the Eleventh Claim for Relief would also be dismissed. *See* Pl.'s Resp. Br. at 84–85.

### D. Randall cannot show unconscionability.

The 2020 Redemption Agreement is not unenforceable due to unconscionability. Randall's Twelfth Claim for Relief should be dismissed. For obvious reasons, Randall focuses on the procedural unconscionability analysis, and highlights her lack of sophistication. Randall claims the undisputed fact that she was a repeat player, selling her stock on five prior occasions, was irrelevant to the unconscionability inquiry. She is wrong; this shows Randall's experience with these transactions, a relevant factor. *See Disc. Fabric House of Racine, Inc. v. Wis. Tel. Co.*, 117 Wis. 2d 587, 602, 345 N.W.2d 417, 425 (1984). Randall also discounts the fact that she received advice from a financial advisor in the week between her request to sell stock and the conclusion of the transaction. But this too shows she had help to even out the bargaining power. These facts undermine her procedural unconscionability argument. The factor of whether changes in the terms was possible cuts against Randall—changes in terms were certainly possible, but it is undisputed that Randall did not ask. Reply to PFOF ¶ 344.

Additionally, the terms of the 2020 Redemption Agreement were not substantively unconscionable as a matter of law from the face of the agreement itself. Randall's only arguments of unconscionability are that the price was low, the interest rate was the legal minimum rate, there was no guaranty from the Companies, and "Defendants sneaked in a self-serving release." None of these points shows the 2020 Redemption Agreement was so commercially unreasonable as to be unconscionable. Moreover, the release in the 2020 Redemption Agreement was *mutual*, meaning that Windy Waters also released its claims against Randall. There is nothing commercially unreasonable about that. In addition to the terms being reasonable on their face, a nearly identical contract (containing the same release) was signed by Randall's brother, Price

Widen, who was represented by counsel when he sold all of his shares. Reply to PFOF ¶¶ 171-76, 318-22, 368-69; ECF No. 75-18; ECF No. 74-8. This further shows the terms were commercially reasonable.

The power to contract is a fundamental right that should not be interfered with lightly:

> The right to make contracts is more than just a socially useful convention; it's an important aspect of personal autonomy. . . . Having the power to bind ourselves in exchange for similar concessions from others gives us a significant measure of control over our lives.
>
> Signing a contract does not, of course, guarantee we will be better off. . . . The right to contract therefore means the right to take chances, to play hunches, to make mistakes; it means having to live by our decisions, no matter how they turn out: "Wise or not, a deal is a deal."

*Layman v. Combs*, 994 F.2d 1344, 1354 (9th Cir. 1992) (Kozinski, J., dissenting in part) (quoting *United Food & Commercial Workers Union v. Lucky Stores, Inc.*, 806 F.2d 1385, 1386 (9th Cir. 1986)); *see also Merten v. Nathan*, 108 Wis. 2d 205, 211, 321 N.W.2d 173, 177 (1982) ("The law of contracts is based on the principle of freedom of contract, on the principle that individuals should have the power to govern their own affairs without governmental interference."). Randall cannot show the contract was unconscionable, and this claim should be dismissed.

### E.  Randall cannot prove duress.

Randall has not offered facts that would allow any fact-finder to conclude by clear and convincing evidence that she signed the 2020 Redemption Agreement under duress. Her Thirteenth Claim for Relief seeking a ruling that the 2020 Redemption Agreement is void from duress should be dismissed. Defendants acknowledge that Randall was not drowning in liquid assets in May 2020. But the standard Randall must prove for duress is to show she had no alternative but to sign the 2020 Redemption Agreement and the economic threat deprived her of her unfettered will. *Wurtz v. Fleischman*, 97 Wis. 2d 100, 109, 293 N.W.2d 155, 160 (1980). This alleged fact cuts

47

both ways. If she was so desperate for money, and had no choice but to sign the redemption agreement out of duress, then nothing Defendants did or failed to do was causal of Randall's harms—regardless of any misrepresentations or omissions by Defendants, Randall was going to enter into the 2020 Redemption Agreement.

Randall also dodges the fact that she knew she had other options for money by nitpicking Defendants' undisputed supporting facts. Pl.'s Resp. Br. at 91. But the point remains—even though Randall may not have consciously considered options like getting a job or selling her gold and silver, she does not and cannot dispute those alternative options were available to her. She just chose not to exercise them.

Randall's attempts to bootstrap her scheme liability claim into a duress claim fail as a matter of law. She insists she was unaware of any scheme prior to her signing the 2020 Redemption Agreement—that is the very premise of her claim and essential to her First Claim for Relief. It is impossible for facts about which Randall had no knowledge to have deprived her of her will. Reply to PFOF ¶ 359; ECF No. 118, ¶¶ 42, 47–48.

## IX.  *Unjust Enrichment Is Barred Because the 2020 Redemption Agreement Is Valid.*

Randall's unjust enrichment claim (her Seventh Claim for Relief) is barred if the Court finds the 2020 Redemption Agreement is a valid and enforceable contract. Defs.' Opening Br. at 58–60. Randall's response confirms this claim fails if the redemption agreement is valid. Pl.'s Resp. Br. at 80–81. As argued in Section VIII, above, the agreement is valid, meaning Randall did not provide something and get nothing in return. As a result, the unjust enrichment claim must be dismissed. *Brame v. Gen. Motors LLC*, 535 F. Supp. 3d 832, 842–43 (E.D. Wis. 2021).

**X.     Randall Has No Standing to Seek Judicial Dissolution, Even If the 2020 Redemption Agreement Is Rescinded.**

Randall's only argument against dismissal of her judicial dissolution claim under Section 180.1430(2)(b) of the Wisconsin Statutes (her Ninth Claim for Relief) is that her request for rescission of the 2020 Redemption Agreement has not yet been decided. Pl.'s Resp. Br. at 84. Randall does not address Defendants' argument that even rescission of the 2020 Redemption Agreement would not retroactively give Randall standing in the first instance to bring a request for judicial dissolution. By failing to address this point, she has waived any objection to dismissal on this basis. It is also appropriate based on the plain language of Section 180.1430 of the Wisconsin Statutes. Randall's Ninth Claim for Relief should be dismissed.

**XI.     Randall's Conspiracy Claim Is Barred.**

Randall's conspiracy claim (her Tenth Claim for Relief) is barred by the intra-corporate conspiracy doctrine, and is otherwise without merit. Randall's contention that the alleged conspiracy is not governed by the intra-corporate conspiracy doctrine is based largely on the point that Reed was the chairman of Widen Enterprises in addition to being the majority shareholder of Windy Waters. Pl.'s Resp. Br. at 82–84. The fact that Reed held both of those roles does not matter. The undisputed facts show that Kiesler carried out his instructions to offer to redeem Randall's shares as the Treasurer of Windy Waters, at the request of Reed, the majority shareholder.  Reply to PFOF ¶¶ 3, 117, 124, 131, 138, 146, 237, 239, 241, 244–45, 249; Resp. to PSOAF ¶¶ 167, 172, 187. Any concerted activity was within Windy Waters and cannot be a conspiracy as a matter of law. *See* ECF No. 35, at 19–20.

Moreover, Randall argues the fact that Gonnering was kept apprised of the situation suggests that Widen Enterprises was involved, and this defeats the intra-corporate conspiracy doctrine. This argument is wrong. The intra-corporate conspiracy doctrine applies to interactions

between a corporation and its wholly owned subsidiary, too. *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 429, 405 N.W.2d 354, 367 (Ct. App. 1987) ("[W]e conclude . . . that in Wisconsin a parent corporation and its wholly owned subsidiary are unable to engage in a conspiracy . . . ."). This does not mean, as Randall suggests, that there is "no legal distinction between those entities" at all, Pl.'s Resp. Br. at 82. Rather, there is a unity of interest between a parent company and its wholly owned subsidiary that precludes any conspiracy claim, even though they are separate legal entities. *Id.*; *Rajaraman v. GEICO Indem. Co.*, No. 23-CV-425-JPS, 2023 WL 5017181, at *4 (E.D. Wis. Aug. 7, 2023). Randall's argument that Widen Enterprises was also involved does not save her doomed conspiracy claim because she cannot point to any involvement by anyone outside of Windy Waters and its wholly owned subsidiary.

In addition, if Randall's underlying fraud claims are dismissed, this conspiracy claim must be dismissed as well because it is not a standalone cause of action. *See Onderdonk v. Lamb*, 79 Wis. 2d 241, 246, 255 N.W.2d 507, 509 (1977). Randall does not contend otherwise.

## XII.    *The Civil Theft Statute Does Not Fit.*

Defendants argued Randall could not meet the statutory elements for civil theft, including intent to deceive and knowledge of falsity, with the facts she has presented. Defs.' Opening Br. at 60–61.  For there to be civil theft under the statute Randall cites, the plaintiff must prove that the person sought to be held liable for theft "[o]btain[ed] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Wis. Stat. § 943.20(1)(d). Randall does not identify any additional facts beyond those supporting her securities fraud claim. Pl.'s Resp. Br. at 80. She makes no argument to show how those facts could rise to the elements in the plain language of the statute. For example, she does not explain how any defendant other than Windy Waters could be found to have obtained title to Randall's property.

50

She does not argue that the alleged omissions or the opinions that form the basis of her securities fraud claim could constitute "a false representation which is known to be false," as the statute requires. Wis. Stat. § 943.20(1)(d). The civil theft claim should be dismissed because it simply does not apply to these facts. Even if the Court finds the case could come within the statute's plain language, if the Court agrees the securities fraud claim should be dismissed, Randall's Eighth Claim for Relief for civil theft should be dismissed as well.

### XIII.    *Veil-Piercing Remains Improper.*

Defendants stand by their request that Randall's veil-piercing claim (her Fifteenth Claim for Relief) should be dismissed as a matter of law because it is not a cause of action. Rather, it is a remedy that should be taken up at trial. Randall agrees. Pl.'s Resp. Br. at 92–93. This claim should be dismissed.

### XIV.    *There Is No Basis for Any Claim Against Widen Enterprises.*

Throughout Randall's entire brief, she fails to identify anything Widen Enterprises has done wrong and no basis for it to be a defendant in the case. There are numerous references to "Defendants" in the collective, but this does not suffice. At the pleading stage of a case, lumping all defendants together is insufficient: "Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Even more specificity is required at the summary judgment stage. *Savory v. Cannon*, 532 F. Supp. 3d 628, 633 (N.D. Ill. 2021). Here, well past the pleading stage, Randall still has yet to identify specific wrongful conduct by Widen Enterprises. Even if any or all of Randall's claims remain, all claims should be dismissed as to Widen Enterprises.

## CONCLUSION

"Securities litigation is expensive to the parties in money, and to the court in time; it should be brought to a conclusion at the first opportunity." *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir. 1989). Ultimately, Randall has failed to put up sufficient facts for a reasonable jury to find in her favor on her claims. Randall was treated fairly, consistent with how other shareholders were treated when they redeemed their shares. That is not fraud. It is a tale of a selling party who has remorse about selling her shares because had she kept it for awhile, she would have received more for it—just like every homeowner who sold her home prior to a housing market explosion. Defendants' motion for summary judgment (ECF No. 62) should be granted and this case should be dismissed.

Dated: November 20, 2023                    Respectfully submitted,

                                             s/Christa D. Wittenberg
                                             Dean P. Laing
                                             Christa D. Wittenberg
                                             O'Neil, Cannon, Hollman, DeJong & Laing S.C.
                                             111 East Wisconsin Avenue, Suite 1400
                                             Milwaukee, Wisconsin 53202
                                             Phone: 414.276.5000
                                             dean.laing@wilaw.com
                                             christa.wittenberg@wilaw.com

                                             Mark H. Churchill
                                             Martin Durkin
                                             Sarah Morain
                                             HOLLAND & KNIGHT LLP
                                             1650 Tysons Boulevards, Suite 1700
                                             Tysons, Virginia 22102
                                             Phone: 703.720.8600
                                             mark.churchill@hklaw.com
                                             martin.durkin@hklaw.com
                                             sarah.morain@hklaw.com

                                             *Attorneys for Defendants*