# In the Matter Of:

*Stacy L. Randall v. Reed C. Widen, et al.*

*Deposition of Ben C. Scharpf*

*January 05, 2024*



```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WISCONSIN
   _____

   STACY L. RANDALL,

              Plaintiff,

        -vs-                    Case No. 3:22-cv-00400-jdp
   REED C. WIDEN, MICHAEL KIESLER,
   WIDEN ENTERPRISES, LLC, and
   WINDY WATERS, INC.,

              Defendants.
   _____

              Deposition of BEN C. SCHARPF,
   taken at the instance of the Plaintiff, under and
   pursuant to Rules 26 and 30 of the Federal Rules of
   Civil Procedure, before Kaila M. Macek, RMR, CRR,
   a Notary Public in and for the State of Wisconsin,
   at Reinhart Boerner van Deuren S.C., located at
   44 East Mifflin Street, Suite 700, Madison, Wisconsin,
   on January 5, 2024, commencing at 1:48 p.m. and
   concluding at 2:22 p.m.
```

Page 2

```
                     A P P E A R A N C E S

   REINHART BOERNER VAN DEUREN S.C., by
     MR. DANIEL G. MURPHY and
     MS. JESSICA H. POLAKOWSKI, via Zoom,
     1000 North Water Street, Suite 1700
     Milwaukee, Wisconsin 53202
              appeared on behalf of the Plaintiff.

   O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
     MR. CHRISTA D. WITTENBERG,
     111 East Wisconsin Avenue, Suite 1400,
     Milwaukee, Wisconsin 53202,
              appeared on behalf of the Defendants.


                           I N D E X

   Examination:                                     Page

   By Mr. Murphy                                       3

                         E X H I B I T S
   No.   Description                          Identified
   Exhibit 1   Defendants' Supplemental Rule         31
               26(A)(1) Disclosures and Rule
               26(A)(2) Disclosures

      (The original exhibit was attached to the original
         transcript and a copy was provided to counsel)


      (The original deposition transcript was filed with
                  Attorney Daniel G. Murphy)
```

Page 3

```
 1              BEN C. SCHARPF, called as a
 2       witness, being first duly sworn, testified on
 3       oath as follows:
 4                       EXAMINATION
 5   BY MR. MURPHY:
 6   Q   Good afternoon, Mr. Sharpf.
 7   A   Good afternoon.
 8   Q   I introduced myself off the record, but my name is
 9       Daniel Murphy.  I'm one of the attorneys
10       representing Stacy Randall in a lawsuit that was
11       filed against Reed Widen and other defendants.
12       We're here today for your deposition.  Is it okay
13       if I call you Ben?
14   A   Of course.
15   Q   Please feel free to call me Dan.
16   A   Okay.
17   Q   Is this your first time being deposed?
18   A   Second.
19   Q   Okay.  How long ago was the last?
20   A   In 2018 when I was going through a divorce.
21   Q   Okay.  This will probably be different.
22   A   I don't know that any of them are fun, so let's --
23   Q   I'm going to try.
24   A   All right.
25   Q   No, it -- yeah, I would expect this to be very
```

Page 4

```
 1       different.  Couple of rules to go over that you're
 2       probably familiar with from that experience.  Most
 3       important one, we want to make Kaila's job easy.
 4       I'll try not to talk over you.  Please try to do
 5       the same.  Okay?
 6   A   Yes.
 7   Q   Please verbalize your answers so that she can copy
 8       down what you're doing.  Okay?
 9   A   Absolutely.
10   Q   If you have any questions about what I'm asking
11       you, whether it's a term or just the nature of the
12       question, what I'm looking for, please ask.  Okay?
13   A   Yes.
14   Q   If you answer, I'm going to assume you understood
15       what I said.
16   A   Okay.
17   Q   Is there any reason, medical condition, you don't
18       have to explain, but any reason you can't give
19       testimony today?
20   A   No.
21   Q   All right.  If it comes to it, we'll take a break.
22       Happy to take a break anytime you need one.
23   A   Okay.
24   Q   My suspicion is we'll be out of here in an hour or
25       less, so hopefully we won't need that.  I may take
```

Page 5

1   a break to review my notes or consult with my
2   colleague, but again, if you need a break, just
3   ask.  Okay?
4 A All right.
5 Q I don't know if Christa's going to have questions
6   or not.  At points in the deposition, she may
7   assert an objection.  If she objects, you still
8   have to answer the question.  Okay?
9 A Yes.
10 Q And that's because she's not your attorney.  The
11   only objections you can make in a deposition where
12   somebody doesn't answer is on the basis of
13   attorney-client privilege.  Okay?
14 A Okay.
15 Q All right.  Can you state and spell your name for
16   the record.
17 A Ben, B-E-N, C, as in Carl, Scharpf, S-C-H-A-R-P-F.
18 Q And can you tell us your address?
19 A 5025 Augusta Drive, Waunakee, Wisconsin 53597.
20 Q What do you do for a living?
21 A I am a entrepreneur, a business owner.
22 Q Okay.  What kind of business?
23 A I own a company called Gressco and a company
24   called Automation Arts.
25 Q Okay.

Page 6

1 A And I am a shareholder in and a board member on
2   Musicnotes.
3 Q Okay.  Any of those businesses -- well, you're
4   familiar with Widen Enterprises?
5 A Yes.
6 Q Are any of those businesses -- and I apologize,
7   I'm not super familiar with any of those --
8   similar to what Widen does?
9 A No.
10 Q Okay.  Do you have any background in finance,
11   aside from your ownership in a company?
12 A I was on Park Bank's board for 15 years.
13 Q Oh, okay.  Do you have a degree in finance?
14 A No.
15 Q Okay.  I want to talk about what you did to
16   prepare for today.  Did you talk to anybody about
17   your deposition today?
18 A I talked to Bill briefly just about, you know,
19   what was to be expected, and I talked briefly to
20   Christa and the people at O'neil Cannon just to
21   make sure I understood what I was in for.
22 Q Okay.  Let's start with Bill.  Did you talk about
23   any of the questions I might ask?
24 A No.  We were just speculating as to how long it
25   would take and what would be expected of us.

Page 7

1 Q Sure.  How much of an inconvenience it would be?
2 A Right.  More along those lines.  Yes.
3 Q And same question with respect to your
4   conversation with Christa.
5 A Same, just what to be -- what to expect, not to
6   talk over each other.
7 Q Okay.
8 A Just general.
9 Q At any point since you've received the subpoena,
10   did you discuss the nature of this case with
11   anyone?
12 A No.
13 Q Did you discuss your subpoena or today's
14   deposition with Reed Widen?
15 A No.
16 Q Okay.
17 A He knew I was called, but that was it.
18 Q How do you know that?
19 A What?
20 Q How do you know that?
21 A He just said I -- he apologized, and that was it.
22   Just sorry you have to go do this; I said no
23   worries.
24 Q Was this via text?
25 A No.  Just a casual conversation.

Page 8

1 Q Okay.  So I guess, in my view, that would be
2   about --
3 A And that's why I'm sharing that.
4 Q Okay.
5 A Yes.
6 Q Okay.  Is there any other person who you had a
7   similar brief conversation with about today?
8 A No.
9 Q Okay.  Prior to receiving the subpoena, at any
10   time since the case has been in existence, which
11   I'll tell you it was filed in July of 2022, at any
12   time did you discuss the nature of this case with
13   anyone?
14 A I've discussed it casually with Reed.  I knew
15   that, you know, prior to the closing, that she had
16   made an argument.  I really haven't spoken in
17   detail about it.  I mean, I understand the crux of
18   it.
19 Q Okay.  What's your understanding of the case?
20 A My understanding is that she had sold stock in
21   advance and that there was prior knowledge to
22   that.  That's the extent of what I --
23 Q That's fine.  What do you mean by prior knowledge
24   of that?
25 A Ask me the question again and I'll answer your

Page 9

1 question.
2 Q Sure. I'm just trying to make sure I understood
3 your answer. What I heard you say was that she
4 sold stock prior to the closing and there was --
5 A Prior to the closing of Reed's selling the
6 company.
7 Q Okay. And then I thought you said, and I could be
8 wrong, that there was prior knowledge of that, and
9 I didn't know what you meant by that.
10 A No, that my prior knowledge was that -- my prior
11 knowledge to today was that that's the crux of the
12 case, that she had sold stock in advance of Reed
13 selling the company, and that was the conflict.
14 Q I gotcha. I now follow. The reference to prior
15 knowledge was that was your prior knowledge?
16 A Correct.
17 Q Got it. Are you familiar with anyone else from
18 Widen Enterprises? And I'll pitch some names out
19 there. Do you know Michael Kiesler?
20 A I've met Michael Kiesler.
21 Q In what context?
22 A I met him for a short period of time. It was the
23 year Obama was elected. I went and I did a couple
24 advisory meetings. He had a very loose advisory
25 group put together, and he asked me to sit on

Page 10

1 that.
2 Q Okay.
3 A And I had met Michael through that.
4 Q And -- okay. So Reed asked you to sit in on an
5 advisory committee?
6 A Correct.
7 Q And you met Michael in that context?
8 A Correct.
9 Q And why do you recall it as the year Obama --
10 A I just -- it was around my birthday, and I know we
11 were out the night of election after one of his
12 board meetings.
13 Q Okay.
14 A Or one of his advisory meetings.
15 Q That's just a funny place marker.
16 A Yeah. Nope, it's my birthday's November 6th, and
17 I think that was at about the time that Obama was
18 elected, and I just remember that we were at a
19 advisory meeting.
20 Q Got it.
21 A At or around that day.
22 Q So that's 2008?
23 A Correct.
24 Q If I got my history right here. What was the, I
25 guess, purpose or role of the advisory committee?

Page 11

1 A I think it was just as they, you know, navigated,
2 you know, continuing to move from prepress to
3 digital asset management, kind of conversations
4 around, you know, do we -- how much of this do we
5 give up. It was more just general business, you
6 know, kind of give and take kind of things.
7 Q Okay.
8 A I think we only had two meetings, and it was just
9 generally around making sure I think Reed feeling
10 comfortable he was in a good spot.
11 Q Okay. Do you have experience with -- I asked you
12 about kind of the overlap between what you do and
13 Widen Enterprises. Do you have experience with
14 companies that do digital asset management?
15 A No.
16 Q Okay. And so I would assume, and I guess I'm
17 asking that your role on the committee -- the
18 reason you were selected for this advisory
19 committee is that you are an entrepreneur, you
20 have experience growing businesses, I presume?
21 A Yes.
22 Q Okay. So that's your context for Michael Kiesler.
23 Anything outside of that?
24 A No.
25 Q Okay. What about Matthew Gonnering?

Page 12

1 A He was also a part of that group. And I will see
2 Matthew out socially, but I don't have Matthew's
3 number or talk to Matthew. I just would run into
4 him. He's a member at Bishops Bay where I'm a
5 member.
6 Q Is that a golf club?
7 A Yes. I think he's just a social member.
8 Q Are you a big golfer?
9 A I am.
10 Q Okay. Me too. Excited for this weekend.
11 A Yes.
12 Q So do you know anyone else -- and I'm not asking
13 if you've heard names, but have you met or had any
14 significant conversation with anyone else from
15 Widen Enterprises other than Reed, Michael,
16 Matthew?
17 A No.
18 Q Okay. I am going to send you a subpoena, and I
19 have a copy of it today. You are allowed under
20 the law to require me to serve you via process
21 server. Some people don't like that; they find it
22 inconvenient and annoying. I'm happy to have you
23 accept service of the subpoena right now.
24 A Yeah. That's fine.
25 Q We're going to discuss in a general sense right

Page 13

```
 1     now the topics that are the very last page of that
 2     packet.  There's a cover letter and then the
 3     subpoena and then the rider to the -- or schedule
 4     to the subpoena, which lists the documents at
 5     issue.  I'm going to take your answers at face
 6     value today, but I would appreciate it if after
 7     today, you review the topics -- you got a ways to
 8     go, I think.  Should be a list of five or six.
 9  A  Five.  Yep.  Document requests.
10  Q  Right.  I'd ask if you after today review those
11     requests, look through any documents you may have,
12     whether on your phone, your computer, or
13     otherwise, that may be responsive to those
14     materials.
15         It is not my intention to make this an
16     onerous task.  If you have an issue with any of
17     the requests or need some guidance on it, please
18     freely free to contact me and I will do my best to
19     be reasonable with you about that.
20  A  Okay.
21  Q  So, but just to give me a sense of what sort of
22     information you may have for purposes of today's
23     discussion, would you -- let's start with the
24     people that I think this is less likely for.
25     Would you email or text with Matthew Gonnering?
```

Page 14

```
 1  A  No.
 2  Q  Michael Kiesler?
 3  A  No.
 4  Q  I presume with Reed, you have?
 5  A  Yes.
 6  Q  Okay.  In those emails and texts, would you on
 7     occasion discuss each other's businesses?
 8  A  No.
 9  Q  Never?
10  A  Rarely.
11  Q  Okay.  So possibly, but that's not a focus of
12     topic that you often discuss?
13  A  Almost never.  Yeah.  No, it's not -- it was not
14     part of our friendship, really.
15  Q  Okay.  I don't -- is your -- so I know that you
16     and Bill Nordland spoke to each other.  I presume
17     that you have hung out together with Reed?
18  A  Correct.
19  Q  My very loose understanding is that there's kind
20     of a group of guys that you would fit into,
21     including Bill Nordland, perhaps, and I'm going to
22     throw out some names, just tell me if these are
23     people that you know.  Terry Vial?
24  A  I know his name.  I don't know that I would know
25     him if we were -- especially out of context, I
```

Page 15

```
 1     would not know him.
 2  Q  Understood.  Tim Macht?
 3  A  Tim Macht, I know.
 4  Q  David Simon?
 5  A  I know.
 6  Q  And Mark Winter?
 7  A  Don't know.
 8  Q  Okay.  Let's -- would you have any emails, texts,
 9     other documents exchanged between those
10     individuals that you do know related to Widen
11     Enterprises?
12  A  No.
13  Q  Okay.  Presumably those are all social
14     communications, if any?
15  A  Correct.
16  Q  Okay.  Have you ever met Stacy Randall?
17  A  Yes.
18  Q  Often?
19  A  Five times, maybe.
20  Q  Okay.  Over the course of --
21  A  Ten years.
22  Q  Okay.  So infrequently?
23  A  Infrequently.
24  Q  Understood.  Any communications, documents,
25     emails, voice mails, anything that you think you
```

Page 16

```
 1     may have related to Stacy Randall?
 2  A  No.
 3  Q  Related to the sale of Widen Enterprises?
 4  A  No.
 5  Q  Okay.  Anything related to the suit?
 6  A  No.  I don't have any of Stacy's contact
 7     information.
 8  Q  Maybe I wasn't clear.  I meant with anyone related
 9     to Stacy, the company, the sale, the suit.
10  A  No.
11  Q  Reed never texted "Stacy's suing me, I can't
12     believe it," something like that?
13  A  I would have to look, but not likely.
14  Q  Okay.
15  A  But nothing -- I've had no interaction with Stacy
16     in several years.
17  Q  Okay.  Understood.  All right.  Backing up to your
18     relationship with Reed, how did you and Reed meet?
19  A  We were both Baker Tilly clients, and our mutual
20     friend would have been Tim Macht.
21  Q  Okay.
22         MS. POLAKOWSKI:  Hey, Dan, I should
23     probably just note for the record that I'm
24     on.
25         MR. MURPHY:  Good call.
```

**Page 17**

1  BY MR. MURPHY:
2  Q   That's my colleague Jessica Polakowski.  She's
3      just going to be listening in.  She's another
4      attorney for Stacy.
5  A   Okay.
6  Q   The -- sorry, got thrown off.  Baker Tilly.  When
7      do you -- when do you think you made that
8      connection that you were both Baker Tilly clients?
9  A   20 years ago.
10 Q   Okay.  And is Tim Macht a Baker Tilly employee?
11     Is that --
12 A   He's a Baker Tilly client, as well.
13 Q   And I guess I don't know, why is it that that was
14     the connection?  Were you at a Baker Tilly event
15     or something?
16 A   Tim and Reed were at a Baker Tilly event, and then
17     post that, we went and played golf or, hey, this
18     is my friend Reed, I met him at a Baker Tilly
19     function.
20 Q   Got it.
21 A   He'll have fun.  Fun friend group.
22 Q   Gotcha.  How often would you say you hang out with
23     Reed?
24 A   Physically, four times a year.
25 Q   And chat or text a couple more times?

**Page 18**

1  A   We both have a love of the Packers, so if we're
2      bemoaning the Packers, we might text back and
3      forth.  We've traveled together a few times.
4  Q   Okay.  Let's stay with that, I guess.  What --
5      tell me about those trips.
6  A   So I've traveled with Reed out to his house.  I've
7      traveled with Reed on a -- the mutual -- a mutual
8      friend group vacation once a year that has -- kind
9      of the ring leader is David Simon.
10 Q   Okay.  When you say out to his house, I assume
11     you're talking about his house in Arizona?
12 A   Correct.
13 Q   And the ring leader being David Simon, what type
14     of trips are these?
15 A   So they're Caribbean trips.  David would rent a
16     house, David would rent a boat and then invite a
17     group of people to go down, and the Widens would
18     be part of that, the Scharpfs would be part of
19     that.
20 Q   My understanding is David is out on a boat right
21     now?
22 A   Correct.  He's out in the Bahamas.
23 Q   And did you say that was an annual trip?
24 A   It was until last year.
25 Q   Okay.  How many times have you guys done that

**Page 19**

1      trip?
2  A   Five.
3  Q   Okay.  Does everybody pay their own way on that
4      trip?
5  A   The Simons are pretty good sponsors with the boat
6      or the house or whatever the amenities are.
7  Q   Okay.  Would say that Reed is a close friend?
8  A   I would consider Reed a close friend.
9  Q   If not on the trips that we were just discussing,
10     have you ever been on trips or outings with Reed
11     where he's paid for everything?
12 A   No.
13 Q   Fair to say more often than not you both pay your
14     way?
15 A   Yes.
16 Q   Okay.  We've talked about how you served on the
17     advisory committee.  Is that your only context of
18     being involved with Widen Enterprises?
19 A   Yes.
20 Q   Do you know much about Widen Enterprises?  Let me
21     rephrase that.  Do you know much about Widen
22     Enterprises outside of your service on that
23     committee?
24 A   No.
25 Q   Okay.

**Page 20**

1  A   I understood the nature of his business, but I
2      couldn't tell you much about it.
3  Q   Sure.
4  A   Just like he would understand the nature of my
5      businesses, but he couldn't tell me a lot about
6      how you run them.
7  Q   Okay.  So I was just going to ask would you
8      discuss business with Reed; sounds like you would,
9      but it would be limited to what your businesses
10     are?
11 A   Correct.
12 Q   Okay.  Did you ever discuss with Reed how much his
13     business was worth?
14 A   No.
15 Q   Have you ever sold a company?
16 A   Yes.
17 Q   And the topic of selling a company, did that --
18     whether a company you were selling -- I'll start
19     there.  Did you ever discuss with Reed that you
20     were selling a company?
21 A   No.
22 Q   Did Reed ever discuss with you an intention to
23     sell his company?
24 A   Yes.
25 Q   When?

Page 21

1  A   February or March of 2021.
2  Q   Okay.  And you don't have to give me every word,
3      but in general what did you discuss?
4  A   Just that they were going to hire an investment
5      bank, I think, to see what the value of it was
6      worth, is my understanding at that time.
7  Q   Okay.  And presumably he wanted to talk to you
8      about this because you've done so before?
9  A   I think it was, again, very general discussion
10     point.  Just part of you're on a trip with
11     somebody, so you're talking about life, and that
12     was one of the topics.
13 Q   Okay.  Was this on a Caribbean trip?
14 A   Yes.
15 Q   And he was hiring an investment banker to assist
16     with the sale.  Did you discuss at all what he
17     expected to sell the company for?
18 A   No.
19 Q   Did you discuss any other detail that you recall
20     regarding the anticipated sale?
21 A   No.  I would take a step back.  There was a time
22     when I was on Musicnotes' board, they were going
23     through a similar thing.  I was just thinking
24     about my direct businesses.  But at one point in
25     time, Musicnotes had hired an investment banker,

Page 22

1      so there was just a little kind of mutual
2      connection there.
3  Q   Okay.
4  A   I understood the process because I had just went
5      through it.
6  Q   And what an investment bank can do in that type
7      of --
8  A   I understood how -- kind of how the process
9      worked.
10 Q   Sure.  Other than that conversation, do you recall
11     any other time discussing a sale of Widen
12     Enterprises?
13 A   No.
14 Q   Other than a discussion with Reed, did you discuss
15     that with anybody else?
16 A   No.
17 Q   Okay.  Did you ever talk to Reed about succession
18     planning at his business?
19 A   Not with any degree of detail outside of I think
20     he hoped his kids would be involved at some time.
21 Q   And they weren't?
22 A   I think Jesse worked there a little bit.
23 Q   I guess, was the discussion that Reed was hoping
24     that his kids would take on the business when he
25     was ready to step back?

Page 23

1  A   I don't know that he had a plan.
2  Q   Okay.
3  A   None that he shared with me.
4  Q   Okay.  And --
5  A   Not succession or other.  I think he always
6      intended to own it and have it for a long period
7      of time and was taking it one day at a time.
8  Q   Okay.  And did you ever have a discussion about
9      his kids not wanting to --
10 A   No.
11 Q   -- take on the business?
12     Do you know Justin Randall?
13 A   Yes.
14 Q   What's the context of your relationship with
15     Justin?
16 A   I've known him -- I knew him through Reed a little
17     bit.  He was also an insurance guy.  I used to own
18     a Culver's, and I think Justin took over that
19     relationship, so he'd play golf a couple times
20     with us.
21 Q   Okay.
22 A   So I knew him casually.  And if, you know, we were
23     up north, I would see him and he would be there.
24 Q   Okay.
25 A   He and Julie.

Page 24

1  Q   Okay.  I want to start with the Culver's.  Do you
2      mean that Justin purchased a Culver's from you?
3  A   No.  Justin sold insurance to Culver's.  Our
4      Culver's was a client of Justin's.
5  Q   Understood.
6  A   But I didn't have -- I was not a controlling
7      partner, so my brother-in-law had that
8      relationship with Justin.
9  Q   Okay.
10 A   I just knew he was our insurance guy.
11 Q   Got it.  And then you mentioned up north?
12 A   You know, we've been up north from time to time,
13     whether we were staying at Simons or Widens or
14     whatever, and then Justin would be up there.  I
15     have many other friends that have places up there.
16     So it wouldn't be uncommon for me to run past
17     Justin while we were up there.
18 Q   Okay.
19 A   Maybe five times in ten years, I'd cross paths
20     with him.
21 Q   Okay.  Otherwise, you would see him when you were
22     otherwise with Reed?
23 A   Yes.
24 Q   And I think those were kind of the two exceptions
25     to knowing him through Reed that you offered;

Page 25

1      right?
2 A Correct.
3 Q Did you ever talk with Justin about -- I know I've
4      already asked you a general question, but in the
5      event this jogs your memory, did you ever talk to
6      Justin about Widen Enterprises?
7 A No.
8 Q Did you ever talk to Justin about his relationship
9      with Reed?
10 A No. I would have made observations, but I've
11      never spoken with Justin about his relationship
12      with Reed.
13 Q Okay. Fair to say you weren't always with Justin
14      when he's with Reed?
15 A No. Small percent of the time.
16 Q Okay. Did you ever observe Justin and Reed talk
17      about Widen?
18 A No.
19 Q When did you learn about the sale of Widen?
20 A The first I had heard about the sale was on the
21      sailing trip in 2021.
22 Q I guess I'm asking the -- that the sale had
23      happened.
24 A The only thing I knew is that Reed was, you know,
25      selling it. That's sometime in that summer.

Page 26

1 Q Did you catch up with Reed after the sale and
2      discuss it at any point?
3 A I'm sure that my paths crossed with him and he
4      expressed that he had sold it.
5 Q Okay.
6 A But not in any detail of what he sold it for or --
7 Q Let me put it this way. Nothing sticks out in
8      your mind about such a conversation?
9 A No. It would have been if I had said never, you
10      would have said "never" never, and I would have
11      known that's -- I'm sure, again, the crux of all
12      of my friendships with my friends, we rarely talk
13      about business. It's more about family and
14      sports, and it just isn't a big part of any of my
15      friendships, honestly.
16 Q Okay. So you've talked about going on trips with
17      Reed, hanging out up north with him. To your
18      knowledge, was Reed retired when he was doing
19      these things?
20 A No.
21 Q And have you ever observed Reed serve on the
22      advisory economy, so let's say after that,
23      observed Reed working on Widen matters?
24 A You know, only in the sense if I called him, what
25      are you doing, you know, or he called me, I'm

Page 27

1      going into the office, I'm meting with Matthew or
2      I'm meeting with Kiesler.
3 Q Okay.
4 A You know, I know he was kind of 24/7, you know,
5      texts, talking to their team. I couldn't speak to
6      his work hours or --
7 Q When you say he was 24/7 texting, talking to his
8      team, how did -- why do you know that?
9 A Again, I just -- you know, it's whatever time in
10      the morning or if we're together and we're golfing
11      and Matthew would call, he would take that call.
12 Q Okay.
13 A And these would be more observations than
14      anything, obviously.
15 Q Are you familiar with -- well, are you familiar
16      with the fact that Justin's brother Andrew
17      committed suicide?
18 A Yes.
19 Q Are you familiar with the fundraiser to support
20      suicide awareness?
21 A Yes.
22 Q Have you participated in that in the past?
23 A I bought tickets to it this year.
24 Q Okay. Had you done so previously?
25 A It was the first year was this year.

Page 28

1 Q Oh, was it?
2 A Yes.
3 Q Oh. Have you ever talked to Reed -- and forgive
4      me if we have covered this, but I don't think we
5      specifically have -- did you ever talk to Reed
6      about anything relating to Stacy?
7 A No.
8 Q Any brother --
9 A Again, I think we covered it. I know he was
10      frustrated, you know, right at closing that I
11      believe she was trying to hold it up, was my
12      understanding, and he was frustrated. Outside of
13      that, I spend time with them and I observed a good
14      brother sister relationship.
15 Q Why do you say that Stacy was holding up closing?
16 A Well, I think she was attempting to have an
17      injunction, was my understanding.
18 Q Okay. So legally trying to hold up closing?
19 A Correct.
20 Q Did you discuss that with Reed?
21 A No. Just the day before, that he wasn't sure if
22      it was going to -- I don't honestly remember the
23      exact specifics outside of, you know, maybe the
24      day before, and then the day of, I just wished him
25      a congratulations when I knew it went through.

Page 29

```
 1  Q  Okay.
 2  A  I mean, it was a big, big deal to him.
 3  Q  So you knew when the deal closed?
 4  A  I just don't remember -- I knew it was in the
 5     summer sometime.  I don't remember.
 6  Q  I understand.  So your earlier answer was just you
 7     don't know the specific date in summer of 2021?
 8  A  Correct.
 9  Q  But you were aware that the sale was proceeding as
10     it was proceeding?
11  A  No.  I knew he had talked to -- like I said, we
12     were on, you know, if you think of the cadence of
13     when we would talk, I knew that in February or
14     March, they were mulling it, and then I didn't
15     really know -- I wasn't keeping track of that
16     process up through a closing date.  I knew they
17     had engaged an investment bank, and then just a
18     day or two before I knew that it was going to
19     close.
20  Q  Okay.  So that latter part is what I'm trying to
21     figure out, how that came about.  So at some point
22     near closing, and I'll represent to you that the
23     closing was in August of 2021.
24            MS. WITTENBERG:  Object to form.
25            MR. MURPHY:  That's fine.
```

Page 30

```
 1  BY MR. MURPHY:
 2  Q  If she objects, you still answer.  How did that
 3     conversation with you and Reed begin around the
 4     time of closing?
 5  A  You know, could have been talking about whether we
 6     were going to play golf next week and then, by the
 7     way, this is what's happening in my life today,
 8     because it was germane to him.
 9  Q  Okay.  And it's in the context of that discussion,
10     whatever it was, that he mentioned that there
11     might be an issue related to Stacy?
12  A  Correct.
13  Q  Okay.  Any other details about that conversation
14     you recall?
15  A  No.  Just that he was, you know, frustrated, I'm
16     sure.
17  Q  Do you have an opinion about this case?
18  A  I don't know enough about it to give a good
19     opinion.
20  Q  Okay.  And I guess another way of saying that is
21     do you have an opinion as to who's right, Reed or
22     Stacy?
23  A  I don't know enough about the case to -- I don't
24     know Stacy's side of the case, and frankly I don't
25     know Reed's side of the case.
```

Page 31

```
 1  Q  Okay.
 2            (Exhibit No. 1 was marked for
 3       identification.)
 4  Q  And you don't need to read this entire thing.
 5     Exhibit 1 is a filing in this case by the
 6     defendants, and it's basically a number of
 7     different disclosures.  What I want to direct your
 8     attention to is page 5.  Do you see your name next
 9     to number 27?
10  A  Yep.
11  Q  Is that your phone number?
12  A  Yes.
13  Q  And the purpose of this disclosure is to identify
14     individuals who may have relevant knowledge.  And
15     it says here, next to your name, "Mr. Scharpf may
16     have information about the existence and timing of
17     communication with Reed Widen or Justin Randall
18     related to any potential sale of Widen
19     Enterprises."
20        My question is, is there anything that we
21     haven't discussed that might relate to that
22     information, meaning is there any other
23     communication with Reed or Justin related to any
24     potential sale that we haven't already covered?
25  A  No.
```

Page 32

```
 1  Q  Okay.  I need a couple of minutes, and then I'll
 2     probably be done.
 3  A  Okay.
 4     (A recess is taken from 2:21 p.m. to 2:22 p.m.)
 5  Q  I don't have any further questions.  Thank you for
 6     your time, Ben.
 7  A  You bet.  Thank you.
 8            MS. WITTENBERG:  Nothing from me.
 9         (Adjourning at 2:22 p.m.)
```

Page 33

```
1  STATE OF WISCONSIN )
                      ) ss.
2  COUNTY OF DANE     )
3
4        I, Kaila M. Macek, RMR, CRR, a Notary Public in
5  and for the State of Wisconsin, do hereby certify
6  that the foregoing deposition of BEN C. SCHARPF was
7  taken before me on January 5, 2024, and reduced to
8  writing by me, a professional court reporter and
9  disinterested person, approved by all parties in
10 interest and thereafter converted to typewriting
11 using computer-aided transcription.
12       I further certify that I am not related to nor
13 an employee of counsel or any of the parties to the
14 action, nor am I in any way financially interested in
15 the outcome of this case.
16       IN WITNESS WHEREOF, I have hereunto set my hand
17 and affixed my notarial seal of office at Madison,
18 Wisconsin, this 10th day of January 2024.
19
20              Kaila Macek
21       _____
         Notary Public, State of Wisconsin
22       My Commission Expires 1/14/2027
23
24
25
```

## Exhibits

**Scharpf 1-5-24 Exhibit 1**
2:18  31:2,5

### 1

**1**
31:2,5
**15**
6:12

### 2

**20**
17:9
**2008**
10:22
**2018**
3:20
**2021**
21:1  25:21  29:7,23
**2022**
8:11
**24/7**
27:4,7
**27**
31:9
**2:21**
32:4
**2:22**
32:4,9

### 5

**5**
31:8
**5025**
5:19
**53597**
5:19

### 6

**6th**
10:16

## A

**Absolutely**
4:9
**accept**
12:23
**address**
5:18
**adjourning**
32:9
**advance**
8:21  9:12
**advisory**
9:24  10:5,14,19,25  11:18  19:17  26:22
**afternoon**
3:6,7
**allowed**
12:19
**amenities**
19:6
**Andrew**
27:16
**annoying**
12:22
**annual**
18:23
**answers**
4:7  13:5
**anticipated**
21:20
**anytime**
4:22
**apologize**
6:6
**apologized**
7:21
**argument**
8:16
**Arizona**
18:11
**Arts**
5:24
**assert**
5:7
**asset**
11:3,14
**assist**
21:15
**assume**
4:14  11:16  18:10
**attempting**
28:16
**attention**
31:8
**attorney**
5:10  17:4
**attorney-client**
5:13
**attorneys**
3:9
**August**
29:23
**Augusta**
5:19
**Automation**
5:24
**aware**
29:9
**awareness**
27:20

## B

**B-E-N**
5:17
**back**
18:2  21:21  22:25
**background**
6:10
**Backing**
16:17
**Bahamas**
18:22
**Baker**
16:19  17:6,8,10,12,14,16,18
**bank**
21:5  22:6  29:17

**Bank's**
  6:12
**banker**
  21:15,25
**basically**
  31:6
**basis**
  5:12
**Bay**
  12:4
**begin**
  30:3
**bemoaning**
  18:2
**Ben**
  3:1,13 5:17 32:6
**bet**
  32:7
**big**
  12:8 26:14 29:2
**Bill**
  6:18,22 14:16,21
**birthday**
  10:10
**birthday's**
  10:16
**Bishops**
  12:4
**bit**
  22:22 23:17
**board**
  6:1,12 10:12 21:22
**boat**
  18:16,20 19:5
**bought**
  27:23
**break**
  4:21,22 5:1,2
**briefly**
  6:18,19
**brother**
  27:16 28:8,14
**brother-in-law**
  24:7

**business**
  5:21,22 11:5 20:1,8,13 22:18,24 23:11 26:13
**businesses**
  6:3,6 11:20 14:7 20:5,9 21:24

---
**C**
---

**cadence**
  29:12
**call**
  3:13,15 16:25 27:11
**called**
  3:1 5:23,24 7:17 26:24,25
**Cannon**
  6:20
**Caribbean**
  18:15 21:13
**Carl**
  5:17
**case**
  7:10 8:10,12,19 9:12 30:17,23,24,25 31:5
**casual**
  7:25
**casually**
  8:14 23:22
**catch**
  26:1
**chat**
  17:25
**Christa**
  6:20 7:4
**Christa's**
  5:5
**clear**
  16:8
**client**
  17:12 24:4
**clients**
  16:19 17:8
**close**
  19:7,8 29:19
**closed**
  29:3

**closing**
  8:15 9:4,5 28:10,15,18 29:16,22,23 30:4
**club**
  12:6
**colleague**
  5:2 17:2
**comfortable**
  11:10
**committed**
  27:17
**committee**
  10:5,25 11:17,19 19:17,23
**communication**
  31:17,23
**communications**
  15:14,24
**companies**
  11:14
**company**
  5:23 6:11 9:6,13 16:9 20:15,17,18,20, 23 21:17
**computer**
  13:12
**condition**
  4:17
**conflict**
  9:13
**congratulations**
  28:25
**connection**
  17:8,14 22:2
**consult**
  5:1
**contact**
  13:18 16:6
**context**
  9:21 10:7 11:22 14:25 19:17 23:14 30:9
**continuing**
  11:2
**controlling**
  24:6
**conversation**
  7:4,25 8:7 12:14 22:10 26:8 30:3,13

Case: 3:22-cv-00400-jdp   Document #: 167   Filed: 03/15/24   Page 13 of 20

| Stacy L. Randall v.<br>Reed C. Widen, et al. | Deposition of Ben C. Scharpf<br>January 05, 2024 Index: conversations..extent |
|---|---|

**conversations**
11:3

**copy**
4:7  12:19

**Correct**
9:16  10:6,8,23  14:18  15:15  18:12,22
20:11  25:2  28:19  29:8  30:12

**couple**
4:1  9:23  17:25  23:19  32:1

**cover**
13:2

**covered**
28:4,9  31:24

**cross**
24:19

**crossed**
26:3

**crux**
8:17  9:11  26:11

**Culver's**
23:18  24:1,2,3,4

**D**

**Dan**
3:15  16:22

**Daniel**
3:9

**date**
29:7,16

**David**
15:4  18:9,13,15,16,20

**day**
10:21  23:7  28:21,24  29:18

**deal**
29:2,3

**defendants**
3:11  31:6

**degree**
6:13  22:19

**deposed**
3:17

**deposition**
3:12  5:6,11  6:17  7:14

**detail**
8:17  21:19  22:19  26:6

**details**
30:13

**digital**
11:3,14

**direct**
21:24  31:7

**disclosure**
31:13

**disclosures**
31:7

**discuss**
7:10,13  8:12  12:25  14:7,12  20:8,12,
19,22  21:3,16,19  22:14  26:2  28:20

**discussed**
8:14  31:21

**discussing**
19:9  22:11

**discussion**
13:23  21:9  22:14,23  23:8  30:9

**divorce**
3:20

**Document**
13:9

**documents**
13:4,11  15:9,24

**Drive**
5:19

**duly**
3:2

**E**

**earlier**
29:6

**easy**
4:3

**economy**
26:22

**elected**
9:23  10:18

**election**
10:11

**email**
13:25

**emails**
14:6  15:8,25

**employee**
17:10

**engaged**
29:17

**Enterprises**
6:4  9:18  11:13  12:15  15:11  16:3
19:18,20,22  22:12  25:6  31:19

**entire**
31:4

**entrepreneur**
5:21  11:19

**event**
17:14,16  25:5

**exact**
28:23

**EXAMINATION**
3:4

**exceptions**
24:24

**exchanged**
15:9

**Excited**
12:10

**exhibit**
31:2,5

**existence**
8:10  31:16

**expect**
3:25  7:5

**expected**
6:19,25  21:17

**experience**
4:2  11:11,13,20

**explain**
4:18

**expressed**
26:4

**extent**
8:22

### F

**face**
  13:5
**fact**
  27:16
**Fair**
  19:13 25:13
**familiar**
  4:2 6:4,7 9:17 27:15,19
**family**
  26:13
**February**
  21:1 29:13
**feel**
  3:15
**feeling**
  11:9
**figure**
  29:21
**filed**
  3:11 8:11
**filing**
  31:5
**finance**
  6:10,13
**find**
  12:21
**fine**
  8:23 12:24 29:25
**fit**
  14:20
**focus**
  14:11
**follow**
  9:14
**forgive**
  28:3
**form**
  29:24
**frankly**
  30:24
**free**
  3:15 13:18

**freely**
  13:18
**friend**
  16:20 17:18,21 18:8 19:7,8
**friends**
  24:15 26:12
**friendship**
  14:14
**friendships**
  26:12,15
**frustrated**
  28:10,12 30:15
**fun**
  3:22 17:21
**function**
  17:19
**fundraiser**
  27:19
**funny**
  10:15

### G

**general**
  7:8 11:5 12:25 21:3,9 25:4
**generally**
  11:9
**germane**
  30:8
**give**
  4:18 11:5,6 13:21 21:2 30:18
**golf**
  12:6 17:17 23:19 30:6
**golfer**
  12:8
**golfing**
  27:10
**Gonnering**
  11:25 13:25
**good**
  3:6,7 11:10 16:25 19:5 28:13 30:18
**gotcha**
  9:14 17:22
**Gressco**
  5:23

**group**
  9:25 12:1 14:20 17:21 18:8,17
**growing**
  11:20
**guess**
  8:1 10:25 11:16 17:13 18:4 22:23 25:22 30:20
**guidance**
  13:17
**guy**
  23:17 24:10
**guys**
  14:20 18:25

### H

**hang**
  17:22
**hanging**
  26:17
**happened**
  25:23
**happening**
  30:7
**happy**
  4:22 12:22
**He'll**
  17:21
**heard**
  9:3 12:13 25:20
**hey**
  16:22 17:17
**hire**
  21:4
**hired**
  21:25
**hiring**
  21:15
**history**
  10:24
**hold**
  28:11,18
**holding**
  28:15

| Stacy L. Randall v. | Deposition of Ben C. Scharpf |
|---|---|
| Reed C. Widen, et al. | January 05, 2024 Index: honestly..love |

**honestly**
26:15 28:22

**hoped**
22:20

**hoping**
22:23

**hour**
4:24

**hours**
27:6

**house**
18:6,10,11,16 19:6

**hung**
14:17

**I**

**identification**
31:3

**identify**
31:13

**important**
4:3

**including**
14:21

**inconvenience**
7:1

**inconvenient**
12:22

**individuals**
15:10 31:14

**information**
13:22 16:7 31:16,22

**infrequently**
15:22,23

**injunction**
28:17

**insurance**
23:17 24:3,10

**intended**
23:6

**intention**
13:15 20:22

**interaction**
16:15

**introduced**
3:8

**investment**
21:4,15,25 22:6 29:17

**invite**
18:16

**involved**
19:18 22:20

**issue**
13:5,16 30:11

**J**

**Jesse**
22:22

**Jessica**
17:2

**job**
4:3

**jogs**
25:5

**Julie**
23:25

**July**
8:11

**Justin**
23:12,15,18 24:2,3,8,14,17 25:3,6,8,
11,13,16 31:17,23

**Justin's**
24:4 27:16

**K**

**Kaila's**
4:3

**keeping**
29:15

**kids**
22:20,24 23:9

**Kiesler**
9:19,20 11:22 14:2 27:2

**kind**
5:22 11:3,6,12 14:19 18:8 22:1,8
24:24 27:4

**knew**
7:17 8:14 23:16,22 24:10 25:24 28:25
29:3,4,11,13,16,18

**knowing**
24:25

**knowledge**
8:21,23 9:8,10,11,15 26:18 31:14

**L**

**law**
12:20

**lawsuit**
3:10

**leader**
18:9,13

**learn**
25:19

**legally**
28:18

**letter**
13:2

**life**
21:11 30:7

**limited**
20:9

**lines**
7:2

**list**
13:8

**listening**
17:3

**lists**
13:4

**living**
5:20

**long**
3:19 6:24 23:6

**loose**
9:24 14:19

**lot**
20:5

**love**
18:1

For the Record, Inc. | 888-892-0392 | office@FTRMadison.com
www.FTRMadison.com

### M

**Macht**
  15:2,3  16:20  17:10
**made**
  8:16  17:7  25:10
**mails**
  15:25
**make**
  4:3  5:11  6:21  9:2  13:15
**making**
  11:9
**management**
  11:3,14
**March**
  21:1  29:14
**Mark**
  15:6
**marked**
  31:2
**marker**
  10:15
**materials**
  13:14
**matters**
  26:23
**Matthew**
  11:25  12:2,3,16  13:25  27:1,11
**Matthew's**
  12:2
**meaning**
  31:22
**meant**
  9:9  16:8
**medical**
  4:17
**meet**
  16:18
**meeting**
  10:19  27:2
**meetings**
  9:24  10:12,14  11:8
**member**
  6:1  12:4,5,7

**memory**
  25:5
**mentioned**
  24:11  30:10
**met**
  9:20,22  10:3,7  12:13  15:16  17:18
**meting**
  27:1
**Michael**
  9:19,20  10:3,7  11:22  12:15  14:2
**mind**
  26:8
**minutes**
  32:1
**morning**
  27:10
**move**
  11:2
**mulling**
  29:14
**Murphy**
  3:5,9  16:25  17:1  29:25  30:1
**Musicnotes**
  6:2  21:25
**Musicnotes'**
  21:22
**mutual**
  16:19  18:7  22:1

### N

**names**
  9:18  12:13  14:22
**nature**
  4:11  7:10  8:12  20:1,4
**navigated**
  11:1
**night**
  10:11
**Nordland**
  14:16,21
**north**
  23:23  24:11,12  26:17
**note**
  16:23

**notes**
  5:1
**November**
  10:16
**number**
  12:3  31:6,9,11

### O

**O'NEIL**
  6:20
**oath**
  3:3
**Obama**
  9:23  10:9,17
**Object**
  29:24
**objection**
  5:7
**objections**
  5:11
**objects**
  5:7  30:2
**observations**
  25:10  27:13
**observe**
  25:16
**observed**
  26:21,23  28:13
**occasion**
  14:7
**offered**
  24:25
**office**
  27:1
**onerous**
  13:16
**opinion**
  30:17,19,21
**other's**
  14:7
**outings**
  19:10
**overlap**
  11:12

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of Ben C. Scharpf
January 05, 2024  Index: owner..Reed's

**owner**
  5:21
**ownership**
  6:11

### P

**p.m.**
  32:4,9
**Packers**
  18:1,2
**packet**
  13:2
**paid**
  19:11
**Park**
  6:12
**part**
  12:1 14:14 18:18 21:10 26:14 29:20
**participated**
  27:22
**partner**
  24:7
**past**
  24:16 27:22
**paths**
  24:19 26:3
**pay**
  19:3,13
**people**
  6:20 12:21 13:24 14:23 18:17
**percent**
  25:15
**period**
  9:22 23:6
**person**
  8:6
**phone**
  13:12 31:11
**Physically**
  17:24
**pitch**
  9:18
**place**
  10:15

**places**
  24:15
**plan**
  23:1
**planning**
  22:18
**play**
  23:19 30:6
**played**
  17:17
**point**
  7:9 21:10,24 26:2 29:21
**points**
  5:6
**Polakowski**
  16:22 17:2
**possibly**
  14:11
**post**
  17:17
**potential**
  31:18,24
**prepare**
  6:16
**prepress**
  11:2
**presume**
  11:20 14:4,16
**pretty**
  19:5
**previously**
  27:24
**prior**
  8:9,15,21,23 9:4,5,8,10,14,15
**privilege**
  5:13
**proceeding**
  29:9,10
**process**
  12:20 22:4,8 29:16
**purchased**
  24:2
**purpose**
  10:25 31:13

**purposes**
  13:22
**put**
  9:25 26:7

### Q

**question**
  4:12 5:8 7:3 8:25 9:1 25:4 31:20
**questions**
  4:10 5:5 6:23 32:5

### R

**Randall**
  3:10 15:16 16:1 23:12 31:17
**rarely**
  14:10 26:12
**read**
  31:4
**ready**
  22:25
**reason**
  4:17,18 11:18
**reasonable**
  13:19
**recall**
  10:9 21:19 22:10 30:14
**received**
  7:9
**receiving**
  8:9
**recess**
  32:4
**record**
  3:8 5:16 16:23
**Reed**
  3:11 7:14 8:14 9:12 10:4 11:9 12:15
  14:4,17 16:11,18 17:16,18,23 18:6,7
  19:7,8,10 20:8,12,19,22 22:14,17,23
  23:16 24:22,25 25:9,12,14,16,24 26:1,
  17,18,21,23 28:3,5,20 30:3,21 31:17,
  23
**Reed's**
  9:5 30:25

**reference**
9:14
**relate**
31:21
**related**
15:10 16:1,3,5,8 30:11 31:18,23
**relating**
28:6
**relationship**
16:18 23:14,19 24:8 25:8,11 28:14
**relevant**
31:14
**remember**
10:18 28:22 29:4,5
**rent**
18:15,16
**rephrase**
19:21
**represent**
29:22
**representing**
3:10
**requests**
13:9,11,17
**require**
12:20
**respect**
7:3
**responsive**
13:13
**retired**
26:18
**review**
5:1 13:7,10
**rider**
13:3
**ring**
18:9,13
**role**
10:25 11:17
**rules**
4:1
**run**
12:3 20:6 24:16

---
**S**
---

**S-C-H-A-R-P-F**
5:17
**sailing**
25:21
**sale**
16:3,9 21:16,20 22:11 25:19,20,22
26:1 29:9 31:18,24
**Scharpf**
3:1 5:17 31:15
**Scharpfs**
18:18
**schedule**
13:3
**selected**
11:18
**sell**
20:23 21:17
**selling**
9:5,13 20:17,18,20 25:25
**send**
12:18
**sense**
12:25 13:21 26:24
**serve**
12:20 26:21
**served**
19:16
**server**
12:21
**service**
12:23 19:22
**shared**
23:3
**shareholder**
6:1
**sharing**
8:3
**Sharpf**
3:6
**short**
9:22

**side**
30:24,25
**significant**
12:14
**similar**
6:8 8:7 21:23
**Simon**
15:4 18:9,13
**Simons**
19:5 24:13
**sister**
28:14
**sit**
9:25 10:4
**Small**
25:15
**social**
12:7 15:13
**socially**
12:2
**sold**
8:20 9:4,12 20:15 24:3 26:4,6
**sort**
13:21
**sounds**
20:8
**speak**
27:5
**specific**
29:7
**specifically**
28:5
**specifics**
28:23
**speculating**
6:24
**spell**
5:15
**spend**
28:13
**spoke**
14:16
**spoken**
8:16 25:11

**sponsors**
  19:5
**sports**
  26:14
**spot**
  11:10
**Stacy**
  3:10 15:16 16:1,9,15 17:4 28:6,15
  30:11,22
**Stacy's**
  16:6,11 30:24
**start**
  6:22 13:23 20:18 24:1
**state**
  5:15
**stay**
  18:4
**staying**
  24:13
**step**
  21:21 22:25
**sticks**
  26:7
**stock**
  8:20 9:4,12
**subpoena**
  7:9,13 8:9 12:18,23 13:3,4
**succession**
  22:17 23:5
**suicide**
  27:17,20
**suing**
  16:11
**suit**
  16:5,9
**summer**
  25:25 29:5,7
**super**
  6:7
**support**
  27:19
**suspicion**
  4:24
**sworn**
  3:2

**T**

**taking**
  23:7
**talk**
  4:4 6:15,16,22 7:6 12:3 21:7 22:17
  25:3,5,8,16 26:12 28:5 29:13
**talked**
  6:18,19 19:16 26:16 28:3 29:11
**talking**
  18:11 21:11 27:5,7 30:5
**task**
  13:16
**team**
  27:5,8
**ten**
  15:21 24:19
**term**
  4:11
**Terry**
  14:23
**testified**
  3:2
**testimony**
  4:19
**text**
  7:24 13:25 17:25 18:2
**texted**
  16:11
**texting**
  27:7
**texts**
  14:6 15:8 27:5
**thing**
  21:23 25:24 31:4
**things**
  11:6 26:19
**thinking**
  21:23
**thought**
  9:7
**throw**
  14:22

**thrown**
  17:6
**tickets**
  27:23
**Tilly**
  16:19 17:6,8,10,12,14,16,18
**Tim**
  15:2,3 16:20 17:10,16
**time**
  3:17 8:10,12 9:22 10:17 21:6,21,25
  22:11,20 23:7 24:12 25:15 27:9 28:13
  30:4 32:6
**times**
  15:19 17:24,25 18:3,25 23:19 24:19
**timing**
  31:16
**today**
  3:12 4:19 6:16,17 8:7 9:11 12:19 13:6,
  7,10 30:7
**today's**
  7:13 13:22
**topic**
  14:12 20:17
**topics**
  13:1,7 21:12
**track**
  29:15
**traveled**
  18:3,6,7
**trip**
  18:23 19:1,4 21:10,13 25:21
**trips**
  18:5,14,15 19:9,10 26:16
**type**
  18:13 22:6

**U**

**uncommon**
  24:16
**understand**
  8:17 20:4 29:6
**understanding**
  8:19,20 14:19 18:20 21:6 28:12,17
**understood**

Case: 3:22-cv-00400-jdp   Document #: 167   Filed: 03/15/24   Page 20 of 20

| Stacy L. Randall v. | Deposition of Ben C. Scharpf |
| Reed C. Widen, et al. | January 05, 2024  Index: vacation..years |

4:14 6:21 9:2 15:2,24 16:17 20:1 22:4,8 24:5

**V**

**vacation**
  18:8
**verbalize**
  4:7
**Vial**
  14:23
**view**
  8:1
**voice**
  15:25

**W**

**wanted**
  21:7
**wanting**
  23:9
**Waunakee**
  5:19
**ways**
  13:7
**week**
  30:6
**weekend**
  12:10
**Widen**
  3:11 6:4,8 7:14 9:18 11:13 12:15 15:10 16:3 19:18,20,21 22:11 25:6,17,19 26:23 31:17,18
**Widens**
  18:17 24:13
**Winter**
  15:6
**Wisconsin**
  5:19
**wished**
  28:24
**WITTENBERG**
  29:24 32:8
**word**
  21:2
**work**
  27:6
**worked**
  22:9,22
**working**
  26:23
**worries**
  7:23
**worth**
  20:13 21:6
**wrong**
  9:8

**Y**

**year**
  9:23 10:9 17:24 18:8,24 27:23,25
**years**
  6:12 15:21 16:16 17:9 24:19