# In the Matter Of:

*Stacy L. Randall v. Reed C. Widen, et al.*

*Deposition of William B. Nordland*

*January 04, 2024*



Stacy L. Randall v.
Reed C. Widen, et al.

**Deposition of William B. Nordland**
**January 04, 2024**

---

```
                UNITED STATES DISTRICT COURT

                WESTERN DISTRICT OF WISCONSIN

_____


STACY L. RANDALL,

             Plaintiff,

      -vs-                      Case No. 3:22-cv-00400-jdp

REED C. WIDEN, MICHAEL KIESLER,

WIDEN ENTERPRISES, LLC, and

WINDY WATERS, INC.,

             Defendants.

_____


      Deposition of WILLIAM B. NORDLAND, taken at

the instance of the Plaintiff, under and pursuant to

Subpoena, before Sheila K. Finnegan-Martinez, RPR,

a Notary Public in and for the State of Wisconsin,

at Reinhart Boerner Van Deuren S.C., located at

1000 North Water Street, Suite 1700, Milwaukee,

Wisconsin, on January 4, 2024, commencing at 9:32 a.m.

and concluding at 10:29 a.m.
```

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3   REINHART BOERNER VAN DEUREN S.C., by
         Mr. Daniel G. Murphy,
 4       1000 North Water Street, Suite 1700,
         Milwaukee, Wisconsin  53202,
 5           appeared on behalf of the Plaintiff.
 6   REINHART BOERNER VAN DEUREN S.C., by
         Mr. David G. Palay,
 7       22 East Mifflin Street, Suite 700,
         Madison, Wisconsin  53703,
 8           appeared via Zoom videoconference on behalf
             of the Plaintiff.
 9
     O'NEIL, CANNON, HOLLMAN, DeJONG & LAING S.C., by
10       Ms. Christa D. Wittenberg,
         111 East Wisconsin Avenue, Suite 1400,
11       Milwaukee, Wisconsin  53202,
             appeared on behalf of the Defendants.
12
13
14                   I N D E X
15
     Examination:                                   Page
16
     By Mr. Murphy....................................  3
17
18   Exhibit Identified:                            Page
19   Exhibit 1   Defendants' Supplemental
                 Rule 26(a)(1) Disclosures and
20               Rule 26(a)(2) Disclosures............ 45
21
     (The exhibit was attached to the original transcript,
22       and copies were provided to counsel)
23
24       (The original transcript was filed with
             Attorney Daniel G. Murphy)
25
```

**Page 3**

```
 1                    WILLIAM B. NORDLAND, called as a
 2      witness, being first duly sworn, testified on
 3      oath as follows:
 4
 5                      EXAMINATION
 6   BY MR. MURPHY:
 7   Q   Good morning, Mr. Nordland.  How are you?
 8   A   Fine.  Thank you.
 9   Q   Is it okay if I call you Bill today?
10   A   You may.
11   Q   All right.  Bill, have you ever -- I asked you
12       this off the record, before the record:  Have you
13       ever been in a deposition before?
14   A   I have not.
15   Q   Okay.  So we have the court reporter taking down
16       everything that we're saying.  We have opposing
17       counsel, who may lodge objections from time to
18       time.  I'll be asking you most of the questions
19       today.  I don't know if Attorney Wittenberg
20       intends to ask questions.  At the end of this, she
21       may; she may not.  But I think safe to assume,
22       principally, I'll be asking the questions.  Okay?
23   A   Okay.
24   Q   There's no need to be nervous or concerned about
25       this process.  If you need to take a break, just
```

**Page 4**

```
 1       let me know.  This is going to be relaxed.  It
 2       shouldn't take all that long.  We've committed to
 3       a three-hour limit, in any event, and I don't
 4       think we're going to butt up against that.  I
 5       suppose it depends on what we end up finding out,
 6       but that's kind of the plan here.
 7            One of the key rules today is I will do my
 8       best to not speak over you, and please try to do
 9       the same.  Okay?
10   A   Okay.
11   Q   I tend to trail in my questions, and I will try to
12       make it obvious when I've come to a stopping point
13       so that you know that it's your turn to talk.
14       Okay?
15   A   Okay.
16   Q   Another key rule is is if I say anything --
17       whether it's part of a question or just a name or
18       a term -- that you don't understand, please ask
19       me to clarify.  Okay?
20   A   I will.
21   Q   Because, if you answer, I'm going to assume that
22       you understood what I said.  Okay?
23   A   Mm-hmm.
24   Q   Other rule is you've got to vocalize your
25       responses.  The record will reflect something like
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024**

Page 5

1  "mm-hmm" or "uh-uh," but it's not clear what that
2  means when we're looking back at this.  Because,
3  at the end of the day, really all that matters is
4  what's on the written page.  We're not recording
5  this.  There won't be a video version of this.
6      So please make sure "yes," "no," verbal
7  answers.  Okay?
8  A  Understood.
9  Q  Thank you.  Are you under the influence of any
10  drugs or have any recent medical procedures,
11  anything that would cause you to not be able to
12  testify today?
13  A  I am not.
14  Q  Okay.  I already talked about breaks, but again,
15  if you need a break at any time, just let me know.
16  So, just starting with some basic information, can
17  you state and spell your name for the record.
18  A  Spell my name?
19  Q  Yes.
20  A  William, W-i-l-l-i-a-m, Nordland, N-o-r-d-l-a-n-d,
21  middle initial B as in boy.
22  Q  And where do you live?
23  A  40402 N. South Newport Drive, Antioch, Illinois
24  60002.
25  Q  What do you do for a living?

Page 6

1  A  I am in contract sales management for Staples.
2  Q  I don't need an in-depth analysis of what that job
3  entails, but can you just give me a little bit
4  of --
5  A  It's not an easy answer.  We have a division
6  that's called the Staples Business Advantage
7  division of Staples that works on large enterprise
8  customers with, you know, contract sales.
9      So the customer signs a contract with us for
10  X amount of time to sell them certain product
11  lines.  I'm responsible for a group of those
12  customers, to grow them, make them profitable,
13  keep them, renew them, enterprise contract sales.
14  Q  Understood.  Are you assigned to a specific
15  region?
16  A  Yes.
17  Q  What is that?
18  A  The midwest region.
19  Q  Okay.  Did you ever have Widen Enterprises as a
20  customer?
21  A  No.
22  Q  Okay.  All right.  Just briefly, I would like to
23  touch on what you did to prepare for today, if
24  anything.  Did you talk to anybody about your
25  deposition today?

Page 7

1  A  Yes.
2  Q  Who was that?
3  A  I talked to Christa.
4  Q  Okay.
5  A  And my wife and my family.
6  Q  Okay.  Did you talk to Reed Widen?
7  A  Yes.
8  Q  Okay.  And we're going to get into those
9  discussions in a moment.
10      Did you talk to anyone else outside of your
11  family other than Reed and Christa?
12  A  Yes.  I talked to Terry Vial.
13  Q  Okay.
14  A  And I talked to Ben Scharpf.
15  Q  Okay.  So let me make sure I got all this down.
16  Let's start with Christa.
17      How often did you talk -- or, excuse me.
18      How many times did you talk to Christa?
19  A  I don't know for sure, but I'm going to say one,
20  regarding this deposition.
21          MR. MURPHY:  I'm sorry.  I keep
22      saying Christa.  It's Chrissa?
23          MS. WITTENBERG:  Christa.
24          MR. MURPHY:  It is Christa.
25          MS. WITTENBERG:  You're right,

Page 8

1      mm-hmm.
2  Q  Okay.  So when -- I'm sorry.  I got distracted.
3  You said you talked to Christa how many times?
4  A  Once.
5  Q  Once.  How did you do so?  Was it over the phone,
6  text, email?
7  A  Over the phone.
8  Q  Okay.  About how long was that?
9  A  Was the conversation?
10  Q  Yeah.
11  A  I can't say for sure, but less than 15 minutes.
12  Q  Okay.  What did you talk about?
13  A  Just making her aware that I had been served and
14  that I was going to be here, and my intention was
15  to be here on time based on that, you know,
16  command on this document right here.
17  Q  And you nailed that part.  You were a half hour
18  early; right?
19  A  Yes.
20  Q  Did you talk about any of the substance of what
21  your testimony today might be?
22  A  No.
23  Q  Any of the issues in this case?
24  A  Can you clarify that question.
25  Q  Sure.  So we're here -- I suppose I should have

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024**

Page 9

1  opened with that.
2      We're here as part of a lawsuit that
3  Stacy Randall, my firm's client, has filed against
4  Reed Widen and others.  And the case, in very
5  broad strokes, deals with the redemption of my
6  client's ownership interest or stock in
7  Widen Enterprises -- or, excuse me, the stock is
8  with Windy Waters, but in any event, her stock
9  in the company and then a subsequent sale of the
10  company.
11      Were you aware of the nature of this lawsuit
12  before you received the subpoena?
13  A  Yes.
14  Q  Okay.  And did you discuss any of those topics, in
15  a very broad umbrella, with Christa?
16  A  In what the lawsuit's about?
17  Q  Correct.  What I would imagine, if a witness such
18  as yourself had contacted me, you might have asked
19  questions about what specific information the
20  questioner would want to know, right.
21      Did you ask those types of questions of
22  Christa?
23  A  I -- not specifically.  I just said what should I
24  be prepared to answer, you know.  I asked for how
25  long we thought it was going to take.  That was

Page 10

1  really about the extent of it.
2  Q  Okay.  In terms of what you should be prepared to
3  answer, do you recall what Christa told you?
4  A  That -- to be prepared to answer anything that I
5  know regarding the topics related to the lawsuit;
6  in other words, the -- Stacy suing Reed about her
7  sale of the -- her shares in the company and, you
8  know, the related topics surrounding that.  I
9  mean, it was really just to make sure I was under
10  the -- under the full understanding of what the
11  lawsuit was about.
12  Q  Okay.  What about your conversation with Reed?
13  A  I just let him know that I had been served and
14  that I was coming up this morning to have a
15  deposition.  That was the extent of our
16  conversation.
17  Q  When did you have that conversation?
18  A  The day that I received that, which was
19  December 23rd.
20  Q  Did you have any similar discussion about the
21  nature of the case or what you should be prepared
22  to answer with Reed?
23  A  No.  No.
24  Q  Okay.  What about Terry?
25  A  Terry called me.  I can't -- I don't know the

Page 11

1  exact date, but since I think we all were served
2  somewhere around the same time, he became --
3  understanding that I had been served as well, he
4  called me and said, When are you going?
5      I told him I was coming today.  He told me he
6  was going tomorrow, and that was about it, just
7  really that, you know, Are you involved?  Yes, I'm
8  going on Thursday.  Yes, I'm going on Friday.  And
9  didn't know what we could do, but we're here to
10  answer whatever we can.
11  Q  Okay.  And I appreciate you coming here, by the
12  way.  I realize that it's a bit of a drive for
13  you, and we appreciate it.
14      Similar questions with respect to Terry.  You
15  guys didn't get into what you might be asked or
16  what you might answer?
17  A  No.
18  Q  Okay.  And I believe you said Ben.  And can you
19  help me with the pronunciation of the last name?
20  A  It's Scharpf.
21  Q  Scharpf.  So the P is, roughly, silent.
22  A  Yes.  The -- yeah.
23  Q  Okay.  Go ahead.
24  A  Very similar conversation as Terry.
25      He called me.  I understand you're going.

Page 12

1  Yes, when are you going?  I'm going Thursday.  He
2  said he was going Friday.  Talked for five
3  minutes, maybe.  Just, again, same topic: We're
4  not sure what we can provide, but we're here to
5  provide whatever we can.
6  Q  And that's what we're here to find out.
7  A  Yeah.
8  Q  Okay.  So of those folks, it sounds like with no
9  one, with perhaps the exception of Christa, did
10  you get into the substance of what this deposition
11  would entail?
12  A  Correct.
13  Q  And with respect to Christa, that conversation was
14  limited to what you should be expected to discuss,
15  not the nature of your answers?
16  A  Absolutely.
17  Q  Okay.  Have you, prior to receiving your
18  subpoena, had any discussions with anyone
19  regarding this case?
20  A  Yes.
21  Q  And let's figure out who that is.
22  A  Reed made me aware of the lawsuit; his wife,
23  Leanne.  And those are the two, really, primary
24  ones that made me aware of it and made me
25  understand that there was a lawsuit going on.

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of William B. Nordland
January 04, 2024

Page 13

1  Q  Okay.  I'm just going to rattle off some other
2     folks you may have talked to --
3  A  Sure.
4  Q  -- to confirm.  Justin Randall?
5  A  No.
6  Q  Stacy Randall?
7  A  No.
8  Q  Okay.  Any of the other witnesses that we just
9     talked about: Ben, Terry?
10 A  Make sure I'm clarifying the question before I
11    answer that.  So that we talked about the lawsuit
12    with those two people prior to this, no.
13 Q  You got it.
14 A  Not Ben or Terry.
15 Q  Okay.  So, as far as you recall, it would just be
16    Reed and Leanne in terms of anyone prior to
17    receiving a subpoena?
18 A  Yes.
19 Q  And we've covered everybody that you've talked to
20    subsequent to receiving the subpoena?
21 A  Yes.
22 Q  All right.  When you talked to Reed about the
23    lawsuit, you said that Reed told you about the
24    lawsuit.  What did Reed tell you?
25 A  Reed told me that Stacy, his sister, had filed

Page 14

1     suit with, you know -- filed suit with him,
2     against him, regarding the -- you know, the value
3     of -- of what she had collected prior to the sale
4     versus what the sale was worth and that she said
5     she was due -- she was suing for more than what
6     she had received once upon a time.
7  Q  Did Reed offer any characterization of his view of
8     those claims?
9  A  No.
10 Q  Reed didn't say that this is all bullshit or
11    Stacy's, you know, out of line, anything like
12    that?
13 A  I think it would be safe to say Reed was
14    surprised.
15 Q  Okay.  And when you say he was surprised, what did
16    he say to you that made you think that?
17 A  I don't recall exactly what the exact conversation
18    was.  I mean, I'd be -- what's the term I'm
19    looking for?  I don't remember the exact
20    conversation.
21 Q  That's fine.  And forgive me if you already said
22    this, do you recall roughly when this conversation
23    was?  And maybe I can help you out a little bit.
24    The lawsuit was filed in July of 2022.
25 A  Okay.

Page 15

1  Q  Formally filed, I suppose.  There may have been --
2  A  It makes sense that it would be after that date.
3  Q  Okay.
4  A  In my head.
5  Q  And does it feel like it would have been that long
6     ago, like over a year ago, or is it more recent
7     than that?
8  A  It feels like it would have been about that time.
9  Q  Okay.  Was the discussion with Reed at the same
10    time or the same discussion as the one with
11    Leanne?
12 A  No.
13 Q  Okay.  So separately you spoke to Leanne about
14    the lawsuit?
15 A  Yes.
16 Q  And what did Leanne say, as best as you recall?
17 A  Again, I don't recall the conversation
18    specifically.
19 Q  Sure.
20 A  Right.  Just that it was going on, and they were
21    working on, you know, making it -- going through
22    the whole process.
23 Q  And, presumably, they were expressing frustration
24    about that process?
25 A  I would say, again, they were very surprised that

Page 16

1     it was going on in the first place.
2  Q  Okay.  Other than Reed and Leanne, you haven't
3     spoken to anybody about the lawsuit other than the
4     individuals we talked about in the context of our
5     discussion about the subpoena and today's
6     deposition.  Those are the only two that you
7     recall?
8  A  As it relates to this; right?
9  Q  Correct.
10 A  Correct.
11 Q  Okay.  Do you have any relationships with -- and
12    maybe this is too broad a question, so help me
13    out -- with anybody else at Widen or --
14 A  Well, I know the kids.  And Reed's son Jesse
15    worked at Widen, so I've known him since he was a
16    baby.  I don't think he's there anymore, but he
17    was at Widen for -- in a capacity, for a few
18    years, at least.
19 Q  Okay.
20 A  I've known Terry Vial for quite a while because
21    we're just common friends with Reed.
22 Q  Okay.
23 A  And they were neighbors and social friends.  I
24    mean, when we would do something together, it
25    wasn't unusual that Terry and I were involved on

Stacy L. Randall v.
Reed C. Widen, et al.

**Deposition of William B. Nordland**
**January 04, 2024**

Page 17

1    a fishing trip or some type of a social event.
2    So I've known Terry for a long time.
3  Q  Okay.
4  A  I have met some of the folks at Widen that are
5    still there and in capacities, but I can't say
6    that I know them. I don't know that I would -- I
7    wouldn't be able to pick them out of a lineup.
8  Q  Okay. Of those folks that you've met but,
9    presumably, more along the lines of an
10   acquaintance, not a friend, do you know
11   Matthew Gonnering?
12 A  I've met Matthew. But, again, it was at an event.
13   How you doing, nice to meet you.
14 Q  Okay.
15 A  But we've never spent any real time together.
16 Q  And same with respect to Michael Kiesler?
17 A  I don't know that I've ever met Mike Kiesler.
18 Q  But, by your answer, it sounds like you're
19   familiar with the name?
20 A  I am.
21 Q  Okay. And in what context would you be familiar
22   with that?
23 A  In the context that Reed spoke about his
24   leadership team.
25 Q  Okay.

Page 18

1  A  And I -- and that name was mentioned.
2  Q  Okay. Any other names that stick out? Again, I
3    understand you have limited contact with these
4    people, but I'm just trying to get a sense of your
5    familiarity with --
6  A  Yeah. No.
7  Q  Okay. It seems as if your connection to this
8    case, to Widen Enterprises in general, is through
9    Reed. Is that a fair statement?
10 A  It appears to be, yes.
11 Q  My point being that you don't have separate
12   connections with Terry, with Jesse, with other
13   folks we've been discussing, other than that you
14   have interacted with them at times when you're
15   otherwise interacting with Reed?
16 A  That is correct, social relationships, you know.
17   And the kids are the kids. We've just known the
18   kids since we were young, so -- since they were
19   young.
20 Q  We talked about any communications that you had
21   with people about this case, about the subpoena.
22        Have you exchanged anything in writing with
23   any of the people that we've talked about related
24   to these topics, whether email, text, voicemail?
25   I guess voicemail wouldn't be writing, but

Page 19

1    anything beyond an oral conversation about this
2    case?
3  A  No.
4  Q  Okay. What about anything in writing? And,
5    again, what I would envision would be, most likely
6    in your scenario, would be something like a text
7    or an email, but please treat this as broadly as
8    you can imagine in terms of what you might have,
9    but anything related to Stacy?
10 A  No.
11 Q  Okay. Anything related to the sale of
12   Widen Enterprises?
13 A  No.
14 Q  Okay. And, after we leave here today, you may
15   receive a subpoena for documents from me, and
16   I'm understanding your answers and I understand
17   your response to that subpoena may be that you
18   have nothing.
19        When you receive that, if you receive it, if
20   you have any questions, please contact me, but
21   those are the types of information I'd ask you to
22   look for, confirm that what you've said today is
23   accurate, and then we can be done with that.
24 A  Okay. Understood.
25 Q  Just mainly giving you a heads-up about that

Page 20

1    because that may be coming. Okay.
2        So let's talk about your relationship with
3    Reed. How did that begin? Where did you meet
4    him?
5  A  Reed's family and my family both had a summer home
6    in northern Wisconsin: Boulder Junction,
7    Wisconsin.
8  Q  Okay.
9  A  A lake on the Manitowish Waters chain.
10 Q  Okay.
11 A  His place was built several years before ours went
12   up. But we met in two fishing boats, 10, 11 years
13   old maybe, as kids that wound up fishing in the
14   same little general area. We struck up a
15   conversation, and that's how we met.
16 Q  Okay. So fair to say you're lifelong friends?
17 A  We've known each other for a long, long time, yes.
18 Q  Sure. So you're based in Illinois now. Were you
19   previously based in Wisconsin, or were you always
20   down there?
21 A  Always in Illinois.
22 Q  Okay. Just had the summer home or cottage --
23 A  We had the summer home. I was born and raised in
24   Illinois. I went to school in Arizona, but other
25   than that, have lived in -- lived in -- my

Page 21

1  residence has been in Illinois my whole life.
2        But, yes, when we were kids, we spent several
3  months up there, summers, up into and including
4  some portion of high school.  And then it depleted
5  its time up there quite a bit because of college
6  and so forth.
7  Q  That tends to happen, unfortunately.
8  A  Yes.
9  Q  So I would imagine your context in developing that
10  relationship with Reed was limited to your time up
11  north?
12  A  Fun, yes.
13  Q  Yeah, in those early years.  As you mentioned, at
14  some point, it sounds like you stopped going up
15  there so often.
16        How did you and Reed kind of stay in contact
17  over the years, or what would be the context in
18  which you would get together?
19  A  Yeah, I can answer that.  We lost touch in --
20  during the college years, I'll say.  So I can't
21  say for sure the age but roughly right around
22  20 years old, we -- he went one way; I went
23  another way.  Two different schools, two different
24  paths.  So there were -- there was a period of
25  time there that we weren't in touch.

Page 22

1        I lived in Arizona, met my fiancé there.  We
2  moved back here to get married and to move back to
3  the Chicago area.  Went back up to the family
4  place.  We literally ran across people -- I ran
5  across him going across the lake in his boat.  We
6  kind of said, Oh, my God, and that rekindled,
7  restarted the relationship, what I would call the
8  adult component --
9  Q  Okay.
10  A  -- of that relationship.
11  Q  So a period of disconnect throughout the college
12  years and kind of early stages of family life but
13  reconnected up north.
14        About when would that have been?  Is that --
15  A  That would have been around 1985.
16  Q  Okay.  And so from 1985 to today, what's the
17  nature of your relationship with Reed?
18  A  We -- we talk occasionally, just catching up --
19  How you doing? -- on the phone.  And then we get
20  together a few times a year.  Once in a while,
21  it's up north.  I don't go very often anymore,
22  but occasionally I do.
23  Q  Do you still have the place up there?
24  A  My brother owns it now.  My parents owned it.  It
25  was a family place, and my brother owns it now; so

Page 23

1  it's transitioned into a different scenario.
2  Q  Okay.
3  A  So I still go.  It's just not very often.
4  Q  You said a few times a year: three or four, two or
5  three?
6  A  I probably -- I mean, I can't say for sure, but
7  it's not more than, I would say, four to five.
8  Q  Okay.
9  A  On average.
10  Q  Sure.  And outside of the trips up north, where
11  else would you hang out with Reed?
12  A  I visited him in Arizona, his place in Arizona.
13  Q  Okay.  Have you ever gone on hunting or fishing
14  trips with him?
15  A  Yes.
16  Q  And my understanding -- limited, so help me out
17  here -- but I think many of those trips are up to
18  Canada?
19  A  I have been to Canada, hunting with him, twice.
20  Q  Okay.
21  A  Which is always a fall trip.  And then I have been
22  fishing with him in Canada once, and that was a
23  spring trip.
24  Q  And so not once on a repeating basis, once period?
25  A  Once period.

Page 24

1  Q  And same with respect to the hunting, twice
2  period?
3  A  Yes, sir.
4  Q  Okay.  And on those trips, would Reed typically
5  foot the bill?
6  A  No.
7  Q  No?
8  A  Well, I mean, let me take that over.
9  Q  Sure.
10  A  The hunting trips I paid for, for my share.  It
11  was a group amount, and then we divvied it up
12  based on who was there, and I paid that portion of
13  it.
14  Q  Okay.
15  A  I -- the one fishing trip I went with, he did foot
16  the bill for that, with the exception of the
17  gratuities and things like that that were above
18  the cost of the trip.
19  Q  Okay.  Are there any other circumstances like
20  that, whether specifically hunting or fishing, but
21  other instances where Reed is covering most of the
22  cost of a trip?  That you're involved in.  I
23  should say that.
24  A  Not that I can -- not that I can recall --
25  Q  Okay.

Page 25

1  A   -- have been, no.  I don't travel with him that
2      much, so . . .
3  Q   Okay.  How often -- you know, you say, I think it
4      was, a maximum four or five times a year.  I'm not
5      trying to get hyperspecific about that data point.
6          How many -- well, let me just say it this
7      way:  How many times a year, if that's the best
8      measure, are you out to Arizona, to visit him?
9  A   Once or twice.
10 Q   Okay.
11 A   And I'll give you the example.  Once -- we went
12     once -- with my wife to go visit them for a
13     vacation.  Typically, it's once a year.  It's only
14     been a couple years, but once a year for that.
15 Q   Okay.
16 A   There was a time when Reed had some surgery, and
17     I went out to help him recover.
18 Q   Okay.
19 A   So that was -- actually, that might have been the
20     only time that year too, but no more than -- it's
21     usually annually.
22 Q   Okay.
23 A   But no more than twice in any given year.
24 Q   Okay.  And I don't need the details of his surgery
25     or what your help consisted of, but fair to say,

Page 26

1      it sounds like, he trusted and relied on you?
2          You know, I wouldn't pick somebody out of my
3      friend group who I didn't trust and rely on to
4      help me out in that circumstance.
5  A   I don't know, but you would -- you would think so.
6      I can't answer for him, but --
7  Q   Sure.
8  A   Sure.
9  Q   All right.  You said that the trips to Arizona are
10     roughly annually.  How far back would those go?
11     Like, do you recall the first time you went out to
12     Arizona?
13 A   Mm-hmm.  It was the first time that -- I mean,
14     again, we've lived in Arizona; so I've been out
15     there a lot.
16 Q   Sure.
17 A   The first time I visited him in Arizona was in the
18     spring of 2020.
19 Q   Where did you live when you lived in Arizona?
20 A   Where did I live when I lived in Arizona?
21 Q   Correct.
22 A   I lived in -- around campus: Tempe, Scottsdale,
23     Phoenix.  Seven places in four years, college
24     life.
25 Q   That's right.  I recall it.

Page 27

1  A   Yeah.
2  Q   And is Reed's place in Scottsdale --
3  A   Yes.
4  Q   -- I believe?  Okay.  I was just trying to get a
5      sense of, if you were going out there to visit
6      other folks you may know, might you bump into
7      Reed?
8  A   I don't know.
9  Q   Has that happened?  Better way to ask that.
10 A   Have I gone to Arizona to visit other people and
11     bumped into Reed?
12 Q   Correct.
13 A   Not that I -- not that I can think of.
14 Q   Okay.  We touched on this a bit, but I want to
15     circle back to.
16         My understanding is your knowledge, your
17     awareness of Widen Enterprises or Windy Waters,
18     would be principally through discussions with
19     Reed?
20 A   Yes.
21 Q   And we talked about how you don't have any
22     business relationship with either of those
23     entities; correct?
24 A   That's correct.
25 Q   Okay.  Did you ever talk to Reed about his

Page 28

1      business?
2  A   Yes.
3  Q   Can you give me a sense of what you might talk
4      about.
5  A   Well, that's going back a long -- a long way.
6  Q   Sure.
7  A   I mean, we talked, years ago, when it was a
8      prepress company, about how we were both working
9      very hard then, in terms of like daily driving,
10     spending a lot of time on the road.  You know, we
11     were both developing our careers; so we talked a
12     lot about how we were getting better at what we
13     were doing.  You know, this is in our -- I guess
14     I would call it our 30s.
15 Q   Okay.
16 A   So that was more on what we were doing on our
17     activity related to the company than -- but, as I
18     understand it, it was a prepress company, which I
19     can't pretend to understand.  It seems to be
20     something that people make to put stuff on paper.
21         I recall that transitioning to going to some
22     on-demand print at some point in time for the --
23     you know, as the company evolved, as -- you know,
24     his father was still involved.  He and his
25     brothers were still involved in the company at

Stacy L. Randall v.
Reed C. Widen, et al.

**Deposition of William B. Nordland**
**January 04, 2024**

Page 29

1    that point in time.
2        And then I recognized that it shifted towards
3    the -- oh, what do they call it? -- digital asset
4    management, what I first heard as intellectual
5    property management.  I, again, don't pretend to
6    understand what that means.  I kind of think I
7    sort of -- but I -- I remember really
8    specifically -- not specifically, but three things
9    that come up in my brain are those three
10   components of what I talked to him -- him about as
11   far as the company's transition and evolution.
12 Q   Okay.  So did you -- and I guess I'm more so
13   concerned about at the point that the company is
14   in kind of that last iteration, where it was over
15   the past, you know, five to ten years, I suppose.
16       Did you ever discuss the value of the
17   company, what Reed might have thought it was
18   worth?
19 A   No.
20 Q   Did you ever discuss whether Reed had been
21   approached by other companies looking to acquire
22   his company or equity firms looking to acquire
23   his company?
24 A   Yes.
25 Q   How did that conversation -- to the best of your

Page 30

1    recollection, how did that conversation come
2    about?
3  A   He brought that up when we were visiting in
4    Arizona.
5  Q   Okay.  And did he happen to share -- well, what do
6    you recall of the conversation?
7  A   We were visiting in the pool.  That there was --
8    somebody had approached them or somebody in the
9    company had said that there might be a reason
10   to -- something that makes -- made him might want
11   to sell, sell the business.
12 Q   Do you recall when that was, that visit?
13 A   It was in spring of 2021.
14 Q   Okay.  And did you get down to any sort of
15   specifics as to the value they were -- or, excuse
16   me, the price they were offering to acquire the
17   company?
18 A   He didn't have any idea what the value was going
19   to be at that point in time.  So, no, he didn't.
20 Q   He didn't mention a ballpark figure of what it
21   might be?
22 A   No.
23 Q   Okay.  Is that the only discussion like that that
24   you've had with Reed?
25 A   I'm not sure I understand your question.

Page 31

1  Q   Is that the only discussion that you've had with
2    Reed related to another business acquiring the
3    company?
4  A   I mean, that's when I heard that it was
5    potentially -- it was on the table, that there was
6    a possibility of him selling the company.
7        You know, I kind of sat back and waited to
8    see if that was something that was going to come
9    to fruition.  Again, we speak occasionally.  But
10   the next time it really made -- that it really
11   comes to mind was, you know, after the sale,
12   which was several months after that initial
13   conversation.
14 Q   And after the sale, what was the nature of that
15   discussion?
16 A   He said he sold the company and . . .
17 Q   And did you talk about how much, what his plans
18   are now, you know, what his work --
19 A   I can't tell you that I know how much his company
20   sold for.
21 Q   Okay.
22 A   I don't -- I don't know the answer to that
23   question.  I have a guess, but I don't know what
24   it was; so I'd be --
25 Q   What's your guess?

Page 32

1  A   I don't -- I mean, does it matter if I'm guessing?
2  Q   No, it doesn't.  I mean, you know, there will be
3    an objection at trial that you're speculating, but
4    for today's purposes, that's perfectly fine.
5  A   I -- I would guess it was -- it was north of
6    $100 million.
7  Q   Okay.  So the sale actually went through in August
8    of 2021.  Would that have been around the time
9    that you had this discussion?
10 A   That makes sense.
11 Q   And the sale process was probably underway at the
12   time that you had that initial discussion in
13   spring of 2021.  I'm representing that to you.
14   I'm not asking to you accept it.
15       But did that discussion -- we've covered it,
16   but knowing that that's the timeline of the sale,
17   did Reed mention that they were in active talks
18   with that company?  Were they, you know,
19   proceeding towards a sale, or was -- go ahead.
20 A   I don't remember the details in terms of what --
21   we didn't get into that level of detail when we
22   talked about it.  Reed and I are old-time, big --
23   you know, big-picture friends, right.  I would
24   love to see him, you know, sell his company, just
25   because I get to spend more time with him, you

Stacy L. Randall v.
Reed C. Widen, et al.

**Deposition of William B. Nordland**
**January 04, 2024**

Page 33

```
 1    know, but it was -- he doesn't speak like that.
 2    It's, This is what we're going to go do.  This is
 3    what I'm hoping to be able to do, and if it works
 4    out, great.  And then we move to the next
 5    conversation.  So we never got into any kind of --
 6    he just doesn't share details like that with
 7    somebody like me.
 8  Q Okay.  Did he talk about -- again, I understand
 9    he's not getting into that level of detail.  I'm
10    going to keep asking questions about this --
11  A Go ahead.
12  Q -- just to see if I can jog your memory.
13  A I'll tell you what I know.
14  Q Did he talk about what he was doing with respect
15    to was he hiring an investment banker?  Was he
16    working with any sort of outside consultant to
17    make this process move forward?
18  A I'm sorry.  I don't know the answer to that
19    question.
20  Q Could have been; could not have been.  Don't know?
21  A Exactly.  But I -- I don't -- I don't know.
22  Q Okay.  Did he ever talk to you -- you mentioned
23    Jesse.  Did he ever talk to you about succession
24    planning?  And I want to back away from the
25    discussion we were just having about those two
```

Page 34

```
 1    specific conversations: the one in the spring of
 2    '21 and then the post-sale discussion.
 3         Did he ever talk to you about what might
 4    become of the business because or related to
 5    Jesse's or his kids' interest in the company?
 6  A As it relates to his kids' interest in the
 7    company, so if --
 8  Q Like, let me -- that's a poorly worded question.
 9  A Okay.
10  Q Did he ever discuss succession planning with you?
11    And I mean that not in a hypertechnical sense but
12    just like what might become of the company when he
13    was ready to retire.
14  A No.  When he was ready to retire, no.  And when he
15    sold it, there was no succession plan because he
16    was selling it.
17  Q Right.  So I guess I'm curious if you ever had a
18    discussion about the lack of a succession plan,
19    meaning that he didn't have someone to pass the
20    company off to?
21  A No.
22  Q Okay.  All right.  My understanding is that
23    Justin Randall has participated in some of the
24    same trips that we were talking about before.
25  A Okay.
```

Page 35

```
 1  Q Is that true?
 2  A I mean, the trips that I have gone on, was Justin
 3    with us?
 4  Q Correct.
 5  A Not on the fishing trip.  Boy, I -- he may have
 6    been on one of the hunting trips, but I can't say
 7    for sure.  Maybe.  I don't remember.
 8  Q That's fair.
 9  A Entirely possible, but --
10  Q Why are you --
11  A -- I don't --
12  Q Go ahead.  Sorry.
13  A I don't remember if he was on one of those trips
14    or not.  I'm sorry.  I just don't remember.
15  Q That's fine.
16  A I can find out.
17  Q Why are you confident he wasn't on the fishing
18    trip?
19  A The fishing trip was one of those trips you don't
20    forget as a fisherman.
21  Q Okay.
22  A It was a bucket-lister.  And I was his guest,
23    Reed's guest, and we went with Reed's son Jesse
24    and his son-in-law Cody as a foursome; so that
25    would have been the four.
```

Page 36

```
 1  Q Where did you go?  I know it was Canada, but --
 2  A It was a place in northern Saskatchewan.
 3  Q Okay.  And, presumably, caught some great fish?
 4  A It was a great time.  Very fun.
 5  Q Good.  Okay.  Do you know Justin outside of those
 6    trips?  Have you hung out with Justin separately
 7    from that?
 8  A Yes.
 9  Q Okay.  More than a handful of times?
10  A So separately, just Justin and I, without Reed?
11  Q No.  Just my initial question was about the trips
12    and whether Reed was involved or not.  Have you
13    hung out with Justin on more than a handful of
14    occasions?
15  A With other people.  I want to make sure I'm
16    answering your question correctly.
17  Q Yeah.
18  A So I've been with Justin a lot, but typically as
19    in a family setting or a group setting.
20  Q That's what I'm trying to ask.
21  A So the answer is yes, then.  Yes.
22  Q Okay.  And would you say that your relationship
23    with Justin -- well, did it span a similar
24    timeline as your relationship with Reed, or is it
25    more recent?
```

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024**

Page 37

1  A   It's certainly more recent because he wasn't born
2      yet.
3  Q   Sure.
4  A   So I would say it's -- remember we talked about
5      the first session of Bill and Reed and then the
6      second one, and there was the lapse in between.
7      It would be as part of the second session when I
8      became, you know, familiar with Justin.
9  Q   Okay.  And we need don't to walk back through all
10     of that, but kind of similar, that you would see
11     him up north in the summertimes?
12  A  Correct.
13  Q  And may have participated in a trip as well?
14  A  To -- to what I remember, okay, is -- like, I
15     didn't go on those trips just because I -- I
16     couldn't afford to or for whatever reason, but
17     Reed used to take Justin and his late brother
18     Andrew on a lot of trips.  I think that fishing
19     trip that I was referring to earlier was one of
20     them that he would bring them on.
21  Q  Okay.
22  A  But I didn't go on those.
23  Q  Okay.
24  A  But, yes, it was -- time with Justin was very
25     simple to represent: up north, in some type of a

Page 38

1      group setting, winter/summer, snowmobiling and ice
2      fishing or, you know, up north in the summer, on
3      the beach or in the boats, and a lot of those.
4      Or in some type of a family event in the Madison
5      area, where they all live, typically at Reed's
6      place, not always, but typically at Reed and
7      Leanne's house, for a birthday or Christmas or a
8      party or something.
9          And then we -- when I visited Reed in
10     Arizona, we did see each other out there at least
11     once.  Because they were staying someplace else,
12     and they visited us while we were there.
13  Q  Okay.
14  A  But we didn't -- Justin and I didn't really do
15     things independently.
16  Q  Sure.  Would you ever talk to Justin about the
17     company, about Widen?
18  A  Not that I can recall.
19  Q  Did you ever talk to Justin, as best as you
20     recall, about the conversation in spring of '21
21     that we talked about earlier that you had with
22     Reed in Arizona?
23  A  Did I talk to Justin after I talked to Reed in
24     spring of '21 about the sale of the company, I --
25     not that I can specifically recall.

Page 39

1  Q   Okay.  Fair to say that that could have happened
2      and you don't recall?
3  A   Yeah, I don't know.
4  Q   Okay.
5  A   I'm sorry.  I just don't know.
6  Q   When you were hanging out with Justin and Reed on
7      any of the occasions that we've just mentioned, do
8      you recall them discussing Widen Enterprises?
9  A   No, I don't.
10  Q  Okay.  And, as you mentioned before, obviously,
11     you were not always with Justin and Reed when
12     those two were together?
13  A  Correct.
14  Q  So we talked about your conversation with Reed
15     after the sale.  Was that when you learned of the
16     sale?
17  A  That's when I learned of the sale.
18  Q  From Reed was the first time you had heard of it?
19  A  Yes.
20  Q  Okay.  And we talked about what you discussed.  I
21     don't know if I established where you were or what
22     the context of that conversation was.
23  A  I'm not -- I can't tell you where I was or how we
24     learned.  If I -- I would guess it was a phone
25     call, but I'd be guessing if that was the case.

Page 40

1          I remember the first conversation because I
2      remember being together with him on the
3      it-might-happen conversation.  But how I learned
4      about this sale, I can't say for sure.
5  Q   Okay.  Were you surprised to learn of the sale?
6  A   Surprised, I'm not sure how to answer that, if I
7      was surprised.  I was happy for him, but I'm
8      not -- I --
9  Q   So maybe not surprised?
10  A  I'm not sure I could equate the answer to that.
11     I'm sorry.  I don't know how to answer that
12     question about the word surprise.  I guess
13     that's -- that could be interpreted in a couple
14     different ways.
15  Q  Well, I mean, I guess the reason I ask is you
16     said that, in the many years you've known Reed,
17     there was all of one conversation about him
18     selling the company.  I would imagine that it
19     might be a surprise that that actually happened.
20  A  It was -- it was -- I would describe it more as
21     happy for him.
22  Q  Okay.
23  A  As -- as -- I don't know how else to say it.
24     Like, I was happy to hear that he had done it.
25  Q  Okay.  Different topic.  And, again, on breaks, we

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024**

Page 41

1    haven't quite yet been going an hour.  I was
2    planning on taking a break at about an hour, but
3    if you need a break at any point, let me know.
4  A  Okay.
5  Q  What do you know about -- let me start it this
6    way:  Have you ever met, hung out with,
7    Stacy Randall?
8  A  Yes.
9  Q  Similar context to what we were talking about with
10   Justin and Reed and being up north?
11 A  Very, very similar.  Now, I've known Stacy much
12   longer because I knew her in phase one.
13 Q  Sure.
14 A  I knew of her in phase one.  I was -- knew who she
15   was.  She didn't want much to do with the kids in
16   those days, but, yeah, we -- very similar:
17   parties, birthdays, Christmas up north.
18 Q  Okay.
19 A  Very -- it was very often that the group was all
20   together, and she was present in most of the
21   things that we did --
22 Q  Okay.
23 A  -- as a -- as a group.
24 Q  I would assume you were much closer with Reed than
25   you were or are with Stacy?

Page 42

1  A  Correct.
2  Q  What do you think of Stacy?
3  A  What do I think of Stacy?  I don't really
4    necessarily have an opinion on what I would say
5    about her.  I've been -- we've been friendly with
6    her for a long, long time, know her kids, spend a
7    lot of time with her, you know.
8  Q  Like her?
9  A  I like -- yeah, I like her.  I'm a little
10   disappointed in what's going on with this,
11   honestly, but I'm -- yeah.
12 Q  Why are you disappointed in what's going on with
13   this?
14 A  Well, because I think it's causing some -- some
15   stress on the whole relationship, and I wish it
16   wouldn't.
17 Q  And you think Stacy is causing that?
18 A  Well, Stacy's filed the lawsuit; right?
19 Q  So you think the lawsuit is what's causing the
20   rift?
21 A  What rift?
22 Q  I thought you said the lawsuit was causing a rift.
23   I must have misheard you.
24 A  No.  I said I like her.  I wish this wasn't going
25   on so that that relationship could have continued

Page 43

1    the way it was going on, I guess, is what I was
2    trying to say.
3  Q  Okay.
4  A  I didn't say there was a rift.
5  Q  Sorry.  I must have misheard.
6        At any point when the lawsuit was filed did
7    you get the impression that you should stop
8    having contact with Stacy?
9  A  Did I get the impression.  From?
10 Q  Anyone.
11 A  No.
12 Q  Do you know enough about this lawsuit to know
13   whether -- to believe -- you know, we're going to
14   ask a jury to decide who's right and wrong here,
15   but --
16 A  Yep.
17 Q  -- to believe that either Reed or Stacy is in the
18   right?
19 A  Say that again.  I'm sorry.
20 Q  Do you know enough about the lawsuit, about what
21   occurred, to believe yourself, whether true or
22   not -- or, excuse me, whether correct or not, just
23   your belief, who is in the right --
24 A  Oh, God no.
25 Q  -- Stacy or Reed?

Page 44

1  A  No.
2  Q  Okay.  My understanding is that -- and correct me
3    if I'm wrong -- that, in the past, you've
4    participated in a fundraiser called Drew Fest.
5        Are you familiar with that?
6  A  I'm familiar with Drew Fest.  I -- did I
7    participate in Drew Fest?
8  Q  In a broad sense, did you support it, contribute,
9    attend?
10 A  I wrote a check.
11 Q  Okay.  And I guess you're distinguishing that
12   from attending?
13 A  Correct.
14 Q  Okay.  How many times have you written a check to
15   Drew Fest?
16 A  To my -- best of my knowledge, once.
17 Q  Okay.  When was that?
18 A  This past year.
19 Q  Okay.
20 A  I'm not familiar that Drew Fest existed before
21   that.  If it did, I am not familiar with that.
22 Q  Okay.  Did you ever talk to -- sorry.  I skipped
23   ahead and failed to cover this.
24        In the context of your communications with
25   hanging out with Stacy, did you ever talk to her

**For the Record, Inc. | 888-892-0392 | office@FTRMadison.com**
**www.FTRMadison.com**
**Pages 41..44**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024**

Page 45

1   about Widen Enterprises, her role, her ownership,
2   anything like that?
3 **A**   No.
4 Q   Okay.
5          MR. MURPHY:  I think I am going to
6      mark one exhibit here.
7          (Exhibit No. 1 was marked for
8          identification)
9 Q   Bill, that's Exhibit 1, and I'll help you out
10   here.  That's a filing in this case, and really
11   I'm not concerned with anything until you flip to
12   page 5.  So what I'll tell you is this list that
13   continues on to page 5 -- and you see your name at
14   number 23; right?
15 **A**   Yep.
16 Q   Okay.
17 **A**   It's not spelled correctly, but I see it.
18 Q   Oh, right.  I didn't even catch that.  It should
19   be a-n-d; correct?
20 **A**   That's right.
21 Q   Is that your phone number?
22 **A**   It is.
23 Q   Okay.  So this is why you're here today, in that
24   in this filing, Reed and the other defendants in
25   the case disclosed that you may have information

Page 46

1   relevant to this case, and that's why you're in
2   this list.
3          Is there anything that we haven't talked
4   about so far that you think is relevant to any of
5   the issues in this case?
6 **A**   Not that I'm aware of.
7 Q   Okay.  And, specifically, they say that you may
8   have information about the existence and timing
9   of communication with Reed Widen or Justin Randall
10   related to any potential sale of
11   Widen Enterprises.
12          Anything that we've not covered -- and we
13   did talk about two communications related to the
14   sale; right?
15 **A**   Yeah.
16 Q   Anything we haven't covered that would fit into
17   that category?
18 **A**   I think we've covered it pretty well, but no, not
19   that I can come up with.  No.
20 Q   Okay.
21          MR. MURPHY:  I want to take a
22      break.  I may be done, but I want to look
23      over my notes and hopefully get you out of
24      here shortly.
25          Christa, I can pass him if you have

Page 47

1   immediate questions and come back.
2          MS. WITTENBERG:  No, why don't you
3   finish up.
4          MR. MURPHY:  All right.  Let's take
5      a five-to-ten-minute break.  Come back a
6      little bit after 10:30.
7      (A recess is taken)
8          MR. MURPHY:  I don't have any
9   further questions.  Thank you very much,
10   Bill, for coming up today.
11      **THE WITNESS:  Thank you.**
12          MS. WITTENBERG:  Nothing for me.
13
14      (Proceedings concluded at 10:29 a.m.)

Page 48

1   STATE OF WISCONSIN      )
                           ) SS:
2   COUNTY OF DANE         )
3
4        I, Sheila K. Finnegan-Martinez, a Registered
5   Professional Reporter and Notary Public in and for
6   the State of Wisconsin, do hereby certify that the
7   foregoing deposition of WILLIAM B. NORDLAND was taken
8   by me on January 4, 2024, and reduced to writing by
9   me, a professional court reporter and disinterested
10   person, approved by all parties in interest and
11   thereafter converted to typewriting using
12   computer-aided transcription.
13        I further certify that I am not related to nor
14   an employee of counsel or any of the parties to the
15   action, nor am I in any way financially interested in
16   the outcome of this case.
17        IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my notarial seal of office at Madison,
19   Wisconsin, this 5th day of January 2024.
20
21      _____
22
23      Notary Public, State of Wisconsin
        My Commission Expires May 3, 2027
24
25

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of William B. Nordland
January 04, 2024Index: $100..Attorney

---

**Exhibits**

---

**Nordland 1-4-24 Exhibit 1**
2:19 45:7,9

---

**$**

---

**$100**
32:6

---

**1**

---

**1**
45:7,9

**10**
20:12

**10:29**
47:14

**10:30**
47:6

**11**
20:12

**15**
8:11

**1985**
22:15,16

---

**2**

---

**20**
21:22

**2020**
26:18

**2021**
30:13 32:8,13

**2022**
14:24

**21**
34:2 38:20,24

**23**
45:14

**23rd**
10:19

---

**3**

---

**30s**
28:14

---

**4**

---

**40402**
5:23

---

**5**

---

**5**
45:12,13

---

**6**

---

**60002**
5:24

---

**A**

---

**a-n-d**
45:19

**a.m.**
47:14

**Absolutely**
12:16

**accept**
32:14

**accurate**
19:23

**acquaintance**
17:10

**acquire**
29:21,22 30:16

**acquiring**
31:2

**active**
32:17

**activity**
28:17

**adult**
22:8

**Advantage**

**6:6**

**afford**
37:16

**age**
21:21

**ahead**
11:23 32:19 33:11 35:12 44:23

**amount**
6:10 24:11

**analysis**
6:2

**Andrew**
37:18

**annually**
25:21 26:10

**answering**
36:16

**answers**
5:7 12:15 19:16

**Antioch**
5:23

**anymore**
16:16 22:21

**appears**
18:10

**approached**
29:21 30:8

**area**
20:14 22:3 38:5

**Arizona**
20:24 22:1 23:12 25:8 26:9,12,14,17, 19,20 27:10 30:4 38:10,22

**asset**
29:3

**assigned**
6:14

**assume**
3:21 4:21 41:24

**attend**
44:9

**attending**
44:12

**Attorney**
3:19

**August**
  32:7

**average**
  23:9

**aware**
  8:13 9:11 12:22,24 46:6

**awareness**
  27:17

---

**B**

**baby**
  16:16

**back**
  5:2 22:2,3 26:10 27:15 28:5 31:7
  33:24 37:9 47:1,5

**ballpark**
  30:20

**banker**
  33:15

**based**
  8:15 20:18,19 24:12

**basic**
  5:16

**basis**
  23:24

**beach**
  38:3

**begin**
  20:3

**belief**
  43:23

**Ben**
  7:14 11:18 13:9,14

**big**
  32:22

**big-picture**
  32:23

**bill**
  3:9,11 24:5,16 37:5 45:9 47:10

**birthday**
  38:7

**birthdays**
  41:17

**bit**
  6:3 11:12 14:23 21:5 27:14 47:6

**boat**
  22:5

**boats**
  20:12 38:3

**born**
  20:23 37:1

**Boulder**
  20:6

**boy**
  5:21 35:5

**brain**
  29:9

**break**
  3:25 5:15 41:2,3 46:22 47:5

**breaks**
  5:14 40:25

**briefly**
  6:22

**bring**
  37:20

**broad**
  9:5,15 16:12 44:8

**broadly**
  19:7

**brother**
  22:24,25 37:17

**brothers**
  28:25

**brought**
  30:3

**bucket-lister**
  35:22

**built**
  20:11

**bullshit**
  14:10

**bump**
  27:6

**bumped**
  27:11

**business**
  6:6 27:22 28:1 30:11 31:2 34:4

**butt**
  4:4

---

**C**

**call**
  3:9 22:7 28:14 29:3 39:25

**called**
  3:1 6:6 10:25 11:4,25 44:4

**campus**
  26:22

**Canada**
  23:18,19,22 36:1

**capacities**
  17:5

**capacity**
  16:17

**careers**
  28:11

**case**
  8:23 9:4 10:21 12:19 18:8,21 19:2
  39:25 45:10,25 46:1,5

**catch**
  45:18

**catching**
  22:18

**category**
  46:17

**caught**
  36:3

**causing**
  42:14,17,19,22

**chain**
  20:9

**characterization**
  14:7

**check**
  44:10,14

**Chicago**
  22:3

**Chrissa**
  7:22

**Christa**
  7:3,11,16,18,22,23,24 8:3 9:15,22
  10:3 12:9,13 46:25

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of William B. Nordland
January 04, 2024Index: Christmas..decide

**Christmas**
38:7 41:17

**circle**
27:15

**circumstance**
26:4

**circumstances**
24:19

**claims**
14:8

**clarify**
4:19 8:24

**clarifying**
13:10

**clear**
5:1

**client**
9:3

**client's**
9:6

**closer**
41:24

**Cody**
35:24

**collected**
14:3

**college**
21:5,20 22:11 26:23

**command**
8:16

**committed**
4:2

**common**
16:21

**communication**
46:9

**communications**
18:20 44:24 46:13

**companies**
29:21

**company**
9:9,10 10:7 28:8,17,18,23,25 29:13,
17,22,23 30:9,17 31:3,6,16,19 32:18,
24 34:5,7,12,20 38:17,24 40:18

**company's**
29:11

**component**
22:8

**components**
29:10

**concerned**
3:24 29:13 45:11

**concluded**
47:14

**confident**
35:17

**confirm**
13:4 19:22

**connection**
18:7

**connections**
18:12

**consisted**
25:25

**consultant**
33:16

**contact**
18:3 19:20 21:16 43:8

**contacted**
9:18

**context**
16:4 17:21,23 21:9,17 39:22 41:9
44:24

**continued**
42:25

**continues**
45:13

**contract**
6:1,8,9,13

**contribute**
44:8

**conversation**
8:9 10:12,16,17 11:24 12:13 14:17,20,
22 15:17 19:1 20:15 29:25 30:1,6
31:13 33:5 38:20 39:14,22 40:1,3,17

**conversations**
34:1

**correct**
9:17 12:12 16:9,10 18:16 26:21 27:12,

23,24 35:4 37:12 39:13 42:1 43:22
44:2,13 45:19

**correctly**
36:16 45:17

**cost**
24:18,22

**cottage**
20:22

**counsel**
3:17

**couple**
25:14 40:13

**court**
3:15

**cover**
44:23

**covered**
13:19 32:15 46:12,16,18

**covering**
24:21

**curious**
34:17

**customer**
6:9,20

**customers**
6:8,12

---

**D**

**daily**
28:9

**data**
25:5

**date**
11:1 15:2

**day**
5:3 10:18

**days**
41:16

**deals**
9:5

**December**
10:19

**decide**
43:14

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of William B. Nordland
January 04, 2024Index: defendants..family

**defendants**
45:24

**depends**
4:5

**depleted**
21:4

**deposition**
3:13 6:25 7:20 10:15 12:10 16:6

**describe**
40:20

**detail**
32:21 33:9

**details**
25:24 32:20 33:6

**developing**
21:9 28:11

**digital**
29:3

**disappointed**
42:10,12

**disclosed**
45:25

**disconnect**
22:11

**discuss**
9:14 12:14 29:16,20 34:10

**discussed**
39:20

**discussing**
18:13 39:8

**discussion**
10:20 15:9,10 16:5 30:23 31:1,15
32:9,12,15 33:25 34:2,18

**discussions**
7:9 12:18 27:18

**distinguishing**
44:11

**distracted**
8:2

**division**
6:5,7

**divvied**
24:11

**document**

**8:16**

**documents**
19:15

**Drew**
44:4,6,7,15,20

**drive**
5:23 11:12

**driving**
28:9

**drugs**
5:10

**due**
14:5

**duly**
3:2

---

## E

**earlier**
37:19 38:21

**early**
8:18 21:13 22:12

**easy**
6:5

**email**
8:6 18:24 19:7

**end**
3:20 4:5 5:3

**entail**
12:11

**entails**
6:3

**enterprise**
6:7,13

**Enterprises**
6:19 9:7 18:8 19:12 27:17 39:8 45:1
46:11

**entities**
27:23

**envision**
19:5

**equate**
40:10

**equity**
29:22

**established**
39:21

**event**
4:3 9:8 17:1,12 38:4

**evolution**
29:11

**evolved**
28:23

**exact**
11:1 14:17,19

**EXAMINATION**
3:5

**exception**
12:9 24:16

**exchanged**
18:22

**excuse**
7:17 9:7 30:15 43:22

**exhibit**
45:6,7,9

**existed**
44:20

**existence**
46:8

**expected**
12:14

**expressing**
15:23

**extent**
10:1,15

---

## F

**failed**
44:23

**fair**
18:9 20:16 25:25 35:8 39:1

**fall**
23:21

**familiar**
17:19,21 37:8 44:5,6,20,21

**familiarity**
18:5

**family**
7:5,11 20:5 22:3,12,25 36:19 38:4

**father**
  28:24

**feel**
  15:5

**feels**
  15:8

**Fest**
  44:4,6,7,15,20

**fiancé**
  22:1

**figure**
  12:21 30:20

**filed**
  9:3 13:25 14:1,24 15:1 42:18 43:6

**filing**
  45:10,24

**find**
  12:6 35:16

**finding**
  4:5

**fine**
  3:8 14:21 32:4 35:15

**finish**
  47:3

**firm's**
  9:3

**firms**
  29:22

**fish**
  36:3

**fisherman**
  35:20

**fishing**
  17:1 20:12,13 23:13,22 24:15,20 35:5,
  17,19 37:18 38:2

**fit**
  46:16

**five-to-ten-minute**
  47:5

**flip**
  45:11

**folks**
  12:8 13:2 17:4,8 18:13 27:6

**foot**

24:5,15

**forget**
  35:20

**forgive**
  14:21

**Formally**
  15:1

**forward**
  33:17

**foursome**
  35:24

**Friday**
  11:8 12:2

**friend**
  17:10 26:3

**friendly**
  42:5

**friends**
  16:21,23 20:16 32:23

**fruition**
  31:9

**frustration**
  15:23

**full**
  10:10

**fun**
  21:12 36:4

**fundraiser**
  44:4

---

**G**

**general**
  18:8 20:14

**give**
  6:3 25:11 28:3

**giving**
  19:25

**God**
  22:6 43:24

**Gonnering**
  17:11

**Good**
  3:7 36:5

**gratuities**
  24:17

**great**
  33:4 36:3,4

**group**
  6:11 24:11 26:3 36:19 38:1 41:19,23

**grow**
  6:12

**guess**
  18:25 28:13 29:12 31:23,25 32:5
  34:17 39:24 40:12,15 43:1 44:11

**guessing**
  32:1 39:25

**guest**
  35:22,23

**guys**
  11:15

---

**H**

**half**
  8:17

**handful**
  36:9,13

**hang**
  23:11

**hanging**
  39:6 44:25

**happen**
  21:7 30:5

**happened**
  27:9 39:1 40:19

**happy**
  40:7,21,24

**hard**
  28:9

**head**
  15:4

**heads-up**
  19:25

**hear**
  40:24

**heard**
  29:4 31:4 39:18

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024Index: high..lawsuit**

high
21:4

hiring
33:15

home
20:5,22,23

honestly
42:11

hoping
33:3

hour
8:17 41:1,2

house
38:7

hung
36:6,13 41:6

hunting
23:13,19 24:1,10,20 35:6

hyperspecific
25:5

hypertechnical
34:11

**I**

ice
38:1

idea
30:18

identification
45:8

Illinois
5:23 20:18,21,24 21:1

imagine
9:17 19:8 21:9 40:18

impression
43:7,9

in-depth
6:2

including
21:3

independently
38:15

individuals
16:4

influence
5:9

information
5:16 9:19 19:21 45:25 46:8

initial
5:21 31:12 32:12 36:11

instances
24:21

intellectual
29:4

intends
3:20

intention
8:14

interacted
18:14

interacting
18:15

interest
9:6 34:5,6

interpreted
40:13

investment
33:15

involved
11:7 16:25 24:22 28:24,25 36:12

issues
8:23 46:5

it-might-happen
40:3

iteration
29:14

**J**

Jesse
16:14 18:12 33:23 35:23

Jesse's
34:5

job
6:2

jog
33:12

July
14:24

Junction
20:6

jury
43:14

Justin
13:4 34:23 35:2 36:5,6,10,13,18,23
37:8,17,24 38:14,16,19,23 39:6,11
41:10 46:9

**K**

key
4:7,16

kids
16:14 18:17,18 20:13 21:2 41:15 42:6

kids'
34:5,6

Kiesler
17:16,17

kind
4:6 21:16 22:6,12 29:6,14 31:7 33:5
37:10

knew
41:12,14

knowing
32:16

knowledge
27:16 44:16

**L**

lack
34:18

lake
20:9 22:5

lapse
37:6

large
6:7

late
37:17

lawsuit
9:2,11 10:5,11 12:22,25 13:11,23,24
14:24 15:14 16:3 42:18,19,22 43:6,12,
20

**lawsuit's**
  9:16

**leadership**
  17:24

**Leanne**
  12:23 13:16 15:11,13,16 16:2

**Leanne's**
  38:7

**learn**
  40:5

**learned**
  39:15,17,24 40:3

**leave**
  19:14

**level**
  32:21 33:9

**life**
  21:1 22:12 26:24

**lifelong**
  20:16

**limit**
  4:3

**limited**
  12:14 18:3 21:10 23:16

**lines**
  6:11 17:9

**lineup**
  17:7

**list**
  45:12 46:2

**literally**
  22:4

**live**
  5:22 26:19,20 38:5

**lived**
  20:25 22:1 26:14,19,20,22

**living**
  5:25

**lodge**
  3:17

**long**
  4:2 8:8 9:25 15:5 17:2 20:17 28:5 42:6

**longer**
  41:12

**lost**
  21:19

**lot**
  26:15 28:10,12 36:18 37:18 38:3 42:7

**love**
  32:24

---

### M

**made**
  12:22,24 14:16 30:10 31:10

**Madison**
  38:4

**make**
  4:12 5:6 6:12 7:15 10:9 13:10 28:20 33:17 36:15

**makes**
  15:2 30:10 32:10

**making**
  8:13 15:21

**management**
  6:1 29:4,5

**Manitowish**
  20:9

**mark**
  45:6

**marked**
  45:7

**married**
  22:2

**matter**
  32:1

**matters**
  5:3

**Matthew**
  17:11,12

**maximum**
  25:4

**meaning**
  34:19

**means**
  5:2 29:6

**measure**
  25:8

**medical**
  5:10

**meet**
  17:13 20:3

**memory**
  33:12

**mention**
  30:20 32:17

**mentioned**
  18:1 21:13 33:22 39:7,10

**met**
  17:4,8,12,17 20:12,15 22:1 41:6

**Michael**
  17:16

**middle**
  5:21

**midwest**
  6:18

**Mike**
  17:17

**million**
  32:6

**mind**
  31:11

**minutes**
  8:11 12:3

**misheard**
  42:23 43:5

**mm-hmm**
  4:23 5:1 8:1 26:13

**moment**
  7:9

**months**
  21:3 31:12

**morning**
  3:7 10:14

**move**
  22:2 33:4,17

**moved**
  22:2

**MURPHY**
  3:6 7:21,24 45:5 46:21 47:4,8

Stacy L. Randall v.                                    Deposition of William B. Nordland
Reed C. Widen, et al.                          January 04, 2024Index: N-O-R-D-L-A-N-D..post-sale

---

**N**

N-O-R-D-L-A-N-D
  5:20

**nailed**
  8:17

**names**
  18:2

**nature**
  9:11 10:21 12:15 22:17 31:14

**necessarily**
  42:4

**neighbors**
  16:23

**nervous**
  3:24

**Newport**
  5:23

**nice**
  17:13

**Nordland**
  3:1,7 5:20

**north**
  21:11 22:13,21 23:10 32:5 37:11,25
  38:2 41:10,17

**northern**
  20:6 36:2

**notes**
  46:23

**number**
  45:14,21

**O**

**oath**
  3:3

**objection**
  32:3

**objections**
  3:17

**obvious**
  4:12

**occasionally**
  22:18,22 31:9

**occasions**
  36:14 39:7

**occurred**
  43:21

**offer**
  14:7

**offering**
  30:16

**old-time**
  32:22

**on-demand**
  28:22

**opened**
  9:1

**opinion**
  42:4

**opposing**
  3:16

**oral**
  19:1

**owned**
  22:24

**ownership**
  9:6 45:1

**owns**
  22:24,25

**P**

**paid**
  24:10,12

**paper**
  28:20

**parents**
  22:24

**part**
  4:17 8:17 9:2 37:7

**participate**
  44:7

**participated**
  34:23 37:13 44:4

**parties**
  41:17

**party**
  38:8

**pass**
  34:19 46:25

**past**
  29:15 44:3,18

**paths**
  21:24

**people**
  13:12 18:4,21,23 22:4 27:10 28:20
  36:15

**perfectly**
  32:4

**period**
  21:24 22:11 23:24,25 24:2

**phase**
  41:12,14

**Phoenix**
  26:23

**phone**
  8:5,7 22:19 39:24 45:21

**pick**
  17:7 26:2

**place**
  16:1 20:11 22:4,23,25 23:12 27:2 36:2
  38:6

**places**
  26:23

**plan**
  4:6 34:15,18

**planning**
  33:24 34:10 41:2

**plans**
  31:17

**point**
  4:12 18:11 21:14 25:5 28:22 29:1,13
  30:19 41:3 43:6

**pool**
  30:7

**poorly**
  34:8

**portion**
  21:4 24:12

**possibility**
  31:6

**post-sale**
  34:2

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of William B. Nordland
January 04, 2024Index: potential..relationship

potential
46:10

potentially
31:5

prepare
6:23

prepared
9:24 10:2,4,21

prepress
28:8,18

present
41:20

pretend
28:19 29:5

pretty
46:18

previously
20:19

price
30:16

primary
12:23

principally
3:22 27:18

print
28:22

prior
12:17 13:12,16 14:3

procedures
5:10

proceeding
32:19

proceedings
47:14

process
3:25 15:22,24 32:11 33:17

product
6:10

profitable
6:12

pronunciation
11:19

property
29:5

provide
12:4,5

purposes
32:4

put
28:20

**Q**

question
4:17 8:24 13:10 16:12 30:25 31:23
33:19 34:8 36:11,16 40:12

questioner
9:20

questions
3:18,20,22 4:11 9:19,21 11:14 19:20
33:10 47:1,9

**R**

raised
20:23

ran
22:4

Randall
9:3 13:4,6 34:23 41:7 46:9

rattle
13:1

ready
34:13,14

real
17:15

realize
11:12

reason
30:9 37:16 40:15

recall
10:3 13:15 14:17,22 15:16,17 16:7
24:24 26:11,25 28:21 30:6,12 38:18,
20,25 39:2,8

receive
19:15,19

received
9:12 10:18 14:6

receiving
12:17 13:17,20

recent
5:10 15:6 36:25 37:1

recess
47:7

recognized
29:2

recollection
30:1

reconnected
22:13

record
3:12 4:25 5:17

recording
5:4

recover
25:17

redemption
9:5

Reed
7:6,11 9:4 10:6,12,22 12:22 13:16,22,
23,24,25 14:7,10,13 15:9 16:2,21
17:23 18:9,15 20:3 21:10,16 22:17
23:11 24:4,21 25:16 27:7,11,19,25
29:17,20 30:24 31:2 32:17,22 36:10,
12,24 37:5,17 38:6,9,22,23 39:6,11,
14,18 40:16 41:10,24 43:17,25 45:24
46:9

Reed's
16:14 20:5 27:2 35:23 38:5

referring
37:19

reflect
4:25

region
6:15,18

rekindled
22:6

related
10:5,8 18:23 19:9,11 28:17 31:2 34:4
46:10,13

relates
16:8 34:6

relationship
20:2 21:10 22:7,10,17 27:22 36:22,24
42:15,25

Stacy L. Randall v.
Reed C. Widen, et al.

Deposition of William B. Nordland
January 04, 2024Index: relationships..span

**relationships**
16:11 18:16

**relaxed**
4:1

**relevant**
46:1,4

**relied**
26:1

**rely**
26:3

**remember**
14:19 29:7 32:20 35:7,13,14 37:4,14
40:1,2

**renew**
6:13

**repeating**
23:24

**reporter**
3:15

**represent**
37:25

**representing**
32:13

**residence**
21:1

**respect**
11:14 12:13 17:16 24:1 33:14

**response**
19:17

**responses**
4:25

**responsible**
6:11

**restarted**
22:7

**retire**
34:13,14

**rift**
42:20,21,22 43:4

**road**
28:10

**role**
45:1

**roughly**

11:21 14:22 21:21 26:10

**rule**
4:16,24

**rules**
4:7

—————————————————

S

—————————————————

**safe**
3:21 14:13

**sale**
9:9 10:7 14:3,4 19:11 31:11,14 32:7,
11,16,19 38:24 39:15,16,17 40:4,5
46:10,14

**sales**
6:1,8,13

**Saskatchewan**
36:2

**sat**
31:7

**scenario**
19:6 23:1

**Scharpf**
7:14 11:20,21

**school**
20:24 21:4

**schools**
21:23

**Scottsdale**
26:22 27:2

**sell**
6:10 30:11 32:24

**selling**
31:6 34:16 40:18

**sense**
15:2 18:4 27:5 28:3 32:10 34:11 44:8

**separate**
18:11

**separately**
15:13 36:6,10

**served**
8:13 10:13 11:1,3

**session**
37:5,7

**setting**
36:19 38:1

**share**
24:10 30:5 33:6

**shares**
10:7

**shifted**
29:2

**shortly**
46:24

**signs**
6:9

**silent**
11:21

**similar**
10:20 11:14,24 36:23 37:10 41:9,11,
16

**simple**
37:25

**sir**
24:3

**sister**
13:25

**skipped**
44:22

**snowmobiling**
38:1

**social**
16:23 17:1 18:16

**sold**
31:16,20 34:15

**someplace**
38:11

**son**
16:14 35:23

**son-in-law**
35:24

**sort**
29:7 30:14 33:16

**sounds**
12:8 17:18 21:14 26:1

**South**
5:23

**span**

**Stacy L. Randall v.**
**Reed C. Widen, et al.**

**Deposition of William B. Nordland**
**January 04, 2024 Index: speak..Terry**

36:23

**speak**
4:8 31:9 33:1

**specific**
6:14 9:19 34:1

**specifically**
9:23 15:18 24:20 29:8 38:25 46:7

**specifics**
30:15

**speculating**
32:3

**spell**
5:17,18

**spelled**
45:17

**spend**
32:25 42:6

**spending**
28:10

**spent**
17:15 21:2

**spoke**
15:13 17:23

**spoken**
16:3

**spring**
23:23 26:18 30:13 32:13 34:1 38:20, 24

**Stacy**
9:3 10:6 13:6,25 19:9 41:7,11,25 42:2, 3,17 43:8,17,25 44:25

**Stacy's**
14:11 42:18

**stages**
22:12

**Staples**
6:1,6,7

**start**
7:16 41:5

**starting**
5:16

**state**
5:17

**statement**

18:9

**stay**
21:16

**staying**
38:11

**stick**
18:2

**stock**
9:6,7,8

**stop**
43:7

**stopped**
21:14

**stopping**
4:12

**stress**
42:15

**strokes**
9:5

**struck**
20:14

**stuff**
28:20

**subpoena**
9:12 12:18 13:17,20 16:5 18:21 19:15, 17

**subsequent**
9:9 13:20

**substance**
8:20 12:10

**succession**
33:23 34:10,15,18

**suing**
10:6 14:5

**suit**
14:1

**summer**
20:5,22,23 38:2

**summers**
21:3

**summertimes**
37:11

**support**
44:8

**suppose**
4:5 8:25 15:1 29:15

**surgery**
25:16,24

**surprise**
40:12,19

**surprised**
14:14,15 15:25 40:5,6,7,9

**surrounding**
10:8

**sworn**
3:2

─────────

**T**

**table**
31:5

**taking**
3:15 41:2

**talk**
4:13 6:24 7:6,10,17,18 8:12,20 20:2
22:18 27:25 28:3 31:17 33:8,14,22,23
34:3 38:16,19,23 44:22,25 46:13

**talked**
5:14 7:3,12,14 8:3 12:2 13:2,9,11,19,
22 16:4 18:20,23 27:21 28:7,11 29:10
32:22 37:4 38:21,23 39:14,20 46:3

**talking**
34:24 41:9

**talks**
32:17

**team**
17:24

**Tempe**
26:22

**ten**
29:15

**tend**
4:11

**term**
4:18 14:18

**terms**
10:2 13:16 19:8 28:9 32:20

**Terry**
7:12 10:24,25 11:14,24 13:9,14 16:20,
25 17:2 18:12

**testified**
3:2

**testify**
5:12

**testimony**
8:21

**text**
8:6 18:24 19:6

**things**
24:17 29:8 38:15 41:21

**thought**
9:25 29:17 42:22

**three-hour**
4:3

**Thursday**
11:8 12:1

**time**
3:17,18 5:15 6:10 8:15 11:2 14:6 15:8,
10 17:2,15 20:17 21:5,10,25 25:16,20
26:11,13,17 28:10,22 29:1 30:19
31:10 32:8,12,25 36:4 37:24 39:18
42:6,7

**timeline**
32:16 36:24

**times**
7:18 8:3 18:14 22:20 23:4 25:4,7 36:9
44:14

**timing**
46:8

**today**
3:9,19 4:7 5:12 6:23,25 8:21 11:5
19:14,22 22:16 45:23 47:10

**today's**
16:5 32:4

**told**
10:3 11:5 13:23,25

**tomorrow**
11:6

**topic**
12:3 40:25

**topics**
9:14 10:5,8 18:24

**touch**
6:23 21:19,25

**touched**

**27:14**

**trail**
4:11

**transition**
29:11

**transitioned**
23:1

**transitioning**
28:21

**travel**
25:1

**treat**
19:7

**trial**
32:3

**trip**
17:1 23:21,23 24:15,18,22 35:5,18,19
37:13,19

**trips**
23:10,14,17 24:4,10 26:9 34:24 35:2,
6,13,19 36:6,11 37:15,18

**true**
35:1 43:21

**trust**
26:3

**trusted**
26:1

**turn**
4:13

**type**
17:1 37:25 38:4

**types**
9:21 19:21

**typically**
24:4 25:13 36:18 38:5,6

---

**U**

**uh-uh**
5:1

**umbrella**
9:15

**understand**
4:18 11:25 12:25 18:3 19:16 28:18,19
29:6 30:25 33:8

**understanding**
10:10 11:3 19:16 23:16 27:16 34:22
44:2

**understood**
4:22 5:8 6:14 19:24

**underway**
32:11

**unusual**
16:25

---

**V**

**vacation**
25:13

**verbal**
5:6

**version**
5:5

**versus**
14:4

**Vial**
7:12 16:20

**video**
5:5

**view**
14:7

**visit**
25:8,12 27:5,10 30:12

**visited**
23:12 26:17 38:9,12

**visiting**
30:3,7

**vocalize**
4:24

**voicemail**
18:24,25

---

**W**

**W-I-L-L-I-A-M**
5:20

**waited**
31:7

**walk**
37:9

**Waters**
9:8 20:9 27:17

**ways**
40:14

**Widen**
6:19 7:6 9:4,7 16:13,15,17 17:4 18:8
19:12 27:17 38:17 39:8 45:1 46:9,11

**wife**
7:5 12:22 25:12

**William**
3:1 5:20

**Windy**
9:8 27:17

**winter/summer**
38:1

**Wisconsin**
20:6,7,19

**witnesses**
13:8

**Wittenberg**
3:19 7:23,25 47:2,12

**word**
40:12

**worded**
34:8

**words**
10:6

**work**
31:18

**worked**
16:15

**working**
15:21 28:8 33:16

**works**
6:7 33:3

**worth**
14:4 29:18

**wound**
20:13

**writing**
18:22,25 19:4

**written**
5:4 44:14

**wrong**

43:14 44:3

**wrote**
44:10

---

### Y

**year**
15:6 22:20 23:4 25:4,7,13,14,20,23
44:18

**years**
16:18 20:11,12 21:13,17,20,22 22:12
25:14 26:23 28:7 29:15 40:16

**young**
18:18,19