IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STACY L. RANDALL,

                    Plaintiff,

     v.                                                OPINION and ORDER

REED C. WIDEN, MICHAEL KIESLER,                        22-cv-400-jdp
WIDEN ENTERPRISES, LLC,
AND WINDY WATERS, INC.,

                    Defendants.

---

Faced with financial difficulties, plaintiff Stacy Randall sold her 20 percent interest in in the family business, Windy Waters, Inc., to the company for $1.3 million in May 2020. The price for Randall's shares was set by the company's treasurer, defendant Michael Kiesler, using the same price-per-share formula that the company had used for nearly two decades whenever it bought or sold its stock, including past transactions with Randall. But about 16 months after Randall redeemed her stock, her brother, defendant Reed Widen, sold the company's main asset, Widen Enterprises, LLC, for $162 million.[1] Had Randall still been a shareholder of Windy Waters, her 20 percent interest would have garnered a payout of about $32 million.

Understandably upset, Randall obtained counsel, who examined the books and records of Windy Waters and Widen Enterprises and communications among its top management. The investigation revealed that the actual sale of Widen Enterprises had not been in the works when Randall redeemed her shares. But Randall learned that years before her stock redemption, Widen Enterprises' CEO Matthew Gonnering had estimated that Widen Enterprises'

---

[1] The court will refer to Reed Widen by his first name, to avoid confusion with Widen Enterprises.

unrealized market value was many times greater than that suggested by the price-per-share formula used to calculate Randall's redemption price; in August 2018, he had estimated that the company's market value was $80 million. Randall also discovered that in late 2019, Gonnering had told Reed and Kiesler that the companies should buy out the shares of the passive shareholders at the "low" formula valuation, and then, once there were no longer any passive shareholders, explore whether there were tax benefits to be gained by compensating Reed and another employee with dividend payments rather than wages. She also learned that Reed had paid himself annual compensation of $1.5 million in 2019 and $2 million in 2020, more than three times the CEO's compensation, even though Reed was not directly involved in the day-to-day management of Widen Enterprises.

Randall sued Reed, Kiesler, and the two companies, asserting several causes of action: securities fraud under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5; state-law securities fraud; breach of fiduciary duty; misrepresentation; and civil theft. She alleges that Reed and Kiesler misstated and withheld material information that, if revealed, would have affected her decision to sell. She contends that Reed and Kiesler deprived her of the benefits of her ownership by funneling corporate profits to Reed in the form of excess compensation and bonuses that she did not receive, and by forging her signature on corporate documents. She asks the court to find her stock redemption agreement void and unenforceable on various grounds, including fraudulent inducement, unconscionability, and duress.

Defendants deny that they lied to Randall or that they failed to disclose anything relevant to the price they offered Randall for her shares or her decision to sell. They contend that they truthfully disclosed everything she needed to know to decide whether the redemption price was calculated properly under the company's standard formula, and that if she wanted

2

more information about the company, she could have asked. As defendants see it, this is nothing more than a case of seller's remorse.

Cross-motions for summary judgment are now before the court. Randall moves for partial summary judgment—on defendants' affirmative defenses of release, ratification, and waiver, and on her breach of fiduciary duty and securities fraud claims. Dkt. 59. Defendants have moved for summary judgment on the entire complaint. Dkt. 62.

The motions for summary judgment raise issues in three main categories. The first category involves the release agreement that Randall signed when she redeemed her stock. The issues are whether that release precludes her claims, and whether Randall's acceptance of payments after she learned about the alleged fraud constitutes waiver or ratification of the release agreement. The court will grant Randall's motion for summary judgment on waiver and ratification. The payments Randall accepted were payments for her stock, not consideration she received in return for agreeing to release claims against defendants. But the court will deny summary judgment to both parties on whether the release precludes Randall's claims, because there are genuine disputes of fact relevant to Randall's duty to investigate potential claims prior to signing the release.

The second category concerns Randall's main claims for federal and state-law fraud and breach of fiduciary duty. These turn largely on two key disputes: first, whether Kiesler made affirmative misrepresentations to Randall; and second, whether, regardless of any alleged misrepresentations, defendants nonetheless had a duty to disclose financial and other information about Widen Enterprises' value to Randall before buying her shares. Randall has no evidence that defendants misrepresented or omitted facts regarding a specific plan to sell Widen Enterprises, so the court will grant summary judgment to defendants on Randall's

3

claims insofar as they are based on alleged misrepresentations and omissions about the sale consummated in 2021. But there are genuine disputes of fact about other alleged misrepresentations and omissions that preclude summary judgment to either party.

The third category concerns the enforceability of the stock redemption agreement. If Randall proves her claims for common-law fraud or breach of fiduciary duty, then she will be able to rescind the redemption agreement, which would open the door to a range of equitable remedies. But Randall has not shown that any of her alternative grounds for voiding the redemption agreement apply (the federal Exchange Act § 29(a), unconscionability, duress, and public policy). The court will grant summary judgment to defendants on those claims.

Because of the length of the opinion, the court provides a table of contents.

BACKGROUND ........................................................................................................5
  A.  Corporate history ............................................................................................6
  B.  Windy Waters' stock price formula................................................................9
  C.  Randall's 2020 request for funds..................................................................11
  D.  Randall's May 6 conversations with Kiesler................................................12
  E.  Kiesler updates the calculation and has documents prepared .....................15
  F.  Kiesler contacts Randall on May 13 ............................................................16
  G.  Defendants' post-redemption activities........................................................19
  H.  Reed decides to sell; Acquia buys Widen Enterprises for $162 million ......................20

SUMMARY JUDGMENT STANDARD ................................................................21

CATEGORY 1 ISSUES: RELEASE AND RATIFICATION ................................22
  A.  The release....................................................................................................22
  B.  Rescission or ratification of the stock redemption agreement .....................24

CATEGORY 2 ISSUES: MISREPRESENTATIONS AND DUTY TO DISCLOSE...............28
  A.  Federal securities fraud: misstatements and omissions ................................28
    1.  Misrepresentations and omissions ...........................................................29
    2.  Scienter....................................................................................................40

3.     Randall's motion for summary judgment on her federal securities fraud claims......42

B.    Federal securities fraud: scheme liability ........................................................42

1.     Unauthorized use of signature stamp ...........................................................44

2.     Randall's evidence of a "squeeze out" ..........................................................45

3.     Randall's claims based on Reed's compensation ..........................................47

C.    State-law breach of fiduciary duty ..................................................................47

1.     Duty...............................................................................................................48

2.     Breach of fiduciary duty: stock redemption .................................................50

3.     Breach of fiduciary duty: disguised dividends .............................................52

4.     Breach of fiduciary duty: use of signature stamp ........................................62

D.    State-law intentional misrepresentation ........................................................62

1.     Duty to disclose ............................................................................................63

2.     Reliance.........................................................................................................65

E.    Civil conspiracy and Widen Enterprises' liability ...........................................66

F.    Civil theft under Wis. Stat. § 943.20(1)(d) .....................................................67

G.    Fraudulent inducement ..................................................................................68

CATEGORY 3 ISSUES: RECISSION AND OTHER REMEDIES ........................................68

A.    Randall's claims for rescission of the redemption agreement ........................68

1.     Federal Exchange Act § 29(a)........................................................................68

2.     Unconscionability..........................................................................................71

3.     Duress............................................................................................................72

4.     Public policy ..................................................................................................73

B.    Minority shareholder oppression ....................................................................73

C.    Unjust enrichment and veil piercing...............................................................73

ORDER ........................................................................................................................74

BACKGROUND

The court begins with comprehensive layout of the facts, which are undisputed except where noted.

A. **Corporate history**

This case is about Stacy Randall's sale of her interest in Windy Waters, Inc. Windy Waters is a holding company whose primary asset was a wholly owned subsidiary, Widen Enterprises, LLC, which was sold to Acquia in September 2021. (The court will refer to the two Widen-owned entities as "the companies," unless it is necessary to distinguish the two.) Widen Enterprises was founded in 1948, by Randall's grandparents, to manufacture films and plates for printing. As traditional printing gave way to digital communication, the company developed software to store digital images and became more of a Software as a Service (SaaS) company. That transition was complete in 2020, when Widen Enterprises decided to terminate its press services division after the COVID-19 pandemic caused sales to drop dramatically.

Randall and her four brothers, Tyler, Stewart, Price, and Reed, had all owned shares in the companies. By the time Randall sold her interest in Windy Waters in May 2020, the only other shareholders were her brother, Reed Widen, and three key employees of Widen Enterprises: Michael Kiesler, its Chief Financial Officer; Matthew Gonnering, its Chief Executive Officer; and Gary Norris. Kiesler was also the treasurer of Windy Waters. Reed was the majority shareholder of Windy Waters, owning approximately 55 percent of the company's outstanding stock immediately prior to Randall's May 2020 redemption.

Reed started working for Widen Enterprises at a young age and spent his entire adult life working for the companies. He was Widen Enterprises' CEO and president until 2009, when Gonnering was promoted to be the CEO. From then until the company was sold in 2021, Reed was the company president and chairman of the board. After 2005, Reed was neither a named director nor an officer of the holding company, Windy Waters, but he was in control of both companies and "ultimately called the shots."

In 2019 and 2020, Reed set his own compensation for his roles at Widen Enterprises. In 2019, his total compensation was around $1.5 million; in 2020, it was around $2 million. Additional facts about Reed's compensation will be discussed in the analysis section.

Randall, on the other hand, had had little active involvement with the companies. She had worked in the darkroom from 1977 to 1991, and in the early 2000s she worked briefly at Widen Enterprises as a receptionist. Despite her lack of active involvement, she held nominal titles: she was a named director of Windy Waters, with others, from 1998 until 2015; from 2015–2020, she was the sole director. Randall was also appointed to serve as president of Windy Waters from approximately 2007 until she gave up the role when she sold her shares on May 13, 2020.

Still, despite her official titles, Randall did not actively participate in corporate governance, which was conducted informally. Although the company filed minutes of annual shareholders' and board of directors' meetings, no corporate meetings were actually held. Randall did not direct the actions of any officers or directors of Windy Waters, and she was a passive shareholder.

Windy Waters received distributions from Widen Enterprises, which it held in investment accounts in the form of cash and marketable securities. In 2016, Randall received a direct shareholder dividend from Windy Waters of $126,000. The company also made estimated tax payments on her behalf in 2015 ($86,346.34), 2016 ($30,170), and 2018 ($22,132). Each year, Randall received tax forms (a Schedule K-1) that provided information about Windy Waters' financials to be used when Randall filed her income taxes. Randall had an accountant, who explained her taxes to her every year.

Windy Waters did not have any formal policies about disclosures to shareholders, directors, or officers. According to Kiesler and Gonnering, who testified as Windy Waters' 30(b)(6) witness, Windy Waters has always had an informal policy of providing information to shareholders on request. For example, in June 2016, when asked for profit and loss information from Randall's then-husband, Kiesler sent copies of Widen Enterprises' financial statements to both Randall and her husband that same day. Similarly, in March 2020, Kiesler provided financial information to Randall's divorce lawyer after Randall asked for help in responding to her husband's discovery requests, including investment account and bank statements showing that Windy Waters held over $4.5 million in three investment accounts and Widen Enterprises had around $3.1 million in the bank. Randall herself never asked to see the financial records of Widen Enterprises and no one ever told her that she could not have records for Widen Enterprises or Windy Waters.

In her role as a corporate officer, Randall sometimes had to sign documents related to Windy Waters or Widen Enterprises. Sometime between 2001 and May 15, 2004, Randall had a rubber stamp made to be used in place of a wet ink signature on corporate documents that she needed to sign. Randall gave the stamp to Kiesler and instructed that it could be used in place of a wet ink signature as long as someone "let [her] know when [they're] using it." Defendants say they never used Randall's stamp without her authorization, but Randall disputes this. Randall contends that she was not aware that her signature stamp was being used on annual shareholder resolutions and meeting minutes appointing her as president or director from 2004 forward. Kiesler acknowledges that he didn't contact Randall before using her stamp on annual meeting minutes and consent resolutions, but he says that's because Randall gave

blanket approval for use of the stamp on these documents after Kiesler explained them to her. Randall denies giving her blanket advance approval for any category of documents.

### B.  Windy Waters' stock price formula

The original Widen Enterprises shareholder agreement, adopted by Windy Waters in 2001, provided a mechanism for the company to redeem shareholders' stock upon their death or permanent disability. Such redemptions were to occur at what the agreement defined as "Fair Market Value," which was defined as "the value an informed and willing buyer and seller would agree upon for the sale and purchase of One Hundred Percent (100%) of the issued and outstanding Stock of the Company, without any discount for lack of liquidity, marketability or minority status." This determination of value could be made by agreement of the parties or by a professional appraisal.

Randall's father, Mark Widen, died in 2003. After his death, Bruce Hutler, an advisor at the accounting firm used by Windy Waters at the time, provided a stock valuation of Windy Waters for the purpose of valuing Mark Widen's estate. In 2004, Hutler provided a follow up report to Reed and Randall, which estimated the fair market value of a marketable, majority interest in all the stock of Windy Waters, Inc. Hutler calculated the value of that interest to be $7,441,000 as of April 30, 2004.

In 2004, Hutler's partner, Brad DeNoyer, prepared a formula (which the court will refer to as the "Stock Price Formula"[2]) that could be used by Windy Waters' management to calculate a per-share price of stock. This calculation adopted the valuation from the Hutler report and turned it into a formula, using the implied multiple of 3.6 times EBITDA to arrive

---

[2] Randall refers to this in her briefs as the "EBIDTA" or "Fair Market Value" calculation.

at an estimated value of all shares of Windy Waters. The formula then divided that dollar amount by the amount of shares to arrive at a price per share.[3] After its creation in 2004, the Stock Price Formula calculation was included in stock transfer agreements for Kiesler, Norris, and two other employees when they acquired Windy Waters' stock in 2004.

In 2007, Windy Waters' counsel recommended to Kiesler that the company memorialize the use of the Stock Price Formula by amending the shareholder agreement. On May 7, 2007, the voting shareholders executed the Second Amendment to the Shareholder Agreement, which states: "The Corporation has established a formula for the determination of the fair market value of the stock that it has used for previous stock transactions" and that the shareholders "desire to amend the Shareholder Agreement to adopt such formula as the basis for determining the fair market value of the Stock." Dkt. 63-38, at 1. Randall signed the document as both a shareholder and as then-President of Windy Waters.

By its terms, the amended shareholder agreement calls for the formula to be applied only to purchases or redemptions of stock upon a shareholder's death or permanent disability. There is no language in the shareholder agreement that requires the corporation to use the formula for voluntary redemptions, nor does the agreement give a shareholder the right to sell her shares back. Nevertheless, Windy Waters used the Stock Price Formula for all share purchases and all share redemptions after the company adopted it, including several for

---

[3] The court hasn't relied on Hutler's testimony that the use of such formulas are common and aren't intended to reflect fair market value. So the court will deny as moot defendants' motion to strike these paragraphs from Hutler's affidavit. Dkt. 104. Nevertheless, the court takes judicial notice of the fact that the use of stock valuation formulas is not unusual. *See, e.g., Unger v. Bauer Indus., Inc.*, 200 Wis. 2d 493, 546 N.W.2d 887 (Ct. App. 1996) (referring to valuation formula contained in buy-sell agreement); *Schulenberg v. River Hills Invs.*, 160 Wis. 2d 47, 468 N.W.2d 31 (Ct. App. 1990) (noting formula in buy-sell agreement that set the common stock value at book value, as determined by generally accepted accounting principles (GAAP)).

Randall. On five occasions between 2005 and 2019, Randall sold some of her stock in Windy Waters back to the company. All of these redemptions were voluntary and initiated at Randall's request. For each of these transactions, Kiesler used the Stock Price Formula, which yielded a per-share price more favorable than an alternative value that he calculated based on a pro-rata portion of the company's net assets.

Randall never asked for nor received any financial information about Windy Waters in connection with these transactions, nor did she inquire how her share price was calculated. Each time, she signed a stock redemption agreement with similar terms (although she now says she does not believe she reviewed any of the agreements before signing). Each agreement included attached financial information showing how the price-per-share was calculated using the Stock Price Formula. Dkt. 75, Exh. 10–14. Randall did not give much thought to the number of shares she was selling or the value of her shares in any of these transactions. Randall says she was generally aware that Windy Waters used a formula to determine the price of shares, but she "didn't know what, where, or how." Dkt. 82 (Randall Dep. 200:10–16).

Kiesler also used the Stock Price Formula in 2013 when Randall exercised her preemptive rights to *purchase* shares from Windy Waters.

### C.  Randall's 2020 request for funds

In May 2020, Randall was going through a divorce and needed about $100,000 for living expenses and to pay her divorce attorney. Randall sent Reed a text message on May 5, informing him that her husband was asking for maintenance in their divorce proceeding and that she was "going to need to get some money." Reed responded that Randall's timing was unfortunate because the companies "had a Covid problem." But he suggested that an option might be available through Millmont, a family-owned real estate holding company.

Reed then contacted Kiesler and asked him to talk with Randall about Windy Waters purchasing her shares as a way to get her money. Reed told Kiesler to contact Randall on behalf of Windy Waters to offer an all-or-nothing redemption of her shares, and if she accepted, to carry out the transaction. Reed understood that any purchase of Randall's shares would be under the Stock Price Formula that had been used with all prior stock redemptions between 2005 and 2020, including the redemption of his brother Price's entire interest in 2015. He never considered any other options, nor did Randall request any.

**D. Randall's May 6 conversations with Kiesler**

The heart of Randall's case involves telephone conversations between her and Kiesler on May 6, 2020. Kiesler called Randall early in the morning. The broad contours of that discussion are not in dispute, but the parties disagree on some of the details.

The court starts with what's undisputed. Randall told Kiesler that she needed money for legal fees and was seeking $100,000. He told her the companies did not have $100,000 they could make available to her. Randall asked if she could obtain $50,000, but Kiesler said the companies could not "afford" that either. Kiesler explained to Randall that COVID was a concern for the company and that it was struggling with a decision about whether to keep or return PPP money that it had received from the government.

Kiesler told Randall that Windy Waters was interested in purchasing her stock only if it could purchase all of her shares, rather than any further partial sales as had occurred previously. Randall told Kiesler that she did not want to sell her entire interest. Kiesler did not offer, nor did Randall request, a loan or some other financial arrangement, nor was Kiesler authorized to make such an offer. Kiesler did not explain to Randall why Windy Waters could afford to purchase all, but not some, of Randall's shares and Randall did not ask.

Kiesler told Randall that the company was not able to pay the full redemption cost in one lump sum, but would pay the amount over a period of seven years. Kiesler explained that Windy Waters was willing to buy Randall's remaining shares using the price-per-share calculation model using the Stock Price Formula. He told Randall that under that formula, her remaining shares were valued at approximately $1.1 million using financial data through November 2019, but that he would have to update the calculation with end-of-the-year numbers if she wanted to move ahead.

Kiesler told Randall that the deal was "take it or leave it" and that if she turned it down, the companies could not be a source of the cash she needed for her divorce. He gave her until the end of the day to decide. Kiesler needed a prompt answer because the next day, May 7, was the safe harbor deadline for returning PPP funds. The company had decided that if it purchased Randall's shares, it should return the $2.7 million in PPP funds. Randall told Kiesler that her investment in the companies was a "really big deal" because it was all she had to live on for the rest of her life, and she wanted time to talk to her "people."

Here's where the parties' versions of the conversation diverge. Kiesler says he walked Randall through the stock price calculation on the phone, including explaining the company's net income. Randall denies this.

Randall says Kiesler told her that she "would be smart" to sell her stock while she had the chance because Widen Enterprises, the subsidiary, might not even be around in seven years, and she risked ending up with nothing if she didn't take his offer. (Kiesler denies that these are the exact words he used, but he agrees that he expressed the general sentiment that it *could* be smart given the current financial state of affairs, including the uncertainty presented by COVID, for Randall to sell her shares. Kiesler says he told Randall she could do whatever she

13

wanted, but it could be smart to sell her shares and be in control of her finances because, with COVID continuing, the amount could be lower in the future.)

Randall told Kiesler that the price seemed too low because she "had a feeling that the company was worth more than" an amount that would make her shares worth $1.1 million, but she did not explain a basis for that belief. Kiesler told Randall that, because the company continually reinvested most of its profits back into the business, the value of her stock would not change substantially over the next seven years.

According to Randall, Kiesler told her that the price was "fair." Kiesler denies using these exact words, but he admits that he expressed the general sentiment that the $1.1 million price was fair because it was calculated using the Stock Price Formula, which was Windy Waters' standard model for voluntary redemptions and was the same formula that had been used for Randall's prior partial share redemptions and the complete share redemptions of her brothers.

After Randall and Kiesler spoke, Kiesler texted Reed, who confirmed that he approved Windy Waters purchasing all of Randall's shares. Reed had no further involvement in the transaction.

After talking to Kiesler, Randall called her son, Justin Randall, and told him about the offer. Justin told her to retain an attorney to look at the financials of Widen Enterprises before she redeemed all of her stock, but Randall didn't contact any attorneys between May 6 and May 12.

Randall also texted her financial advisor, Mark Goff, on May 6 to see if she should consider the offer. Goff and Randall spoke later that day, and Goff provided advice about what she should say to Kiesler.

Later that day, around 4 p.m., Randall and Kiesler spoke again. Randall said she needed more time so she could talk to a lawyer or financial advisor. Kiesler again expressed to Randall the sentiment that the price was fair. Kiesler told Randall that she should consult with counsel (Kiesler says he also told Randall to talk to her financial advisor, but she denies this), and he extended the offer for three more days. He explained that the government had extended the safe harbor deadline for the PPP loan money to May 14, so he did not need Randall's answer that day.

On May 8, 2020, Gonnering sent an "Operational Update" e-mail to Reed and Kiesler. Gonnering noted the uncertainty surrounding the PPP program and discussions that the company was having with counsel about whether to keep the funds. Gonnering noted that "[o]ne opportunity would trip our decision to give the money back without waiting, and that would be fulfilling the liquidity request of Stacy Randall. If we buy her shares, we would not keep the funds. Share buybacks and receiving federal funds don't mix well."

**E.  Kiesler updates the calculation and has documents prepared**

Randall did not accept Kiesler's May 6 offer and did not get back to him by May 9. Kiesler updated the price-per-share calculation model by inserting the December 2019 financial information into the Stock Price Formula. Based on his re-calculations, the redemption price of Randall's shares had increased to approximately $1.3 million.

Kiesler contacted Windy Waters' lawyer, Scott Seid, to ask if his calculation of $1.3 million to redeem Randall's shares using the Stock Price Formula was appropriate, advising Seid that he wanted to handle Randall's stock redemption the same way Windy Waters had handled her brother, Price Widen, when he had redeemed all of his shares in 2015. Seid forwarded Kiesler an old email from Price's buyout, expressing to Kiesler that he was "now

thinking that with a voluntary sale to the corp, the price is negotiated." But Seid later determined that his recollection of Price's buyout was incorrect, and he told Kiesler that it "would be consistent" to calculate Randall's stock price using the Stock Price Formula with December 2019 financial information.

Kiesler asked Seid to prepare a draft stock redemption agreement and promissory note using the price-per-share that Kiesler had calculated based on the updated December 2019 financials. Seid did so, using the same documents he had used for Price Widen's 2015 share redemption as a template, changing only the name, the number of shares being redeemed, and the pronouns.

### F.  Kiesler contacts Randall on May 13

Kiesler called Randall again on May 13 to communicate the updated offer of over $1.3 million. Randall says Kiesler reported that the companies had "found" another $250,000, which she understood to mean another $250,000 "on top of" the $1.1 million initially calculated using the formula. (Kiesler denies this, and says he made clear that he had again used the Stock Price Formula to come up with a new number.) Randall says her response was, "That's all?," and that Kiesler told her that she had until the end of the day to accept the offer. (Kiesler denies this, and says that after he conveyed the updated offer, Randall agreed with the terms "on the spot".)

After talking with Kiesler, Randall emailed her divorce attorney seeking advice, but the attorney said the buyout was beyond her expertise. Randall also left a voicemail for Seid. (Randall's divorce attorney and Seid were both lawyers at the same firm, Stafford Rosenbaum. When Randall hired Stafford to represent her in her divorce, she signed a conflict waiver confirming that she waived any conflict due to the fact that the firm also represented Windy

Waters and Widen Enterprises with respect to business matters, including her stock redemptions, the most recent of which had been completed in April 2019.) Randall also texted her son Justin, stating: "Kiesler did another evaluation of the company and came up with another $250 thousand. Nothing I can do about it. I will be going over to the office to sign the papers at 4:30."

Randall went to Widen's offices at 4:30 p.m. When she got there, Kiesler was waiting for her in the lobby. He was on the phone with Seid talking about an issue related to the PPP loan. Seid said he owed Randall a call, and asked Kiesler if he could speak with her. Kiesler handed the phone to Randall, who told Seid that she was uncomfortable signing the contract. Seid responded that no one could force her to sign the documents. (Seid testified that he also told Randall that he could not give her advice because the firm represented the company, that she did not need to sign the documents if she was uncomfortable doing so, and that she had the right to speak with a lawyer if she wanted to; he also says he offered to give her some names of business attorneys who could help her. Randall denies all this.) Randall did not ask for, and Seid did not provide, any financial statements, tax returns, or other information during that call, or at any other time.

The parties differ in their accounts of what happened after Randall got off the phone with Seid. Kiesler says he asked whether Randall wanted her son or anyone else to review the documents before she signed, but Randall declined. He also says he asked Randall if she wanted to take the documents with her to review alone or with an attorney and not sign them that day, but she declined this offer, too. Kiesler also says he read aloud both the stock redemption agreement and the promissory note word for word while Randall followed along. Kiesler says he stopped after each paragraph to ask if she understood and whether she had any questions,

but she had none. Randall didn't push back on any terms, didn't review the documents herself, didn't ask how the share price was calculated, and didn't ask to see any financial information before executing the documents.

Randall denies most of this. She says Kiesler never read the documents aloud, didn't offer to have her take the documents with her and not sign, and didn't tell her she could have the documents reviewed by her son or an attorney. She admits that she didn't review the documents, push back on the terms, or ask for clarification, but she says this is because "she did not know the relevant questions to ask or issues to dispute or clarify and felt she had run out of time, leaving her with no choice to sign, given her immediate need for the money to fund her divorce proceeding." Dkt. 118, ¶ 39.

The parties agree on a few additional facts concerning the May 13 meeting. They agree that Randall asked Kiesler whether he and the companies' executives had any thought about selling Widen Enterprises. Kiesler responded, "No, there's been no talk of that." The parties also agree that Kiesler did not prevent Randall from leaving or limit how much time she could spend in the office to review the documents. And they agree that Randall signed the redemption agreement and promissory note, and that Kiesler signed on behalf of Windy Waters. At the time of execution, Randall was the sole director and president of Windy Waters, a role she resigned via the Stock Redemption Agreement.

The redemption documents provided that Windy Waters was agreeing to purchase Randall's shares at a price of $1,352,166.31, to be payable in monthly payments of $16,430.09 over seven years, beginning on June 13, 2020, and ending on May 13, 2027. The promissory note provided for an annual interest rate on its outstanding obligation to Randall of .58 percent, which was the applicable Federal Rate. The price per share that Randall received in

2020 was the highest share price anyone had paid or received for Windy Waters stock in the history of the company, including the price paid to a trust that Reed had established for the benefit of his children, when it sold all of its shares in 2019.

The same day Randall sold her shares, Kiesler learned of new government guidance announcing criminal penalties would not be suffered by companies that accepted PPP funds even if the government later determined they didn't qualify. So Widen Enterprises kept the PPP money.

### G. Defendants' post-redemption activities

On May 14, Kiesler messaged Gonnering, stating, "Windy Waters, Inc. has purchased all Randall shares. Mission accomplished. 16k/month, 84 months @ .58%." Gonnering responded, "Excellent. Thank you for making it happen." Kiesler also texted Reed, stating that he had two pieces of good news: (1) Windy Waters now owned all of Randall's shares; and (2) the company was keeping the PPP money because there was new guidance stating that the worst that could happen is if the company had to return the money if it did not meet the qualifications for forgiveness. About a week later, Gonnering sent an "Operational Update" to Widen and Kiesler, which included a sentence noting that the company had "successfully acquired Stacy Randall's shares of Windy Waters, Inc."

On June 3, Kiesler contacted the companies' accounting firm and asked whether, now that all of the shareholders of Windy Waters were employees of Widen Enterprises, it "ma[d]e any sense" to pay a portion of their compensation as pro-rata dividends instead of wages. The accounting firm recommended against that plan, and it was never implemented.

**H. Reed decides to sell; Acquia buys Widen Enterprises for $162 million**

Just weeks after Randall's redemption, after Reed turned 60 in June 2020, Gonnering and Reed talked about Reed's long-term plans to begin succession planning for Widen Enterprises. Reed started to consider various succession plans, including letting Gonnering run the company, creating an employee stock ownership plan, or making plans to sell. Gonnering and Reed had exploratory conversations on July 21, July 24 and August 14, 2020, about succession planning, focusing on the timeframe of two to five years down the road. The first time Kiesler heard of any potential plans to sell the company was in late August 2020, when he learned that Reed and Gonnering had discussed the possibility of selling the company in two to five years.

On August 25, 2020, Gonnering informed Reed that a company called Brandfolder, one of Widen Enterprises' competitors, had sold for $155 million, a price Gonnering considered "unfathomable." Gonnering suspected Brandfolder had revenue smaller than or comparable to Widen Enterprises, and believed Widen had a stronger reputation in their industry. Reed was also shocked to hear the sales price and told Gonnering that it was time to look at selling Widen Enterprises if it could sell for $200 million.

Over the next few months, Reed, Gonnering, and Kiesler had more serious conversations about selling Widen Enterprises, and Reed and Gonnering met with multiple investment banks who could potentially broker the deal. In January 2021, Reed decided to put the company on the market. Widen Enterprises retained Software Equity Group Advisors, LLC, as its sales broker. With Gonnering's help, Software Equity Group Advisors gathered details about Widen Enterprises and prepared extensive marketing materials and due diligence information to share with potential buyers.

20

In September 2021, Windy Waters sold Widen Enterprises to Acquia Inc. for $162 million, with a net closing price of $148.5 million. Reed, who owned just under 70% of the companies at the time of the purchase, received over $100 million for his shares. Kiesler received over $12.3 million for his 8% interest in the companies, and Gonnering received approximately $14 million for his 9.43% interest. Randall estimates that had she still owned the shares that Windy Waters purchased from her, she would have received approximately $32 million in sale proceeds.

SUMMARY JUDGMENT STANDARD

Randall moves for partial summary judgment on the following claims and affirmative defenses:

> (1) federal securities fraud against all defendants based on nondisclosure and misrepresentation;
>
> (2) breach of fiduciary duty against Reed and Kiesler in connection with the redemption of her stock and the payment of alleged disguised dividends to Reed;
>
> (3) defendants' affirmative defense based on the release; and
>
> (4) defendants' affirmative defenses of ratification and waiver.

Defendants move for summary judgment on the entire complaint. As indicated in the introduction, the parties raise numerous issues that fall into three categories, which the court will use to group the issues in the analysis section that follows.

Summary judgment is appropriate when the record demonstrates that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391–92 (7th Cir. 2011). The court construes the evidence, and all

inferences that reasonably can be drawn from the evidence, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the burden of informing the court of the basis for its motion and identifying the parts of the record that demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. *See also Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992) ("The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each."). To defeat the motion, the non-moving party must point to evidence that can be put in an admissible form at trial and that could support judgment in his favor if believed by the fact-finder. *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011). The standard is the same on cross motions for summary judgment: the court evaluates each motion independently, viewing the evidence in favor of the non-moving party. *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 590 (7th Cir. 1991).

## CATEGORY 1 ISSUES: RELEASE AND RATIFICATION

### A.  The release

Defendants contend that Randall's claims are all barred by the redemption agreement's provision releasing Windy Waters, Widen Enterprises, and all of their employees and directors from "any and all claims of any kind or nature, known or unknown, . . . including, but not limited to any claim arising from the sale and purchase of the Shares." Dkt. 1–6, at § 5.

The court already rejected this argument when deciding the motion to dismiss. A contract, including one containing an integrated release, may be unenforceable if it was induced by defendants' fraudulent or material misrepresentations and omissions, on which she justifiably relied. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014); *First*

*Nat. Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 222–23, 293 N.W.2d 530 (1980). In addition, defendants may be equitably estopped from relying on the release if Randall can prove her breach of fiduciary duty claim. *See Gonzalez v. Teskey*, 160 Wis. 2d 1, 12–13, 465 N.W. 2d 525 (Ct. App. 1990) (citation omitted); *Gabriel v. Gabriel*, 57 Wis. 2d 424, 428, 204 N.W. 2d 494 (1973).

Defendants don't dispute these general principles. But they say that the mere existence of the release placed Randall on notice that "a reasonable inquiry should have been undertaken" to discover possible matured claims that she had against defendants before signing the release. Dkt. 71, at 33. In support, defendants rely on *Goodman v. Epstein*, 582 F.2d 388 (7th Cir. 1978), and *Moseman v. Van Leer*, 263 F.3d 129 (4th Cir. 2001).

As the *Goodman* court acknowledged, after *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), the plaintiff's lack of due diligence is no longer a defense to a 10b-5 claim securities fraud claim. 582 F.2d at 403. It isn't fair to require a plaintiff to prove both that the defendant committed an intentional or reckless deception and that the plaintiff did not in any way contribute to his own harm. *Id.* at 404. But the *Goodman* court held that a request for a release of claims triggered a lesser duty on the plaintiff, that of "reasonable inquiry."

> "Reasonable inquiry" will assuredly differ from situation to situation. In many cases, it may involve only the questioning of the person or persons seeking the release; any deception by those persons at that point could amount to fraud in the procurement of the release, which would clearly have invalidated the release . . . .

*Id.*

A reasonable jury could find that defendants intentionally or recklessly defrauded Randall in seeking the release, in which case the release would be unenforceable. Or, a reasonable jury could conclude that Randall had, despite her uneasiness with the transaction,

23

been reasonably diligent under the circumstances by asking questions of Kiesler. The court concludes that the enforceability of the release in this case cannot be resolved on summary judgment.

### B. Rescission or ratification of the stock redemption agreement

Randall's complaint includes a prayer for relief for avoidance or rescission of the redemption documents. Complaint, Dkt. 1, at 55. Defendants assert the affirmative defense of ratification, arguing that Randall ratified the redemption agreement and waived her right to seek rescission by accepting monthly contract payments without objection, even after she discovered the alleged fraud.[4] Am. Answer, Dkt. 45, at 33 (Sixth Affirmative Defense). Disputes about remedies can sometimes be deferred until liability is determined, but here the dispute is pivotal: if Randall ratified the redemption agreement, then she may be entitled to no relief at all.[5]

The equitable remedy of rescission is available when a party is induced to assent to a contract by justifiably relying on a fraudulent or material misrepresentation by the other party. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 36, 270 Wis. 2d 146, 677 N.W.2d 233; *Notte*, 97 Wis. 2d at 222; *Whipp v. Iverson*, 43 Wis. 2d 166, 171, 168 N.W.2d 201 (1969). When a party to a contract discovers an alleged fraud, it has two choices: (1) it can affirm the

---

[4] Whether Randall has waived her right to seek rescission was previously raised by defendants in a motion to strike, which was briefed by both sides. *See* Dkts. 31–33, 36–37. The parties have incorporated their arguments from those briefs into their arguments on summary judgment.

[5] Defendants do not expressly move for dismissal on the ground that Randall ratified the release. At the same time, they have argued that Randall ratified the entire agreement, and they contest Randall's argument that the release is void (*i.e.* could not be ratified) under federal law. So whether Randall ratified the release along with the rest of the contract appears to be an issue properly contested at summary judgment.

contract and sue for damages; or (2) it can disaffirm and seek restitution. *AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 772 (W.D. Wis. 2016) (citation omitted). "Rescission is always coupled with restitution: the parties return the money, property or other benefits so as to restore each other to the position they were in prior to the transaction." *Head & Seemann, Inc. v. Gregg*, 104 Wis. 2d 156, 159, 311 N.W.2d 667 (Ct. App. 1981), *aff'd and remanded*, 107 Wis. 2d 126, 318 N.W.2d 381 (1982). A party may waive her right to rescission if, after learning of the fraud, she expressly affirms the contract or exercises dominion over goods or other items received "in a manner inconsistent with avoidance of the contract." Restatement (Second) of Contracts § 380 (1981), comment b; *see, e.g., Grube v. Daun*, 213 Wis. 2d 533, 551–52, 570 N.W.2d 851 (1997) (plaintiffs affirmed contract by continuing to live on property and making extensive improvements after discovering it was contaminated); *Thompson v. Vill. of Hales Corners*, 115 Wis. 2d 289, 319, 340 N.W.2d 704 (1983) (although village ordinance made plaintiff's arcade unprofitable, plaintiff waived right to rescind lease because he knew about ordinance when he signed lease and delayed asserting rights for six months).

When the facts regarding the parties' conduct after the alleged fraud comes to light are "practically undisputed," waiver is a question of law appropriately decided at summary judgment. *Weinhagen v. Hayes*, 174 Wis. 233, 178 N.W. 780, 786 (1920); *Thompson*, 115 Wis. 2d at 319; *AVL Powertrain*, 178 F. Supp. 3d at 772. The material facts on this issue are undisputed here.

Defendants contend that Randall waived her right to rescission of the stock redemption agreement by accepting monthly payments under it without objection for more than three

years, including eight payments after her attorneys sent defendants a draft complaint but before she filed suit in July 2022, and continuing every month thereafter.

A party does not lose her right to avoid a contract for fraudulent misrepresentation until she knows of the misrepresentation. Restatement (Second) of Contracts § 380 (1981), comment b. Randall could not have known of the fraud until the Acquia sale in September 2021. So her receipt of payments before that date is irrelevant. As for Randall's acceptance of payments *after* she filed suit, Randall argues that her conduct cannot be deemed a waiver or release of any claims because it was not in writing or approved by the court. Dkt. 60, at 64–65 (citing Wis. Stat. § 807.05); *see also Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1215 (S.D.N.Y. 1994) (formal pleading of a rescission claim eliminates any implication of a subsequent ratification), *aff'd*, 57 F.3d 146 (2d Cir. 1995). Defendants haven't responded to this argument, so they have conceded the point.

So the time period that matters for ratification purposes is from September 20, 2021, when Randall's retained counsel sent a litigation hold notice to defendants advising that it appeared that Randall had been misled into selling her stock at an unfair price, to July 21, 2022, when Randall filed her lawsuit. Randall accepted monthly payments from defendants in the amount of $16,430.09 during that time frame. But it's also undisputed that (a) Randall consistently asserted her intent to rescind the redemption agreement since learning of the fraud, and (b) the monthly payments she received were payments for her stock, not consideration for any agreement not to file suit against defendants.

Defendants cite ratification and waiver cases in which plaintiffs exercised acts of ownership that were unequivocally inconsistent with an intent to rescind the contract: continuing to perform large engine testing at defendants' facility for 16 months after learning

26

of the alleged misrepresentation, *AVL Powertrain*, 178 F. Supp. at 776; living on property and making improvements to it after discovering it was not as represented, *Grube*, 213 Wis. 2d at 551–52, and *Ajamian v. Schlanger*, 20 N.J. Super. 246, 249, 89 A.2d 702, 704 (App. Div. 1952); selling trucks that it claimed it had been defrauded into purchasing, *Tankstar USA, Inc. v. Navistar, Inc.*, 2019 WI App 1, ¶ 22, 385 Wis. 2d 211, 923 N.W.2d 170. The cases are far afield from the facts here.

In the cases defendants cite that involve the continued acceptance of payments, the claimants retained consideration given to them in exchange for bargained-for releases that they were trying to avoid. *See, e.g.*, *Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 221 (5th Cir. 1991), abrogated by *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994) (employee who continued to accept severance benefits to which she was entitled under release for months after learning that younger employees in her department had not been terminated ratified release through conduct); *Seward v. B.O.C. Div. of Gen. Motors Corp.*, 805 F. Supp. 623, 634 (N.D. Ill. 1992) (plaintiff paid monthly benefits in exchange for release); *O'Shea v. Com. Credit Corp.*, 930 F.2d 358, 359–60 (4th Cir. 1991) (plaintiff accepted severance benefits, including 27 weeks' severance pay, in exchange for release). Tender back of the benefits received was required in those cases because it is inconsistent to bring suit against a defendant while at the same time retaining the consideration received in exchange for a promise not to bring such a suit.

When "all the plaintiff obtained in exchange for the release was something to which he was already entitled, as distinct from obtaining payment of a disputed or disputable claim," the failure to return the funds does not bar rescission. *Fleming v. U.S. Postal Serv. AMF O'Hare*, 27 F.3d 259, 261 (7th Cir. 1994). *See also Bowe v. Gage*, 127 Wis. 245, 106 N.W. 1074 (1906)

(plaintiffs' failure to return money paid by defendant in settlement of dispute did not preclude them from repudiating settlement, where money could be applied to offset any amount due from defendant).

Defendants say that *Fleming* and *Bowe* aren't on point because those cases addressed the tender-back doctrine, not ratification. But the court sees little *practical* difference between ratification and tender back where the party's only conduct adduced to support ratification is the acceptance of payments that she would be entitled to regardless of the fraud. Whether deemed "continued acceptance" or "failure to return," the fact of the matter is that if the redemption agreement was rescinded and the parties returned to their pre-redemption positions, Randall would be entitled to this consideration for her interest regardless of the outcome of this suit. Further, should she be awarded damages exceeding that amount, the monies already paid by defendants will be credited as an offset. So her retention of those payments does not amount to an effective ratification of the contract, nor is it really a case of her having her cake and eating it too, as defendants repeatedly assert.

The court will grant Randall's motion for summary judgment on defendants' affirmative defense of ratification. Defendants' motion for summary judgment on this defense and to strike Randall's claim for rescission are denied.

## CATEGORY 2 ISSUES: MISREPRESENTATIONS AND DUTY TO DISCLOSE

### A.  Federal securities fraud: misstatements and omissions

Randall alleges that Kiesler and Reed made material misrepresentations and omissions regarding the financial health and fair value of the companies, the Stock Price Formula, and plans to sell Widen Enterprises. To establish liability under § 10(b) and Rule 10b–5 of the

Securities Exchange Act of 1934, Randall must prove that (1) the defendants made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages. *Otto v. Variable Annuity Life Insurance Co.*, 134 F.3d 841, 851 (7th Cir. 1998); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).

Defendants move for summary judgment on two grounds: (1) none of Randall's alleged misrepresentations and omissions are actionable; and (2) Randall cannot show that defendants acted with scienter.

### 1. Misrepresentations and omissions

An individual can be liable for securities fraud either for affirmative misrepresentations or for omissions of material information. Whether a statement is an affirmative misrepresentation under federal security law is evaluated objectively from the standpoint of a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976).

Both statements of fact and statements of opinion can be misrepresentations. Proving the falsity of a fact is straightforward: it merely requires evidence that the "thing" stated "does not accord with facts as they exist." *Notte*, 97 Wis. 2d at 222 (citation omitted). Proving the falsity of an opinion is more complicated. A defendant is not liable for an opinion unless the defendant misrepresents, either affirmatively or by omission, the underlying facts used to form the opinion, or the scope of inquiry made prior to rendering the opinion. *Smykla v. Molinaroli*, 85 F.4th 1228, 1238 (7th Cir. 2023) (citing *Omnicare*, 575 U.S. at 189). The key question is whether a reasonable investor would understand the opinion to convey facts about how the

speaker formed the opinion. *Omnicare*, 575 U.S. at 189. If those facts differ from the true facts, then the speaker's failure to disclose the true facts along with his opinion is misleading. *Id.*

Whether an omission amounts to a misrepresentation is one of the central issues in this case. In general, an omission is not actionable as a misrepresentation unless the non-disclosing party is under a duty to disclose. The same principle applies to the parties to a security transaction. *Chiarella v. United States*, 445 U.S. 222, 235 (1980). In *Chiarella*, the Supreme Court acknowledged that corporate insiders (including officers, directors, and controlling shareholders) have a duty under § 10(b) to disclose material information to the corporations shareholders:

> Application of a duty to disclose prior to trading guarantees that corporate insiders, who have an obligation to place the shareholder's welfare before their own, will not benefit personally through fraudulent use of material, nonpublic information.

*Id*. at 230. When a closely held corporation, such as Windy Waters, buys its own stock, it must disclose any information that is material, that is, any information that would be viewed by a reasonable investor as significant enough to change their investment decision-making. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 434 (7th Cir. 1987); *Michaels v. Michaels*, 767 F.2d 1185, 1196 (7th Cir. 1985).

With these general principles in mind, the court will turn to Randall's alleged misrepresentations and omissions. To put the court's conclusions succinctly, Randall has not adduced evidence that defendants made any actionable misstatements or omissions related to any active plans to sell Widen Enterprises, so the court will grant summary judgment to defendants on that claim. But genuine disputes of material fact preclude summary judgment on the other misstatements and omissions alleged by Randall, which involve the company's finances and its value.

30

### a. Plans to sell Widen Enterprises

Randall alleges that defendants made misrepresentations and omitted material information regarding plans to sell Widen Enterprises. In her complaint, Randall alleges that she asked Kiesler whether he and the companies' executives were "preparing" to sell Widen Enterprises, to which Kiesler replied that there had "been no talk of that." Dkt. 1, ¶ 117. As she appears to concede, this was true. There is no evidence in the record that defendants took any active steps to sell Widen Enterprises until August 25, 2020, when Gonnering informed Reed that Brandfolder had sold for $155 million and Reed told Gonnering that it was time to look at selling Widen Enterprises.

At her deposition, however, Randall testified that her question to Kiesler was whether there had been "any thought about selling the company." Dkt. 82 (Randall Dep. 320:18–23). To show that Kiesler's negative response was a lie, Randall points to (1) a statement by Reed to Randall's son in February 2020 that he was considering a sale of Widen Enterprises because he believed he could sell the company for around $80 million, Dkt. 131, ¶ 51; and (2) Gonnering's September 2019 "Operational Update" to Reed, copying Kiesler, stating that Gonnering would continue to keep Reed "apprised of industry multiples," and noting that he and Kiesler had "chatted about when we would advise to sell based on the realization of maximum valuation." Dkt. 117-11. Randall argues that this shows that Reed, Gonnering, and Kiesler *had* contemplated selling Widen Enterprises, even if Reed had yet to pull the trigger.

Randall fails to raise a genuine dispute that Kiesler made a false statement. Even if Reed might have been thinking about selling Widen Enterprises in early February 2020, there is no evidence that he shared those thoughts with Kiesler. And the most that can be inferred from Gonnering's 2019 email is that Kiesler, Gonnering and Reed had discussed when they would

advise to sell at some undetermined point "years" in the future, not that they were thinking about selling or making plans to do so. Kiesler did not lie when he said there'd been "no talk" of selling the company at the time of Randall's redemption.

Randall's contention that defendants made material omissions about plans to sell Widen Enterprises suffers the same fate. Randall identifies two pieces of information that defendants failed to disclose: (1) that Reed had been considering a sale, as evidenced by his statement to Randall's son and Gonnering's operational update discussed above; and (2) that defendants received "constant solicitations" to purchase Widen Enterprises. To support her second point, Randall identifies an August 10, 2018, correspondence from Gonnering to Reed and Kiesler, in which Gonnering states that he had agreed to "listen" to an inquiry from a private equity firm "express[ing] interest in a minority stake" in the company. Dkt. 63-16.

*Michaels* is instructive. 767 F.2d 1185. In that case, the court of appeals held that a closely held corporation had a duty to inform a shareholder prior to buying his shares that prospects for selling the company had recently brightened and that the company was actively reaching out to prospective buyers. *Id.* at 1197–98. But the corporation had no duty to disclose that it had asked a business partner to investigate (without revealing the company's identity) whether another company might be interested in buying a small, closely held corporation, because this type of inquiry was too theoretical to give a reasonable investor any insight into whether the company might soon sell. *Id.* at 1197. Similarly, the most a jury could infer from the information Randall says defendants failed to disclose is that Reed was open to selling in the future and that selling was a viable option. Randall identifies no omissions that, had they been disclosed, would have led her to believe that prospects for selling the company had brightened or that the company might soon sell. Randall has not identified any false statements

32

or material omissions about plans to sell Widen Enterprises, so the court will grant summary judgment to defendants on Randall's misrepresentation claims insofar as they are based on plans to sell the company.

### b.  Company finances

Randall's other alleged misrepresentations and omissions concern the finances of the companies, specifically their fair market value and economic viability. Randall alleges that defendants misled her in two ways. First, Kiesler represented to Randall that the value the Stock Price Formula calculated for her 20 percent share in Windy Waters, $1.3 million, was a "fair" measure of her stock's value. Dkt. 110, ¶¶ 178, 188, 272. Second, Kiesler misrepresented Windy Waters' current and future financial prospects. Kiesler told Randall that the companies could not "afford" to make $50,000 available to her and that it "would be smart" for her to sell her stock, because Widen Enterprises might not be around in seven years. Dkt. 110, ¶¶ 171, 181.

Randall asserts that Kiesler's statements were contradicted by financial information about the companies that defendants failed to disclose. Gonnering had told Reed and Kiesler that the Stock Price Formula was a low estimate of Windy Waters' value and had produced estimates showing that Windy Waters was worth much more. Dkt. 110, ¶¶ 58, 66–67, 276. Defendants did not reveal this to Randall, nor did they tell her that using the Stock Price Formula was not required for her redemption. Defendants also did not disclose the companies' recurring revenues of more than $27 million for 2020, that the companies had more than $5.5 million in liquid investments, that the companies had just received more than $2.69 million in PPP loans, and that Reed was receiving millions of dollars in compensation each year,

33

information that, according to Randall, belies Kiesler's gloomy opinions about the companies' current and future financial prospects.

The court will deny summary judgment to defendants on misrepresentation claims based on these alleged misrepresentations and omissions. Each of Kiesler's alleged misrepresentations—that the Stock Price Formula value was "fair", that the companies could not "afford" to give Randall $50,000, and that it would be "smart" for Randall to sell her stock—were statements of opinion. Under *Omnicare*, opinions are misleading if a reasonable investor would understand them to be based on facts that aren't actually true. 575 U.S. at 189. A reasonable jury could find each of Kiesler's statements misleading under that standard. His statement that the Stock Price Formula value was "fair" might imply to a reasonable investor that Widen Enterprises' fair market value was close to the value reflected by the Stock Price Formula, which was not true based on Gonnering's estimate of the value of the company. And his statements that the companies' could not "afford" to give Randall $50,000 and that it would be "smart" for Randall to sell her stock might imply to a reasonable investor that the companies were in a precarious financial position—an implication that a reasonable jury could find was false, given Randall's evidence of the companies' strong finances.

Defendant's arguments regarding these opinion statements are unpersuasive. First, defendants contend that Kiesler's statements could not be misrepresentations because Kiesler earnestly believed them. That argument is foreclosed by *Omnicare*, which holds that even earnestly believed statements are misleading if a reasonable investor would understand them to be based on facts that are not true. *Id.* Second, defendants contend that these opinions were consistent with the facts: the Stock Price Formula value was "fair" because the formula had always been used in similar transactions; the companies could not "afford" to give Randall

34

$50,000 because they were not willing to do so; and it would have been "smart" for Randall to sell her stock because COVID-19 had made all business somewhat precarious. A reasonable jury could find that some or all of Kiesler's opinions were consistent with the facts. But that is not the only reasonable conclusion, so the issue can't be resolved at summary judgment.

As for the omissions, defendants had a duty under *Jordan* and *Michaels* to disclose all material information to Randall; that is, anything that would alter the total mix of information such that it would change a reasonable investor's decision-making. *Jordan*, 815 F.2d at 434; *Michaels*, 767 F.2d at 1196. If a jury credits Randall's view of the facts that defendants omitted, it could certainly find that they would change a reasonable investor's decision about selling her shares, because those facts reveal a far rosier image of Windy Waters' financial prospects, and its current value, than Randall previously knew.

Defendants make three main arguments regarding the omitted information: (1) information concerning the fair market value of the companies was immaterial to Randall's stock redemption price, which was a take-it-or-leave-it offer based on the Stock Price Formula; (2) this was routine financial information that Randall could have discovered by examining the company's books or conducting her own assessment of the fair market value of the companies had she wanted to; and (3) Randall cannot rely on any omissions about Reed's compensation because any such omissions support only a derivative claim for corporate waste, not a direct claim for securities fraud.

As for materiality, defendants contend that the omitted information was immaterial because defendants weren't negotiating with Randall about share price or proposing to pay fair market value for her shares; they were proposing to pay her the company's standard price as determined under the Stock Price Formula, just as they had for Randall's five previous

redemptions and for every other shareholder that had redeemed or purchased shares since the adoption of the Stock Price Formula in 2005.

It's true that Windy Waters' customary practice was to use the Stock Price Formula for all share purchases and redemptions, and there's no evidence that the company ever deviated from this practice or that it would have done so for Randall's May 2020 redemption. But even though there's no evidence that the company would have negotiated a different price, Randall had another option available to her: she could have opted not to sell at all. A reasonable jury could conclude that knowledge that the price being offered didn't come reasonably close to approximating the value of a 20 percent stake in the companies would have led a reasonable investor to change her mind as to whether to sell at all. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

Defendants also contend that the nondisclosed information was immaterial because Randall redeemed shares on five prior occasions at a price determined by the formula and never objected to its use, nor did she ever ask for any financial information in connection with those redemptions. But it's undisputed that each of those were much smaller, partial redemptions in which Randall used the company "like a bank" and simply asked Reed if she could liquidate shares in exchange for cash; whether she knew or cared if she was getting fair market value for her shares on those occasions is not clear from the record. What's more, a jury could reasonably find that an investor deciding whether to sell her *entire* interest back to the company would have more interest in knowing that the formula used to calculate the redemption price reasonably approximated the actual fair market value of her shares than would an investor simply looking for a small amount of cash. So the fact that Randall didn't inquire about the

36

fair market value of her shares when she redeemed shares in the past doesn't establish that fair market value wasn't material to Randall's May 2020 decision to part with her entire interest.

As for defendants' argument about routine financial information, defendants contend that they would have provided this information to Randall if she had asked, but that they had no affirmative duty to disclose it. Defendants cite two cases in which the courts held that an insider generally "has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation, at least where that information is readily available; the outsider has knowledge that it is available and makes no inquiry; and the information thus available is not of an unusual or extraordinary nature." *Arber v. Essex Wire Corp.*, 490 F.2d 414, 420 (6th Cir. 1974); *Scarabello v. Reichle*, 856 F. Supp. 404, 408 (N.D. Ill. 1994) (concluding, after reviewing *Jordan* and *Michaels*, that honesty and fair dealing did not require corporate officer, in response to plaintiff's desire to sell stock, to automatically provide the shareholder with information concerning the value of his stock, where such financial information was readily available to the plaintiff on request).

In response to this argument, Randall argues that these cases are inconsistent with Seventh Circuit case law holding that failure by the investor to exercise due care or diligence is generally not a defense to an intentional fraud claim. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1048 (7th Cir.), cert. denied, 434 U.S. 875 (1977); *see also Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540 (7th Cir. 1990); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir. 1985); *Goodman*, 582 F.2d at 405 n. 47. She also points out that *Arber* and *Scarabello* aren't exactly on point because the shareholders in those cases were either provided with financial statements or could have obtained them had they attended annual stockholder meetings. *Arber,* 490 F.2d at 420; *Scarabello*, 856 F. Supp. at 409.

37

On reply, defendants address only *Scarabello*. In that case, the plaintiff argued that the company and its majority shareholder breached their fiduciary duty by failing to disclose "basic information" concerning the value of his shares, "including the book value of the stock, the nature of the business, the economic outlook of the industry, the earnings capacity of the company, the possible goodwill of the company and the market price of the stock." *Id.* at 407. The company had paid the plaintiff $100 per share, which had been the company's standard redemption price since 1959. The price was far below the book value of the stock, but the plaintiff did not know that when he sold his shares. *Id.* at 405–06. Following the Seventh Circuit decisions in *Jordan* and *Michaels*, the court concluded that financial information from which the plaintiff could have determined the "fair value" of his stock—which the court equated with book value—"was readily available to the Plaintiff upon request, and thus was not a material fact of which only the Defendants had knowledge due to their unique positions." *Id.* at 408.

Defendants argue that they fulfilled their disclosure obligations to Randall because "Kiesler disclosed even more than what *Scarabello* found adequate" when he explained the net assets, or book value, for the shares. Dkt. 133, at 25. Randall denies that Kiesler provided this explanation or walked her through the Stock Price Formula calculation, so the court could not grant summary judgment even if it followed the reasoning of *Scarabello*. More important, the court does not find *Scarabello* persuasive. *Jordan* and *Michaels* plainly hold that closely held firms must disclose all material facts when they purchase their own stock—they make no distinction, as *Scarabello* does, between material facts that a plaintiff could and could not have determined on his own through due diligence. And defendants make no attempt to reconcile the tension in the case law between *Scarabello* and *Arber* and the cases holding that an investor's lack of due

diligence is generally irrelevant to an intentional fraud claim. The case law suggests that the plaintiff's conduct can be relevant if it amounts to "gross conduct somewhat comparable to that of defendant." *Sundstrand*, 553 F.2d at 1048 (quoting *Holdsworth v. Strong*, 545 F.2d 687, 693 (10th Cir. 1976)). But defendants haven't developed an argument to that effect, and the record allows for competing inferences on that point. As above with respect to whether the existence of the release imposed a duty on Randall to make a reasonable inquiry, defendants are free to attempt in their pretrial submissions to convince the court that Randall's lack of diligence is relevant to her nondisclosure claim. But for purposes of summary judgment, they have forfeited that issue by failing to develop it. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

As for Reed's compensation, defendants cite Wisconsin law to argue that Randall is "barred" from relying on any "alleged omissions" regarding Reed's salary and bonuses because such claims must be asserted derivatively on behalf of the corporation and cannot be asserted directly. Dkt. 71, at 46. Defendants equate Randall's challenge to Reed's compensation with a claim for corporate waste or self-dealing, which they say Randall can't assert directly. *Krier v. Vilione*, 2009 WI 45, ¶ 31, 317 Wis. 2d 288, 312, 766 N.W.2d 517, 528 ("When money is being misappropriated or stolen from a corporation, the damage is to the corporation, and as a result, the appropriate action is a derivative action and not a direct action."); *Link v. Link*, 2020 WI App 1, ¶ 62, 389 Wis. 2d 624, 937 N.W.2d 296 ("Alleged self-dealing by a corporate director does not transform an action that primarily injures the corporation into one that primarily injures a shareholder."). Accordingly, defendants' argument goes, "none of Randall's alleged omissions regarding Reed's salary and bonuses can be relied on in a direct securities fraud claim under 10b-5." Dkt. 71, at 47.

As discussed below, the court finds that Randall can pursue her state-law disguised dividend claim directly. *See* section D.3.b. And even if Randall could not recover Reed's excessive salary directly, that information about the salary could be material information required to be disclosed under Rule 10b-5(b). In other words, whether a particular harm to Randall is one for which she could recover directly under Wisconsin corporate law principles has nothing to do with whether an omission about that subject is material for purposes of a Rule 10b-5(b) claim. A jury could find that information about Reed's compensation was material, because it showed that the companies were more valuable than Randall previously believed.

## 2. **Scienter**

Defendants contend that even if Randall can show that Kiesler made misleading statements or failed to disclose material information, she still cannot prove the scienter element of her securities fraud claim. In the context of securities fraud, scienter is the "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193, n. 12. To defeat summary judgment on this element, Randall must produce evidence from which a jury could reasonably find that Kiesler either knew that the representations he made to her were false or that he was reckless in disregarding a substantial risk that they were false. *S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008). With respect to omissions, "the scienter requirement is satisfied by a showing of reckless conduct 'defined as a highly unreasonable omission, . . . , which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) (quoting *Sundstrand*, 553 F.2d at 1045).

Randall has presented sufficient evidence from which a reasonable jury could conclude that Kiesler knew, or disregarded a substantial risk, that he was speaking untruthfully when he represented that $1.3 million "fairly" represented the value of Randall's interest in the companies; that the companies could not "afford" to provide Randall $50,000; and that it "would be smart" for her to sell her shares because of a current risk of insolvency. Foremost among Randall's evidence is the history of communications between Kiesler and Gonnering, in which Gonnering not only estimated Widen Enterprises' fair market value to be around four times its revenues, but in which he outlined a plan to buy back the shares of "specific shareholders," which included Randall, at the Stock Price Formula valuation, which he described as "low." Other evidence includes the fact that the companies were willing to forego $2.7 million in PPP loans for what Gonnering described as the "opportunity" to purchase Randall's shares, and Kiesler's description of Windy Waters' acquisition of Randall's interest as "good news" and a "mission accomplished." In addition, although it's undisputed that Kiesler had concerns about Widen Enterprises' future in light of the pandemic, Randall has produced evidence indicating that the company's short-term financial situation was stable. A jury could reasonably conclude from this evidence that Kiesler misstated the truth in order to execute Gonnering's plan to buy out Randall at a "low" price.

In sum, Randall has presented sufficient evidence of scienter to warrant a jury trial on her securities fraud claims for misrepresentation and nondisclosure. Because defendants' motion for summary judgment with respect to Randall's claim for controller liability against Reed and for state-law securities fraud rests entirely on their claim that Randall's federal securities fraud claims have no merit, summary judgment will be denied on those claims as well.

### 3. Randall's motion for summary judgment on her federal securities fraud claims

Randall moves for summary judgment on her misrepresentation and omission claims under Rule 10(b)-5. Randall is not entitled to summary judgment on these claims.

Viewing the facts in the light most favorable to defendants, a jury could reasonably conclude that Kiesler's statements about whether the company could afford a partial redemption, the fairness of the redemption price, and the wisdom of the transaction were not misleading, or that even if they were, Kiesler did not make the statements with the intent to defraud Randall. There is also a genuine dispute whether Randall relied on the alleged misstatements and omissions: as defendants point out, she has stated that she would not have sold her shares if she knew defendants were thinking of selling the company or if she knew what her shares were actually worth, but she has also said that she felt like she had no choice but to redeem her shares because of her financial situation. In addition, in an email to her financial advisor on May 6, Randall stated that she did not trust Kiesler or Reed and didn't think they had her best interests in mind. This is enough to call into question the credibility of her sworn statement that she trusted them. It will be up to the jury to decide whether Randall actually relied on any of Kiesler's alleged misstatements.

### B. Federal securities fraud: scheme liability

In Count I of the complaint, Randall alleges a claim for what is known as "scheme liability" under Rule 10b-5. *See* 17 C.F.R. § 240.10b-5(a) and (c). To establish liability under these subsections, Randall must provide evidence of a "manipulation or deception" by defendants, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 4773 (1977); misstatements or omissions is not enough. *See, e.g., United States Sec. & Exch. Comm'n v. ITT Educ. Servs., Inc.*, 303

F. Supp. 3d 746, 765 (S.D. Ind. 2018) ("[S]cheme liability requires something more—deceptive acts along with misstatements or omissions."). In addition, Randall must establish the other elements of a securities fraud claim: (1) scienter; (2) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (3) reliance upon the alleged deceptive or manipulative act; (4) economic loss; and (5) loss causation. *See Stoneridge Invs. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008).

Randall alleges that she was the victim of a "squeeze out" scheme orchestrated by defendants. Dkt. 1, ¶¶ 202–06. Randall describes the scheme as follows:

> Defendants, through deceptive and manipulative acts including the unauthorized use of Stacy's signature stamp, the payment of disguised dividends to Reed, and the failure to hold shareholder and director meetings, ultimately functioned to squeeze Stacy out, cutting her off from the Companies and necessitating that she sell off portions of her interest therein at below market value, while Reed continued to receive disguised dividends.

Dkt. 114, at 58. Thus, Randall alleges three deceptive acts by defendants: (1) the use of her signature stamp, allegedly without authorization; (2) the failure to hold director meetings; and (3) the payment of "disguised dividends" to Reed.

Defendants move for summary judgment on Randall's claim of scheme liability on three grounds. First, they contend that Randall's "reliance on the use of the stamp is misplaced, and more importantly, time barred." Dkt. 71, at 48. Second, they say that Randall's claim that she was the victim of a "squeeze out" doesn't make sense because she initiated the May 2020 redemption. *Id*. at 49. Third, they argue that Randall is "barred" from asserting any securities fraud claim based on Reed's alleged disguised dividends. The court concludes that none of these arguments is sufficient to grant summary judgment to defendants on this claim.

43

### 1. Unauthorized use of signature stamp

Defendants assert that Randall has "known about the use of her stamp" for nearly two decades and therefore she has been on "inquiry notice" of the fraud for far longer than the two-year statutory limitations period for securities fraud claims. *Id.* at 48 (citing *Antelis v. Freeman*, 799 F. Supp. 2d 854, 861 (N.D. Ill. 2011) (in turn citing *Fujisawa Pharmaceutical Co. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997)). But as stated in the very case that defendants cite, "inquiry notice" is no longer the standard that triggers the two-year statute of limitations. *Id.* Instead, in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), the Supreme Court held that the limitations period begins to run when the plaintiff discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter. *Id.* at 652–53. Defendants don't address the *Merck* standard, but merely assert perfunctorily that if Randall had any concern about defendants' use of the stamp, "she could have requested Defendants to stop using it." Dkt. 71, at 48.

This argument isn't developed enough to show that Randall's fraud claim based on the alleged unauthorized use of her signature stamp is time-barred. What's more, defendants' argument appears to be based on the premise that Randall knew each time that defendants were using the stamp, when in fact Randall denies this, at least with respect to annual meeting minutes and consent resolutions. According to Randall, she never gave advance blanket approval for the use of her stamp on annual corporate documents and didn't learn that defendants were using it on these documents until she filed this lawsuit.

On reply, defendants pivot, arguing that Randall hasn't shown how she was harmed by unauthorized use of her signature stamp or the failure to conduct annual meetings or how that conduct was connected to her May 2020 stock redemption. Dkt. 133, at 35, 45. As defendants

point out, Randall hasn't presented evidence that the stamp was used to authorize self-dealing by others or to hide financial information that would have affected her decision to sell her stock, or that any corporate meetings were actually held. The court agrees that Randall's theory of causation is not clear from the record. But defendants didn't formulate an attack on causation until its reply, so they forfeited the argument for purposes of summary judgment. *Edwards v. Honeywell, Inc.*, 960 F.2d 673, 674 (7th Cir. 1992) (district court may not grant summary judgment on ground first raised in reply).

### 2. Randall's evidence of a "squeeze out"

Randall contends that Reed's compensation of approximately $1.5 million in 2019 and $2 million in 2020 was not based on work he performed for the companies but instead were distributions of corporate profits, or "constructive dividends," that defendants willfully withheld from Randall. *See Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 776–77, 582 N.W.2d 98 (Ct. App. 1998) (payment to corporate insiders that is "not based on work performed for the corporation" may be deemed as a matter of law to be a dividend, regardless what the corporation calls the distribution); *Yates v. Holt-Smith*, 2009 WI App 79, ¶ 16, 319 Wis. 2d 756, 768 N.W.2d 213. *See also Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, ¶ 24, 316 Wis. 2d 640, 764 N.W.2d 904. As evidence that this was a deceptive act done in furtherance of a scheme to commit securities fraud, Randall points to the following communications among defendants and other company personnel:

> In April 2019, Kiesler messaged Gonnering that Reed had a substantial tax bill that he had asked the company to pay as a bonus. Gonnering asked Kiesler whether a dividend would be preferable. Kiesler responded that it would not because a dividend would have to be distributed pro-rata to all shareholders, which would mean "a much higher number." Gonnering told Kiesler to go ahead and make the funds for Reed's tax bill available as a bonus.

On October 16, 2019, Gonnering messaged Kiesler that he wanted to explore buying back the shares of the passive shareholders (who were Randall and a trust that Reed had set up for his children) and then explore the benefits of paying Reed and Gary Norris (a Widen employee and Windy Waters minority shareholder) in dividends instead of wages.

On November 22, 2019, Gonnering sent an email to Reed, with a copy to Kiesler, reiterating his plan to buy back the shares of passive shareholders, noting that the "weighted EBITDA valuation is low."

Almost immediately after Randall's May 2020 redemption, defendants asked their accountants if it made sense to substitute dividends for compensation (the accountants said no).

According to Randall, these email exchanges show that Reed's compensation was not appropriate but rather was an arrangement that defendants set up deliberately to avoid making payments pro-rata to all the shareholders, which included Randall. *See* Dkt. 114, at 63. And she says defendants outlined in advance a plan to buy her out and to explore declaring dividend payments to Reed afterwards, a plan they followed through with. *Id.*

In their opening brief, defendants don't engage with any of this evidence except to say that the purported "squeeze out" makes no sense because it was Randall who came to Reed asking to redeem her shares in exchange for money. But Randall contends that if she hadn't been denied her fair share of the de facto dividends that Reed received as bonus and compensation in 2019 and early 2020, then she wouldn't have had to redeem any, much less all, of her shares in the company in the first place. Further, Randall wasn't looking to cash out her entire interest when she contacted Reed in May 2020; it was Kiesler, acting at Reed's direction, who proposed the total buyout.

### 3.  Randall's claims based on Reed's compensation

As they did with Randall's securities fraud claim based on misrepresentations and omissions, defendants contend that Randall cannot rely on evidence on Reed's compensation in her securities fraud claim based on scheme liability. The court will deny summary judgment for the reasons discussed above in section A.1.b.

On reply, defendants raise an additional challenge about Randall's reliance on Reed's compensation that is applicable only to her scheme liability claim. They argue that Randall's challenge to Reed's compensation is an improper attempt to "bootstrap" a state-law fiduciary duty claim into a federal securities action. Dkt. 133, at 31 (citing *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981)); *see also* Dkt 133, at 37. As the Supreme Court made clear in *Santa Fe Industries., Inc.*, scheme liability under Rule 10b-5 requires deception or manipulation. 430 U.S. at 472–73. As defendants point out, in spite of calling the plan a "scheme," it's not clear how making dividend-like payments to Reed but not to Randall was deceptive, as opposed to merely unfair. But defendants didn't raise this argument until reply, so they forfeited it.[6]

### C.  State-law breach of fiduciary duty

Randall asserts Wisconsin-law breach of fiduciary duty claims against Reed and Kiesler based on the same acts and omissions that form the basis of her securities fraud claims: (1) making material misrepresentations and omissions of fact in connection with her 2020 stock

---

[6] In their reply brief, defendants say that they "moved for summary judgment based on an insufficient set of facts to support a claim for scheme liability." Dkt. 133, at 37 (citing Dkt. 71, at 36–39). But those pages of their opening brief did not address the "disguised dividends" aspect of the scheme at all except to argue that Randall was not squeezed out because she was the one who initiated the stock redemptions. Randall was not required to defend her claim against challenges that defendants never raised.

redemption; (2) paying Reed dividends disguised as wages and bonuses; and (3) using her signature stamp without authorization.

To prevail on her claim for breach of fiduciary duty, Randall must establish three elements: (1) the defendants owed Randall a fiduciary duty; (2) the defendants breached that duty; and (3) the breach caused Randall damages. *Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 752 N.W.2d 800. Defendants and Randall both seek summary judgment on this claim. The court concludes that Reed and Kiesler owed Randall a fiduciary duty, because Kiesler was an officer of Windy Waters and Reed was the majority shareholder. But genuine disputes of fact on the issue of breach preclude summary judgment for either party.

### 1. Duty

Wisconsin recognizes two categories of fiduciary relationships: (1) those created by contract or a formal legal relationship, such as principal and agent, attorney and client, trust and trustee; or (2) "those implied in law due to the factual situation surrounding the transactions and relationships of the parties to each other and to the questioned transactions." *Prod. Credit Ass'n of Lancaster v. Croft*, 143 Wis. 2d 746, 752, 423 N.W.2d 544 (Ct. App. 1988). Randall seeks summary judgment based on the first type of duty.[7] Specifically, she contends

---

[7] Randall has moved for summary judgment on her fiduciary duty claim based on the formal legal relationship between a corporate officer, director, or majority shareholder and a minority shareholder. But she suggests that she may also seek to establish the existence of an implied fiduciary relationship based on "an inequality, dependence, weakness of age, of mental strength, of business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other." Dkt. 114, at 68 (citing *Balistrieri v. Alioto*, 2006 WI App 20, ¶ 17, 289 Wis. 2d 218, 709 N.W.2d 111; *see also Croft*, 143 Wis. 2d at 755–56; *see also* Dkt. 60, at 23. Defendants' motion for summary judgment didn't address the element of duty at all, much less argue that Randall can't prove an implied fiduciary duty. So even if Randall fairly pleaded a claim of implied fiduciary duty, neither side has asked the court to rule on it.

that Reed and Kiesler owed her a fiduciary duty because of their roles as corporate officers of Windy Waters.

Defendants agree that a corporate officer has a duty "to act in good faith and to deal fairly in the conduct of all corporate business," including with respect to its shareholders. *Reget v. Paige*, 2001 WI App 73, ¶12, 242 Wis. 2d 278, 626 N.W.2d 302. They admit that Kiesler, as treasurer of Windy Waters, was a corporate officer. But they deny that Reed was an officer or director, noting that he held no such title.

Randall concedes that Reed was not a named officer of Windy Waters, but she insists that the absence of a formal title is not controlling. Randall asks the court to find Reed to be an officer based on the undisputed fact that he controlled and "ultimately called the shots" at both companies. Dkt. 60, at 27.

Neither side presents a case on point in which the court addressed whether a majority shareholder can be deemed a "de facto" officer by virtue of his alleged control over the company. Randall cites *Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 444, 557 N.W.2d 835, 838 (Ct. App. 1996), for the proposition that the "controlling question is whether an employee is vested with policy-making authority or has the ability to make decisions which bind the company," but she did not make this argument until reply, so defendants have not had an opportunity to respond to it. The court agrees that if the *Modern Materials* inquiry applies, then Reed would seem to qualify as an officer.

But from a practical standpoint, whether Reed was an officer doesn't much matter. For purposes of a federal securities law claim, a controlling shareholder is a corporate insider with a duty to disclose material information. *Chiarella*, 445 U.S. at 228. As the Supreme Court recognized, this is "not a novel twist of the law." *Id*. So it would not be a stretch to deem Reed

49

to be an insider under a duty of disclosure. In any case, defendants admit that Reed owed at least some fiduciary duty to Randall. Defendants concede that, in his capacity as the majority shareholder of Windy Waters, Reed had a fiduciary duty to refrain from "using [his] voting power to require corporate action that grants majority shareholders an improper material benefit at the expense of minority shareholders." *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶ 59, 356 Wis. 2d 665, 849 N.W.2d 693. Moreover, defendants admit that Kiesler was acting at Reed's direction with respect to the May 2020 redemption of Randall's stock. So even if Reed wasn't an officer, he could be liable for Kiesler's statements and omissions under agency law principles. Defendants haven't argued otherwise. *See* Dkt. 35, at 21–22 (discussing agency principles in denying motion to dismiss).

Having concluded that Reed and Kiesler had fiduciary obligations to Randall, the court now turns to the alleged breaches.

### 2. Breach of fiduciary duty: stock redemption

#### a. Affirmative misrepresentations

Randall's claim that Kiesler breached his fiduciary duty by making affirmative misrepresentations to her in connection with the stock redemption requires little additional discussion. Regardless of what else the duty of good faith and fair dealing entails, defendants don't dispute that intentional misrepresentation is inconsistent with such a duty. As discussed in section A.1, material disputes of fact exist concerning whether Kiesler made any statements that were false or misleading. So neither Randall nor defendants are entitled to summary judgment on this claim.

### b. Nondisclosure

The parties dispute whether Wisconsin law imposes an affirmative obligation on Kiesler and Reed to proactively disclose information to Randall in connection with her stock redemption (apart from refraining from making misleading statements). Randall argues that Kiesler and Reed owed her not just a duty of good faith and fair dealing but a duty of loyalty, which "required that when they desired for the company to purchase all of [Randall's] stock, they had a duty to disclose to [Randall] all relevant information about that stock's value." Dkt. 60, at 30 (citing, *e.g.*, *Groshek v. Trewin*, 2010 WI 51, ¶ 18, 325 Wis. 2d 250, 784 N.W.2d 163; *Zastrow v. J. Commc'ns, Inc.*, 2006 WI 72, ¶ 28, 291 Wis. 2d 426, 718 N.W.2d 51). Defendants, on the other hand, deny that their fiduciary duty to Randall extended this far. Citing Delaware law, defendants argue that a director owes a duty of disclosure only when the board seeks collective shareholder action, not when it engages in transactions with individual shareholders. Dkt. 123, at 25 (citing cases).

Neither side is exactly correct on the extent of the fiduciary duty of corporate insiders under Wisconsin law. Wisconsin has adopted the special facts doctrine. *See Nichol v. Sensenbrenner*, 220 Wis. 165, 263 N.W. 650, 657 (1935) (noting that jury's conclusion that corporate insider had breached fiduciary duty by failing to disclose pending reorganization of corporation's subsidiary before purchasing stock from a minority shareholder was in accord with the "special circumstance rule"); *McMynn v. Richardson-Phenix Co.*, 186 Wis. 442, 201 N.W. 272, 280 (1924) ("Even though a director may not be under the obligation of a fiduciary nature to disclose to a shareholder his knowledge affecting the value of the shares, that duty may exist in special cases . . . . ") (quoting *Strong v. Repide*, 213 U.S. 419 (1909)). The *Nichol* court quoted a leading treatise as stating the rule:

> There may be special circumstances requiring a director to disclose to a stockholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a stockholder. The special circumstances producing exceptional cases seem to be an assured sale, merger, or other fact or condition enhancing the value of the stock, known by the officer or officers, not known by the stockholder, and not to be ascertained by an inspection of the books.

*Id.*, 263 N.W. at 657 (quoting Vol. 3, Fletcher (Permanent Ed.) § 1171). *See also Kohler v. Kohler Co.*, 208 F. Supp. 808, 825 (E.D. Wis. 1962), *aff'd*, 319 F.2d 634 (7th Cir. 1963) (noting that Wisconsin adheres to special facts doctrine).

In section A.1.a, the court concluded that Randall had not adduced evidence that defendants had decided to sell the company, so Randall cannot proceed on claims based on that alleged nondisclosure. But Randall has adduced evidence that Reed and Kiesler knew other facts about the company's stock value that could not be ascertained by an inspection of the books, including Gonnering's estimates of Windy Waters' fair market value and his determination that the Stock Price Formula was a "low" estimate of that value. *See* Section A.1.b. Defendants dispute whether these estimates were useful to determine the value of the stock, but that is an issue for the jury to decide. The court will deny summary judgment to both parties on Randall's breach of fiduciary duty claim based on nondisclosure.

### 3.  Breach of fiduciary duty: disguised dividends

Randall claims that Reed and Kiesler also breached their fiduciary duty to her by issuing constructive dividends to Reed, in the form of outsized and unearned salary and bonuses, while withholding the corresponding dividends to Randall. Randall contends that Reed's total compensation of $1.5 million in 2019 and $2 million in 2020 did not reasonably reflect work he did for the companies. Randall also contends that Reed's $500,000 bonus in 2019 was a

constructive dividend because Reed testified that it was for his personal tax liability. Both sides have moved for summary judgment on this claim. The court begins with defendants' motion.

Defendants move for summary judgment on Randall's disguised dividend claim on three grounds: (1) it is barred by the statute of limitations; (2) it's a derivative claim that Randall cannot assert directly; and (3) Randall lacks evidence to show that Reed's salary and bonuses were inappropriate. None of these arguments is persuasive.

### a. Statute of limitations

In Wisconsin, tort claims must be brought within three years of when the cause of action accrues. *See* Wis. Stat. § 893.57. Wisconsin applies the "discovery rule" for the time of accrual for tort causes of action. *See Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983). Under the discovery rule, tort claims accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first. *Id.* Reasonable diligence "means such diligence as the great majority of persons would use in the same or similar circumstances." *Awve v. Physicians Ins. Co.*, 181 Wis. 2d 815, 823, 512 N.W.2d 216 (Ct. App. 1994).

Defendants argue that Randall has been aware of the possibility of a breach of fiduciary duty by Reed for much longer than three years. They say that Randall has known "for decades" that she was not receiving distributions or dividends while at the same time, Reed appeared to be profiting from the company. Dkt. 71, at 68. In support, they present testimony from Randall's son, Justin, who testified that he recalled hearing Randall and his father complaining about their treatment as shareholders "versus what Reed was doing" as far back as 20 years ago. According to defendants, because Randall has had enough information since "well before

2010" that would "cause a reasonable party to make a further inquiry," her breach of fiduciary duty claim based on disguised dividends is barred by the discovery rule.

The court rejects this argument. Defendants don't sufficiently explain how, even with diligence, Randall could have discovered 20 years ago that Reed would pay himself $3.5 million in alleged disguised dividends in the years 2019 and 2020, which is the basis for Randall's disguised dividend breach of fiduciary duty claim. Defendants are free at trial to argue that Randall closed her eyes to means of information reasonably accessible to her about the company, including Reed's compensation, and to seek an instruction on the discovery rule, if the evidence warrants it. But vague complaints that Randall made 20 years ago aren't enough to compel a finding that her disguised dividend claim is untimely.

### b.  Direct vs. derivative action

Defendants contend that Randall's claim based on Reed's alleged excessive compensation is a claim for corporate waste or self-dealing that can only be asserted by a shareholder in a derivative action brought on behalf of the corporation. *See Krier*, 2009 WI 45, ¶ 31 ("When money is being misappropriated or stolen from a corporation, the damage is to the corporation, and as a result, the appropriate action is a derivative action and not a direct action."); *Reget*, 2001 WI App 73, ¶ 16 (allegation that "substantial compensation" was being paid to five employees, therefore wasting corporate assets, is "usually an allegation of an injury primarily to the corporation"); *Link*, 2020 WI App 1, ¶ 62 ("Alleged self-dealing by a corporate director does not transform an action that primarily injures the corporation into one that primarily injures a shareholder."). Because Randall is no longer a shareholder of Windy Waters, defendants argue, she is barred from asserting this claim.

The court disagrees. In determining whether a claim is properly brought by an individual or on behalf of the corporation, the Wisconsin Supreme Court has explained that the underlying question is whether "the primary injury is to the corporation or the shareholder." *Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, ¶ 23, 316 Wis. 2d 640, 764 N.W.2d 904. An injury is primarily to the shareholder if it was "caused by acts against the plaintiff," *Borne v. Gonstead Advanced Techniques, Inc.*, 2003 WI App 135, ¶ 15, 266 Wis. 2d 253, 667 N.W.2d 709, and "affects [the] shareholder's right in a manner distinct from the effect upon other shareholders." *Notz*, 2009 WI 30, ¶ 23 (quoting *Jorgensen v. Water Works Inc.*, (*Jorgensen II*) 2001 WI App. 135, ¶ 16, 246 Wis. 2d 614, 630 N.W.2d 230). Randall's claim is not one of corporate waste, but rather is a claim of unequal treatment among shareholders based on Reed's receipt of alleged dividend payments, disguised as bonus or excess compensation, that Randall did not receive. As Randall points out, the Wisconsin courts have allowed shareholders to proceed directly on similar claims against directors or majority shareholders. *See, e.g., Reget*, 2001 WI App 73, ¶ 15 (shareholder could proceed individually on claim that board paid excessive compensation that should be viewed as "partially a payment of dividends," provided he could show bad faith by directors); *Jorgensen*, 2001 WI App 135, ¶¶ 18–19 (four majority shareholder-directors breached individual rights of minority shareholders when they stopped making distributions to the two minority shareholders while continuing to pay themselves distributions to cover their reportable, pass-through income); *Notz*, 2009 WI 30, ¶ 27 (minority shareholder alleged an injury "primary" to him when he alleged that majority shareholder had treated him inequitably by directly benefitting from the use of corporation's funds to conduct due diligence about a potential acquisition that majority shareholder voted to pass up but that it later acquired for itself).

Defendants offer two primary arguments in response. First, they argue that Randall can't show the required "distinct injury" under these cases because she was not the only shareholder who did not receive a dividend-like payment in the form of a bonus or excess compensation. The other minority shareholders, Kiesler, Gonnering, and Norris, were in the same boat. Second, defendants assert that Randall can't show that she was injured at all because she can't prove that Windy Waters would have declared a dividend if Reed was paid less.[8]

*Reget* defeats both of these arguments. 2001 WI App 73. Reget was one of several minority shareholders in a closely held corporation in which many of the majority shareholders were related to the corporation's founder. Reget sued the corporation, its officers and directors, and the family-member shareholders for breach of fiduciary duty and shareholder oppression, asserting that the corporation had not paid dividends despite its cash-rich position and that five family members had received excessive compensation for their service to the corporation. *Id.* ¶ 8. The Wisconsin court of appeals held that, insofar as Reget had alleged that the corporation wasted corporate funds by paying five family members "substantial compensation" in the form of salaries, bonuses, and other benefits, that was a derivative claim that could only be brought on behalf of the corporation. *Id.* ¶ 16. As for his claims relating to the non-payment of dividends, the court observed that the board had no duty to pay dividends to shareholders instead of using profits for other purposes. *Id.* ¶ 15. Nevertheless, the court held that insofar as Reget's complaint had "implie[d] that the compensation paid five executives was excessively

---

[8] Defendants also suggest that Randall could not have been harmed by Reed's excessive salary because he was paid by Widen Enterprises, not Windy Waters, and Widen Enterprises did not pay dividends. The court rejects this argument. Widen Enterprises was Windy Waters' wholly-owned subsidiary and its only profit-generating asset. Defendants largely viewed ownership of the two companies as the same, as evidenced by (among other things) Gonnering's interest in whether it made sense to pay Reed in dividends rather than salary.

high and should be viewed as partially a payment of dividends," he had not only stated a direct breach of fiduciary duty claim, but he could "survive summary judgment" if he could provide evidence of bad faith by the six directors in their employee compensation decisions. *Id.* ¶ 15. The court went on to explain that under the business judgment rule, the directors were entitled to a presumption that their compensation decisions had been made in good faith, but Reget could overcome it if he showed that the directors had "willfully compensated [the executives] excessively for the services they provided to the corporation in an effort to pay them dividends, which they willfully withheld from other shareholders." *Id.* ¶ 20.

Three principles can be drawn from *Reget*. First, a plaintiff need not be the *only* shareholder denied a dividend in order to establish that her injury is personal rather than one that is primarily to the corporation, at least where there is evidence that dividends (or dividend-like payments) are being paid to another group of shareholders. Second, to show the requisite individual injury, the plaintiff must show that the directors or majority shareholders purposefully withheld dividends or dividend-like payments from the minority shareholder(s). Third, if bad faith is shown, the excess compensation (or similar distribution of corporate profits) to the favored group is *construed* to be a dividend; whether the corporation would *actually* have issued a dividend is irrelevant.

Under these principles, Randall's allegations concerning Reed's compensation state a direct claim. She has not merely alleged that Reed was overpaid, but that Reed and Kiesler intentionally disguised that compensation as wages instead of a dividend in order to avoid having to pay her and the other shareholders their pro-rata share. This claim does not require a showing of injury to the corporation, so Randall may proceed on it.

57

### c. Randall's evidence of inappropriate compensation

In their opening brief, defendants asserted that Randall can't meet her burden to show that Reed's compensation was inappropriate. In support, they cite affidavit and declaration testimony from Gonnering and Reed stating that Reed's compensation for serving as board chairman of Widen Enterprises was "within the range of salaries and bonuses for comparable companies in the market." Def. PPFOF, Dkt. 130, ¶ 79.

Randall offers two arguments in response. First, she contends that this testimony is inadmissible because Gonnering is neither an expert on executive compensation nor did he consult with one. As she points out, Gonnering merely claimed to have read "popular business literature," but he couldn't identify a specific piece of information that led him to believe that Reed's compensation in 2019 and 2020 was a reasonable amount for what Reed did at the company.

Second, Randall contends that even if admissible, Gonnering's testimony is put into dispute by the five types of evidence: (1) a 2019 survey of private companies' executive compensation conducted by Chief Executive Research, which shows that Reed's compensation for serving as a board chairman was not within the range for comparable companies, *see* Dkt. 117-2[9]; (2) Reed was not actively involved in the day-to-day operations of the company, but rather spent up to six months of the year either in Arizona or at the family cottage; (3) Reed's work allegedly consisted of meeting with Gonnering and strategizing about the companies, but

---

[9] Defendants argue that this survey is inadmissible absent a witness who can establish that it meets the test for admissible expert opinions under Rule 702 of the Federal Rules of Evidence. Dkt. 133, at 33–34. The court defers ruling on this objection because Randall has enough evidence to defeat summary judgment without the survey. And the court notes that the survey would seem to be admissible as rebuttal evidence if defendants rely on "popular business literature" to establish the propriety of Reed's compensation.

Reed was unable to describe the company's software products in any detail and Gonnering, who testified as Widen Enterprises' Rule 30(b)(6) witness, offered few specifics of work Reed actually performed; (4) when Grant Thornton LLP, a national accounting firm, conducted a "quality of earnings" study on Widen Enterprises for purposes of marketing the company for sale in 2021, it stated that it had adjusted the company's EBIDTA to add back all of Reed's salary, bonus, and fringe benefits for 2019 and 2020 based on its understanding that Reed's roles as "owner" or "owner/president" were "non-essential to business operations in 2019 and 2020" and that Reed was "not actively involved" in the operations of the company, *see* Dkt. 63-31, at 13; and (5) Reed acknowledged that his process for deciding his compensation amount depended on Widen Enterprises' financial performance.

On reply, defendants invoke the business judgment rule, which acknowledges that corporate directors should be allowed a fair amount of leeway in making business decisions without interference from the courts. Under the rule, the director of a corporation is presumed to have acted in good faith and in the best interest of the company in making business decisions, so long as a minimum level of care is exercised in arriving at the decision. *Yates v. Holt-Smith*, 2009 WI App 79, ¶ 22, 319 Wis. 2d 756, 768 N.W.2d 213. Defendants assert that Randall needs expert testimony to overcome this presumption.

The court disagrees, for two reasons. First, a director who sets his own salary is not protected by the business judgment rule. *Reget*, 2001 WI App 73, ¶ 19 n.11 ("It may be argued that a director who sets his own salary is not protected by the business judgment rule."); *Gauger v. Hintz*, 262 Wis. 333, 346, 55 N.W.2d 426 (1952) (["W]hen an officer or director participates in setting his or her compensation, such transactions "should be subject to close and searching scrutiny[.]"). Second, Randall has expert-like evidence in the form of the due

diligence report from Grant Thornton, whose accountants determined—based on information provided to them by Widen Enterprises—that Reed's role was not essential to the business and therefore his compensation should be added back to corporate earnings. Defendants insist that Randall's interpretation of the Grant Thornton report is "incorrect" and that, in describing Reed's role as "non-essential," Grant Thornton was simply assuming that a potential buyer would not be hiring Reed but would have its own leadership team to provide the same role. But that doesn't make much sense. Grant Thornton indicated that Reed's duties could be absorbed by a potential buyer "at no additional cost burden." If Reed was performing valuable work for the companies, then presumably there would have been a cost associated with it.

Defendants also insist that Grant Thornton was simply wrong about what Reed actually did. But Reed and Kiesler testified that the information they provided to Grant Thornton was accurate. And defendants haven't offered any testimony from anyone at Grant Thornton who prepared the report to say otherwise or to explain the basis for its conclusions about Reed's compensation. Absent clarification from someone at Grant Thornton, the report is sufficient on its face to give rise to a genuine dispute of fact concerning the reasonableness of Reed's compensation.

Defendants' motion doesn't raise any other grounds for dismissing Randall's breach of fiduciary duty claim based on Reed's excess compensation. So their motion for summary judgment on this claim will be denied.

### d. Randall's motion on breach of fiduciary duty based on disguised dividends

Randall contends that defendants have failed to create a genuine dispute about the appropriateness of Reed's compensation and bonus. As to compensation, she argues that the

Grant Thornton report, along with the other evidence described above, establishes as an undisputed fact that Reed's compensation was not based on work performed for the corporation. The court disagrees.

Gonnering, who has personal knowledge of the work Reed performed for the corporation, has testified that insofar as Grant Thornton was suggesting that Reed did not perform valuable work, they were mistaken. Further, although Gonnering and Reed's testimony about what Reed did was somewhat vague, it is sufficient to support a finding that at least some, if not all, of Reed's compensation was for work he performed for Widen Enterprises and was not a disguised dividend. The fact that Reed based his compensation on how well the company was doing isn't conclusive evidence to the contrary. *See Est. of Luterbach v. Ace Redi-Mix, Inc.*, No. 2023AP472, 2024 WL 29569, at *4 (Wis. Ct. App. Jan. 3, 2024) (rejecting proposition that year-end payments to corporate employees that are based on the corporation's performance as a whole, rather than each employee's individual performance, cannot be considered bonuses). Finally, to prove her breach of fiduciary duty claim, Randall must show not just that Reed's compensation was excessive; she must also show that Reed willfully paid himself excessively "in an effort to pay [himself] dividends, which [he] willfully withheld from other shareholders." *Reget*, 2001 WI App 73, ¶ 20. Questions of motive and intent are issues for the trier of fact. *See Gouger v. Hardtke*, 167 Wis. 2d 504, 516–17, 482 N.W.2d 84 (1992); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993).

Randall's claim concerning Reed's bonus payments presents a closer question. Randall presents deposition testimony from Reed stating that he paid himself a bonus in the amount he needed to pay his S Corp taxes, along with contemporaneous email correspondence between

Kiesler and Gonnering confirming that Reed's 2019 bonus was intended to address his "substantial tax bill."[10] Dkt. 126, at 32–33. As Randall points out, a distribution of profits to pay tax liabilities is, by definition, not a distribution for work performed.

But defendants have submitted evidence showing that Reed and his wife owed only a total of roughly $30,000 on their 2018 tax return, which was completed in April 2019. They also present evidence that in 2018, Windy Waters made estimated tax payments on behalf of all the shareholders of Windy Waters, including Randall. *See* Dkt. 124, ¶ 128 (citing Exh. 19 to Windy Waters Dep., Nov. 3, 2023).[11] Although far from overwhelming, the court finds this evidence sufficient to raise a genuine dispute about whether Reed's bonus payments were in fact for taxes and whether such payments were intentionally withheld from Randall to deprive her of dividends.

#### 4.  Breach of fiduciary duty: use of signature stamp

Defendants' motion for summary judgment on this claim is denied for the same reasons discussed above in the context of Randall's scheme liability claim. *See* section B.1.

### D.  State-law intentional misrepresentation

The elements of a common-law intentional misrepresentation claim are similar to those of securities fraud. *See Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶¶ 12–13, 283

---

[10] It's not clear from Randall's submissions whether she contends that Reed's 2020 bonus was also decided based on his personal tax liabilities, nor is it clear whether Reed awarded himself a 2020 bonus before Randall redeemed her stock. So the court limits its discussion to Reed's 2019 bonus.

[11] This exhibit consists of defendants' own notes created in preparation for Widen Enterprises' Rule 30(b)(6) deposition. The court assumes that defendants will be able to introduce this evidence in an admissible form at trial, so it overrules Randall's hearsay objection. *See* Dkt. 127, ¶ 128.

Wis. 2d 555, 699 N.W.2d 205 (plaintiff must allege defendants knowingly or recklessly made untrue factual representation or failed to disclose a fact with the intent to defraud, and plaintiff relied on it to her detriment). Defendants move for summary judgment on the following grounds: (1) no affirmative misrepresentations were made; (2) no omissions were material; and (3) Randall can't show justifiable reliance. On reply, defendants also challenge whether they had a duty to disclose under Wisconsin law.

The parties' arguments on the first two grounds are the same as for Randall's federal securities fraud claim, so the court's conclusion is the same. *See* section A.1. The court will grant summary judgment to defendants on Randall's common-law fraud claims to the extent they are based on alleged misrepresentations or omissions regarding plans to sell Widen Enterprises. But Randall has adduced evidence regarding the other alleged misrepresentations and omissions sufficient to survive summary judgment. The court recognizes that Randall has the burden to prove her common law misrepresentation claim by clear and convincing evidence, which may be a higher burden than required for her securities fraud claims. But the court will allow the jury to determine whether Randall's evidence clears that higher bar.

That leaves defendants' challenges based on duty to disclose and reliance.

## 1. Duty to disclose

The court again addresses the question of "duty," this time as defined under Wisconsin misrepresentation law. A party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the

mistaken party would reasonably expect disclosure of the fact. *Kaloti Enterprises, Inc.*, 2005 WI 111, ¶ 20. If a duty to disclose exists, the failure to disclose is equivalent to a misrepresentation. *See id*. ¶ 13 (When there is a duty to disclose a fact, the law has treated the failure to disclose that fact "as equivalent to a representation of the nonexistence of the fact."); *see also Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95 (1980).

As an initial matter, Randall says defendants didn't contest in their opening brief that they had a duty to disclose. Dkt. 114, at 64. Defendants dispute this, citing to page 46 of their brief. Dkt. 71. But that page merely sets out the general rule from *Kaloti* concerning duty to disclose. Defendants did not specifically develop any argument about how that rule applies to this case.

Defendants did propose one fact, supported by Kiesler's sworn declaration, that he was not aware that Randall was mistaken about any material fact, which would seem to be relevant to the *Kaloti* rule for duty to disclose. *See* Dkt. 130, ¶ 356. In response, Randall cited many of her own proposed facts, which consist mainly of Kiesler's alleged misrepresentations and the various pieces of information that defendants allegedly withheld from her. *Id*. Replying to this response, defendants asserted that, "without explanation," Randall's evidence failed to raise a genuine dispute of fact concerning Kiesler's knowledge. *Id*.

The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment. *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised on pain of forfeiting their position."). Even though

defendants proposed a fact concerning Kiesler's lack of knowledge that Randall was mistaken about any fact, Randall wasn't required to "explain" her opposition facts unless defendants raised the issue in their opening brief.

The issue of Kiesler's duty of disclosure under Wisconsin misrepresentation law was not properly raised on summary judgment, so the court will not decide it on summary judgment.

## 2. Reliance

To prove her claim of intentional misrepresentation, Randall must prove that she believed Kiesler's misrepresentations and omissions and that her reliance on the representation was justifiable. *Bank of Sun Prairie v. Esser,* 155 Wis. 2d 724, 732, 456 N.W.2d 585, 588–89 (1990). "The general rule in Wisconsin, as elsewhere, is that the recipient of a fraudulent misrepresentation is justified in relying on it, unless the falsity is actually known or is obvious to ordinary observation." *Hennig v. Ahearn*, 230 Wis. 2d 149, 171, 601 N.W.2d 14 (Ct. App. 1999). Negligent reliance is not justifiable. *Bank of Sun Prairie*, 155 Wis. 2d at 732. The reasonableness of one's reliance on a misrepresentation is judged after reviewing all the facts and circumstances of the case, including "the intelligence and experience of the misled individual and the relationship between the parties." *Id.* at 734.

Whether Randall reasonably relied on Kiesler's statements and omissions is a question for the jury. Defendants' arguments rest largely on disputed facts (*e.g.,* that Kiesler "walked her through" the formula and read through each paragraph of the redemption agreement) and off-point legal arguments about her past redemptions. At the same time, defendants ignore facts in Randall's favor, including her relative lack of business savvy and her asserted trust in Reed and Kiesler. Moreover, defendants' arguments largely address Randall's purported lack of reliance on misrepresentations concerning the fairness of her share price; they do not (until

reply), address the other alleged misstatements. Accordingly, they have failed to show the the material facts are not genuinely disputed.

### E. Civil conspiracy and Widen Enterprises' liability

Defendants renew their argument, raised initially in their motion to dismiss, that they cannot be held liable for conspiracy to commit fraud (Count X of the complaint) because they are protected by the intra-corporate conspiracy doctrine. Under this doctrine, when it applies, corporate officials acting within the scope of their employment cannot conspire with one another or with the corporation.

The problem for defendants is that the intra-corporate conspiracy doctrine applies only in limited contexts, where it makes sense to treat the corporation as a unified entity for purposes of the claim. The doctrine arose in anti-trust cases under Section 1 of the Sherman Act, which requires proof of anti-competitive behavior among competing businesses. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). Coordination among the employees of a single firm, or between a firm and its subsidiaries, does not meet the Sherman Act requirement of a "plurality of actors." *Id*. The doctrine has been extended to conspiracies to interfere with civil rights under 42 U.S.C. § 1985. *See, e.g., Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972). There, too, the underlying theory is that a discriminatory business decision that reflects the collective judgment of two or more executives of a single company isn't the kind of coordination among multiple actors that would support an illegal conspiracy. *Id*. The *Dombrowski* court expressly disavowed any suggestion that "an agent's action within the scope of his authority will always avoid a conspiracy finding." *Id*. There is no general rule that corporate agents working within the scope of their employment cannot conspire with one another.

66

The rationale of the intra-corporate conspiracy doctrine is inapplicable here. It makes no sense to treat Windy Waters as a unified entity that made a single decision. This case involves multiple actors within the companies who coordinated their activities to purchase a minority shareholder's interest at a price far below its market value. Kiesler, for example, may have effectuated the stock redemption as Windy Waters treasurer, but he was also working at Reed's direction, and he was also advancing his own private interests as a shareholder himself. The court has already concluded that Randall has adduced evidence to support her allegations that the coordinated activities were intentionally deceptive. The court will deny defendants' motion for summary judgment on Randall's civil conspiracy claim.

### F.  Civil theft under Wis. Stat. § 943.20(1)(d)

Under Wis. Stat. § 943.20(1)(d), a person commits civil theft when he "[o]btains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Defendants say this claim should be dismissed for the same reasons they asserted in support of their motion on Randall's securities fraud claim, namely, that Randall has failed to show untrue statements or omissions of material fact or evidence of deception. Dkt. 71, at 60. But as this court has already determined, Randall has adduced evidence from which a jury could find misrepresentations and intent to defraud (*i.e.* scienter, in the language of securities fraud). So the court will deny defendants' motion.

On reply, defendants tersely assert that Randall failed to show that any defendant other than Windy Waters could be found to have obtained title to Randall's property. Dkt. 133, at 53. But defendants didn't raise this argument until their reply brief, so they have forfeited it for purposes of summary judgment.

### G. Fraudulent inducement

Randall moves for summary judgment on her state-law claim for rescission based on fraudulent inducement. The motion is denied. The standards for establishing fraud for purposes of avoiding a contract are less stringent than those for imposing tort liability. *Notte*, 97 Wis. 2d at 223, n.7. But even under the less stringent standard, there are genuine disputes of fact concerning whether Kiesler's statements were misrepresentations, whether he had a duty to disclose facts that were omitted, and whether Randall justifiably relied on the misrepresentations in deciding to enter the redemption agreement.

## CATEGORY 3 ISSUES: RECISSION AND OTHER REMEDIES

### A. Randall's claims for rescission of the redemption agreement

If Randall succeeds on her common-law fraud or breach of fiduciary duty claims, then Randall will be able to seek rescission of the redemption agreement. *See Notte*, 97 Wis. 2d at 223. In counts eleven through fourteen of the complaint, Randall asserts four other grounds to void the redemption agreement. Randall has not shown that any of these provide a basis to void the redemption agreement; the court will grant summary judgment to defendants on each of these counts.

#### 1. Federal Exchange Act § 29(a)

Randall asserts that the redemption agreement is void under the non-waiver provision in Section 29(a) of the federal Exchange Act. That section provides:

> Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void.

68

15 U.S.C. § 78cc(a). Defendants contend that this claim must be denied because Randall can't prove her securities fraud claims. Dkt. 71, at 75. Randall says in response that if her securities fraud claims survive summary judgment, which the court has now ruled that they do, then this amounts to a concession by defendants that the May 2020 redemption agreement is void. Dkt. 114, at 87–88. On reply, apart from repeating their argument that this claim fails along with the merits of Randall's securities fraud claims, defendants assert that this claim should be dismissed because it "seeks a specific remedy for other claims and is not its own cause of action." Dkt. 133, at 48.

The court is not quite sure what defendants mean. Perhaps they are alluding to this court's statement in its order on the motion to dismiss that a declaratory judgment is a remedy for an underlying cause of action and is not a separate, substantive claim for relief. Dkt. 35, at 20. Even so, that would not mean that Randall's request for a ruling that the redemption agreement is void because it violates the Exchange Act's anti-waiver provision must be "dismissed," only that it is premature. And in any case, the court does not understand Randall to be arguing that the redemption agreement is void only if she *prevails* on their securities fraud claims. Rather, she contends that the redemption agreement was void from the beginning because it purports to "waive [defendants'] compliance" with Rule 10b-5 by virtue of its release provision. Defendants' motion for summary judgment does not grapple with this argument.

Regardless, the court does not deem defendants to have "conceded" that the entire May 2020 redemption agreement is void, as Randall asserts. As defendants argued in connection with their motion to strike Randall's request for rescission of the redemption agreement, Section 29(a)'s anti-waiver provision would apply at most to the agreement's release provision, as that is the only provision of the agreement that could arguably purport to "waive

69

compliance" with the Exchange Act. Even assuming Randall could establish that the release was unlawful under Section 29(a), it would not follow that the *entire agreement* was null and void. As defendants point out, the redemption agreement contains a severability clause. Dkt. 37, at 5 (citing ¶ 7.d. of the Stock Redemption Agreement). Severability clauses are entitled to great weight and courts generally enforce them unless severing a provision will "defeat the primary purpose of the bargain." *Roustan v. Robinhood Fin. LLC,* 2022 WI App 13, ¶ 27, 973 N.W.2d 22 (quoting *Schara v. Thiede*, 58 Wis. 2d 489, 495, 206 N.W.2d 129 (1973)). Here, the primary purpose of the redemption agreement was for Windy Waters to redeem Randall's interest in the company at a price of $1.3 million, not to settle any outstanding claims or disputes between the parties. So severing the release provision would not defeat the primary purpose of the agreement.

If Randall succeeds on her fraudulent inducement or breach of fiduciary duty claims, then the release is unenforceable, regardless whether it might also be unenforceable under Section 29(a). But it does not follow that Section 29(a) alone would require that the entire redemption agreement automatically be deemed a nullity and set aside.[12]

---

[12] Randall also argues that the entire redemption agreement is void under Section 29(b) of the Exchange Act, which states that agreements "made in violation of [a] provision of this chapter [and] or [a] rule or regulation thereunder . . . shall be void[.]" *See* Dkt. 36 (Randall's opposition to defendant's motion to strike) at 8–9; Dkt. 60 (Randall's summary judgment brief) at 67. But as defendants pointed out in their reply to the motion to strike, courts have "consistently construed" this provision as making contracts in violation of the Exchange Act "voidable, not void." *Gannett Co. v. Reg. Pub. Co.*, 428 F. Supp. 818, 830 (D. Conn. 1977) (citing cases). As the court explained in *Gannett*, a contract induced by fraud in violation of the Securities Act is "not ipso facto void," but is merely voidable at the option of the innocent party. *Id*. at 830–31. Randall has not presented any contrary authority.

### 2. Unconscionability

"For a contract or a contract provision to be declared invalid as unconscionable, the contract or contract provision must be determined to be both procedurally and substantively unconscionable." *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 29, 290 Wis. 2d 514, 714 N.W.2d 155. For procedural unconscionability, a court must determine whether there was "'a real and voluntary meeting of the minds' of the contracting parties." *Id.* ¶ 34 (citation omitted). Substantive unconscionability "addresses the fairness and reasonableness of the contract provision subject to challenge." *Id.* ¶ 35. "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Disc. Fabric House of Racine, Inc. v. Wisconsin Tel. Co.*, 117 Wis. 2d 587, 601, 345 N.W.2d 417 (1984). Unconscionability is determined as of the time the parties entered into the agreement, not with the benefit of hindsight. *See Gertsch v. Int'l Equity Research*, 158 Wis. 2d 559, 578, 463 N.W.2d 853 (Ct. App. 1990). Unconscionability is a mixed question of fact and law, with the ultimate determination a matter of law for the court. *Jones*, 2006 WI 53, ¶ 25. In this case, the facts material to unconscionability are undisputed.

Starting with substantive unconscionability, Randall hasn't identified anything unreasonable about the actual terms of the parties' agreement. Randall exchanged her shares in Windy Waters for a payment of roughly $1.3 million over a seven-year term, to be paid by the company in monthly installments, with interest accruing at the rate of .58 percent annually. The fact that it was unsecured or that the interest rate was low are not substantively unconscionable: the terms gave Randall a sizeable monthly income. Contrary to Randall's contention, the release provision was not one-sided in the company's benefit, but was mutual:

Randall had potential liability as a director and officer of Windy Waters. The redemption payment was calculated according to a formula that had been used for many previous redemptions.

Randall's arguments on procedural unconscionability are unpersuasive as well. Randall points to her lack of business acumen, her lack of legal representation, the short time frame she had on May 13 to decide whether to take the offer, the fact that the documents were drafted by the company's attorney, her statement to Seid that she was uncomfortable signing the documents, and Kiesler's alleged failure to explain its terms. But Randall admits that Kiesler and her son both advised her to consult with an attorney, that she knew that she could (and did) consult with a financial advisor, that Seid told her that no one could force her to sign the documents, and that Kiesler did not limit the amount of time she had to review the documents. She does not claim that she didn't have time to read the documents or that she didn't understand their terms, or that she didn't understand the magnitude of the decision she was making. Under the full circumstances here, Randall was not deprived of a meaningful choice when she signed the redemption agreement.

The court concludes that the redemption agreement was not unconscionable.

### 3. Duress

To establish duress, Randall must show, by clear and convincing evidence, that she was the victim of a wrongful or unlawful act or threat that deprived her of her unfettered will and compelled her to make a "disproportionate exchange." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 109, 293 N.W2d 155 (1980). Most of the wrongful acts she alleges (the unauthorized use of her signature stamp, the withholding of material information, and the "disguised dividends" to Reed) are things she didn't know about, so they couldn't have compelled her to enter the

72

contract. *See Pope v. Ziegler*, 127 Wis. 2d 56, 60, 377 N.W.2d 201, 203 (Ct. App. 1985) (alleged compulsion must be a "direct result" of the wrongful acts). The only act that could possibly have directly deprived her of her free will was Kiesler's end-of-day deadline on May 13. But "[a] threat to do what the person making the threat has a legal right to do does not constitute duress." *Id.*

### 4.   Public policy

In her response brief, Randall affirmatively waives her claim that the redemption agreement is void as a matter of public policy, Dkt. 114 at 95, so the court will grant summary judgment to defendants on this claim.

### B.   Minority shareholder oppression

Randall asserts a claim for relief against Reed for minority shareholder oppression. Defendants move for summary judgment on the ground that Randall lacks standing to bring this claim because she is no longer a shareholder. Defendants recycle their argument from their motion to dismiss, citing *Northern Air Services., Inc. v. Link,* 2011 WI 75, ¶ 89, 336 Wis. 2d 1, 804 N.W. 2d 458. But as the court explained, *Northern Air* doesn't necessarily preclude Randall from pursuing reinstatement as a minority shareholder as an equitable remedy in the event she succeeds in obtaining a declaratory judgment that the redemption agreement is void and unenforceable. Dkt. 35, at 24–25. Because some of Randall's grounds for rescinding the redemption agreement have survived summary judgment, Randall might be entitled to reinstatement as a shareholder. The court will not dismiss this claim on summary judgment.

### C.   Unjust enrichment and veil piercing

Randall asserts that she's entitled to an equitable remedy for unjust enrichment and to pierce the corporate veil between the two family entities. Defendants' motion for summary

73

judgment on these issues is ultimately tied to their challenges to the merits of Randall's underlying claims.

Defendants contend that unjust enrichment is not viable because the parties have a written contract. But the redemption agreement might be voided if Randall succeeds on her fraud claims, which would put a remedy for unjust enrichment back on the table. Defendants' perfunctory request that Randall be forced to elect her remedies now to prevent double recovery, Dkt. 71 at 71, is so undeveloped it might be deemed forfeited. Whatever remedies Randall might be entitled to, the court will not allow double recovery.

Defendants move for summary judgment on Randall's effort to pierce the corporate veil on the grounds that Reed was not involved in the redemption of Randall's Windy Waters stock. Dkt. 71 at 69. But that factual contention is belied by the record, so the motion for summary judgment is denied. The court concludes that veil-piercing remains among the remedies that Randall may pursue should she succeed on her substantive claims.

ORDER

IT IS ORDERED that:

1. Plaintiff's motion for partial summary judgment, Dkt. 59, is GRANTED IN PART and DENIED IN PART. It is granted as to defendants' affirmative defenses of ratification and waiver, and denied in all other respects.

2. Defendants' motion for summary judgment, Dkt. 62, is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Randall's claims relying on statements and omissions about defendants' plans to sell Widen Enterprises; Randall's claims that the entire redemption agreement is void under the Exchange

Act; and on Randall's claims for declaratory relief based on unconscionability, duress, and violation of public policy. The motion is denied in all other respects.

3. The motion to strike two paragraphs from the Hutler declaration, Dkt. 104, is DENIED as moot.

4. The clerk of court is directed to set a scheduling conference before Magistrate Judge Boor to reset the trial date and pretrial deadlines.

Entered September 16, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge