IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STACY RANDALL,

                        Plaintiff,

    v.                                                   OPINION and ORDER

REED WIDEN, MICHAEL KIESLER,                             22-cv-400-jdp
WIDEN ENTERPRISES, LLC, and
WINDY WATERS, INC.,

                        Defendants.

The case is scheduled for trial on August 4, 2025. This order addresses the pending motions to strike expert testimony and the motions in limine, ruling on some of them and identifying issues that require further discussion during the July 25 final pretrial conference.

ANALYSIS

A. Motions to exclude expert testimony

Both sides have moved to exclude testimony from the other side's expert witnesses. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the court must ensure that proffered expert testimony meets the requirements of Rule 702. For testimony to be admissible under Rule 702, the individual proffering the testimony must be qualified as an expert, the expert's opinions must be based on reliable methods, and those methods must be reliably applied to the facts of the case.

As for qualifications, the question is not whether the expert is generally qualified in his or her field, but whether the expert has the necessary education and training to draw the

conclusions he or she offers in the case at hand. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Experts may testify on the basis of practical experience as well as on the basis of formal education. *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).

The test for reliability is necessarily flexible. *Daubert* identifies factors the court may consider when determining whether an expert's testimony is reliable—whether the expert's technique has been tested, subjected to peer review and publication, analyzed for errors, or is generally accepted—but these factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779–80 (7th Cir. 2017). The reliability inquiry focuses on the expert's methodology; that is, whether the expert exercised "soundness and care" in reaching his opinions. *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). The inquiry does not ask whether the expert's ultimate conclusions are correct. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Gopalratnam*, 877 F.3d at 781 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000))

Finally, expert evidence is relevant if it helps the jury understand a matter beyond the knowledge and experience of a layperson. *Daubert*, 509 U.S. at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Bottom-line conclusions are not helpful and must be excluded if the expert fails to explain how those conclusions are supported by the existing data. *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court." (internal quotation marks

2

and citation omitted)). Expert testimony is also irrelevant if it does not help the jury decide the facts at issue in the case. *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998) (quoting *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997)).

Federal Rule of Civil Procedure 26 requires a complete and detailed disclosure of the expert's opinions and the reasons for them in a timely expert report. *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). Thus, the court's analysis of the admissibility of an expert's testimony is based on the opinions, conclusions, and the basis and reasons for them in the expert's report. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). An expert may not cure deficiencies in his report with later deposition testimony. *Id.* The proponent of expert evidence bears the burden of establishing that the expert's testimony is admissible. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### 1.  Gary Kleinrichert

Gary Kleinrichert is Randall's valuation expert. The opinions in his November 2023 report fall into two categories: (1) the fair market value of Widen Enterprises in May 2020 when Randall sold her shares; and (2) the information that would have been material to a reasonable investor in Randall's position in deciding whether to sell her shares. Dkt. 117-3. Defendants' fifth motion in limine, Dkt. 209, asks the court to exclude the second category of opinions, for two reasons: first, because they are irrelevant to the issues in this case, and second, because Kleinrichert did not use a reliable methodology.

As for relevance, defendants argue that Kleinrichert's opinion about the information that would have been material to a reasonable investor is irrelevant because Randall wasn't a reasonable investor: she was "desperate for cash and completely uninterested in obtaining

financial information about the company." Dkt. 209, at 4. But defendants conflate two different elements of Randall's securities fraud claims. To establish liability under § 10(b) and Rule 10(b)-5 of the Securities Exchange Act, Randall must prove both that defendants made a misstatement "of material fact" and that she relied on the misstatement to her detriment. *Otto v. Variable Annuity Life Insurance Co.*, 134 F.3d 841, 851 (7th Cir. 1998); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). Defendants' assertion that Randall was desperate for cash and uninterested in the company's finances is relevant to the reliance element, but it has no bearing on the materiality element, which is a purely objective inquiry. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). Kleinrichert's opinion about what information would have been material to a reasonable investor in Stacy's position is directly relevant to the materiality element of her securities fraud claim, so the court will not exclude the evidence on relevance grounds.

Defendants argue that Kleinrichert's opinions are irrelevant under *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024), which holds that "pure omissions" are not actionable under Rule 10b-5, but omissions that render affirmative statements "half-truths" are actionable. *Id.* at 263–64. Defendants' position is that even if a jury credited Kleinrichert's view of what a reasonable investor would want to know before selling her shares, defendants' failure to disclose that information was a pure omission, so there is no liability under Rule 10b-5. But Randall's claims are not based only on defendants' failure to tell her financial information about the companies; they are based on Kielser's affirmative representations that the stock price formula was "fair," that the companies could not "afford" to make $50,000 available to her, and that it "would be smart" for Randall to sell her stock.

4

Randall's asserts that financial information about the companies would have contradicted Kiesler's representations. Randall's theory of liability falls squarely into the category of "half-truth" nondisclosure claims, which are actionable under *Macquarie Infrastructure*.

Defendants also contend that Kleinrichert's opinions about what a reasonable investor would want to know are inadmissible under Rule 702 because Kleinrichert did not rely on an established methodology in reaching his opinions. But this is incorrect. Kleinrichert states in his report that his opinions are based on his own experience valuing businesses and on published valuation treatises, which describe the financial information that should be gathered when performing a business valuation. Dkt. 117-3, at 17. Defendants do not challenge the reliability of the treatises Kleinrichert cites, which lay out the basic valuation models that he uses. Kleinrichert used his own judgment in evaluating the data available within the framework of accepted valuation models, and explained how he did it. Kleinrichert's opinions pass muster under Rule 702.

### 2. Seth Fliegler

Seth Fliegler is defendants' rebuttal valuation expert, who defendants retained to critique Kleinrichert's valuation of the companies. Flieger did so by repeating Kleinrichert's valuation methodology while altering key variables to test Kleinrichert's assumptions. Randall contends that Fliegler's opinions critiquing Kleinrichert's guideline public company analysis and discounted cash flow analysis were based on unreliable methods. Randall also asserts that Fliegler's opinions are not helpful to the jury because Fliegler's estimates of value are purely speculative.

Fliegler is a rebuttal expert to Kleinrichert, so the sole purpose of his testimony is "to contradict, impeach or defuse the impact of the evidence offered" by Kleinrichert. *Peals v. Terre*

*Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) (*quoting United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001)). Because Fliegler did not conduct his own valuation of the companies, but simply identified areas of weakness within Kleinrichert's valuation, the court analyzes Fliegler's reliability differently than it would analyze the reliability of an expert offering an independent opinion. As long as Fliegler provides sufficient reasons grounded in his experience and generally accepted valuation methods for his critiques of Kleinrichert's valuation, the court will not exclude his opinions as insufficiently reliable. *See Allen v. Am. Cyanamid*, No. 11-CV-0055, 2021 WL 1086245 (E.D. Wis. Mar. 22, 2021) (finding rebuttal opinions based solely on the expert's experience sufficiently reliable because the sole purpose of the rebuttal opinion was to identify reasons for the jury to be skeptical of the other side's expert).

### a.  Guideline public companies analysis

Guideline public companies analysis is a form of market-based valuation, which involves calculating the value of a company by comparing it to similar publicly traded companies. In his report, Kleinrichert explained that software-as-a-service companies such as Widen Enterprises frequently trade on a price-to-revenue basis, meaning that their value is expressed as a multiple of their total revenue. Dkt. 117-3, ¶ 76. For his guideline public companies analysis, Kleinrichert used six publicly traded Saas companies as comparators, all with similar software products to Widen Enterprises and all with negative EBITDA, suggesting the company was in an active growth phase. *Id.* ¶ 75. All of the comparators were significantly larger than Widen Enterprises by revenue size.  *Id.* ¶ 78. Kleinrichert then used publicly available trading data to calculate revenue multiples for the comparators and applied those to Widen Enterprises, resulting in a value of approximately $113 million. *Id.*

In his rebuttal report, Fliegler opined that Kleinrichert had not adequately adjusted for the difference in revenue size of the comparator companies. Dkt. 235-18, ¶¶ 41–51. To demonstrate why that matters, Fliegler repeated Kleinrichert's analysis and added a regression-based adjustment for revenue size, which reduced the estimated value of Widen Enterprises by almost $10 million compared with Kleinrichert's estimate. *Id.*

Randall contends that Fliegler's analysis was improper because Kleinrichert had already adjusted for the difference in revenue size between Widen Enterprises and the comparator companies, so by adding a regression-based adjustment for revenue size, Fliegler improperly duplicated the adjustment process for the same variable. Randall says that Kleinrichert adjusted for size differences by using a revenue multiple in the bottom quartile for the six public companies as opposed to the average or median revenue multiple. *See* Dkt. 226, at 12. But contrary to Randall's argument, Kleinrichert's report does not say that he used a bottom quartile revenue multiple to adjust for differences in revenue size. And he didn't take the multiple from the smallest companies, he took the lowest multiples. Kleinrichert explains that he compared "revenue growth rates and gross margins for Widen and the publicly traded companies" and that based on that comparison, he selected revenue multiples in the first quartile. Dkt. 117-3, ¶ 78. That suggests that Kleinrichert's used a bottom quartile multiple to adjust for differences in revenue growth rates and gross margins, not revenue size. It's true that the multiples generally correlate to revenue size, which is Flieger's point. Randall is free to cross-examine Fliegler on whether he over-compensated for revenue size, but the court will not exclude Fliegler's testimony on that basis.

### b. Discounted cash flow analysis

Randall also challenges Fliegler's critique of Kleinrichert's discounted cash flow valuation. The discounted cash flow (DCF) approach calculates the value of a company by taking the company's future expected net cash flows and then applying a discount rate to calculate the present value of those cash flows. Kleinrichert's DCF analysis relied on cash flow projections calculated by Widen Enterprises' accounting firm Baker Tilly. Dkt. 117-3, ¶¶ 66–68. Using the Baker Tilly projections, Kleinrichert calculated that Widen Enterprises was worth $8 million under the DCF approach. The DCF calculation was an outlier compared with the values Kleinrichert calculated using the two market-based methods: guideline public companies analysis ($113 million) and mergers-and-acquisition analysis ($79 million). Ultimately, Kleinrichert concluded that the DCF calculation was not an accurate estimate of Widen Enterprises value. Kleinrichert reasoned that Baker Tilly's projections were likely conservative estimates of Widen Enterprises' growth, and that given Widen Enterprises' status as an actively growing SaaS company, a prospective buyer would be more likely to use a revenue multiple approach when valuing the company as opposed to a DCF approach. *Id.* ¶¶ 80–81.

In his rebuttal report, Fliegler opined that Kleinrichert should have reevaluated the assumptions within the DCF approach instead of simply discounting it entirely. Dkt. 235-18, ¶¶ 52–63. Fliegler explained that the Baker Tilley projections of Widen Enterprises future growth were likely overly conservative, because they were substantially lower than similar publicly traded companies during the same period. To demonstrate how changing the projections would change the valuation under the DCF approach, Fliegler repeated Kleinrichert's DCF analysis using the publicly traded data instead of the Baker Tilly projections, which increased the value calculation by nearly $40 million. *Id.* ¶¶ 55–56. Fliegler

concluded that Kleinrichert should have tested different inputs before discounting the DCF approach entirely. *Id.* ¶ 60. Fliegler also critiqued Kleinrichert's conclusion that the DCF approach was not valuable because SaaS buyers generally use revenue multiples to value companies. *Id.* ¶ 58. Citing Shannon Pratt's *Valuing a Business* treatise, Fliegler explained that the DCF approach can be valuable even when the industry commonly uses other methods, because DCF is the method that most directly incorporates the general premise that the value of a business is the present value of the expected future benefits of owning the interest. *Id.*

Randall asserts that Fliegler's DCF analysis should be excluded because using data from similar publicly traded companies instead of a company's actual projections is not consistent with any established methodology for DCF analysis. But Randall ignores the purpose of Fliegler's report. Fliegler did not use the public company data to calculate an alternate valuation for Widen Enterprises; he used it for illustrative purposes only to identify a weakness in the data Kleinrichert used and to explain why that weakness mattered to Kleinrichert's analysis. Fliegler's conclusion is simply that Kleinrichert should have tested his inputs more thoroughly before entirely discounting the DCF approach. His analysis is sufficiently robust to support that limited conclusion.

Randall also argues that Fliegler's hypothetical calculations should be excluded as unhelpful and confusing to the jury, because Fliegler expressly states that they are for illustrative purposes only and are not accurate calculations of the value of Widen Enterprises. But Fliegler's hypothetical calculations are helpful because they explain why the weaknesses Fliegler identifies in Kleinrichert's analysis matter. The value of Widen Enterprises is a crucial question in determining Randall's potential damages. If the jury is skeptical of any of Kleinrichert's assumptions, Fliegler's calculations will help the jury determine how much those

assumptions matter to the ultimate question of what Widen Enterprises was worth. Nor does the court believe that Fliegler's hypothetical calculations will confuse the jury. Randall can make clear that his calculations are hypothetical through cross-examination and argument.

### 3. James Reda

James Reda is defendants' executive compensation expert. Reda provided a report in December 2023 concluding that Reed's salary and bonus in the years 2014–2020 was in line with industry norms and that Widen Enterprises' practice of not paying regular dividends was consistent with the practices of similar businesses. Dkt. 223-10. Randall contends that Reda's testimony is inadmissible because Reda's conclusion about Reed's compensation is not supported by sufficient data, and his conclusion about the company's dividend practices was not based on a reliable method. Dkt. 222.

#### c. Reed's compensation

In his report, Reda concluded that Reed's annual compensation of between $690,000 and $2 million in the years 2014 through 2020 was in line with industry norms given Reed's role at Widen Enterprises. Dkt. 223-10, at 18. To reach this conclusion, Reda compared Reed's compensation to the compensation of non-CEO executive officers at companies in the same industry and with comparable revenue levels, an analytical method known as benchmarking. Randall contends that Reda did not appropriately apply the facts of this case when he determined that "non-CEO executive officer" was an appropriate description of Reed's role at Widen Enterprises. She also contends that Reda did not explain how Widen Enterprises was similar to the companies Reda used as comparators.

The court concludes that Reda's determination that Reed was a non-CEO executive officer was based on a reliable application of the facts. To determine Reed's role at Widen

Enterprises, Reda reviewed materials from this case that described Reed's responsibilities, including the Rule 30(b)(6) deposition of Widen Enterprises and the declarations and depositions of Reed, Kiesler and Widen Enterprises CEO Matthew Gonnering. Reda noted that Reed was a former CEO who had significant institutional knowledge due to his involvement in the company going back decades, and that Gonnering reported to Reed and used him as a key strategic advisor on "big-picture issues." *Id.* at 8. Citing published work on the roles and responsibilities of key executive officers, Reda concluded that Reed's role most closely resembled that of an "executive chair," a non-CEO executive position often held by company founders or former CEOs, in which the former leader advises on high-level corporate strategy. *Id.* at 10.

Randall contends that Reda did not actually rely on any facts about what Reed did at the company to reach his conclusion; instead, he simply assumed that Reed was actively involved in managing the company. Randall points to Reda's deposition, in which Reda testified that his conclusions would not change even if he learned that Reed slept most of the day, used cannabis at work, did not have an active role in the company, or was not performing any work on behalf of the company during the relevant period. Dkt. 222, at 7 (citing Dkt. 198 (Reda Dep. 29:13–30:9; 44:4–10; 84:14–19)). Essentially, Randall asserts that Reda admitted in his deposition that his conclusions were not based on any specific facts about Reed's role at the company. But viewing the relevant portions of Reda's deposition in context, it is apparent that Reda did not admit that. As for why it wouldn't change his conclusion if he learned that Reed slept all day and used cannabis at work, Reda explained:

> In my experience, executives have different styles . . . it's not necessarily an eight to ten, 20-hour day. It's the knowledge that they have and the experience that they have that's important. So I don't get into exactly what their work schedule looks like or—I

> look at what their role in the organization is and the company
> that they're providing the talent to.

*Id.* 30:11–21. As for why it wouldn't change his conclusion if he learned that Reed did not take an active role or perform work for the company, Reda explained: "based on what the CEO, Mr. Gonnering, has said and everything else that I've seen, there's nothing that would lead me to believe that he wasn't fulfilling the role of executive chair." *Id.* 84:23–85:2. Reda testified that his conclusions would not change because hours are not a key consideration based on what executive chairs do, and because Gonnering's statements about Reed's role make clear that Reed played a valuable role. Randall may use the deposition testimony to impeach Reda, but the testimony does not establish that Reda ignored the facts in determining that Reed's role was comparable to an executive chair.

Randall also contends that Reda fails to explains why the companies he selected as comparators were similarly situated to Widen Enterprises. Reda compared Reed's compensation to the mean and median compensation of non-CEO executives at companies in the Russell 3000, an index that includes the largest 3000 publicly traded companies in the United States. Randall argues that such a wide-ranging index cannot be a useful comparator because the companies in the index vary widely in industry and size. But Reda's report accounted for the differences between the companies. Reda not only compared Reed's compensation to the mean and median compensation in the Russell 3000 index as a whole, he also compared it to the mean and median compensation among IT companies (Widen Enterprises' industry) and the mean and median compensation among companies in the lowest revenue tiers (Widen Enterprises' revenue in 2020 was approximately $27.5 million).[1] Reda

---

[1] For the years 2014–2018, the lowest revenue tier in the data Reda relied on was under $100

found that Reed's compensation was within range for all three types of comparators. Reda applied a reliable comparator methodology to reach his conclusions about Reed's compensation, so Randall's motion to exclude his testimony on that issue will be denied.

### d. Dividend payments

Reda also concluded that the company's history of not paying dividends to shareholders was in line with comparable private companies. Reda explained that "in my extensive experience dealing with private companies, issuing dividends is not the norm, particularly when they are focused on growth." Dkt. 223-10, at 19. Randall contends that Reda's opinion should be struck because it is not relevant to the issues the jury must decide and because Reda did not use a reliable methodology.

The court need not consider Reda's methodology because Reda's opinion about other companies' dividend practices is irrelevant to the issues the jury must decide. The parties agree that companies can choose to reinvest their profits instead of issuing dividends to shareholders and that many companies choose to do so. But Randall contends that in this case, Windy Waters chose to pay dividends to only one shareholder (Reed) disguised as salary and bonus payments, and that it withheld dividends from other shareholders, including Randall. Whether other companies commonly issue dividends is not helpful to the jury in determining whether Windy Waters paid Reed dividends and did not pay other shareholders dividends.

Defendants contend that Reda's opinion is relevant because Randall is requesting unpaid dividends in damages, which according to Reda, Randall would not have received as a shareholder of a typical growth-focused company. But again, the key question is not whether

---

million. For the years 2019 and 2010, the lowest revenue tier was under $50 million.

a typical company would have paid dividends, but whether Windy Waters chose to pay them only to Reed. If a jury finds that the company paid dividends to only a single shareholder, then Randall can receive her portion of the dividends in damages.

### 4. Gregory Lynch

Gregory Lynch is a mergers and acquisitions attorney retained by defendants to provide an opinion about what he would have told Randall if she had asked him in May 2020 for advice on whether to accept defendants' offer to redeem her shares for $1.3 million. In his report, Lynch explains that he would have told Randall the following:

- Windy Waters had the right to offer her whatever price it wanted for her shares, whether it was fair market value or not.

- There is no virtually no market for shares in a privately held corporation like Windy Waters, so if Randall did not take the company's offer, she likely could not sell her shares.

- Randall could hire an expert to value the company or Lynch could contact the company and attempt to negotiate a better agreement, but each of those options would cost Randall at least $20,000 and take months.

Dkt. 235-21. Defendants assert that Lynch's testimony is relevant to the issue of causation; that is, whether Randall would have sold her shares no matter what defendants disclosed to her because Randall was desperate for money. Defendants also assert that Lynch's testimony is relevant to whether Randall acted recklessly by not consulting an attorney before selling her shares.

Randall moves to exclude Lynch's testimony for three reasons: (1) it is irrelevant to the issues before the jury; (2) Lynch seeks to opine about the law; (3) Lynch did not use a reliable method. The court agrees on all three points. It is undisputed that Randall did not consult with an attorney before selling her shares, so Lynch's testimony about how he would have counseled Randall doesn't help the jury determine what Randall would have done if there had been full

14

disclosure. Nor is Lynch's testimony probative of whether Randall acted recklessly by not consulting with an attorney before selling her shares. Lynch opines only on what he would have told Randall if she had consulted with him; he doesn't state an opinion on whether Randall should have consulted with an attorney before selling her shares. Defendants are free to argue at trial that Randall should have consulted with an attorney before selling her shares, but the hypothetical advice that she might have received had she done so is simply not relevant.

Much of Lynch's report is devoted to spelling out the legal rights of the parties, which impinges on the role of the court. The court will instruct the jury on any necessary points of law.

Finally, Lynch's proposed advice is unrealistically limited to whether she could have negotiated a better redemption price. Fuller advice would have considered the alternative of not redeeming her stock at all, and finding other ways of dealing with her short-term cash needs.

The court will grant the motion to exclude Lynch's testimony.

**5. Bruce Hutler**

Bruce Hutler is an accountant at Baker Tilly, LLP, which provided accounting services to Windy Waters and Widen Enterprises. In that role, Hutler provided valuations of Windy Waters and assisted in developing the stock price formula that was used to calculate the price the company paid for Randall's shares. Defendants disclosed Hutler as both a fact witness and an expert witness. Hutler's expert report focus on the use of formulas to calculate the price of shares for stock redemptions. Randall moves to strike three of Hutler's opinions: (1) that it was generally appropriate for Windy Waters to use the stock price formula for stock redemptions, (2) that it was appropriate for Windy Waters to use the stock price formula for Randall's May

15

2020 redemption; and (3) that the stock price formula was a reliable mechanism to determine Windy Waters' fair market value.

The court will allow Hutler to testify that it was generally appropriate for Windy Waters to use the stock price formula for stock redemptions. Hutler explained in his report that many businesses use formulas to calculate share prices because formulas simplify negotiations, enhance predictability, and lower costs of stock redemptions. Dkt. 141, at 10. Randall argues that Hutler's opinion is irrelevant because the key question in the case is not whether the formula lowered costs, enhanced predictability, or simplified negotiations, but whether defendants misrepresented key facts that would have changed Randall's mind about selling her shares. But Hutler's opinion is relevant to whether Kiesler misrepresented facts when he told her that the formula-generated price was "fair." Defendants' assert that Kiesler meant that the formula price was "fair" in the sense that the formula had been developed as a proxy for fair market value and had been used in stock redemptions at the company for years. Hutler's testimony that many businesses use similar formulas and that there are good reasons for businesses to do so could lend credence to defendants' view of what Kiesler meant.

As for the other two statements, the court will grant Randall's motion to exclude. Hutler's report contains no analysis of what the fair market value of the company was at the time of Randall's redemption in May 2020, so he has established no foundation for his opinions that the stock price formula was a reliable mechanism of fair market value at that time or that it was appropriate for the company to use the formula for Randall's May 2020 redemption. Hutler's report concludes only that stock price formulas are intended to be a proxy for fair market value and that they can be appropriate for stock redemptions in general. But it does not follow that the formula in this case approximated fair market value in May 2020 or that it

was reasonable for defendants to use that formula for the May 2020 redemption specifically. In fact, Hutler admits in his report that "[a] formula will not always accurately determine the exact fair market value of a company, which is normal and common; however, it is not necessarily unfair as long as it is used consistently over time for all share purchases and sales." Dkt. 141, at 13. By his own admission, Hutler cannot opine reliably on whether the stock price formula accurately determined fair market value for Randall's redemption in May 2020, so he may not testify to that at trial.

## B. Plaintiffs' motions in limine

### 1. Gonnering's testimony about Reed's compensation

Randall seeks to exclude Matthew Gonnering and any other lay witnesses from testifying about the reasonableness of Reed's salary and bonuses, because the reasonableness of executive compensation is an issue requiring specialized knowledge outside the purview of a lay witness. The court will grant this motion in limine as unopposed. However, the ruling does not preclude Gonnering and others from testifying to facts within their knowledge that are relevant to Randall's disguised dividend claim, including Reed's responsibilities at the companies, what Reed's compensation was, and how Reed's compensation compared to the compensation of other executives in the companies.

### 2. Evidence related to the companies' fair market value on May 13, 2020

Randall seeks to preclude defendants from offering "any evidence or argument as to the fair market value of the Companies, changes to that value, or [defendants'] subjective beliefs of that value." Dkt. 234, at 9. Randall says the defendants repeatedly stated in their discovery responses that they had no knowledge of the companies' fair market value as of May 13, 2020, so they should be precluded under Rule 26(e) and 37(c)(1) from contradicting their discovery

responses at trial. For example, Randall says that defendants should be prohibited from arguing that Kiesler subjectively believed that the price he offered Randall for her shares was "fair," because that argument implies that Kiesler knew the fair market value of the company. Dkt. 234, at 10 n.4.

Defendants agree in principle that they cannot offer evidence or argument inconsistent with their discovery responses. Dkt. 279, at 3–4; *see also Johnson v. C. R. Bard, Inc.*, 77 F.4th 641, 646 (7th Cir. 2023). But they assert that the discovery responses mean only that defendants did not know the actual fair market value of the companies as of May 13, 2020, because no appraisal or valuation had been done as of that date. Defendants say that their responses do not preclude them from offering evidence about the value of the companies at other times, the change in value over time, or their views and beliefs about the value of the companies as of May 13, 2020.  Dkt. 279, at 4.

The court largely agrees with defendants. In each of the relevant discovery requests, Randall asked about defendants' knowledge or beliefs about the fair market value of the companies as of May 13, 2020, which she defined as what a willing buyer would pay or what a willing seller would accept. Defendants responded that they did not know the fair market value of the companies under that definition, because they had not valued the companies recently, nor were they trying to sell at that time. Dkt. 235-2–Dkt. 235-3 (responses to Interrogatory No. 11); Dkt. 235-7–Dkt. 235-10 (responses to RFA Nos. 81, 82, 83, & 84); Dkt. 235-11 (RFP No. 1).

Defendants may not offer evidence or argument inconsistent with their responses, which means they cannot argue that they knew the fair market value of the companies on May 13, 2020. But that doesn't preclude defendants from offering a variety of other evidence and

arguments related to value. Defendants may offer evidence of the companies' value at other times. Kiesler may explain that he subjectively believed the stock price formula was a "fair" way to value Randall's shares. Defendants may also testify to their beliefs about whether the companies' value increased or decreased between Randall's stock redemption and the sale to Acquia, if those beliefs are not based on any assertion that they knew the fair market value of the companies when Randall sold her shares. Defendants should be prepared to explain at the final pretrial conference what evidence the intend to offer about how the companies' value changed and why it does not conflict with their discovery responses.

### 3.  Due diligence defense

Randall wants to prevent defendants from arguing that Randall's failure to engage in due diligence or conduct a reasonable inquiry into the finances of the companies means that defendants are not liable for securities fraud or common law fraud. Randall's motion raises two separate issues. First, Randall contends that defendants should be precluded from arguing that her failure to conduct a reasonable investigation means that she cannot satisfy the justifiable reliance element of her securities fraud and state-law misrepresentation claims. Second, Randall contends that defendants should be precluded from arguing that the release agreement Randall signed when she sold her shares bars her claims because Randall did not conduct a reasonable inquiry before signing the release.

#### a.  Justifiable reliance

The parties agree that after *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), a plaintiff's lack of due diligence is no longer a defense to a 10b-5 securities fraud claim. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir. 1997). But the plaintiff must still show that she justifiably relied on the defendants' misstatements or omissions. *Id.* A plaintiff's

reliance is not justifiable if plaintiff closes her eyes to a known risk or otherwise commits "gross conduct somewhat comparable to that of the defendant." *Id.*; *Teamsters Loc. 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 529 (7th Cir. 1985). In *Angelos*, the Seventh Circuit identified three interrelated scenarios in which a plaintiff's reliance would be unjustified: if defendants give plaintiff the relevant information, but plaintiff fails to read it; if it is already known or obvious to the plaintiff that the defendants' representation is false, but the plaintiff relies on it anyway; and if the defendants' representation concerns something that the plaintiff is in a better position to know than the defendant. *Id.* at 530.

The court agrees with Randall that Seventh Circuit precedent bars defendants from arguing that Randall should have conducted her own independent investigation of the companies' finances prior to selling her shares. But defendants may present evidence that Randall's reliance on defendants' misstatements was unjustified because she recklessly closed her eyes to advice and information about the company that the defendants actually gave her or tried to give her. Defendants want to put in evidence that Randall received a significant amount of financial information about the companies less than three months before she decided to sell her shares, which Randall did not review prior to selling her shares. Defendants also say that Randall's son Justin, her financial advisor, Kiesler, and Windy Waters' attorney Scott Seid also told Randall that she should review Windy Waters' financial records, have the company valued, and talk to a lawyer before selling her shares, and yet Randall chose to do none of these things. Defendants are entitled to argue that Randall's failure to heed direct advice to investigate the financial advisability of the stock redemption before going through it constitutes gross recklessness sufficient to undercut the justifiable reliance element of her securities fraud claim.

Randall also contends that her failure to exercise due diligence is irrelevant to her state-law intentional misrepresentation claims. Dkt. 234, at 13–14 (citing *Wisconsin Pattern Civil Jury Instructions*, § 2401 (2023)). Randall is correct that Wisconsin law does not require a plaintiff to independently investigate defendants' representation of the facts before relying on it. *See id.*; *First Nat. Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 224, 293 N.W.2d 530 (1980). But Wisconsin law, like federal securities law, distinguishes between a plaintiff who simply fails to investigate and a plaintiff who actively closes her eyes to obvious risks. *Malzewski v. Rapkin*, 2006 WI App 183 ¶¶ 17–18, 296 Wis. 2d 98, 723 N.W.2d 156. Randall's conduct is relevant to the justifiable reliance element for her state law claims for the same reason as for her federal security law claims.

###### b.  Release of claims

The parties agree that the issue whether Randall needed to make a reasonable inquiry before signing a release of claims is governed by *Goodman v. Epstein*, 582 F.2d 388 (7th Cir. 1978). In that case, the Seventh Circuit held that a request for a release of claims in the securities law context triggers a lesser duty for the plaintiff to make a "reasonable inquiry" to discover possible matured claims prior to signing the release. *Id.* at 404. Applying that rule, the *Goodman* court held that it was not reversible error for the trial judge to have instructed the jury that the plaintiffs had a duty to inquire before signing a release. *Id.* But the trial judge's instruction in *Goodman* was contingent on the jury's decision that the defendants had not committed fraud in obtaining the release. *Id.* A release procured by fraud is unenforceable. *Id.* "[A]ny deception by [the person obtaining the release] . . . could amount to fraud in the procurement of the release, which would clearly [] invalidate[] the release." *Id.*

In their response to Randall's motions in limine, defendants don't take issue with the general principle that the reasonable inquiry requirement does not apply if the release was obtained by fraud. But they argue that "this is all one trial," so they are entitled to argue both that Randall failed to make a reasonable inquiry and that the release was not obtained by fraud. The court disagrees. The release in this case was part of the stock redemption agreement, so if the stock redemption was obtained through fraud (the essence of Randall's securities fraud claims), then the release was as well. If Randall succeeds in proving the merits of her securities fraud claim, then the release is necessarily unenforceable. So defendants may not argue that Randall failed to make a reasonable inquiry before signing the release. The parties should be prepared to discuss at the final pretrial conference whether the court's decision on this issue resolves all issues related to the release, meaning any evidence that Randall signed a release would not be admissible.

### 4. Kiesler's statement that the share price was "fair"

Randall seeks to preclude any evidence or argument that Kiesler subjectively believed his statement to Randall that the share price he offered her was "fair" because the price, like all previous stock redemptions, had been derived from the stock price formula. Randall asserts that any such argument is barred by *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), which held that an opinion that an investment deal is "fair" can be materially misleading for the purposes of federal securities fraud if the opinion is inconsistent with objective financial data. 501 U.S. 1083, 1095 (1991). Randall says that *Virginia Bankshares* defined "fair" to mean fair market value for the purposes of federal securities law, so defendants should be precluded from offering an alternative definition based on Kiesler's subjective belief. But *Virginia*

*Bankshares* did not define "fair;" it simply held that a statement of opinion can be a material fact under federal securities law if the opinion is contravened by objective facts. *Id.*

*Virginia Bankshares* did not change the elements of a federal securities law claim. One of those elements is scienter, meaning the defendant acted with intent to deceive, manipulate, or defraud, or with reckless disregard to a substantial risk that his statements were false or misleading. *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1238 (7th Cir. 1988). Kiesler's subjective belief about what made the share price "fair" is relevant to whether he acted with intent to deceive Randall. The court will not exclude evidence and arguments relevant to Kiesler's subjective beliefs.

### 5. Admissions in the pleadings

Randall says that defendants admitted in their answer that Kiesler told Stacy that the price he was offering her was "fair," that the company could not "afford" a $50,000 or $100,000 partial redemption, and that it would "smart" for Randall to sell her shares. Randall seeks to preclude defendants from offering contradictory testimony at trial. As with Randall's second motion in limine, defendants agree in principle that they cannot contradict the admissions in their pleading, but they assert that Randall has overstated their admissions.

The court will deny Randall's motion to limit evidence of what Kiesler said based on defendants' pleading. In their amended answer, defendants admitted that Kiesler expressed the "general sentiment" that the price was fair and that it would be smart for Randall to sell her shares, but their answer did not limit Kiesler to specific words. Dkt. 45, ¶¶ 79, 81, 89. Defendants did admit without qualification that Kiesler said the companies could not afford to make $50,000 available to Randall. *Id.* ¶¶ 72–73. But the wording of Randall's complaint did not suggest that she was offering a word-for-word quotation of what Kiesler said; in fact,

she herself phrased Kiesler's statements two different ways in the complaint. *Compare* ¶ 72 ("Kiesler told Stacy that the Companies did not have $100,000 they could make available to her.") *with* ¶ 72 ("Stacy asked if she could obtain $50,000, but Kiesler told her that the Companies could not afford that, either."). Defendants may not offer evidence and testimony that directly contradicts the general sentiments they admitted to in their pleading, but they are not required to limit themselves to the exact wording of Kiesler's statements in the complaint

### 6.  Randall's arrangement with counsel

Randall moves to preclude defendants from introducing evidence of her fee arrangements with her counsel, including "resources expended in the prosecution of her case." Dkt. 234, at 35. Defendants object to excluding her fee arrangement with counsel only if the court allows the mediation voicemail discussed in defendants' seventh motion in limine to be presented; the court is excluding that voicemail, so the court will grant the motion to exclude evidence of Randall's fee arrangement. *See* section C.7.

Defendants also object to the motion to the extent that it prevents them from cross-examining plaintiff's expert on the fees he received for his expert opinion. It is well established that evidence about an expert's fees is admissible because it is relevant for the jury to evaluate the expert's potential bias. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988). Defendants may cross-examine Randall's expert witness about the fees he received for his services.

### 7.  Randall's mortgage relief application

Randall seeks to exclude any reference to disclosures she made in a mortgage relief application on May 13, 2020, the same day that she sold her shares in Windy Waters. The mortgage relief application was related to a Florida home Randall bought with her

then-husband in 2007; to finance that purchase, she had obtained a mortgage, which was assigned to U.S. Bank and serviced by PHH Mortgage. Randall and her husband owed U.S. Bank $858,671.62 when they sold the Florida home in 2019 for $395,000, leaving approximately $450,000 still owed on the loan. To obtain relief on the remaining balance, Randall and her husband submitted a mortgage assistance application to PHH Mortgage, in which they disclosed only $7,000 in assets. Dkt. 169-7. The application was faxed to PHH Mortgage at 1:27 p.m. on May 13, 2020, only a few hours before Randall signed the stock redemption agreement selling her shares in Windy Waters. Randall did not disclose in the application that she held shares in Windy Waters or that she was about to redeem those shares for $1.3 million, even though the application explicitly requested disclosure of stock assets.

Defendants says that the mortgage application is relevant for two reasons: (1) it shows that Randall was so financially desperate on May 13, 2020, that she was willing to commit fraud, which undercuts Randall's theory that she wouldn't have sold her shares if she had known what they were truly worth; and (2) it proves that she is a calculating actor, which rebuts her characterization of herself as a financial novice who blindly trusted Reed and Kiesler. For her part, Randall asserts that the mortgage application is irrelevant and alternatively, that any probative value is minor and substantially outweighed by unfair prejudice to Randall. Dkt. 234, at 39.

The court will exclude this evidence under Rule 403. The mortgage assistance application says little about whether Randall was a financial novice when it came to the family business. The application had nothing to do with the business and did not require any significant level of financial expertise to complete. The mortgage assistance application has at most minor probative value in showing that Randall was financially desperate in May 2020,

25

but defendants can demonstrate that with other evidence and any probative value is substantially outweighed by potential prejudice. The primary purpose of this evidence seems to be to attack Randall's character by suggesting that she may have defrauded her bank. But that is not what this case is about.

Randall's motion in limine also argues that defendants should be precluded from cross-examining her about the mortgage assistance application to attack her character for truthfulness under Rule 608. Defendants' response focused on other ways the mortgage assistance application could be admitted, so defendants did not substantively address Rule 608. Defendants may cross-examine Randall about the mortgage assistance application only if Randall raises the topic on direct examination.

### 8. Windy Waters and Widen Enterprises' 30(b)(6) depositions

Randall asserts that during the defendant companies' 30(b)(6) depositions, CEO Matthew Gonnering repeatedly testified that the companies did not know and were not prepared to testify about issues within the scope of the noticed topics. Randall contends that the court should preclude defendants from introducing evidence on these issues or issue an adverse inference instruction as a Rule 37 sanction for defendants' failure to produce a sufficiently prepared Rule 30(b)(6) witness. The issues Randall says Gonnering was not prepared to talk about are as follows:

- The amount of cash that Windy Waters had available to it in May 2020;

- the names of any customers Windy Waters lost during the COVID-19 pandemic and how much revenue Widen Enterprises lost due to the pandemic;

- details about private equity solicitations to buy minority stakes of Widen Enterprises;

- whether Reed had consulted Widen Enterprises' accounting firm Baker Tilly regarding his salary and bonuses, and whether Baker Tilly had ever provided an opinion about the reasonableness of Reed's salary and bonuses;

- whether Widen Enterprises and Windy Waters followed corporate formalities in their interactions with each other;

- whether Widen Enterprises funds had ever been used to pay Windy Waters distributions;

- what financial information the companies had provided to Stacy when she had requested it in the past (with the exception of a 2016 request from Randall's ex-husband and a 2020 request from Randall's divorce attorney, which Randall admits Gonnering was able to answer questions about);

- whether a majority of Windy Waters' Board of Directors voted in favor of electing Randall president, and whether Randall took direction from the Board in her role as President of Windy Waters.

In response, defendants say that Rule 37 sanctions are unwarranted. Defendants assert that Gonnering prepared diligently for the 30(b)(6) depositions, provided extensive testimony, and in the few areas in which he was not able to testify with specificity, Randall could easily have followed up with written discovery. Defendants also say that Randall bears responsibility for any lack of preparation on Gonnering's part, because her noticed topics for the 30(b)(6) depositions were unreasonably broad and Randall refused to make them more specific, even though defendants repeatedly requested that they do so. *See* Dkt. 235-15 (noticed topics for Widen Entepriess); Dkt. 235-16 (noticed topics for Windy Waters); Dkt. 235-17 (emails between counsel).

The court has reviewed the excerpts of the 30(b)(6) depositions Randall refers to in her motion and it agrees with defendants that Gonnering's failure to answer certain highly specific questions is not sanctionable. Rule 30(b)(6) requires a corporate designee to provide testimony "about information known or reasonably available to the organization;" it does not require the corporate designee to conduct extensive investigation or to remember precise details such as

27

exact amounts of money, exact names, or exact dates. *See Kay Beer Distrib., Inc. v. Energy Brands, Inc.,* No. 07-C-1068, 2009 WL 3170886, at *4 (E.D. Wis. Sept. 29, 2009); *Fuentes v. Classica Cruise Operator Ltd, Inc.*, 32 F.4th 1311, 1322 (11th Cir. 2022) (a Rule 30(b)(6) deposition is "not a memory test"). The topics Randall provided for the 30(b)(6) depositions were broad and defense counsel warned Randall that they might be too broad for Gonnering to be adequately prepared to answer every question. Nevertheless, Gonnering testified at length about each of these topics and when he was unable to answer a question, he referred counsel to relevant documents. Nothing in the depositions suggests that Gonnering failed to adequately prepare for his 30(b)(6) depositions.

Further, Randall's motion to exclude any evidence related to these issues fails on another ground: Randall has not shown any prejudice from Gonnering's inability to answer certain questions during his 30(b)(6) depositions. Randall asserts in conclusory fashion that she was "prevented . . . from obtaining information relevant to her claims and Defendants' potential defense." Dkt. 234, at 56. But Randall does not explain why she could not have found the relevant information in documents or other discovery produced by defendants, nor why she could not have served additional discovery on defendants after the 30(b)(6) depositions to acquire this information.

### 9.  Examine each party only once

Randall wants to have each witness examined only once during the trial, meaning that if she calls a witness during her case-in-chief, defendants would then conduct a full examination of that witness and the witness would not be called again during defendants' case-in-chief. This is more efficient for both the witness and the jury and is the court's general practice, so the court will grant this motion. Defendants argue that this requires them to break up their

case-in-chief rather than present it in one cohesive narrative. But trials already require presenting evidence in a somewhat disjointed manner. Defendants can draw their narrative for the jury during their opening and closing arguments.

**10. Reed's drug and alcohol use**

Randall moves to permit testimony from Randall's daughter-in-law Julie Randall that Reed regularly drank alcohol and used cannabis during the workday. Randall asserts that this testimony is relevant for two reasons: first, it rebuts defendants' argument that Reed deserved his high salary and bonuses because he was "always working;" and second, if Reed was under the influence of drugs during any of the relevant events, then he might have an inaccurate perception of events. Randall's motion overlaps with defendants' motion in limine no. 9, which asks the court to exclude any evidence of Reed's drug use.

The court will exclude any testimony about Reed's drug and alcohol use. Randall is correct that evidence that a witness has used illegal drugs might be probative of the witness's ability to accurately recall events. *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987). But drug use evidence is only admissible for that purpose if the party seeking to offer the evidence draws a link between the drug use and the events the witness is testifying about. *Kunz v. DeFelice*, 538 F.3d 667, 677 (7th Cir. 2008). Absent such a link, evidence of drug use serves only to raise the impermissible inference that drug users tend to lie. *Id.* Randall does not say that Reed was using drugs during any of the specific events Reed will be called to testify about, so she has not drawn the requisite link to make his drug use relevant to the issue of recall.

As for whether Reed's drug use is relevant to the reasonableness of his compensation, the court will exclude the evidence for that purpose under Rule 403. Randall seeks to introduce evidence of Reed's daytime drug use to raise the inference that Reed was not working, but the

parties agree that Reed held an advisory position at the companies without regular hours. So the fact that Reed sometimes used drugs during the day is at most minimally probative to how much work Reed did and what kind of value he brought to the companies. Any probative value is substantially outweighed by the potential prejudice of evidence related to alcohol and drug use. *Cameron*, 814 F.2d at 405 ("There is considerable danger that evidence that a witness has used illegal drugs may prejudice the jury to an extent that it will discount the witness's testimony.")

### 11. Designate depositions during opening statements

Randall seeks to designate portions of defendants' depositions during her opening statement. In support, Randall cites Federal Rule of Civil Procedure 32(a)(3), which states that an adverse party may use an opposing party's deposition "for any purpose." In response, defendants say that Rule 32 was not intended to contravene the typical order of a trial, and that playing depositions during opening statements would confuse the jury about what is evidence and what is argument.

The court will reserve a ruling on this motion. Randall does not explain what portions of defendants' depositions she seeks to play during her opening statement, nor why she needs to play portions of the depositions as opposed to simply explaining what the evidence will show. Randall should be prepared to provide details on these two points at the final pretrial conference.

### 12. Worth of Randall's shares

Randall moves to preclude any argument that her shares were worth less or the price she received for her shares was fair because Randall was not actively involved in company management. Defendants do not oppose the motion and the court agrees that defendants may

not argue that shares of stock are worth more or less depending on the owner's level of involvement with the company.

But the court's ruling does not prevent the parties from presenting evidence that the defendants subjectively believed Randall's shares were worth less, because that is relevant to the issue of intent. Defendants raised this issue in their response to Randall's motion, arguing that the relief granted in the motion should preclude Randall from designating a portion of Reed's deposition in which he testified that he believed his stock was "more valuable than [Randall's] stock" because he "worked hard." Dkt. 292 (Reed Dep. 178:5–179:10). The court will not exclude Reed's testimony on that basis.

### 13. Use of stock price formula in other transactions

Randall seeks to preclude defendants from introducing evidence or arguing that the stock price formula had been used in previous transactions and nobody else had challenged whether it was fair. Randall argues that the previous transactions are irrelevant and that this evidence is unfairly prejudicial because the previous transactions took place under different circumstances and with different people.

The court will deny the motion to exclude this evidence. That the stock price formula had been consistently used in previous stock redemptions is probative of whether Kiesler subjectively believed its use in Randall's transaction was "fair," which is directly relevant to the scienter element of her securities fraud claims. Nor is this evidence unfairly prejudicial. Randall is free to cross-examine defendants' witnesses about how the circumstances of Randall's stock redemption differed from the circumstances of previous stock redemptions, but there is no reason to exclude this evidence under Rule 403.

**14. Attorney advice**

Randall moves to exclude the testimony of the companies' attorneys Scott Seid and Scott Fuhr on three bases: (1) they cannot testify about what the law is; (2) they cannot testify about whether defendants followed the law; and (3) their testimony as to the facts is irrelevant. In their response, defendants argue that Seid and Fuhr will testify that they told defendants they were required to apply the stock price formula consistently for all redemptions, which is directly relevant to whether defendants acted with intent to defraud Randall. Dkt. 279, at 54.

The court agrees with Randall that any testimony by Seid and Fuhr about what the law is or whether defendants followed the law would be prohibited. *See Est. of Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *10 (W.D. Wis. Feb. 13, 2017) ("Generally speaking, an expert cannot offer legal opinions or conclusions."). The court also agrees with defendants that some testimony from Seid and Fuhr about what they told defendants regarding the use of the stock price formula is probative of defendants' intent and therefore admissible. But the court will defer a ruling on this motion in limine because it is not clear from defendants' response if the only testimony they intend to elicit from Seid and Fuhr is about their advice regarding the use of the stock price formula. Defendants should be prepared to explain specifically what testimony Seid and Fuhr will offer at the final pretrial conference.

**C. Defendants' motions in limine**

**1. Guesses about Widen Enterprises' value**

Defendants contend that any evidence of "guesses" made by Widen Enterprises' corporate director about what the company was worth are irrelevant as a matter of law, because "soft information" such as guesses about value are not material information that defendants

would have had a duty to disclose to Randall. Dkt. 205, at 5–7 (citing *Arber v. Essex Wire Corp.*, 490 F.2d 414, 416–20 (6th Cir. 1974); *Kohler v. Kohler Co.*, 319 F.2d 634, 640 (7th Cir. 1963); *Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981)).

The general rule is that when a closely held corporation buys its own stock, it must disclose any information that is material, that is, any information that would be viewed by a reasonable investor as significant enough to change their investment decision-making. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 434 (7th Cir. 1987); *Michaels v. Michaels*, 767 F.2d 1185, 1196 (7th Cir. 1985). Contrary to defendants' assertion, there is no distinction in the case law between "soft" estimates about a company's finances and "hard" financial data. "Soft" estimates that are too hypothetical or speculative to give a reasonable investor much insight into the company might be immaterial under the general rule. For example, in *Michaels*, the court of appeals held that a corporation had no duty to disclose that it had asked a business partner to investigate (without revealing the company's identity) whether another company might be interested in buying a small, closely held corporation, because that inquiry was too theoretical to give a reasonable investor any insight into whether the company might soon sell. 767 F.2d at 1197. But if a reasonable investor would find an estimate sufficiently compelling to change his decision-making process, than that estimate must be disclosed just like any other information.

Defendants point to *Kohler v. Kohler Co.*, 319 F.2d 634, 640 (7th Cir. 1963) and *Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981) to argue that speculative financial information is immaterial as a matter of law.[2] But neither case is applicable here. *Kohler* is no

---

[2] Defendants also cite several out-of-circuit cases for the same proposition. But to the extent that these cases hold that estimates are immaterial even if they are sufficiently certain to change

longer good law on the materiality issue; it was abrogated by *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), which set forth the current test for materiality under federal securities law. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). *Panter* holds that company management has no duty to disclose financial projections or estimates, unless disclosure is necessary to avoid making other disclosed information misleading *and* the projections or estimates are reasonably certain. 646 F.2d at 292. But *Panter* relies on rules that apply only to publicly owned companies; in particular, concerns about making insider information public before it is ready to be made public. *See id.* ("projections, estimates, and other information must be reasonably certain before management may release them to the public"). Closely held corporations can reveal pertinent information to investors without that information becoming public, so they have a broader duty to disclose material information than publicly owned companies do. *Jordan*, 815 F.2d at 434.

In sum, the proper test for whether estimates of Widen Enterprises' value are material is whether a reasonable investor would have viewed them as significant enough to change her investment decision-making. Randall seeks to offer evidence that defendants knew between 2014 and 2019 that software-as-a-service companies are generally valued at somewhere between three and six times their annual revenue. This information lead corporate directors at Widen Enterprises to estimate its value was somewhere between $24 million (in 2014) to $80 million (in 2018 and 2020). These were rough estimates, but based on real revenue data and industry knowledge about how similar companies are valued. Randall is entitled to present this evidence and to attempt to convince the jury of its materiality.

---

a reasonable investor's decision-making, they are inconsistent with *Jordan* and *Michaels* and therefore unpersuasive.

2.  **Damages**

Randall wants to seek damages under a recission theory; that is, she wants to argue to the jury that she would not have sold her shares at all if not for defendants' misrepresentations, and thus that she should recover what she would have received had she still owned a 20 percent share in the company when Widen Enterprises sold to Acquia in 2021. Defendants contend that recission is not available to Randall and thus that she should be precluded from introducing evidence or from arguing that she is entitled to damages under that theory. Defendants' arguments fall into two categories: (1) recission is not available as a matter of law in this type of case; and (2) the admissions in Randall's complaint affirmatively establish that she would have sold her shares even if she had known what the company was truly worth.

Recission is a recognized theory of damages in securities fraud cases, particularly when the fraud is against the seller and the defendant buyer's profit exceeded the seller's loss. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972). In *Affiliated Ute*, the Supreme Court articulated that principle as follows: "In our view, the correct measure of damages [for federal securities fraud] is the difference between the fair value of all that the [] seller received and the fair value of what he would have received had there been no fraudulent conduct . . . except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit." *Id.* (citing *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965)). In *Janigan*, the court explained why the defendants' profit was the appropriate measure even though that profit was speculative at the time of the tainted sale. The court reasoned:

> It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made

> the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

*Janigan*, 344 F.2d at 786. The *Janigan* court recognized that there may be exceptions to this principle if the defendants show that the profits were attributable to extra efforts on their part. *Id.* But in most circumstances, when a plaintiff seller is defrauded and the defendant buyer subsequently realizes a profit, equity requires the defendant to "disgorge his fraudulent enrichment." *Id.*

Defendant asserts that recission damages are not appropriate here under *Rowe v. Maremont Corporation*, 850 F.2d 1226 (7th Cir. 1988). In that case, the Seventh Circuit held that *Affiliated Ute* did not set a "hard and fast rule" requiring defendant buyers to disgorge the profits of their fraud. *Id.* at 1240. The court then determined that the plaintiffs had not made a showing that they were entitled to recission because the record showed that they would have sold their shares even in the absence of defendant's misrepresentations, they just would have done so for a higher purchase price. *Id.* at 1241. The same is true for *Capital Investments, Inc. v. Bank of Sturgeon Bay*, 430 F.Supp. 534, 537 (E.D.Wis.1977), another case cited by defendants.[3] As the court will discuss next, it will be up to the jury in this case to determine whether Randall would have sold her shares even if defendants had disclosed the full truth to her.

---

[3] *Lawton v. Nyman*, 327 F.3d 30 (1st Cir. 2003) is also unhelpful. Like this case, *Lawton* involved a closely-held family corporation in which several minority shareholders redeemed their shares approximately a year and half before the company sold for a substantial profit. The court considered whether it would be appropriate to award the defrauded plaintiffs damages based on a recission theory, but ultimately concluded that the facts were too unclear to determine the most appropriate theory of damages. *Lawton* does not hold that a recission theory is unavailable in a case like this; it simply notes that the plaintiff's theory of damages must fit the facts.

Defendants argue that Randall cannot assert at trial that she wouldn't have sold her shares if she had known the true value of Windy Waters because doing so would contradict her complaint. Defendants point to allegations in the complaint that Randall was "financially strained;" "forced to make desperate financial decisions;" "needed to get cash quickly in order to finance her ongoing divorce proceedings;" and "lacked any feasible alternative to do so." Dkt. 1 ¶¶ 52–64. But judicial admissions must be deliberate, clear, and unequivocal before they can bind a party. *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002). Randall's assertions that she was financially desperate and lacked feasible alternatives to obtain cash other than selling her stock are not tantamount to an admission that she would have sold even if she had known that her stock was worth much more than defendants were offering. Defendants may use these statements to impeach her at trial, but Randall is entitled to argue that she would not have sold her stock if she had known its true value.

### 3. Signature stamp

Randall wants to offer evidence that Kiesler used a rubber stamp of Stacy's signature to sign corporate documents on her behalf, in her capacity as director and president of Windy Waters. Randall says that Kiesler used the stamp without Randall's consent to sign documents memorializing annual meetings that never actually occurred. Defendants move to exclude any evidence about the signature stamp on relevance grounds, arguing that Randall has not shown that defendants' use of the signature stamp was connected to any of defendants' alleged wrongdoing.

In response, Randall says that the signature stamp is connected to the alleged "squeeze out" scheme that forms the basis for her scheme liability claim. Randall argues that a jury could infer that defendants used the stamp without her consent to conceal information about the

companies from Stacy so they could squeeze her and the other minority shareholders out of the company. In support, Randall points out that defendants used her stamp on stock redemptions from other minority shareholders of Windy Waters. Randall says that a jury could find that if Randall was of these documents, she would have known that defendants were trying to buy the other minority shareholders' stock, and she might have acted differently when it came to selling her stock.

Randall also asserts that the signature stamp is relevant for other reasons not addressed in defendants' motion. She says that her giving Kiesler a signature stamp shows that she had a relationship of trust with Kiesler, which is relevant to whether Kiesler owed her a duty to speak in the context of her intentional misrepresentation claims. *See Pattern Civil Jury Instructions of Wisconsin* § 2401 (2023) ("A duty to speak may arise when information is asked for; or where the circumstances would call for a response in order that the parties may be on equal footing; or where there is a relationship of trust or confidence between the parties.") And she says that the signature stamp is relevant to rebut any assertion by defendants that Randall exercised a meaningful role in Windy Waters because she was the "president" and "sole director."

The court will not exclude evidence about the signature stamp. The court agrees with Randall that it is relevant to her scheme liability claim, to her relationship with Kiesler, and as rebuttal to any assertion that she played a meaningful role in the companies because she had been appointed to a leadership role.

### 4. Evidence of Reed's compensation

Defendants want to exclude two pieces of evidence that Randall used at summary judgment to support her arguments that Reed's compensation was excessive given his limited responsibilities at the company. The first piece of evidence is an executive compensation survey

from a research company called Chief Executive Research, LLC. In her response to defendants'
motion, Randall says that she does not intend to introduce the executive compensation survey
in her case-in-chief and that she will only seek to introduce it if the defendants intend to rely
on "popular business literature" to establish the propriety of Reed's compensation. Dkt. 266,
at 2 n.1. Nothing in defendants' pretrial submissions suggests that they intend to do so, so the
court need not rule on the admissibility of the executive compensation survey.

That leaves the second piece of challenged evidence, which is a 2021 due diligence
report prepared for Widen Enterprises by the management consulting company Grant
Thornton. Dkt. 63-31. The Grant Thornton report was prepared to provide a summary of the
company's finances in anticipation of a potential sale. Dkt. 191 (Joseph Burke Dep., Grant
Thornton corporate designee, 13:8–17). In the report, Grant Thornton adjusted the company's
EBITDA for one-time or non-recurring expenses and expenses that the company would be
unlikely to continue incurring if it were sold. *Id.* 41:20–42:16. One of the expenses that Grant
Thornton adjusted out of Widen Enterprises' EBITDA was Reed's salary. The report explains:
"This adjustment removes the Company's Owner compensation (base salary, bonus and fringe)
during the Historical Period as these costs are not expected to continue post-transaction. We
understand the owner is not actively involved in the operations of the Company and any role
in the business will be absorbed by current Management." Dkt. 63-31, at 13. Randall wants to
introduce the Grant Thornton report as evidence that Reed did not have valuable
responsibilities at Widen Enterprises, which she says would allow a jury to infer that his salary
and bonuses were excessive.

Defendants say that the Grant Thornton report should be excluded under Rule 702
because any evidence or testimony about the reasonableness of executive compensation is a

matter requiring specialized knowledge. The court disagrees. The report is factual evidence of whether Reed was "actively involved in the operations of the company;" it is not an opinion about whether Reed's compensation was reasonable. The court has already determined that Kiesler and Gonnering can testify as lay fact witnesses about Reed's responsibilities at the company. *See* pg. 17. Randall is also permitted to introduce lay evidence about that.

Defendants also say that the report should be excluded because Grant Thornton's corporate designee Joseph Burke testified in his deposition that the report did not mean Reed's compensation was unreasonable or wrongful; it simply meant that his role would likely be absorbed by others in the event of a possible sale. Dkt. 191 (Burke Dep. 128:10–129:16). Randall counters that Grant Thornton's opinion that Reed's role was absorbable could create a reasonable inference that he was not as valuable to the company as his level of compensation would suggest. The court agrees that the report could help the jury determine how valuable Reed's role was at the company, which is relevant to whether his compensation was excessive.

Defendants also touch on potential foundation and hearsay problems with the Grant Thornton report, although they did not fully brief that issue. Defendants point to Burke's testimony that Grant Thornton didn't observe Reed's responsibilities at the company firsthand, didn't perform an investigation into the hours Reed worked, and would have had no reason to know the specific work that Reed performed at the company. Dkt. 191 (132:1–133:3). Defendants argue that this testimony raises the question whether any witness from Grant Thornton would have the personal knowledge needed to testify about whether Reed performed valuable work. But Grant Thornton presumably reached its conclusions about Reed's role at the company by speaking with company executives. And any assertion that testimony to that effect would raise hearsay issues would fail, because Grant Thornton and the

company executives were acting as agents and employees of Widen Enterprises when they created the report, so the report and conversations between Grant Thornton and executives about the report would be admissible as opposing party statements under Federal Rule of Evidence 801(d)(2)(D). The court will admit the Grant Thornton report.

### 5. Gary Kleinrichert

The court addressed this motion in its discussions of expert testimony. *See* section A.1.

### 6. Randall's son's suicide

Defendants want to exclude any evidence or argument related to Randall's son Andrew Randall's death by suicide in 2015. The court will grant the motion as unopposed. In her response, Randall says that she should be permitted to raise the issue of her son's suicide in defendants open the door, including to explain why she did not report her stock on her 2020 mortgage assistance application. The court has excluded the mortgage assistance application, so that issue is moot. *See* section B.7. The court will consider any further requests to raise the issue on a case-by-case basis.

### 7. Mediation voicemail

Defendants seek to exclude a portion of a voicemail that Reed sent to his and Randall's brother Price in May 2022 during a mediation session related to this litigation. In the voicemail, Reed tells Price, "I'm in mediation with Stacy today, so I don't know if we'll be able to get to you today or tomorrow." Dkt. 146-1. Reed then thought he hung up, but the voicemail continued for another 20 seconds. During that portion of the recording, Reed can be heard discussing mediation strategy with his counsel and Kiesler.[4] He says: "All right. If I can get him

---

[4] The court previously ruled that defendants had waived privilege over the voicemail because they affirmatively raised the issue of the voicemail during Price's deposition. Dkt. 184.

out of the cottage, and I can, I can bankrupt my sister. (Laughing.) She's going to be paying a lot of bills. (Laughing.) I know it's bad of me, but it—." *Id.*

The "cottage" that Reed refers to in the voicemail is a family property owned by Millmont LLC, the Widen family's real estate holding company. Randall says that after she threatened to sue Reed over the sale of her shares in Windy Waters, Reed retaliated by threatening to foist Millmont expenses onto Randall that she would not be able to afford. Dkt. 277-11 (December 12, 2021 text message from Reed to Randall saying, "I have decided that Millmont will no longer pay the bills for the cottage. You can expect notification from my attorney that you will be responsible for 20% of the mortgage utilities insurance and any other costs."). Randall says that Reed did this to force Randall to sell her interest in Millmont to him. *See* Dkt. 278-12 (February 16, 2022 text message from Reed to Randall saying, "Sell me the cottage and get out of my life.") Randall argues that a jury could infer from the voicemail that Reed was engaged in an intentional scheme to put financial pressure on Randall to get her to sell her interest in Millmont.

Defendants contend that the mediation voicemail (and the related facts about Millmont) are irrelevant to this case because any scheme to get Randall out of the family cottage occurred after the events of this lawsuit and are simply unrelated to the sale of Randall's shares in Windy Waters. Randall counters that the Millmont scheme is similar to the alleged scheme to squeeze out the shareholders of Windy Waters, which is the basis for count one of the complaint. Randall says a jury could infer from the Millmont scheme that Reed acted "intentionally, with knowledge, and according to an MO" when he squeezed her out of Windy Waters.

Evidence that a defendant has committed other wrongful acts is inadmissible if offered solely to prove a person's propensity for wrongdoing. Federal Rule of Evidence 404(b)(1). But the evidence can be admissible for other purposes, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). The Seventh Circuit uses a four-part test when a party seeks to admit prior acts to show a defendants pattern or MO. The evidence is admissible when "1) It is of a type which fits into one of the exceptions listed in 404(b) and addresses an issue disputed by the defendant; 2) The probative value of it outweighs the possibility of undue prejudice to the defendant; 3) The proof of the prior misconduct is clear and convincing; and 4) The prior acts are both similar enough and close enough in time to be relevant to the offenses that are charged." *United States v. Stump*, 735 F.2d 273, 275 (7th Cir. 1984).

The court concludes that the voicemail and other evidence of the alleged Millmont squeeze out scheme is inadmissible because the methods used in Millmont scheme are not similar enough to the Windy Waters scheme to show an MO. Defendants did not create the financial pressure that led Randall to sell her shares in 2020; Randall came to the defendants on her own and told them she desperately needed money and wanted to sell her shares. Defendants may have leveraged Randall's financial situation to get her to sell *all* her shares instead of just some of them, but there is no evidence that they foisted expenses onto Randall to get her to sell her shares, as Randall says Reed did with Millmont two years later. The only inference a jury could draw from the Millmont scheme is that Reed was financially manipulative and cruel toward his sister, but that's not an MO; that's character evidence, which is inadmissible.

43

### 8. Julie Randall and Pam Widen

Defendants move to exclude the testimony of Randall's daughter-in-law Julie Randall and her sister-in-law Pam Widen, contending that these witnesses were not timely disclosed under Rule 26. In her response, Randall says that she does not intend to call Pam Widen except for impeachment purposes, so she does not object to the motion unless defendants are also seeking to exclude her for impeachment purposes.[5]

That leaves Julie Randall. Randall says that Julie will testify that Reed frequently slept and used cannabis during the workday,[6] and that Reed told her in 2020 that he was thinking about selling the companies and he thought they were worth about $80 million. Randall first disclosed Julie as a witness on January 8, 2024, eight days before the close of discovery. Randall says that she first learned Julie might have relevant information during Justin Randall's deposition on October 25, 2023. But she did not contact Julie then because defendants had represented to Randall that they represented all former employees of Widen Enterprises, which included Julie. Randall's counsel confirmed with defendants' counsel in January 2024 that they did not in fact represent Julie, so that was when Randall's counsel was able to contact Julie and confirm the information she had to offer.

Federal Rule of Civil Procedure 26 requires parties to supplement disclosures "in a timely manner" if the information it previously disclosed is "incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If a party fails to timely

---

[5] Defendants should clarify at the final pretrial conference if they are seeking to exclude Pam Widen as an impeachment witness.

[6] The court has excluded the cannabis testimony. *See* section B.10.

44

disclose a witness, then exclusion is mandatory under Rule 37(c)(1) unless the party shows that the untimely disclosure was justified or harmless. Randall contends that she timely disclosed Julie as soon as she learned that Julie had relevant information that could support her claims. She also contends that any delay was justified or harmless.

The court concludes that defendants were on notice that Julie Randall may be a witness in this case as of October 2023, when defendants deposed Randall's son Justin, who spoke about his wife's knowledge of the company's value and other company affairs. *E.g.*, Dkt. 101 (Justin Randall Dep. 15:1–6). *See Ammons v. Chicago Bd. of Educ.*, No. 16 CV 4884, 2019 WL 1595870, at *3 (N.D. Ill. Apr. 15, 2019) (no duty to supplement initial disclosures when a new witness is disclosed during a deposition). Further, any failure to disclose was harmless. Julie will testify about conversations she had with Reed and observations she made about Reed's behavior; Reed was involved in all these events, so he was well aware that she was a witness to them. Defendants' motion to exclude Julie's testimony will be denied.

### 9.  Reed's drug use

The court addressed this motion in the context of discussing Randall's motion on the same issue. *See* section B.10.

### 10.  Millmont, LLC

Randall wants to put forth evidence that she held shares in the family real estate holding company Millmont, LLC, for two reasons: (1) to show that Reed engaged in financial manipulation to deprive her of those shares in 2022; and (2) to show that she had another option for acquiring cash in 2020 if she hadn't sold her Windy Waters shares. The court has already ruled that evidence related to Millmont is inadmissible for the first purpose. *See* section C.7. But the court will allow limited evidence related to Millmont for the second purpose. The

evidence is relevant to whether Randall was so financially desperate that she would have sold her Windy Waters shares even if she had known what they were worth.

Defendants argue that any reference to Millmont should be excluded under Rule 403 because references to another family company that is not involved in this lawsuit would confuse the jury. But any risk of confusion is limited if Randall limits her evidence related to Millmont to only what is necessary to show that it could have served as an alternate source of cash.

### 11. Propriety of designating Gonnering as 30(b)(6) designee

Defendants want to exclude any argument that it was not proper for the company defendants to designate Gonnering as their 30(b)(6) designee. The court will grant this motion in limine as unopposed.

### 12. Exclude Zoom video depositions

Defendants want to prevent either party from playing the video recordings made during the Zoom video depositions of Baker Tilly, LLP, Grant Thornton, LLP, Bruce Hutler, Gregory Lynch, and James Reda. The court will grant this motion as unopposed.

### 13. Excel exhibits

The parties jointly move to submit certain exhibits in Excel format, explaining that these exhibits contain mathematical functions that are not perceivable when the Excel document is converted to PDF. The court will grant the motion. The court has a jury cart with a viewer program that can open and view spreadsheets, which the court has used in the past for these types of exhibits. The court will make the jury cart available to the parties after the final pretrial conference so they can do a test display and ensure that the mathematical functions they want to demonstrate work on that viewer program.

46

ORDER

IT IS ORDERED that:

1.  The court rules on plaintiff Stacy Randall's motions as follows:

    a.  Randall's motion to exclude the expert testimony of James Reda, Dkt. 222, is DENIED for Reda's opinion about Reed's compensation. The motion is GRANTED for Reda's opinion about dividend payments.

    b.  Randall's motion to exclude the expert testimony of Gregory Lynch, Dkt. 225, is GRANTED.

    c.  Randall's motion to exclude the expert testimony of Seth Fliegler, Dkt. 226, is DENIED.

    d.  Randall's motion to exclude the expert testimony of Bruce Hutler, Dkt. 227, is DENIED for Hutler's opinion that it was generally appropriate for Windy Waters to use the stock price formula for stock redemptions. The motion is GRANTED for Hutler's opinions that it was appropriate for Windy Waters to use the stock price formula for Randall's redemption specifically and that the formula was a reliable mechanism for fair market value in May 2020.

    e.  Randall's motion to exclude Gonnering from testifying to the reasonableness of Reed's compensation, Dkt. 234, is GRANTED.

    f.  Randall's motion to exclude evidence related to the companies' fair market value, Dkt. 234, is GRANTED in part and DENIED in part. Defendants may not offer evidence inconsistent with their assertions in discovery that they did not know the value of Widen Enterprises on May 13, 2020. But defendants can offer evidence of the companies' value at other times, that they subjectively believed the stock price formula was "fair," and that they believed the value changed between Randall's stock redemption and the company's sale to Acquia.

    g.  Randall's motion to exclude evidence related to Randall's due diligence or reasonable inquiry, Dkt. 234, is GRANTED in part and DENIED in part. It is denied for evidence related to whether Randall justifiably relied on defendants' misrepresentations and omissions. It is granted for any arguments that Randall failed to make a reasonable inquiry before signing a release of claims.

    h.  Randall's motion to exclude Kiesler from testifying that he subjectively believed the stock price was fair, Dkt. 234, is DENIED.

i.  Randall's motion to exclude evidence inconsistent with the pleadings, Dkt. 234, is DENIED.

j.  Randall's motion to exclude evidence of her arrangement with counsel, Dkt. 234, is GRANTED. The court will not exclude evidence of fees paid to her expert witness.

k.  Randall's motion to exclude evidence of her mortgage relief application, Dkt. 234, is GRANTED, except that Randall may be cross-examined on the application if she testifies about it on direct.

l.  Randall's motion to exclude evidence Gonnering did not testify to during his 30(b)(6) depositions, Dkt. 234, is DENIED.

m.  Randall's motion to examine each party only once, Dkt. 234, is GRANTED.

n.  Randall's motion to allow evidence of Reed's drug and alcohol use, Dkt. 234, is DENIED.

o.  The court reserves a ruling on Randall's motion to use deposition testimony during her opening statement. Dkt. 234.

p.  Randall's motion to preclude any argument that her shares were worth less than other shareholders' shares, Dkt. 234, is provisionally GRANTED.

q.  Randall's motion to preclude defendants from introducing evidence of how the stock price formula was used in other transactions, Dkt. 234, is DENIED.

r.  The court reserves a ruling on Randall's motion to exclude testimony from the companies' attorneys. Dkt. 234.

2.  The court rules on defendant Reed Widen, Michael Kiesler, Windy Waters, and Widen Enterprise's motions as follows:

a.  Defendants' motion to exclude estimates of the companies' value, Dkt. 205, is DENIED.

b.  Defendants' motion to exclude evidence or argument related to a recission theory of damages, Dkt. 206, is DENIED.

c.  Defendants' motion to exclude evidence about Randall's signature stamp, Dkt. 207, is DENIED.

d.  Defendants' motion to exclude evidence of Reed's compensation, Dkt. 208, is GRANTED in part and DENIED in part. It is granted for

the executive compensation survey. It is DENIED for the Grant Thornton report.

e.   Defendants' motion to exclude Gary Kleinrichert's expert testimony about what a reasonable investor would want to know, Dkt. 209, is DENIED.

f.   Defendants' motion to exclude evidence of Randall's son's suicide, Dkt. 210, is GRANTED.

g.   Defendants' motion to exclude the mediation voicemail, Dkt. 211, is GRANTED.

h.   Defendants' motion to exclude the testimony of Julie Randall and Pam Widen, Dkt. 212, is GRANTED for Pam Widen and DENIED for Julie Randall.

i.   Defendants' motion to exclude evidence of Reed's drug use, Dkt. 213, is GRANTED.

j.   Defendants' motion to exclude evidence about Millmont, LLC, is GRANTED in part and DENIED in part. The motion is GRANTED for any evidence related to a scheme. It is DENIED for evidence that Randall could have gotten cash from Millmont in May 2020.

k.   Defendants' motion to exclude argument that Gonnering should not have been the companies' 30(b)(6) designee, Dkt. 215, is GRANTED.

l.   Defendants' motion to exclude Zoom video designations, Dkt. 216, is DENIED.

3.   The parties' joint motion to file certain exhibits in .xlsx format, Dkt. 217, is GRANTED.

Entered July 24, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge